**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

GEORGE PERROT,

    Plaintiff,

    v.

THOMAS KELLY, THOMAS JARVIS,
RICHARD KANE, CHARLES ARPIN, JOHN
SCANLON, DAVID LOUDEN, THOMAS
KENNEDY, PAUL LANCE, CHIEF ERNEST
STELZER, MARIANNE POPKO, PAUL
GLANTZ, RONALD ST. GERMAIN, ANDREW
CANEVARI, CHERYL CLAPPROOD, CAPTAIN
JOHN BROWN, UNKNOWN OFFICERS OF
THE SPRINGFIELD POLICE DEPARTMENT,
the CITY OF SPRINGFIELD,
MASSACHUSETTS, FRANCIS BLOOM,
WILLIAM EUBANKS, WAYNE OAKES, and
UNKNOWN AGENTS OF THE FEDERAL
BUREAU OF INVESTIGATION,

    Defendants.

Case No. 18-cv-10147

**JURY TRIAL DEMANDED**

NOW COMES, Plaintiff, GEORGE PERROT, by his attorneys LOEVY &

LOEVY, and complaining of Defendants THOMAS KELLY, THOMAS JARVIS,

RICHARD KANE, CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN,

THOMAS KENNEDY, PAUL LANCE, CHIEF ERNEST STELZER, MARIANNE

POPKO, PAUL GLANTZ, RONALD ST. GERMAIN, ANDREW CANEVARI,

CHERYL CLAPPROOD, CAPTAIN JOHN BROWN, UNKNOWN OFFICERS OF

THE SPRINGFIELD POLICE DEPARTMENT, the CITY OF SPRINGFIELD,

MASSACHUSETTS, FRANCIS BLOOM, WILLIAM EUBANKS, WAYNE OAKES,

and UNKNOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION states

as follows:

1

## INTRODUCTION

1.      Plaintiff George Perrot was just 17 years old when he was wrongfully arrested for the November 1985 assault and rape of a 78-year-old woman named M.P. He was twice convicted of the crime and sentenced to life in prison.

2.      Plaintiff did not commit the crime. At all times during the more than 30 years since he was wrongfully convicted, Plaintiff has steadfastly maintained his innocence.

3.      There was never any legitimate evidence connecting Plaintiff to the crime.

4.      M.P. did not select Plaintiff in identification procedures performed by the Defendants, did not identify Plaintiff at his criminal trials, and provided a description of the perpetrator that did not match Plaintiff. Although Defendants tried to convince M.P. that Plaintiff was her attacker, she resisted Defendants' pressure tactics because their theories and explanations never made any sense. Nor has there ever been any other witness who has credibly connected Plaintiff to the crime.

5.      Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence manufactured by the Defendants. Included among that evidence were fabricated and involuntary inculpatory statements attributed to Plaintiff, which were concocted and coerced by Defendants after more than 12 hours of abusive and illegal interrogation.

6.      In addition, Defendants fabricated physical evidence to frame Plaintiff for a crime that he did not commit: They planted gloves and a single hair, and fabricated evidence suggesting that a more-than-decades old blood stain came from the assault—and from Plaintiff. None of that was true.

2

7.     In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed and destroyed evidence that would have shown that Plaintiff was innocent, as well as evidence that could have been used to undermine the testimony of prosecution witnesses, including the testimony of the Defendants themselves.

8.     At the same time, the Defendants disregarded and intentionally undermined evidence indicating that someone else had committed the rape of M.P. To this day the perpetrator has never been brought to justice.

9.     On October 11, 2017, the state court's grant of post-conviction relief to Plaintiff became final. The Commonwealth dismissed all charges against him on October 18, 2017.

10.    Plaintiff has spent 30 years—the majority of his life—imprisoned for a crime he did not commit.

11.    Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

12.    Plaintiff brings claims against Defendants Thomas Kelly, Thomas Jarvis, Richard Kane, Charles Arpin, John Scanlon, David Louden, Thomas Kennedy, Paul Lance, Chief Ernest Stelzer, Marianne Popko, Paul Glantz, Ronald St. Germain, Andrew Canevari, Cheryl Clapprood, Captain John Brown, Francis Bloom, Unknown Officers of the Springfield Police Department, and the City of Springfield, Massachusetts pursuant to 42 U.S.C. § 1983 and Massachusetts law, and against Defendants Wayne Oakes, William Eubanks, and Unknown Agents of the Federal Bureau of Investigation pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), to redress the Defendants' tortious

conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution and state law.

13.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

14.    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. In addition, Plaintiff's criminal case was investigated and prosecuted in this judicial district, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

15.    Plaintiff George Perrot spent 30 years in prison for a crime he did not commit.

16.    Defendants Thomas Kelly, Thomas Jarvis, Richard Kane, Charles Arpin, John Scanlon, David Louden, Thomas Kennedy, Paul Lance, Chief Ernest Stelzer, Marianne Popko, Paul Glantz, Ronald St. Germain, Andrew Canevari, Cheryl Clapprood, Captain John Brown, and Unknown Officers of the Springfield Police Department (also referred to as "Springfield Defendants") are current or former officers and employees of the Springfield Police Department and the City of Springfield (collectively the "Springfield Defendants"). At all times relevant to the events described in this Complaint, those Defendants either acted directly or in a supervisory capacity—directing, approving and ratifying the decisions of the other Defendants named in this Complaint.

17.    The City of Springfield, Massachusetts, is a municipality of the Commonwealth of Massachusetts, which oversees the Springfield Police Department. Each of the Springfield Defendants was either employed by the City of Springfield or was acting as an agent of the City of Springfield or the Springfield Police Department

while conducting the investigation described in this Complaint. Defendant City of Springfield is therefore liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Defendant City of Springfield is additionally responsible for its policies and practices, as well as the policies and practices of the Springfield Police Department, which were implemented by the Defendants in this case. Finally, Defendant City of Springfield is responsible under Massachusetts law for any judgment entered against the Defendants.

18.    Defendant Francis Bloom was an Assistant District Attorney for Hampden County. At all times relevant to the events at issue in this Complaint, Defendant Bloom was acting as an investigator, without probable cause, before charges were filed against Plaintiff, and in conspiracy with the other law enforcement Defendants, known and unknown. He is sued for his acts undertaken in an investigative capacity.

19.    Defendants William Eubanks, Wayne Oakes, and Unknown Agents of the Federal Bureau of Investigation were, at all times relevant to this Complaint, agents of the Federal Bureau of Investigation (collectively the "FBI Defendants"). Defendant Eubanks was unit chief of the Serology Unit of the FBI Laboratory in Washington, D.C. Defendant Oakes was a supervisory special agent. At all times relevant to this case, Defendants Eubanks and Oakes were employees of the United States of America.

20.    Each and every individual Defendant, known and unknown, acted under color of law, within the scope of his or her employment, and as investigators, at all times relevant to this lawsuit, unless otherwise noted. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS
### The Series of Sexual Assaults in Springfield

21.     Between 1984 and 1986, there were a series of assaults on women over the age of 60 in Springfield, Massachusetts.

22.     The assaults appeared to be committed by the same person: Each occurred in a similar location, at a similar time and targeted a similar type of victim.

23.     The Springfield Police Department began investigating the assaults, but to no avail. With public pressure mounting, the Department was desperate to incarcerate someone and assuage the fears of the community.

24.     Rather than do the work necessary to identify the perpetrator, the Defendants, individually and jointly, short-circuited the investigatory process and wrongfully targeted Plaintiff in an effort to simply close the case. Because there was no evidence linking Plaintiff to the crime, the Defendants fabricated evidence and withheld exculpatory evidence in an effort to frame Plaintiff for a crime he did not commit, as described more fully below.

25.     On January 1, 1986, weeks after Plaintiff's arrest and in response to public concern about the unsolved crimes, then-District Attorney Matthew Ryan stated that Plaintiff's arrest would "result in the lessening of these types of offenses."

26.     But unsurprisingly, because Plaintiff was innocent of each of the sexual assaults at issue, rapes of older women in the Springfield area did not end with Plaintiff's arrest. Instead, right around the time of Ryan's pronouncement, an 80 year-old woman was raped and murdered in Springfield. A man named James Jones later pleaded guilty to this crime. Although Jones matched M.P.'s description of her attacker better than

6

Plaintiff, the Defendants never investigated Jones for M.P.'s assault and instead continued to frame Plaintiff.

## M.P. is Assaulted and Raped on November 30, 1995

27.     In 1985, M.P. was a 78-year-old woman who lived in Springfield, Massachusetts.

28.     On November 30, 1985, at approximately 4 A.M., a man broke into M.P.'s home, attacked her, and raped her.

29.     M.P. identified her assailant as a clean-shaven man with dark wavy hair who was wearing a blue jacket, dark pants, and white sneakers.

30.     The rape of M.P. was a high-profile crime, the third time that M.P. had been assaulted, and the latest in a long series of sexual assaults in Springfield in a short period of time.

## George Perrot Becomes Defendants' Suspect

31.     Plaintiff George Perrot was 17 years old at the time of M.P.'s assault.

32.     He lived with his sister, Nancy Westcott. He had grown up in the neighborhood where the crime took place.

33.     On the evening of November 29, 1985, and into the early morning hours of November 30, 1985, George Perrot was nowhere near M.P.'s home. Instead, he was in Brattleboro, Vermont, with his friends. Early in the morning on November 30, his friends dropped him off at his house, where he stayed the rest of the night and into the next day.

34.     Approximately a week later, on December 7, 1985, Plaintiff was again out with his friends. After finishing up his job at the construction site where he was working, his friend picked him up and they went out. Over the course of the next several hours,

Plaintiff, along with three other people, drank heavily and used drugs, including having himself ingested eight Valium pills.

35.     Sometime after midnight, Plaintiff's friend dropped him at his house. Over the next couple of hours, Plaintiff broke into a house on Allendale Circle, but ran away when he realized that the owners were home. Plaintiff also went to the Denny's near his house, and snatched a purse from someone in the parking lot.

36.     Around 2:30 a.m., Plaintiff ran back home and passed out.

**Plaintiff's Arrest**

37.     A few hours later, the Defendants arrived at Plaintiff's home, and arrested him for the purse-snatch and Allendale Circle attempted break-in.

38.     When the Defendants arrived at Plaintiff's house, he was still asleep. Plaintiff was awakened by his sister, Nancy Westcott, and by the Defendants shaking him. Intoxicated and disoriented, Plaintiff implored the woman who he believed was his girlfriend to contact his sister, not realizing that he was already talking to her.

39.     During his arrest and on the way to the Springfield police station, the Defendants viciously beat Plaintiff: They kicked and hit Plaintiff, and then threw him over a small fence. On the way to the police station, the Defendants threatened to kill him.

**The Defendants Unlawfully Coerce a False and
Fabricated Confession from Plaintiff**

40.     When he arrived at the police station, Plaintiff was still confused, under the influence and exhausted. At most, he had slept two hours before the Defendants had awoken him, beaten him, and dragged him to the station.

41.     Once he arrived, the Defendants physically assaulted Plaintiff and then continued their interrogation of him.

42.     Defendants generated Miranda cards that appear to bear Plaintiff's signature, but Plaintiff does not remember being given his Miranda warnings or signing the cards.

43.     Although the Defendants purportedly arrested Plaintiff for his activities on the night of December 7, 1985, the arrest was a pretext. Indeed, the Defendants used the opportunity to coerce and fabricate a false confession out of Plaintiff for the M.P. assault.

44.     To do so, the Defendants employed a host of legally impermissible and wholly coercive interrogation tactics.

45.     For example, the Defendants interrogated Plaintiff for approximately 12 hours, beginning in the middle of the night at approximately 4:30 a.m. and continuing into the late afternoon and early evening.

46.     During this time, the Defendants purposefully did not let Plaintiff sleep. Instead, any time he tried to get some rest, one of the Defendants would come and bang on the cell doors to ensure he was awake.

47.     The Defendants' intentional refusal to let Plaintiff sleep before interrogating him was particularly egregious given the fact that the Defendants knew that Plaintiff was highly intoxicated. Indeed, during his interrogation, Plaintiff was very emotional, often incoherent, and even at times suicidal, asking Defendant Jarvis for his gun so he could kill himself. Rather than letting Plaintiff sleep and sober up, the Defendants exploited Plaintiff's vulnerabilities and pressed on with their day-long interrogation.

48.     During that interrogation, the Defendants threatened Plaintiff and fed him information about the crime in an effort to get him to confess.

49.     Only 17 years old at the time, Plaintiff never had a parent or any other adult at the interrogation to advocate on his behalf. He was never provided with an attorney or a youth officer. His mother repeatedly tried to come see him, but Defendants blocked her from doing so until after they had coerced and fabricated statements from Plaintiff.

50.     Although Plaintiff repeatedly told the Defendants that he had nothing whatsoever to do with the M.P. assault, Defendants applied psychological and physical abuse and coercion and fabricated a "confession" that says Plaintiff broke into M.P.'s home—an "admission" that was used to secure his wrongful arrest, prosecution, and conviction. The Defendants not only fabricated the content of that confession, but also fabricated certain of Plaintiff's initials and/or signature, which appear on the confession.

51.     Indeed, at one or more times between November 30, 1985, and when Plaintiff's post-conviction relief became final, one or more of the Defendants forged Plaintiff's signature.

52.     Notably, while the equipment existed to do so, Defendants purposefully did not audio or video record their interrogations of Plaintiff.

### Plaintiff is Placed in a Lineup

53.     After Plaintiff's interrogation, the Defendants next conducted a lineup.

54.     The problem for the Defendants, however, was that Plaintiff did not match the description that M.P. gave of the offender in any way. M.P. had described her offender as somewhere between 20 and 30 years old, with neat, short hair and no facial hair. By contrast, Plaintiff was a teenager with a mustache, goatee, and long, wild hair.

10

55.     As a result, and in an effort to falsely induce M.P. to pick Plaintiff, rather than fill the lineup with persons that looked like the perpetrator that M.P. described to the Defendants, the Defendants instead included persons who looked like Plaintiff but who were easily identifiable as police officers.

56.     Nonetheless, M.P. did not identify Plaintiff as her assailant. Indeed, no amount of coercion or cajoling by the Defendants would lead her to say Plaintiff had anything whatsoever to do with her assault.

57.     Indeed, during post-conviction proceedings, the State judge remarked that only M.P. "possessed the human integrity to refrain from joining the movement to say it was George Perrot who physically and sexually assaulted her."

**The Defendants' Further Steps to Implicate Plaintiff**

58.     Because all the Defendants had to implicate Plaintiff in the M.P. assault was Plaintiff's false, coerced and fabricated half-"admission," the Defendants set out to fabricate additional inculpatory evidence to continue their wrongful prosecution.

59.     For example, the Defendants planted gloves at the crime scene and alleged that the gloves were connected to both the crime, and to Perrot. To do so, the Defendants not only fabricated statements from Plaintiff's sister, but also from M.P.

60.     The Defendants also planted and fabricated evidence concerning a single hair and blood stains on a bed sheet—neither of which legitimately implicated Plaintiff in the crime, but both of which Defendants used to frame Plaintiff for the crime.

61.     Finally, Defendants had evidence that another man was responsible for the assaults on elderly women, but withheld that evidence from Perrot so that he could not make use of it in his criminal defense.

11

62.   Defendants' wrongful actions and omissions leading to Plaintiff's wrongful conviction were undertaken in part pursuant to the official and unofficial policies, widespread practices, and customs, of the Springfield Police Department.

63.   For example, it was the policy, practice, or custom of the Springfield Police Department to keep its officers' handwritten notes out of the official police file.

64.   As another example, it was the policy, practice, or custom of the Springfield Police Department to allow interrogations of criminal suspects without the completion of any official police report whatsoever or recording those interrogations in any way.

## The FBI Defendants Conspire to Create False Hair and Blood Evidence

65.   The Defendants not only planted physical evidence, but also relied on fabricated conclusions to connect that evidence to Plaintiff. In particular, Defendants relied on the FBI's hair microscopy analysis in securing Plaintiff's conviction, despite the fact that the analysis was both virtually worthless as a method of identifying a perpetrator and completely false.

66.   The FBI, through its Serology Unit, had used hair microscopy in thousands of cases to assist in the conviction of countless defendants, including innocent ones such as Plaintiff.

67.   Defendant FBI Agent Wayne Oakes falsely reported that the hair allegedly found at the crime scene was Plaintiff's hair. In particular, Defendant Oakes falsely reported that the hair allegedly found at the crime scene was consistent with coming from Perrot, and further that it would be extremely rare that he would compare two hairs from different people and find them to be consistent with each other.

68.   However, hair microscopy was junk science and Defendant Oakes knew it.

12

69.     Defendant Oakes knew that the evidence he was creating was beyond the legitimate scope of hair microscopy evidence, but he purposefully concealed that fact from the prosecutor and defense.

70.     On information and belief, Defendant Oakes had discussed with other hair microscopists, including Defendant Unknown Agents of the Federal Bureau of Investigation, the best way to conceal that the incriminating evidence he was creating was based on junk science.

71.     Instead of disclosing such exculpatory information, Defendants conspired to use the flawed analysis as evidence to secure a conviction against Plaintiff for a crime that he did not commit.

72.     In addition, and pleading in the alternative, even if hair microscopy were scientifically valid and could permit an analyst to reach conclusions about inclusions and exclusions, Defendant Oakes' findings regarding the hair evidence in Plaintiff's case were not valid. The hair allegedly found at the crime scene and Plaintiff's hair did not match in any substantial way. Defendant Oakes was aware that the two were not a match. Rather than disclose that information to Defendant Bloom, however, Defendant Oakes suppressed it, enabling him to give his false report.

73.     Pleading in the alternative, if the hair *did* match Plaintiff, then it was planted by the Defendants to fabricate evidence against Plaintiff.

74.     The hair was allegedly found on the bed sheets, even though M.P. was adamant that her attacker was never on the bed, as the rape happened on the floor.

75.     Further, as discussed later, Defendants, including Defendant Bloom and Kennedy, personally hand-delivered the hair evidence to Defendant Oakes and illicitly

met with Defendant Oakes before he performed his analysis and informed him that Plaintiff was their target.

76.     The use of the flawed and fabricated evidence relating to the alleged crime scene hair was extremely prejudicial and a violation of Plaintiff's constitutional rights. Defendant Bloom, during his opening statement, even stated that hair analysis "[a]t the end of this case, probably along with [Perrot's coerced and fabricated half-"admission"], is the most important part of the case." The Defendants' joint decision to use such a flawed analysis and to secret away any exculpatory evidence regarding the impropriety of the analysis evidences significant misconduct on the Defendants' part.

77.     Defendants' actions were willful and deliberate, given that they had knowledge of the falsity of the analysis and the limits of hair microscopy. Despite that knowledge, Defendants failed to disclose that exculpatory evidence to Plaintiff.

78.     In addition to hair, Defendants used false and misleading evidence about blood, and suppressed exculpatory evidence about blood, to secure Plaintiff's wrongful conviction.

79.     For example, Defendants submitted blood stains that they knew were not caused by M.P.'s assault for blood testing by Defendant Eubanks, and Defendants falsely claimed that the blood *was* from the assault.

80.     Because the blood stain was so old, there were very few markers that could be identified from the blood tests conducted. In other words, the tests did little to discriminate between Plaintiff and any other male, and no conclusions could be drawn. Nonetheless, Defendant Eubanks falsely reported that Plaintiff's blood was "consistent" with the blood from the stain.

14

81.     Further, when some of those blood tests came back *inconsistent* with Plaintiff, that evidence was buried by Defendant, including Defendant Eubanks.

82.     Such fabrication of false evidence and suppression of exculpatory evidence violated Plaintiff's constitutional rights.

### Defendant Bloom's Participation In the Misconduct

83.     Pleading in the alternative, in addition to the Springfield Defendants and the FBI Defendants, Defendant Bloom participated in the misconduct described above.

84.     In particular, Plaintiff pleads in the alternative that Defendant Bloom participated in the arrest and illegal interrogation of Plaintiff, in the coercion and fabrication of his false statements, and in the fabrication of other evidence, including M.P.'s statement and the planting of the gloves and hair.

85.     At all times that Defendant Bloom engaged in this misconduct, he was acting as an investigator, without probable cause, before charges were filed against Plaintiff, and in conspiracy with the other law enforcement Defendants, known and unknown.

### The Defendants' Bad Faith

86.     That the Defendants framed Plaintiff for a crime he did not commit was no accident. To the contrary, their actions in manufacturing false evidence and withholding exculpatory evidence was done recklessly, intentionally, and in bad faith.

87.     The Springfield Defendants were familiar with Plaintiff before November 30, 1985, having harassed him on multiple occasions.

88.     Indeed, so strong was their dislike of Plaintiff that the Springfield Defendants—along with Defendant Bloom—fabricated a false confession to M.P.'s rape and forged Plaintiff's signature on it.

89.     Similarly, Defendant Bloom, who has twice been publicly censured, despised Plaintiff. Bloom described Plaintiff as "inherently evil" and a "sociopath" in his own diary, and viewed Plaintiff as an individual apart from the community of citizens whose rights he was charged with protecting.

90.     Bloom's hatred for Plaintiff led him and Defendant Kennedy to personally drive physical specimens to Washington D.C. – a highly unusual, if not unprecedented, step – so that Bloom and Kennedy could personally speak with FBI Agents Oakes and Eubanks about Plaintiff's "inherent evil."

91.     Defendants also attempted to cover up their wrongdoing by destroying evidence, including handwritten contemporaneous notes, and some of the physical evidence, so that Plaintiff and his post-conviction lawyers could not have it tested for DNA that would have conclusively proved his innocence.

## Plaintiff's Wrongful Conviction

92.     At no time did the Defendants have probable cause to suspect Plaintiff of the assault or rape of M.P.

93.     Nonetheless, as a result of the misconduct described in this Complaint, Plaintiff was arrested, indicted, and convicted of rape, battery, and assault.

94.     Prior to Plaintiff's first conviction, Defendants, including Defendant Kane, fabricated a false statement, allegedly from Plaintiff, concerning the location of incriminating evidence. That statement was false and fabricated—Plaintiff never gave it. Moreover, the things that Plaintiff did say, which were not incriminating, came after a police-initiated interrogation of Plaintiff, after he had been arraigned and appointed counsel, but without his counsel's presence, consent, or even knowledge.

16

95.     As a result, Plaintiff's first conviction was reversed and remanded for a new trial. A new prosecutor took over. As that new prosecutor began preparing for retrial, she found a new statement from Plaintiff allegedly "confessing" to the M.P. assault. That statement, as Defendant Bloom has confessed, was entirely forged by Defendant Bloom and the other Springfield Defendants.

96.     That was not the only time that Plaintiff's signature was forged by law enforcement during the investigation and prosecution of the M.P. assault.

97.     Rather, Plaintiff's initials were also forged on documents created by Defendants, including on the statement fabricated on the day of Plaintiff's arrest concerning M.P.'s home.

98.     The Defendants intended all of this fabricated evidence to be used against Plaintiff.

99.     The creation of the forged "confession" and the forgery of Plaintiff's initials on the other half-admission fabricated on the day of his arrest was undertaken in part pursuant to the official and unofficial policies, widespread practices, and customs, of the Springfield Police Department.

100.    Without the misconduct described above, Plaintiff would never have been arrested, let alone prosecuted or convicted.

101.    At no point in time between 1985 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the assault and rape of M.P.

### The City of Springfield's Policies and Practices

102.    The Springfield Defendants' misconduct was not an isolated occurrence. Rather, it was undertaken in part pursuant to the policies, practices and customs of the

17

Defendant City of Springfield and by Defendants who were final policymakers for the Defendant City of Springfield.

103.   At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Springfield had unlawful policies that allowed its officers to withhold exculpatory and/or material impeachment evidence; conduct hours- and even days-long interrogations of juveniles, during which the juveniles were subject to illegal and improper psychological and physical coercion; and plant and fabricate physical and other evidence.

104.   At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Springfield had unlawful policies that allowed and encouraged its officers to avoid audio or video recording interviews or interrogations of witnesses or suspects unless the information learned was helpful to the prosecution; these policies discouraged the recording of interviews or interrogations that developed information that was unhelpful to the prosecution.

105.   In addition, during the same time frame, the City of Springfield knowingly and willfully failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects, including juvenile suspects, by officers and agents of the Springfield Police Department and the City of Springfield; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking and preserving of investigative notes; preservation of crimes scenes; investigating serial offenders or crime patterns; investigating, retaining and disclosing evidence relating to alternative offenders;

18

obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings.

106. In addition, or alternatively, the City of Springfield knowingly and willfully failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training, supervision, and discipline of officers and agents of Springfield Police Department and the City of Springfield with respect to each of the subjects mentioned in the paragraphs above.

107. In addition, or alternatively, the City of Springfield knowingly and willfully failed to train, supervise, and discipline officers and agents of Springfield Police Department and the City of Springfield with respect to each of the subjects mentioned in the paragraphs above.

108. The unlawful policies or knowing and willful failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of Springfield Police Department and the City of Springfield, including the Defendants.

109. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Springfield had notice of widespread practice and custom and agents of the Springfield Police Department and the City of Springfield under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to implicate themselves in crimes that they had not committed. It was common that suspects, including juvenile suspects, were interrogated in connection with investigations within the jurisdiction of the Springfield Police

Department and the City of Springfield confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

110.   Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Springfield, under which criminal suspects, including juvenile suspects, were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

111.   In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Springfield had notice of widespread practices by officers and agents of the Springfield Police Department and the City of Springfield, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files,

20

and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements, evidence and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

112.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Springfield directly encourages and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees.

113.    The City of Springfield also failed to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff. Indeed, courts in this district have recognized that there is evidence that the City of Springfield has a consistent pattern of rejecting civilian complaints against police officers, and not properly disciplining and controlling officers.

114.    The above widespread practices and customs, so well settled to constitute *de facto* policies of the City of Springfield, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115.    As a result of the policies and practices of the City of Springfield, numerous individuals have been wrongfully convicted of crimes that they did not commit, including but not limited to (A) Charles Wilhite, who was wrongfully convicted of first-degree murder as a result of misconduct of Springfield police officers and despite

no physical evidence linking him to the crime, as described in pleadings in the civil lawsuit *Wilhite v. Pioggia, et al.,* No. 14-30023 (D. Mass.); (B) Mark Schand, who was wrongfully convicted of murder, assault, and robbery as a result of Springfield police misconduct, including suppression and fabrication of evidence, as described in the civil lawsuit *Schand, et al. v. City of Springfield, et al.,* No. 15-30148 (D. Mass.); and (C) Rolando Penate, who was wrongfully convicted and spent five years in prison, in part because the Springfield Police Department refused to investigate, discipline, and stop a police officer who was known to have been stealing money and contraband, as described in the civil lawsuit *Penate v. Kaczmarek et al.,* No. 17-cv-30119 (D. Mass.).

116.    In addition, the misconduct described in this Complaint was undertaken pursuant to the policies and practices of the City of Springfield in that the constitutional violations committed against Plaintiff were committed with the knowledge and approval of persons with final policymaking authority for the City of Springfield or were actually committed by persons with such final policymaking authority.

117.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Springfield, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**Plaintiff's Damages**

118.    Plaintiff was 17 years old when he was wrongfully arrested. He spent the next 30 years of his life imprisoned for a crime he did not commit.

119.   Plaintiff's whole life was turned upside down without any warning. His childhood and young adulthood were consumed by the horror of his wrongful imprisonment.

120.   Because of the Defendants' misconduct, Plaintiff was taken away from, and missed out on the lives of his family and friends. He returned home to relationships changed or lost by the decades away.

121.   Plaintiff was robbed of his childhood, his young adulthood, and his formative years; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions; and he may never start a family of his own. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

122.   During his 30 years of wrongful imprisonment, Plaintiff was subjected to harsh and dangerous conditions in maximum-security prisons, subjecting him to extreme and unpredictable violence.

123.   Because Plaintiff was sentenced to life in prison, he feared regularly that he might die inside the prison walls.

124.   In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a rapist and as someone who preyed on vulnerable elderly women. He has suffered profound reputational harm as a result.

23

### Plaintiff's Exoneration

125.    Plaintiff was granted post-conviction relief, which became final on October 11, 2017. The court held that the admission of flawed evidence, discussed in this Complaint, materially affected the jury and "cast real doubt on the justice of [Plaintiff's] conviction."

126.    Indeed, the court wrote that its finding "was not a close call."

127.    On October 18, 2017, prosecutors dropped the charges against Plaintiff, stating that "the interests and administration of justice are best served by the termination of prosecution of this matter."

128.    George Perrot is now free, having spent the majority of his life in prison.

### LEGAL CLAIMS[1]

129.    Recognizing that a complaint must be "short and plain," Fed. R. Civ. P. 8, and need not specify legal theories, E.g., *Morales-Vallellanes v. Potter*, 339 F.3d 9, 14–15 (1st Cir. 2003), *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989), to the extent it aids in understanding the factual allegations above, Plaintiff provides a short discussion of some—but not necessarily all—of the legal theories implicated by Defendants' misconduct.

130.    In the manner described more fully above, the Springfield Police Defendants and FBI Agents violated Plaintiff's constitutional rights. The Defendants

---

[1]    Plaintiff has timely given notice to the appropriate state and federal entities of his state-law claims, his claims under the Federal Tort Claims Act ("FTCA"), and his demands for relief. After the appropriate agencies resolve those Complaints, or six months after presentment was made without resolution, Plaintiff will seek to amend his Complaint to add in his claims under Massachusetts law and the FTCA, and add the United States of America as a defendant. Those claims include but are not limited to violations of Massachusetts state and constitutional law, including but not limited to Mass. Gen. Laws., Ch. 12, § 11I, malicious prosecution, civil conspiracy, negligent and/or intentional infliction of emotional distress, and spoliation of evidence.

violated, among others, Plaintiff's rights under the Fifth and Fourteenth Amendments by coercing Plaintiff into falsely incriminating himself, which was used against him in his criminal proceedings, withholding evidence from the prosecution, fabricating evidence, destroying evidence, conspiring to frame Plaintiff, failing to intervene, and maliciously prosecuting Plaintiff.

131.    In the manner described more fully above, Defendant Bloom violated Plaintiff's Fifth and Fourteenth Amendments by fabricating evidence used against him, coercing Plaintiff into falsely confessing, which was used against Plaintiff during his criminal proceedings, and by failing to intervene to prevent the other Defendants from fabricating evidence and unlawfully coercing a confession. Defendant Bloom is sued only for the acts that he took in an investigatory capacity.

132.    Moreover, in the manner described above, the City of Springfield is responsible for the constitutional violations that Plaintiff suffered because its policies, practices and/or training caused those violations. The misconduct of the Springfield Police Officers, described in this Complaint, was undertaken pursuant to the policy and practice of the City of Springfield in that the City directly encourages, and is thereby the moving force behind the very misconduct at issue, as described more fully above.

133.    The City and the relevant policy makers have actual knowledge of the persistent and widespread practices resulting in constitutional violations of its citizens, and yet they have failed to act to remedy the patterns of abuse described above, thereby causing the injuries alleged here.

134. The Defendants' conduct, described herein, was objectively unreasonable and was undertaken intentionally with malice, willfulness, wantonness, and reckless indifference to the rights of others.

WHEREFORE, Plaintiff GEORGE D. PERROT respectfully requests that this Court enter a judgment in his favor and against Defendants THOMAS KELLY, THOMAS JARVIS, RICHARD KANE, CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN, THOMAS KENNEDY, PAUL LANCE, CHIEF ERNEST STELZER, MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAIN, ANDREW CANEVARI, CHERYL CLAPPROOD, CAPTAIN JOHN BROWN, UNKNOWN OFFICERS OF THE SPRINGFIELD POLICE DEPARTMENT, the CITY OF SPRINGFIELD, MASSACHUSETTS, FRANCIS BLOOM, WILLIAM EUBANKS, WAYNE OAKES, and UNKNOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

.
.
.

.
.
.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

s/ Debra Loevy
*Attorney for Plaintiff George Perrot*
Bar No. 569212

Arthur Loevy*
Jon Loevy*
Debra Loevy
Gayle Horn*
Steven Art*
Tony Balkissoon*
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
*Attorneys for Plaintiff George Perrot*
* pro hac vice application forthcoming

27