# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS KELLY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS'**
**MOTIONS TO DISMISS (DCKT. 31, 32, 34, 36, 37, 42 & 43)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION .............................................................................................................. 2

BACKGROUND ................................................................................................................ 3

    The Series of Sexual Assaults in Springfield ........................................................... 3

    M.P. is Assaulted and Raped on November 30, 1995 ............................................. 4

    George Perrot Becomes Defendants' Suspect ......................................................... 5

    Plaintiff's Arrest ...................................................................................................... 5

    The Defendants Unlawfully Coerce a False and Fabricated Confession from Plaintiff ........... 6

    Plaintiff is Placed in a Lineup ................................................................................. 7

    The Defendants' Further Steps to Implicate Plaintiff ............................................. 8

    The FBI Defendants Conspire to Create False Hair and Blood Evidence ............... 8

    Defendant Bloom's Participation In the Misconduct .............................................. 10

    The Defendants' Bad Faith .................................................................................... 10

    Plaintiff's Wrongful Conviction ............................................................................ 11

    The City of Springfield's Policies .......................................................................... 12

    Plaintiff's Exoneration ........................................................................................... 15

    Plaintiff's Damages ................................................................................................ 15

    Plaintiff's Complaint .............................................................................................. 15

STANDARD OF REVIEW ............................................................................................. 16

ARGUMENT ................................................................................................................... 17

    1.  THRESHOLD MATTERS ................................................................................ 17

        I.   This Court Should Reject Defendants' Implied Invitation to Take Improper Judicial Notice of the Decision Vacating Plaintiff's Conviction and the Prosecution's Decision to *Nolle Pros* Further Charges .................................................................... 17

II.  The Defendants' Statements of Facts Are Improper.....................................................19

III. Plaintiff Has Filed His Brady Claim Within the Statute of Limitations.....................19

IV. This Court Should Allow Plaintiff To Pursue His Claims Against Unknown
     Defendants ................................................................................................................24

2.  SPRINGFIELD POLICE OFFICER DEFENDANTS MOTIONS TO DISMISS............25

    I.   Plaintiff's Allegations Against the Individual Defendants are Sufficient ..................25

         A.       Group Pleading is Proper ...........................................................................26

         B.       Defendants' Citation to Morales is Unavailing .........................................29

         C.       Defendants Have Failed to Take All of the Allegations Together............30

    II.  The Misconduct at Issue Here Was Material .................................................................32

         A.       The Collective Misconduct was Material ..................................................32

         B.       Defendants' Arguments Do Not Warrant a Contrary Finding...................33

    III. Plaintiff Has Adequately Pled Causation.....................................................................36

    IV. The Defendants Are Not Entitled to Qualified Immunity ...........................................37

3.  CITY OF SPRINGFIELD'S MOTION TO DISMISS .......................................................39

    I.   Plaintiff Has Sufficiently Pled His *Monell* Claim.......................................................39

         A.       *Haley* Controls the Reading of Plaintiff's *Monell* Allegations.................39

         B.       The Defendants' Arguments are Unavailing .............................................41

                  1.  Plaintiff Has Identified "Numerous Individuals," Who Were
                      Wrongfully Convicted, Including Three by Name ..............................41

                  2.  Kennedy and Saldivar are Distinguishable .........................................44

                  3.  The *Nolle Prosequi* Filing by the State is Not Properly Before this
                      Court and Does Not Support the City's Motion .................................45

4. DEFENDANT BLOOM .......................................................................................................47

I.   Plaintiff is Not Suing Defendant Bloom For Bloom's Actions as a Prosecutor, So Absolute Prosecutorial Immunity Does Not Apply ......................................................47

II.  Defendant Bloom Is Not Entitled To A Rule 12(b)(6) Dismissal ..............................54

     A.   Plaintiff's Claims Against Bloom are Well-pleaded and Plausible ...........54

     B.   Defendant Bloom is not Entitled to a Rule 12(b)(6) Dismissal on Grounds of Qualified Immunity ...............................................................................55

          1.   Bloom's Admitted Forgery Shows His Hatred of Plaintiff and His Bad Faith, and Demonstrates the Plausibility of the Other Allegations; Those Allegations Plainly Defeat Bloom's Claim to Qualified Immunity ............................................................................................55

          2.   Plaintiff is not Estopped from Demonstrating His Half-admission was Coerced ............................................................................................58

          3.   Defendant Bloom Can be Liable for His Failure to Intervene and Stop the Ongoing Violations of Plaintiff's Constitutional Rights................60

CONCLUSION....................................................................................................................64

TABLE OF AUTHORITIES

*Aguillard v. McGowen*, 207 F.3d 226 (5th Cir. 2000) ....................................................59

*Alicea v. Com.*, 466 Mass. 228 (2013) .........................................................................59

*Artuso v. Vertex Pharm, Inc.*, 637 F.3d 1 (1st Cir. 2011) ...............................................19

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ............................................58

*Beck v. City of Pittsburg*, 89 F.3d 966 (3d Cir. 1996) ...................................................43

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................16, 26

*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016) ........................................................52

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ......................................40, 42, 43

*Bowen v. Maynard,* 799 F.2d 593 (10th Cir.1986) .........................................................33

*Bradford v. Scherschlight*, 803 F.3d 382 (9th Cir. 2015) ..............................................22

*Brandley v. Keeshan*, 64 F.3d 196 (5th Cir. 1995) .......................................................22

*Brown v. State of Mississippi*, 297 U.S. 278 (1936) ......................................................38

*Brown v. Trs. of Boston Univ.*, 891 F.2d 337 (1st Cir. 1989) .........................................19

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ...................................................... *passim*

*Burns v. Reed*, 500 U.S. 478 (1991) .............................................................................63

*Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1 (1st Cir. 1995) ....................................23

*Carter v. Newland*, 441 F. Supp. 2d 208 (D. Mass. 2006) ...........................................27

*Cignetti v. Healy*, 89 F. Supp. 2d 106 (D. Mass. 2000) ...........................................51, 52

*Clay v. Allen*, 242 F.3d 679 (5th Cir. 2001)..................................................................23

*Collins v. City of New York*, 923 F.Supp.2d 462 (E.D.N.Y. 2013) ................................43

*Connick v. Thompson*, 563 U.S. 51 (2011) .............................................................41, 42

*Cuadrado v. Wall*, No. CA 08-305 ML, 2010 WL 1499589 (D.R.I. March 9, 2010) .................27

*Cuebas v. Davila*, 618 F. Supp.2d 124 (D. Puerto Rico 2009) .....................................25

*DiBlasio v. City of New York*, 102 F.3d 654 (2d Cir. 1996) ........................................22

*Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985) ...............................................................59

*Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013)...............................................32, 37

*Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988).............................................................37

*Echavarria v. Roach*, No. 16-CV-11118-ADB, 2017 WL 3928270 (D. Mass. Sept. 7, 2017)*passim*

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) ...................................28

*Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 2010)...........................................................24

*Filler v. Kellett*, 859 F.3d 148 (1st Cir. 2017) ............................................................48

*Forsyth v. Kleindienst*, 599 F.2d 1203 (3d Cir. 1979) ...................................................50

*Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982) .................................................................61

*Garcia-Catalan v. United States*, 734 F.3d 100 (1st Cir. 2013) ......................................30

*Glaros v. Perse*, 628 F.2d 679 (1st Cir. 1980).............................................................24

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) .........................................43

*Gray v. Derderian*, 472 F. Supp. 2d 172 (D. R.I. 2007)........................................36, 46

*Groark v. Timek*, 989 F.Supp.2d 378 (D. N.J. 2013)....................................................43

*Guzman-Rivera v. Rivera-Cruz*, 29 F.3d 3 (1st Cir. 1994) ...........................................23

*Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26 (1st Cir. 1995) .........................................50

*Hafner v. Brown*, 983 F.2d 570 (4th Cir. 1992).............................................................28

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)....................................................31

*Hall v. Ochs*, 817 F.2d 920 (1st Cir. 1987)....................................................................28

*Heck v. Humphrey*, 512 U.S. 477 (1993)...............................................19, 20, 21, 23

*Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995) ...................................................54

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ..........................................................17

*Hope v. Pelzer*, 536 U.S. 720 (2002) ............................................................................38

*Hyung Seok Koh v. Graf*, No. 11 C 2605, 2013 WL 5348326 (N.D. Ill. Sept. 24, 2013) ............26

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ............................................................47, 50

*In re Colonial Mortg. Bankers Corp*, 324 F.3d 12 (1st Cir. 2003)...............................17

*Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017) ...............................................................58

*Jackson v. Vannoy*, 49 F.3d 175 (5th Cir. 1995).........................................................21

*Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)............................................................22

*Kalina v. Fletcher*, 522 U.S. 118 (1997)......................................................................47

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010).............................................62

*Kennedy v. Town of Billerica*, 617 F.3d 520 (1st Cir. 2010) .......................................44

*Kibbe v. City of Springfield*, 777 F.2d 801 (1st Cir. 1985)...........................................43

*Kyles v. Whitley*, 514 U.S. 419 (1995).........................................................................32

*Lewis v. Mills*, 677 F.3d 324 (7th Cir. 2012) ...................................................36, 46, 52

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ................................................ *passim*

*Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007)............................35, 36

*Lingis v. Waisbren*, No. SUCV200600717, 2011 WL 6379283 (Mass. Super. Oct. 5, 2011) ......59

*Locke v. Haessig*, 788 F.3d 662 (7th Cir. 2015) ..........................................................61

*Longval v. Comm'r of Correction*, 448 Mass. 412 (2007)............................................59

*Lussier v. Runyon*, 50 F.3d 1103 (1st Cir. 1995) .........................................................17

*Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7 (1st Cir. 2011) ..................................36

*Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3 (1st Cir. 2007)..................................25

*McDonough v. Donahoe*, 673 F.3d 41 (1st Cir. 2012) .................................................19

*McGhee v. Pottawattamie Cnty.*, 547 F.3d 922 (8th Cir. 2008) ...................................52

*Mendez v. Artuz,* No. 98 Civ. 2652(LMM), 2000 WL 722613 (S.D.N.Y. June 6, 2000).............33

*Miller v. Fenton*, 474 U.S. 104 (1985).....................................................................31, 38

*Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000)..............................................................28

*Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001) ......................................................50

*Mitchell v. City of Boston*, 130 F. Supp. 2d 201 (D. Mass. 2001) .................................................21

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................................50

*Mitchell v. Rappahannock Reg'l Jail Auth.*, 703 F. Supp. 2d 549 (E.D. Va. 2010) ....................27

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ...................................................16

*Mooney v. Holohan*, 249 U.S. 103 (1935) ................................................................................38

*Moore v. Valder*, 65 F.3d 189 (D.C. Cir. 1995)........................................................................52

*Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015)..............................................................29

*Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 1308946 (N.D. Okla. Mar. 13, 2018) ..................................................................................................................................60

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1 (1st Cir. 2015)........................................30, 31

*Okoro v. Callaghan*, 324 F.3d 488 (7th Cir. 2003).....................................................................21

*Oliveira v. New Prime, Inc.*, 857 F.3d 7 (1st Cir. 2017), *cert. granted*, 138 S. Ct. 1164 (2018)35, 54

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014)............23, 41, 44

*Padilla v. City of Chicago*, No. 06-C-5462, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009)...........43

*Parra v. State of N.H.*, 40 F.3d 1235 (1st Cir. 1994).................................................................52

*Payano v. Potter*, 554 F. App'x 522 (7th Cir. 2014) .................................................................22

*Peterson v. Heymes*, No. No. 1:15-cv-969, 2017 WL 4349456 (W.D. MI, Sept. 29, 2017).........60

*Petty v. Chicago*, 754 F.3d 416 (7th Cir. 2014)........................................................................59

*Presby Constr. Inc. v. Clavet*, No. 00-457-M, 2001 WL 951375 (D.N.H. Aug. 9, 2001).......42, 46

*Randall v. Prince George's Cnty., Md.*, 302 F.3d 188 (4th Cir. 2002).........................................61

*Reid v. Wren*, Nos. 94-7122, 94-7123, 94-7124, 1995 WL 339401 (10th Cir. 1995) ..................62

*Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008)....................................................................28

*Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1 (1st Cir. 2013) ..........................................56

*Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49 (1st Cir. 2013)............................................31

*Rogan v. Menino*, 175 F.3d 75 (1st Cir. 1999) ..........................................................................16

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1 (1st Cir. 2007) ..........................................16

*Saldivar v. Racine*, 818 F.3d 14 (1st Cir. 2016) ...........................................................................44

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015).........................................................................43

*Santiago v. Fenton*, 891 F.2d 373 (1st Cir. 1989)..............................................................36, 37, 46

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)...............................................................................34

*Sherrod v. Berry*, 827 F.2d 195 (7th Cir.1987)...............................................................................43

*Smith v. Sec. of New Mexico Dept. of Corrections*, 50 F.3d 801 (10th Cir. 1995) ........................33

*Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003)....................................................................52

*Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016).......................................................62

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992).........................................................................60

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013).........................................................61

*Tillman v. Orange Cty., Fl.*, 519 F. App'x 632 (11th Cir. 2013)....................................................60

*Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43 (1st Cir. 2005).....................................................61

*United States v. Bagley*, 473 U.S. 667 (1985) ..............................................................................32

*United States v. Hoyts Cinema Corp.*, 380 F.3d 558 (1st Cir. 2004).............................................17

*United States v. Simon*, 842 F.2d 552 (1st Cir. 1988)....................................................................45

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)..............................................................49

*Williams v. City of Boston*, No. 10-10131-PBS, 2013 WL 1336584 (D. Mass March 14, 2013)33, 34

## INTRODUCTION

After serving more than three decades in prison for a crime that he did not commit, Plaintiff, George Perrot, filed the instant lawsuit alleging that he was framed by the Defendants. The bad actors involved are multiple: They involve the City of Springfield, Massachusetts; current and former Springfield police officers Thomas Kelly, Thomas Jarvis, Richard Kane, Charles Arpin, John Scanlon, David Louden, Thomas Kennedy, Chief Ernest Stelzer, Marianne Popko, Paul Glantz, Ronald St. Germain, Andrew Canevari, Cheryl Clapprood, Captain John Brown, and Unknown Officers of the Springfield Police Department; former Hampden County Assistant District Attorney Francis Bloom; and two former FBI agents, Wayne Oakes and William Eubanks.

Currently pending before the Court are four motions to dismiss. Every Defendant except for Oakes and Eubanks, who have not yet appeared in the case, *see* Dckt No. 44, 45, has filed a Federal Rule of Civil Procedure 12 motion—and the Springfield police officers have filed two. *See* Dckt Nos. 31, 32, 34, 35, 36, 37, 42 & 43. Rather than heed the mandates of Rule 12—that the facts be taken in the light most favorable to the Plaintiff, and that the facts be limited to the four corners of the Complaint—the Defendants have re-cast the facts and the claims and self-servingly excised each and every allegation in the Complaint that details their wrongdoing. In other words, according to the Defendants, Plaintiff has not alleged that they committed any misconduct—either because Plaintiff used the term "Defendants" to describe the (discrete) group of bad actors instead of each actor's proper name, or because they simply did not know in 1985 that hair microscopy was unreliable. But a fair reading of Plaintiff's Complaint makes clear that the "Defendants" includes each and every one of them, and that Plaintiff is not suing them for

unwittingly relying on faulty science. To the contrary, he has alleged that the Defendants, individually and in concert, coerced and fabricated a false confession; planted physical evidence and fabricated statements to connect that evidence to Plaintiff and to the crime; and deliberately suppressed exculpatory evidence about how they undertook their conspiracy to frame him, and about an alternative offender. Those deliberate actions were undertaken pursuant to the policy and practice of the City of Springfield.

Because the allegations in the Complaint set forth actionable claims that are plausible on their face, each of the Defendants' motions should be denied.

## BACKGROUND

Plaintiff, George Perrot, was just 17 years old when he was wrongfully arrested for the November 1985 assault and rape of a 78-year-old woman named M.P. Dckt No. 2, ¶ 1. He was twice convicted of the crime and sentenced to life in prison. *Id.* During the more than 30 years since his wrongful conviction, Plaintiff steadfastly maintained his innocence. *Id.* ¶ 2.

The story of how Plaintiff came to be convicted of a crime he did not commit is not one of accident or bad luck. To the contrary, Plaintiff's arrest, prosecution and conviction were based on the misdeeds of the Defendants, who manufactured false evidence, including by fabricating inculpatory statements attributed to Plaintiff, which were concocted and coerced by Defendants after more than 12 hours of abusive and illegal interrogation; planting physical evidence and fabricating witness statements to connect that evidence to the crime and to Plaintiff; and deliberately suppressing evidence that someone else may have committed the crime. *Id.* ¶¶ 5-8.

### The Series of Sexual Assaults in Springfield

Between 1984 and 1986, there was a series of sexually-motivated assaults on women over the age of 60 in Springfield, Massachusetts. *Id.* ¶ 21. The assaults appeared to be committed

by the same person: Each occurred in a similar location, at a similar time and targeted a similar type of victim. *Id*. ¶ 22.

The Springfield Police Department began investigating the assaults, but to no avail. With public pressure mounting, the Department was desperate to incarcerate someone and assuage the fears of the community. *Id*. ¶ 23. Rather than do the work necessary to identify the perpetrator, however, the Defendants, individually and jointly, short-circuited the investigatory process and wrongfully targeted Plaintiff in an effort to simply close the case. Because there was no evidence linking Plaintiff to the crime, the Defendants fabricated evidence and withheld exculpatory evidence in an effort to frame Plaintiff for a crime he did not commit, as described more fully below. *Id*. ¶ 24.

On January 1, 1986, weeks after Plaintiff's arrest and in response to public concern about the unsolved crimes, then-District Attorney Matthew Ryan stated that Plaintiff's arrest would "result in the lessening of these types of offenses." *Id*. ¶ 25. But unsurprisingly, because Plaintiff was innocent of each of the sexual assaults at issue, rapes of older women in the Springfield area did not end with Plaintiff's arrest. Instead, right around the time of Ryan's pronouncement, an 80-year-old woman was raped and murdered in Springfield. A man named James Jones later pleaded guilty to this crime. Although Jones matched M.P.'s description of her attacker better than Plaintiff, the Defendants never investigated Jones for M.P.'s assault and instead continued to frame Plaintiff. *Id*. ¶ 26.

**M.P. is Assaulted and Raped on November 30, 1995**

In 1985, M.P. was a 78-year-old woman who lived in Springfield, Massachusetts. On November 30, 1985, at approximately 4 A.M., a man broke into M.P.'s home, attacked her, and raped her. *Id*. ¶¶ 27-28.

M.P. identified her assailant as a 20-30-year-old clean-shaven man with dark wavy hair who was wearing a blue jacket, dark pants, and white sneakers. Plaintiff looked nothing like the assailant: He was a teenager with a mustache, goatee and long, wild hair. *Id*. ¶¶ 29, 54.

### George Perrot Becomes Defendants' Suspect

At the time of M.P.'s assault, Plaintiff was living with his sister, Nancy Westcott. He had grown up in the neighborhood where the crime took place. *Id*. ¶ 32.

On the evening of November 29, 1985, and into the early morning hours of November 30, 1985, George Perrot was nowhere near M.P.'s home. Instead, he was in Brattleboro, Vermont, with his friends. Early in the morning on November 30, his friends dropped him off at his house, where he stayed the rest of the night and into the next day. *Id*. ¶ 33.

Approximately a week later, on December 7, 1985, Plaintiff was again out with his friends. After finishing up his job at the construction site where he was working, his friend picked him up and they went out. Over the course of the next several hours, Plaintiff, along with three other people, drank heavily and used drugs, including having himself ingested eight Valium pills. *Id*. ¶ 34.

Sometime after midnight, Plaintiff's friend dropped him at his house. Over the next couple of hours, Plaintiff broke into a house on Allendale Circle, but ran away when he realized that the owners were home. Plaintiff also went to the Denny's restaurant near his house, and snatched a purse from someone in the parking lot. *Id*. ¶ 35.

Around 2:30 a.m., Plaintiff ran back home and passed out. *Id*. ¶ 36.

### Plaintiff's Arrest

A few hours later, the Defendants arrived at Plaintiff's home, and arrested him for the purse-snatch and Allendale Circle attempted break-in. *Id*. ¶ 37.

When the Defendants arrived at Plaintiff's house, he was still asleep. Plaintiff was awoken by Westcott, and by the Defendants shaking him. Intoxicated and disoriented, Plaintiff implored the woman who he believed was his girlfriend to contact his sister, not realizing that he was already talking to her. *Id*. ¶ 38.

During his arrest and on the way to the Springfield police station, the Defendants viciously beat Plaintiff: They kicked and hit Plaintiff, and then threw him over a small fence. On the way to the police station, the Defendants threatened to kill him. *Id*. ¶ 39.

### The Defendants Unlawfully Coerce a False and Fabricated Confession from Plaintiff

When he arrived at the police station, Plaintiff was still confused, under the influence and exhausted. At most, he had slept two hours before the Defendants had awoken him, beaten him, and dragged him to the station. *Id*. ¶ 40.

Although the Defendants purportedly arrested Plaintiff for his activities on the night of December 7, 1985, the arrest was a pretext. Indeed, the Defendants used the opportunity to coerce and fabricate a false confession out of Plaintiff for the completely unrelated M.P. assault. *Id*.  43.

To do so, the Defendants employed a host of legally impermissible and wholly coercive interrogation tactics. For example, the Defendants continued to physically assault Plaintiff. *Id*. ¶ 42. In addition, the Defendants interrogated Plaintiff for approximately 12 hours, beginning in the middle of the night at approximately 4:30 a.m. and continuing into the late afternoon and early evening. During this time, the Defendants purposefully did not let Plaintiff sleep. Instead, any time he tried to get some rest, one of the Defendants would come and bang on the cell doors to ensure he was awake. *Id*. ¶¶ 45-46.

The Defendants' intentional refusal to let Plaintiff sleep before interrogating him was particularly egregious given the fact that the Defendants knew that Plaintiff was highly intoxicated. Indeed, during his interrogation, Plaintiff was very emotional, often incoherent, and even at times suicidal, asking Defendant Jarvis for his gun so he could kill himself. Rather than letting Plaintiff sleep and sober up, the Defendants exploited Plaintiff's vulnerabilities and pressed on with their day-long interrogation. *Id*. ¶ 47.

During that interrogation, the Defendants also: threatened Plaintiff and fed him information about the crime; refused to let Plaintiff's mother come to see him until after they had coerced and fabricated statements from Plaintiff; and fabricated the content of his confession, as well as certain of Plaintiff's initials and/or signature. *Id*. ¶ 48-50. Although Plaintiff repeatedly told the Defendants that he had nothing whatsoever to do with the M.P. assault, Defendants fabricated a "confession" that says Plaintiff broke into M.P.'s home—an "admission" that was used to secure his wrongful arrest, prosecution, and conviction. *Id*. ¶ 50.

Notably, while the equipment existed to do so, Defendants purposefully did not audio or video record their interrogations of Plaintiff. *Id*. ¶ 52.

**Plaintiff is Placed in a Lineup**

After Plaintiff's interrogation, the Defendants next conducted a lineup. *Id*. ¶ 53. The problem for the Defendants, however, was that Plaintiff did not match the description that M.P. gave of the offender in any way. As a result, and in an effort to falsely induce M.P. to pick Plaintiff, rather than fill the lineup with persons that looked like the perpetrator that M.P. described to the Defendants, the Defendants instead included persons who looked like Plaintiff but who were easily identifiable as police officers. *Id*. ¶¶ 54-55. Nonetheless, M.P. did not

identify Plaintiff as her assailant. Indeed, no amount of coercion or cajoling by the Defendants

would lead her to say Plaintiff had anything whatsoever to do with her assault. *Id*. ¶ 56.

### The Defendants' Further Steps to Implicate Plaintiff

Because all the Defendants had to implicate Plaintiff in the M.P. assault was Plaintiff's

false, coerced and fabricated half-"admission," the Defendants set out to fabricate additional

inculpatory evidence to continue their wrongful prosecution. *Id*. ¶ 58. For example, the

Defendants planted gloves at the crime scene and alleged that the gloves were connected to both

the crime and to Perrot. To do so, the Defendants not only fabricated statements from Plaintiff's

sister, but also from M.P. *Id*. ¶ 59.

The Defendants also planted and fabricated evidence concerning a single hair and blood

stains on a bed sheet—neither of which legitimately implicated Plaintiff in the crime, but both of

which Defendants used to frame Plaintiff for the crime. *Id*. ¶ 60. Finally, Defendants had

evidence that another man was responsible for the assaults on elderly women, but withheld that

evidence from Perrot so that he could not make use of it in his criminal defense. *Id*. ¶ 61.

### The FBI Defendants Conspire to Create False Hair and Blood Evidence

The Defendants not only planted physical evidence, but also relied on fabricated

conclusions to connect that evidence to Plaintiff. In particular, Defendants relied on the FBI's

hair microscopy analysis in securing Plaintiff's conviction, despite the fact that the analysis was

both virtually worthless as a method of identifying a perpetrator and completely false. *Id*. ¶ 65.

Defendant FBI Agent Wayne Oakes falsely reported that the hair allegedly found at the

crime scene was Plaintiff's hair. In particular, Defendant Oakes falsely reported that the hair was

consistent with coming from Perrot, and further that it would be extremely rare that he would

compare two hairs from different people and find them to be consistent with each other. *Id*. ¶ 66.

Defendant Oakes knew that the evidence he was creating was beyond the legitimate scope of hair microscopy evidence, but he purposefully concealed that fact from the prosecutor and defense. *Id*. ¶ 68. On information and belief, Defendant Oakes had discussed with other hair microscopists, including Defendants Unknown Agents of the Federal Bureau of Investigation, the best way to conceal that the incriminating evidence he was creating was based on junk science. *Id*. ¶ 69. Instead of disclosing such exculpatory information, Defendants conspired to use the flawed analysis as evidence to secure a conviction against Plaintiff for a crime that he did not commit. *Id.* ¶ 70.

In addition, and pleading in the alternative, even if hair microscopy were scientifically valid and could permit an analyst to reach conclusions about exclusions and non-exclusions (in other words, who could be eliminated as a possible source of the hair, and who could not be), which it could not, Defendant Oakes' findings regarding the hair evidence in Plaintiff's case were not valid. Either the hair allegedly found at the crime scene and Plaintiff's hair did not match in any substantial way, or if the hair *did* match Plaintiff, then it was planted by the Defendants. If the former, rather than disclose this information to Defendant Bloom, however, the Defendants suppressed it, enabling Defendant Oakes to give his false report. *Id*. ¶¶ 71-74. Indeed, notwithstanding its obvious falsity, the hair evidence was introduced against Plaintiff at his criminal trial to much fanfare by the prosecution. *Id*. ¶ 76-77.

In addition to hair, Defendants used false and misleading evidence about blood, and suppressed exculpatory evidence about blood, to secure Plaintiff's wrongful conviction. For example, Defendants submitted blood stains that they knew were not caused by M.P.'s assault for blood testing by Defendant Eubanks, and Defendants falsely claimed that the blood *was* from the assault. Because the blood stain was so old, there were very few markers that could be

identified from the blood tests conducted. In other words, the tests did little to discriminate between Plaintiff and any other male, and no conclusions could be drawn. *Id*. ¶¶ 78-80. Nonetheless, Defendant Eubanks falsely reported that Plaintiff's blood was "consistent" with the blood from the stain. Further, when some of those blood tests came back *inconsistent* with Plaintiff, that evidence was buried by Defendants, including Defendant Eubanks. *Id*. ¶¶ 81-82.

### Defendant Bloom's Participation In the Misconduct

In addition to the Springfield Defendants and the FBI Defendants, Defendant Bloom participated in the misconduct described above. In particular, Plaintiff pleads in the alternative that Defendant Bloom, acting as an investigator without probable cause and before charges were lodged, participated in the arrest and illegal interrogation of Plaintiff, in the coercion and fabrication of his false statements, and in the fabrication of other evidence, including M.P.'s statement and the planting of the gloves and hair. *Id*. ¶¶ 83-85.

### The Defendants' Bad Faith

That the Defendants framed Plaintiff for a crime he did not commit was no accident. To the contrary, their actions in manufacturing false evidence and withholding exculpatory evidence were done recklessly, intentionally, and in bad faith. *Id*. ¶ 86.

The Springfield Defendants were familiar with Plaintiff before November 30, 1985, having harassed him on multiple occasions. *Id*. ¶ 87. So strong was their dislike of Plaintiff that the Springfield Defendants—along with Defendant Bloom—fabricated a false confession to M.P.'s rape and forged Plaintiff's signature on it (separate and apart from the fabricated "admission" Plaintiff was coerced into signing on the night of his arrest). *Id*. ¶ 88. Similarly, Defendant Bloom, who has twice been publicly censured, despised Plaintiff. Bloom described Plaintiff as "inherently evil" and a "sociopath" in his own diary, and viewed Plaintiff as an

individual apart from the community of citizens whose rights he was charged with protecting. *Id.* ¶ 89.

Bloom's hatred for Plaintiff led him and Defendant Kennedy to personally drive physical specimens to Washington D.C.—a highly unusual, if not unprecedented, step—so that Bloom and Kennedy could personally speak with FBI Agents Oakes and Eubanks about Plaintiff's "inherent evil," before those agents analyzed any physical evidence and reached any conclusions. *Id.* ¶ 90.

Defendants also attempted to cover up their wrongdoing by destroying evidence, including handwritten contemporaneous notes, and some of the physical evidence, so that Plaintiff and his post-conviction lawyers could not have the evidence tested for DNA or learn of evidentiary leads that would have conclusively proved his innocence. *Id.* ¶ 91.

## Plaintiff's Wrongful Conviction

At no time did the Defendants have probable cause to suspect Plaintiff of the assault or rape of M.P. *Id.* ¶ 92. Nonetheless, as a result of the misconduct described above, Plaintiff was arrested, indicted, and convicted of rape, battery, and assault. *Id.* ¶ 93.

Prior to Plaintiff's first conviction, Defendants, including Defendant Kane, fabricated yet another false statement, allegedly from Plaintiff, concerning the location of incriminating evidence. That statement was false and fabricated—Plaintiff never gave it. Moreover, the things that Plaintiff did say, which were not incriminating, came after a police-initiated interrogation of Plaintiff, after he had been arraigned and appointed counsel, but without his counsel's presence, consent, or even knowledge. *Id.* ¶ 94.

Plaintiff's first conviction was reversed and remanded for a new trial. *Id.* ¶ 95. A new prosecutor took over. As that new prosecutor began preparing for retrial, she found a new

statement from Plaintiff allegedly "confessing" to the M.P. assault. That statement, as Defendant Bloom has confessed, was entirely forged by Defendant Bloom and the other Springfield Defendants, who intended that it be used, along with the other fabricated evidence, to convict Plaintiff. *Id*. ¶¶ 96, 98.

Without the misconduct described above, Plaintiff would never have been arrested, let alone prosecuted or convicted. *Id*. ¶ 100. Indeed, at no point in time between 1985 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the assault and rape of M.P. *Id*. ¶ 101.

### The City of Springfield's Policies

The Springfield Defendants' misconduct was not an isolated occurrence. Rather, it was undertaken in part pursuant to the policies, practices and customs of the Defendant City of Springfield. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City had unlawful policies that allowed its officers to withhold exculpatory and/or material impeachment evidence; conduct hours- and even days-long interrogations of juveniles, during which the juveniles were subject to illegal and improper psychological and physical coercion; and plant and fabricate physical and other evidence. *Id*. ¶¶ 102-103. Those policies included, but were not limited to allowing and encouraging its officers to avoid audio or video recording interviews or interrogations of witnesses or suspects unless the information learned was helpful to the prosecution. *Id*. ¶ 104.

In addition or in the alternative, the City knowingly and willfully failed to promulgate proper or adequate rules, regulations, policies, and procedures to govern criminal investigations, including on each of the topics identified above. It likewise failed to train and supervise its employees in the same. The unlawful policies or knowing and willful failures to promulgate

proper or adequate rules, regulations, policies, and procedures were the moving force behind

constitutional violations committed by officers and agents of Springfield Police Department and

the City of Springfield, including the Defendants. *Id.* ¶¶ 105-06.

Further, at all times relevant to the events described in this Complaint and for a period of

time prior thereto, the City of Springfield had notice of widespread practice and custom of the

Springfield Police Department and the City of Springfield under which individuals such as

Plaintiff were routinely coerced against their will to implicate themselves in crimes that they had

not committed. It was common that suspects, including juvenile suspects, who were interrogated

in connection with investigations within the jurisdiction of the Springfield Police Department

and the City of Springfield confessed, under extreme duress and after suffering abuse, to

committing crimes to which they had no connection. The means that officers used included, but

were not limited to one or more of the following: (1) individuals were subjected to unreasonably

long and uninterrupted interrogations, often lasting for many hours and even days; (2)

individuals were subjected to actual and threatened physical or psychological violence; (3)

individuals were interrogated at length without proper protection of their constitutional right to

remain silent; (4) individuals were forced to sign or assent to oral and written statements

fabricated by the police; (5) officers and employees were permitted to lead or participate in

interrogations without proper training and without knowledge of the safeguards necessary to

ensure that individuals were not subjected to abusive conditions and did not confess involuntarily

and/or falsely; and (6) supervisors with knowledge of permissible and impermissible

interrogation techniques did not properly supervise or discipline police officers and employees

such that the coercive interrogations continued unchecked. *Id.* ¶¶ 109-110.

13

Likewise, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Springfield had notice of widespread practices by officers and agents of the Springfield Police Department and the City of Springfield, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements, evidence and testimony of witnesses; (3) officers fabricated false evidence implicating criminal suspects and defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations. *Id.* ¶ 111.

Notwithstanding their illegality, these practices flourished: The City failed to take any recourse to correct them—be it training, alternate policies or discipline. *Id.* ¶ 112-14. For example, courts have recognized that there is evidence that the City of Springfield has a consistent pattern of rejecting civilian complaints against police officers, and not properly disciplining and controlling officers. *Id.* ¶ 113.

As a result of the policies and practices of the City of Springfield, numerous individuals have been wrongfully convicted of crimes that they did not commit, including but not limited to (A) Charles Wilhite, who was wrongfully convicted of first-degree murder as a result of misconduct of Springfield police officers and despite no physical evidence linking him to the crime, as described in pleadings in the civil lawsuit *Wilhite v. Pioggia, et al.,* No. 14-30023 (D. Mass.); (B) Mark Schand, who was wrongfully convicted of murder, assault, and robbery as a result of Springfield police misconduct, including suppression and fabrication of evidence, as described in the civil lawsuit *Schand, et al. v. City of Springfield, et al.*, No. 15-30148 (D.

Mass.); and (C) Rolando Penate, who was wrongfully convicted and spent five years in prison, in part because the Springfield Police Department refused to investigate, discipline, and stop a police officer who was known to have been stealing money and contraband, as described in the civil lawsuit *Penate v. Kaczmarek et al.*, No. 17-cv-30119 (D. Mass.). *Id.* ¶ 115.

### Plaintiff's Exoneration

After his first conviction was reversed, Plaintiff was re-convicted at his second trial and sentenced to life in prison. Because of his life sentence, Plaintiff feared regularly that he might die inside the prison walls. *Id.* ¶ 123. Nevertheless, he never gave up on trying to prove his innocence.

Plaintiff was granted post-conviction relief, which became final on October 11, 2017. *Id.* ¶ 125. The court held that the admission of flawed evidence, discussed here and in further detail in the Complaint, materially affected the jury and "cast real doubt on the justice of [Plaintiff's] conviction." *Id.* Indeed, the court wrote that its finding "was not a close call." *Id.* ¶ 126.

On October 18, 2017, prosecutors dropped the charges against Plaintiff. *Id.* ¶ 127.

### Plaintiff's Damages

Plaintiff was 17 years old when he was wrongfully arrested. He spent the next three decades of his life imprisoned for a crime he did not commit. Plaintiff's whole life was turned upside down without any warning. His childhood and young adulthood were consumed by his wrongful imprisonment. The horrors that he suffered are unspeakable. *Id.* ¶¶ 118-24. This lawsuit seeks redress for his injuries.

### Plaintiff's Complaint

Plaintiff has brought suit against four sets of Defendants: the City of Springfield, current and former Springfield police officers Thomas Kelly, Thomas Jarvis, Richard Kane, Charles

Arpin, John Scanlon, David Louden, Thomas Kennedy, Chief Ernest Stelzer, Marianne Popko, Paul Glantz, Ronald St. Germain, Andrew Canevari, Cheryl Clapprood, Captain John Brown, and Unknown Officers of the Springfield Police Department; FBI agents Wayne Oakes and William Eubanks, and former Hampden County Assistant District Attorney Francis Bloom. Plaintiff's Complaint alleges that the Defendants violated his constitutional rights, including but not limited to Plaintiff's rights under the Fifth and Fourteenth Amendments, by coercing Plaintiff into falsely incriminating himself, which was used against him in his criminal proceedings, withholding evidence from the prosecution, fabricating evidence, destroying evidence, conspiring to frame Plaintiff, failing to intervene, and maliciously prosecuting Plaintiff. *Id.* ¶¶ 130-31. Plaintiff likewise has sued the City of Springfield under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* ¶¶ 132-33.

The FBI agents have not yet appeared in the case, but the other Defendants have filed motions to dismiss. *See* Dckt Nos. 31, 32, 34, 36, 37. For the reasons stated below, none of those motions should be granted.

## STANDARD OF REVIEW

In deciding whether to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)); *Jones v. Han*, 993 F. Supp. 2d 57 (D. Mass. 2014). To survive a motion to dismiss, the complaint must merely state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at

555. Dismissal of the complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Plaintiff's Complaint easily meets this threshold.

## ARGUMENT

## 1. THRESHOLD MATTERS

I.    **This Court Should Reject Defendants' Implied Invitation to Take Improper Judicial Notice of the Decision Vacating Plaintiff's Conviction and the Prosecution's Decision to *Nolle Pros* Further Charges**

Various of the Defendants' briefs cite to the decision vacating Plaintiff's conviction and the proceedings in which future charges were dismissed pursuant to a *nolle prosequi*, and provide their own gloss or selective citation to what occurred in those proceedings. *See*, *e.g.*, Dckt. No. 35-1 at 2-3; Dckt. No. 37 at 2-5; Dckt. No. 43 at 4-5. While this Court should consider, for purposes of a motion to dismiss, "facts susceptible to judicial notice," *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (citing *In re Colonial Mortg. Bankers Corp*, 324 F.3d 12, 15 (1st Cir. 2003)), the points Defendants attempt to use these documents for are neither "facts" nor "susceptible to judicial notice."

Federal Rule of Evidence 201(b) provides that a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by sources whose accuracy cannot be questioned." Rule 201 "is applied with some stringency, because accepting disputed factual propositions about a case 'not tested in the crucible of trial is a sharp departure from standard practice.'" *United States v. Hoyts Cinema Corp.*, 380 F.3d 558, 570 (1st Cir. 2004) (citing *Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995), cert denied 516 U.S. 815).

Here, other than the "fact" that the Superior Court of Massachusetts overturned Plaintiff's conviction on January 26, 2016, and that a *nolle prosequi* was entered on October 18, 2017, there are no "facts" in either proceeding relevant to these motions. Defendants cite the conclusion of the Superior Court that the FBI first acknowledged the limitations and misuse of the hair evidence at Plaintiff's trial in October of 2014 as a "fact" supporting the conclusion that the officers did not know at the time of trial that the use of this forensic evidence was improper. Dckt No. 37 at 8. Setting aside the obvious fact that the Superior Court opinion does not make the finding about what the officers knew, and makes no findings about whether there was "misconduct by the Springfield Police Department," contrary to the Municipal Defendants' Memorandum (Dckt. No. 37 at 3), this opinion does not controvert the well-pled allegations in Plaintiff's Complaint that the Defendants conspired together to use hair evidence that they knew was false or, in the alternative, planted this hair evidence to fabricate evidence against him. Dckt. No. 2, ¶¶ 69-73.) *See Echavarria v. Roach*, 2017 WL 3928270, at *13 (D. Mass. Sept. 7, 2017) (state court pleadings cannot form the basis for the exercise of judicial notice if those pleadings do not establish the point upon which a party relies). Defendants can point to no specific findings or facts in that opinion that this Court could take judicial notice of that would negate Plaintiff's allegations.

Similarly, the Defendants all provide a summary of the *nolle prosequi* filing by the State and claim, without citation, that the District Attorney filed for a *nolle* because Plaintiff would not have been sentenced for longer than he had already served. Dckt No. 35-1 at 4-5; Dckt No. 37 at 5; Dckt No. 43 at 4. In fact, as alleged in Plaintiff's complaint, the District Attorneys' office also stated on the record that it was dropping the charges because "the interests and administration of justice are best served by the termination of prosecution of this matter." Dckt. No. 2, ¶ 127.

18

There is nothing in the Defendants' Memorandum or the *nolle* prosequi filing itself of which this Court could take judicial notice that would overcome Plaintiff's allegations about the *nolle proequis*.

## II.     The Defendants' Statements of Facts Are Improper

For similar reasons, this Court should look with skepticism on the Defendants' recitation of the facts of this case. Not only do the Defendants invite this Court to take improper judicial notice of the proceedings set forth above, but also the Defendants fail to take the facts and all reasonable inferences in the light most favorable to Plaintiff, as this Court must do. *Haley*, 657 F.3d at  45 (citing *Artuso v. Vertex Pharm, Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)). This is true for both the *nolle* prosequi issue addressed above and for Defendants' description of the NAS Report and when Defendants knew that the FBI was repeatedly testifying beyond the limits of science. When applying the standard properly, this Court should consider these motions in light of the facts and reasonable inferences set forth by Plaintiff above.

## III.     Plaintiff Has Filed His *Brady* Claim Within the Statute of Limitations

The City of Springfield asserts that Plaintiff's *Brady* claims are subject to a statute of limitations that began to run when the first conviction was reversed in 1990. Dckt No. 35-1 at 16. It reasons that Plaintiff's *Brady* claims are now time-barred. *Id.*  The City's argument is conclusory, confined to four sentences, and does not address the complex procedural history of Plaintiff's underlying criminal case or the application of *Heck v. Humphrey* as a bar to his claims at various times, and for that reason alone this Court should deny the Defendant's motion to dismiss on this issue. *McDonough v. Donahoe*, 673 F.3d 41, 49 n.14 (1st Cir. 2012) (citing *Brown v. Trs. of Boston Univ.*, 891 F.2d 337, 352 (1st Cir. 1989)) (issues "adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Even if this Court considers this issue on the merits, however, Defendants' view of when Plaintiff's *Brady* claims accrued is incorrect. Plaintiff's first conviction was overturned on June 4, 1990, but Perrot was immediately subject to the retrial process and again convicted on the same charges on January 9, 1992, using the same evidence that is the subject of Plaintiff's *Brady* claims in this lawsuit. The second proceedings were pending until the prosecution abandoned its appeal on October 11, 2017.

*Heck v. Humphrey*, 512 U.S. 477 (1993) governs when Plaintiff's § 1983 claims accrue. In that case, the Supreme Court considered a claim brought by a prisoner who alleged his conviction was unconstitutional because of official misconduct before and during his criminal trial and because of the use of illegally obtained evidence at his trial. 512 U.S. at 478–79. The Supreme Court held that the prisoner's damages suit was barred, stating that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . . A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Id.* at 486–87. The *Heck* bar is a deferred accrual rule: it provides that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90. An action in habeas corpus is the proper way to challenge the constitutionality of a conviction, and the *Heck* rule ensures that any damages claim attacking the constitutionality of a conviction waits until the conviction has been vacated and the criminal case has terminated. *Id.*

To determine whether the *Heck* bar defers accrual of a particular § 1983 claim, courts ask whether a judgment in the plaintiff's favor on that claim would necessarily imply the invalidity of a conviction or sentence. 512 U.S. at 487; *see also Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 209 (D. Mass. 2001) (citing *Heck*, 512 U.S. at 486) (recognizing that someone in Plaintiff's situation has no ability to bring any *Brady* claims as his civil rights claims were for a "harm caused by actions whose unlawfulness would render a conviction or sentence invalid"). This fact-specific inquiry turns on the allegations in the plaintiff's case. *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003).

Here, the Defendants' argument (although undeveloped) implicitly suggests that Plaintiff was able to bring his *Brady* claims in 1990, once his first conviction had been overturned. Defendants totally ignore the fact that in 1990, Plaintiff immediately faced retrial; indeed, he was still under indictment for the same set of crimes, based on the same set of prosecutorial facts. Because Plaintiff was convicted on all of the same evidence about which his *Brady* claims in this case complain (the hair evidence and the Defendants continuing to withhold other exculpatory evidence), the second conviction maintained the *Heck* bar until 2017.

*Heck* holds that accrual is delayed for § 1983 actions "that necessarily require the plaintiff to prove the unlawfulness of his conviction *or confinement.*" 512 U.S. at 486 (emphasis added); *see also Jackson v. Vannoy*, 49 F.3d 175, 177 (5th Cir. 1995) (holding if judgment in plaintiff's favor "would necessarily imply the invalidity of his conviction *or sentence*…the complaint must be dismissed unless the plaintiff can demonstrate that the conviction *or sentence* has already been invalidated.") (emphasis added). *Heck*'s reference to a "revers[al] on direct appeal," 512 U.S. at 486–87, does not contemplate that § 1983 claims

will accrue whenever a state criminal conviction is reversed on evidentiary grounds and a new trial is ordered. It is only in the case of a reversal in which a plaintiff is no longer subject to criminal prosecution for the same charge that the *Heck* bar is immediately lifted. Were it otherwise, the result would be unwieldy and unworkable: courts would have to contend with serial § 1983 lawsuits filed by criminal defendants throughout the pendency of their criminal proceedings, the misconduct that occurred at the outset of an investigation and tainted each criminal trial would be litigated in multiple lawsuits, and the courts would be faced with §1983 lawsuits and civil discovery occurring at the same time as ongoing criminal proceedings.

In *Heck* itself, the Supreme Court addressed the question of accrual of § 1983 claims by analogy to the common law cause of action for malicious prosecution because "*unlike* the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process. … One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused." 512 U.S. at 484 (emphasis added).

Applying *Heck* and recognizing the *Heck* analogy between § 1983 claims and malicious prosecution claims, various courts addressing the applicability of the *Heck* bar in a retrial situation have concluded that Section 1983 claims do not accrue until a retrial ends favorably. *See, e.g., Julian v. Hanna*, 732 F.3d 842, 845 (7th Cir. 2013); *Payano v. Potter*, 554 F. App'x 522, 524-25 (7th Cir. 2014) ("[E]ven after an appellate court has remanded a criminal case for retrial, the *Heck* bar is not lifted until and unless the retrial ends favorably"); *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) (ruling that "the reversal of a conviction and remand for new trial is not" favorable termination under *Heck*); *Brandley v.*

*Keeshan*, 64 F.3d 196, 1999 (5th Cir. 1995) (same); *Bradford v. Scherschlight*, 803 F.3d 382,

388 (9th Cir. 2015) (finding that claims did not accrue until "the charges were fully and finally

resolved and could no longer be brought against him); *Owens v. Baltimore City State's*

*Attorney's Office*, 767 F.3d 379, 390 (4th Cir. 2014) ("The grant of a new trial does not

terminate the proceedings against a defendant in such a manner that [they] cannot be

revived.") The Fifth Circuit has held that there is no *per se* rule on this front, but that if there is

doubt whether a victory in a Section 1983 suit would impact a pending retrial or lead to

inconsistent results, then a civil suit should be stayed. *Clay v. Allen*, 242 F.3d 679, 680 (5th

Cir. 2001). All of these cases recognize the inherent problem in treating the *Heck* bar as lifted

when a person potentially faces (and as in this case, ultimately does receive) a retrial – it

would allow criminal defendants to file a civil rights lawsuit that directly conflicts with and

would invalidate a pending retrial.

Plaintiff has not been able to find a case within this Circuit directly addressing this

question of *Brady* claims and retrial for *Heck* bar purposes, although the weight of the authority

in other circuits clearly militates towards a conclusion that the *Heck* bar applied to Plaintiff's

claims until charges were dropped in 2017. In a related context, the First Circuit has previously

held that claims under the Fourth and Fourteenth Amendment do not accrue until a criminal

prosecution ends in acquittal. *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995)

(citing *Heck*, 114 S. Ct. at 2371); *Guzman-Rivera v. Rivera-Cruz*, 29 F.3d 3 (1st Cir. 1994)

(holding, under *Heck*, that case alleging unconstitutional conviction could not have accrued

earlier than the date on which the conviction was reversed, expunged, or otherwise determined

invalid). For all the same reasons other courts, including the Supreme Court, have analogized

between malicious prosecution claims and Section 1983 claims in deciding when Section 1983

claims accrue, this Court should do the same and find that Plaintiff's claims did not accrue until 2017, when his prosecution finally ended for good. Had Plaintiff filed a lawsuit in in 1992, for instance, he would have been asserting that the same evidence used to convict him again in 1992 was unconstitutionally flawed and that the same evidence withheld from him in 1990 that was again withheld from him in 1992 violated his right to a fair trial. Under these facts, his civil rights lawsuit would implicitly assert that his 1992 conviction was invalid. This would be a clear violation of *Heck*, and he would not have been allowed to proceed. For all these reasons, this Court should reject the City of Springfield's statute of limitations arguments.

## IV.    This Court Should Allow Plaintiff To Pursue His Claims Against Unknown Defendants

Finally, the Individual Defendants argue that this Court should dismiss Plaintiff's claims against unknown defendants for lack of personal jurisdiction because Plaintiff has not yet identified or served those unknown defendants. Dckt No. 32 at 7. Plaintiff filed his Complaint on January 25, 2018. As of today's date, it has been 102 days since the filing of Plaintiff's Complaint. Contrary to Defendant's Memorandum, Federal Rule of Civil Procedure 4(m) gives Plaintiff 90 days as an initial matter to serve a party, but provides that the District Court "must extend the time for service for an appropriate period" upon a showing of good cause for the failure to make service. The case that Defendants cite for the idea that dismissal of such claims could be appropriate on a motion to dismiss, *Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 2010) is one in which the Plaintiff took no steps over seventeen months to identify or serve anonymous defendants in the case. *Id.* at 82. The other, *Glaros v. Perse*, 628 F.2d 679 (1st Cir. 1980), is one in which a *pro se* litigant sued multiple entities across the United States for supposedly subjecting him to unlawful surveillance. *Id.* at 684. There, the First Circuit held that the district court was under no obligation to wait for the *pro se* plaintiff "indefinitely." *Id.* at 684. Here,

24

Plaintiff has only begun litigation. Plaintiff is just beginning discovery, and anticipates during

the initial stages of discovery to identify other unknown defendants who should be added to

amended pleadings in the future—pursuant to whatever schedule this Court sets for amendment

of the pleadings.

This is not a case where Plaintiff has, for months of litigation, dilatorily sat back and let

the case proceed through litigation without taking steps to identify those parties. There is no

reason at this initial stage of the litigation to dismiss Plaintiff's claims against unknown parties

but rather, this Court should give Plaintiff a reasonable extension of time to engage in discovery

and then to locate and serve those parties. *See Cuebas v. Davila*, 618 F. Supp.2d 124, 133 (D.

Puerto Rico 2009) (denying a motion to dismiss the claims against unknown defendants because

"there is a reasonable likelihood that discovery will provide that information"). If a particular

new defendant that Plaintiff seeks to add believes he or she should have been identified and

added earlier, that would be the time for this Court to consider the question of diligence with the

facts then before it. This is the common practice in cases such as this where a plaintiff "is aware

of the nature and cause of the injury but not the identity of the perpetrators, and has no realistic

means of obtaining the information outside the discovery process." *Martinez-Rivera v. Sanchez*

*Ramos*, 498 F.3d 3, 5 (1st Cir. 2007) (noting that civil rights cases are cases in which the suing of

unknown defendants is common).

## 2. SPRINGFIELD POLICE OFFICER DEFENDANTS MOTIONS TO DISMISS

### I.     Plaintiff's Allegations Against the Individual Defendants are Sufficient

The Defendants' motions rest on a false proposition: that allegations that are lodged

against "Defendants" globally are actually lodged against no one. According to the Defendants,

Plaintiff was required to specifically name which Defendant committed which particular act—

and only where he has done so does the allegation factor into a Rule 12(b)(6) determination. That, however, is not the law. To the contrary, all that Rule 8 requires is a short and plain statement that gives the Defendants fair notice of the allegations against them. There is no requirement that Plaintiff name each Defendant each time he identifies the Defendants' wrongdoing and courts have repeatedly found the group pleading that Plaintiff did proper.

### A.      Group Pleading is Proper

The Defendants have argued that group pleading is improper, but that is unsupported by the law in this district and others. Moreover, any proscription against group pleading is particularly inappropriate here. It should come as no surprise that when the Defendants set about framing Plaintiff for the crimes at issue, they did not leave a paper trail explaining their misdeeds. Thus, Plaintiff cannot point to a document in which any Defendant admits to fabricating or withholding evidence and describes in detail the manner in which he committed such misconduct. But Plaintiff has been able to piece together what the police did in total and has alleged as much in his Complaint.

Fortunately for Plaintiff, the Federal Rules of Civil Procedure do not require him to know the intimate details of the Defendants' conspiracy in order to vindicate his rights. To the contrary, the Complaint need only provide the Defendants with "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Indeed, "Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer." *Hyung Seok Koh v. Graf*, No. 11 C 2605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013). To the contrary, "[s]uch a pleading standard would effectively allow police officers to violate constitutional rights

with abandon as long as they ensured they could not be identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply." *Id.*

For that reason, courts in this district as well as around the country permit plaintiffs to plead in groups. *Echavarria*, 2017 WL 3928270, at *3-4; *see also Cuadrado v. Wall*, No. CA 08-305 ML, 2010 WL 1499589, at *2 (D.R.I. March 9, 2010) (holding that although "it is not clear from the Complaint which two officers allegedly gouged plaintiff's eyes . . . or which officers were included in the 'they' in plaintiff's allegation" that the officers kicked him, "such level of specificity is not required to show that the pleader is entitled to relief or to provide Defendants fair notice of the claims against them"), *report and recommendation adopted*, 2010 WL 1372700 (D.R.I. April 5, 2010); *Mitchell v. Rappahannock Reg'l Jail Auth.*, 703 F. Supp. 2d 549, 559 (E.D. Va. 2010) (denying motion to dismiss even though complaint referred to "all defendants" and did not specify which defendants were responsible for specific incidents); *Carter v. Newland*, 441 F. Supp. 2d 208, 213-14 (D. Mass. 2006) (allowing complaint that described "collective actions or omissions" of defendants to go forward, "although thin on detail" because it provided sufficient notice to defendants). Such a result is especially appropriate here for three reasons.

First, the events at issue here occurred more than 30 years ago and Plaintiff "is faced with the daunting prospect of obtaining evidence" that is decades-old." *Echavarria*, 2017 WL 3928270, at *4. That makes identifying defendants—particularly before discovery commences—difficult. It will be incumbent on Plaintiff, through discovery, to identify which Defendants were involved in which acts of misconduct. That is the very purpose of discovery. If he cannot do so,

then the Defendants can seek summary judgment.[1] But dismissal at this early stage is not the proper remedy.

Second, compounding the difficulty of identifying which Defendants took which actions is the nature of Plaintiff's claims. "[I]f Plaintiff is correct that Defendants fabricated and concealed evidence, such actions by Defendants would add to Plaintiff's difficulty in acquiring the evidence necessary to prove his claims." *Id.* Indeed, "much of the information he seeks is in the sole possession of Defendants," *id.*, and Plaintiff has alleged that the Defendants continue to conspire to cover up their wrongdoing, Dckt No. 2, ¶¶ 62-86, 130.

Third, and finally, the point of a Complaint—and the attendant thrust of Rule 8—is notice. But "notice is not a significant issue where Defendants are aware of their job responsibilities during the time in question and their individual actions as they relate to the investigation and prosecution of Plaintiff." *Echavarria*, 2017 WL 3928270, at *4. To that end, although the Complaint contains allegations of misconduct for which all Defendants may be jointly responsible, nothing prevents each of the named Defendants from understanding each element in the Complaint. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8 (1979) (finding that an injured party may sue single tortfeasor for full damages for an indivisible injury); *Hall v. Ochs*, 817 F.2d 920, 926 (1st Cir. 1987) (for damages in Section 1983 case, all defendants who cause the injury can be jointly found liable); *see also Richman v. Sheahan*, 512 F.3d 876, 884-85 (7th Cir. 2008) (noting that defendants may be jointly and

---

[1] It is worth noting, however, that Plaintiff may be able to win this case even if he is ultimately unable to identify which of the Defendants committed which particular acts. Plaintiff need not identify specific acts, because "[w]hile it is true that a plaintiff must establish a Defendant's personal responsibility for any claimed deprivation of a constitutional right, a Defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *see also Hafner v. Brown*, 983 F.2d 570, 578 (4th Cir. 1992) (finding liability for officers standing by while others break the law).

severally liable for injuries even if it remains unclear which of them committed specific acts). Each Defendant knows what he did or did not do, and each can admit or deny every allegation that Plaintiff has pled based on that knowledge, and consistent with that particular Defendant's view of the truth.

In short, Plaintiff has "identified a discrete group of Defendants that he reasonably believes participated in the conduct that forms the basis of his claims." *Echavarria*, 2017 WL 3928270, at *4. While he could have listed each Defendant by name instead of using the term "Defendants," that alternate invocation does not render these allegations invalid or implausible in any manner. *Id*. Rather, because Plaintiff has properly alleged the misconduct of the Defendants in investigating the assault of M.P. and prosecuting Plaintiff for a crime he did not commit, there is simply no basis for the Defendants to completely ignore the facts where group pleading was used.

## B.   Defendants' Citation to *Morales* is Unavailing

Nothing in the Defendants' citation to *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) changes this calculus. In *Morales*, the First Circuit found allegations remarkably similar to those at issue here to be sufficient: that the defendants had a practice of "issu[ing] and enforc[ing] detainers against U.S. citizens . . . without sufficient investigation into their citizenship or immigration status and without probable cause . . . ." *Id*. at 221. The plaintiff further alleged that two of the defendants, Chadbourne and Riccio, were the heads of two Immigration and Customs Enforcement ("ICE") offices and both should have known of the problem, but instead they either formulated policies to foster the misconduct or willfully ignored the problem. *Id*.

29

The Defendants home in on the following sentence and the use of the word "specific" in

*Morales*:

> Based on these detailed allegations—combined with the previously highlighted allegations discussing Chadbourne and Riccio's *specific* roles—and drawing all inferences in favor of *Morales* . . . . it is plausible that Chadbourne and Riccio either formulated and implemented a policy of issuing detainers against naturalized U.S. citizens without probable cause or were deliberately indifferent to the fact that their subordinates were issuing detainers against naturalized U.S. citizens without probable cause.

*Id.* But there is nothing in this sentence or in the use of the word "specific" that renders group

pleading invalid. Likewise, the "specific roles" that the plaintiff in *Morales* identified were that

Chadbourne and Riccio were heads of two different ICE offices and therefore either formulated

the deficient policies and practices or were deliberately indifferent to the same. That is no more

"detailed" than the Plaintiff's descriptions of the Defendants' roles here as current or former

members of the Springfield Police Department, who as police officers with the Department,

investigated the assault of M.P. Dckt No. 2, ¶¶ 16, 23, 39-64, 75, 87-88, 90-91, 94-99; *see also*

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2015) ("Second, factual

allegations in a complaint do not need to contain the level of specificity sought by the district

court."); *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (explaining that the

plausibility inquiry "does not demand a high degree of specificity") (internal quotation omitted).

For that reason, nothing in *Morales* commands more specificity than Plaintiff has already

provided.

### C.    Defendants Have Failed to Take All of the Allegations Together

Because the Defendants, in moving to dismiss Plaintiff's Complaint, excised any

allegations where they were not identified by proper name, the Defendants also failed to take all

of the allegations collectively, as they are required to do in this Circuit. *Ocasio-Hernandez*, 640

F.3d at 14. For example, the Defendants assert that the only allegations against Defendant

Kennedy are that he transported evidence to Washington, D.C. Dckt. No. 32, at 9-10. But that is

not all that Plaintiff has alleged against Defendant Kennedy. To the contrary, Plaintiff has

alleged that Defendant Kennedy, along with the other Defendants, unlawfully coerced a

fabricated admission that was used against Plaintiff; planted physical evidence and fabricated

statements to connect that evidence to the crime and to Plaintiff; and deliberately suppressed

exculpatory evidence, including of another perpetrator. Dckt No. 2, ¶¶ 41, 45-50, 59-60, 73, 78.[2]

It is axiomatic that in evaluating a complaint, a court must "evaluate the cumulative

effect of the factual allegations." *Ocasio-Hernandez*, 640 F.3d at 14; *see also Garcia-Catalan*,

734 F.3d at 103 ("We emphasize that the complaint must be read as a whole. As we have

explained, '[t]here need not be a one-to-one relationship between any single allegation and a

necessary element of the cause of action.' For pleading purposes, circumstantial evidence often

suffices to clarify a protean issue.") (quoting *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49,

55, 56 (1st Cir. 2013)). When that is properly done, there is no legitimate dispute that Plaintiff

has crossed the Rule 12(b)(6) threshold by plausibly alleging that the Defendants, in an effort to

frame him for a crime that he did not commit, coerced a fabricated confession; planted evidence

and fabricated false statements relating to that evidence; and deliberately suppressed evidence

that someone else committed that crime. *See Limone*, 372 F.3d at 45-47 (unconstitutional to

secure convictions through the use of false testimony or evidence); *Haley*, 657 F.3d at 50

---

[2]      The same errors infect the Defendants' discussion of the misconduct of Defendants Jarvis
and Kane. The Defendants allege that they can only be held liable for the misconduct in which
their name directly appears in an allegation. Likewise, the Defendants suggest that because none
of the other municipal Defendants are identified by proper name, Plaintiff has not alleged that
any of them committed any misconduct; indeed, the City goes so far as to create a chart that
mimics this improper parsing of the allegations. Dckt. No. 35-1, at 8. Because group pleading,
however, is appropriate, *see supra* Argument 2(I), this reading of Plaintiff's Complaint and the
attendant allegations against the Defendants, should be rejected.

(violates constitution to deliberately suppress evidence that would impeach State's key witnesses); *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (improper to coerce confession through "certain interrogation techniques either in isolation or as applied to the unique characteristics of a particular suspect . . . .").

## II.      The Misconduct at Issue Here Was Material

In addition to challenging the sufficiency of Plaintiff's group pleading, the Defendants also contend that Plaintiff's Complaint should be dismissed because none of the misconduct was material to Plaintiff's wrongful conviction. Instead, according to the Defendants, it was caused by one of two things: (1) faulty hair microscopy or (2) Plaintiff pleading guilty to a separate, unrelated crime. Dckt No. 35-1, at 14; Dckt No. 37, at 3. Neither contention has merit.

### A.      The Collective Misconduct was Material

Evidence is material if there is "a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the Defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Thus, a reasonable probability exists when the withholding of evidence undermines confidence in the outcome of the trial. *Id*.; *see also Drumgold v. Callahan*, 707 F.3d 28, 39 (1st Cir. 2013). Of particular importance here, materiality is evaluated cumulatively, and not item by item. *Kyles*, 514 U.S. at 436 (explaining that "[t]he fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item").

When that framework is applied to Plaintiff's allegations, which must be taken as true for purposes of Rule 12, there is no legitimate dispute that the materiality threshold has been crossed. Taken together, Plaintiff has alleged that each and every piece of evidence that was used to convict him was fabricated: his partial confession, the connection between the physical evidence (hair, blood stain and gloves) and Plaintiff and the crime, statements attributed to Plaintiff's sister, and even statements attributed to the victim—and that none of the manner in which the conspiracy to fabricate was carried out was ever disclosed to Plaintiff. Dckt No. 2, ¶¶ 49-50, 58-60, 84, 88, 94, 99. Nor did the Defendants disclose evidence relating to an alternate perpetrator. To the contrary, that too was deliberately suppressed. This misconduct, viewed collectively, was undoubtedly material to Plaintiff's wrongful conviction. *See Limone*, 372 F.3d at 46-50 (fabricating witness statements and deliberately suppressing evidence, including of actual perpetrator, material); *See Smith v. Sec. of New Mexico Dept. of Corrections*, 50 F.3d 801, 829–30 (10th Cir. 1995) (police report was material as it indicated that alternate suspect in double homicide investigation); *Bowen v. Maynard,* 799 F.2d 593, 612–13 (10th Cir.1986) (evidence was material where it related to alternate suspect who was linked to organized crime and who had a more plausible motive and opportunity to commit the crime); *Williams v. City of Boston*, CIV.A. 10-10131-PBS, 2013 WL 1336584, at *8–9 (D. Mass. Mar. 14, 2013) (finding that fabricated statements of witness were "material"); *Mendez v. Artuz,* No. 98 Civ. 2652(LMM), 2000 WL 722613, at *13 (S.D.N.Y. June 6, 2000) (evidence of another suspect having equal opportunity yet a more compelling motive than petitioner was material) (citing cases).

**B. Defendants' Arguments Do Not Warrant a Contrary Finding**

Nothing in the Defendants' arguments changes this straightforward finding. First, the Defendants argue that Plaintiff's conviction was overturned because of challenges to the validity of hair microscopy—and not because of police misconduct or a finding of no probable cause.

On that score, *Echavarria* is particularly instructive. Like the case at issue here, *Echavarria* involved allegations that certain police officers framed him for a crime that he did not commit. In moving to dismiss his complaint, the defendants alleged that because "the Massachusetts Superior Court granted Plaintiff's motion for a new trial due to ineffective assistance of counsel, and not for a failure to produce exculpatory evidence or for a due process violation . . . it is not reasonable to infer a causal link between any policy or practice of the City of Lynn and the alleged deprivations of Plaintiff's rights." *Echavarria*, 2017 WL 3928270, at *5. *Echavarria* rejected such a contention, explaining that "[a]lthough the court did not grant Plaintiff a new trial based on due process violations or wrongful suppression of evidence grounds, this does not prove that these errors did not occur." *Id.*

The same analysis governs here. Although Plaintiff was granted a new trial based on fundamental flaws in the hair microscopy analysis and attendant testimony, that does not prove that other misconduct did not occur (misconduct that was material and therefore caused Plaintiff's injury). *See*, *e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 375 (1993) ("[A] single injury can arise from multiple causes, each of which constitutes an actionable wrong.").

Similarly, and for the same reasons, the fact that the court that overturned Plaintiff's conviction did not say that probable cause was lacking does not mean that probable cause in fact existed. Moreover, while "probable cause" may be part of Plaintiff's malicious prosecution claim, it is not an element of Plaintiff's due process claims. *Williams v. City of Boston*, No. 10-

10131-PBS, 2013 WL 1336584, at *8-9 (D. Mass March 14, 2013). For example, by lodging a claim for fabrication of evidence, Plaintiff "is not alleging that the Defendants lacked probable cause to arrest him or file a criminal complaint against him." *Id*. "Instead, he is claiming that the defendants violated his right to due process by concocting false evidence and that their conduct resulted in his criminal conviction for a crime which [Plaintiff] claims he did not commit." *Id*. So too for Plaintiff's claims that the Defendants deliberately suppressed exculpatory evidence and planted physical evidence. As a result, the Defendants' arguments about probable cause are unavailing.

The Defendants' other argument is that because Plaintiff pled guilty to a completely different crime—an attempted break-in and purse snatching in the Denny's parking lot a week after M.P.'s assault—that their misconduct cannot be material. The Defendants do not elaborate on why this could possibly be so and their perfunctory treatment of this argument should alone doom it. *See Oliveira v. New Prime, Inc.*, 857 F.3d 7, 17 (1st Cir. 2017), *cert. granted*, 138 S. Ct. 1164 (2018) (arguments that are undeveloped are waived). But even if that were not so, at most, the fact that Plaintiff was simultaneously incarcerated for a completely separate crime to which he pled guilty could arguably alter his damages. *Limone v. United States*, 497 F. Supp. 2d 143, 244-45 (D. Mass. 2007) ("In the instant case, Tameleo's and Limone's sentences derived from unrelated convictions, not inextricably intertwined with the wrongful one . . .  The wrongful conviction is responsible for the overwhelming majority of Tamaleo's and Limone's terms of imprisonment, and the conductions under which they served. Removing the unconstitutional sentences from their sentences dramatically changes the picture. While I can make an adjustment to the damages for these concurrent sentences, they should not significantly affect the totals . . .")." And on that point, Plaintiff vigorously disputes the same. Not only is the sentence for an

attempted break-in and purse snatching quantitatively and qualitatively different than the

multiple life sentences that Plaintiff received for the aggravated rape, indecent assault, battery,

and unarmed robbery and burglary of M.P., but so too the type of prison to which Plaintiff—then

just 17 years old—was sent. *Id*. ("Tameleo and Limone served time under far harsher conditions

than they would have for unlawful gambling or interstate transport of stolen goods. Moreover,

life imprisonment is life imprisonment—not a term of years . . . They lived ever day of their

sentences under the mental and emotional anguish of believing that their imprisonment would

never end, that they would die without ever knowing freedom again."). Moreover, and perhaps

most importantly, the fact that Plaintiff pled guilty to unrelated, minor crimes in no way suggests

that the misconduct Plaintiff has alleged was not material to his wrongful conviction.[3]

### III.    Plaintiff Has Adequately Pled Causation

In a closely related argument, the Defendants also contend that Plaintiff's Complaint

should be dismissed because Plaintiff cannot prove that the Defendants "caused" Plaintiff's

wrongful conviction. As an initial matter, causation is an odd argument to raise in this procedural

posture. The question of whether cause—be it proximate or but-for—exists "is normally one for

the fact finder to resolve." *Gray v. Derderian*, 472 F. Supp. 2d 172, 180 (D. R.I. 2007); *see also*

*Gomez v. Rivera Rodriguez*, 344 F.3d 103, 110 (1st Cir. 2003) ("The causation question typically

is grist for the factfinder's mill."); *Lewis v. City of Boston*, 321 F.3d 207, 218-19 (1st Cir. 2003);

---

[3] Plaintiff was also convicted of a separate offense relating to the break-in of a house belonging
to a different woman, E.L. The Defendants have not argued that Plaintiff's conviction for that
offense provides a basis to jettison Plaintiff's claims. *See Martinez-Burgos v. Guayama Corp.*,
656 F.3d 7, 10 (1st Cir. 2011) (arguments raised for the first time in reply are waived). Nor could
they: The relevance of the E.L. case, like the attempted break-in and purse snatching, is only
arguably about damages. *See Limone*, 497 F. Supp. 2d at 244-45. And the amount of damages
that Plaintiff is entitled to is an evidentiary question not subject to Rule 12(b)(6) discussion or
dismissal.

*Damon v. Sun Co.*, 87 F.3d 1467, 1472 (1st Cir. 1996); *Santiago v. Sherwin Williams Company*, 3 F.3d 546, 552 (1st Cir. 1993); *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir. 1992). "It is only when the facts are undisputed and are susceptible to but one inference, that the question is one of law for the Court." *Gray*, 472 F. Supp.2d at 180 (internal citation and quotation omitted). Even then, however, "it is ripe for decision only at the summary judgment or post-trial phase of the proceedings, when the factual record has been fully developed." *Id.*

Here, there is certainly more than one inference that can be drawn from the evidence. As described above, the allegations, when taken in the light most favorable to Plaintiff, are sufficient to plausibly allege that the Defendants' actions caused Plaintiff's wrongful conviction.[4] Such a finding is particularly appropriate given Plaintiff's allegations that the Defendants all acted in concert with one another to frame Plaintiff for a crime that he did not commit. *See Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (explaining that conspiracy can be proven through circumstantial evidence); *Earle v. Benoit*, 850 F.2d 836, 844-45 (1st Cir. 1988) (same).

## IV.   The Defendants Are Not Entitled to Qualified Immunity

Finally, in an effort to avoid liability for their constitutional misconduct, the Defendants attempt to invoke qualified immunity. In doing so, however, the Defendants have re-cast the claims against them to reach the self-serving conclusion that they were acting in good faith. That argument should fail.

---

[4] Causation and materiality are closely related cousins. *Drumgold*, 707 F.3d at 49-50. As the First Circuit explained, "[o]nce a *Brady* violation has been established, there is no need to ask whether the harm (i.e., the conviction) was foreseeable. Once a *Brady* violation has been shown, the causation inquiry in a § 1983 damages suit is only a "but for" inquiry pursuant to the preponderance of the evidence standard." *Id.*

37

According to the Defendants, because "there was no widely recognized pre-existing law that called the scientific validity of hair evidence into question," the Defendants are off the hook. Dckt No. 37, at 7. But these Defendants are not being sued because they unwittingly relied on bad science. Plaintiff is the master of his Complaint and those are not the accusations that he has lodged. *See Limone*, 372 F.3d at 46 ("Courts must be . . . careful . . . not to permit a Defendant to hijack plaintiff's complaint and re-characterize it so as to minimize his or her liability"). To the contrary, Plaintiff has alleged that the Defendants fabricated evidence—planted physical evidence, including gloves and a hair, and fabricated statements to connect that evidence and an unrelated blood stain to the crimes and to Plaintiff—coerced a false, partial confession from Plaintiff, deliberately suppressed exculpatory evidence and maliciously prosecuted him for a crime that he did not commit. Dckt. No. 2, ¶¶ 5-7, 49-50, 58-61, 72, 94-97. In short, Plaintiff has made "a sweeping accusation that the [Defendants] participated in a plot to secure and sustain unjust convictions against [an] innocent m[a]n." *Limone*, 372 F.3d at 46.

This type of allegation falls squarely in the vein of *Mooney v. Holohan*, 249 U.S. 103 (1935). On that score, *Limone* explains that "*Mooney* and its pre-1967 progeny provided reasonable law enforcement officers fair warning that framing innocent persons would violate the constitutional rights of the falsely accused." *Limone*, 372 F.3d at 48. That includes by fabricating evidence—be it planting evidence or falsifying statements—deliberately suppressing evidence and unlawfully coercing a false confession. *Id*. at 48-49 (clearly established by 1967 that cannot secure convictions through the use of false testimony or evidence); *Haley*, 657 F.3d at 50 (clearly established by 1972 that cannot deliberately suppress evidence); *Miller*, 474 U.S. at 109 (explaining that proscription against use of unlawful interrogation techniques "deeply

embedded in our criminal law"); *Brown v. State of Mississippi*, 297 U.S. 278, 284, 286 (1936) (violates right against self-incrimination to "extort a confession" by physical abuse).

As *Limone* explains, "[t]here is no requirement that the facts of previous cases be materially similar to the facts *sub judice* in order to trump a qualified immunity defense. General statements of the law are capable of conveying fair warning." *Limone*, 372 F.3d at 48. Moreover, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 720, 740 (2002). That is particularly true where the misconduct is "obvious"—as it is here. *Id*. at 745.

Given this backdrop, once properly framed, there is no legitimate dispute that each of the rights that Plaintiff alleges the Defendants violated was clearly established. The Defendants' attempt to invoke qualified immunity should be rejected.

### 3. CITY OF SPRINGFIELD'S MOTION TO DISMISS

### I.     Plaintiff Has Sufficiently Pled His *Monell* Claim

The City of Springfield has also moved to dismiss Plaintiff's *Monell* claim against it. The City lodges two arguments in its effort to escape liability: (1) that the allegations are insufficient; and (2) that the City cannot be the moving force behind Plaintiff's wrongful conviction because in the State's *nolle prosequi*, the State identified other reasons for dismissing the charges. Neither contention has merit.

### A.     *Haley* Controls the Reading of Plaintiff's *Monell* Allegations

The City's primary contention is that Plaintiff has not sufficiently pled his *Monell* claim: that is, that the allegations are too thin and rote to survive a Rule 12(b)(6) motion. In making this argument, however, the City not only overlooks entirely *Haley*—which is the authoritative treatment of *Monell* claims at this stage—but also instead cites to cases either in a completely

different procedural posture or which are factually distinguishable. Those are distinctions with a difference.

Plaintiff has alleged that the City had policies and practices that allowed officers to withhold material exculpatory and/or impeachment evidence; conduct hours- and even days-long interrogations of juveniles, during which the juveniles were subject to illegal and improper psychological and physical coercion; and plant and fabricate physical and other evidence. Dckt No. 2, ¶ 103. Plaintiff additionally alleged that the City fostered this misconduct by allowing interrogations to be recorded only when consistent with law enforcement's version of events and by failing to enact proper policies and procedures for the conduct of interrogations, the collection of evidence and the memorialization of the police investigation. *Id*. ¶¶ 104-05. As a result, in repeated instances—including on multiple occasions in this very case—officers of the City deliberately suppressed investigative materials; falsified and fabricated statements, evidence and testimony of witnesses; failed to maintain or preserve evidence; and pursued wrongful convictions through profoundly flawed investigations. *Id*. ¶ 111. For example, the Defendants fabricated the statements of Plaintiff (before his arrest, after arraignment and even after his first trial); fabricated statements of his sister in an effort to falsely connect Plaintiff to a pair of gloves found in the victim's home; and even fabricated statements attributed to the victim to try to link those gloves as well as a blood stain to the crime. *Id*. ¶¶ 6, 59-60, 94-97; *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1161 (1st Cir. 1989) (explaining that "the jury could have considered the incident itself" in determining the policies and practices of the police department). Likewise, Plaintiff alleged that the City's training and oversight was deficient, which allowed these violations of criminal defendants' constitutional rights to continue unabated. Dckt No. 2, ¶¶ 106, 110.

The City complains that these allegations are insufficient, but they closely mirror those in *Haley*—which the First Circuit cited with approval. In *Haley*, the plaintiff alleged that the Boston Police Department "had a standing policy that was itself unconstitutional and that the City failed to train its personnel in their evidence disclosure obligations despite notice of persistent and ongoing violations." *Haley*, 657 F.3d at 51. The First Circuit concluded that those allegations were "sufficient to anchor two separate *Monell*-type claims, each demanding a different kind of proof." *Id*. Although the First Circuit expressly noted that the Plaintiff would need to develop evidence in discovery to support those claims, it held that the allegations themselves were sufficiently pled for Plaintiff to proceed. *Id*.; *see also Echavarria*, 2017 WL 3928270, at *5 (relying on *Haley* to find analogous *Monell* allegations "sufficient to survive a motion to dismiss"). The same result should obtain here.

### B.    The Defendants' Arguments are Unavailing

#### 1.   Plaintiff Has Identified "Numerous Individuals," Who Were Wrongfully Convicted, Including Three by Name

None of the City's claims to the contrary warrant a different finding. First, citing heavily to *Connick v. Thompson*, 563 U.S. 51 (2011), the City argues that Plaintiff's allegations are insufficient because (1) he has only identified three other incidents and (2) those three incidents are distinguishable.

Plaintiff has identified "numerous individuals" who were wrongfully convicted and specifically named three. Dckt No. 2, Compl. ¶ 115. That is more than sufficient at this stage. Indeed, in *Haley*, the First Circuit held adequate plaintiff's allegation that there were "volumes" of other cases where the police had withheld evidence—without specifying any—to be enough to overcome a motion to dismiss. *See Haley*, 657 F.3d at 53; *Owens*, 767 F.3d at 402-04 (finding allegations of "reported and unreported cases" sufficient). That is because the question of

41

whether Plaintiff has alleged enough to pursue his *Monell* claim is very different from whether

he has—through discovery—marshaled sufficient evidence to prove it. Or rather, while

"prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by

definition, easier." *Owens*, 767 F.3d at 403. The three incidents the Defendants complain of help

demonstrate the plausibility of Plaintiff's claim; they do not limit it.

Indeed, the invocation of *Connick* on this score is unavailing. *Connick* was a review of a

verdict on plaintiff's *Monell* claim following a jury trial. Unlike a motion to dismiss, by the time

of trial, plaintiff had had time to conduct discovery and present evidence in support of his

claim—and was still unable to meet the evidentiary threshold required for a *Monell* claim.

Notably, the plaintiff did not even contend that he had proven a pattern of similar violations.

*Connick*, 563 U.S. at 62.[5]

Nor can the City save its Rule 12(b)(6) motion by arguing that some of the incidents

Plaintiff identified are different in time (or even arguably substance).[6] As the City must concede,

---

[5] *Connick* also involved a claim that the district attorney's office failed to train its prosecutors in
the nuances of *Brady*. The Court held that unlike law enforcement, prosecutors are "trained in
the law and equipped with the tools to interpret and apply legal principles, understand
constitutional limits, and exercise legal judgment." *Connick*, 563 U.S. at 64. For that reason,
"[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of
*Canton*'s hypothesized single-incident liability." *Id*. The same cannot be said for the failure to
train law enforcement officers. *Cf. id*. ("There is no reason to assume that police academy
applicants are familiar with the constitutional constraints on the use of deadly force. And in the
absence of training, there is no way for novice officers to obtain the legal knowledge they
require. Under those circumstances, there is an obvious need for some form of training. In stark
contrast, legal training is what differentiates attorneys from average public employees.")
(internal quotation omitted).

[6] Notably, the City spends significant effort trying to prove the veracity (or lack thereof) of the
three incidents. The Defendants' efforts to do so, however, should be rejected. The Defendants
ask this Court to use the procedural status of the related civil litigation as a proxy for the truth of
the underlying allegations. But this Court can no more take judicial notice of the fact that a
summary judgment was rejected for proof that the plaintiff's allegations were true than for proof
that the allegations are false; judicial notice simply does not reach such contested issues. *See
Presby Constr. Inc. v. Clavet*, No. 00-457-M, 2001 WL 951375, at *1 (D.N.H. Aug. 9, 2001)

the wrongful conviction of Mark Schand is close in time to the crime at issue here. And for the

two others—the wrongful convictions of Charles Wilhite and Rolando Penate—the First Circuit

has clearly held that evidence that post-dates an incident can be relevant to show the policies and

practices that existed prior to that time. *See Bordanaro*, 871 F.3d at 1167 (explaining that

"[p]ost-event evidence can shed some light on what policies existed in the City on the date of an

alleged deprivation of a constitutional right").[7] To that end, although the City suggests that the

---

(explaining that courts cannot take judicial notice of testimony in prior proceedings for the truth of the matter testified to). Moreover, neither a Complaint nor a motion to dismiss is the time to "prove" anything. That comes later—after discovery. *See Haley*, 657 F.3d at 52 (explaining that the motion to dismiss stage "is neither the time nor the place to resolve factual disputes between the parties," and whether the plaintiff could "prove what he has alleged is not the issue").

[7] For additional support for that proposition, *see Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (noting that "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right, " and inferences from such post-event facts "lend weight to a finding that there was a policy behind the actions which led to the constitutional violation") (quoting *Bordanaro*, 871 F.2d at1167, and *Kibbe v. City of Springfield*, 777 F.2d 801, 809 (1st Cir. 1985) (internal quotes omitted));  *Beck v. City of Pittsburg*, 89 F.3d 966, 972 (3d Cir. 1996) (explaining that subsequent events "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force"); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made."); *Groark v. Timek*, 989 F.Supp.2d 378, 398 (D. N.J. 2013) ("Subsequent incidents, however, may be relevant to show a continuous pattern that supports a finding of an accepted custom or policy.") (citing *Beck*, 89 F.3d at 972); *Collins v. City of New York*, 923 F.Supp.2d 462 (E.D.N.Y. 2013) (citing *Grandstaff, Bordanaro*, and *Henry*, and concluding in a wrongful conviction case: "Subsequent events may, as the City argues, reflect only [the policy maker's] support for a subordinate accused of wrongdoing. But the lack of any corrective action might also reflect a tacit policy on [the city supervisor]'s part to condone whatever his subordinates deemed necessary to secure a conviction"); *Padilla v. City of Chicago*, No. 06-C-5462, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009) ("The Seventh Circuit has recognized that "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy.") (citing *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir.1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988)).

only purpose of identifying these other cases is "notice," that is simply not so. They are evidence of the City's policy and practice—one that apparently has not changed in the 30 years since Plaintiff was wrongfully convicted.

Likewise, the allegations are not so distinct: At bottom, Plaintiff is alleging that he was framed for a crime that he did not commit. To accomplish that nefarious purpose, the Defendants coerced a fabricated confession, planted physical evidence and fabricated statements to connect that evidence to Plaintiff and the crime at issue, and deliberately suppressed exculpatory evidence. Dckt No. 2, ¶ 5-7, 49-50, 58-61, 72, 94-97. Similar allegations control the wrongful convictions of Schand, Wilhite and Penate.

### 2. *Kennedy* and *Saldivar* are Distinguishable

Alternatively, the City attempts to analogize this case to *Kennedy v. Town of Billerica*, 617 F.3d 520 (1st Cir. 2010) and *Saldivar v. Racine*, 818 F.3d 14 (1st Cir. 2016). But both cases are distinguishable and neither case warrants granting the relief the Defendants have requested.

As to *Kennedy*, like *Connick*, this case arises post-trial; that is, after the plaintiff had an opportunity to conduct discovery and to prove his claims. That alone distinguishes it from the instant case. *See Haley*, 657 F.3d at 53; *Owens*, 767 F.3d at 403. In addition, in *Kennedy*, the First Circuit had granted a new trial on the underlying constitutional violation—the false arrest claim. *Monell*, of course, requires such a violation for a finding imposing liability; therefore, when the First Circuit vacated the jury finding on the false arrest claim, it likewise vacated the *Monell* finding. *Kennedy*, 617 F.3d at 531-32. By contrast, Plaintiff has sufficiently alleged underlying violations, which are the subject of his *Monell* claims, making *Kennedy* inapposite.

So too for *Saldivar*. In *Saldivar*, the plaintiff alleged that a police officer assaulted, battered and raped her at gunpoint after she called the police to report that her child had been

harassed at school. 818 F.3d at 16. The plaintiff sued both the responding officer who had

attacked her and, of relevance here, the police chief (Racine), including under a *Monell* theory.

*Id*.

       *Saldivar* upheld the dismissal of the *Monell* claim. There, the only *Monell* allegation that

the plaintiff lodged was that Racine was the final policymaker. *Id*. at 20. On that score, *Saldivar*

held that "even assuming that the allegation that Racine is a final policymaker is plausible, that

allegation is not enough." *Id*. That is because the gravamen of plaintiff's complaint was not that

Racine set unconstitutional policies—or even that he permitted unconstitutional practices to

flourish—which are the claims Plaintiff has lodged here. Instead, in *Saldivar*, the allegation was

that Racine had specific knowledge that the responding officer would or was likely to assault

plaintiff and was deliberately indifferent to that known risk. *Id*. at 19. And the First Circuit

simply found that such an assertion was not plausible given the allegations in the complaint. *Id*.

Indeed, all that the plaintiff alleged was that the assaulting officer "had a propensity for not

following police regulations" and thus might do so in the future. *Id*. But not following police

regulations is a far cry from raping a victim-complainant at gunpoint.

       Plaintiff's case stands in stark contrast. He has not alleged that the City is liable because

the final policymaker failed to discipline a particular bad actor. Nor that the City should have

forecasted that the particular officers in this case would deprive Plaintiff of his constitutional

rights based on previous (unrelated) misconduct. Instead, Plaintiff has alleged that the City had

unconstitutional policies and practices, and deficient training and oversight that enabled and

caused the constitutional violations at issue here. Dckt No. 2, ¶ 102-117.

### 3. The *Nolle Prosequi* Filing by the State is Not Properly Before this Court and Does Not Support the City's Motion

Finally, the City invokes the *nolle prosequi* filing by the State in an effort to jettison Plaintiff's *Monell* claim. In essence, the City argues that the *nolle* order proves that Plaintiff's conviction was overturned for reasons other than the City's unlawful policies and practices. There are two significant problems with this argument, both of which doom it.

First, as described more fully in Argument 1(I) above, although this Court can take judicial notice that the State filed a motion for a *nolle prosequi*, it cannot take judicial notice of the veracity of the statements in that *nolle*. *See United States v. Simon*, 842 F.2d 552, 555 (1st Cir. 1988) ("The only 'sources' to which counsel pointed to prove the university's existence were a telephone number and an address, which he asked the court to believe belonged to the university. Even if he had offered the actual phone book and not just the numbers, he could, at most, only have required the Court to take notice of the fact that the university's phone number and address were listed, not that the university existed."); *see also Presby Constr.*, 2001 WL 951375, at *1 (cannot take judicial notice of prior testimony for the truth of the testimony). Indeed, the only way the statements in the *nolle* could be before this Court at all would be if this Court converted the Defendants' motion to dismiss into one for summary judgment—a request that the Defendants have not made and which the Plaintiff vigorously contests would be appropriate, particularly given Plaintiff's inability to conduct discovery and the First Circuit's explanation that a motion to dismiss is not the time to prove or disprove Plaintiff's allegations. *Haley*, 657 F.3d at 52.[8]

---

[8] If this Court were to convert the City's pending motion to dismiss into one for summary judgment, then Plaintiff would seek relief under Rule 56(d). Having had no time to conduct discovery into his claims, particularly where most of the information is in the exclusive

Second, even if this Court were to convert the motion to one for summary judgment to consider the *nolle*, all of the statements are hearsay for the purpose for which the City seeks to use them—to prove the truth of the matters asserted; that is, that Plaintiff's indictment was dismissed for reasons unrelated to the City's policies and practices. *See* Fed. R. Evid. 801. That is particularly so because causation questions—like *Monell* causation—are ordinarily questions for the jury and not for resolving on the Defendants' self-serving say-so. *See Gomez*, 344 F.3d at 100; *Lewis*, 321 F.3d at 218-19; *Damon*, 87 F.3d at 1472; *Santiago*, 3 F.3d at 552; *Dedham Water Co., Inc.*, 972 F.2d at 457; *Gray*, 472 F. Supp. 2d at 180.

And finally, as mentioned earlier, the fact that relief may have been obtained on one ground does not disprove the existence of another—no matter the ground on which the State decided to *nolle*, that could never disprove Plaintiff's allegations about the City's policies. *Echavarria*, 2017 WL 3928270, at *5. ("Although the court did not grant Plaintiff a new trial based on due process violations or wrongful suppression of evidence grounds, this does not prove that these errors did not occur.").

## 4. DEFENDANT BLOOM

### I.      Plaintiff is Not Suing Defendant Bloom For Bloom's Actions as a Prosecutor, So Absolute Prosecutorial Immunity Does Not Apply

Defendant Bloom moves to dismiss the claims against him under Rule 12(b)(1), arguing that prosecutorial immunity applies. Bloom bears the burden of convincing this Court that he is entitled to absolute immunity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). That is no light burden: the presumption is that qualified, rather than absolute immunity is sufficient to protect government officials. As a result, courts must be "quite sparing" in recognizing absolute

---

possession of the Defendants, it would be particularly inappropriate to jettison the claim on summary judgment. *See Haley*, 657 F.3d at 52.

immunity, and must refuse to extend such immunity any "further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991). The justification does not go very far: prosecutors are entitled to absolute immunity only for their conduct that is "intimately associated with the judicial phase of the criminal process." *Buckley*, 509 U.S. at 270 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). The Court has regularly rejected prosecutors' attempts to stretch their immunity beyond this core application. *Id*. at 273–74 (no absolute immunity for fabricating evidence against a suspect during initial investigation); *Kalina v. Fletcher*, 522 U.S. 118, 130–31 (1997) (no absolute immunity for acting as a complaining witness); *Burns*, 500 U.S. at 496 (no absolute immunity for giving legal advice to police). Moreover, Defendant Bloom's burden is particularly high at this stage because Plaintiff's allegations must be accepted as true and reasonable inferences must be drawn in his favor. *Filler v. Kellett*, 859 F.3d 148, 150 (1st Cir. 2017) (citing *Buckley*, 509 U.S. at 261); *id*. at 154 (defendant must accept the facts as set forth in the complaint, rather than making arguments based on his own view of what transpired).

Bloom has come nowhere close to carrying his heavy burden. Indeed, to even advance his argument, Bloom had to first recast Plaintiff's complaint into something it is not. That is, while Plaintiff explicitly stated that he sued Bloom only for acts taken as an investigator, Dckt No. 2 ¶¶ 18, 131, Bloom has unilaterally decided that Plaintiff did not mean exactly what he said, and that Plaintiff is seeking to hold Bloom accountable for *prosecutorial* misconduct. But that is simply not so. *Cf. Limone*, 372 F.3d at 46 (courts must be careful "not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability"). Plaintiff is the master of his complaint, and Plaintiff appropriately limited his suit against Bloom to conduct Bloom took as an investigator, for which there is no absolute immunity. *Id*. at 273 ("A prosecutor's administrative duties and those investigatory functions that do not relate to an

48

advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."); *Burns*, 500 U.S. at 494–96.

Defendant Bloom's motion misses the mark on both the law and facts. First, Bloom states that there was probable cause to arrest Plaintiff, and argues that because Bloom's conduct took place after the arrest, he is absolutely immune as a matter of law. Bloom makes that argument twice. Dckt No. 43 at 8 ("Once Plaintiff was placed under arrest, . . ."); *id*. at 11 ("Once a lawful arrest predicated on probable cause occurred . . ."). The legal problem for Bloom is that both the Supreme Court and the First Circuit have flatly stated a contrary rule: "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5; *Filler*, 859 F.3d at 153 ("Importantly, absolute immunity does not necessarily apply to all actions that a prosecutor may take once the 'judicial phase' begins."); *id*. at 154 ("[T]he fact that a prosecutor engaged in certain activities after a prosecution had already commenced is not necessarily dispositive of the question whether absolute immunity attaches."). Instead, the inquiry remains at all times a functional one: was the defendant acting as an investigator or a prosecutor? *Filler*, 859 F.3d at 153–54.

Even more problematic for Defendant Bloom is that to even make his argument—which is wrong on the law—he had to conveniently obscure an important fact in this case: Plaintiff was arrested for completely different crimes taking place on a completely different day—the purse-snatch and attempted break-in at Allendale Circle. Dckt No. 2 ¶ 37, 43. So not only is Plaintiff's arrest not *determinative*, as just explained, it's not even *relevant*, as it would be in a more typical case. In a typical case, when a person is arrested for a crime, probable cause (or at least some evidence) exists to believe he committed that crime. In such a case, the prosecutor can make a

straight-faced argument that his subsequent conduct was aimed at evaluating the evidence and

preparing the State's case for trial—conduct that is absolute immune. No such argument can be

made here—at least not with a straight face—because the facts are completely different: when

Plaintiff was arrested for different crimes that happened on a different day, there was zero

evidence, and zero reason to believe, that he had anything to do with M.P.'s assault. According

to Plaintiff's good-faith, well-pleaded allegations, there was *never* probable cause to suspect him

of M.P.'s assault. Dckt No. 2 ¶ 101. At this stage, that factual allegation is accepted as true and it

is dispositive of Defendant Bloom's motion. *Filler*, 859 F.3d at 155 (absolute immunity cannot

apply before there is probable cause) (citing Supreme Court and sister-Circuit cases); *Whitlock v.*

*Brueggemann*, 682 F.3d 567, 579 (7th Cir. 2012) ("Under the functional line the Supreme Court

drew in Buckley, a prosecutor does not enjoy absolute immunity before he has probable cause.");

*Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (noting that "if [the plaintiff] is

believed," probable cause could never exist, and prosecutor was not absolutely immune for his

fabrication of evidence).

Because there was no probable cause, and indeed no reason at all to suspect Plaintiff for

M.P.'s assault, Defendant Bloom was not acting as a prosecutor. That is, he was not *evaluating*

any evidence to initiate charges or prepare for a trial; rather, he was *creating* evidence out of

whole cloth to bring about charges and a trial that otherwise never could have occurred.[9] For that

---

[9] Of course, the fact that there was eventually a trial does not retroactively immunize Bloom's
misconduct. *Burns*, 500 U.S. at 495 ("Almost any action by a prosecutor, including his or her
direct participation in purely investigative activity, could be said to be in some way related to the
ultimate decision whether to prosecute, but we have never indicated that absolute immunity is
that expansive. Rather, as in *Imbler*, we inquire whether the prosecutor's actions are closely
associated with the judicial process."); *Buckley*, 509 U.S. at 276 ("A prosecutor may not shield
his investigative work with the aegis of absolute immunity merely because, after a suspect is
eventually arrested, indicted, and tried, that work may be retrospectively described as
"preparation" for a possible trial; every prosecutor might then shield himself from liability for

reason, Bloom finds no support in the cases he cites for the proposition that sometimes investigatory-type work might be immunized when it consists of finding "additional" information, or when it is done "during the course of preparing for trial," or when it is "directly connected with the conduct of a trial." Dckt No. 43 at 10.[10]

From the very start, and all before Plaintiff's indictment, Defendants—including Bloom—coerced a confession they knew to be false, forged Plaintiff's initials and signature, and planted hair and blood evidence, among other misconduct. Because no valid evidence ever existed against Plaintiff there was never probable cause, and Bloom's participation in the frame-up of Plaintiff was no different than the participation of the police officers. *Cf. Buckley*, 509 U.S. at 269 (court must look to "the nature of the function performed, not the identity of the actor who performed it"); *id*. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). There is, of course, no absolute immunity for Bloom's participation in that misconduct. *Buckley*, 509 U.S. at 275 ("Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity."); *Cignetti v. Healy*, 89 F. Supp. 2d 106, 115 (D. Mass. 2000) (no absolute immunity for fabricating evidence when no

---

any constitutional wrong against innocent citizens by ensuring that they go to trial."); *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995) ("The prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches.").

[10] One of the cases Bloom cites is *Forsyth v. Kleindienst*, 599 F.2d 1203, 1215 (3d Cir. 1979). Dckt. 43 at 10. Bloom described that case as holding that the "attorney general [was] entitled to absolute immunity for authorizing warrantless wiretap." That's not right. The court said that the attorney general would be entitled to such immunity *if* he authorized the wiretap when exercising his "quasi-judicial" authority, but not if he was acting as an investigator. 599 F.2d at 1215. And when the case reached the Supreme Court, the Court held that the attorney general was *not* entitled to absolute immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985).

probable cause exists; it "would be incongruous to give absolute immunity to prosecutors but only qualified immunity to police officers for engaging in the same activity").

Bloom notes in his brief that Plaintiff alleged the false evidence was "used" at trial. Dckt No. 43 at 9; Dckt No. 2 ¶¶ 76. But Bloom is improperly cherry-picking from Plaintiff's complaint. That paragraph, which discusses Bloom's opening statement, merely demonstrates that the false evidence was material to the injury Plaintiff suffered—something Plaintiff was required to plead.[11] *See Buckley*, 509 U.S. at 271–72 (injury suffered is relevant to whether the complaint adequately alleged a cause of action for damages, but is not the focus of the immunity analysis). Just because Plaintiff's Complaint mentioned Bloom's use of the evidence at trial does not mean that Plaintiff is trying to sue Bloom for his opening statement or his presentation of evidence to the jury. Instead, Plaintiff is suing Bloom for his role in *creating* the false evidence before the existence of probable cause. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("[A] showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial.") (citing *Buckley*, 509 U.S. at 276); *Cignetti v. Healy*, 89 F. Supp. 2d 106, 114–15 (D. Mass. 2000) (prosecutors absolutely immune for offering a tape into evidence, but not for fabricating it in the first place).[12]

Plaintiff alleges that Bloom had a role in planting the hair and blood evidence and took other steps that caused Plaintiff to be wrongfully convicted. Dckt No. 2 ¶¶ 6, 59, 60, 65, 73, 75,

---

[11] *Cf. Buckley*, 509 U.S. at 271–72 (that the misconduct led to a conviction is "relevant to the question whether a complaint has adequately alleged a cause of action for damages" but not relevant to the immunity analysis).

[12] For additional support, *see Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016) (prosecutor absolutely immune for presentation of false evidence to grand jury, but not for earlier misconduct in the investigatory stages); *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 932–33 (8th Cir. 2008); *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003); *Moore v. Valder*, 65 F.3d 189, 194–95 (D.C. Cir. 1995).

79, 83, 84, 85.[13] Moreover, as discussed in Argument 2(I), Plaintiff was not required to needlessly lengthen his Complaint by re-alleging each fact and specifically naming each Defendant who participated in the alleged conduct. Defendants acted in concert and that is how Plaintiff framed his Complaint, in an effort to keep it "short and plain" as required by the Federal Rules. Discovery in this case will show which Defendants were personally and directly involved in which specific acts of misconduct. Based on sworn testimony and court findings in the criminal proceedings, Plaintiff expects the evidence, once developed in this case, to show, at a minimum, that in addition to planting evidence, Defendant Bloom was involved in pre-indictment, pre-probable cause, investigatory conduct including at least: designing the improper and unduly suggestive lineup that M.P. viewed, participating in the improperly coercive interrogation of Plaintiff and fabricating Plaintiff's pre-indictment statements.[14] Plaintiff's allegations against Bloom are well-pleaded and plausible, especially considering the egregious bad faith evidenced by Bloom's later conduct, including Bloom's admitted forgery of Plaintiff's

---

[13] Bloom personally drove the evidence from Springfield, Illinois, to Washington, D.C., and met with the FBI experts (who had no personal knowledge of the case or pre-existing intention to testify) to tell them that Plaintiff was the target and was an "inherently evil" "sociopath." Dckt. 2 ¶¶ 75, 90. That is the type of witness tampering and shopping at issue in *Buckley*, 509 U.S. at 262–63, rather than merely preparing an existing witness for the presentation of trial testimony, as in *Parra v. State of N.H.*, 40 F.3d 1235 (1st Cir. 1994) (table opinion). That personal involvement, along with his forging of Plaintiff's signature, demonstrates that there is no merit to Bloom's argument that Plaintiff is baldly seeking to hold Bloom liable for the misconduct of the police officers. *See* Dckt. 43 at 12.

[14] Finally, as Bloom admits in his brief, Dckt No. 43 at 15, he forged a confession and tried to use it to pressure two of Plaintiff's friends to confessing that they, along with Plaintiff, raped a different elderly woman in Springfield in the same timeframe. Plaintiff's friends did not confess and were never arrested or prosecuted. The incident shows beyond a shadow of a doubt that when it came to Plaintiff and the rapes of elderly women in the mid-1980s in Springfield, Bloom was more than willing to step out of his role as a prosecutor and act as a hard-nosed and unethical investigator.

signature on a "confession," Dckt No. 2 ¶ 95, and Bloom's diary entries referring to Plaintiff as "inherently evil" and a "sociopath," *id.* ¶ 89.[15]

To be sure, when Bloom filed papers with the court, or made his opening statement, or put witnesses on the stand, he was acting as a prosecutor and has absolute immunity—but Plaintiff is not suing Bloom for any of that. Defendant Bloom bore the burden of proving that the specific actions that Plaintiff alleges violated Plaintiff's constitutional rights would have been absolutely immune at common law, and Bloom has come nowhere close to carrying that burden. *Cf. Buckley*, 509 U.S. at 281 (Scalia, J., concurring) (noting that because the defendant bears the burden, "if application of the principle is unclear, the defendant simply loses"); *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995) ("Quite plainly, when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."). Defendant Bloom's Rule 12(b)(1) motion for dismissal on grounds of absolute immunity should be denied.

## II.     Defendant Bloom is Not Entitled to a Rule 12(B)(6) Dismissal

Setting absolute immunity to the side, Defendant Bloom argues that the claims against him should be dismissed because they are not plausibly pleaded, or because he is entitled to *qualified* immunity. Neither argument has merit.

---

[15] To be clear, although Plaintiff detailed all of Bloom's misconduct in his Complaint, he is only seeking to hold him liable for the investigatory acts that he took prior to the existence of probable cause—or in other words, prior to Plaintiff's indictment. The later conduct, however, while not forming a basis for liability, demonstrates both the plausibility of Plaintiff's other allegations against Bloom—he had a personal vendetta against Plaintiff and would stop at nothing to falsely convict him—and Bloom's bad faith.

**A. Plaintiff's Claims Against Bloom are Well-Pleaded and Plausible**

The first argument should not be entertained by this Court because Bloom merely waived his hands at it and did not even attempt to lay the argument out in good faith. He dedicates less than a page of text to the argument, about half of which is citation and quotation to boilerplate legal standards, and none of which is an *explanation* of how those standards apply to this case. It is not this Court's job to make Defendant Bloom's arguments for him, nor is it Plaintiff's burden to rebut a hypothetical argument that Bloom could have made. *See Oliveira*, 857 F.3d at 17, *cert. granted*, 138 S. Ct. 1164 (arguments that are undeveloped are waived); *McDonough*, 673 F.3d at 49 n.14 (citing *Brown*, 891 F.2d at 352) (issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). And in any event, Plaintiff's allegations more than satisfy Federal Rule of Civil Procedure 8 and the plausibility standards: As to liability, Plaintiff alleges that Bloom (along with the other Defendants), framed Plaintiff for a crime he did not commit. To that end, Bloom participated in the illegal interrogation, helped design the improper lineup and had a role in planting the physical evidence and fabricating its connection to Plaintiff and the crime. Dckt No. 2 ¶¶ 6, 59, 60, 65, 73, 75, 79, 83, 84, 85.[16] The allegations against Bloom are well-pleaded and plausible, especially considering the bad faith evidenced by his subsequent conduct, including that he forged Plaintiff's signature on a "confession," *Id*. ¶ 95, and Bloom's diary entries referring to Plaintiff as "inherently evil" and a "sociopath," *id*. ¶ 89. The pleading standards are more than met here.

**B. Defendant Bloom is not Entitled to a Rule 12(b)(6) Dismissal on Grounds of Qualified Immunity**

In arguing that the doctrine of *qualified* immunity entitles him to an early exit from this suit, Defendant Bloom makes arguments—again, none of which have merit—about his admitted forgery of a false confession, about collateral estoppel, and about the state of the law on a defendant's duty to intervene when he has a reasonable opportunity to prevent a constitutional violation. Plaintiff addresses these arguments in turn.

1. **Bloom's Admitted Forgery Shows His Hatred of Plaintiff and His Bad Faith, and Demonstrates the Plausibility of the Other Allegations; Those Allegations Plainly Defeat Bloom's Claim to Qualified Immunity**

There is no dispute that Bloom forged Plaintiff's signature on a false confession. Plaintiff specifically alleged that Bloom intended for the forgery to be used against Plaintiff in his second trial. Dckt No. 2 ¶¶ 95, 98. But in his brief, Bloom painted things in a light he thought more favorable to himself, arguing that all he was trying to do was use the forgery against *other* people, not Plaintiff. Dckt No. 43 at 15. But Bloom cannot win a 12(b)(6) motion by rejecting well-pleaded factual allegations that he does not like and injecting additional facts into the record that are not part of Plaintiff's Complaint (and are hotly disputed). *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 8 (1st Cir. 2013) ("The two-step procedure for assessing a plea of qualified immunity at the motion to dismiss stage is well-rehearsed. *On the basis of the pleadings*, we must decide (1) *whether the facts alleged or shown by the plaintiff* make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation.") (emphasis added and internal quotation marks omitted).[17]

---

[17] And Bloom's version is false. While none of this was required to be in Plaintiff's "short and plain" complaint, based on earlier proceedings Plaintiff expects the evidence in this case to show that when confronted with the forgery, Bloom denied knowing anything about it, and only days later came up with his story. Moreover, after using the forged "confession" against other people, Bloom then put it in the prosecutor's file *for the case against Plaintiff*, and said nothing to

Moreover, Bloom using the forged confession against other people is hardly benign. Those other people were two of Plaintiff's friends, the crime Bloom was pressuring them to confess to was another break-in and rape of an elderly woman, and he wanted them to confess to having done that crime *with Plaintiff*. Had he been successful, no doubt he would have used the friends as witnesses against Plaintiff. But they did not confess, and were never prosecuted. No matter what inferences are drawn from this sordid affair, it is beyond any colorable debate that when it came to Plaintiff and the rapes of elderly women in the mid-1980s in Springfield, Defendant Bloom was acting less as a prosecutor and more as an unethical investigator out to get Plaintiff.

So while it is true that this particular part of Bloom's unconstitutional and unethical plan was fortuitously thwarted, these facts fit hand-in-glove with Bloom's documented hatred of Plaintiff. Dckt No. 2 ¶ 89. They demonstrate Bloom's bad faith and his willingness to pressure people into confessing to crimes they did not commit, and they make more plausible all the other allegations against Bloom for which Plaintiff seeks to hold him liable. Indeed, it is completely duplicitous for Bloom to complain that Plaintiff included in his Complaint the details of Bloom's forgery, while also saying that the complaint doesn't "suggest" that Bloom "knowingly" violated Plaintiff's rights. Dckt No. 43 at 17.

In addition to forging Plaintiff's signature on a false confession and trying to have it used at Plaintiff's second trial, Defendant Bloom had a role in planting the hair and blood evidence or in encouraging the FBI agents to fabricate the results of the tests. Dckt No. 2 ¶¶ 6, 59, 60, 65, 73,

---

anyone about it being fake. The prosecutor for the second trial did exactly what Bloom intended: she found the "confession" and prepared to use it to obtain an easy conviction against Perrot. Fortuitously, because Bloom also forged (or caused someone else to forge) Defendant Kelly's signature on that document, and Defendant Kelly brought that to the prosecutor's attention, this part of Bloom's wrongful plan was thwarted.

75, 79, 83, 84, 85. Regarding the hair, Bloom notes that Plaintiff alleged that Defendant Oakes withheld some information from Bloom about the unknown hair not matching Plaintiff's hair. *Id.* ¶ 72. But that allegation does not mean that Bloom had no role the fabrication. Indeed, Bloom drove all the way to Washington, harboring his ill-will toward Plaintiff, specifically so he could talk to Oakes before Oakes looked at the evidence—and in doing so, influenced Oakes. Dckt. 2 ¶¶ 75, 90. There is nothing inconsistent about Bloom having participated in the fabrication without knowing—or indeed caring—about the specific details (which Plaintiff alleges were withheld from Bloom and from Plaintiff's defense team). Moreover, Bloom entirely skips over the fact that Plaintiff alleged, in the alternative, that the hairs *did* match and that Defendants (including Bloom) planted Plaintiff's hair on M.P.'s bed sheet. Dckt No. 2 ¶ 73. Defendant Bloom does not mention this at all, which on its own defeats his request for qualified immunity.[18]

Additionally, as discussed in the prior section, Bloom also helped design the improper and unduly suggestive lineup that M.P. viewed and participated in the unconstitutionally coercive interrogation of Plaintiff. Most of this conduct took place pre-indictment, all of it took place before there was probable cause, and all of it was in Bloom's role as an investigator, which means he is entitled to only qualified immunity. And as discussed above for the police officers, it was more than clearly established in the 1980s that it violated the constitution to fabricate evidence and frame an innocent man for a crime he did not commit.

## 2. Plaintiff is not Estopped from Demonstrating His Half-admission was Coerced

---

[18] Discovery is needed to determine which of these alternatives is actually the case. As Plaintiff has argued above, Defendants framed him and concealed evidence and their actions, rather than leaving a paper trail. The need for discovery does not inure to Defendant Bloom's benefit, however. *See Irish v. Maine*, 849 F.3d 521, 528 (1st Cir. 2017) (vacating dismissal on qualified-immunity grounds because factual development needed).

As discussed in the fact section above, Defendants aggressively interrogated 17-year-old Plaintiff while he was highly intoxicated, threatened him, blocked him from getting any sleep, blocked his mom from speaking to him, and fed him facts he did not know so they could be put into an inculpatory statement. Hoping to side-step all those facts, Defendant Bloom argues that Plaintiff is collaterally estopped from "litigating the voluntariness of his confession." Dckt No. 43 at 14–15. As an initial matter, Defendant Bloom's estoppel argument would not justify dismissing the claims against him, as he is plausibly alleged not only to have helped coerce a confession, but also to have fabricated evidence (including hair and blood evidence) against Plaintiff.[19]

As the party arguing for preclusion, Defendant Bloom bore the burden of proof on the issue. *Alicea v. Com.*, 466 Mass. 228, 236 (2013); *Longval v. Comm'r of Correction*, 448 Mass. 412, 416–17 (2007). He has failed to carry his burden; indeed, he fails to meet the very standard that he admits is the right one: Plaintiff had to have previously litigated that issue, lost, and that loss had to be essential *to a valid and final judgment*. Restatement (Second) of Judgments § 13 (1982)). But that precondition is not met where, as here, the earlier judgment has been set aside. *Id.* ¶ 13 cmt. f; *Lingis v. Waisbren*, No. SUCV200600717, 2011 WL 6379283, at *2 (Mass. Super. Oct. 5, 2011) ("The arguments of res judicata, claims preclusion, and collateral estoppel are not persuasive. . . . Here, of course, the final judgment plaintiff achieved was vacated and the case dismissed. No final judgment has entered for the defendant."). The upshot is that Plaintiff is

---

[19] Indeed even as to the confession itself, there is a difference between coerced evidence (which can be true, despite having been coerced) and *fabricated* evidence. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Petty v. Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014). Here, Plaintiff alleges that his confession was *both* coerced *and* fabricated. Dckt. 2 ¶ 50. The Defendants' fabrication has never been litigated and thus estoppel has no application here, and the litigation of this case will necessarily involve discovery into the details of how and why the Defendants fabricated the confession.

not barred from arguing that any statements inculpating himself in the crimes against M.P. were unconstitutionally coerced, because Plaintiff's wrongful convictions for those crimes have been vacated.

The analysis in the prior paragraph is not only common sense, and supported by the Restatement, but also is supported by an abundance of precedent from around the entire country firmly establishing that once someone has been exonerated, the rulings at his criminal trial have no preclusive effect because there is no longer a valid final judgment against him. *Aguillard v. McGowen*, 207 F.3d 226, 229 (5th Cir. 2000) (conviction that has been overturned cannot constitute a final judgment for purposes of collateral estoppel); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (once a conviction is vacated, there is nothing "to which [a later court] may accord preclusive effect"); *Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir. 1992) ("A judgment vacated or set aside has no preclusive effect."); *Tillman v. Orange Cty., Fl.*, 519 F. App'x 632, 637–38 (11th Cir. 2013) (issues determined at criminal trial had no preclusive effect because the conviction had been set aside); *see also Peterson v. Heymes*, 2017 WL 4349456 (W.D. MI, Sept. 29, 2017) (comprehensively examining federal law and concluding that a prior finding of voluntariness is not binding once a conviction is vacated).

For a very recent application of this rule, specifically in the context of a coerced confession and a subsequent civil-rights suit, in a thoroughly reasoned opinion, *see Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 1308946, at *9 (N.D. Okla. Mar. 13, 2018) ("[T]his case is a federal civil rights case, brought after the State of Oklahoma opted not to retry Murphy and at a point when, procedurally, no valid state conviction or judgment exists. This court cannot give preclusive effect to a legal nullity.") (citing numerous cases from around the

country). In short, Defendant Bloom came nowhere close to carrying his burden; collateral estoppel does not apply here.

### 3.  Defendant Bloom Can be Liable for His Failure to Intervene and Stop the Ongoing Violations of Plaintiff's Constitutional Rights

Finally, Defendant Bloom argues that the law in this Circuit is not clearly established that government officials can be held liable not only for their own direct constitutional violations, but also for failing to intervene when they are aware that their peers are committing constitutional violations—or rather, Bloom says that law is clearly established, but only in the context of excessive-force cases. Dckt No. 43 at 16–17. For starters, even if accepted, this argument would not justify dismissing any of the claims against Defendant Bloom, because "failure to intervene" is merely a pathway to liability (like "supervisory liability" or "bystander liability"), it is not the underlying constitutional violation. The constitutional violations alleged are violations of the Fifth and Fourteenth Amendments, and in addition to failing to intervene to stop those violations, Bloom is plausibly alleged to have directly caused them and to have caused them through his participation in the Defendants' frame-up. Dckt No. 2 ¶ 18, 85, 131.

Moreover, in support of his argument that failure-to-intervene is limited to the excessive-force context, Bloom cites a single district-court opinion, *Echavarria v. Roach*, No. 16-CV-11118-ADB, 2017 WL 3928270 (D. Mass. Sept. 7, 2017). That court's opinion is not binding on this Court, and respectfully, the *Echavarria* court erred in its conclusion. The court rightly acknowledged that failure-to-intervene is a clearly established doctrine, that no precedent limits its application to excessive-force cases, and that there is therefore no legal justification for limiting it in that way. *Id*. at *10–11 (citing numerous First Circuit and out-of-circuit cases); *see*, *e.g.*, *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 54 (1st Cir. 2005) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights

61

are being violated in [his or her] presence by other officers."). The court erred, however, by then saying that officers who stand by and allow constitutional violations in the wrongful-conviction context are entitled to qualified immunity merely because courts have not often been called upon to apply the failure-to-intervene theory in that context. *Id.* at 11. But that conclusion is wrong for a couple of reasons.

First, courts *do* apply the failure-to-intervene theory in the context of wrongful convictions, *Brady* violations, and numerous other constitutional violations. *See, e.g.*, *Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013) (remanding for new trial on "failure to intervene to halt an ongoing *Brady* violation"); *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) (unlawful arrest); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982) (unlawful arrest); *see also Locke v. Haessig*, 788 F.3d 662, 671 (7th Cir. 2015) (sexual harassment); *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010) (suppression of free speech); *Reid v. Wren*, Nos. 94-7122, 94-7123, 94-7124, 1995 WL 339401, at *2 (10th Cir. 1995) (unpublished) (warrantless search of home). Indeed, in no uncertain terms, the Second Circuit wrote that the duty to intervene applies whenever the defendant "observes or has reason to know "(1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) *that any constitutional violation has been committed by a law enforcement official*." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (internal citations omitted) (emphasis added).

Second, as mentioned above, a failure-to-intervene is a mere pathway to liability—the "clearly established" question asks whether the facts make clear that a *constitutional violation* was at issue. *E.g.*, *Stamps v. Town of Framingham*, 813 F.3d 27, 34 (1st Cir. 2016) ("We ask (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, *whether the right was 'clearly established'* at the time of the defendant's alleged

violation."). And of course, as discussed at length above, the law could not be clearer that it violates the constitution when government officials frame a man for a crime he did not commit.

Because the right not to be framed was clearly established, and because government officials were on clear notice that they could not sit idly by while their cohorts violated citizens' rights, Defendant Bloom has no reasonable argument that he would have thought he could sit idly by despite knowing that Plaintiff was being framed. It is important to recognize that a failure-to-intervene theory only applies when the defendant has a reasonable opportunity to stop a constitutional violation and does not do so. If discovery in this case proceeds and it is learned that only the police framed Plaintiff, and Bloom knew nothing about it, then he will be off the hook. A failure-to-intervene theory will only come into play if Bloom knew or had every reason to know the police were fabricating evidence or suppressing evidence or coercing confessions, and Bloom did nothing about it. If those are the facts that are adduced, Bloom is not entitled to immunity.

Finally, Defendant Bloom's argument that the clearly established law does not extend the failure-to-intervene pathway to prosecutors as well as police officers is fundamentally misplaced. As Plaintiff has made clear, he sues Defendant Bloom for Bloom's conduct *as an investigator*, not as a prosecutor. As the Supreme Court has explained, a functional inquiry regarding immunity is required based on the actual facts on the ground (after they are adduced during discovery, of course); these questions are not resolved by a superficial inquiry that stops after asking what someone's job title is. *E.g.*, *Burns*, 500 U.S. at 486. *Buckley*, 509 U.S. at 273–74. Because Defendant Bloom was acting in the same capacity as the other Defendants, he is entitled to no greater immunity than them. *Burns*, 500 U.S. at 495 (because it would be "incongruous" and "ironic" to afford prosecutors more immunity under these circumstances, the law does not do

so). Because Defendant Bloom is sued for his conduct as an investigator, his argument that qualified immunity applies unless there is case law about *prosecutors'* duties is a non sequitur. It is no more persuasive than a police officer who happened to have a second job as a fitness instructor arguing he was entitled to immunity unless the cases discussed someone just like him.

Moreover, the argument that prosecutors, but not officers, should be allowed to sit by while a man is framed is a non-starter. The First Circuit in *Limone* reviewed decades of precedent from the Supreme Court and other courts around the country and said it was "easy pickings" to hold that it violates the constitution when people are "framed *by government*," and that "if any concept is fundamental to our American system of justice, it is that *those charged with upholding the law* are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Limone*, 372 F.3d at 44–45 (emphasis added). Neither the court's language nor common sense admits of any distinction between police officers and prosecutors: only the willfully malicious prosecutor would purport to believe that police officers cannot frame people for crimes, but a prosecutor who knew that was happening could sit on his hands and receive immunity based on the title on his business card. When a constitutional violation is that obvious, there can be no legitimate claim to qualified immunity. *Hope*, 536 U.S. at 738–42 (holding that even without a prior case on all fours, when a constitutional violation is obvious, qualified immunity does not shield officials from liability). Accordingly, Defendant Bloom's fallback argument—after absolute immunity—that he is entitled to qualified immunity at the motion-to-dismiss stage, should also be rejected and his motion denied.

## CONCLUSION

For all of the reasons identified above, each of the Defendants' motions to dismiss should be denied.

RESPECTFULLY SUBMITTED,

/s/ Gayle Horn
*Attorney for Plaintiff*
Arthur Loevy
Jon Loevy
Debra Loevy
Gayle Horn
Steve Art
Tara Thompson
Tony Balkissoon
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900
Fax: (312) 243-5902
gayle@loevy.com

## <u>CERTIFICATE OF SERVICE</u>

I, Gayle Horn, certify that Plaintiff's Omnibus Response to Defendants' Motions to Dismiss was sent via CM/ECF to all counsel of record.

/s/ Gayle Horn
*Counsel for Plaintiff*