```
1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2                         WESTERN SECTION

3

4
      George Perrot              )
5                               )              18cv10147-DPW
          vs                    )
6                               )             December 6, 2018
      Thomas Kelly, et al       )
7     _____)

8

9

10                    Motion Hearing Held Before

11              The Honorable Douglas P. Woodlock

12                    United States District Judge

13

14

15

16    APPEARANCES:   See the following page

17

18

19

20                    Alice Moran, CSR, RPR, RMR
                      Official Federal Court Reporter
21                    United States Courthouse
                      300 State Street, Room 303D
22                    Springfield, MA 01105
                          (413)731-0086
23                    alice.moran@verizon.net

24

25
```

1    <u>APPEARANCES</u>:

2

3    **On behalf of the plaintiff**:

4    Tara Elizabeth Thompson, 311 N. Aberdeen Street, 3rd
     Floor, Chicago, IL 60607.

5

6

7    **On behalf of the defendants**:

8    Lisa C. DeSousa, 1600 East Columbus Ave., Springfield, MA
     01103.

9

10   Glenn S. Greene, P.O. Box 7146, Ben Franklin Station,
     Washington, DC 20044.

11
     Kathleen E. Sheehan, 293 Bridge Street, Suite 600,
12   Springfield, MA 01103.

13
     Carole Sakowski Lynch, Towersquare Building, Suite 2400,
14   1500 Main Street, PO Box 15387, Springfield, MA
     01115-5387.

15
     Austin M. Joyce, 4 Lancaster Terrace, Worcester, MA 01609.
16
     Jeremy Saint Laurent, 36 Court Street, Springfield, MA
17   01103.

18
     Susan G. Reardon, One Ashburton Place, 18th Floor, Boston,
19   MA 02108.

20

21

22

23

24

25

1          THE CLERK:  This honorable court is now in

2     session.  Please be seated.

3        Civil Action No. 18-10147, Perrot versus Kelly.  If

4     counsel can be please identify yourselves prior to

5     addressing the court.

6          THE COURT:  So let's see if I can do a little

7     bit of housekeeping and get this in place.

8        I guess the place I would like to start is transfer

9     of venue.  I'm not sure why it's made with the motion to

10    dismiss practice initially.

11       We were kind of surprised that we got a call saying

12    that counsel for the City wanted to participate by phone.

13    Is it pretty hard to get up State Street?

14          MS. DeSOUSA:  I'm sorry, that was a misstatement

15    in my office.  We thought we were in Boston today so I

16    apologize for that.

17          THE COURT:  You did?

18          MS. DeSOUSA:  It got diaried incorrectly in my

19    office and it looked like we were in Boston today so I

20    apologize for that.

21          THE COURT:  Well, I take it that this should be

22    sharpened a bit because it does suggest a lack of

23    attention to the case.  But if I were treating this as a

24    motion for transfer which was made when the Rule 12 motion

25    was made, it was not filed then.  It took three months to

1   think about it.  So why?

2          MS. DeSOUSA:  Frankly, Your Honor, we assumed

3   erroneously that counsel for the plaintiff would be

4   willing to conduct the pretrial discovery in Springfield

5   since the vast majority of the deponents, as well as the

6   vast majority of counsel --

7          THE COURT:  We have rules for that.  If there's

8   depositions to be taken in the Western division, they

9   could be done in Springfield.  I don't understand this.

10          MS. DeSOUSA:  Frankly, Your Honor, neither did

11   we.

12          THE COURT:  Did you make a motion?

13          MS. DeSOUSA:  We did not.  We made --

14          THE COURT:  Okay.  So what you did was you

15   waited three months to move to transfer the case after you

16   seen who the judge is?

17          MS. DeSOUSA:  No.

18          THE COURT:  No.  No.  Just a moment.  That's

19   what happened.  That's the timing.  People can draw

20   whatever conclusions they want to draw about it, but in a

21   dilatory fashion the City of Springfield -- which has a

22   tickler system that makes them think they're in Boston

23   when they're in Springfield -- makes this motion saying

24   that it's because there's a problem about discovery in

25   Springfield and never makes a motion about adjusting that,

1     which is easily done.  It probably can be done less than

2     three months such a motion.

3          So the problem I have is this:  I was assigned this

4     case.  Springfield is a courthouse with a single-district

5     judge.  It implicates some important matters in the

6     Western division of the state.  It also involves district

7     attorneys' offices and so there's a potential for a series

8     of recusal motions here.

9          My own view is that if the case gets tried, it's

10    tried out here.  I'll try it out here.  If there's some

11    problem about adjusting discovery, I can work that out

12    too.  But I just don't see (A) why you waited so long and

13    (B) -- maybe we're beyond that, although that will be

14    sufficient grounds to deny it -- (B), what the problem is

15    about discovery because nobody really has made that clear

16    to me.

17               MS. DeSOUSA:  Again, Your Honor, there were

18    numerous emails between our office and counsel for --

19               THE COURT:  What emails?

20               MS. DeSOUSA:  I'm sorry?

21               THE COURT:  What emails?

22               MS. DeSOUSA:  I did not attach them in my --

23               THE COURT:  So I'm supposed to rule on something

24    that I don't have evidence for?

25               MS. DeSOUSA:  I can represent as an officer of

1    the court within the motion to change venue that they were

2    unwilling to schedule depositions in Springfield.

3              THE COURT:  Okay.  So the deponents are all

4    living in Springfield, is that right?

5              MS. DeSOUSA:  All of the deponents that have

6    been marked up to date that I represent or that are

7    current or former employees of the City of Springfield.

8              THE COURT:  So what's the problem?

9              MS. THOMPSON:  Judge, we never said we wouldn't

10   do depositions in Springfield.

11             THE COURT:  Okay.  Now that tells me all I need

12   to know, which is that you are going to be very careful in

13   the future about raising matters like this.  This is

14   sandbox stuff and it is beneath the dignity of members of

15   the bar.

16       The short of it is discovery should take place in

17   Springfield if people are in Springfield.  If not, then

18   wherever they are.  If somebody is in Florida --

19   apparently there are some people who are in the next life

20   that the plaintiffs continue to pursue, but I'm not

21   transferring the venue now for this belatedly.

22       If this case has evidentiary hearings that require my

23   attention, I'll do it out here.  I've done it before.  I

24   think that's my responsibility here.

25       I suspect that after a certain amount of time that

```
 1    the City of Springfield might well even consider whether
 2    or not it wants to have the case tried outside of this
 3    division for purposes of jury taint, but that's to be
 4    dealt with at a later point.
 5              MS. DeSOUSA:  Thank you, Your Honor.
 6              THE COURT:  Okay.  So that motion, which is
 7    number 96, is denied.
 8         Now, did I get all this?  There really has been no
 9    discovery?
10              MS. THOMPSON:  We've conducted depositions in
11    Springfield up to this point, Your Honor.  We've done two.
12    We have another one scheduled for the 17th and we have
13    been trying to work out dates for defendant Bloom who we
14    hope to do in December but who I think was not available
15    given counsels' schedule until January.  We've served
16    written discovery requests.  We received back
17    interrogatories and some documents so discovery is
18    proceeding, Your Honor.
19              THE COURT:  Okay.  So when is it that you think
20    you're going to have an amended complaint?
21              MS. THOMPSON:  We have a couple of additional
22    Springfield defendants that we want to depose still before
23    we're able to do that, but we hope to get them done in --
24    one we have scheduled in December and in the early weeks
25    of January.  If we can have until the end of January, we
```

1     would be prepared to amend then, Your Honor.

2               THE COURT:  So the motion for extension of time

3     to file the first amended complaint to November 5th has

4     been overtaken by time, is that it?

5               MS. THOMPSON:  It has, Your Honor.  We would

6     agree --

7               THE COURT:  Is that real, that time that you're

8     talking about?  Is that real for this because I'm going to

9     treat the complaint with real rigger?  The blunderbuss

10    approach to pleading is not going to last forever.  So are

11    you going to be able in a date that I will establish in

12    January?

13              MS. THOMPSON:  I believe that we are, Your

14    Honor.  I understand the court is telling us this is a

15    real deadline and the court expects to see an amended

16    pleading.  We want to do the same.  I believe defendants'

17    counsel have been cooperative with us in scheduling.

18    There's been some difficulties.  If we can get these

19    depositors done, we will be in a position to amend.

20              THE COURT:  Apparently they thought that those

21    depositions weren't going to take place in Springfield

22    just like they thought this hearing wasn't going to take

23    place in Springfield.  So that's a misunderstanding?

24              MS. THOMPSON:  I've been to depositions in

25    Springfield for this case and defendant Bloom's counsel

1   asked to be deposed in Boston because that's where he

2   resides.  We will honor that, but we're not dragging

3   people to Boston that live in Springfield.  That's not

4   ever been our position.

5            THE COURT:  What date in January?  Bear in mind

6   that this has to include a Federal Tort Claims Act.

7            MS. THOMPSON:  Understood, sir.  If we can have

8   until the end of January to finish the necessary

9   discovery, we'll file our amended complaint by February

10  1st if that's acceptable.

11           THE COURT:  Okay.  February 1st, and I expect

12  that counsel will be reluctantly here and knowledgeable of

13  where they're supposed to be.

14      Now turning to the complaint itself, I want to make

15  sure that I haven't missed something because there's been

16  a tsunami of paperwork that's been submitted in connection

17  with this.

18      I want to turn in particular to the claim itself with

19  the section that deals with claim of exoneration.  There's

20  a reference to finality of October 2017.  This is

21  paragraph 125.

22           MS. THOMPSON:  Yes, Your Honor.

23           THE COURT:  And some sort of it appears to be a

24  writing I assume of Judge King.  I haven't been able to

25  find it anywhere.  Is it anywhere in the papers?  I have

1    the *nolle pross*.

2           MS. THOMPSON:  It was an opinion granting him a

3    new trial and I do not have a copy with me.

4           THE COURT:  That's January 26, 2016.  It's

5    reported in West law.  Now there's a reference here to

6    "plaintiff was granted post-conviction relief, final

7    October 11th.  The court held that the admission of flawed

8    evidence cast real doubt on the justice of plaintiff's

9    conviction."  I assume that that's something on October

10   11th, is it or not?

11          MS. THOMPSON:  I confess I do not know

12   specifically where that quote comes from.

13          THE COURT:  So what I think I'm going to ask is

14   that you provide it to me within say four days.

15          MS. THOMPSON:  I will, Your Honor.

16          THE COURT:  And that my only view is that if

17   you're going to be relying on these kinds of documents

18   which become part of the complaint anyway, that they be

19   attached to the amended complaint --

20          MS. THOMPSON:  Yes, Your Honor.

21          THE COURT:  -- that you file.

22       Now, this question of the plaintiff -- let me step

23   back a bit.

24       What do you think you're going to get from these dead

25   people?

```
 1              MS. THOMPSON:  We believe under the statute that

 2    the City has a duty to indemnify them.  I mean obviously

 3    now we're talking about them but we are talking about the

 4    one person that we're seeking to appoint.

 5              THE COURT:  I thought there were two now.

 6              MS. THOMPSON:  It's only Mr. Kelly, Your Honor,

 7    and that's --

 8              THE COURT:  You made an amended effort to have

 9    me appoint a person to represent him?

10              MS. THOMPSON:  For Mr. Kelly.

11              THE COURT:  Right.  Wasn't there another?

12              MS. THOMPSON:  We did also learn that there was

13    an additional person that was deceased, Your Honor, but

14    he's not --

15              THE COURT:  You don't want me to appoint a

16    person to represent that additional person?

17              MS. THOMPSON:  We are only seeking an

18    appointment related to Mr. Kelly.

19              THE COURT:  So the additional person is not

20    going to be a party in this case?

21              MS. THOMPSON:  That's right, Your Honor.

22              THE COURT:  All right.  So back to what you

23    think you're going to get from the dead person?

24              MS. THOMPSON:  The statute requires

25    indemnification and we --
```

1          THE COURT:  Perhaps.  In any event, so you get a

2     judgment and the judgment can be assessed against the City

3     of Springfield; is that what you're suggesting?

4          MS. THOMPSON:  Well, the judgment could be

5     assessed against the estate.

6          THE COURT:  Correct.  The estate -- a

7     representative of the estate is going to go after the City

8     of Springfield to get the money to put back into the

9     estate to provide funds for whatever judgment you get; is

10    that it?

11         MS. THOMPSON:  Our client would be a

12    beneficiary; we can also seek that as well.

13         THE COURT:  Pardon me?

14         MS. THOMPSON:  Our client would be a beneficiary

15    as well.

16         THE COURT:  I understand that's the theory.  So

17    the theory is that you will get a judgment.  The judgment

18    should result in indemnification from the City and that

19    indemnification from the City becomes part of the estate

20    which is reopened and then your client can make a claim on

21    that reopened estate?

22         MS. THOMPSON:  Yes, Your Honor.

23         THE COURT:  Okay.  Where is the estate closed?

24         MS. THOMPSON:  It was in Massachusetts, Your

25    Honor.  It was in Hampden County Probate Court, Your

1   Honor.

2          THE COURT:   Okay.   So why don't you go into the

3   Hampden County Probate Court?

4          MS. THOMPSON:   It is a complicated process to do

5   this in the state court and it is true --

6          THE COURT:   It's an unknown process in the

7   federal court except in the Seventh Circuit in which the

8   court thought it was useful to appoint somebody to

9   participate as plaintiff to move forward but this is core

10  probate stuff.

11      I have a question of whether I even have jurisdiction

12  to do something like that, putting aside what the Seventh

13  Circuit finds convenient.   This much I know in that 30

14  years on the bench I haven't done it.   This is core

15  probate and family court work.

16      I've had it done where lawyers go into the state

17  court because, as you say, it is a complex process and

18  it's made more complex by a variety different dimensions

19  to it, not the least of which is this question of

20  indemnification, and a probate court judge may well take a

21  position that it's not worth pursuing indemnification or

22  not.   I don't know, but that is very much core state

23  activity.   And if it weren't a matter of jurisdiction for

24  me, I think that I would be abstaining in this hearing.

25      I realize there's been some erosion of the probate

1  exception.  The *Perez* case, the *Marshal* case, but for a

2  federal judge to administer an estate and reopen it

3  through the appointment of someone in a county in which

4  that judge has some familiarity -- not that I would do it

5  for Essex county or Suffix -- it seems to be foolish in an

6  effort at trying to pursue a questionable initiative like

7  this.

8      If you want it, you go into the probate court in

9  Hampden County.  I'm not going to do it and you're going

10  to have to do it in 90 days --

11          MS. THOMPSON:  Understood, Your Honor.

12          THE COURT:  -- if you want to proceed with this.

13      So I am denying the motion to number 79 for the

14  corrected motion to appoint a special representative as to

15  Kelly.

16      I'm denying the motion for leave to file a second

17  corrected motion to appoint a special representative for

18  Kelly, that's 81.

19      I take the representation that there are no more dead

20  people going to be parties in this case?

21          MS. THOMPSON:  I believe we have confirmed that

22  now, Your Honor.

23          THE COURT:  Okay.  So then we turn to this

24  question of striking the summons and the execution of the

25  summons.  I'm not so certain that the City defendants are

1   in a position to make such a motion.  I'm in a position to

2   look at it.  I find it to be ineffective service here and

3   if I'm not mistaken we're only talking about Kelly, right?

4           MS. THOMPSON:  That's right.  That's right, Your

5   Honor.

6           THE COURT:  So the special representative that

7   you'll get in the Hampden Probate Court will be making

8   whatever arrangements.

9           MS. THOMPSON:  We would then seek, Your Honor,

10  an extension of time to effect service until such time as

11  we have an opportunity to seek to reopen.

12          THE COURT:  Well, such time kind of spins -- I

13  said 90 days that you have to get a special

14  representative; that representative you'll get in 90 days

15  so you've got 90 days to perfect service.

16          MS. THOMPSON:  Okay.

17          THE COURT:  So I'm denying the motion number 61

18  to strike since they don't -- the party who made the

19  motion has any standing to do so, but it does call to my

20  attention something that's apparent in the record which is

21  there is a failure to provide to a return of service and

22  focusing only on the defendant, the late-defendant Kelly.

23  As to him I will extend the period of time 90 days to

24  effect proper service which I understand will be through a

25  personal representative.  That seems to be about the only

1      way that you will be able to get service here.  If there's

2      another way, I'm sure you will bring it to my attention.

3      The way that was chosen was not an appropriate way.

4           So then I come back to -- or I should say I come to

5      the motion of the two federal defendants here and that

6      raises some daunting questions I suppose under *Bivens*

7      particularly given Justice Kennedy's final statements with

8      respect to that.  I guess I've waited until and unless I

9      have to, but I have some questions about the nature of the

10     pleadings as they exist now.

11          Just a moment now --

12               MR. GREENE:  Sure.

13               THE COURT:  -- a comment from counsel on this.

14     About the nature of the pleadings which seem to be quite

15     conclusory, not casual and to the degree that there's a

16     suggestion that they're factual, I want to be sure that

17     everyone is aware of the vitality of Rule 11 when making

18     claims of essentially obstruction of justice which are

19     serious claims.  But I look at this now and it seems to

20     be, presently as pled, it seems to me to be conclusory in

21     nature, so conclusory is making it difficult to determine

22     whether or not it's plausible.

23          I guess there are a couple of ways dealing with it

24     which is to say wait until the long-awaited first amended

25     complaint is received or go through this step by step, the

1    first step being I guess paragraph 65 and thereafter of

2    the complaint.

3        Any way of looking at the terms and understanding

4    more broadly the terms, whether they're appropriately

5    determinative on a motion to dismiss is not a matter, but

6    is that there was a late awareness of the shortcomings of

7    the science of this kind of expertise.  It's recited at a

8    point in Judge Cain's decision of January 26, 2016.  He

9    seems to have gone through this quite carefully.

10       As it happened in the Obama administration there was

11   an extensive evaluation of forensic evidence, scientific

12   evidence that parallels this, but for the received wisdom

13   -- let's say I received it from Judge Cain in his opinion

14   is what people thought was science or at least forensic

15   science, meaning as Warren Black once put it, a government

16   architecture is to architecture, military music is to

17   music and forensic science is to science; military music

18   is to music, which is something less than completely

19   vigorous has now been focused a bit since the time period

20   on which this took place and we had two people, Eubanks

21   and Oaks, working in a vineyard that's turned out not to

22   be very productive.  But to say that they did things

23   falsely, falsely reported is a little bit more than I

24   think I can take on just the pleadings like this.  So I

25   guess I don't understand what evidence there is to support

1    the allegations that are made here.

2         At one level I guess I can say false reports means

3    that this was not rigorous enough science to meet current

4    standards, even the current standards that the jurists

5    itself is using as they did apparently go back into this

6    once it was brought to their attention or at least having

7    been brought to their attention and back into it, not

8    treating this kind of evidence the same way it did before,

9    nor are courts.  But if falsely reported simply means that

10   this was someone who believes that the universe revolved

11   around the earth until Galileo suggested otherwise, then

12   I'm not sure that that falls in the category of false

13   reporting at least as I understand it.

14        So I guess I have a two-step process.  Number one, is

15   your false tort claims -- Federal Tort Claims Act case

16   going to address negligence on the part of the bureau

17   employees?  Is that going to be raised there, or are you

18   simply either have it in front of this set of allegations

19   here against the individuals personally or not at all?

20             MS. THOMPSON:  I will confess that I don't know

21   the answer to the court's question because it's something

22   that we have to consider, but I agree with the court that

23   as to these claims this is not about something that they

24   -- you know, we said this in our response to the motion to

25   dismiss that someone can't be liable for something that

1    they don't do -- they can certainly do unintentionally.

2         So this isn't about as we have explained in our

3    pleading, although perhaps inartfully, this is not about

4    new science superceded what Oaks and Eubanks had to say.

5    This is a case where the Springfield defendants talked

6    with Oaks, tell him what they are intending to do, meet

7    with him before the comparison is done, and even as the

8    state court found defendant Oaks in particular slipped

9    from being -- the court's word -- slipped from being a

10   partisan in the case based on that conversation and it is

11   our contention --

12        THE COURT:  It happens all the time.  I mean,

13   you have to have fallen off the turnip truck not to

14   understand the way in which there are interrelationships

15   between experts and those that they are providing

16   expertise from that leads to a kind of combination bias in

17   all that they do.  That's the subject frequently of

18   cross-examination.

19        If somebody goes in the tank, if somebody says I

20   don't care what the evidence is I'm going to say something

21   else or that is I know wrong, then maybe we've got a

22   problem, a problem that can survive qualified immunity.

23   To be sure, you have nothing -- and you will tell me

24   otherwise -- you really have nothing testimonial that can

25   survive absolute immunity, do you?

1            MS. THOMPSON:   We are not making any allegations

2     about testimony.

3            THE COURT:   So nothing testimonial.  So now we

4     are talking about back and forth between experts, the two

5     experts themselves and the prosecution team.  I'll put it

6     that way, the state prosecution team, and there you're

7     saying they just got too close or are you saying they went

8     in the bag?

9            MS. THOMPSON:   We're saying they went in the

10    bag.

11           THE COURT:   How did they do that?  Maybe the way

12    to explore this a bit is to say that to look at paragraph

13    70 of your complaint.  It says, "On information and

14    belief, defendant Oakes had discussed with other hair

15    microscopists, including unknown agents, the best way to

16    conceal the incriminating evidence."  What's the basis for

17    that?

18           MS. THOMPSON:   It's an allegation that we're

19    making on information and belief that he --

20           THE COURT:   I understand it's an allegation

21    you're making on information and belief.  I find it less

22    than plausible.  So in order to make a plausible

23    allegation like that, I have to have some rigor detail,

24    something.  You know, on information and belief isn't I'm

25    looking in the air plucking it out like that and saying we

1    are making that allegation.  What's the information?

2    What's the belief?

3              MS. THOMPSON:  The information is that he could

4    -- and it is based on our view of the evidence that we

5    have so far about this case.  This is not something that

6    he necessarily came up with himself, but that he conferred

7    with others because he needed --

8              THE COURT:  Who?

9              MS. THOMPSON:  Unknown defendants.  We don't

10   know.

11             THE COURT:  How do you know he conferred with

12   others?

13             MS. THOMPSON:  Because this is something that he

14   would have needed to have talked with other people about,

15   how to frame these results in a way that made them seem

16   plausible when fact he knew --

17             THE COURT:  He conferred with others about the

18   best way to conceal?

19             MS. THOMPSON:  Yes.

20             THE COURT:  Who were the others that he

21   conferred with about the best way to conceal?

22             MS. THOMPSON:  We don't know.

23             THE COURT:  But you said that you have

24   information, not just information alone or belief alone,

25   information and belief.  What is the information?

1      I mean, maybe I've been too general.  Rule 11 means

2   something.  This is a very serious allegation against

3   someone.  There better be a basis for it.  It's not enough

4   to say, well, we kind of pulled it together.  We thought

5   as a matter of circumstantial evidence we can hang all

6   these guys together.

7      You made an allegation that they concealed

8   incriminating evidence and talked about it and you say you

9   did it on information, and I've asked now what the

10   information is and I haven't gotten an answer yet.  Who is

11   your informant for this?

12           MS. THOMPSON:  I want to be clear about what I'm

13   saying to the court so let me try to state this in a clear

14   way.

15      It is unusual in my experience to have a meeting

16   between detectives and -- or a meeting between the

17   prosecuting agency, as the court said, the people involved

18   in prosecting a case, and the scientific analyst before

19   their opinion comes back where by admission -- this is

20   what came out in the state court proceedings -- that the

21   state actors explained to these agents what it is that

22   they -- what was going on in this case and what was

23   happening.  That does -- the court indicated that it's not

24   unusual for that but it is in my experience.

25           THE COURT:  Well, I guess I can't introduce my

1    own experience here, can I?  I cannot do that, but it

2    provides a background against which I evaluate the

3    plausibility of something.

4         So not to introduce it but just to provide a sense of

5    background.  I've worked for four years as an assistant

6    U.S. attorney.  I was the head of the state public

7    defender agency.  I've been on the court for over 30

8    years.  For more than 30 years I've observed these kinds

9    of cases.  It is bad practice no question about it.  The

10   bureau ought to be embarrassed, they were, by this kind of

11   faux science that we now know could be faux science, but

12   that's different from saying concealed incriminating

13   evidence.

14        That's sloppy -- well, more than sloppy.  It's just

15   an unprofessional practice.  On the other hand, qualified

16   immunity probably provides protection for sloppiness and

17   lack of professionalism, and so for me to analyze this

18   complaint in that context requires that I do something

19   more than look at on information.

20        I asked the question and it appears that it is on the

21   basis of your experience that this must have been

22   conversations about the best way to conceal incriminating

23   evidence; is that it?

24             MS. THOMPSON:  The other important piece of

25   this, Your Honor, is --

```
 1              THE COURT:  Well, is that it?
 2              MS. THOMPSON:  That's not it.  That's not the
 3    only issue.
 4              THE COURT:  So apart from your perception of
 5    your experience, what else is there?
 6              MS. THOMPSON:  We know that, we know that the
 7    conclusions as reported -- and it's not about the
 8    testimony, although the testimony repeats it.  We know the
 9    conclusions as reported are false.  The question is why.
10        As the court has indicated, there is some analysis
11    that's done by the FBI's own audit about why it is that
12    these reported results were false and that audit does not
13    exculpate these defendants.  It does not say we know with
14    certainty that these were good-faith mistakes.  It just
15    says there's mistakes.
16              THE COURT:  You understand what you have to
17    prove to get beyond immunity?
18              MS. THOMPSON:  Understood.  We have to prove
19    probably and we have alleged a knowing fabrication and
20    that's what we're saying happened.
21              THE COURT:  Now I'm asking what's the known
22    fabrication?  What do you know about known fabrication
23    that permits you to say that?  Do you have someone who was
24    in a meeting and they said the evidence is really lousy
25    here.  We've got to falsely create a report and we've got
```

1    to conceal other incriminating evidence?

2              MS. THOMPSON:   Based on how wrong these results

3    are, we have made a good-faith allegation about what we

4    expect that the evidence can show.  It's true that we need

5    discovery to prove up our claims.

6              THE COURT:   See that's the conundrum of

7    discovery in the face of pleading objections.  You don't

8    really get to come in and say I don't know but I think and

9    so I brought this lawsuit to find out.  That's not the way

10   it goes.

11        You have to have a good-faith basis supported by

12   facts for making an allegation like this, and I'm

13   suggesting to you -- perhaps more gently as I said than

14   the circumstances suggest -- that this has some potential

15   Rule 11 problems, and you better be very certain about the

16   basis that you would rely on as good faith.

17        So far what I understand it to be is your experience

18   that what's probably likely under these circumstances that

19   in the circumstance of the prosecution team and experts

20   meeting and talking about what the thrust of their case is

21   that they would necessarily have discussed concealing

22   incriminating evidence.  Now what's the incriminating

23   evidence that they were concealing?

24              MS. THOMPSON:   I'm sorry?

25              THE COURT:   What's the incriminating evidence

1    that they're concealing?

2              MS. THOMPSON:  Well, it's exculpatory evidence

3    that they were --

4              THE COURT:  It's what?

5              MS. THOMPSON:  That these defendants were

6    concealing exculpatory evidence.

7              THE COURT:  What is it?

8              MS. THOMPSON:  That these hair results in fact

9    did not match Mr. Perrot.  The other forensic --

10             THE COURT:  Is that a product of faux science or

11   is it simply that they knew that one hair was a dog and

12   the other hair was Mr. Perrot's and they said they match?

13   Is that what you're saying?  Or are you saying they had

14   one hair and it was something, they didn't know what, and

15   based on their belief and the science at the time they

16   said it is consistent with or is in fact Mr. Perrot's

17   hair?  Is that the alternative?

18        You know, there are dog hair cases.  Those get

19   outside of immunity when somebody knows that the specimen

20   that they're relying upon, an unknown specimen is in fact

21   something that could never in a million years be the hair

22   of a potential defendant, but I don't understand that

23   that's here yet.  I haven't heard you say that that's

24   here.

25        What I've heard in response is they were

1    unprofessional in the sense of meeting with the

2    prosecution team and learning what the outcome or the

3    result of the prosecution team wanted and then conforming

4    to it.  Lack of professionalism is probably negligence.

5    It doesn't strike me as an intentional tort in the sense

6    of constitutional torts.

7         You said that there's concealment or falsity; falsity

8    seems to tie right back into the question of junk science.

9    But, for instance, was Mr. Eubanks or Mr. Oakes writing

10   home saying I spend my day doing junk science?  Is there

11   some confession like that?  Some acknowledgement that this

12   is non-scientific?  Or is it simply that you have done,

13   more or less what they've done, which is to take the facts

14   and try to meld them in to a way that supports the

15   proposition for which you contend without underlying

16   support for it?

17        So I have your idea of what is likely.  Do I have any

18   writings by these individuals, or do you have any writings

19   by these individuals?

20             MS. THOMPSON:  No, Your Honor.

21             THE COURT:  Do you have any informant who says I

22   sat at a meeting and they said we're going to falsify this

23   evidence and we're going to conceal things that show

24   otherwise?

25             MS. THOMPSON:  We don't have that, Your Honor.

1          THE COURT:  Okay.  That's a pleading problem

2    because I can't say that it plausibly asserts a claim

3    against which a motion to dismiss on the basis of immunity

4    would be resisted.  And what are you going to do to deal

5    with that perception on my part?

6          MS. THOMPSON:  Well, two things, Your Honor.

7    One is if the court doesn't view our pleadings as

8    sufficient, then we can replead and reallege it in a

9    better way.

10          THE COURT:  Well, the question is can you?  You

11    just told me that you don't have somebody who's giving you

12    inside information.  You don't have documents and you're

13    relying on your perception of what likely happens under

14    circumstances like this whenever experts and adversary

15    parities get together to discuss how they're going to

16    present the case.

17          MS. THOMPSON:  If a plaintiff in Mr. Perrot's

18    position had to at the outset --

19          THE COURT:  Excuse me.  Should I be pronouncing

20    it Perott rather than Perrot?

21          MS. THOMPSON:  Our understanding is it's Perrot,

22    Your Honor.

23          THE COURT:  Perrot.

24          MS. THOMPSON:  If a person in plaintiff's

25    position in order to allege -- in order to file a

1    complaint about the situation that arose in this case had

2    to say I know somebody who was at the meeting, here's what

3    was said, somebody in Mr. Perrot's position would never

4    get to sue someone who's in these defendants' context.

5    Maybe the court believes that's appropriate, but that puts

6    a burden on Mr. Perrot that no one in his position is ever

7    going to be able to meet.

8            What he has here is --

9            THE COURT:   That's not true.   It happens all the

10   time.   I get these information and belief pleadings all

11   the time and then I say all right.   What is it?   Now is

12   the time to tell us and I get somebody say, I knew the guy

13   who delivered the coffee and he was there and he heard it.

14   So that's not (A) as a practical matter in my experience

15   always the case but the burden is with you.   The burden is

16   with you to show that there are facts upon which you can

17   reasonably rely to overcome the immunity defense that is

18   going to be raised as to this.

19       I have indicated before that there are issues with

20   respect to the pleadings that may be remediable.   That's

21   what we're doing now.   On this one I don't know if it's

22   remediable.   What you are asking for that would be

23   remediable that could provide the foundation that could

24   ever come is the likely restated view or restated motion

25   to dismiss dealing just with the question of immunity for

1    these defendants.  If I thought there was a prospect, I'd

2    certainly want to consider it fully but you hadn't told me

3    that's a prospect.  Is there one?

4            MS. THOMPSON:  I don't know how to state it at

5    this point any better than this.  We know that we are

6    talking about false reports and the question is why.

7            THE COURT:  When you say false, I just want to

8    be clear false means bad science.  It doesn't mean that

9    the report said X and it was not X in some verifiable

10   form.  That it said it was raining on Friday and it wasn't

11   raining on Friday.

12       This is simply -- I say simply, this is bad science,

13   not very good science.  On the other hand, science that

14   was accepted in courts throughout this time period; that

15   the scientific community didn't really focus on

16   effectively for some time and these guys were practicing

17   this -- if it's not science, I guess it must be art but

18   not necessarily doing it in a way that was believed that

19   what they were doing was false, intentionally false.

20   Unless you got something more specific than that, that's

21   what I'm trying to get at.

22           MS. THOMPSON:  We have pled this in the

23   alternative.  One way that we've pled it is that these

24   defendants knew that these were not matches and reported

25   them as matches, that's one thing.  The second I think

1    what the court's talking about --

2              THE COURT:  But what do you have to say that

3    they knew it wasn't matching, a match?  I said -- I used

4    the dog hair one because those are the most graphic

5    examples of this kind of thing and ones which I have some

6    familiarity with.  Those are easy.  You know, somebody

7    knows it's dog and they say it's human hair.  That

8    happens, false, but that's not what you're saying here I

9    don't think.

10       As I listen to what you're saying is this was lousy

11   science.  Nobody could get matches that anybody could call

12   science that you could say to a reasonable degree of

13   scientific certainty or follicle certainty this was the

14   same hair or even consistently the same hair.

15       Now we know or we think we know -- maybe the

16   defendants don't argue otherwise -- now we know this is

17   not good science.  But the question for these claims,

18   which as I say is very inflammatory and in a way that the

19   court should not foster unless there's support as I say

20   under Rule 11.  I don't know that you have that.

21       So I'm inviting you to tell me what you've got here.

22   Is there somebody who's in hiding in Idaho in a cave

23   afraid that the FBI will come after them, well, maybe I'll

24   think about you saying informant X but I don't think you

25   have that.

1          MS. THOMPSON:   We don't have anyone in a cave in

2     Idaho.   Again, Your Honor, it's our assertion that's not

3     what the pleading requirements require.

4          We have alleged -- and I understand the court

5     disagrees with me.   I'm not trying to -- I understand what

6     the court's view of this is and the court knows what I

7     know at this point.

8          What we have allege is that these defendants

9     understood the limitations of the science that they were

10    proceeding under.   They understood even -- they

11    understood, number one, the limitations of the science

12    that reporting somebody as a match under the science in

13    this situation was overstating the evidence and that's not

14    a -- we're saying that's not an innocent mistake.   We're

15    saying that's a knowing issue.   That these defendants knew

16    that the science didn't support a conclusion that these

17    hair comparisons could be made with the other forensic

18    evidence.

19          THE COURT:   Are you saying the science as it

20    existed then?   I mean that goes to this question of their

21    knowing.

22          MS. THOMPSON:   Right.

23          THE COURT:   If they are United Believers backers

24    or earth centric universes, I suppose I would say that

25    they don't quite have the intent that is necessary.

1          MS. THOMPSON:  I agree, United Believers are --

2          THE COURT:  So what are you saying that this is

3    something other than people who worked in this lab at the

4    bureau who had developed some techniques that they thought

5    were useful that they knew it wasn't?  That they knew it

6    didn't meet any kind of outside standard?  That it was

7    then extant?

8          MS. THOMPSON:  What the FBI -- and the court

9    obviously has familiarity with this.  What the FBI's audit

10   concluded was not that the methodology -- it's not just

11   about methodology.  It's about the way that the certainty

12   and sort of the -- it's the way that the certainty of the

13   comparison is being testified to and reported about.

14      So it's not even the methodology of hair comparison.

15   It's understanding does the fact that there are certain

16   similarities between certain hairs mean that these hairs

17   are the same to the exclusion of all others?  Can you look

18   at two hairs that are similar and say these two are

19   similar, therefore, we know they came from the same person

20   or do --

21          THE COURT:  Why isn't that just sub-competent?

22   I'm looking at this and I have some -- well, I shouldn't

23   say I have some familiarity, but we've had cases of false

24   drug reports, all of the state district attorneys' cases

25   involving drugs and a new wave of them is present out here

1   in Western Massachusetts.

2       Those are people posing to be scientists who didn't

3   do anything or they made stuff up.  That's different from

4   somebody who thinks they knew what they're doing and

5   whatever they're doing is not science, and that

6   distinction probably plots pretty well along the lines of

7   between immunity and lack of immunity.

8       So I look at this and say, is there any way on God's

9   green earth that this thing can make it past the immunity

10  claim?  It doesn't now.  I want you to understand that it

11  is not plausible now.  It's not plausible in part because

12  of the severity of the claims made with respect to these

13  two individuals.

14      In order to make them plausible in this larger

15  context, I need something that shows me that they weren't

16  sub-competent; that they knew what they were doing was

17  just plain wrong, and I don't hear anything that you've

18  said that tells me that you have that.

19      Now let me go back to where I started before.  What's

20  your Federal Tort Claims Act?  What have you teed up your

21  Federal Court Claim Act?

22          MS. THOMPSON:  We've teed it up in the same way.

23  I understand the court's question about whether there's

24  some sort of negligence claim that we could potentially

25  pursue.  That's not -- what we intend to allege is the

1   same thing.  We believe this is not a case about a

2   mistake.  This is a case about people participating in a

3   conspiracy to frame Mr. Perrot.

4           THE COURT:  So I'm not in the business of

5   advising how to draft a complaint, but I mean you're going

6   to neglect negligence?

7           MS. THOMPSON:  Honestly that's not where we've

8   -- that's not where we believe this case is at, but I hear

9   what the court is saying.

10          THE COURT:  Well, it's up to you.  Let me just

11  say that I will do with this what I have done with the

12  previous ones, which is to say I'll deny the motion to

13  dismiss without prejudice to it being raised again upon

14  the First Amended complaint with this adjuration that this

15  is a bit more than simply filling in the dots.

16      This is something that I view as raising serious

17  issues under Rule 11 and you'll evaluate your pleading in

18  that context.  I'm not sure there's more I need to say.

19  I'm going to let you develop your case in your pleadings.

20      There is no question that this is a horrific set of

21  circumstances.  The larger question is, are any of the

22  defendants you allege here responsible in some way that

23  the court's going to identify?

24      The claim is alleged in an incendiary fashion and I'm

25  not sure that there's even smoke to support that kind of

1    fire with this kind of a claim.

2        So I made the government sit down while I asked some

3    questions.  You've kind of heard the bottom line; perhaps

4    you want to argue the bottom line right now, but I think

5    that's where I am on this.

6        You can let me -- if I have to, I'll define the

7    larger principles of *Bivens* but I don't think I have to

8    and I don't think I want to because I think it is an area

9    that is simply too over-textured right now.  Go ahead.

10           MR. GREENE:   I represent the U.S. Department of

11   Justice representing Special Agents Eubanks and Oakes.

12       As the court is familiar, the court instructed that

13   the district courts have to first determine whether or not

14   there is a *Bivens* before proceeding and as we have argued

15   in our motion the way that analysis is done there should

16   be no *Bivens*.

17           THE COURT:   All right.  My view of it this, on

18   that issue is to say that if there is in this uncertainty

19   context of reaching *Bivens*, if there's no clearly

20   available alternative grounds and that's the basically

21   pleadings ground, we reach that first without going to

22   offer scenarios of *Bivens* so that's really what I'm doing

23   here.

24           MR. GREENE:   Understood.  We'd also argue that

25   under qualified immunity defendants have a right to have

1    that determined before discovery commences so is the court

2    denying defendants' motion for qualified immunity?

3              THE COURT:  You said that -- I think my view on

4    it is that I don't see a need for any further -- any

5    discovery.  You've got a motion to stay the discovery in

6    place right now.  I don't see any further discovery here.

7    There was a full hearing with respect to this in state

8    court where this evidence could be developed by that

9    plaintiff, isn't that protecting you?

10             MR. GREENE:  Just to be clear, you are granting

11   the motion to stay discovery?

12             THE COURT:  I'll wan't to hear anything further

13   that counsel has to say on this, but it's very hard when

14   you don't know everything to plead and so you should start

15   the lawsuit to get discovery to find out whether or not

16   you got a good lawsuit, that doesn't do it.

17        Is there something more you want to say?  You did

18   have a full extensive hearing in the state court before

19   Judge King?

20             MS. THOMPSON:  The only thing I'll say is the

21   purpose of that hearing was not to decide if anybody was

22   liable.  That goes to the whole --

23             THE COURT:  It may not be but it certainly was

24   to decide whether or not there's a basis to get a new

25   trial because there was lousy science presented to the

1    state court.

2          MS. THOMPSON:   The only issue there was, was the

3    science lousy.   It wasn't --

4          THE COURT:   The issue to be fully developed

5    there was whether or not there were grounds as a result of

6    the testimony and certain reports by the federal bureau

7    agents so I can't see it here.   It wasn't brought up.

8       I don't see a need for further discovery particularly

9    in light of the alternative or competing consideration of

10   not eviscerating or eroding the concept of qualified

11   immunity by saying you've got qualified immunity for this

12   so just bring a lawsuit, then we get to conduct discovery

13   for awhile unless there's some more specifics.

14         MS. THOMPSON:   We're asking for discovery but I

15   understand that we need to approach the court through a

16   better pleading that we deserve it first and that's what

17   we will do.

18         THE COURT:   Okay.   That's where we are on that.

19   That is to say, with respect to the motion to stay

20   discovery, which is number 89, I will allow that.

21      With respect to the motion to dismiss number 71 for

22   failure to state a claim on behalf of the Agents Eubanks

23   and Oakes, I'm denying that without prejudice to its being

24   reasserted when the first amended complaint gets filed the

25   1st of February.

1          MS. THOMPSON:   The only thing I would ask, Your

2     Honor, there obviously is discovery from Eubanks and

3     Oakes that relates to our claims against the Springfield

4     defendants, so it's discovery that we believe we're

5     entitled to whether or not these defendants remain

6     defendants.

7          THE COURT:   That may be so, but you don't need

8     it with respect to your claims.  You don't really need it

9     with respect to these defendants either.  Either you have

10    the other defendants, the non-federal defendants, you

11    either have it or you don't.

12         MS. THOMPSON:   I'm saying Oakes, for instance,

13    was in this meeting with these defendants talking about or

14    these defendants made representations to him about the

15    case so obviously that's something we need at some point

16    in this litigation.

17         THE COURT:   You may.  The government will have

18    to consider that in *Touhy* in writing.  That's their

19    constraints upon the testimony that the agents can give

20    and there's a form for doing that.  I don't mean to

21    stretch that by the method that I'm affording you to

22    assure that you've got a complaint that is as good as it

23    can be at the outset.

24         MS. THOMPSON:   I just want to make sure that we

25    can pursue what we believe we're entitled to whether or

1    not they're defendants without running a fowl of the

2    court's stay order.

3            THE COURT:  Well, yes, although I don't think

4    that you're going to get deposition testimony from either

5    of one them in the next 90 days.

6            MS. THOMPSON:  I think it's more a documentary

7    issue.

8            THE COURT:  What are the documents?

9            MS. THOMPSON:  We don't know what --

10           THE COURT:  Wait a minute.  What documents?

11           MS. THOMPSON:  They may have records relating to

12   these meetings, relating to their communication of these

13   defendants.

14           THE COURT:  They probably have to turn them over

15   in time, something like that over sometime.  So what's the

16   response, just dig in?

17           MR. GREENE:  Your Honor, we believe that the

18   defendants are protected from discovery until their

19   qualified immunity issue is resolved.

20           THE COURT:  They may be, but if they're out of

21   the case and nevertheless there's a record concerning

22   efforts to get discovery, once you jump through *Touhy*.

23           MR. GREENE:  Sure.  I'm certainly not suggesting

24   that if the FBI were to get a third-party subpoena or some

25   other request for documents, that the FBI wouldn't comply

```
 1    with it if I believe that's what counsel is suggesting.
 2              THE COURT:   That's what I'm suggesting, which is
 3    that I will permit her to do third-party subpoenas in this
 4    interim period to get whatever documents.
 5              MS. THOMPSON:   Thank you, Your Honor.
 6              THE COURT:   That's the limitation; that the stay
 7    is except as to providing third-party subpoenas or I
 8    should say subpoena ducus tecum in documents related to
 9    specific meetings.
10              MS. THOMPSON:   Understood.
11              THE COURT:   Okay.   Now I anticipate that we will
12    all get to think deeply about the pleadings after February
13    1st here but I need to move this case along as best I can.
14         My view is that civilians in Springfield are entitled
15    to come to Springfield.   That the other parties will show
16    up in Boston and may even have ticklers that show Boston
17    and not Springfield here.
18         If there are practical issues, you tell me.   I'll try
19    to deal with that, but as far as I'm concerned this is a
20    case I'm going to keep and deal with it in a fashion that
21    causes the least amount of disruption to the entire
22    system, including the assignment of judges in this
23    district.
24         Are there any other matters that I should be thinking
25    about here or you'd like some direction on?
```

1        Okay.  So February 1st is what I really look forward

2   to.  I also look forward to getting a copy of whatever it

3   was that you were alluding to in paragraphs 125.

4            MS. THOMPSON:  We will provide that promptly,

5   Your Honor.

6            THE COURT:  Anything else?  All right.

7            THE CLERK:  All rise.

8   **(Hearing concluded at 11:07.)**

9            -------------------

10                  CERTIFICATION

11

12        I certify that the foregoing is a correct

13   transcript of the record of proceedings in the

14   above-entitled matter to the best of my skill and ability.

15

16

17

18   /s/ Alice Moran                 December 21, 2018

19   Alice Moran, RMR, RPR

20   Federal Official Court Reporter

21

22

23

24

25