**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

GEORGE PERROT,                           )
                                         )
         Plaintiff,                     )
                                         )
v.                                       )        C.A. No. 18-cv-10147-DPW
                                         )
THOMAS KELLY, et al.                     )
                                         )
         Defendants,                    )

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE UNITED STATES' MOTION TO DISMISS**
**PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION ...........................................................................................1

FACTUAL BACKGROUND ...........................................................................1

    Perrot's Arrest and Conviction.................................................................1

    The FBI's Acknowledgement of Potential Errors in Hair Analysis Evidence
        Presented by FBI Examiners ..........................................................3

    The FBI's Review of the Hair Analysis Evidence in Perrot's Case ..............5

    Perrot's Request for a New Trial .............................................................5

ARGUMENT ...................................................................................................7

I.    PERROT'S FTCA CLAIMS FAIL AS A MATTER OF LAW ..................7

    A.    Absolute Immunity Bars Any Tort Claim Based Upon Testimonial Acts. ......8

    B.    Perrot States No Tort Claim Based Upon Non-Testimonial Acts. ..................8

        1.    The United States is not liable for malicious prosecution. ...................8

            a)    No United States employee or agent instituted criminal
                proceedings against Perrot..........................................................9

            b)    The criminal proceedings were supported by probable cause. 10

            c)    There was no malice on the part of any federal employee or
                agent. ....................................................................................10

        2.    The United States is not liable for intentional or negligent infliction of
            emotional distress. ...............................................................11

        3.    The United States is not liable for any violation of the Massachusetts
            Civil Rights Act ("MCRA"). ..................................................19

        4.    The United States is not liable for any civil conspiracy. .....................19

        5.    The United States is not liable for spoliation of evidence....................20

CONCLUSION................................................................................................20

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Aetna Cas. Sur. Co. v. P & B Autobody*,
    43 F.3d 1546 (1st Cir. 1994) ........................................................................ 19, 20

*Agis v. Howard Johnson Co.*,
    355 N.E.2d 315 (Mass. 1976) ...................................................................... 11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................. 12, 13, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 12, 13

*Boateng v. InterAmerican Univ., Inc.*,
    210 F.3d 56 (1st Cir. 2000) ................................................................................. 1

*Bolduc v. United States*,
    402 F.3d 50 (1st Cir. 2005) ................................................................................. 7

*Brunson v. Wall*,
    541 N.E.2d 338 (Mass. 1989) ............................................................................ 17

*Chaabouni v. City of Boston*,
    133 F.Supp.2d 93 (D. Mass. 2001) ................................................................... 19

*Com. v. Perrot*,
    No. 85-5415, 2016 WL 380123 (Mass. Super. Jan. 26, 2016) ....................... passim

*Conway v. Smerling,*
    635 N.E.2d 268 (Mass. App. Ct. 1994) .............................................................. 9

*Correllas v. Viveiros*,
    572 N.E.2d 7 (Mass. 1991) ............................................................. 9, 10, 15, 16

*Daubert v. Merell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .................................................................................... 13, 14

*DeJoinville v. Commonwealth*,
    381 Mass. 246 (1990) ........................................................................................ 15

*Díaz–Nieves v. United States*,
    858 F.3d 678 (1st Cir. 2017) ............................................................................... 8

*Fletcher v. Dorchester Mut. Ins. Co.*,
    773 N.E.2d 420 (Mass. 2002) ............................................................................ 20

*Gonzalez Rucci v. U.S. I.N.S.*,
  405 F.3d 45 (1st Cir. 2005) .......................................................................... 10

*Grajales v. Puerto Rico Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) ..................................................................... 13, 16

*Grella v. Salem Five Cent Savings Bank*,
  42 F.3d 26 (1st Cir. 1994) ........................................................................... 17

*Haley v. City of Boston*,
  657 F.3d 39 (1st Cir. 2011) ............................................................................ 1

*Johnson v. Mahoney*,
  424 F.3d 83 (1st Cir. 2005) .......................................................................... 17

*Keene v. Brigham & Women's Hosp., Inc.*,
  786 N.E.2d 824 (Mass. 2003) ....................................................................... 20

*Kennedy v. Peele*,
  552 F. App'x. 787 (10th Cir. 2014) .............................................................. 14

*Kowalski v. Gagne*,
  914 F.2d 299 (1st Cir. 1990) ........................................................................... 1

*Kyricopoulos v. Town of Orleans*,
  967 F.2d 14 (1st Cir. 1992) ..................................................................... 17, 18

*Layne v. Superintendent*,
  546 N.E.2d 166 (Mass. 1989) ....................................................................... 19

*Limone v. United States*,
  579 F.3d 79 (1st Cir. 2009) ................................................................... passim

*Matthews v. Rakiey*,
  649 N.E.2d 770 (Mass. App. Dec. 1995) ..................................................... 19

*Meltzer v. Epstein Becker & Green*, P.C.,
  233 F. Supp. 2d 213 (D. Mass. 2002) ...................................................... 17, 18

*Menard v. CSX Transp., Inc.*,
  698 F.3d 40 (1st Cir. 2012) .......................................................................... 12

*Mezullo v. Maletz*,
  118 N.E.2d 356 (Mass. 1954) ......................................................................... 8

*Miles v. Aetna Casualty & Surety Co.*,
  589 N.E.2d 314 (Mass. 1992) ....................................................................... 17

*Papasan v. Allain*,
478 U.S. 265 (1986).................................................................................................. 12

*Payton v. Abbot Labs*,
437 N.E.2d 171 (Mass. 1982) ................................................................................. 11

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) ............................................................................... 7

*Robert L. Sullivan, D.D.S., P.C. v. Birmingham*,
416 N.E.2d 528 (Mass. App. Div. 1981) ................................................................. 8

*Schatz v. Republican State Leadership Comm.*,
669 F.3d 50 (1st Cir. 2012)..................................................................................... 13

*Shay v. Walters*,
702 F.3d 76 (1st Cir. 2012)..................................................................................... 12

*Sklar v. Beth Israel Deaconess Med. Ctr.*,
797 N.E.2d 381 (Mass. App. Ct. 2003) ............................................................ 10, 11

*Tangney v. Sullivan*,
39 N.E. 799 (Mass. 1895) ......................................................................................... 9

*United States v. Berry*,
624 F.3d 1031 (9th Cir. 2010) ................................................................................ 14

*Urman v. South Boston Savings Bank*,
674 N.E.2d 1078 (1997)........................................................................................... 11

*Watterson v. Page*,
987 F.2d 1 (1st Cir. 1993) .......................................................................... 1, 2, 3, 6

*Witham v. Gregory & Read Co.*,
137 N.E. 752 (Mass. 1923) ....................................................................................... 9

## Statutes

28 U.S.C. § 1346(b) ........................................................................................................ 7

28 U.S.C. § 2680(h) ........................................................................................................ 8

28 U.S.C. §§ 2671-2780 .................................................................................................. 7

Mass. Gen. Laws ch. 12, § 11I......................................................................................... 19

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 1

**Other Authorities**

5A Wright & Miller, Federal Practice and Procedure § 1364 (1990) ........................................................ 1

# INTRODUCTION

The Amended Complaint ("Am. Compl.") filed by Plaintiff George Perrot asserts claims against the United States under the Federal Tort Claims Act (the "FTCA") for Perrot's conviction for an assault and rape in Springfield, Massachusetts in 1985. As shown below, Perrot's FTCA claims fail as a matter of law because they fail to state any violation of Massachusetts law for which a private party would be held liable. The Amended Complaint does not establish the liability of any employee or agent of the United States for malicious prosecution, intentional or negligent infliction of emotional distress, violation of the Massachusetts Civil Rights Act, civil conspiracy, or spoliation of evidence. Accordingly, all of Perrot's FTCA claims should be dismissed.

# FACTUAL BACKGROUND[1]

## Perrot's Arrest and Conviction

In 1985, police in Springfield, Massachusetts investigated a series of local break-ins. *Perrot*, 2016 WL 380123, at *1. On November 30, 1985, shortly after 3:00 a.m., someone broke into the home of Emily Lichwala and stole her pocketbook. *Id.* At approximately 4:00 a.m., someone broke into the home of a woman identified as "M.P." and raped her. *Id.* at *2; Am. Compl. ¶ 30. About one week later, Perrot broke into a home sometime after midnight. *Id.* ¶¶ 36-37. Perrot also snatched a purse at

---

[1] For purposes of this motion, the allegations of the Amended Complaint are presumed true. However, additional factual background relevant to Perrot's Complaint is set forth in *Com. v. Perrot*, No. 85-5415, 2016 WL 380123 (Mass. Super. Jan. 26, 2016). A court may augment facts alleged in a complaint, and inferences therefrom, with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice. *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011). Federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990). Courts ordinarily may treat documents from prior state court adjudications as public records. *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000). A court may look to matters of public record in ruling on a motion under Fed. R. Civ. P. 12(b)(6) without converting the motion into one for summary judgment. *Id.* (citing *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)). *See also* 5A Wright & Miller, Federal Practice and Procedure § 1364, at 475-80 (1990) (court judgments and orders, judicial notice of prior pleadings, and transcripts of prior court proceedings, among other evidence, may be taken into account in deciding a Rule 12(b)(6) motion).

a Denny's. *Id.* ¶ 37. Around 2:30 a.m., Perrot ran back to his home and passed out. *Id.* ¶ 38. A few hours later, Springlfield police arrived at Perrot's home and arrested him for the purse snatching and the home break-in. *Id.* ¶ 39.

Springfield police interrogated Perrot multiple times after his arrest. *Id.* ¶ 47; *Perrot*, 2016 WL 380123, at *2. At some point, Perrot agreed to furnish police with blood and hair samples. *Perrot*, 2016 WL 380123, at *2. Ultimately, Perrot signed a statement admitting to breaking and entering the homes of Lichwala and M.P., but he denied any assault. *Id.*

On December 2, 1985, Perrot was indicted by the Commonwealth of Massachusetts for offenses relating to the events that took place on November 30. *Id.* at *1, *3. He was tried twice and convicted twice ( in December 1987 and January 1992) of aggravated rape, burglary and assault in a dwelling, unarmed robbery, indecent assault and battery, and burglary. *Id.* at *1, *10.

Federal Bureau of Investigation Special Agents William Eubanks and Wayne Oakes testified at both of Perrot's trials. The Springfield police focused their investigation on three pieces of forensic evidence taken from the crime scene at M.P.'s house: a bed sheet with blood on it, a pair of gloves with blood on them, and a hair removed from the bed sheet. *Id.* at *3. Special Agent Eubanks testified regarding his analysis of the blood evidence. *Id.* at *5, *14-15. Special Agent Oakes testified regarding his analysis of the hair evidence. *Id.* at *7, *15-18.

Special Agent Eubanks testified that he was able to exclude M.P. as the source of the blood on the bed sheet but he could not exclude Perrot as the source. *See id.* at *6, *15 (citing trial transcript). Eubanks clarified that he was not saying that the blood found on the bed sheet was Perrot's blood; he could not say that the blood came from anyone to the exclusion of the entire population. *See id.* at *6, *15 (citing trial transcript). Eubanks acknowledged that blood analysis is not like fingerprinting; it cannot positively identify a person as leaving blood. *See id.* at *6, *15 (citing trial transcript). Special Agent Oakes testified that hair found on the bed sheet "is either consistent or originated from Mr.

2

Perrot or another individual of the same race whose hairs exhibit all of the same characteristics and arranged in the same way." *See id.* at *7 (quoting trial transcript); *id.* at *16 (citing trial transcript). Oakes acknowledged that hair comparison does not constitute a basis for positive personal identification like fingerprint analysis. *Id.* at *8, *16 (citing trial transcript).

### The FBI's Acknowledgement of Potential Errors in Hair Analysis Evidence Presented by FBI Examiners

In July 2012, twenty years after Perrot's second conviction, the Department of Justice ("DOJ") and the FBI agreed to review criminal convictions in which a microscopic hair examination conducted by the FBI was presented as evidence against the defendant.[2] The purpose of the review is to ensure that FBI Laboratory examiner testimony regarding microscopic hair comparison analysis met accepted scientific standards, and to enable remedial action in appropriate cases in which those standards were not met.[3] The science of microscopic hair comparisons is *not* the subject of the review; microscopic hair comparison analysis is a valid scientific technique *still conducted* by the FBI Laboratory.[4]

In November 2012, the FBI entered into a Memorandum of Understanding ("MOU") with the Innocence Project and the National Association of Criminal Defense Lawyers ("NACDL") on the nature and limitations of microscopic hair examinations. *Perrot*, 2016 WL 380123 at *25. The MOU states the parties' agreement that:

> (1) a well-trained hair examiner can "offer an opinion that a known individual can either be included or excluded as a possible source of a questioned hair collected at a crime scene"; (2) "[m]icroscopic, hair evidence is limited, however, in that the pool of people who could be included as a possible source of a specific hair is unknown"; and (3) testimony that offers "numbers or frequencies as explicit statements of probability

---

[2] Spencer S. Hsu, FBI to Review Use of Forensic Evidence in Thousands of Cases, Wash. Post (July 10, 2012), http://www.washingtonpost.com/local/crime/justice-dept-fbi-to-review-use-of-forensic-evidence-in-thousands-of-cases/2012/07/10/gJQAT6DlbW_story.html.

[3] *See* FBI/DOJ Microscopic Hair Comparison Analysis Review ("FBI/DOJ Hair Analysis Comparison Review webpage"), https://www.fbi.gov/services/laboratory/scientific-analysis/fbidoj-microscopic-hair-comparison-analysis-review.

[4] *See id.*

... cannot be scientifically supported" nor can "opinions regarding frequency, likelihood, or rareness implicitly suggesting probability."

*Id.* at \*34. In April 2013, the FBI created a Guidance Document to be used by an internal team of selected FBI individuals who would review hair testimony in a number of cases nationwide to determine whether trial testimony or a laboratory report contained a statement falling into one of three error categories identified and defined in the 2012 MOU. *Id.* at \*26. In July 2013, DOJ and FBI signed a formal agreement with the Innocence Project and NACDL to review thousands of criminal cases in which the FBI conducted microscopic hair analysis of crime scene evidence.[5]

As part of the FBI's audit, the team reviewed lab reports and trial transcripts to identify errors and limiting statements. *Id.* at \*34. Their findings were sent to representatives of the Innocence Project and NACDL, who in turn conducted independent evaluations and provided these reviews to the FBI. *Id.* Results of these combined reviews were provided by the Department of Justice to the prosecutors and defense counsel associated with each case as well as the defendant.[6] The audit determined that some FBI hair examiners had "exceeded the limits of science by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary hair and a known hair sample." *Id.* at \*24.[7]

On April 29, 2015, the DOJ and the FBI released the following joint statement on Microscopic Hair Analysis:

> The Department has been working together with the Innocence Project to address errors made in statements by FBI examiners prior to December 1999 regarding microscopic hair analysis in the context of testimony or laboratory reports. Such state-

---

[5] Norman L. Reimer, The Hair Microscopy Review Project: An Historic Breakthrough For Law Enforcement and A Daunting Challenge For the Defense Bar By, https://www.nacdl.org/champion.aspx?id=29488.

[6] *See* FBI/DOJ Hair Analysis Comparison Review webpage.

[7] *See also, generally* FBI/DOJ Hair Analysis Comparison Review webpage.

ments are no longer being made by the FBI, and the FBI is also now employing mito-
chondrial DNA hair analysis in addition to microscopic analysis. However, the De-
partment and the FBI are committed to ensuring that affected defendants are notified
of past errors and that justice is done in every instance. The Department and the FBI
are also committed to ensuring the accuracy of future hair analysis testimony, as well
as the application of all disciplines of forensic science. The Department and FBI have
devoted considerable resources to this effort and will continue to do so until all of the
cases are addressed.[8]

**The FBI's Review of the Hair Analysis Evidence in Perrot's Case**

As part of the audit, an FBI team, and representatives from the Innocence Project and

NACDL, reviewed the transcripts of Perrot's criminal trial and identified seven errors in Special Agent

Oakes' trial testimony. *Perrot*, 2016 WL 380123 at *34-35. By letter dated September 20, 2014, the DOJ

formally informed the District Attorney of Hampden County, Massachusetts that there were errone-

ous statements in the testimony regarding microscopic hair comparison analysis in Perrot's criminal

trial.[9] The letter explained the process through which the errors were identified and asked that the

District Attorney determine the actions his office should take in light of the error.[10]

**Perrot's Request for a New Trial**

On July 8, 2014, Perrot asked the Superior Court of Massachusetts to grant him a new trial

citing three reasons: (1) newly discovered evidence consisting of the FBI's acknowledgment that its

examiner provided scientifically unsupported testimony at his prior trials; (2) the violation of Perrot's

due process rights by the Commonwealth of Massachusetts presenting false and misleading testimony

regarding the hair evidence; and (3) ineffective assistance of Perrot's defense counsel because of the

---

[8] Press Release, FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Per-
cent of Cases in Ongoing Review (April 20, 2015), https://www.fbi.gov/news/pressrel/press-re-
leases/department-of-justice-and-fbi-joint-statement-on-microscopic-hair-analysis.

[9] *See* Letters to George Perrot Re Hair Analysis Flaws, DOJ FBI Full Review of Hair Analysis With
Appendices 10/16/14, https://www.documentcloud.org/documents/2395214-letters-to-george-re-
hair-analysis-flaws-doj-fbi.html. The DOJ/FBI review found no inappropriate statements in the re-
port Oakes prepared. *See id.*

[10] *See id.*

failure to investigate the Commonwealth's hair evidence. *Perrot*, 2016 WL 380123 at *24. The Superior Court heard from seven witnesses and admitted forty-six exhibits. *Id.* In a thorough opinion, which included an extensive review of both the hair analysis evidence presented in Perrot's case, *id.* at *7-8, *15-18, as well as the historical usage of hair analysis evidence in criminal cases in general, *id.* at *25-37, the Superior Court found that it was not until *decades after* Perrot's second trial, that the nature and limitations of microscopic hair analysis evidence were recognized, and that this "new consensus" on the use of such evidence constituted "newly available" evidence. *Id.* at *37. The Court found that the new scientific consensus on hair analysis evidence warranted the exclusion of Oakes' original opinions, and that this exclusion was material evidence for purposes of a new trial. *Id.* at *42. For these reasons, Perrot's motion for a new trial was granted. *Id.* at *45.

The Court found that Perrot failed to prove that either the Commonwealth or Special Agent Oakes engaged in a "knowing introduction of false evidence" – specifically noting that this claim "lack[ed] a foothold in the record." *Id.* at *44. The Court also rejected Perrot's ineffective assistance of counsel claim, reasoning that the conduct of Perrot's counsel with respect to the hair evidence introduced at his trials was not manifestly unreasonable given the understanding of the scientific limits of hair microscopy that were known and discoverable at the time. *Id.* at *42-44.

### The Amended Complaint

Perrot asserts claims against the United States under the FTCA. The only allegations that potentially implicate any acts or omissions of an employee or agent of the United States are those which directly relate to the analysis of hair or blood evidence by Special Agents Oakes and Eubanks and the

presentation of that analysis at Perrot's trials.[11] Perrot alleges that Eubanks falsely reported that Perrot's blood was "consistent" with blood stains at the crime scene and "buried" evidence which showed that Perrot's blood was inconsistent with blood from the scene. Am. Compl. ¶¶ 88-89. Perrot alleges that Oakes knew he was "creating" evidence beyond the legitimate scope of hair microscopy evidence and concealed that fact from the prosecutor and defense. *Id.* ¶¶ 75-79. Perrot also alleges that Oakes was "aware" that the hair found at the crime scene did not match Perrot's hair and suppressed this information. *Id.* ¶ 80. Perrot alleges that the conduct of the FBI agents violated Massachusetts law. He asserts claims for malicious prosecution, civil conspiracy, negligent or intentional infliction of emotional distress, and spoliation of evidence. Am. Compl. ¶ 137. Perrot also alleges a claim under Chapter 12, § 11I of the Massachusetts General Laws – *i.e.*, the Massachusetts Civil Rights Act. *Id.*

## ARGUMENT

### I.    PERROT'S FTCA CLAIMS FAIL AS A MATTER OF LAW

The FTCA operates as a limited waiver of the United States' sovereign immunity. Pursuant to this waiver, the United States may be sued for torts arising out of the negligent or wrongful acts or omissions of its employees or agents. *See* 28 U.S.C. § 1346(b); *see also* 28 U.S.C. §§ 2671-2780. In order for the United States to be held liable, the act or omission must be one for which a private person would be liable under "the law of the place where the act or omission occurred," and must have been committed within the scope of the actor's employment. 28 U.S.C. § 1346(b)(1). The FTCA looks to state law to flesh out the elements of particular torts. *See id*; *Bolduc v. United States*, 402

---

[11] There are no plausible allegations that Oakes or Eubanks (or any federal official) coerced Perrot into a confession, conspired to frame Perrot, planted evidence at a crime scene, or had an opportunity and duty to intervene in Perrot's prosecution but did not. *See* Am. Compl. ¶ 137. Accordingly, to the extent these claims are even well pleaded, they are without merit with respect to the United States. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.").

F.3d 50, 56 (1st Cir. 2005). In this case, Massachusetts law serves as the "law of the place" because both the allegedly tortious conduct and the harm complained of occurred in Massachusetts.

As shown below, any FTCA claim based upon allegations relating to the analysis of hair and blood evidence with respect to Perrot's criminal trials fails as a matter of law. Any tort claim based upon testimony offered by Oakes and Eubanks before a grand jury or at Perrot's trials is barred by absolute immunity. And no tort claim based upon non-testimonial conduct has been stated.

## A.     Absolute Immunity Bars Any Tort Claim Based Upon Testimonial Acts.

Under Massachusetts law, "words spoken by a witness in the course of judicial proceedings which are pertinent to the matter in hearing are absolutely privileged, even if uttered maliciously or in bad faith." *Mezullo v. Maletz*, 118 N.E.2d 356, 358 (Mass. 1954). The privilege is a bar to "all actions arising out of the conduct of parties and/or witnesses in connection with a judicial proceeding." *Robert L. Sullivan, D.D.S., P.C. v. Birmingham*, 416 N.E.2d 528, 533 (Mass. App. Div. 1981) (internal quotation omitted). Thus, to the extent Perrot's tort claims are based upon trial or grand jury testimony given by an employee or agent of the United States, the claims are barred.

## B.     Perrot States No Tort Claim Based Upon Non-Testimonial Acts.

To the extent that Perrot's FTCA claims are based upon alleged non-testimonial acts by an employee or agent of the United States, those claims fail as a matter of law.

### 1.     The United States is not liable for malicious prosecution.

The FTCA allows malicious prosecution suits, but only when based on "acts or omissions of investigative or law enforcement officers of the United States Government," 28 U.S.C. § 2680(h). Oakes and Eubanks were FBI agents and hence federal "investigative or law enforcement officers," *see, e.g., Díaz–Nieves v. United States*, 858 F.3d 678, 683 (1st Cir. 2017), but the acts or omissions Perrot alleges do not amount to malicious prosecution under state law. In order to state a malicious prosecution claim under Massachusetts law, Perrot must prove that Oakes and Eubanks (i) instituted

criminal proceedings against Perrot, (ii) with malice and (iii) without probable cause, and (iv) that the proceedings were terminated in the Perrot's favor. *Correllas v. Viveiros*, 572 N.E.2d 7, 10 (Mass. 1991). Failure to satisfy one of these criteria is fatal to a malicious prosecution claim. The Amended Complaint fails to meet three of them.

### a) No United States employee or agent instituted criminal proceedings against Perrot.

An individual has instituted criminal proceedings against another if he or she caused those proceedings to be initiated. *See Witham v. Gregory & Read Co.,* 137 N.E. 752, 752 (Mass. 1923) (per curiam); *Tangney v. Sullivan,* 39 N.E. 799, 799–800 (Mass. 1895). This can occur when a person formally swears out a criminal complaint against another person or when an individual induces another person to lodge formal criminal charges. *See e.g.*, *Correllas*, 572 N.E.2d at 10. An individual may also be held responsible for the institution of a prosecution if he or she either exercises a peculiar degree of control over the charging official or adamantly presses that official to bring a criminal complaint. *See*, *e.g.*, *Conway v. Smerling,* 635 N.E.2d 268, 271 (Mass. App. Ct. 1994).

There are no allegations establishing any of these scenarios. The United States did not file any charges against Perrot. Nor is there any evidence that the United States or its agents had or exercised any degree of control to get the Commonwealth of Massachusetts to file charges against Perrot. *See Limone v. United States*, 579 F.3d 79, 91 (1st Cir. 2009) (no FTCA claim for malicious prosecution where there was no evidence the FBI filed charges, swore out a complaint, or induced Massachusetts to pursue a murder case against the plaintiffs).

Even if Perrot's wholly conclusory allegations that Special Agents Eubanks and Oakes provided the Commonwealth with false evidence are assumed to be true, which they should not be, the allegations do not save his claim. Under Massachusetts law, giving false information to law enforcement officials in response to the officials' queries during an ongoing investigation does not support a malicious prosecution claim. *Id.* The provider of false information "must voluntarily reach out to law

enforcement officials and cause them to commence a new line of inquiry." *Id.* (citing *Correllas,* 572 N.E.2d at 10); *see Correllas*, 572 N.E.2d at 10 (malicious prosecution claim failed where witness who provided false information did not encourage or demand that police institute criminal proceedings against plaintiff).[12] Nowhere does Perrot allege that any federal employee or agent reached out to the Commonwealth of Massachusetts about their case against Perrot or caused local investigators or prosecutors to pursue a line of inquiry in the case that was not already being pursued.

> **b)      The criminal proceedings were supported by probable cause.**

As a general rule, a grand jury indictment definitively establishes probable cause. *Gonzalez Rucci v. U.S. I.N.S.*, 405 F.3d 45, 49 (1st Cir. 2005). Courts have recognized an exception to this rule where law enforcement defendants wrongfully obtain an indictment by knowingly presenting false testimony to the grand jury. *Id.* (citing cases). Perrot was not indicted by the United States. Moreover, Perrot does not specifically allege that false testimony or evidence from any federal employee or agent was presented to the grand jury that indicted him. Thus, Perrot offers no allegations that defeat the presumption that the indictment secured against him was supported by probable cause. *See id.* (allegations that federal officials obtained federal indictment, as well as federal search and arrest warrants, through the use of false testimony stated viable FTCA claim for malicious prosecution).

> **c)      There was no malice on the part of any federal employee or agent.**

To satisfy the malice requirement, Perrot must show that federal employees or agents (1) knew there was no probable cause to prosecute him, and (2) acted with an improper motive. *Sklar v. Beth Israel Deaconess Med. Ctr.*, 797 N.E.2d 381, 387 (Mass. App. Ct. 2003) (citations omitted). Wanton

---

[12] *See also* Restatement (Second) of Torts § 655, comment d (1977) ("The giving of the information or the making of the accusation ... does not constitute a procurement of the proceedings that [a] person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit.").

or negligent behavior is insufficient without some evidence of an ulterior purpose. *Id.* There are no allegations establishing that any federal employee or agent knew that the Commonwealth had no probable cause to suspect Perrot had committed the offenses charged. There are no allegations of bad motive on the part of any federal employee or agent. The sole allegation which might conceivably relate to motive is an alleged meeting between Defendant Bloom, the Assistant District Attorney who prosecuted Perrot, and Oakes in which Bloom allegedly informed Oakes that Perrot was "their target." Am. Compl. ¶¶ 83, 98. Beyond Perrot's conclusory characterization, Perrot offers no evidence supporting the assertion that this meeting was "unusual" or "illicit." *Id.* Moreover, even if the Assistant District Attorney met on one occasion with Special Agents Eubanks and Oakes so he could personally speak with them about "[Perrot's] inherent evil," *id.* ¶ 98, Perrot offers no evidence supporting the conclusion that either Eubanks or Oakes (or any other federal employee or agent) was thereafter imbued with an unlawful ulterior purpose that improperly influenced the analysis of the forensic evidence submitted to the FBI.

### 2.   The United States is not liable for intentional or negligent infliction of emotional distress.

A claim for intentional infliction of emotional distress requires proof of conduct that was "extreme and outrageous . . . beyond all possible bounds of decency and [] utterly intolerable in a civilized community." *Limone*, 579 F.3d at 94 (quoting *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass. 1976)). A claim for negligent infliction of emotional distress requires a showing of negligence – *i.e.*, that a duty of care owed was violated. *Urman v. South Boston Savings Bank*, 674 N.E.2d 1078, 1083 (1997) (citing *Payton v. Abbot Labs*, 437 N.E.2d 171, 175-76 (Mass. 1982)). Perrot fails to establish the United States' liability for either tort. The Amended Complaint offers no proof, beyond conclusory allegations, that any federal official engaged in conduct related to the blood and hair analysis evidence that was "extreme and outrageous . . . [and] beyond all possible bounds of de-

cency." *Limone*, 579 F.3d at 94 (quoting *Agis*, 355 N.E.2d at 318-19. Nor are there any non-conclusory allegations of negligent conduct by any federal official. In addition, Perrot's allegation that hair analysis evidence presented against him was beyond the legitimate scope of forensic science at the time cannot support any emotional distress claim because the argument is precluded here.

### Special Agent Eubanks

In his trial testimony, Special Agent Eubanks acknowledged that blood analysis is not like fingerprinting; it cannot positively identify a person as the source of blood. *Perrot*, 2016 WL 380123 at *15 (citing Trial Tr. vol. 2, 300). Thus, Eubanks could not say that Perrot was the source of blood found on a bed sheet; he could only say that Perrot could not be excluded as the source. *Id.* Similarly, Eubanks could not exclude the victim as the source of blood found on a glove. *Id.* at *14-15.

Perrot alleges that Eubanks "buried" evidence which showed that Perrot's blood was inconsistent with blood from the scene. Am. Compl. ¶ 89. However, Perrot's allegations of false "reports" by Eubanks are wholly conclusory and thus insufficient to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555 (citation omitted)). While a court must take all of the well-pleaded factual allegations in the complaint as true for purposes of a motion to dismiss, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Conclusory statements must rest on pleaded facts. *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012). Thus, the plausibility inquiry requires two steps. First, conclusory legal allegations must be stripped from the complaint; second, the court must determine whether the remaining factual content permits "the reasonable inference that the defendant is liable for the misconduct alleged." *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012)

(citing and quoting *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 45 (1st Cir. 2012)). A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Perrot's theory rests entirely on the bare assertions that Special Agent Eubanks knew there was no match between Perrot's blood and blood allegedly found at the crime scene, and that Eubanks suppressed this information. Am. Compl. ¶ 80. These are conclusory allegations. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (characterizing allegations that company had "knowledge" that its statements were "false" or had "serious doubts" about their truth and a "reckless disregard" for whether they were false as "merely legal conclusions"); *see also Iqbal*, 556 U.S. at 680-81 (rejecting allegation that defendants "knew of, condoned, and willfully and maliciously agreed to" policy solely for discriminatory as opposed to legitimate penological purposes as conclusory and not entitled to the presumption of truth). To survive a motion to dismiss, these conclusions "must be backed by well-pled facts." *Schatz*, 669 F.3d at 56. They are not. Perrot offers no facts which support a plausible inference that Eubanks' "report" that Perrot could not be excluded as the source of blood found at the crime scene was knowingly false. Perrot had a full and fair opportunity to contest the blood evidence at his trials, and he did so. *Perrot*, 2016 WL 380123, at *5-6, *14-15. Whether "no conclusions could be drawn" from the blood tests conducted by Eubanks, *see* Am. Compl. ¶ 88, was a matter for cross-examination of Eubanks or testimony from a defense expert. *See Daubert v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). Perrot offers no facts supporting a plausible inference that Eubanks deliberately concealed evidence of blood test results that were inconsistent with Perrot.

**Special Agent Oakes**

Perrot's allegation that Oakes' evidence was beyond the legitimate scope of forensic science at the time of Perrot's criminal trials, Am. Compl. ¶¶ 75-79, cannot support an intentional or negligent infliction of emotional distress claim. First, the fact that two trial courts ultimately allowed Oakes' testimony to be presented to a jury necessarily means that the evidence "reported" by Oakes was scientifically reliable in the then-controlling legal sense – *i.e.*, that the evidence met the applicable standard for admissibility when it was introduced. "The reliability of a forensic method . . . is 'precisely the kind of evidence that the adversary system is designed to test.'" *Kennedy v. Peele*, 552 F. App'x. 787, 793 (10th Cir. 2014) (quoting *United States v. Berry*, 624 F.3d 1031, 1040 (9th Cir. 2010)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Second, the argument that Oakes' evidence was beyond the legitimate scope of forensic science is precluded here because it has already been litigated and rejected. In fact, if a Massachusetts court had not considered and rejected this argument, Perrot would never have received a new trial.

In July 2014, Perrot asked the Hampden County Superior Court to grant him a new trial on the basis of newly discovered evidence – specifically, "the FBI's acknowledgement [after an internal audit in 2012] that its examiners provided scientifically unsupported testimony" about the microscopic hair comparisons presented as evidence in Perrot's criminal trials. *Perrot*, 2016 WL 380123, at *24. The Superior Court determined that "'justice may not have been done' at Perrot's 1992 trial because of the introduction of hair evidence that in numerous and material respects exceeded the foundational science." *Id.* at *1. The Court ruled that the "new consensus" on the limitations and nature of hair analysis evidence constituted newly available evidence. *Id.* at *37 (citation omitted). However, the Court went on to make clear that the only reason the evidence could be characterized

as "newly available" was because "it was not until decades after Perrot's 1992 [second] trial that errors in testimony on hair evidence came to be authoritatively recognized and addressed." *Id.* at *1. The court observed that

> [A]t the time of Perrot's trial, the claims about hair evidence's limitations lacked legal support. . . Back in 1992, the limitation principles tied to hair evidence that *now* enjoy a consensus, were not "sufficiently developed ... to afford [Perrot] a genuine opportunity to raise [objections to Oakes' unreliable opinions]."

*Id.* at *42 (emphasis added) (quoting *DeJoinville v. Commonwealth*, 381 Mass. 246, 248 (1990)). The Superior Court found that "[s]cientific breakthroughs in defining and limiting hair analysis and testimony [had] only occurred in the last decade," and that while

> [i]t is *now* accepted that a forensic hair examiner may not offer an opinion that it would be rare to find another human having the same hair characteristics as the defendant's hair or the victim's hair's characteristics[,] [t]his substantive limitation on a forensic examiner's authority to articulate what amounts to a statement of the comparison's statistical significance *failed to achieve general acceptance in the 1980's or 1990's.*

*Id.* at *25 (emphasis added); *see also id.* at *37.

This finding was essential for Perrot's cause because it led the Superior Court to reject the Commonwealth's argument that Perrot had waived the right to mount his new challenge to the hair analysis evidence. *Id.* at *42. Waiver was inapplicable because there was "no legal support" at the time of Perrot's trials for his current challenge to the hair analysis evidence. *Id.* "[F]lawed understandings of the significance of hair analysis dominated the forensic community of hair examiners" at that time. *Id.* at *25. For the same reason, the Court rejected Perrot's argument that his defense counsel provided ineffective assistance by failing to investigate the hair evidence. *Id.* at *42-44. This argument was premised upon the assumption that the scientific limits of hair microscopy were "known and discoverable" at the time of Perrot's trials, and therefore, that counsel was ineffective for failing to raise an otherwise available, substantial ground of defense. *Id.* at *42 (citations omitted). The Court found that decisions made by Perrot's counsel to forego examination of Oakes' testimony in certain areas were not "manifestly unreasonable" because those decisions were based upon

15

counsel's (and counsel's expert's) knowledge of the state of hair evidence in 1992. *Id* at \*42-43; *see also id.* at \*35.

In the Amended Complaint, Perrot cites differing views on hair microscopy allegedly held by respected scientists in 1981 and presented at a symposium hosted by the FBI Laboratory Division in 1985. Am. Compl. ¶¶ 69-73. However, as the Massachusetts Superior Court found, at the time of Perrot's trials the forensic community did *not* generally accept the purported "limitations" of hair microscopy Perrot now cites in the Amended Complaint.[13] This is likely why Perrot's trial counsel, when cross-examining Oakes, "mentioned, but failed to draw out, the conflict within the forensic community about the significance that can be placed on 'hair comparison,'" and instead, "focused on an accidental transfer of Perrot's hair and examiner error." *Id.* at \*32.[14]

Perrot alleges there was an FBI "policy" of "not reporting or testifying in reference to hairs being 'matches' or being unable to be distinguished from each other." Am. Compl. ¶ 74. Even if such a policy existed at the time of Perrot's trials, it would not alter whether Oakes' characterization of the hair analysis in Perrot's cases was within the bounds of what was generally accepted by the scientific community at the time.[15]

---

[13] *See Perrot*, 2016 WL 380123, at \*37 ("The accredited view that a hair examiner lacked a scientific basis to statistically assess the chance of another person's hair being consistent with hair found at a crime scene had not been accepted by the forensic community in January of 1992, nor had that viewpoint been endorsed by the courts in January of 1992. . . In the period directly preceding Perrot's trial, it was Gaudette's probability analysis that had general acceptance within the community of forensic examiners.") (citation omitted).

[14] *See Perrot*, 2016 WL 380123 at \*36 ("Given the landscape of forensic articles on hair analysis that preceded Perrot's 1992 trial, it would have been unwise to suggest to defense counsel that he use the Barnett and Ogle article to discredit Oakes' ability to determine the number of other individuals whose hair could be consistent with the hair found on Prekop's bed sheet.").

[15] *See Perrot*, 2016 WL 380123, at \*35 (forensic community generally accepted Gaudette's conclusion that a fair estimate of another person's scalp hair matching the hair found on victim's bed sheet amounted to about 1 in 4500); *id.* at \*36 (subcommittee report from 1985 FBI symposium noted that published research verified by statisticians "show[ed] that when a positive hair comparison has been made by a qualified hair examiner, the chance of coincidental matches are relatively rare").

Issue preclusion (or collateral estoppel) is appropriate where there is "an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction." *Kyricopoulos v. Town of Orleans*, 967 F.2d 14, 16 (1st Cir. 1992) (quoting *Miles v. Aetna Casualty & Surety Co.*, 589 N.E.2d 314, 317 (Mass. 1992)). Massachusetts does not require mutuality of parties to invoke issue preclusion. *Id.* If the party in whose favor collateral estoppel is to be applied was not a litigant in the original action, the central inquiry is whether the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully or whether reasons exist to afford the party a chance to relitigate the issue. *Id.* (citing *Brunson v. Wall*, 541 N.E.2d 338, 341 (Mass. 1989)). Whether the party had a fair opportunity fully to litigate the issue is determined by a four factor test: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have actually been litigated; (3) the issue must have been determined by a final and binding judgment; and (4) the determination of the issue must have been essential to the judgment. *Meltzer v. Epstein Becker & Green*, P.C., 233 F. Supp. 2d 213, 217 (D. Mass. 2002) (citing *Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir. 1994)). Massachusetts courts have repeatedly applied the doctrine of collateral estoppel even where the second action involved a different type of claim than the first. *Johnson v. Mahoney*, 424 F.3d 83, 94-95 (1st Cir. 2005) (Section 1983 action barred where exonerated defendant had a fair procedure for litigating his constitutional claims in the criminal proceeding). A federal court must give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged. *Id.* at 93 (citations omitted).

The Superior Court's determination that the hair evidence was scientifically reliable when originally presented was essential to the judgment that granted Perrot a new trial based on "newly available" evidence. If the general consensus in the relevant scientific community at the time of Perrot's trials had been that hair analysis evidence was scientifically unsupported, Perrot would have

waived the right to make his last, ultimately successful challenge to that evidence – in which he argued that the *new* consensus on the limitations and nature of hair analysis evidence constituted "newly available" evidence warranting a retrial. *See Perrot*, 2016 WL 380123, at *25, *37. The determination that hair analysis evidence was accepted by the relevant scientific community at the time was also essential to the Superior Court's rejection of Perrot's ineffective assistance of counsel claim. *Id.* at *42-43. Perrot had a full and fair opportunity, as well as every motivation to fully litigate the hair evidence issue before the Superior Court. The issue was decided against Perrot and he is precluded from re-litigating it in this action.

As an alternative basis for liability, Perrot claims that Special Agent Oakes' findings were not valid because Oakes was aware that the hair allegedly found at the crime scene did not match Perrot's hair "in any substantial way," and Oakes suppressed that information. Am. Compl. ¶ 77. This argument fails for two reasons.

First, in its ruling on Perrot's motion for a new trial, the Superior Court rejected his argument that "either the Commonwealth or Oakes engaged in a 'knowing introduction of false evidence.'" *Perrot*, 2016 380123 at *44. Thus, any argument that Oakes knowingly presented false hair analysis evidence is precluded. *See Kyricopoulos*, 967 F.2d at 16; *Meltzer*, 233 F. Supp. 2d at 217. Second, Perrot offers no facts supporting a plausible inference that Oakes knew there was no match between Perrot's hair and hair recovered from the crime scene *and* that Oakes deliberately suppressed this information. Perrot's bare assertions amount to nothing more than a "formulaic recitation of the elements" of a legal claim – *i.e.*, that Oakes "knew" particular evidence was false and purposely suppressed that information. *See Iqbal*, 556 U.S. at 680-81. This is insufficient to state any plausible tort claim against Oakes.

Perrot had the responsibility and took the opportunity at both of his trials to challenge the hair and blood analysis evidence presented against him. Perrot offers no evidence that either Special

18

Agent Eubanks or Special Agent Oakes had an ulterior, unlawful purpose that improperly influenced their analysis or presentation of the forensic evidence submitted to the FBI. Perrot offers no evidence of conduct by Eubanks, Oakes, or any other federal official, that was "extreme and outrageous . . . [and] beyond all possible bounds of decency," *Limone*, 579 F.3d at 94, or that breached a duty of care owed to Perrot.

### 3.   The United States is not liable for any violation of the Massachusetts Civil Rights Act ("MCRA").

The MCRA provides that any person who interferes, or attempts to interfere, with another's exercise or enjoyment of rights secured by the constitution or laws of the United States or the Commonwealth of Massachusetts may be liable. Mass. Gen. Laws ch. 12, § 11I (1979). A claim under the MCRA requires a showing of "interference with the plaintiff's civil rights by threats, intimidation, or coercion." *See Matthews v. Rakiey*, 649 N.E.2d 770 (Mass. App. Dec. 1995). Threats, intimidation, or coercion constitute "the 'essential element' of an MCRA violation." *Chaabouni v. City of Boston*, 133 F.Supp.2d 93, 100 (D. Mass. 2001) (quoting *Layne v. Superintendent*, 546 N.E.2d 166 (Mass. 1989)).

Assuming an MCRA claim is even cognizable against a federal official or the United States, no claim is allowed here. Perrot offers no well-pleaded allegation that Special Agent Eubanks or Special Agent Oakes (or any other federal employee or agent) threatened, intimidated, or coerced him such as to support an MCRA claim.

### 4.   The United States is not liable for any civil conspiracy.

Massachusetts courts recognize two different theories of civil conspiracy. Civil conspiracy by coercion requires that a plaintiff allege that defendants, "acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994) (internal quotations omitted). The second form of civil conspiracy requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some

tortious act in furtherance of the agreement." *Id.* at 1564. Neither theory of civil conspiracy is established here.

Apart from conclusory allegations wholly devoid of any factual support, Perrot offers no evidence that any employee or agent of the United States acted in unison with any other defendant in this matter. Nor does Perrot offer any evidence of a common design or agreement to which any officer or agent of the United States was a party. Nor has Perrot offered evidence of any tortious act by any federal officer or employee.

5.     **The United States is not liable for spoliation of evidence.**

Spoliation of evidence is a doctrine which permits the imposition of sanctions and remedies for the destruction of evidence in civil litigation. *Keene v. Brigham & Women's Hosp., Inc.*, 786 N.E.2d 824, 832 (Mass. 2003). Massachusetts law does not recognize a cause of action for spoliation of evidence. *Fletcher v. Dorchester Mut. Ins. Co.*, 773 N.E.2d 420, 424 (Mass. 2002).

## CONCLUSION

For the reasons stated above, Perrot's Amended Complaint fails to state any claim against the United States under the Federal Tort Claims Act and should be dismissed.

Dated: July 29, 2019


Respectfully Submitted,

JOSEPH H. HUNT                          ANDREW LELLING
Assistant Attorney General              United States Attorney
Civil Division                          District of Massachusetts


C. SALVATORE D'ALESSIO                  ANNAPURNA BALAKRISHNA
Acting Director, Torts Branch           Assistant United States Attorney
Civil Division                          District of Massachusetts


RICHARD MONTAGUE
Senior Trial Counsel

/s/ *Glenn S. Greene*
GLENN S. GREENE
(New York State Bar No. 2674448)
Senior Trial Attorney
U.S. Department of Justice, Civil Division
Constitutional and Specialized Tort Litigation
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4143
Fax: (202) 616-4314
Email: Glenn.Greene@usdoj.gov

Attorneys for the United States

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon all counsel of record to

this proceeding by ECF, facsimile, or mailing the same by first class United States mail, postage pre-

paid on this 29th day of July, 2019.


/s/ *Glenn S. Greene*