UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEORGE PERROT,            )
                                   )
            Plaintiff,      )
                                   )          NO. 18-cv-10147-DPW
v.                               )
                                   )
THOMAS KELLY, *et al*.,     )
                                   )
            Defendants.    )

**REPORT AND RECOMMENDATION ON DEFENDANT CHARLES ARPIN'S MOTION TO DISMISS (#129); DEFENDANTS CHERYL CLAPPROOD, PAUL GLANTZ, THOMAS JARVIS, JUDITH KELLY AS ADMINISTRATOR FOR THE ESTATE OF THOMAS KELLY, THOMAS KENNEDY, MARIANNE POPKO, AND RONALD ST. GERMAIN'S MOTION TO DISMISS (#137); THE CITY OF SPRINGFIELD'S MOTION TO DISMISS (#140); DEFENDANT FRANCES BLOOM'S MOTION TO DISMISS (#142); AND DEFENDANT RICHARD KANE'S MOTION TO DISMISS (#146).**

I.   **Introduction**

George Perrot alleges that he was wrongfully convicted, twice, of the November 1985 rape of a 78-year-old woman named M.P. in Springfield, Massachusetts.[1] He asserts that his conviction was orchestrated by the police and prosecutor in violation of his constitutional rights. (#126 ¶¶ 1-8 (amended complaint).) In January 2016, after Mr. Perrot had served approximately thirty years in prison, the Hampden County Superior Court re-examined Mr. Perrot's conviction, found that "justice may not have been done" during his trial because of the introduction of hair comparison evidence that "in numerous and material respects exceeded the foundational science," and granted

---

[1] While M.P.'s name appears in the state court decisions, the parties here use her initials in the pleadings. The court will observe the parties' protocol here.

Mr. Perrot a new trial. *Commonwealth* v. *Perrot* ("*Perrot IV*"), Nos. 85-5415, 5416, 5418, 5420, 5425, 2016 WL 380123, at *1 (Mass. Super. Ct. Jan. 26, 2016); (#110-1). On October 18, 2017, the Commonwealth filed a *nolle prosequi* on all charges relating to the rape. (#126 ¶ 9.)

After the *nolle prosequi* and his subsequent release, Mr. Perrot filed suit in this court against officers, named and unnamed, of the Springfield Police Department, the City of Springfield, and the prosecutor who oversaw the investigation of the case and was the prosecutor at his first trial, Assistant District Attorney ("ADA") Frances Bloom. (#1.) At a hearing on July 11, 2018, District Court Judge Woodlock denied the defendants' motions to dismiss (##31, 34, 36, 42) without prejudice; allowed Mr. Perrot to conduct limited discovery to identify parties to the suit; and allowed Mr. Perrot to file an amended complaint. (#67.)

In the amended complaint, Mr. Perrot joined in the suit Agents William Eubanks and Wayne Oakes of the Federal Bureau of Investigation ("FBI") for their role in processing hair and blood evidence and testifying about laboratory results at trial, and in addition joined the United States. (#126 ¶¶ 21, 67-90.) At a hearing on September 4, 2019, Judge Woodlock granted motions to dismiss the claims against Agents Eubanks and Oakes (#144) and against the United States (#159). (#168; #170 at 4 (transcript of hearing).)  He also dismissed claims against all unnamed defendants. *Id.* Finally, he invited plaintiff to file a further pleading after the hearing, setting out with specificity "what acts were undertaken as alleged as to the particular defendants." (#170 at 22.) Mr. Perrot filed the supplemental pleading on September 9, 2019. (#169.)[2]

---

[2] The pleading contains factual allegations against each of the individual defendants, many of which are based on the limited discovery plaintiff was allowed to take before filing the amended complaint. (#169.) No defendant responded to this pleading. This court agrees with plaintiff that the amended complaint itself is sufficient to make out claims against the defendants, *id*. at 1, and so in the interest of avoiding any dispute over how this court may use the pleading in evaluating the motions to dismiss, the court will not rely on the facts set out in it in this report and recommendation.

Judge Woodlock referred to this court motions to dismiss filed by: Charles Arpin (#129); Cheryl Clapprood, Paul Glantz, Thomas Jarvis, Judith Kelly as the administrator for the estate of Thomas Kelly, Thomas Kennedy, Marianne Popko, and Ronald St. Germaine (#137)[3]; the City of Springfield (#140); Frances Bloom (#142); and Richard Kane (#146).[4] For the reasons set out below, this court recommends that ADA Bloom's motion to dismiss (#142) be allowed in part and denied in part; and that all the remaining motions be denied.

## II.   **Background**

### A.   *The Parties*

George Perrot, seventeen years old, was arrested on December 7, 1985, and was subsequently convicted of, among other charges, the November 30, 1985 rape of M.P. *Commonwealth* v. *Perrot* ("*Perrot I*"), 554 N.E.2d 1205, 1207-09 (Mass. 1990); (#126 ¶¶ 1, 36-39). Mr. Perrot was released in October 2017, after the Hampden County Superior Court vacated his convictions pertaining to the rape and ordered a new trial. *See generally*, *Perrot IV*, 2016 WL 380123; (#126 ¶¶ 1, 9).

In the amended complaint, Mr. Perrot names as defendants Judith Kelly, as administrator for the Estate of Thomas Kelly, Thomas Jarvis, Richard Kane, Charles Arpin, Thomas Kennedy, Marianne Popko, Paul Glantz, Ronald St. Germain, Andrew Canevari, and Cheryl Clapprood,

---

[3] One defendant, Andrew Canevari, is named in the caption of the amended complaint (#126 at 1) and listed with other officers in the amended complaint, *id*. ¶¶ 12, 17, but he is not mentioned in #137, the officers' motion to dismiss, even though he is represented by Attorney Coyle, who filed the motion on behalf of the officers. He is the only defendant in this case who did not move to dismiss. Since the court recommends that the officers' motion to dismiss be denied, if his omission from the motion was in error, it does not matter.

[4] The amended complaint names Paul Lance as a defendant. (#126 at 1.) In a previous pleading, plaintiff stated that the inclusion of Mr. Lance in this case is a mistake, as his name is a misspelling of Paul Glantz, another defendant. (#49 at 1 n.1.) The court recommends that the non-existent Mr. Lance be dismissed from this case and directs plaintiff to stop including this name in pleadings.

(collectively, "the officers"), sued in their individual capacities. *Id*. at 1, ¶ 22. The officers were all employed by the Springfield Police Department ("the Police Department") when Mr. Perrot was arrested and convicted and either acted directly or in a supervisory capacity over other defendant officers in the Police Department during the relevant time period. *Id*. ¶ 17. Given the passage of time, many of the officers no longer work for the Police Department. Defendant Thomas Kelly is deceased and is represented in this suit by Judith Kelly, the administrator of his estate.[5] *Id.* ¶ 18.

Francis Bloom was an ADA in Hampden County, Massachusetts when Mr. Perrot was arrested and convicted. He participated in the investigation of Mr. Perrot's case before trial and was the prosecutor at Mr. Perrot's first trial in 1987. *Id*. ¶ 20. Mr. Bloom was not involved in Mr. Perrot's second trial in 1992, which was prosecuted by ADA Elizabeth Farris, who is not named as a party to this case. *Commonwealth* v. *Perrot* ("*Perrot II*"), 648 N.E.2d 1315, 1316 (Mass. App. Ct. 1995), *rev. denied* 651 N.E.2d 409 (Mass. 1995) (Table); (#126 ¶ 103).

The City of Springfield ("the City"), a municipality of the Commonwealth of Massachusetts, oversees and controls the Police Department. (#126 ¶ 19.)

B.     *Factual Background* [6]

1.     The Underlying Offenses.

According to the amended complaint, between 1984 and 1986, there was a series of assaults on women over the age of sixty in Springfield, Massachusetts. (#126 ¶ 23.) The assaults appeared

---

[5] The court will refer to this defendant as "Thomas Kelly" in this report and recommendation.

[6] The facts are taken from the amended complaint (#126) and the court treats those facts as true. The court also takes judicial notice of the prior decisions of the Massachusetts state courts, though not necessarily the truth of facts found in them. *See Gattineri* v. *Town of Lynnfield*, --- F.4th ---, 2023 WL 355068, at *1 n.2 (1st Cir. Jan. 23, 2023) ("[A]s we have explained, the extent to which a court may consider a public record (here, facts from another [state court] opinion) outside the four corners of the complaint depends upon whether that record, or the facts within it, are

to have been committed by the same person, as the locations, timing, and victims were similar. *Id.* ¶ 24. There was public pressure on the police to solve the crimes. *Id.* ¶ 25.

On November 30, 1985, around 3:00 a.m., someone broke into the home of Emily Lichwala on Covel Street in Springfield and took her pocketbook. *Perrot IV*, 2016 WL 380123, at *1. Ms. Lichwala ran from her home and was later unable to identify the perpetrator. *Id.* The same day, at around 4:00 a.m., someone broke into the home of M.P. (#126 ¶ 30.) The intruder raped M.P. on her bedroom floor. *Id.* ¶¶ 29-30, 82. M.P. described her attacker as a clean-shaven man with dark, wavy hair, wearing a blue jacket, dark pants, and white sneakers. *Id.* ¶ 31.

Mr. Perrot had an alibi for that evening: he alleges that he was with friends in Brattleboro, Vermont on November 29, 1985, that his friends dropped him off at his house in Springfield in the early morning hours of November 30, and that he did not leave his house until the next day. *Id.* ¶ 35.

About a week later, on the evening of December 7, 1985, Mr. Perrot went out with his friends, drank heavily, and used drugs, including Valium. *Id.* ¶ 36. He broke into a house on Allendale Circle but ran away when he realized the owners were home. *Id.* ¶ 37. Mr. Perrot then snatched a purse from someone in the parking lot of a Denny's restaurant before returning home around 2:30 a.m. *Id.* ¶¶ 37-38.

---

susceptible to judicial notice under Federal Rule of Evidence 201."); *Giragosian* v. *Ryan*, 547 F.3d 59, 65-66 (1st Cir. 2008) ("[In deciding a motion to dismiss], [a] district court may also consider documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." (first modifications added, third modification in original) (internal quotations and citations omitted)); *Lopes* v. *Riendeau*, 177 F. Supp. 3d 634, 667 (D. Mass. 2016) ("Taking judicial notice of a decision in another court . . . is not the same as taking judicial notice of a fact within the decision . . . . 'even when a copy of a judicial decision is placed in the record, it is not 'evidence' nor is it fact.'" (quoting *Berríos-Romero* v. *Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011)).

2.     The Arrest and Interrogation of Mr. Perrot.

A few hours after Mr. Perrot returned home on December 7, 1985, police officers from the Springfield Police Department arrived to arrest him, supposedly for the attempted break-in and the purse-snatch.[7] (#126 ¶ 39.)  Mr. Perrot alleges that the arrest and subsequent interrogation were carried out by the defendants in order to coerce him into falsely confessing to the rape of M.P. *Id*. ¶ 45.

Mr. Perrot was asleep when the police arrived; he was woken up by his sister and officers shaking him. *Id*. ¶ 40. Because he was so heavily under the influence of drugs and alcohol, Mr. Perrot mistook his sister for his girlfriend and asked her to contact his sister. *Id*.

On the way to the police station, the officers who arrested Mr. Perrot kicked and hit him. *Id.* ¶ 41. They also threw him over a small fence and threatened to kill him. *Id*.  Mr. Perrot was beaten again at the police station. *Id*. ¶ 43. At approximately 4:30 a.m., Sergeant Kelley began interrogating Mr. Perrot.  *Id.* ¶ 47; *Perrot IV*, 2016 WL 380123, at *2. He was further interrogated at 7:30 a.m., 12:30 p.m. and 3:00 p.m.  *Perrot IV*, 2016 WL 380123, at *2; (#126 ¶ 47). Although the police officers generated *Miranda* cards that appeared to bear Mr. Perrot's signature, Mr. Perrot does not recall being given his *Miranda* warnings or signing the cards.  (#126 ¶ 44.)

Mr. Perrot alleges that the officers interrogating him knew that he was highly intoxicated, but nevertheless would not let him sleep and exploited his vulnerable mental state to coerce him to confess. (#126 ¶¶ 48-52.) Officers never provided him with an attorney, youth officer, or other adult to counsel him. *Id.* ¶ 51. His mother tried multiple times to visit him, but defendants would

---

[7] At the time of his arrest, the officers were familiar with Mr. Perrot, as they had "harassed him on multiple occasions." (#126 ¶ 95.) Allegedly, they disliked Mr. Perrot so much that together with ADA Bloom they fabricated a false confession and forged Mr. Perrot's signature on it. *Id*. ¶ 96. ADA Bloom had previously described Mr. Perrot in his diary as "inherently evil" and a "sociopath." *Id*. ¶¶ 95, 97.

not let her see him until they had coerced and fabricated statements from him. *Id*. During the interrogation, Mr. Perrot was emotional, incoherent, and suicidal. At one point he asked Officer Jarvis for his gun so he could kill himself. *Id*. ¶ 49.

After approximately twelve hours of interrogation, Mr. Perrot falsely confessed to breaking into Ms. Lichwala's and M.P.'s homes, though he remained adamant that he did not assault or rape M.P.  *Id.* ¶¶ 47-48, 51-52; *Perrot IV*, 2016 WL 380123, at *2. Mr. Perrot alleges that by psychologically and physically abusing him, the defendants forced him to make this false confession, which was admitted at his trial; defendants not only fabricated the contents of the confession but also fabricated Mr. Perrot's initials and signature on it. (#126 ¶ 52); *Perrot IV*, 2016 WL 380123, at *2.

After Mr. Perrot's interrogation, the officers conducted a lineup.  (#126 ¶¶ 55-59.)  Mr. Perrot did not match the description of the perpetrator that M.P. had given police: a man twenty to thirty years old, with neat, short hair and no facial hair. *Id.* ¶ 56. In contrast, Mr. Perrot was a teenager with a mustache, goatee, and long, wild hair. *Id*. Mr. Perrot alleges that "rather than fill the lineup with persons that looked like the perpetrator that M.P. described to the Defendants, the Defendants instead included persons who looked like [Mr. Perrot] but who were easily identifiable as police officers." *Id.* ¶ 57. M.P. did not identify Mr. Perrot as her assailant. *Id.* ¶¶ 58-59.

As part of their investigation, the officers claimed to have found three pieces of forensic evidence in M.P.'s house – a bedsheet with blood on it, a pair of gloves with blood on them, and a hair removed from the bedsheet. *Id.* ¶¶ 61-62. Mr. Perrot alleges that the officers planted the gloves at the crime scene and fabricated statements from both Mr. Perrot's sister and M.P. to connect the gloves to Mr. Perrot. *Id.* ¶ 61. He also alleges that the defendants planted and fabricated evidence concerning the hair and the blood on the bedsheet.  *Id*. ¶ 62.  In the alternative, Mr. Perrot

alleges that if the hair did match his own, defendants planted Mr. Perrot's hair on the bedsheet. *Id*. ¶ 81.

Mr. Perrot was arraigned and appointed counsel on December 9, 1985. *Perrot I*, 554 N.E.2d at 1209. On December 10, 1985, Officer Kane went to the Hampden County House of Correction to witness the taking of a blood sample from Mr. Perrot. *Id*. Officer Kane's account was that while he was with Mr. Perrot, Mr. Perrot started talking to Officer Kane, who stopped him and advised him of his *Miranda* rights. *Id*. Officer Kane then questioned Mr. Perrot about the break-in at Ms. Lichwala's residence, and Mr. Perrot told Mr. Kane of the location of Ms. Lichwala's pocketbook. *Id*.  Mr. Perrot asserts that he did not make any of these incriminating statements to Officer Kane and that the statements he did make were the result of a police-initiated interrogation, which took place after he had been arraigned and appointed counsel. (#126 ¶ 102.)

Mr. Perrot was indicted by a grand jury in Hampden County for the November 30, 1985 burglary of Ms. Lichwala's residence and (among other charges) the rape of M.P.  *Perrot IV*, 2016 WL 380123, at *3; (#126 ¶ 101).

### 3.   The Involvement of the Federal Defendants.

As part of the investigation, ADA Bloom and Detective Kennedy drove to Washington D.C. to meet with FBI Agent Oakes and hand-deliver to him the hair supposedly found at M.P.'s house. (#126 ¶¶ 83, 98.) Delivering the evidence personally to Agent Oakes was "a highly unusual, if not unprecedented" step. *Id*. ¶ 98. The hair was allegedly found on a bedsheet, even though M.P. was adamant that her attacker was never on the bed, as the rape happened on the floor. *Id*. ¶ 82. ADA Bloom and Detective Kennedy informed Agent Oakes that Mr. Perrot was their investigative target and that he was "inherently evil." *Id*. ¶¶ 83, 98.

Agent Oakes examined the hair and testified at trial that it was a match with Mr. Perrot's hair. *Id*. ¶ 76. Mr. Perrot alleges that, at least by 1992, when he testified at Mr. Perrot's second

trial, Agent Oakes was aware of the limitations of hair microscopy analysis and knew that his testimony about the hair identification in this case was contrary to science and that the hair did not match Mr. Perrot's hair. *Id.* ¶¶ 76-80.[8]

Mr. Perrot alleges that defendants informed Agent Eubanks that the blood found on M.P.'s bedsheet was from the assault when they knew that was not true. *Id*. ¶ 87. Agent Eubanks tested the blood on the bedsheet and falsely testified that Mr. Perrot's blood was "consistent" with it; tests that showed Mr. Perrot's blood was inconsistent with the sample were never disclosed. *Id.* ¶¶ 88-89.

### 4.   Defendants' Suppression of Exculpatory Evidence.

Mr. Perrot alleges that defendants withheld from him evidence that another man was responsible for the series of assaults on elderly women. (#126 ¶ 63.) After Mr. Perrot's arrest, an 80-year-old woman was raped and murdered in Springfield and a man named James Jones later pled guilty to the crime. *Id.* ¶ 28. Although that man more resembled M.P.'s description of the person who raped her than did Mr. Perrot, the defendants never investigated Mr. Jones for M.P.'s rape. *Id.*

---

[8] In fact, Mr. Perrot's allegations indicate that Agent Oakes should have known that his testimony at Mr. Perrot's first trial, which took place in 1987, was improper. Mr. Perrot points to a February 19, 1981 paper presented at the annual meeting of the American Academy of Forensic Sciences that identified several examples of FBI analysists overreporting the scientific results of hair microscopy and that expressed the view that hair microscopy was not a scientifically valid way to determine the source of hair found at a crime scene. (#126 ¶¶ 69-72.) Mr. Perrot also points to a symposium in 1985 that Agent Oakes attended where, again, presenters discussed the limitations of hair microscopy, including that analysts should not report that hairs "matched" because it was not possible to "match" hairs. *Id.* ¶ 73. Finally, with regard to what Agent Oakes knew after Mr. Perrot's first trial but before his second trial, which took place in 1992, Mr. Perrot points to a 1991 memorandum by Special Agent William Tobin to the Section Chief of the FBI hair microscopy section reaffirming the FBI's policy against agents reporting or testifying that hairs were "matches," and the internal training based on that memorandum. *Id.* ¶ 74.

Mr. Perrot alleges that defendants attempted to coverup their wrongdoing by destroying evidence such as handwritten contemporaneous notes and some physical evidence, so that forensic testing could not be done to prove Mr. Perrot's innocence. *Id.* ¶ 99.

        5.      Proceedings in State Court and Discovery of a Fabricated Confession.

In 1987, during Mr. Perrot's trial for the burglary of Ms. Lichwala's house and for the rape of M.P., ADA Bloom introduced into evidence the blood-stained bedsheet, the gloves, Mr. Perrot's admissions, Ms. Lichwala's pocketbook, and the hair and blood analysis conducted by Agents Oakes and Eubanks. *Perrot IV*, 2016 WL 380123, at *3. He introduced testimony from Ms. Lichwala and M.P., FBI Agents Oakes and Eubanks, Officer Marianne Popko, Detective Thomas Jarvis, and Sergeant Thomas Kelly. *Id.* at *3-7.

Mr. Perrot was convicted on all counts on December 14, 1987, and was sentenced to life in prison for the rape of M.P. *Id.* at *10; (#126 ¶ 1). On appeal, the Massachusetts Supreme Judicial Court ("SJC") found that the statements Mr. Perrot made to Officer Kane were properly suppressed before trial because Officer Kane's interrogation violated Mr. Perrot's Sixth Amendment right to counsel, *Perrot I*, 554 N.E.2d at 1209-10 (affirming the Superior Court's reliance on *Michigan* v. *Jackson*, 475 U.S. 625 (1986)), but that the pocketbook allegedly discovered as a result of those statements should not have been admitted at trial, and so vacated the conviction and ordered a new trial. *Id.* at 1210-11; (#126 ¶¶ 102-03).

In January 1992, Mr. Perrot was tried for the second time for the burglary of Ms. Lichwala's house and the rape of M.P. *Perrot IV*, 2016 WL 380123, at *11. Except for the improperly admitted pocketbook that the SJC identified in *Perrot I*, the Commonwealth's evidence at the second trial was almost identical to the evidence presented at the first trial. *Id.* at *11-23 (describing the evidence and testimony presented at the second trial).

Before the second trial, Sergeant Kelly found a confession in Mr. Perrot's file that had been forged by ADA Bloom and the other officers. *Perrot II*, 648 N.E.2d at 1316; (#126 ¶ 103). In it, Mr. Perrot confessed to the assault of M.P and also to an earlier, unsolved housebreak. *Id.* This forged confession had been used by ADA Bloom to try to coerce two friends of Mr. Perrot's to confess that they had been Mr. Perrot's accomplices in an earlier burglary. The effort failed. *Perrot II*, 648 N.E.2d at 1316.

ADA Farris, who tried the second case, disclosed the forged confession to defense counsel. *Id.* Although Mr. Perrot attempted to introduce the forged confession in the second trial, the trial judge allowed the Commonwealth's motion to exclude it. *Id.* at 1316-17.

Mr. Perrot was again convicted; he appealed to the Massachusetts Appeals Court, which affirmed. *See generally*, *id.*

In 2001, Perrot filed a motion for new trial, arguing that the prosecutor's improper remarks during closing argument warranted reversal. *Perrot IV*, 2016 WL 380123, at * 23.  On September 10, 2001, the Hampden County Superior Court allowed the motion. *Id.* In May 2003, the Appeals Court, in an unpublished decision, reversed, holding that the prosecutor's statements during closing argument did not create a substantial risk of a miscarriage of justice. *See Commonwealth* v. *Perrot* ("*Perrot III*"), 787 N.E.2d 1154 (Mass. App. Ct. 2003) (Table), *rev. denied* 805 N.E.2d 44 (Mass. 2004) (Table).

In 2006 and 2008 Mr. Perrot, pro se, filed motions for new trials that were both denied, and his appeals were dismissed for lack of prosecution. *Perrot IV*, 2016 WL 380123, at *24.

In 2012, the FBI conducted an audit of cases in which its hair microscopy examiners had testified and determined that some examiners, including Agent Oakes, had overstated the conclusions that can be drawn from hair microscopy analysis, and determined that Agent Oakes

had made erroneous statements when testifying at Mr. Perrot's 1992 trial. *Id.* As noted above, Mr. Perrot filed a motion for a new trial in 2014, which was granted by the Hampden County Superior Court 2016; in October 2017 the Commonwealth filed a *nolle prosequi* relating to all charges concerning the rape of M.P. (#141-1.)[9]

### 6. The Police Department's Practices.

Mr. Perrot alleges that the officers' misconduct was not an isolated incident. (#126 ¶ 110.) He alleges that their wrongdoing in his case was undertaken in part pursuant to a policy, practice, or custom of the Police Department. *Id.*

Mr. Perrot alleges that the Police Department did not require officers to file any official police reports after interrogating suspects and did not require officers to record interrogations. *Id.* ¶¶ 66, 112. The Police Department did not keep handwritten notes taken by officers in the official file of a case. *Id.* ¶ 65. It allowed officers to withhold material exculpatory and impeachment evidence; to conduct unduly extended interviews of juveniles with no safeguards in place to prevent physical or psychological coercion; to plant and fabricate evidence; and discouraged officers from recording interviews or interrogations unless there was some information that could help the prosecution. *Id.* ¶¶ 111-12, 118.

Mr. Perrot alleges that the Police Department willfully failed to promulgate rules, regulations, and training procedures to ensure that its officers did not overstep constitutional boundaries when conducting interrogations. *Id.* ¶¶ 113, 119. The Police Department failed to train officers to collect and preserve documents, including investigative files, and to disclose exculpatory evidence. *Id.*

---

[9] The Commonwealth left intact, and Mr. Perrot does not challenge, the conviction for the burglary of Ms. Lichwala's residence.

The City, Mr. Perrot alleges, had notice that its policies were insufficient, especially in light of ongoing litigation, which demonstrated that "numerous individuals have been wrongfully convicted of crimes that they did not commit." *Id.* ¶ 123.

## III.  <u>STANDARD OF REVIEW</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged and that the misconduct is actionable." *Iqbal*, 556 U.S. at 678. In a case brought under 42 U.S.C. § 1983, the court evaluates whether "the facts alleged, viewed in the light most favorable to the complaining party, show that the [defendant's] conduct violated some constitutional right." *Limone* v. *Condon*, 372 F.3d 39, 44 (1st Cir. 2004). Further, "[to resolve a qualified immunity defense], the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law." *Crawford-El* v. *Britton*, 523 U.S. 574, 598 (1998).

To decide whether a complaint sufficiently states a claim on which relief can be granted, the court "accept[s] as true all well-pleaded facts set forth in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Artuso* v. *Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011) (citing *S.E.C.* v. *Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc)). The court need not, however, accept the legal conclusions drawn from those facts. *Iqbal*, 556 U.S. at 678.

In deciding a motion to dismiss, the court may consider documents "integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Clorox Co. Puerto Rico* v. *Proctor & Gamble*

*Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (internal quotation marks and citations omitted). The court may also take judicial notice of the prior decisions of Massachusetts courts in this case, since they are part of the public record and "have relevance to the matters at hand." *Kowalski* v. *Gagne*, 914 F.2d 299, 305-06 (1st Cir. 1990); *see also Giragosian* v. *Ryan*, 547 F.3d 59, 65-66 (1st Cir. 2008). It may not, however, take judicial notice of the facts within those decisions, unless those facts meet the requirements of Fed. R. Evid. 201(d). *Jones* v. *Bank of New York as Trustee for Certificate Holders CWABS, Inc. Asset-Backed Certificates, Series 2004-7*, 542 F. Supp. 3d 44, 51 n.3 (D. Mass. 2021). To satisfy Fed. R. Evid. 201(d), the fact must not be "'subject to reasonable dispute' because that fact is either 'generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.'" *Id.* (quoting *Lopes* v. *Riendeau*, 177 F. Supp. 3d 634, 666 (D. Mass. 2016) (quoting Fed. R. Evid. 201(d)).

The doctrines of res judicata, or claim preclusion, and of collateral estoppel, or issue preclusion, apply in civil rights actions brought pursuant to section 1983. *See Johnson* v. *Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005) (issue preclusion); *Spencer v. Dookhan*, No. 1:16-cv-12076, 2017 WL 2785423, at *4 (D. Mass. Jun. 27, 2017) (claim preclusion). Under both doctrines, the court is required to "give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged." *Johnson*, 424 F.3d at 93. "Both federal and Massachusetts law require proof of three elements to invoke claim preclusion: (1) the identify or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgement on the merits.'" *Spencer*, 2017 WL 2785423, at *4 (internal quotation marks and citations omitted). Under collateral estoppel, however, Massachusetts has abandoned the requirement of mutuality, so in deciding whether to apply the doctrine the court gives judgments

of the state courts preclusive effect if "the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully [and if no] reason exists to afford the party a chance to relitigate the issue." *Kyricopoulos* v. *Town of Orleans*, 967 F.2d 14, 16 (1st Cir. 1992) (per curiam).

## IV.   **THE INDIVIDUAL DEFENDANTS**

Mr. Perrot is suing ADA Bloom, who investigated his case and then represented the Commonwealth during his 1987 trial, and ten officers employed by the Police Department at the time of his original arrest and conviction. (#126 ¶¶ 17-20.) Mr. Perrot contends that the officers and ADA Bloom conspired to violate his rights under the Fifth and Fourteenth Amendments by coercing him into making false and incriminating statements,[10] withholding evidence, fabricating evidence, destroying evidence, conspiring to frame him, failing to intervene, and maliciously prosecuting him for the rape of M.P. *Id.* ¶¶ 137-138. He raises state claims including alleged violation of Mass. Gen. Laws, ch. 12, § 111, malicious prosecution, civil conspiracy, negligent and/or intentional infliction of emotional distress, and spoliation of evidence. *Id.* ¶ 137.[11]

---

[10] Mr. Perrot does not explicitly raise claims under the Fourth Amendment for excessive use of force, though he certainly alleges facts consistent with this kind of claim. *E.g.*, #126 ¶¶ 41-43, 47-50. Consequently, the court considers his claims against the individual officers under both the Fourth and Fifth Amendments.

[11] None of the defendants raise any issue relating to the state law claims, except Officer Kane, who asserts in two sentences that spoliation of evidence is "not a cause of action" but rather is "a doctrine under which a judge can impose sanctions against a litigant who negligently loses or destroys evidence that the litigant knows or reasonably should know would be relevant to a possible action." (#147 at 10.) It is not clear to the court whether the spoliation of evidence alleged in the amended complaint (#127 ¶ 137) refers only to the FBI agents' handling of the blood and hair evidence (which claims have been dismissed by Judge Woodlock), or the officers' conduct. At any rate, Officer Kane is correct that Massachusetts does not recognize a cause of action for spoliation, *see Fletcher* v. *Dorchester Mut. Ins. Co.*, 773 N.E. 2d 420, 424 (Mass. 2002) and as far as the amended complaint may be read to assert one, (rather than simply alleging that evidence was spoliated by defendants), that "cause of action" may not be prosecuted.

It is apparent that Mr. Perrot is seeking damages pursuant to 42 U.S.C. § 1983, which establishes a private right of action against any state official who, under color of law, "subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Mr. Perrot asserts a right to damages under 42 U.S.C. § 1985(3), which extends the right of action established by section 1983 to any conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

A.      *ADA Bloom*

Mr. Perrot alleges that ADA Bloom violated his rights under the Fifth and Fourteenth Amendments by fabricating evidence against him, coercing him into falsely confessing, and failing to intervene to prevent officers of the Police Department from fabricating evidence and unlawfully coercing a confession. (#126 ¶ 138.)[12] In the alternative, Mr. Perrot alleges that ADA Bloom participated in the conduct of the officers, including during their arrest and illegal interrogation of him, in the coercion and fabrication of false statements, and the fabrication of other evidence, including the planting of the gloves and hair. *Id.* ¶¶ 91-93; *see Perrot II*, 648 N.E.2d at 1316.

In response, ADA Bloom argues that he is protected by absolute prosecutorial immunity or that he is at least entitled to qualified immunity for his actions. (#143 at 7-17.)  He also argues that Mr. Perrot fails to allege specific facts about his conduct that would support a reasonable inference of liability. *Id.* at 17.

---

[12] ADA Bloom argues that Mr. Perrot is collaterally estopped from "litigating the voluntariness of his confession" because the SJC previously upheld the trial court's denial of his motion to suppress. (#143 at 14-15); *see Perrot I*, 554 N.E.2d at 1208. This argument fails because Mr. Perrot did not have the opportunity to fully litigate this issue in his motion to suppress and his 1990 appeal. *See Part III*, *supra*.

1.    <u>Prosecutorial Immunity</u>

Prosecutors are absolutely immune from suit under section 1983 for "their conduct in initiating a prosecution and presenting the State's case . . . insofar as that conduct is intimately associated with the judicial phase of the criminal process." *Burns* v. *Reed*, 500 U.S. 478, 486 (1991) (internal quotation marks omitted) (citing *Imbler* v. *Pachtman*, 424 U.S. 409, 430-31 (1976)). As the Supreme Court has explained, this immunity "is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." *Imbler*, 424 U.S. at 422-23. "If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties," and "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Id*. at 424-25.

An "official seeking absolute immunity bears the burden of showing that such immunity is justified." *Burns*, 500 U.S. at 486. "That burden is a heavy one." *Penate* v. *Kaczmarek*, 928 F.3d 128, 135 (1st Cir. 2019) (citing *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 269 (1993) ("[W]e have been 'quite sparing' in recognizing absolute immunity for state actors . . . ." (quoting *Forrester* v. *White*, 484 U.S. 219, 224, (1988)))). "A prosecutor's absolute immunity is narrowly circumscribed, encompassing only those actions . . . which can be characterized as 'quasi-judicial'" and those circumstances in which the judicial process adequately protects the interests of a defendant against a dishonest prosecutor. *Siano* v. *Justices of Massachusetts*, 698 F.2d 52, 58 (1st Cir. 1983) (internal citation omitted). A prosecutor is not, for example, absolutely immune from suit for providing legal advice to law enforcement officers during an investigation, *Burns*, 500 U.S. at 496; fabricating evidence long before a grand jury has made an indictment, *Buckley*, 509 U.S. at 275-76; or making false statements in a probable cause affidavit in support of a search warrant, *see generally Kalina v. Fletcher*, 522 U.S. 118 (1997); *but see*

*Burns*, 500 U.S. at 491 (holding that a prosecutor was absolutely immune for statements made during a hearing in support of a search warrant application); or, for actions taken pursuant to national security functions, *see generally Mitchell* v. *Forsyth*, 472 U.S. 511 (1985).

To determine whether a prosecutor is entitled to absolute immunity for a particular act, courts "have applied a 'functional approach.'" *Buckley*, 509 U.S. at 269.  "The question . . . is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates'" rather than as investigators or administrators. *Id.* at 274. To the extent that ADA Bloom's conduct was directly linked to the judicial process, he is absolutely immune. Mr. Perrot cannot maintain a suit against him for introducing false testimony or fabricated evidence at trial; nor can he recover damages for his failure to disclose exculpatory materials under *Brady* v. *Maryland*, 373 U.S. 83 (1963). *See generally Van de Kamp* v. *Goldstein*, 555 U.S. 335 (2009).

To the extent Mr. Perrot's claims concern ADA Bloom's actions during the investigatory phase of the case, however, ADA Bloom is entitled only to qualified immunity. As alleged, all of ADA Bloom's acts took place outside the judicial process while law enforcement officers and ADA Bloom were still investigating the attack on M.P. *See Filler* v. *Kellett*, 859 F.3d 148, 155 (1st Cir. 2017) (holding that a prosecutor's immunity depends on whether the alleged misconduct occurred during the investigative phase or the prosecutorial phase, and that the question of when conduct occurred is a factual one that may require discovery); *see also Bledsoe* v. *Vanderbilt*, 934 F.3d 1112, 1119-21 (10th Cir. 2019). Therefore, the court recommends that ADA Bloom's motion to dismiss be denied on the grounds that he has absolute immunity.

### 2.   Qualified Immunity

Mr. Perrot's claims against ADA Bloom must be dismissed if he cannot show (i) a violation of a constitutional right, and (ii) that that right was "clearly established at the time of the violation." *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013). "This second part . . . has two aspects,"

namely "the clarity of the law at the time of the violation," and "whether a reasonable defendant would have understood that his conduct violated plaintiff's constitutional rights" under the particular facts of the case. *Id.* Unlike absolute immunity, the "scope or extent of [qualified] immunity" does not depend "on the precise nature of various officials' duties or the precise character to the particular rights alleged to have been violated." *Anderson* v. *Creighton*, 483 U.S. 635, 643 (1987). Instead, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citations omitted).

As set out above, the second part of the qualified immunity test asks whether ADA Bloom's actions violated "legal rules that were clearly established at the time [the complained-of action] was taken." *Anderson*, 483 U.S. at 639 (citing *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law' . . . which means it is dictated by 'controlling authority' or a 'robust consensus of cases of persuasive authority.'" *District of Columbia* v. *Wesby*, 138 S. Ct. 577, 589-90 (2018) (citing, *inter alia*, *al-Kidd*, 563 U.S. at 741-42). This does not mean that there must be caselaw dated before 1985 addressing facts identical to those alleged here. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," so long as "the state of the law in [1985] gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002).

The legal principles Mr. Perrot cites as the basis for his claim that ADA Bloom fabricated evidence, including Mr. Perrot's coerced and fabricated confession that was admitted at trial, the

later forged confession that was put into the case file and discovered before the second trial,[13] and

the allegedly fabricated hair and blood evidence, were clearly established in 1985, when the

investigation into Mr. Perrot began. The Supreme Court held as early as 1935 that "the Due Process

Clause forbids convictions predicated on deliberate deceptions." *Limone*, 372 F.3d at 45 (citing,

*inter alia*, *Mooney* v. *Holohan*, 294 U.S. 103 (1935) (per curiam)); *see also Miller* v. *Pate*, 386

U.S. 1, 7 (1967) (holding that "the Fourteenth Amendment cannot tolerate a state criminal

conviction obtained by the knowing use of false evidence"); *Haley* v. *City of Boston*, 657 F.3d 39,

---

[13] ADA Bloom suggests that there was no constitutional violation concerning the confession which he is alleged to have generated and used to try to coerce two of Mr. Perrot's friends into confessing that they committed another burglary with Mr. Perrot, because that confession was not used against Mr. Perrot in the 1992 trial. (#143 at 15-16.)  The court disagrees. To be sure, one may argue that a plaintiff cannot maintain a suit for violations of due process based on fabricated evidence that was never introduced at trial. *See, e.g.*, *Chavez* v. *Martinez*, 538 U.S. 760, 767 (2003) (holding that questioning by law enforcement does not violate the Fifth Amendment unless the answers are subsequently introduced at trial); *Petty* v. *City of Chicago*, 754 F.3d 416, 422-23 (7th Cir. 2014) (holding that an officer who coerced a witness into testifying against a defendant violated the rights of the witness but not the defendant, meaning the defendant could not maintain a section 1983 claim against the officer); *cf. Matthews* v. *City of New York*, 889 F. Supp. 2d 418, 440-41 (E.D.N.Y. 2012) (holding that a coerced confession provides grounds for a section 1983 suit (citing *Ricciuti* v. *N.Y.C. Transit Authority*, 124 F.3d 123, 130-31 (2d Cir. 1997))).  There is also some debate about causation, and about when a constitutional violation is complete for the purpose of a section 1983 suit. *See, e.g.*, *Whitlock* v. *Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012) (holding that the constitutional violation based on the fabrication of evidence "was not complete until trial" and that, had the evidence not been used, the section 1983 plaintiff would not have been entitled to a remedy because he could not adequately plead causation); *Zahery* v. *Coffey*, 221 F.3d 342, 350-51 (2d Cir. 2000) (holding that there are two ways of looking at causation; the first is to say "no deprivation of liberty occurs unless and until the jury convicts and the defendant is sentenced" and the second is to say that the fabrication itself is the denial of a constitutional right, and collecting cases).

No matter how one conceptualizes causation, however, Mr. Perrot has stated a claim for relief against ADA Bloom with regard to the forged confession. It played some role prior to the second trial in the prosecutor's preparation and evaluation of the strength of the case. *See Perrot II*, 648 N.E.2d at 1316. Because the confession was fabricated to coerce friends of Mr. Perrot's into admitting to committing an additional burglary with him, it also vividly demonstrates the lengths to which ADA Bloom was willing to go to implicate Mr. Perrot in the rape of M.P., including fabricating evidence.

50-51 (1st Cir. 2011) ("'[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit'" (quoting *Limone*, 372 F.3d at 44-45)). In *Limone* v. *Condon*, the First Circuit unequivocally held that "by 1967, no reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit" using false testimony or evidence. 372 F.3d at 50 (internal quotation marks and citations omitted). In short, ADA Bloom was on notice that fabricating evidence violated a suspect's due process rights at the time of the alleged wrongdoing here.

The court concludes that Mr. Perrot's claims relating to ADA Bloom's involvement in delivering evidence to FBI Agents Eubanks and Oakes also survive qualified immunity at this stage, because Mr. Perrot alleges that in an effort to frame him, ADA Bloom intentionally misled Agent Eubanks, at least, about the source of the blood found in M.P.'s residence.

Although ADA Bloom's motion—and indeed, the defendants' motions generally—focus on plaintiff's allegations regarding the alleged fabrication of evidence, that is not plaintiff's only claim. He also alleges that "Defendant Bloom participated in the arrest and illegal interrogation of Plaintiff" (#126 at ¶ 92) and the willful "suppression of exculpatory evidence," including blood test results that were inconsistent with plaintiff's blood, *id.* ¶¶ 87-91.

It was well established by 1985 that all such actions violated the Constitution. For instance, in *Haley* v. *City of Boston*, the First Circuit considered a case similar to this one, where a 1972 trial bolstered by the deliberate suppression of exculpatory statements that contradicted the government's central witnesses led to a man's 34-year wrongful incarceration. 657 F.3d at 50-51. After his conviction was vacated and the charges against him were dismissed, plaintiff sued the city and the two detectives who had spearheaded the investigation in 2009. *Id.* at 43-44. The First

Circuit upheld the officers' qualified immunity for plaintiff's *Brady* claims because by 1972 it was not yet clear that *Brady* extended to police officers.  *Id.* at 48-49. The court denied qualified immunity on the deliberate suppression claims, however, holding that "even as far back as 1972," a reasonable officer would have understood that the deliberate suppression of material exculpatory evidence "would contravene the constitutional right limned in *Mooney* and its progeny." *Id.* at 50-51. By 1985, then, it was clearly established that the deliberate suppression of evidence, as plaintiff alleges here, violated the Constitution.

Similarly, in *Miller v. Fenton*, the Supreme Court stated that it "has long held that certain interrogation techniques . . . are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." 474 U.S. 104, 109 (1985). "Faced with statements extracted by beatings and other forms of physical and psychological torture, the Court held [as far back as 1936] that confessions procured by means 'revolting to the sense of justice' could not be used to secure a conviction." *Id.* (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)).  ADA Bloom (and the other defendants) would have known by 1985 that the beatings, sleep-deprivation, and other "revolting" interrogation tactics alleged in the amended complaint violated plaintiff's constitutional rights.

Plaintiff's allegations that ADA Bloom failed to intervene in the other defendants' bad acts, however, deserve further discussion.  (#126 ¶ 138.)  In the First Circuit, while law enforcement officers may have a general obligation to intercede if a constitutional violation is committed in their presence, this duty has not been clearly established outside the excessive force context.  *See Cosenza* v. *City of Worcester*, 355 F. Supp. 3d 81, 100-01 (D. Mass. 2019); *Echavarria* v. *Roach*, No. 16-cv-11118, 2017 WL 3928270, at *10-11 (D. Mass. Sept. 7, 2017) ("[I]t appears that the duty to intervene itself must be clearly established."). Even then, the First Circuit's earliest

pronouncement of police officers' duty to intervene in the excessive force context was in 1990, five years after the conduct alleged here (and only in dicta). *Gaudreault* v. *Municipality of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991). In addition, although the First Circuit has not had occasion to do so, other courts have expressed caution in extending officers' duty to intervene in police misconduct to prosecutors. *See, e.g.*, *Patrick* v. *City of Chicago*, 213 F. Supp. 3d 1033, 1053-55 (N.D. Ill. 2016) ("There are good reasons to be cautious in expanding the law in this area to include [prosecutors]."); *Ekwunife* v. *City of Philadelphia*, 245 F. Supp. 3d 660, 672-73 (E.D. Pa. 2017); *see also Gaudreault*, 923 F.2d at 207 n.3 (noting only that "[a] police officer cannot be held liable for failing to intercede if he has no realistic opportunity to prevent an attack" (internal quotation marks and citations omitted)).  In light of this uncertainty even today, any duty ADA Bloom may have had to intervene in the officers' use of excessive force during Mr. Perrot's interrogation, or in other constitutional violations the officers are alleged to have committed, was not clearly established in 1985. Thus, ADA Bloom has established qualified immunity with respect to Mr. Perrot's failure to intervene claims against him, and this court recommends that any claims based on failure to intervene be dismissed.

3.      Failure to State a Claim

The final question is whether Mr. Perrot has alleged "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted). As discussed above, Mr. Perrot's claims against ADA Bloom pass muster as they plausibly allege that in the investigative stage of the case, ADA Bloom participated in conduct that violated Mr. Perrot's constitutional rights, and other than the failure to intervene claim, those claims survive qualified immunity at this stage.

23

### B.    Individual Police Officers

Mr. Perrot also brings suit against Thomas Kelly, Thomas Jarvis, Richard Kane, Charles Arpin, Thomas Kennedy, Marianne Popko, Paul Glantz, Ronald St. Germain, and Cheryl Clapprood, who were officers in the Police Department when Mr. Perrot was originally arrested and convicted. (#126 ¶ 17.) In essence, Mr. Perrot alleges that these officers conspired with one another and with ADA Bloom to deprive Mr. Perrot of his right to due process under the Fifth and Fourteenth Amendments by coercing him into making incriminating statements and withholding and fabricating evidence in violation of *Brady*. *Id*. ¶ 137.

In response, Officers Arpin and Kane filed individual motions to dismiss the claims against them, (##129, 146), while the remaining officers filed a joint motion to dismiss the complaint for failing to state a claim of personal liability. (#138.)

### 1.    Qualified Immunity

The officers claimed that they are entitled to qualified immunity in their initial motion to dismiss the original complaint (#37) but did not raise that claim in their present motions. As a general rule, "[i]mmunity, whether qualified or absolute, is an affirmative defense that can be forfeited, if not asserted in a timely manner, or waived."  *Chestnut* v. *City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring) (citing, *inter alia*, *Guzman-Rivera* v. *Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996) ("Qualified immunity is an affirmative defense, and the burden of pleading it rests with the defendant." (internal quotation marks and citations omitted))).  Since the officers have not raised qualified immunity, the court will not evaluate that claim here.[14]

---

[14] The court finds that even if the officers had raised qualified immunity, the claims against the individual officers would survive at this stage. Although *Brady* was not extended to law enforcement officers until 1995, as noted above, the prohibition against the deliberate suppression or fabrication of evidence was well-established as of 1985. *See Mooney*, 294 U.S. 103; *Haley*, 657 F.3d at 50-51. Similarly, the officers who arrested and interrogated Mr. Perrot should have known that their use of force and coercive interrogation techniques were improper under the Fourth and

The officers have not waived the defense altogether. The First Circuit has advised that defendants "may plead the defense at various stages in the proceedings." *Guzman-Rivera*, 98 F.3d at 667.  Specifically, they may raise the defense "on the pleadings, in a motion to dismiss," on a motion for summary judgment, or at trial. *Id.*

2. <u>Officer Kane</u>

In response to the amended complaint, Officer Kane filed an independent motion to dismiss for failure to state a claim and on the basis of the doctrines of *res judicata* and collateral estoppel. (#146.) Officer Kane argues that he was involved only with investigating the burglary of Ms. Lichwala's home and so any claim against him is barred by *Heck* v. *Humphrey*, 512 U.S. 477 (1994). (#147 at 10-11.)  He also argues that Mr. Perrot is precluded from re-litigating his claims concerning evidence related to the burglary of Ms. Lichwala's residence, *id*. at 11-13, and that Mr. Perrot has failed to state a claim of liability against him personally, *id*. at 9-10.

a) *Challenge to a Valid Conviction*

Officer Kane argues that Mr. Perrot's claim against him is barred because, if proven, it would necessarily invalidate his conviction for the burglary of Ms. Lichwala's residence. *Id.* at 11. The Supreme Court has made clear that "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement . . . even though such a claim may come within the literal terms of § 1983." *Heck*, 512 U.S. at 481 (citing *Preiser* v. *Rodriguez*, 411 U.S. 475 (1973); *see also Davis* v. *Schifone*, 185 F. Supp. 2d 95, 100 (D. Mass. 2002) ("Under *Heck*, the principle barring collateral attacks . . . is not rendered inapplicable by the fortuity that a

---

Fifth Amendments. *See, e.g.*, *Terry* v. *Ohio*, 392 U.S. 1 (1968) (regarding the use of force); *Oregon* v. *Elstad*, 470 U.S. 298 (1985) (regarding coercive interrogation tactics).

convicted criminal is no longer incarcerated." (internal quotation marks and citations omitted) (alteration in original)).

For a plaintiff to recover damages for conduct "whose unlawfulness would render the conviction or sentence invalid," he must first prove "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87; *Figueroa* v. *Rivera*, 147 F.3d 77, 80 (1st Cir. 1998) ("Here, the appellants do not allege that an authorized tribunal or executive body overturned or otherwise invalidated [the plaintiff's] conviction. Consequently, *Heck* bars the unconstitutional conviction and imprisonment claims.").

Officer Kane is correct that, in this case, Mr. Perrot is barred under *Heck* from seeking damages for any misconduct that, if proven, would necessarily invalidate his 1992 conviction for the burglary of Ms. Lichwala's residence. That conviction, unlike the conviction for the rape of M.P., has not been overturned or called into question by post-conviction proceedings in either state or federal court.

While certain of Mr. Perrot's specific allegations against Officer Kane may "necessarily imply the invalidity of his conviction" for the burglary of Ms. Lichwala's residence, these are not the only factual allegations in the amended complaint. *Heck*, 512 U.S. at 487. First, Officer Kane is part of the group of officers against whom Mr. Perrot complains, and thus is alleged to have done more than simply taken Mr. Perrot's statement concerning the burglary of Ms. Lichwala's residence. Second, even if one focuses on the specific allegations against Officer Kane, his involvement, and by extension the statements made to him, were not limited to the burglary of Ms. Lichwala's residence. In the amended complaint, Mr. Perrot alleges generally that Officer Kane fabricated false statements and questioned him outside the presence of his counsel, and that those

statements were used against him in his original trial for the rape of M.P. (#126 ¶¶ 102-103.)  The facts in the complaint, read in conjunction with the SJC opinion ordering a new trial, raise the inference that Officer Kane was involved in the investigation of the assault on M.P., and, in the course of questioning, Mr. Perrot made statements to Officer Kane that were related to the rape of M.P. *Id*.; *see also Perrot I*, 554 N.E.2d at 1209 (indicating that Officer Kane was involved in collecting Mr. Perrot's blood and hair samples).

At this stage of the case, one cannot say that Mr. Perrot's allegations against Officer Kane, if proven, necessarily imply only that his undisturbed conviction for the burglary of Ms. Lichwala's residence was invalid.  The court recommends that Mr. Perrot's claims against Officer Kane not be dismissed on this basis.

b)      *Res Judicata and Collateral Estoppel*

Next, Officer Kane argues that Mr. Perrot should be precluded from re-litigating his conviction for the burglary of Ms. Lichwala's residence because this conviction was specifically upheld by the Superior Court in 2016. *See Perrot IV*, 2016 WL 380123 at *1. Officer Kane's argument here, like his argument with respect to *Heck* v. *Humphrey*, is flawed: the amended complaint levels allegations against him that far exceed his investigation of the burglary of Ms. Lichwala's residence.[15]

---

[15] To the extent Officer Kane argues that the constitutionality of Mr. Perrot's admission regarding Ms. Lichwala's pocketbook and the subsequent admission of the pocketbook are precluded by collateral estoppel, that argument, too, fails.  Although both issues were addressed by the trial court and the SJC, and neither piece of evidence was admitted at Mr. Perrot's second trial, plaintiff alleges that Mr. Kane elicited more than information regarding Ms. Lichwala's pocketbook (#126 ¶ 102), and that that information was used to indict and convict him for the rape of M.P., *id.* ¶ 101. In any event, at the time the trial court and SJC addressed these issues, the extent of the defendants' alleged misconduct, which bears directly on the integrity of the investigation, was not yet known. Where Mr. Perrot has alleged that misconduct, dishonesty, and malice permeated defendants' entire investigation into M.P.'s rape, additional discovery is needed to tell how deep each particular bad act cut into Mr. Perrot's constitutional rights. At least at this stage of the case, such

c)       *Failure to State a Claim*

Finally, Officer Kane argues that Mr. Perrot has failed to state a claim for personal liability against him because, again, he was involved only in the investigation of the burglary. (#147 at 9-10.)  He also argues that, because Mr. Perrot has not made any other specific allegations against him, he cannot be held liable for misconduct related to Mr. Perrot's conviction for the assault of M.P. *Id.*

As explained above, the court will not recommend dismissal of Mr. Perrot's claims because of Officer Kane's contentions concerning his limited involvement in the investigation. The court also will not recommend dismissal of Mr. Perrot's claims against Officer Kane, or any of the officers, on the basis that the pleadings do not specifically name the individuals responsible for each violation, especially because Mr. Perrot has pursued this claim, at least in part, as a conspiracy under 42 U.S.C. § 1985.  (#126 ¶¶ 20, 93.)

---

circumstances "justify affording him an opportunity to relitigate the issue." *Johnson*, 424 F.3d at 93 (internal quotation marks and citations omitted).

The same reasoning applies to the alleged wrongful coercion of plaintiff's other admissions, to the burglary of Ms. Lichwala's and M.P.'s homes, by ADA Bloom and the other officers. (#143 at ¶¶ 14-15). When the trial court found that plaintiff's confession following his initial interrogation was voluntary, *Perrot I*, 554 N.E.2d at 1208, that court did not have information concerning the extent of defendants' bad acts. Altogether, plaintiff alleges that defendants framed him to solve a high-profile string of rapes and assaults and vindicate their personal animosity toward him, which clearly bears on the integrity of their initial interrogation. Most of this was not known at the time of the initial motion to suppress or subsequent appeal. *E.g.*, *Perrot II*, 648 N.E.2d at 1316 (noting that ADA Bloom's "overzealous and seriously misguided scheme" to forge Mr. Perrot's "name to a bogus postconviction confession" was not "known at the time the defendant's appeal was heard in the [SJC]"); *Perrot IV*, 2016 WL 380123, at *32 (finding that ADA Bloom's feelings towards Mr. Perrot "enable a person possessing public authority to shed restraints and scruples that limit the exercise of power," and that these "feelings that filled [ADA] Bloom's mind, coupled with his trip to Washington, D.C., produce a reasonable foundation for the inference that Bloom voiced his views about Perrot to Oakes" before Agent Oakes' testimony at Mr. Perrot's second trial). Denied the full context of defendants' scheme, Mr. Perrot "lacked a full and fair opportunity to litigate the issue in the first action." *Johnson*, 424 F.3d at 83 (internal quotation marks and citations omitted). Again, at this early stage and without the benefit of full discovery, this court recommends against applying collateral estoppel to plaintiff's claims related to the constitutionality of his admissions.

3.        The Form of the Pleadings

Like Officer Kane, Officer Arpin and the other officers move to dismiss the amended complaint because, they say, it does not adequately provide the officers with notice of the claims against them. (#129; #137.)  Officer Arpin argues that the complaint fails to allege any specific claims against him and should be dismissed because of its form. (#129.)  Similarly, the other officers argue that the complaint should be dismissed because it fails to mention with specificity which defendant took which unlawful action. (#138 at 9-10.)  They argue that the amended complaint does not specifically identify actions by Officers Kelly, Popko, Glantz, St. Germain, and Clapprood, and therefore that the claims against those officers should be dismissed. *Id.*

In his motion to dismiss, Officer Arpin focuses on the form of the amended complaint, arguing that it constitutes a type of "shotgun pleading" that fails to provide him with adequate notice of the claims against him. (#129 at 2.)  The term "shotgun pleading" has been used by courts to describe a complaint that is "'calculated to confuse the 'enemy' and the court'" by conflating various theories of relief. *Weiland* v. *Palm Beach County Sherriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015) (quoting *T.D.S. Inc.* v. *Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n. 14 (11th Cir. 1985)); *see also United States ex rel. Estate of Cunningham* v. *Millennium Laboratories of California, Inc.*, 713 F.3d 662, 664 n. 2 (1st Cir. 2013).

The Eleventh Circuit has stated that "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. Officer Arpin argues that the amended complaint "assess[es] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions" and therefore should be dismissed. *Id.*; *see* #129. The other named officers raise the same argument and claim that because section 1983 allows only for

personal liability, the claims against officers not specifically named in the allegations should be dismissed.[16]  *See Kostka*, 560 F.2d at 40 ("§ 1983 [does not] authoriz[e] damages liability where an individual has no personal role in the wrongdoing.  Such an actor by definition lacks the bad faith required to expose him to damages liability under § 1983.").

In response, Mr. Perrot argues that the allegations in the amended complaint may proceed under the group pleading doctrine. The First Circuit has acknowledged the existence of the group pleading doctrine, though it has done so almost exclusively in the context of securities cases. *See, e.g.*, *In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (questioning without deciding whether the group pleading doctrine is permissible in securities cases after the passage of the PSLRA.); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 340-41 (D. Mass. 2002).

The First Circuit has also made clear, however, that unlike the securities context, civil rights actions under section 1983 do not carry with them any heightened pleading standards. *See Educadores Puertorriqueños en Acción* v. *Hernández*, 367 F.3d 61, 66-67 (1st Cir. 2004). Moreover, several judges in this District, and on district courts around the country, have concluded that, at the pleading stage, it is sufficient for a civil rights plaintiff to identify a group of individuals who may be liable, even if the complaint does not identify the specific individuals responsible for

---

[16] Although the other officers argue generally that the amended complaint fails to state a claim against them for violations of Mr. Perrot's constitutional rights, (#138 at 8-9), they acknowledge that Mr. Perrot has made specific allegations against Officers Jarvis and Kennedy. *Id*. at 10-13; (#126 ¶¶ 49, 98). Officer Jarvis interrogated Mr. Perrot after his arrest on December 7, 1985, (#126 ¶ 49), and Officer Kennedy traveled to Washington, D.C. with ADA Bloom to deliver the hair and blood samples to Agents Oakes and Eubanks. *Id*. ¶ 98. The Superior Court also indicated that Officer Kelly was in charge of the investigation and initially questioned Mr. Perrot after his arrest and that Officer Popko took M.P.'s statement and was involved in the investigation. *Perrot IV*, 2016 WL 380123, at *2-4. Further, the court again notes that Mr. Perrot makes detailed claims against each of the individual officers in his supplemental pleading, filed after a hearing before Judge Woodlock, *see* #169, to which no defendant responded.

each violation. *See, e.g.*, *Echavarria*, 2017 WL 3928270, at *3-4 (allowing a complaint which identified a group of defendants but did not name any individuals to proceed to discovery because "[i]n this case, Plaintiff is not attempting to claim that all Defendants are liable for the actions of a few; rather, Plaintiff asserts he is unable to know, without further discovery, which Defendant committed or participated in which particular act.").[17]

"[G]roup pleading is not an ideal practice, especially when it would seem possible to name a particular defendant." *Hyung Seok Koh* v. *Graf*, No. 11-cv-02605, 2013 WL 5348326, at *5 (N.D. Ill. Sept. 24, 2013). The events in question here, however, happened well over thirty years ago. Mr. Perrot has not had the benefit of full discovery. Moreover, the officers are all on notice of the claims against them: the amended complaint makes clear that Mr. Perrot is seeking compensation for misconduct that occurred as part of the 1985 investigation into the rape of M.P. Mr. Perrot has described with adequate particularity the conduct of the officers involved, though he has not named them individually. (#126 ¶¶ 41-44, 49-52, 55-59.)

At this stage, then, the court recommends denying the motions to dismiss the claims against Officer Arpin, Officer Kane, or the other officers on the basis that the amended complaint provides insufficient notice of the claims against them. The officers are not precluded from raising a similar

---

[17] *See also Carter* v. *Newland*, 441 F. Supp. 2d 208, 213-14 (D. Mass. 2006) (holding that "plaintiff's complaint, although thin on detail, provides sufficient notice to the defendants of his § 1983 claim alleging deliberate indifference to his serious medical needs" because it describes generally the conduct of the prison medial staff. "At this very early stage in the litigation, that allegation is enough for plaintiff to proceed."); *Mitchell* v. *Rappahannock Reg'l Jail Auth.*, 703 F. Supp. 2d 549, 559-60 (E.D. Va. 2010) (same); *Hyung Seok Koh* v. *Graf*, No. 11-cv-02605, 2013 WL 5348326, at *4-5 (N.D. Ill. Sept. 24, 2013) ("Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer. Such a pleading standard would effectively allow police officers to violate constitutional rights with abandon as long as they ensured they could not be individually identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply.").

argument at the summary judgment stage if Mr. Perrot fails, after discovery, to adduce adequate evidence regarding how specific officers were involved in the alleged wrongdoing.

    4.   <u>Failure to State a Claim</u>

Finally, the individual officers argue that Mr. Perrot has failed to state a claim against them for violations of constitutional rights. They assert that Mr. Perrot has not shown that Officer Kennedy's conduct – driving the hair and blood samples to the FBI laboratory in Washington, D.C. – caused any of the alleged constitutional harms.  (#138 at 11.) They also argue that Mr. Perrot has not shown that Officer Jarvis was involved in any improper conduct other than the initial interrogation or that the statements made during that interrogation were "materially detrimental" to Mr. Perrot. [18]  *Id.* at 12.

Both arguments read the amended complaint too narrowly, and ignore the fact that Mr. Perrot has alleged that all the named officers participated in the alleged misconduct as part of their investigation into the rape of M.P. To illustrate this point the court will focus on arguments that Mr. Perrot has failed to allege that the actions of Officers Kennedy and Jarvis caused Mr. Perrot's injury.

Mr. Perrot has alleged sufficient facts to make out a violation of his constitutional rights. He alleges that, after being arrested, he was beaten, psychologically abused, and interrogated in violation of his constitutional rights until he falsely confessed to the burglary of Ms. Lichwala's and M.P.'s homes. (#126 ¶¶ 41-49, 52.) These statements were admitted against Mr. Perrot at both

---

[18] The officers argue generally that Mr. Perrot fails to state a claim against the other named officers – Officers Clapprood, St. Germain, Popko, Glantz, and Kelly – because none of these officers are specifically named in any of the allegations. (#138 at 8-9.)  The court has already held that the pleadings are sufficient to provide these officers with notice of the claims against them. The allegations in the complaint relating to Mr. Perrot's arrest, interrogation, and placement in a bogus line-up are sufficient to raise at least the inference that his right to be free from excessive force and to due process of law were violated. (#126 ¶¶ 41-44, 49-52, 55-59.)

trials. *Perrot IV*, 2016 WL 380123, at *3. He alleges that Officer Jarvis was involved in the wrongful conduct leading to the statements, as he "ask[ed] Defendant Jarvis for his gun so he could kill himself" during the interrogation. (#126 ¶ 49.) Mr. Perrot has raised a plausible claim that these statements were obtained in violation of his right to be free from excessive force, his right to not be framed for a crime he did not commit, and his privilege against self-incrimination.

The same is true with respect to the hair and blood evidence. Mr. Perrot alleges that the officers fabricated the hair and blood evidence collected from M.P.'s residence and ADA Bloom and Officer Kennedy led Agents Oakes and Eubanks to believe that the hair and blood had been left behind by the perpetrator. (#126 ¶¶ 61-63, 82-83, 87-88.) This evidence too was admitted at both trials. *Perrot IV*, 2016 WL 380123, at *3. Accepting as true Mr. Perrot's allegation that officers fabricated this evidence and intentionally misled Agents Oakes and Eubanks with respect to its provenance, it seems clear that Mr. Perrot adequately has alleged a violation of his right to due process and that Officer Kennedy was directly involved in that violation.

The remaining question is whether the introduction of the statements obtained from Mr. Perrot by Officer Jarvis and other officers or the hair and blood evidence provided to Agents Oakes and Eubanks by Officer Kennedy caused the harm Mr. Perrot suffered. The First Circuit has made clear that "[t]he issue of causation of damages in a section 1983 suit is based on basic notions of tort causation" and "may be fleshed out with reference to state law tort principles." *Rodriguez-Cirilo* v. *Garcia*, 115 F.3d 50, 52 (1st Cir. 1997); *see also Buenrostro* v. *Collazo*, 973 F.2d 39, 45 (1st Cir. 1992). While the actions of a subsequent participant who exercises independent judgment may, in some circumstances, break the chain of causation, "defendants in section 1983 cases are [generally] liable for the consequences caused by reasonably foreseeable intervening forces," if the intervening judgment is "caused by pressure or misleading information provided by the actor

whom the plaintiff seeks to hold liable." *Zahery* v. *Coffey*, 221 F.3d 342, 351 (2d Cir. 2000) (internal quotation marks and citations omitted) (collecting cases). Thus, the officers involved in investigating Mr. Perrot can still be liable for the harm caused by his wrongful conviction if it was reasonably foreseeable that their wrongful conduct, and the evidence uncovered as a result, would have resulted in his conviction. *Id*.

Moreover, Officers Kennedy and Jarvis may be held liable if their conduct "combine[d] to produce a single, indivisible injury" – in this case, the wrongful conviction. *Shepard* v. *General Motors Corp.*, 423 F.2d 406, 408 n. 2 (1st Cir. 1970); *see also Saudi Arabia* v. *Nelson*, 507 U.S. 349, 375 (1993) (Kennedy, J., concurring) ("As a matter of substantive tort law, it is not a novel proposition . . . to recognize that a single injury can arise from multiple causes, each of which constitutes an actionable wrong."). Here, both Mr. Perrot's statements during the interrogation and the hair and blood evidence were obtained in violation of the Constitution and both allegedly contributed to his conviction. Mr. Perrot therefore has adequately alleged that the officers involved in the investigation, including Officers Jarvis and Kennedy, jointly caused his injury and can be held jointly liable.

Mr. Perrot has adequately stated a claim against the officers and this court recommends that their motions to dismiss be denied.

## V.   **CITY OF SPRINGFIELD**

Mr. Perrot sues the City of Springfield separately for the actions of its instrumentality, the Police Department, under *Monell* v. *Dep't of Soc. Services of the City of New York*, 436 U.S. 658 (1978). Mr. Perrot alleges that the Police Department failed to train and supervise its officers and that it failed to institute policies, including relating to interrogations and document retention, to ensure that officers complied with their obligations under the Constitution. (#126 ¶¶ 65-66, 110-119.)

In *Monell*, the Supreme Court extended liability under section 1983 to municipalities in circumstances where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The Court made clear that *Monell* liability is not a version of vicarious or *respondeat superior* liability. *Id*. at 692-93. Instead, it requires that the municipality's "official policy [be] the moving force of the constitutional violation." *Id*. at 694.

For Mr. Perrot to state a claim against the City, then, he must show both that he suffered an injury as the result of a constitutional violation and that the injury was caused by, or can be directly attributed to, the City of Springfield as a result of its policies or practices.

A.    *Constitutional Injury*

The City argues that it cannot be held liable under *Monell* because Mr. Perrot has failed to allege that Mr. Perrot's injuries were caused by a constitutional violation. (#141 at 11-15.)  It is true that "the City cannot be held liable absent a constitutional violation by its officers." *Evans* v. *Avery*, 100 F.3d 1033, 1040 (1st Cir. 1996). Nevertheless, Mr. Perrot's suit against the City is not entirely contingent on the success of his claims against the individual officers.

Unlike public officers, a municipality "does not have available a qualified immunity defense with respect to damages claims alleged to result from its own constitutional infractions." *Haley*, 657 F.3d at 51. Any claims against the City are "measured under current law, without regard to whether the municipality's legal obligations were clearly established when the alleged malfeasance occurred." *Id*. Even if the individual officers may be shielded by qualified immunity, the City is not. In other words, the City can be held liable in the absence of actionable liability against any individual officer.

Moreover, liability against the City, unlike liability against individual officers, does not necessarily require Mr. Perrot be able to attribute individual, unlawful acts to specific officers. It

is sufficient for Mr. Perrot to allege that the practice of the Police Department was "the moving force behind the injury alleged." *Id*. (internal quotation marks and citation omitted); *see also Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 479 (1986) ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of the *employees* of the municipalities, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." (emphasis in original)).

As discussed above, Mr. Perrot has adequately alleged that injury was caused by constitutional violations, and he has stated a claim against officers of the Police Department.  As further explained above, Mr. Perrot has plausibly alleged that the officers improperly questioned him after his arrest and mishandled evidence, in violation of *Brady*. Consequently, Mr. Perrot has adequately stated a claim for the first prong of *Monell* – that he was injured by a constitutional violation.

### B.       The City's Official Policy and Failure to Train

Mr. Perrot must allege sufficient facts to show that his injury was caused by an "official policy" or custom of the Police Department. *See Pembaur*, 475 U.S. at 479. In interpreting this prong of *Monell*, the Supreme Court has explained that, while an "'official policy' often refers to formal rules or understandings . . . that are intended to . . . establish fixed plans of action to be followed under similar circumstances consistently and over time," it is not limited to formal rules or understandings.  *Id*. at 480-81.  Instead, the term "official policy" includes "a 'custom' that has not been formally approved by an appropriate decisionmaker . . . [that] is so widespread as to have the force of law." *Bd. of Commerce of Bryan Cty.* v. *Brown*, 520 U.S. 397, 404 (1997).

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Brown*, 520 U.S. at 404. "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id*.

(emphasis in original). In other words, the plaintiff must show either that a policy promulgated by the City was facially unlawful or that the City acted "with 'deliberate indifference' as to [its policy's] known or obvious consequences." *Id.* at 407.  A plaintiff may satisfy this burden by claim that "'the practices [alleged] have been so widespread or flagrant that in the proper exercise of their official responsibilities, the municipal policymakers should have known of them'" and failed to act. *Bordanaro* v. *McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (1st Cir. 1987)); (#126 ¶¶ 120-22.)

*Monell* also encompass the municipality's failure to train its officers, so long as "the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 388 (1989). To demonstrate "deliberate indifference" on a failure-to-train claim, a plaintiff must show "[a] pattern of similar constitutional violations by untrained employees." *Connick* v. *Thompson*, 563 U.S. 51, 62 (2011).

Here, Mr. Perrot has provided only bare assertions that formal polices promulgated by the Police Department at the time of his arrest and prosecution were facially unlawful. (#126 ¶¶ 110-12, 116.) He asserts in more detail that the City was deliberately indifferent to the obvious consequences of the policies it adopted[19] and failed to modify the policies, supervise officers, or

---

[19] Mr. Perrot alleges that the City ignored the fact that its policies relating to interrogations allowed officers to overstep constitutional boundaries by conducting hours-long interrogations and using improperly coercive tactics. (#126 ¶¶ 65, 111-13, 118.) Similarly, he alleges that the City failed to implement policies that would have required officers to record interrogations or keep handwritten notes during the course of an investigation, resulting in persistent violations of *Brady*. *Id*. ¶¶ 66, 112. With respect to both sets of violations, Mr. Perrot alleges in the alternative that the City failed to train officers to ensure that they complied with the limits placed by the Constitution. *Id*. ¶¶ 113, 119.

At this stage of the case, Mr. Perrot is not required to *prove* that the City promulgated a particular policy or was deliberately indifferent to the consequences of its existing policies. He only needs to allege plausibly that such a policy existed or that the City's decision-makers were on notice of the grave risk of harm posed by its officers. *See, e.g.*, *Huffman* v. *City of Boston*, No. 21-cv-10986,

train officers to comply with the Constitution's mandates. *Id.* ¶¶ 113-22; *see also Connick*, 563 U.S. at 61 ("The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." (internal quotation marks and citation omitted)).

In support of his allegations against the City, Mr. Perrot points to the fact that, in recent years, the City has been sued several times as a result of alleged police misconduct.[20] *Id.* ¶ 123.

---

2022 WL 2308937, at *6-8 (D. Mass. Jun. 27, 2022) ("Plaintiffs will have to overcome significant issues of proof if they are to prevail at trial.  Nonetheless, the Court finds that, at this stage, Plaintiffs have adequately pleaded municipal liability based on the role that City customs and policies allegedly played in the constitutional violations. While the Court does 'not lightly infer a municipal policy or practice from a few scattered claims . . . neither should it blind itself.'") (quoting *Cox* v. *Murphy*, No. 12-cv-11817, 2016 WL 4009978, at *10 (D. Mass. Feb. 12, 2016) (internal alterations incorporated)); *Owens* v. *Baltimore City State's Attorneys Office*, 767 F.3d 379, 403-04 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier. . . .The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. 570)).

[20] Mr. Perrot cites to three cases. (#126 ¶ 123.)  The first is *Wilhite* v. *Pioggia, et. al.*, No. 3:14-cv-30023 (D. Mass.). Mr. Wilhite filed suit against the Springfield Police Department for violations of constitutional rights on the basis that the City's photographic identification process was overly suggestive, and that the Police Department induced false testimony from various witnesses and manufactured evidence against him. *Id.* #1. Mr. Wilhite was indicted and convicted in 2009 but was acquitted after a second trial in 2013. *Id.* He ultimately settled his suit against the City in February 2017.  *Id.* #110.

Mr. Perrot also cites *Schand, et al.* v. *City of Springfield*, No. 15-30148 (D. Mass.). Mr. Schand was originally convicted in 1987, served 27 years for a murder he claimed he did not commit, and was eventually granted a new trial in 2013 because several witnesses recounted their testimony. After the Commonwealth declined to re-try Mr. Schand, his family filed suit on his behalf against the Springfield Police Department, alleging that the Police Department's photographic identification procedure was constitutionally deficient, among other claims. Judge Ponsor granted summary judgment to the City, finding that while the photographic identification procedures the officers used in his case clearly were constitutionally deficient, plaintiffs had not produced any evidence of a pattern of police misconduct prior to 1986 that would put the city on notice of some significant risk that, driven by the inadequate training, constitutional violations would occur. 380 F. Supp. 3d 106, 134 (D. Mass. 2019).

Mr. Perrot argues that the three cases to which he cites all concern wrongful convictions, one of which, involving plaintiff Mark Schand, was close in time to the events at issue here. (#156 at 44-45.) The circumstances of the other two cases, which post-date events here, are relevant to show the policies and practices that existed before those cases were brought. *Bordanaro*, 871 F.2d at 1166-67 ("The Court has never held that inferences about what customs or policies existed in a city before an event could not be drawn from subsequent actions. Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

Regarding whether policymakers were on notice at the time of injury to Mr. Perrot that officers consistently violated the constitutional rights of suspects, the court takes note that as of 1985, when the constitutional violations against Mr. Perrot took place, the City of Springfield had been sued at least twice in federal court for claims that are almost identical to the claims levied here – wrongful arrest and questioning of a minor, unlawful or excessive use of force, and malicious prosecution. *See generally, e.g.*, *Santiago* v. *Fenton*, 891 F.2d 373, 377-78 (1st Cir. 1989) (suit originally filed in 1985); *Kibbe* v. *City of Springfield*, 777 F.2d 801, 802-03 (1st Cir. 1985). In *Kibbe*, the City was held liable for failing to train its officers with respect to the use of force. *Kibbe*, 777 F.2d at 809. These suits, combined with Mr. Perrot's allegations concerning other practices of the Police Department, such as the practice that the Police Department did not

---

Finally, Mr. Perrot cites *Penate* v. *Kaczmarek, et. al*., No. 3:17-cv-30119 (D. Mass.). Mr. Penate filed suit against the City of Springfield, among others, alleging that officers failed to comply with their obligations under *Brady*, that the City failed to supervise the chemists working in its drug labs, and that the City ignored a long-standing practice of one narcotics officer who stole funds seized from defendants and that the City undertook no investigation or disciplinary action following numerous reports about the misconduct. Mr. Penate was originally convicted in 2012; he served five years in prison as a result of several officers' deliberate withholding of evidence. *Id.* #1. Magistrate Judge Robertson denied the City of Springfield's motion to dismiss, *see* 2018 WL 4654708 (D. Mass. Jan. 27, 2018) and eventually the City settled the case.

require officers to file reports or retain handwritten notes from interrogations, *id.* ¶¶ 65-66, are sufficient plausibly to allege that the City was on notice of and deliberately indifferent to the possibility that its officers were routinely engaged in unconstitutional conduct.

Consequently, Mr. Perrot has stated plausible claims against the City under both the custom and policy and failure to train theories. The court recommends that the City of Springfield's motion to dismiss be denied.

## VI.   <u>CONCLUSION</u>

For the reasons set out above, this court recommends that the motion to dismiss the claims against Charles Arpin (#129) be denied; the motion to dismiss the claims against defendants Thomas Kelly, Cheryl Clapprood, Paul Glantz, Thomas Jarvis, Thomas Kennedy, Marianne Popko, and Ronald St. Germain (#137) be denied; the motion to dismiss the claims against the City of Springfield (#140) be denied; the motion to dismiss the claims against Frances Bloom (#142) be allowed in part, in that any claim concerning failure to intervene should be dismissed and that the motion to dismiss otherwise be denied; the motion to dismiss the claims against Richard Kane (#146) be denied; and that the claims against Paul Lance be dismissed.

_____/s/ Page Kelley_____
PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE

February 15, 2023