# EXHIBIT A

Volume: I

Pages: 1-194

Exhibits: 1-15

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 18-cv-10147

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

GEORGE PERROT,
Plaintiff
vs.

THOMAS KELLY, THOMAS JARVIS, RICHARD KANE, CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN, THOMAS KENNEDY, CHIEF ERNEST STELZER, MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAIN, ANDREW CANEVARI, CHERYL CLAPPROOD, CAPTAIN JOHN BROWN, UNKNOWN OFFICERS OF THE SPRINGFIELD POLICE DEPARTMENT, THE CITY OF SPRINGFIELD, MASSACHUSETTS, FRANCIS BLOOM, WILLIAM EUBANKS, WAYNE OAKES and UNKNOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION,
Defendants

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

DEPOSITION of FRANCIS BLOOM

January 23, 2019 10:30 a.m.-3:53 p.m.

Jones & Fuller Reporting

10 High Street

Boston, Massachusetts

Reporter: Cynthia F. Stutz, CSR

APPEARANCES:

TARA THOMPSON, ESQ.
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
312-243-5900  tara@loevy.com
on behalf of the Plaintiff

SUSANNE REARDON, ASSISTANT ATTORNEY GENERAL
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108
617-963-2832  susanne.reardon@ma.gov
on behalf of the Defendant, Francis Bloom

AUSTIN M. JOYCE, ESQ.
WILLIAM JOYCE, ESQ.
Reardon, Joyce & Akerson, P.C.
4 Lancaster Terrace
Worcester, Massachusetts 01609
508-754-7220  ajoyce@rja-law.com
on behalf of the Defendant, Charles Arpin

APPEARANCES, CONTINUED (VIA TELECONFERENCE):

EDWARD PIKULA, ESQ.
City Solicitor of Springfield
36 Court Street, Room 210
Springfield, Massachusetts 01103
413-787-6085 epikula@springfieldcityhall.com
on behalf of the Defendant,
City of Springfield

CAROLE LYNCH, ESQ.
Morrison Mahoney LLP
1500 Main Street, P.O. Box 15837
Springfield, Massachusetts 01115
413-737-4373 clynch@morrisonmahoney.com
on behalf of the Defendant, Richard Kane

GLENN GREENE, ESQ.
U.S. Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
202-616-4143 glenn.greene@usdoj.gov
on behalf of the Defendants,
William Eubanks and Wayne Oakes

# I N D E X


| EXAMINATION OF: | PAGE |
|---|---|
| Francis Bloom | |
| (Direct by Ms. Thompson) | 6 |
| (Cross by Mr. Joyce) | 189 |
| (Cross by Ms. Reardon) | 190 |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Responses to Interrogatories | 6 |
| Exhibit 2 | Statement dated 12/16/87, Plaintiff 4102-4104 | 53 |
| Exhibit 3 | Grand Jury Testimony 2/25/91, Plaintiff 1673 & 1719-1745 | 71 |
| Exhibit 4 | Letter dated 4/1/87, City 3724-3725 | 122 |
| Exhibit 5 | Statements dated 12/7/85, City 4105-4106 | 131 |
| Exhibit 6 | Jarvis Springfield PD Report dated 12/7/85, Plaintiff 4160 | 135 |
| Exhibit 7 | Bloom FBI Phone Message, DA Discovery 386 & 387 | 135 |

INDEX CONTINUED


| EXHIBITS: | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 8 | Public Reprimand Summary dated 1/29/02, City 133-123 | 137 |
| Exhibit 9 | DA File Notes, City 6224-6263 | 139 |
| Exhibit 10 | Blood Sample Needed Notes, City 6267-6277 | 139 |
| Exhibit 12 | Spread Sheet, City 6266 | 139 |
| Exhibit 13 | Commonwealth v. Perrot Chart, DA Discovery 312 | 139 |
| Exhibit 14 | Letter dated 1/13/88, DA Discovery 263 | 175 |
| Exhibit 15 | Evidence Acknowledgment dated 4/1/87, DA Discovery 661 | 179 |


* EXHIBITS RETAINED BY ATTORNEY THOMPSON *

P R O C E E D I N G S

(Bloom Exhibit 1 marked for identification.)

Whereupon:

FRANCIS W. BLOOM,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. THOMPSON:

Q. Can you please identify yourself for the court reporter here, sir?

A. Sure. Francis W. Bloom, B-l-o-o-m and I live in Plymouth, Mass. My office is 85 Post Office Park, Wilbraham, Mass.

Q. You mentioned an office. Are you still working as an attorney, sir?

A. Yes.

Q. What kind of work does your practice currently entail?

A. Just exclusively at this point personal injury.

Q. And are you working, is your practice composing a full-time job for you right now?

A. That would be a stretch to say I'm working full time.
Q. Are you as busy as you want to be?
A. I'm as busy as I want to be.
Q. Have you ever been deposed before, Mr. Bloom?
A. If I have, I don't remember it, being deposed.
Q. As an attorney are you familiar with how a deposition works, sir?
A. I am.
Q. I won't go through the whole litany of things I might otherwise explain, but I will say this. If at any point you need to take a break, you're welcome to do so. And obviously, we started this deposition with a break you probably didn't want, but whenever you want to take a break, that's fine. I would just ask if there is a question pending, that you answer it before we break. Is that all right, sir?
A. Thank you.
Q. Is there any reason that you would be unable to give truthful and accurate testimony today?

A. No, other than there's memory issues. But the things that I can remember I'll be as truthful as I can about.

Q. And when you say memory issues, obviously the events in this case occurred some time ago.

A. Right.

Q. Is that what you're referring to by memory issues?

A. I specifically was referring to, even reading some documents, even my prior testimony in 1991. I don't dispute what my testimony was, but it still didn't refresh me that the event took -- some of the events took place, if that makes sense to you at all.

Q. It does. And I guess my question for you is you have -- Have you ever been diagnosed by a doctor as having some particular memory problem?

A. No.

Q. So when you talk about memory issues, you're saying a normal person having limits of memory that normal people do that might impact your testimony about these events?

A. Sure. The length, the length of time between some of these events and today.

Q. All right. One other thing before we go further. I've conferred with your counsel and while normally in this deposition I believe that I would have the right to ask you some questions that relate to the claim for punitive damages which my client has made in this case, questions that I believe would allow me to go into things having to do with your personal finances. Your counsel and I have an agreement that I won't ask those questions today with the understanding that if in the future part of this litigation it becomes relevant for the litigation, and I think your attorney has indicated that your attorney would want me to seek a court order to do that, that at that point you would cooperate in giving us certain information related to your finances. So I think that's the understanding between your counsel and I.

MS. REARDON: Yes.

A. I certainly will comply with a court order.

Q. All right. So what I'm saying is I'm agreeing not to ask those questions today with the understanding that you will cooperate with an appropriate order in the future that allows me to

get that information from you.
A. Certainly.
Q. Okay. How long have you been practicing law primarily in the personal injury world?
A. I went into private practice in January of 1990. This is a guess, but within a couple years, two or three years anything that was coming into the office that wasn't personal injury I was referring out, because I had enough personal injury to keep my office busy.
Q. Since you went into private practice has your office always been in the location that you identified at the beginning of this deposition?
A. No.
Q. When you first went into private practice where was your office?
A. I was at two other locations and they were all on Boston Road. They were both on Boston Road in Wilbraham. The numbers I couldn't tell you.
Q. Have you taken matters to trial since you went into private practice?
A. Yes.
Q. How many trials would you estimate that you have done since going into private practice?

A. My last trial was in June of this past year in Suffolk, you know, over twenty to forty. Maybe, but let me qualify that. In the beginning I was doing criminal defense and I did a lot of defending trials in criminal matters, so that probably makes that a lot higher. But I think twenty to forty personal injury cases probably would be accurate.
Q. Do you have any idea how many trials you did in criminal court in private practice?
A. Probably twenty.
Q. Were any of those twenty felonies?
A. Yes.
Q. How many?
A. I don't know, but I remember one specifically, so I can say yes to the one that comes to my mind.
Q. Do you think more than half were felonies?
A. No.
Q. More than a quarter?
A. I don't know.
Q. In your private practice have you had any law partners?
A. No.

Q. Have you had any employees?
A. Yes.
Q. What position were those employees? Were they administrative or other attorneys?
A. Other attorneys, paralegals, administrative positions, secretaries, office managers.
Q. Do you have any employees currently?
A. Yes.
Q. How many?
A. Two.
Q. And what role do they play in your practice?
A. One of them's an attorney, so pretty much does everything that I would do, and the other is an administrative position or office manager.
Q. Have you had any employees in your private practice that were formerly with the District Attorney's office?
A. Yes.
Q. Who?
A. Paul Barry.
Q. Can you spell his last name?
A. B-a-r-r-y.

Q. Anyone else beside Mr. Barry?
A. Not that I can think of, no.
Q. Have you had any employees that were previously employed by the Springfield Police Department?
A. No.
Q. Have you ever worked in your private practice with any private investigators who were formerly with the Springfield Police Department?
A. No, I -- The answer would be no. I mean, I have had cases in the past with Dr. John Quiznowski (phon.), who's an accident reconstructionist and he teaches to the Springfield Police, other law enforcement agencies, but he won't be considered an employee of the Springfield Police.
Q. He's never been a sworn officer?
A. No. He's an engineer.
Q. Okay. Prior to going into private practice were you a member of the District Attorney's office?
A. I was.
Q. When did you start -- We're talking about the Hampden County District Attorney's Office?
A. Yes.

Q. When did you start there?
A. My best guess is sometime between '75 and '77.
Q. Did you have any other legal jobs before you started with the DA's office?
A. No.
Q. When did you graduate from law school?
A. '78 or '79.
Q. And when did you pass the bar exam?
A. The next time it came up in '78 or '79 after I graduated.
Q. So when you started in '75 or '77 or whenever that was before you graduated from law school what were you doing with the DA's office?
A. Well, a number of things, but I tried a number of cases. At that time the district court in Massachusetts, criminal cases people that were convicted by a judge had a right, which is not the case any more, to appeal it to a twelve man jury in the superior court. And when I was still a student the District Attorney had me sworn in through the Supreme Court -- I forget the rules, one point whatever, that allowed me to handle those cases. So everybody was convicted in the district court,

particularly if they got any kind of an incarceration, appealed it to the superior court. So I was handling those the last couple years I was in the DA's office before I passed the bar.

Q. Have you had any other employment as an adult other than with the DA's office and the private practice that you have described?

A. Yes.

Q. What other jobs have you had?

A. Oh, boy. You know, I worked construction. I worked in a factory. I worked in the sheriff's department for a summer. I'm sure there were others that escape me at the moment.

Q. Those three jobs, construction, the factory and the sheriff's office, were those all pre-law school?

A. I think, I think maybe the first year I was in law school I was working in the sheriff's department.

Q. You said for the summer?

A. For a period of time. I don't know how long I was there. Could have been for the summer.

Q. But a short-term job?

A. Short term.

Q. What were you doing?
A. Actually, what I was doing was what I remember doing is there was a couple of sequestered injuries, I want to say murder cases, and I was one of the people at night responsible for making sure they were complying with the court orders, you know, no TV, no newspaper, no getting on the phone and talking to family members, no talking about the case among themselves, things of that nature.
Q. Is there anything else you remember doing for the sheriff's department besides that?
A. No.
Q. After you passed the bar and became an attorney in the DA's office were you assigned to try particular cases or to do particular tasks as an Assistant DA?
A. I was in superior court.
Q. And what kind of cases did you work on while you were assigned to superior court?
A. There was never really a breakdown in that office, like maybe some others have. Like, here's the homicide unit and here's the unit that deals with burglaries or whatever. What would happen was the District Attorney would assign cases to his

assistants in the superior court based on whatever he was thinking at that time, I suppose based on people's experiences, their experience and how he viewed their capabilities as he assigned the cases out. But there was no break, like these three guys were in homicide, these three guys were in crimes against property. There wasn't that kind of break in that office for the years I was there.

Q. How many Assistant District Attorneys were there in the office when you started as a lawyer?

A. In superior court?

Q. Well, in the office in total.

A. Well, you've got to understand on top of Springfield, then you have all the outlying court, Holyoke, Palmer, Westfield, you know, 50 to 100, maybe if you talk about the entire Hampden County, I suppose.

Q. And what about ADA's assigned to superior court when you started?

A. I'm going to say ten, give or take would be my best guess. And that's a guess.

Q. Did you ever have any other assignments in the District Attorney's office other than being assigned to superior court?

A. Never.
Q. All right. And in 19 -- Maybe let's start in 1984 how many Assistant District Attorneys were assigned to superior court?
A. Again, if I had to guess, I would say ten, ten, eight to twelve, in the neighborhood of ten.
Q. In 1984 how -- Well, let me ask the question this way. In 1984 if there was some type of ongoing investigation in the Springfield Police Department about a serious felony was there a particular point at which an Assistant District Attorney would be assigned to that case?
A. I know it's a mistake to say never or always, but I can't remember anybody in my, in that office ever having anything to do with a Springfield case before someone was arrested. That certainly was the protocol. And I have no memory of that protocol ever being violated by me or anybody else, for that matter, particularly with Springfield.
Q. When you say particularly with Springfield, for some of the smaller municipalities in Hampden County was it different?
A. Could have been.
Q. And why would there be that difference?

A. Because the DA's office had their own investigative unit, undercover State Police. And Springfield wanted had nothing to do with them being involved in their cases. That was well known to everybody in the DA's office that -- So someone from the DA's office was involved and there was theoretically some type of investigation going on, the State Police from our office would be involved, and that was a no-no as far as Springfield was concerned.

That's not necessarily the case with some of the other, particularly small towns. If you had a major homicide going on in a small town like Agawam or Palmer, they may even have solicited help from the State Police to help them in the investigation.

But it was well known among everybody the Springfield people wanted to handle their own cases up to the point of arrest.

Q. And from your perspective is this just them being territorial about not wanting the State Police involved?

A. I think that's a good way to put it, a fair way to put it.

Q. In the course of your --
A. And if I can add?
Q. Go ahead, go ahead.
A. If I can -- I honestly think that they didn't think they needed their help ever, the people that -- And maybe they're right, you know. I mean, they had some very highly qualified people. Whether they did or they didn't, they didn't think they needed the help of the State Police, from my perspective.
Q. In the course of your work as an Assistant District Attorney you got to know some members of law enforcement on a personal level, is that right?
A. Yes.
Q. I mean, were there people in law enforcement who you became friends with in the course of your work?
A. Yes.
Q. Did, on a friendly basis, anyone from the Springfield Police Department ever ask you, you know, your take on a case, your advice on a case at some point before it was charged -- or excuse me -- at some point before there was an arrest?
A. Not that I can recall.

Q. Did you ever hear of anyone else in the District Attorney's office being asked on more of a friendly basis for advice or for assistance on some case before there was an arrest?

A. No. No, I don't remember.

Q. So what was the process for the Springfield Police Department to get -- Let me start that question again.

What was the process for the Springfield Police Department to notify the District Attorney's office that someone had been arrested in the case?

A. When I worked there the protocol was if it was a significant case from their perspective, they would get ahold of my boss after an arrest had been made.

Q. When you say your boss, you're talking about the District Attorney?

A. Correct.

Q. Who was that in 1984?

A. Matthew Ryan.

Q. Okay.

A. And then from that point forward he was running the show.

Q. Mr. Ryan was?
A. Absolutely.
Q. And when you say getting ahold of him, there are obviously people that get arrested all hours of the day. I mean, would this be a situation where he would get called at home at night if there was some arrest?
A. I'm sure he's been called home at night on many occasions.
Q. Did the District Attorney's office back in 1984 have to approve charging someone with a felony?
A. No.
Q. So is it true that the Springfield Police Department on their own --
A. Can I clarify that?
Q. Go ahead, sure.
A. See, I want to make sure I'm not messing up the semantics. My answer is charging them, no, there would be no need for approval. Between, if it was superior court, between charging them and then presenting it to the Grand Jury, there might be, there would be District Attorney involvement to determine what of those charges should go forward in terms of being submitted to the Grand Jury.

I don't know if that clarifies or that's a better answer. I just -- But the initial charge of someone, they wouldn't call us for that, not while I worked there.

Q. Well, so would they -- Someone can be arrested without ultimately being charged, correct?

A. I'm not sure I understand that.

Q. Well, back in 1984 what were the methods in Massachusetts by which someone could be charged with a crime, one would be a criminal complaint, correct?

A. Yes.

Q. Were there any other methods for charging besides a criminal complaint?

A. DA's complaint, rare. And then ultimately, if it was a significant felony, it would go to the Grand Jury. What I was trying to point out before, I was just trying to distinguish that the initial charges that may have been determined by the police officer may not be the same charges that the District Attorney's office submitted to the Grand Jury when it got to that stage.

Q. And so back in 1984 did the Springfield Police Department swear out criminal complaints in

felony cases without notifying the District Attorney's office?

A. There was a process to go to an ADA in the district court if they were unsure of appropriate charges. But there was nothing written in black and white that prevented the detective from going to their court officer and then just going to the clerk and seeking charges A, B, C and D, to the best of my memory.

Q. What was the process for going to an ADA if the police officer was unsure?

A. Just they would go down there and seek some -- There would be someone assigned in a given week in the district court, and would go in and say, Here's the police report. We think Charges A, B and C are appropriate. What do you think?

Q. And we were talking about going in, you're talking about actually going to the court to talk to that person in question?

A. Right.

Q. You said someone is assigned in a given week. Did that assignment for that week, did that have a name?

A. Not that I remember.

Q. But when you say someone was assigned, was there actually a schedule or something that was available?

A. I think I'm guessing. I was never -- I mean, I know generally that the police didn't necessarily use that on a frequent basis, but I know that was there in place if a particular police officer or investigator wanted to go down and talk to somebody in the DA's office.

Q. Did you ever have that assignment?

A. No.

Q. For the week?

A. I was never in the district court.

Q. We were talking about that space between a criminal complaint being sworn out and then a case going to the Grand Jury and you were saying that it wasn't always the case that what the complaint listed as the charges ended up being what went to the Grand Jury, correct?

A. Correct.

Q. Were their cases in which the Grand Jury charges were more serious than what the complaint indicated? Let me be clear to you. We've been talking about cases with the Springfield Police

Department, so when I'm asking that question, I'm going asking about the Springfield Police Department, okay?

A. I have no personal knowledge, but, you know, my guess would be that there were times where there was a difference in the charges.

If I can back up. Generally speaking, the years that I was there there was two ladies in my office that were Assistant DA's that did nothing but the Grand Jury. Didn't try cases. Never tried a case. They just, their job they were assigned to the district -- to the presentation of matters to the Hampden County Grand Jury.

I don't know this, but common sense I would think, I'm sure there might have been cases where they changed one way or the other what the initial charges were out of the district court in terms of what they submitted to the Grand Jury. But I can't think of a case. It just seems to me that common sense would dictate that probably happened.

Q. Who were those two ladies?

A. Oh, boy. Attorney Chris Hanson.

Q. Is that s-e-n or s-o-n?

A. I don't know. And Carol Kantany,

K-a-n-t-a-n-y. Her last name now, her married name is was Casartello -- Good luck. And her husband's an attorney in Springfield. She was a Clerk Magistrate in Westfield. I don't know if she's retired or not, but they were the two people that ran the Grand Jury when I was there.

Q. During the time that you worked in the District Attorney's office were there cases where the District Attorney's office was informed that someone had been arrested before there were actually, there was actually a complaint that was prepared?

A. I wouldn't know that.

Q. Taking you then specifically back to around 1984, at that time were there particular people assigned to the superior court in the District Attorney's office who did more serious felony work than other people?

A. I think generally that's a fair statement.

Q. I mean, offices have people who the big cases go to, right?

A. Yeah. And there was a couple people that didn't try any cases. So they were, you know, in there for a political reason and/or got the position

because of a political reason and weren't trying cases. And, yeah, I think there were, yeah, there were people, there was a grouping of people that were trying more serious cases.

Q. Who were those people in the mid eighties?

A. Gosh. John Bryson would have been one of them. Myself, Jack Sinclair, Dianne Dillon, Billy Teehan, who became a judge. I think he's retired. This is now we're talking mid eighties?

Q. Right.

A. Not seventies, right?

Q. Right.

A. Those would be the four or five that came to mind. There could be more. That's just, that's all I can think of at the moment.

Q. Were there people in the office in the mid eighties who tried more sexual assault cases than other people?

A. I think that's, yeah, that is, that -- I think that's correct and I left out one person, but she was more to the mid to later eighties, which was Betsy Scibel, who ultimately became the District Attorney in North Hampton. She did primarily sex crimes.

Q. Was there someone that was doing primarily sex crimes before her? I think you said she's more mid to late eighties, right?
A. When I say sex crimes, I want to say that my memory is she did more of the sex crimes in which the victims were young children. And she -- God bless her, she was doing a ton of that. And I don't think it was designed. It just kind of happened that she had this gift with kids and I think people in the office recognized it. And so she, whether she wanted it or not, she inherited that, that position, that untitled position.
Q. Before she started doing that was there somebody in the office who did more adult sexual assault cases than other people?
A. Wasn't broken up that way.
Q. So of the group of people that you identified a second ago, those names, were those people also doing more sexual assault cases than other people?
A. Not necessarily. The people that I named -- if I didn't clarify it, I apologize -- were the people that I, that come to my mind that were doing the more serious felonies, whether they were

murder, sexual related cases, just what was determined by the DA to be the more serious matters in the superior court.

Q. During the time in total that you were with the District Attorney's office how many murder cases were you involved in, whether they went to trial or not?

A. Quite a few. The best I could say is over ten, maybe.

Q. What about sexual assault cases over the course of your career?

A. I did a lot when I was there with little children for a period of time before Betsy kind of relieved me from that, that burden. So if you count children and then adult sexual assaults, I mean, I can't give you a number, but I mean, if you said, Here's fifty of them, I wouldn't argue with you.

Q. In the mid eighties do you have any sense of what your, you know, what the breakdown of your caseload was of serious felony cases versus run of the mill, less serious stuff?

A. The only way I really can fairly answer that question is in superior court back then almost everything was serious that was coming through the

Grand Jury. Granted, some, I think everybody in this room would say might have a more serious tilt than the other, but I wouldn't describe anything that came through the Grand Jury back -- and I'm talking about crimes against persons, I'm not talking about the other stuff, the nonviolent stuff -- I wouldn't describe -- Crimes against persons that went through the DA's office when I worked there were all serious.

Q. In the mid eighties how many cases were you assigned to at a time?

A. I mean, I can give you a number, but it's a total guess. You know, I really don't know. I know I had three juries impaneled at one time. So we were quite busy. It would vary. Maybe thirty to fifty at a time.

Q. How old are you today, sir?

A. Sixty-six.

Q. And when you went into private practice in January of 1990, and I understand that was an estimate, but whenever you left the District Attorney's office and went into private practice, why did you make that shift?

A. I'm going to apologize to you, and I mean

this to the bottom of my heart, before I give you this answer, because it's going to take a couple minutes, if you don't mind.

In the mid eighties there was a man that came into our office that had his teeth removed by a member -- by an enforcer in the local Mafia. And I remember the District Attorney making me aware of it and wanted me to be aware of what was going on with the State Police for our office. There was no local people were going to be involved in it.

The long and short of it, that started a series of wiretaps from our office, court ordered under Chapter 272, 99 in which Billy Walsh was an Assistant DA and myself were in charge of. We had an off site office where the transcripts and the other materials, the tapes were kept.

As time went on in that investigation it became apparent to me that my boss had an inappropriate relation with the Genovese crime family in western Mass. And all these wiretap cases were tried, except the last one was in December of 1989. And at that time there was four people, three or four people that we had in safe houses that were testifying in these cases.

And my intent was to leave the office. I went in and told him, I've been here too long. I've got to get into the civil realm. But the reality of it is when it got to the point that I was convinced in my mind what was going on, I couldn't be there any longer.

So, unbeknownst to me, one of the undercover troopers and another Assistant District Attorney took contents -- and I'll tell you this now, because the statute of limitations is gone. And I've never said this openly publicly before today. They took the transcripts and they went down to the Globe, the Boston Globe Spotlight team and gave the story to them, which involved basically ten various prosecutions within these wiretaps of organized crime people that I was prosecuting, and what the District Attorney did to try to subvert those prosecutions.

And that hit the Boston Globe the first Sunday in January of 1990. And then all hell broke loose probably for the following nine months, which included, but does not limit to death threats in my family with three small children having to be moved out of state for an extended period of time

and people were friends of mine protecting me.

So the specific answer to your question in a nutshell was I left the District Attorney's office because I couldn't be there any longer when I eventually got to the point that my boss had an inappropriate relationship with the Genovese crime family in western Mass.

Q. When you're talking about your boss, are you talking about Mr. Ryan?

A. I am.

Q. Was there some period of time between when you left the office and when you started your private practice where you were taking a break from work, from working?

A. I want to say I got hurt for some reason during that period of time, maybe November or December where I was on -- I think there was an episode where I was on my front lawn where there was a lot of trees and I fell and I hit my head or my neck on a stump. I think that happened during that time period. Nothing else comes to mind.

But I'll be honest with you. You're asking me that question, I came and go as I -- If I was in the middle of a trial and I felt like going

home at 1:00 o'clock, there's nobody that said to me, Don't go home at 1:00 o'clock. I just went.

Q. And what I meant was you were describing a period of, I think, turbulence where there were threats against your family and other things going on. Was there some period of time where you laid low and didn't try and do anything for work?

A. You know, there was no work. I mean, in January of 1990 I eventually had a very good civil case that saved me, but I was borrowing, went in by myself --

You know, I know it's hard in our world to have transparency to understand the power that he wielded, but back then, you know, if your brother was up for a judgeship and Matty Ryan didn't want him to get it, the phone got picked up and he didn't get it. That's the world I lived in.

Q. Did he try to freeze you out of the legal community when you left?

A. There's no doubt. I know for an absolute fact that they went through every file I touched for fifteen years to try to find things. Because I still had friends in the State Police. I still had friends that worked there. I had death threats. I

had the head of the FBI sit in my house one day to debrief me. His name is Mike Smith. I don't know if he, even if he's alive today to tell me, watch your back. He can pick up the phone and have you killed in minute.

Q. Was he talking about Mr. Ryan?

A. Absolutely. Those were his words, not mine.

Q. You said there was a period of time where your family left the state?

A. Correct.

Q. When was that?

A. January or February of 1990.

Q. And when did they -- Did they come back?

A. They came back.

Q. When was that?

A. I don't remember how long they were gone. I really don't.

Q. Did they come back within the calendar year 1990?

A. Yes.

Q. When did your work on the wiretap case that you were just describing, when did your work on that case begin?

A. You know, I would say '85 or '86 it began. And then the last thing I did was try a Genovese crime member in December of 1989, who was from Boca Raton. His name was Joseph Fafone.

Q. Can you spell his last name?

A. F-a-f-o-n-e.

Q. When were the first arrests made in connection with that wiretap case?

A. I can't tell you that, but I can tell you we were -- that Attorney Walsh and I were probably into it a year to two minimum before arrests were made.

Q. You understand this deposition and this, the case that we're here on today concerns someone named George Perrot?

A. I do.

Q. Do you believe that anything that's happened in Mr. Perrot's case has been influenced at all by the wiretap case that you just described?

A. You mean -- I have to ask, because I'm not clear. Do you mean that the Mafia and the circumstances of my leaving the office in December of '89, do I think there's a relationship between that and the Perrot matter?

Q. Well, let me ask a better --
A. Because I do.
Q. And can you explain to me what the relationship that you believe -- Can you explain to me what you think the relationship is between those two things?
A. Well, there is no doubt in my mind that the forged confession was manipulated in a fashion to try to humiliate me and embarrass me and cause problems with the Board of Bar Overseers.
Q. I want to ask you about that. Is there anything else, any other impacts that you think that that wiretap case had on anything having to do with Mr. Perrot's case besides this issue with the manipulated confession, which I'll come back to?
A. Not that I can think.
Q. You have said that you think that Mr. Ryan went back and looked at all of your cases, is that right?
A. You know, before I think I said to you I know. I shouldn't have said that, because I didn't particularly witness it. What I should have said to you is that people that I trust very much who are highly credible in my eyes told me that that was

going on, which didn't surprise me.

Q. Well, if someone had it out for you, you would reasonably expect that's something they might do, is go back and see if they could get some dirt on you somewhere?

A. I couldn't, I couldn't say. The incestuous nature of Springfield back then was there was almost a Whitey Bulger type thing. He was a bigger than life character and was extraordinarily powerful. So the content of these stories were not meaningful to lot of people.

The more of the focus was he took you from the bottom of the ladder to the top. How could you be so treacherous to be a part of delivering this story? That was the perspective. And I couldn't say who really delivered the story, because it was a felony what they did, and I wasn't going to put them in harm's way.

Q. And just to interrupt you for one second, when you're talking about delivering the story, you're talking about taking it to Spotlight?

A. Correct, correct. The first time I -- What actually happened was one of the troopers called me at home one night to go meet a witness who

had a problem, said he would only discuss it with me, who was in a safe house. And I was driven to a restaurant in Longmeadow, Massachusetts. When I walked in, there was Kevin Cullen and Eugene O'Neill, who's the managing editor of the Boston Globe, and in a nice way they said, Here's what's going to happen January -- whatever the date was. And they were trying to influence me to comment on the stories. And, you know, they gave me, like, a week to make a decision.

The magnitude of this, not just his power, but you know, he was friends with my father. I was friends with his children. And I just made the decision that if I didn't say a word, it was the way the stories were being written, it was going to make it could look like I was inappropriately involved with the crime, the Genovese crime family, as well.

So what I did is I confirmed the accuracy of the stories and that was it, and wouldn't give them any more information.

So, and then I, of course, was out of the -- I knew when it was coming. That's how I got out in time, because I was approached about this

story coming a month or a month and a half before it did.

Subsequent to that I went in to him. He, I think, I feel certain he knew something was up. And out of the blue I said, I've had enough of this. I got to do something else. Thank you for everything you have done for me, you know. I'll try this case December 9th or whatever it is, but after that, I'm, you know, I got to move on. I got to try to start getting involved in civil law. So --

Q. And that conversation you're describing going in and saying, I got to get out of this, that was with Mr. Ryan?

A. It was.

Q. All right. Did anyone ever tell you that the District Attorney's office had gone back and relooked into Mr. Perrot's case to, you know, look at your involvement in it and figure out if there was something there they wanted to do in light of wanting to get back at you about your involvement in this wiretap case?

A. I can't recall them telling, giving me the name of any case. The only information I was given was that Liz Dineen was one of the names, who was an

Assistant DA, who coincidentally was the person that found this, according to the documents. And I don't remember if anybody else, but that she had been assigned to going through files I had handled. I don't think I ever got a name, meaning they're looking at the Perrot file versus this murder file versus this child rape conviction. I was just told they were going through everything. I was told they were going, trying go to through everything I touched over the thirteen to fifteen years I worked there.

Q. As a result of everything that you learned doing these wiretap cases, did you ever come to believe that there were any members of the Springfield Police Department who had an inappropriate relationship with the Genovese crime family?

A. No.

Q. And did you come to believe that anyone else in the District Attorney's office besides Mr. Ryan had an inappropriate relationship with the Genovese crime family?

A. In the DA's office?

Q. Yes.

A. Not that -- No, none that I'm aware of.

Q. You started to -- Well, you identified that something, you think something having to do with this manipulated confession issue was related to your work in the wiretap case. Can you explain to me what you think the connection is there?

A. Yeah, I wouldn't say, I would not say specifically associated with the wiretap case, but the end of the wiretap case where it became apparent to me from my perspective that Matty Ryan had an inappropriate relationship with the Genovese crime family, and then the Boston Globe story and pitting me against him and, you know, what it meant for his legacy and the fact that he couldn't run again. Everything that happened to him as a result of this, I think there is a direct connection between that and the forged confession. Meaning that if you look --

Let me back up and say this. When I left that office, because of the way I left, the door in my mind was shut to the DA's office like Fort Knox. I never wanted go to down there again. I didn't want to talk to anybody. I clearly found out who my friends were, which I suppose is a great

thing. You know, I didn't -- On the Perrot case, for example, I never even read any, you know, all these motions for a new trial, my testimony in 1991, never looked at them until the last few weeks. I just, it was like a bad limb. I cut it off from my perspective as best I could and just tried to have nothing to do with it any longer.

If you look at that, the way that it was portrayed and it makes it look like I sat around and came up with this idea -- These two young men, I didn't know from nada to begin with. That I came up with this idea of creating a false confession from George Perrot, putting it together, and then going and interrogating them -- Which I just would point this out. I never interrogated them or carried evidence to a laboratory in my career in the DA's office. And if I did, I would have been booted off a case, for obvious reasons, and would have had major problems with my boss.

So that, that whole line is just borderline ridiculous. They took that thing and made it look like it was my creation, that I came up with the idea, I put it together, and then I used it to interrogate these two young men. And on all

levels that is absolutely and unequivocally an absolute lie. That's not at all how it happened, you know.

I mean, and to just, if I could to add to that, it was turned over not to excul -- There's nothing, whatever you think about that document, there's nothing exculpatory towards George Perrot, whether he's guilty or incident of anything in that document. So one must wonder why that was turned over to his lawyer to begin with. And then, they're handing over to his lawyer my sense impressions in the latter part of 1987 after I'm looking at Mr. Perrot on the witness stand when he's testifying in a motion to exclude statements? Why would anybody ever do that? What was the probative value for George Perrot in turning those documents over? It was in my opinion it was unequivocally done to try to humiliate and embarrass me and make me look bad.

I had no intention of ever coming up with a confession or creating a confession against those two young men.

Tommy Kelly came into my office unannounced one afternoon. I want to say Andy

Canevari may have been with him, but I know there were other Springfield Police officers and wanted a legal opinion. That's how it all started.

And he wanted to know that if he used a forged confession from Mr. Perrot against these two young men that he believed, of which I had no idea, were involved in the rape of Mae Marchand, which there was never a trial on it. She died, I think, shortly thereafter. And I want to say, Andy Canevari, because I trusted him so significantly, I asked him, Do you believe these two young men were involved? And when he said, Yes, my best memory is I talked to Billy Walsh, who was the legal guru in that office. And I believe our conversation basically was the law that subterfuges like that, saying a fingerprint was found at a scene in Massachusetts, or using a false confession, would be okay. You couldn't go to a woman who you thought was in a drug conspiracy and ask her or tell her her children were going to be taken away from her if she didn't cooperate, because that type of subterfuge could cause an innocent person to confess.

I then went back and told them that in my opinion, yes, the confessions would hold up if

someone confessed as a result of using this.

The only reason my name appears on it as a witness is that Sergeant Kelly suggested, since Perrot was incarcerated, that if he came back and gave a statement, they had no ability to get him back up to Springfield, which was true. I would have had to use the Department of Correction to get him back up to Springfield. So it would make, it would look more authentic, in his mind, if I was there when he came back up and confessed.

And I didn't give that a lot of thought. I wish I would have given it more thought. But that's the way it was put together. And the idea that Tom Kelly's name was used without his permission or somebody else signed his name is ludicrous.

Q. Let me take one step back. You mentioned having reviewed some documents for the first time in a while in the last few weeks. Were those documents you reviewed in preparation for this deposition?

A. Yes.

Q. To the best of your memory what did you look at in preparation for this deposition?

A. The, whatever year it was, maybe 2014, the

Judge's findings per a motion for a new trial. I want to say -- I don't know him, but I want to say the judge's name maybe was Kane. I'd never seen that before I reviewed that.

My testimony in February of 1991 on a motion to dismiss for prosecutorial misconduct. I reviewed that.

I reviewed when Judge Simons denied that motion, I believe it was appealed to the appeals court. I reviewed that document. Those three for sure. I reviewed a statement purportedly made by Sergeant Kelly.

Q. Is that the statement where he denies having signed this or says he doesn't know how his name got on there?

A. Correct.

Q. All right. Anything else?

A. I think I looked at the forged confession, the signature page. And I'm not saying that's all. That's all I can recall at this moment.

Q. At some point you prepared interrogatories in this case, is that right?

A. I did.

Q. Did you review those in preparation for

your deposition?
A. I did.
Q. You said one of the things you reviewed was that document from Mr. Kelly where he denies knowing how his signature got on that, what we're calling the forged confession. Do you believe that that report is untrue?
A. I know it's untrue.
Q. And do you have any idea as to why Mr. Kelly prepared something that is untrue?
A. His connection to the former, to the District Attorney.
Q. What, his connection to the, to Mr. Ryan?
A. They were very close. And the District Attorney, among others, took good care of Tom Kelly over the years.
Q. Can you tell me what you mean by taking good care of him?
A. Yeah. I mean that, including my father. And I don't say that without giving it a lot of thought. Tommy Kelly had more brutality charges than I change my underwear. And again, pointing out to what the world was back then, you know, not just a judgeship, I witnessed people walk into Matty

Ryan's office and say their nephew was stopped for OUI in Chicago and Matt picked up the phone and talked to Richard Daley and all of a sudden the charge is gone. And I say that just to give you a idea of what kind of power he had.

He took care of Tommy Kelly more than once over the years. So there is no doubt in my mind if he had to choose sides between Franny Bloom and Matthew Ryan, it would have been a quick choice for him.

Q. You have mentioned your father, and I just want to make sure I understand your father's connection with the legal community in Hampden County. Was your father an attorney, as well?

A. No. My father was a cop for thirty years and then he was the clerk of courts in Ware, Mass. for, like, twenty-something years.

Q. I mean, are you, from the testimony that you have described, was there a political patronage relationship between Mr. Ryan and Mr. Kelly?

A. I know what you're asking me. I don't know if political, I would call it political patronage. I would say that, that if a brutality case was pending and there was a hearing back in

those days, Matthew Ryan could pick up the phone and tell the clerk, I don't want this guy being charged and the guy wasn't and that police officer wasn't going to get charged. That's how Hampden County was back in the mid eighties. And Tommy, he bailed Tommy Kelly out more than once.

Q. Why did he do that?

A. I, maybe -- I don't know. Maybe he saw his good qualities. Maybe he thought that he had benefits as a police officer to him and didn't want him to get charged criminally. I don't know.

Q. Did --

A. I know he knows, I do know he knows exactly what happened in terms of that forged confession.

Q. When you say he knows exactly what happened, who are you talking about?

A. Tommy Kelly, because he's the one that hatched the whole "idea".

Q. When you say he hatched the idea, are you talking about what you testified about earlier about him coming to your office to talk to you about this?

A. Absolutely.

Q. Did Andy Canevari have a similar

relationship with Mr. Ryan?

A. No. He's about as honorable a human being as I met in the years I was in law enforcement.

Q. Well, at one point you considered Thomas Kelly to be a friend, right?

A. You know, I might have -- If I used that word, you know, I was friendly with Tom Kelly. When you say friend, I never socialized with him. You know, I never went to a Red Sox game or a Celtic game or had dinner with him or went to Christmas parties or anything like that. I did my best to try to be friendly to everybody and I would say, yeah, we had a friendly relationship.

Q. Did your friendly relationship with him change as a result of what happened with the statement?

A. I mean, there was no relationship after this. After this all came out and I became aware that he was taking the position of, "I don't know anything about this". And again, I would point out if that was in my file, nobody ever called me. Just, what is this about? How did this come about? Never got a phone call. No one from the District attorney's office ever called me until there was a

hearing. And that might have just been a subpoena. Now, the DA's office had changed by the time there was a hearing there was a new DA. But according to the documents I read, the document was, the forgery was allegedly found and produced in 1990 and Matty Ryan was the DA until December of 1990.

MS. THOMPSON: Let's go off the record for one second.

(Bloom Exhibit 2 marked for identification.)

(Discussion off the record.)

(Document handed to the witness.)

Q. So, Mr. Bloom, I'm showing you what's been marked as Exhibit 2 and this is a three-page documents which is Bates stamped Plaintiff 4102 through 4104. When is the first time that you saw a copy of Exhibit 2?

A. Whenever I, whenever the date was that I signed as a witness. Whatever that date may be.

Q. Okay. So looking at Page 3 of Exhibit 2, that's your signature on Page 3?

A. It is.

Q. All right. And you described a series of events where Mr. Kelly and Mr. Canevari came to you

asking a legal opinion about the use of something false to try to get a confession from these two boys, correct?

A. Yeah. I don't know. I don't -- There's something that suggests to me that Andy Canevari was there, but I'm not sure about that. I know that there were members of the Springfield Police and I know that Kelly was running the show.

Q. Okay. So was there someone with Thomas Kelly from the police department when he came to ask your opinion about this?

A. Yes, there were other members. He didn't come alone, I'm clear on that. I'm just not sure who else was with him.

Q. Is there anyone else who you believe might have been with him other than Mr. Canevari?

A. I would just be guessing. I don't remember.

Q. What's your guess?

A. I really don't -- I don't, you know, I don't -- As I said to you, there's something in the back of my mind that I want to say Andy was there, but I'm not all that sure about that either. What I him sure about is that he wasn't alone and he was

the one that came to me.

Q. And you said then was it you who talked to Billy Walsh about this idea?

A. I want to say that that would have been the normal protocol, but I don't remember doing that either. But any kind of significant legal issue, I would have always run it by Billy.

Q. And why is that?

A. Because he was a brainiac. I mean, he was one of those guys, you'd be in the middle of a murder case and come into the library and say, Hey, the judge is excluding this evidence claiming X. And he'd look you in the face and say, Take a look at 322 Mass. 14, Page 72. And you'd open the book and there it was. That's who Billy was.

Q. Did you talk to Billy in person?

A. I don't know that I talked to him. What I'm saying to you is that any kind of legal issue where I didn't have the answer, my protocol was to go to Billy. I have no memory whether I actually did go to Billy or not on this. I'm saying to you I don't know that I was confident in whether -- on what the right advice was to give the cops. So in a case like that, I would have sought Billy out.

Q. And so I understand that your memory is that you don't know if you spoke to Mr. Walsh or not, but you think given the circumstances of this situation you would have gotten his advice?

A. On legal issues that I wasn't sure of, I'd normally go to Billy if he was available.

Q. And do you believe that at the time that Mr. Kelly and whoever else came to talk to you about this question, do you believe that at that time this was a legal issue you didn't know the answer to?

A. I don't know.

Q. However you got to this answer, you reported back to Mr. Kelly that you thought it would be legal to use this?

A. Yeah. Their specific question was if they confronted these two gentlemen with this forged confession and one or both of them confessed to the Mae Marchand crime, of which Kelly and whoever was with them were absolutely convinced that they were involved in, would the confession hold up or would it be thrown out because of the use of this document, which is Exhibit 1 (sic)? That's specifically what they were asking.

Q. At the time that Mr. Kelly and whoever

else was with him came to talk to you about this idea, did they already have -- was Exhibit 2, this statement, already typed up?

A. It doesn't look like something from the District Attorney's office. But when the content was put together, I don't, I have no memory. Whether they had it with them or whether I gave them the advice and then they put it together, I don't know. I have no memory one way or the other.

Q. When you say that Exhibit 2 does not look like something that was put together by the District Attorney, why do you say that?

A. Just the typing. It just doesn't look to me like something that came from our office. But that's a guess, too.

Q. Well, did you have any role in preparing Exhibit 2?

A. Not that I remember.

Q. Well, do you think it's possible you typed it up?

A. I couldn't -- I can give you an answer to that. I absolutely did not type it up.

Q. Were you present when it was typed up?

A. Or we'd still be there right now typing if

I was typing it.
Q. I mean, I understand you're sort of joking, but you're saying you're not a good typist?
A. Pathetic would be a better way to describe. I can't type.
Q. Were you present when any portion of Exhibit 2 was typed up?
A. I have no memory of being present when any portion of that was typed up.
Q. Is it possible that you were present when Exhibit 2 was typed?
A. I guess it's possible, but I don't remember it.
Q. When relative to Mr. Kelly coming to talk to you with this question about using a fabricated statement did you sign Exhibit 2?
A. I can't -- I don't know. I don't know whether they had it, you know, there was a decision made it would be okay to use it, and I signed it right there. Or they didn't have it, I advised them that it looks like it would be okay to use this against these two gentlemen. They went up and typed it and brought it back to me the next day or two days later, I have no memory of how that happened.

Q. So, and I'm asking you, I guess, how much time passed between when they originally came and talked to you and when you signed it?
A. I don't know.
Q. Are we talking a couple of days?
A. I don't know whether it was a couple days or it was a week or they ran right back up to the station and typed it out and came back down to my office a half an hour later. I have no, absolutely no memory of that, no knowledge or memory of it. And I can't determine that from looking at it.
Q. So why did you sign Exhibit 2?
A. I remember having a discussion with Tom and it was suggested that it would, that I would -- if Perrot, George Perrot had, for lack of a better way of putting it, had come to Jesus or however you want to say it and decided to confess to these things, that I would have been there when it happened, because he was convicted as opposed to being on the street. And stupidly, I signed it.
Q. Why do you say stupidly?
A. Because when I got, you know, when this got to the BBO eventually, and there was a hearing and there was chiefs of police and ADA's and law

enforcement people testifying on my behalf, there was the position they took was that this was -- being a law enforcement agent, you are approving misstatements of facts and untruths constantly. But the BBO said even though that may be so and even though this, if it rendered a confession may have been an appropriate confession, I'm a lawyer first and a law enforcement agent second, and therefore, I shouldn't have signed it because I was engaging in a misstatement of fact, a material misstatement of fact.

So, yeah, I mean, it was stupid to sign it.

Q. Well, do you believe as you sit here today that at the time you signed this that violated the ethical rules for attorneys for you to sign it?

A. No.

Q. Looking still at Page 3 of Exhibit 2, the signature on this page that purports to be of George Perrot, do you know how that signature got on Exhibit 2?

A. No, other than I can tell you he didn't sign it and I didn't sign it.

Q. Meaning you didn't put George Perrot's

name on there?

A. No.

Q. And you don't -- When you say he didn't sign it, how do you know that George Perrot didn't sign this?

A. Because I know the entire document is fraudulent and not valid.

Q. After you signed this document when is the next time that you saw it?

A. Probably February of 1991 when I was testifying in superior court.

Q. When did you first learn that you were going to be needed to give testimony in court in February of '91?

A. I want to preface this by saying this is my best guess. I know I talked to no one from the District Attorney's office. My best guess is I got a subpoena at some point commanding me to appear in superior court on whatever the date was.

Q. Did you make any attempt when you got that subpoena to figure out what this matter was about?

A. I think I talked to Kelly. I mean, I don't remember that, but I don't doubt it, because in my testimony in '91 I said I talked to Kelly

after becoming aware of what was going on, because it probably was a gap between the subpoena and the hearing could have been a month or longer, you know, and my conversation with him, but I don't know what you're talking about.

Q. Is that what he said to you?

A. Yeah, basically.

Q. Do you believe now knowing everything you know that he was not telling you the truth?

A. I knew it then.

Q. Why did you know it then?

A. Well, because I knew it then. I mean, it wasn't -- I mean, you put all of it together. It's not one thing. It's like any other thing in our business. It was the totality of everything.

I knew Ryan was going through my files. I knew Ryan and Kelly were tied at the hip. I knew Ryan had bailed Kelly out a number of times. I knew Kelly had come to me.

I knew everybody knew there wasn't anything exculpatory toward George Perrot. So there was no purpose in giving this document, whatever you think about it, to George Perrot. Had no exculpatory value to him. Then on top of it,

they're giving him my private notes. You put it all together, it was very apparent to me, from at least from my perspective and when you throw the Mafia thing in here that destroyed his legacy and flipped my life upside down and knowing that what Ryan had done for Kelly over the years, I didn't, from my perspective didn't take a genius to figure out what was going on at that point.

Q. So when you showed up to testify on February 25th of 1991 is it fair to say that you knew something was up, but you didn't know what exactly?

A. No, I knew what was up.

Q. How did you -- By that point how did you figure out what was going on?

A. Well, I knew, I knew about the, that it was about the confession.

Q. So let me stop you there. How did you know that?

A. Because I believe -- I don't know whether somebody at the DA's office, one of the cops had talked to me or whether I had called down there when I got the subpoena and was told what was going on. And then I called Kelly and said, Why -- You know,

because, to be honest with you, my first reaction was, put the other allegations in your complaint aside, what does this have to do with George Perrot per se in terms of the Prekop and Lichwalla case? The answers to that are not my opinion. Judge Simons and the appeal court both said nothing. So why did they hand it over to him?

It was obvious to me what was going on at that point. You know, based on all the information I had, I knew what they were doing.

Q. In advance of the hearing did anyone from the District Attorney's office talk to you about the statement, you know, in preparation for the hearing?

A. A lady that was handling the hearing -- The DA had just shifted. So Ryan was out. The hearing, I believe, happened in February of '91, maybe. And I believe Ryan was done on the 31st of December of '90.

I could have talked to somebody in Bill Bennett's office. At that point they were just trying to hash out how to handle the prosecutorial -- the motion for dismissal. And do I remember talking to somebody from their office? No, but I could have.

What I want to clarify before, when I said no one talked to me from the DA's office, this was all put together by Matty Ryan's people, all of this, and the motion, turning this over to defense counsel, turning over my impressions of George Perrot after a motion hearing in late 1987, all that was done by Matty Ryan's office.

So we're clear what I'm saying is I never talked to anybody in his office that I recall about any of this. I may have, once I got the subpoena, talked to someone in Bennett's office, who was the new DA who was going to be dealing with this in February.

Q. Did you tell anyone in Bennett's office words to the effect that you thought this was part of a, you know, campaign by the Ryan office to discredit you?

A. I may have. I don't remember. I may have. I don't think that was their primary concern at that point, but --

Q. Well, was whoever you talked to, did it seem to you that whoever you talked to was concerned with sort of getting to the truth of this matter?

A. No. I think they were more concerned with

not getting -- seeing a dismissal occur as a result of this. Because there was a motion to dismiss that was filed by, I think it was Jerry Rideout, based on prosecutorial misconduct.

Q. Well, did you believe that whoever you talked to in the new administration, that they shared the goals of the Ryan administration of trying to, you know, using this as an opportunity just to discredit you?

A. I can't say there. There were holdovers, you know, but I can't say that.

Q. I can show you a copy of this, but I'll represent to you that the transcript reflects that the person that questioned you from the District Attorney's office at this hearing, his name was Jody Zeprun?

A. You mean Judy?

Q. Judy, Judy Zeprun, Z-e-p-r-u-n. Do you know Miss Zeprun?

A. I mean, from this but I didn't know her from Adam. Never talked to her in my life before this, this hearing.

Q. So she is not a person that you spoke with in preparation for this hearing?

A. I, if I said that, I apologize. I may, I may have talked to her in preparation for this, for this hearing. But other than that, I never had anything to do with her.

Q. Have you ever held the opinion that she was connected in some way with the Ryan folks and shared a goal of trying to discredit you?

A. No. I have known no reason to believe that.

Q. At the time that this hearing was held in February of '91 was there any reason at that time why you didn't tell the court that you believed that this was related to an effort to discredit you because of everything you described in your deposition today related to Mr. Ryan?

A. I was never given that opportunity. In fact, if you look at the back of my -- I was never asked who came up with the idea of this, how was it hatched, how did it start.

99% of the questions when you go through that transcript defense counsel just asked me over and over again, Did my guy confess? Is that his signature? Were you up at the police station when Timmerman and Adkins were -- And I believe Miss

Zeprun only wanted to know did this document which is exhibit whatever, was it created after Mr. Perrot was convicted? I believe that's all she asked me. No one ever asked me or gave me the opportunity to say exactly how this happened and how it was put together.

At one point I blurted out with my big mouth at the end that the cops came to me and that's how this all started. And that got cut off quick, but I was -- That wasn't what they were interested in. And as you know, when you're in a courtroom you answer the questions and you don't get to get the opportunity to run your mouth like you're in a classy way allowing me to run my mouth this morning.

Q. As you have alluded to, there were disciplinary proceedings that were initiated against you as a result of this document?

A. Correct.

Q. Correct?

A. Uh-hum, yes.

Q. And you said there was a hearing in connection with those disciplinary proceedings?

A. Yes.

Q. Did you explain in those disciplinary proceedings what you thought the genesis of this, the surfacing of this document was?

A. I don't know whether Steve Lipman, who was my lawyer -- I want to say he thought that that would be a mistake, because that wasn't their function and it may not go over well. That was the decision that he made.

And it was our defense to the BBO is that I did what law enforcement officers do all the time and I'm being selectively prosecuted by the BBO. And I had a number of people testify on my behalf to that very, to that very point.

I think I told you earlier they weren't, their bottom line was, You're a lawyer first and a law enforcement officer second. You shouldn't have signed it.

Q. Do you have any information as to how a copy of Exhibit 2 ended up in a District Attorney's office files related to Mr. Perrot's case?

A. Well, if I kept it in a file, I think it bodes well for the suggestion I didn't think there was anything wrong that I did. And I don't know, as I sit here today, whether or not I even kept a copy

of this in the file.

Q. Were you ever given a copy of it after you signed it?

A. Not that I remember.

Q. So do you know at all how a copy ended up with the District Attorney's office after you signed it?

A. No.

MS. THOMPSON: Let's go off the record for one minute.

(Brief recess.)

Q. So, Mr. Bloom, before the break we had talked a little bit about your testimony from February 25th of 1991 and I want to go back to that for a minute. In reviewing, you said that you reviewed your testimony from that date prior to your testimony today, is that right?

A. Correct.

Q. Okay. And I think it was your testimony in February of 1991 that it could have been you who signed George Perrot's name to Exhibit 2, is that right?

A. No.

Q. I mean, have you reviewed your testimony

from --
A. I have.
Q. From February '91 that gives that answer?
A. No.
MS. THOMPSON: Let's mark this. Let's stay off the record for one minute.
(Bloom Exhibit 3 marked for identification.)
(Discussion off the record.
Q. I'm about to show the witness what we've marked as Bloom Exhibit 3. This is a document that is Bates stamped 1673, Plaintiff 1673 and then Plaintiff 1719 to Plaintiff 1745. And when I hand this to you, Mr. Bloom, I'm going to show you Page 1724, Plaintiff 1724 and I'm going to have you read Lines 13 through Line 23 of that page.
I'm just going to hand it to your counsel first, since I just have the one copy. So I'm looking at Lines 13 through the end of the page.
(Document handed to the witness.)
MS. LYNCH: So that's the document that has in handwritten Grand Jury at the top?
MS. THOMPSON: It does, yes.
MS. LYNCH: That's Exhibit 3?

MS. THOMPSON: Yes.

A. I've read it.

Q. All right. And did you see there at the bottom of the page where this is Line 21?

A. Yeah.

Q. To 23. You were asked the question, Could it have been you who signed George Perrot's name? And your answer was: Could have been.

A. I think I said, Could have been me, it had to be me or one of the other police officers. Is that what you're referring to?

Q. Well, I'm looking at the actual last question. It could have been you who signed George Perrot's name? And then your answer is, It could have been?

A. Yeah. I think it's a typo, because if you bother going on to the next two or three pages, I think at least a half dozen times I said that's not my signature under Perrot's name. And there are many, many typos in that transcript. So I understand what you're asking me, but I also point out on a number of occasions I make it clear or the transcript makes it clear that I said that that is not my signature where it purports to be George

Perrot on that document.

Q. So you believe that that question that I just showed you, that that's an inaccurate transcription of your testimony?

A. I don't know whether it is or not. It's certainly not consistent, if you turn the next two or three pages over, it's certainly not consistent with me saying a half dozen times it's not my signature over, where it purports to be George Perrot.

Q. Your testimony today is that you did not sign George Perrot's name to that document?

A. That's not my signature. My testimony today is I have no memory as to who specifically signed his name on that forged document. My testimony is it's not my signature, period.

Q. What do you mean by, It's not my signature?

A. It's not my handwriting. It's not my handwriting, George Perrot. I mean, I can look at it and see -- I don't remember signing it, per se, but I can look and say that's my signature. So I'll acknowledge I obviously signed above my name. In terms of Tom Kelly and George Perrot, I don't

remember that act being done in front of me 33 years ago, but I can say that neither of those are my signatures.

Q. Well, would you agree -- Well, let me strike that and ask you a different question.

I think I understand that you're trying to draw a distinction and I'm just trying to understand your testimony. Is it your testimony that you are not certain if you signed George Perrot's name to that document or not?

A. I have no memory of any of the signatures, that would be a fair statement, being done. In other words, I can't think back and say, Yeah, I remember Tom Kelly signing above his name, yeah, I remember signing above my name, yeah, I remember Joe Blow signing George Perrot's name. I have no memory of any of that. It was, what, you know, 31, 32 years ago.

What I'm telling you is that it is my signature clearly over my name and the signature of Tom Kelly and George Perrot's are not my handwriting.

Q. The signature that purports to be yours on Exhibit 2, you recognize that to be your

handwriting?

A. I do, I do.

Q. Is it possible that you signed George Perrot's name to Exhibit 2 in a manner designed to make it look different from your own to make this document look more legitimate?

A. I would say no, because if you look closely at that document, there's even a harder, whoever it -- It looks like who signed Kelly and signed George Perrot was, to me it looks like it was the same person, because whatever pen or whatever instrument was used, it looks like the same pressure, same darkness, varies from my signature. So I would say I'm quite confident saying, for whatever reason -- I mean, I don't know the significance, but I -- It's clearly not my signature over Perrot's. I don't recognize it to be my signature. But I don't have any memory of any of that, meaning the signatures.

Q. Prior to you testifying on February 25th of 1991 did Thomas Kelly tell you that he had not, that he did not sign his name to Exhibit 2?

A. I think my best memory is he said that and I don't know anything about any of this. I don't

know anything about any of this.

Q. And when you talked to him and he said those things to you, did you have any further conversation with him about Exhibit 2?

A. No.

Q. I mean, at the time he told you that did you say, you know, words to the effect that you remembered him coming to you to ask you for advice about this and it seemed that what he was telling you wasn't accurate?

A. No.

Q. Why didn't you?

A. Waste of time.

Q. Why was it a waste of time?

A. I knew what was going on at that point. It was pretty clear to me what was going on. Whatever Kelly's purpose was to say what he was saying to me, nothing that I was going to say was going to change anything, based on my knowledge of him.

Q. Did you ever tell Kelly that you believed that, you know, his position about Exhibit 2 that he took after this document resurfaced, that you believe that was related to all of these issues with

your boss and with everything that you have described in this deposition about the way you left the District Attorney's office?

A. No.

Q. And why didn't you?

A. Because, because if I'm right and I believe that he was in bed with Matty Ryan, for lack of a better term, there would be no purpose of saying that to him.

Q. We talked a little bit before we took this break about testimony that you gave on February 25th, '91 related to you and Mr. Kelly being friends. And I'm just going to show you one other page in this testimony. So let me refer you in Exhibit 3 to Plaintiff 1727, and I'm going to have you look at Lines 10 through 13. I'm going to show it to your counsel first.

MS. REARDON: Which lines?

MS. THOMPSON: 10 through 13.

(Document handed to the witness.)

Q. Have you had a chance to look at those lines?

A. I did.

Q. All right. And the question that you were

asked on those lines is, Did he call and ask you about this not too long ago? And the answer you gave is: He has talked to me a number of times. I have been friends with him for years.

And would you agree with me that that question and answer that was just posed, that the "he" that that's talking about is Sergeant Kelly?

A. Appears to be.

Q. And you see where your answer was in part, I've been friends with him for years?

A. Yes.

Q. Do you believe that that was inaccurately transcribed?

A. No. He's been friends with me for years, I mean, based on my definition of friends. I had a friendly, good relationship with him.

Q. Was there anyone else in the Springfield Police Department that you had a similarly friendly relationship with in the mid 1980's?

A. Just, you know -- And I'm concerned about getting into semantics. I had a good relationship with him. He wasn't a friend like Tommy Kennedy was my friend or John Delaney was my friend, where I

would go to basketball games with them or I would go to parties with them or if there was a Christmas party, they might invite me over to their house. So I guess it all depends on your definition of the word "friends". I should are have been maybe more precise. I've always been friendly with Tom Kelly, but I didn't have the relationship that I did with Tommy Kennedy or John Delaney, for example.

Q. Is it fair to say that your relationship with Thomas Kelly at least before these issues arose in 1991 was a friendly working relationship?

A. Yes.

Q. And it sounds like from what you testified that you do not consider, wouldn't consider him to be friends necessarily outside of work, is that right?

A. Correct.

Q. But you were friends outside of work with Thomas Kennedy?

A. Yes.

Q. And in the mid eighties what other members of the Springfield Police Department were you friendly with outside of work?

A. John Delaney.

Q. Anyone else?
A. Those are the only two that come to mind right now.
Q. And we talked --
A. That I socialized with outside of work.
Q. We talked a little bit about Andy Canevari before.
A. Yeah.
Q. Is he someone you socialized with outside of work?
A. No.
Q. Did you have a friendly working relationship with him?
A. Yes.
Q. We talked a little bit before the break about Thomas Kelly's reputation as a police officer and I believe that you said that he had a reputation of being involved in excessive force cases, is that right?
A. I think it's a fact in terms of how many complaints have been made, brought against him over the years. I mean, that's not an opinion. It was well, I think it was well known in my circles what his record was for alleged abuses.

Q. Are you aware of any discipline that he ever received in the police department for those abuses?
A. No. When I say no, I'm not saying he was never disciplined. I'm saying I'm not aware of it.
Q. Was there anyone else in the Springfield Police Department that you were aware of having a similar reputation of receiving a large number of complaints?
A. No, not during the times I was working there.
Q. And you talked a little bit about your friendship with Thomas Kennedy and John Delaney, and I think you said that you went to basketball games with them?
A. Right.
Q. Was that Celtics games or something else?
A. Celtics.
Q. Were there other activities that you did with them?
A. Probably went to Red Sox games with them. You know, we hung around a lot. Went to dinner together, the six of us, the wives and the three of them.

Q. When you finished your work on the prosecution of George Perrot what did you do with your District Attorney files about the case?

A. Whatever the filing system was back in 1987, to my knowledge, I would have complied with.

Q. Well, do you remember what the filing system was?

A. Not at all.

Q. Did you have a, was there a mechanism for when you were done prosecuting a case for putting the files in storage somewhere?

A. I'm sure, I'm sure there was, but I don't recall. And I don't recall what his status was, because there was other open cases. So I don't know what happened with the file. Mrs. Marchand's case was over after the conviction. So what happened to his file on the Lichwalla and Prekop matters, I don't know. I can't even tell you as I sit here today what the filing system was. I have no memory.

Q. When you worked in the District Attorney's office did you have an office?

A. Yes.

Q. Did you share it with anybody?

A. No.

Q. For files for cases that you were working on, were those files kept in your office or somewhere else?
A. I think when the case, while the cases were still open. I'm guessing. I don't remember.
Q. Was there some kind of, you know, common file space that was accessible to everybody, but still accessible to people's working areas while you worked at the District Attorney's office, like a file room or storage area?
A. I want to guess that they were out front where, if you walked into the DA's office when I was there, all the staff support was out front. You went down into a hallway and that's where all the offices were. My guess -- I want to say some files were kept up front, but, you know, whether you're supposed to put the file back and not keep them in your office, you know, I just don't remember.
Q. At the time that you were working on prosecuting Mr. Perrot did you keep the files related to him in your office?
A. Don't remember.
Q. Who else from the District Attorney's office, if anyone, worked on Mr. Perrot's case

during the time that you were with the DA's office?
A. I mean, I'm guessing maybe Paul Barry, because he would help me out. I never really had a second chair when the case went to trial. But Paul could have helped me out on it. Like I said before, if there's complicated legal issues that come up, I would always go to Billy Walsh. But I have no memory as I sit here today who specifically did any work on that case.
Q. Did you have any administrative people who were assigned to you at the DA's office?
A. No.
Q. When did you first -- Well, strike that.
Let me ask you this. Did you know George Perrot before these sexual assault cases in the mid eighties?
A. No.
Q. Had you ever heard his name before that?
A. No.
Q. When is the first time that you heard his name?
A. The only thing I can say, it would have been after his arrest. What precise moment after his arrest I'd be guessing.

Q. All right. And when you're talking about his arrest, are you talking about his arrest on December 7th of 1985?

A. I believe that's the correct date.

Q. All right. You were contacted that night, is that right, about his arrest?

A. When he was arrested?

Q. Yes.

A. No.

Q. When were you first made aware that he had been arrested?

A. I have no memory, but I don't dispute what I said in '91. As I sit here today I have no memory as to when I first heard his name after his arrest, but I don't dispute what I said in 1991.

Q. Do you believe what you said in '91 is accurate?

A. Yes, that apparently sometime after his arrest the DA, the District Attorney called me or directed me to go up to the Springfield Police station.

Q. Do you know why the District Attorney assigned you to go to the station in response to his arrest, Perrot's arrest?

A. Me, or for what purpose? Me, versus somebody else, or --

Q. It's a good point. So let me start with do you know why you versus somebody else?

A. I could guess. I don't know.

Q. What's your guess?

A. I was one of the people that he would have trusted to handle what would have been considered a high profile case. That would be my guess.

Q. Prior to Mr. Perrot's arrest were you aware of the prior incidents that had occurred in Springfield with older women being sexually assaulted?

A. No.

Q. Are you aware now that at the time that Mr. Perrot was arrested that there were three older women who said that they had been assaulted?

A. I'm aware now, yes.

Q. Okay.

A. I mean, I would have been aware way before today.

Q. And I think you mentioned these women's names earlier, but we're talking about Miss Prekop, Miss Marchand and Miss Lichwalla, correct?

A. Yes. Sometime after his arrest I became aware that Mrs. Prekop was sexually assaulted purportedly three times, three separate occasions. And then Mrs. Marchand was sexually assaulted, purportedly. You know, sometime after the arrest I would have been, that would have been made known to me.

Q. Have you ever learned whether there was anyone in the District Attorney's office who learned about those assaults before you did?

A. I have no idea. I don't know why they would have been, but I don't have any idea.

Q. Well, was -- Let me ask you this. You said that it's your guess that you were assigned to go to the station on December 7th of '85 because this was a higher profile case, right?

A. No. What I said was I think that's the reason why he assigned the case to me. I think, as I look at my testimony and all the documents, that I went to the station on the 7th or 8th, whenever it was to approve a lineup as to what it appears as to why specifically the DA directed me to go up there.

Q. Your purpose in going there was to approve the lineup, but the reason it was you specifically

who was assigned was because it was a high profile case, correct?

A. That's my guess.

Q. And, well, let me ask you this. Do you have any independent memory of what you did on December 7th of 1985 after being assigned to go to the station with respect to dealing with Mr. Perrot or is your, does your -- Let me strike that question and start again.

Do you have any independent memory of the actions that you took with respect to the Perrot investigation after you were assigned to it on December 7th of 1985?

A. None.

Q. So is any of your testimony about the actions you took with respect to that investigation based on the documents that you reviewed, including your testimony and the other documents you have described?

A. Correct, specifically my testimony under oath. And then there's a document somewhere that says there was a lineup maybe at 5:00 o'clock in the afternoon or somewhere thereabouts and I was there. So I don't dispute any of that. But I don't have

any memory of it.

Q. Do you have any memory of Mr. Perrot's trial, the trial that you prosecuted?

A. Yeah, certain parts of it.

Q. Do you have any memory of aspects of the investigation between when you were first called to the station on December 7th and the trial?

A. Independent memories?

Q. Let's start there.

A. When you say investigation, I mean, from my purposes the investigation was over by the time I got involved. I understand there were still physical evidence that was being processed, but the only thing that I may have done that I guess you could say was part of the investigation was the lineup. Other than that, I wouldn't consider anything else I did investigatory, for lack of a better word.

Q. Before you got involved in Mr. Perrot's case did you know either Miss Prekop, Miss Marchand or Miss Lichwalla?

A. No.

Q. And when you say that you were directed to go to the station to approve a lineup, can you

explain to me what your role was with respect to approving a lineup?

A. I have no memory of doing that there, but -- Excuse me. Let me withdraw that. I have no memory of going to the lineup.

Post arrest I have done lineups before. I've been directed by the DA, go up there. And my role in that kind of scenario was to make sure that the lineup was fair to whoever it was who was being looked at as a suspect. You know, the common sense stuff. Someone's got a beard, the defendant, you know, they put seven guys in there that are clean shaven. That type of thing.

Just, it would have been him telling me, Make sure there's no problems with the lineup. To me that meant make sure that it looks fair on its face by the time they bring the civilians in to look at it. That would have been my only reason being up there.

Q. So in the mid eighties did the District Attorney's office have a policy of sending assistant District Attorneys to supervise a lineup to make sure the results would be admissible?

A. I don't want to say a policy. What I

would say to you, it would not have been extraordinarily unusual post arrest if there was a lineup and it was a high profile case for the District Attorney to send somebody up to take a look at the lineup before it was conducted.

Q. Did you have any role in selecting the fillers for the lineup in Mr. Perrot's case?

A. Like I said to you, I don't even remember, I really don't remember being up there. But I'm not contesting that, based on the documents I've seen.

Q. Well, in the lineups that you --

A. Yes. The answer was, would I have? Yeah. If I had said, I don't like that, you're not bringing the people in there, there would have been no lineup.

Q. Well, you know, and I guess I'm asking the question because there's a possibility that you could essentially be sent to observe this lineup and just intervene if something seems off to you, is that one way that you could participate, right?

A. Right.

Q. Was that your role here?

A. I think, yeah, I wasn't going out picking the people and determining who was in it. I was

there, if it looked unfair to me, to intervene. That would be probably a good way of putting it.

Q. When you got to the police station did you talk with anybody there before the lineup itself was conducted?

A. Again, I don't remember. I have no memory of going up there that 7th or 8th or whatever date it was when the lineup occurred.

Q. Did you do anything else at the station other than observe this lineup?

A. Not that I'm aware of.

Q. Do you know Detective John Scanlon?

A. I do.

Q. Is he someone that you were friends with?

A. No. You know, like Tommy Kelly, I was friendly with John Scanlon. I was friendly with most all of them. I wouldn't describe him -- When I say friend, I generally mean outside of work. I didn't have that kind of relationship with him.

Q. What about with Lieutenant Charles Arpin, A-r-p-i-n?

A. Yeah, no. Friendly. I would again say friendly, but not a social friend.

Q. Did you work on any other prosecutions in

your career besides the Perrot case involving a potential serial rapist?

A. Yeah, yes.

Q. Did you work on any other sexual assault cases in your career where there was an allegation that a serial rapist had assaulted more than one person more than once?

A. Not sure.

Q. I mean, at the time --

A. I would say probably yes.

Q. Go ahead, sorry.

A. I would say yes.

Q. At the time that you were working on this prosecution did it seem unusual to you that there were multiple people in this case who said that they were either sexually assaulted or there was an attempt to sexually assault them more than once?

A. The question is did I find it unusual?

Q. Yes.

A. Certainly wasn't usual.

Q. After the lineup in this case was conducted did this case go to the Grand Jury?

A. Again, I have no memory of it going to the Grand Jury, but it must have been presented quickly

to the Grand Jury, because he got indicted in '85 and that's the exclusive basis for me answering that question, but I don't have any personal memory.

Q. Did you have any involvement in the Grand Jury process?

A. Without seeing the Grand Jury minutes, I wouldn't know.

Q. But as you sit here do you have any memory?

A. No.

Q. Of having been involved?

A. No.

Q. Do you know who was assigned to Grand Jury cases at that time?

A. Yeah, same two ladies I described to you before.

Q. Okay. And I think you said earlier that by the time you got to the station on December 7th, that the investigation was done, correct?

A. My guess is I didn't know anything about the investigation when I got there on the 7th. Just my guess is -- she's going to hit me for guessing -- is I was aware of the general circumstances of what had transpired. Somebody would have told me that,

it's common sense, and that there was going to be a lineup and some civilians were going to be brought in. I probably knew very little specifics at the time I was at that lineup.

Q. Have you reviewed any of the reports of the lineup in preparation for your deposition today?

A. Other than the one that's typed with John Scanlon that says I was there, I did see that, which is part of the basis as to why I am saying to you now under oath that I don't dispute that -- I have no reason to believe that's not true.

Q. And did you see in that report that at that lineup that Miss Marchand and Miss Prekop and Miss Lichwalla were not able to identify anyone in the lineup?

A. I did see that.

Q. And obviously, George Perrot was in that lineup?

A. Yes.

Q. Were you concerned at the time that you were there for that lineup that the women were not identifying George Perrot?

A. No. I didn't know anything about the case, so I didn't have any feeling about it one way

or the other. I didn't know anything about it.

Q. Did you know at the time that you went to observe that lineup that this was going to be a case that you were going to be prosecuting?

A. No. More than likely, yes, but I can't say with 100 percent certainty I knew that.

Q. Did you understand at the time you were observing this lineup this lineup was for these women who had been apparent victims of a serial rapist for them to, you know, determine if they could identify George Perrot as the person who had done that to them?

A. I don't know -- I don't, I can't tell you how much information I was given about the investigation, if anything, at the time of that lineup. Certainly I would have known a lot of the details shortly thereafter, but at the time of the lineup I may have known very little. But I have no memory.

Q. After this case went to the Grand Jury you took steps to get this case prepared for trial, correct?

A. Correct.

Q. And one thing that you did was to assist

with getting some physical evidence tested, correct?

A. Correct.

Q. All right. And we'll talk about physical evidence in a minute. Other than whatever steps you took with respect to physical evidence, did you take any other steps to investigate the charges against Mr. Perrot?

A. Oh, boy, that's broad. Investigate. I don't think I, other than preparing the case for trial, I wouldn't say that I did anything that I would put the term investigatory next to.

Q. Prior to trial did you interview Miss Prekop?

A. I'm sure I did.

Q. Did you take any notes of your interview with her in preparation for trial?

A. I may have.

Q. Did you develop any opinions about her reliability as a witness in interviewing her in preparation for trial?

A. You know, I hate to keep saying this, but I don't remember. The only thing I really remember about that lady was one of the photographs, which if I close my eyes right now, I can remember what her

face looked like after she was raped and beaten on one occasion, because it was so extraordinary. That's the only thing I really can recall about her.

I never put a witness on the stand I did an interview, but I have no memory of, you know, 33, whatever years ago. I don't have any memory of talking to her, which I clearly did.

Q. Did you, in preparation for trial, talk with any of the police officers who responded to the scene of the incident on --

A. November 30th.

Q. Well, yeah, let's start with the November 30th incident.

A. I'm sure I did. I mean, I'm sure some of them testified.

Q. Do you believe that you would have interviewed everyone who testified at least for the prosecution in Mr. Perrot's trial?

A. Absolutely.

Q. In addition to the issues with Miss Prekop, did you interview Miss Lichwalla?

A. If she testified, I must have.

Q. All right. And do you remember anything about any of your conversation or conversations with

Miss Lichwalla in preparation for trial?
A. No.
Q. Did you ever do anything to investigate Miss Lichwalla having told the police that the person that sexually assaulted her she thought sounded like someone named John Mezzetti, M-e-z-z-e-t-t-i?
A. I've never heard that before.
Q. Well, did you ever in the course of preparing this case for trial investigate whether someone else, not Mr. Perrot, was responsible for any of the crimes for which he was charged?
A. I don't think that I did anything that you could put the term investigation, investigated next to from the time that I took this file from the DA himself.
Q. We talked at the beginning of your deposition about the District Attorney's office having its own investigators, is that right?
A. Yes.
Q. Were there any District Attorney investigators who worked on the Perrot case with you?
A. No.

Q. Did you use the Springfield Police Department for any investigation that had to be done in preparation for this case to go to trial?

A. It would have been just the Springfield cops, in addition to the fact that I did, you know, there were two FBI agents also who testified in the case.

Q. You're talking about the two FBI agents that dealt with some of the forensic issues?

A. Right.

Q. Okay. In terms of the factual investigation, were there any factual investigative leads that you asked Springfield police officers to, you know, work on or run down as you prepared for trial?

A. Not that I recall. I'm not saying I didn't. I'm saying I don't recall.

Q. Did you know someone from the Springfield Police Department named Curtis McKenzie?

A. Name is familiar. I think he was a Springfield police officer. I can't place him, though.

Q. What about someone named Richard Kane?

A. I know Richard Kane.

Q. And is he someone you were friendly with?
A. Yeah, I was friendly with him. But, I mean, I didn't socialize with him.
Q. What about Linda Derosier, D-e-r-o-s-i-e-r?
A. I'm not sure who that is.
Q. Did you ever talk with Curtis McKenzie about any aspect of the Perrot case?
A. Not that I can recall.
Q. What about Richard Kane?
A. I don't think he testified, so but I don't recall.
Q. Did anyone from the Springfield Police Department ever tell you that they had suspected Mr. Perrot of being involved in the series of sexual assaults for some time before he was arrested on December 7th?
A. I don't remember, but I did read something that said he was a suspect. So I don't know if that part was ever discussed with me after the arrest, that he was a suspect and in the other crimes he wasn't charged with. So my answer is I don't recall.
Q. Well, part of this issue with the

Exhibit 2, this confession that we talked about for some time before the break, that the reason why Kelly came to you about that is because he was attempting to get the two boys that we talked about to confess involvement in assaulting Miss Marchand, right?

A. They specifically told me that they believed that these two gentlemen were in the house when they believe George Perrot sexually assaulted Miss Marchand. What they specifically thought their role was as I sit here today I don't recall, but I do recall them being very certain in their minds, based on how they talked to me, that these two young men were involved in that incident.

Q. When you're saying "they", you're talking about Thomas Kelly and whoever was with him?

A. Whoever else was with him.

Q. Did they also express a certainty that George Perrot was also involved in what happened to Miss Marchand?

A. You can correct me if I'm wrong, but I think he was charged at that point in the Marchand. I think he was charged and then it got dismissed because she died, but I could be wrong about that.

In fact, my memory, my memory is that blood or semen, some forensics were found on her bed sheet and the FBI did analysis and they excluded George Perrot. It was exculpatory. It wasn't him. And then the FBI contacted Springfield and wanted Miss Marchand's blood to see if it was hers. And then she died right around that time.

But I, I could be wrong on this, but I'm guessing, but I, for something in my mind tells me he was charged with that assault. I don't remember what the extent of the evidence was against him or -- And I may be wrong on that, but --

Q. And I understand, I understand what you're telling me. And I guess my question still is in that conversation with Mr. Kelly and whoever else was with him, did he express to you confidence or certainty that George Perrot had been involved with those other two young men in at least breaking into Miss Marchand's house?

A. Yeah, that all three of them were together was their opinion.

Q. Did Kelly tell you words to the effect that his goal in trying to get those two guys to admit involvement was to be able to use that

information ultimately against Mr. Perrot?

A. No. No, that was never said to me. It was my understanding that they were targeting these two gentlemen. I don't know what else they were relying on. Something in the back of my mind tells me Mrs. Marchand said there was three people in the room. I could be wrong on that, too, but that's vaguely floating around in my head. There is not -- This conversation with Kelly and whoever else was there was about their steadfast belief that on the Marchand rape these two other gentlemen were involved. They wanted to know whether, if they were confronted and interrogated with a false confession, would their confessions hold up in court. That was what they specifically said, or words to that effect to me.

Q. Were you responsible for the Marchand, any District Attorney role in the Marchand case before Miss Marchand passed?

A. I think so. I believe I was.

Q. And when she died did that end, basically, any prosecution of anybody for --

A. I believe so.

Q. And I'm sorry to -- I know you are a

lawyer and I think that we're both trying to get this done as quickly as we can, but I am going to ask you to just wait for me to ask the question.
A. I'm sorry.
Q. Because I talk over you a little bit, but I'd ask you not to do that either so our record is clear.
So you were responsible for the Marchand prosecution at least while Miss Marchand was alive?
A. I believe so.
Q. All right. And at the time that Kelly and whoever else came to you is it your understanding that the prosecution was pending at that point?
A. I think it was.
Q. All right. And did you have any belief at the time that they came to talk to you that potentially one avenue you could use for the prosecution was to get either of those two young men to confess involvement and then flip them to testify against George?
A. I suppose you can make that argument, but I don't remember that being the subject of our conversation at the time. And so I sit here with

too many question marks. I don't know what the strength of the case was against Miss Marchand. I don't remember any of that. All I can tell you is the focus of that meeting was about those two gentlemen.

Q. In preparing for trial for Mr. Perrot about the cases that did proceed to trial, did you go through at any point the physical evidence that you were going to use in that case with anyone from the Springfield Police Department before trial?

A. I'm sure I did. I mean, that would have been the normal protocol, with the exception of the stuff that was in Washington. I mean, if there was gloves involved, I obviously would have seen them before the trial started. Well, I shouldn't say that. I guess the FBI had that, too.

Whatever was going to be introduced as evidence I would have, in Springfield, had in their custody I would have seen before the trial started.

Q. And would that have been part of your preparation process, basically to go through the custodians, go through the evidence with the custodian to prepare their testimony and to make

sure that you had everything you needed for trial?
A. Right, and decide who we were going to call as witnesses and things of that nature.
Q. Did you review as part of your preparation for trial any of the property receipts related to the evidence in these cases as part of, you know, preparing people for testimony?
A. I don't know.
Q. Is there any reason you wouldn't have done that?
A. I just have no memory of doing that or doing any of that, which doesn't mean I'm saying I didn't. I just have no memory.
Q. And I'm asking, given your preparation process for trial, if there's any reason that you would not have gone through property receipts for evidence that you intended to introduce at a trial.
A. I'm not really sure what you mean by property receipts. Whatever they had, it should have been tagged. I don't know if I would have looked at receipts.
Q. Well, did you go through and look at the actual tags?
A. I don't know.

Q. Is there any reason you wouldn't have looked at the tags before trial as part of your preparation?

A. There's no reason why I wouldn't and I'm not sure there was any reason why I would.

Q. After Exhibit 2, this confession that we've been talking about was done, did you participate in any questioning of Robert Timmerman?

A. I don't recall whether I spoke to him as he was leaving the station, but I was not involved in the interrogation for obvious reasons.

Q. When you say "for obvious reasons", tell me what you mean.

A. Well, because, you know, whatever I did or didn't do, I was an experienced prosecutor. You never interrogate somebody, because you're off the case. If I interrogate somebody and then you say they were beaten or their rights were violated, I'm a witness. So I never, ever, ever, ever under any circumstances would have done that.

And I never under any circumstances would have taken evidence to a laboratory where you then could say, or any other smart defense attorneys, we're raising a chain of custody issue.

Not only wouldn't I have done it, I would have had major problems with my boss if I ever made that kind of just monumental error.

Q. But you think you may have talked to Timmerman on his way out of the station?

A. I think so.

Q. And what would that conversation have consisted of?

A. Well, that, like, my guess and I'm going to state my guess that I would have said something along the lines that, I don't know whether you're involved in this or not. This is a horrendous crime. And if you are involved and it gets proven down the road that you were involved, your chance for consideration is walking out the door with you today. That, if I talked to him, that's likely something I would have said to him.

Q. And would that have been in an effort to encourage him to cooperate?

A. It was an effort to tell him if you're guilty of this, today is the day to fess up, because if we can independently prove this down the road if in fact you did do it, you're not going to get any consideration at that point.

Q. Did you observe any questioning of Robert Timmerman by others at the police station?

A. No.

Q. I mean, did the Springfield Police Department have, you know, the interrogation room set up where somebody could monitor it either through a camera or through a window?

A. I don't think they had cameras then, I really don't.

Q. Did they have like a two-way window for those?

A. No.

Q. Do you know who did question Robert Timmerman?

A. No idea. No memory.

Q. Was it Thomas Kelly?

A. I have no idea.

Q. I want to show you some documents. But first -- So I think you said that you personally would not have taken physical evidence somewhere because that would have been making yourself a witness in the case, essentially?

A. Correct.

Q. Did you take evidence to Washington, D.C.

in this case to give it to the FBI?

A. No.

Q. Did you --

A. Was I with Tom Kennedy when he was transporting evidence. I believe that's correct. I never touched it.

Q. Why did you go with Thomas Kennedy to take evidence to the FBI?

A. To talk to the serologist and the hair and fiber person who had made findings concerning Mr. Perrot and to interview them before the trial.

Q. And that's Eubanks and Oakes that we're talking about here, correct?

A. Correct.

Q. Did you have an appointment to meet with either of them when you traveled to D.C.?

A. I must have.

Q. Why do you say you must have?

A. I didn't go to Washington hoping that they were going to be there. What if Eubanks was testifying in San Diego? The DA had to approve the plane and the, you know, the expenses for the plane and the hotel and the rest of it. I must have had an appointment with them.

Q. You agree that going to D.C. just hoping them to be there just didn't make sense?

A. No, I agree to that.

Q. Did you go to D.C. in part just to get a trip with your buddy?

A. You know, that's a good question and I, I don't -- Again, I'm going to get pounded by Susanne when this is over, but my guess is that I was going to go down to -- I would never put an expert on without interviewing them. And I knew nothing about this type of evidence, particularly the serology evidence and, you know, the ability to -- You guys take for granted DNA today, but back then my involvement with blood was O, AB. This was a new thing for me, that they could extrapolate proteins and break it down more scientifically, which I wasn't used to. I was going to go down there. Could have been Tommy Kennedy. I believe Tommy Kennedy was taking down the hair and blood of Mrs. Marchand. That's my best guess. And we talked and I said, Well, if you're going down next Thursday, let me see if I can coordinate talking to these guys. I got to eventually go anyways because it was April or May at that point and the trial was coming

up at the end of the year. And again, that's not based on any memory. I have no memory of the Washington, D.C. trip, but I've read my testimony in '91 and I've seen other documents. Obviously, I went.

Q. You were taking --

MS. LYNCH: You're cutting out sometimes. Is there any way you could fix the phone there a little bit?

MS. THOMPSON: Is it both of us?

MS. LYNCH: I don't know if anybody else is having a problem.

MR. PIKULA: I am, too, both your question and the answer.

MS. THOMPSON: All right. I think we're at max volume here and we can go off the record for a second.

(Discussion off the record.)

Q. So I think your answer, Mr. Bloom, maybe was cut off when I requested to break there. The question I asked was whether one reason or a contributing reason for you and Mr. Kennedy going to D.C. was because you were friends and this was a chance to, you know, take a work trip with a friend.

MS. LYNCH: Okay. We're not hearing anything now.

THE WITNESS: That's because my stuff is swirling in my head.

MS. LYNCH: Okay.

THE WITNESS: Because it was a good question.

A. You know, I don't remember, but I can't tell you that's not, that my attempt to go down and see these two experts on the same day that Tom Kennedy was going down to deliver evidence wasn't related to my friendship with Tom Kennedy. In other words, if I wasn't friendly with whoever was taking the evidence down, I can't discount the possibility I would have picked another day to go to Washington. If that answers your question.

Q. Because spending the day with someone maybe that you're not friends with is not -- I mean, like all of us, we prefer to spend time with people we like.

A. Of course. Life is too short. I'm not looking for problems.

Q. Did you actually meet with Eubanks or Oakes in D.C. on that trip?

A. I have no memory, but I must have.

Q. And part of the reason that Kennedy at least was going was because he had evidence to deliver for further testing, is that right?

A. Yes, that's my best memory.

Q. Was that testing that was going to be done by either Eubanks or Oakes?

A. I don't know. I believe it was evidence on the Mae Marchand case, but that's my best guess. And I don't know who was doing the testing on the Mae Marchand case, whether it was different than the people that did the testing on the November 30th cases.

Q. If the evidence that Kennedy was bringing to the FBI on that trip was evidence that related to the upcoming trial, then do you agree that wouldn't have made sense for you to interview Eubanks or Oakes, because essentially, their opinions wouldn't be final, they had more stuff to do?

A. Yeah, I think that's probably true. And it was almost a year and a half after the arrest. Common sense tells me that well before going to Washington I had some kind of document or other, some document or some transmission from them

indicating what their findings have been in regard to 11/30/1985 and Miss Prekop or I wouldn't have been going down there and I wouldn't have known their names.

Q. Had you had phone conversations with either Eubanks or Oakes before you went to D.C.?

A. I don't think so.

Q. I'm going to show you now what's previously been marked as Exhibit 1. So for those of you that are on the phone, this is his interrogatories.

MR. PIKULA: I apologize what document is this?

MS. THOMPSON: This is his interrogatory answers.

MR. PIKULA: Thank you.

MS. THOMPSON: That was among what I e-mailed earlier.

MR. PIKULA: Yes, I have that.

Q. So Exhibit 1 that's now in front of you, Mr. Bloom, those are your interrogatory responses in this case, is that correct?

A. Yes.

Q. And I want to go through some of your

answers here. So let's look first at Interrogatory Number 1, which is on Page 2. I'm paraphrasing, but Interrogatory 1 asked for you to identify people that you thought had knowledge related to this case. You have listed the keeper of the records for the DA's office for obvious reasons, and you have listed Brett Vottero, who prosecuted the retrial of Mr. Perrot, correct?

A. Correct.

Q. Did you ever yourself talk with Mr. Vottero about Mr. Perrot?

A. I, I'm not saying that I didn't, but I don't have any memory of talking to him about the case.

Q. Is Mr. Vottero somebody that you think was connected with the Ryan faction of the DA's office?

A. I think Brett's a pretty independent guy.

MS. LYNCH: What did you just say?

THE WITNESS: My thoughts are, is that although he worked for Matthew Ryan, Brett's a pretty honorable and down the middle type of guy, for lack of a better way of putting it.

Q. Do you believe that any actions that Mr. Vottero took with respect to the Perrot case were

taken for the purpose of trying to get you into trouble or to discredit you?

A. No.

Q. You have also identified Mr. Barry as a person who has information, and I think we talked about him, but you said in response to the interrogatories that he may have assisted you in the initial prosecution?

A. Correct.

Q. Do you know what he did or would have done to help with your prosecution of Mr. Perrot?

A. No, but you know, if there were motions, researching the law, someone files a motion to suppress, someone files a motion to suppress evidence, someone files a motion to suppress a statement, Paul would have been somebody back then that I relied on to research a relevant issue, maybe sit in when I interviewed witnesses to get his perspective, things like that.

Q. And you have identified Miss Elizabeth Farris, F-a-r-r-i-s. Have you ever discussed Mr. Perrot's case with Miss Farris?

A. Not that I recall, but I may have.

Q. And you have indicated on her that she

discovered this confession, Exhibit 2?

A. I think the document I actually read has her and Elizabeth Dineen listed as the two people. And I don't know who found it. I have no knowledge of who found it.

Q. Did you ever talk with Miss Dineen about Exhibit 2?

A. No.

Q. Have you ever talked with her about anything having to do with Mr. Perrot?

A. Never.

Q. After your testimony in 1991 at the motion hearing that we've talked about did you ever talk about anything having to do with Mr. Perrot's case to anyone else between then and the time that the complaint was filed in this civil case? And obviously I'm excluding any communications that you have had with your own counsel about that.

A. Between February of '92 and this civil case did I talk to anybody about George Perrot?

Q. Yeah. And your testimony was in February of '91.

A. '91, okay.

Q. So between then and this complaint was

filed.

A. Not that I recall.

Q. And since the complaint has been filed have you talked with anyone about anything having to do with the issues in this, the civil complaint, again, other than counsel?

A. I bumped into Tom Kennedy at a restaurant when my wife. He was there with a buddy and I think the buddy's wife. I hadn't seen him in a long time. And he told -- I knew he had been sued, because I got a copy of the complaint. I think he told me his deposition was coming up. That was the extent of it.

Q. Is there anything else you remember about that conversation with Mr. Kennedy other than him telling you his dep. was coming up?

A. The only thing I distinctly remember is him saying in front of everyone that George Perrot was one of the worst people he ever dealt with in the years he was a member of the Springfield Police Department.

Q. Anything else you remember about that conversation?

A. That's about it.

Q. Have you ever talked with anyone in the Springfield Police Department about any questioning that any Springfield police officer did of Mr. Perrot about his potential involvement in any of these sexual assault and robbery or burglary cases that we've been talking about in your deposition?

A. Well, I think Tom Jarvis took the statement, if I'm not mistaken, and I must have put that in evidence at the trial. I don't remember, but I must have. So I would have talked to him, obviously, about -- And I suspect, without a memory, that he must have testified. Otherwise, I would have had no way of getting the statement in.

Q. Other than assuming that he's somebody you would have prepared with for trial, do you remember talking to him ever about anything having to do with Mr. Perrot?

A. No.

Q. And is Mr. Jarvis someone that you were friendly with?

A. Yes, I was friendly with him.

Q. When you left the District Attorney's office did you take any records related to your time in the DA's office with you?

A. No.
Q. Back in --
A. Not that I recall.
Q. Back at the time that you left did you have a personal computer at home?
A. 1989, no.
Q. Did you do work on any of your cases at home?
A. No.
Q. So did you have any office at home or any personal files about cases that you were prosecuting that you kept at home?
A. No. I don't think I had a computer in the DA's office.
Q. At the time -- Well, let me -- Actually, I'm done with the exhibit in front of you.
MS. THOMPSON: Let's mark this.
(Bloom Exhibit 4 marked for identification.)
Q. So, Mr. Bloom, I'm showing you what's been marked as Bloom Exhibit 4 and this is a two-page document that's Bates stamped City 3724 and City 3725. Let me give you this copy.
(Document handed to the witness.)

Q. I have a couple questions for you about this, so if you want to, if you need to review it first, you can do that and just let me know when you're done.

MS. LYNCH: And that's Exhibit 4?

MS. THOMPSON: Yes.

Q. All right. So I'm going to have you keep Exhibit 4 for now, Mr. Bloom. Did you author Exhibit 4?

A. Not that I recall.

Q. And I'm going to have you just turn to Page 2. Is that your signature on Page 2 above the typewritten words Francis W. Bloom?

A. It is.

Q. April 1st of 1997, that is the date that you went to D.C. to talk to Mr. Eubanks and Mr. Oakes, correct?

A. That's correct.

Q. And did you deliver Exhibit 4 to the FBI when you went to their offices?

A. Exhibit 4. I have no memory. I mean, did we hand this to them when we were there on the 1st of April?

Q. Yes.

A. I don't know.

Q. This letter references, and I'm looking at Paragraph 2, it references you talking to Bill Eubanks and Ed Burwitz, that's B-u-r-w-i-t-z earlier that week, do you see that?

A. Yes.

Q. Do you remember what you discussed with either Mr. Eubanks or Mr. Burwitz earlier the week of April 1st of 1987?

A. No.

Q. It looks like, if you look at Paragraph 3, that you indicate there, I explained to both gentlemen that, and in parentheses, (See the attached reports). Previously hairs from the scene of the crime were compared to the hairs submitted of the defendant. I would like the hair and fiber section to now compare the two hairs found suitable for comparative analysis to hairs submitted by Mary Prekop. Do you see that?

A. Yes.

Q. In this letter are you asking the FBI to do additional investigative work on the Prekop case?

A. That's what it appears to be suggesting.

Q. Whose idea was it to have -- Well, were

you starting to say something? I'm sorry.

A. Yeah. You know, I don't think that's accurate in terms of if this is correct, which I have no memory of, then I would not have made a decision to have anybody look at Mrs. Prekop's hair. So my, my, my best guess is that if I talked to them earlier that week, they wanted to compare Mrs. Prekop's hair to the hair they found in her bedroom and they didn't have her hair.

Q. So do you know why in this letter you would have written, I would like the hair and fiber section to now compare the two hairs found suitable for comparative analysis to hairs submitted by Mary Prekop?

A. Sure, because if they had called me and told me that they found hair regarding the Prekop rape that was in Mrs. Prekop's bedroom and it was consistent with George Perrot, that would be meaningless to me unless it was not consistent to Mrs. Prekop.

Q. So did you make the decision to have additional analysis done then of those hairs?

A. No.

Q. Who then made that decision?

A. Well, I mean, I suppose you could argue it was a collaborative -- You know, I'm being asked about a conversation I don't recall. I can only guess. But again, the fact that somebody was going to say a hair was consistent with George Perrot's hair, from a prosecutor's point of view, you would want Mrs. Prekop's hair to have been analyzed, as well.

Q. Right. And I guess you're saying you would want it to be analyzed, as well. And I'm asking who made the decision to do that?

A. I don't know.

Q. Are you suggesting that that was something that the FBI decided to do?

A. I can't imagine a good hair and fiber -- You know, an expert -- Yes, I am suggesting the FBI would have wanted to do it. There is no way an expert is going to testify in a trial like this without doing that work. My wording may be poor, but I can't imagine a legitimate expert who found a hair in a rape of an elderly woman like this, and it was consistent with a gentleman who said he was in the room at the time of the commission of this crime, not wanting to compare that hair to the hair

of the lady who was allegedly raped. That would be -- I just can't imagine them not demanding to do that.

Q. Well, if, if the FBI was demanding to do that in this case, do you know why the letter is authored, indicates something that a request by you, essentially, for that to be done?

A. I mean, it just may have been the way I worded it.

Q. Had you worked on any hair microscopy cases before you worked on this case involving George Perrot?

A. Not that I remember.

Q. Did you know anything about hair microscopy before you worked on this case?

A. No.

Q. I take it you had to prepare yourself at least to examine, you know, witnesses in this case about that subject matter, correct?

A. Right.

Q. What did you do to -- Well, strike that.

A. Wasn't a big part of the case, in my mind. I'll just be honest with you. I mean, I know Brett Vottero felt differently in the way he tried the

case. But it wasn't -- I didn't put the significance in the forensics that he did. This was corroborative, but not, to me, the central parts of the case.

Q. What for you was the central part?

A. That at 3:00 a.m. when a woman had a house break and ran out the door, and then an hour later another woman's house is broken into and she's raped, Mr. Perrot saying he was broke into both locations. So from my perspective, and this is just me, you know, I would think it would be a significant factor, if you believe the statement in terms of inculpating or incriminating Mr. Perrot, unless you believe that he was going through the sterling silver at 4:00 a.m. and another perpetrator came in the door behind him and raped Mrs. Prekop, I would choose to think that that's a little preposterous.

So that to me, and I'm not saying any, I'm not saying anything that you probably don't know. That's clearly in my opening and in my closing. And the second thing that I, that I believe was dramatically incriminating was his behavior according to Tom Jarvis during the

statement. He had no problem, he broke into both houses, but denies the sexual assault. And yet he is highly emotional, asked Tom Jarvis a number of times to give him his gun to blow his brains out, which I interpreted it my way, from my point of view, that that was incriminate something terms of the sexual assault.

And then in the statement, if you believe Tom Jarvis in the statement, he said when he went into the Prekop house he had a pair of mittens on. Men generally don't wear mittens. I'm not saying always, but generally. He was staying with his sister. They went to the sister. She said, Yeah, they look like mine, but mine are over here, if you believe the cops. She went over to where she said she had seen those mittens a short time before these events, and the mittens weren't there. So to me, those, those were the keys to the case.

The fact that blood consistent with his, and a hair that was consistent with his and not consistent, both the blood and hair, with Mrs. Prekop were not as important in my mind as the other factors.

Q. Did Miss Prekop tell you before the trial

that she had a relative who stayed there sometimes who had a blood coughing disorder?

A. I don't remember.

Q. Do you ever remember hearing that in connection with this case at all, that Miss Prekop had this relative who sometimes left blood on her sheets?

A. No. As I said before, I'm not trying to dismiss it as nothing, but quite frankly, the blood and hair was secondary in importance to me than the confession, his behavior when he gave the confession, my knowledge of Tommy Jarvis and the impression he made with the jury, and the gloves, in my mind, were much more incriminating than the scientific evidence.

Q. Did you have any information for your prosecution about what happened during Mr. Jarvis' interrogation of Mr. Perrot other than Mr. Jarvis himself and the records that he created relative to that interrogation?

A. No, other than my working knowledge of him and what the report said, I can't think of anything else that comes to mind as we sit here today.

Q. So you were not in the room for any of the

interrogation of Mr. Perrot, is that right?

A. Absolutely not.

Q. Were you at the station while he was being questioned?

A. Not that I was aware of at the time.

Q. Did you see Mr. Jarvis, you know, coming in and out of the room while he was talking to Mr. Perrot?

A. I want to say where the lineup area is is not in the same area of the building as the, where they interrogate people generally in the detective bureau.

First time I saw Mr. Perrot or a young man that was identified as Mr. Perrot to me is when he was in the lineup that day, that day or the next day, whenever it was.

Q. Did you talk with Mr. Jarvis or anybody else in the police department about, you know, questioning Mr. Perrot in terms of discussing a plan for that or a strategy for that?

A. No, I -- No. Whatever interrogation was done of Tom -- of George Perrot, I know as much as you do, I know from reading the police reports.

MS. THOMPSON: Mark this Exhibit 5?

(Bloom Exhibit 5 marked for identification.)

(Document handed to the witness.)

Q. I'm showing you what's been marked as Plaintiff, or, excuse me, as Bloom Exhibit 5 and this is a two-page document that's Bates stamped Plaintiff 4105 and 4106. Have you seen Exhibit 5 before today, Mr. Bloom?

A. Yeah, I'm sure I have.

Q. All right. Were you at the police station at the Springfield Police station on December 7th of 1985 at 12:40 p.m.?

A. Say that again? Give me the date?

Q. December 7th of 1985 at 12:40 p.m.

A. 12:40 p.m.?

Q. Yes.

A. I don't know the time I was there without looking at the lineup.

Q. So --

A. I mean, I have no memory.

Q. So you went to the station to observe the lineup and then did you do anything else there after that?

A. No.

Q. I mean, is it your memory that after the lineup was done, you basically left?
A. Yes.
Q. In preparing for trial did you talk with Thomas Jarvis about the two statements that are reflected in Exhibit 5?
A. I must have.
Q. And I'm going to -- Let's look first at Plaintiff 4105, which has that R78 at the top of the page? The document you have in front of you is two sided.
So looking at that page first, which is Plaintiff 4105, do you see there is a particular font of typewriting for roughly the first half of the page, and then there's a different font that follows and the paragraph that starts, This was about 12:15, do you see that?
A. Yes.
Q. Do you know why there are two different type, styles of typewriting on this document?
A. No.
Q. And in looking at page, the other page which has the R77 at the top, which is Plaintiff 4106, do you know why the typewriting on this page,

4106 is a different style from what we saw on Plaintiff 4105?

A. I have no idea, other than must have been a different typewriter.

Q. Did you receive any information from either Mr. Jarvis or anyone else from the Springfield Police Department about how these two pages in Exhibit 5 were typed up or who did the typing or who prepared them?

A. No. Other than the witnesses, I would have made a presumption. Maybe on the first one Jarvis did it, because he's the only one who's a witness and there's a different font on the other one. And Jarvis and Captain Arpin are witnesses. Maybe Arpin used his own typewriter, which was different, and that's why there's different fonts. But that's just -- I have no knowledge of any of that.

Q. Did you ever, did you ever ask either Mr. Jarvis or Mr. Arpin if they had any notes or other records related to any questioning of Mr. Perrot on December 7th?

A. No, not that I remember.

MS. THOMPSON: We can go off the

record.

(Discussion off the record.)

(Bloom Exhibit 6 marked for identification.)

Q. I'm about to show the witness what's marked as Bloom Exhibit 6 which is a one-page document what is Bates stamped Plaintiff 4160.

(Document handed to the witness.)

Q. So, Mr. Bloom, I've showed you Exhibit 6. Did you ever discuss with Mr. Jarvis the information that's described in the report that is Exhibit 6?

A. I'm not saying I didn't. I have no memory.

MS. THOMPSON: We can go off the record.

(Discussion off the record.)

(Bloom Exhibit 7 marked for identification.)

Q. I'm showing the witness now what's been marked as Bloom Exhibit 7, which is a two-page document that has the Bates stamp DA Discovery 386 and DA Discovery 387.

(Document handed to the witness.)

Q. And my question for you as you're looking

at this, Mr. Bloom, is if you recognize it?
A. No.
Q. Do you recognize the handwriting on Exhibit 6?
A. No, I do not.
Q. Do you remember -- Well, let me ask you this. This appears to be sort of a standard phone message pad note, do you agree?
A. That's what it looks like.
Q. Do you see in the middle of this note, just below the While You Were Out, do you see the words, Routine - head hair don't maintain?
A. Do I see it? Yeah, I see it.
Q. Do you see those words?
A. Yeah.
Q. Do you know what that refers to?
A. Not a clue.
Q. Did you know a David Louden with Springfield Police Department?
A. I did.
Q. And is he someone you were friendly with?
A. I got along with him. I didn't have much to do with him. He was primarily a photographer, as I remember.

Q. Like a scene photographer?
A. Yes.
Q. Did you ever, were you ever made aware in your work on Mr. Perrot's case that there was an issue with the collection of evidence from the Prekop scene from November 30th of '85?
A. No.
Q. Did you ever talk with either Thomas Kelly or with Sergeant Louden about the collection of evidence from that address?
A. No.
Q. Did you ever talk with him about the collection of any evidence from the location where Mr. Perrot was staying with his sister?
A. No.
MS. THOMPSON: This can be off the record.
(Discussion off the record.)
(Bloom Exhibit 8 marked for identification.)
MS. THOMPSON: I'm about to show the witness what's marked as Exhibit 8, Bloom Exhibit 8, which is a two-page document that's Bates stamped City 1722 and City 1723.

(Document handed to the witness.)

Q. So, Mr. Bloom, we discussed earlier a disciplinary proceeding that you had that stemmed from this issue with Exhibit 2, the confession, correct?

A. Correct.

Q. And then I've just shown you Exhibit 8, which is a document related to a different bar investigation that was conducted with respect to your practice, is that right?

A. Correct.

Q. Do you have any other bar complaints that you're aware of that were filed against you other than Exhibit 8 that you're looking at and the complaint related to the confession issue?

A. No.

Q. -- in Mr. Perrot's case?

A. I'm sorry, she didn't finish. No.

Q. This opinion that's in front of you, Exhibit 8, did you essentially reach an agreement with the Board about a penalty for the alleged violation that's reflected in Exhibit 8?

A. Yes.

Q. Okay. And what you were -- Let me ask you

this. I guess there are certain facts related to your practice which are laid out in Exhibit 8. Are those facts accurate?

A. Yes.

Q. Did you satisfactorily complete what the Board requested for you to do following this agreement?

A. Yes.

MS. LYNCH: When there's a good time to break, can we just stop about five minutes?

MS. THOMPSON: I think now is fine. Do you want to just break now?

MS. LYNCH: Yeah, if we can have like a five-minute break?

MS. THOMPSON: Okay. Let me just say before we break, I am going to show the next thing that I think I'm going to show -- We can go off the record here.

(Brief recess.)

(Bloom Exhibits 9-13 marked for identification.)

Q. Mr. Bloom, I'm now showing you a document that's been marked as Bloom Exhibit 9. This is a multiple page document that is Bates stamped City

6224 through City 6263.

(Document handed to the witness.)

Q. And I'm going to ask you generally if you recognize this document?

MS. LYNCH: I'm sorry. Can you just say the last number that it goes to again?

MS. THOMPSON: It goes to 6263.

MS. LYNCH: Okay, thank you.

A. I don't recognize it, but some of it is my handwriting.

Q. And I know that this is a multiple page document. I am trying to understand, you know, whose handwriting is whose. So I don't want to go through every page of it with you, but let's start with Page 1. In general, does this document appear to you to be notes from the District Attorney's file about Mr. Perrot's case?

A. It appears to be.

Q. All right. And I know you indicated before that you, part of your concerns with how at least Mr. Ryan handled your involvement in Perrot's case was his production of some of your personal notes about the case to the defense counsel for Mr. Perrot, correct?

A. Not his files. I'm not talking about files. I was talking about my impressions of him that was documented -- What I was specifically referring to was my impressions of Mr. Perrot apparently post a motion to, a motion to dismiss -- or exclude, I should say, his statement. And there was some personal notes that I made that were turned over.

Q. Right. And it's your -- I didn't mean to cut you off. If you had anything more to say, go ahead.

A. No, that's fine.

Q. I mean, it is your belief that it was inappropriate for him to tender your personal impressions about the case?

A. Yes.

Q. I understand you're not taking issue with other discovery, but that's the concern you had?

A. That and the fact that this -- I'll just go back to what I said before. I've yet to hear somebody explain to me what exculpatory on what was proposed to be done to Mr. Timmerman and Mr. Atkinson or whatever the other gentleman's name was, but that's just my feelings.

Q. Going back to Page 1, then, of Exhibit 9, the top of this page appears to have a listing of various charges against Mr. Perrot, is that correct?
A. Correct.
Q. And the charging portion of this at least the writing that's on the left side that starts with 85-5410 to 85-5422, whose handwriting is that?
A. Not mine. I don't know.
Q. All right. There's a smaller list on the right side, sort of the middle right that starts with 85-5415 and goes to 85-5425?
A. I do.
Q. Whose handwriting is that section?
A. That appears to be mine.
Q. Do you recognize the other handwriting?
A. No. The first section that you asked me about?
Q. Yes.
A. No.
Q. If you go down to that bottom section, there's a stamp with some various lines on it and then some handwriting, do you see that?
A. Stamp?
Q. It looks like there's some words like

Disposition, Day Judge?
A. Oh, yes.
Q. Looks like they're stamped on this page?
A. Correct.
Q. Is that a format that was used in the District Attorney's office for note taking on cases?
A. I can't tell you I remember that, but it could have been.
Q. All right. And do you see where it says, the third line there where it says DA/ASST, that line?
A. Would you repeat that again?
Q. Yeah, sure.
A. I see that.
Q. So there's some stamped words that say DA, ASST?
A. Correct.
Q. And then the handwritten word Bloom next to it?
A. Right.
Q. Is the word Bloom in your handwriting?
A. It is.
Q. Do you see where there's a line, sort of a thick looks like in pen line that's drawn down all

of those columns?
A. Yes.
Q. And so across that thick line from Bloom it says, Same?
A. Uh-hum.
Q. Well, first of all, do you read that word to say, Same? Mayne it doesn't say that.
A. Appears to be.
Q. And do you know whose handwriting that line is in?
A. On the right side?
Q. Yes.
A. That looks like my handwriting.
Q. Do you know why there's that line drawn?
A. Why?
Q. Yes.
A. I really don't. It appears that there is one date is February 10th of '87 and the other one is 12/14 of '87, but I don't know the significance of -- I don't know. I don't know why that line is drawn there. I could say arraignment, but obviously he wasn't arraigned on February 10th, 1987.
Q. Let me have you jump ahead to Page 4 of this document, which on the bottom should say

Page 348.

A. Uh-hum.

Q. It has also has got City 6227 at the top. Are you there?

A. Yes.

Q. All right. The top, just to make sure we're on the same page, has the name Perrot and then (FBI material on 11/30/85), do you see that?

A. I do.

Q. Whose handwriting is this page in?

A. Mine.

Q. Let me have you jump ahead then to Page 6. This page has Bates City 6229 on top. Are you there?

A. 6229?

Q. Yes.

A. And says, One State Meeting?

Q. Yes. Whose handwriting is this in?

A. My handwriting.

Q. All right. Are these, does this page reflect notes to yourself?

A. Appears to be.

Q. Your second note on this page that says, Where are property slips? And then you got the

numbers 51458 and 51465, do you see that?
A. Yes.
Q. Do you know why you made that note to yourself?
A. No, not at all.
Q. And then the third line here or sort of your number 3 of this list here where it says, Seri kit on Prekop 11/3/85, do you see that?
A. I'm sorry.
Q. Sorry. It's the third line of that Wednesday meeting list, Mr. Bloom, that's where I'm looking. Do you see that?
A. Yes. Where it says M. Popko?
Q. Yes. Do you know why you were thinking about that seri kit at the time you took these notes?
A. No, I have no memory of Marianne Popko ever being involved in the case.
Q. Let me have you jump ahead to the next page, which should be City 6230.
A. Uh-hum.
Q. Is this your handwriting on this page?
A. It is.
Q. And then let me have you go to the next

page, which is City 6231.

A. 6231.

Q. Is this your handwriting on 6231, as well?

A. Most of it. Some of it isn't.

Q. Can you tell me what's not yours?

A. Well, the beginning, that's not my -- It says Perrot at the top. 45-50 doesn't look like my handwriting. 85-5418 could be, but I'm not sure if that's my handwriting. The rest of it looks like mine.

Q. Do you know why you took the notes that are on this page, 6231?

A. I don't have any memory of taking them other than what I read somewhere in one of the, the, you know, the documents that were provided to me. It might have been Judge Kane or something that I read said that these notes were made post a motion to suppress hearing or something where Mr. Perrot testified, but I don't remember that either. I don't have any memory of making any of these notes or what the circumstances were.

Q. Well, at the time you made these notes was it your belief that George Perrot was absolutely devoid of all factor we normally associate with

human beings?

A. I don't know the circumstances of why I wrote that, but I'm sure I believed it when I wrote it.

Q. And did you believe at the time you wrote this that George Perrot was inherently evil?

A. I wouldn't have wrote that down -- You know, I got to -- Yeah, yes, I would probably be one of those that would say anybody 17 years old who is raping 80 year old women is inherently evil, but that's just me. But I don't know. There had to be something specifically that generated these comments and I don't know what it was or -- nor do I know when I wrote this.

Q. I'm going to have you go down to Number 6 on this, the same page, Mr. Bloom. So the Number 6 there's the word "Victims" there, do you see that?

A. Uh-hum.

Q. What is the word after Victims?

A. Gone, gave. Gave or gone, maybe.

Q. Okay. And then after that, it says, Recognize he hasn't been convicted?

A. Uh-hum, correct.

Q. Do you know what that note refers to?

A. No.
Q. Then there's an A below that and then a B?
A. Yes.
Q. That note, to my mind, reads, Hyperventilating. Why relax? I'll live longer.
A. That's what it appears to say. I don't know if it's hyper -- My spelling is very poor. Hyperventai -- Looks like it's hyperventilating, but I don't remember this either.
Q. Do you know what that note is about?
A. No. To be honest with you, I don't remember one item on here. I don't remember writing, From the age of 13 to 17 he's got one conviction after another. No break in the record. Convicted six or so B&E's, robbery, etc. I don't know where any of that came -- Committed to the Department of Youth Services. I don't know what the basis was for me putting any of this on paper or when I did it.
Q. I'm going to have you jump ahead to Page 18, which is City 6241. My first question is this page, City 6241, is your handwriting?
A. Yes.
Q. Do you know what these notes were taken

for? And if you need to look at surrounding pages to answer that, go ahead.

A. No.

Q. Let me have you jump down to six --

A. Wait a minute. I want to answer you.

Q. Go ahead.

A. If you go to the, if you go to the page before, that seems to be the start of this particular note. It has, Final. And then maybe I'm just charting out or kicking around the things that I should be concentrating on in my final argument. And it looks like the page that you directed me to pay attention to is the continuation of that.

Q. All right. Does that entire note, which I guess as you said starts on 6240, that's all your handwriting?

A. Yes.

Q. Let me have you go down to 6243. Is that page your handwriting?

A. Yes.

Q. All right. And this note also seems to go for several pages, to 6246, correct?

A. Appears to.

Q. Right. Is that all your handwriting?

A. Yes.

MS. LYNCH: I think you just might have cut out on that one. What was the question?

MS. THOMPSON: The question was if that was all his handwriting.

MS. LYNCH: On which one, 6243?

MS. THOMPSON: I was asking you about that whole set of notes, so starting from 6243 to 6246.

MS. LYNCH: Yeah, you did cut out then.

Q. And your answer to that was yes, Mr. Bloom?

A. Yes.

Q. All right. I'm going to ask you just to take a general look at the pages that follow through 6258 and ask if you there's any handwriting you see on those pages, from the end of the note we were just looking at to 6258 that is not yours?

A. Most all of it is mine. If I can refer you to 06, 006261, that's not my handwriting.

Q. So did you review all the pages from where we left off to the end of the document?

A. Well, I'm almost at the end.

Q. Okay. So 6261, that page is not your handwriting?
A. Correct.
Q. All right.
A. Next page is mine. And then the last page is not mine.
Q. Do you know whose handwriting the last page is?
A. No.
Q. I'm going to now show you Exhibit 10. Let's go off the record.
(Discussion off the record.)
MS. THOMPSON: I'm about to show the witness what's been marked as Exhibit 10, Bloom Exhibit 10. This is a multiple page document which is Bates stamped City 6267 through City 6277.
Q. While we're waiting for all of the counsel to have this document in front of them, I'm just going to give this Exhibit 10 to the witness and I'm just going to ask you generally to review that for a minute. I'll have some questions about that document, Mr. Bloom, in a second.
(Discussion off the record.)
Q. So you have just had a chance to look at

Exhibit 10 in front of you, Mr. Bloom?

A. Yes.

Q. I have the same question in looking at these pages. Maybe let me just start with Page 1 of this document, which is 6267. Is any of that your handwriting?

A. Do you want me to just tell you what's mine on here, would it be easier?

Q. Sure. So you're looking at all of Exhibit 10, correct?

A. Yeah. I've gone through the whole thing. None of it is mine except 006275, which is near the back. And it says November 17th, 1986, Judge Urbano denied motion from defendant for new counsel. Trial date set 12/7/87. That's my handwriting.

On the next page, which is 006276, at the top of the page that looks like my handwriting on the arraignment date, 5/9/86. That looks like my writing of Marchand, M-a-r-c-h-a-r-d (sic). And then in the upper left-hand corner it says, 3/31/86. FBI turned over to Jim Hammerschmidt. The rest of it is not my handwriting, except there's a repeat of the previous page that says, November 17th, 1986, Urbano denied

motion for new counsel. Trial date set 12/7/87. Everything else is somebody else's.

Q. And let's look back at 6276, that page you were just talking about. Is 6276, the general form of that page, is this a form that was used by the District Attorney's office?

A. I don't remember.

Q. All right. Do you see there are some typewritten words on that page?

A. Yes.

Q. With some various things filled in. Do you see the line that's four lines down of that area where there's lines that says Approved by ADA?

A. Yes.

Q. Do you know what that means?

A. No. I mean, I know what Approved by ADA means. I don't know what it means in the context of that page.

Q. What is your understanding of what Approved by ADA means generally?

A. Well, generally, you might have a form in which when you turn discovery over and someone else in the office put the discovery together, I looked at it to say, yeah, that appears to be everything,

and I approved it going out to be handed to defense counsel.

But I can't say that that's what this is. But that would be something that the ADA would have to approve, something like that.

Q. Going up to the page just before that, 6275, it looks likes possibly there's a smaller piece of paper that was over, that was stapled maybe to this original file, that white box at the top that says, Marchand. Do you see that?

A. Yes.

Q. Is anything that's on that piece of paper that was stapled over file of the original, is any of that your handwriting?

A. No.

Q. Do you know whose it is?

A. No.

Q. And in general, if you look at the pages above there's some pages that have these lists on them. So looking at like 6274 and then the list before that, it's 6273, the handwriting on those pages, for instance, do you know whose handwriting that is?

A. No.

Q. So I previously marked something as 11, which I don't think we need, so we'll not have an Exhibit 11, but I'm going to show you an Exhibit 12.

MS. THOMPSON: Off the record.

(Discussion off the record.)

MS. THOMPSON: I'm showing the witness or will be showing the witness what's marked as Bloom Exhibit 12. This is a one-page document that's Bates stamped City 6266. I'm going to give this to you to look at for a minute, Mr. Bloom, and I'll have some questions in a moment.

(Document handed to the witness.)

Q. So looking at Exhibit 12, City 6266, do you recognize that handwriting, Mr. Bloom?

A. No, other than it's not mine.

Q. Do you know, do you recognize the form of what Exhibit 12 is?

A. No. Other than, I would say to my knowledge it's not the District Attorney office's form or any form I'm familiar with.

Q. I mean, it looks likes some type of fact chart related to these three purported victims, right?

A. It does.

Q. All right. Is that a form you have seen anyone in the District Attorney's office use?

A. No.

MS. THOMPSON: Let's go off the record.

(Discussion off the record.)

Q. I'm showing the witness what's been marked as Bloom Exhibit 13. This is a one-page document that has a Bates stamp at the bottom of DA Discovery 312.

(Document handed to the witness.)

Q. And I'm going to ask you look at that, Mr. Bloom, and tell me if you recognize it?

A. No.

Q. Did you --

A. I don't, I don't recognize it. And of course, some of it's typed, obviously, but whatever the handwriting portions that are included in Exhibit 13 are not mine. That's not a form that we use at the DA's office.

Q. Did you ever prepare any charts for cases that you worked on that listed out various, you know, pieces of evidence and analysis with similar content to what's included on this exhibit?

A. Not like this.
Q. And have you ever seen this exhibit before?
A. If I have, I don't remember ever seeing it.
Q. Before you went to the FBI in April of '87 were you aware that there had been other evidence that had gone to the FBI related to this string of sexual assaults for forensic testing?
A. This -- Well, I don't know what was sent when, but recognizing we're talking about November of '85 to April of '87, I think it's a safe bet that I would have been aware that stuff had been sent down to the FBI. I can't imagine it sitting in Springfield for eighteen months and not going down there.
Q. Were you involved in directing other evidence to go to the FBI prior to April 1st of 1987 for this case?
A. No. You know, the term directing, I mean, just hypothetically if I -- If, for example, on the Prekop -- and I don't remember this to be the case. If there had been a report saying this blood in her bedroom is consistent with Mr. Perrot's, this hair

is consistent with Mr. Perrot's, I obviously would have looked to see where the analysis would have been made with Mrs. Prekop's blood and Mrs. Prekop's hair. And if it hadn't been done, I certainly would have wondered why it wasn't. I would have talked to Kelly or Chief Stelzer or my boss or somebody else and said, Hey, they got to get on this part of the case. I'm not saying that I did that, but that would not be an unusual thing to do.

Q. Once there was a decision made to charge someone in a case like Mr. Perrot's -- Well, let me start that question again.

After Mr. Perrot was charged in this case did the Springfield Police Department arrange for additional forensic testing to be done on its own without consulting you related to Mr. Perrot's case, obviously?

A. I don't think they consulted me. My memory is that blood and hair was taken from him on the 30th and I don't even -- I mean, I looked on there and it said May he was arraigned, if that's correct. I don't even know between November of '85 and May of '86 that I would have even seen the file, the police file, that I would have done anything on

the case. You follow what I'm saying to you?

Q. And why is it that you wouldn't have done anything in that period?

A. Well, I just -- There wouldn't have been anything for me to do. The normal course of business is he got put into the Grand Jury and unless the District Attorney came out and said, I want you to do this or I want you to do that, like he said go down to the lineup, I wouldn't have been doing anything until the arraignment. I wouldn't have had a file until the arraignment.

Q. So during that period of time if additional forensic testing was getting arranged for and done relating to any of these cases, the Marchand case, the Lichwalla case, the Prekop case, was the Springfield Police Department doing that on its own without consulting the District Attorney?

A. I don't know what their conversations were with my boss. I'm just saying I personally wouldn't have been involved in doing anything from George Perrot from the day I went into the lineup until I got the file when he was arraigned and I saw something in there, and I don't know if it's a mistake, but it says his arraignment was May of '86,

unless the District Attorney himself came in to me and said, I want you to do this, I want you to do that. I probably knew very little about the specifics of the case in that time period. If those dates are correct.

Q. In your experience is that a long period of time for there to be a delay between someone getting arrested and arraignment?

A. Yeah, I don't know why -- The holidays. I have no idea why -- It looks like the indictment -- and I don't know this, but I'm going by the numbers -- 85 means to me that his case is put into the Grand Jury in 1985. Since he was arrested on December 7th of '85, that doesn't leave a great deal of time. It does seem like a long period between whenever his matter was put into the Grand Jury to the date of his arraignment.

MR. PIKULA: I think I would agree to that.

Q. And after you picked up, after the arraignment, when it's your testimony you would have been involved in the case at that point then more actively, correct?

A. Correct.

Q. After the arraignment did you communicate with the FBI about any of the other forensic testing other than the testing that you went to talk to them about on April 1st of '87?

A. No, because, you know, a lot of times on these cases like this, they can't do anything. So there would be no reason for -- You know, something has degraded or they don't have enough blood or they don't have enough semen or it could be a dog hair or whatever.

I wouldn't have been actively involved with the FBI at all until I received some information from Springfield that indicated to me that they had, they were able to do some testing. And whenever that information first came back to the Springfield Police from the Federal Bureau of Investigation in Washington, without me looking at documents, I don't know.

MR. PIKULA: Correct, yeah.

THE WITNESS: Thank you, Eddy.

Q. Do you remember preparing for trial any issues related to these gloves that were supposedly found at one of the victims' homes?

A. I mean, I don't know how to answer that.

I mean, I was aware what they were claiming, what the police were claiming and which my best memory is that according to Detective Jarvis on the 7th of December when Mr. Perrot gave a statement, he said he was wearing his sister's knit gloves when he broke into the Prekop house. I'm just sticking with Prekop. I was aware that -- I forget who it was. As a result of that, the cops went back with the gloves or a photograph of the gloves -- Gloves may have been off to the FBI. I don't know when it was sent. And showed a picture of the gloves to the sister. And according to the cops the sister says, Yeah, they look like a pair of gloves I have. I've seen them in a closet or some other place, this is my best memory, a couple weeks ago. And according to the cop, she went there and said they're gone. I appreciate at trial that wasn't what the sister said, but that's what my memory of what the evidence was.

Q. Did you know before the police went back to talk to Mr. Perrot's sister that they were going back to do that?

A. No.

Q. Did you participate in any renumbering of

any property tags related to evidence in this case to make that evidence appear that it was collected at a time or a place that it wasn't?

A. No, I never had anything to do with any collection of evidence. And again, if that May date is correct, my best memory would be is I had nothing to do with this case other than the lineup from December until May of '86.

Q. Is it your testimony, though, that you believe that it's possible that your boss, Matt Ryan was involved in the case in some way in that intervening time period?

A. Yeah, he could have been. If I've suggested otherwise, I want to clarify that for the record. I'm not saying that Chief Stelzer or anyone else wasn't consulting with Matthew Ryan in that intervening time period. They may very well have been. They may not have. I don't know. But I have no independent memory of doing anything other than being up at the lineup until I got the file at arraignment.

Q. Was there anyone else from the District Attorney's office who you saw or you were otherwise aware was at the police station on December 7th,

1985 for something having to do with Mr. Perrot or the, you know, alleged victims in this case?

A. No. I don't even remember being there, but I apparently was, according to the lineup document. I have -- Just so we're -- I have no knowledge of anybody in that office being actively involved in this case except what I did and whatever was going on with the District Attorney himself. Other than that, I don't have any knowledge of anybody in the DA's office being involved in the case, other than helping me work on it.

Q. Did you ever tell Eubanks or Oakes that you thought that Mr. Perrot was guilty of all of these sexual assaults that these three women said occurred?

A. No.

Q. Did you ever tell them that you had a negative opinion of Mr. Perrot? And by them, I mean either Oakes or Eubanks or anyone at the FBI.

A. I wouldn't have ever told them that. And I think that the document that generates that came well after in a '87 from the time that I interfaced back and forth with them. And more importantly, their findings had already been made before I ever

knew who Eubanks and Oakes were. They had already submitted findings.

Q. Did anyone from the FBI ever tell you that the blood stains from Miss Prekop's house were not consistent with George Perrot's blood?

A. No.

Q. Did anyone from the FBI tell you that they were consistent?

A. My memory of the evidence was on the glove -- By the way, they did issue exculpatory evidence on the Marchand case. They made exculpatory findings from Mr. Perrot on evidence that was sent down there.

But on the Prekop case, I believe on the gloves Eubanks was able to pull up one protein and it was consistent with both Mrs. Prekop and Mr. Perrot. On the other blood on the sheet, which I believe was on a sheet, a bed sheet, I believe Mr. Eubanks' testimony was that the blood was not consistent with Mrs. Perrot (sic) and that he was able to pull four, maybe, four proteins of which there are 23 variations off of the four and they all were consistent with Mr. Perrot. I believe that's what he testified to, at my trial, anyways.

Q. All right. And I think you said they were not consistent with Miss Perrot, but you meant Miss Prekop?

A. Miss Prekop.

Q. And the answer that you gave as to both the gloves and the sheets, are you basing that on testimony or are you basing that on any other conversations that you may have had with either Eu banks or Oakes where they conveyed information to you?

A. Your question to me today about their testimony will come from documents I read. I mean, I generally know that I have a general memory that Eubanks said the blood was consistent on the sheet with Mr. Perrot. But being able to tell you today there was four enzymes and 23 variations off of the four, that is not a memory I hold. That comes from documents I've read.

Q. Did Eubanks ever tell you that there was not enough blood on either the gloves or the sheet to be able to really assess where that evidence, you know, the profile of that evidence?

A. No.

Q. Did you ever have any conversations with

Oakes about the hair evidence prior to him testifying?

A. I don't recall, but I absolutely would have. I would never have put him on without meeting him and/or talking to him.

Q. At the time that he testified and gave testimony about the hair evidence --

A. Is it my case now we're talking about or the second one?

Q. Yeah. Well, let's talk about --

A. Because there's a big difference.

Q. Let's talk about your case first.

A. Okay.

Q. Did you believe that any hair evidence testimony from -- Well, let me go back.

I think it was your testimony before that you did not see the forensic testimony in this case as being an important part of the case?

A. I think, I think that's a little bit of a mischaracterization.

Q. I want to understand. So you tell me what I've got wrong there.

A. I didn't -- What I said was it was not the main foundation of the case, in my mind. I thought

his admission, without going into the rest of it, which I'll be glad to repeat myself, but the admission of going into the house at the same time frame that there was a burglary with Mrs. Lichwalla and a rape of Mrs. Prekop was much more incriminating in the case than the blood and hair. You know, the hair -- I don't know. There could have been 23 million people that had the same head of hair. That wasn't a big deal to me other than it could have excluded him. But the inclusion was not a big deal in my mind. It just wasn't.

Q. And is that as to both the blood and the hair, or just to one of them?

A. Well, the blood was more, the blood was more incriminating than the hair, significantly more incriminating. Only because there was 23 variations within the four proteins, and if one is off, it's not George Perrot. So obviously, you know, that in my mind was more a stronger piece of inclusionary evidence.

The hair, I mean, the hair, okay, the hair, it could have eliminated him, but the fact that it was consistent with his hair in my mind was not a huge, huge piece of evidence.

Q. So have you reviewed Oakes' testimony from the second trial?
A. I have.
Q. And do you view what his testimony from the second trial as being inconsistent with your understanding of the evidence as you prepared for the first trial?
A. I don't know if the right word is inconsistent. I would say inappropriately definitive.
Q. And are you basing that on your understanding of hair microscopy science at the time that that testimony was given?
A. No. More my understanding of it in the last five or six or seven years.
Q. Well, do you believe there are differences in the way that -- Well --
A. What I believe is that hair is not a big identifying factor. It's just your hair could be, there might be 13 or 11 or whatever it is dynamics within your hair and there could be millions of people that have the same 11 or 13.
If you read the second trial, if you're a fair human being and you read it, he never

said fingerprint, but if you read the testimony, in essence it came across as like a fingerprint. You know, it's not like a fingerprint, but then you say things like, I've never seen two hairs that I couldn't distinguish, which is a suggestion that no two hairs are alike, which is wrong.

And he also said things like, It's kind of like looking at a face, even though people have the same color eyes, same type of smile, there's difference in everybody's face.

And if you read all those things, I think Judge Kane was right that it came across as it was definitive that this was George Perrot's head hair, which was unfair, in my opinion, for what it's worth.

Q. At the time that you were preparing to prosecute George Perrot the first time did you hold these same beliefs that hair, you know, hair inclusion is not that probative for all the reasons that you just identified?

A. I think it was, I probably said that could have excluded him. And I didn't think it was anywhere near as probative.

And if you look at my opening and my

closing, I spend the majority of time talking about the statement, the comments he made during the statement, and the gloves. And then talked about the scientific evidence that could have excluded him and didn't. It included him. I probably talked about the blood more, but if you go to the second trial, Brett, who I love, started off by saying, There's going to be one problem with the defense in this case. Mr. Perrot left his blood and his hair at the scene. That was in his opening. I never said anything like that, and quite frankly, that's just incorrect. There's no evidence that Mr. Perrot left his blood or his hair at the scene. And clearly that's what his focus was in the second trial, which just is what it is.

Q. In your preparation for trial with Mr. Oakes did he ever tell you that it was his belief, essentially, that, you know, no two hairs are alike that all hairs can be distinguished from each other?

A. Not that I remember.

Q. Did he tell you -- Let me ask you this. Your understanding of those principles that you just described, namely that it's not true that two hairs from different people can't be distinguished or can

be distinguished from one another. Did you understand that to be true at the time that you were preparing to put on your case?

A. I may not have understood that. The knowledge that I had was that hair can be consistent with somebody's hair based on these 11 or 13 different variations that they look at. But it can't -- It can be consistent with somebody else's hair, but it's not a fingerprint. And there's no way of knowing how many people on the face of the earth it would also be consistent with.

Q. And where did your information about the limits of hair microscopy as you have just described it come from?

A. Probably what I read.

Q. And that's what you read back in the late eighties?

A. Yeah. I don't think that, I didn't think his testimony went beyond that in my case. Consistent with.

Q. Am I right, then, that you believe that the testimony from Oakes that you elicited in the first trial was a fair representation of the science, that you believe that his testimony from

the second trial is an overreach?
A. I just looked at this the first time in the last couple weeks and I was surprised. I've never read anything associated with George Perrot except for '91 or '92 when I testified. But all these other documents I've just recently reviewed.
I had no idea what Brett Vottero said in his opening. I had no idea what he said in his closing. I don't, I don't know if science changed, you know. I don't remember Eubanks at my trial, and I could be right, saying that you take those four proteins and then the 23 variations and only 8% of the Caucasian population of the world could have left that blood. Was that an advancement in science from my trial to Brett's? I don't know.
But what I personally came away, and I discussed this with my lawyer, is that I personally --
Q. I'm not asking you about any --
A. I know you're not.
Q. I understand.
A. But when I read the second trial, the hair and fiber came across to me as if it was as good as a fingerprint. That's how I interpreted it when I

read it.

Q. Have you ever discussed with Brett Vottero anything having to do with the hair evidence that was elicited at the second trial?

A. No, because it's only within the last couple weeks that I ever realized that that was the testimony.

And I want to point out this poisoning of Mr. Oakes. Well, he didn't do much for me. I don't know what he did for Mr. Vottero, but if I poisoned him, he certainly went way out in the limb, about ten limbs beyond what he did in my trial. I didn't do a very good job on poisoning him on George Perrot for the first trial.

Q. Well, is it possible that on the second trial it was determined that he needed to do more?

A. I don't know what he determined he needed to do, but if I poisoned him, it certainly wasn't reflected in the testimony that he gave in the first trial. If he was poisoned, it looks like he was somehow poisoned between Trial 1 and Trial 2.

MS. THOMPSON: We're off the record.

(Bloom Exhibit 14 marked for identification.)

(Discussion off the record.)

Q. I'm going to show you, Mr. Bloom, what's been marked as Bloom Exhibit 14, which is a one-page letter, which is Bates stamped DA Discovery 263.

(Document handed to the witness.)

A. Yeah, thank you.

Q. Mr. Bloom, have you ever seen Exhibit 14 before?

A. No. If I have, I don't remember.

Q. Do you see in this first paragraph that here the writer of the letter, Director Sessions is referencing, and I'm quoting, Your favorable remarks concerning the assistance rendered by the FBI in connection with the prosecution of a young man charged with raping six elderly women.

A. Yes.

Q. Obviously, Mr. Sessions had the facts wrong there?

A. A little bit, yeah.

Q. Do you remember writing a letter to the FBI in connection with thanking the FBI lab for their involvement in this case?

A. No, I don't remember. I mean, it's something I would have done. It doesn't surprise me

that I would have done something like that, but I don't remember. I don't remember doing it.

Q. Did you tell Director Sessions that George Perrot had been charged with raping six elderly women?

A. No.

Q. Did you tell them that he had been charged with six instances of sexual assault?

A. No. I think it was five, that there was five being investigated. But, you know, he just may have gotten the five versus the six and incidents versus victims, but I don't know what I said in the letter.

Q. Do you know why in the first place the FBI got involved with doing some forensic testing in these cases?

A. As opposed, you mean, to the state crime lab?

Q. Sure.

A. It's a good question. I have no idea. Back in '85 I don't know what the state of the serology people were in Massachusetts. My sense is it would have been not on the same par as the FBI. Maybe that's why they did it, but that's just pure

my guess.

Q. Do you know who made the initial decision in this case to send evidence to the FBI?

A. Which Springfield police officer?

Q. Which person.

A. It would have been somebody in the Springfield Police. I don't know whether it was the chief or there was -- This was an odd case, because there was a crime prevention bureau and the detective bureau all enmeshed in this case. And so somebody, somebody who would have been a superior officer, I would have thought, would make, would have made that decision. Or it could have been my boss. I don't know.

Q. Did you ever communicate with anyone else at the FBI other than Eubanks or Oakes about the substance of any testing that the FBI conducted related to Mr. Perrot?

A. Not that I recall.

Q. Did either Mr. Eubanks or Mr. Oakes ever tell you about any other colleagues that may have been involved with the testing or in consulting on Mr. Perrot's case in any way?

A. If they did, I don't remember.

Q. Did you take any notes in any meetings or conversations either in person or on the phone that you had either with Mr. Mr. Eubanks or Mr. Oakes?

A. I don't think so, because I wouldn't have called them unless I had reports from them. So I would have been using that as my guide. I wouldn't have known who they were until subsequent to them doing their work.

Q. How long did you spend at the FBI offices on April 1st of 1987 when you went there?

A. You know, if I was unclear in this, I apologize. I have no memory of ever going to Washington in this case. But obviously, there is enough evidence to suggest otherwise. But I don't remember, I don't remember being down there.

MS. THOMPSON: We're off the record.

(Discussion off the record.)

(Bloom Exhibit 15 marked for identification.)

MS. THOMPSON: I'm going to show the witness Bloom Exhibit 15, which is a one-page document which has a Bates stamp at the bottom of DA Discovery 661.

(Document handed to the witness.)

Q. Mr. Bloom, have you seen Exhibit 15 before?

A. I'm not sure. In the stuff I looked at I may have. I don't remember it.

Q. Does your handwriting appear on Exhibit 15?

A. Yes.

Q. Was this form filled out by you?

A. Some of it.

Q. What handwriting on here is not yours?

A. It doesn't look like the time is mine and obviously the time stamp isn't mine. The rest of it looks like my handwriting.

Q. Do you have any reason to doubt that that time on there, 2:42 is not the time on April 1st of '87 when this form was filled out?

A. No, I don't have any reason to believe that that was not filled out at 2:42.

Q. And do you see at the bottom in sort of the middle of those paragraphs where it says the typewritten words, it's the line that says, Of sealed evidence for examination. Do you see that line?

A. Yes, I do.

Q. You haven't written the case number there. You have just written the name George Perrot, is that right?

A. Yes.

Q. Do you know why you didn't write a case number there?

A. No.

Q. Does that suggest to you that whoever was receiving this form had some familiarity with the case or the evidence that you were tendering to the FBI?

A. No.

MS. THOMPSON: All right. If everyone's good, let's maybe just take a quick break. And like I said, I think I'm basically done, but I may have just a couple wrap-ups when we're back. Take ten minutes, maybe?

(Brief recess.)

Q. I just have a couple questions about one final topic and then I'm done.

A. Sure.

Q. In general, as a prosecutor when you were prosecuting a case and had to get discovery from the state or from the police, potentially, even to

tender to the defense, how did you go about doing that in cases that involved the Springfield Police Department?

A. When you, when someone was arraigned and there was a determination was made that you had that case, normally that file was handed to you. And it had all the written documentation, hopefully, that was relevant to that given case, meaning all the police reports, if someone gave a confession, a copy of the confession, reports indicating what the investigation had done from beginning to end, etc. You got it all in a packet. And then, you know, you looked through it and if you had issues with it, you would contact the police department.

What happened with this, or there's a reference here that this was sent to a lab, but I don't see anything indicating what laboratory it was sent to. That's basically how it worked.

Q. If there wasn't some clue in the documents that something was missing, did you as a prosecutor have to rely on the police department to have tendered everything to you that was necessary to be tendered relating to the case?

A. Yeah. I would assume that they were being

honest and forthright in giving me everything unless I had evidence to the contrary. So for example, you know, when you have a confession in a case like this, I'll be honest with you, I'm looking at who took the confession and if it's Person A versus Person B, it might resonate differently in my mind based on my knowledge of the police back then. It's just the way it was. I'm not saying it was -- I would discount it if it was B.

For example, in this case Tommy Jarvis, one of the sweetest and nicest human beings I've ever met in my life. I've seen him with people. If somebody was telling me that he hit him or threatened them or punched him or something like that, I may be inclined to at least listen to that if it was somebody else, but Tommy Jarvis, I wouldn't. I just wouldn't. As an example.

Q. Did you ever, in any cases that you worked on that involved the Springfield Police Department, get as part of your file and documentation that you just described any handwritten notes from police officers related to some investigation?

A. That wouldn't be in there.

Q. And why do you say that?

A. I've never seen it. And I don't think my experience is that -- I can't say everybody, but back in the eighties back there in the late seventies I don't know if I've ever seen anybody's handwritten notes.

Q. Are you aware of any procedures that were in place in the Springfield Police Department during the time that you worked in the District Attorney's office to insure that exculpatory evidence that was in the possession of the police department made its way to the District Attorney's office?

A. A procedure? I can't say I'm aware of a procedure.

Q. And other than getting the file and then looking through it yourself to determine if there's anything that seemed on the face of it to you to be missing, were there any other steps that you're aware of that the Springfield Police Department took on a regular basis in cases to make sure that discovery made its way to the state?

A. No. But, I mean, as you review the file there could be times where it was apparent that something was missing because it's referenced in the report that you're reading. And so in those cases

you would call up whoever was in charge of the case and said, Hey, there's a reference to a statement being taken from Joe Blow. Where is it? That wasn't in the packet that went up there? No, it's not in the packet that went up here. I need to see it.

And then they have a liaison officer and, you know, that would then be brought up the next day or that day by a liaison officer.

Q. Is there a different liaison officer for different cases, or that's a person in the police department who is responsible?

A. Yeah, there were liaison officers for, like, the district court when I was down there, and for the superior court. And they would change from time to time, but there would be a liaison officer. And he would be -- Or they used to call them the court officer.

Q. Do you know who the court officer was for the superior court?

A. In '85?

Q. Yes.

A. I'm sure I did, but as I sit here today I don't have a clue.

Q. Do you know who was responsible in the Springfield Police Department for putting together documentation in the file that you initially got? And I'm asking for not a particular person, maybe but for a position, or --

A. No.

Q. You know by title?

A. No, I don't know if they had any protocol, you know, like, protocol on how that was done case by case or it was just done piecemeal from one case to the next based on who was the lead investigating officer.

Q. In the Genovese crime family wiretap cases that we talked about, started talking about at the beginning of your deposition, do you remember any of the names of the people who were ultimately tried?

A. Yeah.

Q. Can you name any of the defendants that you can recall?

A. Francesco Campiti, Gary Westerman, Joseph Fafone, Karen -- and I can't think of her husband's name -- Albano from Springfield. It escapes me, the others. There were probably fifteen or twenty defendants, I would guess. Joseph Basile would have

been one of them. I'm drawing a blank right now.
Q. Was there anyone in the, this period from the mid eighties to when you left the District Attorney's office who was, you know, the top assistant in that office to Mr. Ryan?
A. No.
Q. Was there anyone who was --
A. But I think the pay, you know, like if we, you and I agreed that the pay was the first assistant, yeah, there were people that got paid more than others.
Q. Well, sometimes in a District Attorney's office there's a person who's, you know, the lead assistant, basically.
A. Yeah.
Q. Either the first deputy or someone who's got that position.
A. That office didn't really run that way.
Q. Was there anyone who was in Ryan's, you know, circle of close advisors in the office during that time period?
A. I guess people would throw me in before all this went south as one of them. He was, you know, he was close with most of the people in there,

because most of the people that were in there -- He didn't hire people off the street, generally. In other words, almost everybody that worked in that office, he played ball with their father or his kid played college sports with the other Assistant DA or, you know, Ted Kennedy would call him and ask him, because he was friends with somebody and they wanted this guy to get a job. There was, including me, you know. I'm sure my, without my sports background and/or the relationship that my parents had with him, I wouldn't have been working at the Hampden County DA's office.

Q. Anybody else besides you that you think would be potentially have been considered a top assistant during that time period?

A. You know, other than I think I gave you a list of people that were trying serious felonies back then, I think I gave you four or five people. I don't, you know, Billy Teehan, but he left and became a judge. He might have been considered top. He had been there the longest and probably getting paid the most, but I think he was well gone before any of this, this, before this period of '84, '85.

MS. THOMPSON: Okay. I don't have

any other questions. I thank you for your patience with me, Mr. Bloom.

THE WITNESS: Thank you.

CROSS EXAMINATION

BY MR. JOYCE:

Q. I just have a couple things.

A. Sure.

Q. Just in connection with Mr. Perrot, you were the prosecutor for the first trial in 1987, right?

A. Correct.

Q. Okay. In any of the subsequent proceedings involving Mr. Perrot did you have any role at all?

A. No.

Q. Okay. You did testify in connection with some motion, correct?

A. That was before the second trial.

Q. Okay. So did anyone in the District Attorney's office consult with you in connection with the subsequent litigation involving Mr. Perrot?

A. Not that I remember.

MR. JOYCE: That's all I have.

MS. REARDON: I just have a few

questions, as well.

CROSS EXAMINATION

BY MS. REARDON:

Q. We've been over a lot of stuff. I just want to emphasize a few things.

In terms of the evidence in the Prekop case, did you in any way participate in collecting or transporting or have any physical involvement with the evidence in the Prekop case?

A. No, nor in any other case that I ever touched in fifteen years did I ever carry evidence from Point A to B.

Q. So as far as you can recall, you didn't know anything about what the evidence was in this case until after George Perrot was arraigned?

A. That's probably correct, other -- I might have known that there was rape kits and things of that nature sent somewhere, but I wouldn't have known the specifics to the degree of that is contained in the documents I've been shown today.

Q. And you did not participate in the interrogation of George Perrot on the night he was arrested?

A. No.

Q. And in your experience as an ADA is it unusual when evidence is sent to a crime lab that a suspect is identified?

MS. LYNCH: We can't hear you.

Q. Is it unusual in a criminal case as in his experience as an ADA that a suspect would be identified to the crime lab?

A. No, but, you know, George Perrot's name would have been on, obviously, the hair. My memory is that he gave hair and blood to Tom Jarvis on December 7th or thereabouts. So whenever that was packaged up and sent to the FBI, it would have identified what they were receiving when they logged it in. And they obviously knew there was a suspect, because that would have been clear to them based on the documentation or the material that was being sent down to them.

MS. REARDON: Okay. I think that's all I have.

MS. THOMPSON: Anyone on the phone?

MS. LYNCH: I don't.

MR. GREENE: I do not, thank you.

MS. THOMPSON: Sorry, I think you guys talked over each other, but everybody on the

phone is good?

MR. PIKULA: Yes.

THE COURT REPORTER: Could counsel please put their transcript orders on the record?

MR PIKULA: City of Springfield requests a hard copy and an electronic copy.

MS. THOMPSON: Plaintiff will take an electronic.

MR. GREENE: Department of Justice will take a hard copy and an electronic copy, as well.

MS. REARDON: I'd like an electronic copy.

MR. JOYCE: I do not need one.

(Whereupon, at 3:53 o'clock p.m., the deposition was concluded.)

C E R T I F I C A T E

I, FRANCIS W. BLOOM, do hereby certify under the pains and penalties of perjury that I have read the foregoing transcript of my testimony given on January 23, 2019, and I further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below):

Page Line Correction/Reason

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

Dated at ______________________, this ________ day of ____________________, 2019.

______________________

FRANCIS W. BLOOM

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF SUFFOLK

I, CYNTHIA F. STUTZ, Certified Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify:

That the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of the testimony given by the witness.

I further certify that I am neither attorney, nor counsel for, nor related to or employed by any of the parties to the action; I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of January, 2019.

CYNTHIA F. STUTZ, Notary Public

My Notary expires August 1, 2019