# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No.: 18-cv-10147

COPY

GEORGE PERROT
PLAINTIFF

vs.

THOMAS KELLY, ET ALS
DEFENDANTS

---

DEPOSITION OF: THOMAS KENNEDY

---

Taken before Roxanne C. Costigan, Certified Merit Reporter, Notary Public, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the law offices of ACCURATE COURT REPORTING, INC., 1500 Main Street, Suite 222, Springfield, MA, on December 17, 2018.

Roxanne C. Costigan
Certified Merit Reporter

APPEARANCES:

FOR THE PLAINTIFF:

LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
BY: TARA THOMPSON, ESQ.
tara@loevy.com

FOR THE DEFENDANT:

SPRINGFIELD LAW DEPARTMENT
36 Court Street
Springfield, MA 01103
413-787-6085
BY: LISA C. deSOUSA, ESQ.
Ldesousa@springfieldcityhall.com

FOR THE DEFENDANT:

REARDON, JOYCE & AKERSON, P.C.
4 Lancaster Terrace
Worcester, MA 01609
508-754-7285
BY: AUSTIN M. JOYCE, ESQ.
Ajoyce@rja-law.com

WILLIAM JOYCE, ESQ.
Wjoyce@rja-law.com

FOR THE DEFENDANT:

MORRISON MAHONEY, LLP
1500 Main Street, Suite 2400
Springfield, MA 01115
413-737-4373
BY: CAROLE SAKOWSKI LYNCH, ESQ.
clynch@morrisonmahoney.com

(Continued on page 3)

BY TELEPHONE:

FOR THE DEFENDANTS:

OFFICE OF ATTORNEY GENERAL MAURA HEALEY
One Ashburton Place
Boston, MA 02108
617-963-2832
BY: SUSANNE REARDON, AAG
susanne.reardon@state.ma.us

BY TELEPHONE:

FOR THE DEFENDANTS:

U.S. DEPARTMENT OF JUSTICE
P.O. Box 7146
Ben Franklin Station
Washington, DC 20044
202-616-4143
BY: GLENN S. GREENE, ESQ.
Glenn.Greene@usdog.gov

# I N D E X

Appearances.................................. 2

THOMAS KENNEDY

Examination by Ms. Thompson............... 5

## EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Lisa Eldridge Statement.................. | 54 |
| 2 | George Perrot Statement.................. | 54 |
| 3 | Jeffrey Adkins Statement................. | 54 |
| 4 | Interview Summary of Timmerman........... | 54 |
| 5 | Lineup Summary........................... | 82 |
| 6 | Property Tag............................. | 94 |
| 7 | Answers To Interrogatories............... | 114 |

S T I P U L A T I O N S

It is agreed by and between the parties that all objections, except objections as to the form of the question, and all motions to strike unresponsive answers are reserved to be raised at the time of trial for the first time.

It is further agreed that the deponent will read and sign the deposition, notary waived, and that the sealing of said deposition will be waived.

THOMAS KENNEDY, the Deponent, having been first duly sworn and identified by production of his driver's license, deposes and says as follows:

MS. SAKOWSKI-LYNCH: For the record, for this deposition and any future depositions, we have an agreement that an objection for one is an objection for all, so that once an objection is made, everyone doesn't need to object.

EXAMINATION BY MS. THOMPSON

Q. Mr. Kennedy, good morning.

A. Good morning.

Q. My name is Tara Thompson, and I'm one of the counsel for the Plaintiff in this matter.

A. Okay.

Q. Have you ever been deposed before, sir?

A. I have.

Q. All right. I'm sure you understand how this process works. Just a couple of things I would ask of you as we get this deposition done this morning.

The first thing is that we have a couple of people that are participating in this deposition by telephone, and for those that are on the telephone, are you able to hear Mr. Kennedy and I talking?

MR. GREENE: Yes.

MS. REARDON: Yes.

MS. THOMPSON: I would just ask those on the telephone to let us know if they can't hear, and if we need to move the telephone closer to Mr. Kennedy in particular, we can do that.

Q. (By Ms. Thompson) As you probably already know, sir, this court reporter cannot take down non-verbal responses to questions.

A. Correct.
Q. So, if you are shrugging your shoulders or saying un-ah or mm-hmm, she can't write that down. So, I would ask you to give a verbal response to my question. All right, sir?
A. Sure.
Q. I will do my very best not to interrupt your answers, and likewise, I would ask that you wait until I finish asking the question before you answer so we're not talking over one another.
A. That's fine.
Q. If there's any questions that you don't understand, let me know. Otherwise, I'm going to assume that you understood my question. All right?
A. Okay.
Q. If you need to take a break at any time, that's fine. I just ask that if there's a question pending, that you answer that question before we break. All right, sir?
A. All right.
Q. Is there any reason that you would be unable to give true and accurate testimony this morning?
A. No.

Q. Have you reviewed any documents related to this case in preparation for your deposition?
A. Yes, I have.
Q. What have you reviewed?
A. I've reviewed my prior testimony in Superior Court as well as various police reports.
Q. Did you review both of your pieces of testimony from the two different proceedings?
A. Yes.
Q. All right.
MS. deSOUSA: I'm sorry.
MS. THOMPSON: Yes?
MS. deSOUSA: Go ahead, Tara. I didn't mean to interrupt.
Q. (By Ms. Thompson) Do you recall what specific police reports you reviewed?
A. There was numerous reports. Several statements that were taken. I believe an arrest report. There was a number of papers and paperwork that I reviewed prior to this.
Q. Did you review reports that were created by someone other than yourself?
A. Yes.
MS. deSOUSA: Can I just confer with

my client for one moment?

MS. THOMPSON: Sure.

(Off record conference)

THE WITNESS: I'd like to add to my answer if I could.

Q. (By Ms. Thompson) Sure.

A. I also reviewed my Answers to Interrogatories as well as those police reports.

Q. Anything else you reviewed in preparation for this deposition other than what you described so far?

A. I don't believe so.

Q. How old are you, sir?

A. I am sixty years old.

Q. Are you currently employed?

A. I am.

Q. Where are you employed?

A. I am employed at the Hampden County District Attorney's Office.

Q. What are your job responsibilities with the District Attorney's Office?

A. I was hired as an investigator. My job duties include trial preparation, majority of which is for homicide cases but not exclusively homicide cases,

as well as the review and the re-investigation of open cases. Also, the majority of those are cold case homicides that occurred in the City of Springfield during my tenure there.

Q. How long have you worked for the DA's Office?

A. For about two and a half years.

Q. Is that a full-time position?

A. It is not.

Q. About roughly how many hours a week are you working with that office?

A. I work somewhere between sixteen and twenty hours per week.

Q. Are you doing anything else currently for employment besides that job?

A. No.

Q. Prior to working with the DA, were you employed by the Springfield Police Department?

A. Yes.

Q. Have you had any other employment as an adult other than the DA's Office and with the Springfield Police Department?

A. I worked for several years before being hired by the Police Department by Big Y Foods in

Springfield from probably age seventeen to when I got into the Police Academy when I was twenty-one. So, four years I --

Q. What did you -- I'm sorry.

A. I was a produce clerk.

Q. Have you ever applied for employment with any other law enforcement agency other than the Springfield Police Department?

A. No.

Q. Can you go through for me in general terms the various assignments that you had within the Springfield Police Department during your time there?

A. When I graduated from the Academy, I was assigned to the twelve a.m. to eight a.m. shift in the Uniform Division. I remained there for about a year and a half or two years. I did a few months on the four p.m. to twelve a.m. shift in uniform. And then I was transferred into the Detective Bureau on the twelve a.m. to eight a.m. shift where I stayed for about two or three years after that. And then went to the four p.m. to twelve a.m. shift in the Detective Bureau where I remained until I was promoted to the rank of Sergeant.

Q. As a Sergeant, were you still assigned to

the Detective Bureau?

A. I was re-assigned afterwards. I did -- after being promoted, I spent several years on the four p.m. to twelve a.m. shift in the Uniform Division as a Sergeant and street supervisor until I was again transferred back to the four p.m. to twelve a.m. shift in the Detective Bureau as a Sergeant.

Q. Is that the position you held at the time of your retirement?

A. No. I held the rank of Lieutenant.

Q. So, from working as a four p.m. to twelve a.m. Sergeant in the Detective Division, you were promoted to Lieutenant?

A. I actually went to the eight a.m. to four p.m. shift in the Detective Bureau. I was the court liaison officer for about a year. And then I was transferred into the Robbery/Homicide Unit as a Sergeant. I remained there until I was promoted to the rank of Lieutenant.

Q. Did you have any particular assignments as a Lieutenant?

A. Which assignment?

Q. Well, as a Lieutenant, can you go through the various assignments you held?

A. When I was promoted to Lieutenant, I was assigned to the four P -- four p.m. to twelve a.m. shift in the Uniform Division. I was one of three Lieutenants who worked under a Captain. Generally, I worked as a street supervisor, although on nights that the Captain is not working, based on his days off or vacation day or a personal day or a sick day, the senior Lieutenant takes on the responsibility of the acting Captain. So, I did that as well.

Q. Did you have any assignments as a Lieutenant after working the four p.m. to twelve a.m. shift in the Uniform Division?

A. I did. I worked for several years as a super -- as a Lieutenant and a supervisor in the Community Policing Division of the Police Department. I was assigned to the North End/Hungry Hill sectors. I worked several years in there, until I was transferred to the Robbery/Homicide Unit as a Lieutenant, and I worked about my last ten or eleven years in that capacity until my retirement.

Q. When did you enter the Academy?

A. In August of 1980.

Q. When were you promoted to Sergeant?

A. I believe in September of 1987.

Q. Do you know when you made Lieutenant?
A. Yes. Also somewhere around September, October of 1997 -- or 1996. I'm sorry.
Q. All right. When were you transferred from the Uniform Division to the Detective Division?
A. At what rank?
Q. That's a good question. When did you move for the first time into the Detective Division as -- prior to your promotion to Sergeant?
A. I would -- I'm just now thinking. It was probably sometime in 1983 or '84.
Q. Do you know when you moved from the twelve a.m. to eight a.m. -- let me start that question again.
When did you move from that twelve a.m. to eight a.m. shift into the four p.m. to twelve a.m. shift as a Detective, again, before you became Sergeant?
A. I don't remember the exact month or the year, but it was about -- it was after about a year and a half probably on the twelve a.m. to eight a.m. shift.
Q. In September of 1985, do you know which shift you were on?

A. Yes. I was -- at that time, I was in the four P to twelve a.m. shift in the Detective Bureau.

Q. All right. Have you received any education post high school?

A. Yes.

Q. Can you describe that education for me?

A. I have an Associate's in law endorsement from Holyoke Community College, a Bachelor's Degree from Westfield State College, now Westfield State University, and I have a Master's from Anna Maria College, all in -- those last two degrees in criminal justice.

Q. When did you get your Associate's Degree?

A. I got my Associate's Degree, I believe, in 1978 or '79.

Q. What about your Bachelor's Degree?

A. In 1982 or '83.

Q. And your Master's?

A. 1996.

Q. In your capacity with the District Attorney's Office, have you been involved at all in investigating or reviewing in any other way any cases in which George Perrot was previously convicted?

A. No.

Q. In that capacity, have you been involved at all in reviewing any sexual assault cases from the 1980s?
A. No.
Q. Have you handled any non-homicide cases in your role with the District Attorney's Office?
A. Yes.
Q. You said it's primarily homicide work?
A. It is primarily homicide.
Q. All right. When did you retire from the Springfield Police Department?
A. In March of 2016.
Q. Do you have an independent memory as you sit here today of being involved in any investigations as a member of the Springfield Police Department that involved George Perrot?
A. Yes.
Q. And do you recall that your work in cases that involved George Perrot involved at least in part a prosecutor named Francis Bloom?
A. Yes.
Q. Had you worked on any other cases in your career either before or since in the Springfield Police Department that involved Mr. Bloom?

A. Yes.
Q. How many cases had you worked on before September of 1985 that involved Mr. Bloom?
A. I don't know how many were before or after. There was numerous cases that he prosecuted that I had some involvement in.
Q. When you say numerous, can you give me an estimate of what that means?
A. Probably in the area of ten cases.
Q. Am I right that some of those were before and some were after?
A. They may have been. I don't recall exactly the time period. It was obviously thirty something years ago.
Q. Do you remember the names of any of the defendants in those ten or so other cases?
A. Yes. One in particular, I remember.
Q. What was that person's name?
A. Donald Lee Perry.
Q. Do you remember any other names of defendants of cases you worked on with Mr. Bloom?
A. I do not. Not offhand.
Q. Was Mr. Perry's case before or after '85?
A. It was around that time period. I don't

know which case would have been prior to the other one.

Q. What was Mr. Perry ultimately charged with?

A. Mr. Perry had moved up from North Carolina after being incarcerated there. He was involved in a number of housebreaks and later armed robberies of convenience stores.

Q. Did he work alone?

A. I believe he did. Well, he did -- strike that.

I -- he worked alone on the housebreaks, but he was with several other individuals during the robberies.

Q. Did Mr. Perry have any connection as far as you know to George Perrot?

A. No, I don't believe so.

Q. Did you know in your time in the department someone named Thomas Kelly?

A. Yes.

Q. How did you know Mr. Kelly?

A. Lieutenant Kelly was -- obviously, he was a supervisor when I came on the job. He was a Sergeant when I was a Patrolman. I believe there may

be a period of time when we were both Sergeants but on different shifts. He was a Lieutenant along with me in the Uniform Squad on the four p.m. to twelve a.m. shift. He was also for a period of time when I was a Sergeant in the Homicide Unit, prior to being promoted, he was the supervisor of that unit. He was a Lieutenant.

Q. During your time in the Uniform Division before you were moved to the Detective Division for the first time, were you assigned to particular sectors?

A. I'm sorry. Could you repeat that?

Q. Sure. During your time in the Uniform Division before you transferred to the Detective Division for the first time, were you assigned to particular sectors?

A. Yes. After a period of time.

Q. Did you have kind of a period of initial orientation where you were still working with a field training officer or some person who was supervising you?

A. Yes. Usually, recruits from the Police Academy, for lack of a better term, at the Springfield Police Department, it's considered tramping, meaning

that you don't have a steady district or a car and that you -- your assignment changes often. Sometimes, you work a four and two schedule. You may work four different locations during your four nights. And after a period of time and experience, you get -- it's considered being typed into the car into a certain district.

Q. How long was your period of tramping?

A. Probably about a year or year and a half.

Q. Then you said after that, you were typed into a particular car or district?

A. I actually was typed in several.

Q. What districts did you work in then during your time in Uniform Division before you moved to being a Detective?

A. The two steady areas where I worked in, it was then called District 8, which was East Springfield, and then I went into District 6, which is the downtown area or about half of the downtown area.

Q. Were you pretty familiar with those areas of the City from your time there in Uniform at the time you became a Detective?

A. Yes.

Q. All right. Did you have any interactions

to your knowledge with George Perrot during the time that you worked in the -- during the time that you worked those two Uniform shifts before you moved on to becoming a Detective?

A. No, I did not have any involvement.

Q. When you moved to the Detective Division, how many people were assigned to that unit at the time of your initial transfer into it?

A. On the twelve a.m. to eight a.m. shift, there's -- back then, there was generally four or five detectives who were technically Patrolmen in rank and one Sergeant. Probably six total. The four o'clock at that time probably had twelve or thirteen or fourteen total including the supervisor.

Q. Was there somebody assigned to that shift, the four p.m., at the time you moved into that shift at a higher rank than a Sergeant?

A. No, I don't believe so.

Q. Well, I want to ask you specifically about your time in the four p.m. to twelve a.m. shift of the Detective Division, and I realize that, for you, in your initial stint in the four p.m. to twelve a.m. shift, that you were in that shift both as a Patrolman and then later you came back to that shift

as a Sergeant, is that correct?

A. That's correct.

Q. All right. So, I want to ask you some questions about your time in that four p.m. to twelve a.m. shift prior to becoming a Sergeant, so, your first stint there. Do you understand what I'm talking about?

A. Sure.

Q. Okay. During that time in the four p.m. to twelve a.m. shift, was there a particular method that the shift used to decide who was going to be assigned to what case?

A. The cases, everybody at that time is considered general assignment on those shifts. There was not a lot of follow-up. Follow-up was done on the day shift where the officers were assigned crimes against property, crimes against persons, and so, majority of follow-up was done by those officers. The initial response to an incident was conducted either by the detectives on the four p.m. shift or the detectives on the twelve a.m. Sometimes, it would end up with a contemporaneous arrest. If it did not and there was going to be -- it was going to be complicated and more investigation went into it, that

generally occurred by those detectives assigned to the day shift.

Q. Am I right that most -- well, let me start that question again. What types of crimes were the Detective Division responsible for investigating during your first stint there in the Detective Division from when you were working the four p.m. to twelve a.m. shift?

A. Crimes ranging from housebreaks and larcenies, which obviously were property crimes, to robberies, unarmed and armed, assaults, simple assaults, assaults with weapons, you know, right up to homicides.

Q. Were more of those types of crimes reported either in the four p.m. shift or the twelve a.m. shift than the day shift?

A. I don't know a definitive answer on that. I would say that based on radio transmission, generally, the four p.m. shift is the busiest shift, probably followed by the twelve to eight a.m., and there's less -- I believe there's probably less calls for service on the day shift which would give those officers more time to investigate. It's not a steadfast rule obviously.

Q. When in your time in the Springfield Police Department did you first become aware of someone named George Perrot?

A. I believe I may have heard his name, but I became aware of him on September 21st of 1985.

Q. And how did you -- in what context did you first become aware of him on that date?

A. On that date, I was assigned -- my partner in the four p.m. to twelve a.m. shift at the time was Robert McFarlin who is a -- now a retired Deputy Chief of the Police Department, and we became involved based on a phone call that Mr. Perrot had made to our office or his sister made to the office. I'm not sure which one contacted us.

first became aware of Perrot 9/21

Q. And what was the contact about, whether it came from him or his sister?

A. The contact was that the son of an elderly woman whose home had been broken into the night before had contacted either Mr. Perrot or Mr. Perrot's brother-in-law and inquired -- Mr. Perrot and one of his friends had done some painting the week before for this elderly woman, and apparently, the son of the victim felt that Mr. Perrot may have had some involvement in the break-in and sexual assault of his

mother.

Q. And it was that topic that either Mr. Perrot or his sister were calling about?

A. Correct.

Q. Who took that call?

A. I don't know. I don't know if Officer McFarlin actually took that call in the Detective Bureau or somebody else did. It was directed at that time to myself and Officer McFarlin to investigate.

Q. Who directed it to you and Officer McFarlin to investigate?

A. Once again, I don't know if Officer McFarlin answered the phone or it was possibly directed by our supervisor, who at the time was Sergeant Andrew Canevari.

Q. At that time, on September 21st of 1985, was the Springfield Police Department investigating a series of assaults on older women in Springfield?

A. They -- I think they were but that would have been the Crime Prevention Bureau that would have been investigating that as opposed to where I worked in the Detective Bureau.

Q. Can you explain for me the responsibilities of the Crime Prevention Bureau at

that time?

A. The Crime Prevention Bureau had various duties which included licensing, alcohol licensing and bars as well as prostitution, vice. At that time, there was not a separate Drug Unit. So, there was a Drug Unit out of there as well as a unit that investigated sexual assaults.

Q. And that unit was within the Crime Prevention Bureau?

A. It was.

Q. How many people were assigned to that particular unit at that time, and when I say at that time, I mean September of '85?

A. I don't know. I don't know. There was -- at that time, I don't believe they had a twelve a.m. -- in fact, I know they did not have a twelve a.m. to eight a.m. shift. If the sexual assault occurred during those hours, detectives from the Detective Bureau would initially investigate. At that time, there was no females that worked the twelve a.m. to eight a.m. shift in the Detective Bureau. So, generally, it resulted in a policewoman who was assigned to the Crime Prevention Bureau being contacted at home and coming in to interview the

victim.

Q. From a structural perspective, the Crime Prevention Bureau was a separate unit of the Police Department than the Detective Division?

A. Yes. Yes.

Q. Did those two units, the Detective Division and the Crime Prevention Bureau, work together to solve particular cases that might have some overlap between the two units?

A. Yes. This would -- this type of case would be one of them because the burglary or the breaking and entering or the home invasion, whichever way you would like to define it, would -- the responsibility would have been detectives from the Detective Bureau, the sexual assault would have been investigated by detectives from the Crime Prevention Bureau.

Q. All right. So, did the Crime Prevention Bureau at that time have women that were assigned to it as investigators?

A. Yes.

Q. Do you know why it is when Mr. Perrot or his sister called on September 21 of 1985 that that was something that the Detective Division looked into

rather than that being sent to the Crime Prevention Bureau?

A. I don't know. I would assume they -- that's the number -- they contacted the Detective Bureau. That would just be my assumption though.

Q. Did the Crime Prevention Bureau at that time, September of '85, did it conduct its own independent investigations of sexual assault cases that did not have some component that bled over into someone else's area of responsibility?

A. Yes.

Q. The series of assaults on older women that were being looked into at that time, did those assaults also involve the perpetrator or perpetrators stealing from those victims?

A. I believe so, yes.

Q. All right. And were the theft components of that series of assaults being investigated by the Detective Division?

A. Yes.

Q. Was there anyone in particular in the Detective Division that was assigned to investigate that series of thefts?

A. It would have come under the officers

assigned to the -- it's part of the Crimes Against Property, but there's a Burglary Squad or there was a Burglary Squad. I don't know which particular Detective would have been assigned. It was -- at that time, it was -- that responsibility was divided up geographically by district.

Q. So, within the Detective Division, there was a Burglary Squad that was assigned to investigate those types of crimes?

A. Yes.

Q. And were there particular detectives that were responsible for certain districts in the City to investigate the burglaries in those districts?

A. Yes.

Q. As you sit here today, can you remember anyone who was assigned to the Burglary Squad in the late 1985, meaning the second half the year of 1985?

A. I remember that Charles Arpin, there was a period of time that he was a Lieutenant in there as well as a Sergeant. I don't know what rank he possessed at that time. I believe it was Sergeant. He was -- I think he was one of the supervisors or the supervisor in charge of that unit. And just from reviewing some of the reports, I believe Tom Jarvis

was involved. I don't have any other independent recollection of officers assigned there.

Q. Tom Jarvis was assigned as a Patrolman rank Detective?

A. Yes. For a long period of time, Tom Jarvis was assigned to the Auto Theft Division, but there was a period of time that he was in the Burglary Squad as well.

Q. Do you have any understanding of why, when -- well, let me ask you a different question.

The issue that Mr. Perrot or his sister called about on September 21, 1985, did that also involve a burglary from this woman's home?

A. Yes.

Q. All right. And do you know why, if this involved a burglary, that that matter was not referred to the Burglary Squad?

A. I believe the date in question was a Saturday. Generally, on the weekends, the day unit has a skeleton crew of maybe three or four officers that cover that. And I think the call -- I believe the call came in after four p.m. anyway. So, the day of the week wouldn't have been pertinent. They would have gone home for the day.

Q. The Burglary Unit did not have a four p.m. to eight p.m. shift?

A. They did not, no. Everybody assigned to the four p.m. to eight p.m. shift in the Detective Bureau at the time was general assignment.

Q. In general, since there were cases that could be handled by multiple of these units, as your testimony has described, or handled at various times by people in different units covering, were there particular methods that the Detective Division had in place for various detectives working on the same investigation to communicate with each other?

A. I'm not sure I understand the question.

Q. Let me ask you a better question. Did the Detective Division at this time have any particular practices for people in the Detective Division letting each other know about what they were working on with respect to a particular investigation?

A. I would say at the time, officers at the end of their shift, I know on the four p.m. to twelve a.m. shift, we wrote what we -- they were referred to as night lines, that we left for the Captain, and it would -- the night lines would indicate what we responded to and what we did during that tour of duty.

Q. Okay. And you mentioned that it was largely the day shift who would do follow-up on any particular investigation if there was something that happened during either of the other shifts that didn't get resolved at the end of that shift?

A. Generally, that was what happened.

Q. Okay. Were there any other methods besides night lines for people on either the four p.m. shift or the night shift to let the day shift know about follow-up that needed to occur?

A. Verbal communication.

Q. Would that be verbal communication through the Sergeant or Lieutenant or verbal communication Detective to Detective?

A. It could be either.

Q. Other than night lines and verbal communication, are there any other methods that detectives use to pass information in between shifts?

A. No, you know, unless they generated either an Incident Report or an arrest report or, you know, something that would be -- individuals would read.

Q. Did you have the ability in September of 1985 to access police reports written by other

detectives?

A. Yes.

Q. How would you access those reports?

A. Through the Records Division.

Q. Would the Records Division have reports either for active investigations or cases that were still being activity investigated?

A. Well, they would have the initial report when the incident occurred. However, it wouldn't -- they wouldn't have what was actually done by particular detectives. Hopefully, you know, the night lines would include some of that that officers wrote. At the time as well, there was a sheet that came out every day, or on the four to twelve or twelve a.m. shift, a police cadet would list, have a list of serious incidents that had occurred during the past twenty-four hours involving, you know, stolen cars, breaks into homes, robberies, if there was any BOLOs or be on the lookout for particular vehicles from crimes.

Q. When you said a police cadet would have that list, what do you mean?

A. That's a police cadet, the Police Department employs individuals, I think, between the

ages of eighteen and twenty-four that are looking to become a Police Officer, they're not, but they do clerical tasks in different bureaus, and one that would be assigned to the Records Division on a particular day would be tasked with creating this report.

Q. Would that person sort of go through call information from that shift and then --

A. Yes.

Q. -- compile a list of what was going on, basically?

A. Stolen cars, breaks, look outs.

Q. Did that list have a particular name?

A. Maybe a hot sheet, you know, that would be informal name.

Q. Were those police cadets assigned particular units for some period of time or could they be assigned, you know, anywhere on any given shift?

A. Generally, they were -- they were assigned a certain responsibility. Some worked in the photo lab. The majority of them worked -- the majority worked in the Records Division. Some could be assigned to some of the investigative bureaus. Many times, there was one assigned to the Detective

Bureau that would be responsible for answering the phones so it wouldn't tie up an actual Detective with, you know, sitting in the office during that eight-hour period.

Q. In the last half of 1985, do you remember what, if any, police cadets were assigned to the Detective Division?

A. There was. There was cadets assigned there.

Q. Do you remember --

A. I'm sorry. I didn't mean to interrupt.

Q. Well, you were anticipating my question.

A. Yeah.

Q. I was going to ask you if you remembered their names?

A. I don't, not at that time period.

Q. And do you remember the names of any cadets who were assigned to the Records Division in the last half of 1985?

A. I do not.

Q. For these -- going back to this series of sexual assaults/burglaries that were being investigated in 1985, how did the Detective Division and the Crime Prevention Bureau communicate about

that, that investigation or those investigations in particular?

A. I don't know. I don't -- I don't know the answer to that.

Q. Did you ever talk with anyone in the Crime Prevention Bureau either verbally or through some kind of written communication about those investigations?

A. I don't believe -- I may have, but I don't have any recollection of that.

Q. Was there any particular person in the Detective Division who was responsible for that communication?

A. My communication?

Q. Let me ask that question in a better way. Was there any particular person in the Detective Division who was responsible for communicating with the Crime Prevention Bureau about any investigation into that series of sexual assaults/burglaries?

A. I would assume the Captains of each division and supervisors in those divisions would speak, but I don't have any -- I don't have any independent knowledge of that.

Q. Who was the Captain of the Crime

Prevention Bureau in the fall of 1985?

A. I'm not positive, but I believe it was Captain Thomas Fitzgerald.

Q. To go back then to September 21 of 1985, you said you and your partner, Robert McFarlin, were assigned to follow up on that call that either George Perrot or his sister made?

A. Correct.

Q. And what did you do to follow up on that call?

A. We initially interviewed Mr. Perrot along with his girlfriend at the time.

Q. Where did you interview them?

A. At the -- in the Detective Bureau of the Springfield Police Department.

Q. All right. Did they come in voluntarily?

A. They did.

Q. I mean, did you or Mr. McFarlin or anybody else have to go, like, pick them up to bring them in?

A. We may have picked them up, but I don't have a -- I don't have an independent memory of that, whether they were transported there themselves or someone drove them in or if -- if they had needed a

ride, we certainly would have went and picked them up and brought them back, but I don't recall whether we did that or not in this case.

Q. But is it your memory, however they got there, that they came willingly with the desire to cooperate with law enforcement?

MS. SAKOWSKI-LYNCH: Objection.

MS. deSOUSA: You can answer the question.

THE WITNESS: They came in willingly, yes.

Q. (By Ms. Thompson) Well, in fact, it sounds like that the initial call, whether it was made by Mr. Perrot or his sister, was a call of concern that Mr. Perrot was getting accused of something, essentially?

MS. deSOUSA: Objection.

MS. SAKOWSKI-LYNCH: Objection.

Q. (By Ms. Thompson) Was that your understanding of the initial call that was made to the Detective Division about this issue?

A. Yes. The call was that they were concerned for his safety.

Q. What was the concern for his safety?

A. You know, I don't remember exactly, but apparently, the son of the victim, you know, called and certainly had concerns. I don't know if there was actually threats made or not, but it was enough of a concern that they contacted us.

Q. Was there someone specifically who was investigating the particular sexual assault that Mr. Perrot was calling about?

A. I --

Q. And I said Mr. Perrot, but I understand your testimony was it was either him or his sister.

A. Right.

Q. So, I don't want to misstate your testimony.

A. So, are you asking was somebody assigned to investigate that housebreak and the sexual assault that had occurred the night before or -- actually, I believe we're talking the same day of the week. It was in the early morning hours, I believe, of the 21st, I could be wrong, but I think so. Maybe it was the day or two before. So, certainly, if it was a few days before, it would have been assigned to somebody specifically to investigate.

Q. Do you know who that person was that it

was assigned to?
A. I do not.
Q. I mean, I take it that this investigation -- let me start that question again.
When you were asked to follow up on this, you were not being necessarily assigned to investigate that sexual assault or break-in; you were simply being asked to follow up on this call that either Mr. Perrot or his sister made?
A. Yeah, to follow up on it. There would not have been a Detective probably from either division that would have been available until Monday morning because it was the weekend.
Q. In preparation for talking with Mr. Perrot and his girlfriend, did you look back at any police reports that had been prepared about any investigation that had been done about that sexual assault or break-in up to that point?
A. I -- yes. We would have certainly reviewed the Incident Report or the 911 report that had been filed.
Q. All right. And how would you have reviewed that report?
A. I probably just would have gotten a copy

of it and read it.

Q. Would you have gotten a copy from the Records Division?

A. Either the Records Division or it was probably, because it was a weekend, it was probably on the desk of the supervisor from the Burglary Squad.

Q. And that's because it would have still have been a fresh report at that point?

A. Correct. It would not have actually gotten into the hands of the individual from the Detective Bureau unless that individual was working that Saturday. There was day off groups. However, because it involved a very serious sexual assault on an elderly woman, a policewoman would have been called in that night and would have started the investigation into that aspect of it.

Q. And the policewoman that would have been called in, that would have been someone from the Crime Prevention Bureau?

A. Correct. And potentially, because this was out of the ordinary and a very serious incident, there is a possibility that a Detective from the Detective Bureau from that housebreak squad may have also come in that day, that day during the day hours

of or the early morning hours of the 21st or whatever day it occurred, if I'm correct that it occurred that night. I might be wrong on that. It could have been a day or two before. It would all be dependent on that.

Q. Sexual assaults in general, was that a crime, a type of crime that Springfield Police Department took very seriously in the mid eighties?

A. Yes.

Q. I mean, I take it that's a crime that the Police Department would take seriously probably at any point you worked for the department?

A. Any time, correct.

Q. Sexual assaults, as you alluded to, sexual assaults of elderly woman would be of particular concern because that's a crime on a very vulnerable part of the population, correct?

A. Correct.

Q. And was -- to your knowledge, were the people that you worked with during the time that that series of sexual assaults on elderly woman were being investigated, that series of assaults was of particular concern to the Police Department, is that right?

A. Yes, it would have been, certainly.

Q. And am I right that it would have been because there was potentially a person or persons who were serially preying on this particular vulnerable part of the population?

A. Yes.

Q. In addition to reviewing the Incident Report prior to talking with Mr. Perrot and his girlfriend, did you do anything else to prepare for those interviews?

A. I don't have an independent memory of it, but I'm sure that we would have certainly looked to see if Mr. Perrot had a prior record to that.

Q. And I think you said, but I don't want to misstate your testimony, so, if I've got this wrong, correct me, I think you said that you may have heard Mr. Perrot's name before September 21st of 1985, is that right?

A. I may have. And I should note that his brother-in-law at the time, Mark Wescott, was an acquaintance of mine from my earlier years. I had a sister who grew up in the Sixteen Acres area and lived on the next street from Mr. Wescott. So, I knew his brother-in-law at the time.

Q. You said that your sister grew up in Sixteen Acres?

A. Yes. Well, no. She grew up in Hungry -- in the Hungry Hill section, like I did, but after her marriage, she -- her first home was in the Sixteen Acres section of the City.

Q. When roughly did she move to Sixteen Acres?

A. She's fifteen years older than me. Probably in the late 1960s.

Q. All right. And Mr. Wescott, how did you know him?

A. I knew him. He was one of the -- when I was younger, in my teens, I babysat many times for my niece and nephew out in the Sixteen Acres area, and I became acquainted with him. He was one of the kids from the neighborhood that myself and my brother spent a lot of time, especially during the summer months, watching, babysitting for our niece and nephew.

Q. Was Mr. Wescott your age then or he was more the age of your niece and nephew?

A. No. He's actually -- my niece and nephew -- my niece is only two years younger than me and my nephew is about four or five years younger. So,

Mr. Wescott is probably sixty or sixty-one years old, I would estimate, just about the same age.

Q. I mean, was he someone that you kind of hung out during the summers then?

A. He was one of many. There was a whole group of kids. My older brother had befriended a lot of them before me because he was two years older than me and had been going out there. So, I was introduced to a lot of the kids out there through him, and one of them was Mark Wescott.

Q. Did you know other members of Mr. -- let me start the question again.

After you met Mr. Wescott, did you come to know other members of his family?

A. I think he has another brother. I'm not -- I didn't know him as well. He was younger.

Q. All right. So, when you say that you may have heard Mr. Perrot's name, are you thinking it's possible you heard it in the context of knowing kind of people in that community?

A. It's possible.

Q. Had you heard his name in the context of your police work before September 21st of '85?

A. I don't believe so.

Q. Okay. And you said that you would have checked his record before you went to talk to him, is that right?

A. Correct.

Q. Why is that something you would have done?

A. It would certainly be an investigative technique that a Detective would employ prior to interviewing somebody, you would certainly want to know if they had any type of a criminal past, and if they did, what it was for.

Q. Why would you want to know that?

A. Well, it would be helpful during the interview process, I would think.

Q. At the time that you went to talk to him and his girlfriend, were you thinking that Mr. Perrot might be a suspect in the sexual assault that he or his sister had called about?

A. No. I don't think that I myself or Detective McFarlin had any preconceived ideas.

Q. Well, were you -- you mentioned that there was potentially something there about him having been threatened. I mean, were you concerned that he was a potential victim of a crime at that point?

A. It was certainly possible.
Q. All right. So, were you investigating the nature of those potential threats or if there was some conflict between Mr. Perrot and the victim's family member?
A. Can you say -- can you repeat that?
Q. Yeah. Sure.
A. I'm not sure if I understood it.
Q. I mean, I asked you about -- I don't want to misstate your testimony, but I think you said it was possible that there could have been some issue there with Mr. Perrot being threatened, and I guess my question is, were you interviewing Mr. Perrot in part to determine if there might be some issue or concern about somebody having threatened him?
A. That certainly would have been part of it.
Q. When you interviewed him and his girlfriend, you ultimately took statements from both of them, is that right?
A. That's correct.
Q. All right. Did you take any handwritten notes during those interviews in addition to the written statements that were ultimately prepared?

A. I don't believe so.
Q. Did you prepare any police reports about those interviews other than the statements themselves?
A. No. Just, the statement would speak for itself.
Q. Okay. And after you prepared those statements, did you do any other investigation at that point into that case?
A. Yes.
Q. What else did you do?
A. One of the individuals that Mr. Perrot and his girlfriend said that they were with, we located them. It was two individuals. First one being, I believe, Jeffrey Adkins. The second one being Robert Timmerman. We also asked them if they would come into the Police Department and speak to us about their activities the night before.
Q. All right. And you got statements from both of those gentlemen as well?
A. Mr. Adkins agreed to give a statement. Mr. Timmerman did not. So, I believe I did a summary of that interview.
Q. Okay. Did you take any handwritten notes during those two interviews of those two men?

A. I don't believe so.
Q. Did you prepare any police reports about those interviews other than the statement and the summary that you just described?
A. I don't believe so.
Q. All right. And did you do anything else in terms of that investigation after you did those two interviews?
A. No.
Q. Did you follow up with anyone else who was working on other aspects of that investigation to, you know, update them on what you had done?
A. We turned over those -- that paperwork to Sergeant Andrew Canevari who was our direct supervisor at that time.
Q. Other than turning over that paperwork, did you do anything else to update anyone about what you had done in that investigation?
A. Not that I recall. I may have spoken to detectives, but if I did, I don't have any memory of it.
Q. Okay. Did you do anything else at any point to investigate that particular assault case?
A. No, I don't believe so.

Q. As you sit here today, do you have any recollection about how Mr. Perrot was during your interview of him on September 21st of 1985?
A. I believe he was -- I think he was fine. He was cooperative.
Q. Did you develop any suspicions about him either during that interview or as a result of your investigation into that particular assault?
A. I certainly thought that there, potentially, he could have been involved in this.
Q. Why was that your belief?
A. The three -- the four individuals, the three statements and the summary, there was some discrepancies in what individuals had said. It was certainly fresh at the time, and while everybody does not see things exactly the same, those discrepancies would certainly make me concerned. We certainly knew that there was more than one individual that had participated in this assault. Mr. Perrot had had a prior criminal history and he also had a connection to that individual house, which I believe as time went on, that home was the only home which wasn't really in direct geographical of the geographical area of where Mr. Perrot was living at the time. It was several

miles away, which would be different than some of the other crimes that occurred except for the fact that he had done some work for this woman and certainly knew who she was.

Q. When you talk about the connection, are you talking about that painting job?

A. Correct.

Q. Was there any other connection to that house that you are aware of that he had?

A. Not that I'm aware of.

Q. Did you develop, I mean, given that there were discrepancies between the statements that you took, did you develop -- did you develop concerns that maybe these other men that you had interviewed had some involvement?

A. Yes.

Q. What -- did you have any particular concerns as to them other than what you've just described as to your concerns about Mr. Perrot?

A. After especially during interview of Robert Timmerman, I felt, I think Detective McFarlin felt that he certainly had, although he made no direct admissions, we felt like he was involved.

Q. Do you know why you felt that way?

A. Just his responses to particular questions. And once again, that would just be what we inferred from the answers, not anything directly that he said, that he had done anything, but I believe Mr. Timmerman, and I don't recall exactly what it was, but I remember that he did say that he had lied about either the -- their re-entry into the Big E or who -- how they had actually got in, really, a rather inconsequential item, except the deception that had occurred, in my mind, there would be no reason for an innocent man to lie about something like that. So, we felt like he was maybe hiding or keeping something, his demeanor, his response to questions.

Q. Who was the victim in the case that you were interviewing these people about?

A. There were several victims in those, but I think that was Mrs. Marchand.

Q. And why is it that you believe that more than one person was involved in the assault of Miss Marchand?

A. Because that's, I believe, the way the Incident Report reflects, that more than one individual, she was awoken in the early morning hours, and there was at least two individuals, I believe, in

her home.
Q. Did you convey any of the thoughts that you just conveyed here about having some suspicions about Mr. Perrot and Mr. Timmerman after these interviews, did you convey those suspicions to anyone?
A. Yes.
Q. Who did you convey those to?
A. Sergeant Andrew Canevari.
Q. Are you aware of any other investigation that was done of either Mr. Perrot or Mr. Timmerman into their potential involvement in Miss Marchand's assault after these interviews the night of the 21st into the 22nd?
A. I think there was a continuing investigation to it. I did not partake in it.
Q. Did you have a particular kind of a case that you were -- that you were investigating at this time, in the last half of 1985, and by that, I mean, was there some particular type of crime that you primarily investigated?
A. No. Because we were assigned general assignment on that shift, we generally responded to incidents as they occurred, whether it be a shooting or a bank robbery or a housebreak, so it was -- that's

generally not, that's not a steadfast rule, but that was the majority of the time, it was a response to 911 transmissions that uniformed officers would respond to and request assistance from the Detective Bureau.

MS. THOMPSON: I'm going to mark these four here. Just for the benefit of people that are on the phone, I'm asking the -- we can go off the record for this.

(A recess was taken)

(Exhibits 1-4, marked)

MS. THOMPSON: Back on the record. So, it is 10:29. Counsel for the Department of Justice, Glenn Greene, I don't think is responsive either to my e-mail to him or to us on speaker phone here, I think --

MR. GREENE: I am here.

MS. THOMPSON: Oh, you are here, Glenn.

MR. GREENE: Sorry about that.

MS. THOMPSON: We do not want to ditch you. Let's go back on the record then.

Q. (By Ms. Thompson) So, I've shown the witness what's been marked as Exhibits 1 through Exhibit 4, and I'm going to talk about these in turn

with you, Mr. Kennedy.

So, the first is Exhibit 1 which is a document that has a bate stamp of City 4849. Is Exhibit 1 a copy of the interview report that you prepared of your interview with Lisa Eldridge on September 21st of 1985?

A. Yes, that's the statement that she gave to myself and Detective McFarlin that day.

Q. Who actually typed up Exhibit 1?

A. I did.

Q. The date and time that are at the top of this report where here it says eight o'clock p.m., what does that eight o'clock p.m. indicate?

A. That indicates the time that the statement commenced.

Q. Is that when you started talking with her or when you started typing?

A. Probably when I started typing. May have started speaking to her a few minutes before but within five minutes.

Q. Does this statement reflect everything that Miss Eldridge told you during this interview on the 21st?

A. I believe so.

Q. I note that in this interview, it indicates that Miss Eldridge was sixteen?

A. Correct.

Q. At this time, in September of '85, did the Police Department have a policy for how to conduct interviews of people under eighteen?

A. No. She would -- she would have had to have had parental, someone there as a parent, if she was charged and she was actually being criminally charged with something, not as a witness or a potential witness.

Q. Did you at any point during this interview believe that Miss Eldridge might be involved in a crime?

A. No.

Q. What specifically was the policy at the Springfield Police Department at this time about whether to involve a parent if a person under eighteen was being interviewed as a suspect in a crime?

A. I don't -- I can't specifically say on the date, but I don't think it would be as much the Springfield Police Department's policy as it was Mass. General Law.

Q. And what was your understanding of the

law at that time as to interviews of suspects under eighteen with respect to whether they needed to have a parent present or a parental permission?
A. I believe that they either -- if they were charged with a crime, they would either have to have a parent present or they would have to have the opportunity to speak to a parent or interested adult.
Q. At what point would they have to have either a parent present or the opportunity to speak with a parent or an interested adult?
A. I believe if they had been charged with a crime.
Q. After charges?
A. Yes.
Q. Was it your understanding at that time that it was consistent with both Massachusetts law and the policies and practices of the Springfield Police Department to be able to interview a suspect under the age of eighteen without having a parent present or notified?
A. At the time, I believe the law in Massachusetts was an individual who had attained the age of seventeen was considered an adult in the state of Massachusetts. That obviously has now since

changed.

Q. Do you remember anything else about your interview specifically with Miss Eldridge other than what's reflected in Exhibit 1?

A. No.

Q. Do you remember anything about her demeanor during this interview?

A. No, I don't.

Q. Do you remember as you sit here today what Miss Eldridge looked like during this interview?

A. I do not.

Q. Have you ever communicated with Miss Eldridge since this interview?

A. I have not.

Q. Let's look at Exhibit 2. Exhibit 2 is a one-page document that is bate stamped City 4856. Is Exhibit 2 a copy of the typewritten interview statement that you prepared of your interview with Mr. Perrot on September 21st of 1985?

A. Yes.

Q. All right. Does that 8:30 p.m. date on Exhibit 2 reflect when you started typing this statement?

A. Yes. This document was actually typed by

Detective McFarlin.

Q. Okay. So, does that 8:30 time reflect when Detective McFarlin started typing?

A. I believe so.

Q. Did Mr. Perrot come to the station at the same time as Lisa Eldridge?

A. Yes.

Q. Do you know why you took the statement of Lisa Eldridge first?

A. No. I don't have a memory of why that would have occurred.

Q. Okay. Mr. -- if you look at Exhibit 2, Mr. Perrot's statement has this paragraph, I am looking at the second paragraph where it indicates in part, I am giving this statement of my own free will and without coercion to the Springfield police as a result of a charge made about me by another person. Why was that language included in Exhibit 2?

A. I don't know.

Q. I note that, if you look back at Exhibit 1, there isn't a similar statement about her statement being given of her own free will and without coercion. I guess my question is, for you, if you know, why that was included in Mr. Perrot's affidavit but not hers?

A. I do not know.
Q. Is there anything that Mr. Perrot told you during the time you were with him on September 21st that is not reflected in Exhibit 2?
A. I don't believe so.
Q. I'm going to direct you down to the last paragraph of Exhibit 2. It says, in part, in that paragraph, and I'm paraphrasing, that on the day of this interview, Mr. Perrot got a call from this person who threatened his brother-in-law over the phone. Do you see that in the paragraph?
A. Yes.
Q. And I am paraphrasing, but there is a sentence --
A. Correct.
Q. -- that says, then he threatened my brother-in-law over the phone. Do you see that?
A. I do.
Q. Are you aware of any steps that the Police Department took to investigate those threats?
A. I do not know.
Q. Did Mr. -- you said that you thought this case concerned Miss Marchand, right?
A. I believe it did, yes.

Q. Did the police ever interview Miss Marchand's grandson?
A. I do not know.
Q. Do you know the grandson's name who made these threats?
A. I do not. I think I've actually testified that I thought it was the son, so.
Q. Do you know the son's name?
A. I do not.
Q. Let me refer you now to Exhibit 3. Exhibit 3 is a one-page document which is bate stamped City 4848. Is Exhibit 3 a copy of the typewritten statements that you and Detective McFarlin took from Jeffrey Adkins on September 21st of 1985?
A. Yes.
Q. The last paragraph of this statement reflects that two detectives came to Mr. Adkins' home and told him they would like to ask some questions and he then agreed to come to the police station. Do you see that?
A. I do.
Q. Which detectives went to his home?
A. Myself and Officer McFarlin.
Q. Okay. Do you know which of you and

Officer McFarlin typed this statement up?

A. Officer McFarlin typed this.

Q. And as to all of these exhibits that we've been talking about, is there a reason that you know in particular which of you typed up which statement?

A. I just can tell mine. And also, at that time, generally, you would put your partner's name first and then in the heading area in the first paragraph. I can tell by the style of it. I took one statement and then I also wrote -- so, it's also a division of the labor. He took two statements. I took one statement and then I did the summary.

Q. Can you tell though from the style and the word choice of the interviews essentially which, who typed up what?

A. I can.

Q. Okay. Do you remember anything about Jeff Adkins' demeanor during the interview that's reflected in Exhibit 3?

A. I don't.

Q. Did you believe the account that Jeff Adkins gave you about his whereabouts the night before, September 21st, as reflected in Exhibit 3?

A. I really didn't form any -- an opinion. I think all the individuals clearly stated that they went to the Big E that night. How they re-entered differed somewhat, but nonetheless, I think they all put themselves in a position that they were back at home prior to the time that this incident occurred anyways.
Q. Well, Mr. Adkins, for instance, says in this interview that his parents were home when he got home, is that right?
A. I'd have to find that in the statement.
Q. And I'm just referencing --
A. Yeah.
Q. -- maybe five or six lines up.
A. I see it.
Q. Okay. Did anybody from the Police Department to your knowledge follow up with Jeff Adkins' parents to determine if his alibi was legit?
A. I do not know if anybody -- I would assume somebody did, but I do not know that.
Q. Let me refer you now to Exhibit 4. This is a one-page document. This is bate stamped City 4844. You indicated that, as to the interview of Mr. Timmerman, that he did not agree to give a

typewritten statement in connection with this interview, is that right?

A. That's correct.

Q. But he did agree to be interviewed?

A. He did.

Q. Did he give you any information that's not reflected in this summary, and when I say this summary, I'm referring to Exhibit 4?

A. No, I don't believe.

Q. If you look at about the fourth line of this interview report, it reflects that Mr. Timmerman agreed to come, I think that address is the police station, to answer questions, is that right?

A. That's correct.

Q. Did you and Officer McFarlin bring him to the police station?

A. I believe so. I believe we did.

Q. When Mr. Timmerman, and I think you indicated earlier that during this interview, and I think this is reflected in Exhibit 4, that Mr. Timmerman told you that he actually lied to you about some of what had happened that night with respect to how the group came and went from the Big E that night, is that right?

A. Yes.

Q. Did he tell you why it was that he had supposedly lied?

A. Yes. He indicated that he didn't think it mattered.

Q. You are looking at the sort of last sentence of that, of Exhibit 4, that reflects that, is that right?

A. Correct.

Q. Did you or Officer McFarlin follow up with him about what he meant by him not thinking that it mattered?

A. We may have asked a few more questions. I don't recall.

Q. Was the thing that he was trying to hide from you, that the group had, you know, jumped the fence to get back in when they come back?

MS. SAKOWSKI-LYNCH: Objection.

Q. (By Ms. Thompson) I'm asking from your perception of the interview.

A. I believe he -- looking at this document now, I think he lied about the four individuals, including himself, leaving sometime around eleven o'clock and all leaving together and not returning,

when apparently, in fact, they had dropped off Miss Eldridge and then returned.

Q. What he was telling you when he admitted he lied was that in fact Miss Eldridge had left earlier, that the three of them, the gentlemen, had came back and then they jumped the fence to get back into the fair, correct?

A. Correct.

Q. When you were interviewing Mr. Timmerman, did you tell him that you were interviewing him in connection with this sexual assault investigation?

A. I'm sure we would have told him that we were investigating a break-in and entering that had occurred. I'm sure we would have told him that.

Q. Did you tell Mr. Adkins the same?

A. I would think, yes. I don't have an independent memory of that, but I'm sure we would.

Q. Did you tell him you were investigating in particular an assault?

A. I don't recall.

Q. Is there a reason you're sure you would have told him about that -- that you were looking into a breaking and entering but not necessarily an assault?

A. No. We may have told him about the assault, I don't recall, but we may have.

Q. Did you have any -- well, let me ask you this. At some point -- at some point, a couple months later, you acted as a filler in a line-up that Mr. Perrot participated in, is that right?

A. Yes.

Q. In between acting as a filler in this line-up and these interviews on September 21st and 22nd of 1985, were you involved in any way in any investigation into either break-ins or burglaries or sexual assaults of older women in Springfield?

A. Not that I have a memory of.

Q. Did you receive information about any of those investigations in the intervening weeks?

A. I really don't recall.

Q. Do you remember this being, you know, types of cases that either of your colleagues were working on that you, for whatever reason, were just doing other kinds of things in the interim?

A. Yeah. I know that there was an investigation into other assaults, similar related assaults. I was not directly related or involved in those.

Q. Were those investigations a topic of conversation among your colleagues during that intervening time between September 21st, 22nd, and when you were a line-up filler?

MS. deSOUSA: Objection.

THE WITNESS: I don't have an independent memory of that, but I would assume that they probably -- people were -- the officers that were directly involved in the investigations would be speaking about that.

Q. (By Ms. Thompson) Do you remember in the intervening weeks, and I -- when I -- again, when I say intervening weeks, I'm talking about between September 22nd and when you stood in the line-up as a filler, do you remember reading any night lines or hot sheets or other department documents related to any of those aspects of those investigations?

A. Once again, not directly. I know there was a continuing investigation into these crimes.

Q. Did George Perrot's name come up in any conversations between members of the Police Department that you heard during those intervening weeks?

A. Not that I heard.

Q. Were there other people who were being

investigated as suspects in those intervening weeks that you were aware of, and when I say investigated as suspects, I'm talking about suspects in that series of burglaries or assaults?

A. I do not know.

Q. Do you know how it is that you came to be a participant in the line-up that Mr. Perrot was in related to these cases?

A. I don't know directly. I know that they were, whoever was in charge of that was, you know, looking for white males that, you know, that were younger. At that time, I was probably twenty-three, twenty-four, so, white males, as fillers for that line-up.

Q. Had you run any line-ups for any of the cases that you were working on before the time that you stood as a filler in this line-up involving Mr. Perrot?

A. I had not.

Q. Had you been present for other line-ups before you acted as a filler for this one?

A. No.

Q. Is this the first line-up that you witnessed in your time with SPD?

A. Yes.
Q. At that time, and when I say that, I mean the time of this line-up, what was your understanding about the procedure that the Springfield Police Department would use to get fillers for line-ups?
A. I had no knowledge of how that would be done. That would have been a supervisor.
Q. Well, have you -- after you participated in this line-up, did you yourself run any line-ups?
A. No. I coordinated many show-ups, one-on-one, generally, photographs are used in line-ups, and certainly, I participated in hundreds of those, but not an actual line-up that had occurred live at the Police Department.
Q. When you are talking about photographs, are you talking about what's commonly known as an array?
A. Correct.
Q. So, you have participated in hundreds of arrays?
A. I would say hundreds, yes.
Q. And that's over the course of your entire career?
A. Yes.

Q. Okay. Have you participated or observed any other line-ups during your time in Springfield Police Department other than this one?

A. No, I don't believe so.

Q. Are you aware of other line-ups that occurred during your time in the Springfield Police Department other than this one?

A. I'm sure there was other ones, but I did not participate.

Q. Was it your experience that line-ups were uncommon in your career with the Springfield Police Department?

A. I don't know that they were uncommon. Generally, photographs were used when available. I may be incorrect, but I think at the time, the law, certainly an individual who wanted to participate in a line-up was given that opportunity.

Q. Was it your understanding that Mr. Perrot asked for this line-up to take place?

A. I don't know if he actually asked for it, but I know he cooperated with it.

Q. Okay. But I mean, do you have any information that this line-up was his idea or his request?

A. I may have read in our -- some form of a document about the line-up procedure. I can't recall what form that was in, but I thought I did read something.

Q. Well, did you read somewhere that this was done with his voluntary consent?

A. I believe it was. I don't know if I read that or not.

Q. What is your understanding of this being done at his voluntary consent? Let me start that question again.

What is your understanding of what the term voluntary consent means in that context of a line-up being done at someone's voluntary consent?

A. That the individual agreed to participate. I know that the individual is, you know, given the opportunity to place themselves wherever they would like to stand during the procedure.

Q. Do you know why it is that when -- let me start that question again.

You said as to sort of the arrays versus line-ups issue, that generally it's photos that were used for identification procedures in your experience with the Springfield Police Department, is that

correct?

A. Yes, I would say that arrays are used more times than an actual line-up like this.

Q. What is your understanding of why arrays are the common method of identification procedure that was used in your experience?

A. Well, I would say it's certainly the most -- it's the easier procedure to conduct, just a matter of getting a photograph of the suspect and generally seven fillers that are utilized.

Q. When you say it's easier, you mean it's easier than doing a live line-up?

A. It's easier to conduct, sure.

Q. And is that because you just don't have to wrangle people, essentially?

A. Correct. You do not have to get the physical people there. Just use the photographs.

Q. I take it for a photo array, that as you said, you have to get seven fillers for that, correct?

A. It's not a hard and fast rule, but I believe the court looks for minimum of four or five. Generally, Springfield Police Department use somewhere between eight and maybe ten. Other Police Departments may use a different number of fillers or other

agencies. That's generally the number that was used at the Police Department.

Q. Was it true as of 1985 that the general practice was to try to get eight or ten fillers for photo arrays?

A. I believe so.

Q. Let me ask you this. Who would actually conduct the photo array for Detective investigations that were done in 1985?

A. Generally, the supervising officer of that investigation.

Q. Would that be the Sergeant?

A. Could be a Sergeant. It would depend, I think, on the severity of the crime, what officers were involved.

Q. Could it be an investigating Patrolman or someone had a Patrolman rank that was working in the Detective Division that ran the array?

A. Very possibly.

Q. There was no rule that it had to be a Sergeant or Lieutenant or someone --

A. No.

Q. -- with rank?

A. No.

Q. For photo arrays that were done in the mid eighties, would the person running the array get those fillers by just looking through mug books and selecting people who look similar?

A. Back then, yes.

Q. I take it, in 1985, there was no computer system for going through to pick --

A. Correct.

Q. -- out photos?

A. Correct. Now, it is -- there's software that would -- you could -- you would enter parameters and it would -- the computer would generate a number of individuals that fit within those parameters.

Q. In the mid eighties, at any given time, how many people would be in custody at the Springfield Police Department?

A. It would be depending on the day of the week. If it was a weekend, there would probably be more people because it was a holding area as well. It is not now, but individuals who may have been arrested Friday evening, either for a serious crime or who didn't have the amount, if there was no bail set, and it was an ROR, they would still have to pay the Clerk of Court's fee, if they didn't have that or have

somebody they could contact, they could very well stay until Monday morning when they were brought to Springfield District Court for arraignment.

Q. To the best of your memory, what was your average number of sort of persons that might be in custody at any given time on a weekend?

A. On a weekend?

Q. Around this time period?

MS. deSOUSA: Objection.

THE WITNESS: On a weekend, it could be -- there may be twenty-five or thirty individuals. Could be more. Could be less.

Q. (By Ms. Thompson) Would those overwhelmingly be male?

A. I think the majority of people that were arrested and are arrested are male. Certainly, the cell block area has more capacity for male prisoners than female prisoners.

Q. Who is it that asked you to be a filler in this line-up involving Mr. Perrot?

A. I really have no memory. It with -- I am sure it was a supervisor who was assigned to the case, but I don't know which supervisor.

Q. Did you have any involvement in -- let me

start that question again.

Did you talk with the supervisor about the line-up before it occurred other than someone just asking you to participate?

A. I don't believe so.

Q. Do you have any knowledge about how people other than yourself were selected to be in this line-up?

A. I do not.

Q. Do you know when it was that you were asked to participate?

A. I don't. I'm sure it was that day.

Q. At that time, in December of '85, were you still working the four p.m. to midnight shift?

A. Yes.

Q. If this line-up took place after midnight -- well, let me ask you this.

If this line-up took place early in your shift, do you know when it was -- let me start the question again.

If this line-up took place at about 4:30 p.m., would it be your belief that you would have been asked essentially at the beginning of your shift at four p.m. to participate?

MS. deSOUSA: Objection.
Q. (By Ms. Thompson) I understand you don't remember when you were asked, but I'm asking you, given those circumstances?
A. Yes, I would imagine.
Q. I mean, could you have been called before your shift began to be asked to participate?
A. I could have, but I don't recall being contacted at home.
Q. When you showed up for shifts in December of '85, if you were working a four p.m. to midnight, would you get to the police station right at four o'clock?
A. Generally, the shift actually technically starts at 3:45. So, generally, sometime between 3:30 and 3:45.
Q. When you were working in the Detective Division, was that a plainclothes job?
A. It was.
Q. Did you wear suits or something else for your shifts?
A. No. Not on that shift, no. Generally, just casual.
Q. Would you show up to the station in the

clothes you were going to wear for the shift when you came for your shift?

A. Yes.

Q. Do you remember, do you have any specific memory of how the line-up itself actually was carried out?

A. I do not.

Q. I mean, do you remember, do you have an independent memory as you sit here today of actually being in that line-up?

A. Yes, but basically, because I've seen the photograph.

Q. The photograph has refreshed your memory about it?

A. Yes.

Q. Is this the only line-up that you were a filler in during your time in the Police Department?

A. Yes, it was.

Q. Do you remember anything about Mr. Perrot's demeanor during the line-up itself?

A. I do not.

Q. Did you see any of the people who were going to be viewing the line-up at the police station that day?

A. I did not.

Q. Is it your belief that you looked similar to Mr. Perrot at that time, meaning at the time of the line-up?

A. Generally, young white males.

Q. I mean, do you believe that you were an appropriate filler for a line-up at that time based on the degree of similarity that you had to Mr. Perrot?

MS. deSOUSA: Objection.

THE WITNESS: I didn't -- I didn't -- I never made a determination. I basically was following orders.

Q. (By Ms. Thompson) I mean, at that point, if a supervisor asks you to stand in a line-up, do you have a choice whether or not to participate in that decision?

A. No.

Q. Meaning, I've got -- if a supervise tells you to be in a line-up, you've got to follow that order?

A. Yeah. You would be disobeying a direct order.

Q. Did you see District Attorney or Assistant District Attorney Francis Bloom in the

DA Bloom not at lineup

police station that day?

A. I don't believe so.

Q. Did you know at that time an officer named Kevin Wood?

A. Yes.

Q. What was Kevin Wood's assignment at that time?

A. I don't know.

Q. Did you know him just from seeing him in the course of your police duties?

A. I also worked for him -- didn't work for him. I worked with him at Big Y Foods in East Springfield prior to both of us becoming Police Officers.

Q. Have you ever talked with Kevin Wood at all about this line-up?

A. No, I don't believe so.

Q. Have you ever talked with the Police Officer named Alan Merrick about this line-up?

A. No. Alan Merrick was a Police Officer at that time. He hasn't been a Police Officer for quite some time.

Q. Have you ever talked with a Police Officer named Edward Burnham about this line-up?

A. Nope. I certainly know Officer Burnham, but I have not spoken to him about this.

Q. All right. Have you ever talked with an officer named Michael Reid, R-E-I-D, about this line-up?

A. No. I also know Sergeant Reid, and I have spoken to him, but not about this.

Q. Do you know how any of those officers came to be fillers in this line-up?

A. I do not.

Q. Did you know at that time somebody named Albert Hamel, H-A-M-E-L?

A. No.

Q. Do you know how long it took for this line-up to be conducted?

A. I don't. I don't recall it being overly long. I would say that the whole thing occurred within half an hour or less.

MS. THOMPSON: Are we on 5?

THE COURT REPORTER: Yes.

(Exhibit 5, marked)

Q. (By Ms. Thompson) I've shown the witness what's been marked as Exhibit 5. This is a two-page document which is bate stamped Plaintiff 4146 and

4147. And my first question for you, Mr. Kennedy, is did you review this document, Plaintiff's Exhibit 5, before your deposition today?

A. Yes. I believe this is the document I referred to. I wasn't exactly sure what the format of it was, but this is it.

Q. I'm going to refer you to the third paragraph on the first page and to the last sentence which reads, This line-up was coordinated by Assistant District Attorney Francis Bloom, Lt. Charles Arpin, A-R-P-I-N, and Sgt. Thomas Kelly. From -- let me also say that if you look at the second page of this report, that it appears from the signature that it was authored by Detective John Scanlon. Do you see that?

A. I do.

Q. From looking at those names on this report, does that give you any indication of who it is that asked you to participate in this line-up?

A. No, it actually doesn't.

Q. That sentence on the third paragraph of the first page that says that the line-up was coordinated by the people that are listed, what is your understanding of what coordinated means in that context?

A. I don't know. I didn't -- I didn't prepare this document. So, I don't know what Detective Scanlon was referring to.

Q. Did you ever see this report prior to you reviewing it in preparation for your deposition?

A. No, I don't believe so.

Q. At some point much later, you were involved in collecting some blood samples from Mr. Perrot, is that right?

A. Correct.

Q. Is your memory that those blood samples were collected from him in March of 1987?

A. Yes.

Q. In between this line-up that we've just been discussing and March of 1987, did you have any other involvement in investigating either sexual assaults or burglaries or break-ins involving older women in Springfield?

A. Not that I recall.

Q. In between that time, did you have any involvement in investigating any crimes committed against Mae Marchand?

A. I don't believe so.

Q. What about Mary Prekop?

A. No.
Q. What about Emily Lichwala?
A. No.
Q. And what about Joseph McNabb?
A. No.
Q. In general, have you yourself ever spoken with Miss Marchand?
A. I have not.
Q. What about Miss Prekop?
A. No.
Q. What about Miss Lichwala?
A. No.
Q. What about Mr. McNabb?
A. No.
Q. Have you ever spoken with anyone in either the District Attorney's Office or the Police Department about any conversations that they have had with Miss Prekop?
A. No.
Q. Have you ever heard any member of the District Attorney's Office or the Police Department express an opinion that Miss Prekop had some mental health difficulties?
A. Never.

Q. Have you ever heard anyone express that she, meaning no disrespect to her, but that she was not a reliable reporter of events?

A. I've never heard that.

Q. Have you ever heard anyone in either the District Attorney's Office or the Police Department express the opinion that either Miss Marchand or Miss Lichwala, again, meaning no disrespect to either of them, were not accurate reporters of events?

A. I've never heard that.

Q. Did you ever hear anyone -- let me start that question again.

Did you ever hear about anyone from the Police Department reporting to Miss Prekop's home because there was a call made expressing concern about her well-being?

A. No.

Q. How is it that you came in March of 1987 to participate in collecting some blood from Mr. Perrot?

A. I was directed to do that. I think I received a notification to respond to court. I don't know who that was from.

Q. In March of 1987, you were a Sergeant, is

that correct?
A. Yes.
Q. All right. At that point --
A. Well, actually -- actually, I don't know if I was or not.
Q. Well, do you remember what your assignment was at the time that you were --
A. I thought I was still assigned to the four p.m. to twelve a.m. shift. My memory is that I wasn't promoted until September of 1987.
Q. Okay. So, at the time that you were given this assignment, you were still working as a Detective?
A. Yes.
Q. Okay. I think you said you do not recall who it is that gave you that assignment?
A. As far as the blood?
Q. Yes.
A. No.
Q. Would that have been a supervisor over your shift?
A. It could have been a supervisor of my shift from the Detective Bureau. It also could have been someone from the District Attorney's Office as

well.

Q. But at this time, as far as who it was, you cannot say?

A. I don't recall.

Q. Okay. And you said that you were notified that you needed to report to court, is that right?

A. Yes.

Q. Were you notified as to why you needed to go there?

A. Although I don't have a memory of it, I'm sure I was.

Q. How did you receive that notification?

A. It comes through -- it comes through the court to officers -- there's officers assigned to the District and Superior courts as court liaisons. They issue the requests from the District Attorney's Office for officers to appear on given dates.

Q. At this time, in March of 1987, had you worked with Mr. Bloom on other cases?

A. Yes, I believe so.

Q. Had you -- was he someone that you associated with outside of work as of that time?

A. I did associate with him somewhat

socially, but it probably was after this time.

Q. When did you start associating with him socially, to the best of your memory?

A. Sometime in the late eighties.

Q. But you think it was after March of '87?

A. I think it was, yes.

Q. When you said that you associated with him socially, can you describe what you mean by that?

A. Yes. We were both fans of the 1980 Celtics and we attended several of those games together. At the time, another member of the Springfield Police Department, Sergeant John Delaney, also went, and we occasionally socialized with our then wives, none of which any of us are married to anymore.

Q. And I don't mean this as a joke, but I assume that there were many people who were fans of the Celtics in the late eighties?

A. Sure.

Q. They were a successful team, probably universally popular, is that right?

A. Greatest team ever.

Q. They were the greatest team ever?

A. 1986.

Q. Having a mutual affinity for the Celtics would not have been an uncommon thing for you to have --
A. No.
Q. -- with various colleagues, right?
A. No.
Q. Am I right that you for other reasons just had a friendship with him, it wasn't just about the Celtics?
A. It wasn't just about the Celtics, no. No. He had young sons that were prolific in basketball. I had several that were very good as well. So, we had that in had common.
Q. At that point that you started socializing with Mr. Bloom, how often would you see him in a non-work capacity, meaning is this, like, you would hang out every couple weeks?
A. No.
Q. Every week? What would be the frequency?
A. No. Several times a year, I would say two or three times a year.
Q. At any point in your friendship with Mr. Bloom, did he express to you a desire to pursue higher office or elected office?

A. No.

Q. When you got this notification to appear in court, I take it that you followed that assignment, is that correct?

A. Yes.

Q. And what do you remember about actually collecting blood from Mr. Perrot?

A. I witnessed -- I witnessed an individual with a medical background remove, I think, I believe it was two vials of blood from Mr. Perrot --

Q. Did they --

A. -- from his arm.

Q. Do you remember who the person was that did the collection?

A. I do from reviewing the paperwork. His name was Terry Aberdale.

Q. Did you know Mr. Aberdale?

A. I did not.

Q. Was it your understanding at the time that this blood was collected that blood and hair samples had already been taken from Mr. Perrot prior to that date?

MS. deSOUSA: Objection.

THE WITNESS: I had no knowledge of

that.

Q. (By Ms. Thompson) Do you remember anything about Mr. Perrot's demeanor on the day that the blood was collected?

A. I don't.

Q. Am I right that you showed up at the court and he was already there and you didn't leave the court building with him?

A. I did not leave the court building with him.

Q. Okay. So, essentially, you saw him during the collection that day and that was it?

A. That was it.

Q. All right. How long did you spend with him that day?

A. Perhaps fifteen minutes, ten minutes.

Q. Was he cooperative with the collection?

A. During the period of time that I saw him, yes.

Q. Was anybody else there for the collection besides you and Mr. Aberdale?

A. I don't recall. I would assume that one of the court officers would have stood by as well.

Q. Would that mean a deputy?

A. They're not deputies. They're court officers that are assigned to the court, and they're the caretakers of prisoners. They bring prisoners from the lock-up to the various courtrooms where the individuals have business. So, they're responsible for their safety and the care. So, I would assume that the Court Officer would not have left him. He may have. He may have left him because I was a Police Officer.

Q. Are those court officers Hampden County --

A. Yes.

Q. -- law enforcement?

A. Yes. Yes. Well, they're assigned to Hampden County, but they are actually state wide.

Q. Were you present for this blood collection essentially to be a chain of custody person for the Police Department?

A. I believe to be a witness to the chain of custody, yes.

Q. Okay. What did you do with the blood after -- well, let me ask that question a better way.

What happened to the blood after Mr. Aberdale collected those two vials?

A. I took the two vials of blood and went back to the Springfield Police Department and prepared a property tag for them and then brought them to the Crime Prevention Bureau.

Q. Did you have any understanding at that time, meaning at the time it was collected, as to why this blood was being taken from Mr. Perrot?

A. I knew that it was for comparison sake. I don't know which particular case it was -- like, I don't have an independent memory of which case it was being used for comparison reasons.

Q. Did you talk with Mr. Bloom about that blood collection before it took place?

A. Not that I recall.

MS. THOMPSON: Are we on 6?

THE WITNESS: Is it possible to take a two-minute break?

MS. THOMPSON: Yes. Of course. Those on the phone, we're just going to take a short break, okay.

MR. GREENE: Okay.

(A recess was taken)

(Exhibit 6, marked)

MS. THOMPSON: Back on the record.

Q. (By Ms. Thompson) After the break, Mr. Kennedy, you have in front of you a document that's been marked as Exhibit 6. This is a one-page document that is bate stamped City 3731. Do you recognize Exhibit 6?

A. I do.

Q. What is Exhibit 6?

A. That's the property tag that I utilized to tag into evidence the two vials of blood that were taken from George Perrot.

Q. All right. Is this the document that refreshed your memory that it was Terry Aberdale who had taken the actual blood from Mr. Perrot?

A. Yes.

Q. It looks like there's various handwriting on this slip that's reflected in Exhibit 6. For instance, do you see in kind of the top of the narrative section there that the name George Perrot is written?

A. Correct.

Q. Whose handwriting is that?

A. That is mine.

Q. Okay. And then is all of the handwriting from where it says, George Perrot, down to where it

says, T. Kennedy, I'm talking about just the left side box, is all of that handwriting yours?

A. Yes, including the first line under, Remarks, Above Taken By Terry Aberdale, that is also my handwriting, my printing.

Q. All right. The handwriting that's on the right side box where it says, For Property DIV use, do you see that box?

A. I do.

Q. Whose handwriting is that?

A. I do not know.

Q. Do you know when that was written on that box?

A. It indicates 3/31/87, it would have been the officer that received that as property in the Crime Prevention Bureau that day.

Q. So, where it says, Remarks, the line you just read, Above Taken By Terry Aberdale this date, do you know what this date is referencing?

A. Yes, 3 -- yes, March 31st, 1987.

Q. So, am I right that you then --

A. It's actually up at the top of the slip. No. You can't really see it because of the copy outside the box. There is a -- you can. It's hard to

see, but it does say March 31st, 1987.

Q. You are looking at essentially the top left?

A. Yes.

Q. Just so this is reflected for the record, I'm going to give you a pen and I'm just going to have you circle where on this it reflects March 31st. I think the record will reflect you made a circle in the top left portion of that box?

A. Correct.

Q. I'll take my pen back, sir. Am I correct then, procedurally, that you took the two vials back to the Property Division, that you completed this -- your portion of this property sheet, and then you gave it to the Property Division who completed that right side box?

A. Correct.

Q. The handwriting that is below, Above Taken By Terry Aberdale this date, so, the two lines that appear below that, whose handwriting is that?

A. I don't know. It's -- again, it's an officer assigned to the Crime Prevention Bureau, and that would indicate the day that I or the time and date that, although the time and date is not on there,

it's the date that I took and where that evidence went.

Q. Is that the handwriting of a person who essentially signed this evidence back out to you?

A. Yes.

Q. Okay. Those two lines indicate taken to F.B.I. Washington, also two rape kits number 85-67 and 85-117, also slides number 51226011 and samples number 51226, and then there's some numbers, I can't read. Have I read that correctly?

A. Yes, I believe so.

Q. Can you read those numbers on the bottom that I was not able to read?

A. The last number looks like 51226, then there's a space, and it's hard, it may be a zero or 641 or -- I'm not positive. The last three digits are very small.

Q. You did take evidence to Washington D.C. then in connection with this case, is that right?

A. Yes.

Q. Is it your memory that you took to D.C. the evidence that's reflected in this property sheet?

A. Yes.

Q. So, it looks like the two vials of blood,

then two rape kits, and then slides and samples, is that correct?

A. Yes.

Q. Were the rape kits at that time what sometimes are what's referred to as the Tulo kits?

A. I'm not familiar with that term.

Q. But are these -- were these rape kits, did they contain samples that were taken from sexual assault victims or potential sexual assault victims at the hospital?

A. That's what a rape kit would certainly contain. It was in a box enclosed. So, I don't know exactly what was in the kits, but certainly, that would be some form of samples.

Q. Do you know what this slide and samples that are referred to on that second line, what those were?

A. I don't.

Q. When you took this evidence out from -- well, let me ask you this question. You said that that would have been written by someone from the Crime Prevention Bureau?

A. Yes.

Q. Did you take this evidence from the Crime

Prevention Bureau's possession?

A. Yes.

Q. Did they have their own Property Clerk at that point who retains their evidence?

A. Yes.

Q. Okay. So, you got this from their Property Division?

A. Yes.

Q. Did you open or examine any of that evidence when you took it from them?

A. I did not.

Q. Was anyone with you when you checked that evidence out from the Crime Prevention Bureau to go to D.C.?

A. No.

Q. Do you know who from -- let me start that question again.

I take it, from your testimony, you do not recall who from the Crime Prevention Bureau checked this out to you?

A. I do not.

Q. When did you -- well, let me ask you this question.

Why did you take this evidence to D.C.?

A. It was that evidence was being brought to the crime laboratory at the Federal Bureau of Investigation for analysis.

Q. Did someone assign you to be the person to take that to D.C.?

A. I'm sure it would have been the -- it would have to have been approved by the Captain in charge of the Detective Bureau.

Q. Who was that at that time?

A. I served for a number of Captains. It may have been Captain John Brown, but there's other Captains that were in there. So, I'm not positive of that, but I think it was Captain Brown at that time.

Q. Of all of the staff in either the Crime Prevention Bureau or the Detective Division at that time, do you know why you in particular were chosen to get this evidence to D.C.?

A. I do not.

Q. Whose idea was it to send this evidence to the F.B.I. lab?

A. I do not know.

MS. deSOUSA: Objection.

Q. (By Ms. Thompson) You went with Francis Bloom to D.C., is that correct?

Went to DC w/ Bloom

A. That is correct.
Q. Do you know who it was that determined that you and Francis Bloom would go together?
A. I do not.
Q. Have you visited the F.B.I. lab for any other cases that you worked on as a member of the Springfield Police Department?
A. No. That was the only time that I went there.
Q. At that time, did the Springfield Police Department have a crime lab that it worked with typically on cases?
A. I believe that they utilized the Mass. State crime lab.
Q. Was it unusual for a Springfield Police Department case to involve the F.B.I. crime lab?
MS. deSOUSA: Objection.
Q. (By Ms. Thompson) In your experience?
A. I don't know.
Q. Did you work on any other cases while you were with the Springfield Police Department where the F.B.I. crime lab was involved?
A. Yes.
Q. How many other cases?

A. I don't remember specifically, but there was other cases that the F.B.I. was utilized.

Q. When the Springfield Police Department in your experience, in your career, had evidence that needed to go to the Massachusetts State crime lab, how was the evidence transported to the lab?

MS. deSOUSA: Objection.

THE WITNESS: I don't know.

Q. (By Ms. Thompson) Did you ever in the course of your career with the Springfield Police Department drive evidence to the Massachusetts State crime lab?

A. I think I did on a few occasions.

Q. Did you have cases that you worked on where somebody else from the Police Department drove evidence to the Massachusetts State crime lab?

MS. deSOUSA: Objection.

THE WITNESS: I believe in every case that there was physical evidence, that had to be compared, that one of the evidence officers would bring it to the crime lab.

Q. (By Ms. Thompson) Do you know why an Evidence Officer did not bring the evidence to the F.B.I. crime lab?

A. I did not.

Q. When I'm asking about that, obviously, I'm asking about the evidence that you transported to the F.B.I. crime lab, did you understand that to be my question?

A. I did understand it, yes. I don't know.

Q. Did you ever gain an understanding as to why Mr. Bloom went with you to D.C.?

A. No, other than he was the Assistant District Attorney who was prosecuting that particular individual and that case.

Q. Well, did Mr. Bloom ever tell you that he had some particular goal in going to D.C. with you?

A. No.

Q. Did he tell you that he wanted to talk with some of the F.B.I. staff in connection with this case --

A. No.

Q. -- in going with you to the lab?

A. No, he did not.

Q. Who drove?

A. We did not drive. We flew from Bradley International Airport in Hartford.

Q. Did you do this in a day trip, flying

lab in DC

there and back?

A. We flew on the 1st and returned on the 2nd.

Q. Did you stay overnight in D.C.?

A. We did.

Q. Did you go to the lab on the 1st?

A. Yes.

Q. Did you visit there on the 2nd as well?

A. No.

Q. How did you get from the airport to the lab?

A. We took the subway system.

Q. Let me ask you this. Was it arranged in advance with the F.B.I. that you would be visiting that day?

A. Not that I know of.

Q. I mean, when you got to the lab itself, did it seem like they were expecting you?

A. No.

Q. What do you remember about being at the lab building, specifically, on the 1st?

A. We were there very, very briefly. I don't remember what floor of the building that we went to. We were basically in and out of the building

within five to ten minutes. We went in -- went to the division that accepted property and turned the evidence over and we left the building.

Q. Was Mr. Bloom with you the entire time you were inside the building that day?

A. Yes.

Q. You said you went to the division that handled this. Do you remember what division you went to?

A. No. Where ever they accepted property from law enforcement agencies.

Q. Did you talk with anybody at the division -- at that division?

A. Only the individual who accepted the property.

Q. Do you remember who that was?

A. I do not.

Q. Did you have to fill out any paperwork to turn the evidence over?

A. I would imagine that I did, but I don't recall.

Q. Have you ever seen copies of any paperwork related to that since the time you might have filled it out?

only spoke w/ person who accepted prop.

A. No. The only item I've seen is what we're looking at right now, the property tag that I filled out.

Q. After you left the lab, what did you do in D.C. for the rest of the time that you were there?

A. We left. From there, we checked into the hotel. I think later on, we went out to dinner, and that really basically was that.

Q. Am I right that the only, like, work that you did on this trip was going to the F.B.I. lab?

A. Yes.

Q. Did you spend the rest of that evening with Mr. Bloom?

A. Yes, we had separate rooms, but you know, in between checking into the hotel and then going, we went out to dinner together and returned from dinner and, you know, went to the airport the next day.

Q. Did it seem unusual that Mr. Bloom came with you when it seems like this is a job that could have been done by one person?

A. I don't know. I wasn't in a position to, you know, to make that determination.

Q. Did you talk about this case at all with -- let me start that question again.

On your way to the lab, either on the train or other transportation that you used to get there, before you got to Bradley or after you got to D.C., did you talk with Mr. Bloom about anything having to do with Mr. Perrot?

A. Not that I recall.

Q. Did you ever tell Mr. Bloom about your suspicions about Mr. Perrot stemming from your September interview of him and his acquaintances?

A. Not that I recall.

Q. In the time in your life that you spent socializing with Mr. Bloom, you mentioned that there was another person that would sometimes go to Celtics games with you or that would associate with you with your then wives, and that was Sergeant Delaney, is that right?

A. Correct.

Q. Were there any other members of the Springfield Police Department that you would spend time socially with Mr. Bloom with other than Sergeant Delaney?

A. No.

Q. Were you aware of other people that he was similarly friendly with on the department -- in

the department besides you and Mr. Delaney?

A. I'm sure he was friendly and familiar with many people, but not that I knew directly of.

Q. Did you have to submit any, like, reimbursement requests or documents related to your stay in D.C.?

A. No. I think I did write a report. At the time, the Police Department did not pay monetarily for overtime. They gave time off. It was referred to as balance of overtime, BOT. And I do remember, after returning, that I did write a report for that. Any of the expenses that were incurred, the flight and the hotel and the meals, I believe, was taken care of by the District Attorney's Office.

Q. Have you seen the report that you had to write for your overtime since you submitted it?

A. No.

Q. Who did you submit that to?

A. Ernest Stelzer, who would have been either a Lieutenant at that time or he may have been a Captain, but there was a period of time that I don't think there was a Captain running the Detective Bureau. He ran it in both capacities as a Lieutenant and as a Captain.

Q. So, did you submit that report up through your own chain of command?
A. Yes. Yes.
Q. Do you know what time you and Mr. Bloom left on the 1st to go to D.C.?
A. I think we took a flight sometime in the late morning.
Q. Where was the State Police crime lab located that Springfield used in the eighties?
A. At that time, I'm not positive. It may have been in the Braintree or Sudbury. That's, you know, I'm not positive. I know that there's parts of the lab now are in Springfield, there's parts in Maynard and Sudbury. I believe there may be something in New Braintree where the police -- their Police Academy is.
Q. You mentioned earlier this other case that you worked on with Mr. Bloom, Donald Lee Perry. Was Mr. Perry convicted?
A. Yes.
Q. Was there anyone else in the Police Department that worked on that case with you?
A. Oh, there's many. There was many officers that worked on those cases.

worked on Perry case w/ Bloom

Q. Were you like a Lead Investigator in the Perry case?
A. No. I was only -- my rank was still a Patrolman. For some of it, I may have been a Detective Sergeant, but there certainly would have been people above me.
Q. Was there someone that you considered to be a Lead Investigator or the Lead Investigator in that case?
A. Honestly, his crimes were so many, that there would have been a number of officers that would have been involved in that.
Q. Did you ever -- were you ever involved in any investigation of someone named James Jones for any assaults or burglaries in Springfield?
A. I'm not familiar with that name.
Q. At some point, did you become aware that Mr. Perrot's original conviction had been overturned?
A. I know one of his convictions, or maybe one of his convictions were overturned. I also know that he pled guilty to some of the indictments.
Q. Well, obviously, you know that there -- you know that some aspect of his conviction was overturned because you know you testified twice,

right?

A. Correct.

Q. Are you aware of any steps that the Police Department took to re-investigate any case that Mr. Perrot was convicted of after some aspect of his conviction was overturned the first time or the second time?

A. No. I believe that, if we're talking about the early nineties, at that point, I was either assigned to the Uniform Division as a Lieutenant or I was assigned to Crime -- to Community Policing. So, I wouldn't have directly been involved in any form of investigative type of police work at that point.

Q. How did you hear that you were going to need to testify in his case a second time?

A. I would have been notified via court slip, like all court appearances.

Q. Did you talk with Mr. Bloom to prepare for your testimony for either the first or the second trials?

A. I believe -- yes, I would have spoken to him before the first one. However, I believe that the second time that I made an appearance and testified, it was in front of the Assistant District Attorney

Brett Voterro. So, I would have spoken to him prior to the second time that I testified.

Q. Do you remember anything about your conversations with Mr. Bloom in preparation for the first trial?

A. No, nothing other than we certainly would have gone over what questions he was going to ask me.

Q. Did Mr. Bloom ever talk to you about a statement that he prepared related to Mr. Perrot?

A. Statement that Mr. Bloom prepared?

Q. Yes.

A. No.

Q. Did Mr. Bloom -- has he ever expressed to you one way or another any opinions that he holds about Mr. Perrot?

A. Not that I recall.

Q. Are you aware of any steps that the Springfield Police Department took to re-investigate Mr. Perrot's, the cases for which Mr. Perrot was convicted after additional evidence related to hair samples came to light?

A. I do not know.

Q. Did you talk with anyone about the fact that you were going to be deposed in this case other

than your counsel? I'm not asking about the substance of any communications with counsel.

A. Other than my wife, no.

Q. Other than your spouse, yeah.

A. Yeah. No.

Q. Have you talked with anyone about Mr. Perrot's Complaint in this case since the time that you first learned of it other than, excluding any conversations with your counsel or your spouse, frankly?

A. No.

Q. Other than I think the supervisors that you've already identified or the people that you have already talked about in connection with your testimony, do you know of any other people in the Springfield Police Department who were involved in investigating any of this series of assaults or burglaries or break-ins involving older women in Springfield?

A. Not specifically what officers, no. I'm sure there was several or many.

MS. THOMPSON: Are we on 7?

(Exhibit 7, marked)

Q. (By Ms. Thompson) I've shown the witness

what's been marked as Exhibit 7. Is Exhibit 7 a complete copy of your Answers to Plaintiff's First Set of Interrogatories?

A. Yes, I believe so.

Q. And there are some documents that are attached to the back of those interrogatories, is that right?

A. Yes.

Q. Were there any other documents that you believe were attached to your interrogatories that are not included in Exhibit 7?

A. No, I don't believe so.

Q. Other than your actual testimony for Mr. Perrot's trials and the documents that we have reviewed today in this deposition, are there other documents that you reviewed in preparation for this deposition?

A. Other than the police reports?

Q. Yeah.

A. In my prior testimony, and the interrogatories, I don't believe so.

Q. Okay. Are there any additional police reports that you reviewed in preparation for your deposition other than the exhibits that we've looked

at so far, I think copies of which are all attached there in Exhibit 7?

A. I don't believe so, with the exception of I believe I read an arrest report of which Mr. Perrot was the subject, was the arrestee.

Q. Okay.

A. I don't see that, but I do remember reading that.

Q. You read one arrest report?

A. Yes.

Q. All right. I have a couple questions about your interrogatories.

A. Okay.

Q. And that's the last topic I want to discuss with you in this deposition. Let me have you go to your answer to interrogatory number 1. I'm sorry. These pages are not numbered. So, I can't give you a page.

A. That's okay. I've got it.

Q. Okay. In your answer to interrogatory number 1, you made an objection which included an assertion that there were a number of incidents that were reported to the Springfield Police Department beginning May 1st, 1984, through November 30 of 1985.

Members of the Springfield Police Department investigated all three incidents. Do you see that --

A. I do.

Q. -- information? Do you have knowledge of -- let me ask that question again.

Do you have any knowledge about investigations into those incidents involving M.P. that are indicated in your answer apart from what you've testified about in your deposition so far today?

A. I'm not sure I understand the question.

Q. Let me ask the question in a better way. Do you have knowledge of any aspect of the investigation into any of the incidents that Miss Prekop, who I think is the person that's referred to as M.P. in your answer, that she reported to the Springfield Police Department apart from what you've testified about so far in your deposition today?

A. I don't believe so.

Q. All right. In your answer, you indicated that Robert McFarlin, Anthony Pioggia, P-I-O-G-G-I-A?

A. Yup.

Q. Donald Breor, B-R-E-O-R, and Thomas Fitzgerald were all involved in the investigation of

M.P. Do you see that answer?
A. I do.
Q. All right. And you previously testified that Mr. McFarlin was your partner and participated in those interviews on September 21st with you, is that right?
A. Correct.
Q. Do you have knowledge of other involvement that Mr. McFarlin had in investigating any of the incidents that M.P. -- that involved M.P.?
A. I do not.
Q. What is your understanding of the role that Anthony Pioggia had in investigating any of these incidents that involved Miss Prekop?
A. Anthony Pioggia was a Detective assigned to the midnight to eight a.m. shift. I'm not sure that it was the Prekop incident, but I know that he responded to one of the incidents. He was one of the initial detectives that responded during the overnight hours.
Q. When you say it didn't involve Miss Prekop, do you believe he responded to one of these assaults or break-ins --
A. Yes.

Q. -- that is another one?
A. It may have been --
MS. deSOUSA: Let her finish her question. Don't talk on top of her.
THE WITNESS: Oh, I'm sorry.
MS. deSOUSA: You've done so well.
THE WITNESS: I'm sorry.
MS. THOMPSON: No problem.
Q. (By Ms. Thompson) My question was whether it was your understanding he responded to an incident that involved an older woman in this spate of these incidents that was not Miss Prekop?
A. It may have been Miss Prekop because I think she had several incidents. It may have been one of the other victims.
Q. All right. What's your understanding of the role that Donald Breor played in any investigation involving Miss Prekop?
A. Donald Breor was a Detective assigned to the Crime Prevention Bureau. What he did specifically, I don't recall, but I know that he worked in the Crime Prevention Bureau and did -- he did -- he was involved in these investigations.
Q. Do you know how, other than to know that

he had some involvement?

A. Not off the top of my head, no.

Q. All right. I'm not asking you about any communications with your counsel, but separate and apart from any communications with your counsel, what is your understanding of why it is that he was, or what's the basis for your knowledge that he was involved?

A. I recall seeing his name on a document. I don't recall which document. I don't know if it's an arrest or another document.

Q. Other than seeing his name on some paperwork, do you have any other basis for your knowledge that he was involved in some way?

A. No.

Q. Then your answer indicates that, as I think you testified to previously here, that Thomas Fitzgerald was the Captain over the Crime Prevention Bureau at this time?

A. Correct.

Q. Other than supervising the investigation of Mr. Pioggia, Mr. Breor, and Mr. McFarlin, are you aware of any other acts that Thomas Fitzgerald took as part of any investigation into some incident involving

Miss Prekop?

A. No, but he would have been, in his role as the Captain of the Crime Prevention Bureau, he would have been the overall supervising officer, along with -- because this was a dual investigation, the Captain of the Detective Bureau, which I believe I testified I thought was Captain Brown but I wasn't positive.

Q. Let me refer you to answer to interrogatory number 3. In your answer to interrogatory number 3, you indicated that you had conversations with co-workers during the investigation of these crimes during the preparation for the two trials, is that correct?

A. Yes.

Q. What, if anything, do you remember about those conversations?

A. I really have no specific recollection.

Q. I mean, is it your answer in this interrogatory that you can -- although you know that such communications would have taken place in the course of your involvement, you really can't say one way or another what their content was?

A. Correct.

Q. And are there any documents you believe you could review that would refresh your memory about any conversations you had with co-workers about any investigation into this series of assaults or burglaries on older women in Springfield?

A. I do not believe so.

Q. I'm going to refer you to your answer to interrogatory number 5. I have a question about your answer. So, if you want to read it to yourself and just let me know when you're done, I've got a question for you.

A. Okay.

Q. Have you had a chance to review Mr. Perrot's Complaint in this case?

A. Yes. Initially, I read it.

Q. As you sit here today, do you take a position one way or another whether Mr. Perrot committed sexual assault on Miss Prekop?

MS. deSOUSA: Objection.

THE WITNESS: I did not other than -- other than delivering that evidence in Washington on the Prekop case, I didn't really have any direct involvement in their investigation. Obviously, I was more involved

in the other incident in 1985 with Mrs. -- with Mrs. Marchand. So, I have more personal knowledge of that investigation.

Q. (By Ms. Thompson) Well, am I right then that you are not taking a position one way or another whether Mr. Perrot sexually assaulted Miss Prekop?

MS. deSOUSA: Objection.

THE WITNESS: Do I answer?

MS. deSOUSA: Yes, go ahead and answer.

THE WITNESS: Okay. It's my position that Mr. Perrot was an extremely dangerous individual at that time. I believe he probably was a serial breaker and rapist of elderly women. Part of that belief is based on his own pleas that he rendered in this case. I consider him to be one of the more dangerous individuals that I dealt with in my time in Springfield Police Department.

Q. (By Ms. Thompson) Did you have any interactions with Mr. Perrot other than those that you have described in your deposition so far?

A. No, I don't believe so.

Q. And you said that, and I don't want to

misstatement your testimony, that you believe that he was a serial, I think you said a serial breaker? I don't want to misstate that.

A. Serial breaker and rapist, yes.

Q. When you say serial breaker, you mean a serial breaker, a person who breaks into people's homes?

A. Breaks into homes.

Q. And are you basing your belief he was a serial rapist and a person who serially broke into people's homes on your interactions with him in this case and on the statements that I think you described him, that you believe he made related to those crimes?

MS. deSOUSA: Objection.

THE WITNESS: Yes. I would base it on the totality of the circumstances, my personal involvement with these cases, the knowledge from the reports, and the other investigations that went into it, and certainly his admissions.

Q. (By Ms. Thompson) Other than the reports that you said you read related to Miss Marchand before the interviews that you did on September 21st of 1985, have you reviewed other police reports related to the

investigation of any of these assaults or break-ins related to older women in Springfield?

A. Yes. Some of these other crimes that he had been charged with, I have read those reports as well.

Q. When did you review those reports?

A. I would have read them, the last time would have been in preparation for this, in the last several months.

Q. When did you review those reports prior to the last several months in preparation for this deposition?

A. Prior to --

MS. deSOUSA: So, I want to be clear for the record, he didn't say he read them in preparation for the deposition.

Q. (By Ms. Thompson) Let me restate my question because I don't want to -- I want to make sure I get this right.

You said in the last several months, you have after reviewed these other reports related to Mr. Perrot besides the reports that you reviewed relating to Miss Marchand, is that right?

A. Yes.

Q. Okay. Have you -- prior to the filing of this, Mr. Perrot's Complaint in this case, have you reviewed reports related to the investigation of any of these other break-ins or assaults other than the reports that you read related to Miss Marchand in preparation for your interviews of Mr. Perrot and his associates on September 21st of 1985?

A. No. I read them in the last several months, and the last time before that I would have read any of them would have been thirty something years ago prior to this.

Q. Well, thirty something years ago, did you review other reports related to this series of assaults or break-ins involving older women other than the reports that you read in order to interview Mr. Perrot and his friends on September 21st of 1985?

A. I don't think that would have been possible because I think the incident we had preceded some of the other incidents. So, I don't think that they would have existed at that time. That's my memory anyway. That those incidents or the majority of them anyway occurred after. That's my --

Q. And you --

A. -- memory anyway.

Q. I'm sorry. I didn't mean to --

A. I'm thinking out loud. I'm sorry.

Q. If you have anything more to add to that answer, go ahead.

A. No.

Q. In the documents that you have read in the last -- let me start that again.

And the documents you have read since the filing of this Complaint that have contributed to your belief that he is one of the most dangerous people that you have been involved with in your career are the documents that we've looked at today plus the arrest report, is that right?

A. Yes.

Q. Have you ever talked with anyone else -- and I'm excluding any conversations you had with your counsel -- that have shared your opinion that Mr. Perrot is an extremely dangerous person?

A. I'm sure that I have. I don't recall who or when.

Q. Have you ever reviewed any evidence or court opinions related to Mr. Perrot ultimately receiving a new trial following his second conviction?

A. No.

Q. You saw that there was an interrogatory that we asked you that related to potential documents or evidence concerning punitive damages in this case?

A. I don't recall that, but I'm sure I probably did.

Q. It's not necessarily really for you to review that, because I asked you that specifically to say that I have an understanding with your counsel, your counsel and I may disagree on whether I would have the right today to ask you questions related to Mr. Perrot's claim for punitive damages, but the Plaintiff would assert that, ordinarily, we would have a right in this deposition to ask you questions related to your financial position and other questions that would be relevant to Mr. Perrot's claim for punitive damages, but I have an agreement with your counsel that we will not ask those questions today with the understanding that you would cooperate with us in the future in getting us that information at an appropriate time in the future. Is that your understanding, Mr. Kennedy?

MS. deSOUSA: And with -- I just want to put on the record that our understanding is with appropriate Orders of the

punitive damag

Court. So, with that caveat --

THE WITNESS: Okay.

MS. deSOUSA: -- if you can answer, please answer.

THE WITNESS: I would agree with Miss deSousa.

Q. (By Ms. Thompson) My question is, understanding that you would confer with your counsel about that, do you agree that you would cooperate in the future in getting that information from you at an appropriate time?

A. I would cooperate with a Court Order. I certainly would not feel comfortable discussing my, nor my wife's, financial situation, be it assets or debits with anyone.

MS. THOMPSON: Let's just take one quick break. I think I'm pretty much done. I just want to review a couple things and then we'll be back.

MS. deSOUSA: Sure.

(A recess was taken)

MS. THOMPSON: Back on the record.

Q. (By Ms. Thompson) Mr. Kennedy, you said you had a chance to review your two pieces of

testimony prior to your deposition today, is that right?

A. Yes.

Q. Is there anything in that testimony that you believe was incorrect?

A. I don't think so.

Q. Meaning, and I want to be clear about that, anything about your testimony that you feel like needs to be corrected given your understanding of the case as it stands today?

A. I don't believe so.

Q. You said that you were prepared for your second piece of testimony by Mr. Vottero, is that right?

A. I -- yes, if -- I know I testified more than once. I think it was twice, but -- and the second -- if it was in fact two times, the second time was when Mr. Vottero was the Assistant District Attorney.

Q. You've described a friendly relationship that you had with Mr. Bloom. Did you have a similar level of closeness with Mr. Vottero in terms of socializing outside of work?

A. No.

MS. THOMPSON: Those are all the questions I have for you, Mr. Kennedy.

THE WITNESS: Thank you.

MR. GREEN: I don't have any.

MS. SAKOWSKI-LYNCH: No.

MS. deSOUSA: Are they asking questions or no?

MS. THOMPSON: Glenn or Susanne, do either of you have questions?

MS. REARDON: I don't think I have anything.

MR. GREENE: I don't. I just wanted to get the court reporter's information so I can send her my info.

MS. THOMPSON: Let's make sure we do that at the end. Does anyone else have questions?

MR. GREENE: Okay.

MS. THOMPSON: I think we're done. Thank you, Mr. Kennedy.

(Witness excused)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

I, ROXANNE C. COSTIGAN, a Notary Public in and for the Commonwealth of Massachusetts, do certify that pursuant to notice, there came before me on December 17, 2018, at the offices of ACCURATE COURT REPORTING, INC., 1500 Main Street, Suite 222, Springfield, MA, the following named person, to wit: THOMAS KENNEDY, who was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel or attorney for any of the parties, or a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND, this 29th day of December, 2018.

____________________________
Roxanne C. Costigan

My Commission expires: June 21, 2024

SIGNATURE/ERRATA SHEET

I have read the foregoing, and it is a true transcript of the testimony given by me at the taking of the subject deposition with the following corrections/changes, if any:

________________________ ________________________

Date THOMAS KENNEDY

PAGE LINE CHANGE REASON

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

----------------------------------------------------

Case Name: GEORGE PERROT V. THOMAS KELLY, ET AL.

Date Taken: December 17, 2018

rcc