IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

CASE NO: 18-CV-10147

************************************ *
GEORGE PERROT,
Plaintiff, *
vs.
THOMAS KELLY, THOMAS JARVIS, *
RICHARD KANE, CHARLES APRIN, JOHN
SCANLON, DAVID LOUDEN, THOMAS *
KENNEDY, CHIEF ERNEST STELZAR,
MARIANNE POPKO, PAUL GLANTZ, RONALD *
ST. GERMAIN, ANDREW CANEVARI,
CHERYL CLAPROOD, CAPTAIN JOHN *
BROWN, UNKNOWN OFFICERS OF THE
SPRINGFIELD POLICE DEPARTMENT, THE *
CITY OF SPRINGFIELD, MASSACHUSETTS,
FRANCIS BLOOM, WILLIAM EUBANKS, *
WAYNE OAKES, and UNKNOWN AGENTS OF
THE FEDERAL BUREAU OF *
INVESTIGATION,
Defendants *
************************************ *

DEPOSITION OF: RICHARD KANE

TAKEN AT: LAW OFFICE OF TYLER INGRAHAM

100 Main Street, Third Floor

Northampton, Massachusetts

June 8, 2023 1:20 P.M.

Sharon Waskiewicz

Court Reporter

A. Commerce High School.
Q. Is that around this area?
A. Springfield.
Q. What year did you graduate high school?
A. 1969.
Q. Did you attend any other educational institution after high school?
A. Yes. Holyoke Community College and Springfield Technical Community College.
Q. Did you obtain a degree from either of those?
A. No.
Q. When did you start at the Springfield Police Department, what year?
A. August of 1974.
Q. And when did you leave the Springfield Police Department?
A. September 14th, 1991.
Q. So between those dates, could you just walk me through, starting in the beginning, what your role was within the department when you first signed on, or what your assignment was?
A. I first went through the police academy. Then I was assigned, as a new police officer, to the

MS. SAKOWSKI: Objection.
THE WITNESS: Well, the uniformed car could call in and say there was somebody in the crime prevention bureau investigating an assault that took place behind Holy Name Church in Springfield, Forest Park, and a person matching that description was seen. And we try to locate him and we would try to help.
Q. (By Ms. Gizzi) So there was a lot of -- I shouldn't say a lot. But wouldn't it be fair to say you worked with the uniformed division and then the crime prevention bureau?
A. That is he way it is -- it supposed to work that way, yeah.
Q. And did it actually work that way?
A. Sure.
Q. Moving on a little bit to, as you might know, the Plaintiff, George Perrot for this case, did you know George Perrot, before December of 1985, did you know who he was?
A. No.
Q. So then I guess that answers my next question. You didn't have any interactions with him

bureau?

A. If there was a sexual assault, they would write a report, yes.

Q. I guess what I mean by "hand off," would you then, as a crime prevention bureau officer, take over the investigation for the rest of it?

A. Only if the captain assigned it. It depends who he assigned it to. Detective Greer would send a report over, the captain would assign 'em out, if there was an assault, a sexual assault on a person.

Q. And do you know if the department, or the crime prevention bureau, specifically was investigating the series of sexual assaults, that you were a part of, as being committed by one person?

MR. KENEFICK: Objection.

MS. SAKOWSKI: I'm sorry. Did you say one person?

MS. GIZZI: Yes.

THE WITNESS: Could you say that question again, please.

MS. GIZZI: Sure.

Q. (By Ms. Gizzi) Do you know if in that time, in the mid '80s, those sexual assaults that you

were involved in, were you or the department investigating them as though they were committed by one person or the same person?
MS. SAKOWSKI: Objection.
MR. KENEFICK: Objection.
THE WITNESS: Can I answer that?
MS. GIZZI: Um-hmm.
THE WITNESS: I didn't know about all of them, no.
Q. (By Ms. Gizzi) Well, any of them. Were you investigating any of them potentially?
A. Yes. I was investigating one in particular.
Q. Do you remember who the victim was in that one?
A. Yeah. She lived at Covel Street.
Q. Do you remember her name?
A. Emily -- it's a funny last name.
Q. Lichwala?
A. Lacagla? Lichalla. Lichalla.
Q. I was also not going to be able to pronounce it, so I appreciate you taking a stab at it.
So you were involved in investigating her

sexual assault?
A. In the very beginning, yes.
Q. How did you come to be involved in that?
A. That morning, apparently the detective bureau or uniformed officers transported her to the hospital. And I was sent to the City of Chicopee to pick up a person that the police had on a warrant there. And then, after dropping that person off at the police station, I was sent to the hospital to pick up Emily Lichwala to have the police and Linda Derosier take a statement from her.
Q. So you went to pick up Emily from the hospital to bring her to the police station?
A. Yeah. So they could get a statement. So Linda Desrosier, the female officer at work that day, could take her statement of exactly what happened.
Q. Do you know why Officer Desrosier did not go to the hospital to take the statement?
A. Who, Linda Desrosier?
Q. Yes.
A. While she didn't take it at the hospital? Well, they were releasing her, the victim. And, before bringing her home -- because we still had to go to the house and see what we could find out. We

needed a statement from her because we really didn't know what happened.

Q. And when you went to pick up Ms. Lichwala, from the hospital, did she tell you anything about her assault at that time?

A. I don't really remember driving her from the hospital, Springfield Hospital, back to the police station -- which was probably an eight-minute drive -- having a conversation with her. The police woman -- because of the type of crime it was -- it was I didn't want to make her feel uncomfortable talking to me. And that's kind of the way we always handled these things.

That's why we had Linda Derosier and Marianne Popko and several others. And Marianne -- or Linda, rather, took her in into a private area where she could take a report away from everybody.

Q. And that actually brings up another question.

Was it standard practice for the female officers to always take the sexual assault victim's statements?

MR. KENEFICK: Objection.

THE WITNESS: It wasn't in writing

A. I don't remember if I exactly talked to her right then. I know we took her home, because it had been a long night for her and it was getting late. We wanted to get to the house to see exactly what went on and how he got in.

Q. And so did you, in fact, end up going to Ms. Lichwala's house?

A. Yes.

Q. And that was during that same shift?

A. Yes.

Q. And what did you end up doing when you got to her house that day?

A. We collected some evidence from the clothing she had on, the sheets on the bed, the pillowcases on the bed. And I went in the basement to see where the break was. And it was a small window and I think it was a drier vent was sticking in. You know how cellar windows are. It wasn't very big, but that was pushed out.

And it appeared he gained access that way, which said he was a very small person. We'd thought that how do you fit in there. I replaced the window back in and the vent back in.

Q. So the window wasn't -- there wasn't

anything broken, like you were able to just put it back together, if you remember?

A. I think I did what we call a "police lock". I secured it for now until somebody more talented than me could permanently fix it.

Q. Okay. I've got you.

Was there anything else you remember -- besides the items that you mentioned collecting, like the bedsheets and --

A. I think some of her clothing that we collected. The bedsheets and I think the blanket and bedspread and pillowcases, I'm pretty sure is everything we collected.

Q. Okay. And was it just you and Officer Desrosier there collecting evidence?

A. Yeah, I believe so. I'm not 100 percent sure. Yeah, but I believe so.

Q. Do you remember about how long you were at Ms. Lichwala's house that day?

A. No, I don't. It was -- for her, I thought it was a very long day. So we were there at the police station for a good part of the day. She was very upset. And we were trying to calm her down and trying to get her some help.

been anybody in the bureau. Even somebody on nights might have picked up on it and tried. Obviously we didn't have the phone number. We didn't have anything. It would have been in the report. Worcester is a big place. It's kind of hard.

Q. (By Ms. Gizzi) Okay. So did you have any other involvement in investigating this sexual assault incident of Emily Lichwala?

A. On this day?

Q. After. I'm sorry. After this day.

A. Yes, I did.

Q. What was that?

A. It was in the beginning of December, around the 10th of 12th, I went to York Street Jail, under the order of Caption John Brown, to collect some blood samples. He gave two -- two or three blood vials. I can't remember exactly. And I was to meet a Terry Aberdale, who was the -- I assume -- the pharmacist or the nurse there, to watch blood being drawn from Mr. Perrot.

Q. So did Captain Brown instruct you to go watch what that blood being collected from Mr. Perrot in relation to the October sexual assault on Emily?

A. He never said. He didn't speak to this or anything else. He'd said: You are to go and watch Mr. Aberdale take blood right out of his arm and then you are to return it to the station.

Q. Okay. Did Captain Brown give you any other context when he instructed you to go to the York Street Jail for that purpose?

A. I don't know what you mean by "context".

Q. That's fair.

I mean, did he give you any background information about why you were going to get blood?

A. No. I'll be honest, the way this happened on that particular day was, it was late in the afternoon and everybody goes home at 4 o'clock. And I guess he looked at me said take these vials and go to the jail and meet Mr. Aberdale and watch the blood being drawn.

Q. Was that something that you had done before that date of watching someone's blood get drawn?

A. Years before that, when I was in uniform it happened, yes.

Q. And was it when you are talking about the years before that you were instructed to do that, was

that something similar where you were just there to watch the blood be drawn?

A. It was on an arrest. I was in uniform and it was nothing I remember similar to this. It was for something else.

Q. And, when you went to -- so on that date, December 10th, 1985, to the York Street Jail to collect that blood, did you have anything with you?

A. A couple of vials. There might have been three, but at least two or three vials of the blood to give to Mr. Aberdale.

Q. Okay. What about like did you carry a notepad or a notebook with you?

A. I didn't.

Q. And, at that time, before you went to the York Street Jail, had you met or seen George Perrot before then?

A. Never.

Q. And had you ever seen or -- excuse me. Have you ever heard anybody in the police department talk about George Perrot?

A. Not that I can remember, no.

Q. I'm going to show you another report. This will be Exhibit 2. I'll mark it this time.

I was a police officer for the City of Springfield.

Q. So were you in plain clothes that day?

A. Yes.

Q. And did Mr. Perrot respond or say anything to that?

A. I don't really remember if he said anything at that point. At that point, if I remember correctly, blood was being drawn from his arm.

Q. Okay. Were you ever, throughout that interaction, were you ever along in the room with George?

A. No.

Q. So when you were in there, George was in there and Mr. Aberdale was in there too?

A. Yes.

Q. What happened after he started taking his blood?

A. Mr. Perrot started talking freely about his girlfriend and how pretty she was. And I think it was shortly after that -- he also said how pretty she was and something to the effect of that he would never rape an old lady. And if you just saw my girlfriend, you would know that. And that's when I Miranda-ized him so he would know who I was.

Q. And when you Miranda-ized him, did you have him sign anything like a right's waiver again?
A. I always carried a Miranda card in my wallet all throughout my career. I don't recall if I had him sign it. I know I read it to him so he would get it word for word, to make sure he totally understood his rights, and he'd said he definitely understood his rights.
Q. And about how long were you in the examination room with George before he started talking about his girlfriend.
A. I know he had a little conversation with Terry Aberdale, Mr. Aberdale. I know that Mr. Aberdale told him what he was going to do and who he was going to do it for. And then he started it, so for maybe three or four minutes.
Q. And after he was Miranda-ized, did you ask him any questions?
A. Well, he kept talking about Covel Street. And I did ask him. He'd said, I broke into Covel Street, but I didn't rape any old lady. And so I asked him if he knew where the pocketbook was.
Q. So he's talking about -- just so I understand -- he is talking about his girlfriend and

MS. GIZZI: This is Exhibit 4.
(Exhibit RK-4, general report form, marked)
Q. (By Ms. Gizzi) Have you ever seen this before, this document?
A. Yes.
Q. And what is this document?
A. This is a special I wrote to Captain Brown after leaving the York Street Jail.
Q. What does that mean, "a special," in this context?
A. A general report form advising him of what he sent me there to do.
Q. I guess what I want to know is, where does the name "special" come from, that you guys don't call it a general report.
A. A special to Captain John Brown.
Q. Right. But where does that come from?
A. A special report to Captain John Brown. I always --
Q. I've seen it multiple times. That's why I'm asking.
A. It's a special report. It's an arrest report.

Q. It's not just like an ordinary report you wrote after a shift?
A. No. A daily report. I'm sure this went to the chief's office.
Q. I understand.
And just directing your attention to where it says: Reporting officer.
Above that, is that your signature?
A. On the first page?
Q. Yeah. Any of them.
A. Yeah.
Q. Are these like half sheets that you --
A. Yeah. This would be the ...
Q. Right. Okay.
MS. SAKOWSKI: And the witness just folded the paper over in half.
MS. GIZZI: Thank you.
THE WITNESS: In fact, you see it says "chief's copy".
MS. GIZZI: Yes, it does.
Q. (By Ms. Gizzi) So when did you write this report during your shift?
A. Immediately after leaving York Street Jail I went back to the police station. I remember

that it was getting late. And I had a conversation with Tom Kelly and I wrote the report.

Q. Do you remember if you wrote the report before you talked to Tom Kelly or after?

A. I think during. He was going to go out and look and see if he could locate the pocketbook.

Q. Okay. So I want to go through, specifically, the lines just to make sure I understand everything.

The first line, the first half of this page starts with: About 3 p.m. today I went to the York Street Jail with a search warrant waiver signed by George Perrot.

Did I read that correctly?

A. Yes.

Q. I don't know what that word says. "Giving"?

A. Giving me permission.

Q. Giving me permission to have blood samples drawn. Then "I" something.

A. Met.

Q. I met with Terry Aberdale, of the jail medical staff. Perrot was brought up to the examining room at the jail and Abergale took samples

about a rape. I asked him what he did with the pocketbook. He described how he ran up Covel Street. He stated that he threw the pocketbook into some bushes by the last house on the street.

Q. So just to stop right there, were you the one that brought up the pocketbook first, or did he mention that?

A. No. I brought it up.

Q. Okay. And you believe, even though you don't remember, that you must have talked to someone in order to get that information about the pocketbook.

A. Yeah. I don't know where that came from, but somebody had to say something to me that she was missing a pocketbook or something.

Q. Okay. Did you know the woman, who was talking about Covel Street during this interaction, that it was Emily Lichwala from a previous?

A. I don't think Emily's name was ever mentioned to him. Just Covel Street.

Q. Okay. But it wasn't in your knowledge, at the time, that Emily Lichwala was the one whose house was broken into?

A. And raped. Yes, I knew that.

Q. Well, again, I'm sorry. To be clear, that her house was broken into on November 30th, 1985?

MS. SAKOWSKI: I'm sorry. Can you repeat that question?

Q. (By Ms. Gizzi) Are you aware that Emily Lichwala's house was broken into on November 30th, 1985?

A. A second time?

Q. Yes.

A. This time I was not, no.

Q. And going back to the document, he'd said the house with the driveway goes up the hill on the right, on the right-hand side in the bush.

He gave you all that detail?

A. Yes.

Q. And how did he describe that he disposed of the pocketbook?

A. I don't remember, but I assume he had thrown it in the bushes when he was running.

Q. Okay. And then it states: When I got back to the PD office, I relayed this information to Sergeant Kelly.

Do you remember how you relayed it to

him; was this in person?

A. Yes.

Q. So he was at the station?

A. Yes.

Q. And did Sergeant Kelly say anything in response?

A. I heard him say that he was going to go look. And I believe he went with Cheryl Claprood, but I'm not 100 percent certain.

Q. Going down to the next line, Perrot seemed to have a very soft spoken voice, just like the victim on Covel Street described in her statement.

Do you know what you're referencing here?

A. I think, in Ms. Lichwala's statement, she stated he had a -- if you went back, I could show you -- a calm voice while all this was going on.

Q. And when you wrote this, though, you didn't know that he was referring to Ms. Lichwala?

A. No. Somewhere I had heard that this was said and I listened to his voice.

Q. Is it possible that Sergeant Kelly told you this information while you were writing it?

MR. KENEFICK: Objection.

Q. Right. Correct. But you do have a memory of that?

A. I was at the courthouse on something else, yes.

Q. So directing your attention to Page 65 on the top where it's Bates stamped City 003626.

So what I want to ask you about starts on Line 10.

The attorney asks you: Did you have instructions to be present when the blood was drawn? You answered, yes, sir. Captain Brown told me to take this search warrant waiver, signed by Mr. Perrot, to the jail, meet Mr. Aberdale, and pick up blood samples that Mr. Aberdale would draw from Mr. Perrot in my presence.

A. Right.

Q. And do you remember testifying to that effect?

A. Yes.

Q. I know we talked about this little bit earlier, but did you have anything else besides the search warrant waiver with you and the vials, that you remember?

A. Here?

Q. I'm sorry. When you went to the York Street Jail.

A. Yeah. I had a waiver, that I called a search warrant waiver, but it was a waiver that gave us the right to speak with him. And I had three vials, I believe, two to three vials, but I believe it was three.

Q. And were you instructed by Captain Brown to have all three of those vials filled with blood?

A. You know what, he told me to give the vials to Mr. Aberdale, so that's what I did.

Q. And the waiver that Mr. Perrot signed, was it was already signed by Mr. Perrot, or were you getting it signed there?

A. No. It was already signed.

Q. Okay. Moving on to Page 67, City 003628. About the middle of the page down the attorney asked you: Did you notify Mr. Perrot's attorney that you intended to go to York Street with that consent form to have his blood taken? You answered: No, sir. I was told that his attorney agreed and that's why the consent form was drawn up. I didn't notify his attorney, no, not myself.

Do you remember testifying to that