C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 9, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME III

Q. And you did do something -- is it on the 10th that you did something?
A. Yes.
Q. That is the 10th of December?
A. Yes, sir.
Q. And you did so after receiving some information from Officer Kane, is that right?
A. Yes, sir.
Q. And Officer Kane told you that he had spoken with George Perrot down at York Street, right?
A. Yes, sir.
Q. And he told you, among other things, that he'd ask George where the location was of that purse, correct?
A. Yes, sir.
Q. And Officer Kane described to you or told you the description of the location that he said was given to him by George Perrot, is that right?
A. Yes, sir.
Q. And do you know what time of day it was that you got that information?
A. I had just come to work, it was about 3:30 or quarter to four.

Q. In the afternoon?
A. Yes.
Q. I take it earlier that day you had made no efforts to get that pocketbook -- to send someone out to look for the pocketbook either?
A. No, sir.
Q. This would have been on Tuesday, is that right? The 10th was a Tuesday?
A. Yes.
Q. Now, after speaking with Officer Kane, you personally went to this location to look for the pocketbook?
A. Yes, sir.
Q. And did you go with anyone else?
A. Yes.
Q. How many or people did you go with?
A. One other.
Q. Who was that?
A. Officer Clapprood.
Q. How long was it after you spoke with Officer Kane that you went there? A matter of minutes?
A. Probably within a half hour.

Q. It took you five minutes to find this pocketbook?
A. Yes, sir.
Q. And the reason it took you five minutes to find the pocketbook is because you had a description of where it was, is that right?
A. Yes, sir.
Q. From Officer Kane?
A. Yes.
Q. Now, what is your -- on the diagram on the board that we have here, I take it that this is Covel Street running in front of this house that is marked 33 Covel?
A. Yes, sir.
Q. And does Covel Street end when it intersects at Hilltop?
A. Yes.
Q. And this is still Hilltop as it moves around --
A. Hilltop ends in that driveway. The two houses are situated as I have them, one behind the other one, and Hilltop ends there.
Q. And this space that you have between

ROBERT CHEETHAM (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and this jury your name and your occupation, sir?

A. My name is Robert Cheetham, I am a sergeant with the Springfield Police Department.

Q. Sergeant Cheetham, how many years have you been employed by the Springfield Police Department?

A. Eight years.

Q. And, obviously, that would include the calendar year 1985, correct?

A. Yes.

Q. Going back to November of 1985, would you tell the court and jury what your duties were and where you were assigned in the latter part of that month?

A. I was a patrolman assigned to the Detective Bureau on the midnight to 8:00 A.M. shift.

Q. During the course of the night, and I'm

talking about past midnight into the day or the early morning hours of November 30th of 1985, did you have occasion to go to two locations in Sixteen Acres neighborhood of Springfield?

A. Yes, I did.

Q. Have you reviewed your notes -- I should say the paperwork -- concerning those incidents before you came in today?

A. Yes, I did.

Q. Now, was one of those homes at 33 Covel Street?

A. Yes, it was.

Q. Was the other home 27 Malibu Street?

A. Yes, it was, Malibu Drive.

Q. Excuse me, Malibu Drive. And can you tell us, sir, at what time a call came in concerning Covel, as best you can tell us?

A. Approximately 3:25 A.M.

Q. And can you tell us approximately the time that the call came in from the house on Malibu Drive, I believe it was 27?

A. Approximately 4:00 A.M.

Q. Now, as a result of calls coming in, did

you have occasion to go to both of those locations on that early morning of the 30th of November 1985?

A. Yes, I did.

Q. When you got to those locations, did you have an opportunity to observe the physical structure of the house, the doors and so forth?

A. Yes.

Q. I'd like to show you, if I could, first of all, I'd like to put in front of you three photographs. Can you just tell us what house or which locations the three photographs I have just given you pertain to?

A. 33 Covel Street.

Q. 33 Covel?

A. Yes.

Q. Do they fairly and accurately depict 33 Covel Street, or those sections of 33 Covel Street in reference to November 30th of 1985?

A. Yes.

Q. I am going to ask you to draw your attention to the first two photographs that I am placing in front of you. In reference to the investigation or observations that you made on

Q. Ma'am, going back to November of 1985, did you have an occasion on the 30th of November of 1985 to talk to a woman who was introduced to you by the name of Mary Prekop?

A. Yes, I did, sir.

Q. And did you in fact take a written statement from her based on what she told you had happened earlier that morning?

A. Yes, I did.

Q. Could you tell the judge and the jury approximately what time it was -- strike that.

After she told you what happened, was it reduced to writing?

A. Yes, it was.

Q. Did she get an opportunity to read what she had told you that you had had reduced to writing?

A. Yes, she did.

Q. Did she sign that document?

A. Yes, she did.

Q. Is that the document that is sitting in front of you?

A. Yes, it is.

Q. Can you tell us, ma'am, approximately

what time it was that this whole process was completed on the morning of November 30, 1985?

A. It was completed approximately about 9:00 in the morning.

Q. Can you tell us, ma'am, what it was that she told you had happened to her earlier that day in her home on November 30, 1985?

A. Yes. She told me that she woke up that morning about 4:00 in the morning, she thought that she heard glass breaking, and she put the light on, she went to the kitchen and she sat down in the living room, everything was quiet, she went back into the bedroom and laid down on the bed, and all of a sudden the dog barked, she ran off to the kitchen, and -- would you like me to read the statement?

Q. If you would, ma'am, if you don't have an independent memory, if you could just tell us what she told you.

A. Okay. "I got as far as the bathroom door and I saw a man standing in the kitchen. I hit him on the head with the stick. He grabbed the stick and pushed me into the bedroom. The dog tried to follow, but the man closed the door. I was still

fighting him and he threw me on the floor. He never said anything. I started calling the dog by name, Scuffy. He hit me on the face a couple of times. I kept screaming after the first time, but after a while I decided I should keep still. I kept kicking with my feet and he punched my left thigh. He pulled my nightgown aside and he sucked on my left breast. He did this for a number of minutes. And then he got on top of me. He pushed my nightgown up and lifted my legs up. He put something into my vagina, but I'm not sure what it was. He kept his pants on. I never saw his penis. I started moaning. I pretended to pass out. He got up and left the room.

"I waited until everything was quiet. When the dog stopped barking, I went into the living room. I saw my pocketbook on the floor, the contents were spilled out. I picked up the change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook, I don't know if he took it or not.

"Then I called the police. I wasn't able to dial at first, because I was so nervous. The second time I tried, I was able to get through.

"I can describe the man who broke into my home as a white male, about 20 to 30 years old, he had dark wavy hair and was clean shaven. He was average height and weight. He was wearing a blue jacket, it looked like nylon, and sneakers which were white. He was wearing dark-colored pair of pants, they were neither jeans nor corduroy material. He was not wearing glasses. I didn't notice any jewelry or scars.

"The only thing he ever said to me was to keep quiet. He said this a few times while he was hitting me.

"I forgot to mention, when he first came into the bedroom, he broke the lamp which was on the dresser. He hit it with his fist and knocked it to the floor. This lamp was on before and it went off when he broke it.

"When the police arrived, I noticed a pair of gloves on the foot of the bed. They aren't mine, I never saw them before."

And she signed the statement.

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

complaint, but only for that purpose, and I will so instruct the jury at the proper time.

MR. HAMMERSCHMITH: Thank you.

(End of side bar conference)

Q. (By Mr. Bloom) Ma'am, I am going to place in front of you four photographs, and I wonder if you could tell us in reference to 11/30/85, do those photographs fairly and accurately depict anyone? Could you answer that yes or no?

A. Yes, they do.

Q. In reference to 11/30/85, can you tell us who they fairly and accurately depict?

A. The victim.

Q. And the first two photographs that I am going to hand you fairly and accurately depict what part of her body?

A. Her face.

Q. The third photograph fairly and accurately depicts what part of her body in reference to 11/30/85?

A. Her left hand.

Q. And the last one or the fourth photograph fairly and accurately depicts what part of her body in reference to 11/30/85?

A. Her thigh.

MR. BLOOM: I will offer these, Your Honor.

(Photographs shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

THE COURT: I will hear from you.

MR. HAMMERSCHMITH: Your Honor, I'm not sure of the relevance of these pictures, and what I would state, I don't think that there is any issue in this case, certainly I don't intend to raise an issue but that this woman was assaulted at her home that night, I

A. Okay. "I saw my pocketbook on the floor, the contents were spilled out. I picked up change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook. I don't know if he took it or not."

Q. And that is the sum total of what is said about the pocketbook in the statement?

A. That's correct.

Q. Now, in that statement, she also gives a description of her assailant, does she not?

A. Yes, she does.

Q. And in describing that assailant, she gives an age of approximately 20 to 30 years old, does she?

A. Yes.

Q. And she also says that the person was wearing a blue jacket that looked like it was nylon?

A. Looked like nylon.

Q. And white sneakers?

A. Yes.

Q. And she described the pants that he was wearing, correct?

A. Dark colored.

was that you had occasion to see her?
A. Collections of blood specimen.
Q. Was there a collection of blood specimen from Miss Prekop in your presence?
A. Yes, sir, there was.
Q. Can you tell us how many vials of blood were taken from her in your presence?
A. Three vials.
Q. Now, after the vials were taken -- can you tell the jury the date that that was done?
A. April 30, 1987.
Q. On the 30th of April, 1987, when the blood was extracted from Miss Prekop, what did you do, if anything, with those vials?
A. I observed them being written on by an E.M.T. that extracted the blood, then I took them to the Springfield Police headquarters, I placed them in an evidence box, sealed the box, signed it and caused it at some point to be sent to the Federal Bureau of Investigation.
Q. Was her name written on the vials itself after the blood was taken and deposited in the vials?
A. Yes.

Q. That was done on the 30th of April, is that correct?
A. Yes, sir.
Q. Now, along with the writing on the vials, sir, the box that it was sealed in, did you cause writing to be put on the top of that, something typewritten or handwritten on the top of the box?
A. No, there is -- there are some letters and numbers on the top. I did not do that.
Q. Okay. Now, is the item that you are holding today, does that contain the three vials of blood that you saw taken from Miss Prekop?
A. Yes, it does.
Q. Who put it in this cellophane bag?
A. I did.
Q. And the writing pertaining to the time, the date and the person that the blood was extracted from, who caused that writing to be placed in there?
A. That's my own.
Q. Now, down below is the letters K13 WGE. Does that pertain to the Springfield Police Department?
A. No, sir.

Q. And you said that you had this blood caused to be sent to Washington to the F.B.I. laboratory?

A. That's correct.

Q. And that would pretty much sum up your involvement in this matter?

A. Yes, sir.

MR. BLOOM: That's all I have of this witness.

MR. HAMMERSCHMITH: I don't have any questions of this witness.

MR. BLOOM: I'd like, Judge, to mark this for identification, if I could, just the box.

THE COURT: B for identification.

(B for Identification, box, marked)

THE COURT: I assume the Captain got them back.

MR. BLOOM: Yes.

May we approach.

THOMAS KENNEDY (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you be kind enough to tell Judge Murphy and the jury your name and your occupation, please?

A. My name is Thomas Kennedy, I am a sergeant for the Springfield Police Department.

Q. Sergeant, how long have you been a member of the Springfield Police Department?

A. For about seven and a half years.

Q. I am going to ask you, sir, to direct your attention to the latter part of March of 1987. Did you have occasion at that time to have an involvement with the defendant in this case, George Perrot?

A. Yes, I did.

Q. Did you observe a procedure in your presence that occurred with Mr. Perrot?

A. Yes, I did.
Q. Can you tell us when that occurred and where it was that it took place?
A. It was on March 31, 1987, and it was in one of the rooms, I believe, off of Courtroom 1 or 2, on the third floor of this building.
Q. Can you tell us -- I'm sorry, did you say in this building on the third floor?
A. Yes.
Q. Can you tell us what was done in your presence on that day?
A. Yes. Two vials of blood were taken from George Perrot.
Q. For instance, tell the jury what you did with the blood after it was taken and put into vials. Did you take it or did someone else take it?
A. I took the blood.
Q. Who took it from his arm, though?
A. The blood was taken by Terry Aberdale.
Q. And he is whom, sir?
THE COURT: Wait a minute.
MR. BLOOM: I will withdraw that, Judge.

Q. (By Mr. Bloom) He is a medical personnel, he works in the medical field?

A. Yes.

Q. You witnessed him take the blood from Mr. Perrot, correct?

A. Yes, I did.

Q. Now, after the blood was turned over to you, what, if anything, did you do with it at that time?

A. I took the blood to the Crime Prevention Bureau of the Springfield Police Department where I tagged it as evidence.

Q. After you had it tagged as evidence, sir, did you have occasion to do anything with it within the next week or so?

A. Yes.

Q. Tell the jury what you did with those two vials of blood that you observed being taken out of the defendant's arm on the 30th, 31st of March 1987?

A. On April 1st of 1987, I picked up the blood at the Crime Prevention Bureau of the Springfield Police Department and I delivered that

blood to the F.B.I. laboratory in Washington D.C.

Q. And you arrived at the F.B.I. laboratory in Washington D.C., along with Mr. Perrot's blood, did you bring anything else on that day for examination purposes?

A. Yes, I did.

Q. Can you tell us what that was?

A. Yes, I brought hair samples from Mary Prekop.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Sergeant, you were present when the blood was taken from Mr. Perrot?

A. Yes, I was.

Q. And would it be fair to say that Mr. Perrot gave his blood freely and voluntarily on that occasion?

MR. BLOOM: I'm going to object.

(End of side bar)

MR. HAMMERSCHMITH: May I have a minute to speak with my client?

THE COURT: Yes.

(Pause in the proceedings)

Q. (By Mr. Hammerschmith) Sergeant, you say you took this blood with you to the F.B.I. lab in Washington?

A. Yes, sir.

Q. What did you do with it there?

A. I submitted it as evidence at the F.B.I.

Q. Who did you give it to?

A. I don't recall the name of the technician that received the blood.

Q. What, if anything, did you see done with the blood when you gave it to this technician?

A. I'm sorry, I didn't hear your question.

Q. What, if anything, did you see done with this blood after you gave it to the technician?

A. I just submitted it to the F.B.I. I

card that says Miranda warnings. Is that the type of card that you read to him?

A. Yes, sir, it is.

Q. Can you tell us, sir, exactly what it was that you told him off of that card, and what time it was approximately when this happened, as best you can remember?

A. Approximately 7:45 A.M. that morning, and I advised him, "Before we ask you any questions, you must understand your rights. You have a right to remain silent. Anything you say can be used against you in court. You have a right to talk to a lawyer for advice before we ask you any questions and to have him present -- and have him with you during questioning."

May I put my glasses on for a second? Excuse me.

"If you cannot afford a lawyer, one will be appointed for you before questioning if you wish. If you decide to answer questions now without a lawyer present, you will have the right to stop questioning at any time until you talk to a lawyer."

I asked him, "Do you understand what I

have read to you? Having these rights in mind, do you wish to talk to me now?"

Q. What was his response?

A. Mr. Perrot's response was, "There is no sense in me talking to you. They got me good for the two incidents that happened last night."

Q. Let me ask you this. Did he indicate he'd be willing to talk to you?

A. Yes, sir, he did.

Q. Did you talk to him about anything pertaining to 11/30/85 at that time?

A. No, sir.

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I thought the officer had been instructed not to get into the other matters or his guilt or innocence on those matters.

THE COURT: Well, actually, he didn't ask him the question. I think

rights to him whether he would be willing to talk to you?

A. Yes, sir, he did.

Q. What you didn't indicate, Detective, before you read the rights, I am assuming you introduced yourself to him?

A. Yes, I did.

Q. Now, you were in the neighborhood, you said, between quarter of eight and 8:00?

A. Yes, sir.

Q. Did you cause him to be brought somewhere in the station?

A. He was brought down to the booking section.

Q. And that is normal procedure?

A. Yes, sir, it is.

Q. What does that include, basically?

A. He has to be booked, fingerprinted and photographed.

Q. Now, while he was going through that process, did you go anywhere?

A. Yes, sir, I did.

Q. Where did you go, sir?

A. Yes, sir, I did.

Q. At what time would that have been approximately?

A. Around 11:30 A.M.

Q. What time was it?

A. About 11:30 A.M.

Q. Where did you see him at that time?

A. At the booking desk again.

Q. Did you have occasion to have him removed from that area?

A. Yes, sir, I did.

Q. Where did you bring him?

A. Up to the Detective Bureau.

Q. Can you tell us, sir, approximately what time this would have been that you got back to the Detective Bureau?

A. About quarter to twelve.

Q. When you brought him up then, sir, what did you do at that time? Let me withdraw that. Did you give him his Miranda warnings again, now that you brought him back up?

A. Yes, sir, I did.

Q. And just for the record, is this the

Miranda card that you used to give him his warnings again when you brought him up now to the Detective Bureau?

A. Yes, sir, it is.

Q. And what time does that indicate that you gave it to him?

A. 12:40 P.M.

Q. So, are you saying that he was brought up now at quarter of twelve or quarter of one?

A. Quarter of one, sir.

Q. And the last time you had seen him before 12:30 or quarter of one was approximately when you had taken him to the booking desk?

A. Yes.

Q. What time was that about?

A. Approximately four hours earlier, four and a half hours earlier.

Q. Now, did you read off of the card at 12:40 P.M. on December 7th of 1985 those warnings?

A. Yes, sir, I did.

MR. HAMMERSCHMITH: I am going to object, Your Honor. May I be heard?

told him not to mention that, and I won't lead him on anything that is significant.

THE COURT: All right?

MR. HAMMERSCHMITH: That's fine.

(End of side bar conference)

Q. (By Mr. Bloom) During that time period now, when you are waiting for the second time at about I think you said 12:40, quarter of one --

A. Yes, sir.

Q. -- did you have any problems understanding him?

A. No, sir, I didn't.

Q. Did he have any problem -- did it appear that he had any problem understanding you?

A. No, sir.

Q. When you were done giving him the rights this time now at 12:40, did you ask him to sign that card?

A. Yes, sir, I did.

Q. And just yes or no, can you tell the

jury did he indicate whether he would be willing to talk to you after you gave him those rights?

A. He was willing to talk to me, yes, sir.

Q. Did he sign that card in your presence?

A. Yes, sir, he did.

Q. Did you witness the signature?

A. Yes, sir, I did.

Q. And that was at 12:40, sir?

A. Yes, sir.

Q. On 12/7/85. Just for the record, this is the card, correct, that I am holding in my left hand?

A. That's correct, sir.

MR. BLOOM: Thank you.

(Card shown to Mr. Hammerschmith)

MR. BLOOM: I am going to offer this, Your Honor.

THE COURT: Any objection?

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: Exhibit No. 4.

(Exhibit 4, Miranda card, marked into evidence)

Q. (By Mr. Bloom) Now you are up in a different department, correct?

A. Yes, sir.

Q. What bureau were you in or what part of the building were you in at that time?

A. Interrogation room, Detective Bureau.

Q. That is a separate room from the main part of the detective room itself?

A. Yes, it is.

Q. Now, was there any sort of lunch involved during that time period?

A. Yes, sir, there was.

Q. Who fed or caused Mr. Perrot to be fed during that time period?

A. I fed Mr. Perrot.

Q. Did you do anything else in reference to him at that time? Was there any access to the phone or anything of that nature?

A. He made several phone calls, he made a

couple trips to the bathroom, he had coffee.

Q. Now, during that time period, did you also have other things that you had to do in the department?

A. Yes, sir, I did.

Q. Now, at some point in that afternoon, sir, on December 7th of 1985, did you sit down with Mr. Perrot to discuss the incidents of 11/30/85?

A. Yes, sir, I did.

Q. Could you tell the jury in reference to the incidents of 11/30/85 concerning Miss Prekop and Mrs. Lichwala, approximately what time it would have been on December 7th of '85 that you began discussing those two incidents with George Perrot. Your best estimate?

A. About 3:00.

Q. Just for the record, sir, is that gentleman that you were talking to about 3:00 in the courtroom?

A. Yes, sir, he is, sitting at the table right here. (Indicating)

MR. BLOOM: May the record indicate he has pointed to the defendant, Your

Honor.

THE COURT: The record may so indicate.

Q. (By Mr. Bloom) During the course -- strike that. Give us your best estimate, Detective Jarvis, as to, if you started around 3:00, as to how long it was that you talked to Mr. Perrot concerning those two incidents?

A. Roughly an hour and a half.

Q. When you were done talking or when the whole process was done, had you caused to have reduced to writing that which he had told you concerning those two incidents?

A. Yes, sir, I did.

Q. After you had it reduced to writing, sir, what, if anything, did you do with the document at that time?

A. The document was shown to Mr. Perrot. Mr. Perrot looked over the document, signed the document, the document had a time put on it, and he also initialed mistakes that I made in the typing on the document.

Q. All this was done, conversation,

reduction to writing, ability to read the statement and sign the statement, within an hour, an hour and a half time period?

A. Yes, sir.

Q. And just for the record, sir, can you tell us, is this the statement that was reduced to writing that details what Mr. Perrot told you on December 7th of 1985 concerning the incident with Mrs. Prekop and Mrs. Lichwala on 11/30/85?

(Witness reads statement)

A. That is the statement, sir.

Q. And the GP's, that's what you are referring to, if there was a spelling error or something, the initialing by the defendant?

A. He would initial it George Perrot, GP, correct.

MR. BLOOM: I offer this document, Your Honor

(Shown to Mr. Hammerschmith)

MR. BLOOM: He knows it is an exact copy, but he wants to --

THE COURT: We went through that last week.

MR. BLOOM: I have a few more questions, it will be quarter of one, I will recall him at two.

THE COURT: Okay.

(End of side bar conference)

Q. (By Mr. Bloom) Detective Jarvis, as you were concluding the procedure with Mr. Perrot, did you have occasion just prior to his signing of the document to give his Miranda warnings to him again the third time?

A. Yes, sir.

Q. Is the card that I have just handed you a card that represents the Miranda warnings that you gave to him near the conclusion of this process that started about 3:00?

A. Yes, sir.

Q. Is that also signed by George Perrot?

THE COURT: Sure.

(End of side bar conference)

THE COURT: That will be Exhibit 5.

(Exhibit No. 5, statement, marked into evidence)

Q. (By Mr. Bloom) Detective Jarvis, I wonder if you'd be kind enough to read Exhibit 5 to the jury, which you previously identified as I believe what was reduced to writing during that hour to hour and half time period concerning the incidents of November 30, 1985, at 27 Malibu and 33 Covel?

A. "My name is George Perrot, and I live at 87 Malibu Drive, and I am 17 years old. On November 30, 1985, I went to Brattelboro, Vermont, with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Street. I started drinking about 8:00 P.M., which was a Friday night. We also drank about a case of Bud. I took a purple mescaline on the way to Vermont. We stayed

there until about 2:15 A.M. Michael dropped me off about 3:15 A.M. at my house.

"I headed for number 33 Covel Street. The reason I went there was I heard it had been broken into before. I had a pair of my sister's gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel Street. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street.

"I left 33 Covel Street and went to 27 Malibu Drive. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door. This occurred about 4:00 A.M. on Saturday, November 30, 1985.

"After this, I went home. I had been drinking since about 7:00 P.M. that day and had also taken two purple mescaline pills.

"Signed George Perrot, December 7, 1985, witnessed by Thomas Jarvis and Captain Ernest

Stelzer."

Q. Just finally, correct me if I'm wrong, there are four indications of the initials GP on that statement, is that correct?

A. That's correct, sir.

Q. Could you just tell us again for the jury what that signifies in reference to Exhibit No. 5?

A. Those are the mistakes I made typing, George Perrot initialed them to show the mistakes were made.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Is it fair to say that you asked Mr. Perrot to initial those?

A. Yes, sir, I did.

Q. Now, on this day, December 7, 1985, you first arrived at the Detective Bureau about 7:30 or

second property slip and it was sent to the F.B.I., but only one pair of gloves taken to the Prekop home, my understanding is.

MR. HAMMERSCHMITH: I was misinformed, then.

THE COURT: Okay.

(End of side bar conference)

Q. (By Mr. Bloom) Sergeant, in reference to the allegation concerning sexual assault at 27 Malibu Drive on 11/30/85, at your direction, were certain things taken by the Springfield Police Department as evidence?

A. Yes, sir.

Q. And can you tell us what those were?

A. A pair of knit gloves, a flowered bedsheet, a pillowcase.

Q. Do you have those with you today?

A. Yes, sir.

Q. Now, why don't we, first of all, explain, if you could, the first item that I am

Q. Let's stay with the first item, the bedsheet. Did I just recite the proper number, the 49 --

A. 49452.

Q. Inside that package, does that contain the bedsheet, the package that is in front of you?

A. Yes, sir.

Q. And the item that it was packaged in, is that also contained in that package?

A. Yes, sir.

Q. Could you show that to the jury what it looks like?

A. It is simply a flat brown paper used --

Q. Can you tell us why that is used, or why you used it?

A. This piece of evidence is wrapped in this and sent to the F.B.I. to preserve whatever is on here.

Q. If anything, correct?

A. So that it does not become lost in the outer wrapper. It is an inner wrapping used to preserve the evidence.

Q. And that was done, yes or no, in

reference to the bedsheet?

A. Yes, sir.

Q. Now, correct me if I'm wrong, were the bedsheet and the pillowcase sent down in one package?

A. No.

Q. Can you tell us, sir, there are numbers also on there, Q3 and Q4. Do you know where those numbers came from?

A. Those are letters and numbers that are assigned by the F.B.I. lab.

Q. Is this the bedsheet you took out of the bedroom?

A. It is, sir.

Q. And who directed you to this bedroom?

A. Miss Prekop.

Q. This item, sir, also marked with the same property number, I believe 49452, a pink pillowcase, did you follow the same procedure with this as you did with the bedsheet?

A. Yes, sir.

Q. Would this be the brown paper bag to catch any droppings that may exist in the piece of evidence?

A. Yes, sir.

Q. The number on this, there is a number of Q1 or Q2, and some initials. Are those from the Springfield Police Department?

A. No, sir.

Q. In reference to these two items, the flowered bedsheet and the pillowcase, after you packaged them, sir, what did you do with them?

A. Sent them to the F.B.I. lab in Washington.

MR. BLOOM: I am going to offer these, Your Honor.

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: The bedsheet will be Exhibit No. 8 and its packaging. The pillowcase and packaging will be number 9.

A. No.
Q. Do you know the number that was assigned to the head hair?
A. Yes, sir.
Q. Can you just for the record tell us what that was?
A. 51465.
Q. Was that sent to the F.B.I. at some point, if you know?
A. Yes, sir.
Q. And do you know the date that it was sent down?
A. It was sent down the 8th or 9th, I'm not sure.
Q. Of December?
A. Yes.
Q. 1985?
A. '85.
Q. You indicated before that there was a pair of knit gloves. Can you tell the Court and jury where did you find the pair of knit gloves in relationship to the bedroom that you took Exhibits 8 and 9 from?

A. They were in the bedroom -- in the same bedroom on the floor.
Q. Why did you take those gloves, sir, at that time?
MR. HAMMERSCHMITH: Objection.
THE COURT: Sustained.
Q. (By Mr. Bloom) Did you in fact make inquiry as to whether they belonged to Miss Prekop, those gloves?
MR. HAMMERSCHMITH: Objection.
THE COURT: I will allow him to answer yes or no.
THE WITNESS: Yes, I did.
Q. (By Mr. Bloom) As a result of what she told you, did you take the gloves, just yes or no?
MR. HAMMERSCHMITH: Objection.
THE COURT: Sustained.
Q. (By Mr. Bloom) Did you take the gloves?
A. Yes.
Q. What did you do with the gloves?
A. I sent them to the F.B.I. lab.
Q. Did you package them in the same method you described in reference to Exhibit No. 8 and 9?

Q. (By Mr. Bloom) These items that I am pouring out, sir, were they all inside of the pocketbook when you found it on the 10th of December of 1985?

A. Yes, sir.

Q. Did you go through some of them at that point?

A. Yes, sir.

Q. For instance, was this Emily P. Lichwala, 33 Covel Street, library card inside there?

A. Yes, sir.

Q. And inside there also was this registration for a motor vehicle registered to Emily P. Lichwala, 33 Covel Street, Springfield, Massachusetts?

A. Yes, sir.

Q. Those items came out of a wallet, correct?

A. Yes, sir.

Q. Was this card also in there which certifies that Emily Lichwala is a member of the Golden Age Club, Springfield Golden Age Club?

A. Yes, sir.

Q. Was also her license inside there, as best you can remember?

A. Yes, sir.

Q. A variety of other personal papers with the name Emily Lichwala on it?

A. Yes, sir.

THE COURT: That will be Exhibit No. 13.

(Exhibit No. 13, pocketbook and contents, marked into evidence)

Q. (By Mr. Bloom) Did you have occasion or did you direct someone, I should say, Sergeant Kelly, to take a photograph of this general area here where you indicated you picked up Exhibit 13 on December 10th of 1985?

A. I left it where I found it and asked for a photographer to respond.

Q. Does this picture fairly and accurately depict that area which you have marked on the board with an X circled in reference to December 10th of

A. Back to front, yes, sir.

Q. And she looked at each of the seven individuals in that lineup in the same way, did she?

A. Yes, sir.

Q. And would she have looked at Mr. Perrot first among those seven?

A. Yes, sir.

Q. In looking at that lineup, she did not identify Mr. Perrot as being the person who broke into her home, did she?

A. No.

MR. HAMMERSCHMITH: I'd ask that this be introduced into evidence at this point.

MR. BLOOM: No objection.

THE COURT: It will be Exhibit No. 15.

(Exhibit No. 15, photograph, marked into evidence)

Q. (By Mr. Hammerschmith) By the way, did Mr. Perrot have a lawyer present during that lineup?