COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420,25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury on January 7, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231

A. To be fair to the suspects.

Q. And without getting into the details this was done at 4:30 in the afternoon on December 7?

A. Yes.

Q. And at that point did you have information given to you by George Perrot?

A. Yes.

Q. And you, on the basis of that information you caused this lineup to be assembled?

A. Yes.

Q. What did Mary Prekop say when she viewed the individuals?

A. I asked her to look at all of the individuals and to tell me if she recognized anybody in the group.

At the commission of all seven individuals coming to the window taking the turns as instructed and returning to the line then she told me she was unable to recognize anybody.

Q. Now, from that window how far away is the whole group standing?

A. Probably from here to the prisoner dock.

Q. Now, as each person comes up and you can still see the other six?

A. Yes, sir.

the Springfield Police Department.

Q. How long have you worked as a police officer?

A. For about 11 and a half years.

Q. Were you working as a police officer in November of 1985?

A. Yes, I was.

Q. And what were you doing during that time period?

A. At that time I was assigned to the four p.m. to 12 a.m. shift in the detective bureau.

Q. Now, did you have occasion to become involved with the case of George Perrot, just yes or no at this point.

A. Yes.

Q. And I would like to address you to a procedure, a medical procedure that you observed; do you recall that?

A. Yes, I do.

Q. Where did that take place?

A. On the third floor of this building.

Q. And could you tell us roughly when that was?

A. That was on March 31, of 1987.

Q. And can you tell us what you observed?

A. I observed a medical technician withdraw two vials of blood from the arm of George Perrot.

Q. And what was done with those two vials of blood?

A. After the blood was withdrawn in the vials I took custody of the vials. I brought them to the crime prevention bureau, the Springfield Police Department, where I tagged them as evidence.

Q. And at some point in time did you have occasion to take those vials of blood to a different location?

A. Yes, I did.

Q. When and where was that done?

A. On April 1, of 1987, I went to the crime prevention bureau, signed the blood out and then I transported it to the FBI laboratory in Washington DC.

Q. Did you go with anybody when you went to Washington?

A. Yes, I did.

Q. Who was that?

A. Former Assistant District Attorney Francis Bloom.

Q. Did he have any role of possessing that evidence at anytime?

A. No. I was in possession of the evidence.

Q. What did you do with it when you got to Washington?

A. I went to the FBI laboratory where I turned it in as evidence.

Q. Do you know whether you signed anything or whether

Mr. Bloom signed anything in your presence when you arrived there?

A. I don't recall.

Q. Did you take anything else with you other than the blood?

A. Yes.

Q. And what was that?

A. That was hair samples.

Q. Identified as belonging to whom?

A. Mary Prekop.

MR. VOTTERO: Thank you. That's all that I have.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. With respect to these vials of blood, after you took those vials of blood you had taken them to the Springfield Police Department?

A. That's correct.

Q. And where in the Springfield Police Department did you take them?

A. To the crime prevention bureau.

Q. And were they kept there, to your knowledge?

A. Yes, they were.

Q. And did you have to sign some document indicating you were submitting them to someone in the crime prevention bureau?

A. That's correct.

Q. And who was responsible for custody of that particular piece of evidence in the crime prevention bureau?

A. Don't recall who signed it, which officer on that particular date.

Q. You have to sign some document indicating you were submitting it though?

A. Yes. I had to fill out what I called a property tag.

Q. Was there any other log or book which you had to sign?

A. Yes. I believe there was.

Q. So it was both a property tag and another log?

A. The officer that was receiving it would enter it into a log on the date. The next day, the following day, I took the blood to the FBI. I had to sign a log at that time for taking the evidence back out.

Q. And the purpose for doing that to evidence is to record everyone who handled that particular item?

A. Chain of custody, correct.

Q. And when you took this blood to the FBI laboratory in Washington did they have the same requirement that you sign a document to evidence that you were submitting that piece of evidence?

A. I don't recall if I signed a document in Washington or not.

Q. Do you remember who you gave the blood to in Washington?

A. No. I don't recall the name of the technician at the time.

MR. FERRARA: No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. The drawing of the blood and taking it to Washington that all took place over a one to three day period?

A. Yes, it did. The blood was drawn on March 31, 1987, and it was transferred to Washington on April 1, 1987.

MR. VOTTERO: Thank you.

(The witness steps down.)

blackboard available.

THE COURT: I think we have one.

All right. We will take a recess.

(The Court recessed at 11:26 a.m.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 11:33 a.m.)

* * * * *

WILLIAM C. EUBANKS(sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name please and who's your employer?

A. William G. Eubanks, supervisory special agent, Federal Bureau of Investigation.

Q. How long have you worked for the Federal Bureau of Investigation?

A. Approximately 18 years.

Q. What positions have you held with the FBI?

A. I was initially a laboratory technician in the FBI

Q. Can you tell us, roughly, when you received some of the items in that case?

A. I first received items from the Springfield Police Department in January, 1986.

Q. Do you recall what the items were?

A. Yes, I do.

Q. And what were they?

A. A pillow case, a piece of paper, a sheet, another piece of paper and a pair of gloves.

Q. Now, we could begin with what's been marked Exhibit A for identification; do you recognize these objects, sir? (Indicating)

A. Yes, I do.

Q. What are they?

A. It's a pair of gloves.

Q. And how are you able to recognize them?

A. I recognize it from my initial on the item on the evidence tag and other markings on the item which were mine.

Q. Now, what did you do with those gloves.

A. I examined the gloves for the presence of blood.

Q. Could you describe the results of your examination? First you indicated you always begin a visual examination?

A. Yes, I can.

Q. And what is it?

A. It's a bedsheet.

Q. Is this the bedsheet you received from the Springfield Police Department in connection with this case?

A. Yes.

Q. Did you conduct some examination on the bedsheet?

A. Yes, I did.

MR. VOTTERO: May this be marked as an exhibit at this time, Your Honor?

THE COURT: Yes.

MR. FERRARA: No objection.

THE CLERK: Number 17, Your Honor.

(Commonwealth's Exhibit No. 17 was offered and marked.)

Q. (By Mr. Vottero) Now, -- can I have a hand? Now, there's a number of holes in this item as well, sir. How did those holes get on this item? (Indicating)

A. Those were cuts I took from the item.

Q. And let me turn it around, if I can. What are the markings on the hole?

A. The markings, two of them are marked 1B and the

other one is marked 2B and then there are some other holes that are marked 1S, 2S and so forth.

Q. Now, -- thank you very much.

What did you do with the things that you clipped out of this bedsheet?

A. I subjected them to the various analyses, chemical analysis, that I previously testified to for the presence of body fluid stains.

Q. Were you able to detect, first of all, by quick visual examination whether there were any stains on that sheet?

A. Yes, I was.

Q. What was the result of that, how many stains did you recall seeing?

A. There were two stains that were of a brownish color which appeared to be blood. There were some other lighter stains that were either by touch and feel or by sight yellowish or slightly off color stains.

Q. Now, did you examine the stains on this sheet for the presence of semen?

A. Yes, I did.

Q. What was the results of that examination?

A. It was negative. I did not find any semen.

A. Sometimes it's as many as a hundred or perhaps even less, upwards to several thousand or more.

MR. FERRARA: Okay. No further questions, Your Honor.

MR. VOTTERO: Thank you very much.

THE COURT: Very well. We will stand in recess until two o'clock.

(The luncheon recess was held.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 2:09 a.m.)

* * * * *

WAYNE W. OAKES (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name, please and how you're employed?

A. Yes. My name is Wayne W. Oakes. Last name is spelled O-A-K-E-S. And I am a supervisory special agent at

fingerprint. It is basis of strong association.

Q. Can you say whether you find a hair consistent with somebody somewhere out there in the world there is somebody with that same -- with a hair that is microscopically the same?

A. You would have to identify that individual and you would have to obtain a known hair sample from him or her. Allow me to compare it with that question hair.

In other words, if I match a hair from here from the stand here, with my known hair standard I can say it's consistent with being my hair. If you're asking me could it match someone else I can't eliminate that possibility. I would have to have that person's hairs and I would have to make a comparison and those person's hairs would also have to match.

Q. In every respect?

A. In every respect.

Q. Now, did you receive some evidence from the Springfield Police Department as concerns the case on trial regarding George Perrot?

A. Yes, I did.

Q. I'd like to show you first what's been marked as Exhibit No. 17 and as well what's been marked as Exhibit G for

identification and ask if you recognize either or both of those objects. (Indicating)

A. Yes. Both of these items have my initials WWO as well as designation Q2 referring to the brown paper and Q3 referring to the sheet. And that just means question item number two and question item number three that I examined.

Q. And are these the items you examined in connection with this case?

A. Yes.

MR. VOTTERO: May formally Exhibit G for identification simply be marked as an exhibit at this time?

MR. FERRARA: No objection, Your Honor.

THE CLERK: Number 18, Your Honor?

THE COURT: Yes.

(Commonwealth's Exhibit No. 18 was offered and marked.)

Q. (By Mr. Vottero) Now, what did you do with this in this case?

A. In this particular case the sheet was examined with using the procedure that I previously testified to. The debris that came off of that sheet, as well as a brown piece

of paper that was received with the sheet was collected with -- placed in a pill box. Hairs were later taken out of the pill box, mounted on a glass microscope slide, and examined by myself.

Q. Did you find any hairs as a result of that procedure that were suitable for comparison?

A. Yes, I did.

Q. How many hairs did you find suitable for comparison?

A. One.

Q. You have any ideas how many you obtained all together?

A. Of the hairs I examined there were several, as I recall, animal hairs. One white hair which was devoid of many characteristics. Perhaps some body hair and one Caucasian head hair that was brown in color. I determined, in my opinion, the only hair that was suitable for significant comparison purposes with known samples or known standards was the one brown head hair.

Q. Now, did you also perceive known samples of the hair of George Perrot and the hair of an individual named Mary Prekop?

A. Yes, I did.

A. Told him about my knowledge that he assaulted some elderly ladies in the area, specifically 27 Malibu and 33 Covel and his response, "I don't know anything about any old ladies."

Q. What did you do then, sir?

A. I told him -- I continued the conversation and any point I mentioned the elder ladies his response was, "I don't know anything about any old ladies."

Q. Was this during that 20 minute time period that you already described?

A. Yes.

Q. Was this at the end of it or throughout it?

A. At the end.

Q. At the end. Now, you said you then left to begin working on a search warrant. Where did you go to do that?

A. To the main office of the detective bureau.

Q. And when you left who remained with Mr. Perrot, if anybody?

A. Nobody.

Q. Can you just walk out of the room or is it locked somehow?

A. You can walk out of it if it's unlocked from the outside. If it's locked from the outside you need a key or

someone from the outside to unlock.

Q. Do you know what condition you left the room when you walked out?

A. It was unlocked.

Q. Do you have any idea what was taking place with George Perrot while you were working on the search warrant?

A. No.

Q. How long did you spend working on the warrant?

A. About an hour and a half to prepare the affidavit.

Q. And eventually did you execute a search warrant?

A. Yes.

Q. How long did the whole process take of preparing it, obtaining it and then leaving the station to execute it?

A. Probably two a half hours or more.

Q. You then went to 87 Malibu Drive?

A. Yes.

Q. You have any memories of roughly what time it was you arrived there?

A. It was 8:30, probably a little later.

Q. Now, at that time, sir, while you were in the process of doing that did you take with you to 87 Malibu any of the physical evidence from November 30, of 1985?

A. Yes.

Q. What did you take with you?

A. Pair of knit gloves.

Q. I would like to show you what's marked Exhibit 15? (Indicating)

Are these the glove that you took?

A. Yes.

Q. And when you got to 87 Malibu, sir, just know what did you do with respect to these gloves? (Indicating)

A. I showed them to Miss Westcott who identified herself to me as George Perrot's sister with whom he lived.

Q. And when you showed these to her where were you in the house?

A. Standing outside the door of George Perrot's room.

Q. And did you ask her a question about these?

A. Yes.

Q. And what was the question you asked?

A. I asked her if they were hers.

Q. What was her response?

A. She said she had a pair just like that. I asked her if she could where were they. She indicated she just cleaned out a hallway closet and saw them in there about two weeks ago.

Q. Did you ask her to get the ones that she had?

A. (Witness indicating)
Q. And what did she do?
A. She went to the closet, searched on a shelf and told me they weren't there.
Q. Now, how long did you spend at 87 Malibu between taking the gloves there and executing the search warrant; do you have an idea?
A. Was in the house about an hour.
Q. And when you left the house do you recall where you went?
A. Back to the police station.
Q. And what did you do at the police station?
A. Had further conversation, inventory some evidence, talked with officers, arranged for the booking. I believe the booking had already started with Mr. Perrot and I remember asking that that stand up photo be taken.
Q. Now, sir, at this point when you say "the booking" is it correct he was being booked for the events of December 7, of 1985?
A. Yes, sir.
Q. And could you tell this jury, please, what "booking" is?
A. It's a process where information is taken. Once an

A. I left the station and attended a religious ceremony for one of my sons.

Q. This was what day of the week?

A. Saturday.

Q. Now, do you have a memory as to what time you would have left the station roughly?

A. About 10:30, 11, I believe.

Q. And other than the 20 minutes or half an hour you spent in the interview room with Mr. Perrot did you spend anymore time with him discussing anything with him before you left to go to the religous meeting?

A. No, sir.

Q. Now, when that service was over did you go home or return to the station?

A. I went back to the station.

Q. Do you have a memory as to roughly what time you went back to that station?

A. Two thirty, three p.m. possibly.

Q. Now, when you got back there what did you do?

A. Made preparations for a line-up.

Q. Is this the line-up you were testifying about previously?

A. Yes.

Q. When you returned from the service did you spend some time, just yes or no, discussing with other officers what had taken place in your absence and at some point you began preparing this line-up?

A. Yes, sir.

Q. How did you go about preparing the line-up?

A. Attempted to find individuals of the same physical build, general characteristics of the suspect, Mr. Perrot, is. I would look at who was on duty at time, both those coming on duty and going off duty who would have had the same general characteristics as Mr. Perrot. I came up with seven individuals, six other individuals besides the suspect fitting that general description.

Q. When you returned and began preparing the line-up do you know where George Perrot was at that time?

A. In a cell block.

Q. Who is Tom Jarvis?

A. He was a detective assigned to the house breaks squad and detective bureau. Is he still with the police force?

A. No, sir. Do you recall seeing him on December 7, of 1985?

A. Yes.

brought back into that interview?

A. No.

Q. Did you go into that room?

A. No.

Q. Did you have any more contact with George Perrot that afternoon?

A. Yes.

Q. When did that take place?

A. When I conducted the line-up I got him out of his cell. Told him that a line-up is going to occur and I told him generally I was going to have each one come up to the window and making your turns and give him an opportunity to stand somewhere in the line. I let him chose his place in the line-up.

Q. In particular he is the one on the far left; is that the position he chose?

A. Yes, sir.

Q. You say you went down to the lockup. Where is the lockup located?

A. It's in the same booking area. It's a holding area behind the booking desk that contained individual seats.

Q. On the floor?

A. Yes.