COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420-25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury on January 8, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231





1/7/93

reading the right to use the phone to. It says person colon, and that's where he signed it.

Q. Thank you.

And at that time you also began to question him about the incidents which are on trial here, meaning the break into the Lichwala residence and the break of Mary Prekop; isn't that correct?

A. Yes.

Q. And at that time he told you, "I don't know anything about those incidents," correct?

A. He used the term, "I don't know anything about any old ladies."

Q. But you understood that to mean what you just asked, "I don't know anything about those incidents," correct?

A. Yes.

Q. Do you recall -- did you actually ask him anything about the McNabb break or was your -- were you asking him only about the Sapelli purse snatching?

A. I asked him about both incidents.

Q. You questioned him for a period of, I believe, twenty minutes you testified to?

A. Yes.

Q. And then you left and asked two officers to prepare

Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Referring to that same hearing on September 2nd, 1986.

A. Yes, sir.

Q. Beginning at page 131, sir, you were asked a question, and during that time period that we're dealing with, 5:15 to seven, 7:30. Was he ever taken down and put in a cell? And to that you answered, "No, sir;" is that correct?

A. That's correct.

Q. And you were asked, "Was there a reason for that?" And your answer was "He was very adamant that he didn't want to be placed in a cell. He said that they were -- based on what he told me I had the feeling that he was very uncomfortable in that closed cell. He would alternate between telling us he didn't want to go to the cell and telling us that he wanted to see his girlfriend." And that's the way you testified on September 2, 1986?

A. Yes.

Q. When you began that answer you said that he was "very adamant that he didn't went to be placed in that cell. He said that they were" and you never completed answering what he said. Do you remember now what he told you?

A. That they were cold. That they were cold.
Q. That "they" the cells were cold?
A. Yes.
Q. And he wanted to call his girlfriend?
A. He wanted to see her.
Q. Sir, isn't what Mr. Perrot told you that they were rattling on his cell bars and banging on the floor outside of his cell?
A. No.
Q. Sergeant, Mr. Perrot indicated to you that he was willing to speak to you regarding the pocketbook snatch that morning; is that correct?
A. Yes.
Q. And did you take a statement from him at that time?
A. No.
Q. And this was at five a.m., correct?
A. Correct.
Q. And did Sergeant Canevari take a statement from him at that time about the pocketbook snatch?
A. No.
Q. What you did was asked Officers Germain and Trites to prepare the search warrant affidavit and then you went and obtained some gloves that are in evidence; isn't that correct?

A. Yes.

Q. And when -- the gloves I am referring to specifically are Exhibit No. 15; is that correct?

A. Yes, sir.

Q. And these gloves were in the property room at the -- were they in the detective bureau or the crime prevention bureau?

A. Crime prevention.

Q. Okay. And you testified earlier those were found at the home of Mary Prekop; is that correct?

A. Yes, sir.

MR. FERRARA: Excuse me, Your Honor.

THE COURT: Yes.

Q. (By Mr. Ferrara) I believe your testimony on direct was that one glove was found on the bed and one glove was found on the floor; is that correct?

A. I believe that's how I found them, yes.

Q. Are you not certain, sir?

Are you not certain as to where you found them?

A. I believe that I found them on the floor and on the foot of the bed.

Q. Is it possible that both gloves were on the floor, sir?

A. It's possible, but I don't think so.

Q. You recall testifying at a hearing on this matter --

MR. FERRARA: May I approach the witness, again?

THE COURT: (Indicating)

Q. (By Mr. Ferrara) You recall testifying in a hearing on this matter on December 19, 1987?

A. Yes.

Q. And you were asked a question?

MR. VOTTERO: Could I have the page, please?

MR. FERRARA: I'm sorry, sir. Page is 197.

Q. (By Mr. Ferrara) You were asked a question at that time with reference to those gloves. "Are those the two gloves that you sent down?" And you answered, "Yes, sir," correct?

A. Yes.

Q. And you were then asked, excuse me. And you were then asked by Assistant District Attorney Bloom, "And those were found where, again, in the bedroom of Mary Prekop?" And you answered, "In the bedroom, on the floor, near the bed." Sir having read that does that refresh your recollection that those gloves were found on the floor?

A. No.

Q. But you would agree that's how you testified on December 9, 1987?

A. Yes.

Q. And your recollection was one was on the bed and one was on the floor or you're uncertain?

A. My memory is one was on the bed and one was on the floor.

Q. In any event, sir, you got these gloves from the crime prevention bureau and they had been tagged into evidence on November 30; is that correct?

A. Yes.

Q. And you testified earlier during this trial that property was identified even by a property tag. Well, it was identified by property tag first of all; is that correct?

A. Right.

Q. And when someone signed out property, sir, they have to sign the property tag to indicate that they had taken it?

A. Yes.

Q. And did you do that on December 7, 1987?

A. I don't know.

Q. You would have signed either the property tag or an

evidence log book; is that correct?

A. Yes, one or the other.

Q. So that when you took those gloves you would -- there would be some signature you had taken those gloves on that day, correct?

A. Yes.

Q. And would it also indicate the time that you took the gloves?

A. No, I don't believe so.

Q. In any event?

A. Well, I'm sorry. Let me back up. Depending on what procedure was in place at that time. I believe the log had a time, but I don't believe there is a time or notation or spot for a time or the tag. So, I can't tell you whether a time was noted.

Q. And you took those gloves -- when you took those gloves were they wrapped at that time or were they simply tagged?

A. Tagged.

Q. And that was -- and at about eight a.m. -- well, let me ask you, at what time did you leave the police department with those gloves?

A. Between eight and 8:30.

Q. And you then went to 87 Malibu Drive; is that correct?

A. Yes.

Q. And you knew that was where George Perrot lived, correct?

A. Yes.

Q. And when you went to 87 Malibu Drive your purposes were twofold; isn't that correct?

Well, let me be more specific. First of all you wanted to conduct a search of the premises pursuant to a search warrant, correct?

A. Yes.

Q. And you also wanted to ask Nancy Westcott, George Perrot's sister about those gloves?

A. Yes.

Q. And when you went there Nancy Westcott's husband answered the door; is that correct?

A. I believe so.

Q. And Nancy Westcott was in the shower, correct -- strike that.

I realize you wouldn't have no way of knowing that she was in the shower.

Nancy Westcott came out of the bathroom and she was

wearing a robe; is that correct?

A. I know that I spoke to her. I don't know what she was wearing.

Q. Do you remember speaking with Mr. Westcott first?

A. Yes.

Q. And do you remember asking Mr. Westcott if you could go down in the basement?

A. I don't recall that.

Q. You recall that the officers wanted to search the basement and they wanted Mr. Westcott to turn the light on in the basement?

A. I don't recall.

Q. And, in any event, you did speak to speak to Nancy Westcott about the gloves, correct?

A. Yes.

Q. And you showed her those gloves; is that correct?

A. Yes.

Q. And I believe you testified yesterday that she said to you, "These are my gloves," and then she looked in the closet for -- strike that.

I believe what you said was, she said, "I have a pair of gloves just like that." And then she looked in the closet for the gloves which she said were just like this; isn't that

correct?

A. I asked her if she recognized those gloves. She said, "I have a pair just like that," and then she told me she had cleaned out a hall closet and when she cleaned out the closet they were in that closet.

Q. Sir, isn't what Nancy Westcott told you that those gloves looked familiar to her?

A. My memory is that she said she had a pair just like that.

Q. You completed the search and brought these gloves back to the police department at 10 a.m.; is that correct?

A. We spent about an hour in the house, yes, sir.

Q. Okay. Would it have been roughly 10 a.m.?

A. Roughly.

Q. And did you then return the gloves to the Crime Prevention Bureau property room?

A. I'm not sure where they were returned.

Q. What do you recall happened with the gloves?

A. I don't know.

Q. Do you recall speaking to an Officer Thomas Jarvis when you returned to the police department?

A. Yes.

Q. That was at approximately 10 a.m.?

Q. Mr. Kelly, Lieutenant Kelly, didn't Nancy Westcott indicate to you after she had indicated that these gloves looked familiar, that they looked similar to gloves that belonged to George Perrot's girlfriend?

A. I don't recall that.

Q. After you returned to the police station, sir, didn't you ask Officer Jarvis to bring those gloves to Lisa Eldridge's house?

A. I don't recall doing that, sir.

Q. You were the officer in charge of this investigation weren't, you, sir?

I believe your testimony was that this was your case, correct? I think those were your words, correct?

A. I don't believe I said that.

Q. In any event you were directing the investigation of this case; isn't that correct?

A. Yes.

Q. Would it be fair to say that you reviewed every report written about this case?

A. No.

Q. When someone writes a report as they were written in this case and sent to CPB was that something you would read?

A. I spoke to a few detectives and I went into our interrogation room and I spoke to George Perrot.

Q. Now, do you recall what time it would have been when you first saw Mr. Perrot then?

A. I am going to guess somewhere between 7:30 and quarter to eight, in that area.

Q. Now, you only spent a few minutes before going?

A. Correct.

Q. Was there anybody in the room with Mr. Perrot when you arrived?

A. No, sir.

Q. And could you describe this room?

A. It's a one door with a window and it is approximately 12 foot long by maybe eight foot wide.

Q. And is it a room you use for taking statements from victims and suspects and witnesses?

A. Correct.

Q. Now, what could you -- can you recall today about George Perrot's demeanor, his appearance, when you first went into that room?

Let me ask you a couple of questions before we get to that. I will withdraw the question.

What was the first thing you did when you entered the

witnessed it.

Q. Now, I would like to show you what's been marked as Exhibit 20. (Indicating)

My question, sir, is just is this the same kind of card that you used to advise him of his rights? (Indicating)

A. Yes, it is, sir.

Q. And there is eight questions on the card?

A. That's correct.

Q. Did you go through all eight?

A. Yes, sir. I did.

Q. And did you say anything to him after each question?

A. "Do you understand every question I asked you?"

Q. You do that after each question or just at the end?

A. After each question.

Q. What was George Perrot's response in the interview room when you had gone back in?

A. He understood all these questions.

Q. Did he ever indicate to you any difficulty understanding any of these rights that you were advising him of?

A. No, sir.

Q. Did he tell you whether or not he was willing to

talk to you at that point?

A. Yes, he did. He said he'd talked to me.

Q. Now, roughly, what time was this?

A. Well, the Miranda warning was given about 12:40 that afternoon.

Q. And at that point, sir, what was the topic of the conversation between yourself and George Perrot?

A. A crime that was committed the night before.

Q. How long would you say it took you to eventually -- did you take a written statement?

A. Yes, sir. I did.

Q. Okay. My question now is, from the time you began to the time you completed the written statement do you now have an idea how long you spent with George Perrot?

A. I would probably say 45 minutes to an hour for that one statement.

Q. And do you just type as he talks or do you talk it over first? What is the process you follow?

A. I usually take a statement in writing then I reduce it to the typing.

Q. Now, I'd like to show you this and ask if you can identify that. (Indicating)

A. Yes. This is the statement I took from George

Perrot on December 7, 1985, at 12:40 p.m.

Q. And whose signatures appear on this statement?

A. George Perrot and Thomas Jarvis.

Q. When you had completed typing that and incidentally there appears to be two different types of typing, can you explain?

A. I was going from a manual that wasn't working properly to an electric typewriter.

Q. Did you see George Perrot sign that?

A. Yes, I did.

Q. Before you signed it did you read it to him or did he read it in your presence?

A. I would say both that he read it and I double checked to make sure people can read and I read it back to him.

MR. VOTTERO: Now, may this be marked for identification, Your Honor?

THE COURT: Yes.

THE CLERK: It would be H, I believe, Your Honor. H, if I remember the alphabet correctly.

THE COURT: You're right.

(Commonwealth's Exhibit Let. H was marked for identification.)

his use of alcohol or drugs on either December 6, or December 7?

A. I would have to refresh my memory with the statement, sir.

Q. Thank you. Could you take a minute then and review that and when you're done just let me know whether or not it refreshes your memory.

A. (Witness complying.) Okay. It refreshes my memory.

Q. What information did he tell you in terms of his consumption of either alcohol or drugs during that time period?

A. Well, it's beers according to the statement, that was purchased; there was some cocaine and marijuana.

Q. Did he indicates whether he was alone or with other people?

A. He indicated he was with a couple of people.

Q. Did you ever, at any time, notice the effects of either alcohol or drugs on George Perrot when you spoke to him in the early afternoon?

A. No, sir, none

Q. After that statement was taken and maybe I need to go back just a little bit. Did you have him sign some

additional papers during this time relating to blood and hair?
A. Yes, sir. I did.
Q. And what were those? What was that paper?
A. He was Mirandized and asked if he would give some blood and hair samples and he was read his rights and a statement and he signed it stating that he would give blood and hair.
Q. Do you recognize that? (Indicating)
A. Yes, I do.
Q. And what is that?
A. This is a search warrant waiver.
Q. Relating to the blood and hair samples?
A. That's correct.
Q. Was it signed in your presence?
A. Yes, it was.
Q. And just for the record, notations at the bottom, were those placed there before or after he signed this?
A. Yeah, this is afterward.
Q. All right. Thank you very much.
MR. VOTTERO: May this be marked for identification, Your Honor?
THE CLERK: I for identification, Your Honor.

Q. (By Mr. Vottero) In any event, did you take either the hair or the blood at that point, sir?

A. No, sir. I didn't.

Q. Now, what time would you say you completed the process of the statement relating to the purse snatching and break-in roughly?

A. Twelve forty, 1:40, 1:40 quarter to two, in that area.

Q. And at that, the completion of that could you give us an idea of what Mr. Perrot's demeanor was at that point?

A. I fed him lunch. I let him make six or seven phone calls.

Q. Were these phone calls made in your presence?

A. Yes, sir.

Q. From where?

A. Couple of times I brought him down to the arson squad which is the next division over from the detective bureau squad. He called his girlfriend a couple of times. He called a friend of his a couple of times, excuse me, once if I remember, he called a sister.

Q. And where did you go to get the lunch?

A. Burger King.

Q. Did you go up to the Burger King?
A. No. I sent out for it.
Q. And were you with George Perrot when he had lunch?
A. Yes.
Q. Did you have anything to eat?
A. Yes.
Q. And where did the lunch take place?
A. Probably at my desk which is next to the interrogation room.
Q. Where did these phone calls and lunch, would that have taken place?
Well, is it before, during or after this first statement?
A. I would say after the statement was given.
Q. Did Mr. Perrot use the bathroom at anytime?
A. Yes. I brought him down to the bathroom, the men's room.
Q. Now, did you ever take him back down to the cell on the first floor during this time period?
A. No, sir.
Q. Did he make any request relating to where he should be kept?
A. No, sir.
Q. Now, at some point, sir, did you begin to ask Mr.

Perrot about the incident of November 30, 1985?

A. Yes, sir. I did.

Q. Do you recall when the first time was that you questioned him about that?

A. I would guess at some time around three, 3:10 that afternoon.

Q. And prior to that time have you mentioned it at all during the interview concerning December 7?

A. No, sir.

Q. Now, at that point, sir, when you finished the lunch and the phone calls how did you begin the interview process concerning November 30?

A. I just started speaking to George about certain incidents that happened in that particular area.

Q. And at that time did you go back through the question of his Miranda rights?

A. At that time, no, sir.

Q. Now, can you tell me -- I'm sorry.

MR. VOTTERO: May I have a moment, Your Honor?

THE COURT: Yes.

Q. (By Mr. Vottero) What was his response when you first began questioning him about this incident?

A. I noticed a change in his personality a little bit,

Q. Now, I want to ask you some questions about Mr. Perrot's demeanor during this process; did it change from the earlier statement?

A. Yes, it did.

Q. Can you describe any of the changes?

A. George started getting very upset at himself. At one point he asked me if he could take my gun. He wanted to blow his brains out.

Q. Did he use that term?

A. Yes.

Q. How often did he make that request?

A. He just mentioned that once.

Q. What was his demeanor? You said -- was his voice raised?

A. He his voice was raised, getting very nervous kind of upset, hysterical, kind of like he hated himself. That's the --

MR. FERRARA: (Interposing) Objection. Move to strike.

THE COURT: Yes. Sustained.

THE WITNESS: Okay.

Q. (By Mr. Vottero) You can just describe what he was doing.

Q. Did you confront him directly with whether or not he had physically touched either of these women in some from?

A. Yes, sir.

Q. Did you ask him that?

A. Yes, I did.

Q. What was his response?

A. He said, "I never touched nobody."

Q. Did you see George Perrot sign this paper?

A. Yes, sir, I did.

Q. And prior to signing it who read it?

A. I read it and I read it to him and I made sure that he read it.

Q. And on the statement there's the initial GP in ink in a number of places. How did those get there?

A. I made mistakes typing. I am not the greatest typer in the world. I made mistakes typing that's why I read it to him. I said, "George, there are some mistakes that were made here. Please initial them just so that you are aware of the mistakes were made."

Q. Did he do that?

A. Yes, sir. He did.

MR. VOTTERO: I would like this offered as an exhibit, Your Honor.

every time a piece of evidence is taken from the locker room that you have to sign for it?

A. That's correct.

Q. So when you say it's "a good possibility" what do you mean?

A. Well, it would depend on the crime, sir. There's a lot of different ways of getting evidence. If the evidence was just recovered within a half hour to an hour the evidence is in a patrolman or detective's possession.

Q. Okay.

A. I cannot tell you truthfully how I recovered those gloves. That's it.

Q. Assume for a minute that a piece of evidence had been seized on November 30, 1985, and placed into the evidence locker room. If you wanted access to that piece of evidence you would then have to sign something to obtain it?

If we are talking about week, I'm sorry, a week later or six days later you wanted that piece of evidence you would have to sign something to obtain it, wouldn't you?

A. That's correct.

Q. So would you agree with me that if these gloves had been seized November 30, 1985, and you had them on December 7, 1985, then under your Springfield Police Department evidence

protocol you would have had to have signed something to obtain them?

A. Somebody would have had to sign it; you're correct.

Q. Doesn't ever person who has access to a piece of evidence have to sign a document evidencing that he has that property?

A. Either him or his partner, sir, correct.

Q. Who was your partner on December 7, 1985?

A. I can't tell you.

Q. On December 7th, 1985, you took those gloves to the home of a woman named Lisa Eldridge?

A. That's correct.

Q. And Lisa Eldridge was George Perrot's girlfriend, to your knowledge?

A. That's correct, sir.

Q. And you took those gloves sometime after 10 a.m., correct?

A. I don't know what time it was. It was in the morning.

Q. Well, if you have something to refresh your memory.

A. I have nothing. I don't know if it was nine, 10 o'clock, nine o'clock or 12 o'clock.

Q. Officer, you got these gloves from Tom Kelly,

didn't you, sir?

A. And I told you truthfully I do not know where I received those gloves from, sir.

Q. Did Tom Kelly tell you to bring these gloves over to Lisa Eldridge's house and ask her if they were her gloves?

A. I believe not, no. I believe not.

Q. I believe as part of the investigation you brought those gloves over to Lisa's house.

A. Now, I don't remember anybody telling me what to do.

Q. You don't remember talking to Tom Kelly that morning at all about these gloves?

A. No. Very, very good possibility, but I'm not going to sit here and say yes or no. Sir, I'm sorry.

Q. And you don't remember from where you got the gloves?

A. I remember bringing them up to Lisa's house. I don't remember the time.

Q. Okay. You brought these gloves to Lisa Eldridge's house and you asked her, "Are these your gloves?"

A. That's correct.

Q. And she told you, "No, they're not my gloves," correct?

* * * * *

Q. Do you recall what he was hollering when his voice was raised, what it was he was saying?

A. He got very emotional after he talked about the house breaks. I know he got very emotional and like I said at one point he said, "Give me your gun. I want to blow my brains out," something to that effect.

Q. Would you examine that document and see if that refreshes your memory. (Indicating)

Just tell me yes or no whether it refreshes your memory, what it was he was yelling.

A. (Witness complying) Yes, it does refresh my memory.

Q. And what was it that George Perrot was yelling?

A. George Perrot kept on yelling that the drugs made me do it. "The drugs made me do it."

May I continue?

Q. Yeah, please.

A. He also stated that he never touched the woman, he just wanted money.

Q. Thank you.

Now, did he ever say anything to you concerning his use

A. Yes.

Q. And about what time was it that these came to your home?

A. It was about nine o'clock in the morning, a.m.

Q. Would you tell the jury what occurred when the police came to your home?

A. There were several police. They were in plain clothes. They had a search warrant. My husband had answered the door. I was -- just shortly gotten out of the shower. I went out into the kitchen to see who was here and what they had wanted. They told me they had a search warrant and they wanted to search, if that would be all right. I said that would be fine. One of the police, I don't recall his name, was asking me questions and asked me if these gloves had looked familiar.

Q. First of all, he had a pair of gloves with him?

A. Yes, he did.

Q. And looking at Exhibit No. 15?

A. Uh-huh.

Q. Did those appear to be the gloves he had with him on that occasion?

A. I would say so. They look like they probably were.

Q. And did you have some conversation with him with

respect to the gloves that he had?

A. Yes.

Q. And what -- would you tell the jury what was said?

A. He asked if the gloves looked familiar. I told him, "Yes." He asked me if I owned a pair, did I own these gloves and I told him no, that they were not mine.

Q. Did you have any further conversation with him about the gloves?

A. About the gloves? I really don't recall. He asked me if they were my gloves and I told him no and I recall we went over that a bunch, if they were familiar or not.

Q. Did you make any mention at that time as to whether or not they might have belonged to someone else?

A. I believe I did, yes.

Q. You said you did tell them the gloves looked familiar to you?

A. Right.

Q. Can you tell us why they looked familiar to you?

A. I thought they were George's girlfriend, Lisa's gloves.

Q. And what is Lisa's full name?

A. Lisa Eldridge.

Q. Did you later learn that the gloves were shown to

saw them?

A. We were going to York Street to visit George.

Q. And you say York Street?

A. York Street Jail. It was about a week later or so.

Q. And who went to see George there?

A. My mother, myself and Lisa.

Q. And at that time did you see Lisa with some gloves?

A. Yes, I did.

Q. And were those the gloves that you thought the officer had with him when he came to see her (sic) on December 7?

A. Yes, I did. Yes, they were.

MR. FERRARA: Thank you. No further questions.

* * * * *

CROSS-EXAMINATION BY MR. VOTTERO

* * * * *

Q. When he asked you about the gloves that morning do you recall going and looking in a closet?

A. No, I do not.

Q. The red marks that you saw on George's face you said it looked like he had been abused?

A. Yes.

signature to be his.

MR. FERRARA: There has been -- not been any claim the signature is not his.

THE COURT: Now, can it be said that the signature is not his? I think he pretty well states, sticking to the initials, as I understand it.

MR. FERRARA: It's only the initial that she has testified do not appear to be his; how is this rebuttal?

MR. VOTTERO: It was my impression he was questioning her about the signature on the second confession.

MR. FERRARA: In fact, she said they all look similar and she appears to be his --

MR. VOTTERO: (Interposing) As long as there is no argument tomorrow morning to the jury the signature does not appear to be his.

THE COURT: Okay.

MR. FERRARA: There is no testimony that --

THE COURT: (Interposing) So you are both resting now.

Okay. Let's talk. It is roughly five minutes to three. The most we can do would be arguments and that

(The jury exits at 2:55 p.m.)

THE COURT: All right. So what's happening now?

MR. FERRARA: Your Honor, if I may, at this time I do have some written motions for required findings of not guilty. I would like to renew those motions and I would ask to be heard just very briefly on three of the indictments.

THE COURT: Sure.

MR. FERRARA: Your Honor, with respect to indictment number 85-5416 charging indecent assault and battery on an adult, Mary Prekop; indictment number 85-5418 charging aggravated rape; and indictment number 85-5420 I'm going to ask you to consider dismissing these indictments for the following reason: the victim in this case or the alleged victim in this case -- certainly she is a victim at the hands of someone, has clearly stated that her assailant was not George Perrot.

There has been no identification by anyone of George Perrot as her assailant either for the indecent

assault and battery or for the rape or for the burglary and assault on an occupant.

Now, she was adamant about saying that George Perrot, as he appeared on December 7, of 1985, did not resemble the man that assaulted her in a significant way, specifically the mustache and the beard.

The only evidence that's been admitted to identify Mr. Perrot as the assailant is the blood analysis or testimony by William Eubanks and the hair analysis testimony by Wayne Oakes. And both of those individuals acknowledge that those are not means for identifying an individual. They are means for indicating that an individual may fall into a particular percentage of the population and therefore, cannot be excluded. But I suggest to the Court they are not a means for identifying someone satisfactorily to the law where the victim has said he does not fit the description of the assailant.

You have before you some statements and in none of those statements does George Perrot acknowledge that he committed an indecent assault and battery or rape or assault on the occupant, Mary Prekop. And there is substantial amount of testimony from which the jury might infer that those statements were not given freely,

knowingly, and voluntarily, and I am going to ask you to find that given the state of the evidence that the jury could not, under the law, find that George Perrot was the individual who committed these acts.

MR. VOTTERO: Just briefly, what she's stated repeatedly, she is very concrete in how, the way she states it. How could it be, this man has a beard and a mustache. If she was ever asked she will tell you what she thinks, but clearly that is not an admissible question. The evidence is more than enough to go to the jury on the question of identity.

THE COURT: Okay. On the level of proof required for the stage of the preceding motion for directed verdict I am going to rule there is sufficient evidence so therefore, I am going to deny each of the motions as to each of the indictments.

Okay. Are you ready for the charge conference? We will do that in the lobby.

MR. FERRARA: Sure.

(A recess was taken at 3:02 p.m.)

* * * * *

(The following discussion was held in the Judge's chambers.)