Volume: II

Pages: 216-408

Exhibits: 10-19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 18-CV-10147

- - - - - - - - - - - - - - - - - - - - x

GEORGE PERROT,

Plaintiff,

vs.

CITY OF SPRINGFIELD, et al,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF GEORGE PERROT

Thursday, July 13, 2023

North Central Correctional Center

500 Colony Road

Gardner, Massachusetts

9:24 a.m. to 3:18 p.m.

Reporter: Karen A. Morgan, CSR/RPR

Q. How many times did you speak to your lawyers?
A. Twice.
Q. And when was that?
A. Yesterday and the day before yesterday.
Q. Were those both in person?
A. Yes.
Q. And did they occur here at Gardner?
A. Yes.
Q. In connection with this lawsuit did you answer some interrogatories that were sent to you from Defendant Arpin?
A. Yes.
MR. JOYCE: Could we have that marked, please, as the next exhibit?
(Exhibit 10 was marked for identification.)
(Witness perused document.)
Q. Mr. Perrot, you have Exhibit 10 there in front of you; right?
A. I do, sir.
Q. And would you look at the last page, please? Is that your signature on the last page?
A. It is.

Q. Before you signed those did you read them and review them?
A. I did, yes.
Q. And did you agree with the contents of those answers to interrogatories?
A. Yes.
Q. So I'm going to ask you to turn to interrogatory number three. Would you read that interrogatory to yourself?
MS. GIZZI: The entire thing?
MR. JOYCE: Yes. Just the question.
A. Just the question?
Q. Yes.
A. Okay.
(Witness perused document.)
A. Okay.
Q. And do you see in the response there's an objection that notes partially the first line into the second line that this calls for a narrative better suited for a deposition; right?
A. Yes.
Q. And you will agree we're at your deposition today; right?
A. I do.

Q. Can you answer interrogatory number three for me?
MS. GIZZI: Objection.
Q. In your own words.
MS. GIZZI: Objection. Form. Misstates the testimony.
A. Sir, I'm not a lawyer so I was helped to prepare this with my counsel so what it states in it in the interrogatories is my answer.
Q. Do you have any information other than what's on that paper in front of you in the answer to interrogatory number three?
A. Other than the fact that all the police officers involved in my case, no.
Q. I'm sorry. I don't understand that.
A. You asked me how he violated my rights.
Q. Right.
A. Well, all the officers that were involved in the investigation. I don't know what specifically he did. To the best of my recollection I don't know exactly what he did.
Q. Do you know who Charles Arpin is?
A. He's a Springfield police officer. That I know.

Q. Do you know who he is? Could you identify him?

A. Sir, this happened 40 years ago. No.

Q. So can you tell us exactly what Charles Arpin did on December 7, 1985 when you were arrested?

MS. GIZZI: Objection. Form.

A. Best of my recollection, no.

Q. Do you have any information about the actions of Charles Arpin other than what's indicated in your answer to interrogatory number three in Exhibit 10?

A. I don't, sir. No.

Q. Down at the bottom of Page 3 it indicates that as part of your answer Defendant Arpin acting in conspiracy with the other individual defendants fabricated evidence. Do you see that?

A. Where are you pointing to?

Q. Bottom of Page 3 the last line.

A. Okay. Yes.

Q. So exactly what evidence did Charles Arpin fabricate?

A. Well, there was a fabricated statement in my case.

Q. The next line it goes on to say that Defendant Arpin manufactured false witness testimony as you said to implicate the plaintiff. What false witness testimony was that?

A. At this time, sir, I can't recall the specific what Lieutenant Arpin did.

Q. Did Lieutenant Arpin testify at any of your criminal trials?

A. To the best of my recollection, sir, I can't remember. Like I said, this happened a long time ago. He may have.

Q. You were at each of the criminal trials, weren't you?

A. I was, sir.

Q. You were in attendance and heard all the witnesses testify against you, didn't you?

A. I was, sir.

Q. Did you present witnesses in your defense?

A. No, I didn't, sir.

Q. In either case, either trial?

A. I mean other than -- how do you say it? I don't know the correct word. To refute the blood evidence.

Q. Experts?

proceedings. What information are you referring to in that answer?

MS. GIZZI: Objection. Form.

A. Again, sir, my lawyers helped me prepare this. I'm not a lawyer so to the best of my recollection I can't remember the specifics of it.

Q. Well, Mr. Perrot, it's your case, isn't it?

A. It is, sir, but, again, sir, I'm not a lawyer so this is all foreign to me.

Q. Sure. I understand but you've lived it for, what, 40 years now almost; right? 1985.

A. You're right, sir. I lived in a maximum security prison defending myself against this case, yeah. I didn't have, you know, time to sit there and read documents and all that because I was being tortured because of this case.

Q. And during that time frame you attended all the trials and heard all the witnesses; right?

A. I did.

Q. And during the preparation for that you reviewed all the police reports, didn't you?

MS. GIZZI: Objection. Form.

A. I tried to, yes.

Q. Why not?
MS. GIZZI: Objection. Calls for attorney-client privilege.
A. My lawyer chose not to call him.
Q. And did you talk to Mr. Timmerman in person?
A. I didn't, sir, no.
Q. So in November 1987 where were you located?
A. Norfolk prison.
Q. And Mr. Timmerman didn't come to visit you, did he?
A. Never, sir, no.
Q. Was this your only communication with Mr. Timmerman about his potential testimony in your case?
A. It is, sir.
Q. I'm sorry?
A. It is, yes.
Q. Can we go back to Exhibit 10, please? Just to reiterate you can't give me anymore information than what's in Exhibit 10 with regard to the information that was suppressed during your criminal proceedings?

A. No. You're correct.

Q. Now, it goes on to say they covered up the misconduct and destroyed or suppressed additional evidence that would have exculpated plaintiff including witness statements pointing to other suspects, hiding that information from plaintiff's attorneys and state prosecutors. What exactly are you talking about there, Mr. Perrot?

A. Where are you reading this, sir?

Q. I'm looking at the middle of the paragraph at the top of the page on Page 4. We're still on the same paragraph. We are just continuing on after the semicolon.

(Witness perused document.)

A. Again, sir, my attorneys helped me prepare this so.

Q. So you can't identify for me any specific witness statements that were suppressed; right?

MS. GIZZI: Objection. Form.

A. At this time I can't, sir, no.

Q. Can you identify for me any specific witness statements that were destroyed?

MS. GIZZI: Objection. Form.

A. Well, my counsel requested that --

MS. AGBIRO: I'm sorry. Objection. Attorney-client privilege. You can answer to the extent that it does not reveal any information communicated to you by your attorneys. Go ahead.

A. I requested notes from the officers that were destroyed.

Q. Is that the only thing that you can point to right now today?

A. It is, sir, yes.

Q. That was destroyed; right? You don't know of anything else that was destroyed?

A. According to the officers it was destroyed.

Q. Your answer goes on to say that they presented false evidence to state prosecutors and judicial authorities in order to secure and continue charges against the plaintiff. What false evidence did they present?

MS. GIZZI: Objection. Form.

A. Well, they falsely said that I had a pair of my sister's gloves on. My sister testified that never happened so that was false evidence. Mrs. Prekop told them numerous times that I wasn't the person that broke into her house. I guess that's

it, sir. My lawyers helped me prepare this. I'm not seasoned counsel.

Q. What gloves are you talking about? Related to which crime?

A. Mary Prekop.

Q. So other than the gloves do you have any other information on false evidence?

A. Mary Prekop's -- the blood stain on Mary Prekop's sheet. She told them it was her uncle's. They testified that it was mine. Hair that they allegedly found in her room. Mrs. Prekop stated that the incident didn't happen in the room on the bed. Said it happened on the floor. I would consider that false evidence, false testimony.

Q. All right. You weren't there when the evidence was found; right?

A. No, sir.

Q. And you take issue with the accuracy of the statement regarding where it was found; is that it?

MS. GIZZI: Objection. Form.

A. Well, they claim it was found on the bed and the victim claims that nobody was on the bed so, yeah. I take -- yes.

convince her?

Q. Let me read the question. Paragraph 4 of your amended complaint alleges the defendants involved in the lineup engaged in pressure tactics towards MP. If these allegations include the actions of Defendant Charles Arpin, please state in complete detail the conduct of Defendant Arpin related to this allegation.

A. Okay.

Q. So are you saying in your complaint or your case that Defendant Arpin engaged in pressure tactics towards Mary Prekop in the lineup?

A. Sure.

Q. And what specifically did Charles Arpin do?

A. Well, if Charles Arpin was at the lineup and was involved in putting the lineup together, they continuously had me walk up and back and forth when none of the other officers that were involved in the lineup had to do that. So they kept -- in my opinion they were trying to make her identify me when she told them several times that she didn't identify me. I'm not the guy that broke into her house.

the defendants fabricated or planted evidence to frame you. Again, if you're referring to Defendant Arpin in these allegations in Paragraph 6, can you tell me specifically what Charles Arpin did?

A. Charles Arpin was involved in the investigation; correct?

Q. You have to give me the answers, Mr. Perrot. What did Charles Arpin do?

MS. GIZZI: Objection. Form.

A. Well, I'd say he was involved in planting the gloves. The hair was fabricated. I would say he was involved in the whole investigation. He's just as culpable as the rest of the officers that were there.

Q. How do you know he was involved in planting the gloves?

A. I don't know. I don't know exactly how. How would I know who planted them?

Q. Do you know who planted them?

A. One of the police officers planted them.

Q. Which one?

A. I don't know exactly, sir.

Q. Let's look at interrogatory number six which references Paragraph 26 of the amended

MS. GIZZI: Objection. Form.
A. For certain, no, I don't, sir.
Q. So did you file a lawsuit regarding the force that was used against you during your arrest?
A. I didn't, sir.
Q. Let's look at interrogatory number eight which references Paragraph 44 of your amended complaint.
(Witness perused document.)
A. Okay.
Q. So, Mr. Perrot, to date is it your contention that Defendant Arpin was involved in any of these allegations or actions?
MS. GIZZI: Objection. Form.
A. I would have to see the card to see if he was in the room when I was signing them. I don't know specifically, sir.
Q. You don't know if he was there?
A. I don't.
Q. Mr. Perrot, do you remember testifying at a motion to suppress hearing?
A. I do, yes.
Q. And at that hearing did Assistant District Attorney Francis Bloom show you a succession of

Miranda cards signed by you?
A. He did, sir.
Q. At that hearing did you identify your signature on those Miranda cards as being yours?
A. They appeared to be, yes.
Q. So which ones didn't you sign?
MS. GIZZI: Objection. Form. Misstates his testimony.
A. I just stated, sir, they all appeared to be my signature.
Q. Interrogatory number nine, Mr. Perrot. Let's move on to that and that references Paragraphs 46 through 52 of your amended complaint if you want to refer to those.
(Witness perused document.)
A. Okay.
Q. Do you see that?
A. I do.
Q. Now, in connection with the statements that were obtained by the police department did you challenge those on appeal, the voluntariness?
A. My lawyer did, yes.
Q. And what was the result in the Appellate Court?

A. Appellate Court upheld it.
Q. The Appellate Court upheld them as voluntary; right?
A. Yes.
Q. And during any of that process are you able to point to any actions by Defendant Arpin in connection with those statements or interrogation tactics?
A. Again, I wouldn't know whether I could recognize Lieutenant Arpin that day or today so I don't know if he was one of the officers that was keeping me up in the cell.
Q. Let's move on to interrogatory number ten which references Paragraph 53 of your amended complaint.
(Witness perused document.)
A. Okay.
Q. So can you identify for me today exactly which documents Defendant Arpin forged your signature on?
A. Again, sir, someone forged my name on a statement to induce Jeff Adkins. I don't know which officers were involved.
Q. Was it Charles Arpin?

MS. GIZZI: Objection. Form.
A. Could have been, sir.
Q. Do you know whether it was Charles Arpin?
A. Personally I don't know.
Q. And that statement wasn't used in your trial though, was it?
A. It wasn't, sir, no.
Q. Is that the only statement you say that someone forged your signature on?
MS. GIZZI: Objection. Form.
A. That's the only one I claim, sir, yes.
Q. Let's move on to interrogatory number 11, sir, and that references Paragraphs 57 and 58 of your amended complaint and this references back to the lineup; correct?
A. It does, sir.
Q. And we've covered that. What information do you have that anyone coerced or cajoled MP at the lineup?
A. Well, after my trial, Mrs. Prekop contacted my next door neighbor Mrs. Edwards and told her that the police were lying, that that's not the man that broke into my house and they were trying to convince her to say that I was.

Q. So today can you tell me what evidence Charles Arpin fabricated?

MS. AGBIRO: Objection. Form. Asked and answered.

A. Again, sir, one of the officers in the case planted the evidence so whether it was Charles Arpin or not I can't specifically state that it was him.

Q. Can you tell me what witness statements Charles Arpin fabricated?

A. Again, sir, I don't know exact. I couldn't describe the officers or know the officers' name that were involved in a false confession or typing up the confession that I signed pertaining to the Mary Prekop case.

Q. Interrogatory number 13 which references Paragraph 94 of your amended complaint.

A. Okay.

Q. That indicates Paragraph 94 of your complaint says the defendants framed you by manufacturing false evidence and withholding exculpatory evidence; right?

A. It does, sir.

Q. Can you tell me today what false evidence

was manufactured?
MS. GIZZI: Objection. Form. Asked and answered.
A. The gloves, the hair on Mrs. Prekop's bed. The hair.
Q. Same thing we talked about in answer to an earlier interrogatory? Nothing new?
A. Correct.
Q. And again, do you have any information that Charles Arpin did any of that?
A. I don't, sir.
Q. What exculpatory information or evidence was withheld?
A. Well, if the blood wasn't mine on the sheet, it was obviously somebody else's.
Q. And if I recall correctly, tell me if I'm wrong, didn't some expert testify that the blood could have been yours on the sheet?
MS. GIZZI: Objection. Form.
Q. Based on scientific tests.
A. I don't recall that. At the first trial, yes.
Q. Well, if I understand the process, you were at the trial. The police indicated that they

took some evidence from the house which included a sheet?

A. Mm-mm.

Q. And someone at a lab took the sheet and took a sample of the blood stain and tested it; right?

A. Yes.

MS. GIZZI: Objection. Form.

Q. And the results of that test indicated that it could be your blood; right?

A. No. It said I couldn't be excluded.

Q. You couldn't be excluded?

A. Yes.

Q. But you could be included.

A. Could.

Q. All right. What did the police do in connection with that other than have the sheet tested?

A. Well, it ultimately turned out when it was further tested, it wasn't my blood so it was someone else's blood.

Q. So let's move on to interrogatory number 14 which references Paragraph 99 of your amended complaint. Do you see that?

any of the actions that took place by then Officer St. Germain that you are claiming relief from in your complaint?

A. No, sir.

Q. Are you aware of Officer St. Germain fabricating any evidence?

A. Personally, no.

Q. Are you aware of Officer St. Germain destroying or concealing any documents or other relevant evidence to the crimes which you were charged?

A. Other than what was reported that the officers' notes weren't available because they were either lost or destroyed, no.

Q. Do you have any personal knowledge of whether there were any notes created by Officer St. Germain?

A. Personally, no.

Q. Are you aware from your personal knowledge of any actions by Officer St. Germain that would have been participatory in a conspiracy to frame you?

MS. GIZZI: Objection. Form. Calls for a legal conclusion.

A. Specific actions, no.
Q. Let me direct your attention to then Sergeant Andrew Canevari. Do you know Sergeant Canevari?
A. I don't, sir, no.
Q. Would you know him if he walked in the room?
A. No.
Q. Or perhaps more accurately would you have known him if he walked in the room back in 1985?
A. No, sir.
Q. Are you aware of any actions from personal knowledge which then Sergeant Canevari took which you are claiming to support any of the claims for relief that you've made in your complaint?
MS. GIZZI: Objection. Form.
A. No.
Q. Are you aware of any evidence that you claim was fabricated by then Sergeant Canevari?
A. No, sir.
Q. Are you aware of any evidence or probative matters relating to the charges against you back in 1985 and '86 that were destroyed or otherwise withheld from you back at that time?

A. Other than the notes through discovery, no.

Q. What notes are you referring to?

A. The officers' notes. We requested officers' notes that were written during the interrogation and investigation and they claim they didn't have them.

Q. Did then Sergeant Canevari interrogate you?

A. I couldn't answer that, sir.

Q. Do you know if then Sergeant Canevari made any notes of any interaction with you?

A. Personal knowledge, no.

Q. And do you recall any interaction between yourself and then Sergeant Canevari relating to the investigation or the prosecution of the charges against you?

A. I don't know what Officer Canevari looks like so no.

Q. Directing your attention to then Officer Paul Glantz. Do you know Officer Paul Glantz?

A. I do, sir.

Q. And did you know him back in 1985?

A. I did.

Q. And when did you first come to know Officer Glantz?

A. I was arrested by him at a keg party.

Q. Do you recall when that took place?

A. Would have been the summer months of that year.

Q. Of 1985?

A. '84.

Q. '84. Tell us what happened in regard to your interaction with then Officer Glantz at that keg party.

A. My interactions with him other than he arrested me?

Q. Okay. Did you have any conversation with him? Did he say anything to you? Did you say anything to him?

A. No, sir.

Q. So you were arrested at that time?

A. I was.

Q. What was the charge against you?

A. Illegal sale of alcohol. I want to say assault and battery on an officer.

Q. And what was the outcome of those criminal charges?

A. I received ten days in the house of correction.

Q. Was there a guilty verdict entered against you in the Superior Court?

A. I don't believe it went to Superior Court. I believe it was in District Court.

Q. District Court. And what charges were you found guilty of?

A. Assault and battery and illegal sale of alcohol.

Q. Was that after a trial?

A. I believe it was a plea, sir.

Q. What was your next interaction with then Officer Glantz?

A. He was at the police station when I got arrested on November 30th of 1985.

Q. Did you have any interaction with him prior to that keg party in the summer of I think you said 1984?

A. No.

Q. Did you have any interaction with him between the time of that keg party and the time you were arrested in November 1985?

A. No.

Q. Other than those two situations have you ever had any interaction with then Officer Glantz?
A. No.
Q. So tell us -- describe the interaction you had with him in connection with the 1985 matter.
A. He was sitting outside my cell every time they put me in the cell and wouldn't let me go to sleep. Kept rattling my bars with his nightstick.
Q. Did he say anything to you and did you say anything to him?
A. I can't recall at this time, sir.
Q. Did he participate in any interrogation of you?
A. Not that I recall, no.
Q. Did he ever enter the cell that you were in?
A. Other than taking me upstairs, no.
Q. And how many times would you say he I think you used the term rattled the cell?
A. Yeah. He was running his nightstick across the bars.
Q. How many times did that happen?
A. Every time that I returned to the cell they wouldn't let me go to sleep. They made sure I

stayed awake.
Q. How long were you in the cell while that was going on?
MS. GIZZI: Objection. Form.
A. I couldn't tell you specifically, sir.
Q. Are you aware of then Officer Glantz fabricating any evidence that was used against you?
A. Not to my personal knowledge, no.
Q. Are you aware of him destroying or concealing any evidence that may have been exculpatory for you in those criminal charges?
A. No.
Q. Do you have any personal knowledge or did you witness any events in which you allege to be part of a conspiracy to wrongfully convict you?
MS. GIZZI: Objection to form.
A. Personal knowledge of him, no.
Q. Directing your attention to Officer Jarvis. Do you know Officer Jarvis?
A. Through the discovery, yes.
Q. Would you recognize him if he was here today?
A. I don't think I could recognize him, no.
Q. Have you ever been in his presence?

A. No.
Q. Did you sign a statement at any time during the second interview?
A. No.
Q. And did any of the people who were interviewing you make any threats to you during that interview?
A. Not that I can recall, sir, no.
Q. How long did the second interview last?
A. Again, sir, I don't have a specific time.
Q. Were you coerced in any way in that second interview to provide information or provide answers?
MS. GIZZI: Objection. Form.
A. Well, they kept telling me they knew that I broke into these houses.
Q. Was that the only thing they did that you felt was coercive?
A. To the best of my memory, yeah.
Q. And do I understand that after that interview you were then brought back to the cell?
A. Yes.
Q. How long were you in that cell before you left again?
A. Again, sir, I didn't have a watch on. I

A. Yeah, I did, sir.
Q. Were you given the opportunity to read it?
A. I did.
Q. Are you aware of any other evidence that Officer Jarvis fabricated?
A. Not personally, no.
Q. Are you aware of any evidence, potentially exculpatory evidence that Officer Jarvis either destroyed or concealed?
A. His personal notes of the interview, yeah.
Q. So are you aware of notes that were taken at the interview?
A. Jarvis and Kelly both said they took notes.
Q. Was Kelly present at one of these interviews?
A. Yes.
Q. Which interview was he present at?
A. I don't know, sir. Could have been the second one. I know he was there for the third one talking about the hair and blood that they wanted.
Q. I think you testified yesterday, Mr. Perrot, that the process in these interviews involved them asking you questions and them then

the whole time I was in there.

Q. Were they reading back lines to you saying is this correct?

A. No.

Q. Was that the document which you ended up signing?

A. I signed three documents that day, sir.

Q. Were those documents all the result of them asking you questions, then typing and then at the end of that asking you to sign the document?

MS. GIZZI: Objection. Form.

A. I never signed it after we discussed it. I signed all the documents at once when they was discussing the blood and hair.

Q. You're saying you didn't sign a statement at the end of each interview?

A. No, I didn't. All the documents I signed were at one time.

Q. Did you have any other interaction with Officer Jarvis other than these interviews that you have just described, I'm sorry, relating to the charges against you back in 1985 that are the subject of the lawsuit. Did you have any other interaction with Officer Jarvis other than the

Q. Now, with respect to the robbery at the McNabb residence on Ellendale and the purse snatching at Denny's, did you plead guilty to those?
A. I did, ma'am.
Q. What was the sentence that you received for that?
A. I received ten to 12 years with six to nine concurrent, ma'am.
Q. I'm sorry. Ten to 12 years?
A. Ten to 12 years with six to nine concurrent.
Q. Now, after you appealed, you were granted a new trial. Were you released or were you still incarcerated?
A. I was still incarcerated.
Q. Now, do you know who Richard Kane is?
A. Through documents, yes.
Q. Who is Richard Kane to your knowledge?
A. He is one of the police officers that visited me at York Street to take my blood and hair.
Q. Do you remember what he looked like?
A. At this moment, no, ma'am, I don't.
Q. Do you recall if he was wearing a uniform or he was plain clothes?

A. I believe he was in plain clothes.
Q. Did you have conversation with him?
A. Just that he was there to extract my blood.
Q. Can you tell us in as much detail as possible what you remember about your conversations with Richard Kane?
A. I just told you, ma'am. He told me he was there to extract my blood and he extracted my blood.
Q. Well, he's not one that extracted your blood; right?
A. No. He wasn't, no.
Q. Are you saying that's the only conversation you had with him?
A. It's the only conversation I had with him, ma'am. Asked him why he was there and he told me he was there to drain my blood.
Q. You had agreed to have your blood drawn; correct?
A. I did, ma'am, yes.
Q. And that was on December 10, 1985?
A. It was a couple days after I was arrested, yes.
Q. Is that the first time you saw him?

A. To my recollection, yeah.
Q. Where was it in the jail that your blood was extracted?
A. It was like a triage room.
Q. Do you know who the person was that extracted your blood?
A. Not at this time I don't, ma'am, no.
Q. Can you describe them at all?
A. No, I can't, ma'am.
Q. Prior to that date had you been to court yet with regard to the arrest?
MS. GIZZI: Objection to form.
A. Yeah. I believe I went to my arraignment. Yes.
Q. Was your girlfriend Lisa Eldridge in court for the arraignment?
A. I believe she was, ma'am, yes.
Q. Was your girlfriend in the jail on the day that your blood was drawn?
A. Was my girlfriend in the jail?
Q. Right. When your blood was drawn.
A. No, ma'am. They don't allow people in jail in that area, no.
Q. So she wasn't in the room?

were arrested for that was with regard to Emily Lichwala; correct? She lived on Covel Street.

MS. GIZZI: Objection to form.

A. I got arrested for the McNabb and Sapelli case, ma'am, so no.

Q. You were all also arrested for Emily Lichwala and Mary Prekop as well; correct?

A. I was later charged in conjunction with that case, yes, but I wasn't arrested for that case.

Q. But you were charged?

A. Yes.

Q. Okay. So my question was in terms of the charges that pertain to Covel Street that was with respect to Emily Lichwala; correct?

A. Yes.

Q. Is it fair to say that don't have any information that Richard Kane was involved with regard to the Mary Prekop case?

MS. GIZZI: Objection to form.

A. One way or the other I don't, ma'am.

Q. Now, you were convicted with regard to the Emily Lichwala charges; correct?

A. I was convicted on all charges, ma'am.

Q. And you never appealed with regard to the

the amended complaint, I can show it to you again if you'd like, that they fabricated a false confession and forged your signature on it.

A. Oh, I thought you were talking about a different statement.

Q. No, no. I was just talking about your allegation about that in the complaint. Would you like to see your amended complaint again?

A. No. I know what you're talking about, yes.

Q. And I'm referring here to the statement, and again, this is in Paragraph 96 and 103 of the amended complaint. I'm now referring to the statement that was discovered after your first conviction was reversed and before your second trial. Do you understand what I'm referring to?

A. Yes.

Q. Okay. So I'd now like you to look at Exhibit 19 which I have just showed you. Do you recognize that document?

A. I do.

Q. And what is it?

A. It's a statement reported to be by myself.

Q. And is this the statement that was the

subject of those allegations I was just asking you about?
A. Yes.
Q. And when was this statement prepared?
MS. GIZZI: Objection to form. Lack of foundation.
Q. Do you know when this statement was prepared?
A. I was told it was prepared after my first trial.
Q. And I'm not going to ask you about every line of the statement but I do want to ask you there's a date on the top the first page. Do you see that date?
A. I do.
Q. What does that say?
A. December 16, 1987.
Q. So that date, correct me if I'm wrong, that date would have been shortly after your first trial; correct?
A. Correct.
Q. And before your second trial; correct?
A. Correct.
Q. Are there any other dates other than in

the body of the report? At the top and the bottom of this document are there any other dates listed?

A. Not that I can see, no.

Q. Do you have any reason to believe that this document was created prior to December 16, 1987?

A. To my knowledge, no.

Q. And this document, this statement was never admitted as evidence against you in any trial or court proceeding; correct?

MS. GIZZI: Objection. Form.

A. Correct.

Q. Okay. And just to clarify, when did your second trial take place approximately?

A. '92 I believe.

Q. So it was at least a couple of years after 1987?

A. Correct.

Q. And again, this statement was not introduced at that second trial; correct?

A. It wasn't, no.

Q. And it was not introduced at the first trial either?

A. Correct.

MR. COHEN: I have no further questions at this time.

FURTHER EXAMINATION BY MS. deSOUSA

Q. Mr. Perrot, I have a few more questions for you before we break for today. In response to Attorney Cohen's questions you stated you believe that Tom Kennedy accompanied Mr. Bloom to Washington, D.C. to deliver the hair and blood samples; is that correct?

A. That's what it states in the report, ma'am.

Q. And do you have any -- are you aware that you've named Thomas Kennedy as a defendant in this case?

A. You have to speak up. I can't hear you.

Q. I'm sorry?

A. You've got to speak up. I didn't hear you.

Q. I'll move closer. Is this better?

A. Yes.

Q. Okay. So other than a reference to Thomas Kennedy accompanying Frannie Bloom to Washington, D.C. to deliver the materials to the FBI office, do

you have any other information about anything Thomas Kennedy has to do with claims that you've brought?

A. I don't, ma'am.

Q. Do you know who Thomas Kennedy is?

A. I believe he was a police officer. That's all I know, ma'am.

Q. And would you have recognized him if you saw him?

A. No, I wouldn't, ma'am.

Q. Was he an officer that you believe had interactions with you when you were a juvenile?

A. It's possible, ma'am.

Q. It's possible but you don't have any information supporting that?

A. I don't.

Q. And do you have any information or facts to support any allegation that Thomas Kennedy engaged in a conspiracy with other named defendants or other members of the Springfield Police Department to have you wrongfully convicted for the rape of Mary Prekop?

MS. GIZZI: Objection to form.

A. I don't, ma'am.

Q. Do you have any information that Thomas

Kennedy did anything to result in the alleged wrongful conviction of you for the rape of Mary Prekop?

A. I don't, ma'am.

Q. Since you were convicted in 1986, have you had any interaction with Thomas Kennedy at all?

A. I haven't, ma'am.

Q. Do you believe he testified at your trial?

A. I believe he did.

Q. Your first trial.

A. Yes. I believe he did.

Q. And do you recall as you sit here what the nature of his testimony at the first trial was?

A. Could you say that again, please?

Q. I said as you sit here today, sir, do you have any recollection of what the nature of his testimony at your first trial was?

A. I don't, ma'am.

Q. How about at your second trial? Do you have any recollection that he testified at your second trial?

A. I don't.

Q. Do you have any evidence or facts to support any allegations that he planted evidence

against you?

A. I don't, ma'am.

Q. Do you have any evidence or facts to support your contention that he helped suppress evidence that would be beneficial to you?

A. I don't, ma'am.

Q. Do you have any evidence or facts to support your contention that he offered false testimony?

A. I don't, ma'am.

MS. deSOUSA: I have no further questions at this time but I am going to suspend the deposition because we have not received medical records and other documents the defendants are not in possession of.

MS. GIZZI: We're objecting to that suspension.

MS. deSOUSA: This is my deposition. I get to decide if my deposition is suspended or concluded. I'm going to suspend. You can object. If you want to bring it to the court before we reconvene, you can do that but this deposition is suspended.

MS. GIZZI: I understand that that's

what you're saying. We object based on the court order.

MS. deSOUSA: We're suspending this deposition. Thank you. Does anyone else have any questions?

MS. LYNCH: Very briefly.

FURTHER EXAMINATION BY MS. LYNCH

Q. Mr. Perrot, you stated that Mary Prekop's home had been broken into three times. Do you recall that?

A. I do, ma'am.

Q. Did you know that before you were arrested?

A. I didn't, ma'am.

Q. Okay. Did you know that Emily Lichwala's home had been broken into before you were arrested?

A. I didn't, ma'am.

Q. Since I still have not received your response to my request for production of documents or further answers to interrogatories I just want to ask you at this point other than your involvement with Mr. Kane when your blood was drawn on December 10, 1985, do you have any information to

believe that he violated your rights or was involved in the Mary Prekop investigation?

A. I don't, ma'am.

MS. LYNCH: That's all I have for now but I also join in Lisa deSousa's statement that I think the deposition needs to be suspended because there's still this outstanding discovery.

MS. GIZZI: That's it. We can go off the record now.

(Whereupon, at 3:18 p.m., the deposition was suspended.)

CERTIFICATE

Commonwealth of Massachusetts
Suffolk ss.

I, Karen A. Morgan, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that GEORGE PERROT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand this 27th day of July, 2023.

Karen A. Morgan

Karen A. Morgan
CSR/RPR

My commission expires:
September 28, 2029