COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420,25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

PRE-TRIAL MOTIONS AND JURY TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury, on January 6, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231

MR. FERRARA: I can make that.

THE COURT: All right.

Let's deal also with the motion filed by Mr. Coyle on behalf of witness Mary Prekop. He filed, Mr. Coyle filed a motion to squash a subpoena. He was present Friday, submitted documentation and today an affidavit and report of the physician and from a conference held earlier.

It appears that there is a stipulation between counsel that the fresh complaint allegedly made by Mary Prekop, the alleged victim, to Officer Popko will be introduced through that witness, that is Mary Prekop, and offered as an exhibit thereby making unnecessary for the appearance and testimony of Marianne Popko who is of such a medical condition as it would be extremely detrimental to her health if she were to testify or be required to. So I will take no action in view of the stipulation, but Officer Popko is excused and Mr. Coyle, if you want to be excused you certainly may as well.

MR. COYLE: Thank you, Your Honor.

THE COURT: The defendant's motion for voir dire questions is allowed and the best method for dealing with that, as I've indicated to counsel, is to bring out

hand he threw the stick on the bed.

Q. You saw him do that?

A. Yes.

Q. And did -- you said the light was on in the kitchen. He pushed you from the kitchen to the bedroom? You saw him push you?

A. That's right.

Q. And did you have an opportunity to see him then?

A. I was shutting my eyes and I was looking too much. I said I don't want to see who it was because I could have bad dreams afterward. I heard of other people having nightmares afterward.

Q. But in the course of this event you were able to see enough to give the police a description of an individual?

A. Only what I saw when he was in the kitchen. He had his hands on his face. He had wavy black hair and he had a blue jacket and white sneakers. That is all I can tell you. I know he was young by his build.

Q. Mr. Vottero showed you this statement that you gave and you read it? (Indicating)

A. Uh-huh.

Q. And that was given later that same day, correct?

A. That's right. After eight o'clock that morning.

I don't know if it says it there at the top.

Q. And can, -- I believe you testified on direct that the man that you saw was clean shaven; is that correct?

A. Uh-huh.

Q. Now, when you say clean shaven --

A. (Interposing) He didn't have no mustache. That is why I thought he had to be a younger fellow to me. I didn't look for a beard, but if he needed a shave it could show up more. He looked clean shaven, no beard.

Q. You're certain of that?

A. Uh-huh.

Q. And no mustache?

A. Nothing on his face.

Q. And you observed this during the time when he was pushing you from the --

A. (Interposing) No. I wasn't trying to see too much on his face. I was too much upset to notice anything.

Q. However, you did give a description of his clothing as well; is that correct, his clothing?

A. Yes. I told you had blue jacket, white sneakers.

Q. And you remember he had a blue jacket and white sneakers?

A. That's right.

Q. And you also said that he was wearing some dark pants, a pair of dark pants?
A. Yes. They weren't jeans and they weren't white.
Q. How do you know they were not jeans, ma'am?
A. Jeans -- I never saw any -- they're all about the same color.
Q. And you indicated -- do you remember the name of the policewoman who took the statement?
A. Do I remember her name?
Q. Yes.
A. Popko.
Q. And it was Marianne Popko?
A. Marianne Popko.
Q. Did you also hurt this individual -- you didn't notice if this individual had any jewelry?
A. No. I didn't see any signs of scars on his face and no jewelry. No other rings or anything.
Q. Would you tell us, please, as best you can, how long was this man's hair?
A. Well, it wasn't too long.
Q. Was it --
A. (Interposing) It looked like somebody went -- he went often, went to a barber shop. It wasn't hanging way down

over his neck.

Q. I was going to ask you if it was about my length, but I am reluctant to.

Was his hair -- was his hair shorter than mine or longer than mine?

A. Well, I wouldn't say for sure. It had to be longer. If you're telling me that some of these people they were showing me at the courthouse (sic) they all had longer hair and pretty stringy and pretty sick looking.

Q. I'm not asking you -- all I'm asking you today --

A. (Interposing) The only time -- what I could see of his hair he had his face covered. You couldn't see too much, but when I hit him on the head I had my hands so close to the stick, hanging onto it I could feel the curly hair and I could see it was black.

Q. Ms. Prekop, do you remember testifying at an earlier hearing about the same thing and describing this man's hair; do you remember that?

A. What I told Miss Popko you have got it right there. (Indicating)

Q. Okay. Do you remember testifying that his hair was short and looked like it had been freshly cut?

A. I couldn't say freshly cut. It was, to me, it

wasn't hanging. I didn't think it was down his neck too far. If it was I didn't look him all over, nobody does when they're being hurt, assaulted.

Q. About a week later do you remember that you were brought to the Springfield Police Department?

A. That's right.

Q. And you have testified that you were shown a group of people; is that correct?

A. That's right.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Ms. Prekop, I want to show you this photograph and ask you -- (Indicating)

A. (Interposing) Why you show me so many? I was only shown four men.

Q. Is that correct?

A. That's right.

Q. When you were shown these men -- do you recognize any of these men as being the men you were being shown that day? (Indicating)

A. I'm not going to say. I'm not sure of which one is which.

Q. Ma'am, I want to show you this man here on the far left. (Indicating)

MR. FERRARA: Your Honor, could I have this marked for identification?

THE COURT: Yes. We will mark that for identification.

(Defendant's Exhibit Let. B
was marked for identification.)

THE WITNESS: That man has a mustache.

Q. (By Mr. Ferrara) I'm sorry, Miss Prekop.

A. That's all right.

Q. The man furthest on the left here. (Indicating)

A. You mean the end one?

Q. Yes, ma'am. Does that look like the man who assaulted you on November 30, 1985?

A. How can I say it was when this man has a mustache and a beard? This fellow didn't have any beard. He didn't have any mustache.

Q. Ma'am, with respect to the length of the individual's hair I'm asking you to identify --

A. (Interposing) Yeah. It could be this one, more this length. (Indicating)

Q. You put the bedspread on it?

A. Yeah. Everything was all made up. That's when I saw the gloves at the foot of the bed. We start making the bed up and I said, "Geez, where did those come from? They aren't mine."

Q. This assault occurred on the floor; is that correct?

A. That's right.

Q. When you made up the bed did you observe any blood on the sheets?

A. If there is any blood on the sheets when we never went on the -- how could his blood be on my sheets?

Q. Ma'am, I'm just asking, to your knowledge, was there any blood on the sheets, if that?

A. Well, there was a blood stain, but that blood stain had been there for 14 or 15 years. Hadn't washed out yet.

You want to ask more questions about how it got there? I'll tell you.

Q. Okay. How did that blood stain get there?

A. Okay. My uncle was living with my mother and I and he had lung trouble and at that time he was coughing, doing a lot of coughing up and the doctor gave, even my doctor, my mother's doctor picked the prescription he was using. Then he

said to him, "If you have one that is not so strong it will help you better in your coughing" and he, on the sheets a lot of times on the pillow case and in his handkerchiefs. I would have to put them in Clorox every time I washed his -- Clorox because they are so stained up. He probably used a box of Kleenex a day spitting up.

Q. But as of November 30, 1985, did you see any blood stains from this man on those sheets?

A. The only blood stain was on that sheet had been washed twenty times, probably more than that because he died in 1982 and he was in the nursing home. I couldn't take care of him and my mother.

Q. Ms. Prekop, do you know a woman named Olivet Edward?

A. Yes. She is a neighbor of mine.

Q. Is she a friend of yours?

A. I thought she was a friend of mine.

Q. Since this incident have you spoken to Olivet Edward; since November of 1985 have you spoken to her?

A. Yes. Oh, yeah, she has been in my house different times.

Q. Have you ever spoke to her about this incident here?

A. We didn't talk about that incident.

The only time we talked about it she came by probably a week or so after he broke in. She came down. But I never brought up the conversation about it. I didn't know she was going to say anything about it. She brought it up a couple times.

MR. FERRARA: I have no further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Just a few more. The relative of yours who had the lung problems, when was the last time he lived in your home?

A. Nineteen eighty. That's when my doctor told me my mother wasn't going to last much longer. I told him I couldn't take care of him and her. So he went to a nursing home in Westfield not far from where a sister of his lived and he died the next year, 1982.

Q. And since the day that he moved out can you give us an idea of how many times you washed that particular bedsheet?

A. I didn't understand you.

Q. The bedsheet that he slept on, how many times have you washed that since he left the home?

A. Okay. From '82 to '85 it got washed a lot of

seven or so officers at 27 Malibu?
A. Because of the nature of the assault, it was a sexual assault. It fell under my unit's investigative responsibility. I would have taken control of the scene, gathered evidence and caused things to be done. It was mine.
Q. Now, did you take control of the bedroom scene, for example, at 27 Malibu?
A. Yes, I did.
Q. What's your memory, just tell us what did you observe in the bedroom?
A. A single bed. You walk down the end of a hallway into this rear bedroom. There was a single bed pushed to the left wall as you're looking into the, -- what the bed was against, the wall, there was a single dresser. Very sparsely furnished room. Bed clothes were disheveled. I recovered some items from the bedroom.
Q. Now, before removing any items did you have some photographs taken?
A. Yes.
Q. I would like to show you this photograph first.
Can you describe when and where that photograph was taken? (Indicating)
A. It's taken from the doorway looking in, into the

rear bedroom that I just described. It depicts the bed, the frame, a little stand to the side and you can just see a portion of a chair.

Q. Now, I direct your attention to the -- (Indicating)

A. Yes.

Q. Back edge of the bed. Do you see an object depicted on the bed at that location? (Indicating)

A. Yes. It's a little blurred. It is a glove.

Q. Now, was that glove that's depicted in that photograph was it in that location when you first saw it?

A. Yes.

Q. Do you recall seeing a, finding a second glove in that location?

A. The floor.

Q. Where on the floor?

A. At the foot of the bed.

MR. VOTTERO: May this photograph be marked as an exhibit, Your Honor?

MR. FERRARA: May I see it.

(Pause)

MR. FERRARA: No, objection, Your Honor

Q. (By Mr. Vottero) Now, what items did you remove or recovered from the bedroom, sir?

A. I folded the bedsheet from the corners in and recovered that. I recovered --

Q. (Interposing) Let me just stop you. The bedsheet?

A. -- the bed clothing.

Q. Do you recall anything about it, did you take both sheets or --

A. (Interposing) The bottom.

Q. You recall anything about that particular sheet?

A. It was soiled, appeared to have some fibers on it. It was flowered.

Q. I would like to show you what has been marked Exhibit 2 for identification. Do you recognize this, sir? (Indicating)

A. Yes, sir.

Q. And what is this?

A. That's the bedsheet I recovered from Miss Prekop's bedroom.

Q. And the number of holes and markings -- this sheet, were those holes and marks there when you recovered it?

A. No, sir.