C O M M O N W E A L T H O F M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
Nos. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

MOTION TO SUPPRESS HEARING HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., ON DECEMBER 7, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ., — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RICHARD KANE | 62 | 76 | | |


| EXHIBITS | PAGE |
|---|---|
| Exhibit 1, form | 65 |
| Exhibits 2A, B & C, Miranda cards and telephone card | 84 |

(Hearing convened at 11:35 A.M.
The defendant was present in the courtroom)

THE CLERK: Your Honor, the next matter before the Court is Commonwealth versus George D. Perrot, and we are dealing with indictments number 85-5425, 5422, 5423, 5416, 5417, 5418, 5420 and 5415.

MR. BLOOM: Judge, can we first remand Mr. Perrot to the House of Correction so we can excuse the transportation people from Boston? And they have him -- I guess based on the manner he's been characterized on down at the institution, they have him in leg irons, so they will have to take him out and take that piece of equipment with them, but they just want to go on their way, if that's all right.

MR. HAMMERSCHMITH: I don't have any objection to that. Obviously, he is going to have to be remanded to York

Street.

THE COURT: Okay, so we will remand him to York Street until completion of the trial. All right, very well.

THE COURT OFFICER: We will replace the leg irons with something we have.

MR. HAMMERSCHMITH: I'd ask he not be shackled during these proceedings.

THE COURT: Can I see you?

(The following conference was held at side bar)

THE COURT: There has been some indication that he has tried to harm himself from time to time since he's been incarcerated, and that there is information that they feel that escape and killing is something he wouldn't be beyond at this point. Are you aware of that?

MR. HAMMERSCHMITH: I'm aware that there -- I have been told secondhand there have been some problems at the

institution. I don't have the sense that he is at risk to hurt himself right now.

THE COURT: I'm not talking about hurting himself, I'm talking about hurting others, and you are going to be the closest one to him, Mr. Hammerschmith.

MR. HAMMERSCHMITH: I'm willing to take my chances. Obviously, I don't have any personal knowledge which would suggest that he is such a risk, I think it's a real problem in terms of the fairness of the trial.

THE COURT: Well, I'm not talking about doing it in front of the jury -- obviously, we will have to have additional people in here during the jury trial -- I'm talking about the motion hearing right now.

MR. HAMMERSCHMITH: I don't think it's necessary at this point, but --

THE COURT: Do you have anything

further to say?

MR. BLOOM: The only thing I know is during the course of when he was giving a statement in this case, he mentioned a number of times that he wanted to kill himself.

THE COURT: I know that was part of the motion to suppress.

MR. BLOOM: The other thing, I don't know the full extent of it, but I think it is in the file, and I will provide the Court with a copy, I know Mr. Hammerschmith was aware of it, the institution at one time either once or twice transferred him while these matters were pending and it was based on some investigations they had down there about escaping. That's pretty much all I know about it.

MR. HAMMERSCHMITH: We did a two-day motion to suppress in front of you probably last August or September and he wasn't shackled and they didn't

have any problem with him then.

THE COURT: Where is Mr. Sullivan?

THE COURT OFFICER: I'll get him, Your Honor.

MR. BLOOM: The one thing I would ask, there is a sequestration order, I don't have any problem with it, but I'd like to keep Sergeant Kelly in the courtroom. I will indicate to you that he will be testifying, but the thing is, Judge, in this case, number one, there is a security situation, and number two, more importantly, there is no identification here, so there is no way he can pick up on anything that is being offered by anyone else. The only thing that he is going to be testifying to is he secured the evidence and had it sent to the F.B.I. laboratory, so his testimony, as Mr. Hammerschmith notes, is exclusive of what anybody else would say. In fact, I would tell you for the record that neither one of the victims

can identify Mr. Perrot, so there is no photographic or successful identification that's going to be offered to the jury.

THE COURT: Do you have any objection?

MR. HAMMERSCHMITH: Will there be evidence of unsuccessful identification procedures?

THE COURT: My question is, do you have any objection to one officer, Officer Kelly, being here as the exception to the sequestration?

MR. HAMMERSCHMITH: No, I don't think so.

(Whereupon, Court Officer Sullivan approached side bar)

THE COURT: Mr. Sullivan, Mr. Hammerschmith is asking that his defendant not be shackled during the motion hearing. Do you have any

information -- we had a motion hearing here last spring, I believe it was, and we had no problem when he was in the courtroom. Do you have any information?

THE COURT OFFICER: We didn't have any problem with him at that time. I don't know when his period of escape was, attempted escape.

MR. BLOOM: I think it was before the motion, I believe.

THE COURT: All right, then, we will take the leg irons off him and leave them off him.

MR. HAMMERSCHMITH: Could he be seated at counsel table also?

MR. BLOOM: Probably, Judge, it would be a good idea if there are a couple people from security in here at all times.

THE COURT: What security?

MR. BLOOM: I mean whatever security we have, court officers in the building.

THE COURT: There is going to have to be, especially once he gets in front of the jury.

THE COURT OFFICER: We will have additional officers.

THE COURT: All right, we will proceed on that basis, on your recommendation, Mr. Hammerschmith.

THE COURT OFFICER: Where is he going to be sitting?

THE COURT: I guess he is going to be sitting next to Mr. Hammerschmith.

MR. HAMMERSCHMITH: I think, under the circumstances, that would be best.

THE COURT: Okay.

MR. BLOOM: One other thing. The only other thing, you know, Judge, there is a series of pretrial motions, one of them has to do with a short motion to suppress on one witness, one policeman. He is in in-service training, I can get him down here within a half hour with a phone call, so when we get to that

stage, if you just give me a moment, I will go outside.

THE COURT: I don't think we've got --

MR. BLOOM: We haven't gotten to that point --

THE COURT: But we're not going to be very far from it.

MR. HAMMERSCHMITH: I would have anticipated the motion to dismiss on speedy trial grounds would be addressed first and then the motion to suppress. I don't know how long it will take to do the motion to dismiss. Probably not that long, I don't think.

MR. BLOOM: You want me to have Kelly go out and tell him to be here at 12:30 or as close as he can?

THE COURT: Sure.

(End of side bar conference)

THE COURT: Gentlemen, I have

certain pretrial motions filed by the defendant. We have a motion in limine to exclude evidence of defendant's prior convictions, and what specifically are you talking about, Mr. Hammerschmith?

Well, first of all, does the Commonwealth intend to introduce any?

MR. BLOOM: If he took the stand, we would, Judge. This just came up this morning. He does have some prior convictions on unrelated matters.

THE COURT: What specifically are you talking about?

MR. HAMMERSCHMITH: I'm not sure what Mr. Bloom is talking about. I know that he has, I believe, a conviction for an assault and battery with a dangerous weapon, I believe he has two such convictions at the same time. He pled guilty to an unarmed robbery and I believe a house invasion.

MR. BLOOM: It was either an armed burglary or armed assault in a dwelling,

I'd have to look back at his --

THE CLERK: I have it here, Your Honor, if you would like it. Your Honor, on indictment 85-5414, he pled guilty on February 10th of '87 and the charge is armed assault on a dwelling, and he received a sentence of ten to twelve years at M.C.I. Cedar Junction. He also pled guilty to 5426, and the charge on 5426 was unarmed robbery --

THE COURT: Are these what you're talking about now?

MR. HAMMERSCHMITH: Those, Your Honor, those are among -- actually, he was arraigned on all those charges at the same time.

THE COURT: Okay, but I think the burden has to be on you to tell me what it is you are talking about, because I have a discretion -- I recognize the fact I have a discretion and, obviously, when he is being charged with armed burglary and assault and battery and

armed robbery, I'm not going to let any prior convictions in of armed robbery or the assault and battery by means of a dangerous weapon, but I'm not going to give you a blanket -- I can't give you a blanket promise.

MR. HAMMERSCHMITH: I understand. My understanding is that those are the only convictions that he has on his record, the A and B dangerous and two that Mr. Hickson just read to you, and I assume, unless Mr. Bloom knows otherwise, those would be the only ones I would be asking for exclusion of.

As Your Honor notes, they each parallel --

MR. BLOOM: That would be four charges, Judge, then.

THE COURT: Based on the information that those are the charges, obviously here we are dealing with armed burglary, assault with intent to rape, armed robbery, indecent assault and

battery, assault and battery, assault and battery, and aggravated rape, so based on those representations, the assault on a dwelling or assault and battery by means of dangerous weapon I would exclude.

MR. HAMMERSCHMITH: And the robbery charges, as well, Your Honor?

THE COURT: And the robbery. If there is something else that comes up, Mr. Bloom, I'd just ask you to bring it to my attention.

MR. BLOOM: I think that's it, Judge.

THE COURT: All right, then, allowed with regard to robbery charges, assault with a dangerous weapon and assault on a dwelling.

THE COURT: All right, motion for sequestration of witnesses.

MR. BLOOM: No opposition as long as Sergeant Kelly will be made an exception. Of the people that are going

to testify, he is the only exception I am asking for.

MR. HAMMERSCHMITH: Could I ask for an exception myself, for Mr. Perrot's mother is here.

MR. BLOOM: I don't have any problem with that, Your Honor.

MR. HAMMERSCHMITH: She may be called as a witness.

THE COURT: Is that Nancy Westcott?

MR. HAMMERSCHMITH: No, that is Beverly Daly.

THE COURT: Okay. So the motion for sequestration of witnesses is allowed with the exception of Sergeant Kelly of the Springfield Police Department and Beverly Daly of Springfield, Massachusetts, that will be allowed.

I have defendant's motion for voir dire questions. Question number 1, "Have you or any of your close friends or relatives ever been the victim of a

house break or crime of violence?" I will ask that question. Now, as to the balance of that question, the follow-up information, if they answer yes, then I will take care of that at side bar.

MR. HAMMERSCHMITH: That's fine.

THE COURT: Question number two, "Are you or any of your close friends or relatives a member of any police force, District Attorney's office or other law enforcement agency?" I will ask that question.

Question number three, "Have you ever been a witness either for the prosecution or the defense in a criminal case?" My inclination is not to ask that question.

MR. HAMMERSCHMITH: The reason for the question, Your Honor, is that I think that often times the participants, the witnesses, in a criminal trial, by virtue of their testifying and what happens to them while they testify, may

form some fairly strong opinions either about the defense function or the prosecution function, which may in fact impact upon their ability to look with an even mind upon the evidence in the days before them.

THE COURT: I'm going to tell them as part of the statutory questions that, one, it is a criminal case, I'm going to tell them the nature of the charges, I am going to ask them if there is anything about those charges that they feel reluctant to discuss with others or listen to evidence along that line, and then I am going to ask them the general questions of whether there is anything about the case that they feel that they want to bring to the attention of the Court with regard to their ability to sit as indifferent or unbiased jurors, I am going to ask them if they know of any reason why they would not stand indifferent in the case, but I am going

to let it go at that, counselor. I am not going to ask them if they have testified in court before as a witness one way or the other. So I am going to handle it in the manner outlined as far as question number three goes.

Now, with regard to defendant's motion if limine to exclude certain evidence or arguments, and this deals with the defendant's motion that the Commonwealth refrain from making any reference or otherwise to the fact that either of the alleged victims in the case have previously been the victim of a rape or house break.

I will hear you, counselor.

MR. BLOOM: Judge, I indicated to you, and I would state again for the record, that they have already been instructed during the past week, myself and Sergeant Kelly, who is in the courtroom, visited both Mrs. Lichwala and Mrs. Prekop. Mrs. Prekop, for the

record, prior to the incident that will be placed in front of you, have been raped on two previous occasions within that year period and Mrs. Lichwala on one previous occasion being sexually assaulted, and both Sergeant Kelly and myself I believe made it very clear to them that there should be no conversation or nothing said about anything other than November 30th of 1985.

So we have no problem with having that be allowed and the indication that the witnesses have been so instructed.

THE COURT: Very well, the motion is allowed.

Defendant's further motion in limine to exclude certain evidence or argument. Now, this refers to charges under indictments numbers 85-4510 and 85-5416.

MR. HAMMERSCHMITH: If I may, Your

Honor, what I am asking basically, Mr. Perrot was placed under arrest December 7, 1985, and he was at that time charged with two incidents that happened during the very early morning hours. One was a purse snatch, which was charged as an unarmed robbery, the other was a house break into the home of a Joseph McNabb and assault and battery upon Mr. McNabb during the course of that break.

THE COURT: Do you intend to go into those?

MR. BLOOM: No. Again for the record, the police -- the two or three officers who would have anything to do with the questioning, they obviously know and have been instructed by me that they are not supposed to talk about why he was under arrest, other than the fact he was under arrest, and anything to do about what the other charges were, so I have no problem with that being allowed.

THE COURT: Well, now --

MR. BLOOM: We can't avoid the fact obviously that he was -- it is going to be obvious to the jury he was in police custody for some reason a later, but the specifics, which I don't think Mr. Hammerschmith has any problem with --

THE COURT: Okay, now, are you satisfied with that?

MR. HAMMERSCHMITH: I agree. We have a statement that I assume Mr. Bloom intends to introduce, which was taken while he was in custody.

THE COURT: Doesn't that talk about a pocketbook?

MR. BLOOM: No, there were two statements, Judge. There was one that was given -- and they are totally separate -- one was given about why he was arrested, that has nothing to do with -- he was arrested a week after the cases that you are going to hear.

THE COURT: But in our discussions earlier, you indicated that when he was

giving blood he made a statement to the police, and I think that is the subject of a motion to suppress, is it not?

MR. HAMMERSCHMITH: That's right.

THE COURT: And that dealt with the location of a pocketbook?

MR. BLOOM: Correct.

MR. HAMMERSCHMITH: Different pocketbook, Your Honor.

MR. BLOOM: Well, it's the same pocketbook as one of these cases.

MR. HAMMERSCHMITH: But not the one that was snatched and that he was arrested for on that night.

MR. BLOOM: So there is no problem with that.

THE COURT: So this motion is allowed.

Now I have defendant's motion in limine to exclude certain scientific evidence. This relates to statistical evidence relating to blood tests.

MR. BLOOM: Judge, why don't I, for

the record, tell you what the testimony is going to be. I have been in Washington, I have an idea what the serologist would say, so that will give you an idea what I think Mr. Hammerschmith is getting at. There was on one of these incidents, the one that deals with an aggravated rape, there was a blood stain of some size on the woman's bed. That was taken along with a set of gloves that the woman said the intruder wore, they were not hers, and sent down to Washington.

Ultimately, Mr. Perrot's blood and hair were sent down and the victim's blood were sent down, but pertaining to -- I think he is only dealing with the serologist here -- the serologist did an examination and his report ultimately says and he would testify that he was able to break it down into generic markings beyond what the blood type was, he was able to break it down beyond

that, and the markings, the four generic markings that he was able to break the blood stain down are consistent with the same four generic markings that the defendant has and absolutely are not the victim's blood, and those four generic markings, eight percent -- what he told me, eight percent of the Caucasian population have those four generic markings in their blood, Mr. Perrot being one of the eight percent of the Caucasians in the world.

THE COURT: Has this gentleman written a report?

MR. BLOOM: Yes, he has.

THE COURT: I assume you have seen it.

MR. BLOOM: That's the problem. I I don't think that part of it is in the report. It only says that -- but that's the part I think he objects to is this percentage.

MR. HAMMERSCHMITH: The only report

that I have seen, Your Honor, is one that indicates the characteristics there were noted in Mr. Perrot's blood and obviously I can compare that with what was found in the blood on the sheet. I think if there is anything further explained in the report, I'm not aware of that.

MR. BLOOM: He knows this because I told him about it when I came back from Washington. Last week I told him. Beyond what the report says, saying it could be the defendant's blood, and it is absolutely not the victim's blood. I told him, explaining what the serologist had explained to me on percentages, and then he filed the motion accordingly, so it is based on my conversation in an interview at the F.B.I. with him and then I reported it to defense counsel.

THE COURT: All right, then what I am going to do is defer action on the motion, we will voir dire the expert,

and I ask you not to mention it in your opening.

MR. BLOOM: I won't mention it, but I can talk about him, I'm assuming, without mentioning the specifics.

THE COURT: Sure. All right?

MR. HAMMERSCHMITH: My concern was with the percentages, Your Honor.

THE COURT: Okay.

MR. BLOOM: I won't mention the percentages in my opening.

THE COURT: All right. No action, we will voir dire the gentleman when he gets here.

Now, the one remaining motion I have in front of me is a motion to suppress a statement. Is that the last motion?

MR. HAMMERSCHMITH: There is a motion to dismiss under Rule 36 and a motion to suppress.

THE COURT: Do you have your witness on the motion to suppress?

MR. BLOOM: Yes, Your Honor. The other one is just an oral -- the Rule 36 is just an oral motion. That's the other one you have left, correct?

MR. HAMMERSCHMITH: Yes.

THE COURT: Do you want to do that first and then we can take the officer?

THE COURT: All right.

THE COURT: I take it there was a previous motion to dismiss on the basis of a McCarthy hearing.

MR. HAMMERSCHMITH: That's right. There was a motion that was denied.

THE COURT: This is a Rule 36 motion we are talking about here, is that correct?

MR. HAMMERSCHMITH: Yes.

THE CLERK: Just checking, do you have a copy of the motion? I'm looking in the file and there is no motion. I will use this for the present time, Your Honor, if you don't mind.

THE COURT: I have a copy of the

motion here, and it refers to 85-5415 through 5425. The only cases that are before me are -- well, first of all, 5419 is not in front of me, as I understand it, nor is 5424 or 5421, is that right?

MR. HAMMERSCHMITH: That is my understanding. My understanding was that Mr. Bloom intended to dismiss those three indictments.

THE COURT: Well, all right, but this motion applies to all of them.

MR. HAMMERSCHMITH: I didn't know until this morning which indictments Mr. Bloom intended to go forward on.

THE COURT: All right, then I will hear you, Mr. Hammerschmith, on your motion.

MR. HAMMERSCHMITH: My understanding, as I have stated in the motion, is that when more than one year has passed since the arraignment -- actually, it's the return date of the

summons -- for an individual, and the person has not been brought to trial within this one year period, the burden rests upon the Commonwealth to produce evidence or reasons to justify the delay beyond the one year period. I gave to Mr. Bloom earlier this morning some dates which I understand, from my own notes in this case, -- I don't know whether Mr. Bloom has had a chance to review those and whether he has any disagreement with me as to those dates, but just to assist the Court, I would offer those, unless Mr. Bloom has objection.

MR. BLOOM: I don't have any objection to the dates, Judge. I interpret them a little bit differently, but the dates themselves I don't have any problem with.

THE COURT: Do you have a piece of paper?

MR. HAMMERSCHMITH: Not in a way

that would be very -- I think it would be easiest if I go chronologically through the case. I could --

THE COURT: Go ahead.

MR. HAMMERSCHMITH: Mr. Perrot, as I have said, was arraigned on December 30, 1985, I think that will appear in the docket file, and as far as I can determine, the next significant event that happened in his case was on April 28, 1986, when the case was continued to June 26, 1986 for hearing on a motion to suppress.

THE COURT: What date was that?

MR. HAMMERSCHMITH: April 28, '86, continued to June 26, '86. There then followed June 26th a series of continuances requested by the District Attorney's office with respect to the motion to suppress, as I recall, relating to witnesses being on vacation, one witness I believe had elective surgery for his knee, I believe, if I am

not mistaken, in all instances the allegedly unavailable witnesses were police officers.

The motion to suppress in fact was heard on September 1 and September 2, 1986 by Your Honor. It was continued for a few days to allow me to file a memorandum post hearing, which I did, and it was taken under advisement, decided on September 29, 1986, according to the decision which I received from the Court denying the motion to suppress.

The next event that occurred is that we appeared on October 28, 1986, before Judge Urbano, and on that day I requested and was allowed a transcription of the suppression hearing, and on that date Mr. Perrot in open court signed a Rule 36 waiver which was effective from October 28th until December 1, 1986, which I assume should be in the file.

THE COURT: Go ahead.

MR. HAMMERSCHMITH: On December 1, 1986, Mr. Bloom and I conferred on the case. At that time, Mr. Bloom indicated that he wanted to have a trial first on the other indictments rather than on the ones that are before the Court today, and on that date Mr. Bloom and I set a trial date of February 10, 1987, for those other indictments.

THE COURT: Okay.

MR. HAMMERSCHMITH: And, in fact, on February 10, 1987, Mr. Perrot appeared in court and pled guilty to those charges, I think the charges that were referred to earlier this morning. That was on February 10, '87, that he pled guilty.

The next thing that my notes indicate happened in the file was on March 21, 1987, we were in court again, Mr. Perrot was here, there was a discussion of further blood testing

being done, and on that date Mr. Perrot indicated a willingness in court to have his further blood testing done by the F.B.I. on March 31. Just as an aside, my expectation was the blood test would not take a significant amount of time, I thought they might take a month or possibly two months, but in fact they took much longer.

Mr. Perrot's blood was taken in court that day and I believe within a day or so thereafter was transported to Washington to the F.B.I. by Mr. Bloom and made a trip there.

THE COURT: That was in March of '87?

MR. HAMMERSCHMITH: Yes.

MR. BLOOM: The blood was brought down April 1st of '87.

MR. HAMMERSCHMITH: Apparently, there was also blood needed from the alleged victim in the case, Mrs. Prekop. For reasons that I am not aware of, that

blood was not taken and sent to the F.B.I. until May 4th of 1987. The F.B.I. analyzed the results of the blood -- analyzed the blood and sent its results to Mr. Bloom on August 4, 1987.

The next thing that happened, according to my records, that is on September 15, 1987, Mr. Bloom and I set the present trial date of December 7, 1987. That is my understanding of the chronology, Your Honor.

THE COURT: When did you set that?

MR. HAMMERSCHMITH: September 15, 1987, it was set for December 7, 1987.

THE COURT: Okay.

MR. HAMMERSCHMITH: I would suggest to the Court that that is not within the time frame that I have just indicated to you, the eleven months of excludable time -- which would be required in order to justify the delay that has occurred here.

Essentially, Mr. Perrot was

arraigned on December 30th, this motion was brought I believe shortly after November 30th, which would be a little more than twenty-three months later, and I don't believe that there are eleven months of excludable time within that time period. My understanding of the case law is unless the Commonwealth can establish eleven months of excludable time, the defendant is entitled to a dismissal of the indictments.

THE COURT: Mr. District Attorney.

MR. BLOOM: First thing, Judge, I would indicate to the Court that as has been made apparent to you this morning, there is a series of cases that Mr. Perrot was indicted under, and I would characterize them in three groups.

One was based on December 7th of 1985. That is the incident in which he was arrested and gave a statement concerning the incidents of 11/30 of 1985.

The cases in front of you today are 11/30/85, which one has to do with a home invasion and a few short minutes later a home invasion that resulted in a rape.

On December 7th, the next week, seven days later, he was arrested for a pocketbook snatch and another home invasion, which he was greeted by the husband of the house and there was a scuffle and he left.

It was clear, and the record will show, that from day one -- and there was also a third case of a woman in her 80's that was raped on another home invasion that is the subject of another pending matter -- that we intended to move, be it plea -- which was, of course, Mr. Hammerschmith's decision after talking to Mr. Perrot, either plea or by way of trial on the December 7th cases, and that was our position right from the beginning, and I

don't think there is any mistake or any misapprehension on either side concerning that. It was always clearly understood between counsel from day one that I intended to move on the December 7th case by way of him either pleading or trying the case, and I would indicate, Judge, I had this handed -- this has just come up, so I really didn't have an opportunity to cite cases to you, but my understanding of reading the law is quite clear, and putting it outside a legal context, common sense would have to guide the fact that if you have twelve or fifteen cases, obviously, the way our system works, it's not going to be tried in a year, and the cases that I have read make it quite clear that while you're proceeding on Case A diligently, that time period doesn't obviously count on Case 4, 5 or 6, and there's case law to back that up, which I will be happy to supply to the Court.

The other thing I would tell you, Judge, he did get arraigned right around the first of the year 1986, I believe it was December 30th. The case was continued because of the Grand Jury minutes not being available, and the reason we didn't pick a trial -- a suppression hearing, but again I want to tell you that after a suppression hearing, the intention was that we were going to move on the December 7th cases first. The reason that it wasn't picked until the time period that was some five or six months later is, my records show that Mr. Hammerschmith didn't get those until approximately three months after he was arraigned, the Grand Jury minutes. So that's why we had all these continuances. Again, he never objected to any of the continuances.

I'm not saying you don't have to bring a defendant to trial within a year, but my understanding again of the

law is two things: Those time periods are excludable if you don't object to them, because Rule 36 is intended to protect defendants, it's not supposed to be used as an active tool to try to get yourself out from under when you're facing a bad situation. That's what this is about. All these continuances, the record will reflect, either requested by him or agreed upon, never once at any time, Judge, on any of the indications on the logs of the clerk -- and I know, because I was always there -- did defense counsel or defense counsel on behalf of Mr. Perrot ever object to any continuance for whatever reason that the Commonwealth asked for. In fact, they agreed to them on the record.

Finally, I believe it was continued after the Grand Jury's -- the record came forward, and it was assembled and given to Mr.

Hammerschmith, and we had a September motion to suppress date. Any date from the date he was arraigned to the date the motion to suppress began, continuances for Grand Jury minutes or continuance because a witness wasn't available or a continuance because I was tied up in trial or Mr. Hammerschmith wasn't in court or tried up in trial, were always agreed to by defense counsel, and the record will bear me out on that.

So he can't turn around now and try to use those time periods to try to get out from under this case. My understanding again of the law -- secondly, also, Judge, I will tell you it was clear to Mr. Hammerschmith from day one that we were not moving on these cases, meaning the sexual assault cases, unless the other cases were resolved.

THE COURT: Are those the cases that were pled to?

MR. BLOOM: Yes. The obvious reason being, Judge, he gave a full confession on those cases, so anyone was going to move on those cases first. He gives a confession in these cases to being in the house, but on the assaults and what happened to the women, he doesn't admit to.

So what I had was, on those cases pending, I had an identification by a gentleman on one of the home invasions, an identification on two people on the pocketbook snatch, and I had a full confession. On all the other cases I had no identifications and at best, at that time, at that period, tenuous abilities to tie him in through physical evidence, keeping in mind the F.B.I. stuff didn't come into the picture till much later down the road.

When he ultimately -- when you ruled, and it was -- the motion to suppress ended September 3rd, I believe,

and about a month later you denied his motion, we got a copy of it. We agreed, and he signed for the record at about that time a Rule 36 waiver, because Mr. Hammerschmith, for the record, at that point indicated that he wanted the motion to suppress before he did anything on any of these cases, which was fine, but he recorded a motion to suppress waiver after being advised.

12/1/86 the transcript now is ready and we are ready to pick a trial date on the 12/7 cases, 12/7/85 cases. We agreed to a 2/10/87 trial date. Again, agreed to by both sides, no opposition to the continuance of the two month period. The intention which Mr. Hammerschmith has referred to was to try the December 7th cases, nothing to do with these cases.

He was remanded here because we wanted to give him the opportunity to talk to Perrot if he wanted to, to

prepare his case. We were going forward on the cases of December 7th.

Between that date and the date of the actual trial, I received a call from Washington from a Mr. Eubanks, who runs the serology department, and at that point, Judge, although we had not picked a trial date on these cases, he indicated to me that in reference to the Prekop case, which is one of the two cases pending before you, he had a blood stain, he removed it to a certain extent. He had also been given blood by the Springfield Police Department and found blood on those gloves, that pertaining to the bed sheet, that he needed more blood to either include her or exclude her, and more blood from Mr. Perrot to either include him further or exclude him.

At that time, what I had for a case was his statement saying he went into the homes when the two women said

there was the home invasion and then the rape, but denying any sexual contact, a hair and fiber analysis saying that the hair was not the defendant's hair, or that it was consistent with the defendant's hair that was found at the scene of the rape, and that was basically it, and the blood stain which was very innocuous but did include him as the possible perpetrator of leaving the blood.

After he pled guilty, Judge, and we were moving on this case, I came into Courtroom 1 in front of Judge Urbano and I said the same thing to him that I have said now, that I really don't care. If he wants to pick a trial date on the first available date, we will go with the trial date, but this could exculpate him, because doing the further analysis on the blood may have eliminated him. And I had only a scientific case with no identification,

he would have to have been a moron not to want to get that further examined, because, as it stood, it included him, to a degree. Not broken down to the extent that it ultimately did when they did further testing, but it included him. He had the chance that it could have excluded him.

It was explained to Mr. Perrot, explained to Mr. Hammerschmith, they stated in open court in Courtroom 1, and which I have provided you with a transcript today, and which we argued this last week, and what I'm saying to you about the dates and Mr. Perrot and Mr. Hammerschmith agreeing to the continuance for the purpose of this testing and the fact that I indicated it could and probably would take him months because of their backlog and I had no guarantee as to how long it was going to be before Eubanks was able to do it and get me the results. Mr. Hammerschmith

on the record Friday agreed that that was true.

Judge Urbano at the time indicated that at least this Rule 36 motion wasn't timely filed, and that is also part of the transcript. That's on the record that I have handed to you.

He also, I would indicate this to you, Judge, in terms of not only is the time excludable because there was never an objection and he agreed to all the continuances, and we didn't even start moving on this case until December 1st of 1986 was the first date that we even had meaningful conversations about this case. Up until the point -- and I may be giving you the wrong date -- up until the point that he pled, which may have been February of '86, I'm not sure of the exact date -- everything was being geared toward the December cases. We didn't even start getting into the bulk of this case in terms of what was

going to be done and what was going to be the trial date until he pled guilty, which again I believe is February of 1986.

So Judge Urbano also indicated, Your Honor, I would point out for the record, that on December 17th -- and I think this is relevant to the state of mind that motivates the filing of this motion, which I think is important -- number one, there hasn't been any prejudice, because since February of 1986 he's been incarcerated on a ten to twelve. So whether we tried it the next day or we try it today, no prejudice has befallen him, and that really is the theory of Rule 36. That's number one.

Number two, it wasn't till February, less than a year ago, that we began moving on these cases --

THE COURT: February '87?

MR. BLOOM: February of '86 --

excuse me, February of '87 we started moving --

THE COURT: That's when he pled guilty to the other charges?

MR. BLOOM: I believe so. Isn't that correct?

MR. HAMMERSCHMITH: The date of the guilty plea was February 10, 1987.

THE COURT: Okay. You've been saying '86.

MR. BLOOM: I'm wrong on that. Up to and including that period, everything that was done was directed toward the other set of cases that were the strongest at the time that he ultimately pled guilty to, regardless whether he agreed to all the continuances, which I tell you, as an officer of the Court, he did, and never put up an opposition to any of them, whether he was asking for the continuance or I was.

So without even getting into that, it's been less than a year. And

all those periods during the last eight months he has agreed to. In fact, during the time period that I stood up when we initially started to get into these cases, they wanted these tests done.

Judge Urbano indicated, Your Honor, and I think this is important on the transcript that I have given you, November 17th, less than a month ago, the motion was filed to try to get Mr. Hammerschmith out of the case. Although on all of George Perrot's cases he had been in the case for two years, and I said to Judge Urbano at the time, you know, he either thought he was a lousy lawyer a long time ago or a good lawyer a long time ago. When you see someone in a series of cases for two years and two weeks before trial wants him out of the case, it doesn't take a lot of imagination to recognize what is going on.

And, for the record, Judge Urbano made a finding that it clearly was a dilatory tactic, trying to get a delay in this matter, and part of the reason is the age of the victims, there's no question in my mind.

But all the continuances were agreed upon, any continuance in this case, we never started moving on this case until February of 1987, and when we began to move on this case, it would have been tried within one month from February of 1987, had it not been for Mr. Perrot and Mr. Hammerschmith agreeing that the stuff went back to Washington.

Because, Judge, I didn't send the stuff back to Washington. I brought it in front of a Justice of the Superior Court. And if they had disputed it -- as the record will clearly indicate on that day -- if they didn't want it done, we would have tried the case right then

and there.

Now it takes nine or ten months for the stuff to come back, through no fault of mine, and through the recognition, as I stated so on that day, that it was going to take a number of months, and they are asking you to throw these cases out on Rule 36. I don't think that is the intent of the statute.

THE COURT: Do you want to be heard further?

MR. HAMMERSCHMITH: If I may, Your Honor. Mr. Bloom has made a number of representations, some of which are in my memory accurate, some otherwise. I think I need to first of all make it very clear to the Court that it was not my understanding from day one in this case that we were going to be dealing with the February 10th cases first and that we would then deal with the present cases. Indeed, as defense counsel, my

desire was to the contrary. I would much rather have proceeded first with these cases rather than the others. But I'm leaving aside my desire.

All of the discussions that I had with Mr. Bloom up until the date of setting that February 10, 1987 trial date related to both sets of indictments. Indeed, on a number of occasions I was asking him for information that apparently was available, but I hadn't received yet, test results, all sorts of things like that, which appeared to be in the -- appeared to be available, appeared to be owed to me under the pretrial conference report that we had filed and so on, and certainly the discussions that I had with him did not prior to that time reflect a decision to go forward on only one case rather than the others.

I think in fact the situation was addressed very clearly in Rule 36 --

it's Rule 36(b)(2)(A)(iii), which in defining excluded periods talks about the situation where you have a trial in another case for the same defendant, and that excludes -- and I'm quoting -- "Delay resulting from a trial with respect to other charges against the defendant, which period shall run from the commencement of such other trial until fourteen days after an acquittal or imposition of sentence."

And I would suggest to the Court that under that very specific language of the rule, only fourteen days would be excludable because of that other case, the other pending indictments that had been scheduled for trial. Rule 36 is very explicit in the times which are included and times which are excluded. And it is my understanding that the implication, judicially accepted implication, is delays which are not excluded or

included are counted against the Commonwealth.

Now, I think on another occasion Mr. Bloom -- I think he just misspoke, but I want to make clear -- he mentioned a Rule 36 waiver being signed and filed in connection with the motion to suppress. What I believe he meant to say, and I'd ask that he correct me if I'm wrong, is what I said earlier, that a Rule 36 waiver was in fact signed.

THE COURT: He said it was to obtain a transcript.

MR. HAMMERSCHMITH: That's right.

THE COURT: That is what he said and that is what the Rule 36 piece of paper indicates.

MR. HAMMERSCHMITH: Perhaps I misunderstood him, then. Also, the discussion about how long it would take for the F.B.I. to do these test results. I was not privy to any such discussion or such discussion of a backlog at the

F.B.I. I did understand that it was going to take some period of time and, as I said, I thought maybe a month or two, to get these results from the F.B.I. I didn't anticipate that there would be a delay of a month in obtaining blood from Mrs. Prekop, and again I'm not sure what the reason was for that. Certainly there was some expectation by myself and by Mr. Perrot who gave blood that there was going to be some delay resultant from his giving this blood and having it analyzed by the F.B.I.

THE COURT: When did you get the transcript?

MR. HAMMERSCHMITH: It was received before December 1, 1986, which was the date set by the speedy trial waiver. The other thing is, with respect to what happened in front of Judge Urbano last week, I need to make clear, and I hope it is clear on the transcript that you have, I told Judge Urbano at that time

that although I had filed that speedy trial motion, I was not in a position to discuss it or to argue it, in any event, without having my client present, since it could potentially be a dispositive motion, it was a motion that he in open court said I didn't file for him and he asked me to file for him and I felt very strongly that he should be here. I didn't intend to make any waivers or any factual agreements, and I think if Your Honor looks at the record, you will see that I made it very clear that I needed to have Mr. Perrot here before making any presentation in court on that issue.

With respect to the alleged effort of Mr. Perrot to delay the case, I know Your Honor wasn't present when Judge Urbano made that conclusion. To be honest, I don't know what the basis was for it. There was no evidence taken, it was simply an inference that was drawn from the time of filing the

motion. I'm not sure that it is a justifiable inference.

But, in any event, I'm not sure it has any relevance to the particular motion you have in front of you. My understanding is that prejudice is not something that a defendant needs to show in a Rule 36 motion, when this motion is based upon a delay of one year or longer. I understand that if one is bringing a motion based upon an allegation that a time less than a year has passed and yet prejudice has resulted so serious that the indictments should be dismissed, in that situation -- which is another provision of the rule -- in that situation, prejudice is at issue, but not I think in the present situation.

MR. BLOOM: Judge, can I just indicate one thing to you? The reason that I said that about Judge Urbano about his findings is important, because

in the transcript on November 17th, when he tried to get the motion -- the motion was heard, to exclude Mr. Hammerschmith from representing him last month, there was a reference to Rule 36 being made, and a statement made by the defendant that I have asked my lawyer to file Rule 36, and on the record Mr. Hammerschmith said that's not so, that he had not asked him to file a Rule 36 waiver, and it is part of this record that that did happen on the 17th, and we both referred to it last Friday.

The reason that I pointed that out is clearly I don't agree that you don't have to show prejudice when you are talking about a year. If it is less than a year, then do you. But you can't agree to continuances and then say yeah, but I want that time not to run against me. The law is also clear on that.

If you want to give them the benefit of the doubt -- which I don't

suggest for a moment, because they agreed to all the continuances from the date he was arraigned to the date of the motion to suppress, it's about eight months to the day -- if you want to count all that time against the Commonwealth, which I don't suggest that the Court should, but putting it in the best light to the defendant, if you did, that brings us down to the period that once the results come back from the motion to suppress, they file Rule 36, which brings us to the end of 1986. And then we immediately pick a trial date for the other cases -- that time clearly doesn't run against us -- so that brings us to February.

On February 10th, when we were supposed to try these matters, he pled guilty. From that date till today, the continuances were agreed upon. That's when we got into the F.B.I., and there was no date put on other than I said it

was going to take a number of months.

It certainly isn't fair for them to stand up now, when we agreed to a number of months in our mind, we thought that meant two or three months, and because it was longer than that, that time ought to run against the Commonwealth. And I think that the motion ought to be denied, Your Honor.

THE COURT: I am going to deny the motion at this time based on the record I have in front of me.

We are now ready to go on the motion to suppress the statement?

MR. HAMMERSCHMITH: That is correct, Your Honor.

MR. BLOOM: The witness is here.

RICHARD KANE (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Could you state your full name, please?
A. Richard Kane, K-A-N-E.
Q. Are you employed?
A. Yes, I am.
Q. In what capacity?
A. I am a police officer for the City of Springfield assigned to the Crime Prevention Bureau.
Q. How long have you been with the Springfield Police Department?
A. Since 1974.
Q. How long with the Crime Prevention Bureau?
A. On and off for about twelve years.
Q. Do you hold a rank within the police department?
A. I am a police officer.
Q. Do you recognize the gentleman who is seated next to me?
A. Yes, I do.

Q. Do you recognize him to be George Perrot?

A. Yes, I do.

Q. I draw your attention to December 10, 1985. Did you have occasion on that date to see Mr. Perrot?

A. Yes, I did.

Q. Where did you see him?

A. It was in an examination room at the York Street Jail.

Q. Had you seen Mr. Perrot prior to that day?

A. No, I hadn't.

Q. Had you by any chance been in court when he was arraigned in District Court?

A. No, I wasn't.

Q. And it was where that you saw him on December 10th?

A. The York Street Jail in an examining room.

Q. For what purpose had you gone to York Street Jail?

A. I was sent by Captain Brown with a court

waiver signed by Mr. Perrot to withdraw some blood.

Q. Do you have that waiver with you today?

A. Do I have it? No, I don't.

Q. Let me show you a document and ask you to take a look at it and see if you recognize that as being the order for the blood test that you had that day.

A. I believe it was, yes.

Q. This document is not actually a court order, is it? Isn't it a form that is signed by Mr. Perrot agreeing to have the blood taken?

A. Correct.

Q. And you had this form with you, did you, when you went to York Street on December 10th?

A. Yes, I did.

MR. HAMMERSCHMITH: I'd like to offer this into evidence at this time, Your Honor.

THE COURT: Is there any objection, counselor?

MR. BLOOM: No, Judge.

THE COURT: Exhibit No. 1 for purposes of the motion to suppress

(Exhibit 1, form signed by Mr. Perrot, marked into evidence)

Q. (By Mr. Hammerschmith) So, your purpose in going to the jail was to take the blood that is referred to in this consent form?

A. My purpose was to pick the blood up. I didn't withdraw any blood from Mr. Perrot, no.

Q. Did you have instructions to be present when the blood was drawn?

A. Yes, sir, Captain Brown told me to take this search warrant waiver signed by Mr. Perrot to the jail, meet Mr. Aberdale, and pick up blood samples that Mr. Aberdale would withdraw from Mr. Perrot in my presence.

Q. When you went to the jail, you were aware that Mr. Perrot was in custody there, weren't you?

A. Yes, sir, I was.

Q. Were you aware that he was in custody for the same charges for which you were obtaining the blood test?

A. That and other charges, yes.

Q. Now, you were also aware, weren't you, that Mr. Perrot had been arraigned in District Court on these charges?

A. He told me he was, yes.

Q. Who told you he was?

A. Mr. Perrot.

Q. While you were there?

A. While I was at York Street.

Q. On December 10th?

A. On December 10th.

Q. You also knew from your experience as a police officer, didn't you, that he wouldn't be at York Street if he wasn't there either serving a sentence or on some form of charges?

A. I knew he wasn't visiting.

Q. He was an inmate there?

A. Correct.

Q. If he has not been arraigned on the charges, he is kept at Pearl Street, right, at the police station?

A. I couldn't say if he would be kept at Pearl Street or not. I don't make those decisions.

Q. Well, how many arrests have you been involved in as a police officer?

MR. BLOOM: Judge, we can stipulate he was arraigned -- that he had been arraigned.

THE WITNESS: I wasn't present for his arraignment.

Q. (By Mr. Hammerschmith) Did you notify Mr. Perrot's attorney that you intended to go to York Street with that consent form to have his blood taken?

A. No, sir, I was told that his attorney agreed, and that's why the consent form was drawn up. I didn't notify his attorney, no, not myself, no.

Q. You were told his attorney agreed?

A. That was my understanding, it was agreed upon with his attorney to -- and that waiver was drawn up, that's correct.

Q. So you didn't notify any attorney that you were going down at that time?

A. No, sir, I didn't.

Q. And, to your knowledge, no one else notified his attorney that you were going there?

A. No, sir.

Q. Now, when you saw him there at York Street, do you recall what room you saw him in?

A. A specific room, I don't think they are numbered. It was an examining room. There was a group of rooms in the jail and it was the medical section of the jail, but the particular room, no.

Q. Who was present in that room?

A. Myself and Mr. Aberdale.

Q. Who is Mr. Aberdale?

A. My understanding is he's the jail nurse, he distributes medication.

Q. Was it Mr. Aberdale who was to take the blood from Mr. Perrot?

A. That's correct.

Q. And there was no lawyer there present with Mr. Perrot at that time, was there?

A. No, sir.

Q. Now, when you saw Mr. Perrot there, did you tell him why you were there?

A. No, sir, not at first I didn't, no.

Q. What happened when you -- was he already in the room when you walked in or did you --

A. No, sir, I was in the room by myself, Mr. Aberdale stated he would get Mr. Perrot and return him to the room, which he did.

Q. What happened when they returned? What was the first thing that happened when they returned?

A. Mr. Aberdale sat Mr. Perrot down in a chair, told him he was going to take some blood samples, and started taking the blood samples.

Q. Was there any discussion as to why the blood was being taken?

A. Not at that point, no.

Q. Did either you or Mr. Aberdale in your presence ask Mr. Perrot if he wanted to have his blood taken at that time?

A. I believe Mr. Aberdale did, yes.

Q. Mr. Aberdale is an employee of the Hampden County House of Correction?

A. I would assume so, yes.

Q. When asked whether he wanted to have his blood taken, what did Mr. Perrot respond, if anything?

A. At that point, I really don't recall what he responded right to that particular question

put that way. Mr. Perrot started talking freely.

Q. He was talking, was he not, about his girlfriend?

A. Yes, he was.

Q. And how pretty she was?

A. That's correct.

Q. Now, at some point in time, you gave him his Miranda rights, is that not right?

A. It was almost immediately as -- as he was talking freely about his girlfriend and how pretty she was, I, at that point, stopped him and advised him as to who I was, and then I advised him of his Miranda warnings.

Q. Who did you advise him that you were?

A. I told him my name was Richard Kane and I was a police officer for the City of Springfield.

Q. What Miranda rights did you advise him of?

A. I took a card out of my wallet and I read him his Miranda warnings off of a card in my wallet.

Q. Do you recall what the rights were that you read to him?

A. Yes, I do. (Witness produces card)

Q. What were those rights?

A. I told him these were his Miranda warnings and I told him, "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before questioning, if you wish. If you decide to answer questions now without a lawyer present, you will have the right to stop questioning at any time until you talk to a lawyer."

I said to him, "Do you understand what I have read to you?"

And he said, "I do."

I said, "Having these in mind, do you wish to keep talking now?"

Q. Did you read those to him before or after the blood was drawn?

A. They had already started drawing the blood and he started talking. It was at that time I

stopped and read him his Miranda warnings.

Q. Where was the blood drawn from? Did you watch while it was being drawn?

A. It was drawn from his arm.

Q. Approximately how much was drawn from him?

A. I don't recall. Maybe three vials, but I'm not sure.

Q. What do you mean by a vial?

A. They were vials that a hospital would use to take blood samples.

Q. Could you tell us the approximate size of the vials, just as best you recall?

A. I can't. It's a standard size vial. I wouldn't even want to guess. I really don't know. It's a small amount of blood from his arm.

Q. The size of a finger?

A. I suppose.

Q. There were three of those?

A. I think there was three, but I'm not positive.

Q. And this blood was being drawn as you spoke with him and as he spoke with you?

A. When the blood was being drawn from him, he was speaking.

Q. And you gave him his Miranda rights, correct?

A. Yes, sir, when he was speaking freely, I figured I better let him know who I am at that point, so I stopped him, told him who I was, and then I took a card out of my pocket and read him his Miranda warnings. I just wanted him to be sure he knew who I was.

Q. Up to that point in time when you gave him the Miranda rights, all he really talked about was his girlfriend and how pretty she was and did you see her in court, is that right?

A. Up to that point, yes. When they started drawing blood from him, he asked me if I had seen his girlfriend in court that day.

Q. And after you gave him his Miranda rights, you asked him some questions, correct?

A. I believe I did, yes.

Q. After giving him his Miranda rights, what questions did you ask him?

A. I asked him about a pocketbook.

Q. What was his response?

A. He told me a location on Covel Street of a house at the end of the street where the driveway goes up a hill by Hilltop Street where he placed the woman from Covel Street's pocketbook into the bushes, and I believe it was on the right-hand side of the house.

Q. Before asking him about the pocketbook, you also asked him about the break at Covel Street in general, didn't you?

A. Yes, I asked him if he knew anything about Covel Street. He said he broke into the house. He said he never raped any old lady.

Q. Covel Street is referring to one of the break-ins for which he had just been arraigned, is that correct?

A. Yes, sir, Covel Street is a house where a lady was -- the house was broken into and the lady was sexually assaulted also, correct.

Q. And you also asked him, didn't you, if he knew why his blood was being drawn?

A. Yes, I did.

Q. When you got back -- strike that. At no

time while you were there with Mr. Aberdale and Mr. Perrot in that examining room at York Street on December 10th was counsel present with Mr. Perrot, correct?

A. No.

Q. Was counsel present?

A. No.

Q. Following the drawing of the blood and this discussion with Mr. Perrot, you next went back to the police station, is that correct?

A. That's correct.

Q. When you got back to the police station, you reported your conversation with Mr. Perrot to Sergeant Kelly, is that correct?

A. That's correct.

Q. And you also, I take it, turned over the blood to him?

A. I made a written report of the conversation I had with Mr. Perrot at the jail and I advised Sergeant Kelly and I tagged the blood samples, correct.

Q. In that report you summarize, to the best of your recollection, what had transpired at the

jail?

A. When I made that report, it was the distance from the courthouse to the police station and I wrote the report, so it was only a matter of minutes, correct.

MR. HAMMERSCHMITH: No further questions.

MR. BLOOM: Just a couple things.

CROSS EXAMINATION BY MR. BLOOM:

Q. Prior to your Mirandizing him, meaning Mr. Perrot, he hadn't said anything about any of the cases pending against him, is that true?

A. That's true.

Q. And I believe you told Mr. Hammerschmith, if I'm right, that what he had said was something about how his girlfriend looked and then asked you whether you had seen her in court?

A. That's correct.

Q. And at or about that time, you

Mirandized him, correct?

A. That's correct.

Q. Now, you have gone before, before December 10th of 1985, prior to that date, you have been in the room in which people's blood has been taken in a criminal investigation, correct?

A. That's correct.

Q. And when you left, wherever you were at, to go down to the House of Correction, you were instructed by Captain Brown to see the blood come out of his arm, isn't that right?

A. That's correct.

Q. And the reason for that, Detective, correct me if I'm wrong, would be so there wouldn't be any mistake that that vial belonged to Mr. Perrot, correct?

A. That's correct.

Q. And in this case or any other case, evidence that is taken, a property slip is attached to it, correct?

A. Correct.

Q. So when you take a vial of blood from someone, you make out a property slip and then give

it a number, for instance, 3141 or whatever the next number is in succession up at the police station?

A. The evidence officer assigned a number to it, correct.

Q. And then you write in Richard Kane took bed sheet number 3141 from following location, following time, correct?

A. Yes.

Q. And that is done so there won't be any mistake down the road as to where or whom this piece of evidence came from?

A. That's correct.

Q. And who the officer was associated with taking that piece of evidence, correct?

A. That's correct.

Q. So when you left wherever you were at to go down to the House of Correction, your purpose was to be able to identify that particular vial that you ultimately were going to give a number to to George Perrot?

A. That's correct.

Q. So if any type of analysis was done on that down the road, you could go into court and say

that number on that vial is the vial I saw taken out of Perrot's arm on December 10th of 1985?

A. That's correct.

Q. And that is why you went down there, correct?

A. Exactly.

Q. And on other occasions, sir -- strike that. When you went down there, did you have any intention when you left wherever you were at and headed down to the House of Correction to have conversation with Mr. Perrot?

A. Absolutely not.

Q. And, in fact, Mr. Aberdale was in the room the entire time period?

A. That's correct.

Q. My understanding is that Mr. Perrot had been arrested on December 7th, is that correct, if you know?

A. I believe so, yes.

Q. And he signed a waiver on that day, correct?

A. Yes.

Q. And now it was Monday, you were at work

and Captain Brown was telling you to go up and watch the blood come out of his arm?

A. Yes, an appointment had been made for 3:00 that day.

Q. Did you ever talk to him outside of Aberdale's presence?

A. No.

Q. Did you have any problem communicating with him?

A. No, sir, I didn't.

Q. Did he appear to have any problems understanding the Miranda rights as you gave them to him?

A. I asked him if he understood them, and he said he understood them perfectly, yes.

Q. And, in fact, what he told you was that he had broke into the Covel street residence, is that correct? He told you where he put the pocketbook?

A. That's correct.

Q. And then he said something to the effect I didn't rape anybody?

A. "I didn't rape any old lady," I believe is what he said.

Q. Now, after you had taken the blood and finished this conversation, you went up to the police station, is that correct?

A. That's correct.

Q. And at that time you reduced to writing what had happened a few minutes before down at the House of Correction?

A. Yes, sir, I did.

MR. BLOOM: That's all I have of this witness, Your Honor.

MR. HAMMERSCHMITH: Nothing further of this witness, Your Honor.

THE COURT: Thank you, sir.

(Witness steps down)

MR. BLOOM: Judge, two things. We would stipulate that on December 7th, which that document was drawn up that you have, that is a date you heard about that he was arrested, he was not represented by counsel. That was the date of the arrest.

THE COURT: Okay.

MR. BLOOM: The other thing, Judge, I don't know how you want to handle it, but as I told you, I just received the motion this morning in terms of precisely what it is saying and I don't know whether you want to conduct -- you have heard evidence pertaining to this that I think is relevant that I would offer, and what I am referring to is the fact that on the 7th he had been Mirandized twice, you heard that in the motion to suppress. In fact, I have the two exhibits here that he was Mirandized at 5:00 in the morning and signed the card and then Mirandized again at 1:30 in the afternoon, and I think in light of this motion, if he doesn't want to stipulate to the introduction, I can get ahold of the two officers and bring them back in, unless he can stipulate to the context of their motion to suppress statement, just pertaining to this.

What I'm saying to you is I don't know what the issue is here. Is it a Miranda issue or is it the fact a lawyer wasn't present? Because if it is a Miranda issue, I think this part is relevant. I don't know how he wants to handle it.

MR. HAMMERSCHMITH: I'm not specifically concerned about the giving of the Miranda warnings or the Miranda waiver.

THE COURT: What about the understanding of it? It would go to that issue there if he received them twice before in the last two days.

MR. HAMMERSCHMITH: I am certainly willing to stipulate that these Miranda warning cards were signed by Mr. Perrot on the dates and times indicated on the cards, if that's what Mr. Bloom is requesting.

MR. BLOOM: I think it is relevant, if that is one of the issues to be

argued, Judge. I'd like to offer the two Miranda cards for this hearing and the right to use the telephone card that were both previously signed on December 7th.

THE COURT: You have seen those, counselor?

MR. HAMMERSCHMITH: Yes, I have.

THE COURT: 2A, B and C.

(Exhibits 2A, B and C, two Miranda cards and telephone card, marked into evidence)

THE COURT: Anything further?

MR. BLOOM: Also, Judge, in reference to that, under oath, Detective Jarvis -- and I am reading from the motion to suppress, testified that on December 7th of 1985, he explained the procedure surrounding that document that has been offered to you.

THE COURT: Are you agreed to this?

MR. BLOOM: I don't know whether he wants me to bring him -- I'm just telling you, this was -- I think it's relevant.

THE COURT: I'm going to take it into consideration.

MR. HAMMERSCHMITH: For purposes of this hearing, and this hearing only, I would stipulate that he was given the Miranda rights on that date and apparently seemed to understand the rights and signed the card.

MR. BLOOM: What I am indicating is that there's been previous testimony under oath on the issue of the explanation of the taking of the blood and then the ultimate signing that you heard. I don't expect you to remember it. If that isn't stipulated, I can get Jarvis and run him down here, but he did testify to that.

THE COURT: You gentlemen make up your mind how you want to handle it and

we will reconvene at 2:00.

MR. BLOOM: All right.

MR. HAMMERSCHMITH: I was just going to say that I hadn't -- I had one other document which I was intending to offer, which would be the only additional --

THE COURT: What is it?

MR. HAMMERSCHMITH: It's the appointment of counsel form and the docket sheets from the District Court to show that on these charges Mr. Perrot had been arraigned in court and had been appointed counsel to represent him on December 9, 1985, the day prior to the visit to him at York Street.

THE COURT: Did you show them to your brother?

MR. BLOOM: We can clear all this up for you at 2:00.

(Hearing recessed at 1:05 P.M.)

(Hearing reconvened at 2:15 P.M.
The defendant was present in the courtroom)

THE COURT: Counsel.

MR. HAMMERSCHMITH: Your Honor, with respect to the defendant's case on the motion to suppress, I have spoken with Mr. Bloom and it is my understanding he is willing to stipulate that on the day prior to December 10th, when Richard Kane went to York Street and saw Mr. Perrot, on the day prior to that, December 9th, Mr. Perrot was arraigned on these charges in Springfield District Court and then for the first time he requested and was appointed counsel, and that stipulation would be the last of the evidence that the defendant would intend to produce in support of the motion to suppress.

MR. BLOOM: I'm sorry, what was the last part? Who requested --

MR. HAMMERSCHMITH: He for the

first time requested and was appointed counsel.

MR. BLOOM: I will stipulate that a lawyer was appointed for him on December 9th. I don't know anything about any request on behalf of the defendant. I think we know as a matter of record that would be done in a case like this as part of the procedure in our court system.

THE COURT: Okay. Anything further?

MR. BLOOM: The only other thing, Judge, factually, was on that Exhibit 1 that you were given, if in fact we called the detective -- the detective has already testified and under oath I think we can stipulate to the fact that he had testified and would that he went over the alternatives with Mr. Perrot, explained to him that he didn't have to give consent to his hair or blood, and that it was signed after having that

explanation being given to him on December 7th of 1985. There is previous testimony to that under oath, it is just to bypass having to bring him in here and say that over again. You heard it in the motion to suppress. I'm sure you don't remember it, but --

MR. HAMMERSCHMITH: I don't have a problem with that stipulation, for purposes of this hearing.

THE COURT: Okay.

MR. HAMMERSCHMITH: I would like to be heard, if I may.

THE COURT: Go ahead.

MR. HAMMERSCHMITH: As Your Honor heard, the intention of Officer Kane -- his purpose in going to York Street was to take this blood or witness the taking of the blood that was taken from George Perrot. The authorization form that he had with him when he went, which was introduced as an exhibit, basically appears to be a consent form, it was

signed by Mr. Perrot on December 7th at a time when he did not have appointed counsel.

After signing that form and before Officer Kane's trip to York Street, Mr. Perrot appeared in District Court in Springfield, was arraigned on these charges and had counsel appointed. There was no indication, indeed the evidence seemed to be to the contrary, that notice was given to Mr. Perrot's counsel that Officer Kane intended to go to the station to take the blood. Counsel was not present at any time during the course of what happened there at York Street with Officer Kane, George Perrot and Mr. Aberdale.

My understanding is that whether or not Officer Kane had actual knowledge that Mr. Perrot had been arraigned on these charges and had counsel, that under Michigan versus Jackson, which is quoted or just cited

in my motion, the police officers deemed conclusively to have such knowledge.

In that case -- and I have the U. S. law cite, so I can't give you the U. S. Report citation, but I am quoting -- the Court says, "The State points to another factual difference: the police may not know of the defendant's request for an attorney at the arraignment. However, Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)."

THE COURT: Well, they haven't claimed that here, have they?

MR. BLOOM: No, I'm just indicating to Your Honor that although Officer Kane

did not specifically state that he had knowledge of Mr. Perrot's appointment of counsel at that stage, under the law, he is deemed, as a State actor, to have such knowledge of the proceeding in the Commonwealth's course. That is my understanding of this case.

Given that, I would suggest to the Court that counsel should have been notified and given the opportunity to be present at this very important event which took place at the York Street Jail. The event was important for a number of reasons. First of all, the event was occurring -- what was occurring was the taking of blood without a court order pursuant to a consent which had been obtained from the defendant prior to his having counsel and prior to his having been arraigned on these charges. My understanding of the legal import of that document is that it was simply a consent form which

may have been valid at the time, but my understanding would be that Mr. Perrot could have at any time have said I no longer wish to give blood, the consent form is not something that I am willing to abide by any longer. I think it was, in effect, a contract without consideration.

If he had had counsel, as he should have, he could have made a decision at that point as to whether or not he in fact wanted to have the blood given. He did not have counsel there. It is also a situation where there was a direct confrontation or meeting involving a police officer and Mr. Perrot concerning the circumstances of this case, the blood that was to be obtained was blood to be tested in connection with this case. And I think counsel again had a right to be present to witness that, to counsel the defendant if counseling was needed and

so on.

And I think it also was perhaps a somewhat emotional situation, even leaving aside the recent arraignment and the charges against the defendant. You have somebody who is giving their blood, and a lot of people get very nervous when their blood is being taken and people react in different ways. I think the possibilities as to what might happen are illustrated by what happened apparently in this particular case, where Mr. Perrot gave statements --

THE COURT: Have you filed a motion to attack the validity of the blood taking?

MR. HAMMERSCHMITH: No, I have not, Your Honor. The only reason I am raising -- I am not challenging the taking of the blood itself. What I am suggesting to the Court is this was a situation where the defendant was

entitled to have counsel present, and I think that the fact that they were taking his blood is a circumstance which indicates that that was so. I think it was an important part of the proceedings, he had counsel, who at the very least should have been notified and given an opportunity to be present. That did not occur.

THE COURT: But you are not attacking the validity of it?

MR. BLOOM: That is a confusing thing. You may want to recognize, Judge -- because I know you have no way of knowing it -- the blood that ultimately is going to be used in this case is not that blood. I mean, blood was taken by court order, later on down the road that was the blood that was used to examine him.

MR. HAMMERSCHMITH: I don't think -- I don't think any -- the blood that was taken is meaningless in terms of the

defendant's rights, in retrospect. The only point I am making is when the blood was being taken, that was something which was very important to the defendant, that event, it was something at which he was entitled to have counsel present.

THE COURT: How is it any different from a situation where he makes a statement to the police after being told he's got a right to counsel and being told of his rights and he waives counsel and says I want to make a statement to the police? How is it any different?

MR. HAMMERSCHMITH: Well, at this point in time, he's already been arraigned and he has had counsel appointed. My understanding -- there is certainly nothing to suggest that Mr. Perrot had advance notice of when the police were going to be coming down there, and my understanding would be to the contrary, that they just showed up

to take his blood.

THE COURT: You stated in your motion he could not legally waive counsel, and that's what I'm asking about. Why can't he --

MR. HAMMERSCHMITH: I think again Michigan versus Jackson --

THE COURT: Just because someone's been appointed to represent him in the District Court, he cannot then thereafter ever waive counsel? Is that what you are saying?

MR. HAMMERSCHMITH: He cannot make -- he cannot make a waiver in this type of situation. I'm sure he could go into court and indicate to a judge in the courtroom that he no longer wishes to be represented by counsel. What I am suggesting is that once he has asserted his right to have counsel, an assertion which took place when counsel was appointed in the District Court, then --

THE COURT: Forever after then he

can't waive it? Is that what you are saying?

MR. HAMMERSCHMITH: Thereafter, the Commonwealth is not, I would suggest, allowed to initiate, whether by interrogation or by visiting the defendant for suggested purposes, such as we have here, to initiate contact directly with the defendant concerning the case. I think that's what we have here.

This isn't a case where the defendant went up to the police station and said I want to talk about my case. If that had happened here, we might have a little different situation, but we don't. We have a defendant who is in custody at York Street, who has not initiated this contact, the police are initiating it, for purposes of taking blood, which I might say is, under the cases that I have seen, equivalent to an interrogation -- I refer the Court to

People versus Johnson at 423 New York Supplement 2nd 905, 1979, New York case; and Creijanovsky versus The State, 706 Pacific 2nd 540 at 545 to 546, an Oklahoma case, a 1985 case, both of which hold that taking blood is, in effect, an interrogation, the functional equivalent, I guess is what I'm saying, of an interrogation.

THE COURT: Here again I go back to this, my original question to you. You are not attacking the validity of his signing the waiver on the 7th of December. He signed a waiver of that on December 7th.

MR. HAMMERSCHMITH: Yes. Unrepresented at the time, yes.

THE COURT: And --

MR. HAMMERSCHMITH: It's not a permanent waiver. I certainly don't interpret it as that.

THE COURT: You are saying by the mere appointment of counsel at the time

of arraignment, that automatically terminates it?

MR. HAMMERSCHMITH: No, I think that creates a situation where if the blood is to be taken --

THE COURT: What do you mean if it is to be taken? He's already waived his right and said yeah, you can take it.

MR. HAMMERSCHMITH: But blood had not been taken at arraignment. I'm saying if they are going to take his blood, I would suggest counsel needs to be notified, because it is a police initiated contact with the defendant for the purpose of obtaining evidence.

THE COURT: If that piece of paper means anything at all, it means he has waived the right and he has given them strict permission to take it.

MR. HAMMERSCHMITH: I think the point I'm making, Your Honor, is it's an uncounseled waiver, which does not in itself make it ineffective, but I

certainly suggest it can be revoked at any time.

THE COURT: All right, but you are saying the automatic appointment of a lawyer in the District Court automatically revokes it?

MR. HAMMERSCHMITH: No, what I'm saying is that once a lawyer is appointed, before they intend to implement this document, I think that counsel needs to be appointed. Counsel doesn't even know that --

THE COURT: Counsel needs to be appointed?

MR. HAMMERSCHMITH: I'm sorry, counsel needs to be advised. That would be my position, yes. And I think even if one ignores that, the problem goes still further, and that is that what happened at York Street was in fact an actual interrogation. My understanding of the testimony by Officer Kane was that when he went down there, he

initially -- there was initially something said by Mr. Perrot concerning his girlfriend, his girlfriend being in court, and how pretty she was. Nothing directly related to this case. Nothing directly implicating him with respect to this case.

The officer then took the initiative of giving him Miranda rights and asking him a series of questions, which I would suggest is certainly interrogation. The questions that he asked related to his knowledge of the break-in at the house on Covel Street, the whereabouts of a pocketbook that was taken in the course of that break-in, and the reason for taking the blood sample, all of which -- with respect to all of which there was interrogation or questioning by Officer Kane under his own testimony.

The Jackson case -- again which I have cited in my motion --

states that the state -- I'm quoting again -- "the State maintains that each of the respondents made a valid waiver of his Sixth Amendment rights by signing a postarraignment confession after again being advised of his constitutional rights. In Edwards" -- and they are referring to California versus Edwards -- "We rejected the notion that, after a suspect's request for counsel, advice of rights and acquiescence in police-initiated questioning could establish a valid waiver. We find no warrant for a different view under a Sixth Amendment analysis. Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel and Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." and I think that's what we have.

THE COURT: This is at the time of interrogation.

MR. HAMMERSCHMITH: Yes, I'm referring to two interrogations that occur. I think one is the taking of the blood --

THE COURT: I mean in the cases you are sighting you are talking about cases where they continue interrogation after he has requested a lawyer.

MR. HAMMERSCHMITH: This particular Jackson case is a case where the situation arose after arraignment. In Jackson, the Court said basically that the situation where someone requests and is appointed a lawyer at arraignment is at least as strong and probably much stronger than the situation where at the police station in a pre-arraignment situation the person asks to have counsel appointed, because this -- counsel has already been appointed through the Court.

THE COURT: Counselor.

MR. BLOOM: Two cases, Your Honor, that I would ask you to take a look at, which I think are most close factually, both Massachusetts cases -- and interesting for the record, counsel hasn't cited any Massachusetts law -- Commonwealth versus Sherman, I would ask you to take a look at that, and that is at 389 Mass 566. And then, more importantly, Commonwealth versus Andujar, which is 7 Mass Appeals Court 777.

Now, I think, at least the way I interpret it, that basically Mr. Hammerschmith is not arguing that there was no valid waiver under the Fifth Amendment, he is raising the Sixth Amendment argument to the Court, and as I understand it, in essence, what he is saying to you is what occurred on the 10th of December 1985 was violative of the Sixth Amendment because Mr. Perrot

had been arraigned and his lawyer was not advised that blood was going to be taken from him on that day. At least that is my understanding of what he is saying.

Unfortunately, Judge, that isn't the law in the State of Massachusetts, as I read it, and I think the Court will come to the conclusion as it reads these cases.

These two cases are the closest we can find that have some merit factually to deal with this issue and are similar in nature, to an extent, to the case we have in front of us.

The Sherman case, Judge, is a case where counsel had been appointed and had had a relationship with the defendant for some period of time, and then apparently he had been rearrested on new charges, and the lawyer went to the police officers in charge of the investigation and indicated to him that

in fact he didn't want the police officers talking to him under any set of circumstances, interrogating him in any form, if in fact they decided to do so. If they were even thinking about doing so, even though he didn't want them to talk to him, he wanted to be notified of anything that they were deciding to do in reference to this gentleman that he was representing on unrelated matters.

In that case, Judge, they went ahead and they interrogated him anyways. They didn't notify his lawyer, even after the lawyer told them, number one, I don't want you talking to him; anything you do, or if you are ever contemplating that, I want to be notified; and, three, they attempted to delay the arraignment so they could interrogate him and then go back into court and say, well, Judge, technically, he didn't have a lawyer assigned to him yet on these new cases. Those were

basically the facts.

And the Court held where counsel was appointed to represent a defendant on one charge and he clearly informs the police of his desire to be present at an interrogation of the defendant on unrelated charges, and in giving the Miranda warnings the police did not inform the defendant of counsel's request, any resulting inculpatory statement must be expressed as a failure to inform the defendant of his right to counsel."

Now, that case came down, Judge, after the Andujar case, which is the closest to our set of circumstances, and it distinguishes their facts from Andujar. And in Andujar, Judge, the difference is, this is a case in which the defendant claimed he had had -- and I think this gets to the crux of what we have in front of us -- did not validly waive his Miranda rights because the

police interrogated him despite his attorney's alleged request in the defendant's presence that the police refrain from questioning the defendant.

So there was a set of circumstances here in which the defendant and in the police presence made a request that he didn't want the police interrogating the defendant.

Later on, they went and questioned him again, he waived his Miranda warnings, it was found by the Court that regardless of what had been said before, that that right is held in the hands of the defendant not defense counsel, wasn't a violation of the Sixth Amendment, and the issue for the judge to determine is under the totality of the circumstances, whether or not the defendant made a voluntary waiver prior to the inculpatory statement that the Commonwealth is seeking to introduce.

They went on to say -- and I

think this is right on point -- a detained suspect in any given case has the right to be represented by counsel, there's no question on that. But there is not and never has been an absolute constitutional requirement that his attorney, even if retained or appointed, be present during or notified prior to this interrogation. And that is the holding and that is the status of the law in the State of Massachusetts.

So, where there has been a suppression in Massachusetts it was a clear case of subterfuge, where the cops were horsing around to pull the wool maybe even over the Court's eye, but clearly disregarding a direct statement that had been made to them by someone regarding an attorney-client relationship with the defendant. The Andujar case in which Sherman says we have not set that aside, that is the law in Massachusetts, the police approached

the defendant and interrogated him, even though there was an instance before in which defense counsel was present with the police and the defendant and he expressed an intention, the defense counsel, that he didn't want the defendant talking to the police, the Court held that that right on the waiver of either the Sixth or the Miranda rights was saying that was held by the defendant, not defense counsel, and the determination to be made by the Court is whether those things were waived by the defendant, not whether defense counsel was notified. And the way I look at this case, Judge, it's a lot more intrusive toward the constitutional rights of the defendant in the Andujar case than what was done to George Perrot.

Number one, defense counsel had expressed in the police presence that he didn't want -- he didn't want

anymore questioning to go on. That was heard by the defendant, it was heard by the police, and they continued to interrogate him at a future time. Our set of circumstances are completely different. I don't think there is any argument that the facts are overwhelming that he knew he had a right to counsel, he waived it twice on the 7th, he waived it a third time when he was asked about hair samples on the 7th, and Kane testified under oath today, as I remember it, that Aberdale told him or asked him do you still want to give blood now? Maybe that didn't happen, but I thought Kane said that Aberdale in his presence, before taking the blood, told him that.

There is nothing in the State of Massachusetts that says that this is violative of the Fifth or Sixth Amendment because Detective Kane or someone else in the police department

didn't contact Mr. Hammerschmith before carrying out the waiver that had been signed on the 7th, so in essence, as I see it, Judge, in light of these two cases, Mr. Hammerschmith is asking the Court to make new law, because the bottom line of the Andujar case, which was affirmed in the Sherman case that I cited to you, that is a detained suspect has the right at any point to be represented by a lawyer, but there is no absolute constitutional requirement that his lawyer, even if retained or appointed at the time of the intrusion, be present during or notified prior to any interrogation that the police conduct.

I would ask you to take a look, Judge, if you would, at those two cases, they are Massachusetts cases, not California or Colorado or the other case that Mr. Hammerschmith has cited to the Court, particularly the Andujar case,

which is directly on point, and I think what you have here is way less of an intrusion that the Court in Andujar said was proper, not that they said it is proper procedure, but they said you have to look beyond that -- regardless of the statement made by defense counsel, the Court then has to look at whether or not this was a voluntary waiver of Miranda in light of all the circumstances. In that case they found that it was.

You have an overwhelming record on about this time, on the 7th, 8th, 9th and 10th, he had had innumerable chances or was given innumerable opportunity to be told that he had a right to counsel for the hair, he didn't have to give the hair, he had a right to have a lawyer there during the hair, he had a right to have a lawyer there at 5:00 on the 7th, the first time he was talked to, and 1:00 in the afternoon on the 7th again when a

new police officer talked to him on a new set of cases. He clearly understood that. And then Kane gave him again -- and the interesting thing I would say to you last, Judge, is I don't know if it was intended as criticism, but there was a reference made to Kane interrogating him. Well, hopefully Kane did what we would hope any cop would do, it was obvious to Kane he was just blurting out stuff at random, and before it got to the point it was inculpatory, he stopped him in fairness, hey, I'm a cop, this is gonna come back on you, and here's your rights again. I'm sure Mr. Hammerschmith wouldn't want to him sit there mute to wait until he inculpated himself for half an hour and then said to him by the way, I'm with the CPB and I'm going to make a note on everything you told me. You want a lawyer here? He did what we would all hope any good cop would do. As soon as he saw that he

was talkative and he was blurting out things, before it got inculpatory, he again, for the fourth time within a three day period, got his Miranda rights again, and at that time waived them, decided to talk -- his decision, not Mr. Hammerschmith's decision -- voluntarily waived the right and gave the police a statement.

THE COURT: First of all, I'm not so sure I'm too clear exactly what the statement was, but I gather it was substantially the same statement he gave them two days before, except he gave them the location of the pocketbook.

MR. BLOOM: Yes, sir. There is nothing in there that is not included in the statement of the 10th. The only distinguishing factor is that he gave the information as to where the pocketbook was. There is nothing in the contents of what he told Kane that wasn't in the contents -- in essence,

all he said was he admitted breaking into the Covel home on the 7th, but gave in greater detail how he did it and what part of the house he broke into. So the only distinguishing factor, Your Honor, is he did mention to Kane where the pocketbook was, as I understand the facts.

THE COURT: Were you appointed in the District Court, Mr. Hammerschmith?

MR. HAMMERSCHMITH: My office was appointed, yes, Your Honor.

THE COURT: Were you the lawyer?

MR. HAMMERSCHMITH: Yes, I have had Mr. Perrot's case since arraignment.

THE COURT: So you were at the arraignment?

MR. HAMMERSCHMITH: I was not at -- the way it worked then, we had at that time a law student from our office who represented individuals for whom bail was sought and did the bail argument on behalf of those individuals. Bail was

sought on Mr. Perrot, a law student from my office by the name of Mark Gagnon did the bail hearing, came back to the office that afternoon and advised the secretary there of the appointment. The case went to the head of the office and then it was assigned specifically to me.

I would just say the law in Michigan versus Jackson is a United States Supreme Court case, it is binding on this court, and it's not simply the court from another jurisdiction.

THE COURT: Thank you.

Are there any other motions now?

MR. BLOOM: I think that's it pretrial.

MR. HAMMERSCHMITH: That's right.

THE COURT: We'll take a brief recess.

(Recess taken at 2:45 P.M.)

(Hearing reconvened at 3:15 P.M.)

THE COURT: Gentlemen, I want to take that motion under advisement until tomorrow morning at 9:30. Have you taken a look at the case cited by defense counsel?

MR. BLOOM: No, I haven't.

THE COURT: Take a look at it, it's an '86 case, and you may want -- I want to hear from you in the morning on it, because it looks like it might be right on point.

Now, we may -- I want to start impanelling in the morning, however, there is going to be naturalization tomorrow morning and whether they are going to have to use this courtroom or not, I don't know. I don't know if we can get enough jurors into one of the smaller courtrooms, so we might be delayed a little bit, but, at any rate, we will go on the motion at 9:30 and

then we will start the impanelling as soon as we are ready to go.

MR. HAMMERSCHMITH: Could we make clear the matter of Mr. Perrot's representation on the record, Your Honor? I have spoken -- you will recall that he filed a motion which could be interpreted as saying that he was terminating my services as his lawyer. Just for the record, I have spoken with him about that and he has indicated to me without waiving his request for alternative counsel or new counsel, that given the choice between proceeding pro se and proceeding with me, his choice is to proceed with me.

THE COURT: You are talking now about Judge Urbano's ruling on --

MR. HAMMERSCHMITH: That's correct, Your Honor, the motion that Mr. Perrot filed pro se in connection with it.

THE COURT: It is my understanding that is not before me, that was ruled on

by Judge Urbano.

MR. HAMMERSCHMITH: The request for new counsel was, and to the extent that his motion might be interpreted as asking to fire me as well as get new counsel, my understanding from speaking with him is that inasmuch as he will not be appointed new counsel, he wishes to have me continue to represent him.

THE COURT: Very good. All right, then, gentlemen, 9:30 tomorrow morning.

(Hearing suspended at 3:20 P.M.)

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm