C O M M O N W E A L T H   O F   M A S S A C H U S E T T S

Hampden, ss.

Superior Court
Indictment Numbers
85-5410 through
85-5427

COMMONWEALTH

VS.

GEORGE D. PERROT

DEFENDANT'S MOTION TO SUPPRESS STATEMENT HEARD BEFORE MURPHY, J. AT THE HAMPDEN COUNTY SUPERIOR COURT, COMMENCING SEPTEMBER 2, 1986.

APPEARANCES:

Representing the Commonwealth:

Francis W. Bloom, Esq.
Assistant District Attorney

Representing the Defendant:

Jim Hammerschmith, Esq.

August J. Beucke
Official Court Reporter

12/23/86

(September 2, 1986. 2:20 p.m.
The defendant was present in
the courtroom.)

THE CLERK: The next matter on the list, your Honor, is found on Page 1, the Commonwealth Vs. George D. Perrot, Indictments #85-5410 through #85-5427, and Indictment #86-1707 through #86-1711. Attorney Hammerschmith appearing on behalf of the defendant and Assistant District Attorney Francis Bloom is here on behalf of the Commonwealth.

MR. HAMMERSCHMITH: Good afternoon, your Honor. This is the defendant's motion to suppress. I would ask to have the witnesses sequestered, and I would also ask that once a witness has testified, they be admitted into the courtroom. The reason I ask that is that two of the witnesses for Mr. Perrot will be his mother and sister and they're very much involved in the case and would like to be able, if they could, after the finish testifying, to see what else transpires here.

THE COURT: Counselor?

MR. BLOOM: I have no objection.

THE COURT: Then we'll sequester all the

witnesses prior to their testimony.

MR. HAMMERSCHMITH: Nancy Westcott. I'd like to say a few words before we begin. This is a motion to suppress certain statements that were signed or given orally by Mr. Perrot on the morning or on the date of his arrest.

It was the early morning hours of December 7th, 1985 --

THE COURT: Did you say both written and oral?

MR. HAMMERSCHMITH: There were two written statements that I have received through discovery. It would be my understanding that there would also be oral statements that would be taken in the same context.

The defendant will ask the Court to look at the totality of the circumstances that were involved here and would ask the Court to find that these statements were not given voluntarily and that the defendant did not knowingly, intelligently and voluntarily waive his Miranda rights.

As the Court knows, although the defendant has the burden of going forward on a motion like this, the Commonwealth has the burden to establish beyond any

reasonable doubt that the statements were given voluntarily and that George Perrot did, in fact, knowingly, intelligently and voluntarily waive his Miranda rights.

The burden of the Commonwealth is a heavy one. As the State Supreme Court says in the context of motions to suppress, in Commonwealth Vs. Hooks, "The Court will indulge every reasonable presumption against waiver of constitutional rights."

In viewing the totality of the circumstances here, I'd like the Court to direct its attention toward the age of the defendant, who was 17 at the time that the statements were taken. I would like the Court to attend to his intoxication at the time and that he will testify as to the drugs and alcohol that he took and his physical sickness on the morning following taking those.

Also, he'll testify as to the highly emotional state that he was in and the lack of sleep from which he suffered and some physical abuses that preceded the statements that were given.

The first witness for the defense will be Nancy Westcott.

NANCY WESTCOTT (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH

Q Could you state your full name and address?
A Nancy Westcott, 87 Malibu Drive, Springfield, Mass.
Q I ask you to keep your voice up so the Court can hear you.
Are you related to the defendant, George Perrot?
A Yes.
Q What is your relationship?
A His sister.
Q Are you an older sister or younger?
A Older.
Q How much older are you?
A I'm 26. George is 18.
Q Now, where did you say you lived?
A 87 Malibu Drive.
Q And drawing your attention to December 7th, 1985, did you live there on that date as well?
A Yes.
Q And who else lived at that residence on that date?
A My husband and George.
Q Do you know who owned that home?
A My mother.

Q And your mother's name?
A Beverly Daly.
Q Did she live there?
A No.
Q Again, drawing your attention to the early morning hours of December 7th, 1985, at some time that morning, did something unusual happen?
A Yes, the police came to the door looking for George.
Q Do you recall what time that was that that happened?
A Three thirty.
Q When was the last time prior to that that you had seen George?
A I would say nine o'clock that evening.
Q That would be the evening of December 6th? The evening before?
A Right.
Q And who went to the door when the police came?
A My husband.
Q And were you there to see the police admitted?
A After they had already entered the house, I got up shortly after that.
Q What happened when you first saw the police were there?
A There were looking for George and they had asked if

I knew he was at home, and I had just gotten up, so we went to his room to see if he was in there.
Q Who went with you to George's room?
A Several police officers and my husband.
Q And what happened when you got to the door of his room?
A It was locked, and I had a key to his room. So I went and got the key and unlocked the door. Then we walked into the room.
Q Who walked into the room first?
A I did.
Q Did any of the others follow you?
A Yes.
Q Who else followed you?
A The police officers. My husband.
Q And when you entered the room, did you observe George?
A Yes.
Q Where did you see George?
A He was lying on the bed on his back with his fee. on the floor.
Q Was he awake or asleep?
A He was asleep.
Q What was he wearing?
A Jeans and --

THE COURT: I'm sorry, what was that?

THE WITNESS: Jeans -- dungarees and shoes. No shirt.

Q And again, what was the position that he was in?

A He had his feet on the floor as if he had sat down on the end of the bed and then laid back.

Q So was he flat on his back then?

A Yes, with his feet on the floor.

Q What happened after you walked into the room and observed George there?

A I tried to wake him up. It took a few minutes. Then the police officers were also helping me shake him, to wake him up.

Q At some point did he wake up?

A Yes.

Q What was said when he woke up?

A Well, he was not coherent. He was kind of out of it. You could tell he had been drinking.

Q How could you tell he had been drinking?

A Because the way that he was -- the way that he talked and moved. He didn't really know what was going on.

Q What did he say that led you to believe that he didn't know what was going on?

7829500

A He called me Lisa and wanted Lisa, who is his girl-friend. He wanted her to get a hold of me.
Q Your name is what?
A Nancy.
Q Do you recall what his exact words were?
A "Lisa, you've got to call my sister."
Q Who was that said to?
A To myself.
Q Was Lisa anywhere in the house?
A No.
Q After George was awakened, where did you go next?
A The police officers got him up from the bed and they put his coat on him, and then he was standing over on the side of the room with me while they were going through some stuff.
Q How long did that take?
A Probably about five to ten minutes.
Q At what point was it that he told you that you should get in touch with his sister?
A When he was standing over by me. They had tooken him away from the bed and moved him over to where I was standing in the room.
Q Do you know how long that was after he had been gotten

up?
A I would say probably two or three minutes.
Q At some point, did George leave the room?
A When they took him out of the house.
Q How many police officers was there that took him?
A Yes.
Q How many police officers accompanied him out of the house?
A All but two. I would say probably about five police officers that took him out of the house.
Q Did you follow him out of the house?
A No, I was still in the room with the other two police officers and my husband.
Q Did you notice anything unusual in the minutes after they took him out of the house?
A I heard a gunshot fired.
Q How long was that after they took him out of the house?
A Just a few moments after they took him out of the house.
Q After George was taken out of the house, what was the next thing that you did in response to his having been arrested?
A Well, after I heard the gunshot fired, I went running out of the house to see what was going on, and there

wasn't anybody around. The police officers or George. And then, I came back into the house and called my mother to tell her what was going on.

Q When did you next see your mother after making this phone call?

A Probably within about fifteen minutes. She had come right over.

Q You saw here where?

A At the house.

Q And what, if anything, did she do when she came to your house?

A She waited and then a police officer had given me a number to call, to have her call when she had gotten there to the police station.

Q Did you see her make that phone call?

A Yes.

Q Did you hear what she said?

A Just that George wasn't there yet.

Q Now, did you hear what she said?

A She would try back -- call back after.

Q Did you hear her? You saw her dial the phone.

A Yes.

Q And after she dialed the phone, what was the first thing

you heard her say, to the best of your recollection?

MR. BLOOM: I'm going to object.

MR. HAMMERSCHMITH: I'm not asking to introduce it for the truth, except to indicate that what her mother's conversation was to the police after she dialed the phone.

THE COURT: How is that relevant?

MR. HAMMERSCHMITH: The indication would be if his mother tried to get in touch with him, tried to contact him, and wasn't allowed to do so following his arrest --

THE COURT: Is his mother going to testify?

MR. HAMMERSCHMITH: She will.

THE COURT: I'll sustain it.

Q Was that the only phone call that your mother had placed from your house that morning?

A No, she made another one about an hour later.

Q And any other phone calls after the second one from your house?

A No.

Q Do you remember what time the second call would have been made?

A Five thirty.

Q How is it that you know the time?
A Because after she made that phone call, she had left and I went back to bed.
Q What was the next thing that happened to you with respect to George's arrest?
A At nine o'clock the following -- that morning, several police officers came with a search warrant to search the house.
Q Were you there at that time?
A Yes.
Q Who answered the door when they came?
A My husband.
Q Did you see the warrant?
A Yes.
Q When was the next time that you saw George after he was taken away by the police that night?
A Five o'clock that evening.
Q Where did you see him?
A At the police station.
Q Who did you go to the police station with? If anyone.
A My mother and George's girlfriend, Lisa.
Q And that was at what time that you got there?
A Five o'clock.

Q Did you see George that night?
A Yes.
Q Can you describe his physical appearance when you saw him that night?
A He was crying. All mussed up. His voice was loud. He had on a coat and his pants --
Q Was he wearing a shirt?
A No.
Q Was his coat open or closed?
A Open.
Q Did you notice anything unusual about his face or his torso?
A His face was swollen and he had marks on his chest.
Q What kind of marks?
A Like bruise marks. Red marks.
Q Where did you see those?
A On his upper chest and on his cheeks and --
THE COURT: And where?
THE WITNESS: On his cheeks.
Q Did any conversation take place between George and the three of you?
A Yes, we talked.
Q Can you describe George's conversation? Not the

contents, but the --

A He was upset. He was upset and he said that he had signed some papers that he didn't -- you know -- for things that he didn't do, and he asked if we could get him a lawyer, and he was just talking loudly and wasn't completing sentences.

Kane Rebuttal

MR. HAMMERSCHMITH: No further questions.

CROSS-EXAMINATION BY MR. BLOOM

Q Are you telling this Court that he had a swollen chest when you saw him that next afternoon?

THE COURT: What was that question?

Q Are you saying that he had a swollen chest at five o'clock the afternoon after he was taken into arrest?

A No. That he had red marks on his chest.

Q Whereabouts?

A On his upper chest.

Q And he didn't have a shirt on when you saw him.

A No.

Q Where did you see him in the police station?

A I think it's called a viewing room.

Q Where? What floor? First? Second?

A First.

Q And was he there alone with you or was there someone else there?
A He was on one side of the room and there was like a partition and we were on the other side. It was just a narrow room.
Q Any police officers there?
A Not in the room with him. No.
Q Well, what time did you say this was?
A About five o'clock.
Q The following afternoon, that would have been the 7th; right?
A Yes.
Q It was you and who else? Your husband?
A Myself, my mother and George's girlfriend, Lisa.
Q Did you talk to him earlier that same day? On the phone?
A No.
Q He hadn't called you from the police station at all?
A No.
Q What kind of marks did he have on his face?
A Red.
Q Well, how close were you to him?
A I'd say probably three feet -- two to three feet.

Q There was some kind of wall between you and him?
A Like a screen. A glass partition.
Q Was it glass or was it screen?
A I don't know what it was made out of.
Q Well, did you have any trouble hearing him when you talked to him?
A No.
Q Do you know what I mean? Glass, as opposed to some kind of screen, like screen on a porch? Something like that?
A To the best of my knowledge, I think it was both.
Q There was glass and a screen type of partition between you and him?
A Right.
Q And you saw red marks? Where were they on his face?
A On his cheeks.

MR. BLOOM: May I have this marked, your Honor?

THE COURT: This will be A for Identification.

(A for Identification, photo, offered and marked.)

Q I'm going to show you what's been marked as A for Identification. Do you know who that is?
A George.

Q And can you tell the Court, ma'am, whether that's how he looked at five -- quarter of five p.m. on December 7th, 1985?
A I was more upset looking -- I was crying when I had seen him.
Q Is that how his face looked?
A Yes.
Q You don't see any bruises on that face; do you?
A No, not in the picture.
Q Is that a fair and accurate representation of how you remembered he looked in terms -- first of all, take his face. Is that how he looked about five o'clock? His face, for instance?
A Yes.
Q Did he have that kind of hair on his face, like growth?
A The moustache and beard, yes.
Q Did he have that kind of jacket? Is that the jacket he had on?
A Yes.
Q Was it buttoned in the fashion that it appears to be buttoned in that photograph?
A (No response.)
Q Around the shoulders and neck and so forth?

A The jacket was opened when I saw him.
Q What do you mean? It was on his body, but he had it open like this (indicates)?
A Yes.
Q Was his hair like it is now? Strike that.
Was his hair -- when you saw it at five o'clock, like it is depicted in A for Identification?
A Messed up the way -- you mean the way it's styled?
Q Whatever you want to describe it. The way that it looked when you saw him at five o'clock.
A Yes.
Q So other than the fact that the jacket was opened when you saw him, he appeared pretty much the same way in this picture as you saw him at about five o'clock, but for the jacket being opened and the color in his face -- You can't tell whether there are any marks on that face at all; can you?
A Not the redness.
Q He had no problem understanding you and communicating with you at five o'clock when you talked to him; did he?
A No.
Q He answered your questions at five or quarter of five, and you thought in an intelligent manner; right?

A No, he answered them in a very upset manner and didn't finish answering them.
Q Not whether he was upset or not. Did he seem to you, based on what you saw, was he able to understand what you were saying to him, or was he acting incoherent?
A Incoherent.
Q Well, he told you that he had signed things and he really hadn't done the things he had said in that statement; hadn't he?
A (No response.)
Q That made sense; didn't it?
A Right.
Q He told you that the police had done certain things to him; right?
A Yes.
Q You asked him questions as to what they had done and he told you what they had done; right?
A Yes.
Q You asked him questions as to what he was talking about, about signing something, and he answered that; didn't he?
A Yes.
Q So when you asked him a question, he gave an answer;

right?

A Yes.

Q Did he appear to you to be under the influence of alcohol at five o'clock in the afternoon the next afternoon?

A No.

Q It had been something like fourteen or fifteen hours since you had seen him. You had last seen him at three or three thirty in the morning. Now it's five in the afternoon; right?

A Yes.

Q So whatever alcohol or narcotics he had taken on the 6th, the night of the 6th, he had been away from you since three or three thirty in the morning until five in the afternoon on the 7th; right?

A Right.

Q So he didn't appear to be under the influence of any drugs to you. Based on your observations of him; did he?

A At five o'clock? No.

Q He didn't appear to you to be under the influence of any alcohol at five o'clock on the 7th.

A No.

Q You didn't have to -- when you saw him at about 3:30 on December 7th -- you didn't have to get close enough to him to smell alcohol. You knew just by looking at him, the way that he was acting, that he had taken some drugs and alcohol; didn't you?
A Yes.
Q You had seen him in that condition many times before. You had seen him under the influence of narcotics and it wasn't the first time on December 7th of 1985 that you had seen him under the influence of drugs or alcohol; right?
A I don't know about the drugs, but I have seen him under alcohol before.
Q Many times before the 7th. So you weren't shocked when you saw him acting a little incoherent. You had seen him before like that; right?
A No, not the way that he was that night.
Q Well, how old is George?
A Eighteen.
Q He was 17 on the 7th; right?
A Yes.
Q And you and your husband were having a hard time trying to control him; weren't you?

A Controlling him when? Thatnight?
Q You were having problems with him staying at that house prior to December 7th of 1985.
A I don't understand what type of problem.
Q Well, did he have a curfew?
A Yes.
Q What was that?
A To be in at twelve o'clock.
Q How often did he break that?
A He did break it.
Q All the time?
A Many times.
Q Very, very often; right?
A Many times, yes.
Q So some of those times, either you with your husband or you alone had seen him under the influence of something when he came in after twelve o'clock prior to December 7th; right?
A Yes.
Q So when you saw how he was acting when the police were shaking him, when he was in bed, and you were shaking him, you had seen him like that quite a few times before, and you formed the opinion that he was under the

influence of either drugs or alcohol; right?
A Well, there were drugs there that the police had.
Q Well, you knew he had taken something. He wasn't acting normal; right?
A Right.
Q And you had seen him like that prior to December 7th.
A Under alcohol -- yes.
Q And when you saw him at five the next afternoon, he wasn't under the influence of anything else based on what you saw at that time; correct?
A No.
Q And he talked to you for how long at five o'clock on the 7th?
A I would say probably about fifteen minutes.
Q You didn't wait up for George, you and your husband, that night, and going back to December of 1985; did you?
A Yes.
Q You did wait up that night?
A No, not until three thirty in the morning.
Q Whatever time you went to bed, George wasn't home.
A No, he wasn't.
Q And do you recall what time it was that you went to bed?
A Twelve o'clock, to the best of my knowledge.

Q You have no idea -- you can't help this Court, or you don't know whether he came in at one o'clock or whether he came in the house at five minutes before the police got there; do you?
A No.
Q You know now that he was chased to your house. Someone has told you that; right?
A Yes.
Q And did the police tell you that when they came in?
A Yes.
Q And did the police tell you that some girl whose pocketbook George had supposedly taken had chased him right to your house? Did they tell you that when they knocked on the door?
A (No response.)
Q If you remember.
A They didn't say that she had chased him to the house. They said that the police had followed his footprints or something to the house.
Q And you let them in the room with your key; correct?
A Yes.
Q And do you remember what the police were saying to George in the room when they went down there with you and your husband?

A They were just saying things to him in terms of getting him up.
Q Now, you weren't upset with the way that the police handled him in the room; were you?
A No.
Q In fact, you didn't even follow George upstairs to see them put him in the police car. You stayed in your house.
A It's all one level in the house.
Q What I mean is this, whenever he got himself together well enough so he could walk with the police to the car, you didn't go up and follow them to the police cruiser. You stayed inside your house.
A With other officers, yes.
Q And when you went outside, those officers that you had seen take George away from that bedroom, they weren't around and George wasn't around; right?
A Yes.
Q When was the next time that you saw George?
A At the police station that late afternoon.
Q Did you stay outside then?
A No.
Q Did you see police officers running in any direction

when you were outside?
A No.
Q They were all gone?
A At that time, yes.
Q And who told you what was going on or how did you find out what was going on at that time?
A A police officer had come back and explained to me what had happened.
Q And that they were chasing George?
A Yes.
Q And did they bring him back to the house that night?
A I didn't know. No, I didn't see them.
Q If they did, you weren't outside; right?
A Right.
Q The next time you saw him or had anything to do with him was at five o'clock the next night?
A Yes.
Q Now, what would your guess be or your estimate as to what time it would have been that you went upstairs and you learned that George and a police officer that had taken him outside were no longer outside your house?
What time would it be now?

A Between quarter of four and four o'clock.
Q So they got there about three thirty or so.
A Yes.
Q And it was another fifteen or twenty minutes or so when they were taking him outside.
A It was about fifteen minutes.
Q Would it be in the neighborhood of quarter of four to four, as you mentioned?
A Right.
Q And when did you first learn what it was that George said to the police in his statement?
A At the police station.
Q That night?
A At five o'clock.
Q He told you at five the following night what it was that he had told the police?
A No, a police officer had told us that George had --
Q Given a statement?
A Signed some statements.
Q And when was it, ma'am, that you first learned what it was exactly that he had said to the police in those statements? Not the fact that he had given a statement, but what it was that he had said?

A Not that evening at all. It was when we finally talked to a lawyer.
Q Sometime down the road, weeks down the road?
A Yes.
Q And did you talk to George about that? About the fact that he had marks on his body? Strike that.
Did you talk to George about the fact that he had given two statements after December 7th?
MR. HAMMERSCHMITH: Objection. I'm not sure I understand the question, your Honor.
MR. BLOOM: I'll withdraw it.
Q Did you have a conversation with your brother about the statement that he had given to the police on December 7th? Sometime after the 7th? You and him, either alone or with someone else?
A Yes, I'm sure.
Q And somebody told you, didn't they, ma'am, that those statements caused a lot of problems for him. Did somebody tell you that?
A No, I don't believe so. I don't understand what you mean.
Q Well, didn't George tell you that when you talked to him that he was going to have to do something about the

statements because they caused big problems for him? Didn't he say that to you after December 7th?
A What? The statements? I don't know what you're talking about.
Q Didn't George tell you after December 7th that the statements that he had given to the police were a real problem for him?
A That they -- he told me that they were not true.
Q Did you read them at any time?
A No, I didn't. No, I did not.
Q You never saw them prior to today?
A No.
Q Neither one of them?
A No.
Q You don't know what he said at all to the police in those two statements.
A No, I actually don't.
Q Did you say anything to the police, ma'am? Strike that.
How were you treated by the police up to and including, let's say, five o'clock on the 6th and the 7th?
A Fine.
Q And, in fact, when the police came to your house, you

know now as a result of talking to your husband that he let them in; right?

A Yes.

Q And they talked to you and they asked you if you had a key to the room and you told them that you did; is that correct?

A Yes.

Q You let them in the room, in the room that George was using.

A Yes.

Q In fact, at the house, you felt at that time that you had been treated very nicely by the police.

A Yes.

Q They weren't loud at all?

A No.

Q They weren't screaming at George inside your house in any way.

A No.

Q And, in fact, whatever was said between the police and George in the room that he used was right in front of you; right? You were right there.

A Yes.

Q The time they got away from you is when they left the

house.
A Yes.
Q That's the first time they were alone with George; right?
A Yes.
Q You didn't have any problem with the way in which they were handling him up to this point; did you?
A No.
Q When you got there at five o'clock, ma'am, the next afternoon, did you see any of these same officers that you had seen at three thirty in the morning at your house?
A No, there weren't any there.
Q How many officers did you deal with at that time at five o'clock?
A One.
Q Do you remember what his name was?
A No, I don't.
Q Did he stay in the room when you were talking to your brother?
A No.
Q He stayed outside?
A Yes.

Q Did you have an opportunity to see him again after you were done talking to him at five o'clock?
A George or the police officer?
Q The police officer.
A Yes.
Q Did you tell him at that time that somebody had done something to George because you had seen these marks on his chest?
A I asked him about a police officer that was staying with George in the lock-up. George had said that a police officer or -- I'm sorry -- the police officer that we saw when we first went into the police station.
Q At five o'clock?
A Yes, and told us that they had a one-on-one guard with George because they were afraid that he was going to hurt himself, and I had talked to the police officers about that, police officers that they had watching him, and I had seen George --
Q Let me ask you this, ma'am. When you saw George at five o'clock, and specifically with reference to what you said earlier, what you saw on his chest and what you saw on his face, did you notice that right away when you looked at him?

A Yes.
Q And it was different from when you had seen him at three thirty in the morning at your house.
A Yes.
Q And you noticed that immediately.
A Yes.
Q And did you say anything to the police, ma'am, about those observations?
A (No response.)
Q The one, ma'am, whoever he was, that you had been referring to at five o'clock.
A Yes.
Q And what did you say to him about that?
A I asked -- I told him that George said to me -- I asked George what happened to him and he said that they had roughed him up.
Q He said that they had roughed him up?
A Yes.
Q And what did you say to the police officer about that?
A I asked him about it and he didn't really -- you know -- he answered me, but he didn't really know anything about that.
Q Well, did he offer -- are you saying that you said to

this police officer that someone has been hitting my brother or words to that effect, and I know it's impossible for you to remember the exact words that you used, but did you say something like that to the police, ma'am? Did you bring it to his attention?
A (No response.)
Q That you had seen something, and in your opinion, it led you to believe that someone had hit your brother?
A Yes.
Q And do you remember what his response was to those words that you said to him?
A That he didn't really know -- he didn't know anything about that.
Q And that was the end of it as far as between you and him?
A As far as -- yes.
Q You didn't say anything to him, but you wanted to take pictures of the way that he looked.
A No.
Q And you didn't ask him that you wanted or requested to see a superior and talk to him about it at that time?
A No.
Q Do you remember whether he was a patrolman or a

sergeant or a lieutenant, or don't you know?
A I don't remember what rank he was, but I don't believe that he was a patrolamn.
Q Was he in plain clothes, or did he have a uniform on?
A Plain clothes.
Q Would you know him if you saw him?
A Yes.
Q What did he look like?
A Dark hair. He was -- I would say probably about five feet ten inches tall. He wasn't a very tall person.
Q Moustache?
A I think so, yes.
Q Now, if I were to suggest to you Sergeant Canevari, would that ring a bell? Do you know Sergeant Canevari?
A The name doesn't mean anything, no.
Q But you would know him if you saw him again.
A I can't be sure, but I would think so.
MR. BLOOM: Thank you.

REDIRECT EXAMINATION BY MR. HAMMERSCHMITH

Q What was it about the conversation that you had with George at five o'clock in the afternoon that led you to say that he was incoherent?

MR. BLOOM: I'm sorry, I don't think that is her testimony.

MR. HAMMERSCHMITH: My recollection was on direct that she did use the word "incoherent," and also I thought on --

THE COURT: My recollection of the testimony was that this was at three thirty in the morning, not at five o'clock at the police station. Now, I may be wrong about that. You can question her about that if you would like.

Q Did you use the term in your testimony here today -- did you use the term, to characterize George's conversation with you --

THE COURT: When now?

MR. HAMMERSCHMITH: At five o'clock.

Q That afternoon, when you went to the station with your mother and Lisa to see him --

A I think I said "incoherent."

Q What was it about his conversation or his speech that led you to use that word to describe him?

A The way that he wasn't finishing anything. A statement -- and the way that he was loud in speaking -- you know -- with broken language.

Q Was George already in the room when you walked in the room to see him at five o'clock that afternoon?

A I don't think so, no. I think he had gotten in there just a moment or after us.

Q Do you recall whether when he came in he had his jacket opened or whether it was closed?

A It was open.

Q So it was open the whole time that you were in the room with him?

A Yes, I believe so.

MR. HAMMERSCHMITH: No further questions.

RECROSS-EXAMINATION BY MR. BLOOM

Q When you walked in, did he open his jacket or was it already opened?
A I believe it was opened?

MR. BLOOM: (Indicates.) Could I have this marked?

THE COURT: This will be B for Identification. The lineup picture.

(B for Identification, photo, offered and marked.)

Q Did you become aware at some point that George was asked to appear in a lineup for people to view him, a variety of people to take a look at him? Just yes or no. Did you become aware of that at some time?
A Yes.
Q And I'm going to show you what's been marked B for Identification. Do you see your brother in that group of men that are standing in a room?
A Yes.
Q And where is he, ma'am, just for the record?
A On the end (indicates).
Q And what time does it -- is there a clock in the room, ma'am?

Key Cross

A Yes.
Q And what time does the clock reflect?
A Four thirty.
Q So you saw him about a half hour after that picture was taken? Assuming that lineup was done in the same day.
MR. HAMMERSCHMITH: Objection, your Honor.
THE COURT: All right, assuming it was done the same day.
Q Let's assume for a moment --
THE COURT: Assuming it was four thirty in the afternoon.
MR. BLOOM: Yes.
THE COURT: All right, what time does the clock show in that photograph?
MR. HAMMERSCHMITH: Objection.
MR. BLOOM: Four thirty.
THE COURT: It says four thirty. This is subject to all the things that we mentioned.
Q Did he have his jacket like it's depicted in that photograph when you saw him, and I believe you stated at quarter of five or five o'clock?
A No.

Q How was it on him different at four o'clock than it is depicted in that photograph?
A It was opened. It was on him, but opened.
Q On him the same way, except it was opened, as opposed to zipped up or buttoned up?
A Right, yes.
Q And was there a shirt underneath?
A No.
Q And facially, does his face appear the same way to you in that photograph as it did at five o'clock when you talked to him?
A Yes, without the color, I couldn't tell the coloration of it.
Q You don't see the red marks that you were referring to earlier in your testimony in that photograph either; do you?
A No.
Q Now, ma'am, isn't it true that when you came out from talking to your brother, what you said to the plain-clothes officer was this, that you had some concerns about the person that was watching George. You told that officer that; right?
A Yes.

Goto Murphy



Q It wasn't because of any marks that you had seen; was it?
A It was because of the marks and --
Q What George had said?
A Yes, and George had other dealings with this police officer.
Q And, in fact, isn't it true that when you came out from talking with your brother and you went up to that police officer and said that the man that was watching your brother has been involved with my brother in escapes before and he replied that I don't think he should be in there with him; right?
A Yes.
Q And this person told you that he would take care of it; didn't he?
A Yes.
Q Is that him sitting in the courtroom on the left-hand side about two rows behind your brother?
A In the blue suit?
Q Yes.
A Yes.
Q And what you told him was -- your conversations with him was based on what George had told you; right?

A That the officer -- who the officer was.

Q About the problems with this officer, whoever he was.

A Yes. I never saw the officer. It was just what George had told me who he was.

Q George told you that I don't want to be in there with that guy because I had a problem with him when I escaped on a previous incident; right?

A No.

Q Didn't he tell you that he didn't want the person in there because of a previous problem with him?

A Yes.

Q And it had nothing to do with December 7th.

A Yes.

Q It had to do with a previous problem; right?

A Yes.

Q And that gentleman, for the record, who was Lieutenant Arpin, told you that we'll take care of it; right?

A Yes.

Q You never said to Lieutenant Arpin that it looks to me like somebody has beaten up my brother? You never said that to him?

A I don't remember the exact conversation that I did have with him. How I worded it.

Q Let's forget what the exact -- no one expects you to remember the exact wording, ma'am.
Did you say anything to Lieutenant Arpin, the gist of which was that someone had slapped, punched, pushed or abused your brother in some capacity between the time that you had last seen him and the observations you were making now at quarter of five.
A Yes, I said something to those effect.
Q Did you ask Lieutenant Arpin to take photographs of him?
A No.
Q Did you ask him for an opportunity to take photographs yourself of him?
A No.
MR. BLOOM: That's all I have.
MR. HAMMERSCHMITH: I have nothing further of this witness.
THE COURT: Is Lieutenant Arpin a witness in this case?
MR. BLOOM: Well, he wasn't up to this point, Judge. I had no way of foreseeing what the testimony was going to be. I didn't intend to use him, and I didn't think counsel intended to use him prior to this

point in time.

THE COURT: Do you intend to use him?

MR. BLOOM: I think now I do.

THE COURT: Well, he's sequestered.

MR. HAMMERSCHMITH: I'll call Beverly Daly.

BEVERLY L. DALY (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH

Q Would you state your full name and your address for the record, please?

A Beverly L. Daly, 1495 Parker Street, Springfield, Mass.

Q And your last name would be D-a-l-y?

A Yes.

Q And are you related to the defendant, George Perrot?

A Yes, I'm his mother.

Q And I want to draw your attention to Saturday morning, December 7th, 1985. At some point on that morning, did you learn that your son was being held at the police station or that he had been arrested?

A Yes, I did.

Q And how did you learn that?

A My daughter called me.

Q Do you recall what time it was that she called you?

A It was around quarter or four or four o'clock in the morning.

Q What, if anything, did you do upon receiving this information from her?

A I got dressed immediately and went over to her house.

Q And when you got to her house, what did you do then?

A Well, he was already arrested. He wasn't there any more, so she said that the policeman said that I could call down there in about a half an hour or so at the police station and find out -- you know -- what was going on with him. So I called down there in about an hour.

Q What time would it have been that you called?

A About four thirty, quarter of five.

Q And what happened, what was said when you called?

A They said he wasn't there yet. They told me to call back, and I did call back around five thirty.

Q What happened when you called at five thirty? What did you say to the officer, whoever answered the phone?

A I asked if I could come down and see him, and he said "No."

MR. BLOOM: I'm going to object to the conversation.

THE COURT: I'll allow it for the purpose outlined earlier, that she was denied access.

Q What did you say when you made the call?

A I asked if I could come down and see George. They told me that no, not at that time.

Q Did they tell you when you could see him?

A They told me to call back later.

MR. BLOOM: What time was that?

THE COURT: Five thirty.

THE WITNESS: I believe it was five thirty.

Q Did you, in fact, call back later?

A Yes, I did.

Q What time was it when you called back the next time?

A I'm not sure. I think it was around eight o'clock.

Q Where did you make that call from?

A From my own home. I went home after that.

Q What was said when you called back at eight o'clock?

A Well, they told me that bail hadn't been set on him yet or anything and I couldn't see him at that time.

Q Was anything further said?

A No.

Q Was that the last effort that you made to see George?

A No, I had to go to work, so I went to work, and then in

the afternoon, I called back again and they told me that I could come down to see him.

Q What time was it that you called back?

A I think it might have been around four o'clock in the afternoon.

Q And after that telephone conversation, you went to the station.

A Yes, I did.

Q Did you go alone or with other people?

A I went with my daughter and my son's girlfriend.

Q When you got to the staion, did you see George?

A Yes, we did.

Q Where did you see him?

A It was in a little room off to the right. A little cubby-hole.

Q Were you able to speak with him when you saw him?

A Yes.

Q Can you describe for us his appearance when you saw him that afternoon?

A Well, he was very emotional. He was very hysterical and kept repeating things over and over and he just wasn't acting himself.

Q What kinds of things was he repeating over and over?

A He kept saying that I didn't do the things they said I did, and he said to please get me a lawyer because they're trying to say that I did all these things and I didn't do it.
Q What about his physical appearance? Was there anything out of the ordinary about his physical appearance? First of all, what was he wearing?
A He had on a jacket and jeans. He had no shirt on.
Q How do you know he had no shirt on?
A Because he pulled his coat open and he said, "Look what they did to me." His body was all bruised, all red welts, and his face was all red welts.
Q Where did you see the bruises?
A All over his chest.
Q How long did you stay there talking with him?
A Probably about a half an hour or twenty minutes.
Q And what time would you say that you started talking with him?
A I believe it was five thirty when we got down there.
Q What did you observe about his emotional state when you saw him?
A He didn't act himself. He looked like either he had been drinking or taking some drugs or something -- he

just wasn't himself.
Q What kind of mood did he appear to be in?
A He was very hyper and hysterical.
MR. HAMMERSCHMITH: Nothing further.

CROSS-EXAMINATION BY MR. BLOOM

Q Ma'am, you knew George was taken from your -- in fact, is it your house on Malibu Road?
A It was my house. My daughter owns it now.
Q You owned it at that time?
A Yes.
Q You knew that he had been taken from that house at about four o'clock or so as a result of talking to your daughter.
A Right.
Q And you hadn't seen him until five the next afternoon?
A Right.
Q In fact, it would have been the same date, December 7th.
A Right.
Q And you had gotten up around four o'clock, four fifteen a.m. and gone over to that house on Malibu Drive; is it 87?
A Right.

Q And at about four o'clock or four fifteen; correct?
A Right.
Q And the next time that you saw George was thirteen hours later?
A (No response.)
Q About thirteen hours later? You're going to have to answer for the record. Is that a fair statement or have I misstated anything?
A Yes, that's how long it is between the time I went to see him.
Q Between the time that you got to Malibu Drive and the time that you were actually available to see him physically was thirteen hours?
A Right.
Q And you had seen George under the influence of drugs before; hadn't you?
A Yes, I have.
Q And lots of times; right?
A Right.
Q And under the influence of alcohol before. Lots of times.
A A few times, yes.
Q And he had been arrested a number of times before

December 7th; hadn't he?
A Yes, he was.
Q And unfortunately, you had to get involved in some of those; didn't you?
A Yes, I had.
Q Were you able to understand him at five o'clock when you talked to him in the afternoon on the 7th?
A No, because he wasn't talking very clearly.
Q Are you telling Judge Murphy, ma'am -- just try to think back upon your observations of George at five o'clock. You're telling us that it's your opinion, based on your observations of him at five o'clock that he was under the influence of either alcohol or some sort of drugs?
A Yes, I still think he was.

MR. BLOOM: That's all I have.

MR. HAMMERSCHMITH: No questions of this witness. I'll call the defendant, George Perrot.

GEORGE D. PERROT (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH

Q Could you state your full name, please?
A My name is George David Perrot, 87 Malibu Drive, Springfield, Mass.
Q And what is the date of your birth?
A 1/21/68.
Q How old are you now?
A Eighteen.
Q How old were you on December 7th, 1985?
A Seventeen.
Q Where were you living on December 7th, 1985?
A 87 Malibu Drive, Springfield.
Q And with whom did you live there?
A I lived with my sister, Nancy, and her husband, Mark.
Q I draw your attention to the night of December 6th, 1985, and the early morning hours of December 7th, 1985. During that time, did you at any time have any drugs or alcohol?
A Yes, I did.
Q And when did you have your first of either? What time?
A Around seven thirty p.m.

Q On December 6th?
A Yes.
Q And what is it that you had?
A I had started out with some beer.
THE COURT: You're going to have to speak up.
THE WITNESS: I started out with beer and I had some coke.
Q By "coke," you don't mean Coca Cola?
A No, cocaine.
Q How much beer did you consume that night?
A About two six-packs.
Q And how much cocaine did you consume that night?
A Approximately a gram.
Q Are those the only drugs or alcohol that you had that night?
A No, I did some valiums later in the evening.
Q Let me ask you, when did you have your last drink of beer that night?
A Around two o'clock p.m. -- a.m., I mean.
Q Two in the morning?
A Yes.
Q And what about the cocaine? When was the last time that you had cocaine? Do you know when you had the

cocaine?

A I believe it was around 9:30 p.m.

Q And you just had it at that one time or on more than one occasion?

A No, I did it several times during the night.

Q When was the last time?

A Just before I dropped off my girlfriend around 12:30.

Q You mentioned some valium. How much valium did you have?

A I took eight tens.

Q Eight what?

A Tens.

Q Is that t-e-n-s?

A No, just number ten.

THE COURT: Eight tens, you say?

A Eight number tens.

Q Number ten stands for the size of the valium?

A Yes.

Q When did you have those valiums?

A Around 11:30.

Q You had them all at once?

A Well, I popped a couple, then I did a few more later on.

Q When did you have the last one?

A Around -- maybe one o'clock.
Q One o'clock in the morning?
A Yes.
Q Did you consume any of these at home?
A I had the valiums at home, but I didn't do them there.
Q This was done all outside your home?
A Yes.
Q What time did you get home that night?
A I'd say approximately 2:30, quarter of three maybe. I'm not sure.
Q What did you do when you got home? Do you remember what you did?
A I passed out on my bed.
Q What is the next thing that you remember after you had passed out on the bed?
A I remember being woken by several officers.
Q Do you recall being arrested?
A Well, I wasn't really -- I didn't really know what was going on at the time, but I knew that they were police officers.
Q Do you remember leaving the house?
A Yes, I do.
Q And was this with police officers that you had left the

house?
A Yes, several.
Q What happened after you left the house?
A I got escorted down to the police cruiser with -- I don't recall his name -- and I just started running down the street.
Q How far did you run?
A I ran down to the end of Malibu Drive.
Q How far is that?
A I'd say approximately 150 yards. Then I proceeded to run down Parker Street, Cooley Street, excuse me, and into a back yard.
Q How far would that have been from where you left Malibu?
A Approximately three -- four hundred yards. Then I was apprehended by several police officers.
Q Where did they apprehend you?
A In the back yard.
Q And what street would that have been?
A Cooley Street.
Q Cooley?
A Yes.
Q What happened when they apprehended you?

A Several officers started kicking me, hitting me with sticks. Sticks or flashlights, and two officers threw me over a little fence.
Q How long did the hitting go on?
A Just for a couple of minutes I'd say.
Q Then what happened?
A They tossed me over a little fence.
Q What kind of a fence are we talking about?
A It's a short metal fence.
Q How tall would that be?
A I'd say approximately three and a half to four feet.
Q And how did you land?
A I landed on the back of my head and my neck.
Q How did they throw you over the fence?
A They picked me up and tossed me.
Q Do you remember where they held on to you?
A Around my jacket and around my pants.
Q And after you went over that fence, where were you taken next?
A I was taken to the cruiser. Then I believe they brought me to Ellendale Road.
Q Where were you in the cruiser?
A I was in the back seat with another officer.

Q How many other officers were in the cruiser?
A There was one in the front seat and one in the back with me.
Q Do you know the identity of either of those two officers?
A No, I don't.
Q At some point did you arrive at the police station in that cruiser?
A Yes, about forty-five minutes to an hour later.
Q Did anything unusual happen on the way to the station in that cruiser?
A The officer that was in the back seat with me kept putting his blackjack in my throat and threatening me if I run again, he's going to kill me. He's going to shoot me.
Q Do you know who that officer was?
A No, I don't.
Q When you got to the station, what was the first place that you were taken to, to the best of your knowledge?
A I was taken to the booking desk, I believe.
Q What happened at the booking desk?
A They started searching me and there were several officers around me laughing, and I had my hands straight

up against the desk and one officer hit me in the side, in the rib cage, and I fell to the ground.
Q Do you know who that officer was?
A No, I don't know.
Q What happened after you fell to the ground?
A I was brought to a cell for approximately forty-five minutes to an hour.
Q That was a cell within the police station?
A Yes, it was.
Q Was there anybody watching you, watching over you there?
A Yes, there was a guard.
Q Do you know who the guard was?
A Paul Glantz.
THE COURT: Paul who?
THE WITNESS: Glantz.
Q Do you know is this the first time that you had seen Paul Glantz?
A No, it wasn't.
Q You had a prior acquaintance with him?
A Yes, I had.
Q Can you describe what your prior acquaintance was with Officer Glantz?

A I was accused of assaulting him at a party prior to this -- my arrest.

Q How long were you in that cell?

A I would say forty-five minutes to an hour.

THE COURT: I'm sorry, did you say something about a party?

THE WITNESS: Yes.

THE COURT: When was this?

THE WITNESS: I think it might have been in June.

THE COURT: Some months before this?

THE WITNESS: Yes.

THE COURT: And you were accused of assault and battery on Glantz?

THE WITNESS: Yes.

Q Now, at the time that you were put in that cell, how much sleep had you had since six o'clock, say the previous evening?

A I didn't have no sleep at all. They wouldn't let me go to sleep.

Q What about in your room at your house?

A I couldn't really tell you. I passed out.

Q You don't know how long you were there unconscious?

A No.
Q And did you sleep when you were put in that cell?
A No, I didn't.
Q Why didn't you go to sleep if it had been so long that you hadn't slept?
A Because they were rattling on the bars with a flash-light or a stick.
Q Who was doing that?
A The officer that was sitting out in front of my cell.
Q And you know that officer?
A I believe it was Paul Glantz. I believe it was Paul Glantz.
Q To the best of your knowledge, how long did you stay in this cell?
A Forty-five minutes to an hour.
Q You didn't sleep at all during this period?
A No, I didn't.
Q Where were you taken at the end of that period of time?
A They took me upstairs into an office.
Q And can you describe the office for us?
A It was just a little room with a desk and a typewriter in it.
Q Who was in the room?

A Two officers.
Q And do you know the names of those officers?
A No, I don't.
Q What happened after you were brought into that room?
A They started asking me questions and I told them that I didn't want to talk to them. I just wanted to go to sleep.
Q What, if anything, did they respond when you told them that you didn't want to talk to them?
A They just kept asking me questions.
Q Do you have any idea how long you were questioned?
A Maybe a half an hour.
Q And in the course of that questioning, did you at any point start answering their questions?
A Yes, I did.
Q How long in that questioning period would that have been?
A Excuse me, I don't know what you mean by that.
Q You said they first started questioning you and you told them that you didn't want to talk to them. You wanted to go to sleep.
A Yes.
Q How long did they go on questioning you before you

started saying anything other than you wanted to go to sleep and didn't want to talk to them?
A About fifteen minutes. I just kept saying -- they just kept talking to me, asking me questions.
Q Now, what were they questioning you about?
A The McNabb break-in and an unarmed robbery pocketbook snatch.
Q At some point did you sign a statement that night with respect to those two matters?
A Yes, I did.
Q Where did you sign that statement?
A In the same room.
Q Was there any break in the questioning before you signed that statement?
A Yes, there was.
Q What was the break in the questioning?
A I went downstairs and they fingerprinted me and took pictures. Then I went back to a cell.
Q Did they do that before or after you signed the statement?
A They did it before I signed the statement.
Q So they took your picture and they took you down to a cell?

A Yes.
Q And at that point you still hadn't given any statement or had you?
A Well, I gave an oral statement.
Q Then what happened when you went back down to the cell? Who was there at the cell?
A There was an officer down there.
Q Do you know whether it was the same officer as before?
A No, I can't really tell you.
Q Do you know how long you were in that cell?
A Maybe about twenty minutes to a half hour to an hour.
Q Did you sleep then?
A No, I didn't.
Q Why didn't you go to sleep then?
A Because they wouldn't let me go to sleep. Every five minutes or so they tapped on the floor and tapped on my bars and telling me to wake up.
Q When you were taken out of that cell, where were you taken to?
A I went back up to the statement room.
Q What happened when you got to that room?
A They started asking me questions.
Q Who was asking you questions? Was it the same people

as before, or different people?
A I'm not really sure.
Q Did you answer those questions?
A No, I didn't.
Q What were they asking you about?
A About the Covel Street break-in and the Malibu Drive break-in.
Q The Covel Street break-in and the Malibu Drive break-in? How long did that questioning go on for?
A About a half an hour.
Q And in the course of that questioning, did you sign any written statement?
A I believe I did about the McNabb break-in and the pocketbook snatch.
Q Is that the only statement that you remember signing?
A Yes.
Q Did that happen in the second rather than in the first questioning period?
A Yes.
Q Did you sign the statement with respect to the Covel Street or Malibu Drive incident in that session, to the best of your knowledge?
A No.

Q Where were you taken after that period of questioning ended?
A They brought me into another office and they were questioning me about the pharmacist's house -- a murder -- and I don't recall the other lady's name.
Q Who was doing this questioning? Was it the same officer again?
A No, it was two different officers.
Q Do you know what time it would have been that this questioning would have gone on?
A No, but it was maybe two hours -- to three hours after I got arrested.
Q There was a break between the second and third questioning, or did you go right from one to the other?
A I went from -- well, first they brought me back downstairs. Then they took me out of the cell for more pictures. Then back up to another office in a different department.
Q Had you slept at all prior to the third questioning?
A No, I didn't.
Q Do you recall at any time signing a statement with respect to the Covel Street and Malibu Drive break-ins?
A No, I don't.

Q Do you remember signing a statement with respect to the McNabb break-in and the Sheileen Sapelli purse snatch?
A Yes, I do.
Q In the course of this third questioning, what was your physical condition at that point in time?
A I was still very drowsy. I didn't feel very good. I vomited during the questioning.
Q Was that in the room that you were being questioned in?
A Yes.
Q Where in that room did you vomit?
A On the floor.
Q And what happened after you did so?
A A janitor came in and put some sand on the floor. Then they left me alone for a little while.
Q And how long did they leave you alone?
A I'd say about fifteen or twenty minutes or so.
Q Then what happened?
A I went downstairs. They took more pictures and then they brought me back upstairs.
Q What did they do upstairs?
A They were asking me about a pharmacist's house and one other house that someone got killed in. They were asking me about that.

Q And at any time while this was going on, did you see a clock?
A Not that I can recall. Not that I can remember.
Q You don't have any way of saying exactly what time things happened; is that correct?
A Yes.
MR. HAMMERSCHMITH: I don't have any questions.

CROSS-EXAMINATION BY MR. BLOOM

Q You, Mr. Perrot, weren't under the influence of any drugs or alcohol at four o'clock the next afternoon; were you?
A Well, I was still very beat from the night before. I was kind of drowsy.
Q That's tired, though. You know the difference between being tired and being under the influence of drugs or narcotics.
A Yes, I do.
Q And you weren't under the influence of drugs or narcotics at four o'clock or five o'clock on the afternoon of December 7th of 1985; were you?
A No, I wasn't.

Q You weren't under the influence of drugs or narcotics at one o'clock in the afternoon of December 7th of 1985; were you?
A No, I wasn't.
Q You were scared, number one; weren't you?
A Yes, I was.
Q You were upset?
A Yes, I was.
Q They were asking you questions about an elderly woman that had been raped; right?
A Yes, they were.
Q And that scared you; didn't it?
A Yes, it did.
Q You remember being asked about an eighty and ninety-year-old woman being raped and whether you had anything to do with it. You can remember that very well; can't you?
A Yes, I could, because they were screaming at me.
Q And this was in the afternoon somewhere between one o'clock and four o'clock on December 7th; right?
A No, it wasn't. It was in the early morning hours after I got --
Q When did you sign the statement that you gave, sir?

In the early morning hours or between one o'clock or four o'clock on December 7th?
A When exactly?
Q When?
A I can't tell you exactly what time it was.
Q Is this your signature at the bottom of that page?
A It looks like it, yes.
Q Well, does it look like it or is it yours?
A I guess it is, yes.
Q And have you seen that statement before today?
A Yes, I have.
Q And is that a statement that you gave to the Springfield Police Department on December 7th, 1985? Is that a statement that you gave to the police?
A Yes, it is.
Q And the things that are in there --
MR. HAMMERSCHMITH: Excuse me, I'm not sure which statement is being referred to.
MR. BLOOM: I'll withdraw that until Mr. Moriarty comes back so we can have these marked so that we know what we're referring to.
Q You, in any event, sir, were in your cell from about seven thirty that morning, seven thirty or eight o'clock

until twelve thirty or one o'clock in the afternoon; weren't you?
A I'm not exactly sure.
Q Well, whether you went to sleep or not, wasn't there a period in the morning about two hours after you got to the police station -- two or three hours after you got to the police station that you ended up in a cell, and you agree with me on that; don't you?
A Yes.
Q And you were there until sometime early in the after- noon when you were brought up to the Detective Bureau; right?
A (No response.)
Q I'm not asking you whether you went to sleep or not, I'm just asking you whether you were in the cell during that time period.
A I believe so, yes.
Q And, in fact, when you were brought up at twelve thirty or one o'clock on December 7th in the afternoon, you were supplied or you had conversations about hair samples and blood being taken from you; do you remember that?
A Yes, I do.

Q And it was explained to you, sir, and you remember that very well, that you didn't have to give your hair nor did you have to give your blood, but it was going to be used to test against certain evidence that the police had, and if you would allow them to do so; right?
A Yes.
Q And you remember that conversation; right?
A Yes, I do.
Q And, in fact, your response was that I didn't do any of these things, go ahead, you can have my hair and you can have a sample of my blood; right?
A Yes, it was.
Q You had no trouble at one o'clock or thereabouts understanding when it was explained to you why your hair was wanted and why your blood was wanted. You understood that completely; didn't you?
A Yes, I did.
Q You were told that some of these rapes that were being investigated -- that evidence had been taken and they wanted to use your blood and your hair to match up with the evidence that had been taken from these crimes; right?
A Yes, I did.

Q And your response was to go ahead and take it and that I don't know nothing about those crimes; right?
A Well, I don't know them were my exact words, but I allowed them to take a hair sample willingly.
Q Whatever your exact words were, did you say something -- not the exact words -- but go ahead and take it because I didn't have anything to do with that stuff?
A Yes, I believe so.
Q That was the gist of what you said; right?
A I guess, yes.
Q And after being explained all this, you signed a consent form, allowing the police to take your hair and take a sample of your blood; right?
A Yes, I believe.
Q And from one o'clock or one thirty in the afternoon until four o'clock, you were with a Detective Jarvis on December 7th of 1985; isn't that right?
A I'm not really sure of the name.
MR. BLOOM: Can I bring him in? Just to have him take a look at him and see if he remembers him?
Q My question is, sir, I'm not asking you anything about the morning or afternoon up in the Detective Bureau, but is this the gentleman that you spent the majority of

your time with as you best remember it on December 7th?
A I'm not exactly sure. I can't really remember.
(Jurors withdrew from the courtroom.)
Q You were allowed to call your girlfriend that afternoon; right?
A Yes, I was.
Q And they took you out of the Detective Bureau room and put you in another room where you could talk to her alone; right?
A Yes.
Q Who else did you call, tell Judge Murphy, that afternoon?
A I don't believe I called anybody else.
Q How long did you talk to your girlfriend?
A For about five minutes.
Q And you talked to your mother?
A I'm not really sure if I did call --
Q Well, you didn't want to go back down to the lock-up; did you?
A No, I didn t.
Q There was other inmates giving you a hard time down there; wasn't there?
A No, there wasn't.
Q You wanted to stay up at the Detective Bureau; didn't

A Yes, I believe.
Q And they brought you lunch; right?
A Yes, they did.
Q And no one was in there when you were eating your lunch; right?
A Yes, there were two detectives.
Q Wasn't there a long period of time during the afternoon when you were all by yourself in that room?
A No, there wasn't.
Q Do you remember seeing me that afternoon?
A No, I don't.
Q You don't?
A (No response.)
Q And were you under the influence of drugs at one o'clock, do you think, that afternoon? At about eight hours after you were arrested?
A They were still affecting me, yes.
Q When did they stop affecting you?

MR. HAMMERSCHMITH: Objection, your Honor.

MR. BLOOM: I ask that to give a more precise question. Clinically, we could talk about after-effects that go on for days, and I'm not sure what he's --

you tell the detective that?

A Because they wouldn't let me go to sleep. They kept rapping on my bars.

Q Sir, forget whatever the reason may be -- did you tell the detectives in the afternoon on December 7th of 1985 that you didn't want to go back down to the cell?

A No, I didn't.

Q You never told them that?

A No, I didn't.

Q Did you want to go back to your cell?

A No, I didn't.

Q So you wanted to stay up in the Detective Bureau?

A No, I wanted to go home. That's what I wanted to do.

Q I'm talking about the option of staying in the Detective Bureau room or going back down to the cell. Where did you want to be at one o'clock in the afternoon, between those two hours?

A I wanted to stay upstairs because it was warm. It was cold down there.

Q You told the detectives that you didn't want to go down.

A Yes.

Q At least on one occasion; right?

THE COURT: I'm going to overrule the objection.

Q When did you, in your opinion, feel that you were no longer under the influence of drugs?

A The next day. The day after, when I was sent to York Street Jail and got some sleep.

Q And are you talking about being tired or under the influence of drugs, or both?

A I still felt high.

Q You felt high at one o'clock in the afternoon?

A Yes, I did.

Q You felt high at five o'clock?

A Yes, I did.

Q And how many times did you get hit when you ran away outside your sister's house?

A Several times.

Q Where?

A All over the place. Kicked in the legs. Arms --

Q Let's take one at a time. Who were you being kicked by?

A Yes, several officers.

Q Where?

A In numerous places.
Q Well, let's have them all.
A The stomach, side, legs --
Q Face?
A No, I wasn't kicked in the face, but I was slapped in the face.
Q How many times?
A A couple of times.
Q How many times were you kicked in the stomach?
A Several times.
Q And this is between four and five o'clock in the morning?
A Yes, it was.
Q And you were hit with a stick? Jabbed with a stick?
A Several sticks.
Q Jabbed with a stick?
A Hit.
Q Well, you show me how. How?
A (Indicates.) How were you hit? It's like you would hit a ball.
Q Somebody hitting a baseball?
A Yes.
Q Where did you get hit with that on your body?

A On my legs.
Q Your legs?
A And my back.
Q Where else?
A That was about it.
Q Face?
A No, they didn't hit me in the face.
Q Upper chest?
A No.
Q Anybody hit you in the upper chest?
A No.
Q You never got hit in the upper chest?
A No. The only time I got hit in the chest is when they threw me over the fence. I slid right across the top of the fence.
Q You slid across the top of the fence?
A Yes, I did.
Q What kind of a fence was that?
A A metal fence.
Q When you got out of the house at quarter of four, you elbowed or you bumped into the police officers and took off; didn't you?
A No, I didn't. I just ran.

Q You just ran?
A He wasn't even holding on to me.
Q You were cuffed behind your back; weren't you?
A Yes.
Q Like that (indicates)?
A Yes, I was.
Q You were vaulting fences that were as high as this is that I'm pointing to in the jury box.
A No.
Q You didn't vault a number of fences as high as this when the police were chasing you?
A No.
Q You never did?
A (No response.)
Q You never jumped over a fence?
A No, I didn't.
Q Not at all? How far do you think you ran, sir, before you were caught?
A About five hundred yards.
Q There's no question, sir, that however many times it was that you got hit and slapped in the face, this picture, A for Identification, was taken well after the beating stopped; right?

A I guess, yes.
Q You guess or do you know?
A (No respone.)
Q Was this taken before or after you got smashed around?
A It was after.
Q You had already all the beatings that you described for Judge Murphy. Being thrown over the fence. Being hit with a stick in the legs like someone hits a baseball and being jabbed in the back of the cruiser by the men with a nightstick and being hit in the legs and arms and back numerous times -- that certainly happened before this picture was taken; didn't it?
A Yes, it did.
MR. BLOOM: I'm going to offer this, your Honor.
MR. HAMMERSCHMITH: No objection.
THE COURT: This will be Exhibit #1, formerly A for Identification.
(Exhibit #1, photograph, offered and marked in evidence.)
Q You remember being in a lineup; right?
A Yes.
Q This is B for Identification. Does that look like the

lineup that you were in that day? December 7th?
A Yes.
Q That was in the afternoon, a very short time before you saw your mom and your sister; right?
A I suppose, yes.
Q What time does it say on the wall? What does the clock say on the wall?
A Four thirty-seven.
Q Was it four thirty in the morning or four thirty-seven in the afternoon?
A I couldn't really tell you.
Q You were arrested at four o'clock in the morning; right?
A Yes.
Q You don't know whether this happened a half an hour after you were arrested or sometime twelve or thirteen hours later the next afternoon.
A (No response.)
Q You don't know?
A I believe it was the next day.
Q So it would have been about a half an hour before you saw your mother and your sister.
A (No response.)

Q You heard them testify, saying that they got there about five o'clock.

A Yes.

Q That's how you looked at about a half an hour before you saw your mom and your sister?

A I guess so, yes.

MR. BLOOM: I'm going to offer this, your Honor.

THE COURT: This will be Exhibit #2, formerly B for Identification.

MR. HAMMERSCHMITH: There's no objection.

(Exhibit #2, photograph, offered and marked in evidence.)

Q When you got to the station at four or four fifteen or four twenty, whatever the exact time was, you were given your Miranda rights by someone; weren't you?

A I don't recall, no.

Q Well, did you know what the Miranda rights were on December 7th of 1985?

A Yes.

Q How many times did you have occasion to have those given to you?

A Several.

Q So you knew, you didn't have to have those things, statements -- you knew exactly what they were; didn't you?

A Yes, I did.

Q And is that your signature on this item? That I'm showing you?

A Yes.

MR. BLOOM: May I have this marked just for identification?

THE COURT: This will be Exhibit C for Identification.

(Exhibit C for Identification, Miranda card, offered and marked.)

MR. HAMMERSCHMITH: Excuse me, your Honor, I'd like to see the document so I know which one we're talking about.

MR. BLOOM: (Indicates.) It's the first one.

Q C for Identification, is that your signature?

A I believe so, yes.

Q Well, Mr. Perrot, putting aside that you believe so, do you know whether that is your handwriting?

A It looks like it, yes.

Q Well, do you have an opinion whether that is your handwriting or not?
A No, I don't.
Q You don't know whether that is your handwriting or not?
A It could be. It looks like it.
Q Well, what time does that say on that document?
A It says four thirty a.m.
Q Four twenty; doesn't it?
A Four twenty.
Q Twelve slash, seven slash, eighty-five. Did you get your Miranda rights at that time?
A I don't recall.
Q You don't recall that? Do you recall being thrown over a fence at about fifteen minutes earlier than four twenty a.m.? Do you?
A Yes, I do.
Q And you don't recall this.
A No, I don't.

MR. BLOOM: Could we have these two marked, your Honor? It's a telephone card and another Miranda card.

THE COURT: The telephone card will be D for Identification and the second Miranda card will be

E for Identification.

(Exhibits D and E for Identification, telephone card and second Miranda card, offered and marked.)

Q This is, Mr. Perrot, D for Identification. Does that look like your signature on that document?
A Yes.
Q And do you remember somebody giving you the right to use a telephone at five o'clock?
A Yes, I do.
Q And they told you that you had the right to use a telephone; right?
A Yes.
Q And to call whomever you wanted.
A Yes.
Q And after they told you those things, they asked you to sign the card saying that you had been told that you had the right to use a telephone and call anybody you want d to call; right?
A Yes.
Q You did sign it.
A Yes, I did.
Q That was at five o'clock in the morning on December 7th?
A No, it was the next day.

Q Well, what time is on that card that you signed as to when you were told that you had a right to use the telephone and call whomever you wanted to call?
A Well, they gave me the right to use the phone call when I got arrested, but I didn't call anybody.
Q No, no, the question is what time does that document say that you signed it?
A 5:05 a.m.
Q So at about 5:00, somebody told you that you had the right to use a phone and you could call whomever you wanted, and you signed it, acknowledging that you had been told those two things. You had a right to use the phone and you could call whomever you wanted to call; right?
A I believe, yes.
Q But you didn't call anybody.
A No, I didn't.
Q But they told you that you could if you wanted to; right? At that time?
A Yes.
Q Do you remember that?
A Yes, I do.
MR. BLOOM: I ask that this be marked.

THE COURT: Any objection?

MR. HAMMERSCHMITH: No objection, your Honor.

MR. BLOOM: That's D for Identification.

THE COURT: That will be Exhibit #3, the telephone card.

(Exhibit #3, telephone card, previously D for Identification, offered and marked in evidence.)

Q Mr. Perrot, you're not suggesting for a moment to Judge Murphy that you were upset and confused during this entire period of time because it was a new situation; are you?

A Excuse me, I don't understand the question.

Q You had been through this procedure how many times before?

A Numerous times.

Q It would be fair for me to say well over ten times; right?

A Yes.

Q And you had been booked well over ten times.

A Yes.

Q And had been interrogated well over ten times.

A Yes.
Q And had been given your Miranda rights well over ten times.
A Yes.
Q You had been held in custody well over ten times.
A Yes.
Q And gone through the whole fingerprint and photograph routine that you know well over ten times; correct?
A Yes.
Q So there was nothing new about December 7th of 1985 that upset you. You weren't upset because this was a new situation for you; were you?
A No, I wasn't.
Q You knew exactly what the police officer was talking about when he started talking about Miranda rights. You had heard that at least twenty times before prior to December 7th.
A I don't remember hearing them.
Q Well, this is E for Identification. Is that your signature on the bottom of that document?
A Yes.
Q And that's signed at the same time as the telephone card that is now, I believe, marked as Exhibit #3.

You indicated to the Court a moment ago that you remembered the telephone rights at 5:05 a.m. Didn't you just say that to the Court?

A Yes.

Q Now, I'm going to ask you, at 5:05 a.m., do you remember being given your Miranda rights?

A No, I don't.

Q But you remember the telephone call.

A Yes, I do, because when I was getting booked --

Q Is this signed at the same time by you that the telephone card that is now Exhibit #3 was signed?

A Yes, it does look like it. It looks like it, yes.

MR. HAMMERSCHMITH: Your Honor, I'm going to object. I think that we can say the times are the same, but it doesn't really tell us anything about his personal knowledge. We can all read the times as well as he can.

THE COURT: Overruled.

Q What time on Exhibit #3 did you sign that, acknowledging the fact that you were given the right to use the phone?

A 5:05 a.m.

Q That is Exhibit #3, for the record. This is E for Identification. What time does that say that you

signed the card after being given your Miranda rights, whomever the officer was, and signing the document?

A 5:05.

Q Do you remember signing this at 5:05 a.m., having being given your Miranda rights?

A I really don't remember, but I must have, because it's my signature.

Q But you don't specifically have a memory of that?

A No, I don't.

MR. BLOOM: Just finally, may I have this marked?

THE COURT: What is that?

MR. BLOOM: This is another Miranda card. May I have it marked for identification?

THE COURT: The third Miranda card will be F for Identification.

(Exhibit F for Identification, third Miranda card, offered and marked.)

MR. BLOOM: Finally, so I don't ..ep doing this, could I have this document marked? It's a consent form.

THE COURT: This will be Exhibit G for Identification.

(Exhibit G for Identification, consent form, offered and marked.)

Q Now, this is marked G for Identification, and it says the Springfield Police Department Search Warrant Waiver Consent Form.

Do you remember me asking you, sir, a short while ago about a situation in which at about twelve thirty or one o'clock, you were brought into the Detective Bureau from your cell and you were asked whether you would consent to give a blood sample of your blood and a sample of your hair?

A Yes.

Q And I believe that you told Judge Murphy that you remembered that. You remembered that happening up in the Detective Bureau.

A Yes, I do.

Q I believe you told the Court also that you said something to the effect that finally I didn't have anything to do about that incident or words to that effect, and you can have a sample of my hair and a sample of my blood.

A Yes.

Q And then, after being advised that you didn't have to

give all those things up, you signed that; correct?
A Yes.
Q That is your signature at the bottom; correct?
A Yes.
Q You remember that happening on December 7th of 1985; don't you?
A Yes, I do.
Q And what time does it say that you signed that paper?
A Up there?
Q Yes, what does that say?
A Twelve forty p.m.
Q On December 7th of 1985; correct?
A Yes.

THE COURT: What was the time?

MR. BLOOM: Twelve forty p.m., your Honor.

Q And that is your signature, George Perrot?
A Yes, it is.

MR. BLOOM: I ask that this be marked.

MR. HAMMERSCHMITH: No objection.

THE COURT: This will be Exhibit #4.

(Exhibit #4, consent form, offered and marked in evidence.)

Q Do you remember getting your Miranda rights at 12:40 p.m.?

A I don't recall, no.
Q I'm going to show you what has been marked F for Identification again. At the bottom of that document, what appears to be a Miranda card, you have signed that kind of card numerous times before December 7th.
A Yes, I have.
Q You know what it is before I tell you; right?
A Yes, I do.
Q And is that your signature at the bottom of it?
A I believe so, yes.
Q And do you recall being given your Miranda rights at about quarter of one on December 7th of 1985?
A I don't recall, no.
Q You don't recall that?
A No, I don't.
Q That was at least, according to the document, putting aside your memory for a moment -- again, according to the document, you signed this at the same time that you signed the consent form; right?
A Yes, I did.
Q But you don't remember this.
A I don't remember -- I don't recall hearing them, no, I don't.

Q You don't recall that?
A No, I don't.
Q Mr. Perrot, did you have your jacket on at 5:00 when you saw your mother?
A Yes, I did.
Q And do you remember talking to her and your sister?
A Yes, and my girlfriend was there too.
Q And how long did you talk to them?
A Maybe fifteen -- twenty minutes.
Q Do you remember giving two written statements in the afternoon of December 7th, and when I say afternoon, I'm talking about after noontime, after 12:00?
A No, I don't.
Q You don't remember giving either one of them?
A No, the only time I gave a statement is about maybe an hour, an hour and a half after I got arrested.
Q Let me ask you this. Did you live at 87 Malibu Drive in November and December of 1985?
A Yes, I did.

THE COURT: Are we talking about him signing them or giving them --

MR. BLOOM: I'll clarify that.

Q Do you remember giving a statement about the Covell

and/or Malibu home invasion rapes?
A No, I don't.
Q So you didn't give any information to a police officer concerning those incidents?
A No, I didn't.
Q You neither signed anything nor did you give information about anything.
A I don't believe I did, no.
Q Let me ask you something, sir. Did you have a friend by the name of Bob Timmerman and Jeff Atkinson in November of 1985?
A Yes, I did.
Q Did you ever go to Brattleboro, Vermont with them?
A Yes, I did.
Q Did you ever do purple mescaline with them?
A Yes, I did.
Q You never told those things to a police officer.
A They asked me about where I was that night and I told them.
Q Well, what I'm asking you, sir, is, and I believe your answer to my first question was that you provided no information about the Covell or the Malibu Street break-in rapes; is that right?

A Yes.
Q Did you tell police officers that afternoon, whatever time it was, that Jeff Atkinson and Bob Timmerman were friends of yours?
A I believe so, yes.
Q Did you tell them the week before you were arrested, and that would have been about the 30th of November, the previous week prior to what we've been talking about, that you had come back into the Springfield area about three in the morning with Atkinson and Timmerman from Brattleboro, Vermont?
A I believe I did, yes.
Q You did tell them that; right?
A (No response.)
Q And did you also tell them that during the course of that night that you were in Vermont, that you were doing purple mescaline with them?
A I believe so, yes.
Q Now, on November 30th of 1985, you were very much familiar with Covell Street and Malibu Drive; is that correct?
A No, I wasn't.
Q Familiar with Malibu Drive?

Imp

A Well, yes, I lived on that street.
Q And familiar with Covell Street?
A I know where it is. I walk by that every day.
Q So you're familiar with both of them.
A Yes, I am.
Q They're both in your neighborhood.
A Yes, they are.
Q Both of them are very close to each other, those two streets.
A Yes.
Q And you have been by or on both of them hundreds of times in your life; right?
A Yes, I have.
Q And you told the detectives that at three o'clock a.m., when you came back from Brattleboro, that you went inside two houses.
A No, I didn't.
Q You never told them that?
A I don't remember telling them that, no.
Q Are you saying that you don't remember or you didn't tell them?
A No, they were telline me I was in there.
Q Well, they were telling you?

A Yes.
Q Were they telling you that Bob Timmerman and Jeff Atkinson were your friends?
A No, they didn't. They asked me where I was that night and I told them.
Q Did they tell you that you had unlocked a breezeway door and kicked the rear inner door in?
A That's how they said I entered the house. Yes, they did.
Q And they told you that you started looking through a handbag. They told you that?
A Well, in that sense, yes.
Q Did they tell you a little black dog was barking and you ran out the side door?
A If that's what it says, that's what they said.
Q Forget what it says. That's not the question. Did they tell you that or did you offer it?
A No, I did not offer that.
Q Did they tell you that this occurred at about four a.m. on Saturday, November 30th of 1985?
A Yes, they did.
Q Did they tell you that you had been drinking since seven p.m. that night and had taken two purple

mescaline pills?

A No, I told them that.

Q So some of what is in the statement that I have been reading from -- this should be marked for Identification. I'm sorry.

THE COURT: This will be H for Identification.

(Exhibit H for Identification, statement, offered and marked.)

THE COURT: How do we identify that?

MR. BLOOM: I would just say, Judge, statement number two. There's going to be two of them. H is the second one and the other one I'd like to have marked is the first one in terms of time according to the documents.

THE COURT: I for Identification.

THE CLERK: I for Identification has been marked.

(I for Identification statement, offered and marked.)

Q (By Mr. Bloom) This is what has been marked as H for Identification. Have you seen that before?

A Yes, I have.

Q Is that your signature at the bottom, George Perrot, December 7th, 1985?
A It looks it.
Q Do you remember signing this at about 4:00 p.m. on December 7th, 1985?
A No, I don't.
Q You have no memory of signing it?
A No, I don't.
Q If I understand you correctly, what you're telling Judge Murphy is that that looks like your signature but you have no memory whatsoever about signing that document.
A That's right.
Q But you do remember things that happened to you at 4:00 a.m. right after you got arrested at Malibu Drive; right?
A When you get beat, you --
Q No, the question is, you do remember things that happened to you at 4:00 a.m, twelve hours earlier.
A Yes, I do.
Q You remember certain things that happened between you and Glantz early in the morning down in the cell.
A Yes, I do.

Q You remember at 12:40 someone telling you that they wanted to take your blood and your hair; you remember that very clearly; right?
A Yes. Not clearly, but I remember it.
Q But you don't remember signing this at 4:00 in the afternoon, which is marked H for Identification.
A No, I don't.
Q But you do remember that some of the details in here you gave to the police.
A Yes, where I was that night, yes.
Q Where you were on the night of November 30th.
A Yes.
Q And who you were with.
A Yes.
Q And what you were doing.
A Yes.
Q You never told them anything about going into any houses.
A No, I didn't.
Q Do you see where it appears that a word may be crossed out because it's misspelled or there appears to be some kind of a clerical error and four or five of them that say "G.P.?" Is that your handwriting?

A No, it's not.
Q You see them on there, though; right?
A Yes, I do.
Q How many of them are there that you can see?
A Four.
Q But that's not yours.
A No, it's not.
Q Did you ever read this or see it before you signed it?
A No, I haven't.
Q You don't remember reading this before you signed it?
A Not before I signed it, no.
Q When did you sign it?
A I don't recall.
Q You don't recall signing it at all?
A No.
Q You certainly don't remember reading this at any time? H for Identification?
A Not that night I don't remember it.
Q Sometime later?
A Weeks later when I got copies from my lawyer.
Q That's the first time you remember reading it?
A Yes.
Q Is that right?

A Yes.
Q Now, this is marked I for Identification, and is that your signature at the bottom?
A Yes.
Q Do you remember giving that statement?
A Yes, I do.
Q Did you give that statement?
A Yes.
Q Did you give all the details that are in there or did the police provide the details that are in there?
A Well, I told them what happened and they just filled it in.
Q That that I've put in front of you concerns the McNabb house break-in; right?
A Yes.
Q And the girl who had her pocketbook stolen. Do you remember giving those details to the police about how those two crimes occurred?
A Yes.
Q You provided all the information concerning that; right?
A Somewhat, yes.
Q As we look through that document, the things that are

in there are facts that you gave to the police concerning those two crimes; right?
A Pretty much, yes.
Q Is there anything in there that you look at that is not correct as to what you told the police concerning those two crimes?
A Not that I can see.
Q Does it appear to be what you told the police?
A Yes.
Q And you remember at 12:40 p.m. on December 7th of 1985 telling the police those things that are in that document and then signing it; right?
A I remember signing, but I don't remember what time it was.
THE COURT: I missed that.
THE WITNESS: I remember signing, but I don't remember what time it was.
Q Well, regardless of what time it was, sir, you do remember telling the police what is contained in that statement; don't you?
A Yes.
Q You do remember. And you remember after the statement had been typed out and an officer saying to you,

George, read that before you sign it; right?
A I don't recall, no.
Q Well, did you read it? Do you remember whether you read it before you signed it?
A I don't remember, no.
Q Would you just arbitrarily sign a statement without reading it?
A I'm not sure I read it before I signed it.
Q How about the other one?
A I don't even remember signing that.
Q You remember signing this one?
A Yes, I remember giving that information about this one, yes.
Q And you don't remember what time it was; right?
A No, I don't.
Q You don't remember whether you read it before you signed it, but you do agree that you signed it.
A Yes.
Q And had you been given your Miranda rights prior at any time, as you best can remember it today, in September of 1986 -- your best memory -- had you ever been given your Miranda rights which included the fact that you could call lawyers and you didn't have

to talk to anyone and all the other things that you're very familiar with -- do you remember at any time having them given prior to giving this statement that you have just been answering questions about?

A No, I don't.

Q Are you saying that you didn't or you don't remember?

A I don't remember.

Q Is it possible that you had been given your Miranda rights?

A It's possible, yes.

MR. BLOOM: I'll ask that this be marked.

THE COURT: I for Identification?

MR. BLOOM: I'm going to offer it as an exhibit.

THE COURT: It will be Exhibit #5.

(Exhibit #5, previously I for Identification, offered and marked in evidence.)

Q George, do you remember in the afternoon of December 7th, 1985, on a number of occasions being asked about an elderly woman that had been very badly beaten and raped? Do you remember questions about that?

A Yes, I do.

Q Did you tell the police on a number of occasions that

it was the drugs? Didn't you say that to them a lot of times?
A No, I didn't.
Q Didn't you tell the police that you wanted to kill yourself?
A Not that I remember, no.
Q Well, that would be something that you would intend to remember; wouldn't you, Mr. Perrot?
A Well, I don't remember.
Q You don't remember whether you told the police you wanted to kill yourself?
A No.
Q Do you remember crying that afternoon?
A When I saw my mother and girlfriend and my sister -- I do remember.
Q You were crying from 1:00 to 4:00 on and off that afternoon in the interrogation room at the Springfield Police Department; weren't you?
A I don't remember.
Q You don't remember 1:00 to 4:00, whether you were crying?
A No, I wasn't.
Q You weren't crying or you don't remember?

A I wasn't crying.
Q You never cried once?
A When I saw my mother and girlfriend and sister, I was crying, yes.
Q That's the first time?
A Yes.
Q Never before that?
A No.
Q Did you sit down and prepare an affidavit on this case with your lawyer?
A Excuse me?
Q Do you remember sitting down with your lawyer and talking to him about the things that had happened to you prior to giving the statement?
A Yes.
Q And I'm not asking you what you said, but you had conversations with him about the things that had happened to you.
A Yes.
Q And ultimately, he had some item typed out for you and asked you to sign it; right?
A Yes.
Q Do you remember doing all that? Yes or no?

A Yes.

MR. BLOOM: Can I see those, your Honor? There should be two affidavits in the file.

THE COURT: I'm about to recess if we're going on much longer.

MR. BLOOM: I think we should recess. I'm going to be five or ten more minutes.

(Recess at 4:10 p.m. The defendant was present in the courtroom.)

* * * * *

(September 3, 1986.
9:45 a.m. The defendant was present in the courtroom.)

CROSS-EXAMINATION BY MR. BLOOM (CONTINUED)

Q Mr. Perrot, yesterday you were talking about being thrown over a fence at about 4:00 and being thrown across the top of a fence. Do you remember that?
A Yes, I do.
Q And that happened around 4:00 in the morning or so? Around that time; right?
A Yes.
Q And I think you said yesterday -- and correct me if I'm wrong -- that you also were hit a number of times at that same time, 4:00 a.m. or so in the morning; right?
A Yes, I was.
Q And you don't know who the officers were?
A No, I don't.
Q More than one of them hitting you and kicking you at that time?
A Yes, there were several of them.
Q And then, on the ride to the station, were you also being poked or hit while you were in the police cruiser?

A Yes, I was.
Q Is that during the time period I think you described yesterday -- that whoever it was, who was poking you, said something to the effect that you try to run again and I'll kill you the next time or something like that?
A Yes.
Q So all that occurred sometime around 4:00 or so in the morning; correct?
A Yes.
Q Now, what was the last thing that you had by way of either drugs or by way of drinking -- some type of item that you were drinking that night or early morning?
A Approximately between 1:30 and 2:00.
Q And you said that at some point you had cocaine.
A Yes.
Q Can you tell Judge Murphy, as best you remember, what time either on the night of the 6th or early morning hours of the 7th was it that you had cocaine?
A Well, it was several times during the night.
Q When would have been the last time?
A I'd say approximately around 1:00 -- 1:30 -- somewhere around there.

Q And the high that you get off of cocaine doesn't last too long; does it?
A Not really.
Q In fact, that's one of the problems, you've got to keep doing it because the high is so short.
A Yes.
Q When was the last time that you drank? One thirty? Two?
A Around the same time.
Q What were you drinking? Beer?
A Yes.
Q Did you have any more beer after 1:30 or 2:00 in the morning?
A No, I didn't.
Q And when all this was happening to you, in terms of the physical abuse, this was some two hours after you had stopped drinking and/or had any drugs, somewhere in that neighborhood; is that right?
A Yes.
Q Now, when you talked to the police the next afternoon, sir, you certainly still weren't feeling the effects of the cocaine at 1:00 or 2:00 in the afternoon; were you?
A It was from the valium that I took that evening.

Q When did you take those valium?
A All during the night.
Q Well, not after 2:00 in the morning.
A No.
Q The police didn't let you take any valium.
A No, they didn't.
Q And you were still affected by the valium that you took at 1:00 or 2:00 in the morning of the 7th at 1:00 or 2:00 p.m. that same afternoon, some twelve hours later?
A Yes, I was.
Q And did you still feel you were under the effect of the or under the influence of the beer that you had drank at 1:00 or 2:00 in the morning?
A The mixture between the alcohol and the valiums, yes.
Q You felt you were under the influence?
A Yes.
Q You sat down and prepared an affidavit with your lawyer. Do you remember doing that?
A The night of the 7th?
Q No, sometime afterwards when you consulted with him.
A Oh, yes.
Q And you remember telling your lawyer that you told

the police officer that you wished to consult with an attorney, but your request was dismissed by them and they continued to interrogate you even though you told them that you had a desire to talk to a lawyer?

MR. HAMMERSCHMITH: Objection, your Honor.

THE COURT: Is that part of the affidavit?

MR. BLOOM: I'm reading from the affidavit.

THE COURT: What's your objection?

MR. HAMMERSCHMITH: I don't believe that's an affidavit that was signed by the defendant.

Q Well, did you make two affidavits?

A I'm not actually sure.

Q Well, whether it's in an affidavit or not, are you saying that you requested to get in contact with a lawyer?

A The next day I did, yes.

Q What time would that have been?

A I couldn't really tell you.

Q Well, you certainly told Judge Murphy yesterday that the police made it very clear to you, whoever it was, that you could call anybody in the world that you wanted to. Your mother, your girlfriend, and you declined to use the phone. That's true; isn't it?

A Yes.

Q That was at 5:00. You remember that; right?

A Yes.

Q And when you were down in the lock-up, seven or eight in the morning until 1:00 or so when they brought you back up, is it your testimony that you weren't allowed to sleep during those four or five hours or six hours, however long it was, because someone was banging on your cell?

A Yes. I don't recall the officer's name.

Q Was it Glantz?

A There were two different ones. One was Glantz, and I don't recall the other one's name.

Q Do you remember whether Glantz was banging on your cell from 8:00 or 7:30, whatever the exact time period was that they brought you down to be booked, and 1:00 or so, when they brought you back up to the Detective Bureau?

A (No response.)

Q Would Glantz have been one of the people that was bothering you during that sequence of time?

A I think it was a different officer at that time.

Q But you did see Glantz later that afternoon?

A I think Glantz was on the first shift.

MR. BLOOM: That's all I have.

REDIRECT EXAMINATION BY MR. HAMMERSCHMITH

Q George, do you know what time it was when the police came to your room?

A Not actually, no.

Q Do you know what time it was when you got to the station?

A No, I don't.

Q Do you wear a watch?

A No, I don't.

Q Did you wear a watch then?

A No, I never have.

Q But at any point in time while you were at the station, did you wear a watch?

A No.

Q Do you recall whether at any time while you were at the station you saw a clock in any of the rooms that you were in?

A Not that I can recall, no.

Q Yesterday you saw a clock in a picture of a lineup. Do you remember seeing that yesterday?

A Yes.
Q Did you notice that clock during the actual lineup?
A No, I didn't.
Q So how is it that you would know what time various things happened while you were at the station on December 7th?
A I can't really recall exactly what time it was, but the only way I could tell is from the light and darkness from the windows in the offices.
Q And you signed some statements. You signed a telephone card. You signed a statement involving the McNabb break-in and you signed a consent to a blood sample being taken. Now, each of those documents has on it a time. Do you remember whether when you signed those statements you looked at the times on those? Do you recall?
A No, I don't remember.
Q Did you at some point make a call to your girlfriend, Lisa's, from the police station on December 7th?
A Yes.
Q Do you know whether that was before or after you signed the statement involving the McNabb break-in?
A That was after.

Q Do you know how long after it would have been? What would be your best estimate?

A I would say four hours maybe. I'm not exactly sure. I couldn't really remember.

Q How close would that have been to the time when Lisa, your mother and your sister came to the station and visited you there on December 7th?

A I'd say about an hour maybe.

Q An hour before?

A Yes.

MR. HAMMERSCHMITH: Nothing further.

RECROSS-EXAMINATION BY MR. BLOOM

Q Just one or two things. Mr. Perrot, those statements that I showed you yesterday -- you didn't sign those because of any physical abuse by the Springfield Police Department; did you?

MR. HAMMERSCHMITH: Objection, your Honor.

THE WITNESS: No.

THE COURT: Overruled.

THE WITNESS: No, I didn't.

Q That was some eight, nine, ten, twelve, thirteen hours before you signed either one of those statements.

The problems that you had at 4:00 a.m. in the morning; right?
A I'm not exactly sure.
Q Well, those statements that I showed you yesterday, will you agree with me that they occurred sometime after both of them? After you had been booked and been in the cell four or five hours and then brought back up to the Detective Bureau?
A Yes.
Q So it was a series of hours after you had been beaten by the Springfield Police at about 4:00 a.m. in the morning or so that you signed the two statements that we're concerned with. Isn't that a fair statement on my part?
A I don't exactly know how many hours, but it was very long after that.
Q Whether it was four hours or whether it was twelve hours, you didn't sign those two statements because of the beating that occurred at 4:00 a.m. in the morning; did you?
A No.
Q And the people that were dealing with you when you signed those statements that afternoon, they weren't

beating you; were they?
A No, they weren't.
Q They weren't abusing you in any way; were they?
A Just verbally.
Q Verbally? What did they do to you verbally?
A Just threatening me.
Q What did they say?
A I don't recall exactly what they said. They were screaming at me, threatening me.
Q You don't recall what they said?
A Not exactly, no.

MR. HAMMERSCHMITH: That's all I have. Nothing further, your Honor. Those would be the defense witnesses, your Honor.

MR. BLOOM: I have a few witnesses, Judge.

THOMAS M. KELLY (Sworn)

DIRECT EXAMINATION BY MR. BLOOM

Q Would you tell Judge Murphy your name and occupation?

A My name is Sergeant Thomas M. Kelly. I'm a police officer with the City of Springfield, assigned to the Crime Prevention Bureau.

Q How long have you been working in the Crime Prevention Bureau, sir?

A Eleven years.

Q And now, referring your attention to December 6th and 7th of 1985, at some point in time, did you personally become involved in the investigation concerning Mr. Perrot?

A Yes.

Q And could you tell Judge Murphy on that day, the 7th of December, how you happened to become involved?

A I was called at home at about 3:30 in the morning and told that Perrot had been arrested, and I was asked to come to the station.

Q And at that time, prior to receiving a phone call, were you in charge of an investigation concerning a number of sexual assaults?

A Yes.
Q Home invasions?
A Yes.
Q And when you got down there, sir, give us your best estimate as to what time it would have been.
A It was sometime after 4:15 or 4:30. Around 4:30, I believe.
Q And at some point in time, 4:30, quarter of five, whatever the exact time was, did you go and talk to Mr. Perrot?
A (No response.)
Q Can you describe where that was?
A He was in the interrogation room in the Detective Bureau. It's a room at the far end of the Detective Bureau and that's where I spoke to him.
Q And had you informed any of the officers to do anything prior to your coming down there, if you remember?
A No.
Q And what do you ~member saying to him when you first met him?
A I went into the room with Officer St. Germain, who was from the Crime Prevention Bureau, and read him his Miranda rights.

Q Off of a card or memory?
A From a card.
Q I'm going to show you, Sergeant, an item that has been marked for Identification E, and can you tell us is that the card -- just yes or no -- that you read to Mr. Perrot?
A Yes.
Q And now, that process of reading him his Miranda rights was done at what time?
A I have indicated here 5:05 a.m.
Q Give us the best estimate as to -- strike that.
Can you, based on that time, give us a framework as to what time you would have first seen Mr. Perrot.
A I would have seen him immediately upon coming to the station, but I first talked with the officers who made the arrest and familiarized myself with the events of the morning prior to my coming to the station before I spoke with him, so I would say probably twenty minutes to a half an hour before I read this card to him I would have gotten to the station.
Q So we're talking in the neighborhood of 4:30 -- give or take a few minutes -- one way or the other?
A Yes.

Q Do you remember, sir, what Mr. Perrot's condition was at about 5:05 a.m. as you observed him in that room?
A He was smoking a cigarette.
Q Was there anybody else in the room at that time?
A No.
Q Physically, how did he appear to you at that time?
A He appeared mussed -- you know -- his condition was mussed. His appearance rather, but other than that, there was an odor of alcohol.
Q On him?
A Yes.
Q Did he appear to understand you when you talked to him? Did you have any problem communicating with him?
A No, none.
Q Did you have any problem whatsoever understanding any of the responses that he made to you?
A No.
Q And did you read from those various sentences one through eight on that Miranda card to Mr. Perrot?
A Yes, one at a time, and after I finished each one, I asked him if he knew what that meant.
Q And what was his response? What were his responses?
A They were in the affirmative.

Q And did you have him sign that card then?
A Yes.
Q And who witnessed the card?
A Officer St. Germain.
Q And that was done at 5:05 a.m, you have indicated?
A Yes.
Q Now, did you inform him of any other rights that he had at about the same time?
A I told him he had a right to use the telephone.
Q Did you explain that to him, sir?
A Yes.
Q And did he appear to understand that?
A Yes.
Q And when you were done with that explanation, what is your best memory as to what Mr. Perrot said when you were done explaining to him his rights as to the telephone?
A He told me that he didn't want to use the phone right then, but at some point he would like to call his girlfriend.
Q And did he sign what is referred to as his right to use the phone card (indicates)?
A He signed it next to "person." I gave him the right to

use the telephone slip and he signed before I indicated where he should sign it.

Q When you went through the seven or eight questions, after you got done through question seven and read eight, which says having these rights in mind, do you wish to talk to me now, what was Mr. Perrot's statement?

A (No response.)

Q As best you remember.

A It was yes, that he would talk to me.

MR. BLOOM: I'm going to offer these two. I'm sorry, one is already Exhibit #3, the telephone card, but I'm going to offer the Miranda card.

THE COURT: Any objection?

MR. HAMMERSCHMITH: No objection.

THE COURT: E for Identification will become Exhibit #6.

(Exhibit #6, Miranda card, offered and marked in evidence.)

Q Sergeant, you indicated a moment ago, I believe, that it would have been in the neighborhood of 4:30 when you got there. I'm going to show you C for Identification, which appears again to be a Miranda card, and signed

at least, according to what is written on there,
4:20 a.m. by George Perrot.
Did you go through that process with him or was it
someone else?
A It wasn't me, sir.
Q Now, what did you say to him at that time at 5:05 on
the 7th, whatever it was now, and what did he say to
you after he indicated that he would be willing to talk
to you?
A I told him that he had been arrested and identified as
the person who had snatched a pocketbook and that we
were interested in talking about that.
I indicated that there was a twenty-dollar bill
and a credit card, and I don't remember the type of
credit card it was, but there was a credit card
missing from one of the victims.
Q Where did you gain that knowledge from?
A From the officers who were interviewing the victims.
Q And what did he say about that?
A I asked him where they were and he said that they're
probably still in my room.
Q Now you're talking about -- this is the Sapelli girl,
the girl's name was Sapelli that had her pocketbook

stolen.
A Yes.
Q And is that what you were talking to him about, with him about intially?
A Yes, the purse snatch that had occurred at about 2:50 that morning.
Q What else did he say, if anything, at that time when you initially talked to him?
A I told him that I wanted to talk to him about some attacks on some elderly women and he told me at that time that he didn't know anything about it.
Q And as a result of the information that he gave you on the Sapelli girl, what, if anything, did you do?
A I instructed Officer St. Germain and Officer Cavanaugh to -- I'm sorry, Officer Trites, to prepare an affidavit based on what he told us about the location of the twenty-dollar bill and the credit card and apply for a search warrant to 87 Malibu Drive.
Q And did you do that?
A Yes.
Q And what time did you go out to 87 Malibu? The best of your memory.
A I believe it would be early morning -- 7:30 -- 8:00.

Somewhere in that time.
Q Did you go out there?
A It may have been earlier. I'm sorry, it may have been earlier.
Q Did you go out there?
A Yes.
Q What did you do with him from 5:15 or 5:30 until 8:00 when you went out, or 7:30 when you went out on the search warrant?
A He was kept in the interrogation room.
Q Were you talking to him during that period?
A Either myself or Sergeant Canevari was.
Q About what, sir?
A About the attack on the elderly ladies.
Q At any time during that time period, did he ever indicate that he no longer wanted to talk to you?
A No.
Q Did he ever indicate to you that he wanted to talk to a lawyer?
A No.
Q And during that time period that we're dealing with, 5:15 to 7:00, 7:30, was he ever taken down and put in a cell?

A No, sir.
Q Was there a reason for that?
A He was very adamant that he didn't want to be placed in a cell. He said that they were -- based on what he told me, I had the feeling that he was very uncomfortable in that closed cell and he would alternate between telling us that he didn't want to go to the cell and telling us that he wanted to see his girlfriend.
Q And during that time period, Sergeant, did you have an opportunity to observe his face from a very close distance?
A Yes.
Q Did you ever notice any markings on his face?
A No.
Q Did you ever see any evidence at that time -- and again, I'm referring your attention to 5:15 to let's say 7:00 -- of him being abused by anyone?
A No.
Q Now, after 7:00 or 7:30, whenever it was that you left the station and went up to Malibu Drive, did you have any further involvement with Mr. Perrot at that time? Any one-on-one involvement?

A From what time, sir?
Q After you left the police station, whenever the exact time was, to go up and serve that search warrant, did you have any more involvement with Mr. Perrot?
A No.
Q And when you came back to the station after going and executing the search warrant, do you know where he was at that time?
A I believe he was at the booking desk or in his cell or downstairs.
Q Downstairs where the cells are?
A Yes.
MR. BLOOM: That's all I have of this witness.

CROSS-EXAMINATION BY MR. HAMMERSCHMITH

Q Sergeant Kelly, you were present at the arrest of Mr. Perrot then; were you?
A I was not present.
Q When he was arrested?
A No. No, sir.
Q And the first time that you saw him that day was when you arrived at the station at about 4:30 in the morning?

A About that time, yes.
Q And at that time you didn't speak with him but you saw him; is that correct?
A Yes.
Q The first time you spoke with him was, I think, 5:05?
A Yes, I read him his card. Yes.
Q Now, that was in an interrogation room; is that correct?
A Yes.
Q And he stayed in that interrogation room until you left to go to search the house that he was living in; is that correct?
A He may have been removed from there before that time and brought to the men's room in the Detective Bureau, which is right outside the door.
Q To use the bathroom?
A Yes.
Q And other than that, I take it that that would not have been a long absence from the room.
A No.
Q During that time that he was being questioned. Is that correct?
A Not the entire time, no.

Q When did you stop questioning him? How long before you departed to go and search Mr. Perrot's home?
A Probably talked with him for twenty minutes.
Q How long before you left to search Mr. Perrot's home did you stop talking with him?
A As I said, if I stopped after about twenty or twenty-five minutes, that would put it at about 5:30. The mechanics of preparing the affidavit and getting the search warrant took some time -- I would say probably an hour and a half -- from the time that I stopped talking to him until the time that we went to his house.
Q Now, you didn't prepare that search warrant?
A No.
Q That was prepared by --
A St. Germain and Trites, I believe.
Q And where were you while that was being prepared?
A With them.
Q And was that in the same room with Mr. Perrot or different?
A No, it's the other end of the Detective Bureau.
Q Who would have been in there with Mr. Perrot while

that was happening?
A I don't know. I don't think anybody would have been. He would have been in the room by himself.
Q Would he have been cuffed?
A I don't believe so.
Q And was the room locked?
A Yes.
Q Now, what time was it that you thought that you went to Mr. Perrot's home to execute the search?
A I'd say that it was early in the morning -- 7:00 -- sometime between 7:00 and 8:00.
Q How long did it take you to get there from the station?
A Fifteen minutes.
Q Did you go directly from the station?
A Yes.
Q I want to show you a document and see if this might refresh your recollection as to when you went to Mr. Perrot's home.
Does that refresh your memory, your recollection as to when you went to Mr. Perrot's home?
A I thought it was earlier.
Q It might have been 9:00?
A It very well could have been, but my memory was that it

was earlier.

Q You didn't assist in completing the inventory for the search warrant.

A Yes, I believe I did.

Q You would have reviewed this document then?

A Yes.

MR. HAMMERSCHMITH: First I'll ask to have this marked for identification purposes.

THE CLERK: This will be J for Identification.

(J for Identification, search warrant, offered and marked.)

Q I'm going to ask you to take a good look at this document and take all the time that you need.

THE COURT: What is it you're questioning him on? What is he supposed to be doing with that? Refreshing his recollection about something?

MR. HAMMERSCHMITH: Making sure that he knows what the documer contains. I'll then ask him what the document represents.

THE COURT: Why don't you ask him questions about it because I don't want him sitting there reading that thing and not knowing what the purpose of it

is.

Q Have you had a chance to look at the document, Sergeant?

A Yes.

Q Do you recognize it?

A Yes.

Q What do you recognize it to be?

A A search warrant for 87 Malibu Drive, accompanied by an affidavit in support of the search warrant and an application for a search warrant.

Q That would have been the search warrant that was completed and the inventory filed in connection with the search that morning; is that right?

A Yes.

MR. HAMMERSCHMITH: I'd like to offer that into evidence, if I may.

MR. BLOOM: I don't have any objection.

THE COURT: This will be Exhibit #7, application for the search warrant, affidavit in support of the search warrant, and the search warrant.

THE CLERK: Those will be marked as Exhibit #7.

(Exhibit #7, application for

search warrant, affidavit in support of search warrant, and search warrant, offered and marked in evidence.)

Q Now, when you first spoke with Mr. Perrot in the interrogation room on December 7th, are you saying that he didn't indicate to you that he was tired and sleepy?

A No.

Q He gave no indication to you at all that he wanted to go to sleep?

A No.

Q You're saying that he was perfectly candid and willing to speak to you about the matters that you were inquiring of?

A Yes, he was willing to speak with me regarding the pocketbook snatch that morning, but not any of the other things that I had to talk to him about, specifically the attacks against the elderly women.

THE COURT: Wait a minute. Hold on a second. Are you saying that he wasn't willing to talk about it, or he denied it?

THE WITNESS: He didn't want -- I would say that he was denying it, sir.

Q What was he saying?
A He was cooperative about the pocketbook snatch, but when I started to talk to him about specific attacks on elderly women, he would say that I don't know anything about that.
THE COURT: Now, you're not saying to me now then -- because there's a difference, Sergeant -- what you consider cooperation is he didn't admit them. He answered your questions, didn't he, about the other attacks?
THE WITNESS: Yes. No, no, if you consider answering them saying that I don't know anything about that.
THE COURT: I don't know what else it is.
Q And you were questioning and he was under arrest at that time, wasn't he, not just for this purse snatch involving Miss Sapelli, but he was also under arrest for the break-in at the McNabb residence; is that correct?
A Yes.
Q Did you question him about that?
A No, I did not.
Q You didn't ask him any questions about that?
A No.

Q Even though he was under arrest for that?
A Yes. I had a particular interest in the attacks on the elderly women.
Q And the reason for that particular interest was what?
A Because I'm the head of the morals unit and those attacks involve sexual assaults on the ladies.
Q You had been working on that investigation for quite a while.
A Yes.
Q And even prior to that night, George Perrot was one of your suspects in that investigation; wasn't he?
A Yes.
Q And you welcomed the chance to question him about those attacks; didn't you?
A Yes.
Q The most recent of those attacks was about a week before he was arrested on December 7th.
A About that, yes.
Q And you're saying that questioning went on only for twenty minutes?
A Yes.
Q At the end of which you terminated the questioning?
A I stopped it for that time. I intended -- if he wanted

to talk to me -- to continue to talk to him.
Q So he didn't want to talk to you anymore.
A No, I finished the interview, I said.
Q Officer, you said that if he wanted to talk with you more, you intended to talk to him.
A Yes.
Q Can't I assume or can the Court assume that if the conversation stopped, it was because he didn't want to talk to you anymore?
A No, that's not what I said.
Q What did you say?
A I said that if he wanted to continue to talk with me, I would talk to him. I stopped the interview at that time because I wanted to get the affidavit started for the search warrant for 87 Malibu Drive.
Q Did George Perrot at any point in time indicate to you that he wanted to continue to talk to you?
A Never indicated that he didn't.
Q My question was, did he indicate to you that he wanted to continue to talk to you?
A By not saying that he wanted to stop it, I would assume that he wanted me to continue.
Q But you assumed that he wanted you to keep questioning

ad infinitum.

A I was going to talk to him as long as he wanted to talk to me.

Q But you stopped after twenty minutes.

A Yes.

Q You're saying it took long to prepare the search warrant?

A I would say from the time that the affidavit was started until the search warrant was completed, perhaps, probably an hour and a half -- maybe longer.

Q And the reason that you stopped talking with him was that there was work to be done on the search warrant?

A Yes.

Q You started talking with him at 5:00 in the morning.

A Yes.

Q And now if we assume that you left for George Perrot's home to conduct that search at a quarter of nine in the morning, it took about an hour before that to do the paperwork -- we're talking -- it would take you backwards to 7:15 in the morning; is that correct?

MR. BLOOM: I'm going to object.

THE COURT: Clarify that question. Are you talking about the time that you finished the warrant

but before the search? Is that what you're saying?

MR. HAMMERSCHMITH: My understanding, your Honor, is that the testimony was that he had took about an hour and a half to finish the search warrant, and when they left for the -- after finishing the work on the search warrant, they then left for George Perrot's home and roughly fifteen minutes or so to get there.

THE COURT: Well, I'm going to ask you to rephrase the question. You started working backwards from some point there.

Q Working backwards again --

THE COURT: From where now?

MR. HAMMERSCHMITH: From the time --

THE COURT: From nine o'clock?

MR. HAMMERSCHMITH: From the time that the search warrant was executed.

THE COURT: You're talking about nine o'clock?

MR. HAMMERSCHMITH: According to the document, that would be nine o'clock, your Honor.

THE COURT: What does your question include?

MR. HAMMERSCHMITH: I'm not asking him specific times.

THE COURT: All right.

Q But going backwards from that time, when you executed the search warrant, it took you about fifteen minutes to get to George Perrot's home from the station.
A Yes.
Q And then before that, it took about an hour and a half to do the paperwork?
A Yes.
Q Now, you indicated that George was mussed when you saw him. What do you mean by "mussed?"
A His hair was disheveled. He had shoes on, but they weren't tied.
Q Do you know whether his jacket was open or closed?
A I don't recall.
Q Were his eyelids heavy?
A Pardon me?
Q Were his eyelids heavy?
A Not that I recall.
Q Do you know what time George was photographed at the station?
A No, I don't.
Q Under normal procedures, when does that occur?
A At some point after he's left the booking desk and brought to his cell. He would be removed from the

booking desk -- there is a paperwork transaction that takes place after the booking process. Papers go up to the records room and they're processed and his jacket is completed and paperwork then goes back down to the records, to the booking desk, and he's then removed from his cell and brought to the photo and print section.

Q Do you know when George Perrot would have been booked?

A I believe it was around 8:00 in the morning.

Q It was after you had questioned him?

A Yes.

Q Sometime after that he would have been photographed?

A Yes.

Q Prints would be taken at the same time?

A Yes.

Q Do they keep a record of the time that the photograph is taken?

A I don't think so.

Q Prints?

A No.

Q Did you return to the station after executing the search warrant at that point?

A Yes.

Q What time would you have gotten back to the station?
A (No response.)
Q Let me ask you this. How long after you first walked into George Perrot's home would you have gotten back to the station?
A Probably an hour later.
Q And when you got back, was Lieutenant Jarvis there?
A Officer Jarvis, yes.
Q And did you have occasion to speak with Officer Jarvis when you got back?
A Yes.
Q And did you fill in Officer Jarvis on the questioning that you had done of George Perrot?
A Yes.
Q And did you tell Officer Jarvis that you weren't able to get any information from George about anything other than the Sapelli incident?
A Yes.
Q Where would that conversation have taken place?
A I believe in the D.B.
Q How long would that have been after you returned to the station?
A Upon arrival.

Q Do you know where George Perrot was at that time? Was he visible to you?
A No, I don't.
Q He was not in the interrogation room at that point.
A No.
Q At any point in time did you see George Perrot sleeping?
A No.
Q Would you have been in the vicinity of the interrogation room pretty much continuously from the time that you arrived at the station until you left to execute the search warrant?
A I would have been in the D.B., which includes the interrogation room, yes.
Q And can one see into the interrogation room from the D.B.?
A You would have to go directly in front of the door to see into it.
Q Did you file a police report with respect to your questioning of George Perrot?
A No.
Q You didn't fill out any report at all?
A No.
Q Isn't it customary when one questions a suspect or a

defendant and obtains information to fill out a report?
A No.
Q What determines whether or not one should fill out a report under police procedure?
MR. BLOOM: I object unless there is some relevance to this.
THE COURT: Overruled.
THE WITNESS: The question again?
Q What determines under the standard police procedures whether a report should be completed or not with respect to an interrogation?
A I would imagine the officer's own initiative. If he feels one should be submitted, one is submitted.
Q You obtained information from George Perrot; didn't you?
A Yes.
Q And the information was inculpatory; wasn't it?
A Yes.
Q Eventually it could be used in connection with criminal prosecution.
A Yes.
Q But you didn't fill out a report.
A I didn't fill out a report because the information was placed directly into the affidavit.

Q Did you give that information orally to Officer Jarvis?
A I gave the information to Officer St. Germain who was with me when the information was obtained and Officer Trites for the affidavit, and when I spoke to Officer Jarvis, I turned over the affidavit, the copy of the affidavit and where the information was contained.
Q At any point in time while you were with George Perrot or while he was visible to you, was he sick to his stomach and did he vomit that you saw?
A No, sir.
MR. HAMMERSCHMITH: No further questions.

REDIRECT EXAMINATION BY MR. BLOOM

Q Just one thing, Sergeant. Going back to 5:05. After you indicated to him, or you read those eight sentences off the Miranda card, his response to you concerning whether he would be willing to talk to you was what at that time?
A Yes, that he would.
Q And you questioned him, you said, first of all, to Mr. Hammerschmith and myself, about the Sapelli pocketbook snatch.

A Yes.
Q And secondly, you questioned him about -- yes or no -- other incidents that were pending at that time?
MR. HAMMERSCHMITH: Objection. Leading the witness.
MR. BLOOM: I'll withdraw it.
THE COURT: This area we've been over before. Go ahead.
Q Did you question him about other incidents at that point?
A Yes.
Q Now, those other sexual assault incidents, when you started to question him on that, did he indicate -- just yes or no -- that he didn't want to talk to you anymore?
A No.
Q What was his response when you started talking about the sexual assaults?
A "I don't know anything about any old ladies."
Q Now, at that time, or at any other time that you dealt with him, did he ever indicate to you that he didn't want to talk to you anymore?
A No.

MR. BLOOM: That's all I have.

MR. HAMMERSCHMITH: Nothing further.

THOMAS JARVIS (Sworn)

DIRECT EXAMINATION BY MR. BLOOM

Q Sir, would you tell Judge Murphy your name and occupation?

A Thomas Jarvis, detective, Springfield Police Department. Employed twenty years.

Q And how long have you been in the Detective Bureau?

A Approximately eighteen years.

Q Now, Detective, on December 7th of 1985, did you have an occasion to have an involvement with Mr. George Perrot, who is in the courtroom?

A Yes, I did.

Q And what time would it have been that you got to work that day?

A Approximately seven thirty to seven thirty-five.

THE COURT: Are we talking about the 6th? December 6th?

MR. BLOOM: The morning hours of the 7th, wouldn't it?

THE WITNESS: It would be the morning hours

of the 7th.

Q The morning hours of the 7th -- 7:30 or 7:35?

A A.M.

Q Was Mr. Perrot in custody?

A Yes, he was.

Q And can you tell us where he was when you first saw him?

A He was in the interrogation room.

Q Now, at some point in time, did you have a conversation with a number of officers, including Sergeant Kelly?

A Yes, I did.

Q And at some point, did you approach Mr. Perrot as a result of talking to those officers?

A Yes, I did.

Q And did you introduce yourself?

A Yes, I did.

Q And what did you do when you approached -- what time would it be now?

A Sometime around 7:50 a.m. that morning.

Q And what did you do when you went into the room, sir?

A I told George who I was and identified myself and gave him the Miranda warnings orally and spoke to him

about some crimes that occurred the night before.
Q Now, did you talk about the crimes of the 6th, December 6th?
A Yes, I did.
Q And when you got done giving his -- did you read them off a card or give them of your own memory?
A I gave them off a card.
Q And when you were done reading those to him, sir, did he indicate that he would be willing to talk to you or he wouldn't be willing to talk to you?
A Mr. Perrot said to me that there's no need for me to give you a statement because you already got me for the two crimes I committed last night.
Q What did you do with reference to that?
A With reference to that, I brought the gentleman downstairs and he was booked.
Q And at that time now, whether it was 7:45 or 7:50, is that conversation-wise the extent of your involvement with him at that time?
A That was it.
Q Did you ask him at that time, 7:45 or 7:50 whether he would be willing to give a formal statement?
A (No response.)

Q Do you remember whether you asked him at that time?
A I requested him if he would like to cooperate with me pertaining to a statement and he said that there's no need for me to give you a statement because the two crimes I committed last night they've already got me for, so there's no sense of reducing it to writing.
Q Were you aware at that time, at quarter of eight or so, that he had spoken with Sergeant Kelly?
A No, I really wasn't.
Q And what did you do then, sir, with Mr. Perrot?
A Mr. Perrot was brought downstairs.
Q For what purpose?
A He was brought down and booked.
Q Now, we're talking sometime between quarter of eight and eight.
A Yes.
Q And what did you do at that time?
A I continued the investigation.
Q Specifically, what were you doing?
A I was doing an investigation into some housebreaks and into some rapes of elderly women.
Q Now, can you tell the Court, Detective Jarvis, at this time now, and I'm not talking about information that

you got later, but at 8:00, were you aware at that time that he was a suspect in a series of crimes that weren't related to December 6th of 1985?

A Yes.

Q And during this time period now, you said that you were attempting to familiarize yourself -- what exactly does that mean? What were you doing?

A I went up to see George Perrot's girlfriend. I did some background investigation on the cases that he was a suspect on. We did about two and a half, three hours worth of work on it.

Q Did you have an involvement with a glove that morning?

THE COURT: With a what?

Q With a glove, your Honor. Can you explain to Judge Murphy what you did with a glove that you had in your possession?

A We were trying to match a set of gloves to the owner of the gloves that particular morning I went up to George Perrot's girlfriend's house.

Q First of all, what did the gloves relate to, if you can --

A The gloves related to a break-in and some serious crimes.

Q That occurred on -- do you remember the date?
A I don't know the exact date.
Q And those were unrelated to December 6th? Yes or no?
A Yes.
Q And what did you do with the gloves?
A They were brought up to George Perrot's girlfriend, who we thought might have been in possession of them, and at that particular time they didn't belong to her. I later found out that they belonged to George's sister.

MR. HAMMERSCHMITH: Objection.

THE COURT: Wait a minute now. Wait a minute. Are you objecting, counselor?

MR. HAMMERSCHMITH: Yes, to what he later found out.

MR. BLOOM: I'm not offering this for the truth, just to explain what he was doing in a three and four-hour period. I'll rephrase it. I'll ask another question.

Q What time would it have been that you concluded whatever it was that you wanted to do to familiarize yourself with these cases from 8:00 to when, sir?
A Approximately 11:15 to 11:30, give or take twenty minutes -- half an hour, around there.

Q When you were in the Detective Bureau at 11:15 or 11:30, was George Perrot there?

A No, he wasn't.

Q When was the next time that you saw Mr. Perrot?

A I went down to the booking area and brought him up at approximately 12:20 -- 12:25 -- 12:30 -- somewhere in that area.

Q And had you seen him between quarter of eight and 12:20 or 12:30 when you were bringing him up now?

A No, sir.

Q And when you saw him, Detective, at a quarter of eight, did he appear to understand the questions and the statements that you were making to him?

A Yes, he did.

Q And did you have any trouble whatsoever understanding him when he responded to you at quarter of eight before you had him sent down for the booking process?

A No, I had no problem.

Q And why did you bring him up, sir, now, at twenty-five or twenty after twelve at this time?

A (No response.)

Q This would be some four and a half hours after you had sent him down; correct?

A Correct.

THE COURT: What's your next question?

Q My question was -- I'm sorry -- was there a reason that you brought him up at 12:20 or 12:25?

A I would have talked to George to get more information pertaining to some cases and also District Attorney Matthew Ryan was notified of the situation and he sent down Mr. Bloom to the Detective Bureau to speak with us.

Q When he was brought in, sir, at 12:30 or about that time, where was he placed?

A He was placed in the interrogation room.

Q What happened at that time?

A He was Mirandized.

Q And given his Miranda warnings by yourself?

A By myself.

Q Did you ask him to sign the card when he was done, when you were done giving him those rights?

A Yes, I did.

Q Did you have any problem understanding him at this time?

A No, sir.

Q This is F for Identification, your Honor. Can you just tell us whether or not that is the card that you used

at approximately 12:40 p.m. on December 7th of 1985, to read Mr. Perrot his Miranda warnings?

A That is the Miranda warning.

Q And did you ask him -- just yes or no -- if he understood each and every one of those rights?

A Yes, I did.

Q And did he appear to understand your questions?

A Yes, he did.

Q And were you having any problem at this time understanding him?

A No, he was coherent.

Q Did he appear to, at this time, be under the influence of any type of substance at quarter of one?

A No, sir.

Q And after you got done reading him those rights and you went to question eight, which I believe -- correct me if I'm wrong -- it states that having these rights in mind, do you wish to talk to me now. What was his response?

A He said he wanted to speak to me.

Q And did you ask him to sign this?

A Yes, I did.

Q Is that his signature?

A That's his signature.
Q Is that your signature under the "witness?"
A Yes.
MR. BLOOM: I'm going to offer this.
THE COURT: Any objection?
MR. HAMMERSCHMITH: No objection.
THE COURT: This will be Exhibit #8.
F for Identification will become Exhibit #8.
(Exhibit #8, formerly F for Identification, Miranda card, offered and marked in evidence.)
Q Detective, do you remember having a conversation with Mr. Perrot at that time about hair samples and blood samples?
A Yes, I do.
Q And can you tell us what happened when that occurred and what happened with reference to that?
A He was read his rights. He signed the Miranda warnings. I believe that you came in the room, Mr. Bloom, and we advised him that we would like to take a hair sample and other samples and that he could read a form that we had, and he said, "Fine, no problem at all." And he signed a piece of paper giving us permission to take

the samples that we needed.
Q Did you tell or was Mr. Perrot told in your presence -- just yes or no -- was it ever told to him during that time period that he didn't have to give a sample of his hair or blood in your presence?
A He was advised that he did not have to cooperate with us pertaining to the samples.
Q And with reference to those statements that were made to him, is this the document that he signed, which is presently marked Exhibit number four?
A That was signed in front of me, correct.
Q Is that his signature?
A Yes, it is.
Q And you witnessed it?
A Yes.
Q Along with other officers who witnessed it?
A Yes.
Q What happened then -- it's approximately quarter of one.
A Approximately.
MR. HAMMERSCHMITH: Objection. Leading the witness, your Honor.
Q The Miranda card said what, sir?
A Twelve forty-five.

Q And what happened next?
A I got into a conversation with Mr. Perrot.
Q Concerning what at this point?
A Concerning an incident that happened the night before.
Q Now, how many incidents were you concerned with from the night before?
A There were two.
Q And did you question him -- just yes or no -- concerning those two incidents?
A Yes, I did.
Q And give us an example or give us your best estimate as to how long the questioning went with Mr. Perrot at this time concerning the two incidents of December 6th?
A Roughly forty -- forty-five minutes.
Q And when you were done questioning him on those two incidents, did you have that reduced to writing?
A Yes, I did.
Q And this is for the record, your Honor, Exhibit #5 -- is that the statement that was ultimately reduced to writing concerning the conversation that you had with him, I believe you said, forty to forty-five minutes concerning the crimes of December 6th, 1985?
A Yes, that's the statement.

Q And when you were done, sir, or you were done completing the written portion of that statement, did you ask him to sign it?
A Yes, I did.
Q And did you ask him to read it before he signed it?
A I usually have him read it and I read it back to him.
Q Is that your signature on the lower left-hand corner?
A Yes, it is.
MR. HAMMERSCHMITH: No objection.
MR. BLOOM: It's already in.
THE COURT: That's Exhibit #5.
Q Now, sir, I believe you said that it took about 45 minutes to complete that whole process. What time are we talking about now, roughly?
A One o'clock. Twelve forty-five -- one forty-five -- somewhere.
Q I'm talking about what time would it have been when the statement, after it had been reduced to writing, was signed and you were done and you had allowed him to read it and you read it to him and both of you signed it. If it started at quarter of twelve, what time would it --
A We had lunch. I fed him in between -- he made phone calls and he went to the bathroom -- I'm guessing, an

hour and a half --

Q Let's take one at a time. What do you mean that he made phone calls?

A I allowed -- he wanted to get a hold of his girlfriend. He called his mom. He called his sister. I went up and got him a sandwich at Burger King, with a soda. I had lunch with him. He went to the bathroom.

Q And can you tell us, sir, during any of this time period, did you have discussions with him about going back down to his cell? Was that ever discussed at any time?

A Yes, it was.

Q And can you tell us what was said concerning that?

A George was apprehensive about going back to the cell. He asked if he could spend more time with me upstairs in the Detective Bureau, and I allowed him. I allowed it.

Q Were you questioning him during this entire time period or was there a time when he was alone?

A There were times when he was alone.

Q During the morning, from eight until 11:30 or 12:00, did you have an opportunity to familiarize yourself with some of these other pending cases that didn't

deal with December 6th?

A Yes, I did.

Q At some point in time, did you start to talk to Mr. Perrot about those cases?

A Yes, I did.

Q And now, if you started with him at quarter of one, and you did all these things that you have described to Judge Murphy in between, as best you can remember, what time would it have been approximately when you started to talk to George Perrot about these other crimes that the Crime Prevention Bureau was concerned about?

A Somewhere around 3:00 -- in or about that area.

Q And can you tell us, sir, from quarter of one until three o'clock, how much total time did you spend actually talking to Mr. Perrot?

A Forty-five minutes to an hour.

Q And the rest was doing these other things that you have pointed out.

A Yes.

Q And when he made the phone call, sir, where were those phone calls made from?

A He made them -- he made most of the phone calls in the

Arson Squad, which is the next unit down from our unit.

Q Why was that done?

A I wanted to give him a little privacy.

Q Was there anybody in there when he made those calls?

A I was with him.

Q Anyone else?

A No.

Q Now, at three o'clock or so, sir, as best you can remember, what occurred when you started questioning him about these other incidents?

A We got into a conversation about other incidents and George started cooperating with me as far as what took place.

Q Now, can you tell us, sir, first of all, again now, at this time, 3:00, did he appear to be able to understand what you were saying to him?

A Oh, he was very able.

Q And at 3:00 or any other time during your involvement with him, did he ever indicate to you number one, that he didn't want to talk to you or that he wanted to speak to a lawyer, either one of those?

A He never indicated either one to me. Never.

Q Was he always cooperative in answering your questions,

whether you believed the answers or not, when he answered your questions during these time periods?

A He answered my questions and George and I got along fine.

Q Now, when you started asking him about these assaults, can you tell us what his demeanor was like at that time, as you remember it?

A (No response.)

Q I'm asking you to gear in at 3:00 or so when you started to get into these other matters.

A He was fully knowledgeable about what was going on.

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: I'll rephrase that.

Q What I mean about is demeanor. Let me rephrase that. I'm asking you to tell the Court, when you got into these other crimes, what was his emotional status at that time, as you observed him, when you started to get into these other incidents?

A In certain areas he got emotional.

Q Specifically, what do you remember him doing?

A One time he wanted to take my gun and commit suicide.

Q Do you remember that?

A Yes, I do.
Q And what prompted him making that statement to you?
A As we got into the real meat of the breaks and the crimes against the women, the rapes.
Q Do you remember what he said?
A He said that I'd like to kill myself. I should be dead.
Q And at any point in time, sir, did he offer to explain to you how these crimes occurred or what caused them to have occurred?
A He gave me a statement pertaining to how he got -- gained entrance to the house and his biggest problem was that he was on drugs and drinking when he was committing these crimes.
Q He told you that?
A Yes, he did.
Q And, Detective, when you were dealing with him from 3:00 on, can you tell Judge Murphy at any point during that time di he tell you that he wanted to cut off the questioning?
A Never, never wanted to cut off the questioning.
Q Now, did you have any kind of evidence that you confronted him with during that time concerning these incidents that you discussed with him?

A There were a pair of sneakers and there was a pair of gloves.
Q What do you remember saying to George about the pair of gloves during the time that you were talking to him after 3:00?
A (No response.)
Q First of all, where were the gloves found with reference to your talking to him at 3:00?
A I can't answer that question truthfully at that point.
Q Were you questioning him about any specific incident?
A A break-in where a rape occurred, yes.
Q What was the date of those incidents?
A I couldn't tell you without my papers.
Q I'm going to show you H for Identification, and would you please look at that and just tell us whether that refreshes your memory as to the date of these assaults that you were questioning him about.
A November 30th, 1985.
Q So the two incidents, sir, is it fair to say that you were questioning him about occurred a week before the incident that he was under arrest for?
A Yes.
Q And did they involve -- yes or no -- two elderly

women?

A Yes.

Q And you were aware of what those women had said concerning the assaults.

A Yes.

Q When you questioned Mr. Perrot.

A Yes.

Q And was he crying during that time period?

A He was emotional.

Q And can you tell us, sir, at some point in time, was what he told you about those two incidents of November 30th, 1985, reduced to writing?

A Yes.

Q And did you complete that written statement concerning those two crimes prior to a lineup that was conducted that afternoon?

A Yes, I did.

Q This is Exhibit #2, sir, and looking at that picture, would that refresh your memory as to what time the lineup approximately occurred concerning Mr. Perrot on December 7th?

A Four thirty.

Q And give us your best estimate as to how long, prior

to 4:30 it was when you had caused that statement to be completely reduced to writing and signed by yourself and Mr. Perrot.

A About an hour and ten minutes -- an hour ~~and 15~~ 5 minutes.

Q Now, what, if anything, did he tell you about those incidents, sir, before you reduced it to writing?

A Can I use this to refresh my memory?

Q If you need to.

A You want me to go back to one incident?

Q Let me ask you another question. Did he admit to sexually assaulting either one of the women?

A No, he didn't.

Q What was the essence of what he told you concerning those two break-ins?

A The essence was that he just broke in and stole items from the house.

Q And prior to breaking into those two houses and stealing items, did he tell you where he was and who he was with earlier that night of November 30th?

A Yes, he did.

Q And who was that, sir, that he told you that he was with?

A Mike Edwards and Robert Timmerman. Bobby Timmerman.
Q Did he tell you where he was?
A They were in Vermont.
Q What city or town?
A Brattleboro.
Q And did he tell you, sir -- just yes or no -- what type of drugs that he used?
A Yes, he did.
Q What was that?
A Mescaline.
Q Did you have that reduced to writing?
A Yes, I did.
Q And when you were done reducing this to writing, sir, which is marked H for Identification, did you ask him to read it?
A Yes, I did.
Q And did he read it in your presence?
A (No response.)
Q Did he appear to be reading it in your presence?
A Yes, he did.
Q And did you ask him to sign it after he read it?
A Yes, I did.
Q And the signature that is on that statement of

George Perrot, was that done in your presence?
A Yes, it was.
Q And did you witness it?
A Yes, I did.
Q And who else witnessed the signature?
A Captain Ernest Stelzer.
Q Now, this which is marked H for Identification, sir, there are a number of items in which there appears to be a clerical or misspelled items or whatever, and over them there is G.P. Can you explain to the Court what that is?
A Errors were made during the typing and George Perrot -- I had him initial the errors to show that there was an error and George Perrot read it, saw the error, and he initialled it.
Q And on any clerical or factual error, you asked him to do that?
A Yes, I did.
Q He did it how many times on the face of what has been marked H for Identification?
A Four times.
MR. BLOOM: I'm going to offer these, your Honor.

THE COURT: Any objection?

MR. HAMMERSCHMITH: I would like to see it.

MR. BLOOM: (Indicates.)

MR. HAMMERSCHMITH: No objection.

THE COURT: This will be Exhibit #9.

(Exhibit #9, statement, offered and marked in evidence.)

Q You spent from quarter of one to one thirty with him; correct?

A Approximately, yes.

Q Then three o'clock to approximately quarter of four; is that your testimony?

A Give or take 15 or 20 minutes, correct.

Q And at any point in time, 8:00 in the beginning of the morning, to quarter of one or one thirty or thereabouts, and three to quarter of four, did you ever notice any lesions or bruises or noticeable markings on Mr. Perrot's face or body?

A No, I didn't.

Q Did you ever see anyone raise a hand on him that day from the time that you came in at 8:00?

A No, no.

Q Did you ever hear anybody raise their voice to him at

any time?
A No.
Q Never indicating to you other than he would be willing to talk to you.
A Fully cooperative.

CROSS-EXAMINATION BY MR. HAMMERSCHMITH

Q Sergeant Jarvis, is it?
A No, Detective.
Q You said you arrived that morning around 7:30 in the morning.
A Yes.
Q Did you speak with Sergeant Kelly at that time?
A I had conversation with Sergeant Kelly and a couple of other detectives.
Q At that time?
A Yes.
Q Around 7:30?
A Yes.
Q And did Sergeant Kelly tell you that he had been speaking with George Perrot?
A No, that was not part of the conversation.
Q Didn't advise you that he had been questioning George

Perrot?

THE COURT: I think that was a "no."

THE WITNESS: That was a "no." I didn't have conversation about him speaking with George Perrot.

Q And at any point that morning did you have a conversation with Sergeant Kelly in which Sergeant Kelly told you that he had been speaking with George Perrot?

A I had no conversation at that point with Sergeant Kelly pertaining to George.

Q Sergeant Kelly did not tell you that he had been questioning George Perrot?

A There were three or four other investigators involved.

Q My question was whether Sergeant Kelly --

A I had no conversation with Sergeant Kelly pertaining to George Perrot. With him talking to George Perrot.

Q At any time that morning?

A At any time that morning.

Q Did you see a search warrant that had been completed with respect to --

A I did not, sir.

Q So you saw no search warrant with respect to George Perrot's home that morning.

A I did not.

Q Now, you indicated that you got back to the station after doing the various things at about 11:15 or 11:30 in the morning. Somewhere around there?
A Yes.
Q And it was about an hour later that you first spoke with George Perrot.
A About quarter of one, give or take.
Q And when you spoke with him, the first thing you did was to fill out a Miranda card; is that correct?
A I advised him of his rights. Had him sign the Miranda warning.
Q And when you went over the Miranda card, you went over the Miranda card with him; right?
A Yes, I did.
Q You had him sign it?
A Yes.
Q You went over each of those questions individually.
A Yes, I did.
Q And you questioned him to make sure he understood what it meant.
A Yes.
Q And how long did it take you to go through the Miranda warnings with George Perrot? To go through the

Miranda warnings?

A Five -- seven minutes.

Q When you got finished with that, the first thing that you dealt with was an application or -- excuse me -- a request that he agreed to give blood samples.

A That was a few minutes later. Correct.

Q And there was a gap between when you finished giving the Miranda --

A Three or four minutes -- five to ten minutes.

Q What was happening at that time?

A Conversations probably with George.

Q At some point then, maybe ten or fifteen minutes after you first started giving him his Miranda warnings, you started talking about the request that he give blood samples.

A Yes.

Q Was it just you who was explaining this to him?

A There was myself. I believe Mr. Bloom was around, and Lieutenant Arpin was around.

Q And you took some time on this form.

A Yes.

Q You wanted to make sure that he understood what he was waiving.

A Yes.
Q That he didn't have to agree to sign it if he didn't want to.
A He was advised of that.
Q How long would you say that it took for you to explain the purpose of the form and his rights with respect to the form to him?
A I couldn't tell you truthfully.
Q Fifteen minutes? Twenty minutes?
A I couldn't -- you know -- five -- seven -- eight minutes.
Q Now, this form that you have which is Exhibit #4 -- now, this is actually a copy of what he signed; isn't it? It's not an original?
A This is a copy, correct.
Q Now, was this typed up especially that day for George Perrot to sign?
A I did not type it up, but it was typed up especially for that particular purpose.
Q And that would have been typed up after you understood that George Perrot wanted to sign a waiver form; is that correct?
A That was typed up after I informed him that we would

like to take hair samples and blood samples, and during the process another officer was typing that up.
Q After he had acknowledged that he would do it?
A Yes.
Q But he didn't type it up before you said he was going to sign it. So you questioned him for a period of time and explained his rights to him for a period of time, and then you had this form typed up; is that right?
A Yes.
Q Then you took the form to George, read it over to him thoroughly and made sure he understood it.
A Informed him and made sure he understood everything, and if he wanted to sign it, fine. If he didn't want to sign it, he didn't have to sign it.
Q Ultimately he signed it.
A He signed it.
Q Now, aft. that, what happened after he signed that form? What happened next?
A (No response.)
Q Did you go right into questioning George with respect to the McNabb and Sapelli incidents?
A Yes.

Q And you questioned him with respect to those for about 45 minutes.
A Forty-five minutes to an hour.
Q And at the conclusion of that, you prepared a statement. Did you type that yourself?
A I typed it myself.
Q How is your typing? Are you a proficient typist or a one-finger at a time?
A That was a manual typewriter which didn't work too good, so I went from a manual to an electric. I was having problems with it. Two fingers, three fingers, whatever.
Q It's fair to say that it took you maybe fifteen to twenty minutes at least to type it.
A A little bit longer.
Q And when you finished typing it, then you showed it to -- were you talking to George as you typed it?
A Yes.
Q And going over the information with him?
A I was writing things down also on a piece of paper.
Q Afterwards you had him read it.
A George read it. I read it to George to make sure he understood it, and all errors that were on the state-

ment right there -- I told George to look it over and initial the errors with the typing.

Q Now, that form says on it -- that it has a time on it of 12:40; is that correct?

A Yes.

Q That's not the time he signed it.

A No.

Q It's nowhere near the time.

A It's probably -- that's the time I started the statement, sir, 12:40.

Q That's the time you started doing the statement.

A Somewhere around that area.

Q I thought that at 12:40 you started giving the Miranda rights; is that correct?

A What time does the Miranda warning say?

Q Twelve forty.

A You go from twelve forty from the Miranda rights into the statement.

Q What about the permission to give blood samples? What time does that say on it?

A (No response.)

Q It also says 12:40. Everything says 12:40; doesn't it?

A Give or take a few minutes.

Q But it wasn't all done at 12:40.
A If it started at 12:40.
Q It wasn't all done at 12:40. We're talking about something that spans a period --
A No, it wasn't all done at 12:40. Something that spans a period of at least an hour and a half probably from start to finish.
Q From the time that the Miranda card was first presented to him until the time that he would have signed that statement; correct?
A An hour and a half span or so. An hour and fifteen minutes -- an hour and a half -- somewhere around there.
Q Are you saying at times while talking with George Perrot that he indicated to you that he was tired?
A No.
Q Sleepy?
A I gave George a cup of coffee, in fact.
Q Why did you give him a cup of coffee?
A Because he asked for it.
Q Did he say that I was sleepy?
A No, he asked for a cup of coffee and I gave him a cup of coffee.

Q Did he say that he was sleepy? Did you remember a point in time at which George became sick to his stomach during the course of the interrogation?
A From the time I talked to George until the time I brought him d he never once got sick to his stomach.
Q You don't remember him vomiting on the floor of the interrogation room?
A He never vomited in front of me.
Q He did threaten to kill himself at one point.
A Yes, he did.
Q And that was as you were talking about the November 30th break-ins; is that correct?
A That's correct.
Q Those were the subject of the second statement that you took.
A That's correct.
Q Now, as you were talking with him, isn't it fair to say that he was at times very loud and very emotional while you were speaking?
A I had a good rapport with George.
Q My question was whether he was loud as you were talking with him and very emotional.

A Later on that afternoon during the second statement, George got emotional at times, yes. At himself.
Q Very emotional?
A At himself, yes.
Q And also very loud?
A Not that loud.
Q He wasn't hollering?
A He was -- he was emotional.
Q And was he hollering?
A I wouldn't say he was hollering now.
Q He was not hollering?
A No.
Q Let me show you a document and ask you if this refreshes your recollection as to whether he was hollering or not.
Does that refresh your recollection?
A I put down that drugs maybe do it.
Q You use the word "hollering."
A I used the word "hollering" in that particular special, yes.
Q Do you remember when you filled out that statement?
A That was filled out -- is there a time on that? I don't think there is a time.

Q I was asking you --
A It was filled out that afternoon. I remember that.
Q You don't remember whether it was before or after the questioning?
A That was after the questioning.
Q Which questioning?
A The second.
Q After the second?
A After the statement was completely taken, I wrote a special.
Q In that special report, that police report, you indicated that he was hollering to you that it was the drugs that made him do it.
A Yes.
Q It's fair to say that the word "hollering" connotes that he was being very loud.
A Proably. I was looking for another word. I used hollering in that special, but we were in a confined room, and like I said, the two of us had a good rapport.
Q Now, after George had told you that he was going to threaten to kill himself, he asked you for a gun so he could kill himself, and at one particular point he

said "Give me your gun, I'd like to kill myself."
A I notified the watch commander to put a suicide watch on him.
Q What is a suicide watch?
A You put a patrolman in front of the cell to make sure that they don't do no harm to themselves. That was after the statement was taken.
Q You took your action after the statement was taken.
A That was -- the statement -- the lineup -- he was brought back upstairs. He hung around with me for approximately an hour and a half upstairs so he wouldn't have to go to a cell. More phone calls were made to his sister, his mother, his girlfriend, and then I notified the watch commander and my lieutenant that the boy may have suicidal tendencies and to put an officer in front of the cell.
Q But the suicide threat itself that you heard him make, that was while you were questioning him the second time; is that right?
A Sometime during that or after that, yes.
Q Wasn't it your testimony that it was during the questioning of the --
A It could have been during or after. I'm not too sure.

Q You don't remember when it happened?
A There was a mention of let me have your gun.
Q You say that he made some phone calls.
A Yes, he did.
Q And you were present while the phone calls were made?
A Yes.
Q And how many phone calls did he make?
A I would have to say somewhere from six to seven of them.
Q And did he speak with people each time that he made the phone calls?
A Yes, he did, except once the phone rang and rang and rang and he couldn't get anybody at one particular phone call.
Q Your understanding was that he was talking with his mother?
A Yes, I believe one of the last phone calls he made was his mom.
Q To his sister?
A His sister. He called his sister. He called Lisa approximately two or three times. He found out she wasn't home and he got very upset at that. He called somebody else looking for her.

Q And these phone calls were made in between the two periods of questioning; is that correct?
A I believe a couple of the phone calls were made in between the questioning, after the questioning, and even during the questioning I let him call his girl-friend. He was pretty upset about her.
Q Do you remember when the call was made to the mother?
A No, no, I thought that it might have been one of the last phone calls because I told George that contact his mom, his sister and his girlfriend, and I would make arrangements for him to see her that night while I was in the cell block.
Q Did anybody at the station advise you that George's mother had been trying to get through to him?
A No, not to my knowledge.
Q Not that morning when you came in?
A No, not at 7:30. No.
Q Not later that morning?
A I was gone until 11:30. No.
Q When you got back, nobody told you that his mother had been trying to be wanting to meet him?
A No, not to my knowledge.
Q You were aware, weren't you, that George Perrot at the

time was 17 years old.
A Yes, I was.
Q You knew that from the booking sheet.
A Yes.
Q Do you know what time the photographs would have been taken of George?
A No, I don't.
Q Would it be fair to say that sometime after the booking occurred?
A I have no idea. I don't do that.
Q You didn't send him out to have the pictures taken.
A No, that's done by a different unit.
Q That would not have happened at any time between the time in the afternoon when you first started questioning George until after the second statement was given.
A I have no idea when the -- if George was with me, he wasn't photographed.
Q You're saying basically, aren't you, that George was with you throughout that time period?
A Yes, like I said, I have no idea when he was photographed. It's not my unit.
MR. HAMMERSCHMITH: No further questions.
MR. BLOOM: No further questions. Thank you.

JAMES MURPHY (Sworn)

DIRECT EXAMINATION BY MR. BLOOM

Q Would you tell Judge Murphy your name and occupation?
A Patrolman James Murphy, Springfield Police Department.
Q And how long have you been a member of the Springfield Police Department?
A Approximately six years.
Q And, Patrolman, can you tell us what your tour of duty is presently?
A I work 11:00 p.m. to 7:00 a.m. on the night shift.
Q Dogwatch?
A Dogwatch.
Q Did you have that same tour of duty in November of last year?
A Yes.
Q And did you have it, sir, back in December of last year, 1985?
A Yes.
Q Now, during working the shift that would have begun -- actually, when does your shift begin, at 11:00?
A Eleven p.m., yes.
Q You work actually two days time-wise every time you're

out on the dogwatch.
A That's correct.
Q The tour of duty that you had on December 6th, that would have taken you over into 7:00 in the morning on December 7th.
A Yes, I do.
Q And did you have a partner on that shift?
A No, I didn't.
Q Now, at some point on that night in the early morning hours of December 7th, and more specifically, as a result of a call made, did you go to a certain location?
A Yes, I did.
Q Can you tell us where that was, sir?
A It was Ellendale Circle off of Parker Street.
Q And what did you do at that location?
A I responded there to a breaking and entering in progress.
Q And did you go anywhere after you had completed your duties at Ellendale Circle?
A Yes, I left there and patrolled the neighborhood.
Q What were you doing at that time or what were you looking for?

A I had been told -- given a description of a subject who had broken the door on Ellendale Circle and assaulted the occupant. I was attempting then to see if I could locate that subject in the neighborhood.
Q What happened?
A I left Ellendale Circle and on patrol I got onto Malibu Drive where a vehicle coming in the opposite direction was flashing its headlights on and off and then drove up to the cruiser.
Q Do you know who that person is today?
A Who was flashing the light? Yes. I have it on a report.
Q Could you tell her name? What that person's name was?
A The operator of that car was a female and her name was Ann Serafino from Brown Avenue, Holyoke.
Q Was she by herself?
A No, she wasn't.
Q Do you know the name of the other person in the car?
A Yes, her name was Sheileen Sapelli from Ft. Pleasant Avenue, Springfield.
Q Do you know if a crime was being investigated at that time concerning Miss Sapelli?
A She had stated to me that a crime had just occurred to

her, to Miss Sapelli.
Q And that was the pocketbook snatch?
A Yes, it was.
Q What did you do as a result of what she told you, sir? Did you do anything?
A (No response.)
Q Did you go anywhere or do anything after you talked to those two girls?
A After I spoke to the two girls, a cruiser had been sent to Denny's to investigate that crime.
Q The Sapelli crime?
A Yes. And I told them to return to Denny's to speak with that cruiser.
Q Now, did you at that point have any involvement with footprints over at the first house on Ellendale Circle?
A Yes, I did.
Q What did you do now after you sent the girls back to Denny's?
A Well, at Ellendale Circle, I observed footprints in a patio in the rear of the house in the snow and I made a rough sketch of those footprints in my notepad and I followed the car with the two girls up toward Denny's. They had told me that they had chased -- one

of the girls, the one from Brown Avenue, had chased the subject to an address on Cooley Street, so I had gone to that address. She said -- I asked her if there were footprints there or directions that the subject had travelled and she said that it was her footprints and another set of footprints in the snow.

Q What did you do then?

A I went up with the girls and car number eight, which was Officer Gormally's, and we looked at the footprints in the snow and she indicated which ones were hers and which ones were the subject that she was chasing and I matched them to the preliminary sketch that I had made and they appeared to be the same footprints that I observed on Ellendale Circle.

Q Where did you go at that point in time?

A I went through the -- followed the footprints out into Malibu Drive.

Q From Cooley Street you're talking about?

A From Cooley Street, yes, in the direction that the young lady had pointed out that they had run.

Q Where did those footprints lead you?

A They went through the back yard of the house on Malibu Drive and came out approximately in the center of

Malibu Drive.
Q Now, at some point did you end up at 87 Malibu Drive?
A Yes, I did.
Q And what happened that caused you to end up there?
A Well, I was aware of a subject that lived on Malibu Drive that I had encountered in the past, and he had fit the general description of both the subjects who had allegedly committed the crime on Ellendale Circle and the pocketbook snatch.
Q At some point in time now, did you, with other officers, including Lieutenant Foley, go to 87 Malibu Drive?
A Yes, we did.
Q Give Judge Murphy the best estimate that you can, sir, from the time that you first met these two girls and they claimed what had happened to them to the point where you're now going inside of Malibu Drive? How much time would have transpired?
A Approximately fifteen to twenty minutes.
Q And did somebody let you inside of Malibu Drive?
A Yes.
Q And when you got inside, where did you go?
A There were lights on in the cellar that we observed from outside, so we asked the residents of the house if

they minded if we looked in the cellar. They said "No."

Q Did they take you in?

A They let us in and said this was fine with them, to look in the cellar.

Q At some point, did you see Mr. Perrot in a room down in the cellar?

A No, he was upstairs.

Q You didn't see him until you came upstairs?

A We checked the cellar and came upstairs, and then I had asked Mr. Perrot's sister, Nancy, if she would mind if I could look at where George's bedroom was, if I could check his bedroom, and she said that that would be all right.

Q And when she let you in, was he there?

A Yes, he was.

Q Was he taken into custody at that time?

A Yes, he was.

Q And did you escort him outside to your cruiser?

A Yes, I did.

Q What happened when you took him outside, sir?

A I brought him outside. I was alone. The doors on the cruiser were locked.

Q Was he handcuffed?
A Yes, he was handcuffed behind his back.
Q What happened then?
A I had my flashlight in my left hand, the keys to the cruiser were on my belt, so I let go of George, Mr. Perrot, and took the keys off my belt, and when I put it in the car door, and when I was going to reach for the button that is in the door that would unlock all four doors, he used the upper part of his shoulder and his body weight and knocked me into the cruiser, into where the steering wheel is.
Q Did he say anything to you during this whole time?
A No, he didn't.
Q And after he knocked you with his shoulder, what did he do then?
A He ran like a rabbit down Malibu Drive.
Q And I assume like a rabbit means fast.
A Very fast. He was three times as fast as -- I couldn't catch up to him at all.
Q Did you see any fence, sir, during that run when he took off?
THE COURT: Any what?
Q Were there any fences that he came in contact with

during that run?

A Yes, he had gone down the end of Malibu Drive and circled over from Cooley Street, where the two girls from the pocketbook snatch saw him and they indicated to us that he was in the back yard on the opposite side of Malibu Drive, and while we we were chasing him, he was actually vaulting chain link fences in the back yards with his hands still handcuffed behind his back, without falling. He was actually jumping over them. We had to stop and --

Q Just like in the Olympics?

A Yes, just like that. We had to stop and hoist ourselves over. He was just vaulting those fences.

Q At some point he was taken back into custody?

A Yes, officers coming from the opposite direction -- we sandwiched him in and he was apprehended then.

Q Did you see anybody kick him with their foot or sticks at that point?

A No, I didn't.

MR. BLOOM: I have no further questions.

CROSS-EXAMINATION BY MR. HAMMERSCHMITH

Q When you first went to the McNabb residence on Ellendale Circle -- is that where it's located?

A Yes.

Q You went there in response to a phone call; is that correct?

A A dispatch, yes.

Q What's a dispatch?

A A call came into our 911 and our radio dispatcher notified me to respond to that address for a B and E in progress.

Q And you responded.

A Yes.

Q How long do you think you got there after you heard the dispatch?

A Approximately two to three minutes.

Q And when you got there, you spoke with McNabb about what had happened?

A Yes.

Q How long did you speak with him?

A Maybe eight to ten minutes.

Q And after that you left?

A Yes. I had called my captain and he said that he would send the Detective Bureau down there to investigate, and I left that address to check the neighborhood.

Q And when you first went there, it was about 2:15; is that correct?

A Yes. Well, that's when the call came in. It would have been approximately 2:18, 2:20, somewhere -- three minutes later.

Q And when you ran into or -- I shouldn't say ran into -- when you saw Ann Serafino, that was about fifteen minutes later?

A Yes.

Q About 2:30?

A I believe that's about correct. I think I have the exact time in here.

Q Page three?

A Yes, 2:30 a.m. Yes.

Q And when you saw her, she indicated to you that her friend's purse had just been snatched; is that correct?

A Yes.

Q So it was your understanding that the purse snatch occurred after the McNabb break; is that correct?

A Yes, it was.
Q And after you spoke with Ann Serafino, you followed some footprints; is that correct?
A Yes.
Q You followed those footprints to what turned out to be George Perrot's house; correct?
A Yes.
Q And as you were following those footprints, you didn't see George Perrot; did you?
A No, I didn't.
Q You were just following prints to the house.
A Yes.
Q When you saw him in his bedroom that night, that was the first time that you had seen him that night.
A That's correct.
Q When you saw him, he was lying on his bed; wasn't he?
A Yes.
Q At least partly on his bed.
A Pardon?
Q Partly on his bed?
A Right, his legs were hanging over the end.
Q His feet were on the floor?
A Yes.

Q He was partly dressed?
A He was fully dressed.
Q It's your recollection that he was wearing a coat?
A I don't believe -- I don't think he had his coat on, no.
Q Did he have anything on his upper body?
A I believe he was wearing a shirt.
Q What happened to that shirt?
A (No response.)
Q Did it stay on his body, as far as you know?
A I don't recall.
Q Are you sure that he was wearing a shirt?
A I'm not positive, no.
Q Do you know whether he had shoes on or not?
A He did have sneakers on, yes.
Q As he was lying there?
A Yes.
Q Did he appear to you to be unconscious?
A He appeared to be in a stupor, a sleeping state.
Q It took a while to wake him up; didn't it?
A A couple of minutes.
Q And were you close to him while he was being awaken?
A Yes.

Q Did you notice the odor of alcohol on him?
A No, I didn't.
Q Did you go with him to the station, to the police station?
A At one point I did. I didn't escort him to the station.
Q You weren't in that cruiser that escorted him to the police station.
A No.
Q And did you see him at the station?
A Yes.
Q Where did you see him?
A In an interrogation room in the Detective Bureau.
Q Do you know what time that would have been?
A Oh, probably 3:30, I would say.
Q Three thirty in the morning?
A Yes.
Q Was tha the last time that you saw him that day?
A Well, I was up in the Detective Bureau for quite a while. He also was there.
Q What time did you leave the Detective Bureau?
A Oh, about six thirty, seven o'clock that morning.
Q And where was George? Did you see George Perrot at

other times while you were there that morning?

A He was in the holding room the entire time I was there.

Q You weren't in the room.

A No.

Q When you looked in there, he was there?

A Yes.

Q Is that also known as the interrogation room?

A Yes.

Q Did you ever see him sleeping in there?

A He appeared to be sleeping in the chair there.

Q What time would that have been?

A Sometime while I was in there. I couldn't be specific.

Q How long would you have been watching him for? Did you just look in, just a casual look?

A I would glance in occasionally, but I wasn't staring at him.

Q And you left that morning at about six thirty?

A I believe it was around six thirty -- seven o'clock.

Q You went off duty at that time.

A Yes.

MR. HAMMERSCHMITH: No further questions.

MR. BLOOM: That's all I have.

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm