COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

HAMPDEN COUNTY
SUPERIOR COURT
FILED
SEP 29 1986
William J. Martin Jr.
CLERK/MAGISTRATE

Superior Court
Indictment Nos.
85-5410 through
85-5427

COMMONWEALTH

v.

GEORGE D. PERROT

FINDINGS AND RULINGS ON DEFENDANT'S MOTION TO SUPPRESS STATEMENT

The defendant George D. Perrot was indicted by the Hampden County Grand Jury at its December 1985 sitting on four charges of Armed Burglary, three charges of Assault and Battery by Means of a Dangerous Weapon, three charges of Armed Assault in a Dwelling, two charges of Armed Robbery, a charge of Assault and Battery and Assault and Battery on a Police Officer, one charge of Indecent Assault and Battery, Assault with Intent to Commit Rape, Aggravated Rape, and Unarmed Robbery.

The defendant has moved to suppress oral and written statements made to members of the Springfield Police Department on the date of his arrest, December 7, 1985.

Based upon all of the credible evidence and the exhibits, I find as follows:

1. In the fall of 1985 the Springfield Police Department was investigating a series of house breaks in the neighborhood around Malibu Drive in Springfield. Several of the breaks involved sexual attacks on elderly women. The defendant, who was 17 years of age at the time of his arrest, was a suspect in

#20



CoS RPOD 003960

this investigation and lived with his sister and her husband at 87 Malibu Drive. The defendant was well known to the Springfield police, having been arrested more than 10 times on other offenses prior to December 7, 1985.

2. At 2:18 A.M. on December 7, 1985, patrolman James Murphy of the Springfield Police Department received a radio message in his cruiser to proceed to Allendale Circle where a Breaking and Entering was reported to be in progress. Murphy responded and obtained a description of the perpetrator from the occupants who claimed to have been assaulted. Murphy then proceeded to the area of Malibu Drive where he met two women who reported that an individual had snatched the purse of one of them. They gave a description similar to the house breaker and informed Murphy that they had chased the perpetrator through the snow to Malibu Drive. The footprints in the snow matched a footprint seen at Allendale Circle and led to the defendant's residence. Murphy was familiar with the defendant, and the two descriptions he had been given resembled the defendant.

Murphy called for backup assistance, and he and other officers were admitted to 87 Malibu Drive by the husband of the defendant's sister. The sister led them to the defendant's bedroom and unlocked the bedroom door for the police when they were unable to get a response to their knock. The defendant was lying on the bed, feet on the floor, fully dressed except for a shirt, and appeared to be asleep or passed out. The officers woke him up, placed him under arrest, handcuffed him behind his back, and Murphy was assigned the task of taking him outside the house to the cruiser. As they started to enter the cruiser, the defendant took off running.

He was chased by police for 500 to 600 yards and even though still handcuffed, was able to elude them by vaulting fences that the police had to climb over. The defendant was apprehended hiding in a backyard some few minutes later. He was then transported to the police department.

3. At about 3:30 A.M., Sgt. Thomas M. Kelly of the Springfield Crime Prevention Bureau was called at home and informed of the defendant's arrest. He was in charge of the investigation of the attacks on elderly women. Kelly met with the defendant in the Detective Bureau interrogation room together with Officer Donald St. Germain at about 5:00 A.M. The defendant was read his complete Miranda warning by Kelly, signed the card and agreed to talk with Kelly. (Exh.#6). The defendant was also advised of his right to use the telephone and acknowledged this by signing the notice slip. (Exh.#3). The defendant declined to use the telephone at that time.

After being informed that he had been identified by the victim of the purse snatch, the defendant admitted that crime and the Breaking and Entering at Allendale Circle. When questioned by Kelly about the attacks on elderly women, the defendant denied being involved. Kelly terminated his questioning of the defendant at about 5:30 A.M. to help in the preparation of a search warrant affidavit for defendant's residence.

The defendant at his own request remained in the interrogation room rather than being returned to a cell.

4. At 7:30 A.M. Detective Thomas Jarvis came on duty. Jarvis also was involved in the investigation of the attacks on the



CoS RPOD 003962

elderly women and knew that the defendant was a suspect in the case.

Jarvis gave the defendant his Miranda warning, and they discussed the purse snatch case of December 6 which defendant had admitted to Kelly. Defendant told Jarvis that there was no need for further discussion on that matter as you "got me for the crimes last night." Jarvis then took defendant to be booked.

At 12:30 P.M. on December 7, Jarvis again spoke with the defendant. He again gave defendant his Miranda warning and defendant again signed the card (Exh.#8). Defendant agreed to talk with Jarvis. Jarvis requested permission to take blood and hair samples. Defendant agreed to cooperate, saying he had nothing to hide, and signed the Search Warrant Waiver which is Exhibit #4. Jarvis talked with defendant for about 45 minutes, and defendant's statement was reduced to writing (Exh.#5). This statement dealt with defendant's activities on December 6, 1985. In this statement the defendant admitted the purse snatching and the Breaking and Entering on Allendale Circle. In the statement defendant said he had been doing coke, drinking beer, and smoking marijuana with three other people during the evening of December 6 and early morning of December 7. (In his testimony at the hearing on the motion the defendant stated that 2 six-packs of beer, a gram of coke plus 8 pills of #10 Valium were consumed. The coke and beer were shared with the other three people.)

5. At 3:00 P.M. on December 7, Jarvis again questioned the defendant about Breaking and Entering and sexual assaults that had occurred in the neighborhood on November 30, 1985. At this time defendant admitted two Breaking and Enterings but denied he



CoS RPOD 003963

had raped the occupants. The defendant stated he had been drinking beer and taken two "purple mescaline" pills on the date of those breaks. This statement was also reduced to writing and signed by defendant (Exh.#9). While giving the statement, defendant became emotional, began to cry, and asked for a policeman's gun so he could shoot himself.

6. At about 4:30 P.M. on December 7, defendant was placed in a lineup (Exh.#2). It is not clear from the evidence at the motion hearing whether he was or was not identified by victims of the rapes.

At about 5:00 P.M. defendant was visited by his mother, sister and girlfriend at the Springfield station. At that time he asked them to retain a lawyer.

<u>Further Findings and Rulings</u>

7. The defendant argues that based upon the totality of the circumstances surrounding the questioning, the Commonwealth has failed to prove beyond a reasonable doubt that the defendant's waiver of his state and federal constitutional right to remain silent was made knowingly and intelligently, and that his statements were made voluntarily. To support this argument defendant cites his allegation that he was beaten by the police with night sticks, punches and kicks to his head and body after his attempted escape; his emotional state and lack of sleep prior to questioning; the amount of beer and drugs he had consumed; his age; and the testimony of the police officers he alleged to be conflicting.

**8. I find and rule that the Commonwealth has supported its burden of proving beyond a reasonable doubt that the defendant's waiver**



CoS RPOD 003964

**of his constitutional right to remain silent was made knowingly and intelligently and that his statements were made voluntarily.**

The defendant was photographed twice after his arrest, first at noon and again at 4:30 P.M. on December 7. (Exhs.#1 and #2). Both photographs show clear facial views with no indication of bruises or beating. His mother and sister testified to "red marks" on his chest at 5:00 P.M., December 7. The defendant had been found face down on the ground after his attempted escape about 15 hours earlier.

I find that the defendant has exaggerated the quantity of beer and drugs he had consumed. Whatever he did consume occurred between 9:00 P.M. and midnight on December 6. The defendant's first waiver and statement did not occur until after 4:30 A.M. on December 7 (c for ID). At 5:00 A.M. on December 7 he was able to sign the form indicating he had been given the opportunity to use the phone (Exh.#3). In his testimony the defendant acknowledged that he had been through the procedure of arrest, booking, Miranda warning and police interrogation on at least 10 previous occasions and that he had been well aware of his right to remain silent prior to his arrest on December 7, 1985. During the course of the day of December 7, he signed his name to Telephone form at 5:05 A.M. (Exh.#3); a Miranda Warning Card at 5:05 A.M. (Exh.#6); a Miranda Warning card at 4:20 A.M. (c for ID); a Search Warrant Waiver at 12:40 P.M. (Exh.#4); a Miranda Warning card at 12:40 P.M. (Exh.#8); a written statement at 12:40 P.M. (Exh.#4); and a second written statement at about 3:30 P.M. (Exh.#9). When questioned by Kelly early in the day, he denied raping elderly women. When questioned by Jarvis later in the day, he admitted the Breaking and Enterings

but continued to deny the rapes of the elderly.

The defendant, although only 17 years old, had been exposed to the arrest procedure many times and was fully aware of his rights, made knowing and intelligent waivers, and voluntary statements admitting some crimes and denying others. He was not under the influence of drugs or alcohol when questioned. The police did not beat or coerce him into those statements. He was kept in the detective bureau at his own request rather than be returned to his cell and had several periods to himself during the day when he was seen to be dozing. He was fed by Jarvis and allowed to use the phone on several occasions. The defendant never refused to answer questions nor did he ask that questioning cease or that he be provided with a lawyer. At one point Officer Kelly stated that the defendant did not cooperate when questioned about the rapes. When questioned further, Kelly stated he meant by that that defendant admitted the Breaking and Enterings but denied the rapes. He never refused to answer.

The defendant points to alleged contradictions in police statements as weakening the Commonwealth's proof. He refers to mistakes in time of execution of the search warrant by Kelly, the length of time of questioning and what information had been exchanged between the police officers. He also alleges that the police were biased in that they had a direct interest in solving crimes. I find these arguments to be without merit. They reflect normal memory lapses which were of no consequence. As for police officers' bias toward unsolved crimes, it is inherent in any case presented.

Ruling

**Defendant's motion to suppress is denied.**

John F. Murphy, Jr.
Justice of the Superior Court

Entered: September 29, 1986



CoS RPOD 003967