C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418, 5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 11, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME V

what he said or they said or --

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) Were you allowed to go to the station to see him at that time?

A. Yes, I could have gone at that time, they said bail had just been set on him.

Q. What time of day was that?

A. Around 8:00 in the morning.

Q. Did you in fact go down to the station to see him then?

A. Not at that point, because I had to go to work.

Q. What time did you have to be at work?

A. I had to be to work around quarter of nine.

Q. What is the next -- at some point, did you go down to see George?

A. Yes, I did.

Q. When did you see George?

A. After work, around -- it was about 5:00, 5:30.

Q. And that would have been on December 7th?

A. Right.
Q. This is 5:00 or 5:30 in the afternoon?
A. In the evening, yes.
Q. When you saw him, where was he?
A. Well, they brought him into a little room off to the right, it was just a little cubbyhole like where I went in to see him and talk to him.
Q. Were you alone when you went in to see him?
A. No, my daughter Nancy and my son's girlfriend Lisa was with me.
Q. When you say your son's girlfriend, which son are you referring to?
A. George.
Q. So there were three of you that went to see him at that time?
A. Yes.
Q. And that was about 5:00 or 5:30?
A. Around there, yes.
Q. And when you saw George, did the three of you see him together?
A. Yes.
Q. Was there anything between you and

CROSS EXAMINATION BY MR. BLOOM:

Q. On December 7th of 1985, ma'am, the police were at your house a second time, correct?

A. Yes, they were.

Q. And they had a search warrant, isn't that right?

A. Yes.

Q. And one of the officers showed you these, which, for the record, is Exhibit 10, is that right?

A. Yes.

Q. And he said to you, "Ma'am, do you have a pair of gloves that look just like those," didn't he?

A. Something to that effect, yes.

Q. And you turned and you went to a closet or an area of your house where you kept a pair of gloves that looked just like these, isn't that correct?

A. No, that's not correct.

Q. That's not correct?

A. No.

Q. You never told Sergeant Kelly of the Springfield Police Department that you had a pair of gloves that looked just like these?

A. No, I did not.

Q. You never went to a closet area in your house and said, "I know they're up there, I just saw them a few weeks ago. Here's where I keep them and they're not here"?

A. No, I did not.

Q. You never said that?

A. No, I did not.

Q. Did you own a pair of gloves in 1985 that looked like these?

A. No, I did not.

Q. Was his face, your brother's, at 5:00, swollen when you saw it?

A. Yes, it was.

Q. Were there welts on it?

A. It was discolored, reddish.

Q. Ma'am, let me ask you this. Do you

frequently, didn't he?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: That's all I have.

REDIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Mrs. Westcott, you were asked about a pair of gloves. I ask you to take another look at the pair of gloves. Do you remember being asked about those gloves?

A. Yes, I was.

Q. And do you remember who asked you about the gloves?

A. I don't remember the police officer's name, no.

Q. But it was a police officer?

A. Yes.

Q. And when he asked you about the gloves, did he ask you whether the gloves were yours?

A. Yes, he did.

Q. And your response to that was what?
A. No, that they were not mine.
Q. Did you tell him anything further about the gloves?
A. I told him that the gloves looked familiar.
Q. And why did the gloves look familiar to you?
A. I thought they were George's girlfriend Lisa's.
Q. And since that time, -- strike that. Is it your opinion today that they are Lisa's gloves?
A. No, I don't believe so.
Q. Why do you say that?
A. Because --
MR. BLOOM: Objection.
THE COURT: Sustained.
MR. HAMMERSCHMITH: May I be heard, Your Honor?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: Her testimony,

me. When I did that, there were several officers laughing and one of the cops punched me in the side and I fell to the ground.

Q. Now, at some point, did they place you in a cell there?

A. Yes, they did.

Q. At the police station?

A. Yes.

Q. Can you tell us whether or not you slept while you were in the cell at the police station?

A. No, I didn't.

Q. Do you know why you didn't sleep while you were in that cell?

A. Because they had an officer right out in front of my cell. Every time I tried to sleep, he kept rattling his nightstick on the bars and telling me to wake up.

Q. Do you remember at some point being advised of your Miranda -- first of all, do you remember being advised of your Miranda rights that night?

A. I don't recall hearing them, no.

Q. Do you remember signing a Miranda card?

A. No, I don't.

Q. Do you remember either yesterday or the day before seeing a card which purports to be a Miranda card, which is an exhibit in this trial?

A. Yes, I do.

Q. Did you have a chance to look at that?

A. Yes.

Q. Did you look at the signature on that?

A. Yes, I did.

Q. Does that appear to be your signature?

A. Yes, it does.

Q. Do you remember signing it?

A. No, I don't.

Q. Now, do you remember at some point in time being advised that you had the right to use the telephone?

A. I believe so, yes, when I was at the booking desk.

Q. Do you remember signing the telephone card?

A. I believe I signed a piece of paper, I'm not sure.

Q. Did you see the so-called telephone slip

that was introduced I believe yesterday as an exhibit in the case?

A. Yes.

Q. You had a chance to look at that?

A. Yes, I did.

Q. Does that appear to be your sugnature on the telephone slip?

A. Yes.

Q. Do you remember signing it?

A. Vaguely, yes.

Q. At any point in time, did you tell the police that you did not want to talk with them and answer their questions?

A. Yes, I did, several times.

Q. Can you tell us what happened when you did that, what their response was?

A. They just continued questioning me.

Q. Would that have been after you were advised of your Miranda rights?

A. I believe so, yes.

Q. Do you remember what you said to them, what your words were when you told them you didn't want to talk with them?

Q. (By Mr. Hammerschmith) Do you remember whether or not you were threatening to kill yourself during that questioning?

MR. BLOOM: I'm going to object.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) To the best of your recollection, while you were being questioned, do you recall wanting to hurt yourself?

MR. BLOOM: Objection.

THE WITNESS: No, I don't.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) Now, do you remember seeing in the course of this trial Exhibit No. 5, which purports to be a statement signed by you?

A. Excuse me, I don't understand your question.

Q. Let me show you this document, which I believe is Exhibit 5.

THE COURT: Has it been marked?

MR. HAMMERSCHMITH: The number on it is Exhibit 5, Your Honor.

THE COURT: Okay.

Q. (By Mr. Hammerschmith) Have you had a chance to look at that?
A. Yes.
Q. Do you remember signing that document on that night?
A. No, I do not.
Q. Would you take a look at the signature at the bottom right of that document. Is that your signature?
A. It appears to be, yes.
Q. In various places there are what appear to be the initials GP, do you see those there?
A. Yes, I do.
Q. Do you recognize those to be your initials?
A. No, I don't.
Q. You don't recognize those to be your writing?
A. No.
Q. But the signature you recognize to be your own?
A. Yes.
Q. Do you remember signing this or --

the station?

A. No.

Q. I draw your attention to the week before then, November 30, 1985. On Tuesday, did you hear the testimony of Mrs. Lichwala and Miss Prekop concerning the breaks into their homes?

A. Yes, I did.

Q. Did you break into Mrs. Lichwala's home?

A. No, I did not.

Q. Did you break into Miss Prekop's home?

A. No, I did not.

Q. At the time, on November 30th, where were you living?

A. 87 Malibu Drive.

Q. And you had been living there how long?

A. Approximately 10 years.

Q. How far is that away from 27 Malibu Drive?

A. Approximately five houses.

Q. While you were living at 87 Malibu Drive, did you ever have occasion to walk past 27 Malibu Drive?

A. Several times, yes.

Q. Now, you did live at 87 Malibu Drive on November 30th of 1985, correct?

A. Yes, I did.

Q. Did you ever tell Jarvis or anyone else that on November 30th of 1985 that you went to Brattelboro, Vermont, with Mike Edwards, Bob Timmerman and Jeff Atkinson?

A. Yes, I did.

Q. You told him that. Remember telling him that?

A. Whoever the officer was that was questioning me, I told him where I was that night, yes.

Q. And you told him that it was in Brattelboro, Vermont?

A. Yes, I did.

Q. And you told him you went to Brattelboro, Vermont, with a Mike Edwards, a Bob or Robert Timmerman and a Jeff Atkinson?

A. I believe so, yes.

Q. And all three of those people were your friends back in November of 1985?

A. Yes, they were.

Q. Mike was driving?
A. I believe so, yes.
Q. You told that to the police, didn't you? Do you understand the question?
A. Yes.
Q. "We went to a bar called Flat Street in Brattelboro." Did you tell the police that?
A. Yes, I did.
Q. You started drinking about 8:00?
A. Approximately, yes.
Q. And this was on a Friday night. Did you tell the police that you started drinking at about 8:00 and November 30th was a Friday night?
A. I don't know if those were my exact words, but I told them I started drinking, yes.
Q. Is it possible that you gave them the time you started drinking?
A. Specifically, no.
Q. Did you tell whoever this officer was that you drank a case of Bud?
A. I believe I did, yes.
Q. Did you tell him that you took purple mescaline on the way to Vermont?

A. I believe it was purple microdot, yes.
Q. You provided that information to the police, correct?
A. Yes.
Q. Did you tell whomever the officer was who was questioning you that we, meaning you, Atkinson, Timmerman and this other gentleman, Mike Edwards, "Stayed in Brattelboro till about 2:15 A.M.," did you tell him that?
A. Around that time, yes.
Q. Did you tell him that Michael dropped you off around 3:15 A.M. at your house?
A. I told him he dropped me off around 3:30, twenty of four.
Q. At your house?
A. Yes.
Q. You told that to the police?
A. Yes, I did.
Q. Did you tell him you headed for 33 Covel Street?
A. No, I did not.
Q. So everything that I have read to you up to that point, striking "I headed for 33 Covel

Street", was provided to the police by you, correct?

A. In a sense, yes.

Q. As you look at Exhibit No. 5, and starting with that sentence that says, "I headed for 33 Covel Street," is there anything in there that you provided the police?

A. No, there is not.

Q. Did you read that?

A. I have read it before, yes.

MR. HAMMERSCHMITH: Could I ask the question be repeated, please?

Q. (By Mr. Bloom) The question is, sir, have you read that before?

A. Yes.

Q. My understanding is the details of November 30th of 1985 that are stated in this statement were provided to the police by you up until the sentence that begins, "I headed for number 33 Covel Street"?

A. Yes.

Q. You didn't tell them that?

A. Excuse me?

Q. You did not tell them that?

A. What, I headed for 33 Covel Street?
Q. Yes.
A. No, I did not.
Q. "The reason I went there is because I heard it had been broken into before." You didn't tell them that?
A. No.
Q. "I had a pair of my sister's gloves on." You didn't tell them that?
A. No, I did not.
Q. "They were wool gloves." You didn't tell them that?
A. No, sir, I didn't.
Q. "I entered an unlocked breezeway door at 33 Covel Street and I kicked the rear inner door in." You never said that?
A. No, I did not.
Q. "I entered the house and started looking through the house." Never said that?
A. No, sir, I didn't.
Q. "Found a handbag and took it with me." You never said that?
A. No, sir, I did not.

Q. "I left through the rear door." You never told the police that?

A. No, sir, I didn't.

Q. "I left the pocketbook a few houses down the street." You never said anything about that?

A. No, sir.

Q. "I left 33 Covel and went to 27 Malibu Drive." You never said that?

A. No, sir, I did not.

Q. "I opened the door to the breezeway and kicked the side door in." Did you say that?

A. No, sir, I didn't.

Q. "I started to go through the house and a little dog started barking and I ran out the side door." Did you tell the police that?

A. No, sir, I didn't.

Q. "This occurred around 4:00 A.M. on Saturday November 30, 1985, and after this I went home." Did you tell the police that?

A. No, sir, I didn't.

Q. "I had been drinking since about 7:00 P.M." That's true, isn't it?

A. Around that time, yes.

Are you familiar with these two knit gloves?

A. Yes, sir.

Q. I believe previously you testified concerning where you took those into your possession concerning November 30th of 1985?

A. I found them at 27 Malibu Drive.

Q. Now, at some point in time, and I'm going to ask you to direct your attention now to a week later, on December 7th of 1985, did you have occasion to do something with those gloves?

A. Yes, sir.

Q. Can you tell us what, if anything, you did with them?

A. I took them with me to 87 Malibu Drive.

Q. Can you just tell me yes or no, was it as a result of information you had acquired, just yes or no?

A. Yes.

Q. When you went to 87 Malibu Drive, who did you see there, if anyone?

A. Mrs. Westcott.

Q. Can you tell the Court and jury what, if anything, you did with those gloves at that time?

A. I showed them to Mrs. Westcott.

Q. What, if anything, did she say?

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

MR. HAMMERSCHMITH: Your Honor, may --

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I just want to make it clear for the record that it is my understanding that this would be admitted as a prior inconsistent statement and not for the truth of the matter.

THE COURT: Right. Absolutely.

MR. HAMMERSCHMITH: I just wanted it on the record.

(End of side bar conference)

Q. (By Mr. Bloom) What, if any, conversation did you have with Mrs. Westcott

concerning those gloves that are Exhibit 10 in front of you at the time you are now describing?

A. I showed her the gloves, I asked her if she had ever seen them before. She told me she had a pair just like that.

Q. What, if anything, did she say or do at that time?

A. She told me that she had just rearranged the hall closet several weeks before and she knew they were in there then. She took me to the hall closet, opened it up, I asked her to look and see if they were there, she looked, she indicated that her gloves were not there.

MR. BLOOM: That's all I have.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. What day was this on?

A. That was on December 7th, sir.

Q. And that is more than two years ago?

A. Yes, sir.