C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 10, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME IV

MR. BLOOM: Mr. Eubanks.

WILLIAM EUBANKS (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you tell Judge Murphy your name and your occupation, please?

A. William G. Eubanks, Special Agent, Federal Bureau of Investigation.

Q. How long, sir, have you worked for the F.B.I.?

A. Approximately fourteen years.

Q. Can you tell us where you are presently assigned?

A. I am presently the Unit Chief in charge of the Serology Unit of the F.B.I. laboratory in Washington D.C.

Q. What basically is the nature of your work there as the chief of the Serology Department at the lab in Washington?

applies to the sheet and the Q4 to the paper which is with the sheet.

Q. When you gained possession of that particular item, would you tell the jury what your function was in reference to that bedsheet?

A. Well, the bedsheet was given to me by another agent who also did examinations on this in another field. His name is Special Agent Wayne Oakes, who works in the Hairs and Fibers Unit. He brought it to me in order for me to conduct my examinations.

As I testified to just a moment ago, I looked at the sheet for the presence of blood stains and identified or located two stains on the sheet and then conducted the series of tests that I have previously testified to.

Q. And you did one set of examinations that caused you to file a March 13th report, is that correct?

A. That is correct.

Q. Can you tell us what the analysis was that you did in reference to the first time you dealt with that sheet?

A. I analyzed or located two stains on the sheet and I determined that both stains were human blood stains. One of the stains --

Q. Same procedure you described before?

A. Yes, same procedure. The preliminary screening test followed by confirmatory test, followed by a test to determine whether it is of human origin. All of those tests were positive on both stains. In other words, at that point, I knew that I had two human blood stains. One of the stains was larger than the other. On the larger stain I was able to run several enzyme and protein systems in addition to the ABO system, and I was able to obtain conclusive results in several of those systems.

Q. Again, you are talking about the enzymes or proteins that you have described that there are up to 12 -- there could be up to 12 markings for?

A. Yes, sir.

Q. How many markings could you find on the larger blood stain when you performed that test? And I'm just asking you a number, not what they are, at this point.

A. There were four different genetic

of those. Perrot and Prekop are the same PGM type, which is 1+, but there were differences in numbers two, three and four on the board, that's the enzymes EAP, Hp or haptoglobin, and Tf. Prekop was different than Perrot in those three markers.

Q. In lay terms, sir, what does that mean, in essence?

A. Well, that means that the blood stain that I tested on the sheet could not have come from Prekop and is consistent and could have come from Perrot.

Q. At some point, correct me if I'm wrong, you also were asked, were you not, to perform forensic serology examination in reference to what has been marked Exhibit No. 10, Springfield Police Department number 49492, and it says on there, doesn't it, one pair of knit gloves, correct?

A. Yes.

Q. Can you tell the jury what this means, Q5, Q6, and then WGE?

A. As in the case of the previous one, which was Q3 and Q4, this is just a way of listing or numbering items submitted to us for analysis. In

this case, it refers to questioned item five or Q5 and question item six or Q6. Q5 would be one glove, the Q6 the other glove. Also my initials, WGE, are on the outside of the package.

Q. Did you attempt, sir, like you did with the bedsheet, to lift as many enzymes as the blood stain would allow?

A. Yes.

Q. Can you tell us what the result of that examination was, in reference to exhibit -- is it 10?

A. Yes. On the pair of gloves I identified a blood stain, a human blood stain on each of the pair of gloves, one stain on each of the gloves. On one of the gloves, which was listed as Q5, was in the wrist area of the glove, and on Q6, the human blood stain was actually in the area of the first two fingers, at the base part of the first two fingers.

Q. How many enzymes were you able to lift?

A. Because of the limited quantity of stain there, it was a rather small stain, I was only able to run one genetic marker system on that stain.

Q. On both?

A. Yes.

its color. It did not have a discernable cuticle, I could not see scales, I could not see very many characteristics at all. I could tell it was a human head hair of Caucasian origin and I could tell you it was white. However, if you were to give me white head hairs from 10 different other Caucasians, it may match all of those persons, so it was not a hair that I felt could be used to form the basis of strong association.

So I don't fool with it. I just write it off and I put "not suitable for comparison purposes" in my notes. And then I deal with the brown head hair that is suitable to form the basis of strong associations, if you compare that one with known hair samples.

Q. At sometime within the course of your involvement in this case, were you asked to compare this one head hair that you set aside that you felt was worthy of comparative analysis with a head hair that was submitted to you and purported to come from an individual by the name of George Perrot?

A. Yes, I did.

Q. Can you tell the Court and the jury how

you performed that examination, what type of microscope you used, its power, and what the result of that examination was?

A. I would have used a comparison microscope, which is just two microscopes rigged together in such a way that I can see two specimens side by side.

Q. Like the board?

A. Like the board. The Q3 head hair or the brown Caucasian head hair which came out of this Q3 sheet was placed on one side of the microscope. A slide was prepared of the known head hair standards purportedly from Mr. Perrot that was placed on a glass microscope slide and it was placed on the other side of the comparison microscope. The questioned hair was compared root to tip microscopically at 100 power, 250 power and approximately 400 power side by side with the known hair standard from Mr. Perrot.

Q. Can you tell us what the results of that examination were, sir?

A. Yes, the questioned hair from the sheet exhibited all of the same microscopic characteristics arranged in the same way as the known hair standards

from Mr. Perrot.

Q. Were there any variations whatsoever?

A. None that I could detect, no.

Q. At some point after that, were you asked to compare this head hair that had been removed from Exhibit 8 with a known head hair purportedly from a Mary Prekop?

A. Yes.

Q. Can you tell us how that examination was done, what type of microscope again was used, and what the results of that examination were?

A. I used the same procedure with the known hair standard from Miss Prekop as I did with the known hair standard from Mr. Perrot, that is I mounted the appropriate number of those hairs from the alleged victim on a glass microscope slide and compared the hairs side by side with the questioned hair removed from the sheet, State's Exhibit 8, and they were dissimilar. The questioned hair did not originate from Miss Prekop.

Q. Mr. Oakes, again in reference to yourself and Mr. Eubanks, you have your own numbering or labeling system when an item comes in, correct?

MR. BLOOM: That's all I have, Your Honor.

THE COURT: Thank you, sir, you can step down.

(Witness steps down)

MR. BLOOM: The Commonwealth is going to rest at this point.

THE COURT: Mr. Foreman, ladies and gentlemen, we will recess for lunch. I will ask you to be back shortly before 2:00.

I will see counsel for just one moment.

(Whereupon, the jury was removed from the courtroom)

THE COURT: Have you seen a copy of this motion, counselor?

MR. BLOOM: Just now, yes, Judge.

THE COURT: First of all, with regard to indictment -- I have before me

Defendant's Motion for Required Finding of Not Guilty. With regard to indictment number 85-5422 charging assault with the intent to rape Emily Lichwala, my inclination there is there has been no evidence that supports that.

Do you want to be heard, Mr. District Attorney?

MR. BLOOM: I would say this, Judge. I felt that basically that there was an assault that took place in the home, and I don't believe -- and I will be honest with you, I may be mistaken to what the law basically carries -- I think this is kind of an unusual set of circumstances in reference to the normal scenario that you usually have placed in front of you in reference to this type of charge, and I'd be the first to say that on the record.

I would indicate that her testimony in reference to the fact that she heard a yanking on the door, which

was the door that leads up from the cellar, then she heard someone walking down the cellar steps, the fact that we know now that a pool cue that was in place down in that cellar area was taken down by the assailant and used in some capacity to gain entrance. Ultimately, when this person came in, Mrs. Lichwala is still in the house, there is a breaking of the glass, and due to the fear from the combination of these events, she leaves.

I believe, in light of what I understand the assault to mean, that she was assaulted. I think that the activities, all those activities taken together, can constitute an assault in reference to how it is defined in the Commonwealth of Massachusetts.

The intent to rape, Judge, I would only say this: That in terms of the time span, you have in front of you the following: You know Mr. Perrot

lives in the neighborhood, you can infer he would be familiar with these locations; both of the women are elderly; both homes are entered forcibly and not -- there isn't a grave distinction between the manner in which they were entered; Mrs. Lichwala's call comes in at about 3:30; after everything happens to Miss Prekop, her call comes in at 4:00.

I think you can infer from that -- it's not too much of a jump to infer from those factors that the assailant left the Lichwala home, went to the Prekop home immediately, took whatever time that was necessary -- and you heard there was a few minutes in which there was an initial series of sounds in which a perpetrator was attempting to break in, and then, ultimately, he was successful in breaking in, and then raped Miss Prekop.

I think from that, only

because, Judge, of the likeness of which the two incidents occurred and the time frame and, thirdly, the fact that Miss Prekop was raped, that the intention of the person at the time of the break-in at about 3:30 at the Lichwala residence, less than a quarter of a mile away from the Prekop residence, was to rape her, based on what happened to Miss Prekop.

And I recognize and I appreciate the fact that normally this isn't the type of scenario placed in front of you in reference to that type of charge, but that is the theory, Judge, under which we are proceeding.

THE COURT: As far as evidence of intent to rape on Mrs. Lichwala, I feel there is -- the jury would have to speculate to that aspect of it. I will allow the motion with regard to the assault with the intent to commit rape of Mrs. Lichwala, which is indictment number 5422.

that is sufficient, at least under the facts, to find there was an unarmed robbery.

THE COURT: Taking the evidence with regard to Mary Prekop, taking the evidence in the light most favorable to the Commonwealth, her testimony was that she had the stick and she struck the intruder in the head because she couldn't strike him around the feet because the dog was in the way, if I recall.

MR. BLOOM: That's correct.

THE COURT: And that the intruder took the stick away from her, and her other further testimony was that he threw the stick on the bed, and I think there's pictures in evidence of that stick on the bed.

MR. BLOOM: There is.

THE COURT: Based on that, I would allow the motion with regard to the armed robbery of Mary Prekop, deny it

with regard to -- I will allow it to go to the jury on the issue of unarmed robbery.

MR. BLOOM: That is number 5415, Your Honor?

THE COURT: Right, 5415.

MR. HAMMERSCHMITH: Could I just be heard briefly with respect to the robbery issue, Your Honor?

THE COURT: Okay, I am going to hear you on any of these others that you want to be heard on, but I want to get through the ones that I think don't require any argument.

Now, with regard to the armed burglary of a dwelling house of Mary Prekop, it seems to me we are dealing with the same thing there, aren't we?

MR. BLOOM: No, Judge, all you need is, once you have a breaking and entering, is to have an assault. She certainly was --

THE COURT: I know you have the