IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------x

GEORGE PERROT,

Plaintiff

Civil Action

v. No. 18-cv-10147

THOMAS KELLY, ET AL.,

Defendants

--------------------------------x

DEPOSITION OF CHERYL CLAPPROOD, a witness called by and on behalf of the Plaintiff, taken pursuant to applicable provisions of the Massachusetts Rules of Civil Procedure, before Nicole E. Lavigne, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Springfield Housing Authority, on Thursday, August 24, 2023, commencing at 10:10 a.m.

VOLUME II

academy for new officers?

A. Yes.

Q. Okay. What did that training consist of?

A. The training at the academy level would have been any -- they review all the current policies and procedures and rules and regulations to new recruits. Once a year, they have an inservice week for every member -- every sworn member of the Springfield Police Department is required to go 40 hours of training at the police academy for what they call inservice training, and that was given back in the '80s and is still today.

And when you go to that training, they have an instructor that goes through all the recent policies and procedures that have been updated. So you're getting a year's worth of here's the most recent changes to policies and procedures. They have a class in that. I believe it's a four-hour class and just going over changes and updates to policies and procedures.

Q. Did you review the policies and procedures that were applicable to the Springfield Police Department between 1980 and 1990 to prepare for this deposition?

A. No, I did not.

Q. Were any investigative officers trained on how to take notes during a suspect interrogation?
A. Some could have been, yes.
Q. Okay. What type of training were given to officers regarding note-taking during a suspect interrogation?
A. There was some schools some of the officers did attend, and I did attend crime scene search, crime scene investigation and interrogation. In those classes, which were held at Framingham, they were weeklong classes, some of it did involve a little bit of note-taking, yes. So the officers that attended those schools would have received that.
Q. Was that training provided by the Springfield Police Department?
A. It was offered by the Springfield Police Department, and the training were MPTC instructors, Municipal Police Training Council instructors, and it was held at Framingham state police barracks.
Q. And was that training provided between 1980 and 1990?
A. Yes.
Q. And was the training optional?
A. Yes.

Q. Were officers required to do that training?
A. No.
Q. What officers were -- what officers did do the training?
A. Those who volunteered for it, those who were asked if you wanted to go and if it was something you were interested in. The only mandatory training was the -- if you're investigating sexual assaults, there was a mandatory sexual assault school that we all attended. It was offered through Municipal Police Training Council. It was one week, and I believe it was held in Agawam.
Q. Now, were officers required to maintain any notes taken during the suspect interrogation?
A. They were not required, no.
Q. Okay. Was there a policy regarding the administration of Miranda warnings during the suspect interrogation?
A. I don't believe there was a specific policy, no.
Q. Was there a training on providing suspects with the Miranda warning during interrogation?
A. Not specific that I recall, no.
Q. Was there any sort of practice regarding that?
A. Yes.

Q. All right, but was there any policy at all?
A. No policy, no.
Q. Was there any sort of policy written or unwritten regarding documenting or memorializing interrogations of suspects?
A. No formal policy. The only informal policy we had was practice.
Q. Just want to make sure I don't go over anything that was already done. Was there a procedure on documenting or memorializing interrogation of suspects?
A. We -- there was, and they had a procedure as far as the Miranda rights, the phone call, if there was going to be a statement taken, and making sure that the -- it was noted, and that night line, that daily line so the next shift would understand what happened and who we interrogated, and then the supervisor reading the statement taken. Other than that, nothing formal in a policy written, no.
Q. You mentioned the supervisor reviewing the statement taken?
A. Yes.
Q. How would that work?
A. We always -- after the statement was taken, if the supervisor was working, they would show the

supervisor the statement. If he wanted anything else or you wanted to inquire of something else with the suspect, you could. If he -- if he said you were all set, then that ended the interrogation.

Q. Okay. And if the supervisor reviewed the statement and approved it, would that be notated anywhere in the statement?

A. No.

Q. No. Would a supervisor need to sign a statement for any reason?

A. No.

Q. You mentioned a phone call. What do you mean by "phone call"?

A. A lot of times, depending upon the condition, the age of the suspect before interrogation, we would allow them to make a phone call if they wanted to.

Q. What was the age needed -- what age would a suspect have to be that you would give them a phone call?

A. If it was -- obviously if it was 16 or below, they needed -- they couldn't do the statement. They needed a parent or an interested adult. But if it was close, if you were 17 to 20, a lot of times we told you to call somebody and asked you to get some consultation

MS. deSOUSA: Okay. All right.

Q. (By Ms. deSousa) So you have been asked a number of questions about training over the years at the department, and at one point in your answer, you mentioned MPTC.

A. Yes.

Q. And for the record, can you just explain what MPTC is and what is its role in screening Springfield police officers.

A. Sure. MPTC is the Municipal Police Training Council and it's for the state of Massachusetts and that's who sets all the standards in regards to training for police recruits, for continual training with police officers, for training in special categories. They have their own instructors, and they set the syllabus for the in-service training each year. It may change.

They're the ones that set the requirements, and they're the ones who say who can have an academy. They certify an academy. There's a MPTC academy, and then I believe there's only two or three other towns or cities that are allowed to have their own police academy, and Springfield is one of them.

Q. And do they review your academy curriculum on a

regular basis?
A. Yes. They usually set most of it, and they certainly do review it, yes.
Q. And do the academy instructors get their materials directly from MPTC?
A. Yes. And instructors have to be MPTC certified.
Q. You were also asked a number of questions, Superintendent, about what's been referred to as Brady.
A. Yes.
Q. And you testified that there was no formal Brady policy until a couple of years ago. Do you recall that?
A. Yes.
Q. And that coincided with the Department of Justice coming in and also, at the same time, the Hampden County District Attorney's Office creating and disseminating what is referred to in shorthand as a Brady list, correct?
A. Correct.
Q. And in that context, the Brady information is specifically addressed to IIU or other impeachment-type evidence that might relate to police officers, correct?
A. Correct.
Q. And that's specifically what you were referring

to, is it not?

A. That is.

Q. But you also testified, did you not, that from the time -- from 1980 through the present but certainly since 1980 forward, that it was the practice at the Springfield Police Department to turn over all evidence to the District Attorney's Office, including any exculpatory evidence; isn't that true?

A. That's correct.

Q. And during your trainings at the police academy, during the relevant years, it's true, is it not, that you were trained that it was an obligation of the state, of the Commonwealth in a criminal case to turn over all exculpatory evidence to criminal defendants, were you not?

MS. LINTON: Objection; form.

THE WITNESS: Correct.

Q. (By Ms. deSousa) So whether that was referred to as "Brady information" or not, you understood that anything that might show someone's innocence, the Constitution of the United States required it to be turned over, correct?

A. Correct.

MS. LINTON: Objection; form.

Q. -- of the rules and regulations, correct?
A. Correct.
Q. And that was in effect during those relevant years, correct?
A. Correct.
Q. And having had an opportunity to review it, can you speak to what Section 1 of Rule 29 says.
A. Yes. "All members of the department shall obey the rules and regulations as set forth herein: The ordinance of the City of Springfield, the laws of the Commonwealth of Massachusetts, and the United States of America and shall perform their duties with silent courage, discretion, placing safety and welfare of the City of Springfield and its citizens first at all times."
Q. So Section 1 would also prohibit officers from falsifying evidence for example?
MS. LINTON: Objection; form.
THE WITNESS: Correct. It would be a violation of the law.
Q. (By Ms. deSousa) And tampering with evidence in any way, in fact, would be covered by that Section 1, correct?
MS. LINTON: Objection; form.

THE WITNESS: Correct.
Q. (By Ms. deSousa) Falsifying reports?
MS. LINTON: Objection; form.
THE WITNESS: Correct.
Q. (By Ms. deSousa) Offering false testimony at a trial?
A. Correct.
MS. LINTON: Objection; form. I'm sorry, I said it in my head, not out loud.
THE WITNESS: Correct.
Q. (By Ms. deSousa ) You've also -- and I just want to try to try to straighten this out. So you've also testified regarding file retention. And in a case that's gone -- that goes to trial, the file is turned over to the District Attorney's Office, correct?
A. Correct.
Q. And in some cases, there might be parts of it they say: Oh, we don't need this part, I guess; is that true?
MS. LINTON: Objection; form.
THE WITNESS: True.
Q. (By Ms. deSousa) And then -- but other than that, the entire file is turned over to the District Attorney's Office, correct?

COMMONWEALTH OF MASSACHUSETTS HAMPSHIRE, SS.

I, NICOLE E. LAVIGNE, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 24th day of August, 2023, at 10:10 a.m., the person hereinbefore named, CHERYL CLAPPROOD, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of her knowledge concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

My Commission Expires: April 19, 2024

Nicole E. Lavigne

Nicole E. Lavigne, RPR
Notary Public