C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
Nos. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

MOTIONS AND TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 8, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME II

the dog was jumping all over his feet and I didn't want to hit the dog.

Q. What happened after you hit him in the head?

A. Well, he grabbed the stick from me.

Q. And what happened?

A. He pushed me into the bedroom.

Q. What did he do with the stick?

A. He threw it on the bed and he threw me on the floor.

Q. When you were on the floor, how far were you from your bed?

A. Well, my head was towards the bed and --

Q. I mean how far?

A. Not far, because in little houses like that, the bedrooms are small.

Q. Okay. When you got pushed on the floor, did you see where the stick was at that time?

A. Where the stick was?

Q. Yes.

A. Yes, it was laying on the bed. I saw him throw it on the bed.

Q. What was the next thing that happened?

A for Identification.

(A for Identification, photograph, marked)

Q. (By Mr. Hammerschmith) In any event, on that day, you did look at a group of people?
A. Yes.
Q. You didn't recognize any of that group of people as being the person who broke into your home, did you?
A. No.
Q. And, in fact, you told the police that as far as you could tell, none of them seemed to be the person?
A. That's right. I didn't recognize anyone.
Q. There was a door that was broken that night, is that right?
A. Yeah, the breezeway door, that goes to the house.
Q. That is the door that you referred to which was just outside of the kitchen door?

(Hearing reconvened at 3:55 P.M.
The defendant and jury were present)

EMILY LICHWALA (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Emily, I want you to tell Judge Murphy and the jury your name.
A. Emily Lichwala.
Q. L I C H W A L A?
A. Right.
Q. And you live in Springfield?
A. Right.
Q. And you live in Sixteen Acres?
A. Right.
Q. And what is the number of your street?
A. Thirty three.
Q. And how long -- is that on Covel Street in Springfield?
A. Right.
Q. How long have you lived there?
A. Twenty-four years.

Q. Emily, could you tell the jury how long you have lived alone there?
A. Five years.
Q. How many floors of living space are there in that house?
A. Living space, only one floor.
Q. And you have a basement?
A. Yes.
Q. That is finished over?
A. Yes, it's a rec room and a laundry room.
Q. Two of them separated by a door?
A. Right.
Q. Tell us what you have in the rec room.
A. There's a bar, old English living room set.
Q. Pool table?
A. A pool table.
Q. Do you have sticks for that pool table?
A. Yes, there's a rack on the wall for the sticks.
Q. You don't play?
A. I don't play.
Q. But it's been down there how long, that

pool table, would you say, your best guess?

A. Twenty years.

Q. Now, I'm going to ask you, if you can, if you would be kind enough, ma'am, to go back to November 30th of 1985. Do you remember, when you went to bed that night, being woken up to something? Do you remember being awakened that night?

A. I'm a very light sleeper, I'm up most of the night.

Q. Do you remember on that night hearing something that caused you to get up out of bed?

A. Yes.

Q. Would you tell the jury and Judge Murphy as best you can recall what was it you remember hearing that caused you to be alerted?

A. Well, first I heard the jolting of my door in the kitchen.

Q. Why don't you just explain quickly to the jury, if you could, you've got a door that comes into your kitchen on the first floor, correct?

A. Yes.

Q. Do you also have a breezeway?

A. Yes.

Q. What did that sound like, that noise that you heard coming from the kitchen door area?
A. Well, it was like someone was trying to open up a door and couldn't, because I had it bolted.
Q. That door was bolted?
A. Yes.
Q. Now, that door that you are talking about, if I was to be inside your house in the kitchen and opened it, where would I be looking at as I walked through the door?
A. You would go down the stairs to the laundry room.
Q. So, for instance, today or any other day, if I was in your basement, is that the door you would have to use to get into your kitchen, let's say?
A. From downstairs.
Q. From the downstairs basement?
A. Yes.
Q. When you heard that, what do you remember doing when you heard that sound that you described for us?
A. I thought I was hearing things. I

thought that it was my imagination.

Q. Did you do anything at that time or did you just stay in your room?

A. I also heard like footsteps down the stairs, but I was so convinced that it was my imagination.

Q. You said you thought you heard footsteps going down the stairs. That is the stairs that go into the laundry room and the rec room?

A. Yes.

Q. After, did you hear anything else within the next few minutes?

A. It was silent for at least -- I would say five minutes it was silent, so I was sure it was my imagination.

Q. Let me ask you this. Were you still in your bedroom or had you gotten out?

A. I went back to the bedroom.

Q. Did you hear anything when you went back to your bedroom?

A. Yes, I heard a crash.

Q. Where did that appear to come from, based on what you --

A. It appeared to me like it was in the breezeway and I thought it was the breezeway door, back breezeway door.

Q. Could you describe -- what do you remember it sounded like?

A. Glass shattering.

Q. When you heard that, did you do anything?

A. I wanted to call the police, but I didn't -- was afraid -- I couldn't think fast enough. I thought of sounding the smoke alarm, but I didn't think it would work.

Q. What did you do, if anything?

A. I was just so frightened, and then in a matter of minutes I heard another crash.

Q. Was all this happening quick or was there --

A. It was very, very quick.

Q. And when you heard this next crash, do you remember what you did then?

A. When -- I wanted to make a phone call, but I knew I couldn't, and when I heard -- see, I not only had new locks put on, but I also had chains put

on, and when I heard the chains, I knew that he was only yards away from me, and so I --

Q. Let's back up there. When you heard the chains, what door are we talking about now?

A. It's the other door in the kitchen. Not the one that leads to the basement. That was a glass door.

Q. I want you to explain that, so -- because the jury's never been in your house, so they understand that. The first door you talked about, that's the door from the basement up, correct? The first -- there was one door that if you come up the basement, that leads you into the kitchen?

A. Yes, but it's just a door, no glass.

Q. Now we're talking about another door?

A. Yes.

Q. That also lets you into the kitchen, correct, you can get into the kitchen?

A. Yes.

Q. But that leads you out to the breezeway if you go through it?

A. That's right.

Q. This is the door you're talking about

now, the second one?

A. Right.

Q. And does that have glass in it, the second door?

A. Yes.

Q. So either one of them you can get into the basement with, correct?

A. No.

Q. Excuse me, you can get into the kitchen with?

A. Right.

Q. And when you heard what you thought was glass breaking on that second door that leads to the kitchen from the breezeway, what did you do then? What did you do at that time? Were you still in bed?

A. I was in the bedroom at the time and I started to come into the kitchen, but I heard -- beside the crash earlier, I heard the chains, so I knew he was just yards away from me, so I went back into the bedroom, picked up what I could and ran barefooted outside to the living room door.

Q. Did you eventually get inside the neighbor's house across the street?

A. Yes.
Q. And, Emily, that night, did you ever see who this person was that night?
A. No.
Q. Never got a look at him, correct?
A. No.
Q. All right. Did you, when you got inside your neighbor's house, at some point, end up calling the police or did they call the police in your presence?
A. My neighbor called for me, 'cuz I was too --
Q. Nervous?
A. I was so -- in such shock that I couldn't do it. My neighbor called for me. I asked her to.
Q. After things had calmed down a little bit and the police got there, you eventually had an opportunity to go back to your house, correct?
A. In the morning.
Q. So you stayed there for -- you didn't go back for a while, correct?
A. She fixed up a bed for me to sleep there

overnight.

Q. When you went back to the house, tell us what things, if anything, you saw that were different from when you had gone to bed the night before when all this started?

A. Well, first of all, I saw the damaged door.

Q. Which one are we talking about now?

A. The one to the breezeway.

Q. That's the one that's got the glass in it, you said?

A. Yes.

Q. Was there any glass broken in that door?

A. That was broken also.

Q. All right. Was there glass broken anywhere else that you saw?

A. No, just -- the other breezeway -- you know the back breezeway door? I thought it was the door, but it was the window, it wasn't the door. I didn't see it until I got back home in the morning.

Q. What did you see about that? What did you notice different about that?

A. I said, oh, he got in -- it wasn't the

door, it was the window. It was, you know, a lot of glass shattered.

Q. Okay, what did you see -- where was the glass broken? You said the door that leads in -- the door that leads in from the breezeway into your kitchen, there's glass there?

A. Yes.

Q. You said that was broken?

A. Yes.

Q. Was there any other door or window that you saw the next morning when you went in, besides that, that was busted or broken?

A. Just the window next to the back door.

Q. That's in the breezeway itself?

A. Yes.

Q. And that is separate from the door that you have just told us about, that is a different area?

A. Yes.

Q. Now, did you go outside and notice anything at all during the day?

A. I didn't go outside. Someone was there from the police department and I just went back to

the bedroom and I noticed that my purse was gone, and I said it has to be the same person that victimized me at a previous time --

Q. Let me ask you this, ma'am. When you said that a purse was gone, where was the purse, as best you can remember it, when you went to bed that night? What room?

A. In the bedroom.

Q. Whatever time it was on the next day when you went now to the bedroom, was it gone now?

A. It's the same day.

Q. Well, the afternoon of the same day, right?

A. Not the afternoon, it was early in the morning, as soon as --

Q. I'm not arguing with you, I just want -- all this happened after midnight, right?

A. Yes.

Q. It was 3:00, 3:30 in the morning?

A. Yes.

Q. About?

A. Yes.

Q. Sometime later the next morning, you

went home. I believe you said you slept at your neighbor's for a while, am I mistaken?

A. I never slept, but they offered me a bed.

Q. Okay. At sometime you went back into your house?

A. As soon as they were up, I went back home.

Q. Okay. Now you're telling us that pocketbook was gone, correct?

A. Yes.

Q. Inside of it, can you just give us an idea of some of the things that were in there?

A. In the purse?

Q. Yes, in the purse, if you could.

A. Well, there was my wallet with all my identifications, I had keys, eyeglasses, makeup.

Q. Identification?

A. All my identification, all my credit cards.

Q. And that was gone?

A. Yes.

Q. Did you see a pool cue anywhere that

morning?

A. Not until later in the afternoon when my brother came to board the door for me, 'cuz it was cold and he boarded it.

Q. Where did you see the pool cue?

A. On the floor next to the door, the breezeway door, with the glass.

Q. Was that on the floor in the kitchen?

A. Yes.

Q. When you left and went to bed that night, was there any pool cue on the floor of the kitchen? I know it's kind of a stupid question, but I just want you to answer it for the record. When you went to bed that night --

A. No, because, you know, when I saw the curtain on the floor and the rod and the glass and all this, I saw the cue stick and I said to my brother, "Gee, he must have used this to smash the windows." And my brother picked it up and put it back into the rec room on the rack.

Q. Which, you told us, is downstairs?

A. Someone later picked up -- Cheryl and her assistant picked it up one evening, the cue

stick.

Q. The police department?

A. But by then I had handled it and my brother had handled it.

Q. But, eventually, someone from the police department took it?

A. Yes.

MR. BLOOM: Thank you, ma'am, for coming in.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. You said that you heard a chain rattling on one of your doors?

A. Yes.

Q. Which door would that have been? That is door from the breezeway into the kitchen?

A. Right.

Q. Not a door from the outside into the breezeway?

A. Right.

Q. So it's a door -- the lock is on the kitchen side of the door from the breezeway to the kitchen, is that right? The chain?

A. Yes.

Q. Where were you when you heard that?

A. I was in the bedroom.

Q. Where is your bedroom in relation to the kitchen?

A. Well, there's a little hallway -- there's a long hallway to all the bedrooms and I just went into my bedroom.

Q. Is the kitchen at one end of this long hallway that you referred to?

A. Well, from the kitchen you can get to the hallway. You do get into the hallway from the kitchen.

Q. Does the kitchen lead -- is there a door leading directly from the kitchen into the hallway?

A. Yes.

Q. And there is nothing in between?

A. Not directly, not from the door to the hall. You have to go through the kitchen to get to the hallway.

Q. I take it if I walked in that breezeway door, the one where the chain was rattling, I could walk through the kitchen, right?

A. You had to go through the kitchen to go into the bedroom, to the hallway and bedroom.

Q. And would I have to walk the length of the kitchen to get there?

A. Yes.

Q. And then I would enter a hallway?

A. Right.

Q. And then I'd have to proceed down the hallway to your bedroom door?

A. Yes.

Q. And how many doors down the hallway would that be? Are there other rooms before I would get to your bedroom?

A. Are there other doors to open?

Q. Other doors to other rooms other than your bedroom?

A. No. Even from the kitchen, there is no door.

Q. I'm sorry. Doorways.

A. From the doorway.

Q. If a person leaves your kitchen and starts going down that hallway, away from the kitchen, what is the first doorway that they would come to, entrance to a room?

A. They would enter the bathroom first and then the bedroom is on the right.

Q. Is the bathroom on the same side as the bedroom, as your bedroom?

A. No.

Q. It's on the opposite side. Are there any other rooms between that you would pass on the same side of the hallway as your bedroom before arriving at your bedroom?

A. No.

Q. And you were in that bedroom when you heard this noise, is that right?

A. When I heard the crash, yes.

Q. And when you heard the chains rattling, correct?

A. When I heard the chain rattle, I was entering the kitchen, 'cuz I was going to call, I was going to phone emergency.

Q. So you were in the process -- were you

actually in the kitchen or just in the process of going --

A. I was in the kitchen.

Q. Where in the kitchen?

A. By the telephone, next to the refrigerator.

Q. Where is the telephone in relation to the door -- excuse me, in relation to the hallway?

A. In relation to the hallway? About a yard and a half.

Q. So it is one of the first things you come to when you enter the kitchen, is that right?

A. What is it?

Q. It is one of the first thing you would come to as you enter the kitchen coming from the hallway?

A. That's right.

Q. When you heard the chain rattling, you then turned around and left?

A. I went to the bedroom to quickly pick up whatever I could.

Q. And then you left the bedroom?

A. I left the bedroom and I went out the

front door.

Q. To get to the front door, did you go further down the hallway from the kitchen?

A. Yes.

Q. So the front door is sort of at the opposite end of the house from the kitchen, is that right?

A. Oh, yes, it's quite a distance.

Q. And it was the front door that you went out by when you went to the neighbor's house?

A. Yes.

Q. On that night, you didn't hear anyone say anything, did you, anyone say anything in your house that night?

A. I had left before he entered my house.

Q. So you didn't hear any words at all?

A. No.

Q. And you didn't see anybody at all?

A. No.

Q. You didn't see anybody --

A. I just ran for my life.

Q. You didn't see -- you didn't really see anything at all?

A. No.
Q. No person?
A. No.
Q. And the pool cue that was found was found next to the door leading from the kitchen to the breezeway?
A. Right.
Q. It was on the inside next to the kitchen door?
A. Right.
Q. And that window to the kitchen door was broken?
A. Yes.
Q. And there was another window which was broken also, is that right, in addition to the door to the kitchen?
A. Yes. That's the window next to the back breezeway door. That is also a glass door, but that wasn't broken.
Q. Would the rear breezeway door or the back breezeway door, would that have been kept locked?
A. Yes.

Q. It was the window next to that door that was broken, correct?

A. Yes, the windows were also locked.

Q. Was that door damaged?

A. The door wasn't damaged at all in the back. It was the window that was damaged.

Q. And the only door that was damaged was the door leading from the breezeway to the kitchen?

A. Right.

MR. HAMMERSCHMITH: I have nothing further. Thank you.

MR. BLOOM: Thank you, Emily.

(Witness steps down)

THE COURT: Mr. Foreman and ladies and gentlemen of the jury, we are going to recess for the day, and I'd ask you to be here about quarter past nine tomorrow morning, we should be able to get right into the courtroom at 9:30 and pick up the trial again at that time.

Now, my instructions to you