COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
HAMPDEN SUPERIOR COURT
NOS. 85-5415,16,18,20, and 25

COMMONWEALTH

v.

GEORGE PERROT

HAMPDEN COUNTY SUPERIOR COURT
FILED
JUN - 6 2008
[signature]
CLERK-MAGISTRATE

DEFENDANT'S MOTION FOR A NEW TRIAL

Now comes the defendant, pro se, and moves this Honorable Court to grant him a new trial pursuant to Mass. R. Crim. P. 30(b). The defendant states as grounds for his motion that he was denied due process, based on false testimony knowingly presented by the prosecution to secure this defendant's conviction, as well as ineffective assistance of counsel, violating this defendant's rights guaranteed to him by the Sixth and Fourteenth Amendments to the Constitution of the United States and Article XII of the Massachusetts Declaration of Rights. As well as the laws of the United States and the Commonwealth of Massachusetts as more fully set forth in the defendant's accompanying Memorandum in support of his motion.

Dated: June 2008

Respectfully Submitted

[signature]

George Perrot, pro se
P.O. Box 8000 (SBCC)
Shirley, Ma. 01464

08-21-08 Defendant's 2nd motion for new trial was denied & he failed to prosecute his appeal resulting in its dismissal. Accordingly, he waived his claims. Commonwealth v. ..., 433 Mass. 30 (2000). His reliance on his pro se status is unavailing as he is held to the same standard as an attorney. Commonwealth v. Jackson, 419 Mass. 716 (1995). Accordingly, the defendant's motion is DENIED. [signature] J.

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
HAMPDEN SUPERIOR COURT
NOS. 85-5415,16,18,20, and 25

HAMPDEN COUNTY SUPERIOR COURT
FILED
JUN - 6 2008
CLERK-MAGISTRATE

COMMONWEALTH

V.

GEORGE PERROT

MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL
UNDER MASS. R. CRIM. P. 30(b)

Procedual History

There were two house breaks in Springfield Massachusetts on November 30, 1985 (Tr.I/119-27,134-35).

On December 16, 1985 a Hampden County grand jury indicted the defendant for armed robbery (85-5415), indecent assault and battery (85-5416), aggravated rape (85-5418), burglary and assault in a dwelling (85-5420), and breaking and entering with intent to commit a felony (85-5425), (Tr.I/98-100). There was a pre-trial motion to suppress the defendant's statements to the police admitting the housebreaks but not the rape. n.1/

n.1/ All abbreviations herein will be represented as follows: Defendant's first trial (Tr.1,Vol./Pg.#); Defendant's second trial (Tr.Vol./Pg.#); Defendant's suppression of statement hearing (Supp./Pg.#); Defendant's motion to dismiss hearing (MTD/Pg.#); Defendant's Memorandum of Decision and order on Defendant's first motion for a new trial (Wernick, J.) (Memorandum of Decision/Pg.#).

On December 14, 1987 a jury convicted the defendant of all five charges. On appeal, the defendant argued error in (1) the denial of his pre-trial motion to suppress oral and written statements, and (2) the admission in evidence of the pocketbook of one of the victims under the inevitable discovery rule.

The Supreme Judicial Court reversed the convictions on June 4, 1990. Commonwealth V. Perrot, 407 Mass. 539 (1990) (Refusing to suppress the defendant's statements, but concluded that admitting a pocketbook found as a result of a different, illegally obtained statement, on grounds of inevitable discovery was error and the error was not harmless beyond a reasonable doubt).

On January 9, 1992 the defendant was convicted again of the same five charges. The defendant appealed arguing that: (1) the trial court errored in denying a motion to dismiss for prosecutorial misconduct in forging the defendant's name on a confession to intimidate two other men into admitting certain charges against them, (2) the trial court improperly excluded all references to the forged confession, (3) the trial court should have granted his motion for required finding of not guilty, (4) the trial court errored in admitting evidence of the "product rule" (statistical distribution of certain enzyme markers in the population, an argument that (Murphy, J.) felt was prejudicial and excluded from the defendant's first trial) (Tr.1,IV/3-6), (5) trial counsel provided ineffective assistance in introducing a statement that contained references to the defendant's other alleged crimes, and (6) the jury was not drawn according to the statutory procedures.

The Appeals Court affirmed the convictions. Commonwealth V. Perrot, 38 Mass. App. Ct. 478 (1995). Addressing the first two claims and concluding that the remaining claims were without merit, Id. 482. According to the Appeals Court, even though the prosecutor forged the defendant's name on the bogus confession immediately after the defendant's first conviction, implicating two of his friends to try to force these friends to confess, it was not error to refuse to dismiss the charges with prejudice because this "confession" failed to get the friends to confess and was not used against the defendant in his second trial. Before his second trial, a police officer discovered the bogus confession in the file, told the ADA, who disclosed it to the defendant's lawyer, who filed a motion to dismiss with prejudice on grounds of prosecutorial misconduct. The Appeals Court affirmed the denial of this motion because the forged confession was not used against the defendant at his second trial and he suffered no prejudice. Id. 482.

The SJC denied the defendant's application for further appellate review. Commonwealth V. Perrot, 420 Mass. 1104 (1995).

On April 25, 2000 the defendant filed his first motion for a new trial arguing that the prosecutor made an improper closing argument, that trial counsel was ineffective for failing to preserve certain appellate issues, and that appellate counsel was ineffective in failing to argue these trial errors on appeal. The motion court determined that all issues raised were waived or asserted ineffective assistance and all are viewed for a substantial risk of a miscarriage of justice.

The specific errors that supported the motion courts

decision to reverse were: (1) the prosecutor made references in closing argument to the absence of evidence, which the prosecutor had successfully excluded (the forged confession, which the Appeals Court had already determined was irrelevant), (2) the prosecutor's comments during closing argument regarding the presumption of innocence were improper, (3) the prosecutor vouched for his witnesses, (4) the prosecutor referred to evidence not in the record, (5) the prosecutor referred to excluded evidence, and (6) the prosecutor assumed the role of a thirteenth juror.

According to the motion court, the Appeals Court decision foreclosed the first issue, the second issue was error compounded by the jury instructions and mislead the jurors regarding the Commonwealths burden of proof in a case where Ms. Prekop all but testified that the defendant was not her assailant. The voluntariness of the defendant's confession was strongly attacked base on credible evidence, and there were substantial issues as to how the gloves got into Ms. Prekop's bedroom and onto the bed, (not the location of the attack). Regarding the defendant's third issue, that the prosecutor improperly vouched for his witnesses, the motion court agreed. The motion court similarly agreed with the defendant's fourth argument that the prosecutor reached extensively outside the record during closing argument. The motion court agreed that the defendant's fifth issue, references to facts not in evidence was also error. Finally, the motion court concluded that the defendant's sixth issue, was further evidence of the prosecutor's excess, but would not require a new trial.

These issues combined, according to the motion court

caused a substantial risk of a miscarriage of justice. Accordingly, on September 11, 2001 the Superior Court allowed the defendant's motion for a new trial. The prosecutor's error's were pervasive and counsel had not sound excuse for failing to object to these improper arguments. (Memorandum of Decision/ 15-39).

Other issues raised in the defendant's motion for a new trial, but which were deemed without merit were appellate counsel was ineffective for failing to raise the following issues, or in failing to claim that trial counsel was ineffective for failing to raise them: Specifically, that the Commonwealth withheld the following allegedly exculpatory evidence, (1) that the police were unable to match anyone to a collected palm-print referenced in a report written by officer (Cheetham), and (2) that there was certain blood testing done in a related matter. According to the motion court, trial testimony did not show that the palm-print was exculpatory, and blood testing exculpated the defendant in another case, but not this one. The defendant also argued that counsel was ineffective for not calling a hair expert, and instead chose cross examination (Tr.II/356-82). According to the motion court, there was not evidence that a hair expert could have helped the defense.

However, the motion court did not consider that the Commonwealth's hair expert testified that the question hair reportedly found on Ms. Prekop's bedsheet or brown paper wrapping had a natural root (Tr.II/357-60). This hair root could have and still can be tested for DNA. The defendant requested that his second appointed trial counsel (John Ferrara) independently test



CoS RPOD 001429

the alleged natural root of this question hair, as well as the blood reportedly found on Ms. Prekop's bedsheet.

Counsel insured this defendant that he would have the requested independent tests performed, and per this defendant's request attorney Ferrara petitioned this motion court for funds, which were granted on November 5, 1991 by (Welch, J.) (See Defendant's Docket Entries). Counsel was thus ineffective for not independently testing the hair and blood to determine whether or not the findings and conclusions of the Commonwealth's experts were accurate, or whether other available tests might have excluded this defendant as the source of the forensic evidence that the Commonwealth relied on to convict this defendant.

Especially in light of the fact that this defendant provided counsel with an affidavit dated December 9, 1989 given to this defendant by (Mrs. Olive Edwards), in which Ms. Prekop (the victim), contradicted the source of this relied upon forensic evidence (See Exhibit A, attached hereto).

Counsel was also aware that this defendant's first appointed trial counsel also never independently challenged the Commonwealth's relied upon forensic evidence. By DNA elimination this defendant could have, and still can be set free if this alleged natural root of the question hair, or blood reportedly extracted from Ms. Prekop's bedsheet is tested and comes back not belonging to this defendant.

The defendant asserted error in the general versus specific intent instruction. According to the motion court, the instruction was not challenged and the isses was idenity and not intent. Finally, the defendant sought to relitigate the motion in limine

to exclude evidence that the prosecutor used a forged confession to try unsuccessfully to force witnesses to implicate the defendant. The motion court would not hear this argument because the Appeals Court ruled that the forged confession evidence was irrelevant (Memorandum of Decision/33-34 n.17).

The Commonwealth appealed and the Appeals Court reversed on May 12, 2003 in an unpublished decision. Commonwealth V. Perrot, 58 Mass. App. Ct. 1102, 787 N.E.2d 1154 (2003). The defendant filed a petition for further appellate review on January 14, 2004 prepared by CPCS appointed counsel (James Fox), accompanied by a pro se supplement dated December 29, 2003.

On March 10, 2004 the Supreme Judicial Court declined to review the defendant's case. Commonwealth V. Perrot, 441 Mass. 110 (2004).

On November 25, 2006 the defendant filed a second motion for a new trial claiming numerous error under the guise of ineffective assistance of counsel. The regional administrative justice (Constance Sweeney), addressed this defendant's second motion for a new trial by stating: "I decline to act on this motion. The defendant's convictions were affirmed on appeal. The Massachusetts Appellate Court already considered and rejected the arguments the defendant raised in the current motion for a new trial. Moreover, the defendant previously filed a motion for a new trial which this court (Wernick, J.) allowed. The Appeals Court reversed the allowance of the motion for a new trial and once again affirmed the defendant's convictions. The Supreme Judicial Court denied the defendant's appeal from the Appeals Court decision. Commonwealth V. Perrot, 441 Mass. 110 (2004). In

CoS RPOD 001431

the current motion for a new trial the defendant asks the court to once again review the same issues already considered by the Supreme Judicial Court and Appeals Court. I decline to do so." Constance M. Sweeney, Regional Administrative Judge, Western Massachusetts 12/5/06.

This trial court (Sweeney, J.) is correct that [sum] of the issues presented in the defendant's second motion for a new trial were the same, however, they were intertwined with newly raised issues. This was done due to the flawed advice that this defendant was given by prior appellate counsel (Stewart Graham), that holding an evidentiary hearing on the issues that were overturned by (Wernick, J.) would be unneccessary due to the merit of the arguments presented in the motion itself. It was that failure to not hold an evidentiary hearing that caused in large part the reversal of this defendant's first motion for a new trial by the Appeals Court. The thrust of the Appeals Court ruling was based in large part on the fact that (Wernick, J.) held no hearings and made no credibility determinations, leaving them in the same position as the motion court to review the record. Commonwealth V. Perrot, 58 Mass. App. Ct. 1102, 787 N.E.2d 1154 (2003).

The defendant, being a layman with the law and appellate procedures, and being unable to retain counsel was forced to forego his appellate rights to the waiver of his second motion for a new trial.

On December 18, 2006 the defendant petitioned this motion court through appointed counsel (Greg T. Schubert), for funds to conduct DNA testing that this motion court (Sweeney, J.) denied

CoS RPOD 001432

on January 2, 2007.

The Appeals Court affirmed this motion courts ruling on February 1, 2007, basing it's decision in part on two affidavits submitted to this motion court and the Appeals Court by ADA (Brett Vottero) dated July 5, 2006 and December 1, 2006 (See Exhibits B and C, attached hereto), which state that the physical evidence that this defendant seeks to test can not be located.

Contrary to ADA (Vottero's) great efforts to locate this physical evidence that this defendant seeks to test for DNA, this defendant has an affidavit from attorney (Greg T. Schubert) dated July 25, 2007 stating that he personally seen and viewed the "gloves, bedsheet, and hair" that this defendant seeks to test for DNA when he was assigned by CPCS to prepare this defendant's DNA funds motion (See Exhibit D, attached hereto).

In the present motion, this defendant's third motion for a new trial, this defendant brings forward claims that this motion court, the Massachusetts Appellate Court, or the Supreme Judicial Court have yet to adjudicate. This defendant's third motion for a new trial proves that the Springfield Police Department and District Attorney's Office used deciet and actual lies from day one, and throughout the proceedings in this defendant's case to convict him of several unsolved ongoing crimes with total disregard for the truth.

## STATEMENT OF THE EVIDENCE

### The Assault

On November 30, 1985 the victim, Mary Prekop, who lived at

27 Malibu Drive in Springfield, Massachusetts, was awakened when her dog started barking (Tr.I/127-30). After checking her house and returning to her bedroom, she thought she heard sounds of glass breaking (Tr.I/133-34). She picked up a stick she had taken into her bedroom (Tr.I/133), went into the kitchen, turned the light on, and saw a man standing there (Tr.I/135). Ms. Prekop hit the man with her stick (Tr.I/135-36), he assaulted her (Tr.I/136), pulled her into her bedroom, and raped her on the floor (Tr.I/136-39). She later gave a statement to the police giving the details of the assault (Tr.I/170-73).

Ms. Prekop described her assailant as "clean shaven" (Tr.I/141,154), with black wavy hair (Tr.I/146). One week after this assault, Ms. Prekop could not identify her assailant from a line-up which included the defendant (Tr.I/147; Tr.II/230-31). She insisted that the person who assaulted her was not in the line-up (Tr.I/161). By inference and by uncontroverted direct evidence, the defendant had facial hair at the time an assailant broke into Ms. Prekop's home and was not "clean shaven" as she insisted (Tr.I/141,154,158,161; Tr.II/396; Tr.III/469-70,540), See also (Trial Exhibit #19 that clearly shows this defendant had a "full mustache and goatee" six days after Ms. Prekop's home was broken into when this defendant was arrested for unrelated crimes, and this was not just six days worth of growth). Moreover, Ms. Prekop could not identify a photograph of this defendant as her assailant at trial, and testified that her assailant did not have a "beard or mustache" (Tr.I/157-58,161). Ms. Prekop also could not identify this defendant at trial (Tr.I/160).

After the assault, and after Ms. Prekop received medical



CoS RPOD 001434

treatment (Tr.I/143), she returned home where she found a pair of knit gloves that did not belong to her (Tr.I/144). When presented with the written statement that she made to the police, which referred to these gloves, among other things, Ms. Prekop insisted that she did not mention the gloves to the police when giving her statement, and suggested that the police altered her statement by adding this reference about the gloves (Tr.I/144).

Ms. Prekop also testified that she found no blood on herself, or on her bed, and that the entire incident took place on the floor not the bed (Tr.I/163-64). She explained that the only bloodstain on her sheet was several years old and was made by her uncle who had a lung disease (Tr.I/164). This stain was still visible at the time Ms. Prekop was assaulted, and it was not fresh blood (Tr.I/164,166-67,169).

The Forensic Evidence

Lieutenant Kelly went to Ms. Prekop's home after the incident (Tr.I/187-88). According to Lt. Kelly he found two knit gloves in Ms. Prekop's bedroom (Tr.I/196). Although Lt. Kelly testified at this defendant's second trial that he found one glove on the bed, and the other glove on the floor at the foot of the bed, he later admitted that he previously testified at this defendant's first trial that he reportedly found both gloves on the floor near the bed, but went on to tell the court that his memory is that he found one glove on the bed, and the other glove on the floor (Tr.III/447-49). At this defendant's first trial there was no doubt in Lt. Kelly's mind whatsoever as



CoS RPOD 001435

to where he reportedly found these gloves, Lt. Kelly told the court unequivocally that they were on the floor near Ms. Prekop's bed (Tr.1,III/195-96,197, attached hereto as Exhibit E).

This officers testimony pertaining to these gloves is in direct conflict with that of the victim Ms. Prekop's own trial testimony that she found these gloves, hours later when she returned home and her sister and herself cleaned up her bedroom (Tr.I/144,162-63).

Lt. Kelly testified that he completed his investigation of Ms. Prekop's home prior to her returning home (Tr.I/188). Lt. Kelly also testified that he was in charge of the investigation, and he himself caused the evidence reportedly found in Ms. Prekop's home to be gathered and removed (Tr.I/190-91,194-95; Tr.II/214). Lt. Kelly also reportedly observed a redish brown stain at the base of the finger on one of the gloves (Tr.I/196).

Lt. Kelly also testified that he collected Ms. Prekop's bedsheet prior to her returning home, which appeared to be soiled and have some fibers on it (Tr.I/194). This officers testimony pertaining to Ms. Prekop's bedsheet is also in direct conflict with Ms. Prekop's own trial testimony in which she told the court that when she returned home from the police station that morning, her sister and herself cleaned up her bedroom, and put clean linen on the bed (Tr.I/162-63). Ms. Prekop told the court, when her sister and herself were making up the bed, that's when she saw the gloves at the foot of her bed (Tr.I/162-63).

The gloves and bedsheet were submitted to the FBI laboratories in Washington, D.C., where both a bloodstain and a single hair were reportedly extracted from Ms. Prekop's bedsheet (Tr.II/

290-92,352). Blood was also reportedly extracted from the gloves (Tr.II/284-85).

On December 7, 1985 the police arrested the defendant for an unrelated purse snatching at a restuarant, and for a subsequent break-in at another residence (Tr.II/389-90). After questioning this defendant, Lt. Kelly obtained a search warrant for the defendant's home at 87 Malibu Drive (Tr.II/405). Lt. Kelly brought the gloves that he reportedly found in Ms. Prekop's home a week earlier on November 30, 1985 with him when he went to conduct the search of the defendant's residence (Tr.II/406). Upon arriving at this defendant's home, Lt. Kelly reportedly spoke with this defendant's sister (Nancy Westcott), whom this defendant lived with, asking her whether or not these gloves belonged to her (Tr.II/405-07). According to Lt. Kelly, she responded by saying that she had a pair just like them, but upon searching for them in a hall closet, found them missing (Tr.II/405-07). Trial counsel did not object to this highly prejudicial hearsay testimony through which Lt. Kelly attempted to connect this defendant with these gloves.

The defendant's sister, Nancy Westcott, was the only defense witness, she testified that she merely told Lt. Kelly that the gloves looked familiar, that they looked like a pair of gloves that this defendant's girlfriend owned (Tr.III/546). She testified that she never told Lt. Kelly that the gloves belonged to her (Tr.III/546). At this defendant's first trial Lt. Kelly also told this motion court that he made a written report pertaining to his conversation regarding these gloves with this defendant's sister, but can not produce the report, has not seen it since

the morning he wrote it (Tr.1,IV/138-45, attached hereto as Exhibit F).

Lt. Kelly testified that when he returned to the police station after executing the search of this defendant's home, he spoke with detective Jarvis and told him about questioning this defendant earlier that morning and told him about the search of this defendant's home (Tr.III/453-54; Supp./147). After Lt. Kelly spoke with detective Jarvis about questioning this defendant earlier that morning, and filling him in on the search of this defendant's home, "detective Jarvis" took those gloves over to this defendant's former girlfriends house and asked her if they were hers (Tr.III/497,498-99). This action taken by detective Jarvis with these gloves serves to corroborate this defendant's sisters trial testimony that "she merely told Lt. Kelly that the gloves looked familiar, that they looked like a pair that this defendant's girlfriend owned" (Tr.III/546).

On March 31, 1987 Sergeant (Thomas Kennedy), witnessed as the Commonwealth obtained a second blood sample from this defendant (Tr.II/233-34), that was personally hand delivered by ADA Bloom to the FBI Laboratories in Washington, D.C. (Tr.II/308). The first blood sample that this defendant submitted to, that was withdrawn from him at the York Street County Jail on December 10, 1985 as a result of a consent form that this defendant willing signed, was suppose to be used to test against the forensic evidence reportedly retrieved from Ms. Prekop's home on November 30, 1985 by Lt. Kelly (Tr.1,III/171-76), but was instead used to test against semen found on a bedsheet in another case that the Springfield Police Department and District Attorney's Office was

trying to pin on this defendant. Fortunitely for this defendant the forensic evidence in that case was handled by normal and proper procedures and this defendant was "excluded as the donor of the semen found on (Mae Marchand's) bedsheet" (MTD/65; See also Exhibit G, attached hereto).

In his normal practice as ADA, Bloom did not submit blood and hair samples to the FBI Laboratories (MTD/57), but in this defendant's case ADA Bloom chose to drive by car from Springfield Massachusetts, to Washington, D.C. to do just that. According to ADA Bloom, his main reason for going to Washington was to speak with (Mr. Oaks), the Commonwealth's hair expert, an (Mr. Eubanks), the Commonwealth's serologist (MTD/63). So instead of picking up a phone ADA Bloom personally drove hundreds of miles by car. This motion court needs to take a long hard look at the lengths the Springfield Police Department and District Attorney's Office went to make the physical evidence in this case fit this defendant inorder to convict him.

A blood expert testified that there was insufficient blood on the gloves to test for blood type so he tested only for genetic markers (Tr.II/286-87). According to this expert, "the only test possible was an enzyme test showing type PGM 1+ on both of the gloves" (Tr.II/287). The bloodstain on the bedsheet contained "four markers", (PGM 1+, EAP BA, HP 2-1, and TfC), "which were four of a possible thirteen tested for" (Tr.II/292-94,297). According to this expert approximately eight percent of the population would be expected to have this combintaion of four markers (Tr.II/292-94,301). Justice (Murphy) excluded this statistical argument, "the prodcut rule", from this defendant's first trial due to it's

prejudicial effect (Tr.1,IV/3-6).

Ms. Prekop was excluded as the donor from the blood reportedly found on her bedsheet, but the defendant could not be excluded (Tr.II/299-300).

This expert admitted, that if the bloodstain was fresh, it would have been possible to test for all thirteen genetic markers found in blood (Tr.II/308). The Commonwealth reportedly found two half dollar size bloodstains on Ms. Prekop's bedsheet (Tr.II/290-91,309-10).

The Commonwealth's blood expert therefore had more than adequate sample to test according to his own testimony (Tr.II/308). The blood was reportedly fresh according to the Commonwealth, deposited on Ms. Prekop's bedsheet by this defendant. This reportedly fresh blood was deposited, according to the Commonwealth on Ms. Prekop's bedsheet, so there would have been good concentration, all three factors the Commonwealth's expert testified to that would have enabled him to "test for all thirteen genetic markers found in blood" (Tr.II/308-09). The Commonwealth's blood expert however, testified that he was "only able to identify four genetic markers from the blood reportedly found on Ms. Prekop's bedsheet, and the ABO system was inconclusive" (Tr.II/292), which is more consistant with being an old bloodstain rather than a fresh one.

A hair analysis expert testified that only one human hair was recovered from the crime scene that was testable (Tr.II/352). According to this expert, this hair was similiar in microscopic characteristic's as the defendant's hair (Tr.II/353). Ms. Prekop's hair was dissimiliar (Tr.II/353). This hair expert however,

admitted that, unlike fingerprint comparison, hair comparisons do not constitute a basis for identification of a person (Tr.II/ 370-71). The hair reportedly recovered from Ms. Prekop's bed-sheet also reportedly had a natural root, amenable to "DNA testing", which was never tested (Tr.II/358).

The Defendant's Alleged Statement To The Police

During the defendant's post-arrest interrogation, the defendant denied breaking into Ms. Prekop's home, but allegedly eventually admitted to the break-in, consistently denying that he assaulted anyone. See Perrot, 407 Mass. at 541-42. The defendant insistantly denied both the fact of his statement to the police and their validity. Id. at 549, and asserted that the statements were not voluntary.

There was evidence that the defendant ingested drugs and alcohol shortly before his arrest (Tr.III/509,538). The defendant was either not permitted to sleep or was unable to sleep during many, many hours of interrogation (Tr.III/436,466-67,471,472,483, 501,507-09,512). The defendant was interrogated over and over during a period of approximately twelve hours starting at about 5:00 a.m. (Tr.III/393-94,397-98), and this defendant's sister testified that the defendant looked like he was roughed-up, and saw red marks on his face and chest at the police station (Tr. III/541,548-49).

Detective Jarvis testified that during the police interrogation the defendant raised his voice, became very upset with himself, cried, and asked for detective Jarvis's gun so that he could kill himself (Tr.III/486,513). There was no instruction on

consciousness of guilt requested or given, and trial counsel did not object to the absence of this instruction (Tr.IV/630-669).

## Standard Of Review

Because this is the defendant's third motion for a new trial, all claims are waived and the standard of review is for a substantial risk of a miscarriage of justice. Commonwealth V. Curtis, 417 Mass. 619, 626 (1994); Commonwealth V. Mitchell, 428 Mass. 852, 854 (1999). An error creates a substantial risk of a miscarriage of justice unless a reviewing court is persuaded that it did not materially influence the guilty verdict. Commonwealth V. Freeman, 352 Mass. 556, 563-64 (1967). The traditional treatment of the substantial risk issue calls for courts to decide if they have serious doubt about whether the result of the trial might have been different had the error not been made. Commonwealth V. Lefave, 430 Mass. 169, 174 (1999). A court considers the strength of the Commonwealth's case, the nature of the error, if it was significant enough in context to infer that the jury would have decided otherwise, and whether the failure to object was reasonable. Commonwealth V. Alpha, 430 Mass. 8, 13 (1999).

This defendant's motion is inexpertly drawn, but it does set forth allegations that this defendant's conviction resulted from false testimony, knowingly used by the state authorities to secure this defendant's conviction. These allegations sufficiently charge a deprivation of rights guaranteed by the federal Constitution, and if proven, would entitle this defendant relief under the pronouncemnet made in Mooney V. Holohan, 294 U.S. 103, 55 S.Ct. 340 (1935).

CoS RPOD 001442

The defendant prays that this Honorable Court, "in the interest of justice", will review his claims of error based on their merit to determine whether errors were in fact made, and if so, whether such errors alone, or together, created a substantial risk of a miscarriage of justice.

## ARGUMENT

(1) THE DEFENDANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES, THROUGH THE KNOWING, INTENTIONAL USE OF FALSE TESTIMONY, BY THE LEAD INVESTIGATING OFFICER PERTAINING TO THE PHYSICAL EVIDENCE THAT THE COMMONWEALTH SO HEAVILY RELIED ON TO CONVICT THIS DEFENDANT; (2) THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE TRIAL COUNSEL FAILED: (A) TO INVESTIGATE AND DEVELOP TWO FACT WITNESSES THAT COULD HAVE CORROBORATED THE LEAD INVESTIGATING OFFICERS KNOWING INTENTIONAL USE OF FALSE TESTIMONY; (B) TO CHALLENGE THE BLOOD EVIDENCE THAT THE COMMONWEALTH RELIED ON, AND REPRESENTED TO THE JURY AS BELONGING TO THIS DEFENDANT, AFTER APPRAISING MRS. OLIVE EDWARD'S AFFIDAVIT THAT CONTRADICTED THE COMMONWEALTH'S THEORY OF THE SOURCE OF THIS BLOOD EVIDENCE USED TO CONVICT THIS DEFENDANT; (C) TO OBJECT TO HIGHLY PREJUDICIAL HEARSAY EVIDENCE THAT UNFAIRLY CONNECTED THE GLOVES REPORTEDLY FOUND AT THE CRIME SCENE TO THIS DEFENDANT'S SISTER; AND (D) TO REQUEST A NECESSARY CONSCIOUSNESS OF GUILT INSTRUCTION; ALL OF WHICH COMBINED TO CAUSE A SUBSTANTIAL RISK OF A MISCARRIAGE OF JUSTICE BECAUSE: (1) MS. PREKOP VIRTUALLY TESTIFIED THAT THIS DEFENDANT WAS NOT HER ASSAILANT; (2) THERE IS SIGNIFICANT RECORD EVIDENCE THAT LT. KELLY LIED ABOUT HIS INVESTIGATION WITH THE PHYSICAL EVIDENCE USED TO CONVICT THIS DEFENDANT, AND THE DEFENDANT'S SISTERS HEARSAY STATEMENTS ABOUT THE GLOVES; AND (3) THERE IS SUBSTANTIAL EVIDENCE THAT THE DEFENDANT'S CONFESSION WAS INVOLUNTARY.



CoS RPOD 001443

This court "may grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). It normally has discretion to allow or deny a motion for a new trial. Commonwealth V. Jones, 432 Mass. 623, 632 (2000); Commonwealth V. Moore, 408 Mass. 117, 125 (1990). There is no discretion however, to deny the motion if the original proceeding was infected with prejudicial constitutional error. Commonwealth V. Francis, 432 Mass. 353, 372 (2000), writ of habeaus corpus denied, Francis V. Spencer, 2003 U.S. Dist. Ct. LEXIS 11819; Earl V. Commonwealth, 356 Mass. 181, 184 (1969); Prince V. Johnston, 334 U.S. 266, 68 S.Ct. 1049 (U.S. Cal. 1948); Chessman V. Teets, 354 U.S. 156, 77 S.Ct. 1127 (U.S. Cal. 1957).

(1) The defendant was denied due process of law in violation of the Fourteenth Amendment of the Constitution of the United States, through the knowing, intentional use of false testimony by the lead investigating officer pertaining to the physical evidence that the Commonwealth so heavily relied on to convict this defendant.

The core premise governing this defendant's claim is "well settled." Dubose V. Lefevre, 619 F.2d 973 (C.A.2(N.Y.)1980); Coggins V. O'Brian, 188 F.3d 130, 138 (1st Cir. 1951). The deliberate use of false testimony by representatives of the state deprives the defendant of due process, violating the Fourteenth Amendment and requiring a new trial under the pronouncement made in Mooney V. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935).

In Mooney V. Holohan, the supreme court explained that due



CoS RPOD 001444

process is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretence of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Id. at 112, 55 S.Ct. 340.

Although Constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: "If any concept is fundamental to our american system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Quoting from Limone V. Condon, 372 F.3d 39 (C.A.1(Mass. 2004).

Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to the latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury." Perkins V. Lefevre, 691 F.2d 616, 619 (2nd Cir. 1982)(quoting United States V. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); See also, Sanders V. Sullivan, 863 F.2d 218, 225 (2nd Cir. 1988)(the question is whether the jury's verdict "might" be altered). If it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic", United States V. Stofsky, 527 F.2d 237,

CoS RPOD 001445

243 (2nd Cir. 1975)(citing Napue V. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959, cert. denied, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

The police are part of the prosecution. The court in Smith V. Florida, 410 F.2d 1349, 1350-51 (5th Cir. 1969), explained that the police violate the right described in Mooney V. Holohan, if they suborn perjury even though they do so without the prosecutor's knowledge. See also, Limone V. Condon, 372 F.3d 39, 48 (C.A.1(Mass. 2004); Pyle V. State of Kansas, 317 U.S. 213, 63 S.Ct. 177 (U.S. Kan. 1942); Pina V. Henderson, 586 F.Supp. 1452, 1457 (E.D.N.Y. 1984); Napue V. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173 (U.S. Ill. 1959); United States V. Turner, 490 F.Supp. 583, 610 (E.D. Mich. 1979), aff'd, 633 F.2d 219 (6th Cir. 1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed. 2d 336 (1981); United States V. Espinosa-Hernandez, 918 F.2d 911, 914 (11th Cir. 1990); Commonwealth V. Light, 394 Mass. 112, 474 N.E.2d 1074 (Mass. 1985).

Perjury by a government agent can only be a knowing intentional decision to lie by a member of the institution which is charged to uphold the law and seek just convictions. U.S. V. Sanchez, 813 F.Supp. 241, 247 (S.D.N.Y. 1993).

Even if the prosecutor's office is totally ignorant of the investigating officers activities and deceptions, the prosecution still remains responsible for "any and all" of their actions. Giglio V. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972). Investigating officers are nothing less than "an arm of the prosecution." United States V. Morrell, 524 F.2d 550, 555 (2nd Cir. 1975); Smith V. Florida, 410 F.2d 1349, 1351 (5th

Cir. 1969); Barbee V. Warden, 331 F.2d 842, 846 (4th Cir. 1964); Curran V. Delaware, 259 F.2d 707, 713 (3rd Cir. 1959), citing original record in Pyle V. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

Here, as in Miller V. Pate, 386 U.S. 1, 87 S.Ct. 785 (U.S. Ill. 1967), the prosecution's whole theory with respect to the blood, and physical evidence that the Commonwealth so heavily relied on to convict this defendant depended upon Lt. Kelly's misrepresentations. The Commonwealth's theory with respect to the blood and physical evidence, was that Ms. Prekop's assailant discarded one of the gloves reportedly found at the crime scene by Lt. Kelly, onto her bed, and the blood reportedly extracted from Ms. Prekop's bedsheet came from the glove "now reportedly" found on Ms. Prekop's bed, and not the floor as originally reported.

At this defendant's first trial there was "no doubt" in Lt. Kelly's mind whatsoever as to where he reportedly found these gloves. Lt. Kelly unequivocally testified that he reportedly found "both gloves on the floor, near Ms. Prekop's bed." (Tr.1, III/195-96,197, attached hereto as Exhibit E). At this defendant's second trial, Lt. Kelly deliberately changed his testimony pertaining to where he reportedly found these gloves in Ms. Prekop's bedroom. At this defendant's second trial Lt. Kelly now claims to have found "one glove on the floor, and one glove on the bed" (Tr.II/215; Tr.III/447-49), drawing an erroneous inference for the jury to infer that the blood reportedly extracted from Ms. Prekop's bedsheet, came from the blood reportedly extracted from the glove now reportedly found on Ms. Prekop's bed.

Here, as in Jenkins V. Artuz, 294 F.3d 284 (C.A.2(N.Y. 2002),



CoS RPOD 001447

ADA Vottero did nothing to correct Lt. Kelly's false misrepresentation of where he reportedly found these gloves, rather ADA Vottero in summation reinforced Lt. Kelly's deception by capitalizing on it in closing by placing the states credibility behind Lt. Kelly's untruthful testimony.

(Tr.IV/619) ADA Vottero:

> "but wait a minute, where did the blood come from ? There is blood on the gloves too and the blood on the gloves, while they couldn't type it very far it is the same PGM subtype as the blood on the bed. The gloves weren't hers. They weren't. You know, and I would like you to recall this, this is a very small amount of blood. You probably get more blood cutting yourself shaving. How did George Perrot cut himself ? How was he injured ? By the stick, by breaking the lamp, don't know, but we know he bled on the gloves, the gloves are removed and there is blood on the sheet. Whether it came from him or from the gloves what difference does it make how it got on the sheet. It's there and it's not an uncle who has been dead for sometime."

(Tr.IV/625) ADA Vottero:

> "If you're a police officer extracting a confession by complusion you can bet you are going to have the facts of the crime right in the confession. But they don't do that. Tom Jarvis and Tom Kelly, they don't do that. THOSE ARE PROFESSIONAL MEN. They advise him of his rights and they write down what he tells them and they don't add to it to make it better..."

(Tr.IV/626-27) ADA Vottero:

> "The evidence of his guilt is overwhelming, but take a minute and put yourself in the world of George Perrot's innocence. What kind of world is it where George Perrot is innocent ? It's the kind of world where two FBI agents get together and risk their reputations and careers to create evidence to reach conclusions not supported. It's the kind of world where Tom Kelly and Mr. Jarvis get together to create evidence to pin on this poor man. It's the kind of world where for him to be innocent there has to be such a conspiracy you can't believe..."

Standing alone, a prosecutor's comments upon summation can "so infect a trial with unfairness as to make the resulting conviction a denial of due process." Darden V. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(quoting Donnelly V. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); See also Mills V. Scully, 826 F.2d 1192, 1195 (2nd Cir. (1987).

As long ago as Mooney V. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), the court made it clear that the deliberate deception of court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. This was reaffirmed in Pyle V. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In Napue V. Illinois, the court said, the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears. Id. at 79 S.Ct. at 1177.

Here, as in U.S. V. Wallach, 935 F.2d 445 (C.A.2(N.Y. 1991), Lt. Kelly's investigation and testimony was the centerpiece of the Commonwealth's case. Lt. Kelly took an oath to speak the truth, then took the witness stand and made a conscious decision to lie under oath in order to make the physical evidence in this case fit this defendant in order to convict him. The court in Napue V. Illinois, 360 U.S. 264, 79 S.Ct. 1173 (U.S. Ill. 1959), explained that it is of no consequence that the falsehood bore upon the witnesses credibilty rather than directly upon the defendant's guilt. "A lie is a lie, no matter what it's subject, if it is in any way relevant to the case." Here, however, in this defendant's case, Lt. Kelly's lie's bore directly upon the very

physical evidence that the Commonwealth relied on to convict this defendant.

Here, similarly as in Commonwealth V. Knowlton, 50 Mass. App. Ct. 266, 737 N.E.2d 6 (Mass. 2000), Ms. Prekop's own trial testimony compellingly corroborates Lt. Kelly's intentional falsehoods pertaining to the physical evidence that the Commonwealth relied on to convict this defendant. Also here, as in U.S. V. Turner, 490 F.Supp. 583 (E.D. Mich. 1979), Ms. Prekop had nothing to gain by taking the witness stand and testifying falsely. Unlike Lt. Kelly who was an interested party, who has been investigating ongoing unsolved crimes relating to the same victim for over a year. Ms. Prekop's home was broken into on two prior occassions, both of which she was also reportedly sexually assualted.

Ms. Prekop took the witness stand and told the court that she did not give any statement about any gloves, and doesn't know when "they" put that in, because she didn't see the gloves until two or three hours after she got home from the police station, after giving her statement (Tr.I/143-44).

The only inference that can be drawn based on Ms. Prekop's testimony, is that someone within either the police department, or the prosecutor's office added the last paragraph pertaining to these gloves to Ms. Prekop's fresh complaint after she signed it. (The last paragraph pertaining to these gloves does not line up with the rest of Ms. Prekop's typed statement, suggesting a later addition. See Exhibit H, attached hereto).

ADA Vottero told the court and jury in summation that, "Tom Jarvis and Tom Kelly are professional men, and they don't add to

statements to make them better", (Tr.~~IV/625~~), so that leaves only the prosecutor's office.

Ms. Prekop told the court that when she returned home that morning from the police station, herself and her sister swept up the broken bulb from her lamp, and put "clean linen on her bed", and that's when she found the gloves (Tr.I/162-63).

Lt. Kelly took the witness stand and told the court that he spent about an hour at Ms. Prekop's home that morning, and he completed his investigation of Ms. Prekop's home before she returned (Tr.I/188). Lt. Kelly told the court that when he left Ms. Prekop's home that morning, after having completed his investigation, he took with him, "Ms. Prekop's bottom bedsheet, her pillow-case, and these gloves" that he reportedly found (Tr.I/194-96). "Thus, if Lt. Kelly is to be believed, it would have been virtually impossible for Ms. Prekop to have made the observations of this physical evidence that the Commonwealth relied on to convict this defendant that she did."

The fabric of the prosecution's case against this defendant was such that Lt. Kelly's credibility was a decisive factor, and since Lt. Kelly's testimony was quite important to the prosecution's case, and was more than likely not a substantial factor in the jury's decision, they very well might have assessed Lt. Kelly's credibility in a different light had trial counsel developed his intentional falsehoods surrounding the very physical evidence that the Commonwealth so heavily relied on to secure this defendant's conviction.

Lt. Kelly's intentional falsehoods pertaining to the very physical evidence that the prosecution relied on to secure this



CoS RPOD 001451

defendant's conviction corrupted the truth-seeking function of this defendant's trial, and violated this defendant's due process rights. U.S. V. Seijo, 514 F.2d 1357 (C.A.2 N.Y. 1975); Perkins V. Lefevre, 691 F.2d 616 (C.A.2 N.Y. 1982).

This defendant's sisters trial testimony, as well as detective Jarvis's trial testimony, and actions with these gloves, further serves to corroborate Lt. Kelly's intentional falsehoods pertaining to these gloves that were the essential element in the prosecution's case against this defendant.

Lt. Kelly told the court that he took these gloves over to this defendant's sisters residence when he went to conduct the search of this defendant's home, and according to Lt. Kelly, he showed these gloves to this defendant's sister, who reportedly told Lt. Kelly that she has a pair just like them that are missing (Tr.II/405-07).

This defendant's sister took the witness stand and told the court that she told Lt. Kelly that the gloves he showed her did look familiar. She told the court that she told Lt. Kelly that they look like a pair of gloves that this defendant's girlfriend owns, not that they looked like a pair that she was missing and went looking for in a hall closet (Tr.III/544-48).

Lt. Kelly told the court that after conducting his search of this defendant's sisters residence, he returned to the police station where he had further conversation with officers, including detective Jarvis, about questioning this defendant earlier that morning, "and the search of this defendant's home" (Tr.II/407; Tr.II/410-11; Tr.III/453-54; Supp./147).

Detective Jarvis took the witness stand and his testimony

was totally inconsistant. He told the court that he never spoke with Lt. Kelly around ten o'clock when he returned to the station after executing the search of this defendant's home, "he might have". Lt. Kelly never told him about questioning this defendant earlier that morning, or about his search of this defendant's home (Supp./153-54, Jarvis said he approached this defendant as a result of conversation he had with officer's, including Lt. Kelly when he came into work). He doesn't know how he came into possession of the gloves, but he did bring the gloves over to Lisa's house, this defendant's former girlfriends house. He doesn't remember anything about his conversation with Lisa, but he did show her the gloves but they weren't hers (Tr.III/493-99).

An inference may also be compelling. Commonwealth V. Lavigne, 42 Mass. App. Ct. [50 Mass. App. Ct. 270] 313, 317-18, 676 N.E.2d 1170 (1997). The only logical inference that can be drawn based on the chain of events that took place with these gloves, and the aforementioned trial testimony of Lt. Kelly, this defendant's sister, and detective Jarvis, is that this defendant's sister told Lt. Kelly that the gloves he showed her looked familiar, that "they looked like a pair of gloves that this defendant's girlfriend owns", like she testified to. If this defendant's sister chose to be dishonest, she could have very simple just told Lt. Kelly when he showed her these gloves, that she's never seen them before, period. Which in itself should speak for this defendant's sisters truthfulness.

If this defendant's sister in fact told Lt. Kelly that those gloves were hers, or a pair like the ones she's missing, the investigation would have been over. The gloves would have directly



CoS RPOD 001453

linked this defendant to the crime scene, and it can certainly be infered based on the significance of that information, that every member of the Springfield Police Department involved in this investigation would have been aware of this case breaking information, and detective Jarvis would have never took those gloves over to this defendant's former girlfriends house to ask her if they belonged to her.

Under G.L. c. 268, sec. 1, "Perjury in a judicial proceeding occurs whenever one willfully swears or affirms falsely in a matter material to the issue or point in question." Miaskiewicz V. Commonwealth, Mass. Adv. Sh. (1980), 719, 723, 402 N.E.2d 1036, quoting from Commonwealth V. Geromini, 357 Mass. 61, 63, 255 N.E. 2d 737 (1970).

Perjury strikes at the heart of our judicial system and constitutes, in fact, "an obstruction of justice", the perpetration of which well may effect the dearest concerns of the parties before a tribunal. United States V. Norris, 300 U.S. 564, 574, 57 S.Ct. 535, 539, 81 L.Ed. 808 (1937). See Bronston V. United States, 409 U.S. 352, 357, 93 S.Ct. 595, 599, 34 L.Ed.2d 568 (1937). In short, it is elementry that in a system which strives after truth as the predicate for doing justice, nothing is more pernicious than the deliberate introduction of falsehood. Our statute, like it's federal counterpart, was enacted in an effort to keep the course of justice free from the pollution of perjury. Quoting from United States V. Williams, 341 U.S. 58, 68, 71 S.Ct. 595, 600, 95 L.Ed. 747 (1951).

The gloves clearly played a vital roll in the prosecution's case. They were the "essential link in the chain of circumstantial



CoS RPOD 001454

evidence relied on by the Commonwealth in securing this defendant's conviction", and there can also be no doubt here that Lt. Kelly, knowingly and intentionally lied under oath pertaining to his investigation with this physical evidence. This motion court should deem "all the physical evidence handled by Lt. Kelly unreliable and tainted". Lt. Kelly knowingly and intentionally decieved this trial court with his blantant lies pertaining to the very physical evidence relied on by the prosecution in securing this defendant's conviction, depriving this defendant of due process guaranteed to him by the Fourteenth Amendment.

When the reliability of a particular witness may be determinative of innocence or guilt, a new trial is required if the false testimony could in any reasonable likelihood have effected the judgment of the jury. Giglio V. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Napue V. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Dubose V. Lefevre, 619 F.2d 973, 979 (2nd Cir. 1980).

This defendant's motion indicates intentional falsehoods by the lead investigating officer in the case of crucial facts. It asserts that he deliberately lied when he offered the only testimony that established essential elements of the offense's with which this defendant was charged, and his intentional falsehoods were not harmless beyond a reasonable doubt. Chapman V. California, 386 U.S. 18, 87 S.Ct. 824 (U.S. Cal. 1967). Accordingly, this defendant should be granted a new trial.

*****

Ineffective assistance of counsel is properly raised on the rule 30 motion. See Bates V. Commonwealth, 434 Mass. 1019,



CoS RPOD 001455

1020 (2001); Massaro V. U.S., 538 U.S. 500, 123 S.Ct. 1690 (2003). Because collateral review will frequently be the only means through which an accused can effecuate the right to counsel, restricting the litigation of some sixth amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation. A layman will ordinarily be unable to recognize counsel's errors and evaluate counsel's professional performance. Powell V. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

The Sixth Amendment to the United States Constitution guarantees the defendant's fundamental right to effective assistance of counsel. U.S. Const. Amend. VI; Evitts V. Lucey, 469 U.S. 387, 395-96, 105 S.Ct. 830, 835-36, 83 L.Ed.2d 821 (1985); United States V. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984); Strickland V. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Commonwealth V. Egardo, 426 Mass. 48 (1997). The Fourteenth Amendment makes this right applicable to state prosecutions. Gidion V. Wainwright, 372 U.S. 335, 339-40 (1963); Commonwealth V. Sanders, 435 Mass. 691, 694 n.4 (2002).

Article twelve of the Massachusetts Declaration of Rights also guarantees the right to competent counsel. Mass. Const., pt. 1, art. 12. Article 12 provides broader protections than does the Sixth Amendment. Commonwealth V. Richard, 398 Mass. 392, 393 (1986). Both state and federal law require a showing of substandard performance and prejudice. Commonwealth V. Saferian, 366 Mass. 89, 96 (1974); Strickland V. Washington, 466 U.S. 668, 692 (1984).



CoS RPOD 001456

Where the state standard is met, the federal standard is also satisfied. Commonwealth V. Cardenuto, 406 Mass. 450, 454, nt. 8 (1990). The federal standard is whether "... counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the deficient performance". Quoting from Strickland V. Washington, supra, at 688. See also Mayo V. Henderson, 13 F.3d 528, 533 (2nd Cir. 1994).

(2-A) The defendant was denied effective assistance of trial counsel because trial counsel failed to investigate, and develop two fact witnesses that could have corroborated the lead investigating officers knowing, intentional use of false testimony.

Here, as in Pavel V. Hollins, 261 F.3d 210 (C.A.2 N.Y. 2001), trial counsel failed to investigate and develop "two fact witnesses" who's testimony would have been of great value to this defendant's defense. Their testimony would have served to support Ms. Prekop's observations of the relied upon physical evidence still being in her home when she returned home from the police station after giving her statement, and further corroborated the lead investigating officers knowing, intentional falsehoods pertaining to said physical evidence.

After this defendant's first conviction was over-turned by the SJC in June of 1990, and this defendant was re-appointed counsel for re-trial, this defendant, as did this defendant's mother, (See Exhibit I, attached hereto), provided re-appointed trial counsel with an affidavit dated December 9, 1989 (attached hereto as Exhibit A), that contradicted the prosecution's theory



CoS RPOD 001457

with respect to the source of the "blood evidence" relied on by the prosecution in securing this defendant's conviction.

Within the body of the affidavit that attorney Ferrara was provided, it also states that "Ms. Prekop's sister" was with her when she made up her bed on the morning of this incident. Ms. Prekop also told the court at this defendant's first trial that her "brother-inlaw" was at her home on the morning of this incident when she returned home from the police station (Tr.1,II/225-226, attached hereto as Exhibit J), however, apparently attorney Ferrara did not even bother to read this defendant's first trial transcripts.

In Strickland, the supreme court noted that information supplied by the defendant is a prime source of factual bedrock upon which counsel must rely in making strategic choices. Id. at 691, 104 S.Ct. at 2066. Here, as in Montgomery V. Petersen, 846 F.2d 407 (C.A.7 Ill. 1988), this defendant pointed out and explained to trial counsel why "Mrs. Edward's affidavit" might be important to his defense, and there were no obstacles for counsel in locating Ms. Prekop. Thus this is not a case where counsel's failure to locate a particular witness may be excused. See United States ex rel. Kleba V. McGinnis, 796 F.2d 947, 957-58 (7th Cir. 1986); Denton V. Ricketts, 791 F.2d 824, 827 (10th Cir. 1986); Jones V. Smith, 772 F.2d 668, 674 (11th Cir. 1985), cert. denied, 474 U.S. 1073, 106 S.Ct. 838, 88 L.Ed.2d (1986).

Here, as in Hart V. Gomez, 174 F.3d 1067, 1071 (9th Cir. 1999), counsel pursued a particular line of defense, then failed to introduce readily-available evidence that would have supported that line of defense.



CoS RPOD 001458

Part of this defendant's defense was that the police fabricated the forensic evidence to secure his conviction, and this defendant's counsel never even attempted to contact Ms. Prekop to inquire about the basis of Mrs. Edward's affidavit.

An attorney's investigation is not reasonable within the meaning of Strickland, when facts of a case supply him with notice that a particular line of pre-trial investigation may substantially benefit his client, and he does not pursue it. See generally Holladay V. Haley, 209 F.3d 1243, 1251-52 (11th Cir. 2000).

It is uncontested beased on Ms. Prekop's own trial testimony at this defendant's second trial, had trial counsel conducted an investigation into the basis of Mrs. Edward's affidavit, and interviewed Ms. Prekop, trial counsel would have untapped a wide range of leads that no other source had opened up supporting this defendant's defense. The accumulated leads that defense counsel would have aquired well prior to the outset of this defendant's re-trial, and been able to develop would have destroyed Lt. Kelly's credibility and the prosecution's relied upon physical evidence by showing that Lt. Kelly knowingly, and intentionally lied pertaining to his investigation with this evidence. Moreover, with the information that trial counsel would have aquired, he would not have foregone conducting the independent analysis this defendant asked counsel to conduct on the relied upon forensic evidence.

Trial counsel would have also been in a possition to revise this defendant's previously filed "motion to dismiss" argued before this motion court by attorney (Rideout), and put before this motion court all Lt. Kelly's falsehoods pertaining to the

very physical evidence that the prosecution was to rely on in securing this defendant's conviction.

At this defendant's second trial Ms. Prekop took the witness stand and told the court that "she didn't give any statement about any gloves, and doesn't know when THEY put that in because she didn't see the gloves until two or three hours later when she returned home from the police station" (Tr.I/144). Three things that this motion court should hold significant from that testimony by Ms. Prekop, other than the obvious, that someone within the prosecutorial team altered Ms. Prekop's statement pertaining to the reference about these gloves after she signed it:

(1) When Ms. Prekop took the witness stand at this defendant's first trial, ADA "Bloom" only asked Ms. Prekop to review one portion from page one of her two page statement (Tr.1,II/210-11, attached hereto as Exhibit J).

(2) Within the body of Mrs. Edward's affidavit that attorney Ferrara was provided, it states that Ms. Prekop told ADA "Bloom" that "if he brought up the blood in court she would tell the court how it is". ADA Bloom, nor this defendant's first appointed trial counsel ever asked Ms. Prekop one single question pertaining to the blood reportedly extracted from her bedsheet, or these gloves reportedly found in Ms. Prekop's bedroom by Lt. Kelly during either of their entire cross-examination of Ms. Prekop at this defendant's first trial, something attorney Ferrara should have thought odd after appraising Mrs. Edward's affidavit.

(3) It can be infered based on Ms. Prekop's trial testimony at this defendant's second trial, that Ms. Prekop has not seen, or read her statement that she gave pertaining to this in-

cident in full since the morning that she gave it, and when asked by ADA "Vottero" at this defendant's second trial to "review her statement in full", seven years later, immediately upon seeing the reference pertaining to these gloves, she told the court that she didn't give any statement about any gloves (Tr.I/144).

Ms. Prekop told the court when she returned home from the police station, herself and her "sister" swept up the broken bulb in her room, and made up the bed with "clean linen", and that's when she saw the gloves at the foot of her bed (Tr.I/162-63).

Lt. Kelly told the court that "he completed his investigation of Ms. Prekop's home on the morning of this incident before Ms. Prekop returned home from the hospital, and when he left Ms. Prekop's home that morning, after having completed his investigation, he took these gloves, Ms. Prekop's bottom bedsheet, and pillow-case with him when he left" (Tr.I/188,195-96).

Here, as in Montgomery V. Petersen, 846 F.2d 407 (C.A. Ill. 1988), this defendant's entire defense rested on discrediting Lt. Kelly's version of events with the physical evidence that the prosecution so heavily relied on to convict this defendant at his first trial.

Based on Ms. Prekop's trial testimony at this defendant's second trial, and Mrs. Edward's affidavit, it can be infered that Ms. Prekop's "sister" also made the same observations that Ms. Prekop made pertaining to these gloves, and Ms. Prekop's bottom bedsheet still being in Ms. Prekop's bedroom, after Lt. Kelly already reportedly completed his investigation, and already reportedly allegedly removed these articles of evidence from Ms. Prekop's home. It can also be infered based on Ms. Prekop's trial



CoS RPOD 001461

testimony at this defendant's first trial that Ms. Prekop's "brother-inlaw" was also privy to these same observations (Tr.1, II/210-11, attached hereto as Exhibit J).

The court in Strickland, holds that "an error made by counsel, even if professionally unreasonable, does not warrant setting aside the judgement in a criminal proceeding if the error had no effect on the judgement". Id. 466 U.S. at 691, 104 S.Ct. at 2066. In the present case, similarly to Harris V. Reed, 894 F.2d 871 (C.A.7 Ill. 1990), the defendant has met that burden. If the jury was willing to credit the potential testimony of Ms. Prekop's "sister and brother-inlaw" pertaining to the physical evidence used to secure this defendant's conviction, still being in Ms. Prekop's home when she returned from the police station hours after Lt. Kelly reportedly already completed his investigation and removed these articles of evidence, their testimony would have served to support Ms. Prekop's version of events, and further corroborated Lt. Kelly's intentional falsehoods pertaining to this physical evidence that the prosecution relied on to secure this defendant's conviction, and there can be little doubt that the jury would not have credited testimony from the victims own family members.

By trial counsel resting without presenting any evidence in favor of the defence, counsel left the jury free to only beieve the prosecution's account of the incident. Nealy V. Cabana, 764 F.2d 1173 (C.A.5 Miss. 1985); United States V. Debango, 780 F.2d 81, 85 (D.C. Cir. 1986); Chambers V. Armontrout, 907 F.2d 825, 830-31 (8th Cir.), cert denied 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990). Trial Counsel should have also con-



CoS RPOD 001462

cluded that if he did not do something differently than this defendant's first appointed trial counsel, the results of the proceedings would altimately be the same.

Also here, as in Commonwealth V. Hill, 432 Mass. 704, 739 N.E.2d 670 (Mass. 2000), this defendant's counsel's failure to call Ms. Prekop's "sister and brother-inlaw" deprived this defendant of two impartial witnesses who had no motive to lie, and would have thoroughly contradicted the prosecution's main witnesses testimony pertaining to the very physical evidence the prosecution used to convict this defendant. In order for Lt. Kelly's version of events with this physical evidence to be factual, "Ms. Prekop's observations of this physical evidence would have been impossible". See Commonwealth V. Haggerty, 400 Mass. 437, 442-43, 509 N.E.2d 1163 (1987). Evidence that contradicts the Commonwealth's entire theory of the case could have raised a reasonable doubt in the juror's minds, thus, this defendant was deprived of "an otherwise available substantial ground of defense". Commonwealth V. Saferian, 366 Mass. 89, 96, 315 N.E.2d 878 (1974). "Better work might have accomplished something material for the defense". Commonwealth V. Satterfield, 373 Mass. 109, 115, 364 N.E.2d 1260 (1977).

Even after this defendant's trial counsel heard Ms. Prekop's testimony at this defendant's second trial, counsel still didn't even try to develop the discrepancies for the jury that suppoted this defendant's defense. Here, as in Commonwealth V. Farley, 432 Mass. 153, 732 N.E.2d 893 (Mass. 2000), trial counsel put forth a defense and then failed to develop this defense through evidence, cross examination, or in summation. He thereby effectively left

this defendant "denude of a defense". Commonwealth V. Street, 388 Mass. 281, 287, 446 N.E.2d 670 (1983). See Commonwealth V. Westmoreland, 388 Mass. 269, 274, 446 N.E.2d 663 (1983). Lt. Kelly's intentional faslehoods infected the trial proceedings and interferred with the jury's ability to weigh his testimony, and trial counsel did nothing to develop Lt. Kelly's falsehoods.

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. Strickland, 466 U.S. at 692, 104 S.Ct. 2052. The court in Strickland, made clear that to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694, 104 S.Ct. 2052.

The evidence counsel failed to discover and develop in the present case is overwhelmingly powerful. Counsel's lack of familiarity with this defendant's case, combined with his failure to investigate, provided this defendant with a trial significantly different than the trial this defendant might have recieved if represented by a competent counsel.

Had Lt. Kelly's intentional falsehoods pertaining to the very physical evidence relied on by the prosection to secure this defendant's conviction been developed for the jury, there exists, in short, a reasonable probability that they would not have believed Lt. Kelly's version of events, and returned a different verdict.

The prosecution's entire case was centered around Lt.



CoS RPOD 001464

Kelly's intentional falsehoods pertaining to the prosecution's relied upon physical evidence. Without it the prosecution's case rested entirely on an alleged admission by this defendant to breaking into Ms. Prekop's home. Lt. Kelly's intentional falsehoods would have also served to support this defendant's challenge of the voluntariness of his alleged admission.

(2-B) The defendant was denied effective assistance of trial counsel because trial counsel failed to challenge the blood evidence that the Commonwealth relied on and represented to the jury as belonging to this defendant, after appraising Mrs. Edward's affidavit that contradicted the Commonwealth's theory of the source of the blood evidence used to convict this defendant.

Trial counsel failed to determine whether the findings of the Commonwealth's blood expert were accurate, and whether other available test might have excluded this defendant. "The blood evidence was directly relevant to whether this defendant was in the victims home." Commonwealth V. Baker, 440 Mass. 519, 520 (2003); Commonwealth V. Haggerty, 400 Mass. 437, 440-41 (1987).

The Commonwealth's blood expert testified that he was able to extract four (4) genetic markers from one (1) bloodstain found on Ms. Prekop's bedsheet (Tr.II/244-47), however, he was unable to obtain any blood grouping from a second bloodstain found on the bedsheet, but it was human blood (Tr.II/247-48). The Commonwealth's blood expert also reportedly found human blood on the gloves that he tested, however, he was only able to obtain one (1) single genetic marker from the blood reportedly found on

CoS RPOD 001465

one of the gloves (Tr.II/248). The "ABO System" from the blood reportedly extracted from Ms. Prekop's bedsheet and these gloves was inconclusive (Tr.II/284-87,290-92). This experts testimony was virtually verbatim to his testimony at this defendant's first trial.

Here, as in Commonwealth V. Conley, 43 Mass. App. Ct. 385, 389 (1997), this defendant made it clear to his re-appointed trial counsel that he wanted an independent analysis conducted on the blood evidence that the prosecution relied on to convict this defendant at his first trial. This defendant, as did this defendant's mother (See Exhibit I, attached hereto), provided attorney Ferrara with the affidavit written by Mrs. Olive Edward's (See Exhibit A, attached hereto), that contradicts the prosecution's theory with respect to the source of this blood evidence that was relied on to convict this defendant at his first trial.

Attorney Ferrara moved for funds per this defendant's request to conduct independent analysis on the blood evidence that the Commonwealth was relying on, that was approved by (Welch, J.) on November 5, 1991 (See defendant's Docket Entries). However, attorney Ferrara never had the blood evidence independently analized. Instead of having the blood evidence independently tested, attorney Ferrara relied on cross-examination (Tr.II/302-22,330-33), and left this defendant under an incorrect assumption that counsel conducted independent analysis on the relied upon blood evidence and it was unhelpful.

Until counsel commenced such an investigation, he simply had no way of making that tactical judgment. Strickland V. Washington, Supra, at 690-691. ("strategic choices made after

less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation").

Here, as in United States V. Tucker, 716 F.2d 576, 581 (9th Cir. 1983), there is no indication in this defendant's record that attorney Ferrara possessed the education or experience necessary to assess genetic markers found in human blood, or to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand. The reading of a couple published articles on human blood did not make attorney Ferrara an expert, or qualified. See Dugas V. Coplan, 428 F.3d 317 (C.A.1 N.H. 2005). In essence attorney Ferrara "abandoned his investigation after having acquired only rudimentary knowledge of the issue from a narrow set of sources."). Wiggins V. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

Trial counsel is under a duty imposed by both state, Commonwealth V. Saferian, 366 Mass. 89, 96 (1974); and federal, Strickland V. Washington, 466 U.S. 668, 690 (1984), constitutional law to conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence on which the Commonwealth intends to rely on to prove the defendant's guilt. Commonwealth V. Alvarez, 433 Mass. 93, 103-04 (2000); Commonwealth V. Farley, 432 Mass. 153, 156-57 (2000); Commonwealth V. Roberio, 428 Mass. 278, 281 (1998), S.C. ante 245 (2003); Commonwealth V. Haggerty, 400 Mass. 437, 441-42 (1987); United States V. Baynes, 687 F.2d 659, 669 (3rd Cir. 1982).

All the more so when the "client insists that the test would help establish his innocence." Jones V. Wood, 114 F.3d 1002, 1011 (9th Cir. 1997). Trial counsel should have been aware that the prosecution relied heavily on this blood evidence at this defendant's first trial, and counsel failed to investigate a critical source of potentially exculpatory evidence. A lawyer owes his client "a duty to make a reasonable investigation, or to make a reasonable decision that makes a particular investigation unnecessary, and failure to investigate can certainly constitute ineffective assistance." Washington V. Smith, 219 F.3d 620, 631 (7th Cir. 2000), quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052.

This is not a case where "arguably reasoned tactical or strategic judgments are called into question." Commonwealth V. Rondeau, 378 Mass. 408, 413 (1979). Rather this is a case where defense counsel did not investigate the only realistic defense that this defendant had. The defense was that the police fabricated the forensic evidence, and altered police reports and statements given by both the defendant and the victim, yet counsel never tested the blood reportedly found on the victims bedsheet, even after counsel was provided with Mrs. Edward's affidavit that contradicted the prosecution's theory with respect to the source of this relied upon blood evidence. In that respect, this defendant's case is similar to those cases where at trial defense counsel abandons a defendant and leaves the defendant without any defense at all. Commonwealth V. Westmoreland, 388 Mass. 269 (1983); Commonwealth V. Street, 388 Mass. 281 (1983).

Failure to investigate the only defense a defendant has,

if facts known to, or with minimal diligence accessible to counsel support that defense, falls beneath the level of compotency expected. Osborne V. Commonwealth, 378 Mass. 104, 111 (1979); Commonwealth V. Cepulonis, 9 Mass. App. Ct. 302, 305 (1980). The blood evidence was presented to the jury unrebutted, for this reason, it was manifestly unreasonable strategy for trial counsel to rely merely on cross-examination, more so after appraising Mrs. Edward's affidavit that contradicted the prosecution's theory with respect to the source of this relied upon blood evidence.

Here, similarly as in Driscoll V. Delo, 71 F.3d 701 (C.A.8 Mo. 1995), this defendant was faced with having his life sentence re-instated if re-convicted, and the blood evidence unquestionably played a vital roll in the prosecution's first conviction against this defendant. Trial counsel should have appraised Mrs. Edward's affidavit contradicting the prosecution's theory of the source of this blood evidence an issue of utmost importance and conducted an independent analysis on the relied upon forensic evidence.

Defense counsel's failure to prepare for the re-introduction of the relied upon serology evidence, to subject the states theories to the rigors of adversarial testing, and to prevent the jury from retiring with the false impression that the blood reportedly extracted from Ms. Prekop's bedsheet came from these gloves that the prosecution alleged this defendant wore into Ms. Prekop's home fell short of reasonableness under the prevailing professional norms.

In light of the potential that this evidence had of

diminishing the prosecution's relied upon forensic evidence it was not reasonable for counsel to fail to investigate it, and develop it. Williams V. Washington, 59 F.3d 673 (C.A.7 Ill. 1995).

In the unlikely event that testing is no longer feasible, by reason of contaimination, or otherwise through no fault of the defendant, a new trial should be granted and the defendant permitted to describe to the jury the circumstances of his request for testing and have the jury instructed that despite this defendant's request such testing did not occur. Commonwealth V. Olszewski, 416 Mass. 707, 716-17 (1993), cert denied, 513 U.S. 835 (1994); Conley, 43 Mass. App. Ct. at 396, quoting Jones V. Wood, 114 F.3d 1002 (9th Cir. 1997).

The Commonwealth's blood expert testified that he found "two half dollar size bloodstains" on Ms. Prekop's bedsheet (Tr. II/290-91). This expert also testified that "he could extract all thirteen genetic markers found in blood from a bloodstain approximately half dollar in size if the blood were fresh" (Tr.II/308-09). Here however, he was only able to extract "four (4) genetic markers out of a possible thirteen (13)" from either of the two half dollar size bloodstains reportedly found on Ms. Prekop's bedsheet (Tr.II/244-47,276,321), and the "ABO System" was also inconclusive (Tr.II/290-92), which supports Ms. Prekop's testimony that the bloodstain on her bedsheet was an old bloodstain deposited there by her sick uncle years earlier (Tr.I/163-64, 166-67, 168-70).

The prosecution's theory of this blood evidence was that the blood that was reportedly extracted from Ms. Prekop's bedsheet, came from the blood reportedly extracted from the glove

reportedly found on Ms. Prekop's bed by Lt. Kelly. The Prosecution's blood expert, however, was only able to "extract one (1) single genetic marker from one of these gloves that he tested" (Tr.II/247-48).

Ms. Prekop testified that she found these gloves on the floor at the foot of her bed (Tr.I/162-63). She also told the court that there was "no blood on her rug where these gloves were actually found" (Tr.I/168-69), nor does the prosecution allege that there was "any other blood found anywhere else in Ms. Prekop's home."

Lt. Kelly's testimony with respect to these gloves is unreliable. At this defendant's first trial Lt. Kelly unequivocally testified that he "found both gloves on the floor near Ms. Prekop's bed" (Tr.1,III/195-96,197, attached hereto as Exhibit E), at this defendant's second trial, Lt. Kelly now claims to have found one glove on the floor, and one glove on the bed (Tr. I/215).

It can be infered, however, based on the Commonwealth's blood experts testimony, with relation to the size of these two bloodstains that he reportedly found on Ms. Prekop's bedsheet, "had the source of either of these bloodstains generated from the glove that Lt. Kelly now claims to have found on Ms. Prekop's bed, there can be little doubt that Lt. Kelly, being the seasoned veteran that he was would have certainly spotted this half dollar size bloodstain when he lifted the glove up off the bed."

Ms. Prekop also told the court that this bloodstain on her bedsheet was still visible at the time this assault took place (Tr.I/164, 166-67, 169).



CoS RPOD 001471

However, Lt. Kelly testified that he removed and secured Ms. Prekop's bottom bedsheet because it appeared to be soiled, and have some fibers on it (Tr.I/195). "Not one mention of an appearance of a bloodstain like he alleges he observed on the base of the finger on one of the gloves he reportedly found" (Tr.I/196).

According to Ms. Prekop, herself and her sister put "clean linen" on her bed when she returned home from the police station (Tr.I/162-63). Because this defendant's counsel never conducted an investigation, or inquired during trial, there is no way to determine when the police actually removed this bedsheet from Ms. Prekop's home, or what Ms. Prekop did with this bedsheet after she put clean linen on her bed, did she wash it ?

What this motion court can determine, however, even from a cold-record, is that Lt. Kelly knowingly, and intentionally lied under oath on the witness stand pertaining to his investigation with this physical evidence.

Lt. Kelly told this motion court that he completed his investigation of Ms. Prekop's home, prior to her returning home from the hospital, and took that bedsheet with him when he left Ms. Prekop's home that morning (Tr.I/188, 194-95). Lt. Kelly even told this motion court how he "folded this bedsheet from the corners in" when he recovered it (Tr.I/194). What Lt. Kelly certainly did, is he took an oath to speak the truth, then he took that witness stand and made a conscious decision to lie in order to make the physical evidence in this case fit this defendant.

Mrs. Edward's affidavit that attorney Ferrara was provided, outlined Ms. Prekop's trial testimony at this defendant's

CoS RPOD 001472

second trial pertaining to the source of this blood evidence three years before she testified. Yet attorney Ferrara, even after hearing Ms. Prekop's live testimony, still never had the blood tested, or even tried to find out what Ms. Prekop's uncles blood type was to determine if his blood exhibited any of these same four (4) genetic markers that the prosecution's blood expert reportedly extracted from Ms. Prekop's bedsheet, or if Ms. Prekop's uncles blood exhibited the one (1) single genetic marker that the prosecution's blood expert reportedly extracted from one of the gloves.

This is not a case where counsel made a reasonable decision to cease further investigation as a result of having "discovered evidence to suggest that challenging the prosecution's physical or scientific evidence would have been counterproductive, or that further investigation would have been fruitless." Wiggins V. Smith, 539 U.S. 510, 525, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Nor is this a case of diligent counsel drawing a line when they have good reason to think further investigation would be a waste. Rompilla V. Beard, 545 U.S. 374, 125 S.Ct. 2456, 2463, 162 L.Ed. 2d 360 (2005).

Rather, counsel here never discovered any evidence to suggest one way or another whether such challenges would be counter productive, or such investigation fruitless, nor did counsel have any reasonable basis to conclude that such investigation would be wasteful. Trial counsel here simply did not conduct an independent investigation into the facts surrounding this defendant's case. See also State V. Hicks, 195 Wis. 2d 620, 536 N.W.2d 487, 492 (1995) (noting that "Hicks" trial counsel understood



CoS RPOD 001473

that the hair samples were going to be a major issue in the case, but he provided no reasoned basis for failing to pursue a testing process that he knew had the potential to provide exculpatory evidence on this major issue); Driscoll V. Delo, 71 F.3d 701, 709 (8th Cir. 1995) (finding that "defense counsel's failures to prepare for the introduction of the states scientific evidence, and subject the states theories to the rigors of adversarial testing involving an issue of utmost importance in the states case constituted ineffective assistance); Sims V. Livesay, 970 F.3d 1575, 1580-81 (6th Cir. 1992) (finding that defense counsel "did not make a reasonable decision that further investigation of the physical evidence was unnecessary," and noting that he did not make an independent investigation, and failed to ask a defense expert to examine the evidence), as was the case in this defendant's case.

Here, as in Commonwealth V. Licata, 412 Mass. 654, 591 N.E.2d 672 (Mass. 1992), this defendant has raised serious issues as to the adequacy of his appointed trial counsel's interest in preparing and conducting his defense. In the interest of justice on the defendant's substantial showing on an issue of constitutional importance (the effective assistance of counsel) be heard. See Commonwealth V. Meggs, 30 Mass. App. Ct. 111, 114, 565 N.E.2d 1249 (1991) (substantial issue raised by motion and affidavits requires evidentiary hearing). Schneider V. Estelle, 552 F.2d 593 (C.A.5 Tex. 1977).

(2-C) The defendant was denied effective assistance of trial counsel because trial counsel failed to object to highly prejudicial hearsay evidence that unfairly connected the gloves reportedly found at the

crime scene to this defendant's sister.

Lt. Kelly testified that he brought these gloves to this defendant's residence where the defendant's sister (Nancy Westcott) told him that she had a similar pair that were missing (Tr.II/406-07). Trial counsel did not object to this highly prejudicial hearsay testimony through which Lt. Kelly attempted to connect this defendant with these gloves. Moreover, this defendant's sister testified, by contrast, that she merely told Lt. Kelly that the gloves looked familiar, like a pair that this defendant's girlfriend owns (Tr.III/546). According to this defendant's sister, she told Lt. Kelly that the gloves did not belong to her (Tr.III/546). The defendant's alleged confession that he wore his sisters gloves to the crime scene, and this defendant's sisters alleged admission that the gloves reportedly collected from the crime scene belonged to her, "came from Lt. Kelly".

Lt. Kelly's testimony that the defendant's sister told him that the gloves were hers was an out-of-court statement offered for it's truth, inadmissible hearsay evidence. Commonwealth V. Delvalle, 351 Mass. 489, 491 (1966); Commonwealth V. Keizer, 377 Mass. 264, 269 n.4 (1979) (definition of hearsay). Trial counsel did not object to this testimony, thereby permitting the prosecution to put on the appearance that this defendant's sister corroborated Lt. Kelly's claim that the defendant confessed to wearing his sisters gloves. This defendant's sister denied this herself, but because she's the defendant's sister it is likely that the jury found her denial less credible than Lt. Kelly's assertions. See Curran V. State Of Delaware, 259 F.3d 707 (C.A.3 Del.

1958) (noting that testimony of police officers is usually given credence by members of the jury).

ADA Vottero also took full advantage of this in his summation (Tr.IV/628-29), stating that "no-one can fault the fact that no matter how you behave, your family will always be your family and believe you no matter what." This clearly insinuated that this defendant's sister was lying because she's family. This was yet another prejudicial argument no objected to by trial counsel. See Commonwealth V. Shelly, 374 Mass. 466, 468-70 (1979).

If Trial counsel had prevented Lt. Kelly from testifying that the defendant's sister told him that the gloves belonged to her, there would have been a fare greater likelihood that the jury would not have believed Lt. Kelly. See Darden V. Wainwright, 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (9186) (where the court held that a "decision not to object to the prosecutor's trial efforts may be considered sound trial strategy.") However, the decision in no way condones a lawyer's failure to object to plain misconduct as legitimate trial strategy. Here, trial counsel's failure to object fell below an objective standard of reasonableness and constituted omission outside the wide range of professional competent assistance. Also here, as in Washington V. Holbauer, 228 F.3d 689, 707 (6th Cir. 2000), trial counsel's failures to object were based on simple incompetence and not sound trial strategy. This error by trial counsel combined with his other errors caused a substantial risk of a miscarriage of justice.

(2-D) The defendant was denied effective assistance of trial counsel because trial counsel failed to re-



CoS RPOD 001476

quest a necessary consciousness of guilt instruction.

Detective Jarvis testified that during the police interview, the defendant raised his voice, became very upset with himself, cried, and asked for detective Jarvis's gun so that he could kill himself (Tr.III/486,513). There was no instruction on consciousness of guilt requested or given, and trial counsel did not object to the absence of this instruction (Tr.IV/630-69).

Crying, becoming upset, and expressing the desire to shoot oneself was plainly "consciousness of guilt" evidence. See generally Commonwealth V. Carrion, 407 Mass. 263, 276-77 (1980), and cases cited for circumstances justifying a "consciousness of guilt" instruction, which includes a recitation that even an innocent person may do things "like express the desire to shoot oneself" for a variety of innocent reasons. See Commonwealth V. Perez, 444 Mass. 143, 147-48 (2005) (where the judge gave comprehensive instructions on consciousness of guilt evidence, reminding the jury that "there may be numerous reasons why an innocent person might do things to suggest guilt").

Trial counsel's failure to request such an instruction left it open for the jury to conclude that the defendant must be guilty of rape if he wanted to shoot himself. The defendant was entitled to an instruction that would cause the jury to view this testimony with more even fairness. The defendant was entitled to have the trial court explain that even an innocent person may have motive to make such a statement. Trial counsel's failure to ensure that the jury instructions included a "consciousness of guilt" instruction further prejudiced this defendant and made it



CoS RPOD 001477

more likely that he would be wrongfully convicted.

The above errors and omissions by trial counsel caused a substantial risk of a miscarriage of justice because (1) Ms. Prekop virtually testified that this defendant was not her assailant; (2) There is significant record evidence that Lt. Kelly intentionally lied about his investigation with the physical evidence used to convict this defendant, and the defendant's sisters hearsay statements about the gloves; and (3) there was substantial evidence that the defendant's confession was involuntary.

1. Ms. Prekop was fairly clear that this defendant was not her assailant.

Ms. Prekop described her assailant as average in height and weight, "clean shaven" (Tr.I/141), with black wavy hair (Tr. I/146), wearing a blue jacket that looked like nylon, dark pants that were neither jeans nor corduroy material, and sneakers that were white (Tr.I/153-56,172). One week after this assault Ms. Prekop could not identify her assailant from a line-up, which included this defendant (Tr.I/147; Tr.II/230-31,396). She insisted that the person who assaulted her was not in the line-up (Tr.I/161). By inference and by uncontroverted direct evidence, this defendant had facial hair at the time an assailant broke into Ms. Prekop's home and was not "clean shaven" as she insisted (Tr.I/141,154,158,161; Tr.III/540). Moreover, Ms. Prekop could not identify a photograph of this defendant as her assailant at trial and testified that her assailant did not have a "beard or mustache" (Tr.I/158). Ms. Prekop also could not identify this defen-

dant at trial (Tr.I/160).

2. Lt. Kelly's accounts of his investigation with the physical evidence and his efforts to connect this defendant to these gloves is suspect.

There is significant record evidence that the lead investigating officer, Lt. Kelly, lied at trial. According to Lt. Kelly "he collected a bedsheet, a pillow-case, and a pair of ladies knit gloves from the crime scene before Ms. prekop returned home from the hospital (Tr.I/188; Tr.II/228). By contrast, Ms. Prekop indicates that "she found these gloves herself after returning home from the police station with her sister" (Tr.I/144,162-63). "In order for Lt. Kelly not to have intentionally lied under oath on the witness stand pertaining to these articles of evidence that were instrumental in the prosecution's conviction of this defendant, Ms. Prekop's observations of these articles of evidence would have been impossible".

Additionally, in Ms. Prekop's statement to the police, there was information that Ms. Prekop told the police about these gloves. Ms. Prekop, who has absolutely no reason to lie denied saying this, and told the court that the police must have added that to her statement after she signed it because she didn't see the gloves until two or three hours later when she returned home from the police station (Tr.I/144). The last paragraph of Ms. Prekop's statement (fresh complaint), that includes this information about these gloves does not line up with the rest of the typed statement (See Exhibit H, attached hereto), suggesting a later addition.

CoS RPOD 001479

Lt. Kelly further testified that he spoke with this defendant's sister pertaining to these gloves, and she indicated to him that the gloves were hers (Tr.II/405-07). This was also an intentional lie by Lt. Kelly. This defendant's sister testified that she merely told Lt. Kelly that the gloves he showed her looked familiar, that they looked like a pair of gloves that this defendant's girlfriend owns (Tr.III/545-46).

Trial counsel should have also interviewed this defendant's former girlfriend, and put her on the witness stand pertaining to her conversation with detective Jarvis in regards to the gloves. Detective Jarvis took those gloves over to this defendant's former girlfriends house after Lt. Kelly returned to the police station from executing his search of this defendant's home and reported his alleged conversation with this defendant's sister pertaining to these gloves (Tr.II/405-07; Tr.III/452-54, 493-99; Supp./147), which serves to corroborate this defendant's sisters trial testimony that she merely told Lt. Kelly that the gloves he showed her looked familar, like a pair that this defendant's girlfriend owns (Tr.III/545-46).

If this defendant's sister in fact told Lt. Kelly that those gloves were hers, the investigation would have been over. The gloves would have been a direct link between this defendant and the crime scene, and it can be infered based on the significance of that alleged information, every officer involved in this investigation would have been privy to that information, and detective Jarvis would have never taken those gloves over to this defendant's former girlfriends house to ask her if those gloves belonged to her.

CoS RPOD 001480

Outside of Lt. Kelly, detective Jarvis was the number two investigator prominently involved in this investigation. In order for this motion court not to infer that detective Jarvis would have been privy to this alleged case-breaking conversation between Lt. Kelly and this defendant's sister pertaining to the biggest piece of evidence in this defendant's case (these gloves), this motion court would have to turn a blind eye.

Trial counsel failed to interview Ms. Prekop's "sister and brother-inlaw" who would have been critical "fact witnesses" regarding their observations of Ms. Prekop's bedroom pertaining to these gloves, bedsheet, and pillow-case, which would have served to support Ms. Prekop's observations and trial testimony pertaining to Lt. Kelly's intentional falsehoods relating to these articles of evidence.

Ms. Prekop testified that herself and her sister cleaned her room, and put "clean linen" on the bed when she returned home from the police station, and that's when she first noticed the gloves (Tr.I/144,162-63), after Lt. Kelly already reportedly completed his investigation (Tr.I/188). Lt. Kelly himself reportedly removed these articles of evidence (Tr.II/214,228).

Further, Mrs. Edward's affidavit that this defendant provided counsel also states that "Ms. Prekop's sister was present when Ms. Prekop cleaned her bedroom". This defendant brought all these inconsistancies to trial counsel's attention well prior to the outset of his second trial, however, counsel made no attempt to investigate any of the facts surrounding this defendant's case.

ADA Vottero took full advantage of these inconsistancies

with improper argument during summation. He asked, "what kind of world is it where George Perrot is innocent ? It's the kind of world where two FBI agents get together and risk their reputations and careers to create evidence to reach conclusions not supported. It's the kind of world where Tom Kelly and Mr. Jarvis get together to create evidence to pin on this poor man..." (Tr. IV/625-27).

When in fact the record does reflect that Lt. Kelly created evidence. The record certainly reflects that Lt. Kelly intentionally lied about his investigation regarding the prosecution's relied upon physical evidence (the gloves and bedsheet), which were the "essential elements used in securing this defendant's conviction".

3. There is a grave risk that this defendant's alleged confession the Commonwealth relied upon so heavily was involuntary.

There was evidence that this defendant ingested drugs and alcohol shortly before his arrest (Tr.III/509,538). The defendant was either not permitted to sleep or was unable to sleep during many, many hours of interrogation (Tr.III/436,466-67,471-72,483, 501,507-09,512). The defendant was interrogated over and over during a period of approximately twelve hours starting at 5:00 a.m., and this defendant's sister testified that the defendant looked like he had been rough up, and she saw red marks on this defendant's face and chest at the police station (Tr.III/539-41).

In re-evaluating the voluntariness of this defendant's alleged confession, this defendant asks this Honorable Court to

take into account all the outrageousness of the police and prosecutorial over-zelousness throughtout the history of this defendant's investigation and prosecution that includes, but is not limited to:

(1) The forging of a confession against this defendant by the original ADA in this defendant's case (Francis Bloom), in an effort to try and induce two of this defendant's friends to confess and testify against this defendant, although not ultimately used in court; (2) The personal delivery of blood samples taken from this defendant, by ADA "Bloom" from Springfield, Massachusetts to Washington, D.C. by car (Tr.III/308; MTD/62-64); (3) The intentional lies by Lt. Kelly pertaining to what this defendant's sister said about the gloves; (4) The false additions to Ms. Prekop's statement pertaining to these gloves by someone within the prosecutorial team; (5) The intentional falsehoods by Lt. Kelly pertaining to his investigation of the prosecution's relied upon physical evidence (the gloves and bedsheet); and (6) The continous falsehoods by ADA Vottero pertaining to the physical evidence that this defendant seeks to have independently tested, that ADA Vottero claims no longer exists, (See Exhibits B, C, and D, attached hereto).

This miscondcut, combined with Ms. Prekop's persistent insistence at trial that her assailant was "clean shaven" (Tr.I/141,158,161), while this defendant indisputably had a full "mustache and goatee" at the time Ms. Prekop was assaulted, (See Trial Exhibit #19), strongly supports the conclusion that this defendant was innocent of the crimes charged.

The Springfield Police and Prosecutor's Office wrongly



CoS RPOD 001483

plotted and lied to make the physical evidence in this case fit this defendant in order to convict him on a number of ongoing unsolved crimes because the facts and circumstances of this defendant's own history made him a convient patsy.

Moreover, the mere existence of a confession, even if voluntary, does not automatically mean that the evidence against a defendant is overwhelming. Commonwealth V. Phinny, Jr., 466 Mass. 155 (2005). This defendant's record clearly supports that the evidence in this defendant's case was made to fit.

## CONCLUSION

For the above reasons, this defendant George Perrot, respectfully asks that this Honorable Court, allow his motion for a new trial in the interest of justice.

Dated: June 3, 2008

Respectfully Submitted

[signature]

George Perrot, pro se
P.O. Box 8000 (SBCC)
Shirley, Ma. 01464

CERTIFICATE OF SERVICE

I, George Perrot, pro se, hereby certify that I have mailed a true copy of this document by first class pre-paid mail to the Assistant District Attorney addressed as follows:

Office Of The District Attorney
ATTN: ADA Brett Vottero
Hall Of Justice
50 State Street
Springfield, Ma. 01102

cc. Attorney General's Office
with request for investigation.

Dated: June 3, 2008

George Perrot, pro se

(EXHIBIT "A")

Dec. 09, 1989

To Whom It May Concern

On December 1st,1989 at 1 P:M Mrs. Daly Ms. Prekop and myself Olive Edwards a neighbor who at times visited Ms. Prekop just to see how she was feeling. After the alleged break-in of Ms. Prekop's home ,I disribed George to her and she would not say that he was the person that attacked her. I advised that George's mother get another Attorney and reopen the case and I would be more than happy to go to court if asked. If proper would a few questions of my own. Mrs.Daly asked if she could call on me and I said yes. On the above mentioned date we were sitting in Ms. prekop's living room discussing the incident. These were the questions I asked.

1: How could the person (George) who broke into a house on the next street over, half hour prior of me calling the police, got to my house, pick the lock, attack me and leave?

2 Why in the line up I not see the person who attacked me?

~~3 The pictures shown to me did not look like the person who~~ attacked me.

4 Why did they not bring George out in the court so I could indentify him as the person who attacked me?

5 Why are they saying that George.s blood and hair were found on the bed, when the person who attacked me was no where near the bed? The blood stain that was on the bed was the only blood that was on the bed that day because my sister and myself made up the bed and no new stain was noted. The blood stain that was on the sheet was an old stain that was washed several times in the past. The blood stain was from blood coughed up by my uncle who had lived in my house at one time who had a lung problem. Ms.Prekop told Mr. Bloom that if brought up the blood on the sheet she would tell the court how it was.

Ms Prekop will not write or sign any-thing but had no objection of me writing it.

Olive Edwards

Olive E. Edwards

CC: Ms.Prekop
Mrs Daly

EXHibit
"B"

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT
CRIM. NO. 85-5415-5420

COMMONWEALTH

v.

GEORGE PERROT

## AFFIDAVIT OF BRETT J. VOTTERO

1. My name is Brett J. Vottero and I was the Assistant District Attorney assigned to prosecute the above-entitled matter.

2. In 1985 a bed sheet and a pair of gloves were sent to the FBI Crime Lab from the Springfield Police Department. Blood was found on the gloves, analyzed, and was the subject of trial testimony. A hair or hairs were found on the bed sheet, was compared with known hair of the victim and the defendant and was the subject of trial testimony.

3. Following receipt of Judge Sweeny's order of June 21, 2006, I have contacted both the FBI and the Springfield Police Department and have asked that they conduct a search for these items. However, based on the results of a 2004 search by the Springfield Police Department and FBI for a rape kit also related to the case, it is my understanding that no evidence in the case could be located by either agency.

4. At my request, the FBI is calling for their lab file from their archives to review it so they can tell my if what was done with the hair that Mr. Perrot has inquired about. I expect to hear back from them in one to two weeks.

5. I have left a message for Officer Keith Pouliot of the Springfield Police Department to make a further effort to locate any remaining physical evidence in this case. He is not expected back in the office until July 5.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

Brett J. Vottero

Dated: July 5, 2006

EX H:B:t "C"

## AFFIDAVIT OF BRETT J. VOTTERO

1. My name is Brett J. Vottero and I was the Assistant District Attorney assigned to prosecute *Commonwealth v. George Perrot*, Hampden Superior Court indictment numbers 85-5415 through 5420.

2. In 2004, Attorney James Fox, counsel for Mr. Perrot, requested that the Commonwealth locate the "examination kit" (rape kit) performed on the complaining witness. At that time, I requested Officer Keith Pouliot of the Springfield Police Department to conduct a search of the department evidence areas to see if the kit was still in the custody of the police department. In July 2004, Officer Pouliot advised me that he had conducted a search and could not locate that evidence.

3. In response to the recent pro se request, I directed Officer Pouliot to conduct a further search of the Springfield Police Department to determine if any physical evidence could be located. I also specifically requested search for items with specific property tag numbers in order to locate material, including the specific hair(s) sought by the defendant.

4. On November 28, 2006, Officer Pouliot told me that he was unable to locate any physical evidence pertaining to the rape of Mary Prekop on November 30, 1985. In addition, while Officer Pouliot could not report what had happened to the physical evidence not introduced at trial in this case, Officer Pouliot did state that at the time this case was prosecuted, it was the regular practice of the Springfield Police Department to destroy remaining physical evidence once the case had been criminal prosecution had been concluded.

5. Since my affidavit of July 5, 2006, I have spoken with Mike Van Arsdale of the Federal Bureau of Investigation. Mr. Van Arsdale has told me that he has confirmed that all items of physical evidence submitted to the FBI were returned to the Springfield Police Department upon completion of the testing. This includes the hair whose production has been most recently requested by the defendant.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

[signature]

Brett J. Vottero

Date: December 1, 2006

(EXHIBIT "D")

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

HAMPDEN, ss:

SUPERIOR COURT
HDCR1985-05415
Thru
HDCR1985-05420

COMMONWEALTH OF MASSACHUSETTS
Plaintiff

v.

GEORGE PERROT
Defendant

AFFIDAVIT OF GREG T. SCHUBERT

1. I, GREG T. SCHUBERT, was assigned to represent George Perrot in the above entitled matter.

2. Mr. Perrot was convicted of rape and related crimes.

3. The police collected a hair from the victim's bed, blood stains from the sheet, and blood stains on gloves allegedly found at the scene.

4. There was no evidence that Mr. Perrot was on or near the bed. There was evidence that the blood stains on the sheet were old and came from a relative of the victim.

5. I personnaly spoke with Mr. Dick White in Charge of the Evidence room at the Hampden County Superior Court and in person I viewed the evidence.

SIGNED UNDER PAINS AND PENALTIES OF PERJURY THIS 25th DAY OF APRIL, 2007

GREG T. SCHUBERT

CoS RPOD 001489

A. No.

Q. Do you know the number that was assigned to the head hair?

A. Yes, sir.

Q. Can you just for the record tell us what that was?

A. 51465.

Q. Was that sent to the F.B.I. at some point, if you know?

A. Yes, sir.

Q. And do you know the date that it was sent down?

A. It was sent down the 8th or 9th, I'm not sure.

Q. Of December?

A. Yes.

Q. 1985?

A. '85.

Q. You indicated before that there was a pair of knit gloves. Can you tell the Court and jury where did you find the pair of knit gloves in relationship to the bedroom that you took Exhibits 8 and 9 from?

A. They were in the bedroom -- in the same bedroom on the floor.

Q. Why did you take those gloves, sir, at that time?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) Did you in fact make inquiry as to whether they belonged to Miss Prekop, those gloves?

MR. HAMMERSCHMITH: Objection.

THE COURT: I will allow him to answer yes or no.

THE WITNESS: Yes, I did.

Q. (By Mr. Bloom) As a result of what she told you, did you take the gloves, just yes or no?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) Did you take the gloves?

A. Yes.

Q. What did you do with the gloves?

A. I sent them to the F.B.I. lab.

Q. Did you package them in the same method you described in reference to Exhibit No. 8 and 9?

A. Yes, sir.

Q. The number on the package here, 49492, what number -- what is the significance of that number? What does that number mean?

A. That's the property tag number assigned to it when I recovered it.

Q. These initials, WGE and Q5, Q6, is that writing from the Springfield Police Department or from you, I should say?

A. No, it's not.

Q. Are these the two gloves that you sent down?

A. Yes, sir.

Q. And those were found where, again, in the bedroom of Mary Prekop?

A. In the bedroom on the floor near the bed.

Q. What, if anything, did you observe in relationship to these gloves prior to taking custody of them?

A. Some stains.

MR. BLOOM: I'm going to offer these, Your Honor.

Your Honor.

(Witness steps down)

MR. HAMMERSCHMITH: The defendant rests, Your Honor.

MR. BLOOM: I have one witness, Judge.

Sergeant Kelly.

SERGEANT THOMAS KELLY (Recalled)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you, for the record, again, state your name and occupation?

A. Thomas M. Kelly, I am a sergeant in the Springfield Police Department.

Q. Now, Sergeant, I'm going to ask you if you would be kind enough to draw your attention to what I believe, if I'm not mistaken, is Exhibit 10.

Are you familiar with these two knit gloves?

A. Yes, sir.

Q. I believe previously you testified concerning where you took those into your possession concerning November 30th of 1985?

A. I found them at 27 Malibu Drive.

Q. Now, at some point in time, and I'm going to ask you to direct your attention now to a week later, on December 7th of 1985, did you have occasion to do something with those gloves?

A. Yes, sir.

Q. Can you tell us what, if anything, you did with them?

A. I took them with me to 87 Malibu Drive.

Q. Can you just tell me yes or no, was it as a result of information you had acquired, just yes or no?

A. Yes.

Q. When you went to 87 Malibu Drive, who did you see there, if anyone?

A. Mrs. Westcott.

Q. Can you tell the Court and jury what, if anything, you did with those gloves at that time?

A. I showed them to Mrs. Westcott.

Q. What, if anything, did she say?

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

MR. HAMMERSCHMITH: Your Honor, may --

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I just want to make it clear for the record that it is my understanding that this would be admitted as a prior inconsistent statement and not for the truth of the matter.

THE COURT: Right. Absolutely.

MR. HAMMERSCHMITH: I just wanted it on the record.

(End of side bar conference)

Q. (By Mr. Bloom) What, if any, conversation did you have with Mrs. Westcott

concerning those gloves that are Exhibit 10 in front of you at the time you are now describing?

A. I showed her the gloves, I asked her if she had ever seen them before. She told me she had a pair just like that.

Q. What, if anything, did she say or do at that time?

A. She told me that she had just rearranged the hall closet several weeks before and she knew they were in there then. She took me to the hall closet, opened it up, I asked her to look and see if they were there, she looked, she indicated that her gloves were not there.

MR. BLOOM: That's all I have.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. What day was this on?

A. That was on December 7th, sir.

Q. And that is more than two years ago?

A. Yes, sir.

Q. And you remember exactly what she said then?

A. Yes.

Q. And exactly what she did?

A. Yes.

Q. How many cases have you been involved in since December 7th? Is it fair to say hundreds?

A. No.

Q. How many?

A. Less than a hundred, since '85.

Q. Did you keep a written record of your conversation with Mrs. Westcott?

A. I reduced it to writing.

Q. You reduced this to writing?

A. Yes, I did.

Q. Where was that reduced to writing?

A. At the station.

Q. And is that something which is a matter of record at the station at this time?

A. I don't know.

Q. You are saying you filled out a police report about this?

A. I filled out a report and I put it into

the file.

MR. HAMMERSCHMITH: May counsel approach side bar, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I have received no such report, Your Honor. There was discovery ordered in the case two years ago and there have been a number of discovery orders since then, which I think would have covered a document like this.

THE COURT: Are you saying it comes as a surprise to you?

MR. HAMMERSCHMITH: Yes.

THE COURT: Well, now, wasn't this part of the motion to suppress?

MR. BLOOM: Yes, it was. I have discussed this innumerable times --

THE COURT: I remember it being mentioned to me.

MR. HAMMERSCHMITH: I'm saying he

says there is a statement --

THE COURT: I realize that.

MR. HAMMERSCHMITH: That is the surprise, Your Honor.

THE COURT: Well, now, it was mentioned at side bar here early in the trial.

MR. BLOOM: I think he just said to you that the report is the surprise, not the contents.

THE COURT: Oh, okay, but that's what I'm getting at. The statement that Kelly claims Westcott made to him is not a surprise.

MR. HAMMERSCHMITH: That's correct.

THE COURT: Okay.

MR. BLOOM: I can tell you for the record that Charlie Arpin, Lieutenant Arpin, had this file since day one. We have discussed this before.

THE COURT: Who is Charlie Arpin?

MR. BLOOM: He is a lieutenant up in the Detective Bureau, he slept with

this file for whatever reason.

We've been through it a number of times and have never been able to find the statement. Kelly's told me since day one he put it in writing. I've never been able to find the statement, but it's been well known to counsel and I have discussed it with him on innumerable occasions that, based on what Kelly has told me since day one in this case, and I have shared all information with Mr. Hammerschmith, that he had claimed from day one that this woman identified the gloves and in fact looked for them and couldn't find them, but I will admit I have never seen a report and that's why I haven't turned it over, because I have never had it myself.

MR. HAMMERSCHMITH: Has he been asked for the report?

MR. BLOOM: I just mentioned he and I have gone through the file and we have

not been able to find one, but he claims he made one and he put it in the file. I don't know what I can say other than that.

The key issue is surprise, I would think, and there is none here.

MR. HAMMERSCHMITH: Well, I will question him about where that statement is.

(End of side bar conference)

Q. (By Mr. Hammerschmith) Sergeant Kelly, you say you made a report of this?

A. Yes, sir.

Q. When would that have been done?

A. When I returned to the station after completing the search warrant.

Q. And that would have been done in writing?

A. Yes, sir.

Q. And that would have been filed in the police file?

A. Yes, sir.
Q. Would it be a specific file relating to Mr. Perrot's -- the investigation of Mr. Perrot's charges?
A. Yes.
Q. Do you have that statement with you here today?
A. No, I don't.
Q. Did you attempt to find that statement?
A. Yes.
Q. When did you attempt to find that statement for the first time?
A. Testifying in another proceeding.
Q. How long ago would that have been?
A. It would have been the Grand Jury.
Q. Would it be fair to say that you were not able to produce for us today the statement which you allegedly reduced to writing on that date?
A. I haven't seen it since the day I wrote it.
Q. But you are saying that you wrote it?
A. Yes, sir.
Q. You just don't know where it is?

estimate?

A. Twenty to thirty times.

MR. BLOOM: Thank you.

RECROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Have you ever shown this report to anybody else?

A. I haven't seen it since the day I wrote it, sir.

Q. On the day you wrote it, did you show it to anyone else?

A. I placed it immediately in the file.

Q. Didn't show it to anyone before doing so?

A. I didn't have to, I was the head of the investigation.

Q. So no one else knew there was such a report other than yourself, to your knowledge?

MR. BLOOM: I'm going to object to that question.

THE COURT: Overruled. I will let him answer it.

THE WITNESS: I don't know.

MR. HAMMERSCHMITH: Thank you.

FURTHER REDIRECT EXAMINATION BY MR. BLOOM:

Q. When was the first time you told someone associated with this case, either in the D.A.'s office or a co-worker in the police department, about what happened with Mrs. Westcott concerning December 7, 1985?

A. That morning.

MR. BLOOM: That's all.

MR. HAMMERSCHMITH: No further questions.

MR. BLOOM: That's all I have.

(Witness steps down)

THE COURT: No other witnesses?

(EXHIBIT "G")



12/9 Called Robert Kerber, New England Forensic Laboratory, 7 Bruce Street, Tewksbury 01876 (508-851-9109), a forensic person recommended to me by Linda Thompson. He could not provide me with direct information re: the blood question, but referred me to John Abbott, Serological Research Institute, 138 Great Rd., New Bedford (617-275-7095). He said to call him after 7:00 p.m. (His office number is 617-275-3855).

With respect to the fingerprints, he referred me to Robert Bird, 46 Brookside Street, Rockland, MA 02370 (617-878-1571). He also pointed out that there is no detectable time factor in fingerprints (i.e., you cannot tell how long the prints have been there.)

With respect to hair, Kerber said that there are no experts in the United States. He views hair as a highly questionable type of evidence. He referred me to several publications on hair comparison: Moenssens, Scientific Evidence in Criminal Cases (Foundation Press, Mineola N.Y. 1986, 3d.Ed.), pg. 478; Gaudette, Probabilities and Human Hair Comparison, 27 Journal for forensic Sciences 272 (1982), published by the American Academy of Forensic Scientists, 227 South Academy Blvd., Colorado Springs 80910 (303-596-6006). According to the Gaudette article, rates of incidence of identical hair is 1/4500 for scalp hair and 1/800 for pubic hair.

1987

1/5 JIM HAMMERSCHMITH, ATTY., P. Edwards, Secy. dict. 2/11

Called John Abbott, Serological Research Institute,138 Great Road, Bedford (617-275-3855/Home 617-275-7095). He says that the A & H found in the semen in the Marchand case could not have come from D, since he's type O and a non-secretor. It turned out that he did blood tests results on both Marchand's and Prekop's blood and they were both type O. He did these tests for the Spfld. P.D. He said that these results would exclude D as the source of the semen found in Mae Marchand. He is available to dofurther work or to testify, but would need to speak with ADA Bloom before doind so or before doing further tests on the Prekop blood. Told him I'd talk with ADA Bloom and he or D would get back to him.

1/6 Spoke with ADA Bloom and Lt. Arpin and told them of my conversation with John Abbott. Bloom told Arpin to look into it and said that the DA would authorize whatever tests are needed. Told ADA Bloom that it sounded from my last conversation with D like he would probably want to plead to the charges which are now scheduled for trial on Feb. 10. I told Lt. Arpin that I owuld get the specific parts of the FBI test results that I am concerned about.

1/12 Spoke with Lt. Arpin and gave him copies of the FBI test results that I am relying on and explained that I need a more detailed analysis of Mary Prekop's blood.

2/10 Learned by telephone from the lock-up that D was not taken back to Northampton and is being taken to York Street. Northampton apparently did not wish to accept him back. Spoke with ADA Bloom who says that he will be speaking with Gary King, Hampden HOC about D's situation. D has no right to be at Hampshire HOC.

2/12 JIM HAMMERSCHMITH, ATTY; L. Gore, Secy. dict. 2/13

Called John Abbot - not in - left message to call.

2/12 Spoke with John Abbot. He did receive the SERI sexual assault kits for the Marchand and Prekop rapes. He did not do a written report, but reported the results orally to the Springfield P.D. He would do written reports upon request from the PD or the DA. He says that no semen were found in either exam and that that is not unusual. Nor were any foreign hairs apparently located. Again, this is not unusual.

Abbot also has testified as an expert in hair identification cases. He says that hair is really used more to exclude a suspect than as evidence of guilt. He seemed to say that the incidents of most types of hair is very common and that hair analysis is usually significant only when the hair has unusual characteristics. He would be willing to do a second opinion on the hair analysis, but would need an O.K. from the P.D. or the D.A.

Abbot acknowledged that he's failed to return calls from Lt. Arpin because he's been very busy. He would be willing to do the additional blood testing and to confirm the exclusion of D as the semen source in Marchand, but needs to have a request from the P.D. He says that Arpin could either leave a number where he can be reached at night or could leave a message on Abbot's answering machine requesting what needs to be done and then follow this up with a confirming letter.

2/13 Spoke with Lt. Arpin and told him what Abbot had said. Arpin will follow up on it.

2/17 JIM HAMMERSCHMITH, ATTY., P. Edwards, Secy. dict. 4/6

Spoke with List Clerk Joe Quinlan. The people at York Street want to have D sent to Cedar Junction on hi sentence and brought back to York Street only as needed for trial preparation. I told Joe that the sentence had been stayed and that the stay would only be lifted with D present in court, and that I would oppose lifting the stay unless D wants to go along with it. Joe will have D brought in to court tomorrow so that this issue may be properly addressed.

D was not brought in from York Street and his case was not on the list because ADA Bloom was not going to be available today.

Page 1 of 2

27 Malibu Drive
783-5331

SPRINGFIELD POLICE DEPARTMENT
STATEMENT

(EXHIBIT "H")

DATE November 30, 1985

The following is a statement by Mary A. Prekop

taken at 130 Pearl St. - C.P.B. at 8:10 ~~A.M.~~ P.M. on 11-30-85

I, Mary A. Prekop do hereby make the following statement without promises, inducements or threats, being fully aware that anything herein may be used against me in the event I am prosecuted in any Court of Law.

Taken in the presence of Off. Marianne J. Popko

My name is Mary A. Prekop. I am 78 years old. I live alone at 27 Malibu Drive. I have lived there since 1973.

At about 4:00A.M. this morning I woke up because I thought I heard glass breaking. I went into the kitchen, where I thought the noise was coming from. I put the light on. I have a dog since the last attack. The dog went into the kitchen first and I followed her. I opened the kitchen door and found there was nothing there so I sat in the living room for a few minutes and everything was quiet. Then I went back into the bedroom and layed down on the bed. The dog layed down next to my bed. Then all of a sudden she barked and ran off to the kitchen. I now keep a big stick by my bed and I followed her to the kitchen carrying the stick The dog started barking. I got as far as the bathroom door and I saw a man standing in the kitchen. I hit him on the head with the stick. He grabbed the stick and pushed me into the bedroom. The dog tried to follow but the man closed the door.

I was still fighting him and he threw me on the floor. He never said anything. I started calling the dog name, Scuffy. He hit me on the face a couple of times. I kept screaming after the first time but after a while I decided I should keep still. I kept kicking with my feet and he punched my left thigh. He pulled my nightgown aside and he sucked on my left breast. He did this for a couple of minutes, and then he got on top of me He pushed my nightgown up and lifted my legs up. He put something into my vagina, but I'm not sure what it was. He kept his pants on. I never saw his penis. I started moaning. I pretended to pass out. He got up, and left the room. I waited untill everything was quiet. When the dog stopped barking I went into the living room. I saw my pocketbook on the floor. The contents were spilled out. I picked up the change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook. I don't know if he took it or not. I then called the police. I wasn't able to dial at first because I was so nervous. The second time I tried I was able to get through.

I can describe the man who broke into my home as a white male, about 20-30 years old. He had dark, wavy hair, and he was clean shaven. He

I have read carefully the foregoing statement consisting of 2 pages and have been given the opportunity to make corrections, have initialed or signed each page as evidence thereof, am willing to testify to the facts contained herein and the statement is true to the best of my knowledge and belief.

WITNESSES Marianne J Popko

SIGNED Mary a Prekop

Sworn and subscribed to before me this

day of 19

Notary Public

SPRINGFIELD POLICE DEPARTMEN
STATEMENT

DATE 11-30-85

The following is a statement by Mary A. Prekop

taken at ........ at A.M. P.M. on 11-30-85

I, Mary A. Prekop, do hereby make the following statement without promises, inducements or threats, being fully aware that anything herein may be used against me in the event I am prosecuted in any Court of Law.

Taken in the presence of Off. Marianne J. Popko

was average height and weight. He was wearing a blue jacket, it looked like nylon and sneakers, which were white. He was wearing a dark colorec pair of pants, they were neither jeans nor cordury material. He was not wearing glasses. I didn't notice any jewel ry or scars.

The only thing he ever said to me was to keep quiet. He said this a few times, while he was hitting me.

I forgot to mention when he first came into the bedroom he broke the lamp which was on the dresser. He hit it with his fist and knocked it to the floor. This lamp was on before and it went off when he broke it.

When the police arrived I noticed a pair of gloves on the foot of the bed. They are n ot mine. I never saw them before.

I have read carefully the foregoing statement consisting of 2 pages and have been given the opportunity to make corrections, have initialed or signed each page as evidence thereof, am willing to testify to the facts contained herein, and the statement is true to the best of my knowledge and belief.

WITNESSES Marianne J Popko

SIGNED Mary a Prekop

Sworn and subscribed to before me this

day of 19



Notary Public

CR 304

opening.

THE COURT: If both of you had opened, it might be different. I'm going to let it stand.

(End of side bar conference)

MARY PREKOP (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Mary, you are going to have to speak up in a loud voice so we can all hear you, okay?

A. I will try.

Q. Would you tell Judge Murphy and the jury what your name is?

A. Mary Prekop.

Q. Would you spell your last name for that girl sitting in front of you?

A. P R E K O P.

Q. Mary, how old are you?

A. Eighty.
Q. Do you live in Springfield?
A. Right now.
Q. And that is where, ma'am? Where is that?
A. 27 Malibu Drive.
Q. And that is in -- is that Sixteen Acres?
A. Sixteen Acres, that's right.
Q. How long have you lived there?
A. In Springfield or there?
Q. No, just at that house.
A. Fifteen years.
Q. Did somebody used to live there with you?
A. My mother.
Q. Has she been dead for sometime?
A. Well, a few years.
Q. How long?
A. Let's see, six.
Q. Has anybody lived there with you since your mom died?
A. No.
Q. Do you have relatives in Springfield?

A. Have what?

Q. Sisters or brothers?

A. Yes, I have a sister in Springfield.

Q. Do you see her once in a while?

A. I see her everyday.

Q. Does she -- who sleeps at your house for the last six years other than you?

A. Just myself.

Q. How many bedrooms do you have in there?

A. Two.

Q. How long have you lived there total, that house on Malibu, how long have you lived there yourself?

A. Well, I have lived -- well, since mother died, I have been alone for six years.

Q. But how long have you lived in the house even when your mom was alive?

A. That is fifteen years I have lived on Malibu.

Q. You just told me that, didn't you, but I wasn't paying attention, I'm sorry.

Mary, do you remember back in the end of 1985 something happened and you had to talk to the

police about it, do you remember that? Do you remember November 30th of 1985?

A. Yes, I remember.

Q. Is it fair to say you lived alone then?

A. I lived alone then.

Q. How many bedrooms do you have in that house?

A. Two.

Q. Did you have any animals at that time back in November of 1985?

A. No.

Q. At sometime did you get a dog?

A. Wait a minute.

Q. Let me ask you this: Do you have a dog now?

A. Yes. I think I got the dog -- I know I got the dog around the 4th of July, it had to be in '85.

Q. So you would have had the dog in November of '85, correct?

A. Yes.

Q. Do you remember on -- I'm going to ask you about that, just about that date, November 30,

1985, okay?

A. Okay.

Q. Do you remember something happening that caused you to wake up? Do you remember waking up in the middle of night on that night?

A. Well, it was 4:00 in the morning.

Q. At about 4:00 in the morning. You tell the jury what is the first thing you remember hearing?

A. Okay. The first thing, the dog ran to the kitchen door and was doing a lot of barking.

Q. Is that what woke you up, the dog?

A. Yeah, her barking.

Q. Do you let the dog roam around or does he stay in a certain room?

A. Oh, no, she can do anything she wants.

Q. After you heard the dog bark and you woke up, what was the next thing that you remember happening?

A. The next thing, I went out to the kitchen door and I opened the kitchen door -- not the outside one, but the one near the back door --

Q. Is that the breezeway?

A. That's right, the door to the breezeway. I didn't open that -- I don't know why; something just told me not to -- and the dog was just standing looking at me. So, I said, well, I guess it's nothing, just your imagination. I come back in the house and I sat down for a couple minutes.

Q. Where, Mary? Where did you sit down?

A. I went to the living room and I sat down for a couple minutes, I didn't hear anything more, so I went back to the bedroom and I no more than -- but when I went to the bedroom -- my brother-in-law made me a stick to put near the kitchen door, he said if I put it there every night, nobody can open the door from the outside.

Q. Kind of like using it as a brace against the door, you mean?

A. No, on the floor, you put it just on the floor. So, anyway, I picked it up. Why I picked it up, I don't know, I just picked it up and took it with me.

Q. Took it with you where?

A. Back to the bedroom.

Q. Now, you came out of your bedroom into

the kitchen and then you ended up sitting in the living room for a couple minutes, right?

A. For a couple minutes, that's right.

Q. Now, when you went back to your bedroom, how long before something happened?

A. Well, I hadn't got settled in the bed and I heard a noise and it sounded like glass breaking, so I jumped up, grabbed the stick and went off into the kitchen. I didn't get farther than the bathroom door and there was a fellow there.

Q. Mary, can you help us a little bit? Could you tell the jury how far is it to walk from like your bedroom to like where your kitchen is? Between like you and me or would I have to go farther back? Or how long would you say it is?

A. Well --

Q. Put me someplace, Mary. Between you and I?

A. You mean to the kitchen door or to where --

Q. From where the man was standing in the kitchen.

A. No, it wasn't that far. Well, yeah,

probably you could say where you are now.

Q. Between you and I?

A. Yeah.

Q. Okay. So it's not very far from your bedroom to the kitchen.

A. No, just the bedroom, then the bathroom door, and then the kitchen is right there.

Q. What do you remember at that time -- do you remember anything about the person?

A. Remember anything about him?

Q. For instance, was he a white or black -- what do you remember about the person at that time?

A. Well, you're so upset, you don't remember anything much. He had his hands up over his face, but what I remembered the most was he had wavy hair, black wavy hair, and he had white sneakers on. That's about all.

Q. You remember those two things?

A. Those two things.

Q. After you saw him and you said you had the stick, what happened then?

A. Well, I hit him on the head. I couldn't hit him -- I didn't want to hit him on the head, but

the dog was jumping all over his feet and I didn't want to hit the dog.

Q. What happened after you hit him in the head?

A. Well, he grabbed the stick from me.

Q. And what happened?

A. He pushed me into the bedroom.

Q. What did he do with the stick?

A. He threw it on the bed and he threw me on the floor.

Q. When you were on the floor, how far were you from your bed?

A. Well, my head was towards the bed and --

Q. I mean how far?

A. Not far, because in little houses like that, the bedrooms are small.

Q. Okay. When you got pushed on the floor, did you see where the stick was at that time?

A. Where the stick was?

Q. Yes.

A. Yes, it was laying on the bed. I saw him throw it on the bed.

Q. What was the next thing that happened?

A. The next thing that happened?
Q. That you remember, after he threw you on the floor.
A. Well, before he threw me on the floor with one hand, he hit the light and he knocked it off -- I had -- the light was lit. He broke the bulb and knocked the lamp off on the floor. Then he assaulted me, whatever you want to call it.
Q. What do you mean -- where was he hitting you then?
A. What?
Q. Where was he hitting you at that time?
A. Well, when he threw me on the floor, when he assaulted me, he hit me, he gave me a black eye on my left side, the left eye.
Q. What was he hitting you with at that time?
A. I didn't understand you.
Q. What was he hitting you with?
A. With his hand.
Q. How many times do you think he hit you with his hand?
A. I don't think he hit me more than twice

on my face.

Q. All right. Did you get hit anywhere else at that time?

A. Well, not right then, but before he left, before he left the bedroom, he took -- with his foot, he kicked me on my -- well, the buttocks on my left side, too, because he couldn't reach on the right, because there's a table that was in the way, the bedstand.

Q. Do you remember -- what were you doing, Mary, when you were on the floor? Were you doing anything at that time?

A. I wasn't doing anything. As I say, he was molesting me.

Q. Did he say anything to you?

A. No. When I cried out, he just told me to keep still, so I said to myself, well, better to keep still, it won't help any.

Q. What else -- tell us what else he did to you when you were in that bedroom. Was the door opened or closed?

A. No, it was closed. If it was open, he couldn't have done anything, the dog would have

bothered him too much. The dog was running around the house barking like mad.

Q. I want you to tell us, Mary, what else he did to you when you were on the floor?

A. Well, I'm saying he assaulted me. You can call it something else.

Q. Well, I don't want you to use words like assault or molest, I want you to tell Judge Murphy and the jury exactly what he did with his body to your body.

A. Well, I'm trying to think of the right word, 'cuz I don't talk about those things much.

Q. I know you don't talk about them, Mary, but it is important for you to tell us what part of your body got assaulted.

A. Could you help me? (Referring to the court reporter)

Q. Where on your body is it that you got assaulted?

A. The lower part of your body.

Q. Can you give us a word? I know it's hard, but --

A. I'm trying to think of the right word

and I can't think of it.

Q. Is it your vagina?

A. Well, okay.

Q. What happened there? Tell us what happened there.

A. Well, all I know is when he got down on me, I shut my eyes and I just -- everything, I mean -- you could say it was like blank, I just didn't -- I was like out of this world.

Q. But what happened there?

A. What happened to me?

Q. What happened to your vagina?

A. Nothing happened to it. He --

Q. He what?

A. If I had a dictionary, I'd find the right word.

Q. Excuse me? I'm sorry. What did you say, Mary?

A. I'm just talking to myself. I can't think of the right word.

Q. Let me ask you this --

A. Well, I will tell you, I know you don't want me to say this, but I will say it just the same

--

Q. No, hold on for a minute, we don't want you blurting out anything. Did you that day, after all this had happened to you, did you talk to the police?

A. To who?

Q. To the policewoman. Later on that same day, did you talk to the policewoman?

A. Yeah, she came to the -- what do you call it -- she came to the emergency room where I was and then she took me to the police station.

Q. Do you remember telling the policewoman what happened to you?

A. Well, I told her what I thought happened.

Q. Let me ask you this -- if you could tell us, is that your signature there, that is Mary A. Prekop?

A. Yes, that's my signature.

Q. I'm going to show you the second paragraph here. Do you see where I point to the word and it says "he", can you read that?

A. Yes.

Q. Would you read from there to where I've got the other black mark to yourself?

A. Okay. "He pulled my --"

Q. No, just to yourself.

A. Oh, read it to myself, okay.

(Witness reads portion of transcript)

Q. Did you read that?

A. Yes.

Q. What I am asking you, ma'am, if you could tell the jury what did he do, if anything, to that part of your body?

A. Well, that's what I say, I can't think of the right word, because what I would tell you you don't agree with me, so I'm not going to say.

Q. What I'm asking, ma'am, was something put inside your vagina?

A. Yes.

Q. And do you know what it was?

A. No.

Q. Was it his penis, do you know?

A. That's why I say I don't want to talk

about it, because I was told that what I didn't see you can't use as evidence, so --

Q. Okay. Let me ask you this, so we can understand. Whatever it was, the thing that went inside your vagina, who put it there, the man that was in the room with you?

A. Who else?

Q. That's your answer?

A. That's right.

Q. During the time you were in that room, did anything happen to your breast area at all when you were in there with this person?

A. Well, when he first threw me on the floor and he -- I'm still using the word assault -- he went and put his mouth near my left breast for probably a minute, I don't know what he did it for, but --

Q. Did it touch your breast?

A. Yes.

Q. Did you have a pocketbook around there that night, somewhere in your house?

A. Yeah, I had one in the other bedroom on the chair.

Q. And after he left, did you go look at that pocketbook?

A. Well, he must have, because I found it on the kitchen floor. He went into -- he must have gone in there, picked it up --

MR. HAMMERSCHMITH: I object, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Bloom) Let me back up a little bit. When you went to bed that night, before all this terrible stuff happened, when you first went to bed, where was your pocketbook?

A. On the chair in the other bedroom.

Q. That is the second bedroom?

A. That's right.

Q. Not the bedroom where you got assaulted?

A. No.

Q. After this person had done these things to you and left, did you see the pocketbook again that night? Where did you see the pocketbook again?

A. When he left, when I felt like I could get up and have my bearings, I went in and there it was on the floor near the bathroom door in the

kitchen, so I picked it up and I only had a dollar bill in it, but that was gone, and the change purse was gone.

Q. Did you call the police then?

A. Yes, then I went to call the police, but I got mixed up, I guess.

Q. Did they come?

A. Just nerves, I got mixed up and I didn't get them the first time I called, because I probably rang the wrong number -- I mean, I dialed the wrong number. Then I waited a couple minutes and I dialed again and I got the police.

Q. Did they eventually come that night?

A. Yes, they came right away.

Q. Miss Prekop, how many doors to the inside of your house?

A. How many doors?

Q. How many doors to the house? Front doors -- how many doors to your house?

A. Well, there's the front door and then there's the two doors on the breezeway in the front and then to the back door, and then you call it a door that comes to the kitchen, it's not a kitchen

door --

Q. It goes down to the cellar?

A. It goes down to the cellar, and then on the left is the kitchen door.

Q. When you went to bed that night, tell us how those doors were. Were they locked, were they wide open?

A. Oh, no, it was November, they were all shut and locked.

Q. And after all this had happened and the police had come out there, did you see the condition of your doors? Did you see what they looked like then?

A. Well, that's the only door he -- he broke the lock in the door.

Q. Which one are we talking about now?

A. That was the one to come into the house that goes down into the cellar.

Q. The breezeway door?

A. Yeah.

Q. You are not talking about the front door?

A. No, he didn't --

Q. What did it look like the next time you saw it after this man left, the next time you saw the door? Tell the jury what you remember.

A. Well, I didn't see it before he came. It was okay.

Q. I know it was okay before he came. I'm asking, after he had gone, what did it look like when you saw it?

A. Okay, it was all scratched up and the wood was all -- he had to have been using a knife or something to pick around the lock --

MR. HAMMERSCHMITH: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: When I looked, I could see the lock was broke.

MR. BLOOM: That's all I have, Judge.

Mary, he is going to ask you some questions now, okay?

THE WITNESS: Okay.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Do you have a dog?
A. Do I have a dog?
Q. Yes.
A. Yes.
Q. What kind of dog is that?
A. Cocker spaniel, black.
Q. It's a cocker spaniel?
A. Yes.
Q. This was the dog that you heard that night barking?
A. I can't hear you.
Q. On this night that we are talking about, you heard that dog barking?
A. That's right.
Q. And you went out of your bedroom?
A. Yes.
Q. And you looked around the house, is that right?
A. I just went to look at the door that opens from the breezeway to where you go down the

cellar.
Q. Did you have any lights on in the house at that time?
A. The only light I have on at night is my bedroom light.
Q. What about when you went to the breezeway, did you turn any lights on?
A. Yeah, I put a light on in the kitchen.
Q. What about in the hallway, did you have a light on in the hallway?
A. No, I haven't got any hallways.
Q. So your bedroom opens right into the kitchen, does it, or --
A. Well, really you wouldn't call it a hallway, it's probably not as big as that table, the bathroom is here and the bedroom here and the other bedroom here, the three -- and just a few steps more and there's a kitchen proper.
Q. So everything is very close together, then?
A. That's right.
Q. Now --
A. No wasted space.

Q. When you left the kitchen, did you turn the light off behind you?

A. Well, I don't remember.

Q. So you don't remember whether the kitchen light was on or not after --

A. No, I must have put it off, because when I heard the like glass breaking, when I run into the kitchen, I put the light on, 'cuz from both ends you can put the light on in the ceiling.

Q. But when you went back -- before you went back into your bedroom --

A. I must have put it on, because I put it on when I heard the sound of glass breaking, and I put it on when I heard the glass break, so I wouldn't have put it on if it was already on.

Q. So the first time you heard your dog and you went to the kitchen, right?

A. Yes.

Q. And when you got to the kitchen, you turned the light on in the kitchen?

A. That's right.

Q. And you didn't see anything when you looked out the door, right?

A. I didn't look out the door.
Q. You just looked in the kitchen?
A. I went in the kitchen, I opened the kitchen door, but the kitchen door is here and the door to go down the basement is here, but it had glass in that, but I didn't look out, I don't know why, just something -- intuition I'll call it -- told me not to look.
Q. You talk about the kitchen door. Where does the kitchen door lead to? What is it between?
A. There is nothing, just a little platform, a little space there, and you go out to the breezeway and the cellar stairs are right there.
Q. So the kitchen is on one side?
A. Yeah.
Q. And the other side is the breezeway?
A. Well, no, that's in back of the kitchen. When you go to -- the cellar stairs are here, here's the door to the breezeway.
Q. Would you feel comfortable putting a drawing of it on the board? Do you think you could do that?

(Witness goes to blackboard)

A. Here's the kitchen door.
Q. If you would make it fairly big.
A. Here's the kitchen over here.
Q. Is it a square kitchen?
A. No, it's a big, long kitchen.
Q. Okay. Could we draw where the walls of it would be there?
A. There's walls here and walls here, and over here is the windows.
Q. Okay. And where would your bedroom be or the hallway -- you mentioned a short hallway?
A. Yeah, well, it's short. You get this end of the kitchen, there's a door here to one bedroom and there's a door to this bedroom, and there's a door to the bathroom all right together, they almost hit each other.
Q. And that space in between is the hallway between there and --
A. Yeah, a little space like that.
Q. Now, you talked about the kitchen door, going to the kitchen door --

A. This is the kitchen door and this is the breezeway door here and here's the stairs to go downstairs.

Q. Down to the cellar?

A. Yes.

Q. And the cellar stairs open up into the breezeway, do they?

A. No, there's a little -- I say like a little platform. When you step from the kitchen, there's a little platform like here and there's the stairway to go downstairs and here's the door here, that little space there. Every house is the same way.

Q. Now, when you went to the kitchen door, you were going right to here, is that right?

A. That's right.

Q. And you didn't open that door?

A. Oh, yeah, that's the kitchen door. I opened that door, but I didn't open the breezeway door, because something -- I don't know, some feeling inside of me, I was afraid I was going to see something, because the door had a window in it.

Q. And the breezeway door that you are

talking about that you didn't open, that would have taken you from that little platform there into the breezeway?

A. Yeah, it's only two steps, one to the breezeway and one to the kitchen.

Q. Okay, why don't you have a seat again. Thank you.

So you went to the kitchen door and you had the light on in the kitchen, and then when you didn't see anything, you returned to your room?

A. That's right. The dog was quiet, he sat near me, and he wasn't making any fuss, so I said, well, it's just something he heard outside.

Q. And the next place you went was to your living room?

A. That's right.

Q. And you spent a few minutes in the living room?

A. That's right, I sat down in the chair that is right near the living room door, and everything was quiet, so I said, well, I guess I better go back to bed, and I went back to the bedroom.

Q. So then you returned to your bedroom, and it is your recollection that when you went back into your bedroom, the light was not on in the kitchen, is that right?

A. That's right.

Q. But there was a light on in your bedroom?

A. That's right. I keep it on all night.

Q. What kind of a light is that?

A. What do you mean what kind of light? It's no ceiling light or -- it's a lamp.

Q. It's a lamp that is on the table?

A. Yes, a small lamp.

Q. Where is that in the room?

A. It was on the dresser.

Q. Is the dresser next to the door?

A. Well, the door to the bedroom is here and there's a door right next to that, that is to the closet, and the dresser is right there.

Q. All right. Now, you mentioned that after you went back into your room, you heard glass breaking?

A. Yeah, I thought it was I heard glass. I

hadn't got settled in the bed and I thought, my gosh, something like glass breaking.

Q. So you got right out of bed again?

A. Yeah, I got out of bed again --

Q. I take it you --

THE COURT: Wait a minute, counselor, let her finish the answer before you ask another question.

Go ahead.

THE WITNESS: So I picked up the stick that I had with me all the time and, as I say, I just got to the other side of the bathroom door into the kitchen and there was a fellow standing there.

Q. (By Mr. Hammerschmith) You had not fallen back to sleep, had you, between the time when you went back to bed and the time when you heard what sounded like glass breaking? You were awake?

A. Yes, I was awake.

Q. By the way, was there any glass broken in the house?

A. No, there wasn't glass. I thought it

was glass all the time, but when my brother-in-law came, I mean, I was down to the -- what do you call it -- the police station, when he and my sister came. Somebody called them up and told them that somebody broke in, so they came to the house, and he told me when I told him --

Q. Excuse me, Miss Prekop --

A. -- about the glass, he said it was the chain on the door that made the noise that I thought was glass; glass wasn't broke.

Q. Miss Prekop, I'd ask that you listen to the questions that I am asking you, and when you have answered the question, then I will ask you another question.

A. Okay.

Q. If you could, please. Now, when you -- after you got back out of bed the second time, you went to the kitchen, did you?

A. Well, yes, I went to the kitchen, 'cuz that's where the sound came from.

Q. And so you went through that hallway. It's a very small hallway?

A. Yes.

Q. And you went into the kitchen, right?
A. That's right.
Q. And you turned the light back on near the kitchen?
A. I turned the light on.
Q. And was it at that point that you saw someone?
A. That's right, at that point, I saw someone.
Q. And where was the person that you saw, where in the kitchen?
A. Well, he was near the table.
Q. How far was that from where you were?
A. Well, probably three, four feet.
Q. What was the first thing that happened -- first of all, was that person facing you when you first saw him?
A. I didn't understand you.
Q. When you first saw that person in your kitchen, was the person facing you?
A. Yes.
Q. What was the next thing that happened after you saw him?

A. Well, the dog started jumping all over his feet, so the stick I had in my hand, I couldn't hit him in his feet, to hurt his feet, so I hit him on the head. That's the only place I could hit him.

Q. How long were you there with him in the kitchen, do you think?

A. Probably two minutes at the most, two or three minutes. Not even five, 'cuz, as I say, just half a dozen steps and you're right in the bedroom.

Q. But you were looking at him the whole time that you were in the kitchen, weren't you?

A. No, I wasn't looking at him, I wasn't looking at anything, I was too scared. That's all I know, his hands were covering his face. That's all I saw, the white sneakers and the black wavy hair.

Q. What did the hair look like? Was it long hair or short hair?

A. No, it was -- it wasn't long.

Q. Did it look neat?

A. Yes, it looked neat.

Q. Would it be fair to say it looked like he had recently had a haircut?

A. That's right.

Q. And it was fairly short hair?
A. It was on the short side, his hair was.
Q. Now, you gave a description to the police, didn't you? You were able to remember some things about the person and you gave a description to the police?
A. That's all I know about him. I can't describe anything else, except the sneakers. I know he had a blue -- like a blue jacket and he had dark trousers on.
Q. And you knew that he wasn't wearing glasses?
A. No.
Q. Isn't that right?
A. Well, I mean, I didn't see the glasses when he had his hands covering his face and when he came in the bedroom his hands weren't on his face and he didn't have glasses on.
Q. Well, you also noticed that he didn't seem to have any jewelry or scars, didn't you?
A. No, I saw no jewelry.
Q. And no scars?
A. It would be only his face would have the

scars.

Q. Yes.

A. I didn't see anything.

Q. And he was clean shaven, wasn't he?

A. Yeah, he was clean shaven.

Q. Didn't have a beard or moustache?

A. No.

Q. You're certain of that, aren't you? You're certain that he was clean shaven?

A. Yes, he was clean shaven.

Q. Now, after this incident occurred, you went at sometime to the hospital, is that right? Did you go to the hospital that night or that morning?

A. I called the police and they came and took me down to emergency.

Q. How did you get to the emergency room? Was that in an ambulance or a police car?

A. Yeah, they went and called an ambulance.

Q. When you got to the hospital, what hospital was that?

A. Wesson.

Q. You were treated, were you, in the emergency room?

A. That's right.
Q. How long were you at the hospital?
A. More than two hours before they took me to the police station. I don't know why.
Q. So you were at the hospital a couple of hours?
A. Yes, I sat there for two hours.
Q. Did they give you any treatment there at the hospital?
A. Well, they examined me.
Q. Did you have any broken bones or anything like that?
A. No, nothing like that. They didn't look for broken bones.
Q. Did any turn up later?
A. They just noticed the black and blue, the eye all swollen.
Q. You had some bruises, is that right?
A. What?
Q. You had some bruises?
A. Well, on my buttocks where he kicked me, it still bothers today.
Q. Do you know where 87 Malibu Drive is?

A. What?

Q. Do you know where 87 Malibu Drive is?

A. Well, I know it's up the street, but I couldn't tell you which house it was, 'cuz I never go up that direction, I always go to the other end when I go anywhere.

Q. But 87 Malibu Drive would be a few houses down from you, is that right?

A. It would be almost near Parker Street.

Q. Now, the person that broke into your home that night, was that somebody you had ever seen before?

A. If I had, I didn't remember.

Q. You did not recognize that person?

A. I didn't recognize him, no.

Q. What kind of build did the person have? Was he tall, was he short, was he thin?

A. He wasn't short, he was medium build.

Q. What about height, do you know how tall he was? Did you notice?

A. Well, I know he was a little taller than I was, but not too much.

Q. Now, about a week after this, you were

called down to the police station, weren't you, to look at some people?

A. Yes. A week or ten days after, that's right.

Q. So this happened on November -- this break into your home happened on November 30th?

A. November 30th.

Q. Of 1985?

A. 1985.

Q. And then about a week or ten days afterwards, you went down to the police station, right?

A. I think it was on a Sunday.

Q. And when you went down to the police station, the police there had you look at some people, didn't they?

A. That's right.

Q. They had a lineup of people for you to look at?

A. That's right.

Q. And I'm going to show you a picture and I'm going to ask you if you recognize this group of people. (Showing photograph to the witness)

A. I don't think so.

Q. You don't remember looking at that group of people?

A. Yes, I remember looking, but I don't think I --

Q. Let me just ask you. Is that the group of people that you looked at when you went down to the police station? Is that a picture of the group of people that you looked at when you went down to the station, police station, about a week after this incident?

A. Well, I don't know. I know some of them, their hair was long and messy, and I only see one fella here that his hair is so long. It seems that there was more than one there. And the --

Q. You don't remember whether this is the group of people that you looked at on that date or not?

A. No.

MR. HAMMERSCHMITH: Perhaps we should mark this for identification, Your Honor.

THE COURT: The photograph will be

A for Identification.

(A for Identification, photograph, marked)

Q. (By Mr. Hammerschmith) In any event, on that day, you did look at a group of people?

A. Yes.

Q. You didn't recognize any of that group of people as being the person who broke into your home, did you?

A. No.

Q. And, in fact, you told the police that as far as you could tell, none of them seemed to be the person?

A. That's right. I didn't recognize anyone.

Q. There was a door that was broken that night, is that right?

A. Yeah, the breezeway door, that goes to the house.

Q. That is the door that you referred to which was just outside of the kitchen door?

A. That's right.

Q. What about the kitchen door, was that broken?

A. No,.

Q. Only the breezeway door was broken?

A. Only the breezeway door, it had a -- what do you call it -- when he -- with his foot, he opened the kitchen door, but it's got like a crack a little ways up, but it didn't hurt the door, I guess.

Q. So the kitchen door seemed to be pried open, that's what you are saying?

A. Yeah, the kitchen door was okay.

Q. But the breezeway door looked like it had been kicked open, is that right?

A. That's right, it was, because he broke the locks, it was picked all around.

Q. And that door that was kicked in, did that lead from the breezeway outside or from that platform into the breezeway?

A. That door was only from the platform into the breezeway, like the house proper, you would call it.

Q. And to get into the kitchen, would you

have to go through the breezeway?

A. Yes, to come into the house, if you come from that end of the house, you'd have to come into the breezeway first.

Q. And if you went through the breezeway, you'd come to the kitchen door?

A. That's right.

Q. And when you are outside that breezeway door, you'd be on the little platform, but you'd also be outside, is that right?

A. Yes.

Q. So the door that was broken in was the door leading from the outdoors into the breezeway?

A. No, it was in the breezeway, the door was in the breezeway, and when you open that door, you go down the basement and you turn to your left and there's the kitchen door.

MR. HAMMERSCHMITH: May I have a minute, Your Honor.

(Pause)

MR. HAMMERSCHMITH: I have no

further questions of this witness.

MR. BLOOM: Thank you, ma'am, you're all set.

(Witness steps down)

THE COURT: Can I see you side bar.

(The following conference was held at side bar)

THE COURT: Do you have your next witness?

MR. BLOOM: I have the other woman here, but I guess she's a problem. I don't want to have to bring her back, Judge.

THE COURT: Well, the only trouble is it's quarter of four.

MR. BLOOM: I know, but if we have to hold them till 4:30 -- I have a real problem with this woman. Can I report back to you in five minutes? Because she's in hysterics, I guess.