COMMONWEALTH OF MASSACHUSETTS

Hampden, ss. Grand Jury

COMMONWEALTH OF MASSACHUSETTS

VS

GEORGE D. PERROT

HEARING HELD BEFORE THE HAMPDEN COUNTY GRAND JURY ON DECEMBER 13, 1985.

APPEARANCES:

MATTHEW J. RYAN, JR., ESQ., District Attorney, Hampden County.

FRANCIS W. BLOOM, ESQ., Assistant District Attorney.

LINDA CLAIN
SHORTHAND REPORTER

PHILBIN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
CERTIFICATE OF PROFICIENCY
CERTIFICATE OF MERIT

95 STATE STREET
SPRINGFIELD, MASSACHUSETTS 01103
TEL. (413) 733-4078

P.O. BOX 402
PITTSFIELD, MASSACHUSETTS 01201
TEL. (413) 499-2231

# INDEX



| WITNESS | DIRECT |
|---|---|
| Officer James Murphy | 3 (Mr. Bloom) |
| Officer Thomas A. Trites | 10 (Mr. Bloom) |
| Lieutenant Gerald Foley | 14 (Mr. Bloom) |
| Officer Robert Cheetham | 17 (Mr. Bloom) |
| Sergeant Thomas M. Kelly | 23 (Mr. Bloom) |
| Detective Thomas Jarvis | 31 (Mr. Ryan) |
| Lieutenant Charles Arpin | 38 (Mr. Ryan) and 43 (Mr. Bloom) |



*****

(December 13, 1985.)

(Officer James Murphy, sworn.)

DIRECT EXAMINATION BY MR. BLOOM

Q Would you identify yourself for the record, please?

A Patrolman James Murphy, Springfield Police Department.

Q How long have you been a member of the Springfield Police Department?

A Five years.

Q Now, patrolman, I am going to ask you what tour of duty do you work at the police department?

A I work from eleven p.m. to seven a.m.

Q And, did you have an occasion to be working on the night of November 30th of 1985?

A November 30th?

Q November 30th, 31st?

A December 12th.

Q Strike that. I just got done with a trial and my dates are off.

What was the date?

A The incident in question was December 12th, '85, a week ago from today.

Q You were working that night from eleven to seven.

Yesterday was the twelfth..

A December 7th.
Q What did you say, the twelfth?
A December seventh of this year.
Q You filed a report December 7th, '85; is that correct?
A Correct.
Q What would your tour of duty have started on the 6th. The 7th was midnight, and this occurred on your shift?
A That's correct.
Q At eleven o'clock on December 6th you actually went to work?
A That's correct.
Q On the 7th certain things happened that caused you ultimately to file a report?
A Right.
Q Could you read that report please into the record?
A From the report dated December 7th, 1985.

At approximately 2:15 a.m, the 7th, I received a call to respond to number 6 Ellendale Street for a report of an assault.

Upon arriving I found that the front door was open. It was broken and the lock catch was on the floor.

I was met by a Joseph McNabb, of that address, and his wife, Helen.

Helen was very upset. She stated, "My God, someone broke into my house. He hit my husband with a stick." I asked Joseph. He stated, "We were asleep. We heard a bang. I came into the kitchen and I observed a young white male with dark hair and a muscular body." He stated he was chunky. "He had a stick and hit me in the head several times." Helen reached to the ground and picked up an orange broom handle.. She stated, "I think that's my broom. Come I'll show you!" She led me to the side breezeway door. We walked onto the open breezeway. She showed me where she kept the broom near a small shed. I looked around the area, behind the shed, and I found the brush part of the broom laying on the ground. The handle had been broken off. Helen identified both pieces of the broom as hers and also as the instrument used in the assault on her husband. I observed six footprints on a cement patio to the rear of the breezeway. I made a sketch of the prints in my notebook. Then I went back to the house to notify Captain Basile, who was the Captain of the evening. He stated he would send the Detective Bureau up to the house to investigate. I told the McNabbs to secure their home and wait for the

Detectives. I then went in search of the subject. Approximately 2:30 a.m. as I was operating my cruiser on Malibu Drive I observed a black car flashing its headlamps on and off. I drove quickly to the vehicle. When I stopped near this vehicle a female subject, Ann Serafeno, 84 Brown Ave., Holyoke, Mass, told me that her girlfriend had just had her purse snatched in front of Denny's Restaurant, 320 Cooley Street. She stated that she chased the subject from Denny's across Cooley Street up the driveway of 329 Cooley Street, where fresh footprints were found in the snow, and into the backyards south-easterly to Malibu Drive. She indicated that he had headed toward the center of the street and into the yards. She stated that she could not catch him. At this time Car 8 Officer Gormally and Officer Martel arrived and I told Ann to tell them what happened. I returned to Ellendale Street to check on the victims.

At this time Officer Gormally notified me that he had footprints in the driveway of 329 Cooley Street. I responded there and examined the prints. They were exactly the same type as the ones on Ellendale Street. I decided to check the houses on Mailbu Drive

for matching prints. Since George Perrot is known to me and fit the general description of the purse snatcher and the breaker, I responded to his home first. In the driveway at 87 Malibu I observed the exact same prints leading up the driveway and into the backyard. The prints stopped, returned from the yard and led up the stairs into the house. I called for Lieutenant Foley for assistance. Officer K. Gagner, Lieutenant Foley and I entered the house with the consent of Mark Westcott of that address. Lieutenant Foley and I entered the cellar and searched. We found no subjects. We returned to the first floor. I asked Nancy Westcott, Perrot's sister, if she would mind if we inspected George's bedroom. She said, "okay", and led us to the rear east bedroom. I tried the door handle and it was locked. Nancy walked to the north-east bedroom and returned with a set of keys. She opened the door. I observed George to be laying on his back on the bed with his feet hanging over the edge. On the floor, near his feet, was a blue vinyl pocketbook containing papers belonging to Sheileen Sapelli, 31 Fort Pleasant Ave., Springfield. In plain view on the dresser was a brown vial containing a white

powder residue which appeared to be a drug substance. Officer K. Gagner removed this vial and handed it to me. There were four $20 bills, two $5 bills, and three $1 bills on the dresser. The vial was tagged and the pocketbook was tagged, and the money was later tagged. It wasn't taken, the money was left there at that time.

At that time Lieutenant Foley, Officer Gagner, and myself placed George Perrot under arrest.

The Lieutenant advised me to escort him to my cruiser and bring him to Denny's Restaurant.

Q Now, you're not reading form the report correct?

A No.

Q From this point forward, the report indicated the following:

A I escorted George to my cruiser in front of the house. As I attempted to unlock the door George struck me using his left shoulder and body weight, knocking me into the cruiser. He then ran westerly on Malibu Drive and into the backyards. Approximately five minutes later with the assistance from several cruisers Perrot was recaptured.

Q Then later on that night he was placed under arrest at

the Springfield Police Department -- or booked at the Springfield Police Department, is that correct?
A That's correct.
Q Ultimately you signed your report on the bottom of the page?
A That's correct.
Q Now, let's just, the names referred to, the girl stopped in the car, stopped you in a car?
A Right.
Q She was the girlfriend of Sheileen Sapelli, who had her pocketbook snatched, is that right?
A That's correct.
Q You ultimately ended up at George Perrot's house and Sheileen Sapelli's pocketbook was in that house, in a room, lying on the bed, is that also correct?
A That's correct.
MR. BLOOM: Any questions of this Officer? Thank you, sir.

*****

(Officer Thomas A. Trites, sworn.)

DIRECT EXAMINATION BY MR. BLOOM

Q. Would you indicate for the record your name and occupation?

A Thomas Allen Trites, Springfield Police Officer, presently assigned to the Detective Bureau.

Q Detective Trites, did you have an occasion to become involved in an incident on December 12 of 1985 -- an investigation I should say, ensuing by your Department on that day?

A I got involved on December 7th, if that is the one you're referring to.

Q In any event, did you have an occasion, during the course of your tour of duty to take a statement from a young lady, Sheileen, I think is the first name, Sapelli?

A Yes, I did.

Q Would you read that statement into the record for the Grand Jury?

A Yes, I will.

The following is a statement by Sheileen Sapelli, taken at 130 Pearl Street at 4:15 a.m. on December 7, 1985. Taken in the presence of P. Cavanaugh, T. Trites, E. Dean.

My name is Sheileen Sapelli. I am twenty-five years old and I live at 31 Fort Pleasant Ave., in Springfield. My phone number is 732-1709. On this date I was with Ann Serafino. This morning at about 2:15 a.m. I went to Denny's Restaurant on Cooley Street to get something to eat. We were in separate cars and we parked them on the north side of the building. We both got out of our cars and started walking towards the front of the restaurant in the road. Next thing I know is that someone was behind me touching the left side of my body. I then turned around and saw a white male with dark hair, scragglev beard wearing a dark colored jacket. The white male then grabbed my pocketbook and started running across Cooley Street and into a backyard.

My friend Ann Serafino, chased the subject to a backyard on Mailbu Drive, but she lost him.

I then flagged down a cruiser, which was coming down Cooley Street and I told them that my pocketbook had just been stolen. Ann and I were then on our way back to Denny's to wait for the Police. We waited for about twenty minutes till the Police arrived. They then took us both over to where Ann had chased the subject and

then lost him because they wanted to look at the footprints in the snow. We both then went back to Denny's to wait for the Police again. About ten minutes later the Police came back and told us that they had an idea of who it was had stolen my pocketbook, but that he was not at home now. The Police left again and returned five to ten minutes later. This time they told us that they had arrested the guy and that they had my pocketbook. We both then got into a cruiser and were going to make an identifiecation of the person the Police had in custody when we heard on the Police radio that the subject had got away. We were then told to get out of the cruiser and go back to Denny's. We were standing in front of Denny's on the grass. I thought I saw someone running through a yard across the street on Malibu Drive. He hid in the bushes. I then told Ann to go over to one of the cruisers on Cooley Street to tell them that we thought we saw someone in a backyard. All of a sudden the person we saw hiding in the bushes came out and stoood on the sidewalk. He was wearing a blue jacket with white lining. I then screamed, "there he is" and I saw him start running up Cooley Street.

A few minutes later a cruiser came back to where we were at Denny's and it was at this time that I positively identified the subject in the back seat of the cruiser as being the person who stole my pocketbook earlier in the evening. Another cruiser pulled up and had a pocketbook inside it. At this time I identified it as being mine.

A short time later I along with Ann Serafino were brought to the Detective Bureau by Officer Cavanaugh to give this statement. While I was there they told me that the subject that they had arrested for stealing my pocketbook was George Perrot of 87 Malibu Drive and that his date of birth was 1/21/68.

Then Ann Serafino also signed a short paragraph.

I have read the above statement and it is true to the best of my knowledge. I was a witness to this crime and I also identified George Perrot as being the person who stole my friend Sheileen Sapelli's pocketbook.

MR. BLOOM: Any questions of Detective Trites?

Thank you, sir.

*****

(Lieutenant Gerald Foley, sworn.)

DIRECT EXAMINATION BY MR. BLOOM

Q Would you identify yourself?

A Lieutenant Gerald Foley, Springfield Police Department.

Q Now, on December 7th of 1985 did you have an occasion to become involved in an investigation here in Springfield, out in, I guess, the Sixteen Acres area of the City of Springfield, correct?

A Yes, I did.

Q At some point did you have an occasion to go to someone's house in conjunction with that investigation?

A Yes, sir, I did.

Q And, do you know whose house that is, today?

A Belongs to Mr. and Mrs. Westcott.

Q Who were you looking for, sir?

A A Mr. Perrot, Mr. George Perrot.

Q Are you familiar with him?

A Yes, I was. I had known the subject and heard his name quite a bit.

Q Do you remember at some point in time, did you gain access to that house?

A Yes, sir, I did.

Q Who gave you permission to go in the house?

A Mr. Westcott.

Q He is the owner, correct?

A Yes, sir.

Q When you got in there, sir, as best you recall, can you tell the Grand Jury where you went?

A Well, I was notified before the subject may be hiding in the cellar. When I explained to the Westcotts I would like to come in and look for George Perrot, who lived there and asked if I could come in, I got my permission and we went right to the cellar. Officer Murphy and myself. Officer Gagner stayed on the first floor, in case the subject was there. We searched the whole cellar and couldn't find George down there. We came back up to the first floor and asked if we could search the first floor. They said, "sure." We searched the first floor and found one door that was locked. Nancy Westcott, the sister of George Perrot said, "oh, that's George's room, I have got a key here." She opened the door and two officers and myself were standing right there. We looked into the room and George was lying on the bed. He wasn't lengthwise. He was laying widthwise, with his feet hanging off the bed.

We saw a blue pocketbook right at his feet. We went

and lifted the blue pocketbook, that fit the description of the pocketbook taken just a few minutes before. So we looked and found identification in the pocketbook, belonging to the person.

Q Sheileen Sapelli?

A Right.

Q Some personal papers, the cards, so forth in the pocketbook?

A In the pocketbook.

At that time he was placed under arrest. Then Kenny Gagner, Officer Gagner, took the pocketbook and returned to Denny's to be identified. And we were bringing George Perrot to Denny's to see if they could also identify him.

Q And, that's when Mr. Perrot pushed or shoved Officer Murphy, there was a chase, and ultimately he was recaptured?

A Right, right.

MR. BLOOM: Any questions of Lieutenant Foley? Thank you, sir.

*****

(Officer Robert Cheetham, sworn.)

DIRECT EXAMINATION BY MR. BLOOM

Q Would you first identify yourself for the record, please?

A Robert Cheetham, Springfield Police Officer.

Q Now, Officer Cheetham, can you tell us how long you have been a member of the Springfield Police Department?

A Six years.

Q And, what is your present tour of duty?

A Twelve a.m. to eight a.m. in the morning.

Q Were you working that tour of duty, going back, let's say to November, I think it was, 30th of 1985?

A Yes, I was.

Q Did you have an occasion to investigate an alleged crime on that night?

A Yes, I did.

Q Was it more than one or one crime that you were aware of?

A It was two crimes.

Q Can you tell us the location in the City of Springfield, you were concerned with on that night?

A The Sixteen Acres area, area of Allen and Cooley Streets.

Q As a result of your involvement, again on November 30th, just so we can clarify it for the record, when you went on duty at midnight it was the 30th. Previous at eleven o'clock that night it would have been the 29th, correct?

A Yes.

Q You submitted a report to the Crime Prevention Bureau, right, as a result of your involvement in this investigation that night?

A Yes, I did.

Q I am going to read that into the record, please indicate if I make any mistakes or if there is something that I misstate as I read it in.

This report is dated 11/30/85.

Special to the CPB.

On this date at about 3:45 a.m. Officer E. Dean and I responded to 33 Covel Street, the home of Emily Lichwala, age sixty-four years. The victim stated to us and the officers that responded to the original transmission, that at about 3:25 a.m. she heard some loud bangs. The subject had been the victim of a previous B & E and rape. She heard the sound of breaking glass. She ran out of her front door to 280 Forest Hills Road, the home of her neighbors, the

Jilsons. Entry was initially gained by kicking out the dryer vent, which was through the cellar window. This was the point of entry in the previous break. The intruder was unable to get to the main floor because the cellar door was double bolted. It appears that the intruder then left via the walkout cellar door, taking a pool cue with him. The subject used the pool cue to break out the window on the south side breezeway. The window was raised and entry gained. Once inside the breezeway the subject broke a plexiglass window and kicked in the door, thereby gaining entry into the home. Taken was a beige handbag containing $50 and various credit cards.

At about 4:10 a.m. we responded to 27 Malibu Drive....

Q (By Mr. Bloom) Before I go any farther, what is the distance from 33 Covel Street to 27 Malibu Drive?

A Probably a mile, at best.

Q .......the home of Mary A. Prekop. At about four a.m. Officers responded to that address in regard to a B & E. The victim stated that earlier she heard the dog bark. She checked her house and saw nothing. She went back to sleep. She then heard the two doors leading from the breezeway being kicked in. Miss

Prekop is the victim of two other B & E and rapes. She got out of bed and was met by a white male, early twenties, 5'7" - 6'0", slim-medium build with dark wavy hair, wearing a black jacket and sneakers. Victim states that she was pushed into her bedroom, her dog kicked out of the room, and she was thrown to the floor. Victim states that she was beaten about the face, arms, legs, and side. She also reports that she was sexually assaulted. Her purse was ransacked. No losses. A pair of white gloves with design on them were found in the bedroom, one on the floor and the other on the bed. One of the gloves had some blood on it. Tagged by Sergeant Kelly. Victim transported to the Wesson ER by ambulance. Victim treated for contusions to the face and body and lacerations to the right hand. Photos taken at both locations. Prints taken at 33 Covel Street by Officer Reigner. 911 reports made by both DB and CPB. Rape kit tagged. Respectfully submitted, Robert Cheetham.

MR. BLOOM: Any questions of Officer Cheetham?

GRAND JUROR: The crime that was just read in is separate from the previous break ins and rapes of this woman?

Q (By Mr. Bloom) Correct me if I am wrong, we're talking now, on November 30th, at about 3:30 or quarter of four, in that neighborhood, someone broke into the house of Mrs. Lichwala on Covel Street, in about fifteen minutes later or thereabouts, in the same general neighborhood Mrs. Prekop had her house broken in. A similar type of entry was gained and she was raped?

A Yes.

Q Both of the woman had been raped, almost under identical type of circumstances. I believe Mrs. Lichwala's was five or six days before. Mrs. Prekop is about eighty years old and was raped on two previous occasions, to date. You have now described to the Grand Jury an almost identical type of injury. Is that a fair assessment of what allegedly has occurred?

A As far as Mrs. Lichwala, probably closer to a month earlier, but entry was gained, the original entry and original -- both entries were gained through the dryer vent area.

Q I'll clarify it by the detectives, I thought 11/24 was Mrs. Lichwala's previous rape?

A I could be wrong.

Q In any event, both woman were sexually molested. Mrs. Lachwala in fact, heard the noise and because of what

happened previously she just ran out of the house?

A Ran out the front door.

Q Talking fifteen minutes, twenty minutes difference, two incidents in the same general neighborhood, as far as the 30th of November is concerned?

A Correct.

Q Then followed up and investigated by the Detective Bureau and the Crime Prevention Bureau, correct?

A Yes.

Q Some of those officers, superior officers are outside today?

A Yes, they are.

MR. BLOOM: Any other questions of this Officer? Thank you, sir.

*****

(Sergeant Thomas M. Kelly, sworn.)

DIRECT EXAMINATION BY MR. BLOOM

Q Identify yourself for the record, please?

A My name is Thomas M. Kelly, Police Officer for the City of Springfield, assigned to the Crime Prevention Bureau.

Q Could you indicate for the Grand Jury, were you involved in an investigation about a week or so ago concerning some breakings and sexual assaults up in the Sixteen Acres neighborhood of Springfield?

A Yes, sir.

Q Initially, within the course of your investigation on the 30th, did you have an occasion to take a statement on that date from a Mrs. Mary Prekop?

A Yes, sir.

Q Sergeant, before we get into that, tell the Grand Jury do you know how old that lady is?

A She is seventy-eight years old.

Q There was a question from the other witness, who just got done testifying, had you an occasion to investigate two previous rapes of that woman?

A Yes, sir, one in May of 1984 and one in July of 1985.

Q Were those alleged rapes made or committed by intruders

who broke into the house in the middle of the night?

A Yes, sir.

Q Can you tell us as a result of your investigation that night did you have an occasion to take a statement from her?

A Yes, sir.

Q Do you have that with you today?

A I do.

Q Would you read that into the record, please?

A It's a statement by Mary A. Prekop, dated November 30, 1985, at 8:10 in the evening.

My name is Mary A. Prekop. I am seventy-eight years old. I live alone at 27 Malibu Drive. I have lived there since 1973.

At about four a.m. this morning I woke up because I thought I heard glass breaking. I went into the kitchen, where I thought the noise was coming from. I put the light on. I have a dog since the last attack. The dog went into the kitchen first and I followed her. I opened the kitchen door and found there was nothing there so I sat in the living room for a few minutes and everything was quiet. Then I went back into the bedroom and layed down on the bed. The dog layed down

next to my bed. Then all of a sudden she barked and ran off to the kitchen. I now keep a big stick by my bed and I followed her to the kitchen carrying the stick. The dog started barking. I got as far as the bathroom door and I saw a man standing in the kitchen. I hit him on the head with the stick. He grabbed the stick and pushed me into the bedroom. The dog tried to follow, but the man closed the door.

I was still fighting him and he threw me on the floor. He never said anything. I started calling the dog by name, Scuffy. He hit me on the face a couple of times. I kept screaming after the first time, but after a while I decided I should keep still. I kept kicking with my feet and he punched my left thigh. He pulled my nightgown aside and he sucked on my left breast. He did this for a couple of minutes, and then he got on top of me. He pushed my nightgown up and lifted my legs up. He put something into my vagina, but I'm not sure what it was. He kept his pants on. I never saw his penis. I started moaning. I pretended to pass out. He got up and left the room. I waited until everything was quiet. When the dog stopped barking I went into the living room. I saw my pocketbook on the floor.

The contents were spilled out. I picked up the change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook. I don't know if he took it or not. I then called the police. I wasn't able to dial at first because I was so nervous. The second time I tried I was able to get through.

I can describe the man who broke into my home as a white male, about twenty to thirty years old. He had dark, wavy hair, and he was clean shaven. He was average height and weight. He was wearing a blue jacket, it looked like nylon and sneakers, which were white. He was wearing a dark colored pair of pants, they were neither jeans nor corduroy material. He was not wearing glasses. I didn't notice any jewelry or scars.

The only thing he ever said to me was to keep quiet. He said this a few times, while he was hitting me.

I forgot to mention when he first came into the bedroom he broke the lamp which was on the dresser. He hit it with his fist and knocked it to the floor. This lamp was on before and it went off when he broke it.

When the police arrived I noticed a pair of gloves

on the foot of the bed. They are not mine. I never saw them before.

Signed Mary Prekop.

Q (By Mr. Bloom) Sergeant, did you have an occasion to have photographs taken of Mary Prekop on that night?

A Yes, sir.

Q Do you have them with you today?

A I believe you do.

Q Are they in the box somewhere?

A Yes.

Q Would you identify those photographs and date them for us, if you would?

A These photographs were taken in the evening of November 30th, at the time the statement was taken. They picture the injuries explained by Mrs. Prekop. They were taken at nine a.m., nine a.m., November 30th.

Q That would have been in the morning. She was raped somewhere around four o'clock.

A This is about five hours later.

Q Would you pass those around to the Grand Jury, please?

A (The witness complying.)

Q Sergeant, that night, was there an investigation concerning a crime in the neighborhood fifteen minutes apart

from the Prekop incident, just referred to and can you tell us what that concerned?

A Just prior to the break and entering of Miss Prekop's home, Emily Lichwala was at home and heard some noises. She investigated in the area of her home. She discovered an individual breaking in to her back door. He kicked two doors in and entered the home. She escaped through the front door of her home, never saw the assailant, and went to a neighbor's home.

Q And, did you know Mrs. Lichwala, have an occasion to know her prior to the 30th of November of 1985?

A Yes, sir. She was the victim of a burglary and sexual assault that took place on October 24, 1985.

Q What were the circumstances of that, in terms of similarities, if any?

A The method of entry on October 24th was through a dryer vent in the cellar window, it was kicked in. The assailant gained entry and came into the house through the cellar stairs.

The method of entry, intitially, on November 30th was the same way, kicked the dryer vent and went in, up the cellar stairs. Miss Lichwala had double, two, bolts put on the cellar door this time.

The assailant then went back down the stairs, took a pool cue from the pool table area, went out the hatchway door, around to the breezeway, broke a window, lifted up that window, got into the breezeway, broke another window, turned the handle on the inside door, but Miss Lichwala also put a chain at the very bottom of the door and that stopped him from entering, so he kicked that one in. And, that's how he gained entry that time. Very similar, the initial attempt, through the same window.

Q Picking up in terms of the four incidents, you knew, did you not, sir, on the 30th -- on December 7th Mr. Perrot was placed under arrest on that night?

A Yes, sir.

Q The four incidents that happened prior to can you tell the Grand Jury what, if anything, was done in order to investigate those matters?

A There was evidence that was recovered. The incident on November 30th with Miss Prekop, some blood was recovered on the bedsheets, and a pair of gloves were recovered, cloth gloves that appeared to have blood on them. They're now at the PBRI Lab being analyzed. And, also fluid was obtained in a medical exam from Miss Prekop, and that also is being analyzed.

Q So, is it fair to say, you are also aware of the fact that hair, and pubic hair samples have been taken from George Perrot, correct?

A Yes, sir.

Q Blood has been taken from him?

A Yes, sir.

Q You're basically waiting for the results of those various pieces of evidence to find out if in fact there is any match between them at this point?

A Yes, sir.

Q Concerning the four other incidents?

A Yes, sir.

Q Now, Mr. Perrot was arrested on the 7th and you charged him in conjunction with the two incidents you just described happened about a week earlier?

A Yes, sir.

MR. BLOOM: Any questions of Sergeant Kelly? Thank you, sir.

*****

(Detective Thomas Jarvis, sworn.)

DIRECT EXAMINATION BY MR. RYAN

Q Would you tell the members of the Grand Jury your name and your address, and your occupation?

A Thomas Jarvis, Detective, Springfield Police Department, employed nineteen years, Detective Bureau.

Q And, were you so employed on December -- earlier this month?

A Yes, I was.

Q At sometime did you have an occasion to investigate one, George Perrot?

A Yes, sir, I did.

Q Can you tell us when it was you became involved in the case?

A Approximately on December 7th, around 12:40 p.m.

Q And, who were you working with?

A At that time I was working with numerous detectives.

Q Can you tell us what first you did in conjunction with this investigation?

A Yes, talked to George Perrot and advised him of his Constitutional rights.

Q When you advised him of his rights did you have a card of some kind?

A Yes, sir, I had a card with the Miranda Rights that he signed.

Q Did you have that with you?

A Yes, sir, I did.

Q May I see that. This card indicates, he was given the right to use the telephone, also his Miranda rights were read to him.

He signed that, did he not?

A Yes, sir, he did.

Q Both places, on the telephone and also on the Miranda card?

A Yes, sir.

Q Thereafter you took a statement?

A Yes, sir, I did.

Q Would you read that statement to the Grand Jury, please?

A Statement taken from George David Perrot, age seventeen,

87 Malibu Drive, Springfield, 782-6932,

Statement taken by Detective Thomas Jarvis, on

December 7, 1985 at 12:40 p.m.

I returned home from work at about five p.m., Friday, December 6, 1985. I work on construction. I called my girlfriend, Lisa Eldridge, when I got home from work,

and asked her if she was ready to go out. I then called Bob Timmeran and asked him to pick me up, so that we could go out with the girls. Bob came over at about six p.m., Friday night. We went over to pick up Lisa who lives at 116 Corey Road. From there we went over to East Longmeadow to pick up her friend, Debbie, I am not sure of her last name. We picked up a case of Bud at the Springfield Package Store at Allen and Cooley. Then we went driving around the City drinking beer and smoking Marijuana. We then made two trips up to Dickinson Street, where we bought one half gram of coke on two occasions. Then we went over to Bob's house and did a couple of lines of coke. Then we went over to my house and did a couple of lines of coke. Then we went over to the package store and bought another six pack of Bud. It was getting late so we dropped Lisa off at her house and then dropped Debbie off, in East Longmeadow. This was about 12:15 a.m. Saturday morning. Bob dropped me off at my house. I walked up to Denny's Restaurant at Allen and Cooley Street. I went inside and had a coffee. After I finished my coffee, I walked outside and noticed two girls walking from the

parking lot towards Denny's. One of the girls had her pocketbook dangling. I ran over and grabbed the pocketbook, and ran across Cooley Street towards my house on Malibu Drive. I went into my house and went into my bedroom. I checked the pocketbook for money and only saw a little more than a dollar in change. I left the pocketbook in my room. I then left the house and started walking up Malibu, I walked over two streets to Ellendale Street. I walked up to a house. I don't know the number, and saw a broken broom handle in the carport. I kicked the front door in and started to walk around what I thought was the dining room. I had the broom handle in front of me so I would not bump into anything. I started to hear a lot of voices. I got scared and ran out the front door. The reason I broke into the house was to get money for drugs. I ran back home and the police were there.

Statement given by George David Perrot. Signed and my signature was there also.

Q (By Mr. Ryan) Now, did you have an occasion to search the house?

A No, sir, I didn't.

Q Do you know who was there at the time?

A I believe Officer Cheetham, and the detectives working that midnight to eight shift.

Q What next, if anything, did you do in conjunction to this case?

A Another statement was given by George Perrot.

Q When was that taken?

A The same day, approximately two hours after the first statement was given me.

Q Would you read that to us?

A Yes, sir.

My name is George Perrot and I live at 87 Malibu Drive and I am seventeen years old.

On November 30, 1985 I went to Brattleboro, Vermont with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Street. I started drinking about eight p.m., which was a Friday Night. We also drank about a case of Bud. I took a "purple mescaline" on the way to Vermont. We stayed there until about 2:15 a.m. Michael dropped me off about 3:15 a.m. at my house. I headed for number 33 Covel Street. The reason I went there was I heard it had been broken into before. I had a pair of

of my sisters gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel Street. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street. I left 33 Covel Street and went to 27 Malibu Drive I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door. This occurred about four a.m. on Saturday November 30, 1985. After this I went home.

I had been drinking since about seven p.m. that day and had also taken two purple mescaline pills. Signed George Perrot, December 7, 1985. Witnessed Thomas Jarvis and Captain Ernest M. Stelzer.

Q (By Mr. Ryan) Is it fair to say he admitted he had broken in these places, but at no time did he give you a statement that a rape was involved or any altercation with any people within the house, is that correct?

A That's correct.

Q That is the extent of your investigation?

A That's the extent of my investigation.

MR. RYAN: Any questions? All right, thank you.

*****

(Lieutenant Charles Arpin, sworn.)

DIRECT EXAMINATION BY MR. RYAN

Q Would you tell the members of the Grand Jury your name, your address, and your occupation?

A My name is Charles Arpin, A-R-P-I-N. Springfield Police Officer, assigned to the Detective Bureau. I have been a Police Officer for approximately seventeen years.

Q What rank do you hold at this time, sir?

A I am a Lieutenant.

Q Were you so engaged in early December of this year?

A Yes.

Q At sometime did you have an occasion to investigate in conjunction with other investigations, a pocketbook snatch at Denny's Restaurant, out on Cooley Street?

A Later in the morning hours, sometime after the incident.

Q Can you tell us what, if anything, you learned in conjunction with the investigation that led to one George Perrot?

A Perrot had been initially charged with the purse snatch, had been identified as the suspect in the previous house break, just maybe fifteen minutes or so prior to the purse snatch, at Ellendale Circle, the house of Joseph and Helen McNabb.

Investigation by the Crime Prevention Bureau and the Detective Bureau, there were footprints found at the scene at Ellendale Circle that were similar to footprints found between some houses on Malibu Circle, which the assailant of the purse snatch had run through. And, Officer Murphy upon noting the similarity in prints, and had some previous knowledge, went to 87 Malibu Drive, and noticed the same footprints into the stairway into that house. As a result of that he was, George Perrot, was arrested and charged with the purse snatch. His sneakers were impounded. They did match the pattern.

Q Of the three different locations?

A Yes, the same pattern, same size.

Photographs were taken of the comparisons and later on a line up was conducted at the Springfield Police Department, which Mr. McNabb picked George Perrot and positively identified him as the man that had broken into his house and assaulted him.

Q Do you have that line up?

A Yes, sir. These are the photos of the line up.

Q These are the numbers of the people that were there?

A Yes, sir.

Q Which is Perrot?

A Perrot is in the number one position. He was allowed to choose the position he wanted. He chose that position.

Q He is the man who McNabb picked out as the person who assaulted him on the previous evening?

A Yes, sir.

Q And, at sometime did you also obtain authority to search Perrot's house?

A Yes, there was a search warrant issued.

Q Did he also give you a waiver?

A Yes, sir, a waiver to take hair samples, both head and pubic hair samples, along with blood samples of his blood.

Q Those you have done, yet you have not gotten the results, is that correct?

A That's correct, sir.

Q Now, in the course of the search of the house, can you tell the members of the Grand Jury what, if anything you found?

A I wasn't present at the time of the search, but I have knowledge what was recovered.

Q This knowledge you gained from talking with other officers and reading their statements, is that correct?

A Yes, sir, that's correct.

Q Can you tell us what you obtained?

A Four $20 bills were confiscated as what was named in the warrant as one of the items we were looking for was four $20 bills. Also credit cards.

Q Who had he obtained the $20 bills, had Perrot, supposedly?

A That was part of the contents of the pocketbook of Ms. Sapelli.

Q Was there also an American Express card?

A There was, that was not recovered.

Q She indicated a certain number of bills and also credit cards, is that correct?

A That's correct.

Q You recovered what she had said regarding the money, you recovered from him, not the credit cards, is that correct?

A That's correct.

Q What else, if anything?

A There was some other items located in there, that may have been drug paraphernalia, which was forwarded to the lab.

Q Nothing to tie him in to the robberies?

A No, sir.

Q What else, if anything, did you do, sir?

A I supervised the investigation. He was questioned by Detective Tom Jarvis. He gave two statements.

Q Is it fair for me to say the statements involved all the breaks but to a limited extent, all indicated he broke into the house, but at no time did he indicate that he raped this woman, is that correct?

A That's correct.

That's also correct in the McNabb break, he refused to actually admit assaulting Mr. McNabb. However, he admits breaking in there.

Q Mr. McNabb was assaulted in addition?

A Yes, sir, he received three hits. He was protecting himself and he got a bruise to his head and as he was hitting him in the head he put up his left arm.

Q What was he hit with?

A A broken broom handle.

Q Will you tell us, as best you can, the age of Mr. McNabb and his wife?

A Mr. McNabb I think is sixty-one years old. His wife, I don't have her age.

Q They're roughly about that age?

A Yes, sir.

Q Anything else, sir?

A No, sir.

MR. RYAN: Any other questions?

Thank you very much.

*****

(Lieutenant Charles Arpin resumes the witness stand.)

DIRECT EXAMINATION BY MR. BLOOM

Q Lieutenant, would you reidentify yourself?
A Charles Arpin.
Q Lieutenant, you testified a few moments ago on these matters in front of the Grand Jury?
A Yes, sir.
Q Now, Lieutenant, at some point in time was a footprint analysis done in terms of the McNabb home invasion of December 7 of 1985?
A Yes, sir, there was.
Q Can you tell us, just give us a little background, how that ws done, what area of the footprint was discovered, what type of matching technique was used and what the outcome of all that process was?
A Just a little history. The initial investigating officer, Officer Murphy responded to 6 Ellendale Circle and observed a set of footprints in the snow leading from the house. It was in the area, which he fled the house, located on the side of the house in a patch of snow. He looked at it and observed the prints were fairly clear, unusual pattern,

it was a distinct sneaker pattern, quite clear. He made a sketch, checked the area.. He was flagged down by the victim or the witness to the purse snatch, which happened just a few minutes afterwards. In talking with her, she pointed out a location where she last chased the subject. I believe it was Serafino, the girl, and pointed out the area between the house. Yeah those are my footprints, and she pointed to hers. And those are the suspect's that she chased.

Q This is all in the vicnity of the McNabb residence?

A Yes, within walking distance, all of this area.

He noted the same distinct pattern from memory and in fact had made a sketch, had drawn and noted the same distinct pattern on that.

Then he went to 87 Malibu Drive, the home of George Perrot and in the driveway he observed a sample of the sneaker print up to the stairway and into the house.

Now, the sneaker print in this photograph here, this is the McNabb residence, 6 Ellendale Circle. This is the area to the side of the house and we have a close up of this area. This is where those prints are from.

Q Is that the door which entry was gained through, do you know?

A No, I don't believe so. I believe it was the front door, which entry was gained.

Q But the -- excuse me -- this shows the area just behind what appears to be a carport, looks like a carport, is the area you are referring to, correct?

A That's correct.

Q Now, the second photograph, which would indicate to you what?

A This would indicate one of the sneaker prints left behind by the perpetrator.

Q And, pressed by someone from the Springfield Police Department.

A That's correct.

Q The type of striations of the foot, of whoever made that?

A The distinct pattern and size.

Q Then thirdly, if I am not mistaken, you went over and you got George Perrot's sneaker and that was impressed in the snow, right next to one of the distinct footprints at the location depicted in the first photograph the Grand Jury is looking at?

A Yes, sir. Prior to that there is a photograph showing the sneaker, showing the pattern in comparison to the

pattern on the ground.

Then this one here.

Q The fourth one, showing the actual -- correct me if I am wrong -- what appears to be in the area of the first photograph, a distinct, I would say, right sneaker, right foot sneaker print?

A That's correct.

Q Once Mr. Perrot was in custody, the right sneaker was layed down right next to that footprint in the snow for comparative analysis, right?

A Yes, sir.

Q That photograph shows that?

A That's correct.

Q Sir, this one is the one left there at the scene. This one impressed by the police with the sneaker. As I hold it to the Grand Jury, the bottom one was left by the suspect. The top one is the sneaker of Mr. Perrot pushed into the snow in comparison to the one left by the suspect?

A Yes, sir.

Q There were also gloves taken into custody by the Springfield Police Department from the house of which incident, sir, concerning the 7th or the 30th?

A I'll have to refer to the case because there were

several incidents involved here.

Q At one point was there gloves taken into custody that I beleive his sister indicated looked exactly like a pair she was missing?

A Yes, that was at the Prekop residence. I am not sure which incident we're referring to.

Q I believe at some point during the interview Perrot admitted to Patrolman Jarvis, in fact those were his sister's gloves, if I am not mistaken?

A That's correct.

Q Also, if I am not mistaken, I believe that was from the November 30th incident?

A I am not sure at this point. If I may refer to my notes I could --

MR. BLOOM: Are there any questions? Any other questions for Lieutenant Arpin? I wanted to give you a chance to see those photographs. I wasn't sure you had been given access to them.
Thanks, Lieutenant.

*****

(Conclusion of the Grand Jury minutes.)

*****

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF HAMPDEN

I, LINDA CLAIN, do hereby certify that the foregoing is a true and accurate copy of my stenographic notes to the best of my knowledge and ability.

Linda Clain
Linda Clain
Shorthand Reporter

*****