UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 18-CV-10147

| | |
|---|---|
| GEORGE PERROT | |
| Plaintiff, | |
| | |
| v. | LEAVE TO FILE EXCESS PAGES GRANTED ON March 28, 2024 |
| | |
| THE CITY OF SPRINGFIELD, et. al., | |
| Defendants | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF DEFENDANTS, CITY OF SPRINGFIELD, CHERYL CLAPPROOD, THOMAS KENNEDY, MARIANNE POPKO, JUDITH KELLY AS THE ADMINISTRATOR FOR THE ESTATE OF THOMAS KELLY, ANDREW CANEVARI, PAUL GLANTZ, THOMAS JARVIS AND RONALD ST. GERMAIN

1

**TABLE OF CONTENTS**

| Content | Page |
|---|---|
| Table of Authorities | 4 |
| I.   Introduction and Statement of Facts | 8 |
| II.  Standard for Summary Judgment | 19 |
| III. Argument | 20 |
|     A.  There Is No Evidence of any Municipal Employee Having Violated Perrot's Constitutional Rights | 20 |
|         1.  Defendants Kennedy, Popko, Clapprood, Canevari and St. Germane had no significant involvement in the arrest and prosecution of Perrot. | 20 |
|             a.  Marianne Popko | 20 |
|             b.  Cheryl Clapprood | 21 |
|             c.  Ronald St. Germain | 21 |
|             d.  Thomas Kennedy | 22 |
|             e.  Andrew Canevari | 23 |
|         2.  The Statement Perrot Gave On November 30, 1985 Cannot Be Challenged In This Matter As A Matter of Law | 23 |
|             a.  The statement is protected from challenge by the doctrine of collateral estoppel; | 23 |
|             b.  The statement cannot be challenged as it would implicate the validity of a conviction that has not been reversed or vacated; | 26 |
|         3.  There is No Evidence Of Failure To Provide Exculpatory Evidence | 27 |
|         4.  Municipal Defendants are Entitled to Absolute Testimonial Immunity For Any Statements Given In The Criminal Proceedings | 28 |
|         5.  There Is No Evidence "False" Testimony Lead to Perrot's Conviction | 29 |

| <u>Content</u> | <u>Page</u> |
|---|---|
| 6.   There is No Evidence Any Municipal Defendant Falsified or Destroyed Evidence | 30 |
| 7.   The Line-up Is Irrelevant in This Case | 31 |
| 8.   Probable Cause Existed for The Arrest And Prosecution of Perrot, Requiring Summary Judgment on any Claim for Malicious Prosecution | 31 |
| 9.   No Reasonable Jury Could Find A Civil Conspiracy To Deprive Perrot of His Constitutional Rights Based Upon The Summary Judgment Record | 33 |
| 10.  All Individual Defendants Are Entitled To Qualified Immunity in this Case | 35 |
| B.  The City of Springfield Is Entitled To Summary Judgment For Any Alleged Violations of 42 U.S.C. §1983 | 39 |
| C.  The Municipal Defendants Are Entitled to Summary Judgment On All State Law Claims | 43 |
| 1.   Negligence Generally | 43 |
| a.   Negligence Claims are Barred By The Statute of Limitations; | 44 |
| b.   Claims Sounding In Negligence Cannot Be Brought Against Individual Municipal Employees | 44 |
| c.   Perrot Failed To Provide Statutory Notice of Claims, thus Barring Him From Proceeding | 44 |
| 2.   The Summary Judgment Record Is Insufficient As A Matter Of Law To Support A Claim for Malicious Prosecution | 45 |
| 3.   The Summary Judgment Record Is Insufficient As A Matter Of Law To Support A Claim for Civil Conspiracy Under Mass. Law | 46 |

| **Content** | **Page** |
|---|---|
| 4. The Summary Judgment Record Is Insufficient As A Matter Of Law To Support A Claim for Intentional Infliction of Emotional Distress | 47 |
| 5. The Summary Judgment Record Is Insufficient As A Matter Of Law To Support A Claim for Violation of G.L. c.12, §11 | 47 |
| IV. Conclusion | 49 |

## **TABLE OF AUTHORITIES**

| **Case** | **Page** |
|---|---|
| *Aetna Cas. & Sur. Co. v. Niziolek*, 481 N.E.2d 1356, 1360 (1985) | 25 |
| *Almeida v. Rose*, 55 F. Supp. 3d 200, 203 (D. Mass. 2014) affd No. 14-2133 (1st Cir. 2015) | 32 |
| *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) | *36* |
| *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1983) | *34* |
| *Avery v. Hughes*, 661 F.3d 690, 693 (1st Cir. 2011). | *20* |
| *Barbosa v. Cordon*, 962 F.Supp.2d 316, 334 (D. Mass. 2013) | *47* |
| *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822-823 (1985) | 47 |
| *Beecy v. Pucciarelli,* 387 Mass. 589, 593, 441 N.E.2d 1035 (1982) | *45* |
| *Bellone v. Southwick-Tolland  Sch. Dist.,* 748 F.3d 418, 422 (1st Cir. 2014) | *20* |
| *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404, *reh'g denied,* 520 U.S. 1283 (1997) | *40, 41* |
| *Brady v. Maryland,* 373 U.S. 83 (1963) | *27* |
| *Briscoe v. LaHue*, 460 U.S. 325, 330-31, 35 (1983) | *28* |
| *Calvi v. Knox County,* 470 F.3d 422, 428 (1st Cir. 2006) | |
| *Castagna v. Jean, 955 F.3d 211, 219 (1st Cir.,2020)* | *36* |
| *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) | *19,* |

| **Case** | **Page** |
|---|---|
| *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 102–03 (2006) | 45 |
| *City of Canton v. Harris,* 489 U.S. 378, 388, 391, (1989) | 40, 41 |
| *Commonwealth v. Perrot*, 407 Mass. 539 (1990.) | 15, 17, 24 |
| *Commonwealth v. Perrot*, 38 Mass. App. Ct. 478 (1995) further review denied *Commonwealth v. Perrot*, 420 Mass. 1104 (1995.) | 18 |
| *Commonwealth v. Perrot*, 441 Mass. 1104 (2004.) | 18 |
| *Commonwealth v. Perrot*, 58 Mass. App. Ct. 1102, n. 22 (2003.) | 18, 26 |
| *Connick v. Thompson*, 563 U.S. 51, 62(2011) | 41 |
| *Cosenza v. City of Worcester*, 355 F.Supp.3d 81, 92 (D. Mass., 2019) | 25 |
| *DesLauries v. Shea*, 300 Mass. 30, 33 (1938) | 46 |
| *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) | 36 |
| *Drumgold v. Callahan, 707 F.3d 28, 42 (1ˢᵗ Cir., 2013)* | 36 |
| *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) | 33, 34 |
| *Echavarria v. Roach*, 2017 WL 3928270, at *9 (D.Mass., 2017) | 26 |
| *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) | 35 |
| *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) | 33 |
| *Gonzalez Rucci v. I.N.S.*, 405 F.3d 45, 49 (1st Cir. 2005) | 32 |
| *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) | 41 |
| *Haley v. City of Boston*, 657 F.3d 39, 52 (1ˢᵗ Cir., 2011) | 41, 44 |
| *Heck v. Humphrey, 512 U.S. 477 (1994)* | 22, 27 |
| *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99-101 (1ˢᵗ Cir. 2013) | 32 |
| *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) | 32 |
| *Howcroft v. City of Peabody, 51 Mass.App.Ct. 573, 596 (2001)* | 47, 48 |
| *Jarosz v. Palmer, 766 N.E.2d 482, 487-88 (2002)* | 25 |
| *Johnson v. Mahoney*, 424 F.3d 83, 94 (1ˢᵗ Cir., 2005) | 22, 25 |
| *Jrugens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass. 1985) | 46 |
| *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) | 36 |
| *Layne v. Mass Correctional Institution,* 406 Mass. 156, 158 (1989). | 48 |

| **Case** | **Page** |
|---|---|
| *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) | *29* |
| *Los Angeles County, Cal. v. Humphries*, 131 S. Ct. 447 (2010) | *39* |
| *Martin v. Ring,* 401 Mass. 59, 514 N.E.2d 663, 665 (1987) | *25* |
| *McGrath v. Town of Sandwich*, 22 F. Supp. 3d 58, 71 (D. Mass. 2014) | *29* |
| *Med'l Prof. Mut. Ins.  v. Breon Laboratories, Inc.*, 966 F.Supp. 120 (D.Mass, 1997). | *44* |
| *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) | *35* |
| *Miller-el v. Cockrell*, 537 U.S. 322, 327 (2003) | *37* |
| *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) | *39* |
| *Mu v. Omni Hotels Mgmt. Corp.,* 882 F.3d 1, 5 (1st Cir.) | 20 |
| *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) | *33* |
| *Parker v. Chief Justice For Admin. and Management of Trial Court*, 67 Mass.App.Ct. 174, 852 N.E.2d 1097 (2006) | *44* |
| *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) | *36* |
| *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84, (1986) | *40* |
| *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) | *36* |
| *Pinto v. Nettleship*, 737 F.2d 130, 133 (1st Cir. 1984) | 20, 22 |
| *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) | *29* |
| *Reichle v. Howards, 566 U.S. 658, 664 (2012)* | *36* |
| *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 215 (1st Cir. 2015) | *35* |
| *St. Louis v. Prapotnik*, 485 U.S. 112, 128 (1988) | *40* |
| *Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir.1989)* | *34, 48* |
| *Schand v. City of Springfield*, 380 F.Supp.3d 106, 133 (D.MA., 2019.) | *43* |
| *Sietins v. Joseph*, 238, F.Supp.2d 366, 379 (D. Mass, 2003) | *47* |
| *Sklar v. Beth Israel Deaconess,* 59 Mass.App.Ct. 550, 797 N.E.2d 381, 387 (2003) | *45* |
| *Strickler v. Greene*, 527 U.S. 263, 281-2 (1999) | *27* |
| *Swain v. Spinney,* 117 F.3d 1, 11 (1st Cir.1997) | *41* |

| **Case** | **Page** |
|---|---|
| *Swanset Dev. Corp. v. Taunton,* 423 Mass. 390,395, 668 N.E.2d 333 (1996) | *48* |
| *Tennaro v. Ryder System, Inc.*, 832 F.Supp. 494 (D.Mass. 1993) | *46* |
| *Thompson v. Clark*, 142 S.Ct. 1332, 1340–41, (2022) | *32* |
| *United States v. Ríos-Orama*, 2023 WL 7403602, at *4 (D.Puerto Rico, 2023) | *31* |
| *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) | *31* |
| *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999) | *32* |
| *Watterson v. Page*, 987 F.2d 1, 9 (1st Cir.1993) | *29* |
| *Williams v. Bisceglia*, 115 F. Supp. 3d 184, 189 (D. Mass. 2015) | 20, 22 |
| *Williams v. City of Boston*, 974 F.Supp.2d 13, 15-16 (D.Mass.2013) | *29* |
| *Wynne v. Rosen*, 391 Mass. 797, 800–01 (1984) | *46* |
| *Young v. City of Providence,* 404 F.3d 4, 27 (1st Cir. 2005) | *41* |

## I.    INTRODUCTION AND STATEMENT OF FACTS

The within matter was filed in 2018, with the operative complaint filed on May 23, 2019.

Doc. No. 126.  The amended complaint names current or former Springfield Police Department

(SPD) employees Thomas Kelly (through his estate), Thomas Jarvis, Richard Kane, Charles

Arpin, Marianne Popko, Thomas Kennedy, Paul Glantz, Ronald St. Germain[1], Andrew Canevari

and Cheryl Clapprood (*collectively* "municipal employees") as well as the City of Springfield

("Springfield") as named defendants (individuals and Springfield collectively referred to as

"municipal defendants.")[2]  All municipal defendants have filed a comprehensive joint Statement

of Uncontested Material Facts (MDSOF), and the citations herein are to the MDSOF.

Although not drafted as separate counts, Perrot alleges the municipal employees violated his

rights under the Fifth and Fourteenth Amendments, that his arrest on December 7, 1985 was

pretextual, that no probable cause existed to charge Perrot with the sexual assault on Mary A,

Prekop, that the confession to the November 30, 1985 break-ins was fabricated, was the product

of coercion and was otherwise false, that the line-up held on December 7, 1985 was improper,

that some evidence was planted and/or fabricated evidence (bedsheet, hair, and gloves), evidence

was destroyed, and evidence of a different suspect was improperly withheld from Perrot.  Perrot

further alleges the foregoing misconduct was as a result of Springfield's constitutionally

inadequate and flawed policies, practices and customs.

Perrot alleges he was wrongfully convicted for the Unarmed Robbery of Mary A. Prekop

(Prekop), Indecent Assault and Battery of Prekop Aggravated Rape of Prekop, and Burglary and

---

[1] Defendant St. Germain passed away during the pendency of this action.  To date the Plaintiff has failed to perfect a claim against his estate.

[2] The within motion is being filed on behalf of Estate of Kelly, Jarvis, Popko, Kennedy, Glantz, St. Germain, Canevari and Clapprood.  Defendants Kane and Arpin are filing separate motions and memoranda.  The Statement of Uncontested Facts, filed simultaneously with this motion, as joint as to all municipal defendants.

Assault in Dwelling of Prekop, and the November 30,1985 Burglary of Emily Lichwala. Perrot was first convicted in the Superior Court, Hampden County of these charges (and others) on December 14, 1987. *MDSOF ¶ 153* Perrot appealed his convictions and on June 4, 1990, the Supreme Judicial Court reversed the convictions. *MDSOF ¶ 203* On January 9, 1992, after retrial, a jury convicted Perrot of the same offenses. *MDSOF ¶ 153-157.*

In both the 1992 and the 1987 trial testimony was given by two members of the FBI Crime Laboratory analyzing forensic evidence recovered from the scene of Prekop's house following her sexual assault on November 30, 1985. *MDSOF ¶180, 181, 182, 209, 210, 211, 212, 213.* The FBI agents testified relative to the results of their analysis, which included both analysis of blood stains on a pair of gloves and on Prekop's bedsheet, and hair analysis (called hair microscopy analysis). *MDSOF ¶¶180, 181, 182, 209, 210, 211, 212, 213.*

Beginning in 2012 the FBI disavowed previously sworn expert testimony concerning hair microscopy. *MDSOF ¶ 316.* On July 8, 2014, Perrot filed his fourth Motion for a New Trial. *MDSOF ¶ 317.* While not dispositive of the defendant's guilt, the expert testimony was ruled by the Hampden County Superior Court, (Kane, J.) to require a third trial for the defendant on the crimes involving Prekop. *MDSOF ¶ 318.* The Court determined that "justice may not have been done" at Perrot's 1992 trial, not because of any misconduct by the Springfield Police Department, but because of "the introduction of the hair evidence that in numerous and material respects exceeded the foundational science". *MDSOF ¶ 318.* In making that judgment, "the court determined that it was not until decades after Perrot's 1992 trial that errors in testimony on hair evidence came to be authoritatively recognized and addressed". *MDSOF ¶ 318.*

Perrot appealed the denial of his motion for a new trial on the conviction for the burglary of Lichwala, but dismissed that appeal in or about October 18, 2017, and his stands. *MDSOF ¶ 320*

and 321. At the same time the Hampden County District Attorney's Office (HCDA) filed a *nolle pros* on the claims involving Prekop, for reasons unrelated to any misconduct by any municipal defendant. *MDSOF* ¶ 321.

Perrot's arrest for the Prekop crimes occurred on December 7, 1985. *MDSOF* ¶ 132. In the early morning that day Perrot was arrested for an assault and purse snatch at a local restaurant, and a break in and assault on a homeowner, both of which crimes had occurred sometime around 2:15 a.m. that day. *MDSOF* ¶ 99 Perrot confessed to both of those crimes, and the confession and sentencing relating to those crimes have never been challenged by Perrot. *MDSOF* ¶ 153. He was sentenced to serve 10 to 12 years in state prison on those charges. *MDSOF* ¶ 153.

By December 1985 there had been multiple burglaries and sexual assaults on three separate women who lived in the same area as Perrot. *MDSOF* ¶ 1, 45, 46, and 66. One of the woman, Mae Marchand (Marchand), 82 years old at the time, had hired Perrot and one of his friends (Jeffrey Adkins) to paint a shed at her home. *MDSOF* ¶ 10 Shortly after having Perrot do that work, in the early morning of September 21, 1985, her home was broken into and she was violently raped. *MDSOF* ¶1 She identified Perrot as the man who raped her, based upon his voice, as the attacker had his face covered. *MDSOF* ¶ 43.

Later in the day of September 21, 1985 Perrot was contacted by Marchand's grandson who accused Perrot of raping his grandmother that day. *MDSOF* ¶ 11. Perrot contacted the SPD, and gave a statement the same day denying his involvement in the rape and burglary, and offering an alibi. *MDSOF* ¶ 11 through 21. The statement was taken by SPD officer Thomas Kennedy. *MDSOF* ¶ 13. Statements were also taken of Perrot's girlfriend at the time (Lisa Eldridge), and Adkins. *MDSOF* ¶ 22 to 36. Both Eldridge and Adkins stated they had been with Perrot during the evening of September 20, 1985 and into the early morning hours of the 21st. *MDSOF* ¶ 22 to

36.  An interview of another friend, Robert Timmerman, was also conducted, although he refused to sign a statement, and his recounting of the events from September 20 – 21 was different in some respects than the other three statements.  *MDSOF ¶* 37 to 39.  No one was ever charged with the rape or burglary at Marchand's house.

At approximately 2:30 a.m. on October 24, 1985 64 year old Emily Lichwala's (Lichwala) house was broken in to and she was violently raped.  *MDSOF ¶* 46. Her wedding and engagement ring and cash were stolen from her home. *MDSOF ¶*  48. No one was ever charged with those crimes.

On November 30, 1985 at approximately 3:25 a.m. Lichwala's house was again broken into, and items stolen from the home.  *MDSOF ¶* 56 and 60.  Lichwala fled the house, and alerted a neighbor, who called the police.  *MDSOF ¶* 56. Before 4:00 a.m. the same day the home of Prekop, 78 years old, was broken into and she was violently raped.[3] *MDSOF ¶*  66.  After the assault on November 30th a pair of women's gloves with apparent blood stains, a bed sheet with blood stains, a pillow case, and hair were removed from Prekop's bedroom, and tagged into evidence at the SPD, and eventually sent for analysis to the FBI crime lab in Washington, D.C. *MDSOF ¶* 69, 175, 176

As a result of his being named by Marchand as her likely attacker, as well as the statement he gave on September 21, 1985, Perrot was already a suspect in some of the home break-ins and sexual assaults of women that had been occurring in that neighborhood.  Both SPD officers Thomas Jarvis and Thomas Kelly were aware of interest in Perrot for those crimes.

When he was brought to the SPD on December 7, 1895 he was questioned by Kelly. *MDSOF ¶* 104. Perrot was given his Miranda rights, and signed a card acknowledging he had

---

[3] This was the 3rd time since 1984 Prekop had been sexually assaulted by someone breaking into her home in the early morning hours.

been advised of his rights at 5:05 a.m. *MDSOF ¶* 105. Perrot was told he could use the phone, but declined to do so at that time. *MDSOF ¶* 106. He signed a card acknowledging he had been advised he could use the phone. *MDSOF ¶* 106. After Perrot confessed to the crimes from December 7, 1985, Kelly began questioning Perrot about the crimes from November 30th. *MDSOF ¶* 108. He told Perrot they knew he was involved in those crimes. Perrot denied any involvement in the crimes from November 30th. *MDSOF ¶* 108. Kelly did not take a statement at that time, but left to assist with getting a search warrant for Perrot's home. *MDSOF ¶ 109.*

Kelly took the gloves that had been recovered from Prekop's home to Perrot's home when he went with other SPD officers to execute the search warrant at approximately 8:30 a.m. on December 7, 1985. *MDSOF ¶* 110. Perrot lived with his sister, Nancy Westcott. Kelly testified that he showed the gloves to Westcott who stated they looked like a pair she owned. When she then went to look for the gloves they were missing. *MDSOF ¶* 111. Westcott later denied that conversation, and testified at a motion to suppress, and at both criminal trials, that she did not have a pair of gloves like that, but that rather she told Kelly she thought they looked like a pair belonging to Eldridge, Perrot's girlfriend. *MDSOF ¶* 190, 191, 228-230.

Jarvis came to the SPD on the morning of Dec. 7, 1985 and began questioning Perrot around 7:45 a.m. *MDSOF ¶* 113 He advised Perrot of his Miranda rights. *MDSOF ¶* 114 Perrot signed a card acknowledging his rights had been read to him. *MDSOF ¶* 118 Perrot admitted to the crimes from the night before, and he signed a confession. *MDSOF ¶* 129. On Feb. 10, 1987, On Feb. 10, 1987, Perrot entered a plea agreement and was sentenced to serve 10 to 12 years in state prison for those crimes. On Feb. 10, 1987, Perrot entered a plea agreement and was sentenced to serve 10 to 12 years in state prison for those crimes.

Perrot was then brought through booking, was fingerprinted and photographed. *MDSOF* ¶ 116. Jarvis gave him his Miranda warning a second at approximately 12:40 p.m in the investigation room at the SPD.  *MDSOF* ¶ 117. Jarvis got lunch for Perrot. *MDSOF* ¶ 120. Perrot also made several phone calls, went to the bathroom a couple of times, and drank coffee. *MDSOF* ¶ 120.

At about 3 PM on December 7, 1985 Jarvis sat down with Perrot and discussed the events of November 30, 1985 pertaining to Lichwala and Prekop for about 1.5 hours. *MDSOF* ¶ 121.

Jarvis reduced to writing what Perrot said concerning the incidents from November 30, 1985. *MDSOF* ¶  In that statement Perrot gave a detailed account of his activities on the night of November 29th leading into the early morning of November 30th. *MDSOF* ¶  He admitted to breaking into both homes, but denied ever sexually assaulting anyone.  *MDSOF* ¶ 131 and 132. After reducing the statements to writing, Jarvis showed it to Perrot who appeared to read it over and signed it.  *MDSOF* ¶ 124. Perrot admits that the signature on the document is his, but denies having read the document, and cannot remember signing the document. *MDSOF* ¶ 126.

Jarvis asked Perrot's permission to take blood and hair samples. *MDSOF* ¶ 128. Perrot agreed to cooperate, and he signed a search warrant waiver for the samples. *MDSOF* ¶ 128.

When Kelly returned to the station he began putting together a line up. *MDSOF* ¶ 133. All the members of the line up resembled Perrot in that they all were young white men with facial hair.  Neither Lichwala nor Prekop identified Perrot at the line up or any time thereafter. *MDSOF* ¶ 136. Both testified at his criminal trials. *MDSOF* ¶ 171, 183, 214.   Prekop's description of the assailant who raped her on November 30, 1985 did not match Perrot's description in several key respects, including that her assailant did not, to her memory, have facial hair.  *MDSOF* ¶ 214.

On December 10, 1985, SPD officer Richard Kane went to the York Street Jail to observe blood and hair samples being taken from Mr. Perrot. *MDSOF ¶* 140. Perrot had already been arraigned.  He began speaking with Kane about Perrot's girlfriend.  *MDSOF ¶* 141. According to Kane, Perrot denied ever raping "an old lady", but admitted to the break-in. *MDSOF ¶*  144. Kane asked him about the purse that had been taken from Lichwala's house, and states Perrot told him where to find it.  *MDSOF ¶* 146.  Later Kelly, in the company of SPD officer Cheryl Clapprood, went to where Perrot allegedly directed Kane, and retrieved Lichwala's pocketbook from bushes. *MDSOF ¶* 149.

On March 31, 1987 Kennedy observed two vials of blood being taken from Perrot. *MDSOF ¶* 239. On April 1, 1987 Kennedy, in the company of HCDA Francis Bloom brought the vials of Perrot's blood and hair sample to the FBI laboratory in Washington, DC.  *MDSOF ¶* 240-241. Kennedy and Bloom only spoke with the person who accepted the evidence. *MDSOF ¶* 243.

On September 2, 1986 the trial judge (Murphy, J.) held an evidentiary hearing on Perrot's motion to suppress the statement he made subsequent to his arrest on December 7, 1985 relating to the break-ins.  *MDSOF ¶* 158. The witnesses at the motion were Westcott (Perrot's sister, called by Perrot), Beverly Daly (Perrot's mother, called by Perrot) and Perrot.  *MDSOF ¶* 159. The Commonwealth witnesses were Kelly, Thomas and Officer James Murphy. *MDSOF ¶*  159. Following the hearing the Court denied Perrot's motion to suppress the statements.  *MDSOF ¶ 1*60. The court found that Perrot had at least ten prior encounters with police officers and, during those encounters, "had been exposed time and again to the content of the Miranda warnings." *MDSOF ¶* 160. Murphy found that photographs that were taken of Perrot defendant while in custody revealed no indication that he sustained bruises or beatings.  *MDSOF ¶* 160. The Court found Perrot "had been exposed to the arrest process many times and was fully aware of his

rights, made knowing and intelligent waivers, and voluntary statements admitting some crimes and denying others." *MDSOF* ¶ 160.  On the issue of his sobriety the Court found Perrot had exaggerated his consumption of drugs and alcohol, and was not under the influence at the time he gave the statements as issue. *MDSOF* ¶ 161. The court found police did not beat or coerce him into making any statements. *MDSOF* ¶ 161. Perrot had testified that he did not sign the statements due to any physical abuse by any member of the SPD. *MDSOF* ¶ 161. In 1990 the Supreme Judicial Court affirmed so much of Judge Murphy's order as found Perrot's statements had been voluntarily made. *Commonwealth v. Perrot*, 407 Mass. 539 (1990.)

In a separate motion to suppress, the trial court disallowed any testimony from Kane regarding the statements Perrot made to him on December 10, 1985. *MDSOF* ¶  166. The Court allowed the admission of the pocketbook discovered under the "inevitable discovery" exception. *MDSOF* ¶ 168.

In December of 1987 Perrot stood trial for the crimes against Lichwala and Prekop which had occurred on November 30, 1985.  During the trial both Prekop and Lichwala took the stand and did not identify Perrot as the assailant. *MDSOF* ¶*171, 183, 214.*

Kelly testified that he had removed a pair of women's gloves from Prekop's bedroom after the rape on November 30, 1985, as well as a bedsheet and a pillowcase, and sent all of those items to the FBI crime lab in Washington, DC. *MDSOF* ¶  174-176.  He further testified that he had brought the gloves to Perrot's home when executing the search warrant on December 7,1985. He testified  he showed the gloves to Perrot's sister, Westcott, who stated they looked like a pair she owned.  When she then went to look for the gloves they were missing. *MDSOF* ¶ 178-179.

Jarvis testified regarding obtaining the statement in which Perrot admitted to the November30,1985 break-ins that Perrot signed on December 7, 1985, including the multiple times he advised Perrot of his Miranda rights.  *MDSOF ¶* 189.

Marianne Popko testified regarding obtaining a statement from Prekop after the assault of November11/30/,1985.  *MDSOF ¶ 185.*  Prekop did not identify or inculpate Perrot in that statement, and the statement has never been challenged.

Kennedy testified about observing Perrot's blood being drawn on March 31,1987, and delivering it to the crime lab in Washington, DC on April 1,1987.  *MDSOF ¶* 188.  Two FBI agents, William Eubanks and Wayne Oakes testified regarding the forensic testing performed on hair and blood samples provided.  *MDSOF ¶* 180-182.  This included hair microscopy analysis, which was later determined to have been scientifically unsound evidence.  *MDSOF ¶* 180-182.

Westcott testified that she had not had the conversation with Kelly on December 7, 1985 that he recalled.  *MDSOF ¶* 191-192 She testified that when shown the gloves she said they looked familiar, and may have belonged to Perrot's girlfriend, Eldridge. *MDSOF ¶* 192.

Perrot testified, and while acknowledging his signature on the statement regarding the break-ins at Lichwala and Prekop's home, he denied recalling giving the statement, and, further, denied ever having broken into their homes as recounted in that statement.  *MDSOF ¶* 196, 197, 199.

Defendants Kane, Jarvis, Glantz, St. Germaine and Clapprood did not testify at either trial. Popko only testified at the first trial.

On December 14, 1987, the jury convicted Perrot of unarmed robbery, indecent assault and battery, assault and battery, aggravated rape, burglary and assault in a dwelling, and larceny (all relative to Prekop), and burglary of Lichwala's home. *MDSOF ¶* 202.

Perrot appealed the convictions.  On June 4, 1990, the Supreme Judicial Court reversed the convictions and ordered a retrial. *Commonwealth v. Perrot*, 407 Mass. 539 (1990).  The bases for the grant of a new trial was the admittance into evidence of the pocketbook found after the disclosure by Perrot to Kane at the York Street jail on December 10, 1985. *Commonwealth v. Perrot*, 407 Mass. 539, 540-544 (1990)

Perrot was tried again in January of 1992, without Lichwala's pocketbook in evidence. *MDSOF* ¶ 205, 206. He did not take the stand in his second trial.  *MDSOF* ¶ *208.* Prekop testified and again stated Perrot was not the man who assaulted her.  *MDSOF* ¶ 214. She testified that the bloodstains on her sheets were old, and long pre-dated November 30, 1985.  *MDSOF* ¶215.  Jarvis, Kelly and Kennedy and FBI agents Eubanks and Oakes testified at the second trial. *MDSOF* ¶ 209, 212, 217, 221, 224.

Westcott testified at the second trial stating she did not tell Kelly the gloves might be hers, but rather said they might look like ones Eldridge had.  *MDSOF* ¶228, 229. At this trial she added that she had seen Eldridge wearing the gloves about a week after December 7, 1985. *MDSOF* ¶ 230.

Perrot's counsel argued for a required finding of not guilty after the Commonwealth rested, noting that Prekop was "adamant" that Perrot did not resemble the person who attacked her.  *MDSOF* ¶232. The motion was denied.   Perrot was again found guilty on all five charges. The Court sentenced Perrot to life in prison for the crimes against Prekop, and fifteen to twenty years for the break-in at Lichwala's home, on and after the sentence for the Prekop crimes. *MDSOF* ¶ 236.

On direct appeal, the Appeals Court affirmed the convictions, *Commonwealth v. Perrot*, 38 Mass. App. Ct. 478 (1995), and the Supreme Judicial Court denied further appellate review. *Commonwealth v. Perrot*, 420 Mass. 1104 (1995.)

In April of 2000, Perrot filed a motion for a new trial based, *inter alia,* upon allegations that the 1992 prosecutor's closing argument was improper and prejudicial. Superior Court Judge Wernick (not the trial judge) agreed, and granted the motion. *MDSOF ¶* 302. The Appeals Court reversed Judge Wernick's decision allowing Perrot's motion for a new trial, finding that errors in the trial prosecutor's closing argument did not create a substantial risk of a miscarriage of justice. C*ommonwealth v. Perrot*, 58 Mass. App. Ct. 1102 (2003), and the Supreme Judicial Court denied further appellate review. *Commonwealth v. Perrot*, 441 Mass. 1104 (2004.) The 2003 Appeals Court also said that the issue of the voluntariness of the defendant's statements "should have been foreclosed" by the suppression motion judge's finding of voluntariness, which had been upheld by the Supreme Judicial Court, and by the Perrot's denial at the suppression hearing that his confession had been the product of police brutality. *Id.*

As set out in the statement of facts, multiple other unsuccessful attacks on his conviction were launched by Perrot in the intervening years. On July 14, 2014, Perrot filed another motion for a new trial based upon the FBI's acknowledgement that its microscopy examiners provided scientifically unsupported testimony. *MDSOF ¶* 317. On January 26, 2016, Judge Kane of the Superior Court granted a new trial on Indictments No. 85-5415 (unarmed robbery of Prekop), No. 85-5416 (indecent Assault & Battery of Prekop), No. 85-5418 (rape of Prekop), and No. 85-5420 (Burglary and Assault of Prekop) based on the demonstrated scientific unreliability of the FBI's hair microscopy. *MDSOF ¶* 318. Judg*e* Kane found against Perrot's other claims, and specifically denied the motion on Indictment No. 85-54-25, relating to the burglary of Lichwala.

*MDSOF ¶* The Commonwealth appealed the order, and Perrot appealed the denial of his motion

pertaining to the Lichwala conviction. *MDSOF ¶* 320.  In October 2017, Perrot and the

Commonwealth reached an agreement to dismiss the appeals with prejudice, and the

Commonwealth filed a *nolle prosequi* for Indictments No. 85-5415, No. 85-5416, No. 85-5418,

and No. 85-5420 in the Superior Court, dated October 18, 2017.   *MDSOF ¶* 321.  The stated

reasons are:

1. Perrot agreed to dismiss the appeal relating to Lichwala burglary;
2. The FBI's disavowal of the reliability of hair microscopy; while not dispositive, would require a third trial 30 years after the underlying offenses;
3. Both the alleged victim and the lead investigator had died, and several civilian and law enforcement witnesses were retired or otherwise not available to testify;
4. There was unlikely to be any further forensic testing available;
5. Perrot, 17 at the time of his conviction, would now be governed by the holding in *Miller v. Alabama*, 567 U.S. 460 and by *Commonwealth v. Perez*, 477 Mass. 677 (2017), and such that any additional sentence beyond the years he had already served was highly unlikely; and
6. Since his release on February 10, 2016 he had complied with his conditions of release including remaining drug free, alcohol free for 6 months, and report twice monthly to probation.  *MDSOF ¶* 321.

## II.   STANDARD FOR SUMMARY JUDGMENT

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut,

but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the

just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)(internal citations omitted).  Summary judgment is appropriate if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Bellone v. Southwick-Tolland Reg'l*

*Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014). "An issue is 'genuine' when a rational factfinder

could resolve it either direction." *Mu v. Omni Hotels Mgmt. Corp.,* 882 F.3d 1, 5 (1st Cir.)  A

fact is material when its existence or nonexistence "could change a case's outcome."  *Id.*  All

"undisputed material facts and all reasonable inferences from those facts in the light most

favorable to the nonmoving party." *Avery v. Hughes*, 661 F.3d 690, 693 (1st Cir. 2011).

### III.  <u>ARGUMENT</u>

### A.  <u>There Is No Evidence of any Municipal Employee Having Violated Perrot's Constitutional Rights</u>

As noted above, Perrot alleges the municipal employees violated his rights under the Fifth

and Fourteenth Amendments, that his arrest on December 7, 1985 was pretextual, that no

probable cause existed to charge Perrot with the sexual assault on Prekop, that the confession to

the November 30, 1985 break-ins was fabricated, was the product of coercion and was otherwise

false, that the line-up held on December 7, 1985 was improper, that some evidence was planted

and/or fabricated evidence (bedsheet, hair, and gloves), evidence was destroyed, and evidence of

a different suspect was improperly withheld from Perrot.  The summary judgment record of the

events in question is devoid of competent evidence to support any of the constitutional claims.

### 1.  <u>Defendants Kennedy, Popko, Clapprood, Canevari and St. Germaine No Significant Involvement In The Arrest and Prosecution of Perrot</u>

An official can be liable for damages pursuant to 42 U.S.C. § 1983 only when he was

personally involved in the deprivation of constitutional rights. *Pinto v. Nettleship*, 737 F.2d 130,

133 (1st Cir. 1984); *Williams v. Bisceglia*, 115 F. Supp. 3d 184, 189 (D. Mass. 2015). Defendants

Kennedy, Popko, Clapprood, Canevari and St. Germaine had only tangential connection with the

Perrot arrest and prosecution, and are entitled to summary judgment as a matter of law.

### a.  <u>Marianne Popko</u>

Officer Popko's entire involvement in this matter was taking a statement from the victim Prekop on the morning following her assault and rape on November 30, 1985.  *MDSOF* ¶ 237-238.   Prekop did not identify Perrot in that statement.  *MDSOF* ¶ 237-238.   The description Prekop gave of her assailant did not match Perrot.  Popko testified at the first criminal trial about the statement, but did not testify at the second trial due to her unavailability.  There has never been a challenge to the process Popko followed in obtaining the statement, and the truth of the facts alleged in that statement are similarly unchallenged.  No fact in this record could support any finding that Popko violated Perrot's constitutional rights, and she is entitled to summary judgement in her favor.

**b.   Cheryl Clapprood**

Officer Clapprood similarly had little to no involvement in this matter.  Clapprood went with Kelly to retrieve what was later identified as Lichwala's pocketbook following Kane's report that Perrot had disclosed the location of the purse. She did not testify at any of the evidentiary proceedings in this matter.  Since there is no evidence in the summary judgment record upon which a reasonable factfinder could find any wrongful conduct by Clapprood, she is entitled to summary judgement in her favor.

**c.   Ronald St. Germain**

Officer St. Germain's only involvement in this matter was his presence for some part of the time when Jarvis questioned Perrot on December 7, 1985.  St. Germain signed a Miranda card as a witness to Perrot having been read his rights.  St. Germain was a mere witness to the statement, and, as will be argued more fully below, the statement was voluntarily given after Perrot knowingly waived his rights, and are not subject to being re-litigated under the reasoning of both

*Heck v. Humphrey*, 512 U.S. 477 (1994) and *Johnson v. Mahoney*, 424 F.3d 83, 94 (1ˢᵗ Cir., 2005).

Moreover, there is no evidence that St. Germain directed or even participated in the questioning of Perrot.  The "mere presence [of an officer] at the scene, without more, does not by some mysterious alchemy render him responsible under Section 1983 for the actions of a fellow officer." . An official can be liable for damages pursuant to 42 U.S.C. § 1983 only when he was personally involved in the deprivation of constitutional rights. *Pinto v. Nettleship*, 737 F.2d 130, 133 (1ˢᵗ Cir. 1984); *Williams v. Bisceglia, 115 F. Supp. 3d 184, 189 (D. Mass. 2015)*.

The summary judgement record establishes St. Germain is entitled to summary judgement.

**d.  Thomas Kennedy**

Kennedy's involvement in this matter is equally tangential.  As noted above, Detective Kennedy was on duty at the SPD on September 21, 1985 when Perrot, at his own initiative, came to the station for purposes of giving a statement. He gave a detailed statement about his whereabouts on September 20ᵗʰ and into the early morning hours of September 21, 1985.  In that statement he denied breaking into Marchand's house of an 82-year-old, and further denied raping that woman. Perrot was never charged with the crimes involving Marchand.

Kennedy's next involvement came on December 7, 1985 when he was in a line up at the SPD in which Perrot was the suspect.  Kennedy resembled Perrot in so far as they both were young white men with facial hair. Kennedy did not assemble, direct or have any further involvement in the line-up.  Prekop did not identify anyone in the line-up as her assailant.

On March 31, 1987 Kennedy witnessed Perrot's blood being drawn.  *MDSOF* ¶ 239.  The next day Kennedy and HCDA Francis Bloom flew the blood and some hair samples to the FBI laboratory in Washington DC. *MDSOF* ¶ 240-241.  They delivered the samples to the lab and

left. The only person they spoke with was the person who took the evidence samples. *MDSOF*
*¶*242-243.

Nothing that Kennedy did raises any likelihood of his having liability in this matter.  He
is entitled to summary judgement in his favor as a matter of law.

### e.  <u>Andrew Canevari</u>

Canevari had no involvement in either the Lichwala or the Prekop investigations. *MDSOF ¶*
265. He was present at the SPD station in September, 1985 when Perrot appeared voluntarily to
deny his involvement in the attack, rape and burglary of Mae Marchand. Canevari authored a
report detailing the interviews conducted of Perrot and his friends, Adkins and Timmerman.

Canevari had no involvement in the arrest and prosecution of Perrot, nor did any other of his
actions raise any issues of constitutional misconduct toward Perrot.  Canevari is entitled to
summary judgment in his favor in this matter.

### 2.  <u>The Statement Perrot Gave On December 7, 1985 Cannot Be Challenged in This Action</u>
#### a.  <u>The Voluntariness of the Statement of December 7, 1985 is Protected From Challenge by the Doctrine of Issue Preclusion</u>

Perrot moved to suppress statement given by him on December 7, 1985 which related to the
burglaries at Lichwala and Prekop's homes.  As noted, an evidentiary hearing was held and the
trial judge (Murphy, J.) issued a written decision denying the motion.  The Court found Perrot
had exaggerated his consumption of alcohol and drugs and that photographs that had been taken
of the defendant while he was in custody revealed no indication that he sustained bruises or
beatings.  Judge Murphy's order stated:

> "The defendant, although only 17 years old, had been exposed to
> the arrest process many times and was fully aware of his
> rights, made knowing and intelligent waivers, and voluntary
> statements admitting some crimes and denying others. He was not
> under the influence of drugs or alcohol when questioned. The

police did not beat or coerce him into those statements. He was kept in the detective bureau at his own request rather than be returned to his cell and had several periods to himself during the day when he was seen to be dozing. He was fed by Jarvis and allowed to use the phone on several occasions. The defendant never refused to answer questions nor did he ask that questioning cease or that he be provided with a lawyer." *MDSOF ¶*

In June 1990 the Supreme Judicial Court affirmed so much of Judge Murphy's order as found Perrot's statements had been voluntarily made. *Commonwealth v. Perrot*, 407 Mass. 539 (1990). The SJC stated:

> "The judge made findings of fact which are supported by the evidence that he deemed the most credible. . . The defendant was known to the police, having been arrested more than ten times on other offenses prior to December 7, 1985 . . At about 3:30 A.M., Sergeant Thomas M. Kelly of the Springfield police department was called at home and informed of the defendant's arrest. He was in charge of the investigation of the attacks on elderly women. At about 5 A.M., Kelly and another officer met with the defendant in an interrogation room. The defendant was read his Miranda warnings. He signed a card acknowledging receipt of his rights and agreed to talk with Kelly. The defendant was also advised of his right to use the telephone and acknowledged this by signing a notice slip . . .The defendant was interrogated three more times on December 7 by Detective Thomas Jarvis . . .These interrogations took place at 7:30 A.M., 12:30 P.M., and 3 P.M. The judge found that Miranda warnings were furnished to the defendant, and acknowledged by him, prior to the first two periods of questioning. The defendant signed a form agreeing to furnish the police with blood and hair samples. During the interrogation, the defendant made oral and written statements in which he admitted the purse snatch, the breaking and entering on Allendale Circle, and the breaking and entering of the residences of the two victims in this case. The defendant denied, however, that he had ever sexually attacked anyone. While giving his statement to Jarvis during the final meeting at 3 P.M. the defendant became emotional, began to cry, and asked for a police officer's gun so he could shoot himself. After the last written statement had been completed, read, and signed, Jarvis, pursuant to prescribed police procedure, asked that the defendant be placed on a suicide watch."

It is well established that federal courts "must give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged." *Johnson v. Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005). "In Massachusetts, the 'doctrine of issue preclusion provides that when an issue has been actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or different claim.' *Jarosz v. Palmer*, 436 Mass. 526, 766 N.E.2d 482, 487-88 (2002)" *Cosenza v. City of Worcester*, 355 F.Supp.3d 81, 92 (D. Mass., 2019.) As applied in the present context, Massachusetts courts have abandoned the requirement of mutuality. *See Aetna Cas. & Sur. Co. v. Niziolek*, 395 Mass. 737, 481 N.E.2d 1356, 1360 (1985) ("[A] party to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution."). "The guiding principle in determining whether to allow defensive use of collateral estoppel is whether the party against whom it is asserted 'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.'"). *Martin v. Ring*, 401 Mass. 59, 514 N.E.2d 663, 665 (1987); *Johnson v. Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005).

In *Johnson* the Plaintiff was convicted in state court of first-degree murder and appealed his conviction to the Massachusetts Supreme Judicial Court (SJC), arguing the prosecution failed to provide him exculpatory evidence. The SJC agreed that potentially exculpatory evidence had been withheld and condemned the police misconduct but affirmed the conviction, finding that Johnson had suffered no prejudice flowing from it. Five years into his sentence, Johnson was released when the prosecutor *nolle prossed* his conviction based on new evidence. Johnson brought a claim under § 1983 in federal court against the officers based on their misconduct in

failing to produce the exculpatory evidence.  The First Circuit held that Johnson's claim was barred by collateral estoppel. *Id.*at 93-94. The court rejected the argument that collateral estoppel should not apply in a subsequent civil matter, concluding that "issues decided in criminal prosecutions may preclude their later relitigation in a civil action." *Id.* at 94.

There can be no doubt that the SJC decision in this case is a valid and final judgment.  Just as in *Johnson*, the issue Plaintiff is seeking to relitigate was decided by the SJC.  This is not an instance where the prior judgment was from the trial court, i.e. the court whose judgment has now been vacated by the allowance of the motion for a new trial and the subsequent *nolle pros*. See also *Echavarria v. Roach*, 2017 WL 3928270, at *9 (D.Mass., 2017)(precluding relitigating issue that had been ruled upon in underlying criminal trial by the SJC.)   As noted above, the issue of the voluntariness of the statements was clearly raised, argued and decided in the appeal to the SJC.  In a later appeal which Perrot unsuccessfully pursued the Massachusetts Appeals Court noted the issue of the voluntariness of the confession should have been foreclosed by the earlier SJC ruling.  *Com. v. Perrot*, 58 Mass. App. Ct. 1102, n. 22 (2003.)  Perrot has made the voluntariness of his confession to the break-ins on November 30, 1085 central to his claim in the within matter, and it is clearly an issue that is conclusive in the within matter.

The Plaintiff is collaterally estopped from raising the voluntariness of his statements given on December 7, 1985.

### b.   Perrot's Statement of December 7, 1985 may not be challenged as it would implicate the validity of a criminal conviction that has not been reversed or vacated

The statement Perrot gave on December 7, 1985 involved both the break-in and burglary at Lichwala's house, as well as an attempted burglary of Prekop's house, both in the early morning hours of November 30, 1985.  Perrot's conviction on the burglary at Lichwala's has

never been vacated or reversed. His last appeal of that conviction was dismissed, with prejudice, on October 18, 2017 as part of the agreement for the HCDA's office to enter the *nolle prosequi*.

In 1994 the Supreme Court held a plaintiff may not bring suit under § 1983 where his claims would implicate the validity of a criminal conviction unless that conviction has been reversed or vacated. *Heck v. Humphrey*, 512 U.S. 477, 486–90 (1994.) Since a challenge to the validity of the statement at issue would necessarily implicate the legitimacy of his conviction in the Lichwala house break and burglary *Heck* requires such argument be disallowed.

**3.** ***There Is No Evidence The Individual Defendants Withheld Exculpatory Evidence***

Perrot has alleged that the SPD defendants failed to disclose potentially exculpatory evidence in violation of their constitutional obligation to do so. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to show a *Brady* violation the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-2 (1999).

It is unclear what exculpatory evidence Perrot is alleging was not disclosed. In an answer to contention interrogatories, the Plaintiff did not identify any "suppressed or destroyed evidence that would have shown that [Perrot] innocent", citing prematurity as discovery was ongoing, and such interrogatory answer has not been supplemented.

At his deposition, Perrot was asked what exculpatory or impeaching evidence he is alleging was withheld, Perrot stated he had read "case law" where the SPD allegedly withheld exculpatory or impeachment evidence, but does not remember what case law. Perrot stated he saw "in case law" that the SPD conducted illegal interrogations of juveniles, and that the SPD planted physical evidence, but does not remember what case law. MDSOF ¶294, 295.

The only exculpatory evidence that a fair reading of the facts in the summary judgment record discloses were known to Perrot and his attorneys at all times relevant.  The fact that Prekop never identified him was known to everyone, and at the 1992 trial she strongly reiterated that in front of the jury.  The fact that Prekop had told the SPD that she believed the bloodstains on the sheets were many years old was known to everyone as it was included in her testimony. The jury was fully apprised of that fact.

Ultimately, the lack of scientific reliability of the forensic was the reason for the grant of the new trial, and the entry of the *Nolle Prosequi*.  None of the municipal employees had any idea regarding the reliability of the forensic testing performed by the FBI, and cannot be held responsible if there were indications of unreliability that were not timely disclosed.

The Defendants are entitled to summary judgment in their favor on any claim for a *Brady* violation.

### 4.  *The Municipal Defendants are Entitled to Absolute Immunity for Testimony in a Court Proceeding*

The Plaintiff has alleged the testimony given by Thomas Kelly relative to the conversation he had with Westcott about the gloves was false which amounted to a violation of the Plaintiff's rights under §1983.  Doc. No. 126, ¶61.  Additionally, he has alleged that some officers offered false testimony about the origins of the bloodstains on the bedsheets.  *MDSOF ¶* 299. All the municipal defendants are entitled to immunity from any claim of false testimony.

Parties and witnesses are immune "from subsequent damages liability for their testimony in judicial proceedings*." Briscoe v. LaHue*, 460 U.S. 325, 330-31, 35 (1983) (police officers testifying at trial are immune from liability under § 1983). The Supreme Court has ruled that "[t]he factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses," and that there is no reason to treat law enforcement witnesses any differently

from lay witnesses. *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012); *Watterson v. Page*, 987 F.2d 1, 9 (1st Cir.1993) ("immunity applies even to public officials who knowingly give false testimony."); *McGrath v. Town of Sandwich*, 22 F. Supp. 3d 58, 71 (D. Mass. 2014) (Court will follow other courts that have extended the holding of Rehberg to testimony provided under oath at other pre-trial proceedings); *Williams v. City of Boston*, 974 F.Supp.2d 13, 15-16 (D.Mass.2013) (finding police officer entitled to absolute immunity for testimony provided under oath at a hearing on a motion in limine).

### 5. *There Is No Evidence That Any "False" Testimony Resulted In Perrot's Conviction*

The First Circuit has recognized an actionable due process violation where a state actor has fabricated or falsified evidence. *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004). Beyond his testimonial privilege, Kelly cannot be liable under a due process claim for false testimony under these circumstances.

There is no evidence from which a jury could conclude that Kelly lied about the conversation with Westcott regarding the gloves. Kelly is now deceased, and has been during the entire pendency of this case. However, he testified twice regarding his conversation with Westcott about the gloves, and she gave a differing account of the conversation to the same juries. The juries either did not believe Westcott, or, did not find the discrepancy in their recollections material. Westcott stated she did not say they looked like a pair she had, but rather stated they looked like a pair Eldridge, Perrot's girlfriend, had. In either Westcott's or Kelly's account the pair of gloves recovered from the scene resembled gloves Perrot would have had access to.

Westcott added to her testimony during the 1992 trial by saying that she had seen the gloves on Eldridge after Perrot's December 7, 1985 arrest. This testimony was also apparently not persuasive to the jury. Eldridge did not testify at either trial.

**6.**   _**There Is No Evidence The Individual Defendants Falsified or Destroyed Evidence**_

In his complaint Perrot has alleged that the municipal defendants withheld, destroyed, suppressed and/or fabricated evidence.  It is unclear to what evidence Perrot is referring. In answer to contention interrogatories, the Plaintiff did not identify what evidence was withheld, destroyed or suppressed by Kelly, Jarvis, Kane, Arpin, Kennedy, Popko, Glantz, St. Germian, Canevari or Clapprood or what evidence was fabricated, citing prematurity as discovery was ongoing, and such interrogatory has not been supplemented.

Perrot stated at his deposition officers falsely stated he had on a pair of his sister's gloves. _MDSOF_ ¶ 297. There is no evidence in any of the transcripts that anyone ever testified that Perrot had on his sister's gloves.  If there had been such testimony the officers would be entitled to testimonial privilege, as set out above.  At his deposition Perrot stated Prekop told officers bloodstains on sheet were her uncles and they testified it was his. _MDSOF_ ¶ 299.  There is no evidence anywhere in the record from any proceeding that any of the municipal defendants stated the bloodstains were Perrot's.  Again, if there were, the officers would be entitled to testimonial privilege.

Perrot testified that he considered the hair sample submitted to the FBI to be false evidence because it was taken from Prekop's bed, and Prekop stated the incident happened on the floor. _MDSOF_ ¶ 300. However, Prekop testified her assailant had taken a stick away from her and threw it on the bed, and further testified that she was raped on the floor, near her bed, in a very small bedroom. The evidence both about the collection of the evidence and Prekop's own testimony about where the assault occurred was put before the jury.

No reasonable jury could conclude that any evidence in this case was withheld, destroyed, suppressed and/or fabricated, and the defendants are entitled to summary judgment on so much of this claim that is based on that allegation.

### 7. ***The Line Up Is Irrelevant in This Case.***

Perrot contends the line-up was unconstitutional as it was made up of men with facial hair, when Prekop had described someone without facial hair, including other physical differences. The men in the line-up all in general ways resembled Perrot (young, white, and with facial hair). withheld, destroyed, suppressed and/or fabricated  Perrot contends the fillers should have resembled the description given by Prekop.

This argument fails on two levels.  If none of the people in the line-up resembled Perrot, then the line up with him in it would have been unduly suggestive, in violation of Perrot's rights.  See, generally, *United States v. Ríos-Orama*, 2023 WL 7403602, at *4 (D.Puerto Rico, 2023) (citing *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002)) (holding officers conducting lineups need to make reasonable efforts to find lineup participants that approximate the defendant's size and appearance.)

More importantly, however, neither Prekop nor Lichwala identified Perrot as their assailant, and that fact was known to Perrot and his counsel.

Under the circumstances, the make-up of the line-up cannot support any finding of constitutional harm to Perrot, and summary judgment for the Defendants on this issue should enter.

### 8. ***Probable Cause Existed For The Arrest and Prosecution of Perrot, Defeating Any Claim for Malicious Prosecution***

Perrot has alleged the municipal defendants maliciously prosecuted him for the Prekop crimes. The First Circuit has recognized a cause of action for malicious prosecution. *Almeida v.*

_Rose_, 55 F. Supp. 3d 200, 203 (D. Mass. 2014), affd No. 14-2133 (1st Cir. 2015). The necessary

elements that a plaintiff must prove are that the defendant (1) caused (2) a seizure of the plaintiff

pursuant to legal process unsupported by probable cause, and (3) criminal proceedings

terminated in plaintiff's favor. _Id_. at 204 (quoting _Hernandez-Cuevas v. Taylor_, 723 F.3d 91, 99-

101 (1st Cir. 2013)). The Supreme Court has reinforced the Plaintiff's obligation to show absence

of probable cause as an element in proceeding with a malicious prosecution claim.  _Thompson v._

_Clark_, 142 S.Ct. 1332, 1340–41, (2022) The test is an objective one, evaluating the

circumstances through the viewpoint of a reasonable person in the officer's position. See _Holder_,

_585 F.3d at 504_. "Probable cause requires only a probability that the defendant committed the

crime." _Holder v. Town of Sandown_, 585 F.3d 500, 504 (1st Cir. 2009). Proof of probable cause

is not the more onerous standard of proof of guilt beyond a reasonable doubt. _United States v._

_Winchenbach_, 197 F.3d 548, 555-56 (1st Cir. 1999). The burden of proving lack of probable

cause rests on plaintiffs. _Id._ To determine whether probable cause was lacking, a court looks to

the information that the defendant had available at the time it took the actions in question.

Generally, "a grand jury indictment definitively establishes probable cause." _Gonzalez Rucci_

_v. I.N.S._, 405 F.3d 45, 49 (1st Cir. 2005).  To overcome that presumption, a Plaintiff must have

sufficient facts to "demonstrate that—despite the [jury's] determination that the evidence

presented was, on its face, sufficient to establish probable cause—that evidence was, in fact,

constitutionally unacceptable because the officers formulated evidence essential to the probable

cause determination with a mental state similar to common law malice."  _Hernandez-Cuevas,_

_supra_ at 91, 101 (1st Cir. 2013) (quotation omitted).

There are no facts in the summary judgment record upon which a reasonable jury could make

such a determination.  For the reasons stated above the statements given by Perrot after his arrest

on December 7, 1985 have been determined to have been given freely and voluntarily and with a knowing waiver of his rights.  The only other fact upon which Perrot has attempted to build his case is his unsupported insistence that the factual discrepancies between Kelly's recollection of his conversation with Westcott about the gloves, and Westcott's recollection about that conversation are indicative of some constitutional tort.  Under the malicious prosecution analysis in this case the Court need not consider that argument at all, since no testimony regarding that conversation was ever put to the Grand Jury.

Since the indictments were supported by probable cause, the municipal defendants are entitled to summary judgment in their favor on any claim for malicious prosecution.

### 9. *The Defendant Officers Did Not Engage In A Conspiracy To Deprive Perrot of His Constitutional Rights.*

In order to establish the existence of a conspiracy under a federal claim, a plaintiff must prove that "a combination of two or more persons act[ed] in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (internal citation omitted). Where the claim is brought pursuant to Section 1983 for violation of the plaintiff's civil rights, the plaintiff must also show that the conspiracy resulted in "an actual abridgement of some federally-secured right." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001); *see Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988); *see also* 42 U.S.C. § 1983 (requiring the deprivation of a federal right). A conspiracy may be a "matter of inference [.]" *Estate of Bennett*, 548 F.3d at 178. For such a conspiracy to be actionable under §1983, however, a plaintiff must prove that there has been, in addition to the conspiratorial agreement, "an actual deprivation of a right secured by the

Constitution and laws." *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir.1989) (quoting *Earle*, 850 F.2d at 844)

The First Circuit has noted "the agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Id* at 843; *see also Santiago*, supra, 891 F.2d at 389 (reversing directed verdict on conspiracy claim where a reasonable jury could have found that officers conspired to unlawfully arrest the plaintiff.) There must, however, be sufficient circumstantial evidence for a reasonable jury to find the existence of a civil rights conspiracy "without speculation and conjecture." *Earle* 850 F.2d at 845 (quoting *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1983.)

As noted, Perrot did not suffer any deprivation of any constitutional rights. Moreover there is no evidence at all from which a jury could infer an agreement between any two of the individual officers.  As noted above, most of the officers had little or nothing to do with the investigation into the November 30, 1985 crimes.

Glantz is alleged to have been with Perrot for some period of time, and allegedly banged on the bars of Perrot's cell to keep him awake.  *MDSOF ¶* 267. This is not a constitutional harm, and the statements that Perrot gave that day were given freely and with a knowing waiver of his rights.

Under the circumstances the SPD officers were faced their questioning Perrot about the crimes from November 30, 1985 was reasonable.  He had already confessed to the crimes that occurred on December 7, 1985.  He had been named by the victim in another similar robbery and rape, Marchand, through a voice identification.  He had voluntarily come in to the station to deny his involvement in the Marchand rape.  He was given his Miranda warnings three times.  He was advised of his right to a phone call, which he eventually used to call his girlfriend.  He waived

his right to a search warrant and voluntarily provided blood and hair samples.  His mother, sister and girlfriend were allowed to visit him at the SPD. There is neither evidence of a conspiracy to deprive him of rights, or any deprivation of rights in the actions of the officers.

Nor is there any credible evidence, beyond rank conjecture, that anyone from the SPD influenced or attempted to influence the FBI agents who conducted the forensic analysis on the evidence taken from Prekop's house, and Perrot's blood and hair samples.  The fact that Kennedy accompanied Bloom to the FBI lab in D.C. is not evidence of any act to deprive Perrot of any rights.  They only spoke to the person who took in the evidence, and were in and out of the FBI building in less than 20 minutes.

Summary judgment is warranted for the municipal actors on the federal civil conspiracy claim.

### 10. *The Defendant Officers are Entitled To Qualified Immunity*

"Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity "protects all but 'the plainly incompetent [and] those who knowingly violate the law.'" *Pagán v. Calderón*, 448 F.3d 16, 31 (1st Cir. 2006) (alteration in original) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable." *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) (citing *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 215 (1st Cir. 2015)).

The qualified immunity analysis breaks down into two parts. *McKenney*, 873 F.3d at 81. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal

statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly

established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting

*Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "The 'clearly established' inquiry itself has two

elements." *Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir.), cert. denied, 141 S. Ct. 896 (2020).

The first focuses on the clarity of the law. *Id.* While "a case directly on point" is unnecessary,

"existing precedent must have placed the statutory or constitutional question beyond debate."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640

(1987); *Malley*, 475 U.S. at 341). The rule must be settled, meaning that it is "dictated by

'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" *Wesby*, 583

U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741-42). "The precedent must be clear enough that every

reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."

*Id.* (citing *Reichle*, 566 U.S. at 666). The second element of the "clearly established" inquiry

"'focuses on the objective legal reasonableness of an official's acts . . .'" *Castagna*, 955 F.3d at

220 (quoting *Eves v. LePage*, 927 F.3d 575, 583 (1st Cir. 2019) (en banc)). This requires a focus

"'on the facts of the particular case and whether a reasonable defendant would have understood

that his conduct violated the plaintiff's constitutional rights.'" *Penate v. Hanchett*, 944 F.3d 358,

366 (1st Cir. 2019) (quoting *Drumgold v. Callahan*,  707 F.3d 28, 42 (2013)). It is well-settled

that, in a qualified immunity analysis, courts must not define clearly established law at a high

level of generality. See *Wesby*, 583 U.S. at 63-64. The components of the qualified immunity test

can be addressed in any order. See *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (citing

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In 2004, Perrot also filed a federal habeas corpus petition under 28 U.S.C. § 2254 in the U.S.

District Court for the District of Massachusetts, case no. 1:04-cv-11666, challenging his

convictions related to Prekop and Lichwala (Indictments 85-5415 through 85-5418 and 85-5420 through 85-5425). This effort to overturn his state court convictions moved his case into the federal judiciary's purview. However, the petition encountered a significant judicial roadblock when, on August 30, 2005, Judge Reginald Lindsay dismissed the petition. Judge Lindsay's order unequivocally held that Perrot had "raised no issue of constitutional magnitude about which jurists of reason could disagree," subsequently denying a certificate of appealability and aligning with the precedent of *Miller-el v. Cockrell*, 537 U.S. 322, 327 (2003). This adjudication lends substantial weight to the individual municipal defendants' contention that Perrot's current claims are effectively barred by issue preclusion, asserting that the matters he presently raises have been thoroughly and fairly adjudicated in past litigation. Moreover, Judge Lindsay's explicit determination that Perrot's petition did not raise substantial constitutional issues amplifies the municipal defendants' claim to qualified immunity, thereby reinforcing their position that there has been no breach of clearly established constitutional rights as required to overcome the protections of qualified immunity.

As noted, there is no evidence in this record that the individual officers violated Perrot's constitutional rights. The facts and circumstances surrounding his giving the statement regarding breaking in to Prekop's home on November 30, 195 have been reviewed at an evidentiary hearing prior to his first trial, and the trial court found the statement admissible. This was later affirmed by the SJC. Where both the trial court and the highest state court found the conduct of the officers to comport with constitutional mandates, clearly no police officer in 1985 would have thought differently. As such, the individual defendants are entitled to qualified immunity if that is the basis for their liability in this matter.

Three different times on December 7, 1985 Perrot signed Miranda cards acknowledging that he had been read his Miranda rights. Perrot acknowledges the signature on the statement is his signature, although he claims he does not recall signing the document.  He was advised, and signed a card acknowledging that fact, of his right to use the phone, which he eventually used to call his girlfriend.  He signed a waiver of his right to a search warrant and voluntarily provided hair and blood samples.  All potentially exculpatory evidence was known to Perrot at the time. No police officer in 1985 would have reason to believe that their conduct as recounted above did not comport with the constitutional protections to which Perrot was entitled, and as such, the individual defendants are entitled to qualified immunity if that is the basis for their liability in this matter.

The fact that the forensic testimony given by the FBI was later discredited cannot be used to establish any wrongdoing on the part of the SPD officers. They had a right to rely on the professionalism of the FBI's crime lab.  There is no case in any jurisdiction that requires that members of a police department confirm the reliability of testing done by the FBI Crime Lab. As such, the individual defendants are entitled to qualified immunity if that is the basis for their liability in this matter.

Perrot has suggested that his age at the time, i.e. 17, should have mandated he be treated differently than an adult by the SPD officers.  Perrot was treated, charged and tried as an adult for the crimes at issue in accordance with Massachusetts law.  He was arraigned as an adult, indicted on multiple crimes as an adult and tried in Superior Court as an adult.  He was sentenced as an adult.  In 1985, 17 year-olds in Massachusetts were considered adults when facing criminal charges.  *See* M.G.L. c. 119 § 74 (in 1985 a 17-year-old was charged as an adult, and the age was not raised to until 18 2013).  No officer in Massachusetts would have reason to believe that 17-

year-old Perrot was constitutionally protected from being treated as an adult.  As such, the

individual defendants are entitled to qualified immunity if that is the basis for their liability in

this matter.

**B.   Defendant City of Springfield is entitled to summary judgment in its favor for any alleged violations of 42 U.S.C. § 1983 under the Fourteenth Amendment based upon a *Monell* type claim.**

Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct.

2018 (1978) and its progeny, a plaintiff seeking to prove municipal liability under Section 1983

must demonstrate that a municipal custom or policy caused a plaintiff's injury. A Section 1983

action based on municipal policy is viable where "the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted

or promulgated by that body's officers." *Monell*, 436 U.S at 690.

The Supreme Court has reiterated the first element of a "policy or custom" as the basis for

municipal liability in a case brought under 42 U.S.C. § 1983: "In sum, in *Monell* the Court held

that "a municipality cannot be held liable" solely for the acts of others, *e.g.,* "*solely* because it

employs a tortfeasor." *Id*. 436 U.S., at 69. But the municipality may be held liable "when

execution of a government's *policy or custom* ... inflicts the injury."  *Id.*, at 694. *Los Angeles

County, Cal. v. Humphries*, 131 S. Ct. 447 (2010) (emphasis retained).

Moreover, in addition to "official policies" a plaintiff may also point to a municipality's

custom or practice that is "so well settled as to constitute a 'custom or usage' with the force of

law." *Id*. at 691. A *Monell* claim based on failure to train, [supervise, investigate, control and

discipline] requires a plaintiff to demonstrate that the "municipalities' failure to train its

employees in a relevant respect . . . amount[ed] to 'deliberate indifference to the rights of persons

with whom the [untrained employees] came into contact.'" *Connick v. Thompson*, 131 S.Ct.

1350, 1359-60 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

A policy is instituted when the decision maker who has the final authority to establish

policy for the municipality on that topic issues an official proclamation, edict or policy. *Pembaur*

*v. City of Cincinnati*, 475 U.S. 469, 481-84, (1986) (explaining that "official policy" specifically

refers to the "formal rules or understandings . .  that are intended to, and do, establish fixed plans

of action to be [consistently] followed under similar circumstances . . . ." ). Actions considered

custom, on the other hand, lack the requisite formal approval by the decision maker, but are "so

widespread as to have the force of law." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397,

404, *reh'g denied*, 520 U.S. 1283 (1997).  Essentially, the "official policy" requirement exists to

distinguish the acts of the municipality from the acts of municipal employees, and it is intended

to limit municipal liability "to action for which the municipality is actually responsible."

*Pembaur*, 475 U.S. at 479. The "official policy" element thus safeguards the municipality from

liability under § 1983 "unless … the existence of an unconstitutional municipal policy," can be

proven. *St. Louis v. Prapotnik*, 485 U.S. 112, 128 (1988).

In the instant case the Plaintiff cannot point to any policy, procedure or custom that was 1.)

constitutionally deficient, and 2.) caused Perrot's rights to be violated.  It was the written policy

and known to all officers that falsifying or tampering with evidence was a violation of the law, as

well as the policies of the SPD.  Similarly, all officers knew that offering false testimony was a

crime, and was in violation of the SPD's policies and practices.

Nor can the Plaintiff show deficiencies in the training offered to SPD personnel during the

relevant time period.  "Triggering municipal liability on a claim of failure to train requires a

showing that municipal decisionmakers either knew or should have known that training was

inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (quoting *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir., 2011)). For the City to be liable for failing to train, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Young v. City of Providence ex rel. Napolitano,* 404 F.3d 4, 27 (1st Cir. 2005). Further, "[i]t is not enough to show that the Town's training regimen was faulty; [the plaintiff] must also show that the Town knew or had reason to believe that such a regimen had unconstitutional effects." *Gray*, 917 F.3d at 14. "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees ... to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62(2011)).

Additionally, Plaintiff must show the alleged inadequacies in its training program rose to the level of deliberate indifference.  *Id.*  Deliberate indifference means the City disregarded a known or obvious risk of serious harm. *Id.*   *See Brown,* 520 U.S. at 407–08, 117 S.Ct. 1382; *see also Swain v. Spinney,* 117 F.3d 1, 11 (1st Cir.1997); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 28.  Plaintiff must also show "the identified deficiency in a city's training program [is] closely related to the ultimate injury."  *City of Canton v. Harris,* 489 U.S. 378, 388, 391, (1989); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005).

Plaintiff has failed to present facts sufficient to meet the standard for a 1983 *Monell* claim. There is no evidence of a policy, practice or custom at the SPD that would tacitly condone, never mind expressly allow, falsifying, tampering or suppressing evidence, or offering false testimony. Further, there is no basis in fact for the Plaintiff's contention that the officers at the SPD had a

demonstrated pattern or practice of violating citizens constitutional rights in the ways alleged herein by Plaintiff.

As to training, the summary judgment record has no facts upon which a jury could find that the training offered to SPD detectives in and around 1986-87 was deficient, never mind that it rose to the level of deliberate indifference.   M.G.L. c. 41 § 96B requires courses of training for police officers of the Commonwealth, and did so in 1985. It outlines the program or recruit training for new officers, as well as mandatory in-service training for veteran officers and required training for newly promoted supervisors.  The Municipal Police Training Counsel for the state of Massachusetts (MPTC) sets all the standards in regards to training for police recruits, for continuing training for officers and training for special categories. *MDSOF ¶ 327.* They have their own instructors and syllabus which may change. *MDSOF ¶  327.* They certify the academy and set most of the curriculum.  *MDSOF ¶  327.* Training Materials come directly from the MPTC and instructors have to be MPTC certified.  During the relevant years the academy trained officers it was an obligation of the state in a criminal case to turn over all exculpatory evidence to criminal defendants. *MDSOF ¶ 328.*

Even if the training offered to SPD officers during the time period at issue was found to be deficient in some respect, there is nothing to support a finding that the deficiencies were the product of deliberate indifference.  Indeed, the only evidence in the summary judgment record is that the training given to all SPD personnel during the time periods at issue comported with the requirements of Massachusetts law, and followed the curriculum developed by the MPTC. *MDSOF ¶* 327.

Springfield was a defendant in a separate §1983 case involving an individual who was released after serving 27 years for a murder he alleges he did not commit.  The case also alleged

inadequate training in and before the mid-1980s.  The Court allowed Springfield's motion for summary judgment on the Monell claim, holding, in part "the city's training regimen does not appear to have dropped to a level of deficiency adequate to support a jury verdict for Plaintiffs on their failure-to-train claim, as a constitutional matter."  *Schand v. City of Springfield*, 380 F.Supp.3d 106, 133 (D.MA., 2019.)

In Schand, the allegations of misconduct by the officers were so basic and crude as to "undercut their claim that it was poor training that drove the constitutional violation".  *Id*. Similarly here the allegations of misconduct are to falsifying evidence, suppressing evidence, and perjury.  All of the officers would have known of the illegality of such acts.  As the Court concluded in *Schand*, "(n)o reasonable jury could conclude that this conduct was driven by poor training."  *Id*.

The *Schand* case involved allegedly unduly suggestive identification procedures, including using a polaroid in a photo array when all of the other photos were police booking photos, and pointing to which photo the officers wanted the witnesses to select.  *Id*.  In other filings the Plaintiff in this matter has attempted to use the case as indicating a known practice or pattern of misconduct.  This argument fails on two fronts.  First the misconduct alleged was completely different than the alleged misconduct here.  Moreover, the *Schand* case was not brought until 2015, long after the events in this matter occurred.  In fact all of the cases cited by Perrot in the amended complaint significantly post-dated the acts here.  Document No. 126, page 24. These cases are thus wholly irrelevant to what Springfield's notice would have been in 1985 to 1987.

Springfield is entitled to summary judgment in it's favor on any Monell claim.

## C.  The Municipal Defendants Are Entitled To Summary Judgement on State Law Claims

### 1.  Negligence generally

**a.   Negligence Claims Are Barred by the Statute of Limitations**

All of the acts complained of occurred during 1985, 1986 and 1987. "Except as otherwise
provided, actions of tort, actions of contract to recover for personal injuries, and actions of
replevin, shall be commenced only within three years next after the cause of action accrues."
Mass. Gen. Laws Ann. ch. 260, § 2A.  Under Massachusetts law, cause of action generally
accrues when plaintiff receives notice that he has suffered injury as result of defendant's conduct;
while plaintiff need not know full extent of harm suffered at time of accrual, some degree of
harm or injury is necessary. *Medical Professional Mut. Ins. Co. v. Breon Laboratories, Inc.*, 966
F.Supp. 120 (D.Mass, 1997).  The Plaintiff was aware of the facts underlying these claims no
later than 1992, when the first motion for a new trial filed

**b.   Claims Sounding In Negligence Cannot be Maintained Against Individuals**

Tort claims in Massachusetts are governed by M.G.L. c.258, which chapter abrogated the
Common Law rule of Sovereign immunity. Where ordinary negligence is alleged, claims cannot
stand against the public employees, but can only be brought against the public employer, i.e. the
Springfield.  M.G.L.A. c. 258, § 2. See *Parker v. Chief Justice For Admin. and Management of
Trial Court*, 67 Mass.App.Ct. 174, 852 N.E.2d 1097 (2006).  Accordingly, the individually
named defendants are each entitled to summary judgment for any claims sounding in negligence.

**c.   Perrot failed to timely provide notice of claims against Springfield**

If Perrot is bringing negligence based claims against Springfield, the presentment letter
required under the M.G.L. c.258 was not sent within two years of the actions accrual. The First
Circuit has noted that while the SJC has sometimes tolled the larger three-year limitations period,
it has "held that a plaintiff's inability to bring a suit does not toll the running of the presentment
period."  *Haley, supra*, 657 F.3d at 54. (holding "an impediment to bringing suit does not

necessarily denote an inability to give notice, and a municipality should not be deprived of its right to conduct a timely investigation and build an effective defense where notice is feasible." *Id* at 55.)  Perrot's failure to comply with the compulsory notice requirements entitles Springfield to judgement in it's favor for any negligence claims.

### 2.  <u>Malicious Prosecution</u>

To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with improper purpose, and that the original action terminated in his favor. *Beecy v. Pucciarelli,* 387 Mass. 589, 593, 441 N.E.2d 1035 (1982). *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 102–03 (2006) (substituting "improper purpose" for malice in accordance with the Restatement (Second) of Torts).   As addressed above, the issuance of the grand jury indictments establishes that the criminal action at issue herein was supported by probable cause.  In addition, malice could not reasonably be inferred from the officers' actions here.  See *Beecy v. Pucciarelli*, 387 Mass. 589 n. 9 (1982).  "To raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that [the defendant] (1) knew there was no probable cause, and (2) acted with an improper motive ... i.e., acted primarily for a purpose other than that of properly adjudicating the claim." *Sklar v. Beth Israel Deaconess Medical Center,* 59 Mass.App.Ct. 550, 797 N.E.2d 381, 387 (2003) (internal quotation marks and citations omitted).  There is no evidence in this record from which knowledge of a lack of probable cause can be inferred.

Moreover, plaintiff cannot prove the criminal proceedings herein at issue terminated in his favor.  Massachusetts holds a prosecution that terminates with a nolle prosequi will be considered "in favor of the plaintiff" where the reasons for the nolle pros are consistent with

actual innocence or lack of reasonable grounds to pursue the criminal action. *Wynne v. Rosen*, 391 Mass. 797, 800–01 (1984) This is not the case here, where both the Superior Court decision granting the new trial and the prosecutor has made clear their actions were motivated by newly discovered evidence, but stated such evidence was "not dispositive." *MDSOF ¶*  The other reasons cited in the Nolle Prosse were logistical impediments (i.e. witnesses and victim is now dead, law on sentencing has changed) and not for lack of grounds to re-try the case.

The summary judgment record does contain any evidence to establish malicious prosecution under Massachusetts law, and the defendants are entitled to summary judgment in their favor.

**3.  Civil conspiracy under state law**

Civil conspiracy is an intentional tort which requires: (1) a combination of two or more persons; (2) to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means; (3) some peculiar power of coercion over the plaintiff possessed by the defendants in combination which any individual defendant standing in like relation to the plaintiff would not have had; and, (4) damage. *DesLauries v. Shea*, 300 Mass. 30, 33 (1938); *Fleming v. Dane*, 304 Mass. 46 (1939). In Massachusetts "civil conspiracy is a very limited cause of action." *Tennaro v. Ryder System, Inc.*, 832 F.Supp. 494 (D.Mass. 1993), quoting *Jrugens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass. 1985).

It is clear from the record that the plaintiffs cannot sustain their burden on civil conspiracy under Massachusetts law.  As recounted above in the discussion of the Federal Conspiracy count, there is no evidence in the record of any agreement or meeting of the minds of two or more people to further a conspiracy here.  There is neither evidence of an unlawful purpose nor did the officers act in a coercive manner.  They had probable cause to arrest, and observed all due process, including advising Perrot of his Miranda rights.

4. **Intentional Infliction of Emotional Distress**

A successful claim for intentional infliction of emotional distress requires a plaintiff to prove that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress. To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and ... utterly intolerable in a civilized community. Liability cannot be founded upon mere insults, threats, or annoyances. *Sietins v. Joseph*, 238, F.Supp.2d 366, 379 (D., Mass. 2003) (quoting *Howcroft v. City of Peabody*, 51 Mass.App.Ct. 573, 596 (2001) (internal quotations omitted)). "Moreover, to the extent that police are merely carrying out their obligations as law enforcement officers, their conduct as a matter of law is not deemed extreme and outrageous. See *Barbosa v. Cordon*, 962 F.Supp.2d 316, 334 (D. Mass. 2013) (citing *Sietins,* 238 F.Supp.2d at 379).

Here, as fully recounted above, the police questioning was reasonable under the circumstances, the statement Perrot gave cannot herein be challenged, he was given Miranda warning multiple times, and was advised of and did use the phone.  The evidence was turned over to the HCDA's office and evidence was sent to the FBI lab for analysis.  All of these actions were taken as part of carrying out their obligations as police officers, and they are thus entitled to summary judgement on this claim.

5. **Defendants are entitled to Summary Judgment on Claims of Arising from M.G.L. c.12, §11**

Plaintiff claims the defendants violated his civil rights under the Massachusetts Civil Rights Act, G.L. c. 12 § 11I ("MCRA"). Section 11I of the MCRA coexists with § 1983 and provides a parallel remedy for injured parties. *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822-823

(1985). There are, however, three critical differences between the federal statute and the state statute. First, the Massachusetts Civil Rights Act enlarges the scope of protected rights to include not only claims based on a deprivation of a federally guaranteed right, but also claims based on rights guaranteed by state statute or the Massachusetts Constitution. Second, unlike the federal statute, the MCRA does not require the conduct at issue to be made "under color of right." This difference is not material to the case at bar. Finally, to maintain a claim under the Massachusetts statute, plaintiff must demonstrate that the defendant used "threats, intimidation or coercion" to interfere with a civil right. *Layne v. Superintendent, Massachusetts Correctional Institution,* 406 Mass. 156, 158 (1989).

The MCRA requires an interference with the exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of Massachusetts, by means of "threats, intimidation, or coercion." *Swanset Dev. Corp. v. Taunton,* 423 Mass. 390,395, 668 N.E.2d 333 (1996); *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 593-94, 747 N.E.2d 729, 745 (2001).

Perrot cannot claim that any right of his was abridged as a result of "threats, intimidation or coercion".  To the extent he claims his statement regarding the November 30, 1985 was the product of threats, intimidation or coercion, for the reasons set forth above that claim cannot be brought.    Nor can he proceed on a claim that an arrest was made without probable cause.  *Santiago v. Fenton, supra*, 891 F.2d at 387.  As demonstrated above, the arrest and prosecution of Perrot was supported by probable cause

Perrot cannot sustain his burden that his rights have been violated under the Federal Constitution.  He has failed to identify nor does the summary judgment record reveal any unique rights under either the Massachusetts constitution or statutory law that were allegedly violated.

His claims under the MRCA must fail, and summary judgment enter for the defendants on any claim arising under such statute.

2. **CONCLUSION**

WHEREFORE, based upon the foregoing, Defendants, including the individual municipal employees and the City of Springfield, respectfully request that this Court grant summary judgment in their favor on all counts of the complaint. Specifically, Defendants have demonstrated that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. The allegations against the municipal employees lack sufficient evidence of constitutional violations, and these employees, as well as the City of Springfield, are entitled to immunity protections. Additionally, all actions taken by the municipal employees in their official capacities were within the bounds of their duties and supported by probable cause, negating claims of malicious prosecution, negligence, and intentional infliction of emotional distress. The City of Springfield is also entitled to summary judgment regarding the Monell claim, as no evidence shows a policy, practice, or custom that led to a violation of Perrot's rights. Given these circumstances, Defendants assert that summary judgment is not only justified but necessary to conclude this matter justly and expeditiously.

Respectfully submitted,
The Defendants, City of Springfield,
Cheryl Clapprood, Thomas Kennedy, and
Marianne Popko (n/k/a Moriarty), Kelley
Estate, By their attorneys,

Dated: March 29, 2024

*/s/ Lisa C. deSousa*
Lisa C. deSousa, Esq. BBO#546115
Tyler J. Kenefick, Esq. BBO#696304
Robert A. Schmidt, Esq. BBO#666905
Phil Ciccarelli, Esq. BBO#678452
City of Springfield Law Department
1600 E. Columbus Ave., 2nd Floor
Springfield, MA 01103

Tel: (413) 886-5205
ldesousa@springfielcityhall.com
tkenefick@springfieldcityhall.com
attyschmidt@gmail.com
phil@ciccarelli.law

Defendant City of Springfield
by its attorneys,

*/s/ Thomas P. Campbel*
Thomas P. Campbell, Esq. BBO#564124
Paul Tellier, Esq. BBO#676203
Joshua Loveall, Esq. BBO#692161
Nathan Y. Pak, Esq. BBO#70573
D'Ambrosio LLP
185 Devonshire Street, 10th Fl.
Boston, MA 02110
Tel:    (617) 720-5657
tcampbell@dambrosiollp.com
ptellier@dambrosiollp.com
jloveall@dambrosiollp.com
npak@dambrosiollp.com

Defendants, Thomas Jarvis, Charles Arpin,
Paul Glantz, Ronald St. Germain and Andrew
Canevari, by their attorney,

*/s/ Kevin B. Coyle*
Kevin B. Coyle, Esq. BBO #103540
1299 Page Boulevard
Springfield, MA 01104
Tel: (413) 787-1524
attycoyle@aol.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true copy of the within was this day served upon the parties via the Federal Court's ECF Notice and Delivery System.  I am not aware of any party who is a non-registered participant, and therefore electronic filing is the sole means of service of this document.

Signed under the pains and penalties of perjury.

Dated: March 29, 2024                  /s/ Lisa C. deSousa
                                       Lisa C. deSousa, Esq