**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GEORGE PERROT<br>Perrot,<br><br>v.<br><br>THE CITY OF SPRINGFIELD, et. al.,<br>Defendants | CIVIL ACTION NO: 18-CV-10147 |

**PLAINTIFF'S RESPONSE TO DEFENDANT BLOOM'S STATEMENT OF MATERIAL FACTS**

1. ADA Bloom worked as a prosecutor in the Hampden County District Attorney's Office beginning sometime between 1975 and 1977, until around January of 1990. (Bloom Dep. 10:3-10, 14:9-24, hereinafter "Exh. A [page number]:[line number].")

**RESPONSE**: Admit that these represent the approximate dates that Bloom worked in the Hampden County District Attorney's Office, although since Bloom did not graduate from law school and pass the bar until 1978 or 1979, a number of the years in the timeframe referenced above represent work Bloom would have engaged in under the student practice rule and/or as a law clerk, rather than as a fully licensed prosecuting attorney. *See* Dkt. 331-1 (Bloom Dep.) at 14:7-15:4.

2. As a prosecutor, ADA Bloom could not recall ever being assigned a case before someone was arrested, nor was he ever asked for advice on a matter by police before an arrest was made. (Exh. A 18:7-19, 20:19-24.)

**RESPONSE**: Admit that Bloom testified at his deposition that he could not recall any such incidents, but disputed to the extent Bloom intends this as a broader statement denying he played any role in police investigations. *See, e.g.*, Pl.'s Ex. 15 (Bloom 1991 Testimony) at 58:22-60:4.

3. On the evening of December 6, 1985, the Plaintiff, his girlfriend Lisa Eldridge, and his friends Robert Timmerman and Jeff Adkins were driving around Springfield, drinking, and using drugs. (Perrot Dep. 34:24-35:17, hereinafter "Exh. B [page number]:[line number].") In addition to consuming alcohol, the Plaintiff snorted cocaine and took Valium pills. (Exh. B 89:21-24, 90:1-10, 91:4-7.)

**RESPONSE**: Admit.

4. Sometime after 11:30 P.M., the Plaintiff was dropped off near his residence on Malibu Drive. (Exh. B 39:6-24, 40:1-13.) He then proceeded to Ellendale Circle and broke into Joseph McNabb's home. (Exh. B 33:7-12, 67:19-22, 115:10-19.) About half an hour later, the Plaintiff went to a Denny's restaurant and stole a woman's pocketbook. (Exh. B 36:22-24, 37:1.) He then returned home and passed out. (Exh. B 41:5-14.)

**RESPONSE**: Disputed to the extent that "[s]ometime after 11:30 P.M." is intended to imply a timeframe reasonable proximate to 11:30pm, since the cited testimony reflects that this may have occurred at least "an hour or two" later. Dkt. 331-2 at 39:6-18. Undisputed that the sequence of events stated is generally correct, although the cited portions of the deposition do not support the stated facts regarding the McNabb break-in, the theft of the pocketbook, or the timeframe in between them.

5. In the early morning hours of December 7, 1985, approximately six uniformed police officers entered the Plaintiff's bedroom and placed him under arrest. (Exh. B 41:15 -43:7.) The Plaintiff was eventually brought to SPD headquarters. (Exh. B 48:19-20, 49:9-13.)

**RESPONSE**: Admit that this is a generally correct description of these events, although Plaintiff's testimony was that "at least six" officers were in his bedroom. Dkt. 331-2 at 42:19-21. Furthermore, this statement omits a number of events in the sequence between Plaintiff's arrest and being brought to SPD headquarters, including that officers handcuffed Plaintiff, *id.* at 43:14-17; Plaintiff ran down the street and was "roughed up" by a couple of officers who kicked Plaintiff while he was down on the ground, hit him with a flashlight or nightstick, and then threw him over a fence, *id.* at 44:17-20, 45:9-47:5; and officers brought Plaintiff to a show-up identification procedure with Mr. McNabb, *id.* at 48:14-18; all of which took place before Plaintiff was taken to the police station, *id.* at 48:19-20.

6. At the police station, the Plaintiff was booked and brought to a cell by an unknown number of officers. (Exh. B 49:14-24, 50:2-22.) While at the station that day, the Plaintiff was questioned four different times. (Exh. B 52:12-24, 53:2-5, 55:3-5, 56:5-12, 64:14-21, 72:21-24, 73:1-16.)

**RESPONSE**: Admit that Plaintiff was booked and brought to a cell, although the cited deposition testimony is silent on the number of officers involved, and the statement omits Plaintiff's testimony within the cited range of testimony in which Plaintiff describes standing with his hands up on a desk to be patted down, at which point an officer struck him in the ribs so hard that he fell to his knees. Dkt. 331-2 at 49:21-50:5. Undisputed that Plaintiff testified to at least four separate phases of interrogation but disputed to the extent that "questioned four different times" is intended to downplay the extent and severity of Plaintiff's 12-hour ordeal at the police station. *See generally id.* at 49-83.

7. The Plaintiff had no reason to believe that each round of questioning was conducted by anyone other than a police officer. (Exh. B 370:10-15, 371:19-21, 372:21-23, 373:12-22, 374:16-21.)

**RESPONSE**: Admit that, at the time he was being interrogated, Plaintiff believed each of the individuals present during the various aspects of his interrogation was a police officer, but disputed that that was correct or that he believes that to be true today: at his arraignment, Plaintiff recognized Bloom as being one of the individuals present in the interrogation room during part of his time at the police station. Dkt. 331-2 (Perrot Dep.) at 383:9-384:10, 385:22-386:4.

8. ADA Bloom had been directed by the Hampden County District Attorney to attend lineups to ensure that they were fair to the suspect and not unduly suggestive. (Exh. A 89:23-24, 90:1-24, 91:23-24, 92:1-2.)

**RESPONSE**: Admit that this was one aspect of Bloom's role at the police station, but disputed that this was his only role. *See* Dkt. 331-2 (Perrot Dep.) at 383:9-384:10, 385:22-386:4; Ex. SH101 (Bloom 1991 Testimony) at Plaintiff 1720:21-1721:16, 1730:13-21.

9. ADA Bloom appeared at the police station during the afternoon of December 7, 1985 to approve a lineup in which the Plaintiff would be participating. (Exh. A 87:13-24, 88:1-3.)

**RESPONSE**: Disputed. Bloom came to the police station in the morning and had conversations with a number of police officers about the Prekop investigation before he joined in part of Plaintiff's interrogation. *See* Dkt. 331-2 (Perrot Dep.) at 383:9-384:10, 385:22-386:4; Ex. SH101 (Bloom 1991 Testimony) at Plaintiff 1720:21-1721:16, 1730:13-21.

10. While at the station, ADA Bloom entered the Plaintiff's interrogation room when officers were discussing whether the Plaintiff would submit to giving samples of hair and blood. (Exh. B 383:17-24, 384:1-10.) ADA Bloom "came into the room" when "they" (presumably other officers) "were discussing the waiver to sign blood and hair." (Exh. B 384:23-385:6.) ADA Bloom entered the room "separately" from the officers who were questioning the Plaintiff. (Exh. B 385:7-11.) The Plaintiff does not know how long ADA Bloom remained in the room. (Exh. B 385:12-18.) The Plaintiff offered no testimony regarding ADA Bloom's actions before, during, or after his appearance in the interrogation room that day. (See generally Exh. B 383-385.)

**RESPONSE**: Disputed that Bloom entered the room while the hair and blood discussion was already underway. Plaintiff clarified that Bloom was already "in there when they *started* discussing the waiver to take blood and hair." Dkt. 331-2 at 385:12-18 (emphasis added).

11. ADA Bloom did not speak to anyone at the station regarding the Plaintiff's questioning. (Exh. A 130:24-131:23.)

**RESPONSE**: Disputed. Bloom has testified that he played a role in the investigation of the Prekop assault alongside at least eight or nine Springfield police officers, Ex. SH101 (Bloom 1991 Testimony) at Plaintiff 1730:13-21, and that he had conversations with a sub-set of these officers about the Prekop investigation and Plaintiff's status as a suspect during his time at the police station, *id.* at Plaintiff 1721:10-22. Moreover, since Bloom has falsely testified about his role in Plaintiff's interrogations, *compare* Dkt. 331-1 (Bloom Dep.) at 130:24-131:2 (Bloom testimony that he was "absolutely not" in the room for "any of the interrogation of Mr. Perrot.") *with* Dkt. 331-2 (Perrot Dep.) at 383:9-384:10 (Bloom was present during a portion of the interrogation alongside other officers), there is a reasonable 'consciousness of guilt' inference that Bloom played a much greater role alongside Defendant Officers in orchestrating the

coercion and fabrication of false inculpatory statements from Plaintiff, and he is lying to minimize his role in and liability for this misconduct.

12. When the lineup was completed, ADA Bloom left the station. (Exh. A 132:21-133:3.)

**RESPONSE**: Admit.

13. On April 1, 1987, ADA Bloom accompanied Officer Thomas Kennedy, who was transporting physical evidence connected to the Plaintiff's prosecution, to Washington, D.C. (Exh. A 111:15-24, 123:15-23; Kennedy Dep. 101:23-102:4, hereinafter "Exh. C [page number]:[line number].") ADA Bloom and Officer Kennedy personally delivered the evidence to the Federal Bureau of Investigation ("FBI"). (CoS RPOD 003732-33, 003746-47, 003749-50, hereinafter "Exh. D [bates page number].")

**RESPONSE**: Admit.

14. Because the type of scientific evidence ADA Bloom expected to introduce was new and not well understood in 1987, he planned to visit Washington, D.C. at some point before the trial. (Exh. A 112:4-24.)

**RESPONSE**: Deny. Bloom's testimony supports only that this type of evidence was new to him and not well understood by him, not that it was new or poorly understood in general. Dkt. 331-1 (Bloom Dep.) at 112:10-17 ("I knew nothing about this type of evidence . . . This was a new thing for me . . . which I wasn't used to."). Furthermore, Bloom repeatedly qualified his testimony by stating that this was only a "guess" and that this was "not based on any memory" but simply based on having "read" his prior testimony and "seen other documents." *Id.* at 112:6-10, 112:20-113:5.

15. ADA Bloom's purpose in traveling to Washington, D.C. that day was to speak with William Eubanks and Wayne Oakes, members of the FBI, concerning scientific testing of the hair and blood evidence because Eubanks and Oakes were expected to provide expert-witness testimony at the Plaintiff's criminal trial, and ADA Bloom would not put them on the witness stand without first interviewing them. (Exh. A 111:7-113:4.)

**RESPONSE**: Deny. Bloom repeatedly qualified his testimony by stating that this was only a "guess" and that this was "not based on any memory" but simply based on having "read" his prior testimony and "seen other documents." Dkt. 331-1 (Bloom Dep.) at 112:6-10, 112:20-

113:5. Moreover, Bloom stated that he may have been motivated to take the trip based at least in part on his friendship with Defendant Kennedy. *Id.* at 113:19-114:16.

16. ADA Bloom believed that the timing of his trip to Washington, D.C. could have coincided with Officer Kennedy's trip because they were friends. (Exh. A 113:19-114:16.)

**RESPONSE**: Deny.

17. Ultimately, ADA Bloom and Officer Kennedy ended up only dropping the evidence off at the FBI's lab, and departed within five or ten minutes. (Exh. C 105:20-106:6.) They did not speak about the Plaintiff's prosecution. (Exh. C 108:1-10.)

**RESPONSE**: Deny. Kennedy's testimony in this regard conflicts with Bloom's testimony that he "must have" had an appointment to meet with the FBI forensic experts to interview them before trial, because it would not have made any sense to travel to Washington merely "hoping that they were going to be there," given the considerable time and expense involved in traveling from Springfield to Washington. Dkt. 331-1 (Bloom Dep.) at 111:7-112:3.

18. On December 14, 1987, the Plaintiff was convicted of aggravated rape, burglary and assault in a dwelling, unarmed robbery, indecent assault and battery, and burglary. *See Commonwealth v. Perrot*, Nos. 85-5415, 5416, 5418, 5420, 5425, 2016 WL 380123, at *10 (Mass. Super. Ct. Jan. 26, 2016). ADA Bloom was the trial prosecutor. *See id.* at *9-10.

**RESPONSE**: Admit.

19. Shortly after the Plaintiff's convictions, on December 16, 1987, ADA Bloom forged a false confession by the Plaintiff that purportedly admitted to, among other things, raping three women. (Perrot Dep. Ex. 19, hereinafter "Exh. E.") The false confession also implicated Timmerman and Adkins. (Exh. E.)

**RESPONSE**: Admit that Bloom forged this false confession and that the date on the forged document reads December 16, 1987, but disputed that this date is necessarily accurate, since Bloom admits that "the entire document is fraudulent," Dkt. 331-1 (Bloom Dep.) at 61:3-7.

20. On June 4, 1990, the Supreme Judicial Court reversed the Plaintiff's convictions for reasons unrelated to the forged confession. *See Commonwealth v. Perrot*, 407 Mass. 539, 549 (1990). The Commonwealth retried the Plaintiff in January 1992. See Perrot, 2016 WL 380123, at *11. The Commonwealth was represented by ADA Brett Vottero at the retrial. *Id.*

**RESPONSE**: Admit.

21. Before the Plaintiff's retrial, when ADA Bloom no longer worked at the Hampden County District Attorney's Office, prosecutors learned of the forged confession and disclosed it to the Plaintiff's attorney, who filed a motion to dismiss for prosecutorial misconduct. *See Commonwealth v. Perrot*, 38 Mass. App. Ct. 478, 480 (1995). That motion was denied, and, on appeal after the Plaintiff was convicted a second time, the Massachusetts Appeals Court affirmed the conviction because the false confession had no impact (and thus caused no harm) in the Plaintiff's retrial. *Id.* at 482.

**RESPONSE**: Admit that this generally reflects the procedural history and the ultimate holding of the court, provided that "false confession" is meant to refer to the forged Marchand confession which was fabricated by Bloom, and not the earlier fabricated inculpatory statements related to Prekop.

22. The forged confession was not introduced at either of the Plaintiff's two criminal trials, was promptly disclosed to the defense when a different prosecutor learned of its existence, and ADA Bloom was disciplined by the Board of Bar Overseers for his role in its creation. *See Perrot*, 38 Mass. App. Ct. at 480-82; Matter of Francis W. Bloom, SJC No. BD-1993-078 (December 16, 1993).

**RESPONSE**: Understanding that "forged confession" is meant to refer to the forged Marchand confession which was fabricated by Bloom, and not the earlier fabricated inculpatory statements related to Prekop, undisputed that this confession was not introduced into evidence at Plaintiff's criminal trials, that it was ultimately disclosed to the defense, and that Bloom received professional discipline for his role in this forgery. Disputed that the confession was "promptly" disclosed to the defense; the cited source describes that the newly-assigned prosecutor discovered the forged confession, "naturally took [it] to be legitimate," and discussed with Defendant Kelly her view that retrying the case would be "relatively easy" in light of this confession, and that it was only some undefined period of time thereafter ("at a later point in trial preparation") that Kelly revealed the document to be a forgery, at which point it was disclosed to defense counsel. *Com. v. Perrot*, 38 Mass. App. Ct. 478, 480 (1995).

Dated: May 17, 2024

Respectfully Submitted,

*/s/ Jon Loevy*
*One of the Plaintiff's Attorneys*

*Attorneys for Plaintiff*

Mark Loevy-Reyes, BBO No. 707974
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
Ph: (312) 243-5900
Fax: (312) 243-5902

Debra Loevy, BBO No. 569212
Jon Loevy*
Steven Art*
Gayle Horn*
Gianna Gizzi*
Carla Agbiro*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
jon@loevy.com
*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, hereby certify that on May 17, 2024, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Jon Loevy
*One of Plaintiff's Attorneys*