**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT STATEMENT OF FACTS**

## I. September 21, 1985, Incident at 26 Pineview Drive (Marchand)

1. In the early morning of Saturday, September 21, 1985, Mae Marchand, age 82 at the time, reported to her neighbor (Alfred Roberts) on Pineview Drive in Springfield that three people had broken into her home the previous evening and raped her. When he asked if she had called the police, she told him she had not because they ripped her phone out. *(Ex. 'A' Alfred Roberts 9/21/1985 Statement)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Alfred Roberts has never given any testimony under oath concerning these assertions, nor is he disclosed as a witness in this matter. Accordingly, Plaintiff denies the record reflects this statement of fact.**

2. He took her into his house, and he called the police. *(Ex. A)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Alfred Roberts has never given any testimony under oath concerning these assertions, nor is he disclosed as a witness in this matter. Accordingly, Plaintiff denies the record reflects this statement of fact.**

| | |
|---|---|
| 3. | Her daughter convinced her to go to the hospital. Officer Linda DeRosier of the Crime Prevention Bureau interviewed her at the hospital on September 21, 1985. *(Ex. 'B' 9/21/1985 L. DeRosier Report to Capt. Stelzer)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Mae Marchand, deceased, Captain Stelzer, deceased, and Officer Linda DeRosier, who has not been disclosed as a witness, have never given any testimony under oath concerning these assertions. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 4. | Ms. Marchand told Officer DeRosier that three teenage boys broke a breezeway window to get into her house sometime between when she went to bed at 9:30 p.m. and 1:30 a.m., when she checked the clock after they left. *(Ex. 'C' M. Marchand 9/21/1985 Statement)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Mae Marchand, deceased, nor Officer Linda DeRosier, who has not been disclosed as a witness in this matter, have ever given any testimony under oath concerning these allegations. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 5. | She told the officer that only one of the boys raped her vaginally. They took money from her wallet when they left. *(Ex. C)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Mae Marchand, deceased, nor Officer Linda DeRosier, who has not been disclosed as a witness in this matter, have ever given any testimony under oath concerning these allegations. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 6. | She could describe only her rapist. He was a teenager, approximately 5'5" tall, curly hair, hairy arms, wearing a sweatband, cutoff sweatshirt, shorts, and sneakers. *(Ex. C)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Mae Marchand, deceased, nor Officer Linda DeRosier, who has not been disclosed as a witness in this matter,** |

| | |
|---|---|
| | **have ever given any testimony under oath concerning these allegations. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 7. | Officers Thomas Jarvis and Officer Arcetta of the Detective Bureau responded to Ms. Marchand's home. They took photographs. They seized as evidence the sheet and pillowcase from the area of the attack, attaching property tag #49227 to them.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1.** |
| 8. | The rape kit from the hospital was property tag #49228.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1.** |
| 9. | Ms. Marchand's grandson, Richard Croughwell, told Officer Arcetta that, if he finds out who raped his grandmother, he will kill him.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Furthermore, Plaintiff objects to the stated assertion because it is inadmissible hearsay, without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

## II. Investigation and Interaction with George Perrot and other Witnesses

### A. Initial Interactions with George Perrot and Police Interviews 9/21/1985

| | |
|---|---|
| 10. | On the Tuesday before the incident, Ms. Marchand hired two youths to do some painting around her home. George Perrot was one of those youths. *(Ex. 'D' Sgt. Canevari 9/22/1985 Report to Capt. Stelzer).*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 11. | During the evening of September 21, 1985, Mr. Croughwell telephoned George Perrot to discuss what happened to Ms. Marchand. *(Ex. 'E' George Perrot 9/21/1985 Statement)*, *(Ex. D)*<br><br>**RESPONSE: Admit.** |
| 12. | Following that call, George Perrot called the Detective Bureau around 7 p.m. and agreed to come in and talk to the detectives. *(Ex. E)*, *(Ex. D).*<br><br>**RESPONSE: Admit.** |
| 13. | Officers Thomas Kennedy and Robert McFarlin picked up George Perrot and his girlfriend, Lisa Eldridge and drove them to police headquarters. *(Ex. D)*<br><br>**RESPONSE: Admit.** |
| 14. | At approximately 8:30 p.m. on September 21, 1985, George Perrot, age 17 at the time, told the detectives that he, Ms. Eldridge, Robert Timmerman, and Jeffrey Adkins were together most of the previous night. He said that he and Ms. Eldridge were together at his home on Malibu Drive on Friday night around 6:30 p.m. They walked from his house to meet Robert Timmerman at his house on Telbar Street when they met Jeffrey Adkins, and he joined them. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 15. | He said that as they walked toward Mr. Timmerman's house, Mr. Timmerman came by in his car. They got in and drove around, stopping at a package store to buy a case of Budweiser. He said they then cruised the city, talking and drinking beer for a time, then decided to go to the Big E in West Springfield. |

| | |
|---|---|
| | He thought it was approximately 7:30 p.m. because it was just starting to get dark. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 16. | He said they climbed the fence at the Big E to get in and that they stayed there until approximately 9:30 p.m. when Lisa Eldridge complained of sickness. He said they left and dropped her off at her house around 10:00 p.m. The three of them decided to go back to the Big E. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 17. | He said that they climbed the fence in the same place and that they stayed there until about 11:30 p.m. when the police were making people leave the fair. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 18. | He said they drove back to their neighborhood in Sixteen Acres, where Mr. Timmerman dropped Jeff Adkins off at his house on Malibu Drive before dropping Mr. Perrot off at Ms. Eldridge's house on Corey Road at approximately 12;15 a.m. He said Mr. Timmerman drove away. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 19. | Mr. Perrot said that he tapped on Ms. Eldridge's window and that she came out. They walked to his house, arriving around 12:30 a.m. He said they stayed there until 3:30 a.m., when he walked her home. *(Ex. E)*<br><br>**RESPONSE: Admit.** |
| 20. | Perrot said he was wearing grey corduroy pants and a brown, short-sleeved sport shirt. He said Mr. Adkins was wearing jeans and a striped sport shirt. |

He said Mr. Timmerman was wearing jeans and a Springfield Technical Community College tank top. *(Ex. E)*

**RESPONSE: Admit.**

21. Mr. Perrot said that he got a call from Ms. Marchand's grandson at 5:30-6:00 p.m. who told him that Ms. Marchand was raped last night. The grandson asked what Mr. Perrot knew about it. The grandson then threatened Mr. Perrot's brother-in-law. Mr. Perrot told him he did not know anything about it. Mr. Perrot's sister then called the police to report the conversation, and Mr. Perrot spoke to the detectives, agreeing to come to the police station to make a statement. *(Ex. E)*

**RESPONSE: Admit.**

22. At approximately 8:00 p.m. on September 21, 1985, Lisa Eldridge, age 16 at the time, told the detectives that George Perrot came over to her house around 5:00 p.m. She said she had been going out with Mr. Perrot for about three years. *(Ex. 'F' Lisa Eldridge 9/21/1985 Statement)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.**

23. She said they walked back to Mr. Perrot's house and that Mr. Timmerman picked them up there about a half-hour later to go to the Big E. Jeff Adkins came with them. *(Ex. F)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to**

| | |
|---|---|
| | **officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 24. | Ms. Eldridge said that they stayed at the fair until about 9:30 p.m., when she began to feel sick. She said they brought her home, arriving there around 10:00 p.m. She said her father was watching television and her mother was sleeping. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 25. | She said she told Mr. Perrot to come back later when they dropped her off. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 26. | She said she went to her room and lay on her bed, listening to the radio. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 27. | She said Mr. Perrot knocked on her window sometime between midnight and 12:05 a.m. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

| | |
|---|---|
| 28. | She said she walked with Mr. Perrot to his house, arriving fifteen or twenty minutes later. She said she stayed there until 3:30 a.m. when Mr. Perrot walked her home. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 29. | Ms. Eldridge said Mr. Perrot wore a brown alligator shirt and gray corduroy pants. Mr. Timmerman wore jeans and a striped tank top, according to her. Mr. Adkins wore jeans and a tee shirt, but she could not remember the color. *(Ex. F)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Lisa Eldridge has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Eldridge's statements to officers, officers report of her statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 30. | At approximately 10:30 p.m. on September 21, 1985, Jeffrey Adkins, age 20 at the time, told the detectives that he was walking down Malibu Drive at approximately 5:30-6:00 p.m. the previous night when he met George Perrot and his girlfriend, Lisa Eldridge. They told him they were going to Robert Timmerman's house, so he went with them. *(Ex. 'G' Jeffrey Adkins 9/21/1985 Statement) (Ex. D)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

| | |
|---|---|
| 31. | He said that a few minutes later, they saw Mr. Timmerman in his car. They got in and drove around for about half an hour. He said they drank a six-pack of beer and then went to the Big E in West Springfield. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 32. | He said that they jumped the fence to get in, but Lisa Eldridge paid. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 33. | He said they met two girls who also lived on Malibu Drive shortly after they got into the fair. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 34. | Mr. Adkins said that they walked around for a few hours and that they brought Lisa Eldridge home about 9:00-9:30 p.m., returning to the fair afterwards. They stayed until about 11:45 p.m., and they saw two kids they knew. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

| | |
|---|---|
| 35. | He said that, when they left at 11:45, they drove straight home and that Mr. Timmerman dropped him off first. He said it was 12:15 a.m. when he walked into his house and his mother and father were home. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 36. | Mr. Adkins said he wore a white and gray sport shirt, blue jeans, and sneakers. He said Mr. Timmerman wore a tank top, blue jeans, and sneakers. He said he was not sure what Mr. Perrot wore. *(Ex. G)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, because Jeff Adkins has never given any testimony under oath as to these assertions in this matter. Additionally, the cited exhibit contains multiple levels of hearsay–e.g., Adkins's statements to officers, officers report of his statements. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

**B. Further Witness Statements and Initial Law Enforcement Response**

| | |
|---|---|
| 37. | At approximately 1:00 a.m. on September 22, 1985, Robert Timmerman, age 20 at the time, told the detectives that the four friends went to the Big E in West Springfield in his car. He said they all paid to enter the fair. *(Ex. 'H' Thomas Kennedy 9/22/1985 Report of Interview with Robert Timmerman)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Robert Timmerman has never testified to these assertions in this matter. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 38. | He said that they remained there until about 11:30 p.m. when he dropped Lisa Eldridge at home, then George Perrot, and then Jeffrey Adkins. *(Ex. H)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Robert Timmerman has never testified to these assertions in this matter. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

| | |
|---|---|
| 39. | After telling this story, Mr. Timmerman admitted it was not true. He said that sometime between 9:00 p.m. and 9:30 p.m. the four of them left the fair and dropped Lisa Eldridge off at her home. He said the remaining three then returned to the fair, jumping the fence to get back in this time. He said they remained at the fair until about 11:30 p.m. He said he dropped off George Perrot first and then Jeffrey Adkins. He said he lied the first time because he did not think it mattered. *(Ex. H)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Robert Timmerman has never testified to these assertions in this matter. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 40. | Members of the Springfield Police Department interviewed Nancy and Mark Westcott, with whom George Perrot lived, and they stated Perrot came home around 12:30 a.m. on September 21, 1985. *(Ex. D)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 41. | Jeff Adkins' father was interviewed by the Springfield Police Department and said Jeff Adkins had gotten home around 12:30 a.m. on September 21, 1985. *(Ex. D)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

III. **Evidence Collection**

| | |
|---|---|
| 42. | By letter dated October 3, 1985, Captain Ernest Stelzer of the Springfield Detective Bureau sent evidence from the incident at 26 Pineview Drive to the |

| | |
|---|---|
| | Federal Bureau of Investigation for scientific examination and comparison of fingerprints, hair samples, blood stains, and seminal fluid/sperm stains. *(Ex. 'I' Capt. Stelzer 10/3/1985 letter to FBI)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Captain Stelzer, deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 43. | On October 7, 1985 Mae Marchand gave a second statement to the Springfield Police Department about her attack which had occurred on September 21, 1985. She had spoken with George Perrot prior to the attack when he had painted her shed in the company of Jeffrey Adkins. She recounted that while she was being attacked the assailant was asking her "where is your money?" In her statement she stated she believed "very strongly" that the man who assaulted her was George Perrot based upon his voice. *(Ex. 'J' Mae Marchand 10/7/1985 Statement)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Mae Marchand, deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 44. | By letter dated December 24, 1985, the Federal Bureau of Investigation notified Captain Stelzer that the latent fingerprint recovered from the window at 26 Pineview Drive and two latent fingerprints recovered from the metal door pull at 26 Pineview Drive belonged to George Perrot.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Moreover, Plaintiff objects to this assertion as the referenced correspondence is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

## IV. October 24, 1985, Incident at 33 Covel Street (Lichwala)

45. At approximately 2:30 a.m. on Thursday, October 24, 1985, Emily Lichwala, age 64 at the time, awoke from sleep at 33 Covel Street in Springfield to see a male silhouette in her bedroom doorway. *(Ex. 'K' Emily Lichwala 10/24/1985 Statement)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.**

46. The man came to the bed and removed her pajamas, bra, and underwear. He had her lie on her stomach, and he tied her hands behind her back with her bra. He raped her in multiple ways. *(Ex. K)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.**

47. He threatened to kill her if she called the police. *(Ex. K)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.**

48. He took her wedding ring, her diamond engagement ring, and cash from her wallet. *(Ex. K)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.**

| | |
|---|---|
| 49. | Ms. Lichwala later described him as small-framed and under six feet tall but taller than she was at 5' 5". She said he wore dark clothes, and his jacket might have nylon. She could not describe his face because he put a pillowcase over her head. *(Ex. K)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 50. | She said that she thought his voice might belong to a neighborhood boy that lived on Forest Hill Road that she spoke with in the springtime about his brother riding his bike on her lawn. *(Ex. K)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 51. | She did call the police. Detectives came to her house. *(Ex. K)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Emily Lichwala, deceased, has never given any testimony under oath about the October 24, 1985 assault. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 52. | The detectives determined that the male entered the house by removing the dryer vent pipe from a cellar window and that he left through a cellar door. They found footprints outside the window. They photographed the footprints and the bedroom. They took bedding and personal clothing items to be examined for clues. They notified other personnel to search for fingerprints in the house. *(Ex. 'L' Sgt. Carlson and A. Pioggia 10/24/1985 Report to Capt. Stelzer)* |

| | |
|---|---|
| | **RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Sgt. Carlson nor Officer Pioggia have ever given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 53. | On October 29, 1985, Defendant Kane was sent to a Springfield hospital to pick up victim E.L. – who had been assaulted on October 24, 1985 and was being released following treatment. Kane's orders were transport her to the police station so that she could provide a statement to a female officer named Linda Desrosiers, and then transport her home. *(Ex. 'M' Richard Kane 6/8/2023 Deposition transcript pp. 54:23-57:17)*<br><br>**RESPONSE: Admit.** |
| 54. | E.L. gave a statement to Desrosiers. Kane and Desrosiers thereafter drove E.L. home and performed a brief investigation at her house. *(Ex. M, pp. 59:6-60:24)*<br><br>**RESPONSE: Admit.** |
| 55. | Kane had no further involvement in the E.L. matter, or in any matter involving Perrot, until being sent to witness Perrot's blood draw on December 10, 1985. *(Ex. M, p.75:7-21)*<br><br>**RESPONSE: Deny. (Pl.'s Exhibit 53, Kane's Dep., 6/8/23, pp. 67:17-70:24).** |

## V. <u>November 30, 1985, Incident at 33 Covel Street (Lichwala)</u>

| | |
|---|---|
| 56. | At approximately 3:25a.m. on Saturday, November 30, 1985, Emily Lichwala was awake when she heard some loud bangs and glass breaking at her home at 33 Covel Street. She ran out the front door to her neighbor's house at 280 |

| | |
|---|---|
| | Forest Hills Road (Jilson) and called the police. *(Ex. 'N' Cheetham 11/30/1985 Special to C.P.B.)*<br>**RESPONSE: Admit.** |
| 57. | Detectives arrived at her house approximately twenty minutes later, around 3:45 a.m. *(Ex. N)*<br>**RESPONSE: Admit.** |
| 58. | The detectives determined that someone had kicked out the dryer vent through the cellar window to gain entry to the cellar but was unable to enter the main floor because the cellar door was double bolted. *(Ex. N)*<br>**RESPONSE: Admit.** |
| 59. | They determined that the intruder then left through the walkout cellar door, taking a pool cue from the cellar. The intruder then used the pool cue to break a window on the south side breezeway, raising the window to climb through. Once inside, the intruder broke a plexiglass window and kicked in the door to gain entry to the house. *(Ex. N)*<br>**RESPONSE: Admit.** |
| 60. | The intruder took a beige handbag containing cash and credit cards. The detectives took photographs and another officer responded to the scene to search for fingerprints. *(Ex. N)*<br>**RESPONSE: Admit.** |
| 61. | Ms. Lichwala did not see the intruder before she ran out of the house. *(Ex. N)*<br>**RESPONSE: Admit.** |

## VI. November 30, 1985, Incident at 27 Malibu Drive (Prekop)

| | |
|---|---|
| 62. | Before 4:00 a.m. on Saturday, November 30, 1985, the barking of her dog awoke Mary Prekop, age 78 at the time, at her 27 Malibu Street home. She got up to investigate, but found nothing, and she returned to bed. *(Ex. N)*, *(Ex. 'O' 12/9/1987 Trail Transcript, Volume III, p. 94:8-14)*<br>**RESPONSE: Admit.** |
| 63. | She heard the two doors leading in from her breezeway being kicked in. *(Ex. N)*<br>**RESPONSE: Admit.** |
| 64. | She got out of bed, and, upon entering her kitchen, she met a white male in his early twenties. She described him as 5'7" to 6' tall, slim to medium build, dark wavy hair, and he wore a black jacket and sneakers. *(Ex. N) (Ex. O, p. 96:1-9)*<br>**RESPONSE: Admit.** |
| 65. | He pushed her back into the bedroom, and he closed the door behind him, throwing the dog outside the door. *(Ex. N)*, *(Ex. O, p. 94:21-23)*<br>**RESPONSE: Admit.** |
| 66. | He threw her to the floor and beat her about the face, arms, legs, and side. He sexually assaulted her. *(Ex. N), (Ex. O, p. 95:9-13)*<br>**RESPONSE: Admit.** |
| 67. | Uniformed officers responded to the house at approximately 4:00 a.m. Detectives arrived at her house from the Lichwala residence at approximately 4:10 a.m. *(Ex. N)*<br>**RESPONSE: Admit.** |

| | |
|---|---|
| 68. | They found that her purse had been ransacked, but she was unsure if anything was missing. *(Ex. N)*, *(Ex. O, p. 109:1-5)*<br><br>**RESPONSE: Admit.** |
| 69. | In the bedroom, they found a pair of white gloves with a design on them. One was on the floor, and the other was on the bed. One of them had blood on it. Sgt. Kelly tagged then as evidence with property tag #49449. He also tagged a door bolt from the entry way with property tag #49450. *(Ex. N)*<br><br>**RESPONSE: Deny. (Pl.'s Ex. 16, Trial 2 Trans., 1/6/92, p. 144) (Pl.'s Ex. 4, Prekop Statement, 11/30/85).** |
| 70. | An ambulance took Ms. Prekop to the hospital for treatment of her facial and body contusions, as well as for the lacerations to her right hand. *(Ex. N)*<br><br>**RESPONSE: Admit.** |
| 71. | The detectives also took photographs and had another officer search for fingerprints. *(Ex. N)*<br><br>**RESPONSE: Deny that the cited exhibit supports that prints were searched for or collected at 27 Malibu, Ms. Prekop's residence.** |
| 72. | Marianne Popko took a statement from Mary Prekop on the morning of November 30, 1985. *(Ex. O, p. 93:1-9, 15-19)*<br><br>**RESPONSE: Admit.** |
| 73. | In the statement taken on November 30th Prekop did not identify Perrot as her assailant. *(Ex. O, pp. 93:1-96:21).*<br><br>**RESPONSE: Admit.** |
| 74. | In the statement taken on November 30th the description Prekop gave of her assailant did not match the description of Perrot. *(Ex. O, pp. 93:1-96:21)* |

| | |
|---|---|
| | **RESPONSE: Admit that Prekop described her assailant as a white male, between 20 and 30 years old, who was clean shaven and had dark wavy hair. She also described her assailant as average height and weight. (Ex. O, pp. 96:1-9).** |

**VII. December 7, 1985, Incident at 6 Ellendale Circle (McNabb)**

| | |
|---|---|
| 75. | At approximately 10:00 p.m. on Friday, December 6, 1985, Joseph McNabb, age 62 at the time, and his wife went to bed in their home at 6 Ellendale Circle. Both were asleep by 10:30 p.m. *(Ex. 'P' J. McNabb 12/7/1985 Statement)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Joseph McNabb Jr., deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 76. | At approximately 2:15 a.m. Mr. McNabb awoke to his wife screaming that there was somebody in the house. He rolled over in bed and saw a male walking toward down the hall toward the bedroom. *(Ex. P)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Joseph McNabb Jr., deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 77. | He got out of bed and went to the bedroom doorway, and the male swung a broom handle at Mr. McNabb's head. He blocked it with his left arm. He continued to walk toward the male, and the male backed up, taking more swings at Mr. McNabb head, which he again blocks with his left arm. After the third swing, the male dropped the broom handle and ran out of the house. *(Ex. P)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Joseph McNabb Jr., deceased, has never given** |

| | |
|---|---|
| | **any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 78. | Mr. McNabb followed him to the front door. His wife put on the house lights and called the police. *(Ex. P)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Joseph McNabb Jr., deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 79. | Mr. McNabb described the male as approximately 5'7" tall, white, and about 25 years old, give or take a couple of years. His clothing was tight fitting and dark, and he may have been wearing a dark hat. *(Ex. P)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Joseph McNabb Jr., deceased, has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 80. | A uniformed police officer (James Murphy) responded to the call at approximately 2:15 a.m. on Saturday, December 7, 1985. Finding the front door open and broken with the lock catch on the floor, he spoke to both Mr. and Mrs. McNabb. *(Ex. 'Q' James Murphy 12/7/1985 Arrest Report and Special to Detective Bureau)*<br><br>**RESPONSE: Admit.** |
| 81. | Mrs. McNabb identified the broom handle as being from a broom that she kept near a small shed by the open breezeway. The officer found the broom's head on the ground behind the shed, broken off the handle. He also located footprints on a cement patio. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception because Helen McNabb, deceased, has never given any** |

**testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.**

82. After notifying his Captain so that detectives could be assigned, he went back to his patrol to look for the intruder. *(Ex. Q)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any testimony as to the above factual assertion under oath at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.**

## VIII. December 7, 1985, Incident at Denny's (Sapelli)

83. At approximately 2:15 a.m. on Saturday, December 7, 1985, Sheileen Sapelli, age 25 at the time, went to Denny's Restaurant on Cooley Street with her friend Ann Serafino to get something to eat. *(Ex. 'R' Sheileen Sapelli 12/7/1985 Statement) (Ex. 'S' John Martel 12/7/1985 Special to D.B.)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Sheileen Sapelli nor John Martel have ever given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.**

84. Cooley Street intersects with Malibu Drive, and it is near Ellendale Circle.

**RESPONSE: Admit.**

85. They arrived in separate cars, and they parked on the north side of the building. *(Ex. R)*

**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Sheileen Sapelli has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.**

86. As Ms. Sapelli started walking toward the front of the restaurant, she felt someone behind her, touching the left side of her body. She turned and saw a

| | |
|---|---|
| | white male with dark hair, a scraggly beard, and a dark jacket. He grabbed her pocketbook and ran across Cooley Street into a backyard. *(Ex. R)*, *(Ex. S)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and neither Sheileen Sapelli nor John Martel have ever given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 87. | Ms. Serafino chased the man to a backyard on Malibu Drive where she lost him. *(Ex. R)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Ann Serafino has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 88. | Ms. Sapelli flagged down a cruiser passing by on Cooley Street. She told the officers that her pocketbook had been stolen. *(Ex. S)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Sheileen Sapelli has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 89. | At approximately 2:30 a.m., Ms. Serafino flagged down Officer Murphy as he drove down Malibu Drive. She told him what had happened at Denny's and her pursuit of the thief. *(Ex. R)*, *(Ex. S)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and Ann Serafino has never given any testimony under oath in this matter at any time. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 90. | Officer Murphy then returned to Ellendale Circle to check on the McNabb's, concerned for their safety. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

| | |
|---|---|
| 91. | One of the officers that encountered Ms. Sapelli then radioed that he had footprints in the snow at 329 Cooley Street. Officer Murphy went there, and he noted that the footprints were identical to the ones he had seen at 6 Ellendale Circle. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 92. | Officer Murphy then began to check the houses on Malibu Drive for footprints. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 93. | He observed identical footprints in the driveway at 87 Malibu Drive, George Perrot's home. They led up the driveway and into the backyard, where they stopped, and then they returned to go up the stairs into the house. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 94. | Officer Murphy waited for other officers to arrive. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any testimony under oath about this matter as asserted above. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

## IX. December 7, 1985, Arrest of George Perrot

| | |
|---|---|
| 95. | At approximately 2:45 a.m. on Saturday, December 7, 1985, Lt. Gerald Foley met Officer Murphy and other officers at 87 Malibu Drive. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any** |

| | |
|---|---|
| | **testimony under oath about this matter as asserted above. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 96. | Lt. Foley knocked on the door, and Mark Wescott, George Perrot's brother-in-law, answered it. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any testimony under oath about this matter as asserted above. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 97. | Lt. Foley explained why they were there, and Mr. Wescott gave them permission to search for Mr. Perrot. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any testimony under oath about this matter as asserted above. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 98. | Nancy Westcott, George Perrot's sister, opened Mr. Perrot's bedroom door. He was lying on his bed on his back with his feet hanging over the edge. On the floor near his feet was a blue vinyl pocketbook containing papers belonging to Sheileen Sapelli. *(Ex. Q)*<br><br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception, and James Murphy, deceased, has never given any testimony under oath about this matter as asserted above. Accordingly, Plaintiff denies the record reflects this statement of fact.** |
| 99. | The officers arrested George Perrot, and Officer Murphy escorted him out of the house to Officer Murphy's cruiser that was parked in front of the house. *(Ex. Q)*.<br><br>**RESPONSE: Admit.** |
| 100. | According to Officer Murphy, George Perrot struck him with his left shoulder as he was unlocking the cruiser door. Mr. Perrot then ran westerly on Malibu |

| | |
|---|---|
| | Drive into some back yards. The officers located Mr. Perrot a few minutes later, returning him to custody, and they took him to police headquarters at 130 Pearl Street after a show-up identification by Mr. McNabb at Ellendale Circle. *(Ex. Q)*<br>**RESPONSE: Plaintiff objects as the cited Exhibit is inadmissible hearsay without exception. Accordingly, Plaintiff denies the record reflects this statement of fact.** |

**A. <u>December 7, 1985 Events at Police Headquarters</u>**

| | |
|---|---|
| 101. | Perrot alleges Officer Glantz was on duty on December 7, 1985. Perrot alleges he knew Glantz from an arrest in 1984 when Perrot was charged with Assault and Battery on a police officer, i.e. Glantz. *(Ex. 'W', George Perrot 7/13/2023 Deposition transcript, pp. 290:1-291:24)*<br>**RESPONSE: Admit.** |
| 102. | Perrot alleges Glantz banged on the cell bars with his baton and prevented Perrot from sleeping after his December 7, 1985 arrest. *(Ex. W, pp. 292:4-11, 18-24)*<br>**RESPONSE: Admit.** |
| 103. | Approximately one hour later, two officers took him from the cell to a small room upstairs in the building that had a desk and a typewriter.<br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 104. | Sgt. Thomas Kelly and Officer Ronald St. Germain, both of the Crime Prevention Bureau, came into the room to ask Mr. Perrot questions. |

| | |
|---|---|
| | **RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 105. | Before asking anything, Sgt. Kelly read Mr. Perrot his Miranda rights from a card. He asked Mr. Perrot if he understood his rights, and, after Mr. Perrot responded affirmatively, Sgt. Kelly had him sign the Miranda card. This occurred at 5:05 a.m. on December 7, 1985.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 106. | Sgt. Kelly also told Mr. Perrot that he had the right to use the telephone. Mr. Perrot declined at the time, but he said he would like to call his girlfriend later. Mr. Perrot then signed a card about his right to make a phone call.<br><br>**RESPONSE:The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 107. | Sgt. Kelly then asked Mr. Perrot about some items still missing from the purse-snatch at Denny's. Mr. Perrot told him they were probably still in his room at 87 Malibu Drive.<br><br>**RESPONSE:The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |

108. When Sgt. Kelly asked Mr. Perrot about some attacks on elderly women, Mr. Perrot told him that he did not know anything about that. *(Ex. 'T' 1/7/1992 Trial Transcript, Volume II, p. 404:1-4), (Ex. 'U' 1/8/1992 Trial Transcript, Volume III, p. 440:4-15) (Ex. ee, pp. 63:12; 133:5; 135:4)*

**RESPONSE: Admit.**

109. Sgt. Kelly then left to assist other officers in preparing the paperwork to request a warrant to search 87 Malibu Drive for the other items from the purse-snatching, the interview lasted approximately 20 minutes and was the only interview of Mr. Perrot conducted by Sgt. Kelly. *(Ex. T, p. 404:14-16), (Ex. ee, pp. 63:12; 133:5; 135:4)*

**RESPONSE: Deny that the cited portions of the record support the above-described contention that Sgt. Kelly only conducted one interview of Mr. Perrot. Otherwise, Plaintiff admits the remainder of the factual assertion.**

110. Sgt. Kelly took the gloves he had found in MP bedroom with him when he executed search warrant. *(Ex. T, pp. 405:20-406:2), (Ex. U, pp. 450:16-451:3)*

**RESPONSE: Deny that the gloves that Sgt. Kelly took with him were found in MP's bedroom. (Pl.'s Ex. 16, Trial 2 Trans., 1/6/92, p. 144) (Pl.'s Ex. 4, Prekop Statement, 11/30/85).**

111. Kelly later testified he showed the gloves to Nancy Westcott who stated she had a pair just like that. Kelly asked where they were, and Westcott went to look for them. She said they were no longer where she left them. *(Ex. T, pp. 406:5-10,17-407:4).*

**RESPONSE: Deny. (Pl.'s Ex. 12, Trial 1 Test., 12/11/87, pp. 61-63, 71-72) (Pl.'s Ex. 18, Trial 2 Trans., 1/8/92, pp. 495-99).**

| | |
|---|---|
| 112. | Mr. Perrot asked to remain in the room, rather than returning downstairs to a cell. They let him stay in that room because he did not want to return to the cell, because it was cold, because he was uncomfortable in the closed cell, and because he wanted to see his girlfriend. *(Ex. U, pp. 445:6-446:5)*<br><br>**RESPONSE: Admit.** |
| 113. | Jarvis spoke to Perrot around 7:30 to 7:45 AM on 12/7/85. *(Ex. U, p. 467:1-8)*<br><br>**RESPONSE: Admit.** |
| 114. | Jarvis read Perrot his rights at approximately 7:45 AM on 12/7/85, included a reference to his right to remain silent, his right to have a lawyer present for questioning or to speak with his lawyer before questioning and to have a lawyer appointed for him if he cannot afford one and his right to stop questioning at any time if he chooses not to have a lawyer present. *(Ex. O, p. 133:8-23)*<br><br>**RESPONSE: Deny. (Defs.' Ex. EE, Motion to Suppress Hearing Trans., 9/2/86, 92:1-96:2).** |
| 115. | When he asked Perrot if he understood his rights, Perrot told him they "got [him] good for 2 incidents that happened last night." *(Ex. O, p. 134:4-6)*<br><br>**RESPONSE: Admit.** |
| 116. | Perrot was brought to booking to be fingerprinted, photographed and booked. *(Ex. O, p. 139:11-14, 17-19)*<br><br>**RESPONSE: Admit.** |
| 117. | Jarvis saw Perrot again at approximately 12:40 PM, and gave him his Miranda warning a second time. *(Ex. O, pp. 141:14-142:4)* |

| | |
|---|---|
| | **RESPONSE: Deny. (Defs.' Ex. EE, Motion to Suppress Hearing Trans., 9/2/86, 92:1-96:2).** |
| 118. | Officer St. Germain was with Jarvis when Perrot signed the Miranda card, and St. Germain signed as a witness. *(Ex. ee, p. 124)*<br><br>**RESPONSE: Deny that the cited portions of the record support the above-described contention. (Defs.' Ex. EE, p. 123-124).** |
| 119. | Perrot indicated he was willing to talk to him after being read his rights. *(Ex. O, p. 146:23-147:7), (Ex. U, pp. 473:23-474:2)*<br><br>**RESPONSE: Deny, Mr. Perrot told the police officers that he did not want to talk to them. (Defs.' Exhibit EE, 9/2/86, 63:4-10).** |
| 120. | At the time Jarvis read Perrot his rights the second time, they were in the detective bureau investigation room at the SPD headquarters. Jarvis got lunch for Perrot. Perrot also made several phone calls, went to the bathroom a couple of times, and drank coffee. *(Ex. O, pp. 148:8-10,14-23; 149:1)*<br><br>**RESPONSE: Confirmed that is what Jarvis testified to but the timing is vague.** |
| 121. | At about 3 PM on December 7, 1985 Jarvis sat down with Perrot and discussed the events of November 30, 1985 pertaining to Lichwala and Prekop. *(Ex. O, p. 149:6-16)*<br><br>**RESPONSE: Admit that is what Jarvis testified to but clarify that this interaction was not the first time officers questioned Mr. Perrot about the November 30, 1985 crimes on Mary Prekop and Emily Lichwala. (Ex. V, pp. 55:3-63:24).** |
| 122. | He spoke with Perrot about those two incidents for about 1.5 hours. *(Ex. O, p. 150:4-9)*<br><br>**RESPONSE: Admit that is what Jarvis testified to.** |

| | |
|---|---|
| 123. | After speaking with Perrot, he reduced to writing what Perrot said concerning the two incidents from November 30, 1985. *(Ex. O, p. 150:10-14)*<br><br>**RESPONSE: Deny that Jarvis reduced Mr. Perrot's statements to writing or that Mr. Perrot provided any information or statements about November 30, 1985 to Jarvis. (Exhibit 38, Statement of George Perrot by Jarvis, Dec. 7, 1985 - CITY 004730); (Defs.' Exhibit EE, Motion to Suppress Hearing Testimony, 9/2/86 p. 104) (Pl.'s Ex. 12, Trial 1 Trans., 12/11/87, p. 92).** |
| 124. | After reducing the statements to writing, he showed it to Perrot who appeared to read it over and signed it. The document had a time put on it and Perrot initialed mistakes that Jarvis made in typing up what Perrot said. *(Ex. O, p. 150:15-22)*<br><br>**RESPONSE: Deny that Jarvis reduced Mr. Perrot's statements to writing or that he showed Mr. Perrot the statement he typed up. Plaintiff further denies that he placed his initials on the statement. (Exhibit 38, Statement of George Perrot by Jarvis, Dec. 7, 1985 - CITY 004730); (Defs.' Exhibit EE, Motion to Suppress Hearing Testimony, 9/2/86 p. 104) (Pl.'s Ex. 12, Trial 1 Testimony, 12/11/87 pp. 89-93). Trial 1 Testimony, 12/11/87, p. 92).** |
| 125. | As he was concluding his proceeding with Perrot, he gave Perrot his Miranda warnings for the third time just before Perrot signed the statement. *(Ex. O, p. 155:12-22)*<br><br>**RESPONSE: Deny. (Defs.' Exhibit EE, Motion to Suppress Hearing Testimony, 9/2/86 p. 102) (Pl.'s Ex. 12, Trial 1 Testimony, 12/11/87 pp. 89-93).** |
| 126. | Perrot admits that the signature on the document is his, but denies having read the document, and cannot remember signing the document. *(Ex. 'V', George Perrot 7/12/2023 Deposition trans., p. 106:10-17), (Ex. W, pp. 248:1-5,9-10;249:20-24)* |

| | |
|---|---|
| | **RESPONSE: Admit but clarify that Perrot testified it looked like his signature.** |
| 127. | During the time he was being interrogated Perrot became emotional, and requested Jarvis' gun so Perrot could shoot himself. *(Dkt. 126, ¶49, Amended Complaint)*<br><br>**RESPONSE: Admit.** |
| 128. | Detective Jarvis asked Mr. Perrot's permission to take blood and hair samples. Mr. Perrot agreed to cooperate, and he signed a search warrant waiver for the samples. *(Ex. U, pp. 477:22-478:10)*<br><br>**RESPONSE: Admit.** |
| 129. | Detective Jarvis spoke with Mr. Perrot for approximately forty-five minutes. Detective Jarvis reduced Mr. Perrot's answers to a written statement about his activities on December 6-7, 1985. Mr. Perrot signed this statement along with Detective Jarvis. *(Ex. U, pp. 474:9-16,21-475:3)*<br><br>**RESPONSE: Admit.** |
| 130. | After completion of the statement at approximately 1:00 p.m., Mr. Perrot asked to make some phone calls, and Detective Jarvis permitted it. Mr. Perrot called his girlfriend, his mother, and his sister. Detective Jarvis ordered lunch from Burger King for Mr. Perrot and himself, and they ate together. Perrot had told Detective Jarvis that he would rather not go back to a cell. Perrot used restroom. *(Ex. U, pp. 481:10-482:1-6, 14-22)*<br><br>**RESPONSE: Deny that the cited portions of the record support the above-described contention that Mr. Perrot called his mother or that Mr. Perrot told Detective Jarvis that he would rather not go back to a cell. Otherwise, Plaintiff admits the remainder of the factual assertion.** |

131. After lunch and the phone calls, at about 3:30 p.m., Detective Jarvis asked Mr. Perrot about the incidents that occurred on November 30, 1985. Mr. Perrot admitted to the two home entries, but he denied any sexual attacks on the two women. Detective Jarvis reduced these answers to writing, and Mr. Perrot also signed this statement. *(Ex. 'vv' Jarvis 12/7/1985 Special to Capt. Stelzer)* ; *(Ex. U, p. 483:10-14, 21-23)*

**RESPONSE: Deny that the cited portions of the record support the contentions in the above paragraph. Plaintiff further denies that he admitted to breaking into two homes on November 30, 1985, or that he gave any information about the crimes he was being questioned about. Moreover, Plaintiff denies signing the statement that Jarvis drafted about the November 30, 1985 crimes at issue. (Defs.' Ex. EE, Motion to Suppress Hearing Testimony, Sept. 2, 1986, pp. 96-104) (Exhibit 12, Trial 1 Testimony, Dec. 11, 1987, pp. 94, 107-118).**

132. Perrot admitted to breaking into MP and EL's houses on 11/30. He was upset, asked for Jarvis' gun so he could "blow his brains out"; said "the drugs made me do it." Perrot denied touching either woman, he just wanted money. *(Ex. U, p. 486:1-12; p. 488:1-7; p. 519:3-8, 16-17, 20-21)*

**RESPONSE: Deny that the cited portions of the record support the contentions in the above paragraph. Plaintiff further denies that he admitted to breaking into two homes on November 30, 1985, or that he gave any information about the crimes he was being questioned about. (Defs.' Ex. EE, Motion to Suppress Hearing Testimony, Sept. 2, 1986, pp. 96-104) (Exhibit 12, Trial 1 Testimony, Dec. 11, 1987, pp. 94, 107-118).**

133. Kelly put together a line up. They tried to find people who generally resembled Perrot. They had 6 people plus Perrot in the lineup. *(Ex. T, pp. 409:16-410:13)*

**RESPONSE: Admit.**

| | |
|---|---|
| 134. | Hampden County Assistant District Attorney Francis Bloom came to the SPD headquarters and was present during the lineup that was held on December 7, 1985. *(Ex. 'X', Francis Bloom 1/23/2019 Deposition Transcript, pp. 89:23-90:19)*<br><br>**RESPONSE: Admit.** |
| 135. | Kelly got Perrot from lock up and brought him for the lineup. He let Perrot choose where he wanted to be in the lineup. *(Ex. T, p. 412:5-14)*<br><br>**RESPONSE: Admit.** |
| 136. | At approximately 4:30 p.m., Mr. Perrot was in a lineup of seven men, five of whom were police officers; none were clean shaven. Mr. Perrot had facial hair and long hair. Ms. Prekop, Ms. Lichwala, Ms. Marchand, and Mr. McNabb viewed the lineup. None of the women identified anyone in the lineup as her assailant, but Mr. McNabb positively identified Mr. Perrot as his assailant. *(Ex. 'Y', Scanlon 12/7/1985 Lineup Summary).*<br><br>**RESPONSE: Admit.** |
| 137. | MP did not recognize anyone in the lineup, and said none had the same color hair as the assailant. *(Ex. 'Z', 1/6/1992 Trial Transcript, Volume I, p. 158:1-19).*<br><br>**RESPONSE: Admit that MP did not recognize anyone in the lineup but deny that the cited exhibit supports that MP testified about the hair color of her assailant.** |
| 138. | At approximately 5:00 p.m., Mr. Perrot visited with his girlfriend, his mother, and his sister at the police station.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp.** |

| | |
|---|---|
| | **1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |

B. **Events at York Street Jail**

| | |
|---|---|
| 139. | At his arraignment on December 9, 1985, the court set Mr. Perrot's bail at \$2,500.00 and appointed counsel for him. The court remanded Mr. Perrot to the custody of the Sheriff to be held at York Street Jail. In December 1985 (and at all times relevant hereto), Kane was employed as a police officer for the City of Springfield assigned to the Crime Prevention Bureau. *(Ex. 'aa', 12/7/1987 Motion to Suppress Transcript, p. 42:5-20) (Ex. M, p. 11:13-18)*<br><br>**RESPONSE: Admit.** |
| 140. | On the afternoon of Tuesday, December 10, 1985, Kane was sent by his commanding officer, Captain John Brown, to the York Street Jail in Springfield to witness and document the blood draw from Perrot. *(Ex. M, pp. 75:7-76:4).*<br><br>**RESPONSE: Admit.** |
| 141. | Kane had not seen Perrot or otherwise interacted with him until arriving at the York Street Jail to witness the blood draw. *(Ex. M, pp. 46:18-22; 77:15-18).*<br><br>**RESPONSE: Admit.** |
| 142. | Kane was given, and brought with him, the search warrant waiver signed by Perrot on December 7, 1985, in which Perrot consented to the blood draw. *(Ex. 'bb', 12/7/1987 Search Warrant Waiver), (Ex. aa); (Ex. M, pp. 104:24-105:7); (Ex. bb)*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 143. | When Detective Kane accompanied Mr. Aberdale to see Mr. Perrot, Mr. Perrot began to speak to the detective about his girlfriend. Detective Kane stopped him, identified himself, and he advised Mr. Perrot of his Miranda rights. *(Ex. M, p. 85:16-24)*.<br><br>**RESPONSE: Deny that Detective Kane advised Mr. Perrot of his Miranda rights. (Exhibit 41, Perrot's Dep, 7/13/23 p. 352-355).** |
| 144. | Afterwards, Mr. Perrot continued to speak with him, and admitted breaking into Covel Street, but denied raping the woman. *(Ex. M, p. 86:17-22)*<br><br>**RESPONSE: Deny. (Exhibit 41, Perrot's Dep, 7/13/23 p. 352-355).** |
| 145. | Perrot said he could never rape an old lady, and talked about how pretty his girlfriend was. *(Ex. M, p. 85:16-24).*<br><br>**RESPONSE: Admit.** |
| 146. | Detective Kane asked him about the pocketbook that was still missing from the break-in at 33 Covel Street on November 30, 1985. Mr. Perrot told him that he had tossed it away in some bushes in the area of the break-in. *(Ex. M, 86:17-22; 95:5-8).*<br><br>**RESPONSE: Deny. (Exhibit 41, Perrot's Dep, 7/13/23 p. 352-355).** |
| 147. | At the conclusion of the blood draw, Kane returned to police headquarters and wrote up a report of his conversation with Perrot. *(Ex. aa), Ex. M, pp. 90:1-13;91:21-92:2; Ex. 'cc', Kane 12/10/1985 Special to Capt. Brown).*<br><br>**RESPONSE: Admit that Kane returned to police headquarters and drafted a report but deny that it reflected his interaction with George Perrot on December 10, 1985. (Exhibit 41, Perrot's Dep, 7/13/23 p. 352-355).** |

148. He submitted that report to his commanding officer and relayed the information in it to Sergeant Kelly. *(Ex. M, pp. 96:21-97:9).*

**RESPONSE: Admit.**

149. Sgt. Kelly and Officer Cheryl Clapprood then went to Covel Street to look for the pocketbook. They found it in some bushes, approximately five feet from the street, and the location was on a direct line between the break at 33 Covel Street (Lichwala) to the break at 27 Malibu Drive (Prekop). *(Ex. O, pp. 22:12-15,24-24:7).*

**RESPONSE: Admit that is what Sgt. Kelly testified to.**

150. During Mr. Perrot's trial on December 9, 1987, Sgt. Kelly provided testimony regarding the pocketbook discovered in the bushes. According to Sgt. Kelly, the pocketbook contained personal belongings of Ms. Lichwala, including her library card, vehicle registration, club membership card, and driver's license. This pocketbook was entered into evidence as Exhibit No. 13 during the trial proceedings. *(Ex. O, pp. 214:1-215:16)*

**RESPONSE: Admit.**

## X. Hampden County Superior Court Indictments of George Perrot

151. On December 16, 1885, a Hampden County grand jury returned eighteen indictments against George Perrot. *(Ex. 'jj' Certified Copy of Hampden County Superior Court Docket #8579CR05410), (Ex. yy)*

**RESPONSE: Assuming that Defendants meant "1985," admit.**

| | |
|---|---|
| 152. | There was no testimony at the Grand Jury regarding the conversation Kelly had with Westcott regarding the gloves found at Prekop's home after the burglary and rape which occurred on November 30, 1985. *(Ex. yy, pp. 23-30)*<br>**RESPONSE: Admit.** |
| 153. | Indictments 85-5410 [Armed Burglary of Joseph and Helen McNabb, nolle prosequi entered on February 10, 1987], 85-5411 [A&B Dangerous Weapon on Joseph McNabb, nolle prosequi entered on February 10, 1987], 85-5412 [A&B Dangerous Weapon Joseph McNabb, nolle prosequi entered on February 10, 1987], 85-5413 [A&B Dangerous Weapon on Joseph McNabb, nolle prosequi entered on February 10, 1987], and 85-5414 [Armed Assault in a Dwelling of Joseph McNabb] which concerned the incident at 7 Ellendale Circle on December 7, 1985 and the assault of Mr. McNabb. There was a plea on February 10, 1987, which resulted in Mr. Perrot pleading guilty to Indictment No. 85-5414, receiving a state prison sentence of ten to twelve years, which was stayed to April 30, 1987. The Commonwealth filed a nolle prosequi on the other indictments. This sentence has never been overturned.<br>**RESPONSE: Admit.** |
| 154. | Indictments 85-5415 [Unarmed Robbery of Mary A. Prekop], 85-5416 [Indecent Assault and Battery of Mary A. Prekop], 85-5417 [Assault and Battery of Mary A. Prekop, dismissed December 13, 1987], 85-5418 [Aggravated Rape of Mary A. Prekop], 85-5419 [Armed Assault in Dwelling of Mary A. Prekop, nolle prosequi entered December 14, 1987], and 85-5420 [Burglary and Assault in Dwelling of Mary A. Prekop] concerned the incident |

| | |
|---|---|
| | at 27 Malibu Drive on November 30, 1985, including the rape of Mary Prekop. Mr. Perrot twice stood trial for these indictments. The first trial resulted in a jury finding Mr. Perrot guilty on Indictments No. 85-5415, No. 85-5416, No. 85-5418, and No. 54-5420 on December 14, 1987. The second jury also found him guilty on those indictments on January 9, 1992. **RESPONSE: Admit.** |
| 155. | Indictments 85-5421 [Armed Assault in a Dwelling of Emily Lichwala, nolle prosequi entered December 14, 1987], 85-5422 [Assault to Rape Emily Lichwala, dismissed December 14, 1987] 85-5423 [Larceny of Emily Lichwala, dismissed on December 14, 1987], 85-5424 [Armed Burglary of Emily Lichwala, nolle prosequi entered on December 14, 1987], and 85-5425 [Burglary of Emily Lichwala] concerned the incident at 33 Covel Street and burglary of Emily Lichwala on or about November 30, 1985. Mr. Perrot twice stood trial for these indictments. The first trial resulted in a jury finding Mr. Perrot guilty on Indictment No. 85-5425 on December 14, 1987. The second jury also found him guilty on that indictment on January 9, 1992, and the court imposed a state prison sentence of fifteen to twenty years, on and after his sentence in docket 85-5418. **RESPONSE: Admit.** |
| 156. | Indictment 85-5426 [Unarmed Robbery of Sheileen Sapelli] concerned the incident at Denny's on December 7, 1985. There was a plea deal on February 10, 1987, where Mr. Perrot changed his plea to guilty, and he received a state |

prison sentence of six to nine years to run concurrently with Indictment No. 85-5414. This sentence has never been overturned.

**RESPONSE: Admit, but clarify that Mr. Perrot has always admitted to his involvement in the December 7, 1985 Denny's incident so it is not at issue.**

157. Indictment 85-5427 concerned Mr. Perrot's escape from Officer Murphy's custody on December 7, 1985. As part of the plea deal on February 10, 1987, the Commonwealth filed a nolle prosequi.

**RESPONSE: Admit.**

## A. Motion To Suppress 1986

158. On September 2, 1986 the Superior Court trial judge, John Murphy, held an evidentiary hearing on Perrot's motion to suppress statements he made subsequent to his arrest on December 7, 1985 relating to the break-ins at Mary Prekop and Emily Lichwala's houses on November 30, 1985. *(Ex. 'ee', 9/2/1986 Commonwealth v. Perrot, Defendant's Motion to Suppress Statement)*

**RESPONSE: Admit that on that date Judge John Murphy held an evidentiary hearing on Mr. Perrot's motion to suppress the 12/7/85 statements that police officers claimed were made by Mr. Perrot.**

159. The witnesses at the motion to suppress were Nancy Westcott (Perrot's sister, called by Perrot), Beverly Daly (Perrot's mother, called by Perrot) and George Perrot. The Commonwealth witnesses were Thomas Kelly, Thomas Jarvis and Officer James Murphy. Following the evidentiary hearing the Court (Murphy, J.) denied Perrot's motion to suppress the statements he made subsequent to his arrest. *(Ex. ee)*

**RESPONSE: Admit.**

160. In a written decision denying the motion to suppress the statements, the court found that Perrot had had at least ten prior encounters with police officers and, during those encounters, "had been exposed time and again to the content of the Miranda warnings." Judge Murphy further found that Perrot had exaggerated his consumption of alcohol and drugs and that photographs that had been taken of the defendant while he was in custody revealed no indication that he sustained bruises or beatings. Judge Murphy's order stated:

> The defendant, although only 17 years old, had been exposed to the arrest process many times and was fully aware of his rights, made knowing and intelligent waivers, and voluntary statements admitting some crimes and denying others. He was not under the influence of drugs or alcohol when questioned. The police did not beat or coerce him into those statements. He was kept in the detective bureau at his own request rather than be returned to his cell and had several periods to himself during the day when he was seen to be dozing. He was fed by Jarvis and allowed to use the phone on several occasions. The defendant never refused to answer questions nor did he ask that questioning cease or that he be provided with a lawyer.

*(Ex. 'ff', Judge Murphy's 9/29/1986 Order on Defendant's Motion to Suppress Statement)*

**RESPONSE: Admit.**

161. During the motion to suppress statements, before Judge Murphy on September 2, 1986, ADA Bloom asked Perrot the following question and Perrot responded as follows:

Q Just one or two things. Mr. Perrot, those statements [confession] that I showed you yesterday – you didn’t sign those because of any physical abuse by the Springfield Police Department; did you?
A No. No, I didn’t.

Q That was some eight, nine, ten, twelve, thirteen hours before you signed either one of those statements. The problems that you had at 4:00 a.m. in the morning; right?
A I'm not exactly sure

Q Well, those statements that I showed you yesterday, will you agree with me that they occurred sometime after b6th of them? After you had been booked and been in the cell four or five hours and then brought back up to the Detective Bureau?
A Yes.

Q So it was a series of hours after you had been beaten by the Springfield Police at about 4:00 a.m. in the morning or so that you signed the two statements that we're concerned with. Isn't that a fair statement on my part?
A I don't exactly know how many hours, but it was very long after that.
Q Whether it was four hours or whether it was twelve hours, you didn't sign those two statements because of the beating that occurred at 4:00 a.m. in the morning; did you?
A No

Q And the people that were dealing with you when you signed those statements that afternoon, they weren't beating you; were they?
A No, they weren't.

Q They weren't abusing you in any way; were they?

A Just verbally.

Q Verbally? What did they do to you verbally?

A Just threatening me

Q What did they say?

A I don't recall exactly what they said. They were screaming at me, threatening me.
Q You don't recall what they said?

A Not exactly, no.

*(Ex. ee, p. 120:14-21)*

**RESPONSE: Plaintiff objects to this statement to the extent it may be construed that this exchange between Mr. Perrot and Defendant Bloom provides a full picture of the circumstances surrounding Mr. Perrot signing the fabricated statement. Notably, Mr. Perrot was not asked if he was allowed to sleep prior to being asked to sign the statement, which is at issue in this case.**

162. Perrot's trial attorney, James Hammerschmith, questioned Lt. Kelly at the 1986 suppression hearing related to his investigation into the sexual assaults of elderly women and his consideration of Perrot as a suspect in those attacks.

*(Ex. ee, pp. 140:1-5;141:2-23).*

**RESPONSE: Plaintiff objects to this statement to the extent that it may be construed that Lt. Kelly testified as to why Mr. Perrot was a suspect of the sexual assaults, as this is not supported by the cited evidence.**

163. In June 1990 the Supreme Judicial Court affirmed so much of Judge Murphy's order as found Perrot's statements had been voluntarily made. *Commonwealth v. Perrot*, 407 Mass. 539 (1990). The SJC held:

> The judge made findings of fact which are supported by the evidence that he deemed the most credible. . . The defendant, who was seventeen years of age at the time of his arrest, was a suspect in the investigation. The defendant was known to the police, having been arrested more than ten times on other offenses prior to December 7, 1985 . . At about 3:30 A.M., Sergeant Thomas M. Kelly of the Springfield police department was called at home and informed of the defendant's arrest. He was in charge of the investigation of the attacks on elderly women. At about 5 A.M., Kelly and another officer met with the defendant in an interrogation room. The defendant was read his Miranda warnings. He signed a card acknowledging receipt of his rights and agreed to talk with Kelly. The defendant was also advised of his right to use the telephone and acknowledged this by signing

> a notice slip . . .The defendant was interrogated three more times on December 7 by Detective Thomas Jarvis . . .These interrogations took place at 7:30 A.M., 12:30 P.M., and 3 P.M. The judge found that Miranda warnings were furnished to the defendant, and acknowledged by him, prior to the first two periods of questioning. The defendant signed a form agreeing to furnish the police with blood and hair samples. During the interrogation, the defendant made oral and written statements in which he admitted the purse snatch, the breaking and entering on Allendale Circle, and the breaking and entering of the residences of the two victims in this case. The defendant denied, however, that he had ever sexually attacked anyone. While giving his statement to Jarvis during the final meeting at 3 P.M. the defendant became emotional, began to cry, and asked for a police officer's gun so he could shoot himself. After the last written statement had been completed, read, and signed, Jarvis, pursuant to prescribed police procedure, asked that the defendant be placed on a suicide watch.

**RESPONSE: Plaintiff objects to the statement that the Supreme Court "affirmed so much of Judge Murphy's order as found Perrot's statements had been voluntarily made" as vague and incomplete. Subject to this objection, Plaintiff admits.**

164. Following his conviction, Perrot filed an appeal, which included a challenge to the denial of his motion to suppress by Judge Murphy. The Supreme Judicial Court accepted the factual findings made by the motion judge during the motion to suppress and specifically that Perrot was given timely Miranda warnings, Perrot had exaggerated his consumption of drugs and alcohol, he was well versed in booking and interrogation procedures due to prior encounters with the police, photographs taken at the time showed no indications of bruises or beatings, and he had made rational and informed

| | |
|---|---|
| | choices in admitting his guilt. *Commonwealth v. Perrot*, 407 Mass. 539, 540-544 (1990).<br><br>**RESPONSE: Admit.** |
| 165. | The Supreme Judicial Court found that the statements made by Perrot on December 7, 1985 had been voluntarily made after knowing and intelligent waiver of his constitutional rights. *Commonwealth v. Perrot*, 407 Mass. 539, 540-544 (1990).<br><br>**RESPONSE: Admit but clarify that the Supreme Judicial Court found that record demonstrated a sufficient factual and legal basis for the district court's denial of the motion to suppress. The Supreme Court did not analyze this issue de novo.** |

## XI. First Trial: December, 1987

| | |
|---|---|
| 166. | Prior to his first trial, Perrot moved to suppress the statements he made to Kane during his December 10, 1985 blood draw and the pocketbook thereafter located. *(Ex. aa)*<br><br>**RESPONSE: Admit.** |
| 167. | At that December 7, 1987 hearing, Perrot's attorney argued that, pursuant to a recent Supreme Court ruling in the case of *Michigan v. Jackson*, 475 U.S. 625 (1986), Kane's post-arraignment questioning of Perrot after an attorney had been appointed violated Perrot's Sixth Amendment right to counsel even though Kane had advised Perrot of his Miranda rights. *(Ex. aa, pp 69:1-12; 98:1-12)*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 168. | The trial court initially expressed skepticism as to this constitutional argument but, after being provided with a copy of the opinion in *Michigan v. Jackson*, ultimately agreed and suppressed the statements Perrot made to Kane on December 10, 1985. *(Ex. aa, p.99:3-13)*<br><br>**RESPONSE: Admit.** |
| 169. | Kane did not testify as a witness at any of Perrot's trials. *(Ex. aa, p. 115:9-14)*<br><br>**RESPONSE: Admit but clarify that Kane testified at the December 7, 1987 motion to suppress related to these charges/prosecutions. See Pl.'s Exhibit 53 103:21- 104:19.** |
| 170. | At the December 7, 1987 hearing, after Perrot's defense counsel argued that *Michigan v. Jackson* held post-arraignment statements given outside the presence of counsel to be violative of a defendant's Sixth Amendment rights, the District Attorney himself stated "unfortunately, that is not the law in Massachusetts, as I read it[.]" *(Ex. aa, pp.85:1-14;86:1-10)*<br><br>**RESPONSE: Plaintiff objects to this statement to the extent that the cited evidence does not support the factual assertion. The proper citation to this statement can be found at Ex. AA, 106:6-10. Plaintiff further objects to the extent that it can be construed that Defendant Bloom believed that it was not Massachusetts law that post-arraignment statements given outside the presence of counsel was a violation of a criminal defendant's Sixth Amendment rights. Defendant Bloom was actually stating that Massachusetts law did not require that defense counsel be advised when blood evidence will be collected from a client. See Ex. AA, 105:14-106:10.** |
| 171. | Mary Prekop testified at the first trial in December of 1987 that she did not identify George Perrot as the person who had raped her. *(Ex. 'ww' 12/8/1987 Trial Transcript, Volume II, p. 235:9-16)*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 172. | Mary Prekop testified the assailant was pushing her with a stick, which he took from her, and pushed her into the bedroom. He threw the stick on the bed and threw MP to the floor. *(Ex. ww, p. 205)*<br><br>**RESPONSE: Admit.** |
| 173. | When Mary Prekop was on the floor, she was close to her bed. She testified that her bedroom was small. *(Ex. ww, p. 205)*<br><br>**RESPONSE: Admit.** |
| 174. | Thomas Kelly testified at the first trial that he caused a pair of gloves, a flowered bedsheet and a pillowcase to be removed from Prekop's home and brought to the SPD on November 30, 1985. *(Ex. O, p. 189:11-18)*<br><br>**RESPONSE: Admit.** |
| 175. | The flowered bedsheet and the pillowcase were submitted to the FBI crime laboratory in conformity with the FBI's procedures. *(Ex. O, p. 191:14-193:10)*<br><br>**RESPONSE: Plaintiff objects to this statement to the extent that the cited evidence does not support the factual assertion. The cited testimony describes the manner in which the evidence was submitted to the FBI, but does not state that that process was in conformity with the FBI's procedures. See Ex. O, p. 191:14-193:10. Subject to this objection, Plaintiff admits that the bedsheet and the pillowcase were submitted to the FBI crime laboratory.** |
| 176. | Thomas Kelly testified he found a pair of white gloves in Prekop's bedroom on November 30, 1985, and he also had those sent to the FBI lab. *(Ex. O, pp. 195:19-196:1-4, 18-21)*<br><br>**RESPONSE: Plaintiff objects to this statement to the extent that the cited evidence does not support the factual assertion. Detective Kelly did not state that the pair of gloves found were white. See Ex. O at** 195:19-196:1-4. **Plaintiff admits that Detective Kelly testified that he sent the gloves to the FBI lab.** |

| | |
|---|---|
| 177. | Thomas Kelly testified that he was present when Mary Prekop viewed the line up on December 7, 1985, that she viewed Perrot and did not identify Perrot as her attacker. *(Ex. O, p. 227:2-11)*<br><br>**RESPONSE: Admit.** |
| 178. | Thomas Kelly testified that he brought the gloves he had found at Prekop's house on November 30, 1985 to Perrot's house on December 7, 1985 and showed the gloves to Nancy Westcott, Perrot's sister. *(Ex. 'gg', 12/11/1987 Trail Transcript, Volume V, pp. 136:1-14,19-137:1).*<br><br>**RESPONSE: Admit.** |
| 179. | Kelly testified that on December 7, 1985 Westcott told him she had a pair just like those, and she had just seen them a week ago while rearranging her closet. She then went to look for them and they were missing. *(Ex. gg, pp. 137:22-138:13).*<br><br>**RESPONSE: Admit but clarify that Nancy Wescott testified that she never told Defendant Kelly that she owned a similar pair of gloves or went to her closet to go look for them. See Ex. XX (Wescott first trial testimony) 66:4-14.** |
| 180. | William Eubanks, an FBI Special Agent and Chief of the FBI Serology Unit in Washington DC , testified regarding forensic testing he performed on bloodstains found on a sheet in Mary Prekop's bedroom. *(Ex. 'hh', 12/10/1987 Trial Transcript, Vol. IV, pp.7:9-23;17:1-18:23).*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 181. | He also performed forensic analysis on the blood stains found on the gloves that were recovered from Mary Prekop's bedroom following the 11/30/1985 assault. *(Ex. hh, pp. 32:12-33:23).*<br>**RESPONSE: Admit.** |
| 182. | FBI Special Agent Wayne Oakes testified he examined the bedsheet and removed hairs from the sheet, and compared it to hair known to belong to Perrot. *(Ex. hh, pp. 79:16-81:1).*<br>**RESPONSE: Admit.** |
| 183. | Emily Lichwala testified at the trial about the burglary of her house and the theft of her purse on 11/30/1985. *(Ex. ww, pp. 240:8-261:12)*<br>**RESPONSE: Admit.** |
| 184. | Robert Cheetham testified regarding his arrival at Lichwala's and Prekop's homes following the crimes of 11/30/1985. *(Ex. O, pp. 72:21-74:19)*<br>**RESPONSE: Admit.** |
| 185. | Marianne Popko testified regarding the statement she took from Prekop on November 30, 1985. *(Ex. O, pp. 93:1-96:21)*<br>**RESPONSE: Admit.** |
| 186. | Popko also identified four photos of Prekop taken on 11/30/1985 which documented injuries Prekop sustained in the attack. *(Ex. O, pp. 98:8-99:5)*<br>**RESPONSE: Admit.** |
| 187. | Captain William Fitchet testified regarding witnessing Prekop's blood being drawn on 4/30/1987 and causing it to be sent to the FBI Crime Lab. *(Ex. O, pp. 113:12-116:7)* |

| | |
|---|---|
| | **RESPONSE: Admit.** |
| 188. | Officer Thomas Kennedy testified regarding observing blood being taken from Perrot on 3/31/1987, and taking the blood and hair samples to the FBI crime lab on April 1, 1987. *(Ex. O, pp. 118:22-121:19)*<br>**RESPONSE: Admit.** |
| 189. | Thomas Jarvis testified regarding his interactions with Perrot on 12/7/1985, including giving Perrot his Miranda warnings, and obtaining the statement from Perrot which Perrot signed relative to the Lichwala and Prekop attacks of 11/30/1985. *(Ex. O, pp. 133:1-23; 147:1-23; 149-151; 155:12-23; 160:10-23;161:1-162:13)*.<br>**RESPONSE: Plaintiff objects to the extent that it can be construed that Mr. Perrot gave these statements to Detective Jarvis and that he read the statement before signing it, which Mr. Perrot disputes.** |
| 190. | Mary Daly, Perrot's mother, testified that she could have seen Perrot at 8:00 a.m. on December 7, 1985, but she waited until after work. She visited with him at approximately 5:00 PM to 5:30 PM on the afternoon of December 7, 1985. *(Ex. gg, pp. 34:1-35:3)*.<br>**RESPONSE: Admit but clarify that Mr. Perrot's mother's name is Beverly Daly, not Mary Daly.** |
| 191. | Nancy Westcott testified that she had not told Kelly she had gloves resembling the ones found at Mary Prekop's home, or that she had gone to look for the gloves and they were missing. *(Ex. gg, pp. 61:12-62:17)*.<br>**RESPONSE: Admit.** |

192. Nancy Westcott testified that she recalled being asked about a pair of gloves by a police officer, and she told the officer the gloves looked familiar, and she thought they might belong to Perrot's girlfriend, Lisa Eldridge. *(Ex. gg, pp. 71:10-72:10).*

**RESPONSE: Plaintiff objects to the extent that it can be construed that this statement is inconsistent with Ms. Westcott's subsequent statement that she never owned the pair of gloves in question. In this testimony, Ms. Westcott also states that the gloves were not hers. See Ex. GG 71:21-72:2.**

193. George Perrot testified at the first trial and told the jury he did not remember being given his Miranda warning, and does not recall signing a Miranda card. *(Ex. gg, pp. 86:18-87:1)*.

**RESPONSE: Admit.**

194. George Perrot reviewed the Miranda card and acknowledged in front of the jury the signature appeared to be his. *(Ex. gg, p. 87:2-12)*.

**RESPONSE: Admit.**

195. George Perrot testified he thought he was advised of his right to use the phone, and he thought he signed a piece of paper to that effect, but cannot be sure. Acknowledged the signature on the card appears to be his. *(Ex. gg, pp. 87:14-88:10).*

**RESPONSE: Admit.**

196. George Perrot reviewed the statement in which he admitted to breaking in to both Lichwala and Prekop's houses on November 30, 1987, and admits the signature appears to be his. *(Ex. gg, pp. 91:12-15;92:1-10).*

**RESPONSE: Plaintiff objects to this statement to the extent that the cited evidence does not support the factual assertion. Subject to this objection, Plaintiff denies. Plaintiff did not testify that he reviewed the statement.**

| | |
|---|---|
| | **He only states that he recognized his signature at the bottom of the statement. See Ex. GG 91:12-93:1.** |
| 197. | George Perrot denied breaking into either of the homes on November 30, 1985 under oath in front of the jury. *(Ex. gg, p. 94:8-11).*<br><br>**RESPONSE: Admit.** |
| 198. | George Perrot admitted to the jury that he had told the police the following about his activities on November 30, 1985: He went to Brattleboro VT with his friends Mike Edwards, Bob Timmerman and Jeff Atkinson; he took a purple microdot of mescaline on the way to VT, he drank a case of "Bud". *(Ex. gg, pp. 112:4; 113:19-114:4).*<br><br>**RESPONSE: Admit.** |
| 199. | George Perrot denied he told the police on November 30, 1985 he then headed to Covel Street, broke in with his sister's gloves on, by kicking in the inner rear door, taking a handbag and leaving Covel Street. *(Ex. gg, pp. 115:3-116:23).*<br><br>**RESPONSE: Admit.** |
| 200. | George Perrot testified he did not tell the police he then went to 27 Malibu Drive, broke in through the breezeway, a little dog started barking so he ran out the door. *(Ex. gg, p. 117:7-16).*<br><br>**RESPONSE: Admit.** |
| 201. | At the conclusion of the Commonwealth's case the trial judge allowed Perrot's motion for a required finding of not guilty on the assault with intent |

| | |
|---|---|
| | to rape Lichwala and the armed robbery of Prekop; remainder of charges went to the jury. *(Ex. hh, pp. 112-116; 122-123).*<br><br>**RESPONSE: Admit.** |
| 202. | On December 14, 1987, the jury convicted Perrot of unarmed robbery (Indictment Number 1985-5415), indecent assault and battery (Indictment Number 1985-5416), assault and battery (Indictment Number 1985-5417), aggravated rape (Indictment Number 1985-5418), burglary and assault in a dwelling (Indictment Number. 1985-5420), larceny (Indictment Number 1985-5423), and burglary (Indictment Number 1985-5425).; *(Ex. 'ii' 12/14/1987 Trial Transcript, Volume VI, pp. 194-196).*<br><br>**RESPONSE: Admit.** |

## A. Second Trial: January, 1992, Basis for Retrial, and Evidence Presentation

| | |
|---|---|
| 203. | Mr. Perrot appealed the five convictions. On June 4, 1990, the Supreme Judicial Court reversed the convictions and ordered a retrial. *Commonwealth v. Perrot*, 407 Mass. 539 (1990)<br><br>**RESPONSE: Admit.** |
| 204. | The basis for the grant of a new trial was the admittance into evidence of the pocketbook found after the disclosure by Perrot to Kane at York Street jail on December 10, 1985. *Commonwealth v. Perrot*, 407 Mass. 539, 540-544 (1990).<br><br>**RESPONSE: Admit.** |
| 205. | Perrot was tried a second time in January of 1992. *(Ex. jj)* |

| | |
|---|---|
| | **RESPONSE: Admit.** |
| 206. | The pocketbook was not admitted into evidence in the 1992 trial. *Commonwealth v. Perrot*, 407 Mass. 539, 540-544 (1990)<br><br>**RESPONSE: Admit.** |
| 207. | Marianne Popko did not testify at the second trial. *(Ex. 'Z' 1/6/1992 Trial Transcript, Volume I, p. 17:2-19)*<br><br>**RESPONSE: Admit.** |
| 208. | Perrot did not testify at the second trial. *Commonwealth v. Perrot, 58 Mass. App. Ct. 1102, at 2 (2003)*<br><br>**RESPONSE: Admit.** |
| 209. | FBI agent William Eubanks testified at the second trial. *(Ex. T, p. 269:16-23)*<br><br>**RESPONSE: Admit.** |
| 210. | Eubanks tested bloodstains found on the gloves he received from the SPD . *(Ex. T, p. 284:3-20)*<br><br>**RESPONSE: Admit.** |
| 211. | Eubanks testified he tested bloodstains found on the sheet he received from the SPD. *(Ex. T, pp. 290:1-8,17-291:16)*<br><br>**RESPONSE: Admit.** |
| 212. | FBI special agent Wayne Oakes testified at the second trial. *(Ex. T, p. 333:20-23)*<br><br>**RESPONSE: Admit.** |
| 213. | Oakes did forensic testing on hair samples he got from the SPD. *(Ex. T, p. 350:18-352:23)* |

| | |
|---|---|
| | **RESPONSE: Admit.** |
| 214. | Mary Prekop again testified, and she told the jury that Perrot did not resemble the person who had raped her. *(Ex. Z, p. 153:8-160:19)*<br><br>**RESPONSE: Admit.** |
| 215. | Mary Prekop testified the bloodstains on the sheet that was taken from her house on November 30, 1985 were old bloodstains, that had been on the sheet for 14 to 15 years, and were from her uncle, not the assailant in the 11/30/1985 rape. *(Ex. Z, p. 163:9-10, 15-18, 20-23)*<br><br>**RESPONSE: Admit.** |
| 216. | Mary Prekop testified under oath that she had never discussed the 11/30/1985 assault with her neighbor, Olivet Edwards. *(Ex. Z, pp. 164:22-165:8)*<br><br>**RESPONSE: Deny. Ms. Prekop testified that she talked to Ms. Edwards a week or so after the incident took place. See Ex. Z, pp. 164:22-165:8.** |
| 217. | Thomas Kelly testified at the second trial. He identified the gloves he took from Prekop's house on 11/30/1985. *(Ex. Z, pp. 191:20-192:16)*<br><br>**RESPONSE: Admit.** |
| 218. | Thomas Kelly testified that he also removed a sheet and a pillowcase from Prekop's home on 11/30/1985. *(Ex. Z, p. 194:8-23)*<br><br>**RESPONSE: Admit.** |
| 219. | Kelly testified that Prekop did not identify Perrot in the line-up which was held at the SPD on 12/7/1985. *(Ex. T, pp. 227:11-17)*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 220. | Kelly testified he had taken the gloves that he had found at Prekop's house on 11/30/1985 to Perrot's home when he executed a search warrant on 12/7/1985. He showed the gloves to Perrot's sister, Nancy Westcott, who told him she had a pair just like that. She went to look for her pair and was unable to find them. *(Ex. T, pp. 406:1-407:23)* <br> **RESPONSE: Admit.** |
| 221. | Thomas Kennedy testified at the second trial that he had observed blood being drawn from Perrot on 3/31/1987. *(Ex. T, p. 234:13-22)* <br> **RESPONSE: Admit.** |
| 222. | On 4-1-1987 Kennedy signed the blood out of the evidence room and brought it to the FBI Lab in Washington D.C. ADA Francis Bloom accompanied him. *(Ex. T, p. 235:9-16)* <br> **RESPONSE: Admit .** |
| 223. | Kennedy also brought hair samples to the FBI lab in DC on 4-1-1987. *(Ex. T, p. 236:4-8)* <br> **RESPONSE: Admit.** |
| 224. | Jarvis testified that Perrot never admitted to assaulting either Prekop or Lichwala. *(Ex. U, p. 488:1-7)* <br> **RESPONSE: Admit.** |
| 225. | Jarvis testified on 12/7/1985 he took the gloves that had been recovered from Prekop's home on 11/30/1985 to the home of Lisa Eldridge, George Perrot's then girlfriend. *(Ex. U, p. 497:10-15)* <br> **RESPONSE: Admit.** |

| | |
|---|---|
| 226. | Nancy Westcott, Perrot's sister, testified at the second trial.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 227. | Ms. Westcott testified around 9:00 a.m. SPD officers came to her house with a search warrant. *(Ex. U, p. 545:2-4)*<br><br>**RESPONSE: Admit.** |
| 228. | Ms. Westcott testified that one of the officers showed her a pair of gloves and she said they looked familiar. *(Ex. U, p. 545:11-22)*<br><br>**RESPONSE: Admit.** |
| 229. | Ms. Westcott testified that while they looked familiar they were not her gloves, she believed they may belong to Lisa Eldridge, George Perrot's girlfriend. *(Ex. U, p. 546:4-6, 18-22)*<br><br>**RESPONSE: Admit.** |
| 230. | Ms. Westcott stated she later learned the gloves were not Lisa's, and that she saw Lisa wearing her gloves about a week later. *(Ex. U, pp. 546:6-12,20-22;548:4-12)*<br><br>**RESPONSE: Admit.** |
| 231. | At the conclusion of the evidentiary portion of the second trial counsel for Perrot stipulated that he was not claiming the signatures on the statements were not George Perrot's. *(Ex. U, p. 555:2-3)*<br><br>**RESPONSE: Admit.** |

| | |
|---|---|
| 232. | Defense counsel, John Ferrara, argued for a required finding of not guilty after the Commonwealth rested, noting that Mary Prekop was "adamant" that George Perrot did not resemble the person who attacked her. *(Ex. U, pp. 558:12-560:16)*<br><br>**RESPONSE: Admit.** |
| 233. | The motion for a required finding based on the victim's statement was denied.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 234. | Defense counsel John Ferrara questioned witnesses about how evidence was collected, packaged, and delivered to the FBI laboratory, questioned Sergeant Kelly about discrepancies in his testimony about where he discovered the gloves in Mary Prekop's bedroom, and questioned both Sergeant Kelly and Detective Jarvis about their handling of the gloves -including where they obtained them and whether they followed police department evidence procedures – on the day that they showed the gloves to Westcott and Eldridge *(Ex. T, pp. 236:16-238:12), (Ex. U, pp. 446:21-23; 447-453:9; 455:1-9; 496:21-23; 497-498)*<br><br>**RESPONSE: Admit.** |
| 235. | John Ferrara argued to the jury that the arrest and trial of Perrot was the product of police misconduct, including perjury, evidence fabrication, and a coerced confession.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp.** |

| | |
|---|---|
| | **1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 236. | At the conclusion of the second trial Perrot is again found guilty on all five charges. *(Ex. kk, pp. 674:1-675:22)*<br>**RESPONSE: Admit.** |

**XII. UNCONTESTED FACTS RELATING TO INVOLVEMENT OF INDIVIDUALLY NAMED DEFENDANTS**

| | |
|---|---|
| 237. | Marianne Popko took a statement from Mary Prekop on November 30, 1985 relative to the sexual assault she suffered in the early morning hours of that day. *(Ex. O, p. 93:1-9)*<br>**RESPONSE: Admit.** |
| 238. | Popko testified at the 1987 trial regarding the statement Mary Prekop gave on November 30, 1985. Popko testified to what Prekop told her, including that Prekop does not identify George Perrot as her assailant in that statement. *(Ex. O, pp. 94:5-96:23)*<br>**RESPONSE: Admit.** |
| 239. | On March 31, 1987 Kennedy observed 2 vials of blood being taken from George Perrot at the Springfield Court House. *(Ex. O, pp. 118:16-119:13)*<br>**RESPONSE: Admit.** |
| 240. | On April 1, 1987 Kennedy brought the vials of Perrot's blood and hair sample from Perrot to the FBI laboratory in Washington, DC. *(Ex. O, pp. 119:14-20; 120:17-121:9; p. 129:9-17)*<br>**RESPONSE: Admit.** |

| | |
|---|---|
| 241. | ADA Bloom accompanied Kennedy when the blood and hair were delivered to the FBI headquarters in Washington, DC. *(Ex. X, pp. 110:24-111:24)*<br><br>**RESPONSE: Admit.** |
| 242. | Kennedy and Bloom delivered the evidence to the FBI laboratory and were only in the FBI building for 5 to 10 minutes. *(Ex. 'll' Thomas Kennedy 12/17/2018 Deposition Transcript, pp. 105:1-106:6)*<br><br>**RESPONSE: Admit that this is what Defendant Kennedy testified at his deposition.** |
| 243. | The only person Kennedy and Bloom spoke with while at the FBI headquarters on April 1, 1987 was the person accepted the evidence. *(Ex. ll, p. 106:12-17)*<br><br>**RESPONSE: Admit but clarify that Bloom previously testified that he went to DC to speak with Agent Oakes and the head serologist. (Pl.'s Ex. 15, 2/25/91, p. 63-64).** |
| 244. | Other than accompanying Bloom to the FBI headquarters, Perrot has no evidence that Kennedy had any involvement in the claims Perrot is bringing in this lawsuit. *(Ex. W, p. 401:5-12)*<br><br>**RESPONSE: Deny. The cited evidence does not support this factual assertion. Plaintiff only admits that he believes Defendant Kennedy accompanied Defendant Bloom to D.C. See Ex. W, p. 401:5-12.** |
| | |
| 245. | Perrot has no evidence that Kennedy engaged in a conspiracy to have Perrot convicted, planted evidence, suppressed evidence or offered false testimony against him. *(Ex. W, pp. 402:1-404:10)*<br><br>**RESPONSE: Deny.** |

246. George Perrot does not recall any of the names of the officers who arrested him on December 7, 1985. *(Ex. V, p. 42:9-23)*

**RESPONSE: Admit but clarify that Plaintiff did not remember the names of the officers who arrested him at his deposition almost 40 years ago, but he did remember that there were six officers who were all white males. Ex V 42:16-43:6.**

247. All of the officers who arrested Perrot on December 7, 1985 were white men. *(Ex. V, p. 43:1-2)*

**RESPONSE: Admit.**

248. Perrot did not see any female officers on December 7, 1985. *(Ex. V, pp. 98:1-99:17)*

**RESPONSE: Admit.**

249. Perrot has no knowledge of Marianne Popko violating his rights. *(Ex. V, p. 100:2-24)*

**RESPONSE: Deny. At his deposition, Plaintiff was asked if, in his opinion, Defendant Popko violated his constitutional rights. Plaintiff responded " I never met Officer Popko, so I couldn't tell you." Perrot then refers to his research as the documents he's written for the basis of his claims against Popko.** *(Ex. V, p. 100:2-24)*

250. Perrot has no knowledge of why Clapprood was named in this lawsuit. *(Ex. V, pp. 102:9-103:15; 104:1-21)*

**RESPONSE: Admit but clarify Plaintiff was asked if he named Clapprood in his complaint. Plaintiff stated that his attorneys wrote the complaint for him.**

251. He has no information to suggest either Clapprood or Popko were involved in the statement he gave on December 7, 1985 which related to the events of November 30, 1985. *(Ex. V, p. 109:2-24)*

| | |
|---|---|
| | **RESPONSE: Admit.** |
| 252. | No member of the Springfield Police Department ever stated or alleged that Mary Prekop had identified George Perrot as her assailant. *(Ex. V, p. 110:15-20)*<br><br>**RESPONSE: Admit.** |
| 253. | George Perrot does not know what false testimony he is alleging Charles Arpin gave. *(Ex. W, p. 231:1-11)*<br><br>**RESPONSE: Deny. Mr Perrot stated that at the time of his deposition he could not recall the specifics of what Defendant Arpin did. Ex. W, p. 231:1-6.** |
| 254. | Perrot does not know what evidence Arpin allegedly suppressed. *(Ex. W, p. 233:1-6)*<br><br>**RESPONSE: Admit but clarify that Perrot did not personally know who Defendant Arpin is.** |
| 255. | Perrot does not know what witness statements were allegedly suppressed or destroyed. *(Ex. W, pp. 237:20-239:13)*<br><br>**RESPONSE: Deny. Plaintiff states that the statements of Jeff Adkins and Robert Timmerman were suppressed. See PSOF 20.** |
| 256. | Perrot alleges SPD used "pressure tactics" to try to make Prekop identify him in the lineup, and that she did not identify him. *(Ex. W, p. 242:2-24)*<br><br>**RESPONSE: Admit.** |
| 257. | Perrot believes one of the officers planted the gloves, but he does not know which one. *(Ex. W, 246:10-22)*<br><br>**RESPONSE: Admit.** |

258. The only document Perrot alleges was forged was a statement used to induce Jeff Adkins. *(Ex. W, pp. 250:18-251:11)*

**RESPONSE: Deny. Plaintiff also alleges that the portion of the November 30, 1985 statement where he allegedly confessed to the crimes against M.P. and the glove reference in M.P.'s statement were fabricated. See PSOF 4.**

259. The document Perrot alleges was forged was created after his first trial. *(Ex. W, pp. 395:11-396:24)*

**RESPONSE: Plaintiff objects to the extent this statement can be construed to mean that only the statement used to induce Jeff Adkins was forged.**

260. The document Perrot alleges was forged was never admitted into evidence in any trial involving George Perrot. *(Ex. W, p. 397:1-24)*

**RESPONSE: Plaintiff objects to the extent this statement can be construed to mean that only the statement used to induce Jeff Adkins was forged.**

261. George Perrot claims the gloves and hair from the bed were false/manufactured. *(Ex. W, pp. 254:24-255:22)*

**RESPONSE: Admit.**

262. George Perrot claims the blood on the sheets was not his, but acknowledges no one ever testified to a jury that the blood was his. *(Ex. W, p. 256:4-21)*

**RESPONSE: Plaintiff objects to the extent the evidence cited does not support the factual allegation. Plaintiff did not testify that "no one ever testified to a jury that the blood was his." Plaintiff further states that William G. Eubanks testified that the blood on the sheet was consistent with Perrot's blood. See PSOF 30.**

| | |
|---|---|
| 263. | George Perrot does not know St. Germain, and has no knowledge of any involvement St. Germain had in his arrest and convictions for the November 30, 1985 housebreaks or attacks on Mary Prekop. *(Ex. W, pp. 287:1-288:1)*<br><br>**RESPONSE: Admit** |
| 264. | George Perrot does not know Canevari and has no knowledge of Canevari fabricating evidence, destroying evidence, or concealing evidence. *(Ex. W, pp. 288:1-289:19)*<br><br>**RESPONSE: Deny to the extent that this statement claims that Plaintiff has no knowledge of Defendant Canevari's involvement. Canevari went with Kelly to execute the search warrant at Perrot's residence and was present when Ms. Wescott stated that she did not own a pair of gloves like the ones found at Ms. Prekop's home. PSOF ¶¶** 30-32. |
| 265. | Canevari had no involvement in the investigations into the November 30, 1985 crimes against Lichwala and Prekop. *(Ex. 'nn' Andrew Canevari 7/21/2023 Deposition Transcript, p. 42:7-18)*<br><br>**RESPONSE: Admit.** |
| 266. | Canevari was involved in the investigation into the rape of Mae Marchand. *(Ex. nn, pp. 42:19-43:20)*<br><br>**RESPONSE: Admit.** |
| 267. | George Perrot alleges Paul Glantz banged his nightstick against the cell bars preventing Perrot from sleeping following his arrest on 12/7/1985. *(Ex. W, p. 292:4-24)*<br><br>**RESPONSE: Admit.** |
| 268. | George Perrot has no knowledge of Glantz fabricating, destroying or concealing evidence. *(Ex. W, p. 293:6-17)* |

**RESPONSE: Admit.**

269. George Perrot was not threatened during the first 2 interviews on the day of his arrest on 12/7/1985.

**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.**

270. George Perrot alleges it was "coercive" for the officers interviewing him to repeatedly tell him they knew he had broken into the houses of Lichwala and Prekop. *(Ex. W, p. 298:11-18)*

**RESPONSE: Admit.**

271. George Perrot was given an opportunity to read the statements he gave on 12/7/1985. *(Ex. W, p. 301:2-3)*

**RESPONSE: Plaintiff objects to the extent that it can be construed that Plaintiff in fact read the statement before signing it. As the evidence in the record shows, Plaintiff was inebriated and sleep deprived when he was presented with this statement. See Pl's Ex. 1.**

272. George Perrot signed the statements he gave on 12/7/1985. *(Ex. W, p. 303:5-7)*

**RESPONSE: Deny. The evidence cited does not support this factual allegation. Plaintiff testified that he signed three documents that day while they were discussing the blood and hair samples. He did not sign a statement at the end of each interview.**

273. Defendant Charles Arpin began work for the Springfield Police Department in 1969. *(Ex. 'oo' Charles Arpin 6/9/2023 Deposition transcript, p. 19:15-18)*

**RESPONSE: Admit.**

274. He had four weeks of in-house training covering law, first aid, and firearms.*(Ex. oo, pp. 19:19-20:2)*.

**RESPONSE: Admit.**

275. He started as a uniformed patrol officer. He became a Sergeant a few years later. He became a Lieutenant less than ten years after his promotion to Sergeant. His next promotion was to Captain. Later, he was Acting Deputy Chief for a little while. He retired from the police department in 2010. *(Ex. oo, pp. 22:2-5; 27:10-14; 33:5-10; 40:12-18;-41:11-17; 53:20-21)*

**RESPONSE: Admit.**

276. At the time of George Perrot's arrest on December 7, 1985, Charles Arpin was a Lieutenant assigned to the department's Detective Bureau Housebreak Squad under the command of Captain Ernest Stelzer. *(Ex. oo, p. 62:14-17)*

**RESPONSE: Admit.**

277. Perrot testified that he saw Richard Kane for the first time when Kane was at the York Street Jail on December 10, 1985 as Perrot had agreed to have his blood drawn. *(Ex. W, pp. 348:18-350:1)*

**RESPONSE: Admit.**

278. Perrot has no information that Kane was involved with the Mary Prekop case. *(Ex. W, p. 357:16-20)*

**RESPONSE: Admit.**

279. Perrot testified that other than his involvement with Kane when his blood was drawn on December 10, 1985, he had no information that Kane violated his

| | |
|---|---|
| | rights or was involved in the Mary Prekop investigation. *(Ex. W, pp. 405:19-406:3)*<br><br>**RESPONSE: Admit, but clarify that this statement was made before Plaintiff produced his supplemental discovery response which state Defendant Kane's involvement in greater detail. See Pl.'s Ex. 59** |
| 280. | In responses to Perrot's Interrogatories, Kane confirms he was not involved in Mary Prekop investigation. *(Ex. 'pp' Richard Kane's Answers to Plaintiff's Interrogatories, ¶¶5-6)*<br><br>**RESPONSE: Admit.** |
| 281. | Canevari had no involvement in the investigations regarding the Lichwala or the Prekop crimes. *(Ex. nn, p. 42:3-18)*<br><br>**RESPONSE: Admit.** |
| 282. | Canevari did have some involvement in the Marchand investigation. *(Ex. nn, p. 42:19-21)*<br><br>**RESPONSE: Admit.** |
| 283. | Canevari went to Marchand's home and took pictures, reviewed the scene, gathered evidence. *(Ex. nn, p. 43)*<br><br>**RESPONSE: Admit.** |
| 284. | Canevari was present at the SPD station when Perrot voluntarily appeared and gave a statement denying involvement in the rape, assault and burglary of Marchand. *(Ex. nn, p.56:2-11)*<br><br>**RESPONSE: Admit.** |

285. Canevari wrote a report after Perrot (and others) gave statements denying their involvement in the rape, assault and burglary of Marchand. *(Ex. nn, pp. 103:1-106:24)*

**RESPONSE: Admit.**

## XIII. CONTENTION INTERROGATORIES AND DEPOSITION TESTIMONY

286. In answer to contention interrogatories, the only acts identified by Perrot relative to Kane as wrongful in this case related to Kane's actions in speaking with Perrot on December 10, 1985, and the subsequent discovery of the pocketbook taken from Emily Lichwala's house. *(Ex. 'qq' Plaintiff's Supplemental Answers to Richard Kane's Interrogatories, ¶¶4,5,6,7,8,9)*

**RESPONSE: Deny. Plaintiff's interrogatory response states that "Defendant Kane was involved in the investigations by collecting evidence from Plaintiff, fabricating the information that he claimed Plaintiff provided to him on December 10, 1985, and failing to conduct proper follow up investigation of alternative suspects. Plaintiff reserves the right to supplement his response to this interrogatory in accordance with the applicable Federal Rules of Civil Procedure, Local Rules, or Scheduling Order. Investigation continues." See Pl.'s Ex. 59**

287. In answer to contention interrogatories, the Plaintiff did not identify any "suppressed or destroyed evidence that would have shown that [Perro ] innocent", citing prematurity as discovery was ongoing, and such interrogatory answer has not been supplemented. *(Ex. 'rr' Plaintiff's Second Supplemental Answers to City of Springfield's Interrogatories, ¶8)*

**RESPONSE: Admit, but clarify that Plaintiff provided supplemental responses for the interrogatories for each individual Defendant that answered this question. Pl.'s Ex. 46, 53,54,55,56,57**

288. In answer to contention interrogatories, the Plaintiff did not identify what exculpatory evidence was "withheld, destroyed or suppressed by" Kelly,

| | |
|---|---|
| | Jarvis, Kane, Arpin, Kennedy, Popko, Glantz, St. Germain, Canevari or Clapprood" citing prematurity as discovery was ongoing, and such interrogatory has not been supplemented. *(Ex. rr, ¶¶9-10)*<br><br>**RESPONSE: Admit, but clarify that Plaintiff provided supplemental responses for the interrogatories for each individual Defendant that answered this question. Pl.'s Ex. 46, 53,54,55,56,57** |
| 289. | In answer to contention interrogatories, the Plaintiff did not identify what evidence was fabricated by Kelly, Jarvis, Kane, Arpin, Kennedy, Popko, Glantz, St. Germain, Canevari or Clapprood", citing prematurity as discovery was ongoing, and such interrogatory has not been supplemented. *(Ex. rr,¶¶12-14)*On May 16, 2023, George Perrot answered, under the pains and penalties of perjury, sixteen interrogatories propounded to him by Defendant Arpin. *(Ex. W, pp. 225-226)*<br><br>**RESPONSE: Object to the extent that this statement of facts contains two factual statements and not one. Admit, but clarify that Plaintiff provided supplemental responses for the interrogatories for each individual Defendant that answered this question. Pl.'s Ex. 46, 53,54,55,56,57** |
| 290. | Interrogatory Number 3 and the Plaintiff's answer to that interrogatory are:<br><br>**<u>INTERROGATORY NO. 3</u>**<br><br>Please state, in complete detail:<br><br>a) the specific acts by Defendant Charles Arpin that deprived you of your rights under federal and Massachusetts law, and;<br><br>b) which of your rights were deprived by the actions of Charles Arpin.<br><br>RESPONSE: Plaintiff objects to this interrogatory as unduly burdensome as it calls for a narrative better suited for a deposition. |

Plaintiff further objects to this interrogatory as compound as it includes multiple questions and subparts that are improperly set forth in one interrogatory. Plaintiff further objects to this interrogatory to the extent it calls for a legal conclusion or opinion that he is not qualified, nor obligated, to provide. Plaintiff further objects to this interrogatory to the extent it seeks information protected from disclosure by attorney-client privilege or the work-product doctrine, including but not limited to seeking information about Plaintiff's legal theories. Plaintiff objects to this interrogatory because it is a contention interrogatory that is being propounded at the outset of full fact discovery, before Plaintiff has had an opportunity to pursue full discovery, and before Defendants have provided documents in their sole possession and relevant to Plaintiff's claims in response to Plaintiff's previously served requests for production of documents. It is, therefore, premature for Plaintiff to be able to fully answer this interrogatory at this time*. See Eveden, Inc. v. The Northern Assurance Company of America*, No. 10–10061–GAO, 2012 WL 12345021(D. Mass. Feb. 7, 2012). Plaintiff objects further because certain information relevant to this inquiry is in the possession, custody, or control of Defendants.

Subject to and without waiving the foregoing objections, Plaintiff specifically alleges that Defendant Arpin was one of the supervisors of the investigations stemming from the series of assaults in Springfield in 1984-1986 Therefore, Arpin was responsible for overseeing the conduct of the other Individual Defendant Officers throughout the course of the relevant sexual assault investigations. Plaintiff states that to the best of his current knowledge, Defendant Arpin was present at the Springfield Police Station when Plaintiff was interrogated in December 1985, interviewed other witnesses, wrote and reviewed police reports, and approved Plaintiff's arrest and charges against him. Moreover, Defendant Arpin coordinated the lineup of Plaintiff in 1985, took Joseph McNabb's statement, participated in obtaining Plaintiff's signature on the search warrant waiver, testified at the grand jury hearings against Plaintiff on December 13, 1985 and April 10, 1986, and generally oversaw much of the investigation of which Plaintiff was the subject.

Additionally, as part of the investigative team, Defendant Arpin, acting in conspiracy with other Individual Defendants, fabricated evidence in order to connect Plaintiff to the crimes, including false police reports and witness statements regarding Plaintiff's purported connection to the crimes; manufactured false witness testimony that was used to implicate Plaintiff; and then suppressed that information during criminal proceedings; covered up their misconduct and destroyed or suppressed additional evidence that would have exculpated Plaintiff, including witness statements pointing to other suspects, hiding

> that information from Plaintiff, his attorneys, and state prosecutors; presented false evidence to state prosecutors and judicial authorities in order to secure and continue charges against Plaintiff; and provided false reports, statements and testimony in order to implicate Plaintiff in a crime he had not committed.
>
> Plaintiff further states that Defendants engaged in this misconduct even though there was absolutely no evidence (forensic, eyewitness, circumstantial, character, or otherwise), apart from that evidence fabricated by the Defendants, that connected Plaintiff to the sexual assault of Mary Prekop and attempted assault of Emily Lichwala. On the contrary, there was ample evidence that the crimes were committed by someone else, which Defendants suppressed, ignored, or disregarded, leaving the real assailant free to continue committing such crimes.
>
> Discovery is still ongoing in this Action. Plaintiff reserves the right to supplement this answer in accordance with the applicable Federal Rules of Civil Procedure, Local Rules, or Scheduling Order.

*Ex. 'ss' Plaintiff's Answers to Charles Arpin's Interrogatories, pp. 3-4*

**RESPONSE: Admit.**

291. The Plaintiff referred back to the substance of this answer as his answers to the remaining thirteen interrogatories. *(Ex. ss, pp. 4-13)*

**RESPONSE: Admit.**

292. During his deposition, the Plaintiff was unable to supplement his answer to Interrogatory Number 3 with any additional facts. *(Ex. W, pp. 225:10-228:24)*

**RESPONSE: Admit.**

293. By email dated August 1, 2023, at the close of discovery, Defendant Arpin's counsel sought supplementation from the Plaintiff of his answers to the Defendant's contention interrogatories. After an exchange of emails, Plaintiff's counsel indicated on August 7, 2023, that the Plaintiff would not

| | |
|---|---|
| | supplement his previous answers to Defendant Arpin's interrogatories. *(Declaration of Austin M. Joyce, Esquire)* **RESPONSE: Admit.** |
| 294. | When asked at deposition what exculpatory or impeaching evidence he is alleging was withheld, Perrot stated he had read case law" where the SPD allegedly withheld exculpatory or impeachment evidence, but does not remember what case law. *(Ex. V, p. 187:6-24)* **RESPONSE: Admit.** |
| 295. | Perrot stated he saw "in case law" that the SPD conducted illegal interrogations of juveniles, and that the SPD planed physical evidence, but does not remember what case law. *(Ex. V, p. 188:6-14)* **RESPONSE: Admit.** |
| 296. | Perrot stated at his deposition that he can't identify any specific witness statements that were suppressed or destroyed. *(Ex. W 238:17-239:9)* **RESPONSE: Deny. The witness statements of Jeff Adkins and Bob Timmerman were not produced to Perrot. PSOF ¶**66. |
| 297. | Perrot stated at his deposition officers falsely stated he had on a pair of his sister's gloves. *(Ex. W, p. 239:20-24)* **RESPONSE: Admit.** |
| 298. | When asked about what evidence had been suppressed, at deposition Perrot stated Prekop told police numerous times he was not the person who broke into her house. *(Ex. W, p. 239:22-24)* **RESPONSE: Plaintiff objects to the extent this is an incomplete representation of Plaintiff's testimony. When asked what false evidence was provided to the prosecutors, Plaintiff stated "[w]ell, they falsely said** |

**that I had a pair of my sister's gloves on. My sister testified that never happened so that was false evidence. Mrs. Prekop told them numerous times that I wasn't the person that broke into her house. I guess that's it, sir. My lawyers helped me prepare this. I'm not seasoned counsel." Ex. W 239:20-240:2.**

299. When asked about false evidence at his deposition, Perrot stated Prekop told officers bloodstains on sheet were her uncles and they testified it was his. *(Ex. W, p. 240:8-14)*

**RESPONSE: Admit.**

300. Perrot testified that he considered the hair sample submitted to the FBI to be false evidence because it was taken from Prekop's bed, and Prekop stated the incident happened on the floor. *(Ex. W, p. 240:8-14)*

**RESPONSE: Admit.**

## XIV. <u>POST-CONVICTION PROCEEDINGS</u>

301. Following the reversal of his convictions from his first trial, <u>Commonwealth v. Perrot</u>, 407 Mass. 539 (1990), Mr. Perrot received convictions for aggravated rape, armed robbery, burglary and assault in a dwelling, burglary, and indecent assault and battery, resulting in dual-life and other sentences. On direct appeal, the Appeals Court affirmed the convictions, <u>Commonwealth v. Perrot</u>, 3 8 Mass. App. Ct. 4 78 (1995), and the Supreme Judicial Court denied further appellate review. *<u>Commonwealth v. Perrot</u>, 420 Mass. 1104 (1995)*

**RESPONSE: Admit.**

302. In April of 2000, Mr. Perrot filed a motion for a new trial based, *inter alia,* upon allegations that the 1992 prosecutor's closing argument was improper

| | |
|---|---|
| | and prejudicial. Superior Court Judge Wernick (not the trial judge) agreed, and granted the motion.<br><br>**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.** |
| 303. | The Appeals Court reversed Judge Wernick's decision allowing Mr. Perrot's motion for a new trial, finding that errors in the trial prosecutor's closing argument did not create a substantial risk of a miscarriage of justice. Commonwealth v. Perrot, 58 Mass. App. Ct. 1102 (2003), and the Supreme Judicial Court denied further appellate review. *Commonwealth v. Perrot, 441 Mass. 1104 (200)*<br><br>**RESPONSE: Admit.** |
| 304. | The 2003 Appeals Court also said that the issue of the voluntariness of the defendant's statements "should have been foreclosed" by the suppression motion judge's finding of voluntariness, which had been upheld by the Supreme Judicial Court, and by the defendant's denial at the suppression hearing that his confession had been the product of police brutality. *Com. v. Perrot, 58 Mass. App. Ct. 1102, n. 22 (2003)*<br><br>**RESPONSE: Admit.** |
| 305. | On or about June 14, 2004, Perrot filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts under 28 U.S.C. § 2254, challenging his convictions in Indictments 85-5415 through |

| | |
|---|---|
| | 85-5418 and 85-5420 through 85-5425 related to Prekop and Lichwala. See Perrot v. Maloney, Docket No. 1:04-cv-11666 (D. Mass) at Document No. 1<br>**RESPONSE: Admit.** |
| 306. | In his petition, Perrot alleged violations of his rights under the Sixth and Fourteenth Amendments, including claims that his confession was coerced, that exculpatory evidence was withheld in violation of Brady v. Maryland, and that he received ineffective assistance of counsel at trial. See Perrot v. Maloney, Docket No. 1:04-cv-11666 (D. Mass) at Document No. 1<br>**RESPONSE: Admit.** |
| 307. | In an order dated August 30, 2005, Massachusetts District Judge Reginald C. Lindsay denied Perrot's habeas petition. Judge Lindsay held that Perrot's petition "raises no issue of constitutional magnitude about which jurists of reason could disagree" and that Perrot had therefore "made no substantial showing of the denial of a constitutional right." Accordingly, Judge Lindsay declined to issue a certificate of appealability. See Order, Perrot v. Maloney, No. 1:04-cv-11666 (D. Mass. Aug. 30, 2005) at Document No. 15.<br>**RESPONSE: Admit.** |
| 308. | Mr. Perrot filed another motion for a new trial on or about November 29, 2006, alleging *inter alia*, that his confession was involuntary and "[t]he police and the prosecutor wrongfully plotted and lied to convict the defendant for crimes he did not commit because the facts and circumstances and his own history made him a vulnerable target for this misbehavior." *Ex. zz, Commonwealth v. Perrot 8579-5410 at 136-137* |

**RESPONSE: Admit.**

309. On or about December 5, 2006, Hampden County Superior Court Judge Sweeney, denied Mr. Perrot's November motion, issuing the following order:

> I decline to act on this motion. The defendant's convictions were affirmed on appeal. The Massachusetts appellate courts already considered and rejected the arguments the defendant raises in his current motion for a new trial. Moreover, the defendant previously filed a motion for new trial which this court (Wernick, J.) allowed. The Appeals Court reversed the allowance of the motion for new trial and again affirmed the defendant's convictions. The Supreme Judicial Court denied the defendant's appeal from the Appeals Court's decision. In the current motion for a new trial the defendant asks the court to once again review the same issues already considered by the Supreme Judicial Court and the Appeals Court. I decline to do so.

*(Ex. 'zz', Commonwealth v. Perrot 8579-5410, December 5, 2006, Decision)*

**RESPONSE: Admit.**

310. Mr. Perrot later acknowledged Judge Sweeney's decision which he outlined in his subsequent motion for a new trial that he filed on or about June 6, 2008, where he wrote the following, "[t]his trial court (Sweeney, J.) is correct that [sum] of the issues presented in the defendant's second motion for a new trial were the same…" *(Ex. 'xx' George Perrot's June 6, 2008 Memorandum in Support of Motion for New Trial, p. 8).*

**RESPONSE: Admit.**

| | |
|---|---|
| 311. | On or about February 8, 2007, Mr. Perrot filed a notice of appeal of Judge Sweeney's decision, which was docked in the Appeals Court. *(Ex. 'dd', Massachusetts Appeals Court Docket #2007-P-195)*<br><br>**RESPONSE: Admit.** |
| 312. | Mr. Perrot failed to perfect his appeal and consequently, the Appeals Court dismissed the appeal on or about May 31, 2007. *(Ex. 'dd' Massachusetts Appeals Court Docket #2007-P-195)*<br><br>**RESPONSE: Admit.** |
| 313. | On or about June 6, 2008, Mr. Perrot filed another motion for a new trial essentially alleging the same issues, among those were that the defendant's statement to police was involuntary and asked the court to "re-evaluat[e] the voluntariness of this defendant's [Perrot] alleged confession" based on, "but not limited to" the following:<br><br>(1) The forging of a confession against this defendant by the original ADA in this defendant's case (Francis Bloom), in an effort to try and induce two of this defendant's friends to confess and testify against this defendant, although. Not ultimately used in court; (2) The personal delivery of blood samples taken from this defendant, by ADA "Bloom" from Springfield, Massachusetts to Washington, D.C. by car (Tr.III/308; MTD/62-64); (3) The intentional lies by Lt. Kelly pertaining to what this defendant's sister said about the gloves; (4) The false additions to Ms. Prekop's statement pertaining to these gloves by someone within the prosecutorial team; (5) The intentional falsehoods by Lt. Kelly pertaining to his investigation of the prosecution's relied upon physical evidence (the gloves and bedsheet); and (6) The continous [*sic*] falsehoods by ADA Vottero pertaining to the physical evidence that |

> this defendant seeks to have independently tested, that ADA Vottero claims no longer exists… The Springfield Police and Prosecutor's Office wrongly plotted and lied to make the physical evidence in this case fit this defendant in order to convict him on a number of ongoing unsolved crimes because the facts and circumstances of this defendant's own history made him a convient [*sic*] patsy.

*(Ex. 'xx', Commonwealth v. Perrot, 8579-5410, p. 58-60)*

**RESPONSE: Admit.**

314. On August 21, 2008, Josephson, J., denied the motion. In her endorsement, the motion judge held:

> Defendant's 2d motion for new trial was denied & he failed to prosecute his appeal resulting in dismissal. Accordingly, he waived his his [sic] claims. Mains v. Commonwealth, 433 Mass. 30 (2000). His reliance on his pro se status is unavailing as he is held to the same standard as an attorney. Commonwealth v. Jackson, 4 [19] Mass. 716 (1995). Accordingly, motion is DENIED.

*(Ex. xx, p. 58-60)*

**RESPONSE: Admit.**

315. Mr. Perrot, again appealed and again failed to perfect his appeal which was dismissed by the Appeals Court on or about March 13, 2009. *(Ex. 'dd', Massachusetts Appeals Court Docket #2008-P-1613)*

**RESPONSE: Admit.**

316. In 2012, the Federal Bureau of Investigation questioned the science underlying the testimony of its microscopy examiners, and it audited its prior

| | |
|---|---|
| | microscopy cases, including Mr. Perrot's. *(Ex. 'tt' Judge Kane 1/26/2016 Order, p. 40)* <br> **RESPONSE: Admit.** |
| 317. | On July 14, 2014, Mr. Perrot filed another motion for a new trial based upon the FBI's acknowledgement that its microscopy examiners provided scientifically unsupported testimony was newly discovered evidence, that the Commonwealth presented false and misleading evidence testimony regarding the hair evidence, and that his second defense counsel provided ineffective assistance of counsel by failing to investigate the Commonwealth's hair evidence. *(Ex. tt, p.40)* <br> **RESPONSE: Admit.** |
| 318. | On January 26, 2016, Judge Kane of the Superior Court granted a new trial on Indictments No. 85-5415 (unarmed robbery of Mary Prekop), No. 85-5416(indecent Assault & Battery of Mary Prekop), No. 85-5418 (rape of Mary Prekop), and No. 85-5420 (Burglary and Assault of Mary Prekop)based on the demonstrated scientific unreliability of the FBI's hair microscopy. *(Ex. tt)* <br> **RESPONSE: Admit.** |
| 319. | Judge Kane found against Mr. Perrot's other claims, and specifically denied the motion on Indictment No. 85-54-25, relating to the burglary of Emily Lichwala. *(Ex. tt, p. 79)* <br> **RESPONSE: Admit.** |
| 320. | The Commonwealth appealed the order for a new trial, and Mr. Perrot appealed the denial of his motion pertaining to that indictment. |

**RESPONSE: The court can disregard factual assertions that are not supported by citations to the record. *Brown v. Armstrong*, 957 F. Supp. 1293, 1297–98 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997); *see also*, Local Rule 56.1. Accordingly, Plaintiff objects to this assertion because without a citation to the record, Plaintiff cannot adequately respond.**

321. In October 2017, Mr. Perrot and the Commonwealth reached an agreement. They agreed to dismiss the appeal and cross appeal with prejudice, and the Commonwealth filed a nolle prosequi for Indictments No. 85-5415, No. 85-5416, No. 85-5418, and No. 85-5420 in the Superior Court, dated October 18, 2017. *(Ex. 'uu' Commonwealth 10/18/2017*, page 1, ⁋1) The stated reasons for the Nolle Prosequi are:

1. Perrot agreed to dismiss the appeal relating to Lichwala burglary;
2. The FBI disavowed previously sworn testimony concerning hair microscopy; this disavowal, while not dispositive, would require a third trial 30 years after the underlying offenses;
3. Both the alleged victim and the lead investigator are now dead, and several civilian and law enforcement witnesses were retired or otherwise not available to testify;
4. Due to the deterioration of the materials in previous testings, there was unlikely to be any further forensic testing available;
5. Perrot, who was 17 at the time of his conviction, would now be governed by the holding in Miller v. Alabama, 567 U.S. 460 (477078) and by Commonwealth v. Perez, 477 Mass. 677 (2017), and his age and other factors would have to be considered in any new sentence imposed, such that any additional sentence beyond the years he had already served was highly unlikely;
6. Since his release on February 10, 2016 he had complied with his conditions of release including remaining drug free,

| | |
|---|---|
| | alcohol free for 6 months, and report twice monthly to probation.<br>*(Ex. uu, pp.1-3)*<br><br>**RESPONSE: Admit.** |

**XV. Monell Related Facts**

| | |
|---|---|
| 322. | During the time of the investigation of George Perrot officers in the Springfield Police Department were required to take 40 hours of in service training each year. *(Ex. 'mm' City of Springfield 30(b)(6) deposition of Superintendent Cheryl Clapprood 8/24/2023 Vol. II Deposition Transcript, p. 20:4-20)*<br><br>**RESPONSE: Admit.** |
| 323. | During the time of the investigation of George Perrot officers in the Springfield Police Department had additional and optional week-long training opportunities available to them administered by the Massachusetts Municipal Police Training Council. *(Ex. 'mm', p. 162:7-24)*<br><br>**RESPONSE: Admit.** |
| 324. | During the time of the investigation of George Perrot officers in the Springfield Police Department investigating sexual assaults were required to attend a week-long training also administered by the MPTC. *(Ex. 'mm', p. 163:5-12)*<br><br>**RESPONSE: Admit.** |
| 325. | During the time of the investigation of George Perrot although there was no written policy regarding memorializing the interrogation of subjects, but there was a procedure the officers followed. *(Ex. 'mm', p. 218:10-18)* |

| | |
|---|---|
| | **RESPONSE: Plaintiff objects to this statement as vague and ambiguous. Plaintiff is unable to admit or deny this Statement of Fact.** |
| 326. | Procedural steps included, Mirandizing the suspect, and providing them the opportunity to make phone calls prior to giving statements, especially if they were between the age of 17-20. *(Ex. 'mm', p. 219:14-24)* **RESPONSE: Plaintiff objects to the extent the cited evidence does not support the factual allegation. The testimony does not mention Mirandalization of suspects.** |
| 327. | At all material times the Municipal Police Training Counsel (MPTC) for the state of MA and sets all the standards in regards to training for police recruits, for continuing training for officers and training for special categories. They have their own instructors and syllabus which may change. They certify the academy and set most of the curriculum. *(Ex. 'mm', p. 224)* **RESPONSE: Deny. The cited evidence does not support the factual allegation. The testimony does not state that this was the applicable training procedure at all times material to this complaint.** |
| 328. | Training Materials used at the Springfield Police Academy during the relevant years came directly from the MPTC and instructors have to be MPTC certified. The Brady policy came in to effect a few years ago as the result of DOJ coming in and the DA distributing a Brady list. The Brady information is specifically addressed to IIU or other impeachment-type evidence that might relate to police officers. *(Ex. mm, p. 225:)* **RESPONSE: Plaintiff objects to the statement "came into effect a few years ago" as vague and ambiguous. Plaintiff cannot properly respond to this statement.** |

| | |
|---|---|
| 329. | During the relevant years the academy trained officers it was an obligation of the state in a criminal case to turn over all exculpatory evidence to criminal defendants. *(Ex. mm, p. 226: )*<br><br>**RESPONSE: Deny. The Springfield Police Department did not provide any training on the disclosure of exculpatory evidence. See PSOF ¶¶** 108-109. |
| 330. | Falsifying and tampering with evidence as well as false testimony would be a violation of law and therefore covered under Rule 29 of the SPD rules and regulations. *(Ex. mm, p. 228 and 229)*<br><br>**RESPONSE: Admit.** |
| 331. | At all times material it was the practice at the SPD for the entire case file to be turned over to the prosecutor to determine which part of the file they will need. *(Ex. mm, p. 229)*<br><br>**RESPONSE: Admit.** |

Dated: May 17, 2024

Respectfully Submitted,

*/s/ Gianna Gizzi*

*One of the Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Mark Loevy-Reyes, BBO No. 707974
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
Ph: (312) 243-5900
Fax: (312) 243-5902

Debra Loevy, BBO No. 569212
Jon Loevy*

Steven Art*
Gayle Horn*
Gianna Gizzi*
Carla Agbiro*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
gizzi@loevy.com
*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I, Gianna Gizzi, an attorney, hereby certify that on May 17, 2024, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Gianna Gizzi

*One of Plaintiff's Attorneys*