**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 9

CITY 003296

C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
Nos. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

MOTIONS AND TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 8, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME II

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARY PREKOP | 197 | 217 | | |
| EMILY LICHWALA | 240 | 254 | | |

| EXHIBITS | PAGE |
|---|---|
| A for Identification, photograph ------------- | 235 |

(Hearing convened at 9:50 A.M.
The defendant was present)

THE CLERK: Your Honor, back before the Court is Commonwealth versus George D. Perrot.

THE COURT: I think the only thing I have to decide is the motion to suppress the statement, that is the only thing that is left, is that right?

MR. BLOOM: I think that's it.

MR. HAMMERSCHMITH: That is my understanding.

THE COURT: Did you have an opportunity to take a look at that case?

MR. BLOOM: I did, Your Honor. Could I be heard briefly on it?

THE COURT: Sure.

MR. BLOOM: I think, first of all, the first thing is it seems to be somewhat of a confusing area, reading all of those cases, but the three cases I spent the most time with is the case

that you cited or you indicated that had been cited by Mr. Hammerschmith that you referred to at 3:30 yesterday, which was the Supreme Court case, Michigan versus Jackson, and the two Massachusetts cases that appeared, and I Shepardized both of them to be good law, still in the Commonwealth of Massachusetts, and I think, Judge, they all can be resolved within each other factually.

The Sherman case, the statement was thrown out under the facts, and that is a Massachusetts case. In the Jackson case, the statement was thrown out under the facts. But on the Andujar case, the statement was allowed to stand, that again being a Massachusetts case. I think there is a dramatic difference in the facts on the three of them. I think, Judge, and it seems to me at least this is the conclusion that I have reached from reading them, that the Court does not

take lightly what they think appears to them to be factually to be an interference with the Sixth Amendment right of an accused, and I don't have any problems with that, we don't argue, for the record, that anything that happens of any merit after a lawyer's been appointed is a critical stage for Sixth Amendment, we don't dispute that at all, but we don't think that there is any law including Michigan versus Jackson that stands for the proposition that once a lawyer is appointed, a defendant cannot within the context of the Sixth Amendment waive his Fifth Amendment rights. I know no case in the United States or Massachusetts that says that.

Basically, that is what I believe defense is asking you to do today. The distinction between the Jackson case and our case is that the Jackson case and the other cases that I

have read in which a statement has been knocked out once the Sixth Amendment mechanism takes hold are cases in which it is very clear to see how the law enforcement people --

For instance, in the Jackson case, you have two things, as I read the facts. Here is a defendant who the only evidence we have in the case is that he is repeatedly asking for a lawyer. Not only post-arraignment, but it appears -- I'm referring to the second page, which is 1405 -- excuse me, I have the wrong -- no, that's right -- page 1406 of the opinion, it talks about this gentleman being arrested and then making an inquiry about having a lawyer present, and apparently it is a little confusing, but apparently he asked for a lawyer when he was arraigned, and upon being arraigned, a lawyer isn't provided for you, but the Court here mails out an indegency slip to a law firm, and then

the officer who is in charge of the investigation, according to the facts here, was in the court and heard the judge appoint a lawyer from a law firm in town to represent this Mr. Blaisdell. It goes on to say apparently that the slip didn't arrive for three or four days, so whoever this lawyer was never really found out that he was supposed to represent Blaisdell until after the cops had gone and approached him.

So, the fact is I draw a tremendous distinction in the facts here, because what they are really doing, at least in my opinion, is they are trying to prohibit the blatant interference of the Sixth Amendment right of an accused, and they are not going to let you circumvent it by saying yes, but still there was a voluntary waiver within that context of the Fifth Amendment. And, in this case, apparently there was a voluntary waiver

of the Fifth Amendment, but I think what the Court is saying, it appears to me, is yeah, here's a guy that was requesting a lawyer on numerous occasions. In fact, Judge, I don't think it is that clear, but if you read the second paragraph of 1406, not only did this investigator and his partner know that a lawyer had been appointed, but it appears when they went to talk to him, that he made several requests asking about the status of his lawyer, and that is the first and second paragraph of page 1406. He had inquired about the representation several times since his arraignment --

THE COURT: What are you reading from?

MR. BLOOM: From page 1406, Judge.

THE COURT: Where?

MR. BLOOM: The second paragraph -- I should say the first paragraph, the second column.

THE COURT: Okay.

MR. BLOOM: I will be honest with you, it is a little confusing to determine exactly what happened here, for me anyways, reading this. I think what is clear is that this man wanted a lawyer, he was arraigned on the day of arraignment, the Court sent a slip out to a lawyer in town. It doesn't appear that the defendant knew that that actually happened, although he was -- he did ask at the day of his arraignment, very clearly, he told him he did want a lawyer. But apparently the slip was sent out from the judge or the clerk and it didn't arrive at that law office until four or three days later, and in the interim, the police knowing that all of that had been done and knowing the defendant had made a voluntary request for a lawyer, and I guess the inference from that was that he wanted to talk to a lawyer, they went down to the jail for

the sole and singular purpose of trying to use whatever tactics they had at their disposal to get this man to give a confession. I think that much is clear.

The part that is confusing, Judge, is the first paragraph of the second column. I don't know what this means. Who did he inquire of? I couldn't know whether this means he actually inquired of the cops when they were down there in the institution, what is the story with my lawyer, or whether it means that he asked of other people. You know, in fairness, I don't know if I can really attribute that to the police. I don't know -- I guess you could read that four or five different ways. It says a notice for appointment was properly promptly mailed to a law firm, but the law firm didn't receive it until Tuesday, March 27th.

In the interim, on the 26th, the officers interviewed Blaisdell in

the county jail, and obtained a confession. Although he inquired about his representation several times since the arraignment, Blaisdell was not told that a law firm had been appointed to represent him. And the inference I draw from that is that the Court is very concerned about the fact that his Sixth Amendment rights, in their opinion, under these circumstances, had been trampled on, and the police had gone down there knowing that this man had made numerous requests to have a lawyer appointed for him, and the inference from that was that he wanted legal advice and he wanted to talk to a lawyer, and knowing that, and regardless of that, the police went down and they sought to elicit a confession from him. I don't find that in our case to be the facts.

The holding Judge, again -- and I think this is the most crucial

part of the case -- this case doesn't hold that once the Sixth Amendment is triggered by an arraignment -- and that is what we are talking about here -- you can't waive your Fifth Amendment right. It doesn't say that. What it says, Judge, as I read it, and again I refer to page 1404 and page 1405 of that same decision, in essence it says that constitutional right to assistance of counsel is of such importance that after formal accusation has been made, police may no longer employ techniques that are used for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of the investigation. When a defendant requests a lawyer, it is presumed that the defense requests lawyer services at every critical stage of the prosecution.

And then, Judge, what I think to be -- and I am reading right from page 1405 -- is the critical part of

this, "After a defendant has been formally charged with a crime and requested an appointment of counsel at his arraignment, advice of rights and acquiescence of police-initiated questioning cannot be considered a valid waiver."

The first thing you have here that I would draw -- two things I think that are crucial. Number one, factually what you have, and the difference between Blaisdell and here is that George Perrot didn't request a lawyer. Now, I don't know, you have been --

THE COURT: He what?

MR. BLOOM: George Perrot did not request a lawyer. And you know the way the systems works downstairs, and I think that is an important distinction to draw. There had been at least four times prior to his arraignment in which the presence of a lawyer had been discussed. Three Miranda situations and

one hair sample situation in which he was instructed he could have a lawyer present. He didn't have to waive. And on all four occasions he indicated, in his opinion, at the time or his feeling, he had no use for a lawyer.

Now, when he came in and was arraigned on the 9th, two days later, you know how that works in District Court. There is a request being made for a hundred or a hundred fifty -- the judge isn't asking -- someone comes in and he is indigent, if he doesn't come there with appointed counsel, he is indigent, there is colloquy in which a judge asks a defendant whether he wants a lawyer. The public counsel service gets appointed. If a pro se situation is going to be resolved, that gets resolved down the road. In fact, we all know from our experience in the system that if, in fact, Mr. Perrot had stood up and said I don't need no lawyer in

this case, that the judge in the District Court on charges of this nature would have appointed a lawyer at that stage of arraignment and then he would have conducted a hearing down the road if Mr. Perrot wanted to go pro se.

The difference between that and here is that you have an individual here that is -- the two distinctions in the Michigan case are, number one, we have someone repeatedly requesting a lawyer, and the presumption of that is that he wanted legal counseling and possibly he might not have talked if in fact he had gotten that counseling, and he deserved that in light of the Sixth Amendment.

Secondly, this case turns on police-initiated investigation. The two cases in which they have been thrown out that are most applicable, you have referred to the United States Supreme Court case, and the Commonwealth case of

Commonwealth versus Sherman are police-initiated interrogation.

This is not a police-initiated interrogation. Officer Kane went down there, and I don't think there is any dispute on this, for a custodial purpose, and that is important, Judge, because I think what the Courts are trying to protect against are overzealous activity on behalf of the police department when it is recognized that the Sixth Amendment has been triggered.

Now, if in this case this statement was to go out, then, in essence, hypothetically, Judge, I don't understand the distinction between our case and this scenario, for example: tonight there is a fire somewhere and a black and white gets a call and goes to the fire. Within the course of fighting the fire, they take two people out of the building. Perfectly legitimate law

enforcement purpose of the black and white that is scouring or servicing that community. They take the man of the house out, and as he is coming down the stairs, they are talking to him about how he believes the fire started and they talk about something that happened in the kitchen, it's a grease fire or whatever. Within the course of that, he turns and says to the officer, you know, this has been a lousy week for me, I got arraigned for a rape two days ago in Superior Court, and then starts to make admissions. The individual, the cop, has enough brains to stop him right there, Mirandizes him, no dispute that he makes a voluntary waiver, and then makes an inculpatory statement.

That statement goes out because he had had a lawyer? I don't think that is the stage that the law has gone to, Judge. They are trying to protect against the police ignoring the

Sixth Amendment.

In the Michigan case, the cops ignored the Sixth Amendment. They knew that this guy requested a lawyer, they knew that a lawyer had been appointed, whether a meeting had been conducted or not, and they threw that aside and went down there hoping to get a statement before this guy had an opportunity to talk to whoever the lawyer in town was who was ultimately going to talk to him, to whom the letter had been sent out.

Kane isn't even involved in this case, Your Honor. He goes down for one purpose only, that is during the course of this trial now, today, if there is a dispute that the blood that the F.B.I. wants to talk about came from the arm of George Perrot, I can bring Kane in here and say I know this came out of Perrot's arm, because I stood there when Aberdale stuck the needle into his arm and saw the blood go in

there. That is the only reason he was down there. The police weren't trying to interfere with his Sixth Amendment right, he had already given a statement putting himself in -- you know that as part of the facts now -- putting himself inside the home of the Covel and the Malibu residence at or about the time that these awful incidents had occurred, about ten days before.

Kane wasn't even involved in these cases. He went down there not to interfere with George Perrot's Sixth Amendment right, but for the sole and simple purpose of trying to maintain the chain of custody, and then this man decided on his own, which I believe is still the status of the law in the state of Massachusetts, to waive his Fifth Amendmen right.

Judge, I really don't believe, if you look at the factual distinctions, that what I said to you yesterday

doesn't hold, and that is again Commonwealth versus Andujar. A detained suspect has the right to be represented by an attorney. We don't dispute that. But there is no absolute constitutional requirement that his attorney, even if already retained or appointed, be present during or notified prior to an interrogation. That is still the status of the law.

Now, the difference between that and the Michigan case, Judge, is the Michigan case turns, number one, on the fact that it is police-initiated interrogation with a knowledge of the Sixth Amendment already attached and having an individual who is asking to talk to a lawyer. That is a tremendous distinction from our pattern. In essence, Judge, to rule that this is out under the fact pattern that we have, which is Kane innocently doing his job in which someone starts blurting out

statements -- and the Fifth and Sixth Amendments are right that incur or inure to Mr. Perrot, and to nobody else, to Mr. Perrot. He has the right to waive them.

What the Court is saying in Michigan is that we are not going to rule that as a waiver, because we don't think it is a voluntary waiver in which a guy is repeatedly asked to talk to a lawyer, in which he has a serious case pending, and then the cops, knowing that, say tough, we don't care whether you want to talk to a lawyer, we are going to go down there and try to use a technique and get you to say something.

You don't have any of that in the case of Commonwealth versus Perrot. And to rule against the Commonwealth in this case, in my opinion, in essence, says that the Sixth Amendment says once the person is arraigned, he can't waive his Fifth Amendment rights. That is the

effect that a knocking out of this evidence would have under this scenario. I don't believe that is what the Supreme Court has ever intended or will ever intend. And I think the Michigan case turns on its facts.

I have Shepardized this Andujar case, Judge, it appears to be good law in the state of Massachusetts. I am asking you to deny the motion, and I don't dispute basically the findings of the case, but I think that they turn on the facts, because they clearly say that they are concerned about the activities of the police, the fact that its police-initiated interrogation after the Sixth Amendment had been triggered and where a defendant is repeatedly requesting an opportunity to talk to his lawyer.

If anything, you have here a clear and convincing amount of evidence that George Perrot had no desire to talk

to his lawyer and, secondly, there is no police-initiated interrogation, you have a very proper function on behalf of the police department going down to watch blood come out of the arm of Mr. Perrot, and then him deciding on his own to blurt out certain statements.

THE COURT: Well, first of all, as far as the knowledge of Officer Kane goes, I think that the knowledge has to be imputed to him, that he did know that he was arraigned and --

MR. BLOOM: I agree to that, I don't dispute that.

THE COURT: I agree with you that he was there for a legitimate purpose, that the chain of custody on the blood sample was a legitimate purpose for him to be there, and I think his injunctions were that was the purpose of him going there, and I don't think that Jackson says that a defendant cannot initiate a desire to talk to police without the

presence of his counsel, but what it does seem to say is that the police cannot initiate conversations with the defendant once he has been arraigned, and, obviously, from the decision itself, there is a split in the court as to the wisdom of the decision.

However, in this case, the evidence I have before me right now is that, granted that Kane was there for a legitimate purpose, but then the evidence I have is he identifies himself to the defendant as a police officer of the City of Springfield. The defendant then says did you see my girlfriend in court, isn't she pretty. This is the evidence I have in front of me. And then, at that point, Kane gives him his Miranda rights and starts to question him about the incident. Now, that is the evidence as I remember it.

MR. BLOOM: Can I just say one thing to you, Judge, because I think it

is crucial in his case, and can we have an opportunity to have that back, because I'm wrong a lot, but I think the evidence was that Kane stated that he went in there, did not, I believe, indicate he had -- he did not identify himself, was not going to identify himself, and Mr. Perrot -- the first thing that was said, Mr. Perrot turned to him and said, "Weren't you down at my arraignment today? Did you see how pretty my girlfriend was?" And mentioned about why would I be raping or why -- I didn't do anything with old women, and he, at that point -- because if you are using --

THE COURT: There is no testimony about that.

MR. BLOOM: What I'm suggesting to you, Judge, if the -- the key factor is whether Perrot, when Kane initiated this -- then I would ask, can I please at least have the opportunity to go back to

that point, because I'm a hundred percent sure that he testified yesterday that Perrot made those statements to him, and when he mentioned about the elderly woman after talking about how pretty his girl was, he stopped at that point and Mirandized him. And you would admit, I believe, that that would make a difference possibly in your ruling.

THE COURT: That is not my recollection of the evidence.

MR. BLOOM: Can we at least get back to that, because I think I'm right on that?

THE COURT: Do you want to be heard on that?

MR. HAMMERSCHMITH: On that particular point?

THE COURT: On the argument itself.

MR. HAMMERSCHMITH: There are a number of things I think that create problems in what Mr. Bloom said. Obviously, the cases that he relies on,

the Massachusetts cases, predate Jackson and the Appeals Court, and the SJC in those cases didn't have the benefit of the Jackson opinion in passing on the facts before them. I don't believe the situation has in fact presented itself to either of those two courts to consider whether that is still good law in light of Jackson, which is a fairly recent case.

The other thing about the particular facts of Jackson, what Mr. Bloom neglects to mention is that there are two criminal defendants whose cases were before the Supreme Court in Jackson, and one of them was Mr. Blaisdell, who was referred to by Mr. Bloom, but the other, Mr. Jackson, is someone who in fact had apparently, according to the opinion, given six statements to the police, each time being Mirandized pre-arraignment, had gone into court and had counsel

appointed for him there for the first time, that being the only time, which I can tell from the opinion, that counsel was requested by Mr. Jackson, and the Court reached the same conclusion with respect to Mr. Jackson as with respect to Mr. Blaisdell.

MR. BLOOM: Excuse me for a minute. I didn't indicate, and I should have, I agree with what you are saying, Judge. If that is what you found Kane said, I agree with that, that is the proper application of law. All I am suggesting is I'm almost a hundred percent sure that's not what Kane said yesterday.

THE COURT: Let's find out what Mr. Kane said.

MR. HAMMERSCHMITH: My recollection is different from Mr. Bloom's. I think that he -- well, I don't know whether it matters -- we can find out, I guess it doesn't matter what my recollection is.

THE COURT: Let's find out.

(Recess taken at 10:10 A.M.)

(Hearing reconvened at 10:25 A.M. The defendant was present)

THE COURT: Would you please read back the portion of Officer Kane's testimony.

(Whereupon, a portion of Officer Kane's testimony was read back by the reporter)

THE COURT: This is the thing that has been bothering me.

MR. BLOOM: I was wrong about the incidents, anything mentioned about them, but -- so the only thing I think we can agree upon is that he said both to myself and Mr. Hammerschmith that the the defendant came in, was talking

freely, mentioned something about his being in court that day and the looks of his girlfriend, and I stopped him, identified myself and then Mirandized him.

THE COURT: I was wrong about that, I thought the identification came first.

MR. BLOOM: The question then, Judge, is who initiated the process -- and, again, I want to try to be fair. I don't dispute at all that after the Miranda -- and, again, I don't think the defense disputes and there is no argument that there was a free waiver of Miranda -- the question is was what you heard factually a police-initiated interrogation in light of the Michigan case. I think at least we should be able to agree that is what the issue is.

THE COURT: Right. That is it exactly.

MR. BLOOM: I wonder if you can't infer -- at least it comes to my mind, I

don't know how fair it is, but when he was talking freely and made these statements concerning the way his girlfriend looked and whether he had seen her in court that day, whether Kane, knowing that this involved elderly women, at that time felt -- and I don't cast any aspersions, I think he did the right thing -- that something may in fact be coming that was going to be incriminating. I think you could have inferred that under all the circumstances at that time, and he did the proper thing by stopping him, because, in fairness to Perrot at the time, he'd have no way of knowing who this guy was, so in fairness to him, Kane was saying hey, I'm a cop and I'm going to give them to you again, and maybe you don't want to say these things in front of me.

And I may be wrong, Judge, but my reading of the cases -- and, again, I

apologize, because I was wrong on the fact that there was no context about these incidents said before the Miranda, that's clear from the record, but it is clear that the Miranda -- there was no intention of talking to Mr. Perrot, there was no intention of ever giving him Miranda when Kane went down there, that Miranda was given because he was talking freely, Mr. Perrot, and Mr. Perrot made the statements about being in court that day and how pretty his girlfriend was and words in that context, which scared Kane into thinking something inculpatory might be coming and, in fairness, the guy gets his Miranda rights again.

I really feel strongly, at least factually, I don't think that is what the United States Supreme Court means when they talk about police-initiated interrogation. Clearly, police-initiated interrogation,

because when you leave the police station and you go down the jail hell bent to get a statement out of somebody, and I think what was initiated here, although Kane did ask him some questions, was initiated on behalf of the defendant and I don't believe it is the police-initiated type of interrogation that the Supreme Court refers to.

THE COURT: Well, first of all, don't misunderstand me, I don't criticize Kane's actions in any way. He had a man talking in front of him, gave him his Miranda rights and asked him no questions, and, at that point, I think it did become a police-initiated question. The statement that preceded it certainly was just a general statement of did you see my girlfriend, she's a goodlooking woman, to that effect. So, based on the Jackson case, I'm afraid I have to allow the motion to

suppress.

MR. BLOOM: Does the motion address itself to the statement or --

THE COURT: The statement.

MR. HAMMERSCHMITH: As a result of that statement, Your Honor, the police went to the location given to Officer Kane by Mr. Perrot at the jail and apparently there found a purse, which I assume Mr. Bloom had intended to introduce in court. I would object to the introduction of that.

There is a handwritten addition to the motion, it was an oversight, I didn't mention the purse initially in the motion, but before filing it I made that addition and I advised Mr. Bloom of it, and I think that clearly the location of that purse was the fruit of the poisonous tree, as it were, and I think it is suppressable as a result of that.

THE COURT: Is there anything in

his original statement about discarding a purse?

MR. BLOOM: I don't know, Judge. Of course, we would have prepared something on inevitable discovery, in terms of where the purse was found, and I didn't have a chance to argue that --

MR. HAMMERSCHMITH: The original statement, Your Honor, was I left the pocketbook a few houses down the street. That statement was given on the 7th, three days before the statement.

THE COURT: Who is the officer that is going to testify to finding it?

MR. BLOOM: Sergeant Kelly. I would tell you this, Judge, that where it was found, as an officer of the Court, is consistent, it is a few houses down the street, and just for your own edification, timewise in this case will be Covel Street happened first, then the Malibu Street happened second, and where the purse is found as few houses down

the street in direct line between the house where one would have been walking, so this is a couple days after. I think I would have a legitimate argument under inevitable discovery that this would have been found, in any event, once there had been a scouring of the neighborhood.

THE COURT: When is Kelly going to take the stand?

MR. BLOOM: I think he will be the fifth witness.

THE COURT: We will go into it at that time.

MR. BLOOM: You want to voir dire him after we are done picking the jury? He will be here then.

THE COURT: We will voir dire him when he testifies. It will give you time to prepare whatever argument you want to present to me. That is, obviously, that was not the first time that the fact that he had discarded the

pocketbook after leaving the house.

MR. BLOOM: I'm sorry?

THE COURT: That was the not the first time that that came to the attention of the police, since the exact location -- I assume it was the exact location.

MR. BLOOM: I would say, for the record, on December 7th in reference to that, it says -- and I'm reading from the second paragraph -- "The reason I went there is I heard it had been broken into before. I had a pair of my sister's gloves on, they were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel. I kicked the rear inner door in, I entered the house and started looking through the house. I found a handbag and I took it with me. I left through the rear door. I left the pocketbook a few houses down the street. I left 33 Covel Street and went to 27 Malibu Street," which would

be right in the direction between the --

THE COURT: Okay, motion to suppress statement allowed. I haven't seen any addition to that motion.

MR. HAMMERSCHMITH: On the original of the motion, the opening paragraph, I believe that there is a handwritten few words.

THE COURT: "And the purse which was located as a result of the statement," okay. Allowed as to statement only. Defendant will have the opportunity to reopen the issue of the purse at the time Sergeant Kelly takes the stand.

All right, are we ready to impanel, gentlemen?

MR. BLOOM: Yes, sir.

THE COURT: We agree that there will be fourteen challenges a piece?

MR. BLOOM: Judge, are you going to ask -- there were two voir dire questions you are going to ask?

THE COURT: Right.

MR. BLOOM: Are you going to get an entire panel before you seat them, like you have done in the past? I find that is easier for the lawyers, if you don't mind doing it that way.

THE COURT: I am not going to ask individual voir dire.

MR. BLOOM: All right.

THE COURT: I am going to ask them as a group. There has been no request for an individual voir dire in the motion, as I recall it.

MR. BLOOM: I thought those two questions were a request for an individual voir dire. That's why I asked you --

MR. HAMMERSCHMITH: No, I hadn't requested an individual voir dire.

THE COURT: Okay. Now, all right, we are agreed there will be fourteen challenges.

I want to tell you for

scheduling purposes, too, gentlemen, on Thursday morning I have two cases coming in from Dukes County that are going to take perhaps about an hour, an hour and a half of my time starting at 11:00, and on Friday afternoon at 2:00 I've got to be in Northampton, and it is something I can't cancel, it is something I made arrangements for three months ago and I just can't cancel it, so take that into consideration as we move along here.

I am going to tell the jury we could anticipate the case may not get to them until either late this week or possibly as late as Monday, with interruptions. Unless you gentlemen think realistically we are going to get it to them Thursday.

MR. BLOOM: We may.

MR. HAMMERSCHMITH: I don't -- my understanding is Mr. Bloom has his last two witnesses coming in Wednesday at 11:00, so --

THE COURT: If we can do that, I can always get this case -- if this case is ready for the jury on Thursday morning, we will get it to the jury Thursday morning and I will take care of the other matters afterwards. I just wanted to give you that information for planning purposes.

Do you want a few minutes?

THE CLERK: Yes, Your Honor.

(Recess taken at 10:40 A.M.)

(Hearing reconvened at 10:50 A.M. The venire and defendant were present)

THE CLERK: Commonwealth move for trial?

MR. BLOOM: Yes, Your Honor, Commonwealth moves for trial on the eight indictments that I have given to

Mr. Hickson.

THE CLERK: George D. Perrot, please stand.

George D. Perrot, you are now set to the bar it be tried, and these persons whom I shall call are to pass between the Commonwealth and you upon your trial. If you would object to any of them, you must do so as they are called and before they are sworn.

You may be seated.

Will all the jurors please rise, raise your right hand.

(Whereupon, the venire was duly sworn)

THE COURT: Good morning, ladies and gentlemen. My name is John Murphy and I am and Associate Justice of the Superior Court assigned to preside at this particular trial.

The case we are about to impanel is a criminal case. The

defendant in the case is George D. Perrot of 87 Malibu Drive in Springfield, and Mr. Perrot is charged with armed robbery of Mary A. Prekop, indecent assault and battery on that same woman, assault and battery, aggravated rape, and armed burglary in a dwelling; he is also charged with assault with the intent to commit rape of Emily Lichwala, armed robbery of that same woman, and armed burglary in her residence. To these charges Mr. Perrot has pled not guilty.

Representing the Commonwealth in the trial will be Assistant District Attorney Francis Bloom, who is counsel at the far table standing here in front of you, and representing Mr. Perrot is Attorney James Hammerschmith, who has offices here in Springfield and who is counsel standing at that table in front of the bench.

We anticipate that it will

take about two or three days to try the case, which means that the case could get to the jury later this week. It is possible that it could go over as late as next Monday, depending if there are any interruptions. So I'd like to have you take that time schedule into consideration when I ask you questions about whether you will be eligible as a juror in this particular case.

Now, the prospective witnesses in the case -- these are prospective witnesses, it doesn't necessarily mean they will all testify, but the prospective witnesses in the case are Emily Lichwala of Springfield, Mary Prekop of Springfield, Robert Cheetham of the Springfield Police Department, Marianne Popko of the Springfield Police Department, Sergeant Thomas Kelly, Sergeant Thomas Kennedy, Thomas Jarvis and Richard Kane, all of the Springfield Police Department, Wayne

Oakes and William Eubanks, who are attached to the Federal Bureau of Investigation, Beverly Daly of Springfield, Nancy Westcott of Springfield, and Olivette Edwards of Springfield.

Now, with that basic information in mind, ladies and gentlemen, I am going to ask you some questions. After I have asked you these questions, if there is anything you feel you want to bring to the attention of the Court with regard to your ability to sit as an unbiased or indifferent juror in the case, just raise your hand, give your name and number to the court officer, we will bring you forward and discuss the matter with you.

Now, before I ask the questions, is there anything the defendant would have me add?

MR. HAMMERSCHMITH: Nothing additional, Your Honor.

THE COURT: Anything --

MR. BLOOM: No, sir.

THE COURT: All right, ladies and gentlemen, with that basic information in mind, my first question is, are you or any member of your family related to any party in the case, any prospective witness or any of the lawyers?

Let the record indicate that one hand has been raised.

After I have gone through the other questions, we will bring you forward.

Are you or any member of your family acquainted with or have you done business with any party to this case, any of the prospective witnesses or any of the lawyers?

Let the record indicate that two hands have been raised -- three hands have been raised.

Do you have any interest in this case?

CITY 003342



No hand has been raised.

Have you expressed any opinion about the case?

Again no hand has been raised.

Are you aware of any bias or prejudice with regard to this case or this type of a case?

Two hands have been raised -- three hands have been raised.

Have you or any of your close friends or relatives ever been the victim of a housebreak or a crime of violence?

Let the record indicate that at least a dozen hands have been raised.

Are you or any of your close friends or relatives a member of any police force, District Attorney's office or other law enforcement agency?

Let the record indicate that a half a dozen hands have been raised.

Would you be embarrassed to listen to testimony in this type of a

case or be embarrassed to discuss evidence of charges of this nature with fellow jurors during deliberation?

Let the record indicate that three hands have been raised.

Now, ladies and gentlemen, I know that you have all watched the instructional videotape of Judge Lynch's explanation of your duty as jurors, and I am, of course, referring to the videotape you saw when you first came to court this morning. In that tape he explained to you that in a criminal case, such as we have here, that a person accused of a crime is presumed to be innocent until proven guilty by the Commonwealth beyond a reasonable doubt. Now, under our law, a person is presumed to be innocent until proven guilty beyond a reasonable doubt.

Judge Lynch also told you, and I repeat it, that the burden of proving the defendant guilty beyond a reasonable

doubt rests entirely on the Commonwealth. This means, ladies and gentlemen, that a defendant in a criminal case is not required to produce any evidence of his innocence. A defendant has the right to remain inactive and to require the Commonwealth to go forward to produce evidence sufficient to prove his guilt. A defendant in a criminal case need not present any evidence on his own behalf. The burden of proving a defendant guilty beyond a reasonable doubt rests on the Commonwealth and it never shifts to the defendant. The Commonwealth has the burden of proving all elements of a crime charged beyond a reasonable doubt.

If any of you do not understand these principles and standards of proof or are not willing to accept them, please raise your hand.

Let the record indicate that no one has raised their hand.

My final question, ladies and gentlemen, is, do you know of any reason why you cannot or do not stand indifferent in this case or this type of a case?

Let the record indicate that two hands have been raised.

Those jurors who have raised your hand, please give your name and number to the court officer and we will bring you forward.

(The following conference was held at side bar with a juror)

THE COURT OFFICER: Panel one, seat one.

THE COURT: Mr. Krzminski?

THE JUROR: Yes, sir.

THE COURT: What would you like to tell me?

THE JUROR: I'd like to say I don't want to be involved in the jury

situation right now because of me going to court right now, in the process of going to court in the City of Chicopee for disorderly person, because I'm going to be asking for a jury myself.

THE COURT: Okay, I'm going to excuse you. I just ask you not to have any discussions with any of the other jurors, all right?

THE JUROR: Right.

THE COURT: Mr. Krzeminski is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat two.

THE COURT: Mr. Palazzi.

THE JUROR: I may know the family, I'm not sure.

THE COURT: Which one?

THE JUROR: Perrot. And also my mother was knocked down and her

pocketbook taken just recently.

THE COURT: Your mother was knocked down and what was taken?

THE JUROR: Her purse.

MR. BLOOM: It is the same family, I think, Judge.

THE COURT: Okay, I'm going to excuse you from the panel. I just ask you not to have any discussion with any of the other jurors.

THE JUROR: Yes, Your Honor.

THE CLERK: Mr. Palazzi is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat three.

THE COURT: Doctor Poppo?

THE JUROR: I have a bias against police officials.

THE COURT: Just police officials in general?

THE JUROR: Right.

THE COURT: You don't feel you could listen to testimony in the trial and not be influenced by that bias?

THE JUROR: Correct.

THE COURT: What brings that on, sir?

THE JUROR: I guess just my nature.

THE COURT: You practice medicine?

THE JUROR: Yes.

THE COURT: You are a physician?

THE JUROR: Yes.

THE COURT: Where do you practice?

THE JUROR: Springfield.

THE COURT: This doesn't spring from any other factor other than you have a general disbelief of police officers for no basic reason?

THE JUROR: I didn't say I have a disbelief. I tend to believe police officers.

THE COURT: Believe them. I'm sorry, I misunderstood you, I apologize.

Okay, sir, then I will excuse you from the panel. Thank you, sir.

(Next juror)

THE COURT OFFICER: Panel one, seat six.

THE COURT: Mrs. Rooney?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: When we first moved into our house, it was broken into and a lot of damage was done.

THE COURT: Was anybody ever arrested?

THE JUROR: No.

THE COURT: How long ago was that?

THE JUROR: Six years ago.

THE COURT: Were you living on Forest Street in Wilbraham at the time?

THE JUROR: Yes.

THE COURT: Do you think that might

affect your ability to sit in the case like this, where we are going to be dealing, as I understand it, with a breaking and entering into a home, it might affect your ability to sit as an unbiased juror in the case?

THE JUROR: Yes.

THE COURT: Your answer is yes?

THE JUROR: Yes.

THE COURT: Okay, Mrs. Rooney, I will excuse you from the panel.

Mrs. Rooney is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat seven.

THE COURT: Miss O'Donnell?

THE JUROR: I work at the Holyoke Police Department as a police matron and my brother is a police officer.

THE COURT: How long have you been

working --

THE JUROR: Just about three weeks.

THE COURT: How long has your brother been -- is he a police officer in Holyoke?

THE JUROR: Yes.

THE COURT: How long has he been there?

THE JUROR: Two years.

THE COURT: Did you go for any training?

THE JUROR: Just CPR training.

THE COURT: Do you think the fact that you have had this exposure to the Holyoke Police Department would affect your ability to sit as a juror in this case?

THE JUROR: No. I haven't heard anything about this case at all.

THE COURT: Do you think you could decide the case based on the evidence you hear and not be affected by the fact that you work -- do you work every

night?

THE JUROR: No, it's on an on-call job. I guard the women prisoners.

THE COURT: So you feel that you could decide this case based on the evidence and not be influenced by the fact that you work in the police department?

THE JUROR: Yup.

THE COURT: Miss O'Donnell remains on the panel.

MR. HAMMERSCHMITH: Excuse me, Your Honor, could I request a question concerning credibility of police officers as opposed to other witnesses?

THE COURT: Okay. Now, you are going to be in a position here where you are going to have to determine the credibility of police officers and whether they are, in effect, telling the truth or if there is contradictory evidence, you may have to make a decision as to whether the cop is

telling the truth or a lay witness is telling the truth. Now, do you think your work is going to interfere with that?

THE JUROR: No, I don't.

THE COURT: Okay. Miss O'Donnell remains on the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat eight.

THE COURT: Mrs. Vanderhoof?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I didn't know if Attorney McDonough had anything to do with this case. He used to be in the office that I work for.

THE COURT: Well, no, I don't believe he is going to participate in the case. He is attached to the

District Attorney's office now.

THE JUROR: I didn't know if it had anything to do with it. It doesn't bother me.

THE COURT: Would it affect your ability to sit in the case?

THE JUROR: I just work for attorneys and I knew him, so that's why I said -- they told me if I knew anybody, to say something.

THE COURT: Do you think you can decide the case based on the evidence and not be influenced by any fact that comes to your attention?

THE JUROR: Yes, it's criminal and I work in civil.

THE COURT: Okay. I will allow you to remain on the panel.

Mrs. Vanderhoof remains on the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat ten.

THE COURT: Mrs. Lyons?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I just don't think I'd be fair about the whole thing. I would feel uncomfortable in this type of a trial.

THE COURT: Well, I think most all of us are going to feel uncomfortable, jurors and lawyers and everybody, but do you think you could decide the case based on the evidence?

THE JUROR: I don't know.

THE COURT: Why is there a question in your mind, other than the fact that it would be uncomfortable?

THE JUROR: The fact that I am a woman, I guess, I don't know.

THE COURT: You think that would affect your judgment?

THE JUROR: It might.

THE COURT: You don't think you could decide it on the facts and not be influenced by the fact that the alleged victims are women?

THE JUROR: I don't know. I would want to be fair, but it would be hard for me.

THE COURT: Why would it be hard for you?

THE JUROR: Because I just don't know -- you can't always believe what you are hearing.

THE COURT: That's true. That's the whole purpose of a trial, for the jury to evaluate the witnesses and determine who is telling the truth and who is not. Now, you think you could do that?

THE JUROR: No.

THE COURT: And the reason is?

THE JUROR: I just don't think I could, because I think I'd feel right

away he was at fault.

THE COURT: Okay, Mrs. Lyons, I will excuse you from the panel. I'd ask you not to have any discussions with any of the other jurors.

Mrs. Lyons is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel one, seat twelve.

THE COURT: Mr. Shea?

THE JUROR: Yes.

THE COURT: Would you like to tell me?

THE JUROR: The only problem I have is I am partially prejudiced -- partial to being prejudiced.

THE COURT: In what way?

THE JUROR: Towards Hispanics or black people.

THE COURT: We are not dealing with

any Hispanics or black people in this case.

THE JUROR: I just wanted to state that.

THE COURT: Do you think -- as far as I know, there are no blacks or Hispanics involved in this case. Now, accepting that as a fact, do you think you could decide this case based on the evidence without being influenced by prejudice or bias and just accept the testimony?

THE JUROR: Yes.

THE COURT: Mr. Shea will remain on the panel.

Thank you.

(Next juror)

THE COURT OFFICER: Panel one, seat fourteen.

THE JUROR: Your Honor, I am a public works foreman, I'm on call

twenty-four hours for sewer emergencies. Also, Friday is my week for salt and sand operations, in case of emergencies I have to get operations set up Friday, trucks to be loaded, in the case of storm or emergency for the whole weekend, starting Friday. It's my turn to be on duty.

THE COURT: Nobody can take your place?

THE JUROR: No.

THE COURT: Nobody in the Public Works Department for the City of Holyoke, nobody can replace you?

THE JUROR: They won't do it.

THE COURT: The streets won't get sanded if you are not there and the pot holes won't get filled?

THE JUROR: They may, but there will be some ill-feelings there. They will reprimand me.

THE COURT: If they reprimand you, you let me know, and I'm sure you can

overcome the ill-feelings. I'm going to have you remain on the panel.

Mr. Iacchini will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat four.

THE COURT: Mrs. Carbonneau?

THE JUROR: It's not a problem with me, but I just wanted to let it be known that my in-laws were victims of a housebreak. You had mentioned that as one of the things.

THE COURT: I take it that is your husband's family?

THE JUROR: Yes.

THE COURT: How long ago did that occur?

THE JUROR: Maybe five or six years ago, seven years, I can't even remember.

THE COURT: As far as you know, was

anyone arrested?

THE JUROR: No.

THE COURT: Do you think the fact that this case is going to deal with, as I understand it, evidence of a housebreak and things that went on after the break inside the house, do you think that would affect your ability to sit in this case?

THE JUROR: I don't think so.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: All right, then I will have you remain on the panel.

Mrs. Carbonneau will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat five.

THE COURT: Mrs. O'Neill?

THE JUROR: Yes. As indicated on my questionnaire, we had a break into our home, my husband chased and caught the person, he was assaulted and at that time incurred medical expenses. My children were devastated, frightened out of their mind by the whole experience, and I really don't think I could be unbiased in this case.

THE COURT: Okay, I am going to excuse you from the panel. I just ask you not to have any discussions with any of the jurors.

Mrs. O'Neill is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat eight

THE COURT: Mrs. Nuzzolilli?

THE JUROR: I have a sister who lives on that street.

THE COURT: On which street?
THE JUROR: Malibu.
THE COURT: How often do you see your sister?
THE JUROR: I haven't seen her in a while.
THE COURT: What is a while?
THE JUROR: About a month or so.
THE COURT: How long has she lived on that street?
THE JUROR: About eight or nine years.
THE COURT: Do you recognize the name of Perrot?
THE JUROR: I don't know anybody on the street.
THE COURT: Is the fact that your sister lives on the street, do you think that would affect your ability to sit on this case?
THE JUROR: No. I just wanted to let you know that I had somebody that lived there.

THE COURT: Okay. Other than that, you are not asking to be excused?

THE JUROR: No.

THE COURT: What is the address?

THE JUROR: She lives on 40 Malibu Drive.

THE COURT: But you think that is not going to affect your ability to sit as a juror in this case?

THE JUROR: I don't think so.

THE COURT: The fact you may have to make judgments with regard to one of your sisters neighbors?

THE JUROR: No, I don't know any of her neighbors.

THE COURT: Okay, I will allow to you remain. Thank you very much.

Mrs. Nuzzolilli will remain on the panel.

MR. BLOOM: I would indicate just for the record that Mrs. Prekop lives at 27, I think she said her sister lived at 40. Perrot lived at 87. Mrs. Westcott,

who is his sister lives at 87, she is going to testify. The only thing I would point out for the record is Mrs. Prekop was raped three times, there's been a lot of publicity about it, a lot of stuff in the newspaper. You'd have to be asleep to live in that neighborhood and not know about it, so I don't know, I will leave it to your discretion, but there is a danger somehow it could get back to this woman.

THE COURT: I didn't realize all of them lived on the same street.

MR. HAMMERSCHMITH: One of the breaks was on another street.

MR. BLOOM: On the aggravated rape case, the woman lives on the same street.

THE COURT: This one here?

MR. BLOOM: Yes, the same street as this girl's sister and the defendant, where he was living at the time of the attack.

THE COURT: Any comments?

MR. HAMMERSCHMITH: I think she should be excused.

THE COURT: Mrs. Nuzzolilli.

(Juror returns to side bar)

THE COURT: Counsel has brought to my attention apparently there is going to be quite a bit of testimony of various people that live on that street, not just Mr. Perrot, so I am going to excuse you from the panel rather than put you in an embarrassing position, all right?

THE JUROR: Okay.

THE COURT: Mrs. Nuzzolilli is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat ten.

THE COURT: Mrs. Kalajian. What would you like to tell me?

THE JUROR: I have been broken into twice in the past ten years, nothing happened to me, but at the time it happened I was not at home.

THE COURT: It happened when you were at home?

THE JUROR: What I was not home, nobody was home.

THE COURT: Was anyone arrested?

THE JUROR: No, they never found them.

THE COURT: We are going to be dealing here with breaking and entering, as I understand it, and two women in the house were both at home. Do you think that would affect your ability to sit as an unbiased juror in this case?

THE JUROR: No.

THE COURT: Do you think you could decide this case on the evidence and not be influenced by the fact that you have

gone through a similar experience, other than the fact that you weren't at home when it occurred?

THE JUROR: I don't think it would affect my feeling, because it was altogether different than this case, nothing happened to me, so --

THE COURT: How long ago were the breaks?

THE JUROR: One was about ten years ago and the other one was about five years ago. It's a scary experience, all right.

THE COURT: What type of damage was done or what was stolen?

THE JUROR: Some money, jewelry, silverware.

THE COURT: There is going to be evidence here of things being stolen from the house, as I understand, also a door kicked in. Do you think that would affect your ability to sit in this case unbiasedly?

THE JUROR: No, I really don't think so, because --

THE COURT: How did they get into your house, do you know?

THE JUROR: Through the -- they opened the door, and I have locks on it, so --

THE COURT: So you feel you could sit on this case?

THE JUROR: I think so.

THE COURT: Any question in your mind that you wouldn't be affected by this prior experience?

THE JUROR: I have forgotten about it, nobody was ever found, I now have bolt locks on my door, so I feel a little more secure.

THE COURT: You're telling me you can sit on this jury and not be affected by that experience, decide it on the evidence in this case and not have your own experience play a part in the decision?

THE JUROR: I guess it might if I --

THE COURT: Okay, I will excuse you from the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat twelve.

THE COURT: Mrs. Candido?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: Two questions. The first on housebreaks, I have had two sisters that have had housebreaks, one on two occasions. The second is I work for postal inspectors and, consequently, with all law enforcement agencies.

THE COURT: Where do your sisters live?

THE JUROR: Denver Street, Springfield.

THE COURT: Was anyone arrested for those breaks?

THE JUROR: No, they weren't able too find who they --

THE COURT: Were they at home at the time the breaks occurred?

THE JUROR: No.

THE COURT: I take it the law enforcement people are in and out of your office?

THE JUROR: Yes.

THE COURT: As a postal inspector?

THE JUROR: Indeed.

THE COURT: We are going to have law enforcement people testifying in this case. Do you think your experience might affect you? You are going to have to make a decision over cops telling the truth or the layman telling the truth. You are going to have to evaluate the testimony of police officers in deciding the case. Do you think your work might influence your decision?

THE JUROR: I hate to say this, but I'd like to say no, but I think it would.

THE COURT: I appreciate it. In light of the fact of your sisters' experience, too, I will excuse you from the panel.

THE JUROR: Thank you.

THE COURT: Miss Candido is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat fourteen.

THE COURT: Mr. Pighetti?

THE JUROR: Your Honor, sometime before I got my summons for jury duty, we had made plans to go to California, I have purchased plane tickets for next Tuesday morning at seven o'clock. I was wondering if this is going to interfere with the case.

THE COURT: It would be an outside -- really an outside chance.

MR. HAMMERSCHMITH: I'm going to California on Wednesday afternoon, so --

THE COURT: I don't think it is going to affect -- if won't interfere with your trip. We are going to impanel additional jurors, so if something comes up and there is a delay, there will be additional jurors.

THE JUROR: In other words -- but if I were to be picked for this jury and it came up to Monday night, I would be dismissed?

THE COURT: Once you start deliberation, you couldn't be dismissed, but if at the time deliberations start and it looks like it is going to interfere with your trip, we could take care of it at that time.

Agreed, gentlemen?

MR. BLOOM: Yes, sir.

THE COURT: Mr. Pighetti will

remain on the panel.

(Next juror)

THE COURT OFFICER: Panel two, seat sixteen.

THE COURT: Doctor Mausel?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: The length of the trial is a problem. I am a member of an emergency physician group, coverage is very short, one of the doctors just got cancer and is dying and we are absolutely up tight for coverage, and there are no new doctors coming into this state.

THE COURT: I heard about that.

THE JUROR: And it is going to get worse. That is a real problem.

THE COURT: Okay, Doctor, I will excuse you from the panel.

Doctor Mausel is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat two.

THE COURT: Mr. Goodreau?

THE JUROR: Yes, sir.

THE COURT: What would you like to tell me?

THE JUROR: I have a first cousin who's a police officer in Springfield.

THE COURT: What is his name?

THE JUROR: Alan Goodreau.

THE COURT: How long has he been on the force?

THE JUROR: I couldn't really tell you, I have only seen him one time in twenty years.

THE COURT: Do you think that would affect your ability to sit in in case?

THE JUROR: No.

THE COURT: Thank you for bringing it to our attention.

Mr. Goodreau will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat five.

THE COURT: Mr. Orlick?

THE JUROR: Yes. I'm scheduled for major surgery on Friday morning.

THE COURT: Okay, it is conceivable we could go into that date.

THE JUROR: I'd gladly sit the next three days, but --

THE COURT: I think we might be -- it is a possibility the case wouldn't be over by then, so I will excuse you from the panel.

Mr. Orlick is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat seven.

THE COURT: Mr. Scott?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I'm one of the presiding ministers of the Jehovah Witnesses, and due to conscience matter, I do not sit on criminal cases.

THE COURT: Have you been called before?

THE JUROR: No, this is the first time, sir.

THE COURT: I didn't understand your statement when you said you usually don't --

THE JUROR: Well, Jehovah Witnesses usually do not sit on criminal cases.

THE COURT: Are you asking me to excuse you on the basis of your religion?

THE JUROR: Yes, sir.

THE COURT: All right, Mr. Scott, I will excuse you from the panel.

Mr. Scott is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat eight

THE COURT: Ms. Otero?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I have a case pending.

THE COURT: It is a civil case, I take it from your statement.

THE JUROR: Yes.

THE COURT: And it is -- that is a civil case?

THE JUROR: I don't know, the lawyer's secretary fill it out for me.

THE COURT: It says, "I am

presently a defendant in a civil lawsuit against the Commonwealth. The case is pending approximately five years. I was a party in a civil suit that has been settled." Do I read that correctly?

THE JUROR: Yes.

THE COURT: Do you think the fact that those cases have been the subject matter of your concern, at least, would affect your ability to sit in this case, where the Commonwealth is a party to the case?

THE JUROR: I don't know.

THE COURT: You think it might?

THE JUROR: I don't understand that, what you mean.

THE COURT: Well, the fact that you've got a suit against the Commonwealth of Massachusetts, I take it from what is stated here, and the Commonwealth is a party to this case, they are the prosecution, and do you think that fact would affect your

ability to sit as an unbiased juror in this case?

THE JUROR: No.

THE COURT: What does that suit involve, do you know, the suit that you have against the Commonwealth?

THE JUROR: They busted in my house --

THE COURT: They busted into your house?

THE JUROR: Yes, and they took my money, and my boyfriend uses drugs, so they took his drugs.

THE COURT: So I take it someone broke into your house?

THE JUROR: The detectives broke into the house.

THE COURT: Well, now, we are going to have detectives testifying in this case. You think that might be a problem?

THE JUROR: Yes.

THE COURT: Okay, I will excuse you

from the panel.

Miss Otero is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat eleven.

THE COURT: Ms. Rzewnicki?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I just have one problem. My brother was convicted of a felony, my brother was arrested and sent to jail for armed robbery.

THE COURT: How long ago ago was this?

THE JUROR: It had to be like five years ago.

THE COURT: Where was he living at the time?

THE JUROR: At my mother's house in

Chicopee.

THE COURT: So it was in this Court?

THE JUROR: No -- well, I'm not sure. He went to jail in Greenfield.

THE COURT: You don't know where the alleged offense took place, do you?

THE JUROR: No, I just know that it was a package store robbery. He was in on it with one of my brother's friends.

THE COURT: Here we are talking about robbery. The allegations -- one of the allegations is armed robbery. Do you think that would affect your ability to sit --

THE JUROR: I think so.

THE COURT: I will excuse from you the panel.

Ms. Rznewnicki is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat twelve.

THE COURT: Mr. Trinchini, what you would you like to tell me?

THE JUROR: It is two parts. One, my house was broken into on three different occasions, and it was a pretty traumatic experience for my wife. That was approximately five years ago.

THE COURT: Was she in the house at the time?

THE JUROR: No. Right after it happened.

THE COURT: What was the other thing?

THE JUROR: I am self-employed and I do have people working right now.

THE COURT: What do you do?

THE JUROR: Structural steel, I have people working on the bridge. We all want to see the bridge open.

THE COURT: The North End Bridge?

THE JUROR: Right.

THE COURT: So you have had those experiences with the B and E's, and that would affect your ability to sit in the case?

THE JUROR: I really couldn't answer that until it happened.

THE COURT: Is there a question in your mind?

THE JUROR: Yes, there is.

THE COURT: I will excuse you from the panel. Thank you very much.

Mr. Trinchini is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel three, seat fifteen.

THE COURT: Mrs. Carroll?

THE JUROR: Yes. My brother's house was broken into two years ago by two young kids and lots of things were stolen that were never found again, and

then I also -- my daughter has seizures and she's on medication four times a day, so if I had to stay over, it would be kind of hard.

THE COURT: I will excuse you from the panel, Mrs. Carroll.

Mrs. Carroll is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat two.

THE COURT: Ms. Davis?

THE JUROR: I had stated on the sheet that I am a Jehovah's Witness and I can't sit in a criminal case.

THE COURT: The statement on the form she is referring to, "As one of Jehovah's Witnesses, I do not want to serve as a juror in any criminal case," and then it goes on to talk about civil cases.

Are you asking me to excuse you on religious grounds?

THE JUROR: Yes.

THE COURT: All right, I will excuse you.

(Next juror)

THE COURT OFFICER: Panel four, seat three.

THE COURT: Miss Henriques?

THE JUROR: Yes, breaking and entering, my son and my neighbors were broken into.

THE COURT: How long ago was that?

THE JUROR: Two years ago.

THE COURT: Anyone arrested for it?

THE JUROR: No one was ever caught.

THE COURT: Do you think that would affect your ability to sit in this case, where we are going to be dealing with a breaking and entering and stealing within the house?

THE JUROR: No.

THE COURT: How long ago did it happen to your son?

THE JUROR: His was three years ago.

THE COURT: How about your neighbors?

THE JUROR: A year and a half about.

THE COURT: How did they get into the house, do you know?

THE JUROR: Back window.

THE COURT: No one was ever arrested.

THE JUROR: No one.

THE COURT: What was taken from your son's house?

THE JUROR: All his stereo equipment, his TV, anything of any value.

THE COURT: Here we will be talking about a breaking and entering. You understand there is going to be some

evidence of drug use, and kicking the door in, stealing from the house and all the while the people were in there. Do you think you could sit as an unbiased juror in a case like that?

THE JUROR: I think so.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: All right, I will allow you to remain on the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat eight.

THE COURT: Mr. O'Toole?

THE JUROR: Yes. Two things that you mentioned. The first one was that my parents' home was broken into fifteen years ago, it wasn't very traumatic or anything like that, so I don't see it as such a big deal. The second is that two

of my best friends are police officers.

THE COURT: What department is that?

THE JUROR: Westfield and West Springfield.

THE COURT: How long have they been cops?

THE JUROR: Well, the one in Westfield has been just about two years and the West Springfield one is actually still in the academy.

THE COURT: Here you are going to have to make a decision with regard to police officers testifying in the case and credibility of those police officers. Do you think the fact that your friends are police officers would affect your ability to sit in this case?

THE JUROR: No.

THE COURT: You are a claims rep. What type of claims do you handle?

THE JUROR: Bodily injury.

THE COURT: Do you deal with the

police?

THE JUROR: Well, not so much on a one to one basis, but I look at the police reports and investigate the accidents.

THE COURT: How long have you been doing that?

THE JUROR: About a year and a half.

THE COURT: So you feel that the fact that -- how about when someone broke into your parents' home, anyone arrested for that?

THE JUROR: I don't think so, no.

THE COURT: Where do they live?

THE JUROR: West Springfield.

THE COURT: Do you think that would affect your ability to sit as an unbiased juror in this case?

THE JUROR: No.

THE COURT: And the fact that your two friends are cops wouldn't affect your ability?

THE JUROR: I don't believe so.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: Mr. O'Toole will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat eleven.

THE COURT: Mrs. Remillard, what would you like to tell me?

THE JUROR: My daughter's girlfriend Kim was raped a couple years ago and her parents didn't want to make any big issue of it, but the emotional trauma, I don't know if I could stop thinking about that during a trial like this, I really don't.

THE COURT: Okay. That is the reason we ask these questions and ask you to come forward. I appreciate it.

I will excuse you from the panel.

Mrs. Remillard is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat fourteen.

THE COURT: Mr. Cross?

THE JUROR: Yeah. One of the police officers I went to school with.

THE COURT: What is his name?

THE JUROR: Kennedy.

THE COURT: Where was that, high school?

THE JUROR: Holyoke Community.

THE COURT: How long ago was that?

THE JUROR: Seven years ago.

THE COURT: Have you seen much of him since then?

THE JUROR: No.

THE COURT: Do you think the fact that Kennedy was in school at the same

time you were would affect your sitting as an unbiased juror in this case?

THE JUROR: No.

THE COURT: I will allow you to remain on the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat twelve.

THE COURT: Mr. Russell, what would you like to tell me?

THE JUROR: The fact of your question about people that you know being robbed, just I have relatives, a brother was robbed twice in the same week.

THE COURT: Was it a B and E?

THE JUROR: Yes.

THE COURT: Where was he living then?

THE JUROR: Montgomery.

THE COURT: Anyone arrested for

this?

THE JUROR: No.

THE COURT: Now, the fact that your brother had a breaking and entering into his house, we are going to be dealing with a breaking and entering here and theft from the house. Do you think that would affect your ability to sit on this trial and not be affected by the fact that your brother had a similar experience?

THE JUROR: I don't think so.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: Anything else you wanted to bring to my attention other than your brother's experience?

THE JUROR: No.

THE COURT: Okay, Mr. Russell, I will allow you to remain on the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat fifteen.

THE COURT: Mrs. Meyers?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: Well, first of all, I'm a neighbor and acquaintance of Mr. Bloom. I have a son who is an attorney.

THE COURT: Practicing in Springfield?

THE JUROR: In Boston. And we did have a break-in seven years ago, nobody was home, it was non-violent, it was strictly robbery.

THE COURT: Was anyone arrested for the break?

THE JUROR: Not to my knowledge.

THE COURT: Do you think those combinations of circumstances would affect your ability to sit on this case, where Mr. Bloom is obviously going to be

the prosecutor -- I take it he is still your neighbor?

THE JUROR: Yes, I hope so for a long time.

THE COURT: You are going to be running in to him from time to time at the bus stop and whatever?

THE JUROR: Backyards.

THE COURT: I think I will excuse you from the panel. Thank you.

Mrs. Meyers is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel four, seat sixteen.

THE COURT: Mrs. Cortis?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I would have a problem discussing any sexual aspects with other

members of the jury. I would be real embarrassed. I don't think I could be fair to that man, because when you had read what he was charged with, I looked at him and kind of already made up my mind. I never thought I'd hear myself say that, that I would judge someone before. I guess I'm more prejudice than I ever thought.

THE COURT: Okay. That is why we ask that question.

THE JUROR: It makes me feel embarrassed.

THE COURT: Don't be embarrassed. I appreciate you coming forward. I will excuse from you the panel.

Mrs. Cortis is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat one.

THE COURT: Dr. Kantor?

THE JUROR: Yes, Your Honor, I have a full schedule of patients undergoing treatment. My concern is that I might be liable for any negligence. I have one patient coming in this week from Manchester, New Hampshire, it's been postponed several times and a great inconvenience to himself.

THE COURT: Well, I doubt if your service as a juror would be evidence of negligence in a malpractice trial, Dr. Kantor. And do you operate alone?

THE JUROR: Yes, I do, sir.

THE COURT: Is this just the one patient you are concerned about?

THE JUROR: No, there are several postoperative treatment, route canal, surgery.

THE COURT: Do you operate in a hospital or in your office?

THE JUROR: In my office, sir.

THE COURT: Well, Doctor, I usually

wouldn't excuse you for that reason, however, I will excuse you in this case.

THE JUROR: Thank you, sir.

THE COURT: Doctor Kantor is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat two.

THE COURT: Mr. Heffernan?

THE JUROR: I attended school in Springfield with Sergeant Thomas Kennedy, one of the witnesses in this case.

THE COURT: What school?

THE JUROR: Our Lady of Hope School.

THE COURT: That is grammar school?

THE JUROR: Yes.

THE COURT: How long ago was that?

THE JUROR: About fifteen years ago.

THE COURT: Have you seen much of him since?

THE JUROR: No, I haven't seen him.

THE COURT: Do you think the fact you went to grammar school with him -- who is it, Kennedy?

THE JUROR: Yes.

THE COURT: -- would affect your ability to sit as an unbiased juror in this case?

THE JUROR: No, I don't think so.

THE COURT: I will allow you to remain on the panel.

(Juror leaves side bar)

MR. HAMMERSCHMITH: Before we go on, I just wanted to make sure I understood for the record what the testimony of Officer Kennedy was going to relate to. I believe it was just chain of custody.

MR. BLOOM: I would indicate this.

When this gentleman came in the courtroom, he waived --

THE COURT: Can I see you a minute.

(Juror returns to side bar)

THE COURT: Do you know the defendant?

THE JUROR: No, I don't believe so.

THE COURT: Okay.

THE JUROR: I didn't really look at him. You want me to take a look at him?

THE COURT: You can take a look at him, if you think you recognize him.

THE JUROR: No.

THE COURT: I will allow you to remain on the panel, Mr. Heffernan.

(Juror leaves side bar)

MR. HAMMERSCHMITH: Just for my own information, I want to be sure we are talking about Officer Kennedy about a

chain of custody witness rather than anyone who has anymore direct --

MR. BLOOM: He witnessed the blood being taken out of Perrot's arm that ultimately in '87 was taken down to Washington, that he took down himself. Other than that --

(Next juror)

THE COURT OFFICER: Panel five, seat nine.

THE COURT: This is Mr. Hurley?

THE JUROR: My sister was assaulted and robbed in Boston several years back and hospitalized.

THE COURT: What was robbed from her, do you know?

THE JUROR: It was a purse snatching basically, but she was kind of beaten up a little bit.

THE COURT: Anyone arrested?

THE JUROR: No one.

THE COURT: This is a case whereas I understand the evidence is going to be about a breaking and entering and a grabbing of a purse in a house. Do you think that would affect your ability to sit in this case?

THE JUROR: I'd like to say no, but I'm afraid yeah, I'm a little biased.

THE COURT: I will excuse you from the panel.

Mr. Hurley is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat seven.

THE COURT: Mrs. Surprenant?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: Well, I could not be impartial to this case, because I had a

daughter that was mugged about a year and a half ago.

THE COURT: She was mugged?

THE JUROR: Yes.

THE COURT: Okay. I take it it involved drugs, is that right?

THE JUROR: No, he just mugged her and banged her up and forced her in the car and she had to jump out of the car to save herself.

THE COURT: Okay. I'm going to excuse you from the panel.

THE JUROR: Thank you.

(Next juror)

THE COURT OFFICER: Panel five, seat eight.

THE COURT: Mrs. Maliga?

THE JUROR: I think I would be too nervous right offhand and scared like I am now.

THE COURT: Well, do you think --

THE JUROR: I am forgetful sometimes in words.

THE COURT: Do you think -- I think you'd get over the nervousness. I think anyone of us would be nervous. Do you think, other than that, any reason why you need to be excused?

THE JUROR: I am borderline diabetic, I don't know if that would be an excuse.

THE COURT: Are you taking medication?

THE JUROR: No, I'm not taking medication, just for my palpatations.

THE COURT: Palpatations?

THE JUROR: Yes.

THE COURT: And that is --

THE JUROR: For my irregular heart.

THE COURT: Are you asking me to excuse you?

THE JUROR: Well, in a way I am.

THE COURT: For medical reasons or just that the nervousness?

THE JUROR: The nervousness more than anything.

THE COURT: Do you think that would affect your heart problem?

THE JUROR: No, I don't think so. I think I could calm myself.

THE COURT: You really want me to excuse you?

THE JUROR: Yes.

THE COURT: Okay, I will excuse you.

THE JUROR: Thank you.

(Next juror)

THE COURT OFFICER: Panel five, seat ten.

THE COURT: Mr. Mesecher. What would you like to tell me?

THE JUROR: I'm a military police officer at Westover, correctional officer for the State of Connecticut.

THE COURT: Where do you work in

the State of Connecticut?

THE JUROR: Enfield Minimum Security.

THE COURT: How long have you been with the security police at Westover?

THE JUROR: Twelve years.

THE COURT: What is your position?

THE JUROR: I'm a security supervisor.

THE COURT: A civilian?

THE JUROR: Military.

THE COURT: But what is your rank?

THE JUROR: My rank is master sergeant.

THE COURT: You have been involved in that for a while?

THE JUROR: For twelve years.

THE COURT: We are going to be dealing with police officers testifying and judging the credibility of those police officers with regard to alleged statements made by the defendant. Do you think that your background is going

to affect your ability in this case?

THE JUROR: I think so.

THE COURT: Okay, I will excuse you, sir. Thank you.

Mr. Mesecher is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat eleven.

THE COURT: Mrs. Novak?

THE JUROR: Yes. I have been a victim of my own home being broken into. I also have two small children at home and it would be very difficult to find a babysitter for this amount of days.

THE COURT: Three years and seven months?

THE JUROR: Yes.

THE COURT: How long ago was the break at your house?

THE JUROR: About three years ago.

THE COURT: Anyone arrested?
THE JUROR: No, nobody was.
THE COURT: Do you think that would affect your ability to sit in this case?
THE JUROR: Yes, sir.
THE COURT: I will excuse you.
Mrs. Novak is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat twelve.
THE COURT: Mrs. McDonald?
THE JUROR: My nephew is on the police force in Springfield.
THE COURT: What is his name?
THE JUROR: Daniel Maloney.
THE COURT: How long has he been a police officer?
THE JUROR: Five, eight years.
THE COURT: Do you see much of him?
THE JUROR: Oh, yeah.

THE COURT: We are going to be dealing with police officers from the Springfield Police Department testifying in this case. Do you think that that is going to be a problem for you sitting on the jury?

THE JUROR: I think it might pose a problem.

THE COURT: All right, I will excuse you from the panel.

Miss McDonald is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat fifteen.

THE COURT: Mr. Ekmalian?

THE JUROR: Yes, sir. My problem is a problem I have at home. My wife is crippled with rheumatoid arthritis and she shouldn't be left alone all day.

THE COURT: No one else is at home?

THE JUROR: No.

THE COURT: Okay, sir, I will excuse you from the panel.

Mr. Ekmalian is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel five, seat sixteen.

THE COURT: Mrs. Kearns?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: Your Honor, several things. One is that our house was broken into about five years ago, you asked that question. Another is I know several of the people in the courtroom.

THE COURT: Who do you know in the courtroom?

THE JUROR: Judy Fiorentino and Bob Perkins.

THE COURT: They are impartial.

THE JUROR: I figured they were. And also I might have a preconceived idea about this nature of the case, because of the charge. I don't think I could be --

THE COURT: Which one?

THE JUROR: I don't think I could be impartial.

THE COURT: How long ago was the break-in at your house?

THE JUROR: About five years.

THE COURT: Anyone arrested?

THE JUROR: Not that I know of. It was -- they never found who did it.

THE COURT: Was anyone at home at the time?

THE JUROR: No.

THE COURT: Do you think that would affect your ability --

THE JUROR: It could. It made a definite impression on me.

THE COURT: I will excuse you from

the panel.

Mrs. Kearns is excused from the panel.

(Juror leaves side bar)

MR. HAMMERSCHMITH: Your Honor, there are two jurors who didn't come forward, but I think inquiry may be appropriate.

Juror 4-9 has the notation police officer here and I don't know --

THE COURT: That is what number?

MR. HAMMERSCHMITH: It says 4-9, but it was in the place of 2-9 on the forms I received.

THE COURT: What about her?

MR. HAMMERSCHMITH: She has listed police officer here. I don't believe she was one of the ones who came forward, and I don't know what that notation means.

MR. BLOOM: He works for -- I have

done a million cases with him and he is assigned to Kelly, Kelly is his boss.

MR. HAMMERSCHMITH: I didn't realize it was Marty Bryant.

MR. BLOOM: If she is here, she can't sit on this case, obviously.

MR. HAMMERSCHMITH: The other one, there is a reporter from the Springfield Union News. I don't think there's been any recent publicity in this case, but I know in fact there has been a lot of notoriety here, and I just would be afraid that someone in that position may --

THE COURT: Do you want me to bring him forward and question him?

MR. HAMMERSCHMITH: I think it would be appropriate, Your Honor.

THE COURT: What is that number?

MR. HAMMERSCHMITH: That is 2-15.

THE COURT: Bring 4-9 and 2-15.

MR. BLOOM: Did you ask them if they have read anything?

THE COURT: No. I asked them if they formed any opinion about it.

THE COURT OFFICER: 4-9 is not here.

THE COURT: How about 2-9?

THE COURT OFFICER: I don't get any answer for 4-9 or 2-9.

(Juror comes to side bar)

THE COURT: What is your number again?

THE JUROR: 2-15.

THE COURT: It's been brought to my attention that you work for the Union News.

THE JUROR: Yes.

THE COURT: This is juror 2-15, Mrs. Kimball?

THE JUROR: Yes.

THE COURT: And do you recall having any information about this case, having read about it or heard about it?

THE JUROR: No.

THE COURT: So you don't have any information one way or the other about this?

THE JUROR: No, I write feature stories, I don't work for the news.

THE COURT: So there is no information in your background about this particular case?

THE JUROR: No.

THE COURT: Okay, Mrs. Kimball will remain on the panel.

(End of side bar conference)

THE CLERK: Juror number 1-7, Vicki O'Donnell, please come forward and take seat number one. Juror number 1-8, Mary Vanderhoof, please take seat number two. Juror number 1-9, Lisa Roberts, please take seat number three. Juror number 1-11, Earl Bean, Jr., please take seat number four. Juror number 1-12,

James Shea, please take seat number five. Juror 1-13, Alan Rich, please take seat number six. Juror number 1-14, Lino Iacchini, please take seat number seven. Juror number 1-15, Richard Pease, please take seat number eight. Juror number 2-1, James Grady, Jr., please take seat number nine. Juror number 2-2, William Covington, please take seat number ten. Juror number 2-3, Ernest Davieau, please take seat number eleven. Juror number 2-4, Margaret Carbonneau, please take seat number twelve. Juror number 2-6, Eva Matte, please take seat number thirteen. Juror number 2-7, Everett Baillieul, please take seat number fourteen.

THE CLERK: Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: Will the following

jurors please step down from the panel, having been challenged by the Commonwealth: Juror number 1-7, Vicki O'Donnell; juror number 1-9, Lisa Roberts; juror number 1-15, Richard Pease; and juror number 2-1, James Grady, Jr.

Juror number 2-9, Sylvia Mace, please take seat number one.

MR. BLOOM: What was the number?

THE CLERK: She was excused upstairs.

Juror number 2-11, John Hicks, please take seat number one. Juror number 2-13, Girard Ford, please take seat number three. Juror number 2-14, David Pighetti, please take seat number eight. Juror number 2-15, Mary Kimball, please take seat number 9.

Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: Will the following jurors please step down from the panel, having been challenged by the Commonwealth: 2-11, John Hicks; and juror number 2-15, Mary Kimball.

Juror number 3-2, James Goodreau, please take seat number one. Juror number 3-3, William Diamond, please take seat number nine.

MR. BLOOM: Satisfied.

THE CLERK: Commonwealth satisfied.

Defendant challenge.

(Whereupon, Mr. Hammerschmith approached the clerk)

THE CLERK: Will the following jurors please step down from the panel, having been challenged by the defendant: 1-8, Mary Vanderhoof; 2-4, Margaret Carbonneau; 1-11, Earl Bean, Jr.; 2-13, Girard Ford; 2-2, William Covington; 2-3, Ernest Davieau; 2-6, Eva Matte; and

1-13, Alan Rich.

Juror number 3-4, James Williams, please take seat number two. Juror number 3-6, Paul Parentela, please take seat number three. Juror number 3-9, Diane Graham, please take seat number four. Juror number 3-13, Donald Bedford, please take seat number six. 3-16, Robert Roy, please take seat number ten. Juror number 4-3, Eleanor Henriques, please take seat number eleven. Juror number 4-4, Blair Gaudreau, please take seat number twelve. Juror number 4-6, Annie Morales, please take seat number thirteen.

THE CLERK: Defendant challenge.

(Whereupon, Mr. Hammerschmith approached the clerk)

THE CLERK: Will the following jurors please step down from the panel, having been challenged by the defendant:

CITY 003421



Juror number 3-13; Donald Bedford; and juror number 4-3, Eleanor Henriques.

Juror number 4-8, Michael O'Toole, please take seat number six. Juror number 4-10, Pearl Plouffe, please take seat number eleven.

Defendant challenge.

(Whereupon, Mr. Hammerschmith approached the clerk)

THE CLERK: Will juror number 4-8, Michael O'Toole, please step down from the panel, having been challenged by the defendant.

Juror number 4-12, James Russell, please take seat number six.

Defendant challenge.

MR. HAMMERSCHMITH: Defendant is satisfied.

THE CLERK: Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: Will the following jurors please step down from the panel, having been challenged by the Commonwealth: 3-4, James Williams; 3-6, Paul Parentela; 3-16, Robert Roy; 4-6, Annie Morales.

Juror number 4-13, Patricia Drewniak, please take seat number two. Juror number 4-14, Michael Cross, please take seat number three. Juror number 5-2, Timothy Heffernan, please take seat number ten. Juror number 5-3, William Bard, please take seat number thirteen.

Commonwealth challenge.

MR. BLOOM: Judge, can I see you for a moment.

(The following conference was held at side bar)

MR. BLOOM: 5-3, which was the last juror that just went in there, I just prosecuted a Bard out of Westfield, the

kid would have been about 25 or 26 years old, he broke into the Big Y and stole about $100,000, him and another kid, and they are from Westfield.

Would it be possible to ask him -- I think the kid's first name is Richard -- whether he has a son who is in prison at the present time? I didn't intend otherwise to challenge him, but if it is the father, I'm obviously going to use a challenge.

THE COURT: Mr. Bard, would you come forward, please.

(Whereupon, the juror came to side bar)

THE COURT: Mr. Bard, do you have a son named Richard?

THE JUROR: Yes.

THE COURT: Was he involved in --

THE JUROR: A theft.

THE COURT: He was?

THE JUROR: Yes, and he served his

time.

THE COURT: He was prosecuted by this office?

THE JUROR: Right.

THE COURT: Okay, Mr. Bard, thank you.

MR. BLOOM: I would just ask the record to reflect that he wasn't only prosecuted by the office, I prosecuted him. I think, under the circumstances, in fairness, he ought to be excused. It seems a little bit of a stretch of the imagination that there wouldn't be a little bit of ill will harbored in light of the fact that one of his sons --

THE COURT: Was it a trial?

MR. BLOOM: He ended up pleading guilty and he got either a six to nine or a five to nine, he went to States Prison.

THE COURT: I am inclined to agree with you.

MR. BLOOM: I don't know why he

didn't say anything. The question is pretty direct on whether he or any of his family has had any contact with --

THE COURT: Okay.

MR. BLOOM: -- criminal proceeding, and he answered the question no.

THE COURT: Okay.

THE CLERK: Excused by the Court. That leaves us two left until we get a new panel down.

(End of side bar conference)

THE CLERK: Juror number 5-3, William Bard, please step down from the panel, excused by the Court.

Juror number 5-5, Conrad Simmons, please take seat number thirteen.

THE CLERK: Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: The following jurors please step down from the panel, having been challenged by the Commonwealth: Juror number 5-2, Timothy Heffernan; juror number 5-5, Conrad Simmons.

Juror number 5-6, Darrel Bewsee, please take seat number ten. Juror number 5-13, Diane St. Pierre, please take seat number thirteen.

Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: Juror number 5-6, Darrel Bewsee, please step down from the panel, having been challenged by the Commonwealth.

Juror number 5-14, James Crocker, please take seat number ten.

MR. BLOOM: Satisfied, Your Honor.

THE CLERK: Defendant challenge.

(Whereupon, Mr. Hammerschmith approached the clerk)

THE CLERK: Will jurors number 4-13, Patricia Drewniak, please step down from the panel, having been challenged by the defendant; and juror number 4-14, Michael Cross, please step down from the panel, having been challenged by the defendant.

THE COURT: Ladies and gentlemen, we are going to have to continue further with the impanelling process, but until we are ready to do that, I am going to give you a brief recess. You can go with the court officer and have an opportunity to get rid of your coats.

I would instruct you at this time that there is to be no discussion among yourselves about the case, even though you only have a bare outline of information, so I will elaborate on that instruction a little later, but as of right now, we will take a brief recess

(Brief recess taken at 12:30 P.M.)

(Hearing reconvened at 12:40 P.M. Another venire was present in the courtroom)

THE COURT: Good afternoon, ladies and gentlemen. My name is John Murphy, and I am the Associate Justice of the Superior Court that has been assigned to preside at this particular trial, and we are in the process of impanelling a jury in a criminal case.

The defendant in the case is George D. Perrot of 87 Malibu Drive in Springfield. Mr. Perrot has been charged with the armed robbery of Mary A. Prekop, indecent assault and battery on that same woman, assault and battery on Mary A. Prekop, aggravated rape on the same woman, armed burglary in her

dwelling house, also assault with intent to rape Emily Lichwala, armed robbery of the same woman, and armed burglary in her dwelling house. These arise out of events that were alleged to have occurred on November 30, 1985, and to these charges Mr. Perrot has pled not guilty.

Representing the Commonwealth in the case will be Assistant District Attorney Francis Bloom, who is counsel at that far table, now standing in front of you. And representing Mr. Perrot is Attorney James Hammerschmith, who has offices here in Springfield and is standing here at the table in front of the bench.

We anticipate it will take about two or three days to try the case, with interruptions it is conceivable that the case could get to the jury late this week or as late as Monday next week, depending on the interruptions.

I'd like to have you take that into consideration when I ask you if there is anything you want to bring to the attention of the Court with regard to your ability to sit as a juror in this case.

The prospective witnesses in the case -- and these are prospective witnesses, it does not necessarily mean they will all testify -- but the prospective witnesses in the case are Emily Lichwala of Springfield, Mary Prekop of Springfield, Robert Cheetham, Marianne Popko, Sergeant Thomas Kelly, Sergeant Thomas Kennedy, Thomas Jarvis, and Richard Kane, and all those are members of the Springfield Police Department. Also, Wayne Oakes and William Eubanks, who are connected with the Federal Bureau of Investigation. Also Beverly Daly of Springfield, Nancy Westcott of Springfield, and Olivette Edwards of Springfield.

Now, with that basic information, ladies and gentlemen, I am going to ask you some questions. After I have asked you those questions, if there is anything you want to bring to the attention of the Court with regard to your ability to sit as an indifferent or unbiased juror in the case, please raise your hand and give your name and number to the court officer, we will bring you forward and discuss the matter with you.

Now, before I ask the questions, anything the Commonwealth would have me add?

MR. BLOOM: No, sir.

THE COURT: Anything the defendant would have me add?

MR. HAMMERSCHMITH: No, Your Honor.

THE COURT: All right, ladies and gentlemen, with that basic information I have given you about the case, my first question is, are you or any member of

CITY 003432



your family related to any parties in the case, any prospective witness or any of the lawyers?

Let the record indicate that no one has raised their hand.

Are you or any member of your family acquainted with or have you done business with any party to the case, any of the prospective witnesses or any of the lawyers?

One hand has been raised.

Do you have any interest in the case? Have you expressed any opinion about the case?

Let the record indicate no hand has been raised with regard to those two questions.

Have you formed any opinion about the case?

Again no hands have been raised.

Have you or any of your close friends or relatives ever been the

victim of a housebreak or crime of violence?

Let the record indicate that five hands have been raised.

Are you or any of your close friends or relatives a member of any police force, District Attorney's office or other law enforcement agency? Let the record indicate that five hands have been raised.

Now, ladies and gentlemen, I know that you have all watched the instructional videotape of Judge James Lynch's explanation of your duty as jurors, and I am, of course, referring to the videotape you saw when you first came to court this morning. In that tape he explained to you that in a criminal case, such as we have here, that a person accused of a crime is presumed to be innocent until proven guilty by the Commonwealth beyond a reasonable doubt. Now, under our law, a

person is presumed to be innocent until proven guilty beyond a reasonable doubt.

Now, Judge Lynch told you, and I repeat it, that the burden of proving the defendant guilty beyond a reasonable doubt rests entirely on the Commonwealth. This means, ladies and gentlemen, that a defendant in a criminal case is not required to produce any evidence of his innocence. A defendant has the right to remain inactive and to require the Commonwealth to go forward to produce evidence sufficient to prove his guilt. The defendant in a criminal case need not present any evidence in his own behalf. The burden of proving a defendant guilty beyond a reasonable doubt rests on the Commonwealth and it never shifts to the defendant. The Commonwealth has the burden of proving all elements of the crime charged beyond a reasonable doubt.

Now, if any of you do not

understand these principles and standards of proof or are unwilling to accept them, please raise your hand.

Let the record indicate no one has raised their hand in answer to that question.

Now, would you be embarrassed to listen to testimony in this type of a case or be embarrassed to discuss evidence of charges of this nature with fellow jurors during deliberation?

Let the record indicate no one has raised their hands.

Are you aware of any bias or prejudice with regard to this case or this type of a case?

Again, no hands have been raised.

Finally, ladies and gentlemen, do you know of any reason why you cannot or do not stand indifferent in this case or this type of a case?

No hands have been raised.

Will those jurors that did raise your hands -- is there something you want me to add?

MR. HAMMERSCHMITH: I believe -- I don't believe you asked -- may counsel approach.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I don't believe you asked the questions requested in my motion. Maybe I --

THE COURT: I went through them both.

MR. HAMMERSCHMITH: I was in another world and I apologize.

THE COURT: I asked them about friends and close relatives having been the victim of a housebreak, there were five or six hands raised, and I asked them about law enforcement agencies also.

MR. HAMMERSCHMITH: My apologies

(End of side bar conference)

THE COURT: Will those jurors that raised their hands please give their name and number to the court officer and come forward.

(The following conference was held at side bar with a juror present)

THE COURT OFFICER: Panel six, seat eight.

THE COURT: Mrs. Pennington, what would you like to tell me?

THE JUROR: I just -- my husband's aunt and her husband are on the police force.

THE COURT: In Amherst?

THE JUROR: Yes.

THE COURT: What are their names?

THE JUROR: Ominski.

THE COURT: How often do you come

in contact --

THE JUROR: Only on holidays.

THE COURT: Do you think the fact that we are going to have police officers testifying in this case and you are going to have to make judgments as to credibility would affect your ability to sit as an unbiased juror in the case?

THE JUROR: No, I don't believe so.

THE COURT: All right. Mrs. Pennington will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel six, seat fifteen.

THE COURT: Mrs. Jurkowski?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: My daughter's home was broken into.

THE COURT: How long ago was that?

THE JUROR: I would say about four years.

THE COURT: Anyone arrested for it?

THE JUROR: No.

THE COURT: Where does she live?

THE JUROR: She's moved. She lived on Berkshire Avenue at the time.

THE COURT: In Springfield?

THE JUROR: Yes.

THE COURT: Was she at home at the time of the break?

THE JUROR: No, there was no one home.

THE COURT: We are going to be dealing here with an allegation of a breaking and entering, robbery in the house while the people are there. Do you think that would affect your ability to sit on the case?

THE JUROR: I don't think so.

THE COURT: Any question in your mind?

THE JUROR: No, I don't think so.

THE COURT: You think you could decide it based on the evidence you hear in this case and not be affected by what happened to your daughter?

THE JUROR: I think I could.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: All right, Mrs. Jurkowski will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel seven, seat one.

THE COURT: Mr. Giokas, what would you like to tell me?

THE JUROR: You just asked about any of my family in a break-in. Well, this happened about twelve years ago, my mother was visiting my brother, my sister-in-law was in the hospital, and she was there with her sister, and

somebody broke in while they were upstairs and ransacked the house.

THE COURT: Anything happen to the people that were in the house?

THE JUROR: No.

THE COURT: Here we are going to be dealing with allegations of a break-in into a house and robbery in the house while the people were there, and confrontation with these people and allegations of rape. Do you think you could sit as an unbiased juror?

THE JUROR: No.

THE COURT: Okay, I will excuse you from the panel. Just don't talk with any of the other jurors.

Mr. Giokas is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel seven, seat three.

THE COURT: Mrs. Scott?

THE JUROR: This was pertaining to my mother's house break, but it was ten years ago and nobody was home at the time.

THE COURT: Where was she living at the time?

THE JUROR: In Springfield.

THE COURT: Was anyone arrested?

THE JUROR: No.

THE COURT: Was anything taken?

THE JUROR: Yes.

THE COURT: Well, now here we are going to be dealing with allegations of a breaking and entering, there were people in the house, confrontation with people in the house. Do you think the fact that your mother went through this experience would affect your ability to sit as an unbiased juror in this case?

THE JUROR: No.

THE COURT: You feel you could decide it based upon this case and not

be affected by what happened to your mother?

THE JUROR: Right.

THE COURT: Mrs. Scott will remain on the panel.

(Next juror)

THE COURT OFFICER: Panel seven, seat four.

THE COURT: Mr. Flahive?

THE JUROR: I'm not sure whether I know one of the witnesses, Popko. I went to high school with a Popko, Cathedral, 1983.

THE COURT: Her name is Marianne, she's a police officer.

Is she married?

MR. BLOOM: Yes.

THE JUROR: Oh, no. My cousin Eddie Ryan I think is on the D.A.'s --

MR. BLOOM: He is in our office,

District Court.

THE JUROR: And I'm friends with the Dillon family, too.

THE COURT: Dillon family?

MR. BLOOM: Diane Dillon.

THE COURT: I will excuse you.

THE COURT: Mr. Flahive is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel seven, seat five.

THE COURT: Mrs. Spencer, what would you like too tell me?

THE JUROR: First, I am close friends with at least a half a dozen police officers from the Holyoke Police Department and, second, my brother's girlfriend, who is also a close friend of mine, had her house broken into twice within the past year.

THE COURT: Do you think all those

reasons would affect your ability to sit on this jury? We are going to be dealing with a breaking and entering in a house.

THE JUROR: I don't think so.

THE COURT: We are going to be also dealing with several police officers. You are going to have to make a determination as to whether those police officers are credible, telling the truth. Do you think the fact that you have this connection with the Holyoke department is going to make a difference to you?

THE JUROR: No.

THE COURT: Any question in your mind?

THE JUROR: No.

THE COURT: How long ago was your girlfriend's house broken into?

THE JUROR: My brother's girlfriend. It was this past summer, in July, and then the summer before that.

THE COURT: Twice?

THE JUROR: Yes.

THE COURT: Was she in the house at the time?

THE JUROR: The second time, they were sleeping.

THE COURT: Any confrontation?

THE JUROR: No.

THE COURT: Anything stolen?

THE JUROR: Yes.

THE COURT: Both times?

THE JUROR: Yes.

THE COURT: What about the Holyoke Police Department now? What did you tell me?

THE JUROR: That I was close friends with at least about a half dozen of them.

THE COURT: Half a dozen police officers?

THE JUROR: Yes.

THE COURT: People you grew up with or what?

THE JUROR: Well, my husband used to work at a garage and they all went there and we'd go to their houses and stuff.

THE COURT: Still doing it?

THE JUROR: Yes.

THE COURT: Okay, I am going to excuse you from the panel, Mrs. Spencer.

THE JUROR: Okay.

THE COURT: Mrs. Spencer is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel seven, seat ten.

THE COURT: Mr. Correa?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: A member of our family is a police officer.

THE COURT: What department is he

on?

THE JUROR: Holyoke Police Department.

THE COURT: Is it a nephew?

THE JUROR: Yes.

THE COURT: Now, this is a case involving several police officers are going to testify, the jurors are going to have to make a decision as to credibility of those police officers, and maybe compare them with lay witnesses. Do you think the fact that your nephew is on the department might make a difference?

THE JUROR: No.

THE COURT: Not at all?

THE JUROR: No.

THE COURT: Okay, I will allow you to remain on the panel.

(Next juror)

THE COURT OFFICER: Panel seven,

seat eleven.

THE COURT: Mrs. Diamond?

THE JUROR: Miss.

THE COURT: I'm sorry, Miss Diamond. What would you like to tell me?

THE JUROR: That I am still in school and I have finals this week, so if it's going to be more than one day, I can't do it.

THE COURT: Where are you going to school?

THE JUROR: Holyoke Community College.

THE COURT: What year are you in?

THE JUROR: My second year.

THE COURT: What are you studying?

THE JUROR: Retail management.

THE COURT: I am not going to keep you from your finals. I will excuse us from the panel.

THE JUROR: Thank you.

THE COURT: Miss Diamond is excused

from the panel.

(Next juror)

THE COURT OFFICER: Panel eight, seat three.

THE COURT: Mrs. Ciocca?

THE JUROR: Yes.

THE COURT: What would you like to tell me?

THE JUROR: I just answered the question about someone breaking into the house. My mother-in-law's house. No one was home at the time, but it was quite a lot taken.

THE COURT: How long ago did that happen?

THE JUROR: A couple years ago.

THE COURT: Where was that?

THE JUROR: East Longmeadow.

THE COURT: Anyone arrested for it?

THE JUROR: Not that I know of, no.

THE COURT: We are going to be

dealing --

THE JUROR: I also wanted to make another comment that the length of this particular thing here, I have a young daughter at home and I have never left her with a babysitter, I don't have any family of my own in this area, so I have no one to watch her.

THE COURT: Your daughter is seven?

THE JUROR: Yes.

THE COURT: Are you asking me to excuse you?

THE JUROR: Yes, please.

THE COURT: Okay. Mrs. Ciocca is excused from the panel.

(Next juror)

THE COURT OFFICER: Panel eight, seat four.

THE COURT: Mr. Bready?

THE JUROR: Yes, sir.

THE COURT: What would you like to

tell me?

THE JUROR: One, I am an attorney.

THE COURT: Where do you practice?

THE JUROR: I am self-employed at this point.

THE COURT: Where?

THE JUROR: Wilbraham. But I also at one point was an associate in the District Attorney's office, his private practice.

THE COURT: Were you an assistant D.A.?

THE JUROR: No, before the District Attorney became full-time, Mattie Ryan was in Bulkley, Richardson, Ryan and Gelinas, I was in that office.

THE COURT: With Mattie Ryan?

THE JUROR: Right. I also am employed by the Commonwealth in an educational thing.

THE COURT: What do you teach?

THE JUROR: At the community college.

THE COURT: Are you asking me to excuse you?

THE JUROR: No, sir, not particularly, but I think it is only fair for everyone to understand.

THE COURT: Okay. How long did you work with the District Attorney?

THE JUROR: A little over three years.

THE COURT: Have you handled criminal matters?

THE JUROR: No, no criminal. That's one thing I stayed out of.

THE COURT: Have you had any contact with the District Attorney since --

THE JUROR: Only in a social manner.

THE COURT: Where did you see him socially?

THE JUROR: At political things, these type of things from time to time.

THE COURT: Anything when he was

running for office?

THE JUROR: I didn't do anything in regard to his -- any work in regard to that.

THE COURT: Do you think you could decide the case based on the evidence you hear and --

THE JUROR: I'm not asking you to excuse me, I just think it's fair for both attorneys to understand.

THE COURT: All right, I will allow to you remain on the panel.

(End of side bar)

THE CLERK: Juror number 6-1, Jocelyn Dosick, please take seat number three. Juror number 6-2, Adelle Love, please take seat number three.

Defendant challenge.

(Whereupon, Mr. Hammerschmith approached the clerk)

CITY 003455



THE CLERK: Juror number 6-1, Jocelyn Dosick, please step down from the panel, having been challenged by the defendant.

Juror number 6-3, Blondelle McCloud, please take seat number two.

MR. HAMMERSCHMITH: Defendant is satisfied, Your Honor.

THE CLERK: Commonwealth challenge.

(Whereupon, Mr. Bloom approached the clerk)

THE CLERK: Will juror number 6-3, Blondelle McCloud, please step down from the panel, having been challenged by the Commonwealth.

Juror number 6-4, Anna Powalka, please take seat number two.

MR. BLOOM: Satisfied.

THE CLERK: Commonwealth is satisfied.

Defendant challenge.

MR. HAMMERSCHMITH: Defendant is

CITY 003456


satisfied.

THE COURT: All the spare jurors are excused.

THE CLERK: Juror number 2-14, David Pighetti, the Court is going to appoint you the foreman of this jury.

Will all the jurors please rise and raise your right hand.

(Whereupon, the jury was duly sworn)

THE CLERK: Ladies and gentlemen of the jury, hearken to indictment number 85-5415, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the County of Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five at Springfield in the County of Hampden, being armed with a dangerous weapon, to wit: a stick or similar object, did assault one Mary A.

Prekop with intent to rob her and thereby did rob and steal from the person, presence, protection and possession of said Mary A. Prekop certain property, to wit: money, in the amount and of the value of less than one hundred dollars of the property of said Mary A. Prekop. A true bill, signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, foreman.

Hearken to indictment number 85-5416, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the County of Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five at Springfield, in the County of Hampden, did commit an indecent assault and battery on the person of Mary A. Prekop, in violation of Section 13H of Chapter 265 of the

CITY 003458


Massachusetts General Laws as amended. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indictment number 85-5417, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the County of Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five, in the County of Hampden, did assault and beat Mary A. Prekop. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indictment number 85-5418, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the Counlty of Hampden,

on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five at Springfield, in the County of Hampden, that George D. Perrot did assault Mary A. Prekop with intent to commit aggravated rape and did commit aggravated rape upon the said Mary A. Prekop. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indictment number 85-5420, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive Springfield, in the County of Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five at Springfield in the County of Hampden, did break and enter a dwelling house, to wit: of Mary A. Prekop, in the nighttime with intent to commit a felony and being armed with

a dangerous weapon, to wit: a stick or similar object, at the time of entry, or so arming himself in said house, did make an actual assault on a person lawfully therein, to wit: Mary A. Prekop, in violation of Section 14 of Chapter 266 of the Massachusetts General Laws as amended. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indictment number 85-5422, the jurors for said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the county of Hampden on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five at Springfield, in the County of Hampden, did assault Emily Lichwala with the intent to commit rape upon said Emily Lichwala, in violation of Section 24 four of Chapter 265 of the

CITY 003461


General Laws of Massachusetts as amended. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indictment number 85-5423, the jurors of said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the Counlty of Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five, in Springfield, in the County of Hampden, being armed with a dangerous weapon, to wit: a pool cue, did assault one Emily Lichwala with intent to rob her and thereby did rob and steal from the person, presence, protection and possession of said Emily Lichwala certain property, to wit: pocketbook, money and credit cards, in the amount of the value of less than one hundred dollars of the property of Emily

Lichwala. A true bill signed by Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

Hearken to indict number 85-5425, the jurors of said Commonwealth on their oath present that George D. Perrot of 87 Malibu Drive, Springfield, in the County or Hampden, on or about the 30th day of November in the year of our Lord one thousand nine hundred eighty-five, at Springfield, in the County of Hampden, did break and enter a dwelling, to wit: of Emily Lichwala, in the nighttime with intent to commit a felony, and being armed with a dangerous weapon, to wit: a pool cue, at the time of entry, or so arming himself in said house, did make an actual assault on a person lawfully therein, to wit: Emily Lichwala, in violation of Section 14 of Chapter 266 of the Massachusetts General Laws as amended. A true bill signed by

Mary L. Hansen, Assistant District Attorney for the Western District, and Douglas Gebbe, Foreman.

To these indictments, ladies and gentlemen of the jury, the defendant has pleaded that he is not guilty and for trial thereof puts himself upon his country, which country you are. You are now sworn to try the issues. If he is guilty, you will say so. If he is not guilty, you will say so and no more. Ladies and gentlemen of the jury, hearken to your evidence.

THE COURT: Mr. Foreman, ladies and gentlemen, at this time we are going to recess for lunch, and I'd ask you to be back here in your jury room about quarter past two. We should be able to get back into the courtroom shortly thereafter. There is a matter I might have to take care of about that time, but we should be ready to start shortly after quarter past two.

My instructions to you at this point are that there is to be no discussion among yourselves, should you be going down the elevator together or while you are waiting out there in the jury room or if you are having lunch together. There is to be no discussion among the jurors about the case until the case is given to you for decision. That means till all the evidence is in and till the lawyers have argued and I have instructed you on the law that you are going to apply to the facts as you find them to be in this case.

So I am going to repeat this instruction to you at the end of the day and I am going to repeat it continually throughout the trial.

Also, I would instruct you that you are not to have any discussions with anyone outside the courthouse or outside the jury that might inquire as to what your jury duties involve or what

type of case you are sitting on or anything at all about your jury duties, because you've got to decide the case based on the evidence presented during the trial. If you start talking to people about the case, your family or friends or anyone that inquires, you might have ideas about the case or they might have thoughts about this type of a case and start expressing them to you. You've got to decide the case based on the evidence presented during the trial.

I am going to repeat these in more detail at the end of the day, but for now I will just excuse you for lunch. We will see you at about quarter past two.

I will see you gentlemen for one moment.

(Whereupon, the jury was removed from the courtroom)

THE COURT: Gentlemen, I had a scheduled sentencing for tomorrow morning and they have asked me to change the time to 2:30. I will see if I can get it in here at 2:15. We might have a slight delay before we get in here, but it should be a brief sentencing.

(Luncheon recess taken at 1:15 P.M.)

CITY 003468



(Hearing reconvened at 2:35 P.M.
Jury and defendant were present)

THE COURT: Mr. District Attorney.

MR. BLOOM: Thank you, Your Honor.

Mr. Foreman, ladies and gentlemen of the jury, my name, as Judge Murphy told you earlier, is Francis Bloom and I am an assistant district attorney in this county, in Hampden County, and at this time in a criminal case, that person who happens to be representing the government gets an opportunity to talk to the jury, like I am now, and explain to you what I expect you will hear from the witness stand over the next couple of days concerning the eight indictments that Mr. Hickson told you about earlier this morning, who is the clerk, and how they refer to a series of incidents that occurred November 30, 1985.

There are two victims in this

CITY 003469


case, a woman by the name of Emily Lichwala, who lives in Springfield, who is an elderly woman, she will tell you her exact age, she is in her 70's, I believe, and a Mary Prekop, who is in her 80's, who is the other victim in this case. These two women will tell you what happened to them on the night of November 30, 1985.

I expect that you will hear that at about 3:30 in the morning at Mrs. Lichwala's house, 3:30 A.M., she heard some banging, what appeared to her to be glass smashing going on, and she will tell you how her house is set up, and that she has a first floor, which contains a kitchen and a living room and a bathroom and a series of bedrooms, and that she has a basement that is finished, and that there is a pool table down there and a variety of other things down there in the basement.

She will indicate to you that

she heard these sounds, became terrified, got out of bed, heard someone trying to get into the house through one of the doors that would lead into the kitchen. She will tell you at some point in time that she heard -- as the house is explained to you, how it is set up, you will recognize that she has a basement, as I mentioned to you, and as you come up those basement stairs, that is one entry or one method of getting into the interior of the house, the kitchen and the bathroom and the bedrooms and the other areas on the first floor. And that is one method of getting into her house, the interior.

She will tell you she thought she heard that door being pulled, but that she had a series of locks on that door. Eventually, she heard some more noise and some glass being broken and she ran out.

She will tell you she can't

identify anybody from that night. She, in fact, on that night, never saw the individual.

She ran across the street in her nightgown, eventually was let into the house by the people across the street, as I understand it, called the police, the police arrived a short time later.

You will see that in the back of the house the window that leads to the basement was yanked right out. You can see where the dryer or the vent from her dryer was pulled right out of the window and the window was smashed through, and she will explain to you how down in there there was her pool table and her pool cues, and that the only way you can go up into the house from there is to go up the cellar stairs and there is one set of doors that leads you directly into the house. She will tell you how those were bolted and how she

CITY 003472


heard sounds pertaining to them.

Then you will hear from the police and from her, who looked at the house after the police arrived, how the breezeway, which is around another side, how the two doors were forcibly entered there, and how they had been kicked in, how the windows had been broken, and how a pool cue, when she got back in the house, was found inside her house on the floor.

She will tell you that her purse had been taken by whoever went into that house and the contents of her purse was money and her personal papers and her credit cards and identification and things of that nature. And her call came into the Springfield police at about 3:30.

Now, during the course of this case, it is going to be important to recognize the distances between where she lives and where Miss Prekop lives.

And you will hear that where Mrs. Lichwala, the woman I just spoke to you about, lived is a very short distance to where actually Miss Prekop lived, and on the same street that the second woman that I am going to tell you about lives.

Mr. Perrot was staying with his sister on Malibu Drive, and his house is directly, if you take Miss Prekop's house as being on the far right, if you want to look in terms of left to right, her house is on Malibu, then Mr. Perrot's sister's house is on Malibu going in the direction towards Covel or the Lichwala house. You have to cross Parker Street, but that is the direction that these three given houses are located.

The first house, as I told you, is on Covel Street, 3:30 is this break-in, in which Mrs. Lichwala's pocketbook was taken. Then as you go in the direction towards Miss Prekop's

house, you have to cross Parker Street, you will hear exactly what the distances are, past Mr. Perrot's house where he was living at the time, and then go farther down this street and ultimately to Miss Prekop's house.

Miss Prekop heard some noises at her house, too, really not unlike the noises that Mrs. Lichwala heard, and she used to keep a board by her bed, a stick. She heard a dog barking, she got up. She got up and she didn't see anything. She went back to bed. This was about 4:00 in the morning.

Miss Prekop is in her 80's. Both of these women live alone, have lived alone for a number of years, in this Sixteen Acres section of Springfield.

Miss Prekop heard noises a second time, and when she got up, she was confronted by a young boy, young man who was standing in her kitchen. She

tried to hit him with that board. In fact, I think she will tell you she did hit him with the board. He took the board away from her, had the board in his hand, holding it over her, took her and threw her back into her bedroom. Before the dog could get back in that bedroom, the door was slammed shut.

She will tell you what happened to her. She was taken, this 80 year old woman, thrown to the ground, beaten viciously, you will take a look at the pictures of what her face looked like after she absorbed this terrible beating.

Her nightgown was lifted up at some point during this assault by this young man, he was sucking on her left breast during a period during the assault, he was punching her in the head, she was kicking and fighting, and ultimately she will tell you she is not sure what it was, but some item was

inserted into her vagina during the course of this incident.

After this man got up, at some point during the incident, her pocketbook also was taken, and contents removed, and the individual left.

You will hear from the police that arrived there early that morning how the doors had been kicked right open and what type of forcible entry had been used in order to gain access to that woman on that night.

Now, Miss Prekop can't identify George Perrot either. She will tell you why she can't. She couldn't identify whomever it was that did this to her.

The police became involved in this case immediately. Sergeant Kelly, who runs the Crime Prevention Bureau on the four to twelve shift, and primarily is involved in morals, he runs the morals or the sexual assault unit, he

was involved on that day, and he will tell you exactly what he did, and there was no evidence, physical evidence, taken from the first house, but there was a series of items that were taken from the Prekop house, and Sergeant Kelly will tell you that what he took -- and tell you the reasons why he took the items that he ultimately did -- which were Miss Prekop's bedsheet, because he observed what he thought was blood at the time, that's why he took it; a pair of gloves that were in this general neighborhood of her bedroom where the struggle occurred, because Miss Prekop said they weren't hers -- she will tell you that, I expect -- because there appeared to be drops of human blood on those gloves, and that's why Kelly took them, along with a pillowcase.

He will tell you at or about this time, December 7th, the next week, December 7th or December 8th, that

ultimately you will hear from other officers, that Mr. Perrot was placed under arrest.

In any event, on the 7th or 8th of December, about a week or eight days later, those three items were sent to the F.B.I. laboratory in Washington. The first two items I mentioned to you, the bedsheet which will become very crucial in this case, also, in addition to the bedsheet, the gloves that were sent, that were found in the bedroom from the rape of Mary Prekop, and also head hair samples that had been removed from Mr. Perrot were sent down at about that same time, December 7th or 8th. All those items were sent at or about that time down to the Federal Bureau of Investigation laboratory in Washington D.C. for the purposes of being analyzed.

You will hear from another detective who had nothing to do with this case, and his name is Sergeant

Kennedy, and he will tell you later on in the investigation that there was continuing communication between the Springfield Police Department, this office here, the District Attorney's office, and the F.B.I. laboratory. As a result of those communications, more blood was drawn -- or blood was drawn, excuse me, from George Perrot in the presence of Sergeant Kennedy, that hairs from the head of Miss Prekop were taken and blood was taken from her later on in the investigation.

So three things that I mentioned to you initially were done. A bedsheet was taken from the Prekop rape, because it appeared to Kelly there was blood. Whether right or wrong, there appeared to him there was blood on it. Gloves found at the scene of this terrible incident, it appeared that there was blood on there also. And Mr. Perrot's head hair. Within a week or so

of this incident, those three items were sent down, and then later in the investigation, as a result of the communication between the District Attorney's office, the F.B.I. and the Springfield police, three more items were sent down. Samples of Mary Prekop's hair, blood from the defendant, George Perrot -- and Sergeant Kennedy will tell you that those items, the blood from Perrot, the blood from Miss Prekop, and the head hairs of Miss Prekop, those three additional items, were also sent to the F.B.I. for analysis.

Now, on December 7th, a week after these two incidents, George Perrot was placed under arrest. Sergeant Kelly will tell you that at about -- and he was arrested, I believe, at 87 Malibu Drive, where he was living with his brother-in-law and sister, if I'm not mistaken.

At about 5:00 that morning, he was placed under arrest, and he was given his Miranda warnings. Sergeant Kelly had very little to do with him, he will tell you, at that time, very little conversation, but he gave him his Miranda warnings and Mr. Perrot signed a card, that at about 7:30 -- you will hear from this person under oath in this case, obviously -- but about 7:30 on December 7th, you will hear from a detective by the name of Tom Jarvis, who will indicate to you that he was apprised as to what had happened and that Mr. Perrot had been arrested, and he was somewhat familiar with the incidents of the week before the 30th, but he had never really looked at the files, and that he met George Perrot that morning at about 7:30, the week after this all happened, the 7th. He will tell you he orally gave him his Miranda rights again and he took him

within a few minutes down another part of the Springfield Police Department building, which is called the booking end, where your prints are taken and your photograph is taken and if it is a situation where you are held on bail, you are placed in a cell.

He will tell you that he left him down there and he went back up to the Detective Bureau, Jarvis, and he will tell you the reason he went back up to the Detective Bureau is he had things to do. The most important things he had to do at that time was an attempt to familiarize himself with the facts of the case the week before.

So, in other words, he will tell you that he went to the files from 11/30 and read who was in there as far as statements that had been taken and police reports that had been made, so he could become more acquainted with exactly what had supposedly happened the

week before.

At about quarter of one that same day, on the 7th, he went and he got George Perrot from downstairs, brought him up, he will tell you that he did a number of things, but the first thing he did at or about that time was he was Mirandized, he was given his Miranda rights, and he will tell you that Mr. Perrot said, "I have no problem, I'll talk to you."

He also explained to him that the police wanted to take hair samples from him and blood from him, and that it was explained to him that he didn't have to do that. He had no problem with that. I'll give you my head hairs, any other hairs you want, and blood samples, and signed a document saying that.

Jarvis will tell you then he fed him, went to the bathroom a couple times, he made a series of phone calls, I believe he will tell you, to his

CITY 003484



girlfriend on a number of occasions, his mother and some other people. That, eventually, as it got to be around 3:00, Jarvis will tell you he sat down with him. He sat down with him and he started asking him about these incidents. He will tell you exactly what happened. He will tell you they were discussing them, and within the course of about an hour, a statement was taken, with Mr. Perrot telling him what had happened the week before and ultimately reading that statement and signing it. You will have an opportunity to hear and see exactly what he told Detective Jarvis.

Detective Jarvis will tell you what he observed during that hour, hour and fifteen minutes period, how that during this incident that there were times that Mr. Perrot would stop and just break down and cry, asking Detective Jarvis if he could take his

gun and kill himself, recognizing, saying to Detective Jarvis, I know I should be dead, it would be better off if I was dead, during the course of talking to him, when they got into these incidents. In essence, giving a statement which you will hear and will be read to you in which he explains how he went into Mrs. Lichwala's house, what doors he broke, how he broke them, how he got inside, the pocketbook he took, and then, as he was running away in the direction of Malibu, that he dumped the pocketbook, and then he will say how he went inside of Malibu Street, Miss Prekop's house.

Basically, ladies and gentlemen, as you hear that statement and have an opportunity to look at it, almost identically from what you will hear from the victims, with one exception, he doesn't admit sexually assaulting or beating the victim.

Everything is almost a mirror of what I expect -- and again, this is for your recollection -- what I expect the two elderly women to tell you what happened to them, with the exception of when Miss Prekop starts telling you about the vicious beating and the sucking of the breast and the throwing on the ground and the raping that occurred in that room, he doesn't admit to that. He says he left before any of that happened. But other than that, I think you will see in detail pretty much that his statement to Detective Jarvis mirrors pretty much what these victims say happened to them on this night.

At the end of this case, probably along with the statement given to Detective Jarvis, is probably the most important part of this case. Because you are going to have two people who are really experts in their field who work out of the F.B.I. laboratory in

Washington, and I expect they will be the last two witnesses, and one of them is an individual by the name of Wayne Oakes, who is a fiber and hair expert from the F.B.I. laboratory, he has testified throughout the country, he's done thousands of examinations of hair taken within the course of evidence in a given community to be matched to somebody's head hair or pubic hair or whatever the case may be, and he will tell you he did that exactly in this case, that he analyzed, and you will hear, and I haven't mentioned this to you, but you will hear that when Kelly took the bedsheet -- and remember I told you a few minutes ago he took a bedsheet and he took a pair of gloves from the Prekop incident and that head hair was sent down -- and you will hear from Oakes that when he performed these examinations, they always shake those items, because very frequently hair may

be found within the course of the paper that contains the item or on the item itself, and that he found two head hairs, and that he through a microscope analyzed those head hairs and compared them to this man's head hairs that had been sent by the Springfield Police and compared them to the head hairs that were sent down from the police of the only other woman that has lived in that house for the last seven or eight years, Miss Mary Prekop, and he will tell you that those two head hairs absolutely are not the head hairs from the head of Miss Prekop, and there are 15 to 25 characteristics in every strand of hair, and that every one of those characteristics from those two sample hairs that were found on the bedsheet are identical to every characteristic of the head hair that was pulled from his head by the Springfield Police Department and sent down to the Federal

Bureau of Investigation to be analyzed.

And, beyond that, you will hear from a Bill Eubanks. He runs the Serology Department from the Federal Bureau of Investigation, Justice Department, he is in charge of that entire unit, testifies throughout the country, has testified in innumerable states and in innumerable federal districts, in the field of serology, and he will explain to you exactly what serology is.

But for your purposes in this case, Mr. Eubanks did a blood analysis, in its most simplistic terms, that is what it comes down to. He will tell you how, depending on the amount of a sample, they can break down the blood into various genetic markers, and how that was done in this case, and the blood that was taken from the gloves that Miss Prekop said weren't hers, so they were sent down to the F.B.I.,

consistent with his blood that was analyzed.

He will tell you also that the blood that was taken from the bed of Mary Prekop, as a result of the comparative analysis he did of Mary Prekop's blood, which had already been sent also, that it is absolutely not her blood on the bed, but on every genetic marker and characteristic is consistent with the genetic markers and characteristics of this man, George Perrot.

Ladies and gentlemen, what happened on November 30th was a nightmare for any human being. All that I ask you in this case is to be fair and objective and return a verdict and make sure that that verdict speaks the truth, so that that man sitting right there is held accountable for what he did to these women.

Thank you.

CITY 003491



THE COURT: Counselor, do you wish to open at this time?

MR. HAMMERSCHMITH: No, I don't, Your Honor.

If I may, Your Honor may we approach the bench.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I think that some of the facts that were stated by Mr. Bloom in his opening are inaccurate and I would ask the Court to give a cautionary instruction to the jury as to the fact that opening statements are not evidence. I'd ask that it be done at this point in time before evidence begins to be taken.

THE COURT: Well, I am going to explain to the jury that opening statements and closing arguments are not evidence, I will do that at the close of the case.

MR. HAMMERSCHMITH: Not at this point?

THE COURT: Not at this point. First of all, a broad statement that --

MR. HAMMERSCHMITH: He alleged that every genetic marker matched. In fact, they didn't test for every genetic marker, they only tested for a few genetic markers. The ages of the women are inaccurate.

THE COURT: He said one was in her 70's, and one was in her 80's.

MR. HAMMERSCHMITH: One was in her 70's and one in her 60's, I believe.

MR. BLOOM: I think she is 81. I'm assuming you're going to do that at the end like you always do.

THE COURT: Yes.

MR. HAMMERSCHMITH: I think the end is several days away, Your Honor, and I think --

MR. BLOOM: If you do it now, it's almost like you're commenting on my

opening.

THE COURT: If both of you had opened, it might be different. I'm going to let it stand.

(End of side bar conference)

MARY PREKOP (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Mary, you are going to have to speak up in a loud voice so we can all hear you, okay?
A. I will try.
Q. Would you tell Judge Murphy and the jury what your name is?
A. Mary Prekop.
Q. Would you spell your last name for that girl sitting in front of you?
A. P R E K O P.
Q. Mary, how old are you?

A. Eighty.
Q. Do you live in Springfield?
A. Right now.
Q. And that is where, ma'am? Where is that?
A. 27 Malibu Drive.
Q. And that is in -- is that Sixteen Acres?
A. Sixteen Acres, that's right.
Q. How long have you lived there?
A. In Springfield or there?
Q. No, just at that house.
A. Fifteen years.
Q. Did somebody used to live there with you?
A. My mother.
Q. Has she been dead for sometime?
A. Well, a few years.
Q. How long?
A. Let's see, six.
Q. Has anybody lived there with you since your mom died?
A. No.
Q. Do you have relatives in Springfield?

A. Have what?
Q. Sisters or brothers?
A. Yes, I have a sister in Springfield.
Q. Do you see her once in a while?
A. I see her everyday.
Q. Does she -- who sleeps at your house for the last six years other than you?
A. Just myself.
Q. How many bedrooms do you have in there?
A. Two.
Q. How long have you lived there total, that house on Malibu, how long have you lived there yourself?
A. Well, I have lived -- well, since mother died, I have been alone for six years.
Q. But how long have you lived in the house even when your mom was alive?
A. That is fifteen years I have lived on Malibu.
Q. You just told me that, didn't you, but I wasn't paying attention, I'm sorry.
Mary, do you remember back in the end of 1985 something happened and you had to talk to the

police about it, do you remember that? Do you remember November 30th of 1985?

A. Yes, I remember.

Q. Is it fair to say you lived alone then?

A. I lived alone then.

Q. How many bedrooms do you have in that house?

A. Two.

Q. Did you have any animals at that time back in November of 1985?

A. No.

Q. At sometime did you get a dog?

A. Wait a minute.

Q. Let me ask you this: Do you have a dog now?

A. Yes. I think I got the dog -- I know I got the dog around the 4th of July, it had to be in '85.

Q. So you would have had the dog in November of '85, correct?

A. Yes.

Q. Do you remember on -- I'm going to ask you about that, just about that date, November 30,

1985, okay?

A. Okay.

Q. Do you remember something happening that caused you to wake up? Do you remember waking up in the middle of night on that night?

A. Well, it was 4:00 in the morning.

Q. At about 4:00 in the morning. You tell the jury what is the first thing you remember hearing?

A. Okay. The first thing, the dog ran to the kitchen door and was doing a lot of barking.

Q. Is that what woke you up, the dog?

A. Yeah, her barking.

Q. Do you let the dog roam around or does he stay in a certain room?

A. Oh, no, she can do anything she wants.

Q. After you heard the dog bark and you woke up, what was the next thing that you remember happening?

A. The next thing, I went out to the kitchen door and I opened the kitchen door -- not the outside one, but the one near the back door --

Q. Is that the breezeway?

A. That's right, the door to the breezeway. I didn't open that -- I don't know why; something just told me not to -- and the dog was just standing looking at me. So, I said, well, I guess it's nothing, just your imagination. I come back in the house and I sat down for a couple minutes.

Q. Where, Mary? Where did you sit down?

A. I went to the living room and I sat down for a couple minutes, I didn't hear anything more, so I went back to the bedroom and I no more than -- but when I went to the bedroom -- my brother-in-law made me a stick to put near the kitchen door, he said if I put it there every night, nobody can open the door from the outside.

Q. Kind of like using it as a brace against the door, you mean?

A. No, on the floor, you put it just on the floor. So, anyway, I picked it up. Why I picked it up, I don't know, I just picked it up and took it with me.

Q. Took it with you where?

A. Back to the bedroom.

Q. Now, you came out of your bedroom into

the kitchen and then you ended up sitting in the living room for a couple minutes, right?

A. For a couple minutes, that's right.

Q. Now, when you went back to your bedroom, how long before something happened?

A. Well, I hadn't got settled in the bed and I heard a noise and it sounded like glass breaking, so I jumped up, grabbed the stick and went off into the kitchen. I didn't get farther than the bathroom door and there was a fellow there.

Q. Mary, can you help us a little bit? Could you tell the jury how far is it to walk from like your bedroom to like where your kitchen is? Between like you and me or would I have to go farther back? Or how long would you say it is?

A. Well --

Q. Put me someplace, Mary. Between you and I?

A. You mean to the kitchen door or to where --

Q. From where the man was standing in the kitchen.

A. No, it wasn't that far. Well, yeah,

probably you could say where you are now.

Q. Between you and I?

A. Yeah.

Q. Okay. So it's not very far from your bedroom to the kitchen.

A. No, just the bedroom, then the bathroom door, and then the kitchen is right there.

Q. What do you remember at that time -- do you remember anything about the person?

A. Remember anything about him?

Q. For instance, was he a white or black -- what do you remember about the person at that time?

A. Well, you're so upset, you don't remember anything much. He had his hands up over his face, but what I remembered the most was he had wavy hair, black wavy hair, and he had white sneakers on. That's about all.

Q. You remember those two things?

A. Those two things.

Q. After you saw him and you said you had the stick, what happened then?

A. Well, I hit him on the head. I couldn't hit him -- I didn't want to hit him on the head, but

the dog was jumping all over his feet and I didn't want to hit the dog.

Q. What happened after you hit him in the head?

A. Well, he grabbed the stick from me.

Q. And what happened?

A. He pushed me into the bedroom.

Q. What did he do with the stick?

A. He threw it on the bed and he threw me on the floor.

Q. When you were on the floor, how far were you from your bed?

A. Well, my head was towards the bed and --

Q. I mean how far?

A. Not far, because in little houses like that, the bedrooms are small.

Q. Okay. When you got pushed on the floor, did you see where the stick was at that time?

A. Where the stick was?

Q. Yes.

A. Yes, it was laying on the bed. I saw him throw it on the bed.

Q. What was the next thing that happened?

A. The next thing that happened?
Q. That you remember, after he threw you on the floor.
A. Well, before he threw me on the floor with one hand, he hit the light and he knocked it off -- I had -- the light was lit. He broke the bulb and knocked the lamp off on the floor. Then he assaulted me, whatever you want to call it.
Q. What do you mean -- where was he hitting you then?
A. What?
Q. Where was he hitting you at that time?
A. Well, when he threw me on the floor, when he assaulted me, he hit me, he gave me a black eye on my left side, the left eye.
Q. What was he hitting you with at that time?
A. I didn't understand you.
Q. What was he hitting you with?
A. With his hand.
Q. How many times do you think he hit you with his hand?
A. I don't think he hit me more than twice

on my face.

Q. All right. Did you get hit anywhere else at that time?

A. Well, not right then, but before he left, before he left the bedroom, he took -- with his foot, he kicked me on my -- well, the buttocks on my left side, too, because he couldn't reach on the right, because there's a table that was in the way, the bedstand.

Q. Do you remember -- what were you doing, Mary, when you were on the floor? Were you doing anything at that time?

A. I wasn't doing anything. As I say, he was molesting me.

Q. Did he say anything to you?

A. No. When I cried out, he just told me to keep still, so I said to myself, well, better to keep still, it won't help any.

Q. What else -- tell us what else he did to you when you were in that bedroom. Was the door opened or closed?

A. No, it was closed. If it was open, he couldn't have done anything, the dog would have

bothered him too much. The dog was running around the house barking like mad.

Q. I want you to tell us, Mary, what else he did to you when you were on the floor?

A. Well, I'm saying he assaulted me. You can call it something else.

Q. Well, I don't want you to use words like assault or molest, I want you to tell Judge Murphy and the jury exactly what he did with his body to your body.

A. Well, I'm trying to think of the right word, 'cuz I don't talk about those things much.

Q. I know you don't talk about them, Mary, but it is important for you to tell us what part of your body got assaulted.

A. Could you help me? (Referring to the court reporter)

Q. Where on your body is it that you got assaulted?

A. The lower part of your body.

Q. Can you give us a word? I know it's hard, but --

A. I'm trying to think of the right word

and I can't think of it.

Q. Is it your vagina?

A. Well, okay.

Q. What happened there? Tell us what happened there.

A. Well, all I know is when he got down on me, I shut my eyes and I just -- everything, I mean -- you could say it was like blank, I just didn't -- I was like out of this world.

Q. But what happened there?

A. What happened to me?

Q. What happened to your vagina?

A. Nothing happened to it. He --

Q. He what?

A. If I had a dictionary, I'd find the right word.

Q. Excuse me? I'm sorry. What did you say, Mary?

A. I'm just talking to myself. I can't think of the right word.

Q. Let me ask you this --

A. Well, I will tell you, I know you don't want me to say this, but I will say it just the same

--

Q. No, hold on for a minute, we don't want you blurting out anything. Did you that day, after all this had happened to you, did you talk to the police?

A. To who?

Q. To the policewoman. Later on that same day, did you talk to the policewoman?

A. Yeah, she came to the -- what do you call it -- she came to the emergency room where I was and then she took me to the police station.

Q. Do you remember telling the policewoman what happened to you?

A. Well, I told her what I thought happened.

Q. Let me ask you this -- if you could tell us, is that your signature there, that is Mary A. Prekop?

A. Yes, that's my signature.

Q. I'm going to show you the second paragraph here. Do you see where I point to the word and it says "he", can you read that?

A. Yes.

Q. Would you read from there to where I've got the other black mark to yourself?
A. Okay. "He pulled my --"
Q. No, just to yourself.
A. Oh, read it to myself, okay.

(Witness reads portion of transcript)

Q. Did you read that?
A. Yes.
Q. What I am asking you, ma'am, if you could tell the jury what did he do, if anything, to that part of your body?
A. Well, that's what I say, I can't think of the right word, because what I would tell you you don't agree with me, so I'm not going to say.
Q. What I'm asking, ma'am, was something put inside your vagina?
A. Yes.
Q. And do you know what it was?
A. No.
Q. Was it his penis, do you know?
A. That's why I say I don't want to talk

about it, because I was told that what I didn't see you can't use as evidence, so --

Q. Okay. Let me ask you this, so we can understand. Whatever it was, the thing that went inside your vagina, who put it there, the man that was in the room with you?

A. Who else?

Q. That's your answer?

A. That's right.

Q. During the time you were in that room, did anything happen to your breast area at all when you were in there with this person?

A. Well, when he first threw me on the floor and he -- I'm still using the word assault -- he went and put his mouth near my left breast for probably a minute, I don't know what he did it for, but --

Q. Did it touch your breast?

A. Yes.

Q. Did you have a pocketbook around there that night, somewhere in your house?

A. Yeah, I had one in the other bedroom on the chair.

Q. And after he left, did you go look at that pocketbook?

A. Well, he must have, because I found it on the kitchen floor. He went into -- he must have gone in there, picked it up --

MR. HAMMERSCHMITH: I object, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Bloom) Let me back up a little bit. When you went to bed that night, before all this terrible stuff happened, when you first went to bed, where was your pocketbook?

A. On the chair in the other bedroom.

Q. That is the second bedroom?

A. That's right.

Q. Not the bedroom where you got assaulted?

A. No.

Q. After this person had done these things to you and left, did you see the pocketbook again that night? Where did you see the pocketbook again?

A. When he left, when I felt like I could get up and have my bearings, I went in and there it was on the floor near the bathroom door in the

kitchen, so I picked it up and I only had a dollar bill in it, but that was gone, and the change purse was gone.

Q. Did you call the police then?

A. Yes, then I went to call the police, but I got mixed up, I guess.

Q. Did they come?

A. Just nerves, I got mixed up and I didn't get them the first time I called, because I probably rang the wrong number -- I mean, I dialed the wrong number. Then I waited a couple minutes and I dialed again and I got the police.

Q. Did they eventually come that night?

A. Yes, they came right away.

Q. Miss Prekop, how many doors to the inside of your house?

A. How many doors?

Q. How many doors to the house? Front doors -- how many doors to your house?

A. Well, there's the front door and then there's the two doors on the breezeway in the front and then to the back door, and then you call it a door that comes to the kitchen, it's not a kitchen

door --

Q. It goes down to the cellar?

A. It goes down to the cellar, and then on the left is the kitchen door.

Q. When you went to bed that night, tell us how those doors were. Were they locked, were they wide open?

A. Oh, no, it was November, they were all shut and locked.

Q. And after all this had happened and the police had come out there, did you see the condition of your doors? Did you see what they looked like then?

A. Well, that's the only door he -- he broke the lock in the door.

Q. Which one are we talking about now?

A. That was the one to come into the house that goes down into the cellar.

Q. The breezeway door?

A. Yeah.

Q. You are not talking about the front door?

A. No, he didn't --

Q. What did it look like the next time you saw it after this man left, the next time you saw the door? Tell the jury what you remember.

A. Well, I didn't see it before he came. It was okay.

Q. I know it was okay before he came. I'm asking, after he had gone, what did it look like when you saw it?

A. Okay, it was all scratched up and the wood was all -- he had to have been using a knife or something to pick around the lock --

MR. HAMMERSCHMITH: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: When I looked, I could see the lock was broke.

MR. BLOOM: That's all I have, Judge.

Mary, he is going to ask you some questions now, okay?

THE WITNESS: Okay.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Do you have a dog?
A. Do I have a dog?
Q. Yes.
A. Yes.
Q. What kind of dog is that?
A. Cocker spaniel, black.
Q. It's a cocker spaniel?
A. Yes.
Q. This was the dog that you heard that night barking?
A. I can't hear you.
Q. On this night that we are talking about, you heard that dog barking?
A. That's right.
Q. And you went out of your bedroom?
A. Yes.
Q. And you looked around the house, is that right?
A. I just went to look at the door that opens from the breezeway to where you go down the

cellar.
Q. Did you have any lights on in the house at that time?
A. The only light I have on at night is my bedroom light.
Q. What about when you went to the breezeway, did you turn any lights on?
A. Yeah, I put a light on in the kitchen.
Q. What about in the hallway, did you have a light on in the hallway?
A. No, I haven't got any hallways.
Q. So your bedroom opens right into the kitchen, does it, or --
A. Well, really you wouldn't call it a hallway, it's probably not as big as that table, the bathroom is here and the bedroom here and the other bedroom here, the three -- and just a few steps more and there's a kitchen proper.
Q. So everything is very close together, then?
A. That's right.
Q. Now --
A. No wasted space.

Q. When you left the kitchen, did you turn the light off behind you?
A. Well, I don't remember.
Q. So you don't remember whether the kitchen light was on or not after --
A. No, I must have put it off, because when I heard the like glass breaking, when I run into the kitchen, I put the light on, 'cuz from both ends you can put the light on in the ceiling.
Q. But when you went back -- before you went back into your bedroom --
A. I must have put it on, because I put it on when I heard the sound of glass breaking, and I put it on when I heard the glass break, so I wouldn't have put it on if it was already on.
Q. So the first time you heard your dog and you went to the kitchen, right?
A. Yes.
Q. And when you got to the kitchen, you turned the light on in the kitchen?
A. That's right.
Q. And you didn't see anything when you looked out the door, right?

A. I didn't look out the door.
Q. You just looked in the kitchen?
A. I went in the kitchen, I opened the kitchen door, but the kitchen door is here and the door to go down the basement is here, but it had glass in that, but I didn't look out, I don't know why, just something -- intuition I'll call it -- told me not to look.
Q. You talk about the kitchen door. Where does the kitchen door lead to? What is it between?
A. There is nothing, just a little platform, a little space there, and you go out to the breezeway and the cellar stairs are right there.
Q. So the kitchen is on one side?
A. Yeah.
Q. And the other side is the breezeway?
A. Well, no, that's in back of the kitchen. When you go to -- the cellar stairs are here, here's the door to the breezeway.
Q. Would you feel comfortable putting a drawing of it on the board? Do you think you could do that?

(Witness goes to blackboard)

A. Here's the kitchen door.
Q. If you would make it fairly big.
A. Here's the kitchen over here.
Q. Is it a square kitchen?
A. No, it's a big, long kitchen.
Q. Okay. Could we draw where the walls of it would be there?
A. There's walls here and walls here, and over here is the windows.
Q. Okay. And where would your bedroom be or the hallway -- you mentioned a short hallway?
A. Yeah, well, it's short. You get this end of the kitchen, there's a door here to one bedroom and there's a door to this bedroom, and there's a door to the bathroom all right together, they almost hit each other.
Q. And that space in between is the hallway between there and --
A. Yeah, a little space like that.
Q. Now, you talked about the kitchen door, going to the kitchen door --

A. This is the kitchen door and this is the breezeway door here and here's the stairs to go downstairs.

Q. Down to the cellar?

A. Yes.

Q. And the cellar stairs open up into the breezeway, do they?

A. No, there's a little -- I say like a little platform. When you step from the kitchen, there's a little platform like here and there's the stairway to go downstairs and here's the door here, that little space there. Every house is the same way.

Q. Now, when you went to the kitchen door, you were going right to here, is that right?

A. That's right.

Q. And you didn't open that door?

A. Oh, yeah, that's the kitchen door. I opened that door, but I didn't open the breezeway door, because something -- I don't know, some feeling inside of me, I was afraid I was going to see something, because the door had a window in it.

Q. And the breezeway door that you are

talking about that you didn't open, that would have taken you from that little platform there into the breezeway?

A. Yeah, it's only two steps, one to the breezeway and one to the kitchen.

Q. Okay, why don't you have a seat again. Thank you.

So you went to the kitchen door and you had the light on in the kitchen, and then when you didn't see anything, you returned to your room?

A. That's right. The dog was quiet, he sat near me, and he wasn't making any fuss, so I said, well, it's just something he heard outside.

Q. And the next place you went was to your living room?

A. That's right.

Q. And you spent a few minutes in the living room?

A. That's right, I sat down in the chair that is right near the living room door, and everything was quiet, so I said, well, I guess I better go back to bed, and I went back to the bedroom.

Q. So then you returned to your bedroom, and it is your recollection that when you went back into your bedroom, the light was not on in the kitchen, is that right?

A. That's right.

Q. But there was a light on in your bedroom?

A. That's right. I keep it on all night.

Q. What kind of a light is that?

A. What do you mean what kind of light? It's no ceiling light or -- it's a lamp.

Q. It's a lamp that is on the table?

A. Yes, a small lamp.

Q. Where is that in the room?

A. It was on the dresser.

Q. Is the dresser next to the door?

A. Well, the door to the bedroom is here and there's a door right next to that, that is to the closet, and the dresser is right there.

Q. All right. Now, you mentioned that after you went back into your room, you heard glass breaking?

A. Yeah, I thought it was I heard glass. I

hadn't got settled in the bed and I thought, my gosh, something like glass breaking.

Q. So you got right out of bed again?

A. Yeah, I got out of bed again --

Q. I take it you --

THE COURT: Wait a minute, counselor, let her finish the answer before you ask another question.

Go ahead.

THE WITNESS: So I picked up the stick that I had with me all the time and, as I say, I just got to the other side of the bathroom door into the kitchen and there was a fellow standing there.

Q. (By Mr. Hammerschmith) You had not fallen back to sleep, had you, between the time when you went back to bed and the time when you heard what sounded like glass breaking? You were awake?

A. Yes, I was awake.

Q. By the way, was there any glass broken in the house?

A. No, there wasn't glass. I thought it

was glass all the time, but when my brother-in-law came, I mean, I was down to the -- what do you call it -- the police station, when he and my sister came. Somebody called them up and told them that somebody broke in, so they came to the house, and he told me when I told him --

Q. Excuse me, Miss Prekop --

A. -- about the glass, he said it was the chain on the door that made the noise that I thought was glass; glass wasn't broke.

Q. Miss Prekop, I'd ask that you listen to the questions that I am asking you, and when you have answered the question, then I will ask you another question.

A. Okay.

Q. If you could, please. Now, when you -- after you got back out of bed the second time, you went to the kitchen, did you?

A. Well, yes, I went to the kitchen, 'cuz that's where the sound came from.

Q. And so you went through that hallway. It's a very small hallway?

A. Yes.

Q. And you went into the kitchen, right?
A. That's right.
Q. And you turned the light back on near the kitchen?
A. I turned the light on.
Q. And was it at that point that you saw someone?
A. That's right, at that point, I saw someone.
Q. And where was the person that you saw, where in the kitchen?
A. Well, he was near the table.
Q. How far was that from where you were?
A. Well, probably three, four feet.
Q. What was the first thing that happened -- first of all, was that person facing you when you first saw him?
A. I didn't understand you.
Q. When you first saw that person in your kitchen, was the person facing you?
A. Yes.
Q. What was the next thing that happened after you saw him?

A. Well, the dog started jumping all over his feet, so the stick I had in my hand, I couldn't hit him in his feet, to hurt his feet, so I hit him on the head. That's the only place I could hit him.

Q. How long were you there with him in the kitchen, do you think?

A. Probably two minutes at the most, two or three minutes. Not even five, 'cuz, as I say, just half a dozen steps and you're right in the bedroom.

Q. But you were looking at him the whole time that you were in the kitchen, weren't you?

A. No, I wasn't looking at him, I wasn't looking at anything, I was too scared. That's all I know, his hands were covering his face. That's all I saw, the white sneakers and the black wavy hair.

Q. What did the hair look like? Was it long hair or short hair?

A. No, it was -- it wasn't long.

Q. Did it look neat?

A. Yes, it looked neat.

Q. Would it be fair to say it looked like he had recently had a haircut?

A. That's right.

Q. And it was fairly short hair?
A. It was on the short side, his hair was.
Q. Now, you gave a description to the police, didn't you? You were able to remember some things about the person and you gave a description to the police?
A. That's all I know about him. I can't describe anything else, except the sneakers. I know he had a blue -- like a blue jacket and he had dark trousers on.
Q. And you knew that he wasn't wearing glasses?
A. No.
Q. Isn't that right?
A. Well, I mean, I didn't see the glasses when he had his hands covering his face and when he came in the bedroom his hands weren't on his face and he didn't have glasses on.
Q. Well, you also noticed that he didn't seem to have any jewelry or scars, didn't you?
A. No, I saw no jewelry.
Q. And no scars?
A. It would be only his face would have the

scars.

Q. Yes.

A. I didn't see anything.

Q. And he was clean shaven, wasn't he?

A. Yeah, he was clean shaven.

Q. Didn't have a beard or moustache?

A. No.

Q. You're certain of that, aren't you? You're certain that he was clean shaven?

A. Yes, he was clean shaven.

Q. Now, after this incident occurred, you went at sometime to the hospital, is that right? Did you go to the hospital that night or that morning?

A. I called the police and they came and took me down to emergency.

Q. How did you get to the emergency room? Was that in an ambulance or a police car?

A. Yeah, they went and called an ambulance.

Q. When you got to the hospital, what hospital was that?

A. Wesson.

Q. You were treated, were you, in the emergency room?

A. That's right.
Q. How long were you at the hospital?
A. More than two hours before they took me to the police station. I don't know why.
Q. So you were at the hospital a couple of hours?
A. Yes, I sat there for two hours.
Q. Did they give you any treatment there at the hospital?
A. Well, they examined me.
Q. Did you have any broken bones or anything like that?
A. No, nothing like that. They didn't look for broken bones.
Q. Did any turn up later?
A. They just noticed the black and blue, the eye all swollen.
Q. You had some bruises, is that right?
A. What?
Q. You had some bruises?
A. Well, on my buttocks where he kicked me, it still bothers today.
Q. Do you know where 87 Malibu Drive is?

A. What?
Q. Do you know where 87 Malibu Drive is?
A. Well, I know it's up the street, but I couldn't tell you which house it was, 'cuz I never go up that direction, I always go to the other end when I go anywhere.
Q. But 87 Malibu Drive would be a few houses down from you, is that right?
A. It would be almost near Parker Street.
Q. Now, the person that broke into your home that night, was that somebody you had ever seen before?
A. If I had, I didn't remember.
Q. You did not recognize that person?
A. I didn't recognize him, no.
Q. What kind of build did the person have? Was he tall, was he short, was he thin?
A. He wasn't short, he was medium build.
Q. What about height, do you know how tall he was? Did you notice?
A. Well, I know he was a little taller than I was, but not too much.
Q. Now, about a week after this, you were

called down to the police station, weren't you, to look at some people?

A. Yes. A week or ten days after, that's right.

Q. So this happened on November -- this break into your home happened on November 30th?

A. November 30th.

Q. Of 1985?

A. 1985.

Q. And then about a week or ten days afterwards, you went down to the police station, right?

A. I think it was on a Sunday.

Q. And when you went down to the police station, the police there had you look at some people, didn't they?

A. That's right.

Q. They had a lineup of people for you to look at?

A. That's right.

Q. And I'm going to show you a picture and I'm going to ask you if you recognize this group of people. (Showing photograph to the witness)

A. I don't think so.
Q. You don't remember looking at that group of people?
A. Yes, I remember looking, but I don't think I --
Q. Let me just ask you. Is that the group of people that you looked at when you went down to the police station? Is that a picture of the group of people that you looked at when you went down to the station, police station, about a week after this incident?
A. Well, I don't know. I know some of them, their hair was long and messy, and I only see one fella here that his hair is so long. It seems that there was more than one there. And the --
Q. You don't remember whether this is the group of people that you looked at on that date or not?
A. No.
MR. HAMMERSCHMITH: Perhaps we should mark this for identification, Your Honor.
THE COURT: The photograph will be

A for Identification.

(A for Identification, photograph, marked)

Q. (By Mr. Hammerschmith) In any event, on that day, you did look at a group of people?

A. Yes.

Q. You didn't recognize any of that group of people as being the person who broke into your home, did you?

A. No.

Q. And, in fact, you told the police that as far as you could tell, none of them seemed to be the person?

A. That's right. I didn't recognize anyone.

Q. There was a door that was broken that night, is that right?

A. Yeah, the breezeway door, that goes to the house.

Q. That is the door that you referred to which was just outside of the kitchen door?

A. That's right.
Q. What about the kitchen door, was that broken?
A. No,.
Q. Only the breezeway door was broken?
A. Only the breezeway door, it had a -- what do you call it -- when he -- with his foot, he opened the kitchen door, but it's got like a crack a little ways up, but it didn't hurt the door, I guess.
Q. So the kitchen door seemed to be pried open, that's what you are saying?
A. Yeah, the kitchen door was okay.
Q. But the breezeway door looked like it had been kicked open, is that right?
A. That's right, it was, because he broke the locks, it was picked all around.
Q. And that door that was kicked in, did that lead from the breezeway outside or from that platform into the breezeway?
A. That door was only from the platform into the breezeway, like the house proper, you would call it.
Q. And to get into the kitchen, would you

have to go through the breezeway?

A. Yes, to come into the house, if you come from that end of the house, you'd have to come into the breezeway first.

Q. And if you went through the breezeway, you'd come to the kitchen door?

A. That's right.

Q. And when you are outside that breezeway door, you'd be on the little platform, but you'd also be outside, is that right?

A. Yes.

Q. So the door that was broken in was the door leading from the outdoors into the breezeway?

A. No, it was in the breezeway, the door was in the breezeway, and when you open that door, you go down the basement and you turn to your left and there's the kitchen door.

MR. HAMMERSCHMITH: May I have a minute, Your Honor.

(Pause)

MR. HAMMERSCHMITH: I have no

further questions of this witness.

MR. BLOOM: Thank you, ma'am, you're all set.

(Witness steps down)

THE COURT: Can I see you side bar.

(The following conference was held at side bar)

THE COURT: Do you have your next witness?

MR. BLOOM: I have the other woman here, but I guess she's a problem. I don't want to have to bring her back, Judge.

THE COURT: Well, the only trouble is it's quarter of four.

MR. BLOOM: I know, but if we have to hold them till 4:30 -- I have a real problem with this woman. Can I report back to you in five minutes? Because she's in hysterics, I guess.

THE COURT: Do you want to take a recess or just go out and talk to her?

MR. BLOOM: I think it would be better if you give me a recess and see if I can talk to her for five minutes.

(End of side bar conference)

THE COURT: Ladies and gentlemen, we will take a very brief recess.

(Brief recess taken at 3:45 P.M.)

(Hearing reconvened at 3:55 P.M. The defendant and jury were present)

EMILY LICHWALA (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Emily, I want you to tell Judge Murphy and the jury your name.
A. Emily Lichwala.
Q. L I C H W A L A?
A. Right.
Q. And you live in Springfield?
A. Right.
Q. And you live in Sixteen Acres?
A. Right.
Q. And what is the number of your street?
A. Thirty three.
Q. And how long -- is that on Covel Street in Springfield?
A. Right.
Q. How long have you lived there?
A. Twenty-four years.

Q. Emily, could you tell the jury how long you have lived alone there?
A. Five years.
Q. How many floors of living space are there in that house?
A. Living space, only one floor.
Q. And you have a basement?
A. Yes.
Q. That is finished over?
A. Yes, it's a rec room and a laundry room.
Q. Two of them separated by a door?
A. Right.
Q. Tell us what you have in the rec room.
A. There's a bar, old English living room set.
Q. Pool table?
A. A pool table.
Q. Do you have sticks for that pool table?
A. Yes, there's a rack on the wall for the sticks.
Q. You don't play?
A. I don't play.
Q. But it's been down there how long, that

pool table, would you say, your best guess?

A. Twenty years.

Q. Now, I'm going to ask you, if you can, if you would be kind enough, ma'am, to go back to November 30th of 1985. Do you remember, when you went to bed that night, being woken up to something? Do you remember being awakened that night?

A. I'm a very light sleeper, I'm up most of the night.

Q. Do you remember on that night hearing something that caused you to get up out of bed?

A. Yes.

Q. Would you tell the jury and Judge Murphy as best you can recall what was it you remember hearing that caused you to be alerted?

A. Well, first I heard the jolting of my door in the kitchen.

Q. Why don't you just explain quickly to the jury, if you could, you've got a door that comes into your kitchen on the first floor, correct?

A. Yes.

Q. Do you also have a breezeway?

A. Yes.

Q. What did that sound like, that noise that you heard coming from the kitchen door area?
A. Well, it was like someone was trying to open up a door and couldn't, because I had it bolted.
Q. That door was bolted?
A. Yes.
Q. Now, that door that you are talking about, if I was to be inside your house in the kitchen and opened it, where would I be looking at as I walked through the door?
A. You would go down the stairs to the laundry room.
Q. So, for instance, today or any other day, if I was in your basement, is that the door you would have to use to get into your kitchen, let's say?
A. From downstairs.
Q. From the downstairs basement?
A. Yes.
Q. When you heard that, what do you remember doing when you heard that sound that you described for us?
A. I thought I was hearing things. I

thought that it was my imagination.

Q. Did you do anything at that time or did you just stay in your room?

A. I also heard like footsteps down the stairs, but I was so convinced that it was my imagination.

Q. You said you thought you heard footsteps going down the stairs. That is the stairs that go into the laundry room and the rec room?

A. Yes.

Q. After, did you hear anything else within the next few minutes?

A. It was silent for at least -- I would say five minutes it was silent, so I was sure it was my imagination.

Q. Let me ask you this. Were you still in your bedroom or had you gotten out?

A. I went back to the bedroom.

Q. Did you hear anything when you went back to your bedroom?

A. Yes, I heard a crash.

Q. Where did that appear to come from, based on what you --

A. It appeared to me like it was in the breezeway and I thought it was the breezeway door, back breezeway door.

Q. Could you describe -- what do you remember it sounded like?

A. Glass shattering.

Q. When you heard that, did you do anything?

A. I wanted to call the police, but I didn't -- was afraid -- I couldn't think fast enough. I thought of sounding the smoke alarm, but I didn't think it would work.

Q. What did you do, if anything?

A. I was just so frightened, and then in a matter of minutes I heard another crash.

Q. Was all this happening quick or was there --

A. It was very, very quick.

Q. And when you heard this next crash, do you remember what you did then?

A. When -- I wanted to make a phone call, but I knew I couldn't, and when I heard -- see, I not only had new locks put on, but I also had chains put

on, and when I heard the chains, I knew that he was only yards away from me, and so I --

Q. Let's back up there. When you heard the chains, what door are we talking about now?

A. It's the other door in the kitchen. Not the one that leads to the basement. That was a glass door.

Q. I want you to explain that, so -- because the jury's never been in your house, so they understand that. The first door you talked about, that's the door from the basement up, correct? The first -- there was one door that if you come up the basement, that leads you into the kitchen?

A. Yes, but it's just a door, no glass.

Q. Now we're talking about another door?

A. Yes.

Q. That also lets you into the kitchen, correct, you can get into the kitchen?

A. Yes.

Q. But that leads you out to the breezeway if you go through it?

A. That's right.

Q. This is the door you're talking about

now, the second one?

A. Right.

Q. And does that have glass in it, the second door?

A. Yes.

Q. So either one of them you can get into the basement with, correct?

A. No.

Q. Excuse me, you can get into the kitchen with?

A. Right.

Q. And when you heard what you thought was glass breaking on that second door that leads to the kitchen from the breezeway, what did you do then? What did you do at that time? Were you still in bed?

A. I was in the bedroom at the time and I started to come into the kitchen, but I heard -- beside the crash earlier, I heard the chains, so I knew he was just yards away from me, so I went back into the bedroom, picked up what I could and ran barefooted outside to the living room door.

Q. Did you eventually get inside the neighbor's house across the street?

A. Yes.
Q. And, Emily, that night, did you ever see who this person was that night?
A. No.
Q. Never got a look at him, correct?
A. No.
Q. All right. Did you, when you got inside your neighbor's house, at some point, end up calling the police or did they call the police in your presence?
A. My neighbor called for me, 'cuz I was too --
Q. Nervous?
A. I was so -- in such shock that I couldn't do it. My neighbor called for me. I asked her to.
Q. After things had calmed down a little bit and the police got there, you eventually had an opportunity to go back to your house, correct?
A. In the morning.
Q. So you stayed there for -- you didn't go back for a while, correct?
A. She fixed up a bed for me to sleep there

overnight.

Q. When you went back to the house, tell us what things, if anything, you saw that were different from when you had gone to bed the night before when all this started?

A. Well, first of all, I saw the damaged door.

Q. Which one are we talking about now?

A. The one to the breezeway.

Q. That's the one that's got the glass in it, you said?

A. Yes.

Q. Was there any glass broken in that door?

A. That was broken also.

Q. All right. Was there glass broken anywhere else that you saw?

A. No, just -- the other breezeway -- you know the back breezeway door? I thought it was the door, but it was the window, it wasn't the door. I didn't see it until I got back home in the morning.

Q. What did you see about that? What did you notice different about that?

A. I said, oh, he got in -- it wasn't the

door, it was the window. It was, you know, a lot of glass shattered.

Q. Okay, what did you see -- where was the glass broken? You said the door that leads in -- the door that leads in from the breezeway into your kitchen, there's glass there?

A. Yes.

Q. You said that was broken?

A. Yes.

Q. Was there any other door or window that you saw the next morning when you went in, besides that, that was busted or broken?

A. Just the window next to the back door.

Q. That's in the breezeway itself?

A. Yes.

Q. And that is separate from the door that you have just told us about, that is a different area?

A. Yes.

Q. Now, did you go outside and notice anything at all during the day?

A. I didn't go outside. Someone was there from the police department and I just went back to

the bedroom and I noticed that my purse was gone, and I said it has to be the same person that victimized me at a previous time --

Q. Let me ask you this, ma'am. When you said that a purse was gone, where was the purse, as best you can remember it, when you went to bed that night? What room?

A. In the bedroom.

Q. Whatever time it was on the next day when you went now to the bedroom, was it gone now?

A. It's the same day.

Q. Well, the afternoon of the same day, right?

A. Not the afternoon, it was early in the morning, as soon as --

Q. I'm not arguing with you, I just want -- all this happened after midnight, right?

A. Yes.

Q. It was 3:00, 3:30 in the morning?

A. Yes.

Q. About?

A. Yes.

Q. Sometime later the next morning, you

went home. I believe you said you slept at your neighbor's for a while, am I mistaken?

A. I never slept, but they offered me a bed.

Q. Okay. At sometime you went back into your house?

A. As soon as they were up, I went back home.

Q. Okay. Now you're telling us that pocketbook was gone, correct?

A. Yes.

Q. Inside of it, can you just give us an idea of some of the things that were in there?

A. In the purse?

Q. Yes, in the purse, if you could.

A. Well, there was my wallet with all my identifications, I had keys, eyeglasses, makeup.

Q. Identification?

A. All my identification, all my credit cards.

Q. And that was gone?

A. Yes.

Q. Did you see a pool cue anywhere that

morning?

A. Not until later in the afternoon when my brother came to board the door for me, 'cuz it was cold and he boarded it.

Q. Where did you see the pool cue?

A. On the floor next to the door, the breezeway door, with the glass.

Q. Was that on the floor in the kitchen?

A. Yes.

Q. When you left and went to bed that night, was there any pool cue on the floor of the kitchen? I know it's kind of a stupid question, but I just want you to answer it for the record. When you went to bed that night --

A. No, because, you know, when I saw the curtain on the floor and the rod and the glass and all this, I saw the cue stick and I said to my brother, "Gee, he must have used this to smash the windows." And my brother picked it up and put it back into the rec room on the rack.

Q. Which, you told us, is downstairs?

A. Someone later picked up -- Cheryl and her assistant picked it up one evening, the cue

stick.

Q. The police department?

A. But by then I had handled it and my brother had handled it.

Q. But, eventually, someone from the police department took it?

A. Yes.

MR. BLOOM: Thank you, ma'am, for coming in.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. You said that you heard a chain rattling on one of your doors?

A. Yes.

Q. Which door would that have been? That is door from the breezeway into the kitchen?

A. Right.

Q. Not a door from the outside into the breezeway?

A. Right.

Q. So it's a door -- the lock is on the kitchen side of the door from the breezeway to the kitchen, is that right? The chain?
A. Yes.
Q. Where were you when you heard that?
A. I was in the bedroom.
Q. Where is your bedroom in relation to the kitchen?
A. Well, there's a little hallway -- there's a long hallway to all the bedrooms and I just went into my bedroom.
Q. Is the kitchen at one end of this long hallway that you referred to?
A. Well, from the kitchen you can get to the hallway. You do get into the hallway from the kitchen.
Q. Does the kitchen lead -- is there a door leading directly from the kitchen into the hallway?
A. Yes.
Q. And there is nothing in between?
A. Not directly, not from the door to the hall. You have to go through the kitchen to get to the hallway.

Q. I take it if I walked in that breezeway door, the one where the chain was rattling, I could walk through the kitchen, right?

A. You had to go through the kitchen to go into the bedroom, to the hallway and bedroom.

Q. And would I have to walk the length of the kitchen to get there?

A. Yes.

Q. And then I would enter a hallway?

A. Right.

Q. And then I'd have to proceed down the hallway to your bedroom door?

A. Yes.

Q. And how many doors down the hallway would that be? Are there other rooms before I would get to your bedroom?

A. Are there other doors to open?

Q. Other doors to other rooms other than your bedroom?

A. No. Even from the kitchen, there is no door.

Q. I'm sorry. Doorways.

A. From the doorway.

Q. If a person leaves your kitchen and starts going down that hallway, away from the kitchen, what is the first doorway that they would come to, entrance to a room?
A. They would enter the bathroom first and then the bedroom is on the right.
Q. Is the bathroom on the same side as the bedroom, as your bedroom?
A. No.
Q. It's on the opposite side. Are there any other rooms between that you would pass on the same side of the hallway as your bedroom before arriving at your bedroom?
A. No.
Q. And you were in that bedroom when you heard this noise, is that right?
A. When I heard the crash, yes.
Q. And when you heard the chains rattling, correct?
A. When I heard the chain rattle, I was entering the kitchen, 'cuz I was going to call, I was going to phone emergency.
Q. So you were in the process -- were you

actually in the kitchen or just in the process of going --

A. I was in the kitchen.

Q. Where in the kitchen?

A. By the telephone, next to the refrigerator.

Q. Where is the telephone in relation to the door -- excuse me, in relation to the hallway?

A. In relation to the hallway? About a yard and a half.

Q. So it is one of the first things you come to when you enter the kitchen, is that right?

A. What is it?

Q. It is one of the first thing you would come to as you enter the kitchen coming from the hallway?

A. That's right.

Q. When you heard the chain rattling, you then turned around and left?

A. I went to the bedroom to quickly pick up whatever I could.

Q. And then you left the bedroom?

A. I left the bedroom and I went out the

front door.

Q. To get to the front door, did you go further down the hallway from the kitchen?

A. Yes.

Q. So the front door is sort of at the opposite end of the house from the kitchen, is that right?

A. Oh, yes, it's quite a distance.

Q. And it was the front door that you went out by when you went to the neighbor's house?

A. Yes.

Q. On that night, you didn't hear anyone say anything, did you, anyone say anything in your house that night?

A. I had left before he entered my house.

Q. So you didn't hear any words at all?

A. No.

Q. And you didn't see anybody at all?

A. No.

Q. You didn't see anybody --

A. I just ran for my life.

Q. You didn't see -- you didn't really see anything at all?

CITY 003556


A. No.

Q. No person?

A. No.

Q. And the pool cue that was found was found next to the door leading from the kitchen to the breezeway?

A. Right.

Q. It was on the inside next to the kitchen door?

A. Right.

Q. And that window to the kitchen door was broken?

A. Yes.

Q. And there was another window which was broken also, is that right, in addition to the door to the kitchen?

A. Yes. That's the window next to the back breezeway door. That is also a glass door, but that wasn't broken.

Q. Would the rear breezeway door or the back breezeway door, would that have been kept locked?

A. Yes.

Q. It was the window next to that door that was broken, correct?

A. Yes, the windows were also locked.

Q. Was that door damaged?

A. The door wasn't damaged at all in the back. It was the window that was damaged.

Q. And the only door that was damaged was the door leading from the breezeway to the kitchen?

A. Right.

MR. HAMMERSCHMITH: I have nothing further. Thank you.

MR. BLOOM: Thank you, Emily.

(Witness steps down)

THE COURT: Mr. Foreman and ladies and gentlemen of the jury, we are going to recess for the day, and I'd ask you to be here about quarter past nine tomorrow morning, we should be able to get right into the courtroom at 9:30 and pick up the trial again at that time.

Now, my instructions to you

at this time are that you are not to have any discussion among yourselves about the case. This is the same instruction I gave you at lunch. As I told you then, you are not going to have any discussion among yourselves about the case until it is given to you for decision, which means after all the evidence is in, the lawyers have argued and I have instructed you on the law, and the reason for that is to start forming opinions or exchanging opinions or ideas about the case wouldn't be fair to the Commonwealth and it wouldn't be fair to the defendant until you get the complete picture, so I am going to repeat this instruction to you throughout the trial.

Nor are you to have any discussions with anyone outside the courthouse about the case, anyone that inquires, as I told you at noontime. The reason for that is you have got to

CITY 003559


decide the case based on the evidence presented at the trial. You can't be influenced by anything that comes to your attention by any other source. If you start discussing it with some people outside the courthouse, they are going to have ideas or express opinions about the case or give you information that you shouldn't have. You have got to base your decision based on the information you get here in the courtroom. For that very same reason, I am going to impose an obligation on you to avoid all publicity about the case, any newspaper articles or news reports that, should there be any, for the very same reason, you have got to decide the case based on the evidence you hear in the courtroom, you can't be influenced by any newspaper articles or news reports or anything that comes to your attention from any other source.

Nor are you to take any

personal views of this area up on Malibu Street or Malibu Drive, I believe. No personal views of that area, because you have got to decide the case based on the evidence you received as a group, and that is the reason for that instruction.

I am going to repeat these instructions throughout the trial, and the reason I repeat them is because they are so important. So with that I will say good evening to you, we will see you tomorrow morning. Be in the courthouse about quarter past nine, we should be ready to go at 9:30.

(Hearing suspended at 4:15 P.M.)

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm