**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 10

C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 9, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME III

EXHIBITS


| EXHIBITS | PAGE |
| --- | --- |
| Voir Dire Exhibit 1, statement | 15 |
| Voir Dire Exhibit 2, photograph | 15 |
| Exhibits 1A, B & C, photographs | 76 |
| Exhibits 2A, B & C, photographs | 78 |
| Exhibits 3A, B & C, photographs | 103 |
| B for Identification, box | 116 |
| Exhibit 4, Miranda card | 148 |
| Exhibit 5, statement | 160 |
| Exhibit 6, photograph | 166 |
| Exhibit 7, waiver | 177 |
| Exhibit 8, bedsheet and packaging | 194 |
| Exhibit 9, pillowcase and packaging | 194 |
| Exhibit 10, pair of gloves and packaging | 198 |
| Exhibit 11, Miranda card | 207 |
| Exhibit 12, telephone card | 207 |
| Exhibit 13, pocketbook and contents | 215 |
| Exhibit 14, photograph of pocketbook | 216 |
| Exhibit 15, photograph | 227 |

(Hearing convened at 9:50 A.M.
The defendant was present, the jury
was not present in the courtroom)

MR. BLOOM: Judge, can we take care of that voir dire matter now?

THE COURT: Sure.

MR. BLOOM: Sergeant Kelly.

THOMAS KELLY (Sworn)

(Voir Dire)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you state your name for Judge Murphy, please, and your occupation?

A. My name is Thomas M. Kelly, I'm a sergeant in the Springfield Police Department, I am currently assigned to the Crime Prevention Bureau.

Q. Sergeant, were you involved in a series of cases in which ultimately those cases were

directed at George Perrot back in 1985, during that time period?

A. Yes, sir.

Q. And you were assigned to what bureau at that time?

A. Crime Prevention Bureau.

Q. What shift?

A. Four to twelve.

Q. Specifically, did you work in Morals or Drugs or both?

A. I worked in both, I was the head of the Morals Unit.

Q. Now, at some point at the end of 1985, did you become aware that Mr. Perrot was arrested?

A. Yes, sir.

Q. Do you remember the date that he was arrested?

A. December 7, 1985.

Q. Did you see him when he was brought into the station on that day?

A. Shortly after.

Q. On the 7th?

A. On the 7th, yes.

Q. Without going into the entire day, Sergeant, could you tell Judge Murphy, before the day had concluded on December 7th of 1985, were you aware on that day that he had given a written statement to Detective Jarvis?

A. Yes.

Q. Did you have an opportunity to look at it and review it on that day, the 7th?

A. Yes, sir.

Q. Could you just -- and this pertains to another hearing, but is this the document that you saw on that day that purports to have George Perrot's signature on the bottom of it?

A. Yes, sir.

Q. And just so we can keep it straight, it says Exhibit 9?

A. Yes.

Q. That would probably pertain to a motion to suppress that was previously held?

A. Yes, sir.

Q. And were you aware as a result of reading that statement that Mr. Perrot had purportedly said certain things about the Covel

Street break that occurred on 11/30/85?
A. Yes, sir.
Q. Did you read those portions on the 7th before you went home that pertained to the Covel Street break?
A. Yes, sir.
Q. Can you tell us what that document says in terms of the Covel Street break?
A. Perrot indicates in the statement that he found a handbag and took it with him and that he tossed it into some bushes further down the street, down Covel Street.
THE COURT: And he what?
THE WITNESS: He found a handbag, took it with him and tossed it into some bushes further down the street.
Q. (By Mr. Bloom) And just correct me if I'm wrong, just so the record is straight, in reference to the Covel Street break, does this document say, "I headed for number 33 Covel Street. The reason I went there is I heard it had been broken into before. I had a pair of my sister's gloves on, they were like wool gloves. I entered an unlocked

rear breezeway door at 33 Covel Street. I kicked the rear inner door in, I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door, I left the pocketbook a few houses down the street"?

A. Yes, sir.

MR. BLOOM: I would just offer this, Judge, for the purposes of this hearing. Mr. Hammerschmith's got a copy.

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: That was part of the motion to suppress?

MR. BLOOM: Yes, it's marked Exhibit 9, Judge.

MR. HAMMERSCHMITH: Out of the first motion to suppress?

THE COURT: Right.

Q. (By Mr. Bloom) Were you aware and also involved in the investigation concerning Mary Prekop on 11/30/85?

A. Yes, sir.

Q. For the purposes of this hearing, sir, we are looking left to right, we can make this first 33 Covel -- I will just start by making 33 Covel Street. I'd like to you draw in, again keeping this left to right, where Malibu is, and if you can put in 87 Malibu and 27 Malibu in that diagram, keeping in mind where I put Covel Street?

A. Covel Street continues another couple hundred yards, runs into Hilltop. Hilltop's a dead end here. There is a slight rise, there's some houses up in here. I believe this street is Telbar. I confuse Telbar and Bartels. I believe it's Telbar.

Q. There is a walkway between Covel and Telbar?

A. There's a path from this house --

Q. Put the house at the top of the hill.

A. Okay. There's a path through here, and to Parker Street, almost opposite of Telbar or Bartels is Malibu. Number 27, Miss Prekop's house, is here. Number 87, Perrot's sister's, is here.

THE COURT: 33 Covel is --

THE WITNESS: Mrs. Lichwala.

Q. In terms of a straight line -- and I

know there's intersecting items that you put in there, from looking from left to right, if you were standing facing Covel, it would be 33 Covel, 87 Malibu, 27 Malibu?

A. Yes, sir.

Q. 87 is the defendant's sister's home?

A. Yes.

Q. And 27 is Mrs. Prekop's home?

A. Miss Prekop's, yes.

Q. Both on the same side of the street?

A. Yes, sir.

Q. Can you give Judge Murphy an estimate, if you were walking from 33 Covel and you came into Hilltop and you said there is a pathway that takes you to Telbar, and Telbar takes you straight across Parker into Malibu, how much of a distance are we talking? Let me rephrase that.

I don't know how you could possibly give it. How much time would it take you walking at a normal pace to get from 33 Covel to 27 Malibu?

A. About three to five minutes.

Q. Do you have an estimate as to what -- strike that. Do you have an idea as to how many

houses are in between here, would you be guessing?
A. I would be.
Q. Between 33 Covel and Hilltop?
A. It's a short street. I would say there's probably ten.
Q. So there's a series of houses between 33 Covel and Hilltop?
A. Yes, sir.
Q. Now.
Q. Now, if you were going from Covel Street to Malibu in the quickest direction, or the quickest time to take you there, would this be the method to go as you described?
A. Yes, sir.
Q. Down to Hilltop, Telbar and then over Parker Street into Malibu?
A. Yes, sir.
Q. What kind of distance, do you have any opinion? Is it more than a mile or less than a mile?
A. No, it a quarter mile, maybe a little more.
Q. Now, at some point -- and you were aware of what Mr. Perrot allegedly said on the 7th to

Detective Jarvis?
A. Yes, sir.
Q. That statement indicated that he had supposedly thrown the pocketbook somewhere after leaving Covel in the direction of Malibu, he said he dumped the pocketbook a few houses down?
A. Yes, sir.
Q. Was there anything else in that statement, as you remember, about the location of the pocketbook?
A. I think he said in some bushes.
Q. Were you also aware in that statement that he indicated that when he left Covel Street, and I'm going back to December 7th, were you aware on December 7th that when he indicated that when he left Covel Street, he went to 27 Malibu?
A. Yes.
Q. Sergeant, on December 10th, you received a phone call from Richard Kane, is that fair to say, or he talked to you in person, one or the other?
A. Face to face, yes, sir.
Q. And as a result of what he told you on December 10th, that would have been three days after

you learned the context of Mr. Perrot's statement?

A. Yes.

Q. You did something, and can you tell Judge Murphy what you did?

A. I went to the intersection of Covel and Hilltop and I checked every house in that intersection.

Q. What caused you to go to this intersection here?

A. My conversation with Officer Kane.

Q. Now, when you went to that intersection, did you find something?

A. Yes, sir.

Q. And could you give the judge an idea in terms of the direction from Covel to Malibu Street, what kind of distance is it from Covel Street to this area on Hilltop Avenue or Hilltop Street that you searched on December 10th?

A. The area that I searched?

Q. Yes, what would be the distance from Mrs. Lichwala's house?

A. Two to three hundred yards.

Q. Did you find something?

A. Yes, sir.
Q. What did you find?
A. I found Mrs. Lichwala's brown pocketbook and the contents of it.
Q. Which included identification --
A. Personal papers, photographs, identification.
Q. On that day, in reference to the incident of 11/30/85, on 12/10/85 did you have an opportunity to have that pocketbook photographed as to where you found it?
A. Yes, sir.
Q. Does this photograph fairly and accurately depict where you found the purse and how it appeared to you as you picked it up on the 12th -- excuse me -- the 10th of December 1985?
A. Yes, sir.
Q. Someone wrote in 11/10/85, that should be 12/10/85, correct?
A. Right.
Q. Is that the pocketbook?
A. Yes, sir.
MR. BLOOM: I'd like to mark this,

Judge, for purposes of this hearing.

THE CLERK: The statement is Voir Dire No. 1, the photograph is Voir Dire No. 2.

(Voir Dire Exhibit No. 1, statement, marked into evidence)

(Voir Dire Exhibit No. 2, photograph, marked into evidence)

Q. (By Mr. Bloom) Could you put an X at the approximate spot that you found the pocketbook on the 10th of December of '85?

A. There's a house here and there's a house further up here.

Q. Is that on a hill?

A. Yes, sir. There's a driveway that runs between these two, and I found the pocketbook here.

Q. How long did you find it after you went up to that location?

A. Five minutes.
Q. Did it appear the way it does in that exhibit that I have just handed the Court on the 10th when you saw it?
A. Yes, sir.
Q. Can you tell us -- you can sit down, Sergeant -- there is no dispute that the reason that you were there at that time on that day was based on what Kane had said to you?
A. Yes, sir.
Q. As a result of the information that you had been given on the 7th of December of 1985, can you tell Judge Murphy whether you intended at some point to go up there or instruct somebody to go up there as a result of the information you learned on the 7th?
A. My intent would be to bring every available man with me and begin at 33 Covel Street and search every home along that route.
Q. You didn't do that on the 8th or 9th?
A. No.
Q. Where were you on the 8th and 9th, do you know?

A. I was off.

Q. And the day of the 10th, sometime during the course of the day, Kane provided you with this information?

A. Yes, sir.

MR. BLOOM: That's all I have for this hearing, Judge.

CROSS EXAMINATION BY MR. HAMMERSCHMITH

Q. You were the officer in charge of this investigation, were you?

A. Pardon me.

Q. You were the officer in charge of this investigation?

A. Yes, sir.

Q. And your first awareness of the break-in as Mrs. Lichwala's house was at about 3:30 or 4:00 in the morning on December 7th, is that right?

A. No.

THE COURT: The break was on the

CITY 003037



30th.

MR. HAMMERSCHMITH: I'm sorry.

Q. On November 30th?

A. Yes, sir.

Q. And that would have been, I guess, a Saturday morning?

A. Yes, sir.

Q. And you went down to the police station upon being notified of the break-in -- excuse me -- you went down to the police station on December 7th, is that right?

A. Yes, sir.

Q. And, at that point, you were also there in the very early morning hours, is that right?

A. What day?

Q. On December 7th.

A. Yes, sir.

Q. You were there about 4:00 in the morning?

A. It would have been around that time.

Q. And it was in connection with George Perrot that you came down there, is that right?

A. Yes, sir.

Q. And sometime during that day a statement was taken from Mr. Perrot, is that right?

A. Correct.

Q. Relating to the incidents of November 30th at Mrs. Lichwala's house and Miss Prekop's house?

A. Yes, sir.

Q. And you were familiar with the contents of that, were you not?

A. That afternoon, yes.

Q. You were at the station that afternoon also, right?

A. Yes.

Q. And you became aware of the statement shortly after it was given by him, is that right?

A. That's correct.

Q. Now, that statement does not say anything about bushes, does it? The statement --

A. I'd have to look at it again.

THE COURT: Which one are we talking about?

MR. BLOOM: The one you have, Judge.

THE WITNESS: I'd have to see it again.

Q. (By Mr. Hammerschmith) Well, you indicated earlier when Mr. Bloom first asked you that the statement said that the purse was in some bushes. Is that your recollection?

A. I would have to see it again, sir.

(Document shown to the witness)

THE WITNESS: No.

Q. It doesn't say anything at all about bushes?

A. No, sir.

Q. The only things it says in terms of location was the pocketbook was a few houses down the street?

A. Yes, sir.

Q. Now, you were aware, were you not, that the pocketbook that was referred to was one that had been taken in the break into Mrs. Lichwala's house?

A. Yes.

Q. And you knew from your experience a week

before with this case that there was a missing pocketbook, is that right?

A. Yes.

Q. Now, did you take any steps at all upon seeing this statement, did you take any steps at all on December 7th, to send someone there to locate the pocketbook?

A. No.

Q. And you did not do so on the 8th or on the 9th, is that right?

A. I did not, no.

Q. And you didn't instruct anybody else to go there?

A. No.

Q. On either of those two days?

A. No.

Q. So we are already -- you first learned of this possible location of the pocketbook about a week after the break, correct?

A. Yes.

Q. So you didn't do anything the next day or the day after, right?

A. No.

Q. And you did do something -- is it on the 10th that you did something?
A. Yes.
Q. That is the 10th of December?
A. Yes, sir.
Q. And you did so after receiving some information from Officer Kane, is that right?
A. Yes, sir.
Q. And Officer Kane told you that he had spoken with George Perrot down at York Street, right?
A. Yes, sir.
Q. And he told you, among other things, that he'd ask George where the location was of that purse, correct?
A. Yes, sir.
Q. And Officer Kane described to you or told you the description of the location that he said was given to him by George Perrot, is that right?
A. Yes, sir.
Q. And do you know what time of day it was that you got that information?
A. I had just come to work, it was about 3:30 or quarter to four.

Q. In the afternoon?
A. Yes.
Q. I take it earlier that day you had made no efforts to get that pocketbook -- to send someone out to look for the pocketbook either?
A. No, sir.
Q. This would have been on Tuesday, is that right? The 10th was a Tuesday?
A. Yes.
Q. Now, after speaking with Officer Kane, you personally went to this location to look for the pocketbook?
A. Yes, sir.
Q. And did you go with anyone else?
A. Yes.
Q. How many or people did you go with?
A. One other.
Q. Who was that?
A. Officer Clapprood.
Q. How long was it after you spoke with Officer Kane that you went there? A matter of minutes?
A. Probably within a half hour.

Q. It took you five minutes to find this pocketbook?
A. Yes, sir.
Q. And the reason it took you five minutes to find the pocketbook is because you had a description of where it was, is that right?
A. Yes, sir.
Q. From Officer Kane?
A. Yes.
Q. Now, what is your -- on the diagram on the board that we have here, I take it that this is Covel Street running in front of this house that is marked 33 Covel?
A. Yes, sir.
Q. And does Covel Street end when it intersects at Hilltop?
A. Yes.
Q. And this is still Hilltop as it moves around --
A. Hilltop ends in that driveway. The two houses are situated as I have them, one behind the other one, and Hilltop ends there.
Q. And this space that you have between

what appears to be a house at the end of Hilltop and another house is a pathway?

A. No, that's the fence. I drew that line as a fence.

Q. This is a fence here?

A. Right.

Q. There is no road that goes through here?

A. No. There are driveways on either side.

THE COURT: That lead into the house, you mean?

THE WITNESS: Yes, sir.

Q. How does the driveway get through the fence?

A. It's not drawn to scale. This should probably be a little further away. This is not accurate, it's a rough diagram. There's a fence between these two houses. Hilltop comes and ends in these driveways.

Q. And how long are those driveways, roughly. Could you point to something in the courtroom that --

A. They are about 60 to 70 feet.

Q. Perhaps the length of the courtroom,

then?

A. Yes.

Q. Each of those is?

A. This would be a little longer, it's set back farther.

Q. Would the fence run alongside the driveways also?

A. It separates the driveways.

Q. But it goes past the driveways, it separates the houses, as well?

A. Yes.

Q. You can have a seat. What is along either side of the fence?

A. I'm sorry?

Q. What is along either side of the fence, between the driveways?

A. Bushes and leaves.

Q. How long does that fence extend?

THE COURT: How long does what?

Q. How long does that fence extend? How long is that fence?

A. My estimate would be that it's a hundred feet, maybe less.

Q. At what point along that fence did you find -- first of all, what side of the fence is that on?

A. It's on the side that I indicated.

Q. That would be on the bottom of the diagram on the board?

A. Right.

Q. Whereabouts in relation to the house on the bottom side is --

A. It's still on the approach path on the driveway.

Q. How far is that from Covel Street, if one walked down Covel Street, turned on Hilltop and walked along the fence, what would be the total distance that you'd walk to get to that point?

A. I estimated two to three hundred yards.

Q. How far would that have been from 87 Malibu?

A. Somewhat less than a quarter of a mile.

THE COURT: Are we talking about where the pocketbook was located or are we talking about 33 Covel?

MR. HAMMERSCHMITH: My question

related from where the pocketbook was found to 87 Malibu. About a quarter of a mile?

THE WITNESS: Yes, sir, somewhat less.

Q. (By Mr. Hammerschmith) Are there other streets that run between Hilltop and Parker in that vicinity? Do you understand my question? Are there other --

A. Hilltop doesn't reach Parker.

Q. I understand that. Are there other streets, though -- Parker and Hilltop are parallel, correct?

A. Right.

Q. Are there other streets that run from Hilltop to Parker?

A. No.

Q. No other --

A. At the end of Hilltop, I'm not aware of the name of it.

Q. How far would that be from Covel Street to the end of Hilltop?

A. From where Covel and Hilltop meet to the

end of Hilltop?
Q. That's right.
A. That's a short street, as well. Maybe five houses, five building lots.
Q. So if one were going from 33 Covel Street to 87 Malibu, one would have basically two ways that one could go. One would be to follow the streets, correct?
A. Yes.
Q. And that would take you down Covel Street, a right on to Hilltop, a left on to Parker, and up Parker Street until you took a right at Malibu, right?
A. Left on to whatever the street is that Hilltop goes out to, and then to Parker.
Q. And then you'd have to go down Hilltop about five houses to get to that other street that takes you over to Malibu, correct?
A. Yes, sir.
Q. Where you found the purse, that wasn't actually a road at all, was it?
A. No.
Q. It was a back way that one could go if

CITY 003049


one was familiar with the area, correct?
A. Yes.
Q. The purse you found was a brown purse?
A. Yes.
Q. Do we have that purse here, by any chance?
A. Yes.
MR. BLOOM: Do you want me to get it, Judge?
MR. HAMMERSCHMITH: With the Court's permission, I'd like to have it. It seems to me it would be relevant to the Court in terms of the evidence --
MR. BLOOM: May I just have a minute?

(Pause in the proceedings, after which Mr. Bloom returned with the purse)

Q. (By Mr. Hammerschmith) Officer, this is the purse that you found that day?
A. Yes, it is.

Q. And this is the state it was in when you found it?

A. Yes.

Q. Same color?

A. Yes, sir.

MR. HAMMERSCHMITH: I don't know whether I need to offer it into evidence at this point. I would just like --

THE COURT: We have a photo of it.

MR. HAMMERSCHMITH: I understand. I was more interested in the color of it than the size.

THE COURT: You mean you haven't seen that before?

MR. HAMMERSCHMITH: No, I hadn't.

No further questions.

REDIRECT EXAMINATION BY MR. BLOOM:

Q. Mr. Hammerschmith asked you, this would be the way you would go -- I believe that's what he

said, correct me if I'm wrong, Sergeant -- if you were familiar with the neighborhood?
A. Yes.
Q. On December 7th and 10th, you believed that Mr. Perrot was familiar with the neighborhood, didn't you?
A. Yes, sir.
Q. And isn't it a fact, Sergeant -- strike that. An alternate way to get to Malibu would be -- and there is a series of houses on both sides of the street here on Hilltop going in this direction, correct?
A. Yes.
Q. -- would be to turn out here and then ultimately come out to Parker Street, correct?
A. Yes.
Q. And then you'd have to take a left on to Parker, right?
A. Right.
Q. And then go up Parker Street to Malibu, correct?
A. That's correct.
Q. And how much longer would you estimate

that that would be from 33 Covel, as opposed to the more direct route that you have described for Judge Murphy? I'm saying 33 Covel to Hilltop, right on to Hilltop -- I don't know, is this Bartels?

A. I don't know.

Q. Left on to the lower street, out to Parker and then a left on to Parker Street?

A. If the straight line is three to five minutes, that route would add another five.

Q. Walking?

A. Yes.

Q. Can you tell us, Sergeant, as you left 33 Covel and you came up to Hilltop, you indicated there is a path that connects Hilltop to Telbar or whatever the name of the street is that leads you into Parker, is that correct?

A. I'd call it an access. I don't think the guy that owns the house is too happy about --

Q. Well, I'm more concerned with --

A. There is a route there.

Q. Can you walk through there unobstructed by bushes and trees?

A. Yeah.

Q. How wide is that access? Just give us an estimate. Big enough for how many people to walk through at a time?
A. Three to five.
Q. Width?
A. Yes. Actually, the whole yard is access.
Q. Can you tell us, Sergeant, when you went up to this area and you were standing in this pathway, how far off of the pathway was the pocketbook that is in the exhibit?
A. It was in the driveway and it was --
Q. I'm asking you this: If you were leaving 33 Covel, you went on to Hilltop and you started going toward Malibu in this direction -- do you understand what I'm saying?
A. Yes.
Q. -- and you ended up in this area that you have called an access that is three to five feet wide that takes you to Telbar; as you were standing in this access area, the first opportunity that you would have to see the pocketbook when you got here, how far a distance would you have been if you were

standing in the access area?

A. I'd be five feet from it.

Q. Could you see it without any problem?

A. Yes.

MR. BLOOM: That's all I have, Your Honor.

RECROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. On this diagram on the board, there is actually, isn't there, a street that goes sort of like this and one that goes straight out this way, one being Bartels, the other being Telbar?

A. I don't know which one is Bartels and which one is Telbar. I don't know of one that is on an angle, sir.

Q. Are there two streets that intersect at this point with Hilltop?

A. I don't think so. With Hilltop. There's a street that goes from Hilltop to Parker.

Q. You are saying that there is only one

such street at that point?

A. Telbar -- whatever this curved street is, whether it's Telbar or Bartels, also goes into that street, I believe, but I don't think it's on the angle you indicated.

Q. Well, this is Telbar Street here, which runs basically into Malibu, right?

A. Right.

Q. -- also runs into Bartels Street, we'll assume this is Bartels Street here, at some point fairly close to Hilltop, isn't that right?

A. I believe it's on a straight line down from what I have drawn. Are you saying that it comes to the intersection of Hilltop and it's a three-way intersection?

Q. I'm asking you.

A. Then I don't know.

Q. You think it does intersect someplace after Hilltop intersects with Bartels Street?

A. I believe so.

Q. Isn't there another fence at the end or somewhere along this pathway, isn't there another fence which would obstruct your path if you were

walking through there?

A. I don't think so.

Q. You think you could walk unobstructed by any fence from this point here to Telbar street?

A. I believe so. I don't recall seeing one, sir.

Q. Were you familiar with the area before you went up there that day?

A. That area? No.

Q. So you weren't familiar with this area at that time?

A. No.

Q. You have since become familiar with the area?

A. Yes.

Q. And that is since December 7th or December 10th?

A. 10th.

Q. And basically they are about the length of Hilltop there before it runs into Bartels, there's about four or five houses?

A. Right.

MR. HAMMERSCHMITH: No further

questions, Your Honor.

MR. BLOOM: That's all I have, Your Honor, unless the Court wants to ask him some questions.

THE COURT: Sergeant, in the November-December time, when I heard the motion to suppress in this case, I remember there was a general investigation going on in this area.

THE WITNESS: Yes.

THE COURT: What did that pertain to?

THE WITNESS: There were a series of assaults, sir. Miss Prekop had been assaulted by -- November 30th was the third assault on her, the third sexual assault. Mrs. Lichwala had been assaulted one time prior to the November 30th house invasion, and a woman named Mae Marchand had been sexually assaulted, she was an 82 year old woman who lived on Pineview, which is in the area.

THE COURT: All prior to December 7th?

THE WITNESS: Yes. On December 7th there was a house invasion at Allendale Circle, which is up from Mrs. Lichwala's house.

Q. (By Mr. Bloom) Is that what caused Mr. Perrot to be arrested, the incidents on the 7th, along with another?

A. Right.

Q. Different from the cases on trial here?

A. Right.

THE COURT: I have nothing further.

MR. BLOOM: That's all I have, Your Honor.

(Witness steps down)

MR. HAMMERSCHMITH: Your Honor, I would call Mr. Perrot in connection with this motion.

THE COURT: Okay

GEORGE PERROT (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Just for the record, your name is George Perrot?
A. Yes.
Q. And you're the defendant in the case?
A. Yes.
Q. Now, you lived, did you not, at 87 Malibu?
A. Yes.
Q. How long did you live at 87 Malibu?
A. About ten years.
Q. Are you familiar with the area surrounding 87 Malibu Drive?
A. Yes.
Q. And you have had a chance to listen to Officer Kelly describe the geography of that area just a few minutes ago?
A. Yes, I have.

Q. I'm going to ask you, first of all, if you could just show -- are you familiar with Telbar Street?

A. Yes, I am.

Q. Can you tell us, to the best of your knowledge, where Telbar Street intersects with either Hilltop or Bartels Street, whichever it is?

A. Well, Hilltop comes down, turns on to Bartels Street, and Telbar would come down straight like this, intersect on Bartels Street, not exactly in the corner, but I'd say maybe two, three houses down, then Telbar.

Q. That's an accurate angle for Telbar Street?

A. Yes. Hilltop comes down straight on angle, then Telbar comes down --

Q. You mean Bartels?

A. Bartels comes down to Parker and Telbar comes straight down and it goes to an angle like this.

Q. And it leads directly into Malibu?

A. Well, not straight across. Malibu would be about up here.

Q. Are you familiar with the pathway between those two houses at the end of Hilltop?
A. Yes, I am. I used to go to school with a kid that lived in the house right here --
Q. That is the lower of the two houses?
A. Yes, with a path goes straight through this like that, I used to go to school with Ricky Strom, and there is a path, it used to be an old path, his father put a fence where his house ends, put like a chicken wire fence there, and you can't fit more than one person down that path, 'cuz it goes down to a hill and there's various trees in between that path.
Q. There's a fence between the two houses there at the end of Hilltop?
A. Separating them?
Q. Yes. Separating the two houses?
A. Not that I can recall, no.
Q. Did you hear Officer Kelly describe a fence at this location here?
A. That separates the house.
Q. Separating the driveways of the houses?
A. There's not one that I know of.

Q. What is there between the driveways and the houses, if anything, there?
A. Trees, earth, bushes, stuff like that.
Q. Is there any fence between those two houses or in that area between the two houses before you get to that fence that you did refer to a minute ago?
A. No, not that I believe so, no.
Q. And that fence that you are referring to would run perpendicular to one's path as one went from Hilltop to Telbar?
A. Where the house ends, it cuts off the path right here.
Q. How high is that fence?
A. It's about maybe four feet high.
Q. How wide is the path leading from Hilltop to Telbar Street there?
A. It's not very wide at all, 'cuz you got to curve through many trees.
Q. What do you mean by not very wide at all? Can you give us an example of something in the courtroom which you think reflects the width of the path?

A. Maybe three feet, two feet at the most.

MR. HAMMERSCHMITH: Nothing further.

CROSS EXAMINATION BY MR. BLOOM:

Q. If I were chasing you from 33 Covel with a gun down the street and you wanted to get inside your house, the quickest way would be to go right up here on Hilltop, down the hill, down Telbar, across Parker Street and to 87 Malibu, isn't that right.

A. No, it wouldn't.

Q. What is the quickest way to get there?

A. Maybe during the day that would be the quickest way, but if you were to run down Covel Street, up Hilltop, down that hill in darkness, you would trip over and hit more trees on your way, you would not make it through there.

Q. Unless you knew the area, right?

A. Even if you know the area, it's pitch dark back there.

Q. Let me ask you this. You know that area great, don't you?
A. Yes, I lived there for ten years, I know it.
Q. Let me ask you. You know the area we are talking about where this pathway is, you've been there a number of times, haven't you?
A. I wouldn't say a number of times, I have been up there a few times, yeah.
Q. You just told us there's a fence there, right?
A. Yeah.
Q. You said only one person can go down at a time, right?
A. Yes.
Q. You said if you are going from the direction of Covel Street toward Telbar, it goes downhill, you said that, didn't you?
A. Yes.
Q. That's true?
A. Yes.
Q. And you said there's trees and bushes around there?

A. Yes, I did.
Q. So you know that area pretty well, right?
A. Yes, I do, I used to go to school with the guy that lived in the house there.
Q. You've been through there a number of times?
A. No, I haven't, because his father stopped it and put up a fence.
Q. When did his father put up a fence?
A. Back when I was in junior high, about six, seven years ago.
Q. How many times do you think you've been in that general area, sir, in your life?
A. On that path?
Q. Yes.
A. I'd say maybe ten times.
Q. Let me ask you this: In terms of just distance -- forget the fact that it goes downhill and forget the fact there is a three or four foot fence -- wouldn't you agree with me, in terms of going from Covel Street to 27 Malibu Street, the most direct route is to go up Hilltop and then down across that

way?

A. If there were no obstacles there, yes.

Q. That's what I'm asking you. Forget whether you would fall down or break your leg, I'm not asking you about that. In terms of distance, don't take anything else into account, distance-wise, would you agree with me that it is the closest distance?

A. Yes, but by very little.

Q. If you go down Covel and then you go take a right on to Hilltop and you go out to Bartels --

A. Covel Street --

Q. Let me ask you the question, would you?

THE COURT: Wait a minute, gentlemen.

MR. BLOOM: I'm sorry, Judge. Let me rephrase it.

THE COURT: All right, but how is this relevant to the issue I've got before me in the voir dire?

MR. BLOOM: Assuming he was put on for the purpose of saying somebody

couldn't have gone down there, for whatever relevance that is, I don't know. That's all I'm cross examining him on.

THE COURT: All right, go ahead.

MR. BLOOM: I don't have any further -- that's all I have.

THE COURT: Do you want to ask further questions.

MR. HAMMERSCHMITH: I have no further questions.

THE COURT: Thank you, sir

(Witness steps down)

MR. BLOOM: The only cases I'm going to cite to you, two cases that I think that are on point, there may be other cases, but in 1981 there is a case of Commonwealth versus Benoit, that really has kind of an extensive conversation about inevitable discovery, and that is at 382 Mass. page 210. And

that particular case, Judge, says -- and the reason that it is helpful is that it gives kind of -- goes through kind of an academic discussion of inevitable discovery, and it talks about the fact that in most jurisdictions the concept has been recognized, in most state and federal jurisdictions.

This case specifically refers to the fact that -- in fact, a holding indicates that they aren't making a decision based on this case as to whether inevitable discovery applies or doesn't apply in the State of Massachusetts. The holding of the case is that they will not allow inevitable discovery to be a principle in the State of Massachusetts where the applicability would be to, in effect, nullify a warrant requirement under the Fourth Amendment.

So, in essence, what that case stands for, and there is what I think is

an exhaustive discussion about how many jurisdictions apply this rule, under what circumstances it gets applied. All it said in this case is that they wouldn't apply it in a situation in which the effect would be to nullify a warrant requirement of the Fourth Amendment. The argument of the Commonwealth was that whether they got a warrant or not or whether there was probable cause or not, they would have found the item anyways, and I believe it has to do with the search into a house. Now, since that time -- I will refer your attention, Judge, to a case --

THE COURT: What was the date on the Benoit case?

MR. BLOOM: 1981.

THE COURT: Go ahead.

MR. BLOOM: Nix versus Williams, which is a 1984 United States Supreme Court case, cite is 467 U.S. 431, just for your purposes, the Lawyer Edition

2nd 377.

THE COURT: I've got it.

MR. BLOOM: All right. And my reading of that case, Judge, establishes the proposition that basically the key to the case or the holding of the case, as I read it, is that the ultimate discovery exception to the exclusionary rule as adopted and if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, then the deterrence rationale has so little basis that the evidence in fact should be received by the Court.

And that is what I think the status of the law is in reference to this, because Benoit doesn't apply, we are not talking about the violation of a warrant requirement under the Fourth Amendment.

In fact, if you go on and read

Benoit, the Court in Massachusetts at that time says we are not saying whether we are going to adopt this rule or we aren't, we are just saying that under this set of circumstances, which isn't the Perrot case, the warrant requirement scenario, we don't think that it should, in effect, be used to nullify the Fourth Amendment in reference to a warrant situation.

Also, Judge, it's been recognized by the federal courts in a number of jurisdictions the independent source exception, and I think that you can justify the finding of this pocketbook on either or the other.

It seems to me, Judge, and one of the important things that I would suggest to you, and I don't -- it is already in front of you for the purpose of this motion -- at the time, there was a series of sexual assaults. Miss Prekop had been assaulted three times,

CITY 003072



Mrs. Lichwala had been assaulted a previous time prior to the 11/30 incident, as Sergeant Kelly told you, and another 82-year-old woman had been sexually assaulted. This was as serious as anything, you can infer, no one needs to tell you this, in terms of what the Springfield Police Department was involved in from the Crime Prevention Bureau in the latter part of 1985.

It boggles the mind to think -- and we are not here to judge whether Kelly should have gone up there in the night on the 7th or the fact that he was out there, that he was on vacation on the 8th and the 9th and should have assigned someone out there, that's not the issue in front of us. The issue is, in light of the seriousness of the scenario that existed at that time, and the fact that he had been charged in terms of two of these incidents, it seems to boggle the mind in light of his

statement to suggest that at some point within a very short period of time the Springfield Police Department would not have conducted an exhaustive search of that area, and if the Court can agree with me on that, then the issue is whether or not that thing would have been inevitably found, whether it had been the week of December 14th or it would have been the first week of January, and certainly, Judge, I think it is fair to assume they would have sought out and discovered every route from Covel Street to Malibu, but in Mr. Perrot's statement he indicates when he left Covel, and it is very important, he went right to 27 Malibu, and there is no dispute -- now, there may be an argument as to how easy it is to get through here, but there is no dispute that the quickest way of getting there, if you can accomplish it, there seems to be some dispute on that, is to go up to

Hilltop, turn around the corner, go through that pathway on to Telbar, and straight across to Malibu, less than a quarter of a mile. I think in fairness, Judge, I think it really boggles the mind to suggest that the Springfield Police would not have been up in that area.

And then the next issue becomes whether they would have found it. You can see from that photograph, if you were in that area, you'd have to be blind not to find it. It is within three to five feet from the pathway, as Kelly describes it, and right out in the open, and you have seen the size of the pocketbook.

So I think in light of the Nix case, Judge, that this evidence ought to come in based on Kelly's search of the 10th under the doctrine of inevitable discovery.

MR. HAMMERSCHMITH: There is

obviously a threshold question, and that is whether the doctrine of inevitable discovery is applicable in Massachusetts.

THE COURT: What do you say the status of the law is?

MR. HAMMERSCHMITH: My understanding is that there has been no case in Massachusetts which has determined whether or not the Supreme Judicial Court would, as a matter of state law, apart from federal law, adopt an inevitable discovery rule. Obviously, there is an inevitable discovery rule under the federal constitution, but I don't believe that that rule would preclude our own Supreme Court from finding that rule was inappropriate in Massachusetts state courts.

So it is an open question, and I think in the Benoit case, which is correctly pointed out to you by Mr.

Bloom, that the Supreme Judicial Court refers to the cases that are appropriate and it also indicates that the rule has not gone free from criticism and it talks about the major criticism which is, in the words of the Court, that the rule collides with the fundamental deterrence purpose of the exclusionary rule and it would encourage police shortcuts, since the illegal route is often faster and easier than the legally required route. That is from page 218 of the Benoit decision.

The Court considered those things and left the question open, decided that in a particular case in front of it, which it involved the failure of the police to obtain a warrant, the Court could not -- would not say that that was the sort of thing --

THE COURT: We are not dealing with that here.

MR. HAMMERSCHMITH: I understand. And that's why the case itself is not directly on point for us. The Nix case did adopt inevitable discovery rule, and if one were to be applicable in Massachusetts, I think there still would remain the question of what the standard of proof is on that rule, and I think there are a number of situations in which Massachusetts Supreme Court Judicial Court has adopted a more stringent rule on burden of proof than has been adopted by its federal counterpart. Often times the Supreme Judicial Court will adopt a rule of beyond a reasonable doubt or clear preponderance of the evidence where the U. S. Supreme Court has adopted a rule of preponderance of the evidence. And I think that this would be an appropriate case for that.

But on a factual basis, if we assume that Nix versus Williams were

applicable here, I think there are some serious problems with the factual situation that we have here.

We have basically a break occurring on November 30th. It is known on November 30th that the purse was taken. We don't have any evidence of a search for the purse initiated at that time or at any time prior to December 7th.

On December 7th, we have Mr. Perrot allegedly giving the statement which Officer Kelly, I assume, would rely upon in terms of the inevitability of discovery of the purse. In that statement, all that is said is that the purse or the pocketbook was left a few houses down the street. I think initially --

THE COURT: I think it also states that he went directly to 27 Malibu from 33 Covel.

MR. HAMMERSCHMITH: I don't think

the word direct was used, Your Honor, to the extent that there might be suggestion of geography, I think that is --

THE COURT: I've got to deal with what I have in front of me. If I recall the statement, it said he went from 33 Covel to 27 Malibu and in the same statement said he dropped the pocketbook a few houses down the street, isn't that right?

MR. HAMMERSCHMITH: That's right. He said I left Covel and went to Malibu. He didn't indicate the route that he followed and, obviously, as the evidence has come out, there are two possibilities, one is the route that if one were following streets, one would take. There is another route, which presumably -- well, obviously, Mr. Perrot was aware of at the time. I don't know that there has been any evidence that Officer Kelly was aware of

it at the time. Indeed he indicated that at that time he wasn't really familiar with the area.

In any event, he gets this statement on the 7th -- and the 7th, as I recall, was a Saturday -- he has it in the afternoon. No attempt is made to locate the purse that day, no attempt made the next day, no attempt made the following day, and no attempt made the following day, which is Tuesday, until after Officer Kelly speaks with Officer Kane.

Now, I can appreciate the fact that police officers have days off, but it would seem to me that if this purse was of such concern, that Officer Kelly was going to do everything in his power to locate that purse, he would have had somebody go out there and look for it.

He found out on December 7th -- he was told that the purse was taken

and was thrown a few houses down the street. That's all the information he had. I think that's all the information he could permissibly use.

If he was going to have that purse located, maybe he wouldn't send somebody out on a Sunday, but we have Monday and we have basically all day Tuesday, because he is saying that he didn't find out until Tuesday afternoon, I think it was around 3:30 or 4:00, from Officer Kane the exact location of the purse. When he found the exact -- when he was told the exact location of the purse by Officer Kane, then he went out there and then he found it within a space of a few minutes. Now, this is a purse which, apparently, will be there for ten days.

Now, the Commonwealth would suggest to you that it was a purse which was obvious to view, and yet we know that it was in fairly close proximity to

these two houses out here, and one would think that if somebody had a purse lying in their yard in open view, somebody would pick it up and --

THE COURT: I'm not sure what the point of that argument is. Are you saying he planted it or what?

MR. HAMMERSCHMITH: I don't mean to suggest that at all. What I am suggesting is if this purse is in such obvious view, I think the normal person, if they see a purse lying in their yard, is going to go out and pick it up and do something with it, either throw it away or --

THE COURT: Maybe give it to the police.

MR. HAMMERSCHMITH: Or that. None of which happened.

THE COURT: I just don't understand the point of your argument on that point.

MR. HAMMERSCHMITH: I am suggesting

that the purse was not as obvious to view as Officer Kelly's oral testimony indicated that it was. I think the picture that you have would be supportive of that, I think the color of the purse is such that it would be likely to blend into the earth and so on, and the exception that Mr. Bloom seeks to bring this within is the inevitable discovery exception.

My understanding is it's not just a question of whether they probably have found it, it's a question of whether the discovery was inevitable, and I think that the evidence falls very far short of that. And I also think the evidence falls very far short of establishing that they would inevitably have made a serious attempt to locate this purse but for the information that was received by Officer Kane and reported to Officer Kelly. Once Officer Kelly got that information, he went out

and in the space of a few minutes, whereas before he waited, it had been several days since the original statement from Mr. Perrot was accepted.

For those reasons, I'd ask the purse not to be considered.

MR. BLOOM: Judge, I want to indicate I am relying on both. I am also relying on the independent source rule also for the justification, I think both of them apply.

THE COURT: I will make written findings on my decision here, but I am going to -- I rule that the Commonwealth has the right to introduce the pocketbook in evidence. I think that, one, that the rule is reasonable, and here we are not dealing with a method to avoid the issuance of a warrant, we are dealing with a situation where on the 7th of December the information as to the general location of the pocketbook is received, there is an investigation

that is proceeding, whereas at this time the police have information there's been at least six attacks on older women in that general area, and I gather it is within a few blocks of that whole area that we have six attacks on older women, and I accept, quite frankly, Sergeant Kelly's testimony that he would have ordered a complete search of the area by, I think his terminology was, all the men available.

But even then, if Sergeant Kelly didn't order it, somebody in that police department would have ordered it, based on the fact situation that we are faced with here. Here they've got a problem of six attacks on older women within a short period of time in the same neighborhood, they receive information that a pocketbook is taken from one of the older women, it is within a few houses of the scene of the break. There is no question in my mind,

and as far as the standard of proof goes, I think the Commonwealth has sustained its burden beyond a reasonable doubt, whether we are talking preponderance of the evidence or whatever rule the Commonwealth sees fit to apply, in this case, beyond a reasonable doubt, sooner or later there would have been a search of that area and there would have been a discovery of that pocketbook. I will allow the Commonwealth to introduce it during the course of that trial.

Now, are we ready to go, gentlemen?

MR. BLOOM: Yes, sir. I will erase the board.

THE COURT: Who is your next witness?

MR. BLOOM: Cheetham, Springfield Police Department.

THE COURT: All right, we will take a brief recess.

(Recess taken at 11:05 A.M.)

(Hearing reconvened at 11:15 A.M.
The jury and defendant were present)

THE COURT: Mr. Foreman and ladies and gentlemen, I want to explain to you the reason for the delay. You will find that during the course of the time, from time to time we are going to go to side bar with the court reporter and the lawyers and myself and we will have to whisper discussions over there and you are not going to be able to hear what is being discussed, and in the videotape that you watched on the first day you came to court, you were told, I believe, that you are the judges of the facts, the triers of the facts, and the Court has to make decisions of law.

ROBERT CHEETHAM (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and this jury your name and your occupation, sir?

A. My name is Robert Cheetham, I am a sergeant with the Springfield Police Department.

Q. Sergeant Cheetham, how many years have you been employed by the Springfield Police Department?

A. Eight years.

Q. And, obviously, that would include the calendar year 1985, correct?

A. Yes.

Q. Going back to November of 1985, would you tell the court and jury what your duties were and where you were assigned in the latter part of that month?

A. I was a patrolman assigned to the Detective Bureau on the midnight to 8:00 A.M. shift.

Q. During the course of the night, and I'm

talking about past midnight into the day or the early morning hours of November 30th of 1985, did you have occasion to go to two locations in Sixteen Acres neighborhood of Springfield?

A. Yes, I did.

Q. Have you reviewed your notes -- I should say the paperwork -- concerning those incidents before you came in today?

A. Yes, I did.

Q. Now, was one of those homes at 33 Covel Street?

A. Yes, it was.

Q. Was the other home 27 Malibu Street?

A. Yes, it was, Malibu Drive.

Q. Excuse me, Malibu Drive. And can you tell us, sir, at what time a call came in concerning Covel, as best you can tell us?

A. Approximately 3:25 A.M.

Q. And can you tell us approximately the time that the call came in from the house on Malibu Drive, I believe it was 27?

A. Approximately 4:00 A.M.

Q. Now, as a result of calls coming in, did

you have occasion to go to both of those locations on that early morning of the 30th of November 1985?

A. Yes, I did.

Q. When you got to those locations, did you have an opportunity to observe the physical structure of the house, the doors and so forth?

A. Yes.

Q. I'd like to show you, if I could, first of all, I'd like to put in front of you three photographs. Can you just tell us what house or which locations the three photographs I have just given you pertain to?

A. 33 Covel Street.

Q. 33 Covel?

A. Yes.

Q. Do they fairly and accurately depict 33 Covel Street, or those sections of 33 Covel Street in reference to November 30th of 1985?

A. Yes.

Q. I am going to ask you to draw your attention to the first two photographs that I am placing in front of you. In reference to the investigation or observations that you made on

CITY 003091



November 30th of 1985, what do those two pictures fairly and accurately depict?

A. The first picture is a rear view of the house from the outside. It's a cellar window. The second picture is the same cellar window taken from the inside and there's a dryer vent sitting on top of the washer and dryer.

Q. The third photograph you indicated referred also to 33 Covel Street. Can you tell us what that fairly and accurately depicts, if anything, in reference to 33 Covel on 11/30/85?

A. That's a door leading from the breezeway to the kitchen area.

Q. Is anything depicted on the floor area?

A. Yes, a pool cue.

Q. How about in reference to the door itself, what is fairly and accurately depicted, if anything, in reference to that door leading to the kitchen of 33 Covel?

A. The window's broken.

MR. BLOOM: I'm going to offer these three, Judge, in the order they have been referred to.

(Photographs shown to Mr. Hammerschmith)

THE COURT: Any objection?

MR. HAMMERSCHMITH: No objection, Your Honor.

MR. BLOOM: The back, Judge, will have to be sanitized.

THE COURT: Those will be 1A, B and C.

(Exhibits 1A, B and C, photographs, marked into evidence)

Q. (By Mr. Bloom) I am going to place in front of you three more pictures, and what residence in reference to November 30th of 1985 do these three photographs pertain to?

A. 27 Malibu Drive.

Q. And the first photograph, sir, in order, can you tell us what that fairly and accurately depicts, if anything, in reference to 27 Malibu Drive

in the early morning hours of November 30, 1985?

A. It's a doorway leading to the kitchen area.

Q. What is fairly and accurately depicted, if anything, in reference to this piece of wood that is in this photograph?

A. That is a door molding that's been broken loose from the door.

Q. The next two photographs, do they fairly and accurately depict, in reference to the interior of 27 Malibu Drive, the same room in reference to 11/30/85?

A. No.

Q. Can you tell us, sir, what this fairly and accurately depicts, the first one I am holding?

A. The bedroom area.

Q. And do you know what this fairly and accurately depicts?

A. The same room.

Q. Shot at a different angle?

A. Yes.

Q. That was the bedroom inside of 27 Malibu Drive as you saw it on 11/30/85?

A. Yes.

MR. BLOOM: I'm going to offer these three, Judge.

(Photographs shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: 2A, B and C.

(Exhibits 2A, B and C, photographs, marked into evidence)

THE COURT: Can I see you a minute, gentlemen.

(The following conference was held at side bar)

THE COURT: We will white all this stuff out rather than tape it over.

MR. BLOOM: That's fine, it's my writing anyway.

CITY 003095



(End of side bar conference)

Q. (By Mr. Bloom) Sergeant Cheetham, you were not a sergeant at that time, is that correct?
A. That's correct.
Q. Was some superior there called in concerning these two incidents on 11/30/85?
A. Yes, Sergeant Kelly.
Q. Until Sergeant Kelly got there, what would have been your function in reference to 11/30/85, from the time that you got there until Kelly arrived?
A. To secure the premises.
MR. BLOOM: Thank you, sir. That's all I have of this witness.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Officer, would it be fair to say the distance from 33 Covel Street to 27 Malibu Drive is

probably about a mile or so at best?
A. Yes.
Q. And you went first to Mrs. Lichwala's house, is that correct, the house on Covel Street, is that where you went first?
A. No, the first address I went to was Malibu Drive.
Q. Even though that was the second in time in terms of reporting?
A. Yes.
Q. Now, were you there when the pictures were taken that we have seen?
A. I believe so.
Q. And you were familiar with the premises there, Miss Prekop's house?
A. I hadn't been there before.
Q. But you checked out the premises on that day and became familiar with the premises?
A. Yes.
Q. Now, one of the pictures of Miss Prekop's house, the first of the three, which I believe was marked Exhibit 2A, portrays a doorway leading into the kitchen area of her home, is that

right?

A. Yes.

Q. Are you familiar with that photograph without looking at it again?

THE COURT: Why don't you show it to him.

Q. (By Mr. Hammerschmith) This is Exhibit 2A. Looking at that picture, it was taken by someone standing inside the kitchen, is that right?

A. Yes.

Q. You didn't take the picture yourself, did you?

A. No, I didn't.

Q. And there is a doorway there in the middle of the picture. Can you tell us what is on the outside of the doorway?

A. I believe that's a breezeway area.

Q. Can you tell us what you mean by a breezeway area?

A. A place between the garage and the home itself.

Q. And if one went through this door that you look at in the picture, one would not be outside,

would one?

A. No.

Q. How is the breezeway entered?

A. I have no idea.

Q. Was there another door from the outside that you saw into the breezeway?

A. Yes.

Q. What was the condition of that door?

A. I don't recall what the condition of that door was.

Q. You only remember the condition of the door leading from the breezeway into the kitchen?

A. Yes.

Q. Now, you spoke with Miss Prekop at that time, did you not?

A. Yes.

Q. And you obtained from her, at least in part, a description of her assailant, didn't you?

A. Yes.

Q. Among other things about that assailant, she told you that the assailant was --

MR. BLOOM: I'm going to object to the conversation between him and her.

THE COURT: Can I see you at side



(End of side bar conference)

Q. (By Mr. Hammerschmith) In terms of the description that she gave you of her assailant, she told you that the assailant was 5'7" to six feet tall, didn't she?

A. I don't recall without reading the report.

Q. Do you think if you read the police report that you filled out at that time it might refresh your recollection?

A. Yes.

Q. I'd ask you to take a look at this.

(Showing police report to witness)

Q. Now, having taken a look at that, does that refresh your recollection as to what Miss Prekop told you about the height of her assailant?

A. Yes.

Q. It's true, is it not, that she told you the person was 5'7" to six feet tall?

A. Yes.

Q. And with respect to build, she told you the person was slim to medium build, is that right?
A. Yes.
Q. She also told you, did she not, that she suffered no losses in the break, meaning nothing taken?
A. It says her purse was ransacked, no losses.
Q. No losses?
A. Yes.
Q. And you wrote no losses?
A. At that time, yes.
Q. And that was intended by you to mean nothing was taken?
A. At that time, yes.
MR. BLOOM: I'm going to object to what was intended. It's what she said, not his intention.
THE COURT: Sustained. What he intended it to mean is not relevant. What she said is relevant.
Q. (By Mr. Hammerschmith) She told you at that time that she suffered no losses?

MR. BLOOM: Object. He has answered that, Judge.

THE COURT: It's been answered.

Q. (By Mr. Hammerschmith) After speaking with Miss Prekop, you then went to Mrs. Lichwala's house, did you?

A. Yes.

Q. When you went to Mrs. Lichwala's house, how much later was that after you first arrived at Miss Prekop's house?

A. I have no idea, to be honest with you.

Q. Do you have any idea what time it was that you arrived at Mrs. Lichwala's house?

A. It would have to be, since we were on Malibu Drive, have to be anywhere from 45 minutes, maybe 30 to 45 minutes after we were told to respond to Malibu Drive.

Q. Was Mrs. Lichwala home when you arrived there?

A. No, she was at a neighbor's house on Forest Hills.

Q. Did you go first to speak with her or did you go directly to her house?

A. I went first to speak with her.
Q. After speaking with her, you went to her house?
A. Yes.
Q. How long was that after you first spoke to her approximately?
A. I have no idea.
Q. Was it more than a half hour?
A. I don't think so.
Q. When you went into the house, I take it you made observations as to the condition of the house?
A. Yes.
Q. I'm going to show you a picture which has been marked Exhibit 1C, and again, just for our information, can you tell us what that picture depicts?
A. It's the entrance to the kitchen from a breezeway area.
Q. So the picture would have been taken by someone standing in the breezeway area?
A. Yes.
Q. And the picture looks through a door

CITY 003103


into the kitchen?

A. Yes.

Q. Next to the door, inside the kitchen, there is a piece of wood on the floor, is that right? That's what the picture portrays?

A. Right there, yes.

Q. Can you tell us what that is?

A. It's a pool cue.

Q. How far was that from the doorway?

A. It's laying maybe about a foot or so.

Q. So it was right next to the doorway?

A. Yes.

Q. And was that taken into custody, do you know?

A. As far as I know, yes.

Q. And that is where the pool cue was when you first entered the house?

A. Yes.

Q. To your knowledge, it hadn't been moved prior to the picture being taken.

MR. BLOOM: I will object.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) From the time

that you entered the building?

MR. BLOOM: I object on how he could have known whether it was moved, Judge.

THE COURT: Well, he is asking him now, once he got there, was it moved after he got there, so I will allow that.

THE WITNESS: No, it wasn't moved after I got there.

Q. (By Mr. Hammerschmith) When you went back to the house, did Mrs. Lichwala go with you?

A. No.

Q. To your knowledge, then, she remained at the neighbor's house?

A. Yes.

Q. Now, the door between the breezeway and the kitchen that we just looked at a picture of, there was a window in that door?

A. Yes.

Q. And that window was broken, was it, when you first saw it?

A. Yes.

Q. What was the window made of?
A. I believe glass.
Q. Do you know whether it was glass or Plexiglas?
A. I have no idea. I believe it was glass.
Q. Was there another window that was also broken?
A. Yes.
Q. Which window was that?
A. That was a window in the breezeway.
Q. Would that be the window next to the rear breezeway door?
A. Yes.
Q. That was also broken when you saw it?
A. Yes.
Q. Do you know what that window was made of?
A. I believe glass, I don't know for sure.
Q. In your police report concerning this, didn't you say that one of the windows was a Plexiglas window?
A. I'd have to see the report.
Q. Okay. (Showing report to the witness)

CITY 003106



A. Yes.

Q. Which window did you refer to in your report as being a Plexiglas window, which of the two that were broken?

A. Going by this, I would have to say it was the window entering the kitchen.

Q. That would be the window in the door?

A. Yes.

Q. And this report was filled out, wasn't it, the same day that you investigated this matter?

A. That morning, yes.

Q. And would it be fair to say that your recollection at that point in time was much better than it is today concerning what you had observed there?

A. As far as Plexiglas, yes.

MR. HAMMERSCHMITH: Thank you, Sergeant, I have no further questions.

MR. BLOOM: That's all I have, Your Honor.

THE COURT: Thank you, Sergeant.

(Witness steps down)

MARIANNE POPKO (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and the jury your name and your occupation, ma'am?
A. My name is Marianne Julie Popko, I am a Springfield police officer.
Q. Where are you assigned, to what department?
A. I am assigned to the uniform division.
Q. In 1985, will you tell us what department you were assigned to?
A. I was assigned to the Crime Prevention Bureau.
Q. Within the course of your functions in the calendar year 1985, did you have occasion to take statements from people that were sexually assaulted?
A. Yes, I did, that was my primary function.

Q. Ma'am, going back to November of 1985, did you have an occasion on the 30th of November of 1985 to talk to a woman who was introduced to you by the name of Mary Prekop?
A. Yes, I did, sir.
Q. And did you in fact take a written statement from her based on what she told you had happened earlier that morning?
A. Yes, I did.
Q. Could you tell the judge and the jury approximately what time it was -- strike that.
After she told you what happened, was it reduced to writing?
A. Yes, it was.
Q. Did she get an opportunity to read what she had told you that you had had reduced to writing?
A. Yes, she did.
Q. Did she sign that document?
A. Yes, she did.
Q. Is that the document that is sitting in front of you?
A. Yes, it is.
Q. Can you tell us, ma'am, approximately

what time it was that this whole process was completed on the morning of November 30, 1985?

A. It was completed approximately about 9:00 in the morning.

Q. Can you tell us, ma'am, what it was that she told you had happened to her earlier that day in her home on November 30, 1985?

A. Yes. She told me that she woke up that morning about 4:00 in the morning, she thought that she heard glass breaking, and she put the light on, she went to the kitchen and she sat down in the living room, everything was quiet, she went back into the bedroom and laid down on the bed, and all of a sudden the dog barked, she ran off to the kitchen, and -- would you like me to read the statement?

Q. If you would, ma'am, if you don't have an independent memory, if you could just tell us what she told you.

A. Okay. "I got as far as the bathroom door and I saw a man standing in the kitchen. I hit him on the head with the stick. He grabbed the stick and pushed me into the bedroom. The dog tried to follow, but the man closed the door. I was still

fighting him and he threw me on the floor. He never said anything. I started calling the dog by name, Scuffy. He hit me on the face a couple of times. I kept screaming after the first time, but after a while I decided I should keep still. I kept kicking with my feet and he punched my left thigh. He pulled my nightgown aside and he sucked on my left breast. He did this for a number of minutes. And then he got on top of me. He pushed my nightgown up and lifted my legs up. He put something into my vagina, but I'm not sure what it was. He kept his pants on. I never saw his penis. I started moaning. I pretended to pass out. He got up and left the room.

"I waited until everything was quiet. When the dog stopped barking, I went into the living room. I saw my pocketbook on the floor, the contents were spilled out. I picked up the change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook, I don't know if he took it or not.

"Then I called the police. I wasn't able to dial at first, because I was so nervous. The second time I tried, I was able to get through.

"I can describe the man who broke into my home as a white male, about 20 to 30 years old, he had dark wavy hair and was clean shaven. He was average height and weight. He was wearing a blue jacket, it looked like nylon, and sneakers which were white. He was wearing dark-colored pair of pants, they were neither jeans nor corduroy material. He was not wearing glasses. I didn't notice any jewelry or scars.

"The only thing he ever said to me was to keep quiet. He said this a few times while he was hitting me.

"I forgot to mention, when he first came into the bedroom, he broke the lamp which was on the dresser. He hit it with his fist and knocked it to the floor. This lamp was on before and it went off when he broke it.

"When the police arrived, I noticed a pair of gloves on the foot of the bed. They aren't mine, I never saw them before."

And she signed the statement.

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I understand that this was being admitted as fresh complaint, and I would just -- I'm not asking for an instruction at this point in time, but I would ask that the Court note my objection to the introduction of the truth or falsity of the statement, any matters in the statement as far as truth or falsity independent of their fresh complaint in court.

THE COURT: Well, as I understand it, this recent testimony being offered, and I am accepting it, is only for fresh complaint, which is for the sole purpose of corroborating Mrs. Prekop's statement that she made on the stand, and I will so instruct the jury. I also find that this is made within a time frame that is within a few hours of the alleged attack, that it qualifies as being fresh

complaint, but only for that purpose, and I will so instruct the jury at the proper time.

MR. HAMMERSCHMITH: Thank you.

(End of side bar conference)

Q. (By Mr. Bloom) Ma'am, I am going to place in front of you four photographs, and I wonder if you could tell us in reference to 11/30/85, do those photographs fairly and accurately depict anyone? Could you answer that yes or no?

A. Yes, they do.

Q. In reference to 11/30/85, can you tell us who they fairly and accurately depict?

A. The victim.

Q. And the first two photographs that I am going to hand you fairly and accurately depict what part of her body?

A. Her face.

Q. The third photograph fairly and accurately depicts what part of her body in reference to 11/30/85?

A. Her left hand.
Q. And the last one or the fourth photograph fairly and accurately depicts what part of her body in reference to 11/30/85?
A. Her thigh.
MR. BLOOM: I will offer these, Your Honor.

(Photographs shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

THE COURT: I will hear from you.
MR. HAMMERSCHMITH: Your Honor, I'm not sure of the relevance of these pictures, and what I would state, I don't think that there is any issue in this case, certainly I don't intend to raise an issue but that this woman was assaulted at her home that night, I

don't think that is being contested by anyone. These particular pictures I think would simply inflame the jury or perhaps upset the jury or create emotional content in the case, which I don't think is appropriate. I don't think they are relevant to any of the issues that we have here. I know there is a charge of aggravated rape, but I don't think that there is --

THE COURT: There is a charge of assault and battery, indecent assault and battery.

MR. HAMMERSCHMITH: I understand, but I don't think there is any issue as to the occurrence of those things. I think the only issue is the identity of the perpetrator.

THE COURT: I think, first of all, they go to that issue of whether she was assaulted, and I haven't heard any admission or stipulation to that effect, quite frankly. And I think it goes to

substantiate her testimony, too, as to what occurred that night, so I don't -- first of all, I find two photographs of the left side of Miss Prekop's face, showing bruises along the side of her face and a black eye. The third photograph shows her left wrist, it apparently is entered to show a bruise on her left wrist. And the fourth photograph shows her thigh with a black and blue mark on the thigh. I am going to overrule your objection. I find they are relevant to the case.

MR. HAMMERSCHMITH: I think, Your Honor, it is a matter of balancing their relevance against the prejudice to the defendant.

THE COURT: I agree there has to be a balance. I don't find them overly inflammatory. It describes what happened to her. It shows a woman with bruises on her face, wrist and thigh, she says she was kicked and punched.

CITY 003117



MR. BLOOM: If there is no objection -- I don't want to make any extra work for Mr. Hickson -- there is writing on the back, all it says is taken 9:00 A.M. on the date by her and the victim's name. Unless he objects to that, I'd just as soon leave them in.

MR. HAMMERSCHMITH: I don't have a problem with that. Can I state one further problem? I think pictorial evidence, if it is introduced as an exhibit, normally goes in front of a jury and it is with them in the jury room and I'd ask the Court to consider circulating the pictures among the jury at this point, but not having them go into the jury room with the jury.

THE COURT: I see no reason to do that. We will treat it like any other piece of evidence. They are not inflammatory, they show a black eye and bruises on her body.

(End of side bar conference)

THE COURT: 3A, B, C and D.

(Exhibit Nos. 3A, B, C and D, photographs, marked into evidence)

THE COURT: Can I see you one moment.

(The following conference was held at side bar)

THE COURT: I'm sorry, was there agreement that the writing can stay on the back?

MR. HAMMERSCHMITH: They each say victim Mary Prekop. Is there a problem with eracing that?

MR. BLOOM: I don't think so. I think on the record it's pretty much in she's a victim. I don't see this is a problem.

MR. HAMMERSCHMITH: I'd like the word victim not go to the jury. If there is no substantial reason not to, I'd ask it be eraced.

THE COURT: We will white it out.

(End of side bar conference)

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Officer Popko, at this time, referring back to November 30, 1985, your job was to interview people who were victims of alleged sexual assaults, is that right?

A. Yes, that's correct.

Q. And part of the job was taking statements from those people is also?

A. Yes, it was.

Q. How long had you been doing that?
A. I had been doing that since 1980.
Q. So you had been doing it five years?
A. Five years.
Q. I take it during that time you have taken hundreds of statements from hundreds of different people?
A. That's correct.
Q. Now, this particular statement which was taken -- you started taking the statement at 8:00 in the morning, 8:10 in the morning, is that right?
A. I started taking the statement -- I started typing the statement at 8:10 in the morning.
Q. And it was at the police department that the statement was taken, is that right?
A. Yes, it was.
Q. Can you describe the room in which it was taken?
A. It was taken at the Crime Prevention Bureau, which is located on the second floor of the police department, it is a room with several desks, chairs, typewriters, sets.
Q. Was anyone else in the room at the time?

A. No, just myself and the victim.
Q. Was that throughout the time that you were typing up the statement, that no one else was in the room?
A. No one else was in the room. Someone else might have come into the room and left, but no one else was actually in the room for any length of time.
Q. For any length of time?
A. Yes.
Q. Did you type the statement as you spoke with her?
A. Yes, that's my customary way of doing it.
Q. Why don't you tell us how you took it, just in terms of the procedure that you followed?
A. I asked her to tell me what happened and, as she did, I would reduce what she said to writing.
Q. Did you check with her while you were typing to make sure you were typing down what she was saying?
A. What she wanted, yes.

Q. How long did it take to get this whole statement down?
A. Approximately an hour.
Q. At the end of the hour, you gave her the statement to read, did you?
A. That's correct.
Q. So you didn't read it back to her, she read it herself.
Q. She read it herself.
Q. After reading it, did you ask her whether it was all correct?
A. Yes, I did.
Q. And she in fact indicated that everything there was correct?
A. Everything was correct.
Q. With respect to her purse or her pocketbook, she did not say that her coin purse had been taken in that statement, did she?
A. At this point, she wasn't aware exactly what was taken --
Q. My question is what she said.
MR. BLOOM: I think she answered the question, she got cut off.

THE COURT: I'm going to allow her to answer.

Q. (By Mr. Hammerschmith) My question is what did she say --

MR. BLOOM: I'm sorry, can she give the answer? She was interrupted, Judge.

THE COURT: Let's start again. All right, what is your question?

Q. (By Mr. Hammerschmith) What in her statement did Miss Prekop say about her coin purse, if anything?

A. She wasn't aware at this point what was taken. I don't think -- I think this was the least of her concerns at this point.

Q. She said in her statement that she was not aware that her coin purse had been taken?

A. She wasn't aware of what was taken in her purse exactly.

Q. Where did she say that in the statement? Do you have the statement in front of you?

A. Yes, I do.

Q. Could you read me the exact words where she says that?

A. Okay. "I saw my pocketbook on the floor, the contents were spilled out. I picked up change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook. I don't know if he took it or not."
Q. And that is the sum total of what is said about the pocketbook in the statement?
A. That's correct.
Q. Now, in that statement, she also gives a description of her assailant, does she not?
A. Yes, she does.
Q. And in describing that assailant, she gives an age of approximately 20 to 30 years old, does she?
A. Yes.
Q. And she also says that the person was wearing a blue jacket that looked like it was nylon?
A. Looked like nylon.
Q. And white sneakers?
A. Yes.
Q. And she described the pants that he was wearing, correct?
A. Dark colored.

Q. "A dark colored pair of pants, they were neither jeans nor corduroy material," that is what she said?
A. Yes.
Q. And she was able to tell you that he wasn't wearing glasses?
A. That's correct.
Q. And that she didn't notice any jewelry or scars?
A. Yes.
Q. At no point in time in that statement does she mention that his face was obscured from her, does she?
A. No.
Q. And in that statement she also says that he was clean shaven?
A. Yes.
Q. That her assailant was clean shaven?
A. Yes.
Q. Now, this statement was taken and finished approximately 9:00 in the morning?
A. Approximately thereabouts.
Q. On November 30, 1985?

A. That's correct.
Q. And that would be the same day as the assault on her in her home?
A. Yes.
MR. HAMMERSCHMITH: Thank you very much.
MR. BLOOM: That's all I have, Your Honor.
THE COURT: Thank you.

(Witness steps down)

WILLIAM FITCHETT (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and the jury, sir, your name and your occupation?
A. Captain William Fitchett, police officer, City of Springfield.
Q. Captain Fitchett, would you tell Judge

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS KELLY (Voir Dire) | 4 | 17 | 31 | 35 |
| GEORGE PERROT (Voir Dire) | 40 | 44 | | |
| ROBERT CHEETHAM | 72 | 79 | | |
| MARIANNE POPKO | 92 | 104 | | |
| WILLIAM FITCHETT | 111 | | | |
| THOMAS KENNEDY | 118 | 121 | | |
| THOMAS JARVIS | 130 | 162 | | |
| THOMAS ~~KENNEDY~~ Kelly | 182 | 218 | 228 | |
| WILLIAM EUBANKS (Voir Dire) | 240 | 264 | 277 | |

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm

Murphy and the jury how long you have been a member of the Springfield Police Department?

A. About fifteen years.

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

THE COURT: What is this guy's name?

MR. BLOOM: Fitchett.

THE COURT: He's not on the list.

MR. BLOOM: All he's going to testify to is he took the blood from the victim. I'd have the record state that I was under the misimpression that Kennedy, who was going to be a witness on some other aspect, also was there when the victim's blood was taken. When I looked back at the paperwork, I found he wasn't. My only questions of him is he witnessed the blood being taken by Miss Prekop and sent it to the F.B.I.

THE COURT: From Miss Prekop.
MR. BLOOM: Yes.
MR. HAMMERSCHMITH: Not from the defendant.
MR. BLOOM: No, he had nothing to do with the defendant.
MR. HAMMERSCHMITH: Okay, I don't have any objection, then.

(End of side bar conference)

Q. (By Mr. Bloom) Captain, how long did you indicate you have been a member of the Springfield Police Department?
A. About fifteen years.
Q. And you have held the rank of captain how long approximately?
A. About seven months.
Q. Now, going back to earlier in this year, did you have occasion to have an involvement with a Miss Mary Prekop?
A. Yes, I did.
Q. Can you tell us for what purpose that

was that you had occasion to see her?

A. Collections of blood specimen.

Q. Was there a collection of blood specimen from Miss Prekop in your presence?

A. Yes, sir, there was.

Q. Can you tell us how many vials of blood were taken from her in your presence?

A. Three vials.

Q. Now, after the vials were taken -- can you tell the jury the date that that was done?

A. April 30, 1987.

Q. On the 30th of April, 1987, when the blood was extracted from Miss Prekop, what did you do, if anything, with those vials?

A. I observed them being written on by an E.M.T. that extracted the blood, then I took them to the Springfield Police headquarters, I placed them in an evidence box, sealed the box, signed it and caused it at some point to be sent to the Federal Bureau of Investigation.

Q. Was her name written on the vials itself after the blood was taken and deposited in the vials?

A. Yes.

Q. That was done on the 30th of April, is that correct?
A. Yes, sir.
Q. Now, along with the writing on the vials, sir, the box that it was sealed in, did you cause writing to be put on the top of that, something typewritten or handwritten on the top of the box?
A. No, there is -- there are some letters and numbers on the top. I did not do that.
Q. Okay. Now, is the item that you are holding today, does that contain the three vials of blood that you saw taken from Miss Prekop?
A. Yes, it does.
Q. Who put it in this cellophane bag?
A. I did.
Q. And the writing pertaining to the time, the date and the person that the blood was extracted from, who caused that writing to be placed in there?
A. That's my own.
Q. Now, down below is the letters K13 WGE. Does that pertain to the Springfield Police Department?
A. No, sir.

Q. And you said that you had this blood caused to be sent to Washington to the F.B.I. laboratory?

A. That's correct.

Q. And that would pretty much sum up your involvement in this matter?

A. Yes, sir.

MR. BLOOM: That's all I have of this witness.

MR. HAMMERSCHMITH: I don't have any questions of this witness.

MR. BLOOM: I'd like, Judge, to mark this for identification, if I could, just the box.

THE COURT: B for identification.

(B for Identification, box, marked)

THE COURT: I assume the Captain got them back.

MR. BLOOM: Yes.

May we approach.

(The following conference was held at side bar)

MR. BLOOM: I'm only asking it be marked for identification, just so when the guy from Washington comes in, he can identify that as the blood he performed the test on. I am obviously not going to introduce the blood.

THE COURT: Okay.

MR. HAMMERSCHMITH: I don't have any objection to marking it for identification.

(End of side bar conference)

MR. BLOOM: That's all I have of Captain Fitchett.

MR. HAMMERSCHMITH: Nothing.

(Witness steps down)

MR. BLOOM: Sergeant Kennedy.

THOMAS KENNEDY (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you be kind enough to tell Judge Murphy and the jury your name and your occupation, please?

A. My name is Thomas Kennedy, I am a sergeant for the Springfield Police Department.

Q. Sergeant, how long have you been a member of the Springfield Police Department?

A. For about seven and a half years.

Q. I am going to ask you, sir, to direct your attention to the latter part of March of 1987. Did you have occasion at that time to have an involvement with the defendant in this case, George Perrot?

A. Yes, I did.

Q. Did you observe a procedure in your presence that occurred with Mr. Perrot?

A. Yes, I did.

Q. Can you tell us when that occurred and where it was that it took place?

A. It was on March 31, 1987, and it was in one of the rooms, I believe, off of Courtroom 1 or 2, on the third floor of this building.

Q. Can you tell us -- I'm sorry, did you say in this building on the third floor?

A. Yes.

Q. Can you tell us what was done in your presence on that day?

A. Yes. Two vials of blood were taken from George Perrot.

Q. For instance, tell the jury what you did with the blood after it was taken and put into vials. Did you take it or did someone else take it?

A. I took the blood.

Q. Who took it from his arm, though?

A. The blood was taken by Terry Aberdale.

Q. And he is whom, sir?

THE COURT: Wait a minute.

MR. BLOOM: I will withdraw that, Judge.

Q. (By Mr. Bloom) He is a medical personnel, he works in the medical field?

A. Yes.

Q. You witnessed him take the blood from Mr. Perrot, correct?

A. Yes, I did.

Q. Now, after the blood was turned over to you, what, if anything, did you do with it at that time?

A. I took the blood to the Crime Prevention Bureau of the Springfield Police Department where I tagged it as evidence.

Q. After you had it tagged as evidence, sir, did you have occasion to do anything with it within the next week or so?

A. Yes.

Q. Tell the jury what you did with those two vials of blood that you observed being taken out of the defendant's arm on the 30th, 31st of March 1987?

A. On April 1st of 1987, I picked up the blood at the Crime Prevention Bureau of the Springfield Police Department and I delivered that

blood to the F.B.I. laboratory in Washington D.C.

Q. And you arrived at the F.B.I. laboratory in Washington D.C., along with Mr. Perrot's blood, did you bring anything else on that day for examination purposes?

A. Yes, I did.

Q. Can you tell us what that was?

A. Yes, I brought hair samples from Mary Prekop.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Sergeant, you were present when the blood was taken from Mr. Perrot?

A. Yes, I was.

Q. And would it be fair to say that Mr. Perrot gave his blood freely and voluntarily on that occasion?

MR. BLOOM: I'm going to object.

THE COURT: Hold on a second.

(The following conference was held at side bar)

THE COURT: Now, are you opening it up so he can get in the fact that he had to get a court order to do it?

MR. HAMMERSCHMITH: He didn't have to get a court order to do it. Mr. Bloom and I discussed the matter --

THE COURT: I thought you did get a court order.

MR. BLOOM: I did have a court order -- I presented a court order and it's still technically ordered by the Court.

THE COURT: He's going to get into that.

MR. BLOOM: We don't know whether the agreement was based on conversations of him telling him, in light of the law, you got no leg to stand on to oppose it, because we don't know what the law is on

that area. Technically, I had a court order.

MR. HAMMERSCHMITH: I think Mr. Bloom knows as well as I do the conversations that I had --

THE COURT: Look, if you want to get into it, if he gave his blood freely, fine. And then he is going to get up and ask about was there a court order issued, and then what are you going to do, start explaining what that means to the jury?

MR. BLOOM: It's attorney-client --

MR. HAMMERSCHMITH: Call Attorney Bloom as a witness. I mean the problem I have -- Your Honor --

THE COURT: Go ahead, but I just want to make sure you realize that he is going to --

MR. BLOOM: What is the relevancy, anyhow?

MR. HAMMERSCHMITH: I think the relevancy --

THE COURT: Is it he was cooperative?

MR. HAMMERSCHMITH: I think the relevance is consciousness of innocense.

MR. BLOOM: Let me say this, Judge: the problem I have with it is, obviously, they had a conversation and that's where the problem comes in.

THE COURT: Wait a minute now.

MR. BLOOM: Did he cooperate because of the voice of counsel or did he cooperate because he was being a cooperating individual? That's where the problem is.

THE COURT: If he gave it under court order, how is it consciousness of innocence? You are saying it as if he had a choice.

MR. HAMMERSCHMITH: He did.

MR. BLOOM: He didn't.

MR. HAMMERSCHMITH: Mr. Bloom told you two days ago the situation that transpired.

THE COURT: Look at, I haven't memorized everything you gentlemen told me throughout this trial, so -- if he gave it under a court order, how can it be evidence of consciousness of innocence? And if that's what you are offering it for, that's exactly what he is going to do.

MR. HAMMERSCHMITH: Let me explain. As was said the other day, we were in a posture back in March of this year in which Mr. Bloom said he was ready to go to trial on the case and we had -- Mr. Bloom and I had discussions, we had a number of discussions concerning the need for further blood examples. Mr. Bloom told me that he had spoken with the fellow at the F.B.I., who later will be testifying, and that that person indicated to him that further blood testing would be helpful, that blood testing could either exclude -- could possibly exclude Mr. Perrot or perhaps

prove --

THE COURT: How is that admissible?

MR. HAMMERSCHMITH: Well, I think in terms of the consciousness of Mr. Perrot as to what was happening and the -- you brought up the Court order, I'm just telling you the background for that court order.

THE COURT: I know that, but all I called you to side bar for was to -- you're opening up that area, that he can say that that blood was taken under court order, and I don't see how anything else can go in.

MR. HAMMERSCHMITH: I guess I can get a transcript that will indicate that the court order was stipulated to, agreed to by -- and I think Mr. Perrot, himself, can testify that --

MR. BLOOM: He can testify, that's not the issue in front of Judge Murphy now.

THE COURT: What he is going to

testify to is -- I can't base any rulings on that, counselor. It is my understanding he gave his blood under a court order, and I don't consider it consciousness of innocence, okay? Now, the fact that you and Mr. Bloom had some conversations is not going to be evidence in this case. Your trial strategy is not going to be evidence in this case.

MR. HAMMERSCHMITH: I would simply represent to the Court that I don't think that Mr. Bloom can argue in good faith that this blood was not given willingly, freely and voluntarily, knowing --

THE COURT: I am not basing my decision on that. I am basing my decision on what is going to go into evidence, and if you get into evidence that he stuck his arm out there and said go ahead, I am sure Mr. Bloom is going to be -- you have told me you are

offering it as consciousness of innocence. First of all, I don't know how it is admissible on that basis. Consciousness of innocence is not admissible as far as argument goes, until there's been consciousness of guilt. But if you are going to offer it for that purpose, why can't he say it was under court order?

MR. HAMMERSCHMITH: Well, I think -- I don't really know that this officer knows whether it was under court order.

THE COURT: At any rate, I just want to let you know what you are opening up here and all this conversation that went on between Mr. Bloom and what your trial strategy was in the case, what your client agreed to, I can't base a decision on that. But if you want to proceed with that line of questioning, on the record I am telling you go right ahead.

(End of side bar)

MR. HAMMERSCHMITH: May I have a minute to speak with my client?

THE COURT: Yes.

(Pause in the proceedings)

Q. (By Mr. Hammerschmith) Sergeant, you say you took this blood with you to the F.B.I. lab in Washington?

A. Yes, sir.

Q. What did you do with it there?

A. I submitted it as evidence at the F.B.I.

Q. Who did you give it to?

A. I don't recall the name of the technician that received the blood.

Q. What, if anything, did you see done with the blood when you gave it to this technician?

A. I'm sorry, I didn't hear your question.

Q. What, if anything, did you see done with this blood after you gave it to the technician?

A. I just submitted it to the F.B.I. I

CITY 003147



didn't see any type of procedure done with the blood.

Q. Is that the last time that you saw the blood?

A. Yes.

MR. HAMMERSCHMITH: No further questions.

MR. BLOOM: That's all I have. Thank you, Sergeant.

(Witness steps down)

MR. BLOOM: Detective Jarvis.

THOMAS JARVIS (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and this jury, please, what your name and your occupation is?

A. Thomas Jarvis, Detective, Springfield Police Department.

Q. Now, Detective, can you tell the Court and jury how long you have worked as a Springfield police officer?

A. Twenty-one years.

Q. And you have been in the Detective Bureau approximately how long?

A. Eighteen.

Q. During those eighteen years that you have been assigned to the Detective Bureau -- let's go back, for instance, to 1985. Did you have a specific assignment or were you just generally in the Detective Bureau?

A. I work housebreaks.

Q. At some point on December 7th -- strike that. What was your tour of duty on December 7th of 1985?

A. 7:30 A.M. to 3:45 P.M.

Q. And you have been on that type of shift how long?

A. Ten years.

Q. What time did you normally get into the station?

A. Somewhere around twenty-five after

seven.

Q. Now, did you work on that day, on the 7th of December of 1985?

A. Yes, sir, I did.

Q. And at some point, sir, after you got into work at 7:30 or whatever the exact time was, did you become aware that George Perrot was in custody?

A. Yes, sir, I did.

Q. And at some point in time, did you see him during that time period between 7:30 and let's say 8:00?

A. Yes, sir, I did.

Q. When you saw him, sir, what was the first thing that happened between the two of you? What did you do, if anything?

A. I gave him the Miranda rights.

Q. That was done how, in what fashion?

A. I gave it to him off a card.

Q. Can you tell the jury what that is? Did you read actually from the card?

A. I read the Miranda warnings from the card.

Q. I'm just showing you this particular

card that says Miranda warnings. Is that the type of card that you read to him?

A. Yes, sir, it is.

Q. Can you tell us, sir, exactly what it was that you told him off of that card, and what time it was approximately when this happened, as best you can remember?

A. Approximately 7:45 A.M. that morning, and I advised him, "Before we ask you any questions, you must understand your rights. You have a right to remain silent. Anything you say can be used against you in court. You have a right to talk to a lawyer for advice before we ask you any questions and to have him present -- and have him with you during questioning."

May I put my glasses on for a second? Excuse me.

"If you cannot afford a lawyer, one will be appointed for you before questioning if you wish. If you decide to answer questions now without a lawyer present, you will have the right to stop questioning at any time until you talk to a lawyer."

I asked him, "Do you understand what I

have read to you? Having these rights in mind, do you wish to talk to me now?"

Q. What was his response?

A. Mr. Perrot's response was, "There is no sense in me talking to you. They got me good for the two incidents that happened last night."

Q. Let me ask you this. Did he indicate he'd be willing to talk to you?

A. Yes, sir, he did.

Q. Did you talk to him about anything pertaining to 11/30/85 at that time?

A. No, sir.

MR. HAMMERSCHMITH: May counsel approach, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I thought the officer had been instructed not to get into the other matters or his guilt or innocence on those matters.

THE COURT: Well, actually, he didn't ask him the question. I think

there was a question that preceded that that would have opened that issue up. He asked him what Perrot said, and Perrot said, "There is no sense in me talking to you, they got me for --"

MR. BLOOM: For the two incidents, and it got cut off, it didn't specify, but --

THE COURT: So he didn't really start talking about the other incidents, because he didn't say what the question was that that answer came to.

MR. BLOOM: He has been instructed -- believe me when I tell you that, he's been instructed.

MR. HAMMERSCHMITH: Does he need to be reinstructed?

MR. BLOOM: I hope not. I don't think it's necessary.

THE COURT: Okay. Well --

MR. BLOOM: I understand, no one wants a mistrial any less than I do, for obvious reasons.

THE COURT: You feel you have given him all the instructions?

MR. BLOOM: Yes.

MR. HAMMERSCHMITH: I think we already have a problem, as I heard his testimony, he was saying that Mr. Perrot had already admitted to two incidents now.

THE COURT: He didn't say that. He didn't say any such thing.

MR. HAMMERSCHMITH: Maybe I misunderstood.

THE COURT: I will tell you what he said. He said, "What did Perrot say?" And Perrot said, "There's no sense in me talking to you. They got me good on the two incidents last night." And that is the case on trial.

MR. BLOOM: And I interrupted him at that point.

MR. HAMMERSCHMITH: The two incidents last night, Your Honor, were not the cases on trial today. They were

a week before.

MR. BLOOM: There is no way for the jury to know, based on the statement that he made, that they were talking about anything but the two incidents that are placed in front of them.

THE COURT: Okay, now I understand.

MR. BLOOM: Because I interrupted him after he said two incidents, I interrupted him and he didn't specify what -- that it could be something beyond what is in front of the jury. He has been instructed, that guy's an experienced police officer, I have told all of them innumerable times, including Emily Lichwala and Miss Prekop, what would cause a mistrial.

THE COURT: All right, we will allow it to go. I don't think we have a problem at this point, as you indicated, because I don't think the jury can infer anything from the statement that has been made up to this point, at that time

the District Attorney interrupted him. I don't think there is any prejudicial inference that the jury can draw at this point, but if you say you have given him all the instructions, okay, we will go with it and see what happens.

MR. HAMMERSCHMITH: Let me say for the record, Your Honor, I think you accurately stated what was said by the officer and I do disagree as to whether it is prejudicial, and, for the record, I'd ask for a mistrial.

THE COURT: Based on what I have heard, I'm denying the motion for a mistrial, I don't think there has been any prejudicial statement made at this point, prior to the time he was interrupted by the District Attorney.

(End of side bar conference)

Q. (By Mr. Bloom) Could you just tell me, yes or no, did he indicate after you read those

rights to him whether he would be willing to talk to you?

A. Yes, sir, he did.

Q. What you didn't indicate, Detective, before you read the rights, I am assuming you introduced yourself to him?

A. Yes, I did.

Q. Now, you were in the neighborhood, you said, between quarter of eight and 8:00?

A. Yes, sir.

Q. Did you cause him to be brought somewhere in the station?

A. He was brought down to the booking section.

Q. And that is normal procedure?

A. Yes, sir, it is.

Q. What does that include, basically?

A. He has to be booked, fingerprinted and photographed.

Q. Now, while he was going through that process, did you go anywhere?

A. Yes, sir, I did.

Q. Where did you go, sir?

A. I went to familiarize myself with a couple of cases, I went up to a girlfriend of Mr. Perrot's --

Q. Let me take the first thing, to begin with. Did you have a specific knowledge that there were two incidents concerning November 30th of 1985?

A. At the present moment, no, I didn't, sir.

Q. So you are telling us that you wanted to familiarize yourself with that, is that correct?

A. That's correct.

Q. And were there other things that you did during that time period he was being booked and processed?

A. Yes.

Q. In any event, did you get the files and read them?

A. Yes, sir, I did.

Q. That pertained to 11/30/85?

A. Yes, sir.

Q. And after you had done that, sir, later on during the 7th of December, did you have occasion to see Mr. Perrot again?

A. Yes, sir, I did.
Q. At what time would that have been approximately?
A. Around 11:30 A.M.
Q. What time was it?
A. About 11:30 A.M.
Q. Where did you see him at that time?
A. At the booking desk again.
Q. Did you have occasion to have him removed from that area?
A. Yes, sir, I did.
Q. Where did you bring him?
A. Up to the Detective Bureau.
Q. Can you tell us, sir, approximately what time this would have been that you got back to the Detective Bureau?
A. About quarter to twelve.
Q. When you brought him up then, sir, what did you do at that time? Let me withdraw that. Did you give him his Miranda warnings again, now that you brought him back up?
A. Yes, sir, I did.
Q. And just for the record, is this the

Miranda card that you used to give him his warnings again when you brought him up now to the Detective Bureau?

A. Yes, sir, it is.

Q. And what time does that indicate that you gave it to him?

A. 12:40 P.M.

Q. So, are you saying that he was brought up now at quarter of twelve or quarter of one?

A. Quarter of one, sir.

Q. And the last time you had seen him before 12:30 or quarter of one was approximately when you had taken him to the booking desk?

A. Yes.

Q. What time was that about?

A. Approximately four hours earlier, four and a half hours earlier.

Q. Now, did you read off of the card at 12:40 P.M. on December 7th of 1985 those warnings?

A. Yes, sir, I did.

MR. HAMMERSCHMITH: I am going to object, Your Honor. May I be heard?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I think we are leading the witness very significantly and I --

THE COURT: I am afraid that it is necessary, because I don't want to have a mistrial, and there's so many other things that could go wrong here if he doesn't lead him, and he hasn't led him on any significant issues up to now.

MR. HAMMERSCHMITH: I think he led him on he had not seen him between 7:30 and whatever time he saw him at the booking section and when he saw him at 12:45.

THE COURT: When was the last time you had seen him prior to 12:40, and he said four hours before.

MR. HAMMERSCHMITH: I thought the form of the question was different, but, in any event, I understand the problem, I just would hope that leading could be

limited to the extent necessary to deal with that problem.

THE COURT: Well, actually, that is the only reason I allow it.

For the record here, we are talking about I think this man had been arrested for other molesting, hadn't he?

MR. BLOOM: He had been arrested for two other incidents and he was being investigated in reference to a series of --

THE COURT: So, obviously, we've got a very serious problem here of prejudicial information coming before the jury, so I am going to allow leading to a certain extent, but, obviously, I am not going to allow it once we get to the heart --

MR. BLOOM: Can I point this out for the record, Judge, that I have talked to him and one of the problems -- I will put it on the record so you can understand this now -- at about quarter

of one, when he is going to say he waived his Miranda and signed the card, I have instructed to him to say that he fed him lunch, which he did, took him to the bathroom a couple times, which he did, let him make, I believe, in the neighborhood of six to ten phone calls, and they don't get into the 11/30/85 incidents until 3:00.

The truth of the matter is a good portion of that time he gave him a confession on the December 7th incidents, but I have told this guy that -- instructed him to fill in the time periods from one to three on food, him having to do a few things around --

THE COURT: Do you think he understands that?

MR. BLOOM: I do. But I want it on the record that the cross examination ought to be aware, too, what I have done on that. Mr. Hammerschmith knows that there also was another statement, and I

told him not to mention that, and I won't lead him on anything that is significant.

THE COURT: All right?

MR. HAMMERSCHMITH: That's fine.

(End of side bar conference)

Q. (By Mr. Bloom) During that time period now, when you are waiting for the second time at about I think you said 12:40, quarter of one --

A. Yes, sir.

Q. -- did you have any problems understanding him?

A. No, sir, I didn't.

Q. Did he have any problem -- did it appear that he had any problem understanding you?

A. No, sir.

Q. When you were done giving him the rights this time now at 12:40, did you ask him to sign that card?

A. Yes, sir, I did.

Q. And just yes or no, can you tell the

jury did he indicate whether he would be willing to talk to you after you gave him those rights?

A. He was willing to talk to me, yes, sir.

Q. Did he sign that card in your presence?

A. Yes, sir, he did.

Q. Did you witness the signature?

A. Yes, sir, I did.

Q. And that was at 12:40, sir?

A. Yes, sir.

Q. On 12/7/85. Just for the record, this is the card, correct, that I am holding in my left hand?

A. That's correct, sir.

MR. BLOOM: Thank you.

(Card shown to Mr. Hammerschmith)

MR. BLOOM: I am going to offer this, Your Honor.

THE COURT: Any objection?

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: Exhibit No. 4.

(Exhibit 4, Miranda card, marked into evidence)

Q. (By Mr. Bloom) Now you are up in a different department, correct?
A. Yes, sir.
Q. What bureau were you in or what part of the building were you in at that time?
A. Interrogation room, Detective Bureau.
Q. That is a separate room from the main part of the detective room itself?
A. Yes, it is.
Q. Now, was there any sort of lunch involved during that time period?
A. Yes, sir, there was.
Q. Who fed or caused Mr. Perrot to be fed during that time period?
A. I fed Mr. Perrot.
Q. Did you do anything else in reference to him at that time? Was there any access to the phone or anything of that nature?
A. He made several phone calls, he made a

couple trips to the bathroom, he had coffee.

Q. Now, during that time period, did you also have other things that you had to do in the department?

A. Yes, sir, I did.

Q. Now, at some point in that afternoon, sir, on December 7th of 1985, did you sit down with Mr. Perrot to discuss the incidents of 11/30/85?

A. Yes, sir, I did.

Q. Could you tell the jury in reference to the incidents of 11/30/85 concerning Miss Prekop and Mrs. Lichwala, approximately what time it would have been on December 7th of '85 that you began discussing those two incidents with George Perrot. Your best estimate?

A. About 3:00.

Q. Just for the record, sir, is that gentleman that you were talking to about 3:00 in the courtroom?

A. Yes, sir, he is, sitting at the table right here. (Indicating)

MR. BLOOM: May the record indicate he has pointed to the defendant, Your

Honor.

THE COURT: The record may so indicate.

Q. (By Mr. Bloom) During the course -- strike that. Give us your best estimate, Detective Jarvis, as to, if you started around 3:00, as to how long it was that you talked to Mr. Perrot concerning those two incidents?

A. Roughly an hour and a half.

Q. When you were done talking or when the whole process was done, had you caused to have reduced to writing that which he had told you concerning those two incidents?

A. Yes, sir, I did.

Q. After you had it reduced to writing, sir, what, if anything, did you do with the document at that time?

A. The document was shown to Mr. Perrot. Mr. Perrot looked over the document, signed the document, the document had a time put on it, and he also initialed mistakes that I made in the typing on the document.

Q. All this was done, conversation,

CITY 003168


reduction to writing, ability to read the statement and sign the statement, within an hour, an hour and a half time period?

A. Yes, sir.

Q. And just for the record, sir, can you tell us, is this the statement that was reduced to writing that details what Mr. Perrot told you on December 7th of 1985 concerning the incident with Mrs. Prekop and Mrs. Lichwala on 11/30/85?

(Witness reads statement)

A. That is the statement, sir.

Q. And the GP's, that's what you are referring to, if there was a spelling error or something, the initialing by the defendant?

A. He would initial it George Perrot, GP, correct.

MR. BLOOM: I offer this document, Your Honor

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: May council approach, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: This is a copy.

MR. BLOOM: I think that is the original. It may or may not be, I may have put holes in it.

THE COURT: What's that?

MR. HAMMERSCHMITH: It looks like a copy to me.

THE COURT: I don't know, it may be. It looks like it came out of your file.

MR. BLOOM: I think I put it in my folder.

THE COURT: Is the original with the motion to suppress.

MR. BLOOM: I put the original in with the motion to suppress. Then Terry O'Brien gave it to me in the Clerk's office and I think I had cause to have

the two holes put in it to put in a folder, but the original was put in on the motion to suppress and marked, and then I got it back before trial, I signed out for it. I do believe that is the original.

MR. HAMMERSCHMITH: It looks very clearly to me to be a Xerox. The paper even has the shadows on it from the Xerox.

THE COURT: Are you objecting.

MR. HAMMERSCHMITH: Yes.

THE COURT: On the basis that it is --

MR. HAMMERSCHMITH: That it is a copy, yes.

THE COURT: Okay, where do you think it is.

MR. BLOOM: I will have them look for it and see if they have it.

THE COURT: We can recess early for lunch.

MR. BLOOM: I can finish up with

him in five minutes.

THE CLERK: This has to be the original, because if this were a copy, it wouldn't be on there.

THE COURT: It may be they introduced a copy at the motion to suppress.

MR. HAMMERSCHMITH: I didn't care about copies at that point.

THE COURT: There is one I think attached to my findings as to what it was, one way or the other.

MR. HAMMERSCHMITH: The reason -- I'm not trying to make things difficult, but I think when we were talking about things like that, I think it is important to see the original.

THE COURT: Well, are you contesting the fact that it's not an exact copy?

MR. HAMMERSCHMITH: I don't know whether it is an exact copy or not, that's my problem.

MR. BLOOM: He knows it is an exact copy, but he wants to --

THE COURT: We went through that last week.

MR. BLOOM: I have a few more questions, it will be quarter of one, I will recall him at two.

THE COURT: Okay.

(End of side bar conference)

Q. (By Mr. Bloom) Detective Jarvis, as you were concluding the procedure with Mr. Perrot, did you have occasion just prior to his signing of the document to give his Miranda warnings to him again the third time?

A. Yes, sir.

Q. Is the card that I have just handed you a card that represents the Miranda warnings that you gave to him near the conclusion of this process that started about 3:00?

A. Yes, sir.

Q. Is that also signed by George Perrot?

A. Yes, sir, it is.

Q. Can you tell us, Detective Jarvis, does it indicate the time that he signed that card?

A. Excuse me for a second.

Q. Is there a time on that card?

A. It's 4:20 A.M.

Q. So that's not the card that you gave him, correct?

A. No, sir.

Q. All right. Now, when you were talking to Mr. Perrot, can you tell us, the Court and jury, can you describe for the Court and jury what his emotional state was, as you remember it?

A. Mr. Perrot was very highly emotional, at sometimes crying, and at one point asked me, he said I'd like to have your gun so I could blow my brains out.

Q. And this crying existed how many times during the hour, hour and a half period?

A. Quite a few times.

Q. How many times did he make a statement like that to you about killing himself?

A. He only made that statement once to me.

Q. Total time period you were with him was basically how long, from 3:00?

A. An hour and fifteen minutes to an hour and a half.

MR. BLOOM: That's all I have on this, Judge. I'd like to have the right to recall Detective Jarvis.

THE COURT: Mr. Foreman, ladies and gentlemen, we are going to recess a few minutes early for lunch. It is quarter of one now, we will reconvene at quarter of two.

(Luncheon recess taken at 12:45 P.M.)

(Hearing reconvened at 2:05 P.M.
The defendant and jury were present)

Q. (By Mr. Bloom) During the time period you were with him, specifically from 3:00 to 4:15 or 4:30, whatever the exact time period was, did you have any problems with him during that time?

A. No, sir, we got along very well together.

Q. After you were done taking the statement at 4:20 or 4:30 or thereabouts, that was pretty much the end of your involvement with him for that day, correct?

A. Yes, sir.

MR. BLOOM: If I could just have a moment, Judge, I'd like to offer this document.

MR. HAMMERSCHMITH: May we be heard?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: This is the

original, Your Honor. The only thing --

THE COURT: For the record, this is the statement that was discussed at side bar prior to the noon lunch break.

MR. HAMMERSCHMITH: The only thing I wanted to make clear for the record is that the defendant is reserving his right to challenge the voluntariness of the statement under Tavares, and I'd like to make that clear.

THE COURT: It is a question for the jury.

MR. BLOOM: You have to instruct on every case.

THE COURT: Don't you feel the issue of the Miranda warnings, too? Or are you talking just about the voluntariness of the statement?

MR. HAMMERSCHMITH: Tavares and Williams both.

THE COURT: I would intend to put both those issues to the jury.

MR. HAMMERSCHMITH: Okay.

THE COURT: Sure.

(End of side bar conference)

THE COURT: That will be Exhibit 5.

(Exhibit No. 5, statement, marked into evidence)

Q. (By Mr. Bloom) Detective Jarvis, I wonder if you'd be kind enough to read Exhibit 5 to the jury, which you previously identified as I believe what was reduced to writing during that hour to hour and half time period concerning the incidents of November 30, 1985, at 27 Malibu and 33 Covel?

A. "My name is George Perrot, and I live at 87 Malibu Drive, and I am 17 years old. On November 30, 1985, I went to Brattelboro, Vermont, with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Street. I started drinking about 8:00 P.M., which was a Friday night. We also drank about a case of Bud. I took a purple mescaline on the way to Vermont. We stayed

there until about 2:15 A.M. Michael dropped me off about 3:15 A.M. at my house.

"I headed for number 33 Covel Street. The reason I went there was I heard it had been broken into before. I had a pair of my sister's gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel Street. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street.

"I left 33 Covel Street and went to 27 Malibu Drive. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door. This occurred about 4:00 A.M. on Saturday, November 30, 1985.

"After this, I went home. I had been drinking since about 7:00 P.M. that day and had also taken two purple mescaline pills.

"Signed George Perrot, December 7, 1985, witnessed by Thomas Jarvis and Captain Ernest

Stelzer."

Q. Just finally, correct me if I'm wrong, there are four indications of the initials GP on that statement, is that correct?

A. That's correct, sir.

Q. Could you just tell us again for the jury what that signifies in reference to Exhibit No. 5?

A. Those are the mistakes I made typing, George Perrot initialed them to show the mistakes were made.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Is it fair to say that you asked Mr. Perrot to initial those?

A. Yes, sir, I did.

Q. Now, on this day, December 7, 1985, you first arrived at the Detective Bureau about 7:30 or

7:35 in the morning?

A. Yes, sir, I did.

Q. And shortly thereafter, you spoke with Mr. Perrot for the first time?

A. Yes, sir, I did.

Q. And that would have been around 7:45 or 7:50 in the morning?

A. Yes, sir.

Q. And before doing so, you spoke, did you, with Sergeant Kelly?

A. I can't be sure of that.

Q. You may have spoken with Sergeant Kelly?

A. I might have, I may not have. I can't be sure of that.

Q. Who is Sergeant Kelly?

A. He is the sergeant of the Crime Prevention Bureau.

Q. What was his position at the time there?

A. He was, I believe, one of the head investigators for rapes.

Q. Would he have been the head investigator for this particular case, Miss Prekop's incidents?

A. Yes, sir, I believe so.

Q. You think you may have spoken with him, but you are not sure?
A. I'm not too sure, sir.
Q. When you saw Mr. Perrot for the first time that morning, it was in an interrogation room, wasn't it?
A. Yes, sir, it was.
Q. When you saw him that day, you had a chance to look at how he appeared that morning?
A. Yes, sir, I did.
Q. And would it be fair to say that his hair did not appear to have been freshly cut?
A. I can't answer that question, sir.
Q. Do you recall whether or not he had any facial hairs, a beard or a moustache?
A. He had a beard and a moustache, I believe, yes, sir.
Q. And you don't remember what his hair looked like?
A. No, sir, I don't.
Q. I believe you said you took him down to the booking room?
A. Booking area, yes, sir.

Q. And that would have been shortly after you first saw him that morning?

A. Yes, sir.

Q. And at some point after that, he would have had his picture taken, is that right?

A. If it was done, it would have been taken within an hour or so, half hour, forty minutes.

Q. I'm going to show you a photograph and ask you to take a look at it, and can you tell us what that picture is?

A. That is George Perrot with a beard, a moustache and curly hair.

Q. And can you tell us when that picture was taken?

A. 1985.

Q. And the date?

A. December 7, 1985.

Q. Would it be fair to say you recognize that to be a booking photograph such as is taken at the Springfield Police Department?

A. That should be a booking photograph.

(Photograph shown to Mr. Bloom)

MR. HAMMERSCHMITH: I'd like to introduce that into evidence.

MR. BLOOM: No objection.

THE COURT: Exhibit No. 6.

MR. HAMMERSCHMITH: With the Court's permission I'd like to ask it be circulated among the jurors.

THE COURT: Okay.

(Exhibit No. 6, photograph of George Perrot, marked into evidence)

Q. (By Mr. Hammerschmith) Now, you also spoke with Mr. Perrot again around 12:20 or 12:30, is that right?

A. Yes, sir.

Q. And when you spoke with him at that time, or shortly thereafter, you spoke with him about his signing a form, did you not, a search warrant waiver?

MR. BLOOM: Can we be seen, Judge?

(The following conference was held at side bar)

MR. BLOOM: I just want the record to reflect we talked about this a moment ago and I didn't get a chance to talk to Jarvis, because the jury came out, but my memory was, because I think this is what they are going to get into, is to try to show that he cooperated, which we talked about before. The problem that I have, and I want the record to reflect it very clearly, that what was said to him in my presence is you are being investigated concerning a series of rapes and we'd like to have your hair and your blood taken. So if he is going to ask him about what information was given to Perrot, I just want him to be alerted to what the answer may be. I'm just putting it on the record.

I know he doesn't want that, and he wants it for the purposes of

showing the guy agreed to give his blood and head hair, but I am also telling you he knows what was said to him and it may come flying out.

MR. HAMMERSCHMITH: Obviously, Your Honor, I am concerned that it not come flying out.

THE COURT: Obviously.

MR. HAMMERSCHMITH: I think Mr. Bloom and I were about to talk with Officer Jarvis about that before the jury walked in. I suppose the most prudent thing to do would be to ask to recess for just a very brief moment and make sure that Officer Jarvis understands the question I intend to ask him is simply whether it was explained to Mr. Perrot that this blood was wanted in connection with the Prekop and Lichwala break-ins of November 30th, and --

MR. BLOOM: That probably is all right, I just wanted to make sure he

didn't say to him what was Perrot told before he signed this waiver, because then he might get what he wasn't looking for. If he leads him, it should be all right.

THE COURT: All right.

MR. BLOOM: If you can ask him can you answer that yes or no, was he asked about the specific incidents.

MR. HAMMERSCHMITH: Okay.

(End of side bar conference)

Q. (By Mr. Hammerschmith) Officer, when you spoke with Mr. Perrot around 12:30 or so on December 7th, you spoke with him, did you not, about a search warrant waiver form?

A. Yes, sir, I did.

Q. You in fact asked him at some point in time to sign that form, did you not?

A. Yes, sir, I did.

Q. I am going to show you a document and ask you to take a look at it and tell us whether you

recognize it?

A. That's correct.

Q. You recognize the form?

A. Yes, sir, I do.

Q. Is that form in fact the search warrant waiver that you asked Mr. Perrot to sign that morning?

A. Yes, sir, it is.

THE COURT: Could I see you at side bar.

(The following conference was held at side bar)

THE COURT: Now, I recall from our motion to suppress that this particular -- the blood that was taken as a result of this particular warrant had nothing to do with this case.

MR. BLOOM: It didn't.

THE COURT: If you ask him that question and he says no, because it was some other case --

MR. HAMMERSCHMITH: I'm going to

ask him --

THE COURT: You are going to ask him if this was the blood that was to be taken in connection with the Prekop and Lichwala?

MR. BLOOM: Of course, Lichwala, there wasn't any physical evidence, but it was basically the Prekop case.

THE COURT: The Prekop case. What if he says no?

MR. BLOOM: That's what I want -- for instance, what I want to indicate is at that time there was at least one other rape, Mrs. Marchand, in which there was blood.

THE COURT: As I understand, it didn't apply to this case. When was this taken, when was this signed?

MR. HAMMERSCHMITH: The 7th.

MR. BLOOM: The same day as the statement.

THE COURT: But it wasn't until hours later that he found out about him

being in Prekop's house, right?

MR. BLOOM: The statement given about his admission was made hours after he signed this.

THE COURT: Okay. I just wanted -- I don't know what he is going to say or why he took that.

MR. HAMMERSCHMITH: Well, I'd suggest we conduct a voir dire on that, then, Your Honor.

MR. BLOOM: The problem I have is, Judge, they suspected him in a number of cases, but the blood and hair that was directed to evidence they had from other cases that were outstanding, and the thing that directed them toward Prekop --

(End of side bar conference)

THE COURT: Mr. Foreman and ladies and gentlemen, I am going to ask you to return to your jury room for a moment.

(Whereupon, the jury was removed from the courtroom)

THE COURT: Now, as I understand it, this piece of paper was signed sometime around 7:00 in the morning.

MR. HAMMERSCHMITH: It was signed, Your Honor, the time on it is 12:40.

THE COURT: 12:40 in the afternoon. And the statement that is Exhibit 5 wasn't given until sometime around 4:00 in the afternoon.

MR. BLOOM: 4:00 to 4:30.

THE COURT: Why don't you ask your question.

Q. (By Mr. Hammerschmith) Officer, referring to the search warrant waiver that you just saw, prior to having George Perrot sign this waiver form, did you explain to him what the purpose of the form was, yes or no?

A. Yes.

Q. Did you explain to him that he did not

have to sign that form if he did not wish to?

A. That's correct.

Q. And you told him that the form would authorize you to take blood samples and hair samples, did you?

A. That's correct.

Q. From him?

A. That's correct.

Q. Did you also explain to him that the reason that you wished to take the blood and hair samples was in connection with the investigation of a break-in or break-ins to the homes of Emily Lichwala and Mary Prekop?

A. That's correct, plus another one.

THE COURT: You told him it was for Prekop's investigation?

THE WITNESS: Yes, sir, it was.

THE COURT: That is the limit of the testimony, then, on that subject.

MR. HAMMERSCHMITH: That's what I would intend to introduce, yes.

THE COURT: Are we ready for the jury?

MR. HAMMERSCHMITH: Yes. You understand now --

THE WITNESS: Yes, sir, I do, you want me to limit it to two.

MR. BLOOM: Can he just ask him yes or no on the Prekop and then he can answer it yes or no and then we don't have any problems?

THE COURT: We are ready for the jury.

(Whereupon, the jury returned to the courtroom)

Q. (By Mr. Hammerschmith) Officer Jarvis, just before the jury was excused, we were discussing a search warrant waiver. Now, that search warrant waiver was obtained from Mr. Perrot at approximately 12:40 in the afternoon on December 7th, is that right?

A. May I see the time again, sir?

Q. Sure.

A. That's correct.

Q. And prior to having -- did Mr. Perrot

sign that in your presence?

A. Yes, sir, he did.

Q. Prior to his signing that, did you explain to him what you wanted the warrant for, yes or no?

A. Yes, sir.

Q. Did you explain to him that you wanted to take hair and blood samples from him?

A. Yes, sir.

Q. Did you also explain to him that the hair and blood samples that you wanted to take from him were in connection with the November 30th break-in to Miss Prekop's home?

A. Yes, sir.

Q. And he appeared to you to understand those things?

A. Yes, sir.

Q. And after you explained those things to him, did he sign the form?

A. Yes, sir, he did.

Q. And did he appear to do so willingly?

A. Yes, sir, he did.

MR. HAMMERSCHMITH: I'd like to

introduce this into evidence.

MR. BLOOM: No objection.

THE COURT: Exhibit No. 7.

(Exhibit No. 7, waiver, marked into evidence)

Q. (By Mr. Hammerschmith) By the way, at the time that Mr. Perrot signed that form, he didn't have a lawyer present with him, did he?

A. No, sir, he didn't.

Q. And he didn't have a lawyer present with him at any point in time on that day at the station, so far as you were aware, did he?

A. No, sir, he didn't.

Q. Prior to the signing of that form, would it be fair to say that the Assistant District Attorney, Mr. Bloom, had arrived at the police station?

A. I would say he did arrive.

Q. To the best of your recollection, was he present, not necessarily in the room, but at the station when this form was signed?

A. I believe so, sir.

Q. At some point later, you began to question Mr. Perrot concerning the Prekop and Lichwala break-ins on November 30th, is that right?

A. Yes, sir.

Q. And it is your testimony that he spoke willingly and freely about those to you?

A. He did.

Q. Had you asked him about those break-ins when you first saw him in the morning that day?

A. No, sir.

Q. When you had him sign the form that we just saw, the search warrant waiver form, you explained to him at that time, at least, what these particular break-ins were?

A. Yes, sir, I did.

Q. But did you not question him about those break-ins at that point, about those two break-ins?

A. Early in the morning?

Q. Either at 12:20, 12:30, whatever time you had the form signed or earlier in the morning?

A. Between the hours of approximately nine and twelve, I was doing an investigation with those

two breaks.

Q. Did you -- so my question was whether you questioned him about those either first when you saw him in the morning, around 7:45 --

A. At 7:30 in the morning I did not question him about those.

Q. And prior to having him sign this form, did you question him about those or did you just ask him to sign the form?

A. I can't answer that.

Q. When you were speaking with him about these two incidents -- you said you spoke for about an hour to an hour and a quarter -- I'm sorry, an hour and a quarter to an hour and a half?

A. Correct.

Q. During the time that you were speaking with him, would it be fair to say he was in a very emotional state?

A. He was upset at himself, yes.

Q. He was crying?

A. Emotional, crying, wanted to commit suicide, correct.

Q. He was also sometimes shouting as this

was going on?
A. Yes.
Q. Now, in fact, Mr. Perrot was placed on a suicide watch at the station, wasn't he?
A. I had that done, yes.
Q. Now, you were aware at the time, weren't you, that George Perrot was then seventeen years old?
A. Yes, sir, I did.
Q. The statement that you ultimately took from him does not at any point admit to assaulting Mary Prekop, does it?
A. No, sir, it doesn't.
Q. And Mr. Perrot at no time admitted that to you, did he?
A. No, sir, he didn't.
Q. And he didn't admit to raping Miss Prekop either orally or in that statement?
A. No, sir, he didn't.
Q. Now, in the statement, he told you, did he, that he entered the Covel Street address, Miss Lichwala's address, through an unlocked rear breezeway door, is that accurate?
A. You've got the statement in front of

you, sir, I will have to have a copy of it to refresh --

Q. I'm sorry. If you would, take a look at Exhibit 5?

A. What was the question now, sir?

Q. In that statement he explains, does he not, the means of entry into Mrs. Lichwala's on Covel Street?

A. "I entered an unlocked rear breezeway door and kicked the rear inner door in," correct.

Q. So he at no point told you, did he, about breaking a window to open the unlocked rear breezeway door?

A. No, sir, he didn't.

Q. And he didn't tell you anything about going into the basement of Miss Lichwala's home before breaking in upstairs?

A. No, sir.

Q. And, in fact, he doesn't say anything in that statement about breaking any windows, does he?

A. No, sir, he doesn't.

Q. By the way, there was a lineup that afternoon at the station including Mr. Perrot, wasn't.

there?

A. Yes, there was.

Q. Did you have an opportunity to observe that lineup?

A. No, sir, I didn't.

MR. HAMMERSCHMITH: I have no further questions. Thank you, Officer.

MR. BLOOM: Thank you, sir. That's all I have.

(Witness steps down)

SERGEANT THOMAS KELLY (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you tell Judge Murphy and the jury, please, your name and your occupation?

A. My name is Thomas M. Kelly, I am a sergeant with the Springfield Police and I am assigned to the Crime Prevention Bureau.

Q. Could you tell the Court and jury, sir, how long a time you have been a member of the Springfield Police Department?

A. I have been a police officer thirteen years and two months.

Q. How long have you been involved with the Crime Prevention Bureau?

A. Twelve and a half years.

Q. At some point in time, sir, did you become involved in the November 30th incident concerning 37 Covel Street and 27 Malibu Drive?

A. 33 Covel, yes, sir, and 27 Malibu.

Q. Excuse me. Would you diagram, if you could, on the board -- I'd like you to, just so you can give the jury an idea of where these locations are. If we just start with this as 33 Covel, if you can go from there. Can you draw where Malibu would be in relationship to that address?

A. Yes, sir.

Q. And the areas in between.

A. (Witness drawing) This is Forest Hills, that's Covel, that's Hilltop, this is Malibu, Cooley Street is here, Parker Street, that's Telbar.

Q. All right, you can sit down.

I would like you, if you would, to give us in a straight line the approximate distance between 33 Covel and 27 Malibu, as best you can estimate?

A. It's about a quarter mile.

Q. Now, is this diagram, obviously taking into account it isn't drawn to scale, is it accurate in terms of portraying 87 Malibu in between 27 and 33 Covel?

A. Yes, sir.

Q. Could you tell us, Sergeant Kelly, do you know who resided in the month of November of 1985 in reference to this investigation at 87 Malibu?

A. Yes.

Q. Who was that, sir?

A. George Perrot.

Q. Now, did you have occasion on the night -- I should say the early morning hours of 11/30/85 to become involved in this investigation?

A. Yes, sir.

Q. Did you go to either or both locations that day?

A. I went to both 33 Covel and 27 Malibu.
Q. Did you meet both Mrs. Lichwala and Miss Prekop on that day?
A. Not at those locations, but I did see them.
Q. Before the day was over?
A. Yes.
Q. When you were there, sir, had other officers already responded?
A. Yes.
Q. Can you tell us, as you arrived there, what your primary function was at that time when you first arrived at either scene on 11/30/85?
MR. HAMMERSCHMITH: Objection.
THE COURT: You mean what was his job?
MR. BLOOM: Yes.
THE COURT: I will allow him to answer.
THE WITNESS: Because one of the incidents involved a sexual attack, I was called, and my purpose there was to search the scene and gather whatever

evidence I could.

Q. (By Mr. Bloom) First of all, sir, did you see Mrs. Lichwala before the day was out -- excuse me, Miss Prekop?

A. Yes.

Q. Exhibits 3A and 3B, do they fairly and accurately depict how she looked when you saw her on November 30th of 1985?

A. Yes, sir.

Q. In terms of her face?

A. Yes, sir.

MR. BLOOM: I'd like to pass those around, if I may, Judge.

MR. HAMMERSCHMITH: Your Honor, could counsel approach side bar.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I may be getting ahead of the game a little bit, but it appears to me that Mr. Bloom intends to offer into evidence at least the purse and apparently a pair of

gloves, and I think there is a serious problem of foundation for --

THE COURT: For what?

MR. HAMMERSCHMITH: For both the gloves and the purse, because I don't believe --

THE COURT: Well, no one has identified the purse as --

MR. HAMMERSCHMITH: As being hers.

THE COURT: As belongs to Mrs. Lichwala, but I assume there is something in it.

MR. BLOOM: There was her driver's license and probably fifty or sixty pieces of identification inside the purse.

MR. HAMMERSCHMITH: And the --

MR. BLOOM: The gloves were taken because Miss Prekop said they weren't hers.

MR. HAMMERSCHMITH: I think that is a problem.

THE COURT: You what do you mean

taken from her?

MR. BLOOM: From her house.

THE COURT: Well, I think she testified that after this whole event took place, there was a couple of gloves on the end of her bed that weren't hers.

MR. BLOOM: Also it is into evidence in Exhibit 5 that Mr. Perrot had a pair of wool gloves that he took into --

THE COURT: His sister's gloves.

MR. BLOOM: Yes, and if it becomes an issue, the sister identified the gloves later in the day for Kelly, so I don't intend to put it all in if it's not necessary, but I think there certainly is a foundation for offering them.

MR. HAMMERSCHMITH: My understanding is there were two pairs of gloves taken.

MR. BLOOM: No, there was one pair of gloves taken, it was re-marked with a

second property slip and it was sent to the F.B.I., but only one pair of gloves taken to the Prekop home, my understanding is.

MR. HAMMERSCHMITH: I was misinformed, then.

THE COURT: Okay.

(End of side bar conference)

Q. (By Mr. Bloom) Sergeant, in reference to the allegation concerning sexual assault at 27 Malibu Drive on 11/30/85, at your direction, were certain things taken by the Springfield Police Department as evidence?

A. Yes, sir.

Q. And can you tell us what those were?

A. A pair of knit gloves, a flowered bedsheet, a pillowcase.

Q. Do you have those with you today?

A. Yes, sir.

Q. Now, why don't we, first of all, explain, if you could, the first item that I am

holding says number 49452. Does that pertain to the bedsheet?

A. Yes, sir.

Q. What does that number signify, if you could explain to the jury?

A. Every piece of evidence that comes to the Springfield Police Department is tagged for inventory purposes. It is assigned a number on a property tag. That number follows it wherever it goes.

Q. Excuse me. On the property tag, it is also marked on that container, isn't it?

A. It is.

Q. Can you tell us, sir, when you are packaging it, how that is done, or how it was done in this case?

A. It is done in a consistent manner each time that it is sent to the Federal Bureau of Investigation, they have a procedure that they want followed when evidence is sent to them.

Q. Did you follow it in this case in reference to the items you took from Miss Prekop?

A. Yes.

Q. Let's stay with the first item, the bedsheet. Did I just recite the proper number, the 49 --

A. 49452.

Q. Inside that package, does that contain the bedsheet, the package that is in front of you?

A. Yes, sir.

Q. And the item that it was packaged in, is that also contained in that package?

A. Yes, sir.

Q. Could you show that to the jury what it looks like?

A. It is simply a flat brown paper used --

Q. Can you tell us why that is used, or why you used it?

A. This piece of evidence is wrapped in this and sent to the F.B.I. to preserve whatever is on here.

Q. If anything, correct?

A. So that it does not become lost in the outer wrapper. It is an inner wrapping used to preserve the evidence.

Q. And that was done, yes or no, in

reference to the bedsheet?
A. Yes, sir.
Q. Now, correct me if I'm wrong, were the bedsheet and the pillowcase sent down in one package?
A. No.
Q. Can you tell us, sir, there are numbers also on there, Q3 and Q4. Do you know where those numbers came from?
A. Those are letters and numbers that are assigned by the F.B.I. lab.
Q. Is this the bedsheet you took out of the bedroom?
A. It is, sir.
Q. And who directed you to this bedroom?
A. Miss Prekop.
Q. This item, sir, also marked with the same property number, I believe 49452, a pink pillowcase, did you follow the same procedure with this as you did with the bedsheet?
A. Yes, sir.
Q. Would this be the brown paper bag to catch any droppings that may exist in the piece of evidence?

A. Yes, sir.

Q. The number on this, there is a number of Q1 or Q2, and some initials. Are those from the Springfield Police Department?

A. No, sir.

Q. In reference to these two items, the flowered bedsheet and the pillowcase, after you packaged them, sir, what did you do with them?

A. Sent them to the F.B.I. lab in Washington.

MR. BLOOM: I am going to offer these, Your Honor.

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: The bedsheet will be Exhibit No. 8 and its packaging. The pillowcase and packaging will be number 9.

(Exhibit No. 8, bedsheet and packaging, marked into evidence)

(Exhibit No. 9, pillowcase and packaging, marked into evidence)

Q. (By Mr. Bloom) Can you tell the court and jury at about this same time, the 8th or 9th -- strike that. During the same period of time that you had Exhibits 8 and 9 sent to the F.B.I., can you tell us if head hair from Mr. Perrot was sent down by the Springfield Police Department?

A. Yes, sir.

Q. And would it have been packaged the same way that Exhibits 8 and 9 were packaged?

A. Yes, sir.

Q. Would that also have been assigned a number to keep track of it?

A. Yes, sir.

Q. Is that the item you have in front of you?

A. No.
Q. Do you know the number that was assigned to the head hair?
A. Yes, sir.
Q. Can you just for the record tell us what that was?
A. 51465.
Q. Was that sent to the F.B.I. at some point, if you know?
A. Yes, sir.
Q. And do you know the date that it was sent down?
A. It was sent down the 8th or 9th, I'm not sure.
Q. Of December?
A. Yes.
Q. 1985?
A. '85.
Q. You indicated before that there was a pair of knit gloves. Can you tell the Court and jury where did you find the pair of knit gloves in relationship to the bedroom that you took Exhibits 8 and 9 from?

A. They were in the bedroom -- in the same bedroom on the floor.

Q. Why did you take those gloves, sir, at that time?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) Did you in fact make inquiry as to whether they belonged to Miss Prekop, those gloves?

MR. HAMMERSCHMITH: Objection.

THE COURT: I will allow him to answer yes or no.

THE WITNESS: Yes, I did.

Q. (By Mr. Bloom) As a result of what she told you, did you take the gloves, just yes or no?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) Did you take the gloves?

A. Yes.

Q. What did you do with the gloves?

A. I sent them to the F.B.I. lab.

Q. Did you package them in the same method you described in reference to Exhibit No. 8 and 9?

A. Yes, sir.

Q. The number on the package here, 49492, what number -- what is the significance of that number? What does that number mean?

A. That's the property tag number assigned to it when I recovered it.

Q. These initials, WGE and Q5, Q6, is that writing from the Springfield Police Department or from you, I should say?

A. No, it's not.

Q. Are these the two gloves that you sent down?

A. Yes, sir.

Q. And those were found where, again, in the bedroom of Mary Prekop?

A. In the bedroom on the floor near the bed.

Q. What, if anything, did you observe in relationship to these gloves prior to taking custody of them?

A. Some stains.

MR. BLOOM: I'm going to offer these, Your Honor.

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled. Exhibit 10.

(Exhibit No. 10, pair of gloves and packaging, marked into evidence)

MR. HAMMERSCHMITH: Your Honor, may counsel approach side bar.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: Just for the record, I wanted to make it clear that my objection to the introduction related to what we discussed earlier at side bar. There's been no evidence to show -- there's been no evidence to connect them with this incident, and, at least at this point, I think they are irrelevant.

THE COURT: The evidence, first of all, Miss Prekop said, after this was

all over, she found a pair of gloves in the bedroom that didn't belong to her.

MR. HAMMERSCHMITH: Well, that didn't belong to her hasn't come in.

MR. BLOOM: She stated that.

THE COURT: Wait a minute now, I'm making the statements.

MR. BLOOM: I'm sorry.

THE COURT: She testified that after this was all over, there was a pair of gloves in the bedroom that didn't belong to her. We have a statement in evidence from the defendant that he was wearing his sister's gloves that night, the night that he went into the Prekop home. I think that there has been enough foundation laid to allow them into evidence.

(End of side bar conference)

Q. (By Mr. Bloom) Sergeant, again, just confining yourself, if you would, to November 30th of

1985, can you tell us during the course of that day did you talk with Miss Prekop?

A. On November 30th, yes, sir.

Q. Excuse me?

A. Yes, sir, I did.

Q. Can you tell us, during the course of this discussion, did you talk to her about the assailant in reference to what happened to her earlier on that day?

A. Yes, I did.

Q. Can you tell the Court and jury did you have conversation with Miss Prekop as to whether she could making an identification?

A. Yes.

Q. And as best you can remember, what did she say concerning that?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: May we be heard, Judge.

(The following conference was held at side bar)

MR. BLOOM: At least my memory was

that yesterday he asked Miss Prekop, he's putting through a variety of people that this woman failed to identify during a lineup. He also asked Miss Prekop, I believe the last question was something along the lines you looked at the lineup and the man that did this to you wasn't there, or words to that effect.

Miss Prekop indicated yesterday that she never really got a good look at the individual, and the source of these conversations about the assailant came in under the theory it was part of the identification process when defense counsel tried to elicit information. I think it is relevant, on the other side of the coin, that from the beginning she told Sergeant Kelly I never got a good look at him, I wouldn't be able to identify him.

THE COURT: How is it not hearsay?

MR. BLOOM: It's not hearsay

because it is an exception to the hearsay rule, because it is part of the identification.

THE COURT: There has been no identification.

MR. BLOOM: I think -- my feeling is I should be entitled to it based on the fact that he's got the inverse aspect of it in yesterday by questioning Miss Prekop, at least my memory --

THE COURT: He was getting evidence that she gave a description of somebody that didn't fit the defendant.

MR. BLOOM: Right.

THE COURT: I think he is entitled to that.

MR. BLOOM: I don't dispute that.

THE COURT: But I don't think --

MR. BLOOM: I mean his questions about the lineup, he asked about the lineup procedure.

THE COURT: Right. Well, I suppose if that gets into evidence, it is going

to show the defendant was in the lineup.

MR. BLOOM: He asked her yesterday, showed her a picture and said, Is that the lineup you saw? Yes. And you didn't see the man in there that committed this crime? The point is that she never could see the man, she couldn't make an identification. I'm sure the jury can come to that conclusion also.

THE COURT: I will allow the objection.

(End of side bar conference)

Q. (By Mr. Bloom) Can you just answer yes or no to the question as to whether you did have a discussion with her about whether she could identify this person? Can you answer that, please, just yes or no?

A. Yes, I did.

Q. After, sir, the 30th, did you have occasion to be involved in the November 30th case

again on December 7th, the following week?
A. Yes.
Q. Did you see George Perrot on that day?
A. I did.
Q. Sergeant Kelly, the 7th was one week almost to the day after the 30th, is that correct?
A. Yes.
Q. And do you know where Mr. Perrot was placed under arrest at that time, where he was living at that time?
A. Yes, sir.
Q. Where would that be, sir?
A. 87 Malibu Drive.
Q. At some point in time after he was placed under arrest, you had occasion to see him, you have indicated?
A. Yes, sir.
Q. And at some point after being introduced to him or introducing yourself to him, did you give him his Miranda rights?
A. Yes, sir.
Q. I am going to show you a card and place it in front of you that just says Miranda Warnings,

CITY 003222



and can you tell us if that is the card you used when you gave Mr. Perrot his Miranda rights on 12/7/85?

A. Yes, sir.

Q. And would you tell the Court and jury approximately what time it was that he received his Miranda warnings by you?

A. I made the notation on the card of 12/7/85, 5:05 A.M.

Q. Did he appear to have any problem understanding you at that time?

A. No.

Q. Were you able to communicate with him at that time?

A. Yes, sir.

Q. Did you read to him all the eight items that are referred to one through eight on that card?

A. Yes, sir.

Q. Did he indicate, just yes or no, whether he would be willing to talk to you at that time?

A. Yes, sir.

Q. And what was that indication?

A. He said that he would talk to me.

Q. Now, I'm going to place in front of you

a card that -- at least it states Right to Use the Telephone, and is that something that you did in reference to Mr. Perrot at about this same time?

A. Yes, sir.

Q. Would you explain what you did precisely as you can remember to the jury concerning the right to use the telephone?

A. After reading him his Miranda warnings, I informed him that he had a right to use the telephone and that if he wanted to use the phone then, I would let him use the phone. I asked him to sign it and placed it in front of him, and before I could tell him where to sign it, he signed in another spot.

Q. That is your signature on the bottom?

A. Yes.

Q. That is his signature on the top that you witnessed in your presence?

A. Yes, sir.

MR. BLOOM: I am going to offer these two, Your Honor.

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: The Miranda card will be number 11 and the telephone card will be number 12.

(Exhibit No. 11, Miranda card, marked into evidence)

(Exhibit 12, telephone card, marked into evidence)

Q. (By Mr. Bloom) Sergeant, on or about the 30th of November 1985, did you have occasion not only to talk to Mary Prekop, but also to members of the family?

A. Yes.

Q. Who were those people, as best you can remember?

A. I know that I talked with Miss Prekop's sister.

Q. As a result of that, did you determine

that day whether Miss Prekop had been married or not? Can you answer that yes or no?

MR. HAMMERSCHMITH: Objection.

THE COURT: I'm sorry, I missed the question.

MR. BLOOM: My question was, did you determine on that day whether Miss Prekop had been married or not?

THE COURT: Sustained.

Q. (By Mr. Bloom) Can you tell us, sir, did you have conversation about Miss Prekop's background with her and her family?

A. Yes, sir.

Q. On the 7th -- strike that. Sometime after the 7th -- excuse me, strike that also. When you went down on the 7th, how did you happen to go to the station at 4:30 or 5:00 in the morning?

A. I was called at home.

Q. Prior to going to the station, did you give any instructions to anyone?

A. Yes.

Q. What was that, sir?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) As a result of going down to the station, you gave Mr. Perrot his Miranda warnings, is that correct, sir?

A. Yes, sir.

Q. After you gave him his Miranda warnings, did you conduct an investigation out of your own, outside of Mr. Perrot, I mean not dealing with Mr. Perrot? Did you do certain things in reference to this case at that time on the 7th, just yes or no?

A. Yes.

Q. Can you tell us, Sergeant, at some point in time after the 7th of December, did you have occasion yourself to go up to that same general neighborhood up in Springfield?

A. Yes.

Q. When was that, sir?

A. December 10th.

Q. When you went up there on the 10th, did you have a reason for going up there? Can you answer that yes or no?

A. Yes.

Q. Were you looking for something?

A. Yes.

Q. Tell the Court and jury what you were looking for when you went up there on the 10th.

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

THE WITNESS: I was looking for Emily Lichwala's pocketbook.

Q. (By Mr. Bloom) At some point during the time that you were up in that general neighborhood, did you take into custody something that you found?

A. Yes.

Q. And would you show us on that map, if you would, sir, where it was that you found this item you took into your custody?

A. At the end of Hilltop Street there's a house here and a house here. I took something into custody at about here.

Q. Would you put a circle around that X. And the item that you took on that day, do you have it with you today, sir?

A. Yes, sir.

Q. Is that it on the floor?

A. Yes.

Q. When you took it that day, sir, did you open it?
A. I did.
Q. Did you observe something inside of it?
A. Yes, I did.
Q. What did you observe?
A. Identification papers, personal papers, credit cards of Emily Lichwala.
Q. This was on the 10th of December 1985?
A. Yes, sir.
MR. BLOOM: I'm going to offer this, Your Honor.

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: May counsel approach, Your Honor?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I don't know what all is in here and I'm not sure whether there may be objectionable

CITY 003229


material. It looks like there's a lot in here and I'm not sure that that should go into the jury room.

THE COURT: Well, we can sanitize it later.

MR. BLOOM: I don't know what possibly could be in there that could prejudice the defendant, but I haven't looked through any of it.

THE COURT: You will both have an opportunity to go through it.

MR. BLOOM: I'm only interested, obviously, in the identifications.

THE COURT: You may find something in there you wouldn't want to go to the jury, too. So we will have it sanitized before it goes to the jury.

MR. HAMMERSCHMITH: The only other objection is my previously noted objection with respect to the motion to suppress.

THE COURT: Motion to suppress with regard to being the fruit of the --

MR. HAMMERSCHMITH: Yes.

THE COURT: My ruling on the inevitable discovery. Well, first of all, what is in it there that I.D.'s this thing?

MR. BLOOM: Her license, credit cards.

THE COURT: Have him pull them out, because we don't have anything in evidence other than the general statement that there was I.D. of her in there.

MR. BLOOM: I thought he said personal papers identifying Mrs. Lichwala.

THE COURT: Are there some in there?

MR. BLOOM: Sure.

THE COURT: Put some of them -- identify some of them.

(End of side bar conference)

Q. (By Mr. Bloom) These items that I am pouring out, sir, were they all inside of the pocketbook when you found it on the 10th of December of 1985?
A. Yes, sir.
Q. Did you go through some of them at that point?
A. Yes, sir.
Q. For instance, was this Emily P. Lichwala, 33 Covel Street, library card inside there?
A. Yes, sir.
Q. And inside there also was this registration for a motor vehicle registered to Emily P. Lichwala, 33 Covel Street, Springfield, Massachusetts?
A. Yes, sir.
Q. Those items came out of a wallet, correct?
A. Yes, sir.
Q. Was this card also in there which certifies that Emily Lichwala is a member of the Golden Age Club, Springfield Golden Age Club?
A. Yes, sir.

Q. Was also her license inside there, as best you can remember?

A. Yes, sir.

Q. A variety of other personal papers with the name Emily Lichwala on it?

A. Yes, sir.

THE COURT: That will be Exhibit No. 13.

(Exhibit No. 13, pocketbook and contents, marked into evidence)

Q. (By Mr. Bloom) Did you have occasion or did you direct someone, I should say, Sergeant Kelly, to take a photograph of this general area here where you indicated you picked up Exhibit 13 on December 10th of 1985?

A. I left it where I found it and asked for a photographer to respond.

Q. Does this picture fairly and accurately depict that area which you have marked on the board with an X circled in reference to December 10th of

1985 and where you found Exhibit 13?

A. Yes, sir.

Q. Is that in fact the pocketbook in the picture?

A. It is.

Q. Exhibit 13?

A. It is.

MR. HAMMERSCHMITH: No objection, Your Honor.

THE COURT: That is number 14.

(Exhibit No. 14, photograph of pocketbook, marked into evidence)

Q. (By Mr. Bloom) Sergeant, in that general area between those houses, is there any type of avenue or walkway or anything of that nature in there?

A. I don't believe it is an established walkway, but there is an area that is traveled.

Q. And that area that is traveled would be how wide?

A. Three to five feet.
Q. How far off of that area did you observe the pocketbook to be located, as best you can estimate?
A. From here to the bench, sir, another five feet.
Q. And this area that you are talking about, if you are heading from the direction of Covel toward Malibu, will eventually bring you to Telbar Street?
A. Yes, sir.
Q. Telbar goes into Parker?
A. Yes, sir.
Q. Right across the street to Malibu?
A. Yes, sir.
Q. And your best estimation of the distance between 33 Covel to 27 Malibu, you said, was about a quarter of a mile?
A. Maybe a little more. About that.
Q. How long would it take you to walk?
A. Three to five minutes.
MR. BLOOM: That's all I have.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. When you found the purse, was the wallet in it?

A. Yes, it was.

Q. I believe you have indicated that Mr. Perrot was arrested and taken to the station on the morning of December 7, 1985, is that right?

A. Yes, sir.

Q. And would it be fair to say that he was arrested about 3:00 in the morning, a little before that?

A. I'm not sure of the time. That might be right.

Q. When you saw him for the first time, it was about 4:30 in the morning?

A. I first saw him at 4:30 and spoke to him at five.

Q. When you first saw him, he was in an interrogation room at the Detective Bureau at the police station?

A. Yes, sir.
Q. And when you saw him later, he was in the same room?
A. Yes, sir.
Q. Now, his appearance when you saw him, he was disheveled, was he not?
A. Unkempt, disheveled.
Q. There was a note of alcohol about him, wasn't there?
A. Yes, sir.
Q. And he was wearing a jacket with no shirt, wasn't he?
A. I'm not sure of that.
Q. Now, you had him sign this card at 5:05 in the morning, a Miranda card?
A. Yes, sir.
Q. And also a telephone card at that time?
A. Yes, sir.
Q. Do you know whether he had any contact with any relatives at the station up to that point in time?
A. Up to that point?
Q. Yes.

A. I know that from the time I got to the station until I talked to him, he did not. I don't know before that.

Q. What time did you leave the station at the end of your workday on that day?

A. That was not my workday, but I left it at about six that night.

Q. And are you aware of any point in time during that day when Mr. Perrot was visited by relatives?

A. Not in my presence.

Q. Now, sometime after you first saw him at 5:00 in the morning, you attempted to ask him some questions about the break-ins to Miss Prekop's and Mrs. Lichwala's, did you not?

A. That's right.

Q. And would it be fair to say that he did not want to talk to you about those break-ins, that he told you he didn't want to talk to you?

A. No, that wouldn't be fair to say.

Q. Would it be fair to say that you asked him questions concerning those?

A. Yes.

Q. Would it be fair to say that he told you that he didn't know anything about those two incidents?

A. His words were, "I don't know anything about any old ladies."

Q. Now, at some point you stopped questioning him concerning those two incidents, did you not?

A. Yes, sir.

Q. And at the time when you stopped questioning him about those incidents, he had not admitted to breaking into either that home at 33 Covel Street or into Miss Prekop's home, had he?

MR. BLOOM: Objection. Can we be heard?

(The following conference was held at side bar)

MR. BLOOM: Your Honor, defense counsel knows from the discovery and from the previous hearing that Kelly stopped questioning him because they were in the process of getting a search

warrant to go into his home concerning the incidents of December 7th, which was the break-in, home invasion and a pocketbook snatch, and I don't want a mistrial, but I don't think he should be able to play that aspect of it.

In other words, the last question was I think he is trying to draw the inference by asking a series of questions that you attempted, but this kid wouldn't talk to you about these two incidents, where the truth is, and defense counsel knows the truth is he didn't spend any time with the kid because he was in the process of coordinating an investigation which led to the implementation of search warrants based on two serious felonies on December 7th.

THE COURT: You can bring that out on redirect. You don't have to do it that way, but if he brings it up, you can bring it out on redirect.

MR. HAMMERSCHMITH: Let me just say, Your Honor, the only question I asked was whether at some point --

THE COURT: He hadn't admitted anything.

MR. HAMMERSCHMITH: Yes. He was questioned for about 20 minutes concerning these, which he did not admit --

MR. BLOOM: That's not what I'm objecting to.

(End of side bar conference)

THE COURT: Ladies and gentlemen, we are going to take the afternoon recess.

(Brief recess taken at 3:10 P.M.)

(Hearing reconvened at 3:25 P.M.
The defendant and jury were present)

Q. (By Mr. Hammerschmith) Sergeant Kelly, during the time when you spoke with Mr. Perrot that morning, he at no point told you that he was involved in the break-ins either at Mrs. Lichwala's or Miss Prekop's home, did he?

A. That's correct.

Q. Now, at some point in time that morning, Officer Jarvis, Thomas Jarvis, came into work, is that right?

A. Yes, sir.

Q. At some point after he came into work, you spoke with him, correct?

A. Yes, sir.

Q. Would it be fair to say that you told him what had transpired in terms of George Perrot from the time that you arrived until the time that he arrived?

A. Yes, sir.

Q. Now, later that day you became involved, did you not, in arranging a lineup?

CITY 003242


A. I did.
Q. And the lineup that you arranged was at the Springfield Police Department, correct?
A. Yes, sir.
Q. And you asked Miss Prekop to come in and view this lineup, did you?
A. Yes, sir.
Q. Would that have been about 4:30 in the afternoon?
A. Yes.
Q. And she in fact came down and viewed the lineup, did she not?
A. Yes, sir.
Q. And one of the people in the lineup was George Perrot, correct?
A. Yes, sir.
Q. I show you a picture which has been marked for identification earlier, A for Identification. I'd ask you to take a look at it and tell us whether you recognize it?
A. Yes, sir, I do.
Q. Can you tell us what that picture is?
A. It's a photograph of seven men and these

are the individuals that I put into a lineup.
Q. One of the individuals is George Perrot, correct?
A. He is.
Q. And that is the individual on the far left as you look at the photograph?
A. Yes, sir.
Q. Is this the lineup that was viewed by Miss Prekop?
A. Yes, sir.
Q. In viewing that lineup, can you tell us, did you have each of the individuals in the lineup step forward at some point?
A. Yes, sir.
Q. While she was watching?
A. Yes, sir.
Q. Where was she watching from?
A. From behind a one-way mirror.
Q. So, as she watched, each of the individuals would step forward?
A. Yes, sir.
Q. And turn to one side, then turn to the other side, and then return to position?

A. Back to front, yes, sir.
Q. And she looked at each of the seven individuals in that lineup in the same way, did she?
A. Yes, sir.
Q. And would she have looked at Mr. Perrot first among those seven?
A. Yes, sir.
Q. In looking at that lineup, she did not identify Mr. Perrot as being the person who broke into her home, did she?
A. No.
MR. HAMMERSCHMITH: I'd ask that this be introduced into evidence at this point.
MR. BLOOM: No objection.
THE COURT: It will be Exhibit No. 15.

(Exhibit No. 15, photograph, marked into evidence)

Q. (By Mr. Hammerschmith) By the way, did Mr. Perrot have a lawyer present during that lineup?

A. No, he did not.

Q. Was Mr. Bloom from the District Attorney's office present when that lineup was taken?

A. Yes, he was.

MR. HAMMERSCHMITH: No further questions. Thank you, Officer.

REDIRECT EXAMINATION BY MR. BLOOM:

Q. Will you just tell us, Sergeant Kelly, was the lineup set up by you?

A. Yes, it was.

Q. And was it set up -- strike that. Was it set up because you had a belief that Miss Prekop could identify her accuser?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: May we be heard?

(The following conference was held at side bar)

MR. BLOOM: He is obviously going to argue and he's put this in for the purposes of arguing that the woman was attacked, the police obviously had to believe she could identify her accuser if she saw him again.

THE COURT: You better not.

MR. BLOOM: They brought her down and --

THE COURT: Well, first of all, it is improper argument. If he tries to argue it, I will instruct the jury on it. So, I don't think we can go on that assumption.

MR. BLOOM: I just tell you as part of the record that I don't want to get into the other ones, we are not going to, but the truth of the matter is it was based on the December 7th statement by the two people who were victims; if I see the guy again, I can absolutely identify him. I don't want to get that in, but I think now, in light of this

coming in and the inferences that can be drawn --

THE COURT: What coming in? That she didn't identify the defendant as the attacker. That's been in all the way.

MR. BLOOM: Maybe I'm wrong, but I thought the question started yesterday when he asked her the last question: In fact, you looked at the lineup and the man that attacked you wasn't in there?

what I am suggesting to the Court, Judge, I think I've got a right to get in from the beginning she was telling the police I can't identify the person --

THE COURT: She said that?

MR. BLOOM: -- who sexually assaulted me.

THE COURT: She said that on the stand.

MR. BLOOM: I know she did. I think it would be just introducing error into the case. By the same token, I

don't anticipate you are going to start arguing what the police thought they could or couldn't do.

MR. HAMMERSCHMITH: Certainly not. What she could or couldn't do, not what the police found.

MR. BLOOM: Can I ask him what she said --

THE COURT: What is the answer?

MR. BLOOM: I expect she said I don't know who did this to me, or words to that effect.

THE COURT: I will allow that.

MR. BLOOM: I think.

THE COURT: Are you going to ask a question you don't know the answer to?

MR. BLOOM: It's either going to be A or B, but it won't be a problem. My memory is she said something like that, I don't recognize anybody here.

MR. HAMMERSCHMITH: Let me say I received an identification summary from Mr. Bloom pursuant to discovery and I

believe the response of each of the individuals was included in that, in the written summary that I received, and I don't believe -- maybe we should check that.

MR. BLOOM: Well, I didn't ask that. I might as well ask it while we are over here. I intend to ask whether or not she ever made an indication to him as to whether she could identify her assailant, yes or no to that question. Is that a permissible question in light of the lineup going in? I just don't want to leave it with the idea this lineup was set up because there was some kind of feeling she'd be able to pick somebody out, because that, in fairness, Judge, wasn't why it was done.

MR. HAMMERSCHMITH: I think if Mr. Bloom asks that question, it may cut the other way for him.

THE COURT: It may what?

MR. HAMMERSCHMITH: May cut the

other way for him.

MR. BLOOM: I'm willing to take a chance.

THE COURT: Are you objecting to the question?

MR. HAMMERSCHMITH: I am also objecting to the reason that a lot of times we have had questions get asked, did somebody tell you something --

THE COURT: At any rate, I am going to sustain the objection.

(End of side bar conference)

MR. BLOOM: That's all I have of this witness.

THE COURT: Anything further?

MR. HAMMERSCHMITH: No, Your Honor.

(Witness steps down)

THE COURT: Do you want to take up the other matter we discussed earlier?

MR. BLOOM: Fine with me, Judge.

THE COURT: Mr. Foreman, ladies and gentlemen of the jury, I have another matter of law that I have to take up with regard to a matter in the case and it is going to be one of those matters that I am going to have to conduct a hearing outside the presence of the jury. I expect that that is going to take the rest of the day. So rather than do it tomorrow morning when you are sitting out in the jury room waiting to come into court, I am going to do it now and I will excuse you for the day.

So, we will reconvene tomorrow morning at 9:15, we should be ready to go right at 9:30. I know I told you that this morning, but I would anticipate that I'd be able to keep that promise tomorrow morning.

But, again, before I dismiss you, I want to repeat the instructions that I have given you. No discussion

among yourselves about the case for the reasons that I gave you yesterday afternoon, no discussions among yourselves until the evidence is complete, the lawyers have argued, I have instructed you on the law; no discussions with anyone outside the courthouse about the type of case you are sitting on or what your jury duties involve, for the reasons that I gave you yesterday afternoon. You've got to decide the case based on the evidence.

I am going to impose the obligation on you to avoid all publicity about the case, newspaper articles or news reports in any form for the very same reason.

Again, I will instruct you there are to be no personal views of this area on Malibu Street or Malibu Drive and that general area, because you have to take the evidence as a group, you can't do it individually.

With that, I will say good evening to you, we will see you in the morning.

(Whereupon, the jury was removed from the courtroom at 3:40 P.M.)

THE COURT: Gentlemen, what exactly is --

MR. BLOOM: This was based on yesterday, Judge --

THE COURT: I know that, but there was a motion in limine to exclude certain scientific evidence, as I recall it didn't go much beyond that.

MR. BLOOM: What he was attempting to exclude was that I indicated that the serologist would go through what he did in this case and indicate very briefly that the blood that he took off the bedsheet that is, I believe, Exhibit 8 or 9, matched up the blood that was submitted to him of the defendant,

excluded the victim, and will break it down and explain on the board for you how each genetic marker was made --

THE COURT: What specifically is the objection to it? As I understood the motion, part of the testimony was unobjectionable.

MR. BLOOM: That's right.

THE COURT: This motion in limine only applied to part of the testimony.

MR. BLOOM: I thought the objection was that I indicated to Mr. Hammerschmith that breaking all the genetic markers down and taking in a mathematical formula, that eight percent of the Caucasian population had all those in combination with each other in the world, and that Mr. Perrot was one of those eight percent, and that was the part, my understanding was, that he was objecting to.

MR. HAMMERSCHMITH: That is basically correct, Your Honor. As I

understand the testimony of the expert, the proposed testimony of the expert, he would indicate that several genetic factors were identified on the blood sheets and were identified also in Mr. Perrot's blood sample, and that the expert would intend to offer percentages of incidents of each of those genetic blood factors and would further intend, as I understand it, to offer an opinion -- again, a percentage as to the number of people who would possess that group of genetic blood characteristics, that's all the ones identified with Mr. Perrot on the blood sheet, which I believe are four or five. I understood from Mr. Bloom that the percentage that was going to be suggested would be eight percent of the population.

MR. BLOOM: Caucasian population.

THE COURT: What specifically is your objection?

MR. HAMMERSCHMITH: Well, I think

that the offer of statistical incidents of -- whether it be expressed as only eight percent of the population has this or 92 percent of the population would be excluded, tends to give undue weight to this evidence, I think tends to confuse the jury, suggests that -- I think sometimes people, when they think about reasonable doubt, may think 90 percent sure, 95 percent sure, and I think that what happens with numbers like this, statistical evidence that gets thrown out is that it tends to be over emphasized.

THE COURT: Let's get on with the voir dire.

MR. BLOOM: Judge, can we accept him as an expert and move into this area rather than go through all the preliminaries? That's all he's objecting to, as I understand it.

MR. HAMMERSCHMITH: I don't know what his statistical background is. I

understand he does blood testing.

THE COURT: I will let you go into that on cross.

MR. HAMMERSCHMITH: That's fine.

WILLIAM G. EUBANKS (Sworn)

(VOIR DIRE)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you be kind enough to tell Judge Murphy your name, please.

A. William G. Eubanks, Special Agent, Federal Bureau of Investigation.

Q. How long have you worked for the F.B.I., sir?

A. Approximately fourteen years.

Q. Can you describe briefly for us what the nature of your work is now with the Federal Bureau of Investigation?

A. I am currently the Unit Chief in charge

of the Serology Unit of the F.B.I. Laboratory in Washington D.C. At the time of conducting examinations in this matter, I was a Special Agent Examiner, that is assigned to conduct analyses of evidence submitted from law enforcement agencies across the country.

Q. How much of your time in the F.B.I. is engaged in the work as you just described it for the Court?

A. Just about all of it.

Q. Now, how long have you been involved in that particular type of work, the serology work that you have described?

A. Since August of 1981.

Q. Would you describe what type of educational background you have in reference to that specialty?

A. I have a Bachelor of Science degree in biology from Southern Methodist University in Dallas, Texas, and a Master of Science in forensic science from George Washington University in Washington D.C. That is the formal education.

In addition to that, during my one year

of training -- upon being transferred back to the F.B.I. laboratory in 1981, that training lasting one year -- I underwent an intensive period of training under the direct supervision of experienced examiners in this field, which included also two formal courses in the field of forensic serology, various oral boards, and in July of 1982 I was qualified as an examiner in the field of forensic serology.

Q. Who does that qualifying, who gives that qualification?

A. Well, technically, the document is signed off by the director of the F.B.I., but he acts only on the recommendations of my immediate superiors.

Q. Give us an idea -- you are the head of that department presently, correct?

A. Yes, sir.

Q. How many examinations do you make in the field of forensic serology, let's say yearly over the last five year period?

A. I was an examiner for about four and a half years and, on the average, I examine around 220 cases per year, the average case is approximately 12

items, so roughly over 2,000 items per year.
Q. Is it fair to say that you have been doing this on a regular basis for at least the past four to five years?
A. Yes, sir.
Q. Can you just tell us briefly, Mr. Eubanks, what does that field entail, forensic serology?
A. It involves the examination of physical evidence for the identification and characterization of body fluid stains. Those being blood, semen, saliva and urine.
Q. Do you have a background, in terms of any mathematical background, in terms of the statistics that may or may not relate to the findings that you make in a given case?
A. Well, the statistics training that I had was primarily during the one year of training to become an examiner in the field of forensic serology. Of course, in my formal education, my bachelors degree included a general ethics course, which included some statistics, but my area -- my experience in this area is limited to those two

formal education areas.

Q. Can you tell us, sir, in reference to forensic serology, do you learn within the course of that mathematical background the percentages that are attached to certain blood types? Is that part of your educational background?

A. Yes. I don't really learn them, they are well published. They are published in scientific documents either by the Red Cross, American Red Cross, or through the American Association of Blood Banks, or through actually by a study that the F.B.I. conducted, the F.B.I. laboratory in 1982, which compiled statistics of various population studies of these percentages of genetic markers and their percentages in the population from major cities across the United States, and basically we looked at the various studies, there were, I believe, sixty-four references that were looked at, and came up with averages for the various genetic markers, that is enzymes and proteins which are typed in blood and semen, and the various percentages of the population that would be expected to have a particular type within each enzyme and protein.

Q. Let me ask you this, sir. Are you expected, as the head of that department, and/or anyone else working for you at the F.B.I. in the specific field, to be acquainted with and have a working knowledge of the percentages not only concerning the blood type, but the enzymes in terms of these genetic markers that you have referred to?

A. Yes.

Q. Could you tell Judge Murphy, sir, have you been -- have you testified in other courts in this country?

A. Yes, sir.

Q. Can you give us a brief synopsis of them?

A. I have testified approximately one hundred times in federal, state and local courts, in states all over the country. I'm not sure how many. At least probably half of the states, as well as U. S. territories, the U. S. Virgin Islands.

Q. Give us an idea of how many times you have been qualified as an expert in the field of forensic serology over the last five year period for the purposes of rendering an opinion based on an

examination that you performed?

A. Approximately one hundred times.

Q. Now, at some point, sir, going back to 1985, is it fair to say that you were in receipt of communication and follow-up evidence from the Springfield, Massachusetts Police Department?

A. Yes, sir, that's correct.

Q. And I would just tell you this for the purposes of keeping the record clear, I am handing you Exhibit 8, which is marked "Springfield" with a Springfield Police Department number 49452. Do you recognize that? And it says "1 flowered bedsheet and 1 paper used to catch droppings"?

A. Yes, I do recognize it, by my initials and other markings which appear on the outside of the package.

Q. Now, when an item is packaged and sent to you from a given location in the United States, do you immediately put some sort of identifying markers on it yourself?

A. Yes. I either assign a Q number, which stands for questioned item -- for example, a sheet or a pair of panties, something like that -- or a K

number, which stands for known, in the case of a known blood sample taken from someone or a known hair sample. In addition, I place my initials, and I also place other markers on the item, depending on what I do to that item.

Q. Now, this item was submitted to you, and are those your initials, WGE?

A. Yes, sir.

Q. And the numbers Q3 and Q4, what does that pertain to?

A. That is an F.B.I. numbering system, refers to Q3 on the F.B.I. report, which is a sheet, and Q4, which is a piece of paper.

MR. BLOOM: Judge, I would just, for the record, indicate that there were some examinations done on the gloves, but that has nothing to do with this specific area, so if it's all right with the Court, I won't bother to get into that.

THE COURT: All right.

Q. (By Mr. Bloom) At some point in time, Mr. Eubanks, you did an analysis in an attempt to

lift blood from that particular item, isn't that correct?

A. That is correct.

Q. And could you tell us, using the board, first of all, in reference to -- so we can keep the record straight -- Exhibit 8, which is a pink bed sheet, how and what you did in reference to that to determine if there was any blood contained on that sheet?

A. Well, I'll take it through a step by step process. The first step in looking at any item, whether it be clothing or a weapon or whatever, is to visually examine it. If a stain is seen, looks like blood, that stain is chemically tested using a cotton swab test, which is then treated with two chemicals, and this particular test tells us if the stain possibly is blood. It is called a preliminary screening chemical test.

The next step would be to conduct a confirmatory chemical test in which a small snip or cutting from the stain is taken, placed on a microscope slide, and a chemical is added called takayama, which is a mixture of chemicals, actually,

and the result is read microscopically, the test is called a hemochromogen test. If the test is positive, this test indicates that the stain is in fact definitely a blood stain.

The next step would be to determine whether the blood stain is from a human or animal origin. This test is called an antihuman test. If it indicates that it is of human origin, then I would attempt to characterize the blood stain in the ABO grouping system, that is we all belong to one of four major blood groups. Those groups are O, A, B and AB.

Then, depending on the amount of stain left, I would attempt to further characterize that stain in what we call genetic marker systems, which is sort of a fancy word for enzymes and proteins, which can be characterized or classified in dried body fluid stains. At the present time, there are about 11 or 12, I believe, enzymes or proteins which are routinely tested for in a blood stain in the F.B.I. laboratory.

Q. I am assuming the first two tests you referred to is a test which would indicate whether or not blood was present in the particular item?

A. Yes.
Q. And then you indicated that a further test is done for the purposes of determining whether it is animal or human blood?
A. That's correct.
Q. Is it fair to assume in this case that, number one, it was positive for blood?
A. Yes, sir.
Q. And, second, it was positive for human blood?
A. That's correct.
Q. After you got to that stage in your analysis, what was the next thing that was done to break this particular blood stain down from Q3?
A. There were actually two stains that I tested. One of the stains I tested for the ABO factor. That result was inconclusive. In other words, I could not determine the ABO blood type.
Q. Both on the sheet?
A. Yes, there were two stains on the sheet and one of them I tested for ABO, the other one I only tested for one enzyme, due to the limited quantity of the stain, but on the other stain which I

tested for ABO, I was able to run a number of different enzymes and protein tests, of which I got conclusive results in several.

Q. Could you explain, first of all, what exactly that means, the enzyme or genetics marker that you are talking about?

A. An enzyme is a protein which causes a specific chemical reaction in the body which would not occur without the presence of the enzyme. There are literally thousands of enzymes in the human body, but there are only a certain number of enzymes which lend themselves to characterization in dried body fluid stains and which have what we call polymorphism. That is, they are presented in several different types, usually at least three types for each enzyme or protein.

Now, currently the enzymes that are tested for include enzymes like PGM, EAP, serum proteins such as haptoglobin, which is similar to hemoglobin, groups specific component, and, as I said, there are about twelve to thirteen that we commonly test for.

Q. Let's start one at a time. What was the

first enzyme you tested for and received a result pertaining to in reference to Exhibit 8?

A. The first enzyme that was tested for is what we call PGM, and that stands for an enzyme called phosphoglucomutase, but it is seen in the literature as PGM, and the type that I identified, and in this system --

Q. Are there more than one type?

A. Yes. In fact, I said earlier there are three types of these enzymes and proteins, but with PGM, through a technique known as sub-typing, there are ten possible types. All of us belong to one of ten possible types. In this case, on the bed sheet I identified the PGM sub-type as what is known as 1+.

Q. 1+ did you say?

A. Yes.

Q. And that was the first enzyme or genetic marker that you have been referring to that you were able to lift from that bedsheet?

A. That is correct.

Q. I believe, if I'm not mistaken, you indicated that there are ten possibilities concerning that?

A. That's correct.

Q. That particular enzyme?

A. That's right. With PGM, 1+ is the most common type.

Q. Before you referred to the fact that you were familiar with the data and the literature in reference to the statistical numbers referring to not only blood types, but to these various genetics markers. Do you know -- and you said there were ten concerning that PGM. Do you know what in reference to this specific one, PGM 1+, in terms of our population, what the percentage would be?

A. Well, according to statistics of the American Association of Blood Banks, roughly 41 percent, approximately 41 percent, of the Caucasian population would be expected to have this particular PGM type.

Q. Were you able to lift any other genetic markers off of again Exhibit 8, or Q3 as you identified it through your numberkeeping system?

A. Yes, the next enzyme which I obtained results was an enzyme called EAP, that's all caps, that stands for erythrocyte acid phosphotase; and the

type that I identified was what is known as an EAP BA type.

Q. Is that cap or small?

A. All caps, BA.

Q. Does the BA just signify a variety or a specific EAP genetic marker?

A. It signifies that on this particular human blood stain, that the EAP phenotype is a BA as opposed to an EAP B or an EAP A. There are also three others, what we call an EAP CB, an EAP C and an EAP CA.

Q. There are somewhere in the neighborhood of six or seven EAP types, correct?

A. That is correct.

Q. In terms of that statistical reference that you made, in terms of number one or PGM 1+, what percentage of the population should be or would be expected to have this particular genetic marker?

A. Well, based on, as I testified earlier, the study that we conducted in 1982, early 1983 by the F.B.I. laboratory, which studied about 64 different population studies from major cities across the U. S., our statistics show that roughly 41

percent -- and that is the same as the PGM -- roughly 41 percent of the population would be expected to have that particular EAP type.

Q. Now, you indicated on the first genetic marker there are ten possibilities, is that correct?

A. Correct.

Q. And did you say there were six or seven on this?

A. There's six. There are some rarer types in all of these, but these are the major --

Q. Now, were you able to lift any other genetic marker from that bedsheet, again Q3 or Exhibit No. 8 for the record?

A. Yes, the next factor that I identified or genetic marker is a serum protein called haptoglobin, it is labeled as Hp, and in this system there are four major types. In this case, I identified haptoglobin type 2-1.

Q. Actually, these in parentheses are all the types, correct?

A. Yes, sir.

Q. You say there's four alternatives or four major types on the Hp or the haptoglobin?

A. That's correct.
Q. Were you able to determine any other genetic markers?
A. Yes, one other serum protein called transferrin, which is abbreviated Tf, and the type that I identified is the most common type, which is a C, cap C.
Q. How many types are there, how many different varieties?
A. In addition to the C, there are two others.
Q. So there's three total. Let me back up to number three. Did you indicate in the population there are four major -- and there are unique strains to all of these, correct?
A. Yes.
Q. You are just talking about the majors that you would expect?
A. These are the ones that you can characterize in a dried body fluid stain.
Q. What would be the percentage of the population that you would expect to find concerning this 2-1 on the Hp genetic marker?

A. About 48 percent of the Caucasian population would be expected to be a haptoglobin 2-1.

Q. On all of these, 1 through 3, you use the term Caucasian population. What is the significance of that?

A. Well, in the study we conducted, we broke it down into Caucasians and blacks, and there are some differences between Caucasians and blacks.

THE COURT: We are talking strictly Caucasian here?

THE WITNESS: Yes. But comparing Caucasians and blacks, there are some slight differences between these various percentages of the population that have these phenotypes.

Q. (By Mr. Bloom) Now, fourth is the Tf and the C strain, you indicated there were three total possibilities, major possibilities. What percentage are we talking about there? You indicated, I think, that is the most common type.

A. Yes, it's very common. In fact, in Caucasians, it is roughly 99 percent of the population.

Q. Mr. Eubanks, first of all, let me ask you, at some point in time after you did this examination, and when you completed your examination in reference to Exhibit No. 8, that is what you came up with, correct?

A. Yes, that's correct.

Q. At some point, you had an opportunity to analyze the blood that was sent to you from Mary Prekop, correct?

A. Yes.

Q. And can you tell us whether she would have been capable of depositing the blood stain that you have just broken down for us on the blackboard?

A. No, she could not be a contributor of that blood stain.

Q. Did you, at some point --

MR. BLOOM: And I'm not going to, at this point, Judge, go into the specifics other than that, unless the Court finds it is necessary.

Q. In reference to the defendant, at some point, did you receive blood samples purportedly taken from the body of George Perrot?

A. Yes, sir, I did.

Q. Were you asked to make a comparative analysis between the blood that was sent to you purportedly from the defendant, Mr. Perrot, and Exhibit No. 8, which you have documented to us on the board?

A. Yes, I was.

Q. Would you explain for Judge Murphy what your findings were in reference to that comparative analysis that you performed?

A. The blood stain that I identified the four genetic marker types that are listed on the board, those four types are consistent with the same four enzymes or proteins that I found in George Perrot's reportedly known blood sample. In other words, the human blood on the sheet in that stain is consistent with George Perrot.

Q. In terms of all four of the enzymes or three of them or two of them or how many of them?

A. All four.

Q. Can you tell us, sir, taking these particular enzymes, are you capable of arriving at a figure as to how many -- and we are dealing again

with Caucasian population -- what percentage of the Caucasian -- strike that. Are you capable of giving me an answer as to how much of the Caucasian population has all four of these genetic markers within their blood? Can you answer that one yes or no?

A. Yes. Perhaps I can answer it this way, by saying I can give you an estimate of the percentage of the Caucasian population that would be expected to have this particular combination of genetic markers.

Q. Why don't you start off and explain to the Court how you determined and what methodology that you used to come up with the figure you would arrive at?

A. Well, it is a fairly simple procedure known as the law of independent events, which is a statistical procedure, which is commonly used in forensic serology for looking at a combination of genetic marker types, as we have here, and figuring the percentage of the population that would have that particular combination of genetic markers in their body fluid or in their blood, and it is done by

simply taking the figures that we see on the board, the two 41 percent figures, the 48 percent figure for the haptoglobin 2-1 and the 99 percent figure for the transferrin type and multiplying that together.

Q. What figure do you come out with, sir?

A. If you multiply those figures together, you come out with just slightly under 8 percent or roughly 8 percent of the population. Now, that means --

Q. Again, Caucasian population?

A. Caucasian population. What that means is that it is expected -- obviously, we haven't looked at every person in the United States or in the major cities or in the U. S. or, for that matter, in the world, but based on statistical analysis and the law of independent events, it is expected that roughly 8 percent of the population would have that particular combination of genetic markers in their blood.

Another way of saying it is that approximately 8 out of 100 or 80 people out of 1,000. If you took 1,000 people randomly selected, it would be expected that 80 of those 1,000 would have that

particular combination of genetic markers.

Q. And that statistic is based on the data that you have taken -- the data that has been used over the past year since statistics have been kept in reference to blood typing, correct?

A. Yes, sir.

Q. And you obviously haven't typed and made a determination in reference to genetic markers on every human being in the United States or in the world, for that matter, correct?

A. Yes, sir.

Q. So it is a test based on what is known to you or it is a statistic that is based upon the knowledge that you have accumulated in this field, correct?

A. That is correct.

Q. Based on knowns that you have accepted in the field?

A. Yes, sir.

Q. So, if my understanding is correct, what you are saying, based on the knowledge that you have accumulated through these statistics that have been compiled over the last number of years, you are

telling the Court today that about 8 percent of the Caucasian population should be expected to have those four enzymes or genetic markers in their blood and that Mr. Perrot is one of that 8 percent, is that a fair statement?

A. Yes, sir.

MR. BLOOM: That's all I have.

THE COURT: As I understand it, Counselor, what you are objecting to is the 8 percent figure?

MR. HAMMERSCHMITH: Yes, and its method of derivation.

THE COURT: Well, the use of the 8 percent figure. I take it the balance of it you are not objecting to. I take it if you didn't get to the 8 percent figure, you'd be testifying that Mr. Perrot has all four of those characteristics that are listed on the board.

MR. HAMMERSCHMITH: That's correct.

THE COURT: And that blood stain they found on the sheet would be

characteristics with --

MR. HAMMERSCHMITH: That's right, each of those being the most common, as I understand it.

THE COURT: But it is the 8 percent that you are objecting to?

MR. HAMMERSCHMITH: Yes.

THE COURT: The next step.

MR. HAMMERSCHMITH: Yes. And I think just in terms of how it is arrived at as well as its validity.

THE COURT: Okay. I just want to get that clear.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Mr. Eubanks, you indicated that you have testified in about a hundred cases. Have you always testified for the prosecution in those cases or have you sometimes testified for the defense?

A. Sometimes --

THE COURT: I think that might impress the jury, counselor, but that is not going to -- not for the purposes of the voir dire.

Q. (By Mr. Hammerschmith) Let me see if I understand your expertise in the area of statistics. You took a genetics course in college, is that right?

A. Yes, sir.

Q. And that course dealt specifically with genetics, part of what you studied in it was statistics, is that right?

A. Yes.

Q. And that's because statistics are relative to genetics?

A. Yes, sir.

Q. And I believe your other formal training with respect to statistics was with the F.B.I. during that one-year training program you referred to?

A. Yes, sir.

Q. First of all, can you describe that general training program?

A. Yes. The training lasts one year. Upon being assigned to the F.B.I. laboratory, you are

assigned to a particular special agent examiner in that unit, the particular unit you are assigned to -- in this case, the serology unit -- and you begin working under basically his direct supervision, which consists of a great deal of on-the-job training. You begin your experience out at the bench, actually conducting the tests according to specific protocols, along with that goes the theoretical training, the required reading of numerous texts, as well as papers and published studies in the field of forensic serology and related fields.

About midway through your training you go through two formal courses, one is a basic serology course which is given at the F.B.I. Academy and taught by personnel from the F.B.I.'s research and training center, as well as examiners in the serology unit. It is a graduate level course which is accepted as a graduate level course and is actually sanctioned by the University of Virginia. That course primarily deals with basic concepts in the field of serology and forensic serology. For example, as I testified to earlier, the actual identification of a body fluid stain up through the

ABO analysis.

The next course, which is a much more intense course, which is also two weeks, is a course called Biochemical Methods in Blood Stain Analysis. This course deals with more advanced techniques for analysis of a body fluid stain using the technique known as electrophoresis, which is the technique used in classifying enzymes and protein as we see here on the board. That course is also a graduate level course and is two weeks, and it is again taught by scientists from the Forensic Science Research and Training Center at the F.B.I. Academy, as well as personnel from my unit.

Toward the latter part of the training you undergo a series of three or four oral boards, or sometimes more if you have problems in those oral boards. In addition -- I might back up -- the two formal courses are credit courses in which you receive a grade and there are two midterm exams as well as a final examination in both courses. But you go through the three or four oral boards toward the latter part of the training, and also you go through a series of blind tests or blind, what we call,

proficiency testing at the bench, and based on the results of all of that training and how you perform, at about the one-year mark, a decision is made as to whether you are qualified to begin working cases on your own and to testifying to those results.

Q. So that the vast bulk of that training, that one-year program, is, first of all, sort of an apprenticeship with a senior person on the staff, is that right?

A. Yes, sir.

Q. And the vast bulk of that training also consists of learning how to identify various blood factors, genetic factors?

A. Yes, sir.

Q. Now, some part of that covers statistics, does it?

A. Yes, the Biochemical Methods and Blood Stain Analysis course has a section in it that deals specifically with statistical matters and statistical manipulations concerning genetics markers, discrimination possibilities, probability of a match, law of independent events, various concepts like that which are typically used in forensic serology.

Q. That course you said is a college course?

A. Yes.

Q. College credit course?

A. Graduate level, University of Virginia.

Q. Do you know how many credits you get for a course like that?

A. It is either three or four.

THE COURT: Let's get to the point, counselor. Let's get to the issue rather than go into how much training he's had in statistics. He doesn't hold himself out to be a statistician.

MR. HAMMERSCHMITH: I think he is offering statistical evidence requiring statistical --

THE COURT: I know he is. Let's get to the point of what it is you're driving at.

MR. HAMMERSCHMITH: All right.

Q. (By Mr. Hammerschmith) Now, these are the four blood genetic factors that you were able to identify in the blood stain, is that right?

A. On the sheet, yes.
Q. And I think you said there were two stains?
A. Yes.
Q. And you identified these four and no other factors on one of the stains?
A. That is correct.
Q. And on another of the stains you identified a different -- you identified it as being human blood, is that right?
A. That's correct. Human blood. The one grouping test that I performed on the second stain was inconclusive.
Q. Now, each of these four factors that you have here on the board, that are listed 1 through 4, is the most common in its category, is it not?
A. I'd have to consult a statistics sheet in my briefcase, which I don't have with me right now. The PGM is definitely the most common, the transferrin obviously is the most common. I'm not sure about the haptoglobin or the EAP, but, obviously, it is approaching 50 percent, so it is either the most common or the second most common of

those two systems.
Q. So when you are determining these percentages, you look at a chart, correct?
A. That's correct.
Q. And the chart that you look at is from what source?
A. That is the study conducted by the F.B.I. laboratory in 1982, which compiles statistical population study data from 64 different studies conducted in major cities of this U. S., primarily the studies were from blood bank studies as well as crime laboratories and universities.
Q. What would be, among those 64 areas, the area closest to the Springfield area geographically?
A. I don't recall.
Q. The figures that you are using, then, are not for any specific geographical area, are they?
A. Not specifically, no.
Q. They are derived from the total reports from each of those 64 areas?
A. Yes, sir.
Q. Are you aware whether there has been any study as to whether there is a discrepancy among the

figures coming from the various geographic areas?

A. I would expect that there would be some variance, and I believe I have testified that this is -- these are percentages of the population that would be expected, and also I have testified that there are slight differences between Caucasian and blacks. There is going to be some variance from area to area, from ethnic group to ethnic group, blacks versus Caucasians versus Hispanics, for instance, so I'm not sure if I am answering your question, but there will be some variance, that's correct, and these are only approximations, these statistics.

Q. You mentioned they are expected to vary by ethnic group. Obviously, that would cover blacks versus Caucasian. Would it also cover less extreme variations?

A. Perhaps. For example, Eskimos, we do almost all of the major cases from the state of Alaska. Eskimos are about 60 to 80 -- 60 to 65 percent of Eskimos are type O blood, which is much higher than the 45 percent figure quoted by the American Red Cross for the general population.

Q. What about say between Northern European

and Southern European?

A. I don't know.

Q. You're not aware of any studies --

A. Well, there probably are. Our studies were conducted based on major -- studies from major cities in the United States.

Q. So when you approach a case having already picked out these four characteristics, you basically go to this chart and pick out those percentages?

A. If requested, yes.

Q. And the method that you are proposing here for drawing a cumulative percentage is to basically factor each of those four together, is that right?

A. Yes.

Q. Multiply one times the other?

A. That's correct.

Q. That, of course, assumes, does it not, that each of those factors is independent from the other?

A. They are independent. They are each inherited genetic factors, independently inherited.

Q. Just so we understand what we are talking about, if it turned out that people with PGM Sub 1 were more likely to have EAP BA more than some other form of EAP, then the analysis that you are proposing would not be appropriate?

A. I have never seen anything published to that effect and that would be genetically impossible, as far as I can tell.

Q. What is your basis for saying that they are each independent from the other?

A. Well, that is based on genetics, simply that each one of these is expressed based on a gene or allele found on a chromosome, and you inherit the particular type that you are going to have from your parents, basic inheritance, so each one is inherited independently, they are not related. EAP is not related to PGM, which is not related to transferrin.

Q. Have there been studies that have confirmed that, that you are aware of?

A. I think you could probably pick up most any genetics book that would explain that.

Q. Could you give me an example?

A. I don't have one in mind today, I

haven't looked at a basic genetics book recently, but there's many, many books that would discuss that factor, and the law of independent events and the particular equation we are talking about that I have discussed here today is a very common statistical equation used in genetics.

Q. Have you ever worked in the field of genetics other than at the F.B.I. crime lab?

A. No.

Q. And your background in genetics consists of what?

A. As I have testified, I had genetics while in my senior year in college, which lasted one year, which included statistical equations as far as used in genetics, and, in addition to that, I have had training in our biochemical methods and blood stain analysis course, as well as on the job in the F.B.I. laboratory in this area.

Q. Do you hold yourself out as an expert in genetics as opposed to blood testings?

A. No, I am actually a forensic serologist.

Q. You have had some training, though, in genetics?

A. Yes.

Q. So, basically, when you assert the opinion, you are basing that on what you have read from other sources outside your major field, is that correct?

A. Yes, sir.

Q. I believe you characterized the 8 percent as an estimate. What was your --

A. Yes, sir.

Q. Did I understand you correctly to call it an estimate?

A. Well, as we have sat here today, there are some variances from one study to another, so I have testified that with each one of these, it would be expected that the population, Caucasian population, would have approximately 41 percent of PGM Sub 1, approximately EAP BA 41 percent, so, therefore, the 8 percent is an approximation, too, based on statistical analysis.

Q. As a result of multiplying four approximate figures, you come up with another approximate figure?

A. Correct. As I testified, we haven't

tested everybody in this country. It is similar to, if I can draw an analogy, like what you have heard on TV Neilson ratings, where they set up a thousand boxes on a thousand TV's across the country and then they determine, based on those boxes, how many people are watching a given show and whether or not a show is going to stay on the TV or not, a particular show. The the same type of statistical approach.

MR. HAMMERSCHMITH: I have no further questions.

MR. BLOOM: I just want to clarify one thing.

REDIRECT EXAMINATION BY MR. BLOOM:

Q. If there was a random study done of half the people in the United States of America tomorrow, which satisfied you, based on the findings, that 50 percent of the population was type O blood, that doesn't necessarly mean within a hundred percent certainty that 50 percent of the United States is

type O blood, correct?

A. That's correct.

Q. And that is, in essence, what you are saying when you say 41 percent have PGM 1+, that is based on a study that was done in 64 major cities and the Red Cross and the blood banks associated with those cities, and then, based on that, that figure was arrived at?

A. Well, not 64 major cities, but 64 separate studies done, corrected information from various major cities.

MR. BLOOM: That's all I have, Your Honor.

THE COURT: Thank you, gentlemen. I will take it under advisement. I will give you my ruling tomorrow morning before 9:30.

(Hearing suspended at 4:25 P.M.)