**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 11

CITY 002892

C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418, 5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 10, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME IV

# I N D E X



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM EUBANKS | 7 | 35 | 52<br>55 | 53 |
| WAYNE W. OAKES | 56 | 86 | | |

(Hearing convened at 9:50 A.M.
The defendant was present,
the jury was not present)

THE COURT: Gentlemen, with regard to the defendant's motion in limine to exclude certain scientific evidence, I reviewed the cases cited by defense counsel and I have come to the conclusion that to allow the estimate of the percentage of the Caucasian population that would be expected to have all four of these genetic markers would fall within the statistical -- well, the way that the Supreme Judicial Court looks at statistics in cases of this type, so as to that final calculation, I am going to allow the motion to exclude it.

Are we ready to go?

MR. BLOOM: I'm sorry, I thought you said -- you said you don't feel that it falls within --

THE COURT: I think it does fall within that area that --

MR. BLOOM: I misunderstood. I thought you said, Judge, that I find that it falls within that area that the Supreme Judicial Court allows --

THE COURT: No, I feel that the use of statistics would be prejudicial. It is a gray area and it is a discretionary area, but I am going to --

MR. BLOOM: Now, that goes to the 8 percent figure.

THE COURT: Right.

MR. BLOOM: We are not talking about anything else, correct?

THE COURT: Right.

Okay, are we ready to go?

MR. HAMMERSCHMITH: Could I inquire as to one thing, Your Honor? I had hoped in questioning the expert to ask the expert how many people he would expect to find in a city the size of Springfield who would possess these

characteristics, which I would anticipate would be an answer of probably about fifteen thousand people.

THE COURT: He might say 8 percent, too. That is exactly what he is going to say.

MR. BLOOM: I don't have any objection to that, but I think, in fairness, if he is allowed to ask that question, then I can reopen the percentage of Caucasians based on the studies done, I think in fairness, Judge.

THE COURT: You ask your questions, I will rule on them as they come along, counselor.

MR. HAMMERSCHMITH: I guess what I am asking --

THE COURT: You've got to exercise your own trial strategy.

MR. HAMMERSCHMITH: I understand that. I'm trying to understand whether if I were to ask that question and the

response would be a number, which is what I would be asking for, whether --

THE COURT: Numbers can be converted into percentages. You don't need my help to tell you that, counselor. When you are asking as a group how many in the city of Springfield, I would assume the first question he is going to ask you is what is the population, and then he is going to calculate 8 percent of that population to come up with that figure. If the District Attorney asks him how he reached that figure -- but, as I say, that seems like a logical result of your question, but I will leave it up to you.

MR. HAMMERSCHMITH: All right.

(Whereupon, the jury entered the courtroom)

THE COURT: Good morning, ladies and gentlemen. A little bit of a delay, but not as long as yesterday.

MR. BLOOM: Mr. Eubanks.

WILLIAM EUBANKS (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you tell Judge Murphy your name and your occupation, please?

A. William G. Eubanks, Special Agent, Federal Bureau of Investigation.

Q. How long, sir, have you worked for the F.B.I.?

A. Approximately fourteen years.

Q. Can you tell us where you are presently assigned?

A. I am presently the Unit Chief in charge of the Serology Unit of the F.B.I. laboratory in Washington D.C.

Q. What basically is the nature of your work there as the chief of the Serology Department at the lab in Washington?

A. My present assignment involves the management of approximately 34 employees, 12 of whom are special agent examiners in the field of forensic serology and 22 support personnel. In addition, I also occasionally examine cases for the identification and characterization of body fluid stains, which is what I mean by the term serology.

Q. Mr. Eubanks, how much of your time, as an agent for the F.B.I., is devoted to the work that you described in the serology field?

A. All of my time.

Q. Can you tell us briefly, sir, what your educational background is?

A. I have a Bachelor of Science in biology from Southern Methodist University, Dallas, Texas, and a Master of Science in forensic science from George Washington University in Washington D.C.

Q. After becoming an agent with the F.B.I., would you document for the Court and jury what type of specialized training, beyond the education you have just described for us, you have had in reference to this area of serology that now you are engaged in?

A. When I was assigned to the F.B.I.

laboratory in August of 1981, I began a period of training which lasted approximately one year. During that training, which was conducted under the direct supervision of an agent examiner who is experienced in the field, I attended two courses, formal courses, in the field of forensic serology, which were given at the F.B.I. academy, but the major portion of my training was what you would call on-the-job training, involve actually benchwork analysis of evidence, learning of the various protocol and procedures used in the identification and characterization of body fluid stains, and, of course, learning all of the background and theory that goes with this.

Toward the end of the training, I underwent a series of oral boards, basically oral tests, I also had several written examinations during that period, and at the end of the training period was qualified as an examiner in the field of forensic serology.

Q. Let me ask you, sir, in reference to forensic serology, the department that you are the head of down in Washington, in reference to that laboratory, what jurisdictions do you service in this

country?

A. All state and local law enforcement agencies in this country, as well as U. S. territories and, of course, the F.B.I.

Q. Can you tell us, sir, can you give us an estimate as to how many examinations you have conducted as a forensic serologist?

A. I don't have an exact number, but, generally, when I was a full-time examiner I was conducting analyses of approximately 200 to 220 cases per year, and the average case is anywhere from 10 to 12 items, so if you multiply that together, I guess it's over 2,000 items per year.

Q. How many different courts, sir, have you testified in?

A. I have testified in state, local and federal courts across the country.

Q. Can you give us an idea of how many times you have been qualified as an expert in forensic serology in a court in this country?

A. Approximately 100 times.

Q. Now, could you explain for the jury just what it is that you would do in terms of making an

analysis of a blood stain that was given to you by various -- by a state, for instance?

A. Well, generally, we receive evidence from various crimes that have been committed and they are received in the F.B.I. laboratory, the evidence consists of clothing, weapons, items recovered from the scene of a crime. My job involves the looking at these items first to identify visually any stains that I see which may be blood or some other body fluid stain, such as semen or saliva.

In the case of a blood stain, then I would perform a chemical test, actually two chemical tests, one is a preliminary screening test and the second test is known as a confirmatory test, which conclusively identifies a stain as a blood stain.

Once that test is complete and is positive, I would attempt to characterize that blood stain as being from a human individual or -- from a human being as opposed to an animal.

If I determine that the stain is of human origin, then I would attempt to characterize it in the ABO blood grouping system, and that means that all of us belong to one of four major blood types, we

are familiar with this, about 45 percent of us belong to type O blood, and from that point on it decreases, but the major four blood types are O, A, B and AB.

And then, depending on the amount of stain left, I would attempt to characterize that stain further, based on various enzymes and proteins which are present in a blood stain, which can be grouped and can be typed, and there is approximately 12 to 13 of these enzymes or proteins which are commonly tested for in a forensic or in a dried blood stain.

Then I would take those results and compare them with a known blood sample received from an individual, and the conclusions that can be drawn from that are that comparing the known blood sample with the blood stain on the item, questioned blood stain, if you will, and the same genetics markers that were identified, and comparing those, I can say that this unknown blood stain could have come from this individual or it could not have come from this individual.

In other words, the analysis is not like a fingerprint. We cannot say that a blood stain on

an item came from an individual to the exclusion of everyone in the population. We can only either associate it with that individual as having possibly come from that individual. On the other hand, if it's not consistent, I can say that the blood stain could not have originated from that individual.

Q. So there is a distinction in terms of fingerprinting, for instance, as opposed to what you are doing in forensic serology?

A. That's correct.

Q. Your study either includes someone or excludes them?

A. Yes, sir.

Q. But it doesn't absolutely identify them?

A. That's correct.

Q. Now, you indicated, correct me if I'm wrong, that the first test you do determines whether there is -- whether it is human blood or not, is that correct?

A. Well, there is actually two tests to identify the stain as blood, and then the third test is to determine whether it is of human origin.

Q. Once you go through step A and B to

determine that it is blood and it is of human origin, you indicated that there is a test performed, after you attempt to type it, as to determine the proteins or enzymes in that particular blood stain, is that correct?

A. Yes, sir.

Q. And does the amount of blood in the stain determine how far you are able to type?

A. Yes, the size of the stain. Generally, a stain that is about the size of a silver dollar or maybe slightly larger is sufficient to attempt to run a number of the genetic markers or the enzymes and proteins that we commonly test for.

Q. Now, Mr. Eubanks, again I would like you just to state again, so we are clear on it, you indicated that there are how many different types of proteins or enzymes that you would expect to find in a blood sample, if it was a sufficient amount?

A. If you include the ABO system as a genetic marker, which it is, there are 11 other systems that can be run, that we run in the F.B.I. laboratory on a dried blood stain.

Q. So the amount of enzymes that you find

in a given blood sample is determined by what?

A. Well, it is determined by obviously the age of the stain is a factor, the size of the stain, the concentration of the stain, that is how much blood is there, all of those factors enter into whether or not I am able to characterize it in these systems.

Q. And you could get, depending on the stain, anywhere from zero to 12 factors, correct?

A. Yes, sir.

Q. Now, at some point in time, sir, you became involved with the Springfield Police Department, is that correct?

A. Yes.

Q. And I'm going to show you what has been marked in this case as Exhibit No. 8, and just for the record, it says up in the upper right-hand corner 49453 one flowered bedsheet and one paper used to catch droppings. Are you familiar with this item?

A. Yes, I am.

Q. Underneath that writing there is the writing Q3, Q4, WGE. Can you tell the jury, do you have an idea, do you have any knowledge of what those

items signify or what that writing signifies?

A. The WGE is my initials, William G. Eubanks, and I placed those on there. The Q3 and Q4 refers to a numbering system that we use in the F.B.I. laboratory. The Q refers to it being a questioned item as opposed to a K, which is a known item.

A questioned item would be, for example, a clothing item, let's say, recovered from the scene of a crime. A K item or a known item would be, for example, a known hair sample taken from an individual or a known blood sample.

Q. Now, when an item comes in from anywhere in the country to your laboratory and it's already got a number, such as this one has 49452, are you indicating that you give it its own marking within your system?

A. Yes, sir.

Q. And, in this case, the numbers or letters assigned to that bedsheet and the catch paper that is used to encase that bedsheet were what, sir, again for the record?

A. It was assigned the Q3 and Q4. The Q3

applies to the sheet and the Q4 to the paper which is with the sheet.

Q. When you gained possession of that particular item, would you tell the jury what your function was in reference to that bedsheet?

A. Well, the bedsheet was given to me by another agent who also did examinations on this in another field. His name is Special Agent Wayne Oakes, who works in the Hairs and Fibers Unit. He brought it to me in order for me to conduct my examinations.

As I testified to just a moment ago, I looked at the sheet for the presence of blood stains and identified or located two stains on the sheet and then conducted the series of tests that I have previously testified to.

Q. And you did one set of examinations that caused you to file a March 13th report, is that correct?

A. That is correct.

Q. Can you tell us what the analysis was that you did in reference to the first time you dealt with that sheet?

A. I analyzed or located two stains on the sheet and I determined that both stains were human blood stains. One of the stains --

Q. Same procedure you described before?

A. Yes, same procedure. The preliminary screening test followed by confirmatory test, followed by a test to determine whether it is of human origin. All of those tests were positive on both stains. In other words, at that point, I knew that I had two human blood stains. One of the stains was larger than the other. On the larger stain I was able to run several enzyme and protein systems in addition to the ABO system, and I was able to obtain conclusive results in several of those systems.

Q. Again, you are talking about the enzymes or proteins that you have described that there are up to 12 -- there could be up to 12 markings for?

A. Yes, sir.

Q. How many markings could you find on the larger blood stain when you performed that test? And I'm just asking you a number, not what they are, at this point.

A. There were four different genetic

markers that I identified.

Q. Can you explain for the jury, when you say genetic markers, what do you mean by that? Reference to these proteins or enzymes?

A. Genetic marker is a term that is used in genetics as well as in forensic serology and it refers to a particular enzyme or protein or it could be even the ABO blood type -- for example, let's take an enzyme such as the enzyme known as PGM. First of all, an enzyme is a protein which causes a specific chemical reaction in the body. There are literally hundreds, perhaps even thousands of enzymes in the human body. At the present time, though, there's about 12 to 13 of those that are commonly tested for in forensic serology and are useful in analyzing a dried stain. The reason that these 12 have been isolated as good for forensic work is that each enzyme has various types.

For example, let's take the enzyme PGM. In that particular enzyme, there are 10 possible types. They are often referred to as phenotypes, but we'll just call them types here. In the ABO blood system there are four blood types, type A, type B

type O, and type AB, four major ones. So, in the PGM system, which is an enzyme, there are 10 possible types. All of us belong to one of those types.

Q. Let me see if I understand you correctly. There's 12 potential genetic markers that could be found in a blood stain, correct?

A. Yes.

Q. On each one of those markers there is a variance off of that marker, is that correct?

A. Yes, sir.

Q. That's what you are explaining?

A. Right.

Q. Some of them have more than four variables, others have 10 variables?

A. Yes, sir.

Q. Mr. Eubanks, you indicated a few moments ago that you were able to find four genetic markers in the larger blood stain from Q3, as you marked it, referring to the flowered bedsheet?

A. Yes, sir.

Q. Can you tell us what the first genetic marker was that you found in that blood stain?

A. The first one was the enzyme PGM and the

type that I identified was what we call a 1+, PGM 1+.

Q. How many different types of PGM in that particular genetic marker are there?

A. In addition to the 1+, there are 9 others, so a total of 10.

Q. And can you tell us what the percentage in our population is that is expected to have that blood type?

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

MR. HAMMERSCHMITH: May I be heard?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: The basis for my objection, Your Honor, relates to the testimony that we heard yesterday. I don't believe that this individual has a sufficient expertise to testify as to percentages in this area.

THE COURT: As I recall on your voir dire on your motion, your motion was directed specifically to the final

calculation that 8 percent of the Caucasian population would be expected to contain all four of these genetic markers. That was the thrust of your motion and that was what I ruled on.

MR. HAMMERSCHMITH: I understand, Your Honor, but I don't think it precludes me from raising this objection also.

THE COURT: You have had this information for how long?

MR. HAMMERSCHMITH: Since last night.

THE COURT: Well, first of all, I am going to overrule the objection, I am going to allow him to testify based on the testimony that I heard during the voir dire. My allowance of your motion was limited, as I indicated when I ruled on the motion.

MR. HAMMERSCHMITH: My objection to be noted, please.

(End of side bar conference)

Q. (By Mr. Bloom) If we can back up just for a moment, so that we understand this. Everybody has one of the 10 PGM enzymes or proteins that exists in a given blood sample, correct?

A. That is correct.

Q. And what percentage, sir, -- could you tell us the percentage that would have this variable that you have described, 1+, of the PGM protein?

A. According to the American Association of Blood Banks' statistical studies, approximately 41 percent of the Caucasian population would be expected to be PGM Sub 1+.

Q. What was the second enzyme or protein you were able to lift or make a determination of concerning this larger blood stain in reference to Exhibit No. 8?

A. The second enzyme, as it is placed on the board, is an enzyme called EAP, and there are six major types of EAP. In this case, I identified EAP BA. There are five other types that can be identified.

Q. What would be the percentage of people that you would expect, sir, to have that particular strain of that marker, that enzyme?

A. Approximately 41 percent.

Q. Now, were you able to detect a third enzyme off that Exhibit No. 8?

A. The other two listings on the board, which are numbers three and four, refer to not what we call enzymes, but what we call serum proteins. That is, they are proteins found in the serum fraction of blood, which have a specific function. The one listed there, cap H little P, stands for haptoglobin, which is involved with hemoglobin in the blood, and there are four possible types, all of us belong to one of those four. In this particular blood stain, I determined the type was haptoglobin 2-1.

Q. And how many strains of that enzyme are there?

A. Four major.

Q. What would be the percentage you would expect to find in the population concerning that particular strain 2-1?

A. About 48 in the Caucasian population.
Q. And finally, sir, the last or the fourth genetic marker you were able to lift or make a determination of concerning the blood stain that you took from Exhibit 8, can you tell us what that was, sir?
A. That is a protein which is listed on the board as cap T little F, which stands for a serum protein like haptoglobin, it stands for transferrin, and there are three major types, in this case I identified transferrin type C.
Q. Can you tell us what the percentage of the population would be expected to have that?
A. In the Caucasian population, the transferrin C type is the most common by far, it is roughly 99 percent of the Caucasian population.
Q. And there are how many major strains of that?
A. There are three.
Q. Mr. Eubanks, if you were to take a blood sample from anyone, including myself, how do you eliminate or include someone based on the taking of the blood sample? Can you explain how that is done?

A. If a blood sample is taken from an individual which is to be compared with these type of results which we have on the board, you simply look at the results obtained from the blood sample for those same four genetic markers and compare the results. If they are the same in those four genetic markers, then you can conclude that that particular unknown blood stain on whatever item it is could have come from the individual that the blood sample came from, the known blood sample. It is consistent with that individual.

On the other hand, if there is one or more differences in any of those four, then that blood on that item could not have come from the individual who gave the blood sample.

Q. Now, if you were to take, for instance, my blood sample and I had the genetic marker you referred to as number four here, of which there are three strains; number three, of which there are four strains -- correct?

A. Correct.

Q. -- and number two, which is, for the record, EAP, of which there are six strains, but in

reference to PGM, if I had other than 1+, it couldn't be my blood, is that correct?

A. That's correct.

Q. Now, after making this initial determination, at some point did you do an examination in reference to blood that was provided to you that purportedly came from an individual by the name of George Perrot?

A. Yes, I did.

Q. Can you tell us, sir, in reference -- can you explain for us what you did in reference to that blood that was given to you that purportedly came from Mr. Perrot? Again, did you assign it a number other than Springfield had assigned it?

A. Yes, I did.

Q. Can you tell us for the record what number was assigned to Mr. Perrot's blood?

A. The number that we assigned to the known blood sample reportedly taken from Mr. Perrot was a K-11.

Q. Can you tell us, sir, again explain for the jury, what you did in reference to Mr. Perrot's blood, in light of the findings that you had already

made in reference to Exhibit No. 8?

MR. HAMMERSCHMITH: Objection, Your Honor.

THE COURT: Overruled.

MR. HAMMERSCHMITH: May I be heard at side bar.

THE COURT: Okay.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I don't believe, Your Honor, there's been any establishment of a connection between Mr. Perrot's blood and that to which Mr. Eubanks is about to testify. Now, I understand the chain of custody goes to weight, but I don't think we have any connection at all except that he received some blood which is purportedly Mr. Perrot's. I don't think that is sufficient foundation to allow him to testify.

THE COURT: I think what you are

telling me is the chain of custody is weak. He said he got a sample that purportedly came from the defendant, George Perrot, he assigned a number to it. All you are telling me now is that chain of custody may be weak at that point. I don't think -- that's not grounds for excluding it.

MR. HAMMERSCHMITH: I thought there was a minimum level which is required before testimony --

THE COURT: Of course, we have the other evidence in the case that the blood sample was taken, it was delivered to the laboratory, that is in evidence, is it not?

MR. HAMMERSCHMITH: That is, yes.

THE COURT: A sample was taken from Mr. Perrot, that it was delivered to the F.B.I. laboratory in Washington, and I believe it was hand delivered, was it not?

MR. BLOOM: Yes, Sergeant Kennedy.

MR. HAMMERSCHMITH: To the F.B.I.

THE COURT: To the F.B.I. lab Friday in Washington. Overruled.

(End of side bar conference)

Q. (By Mr. Bloom) Can you tell the Court and jury what you did in reference to what was indicated to you to be Mr. Perrot's blood in reference to the findings you had made on Exhibit 8 that are on the board in front of the jury?

A. I examined the known blood sample and ran the same genetic marker systems or the same enzymes and proteins which were identified on the sheet. I ran those on the liquid blood to determine what types Mr. Perrot belonged to in those genetic markers.

Q. Can you tell us, Mr. Eubanks, what the results of that test were?

A. For the four enzymes and proteins which are listed on the board and numbered 1 through 4, Mr. Perrot is the same type in all four of those markers.

Q. One, two, three and four?

A. Yes, sir.

Q. Any variation to any degree on any of the four?

A. No.

Q. Now, at some point, sir, within the course of your involvement in this case, did you receive a blood sample purportedly to come from a woman identified as a Mary Prekop?

A. Yes, I did.

Q. Can you tell us what examination you did in reference to that blood that was given to you?

A. The same examination as on the other blood sample. I examined the known blood sample from Mary Prekop, reportedly taken from her, and the same genetic markers that I did for Mr. Perrot, the same ones found on the board. In addition, I ran several others at that time.

Q. Can you tell us what the results were of the examination you did in reference to Miss Prekop's blood, in light of the examination you had completed in reference to Exhibit 8?

A. The results were indicated that there were differences in the enzymes and proteins in three

of those. Perrot and Prekop are the same PGM type, which is 1+, but there were differences in numbers two, three and four on the board, that's the enzymes EAP, Hp or haptoglobin, and Tf. Prekop was different than Perrot in those three markers.

Q. In lay terms, sir, what does that mean, in essence?

A. Well, that means that the blood stain that I tested on the sheet could not have come from Prekop and is consistent and could have come from Perrot.

Q. At some point, correct me if I'm wrong, you also were asked, were you not, to perform forensic serology examination in reference to what has been marked Exhibit No. 10, Springfield Police Department number 49492, and it says on there, doesn't it, one pair of knit gloves, correct?

A. Yes.

Q. Can you tell the jury what this means, Q5, Q6, and then WGE?

A. As in the case of the previous one, which was Q3 and Q4, this is just a way of listing or numbering items submitted to us for analysis. In

this case, it refers to questioned item five or Q5 and question item six or Q6. Q5 would be one glove, the Q6 the other glove. Also my initials, WGE, are on the outside of the package.

Q. Did you attempt, sir, like you did with the bedsheet, to lift as many enzymes as the blood stain would allow?

A. Yes.

Q. Can you tell us what the result of that examination was, in reference to exhibit -- is it 10?

A. Yes. On the pair of gloves I identified a blood stain, a human blood stain on each of the pair of gloves, one stain on each of the gloves. On one of the gloves, which was listed as Q5, was in the wrist area of the glove, and on Q6, the human blood stain was actually in the area of the first two fingers, at the base part of the first two fingers.

Q. How many enzymes were you able to lift?

A. Because of the limited quantity of stain there, it was a rather small stain, I was only able to run one genetic marker system on that stain.

Q. On both?

A. Yes.

Q. What was the result of that examination, sir?

A. The system that was run was the PGM enzyme and I identified PGM type 1+ on the human blood stains on the Q5 and Q6 gloves.

Q. On both of them?

A. Yes.

Q. So correct me if I'm wrong, on both gloves the only genetic marker you were able to lift is what you have documented as number one up here?

A. That's correct.

Q. And that is consistent with -- strike that. What did you indicate again for the Court and jury Mr. Perrot was, in terms of the 10 variations of PGM?

A. Mr. Perrot is a PGM 1+.

Q. And the two stains on the glove were again what?

A. 1+.

Q. And Miss Prekop is what in reference to PGM?

A. She is also a PGM 1+.

Q. Consistent with both gloves?

A. That is correct.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Mr. Eubanks, you are employed by the F.B.I., is that right?

A. That's correct.

Q. And in that capacity, you work in their laboratory in Washington?

A. Yes, sir.

Q. You testified to, I think, the numbers of items that you have examined in the course of your employment. First of all, is the F.B.I. the only place that you have worked in the profession of blood testing?

A. Yes.

Q. The work that you do there, that consists, does it not, of items that are sent to you for testing by state, local and federal police

authorities?

A. That is correct.

Q. By anyone else?

A. The federal law, which is the code of federal rules, allows the F.B.I. only to accept evidence from duly constituted law enforcement agencies.

Q. So that all of the evidence that you examine is in connection with presumably police investigations or police prosecutions, is that right?

A. Yes, sir.

Q. Now, you spoke briefly about your training. You have a college degree from Southern Methodist?

A. Yes, sir.

Q. And that is a Bachelor of Science degree, is it?

A. Yes.

Q. Was there a specific major there?

A. Biology.

Q. Postgraduate you have another degree from George Washington University, was it?

A. Yes.

Q. And that degree was in --
A. Forensic science.
Q. When was that obtained?
A. I believe in May of 1976.
Q. Were you employed by the F.B.I. at that time?
A. Yes, I was.
Q. Did the F.B.I. send you to George Washington University to get that degree or is that something you did independently?
A. Independently.
Q. Now, the training that you had at the F.B.I., that was essentially a one-year apprenticeship, primarily?
A. Yes.
Q. That was the vast bulk of the time, correct?
A. Yes.
Q. And it was an apprenticeship with another person who had worked at the F.B.I. perhaps longer and with more experience than you?
A. Not just one, but a number of people.
Q. In addition to that, you took two

courses, I think you said, is that right?

A. Yes, all examiners are required to successfully complete the two formal courses in the field, one dealing with a basic serology approach and the other one is a much more advanced course.

Q. Where did you take those courses?

A. They are actually given at the F.B.I. academy's training center at Quantico, Virginia, and are taught by personnel from the Serology Unit as well as personnel from the research and training staff at Quantico.

Q. What is Quantico?

A. Quantico is a Marine base where the F.B.I. academy is located.

Q. Are those -- is college credit given for those courses, to your knowledge?

A. Yes, it is.

Q. Can you tell us how many college credits are given for each of those two courses?

A. It's either three or four hours for each course under the University of Virginia system and it's graduate credit.

Q. Now, you examined, I think you said,

about two thousand items a year, is that right?
A. Yes.
Q. Is that primarily for blood that you are examining?
A. It would be for blood, semen, saliva and urine.
Q. You don't examine that many anymore, do you?
A. No, I rarely work cases now.
Q. Now, can you explain to us how you determine that an item of blood -- a dried blood stain -- has the characteristic PGM 1+ or whether it has some other such characteristic of PGM?
A. The technique that is performed on blood stain to determine its enzyme type is something called electropheresis. That is a big word to describe a process in which a blood stain is placed on a gel medium, kind of like Jello, only much thinner and it's not jelly, but if you could imagine that, and an electrical current is passed through this gel. Of course, the gel has other components, it has a buffer solution, it has wicks at both ends, it has a positive end and a negative end, it has a

circulating bath which keeps itself cool, and this process is conducted over a period of anywhere from up to an hour to two or three hours, depending on the system that is being run.

In the case of PGM, we use a technique called isoelectric focusing, which has an advantage over traditional electropheresis in that it tends to concentrate proteins into a very narrow, sharp and linear band. It also has an advantage in that lesser amounts of protein, which would be found in a stain, for example, a weaker stain or an older stain, can be typed with this system over traditionally electropheresis systems.

What happens is the proteins which are charged particles, if you will, will migrate through this gel to a particular point on this gel, and then they will stop. Depending on the type, the PGM type, this protein will migrate to a particular area. In other words, a PGM 1+ band is different from a PGM 2- band. They are easily identified when compared with known controls which are run on every plate. That is the method used to determine the PGM type or, for that matter, any other enzyme or protein in blood or

semen.

Q. In looking at the results of that to determine what the PGM result is, do you do so through a microscope?

A. No, it is naked eye right over a light box.

Q. Is there -- what would distinguish PGM Sub 1+ from another of, say, the common PGM types?

A. The location on the gel, to some extent, the intensity of the band, that is how dark it is, but primarily it is based on the location of the banding pattern on the gel in comparison or pattern recognition of that banding pattern with known controls and with known controls that are published that show where these positions or where these bands run.

Q. It's not a matter as simple as determining if it's one kind it turns black, if it is another kind it turns white, is it?

A. No, it's not as simple as that.

Q. It takes a trained eye?

A. Yes.

Q. And there are cases, are there not,

where there are differences of interpretation?

A. Yes.

Q. And that would apply to each of those four areas, wouldn't it?

A. Yes, there is always an interpretation or interpretive aspect to any type of scientific examination, as far as the actual interpretation of the results.

Q. And, in this case, you were the one who interpreted the results, is that correct?

A. Yes, sir.

Q. Now, the test that you did in this case was for these four characteristics that we have on the board?

A. Yes, sir.

Q. Just referring to the last of those, Tf C, that is found in 99 percent of the population?

A. That is correct.

Q. So it would be fair to say that that particular characteristic is really not of any great significance in excluding a blood sample unless somebody has one of those other items which consists of the other one percent there?

A. That's correct.

Q. So almost everybody has Tf C, right?

A. That's correct.

Q. And although you say that there are three characteristics there, the other two, I take it, comprise one percent of the population?

A. One percent or less. There are -- that is Caucasian population. In the black population, the percentages are different.

Q. Where did the percentages come from?

A. These percentages come from, as far as items two, three and four, come from various studies done in the field of forensic serology, as well as genetic studies, blood bank studies, either through the American Red Cross or the American Association of Blood Banks, or some other well-known agency of individuals -- a cross section of individuals randomly selected from the population and generally represent individuals from major cities in the U. S. or whatever area that was being studied.

The percentages that we use in the F.B.I. laboratory at the present time are percentages based on an average of various studies done across

the country from major cities. In fact, there are about 64 different published studies that we studied or referred to in compiling those averages when this was done back in 1983.

Q. Did you participate in the compilation of these percentages?

A. No, I did not.

Q. So your knowledge, then, is limited to having them as a given in your work, something that is given to you?

A. That's correct.

Q. And you mentioned that these percentages are averages of 64 different studies, did I understand you correctly?

A. I believe it is 64, it might be 63, it is somewhere in that area.

Q. Were these geographical studies?

A. They are studies from various major cities, primarily major cities, across the country.

Q. Are you aware of any study for the Springfield area?

A. There may be listed -- with that 64, there may be one from this area. I don't know, I

don't recall.

Q. In determining these percentages, you didn't use a study which was specific to the Springfield area, did you?

A. No.

Q. You used an average nationwide, would it be?

A. Yes.

Q. And, in fact, there is apparently some variation in the statistics by geographic area, isn't there?

A. I don't know about geographic area. There may be. I would say there would be variation in statistics of this type from -- obviously, there is from the black to Caucasian races, as well as Hispanics.

For example, we work a lot of cases from the state of Alaska, we know that there are significant differences in Eskimos as opposed to Caucasians from the United States.

Q. Do you know of any studies dealing with whether there are differences between people with black or brown hair and people with blond hair?

CITY 002937



A. That would have no affect on these genetic markers.

Q. Wouldn't it be fair to say that people with blond hair are more likely to come from a different ethnic group than people with dark or brown hair?

MR. BLOOM: I'm going to object now, he is outside of --

THE COURT: I will allow him to answer.

THE WITNESS: Well, that depends on the mother and father. Ethnic group I guess would be a factor, yes.

Q. And it would be fair to say that hair coloring varies by ethnic group, correct?

A. Yes.

Q. For example, one doesn't see very many Japanese people with blond hair?

A. That is correct.

Q. And perhaps blond hair is more common among northern populations of Europe than southern populations?

A. I don't know. Possibly.

Q. You are not aware of any study that deals directly with the correlation of hair coloring in these types of enzymes, then?
A. No. There is no study that I am aware of and there would be no reason to do that type of study.
Q. But you say that these percentages that you have on the board can be expected to vary by ethnic group, correct?
A. No, I'm not saying that they vary by ethnic group. I can say that I would expect there would probably be some variation by ethnic group, and obviously if we are talking about Hispanics as opposed to Caucasians, there are some variations there. American Indians as opposed to American Caucasians, if you will, Anglo-Saxon, there is variations. For example, in the ABO system there are predominently American Indians are type O blood.
Q. So the percentages that you have on the board are approximations, would that be fair to say?
A. That's correct.
Q. And they rest on the assumption that white Caucasians -- they rest on the assumption that

one would expect the same incidence of these types of blood within all groups of white Caucasians?

A. Well, again, they are approximations. There are 270 or some odd million people in the United States, obviously not everybody has been tested in these various genetic markers. A lot of people know their ABO blood type, either have been in the service or for some other reason, but this system, the majority of the population have not been tested in, but based on statistical studies that have been published, on randomly selected individuals from across the country, primarily major cities, and we consulted approximately 64 of these studies, we arrived at these percentages which represent averages of those studies.

Q. And the percentages that you have on the board here for these types, you have got Tf C, Hp 2-1, EAP BA, PGM 1+, one of these is the most common type that one would find at least among white Caucasian population, according to your studies?

A. Well, I know that PGM is most common at 41 percent, and based on the percentages there for EAP and haptoglobin, which are 41 and 48

respectively, they are probably the most common.

Q. You've got numbers written on the right there, the 10, the 6, the 4 and the 3. Those just tell you how many different possibilities there are, don't they?

A. Yes, sir.

Q. But they don't tell you -- you don't mean to suggest to the jury, do you, that it is equally possible that a person would have any one of those 10 blood types? In other words, it is more likely a person is going to have PGM 1+ than any of the other 9, correct?

A. That's correct.

Q. And the same would apply with the other figures, although you are not sure whether they are the most common or not?

A. I think they probably are. Anything that is approaching the 50 percent is just about the most common of these various markers.

Q. And all of these are approaching the 50 percent mark, correct?

A. Yes.

Q. Except for the Tf C which is found in

almost everyone?

A. Yes.

Q. Now, you received blood purporting to be that of George Perrot on two occasions, did you not?

A. That is correct.

Q. The first occasion that you received it on was back in January of 1986, is that correct?

A. Yes.

Q. And the second time that you received it was in April of 1987, is that right?

A. Yes, that's correct.

Q. And the blood results that you have testified to here today relate to the April 1987 blood that was received by you, is that correct?

A. Yes.

Q. Now, at the time that you did the blood test on this April 1987 blood, you had before you, did you not, the results from the testing of the bedsheet that was referred to by Mr. Bloom earlier?

A. I'm not sure I had it before me. The bedsheet -- the tests on that were conducted primarily in January of 1986 and the tests on the second blood sample reportedly taken from Perrot was

done in April or May of 1987.

Q. Now, as a result of doing the tests that you have done, you are not saying, are you, that the blood that you found on that bedsheet is George Perrot's blood?

A. No, I'm not able to say that it came from anyone to the exclusion of all the population. As I previously testified to, it is not like a fingerprint. I can only include someone or exclude someone.

Q. What you are saying is that you were able to exclude Miss Prekop as being the source of that blood, correct?

A. That's correct.

Q. But you were not able to exclude George Perrot as the course of that blood?

A. That's correct.

MR. HAMMERSCHMITH: No further questions, thank you.

REDIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, you were asked, and I think you referred to the federal code, that all the items that you take for examination come from a law enforcement agency, remember that question?

A. Yes, sir.

Q. Have you had occasion to testify for defendants in the United States courts, any court in the United States of America?

A. Yes, I have.

Q. And is that in conjunction with findings you made as a forensic serologist?

A. Yes.

Q. Can you tell us, sir, did you indicate in reference to Miss Prekop how many of the -- again, could you tell the jury -- of these four genetic markers, was she -- did she have a different strain from what you have put on the board in reference to the bedsheet?

A. She was different in three of those markers.

Q. In reference to those four, just the

four that you were able to lift off the bedsheet, am I correct in stating there's 23 possibilities that could be found?

A. That's correct.

Q. And if you are off on any of them, it's not your blood, is that correct?

A. That's correct.

MR. BLOOM: That's all I have.

RECROSS EXAMINATION BY MR. HAMMMERSCHMITH:

Q. Two of those 23 are the Tf factors other than Tf C?

A. Yes, sir.

Q. And those are pretty rare, isn't that right?

A. Yes, in the Caucasian population.

Q. And among each of the other three categories that you have on the board there, there are in each of those different ones that are very rare, is that right?

A. In the PGM system, the first one listed on the board, the rarest one is a PGM 2-, which I think it is somewhere less than five percent of the population. In the EAP system, they are a little more evenly distributed. There is a possibility of six types there, and I don't recall what the rarest is. It's probably a little higher than five percent. In the haptoglobin system there are a total of four major types, actually three in the Caucasian population and one additional one in the black population, and they are fairly evenly distributed.

Q. In the EAP grouping, the rare ones that you are referring to would be CA, CB and C?

A. Yes, they would be the rarer ones, although by rare -- I don't have it in front of me, I can easily get it, but we are not talking about something less than two percent of the population or something like that.

Q. Not even with respect to C?

A. I'd have to look that up. C is probably one of the rarer ones.

MR. HAMMERSCHMITH: Nothing further.

FURTHER REDIRECT EXAMINATION BY MR. BLOOM:

Q. Mr. Eubanks, with reference to 1, 2 and 3, on all three of them, over 50 percent of the population has a strain other than what you have found on that bedsheet, isn't that correct?

A. Yes, sir.

MR. BLOOM: Thank you. That's all I have, Your Honor.

THE COURT: Is that it?

MR. HAMMERSCHMITH: Yes, that's all.

THE COURT: Thank you, sir.

(Witness steps down)

MR. BLOOM: Mr. Oakes.

WAYNE W. OAKES (Sworn)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Sir, would you be kind enough to tell Judge Murphy your name and your occupation, please?

A. Wayne W. Oakes, last name is spelled O A K E S, and I am a Supervisory Special Agent with the F.B.I.

Q. How long have you been employed by the Federal Bureau of Investigation?

A. Approximately 10 years.

Q. Would you describe, sir, for the Court and jury what the nature of your work is with the F.B.I.?

A. Certainly. I am presently and have been for the last six and a half years assigned to the laboratory division of the F.B.I. at headquarters in Washington D.C. Specifically, I am assigned to the hairs and fibers unit where myself and 10 other special agent examiners do examinations and comparisons of hairs and textile fibers that are submitted to the laboratory by law enforcement

agencies.

Q. Can you tell us, sir, how long you have been engaged in that specific field?

A. Six and a half years.

Q. Would you tell us what type of training you have received in reference to that area that you have been engaged in for the last six and a half years?

A. Yes, after being a special agent in the field for three and a half years doing general criminal investigations and upon being assigned to the laboratory, I underwent one year of intensive training. The training consisted of formal classroom training at our Quantico, Virginia academy.

Also, during that one year period I read the available literature, worked cases for one year under the supervision of experienced agents and performed a number of practical examinations concerning hair identification and comparison, and then was required to pass a number of oral certification boards, and after the completion of this one year, I was certified by the director of the F.B.I.

Q. Mr. Oakes, can you tell us briefly where did you go to school as an undergraduate?

A. I received a Bachelor of Science degree in biology from Boston College.

Q. And can you tell us in reference to the last -- or I should say now presently your occupation or your involvement with the F.B.I. presently, how much of your time is devoted to this hair and fiber analysis?

A. One hundred percent of the time. The only time that I am not doing that is when I am testifying like I am today.

Q. How many occasions, sir, have you testified in a court in the United States for the purposes of giving an opinion based on some sort of scientific analysis that you performed in the laboratory back in Washington?

A. Approximately 95 times.

Q. What type of courts are we talking about?

A. Approximately 35 to 40 states and probably half federal and half state and local courts, including probably six or seven prior

testimonies in Massachusetts state courts.

Q. I'm going to ask you, first of all, if you would explain what is the purpose or what basically is the purpose behind -- and I ask you to confine yourself to hair examination -- what is the purpose of that examination in reference to what you do down in Washington?

THE COURT: Let's wait till we get the blackboard in here, it will be coming in the door there.

(Pause in the proceedings)

Q. (By Mr. Bloom) Can you tell the Court and jury what the purpose is or the function of, for instance, I am going to ask you to confine yourself to a hair analysis.

A. Certainly. The reason that myself and 10 other special agent examiners in my unit are interested in conducting hair examinations is because there is a basic forensic principle called the Locard Exchange principle, which simply states that when two objects come together, part of each object may be

transferred to the other object, and thereby lending a possible association to these two objects.

This is particularly true of human beings whose hairs on the head, pubic region, other parts of their body are constantly being shed and can be transferred to another person's body, to that person's clothing or to environment which tend to associate a particular individual with an object, a person or an environment. It is these hairs that can transfer from one person to another or another object that I look for for examination and comparison with known hair standards from a particular individual.

Q. What can you expect to determine, if anything, from a hair examination from a known individual compared to hair that is taken off a piece of evidence?

A. Myself and any experienced hair examiner very quickly can look at a particular hair and, first of all, tell you whether it is a human hair or an animal hair. If it is a human hair, I can tell you the race of the person that the hair came from, whether it came from a Negroid, Caucasian or Mongoloid individuals. Mongoloid individuals we

include American Indian and Orientals. I can tell you the body part that a hair came from, whether it is a head hair, facial hair, limb hair, pubic hair, eye area or whatnot. This is something I can tell you very quickly by looking at a single hair.

I can also tell you whether it was forcibly removed, whether it fell out naturally, whether it's been artificially treated, bleached, dyed, cut, damaged, burnt, and a number of other things. These are things that I can look at very quickly.

Q. These determinations that you make, is that done through the naked eye or through the use of some device?

A. These examinations are done microscopically by the use of a microscope. The hairs will be mounted on glass microscope slides and in a particular medium that allows me to look at internal characteristics of a hair that you can't see with the naked eye. By looking at these characteristics, I can arrive at these types of conclusions.

Q. Mr. Oakes, would you explain to the

court and jury how you carry out your function specifically in analyzing a known hair from a hair that in fact came from a piece of evidence? What are are you looking for, how do you carry out that procedure?

A. If the question is if Mr. Bloom and myself come in contact with each other, can we be associated through a hair exchange, the clothing that I wear will be scraped down and the hairs that are on my clothing will be mounted on glass microscope slides.

Q. Explain that first. What do you mean scraped down?

A. In a particular room that we have in our unit at the laboratory are what we call scraping rooms. Each room is sealed off from other rooms and there is a large table on which we place butcher block paper. Over the table is a rack that we suspend the clothing from. With a kitchen spatula the clothing are scraped down. The debris, which might trap the debris which may include hairs, textile fiber, paint chips, glass, soil or a number of other things, is allowed to fall onto the paper.

It is then collected, placed in pill boxes, appropriately labeled so we know that this is the debris that came off of this particular item of clothing.

At a later date, the debris in our unit, hairs and textile fibers, are taken out of that pill box and placed on glass microscope slides and mounted in a particular mounting medium and affixed with a permanent glass slide and likewise labeled.

So, now I have in my possession a glass microscope slide, permanently fixed so nothing can be lost from it, and appropriately labeled, so I know that this is the debris, namely the hairs, that came off of a particular item.

I will then conduct a screening of that slide, looking for primarily head hairs and pubic hairs. I generally will discount for comparison purposes other hairs, fragments, fringe hairs, body hairs from the limbs or the legs. The reason being is that we do not see enough variation in those types of hairs from one person to another within a particular racial group. Unlike head hairs and pubic hairs, which can differ greatly from one person to

another and can form the basis of strong associations. So I would look at that slide, identify head hairs or pubic hairs that are suitable for comparison purposes.

I will then take known hair standards from, let's say, a victim and a suspect in a particular crime, mount a representative sample of those hairs, head and pubic, on glass microscope slides. I will examine those hairs briefly, making a mental note of what those hairs generally look like. I will then go back and rescreen the slides containing the debris from items of clothing. I will look for, for instance, on Mr. Bloom's clothes, slides containing the hairs from Mr. Bloom's clothes, hairs that are dissimilar to his head and pubic hairs. If I find those hairs are dissimilar to Mr. Bloom's and did not originate from him, then I would compare those side by side, using a comparison microscope, with the known hair standards from myself or from a victim or a suspect in a particular case, and that is the basis on how we conduct the microscopic examination.

There are a number of characteristics,

as I said earlier, that I can see that you can't see with the naked eye, and if I could --

Q. Could you illustrate on the board, if you would, if you can best make it more understandable for the jury, what you would expect to see when you perform the microscopic analysis of a head hair, for instance?

A. Certainly. With the naked eye, if you just look around the courtroom, you can see tremendous differences in persons' head hairs, and all you are really looking at is these features, the color, the length and the texture. Obviously, I can see these characteristics when I mount the hairs on glass microscope slides, but what I can see that you can't see is what I am going to try to demonstrate.

If you think of a head hair with the bulbous root and a long shaft and then generally a cut tip, and we take a portion of this hair in the shaft and magnify it 250 to 400 times and look inside of it. You have to think for a moment of a three dimensional object. If you would, just think of a lead pencil and running down the center of the pencil is a layer or a core of graphite or lead. Running

down the center of the hair is a core of cells called the medulla, I'll just put an M there. This you can't see with the naked eye. I can see it when I look inside the hair when I mount it on a glass microscope slide. The main portion of the pencil is the wooden portion. The main portion of the hair is called the cortex, and that will be from here to here. Remember, you're looking at a sliced hair inside this hair now.

Outside the pencil, usually on a yellow pencil, will have a layer of yellow paint. The outside layer of the hair is called the cuticle, and on the outside of the cuticle is a layer of scales, much like shingles on a roof or scales on a fish, and they overlap and protect this hair and make it a very durable biological specimen.

So we have the three layers, the medulla, the cortex and the cuticle with the scales covering the outside.

Inside the cortex we have pigment granules --

Q. I'm sorry, what was that?

A. Pigment granules, and it is these

pigment granules that give hair its color. If you have white or graying hair, you have lost those pigments. Your hair has stopped producing those when you have white hair or the absence of color, based on a lack of these pigment granules. If you have black hair or if you are a person of the Negroid race, particularly in blacks you have a phenomena called clumping where the granules are all clumped together throughout the layer. That is why people of the Negroid race have very dark hair.

We also find a number of other characteristics, little air filled sacs called cortical fusi or large dark bodies called ovoid bodies.

So these are basically the characteristics that can be present in a hair, and it is much like a person's face. Most people have two eyes, two ears, a nose and a mouth, but you can tell the difference from the person sitting next to you because of very subtle variations in those characteristics. Not everybody's eyes or mouth look the same. So when we talk about characteristics, there aren't that many, but they can vary and they do

vary greatly generally from one person to another within the same racial group, but if I was to take a known hair sample of 12 to 25 hairs, I would get a mental image or picture of what these characteristics look like in this person's hair.

If I have a victim and a suspect and their hair is different, I can use these hairs for association. Not everybody's hair will look like that. Some are long and flat. If you bleach your hair a lot, you are going to get scale damage and you will have a lot of scale protrusion. They may be long or they may be short. The cuticle may be thick, thin, it might not be visible at all to the eye, it might be clear, cloudy or yellow.

The general diameter of the hair, the general color of the hair, texture, shape, the arrangement of the pigment granules can vary. We might have bleaching towards the tip from solar bleaching, if you're out in the sun a lot, or we might have a lot of concentration of pigment toward the cuticle. These little air sacs might be present, they might be totally absent, they might only be down near the root, they might be absent in the shaft in

one person's hair sample. The same with the ovoid bodies.

So all of these characteristics are important and it is these characteristics and how they are arranged from the root to the tip in a known sample that I use to form the basis of comparison.

Now, when I do an examination, I said that I compare side by side the questioned hair with the known hair. And what I see is like a split image on a TV screen. I put the Q1 on one side and the K1 here on the other side.

Q. Explain what that means.

A. Q means questioned item number one. Let's say the first item that I examine is Q1, my jacket, questioned item, and I find a hair on it, the hair is on this side, and you ask me can I associate Mr. Bloom with my jacket, and I find a head hair, Q1, on my jacket, and I take a known head hair from Mr. Bloom, call it K1, known sample number one, because I know where that came from, police took it off of his head, and I will compare it side by side, and I will compare every single characteristics that I indicated, the color, the medulla, the cuticle, the

cortex, the scales, how the pigment granules are arranged, everything about it. If I see any differences in any of these characteristics or how they are arranged along the length of the hair, I will say positively, based on my opinion, based on my experience, that this Q1 hair did not originate from the source of the K1 sample. In other words, the hair found on my jacket did not come from Mr. Bloom, and that is positive.

If I see no differences microscopically between these hairs and all of these characteristics and the arrangement of these characteristics, I can see no differences, if I cannot detect any differences microscopically, I will say that this Q1 hair is consistent with having originated from the source of the known hair, this hair is consistent with coming from Mr. Bloom. It either originated from Mr. Bloom or from another person of the same racial group whose hairs exhibit all of these characteristics arranged in exactly the same way.

It is my experience and the experience of the F.B.I. laboratory that it is extremely rare that we will have a situation wherein we have two

known samples from two people, two known head hair samples or pubic samples, that are so alike that I cannot tell them apart microscopically.

MR. HAMMERSCHMITH: Objection, Your Honor. May I be heard.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I would move to strike the last conclusion stated by this individual. It is my understanding --

THE COURT: What do you think he said, first?

MR. HAMMERSCHMITH: He said that it is extremely rare to find two -- well, find situations where there is a match where they are coming from different sources.

THE COURT: I don't think he said that. I think what he said was it is extremely rare where I can look at two identical pieces of hair and not

recognize them to be identical. I don't think he said that he could state it that it came exclusively, in his example, from Bloom. I don't think he said that. I think what he is saying is if I take Bloom's hair and I take my unknown hair, the case is very rare or extremely rare where I cannot look at them and say yes, they are identical or no, they are not. That is my interpretation of his testimony. I don't think he said that --

MR. HAMMERSCHMITH: He didn't refer to source.

THE COURT: That I can say exclusively that it came from Bloom. I don't think he said that. Based on my interpretation of what he said, I am going to deny your objection.

MR. HAMMERSCHMITH: I'd like my exception noted.

(End of side bar conference)

Q. (By Mr. Bloom) I'd like to ask you, first of all, can you give us an idea in terms of number, just to better acquaint the jury, when you have a known hair sample -- strike that -- any hair sample that you are doing a microscopic analysis of, how many type of characteristics are we talking about? You have referred to a variety of characteristics. Can you give us an estimation in number as to how many characteristics you expect to see during a microscopic analysis of a head hair?

A. It is a difficult question to answer. It's not like fingerprints, where the literature suggests that you need 8 to 12 points for identification. As I testified, for me to match a questioned hair with a known sample, I have to see no differences. All of the characteristics in one have to be present in the other and they have to be the same, so --

Q. I'm not asking you for identification purposes. I'm just asking, in a given head hair, can you give us an estimation as to how many characteristics there are that you observe when you

do your analysis of that head hair?

A. The literature suggests 15 to 25 characteristics are present in the hair. I don't like to use that, because I think it depends on how you count them. For instance, we can say scales, but then we can talk about scale length, scale thickness, scale protrusion, we can talk about pigment, we can talk about distribution, is it course, heavy or light, is it centered towards the medulla of the cuticle, is there clumping, streaking. It just depends how you want to count the characteristics. It's like saying how many characteristics are present on a person's face, two eyes, two ears, you can start adding these up. There are virtually as many characteristics as you want to make, if you want to count them definitely.

Q. Whatever the number may be, if there is one variation between Q1 and K1, the results of your examination are what?

A. That the Q1 hair did not originate from the source of the K sample.

Q. I am going to ask you, Mr. Oakes, if you would, to draw your attention to, for the Court,

Exhibit No. 8, which again for the record says Springfield Police Department 49452, one flowered bedsheet and one paper used to catch the droppings. Now, underneath that it says Q3, Q4, and then there's initials WGE. Can you tell us what that is, WGE?

A. Yes, that would be the initials of Special Agent William G. Eubanks, who is the agent assigned to the serology unit, who also worked this case with me.

Q. And WWO is who, sir?

A. My initials, Wayne W. Oakes.

Q. Now, have you performed any examinations or any functions in reference to Exhibit 8 that I have handed you?

A. Yes. Following the procedure that I described earlier, that is the scraping procedure --

Q. If we can take that step by step, I just want to -- so the jury understands that -- here's the item and is this the paper sheet?

A. Yes, the sheet has Q4, questioned item number four -- the paper does -- the Q3 is on -- the sheet is questioned item number three.

Q. If you would, first, explaining in

reference to your specialty in reference to hair and fiber examination, what that piece of paper is for, if you know?

A. This piece of paper, our Q4, was received with the sheet, Q3, in a sealed brown paper bag. We unsealed it in our unit. This paper, I believe, is just a catch paper. In other words, when this item was originally seized by the police department, they probably -- and I'm assuming -- either collected it or wrapped it in this.

Q. What do you do -- again, so you can explain this, you refer to the fact that when we get a piece of evidence, we scrape it. Explain specifically what that process is and was in reference to Exhibit 8.

A. The procedure is, and was in this case, the Q3 sheet was suspended over a scraping table on a rack with clips. A piece of brown paper -- not this brown paper, but another piece of brown paper -- was placed under that item. The kitchen spatula, the debris including hairs and textile fibers, are scraped off of the sheet. It is allowed to fall onto the table on top of the paper. All of that evidence

from that item is then collected, placed in a pill box and marked Q3, WWO, and a laboratory number that tells me what case this pill box pertains to and which item it came from.

At a later time, with tweezers and a low power stereo magnification --

Q. What is the power of that, sir? Did you mention that? The power of the microscope that would be used in there --

A. In this particular instance, it would be 10 to 70 power. This is low power, just to pick out the hairs and put them on glass microscope slides. This is not to examine internally the characteristics.

So the hairs are put on a glass microscope slide, sealed and appropriately labeled Q3, WWO, and our laboratory number. So now I have hairs off of this sheet permanently fixed in glass microscope slide, so that I can do an in-depth microscopic examination.

Q. Were you able to identify any head hairs that were scraped off of Exhibit No. 8?

A. Yes, I was.

Q. How many, sir?

A. There was one brown Caucasian origin head hair that was suitable for comparison purposes. In other words, it contained enough characteristics that I felt comfortable attempting to associate that with a known standard. There was also one white Caucasian origin head hair, which was essentially devoid of characteristics, and I ruled in my opinion that that hair was not suitable for comparison purposes. In other words, I could identify it as a Caucasian origin white head hair, however, in my opinion, it could look like a lot of other persons' white Caucasian origin head hairs.

Q. Could you just briefly elaborate on that again. If you find a head hair, as did you in this case, what determination or how do you come to the determination as to whether or not you feel it can be used for comparative analysis down the road?

A. In this particular case, the white Caucasian origin head hair lacked ovoid bodies, it lacked cortical fusi, it lacked pigmentation, it was a hair that had stopped producing melanin, which is the substance that produces pigment and gives hair

its color. It did not have a discernable cuticle, I could not see scales, I could not see very many characteristics at all. I could tell it was a human head hair of Caucasian origin and I could tell you it was white. However, if you were to give me white head hairs from 10 different other Caucasians, it may match all of those persons, so it was not a hair that I felt could be used to form the basis of strong association.

So I don't fool with it. I just write it off and I put "not suitable for comparison purposes" in my notes. And then I deal with the brown head hair that is suitable to form the basis of strong associations, if you compare that one with known hair samples.

Q. At sometime within the course of your involvement in this case, were you asked to compare this one head hair that you set aside that you felt was worthy of comparative analysis with a head hair that was submitted to you and purported to come from an individual by the name of George Perrot?

A. Yes, I did.

Q. Can you tell the Court and the jury how

you performed that examination, what type of microscope you used, its power, and what the result of that examination was?

A. I would have used a comparison microscope, which is just two microscopes rigged together in such a way that I can see two specimens side by side.

Q. Like the board?

A. Like the board. The Q3 head hair or the brown Caucasian head hair which came out of this Q3 sheet was placed on one side of the microscope. A slide was prepared of the known head hair standards purportedly from Mr. Perrot that was placed on a glass microscope slide and it was placed on the other side of the comparison microscope. The questioned hair was compared root to tip microscopically at 100 power, 250 power and approximately 400 power side by side with the known hair standard from Mr. Perrot.

Q. Can you tell us what the results of that examination were, sir?

A. Yes, the questioned hair from the sheet exhibited all of the same microscopic characteristics arranged in the same way as the known hair standards

from Mr. Perrot.

Q. Were there any variations whatsoever?

A. None that I could detect, no.

Q. At some point after that, were you asked to compare this head hair that had been removed from Exhibit 8 with a known head hair purportedly from a Mary Prekop?

A. Yes.

Q. Can you tell us how that examination was done, what type of microscope again was used, and what the results of that examination were?

A. I used the same procedure with the known hair standard from Miss Prekop as I did with the known hair standard from Mr. Perrot, that is I mounted the appropriate number of those hairs from the alleged victim on a glass microscope slide and compared the hairs side by side with the questioned hair removed from the sheet, State's Exhibit 8, and they were dissimilar. The questioned hair did not originate from Miss Prekop.

Q. Mr. Oakes, again in reference to yourself and Mr. Eubanks, you have your own numbering or labeling system when an item comes in, correct?

A. That's correct, and it may not correspond with the submitting agency. In other words, an F.B.I. agent or State Police or county police or city police may number items one way and then we may change those or just add to that number system, so that we can understand exactly what is questioned, what is known, where they came from, so we can conduct meaningful examinations.

Q. So you indicated, for instance, that the known head hair that was used for comparative analysis -- excuse me -- the head hair that was removed from Exhibit No. 8 was given a number, I believe it is either Q2 or Q3, something of that nature, by the F.B.I., the sheet was given that number, correct?

A. It was given Q3, State's Exhibit 8, the sheet, is our Q3, questioned item number three, and it has no significance other than it is the third questioned item that we listed on our worksheet.

Q. And that number or that letter stays with that head hair, correct?

A. Yes.

Q. As far as you are concerned?

A. It follows it to the pill box and then to the glass microscope slide and then to our record, it will always be referred to as Q3.

Q. And Mr. Perrot's head hair and Miss Prekop's head hair, is it fair to assume they were assigned a letter or number of some sort?

A. Yes.

Q. Without those numbers -- and I am going to ask you to confine yourself to the head hair that was taken off of Exhibit 8 and the known head hair purportedly from Mr. Perrot -- without those numbers, could you tell us today under a microscope which came from Exhibit 8 and which purportedly came from Mr. Perrot?

MR. HAMMERSCHMITH: Objection.

THE COURT: Let me see you at side bar.

(The following conference was held at side bar)

THE COURT: What is Exhibit A?

MR. BLOOM: Exhibit 8. I thought I said 8.

THE COURT: Maybe you did. What is the question again?

MR. BLOOM: I asked him --

THE COURT: Without the numbers.

MR. BLOOM: Without numbers, if, based on his examination of Q3 and the known head hair of Mr. Perrot, without the numbers or letters associated with them, could he tell the difference between them based on the microscopic examination he conducted, and then he objected.

THE COURT: Could he tell the difference between them if he had what?

MR. BLOOM: Could he tell which one came from the bedsheet and which one came from Mr. Perrot's head hair without --

THE COURT: He said they are identical.

MR. BLOOM: I know.

THE COURT: I will sustain the objection.

(End of side bar conference)

Q. (By Mr. Bloom) Sir, have you testified for other than the government before today?

A. Yes, I have.

Q. Can you tell us, sir, were there any variations between Mr. Perrot's head hair and the sample taken from Exhibit 8?

A. There were no significant differences in any of the microscopic characteristics or the arrangement of those characteristics between the questioned hair from the sheet and the known hair standards from Mr. Perrot.

Q. Which in terms of your expertise means what, sir? What conclusion, if any, can you draw from that?

A. That the questioned hair was consistent with having originated from Mr. Perrot.

MR. BLOOM: That's all I have.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. When you say it was consistent with Mr. Perrot's hair, you mean it could have come from Mr. Perrot, correct?

A. That's correct. As I testified earlier, it is either consistent or originated from Mr. Perrot or another individual of the same race whose hairs exhibit all of the same characteristics and arranged in the same way.

Q. It could have been Mr. Perrot's hair, it could have been someone else's hair, correct?

A. No, I can't answer that question with a yes or no. I can't say that that hair could come from someone else, because I would have to have that person's hair and I would have to examine it microscopically, and that also would have to match Mr. Perrot's known standard and the questioned hair. I can't discount the possibility that there is someone else whose hairs exhibit all of these same microscopic characteristics, because I haven't examined everybody in the world's hairs and compared it with their hair standard, so I can't discount that

possibility, but I do not know that that person even exists.

Q. Isn't it established knowledge within your field that hair comparison is not a basis for positive identification?

A. Yes, and that language appears in my F.B.I. laboratory report stating that hairs do not constitute a basis for positive personal identification, they are not like fingerprints.

Q. Yes or no, isn't it true that the reason that it's not a basis for positive identification is because different people can have hair that looks the same under the microscope?

MR. BLOOM: I'm not going to object to the question, but the yes or no I am going to object to.

THE COURT: I'm sure that the witness can decide whether he can answer that yes or no.

THE WITNESS: It is possible for two persons' hairs to match microscopically, yes.

Q. (By Mr. Hammerschmith) In comparing

them, you were not able to exclude Mr. Perrot as being the source of that head hair that you found on the bedsheet, correct?

A. That's correct, I could not exclude him.

Q. And that's what you mean when you say it was consistent, correct?

A. To me, hair associations are the basis of strong association, based on my experience. In the six years at the laboratory, I have worked thousands of cases involving thousands of known hair standards, so when I do in fact associate a questioned hair with a known hair standard, in my opinion, it forms a basis of a strong association, because very rarely do I see known samples from two people that are so alike that I cannot tell them apart, so it is more than just I can't exclude him; I feel reasonably strong about that association or I wouldn't be testifying to it.

Q. You've not done any studies, have you, about the incidence of people with identical hair?

A. No, the Royal Canadian Mounted Police have done studies, I have not.

Q. You have not done studies?

A. No, I have not.
Q. Now, your only experience is based upon the individual comparisons that you have done at the F.B.I.?
A. Yes, and the collective experience of the agents that I work with on a daily basis.
Q. When you are comparing hairs, you are generally comparing one, two or three hairs, small numbers of hairs, correct, with each other?
A. Well, the average case that I work probably involves a hundred items, and on those hundred items there may be literally thousands and thousands of hairs, so each case involves a lot of hairs. It is usually not just one or two items with one or two hairs on those items.
Q. But when you compare them, you are comparing a known -- and the letters that you have on the board -- a Q1 against a K1 normally, correct?
A. That is the final result, yes, it gets down to a one to one comparison.
Q. You first determine whether you've got human hairs and then you may go through those human hairs and compare them each with a known sample, for

example?

A. Basically, yes, sir.

Q. So you do comparisons on a small scale?

A. Ultimately, yes, it is a one to one comparison, it's a large screening process getting to hairs that look generally like known standards and then it is more of a one to one in-depth comparison, yes.

Q. Your experience, you indicated that you got involved in this hair testing while you were working for the F.B.I., is that right?

A. Yes, upon being assigned to the laboratory division.

Q. Where were you assigned before the laboratory division?

A. Indianapolis, Indiana.

Q. What sort of function?

A. As a special agent investigator.

Q. What kind of work do you do as a special agent investigator?

A. General criminal.

Q. And then they sent you to the F.B.I. lab?

A. Yes.
Q. And you got some training there?
A. Yes, as I have testified previously, it was a one-year training period that included classroom training at Quantico, practical examinations, working cases under the supervision of other agents for a year, oral testing and certification by the director.
Q. That was basically an apprenticeship with a couple of courses, correct?
A. That's correct.
Q. And the courses that you took were three-hour credit courses maybe on a college level?
A. I don't know, these are done at the F.B.I. academy which has in affiliation with the University of Virginia. These courses and this training period was not part of that program. I did not do this for college credit, I did this as a job-related training.
Q. I understand. And the only hair testing you have ever done is in connection with your work at the F.B.I., is that correct?
A. Yes, I did not do that prior to my

employment with the F.B.I.

Q. And you have never done research in the area or anything like that, have you?

A. We have a Forensic Science Research and Training Center at Quantico, Virginia, where we have special agents with PhD's who do the research for us and then they meet with us, produce papers, publish papers, and they bring us up to date on the current research that is going on at the academy. I personally do not do research. My time is devoted one hundred percent to case work.

Q. You don't have a PhD, do you?

A. No, I do not.

Q. You haven't done any research at all since you've been with the F.B.I.?

A. No.

Q. Basically, what you do is compare hair, correct?

A. That's correct.

Q. Now, isn't it true that even hairs from the same individual can look different under a microscope?

A. Yes, that's why when we ask for a known

standard, we ask for at least 12 and preferably 25 head hairs. Obviously, there are different looking hairs on your head. For instance, the hairs down here on my head are starting to turn white or gray. If I was to compare that hair with a hair from the top of my head, it would look different, obviously. That's why we get a known standard that consists of more than one hair, so we get the full range of characteristics that might be present in your hair.

Q. When you examined Mr. Perrot's hair, how many hairs did you have?

A. I don't count the hairs, I make sure that it is an adequate known hair sample, and if it is adequate, I would proceed. For me to answer that question, I would have to go back to the slides, look at the slides, count each and every hair, go back to the envelope, look back in there, see what number of hairs are left. Whatever number it was, whatever hairs were there, they exhibited the same characteristics as Mr. Perrot's.

Q. You are not suggesting that all of those hairs exhibited the same characteristics as each other, are you?

A. Certainly not.

Q. And I take it, based upon your practice, you must have had at least 10 hairs of his, would that be fair to say?

A. I would assume that there were probably 10 hairs, yes.

Q. And you picked out one of those hairs or did you test them all?

A. I would test them all. There has to be at least one that is microscopically indistinguishable. The questioned hair has to fall within the range of characteristics exhibited in the known standard and then for me, being a conservative hair examiner, I have to find at least one hair in that known hair sample that I cannot differentiate microscopically. In other words, if I was to mix that hair in with that known hair standard, I could not pick it out as being a foreign hair. There has to be what I consider to be a duplicate hair in there.

Q. So what you are telling us is that one among the hairs that you were given, which was purported to be Mr. Perrot's hair, matched the hair

that was found in the bedsheet?

A. I'm telling you at least one and probably more of the hairs in the known hair standard. Once I find -- once I look at the hairs and they all exhibit or a majority of the hairs exhibit a range of characteristics, then obviously it's not necessary to compare a questioned hair with each of the 25 hairs in the known hair standard. Once I find one that matches, it doesn't matter whether I find two or three or four, it is consistent with having originated from the same source as those known head hair standards. It's not practical or even necessary or feasible to continue comparisons and examinations beyond that point.

Q. When did you do this hair testing?

A. The original testing was done, I believe, in February of 1986.

Q. Do you know how many hairs you went through at that time before you got one that matched?

A. It wouldn't be a large number. I believe there were only two glass microscope slides representing a representative known sample from Mr. Perrot, probably four or five or six hairs on each

slide, so it would be somewhere less than 12. It may have been the first hair I looked at, I don't recall.

Q. You don't recall how many it was?

A. No.

Q. And you reviewed your findings recently?

A. Yes.

Q. And, at that time, how many hairs did you look at?

A. When you say did you review your findings, I reviewed the written report of my findings, I did not re-examine the glass microscope slides. What I found then is in writing, it is what I found then. There is no need to re-examine it.

Q. There was a written report of your findings?

A. Yes.

MR. HAMMERSCHMITH: May counsel approach side bar, Your Honor?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I didn't see the written report.

MR. BLOOM: March 13th and August 4th are the two written reports he is referring to, the only two that I am aware of. Mr. Hammerschmith has had them for months.

THE COURT: Have you had those two reports he is referring to?

MR. HAMMERSCHMITH: There's about two sentences total, it doesn't sound like --

MR. BLOOM: I'm not responsible for the department.

THE COURT: Have you seen the reports that the District Attorney is referring to?

MR. HAMMERSCHMITH: I've seen those reports. I can inquire further. It doesn't sound to me like those are the reports that he is talking about.

MR. BLOOM: Why doesn't he ask him that. Everything I have from the department he's had for months.

(End of side bar conference)

Q. (By Mr. Hammerschmith) Can you describe this written report to us, please?
A. From memory, not in detail, no. I believe it's a laboratory report from the F.B.I. and I believe it is dated March 13, 1986. It contains my hair examination results, basically paraphrasing it, that a brown head hair of Caucasian origin found on the Q3 sheet exhibits the same microscopic characteristics as the known hairs of Mr. Perrot, K6, and is consistent with having originated from Mr. Perrot. Also contained in that report are the seriological results from Special Agent Eubanks.
Q. And that is the only report that was completed in connection with your examination of these head hairs?
A. There was a subsequent report I believe in May of this year, possibly June of 1987, wherein I excluded the victim from being the source of that questioned hair that was found on her sheet, and in that report I said that that hair did not originate from the victim, and I believe I reiterated that it

was consistent with having originated from the defendant.

Q. So the report that you are referring to says about one or two sentences about the hair, correct, the first of the two reports?

A. I believe it is probably three to four sentences and contains at least two paragraphs, the second paragraph being that hairs do not constitute a basis for absolute personal identification.

Q. Is that the only written record that was kept of your examination of these head hairs?

A. There are brief working notes that I prepare that are not made available to the contributor. These are my working type notes wherein I have done my examinations. The only thing that was sent back to the contributing agency, which in this case was the Springfield Police Department, was the report that you are referring to, that I have just discussed.

Q. Do you take pictures through the microscope of the hair comparisons?

A. No.

Q. Where would the hairs be now that you

examined?

A. They are either in the custody of the Assistant District Attorney, Mr. Bloom, or in the evidence control of the Springfield Police Department.

Q. And would the hairs that you examined be in the same state that they were before you examined them?

A. Yes. The examinations that we do, as I indicated previously, are microscopical in nature. As I testified, the hairs are permanently mounted on the glass microscope slide and labeled. They are permanent. They are self-destructive examples that we do, they are there for anyone else to examine, whether it be an imposing expert or whatnot. They have not been altered in any way.

Q. When you returned these to Springfield, would they have been mounted on slides at that point in time, the hairs?

A. Yes. As I indicated, that's what I do before I examine them, is I make permanent glass microscope slide mounts of them. They are not taken apart after that. The hairs are left there and

labeled so that everybody knows that what is fixed permanently on that glass microscope slide is the hair from the Q3 sheet, and that is what is on it and that what is the K6 slide is Mr. Perrot's known hair sample. That way, if anybody wants to examine them, the can do the re-examination. They are to be looked at.

Q. The slide that we are talking about, would that contain more than one hair?

A. It probably contains the white Caucasian origin head hair that I also testified to as having come from the Q3 sheet. It also may contain other hairs that are not suitable for comparison purposes. I believe there were a number of animal hairs on the pillowcase and sheet, and there may have been limb hairs or fragments which I don't compare with known hair standards.

Q. When is the last time that you looked at those slides?

A. In my office when I did the examinations back in February, I believe, of 1986. At that time, I did my examination and prepared a written report which was sent back to the police department. I have

not re-examined those slides since.

Q. So you are testifying from memory of what you saw in February of 1986?

A. From memory and from what I know my criteria is for hair match, yes.

Q. You have drawn on the board I guess what purports to be a strand of hair. Are you suggesting that that is a hair which has been cut transversely or are you suggesting that that is a picture of the whole hair, as one looks at it?

A. I am not suggesting that this is a hair from this particular case, I am just doing this for illustration purposes. The tip of that hair in this diagram would be representative of a hair that has been cut at the tip, yes, perhaps with a scissor cut as opposed to a razor cut.

Q. This part of the diagram here, which you spoke at some length about, is that supposed to represent what a hair would look like if one just pulled it out of the head and stuck it under a microscope?

A. No. If you did that without mounting it in a particular mounting medium, all you would see is

surface characteristics. All you would see is the outside layer, the scales. Because we mount it in a mounting medium that has the same refractive tendencies as the hair, we can look inside the hair. This is not a cross section of the hair, it's not like taking a pencil, chopping it that way and looking down at the tip. If we did that, it would be a circle with the medulla in the middle.

Q. Also, you don't slice the hair lengthwise either.

A. No, we don't touch the hair at all. This is just what we are able to see because of the particular medium that the hair is mounted in. We are able to transmit the light through the hair, focus up and down and see the hair at different layers.

Q. And which characteristics did you evaluate or consider in looking at the hair in this case?

A. All of these.

Q. Can you tell us what those are?

A. The cuticle, cortex, the medulla, the scales, the pigmentation, the size, the shape, the

distribution, the arrangement of the pigmentation, the lack of or prominence or presence or distribution of cortical fusi, ovoid bodies, medulla, whether it was continuous, discontinuous, fragmented, vaculated, opaque, the general diameter of the hair, the length, the shape, cuticle color, thickness.

Q. Let's talk about pigmentation. What do you mean by pigmentation?

A. The size of the pigment granules, the shape of the pigment granules, the prominence of those pigment granules, the distribution of those pigments, whether there is any streaking, chaining, clumping, whatnot.

Q. Is pigmentation the determinate of color in hair?

A. Yes.

Q. Would you expect to see the same or approximately the same pigmentation in the hair of people with the same color hair?

A. What you perceive with the naked eye, you would look around the courtroom and maybe find three or four people who you think have the same shade of brown hair. That's like saying if there's

five people in here with a red sweater on, that all those reds are alike. Well, they may look alike to the naked eye, but if you magnify those fibers 250 to 400 times and run instrumentation with the microspectrophotometer of the dyes that constitute that color, you will see tremendous differences. Unless those garments were manufactured and dyed by the same company within relatively the same time period, even though they all look the same red to you, there is going to be tremendous variations, tremendous differences.

It's the same with persons' head hair. You can look next to you and say he's got the same hair color as I do. It may look the same with the naked eye, but when you magnify it 250 to 400 times, it would be -- the chances of those not being discernible microscopically would be extremely remote, to just randomly pick out a person next to you and not be able to tell those apart under the microscope, at least for a trained microscopist not to be able to tell them apart.

Q. Of course, there are different hairs of different colors in a single person's head, correct?

A. Sure. As I indicated previously, if you're out in the sun, the hairs maybe on the top of your head are going to bleach out a little bit. They are going to look a little different than the hairs in the back of your head or the side. The graying at the temple, obviously those are going to look different than hairs from other parts of your head.

Q. The pigment in those hairs will look different than the pigment in others of your hair?

A. Right. Again, that's why we ask for a sample of hair, a representative sample from different areas of the head.

Q. And if you were going to -- you mentioned comparing different people in the courtroom. If you were going to do that, you would have to compare large numbers of hairs from all of those people, wouldn't you? You couldn't just compare a single person's hair with that of another single person's.

A. I could if you asked me to.

Q. I understand, but what I am suggesting to you is every person in this courtroom probably has hairs with different color pigments in his or her own

hair?

A. I would agree that every person in this courtroom probably has hairs on the head that might vary from another hair on the head. There is probably a range of characteristics on most persons' head hairs, that's correct.

Q. Variation in terms of color, as well, right?

A. Right. That's why when I ask for a known hair sample from an F.B.I. agent in the field or from a Springfield police officer, I ask them not to send me one hair, because if they send me one hair in the temple and it's gray and that person deposited a brown head hair from the top of his head on a sheet at the victim's residence, I would make a false exclusion, I would say hey, these hairs are different, based on this known hair sample which is one fringe hair that is gray. I can't associate it with that questioned hair on the victim's sheet.

THE COURT: I'm going to interrupt, counselor.

Mr. Foreman, ladies and gentlemen, we are going to take the

morning recess.

(Recess taken at 11:45 A.M.)

(Hearing reconvened at 12:50 P.M.)

Q. (By Mr. Hammerschmith) Mr. Oakes, the diagram you have on the board with a circle around it, that is a little deceptive, isn't it? Let me ask you this: The way it is drawn here, it suggests, doesn't it -- you are suggesting that this is -- this would be the known hair sample, this would be the questioned hair sample, is that right?

A. Yes, but as I indicated previously, this is not meant to represent the hairs in this case, necessarily.

Q. I understand that. But what you've done, drawn a line through the middle of a continuous drawing, suggests, doesn't it, that the two hairs fit together like the pieces of a puzzle?

A. Yes.

Q. That, in fact, is not the way it would appear to you, is it, if you asked this?

A. That's the way it appears to me when I make a match, when I arrive at a conclusion that a questioned hair and a known hair sample match, that's what I see.

Q. For example, you've got this little squiggly line down here at the bottom, all right? Now, the way you have this line drawn through here, you have part of that squiggly line here, picked up on the other side of the line, as if it was uninterrupted. Now, that's not accurate, is it?

A. It could be made to do that by just moving the slide stage back and forth until you did have a type of a connection. But, no, generally it's not meant to represent that. What it should look like is the same coloration in the cuticle, the same thickness, the same scale length, the same scaling protrusion.

Q. What you are suggesting is you see the same things over here as you see over here, not that there is a continuation from one to the other?

A. No, but it will look like one hair split

down the middle when I arrived at a matched conclusion.

Q. But if you cut it, for example, here, you might have it cut here and then pick up over here or something like that, is that right?

A. Yes.

Q. So they don't really fit together like the pieces of a puzzle in that sense, do they, the hairs that you looked at?

A. Not exactly as you have indicated, but they will look like the continuation of one hair cut or separated in the middle.

Q. They look the same on one side as the other?

A. Yes, as I tried to indicate in my diagram.

Q. And in determining whether they look the same on one side or the other in evaluating these factors that you have, there is judgment involved, isn't there?

A. Certainly.

Q. And it is, in a sense a subjective determination, because it depends upon how the

examiner looks at it?

A. Yes, it is a learned skill based on years of training and experience, yes.

Q. And even among experienced examiners, different examiners may look at hairs differently, correct?

A. That is possible, yes.

Q. And in this particular case, the only hairs that you compared with the hair found on the bedsheet were hairs of Mr. Perrot and Miss Prekop, correct?

A. That's correct.

Q. You didn't compare hairs from any other source with that single hair that you had from the bedsheet, did you?

A. No.

Q. And the conclusion that you reached after doing so was that the hair could have originated from Mr. Perrot, is that correct?

A. Could have or, stated another way, is consistent with having originated from him.

MR. HAMMERSCHMITH: Thank you very much.

MR. BLOOM: That's all I have, Your Honor.

THE COURT: Thank you, sir, you can step down.

(Witness steps down)

MR. BLOOM: The Commonwealth is going to rest at this point.

THE COURT: Mr. Foreman, ladies and gentlemen, we will recess for lunch. I will ask you to be back shortly before 2:00.

I will see counsel for just one moment.

(Whereupon, the jury was removed from the courtroom)

THE COURT: Have you seen a copy of this motion, counselor?

MR. BLOOM: Just now, yes, Judge.

THE COURT: First of all, with regard to indictment -- I have before me

Defendant's Motion for Required Finding of Not Guilty. With regard to indictment number 85-5422 charging assault with the intent to rape Emily Lichwala, my inclination there is there has been no evidence that supports that.

Do you want to be heard, Mr. District Attorney?

MR. BLOOM: I would say this, Judge. I felt that basically that there was an assault that took place in the home, and I don't believe -- and I will be honest with you, I may be mistaken to what the law basically carries -- I think this is kind of an unusual set of circumstances in reference to the normal scenario that you usually have placed in front of you in reference to this type of charge, and I'd be the first to say that on the record.

I would indicate that her testimony in reference to the fact that she heard a yanking on the door, which

was the door that leads up from the cellar, then she heard someone walking down the cellar steps, the fact that we know now that a pool cue that was in place down in that cellar area was taken down by the assailant and used in some capacity to gain entrance. Ultimately, when this person came in, Mrs. Lichwala is still in the house, there is a breaking of the glass, and due to the fear from the combination of these events, she leaves.

I believe, in light of what I understand the assault to mean, that she was assaulted. I think that the activities, all those activities taken together, can constitute an assault in reference to how it is defined in the Commonwealth of Massachusetts.

The intent to rape, Judge, I would only say this: That in terms of the time span, you have in front of you the following: You know Mr. Perrot

lives in the neighborhood, you can infer he would be familiar with these locations; both of the women are elderly; both homes are entered forcibly and not -- there isn't a grave distinction between the manner in which they were entered; Mrs. Lichwala's call comes in at about 3:30; after everything happens to Miss Prekop, her call comes in at 4:00.

I think you can infer from that -- it's not too much of a jump to infer from those factors that the assailant left the Lichwala home, went to the Prekop home immediately, took whatever time that was necessary -- and you heard there was a few minutes in which there was an initial series of sounds in which a perpetrator was attempting to break in, and then, ultimately, he was successful in breaking in, and then raped Miss Prekop.

I think from that, only

because, Judge, of the likeness of which the two incidents occurred and the time frame and, thirdly, the fact that Miss Prekop was raped, that the intention of the person at the time of the break-in at about 3:30 at the Lichwala residence, less than a quarter of a mile away from the Prekop residence, was to rape her, based on what happened to Miss Prekop.

And I recognize and I appreciate the fact that normally this isn't the type of scenario placed in front of you in reference to that type of charge, but that is the theory, Judge, under which we are proceeding.

THE COURT: As far as evidence of intent to rape on Mrs. Lichwala, I feel there is -- the jury would have to speculate to that aspect of it. I will allow the motion with regard to the assault with the intent to commit rape of Mrs. Lichwala, which is indictment number 5422.

With regard to the armed robbery of Mrs. Lichwala, indictment number 5423, I will hear you on that, Mr. District Attorney.

MR. BLOOM: Again, Judge, I think that -- my understanding of the armed robbery statute, one of the elements that is an alternative is placing a person in fear through the use of violence, and taking the property in that method.

THE COURT: Wait a minute, you've got to have the possession of dangerous weapon.

MR. BLOOM: Yes, I understand that, that is the first portion I'm talking about. I think, in this case, first of all, without question, the woman was placed in fear by a series of events -- more particularly, if you want to generalize it, an attempt to break into her home at 3:30 in the morning. We know now from her testimony that the

first sound she heard, which I think is very important on this, was downstairs -- that is important -- supported by the fact that Cheetham testified and showed you a picture that is in evidence of how that person, which we believe is the defendant in this case, got downstairs, by yanking out the vent in the basement, which Mrs. Lichwala indicates, once you go through that window, gives you access to the laundry room and the room in which the pool cues are located.

After she came upstairs, that person came upstairs, and she indicated, Judge, for the record, that that door she had deadbolts on. She heard a yanking. Then she said she heard the person go back down the stairs. I believe her testimony was initially, at that time, I thought I was dreaming, I wasn't sure.

Then, later on, when we talk about a different entrance into the

kitchen from a different door, she indicates she hears a breaking of glass, at that time she recognizes she is not dreaming, and she leaves.

Whomever it was, Judge, down there, Mrs. Lichwala testified the pool cue wasn't in the kitchen, it was downstairs in the rack next to the pool table with the rest of the pool cues. Whoever took that vent out and went downstairs -- and Mrs. Lichwala wasn't dreaming, someone came up those steps and back down again, and someone came around the other way and broke the glass and kicked the door in. That person had a pool cue. A pool cue could be considered a dangerous weapon. A pool cue was found inside the house. And we know that her pocketbook was taken by the intruder and dumped somewhere between her location and Malibu Drive, as specified by Sergeant Kelly.

I think, Judge, all the

CITY 003011



elements are there. The ability to take this property from this woman was accomplished through fear, force and violence by the activity that led up to her being so scared, and she said I was scared for my life, I ran out into the street, across the street to my neighbor.

And there is evidence, I would respectfully submit to you, from which a reasonable and rational trier of fact could infer that that pool cue was brought upstairs, based on what Mrs. Lichwala said, by the intruder, and the force and violence associated with the breaking of glass and the yanking on the door and all the other noises that were heard produced a scenario of violence, force, intimidation that caused this woman to leave and surrender her property and allowed the intruder to be able to take that property and carry it away.

So that would be the theory, Judge. I think the elements are there for an armed robbery.

THE COURT: What about the armed robbery of Mary Prekop?

MR. BLOOM: I don't -- I would submit to you, Judge, there is either an armed robbery or an unarmed robbery there, and I would leave that to your discretion. There was some evidence that Miss Prekop indicated that once she hit him with a stick, that he took the stick in one hand and took her with the other hand and pushed her down the hall and then threw her on the ground, and after she was on the ground, threw the stick on the bed.

I don't think it would be unreasonable that you can infer from that that the stick was held in a menacing manner during that brief period of time, even though it may have been a few seconds, and the Court can find that

that is sufficient, at least under the facts, to find there was an unarmed robbery.

THE COURT: Taking the evidence with regard to Mary Prekop, taking the evidence in the light most favorable to the Commonwealth, her testimony was that she had the stick and she struck the intruder in the head because she couldn't strike him around the feet because the dog was in the way, if I recall.

MR. BLOOM: That's correct.

THE COURT: And that the intruder took the stick away from her, and her other further testimony was that he threw the stick on the bed, and I think there's pictures in evidence of that stick on the bed.

MR. BLOOM: There is.

THE COURT: Based on that, I would allow the motion with regard to the armed robbery of Mary Prekop, deny it

with regard to -- I will allow it to go to the jury on the issue of unarmed robbery.

MR. BLOOM: That is number 5415, Your Honor?

THE COURT: Right, 5415.

MR. HAMMERSCHMITH: Could I just be heard briefly with respect to the robbery issue, Your Honor?

THE COURT: Okay, I am going to hear you on any of these others that you want to be heard on, but I want to get through the ones that I think don't require any argument.

Now, with regard to the armed burglary of a dwelling house of Mary Prekop, it seems to me we are dealing with the same thing there, aren't we?

MR. BLOOM: No, Judge, all you need is, once you have a breaking and entering, is to have an assault. She certainly was --

THE COURT: I know you have the

assault, but you've got it while armed, he is charged with assault while armed.

MR. BLOOM: No, if you read that statute, Judge, that is a misnomer, that armed burglary statute, you don't have to be armed.

THE COURT: There is another statute that calls for breaking and entering and assaulting. I agree there can be an assault, but I'm talking about that provision of your indictment that says while armed.

MR. BLOOM: Well --

THE COURT: It may be a lesser included.

MR. BLOOM: Maybe I don't understand the statute that well, but my understanding of the armed burglary statute, and I think it is 266-14 or 16 -- I think it is 14 --

THE COURT: I know, I have looked at it.

MR. BLOOM: It's a misnomer, it

gives the alternative -- in order to establish the elements, the Commonwealth, under that statute, we can establish or satisfy, as I understand that statute, show a breaking and entering in the nighttime and an actual assault on an occupant lawfully therein, and that is the portion of that statute we are proceeding under.

THE COURT: But that's my point, that you don't have to find the element of him being armed.

MR. BLOOM: No, you don't, but it's the same statute, and I think on the theory of the beating that occurred after the breaking and entering, that should go to the jury under that theory.

THE COURT: Okay, but the specific indictment talks about either arming himself when he went in or arming himself when he got in. Do you want that as an element of your proof?

MR. BLOOM: No, I have no problem,

Judge, I will amend that at this point, but I think we have presented a case under that statute in which the elements have been met.

THE COURT: I'm just talking about the armed section of it. Okay.

Right now I am going to go to lunch. I will hear you at 2:00.

MR. HAMMERSCHMITH: Do I understand, then, that those are the actions -- that the remaining indictments you will want to hear from me about when you get back?

THE COURT: Right.

(Luncheon recess taken on 1:05 P.M.)

(Hearing reconvened at 3:00 P.M.
The defendant and jury were present.
Mr. Yelle standing in for Mr. Bloom)

THE COURT: I seem to spend a great deal of my time apologizing to you for delays, but over the noon hour an emergency arose and it was the type of emergency that we just could not ignore. It required us to just stop things at this point and we are not going to be able to take them up again until tomorrow morning at 9:30, so I am going to excuse you for the day, and I apologize, but, believe me, it is unavoidable. I can't give you any further explanation than that, other than it is an unavoidable emergency.

So we will recess for the day, as far as the jury is concerned, and again I instruct you there is to be no discussion among yourselves about the case until you get it for decision, no

discussion with anyone outside the courthouse about the case, for all the reasons that I have given you, and again I am imposing the obligation on you to avoid all the publicity about the case in any form, be it newspaper articles or any news reports or radio or television, whatever they might be, again, because you've got to decide the case based on the evidence presented to you during the trial and on no other basis.

With that, I will say good afternoon to you.

(Hearing suspended at 3:05 P.M.)

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm