**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 12

CITY 002731

C O M M O N W E A L T H OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 11, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME V

CITY 002732

# I N D E X



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BEVERLY DALY | 25 | 40 | | |
| NANCY WESTCOTT | 53 | 61 | 71 | 74 |
| GEORGE PERROT | 78 | 106 | 132 | |
| SGT. THOMAS KELLY (Recalled) | 135 | 138 | 145 | 146<br>147 |

(The following lobby conference convened at 9:35 A.M. Counsel were present)

MR. BLOOM: I thought I should tell you that when I got back yesterday -- I went home and I came back here and I was here from 4:00 to 6:00 or 6:15 -- and Lieutenant Mace was waiting for me, indicated that an individual by the name of Michael LaRose had come in, the exact time yesterday I don't know, came in for some other reason, defendant, criminal record. I don't know what kind of case it is. He's got some cases pending, I'm sure, up here.

He told Lieutenant Mace that he was friendly with Perrot -- and, again, I didn't interview him -- while he was in the jail with him, that he was familiar with him and friendly with his girlfriend, I thought he said her name was Lisa -- that's what Mace said, but I may be wrong -- told me that his

girlfriend has since moved to Florida -- again I don't know whether that's true or not -- said that while he was down there he had conversations with him and this kid admitted to him committing these crimes.

I have no intention of putting him on, obviously, at this point, but I don't know whether the defendant's going to take the stand and whether it may be something that may come up on rebuttal, so I thought, in fairness, he ought to know about it now, talk to Perrot, decide whether he was going to use him or not. That's it.

THE COURT: Okay.

MR. HAMMERSCHMITH: I don't know anything about Michael LaRose, who he is, whether he's represented by my office or anything else about him.

MR. BLOOM: Lauro is his lawyer, I do know that much, Phil Lauro is his lawyer.

Again, I didn't talk to him, I wasn't here when he came in. I found out at about 4:00 yesterday, between 4:00 and 4:30.

MR. HAMMERSCHMITH: Well, my expectation would be that George would take the stand, but I don't know anything about this person, what he would say, what his background is, what his criminal record is. I haven't had any time to prepare for this particular witness.

THE COURT: Well, if the defense -- if the prosecutor intends to use him, you will have the weekend, we'll get you access to the records. Okay.

At any rate, what I intend to do, I want to finish the motion for a required finding, then I am going to have to go to a sentencing in Mr. Sergienko's case, then we will go back to the trial, all right?

And from what you tell me, we

are not going to get this case to the jury till Monday morning, that's the way it would appear now. Have you got any requests for instructions?

MR. HAMMERSCHMITH: I have some, yes.

THE COURT: You better get them to me.

MR. HAMMERSCHMITH: I take it we will have a charge conference at some point.

THE COURT: Yes, but I want to do it today, if we can do it.

MR. BLOOM: I do have a motion to amend on one of the indictments. I will give it to you when we get out in the courtroom.

THE COURT: Okay, let's handle it that way, all right.

MR. HAMMERSCHMITH: I need to speak with George, I haven't told him about this at all.

THE COURT: What you are going to

have a chance to do is, after the motion for require finding -- complete that, and I am going to have to interrupt this case, because I have to go to the Sergienko sentencing.

(End of lobby conference)

(Hearing convened at 9:50 A.M. The defendant was present. No jury)

THE COURT: I think, at this point, I was going to hear from the defendant with regard to the motion for required finding.

MR. BLOOM: Judge, can I give you 85-5420, which is just a motion I filed to amend? If I could be heard later, after defense counsel is finished. I have given a copy to Mr. Hammerschmith.

THE COURT: On the motion for

required finding, I have already acted on -- my recollection is I have already acted on the assault with intent to commit rape on Emily Lichwala, and I have allowed it, is that right?

MR. BLOOM: And 5415, Judge.

THE COURT: And I said that that would go to the jury on the basis of unarmed robbery.

MR. BLOOM: Yes, that is 5415.

THE COURT: Right.

THE COURT: Okay. Where do you want to start?

MR. HAMMERSCHMITH: I believe you also acted on 5420 to the extent of the amendment we have here, but -- if I could start with the Lichwala amendments. I think it's probably easiest --

MR. BLOOM: Prekop was amended, not the -- -- that is a Prekop --

MR. HAMMERSCHMITH: That's right. If I could start with the Lichwala

indictments, I think that would be easiest.

THE COURT: Well, we've got --

MR. HAMMERSCHMITH: I believe there are three of them.

THE COURT: Armed burglary and -- well, we have already gotten rid of one. Lichwala is 5422, so we got rid of that. We've got 5423 which charges armed robbery.

MR. HAMMERSCHMITH: That's correct, and --

THE COURT: 5425 charging armed burglary or assault on a dwelling -- burglary and assault on a dwelling.

MR. HAMMERSCHMITH: It's my mistake, there are two remaining indictments, not three.

THE COURT: Start with the armed robbery where the alleged victim is Emily Lichwala.

MR. HAMMERSCHMITH: I think it's easiest, sir, for me, addressing it, to

talk about the issue of whether he was armed and the issue of whether there was an assault that was done. If I may, I think both of those issues are common to the two indictments.

THE COURT: Okay.

MR. HAMMERSCHMITH: My understanding and recollection of the evidence with respect to Mrs. Lichwala was that, essentially, she heard noises which I think could be inferred to have been the noises of someone breaking into her house. At some point, she heard a specific noise, the rattling of the chain on the door between the kitchen and the breezeway, which again I think would have to be associated with an effort by someone to break into the house.

Upon hearing that, as I understood the evidence, she basically ran out of the house, although I think she may have stopped someplace in

between to pick up some items, I think that's what she seemed to suggest, and then went out of the house at the other end. She did not see the intruder, she did not hear any words spoken by the intruder.

THE COURT: What are you suggesting I do with that charge of armed robbery?

MR. HAMMERSCHMITH: I think for armed robbery one has to have an assault --

THE COURT: What are you suggesting I do with the charge?

MR. HAMMERSCHMITH: I think it should be reduced to a larceny.

THE COURT: I agree. Do you want to be heard?

MR. BLOOM: You want him to go through them all?

THE COURT: Okay. I agree with you on that. Now, with regard to 5425 --

MR. HAMMERSCHMITH: That is a --

THE COURT: I think that should be

CITY 002742


reduced to burglary.

MR. HAMMERSCHMITH: Breaking and entering in the nighttime with intent to commit a felony.

THE COURT: A dwelling, which is burglary.

MR. HAMMERSCHMITH: That would be my understanding, as well.

THE COURT: We are in agreement on those two, okay. I just don't want -- I certainly recognize your right to argue, but I just want to let you know what I have done with these and perhaps save some time, okay?

Now, do you want to be heard on those two at this point, counselor?

MR. BLOOM: No, I'll just let him finish, Judge. I don't know if I'm going to be heard on anything. I'm going to see what you're going to do first. I may not have anything to say.

THE COURT: Now, with regard to assault and battery, 5417, on Mary A.

Prekop.

MR. HAMMERSCHMITH: I think the assault and battery charge as well as the indecent assault and battery charge are, in effect, lesser included offenses of the aggravated rape that is charged, and I think at this point in time it probably doesn't matter whether they all go to the jury, although I think if verdicts of guilty were returned on all of those, I think the indecent assault and battery should be stricken as duplicative as lesser included offenses.

THE COURT: All right, so we've got the assault and battery on Mary Prekop, we've got 5416, which deals with indecent assault and battery on Mary Prekop.

MR. HAMMERSCHMITH: My feeling with respect to that is the same as with respect to the assault and battery.

THE COURT: That it is contained within the -- it is one offense.

MR. HAMMERSCHMITH: Yes.

THE COURT: And with regard to the aggravated rape on Mary Prekop, charge of aggravated rape on Mary Prekop, I think that should stand.

MR. HAMMERSCHMITH: The only reservations I have with respect to that, the indictment itself does not specify the aggravating circumstance. I would suggest to the Court that there has been, obviously, no evidence of joint enterprise --

THE COURT: I think it would have to be either robbery or burglary.

MR. HAMMERSCHMITH: That's correct. I would suggest to the Court there's been no evidence of serious bodily harm as an aggravating circumstance.

THE COURT: Well, I will hear from the District Attorney on that one, but it is certainly robbery and burglary I think fall within the definition which would convert it to aggravated rape.

MR. HAMMERSCHMITH: That would be my understanding, yes.

THE COURT: Okay. Now, I have already acted on the armed robbery with regard to Mary Prekop.

MR. HAMMERSCHMITH: With respect to the robbery, Your Honor, I think there is something in addition that I would like to say.

THE COURT: Go ahead.

MR. HAMMERSCHMITH: And that is that the sequence of events that we seem to have is that there is a break, an entry, an assault and rape, and at some point afterwards, it seems like it is at some point afterwards, based on evidence from Miss Prekop, I believe her testimony suggesting that nobody was inside the house until very, very briefly before she went into the kitchen, the kitchen being the means of entry. I think that we have a situation here which may fall within the Moran

CITY 002746


case where it appears that the taking of property, if there was taking, I think there was some question about that, but --

THE COURT: I think the evidence, as far as the taking goes, I think the evidence was that, again taking it in the light most favorable to the Commonwealth, that a dollar bill plus a change purse -- I think that was Mary Prekop's testimony, a dollar bill plus a change purse was missing.

MR. HAMMERSCHMITH: I think that's what she testified to. There was later testimony by Ms. Popko which suggested otherwise, but that goes to credibility.

THE COURT: Well, at any rate, I think the jury has to make that decision --

MR. HAMMERSCHMITH: That's right.

THE COURT: -- whether anything was taken. Go ahead.

MR. HAMMERSCHMITH: But my

understanding is that in a situation where a taking is merely an afterthought to the assault, the assault cannot be said to be an assault with intent to steal and, therefore, the situation cannot be said to be a robbery.

In other words, what we have here is a breaking, an assault and rape, and then at some point after that it appears money is taken, apparently -- perhaps on the way out, I don't know -- and I would -- there is no evidence, I think, to suggest that the assault that was undertaken was an assault with intent to steal. That would be the basis for my request with respect to that instruction.

THE COURT: Again taking the evidence in the light most favorable to the Commonwealth, Mary Prekop testified that she confronted this man in the kitchen, she started to strike him, he took -- after he broke into the house,

there is sufficient evidence of breaking -- he took the stick away from her, assaulted her, and when she got up, she found the pocketbook had been rifled. I think the jury has to decide whether this is all one continuous act. Certainly the assault would constitute the required assault for robbery, assuming the jury doesn't find that there is a lapse.

I intend to instruct the jury with regard to 5415 on the lesser included of larceny, but I think it is a jury question, a question the jury has to decide, was there a termination of -- I'm going to let it go on that basis, counselor, because I think there is sufficient evidence on the Commonwealth to get to the jury on the unarmed robbery.

MR. HAMMERSCHMITH: My point was simply that there is no showing that the assault -- and clearly there was an

assault -- was an assault with intent to steal.

THE COURT: Well, there was an assault and there is evidence of an assault and there is evidence of a rape and there is evidence of a stealing, so I think that is the -- the jury is going to have to decide whether it was a separate larceny or whether the assault was a combined assault for the purposes of rape and robbery.

MR. HAMMERSCHMITH: I understand the Court's position.

THE COURT: Are we all set now?

MR. BLOOM: I think we are, Judge. Just can you go through them again and let me understand what your position is on them, and maybe I don't have anything to say, okay?

THE COURT: I'll try. 5415, which is the allegation of armed robbery on Mary Prekop, is going to go to the jury on the question of unarmed robbery with

a lesser included of larceny. 5416, which charges indecent assault and battery on Mary Prekop, will go to the jury in that form. 5417, which charges assault and battery on Mary Prekop, will go to the jury. 5418, which charges aggravated rape on Mary Prekop will go to the jury. Right now it would be my intention to say that the underlying felony would be either or -- either both or one of robbery or burglary, all right?

MR. BLOOM: Correct. I think unarmed robbery and armed burglary are both stated in the --

THE COURT: Within the statute for aggravated rape.

MR. HAMMERSCHMITH: Correct.

THE COURT: 5420, which charges burglary and assault on a dwelling, will go to the jury on the basis of burglary and assault in a dwelling.

MR. BLOOM: All right, I'm all set,

because I know what your position is on the two with Lichwala, I don't have anything to say.

THE COURT: Okay.

MR. BLOOM: Judge, in light of the amendment, it could be just whited out, that portion. I didn't change the indictment, I just took out the part that dealt with a dangerous weapon, which still the indictment as you have had it contains the other form of that burglary assault on an occupant section.

THE COURT: Have you seen that, counselor?

MR. HAMMERSCHMITH: I have seen the motion, which was filed by Mr. Bloom this morning.

THE COURT: The motion to amend?

MR. HAMMERSCHMITH: Yes, I have.

THE COURT: Do you have any objection?

MR. HAMMERSCHMITH: I believe that that encompasses what Your Honor

indicated yesterday. I assume it can be done by whiting out.

MR. BLOOM: That's what I would suggest also.

THE COURT: I think that the indictment itself, as it reads now, contains the wording of the statute, I'm going to read the statute, I'm going to tell them what the Commonwealth is alleging in this case, that it was a burglary and an assault on a dwelling, and that's what they are going to have to find.

MR. BLOOM: I will tell you what the problem is, Judge. The wording in the statute, it's a disjunctive in the statute, but in my indictment --

THE COURT: I'm just going to read them that part of the statute that deals with assault.

MR. BLOOM: My indictment makes it sound like that's an element that has to be proved, the dangerous weapon. Of

course, we know that's not so. That's why I thought it would make more sense to just white out a copy than attach that to your verdict, because I think it is misleading the way it is stated right now, and I think that is a problem that you brought up yesterday, that it is a disjunctive, but the word in here may be arming an element, which I attempted to take out by whiting it out through the motion to amend. I don't think counsel objects to having it go that way, whiting it out.

MR. HAMMERSCHMITH: My understanding of the indictment was that it was pleaded in a form which goes beyond that required in statute, because it was pleaded in the conjunctive, as I read it, but my understanding is that the language referring to being armed is essentially surplusage (sic) and I have no objection to it being deleted.

THE COURT: Very well, we will do

it that way.

MR. BLOOM: Are you going to do the sentencing now, Judge?

THE COURT: Okay, gentlemen, anything further before we get back to the trial?

MR. HAMMERSCHMITH: The only thing I would say at this point, I don't intend to make an opening statement, I'd just advise the Court of that at this time.

THE COURT: Very well, then. As soon as I get through the sentencing, we'll go back to the trial.

(Recess taken at 10:10 A.M.)

(Hearing reconvened at 10:50 A.M. The defendant and jury were present)

THE COURT: Good morning, ladies and gentlemen.

Counselor.

MR. HAMMERSCHMITH: Thank you, Your Honor.

The defendant would call Beverly Daly to the stand.

Beverly Daly.

BEVERLY DALY (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Could you state your name, please?
A. My name is Beverly L. Daly.
Q. Could you spell your last name, please?
A. D A L Y.
Q. Are you related to the defendant, George

Perrot?

A. Yes, I am, I'm his mother.

Q. I'm going to draw your attention to Saturday morning, December 7, 1985. At some point on that morning, did you learn that your son was being held at the -- had been arrested?

A. Yes, I did.

Q. How did you learn of that?

A. My daughter phoned me about 3:30 in the morning, quarter of four.

Q. What did you do after being phoned with that information?

A. I immediately got up and got dressed and went over to her house.

Q. To whose house?

A. To my daughter's house.

Q. Where would that house have been?

A. 87 Malibu Drive.

Q. When you got there, what did you do?

A. Well, I found out that my son had already been arrested and he had already left the house. It was about 4:00 in the morning.

Q. At some point in time, did you call the

police station?

A. Yes, I waited about a half an hour and then I called down there and they told me he wasn't there yet.

Q. Did you call back later?

A. Yes.

Q. How much later did you call back?

A. About -- it must have been about 5:30.

Q. That's 5:30 in the morning?

A. Right.

Q. What did you say when you called the station at that time?

MR. BLOOM: I'm going to object to the conversation, Judge.

THE COURT: I'll see you at side bar.

(The following conference was held at side bar)

THE COURT: What do you expect her testimony to be?

MR. HAMMERSCHMITH: I expect her to testify that she asked if she could come

down and see her son, and she was told that she could not at that time.

THE COURT: How is that relevant?

MR. HAMMERSCHMITH: I think it goes to the voluntariness of the confession, the fact that her son was kept without --

THE COURT: Wait a minute now. You think he's got a right to receive phone calls while he's at the jail?

MR. HAMMERSCHMITH: He is a seventeen-year-old boy and I think that one of the circumstances that can be considered by the jury is whether or not he was able to see his mother or his mother was able to see him.

THE COURT: I'll let you -- the question did you ask to talk to your son, allowed to talk to your son, but I won't let you go any further than that. I don't think she can repeat the conversation she had with some cop that we don't even know about or some

telephone operator.

MR. HAMMERSCHMITH: What happened was they told her to call back later and she called back and she was again told she couldn't see him, and she finally was told in the afternoon that she could come down and see him.

MR. BLOOM: It's hearsay, isn't it, Judge?

THE COURT: At any rate, I think you can get the information that she called -- this is the second phone call, right?

MR. HAMMERSCHMITH: Yes, there are three altogether or four.

THE COURT: She called once and was told he wasn't there. That's in. She called this time, did you ask to talk to your son -- not to see him, but --

MR. HAMMERSCHMITH: I think she asked to see him.

THE COURT: On the telephone?

MR. HAMMERSCHMITH: No, if she

could come down and see him.

MR. BLOOM: Well, the problem, Judge, is now we get into -- what are the police policies subsequent to arrest and all that stuff, and what is the relevance? Plus isn't it hearsay, the conversations?

THE COURT: Yes, it is. I think your question was did you ask to talk to him, the second phone call, not did you ask to --

MR. HAMMERSCHMITH: I think it might -- I thought my question was more open-ended than that.

THE COURT: Well --

MR. HAMMERSCHMITH: I think it's part of the totality of the circumstances surrounding the alleged confession.

THE COURT: I will let her say what she said. She can testify as to what she said when she made the phone call, and if you want to follow it up with

were you allowed to or did you go, I will let you take it that far, but I'm not going to let you get into any conversation with the telephone operator or some unknown cop.

MR. HAMMERSCHMITH: I'm not intending to offer anything with respect to truth or falsity of what was said, it's just an offer of utterances as to I asked to come down, I was told no.

THE COURT: Well, you're answering for the truth of the matter that no one was allowed to see him until they got a confession from him, that's what you're trying to prove, isn't it?

MR. HAMMERSCHMITH: I think that is inference that can be drawn.

THE COURT: That's what you're trying to prove?

MR. HAMMERSCHMITH: Yes.

MR. BLOOM: Judge, the problem with it is I think we all know, the three of us, that in a situation like this, they

CITY 002762


don't let phone calls come in. You get a right to a phone call, and if that is the normal --

THE COURT: I'm going to let him get the evidence in that she tried, I will let you get that in. Now what you want to do to follow that is up to you.

(End of side bar conference)

Q. (By Mr. Hammerschmith) Mrs. Daly, I was asking you about the second time that you called the police station that morning. That was about 5:30 in the morning?

A. Around there, I'm not quite sure of the time.

Q. When you called the police station, you made a request, did you?

A. Yes, I asked if I --

Q. What was the request that you made?

A. I asked if I could come down and see George.

Q. Were you in fact -- strike that. After

that conversation, did you in fact go down to see George?

A. No, I didn't, they told me that I --

MR. BLOOM: Objection.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) As a result of what the police told you, did you call back to the police station later?

A. Yes, I did.

Q. What time was it when you called back to the police station again?

A. I think it was around 8:00.

Q. You're talking about 8:00 in the morning or the evening?

A. In the morning.

Q. Would this still be the morning of December 7th?

A. Right.

Q. When you called that time, did you make a request?

A. Well, I asked if I could see George at that time, and they said that --

MR. BLOOM: I'm going to object to

what he said or they said or --

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) Were you allowed to go to the station to see him at that time?

A. Yes, I could have gone at that time, they said bail had just been set on him.

Q. What time of day was that?

A. Around 8:00 in the morning.

Q. Did you in fact go down to the station to see him then?

A. Not at that point, because I had to go to work.

Q. What time did you have to be at work?

A. I had to be to work around quarter of nine.

Q. What is the next -- at some point, did you go down to see George?

A. Yes, I did.

Q. When did you see George?

A. After work, around -- it was about 5:00, 5:30.

Q. And that would have been on December 7th?

A. Right.
Q. This is 5:00 or 5:30 in the afternoon?
A. In the evening, yes.
Q. When you saw him, where was he?
A. Well, they brought him into a little room off to the right, it was just a little cubbyhole like where I went in to see him and talk to him.
Q. Were you alone when you went in to see him?
A. No, my daughter Nancy and my son's girlfriend Lisa was with me.
Q. When you say your son's girlfriend, which son are you referring to?
A. George.
Q. So there were three of you that went to see him at that time?
A. Yes.
Q. And that was about 5:00 or 5:30?
A. Around there, yes.
Q. And when you saw George, did the three of you see him together?
A. Yes.
Q. Was there anything between you and

George as you spoke when you saw him?

MR. BLOOM: I'm sorry, I didn't hear that.

THE COURT: You mean anything blocking your view, is that what your question is?

MR. HAMMERSCHMITH: Any partition or anything else of that nature?

THE WITNESS: Yes, there was a partition. It was like a little glass window.

Q. (By Mr. Hammerschmith) Were you able to see George?

A. Yes.

Q. Were you able to hear George?

A. I couldn't hear him that well, 'cuz he was very upset and hysterical, but we could communicate back and forth.

Q. I'm going to ask you to keep your voice up.

Now, when you saw George that afternoon, did you notice anything out of the ordinary with respect to his physical appearance?

A. Well, he was very hysterical, he wasn't acting himself.

MR. BLOOM: I'm going to object and ask that that go out as not being responsive. He asked for his physical appearance.

THE COURT: I will sustain it. You want to rephrase the question.

Q. (By Mr. Hammerschmith) When you saw George that afternoon, was there anything out of the ordinary about the way he looked to you? Not the way he acted, but the way he looked to you?

A. He looked like he had been drinking or on drugs or something. He wasn't himself.

Q. How was he dressed when you saw him?

A. He had on a jacket and I believe jeans or corduroys. No shirt.

Q. What did he have on under his jacket?

A. He didn't have no shirt or anything on.

Q. At some point in time, were you able to see under his jacket?

A. Yes.

Q. Can you tell us how that happened?

A. Well, he kept telling me that --

MR. BLOOM: Objection.

THE COURT: Sustained.

THE WITNESS: I don't know how to put this. He kept trying to tell me that --

MR. BLOOM: Objection.

Q. I'm not asking you what he told you, I'm just asking -- you said he was wearing a jacket?

A. Yes.

Q. At some point, you saw underneath the jacket?

A. At one point, he opened his jacket.

Q. And what, if anything, out of the ordinary did you see when he opened his jacket?

A. His chest was all scratches and bruises.

Q. What about his emotional state when you saw him? Was there anything out of the ordinary about his emotional state when you saw him that afternoon?

A. Yes, he was very emotional.

Q. What do you mean when you say he was very emotional?

A. He kept repeating himself and saying things over and over again, like they are blaming me for --

MR. BLOOM: Objection.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) Was he speaking in a normal tone of voice?

A. No, he wasn't.

Q. What was abnormal about his tone of voice?

A. He was very hysterical when he was speaking.

Q. He was very --

A. Hysterical.

Q. Was he talking quietly?

A. No, he wasn't. He was yelling and blurting the words out. I couldn't make out what he was saying half the time.

Q. And this was at what time?

A. Approximately around 5:30, 5:00.

Q. On December 7th?

A. Right.

MR. HAMMERSCHMITH: Thank you very

much, ma'am.

CROSS EXAMINATION BY MR. BLOOM:

Q. Mrs. Daly, just so we understand you on one point, I believe you indicated that around -- somewhere around 4:00 of 4:30 in the morning on December 7th you arrived at Malibu Drive as a result of a phone call to your house?

A. That's right.

Q. And sometime around that, whether it was 4:30 or quarter of five, within a short time after you got there, you called the Springfield Police Department, correct?

A. Correct.

Q. And the first time you talked to them, whoever it was that you talked to, you learned that George -- you knew George had been arrested, but he apparently hadn't arrived at the police station yet, is that correct?

A. Correct.

Q. You called back now an hour or an hour and a half later, whatever the exact time was, 5:30, 6:00, somewhere in that neighborhood, and you couldn't talk to him at that time, they told you to call back later, is that correct?

A. They told me he hadn't been booked yet or something.

Q. But for whatever the reason was, you couldn't talk to him at that time?

A. Right.

Q. So you did call back later?

A. Right.

Q. And I believe you told Mr. Hammerschmith that was approximately about 8:00, give or take a few minutes?

A. Right, around there.

Q. And at that time, whomever it was that talked to you said yes, bail is set; if you want to, you can come down and see him, correct?

A. Right.

Q. But you had to be at work within a very short time?

A. Right.

Q. You went to work, got out, and about 5:00 you went to the police station and you saw George, and that's when you made these observations you've just told us about, around 5:00?

A. Right.

Q. Now, I want you to tell the jury what observations you made about his face at about 5:00 on December 7th of 1985 when you observed him at the Springfield Police Department?

A. Well, he had been crying, his face was very red.

Q. And was there bruising and welts on his face?

A. It's hard to tell if they were bruises or welts, because he was crying so hard and so upset. He was a mess.

Q. Do you have a recollection, ma'am, whether or not he had bruises and welts on his face when you saw him at about 5:00 on December 7th of 1985?

MR. HAMMERSCHMITH: May counsel approach the bench, Your Honor?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I was under the impression from speaking with Mr. Bloom that he did not intend to get into the area of whether there were marks on George's face or not.

MR. BLOOM: I intend -- I would tell you that what I'm doing is -- you probably don't remember this, because it's been so long ago, but when she testified the first time, her and the sister came in and talked about distinctive bruising and welts on the face, when you saw him at five.

And then I showed them a picture of the lineup in which in the background you can see it's about quarter of five or somewhere in that neighborhood, and they did a double take when they saw the picture.

Now she comes here in trial, doesn't say a word about the face,

knowing -- I'm assuming that she knows I'm going to ask her about the lineup picture, how he looked fifteen minutes later, when she saw him in the room.

MR. HAMMERSCHMITH: What I'm trying to tell you, Your Honor, is that I spoke with her and told her that I didn't intend to ask about the face or get into the face, and that was pursuant to a conversation with Mr. Bloom that I had, and I was under the impression that that was his desire, I don't know whether she's still operating under those instructions or not.

MR. BLOOM: I didn't know anything about that. I intend to ask her and never gave any impression I wasn't going to get into this. This is probably the only area of cross examination I have with her.

I'm sure you don't remember, but there was --

THE COURT: Well, I take it this is

part of your theory in the case.

MR. BLOOM: That he got pounded.

MR. HAMMERSCHMITH: I'm not intending to suggest that he was beaten about the face, no. I don't believe, based on my understanding of the testimony, I don't believe that the defendant will testify that he was, other than maybe hit once or twice in the face, but --

MR. BLOOM: Of course, the problem I have is I can't physically refute the chest, but I have pictures of his face at or about the time that his witnesses have said under oath on a previous occasion that he had distinctive bruising and welting, and I believe they are backing off now, based on the cross examination of the motion to suppress, in which I showed them pictures at about that time and, in fact, Mrs. Westcott said after talking about the welting and bruising, when I showed her the lineup

picture, she looked and did a double take and said, "Yeah, I guess he looked pretty much like that facially." I mean, I think this is permissible cross examination.

THE COURT: Well, I don't know what it is being offered for. To impeach her? She says she doesn't know at this point.

MR. BLOOM: It's a prior inconsistent statement. If she says something different here today, or if she doesn't say something inconsistent, if she says I don't remember, I have a right to try to refresh her memory as to what she saw in reference to his face.

THE COURT: Well, if you want to refresh her memory about that --

MR. BLOOM: That's what I intended to do when he called you over to the side bar.

THE COURT: If you want to refresh her memory about how the face appeared,

I will let you do that, but that is the only thing I can do.

MR. HAMMERSCHMITH: My major concern, as I say, Your Honor, is the fact that I think based on my discussions with Mr. Bloom, I had suggested to her that she not talk about what his face looked like, and I only did that because I thought Mr. Bloom did not want that to -- there was a problem with that.

MR. BLOOM: I don't know how he got that impression.

MR. HAMMERSCHMITH: Well, I can explain that.

THE COURT: You can refresh her recollection as to what she said before.

(End of side bar conference)

Q. (By Mr. Bloom) Mrs. Daly, do you remember testifying in, I believe it was, in this court at a previous hearing concerning this case?

A. Yes, I do.
Q. Would it be fair for me to say that you were asked some of the same questions that you have been asked here this morning about certain things you saw and you heard on December 7th of 1985?
A. Yes, I did.
Q. If you would, ma'am, I'm going to refer to page 49 of this transcript, and if you would just be kind enough to read lines 9 through 14, just to yourself, if you would.

(Witness reads specified portion of document)

A. Yes.
Q. Have you read that?
A. Yes.
Q. Can you tell me, ma'am, does that refresh your memory as to whether or not you saw welts and bruises on your son's face on December 7th of 1985?
A. As I stated before, yes, I did, but I couldn't tell if they were bruises or from crying so hard, and he opened his jacket and showed me his

chest.

Q. Let's forget the jacket for a minute. Let me see if I understand you. Are you saying -- you know the difference between redness in a common welt or a bruise, correct?

A. Correct. You also get welts on your face when you cry a lot, too, and he was very hysterical.

Q. Did you see welts on his face?

A. Yes, I did.

Q. Are you saying that people get welts on their face from crying, based on your experiences?

A. Yes.

Q. Did you see bruises on his face?

A. I couldn't tell if they were bruises or scratches or just from his actions. He was acting very hysterical.

Q. Just if we can concentrate on the face for a minute. Did you see bruises or scratches on his face?

A. I saw a lot of red marks on his face.

Q. Did you see bruises or scratches on his face?

MR. HAMMERSCHMITH: I'm going to object, Your Honor.

THE WITNESS: I don't know what you are saying about a bruise. What is a bruise? Black and blue?

Q. (By Mr. Bloom) Yes, black and blue marks.

A. I couldn't see if it was black and blue or not.

THE COURT: I'm going to overrule your objection based on the answer. What is your next question?

Q. (By Mr. Bloom) Did you see anything black or blue on his face?

A. I might have.

Q. Well, do you remember, ma'am?

A. His face did look bruised.

Q. It did look bruised?

A. Yes, it did.

MR. HAMMERSCHMITH: May counsel approach side bar.

(The following conference was held at side bar)

THE COURT: Let me see it.

(Photograph shown to the Court)

MR. HAMMERSCHMITH: Your Honor, if this is the only picture that is intended to be offered, I don't have any problem with that. I was going to say the booking picture --

THE COURT: That is already in evidence.

MR. HAMMERSCHMITH: But that's from eight in the morning, so --

MR. BLOOM: I didn't intend to ask her about that.

(End of side bar conference)

Q. (By Mr. Bloom) This is Exhibit 15, ma'am, and I just wonder if you could tell us, do you see your son in that photograph?

A. Yes, I do.

Q. And can you just tell us, as best you can remember it, is that how he appeared to you in terms of his face, based on what you've told us you saw at about 5:00 on December 7th of 1985, or did he look different?

A. Basically, I think his face was a lot redder when I saw him, because he was crying and upset.

Q. Can you see any bruises on that photograph on his face, the type that you saw at about 5:00, based on that picture?

A. Not really.

MR. BLOOM: That's all I have, Your Honor.

MR. HAMMERSCHMITH: Nothing further, Your Honor.

THE COURT: Thank you, Mrs. Daly

(Witness steps down)

MR. HAMMERSCHMITH: The defendant would call Nancy Westcott.

CITY 002783


NANCY WESTCOTT (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Could you state your full name, please?
A. Nancy Westcott.
Q. Would you spell that for us please?
A. W E S T C O T T.
Q. I'm going to ask you to keep your voice up so the people in the courtroom can hear you, all right?
A. Okay.
Q. Are you related to George Perrot, the defendant in this case?
A. Yes, I am.
Q. What is your relation to George?
A. I'm his sister.
Q. An older sister or younger sister?
A. Older.
Q. Can you tell us how old you are?
A. Twenty-seven.

Q. Are you married or single?
A. Married.
Q. Now, where do you live?
A. 87 Malibu Drive in Springfield.
Q. Do you own that home?
A. Yes, I do.
Q. In December of 1985, did you also live in that home?
A. Yes, I did.
Q. Did you own the home at that time?
A. No, I did not.
Q. What was the ownership of the home at that time?
A. My mother owned the house.
Q. And your mother's name?
A. Beverly Daly.
Q. Can you tell us where 87 Malibu Drive is in relation to 27 Malibu Drive?
A. About six -- five or six houses down the street.
Q. Is it on the same side of the street or across the street?
A. On the same side.

Q. Now, again referring to December of 1985, who else lived in that house at that point in time other than yourself?
A. My husband and my brother George.
Q. And your husband's name?
A. Mark.
Q. And your brother George meaning George Perrot?
A. Right.
Q. And do you recall the early morning hours of Saturday, December 7, 1985?
A. Yes.
Q. At about 3:00 or maybe 3:30 that morning, did something out of the ordinary happen at your home?
A. Yes, the police came.
Q. That is 3:00 or 3:30 A.M., is that right?
A. Right, 3:30 A.M.
Q. Can you tell us what happened after the police arrived?
A. They were looking for George and they wanted to know if he was home, and I didn't know at

that point, because I had just woken up, so we went to George's room and his bedroom door was locked, so I got a key to open the door and George was on his bed sleeping.

Q. Do you remember whether the lights were on or not when you opened the door?

A. I believe they were on.

Q. When you opened the door, you saw George?

A. Yes.

Q. Where was George when you saw him?

A. Lying on the bed.

Q. Can you describe to us how he was lying on the bed?

A. He was on his back with his feet on the floor, as if he had sat down and laid back.

Q. Was he awake or asleep?

A. Asleep.

Q. Can you tell us how he was dressed?

A. He was in dungarees, jeans, and sneakers, with no shirt.

Q. What happened after you opened the door and saw George there?

A. I walked into the room, and several officers had followed me, and I tried to wake him up.
Q. Were you able to wake him up?
A. After quite a few minutes.
Q. How did you wake him up?
A. By shaking him.
Q. At some point he did wake up?
A. Yes.
Q. Could you tell us what happened after he was awakened?
A. A couple of policemen helped him up off the bed and they had helped him put his coat on and then they had handcuffed him and were going through some of his things.
Q. You said they put his coat on?
A. Right.
Q. Was he wearing a shirt?
A. No.
Q. Was he wearing anything under the coat?
A. No.
Q. At some point in time, did the police leave with George?
A. Yes, they did.

Q. When was the next time after that that you saw George?
A. At about 5:00 that same evening.
Q. You saw him at 3:00 or 3:30 in the morning when the police came?
A. Yes.
Q. And the next time after that you saw him was in the evening hours of the same day?
A. Yes.
Q. That was around what time?
A. 5:00.
Q. Where did you see him then?
A. At the police station.
Q. Who was with you when you saw him, if anyone?
A. My mother and George's girlfriend, Lisa.
Q. Now, you refer to Lisa. Was Lisa someone who was known to you at the time?
A. Yes.
Q. She was George's girlfriend?
A. Yes.
Q. How long had she been George's girlfriend?

A. I would say probably about four years.
Q. She went down with you also?
A. Yes.
Q. Can you describe -- did you see George when you got down there?
A. Yes, I did.
Q. Can you describe for us where you saw George?
A. I think it was a viewing room.
Q. What were the approximate dimensions of the room?
A. Probably three feet by five or six feet or maybe four feet.
Q. Was there a partition of any sort separating you from George?
A. Yes, there was.
Q. Do you remember what it was made of?
A. I believe it was glass or some type of glass.
Q. Were you able to see George through that?
A. Yes, I was.
Q. Were you able to hear him through that?

A. Yes, I was.

Q. Can you describe for us his physical appearance when you first saw him there?

A. He was very upset, tired, exhausted looking.

Q. Why do you say -- what about his appearance made you say that he was very upset?

A. He had been crying, he was very loud, when we were talking with him he didn't make sense a lot of times.

Q. Was he crying some of the time when you saw him?

A. Yes.

Q. How long did you spend with George?

A. Probably about fifteen minutes.

Q. I'm not going to ask you what was said, but can you describe his speech for us?

A. Loud, upset, angry, confused.

MR. BLOOM: I'm going to object and ask that go out.

THE COURT: Sustained.

MR. HAMMERSCHMITH: No further questions, thank you very much.

CROSS EXAMINATION BY MR. BLOOM:

Q. On December 7th of 1985, ma'am, the police were at your house a second time, correct?

A. Yes, they were.

Q. And they had a search warrant, isn't that right?

A. Yes.

Q. And one of the officers showed you these, which, for the record, is Exhibit 10, is that right?

A. Yes.

Q. And he said to you, "Ma'am, do you have a pair of gloves that look just like those," didn't he?

A. Something to that effect, yes.

Q. And you turned and you went to a closet or an area of your house where you kept a pair of gloves that looked just like these, isn't that correct?

A. No, that's not correct.
Q. That's not correct?
A. No.
Q. You never told Sergeant Kelly of the Springfield Police Department that you had a pair of gloves that looked just like these?
A. No, I did not.
Q. You never went to a closet area in your house and said, "I know they're up there, I just saw them a few weeks ago. Here's where I keep them and they're not here"?
A. No, I did not.
Q. You never said that?
A. No, I did not.
Q. Did you own a pair of gloves in 1985 that looked like these?
A. No, I did not.
Q. Was his face, your brother's, at 5:00, swollen when you saw it?
A. Yes, it was.
Q. Were there welts on it?
A. It was discolored, reddish.
Q. Ma'am, let me ask you this. Do you

think you know the difference between what a face looks like after crying as opposed to after being beat up?

A. Yes, I do.

Q. What did George Perrot's face appear to you as you observed him on December 7th of 1985?

A. It was puffy and it was red.

Q. Did it look to you like he had been hit?

A. It was hard to tell.

Q. Well, you saw welts, didn't you, on his face?

A. Yes, around his eyes and stuff.

Q. Do you think you get welts from crying?

A. Yes, you do.

Q. And do you think you get bruises from crying?

A. No, you don't.

Q. Did he have bruises or discolorations that appeared to look like bruises to you anywhere on his face on December 7th of 1985?

A. He had redness on his face.

Q. Let me go back again. Bruises -- do you understand what I mean when I say bruises?

A. Black and blue.
Q. Did you see anything on his face that appeared to you to be a bruise?
A. No.
Q. Did his face appear to be swollen to you?
A. Yes, it did.
Q. You remember, ma'am, don't you, testifying at a previous hearing concerning this case?
A. Yes, I do.
Q. And I am going to ask you if you would be kind enough to read on page 14, lines 13 to 15 to yourself.

(Witness reads specified portion on document)

A. Yes.
Q. Do you remember stating at that previous hearing, just yes or no -- does that refresh your memory as to whether you stated at a previous hearing that he had bruises on his face?
A. Yes.

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: Can I be heard?

(The following conference was held at side bar)

THE COURT: She was never asked what she testified to at a previous hearing, so you're asking her to refresh her recollection -- that's not the proper question and that's why I sustained it.

MR. HAMMERSCHMITH: May I, Your Honor? With respect to the actual statement, his face was swollen and he had marks on his chest; what kind of marks? Like bruise marks, referring to the chest, not --

THE COURT: He has shown it to her to refresh her recollection.

(End of side bar conference)

Q. (By Mr. Bloom) Does that refresh your memory, ma'am, as to what you said at a previous hearing concerning your observations of your brother's face on December 7, 1985, at about 5:00?

A. Yes.

Q. And what is your memory now as to what you said as to how you observed his face at about 5:00 on December 7th of 1985?

A. How did I see his face?

Q. Yes.

A. He looked like he had been crying, it was red, swollen, puffy.

Q. Did you say anything about bruising?

A. In my last statement?

Q. At the previous hearing. Does that refresh your memory as to what you said at the previous hearing?

A. Yes, I said it looked bruised, reddish.

Q. You don't normally use the word bruised to mean red marks, do you? Let me withdraw that. When you observed his face, did you see anything on his face that indicated to you, based on your experiences, that would indicate to you in your mind

at that time that it appeared that something had struck his face?

A. It could have. I --

Q. It appeared to you that he was crying?

A. Yes.

Q. It appeared to you that he had been crying?

A. Yes.

Q. 'Cuz you saw things on his face that indicated that -- you have seen people cry before?

A. Yes.

Q. You have also seen people who have got black and blue marks or other types of items on their face as a result of being hit, correct?

A. Right.

Q. The first thing you thought when you saw him was that he had been crying?

A. Right.

Q. I'm asking you, based on what you saw at about 5:00 on December 7th, did it appear to you that something had struck his face also?

A. Yes, it's possible.

Q. And this, for the record, Exhibit 15,

ma'am, contains a picture of your brother, correct?

A. Yes, it does.

Q. And that is exactly how he looked facially in Exhibit 15, exactly the same as when you saw him at 5:00?

A. Yes.

Q. Isn't that correct?

A. Yes.

Q. In fact, when the police were there that morning, you didn't have any problem with the way in which they handled your brother in front of you, did you?

A. No.

Q. In fact, they told you what number to call if you wanted to call down later and find out if you could talk to him or see him, correct?

A. Yes.

Q. And, in fact, somebody in your family did talk to him or try to talk to him later on, either you or your mother?

A. Yes.

Q. You didn't see anything that upset you in the manner in which they handled him?

A. No, I did not.
Q. None of the officers were screaming at him?
A. No.
Q. None of them were pushing him around?
A. No.
Q. Took him upstairs, correct?
A. I have a one-level house.
Q. Took him outside?
A. Yes.
Q. And then you didn't see George again until 5:00?
A. Right.
Q. Now, when the police came in, I think you said it was around 3:00 or 3:30 or somewhere in that neighborhood, is that correct?
A. 3:30.
Q. And the fact of the matter is, you have no idea how long George Perrot had been in that house, isn't that a fair statement to make?
A. Yes.
Q. He could have been in there two hours, he could have been in there five minutes. You just

don't know because you were asleep, correct?

A. Yes.

Q. And when you went to bed that night, George wasn't in yet?

A. No, he wasn't.

Q. You went to bed around midnight or so, isn't that correct?

A. Somewhere around there, yes.

Q. And sometime between midnight and 3:30, he came home?

A. Yes.

Q. That wasn't unusual for him to come in way after midnight, was it?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

Q. (By Mr. Bloom) Did he have a curfew?

A. Yes, he did.

Q. What was that, ma'am?

A. 12:00.

Q. He broke the curfew on December 7th, correct?

A. Yes, he did.

Q. And he used to break it quite

frequently, didn't he?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: That's all I have.

REDIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Mrs. Westcott, you were asked about a pair of gloves. I ask you to take another look at the pair of gloves. Do you remember being asked about those gloves?

A. Yes, I was.

Q. And do you remember who asked you about the gloves?

A. I don't remember the police officer's name, no.

Q. But it was a police officer?

A. Yes.

Q. And when he asked you about the gloves, did he ask you whether the gloves were yours?

A. Yes, he did.

Q. And your response to that was what?
A. No, that they were not mine.
Q. Did you tell him anything further about the gloves?
A. I told him that the gloves looked familiar.
Q. And why did the gloves look familiar to you?
A. I thought they were George's girlfriend Lisa's.
Q. And since that time, -- strike that. Is it your opinion today that they are Lisa's gloves?
A. No, I don't believe so.
Q. Why do you say that?
A. Because --
MR. BLOOM: Objection.
THE COURT: Sustained.
MR. HAMMERSCHMITH: May I be heard, Your Honor?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: Her testimony,

as I understand, would be that she since this date saw -- she, since that date, saw Lisa wearing the gloves that she thought were the ones.

MR. BLOOM: It's hearsay.

THE COURT: We're talking two years ago. I'm sustaining the objection.

(End of side bar conference)

Q. (By Mr. Hammerschmith) You said that these gloves look like a pair of gloves that belonged to Lisa?

A. Yes.

Q. After December 7, 1985, did you have occasion to see the gloves of Lisa that you thought that these looked like?

MR. BLOOM: Objection.

THE COURT: Sustained.

MR. HAMMERSCHMITH: No further questions.

RECROSS EXAMINATION BY MR. BLOOM:

Q. Ma'am, when you were done talking to your brother, whatever the precise observations you made, you came away with a feeling that he possibly had been struck about the face, isn't that fair to say?

A. Yes.

Q. His face looked different to you than it did at three in the morning when he left your house?

A. Yes, it did.

Q. And some of the things you saw in the face you didn't think were due all to crying, isn't that right?

A. Yes.

Q. Did you say anything to Lieutenant Arpin, who was right there with you and your mother, about your concern for the fact that you believed George had been hit?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: That's all I have.

THE COURT: Anything further, counselor?

MR. HAMMERSCHMITH: Just if I could be heard at side bar again, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I just need to make very clear my offer of proof with respect to what this witness would say about those gloves.

THE COURT: Just make an offer of proof.

MR. HAMMERSCHMITH: The offer of proof is that if allowed to answer, she would say that sometime shortly after she spoke with Sergeant Kelly, she in fact saw Lisa and that Lisa was wearing the pair of gloves which this witness thought these particular gloves might have been.

THE COURT: That's not what you indicated to me at side bar earlier. At

side bar earlier I asked you what she was going to testify to and you told me something entirely different.

MR. HAMMERSCHMITH: If I did, I misspoke.

THE COURT: Anything else?

MR. HAMMERSCHMITH: It is my understanding that these gloves have been in the custody --

THE COURT: You're making an offer of proof?

MR. HAMMERSCHMITH: That's -- in terms of relevance to the case, it is my understanding these gloves have been in the custody of the Springfield Police Department since they were shown to her.

THE COURT: You are not asking me for a ruling, are you? You just made an offer of proof, right?

MR. HAMMERSCHMITH: I would like to be allowed to ask her the questions leading to that result.

THE COURT: The representation made

to the Court earlier when this question was asked was that sometime after -- her testimony was going to be that sometime after December 7th, she saw a pair of gloves that she thought might be Lisa's gloves. Now the defense counsel comes with an entirely different offer of proof in a more detailed manner, sometime shortly after. I still think it is too vague and I am sustaining the objection.

(End of side bar conference)

MR. BLOOM: That's all I have, Your Honor.

MR. HAMMERSCHMITH: Thank you.

(Witness steps down)

MR. HAMMERSCHMITH: I call the defendant to the stand, Your Honor.

GEORGE PERROT (Sworn)

DIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. Would you state your name, please?
A. George David Perrot.
Q. For the record, you are the defendant in this case, are you not?
A. Yes, I am.
Q. Can you tell us how old you are?
A. 19.
Q. Referring you back to December of 1985, December 7th, how old were you then?
A. Seventeen.
Q. Where were you living at that time?
A. 87 Malibu Drive.
Q. Who, if anyone, did you live with at that time?
A. My sister, Nancy Westcott, and her husband Mark.
Q. Do you recall who owned the house at

that time?
A. Excuse me?
Q. Who owned that house at 87 Malibu Drive?
A. I believe my mother did.
Q. Is that a one-family house?
A. Yes.
Q. How long had you been living at that address at that time?
A. Approximately 10 years.
Q. Were you attending school at that time?
A. No, I wasn't.
Q. How many years of formal schooling did you have?
A. Eight.
Q. Were you working in December of 1985?
A. Yes, I was.
Q. Where were you working?
A. I was working construction for my brother-in-law, Mark Westcott.
Q. Now, drawing your attention to the night of December 6th, the morning of December 7, 1985, do you remember that night and morning?
A. Yes, I do.

Q. At some point on the night of December 6th, did you have occasion to leave your home?

A. Yes, I did.

Q. While away from your home, did you have occasion to have any alcohol to drink?

A. Yes, I did.

Q. Can you tell us approximately what time you had your first drink of alcohol that night?

A. Around 7:00 P.M.

Q. And that would be on December 6th?

A. Yes.

Q. Do you recall when you had your last drink of alcohol?

A. Between 1:30 and 2:00 in the morning.

Q. Do you recall what you were drinking?

A. Beer.

Q. Were you drinking anything other than beer?

A. No, I wasn't.

Q. How much did you have to drink that night?

A. Approximately two six-packs.

Q. Of beer?

A. Yes.

Q. Who were you drinking with?

A. My girlfriend, Lisa Eldridge, her friend Debbie -- I don't recall her last name -- and a buddy of mine, Bob Timmerman.

Q. You refer to Lisa. She was your girlfriend?

A. Yes, she was.

Q. Would she have been a steady girlfriend?

A. Yes.

Q. For how long had she been your girlfriend?

A. About four, four and a half years.

Q. Now, other than the beer that you had to drink, did you have any pills that night?

A. Yes, I did.

Q. Can you tell us what kind of pills?

A. Valiums.

Q. I'm sorry?

A. Valiums.

Q. How many Valiums did you have that night?

A. Between seven and eight.

Q. Do you recall when you would have had your first one?

A. I believe it was around 11:30.

Q. And your last one?

A. Between 1:30 and 2:00 P.M.

Q. Now, as of 1:30 or 2:00 P.M. when you had your last Valium, when was the last time that you had any sleep?

A. The previous night, December 5th.

Q. And the morning of December 6th?

A. Yes.

Q. Now, at some point that night, did you return to your home at 87 Malibu?

A. Yes, I did.

Q. And do you recall approximately what time you got home?

A. It would be anywhere between 2:00 and 2:30 in the morning.

Q. Do you recall what you did when you got home?

A. I remember going into my house, I took off my coat, my shirt, I sat down on my bed and after that I guess passed out.

Q. Do you remember being awakened at some point?
A. Yes, I do.
Q. Do you remember who awakened you?
A. Several police officers.
Q. Was there anybody else in the room when you were awakened?
A. Yes, my sister Nancy.
Q. At some point in time, did the police take you out of the house?
A. Yes, they did.
Q. What were you wearing when you left the house?
A. Blue jeans, white and blue sneakers, and a blue coat.
Q. Do you recall what you were wearing under your blue coat?
A. Nothing.
Q. What was the coat made of?
A. Corduroy material.
Q. Now, can you tell us what happened when you got outside?
A. On my way down to the cruiser, I saw the

lights flashing, I freaked out, I bumped into the officer and I ran off down the street.

Q. How far did you run?

A. Approximately two, three hundred yards.

Q. Were you running away from the officers?

A. Yes.

Q. What happened after two or three hundred yards when you stopped running?

A. Several officers caught me in the backyard.

Q. Can you tell us what happened when you were caught in that backyard?

A. They caught me, they threw me to the ground, several officers were kicking me in the stomach, hit me with nightsticks or flashlights, I don't recall which one it was.

Q. Did they hit you with anything other than flashlights or nightsticks?

A. Their feet and hands.

Q. Where were you hit?

A. In the stomach and the back, the legs.

Q. Were you hit in the face?

A. Not that I recall, no.

Q. How long did that go on?
A. For a couple of minutes.
Q. At the end of that -- strike that. At some point, were you taken to the police station?
A. Yes, I was.
Q. And how were you taken -- what mode of transportation were you taken to the police station?
A. Police car, I believe.
Q. Did anything happen to you in the police car on the way to the police station?
A. The cop that was in the back seat with me kept sticking something in my throat, I don't recall what it was, a nightstick or a blackjack thing. He kept telling me if I run again, he was going to kill me.
Q. At some point, you arrived at the police station?
A. Yes, I did.
Q. Can you tell us what happened immediately after you arrived at the police station?
A. I believe I was brought to a booking desk. One of the officers told me to put my hands on the desk and spread my feet apart so he could search

me. When I did that, there were several officers laughing and one of the cops punched me in the side and I fell to the ground.

Q. Now, at some point, did they place you in a cell there?

A. Yes, they did.

Q. At the police station?

A. Yes.

Q. Can you tell us whether or not you slept while you were in the cell at the police station?

A. No, I didn't.

Q. Do you know why you didn't sleep while you were in that cell?

A. Because they had an officer right out in front of my cell. Every time I tried to sleep, he kept rattling his nightstick on the bars and telling me to wake up.

Q. Do you remember at some point being advised of your Miranda -- first of all, do you remember being advised of your Miranda rights that night?

A. I don't recall hearing them, no.

Q. Do you remember signing a Miranda card?

A. No, I don't.

Q. Do you remember either yesterday or the day before seeing a card which purports to be a Miranda card, which is an exhibit in this trial?

A. Yes, I do.

Q. Did you have a chance to look at that?

A. Yes.

Q. Did you look at the signature on that?

A. Yes, I did.

Q. Does that appear to be your signature?

A. Yes, it does.

Q. Do you remember signing it?

A. No, I don't.

Q. Now, do you remember at some point in time being advised that you had the right to use the telephone?

A. I believe so, yes, when I was at the booking desk.

Q. Do you remember signing the telephone card?

A. I believe I signed a piece of paper, I'm not sure.

Q. Did you see the so-called telephone slip

that was introduced I believe yesterday as an exhibit in the case?

A. Yes.

Q. You had a chance to look at that?

A. Yes, I did.

Q. Does that appear to be your sugnature on the telephone slip?

A. Yes.

Q. Do you remember signing it?

A. Vaguely, yes.

Q. At any point in time, did you tell the police that you did not want to talk with them and answer their questions?

A. Yes, I did, several times.

Q. Can you tell us what happened when you did that, what their response was?

A. They just continued questioning me.

Q. Would that have been after you were advised of your Miranda rights?

A. I believe so, yes.

Q. Do you remember what you said to them, what your words were when you told them you didn't want to talk with them?

A. I told them I just wanted to go to sleep, that I didn't feel good and I don't want to answer any questions.
Q. Do you remember being questioned at some point that day about the Prekop and Lichwala break-ins?
A. Yes, I do.
Q. Do you remember who did the questioning?
A. I'm not quite sure of the officer's name.
Q. Did you see Officer Jarvis testify here?
A. Yes, I did.
Q. Is it possible that he was one of the officers?
A. He looked familiar, but I couldn't tell you positively, no.
Q. But you remember being questioned at some point about those two break-ins, correct?
A. Yes, I do.
Q. Do you recall whether or not you were shouting when you were being talked to or about those two break-ins?
A. Yes, I do.

Q. Were you shouting?

A. Yes.

Q. Do you remember why you were shouting?

A. Yes, I do, 'cuz they were -- they kept yelling at me, insinuating I was the man that broke into these houses and sexually assaulted this elderly woman.

Q. Do you remember crying while you were being questioned?

MR. BLOOM: Again, Judge, this is his witness.

THE COURT: Sustained. You're leading the witness, counselor.

Q. (By Mr. Hammerschmith) Do you remember whether or not you were crying that day?

MR. BLOOM: Objection.

THE COURT: Sustained.

MR. HAMMERSCHMITH: May I be heard at side bar?

MR. BLOOM: I will withdraw it, then. I'll withdraw the objection.

THE WITNESS: Not that I can remember, no.

Q. (By Mr. Hammerschmith) Do you remember whether or not you were threatening to kill yourself during that questioning?

MR. BLOOM: I'm going to object.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) To the best of your recollection, while you were being questioned, do you recall wanting to hurt yourself?

MR. BLOOM: Objection.

THE WITNESS: No, I don't.

THE COURT: Sustained.

Q. (By Mr. Hammerschmith) Now, do you remember seeing in the course of this trial Exhibit No. 5, which purports to be a statement signed by you?

A. Excuse me, I don't understand your question.

Q. Let me show you this document, which I believe is Exhibit 5.

THE COURT: Has it been marked?

MR. HAMMERSCHMITH: The number on it is Exhibit 5, Your Honor.

THE COURT: Okay.

Q. (By Mr. Hammerschmith) Have you had a chance to look at that?

A. Yes.

Q. Do you remember signing that document on that night?

A. No, I do not.

Q. Would you take a look at the signature at the bottom right of that document. Is that your signature?

A. It appears to be, yes.

Q. In various places there are what appear to be the initials GP, do you see those there?

A. Yes, I do.

Q. Do you recognize those to be your initials?

A. No, I don't.

Q. You don't recognize those to be your writing?

A. No.

Q. But the signature you recognize to be your own?

A. Yes.

Q. Do you remember signing this or --

A. No, I don't.
Q. Can you describe for us what your physical condition was at the station that day?
A. Well, I didn't feel very well, and during interrogation I threw up on the floor, vomited all over the floor.
Q. What happened when you did that?
A. They stopped questioning me for a little while.
Q. What did you observe after they stopped questioning you for that?
A. I believe the janitor came in, put some kind of sand or something on the floor, and they took me into another room.
Q. At some point that day, did you see your mother, your sister and your girlfriend at the station?
A. Yes, I did.
Q. Had you seen -- do you know what time that was?
A. I couldn't tell you exactly, no.
Q. Prior to seeing them there, had you seen anyone other than police officers while you were at

the station?
A. No.
Q. I draw your attention to the week before then, November 30, 1985. On Tuesday, did you hear the testimony of Mrs. Lichwala and Miss Prekop concerning the breaks into their homes?
A. Yes, I did.
Q. Did you break into Mrs. Lichwala's home?
A. No, I did not.
Q. Did you break into Miss Prekop's home?
A. No, I did not.
Q. At the time, on November 30th, where were you living?
A. 87 Malibu Drive.
Q. And you had been living there how long?
A. Approximately 10 years.
Q. How far is that away from 27 Malibu Drive?
A. Approximately five houses.
Q. While you were living at 87 Malibu Drive, did you ever have occasion to walk past 27 Malibu Drive?
A. Several times, yes.

Q. How often would you walk past that?
A. Basically everyday.
Q. Did you have a driver's license?
A. No, I did not.
Q. Where would you be walking to in walking past 27 Malibu Drive?
A. Either to the store or to hang out at the stairs at the top of my street.
Q. On occasion, while you did so, did you see Miss Prekop outside?
A. Several times.
Q. How often would you have seen Miss Prekop outside when you walked by?
A. During the summer, she's always out there doing garden work.
Q. And you lived at that address, 87 Malibu Drive, for how long?
A. Approximately 10 years.
Q. On November 30, 1985, did you have a beard and moustache?
A. Yes, I did.
Q. Did you have a chance to look at the picture taken when you were booked on December 7,

1985? Did you have a chance to look at that picture yesterday?

A. Yes, I did.

Q. Did your beard and moustache look any different on November 30, 1985, than it did in that picture taken December 7th, 1985?

A. No.

Q. Do you recall having your blood taken in connection with this case?

A. Yes, I do.

Q. Do you remember how many times you had your blood taken in connection with this case?

A. Twice, I believe.

Q. Do you recall when the first times was?

A. I believe it was a couple days after I got arrested.

Q. Do you recall whether that was pursuant to the search warrant waiver that you signed on December 7, 1985?

A. I believe so, yes.

Q. Did you also have your blood taken at a later date?

A. Yes, I did.

Q. Do you know approximately when that would have been?
A. Sometime in '87.
Q. Could it have been March 31, 1987?
A. Possibly, yes.
Q. Where was that blood taken?
A. Here in the court.
Q. Prior to having your blood taken on that occasion, did you have occasion to speak with me?
A. Yes, I did.
Q. And did you speak with me concerning the purpose for which the blood was taken?
A. Yes, I did.
Q. What was your understanding of the reason for which your blood was being taken at that time?
MR. BLOOM: Objection.
THE COURT: Sustained.
MR. HAMMERSCHMITH: May I be heard at side bar?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: My expectation is his answer would be that he was aware that the blood was being taken in connection with this case, that it was to compare his blood with that of Miss Prekop or that found in the home of Miss Prekop, to possibly exclude him as a suspect in the case or, on the other hand, to show or to improve the strength of the Commonwealth's case against him.

THE COURT: Why is it being offered?

MR. HAMMERSCHMITH: As a proof of consciousness of innocence, Your Honor.

THE COURT: You realize full well that he is going to get into the issue of the court order.

MR. HAMMERSCHMITH: Well, I think, Your Honor, I have a -- I know what the discussions were prior to that. Mr. Bloom stated --

THE COURT: How are you going to get that in?

MR. HAMMERSCHMITH: If I may just --

THE COURT: No. Your discussions with Bloom about the motion to have the blood taken, how is that going to be admissible? Are you going to testify?

MR. HAMMERSCHMITH: I am more than happy to have him testify about the Court order, because he went in assenting to it.

MR. BLOOM: The two things I see, number one, we are getting right into the attorney-client privilege, that's the first thing, and, secondly, he is making himself a witness. He is getting into the bulk of the conversations between him and Mr. Perrot.

Now, if this is being offered for the purpose of showing that he agreed, we have no way of knowing, unless he takes the stand, whether the agreement was advice on behalf of Mr. Hammerschmith or it was a consciousness

CITY 002830


of innocence. He ends up becoming a witness technically by going through this.

THE COURT: That's what you're going to do, make yourself a witness in this case.

MR. BLOOM: That is my objection.

MR. HAMMERSCHMITH: If that's what it means, that's what it means. I remember distinctly the conversation with Mr. Bloom. Mr. Bloom remembers the conversation, recanted it in front of Judge Urbano, we have a transcript of it.

MR. BLOOM: I'm talking about their conversations.

THE COURT: It is my understanding from the outset of this trial that the blood samples taken in 1987 were taken as a result of a court order issued by -- Judge Urbano, is it?

MR. BLOOM: I think it was Judge Urbano.

THE COURT: Who issued the court order?

MR. BLOOM: I believe it was Judge Urbano.

MR. HAMMERSCHMITH: I won't say who it was back in March.

THE COURT: But it was as a result of a court order filed by the Commonwealth.

MR. HAMMERSCHMITH: And on the record Mr. Bloom stated the reason for doing so, stated that it was assented to by the defendant, stated that the Commonwealth was ready to go to trial, but --

THE COURT: I'm not interested in that. The only thing I have in front of me is the fact that this was blood taken as a result of a court order, and based on that, I'm sustaining the objection.

MR. HAMMERSCHMITH: I'd just like to -- this is the transcript that Mr. Bloom had prepared of the hearing that

we had in front of Judge Urbano with respect to the motion to dismiss on speedy trial grounds.

THE COURT: When was this?

MR. HAMMERSCHMITH: It was done --

THE COURT: Last week?

MR. HAMMERSCHMITH: Yes, right before the case came to you. And this is the statement of Mr. Bloom which was made at that time before Judge Urbano, referring back to March of 1987, and I am quoting, "I was more than glad to go forward" -- I'm sorry, let me start earlier. "There had been a blood stain removed from the bedsheet of the victim, in which the F.B.I. had consulted with me and told me that they had needed a greater blood supply from the victim and the defendant, because, as it stood now, the blood could have been deposited by either the victim or the defendant, but if they got the greater supply of blood, that, in fact, they might either be able

to exclude one or both of them, or, with more definitiveness, include both of them, and this was all explained in open court. Now, at the time that I want to make it clear, as Mr. Hammerschmith well knows, on that particular case, I had hair samples found in the bedroom of the rape matching the defendant and the defendant's statement subsequent to motion to suppress, which was going to be allowed, putting himself in the house, but denying the rape, and I was more than glad enough to go forward, but that this evidence could exculpate him, as well as inculpate him. Both the defendant and Mr. Hammerschmith wanted the further scientific serological analysis to be done, although I explained on the record that because of the backlog, it could take six months, a year, twelve, fifteen months before that examination was completed. They both wanted it."

THE COURT: But you are not asking him that question. Ask him, do you know what was the purpose of the blood test? Did you want it taken? But don't go into this business of what you and he said to each other. That's got nothing to do with it.

You've got to learn how to ask these questions, counselor. If you're going to ask him did he know the purpose for which the blood was being taken and did he want it taken, go a right ahead, but don't get into this business of did you and I talk and did -- that's not admissible, that's improper.

MR. HAMMERSCHMITH: I'm sorry, I just was going -- my next question intended to be was he aware --

THE COURT: That is not the question you're asking. Go ask the question right.

(End of side bar conference)

Q. (By Mr. Hammerschmith) On March 31, 1987, were you aware of the reason for which your blood was to be taken?

A. Yes, I was.

Q. What was your understanding of that reason on that date?

MR. BLOOM: I'm going to object to that question.

THE COURT: I will allow it.

THE WITNESS: To take further tests and to either exclude me or include me in the case.

Q. Having that information, did you make a decision as to a choice as to whether to have your blood taken or not?

A. Yes, I did.

Q. What was the choice that you made?

A. To give the blood.

MR. HAMMERSCHMITH: No further questions, thank you.

CROSS EXAMINATION BY MR. BLOOM:

Q. You were told you had no choice but to give the blood by your lawyer, weren't you?

MR. HAMMERSCHMITH: Objection.

THE WITNESS: No, I wasn't.

THE COURT: Sustained. I'm sustaining the objection.

Q. (By Mr. Bloom) Mr. Perrot, you knew that Mary Prekop lived at that home alone back in 1985, didn't you?

A. I couldn't tell you honestly whether I knew she lived with someone or not, no.

Q. The answer to that is you didn't know whether she lived with anyone?

A. No.

Q. And you were familiar with the house, though, weren't you?

A. Yeah, I used to walk by it everyday.

Q. Yes or no?

A. Yes.

Q. Familiar with 33 Covel Street, that

neighborhood?

A. Yes.

Q. And that house?

A. Not that specific house, no.

Q. How many times have you been on that street?

A. Just about everyday.

Q. Everyday?

A. Yes, my girlfriend lives right around the corner.

Q. You were questioned at the police station about an incident in which the police told you on one of the incidents that an elderly woman had been raped, isn't that right?

A. Yes.

Q. And you don't remember who questioned you about that, is that right?

A. I don't remember the police officer, no.

Q. You remember that you were woken out of bed at 3:00 in the morning or 3:30 in the morning at your sister's house, right?

A. Yes.

Q. You know what kind of jacket you had on,

right?

A. Yes.

Q. You know what you had on your feet?

A. Yes.

Q. You know what you had on for pants when the police came in the room?

A. Yes, I do.

Q. And you know within a short time after getting outside, you elbowed or you bumped into a policeman and you took off, you remember all that, don't you?

A. Yes.

Q. And you remember that ultimately you were caught?

A. Yes, I do.

Q. And when you were caught, you were beaten, you remember that, right?

A. Yes, I do.

Q. And you remember you were thrown over a fence, right?

A. Yes, I do.

Q. And you remember that on the ride to the police station, some cop was clubbing you in some

part of your body with a nightstick or some other hard object?

A. Yes, I do.

Q. And then when you got to the station, you remember that at the booking desk, someone smashed you again in the side of your body when you were being booked, right?

A. Yes.

Q. All that happened hours before you were questioned about the Prekop rape, isn't that right?

A. Not hours, no.

Q. Did it happen before you were questioned about the Prekop rape, all the things I just asked you about?

A. Yes.

Q. And you were being asked about a rape of an elderly woman, is that right?

A. Yes.

Q. And you don't know who was asking you the questions?

A. I don't know their names, no.

Q. You saw Jarvis testify here. Was he the guy that asked you about the Prekop rape?

A. I told you before, he looked familiar, yes.

Q. I'm asking you now.

A. I'm not positively sure, no.

Q. You remember seeing your sister, your mother and your girlfriend at 5:00 that night, right?

A. Yes, I do.

Q. And you remember crying during that meeting?

A. Yes, I do.

Q. You remember hollering during that meeting?

A. Yes, I do.

Q. You don't know who questioned you?

A. Their names, no.

Q. You don't know by face either?

A. No, I don't.

Q. You don't have any idea if this is the police officer that talked to you about the Prekop incident?

A. No, I don't.

Q. And you don't remember signing Exhibit No. 5?

A. No, sir, I don't.
Q. Is it fair for me to state, sir, that the effects of the alcohol as time went on were less than they were at 3:00 in the morning, isn't that a fair statement to make?
A. Yes.
Q. If you were drunk at 3:00 in the morning, you weren't as inebriated at 2:00 in the afternoon, correct?
A. No, I wasn't.
Q. You specifically remember the details that led up to you getting into the Springfield Police Department on December 7th of 1985, as you and I just talked about, correct?
A. Basically, yes.
Q. After that, things start to become a little hazy in your mind, isn't that right?
A. I don't understand your question.
Q. After you got to the police station, as I asked you to recall what happened once you got there, a number of the things you can't remember, correct?
A. That's true, yes.

Q. Now, you did live at 87 Malibu Drive on November 30th of 1985, correct?

A. Yes, I did.

Q. Did you ever tell Jarvis or anyone else that on November 30th of 1985 that you went to Brattelboro, Vermont, with Mike Edwards, Bob Timmerman and Jeff Atkinson?

A. Yes, I did.

Q. You told him that. Remember telling him that?

A. Whoever the officer was that was questioning me, I told him where I was that night, yes.

Q. And you told him that it was in Brattelboro, Vermont?

A. Yes, I did.

Q. And you told him you went to Brattelboro, Vermont, with a Mike Edwards, a Bob or Robert Timmerman and a Jeff Atkinson?

A. I believe so, yes.

Q. And all three of those people were your friends back in November of 1985?

A. Yes, they were.

Q. Mike was driving?
A. I believe so, yes.
Q. You told that to the police, didn't you? Do you understand the question?
A. Yes.
Q. "We went to a bar called Flat Street in Brattelboro." Did you tell the police that?
A. Yes, I did.
Q. You started drinking about 8:00?
A. Approximately, yes.
Q. And this was on a Friday night. Did you tell the police that you started drinking at about 8:00 and November 30th was a Friday night?
A. I don't know if those were my exact words, but I told them I started drinking, yes.
Q. Is it possible that you gave them the time you started drinking?
A. Specifically, no.
Q. Did you tell whoever this officer was that you drank a case of Bud?
A. I believe I did, yes.
Q. Did you tell him that you took purple mescaline on the way to Vermont?

A. I believe it was purple microdot, yes.
Q. You provided that information to the police, correct?
A. Yes.
Q. Did you tell whomever the officer was who was questioning you that we, meaning you, Atkinson, Timmerman and this other gentleman, Mike Edwards, "Stayed in Brattelboro till about 2:15 A.M.," did you tell him that?
A. Around that time, yes.
Q. Did you tell him that Michael dropped you off around 3:15 A.M. at your house?
A. I told him he dropped me off around 3:30, twenty of four.
Q. At your house?
A. Yes.
Q. You told that to the police?
A. Yes, I did.
Q. Did you tell him you headed for 33 Covel Street?
A. No, I did not.
Q. So everything that I have read to you up to that point, striking "I headed for 33 Covel

Street", was provided to the police by you, correct?

A. In a sense, yes.

Q. As you look at Exhibit No. 5, and starting with that sentence that says, "I headed for 33 Covel Street," is there anything in there that you provided the police?

A. No, there is not.

Q. Did you read that?

A. I have read it before, yes.

MR. HAMMERSCHMITH: Could I ask the question be repeated, please?

Q. (By Mr. Bloom) The question is, sir, have you read that before?

A. Yes.

Q. My understanding is the details of November 30th of 1985 that are stated in this statement were provided to the police by you up until the sentence that begins, "I headed for number 33 Covel Street"?

A. Yes.

Q. You didn't tell them that?

A. Excuse me?

Q. You did not tell them that?

A. What, I headed for 33 Covel Street?
Q. Yes.
A. No, I did not.
Q. "The reason I went there is because I heard it had been broken into before." You didn't tell them that?
A. No.
Q. "I had a pair of my sister's gloves on." You didn't tell them that?
A. No, I did not.
Q. "They were wool gloves." You didn't tell them that?
A. No, sir, I didn't.
Q. "I entered an unlocked breezeway door at 33 Covel Street and I kicked the rear inner door in." You never said that?
A. No, I did not.
Q. "I entered the house and started looking through the house." Never said that?
A. No, sir, I didn't.
Q. "Found a handbag and took it with me." You never said that?
A. No, sir, I did not.

Q. "I left through the rear door." You never told the police that?
A. No, sir, I didn't.
Q. "I left the pocketbook a few houses down the street." You never said anything about that?
A. No, sir.
Q. "I left 33 Covel and went to 27 Malibu Drive." You never said that?
A. No, sir, I did not.
Q. "I opened the door to the breezeway and kicked the side door in." Did you say that?
A. No, sir, I didn't.
Q. "I started to go through the house and a little dog started barking and I ran out the side door." Did you tell the police that?
A. No, sir, I didn't.
Q. "This occurred around 4:00 A.M. on Saturday November 30, 1985, and after this I went home." Did you tell the police that?
A. No, sir, I didn't.
Q. "I had been drinking since about 7:00 P.M." That's true, isn't it?
A. Around that time, yes.

Q. "That day I had also taken two purple mescaline pills." Did you tell the police that you had taken two purple mescaline pills?

A. No, I told them I took one.

Q. One? Is there something funny about that?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

THE WITNESS: Is there something funny about what?

Q. Did you tell them that you had been drinking since 7:00?

A. Around that time, yes.

Q. Did you tell the police that? I'm not asking you when you started drinking, I'm asking you did you tell the police that you started drinking on November 30th of 1985 around 7:00?

A. That specific time, no.

Q. You said around 7:00?

A. I said around 8:00.

Q. And that you had taken some sort of pills, did you provide that information to the police?

A. Yes, I did.
Q. You don't remember signing this?
A. No, sir, I don't.
Q. In fact, you don't even remember being questioned about that?
A. Yes, I remember being questioned.
Q. You do?
A. Yes, sir --
Q. You are familiar with this neighborhood, aren't you?
A. Yes, I am.
Q. In fact, if you go from Covel Street and head toward Malibu, you run into Hilltop, correct?
A. Yes, you do.
Q. If you stay on the streets -- I'm talking about the paved streets -- if you head from Covel in this direction to Malibu, you would take a right on to Hilltop?
A. That's right.
Q. Then down here, correct me if I'm wrong, there is a street, I think it's Bartels, is that correct?
A. Yes, there is.

Q. Right about there. Is it Bartels?
A. Yes.
Q. And that would take you to Parker?
A. If you go straight, yes.
Q. What I'd like to ask you, sir, and if you can clarify for the jury, if you are on Covel Street and you are in a car and you want to head in this direction toward Hilltop, the only way to get there is to go to Hilltop, take a right, and then go out on to Bartels, correct?
A. Yes.
Q. And ultimately that will lead you to Malibu, take a left on to Parker, and Malibu is a little way down the road, correct?
A. Yes.
Q. Now, if you wanted to go the other way, of course, you could turn out Covel the other direction and you ultimately could come out to Malibu also, correct?
A. No.
Q. You couldn't get to Malibu by going out the other direction of Covel?
A. No, you couldn't.

Q. You can't? What street is there? Doesn't Forest take you out to Allen street?

A. Yeah, way -- well, if you took another right.

Q. I understand the distances are a lot longer. I'm asking could you, if you came out this direction of Covel Street, take a right onto Forest, come out to Allen Street, go around to Parker Street and then get to Malibu that way?

A. Yes, you could.

Q. And it's a lot longer than going in the other direction, isn't it?

A. Yes, it is.

Q. But if you're in a car or if you're walking and you want to stay on the paved street, if you're going in the direction that I am indicating, based on this board, left to right, the only way to get to Malibu Drive, staying on the paved street, is to take a right on to Hilltop, a left on to Bartels, and then ultimately out to Parker and over to Malibu?

A. No, that's not true.

Q. How is the other way of getting there?

A. You take Telbar Street, it goes around,

and it leads out to where Malibu is.

Q. Where does Telbar go out to Malibu?

A. Telbar cuts off somewhere in here, the street goes around into a circle like that, Malibu is about right here.

Q. The point I'm making, sir, if I can, you would agree with me that if you want to stay on the paved road, moving from left to right to Covel, going to Malibu, you have to take a right on to Hilltop, correct?

A. Yes.

Q. And you have to take a left on to Bartels?

A. Yes.

Q. And either then get on Telbar and go to Malibu or get on Parker and go to Malibu?

A. Yes.

Q. You can't take a left off of Covel on to Hilltop in a car or walking and stay on a paved road and get to Malibu, can you?

A. No, you can't.

Q. But up in here where the X and the circle is marked, there is a house up on the hill,

correct?
A. I believe so, yes.
Q. Well, you believe so. Do you know that there is, sir?
A. I know there is one house up there.
Q. You have seen that house a hundred times or better, haven't you?
A. I just stated I believe there's one house up there.
Q. How many times have you been by that house?
A. Several times. I used to go to school with a kid that lived in the house.
Q. And it sits way up on the hill, doesn't it?
A. No, you drive up a driveway and it's set back in the woods.
Q. And it's a higher elevation than the rest of the houses in that area, correct?
A. No.
Q. It's not?
A. All the houses on Hilltop are on a hill.
Q. Are you familiar with that house, sir,

regardless of how high up it is?
A. Yes, I am.
Q. In fact, there's a walkway or a pathway right in this general neighborhood, isn't there?
A. Yes, there is. Well, there used to be.
Q. Well, going back to 1985 there was, wasn't there?
A. It was blocked off by a fence.
Q. Where was the fence, sir?
A. The fence was back here where the house was, that they cut off the path.
Q. You've been through there a number of times?
A. I just told you, yes.
Q. Well, I'm asking you, have you?
A. Yes, I have.
Q. Why don't you tell us about what it looks like when you get in that area. If you are walking from Hilltop, trying to come out on to Telbar to get to Malibu, what would I have found in November of 1985?
A. What would you have found?
Q. Well, there's a walkway, first of all?

A. First you go up a driveway -- it's not a walkway, it's a driveway -- then you'd have to go up the hill and come down a hill.
Q. So the terrain goes up --
A. There is no made path there, no.
Q. Did you ever walk through there yourself?
A. Yes.
Q. And it goes up, right?
A. And it goes down.
Q. Then it goes down?
A. Yes.
Q. You said there is a fence about three feet high or so?
A. Approximately, yes.
Q. And if you go over that fence, you come out to Telbar and Telbar comes out to Parker Street, correct?
A. Yes.
Q. And you are familiar with that location?
A. Yes, I am.
Q. And you were familiar with it in November of 1985, correct?

A. Yes, I am.
Q. Now, do you remember, sir, signing any Miranda warning cards that day of December 7th of 1985?
A. No, I don't.
Q. You don't remember signing any of them?
A. No, I don't.
Q. How long were you in your house on December 7th of 1985 when the police came in?
A. I couldn't tell you.
Q. You have no idea?
A. No, I don't.
Q. After you ran from the police, you jumped over a series of fences before you were caught, isn't that right?
A. No, I did not.
Q. You didn't?
A. No, I didn't.
Q. Were your hands handcuffed behind your back?
A. Yes, they were.
Q. Did you run away?
A. Yes, I did.

Q. Did you jump over any fences?
A. No, I didn't.
Q. You never did?
A. No, I didn't.
Q. Were you pretty drunk at that time?
A. Yes, I was.
Q. How many had you drank again?
A. Approximately two six-packs.
Q. Two six-packs?
A. About that. I don't really keep track.
Q. Well, to the best of your ability to remember?
A. I'd say two six-packs.
Q. When do you think you weren't under the influence of the beer anymore?
A. Excuse me?
Q. When do you think you stopped feeling the effects of the beer on that day, the 7th?
A. Specific time I couldn't tell you.
Q. No one expects you to remember a specific time. Let's take, for instance, 8 or 9 hours later, at noon. Do you think you were still under the influence of the beer at that time?

A. Not really the beer, but the Valiums, yes.

Q. How about four the next afternoon, which would have been about 12 hours after you were taken out of your house?

MR. HAMMERSCHMITH: Objection.
Could we approach?

Q. (By Mr. Bloom) Could you still feel the effects at that time?

MR. HAMMERSCHMITH: I'm not sure what is meant by the next afternoon.

MR. BLOOM: I'm sorry, December 7th is what I'm asking about.

THE COURT: All right.

Q. Did you still feel the effects at 4:00?

A. In the afternoon?

Q. Yes.

A. My head was still light, yes.

Q. You, in fact, sir, remember being in a lineup that day?

A. Yes, I do.

Q. And you would agree with me, wouldn't you, that all these things that had been done to you,

the beating that you described for Mr. Hammerschmith and myself, occurred hours before you were placed in a lineup, isn't that fair to say?

A. Yes.

Q. In fact, most of what had happened to you physically occurred outside of your house on Malibu, however far you got before the police grabbed you, and then when you first got to the station and you took a couple hits to the side at the booking desk, correct?

A. Yes.

Q. And being in the lineup was hours after that?

A. I believe so, yes.

Q. You didn't get beat again after you got hit at the bookiing desk?

A. No, I didn't.

Q. And do you think that picture, Exhibit 15, fairly and accurately depicts how you looked when you stood in that lineup on that day?

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Basically, yes.

CITY 002860


Q. Do you remember what time it was that you were in the lineup?
A. Not exactly, no.
Q. Well, can you see the clock in the background? You can answer that yes or no.
A. Yes.
Q. Would that refresh your memory as to what time it was you were in the lineup?
A. About 4:37.
Q. 4:37?
A. About that time, yes.
Q. Is it fair to say, sir, that about fifteen minutes to a half an hour after the lineup, if the lineup happened about twenty minutes of five, within about a half an hour or so you saw your mother and your sister?
A. Yes.
Q. Is that a fair statement?
A. Yes.
Q. You used to go down Covel Street just about everyday back in 1985, isn't that right?
A. Yes, I did.
Q. You knew that a woman lived there,

correct?

A. I didn't know who lived there.

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

Q. (By Mr. Bloom) Did you know that a woman lived there?

A. I didn't know who lived there.

Q. You had no idea who lived there?

A. No, I didn't.

Q. Did you ever see anybody out on the lawn working at that house?

A. No, I didn't.

Q. Did you ever see anybody on that property prior to November 30, 1985, any one of the days that you used to walk down Covel Street?

A. Not that I can remember, no.

Q. And you heard Sergeant Kelly say -- you were in this courtroom, you heard where he said he found a pocketbook, didn't you?

A. Yes.

Q. And you don't dispute the fact that you are familiar with that area of Hilltop, correct?

A. No, I don't.

Q. You are familiar with it, correct?
A. Yes, I am.
Q. Were you familiar with it in 1985?
A. Yes, I was.
MR. BLOOM: Thank you.

REDIRECT EXAMINATION BY MR. HAMMERSCHMITH:

Q. At any time on December 7, 1985, were you beaten in the face?
A. Not that I can remember, no.
Q. Where were you beaten?
A. Above the stomach, back, legs.
Q. Referring you to March 31, 1987, when you gave blood, was it your understanding -- what was your understanding as to whether or not you had a choice in that matter?
MR. BLOOM: Objection. I never asked this on cross, Judge.
THE COURT: Yes, you did -- well, no, that's right, I sustained the

objection to that.

MR. HAMMERSCHMITH: I think -- may I be heard?

(The following conference was held at side bar)

THE COURT: What is the question now?

MR. HAMMERSCHMITH: The question is understanding as to whether he had a choice about his blood being taken.

THE COURT: Wait a minute now, I sustained the objection to that when you objected to it.

MR. HAMMERSCHMITH: I understand, but I think what he asked referred to didn't your lawyer tell you this.

MR. BLOOM: You objected.

MR. HAMMERSCHMITH: I think the insinuation was very clear to the jury he --

THE COURT: I will explain to the jury that a question that a lawyer asks

the witness is not evidence, I do that in every charge I give, so I sustained your objection.

MR. HAMMERSCHMITH: I just think, in light of the question that was asked, it is appropriate to let that be clarified.

THE COURT: I think once the objection was sustained, I think that was sufficient, and I am going to explain to the jury that a question any lawyer asks a witness standing alone is not evidence, that only when the witness is allowed to answer can the question and answer be taken as part of the evidence. I do that in every charge I give, so I am going to let it stand.

(End of side bar conference)

MR. HAMMERSCHMITH: I have nothing, Your Honor.

MR. BLOOM: I have nothing further,

Your Honor.

(Witness steps down)

MR. HAMMERSCHMITH: The defendant rests, Your Honor.

MR. BLOOM: I have one witness, Judge.

Sergeant Kelly.

SERGEANT THOMAS KELLY (Recalled)

DIRECT EXAMINATION BY MR. BLOOM:

Q. Would you, for the record, again, state your name and occupation?

A. Thomas M. Kelly, I am a sergeant in the Springfield Police Department.

Q. Now, Sergeant, I'm going to ask you if you would be kind enough to draw your attention to what I believe, if I'm not mistaken, is Exhibit 10.

Are you familiar with these two knit gloves?

A. Yes, sir.

Q. I believe previously you testified concerning where you took those into your possession concerning November 30th of 1985?

A. I found them at 27 Malibu Drive.

Q. Now, at some point in time, and I'm going to ask you to direct your attention now to a week later, on December 7th of 1985, did you have occasion to do something with those gloves?

A. Yes, sir.

Q. Can you tell us what, if anything, you did with them?

A. I took them with me to 87 Malibu Drive.

Q. Can you just tell me yes or no, was it as a result of information you had acquired, just yes or no?

A. Yes.

Q. When you went to 87 Malibu Drive, who did you see there, if anyone?

A. Mrs. Westcott.

Q. Can you tell the Court and jury what, if anything, you did with those gloves at that time?

A. I showed them to Mrs. Westcott.

Q. What, if anything, did she say?

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

MR. HAMMERSCHMITH: Your Honor, may --

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I just want to make it clear for the record that it is my understanding that this would be admitted as a prior inconsistent statement and not for the truth of the matter.

THE COURT: Right. Absolutely.

MR. HAMMERSCHMITH: I just wanted it on the record.

(End of side bar conference)

Q. (By Mr. Bloom) What, if any, conversation did you have with Mrs. Westcott

concerning those gloves that are Exhibit 10 in front of you at the time you are now describing?

A. I showed her the gloves, I asked her if she had ever seen them before. She told me she had a pair just like that.

Q. What, if anything, did she say or do at that time?

A. She told me that she had just rearranged the hall closet several weeks before and she knew they were in there then. She took me to the hall closet, opened it up, I asked her to look and see if they were there, she looked, she indicated that her gloves were not there.

MR. BLOOM: That's all I have.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. What day was this on?

A. That was on December 7th, sir.

Q. And that is more than two years ago?

A. Yes, sir.

Q. And you remember exactly what she said then?
A. Yes.
Q. And exactly what she did?
A. Yes.
Q. How many cases have you been involved in since December 7th? Is it fair to say hundreds?
A. No.
Q. How many?
A. Less than a hundred, since '85.
Q. Did you keep a written record of your conversation with Mrs. Westcott?
A. I reduced it to writing.
Q. You reduced this to writing?
A. Yes, I did.
Q. Where was that reduced to writing?
A. At the station.
Q. And is that something which is a matter of record at the station at this time?
A. I don't know.
Q. You are saying you filled out a police report about this?
A. I filled out a report and I put it into

the file.

MR. HAMMERSCHMITH: May counsel approach side bar, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: I have received no such report, Your Honor. There was discovery ordered in the case two years ago and there have been a number of discovery orders since then, which I think would have covered a document like this.

THE COURT: Are you saying it comes as a surprise to you?

MR. HAMMERSCHMITH: Yes.

THE COURT: Well, now, wasn't this part of the motion to suppress?

MR. BLOOM: Yes, it was. I have discussed this innumerable times --

THE COURT: I remember it being mentioned to me.

MR. HAMMERSCHMITH: I'm saying he

says there is a statement --

THE COURT: I realize that.

MR. HAMMERSCHMITH: That is the surprise, Your Honor.

THE COURT: Well, now, it was mentioned at side bar here early in the trial.

MR. BLOOM: I think he just said to you that the report is the surprise, not the contents.

THE COURT: Oh, okay, but that's what I'm getting at. The statement that Kelly claims Westcott made to him is not a surprise.

MR. HAMMERSCHMITH: That's correct.

THE COURT: Okay.

MR. BLOOM: I can tell you for the record that Charlie Arpin, Lieutenant Arpin, had this file since day one. We have discussed this before.

THE COURT: Who is Charlie Arpin?

MR. BLOOM: He is a lieutenant up in the Detective Bureau, he slept with

this file for whatever reason.

We've been through it a number of times and have never been able to find the statement. Kelly's told me since day one he put it in writing. I've never been able to find the statement, but it's been well known to counsel and I have discussed it with him on innumerable occasions that, based on what Kelly has told me since day one in this case, and I have shared all information with Mr. Hammerschmith, that he had claimed from day one that this woman identified the gloves and in fact looked for them and couldn't find them, but I will admit I have never seen a report and that's why I haven't turned it over, because I have never had it myself.

MR. HAMMERSCHMITH: Has he been asked for the report?

MR. BLOOM: I just mentioned he and I have gone through the file and we have

not been able to find one, but he claims he made one and he put it in the file. I don't know what I can say other than that.

The key issue is surprise, I would think, and there is none here.

MR. HAMMERSCHMITH: Well, I will question him about where that statement is.

(End of side bar conference)

Q. (By Mr. Hammerschmith) Sergeant Kelly, you say you made a report of this?
A. Yes, sir.
Q. When would that have been done?
A. When I returned to the station after completing the search warrant.
Q. And that would have been done in writing?
A. Yes, sir.
Q. And that would have been filed in the police file?

A. Yes, sir.
Q. Would it be a specific file relating to Mr. Perrot's -- the investigation of Mr. Perrot's charges?
A. Yes.
Q. Do you have that statement with you here today?
A. No, I don't.
Q. Did you attempt to find that statement?
A. Yes.
Q. When did you attempt to find that statement for the first time?
A. Testifying in another proceeding.
Q. How long ago would that have been?
A. It would have been the Grand Jury.
Q. Would it be fair to say that you were not able to produce for us today the statement which you allegedly reduced to writing on that date?
A. I haven't seen it since the day I wrote it.
Q. But you are saying that you wrote it?
A. Yes, sir.
Q. You just don't know where it is?

A. That's correct.
Q. Misplaced?
A. I don't know.
Q. You haven't seen it since the day you wrote it?
A. Again, that's correct.
Q. And yet today, two years later, you still remember exactly what was said to you by Mrs. Westcott and exactly what happened, without referring to that report?
A. Yes, sir.
MR. HAMMERSCHMITH: No further questions.

REDIRECT EXAMINATION BY MR. BLOOM:

Q. Give us your best estimate, either in court in a judicial proceeding or outside of court with people working on this case, how many times since December 7th of 1985 you have discussed what you just testified to in number, as best you can

estimate?

A. Twenty to thirty times.

MR. BLOOM: Thank you.

RECROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Have you ever shown this report to anybody else?

A. I haven't seen it since the day I wrote it, sir.

Q. On the day you wrote it, did you show it to anyone else?

A. I placed it immediately in the file.

Q. Didn't show it to anyone before doing so?

A. I didn't have to, I was the head of the investigation.

Q. So no one else knew there was such a report other than yourself, to your knowledge?

MR. BLOOM: I'm going to object to that question.

THE COURT: Overruled. I will let him answer it.

THE WITNESS: I don't know.

MR. HAMMERSCHMIDT: Thank you.

FURTHER REDIRECT EXAMINATION BY MR. BLOOM:

Q. When was the first time you told someone associated with this case, either in the D.A.'s office or a co-worker in the police department, about what happened with Mrs. Westcott concerning December 7, 1985?

A. That morning.

MR. BLOOM: That's all.

MR. HAMMERSCHMITH: No further questions.

MR. BLOOM: That's all I have.

(Witness steps down)

THE COURT: No other witnesses?

MR. BLOOM: No.

THE COURT: Evidence completed?

MR. BLOOM: Yes, Your Honor.

THE COURT: Evidence completed?

MR. HAMMERSCHMITH: Yes, Your Honor.

THE COURT: Mr. Foreman, ladies and gentlemen of the jury, the evidence in the case is now completed, which means the next step in the trial is for the lawyers to argue to you and and make their closing statements to you and for me to instruct you on the law that you are going to apply to the facts as you find them to be in the case. Prior to that, I have a matter to take up with the attorneys before we get to that stage of the trial, so we are going to start the arguments and charge on Monday morning at 9:30, but until that time, my instructions are that until Monday morning and you have heard the arguments of the lawyers and I have instructed you

on the law and the case is given to you for decision, until that time, you are not to have any discussions among yourselves about the case, you are not to discuss the case with anyone outside the courthouse for all the reasons that I have given you throughout the trial, and, again, I am imposing the obligation on you to avoid all publicity about the case, be it newspaper articles or news reports from radio or television, any form, for all the reasons that I have given you, no special views of Malibu Street, individual views of Malibu Street or that area that we have been discussing here in the course of the trial, because, again, I have to repeat for you, and the reason I repeat it is because it is so important, you have to decide the case based on the evidence produced in the trial, you are not to be influenced by anything that comes to your attention from any other source.

So, with that, I will say have a good weekend to you, we will see you Monday morning at quarter past nine. This will be the first order of business Monday morning, ladies and gentlemen.

(Whereupon, the jury was removed from the courtroom at 12:40 P.M.)

THE COURT: I'd like to see counsel.

(The following conference was held at side bar)

THE COURT: Do you have any requests for instructions?

MR. HAMMERSCHMITH: Yes. I believe there are two other brief instructions, which I don't seem to have here.

THE COURT: Okay, I have defendant's request for jury instructions on admissibility of statements, defendant's request for

instruction on consciousness of innocence, and defendant's request for instructions that intoxication is negating intent.

THE COURT: Anything -- what are the others?

MR. HAMMERSCHMITH: I had a special question, I don't know whether --

THE COURT: You mean --

MR. HAMMERSCHMITH: A special question with respect to the voluntariness of the statement.

THE COURT: A special question?

MR. HAMMERSCHMITH: With respect to the voluntariness of the defendant's --

THE COURT: You mean on the verdict slip?

MR. HAMMERSCHMITH: Yes. Which, if I didn't give to you, it is over here, if I may.

I seem to have misplaced the original for the moment, Your Honor. This is a copy, and I believe I gave you

a copy of it.

THE COURT: Now, just in glancing at these, there is one thing you are going to have to convince me of. I haven't gone over them in detail, but you say the intent to steal and the intent to rape are essential elements of the crimes of robbery and rape respectively. You are going to have to convince me that there is a specific intent to rape element that has to be proved, because I think the law is to the contrary.

MR. HAMMERSCHMITH: With respect to intent to steal --

THE COURT: Well, there is no question about that. I'm just raising that issue. You seem to be saying to me that I have to charge the jury that the specific intent to rape. I think the law is to the contrary, and you are going to have to get some case law to convince me otherwise, counselor.

Because my recollection is that the case law specifically says it's not a specific intent.

MR. BLOOM: He may have prepared that when the assault with intent to rape still was alive.

MR. HAMMERSCHMITH: I defer to the Court.

MR. BLOOM: It would apply to that, but it doesn't apply to the rape.

MR. HAMMERSCHMITH: I believe it is pled with an intent to rape in the rape charge, maybe my recollection is incorrect on that.

THE COURT: Aggravated rape.

MR. BLOOM: Right. It's a general intent crime, my understanding.

THE COURT: Yes. Well, at any rate. Okay, so that's it?

MR. BLOOM: I don't have anything other than consciousness of guilt. I'm assuming --

MR. HAMMERSCHMITH: There are other

things. I think -- I don't have specific instructions on them. I know with respect to reasonable doubt we have had a discussion before.

THE COURT: I might go along with you on that one, changing that to -- changing possibility to probability. We have discussed that. I'm not so sure, but, at any rate, I'm not sure the change makes any difference.

MR. HAMMERSCHMITH: My first preference would be for the straight Webster instruction, but -- I think we need to have an instruction on expert witnesses.

THE COURT: I am going to.

MR. HAMMERSCHMITH: I think we need to have an instruction under the Moran case as to the issue that I mentioned in connection with request for required finding, that is that the assault -- on the robbery charge, there must -- the assault must be done with the intent to

rob rather than some other intention, and I understand on the aggravated rape charge, the only aggravating factor will be the other criminal --

THE COURT: Burglary and robbery.

MR. HAMMERSCHMITH: Right. That's basically what I have.

THE COURT: Okay. Regarding your specific requests here, I will go over those with you Monday morning.

Now, first of all, how long are you going to argue?

MR. HAMMERSCHMITH: Probably a half hour, I would think.

MR. BLOOM: About a half an hour.

THE COURT: Okay. Let's set up a conference on the charge at 9:00 or shortly thereafter on Monday, because I want to get this to the jury first thing Monday morning.

MR. HAMMERSCHMITH: That's fine.

(End of side bar conference)

MR. HAMMERSCHMITH: Your Honor, there is one other matter. I don't know whether it needs to be on the record or not. Mr. Perrot is concerned about his remand. It would be his request to be remanded to Norfolk rather than to York Street. The reason that he has indicated to me is he is having some problems down at York Street in terms of verbal abuse, harassment, perhaps related to the news reports of the case. He has also indicated to me that he has not been able to get a shower since he was there and so on, which would make it rather difficult for him to stay at York Street.

MR. BLOOM: I don't care one way or the other, but you have to recognize we may not get started till 11:00 if you do it.

THE COURT: Okay, can I talk to you, Mr. District Attorney, and can I

talk to --

MR. BLOOM: You want Mr. Sullivan?

THE COURT OFFICER: He's not here.

THE COURT: Is Mr. Martin standing in for him?

THE COURT OFFICER: Yes.

THE COURT: Would you get Mr. Martin for me.

I think if we do what you're requesting, counselor, we probably won't get this case started Monday morning until closer to noontime rather than 9:30.

(Off record discussion held)

THE DEFENDANT: May I be heard?

MR. HAMMERSCHMITH: Can we have just a minute?

(Pause in the proceedings)

MR. HAMMERSCHMITH: Mr. Perrot is

quite concerned about the situation at the jail. I guess he is somewhat cynical about the possibility of correcting it. He does say to me that with an early mittimus he could be brought up here in time not to delay the proceedings on Monday. I'm not familiar enough myself with the procedures.

MR. BLOOM: I never had a state prisoner here before 10:30 or 11:00 in the eleven years I have been here.

THE COURT: Mr. Martin, check with the jail and report back.

MR. BLOOM: I can get one of the jail officials to make contact with your court officer, if you want to handle it through that method.

THE COURT: Let's see what happens with Mr. Martin.

(Pause in the proceedings)

MR. HAMMERSCHMITH: Your Honor,

could we be excused from the courtroom a minute so I can speak with Mr. Perrot.

THE COURT: Let's wait till we get a report back. I want to get a report back first.

THE COURT: Could I see you gentlemen.

(The following conference was held at side bar)

THE COURT: Can you make arrangements also, Mr. District Attorney, with the people at the jail to make sure that there are no problems this weekend?

MR. BLOOM: I will, I'll talk to them. Is he segregated?

MR. HAMMERSCHMITH: I don't know whether he's been in segregation or not.

MR. BLOOM: I will gladly call Jay Ashe and find out what the story is.

THE COURT: Can Sergeant Kelly do something for us, too, if he has to?

MR. BLOOM: I'll call as soon as I get back to the office Jay Ashe and find out what is going on. In fact, the best thing to do, Ross Murray that works in the jail is the liason person, he should be in the building.

THE COURT OFFICER: Let me check and see.

(End of side bar conference)

(Whereupon, Ross Murray entered the courtroom and a discussion was held)

THE COURT: Monday morning.

(Hearing suspended at 1:00 P.M.)

I, JANIS H. TRENHOLM, Official Court Reporter, do hereby certify that the foregoing testimony is true and accurate, to the best of my knowledge and ability.

Janis H. Trenholm