**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 13

CITY 002531

C O M M O N W E A L T H  OF M A S S A C H U S E T T S

Hampden, ss

Dept. of the Trial Court
Superior Court Division
No. 85-5415 thru 5418,
5420, 5422, 5423, 5425

COMMONWEALTH

VS

GEORGE PERROT

TRIAL HELD IN HAMPDEN COUNTY SUPERIOR COURT, SPRINGFIELD, MASSACHUSETTS, BEFORE MURPHY, J., AND A JURY, CONTINUING ON DECEMBER 14, 1987.

APPEARANCES

FRANCIS BLOOM, ASSISTANT DISTRICT ATTORNEY — Representing the Commonwealth

JAMES HAMMERSCHMITH, ESQ. — Representing the Defendant

Janis H. Trenholm
Official Court Reporter

VOLUME VI

(The following lobby conference commenced at 9:20 A.M.)

THE COURT: Okay, we have defendant's requested instruction on intoxication as negating, I guess, intent. And it reads the intent to steal and the intent to rape are essential elements of the crime of robbery and rape respectively. Evidence of intoxication, whether from alcohol or from hallucinogenic drugs or other substances may be sufficient in the area of reasonable doubt as to whether a defendant was able to form the required intent charged.

First of all, I don't feel rape is a specific intent crime. I am going to charge that the jury can consider the evidence of consumption of alcohol and drugs at the time of the alleged offenses in determining whether the Commonwealth has proved specific

intent on those crimes that require specific intent. I am also going to --

MR. BLOOM: Will you specify for them which ones that will pertain to and which ones it wouldn't?

THE COURT: Yes, I will have that. Now, also, with regard to the waiver of his rights and the voluntariness of his statements to the police on the 7th, I am going to tell them they can take into consideration his alcohol consumption and drug consumption, give whatever weight they want to give it.

Defendant's requested jury instruction on the admissibility of statements. I am going to charge on that substantially the way you have set it out here. It won't be verbatim, but it is going to cover just about everything you've got in your request, Mr. Hammerschmith, I just ask you to listen to it at the time I give it.

MR. HAMMERSCHMITH: That covered

the situation where someone says that they don't want to talk to the police and the obligation of the police at that point.

THE COURT: I am going to charge them on the Miranda rights and what the Miranda rights mean. I don't know if I am going to specifically say that once he exercises them, they can't do anything after that.

MR. HAMMERSCHMITH: I think, in this case, my recollection of his testimony was he told the police at least once, and I believe more than once, after being advised of his rights, that he didn't want to talk to them, and I think, if indeed that were found as a fact by the jury or if actually there was reasonable doubt as to that by the jury, that the jury should not consider the statements.

THE COURT: Well, I am going to tell them if they find he didn't waive

his rights, they've got to ignore his statements.

MR. HAMMERSCHMITH: Well, this is a point a little different than that, I think.

THE COURT: I understand it is, but you will just have to listen to my charge and see if you feel I have covered it or not.

MR. BLOOM: Can I just say, Judge, that I know you are going to say that. My problem with the language of this request is that my memory is that the contents that are inculpatory he denies ever making, so I know we have the duty beyond a reasonable doubt, but it really hasn't been placed as a substantial issue the way it is referred to here. My memory is the way he left it, as far as the contents of Exhibit 5, the incriminating aspects, once he starts talking about kicking in the door, I never said any of that stuff to the

police at any time.

THE COURT: Okay. Well, here again, I'm not going to give that part of the charge verbatim.

MR. BLOOM: All right.

THE COURT: Now, with regard to defendant's motion for special questions, and in this motion the defendant requests the Court to propose a question to the jury as follows: Do you find beyond any reasonable doubt that the defendant's statement to the Springfield Police Department was made voluntarily by him and that he voluntarily waived his right to remain silent and his right to have counsel present?

I am not going to ask the jury that question, counselor, and I will note your objection. I don't feel it is necessary, I'm going to instruct them thoroughly on it. I'm sure the jury is going to realize that if they find that

he didn't voluntarily make the statements or if he didn't voluntarily waive his rights, that I am going to tell them that they are going to have to ignore that statement and reject it entirely, but I am not going to ask them the specific question.

MR. HAMMERSCHMITH: Could I be heard very briefly?

THE COURT: Sure.

MR. HAMMERSCHMITH: My concern is that it is very, very difficult analytically for a jury of lay persons to separate out these questions. Lawyers and judges do it all the time, but I think in a case like this, the jury has been sitting for five days now, they are going to want to get to deciding the guilt or innocence, I think that's what they see their role as, and I think it is extremely difficult and maybe even unreasonable to expect them to be able to stop before they even

start to do that and answer this question about the voluntariness of the statement, which is really the crux of the case against Mr. Perrot.

MR. HAMMERSCHMITH: And the purpose of this question is to assist the jury to make sure that they do in fact answer that question and do in fact consider that question as they are supposed to consider under the law. I think it would be very helpful to the jury in that regard.

THE COURT: I don't think there is any question that they will do it. Actually, there is no identification of the defendant. The only substantial evidence is his statement that he was in the house -- in both houses at the time the offenses occurred, and I have no reason to believe that this is not an intelligent jury and they can make that determination that either he either sinks or swims on this statement, and

whether they do find that he made the statement or he didn't make it, and if he did make it, was it voluntary and was there a valid waiver? So I don't think I am required that ask that specific question, counselor, I am not going to ask it and I will note your objection.

Now, defendant's requested instruction on consciousness of innocence. Have you got any case law on that for me, counselor?

MR. HAMMERSCHMITH: I don't believe that there are any cases which specifically dictate a consciousness of innocence argument. My recollection is that Commonwealth versus Porter discusses the propriety of the consciousness of innocence instruction.

THE COURT: Have you got the citation?

MR. HAMMERSCHMITH: I may not have brought that with me. It's just a very brief discussion and it's not --

THE COURT: Here I assume you are referring to his signing the waiver on the night of his arrest with regard to the blood samples, and that's when I think they took the hair sample is too, isn't it?

MR. HAMMERSCHMITH: I think they took the hair at that time.

THE COURT: I think it is written right into that form. That form is in evidence.

MR. BLOOM: Yes, I think it was put in evidence.

THE COURT: Yes. So I assume you are referring to that.

MR. HAMMERSCHMITH: Yes, the giving of the blood and the hair.

THE COURT: Well, there are two problems I've got. First of all, I think the case law doesn't support your position. And, secondly, this is the same time he signed the statement. Right?

MR. HAMMERSCHMITH: The blood was given three days after the statement.

THE COURT: No, I'm talking about the piece of paper that he signed, that he voluntarily did it.

MR. BLOOM: He signed it about quarter of two and then the statement process started about three.

MR. HAMMERSCHMITH: I think the time on the statement was 12:40, there is no time on the statement.

THE COURT: But it is the same date.

MR. HAMMERSCHMITH: Yes.

THE COURT: It is within a couple of hours of giving the statement, which -- it seems to me that you are kind of working yourself with that one, aren't you?

MR. HAMMERSCHMITH: As I say, the blood was given three days after that, the second blood was given a year and a half ago --

THE COURT: Voluntarily when he signed the statement.

MR. HAMMERSCHMITH: Well, my recollection was that there was evidence that he did so voluntarily when he gave the blood on March 31, 1987, also.

THE COURT: That was under the court order.

MR. BLOOM: Yes.

MR. HAMMERSCHMITH: I don't believe there was any evidence of a court order. I believe the evidence was that he was -- he understood that he had a choice and he made a choice to have the blood taken, knowing what it was going to be used for. That is my recollection.

THE COURT: But what choice did he have? He was asked if he realized what the blood test would do, and he said yes, I did, it could either include me or exclude me.

MR. HAMMERSCHMITH: I guess we've been through this before. My

understanding -- this is not the evidence, but my understanding at the time was that he clearly did have a choice and it was posted to me by Mr. Bloom as a choice and I posed it in that way to Mr. Perrot, he made the decision.

THE COURT: You mean as far as the delaying the trial goes?

MR. HAMMERSCHMITH: No, as far as having the blood taken back in March, and understanding the purposes of it --

THE COURT: I thought you had a court order for that.

MR. BLOOM: We did. We have had that at side bar. That's the whole scenario we got into about Mr. Hammerschmith becoming a witness. How could you -- if you were going in now to talk to a client, what are you going to tell them? We all know you've got to give the blood, the law is clear on it. The fact that, ultimately, when the guy comes out of the lock-up and doesn't

have his lawyer oppose it through verbiage has nothing to do with whether it's a cooperative method, because the law is clear in a case like this because if you have some evidence to suggest that you need a blood or hair sample, the Court is going to give it to you.

So I would, first of all, ask you to -- we are only talking about the 7th. You've been over that I think five or six times, we've been over it at side bar. There is no law to support this, Judge. I looked over the weekend. I know nothing about consciousness of innocence in reference to something like this. I could find no cases to justify this position. He's asking you in essence to do something that I can find no law for.

MR. HAMMERSCHMITH: What happened on that day back in March -- Mr. Bloom has made representations to -- I read the transcript of it in front of Judge

Urbano as to what happened and that is accurate as to what happened. He said he is more than happy to go to trial right now, but if we want to have the blood test, we can have them. I told that to George, he wanted The blood test, the blood test was done.

THE COURT: But that is not in evidence.

MR. HAMMERSCHMITH: What is in evidence, Your Honor, is that he understood and he made a decision. Now, Mr. Bloom is suggesting that he was forced to do that. That's not in evidence either and, in fact, the contrary is the truth.

MR. BLOOM: In fact, Judge, I never made a point that --

THE COURT: I've got to deal with what is in evidence.

MR. HAMMERSCHMITH: I understand. What is in evidence, Your Honor, that George Perrot was told what was going to

happen --

THE COURT: There is nothing about what he was told.

MR. HAMMERSCHMITH: Excuse me, he understood what the blood was being taken for and he made a decision that he wanted to have the blood taken. That, as I recall, is in evidence. I don't remember the exact wording.

THE COURT: "When you gave the blood, did you understand what the results of that could be?"

"Yes, it could either exclude me or include me."

I think that is the evidence. Then he might have said I wanted to give it.

MR. HAMMERSCHMITH: I think he said he made a decision that he wanted to give it.

With respect to consciousness of innocence, in general, I think it is just a matter of fundamental fairness.

If we have consciousness of guilt, we have an instruction given in that situation, now we have the opposite here, consciousness of innocence, and I think reciprocal fairness demands that that be given.

MR. BLOOM: The reason is there is law that recognizes certain types of behavior, that there is an entitlement to consciousness of guilt, that is number one.

Number two, the problem I have, I don't know what went on, but that evidence in and of itself is neutral. We have no way of knowing from those facts what actually transpired between Mr. Perrot and Mr. Hammerschmith before Mr. Perrot came into court and agreed, in essence, on the record to give his blood in light of the court order that was being imposed at that time, that there wasn't any opposition. There is no law to justify what the

defense is asking you to do. On the face of that, that could be interpreted two ways.

MR. HAMMERSCHMITH: I don't believe the fact that there was a court order was introduced into evidence.

MR. BLOOM: When he tried to ask certain questions, there were requests made by you as to whether there was a court order, a multiple number of times during this trial, and it was represented to you at the side bar that there was a court order, and you terminated the examination into that area, other than to let him ask the preliminary questions: Was it explained to you? Yes, it was. What did you understand? It could hurt me, could help me.

And he may in fact have said I wanted it at that point. But, you know, there obviously had to be some discussion that went on between -- just

on the basis of that between lawyer and defendant. I don't know how much of the advice by counsel was as a result of the statement that Perrot ultimately made, which has nothing to do with consciousness of guilt.

Would you give a consciousness of guilt instruction if Mr. Hammerschmith had stood up in court or Perrot had stood up in court and said I don't want to give my blood? Of course not. That is the inverse of what this is all about.

There is no law to justify. And we don't know whether he may in fact have wanted to give his blood but his lawyer advised him don't agree to it.

THE COURT: I'm not going to give the instruction. I will note your objection, counselor.

Now, are we ready to go? Is that it?

MR. BLOOM: Yes, sir.

MR. HAMMERSCHMITH: One other thing I thought I should mention on lesser included offenses with respect to the Prekop case.

THE COURT: Which charge are you talking about?

MR. HAMMERSCHMITH: There is a charge of robbery that is remaining. Will there be a lesser included offense of larceny given on that?

THE COURT: Yes. And that is on the basis of your argument that the assault was -- if in fact it happened -- the evidence would indicate that it goes strictly on the rape and not on the robbery.

MR. HAMMERSCHMITH: Yes.

THE COURT: I am going to give that.

MR. HAMMERSCHMITH: I assume that rape as well as -- rape will be given even as a lesser included of aggravated rape.

THE COURT: Right. Let's see, we've got --

MR. BLOOM: Judge, I have no objection to you mentioning the fact that the theory is armed burglary and/or the unarmed robbery, the attempt or within the course of the alleged commission of those offenses, the theories that would make it an aggravated rape, if found beyond a reasonable doubt by the jury, because that is what we are proceeding under, obviously.

THE COURT: Okay, we've got a lesser included on Mary Prekop's unarmed robbery and a lesser included on the aggravated rape charge, okay?

Okay, gentlemen.

(End of lobby conference)

(Hearing convened at 9:50 A.M. The defendant was present. The jury was not present)

MR. HAMMERSCHMITH: Your Honor, for the record, I have not at this point renewed my motion for required finding. I would at this point ask to renew that motion with respect to the remaining indictments.

THE COURT: The motion is denied, other than that part of the motion that has already been allowed.

MR. HAMMERSCHMITH: Thank you.

(Whereupon, the jury entered the courtroom)

THE COURT: Good morning, ladies and gentlemen.

Mr. Hammerschmith.

MR. HAMMERSCHMITH: Good morning, ladies and gentlemen. First of all, I'd like to thank you on behalf of George Perrot for the time and the attention

you have paid here to this case. I know it's been a burden for all of you to take basically a week out of your lives to hear the evidence in the case and to deliberate as you will be doing in this case. Mr. Perrot and I appreciate that time that you have given to this.

At this point in time, an opportunity is given to me to explain to you the facts that you have heard in evidence that I think should be considered by you in reaching a verdict in this case. I will have a chance to explain the defendant's position to you.

When I am finished, Mr. Bloom will have a chance to explain the prosecution's to you.

When we are both finished, Judge Murphy will explain to you the law that you are to apply to the evidence in deciding the guilt or innocence of George Perrot.

After that is explained, you,

of course, will have the opportunity to deliberate on the guilt or innocence of George Perrot. I would suggest to you that as you do so, there are three general categories of issues which you will need to consider. One set of issues -- and I would suggest to you that in analyzing the case, that the first set of issues that needs to be considered is the issue of the statement that was received into evidence. You will need to consider whether that statement is something that can in fact be considered in your deliberations.

You will have to ask yourselves about the voluntariness of that statement, the voluntariness of any waiver of rights that may have been given, the right to counsel, the right to remain silent, you will have to decide whether those rights were waived voluntarily and intelligently, you will have to decide whether the statement was

given voluntarily, and unless you are convinced beyond a reasonable doubt that the rights were waived voluntarily and that the statement was given voluntarily, and I would suggest to you under the instructions you will receive from Judge Murphy, that statement is not something that you should consider in passing upon the evidence in this case.

Second category of issues you will need to decide is whether the particular things that are alleged in the particular indictments were actually done. The third thing that you will need to decide is whether, if they were done, or whatever was done, was it done by this defendant, George Perrot.

Now, I really intend to talk with you pretty much only about the first and third of those two issues. With respect to the second, I would simply ask that you pay very close attention to the instructions which

Judge Murphy will give to you on the elements of each of the offenses with which Mr. Perrot is charged, and, particularly, he will, I believe, explain to you that a taking of property is a robbery only if the purpose of the assault -- and assault is another element that is needed for robbery -- only if the purpose of the assault is to take money or property. You will have to decide whether you are convinced beyond any reasonable doubt that Miss Prekop was assaulted, that her property was stolen, and also you will have to decide whether you are convinced beyond any reasonable doubt that the purpose of this assault was to accomplish the taking, that is the stealing of property, rather than simply an afterthought following a rape that occurred.

Now, as I said, what I really want to talk to you about today is the

statement that was taken from Mr. Perrot on December 7th and signed by him on that date and introduced into evidence here by the prosecutor, and the issue of identification. Is George Perrot the person who broke into those two homes?

Now, this is not a case where the victim of a crime identifies the person who did it to her. This is not a case where Miss Prekop or Mrs. Lichwala comes into court, points to the defendant and says that's him, that is the man who did this to me. We don't have that here.

In fact, with Miss Prekop, what we have is basically a neighbor of George Perrot. I believe the testimony was that she lived four or five houses away. She had lived there for fourteen or fifteen years, he had lived there for ten. You have heard that George Perrot walked by her house almost daily, and often when he walked by, he would see

her outside there. Yet Miss Prekop, when I asked her, told you that she did not recognize her assailant that night as being someone who was familiar with her, as you would expect that someone's neighbor would be. She did not identify George Perrot as her assailant.

The heart of the prosecution's case against George Perrot is really a statement that he signed at the police station on December 7th. Judge Murphy is going to instruct you on the law concerning that statement. I'd ask that you pay very, very careful attention to the law as he explains it to you, because it is very important to this case.

Now, what do you know about the circumstances surrounding that statement? What do you know about how it was taken, what George Perrot was like when it was taken? What was the evidence that you heard?

You heard that George Perrot was a seventeen-year-old boy at the time. You heard that he had apparently been out drinking the night before. He was seventeen, he shouldn't have been out drinking, but he was, and he had apparently some Valium pills, as well, he had seven or eight Valium pills and half a case of beer the night before.

He got home, I believe he said around 2:00 or 2:30, and you heard the evidence as to what he looked like when his room was opened up by his sister and the police officers that night. Apparently, the light was on in the room, I believe that's what his sister said.

In addition, how was George? What did George look like when the door was opened? Wasn't the testimony that he was laying with his back on the bed, his feet on the floor, his shoes on, his pants on and his shirt off? Basically,

the appearance of somebody who has just passed out there on the bed without even getting their clothes off and getting into bed.

We also know it was about an hour after he had first come home that the police came in and woke him up, and you heard what happened afterwards. He had a coat put on him, he wasn't wearing a shirt, but he was wearing a coat, taken out of the house, and apparently he tried to run away. He was chased for what sounded like several blocks and he was caught.

And he told you what happened after he was caught. He was kicked and he was beaten by the police officers. At some point, he was taken down to the station in a police car. He told you what happened on the way down to the station also. On the way to the station, one of the police officers apparently was jabbing him in the throat

with a nightstick or flashlight or something of that sort and telling him he better not try and run again, because if he did, he was going to be killed, or words to that effect.

When he got to the station, what did he tell you happened there? He told you when they took him to the desk, officers were laughing at him, and that at least one of the officers struck him and he fell down.

Now, he didn't tell you that anybody beat a confession out of him, and I don't mean to suggest that that is what happened. But Judge Murphy will instruct you that when you consider the statement that was signed by George Perrot that night or that afternoon, you consider all of the circumstances leading up to the statement, and I would suggest to you that what happened before he even got to the station and what happened when he first got to the

station are very important factors in determining whether this statement is one that should be considered by you.

Now, you also heard that at the station he wasn't allowed to sleep. He was kept awake. He said he was in a cell, I believe, and officers were banging on the bars of his cell so he couldn't sleep. And I believe you know from the evidence that he had only slept about an hour since the previous morning.

You also heard he actually became physically sick at some point during the questioning, I believe he said he vomitted on the floor, someone came in, a janitor, put some stuff on it, and they had to go to another room for the questioning.

You have heard from his mother, from his sister what he was like when she saw him at 5:00 in the afternoon. He was crying, he was

shouting, he was rambling, he was incoherent, his face was red. But, most importantly, you heard from Officer Jarvis what he was like during the questioning.

Officer Jarvis told you that George was crying, that he was shouting, that he was suicidal, that he wanted to kill himself, and he told you, Officer Jarvis, that in fact George was put on a suicide watch at the station. What does that tell you about the statement that was taken? What does that tell you about the voluntariness of any waiver of rights? Does that tell you that any rights that were waived were waived as part of a carefully considered and knowing intelligent decision, a voluntary decision? I'd suggest not. Can you say beyond any reasonable doubt that this seventeen-year-old kid gave a voluntary statement to the police? A seventeen-year-old kid who is suffering

from lack of sleep, after effects of alcohol and Valium binge of the night before, the results of a police beating at the time of his arrest and shortly thereafter, seventeen-year-old kid who was crying, who was shouting, threatening to kill himself.

Mr. Perrot also told you that he told the police he didn't want to be questioned; that he wanted to go to sleep, he just didn't want to be questioned. I believe he said that more than once. I would suggest to you that if he is telling the police that he doesn't want to be questioned, he is exercising his rights not to be questioned. The burden then rests on the police to stop questioning him.

The rights are given, the right to remain silent, the right to have counsel and so on, are given so that people can exercise them, and indeed George Perrot exercised those

rights by telling the police that he didn't want to talk to them. The obligation fell to the police to stop questioning him.

You have seen the statement that he signed, or you will see the statement that he signed. Now, as I say, under the instructions that Judge Murphy will give you, you should not even consider that statement unless you are convinced beyond any reasonable doubt that it was given voluntarily and of a voluntary waiver of rights.

But what about the statement? Let's say you do get there, you do consider it. First of all, in that statement nothing is said about any rape or any assault on Mary Prekop. And indeed some of the things that are in the statement are obviously incorrect, I would suggest. The statement talks about how the entry was made into Mrs. Lichwala's home. In the words of the

statement, "I entered an unlocked breezeway door at 33 Covel Street. I kicked the rear inner door in."

Well, compare that with what you know from the testimony as to how the break-in at Miss Lichwala's home was accomplished. You've heard that the first point of entry was through the door to the cellar -- excuse me, the window to the cellar -- that a vent for the dryer was evidently kicked in, entry was made into the cellar, somebody went up the steps, came back down, back out the window again, and then entered the breezeway. Nothing in the statement is said about anything happening in the cellar.

And what about how the breezeway was entered? What does the statement say? "Entered an unlocked rear breezeway door." What was the evidence you heard? The breezeway door apparently was locked. And the entry

was made not by opening an unlocked door, but by breaking a window and opening a door from the inside, apparently.

I believe the testimony strongly suggests that, because you heard that the window next to this rear breezeway door was in fact broken. And I believe the suggestion was that that's how an entry was made, not through an unlocked rear door.

Now, if George Perrot really did this and was really explaining what he did, why wouldn't he be able to give an accurate explanation of what was done? Clearly, if you look at the statement, you will see that there are inaccuracies in it, very obvious inaccuracies.

What about the other evidence? What about the evidence from the two F.B.I. agents that you heard, Mr. Eubanks and Mr. Oakes, who told you

about the blood found at the scene and about the hair found at the scene? Well, first of all, Judge Murphy is going to explain to you that these witnesses are witnesses like other witnesses, it is for you to determine whether they are credible, not credible, how much weight you should attribute to the evidence that they have given you, the testimony that they have given you.

In considering their testimony, I would ask you to consider whether in fact there was any evidence of bias or interest in the case which was exhibited when they were testifying. After all, both of these men told you that they are F.B.I. agents, special agents I think was the word they used, federal police officers. Each of them got all of their training in their specialty while they were working at the F.B.I. Mr. Eubanks, before he started working for the F.B.I. and got trained

by the F.B.I., apparently never examined any blood before. And also Mr. Oakes, with respect to hair, I don't believe it was suggested that he had ever examined any hair under a microscope before he was trained to do so by the F.B.I.

And why does the F.B.I. train them? What are they doing? What is their job? Their job is to examine blood and hair respectively in connection with state, local, federal prosecutions, police prosecutions. They are in fact there to assist local law enforcement officials as well as federal law enforcement officials.

I would suggest to you that they are not independent or disinterested in this case. Wasn't that particularly obvious with Mr. Oakes, the hair expert? If you recall how he answered questions when he was asked things, did he give a simple answer, a simple yes or no answer when asked to do

so? Or did he go into a long explanation at every question, trying to tell exactly why the evidence should be seen in the light, I guess, most unfavorable to Mr. Perrot? Did he sound like a witness who was testifying with disinterest? Or a witness who wanted to make a point, who was trying to help to make out a case against George Perrot?

And I think it is important to remember when you consider their testimony, they were testifying as to matters of judgment. This is not a case where it is a difference between telling black from white, red from green. Both of them acknowledged that what they do is apply judgment, judgment to blood in analyzing what kind of blood it is, what factors are present in the blood, apply judgment to hair in deciding, making a judgment, is this hair like that hair? And ask yourselves, can you feel confident that the judgment that they

exercised in this case was exercised with disinterest rather than as part of making out a case against George Perrot?

Because, really, in the end, what was the ultimate effect of their testimony? Mr. Eubanks told you the blood could have come from George Perrot, the blood found on the bedsheet could have come from George Perrot. Mr. Oakes told you that the hair or -- the hair that he found that was in the bedsheet could have come from Mr. Perrot. I believe he liked to use the word consistent instead, but ultimately when it came down to it, he acknowledged what he was saying is the hair could have come from George Perrot.

I would suggest to you that there is something more significant about this blood evidence and this hair evidence than the results which were reached by Mr. Eubanks and Mr. Oakes. What is significant here is that George

Perrot gave his hair to be tested, gave his blood to be tested not once, not just on December 10th, but twice, again on March 31, 1987. And he indicated to you, I believe, that when he did so, he did so understanding why it was being taken, he did so understanding that it was going to be compared with the blood and the hair that were found in the room of Mary Prekop.

And he told you, I believe, that he understood that he had a choice to make and that he made a choice about the taking of that blood. And his choice was to have that blood taken. Isn't that significant?

If George Perrot were the person who had done these things to Mary Prekop, who had broken into her room and left his hair, left his blood on her bedsheet, do you think that he would have been willing to have his hair taken, his blood taken to do these

tests? Isn't the fact that he did so a strong indication that he did not do these things to Mary Prekop?

Finally, ladies and gentlemen, let me return to what I would suggest to you is most significant in this case. The testimony of Mary Prekop. You saw her last Tuesday, it was two years then after the break-in at her home. She didn't tell you that George Perrot was the person who broke into her home, she didn't tell you that George Perrot was her assailant. She saw George Perrot in a lineup, and you have a picture of the lineup, and you will have it with you in the jury room. She saw that line up one week to the day after the break-in at her home. And in looking at that lineup, she didn't pick out George Perrot as the person who had broken into her home.

Now, the prosecution, I assume, will suggest to you that Miss

Prekop was 78 years old at the time and how could she possibly know what her assailant looked like or remember what her assailant looked like? Well, again, I remind you, George Perrot lived four or five houses down the street from Mary Prekop. He lived there for ten years, she for fifteen. He said that he basically walked by there almost everyday and often times, especially in the summertime, would see her outside working in her yard as he walked by. Yet Miss Prekop did not identify her assailant as someone who was familiar to her, a neighbor. She did not recognize him at all.

Now, what did she tell you about her assailant? What did she tell the police about her assailant after the break-in at her home? She told you that she saw him in the kitchen, the testimony was that the light was on when she saw him, she saw him well enough

that she went up to him with a stick and started hitting him. She also said that a light was on in her bedroom, and she was taken there, until it was knocked over. She was very clear about this.

She gave a description to the police, you heard the description. In the description -- I asked her on Tuesday -- she indicated that her assailant was clean shaven. She indicated that her assailant, I believe, had dark wavy hair, but she said that the hair was short, it looked like it had recently been cut. She said the same thing about the clean shaven face to Marianne Popko, the police officer who spoke with her just a few hours after this incident.

Ms. Popko took down a statement from her, and you heard that statement read to you, and in that statement it says very clearly the assailant was clean shaven.

Now, you have the good fortune in making your decision in this case to consider a picture that was taken of George Perrot. This picture was taken one week to the day after the break-in at Miss Prekop's home. Take a look at the picture. Is this a picture of someone whose hair was recently cut? Is this a picture of someone who was clean shaven? Yet Miss Prekop was so clear that her assailant was clean shaven. Doesn't that tell you that her assailant, the person that broke into her home, that did these things to her, was not George Perrot?

I'd ask you, ladies and gentlemen, to find Mr. Perrot not guilty of these charges. Thank you.

MR. BLOOM: Judge, with the Court's permission, can I move these two boards?

THE COURT: Sure.

MR. BLOOM: Mr. Foreman, ladies and gentlemen of the jury, I indicated to

you before this trial started what the charges were against this defendant. I am not going to spend a lot of time talking about them, but for your own purposes, I am going to take a moment and explain what facts apply to each charge.

In reference to Mrs. Lichwala, there's two charges, the burglary, which is obvious, the breaking and entering into the nighttime with intent to commit a felony, and the felony that was intended was ultimately committed, and that was the taking of the property. That is the evidence pertaining to the second charge, a larceny charge that Judge Murphy will instruct you on. And that was based on the taking of the pocketbook after the breaking and entering in the nighttime in the dwelling home of Emily Lichwala was accomplished on November 30, 1985.

In reference to Miss Prekop,

there are five charges. The assault and battery. Most of you or all of you, I would suggest, know what that is. That is based on the punching to the face. You have all had an opportunity to look at those pictures. There is no question she was assaulted and battered on that night in her home. The indecent assault and battery pertains to her saying that the intruder sucked on her breast during the course of this attack. There is a charge that is referred to in our law as armed burglary or assault on an occupant. And that is based on the breaking and entering in the nighttime in a dwelling, the dwelling of Mary Prekop, and then an assault upon her.

Of course, there was an assault; not only an assault, but an assault and battery. That is a third charge. There also is a charge in this case, ladies and gentlemen of aggravated rape. Aggravated rape, as the judge

will tell you, there is sexual intercourse, and in this particular case, what she told you about what happened to her vagina. And the judge will tell you that any penetration of her vagina -- because that's what the allegation is here -- by the male sex organ, a finger or any other device, is rape. It is aggravated rape in this case, because that rape happened within the attempted commission or, more particularly, within the commission of the burglary, assault on the occupant charge that I have told you about, and within the course of an unarmed robbery.

Now, defense counsel says that was an afterthought, even if you find that he did it. He took Mrs. Lichwala's pocketbook fifteen, twenty minutes before. Do you think that was an afterthought that he took Miss Prekop's pocketbook? Or is that one of the obvious intentions that he had in his

mind when he broke in the home less than a quarter of a mile away, ten or fifteen minutes later?

Unarmed robbery is the last charge. If you take someone's property within the course of using force and violence, as was done here, whether you beat them up or you rape them, and within the course of that you carry away their property by carrying out those acts and inflicting that type of violence, that is an unarmed robbery.

Ladies and gentlemen, I don't suggest to you that this case has been proven beyond a reasonable doubt. I go beyond that. I suggest to you that all the evidence taken in conjunction with each other would cause anyone who is objectively looking at it to come to an inescapable conclusion. There is no other logical conclusion that can be reached in this case. Not because of one single factor, but the combination

of everything taken together.

Now, they would like you to rely on three or four things. First of all, Miss Prekop -- and we don't argue with the fact that she said in her statement he was clean shaven or to the best of her memory she stated under oath in this trial he was clean shaven. But I would indicate this to you:

Here is a 78 year old woman living alone, no one living in the house. I believe she said it is either, I think she said, six to seven years since her mother died. Somebody comes in her house at four in the morning. How much eye for detail do you think she had on that night? Do you think she was probably more preoccupied with whether this was going to be her last night on this earth as opposed to what the facial features were of her attacker?

No matter how many questions were asked by Mr. Hammerschmith, she

explained a couple of things very clear. When she first saw him, she said he had his hands up like this. Mr. Hammerschmith said yeah, but when he pushed you those few feet into the bedroom, didn't you look at his face? She said repeatedly no, I never looked at him. I was too scared.

Is that unusual? Imagine what was going on in her mind. Seventy-eight years old, living alone, somebody breaks into your house and then rapes you on the floor of your bedroom. Do you think it was unnatural to be scared, be scared out of her mind, wondering what was going to happen next to her? I was too scared to look at him. And to the best of her ability, there was no hair, because she never saw any hair. But she never saw any face. And she never touched any face with her hand. That's what they are relying upon.

The fact of the matter is, she

never saw that face. And we never suggested otherwise to you. We told you in the beginning of this trial she never got a look at him and she wouldn't be able to make an identification.

Don't be fooled by that. Miss Prekop never said she knew this gentleman, never said -- Mr. Perrot had an opportunity, was on the stand, never said he had any conversation with her. There is no indication at all they have ever had any conversation or any eye contact, at least from Miss Prekop to him. An older woman living alone, trying to live out her years with some sense of dignity and peace. That went away on the night of November 30, 1985.

Why is the conclusion inescapable? Let's start off with a statement in this case. If you accept that statement on the face of it, that is the end of the case. You don't have to look at any scientific evidence. You

don't have to think about Sergeant Kelly. That is the end of it. And that is the most attention that Mr. Hammerschmith gave in his final argument, because he recognizes it. That is the most important piece of evidence in this case. Everything beyond that is just icing on the cake; if you believe the statement. Because he puts himself right in the home at about the exact time period that these incidents occurred, based on that statement.

Do you find it unusual that a seventeen-year-old kid could admit to kicking the door in, but not being able to admit to raping a 78-year-old woman? What is so unusual about that? It's one thing to say you kicked the door in, it's another thing to say I raped a 78-year-old woman in her home at 3:00 in the morning.

I don't mean to suggest to you

for a moment that we do not have the burden of convincing you that the statement, number one, the Miranda rights, were voluntarily waived, and you heard evidence that he got his Miranda rights, signed, I believe, two cards, and was given his Miranda rights at least on two other occasions orally, three or four times during that day. Or, beyond that, that the statement that was given was given voluntarily.

And what does that mean? It means just common sense that if there was evidence in a case that someone was beaten or through some form of duress or coercion gave a statement, whether it was through the use of being beaten or some other mechanism, then you can't use the statement. We have the duty to convince you of that on both scores.

And I want to make that clear to you that my next remarks don't indicate to you that we don't have that

duty. But keep in mind very importantly that that issue, I submit to you, is not an issue that is going to take a long determination by you people. You have the help of George Perrot, because he took the stand and he didn't say that I didn't get my Miranda rights, so the statement's no good, or he never said to you I was beaten at 3:30 in the afternoon and I told them anything they wanted to hear, just so they would stop pounding me. That isn't what he said.

He said I never gave them a statement. That is the issue in front of you. He left it on direct examination with his lawyer I never talked to them about November 30th. But then, of course, when he is shown the statement, he adopts the first couple paragraphs, where he went on November 30th, what he had for drugs, what's the name of the bar in Brattelboro, Vermont, who are the guys he went with, how much

he had to drink, what time he left Brattelboro, Vermont, what time he got back to Springfield, Massachusetts, at 3:15 in the morning and dropped off at his house.

Who out of the four or five occupants of this incident on that night or this drinking excursion drove the car? Mike. His last name escapes me, but it's in the statement. He agreed under oath in front of all of you, after just telling you a moment before he never talked about November 30th, that all those details he gave to Jarvis. And then the next sentence, then I went to 33 -- no, I never said that.

Well, the issue is whether he did say those things. And then it comes down to this: He either did say them, and you don't have to look at any other evidence, he is guilty beyond any question of a doubt in your mind, or should be, or Jarvis inserted the rest

of the details.

Let's look at that for a moment. Jarvis inserted the rest of the details. Is there anyone in this courtroom, after hearing what you heard, that can dispute the fact that the most horrendous, the most mind boggling, the most offensive thing that we have all heard wasn't the kicking of doors, wasn't the breaking of windows, wasn't the taking of property, it was the assault and the rape of that poor defenseless woman in her home at 4:00 in the morning. That is the worst thing that happened that night. Can anybody dispute that? Of course not.

So if you are a cop of 21 years and you are going to just provide details of a statement knowing what the facts are, why didn't Jarvis put anything in there about the rape? I mean, that's ludicrous. If he is just going to make up the statement, why

didn't he put anything in there about the rape?

And even beyond that, keep in mind, ladies and gentlemen of the jury, the pocketbook. It's not found until three days later. Look at the details about the pocketbook. He's gotten himself going, Perrot, away from Covel in the direction of Malibu Drive, where Miss Prekop and he live at the time. And the pocketbook is found completely consistent with the details in that statement. How could Jarvis have been so lucky? With all the alternatives of where that pocketbook could be in the world, Jarvis hit it right on the head. He got that lucky? Where did he go get that information on the 7th? How did he know where the pocketbook was going to be when Kelly didn't even find it till three days later, if Perrot didn't supply him with that?

And keep in mind something

that you probably haven't had a chance to think about. The F.B.I. information comes months down the road. Jarvis has no way of knowing on December 7th that ultimately from the bedroom of Mary Prekop there is going to be hair that comes back that isn't hers, that is consistent with his, and there is going to be blood off of that same sheet that comes back that isn't hers, but is consistent with Mr. Perrot's.

Now, what if Jarvis does something like this and then the pocketbook is found completely inconsistent with the statement and the hair and/or blood isn't Mr. Perrot's? You think he could do that as a matter of policy over a 21 year career and get away with it? That's ludicrous to throw that out to you, that is a major insult to your intelligence. If you were going to do that, if you were that unethical and you were that scheming and you were

that lousy of a cop, you certainly would have enough brains to throw the worst part of the incident in there. You might as well go the whole nine yards and put the rape in.

Jarvis didn't put the rape in there because the seventeen-year-old boy who did these horrendous acts couldn't own up to it, couldn't own up to it.

Sergeant Kelly is an important witness in this case. Two very important reasons. The pocketbook, where it is found, not only is it consistent with the statement, but keep in mind, ladies and gentlemen of the jury, one very important thing. If you committed this crime on Covel Street, if you go out in the direction that I am pointing, which in reference to the board is right to left, if you stay on the paved road, which you would assume that someone who wasn't familiar with the neighborhood would, you have to go

out in this direction onto Forest Hill. The pocketbook wasn't found down there. If you go in the direction toward Malibu, when you get to Hilltop, there is only one way to go, if you want to stay on the paved road. You have got to go right, and then down to Bartels, and then you either go out to Parker that way or onto Telbar. You don't turn left on Hilltop and go up into this area, because that leads you nowhere. And if you committed these crimes, you are getting out of there and you can't get through there with a car and you can't get to Mary Prekop's that way with a car, and why is that important? Because it suggests to you very strongly that whomever did this is pretty familiar with that neighborhood. Pretty familiar with that neighborhood.

And then Sergeant Kelly tells you that gloves ultimately taken out of the bedroom are identified by his

sister. I don't know how much more you could possibly have.

Then you go on beyond that to the two experts. Do they have an axe to grind? They are in Washington. They don't know anybody in there. They are sent down blood samples, hair samples. He wants to suggest to you that they in fact have an axe to grind or that they are biased toward one side. Both of them told you that they have testified for defendants in criminal cases in courts of law based on findings that they have made. They are scientists, they make a finding. Whatever the finding is, that's what it is, and if that hair and/or blood had excluded him and there would still be a trial, you can bet they would have been defense witnesses in this case.

So don't for a minute be fooled by the suggestion that these people have an axe to grind. They are

working in Washington. They don't know anybody in Springfield, Massachusetts. Least of all, George Perrot. What difference does it make to them what happens to George Perrot?

Ladies and gentlemen, look at their testimony. Wayne Oakes. Hair found on the bed. Why is it so important? It is so much more important than it could be under a different set of circumstances, because you have a woman that lives alone, so if it's not her hair in her bedroom, there is no other human that is sleeping in that bedroom beside her. She told you that. It's got to be the perpetrator's hair.

She also indicated to you that no one has been in that house, sleeping, for six or eight years, however long it's been since her mother died. What does that indicate to you? Off of the same bedsheet the blood has to be the perpetrator's blood. Mr. Hammerschmith,

after he was done giving his direct testimony, walked up to Wayne Oakes and said something to the effect -- and it is for your memory, but something to the effect: Now, as you cut those two hairs and took Mr. Perrot's and the head hair found off the sheet, the appearance that this gives is that it meshed with all characteristics into one head hair that couldn't be distinguished, every characteristic in reference to Q1 was identical and meshed right into every characteristic of the head hair that you mounted and put under a microscope and magnified to four hundred times its normal size?

Do you remember what his answer was? That is exactly what I'm telling you. Fifteen to 25 characteristics. Fifteen to 25 characteristics.

He told you about the cortex, the medulla, told you about the

pigmentation and the grouping of the pigmentation, and a number of other variables that are determined and looked at by a person who is an expert in this field. And that his head hair was identical in every single characteristic to the characteristics from the head hair taken off that sheet.

And if that wasn't enough, William Eubanks testified. Ladies and gentlemen, take a look at what he said. Now, I'd be the first to agree with you and to agree with the defendant that that wouldn't have been a big piece of evidence if in our society, for instance, hypothetically, let's say type O blood there are 80 or 85 percent Caucasian population, and an expert comes in and says it's type O blood, George Perrot is type O. I mean, so what? If you did a random sampling, if you picked any hundred people, Caucasians, you'd expect to find around

85 or so that had that blood type. That really wouldn't be anything that would cause you fairly and objectively to be able to direct your attention toward the defendant. That wouldn't be fair. That's not the evidence in this case.

In reference to proteins and enzymes, genetic markers, there are ten. Based on the size of a given blood stain, you may not be able to raise any of them. If it's a sufficient enough size blood stain, you may under ideal circumstances be able to raise ten of them. In this case, based on the blood stain and it's size, the quantity of the blood, you have an expert that is able to raise four genetic markers. He told you what those are, just proteins or enzymes that we have that make up our blood. Four of them.

And the reason that this is so crucially important is that for PGM, which is the first one we talked about,

there are ten alternatives. PGM +1 is just one of them. There's nine others. What are the two important things in reference to that? That if Perrot was any of the other nine other than +1, you don't have to go any farther, that is the end of it, it isn't his blood, and that six out of ten, if you did it randomly, 59 percent of the male or the Caucasian population have other than PGM +1. If he is any of these 59 percent or any of the nine other alternatives other than +1, that is the end of it, it isn't his blood.

EAP. Six possibilities. BA is the one that is found by Mr. Eubanks. Again, about 60 percent of the population, 59 percent of the Caucasian population have other than that strain of EAP, the BA. If he has any of these other five other than the strain found, that is the end of it, it's not George Perrot's blood.

Hp 2-1. There are three other alternatives other than 2-1. Over half of the Caucasian population, approximately 52 percent, have other than 2-1. If he is any of those 5 percent or if he has any of the other three other than this specific strain, that is the end of it. The first three strains, over half of the population.

Fifty-nine percent in the first two and about 52 percent in the third have other than this particular strain, and if he doesn't have it exactly on those three, that is the end.

And in reference to the last one, certainly the most common, but there are three alternatives. If he has other than this strain, of which, incidentally, Mary Prekop did, she didn't have strain C, then it's not George Perrot's blood.

When this stain was raised, ladies and gentlemen, there were 23

possibilities that could be found by Eubanks. Twenty-three. Ten in reference to PGM, six in reference to EAP, four in reference to Hp, and three in reference to Tf. And out of those 23 alternatives, there are four that were found. If he has any of the other nineteen in reference to these four strains, it's not his blood. Pretty significant piece of evidence.

In essence, what you have here -- and, again, remember back to his statement -- isn't it worthy to note that one thing that he admits, that at 3:15 in the morning, 3:15 in the morning on November 30, 1985, George Perrot is right out on the roadway, right if front of his house at 3:15, admitted it under oath, and we know about fifteen minutes later someone who was familiar with the neighborhood went into 33 Covel.

Do you think it is coincidental that these two women just

by luck are both elderly and living alone, both of them? Do you think that that is just coincidence? Or, again, does that indicate the person in all probability lived in the neighborhood? He is out on the road.

Fifteen minutes later, the first house is broken into. The pocketbook is found, again substantiating the fact that the person in all probability lives in the neighborhood. He gives a statement putting himself in the house at the time that these two awful incidents occur.

Kelly finds gloves, again not in and of itself, but it is PGM +1, and they are not Mary Prekop's gloves, and they are identified on that day by the sister. In fact, she takes Kelly right in the house. On that day she had no way of understanding the significance of those gloves. She knows what they mean now, but not then.

MR. HAMMERSCHMITH: Objection.

THE COURT: Overruled.

MR. BLOOM: Takes her right into the house and goes into a cupboard looking for where she had last remembered seeing those gloves, and can't find them. That's what Kelly testified to. Again pointing the finger at this man.

And if that wasn't enough, the admissions and all those things taken together, you have two pieces, three pieces, the blood on the gloves, the blood on that bed, and the hair on that bed. All those things taken together, what do they suggest to you? Coincidence?

And if that wasn't enough, ladies and gentlemen, then they put on a defense for you, they put on evidence, and I don't cast any aspersions at his sister or his mother -- it is his sister and his mother; I recognize that as well

as all of you do. None of us know how we will react if something like this happened to our son. So I don't say anything negative about them. I just ask you with a common sense assessment to interpret what they said to you.

They tell you about all this bruising. And the clear indication that was attempted to be left with you is that this man was beaten, I submit to you, and you heard, eventually, after a number of questions, Mrs. Westcott saying that on a previous occasion, yes, she did see some things on his face that were indicative in her mind of the fact that he had been hit in the facial area. We went on over that for about ten minutes. And she did not want to admit to that, but eventually said, well, probably.

Take a look at the two pictures of his face and the way he is standing in line and see if you see any

telltale signs of being viciously beaten. Take a look at it. The lineup picture that Sergeant Kelly said, the lineup happened after Jarvis was done taking the statement. Look at the clock in the back, about twenty minutes of five. Twenty minutes before the mother and the sister have an opportunity to see him. Take a look at the way he looked, take a look at his posture, take a look at the way he was standing, take a look at his facial features, and see how he looked to you. They know there's no markings on that face.

In fact, his mother or somebody, when I asked her a number of times about didn't you say on a previous occasion about welts, she said something to the effect, well, you know, you can get welts from crying.

Use your life experience to determine how many welts you have seen in your life as a result of crying, how

many bruises you have seen in your life on faces as a result of crying. They try to come in to help testimony, and I'm not saying that's all that bad, but look at it, exercising your common sense.

Ladies and gentlemen, I indicated to you when this case started that the evidence will be presented in such a way in which there would be little if no doubt in your minds as to what happened on that night. The evidence in this case, I respectfully submit to you, causes or would cause you or any other group of fair and objective people looking at it, putting everything together and drawing the reasonable and logical conclusions and inferences from the things that you find in this case, to render a decision that is inescapable. There is nothing else that can make any sense. I don't ask you to do it for retribution, I don't ask you

to do it for Mary Prekop or Emily Lichwala, because you can't do anything for Emily Lichwala or Mary Prekop. I ask you to do it so that justice can occur in this case. And the only way that justice can occur in this case is if this man is held accountable for what he did.

You draw whatever inference you want to draw from Friday morning, but ask yourself this: You are all human beings. As you sat there and heard this evidence come in, it must have struck your mind, putting George Perrot or anyone else aside, what kind of human being can do this to a defenseless woman?

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained.

MR. BLOOM: It had to cross your mind. Think about George Perrot's smirking and smiling on the stand.

MR. HAMMERSCHMITH: Objection.

THE COURT: Sustained. I am going to ask you to refrain from that line of argument, counselor.

MR. BLOOM: When you assess this, use your God-given common sense. The conclusion that you reach in this case, there is only one that can be reached. Render a verdict that is true, so that justice can occur in this particular courtroom and that that man is held accountable for what he did on November 30th.

Thank you.

THE COURT: The jury may stand up and stretch.

MR. HAMMERSCHMITH: May I be heard at side bar.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: In addition to the objections I expressed in the course of argument, I have three objections,

Your Honor. First of all, Mr. Bloom referred to me as recognizing something as being the most important evidence. I think that was inappropriate on his part.

THE COURT: I think your argument would justify that argument. You said you wanted to emphasize the statement, that that was the most important piece of evidence in the case, and I think that was rephrasing what you said to the jury.

MR. HAMMERSCHMITH: With respect to the argument on the blood, I think that that was misleading in terms of what we know about the blood. I think it also suggested that those factors are independent, although there was no evidence of independence of those blood factors put before the jury.

THE COURT: I don't know what you are talking about.

MR. HAMMERSCHMITH: Well, first of

all, the talk about the twenty-three different factors.

THE COURT: That was part of the --

MR. HAMMERSCHMITH: I understand it's part of evidence, but I think it was -- in terms of the likelihood, I think it misexpressed the likelihood --

THE COURT: It was part of evidence, that's the way the expert explained it on the stand, when he was on the stand, and that is what the figures on the board indicate.

MR. HAMMERSCHMITH: And with respect to the gloves, Your Honor, I believe Mr. Bloom argued as if the gloves had been -- there had been specific testimony admitted for its truth concerning the gloves. My recollection is that the testimony that was admitted was admitted as a prior inconsistent statement, going to the credibility of the witness.

THE COURT: When Mr. Bloom made

that statement to the jury, then went on to specify what the evidence was in the case, and, as I recall, his review of what the evidence was with regard to the conversation between the sister and Sergeant Kelly and the gloves was accurate, that she said they look like mine, she went to the closet, she couldn't find them.

MR. HAMMERSCHMITH: I think the point is, Your Honor, that there was no evidence that that evidence was not admitted for that purpose, it was simply admitted to show inconsistencies. It was not admitted for its truth, and it was argued as if it were.

MR. BLOOM: I never stated I had the conclusion that should be reached, I just related what both of them testified to concerning the gloves, and that is my memory of what they both said.

THE COURT: Yes.

MR. HAMMERSCHMITH: I assume that

Your Honor will give instructions on prior inconsistent statement.

THE COURT: Yes.

MR. HAMMERSCHMITH: And that the jury will be instructed to make a decision not based on sympathy, but on the evidence before it.

THE COURT: Absolutely.

(End of side bar conference)

THE COURT: Mr. Foreman, ladies and gentlemen, we will take a very brief recess. Again I remind you, until I have charged you on the law and the case is given to you for deliberation, no discussions among yourselves.

(Brief recess taken at 10:50 A.M.)

(Hearing reconvened at 10:55 A.M.)

THE COURT: Mr. Foreman, members of the jury, it is now my duty to instruct you on the law which you must apply to the fact as you find them to be in this case; and you are the sole judges of the facts. Nothing that I say is intended to suggest to you that you believe any particular version of the facts. It doesn't matter what I might think the facts are, it doesn't matter what the lawyers think the facts are or what the court officers or the clerk think the facts are. You, the jury are the sole judges of the facts.

But, on the other hand, you must take the law as I give it to you. You are bound to accept what I tell you as to the law. You accept that law as I give it to you, then you apply it to the facts as you find them to be. You may not like the law, you may not agree with it, but you are bound by it and you are

bound to accept the law as I give it to you.

But, again, I repeat, you, the jury, are, however, the sole judges of the facts.

And I'm sure you will agree that you have an awesome responsibility, and I am also sure you will perform this duty with the very best that is in you. You cannot be influenced by emotion or sympathy or prejudice; you must make your decision on the basis of common sense, good reasoning, good judgment, without partiality and without concern for the effects or the consequences of your decision, so long as it it is otherwise a just and proper decision.

Now, in determining what the facts are, you must rely solely upon your recollection of the testimony and the evidence presented in the trial together with the exhibits that you are going to take into the jury room with

you.

Now, what is evidence? Well, the evidence is the testimony from the lips of the witnesses that testified in the case; the evidence are the exhibits which were introduced, and I believe there have been some fifteen exhibits introduced in this case.

What is not evidence? Everything that went on during the trial was not evidence. The opening argument that you heard at the beginning of the trial was not evidence. This was an outline of what the lawyer expected the evidence would be in the case. And the closing arguments that you have heard here this morning are not evidence. Closing arguments are attempts by the lawyers to remind you of evidence that is favorable to their particular side of the case. The indictments are not evidence. Indictments are merely pieces of paper that consist of the charges.

The accusations in the indictment read by the clerk are not evidence. Any conversations between the lawyers or between the lawyers and the judge are not evidence. Objections that were made by the lawyers and rulings made by the Court are not evidence. And the question that a lawyer asks a witness standing alone is not evidence, but that question taken in conjunction with the answer given by the witness is evidence that you can consider.

And almost all of the evidence in the case was admitted generally, which means you can make whatever use of it you wish, but some evidence was admitted for a limited purpose, and I will cover that with you in a moment. But I have stated that the live testimony you heard from the lips of the witnesses is evidence you may consider.

Now, how do you determine how much credit to give that testimony? You

have to make some sort of determination, because this, again, is the power and the responsibility of the jury. If you want to, you could ignore or reject every word that a particular person says on the witness stand. If you want to, you can accept every word that a person says on the witness stand or, if you like, you can accept part of a person's testimony and you can reject the remainder. So, as you can see, you have a great deal of power.

Now, how do you determine how much credibility to give to a particular person who has testified before you? Well, you can take into consideration the demeanor of the person who takes the stand, you can take into account the appearance of a person, you may take into account what you believe concerning that person's power to observe what he or she testifies to, you may take into account how good is the memory of the

person who is now testifying. These are some of the things that may be considered by you in determining how much credibility you attach to a particular person's testimony.

In addition, you may determine whether a person has an interest in the outcome of the case, and you may take that into consideration in determining how much faith you place in the words of a person who has testified before you. You may take into consideration whether a witness is friendly to one side or the other in the case or whether the witness has any motive in testifying in a particular way.

But it is your duty to give the testimony of each witness the credit, the weight and value that you deem proper under all the circumstances. It is for the jury collectively to evaluate the testimony of each witness, applying your good, everyday, sound

common sense and intelligence in determining whether to believe it or disbelieve it either in whole or in part and in determining what weight should be given to it. It is for you to sift through the evidence and to decide which witness, is worthy of belief and which, if any, is not, and to say where the truth lies.

I said to you that certain evidence was admitted for a limited purpose. During the course of the trial there has been some evidence that certain of the witnesses who testified here and previously made statements which were claimed to be different from or inconsistent with the statement that they made under oath on the witness stand. Now, evidence of any such prior inconsistent statement by a witness is admissible only on the question of the credibility of that witness. It is within your power to decide whether the

inconsistencies are so minor that they have no importance or affect upon the witnesses credibility or whether they are so grave as to require you to reject that testimony of the witness in whole or in part as being either inaccurate or untrue. It is for the jury alone to decide whether and, if so, to what extent any such inconsistencies affect or detract from the testimony given by the witness in question. Therefore, it is for the jury in each instance to determine whether or not a witness has made a prior inconsistent statement and it is also for the jury to determine whether the inconsistencies affect the credibility of that witness.

But as I stated, prior inconsistent statements may be shown for the sole purpose of affecting the weight or credibility of a witness. Any such prior inconsistent statements are not in themselves evidence of the truth of the

prior statements which were made, and you cannot consider them as such.

Now, also in the case there was testimony from Miss Prekop that after the incident occurred, that she complained to the police that she had been sexually assaulted against her will. Now, when a defendant is charged with a sexual offense, if the victim involved complains about the offense and its details within a reasonable time after the alleged offense was committed, the victim is permitted to testify to the complaint she made, and the person or persons to whom the complaints were made are permitted to tell the jury that the victim complained and the details of that complaint.

Now, this evidence is admitted not for the purpose of establishing the truth of the facts alleged, but for the purpose of confirming and corroborating the testimony of the victim. You,

therefore, may consider the testimony of the complaints made here to Officer Popko, if you are satisfied that they were made within the reasonable time after the incident occurred, as supportive of Miss Prekop's testimony regarding the incident.

Again, I caution you, you are not to take the statement as proving the truth of what Miss Prekop claims, that is that she was sexually assaulted. You, and you alone, must find the facts as to these charges. But you may consider the testimony of the complaints by Miss Prekop as supportive of her testimony as what occurred that night. You may consider it for that purpose and for no other.

But again I instruct you that you may not consider the fact of fresh complaint, if you found it to be a fact, as positive evidence that the sexual intercourse did occur. The likelihood

that any story is true is not increased just because it is repeated several times by the victim. So if you accept this testimony of fresh complaint, you may consider such testimony for whatever light you feel it provides on Miss Prekop's truthfulness on the witness stand here in the trial, but, again, you may not take it as direct proof that the events occurred as described.

Now, in the case also there was evidence that Mr. Perrot ran from the scene at the time of his arrest, and evidence of this sort is introduced for the purpose of showing consciousness of guilt on the part of the defendant. Evidence of this sort may be evidence of consciousness of guilt if believed by you and if you accept it as such. It constitutes an implied admission which, with other evidence, may be sufficient to prove guilt; but standing alone, however, it is not enough.

Such evidence may turn the scale when the evidence is conflicting, but in the absence of other evidence, it would be an insufficient foundation on which to base a finding of guilt. For example, flight by a person after a crime has been committed or after he has been accused of a crime may be motivated by a variety of factors which are fully consistent with innocence. It does not create a presumption of guilt nor does a person's flight necessarily reflect feelings of guilt, since innocent persons sometimes have feelings of guilt.

While you may consider this evidence as one circumstance tending to show feelings of guilt, you may also consider feelings of guilt as evidence tending to show actual guilt. You are not required to do so. Under no circumstances may you presume a defendant guilty from his flight or

concealment alone. Before you can give any effect to this evidence, you must first be convinced beyond a reasonable doubt that the defendant did in fact attempt to flee and you must also be convinced that he did so because he was conscious of his guilt to the crime charged.

The mere fact that the defendant did these things, if he in fact did so, would not, without more, warrant you in finding him guilty of the crime charged. It is merely one fact which with other facts similarly proved, an inference of guilt could conceivably be drawn.

In the case there has also been introduced into evidence the testimony of certain persons who have been allowed to testify as expert witnesses and to express opinions as to matters within their field of expertise. I am here, of course, referring to the

testimony of the two F.B.I. agents.

Now, ordinarily in the trial of cases civil or criminal, witnesses are not permitted to express opinions. They are generally limited to a description or statement of facts as distinguished from opinion. But there are, however, exceptions to that general rule. The law recognizes that in some situations expert persons, through training or experience or both, have special knowledge in a particular field and that the opinion of such a person may be of assistance to a jury in arriving at a conclusion pertaining to that field. For example, in some cases, psychiatrists or ballistics experts, real estate appraisers, and many other types of experts are frequently and customarily allowed to testify as experts in cases involving some fact or facts within their field of special knowledge in order to aid or assist the

jury in its determination of such fact or facts.

But you will note, however, that the ultimate determination is that of the jury and not of the expert. The mere fact that a witness has been permitted to testify as an expert and thereby permitted to express an opinion does not endow its testimony with probative value beyond that of any other admissible evidence in the case. Their opinion is merely evidence to be weighed by the jury with all the other evidence. You may totally accept it or totally reject it or accept in part and reject it in part, depending on where you believe the truth lies. You are not bound by the opinion of any expert witness any more than you are bound by any other single piece of evidence in the case. It is for you, the jury, to determine the credibility of an expert witness just as it is your function to

determine the credibility of any other witness. And I repeat, ladies and gentlement, you, the jury, are the triers of the facts. The matter to which the expert witnesses were permitted to express opinions are matters of fact and their opinions are evidence which has been introduced to assist you in your deliberation. You should consider them along with all the other evidence and give them weight and only the weight to which you deem they are entitled.

Now, evidence has also been introduced that the defendant allegedly admitted to some of the crimes with which he has been charged. Now, such an admission can only be considered as evidence if it was given by the defendant freely and voluntarily. If such admissions are induced by promises of favor or by threats of injury, they are not competent as evidence and should

not be considered at all.

The reason for the rule is that a person suspected of a crime, particularly a person in custody and under interrogation, may be induced by the pressure and the hope or the fear to admit facts unfavorable to him with regard to the truth in order to obtain a promise of release or avoid the threatened danger.

Now, the first question you should consider in this case with respect to the defendant's statements, therefore, is whether the Commonwealth has proved beyond a reasonable doubt that it was completely free and voluntarily. If you find he was induced to make the statements by some threat or promise made to him by any of the police officers conducting their interrogation, then you should disregard his statement completely.

If you are satisfied that the

defendant's statement was freely and voluntarily given, you may consider it as evidence of the facts stated by him. But it is not, however, conclusive of the facts stated, and you should also consider any contrary evidence, including the defendant's testimony here in the courtroom. The ultimate issue to be determined in this case is not whether the defendant said he committed the crime charged in the indictment, but whether he in fact did so.

In order to find the defendant guilty on these indictments, you must be satisfied beyond a reasonable doubt that the Commonwealth has proved that he in fact did commit the crimes. If he made a statement in which he freely and voluntarily admitted facts, that statement may be considered as evidence of the fact, but only as evidence.

If, after considering all the evidence, you are left with a reasonable

doubt as to the truth of his admissions or confessions, you should resolve that doubt in favor of the defendant and find him not guilty.

Now, further with regard to the statements made by the defendant, under our Constitution, a person who has been arrested and charged with a crime has an absolute right to remain silent and not to make any statements which might be in any way used against him at his trial. He also has a right to be assisted and advised by counsel that at every stage of the proceeding following his arrest and continuing right up until the end of his trial.

As a result a few years ago in the case of Miranda versus Arizona, the Supreme Court of the United States laid down certain guidelines that have been -- come to be known as the Miranda warnings, and, briefly stated, the Court required that whenever a defendant is

arrested or taken into custody, no statement shall be taken from him and he shall not be questioned until he has been advised, one, that he has a right to remain silent; two, that any statements that he does make may be used against him at his trial; three, that he has a right to an attorney; and, four, that if he cannot afford an attorney, one will be provided for him.

Now, any statements that the defendant makes after his arrest and before he has been given the Miranda warnings cannot be used against him at his trial. Now, once a defendant has been given the Miranda warnings, he may, of course, waive his right to make a statement to the police if he so desires. However, the Supreme Court of the United States and our own Supreme Judicial Court of Massachusetts have both emphasized that any such waiver must be made knowingly and intelligently

and voluntarily, and that the burden rests on the Commonwealth to prove beyond a reasonable doubt that it was knowingly and intelligently made. The Miranda warnings are intended to be more than a mere ritual, and a defendant, particularly a young or immature defendant, should not be found to have waived his rights unless it was clear beyond a reasonable doubt that he did so intentionally.

Now, in this case the police officers have testified that the defendant was given the Miranda warnings and advised of his rights, but that he nevertheless made certain statements to the officers. Now, if you are satisfied that the defendant was advised of his rights in accordance with the standard laid down by the Supreme Court in the Miranda case, and if you are satisfied that the defendant did intelligently and knowingly and rationally waive those

rights by making statements to the officers, then you may consider those statements as evidence against the defendant.

If, on the other hand, you are not satisfied that the defendant was given the Miranda warnings or if even though you are satisfied that he was given the warnings, if you are not satisfied that he knowingly and intelligently and voluntarily waived his rights when he spoke to the officers, then you should completely discard such statements to the officers.

Now, in considering both the voluntariness of the defendant's statements and the question of whether he intelligently and knowingly and rationally waived his constitutional rights, that is his Miranda rights, you may consider the totality of the circumstances surrounding the statements, including the defendant's

age, his intelligence, his physical, mental condition, the initiator of the discussion, you may take into consideration the evidence you believe of his prior intake of alcohol and drugs before he made the statements, and I repeat, the burden is on the Commonwealth to prove beyond a reasonable doubt that the statements were made freely and voluntarily and that the Miranda rights were waived knowingly, intelligently and voluntarily, and I will discuss the terminology of beyond a reasonable doubt with you in a moment.

Now, in this case there has been both direct and circumstantial evidence. Direct evidence, for example, is when a witness testifies I was there and I heard someone say this. That is direct evidence. Then you, as jurors, decide whether you believe that evidence and what weight you will give to it.

And there is another kind of evidence where inferences are drawn from the facts. Having decided what testimony you believe, you can draw reasonable inferences from it. Inferences are things you do everyday by the thousands, little steps in reasoning based on your experience in life and your knowledge of the rules of life, coupled with some import or clue or information that you perceive to lead you to draw conclusions.

The classic example is when you look outside in the wintertime and you see a white powdery substance on the ground, the thermometer reading below 32 degrees, you draw the inference that there is snow out there. Furthermore, based on our experience around this part of the country, if you see footprints in the snow, you draw the conclusion that some creature has passed that way. And if the footprints are in the shape of a

human foot, you can draw the inference that a human being passed that way, or the tracks of an animal, and you are skilled in that perception, you can draw the inference that it was a particular type of animal.

But these are things, as I say, you do by the thousands everyday without even thinking about it.

In this case, you are going to have to consider questions of intention. And this, of course, is a subjective thing, that is to say things that go on only inside somebody's head and is by necessity the subject exclusively of inference. You can't see inside somebody's head. The only way you can tell what is going on inside there is by inference. But, here again, you draw such inferences everyday.

If you came into your home on a rainy day and you saw your spouse or one of your children putting on a dry

raincoat or taking out a dry umbrella from the front closet, without anything being said, you could draw two conclusions: one, that the person knew that it was raining outside and, two, that the person intended to go out into the rain.

So, from these observations you have drawn inferences that is to acknowledge and intention without thinking very much about it, because you know that is how people behave under those circumstances and that is what that behavior indicates as to the state of knowledge or intention of that person.

Inferences are merely logical deductions that you, the jury, may properly draw from the facts as you find them to be. Remember that when you are dealing with inferences, you never have to infer anything. You may if you want to, but you do not have to draw any

inferences whatsoever. But you may draw reasonable inferences in connection with the evidence that you believe in this case. But you should not pile inference on inference until the pile gets so high that it tips over logically or the chain gets so weak that it doesn't hold together anymore. Make sure when you run through your inference that you check the starting point and the ending point to make sure that they are still reasonable.

Again, I want to tell you that you are required to make your decision without regard to the consequences of that decision.

Again I remind you that you must not allow bias or prejudice or sympathy for or against any party to affect your judgment.

Now, this is a criminal case, and at the beginning of the trial, the defendant has the benefit of the

presumption of innocence. The law says that a person is presumed to be innocent until he has been proven guilty beyond a reasonable doubt. That means, ladies and gentlemen, that no inference unfavorable to this defendant may be drawn from the fact that he has been indicted. I explained to you that the indictments are only accusations, they are not evidence. You may draw no unfavorable inference against this defendant from the fact he has been indicted or from the fact that he is on trial before you. This is not evidence. A defendant may be found guilty only on the basis of evidence produced in court during the trial and on no other basis.

Now, a defendant in a criminal case is not required to produce any evidence of his innocence. The defendant has a right to remain inactive and require the Commonwealth to go forward to produce evidence sufficient

to prove his guilt. A defendant is entitled to a verdict of not guilty unless the evidence produced by the Commonwealth is sufficient to warrant a finding of guilty beyond a reasonable doubt. The burden is on the Commonwealth to prove a defendant guilty beyond a reasonable doubt.

Now, I know that in your original instructions when you first came to court you were told that criminal cases and civil cases are different as to the burden of proof, and I believe you were told that in a civil case a party asserting a claim must prove his claim by a preponderance of the evidence. But this is not a civil case. This is a criminal case and the burden is heavier in a criminal case, the burden is on the Commonwealth to prove a defendant guilty beyond a reasonable doubt. The Commonwealth must prove the essential elements of the

crime, all the essential elements of the crime, beyond a reasonable doubt.

Now, what is a reasonable doubt? What is proof beyond a reasonable doubt? Well, it is not proof beyond all doubt nor proof beyond a whimsical, fanciful doubt nor proof beyond a possibility of innocence, because there is rarely a case so clear that it can be proved beyond the possibility of innocence. A reasonable doubt is not that doubt which may exist in the minds of a man or woman who is seeking a doubt or an excuse to acquit a defendant. A reasonable doubt means a doubt that remains in the minds of reasonable men and women who are earnestly seeking the truth. The fact is proved beyond a reasonable doubt when it is proved to a moral certainty. It must be proved to that degree of certainty that satisfies your judgment and your consciences as reasonable men

and women and leaves in your mind a clear and settled conviction of guilt.

If after evaluating all the evidence there remains in your minds any reasonable doubt of the existence of any element of a crime charged, then the defendant must have the benefit of that doubt and must be acquitted.

Now, in every case there are extraneous facts that come out in evidence that may or may not be of importance for the essential elements of the crimes, but these are not the facts that I am talking about. Each crime has its essential elements and it is for you to determine whether these elements on each indictment have been proved by the Commonwealth beyond a reasonable doubt. If you find the Commonwealth has proved all essential elements of a crime beyond a reasonable doubt, the Commonwealth is entitled to a conviction. If you find the Commonwealth has failed to prove all

the essential elements of a crime beyond a reasonable doubt, then the defendant is entitled to be acquitted.

Now, in the indictments that I will instruct you on and charge you on, you will consider the fact that one of the elements the Commonwealth must prove beyond a reasonable doubt in each of these indictments is the intent of the defendant at the time the alleged offense occurred. Now, intent may be proved by circumstantial evidence. Indeed, as I stated to you earlier, it can rarely be established by any other means. It is to be determined from all the evidence and circumstances developed or disclosed at trial.

While witnesses may see and hear and so be able to give direct evidence of what a defendant does or fails to do, of course, there can be no eyewitness account of the state of mind with which the act was done or omitted.

But what a defendant does or fails to do may indicate intent or lack of intent to commit the offense charged. Resort may be had by the jury to logical and reasonable inferences drawn from all the facts and circumstances as the jury finds them to be.

Now, in certain crimes there must be specific intent on the part of the defendant as opposed to other times where a general intent must be proved. General intent is when we do things more or less unconsciously. It is a reflex action. Sitting down in a chair, walking upstairs, these are actions which are done with general intent. We would not do them unless our minds first resolved to do them, but they do not require any concentration or focusing of find.

Specific intent, which is required in some of the indictments that I am going to charge you on, is the act

of concentrating or focusing the mind for some perceptible period. It is a conscious act and the determination of the mind to do an act. It is contemplation rather than reflex and it must precede the act.

In determining the issue as to the intent of the defendant, the jury is entitled to consider any statements made and any acts done or omitted by the accused and all facts and circumstances in evidence in the case which may aid in the determination of a state of mind. But the jury will always bear in mind the law never imposes on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. That burden rests on the Commonwealth, that burden of proof with regard to the elements of intent, as with all other elements, is on the Commonwealth and it never shifts to the defendant.

Now, there has been testimony in the case by the defendant, Mr. Perrot, that he had been drinking alcohol and taking drugs at or about the time that the alleged crimes were committed. Now, I instruct you that this evidence of intoxication is a factor you may weigh and consider in making your decision on whether the Commonwealth has proved the element of specific intent as it applies to the crimes that I am about to define for you. You may consider evidence of the defendant's intoxication in deciding whether or not the defendant had the capacity to form a specific intent to commit a crime where specific intent is an element of that crime.

I further instruct you that if you find the Commonwealth has proved beyond a reasonable doubt that the defendant had a required specific intent, his intoxication, if any, is not

an excuse or a justification for his action.

Now, as to the specific charges before you and the law that applies to those charges, as I stated, the burden is on the Commonwealth to prove all the essential elements of the crimes charged and they must prove all the elements beyond a reasonable doubt.

Now, in outlining the specific elements of the charges against the defendant, I caution you about any reference to portions of the evidence by me. You should not attach any more or any less significance to those portions of the evidence to which I might refer than to all other parts of the evidence. My references, should I make any, are not designed to persuade you to believe them or not to believe them. I am using them only as illustrations for applying the an applicable law, if I use them at all. And before I begin this, I want to

instruct you that there are only certain charges that you are going to deliberate and make decisions on, and I also instruct you that you are not to speculate as to the reason for this.

Now, the first indictment that I want to discuss with you is indictment 85-423, and you are going to consider so much of this indictment as charges Mr. Perrot with larceny from Emily Lichwala on November 30, 1985. As I say, the defendant in this case is charged with the crime of larceny. Larceny is synonymous with stealing. Stealing is the wrongful taking of the personal property of another from the possession of another with the intent to deprive that person of the property permanently. The intent need not be proved directly, but may be inferred from all the facts.

The Commonwealth has alleged that the defendant stole the property of

Emily Lichwala. Larceny is a violation of General Laws Chapter 266, Section 30, which provides in part that whoever steals or whoever unlawfully with the intent to steal converts or secretes the property of another, whether such property is or is not in the possession at the time of the conversion, shall be punished, etcetera. So pursuant to statute, the Commonwealth must prove that must prove the defendant guilty of larceny by the actual taking and carrying away of the property of another. In order to constitute the crime of larceny by taking and carrying away the property of another, the Commonwealth must prove the defendant wrongfully took the property of Emily Lichwala with the intent to convert that property and the defendant wrongfully took the property if, at the time he took it, he had no right to possess the property. The defendant had the intent

to convert the property if, at the time he took it, he intended to steal it, which is the same as to say that he had the intention of permanently depriving Mrs. Lichwala of the property.

The Commonwealth must prove these elements of the crime of larceny by the taking and carrying away of the property of another beyond a reasonable doubt.

Thus, in order for to you find the defendant guilty of the crime of larceny by taking and carrying away of the property of another, you must find first that the defendant took into his possession the property of Emily Lichwala and, two, that the defendant had no right to possess the property of Mrs. Lichwala, which he took, and that at the time he took the property, he had the intention of stealing the property. The Commonwealth must prove each of these elements of the crime of larceny

beyond a reasonable doubt.

Now, the second indictment that I want to discuss with you is indictment number 85-5425, and you are going to consider so much of that indictment that charges Mr. Perrot with burglary. This indictment reads in part that George D. Perrot on or about November 30, 1985, in Springfield, did break and enter a dwelling house of Emily Lichwala in the nighttime with the intent to commit a felony. Now, as I say, in this case, the defendant, Mr. Perrot, is charged with burglary, and our state legislature has specifically defined burglary in a statute, General Laws 266, Section 15, and the relevant portion, of this statute reads as follows: Whoever breaks and enters a dwelling house in the nighttime with the intent to commit a felony shall be punished, etcetera.

I am going to read that one

again. Whoever breaks and enters a dwelling house in the nighttime with the intent to commit a felony shall be punished.

The Commonwealth, in order to prove the defendant guilty of burglary, must convince you, the jury, beyond a reasonable doubt of the following elements: First, that the premises were the dwelling house of Emily Lichwala; second, that the dwelling house was broken into by the defendant in this case before he entered it; third, that the dwelling house was entered by the defendant; and, fourth, that the defendant specifically intended at the time of his entry to commit a felony in that dwelling house; and, fifth, that all these events took place during the nighttime.

Now, with regard to these elements, these five elements, the first element which the Commonwealth must

prove beyond a reasonable doubt is that the premises were the dwelling house of Emily Lichwala, and to prove this element, the Commonwealth must show that the premises were a place for the living and habitation of Mrs. Lichwala.

The second element which the Commonwealth must prove beyond a reasonable doubt is a breaking, and a breaking requires the movement to a material degree of something that barred the way to entry into a dwelling. Examples are the forced opening of a locked door or window. The opening of a closed but unlocked door or window constitutes a breaking. However, passing through an open door or other aperture is not a breaking.

The third element which the Commonwealth must prove beyond a reasonable doubt is an entry. An entry is the unlawful making of ones way into a dwelling. It is sufficient if any

part of the defendant's body, hand or foot, physically enters the dwelling.

The fourth element which the Commonwealth must prove beyond a reasonable doubt is that the defendant specifically intended to commit a felony in the dwelling. In this case, the Commonwealth contends that the defendant had the specific intent to commit larceny. I instruct you that larceny in a case of this type is a felony under the laws of the Commonwealth.

As I told you, the law recognizes two kinds of intent, general intent and specific intent. In this case, the Commonwealth must show a specific intent to commit a felony, that is larceny, in the dwelling as opposed to a general intent.

And the fifth and final element the Commonwealth must prove beyond a reasonable doubt is that the breaking and entering took place in the

nighttime. Under our law, nighttime is the time between one hour after sunset on one day and one hour before sunrise on the next day.

Let me repeat that. Under our law, nighttime is the time between one hour after sunset on one day and one hour before sunrise on the next day.

Therefore, if, after considering all of the evidence, you find the Commonwealth has proved beyond a reasonable doubt each of the five elements I just defined, that is that the premises was the dwelling of Emily Lichwala, that the dwelling house was broken into by the defendant before he entered it, that the dwelling house was entered by the defendant, that the defendant specifically intended at the time of his entry to commit a felony in the dwelling house, and that all these events took place during the nighttime, then you shall find the defendant guilty

of burglary. If, however, after your consideration of all the evidence, you find the Commonwealth has not proved any one of these five elements beyond a reasonable doubt, you shall find the defendant not guilty under that indictment.

Now, the next indictment that I want to discuss with you is indictment number 85-5417, which charges that George D. Perrot on or about the 30th day of November, 1985, at Springfield, did assault and beat Mary Prekop. And this charges the defendant with the crime of assault and battery. Assault and battery consists of the intentional, unlawful, unjustified use of force or violence against the person of another, no matter how slight. An assault is an attempt or an offer or a threat without legal justification or lawful consent to do bodily harm or violence to another. It involves the intent to cause an

apprehension on the part of the victim, that the act will then and there be completed with the act of battery, whether or not that apprehension is actually felt by the victim. And the battery is the intentional and unjustified touching or use of force on the person or clothing of another regardless of the severity. It can be accomplished with any part of the body, such as the face or the foot or the hand or the fist.

And thus the term assault and battery describes the completed act, first the attempt or threat, which is the assault, and then the successful completion, which is the battery.

Now, not every touching or brushing is a battery. In everyday life, shopping, public assembly and sporting events, a person is subjected to a certain amount of pushing and shoving, and while these contacts may be

somewhat offensive, they do not constitute batteries, because they enjoy a measure of justification if they are not excessive.

In order to find the defendant guilty of assault and battery in this indictment, you must be satisfied the Commonwealth has proved beyond a reasonable doubt, first, that there was an actual unlawful touching of the body of Miss Prekop by the defendant by force, however slight; two, that the defendant intended to make the unlawful contact, that it was not accidental; and, three, that there was no consent on the part of Miss Prekop. So assault and battery is the intentional, offensive, unprivileged touching of the person of another.

Now, the next indictment that I want to discuss with you is indictment number 85-5415, and under this indictment, Mr. Foreman and ladies and

gentlemen of the jury, you are to consider the charge of unarmed robbery. This indictment reads in part that George D. Perrot, on or about the 30th day of November, at Springfield, did assault Mary A. Prekop with the intent to rob and thereby did rob and steal from the person, presence, protection and possession of Mary Prekop certain property. As I say, the defendant in this indictment is charged with the crime of unarmed robbery.

The statute reads in part that whoever, not being armed with a dangerous weapon, by force and violence or by assault and putting in fear, robs, steals and takes from the person of another money or property, shall be punished.

In order to find the defendant guilty of this crime, the Commonwealth must prove the following elements beyond a reasonable doubt: First, that the

defendant with the intent to steal property used force or violence or assaulted the victim by putting her in fear, but not being armed with a dangerous weapon; and, second, that the defendant robbed, stole or took money or other property, that is committed a larceny; and, third, that the defendant robbed, stole or took this money or other property from the person of Mary Prekop.

Now, to prove the use of force or violence, the Commonwealth must prove that the defendant applied some force to the body of the victim with the intent to steal property, and which in fact allowed the defendant to obtain possession of the property, and the degree of force is immaterial.

In the alternative, to prove assault by putting in fear, the Commonwealth must prove that the defendant by threatening words or

gestures put the victim in fear. This must be done with the intent to steal the property, and must in fact allow the defendant to obtain possession of the property.

To prove the defendant robbed, stole or took property, the Commonwealth must prove that the defendant by force or violence took and carried away property against the victim's will with the intent to deprive her permanently of its possession. The value of the property is immaterial and the defendant must have acquired dominion and control of the property for some period of time, however brief. The carrying away has taken place when the defendant transfers the money or goods from the victim's control to his own control, even if such transfer was momentary. And the property must have been taken from the possession or control of the victim. And property is considered under control

of the victim when it is within her reach or inspection or observation or control that she can readily obtain possession if not overcome by violence or fear. The property need not have been owned by the person from whom it is taken.

Now, the defendant in this case argues that the Commonwealth has failed to prove that the attacker of Miss Prekop formed an intent to rob prior to the alleged rape and that, therefore, the Commonwealth has not sustained its burden of proving the first element of unarmed robbery.

Now, if you are satisfied beyond a reasonable doubt that the defendant robbed, stole or took money or other property, that is committed a larceny from Mary Prekop, and that the defendant robbed, stole or took this money or other property from the person of Mary Prekop, but you have reasonable

CITY 002663


doubt that the defendant used force or violence or assaulted the victim by putting her in fear, for purposes of the robbery, then you must acquit the defendant of so much of the indictment as charges unarmed robbery, and then you must consider the lesser included offense contained within the framework of this indictment, which is larceny.

And the essential elements of the lesser included offenses which the Commonwealth must prove beyond a reasonable doubt are, one, that the defendant took into his possession the property of Mary Prekop; two, that the defendant had no right to possess the property of Mary Prekop; and, three, that at the time he took the property, he had the intention of stealing the property.

You cannot find the defendant guilty of both of these charges. He is either guilty of one of these charges,

that is unarmed robbery or the lesser included offense of larceny, or he is not guilty of both. If you have a reasonable doubt that the defendant stole or took money or other property of Mary Prekop, then you must find the defendant not guilty under this indictment.

Now, the next indictment that I want to discuss with you is indictment number 85-5420. And you are going to consider so much of this indictment that charges burglary, assault in a dwelling. This indictment reads in part as follows: George D. Perrot, on or about the 30th day of November 1985, at Springfield, did break and enter a dwelling house of Mary A. Prekop in the nighttime with the intent to commit a felony and did make an actual assault on the person lawfully therein, that is Mary Prekop, in violation of Section 14 of Chapter 266 of our General Laws. And

that section reads in part as follows: Whoever breaks and enters a dwelling house in the nighttime with the intent to commit a felony, any person being then lawfully therein, and the offender makes an actual assault on a person lawfully therein, shall be punished, etcetera.

Now, I am going to instruct you on the substantive law for this particular crime. And, as I said, the defendant, Mr. Perrot, is charged with burglary and assault on a dwelling. And the Commonwealth, in order to prove the defendant guilty of this offense, must convince you, the jury, beyond a reasonable doubt of the following elements: First, that the premises where the dwelling was the dwelling house of Mary Prekop; second, that the dwelling house was broken into by the defendant; third, that the dwelling house was entered by the defendant;

fourth, that the defendant specifically intended at the time of his entry to commit a felony in that dwelling house; fifth, that all these events took place during the nighttime; and, sixth, that the defendant assaulted Mary Prekop while he was in the dwelling house.

Now, the first elements which the Commonwealth must prove beyond a reasonable doubt is that the premises were the dwelling house of Mary Prekop. Again, to prove this element, the Commonwealth must show the premises were presently a place for the living and habitation of that person.

The second element which the Commonwealth must prove beyond a reasonable doubt is a breaking. As I told you, a breaking requires the movement to a material degree of something that barred the way to entry into the dwelling. Examples again are the forced opening of a locked door or a

window. The opening of a closed but unlocked door or window constitutes a breaking, but, again, as I told you, however, passing through an open door or other aperture is not a breaking.

The third element which the Commonwealth must prove beyond a reasonable doubt is entry. Here again, an entry is the unlawful making of one's way into a dwelling. And it is sufficient if any part of the defendant's body, hand or foot, physically enters the dwelling.

The fourth element which the Commonwealth must prove beyond a reasonable doubt is the defendant specifically intended to commit a felony in the dwelling. In this case, the Commonwealth contends that the defendant had the specific intent to commit robbery, larceny and rape or any one of those crimes. And I instruct you that robbery and larceny and rape are

felonies under the laws of the Commonwealth. I will later define rape for you, I have previously defined robbery and larceny.

In this case, the Commonwealth must show specific intent again to commit a felony in the dwelling as opposed to general intent, and I have described specific intent for you, and defined it for you a few moments ago.

The fifth element the Commonwealth must prove beyond a reasonable doubt is that the breaking and entering took place in the nighttime, and, again, as I told you, under our law, nighttime is the time between one hour after sunset on one day and one hour before sunrise on the next day.

And the sixth and final element the Commonwealth must prove beyond a reasonable doubt is the defendant assaulted Miss Prekop while

she was lawfully in the dwelling. And I previously defined assault for you.

Therefore, if, after considering all of the evidence, you find that the Commonwealth has proved beyond a reasonable doubt each of the six elements I have defined, that is that the premises were the dwelling house of Mary Prekop, that the dwelling house was broken by the defendant before he entered it, that the dwelling house was entered by the defendant, that the defendant specifically intended at the time of his entry to commit a felony in that dwelling house, and that all these events took place during the nighttime, and that he assaulted Miss Prekop in the dwelling, then you shall find the defendant guilty of burglary and making an assault on a dwelling.

But if, however, after your consideration of all the evidence, you find the Commonwealth has not proved any

one of these six elements beyond a reasonable doubt, you are to find the defendant not guilty under this indictment.

Now, the final indictment that I am going to discuss with you is indictment number 85-5418, which charges that George D. Perrot, on or about the 30th day of November 1985, at Springfield, did assault Mary A. Prekop with the intent to commit aggravated rape and did commit aggravated rape upon Mary A. Prekop. As has been told to you, this charges the defendant with the crime of aggravated rape.

Let me begin by defining rape. Before 1974, rape was defined by statute as the unlawful forcible carnal knowledge by a man against a woman, against her will, without her consent. And, traditionally, rape was a crime which only a man could commit and the victim necessarily was a woman.

However, the law was changed in 1974 by our legislature. And the new law uses the phrase sexual intercourse or unnatural sexual intercourse. Under the old law and the new law, a showing of natural sexual intercourse requires a penetration, however slight, of the man's penis into the woman's sexual organ, her vagina. Emission or ejaculation by the male was not required nor is it now required under the new law. Rape is now defined to be natural or unnatural sexual intercourse compelled by force with another person against that person's will or by compelling such person to submit to such an act by threat of bodily injury or violence.

You will note that the essential elements which the Commonwealth must prove beyond a reasonable doubt are, first, sexual intercourse, either natural or

unnatural; second, by compelling such person to submit by force against that person's will or by compelling such person to submit by threat of force or violence.

You will note that the present law describes two types of sexual conduct. First, sexual intercourse, which we know as normal or natural fashion, which would consist of the insertion of penis, no matter how slight, into the vagina. And the second as set forth in the statute is defined as unnatural sexual intercourse. Unnatural sexual intercourse includes oral or anal intercourse including fellatio, cunnilingus and other intrusions of a part of a person's body or other object into the genital or anal opening of another person's body. Acts which do not involve penetration of a genital or anal opening or penetration by a sexual organ do not fall within the

meaning of rape. Penetration of a woman's vagina buy a finger or any other object by the defendant would be examples of unnatural sexual intercourse.

The burden is on the Commonwealth to show the natural or unnatural sexual intercourse was accomplished by force against the victim's will or that she was compelled to submit by threat of bodily injury. In this case, you may consider evidence of violence, struggle or outcry. Weight and credibility of this evidence is for you to determine. The lack of evidence of a struggle or violence, however, does not imply consent, because in certain circumstances violence or struggle might not be possible. If the person submitted because of a reasonable fear of immediate bodily harm, it is not consent. The person has to be free to exercise her will without restraint.

CITY 002674


Thus, if there is some intervening restraint due to a reasonable fear, there can be no consent. The simplest way to put it is: Was the person willing or was there compulsion?

If you find beyond a reasonable doubt the factors of either natural or unnatural sexual intercourse and submission by force or threat of bodily injury, conviction for rape has been proved. If, however, you have a reasonable doubt as to any of these elements, the defendant is entitled to be acquitted.

Now, the indictment before you charges Mr. Perrot, the defendant, with committing aggravated rape. Now, our General Laws provide in part that whoever commits a rape, as I have defined it for you, and the rape is committed during the commission or attempted commission of a burglary or a robbery, then that rape becomes

aggravated rape as charged in this indictment.

If you find that the Commonwealth has proved beyond a reasonable doubt that Mr. Perrot is guilty of rape and that the Commonwealth has also proved beyond a reasonable doubt that he committed the rape during the commission or attempted commission of a burglary or a robbery, then you would be warranted in finding Mr. Perrot guilty of aggravated rape. If you find that the Commonwealth has proved beyond a reasonable doubt that Mr. Perrot is guilty of rape, but you also find that the Commonwealth has not proved beyond a reasonable doubt that the rape was committed during the commission or attempted commission of a burglary or a robbery, then you would be warranted in filnding Mr. Perrot guilty of the lesser included offense contained within the framework of this indictment, which is

rape.

Now, I have instructed you that evidence of the defendant's intoxication from alcohol and/or drugs may be considered by you in determining whether he was capable of forming the specific intent which the Commonwealth must prove beyond a reasonable doubt as an element of certain of the crimes as I have defined them. But I instruct you that specific intent is not an element which the Commonwealth must prove in the crime of rape, which is the lesser included offense under this indictment that we have been discussing. I instruct you that the defendant's intoxication, if any, would not be an excuse or justification for his actions as you find them to be, when and if you consider the charge of rape under this indictment.

But, here again, you cannot find Mr. Perrot guilty of both

CITY 002677


aggravated rape and the lesser included offense of rape. He is either guilty of one of these crimes or he is not guilty of both under this indictment. If you find that the Commonwealth has not proved beyond a reasonable doubt that Mr. Perrot is guilty of rape, then you must find Mr. Perrot not guilty under this indictment charging aggravated rape.

Now, finally, ladies and gentlemen of the jury, again, always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. That burden is on the Commonwealth and it never shifts to the defendant.

The verdict of the twelve of you that are going to decide this case must be unanimous. Two of you, not counting the foreman, will be drawn by lot and placed on stand-by. And, again,

I instruct you that the twelve of you that are going to decide the case, your verdict must be unanimous.

The foreman's function is to act as moderator of chairman, but his or her own opinion does not carry any more weight than any other juror.

Now, with regard to each indictment, Mr. Foreman, you are going to have in the jury room with you a verdict slip for each indictment. I have before me the verdict slip for indictment number 85-5423 charging Mr. Perrot with larceny from Emily Lichwala. That verdict slip contains two possible findings, Mr. Foreman, one, not guilty; two, guilty of larceny. When you reach your decision, Mr. Foreman, I ask you to check the applicable box, sign the verdict slip in the lower right-hand corner in the space provided, and when you do that, Mr. Foreman, I ask that you do that in ink.

CITY 002679



Indictment number 85-5425 charges burglary in the dwelling house of Mrs. Lichwala, two possible findings there again, Mr. Foreman, not guilty, guilty of burglary. The same with regard to 5417 charging assault and battery on Miss Prekop, the same with regard to indictment 5416 -- I don't believe I charged on indictment number 5416. Bear with me a moment. No, I didn't.

I'm sorry, ladies and gentlemen. There is one more indictment that I am required to charge you on, and that is indictment 85-5416, which charges George D. Perrot on or about the 30th day of November 1985, at Springfield, committed indecent assault and battery on the person of Mary A. Prekop. Now, we have a statute in this Commonwealth which provides that whoever commits an indecent assault and battery on a person who attains the age of

CITY 002680


fourteen shall be punished, etcetera.

This crime, as defined by statute, has three elements. In order to obtain a conviction of the crime as charged, the Commonwealth must prove beyond a reasonable doubt, first, that the defendant committed assault and battery; second, that the victim of the assault and battery had reached the age of fourteen; and, third, that the assault and battery was indecent.

To repeat, assault and battery within the meaning of this statute means the intentional and unjustified use of force, however slight, upon the person of another. To constitute a battery, there must be some touching or striking of the person of the victim, but the touching may be very slight and it's not essential to the offense that the victim be injured by the contact. The contact must, however, be intentional as opposed to accidental. And the victim of the

assault and battery must have reached the age of fourteen. This means that the jury must be satisfied beyond a reasonable doubt that at the time when the incident occurred, Miss Prekop had reached the fourteenth anniversary of her birth.

In making that determination, the jury may consider its own observations of Miss Prekop as well as any other evidence which may have been introduced as to the date of the victim's birth. And the assault and battery must be indecent. That means that it must be of a sexual nature. An inidecent assault and battery may, but does not necessarily, involve an attempt at sexual intercourse or the commission of some other sexual act. It may consist of the touching of the sex organ of the person by the assailant or the forcing of the person to make some contact with the sex organ of the

assailant. It means the taking of liberty with the body of a person which common sense of society regards as indecent or improper.

If you are satisfied that the Commonwealth has proved beyond a reasonable doubt that the defendant did in fact commit an assault and battery on Mary Prekop without her consent and at the time of the assault and battery she was over the age of fourteen, and that the assault and battery was indecent in nature, then you would be warranted in finding the defendant guilty as charged.

If, on the other hand, you have a reasonable doubt as to whether the defendant did touch or strike the person of Mary Prekop, or that the Commonwealth has not proved any of the other elements of this crime beyond a reasonable doubt, you would be required to find the defendant not guilty. And, again, as I say, the Commonwealth must

prove that that touching was indecent in nature.

So, again, Mr. Foreman, you will have the verdict slips for each charge, and these verdict slips for indictment number 85-5418 and 85-5415 have three possible findings. These are the charges that have the lesser included offenses.

The verdict slip for indictment 5418 charges aggravated rape. There are three possible charges, Mr. Foreman. One, not guilty; two, guilty of aggravated rape; three, guilty of the lesser included offense of rape.

In indictment 85-5415 which charges unarmed robbery of Mary Prekop, three possible findings, Mr. Foreman; one, not guilty; two, guilty of unarmed robbery; three, guilty of the lesser included offense of larceny.

Again, Mr. Foreman, when you have reached your decision, check the

applicable box, sign the verdict slip in the space provided, and I suggest to you, Mr. Foreman and ladies and gentlemen of the jury, that you take each indictment separately.

Can I see counsel at side bar, please.

(The following conference was held at side bar)

THE COURT: Does the defendant have any objections?

MR. HAMMERSCHMITH: Two basic sets of objections. One relates to the consciousness of guilt charge, Your Honor. Your Honor referred to George being arrested at his home and fleeing --

THE COURT: I'm sorry.

MR. HAMMERSCHMITH: You referred to the defendant being arrested at his home and fleeing thereafter. I don't believe that that was suggested by anyone to

represent consciousness of guilt. Indeed, it happened a week after these charges.

THE COURT: It happened when he was arrested on the charges.

MR. HAMMERSCHMITH: No, Your Honor, it happened when he was arrested on some other charges. Mr. Bloom can confirm that.

MR. BLOOM: Well, the problem is there is no evidence on that, and I would point out for the record that that evidence was put in front of the jury by the defendant, not by me, and clearly the jury could draw the conclusion, whether he technically was being placed under arrest for these or any other charges, the running was in relationship to his feelings of guilt pertaining to what we claim he did a week before. It doesn't matter whether the formal charge was as to -- the fact of the matter was he was placed under arrest right there

for a pocketbook snatch and another home invasion that occurred about ten to fifteen to twenty minutes earlier to him being grabbed at his house. But that is irrelevant to the reasoning behind --

THE COURT: I had two choices based on the evidence, either ignore it complete or tell them what it meant.

MR. HAMMERSCHMITH: I had hoped it could be ignored completely.

MR. BLOOM: It was discussed this morning, and there was no objection at that time. My memory was there was no objection at that time.

MR. HAMMERSCHMITH: The only discussion I remember was my request for consciousness of innocence argument was not going to be given, and I again would repeat my request that such a charge be given on consciousness of innocence, based upon the provision of the hair and blood samples and signing the authorization form.

MR. BLOOM: The record should reflect, in fairness to you, Judge, that Friday I requested a consciousness of guilt instruction in front of defense counsel in front of you and there was no objection at that time by defense counsel. And you indicated on the record at that time that you were going to give it. That is my memory of what happened Friday.

THE COURT: I don't remember what led up to it, but I did indicate that I was going to give a consciousness of guilt charge, and it seems to me, based on the fact that the jury has -- it was warranted, because I also told them it could be just as much evidence of innocence, it could be considered evidence of not necessarily consciousness of guilt, because it could be the act of an innocent man, as well.

I am going to let it stand, counsel.

MR. HAMMERSCHMITH: And with respect to the charge of consciousness of innocence.

THE COURT: My ruling on that stands.

MR. HAMMERSCHMITH: With respect to the statement, Your Honor, I believe that the impression that was conveyed was that the waiver could be involuntary, the statements could be involuntary only if there are promises or threats involved.

THE COURT: I gave those as examples, not only. I said that they could consider violence, threats of violence, promises, his intoxication, the age of the defendant, all those things.

MR. HAMMERSCHMITH: That was mentioned later on. I think the initial discussion of involuntariness with respect to the statement only mentioned the first -- the possibility of threats

or coercion and promises or reward.

THE COURT: First of all, he testified that he was beaten. Secondly, he testified that he was harassed and wasn't allowed to sleep until he gave the statement. I think the charge was warranted based on those facts, counselor.

MR. HAMMERSCHMITH: I think so, but I think the problem is it seems to suggest that these things have to be overt rather than a matter of -- well, something which is covert or a product of all the circumstances.

THE COURT: Well, I told them they can look at the totality of the circumstances in deciding the issue, including the place where he was interrogated, his age, his physical condition.

MR. BLOOM: Who initiated. You also said maturity and age specifically, it should be taken into account.

THE COURT: Taken into account the totality of the circumstances in deciding that issue, counselor. I am going to let it stand.

MR. HAMMERSCHMITH: Finally, with respect to that, Your Honor, my point that I raised in chambers with respect to the defendant exercising his right to remain silent, I believe that the jury should be charged that if the defendant, having been advised of his rights, told the police that he did not want to talk with them, it was incumbent upon the police to cease immediately all questioning of him and that their failure to do so would result in a situation where the statements -- any statements made thereafter could not be considered by the jury in reaching their verdict.

MR. BLOOM: Judge, we went over that and that goes beyond the charge. That type of instruction is very highly

insinuative, in my opinion, on you finding the facts, giving that type of instruction to the jury. You instructed everything that could possibly have been instructed to this jury in terms of fairness on what is meant by voluntariness, what is meant by free and voluntary waiver of his rights, and to take that type of instruction as we previously talked about, which I know of no law for, and give that to the jury, that insinuates to them that there is some particular attention that should be given to that particular piece of evidence, and I am going to object to that, because I think that is highly unfair.

THE COURT: I am going to let my charge stand on that basis, as I have given it.

MR. HAMMERSCHMITH: Note my objection, please.

THE COURT: Right.

CITY 002692


THE COURT: How about the Commonwealth?

MR. BLOOM: No objections.

THE COURT: Gentlemen, take a good look at those verdict slips.

MR. BLOOM: I am not making any specific requests, I just draw it to your attention, it may eliminate the possibility of confusion on the two Lichwala indictments to just white out those portions now that are irrelevant based on the granting of the motion for -- particularly on the assault on an occupant charge, it starts off by saying whoever did break and enter into the dwelling in the in the nighttime, and then it goes on to the pool cue and the rest of it. I don't really care one way or the other, I thought it might just serve some purpose.

MR. HAMMERSCHMITH: I will leave it to the Court, it doesn't matter to the defendant.

THE COURT: It states in the front of the verdict slip what the charge is, I will let it stand.

MR. BLOOM: Okay.

MR. HAMMERSCHMITH: With respect to the exhibits, there is still the question of the purse of Mrs. Lichwala and what is inside there.

THE COURT: Oh, yes. Did you go through it yet?

MR. BLOOM: No. I will once we send them out. I forgot about that.

THE COURT: I will tell them the exhibits will follow them.

MR. HAMMERSCHMITH: That is fine.

(End of side bar conference)

THE CLERK: Juror number 6-4, Anna Powaka, please step down from the panel. Juror number 5-13, Diane St. Pierre, please step down from the panel.

Court officers to be sworn,

raise your right hand.

(Whereupon, the court officers are duly sworn)

THE COURT: I would instruct the alternate jurors that your duties aren't completed. If for any reason the deliberating jurors are unable to complete deliberation, you will be drawn by lot and sent to the jury room. My instruction to our alternate jurors are that you are not to discuss the indicates among yourselves. Obviously this does not apply to the deliberating jurors once you reach your jury room. .

THE CLERK: Take the jury out.

(Whereupon, the jury was removed from the courtroom at 12:25 P.M.)

MR. BLOOM: Judge, I don't know whether it matters either, but on indictment 85-5420, I have always known

that as burglary, assault on an occupant, it says burglary, assault on a dwelling. I don't know if that matters, but -- I'm not suggesting there was anything improperly instructed on the elements, but I just --

THE COURT: The title?

MR. BLOOM: The title. I don't know if it will matter. That's how I know the statute to be, but --

THE COURT: Okay, well, I gave them the elements.

MR. BLOOM: I know you did. I don't dispute that the elements are correctly given, I just that draw that to your attention.

THE CLERK: Counsel, come forward and check the exhibits. The first is Exhibit 1A, 1B, one C, which is three photos. The second is exhibits 2A, B and C, three photos. The third is Exhibit 3A, B, C and D, which is four photos. Exhibit 4 is a Miranda card.

Exhibit 5 is a statement by George Perrot. Exhibit 6 is a mug shot. Exhibit 7 is a search warrant waiver. Exhibit 8 is a bedsheet, Exhibit 9 is a pillowcase, Exhibit 10 is a pair of gloves, Exhibit 11 is a Miranda card, Exhibit 12 is the request for a telephone, Exhibit 13 is the pocketbook, which is right here; and then Exhibit 14 and 15 are two photos.

Counsel satisfied?

THE COURT: Go through the pocketbook, gentlemen.

MR. BLOOM: I looked through it quick, Judge, I didn't see anything in the pocketbook that I had an objection to.

THE COURT: Okay. You want to do that, Mr. Hammerschmith?

MR. HAMMERSCHMITH: Yes.

MR. BLOOM: I'm satisfied, Judge.

MR. HAMMERSCHMITH: Defendant is satisfied.

THE COURT: Okay, recess.

(Recess taken at 12:35 P.M.)

(The following lobby conference was held with counsel at 2:55)

THE COURT: Gentlemen, the court officer brought me an envelope from the jury, which I haven't looked at yet, but which I will now open.

It reads: "Indictment number 85-5418 --"

MR. BLOOM: Aggravated rape.

THE COURT: "-- what does 'with intent' mean?"

THE COURT: In indictment number 85-5418, it reads as follows -- of course, I am reading from part of this -- George D. Perrot did assault Mary Prekop with the intent to commit

aggravated rape and did commit aggravated rape upon said Mary A. Prekop.

MR. BLOOM: What does that say again, Judge, for the record? I mean, the question.

THE COURT: "What does 'with intent' mean?"

Assault with intent to commit aggravated rape, I think the indictment reads, is that right?

MR. BLOOM: Yes, did assault Mary Prekop with intent to commit aggravated rape and did commit aggravated rape upon said Mary Prekop.

THE COURT: Is that taken from the statute, statutory language of the indictment?

MR. BLOOM: I think it is. It is surplusage, but I think that is the way the statute reads, if I'm not mistaken.

MR. HAMMERSCHMITH: I don't think it is necessarily surplusage. I think

maybe what it is referring to is a causal and intentional connection between the assault and the rape. It is the same sort of thing that was in connection with the robbery charge, the assault and the theft have to have a necessary relationship, both in terms of the defendant's intentions. At least that would be my understanding of it, that it connects the two.

MR. BLOOM: You know what it is -- what I think anyways, Judge -- it is again one of the statutes that doesn't make a heck of a lot of sense in light of what your instructions are. They don't have to, you know, find any type of specific intent, if they find the elements as you define them, but that is the way the statute -- I mean, you gave the elements of aggravated rape.

THE COURT: I am trying to think how I am going to answer this question.

MR. BLOOM: Natural or unnatural

sexual intercourse?

THE COURT: But --

MR. BLOOM: I don't know if they are asking about the specific or general intent distinction that you were talking about.

THE COURT: If we had a straight rape charge, there must be -- is there a statute that sets up the form of the indictment?

MR. BLOOM: Yes.

THE COURT: What is that?

MR. BLOOM: I would think, off the top -- I think it is 265-22.

THE COURT: That's the charge.

MR. BLOOM: The aggravated rape.

THE COURT: But there are indictment forms.

MR. BLOOM: That is somewhere else.

MR. HAMMERSCHMITH: 276 or 277.

THE COURT: Are you sure that's it?

MR. HAMMERSCHMITH: I'm not certain, no. That was just my vague

recollection.

THE CLERK: There was a lesser included of rape, aggravated rape or



attempted commission of.

THE COURT: Right. It seems to me the logical answer would be was intent -- what was the question now? "What does 'with intent' mean?" It means with a general intent -- assault, as I defined it for them, is committed with a general intent to rape and the thing that makes it aggravated would be if it was done in either during or -- during the commission of a burglary, larceny or robbery, right?

MR. HAMMERSCHMITH: I think it was burglary or robbery. I don't believe larceny was among the --

THE COURT: No, you're right, burglary and robbery.

MR. BLOOM: You gave them the lesser included, didn't you?

THE COURT: But that would only be -- that would be only with regard to

larceny. What do you think of that answer?

MR. HAMMERSCHMITH: I'm not -- to be honest, I'm not sure what they are asking for, whether it goes to the specific intent, general intent, distinction or whether it relates to something else. Perhaps the argument -- as I said, the argument that I made about the robbery charge, talking about whether there is an intent to steal and the connection between that and the theft. I don't know.

THE COURT: It seems to me -- the answer to the question is with with intent in this case means to assault with a general intent to commit rape -- it is kind of fouled up wording, isn't it, when you think of --

MR. BLOOM: I think it is -- it seems to me, Judge, I don't know what they mean, and the problem that you have is that these indictments and forms --

THE COURT: But I have to make a decision as to how I am going to answer it.

MR. BLOOM: I am suggesting it would make more sense to redefine aggravated rape for them. I would want them, when they walk out of there, to understand what they have to find in order to convict this guy.

The problem in a lot of these cases, your charge properly given, has got to create confusion if they then take the indictment and attach the literal meaning to the words in the indictment, and that may be what they have done here, because as you set out the five elements as you gave for aggravated rape, it didn't -- it's not completely consistent with what the wording of the indictment is. This suggests that there has to be an intent to commit rape at the time of the assault. I don't know if that is what

they are thinking. I don't know. But I mean, you know, it seems to me if you redefine the five elements for them, then you'd be telling them what they had to have find in order to convict or acquit this defendant on this charge. Because really we don't know -- that seems to me to be somewhat confusing, "What does 'with intent' mean?" Clearly what it means is what it says, it says with intent to commit aggravated rape. They obviously are asking something that goes beyond the scope of what they have stated there. There is no way of knowing --

THE COURT: Maybe I should ask them to clarify the question.

MR. BLOOM: It's kind of confusing.

MR. HAMMERSCHMITH: That's fine with me. I agree that it's a difficult question to answer, because you don't really know what they are asking.

MR. BLOOM: I think that would be a

good solution.

THE CLERK: Do you want them to do it in writing?

THE COURT: Yes.

THE CLERK: Send back the court officer --

THE COURT: How about if I send back the court officer and have him tell the foreman the judge wants you to further define your question, all right?

MR. HAMMERSCHMITH: That's fine.

THE COURT: Would you take this back in and give it to the foreman and say the judge would like to have you clarify the question further as to what it is you're asking. Is that acceptable?

MR. HAMMERSCHMITH: Yes.

MR. BLOOM: Yes, sir.

THE COURT OFFICER: Okay.

(Whereupon, a brief recess was taken)

(Back in the lobby at 3:30 P.M.)

THE COURT: I have another sealed envelope from the court officer. "85-5418. Does with intent mean he went there just to rape her or does with intent mean he went there to rob her, then the rape just happened?"

MR. BLOOM: That's what I thought. I'm going to, obviously, ask that you instruct that we don't need to prove that when he went there he didn't need to have the intent to rape her, as which I think is clear -- clearly, we need not prove that. I think that clarifies a little bit to what they were getting.

THE COURT: "Does with intent mean he went there just to rape her or does with intent mean he went there to rob her, then the rape just happened?"

MR. BLOOM: I think they are asking

you, Judge, when did he have to form the intent to rape her. It seems to be asking -- the question suggests to me that they want to know in order on the aggravated rape charge when did he have to form the intent to rape in order to satisfy the elements of this charge, if they find the elements to be so. Well, there is something about --

THE COURT: I know that, I'm just trying to figure out how to answer it.

MR. HAMMERSCHMITH: It seems to me they may be under a misconception with respect to the robbery here also. I think the question may require clarification. I think it was in fact suggested and argued one time if a person went there to steal something, that's all the connection you need between the assault and the taking to have a robbery. My understanding of the law is a little different from that. My understanding was a person could go to a

house, planning on sneaking in and taking something, not planning on assaulting a person at all, so that the intent that one forms is --

MR. BLOOM: I think that's what they are asking, Judge --

MR. HAMMERSCHMITH: I think they may be under the misconception that it is what you go there to do is all the intent that you have to have. My understanding of the law is that the assault has to be intended to further, in the case of robbery, the robbery, and in terms of the rape, the rape.

THE COURT: Well, okay, but --

MR. BLOOM: There is no evidence but the assaults happened inside the house. They are asking you about what type of intention he had to have in reference to going there. The only thing I would ask the Court -- we need not prove that he had any intention in reference to rape, we don't have to

prove he intended to rape anybody when he went to Malibu. I mean, that intention can be formed after he got inside of the house.

MR. HAMMERSCHMITH: You have to have an intention to commit a felony for one of the charges.

MR. BLOOM: But they have specifically asked you about the same charge both times, haven't they, Judge? They have given you the same number?

THE COURT: This specifically applies to the aggravated rape.

MR. BLOOM: I think they are asking you --

THE COURT: Wait a minute now, wait a minute. I can read the words, I know what they are asking, the question is how do I answer it? "Does with intent mean he went there just to rape her?" No, it doesn't. "Or does with intent mean he went there to rob her, then the rape just happened?" Actually, no, it

doesn't mean that either. I've got to answer them both no.

MR. HAMMERSCHMITH: I think, from the defendant's point of view, it would make sense to explain -- to answer both no, I suppose, and to indicate to them that the intent at the time the person goes there is relevant only to the burglary charge, because you have to have an intent to commit a felony there, and then to discuss intention with respect to the other charges and explain the intent that is required and its relation between other actions of the accused.

MR. BLOOM: I have no problem, Judge, with that. I think he is asking for the same thing that I am pretty much requesting.

THE COURT: How about if I do this. I answer the specific questions no, and then I go on to say that I had instructed you on intent and I told you

what general intent meant and what specific intent meant, and that the crimes of burglary and robbery are specific intent crimes, and the crime of rape is not a specific intent crime, and let it go at that, or I could just answer each with no and let it go at that.

MR. BLOOM: I wonder, Judge, if it would be proper to tell them that the intent for either one of the two charges they refer to need not have been formed prior to going to the location, because that seems to be something that they are driving at, they specifically refer to going there.

THE COURT: I said the burglary is breaking and entering with the intent to commit a felony. That's what burglary is.

MR. BLOOM: Could you tell them that that's the only charge in which the intent had to be formed before actually

going inside of the house, because I think that's what they are asking you.

THE COURT: Burglary is a breaking and entering in a dwelling in the nighttime with intent to commit a felony. So he had to specifically intend to commit a felony, which could be either robbery or burglary or rape.

THE COURT: No rape, I'm sorry.

MR. HAMMERSCHMITH: Rape or robbery.

THE COURT: It can't be rape. Aggravated rape, it can't be rape for aggravated rape.

MR. BLOOM: What do you mean? Burglary, it's any felony, it has to be one or the other.

THE COURT: I'm sorry. So, actually, what I told them was they could convict for burglary if they proved there was a specific intent to either rape, rob or commit a larceny.

MR. BLOOM: Yes, right.

THE COURT: That's what I told them.

MR. BLOOM: That's right.

THE COURT: Why am I getting into that when we are dealing with the aggravated rape charge?

MR. BLOOM: Because I think they are asking you, Judge, when the intent would, whatever intent is --

THE COURT: This is aggravated rape.

MR. BLOOM: Yes. When does it very to be formed. And I think you'd be clarifying for them --

THE COURT: If I said to them that for aggravated rape, which is what this indictment deals with, this indictment deals with aggravated rape or the lesser included offense of rape, with regard to that indictment, the answer to your questions are no. That seems to me the logical answer.

MR. HAMMERSCHMITH: It's accurate.

Whether it gives them all the information that they want, again I suppose there is some guesswork involved in that.

THE COURT: Then they will have to come back and ask me again.

MR. BLOOM: I think they are really asking you when does the intent have to be formed on the rape, and specifically I think they are asking --

THE COURT: They are asking me when he went there.

MR. BLOOM: Yeah, did he have to have that intent.

THE COURT: And the answer is no.

MR. BLOOM: Of course, the second question doesn't even apply to the aggravated rape, does it?

THE COURT: Yes, it does, because they are saying robbery, which would be the underlying felony for aggravated rape. The robbery would be the underlying felony for an aggravated

rape. They specifically ask me about that indictment. I think that's the way I am going to answer it, gentlemen. This indictment you have asked me about is the indictment that charges rape and aggravated rape, and I told you that the lesser included of rape. With regard to that specific indictment, the question does with intent mean he went there just to rape her? The answer is no. Does with intent mean he went there to rob her, then the rape just happened? The answer is no.

MR. BLOOM: I guess the answer could be yes to the second one, couldn't it?

THE COURT: He went there to rob her, then the rape just happened? Does with intent mean he went there to rob her then the rape just happened?

MR. BLOOM: You can't really answer no to that, can you, Judge?

THE COURT: Maybe I better define

aggravated rape again. I think maybe that's what I better do. Because I don't know if I can come up with a good answer the way they have worded this. I don't think I have to redefine rape. I started off in this indictment by defining rape and then I said that this indictment charges the defendant with aggravated rape, and then I went on to say what aggravated rape is, if it is committed in the course of a burglary or a robbery --

MR. BLOOM: Or the attempted commission of either --

THE COURT: Yes. I think that's the way I am going to answer it, just redefine aggravated rape for them. I don't know what else I can do, the more I think about it. Any objection?

MR. HAMMERSCHMITH: Well, I suppose, as I indicated, my preference would be to talk about intention in general with respect to each of the

three charges, the robbery, the burglary and the rape, and --

THE COURT: Well, they don't ask me what rape means, they don't ask me what robbery means.

MR. HAMMERSCHMITH: I understand. I guess what I'm saying is implicit in the question I think is confusion as to what intention means. They seem to be saying, well, all you need for a robbery is to have a person break into a home intending to steal something and then the assault occurs. That's not my understanding. I think there has to be a relation between the assault and the taking of property.

THE COURT: I don't know how we get into that.

MR. BLOOM: No.

THE COURT: Well, that's what I'm going to do, I'm going to redefine aggravated rape.

(Lobby conference concluded at 3:40 P.M.)

(Hearing reconvened in the courtroom with the jury present at 3:45 P.M.)

THE COURT: Mr. Foreman, I have received your question, and I want to just read it for the record. "With regard to indictment 85-5418. Does 'with intent' mean he went there just to rape her or does 'with intent' mean he went there to rob her, then the rape just happened?"

Have I read that correctly, Mr. Foreman?

THE FOREMAN: Yes, sir.

THE COURT: Mark that as A for Identification or whatever the number is.

THE COURT: Now, the best way I can answer your question, Mr. Foreman, is to

repeat for you part of my charge on that indictment, 85-5418, which I told you charged Mr. Perrot with aggravated rape of Mary A. Prekop. And when I charged you on that indictment, I started out by defining rape for you. I defined natural intercourse and unnatural intercourse as it applies to rape, and then I went on to tell you that this indictment charges Mr. Perrot with committing aggravated rape. And I told you that under our law, our law provides in part that whoever commits a rape, as I defined if it for you, and that the rape is committed during the commission or attempted commission of a burglary or a robbery, then that rape becomes aggravated rape, as charged in this indictment.

And I went on to tell you that if you find the Commonwealth has proved beyond a reasonable doubt that Mr. Perrot is guilty of rape and that the

Commonwealth has also proved beyond a reasonable doubt that he committed the rape during the commission or attempted commission of a burglary or a robbery, then you would be warranted in finding Mr. Perrot guilty of aggravated rape.

Then I went on to tell you that if you find that the Commonwealth has proved beyond a reasonable doubt that Mr. Perrot is guilty of rape, but you also find that the Commonwealth has not proved beyond a reasonable doubt that the rape was committed during the commission or attempted commission of a burglary or a robbery, then you would be warranted in finding Mr. Perrot guilty of the lesser included offense contained within the framework of this indictment, which is rape.

I went on to tell you -- and, again, I am just giving my charge in part -- that you cannot find Mr. Perrot guilty of both aggravated rape and the

letter included offense of rape. He is either guilty of one of these crimes or he is not guilty of both of them under this indictment.

And then I told you that if you find that the Commonwealth has not proved beyond a reasonable doubt that Mr. Perrot is guilty of rape, then you must find him not guilty under this indictment charging aggravated rape.

Can I see counsel at side bar.

(The following conference was held at side bar)

THE COURT: My intention is to let it stand at that, gentlemen. Any comments, Mr. Defense Counsel?

MR. HAMMERSCHMITH: That's fine, Your Honor.

MR. BLOOM: Fine. The only thing I was requesting, Judge, is in light of the question, I was asking the Court to indicate that there is no requirement

that the defendant had the intent to rape upon going to the residence. I thought -- I felt, myself, that that was part of what they were asking, but I'm satisfied with the charge on aggravated rape.

THE COURT: I will let it stand.

(End of side bar conference)

THE COURT: Mr. Foreman, ladies and gentlemen, I'd ask you to return to your deliberations.

(Recess taken at 3:50 P.M.)

(Hearing reconvened at 4:05 P.M.)

THE CLERK: Mr. Foreman, has the jury agreed upon its verdicts?

THE FOREPERSON: Yes, sir, we

have.

THE CLERK: Would you please hand them to the court officer.

May the verdicts be affirmed, Your Honor?

THE COURT: They may.

THE CLERK: Mr. Foreman, ladies and gentlemen of the jury, hearken to the verdict which the Court will record. Indictment 85-5415, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of unarmed robbery.

Hearken to indictment number 85-5416, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of indecent assault and battery on an adult.

Hearken to indictment number 85-5417, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of assault and baattery.

Hearken to indictment number 85-5418, Commonwealth versus George D.

Perrot, the jury finds the defendant guilty of aggravated rape.

Hearken to indictment number 85-5420, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of burglary and assault in a dwelling.

Hearken to indictment number 85-5423, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of larceny.

Hearken to indictment number 85-5425, Commonwealth versus George D. Perrot, the jury finds the defendant guilty of burglary.

So you say, Mr. Foreman?

THE FOREPERSON: Yes, sir.

THE CLERK: So you all say, ladies and gentlemen of the jury?

THE JURORS: Yes, sir.

THE CLERK: Have these verdicts been unanimous?

THE JURORS: Yes.

THE CLERK: You may be seated.

THE COURT: Mr. Foreman, ladies and gentlemen of the jury, and to our alternate, on behalf of the Superior Court, I thank you for the attention you paid in the performance of your duties, and I want to emphasize I don't comment one way or the other on your verdicts, because, as I told you, I am not entitled to an opinion, but on behalf of the Superior Court, I thank you for your services.

(Whereupon, the jurors were excused)

MR. BLOOM: We are going to move for sentencing for the record, Your Honor.

THE COURT: Commonwealth have a recommendation?

MR. BLOOM: No. If it's alright with the Court, I'd just as soon put it off till the morning, if it's okay. I

know they have an extensive record, the Probation Department. I'd like to have the Court have an opportunity to look at it between then and now.

I also, in compliance with the statute, have to make contact with the victims, and I told them I would be doing so as soon as I heard one way or the other on this, and I can't do that right now.

MR. HAMMERSCHMITH: Your Honor, I had intended to ask to postpone sentencing until after Christmas. I am going to be gone from the 16th until the 28th and I'd like to ask that sentencing be put off until perhaps the 30th of the month, if that is acceptable to Mr. Bloom.

THE COURT: For what reason?

MR. HAMMERSCHMITH: I need a little bit of time to prepare. I've got quite a number of different things scheduled tomorrow. My time -- things have been

backing up for the last week and a half in courtrooms in this courthouse and --

MR. BLOOM: I don't want to give you the wrong impression. I'm ready to do it now, I just think, in light of the statute, I have to inform them and give them the opportunity of coming in here if they want to do so, which they may very well not want to. That would be -- I'd be able to do that tomorrow morning, I just need the opportunity to contact both of them.

Judge, can we see you for a moment?

(The following conference was held at side bar)

MR. BLOOM: I will be quite honest with you, my understanding is that he is scheduled for trial in January in Middlesex County --

THE COURT: What's that got to do with anything?

MR. BLOOM: I don't think it's a great idea to put this off.

THE COURT: I want to do it right away.

MR. BLOOM: I wanted to bring that to your attention.

MR. HAMMERSCHMITH: He is scheduled.

MR. BLOOM: I was told by Ross Murray that he was and I didn't want him to take anymore trips back and forth than was necessary.

THE COURT: I'm ready to sentence right now, but I think, since the victims aren't here, they haven't been notified, I don't think I have any choice.

MR. BLOOM: They have been notified, I just didn't know when -- I have explained the whole thing to them, I just have to get an answer and get them down here one way or the other.

THE COURT: Alright, I'm going to

do it tomorrow morning at 9:15, 9:30.

(End of side bar conference)

MR. HAMMERSCHMITH: Your Honor, there are two matters which I wish to raise. One is the matter of the assault and battery and indecent assault and battery charge. I'd ask the Court to dismiss those charges in light of the finding of guilty on the rape charge.

MR. BLOOM: I just draw to your attention Commonwealth versus Steed is the case that you presided over out of this court and would clearly indicate a reading out of that case that those crimes were separate.

THE COURT: Are you talking about indecent assault and battery?

MR. BLOOM: Yes, and the assault and battery. I do not think they merged in and I think the case of Commonwealth versus Steed that you presided over out

of this office --

THE COURT: What was the name of the case?

MR. BLOOM: Steed, S T E E D, clearly would indicate that those crimes did not merge into the aggravated rape and are separate and distinct acts.

THE COURT: Anything else at this time, counselor?

MR. HAMMERSCHMITH: I would ask that guidelines be prepared for sentencing.

THE COURT: They are going to be. Alright, then, 9:15 tomorrow morning.

THE CLERK: George D. Perrot, the Court orders disposition in these cases until December 15, 1987, 9:15.

The Court now orders you held without right to bail.

Mr. Court Officer, the defendant is in your custody.

(Recess at 4:15 P.M.)