**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 15

COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415
thru 85-5425

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

MOTIONS HELD IN HAMPDEN COUNTY SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, by Moriarty, J., on February 25, 1991.

APPEARANCES:

JUDY ZEPRUN, Assistant District Attorney, representing the Commonwealth.

JERRY E. RIDEOUT, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413 499-2231



-11-15-91 -

PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

# I N D E X



| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Elizabeth Dineen | 10 | 16 | | |
| Jeffrey Adkins | 17 | 20 | | |
| Robert Timmerman | 21 | 24 | | |
| Thomas Kelly | 28 | 39 | 43 | |
| Francis Bloom | 45 | 64 | 68 | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Defendant's 1 | three page confession | 27 |
| Defendant's 2 | apparent tracing | 27 |
| Defendant's 3 | report | 36 |





PENGAD CO., BAYONNE, NJ 07002 LASER BOND A

(The defendant was present.)

THE CLERK: That brings us to Mr. Perrot.

Your Honor, Mr. Perrot is found on page 5 of the list. He is represented by Attorney Rideout, the Commonwealth by Attorney Zeprun.

THE COURT: All right. It is your motion.

MR. RIDEOUT: The basis of the motion would be to dismiss for no prophylactic relief evidence wise based on the misconduct of the prosecution in the original trial of Mr. George Perrot. That is the basis of the motion here today.

I would intend to call five witnesses, one of whom is Mr. Francis Bloom, the DA who handled the case. It's the first time and there are three relevant documents we intend to use, one being a purported confession where we intend to show that the signature on that confession was forgery. The witness by a police officer was a forgery. And that was done by the prosecutor in the first case. And that the conduct along with other conduct that can be inferred is egregious enough to warrant if not a dismissal at least some prophylactic relief of the evidence that was allowed in



PENGAD CO., BAYONNE, NJ 07002 LASER BOND-A

the evidence of the first trial.

THE COURT: You said, "The first trial," the case has been tried?

MR. RIDEOUT: The case has been tried where Mr. Perrot was found guilty and was sentenced and it was overturned on appeal on an Evidence Rule -- ultimate discovery received.

THE COURT: I see. So right here it is for a second trial?

MR. RIDEOUT: That is correct.

THE COURT: Miss Zeprun.

MS. ZEPRUN: I think the key to this is the confession that Mr. Rideout -- was never offered against Mr. Perrot. Subsequent to his conviction it was determined that -- I am sorry.

Subsequent to the reversal of the conviction of June, 1990, the conviction was in 1987 the -- a member of the District Attorney's Office notified Mr. Rideout about a confession, it had appeared to have been fabricated by Mr. Bloom and that confession was used against two suspects in another case, a totally different case involving two other suspects involving another victim.

So this was brought to Mr. Rideout's attention.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Just to keep the record straight it has no bearing on this case and I think that before we get involved in an evidentiary hearing we ought to have some threshold showing some prejudice or egregious misconduct involving this case.

THE COURT: What do you say about this?

MR. RIDEOUT: This 85-415 is one of several convictions Mr. Perrot had. The single investigation, the same neighborhood, the same investigators, and the same district attorney. The particular one happened to be this was the one that was overturned on an Evidence Rule. The other conviction stands, but as a group they stand together in terms of continued misconduct of the prosecution.

Now, what we intend to show if it's handled in the vacuum, Your Honor, may in of itself may not be that egregious. It certainly -- it is forgery. I think it is misconduct. It may not rise to the level --

THE COURT: (Interposing) Who forged it?

MR. RIDEOUT: We are going to allege Attorney Francis Bloom, the Assistant District Attorney, he forged the three page confession which we'll stipulate was not used yet, has not been used in anyway against Mr.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Perrot directly at his prior trial. What was left in the trial folder, but for the fact that for another Assistant District Attorney found it and questioned it, it could may have well been used against him at any trial at his forthcoming trial. And by forging Mr. Perrot's name and by forging Sargent Kelly's name and presenting statements and using it will show to this Court a conduct -- a kind of conduct that I would allege that he would use on all the other evidence when he was investigating this case because like I say, this particular one is here because it was overturned on a Rule of Evidence, this is part of a greater scheme.

There were some three, or five different breaks in the same neighborhood all investigated by Mr. Bloom, all prosecuted. The convictions were prosecuted by Mr. Bloom and all investigated by the same people. The two young men mentioned in the confessions, the two young men who are directly affected by this confession were also under investigation for the other thing that Mr. Perrot was accused of and the particular victim in '88-5415, her name is in that three page confession.

To say this document is not relevant to Mr. Perrot in this particular breaking an entering is not true



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

because her name was not in there.

MS. ZEPRUN: It's not going to be offered, Your Honor. Obviously to me this just seems like a fishing expedition. There is absolutely no indication that before the conviction was obtained there was anything done with respect to Mr. Perrot.

THE COURT: Well, it certainly is a very very serious charge.

MS. ZEPRUN: It is, Your Honor. I will stipulate that he did it.

THE COURT: You will stipulate that he did it?

MS. ZEPRUN: I will stipulate that he and that is his signature at the bottom of the three page document.

MR. RIDEOUT: We would expect Mr. Bloom to admit that, Sergeant Kelly to deny his signature was on there, show they had a conversation later and that Mr. Bloom put Kelly's name on this. That is what we would expect to come out.

THE COURT: You're suggesting because of that -- even though it was not used in evidence against him that you still should be entitled to have this indictment --



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A
16/6

MR. RIDEOUT: (Interposing) I am suggesting --

THE COURT: -- dismissed?

MR. RIDEOUT: Nothing happens in a vacuum. This will be shown to be just part of a course of conduct.

This particular document, we'll stipulate, was not used against Mr. Perrot directly, but was part of a greater course of conduct to which Mr. Bloom went far beyond his role as an Assistant District Attorney.

As an example I intend to ask him if there is an FBI -- one blood sample -- there is a notation by FBI "hand-delivered by Mr. Bloom". I think he went to extraordinary lengths in this case that involved Mr. Perrot.

If I can demonstrate to the Court's satisfaction that this account indeed happened then it was a part of a greater course of conduct he has been misconducted.

THE COURT: Given the seriousness of the charge that is being leveled here I do not think I should deprive him of the hearing. We will go forward with it.

MR. RIDEOUT: As far as the hearing, sir, as I have said I have five witnesses.

THE COURT: All right.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

MR. RIDEOUT: Assistant DA Elizabeth Dineen, the two gentlemen who are mentioned in the statement, Attorney Bloom and Detective Kelly, I understand Attorney Bloom and Detective Kelly aren't going to be available until two o'clock.

THE COURT: All right.

MR. RIDEOUT: It is a little awkward. I can take them out of order.

THE COURT: Will you do that?

MR. RIDEOUT: Certainly.

MS. ZEPRUN: May I also put on the record Miss Prekop, the victim, was summoned here this morning by the defense as well, that after speaking with Miss Prekop she was told that she could leave.

MR. RIDEOUT: That is correct. And I will say I was the one who summoned her. An 83 year old woman, I spoke with her briefly. It would not be of any benefit to this motion.

THE COURT: All right. Go ahead. Mr. Rideout, proceed.

MR. RIDEOUT: I call Miss Dineen first.

* * * * *

ELIZABETH DINEEN (sworn)


PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

DIRECT EXAMINATION BY MR. RIDEOUT

Q. Would you state your name for the record?

A. My name is Elizabeth Dineen.

Q. How are you employed?

A. I am an Assistant District Attorney for Hampden County.

Q. Were you so employed in the fall of last year?

A. Yes, I was.

Q. Were you involved in the case of Commonwealth versus George Perrot?

A. Yes, I was. I was the Assistant District Attorney assigned to write the appellate brief.

Q. Was that this particular 88-5415 (sic) -- 6 -- 7, etc.?

A. Yes.

Q. That case involving the rape and breaking an entering of Miss Prekop's home?

A. Yes, it was.

Q. And I am sorry, you said at first you were involved in the appeal?

A. Yes.

Q. And could you tell the Judge what your role in that was?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

A. My role was to write the Commonwealth's brief along with another Assistant District Attorney, Jennifer Fitzgerald.

Q. Had you been involved at all with the first trial itself?

A. No.

Q. Had you been involved at all in looking into the trial file for any anticipated second trial?

A. No.

THE COURT: What was the case number again that you referred to?

MR. RIDEOUT: 88-5415 (sic) through 5425, I believe was the last number.

THE COURT: All of those cases were involved you feel?

MR. RIDEOUT: All with one --

THE COURT: (Interposing) All right.

Q. (By Mr. Rideout) At some later time did you become involved with the trial file itself?

A. Yes. When I prepared the appeal all I looked at was the transcripts of the motion, as well as the trial transcripts.

During mid-October, one day Attorney Fitzgerald and myself were having a conversation in my office and Attorney



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

Beth Dunphy, another Assistant District Attorney, came to the office and told us that we should go to her office because at that time she was having a conversation with Sergeant Thomas Kelly of the Springfield Police Department regarding the trial folder and the content thereof.

Q. Okay. Was there anything in particular that you brought up?

What was Sergeant Kelley there for?

A. Sergeant Kelly had been given some documents by Attorney Beth Dunphy. He had brought those documents back to Springfield Police Station without looking at them. They were documents relating to the George Perrot file. He had returned to the District Attorney's Office that afternoon. And it was an afternoon in mid-October of 1990 to tell Attorney Dunphy, who he thought was handling the case at the time, that there was a statement by the defendant that was three pages that had his signature on it.

THE COURT: "His" meaning Sergeant Kelly's?

THE WITNESS: Yes. And he was upset because he said that it was not his signature.

Q. (By Mr. Rideout) And do you understand -- and his signature was on it as a witness?

A. Right.



PENGAD CO. BAYONNE, NJ 07002 · LASER BOND A

Q. So someone else's signature?
A. George Perrot's signature appeared on it, as well as Attorney Francis Bloom's signature on it.
Q. I am sorry. Did you say, "He was upset."
A. Yes. Because he said it was not his signature.
Q. And he brought this to the DA's attention or Assistant DA's?
A. He brought that to Beth Dunphy's attention. Beth came and got me because at that time I had been assigned to prosecute the case by Mr. Ryan who was then the District Attorney.
Q. What did you do with that information, Miss Dineen?
A. As a result of receiving that information I had a conversation with the District Attorney, at the time Mr. Ryan.
Q. And subsequently you gave me a copy of the confession and that was in a matter of a day or to finding discovery wasn't it?
A. Yes. , It was.
Q. When you were able to contact me, basically right away, did you and I have some further discussion with you with this document?
A. Yes.
Q. At some point then was Judge Ford involved?



PENGAD CO. BAYONNE, NJ 07002 · LASER BOND A

A. Yes.
Q. And it was a motion?
A. There was a motion before Judge Ford where the Commonwealth was to produce original statements by George Perrot that had the four signatures on it, as well as another document that had George Perrot's name traced over it.
Q. When you say "documents" Miss Dineen --
A. (Interposing) It was an affidavit within the original file that had where George Perrot had signed his -- legitimately signed his signature and his signature had been traced over in pencil. And that was part of -- I had to produce that and I also had to produce a report by Thomas Kelly that Tom Kelly had written as a result of being asked to write the District Attorney's Office regarding his investigation of this incident.
Q. In your mind at that time when you had these discussions did you feel that tracing, that one signature of George Perrot's name was used to copy his signature?
A. I wasn't sure if it had been used to copy -- I noticed the signature was very similar to the signature that had been put on the forged documents.
Q. Okay. At that time when with you were taking -- isn't it fair to say you decided the best course of action


PENGAD CO. BAYONNE, NJ 07002 · LASER BOND A

would be to show me all of these documents?
A. Yes.
Q. And right away --
A. (Interposing) Right.
Q. -- you did so?
A. I did that within a day or two.
Q. And we brought that to Judge Ford's attention --
A. (Interposing) Yes, we did.
Q. -- explaining what the documents were and asked the original would be held in the clerk's office for introduction of evidence on a motion to dismiss?
A. Right.
Q. And have you ever talked to Mr. Bloom after -- did you ever talk to Mr. Bloom at all about this document?
A. No.
Q. And have you, up until today, have you seen him at all today?
A. I haven't seen him today. I was present during a conversation last week in Attorney Zeprun's office where she questioned him and State Trooper Sullivan was also present.
Q. But again, it is fair to say that after discovery you immediately notified me?
A. Yes.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. Provided me with copies?
A. Right.
Q. We agreed the best course of action would be have an original held in a safe place?
A. Yes, in the clerk's office.
Q. Yes. We all agreed the original of those three documents, a statement by Sergeant Kelly about his signature, a statement or an affidavit where George Perrot's signature is written over, and a third page purported confession signed by George Perrot, Springfield Police Kelly and Francis Bloom. We agreed those would be held in some place to be used in as evidence for a motion of misconduct?
A. Yes.
Q. Thank you. That was -- again for the record -- that was all done immediately with full disclosure to me?
A. Yes.

MR. RIDEOUT: Thank you. That's all I have.

THE COURT: Miss Zeprun.

* * * * *

CROSS-EXAMINATION BY MS. ZEPRUN

Q. You mentioned "October" you didn't mention the year. Was this October, 1990?
A. October, 1990.



PENGAD CO. BAYONNE, NJ 07002 · LASER BOND-A

Q. That would have been after the conviction was overturned by the Supreme Judicial Court?

A. Right. The conviction was overturned in June of 1990.

MS. ZEPRUN: No further questions.

THE COURT: Thank you, Miss Dineen.

* * * * *

JEFFREY ADKINS (sworn)

DIRECT EXAMINATION BY MR. RIDEOUT

Q. Would you state your name, please?

A. Jeffrey Adkins.

Q. Would you spell your last name?

A. A-D-K-I-N-S.

THE COURT: Could I have that again?

THE WITNESS: A-D-K-I-N-S.

THE COURT: Thank you.

Q. (By Mr. Rideout) At some point, Mr. Adkins, did you have occasion to meet Attorney Francis Bloom from the DA's office?

A. Yes.

Q. Could you tell us in what circumstance that was?

A. Called down for questioning about this particular case.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

Q. About a particular case of breaks in the Malibu Street neighborhood?
A. Yes.
Q. More than one break you're referring too?
A. Yeah. Well, that particular one.
Q. When you met Mr. Bloom in regard to breaks in the Malibu Street neighborhood; is that correct?
A. Yes.
Q. And at that time did you know George Perrot?
A. Yes.
Q. Someone else brought you down to the police station, at the same time you were --
A. (Interposing) Yes.
Q. Who was that?
A. Bob Timmerman.
Q. Were you and Bob left together or separate?
A. Separate.
Q. And when you talked to Mr. Bloom did he --
MR. RIDEOUT: Judge, the original and I think Mr. Eason is looking for it -- if I may show it to him, the copy.
THE COURT: Yes.
MS. ZEPRUN: No objection.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. (By Mr. Rideout) Have you ever seen that before, Mr. Adkins? (Indicating)

A. Yes.

Q. Where did you see that?

A. Francis Bloom showed it to me at Pearl Street.

Q. What did he tell you it was?

A. He told me George had wrote statements stating that me and Bob were involved in this case.

Q. Okay. Were you involved in that case?

A. No, I wasn't.

Q. When you were brought down this and shown that statement by Mr. Bloom can you describe his demeanor?

A. Well, before he showed it he was friendly and after he showed it to me he started saying, "I am going to charge you with all these different counts with him if you don't cooperate with me."

Q. Did you take that as a threat?

A. Yes.

Q. What kind of language did he use when he talked to you?

A. Well, swears, and cussing.

Q. More specifically did he call you any names?

A. He said, "You and that motherfucking asshole," were



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

his exact words, "are going to go to jail."

Q. This was by Francis Bloom?

A. Yes.

Q. Not by one of the policeman?

A. No.

Q. And after did he give you a chance to read that three page statement?

A. Yes, he did.

Q. After reading it did you in your mind believe that it was a confession by George Perrot?

A. I thought it was.

Q. Were you ever charged with a crime?

A. No, I wasn't.

Q. Have you to this date been charged with a crime?

A. Nope.

MR. RIDEOUT: Thank you. That is all.

* * * * *

CROSS-EXAMINATION BY MS. ZEPRUN

Q. Mr. Adkins, you said "involved in this case" are you referring to the Mae Marchand case?

Are you referring to the Prekop case, Mae Marchand?

Was your council present when Mr. Bloom interviewed you?

A. No. I did not have no council at that time.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

MS. ZEPRUN: No further questions.

MR. RIDEOUT: Mr. Bob Timmerman.

* * * * *

ROBERT TIMMERMAN (sworn)

DIRECT EXAMINATION BY MR. RIDEOUT

Q. Would you state your full name, please?

A. Robert Timmerman.

Q. Spell your last name.

A. T-I-M-M-E-R-M-A-N.

THE COURT: Let me have it again.

THE WITNESS: T-I-M-M-E-R-M-A-N.

Q. (By Mr. Rideout) Mr. Timmerman, I am sure you just heard what I asked Mr. Adkins which I am going to ask you; did you have occasion to met Attorney Bloom?

A. Yes, sir.

Q. When was that?

A. At the Springfield Police Station.

Q. And when was that?

A. Around 1987.

Q. Okay. And how were you brought down to the police station?

A. They came and picked me up at my house, brought me -- it brought me down. Said they wanted to question me about



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

those alleged rapes.
Q. They wanted to talk to you about several incidents; is that correct?
A. Correct.
Q. Did they want to talk about house breaks in a general neighborhood?
A. Correct.
Q. Malibu Street neighborhood?
A. Correct.
Q. And the first time you met Mr. Bloom was in the police station?
A. Correct.
Q. The document that is left on the table in front of you would you take a look at it for a second?
A. Yeah.
Q. Have you seen that before, sir?
A. Yes, sir.
Q. Where did you see it.
A. At the Springfield Police Station.
Q. Who showed it to you?
A. Francis Bloom.
Q. When he showed that to you can you describe his demeanor and how he acted toward you?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

A. Not very nice.
Q. Okay. By "not very nice" what do you mean?
A. Telling me that he was going to lock me up for these crimes.
Q. He was going to lock you up. Were those his words?
A. Yes.
Q. Personally?
A. Yeah.
Q. Did you take it personally?
A. Sort of. I knew I wasn't there.
Q. Okay. I will ask you that. Were you ever charged with any crime?
A. No, sir.
Q. Were you ever charged with any of the breaks or rapes in that area?
A. No, sir.
Q. And at the time of signing this did you believe it to be a confession from George Perrot?
A. Yeah.
Q. Let me ask that in a different -- whether you believe it or not did Mr. Bloom represent that it was a confession?
A. That is what he said.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. And his demeanor or words was "not very nice," could you be a little more specific? His language, what type of language did he use?
A. Foul.
Q. You heard what Mr. Adkins testified to?
A. Yes.
Q. And would it be fair to say you were treated the same way?
A. Yes.
Q. Were you in separate rooms?
A. Yes.
MR. RIDEOUT: Thank you. That is all.

* * * * *

CROSS-EXAMINATION BY MS. ZEPRUN

Q. Mr. Timmerman, was your lawyer present at the time?
A. No, he was not.
THE COURT: Would you keep your voice up.
THE WITNESS: Yes, Your Honor.
Q. (By Ms. Zeprun) And at the time that you went to the police station and spoke with District Attorney Bloom were you aware whether or not Mr. Perrot had already been convicted?
A. No.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

Q. And this was all concerning the Mae Marchand incident, was it not?

A. I am not certain.

Q. Did he accuse you of taking part in the Mae Marchand rape?

A. Yes.

Q. Did he ever mention Miss Prekop to you at all?

A. Yes.

Q. When did he mention Miss Prekop?

A. When we were down there.

Q. Did he accuse you of taking part in the Prekop case?

A. Yes.

Q. Was that by showing you this statement? (Indicating)

A. Excuse me.

Q. In the form of showing this statement? (Indicating)

A. Correct.

Q. Beyond that was the focus of the conversation on the Marchand case?

A. Both really.

THE COURT: I'm sorry. (Indicating)



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

THE WITNESS: Both, I think.

MS. ZEPRUN: Okay. No further questions.

THE COURT: Were you ever called to testify as a witness in either of these crimes?

THE WITNESS: No, sir, Your Honor.

MR. RIDEOUT: That's all.

Judge, that is what I have for now, pending arrival of Detective Kelly and Attorney Bloom.

THE COURT: You are expecting him at two o'clock?

MS. ZEPRUN: I am expecting Mr. Bloom at two. He is in Northampton in front of a judge who apparently was called in specially. Had we might be able to find out from the court what time he will be here. He assured me it would be by two.

Sergeant Kelly is involved in an investigation of a criminal matter this morning and he left word he would be here as soon as he could.

THE COURT: Okay. These are apparently the documents that you were referring to. (Indicating)

Show them to Miss Zeprun.

MR. RIDEOUT: Judge, if we could mark the first two and actually offer them into evidence pursuant



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

to our agreement -- Miss Dineen -- be the third page statement allegedly signed by Mr. Perrot, the one page that purports to be a tracing of the signature of Mr. Perrot.

THE COURT: Wait just a moment. (Pause)

The three page statement, that will be Exhibit 1.

(Defendant's Exhibit No. 1 was offered and marked.)

THE COURT: And what is the second one?

MR. RIDEOUT: The second one, Judge, is a document -- it's only relevant use would be the bottom where Mr. Perrot's signature is found. It appears it has been traced over so that someone could copy that signature.

THE COURT: I am going to call it apparent tracing. I will make it Exhibit No. 2.

(Defendant's Exhibit No. 2 was offered and marked.)

MR. RIDEOUT: There would only be one more, sir, that is Sergeant Kelly's -- after discussion with Miss Dineen that appears to me it is not an original. Maybe we will wait until he arrives. He may have that with him.

THE COURT: Okay. All right. It's only



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

five minutes of 12, if anybody should arrive there will be time to testify before one o'clock let me know. I will come out, otherwise I will wait.

Release Mr. Adkins and Mr. Timmerman. They may be released as far as I am concerned.

MS. ZEPRUN: No objection. I'd ask Miss Dineen would be able to stay with me at council table this afternoon.

THE COURT: Of course.

MR. RIDEOUT: No objection.

(A recess was taken.)

* * * * *

THE CLERK: That bring us back to George Perrot's hearing, Your Honor.

MR. RIDEOUT: Judge, I will call Sergeant Thomas Kelly.

THE COURT: All right, Mr. Rideout.

* * * * *

THOMAS KELLY (sworn)

DIRECT EXAMINATION BY MR. RIDEOUT

Q. Would you state your name and occupation?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

A. My name is Thomas Kelly. I am a sergeant in the Springfield Police Department.
Q. Where is your basis of work right now?
A. Detective Bureau.
THE COURT: With an "E" or without an "E"?
THE WITNESS: Without an "E".
Q. (By Mr. Rideout) That is on the Springfield PD?
A. Yes, sir.
Q. Are you familiar with the cases of the Commonwealth versus George Perrot?
A. I am.
Q. Were you an investigating officer on those cases?
A. Yes.
Q. You remember what years?
A. 1984 through 1987.
Q. Were you involved in pretty much all of the cases that involved George Perrot?
A. Many -- some of them.
Q. But how many? If you can tell me exactly how many cases did you investigate with George Perrot as one of those suspects?
A. There were multiple victim's and multiple assaults. Some of those victims -- one lady was assaulted three times,



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

another twice, one individual a single assault. There was an unarmed robbery involving a purse snatch.

Q. Were these all in the same area, the same general neighborhood?

A. Yes.

Q. So it's an ongoing investigation over a period of time being investigated?

A. Yes.

Q. As part of your involvement did you ever interview or meet a gentlemen by the name of Bob Timmerman?

A. Yes.

Q. Did you ever meet or interview a gentleman named Jeffrey Adkins?

A. Yes.

Q. How many -- you were aware of the original trial, were you not?

A. "Original trial," you said?

Q. Commonwealth versus George Perrot?

A. Yes.

Q. Are you also aware how one of those cases, the original trials or trial of George Perrot, one of those cases was overturned on appeal?

A. Yes.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. Were -- after you were notified or found out that one of those cases had been overturned on appeal did you have further contact with the DA's office or the Assistant District Attorney handling these trials?
A. Yes.
Q. Who handled the original trial?
A. Francis Bloom.
Q. Did Attorney Bloom also help investigate the original case?
A. He became involved on the morning of Perrot's arrest in 1985.
Q. When you say "involved" did he do any on-hand investigation? For example, did he visit Miss Prekop?
A. In preparation of trial, yes.
Q. He did visit Miss Prekop?
A. Yes.
Q. Did he assist in any way gathering anything from Miss Prekop's home, for example, bed sheets?
A. No.
Q. Did not?
A. No.
Q. Did he assist in anyway with the examine -- you had occasions to met Mr. Adkins?



PENGAD CO., BAYONNE, NJ 07002 - LASER BOND-A

A. No.
Q. Did you assist in any way on your occasion to meet Mr. Timmerman?
A. No.
Q. When you became aware that there was likely to be a trial on just one of those indictments were you contacted by the Assistant DA?
A. Yes.
Q. Who was that?
A. Beth Dunphy-Ferris.
Q. Why don't you just tell me what happened when Miss Ferris called you up.
A. We had a conversation after the case was overturned and in the course of that conversation she said, "We wont have any problem because you have that confession from Perrot." I understood that to mean the original statement taken December 7, 1985, the day of his arrest and so I agreed with her that I thought that would get into evidence.
Q. Excuse me one second. It is fair to say then the Assistant DA assigned to the case contacted you and said, "We are going to get ready for this new trial."
A. Right.
Q. And at that time you said, "I am ready. I am



PENGAD CO., BAYONNE, N.J. 07002 · LASER BOND-A

prepared to go forward."

A. Right.

Q. At that time -- at that time, sir --

MR. RIDEOUT: May I approach, Judge?

THE COURT: Uh-huh.

Q. (By Mr. Rideout) At that time had you seen this document? (Indicating)

A. No.

Q. That is Exhibit No. 1, the three page purported confession. (Indicating)

Again, at that time when you first talked to Assistant DA Beth Dunphy did anybody refer to a confession? And they were referring to that document you testified just now that you thought they were talking about the original report?

A. The original admission made by Perrot to Officer Jarvis throughout the day of December 16.

Q. When did you become aware that this three page statement was what they were in fact talking about?

A. I had several conversations with Miss Dunphy. She at one point returned some originals to me, some original statements to me that had been mixed up and put into the DA's file and should have been returned to the police file.

She give them to me in a file, a Manila file. I returned



PENGAD CO., BAYONNE, NJ 07002 - LASER BOND-A

to the station and when I went to return them to the police file I glanced through them and saw this and -- (Indicating)

Q. (Interposing) I will do this. That is my copy. I will replace that with the original. Is that the original to the best of your memory of what you saw?

A. Yes, sir.

Q. And that is Exhibit No. 1 you're referring to. And what did that purport to be when you saw it?

A. A confession from George Perrot taken at the Hampden County House of Correction on December 16, 1987.

Q. And about when, again, did you say you first saw that document?

A. It would have been in late September, October of 1990?

Q. Of last year?

A. Yes.

Q. Getting ready for this trial?

A. Yes.

Q. Would you turn to the last page, sir.

A. (Witness complying.)

Q. If you will notice the document is signed by George Perrot or a signature of George Perrot and then witnessed by two other people. Is your name one of the names on as a



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

witness?

A. Yes.

Q. Did you witness that document?

A. No.

Q. That's not your signature in your ink?

A. No.

Q. And did you make a report to that effect?

A. I did.

Q. And did you have discussions with the DA's Office, -- Miss Dunphy, Miss Dineen involved in these conversations?

A. Yes.

Q. Was it decided at that time the best thing to do was make a report to explain this discrepancy and then you made a one page report?

A. I made that report at the request of Captain McMahon of the Crime Prevention Bureau who was assigned to investigate whether any wrongdoing took place.

Q. Right. And the report was given to Miss Dineen and Miss Dunphy?

A. Yes. Yes it was.

MR. RIDEOUT: Judge, that would be Exhibit No. 3 which I held off offering because it wasn't the original. I don't believe we have the original.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

If I may show the copy the clerk's office has I believe we could enter it in.

Q. (By Mr. Rideout) Sergeant Kelly, take a minute and read it over and make sure that is the same document. (Indicating)

A. (Witness complying.) That's it, sir. (Indicating)

MR. RIDEOUT: I will return, Your Honor, No. 1. Mr. Eason, if that will be marked as No. 3.

THE COURT: No objection, I take it, Miss Zeprun?

MS. ZEPRUN: No objection.

THE CLERK: It may be marked, Your Honor?

THE COURT: Yes. Exhibit 3.

MR. RIDEOUT: Even though that is a copy the original is not available, but all parties agree that is what we are talking about.

(Defendant's Exhibit No. 3 <u>was offered and marked.</u>)

Q. (By Mr. Rideout) Oh, Sergeant, at any time after you discovered that somebody apparently had used your name -- signed your name to a document. Did you have a conversation with Attorney Francis Bloom about this?

A. Yes.

Q. What's the nature of that conversation?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

A. I called him and told him what I had in my hands. In my hands was that three page confession. And I asked him what he knew about it. And he said he didn't recall and it was at his law office I made the call. He said he would get back to me. He called me -- I don't believe it was the same day, it might even be as much as two days later and indicated that he remembered making that up and using my name because I was prominently involved in the case.

Q. So he told that you he had in fact wrote the three page report. He in fact created this three page document?

A. Yes.

Q. You know who actually typed it?

A. No.

Q. You don't know who exactly made up the words on it?

A. No.

Q. Attorney Bloom told you it was him responsible for the document?

A. Yes.

Q. It was Attorney Bloom who signed your name to it as a witness?

A. No. He didn't say that.

Q. Would you repeat what he told you?

A. That he used my name on the document because I was



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

prominently involved in the investigation.

Q. He used your name on the document for his own reasons, but he used your name on the document; he told you that?

A. Yeah.

Q. Up until that point, I will say it again for the record to be clear, you did not know; is that fair to say?

A. Know what.

Q. Know that he used your name on this three page document?

A. That is correct. When I saw it nobody did.

Q. Up until the time you called Attorney Bloom to tell him about it you didn't know?

A. No.

Q. Or up until the point when Miss Dunphy showed it to you?

MR. RIDEOUT: Your Honor, may I approach?

THE COURT: (Indicating)

Q. (By Mr. Rideout) Can I just show you that. Have you ever seen that before?

A. Yes.

Q. This is Exhibit 2. I am referring specifically to that statement because that is a copy. (Indicating)



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

What I want to draw your attention to is the signature of George Perrot. Does it appear to you that name has been written once or more than once?

A. It looks like it is more than once. Yes.

Q. Traced over; is that fair to say?

A. Yeah.

Q. Is it also fair to say is this today the first time you have seen this so called tracing?

A. No, I don't think so.

Q. If you saw it before today did you see it after Attorney Dunphy notified you of the three page statement?

A. Yes.

Q. So this would also be something that you would state today, testify you were unaware of this tracing until after you were contacted by Attorney Dunphy?

A. Yes.

MR. RIDEOUT: Thank you, Sergeant. That is all.

* * * * *

<u>CROSS-EXAMINATION BY MS. ZEPRUN</u>

Q. Sergeant Kelly, would you describe your educational background, please, in terms of law enforcement?

A. I have a Master's Degree in Criminal Justice,



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 9/91

attended the Academy, attended schooling from Mass., that is sponsored by Mass. Criminal Justice Training Institute. I've taught at Springfield Technical Community College in the criminal justice program. I else continued to teach at the Western Mass. Criminal Justice Academy.

Q. Have you taken any courses or have you taught any courses with respect to taking of confessions from suspects?

A. Yes.

Q. And during the course of your training have you had occasion to learn the rules regarding use of false information in taking confessions from a suspect?

THE COURT: I am sorry. I can't hear you.

Q. (By Ms. Zeprun) Sergeant Kelly, during the course of your training have you come to learn the law regarding false -- the imparting of false information to a suspect?

A. Yes.

Q. What is your understanding of the police officer's responsibility?

MR. RIDEOUT: Judge. I would like to object. Sergeant Kelly is a witness simply on his signature. The issue of whether it was proper or not for Mr. Bloom to do is an issue for the Court to decide.

THE COURT: Well, nevertheless I will allow the



PENGAD CO. · BAYONNE, NJ 07002 · LASER BOND A

question.

MR. RIDEOUT: Thank you, sir.

THE WITNESS: My understanding of subterfuge deception is an accepted practice as long as the use of that false information or phony information does not induce a person to make a false confession. You do not use the promise of a lighter sentence or the fact a person would be allowed to go free if they give a confession.

Q. (By Ms. Zeprun) And not withstanding your understanding of the law you were nevertheless upset that your name was used at the bottom of that statement; is that a fair statement?

A. Yes. That is true.

Q. And you expressed that to Mr. Bloom?

A. Yes.

Q. Is it fair to say that your state of mind came about as a result of your name being used rather than the substance of the --

A. (Interposing) Yes.

Q. Okay. With respect to customary procedure of the Springfield Police Department in the collection and retention of evidence could you give the Court some indication what that



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

is?

A. If abuse of property of an item is to be used as evidence or seized as a result of an arrest or investigation the officers seizing that property or taking it into his control would maintain it in his custody, bring it to the station. Place a property tag on it and place it within a secure evidence room. If it is drugs, in the CPB. If an investigation of say a robbery that would go in the detective bureau's main evidence room.

It's logged in by the evidence control officer and is kept within his control unless it is removed. For in the case of drugs and analysis and in the case of pieces of say evidence from a house break it might be removed for prints, it might be sent to a lab for analysis and at that point it is logged out to the person taking custody of it. The date that it's removed and before it's returned it is also signed back in so that a chain of control and custody is maintained.

Q. You, yourself, executed the search warrant -- excuse me, you, yourself, responded to Miss Prekop's home?

A. Yes.

Q. And you, yourself, executed the search warrant to Mr. Perrot's home; is that correct?

A. That's correct.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

Q. Was it a customary and usual procedure followed in this case?

A. Yes.

MS. ZEPRUN: I have no further questions.

* * * * *

REDIRECT EXAMINATION BY MR. RIDEOUT

Q. When you refer to customary and usual procedures in this arrest, in this search warrant, you are referring to your police practicing, aren't you?

A. Yes.

Q. And your training is police tactics; is that true?

A. That's correct.

Q. And you're not a practicing party in the Commonwealth?

A. No.

Q. Okay. When you say "subterfuge," okay, does that include forgery? (pause)

If you don't know --

A. (Interposing) No. I would consider if I was going to show a document to a person and tell them I had obtained a confession from a co-defendant, I might put that co-defendant's name at the bottom of the paper.

Q. So I take that to be, "Yes. Forgery is okay."



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

A. I don't. It is forgery if you are referring to copying a signature I might just put --

Q. (Interposing) I was referring to forgery as you know it, as you understand it in your police training that you just testified.

A. I don't consider that forgery.

Q. Okay. Thank you.

MS. ZEPRUN: No. No further questions.

THE COURT: All right.

MS. ZEPRUN: May Sergeant Kelly leave, Your Honor? I am through with Sergeant Kelly. May he be dismissed?

MR. RIDEOUT: No objection.

THE COURT: As far as I am concerned sure.

MR. RIDEOUT: Judge, I have one more witness left, Attorney Francis Bloom.

THE COURT: That will be two o'clock.

(Luncheon recess was taken.)

* * * * *

(The Court entered.)

(The defendant was present.)



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

THE CLERK: Continuation on the hearing, Your Honor, on Mr. Perrot.

THE COURT: All right. Mr. Rideout, are you ready to continue?

MR. RIDEOUT: Ready, sir. I call Attorney Francis Bloom.

* * * * *

FRANCIS BLOOM (sworn)

DIRECT EXAMINATION BY MR. RIDEOUT

Q. Would you state your name, please.
A. Yes. Francis Bloom.
Q. Would you spell your name, sir?
A. B-L-O-O-M.
Q. And how are you so employed, sir?
A. Privately. Lawyer.
Q. And practicing here in the Commonwealth?
A. Yes.
Q. And in October of last year how were you so employed?
A. October of '90?
Q. 1990.
A. Assistant District Attorney, Hampden County.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. And how long have you been employed as an ADA?
A. Since sometime in '77.
Q. Did you have occasion to be the Assistant District Attorney in the case of Commonwealth versus George Perrot?
A. Yes.
Q. And were there a number of cases in Commonwealth versus George Perrot?
A. Yes.
Q. Did you handle all of them?
A. As best I can recall I was the only one involved in the cases.
Q. How many to your knowledge did you prosecute?
A. Incidents you mean?
Q. Yes.
A. I believe there were two incidents that he originally pled guilty to and then there was two other unrelated incidents that he went to trial on so it would have been four incidents.
Q. So when you say "unrelated" --
A. (Interposing) Time wise.
Q. Time wise. Were you part of an investigation of some break-ins and rapes that occurred in the same neighborhood over the same period of time?


PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

A. The first time I have had anything to do with a case was the day that or the day after Mr. Perrot had been arrested for a break-in and a pocketbook snatch out in the Allen Cooley section of Springfield and he had been arrested at that time. Prior to that I didn't have any involvement in the case.

Q. After your initial involvement with the pocketbook snatch that was at the Denny's Restaurant?

A. Yes.

Q. Did it become explained to you or did you learn there was a greater interest in Mr. Perrot and other people in this particular neighborhood?

A. Well, the only person I became aware of at that time was Mr. Perrot. I was directed to go to the station, Springfield Police Station the morning after he became arrested. I wasn't aware of anyone at that time.

Q. At that time -- you said later, sometime during this investigation at this time period?

A. At some time, as a result of conversation with people in the Springfield Police Department on one case they had indicated to me they had suspects, people they believed to be suspects.

Q. So there were other cases than just the one's that



PENGAD CO., BAYONNE, N.J 07002 · LASER BOND A

you prosecuted against Mr. Perrot that fit in this time scheme and this neighborhood in this area?
A. Would you rephrase that again.
Q. Was there more --
A. (Interposing) Was there more than one case? There was a multitude of cases, as I remember.
Q. May I -- this is Exhibit No. 1. Would you take a minute and look at that, sir. (Indicating)
A. I've seen this. (Indicating)
Q. Who made up the wording of that, sir?
A. I couldn't tell you.
Q. Who typed it?
A. Don't know.
Q. You have seen it before?
A. Yes.
Q. When did you see it?
A. The last time? The last time prior to today that I have seen it?
Q. Yes. When was the first time you saw it?
A. The first time I saw it would have been the day it was being put together.
Q. Going back --
A. (Interposing) What I mean is I was involved within


PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

this process. I just can't tell you physically who typed it and where -- when it was typed, here or at the Springfield Police Station, I would be guessing.

Q. What's the reason you would be guessing?

A. Just the length of time I was aware of it I was involved in this, but I don't want to say it was done in the DA's office as opposed to Springfield Police Station because I can't tell you. I don't know.

Q. Okay. And you can't tell me who's words those are?

A. It would have been authorized by me. Whether I came up with the words or someone else did and offered it to me for approval I don't know.

Q. Okay. So it's your document, basically, but you can't tell me whether you recall -- whether you did the actual typing or somebody else typed it?

A. I don't want to say that. I don't see it as being important. I don't know whether I put this together or one of the police officers put it together and then showed it to me. I just don't -- I don't know whether it was me or one of the other officers. Ultimately before anything was done with it I had seen it and approved it.

Q. Okay. Whether or not you remember how it had got created please turn to page three.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A
9/91

A. (Witness complying.) Uh-huh.
Q. Would you notice, please, there are three signatures there? (Indicating)
A. Right.
Q. One of those yours?
A. Yes.
Q. Do you recall signing your name?
A. No. I have no recollection of signing it. That is my signature.
Q. One of the signatures that you recognize the handwriting?
A. Yes.
Q. Is one of those signatures George Perrot's?
A. Is it his signature? Yes.
Q. Does it purport to be -- do you recall signing this?
A. No. He didn't sign it. I don't know. It would have been me or either one of the police officers. I don't have any recollection of doing it myself, but I can't say I did.
Q. It could have been you who signed George Perrot's name?
A. Could have been.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. You are telling this Court, now, you don't know who it was that signed the third page of this document next to your signature?
A. I have no recollection either to tell you the two other signatures do not appear to be my handwriting. So I don't have --
Q. (Interposing) That is not what I asked you. I didn't ask you who's handwriting it appeared to be.
A. I don't know who signed it.
Q. I wasn't asking you who's handwriting it appeared to be. I am just asking you do you know if George Perrot signed it?
A. Yes. I know whether he signed it or not.
Q. And did he?
A. No.
Q. Somebody else signed his name?
A. Yes.
Q. Are you telling me you can't remember who it was?
A. I don't remember specifically. I know it wasn't me.
Q. What function is your name on there?
A. As a witness to George Perrot, correct.
Q. You didn't witness it?



PENGAD CO. BAYONNE, NJ 07002 · LASER BOND-A 9/91

A. No.
Q. Or you can't remember?
A. No. I have said twice it is not his signature.
Q. Did you witness the pen going to that piece of paper or can't you remember?
A. You mean whoever signed it did I see them sign his name? That's what you are asking me? I don't know.
Q. You don't remember?
A. No.
Q. It is possible that it could have been you that did it?
A. No. I would say it is not. Excuse me. I would say that it is not my handwriting.
Q. Again, I am not asking you to be a handwriting expert. If I may, the other signature, does it purport to be Sergeant Kelly's?
A. Yes.
Q. And did you at some time have a conversation with Sergeant Kelly about that signature?
A. At the time this was done?
Q. At some time did you have a conversation with Sergeant Kelly about that signature?
A. I talked to Sergeant Kelly about this, yes.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. When?
A. In the last few weeks I've talked to him.
Q. Okay. And what was the nature of that conversation?
A. It was about this.
Q. Did Sergeant Kelly tell you that he put his signature on that paper?
A. No, he didn't. He told me that it is not his signature and he doesn't remember being involved.
Q. Did he call and ask you about this not too long ago?
A. He has talked to me a number of times. I have been friends with him for years.
Q. About this particular document, you talked to him a number of documents (sic) over the years; is that what you are saying?
A. I talked to him more than once about this, yes.
Q. You have?
A. Yes.
Q. Was there a specific phone call that you can recall to your law office or your home from Sergeant Kelly recently after the decision of the appeal had been granted and the decision to retry George Perrot had come up? Did you and



PENGAD CO. BAYONNE, NJ 07002 · LASER BOND-A

Sergeant Kelly discuss this document? (Indicating)

A. We've discussed this when I took the call and when I don't --

Q. (Interposing) I am trying to aid in remembering specifics.

A. I don't remember where it was or whether he called me at home or whether he called me at work. I can't tell you.

Q. But at least you remember that you and Sergeant Kelly talked about this document?

A. We have talked about this document.

Q. At the time Sergeant Kelly's name was signed did you -- do you recall asking him if it was all right to use his name?

A. I don't know who signed Kelly's name.

Q. Do you recall asking him if it was all right to use his name?

A. No.

Q. You recall telling him you used his name during one of these many conversations you had with Sergeant Kelly?

A. Do I recall telling Kelly I used his name?

Q. Yes.

A. No.

Q. You don't recall that at all?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

A. No.
Q. I ask you to look at number two.
One more question about document number one just to make sure I am not confused here.
You can't remember who typed it or who worded it, but you are a adopting that document as something that you approved of?
A. Yes.
Q. And you recognize the handwriting as a witness to George Perrot's signature as your own?
A. That is my signature from my name not the other two.
Q. As a witness?
A. Right.
Q. And you also testified that George Perrot did not sign this?
A. Correct.
Q. So you did not witness George Perrot signing this?
A. No.
Q. Take a look it that one, number two.
Actually, sir, I am going to direct just to the bottom at the signature of George Perrot, does it appear to you there has been more than one signature done there? (Indicating)



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 16/6

A. Whose signature are you talking about there.
Q. Mr. Perrot.
A. Yes. It looks like someone went over it in pencil over the pen.
Q. When you say, "it looks like someone" am I to take it then you don't recall ever seeing that before, that tracing?
A. What you're showing me?
Q. Yes.
A. No.
Q. You didn't do that?
A. No.
Q. Who else was involved in this investigation beside you and Sergeant Kelly?
A. Chief Stelzer, Captain Arpin, Sergeant Kennedy, Sergeant McFarlin, Detective Jarvis.
Q. All Springfield police?
A. About at least eight or nine people that were prominently involved.
Q. All from the Springfield Police Department?
A. Correct.
Q. Anybody from the state police ever involved?
A. No.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. How about the FBI?

A. Not that I remember, no.

Q. Well, wasn't there evidence in this case submitted to the FBI?

A. Yes.

Q. There were. I was thinking in terms of investigators. There were laboratory people in Washington who were involved in this case?

MR. RIDEOUT: And if I may again, Your Honor, take a minute and look at some of these reports.

(Pause)

Q. (By Mr. Rideout) Do you recognize those basically as to be reports from Commonwealth versus George Perrot? (Indicating)

A. Yes.

Q. In your normal practice as an Assistant District Attorney did you often submit head hair samples, blood samples to the FBI for analysis?

A. No.

Q. You did it in the George Perrot's case?

A. Did I what, sir?

Q. Did you submit -- you led the investigation in the prosecution in this case; is that correct?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

A. Well, you know, I was responsible from the DA's point of view. I wouldn't use the words "I led the investigation." I believe the -- I would say the police are making the most of the decisions to be made.
Q. Well, didn't you become involved in the investigation that this -- the rapes in that neighborhood when you met a Mr. Bob Timmerman?
A. I would not say I was involved in the investigating of these cases if that is what you're asking me.
Q. Okay. I am asking you do you know Bob Timmerman?
A. Yes.
Q. Where?
A. Springfield Police Station.
Q. What time of day or night?
A. I would say late afternoon.
Q. How was he brought to the police station?
A. I don't know.
Q. Why was he brought to the station?
A. To be questioned.
Q. By whom?
A. Springfield Police Department.
Q. Why were you there?
A. I had received a call by one of the Springfield



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

police officers indicating what the status of the questioning was and on my way home I dropped by there at their request.

Q. You just dropped in?

A. No. I just dropped in -- I was asked to go up there.

Q. At their request?

A. Yes.

Q. And that would be in your role as an Assistant District Attorney?

A. It was a common practice.

Q. Investigating these breaks in that Malibu Street neighborhood area; is that correct?

A. They asked me to go up there, yes.

Q. On that subject matter, on the breaks, rapes, etc. that had been occurring over a period of time in Malibu?

A. The Marchand case specifically.

Q. That one specifically. The two gentlemen, Greg (sic) Adkins and Bob Timmerman, did you question them yourself?

A. I talked to both of them, yes.

Q. Well, I ask you, did you question them?

A. I can't tell you what I said and what I didn't. It was pretty much over by the time I got there, but I did talk



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

to both of them. I did ask them questions, yes.

Q. Okay. So you do have memory of asking them questions?

A. Yes.

Q. That three page document, you recall that being in the room?

A. Which one now?

Q. The purported confession of George Perrot, number one.

A. It was. It was shown to them. Whether it was there when I got there or not I don't know.

Q. When you say, "it was shown to them" you don't know, are you telling me you didn't show it to them?

A. I didn't say that. I said --

Q. (Interposing) Did you show them?

A. I said, "I don't remember whether I showed this specifically to them," and obviously it was shown to them by the police and or I don't have a memory as to whether I specifically showed it to him. I may have. I don't know.

Q. Well why do you say it was "obviously" shown to them?

A. That was the purpose they were brought up there. I know obviously it was shown to them.


PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. But you don't recall you showing it to them?
A. I may have, but I can't say from memory that I specifically showed it to them, but the police certainly did prior to my getting there.
Q. And you're certain of that?
A. That is the reason why they were there.
Q. So when you used the word "certainly" you are making a conclusion?
A. I am assuming it I should say.
Q. Okay. You don't recall showing that document to either Mr. Adkins or Mr. Timmerman and the lack of better words threatening them with it?
A. No. I don't remember whether I specifically showed this to them or not.
Q. When you -- did you question both of them?
A. I don't recall. I may have.
Q. Did they have lawyers present, do you recall that?
A. No.
Q. You don't -- you do have a memory?
A. No. When I was there there was no lawyers there.
Q. You do have memory of it at least?
A. Yes. There were no lawyers there.
Q. You don't have memory of whether you asked them a


PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 9/91

question or not?

A. No. I said I could ask them questions. There were no lawyers there when I got there.

Q. And you don't have memory if it was you who showed them that three page document or not?

A. I don't remember whether I showed them the documents or not.

Q. In the FBI reports there -- if I may, to save time, turn to August 4. If I may point out about the sample they are talking about on August 4, do you have memory of hand-carrying that sample yourself to the FBI lab?

A. Yes. I remember going down there.

Q. Down where?

A. To the FBI.

Q. Where is that?

A. Washington, DC.

Q. And that was in your role as an Assistant District Attorney?

A. What was my role?

Q. Going down to Washington, DC.

A. Yes. To review the serologist and the head hair fiber.

Q. Is this something you had done before as an ADA?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A

A. Gone to other areas to interview people? Yes.
Q. Did you do it for other tests that were done on George Perrot?
A. I'm sorry. I don't understand.
Q. The one page refers to one specific --
A. (Interposing) I was down there only once, if I understand your question. I just went one time.
Q. So the answer is, "No." You didn't do it on any of the other tests, but you -- the FBI uses the words "hand-carried" whether you carried the blood or not you went to Washington, DC, as part of your job at the Commonwealth's expense with evidence in the George Perrot case?
A. No.
Q. You didn't go to Washington, DC?
A. No. I didn't have evidence.
Q. Why did you go to Washington?
A. I went to Washington to talk to Mr. Oaks and the gentlemen who was the head serologist.
Q. So the evidence was already there?
A. I can't remember his name, whoever the serologist was there.
Q. You do have a memory of that trip though?
A. Excuse me.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. You have memory of that trip?
A. Yes.
Q. Who went with you?
A. Sergeant Kennedy of the Springfield Police Department.
Q. And you have memory except for one whom who you saw down there?
A. Yeah. I probably could remember the written version. I don't know why it escapes me, but he was the head of the serology department.
Q. And one more time, Mr. Bloom -- Attorney Bloom, excuse me, not to belabor it, the three page document, the one that is marked as number one, you're adopting that as something that you approved of?
A. Yes, sir
MR. RIDEOUT: Thank you.
THE COURT: Miss Zeprun.

* * * * *

CROSS-EXAMINATION BY MS. ZEPRUN

Q. Mr. Bloom, that three page statement was generated after the conviction was reversed by the SJC; that's correct?
MR. RIDEOUT: Objection.
THE COURT: Start again. I can't hear you.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

Q. (By Ms. Zeprun) Was that three page statement generated after the conviction of George Perrot?

MR. RIDEOUT: Objection, Your Honor.

THE WITNESS: No.

MR. RIDEOUT: He has already testified he doesn't remember most of what went on and how it happened.

THE COURT: Well, this is cross-examination, Mr. Rideout. I don't think it exceeds the bounds of cross-examination. You may proceed.

THE WITNESS: No. My answer is "no" to that question.

Q. (By Ms. Zeprun) Your answer is, "No." You don't remember when it was done?

A. I remember I didn't give you a date, but I think your question, "Was it after the conviction?" My answer is, "No. It was before the conviction was overturned."

Q. Was it before the conviction was rendered?

A. It was after Mr. Perrot had been convicted in the Lichwala and Prekop case but before the conviction had been overturned in that case.

Q. And what was the intent behind the generation of that statement?



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 9/91

A. Mrs. Marchand, after Mr. Perrot had been convicted in the Lichwala and Prekop cases, Your Honor, the police came to discuss the Marchand case which was another case he had been indicted on.

The stain that had been removed from the bed in this case exculpated Mr. Perrot as the donor of the stain. We had a conversation and I indicated I didn't think the case -- well, I didn't feel the case would be prosecuted on that basis and that they would have to give Mrs. Marchand's blood sample to determine if possibly it was her seminal fluid that contributed to the stain.

A time frame went on, Mrs. Marchand's blood was taken. It was sent to the FBI to see if she would have been the donor of that stain on her bed sheets. Between the time that her blood was taken by the Springfield police and sent down for analysis purposes she died.

After she died members of the Springfield police came up in this building. I had previous conversations with them about this Mr. Timmerman and Mr. Adkins who I had conversations about but had not met.

They felt very strongly that they had entered Mrs. Marchand's home with Mr. Perrot and were involved in that particular incident and they had discussion with me as to the



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

fact that they wanted to approach the two of them and talk to them. Basically, they were looking for approval as to what type of subterfuge they could use in talking with them.

My conversation with them was number one, whether they had to determine whether they had lawyers. Number two, to see if they would voluntarily come to the station. And if so, I felt based on a case that I had a short time before dealing with this type of subterfuge.

What the SJC had said, I felt, that this was legal and the specifics again as to whether this was done up at the station or in the DA's office, I don't remember, but I authorized it. Someone of police people of the group that came to me made contact with two of them. I don't have any role -- specific knowledge -- of that asked them to come to the station, apparently they did.

I received a call later saying that the two gentlemen unequivocally denied any participation. I went up there and talked to both of them for a very short period of time and took the statement and put it back in the file. That was the end of it.

Q. And your focus was on the Marchand case; is that correct?

A. There wasn't any other focus at that time.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A

Q. As far as you're concerned the case against Mr. Perrot was over; is that fair to say?
A. At that time.
Q. Okay. Did you have anything to do with the collection or retention of any of the physical evidence that was used in the Perrot case to convict him?
A. No.
Q. Did you ever fabricate or manufacture or generate any false information or false evidence against Mr. Perrot?
A. Well, that's false there. (Indicating)
Q. Outside of that statement?
A. No.
MS. ZEPRUN: No further questions.
MR. RIDEOUT: If I may ask.

* * * * *

REDIRECT EXAMINATION BY MR. RIDEOUT

Q. I am a little confused. If I asked before forgive me, Attorney Bloom.
A. Uh-huh.
Q. When you went to the police station at their request Mr. Adkins and Mr. Timmerman was there, was Sergeant Kelly there?
A. There were a number of police officers there. I



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

can't swear that Kelly was one of them. I have no independent memory of whether Kelly was there or he wasn't there. There were four or five police officers that were there involved interrogating these two young men, whether Kelly was one of them or not I can't tell you.

Q. Is it likely he was there?

MS. ZEPRUN: I object to that question.

THE COURT: I'm sorry.

MR. RIDEOUT: I asked if it was likely if he was there.

THE COURT: I will sustain that.

Q. (By Mr. Rideout) In these conversations, the many conversations you had with Sergeant Kelly since then has this issue ever come up whether or not Sergeant Kelly was there when you questioned?

A. Yes.

Q. So you spoke with Sergeant Kelly whether or not he was there --

A. (Interposing) Yes.

Q. -- and questioned Adkins?

Did you use any profanity or foul language on Mr. Adkins or Mr. Timmerman?

A. Not that I recall.



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND A 9/91

Q. You have no memory of that?

A. I have no memory as to what specifically was said between the two of us. I was only a few minutes before they went home.

MR. RIDEOUT: That is all I have.

MS. ZEPRUN: Nothing further.

THE COURT: All right. Thank you.

MR. RIDEOUT: No further witnesses.

THE COURT: Does the Commonwealth have any?

MS. ZEPRUN: Nothing further, Your Honor.

THE COURT: Would you like to argue?

MR. RIDEOUT: Judge, I would like to file a memo so I would.

THE COURT: All right. How much time do you wish?

MR. RIDEOUT: Probably wouldn't need beyond the end of the week or Monday by the latest. I am prepared to argue today or file a memorandum, whatever is preferable.

THE COURT: If Mr. Rideout is going to file a memorandum it is just as well both sides did the same thing.

MR. RIDEOUT: The problem is I discovered



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 9/91

things that I was previously unaware of. To do an argument I don't think it would serve I think a memo --

THE COURT: (Interposing) All right. A week from today.

MR. RIDEOUT: Fine.

THE COURT: All right. As soon as I get the memorandums I will take it under advisement.

MR. RIDEOUT: Thank you, sir.

MS. ZEPRUN: Thank you, Your Honor.

THE COURT: You can also argue orally if you wish.

MR. RIDEOUT: At this time, sir, can I reserve that right?

MS. ZEPRUN: I am prepared to go forward today. I have heard nothing to indicate Mr. Perrot was in any way prejudiced or that Mr. Bloom did anything that had anything to do with the Prekop case and I am going to ask defense counsel to withdraw his motion.

MR. RIDEOUT: Well, I am going to respectfully decline and say one of the basis I have is that tremendous specifics Attorney Bloom has. The name of the Marchand case who remembered what sample, who remembered what stain, what type of blood it was, her death,



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A 9/91

everything else that was going on at the same time he seems to have no memory of. I have a problem with that.

I also have a problem with the numerous conversations between he and Sergeant Kelly and to which did come up today or which good police practice which Sergeant Kelly was subterfuge. Is good police practice acceptable legal practice?

Those are the kinds of things I think, Judge, are better addressed in a memo. Frankly, the case law, as you well know, comes down to Commonwealth versus Lewin on prosecutorial misconduct. As far as this indicates police subterfuge with good legal tactics that is in issue that's raised today.

THE COURT: All right. We will wait for the memos.

(The hearing was concluded.)

* * * * *



PENGAD CO., BAYONNE, NJ 07002 · LASER BOND-A