**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 16

COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420,25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

PRE-TRIAL MOTIONS AND JURY TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury, on January 6, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231



4/2/92

# I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Pre-trial motion | | | | |
| Edward Sullivan | 4 | 6 | | |
| | | 9 | | |
| George Perrot | 10 | 13 | | |
| Openings | | | | |
| Mr. Vottero | 103 | | | |
| Mr. Ferrara | 110 | | | |
| Commonwealth's | | | | |
| Emily Lichwala | 119 | | | |
| Mary Prekop | 126 | 148 | 165 | 168 |
| Robert Cheetam | 173 | 181 | 183 | |
| Thomas Kelly | 185 | | | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Commonwealth's 1 | statement | 145 |
| A for identification | gloves | 145 |
| B for identification | photo | 158 |
| C for identification | photo | 161 |
| D for identification | sheet | 166 |
| Commonwealth's 2 | photo | 176 |
| Commonwealth's 3 | photo | 176 |
| Commonwealth's 4 | photo | 176 |
| Commonwealth's 5 | photo | 179 |
| Commonwealth's 6 | photo | 180 |
| Commonwealth's 7 | photo | 180 |
| Commonwealth's 8 | photo | 189 |
| Commonwealth's 9 | photo | 189 |
| Commonwealth's 10 | photo | 189 |
| Commonwealth's 11 | photo | 189 |
| Commonwealth's 12 | photo | 193 |
| Commonwealth's 13 | photo | 193 |
| E for identification | pillow case | 196 |

(The defendant was present.)

(The Court entered at 10:03 a.m.)

THE COURT: Good morning. For the record these are the cases of Commonwealth versus George Perrot. Defendant is present. Counsel are present.

Preliminary to proceedings on some motions which I will rule on in a moment it's going to be necessary to take some evidence in this case in connection with the motion of the defendant to be seated at counsel table. While it's not specifically objected to by the Commonwealth I'm informed by the people who are involved with security, the court officers, that there is a serious consideration concerning mainly, the availability of court officers due to the number of sessions and the lack of full staff, the configuration of the courtroom, the various matters going on in close proximity and therefore, I'm going to take some evidence.

And I will first hear from the Chief Court Officer, Mr. Sullivan. Perhaps if you would be sworn you could answer some questions.

* * * * *

EDWARD J. SULLIVAN (sworn)

EXAMINATION BY THE COURT

* * * * *

THE COURT: Would you kindly identify yourself for the record.

THE WITNESS: My name is Edward J. Sullivan. I am Chief Court Officer in Superior Court, Hampden County.

THE COURT: Mr. Sullivan, you are familiar with the number of staff you have today and for the balance of the week?

THE WITNESS: I am, Your Honor.

THE COURT: And you also understand the number of other matters being contended to in the various sessions of the Court today and subsequent for the rest of the week?

THE WITNESS: Yes. I am familiar with the scheduling of the Superior Court and the other courts we are servicing as well.

THE COURT: And you have been advised by Mr. Kavane, who is involved in this session, which for the record is session four, Hampden County, that there is a request on the part of the defendant, Mr. Perrot, to be

seated at counsel table?

THE WITNESS: Yes. I am aware that that request had been made.

THE COURT: Would you let us have whatever information you have pertinent to that, please.

THE WITNESS: Well, basically, I would be opposed for security purposes for Mr. Perrot to be sitting at counsel table rather than sitting in the dock where he is presently sitting.

The reasons I have, four of the reasons, number one, Mr. Perrot has, in the past, attempted to escape. Back in 1985 York Street filed a complaint against him. He is doing time at Walpole State Prison. Now, he is here for the trial of these cases. In addition, for the record of Mr. Perrot in the past.

We are operating out of courtroom six here which is adjacent to the Grand Jury room were there are a number of civilian witnesses appearing before the Grand Jury which is sitting today for the first day of a new session and there has been some backlog of a number of people in and around the hallways. This creates some problem with transporting Mr. Perrot from the cell block here on the third floor to the courtroom.

In addition to this, this courtroom will be running short handed all week long unless we can find some other session that shuts down and at that point we would reassign officers from the session that was used. I do not foresee any of these sessions closing down here in the Superior Court or in the other courts that we have a jurisdiction to service.

THE COURT: Very well. Any questions, Mr. Ferrara, if you wish?

MR. FERRARA: Just a few questions.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Mr. Sullivan, you made reference to an escape attempt back in 1985 and a complaint requested or filed by the Hampden County House of Correction?

A. That's correct.

Q. And what is the basis of that information, sir?

A. That's the information that has been passed to me from York Street.

Q. And when did that, was that information?

A. When? Today.

I might point out York Street transported Mr. Perrot in

leg irons because of their concern about security between the jail and here.

Q. Did they indicate to you that there was an escape attempt and that a complaint had been filed?

Did they simply say there was a rumor of an alleged conspiracy back in 1985 for which he was locked down?

A. Their advice to me was to keep an extra eye on Mr. Perrot because of this past experience.

Q. My question was, sir, though, did they specifically say that there was an actual escape attempt or did they tell you back in 1985 he was locked down because of an alleged conspiracy?

A. They did not go into the detail of any incident.

Q. Were you aware that during the -- I'm sorry. Was that 1985 or 1987 by the way?

A. I'm not certain.

Q. During this last trial?

A. I'm not certain.

Q. I believe the last trial was December of 1987, sir. Were you aware at that time that Mr. Perrot was seated at counsel table throughout the trial?

A. I don't have a memory of that.

Q. And I know you described Mr. Perrot seated behind

me in the docket and would it be fair to say he is seated by about three feet behind where I would be at the counsel table?

A. Approximately that distance, sir.

Q. And can you tell me what is the significance, security advantage to have him seated behind me as opposed to seated at the table with me?

A. Yes, sir. The court officers are sitting about four feet away from Mr. Perrot now and the dock restrains him from approaching either the counsel table or the clerk's bench or the judge's bench or witness bench where he is sitting at, the table, that puts the barrier between the court officers and him.

Q. Wouldn't it be feasible simply to have a court officer to sit at a location where that barrier wouldn't be between the officer and Mr. Perrot?

A. Well, are you suggesting that the court officers sit at counsel table with you?

Q. No, sir?

A. Oh.

Q. I am suggesting he sit perhaps at a chair next to counsel table or not directly next to counsel table, but in a position where there is no barrier between him and counsel table.

A. Well, unless he was sitting at the table there is a barrier between the officer and him, sir, and in a normal configuration of the courtroom.

Q. I understand. But as he is sitting in the docket, the end of the docket constitutes a barrier than it would be if he was seated in a chair to my right, here at the table, wouldn't it?

A. May I have that question again.

Q. As he is seated in the docket, this end of the docket here constitutes a physical barrier more so than if he was seated at the table to my right and the court officer were seated here? (Indicating)

A. Well, the court officer is sitting behind him, sir.

MR. FERRARA: I have no further questions.

THE COURT: You can go.

* * * * *

CROSS-EXAMINATION BY MR. VOTTERO

* * * * *

Q. Are you aware during the first trial he was actually transferred to a different House of Correction because of security problems?

A. I was aware he was not housed at York Street.

MR. VOTTERO: Nothing further.

THE COURT: Very well. Thank you, Mr. Sullivan.

MR. FERRARA: May I have Mr. Perrot take the stand for a moment?

THE COURT: Sure.

* * * * *

GEORGE PERROT (sworn)

DIRECT EXAMINATION BY MR. FERRARA

* * * * *

MR. FERRARA: May I proceed, Your Honor?

THE COURT: Go right ahead.

Q. Mr. Perrot, you were present and just heard Officer -- Mr. Sullivan testify with respect to your detention at the first trial of this matter, did you not?

A. Yes, I did.

Q. And did you hear what he said with respect to an attempted escape and a complaint regarding escape during that trial?

A. Yes, I did.

Q. Would you tell the Court what you recall and understand about that?

A. Well, York Street made a complaint of a conspiracy to attempted escape while I was housed at York Street awaiting

trial.

Q. Was there ever a complaint filed against you for an attempted escape?

A. No, sir.

Q. Were you kept at York Street or somewhere else?

A. At York Street.

Q. And were you kept at York Street throughout the trial?

A. Yes.

Q. And during the trial where were you seated?

A. Next to counsel.

Q. And who was your attorney at that time?

A. James Hammerschmith.

Q. How long did that trial last?

A. Approximately five, six days.

Q. And was there, at any time, during the course of that trial where Court personnel had to restrain you?

A. No, sir.

Q. In preparation for this trial have you reviewed a approximately five volumes of transcripts of testimony given at the first trial?

A. Yes, I did.

Q. And have you also reviewed an index of those

volumes of testimony that I provided you?

A. Yes, I did.

Q. Do you remember how many pages that index was?

A. Approximately 20 maybe.

MR. FERRARA: May I approach the witness for a moment?

THE COURT: Yes.

Q. (By Mr. Perrot) And does this refresh your recollection as to how how many pages is that? (Indicating)

A. Approximately 20, a little more.

Q. Okay. And have I discussed with you that the manner in which you could assist me in the trial of this case?

A. Yes, you have.

Q. And would you tell the Court how it was anticipated that you would be able to assist me?

A. In locating certain testimony of both the prosecutor's witnesses and the defense witnesses.

Q. During the course of the trial?

A. During the course of the trial.

Q. And did we specifically go over that index and its use and how it pertained to the five volumes of testimony?

A. Over the last couple days, yes.

MR. FERRARA: No further questions, Your Honor.

* * * * *

CROSS-EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, when you were moved from your home on December 7, of 1985 do you recall making an attempt to escape from the custody of police at that time?

A. Yes, I do.

Q. They had to chase you to apprehend you at that point?

A. Yes, they did.

Q. That is after you had already been placed under arrest; is that correct?

A. Yes.

Q. Is it your testimony you were housed out at the York Street Jail during the trial?

A. Not during trial.

Q. Where were you housed other than the York Street Jail?

A. Northampton County Jail.

Q. Were you told why you were being moved?

A. Alleged conspiracy to escape.

Q. Were you, in fact, involved in an attempt to escape?

A. There was never an escape attempt made.
Q. I understand that. It is a fact you were engaged in plans to make such an escape.
A. No. It was just hearsay in the guards and other inmates.
MR. VOTTERO: I don't have anything further.
THE COURT: Anything further?
MR. FERRARA: Nothing, Your Honor.
THE COURT: Very well, you may step down. Anything else?

Very well. I'm going to rule that there is a security issue that interferes with what I would normally grant and that is the ability to sit at counsel table. I would like to state for the record that my findings are that there is unfortunate security of personnel probably in the entire court systems, but certainly in Hampden County. At this time there is an insufficient number of court officers to provide security for the jurors and other personnel involved.

There happens to be matters going on in other sessions, the other proceedings in the immediate vicinity of this courtroom. There are concerns for those involved in the security issues. They have exacerbated the

problem and the previous history of this defendant on a prior occasion. I do not give great weight to the fact that he is presently serving a sentence in Walpole on other matters and is in custody for these reasons, as well.

I should also point out that the dock in this courtroom and in this courthouse is not the traditional dock familiar to those who have practiced in the Suffolk County courthouse where it is an enclosure of substantial size segregated by distance from counsel table and positioned in such a way as it is offensive.

The dock in this courtroom and other courtrooms in this courthouse is a pew seat at least eight feet long that is similar in all respects to the other seating in the courtroom. And it is indistinguishable from the other seats. The enclosure is a simple bar that is probably four feet high, no more. That does not obstruct the view. The dock itself is within three or four feet of counsel table and the defendant's counsel is separated by no more than that three feet or so. They can confer privately without having to stand up or move around. It might take turning and moving a chair a few feet or so.

But I would rule that the defendant may have access

to all of the books and papers at counsel's desk. If there is some way of providing a flat surface for him we can do that. If counsel wants to move his table back a little he can do that too so that there will not be an interference with the contact or communication. The condition of the dock is not an offensive one.

At some point I think we ought to take a photograph and put it in the record because it is very different from the dock that exists in many of the other courthouse's of this Commonwealth.

And for these, based on these findings I am going to deny the defendant's motion to have the defendant sit at counsel table. With the proviso that he have full access to all the documents, papers and there be able to assist counsel to that extent.

MR. FERRARA: May I suggest, Your Honor, for that, perhaps if we were to bring in a table over here abutting the bar I could put the books and index here.

THE COURT: Maybe you want to move your table down a little this way and give you more room.

Mr. Vottero, move your table also so he can get out if he needs to approach the witness.

MR. FERRARA: I can make that.

THE COURT: All right.

Let's deal also with the motion filed by Mr. Coyle on behalf of witness Mary Prekop. He filed, Mr. Coyle filed a motion to squash a subpoena. He was present Friday, submitted documentation and today an affidavit and report of the physician and from a conference held earlier.

It appears that there is a stipulation between counsel that the fresh complaint allegedly made by Mary Prekop, the alleged victim, to Officer Popko will be introduced through that witness, that is Mary Prekop, and offered as an exhibit thereby making unnecessary for the appearance and testimony of Marianne Popko who is of such a medical condition as it would be extremely detrimental to her health if she were to testify or be required to. So I will take no action in view of the stipulation, but Officer Popko is excused and Mr. Coyle, if you want to be excused you certainly may as well.

MR. COYLE: Thank you, Your Honor.

THE COURT: The defendant's motion for voir dire questions is allowed and the best method for dealing with that, as I've indicated to counsel, is to bring out

these issues in the beginning to the entire jury pool before we commence to seat them and one by one invite those who are affected to come up to the bench one at a time I found to be an effective way of eliciting this information.

So the first question dealing with relationships to police is something that will be responded to in the questionnaire. Those jurors so responding will be invited to the bench one at a time as follow up questions. The other two, a history of violent crime and a family or nature of the crime I will ask in a general way as indicated.

The defendant's motion to exclude prior convictions no action because the Commonwealth has indicated that in view of the trial will not offer any such prior conviction; is that correct?

MR. VOTTERO: That's correct. To make clear I will not offer it as it pertains to his truthfulness or lack thereof based on the statutory procedure of impeachment. It is a chance that his convictions may be relevant in other areas if the defendant testifies.

THE COURT: Very well. Very well.

The motions dealing with the alleged confession I will deal with before it becomes an issue in the case. The motion for sequestration of prosecution witness allowed, reciprocal except the defendant's mother, Mrs. Daley, may attend even though she is going to be a witness.

The motion to exclude evidence that either of the alleged victims had been a victim of prior incident; counsel, that's agreed not to mention that in argument as I understand it. I will treat that as having been allowed. And defendant's motion for special questions we'll take up at the appropriate time. There was something about, motion about photos. I have a notebook that --

MR. FERRARA: (Interposing) I didn't file a printed motion.

THE COURT: Okay. What is that again?

MR. FERRARA: I made a request to be able to use two photographs of the defendant, Mr. Perrot, in my opening argument, if I could, and I expect they will go into evidence -- they did in the first trial.

MR. VOTTERO: I have no problem. I expect to refer to photos of the victim as well as a chalkboard

diagram will be introduced.

THE COURT: Anything else before -- very well, anything else before we bring down the jury?

Did you say you wanted to put something on the board?

MR. VOTTERO: I wanted to have streets put on the board.

THE COURT: We can do that by breaking after the jury selection or by break now. I don't know, how long do you think it will take the jury to come down?

THE COURT OFFICER: Minutes, Judge.

THE COURT: We are going to have to squeeze them in.

(Pause)

(The jury pool entered at 10:35 a.m.)

THE COURT: All right. Mr. Vottero, are you ready for trial?

MR. VOTTERO: Commonwealth moves for trial.

THE COURT: Will you swear in the jurors?

THE CLERK: Will all the jurors please stand

and raise your right-hand.

(The jury pool was sworn.)

THE CLERK: George Perrot please stand.

(The defendant complies.)

THE CLERK: You are now set to the bar to be tried and these persons whom I shall call are to pass between you and the Commonwealth upon your trial. If you will object to any of them you must do so as they are called and before they are sworn. You have a right to challenge any 14 for no cause.

You may be seated.

(The defendant complies.)

THE COURT: Good morning, ladies and gentlemen.

My name is William Simons. I am a judge in the Superior Court. I am going to be presiding at the trial in which you have been summoned as prospective jurors.

I am now going to attempt to give you some

information about the case and what I tell you is not evidence. It is simply background information to assist you in understanding the questions I am going to be putting you as a group. The questions, I can assure you, are simply for the purpose of obtaining impartial jurors who will be able to listen to the evidence with an open mind without preconceived ideas and to fairly and objectively weigh the evidence and to return a fair and impartial verdict.

I can assure you there are no trick questions. There is going to be no attempt to pry into your private affairs. We are all simply trying to obtain jurors who can be impartial.

I note, of course, that you're seated here kind of crowded in and I'm certain in an uncomfortable position. You are carrying your coat, your clothes and other things you have and in a very short time we will be able to make you more comfortable and provide you with a room and you can hang up your clothes and be able to sit and listen to the evidence in much more comfort than you're afforded now. And we crowd you in because we need as large a group as you are in order to proceed.

So can you bear with us for what I expect will be a

brief period. So allow me to tell you a little about the case at which you have been summoned as prospective jurors. This is a criminal case. The defendant's name is George Perrot. That is spelled P-E-R-R-O-T. Mr. Perrot is represented by Attorney John Ferrara. Mr. Ferrara, if you will stand. Mr. Ferrara is with the offices of Dalsey & Ferrara here in Springfield.

Thank you.

The Commonwealth is represented by Assistant District Attorney Brett Vottero. And Mr. Vottero has also stood. You can see who he is.

There are five indictments or charges against George Perrot and they involve what is alleged to have been two incidents that occurred within approximately a half hours time in Springfield back in November of 1985, November the 30th, of 1985. There are four charges involving an incident involving a Mary Prekop. That's spelled P-R-E-K-O-P. Mary Prekop is the alleged victim in these four incidents and they are robbery, indecent assault and battery on an adult, aggravated rape, and burglary. Those four charges are alleged to have occurred at 33 Covel Street, C-O-V-E-L, Street in Springfield.

There is an additional charge involving burglary and the alleged victim of that burglary is an Emily Lichwala, L-I-C-H-W-A-L-A. And that's alleged to have occurred at 27 Malibu Drive in Springfield.

Now, obviously, I'm telling you the names of the persons involved, the addresses, the time, so that if any of you have had some event in your background or some matter that jogs your memory, you seem to know something about it, for reasons that are not important, I'm going to persuade you to come up one at a time to the extent you are effected by that information or anything else that might effect your ability to be an impartial juror. And you'll tell us, in the presence of counsel, one at a time, at the side bench. That's one opportunity that you will have.

So I have told you what the charges are, who the attorneys are, the defendant's name, the alleged victim's, and now I'm going to read off to you a list of witnesses who may testify in the course of this trial. Obviously, I am giving you these names so that if any of you have had any contact, any significant contact with any of them you're going to be expected, at the appropriate time, come up and tell us about it and whom,

to what extent it might effect your ability to be impartial. It's clear any contact should be reported.

So the witnesses who may testify in the course of this trial are Mary Prekop, again that's P-R-E-K-O-P; Emily Lichwala, L-I-C-H-W-A-L-A; a Lieutenant Thomas Kelly of the Springfield Police Department; Richard Kane, K-A-N-E, of Springfield; Thomas Jarvis, J-A-R-V-I-S, of Wilbraham; a William Eubanks of Dallas Texas; Wayne Oakes of Washington, DC; Terry Aberdale A-B-E-R-D-A-L-E,of Springfield. And the following five Springfield police department personnel, Lieutenant Robert Cheetam, Captain William Fitchet; Sergeant Thomas Kennedy; Chief Ernest Stelzer, and Sergeant Andrew Canevari, that's spelled C-A-N-E-V-A-R-I.

Beverly Daley of Springfield, Nancy Westcott, Springfield; Robert Timmerman, T-I-M-M-E-R-M-A-N, of Springfield; Jeffrey Atkins of Springfield; Olivet, first name O-L-I-V-E-T, Edward of Springfield; an expert on hair comparison, Elizabeth Zolkiwski, that's Z-O-L-K-I-W-S-K-I, a resident of Newton, Massachusetts; and Francis Bloom, an attorney in Wilbraham.

I should tell you, as a housekeeping matter, that this case we expect will take four days, counting today,

so jurors who are selected to serve will be expected to serve during normal business hours. You will certainly be allowed to go do your usual activities during the rest of the day, but when I say normal business hours I mean nine to four or 4:30 and of course a lunch recess and a recess half-way through the morning and half-way through the afternoon. We find that that's what the people need in order to concentrate and be alert.

So certainly jurors will be free to go about their usual affairs after business hours, but four days is our best estimate of what it is that will take to complete this trial. Now, unfortunately, we cannot be exact. There are also possibilities that the case may take less time or may take some more time. So I would suggest that if there is any among you who are going to be substantially effected by some reasonable hardship or as a result of the length of the trial I will certainly hear you out at, again, the appropriate time if you are going to be suffering that condition. So jurors will be able to bring that to my attention or I will certainly give you every consideration in that context.

So I've now told you the nature of the charge and again if there is anything about the nature of the charge

that is going to effect your ability to hear the evidence impartially and to return a fair and impartial verdict we expect you to bring that to our attention. Of course this is not a referendum on whether you like the charge or not. Of course this means a substantial concern, perhaps there is any among you who have someone in their close family or yourself have been the victim of a violent crime or have been a victim of a burglary. I will ask you to bring that to our attention as well so that we can inquire as to how that effects your ability to serve as impartial jurors.

Any of you who might have any close relation to law enforcement, that would affect your ability to assess in any way the testimony of police witnesses fairly and impartially are also asked to bring that to our attention.

So now, ladies and gentlemen, I've indicated to you the length of the trial, the nature of the charges; I've given you the names of the participants and the prospective witnesses. I've brought to your attention the names of the alleged victims, as well, and before we proceed to seat any of you in the jury box and proceed with these matters I'm going to inquire of you as a group

if there are any among you who are affected in anyway by the information I brought to your attention or have anything to report to me concerning your ability to be an impartial juror please let us know. We will see you one at a time and the court officers will bring you in what order you come up. So please let us know now. If you will stand up that way we won't miss any of you.

(The following discussion was held at the side bar.)

THE COURT OFFICER: Juror 4, seat 3, please.

THE COURT: Good morning. For the record, you're Andrea Engleman.

Yes, ma'am?

THE JUROR: I have to be back in school on Sunday. I only have five days. If it runs past then I can't stay. It's in New York.

THE COURT: You're all right this week?

THE JUROR: You say it might be more than four.

THE COURT: If it is more than four it will be through Friday.

THE JUROR: That will be it?

THE COURT: She will remain.

(Next juror.)

THE COURT OFFICER: Panel 4, seat 6.

THE COURT: And you are Michelle Bressette?

THE JUROR: Yes. I have a doctor's note. I have mono.

THE COURT: I will excuse you.

This juror is excused.

(Next juror.)

THE COURT OFFICER: Panel 4, seat 12.

THE COURT: And you're Carol Premont.

Yes, ma'am.

THE JUROR: I don't know if it is a problem. I recognized the name of one of the officers.

THE COURT: Which one was it?

THE JUROR: Fitchet.

THE COURT: Captain William Fitchet?

THE JUROR: Uh-huh.

THE COURT: Can you give us an idea of --

THE JUROR: (Indicating) I was just introduced

to him years ago and I just don't know if it's a problem or not. I haven't seen him since then.

THE COURT: Let me ask you this. If he were to testify would you give any greater or lesser weight to his testimony in view of your prior contact?

THE JUROR: No.

THE COURT: Would you be able to assess his testimony as of any other witness?

THE JUROR: Yes.

THE COURT: I am going to ask you remain.

(Next juror.)

THE COURT OFFICER: Panel 5, seat 6, please.

THE COURT: You are Emily LeClair?

THE JUROR: Yes.

THE COURT: Yes, ma'am?

tHE JUROR: I wouldn't be able to serve four days. I am returning to college tomorrow.

THE COURT: I will excuse you.

(Next juror.)

THE COURT OFFICER: Panel 5, seat 8.

THE COURT: And you're Angelo Polumbo?

THE JUROR: Yes, I am.

THE COURT: Yes, Mr. Polumbo?

THE JUROR: I am a self-employed barber. I have a barber shop out in Southwick.

THE COURT: All right. I will excuse you.

(Next juror.)

THE COURT OFFICER: Panel 5, seat 13.

THE COURT: And you're Christopher Kenney?

THE JUROR: Correct.

THE COURT: Yes, Mr. Kenney.

THE JUROR: I just told in the form that my uncle is a cop. My wife's father's cousin is a cop.

THE COURT: Let me ask you this. There are going to be police officers testifying in the course of this trial so this is hypothetical.

Assume everything is equal. Would you tend to believe the testimony of police witnesses more or less than that of another witness?

THE JUROR: Possibly. I have been around

them quite a bit.

THE COURT: Okay. I will excuse you.

(Next juror.)

THE COURT OFFICER: Panel 6, seat 2.

THE COURT: And you are Duane Victory?

THE JUROR: Right.

THE COURT: Yes, Mr. Victory, what's your situation?

THE JUROR: I don't have any problems.

THE COURT: All right. I will ask you, you will remain.

This juror will remain.

(Next juror.)

THE COURT OFFICER: Panel 6, seat 5.

THE COURT: And you're George Lempke.

Yes, Mr. Lempke?

THE JUROR: Well, I guess I have two reasons. I remember Mr. Perrot. I remember the trial being in the papers and also I remember Mary was an elderly woman. I

have a mother 84, lives at home. So I think I would be a little bit against.

Plus where I work I'm the only senior designer in the company. I had to do a lot of talking to get today off. I don't know how that would affect four more days.

THE COURT: All right. I will excuse you, sir.

(Next juror.)

THE COURT OFFICER: Panel 6, seat 12.

THE COURT: And you are Elizabeth Dunnigan?

THE JUROR: Yes. Today I had to make arrangements. I have an 11 month old daughter. I don't think I can find someone to watch her for four days.

THE COURT: All right. I will excuse you.

(Next juror.)

THE COURT OFFICER: Panel 6, seat 13.

THE COURT: And you're Elizabeth Atkins?

THE JUROR: I am. I know members of his family.

THE COURT: Mr. Perrot's family?

THE JUROR: I am a bar manager and I can remember them talking about this one.

THE COURT: Talking about this one?

THE JUROR: When he was arrested.

THE COURT: Did that, what you heard, cause you to have any feelings about him?

THE JUROR: Uh-huh.

THE COURT: All right. I will excuse you.

(Next juror.)

THE COURT OFFICER: Panel 6, seat 15.

THE COURT: Good morning. And you're Helen Russell?

THE JUROR: That's correct.

THE COURT: I'm sorry to have to ask to be excused. My work is such that I could be out today, but to be out four days would make it extremely difficult. Where I work we have been closed for two weeks. We just reopened this morning. I do all the booking of all the events and conferences and oversee them. I am the only one doing it. It will be a real hard time.

THE COURT: All right. I will excuse you.

(Pause)

THE COURT: Let me just take a quick look here and see what we got in reference to police people.

MR. VOTTERO: Four dash eight I think should be questioned.

THE COURT: Could you ask juror 4 dash 8 to come up, please?

THE COURT OFFICER: Juror number 4 dash 8, Donna Carlson, would you please step forward. Right over here. (Indicating)

THE CLERK: He wants to speak to her. Come over here, please, ma'am.

(The juror approaches the side bar.)

THE COURT: Mrs. Carlson, you have indicated you have a relative?

THE JUROR: Yes. He was living at home and so he --

THE COURT: (Interposing) How long ago was that?

THE JUROR: Three years.

THE COURT: And was he prosecuted by this district attorney's office, if you know?

THE JUROR: He's in Connecticut.

THE COURT: And did that experience -- so this occurred in Connecticut?

THE JUROR: Uh-huh.

THE COURT: And what is your son's name?

THE JUROR: James.

THE COURT: Same last name Carlson? And did that experience leave you with any feeling that might affect you in the case?

THE JUROR: No. Because I believe he is -- he gave himself up. He knows he did wrong.

THE COURT: And do you have any feeling about people accused of a crime or the police or anything like that, prosecutors that might affect you in hearing the evidence in this case?

THE JUROR: No.

THE COURT: Would you be able to render a fair and impartial verdict?

THE JUROR: Everyone is innocent in the beginning.

THE COURT OFFICER: One of the other jurors raised his hands.

THE COURT: Oh, sure.

MR. FERRARA: I would like to have -- (Indicating).

(Next juror.)

THE COURT OFFICER: Panel 4, seat 11.

MR. VOTTERO: That is the one he just called up.

THE COURT: Yes, Mr. Laduzinksi.

THE JUROR: Yes. There is no way I am going to be able to go through that trial, jury. I have to go to the bathroom a lot. There is no way I will be able to go through it.

THE COURT: All right. We will excuse you.

(The juror leaves the side bar.)

THE COURT: There is a juror who indicated he and his wife were prejudice. So I think it's a consensus that he would be excused.

MR. FERRARA: Judge, juror 4 dash 6 has indicated two family members who are police officers.

THE COURT: Yeah, I missed that.

THE CLERK: He was already excused.

THE COURT: This is 4 dash 16. You want to do him?

THE CLERK: Juror number 4 dash 16, Peter Gazda, please step forward.

MR. FERRARA: Your Honor, 4 dash 8 was not excused. She was the woman.

MR. VOTTERO: That's right.

MR. FERRARA: Whose son had been prosecuted. You asked her to remain.

THE COURT: Yeah. She was not excused.

THE COURT OFFICER: Step right up.

(The juror approached the side bar.)

THE COURT: You're Mr. Gazda?

THE JUROR: Yes.

THE COURT: Mr. Gazda, you have indicated there is a criminal charge pending in New Hampshire.

THE JUROR: That's being contested.

THE COURT: And that involves you?

THE JUROR: Yeah.

THE COURT: Does the fact you are being prosecuted by -- what is it -- the New Hampshire police?

THE JUROR: Yeah.

THE COURT: Is it a federal situation or what?

THE JUROR: District, I think.

THE COURT: Does that experience leave you in a situation where you might have a problem sitting impartially in a criminal case?

THE COURT: As far as this goes, no. I don't think so. My only concern would be the length of the trial because it just happened recently and I was scheduled to contact a lawyer. I was supposed to met with her sometime this week. So technically it could be done on any day, but she said for me to call after I found out whether or not I was going to have to sit so I can find out a specific time. I can do it, but I will leave it up to you.

THE COURT: You think you might need to go to New Hampshire between now and Friday? I am going to excuse you under these circumstances.

THE COURT OFFICER: Okay, sir, you can see the

court officer.

(The juror left the side bar.)

THE COURT: Five dash four belonged to Westfield Massachusetts police.

THE COURT: Juror number 5 dash 4, Louis Fontaine, please step forward.

(The juror approached the side bar.)

THE COURT: Good morning, Mr. Fontaine.

THE JUROR: Good morning.

THE COURT: You indicated you're a member of the Chiefs of Police Association. There is going to be police witnesses testifying in the course of this trial. Does the fact that you have that association with them, in anyway, affect your ability in the testimony?

THE JUROR: I don't believe so.

THE COURT: Let me ask you a hypothetical question.

If everything is equal would you tend to believe an officer's testimony simply because they are

police officers?

THE JUROR: Possibly, yes.

THE COURT: All right. I will excuse you.

THE COURT OFFICER: Okay. See the court officer in the back of the courtroom, please.

(The juror left the side bar.)

THE COURT: This guy is a vocational instructor in a Connecticut -- is that a jail?

MR. FERRARA: Vocational instructor at a Connecticut jail.

I would like him to be questioned.

THE COURT: Sure. What was that number?

MR. FERRARA: Excuse me, Your Honor. What number was he?

MR. VOTTERO: Five, twelve.

THE COURT: Five, twelve.

THE CLERK: Juror number 5 dash 12, Steven Beaumier, please step forward.

(The juror approached the side bar.)

THE COURT: Good morning, Mr. Beaumier. You have indicated that you're employed in the Department of Corrections in Connecticut.

THE JUROR: Uh-huh.

THE COURT: Does that contact with prisoners or persons convicted of a crime would that effect your ability to view the evidence in this case?

THE JUROR: I don't believe, so, sir.

THE COURT: And will you be able to listen to testimony of someone who might have a record of a conviction and give the same credence to that witness as you would any other witness?

THE JUROR: Yes, sir. First and foremost I'm an educator, but I am an educator and I have an open mind.

THE COURT: Very well. This juror will remain.

(Next juror.)

THE COURT: Five dash 14 everybody.

THE CLERK: Juror number 5 dash 14, Geraldine Szarkowski, please step forward.

THE COURT: I don't need to remind you there

are two FBI witnesses.

Good morning, Mrs. Szarkowski. You indicated you have a relative who works for the FBI?

THE JUROR: My cousin.

THE COURT: What kind of work does he do for them?

THE JUROR: I have no idea. He is from Washington.

THE COURT: There are going to be two FBI witnesses. You did indicate --

THE JUROR: (Interposing) Neither one of them is my cousin.

THE COURT: Okay. That's Eubanks and Oakes, I take it.

THE JUROR: Uh-huh.

THE COURT: Now, the fact you have a relative who is so employed and there will be witnesses from the same organization would that effect your ability to be impartial?

THE JUROR: You mean would I tend to believe them? Probably.

THE COURT: Okay. I will excuse you under these circumstances.

THE JUROR: Thank you.

THE COURT: Excused.

(Next juror.)

THE COURT: Would you bring in 5,15, please.

THE CLERK: Juror number 5 dash 15, Jocelyn Dosick, please step forward.

THE COURT: You want me to bring up Class D abuser?

MR. VOTTERO: Not for me.

THE COURT: Good morning, Miss Dosick.

You've indicated that the leniency of the criminal justice system -- I am simply requiring if those feelings are so strong they might affect your ability to hear evidence impartially. So you have to tell me.

THE JUROR: I think possibly could.

THE COURT: All right. Think I will excuse you.

THE CLERK: Excused.

(Next juror.)

THE COURT: Okay, 6 dash 8.

THE CLERK: Juror number 6 dash 8, Anton Koss, please step forward.

THE COURT: Good morning, Mr. Ross.

THE JUROR: It's Koss.

THE COURT: I stand corrected. You have a close relative, a brother who is a police officer. There are going to be police officers testifying in the course of this trial. Does the fact that you have that close relationship with an officer, would that effect your ability to hear the testimony impartially?

THE JUROR: No.

THE COURT: Allow me to ask you a hypothetical question. So say everything is equal. Would you tend to believe or not believe the testimony of a police witness more or less than that of any other witness?

THE JUROR: No, I would not.

THE COURT: Would you render a fair and impartial verdict?

THE JUROR: Yes, I would.

THE COURT: Very well, this juror will remain.

(The juror left the side bar.)

THE COURT: I guess we are all set.

(End of the side bar discussion.)

THE COURT: Thank you very much for your patience, ladies and gentlemen.

We are now going to adopt the following procedure with your cooperation. Fourteen of your names will be called and those 14 will be asked to take a seat in the jury box. When that has been accomplished I am going to ask a series of questions along the lines of your ability to be impartial to those 14 jurors as a group. If any of those jurors are effected, unless you have already brought it to our attention, simply raise your hands and then we will inquire at the side of the bench how it is you might be effected.

Those jurors in the rear not yet seated in the box are asked to listen carefully to the questions since some of you will be taking the place of jurors in the box and then instead of repeating all the questions I will simply ask if you have heard and understood the questions and then whether you are affected by any of them. So as you

CITY 002292


can see it will be most helpful if you are attentive. So we will now proceed to seat 14 of your number.

THE CLERK: Juror number 4 dash 1, Crystal Semanie, please step forward and take seat number one.

(Next juror.)

THE CLERK: Juror number 4 dash 2, Matthew Kullberg, please step forward, seat number two.

(Next juror.)

THE CLERK: Juror number 4 dash 3, Andrea Engleman, seat number three.

(Next juror.)

THE CLERK: Juror number 4 dash 4, Kenneth Sirois, please step forward, seat number four.

(Next juror.)

THE CLERK: Juror number 4 dash 5, Paul E.

Bluemer, seat number five.

(Next juror.)

THE CLERK: Juror number 4 dash 7, Angela Winkler, please step forward, seat number six.

(Next juror.)

THE CLERK: Juror number 4 dash 8, Donna Carlson, please step forward, seat number seven.

(Next juror.)

THE CLERK: Juror number 4 dash 9, Michael Magdycz, please step forward, take seat number eight.

(Next juror.)

THE CLERK: Juror number 4 dash 10, Frederick Enko, please step forward, take seat number nine.

(Next juror.)

THE CLERK: Juror number 4 dash 12, Carole Premont, seat number 10.

(Next juror.)

THE CLERK: Juror number 4 dash 14, John Runte, please step forward, take seat number 11.

(Next juror.)

THE CLERK: Juror number 4 dash 15, Carolyn Tierney, please step forward, seat number 12.

(Next juror.)

THE CLERK: Juror number 5 dash 1, Kimberly Chisholm, please step forward, seat number 13.

(Next juror.)

THE CLERK: Juror number 5 dash 3, Albert Tranghese, please step forward seat number 14.

THE COURT: Once again, ladies and gentlemen, I'm going to ask a series of questions and I will pause after each question. If you are affected, unless you've already brought it to our attention let us know by simply raising your hand and we'll inquire at the side of the bench.

Again, jurors in the rear are asked to listen carefully because some of you will be taking the place of the jurors in the box and it will be of great help to me.

And my question, ladies and gentlemen, is whether any juror or member of your family is related to either the defendant or either of the alleged victims in this case.

(Pause)

THE COURT: Next question, has any juror had any business or social or any other association with any party, attorney or witness whose name I read?

(Pause)

THE COURT: Next question, does any juror

manufacturer any personal or financial interest in the outcome of this case?

(Pause)

THE COURT: Next question, has any juror either formed or expressed any opinion concerning the guilt or innocence of this defendant?

(Pause)

THE COURT: Next question, is any juror aware of any feeling of bias or prejudice in relation to this case of this defendant?

(Pause)

THE COURT: Included among the principles of our system of justice are the following: a defendant is presumed innocent until proven guilty beyond a reasonable doubt. The Commonwealth has the burden of proving guilt beyond a reasonable doubt and a defendant need not present evidence in his own behalf.

Is any juror who either does not understand these principles or who will not follow the instruction of this Court in applying these principles to your deliberation and verdict in this case?

(Pause)

THE COURT: My final question, ladies and gentlemen, is does any juror know of any reason why he or she cannot be indifferent or impartial between the parties in hearing the evidence and in returning a fair and impartial verdict in this case?

(Pause)

THE COURT: There have been no response. I find this panel to be indifferent.

Now, ladies and gentlemen there will be a short time during which each counsel in turn will be given an opportunity to assert some challenges. I want to assure any juror that is challenged that it is not anything you ought to take personally. There are reasons, many of them technical, why attorneys do these things. So bear

with us, please, for a short time.

MR. FERRARA: May I have just one moment, please, Your Honor?

THE CLERK: Juror number 4 dash 2, Matthew Kullberg, please step down. You are excused from the panel having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 3, Andrea Engleman, please step down. You're excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 15, Carolyn Tierney, please step down. You're excused from the panel having been challenged.

(The juror steps down.)

THE CLERK: Juror number 5 dash 3, Albert Tranghese, please step down from the panel having been

challenged.

(The juror steps down.)

THE CLERK: Juror number 5 dash 5, Tara Demers, please step forward, take seat number two.

(Next juror.)

THE CLERK: Juror number 5 dash 7, Karen Davis, please step forward, take seat number three.

(Next juror.)

THE CLERK: Juror number 5 dash 9, Dale Pappas, please step forward, seat number 12.

(Next juror.)

THE CLERK: Juror number 5 dash 10, Barbara Fogarty, please step forward, seat number 14.

MR. FERRARA: Excuse me. Can I approach for just a moment?

(Pause)

THE COURT: Miss Demers, Miss Davis, Miss Pappas, and Miss Fogarty, did each of you hear and understand the questions I asked the other jurors?

(Pause)

THE COURT: Are any of you affected by any of those questions?

THE JUROR: I had a question.

THE COURT: If you will step up, please.

(The following discussion was held at the side bar.)

THE COURT: And for the record, juror 5 dash 9, Dale Pappas.

THE JUROR: I just had a question. My husband was broken into before we were married. Burglary -- I didn't know if that would have an impartial --

THE COURT: (Interposing) All right. Let me ask you this, does the fact that your husband was a

victim of that kind of crime and, in fact, that this gentleman was charged with among other things burglary would that affect your ability to hear the evidence?

THE JUROR: I think it would.

THE COURT: All right. I will excuse you.

(End of the side bar discussion.)

THE CLERK: That was juror number 5 dash 9, counselors.

MR. FERRARA: Thank you.

THE CLERK: Juror number 5 dash 11, Elizabeth Quirk, please step forward, take seat number 12.

THE COURT: Miss Quirk, did you hear and understand the questions?

THE JUROR: I understand. Yes, Your Honor.

THE COURT: Are you affected by the others?

THE JUROR: No, sir.

THE COURT: I find these four jurors to be indifferent.

THE CLERK: Commonwealth?

(Pause)

THE CLERK: Juror number 5 dash 5, Tara Demers please step down from the panel, you have been excused having been challenged.

(Next juror.)

THE CLERK: Juror number 5 dash 12, Steven Beaumier, step forward, seat number two, please.

THE COURT: Mr. Beaumier, did you hear and understand the questions I asked the other jurors?

THE JUROR: Yes, sir.

THE COURT: Are you effected by any of those questions?

(Pause)

THE COURT: I find this juror to be indifferent.

THE CLERK: Commonwealth?

(Pause)

THE CLERK: Juror number 5 dash 12, Steven Beaumier, please step down from the panel you have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 5 dash 16, John Leibel, please step forward take seat number two, please.

THE COURT: Mr. Leibel, did you hear and understand the questions I asked the other jurors?

THE JUROR: Yes.

THE COURT: Are you affected by any of those questions?

THE JUROR: No, I'm not.

THE COURT: I find this juror to be indifferent.

THE CLERK: Juror 5 dash 16, John Leibel, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 6 dash 1, Susan Murray, please step forward, seat number two.

THE COURT: Miss Murray, did you hear and understand the questions I asked the other jurors; are you affected by any of the questions?

(Pause)

THE COURT: I find this jury to be indifferent.

MR. VOTTERO: Commonwealth is satisfied.

MR. FERRARA: May I have just one moment, Your Honor?

THE COURT: Yes.

(Pause)

THE CLERK: Juror number 4 dash 1, Crystal Semanie, please step down from the panel. You've been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 6 dash 1, Susan

Murray, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 5, Paul Bluemer, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 7, Angela Winkler, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 9, Michael Magdycz, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 10, Frederick Enko, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 12, Carole Premont, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 4 dash 14, John Runte, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 5 dash 11, Elizabeth Quirk, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 5 dash 10, Barbara Fogarty, please step down having been challenged.

(The juror steps down.)

THE CLERK: Juror number 6 dash 2, Duane Victory, please step forward take seat number one.

(Next juror.)

THE CLERK: Juror number 6 dash 3, Stanley Stucenski, seat number four -- take seat number two.

(Next juror.)

THE CLERK: Juror number 6 dash 4, Lyle Stott, please step forward take seat number five.

(Next juror.)

THE CLERK: Juror number 6 dash 6, Catherine Simis, please step forward take seat number six.

(Next juror.)

THE CLERK: Juror number 6 dash 7, Maura Sullivan, please step forward take seat number eight.

(Next juror.)

THE CLERK: Juror number 6 dash 8, Anton Koss, please take seat number nine.

(Next juror.)

THE CLERK: Juror number 6 dash 9, Debra Balog, take seat number 10.

(Next juror.)

THE CLERK: Juror number 6 dash 10, John Fisher, please step forward, seat number 11.

(Next juror.)

THE CLERK: Juror number 6 dash 14, Susan Walker, please step forward, seat number 12.

(Next juror.)

THE CLERK: Juror number 6 dash 16, Sylvia Monfette, please step forward, seat number 14.

THE COURT: Has each of the 10 jurors that has been seated, has each of you heard and understood the questions that I asked the other jurors?

(Pause)

THE COURT: Are any of you affected by those questions?

(Pause)

THE COURT: I find these 10 jurors to be indifferent.

MR. FERRARA: One moment, Your Honor.

(Pause)

THE CLERK: Juror number 6 dash 7, Maura Sullivan please step down from the panel. You've been excused having been challenged.

(The juror steps down.)

THE CLERK: And juror number 6 dash 8, Anton Koss, please step down from the panel you have been excused having been challenged.

(The juror steps down.)

THE COURT: Maybe we ought to see if you have any challenges in this group before we bring them down and then I will take a short recess.

MR. VOTTERO: At this point I have one thus far.

THE COURT: You have one?

MR. VOTTERO: So far.

THE COURT: Why don't you exercise it of this group?

MR. VOTTERO: May I be heard?

(The following discussion was held at the side bar.)

MR. VOTTERO: It would be my preference until defense counsel is satisfied with the panel before I exercise any challenges before taking a partial panel.

THE COURT: I will know how many I need to bring down because he only has two left.

MR. FERRARA: That's correct.

MR. VOTTERO: Thus far there is only one person on this panel I wish to challenge.

THE COURT: You don't want to do that now?

MR. VOTTERO: I prefer to wait and see what replacement juror there is.

THE COURT: I am going to take a short recess.

(End of the side bar discussion.)

THE COURT: Ladies and gentlemen, as you have seen we've exhausted the panel. We are bringing down some additional jurors. It is going to take a few minutes and it's going to take some time to speak to that group and then we are going to have to seat the empty

chairs, so to speak, and go on from that. But rather than keep you waiting, this way I am going to take a short recess which will give you an opportunity to go in the room, hang up your coat and get a little more comfortable.

I would like to tell you two things before you do that. One is please remember the seat that you're in since you will be occupying those seats for the rest of the impanelment process and also for the rest of the trial if you are selected to be the final jurors. So remember the seat you're in and return to those same seats. The other thing I must tell you is that we're going through extraordinary lengths to obtain impartialjurors.

It is going to be your responsibility to maintain that impartiality. And the way you do that in a public building like that, when you are thrown into contact with others who might have something to do with the case, they might be relatives or something, is don't discuss this case with anyone, even among yourselves. Talk about everything else, but not this case. Make whatever efforts may be necessary to keep yourselves impartial. And the reason is you are supposed to make

your decision only on the evidence that comes out of here in the courtroom and not be influenced by any other information. So maintain that impartiality.

We are going to take a short recess now and if you will follow the court officer he will take you in a room where you can hang up your clothes and then we will resume with this process in a few moments. So if you will kindly follow the court officers.

(The jurors exit at 11:40 a.m.)

(A recess was taken.)

* * * * *

(The defendant was present.)

(The Court entered at 12:00 p.m.)

(The jury pool was present.)

THE COURT: Good morning, ladies and gentlemen.

My name is William Simons. I am a Judge at the Superior Court. I am presiding at a trial which you

have been summoned as prospective jurors. We have commenced the process. A certain number of jurors have already been selected. We are now attempting to complete the process. We expect that some number of you will be selected to serve as jurors in this case.

So allow me to give you some background information about the case. What I tell you is not evidence. It's information that will assist you in responding to my questions to you which I assure you are for the purpose of obtaining impartial jurors. The questions that I will be asking you are not trick questions. There is no effort to pry into your affairs or to embarrass any jurors. We are simply trying to obtain impartial jurors.

So allow me to tell you, first of all, that this is a criminal case and the defendant's name is George D. Perrot and that is spelled P-E-R-R-O-T. There are five indictments or five charges and there are four that involve one alleged incident. And one, a second incident that it alleged occurred approximately half an hour later. And each of these incidents occurred on November the 30, 1985, it is alleged.

There are charges of robbery, indecent assault and battery of an adult, aggravated rape, and burglary. Each

of those four charges alleges that a Mary Prekop, P-R-E-K-O-P, was the alleged victim. And it is alleged that this incident occurred, as I said, on November 30, 1985, at 33 Covel, C-O-V-E-L, Street in Springfield.

The fifth indictment charges burglary and it is alleged to have occurred at 27 Malibu Drive in Springfield and the alleged victim of that incident is Emily Lichwala and that's spelled L-I-C-H-W-A-L-A.

The defendant, Mr. George Perrot, is represented by Attorney John Ferrara. Mr. Ferrara will stand so you can see who he is. And Mr. Ferrara is with the firm of Dalsey & Ferrara here in Springfield. And the Commonwealth is represented by Assistant District Attorney Brett Vottero. (Indicating)

MR. VOTTERO: Good morning.

THE COURT: Mr. Vottero has stood so you can see who he is. I have told you the defendant's name, the alleged victims' names, the attorneys' names.

I am now going to read to you a list of witnesses who may testify in the course of this trial and where appropriate I will spell the name. Mary Prekop, again that is P-R-E-K-O-P; Emily Lichwala, L-I-C-H-W-A-L-A; Lieutenant Thomas Kelly, Springfield Police Department;

Richard Kane of Springfield; Thomas Jarvis of Wilbraham; William Eubanks of Dallas, Texas; Wayne Oakes of Washington DC; Terry Aberdale, A-B-E-R-D-A-L-E, of Springfield.

The following five police officers for the City of Springfield, Lieutenant Robert Cheetham, Captain William Fitchet, Sergeant Thomas Kennedy, Chief Ernest Stelzer, Sergeant Andrew Canevari, C-A-N-E-V-A-R-I. Beverly Daley; Nancy Westcott; Robert Timmerman; Jeffrey Atkins; Olivet, first name O-L-I-V-E-T, Edward, all of Springfield. Elizabeth Zolkiwski, Z-O-L-K-I-W-S-K-I, Newton; Francis Bloom, an attorney of Wilbraham.

Our best estimate, ladies and gentlemen, is that this case will take four days. It is impossible to be precise and it very well may take a little more or a little less time.

In a short time I am going to give those of you who are effected an opportunity to bring to my attention any substantial hardship that you might face if any of you are required to serve as jurors over that period of time. And if there is, indeed, such a hardship I will certainly hear you out and consider that. Potentially excusing you.

I should also tell you that the reason that I carefully pointed out to you the names of the parties in terms of witnesses so that if there are any among you who have not had any contact in a substantial way or any relationship with any of those witnesses, parties, alleged victims, attorneys, you should bring that to my attention and I will give you an opportunity to do that in a moment.

If any of you have any physical problem or any other matter that's going to interfere with your ability to be impartial obviously, you should bring that to my attention. And if any of you have any strong feelings about the case, the nature of the charges, that are going to interfere with your ability to hear the evidence impartially.

No one is asking for a vote on whether the crimes charged are popular or not. We all know that, but when you have had some experience, someone close to you or yourself, perhaps a burglary or a violent crime or any such event in your lives or someone close to you and that event has left you with a feeling that might effect you in hearing the evidence in this case you should bring that to our attention.

Also there are going to be some prominent witnesses who are police officers and when I say "prominent" I mean important testimony. And if any of you had close contact or relationships with law enforcement and that might effect you in hearing the evidence impartially then you bring that to our attention as well.

So before we proceed to seat any of your number I am going to ask that you all stand and be sworn and then following that any of you who are effected I will see you one at a time at the side.

THE CLERK: Jurors, please stand and be sworn.

(The jurors were sworn.)

THE COURT: And those of you who have something to report to me along the lines I mentioned simply remain standing.

(The following discussion was held at the side bar.)

THE COURT OFFICER: Juror 7, 1.

THE COURT: You're Charles Suglia?

THE JUROR: Yes.

THE COURT: Yes, sir.

THE JUROR: I just recently began a program recovery for drug addiction and alcohol. What I am doing right now -- I am not recovered. I just see myself --

THE COURT: (Interposing) Okay. I will excuse you then. See whichever of the court officers in the back of the court.

(Next juror.)

THE COURT OFFICER: Panel 7 seat 10.

THE COURT: And can you step up, please; you're Anna Reyes?

THE JUROR: Yes.

THE COURT: I see you have a son who, a son-in-law who is a police officer.

There are going to be police officers who testify here. Would you, because your -- what department is he in by the way?

THE JUROR: I think he is in photo lab. He used to be a homicide detective.

THE COURT: Here in Springfield and what is

his name?

THE JUROR: Roman Robero.

THE COURT: And would the fact that police officers may testify in the course of this trial would you tend to put more stock in what he says than you would any other witness?

THE JUROR: I would say yes, I would.

THE COURT: All right then I will excuse you. Thank you.

THE JUROR: Thank you.

(Next juror.)

THE COURT OFFICER: Panel 8 seat 2.

THE COURT: And you're Kenneth Greenmiller?

THE JUROR: Hard of hearing. I got one other that's bad.

THE COURT: All right. I will excuse you, sir. You can go.

(Next juror.)

THE COURT OFFICER: Panel 7 seat 4.

THE COURT: And you're Naomi McCann?

THE JUROR: Yes.

THE COURT: Yes, ma'am, what's your situation?

THE JUROR: I don't have one.

THE COURT: You're perfectly able to sit as a juror.

(Next juror.)

THE COURT OFFICER: Panel 8 seat 5.

THE JUROR: Hi. I own my own business and I can't afford to close for four days.

THE COURT: You're Karen Grencho?

THE JUROR: Yes.

THE COURT: You're excused.

(Next juror.)

THE COURT OFFICER: Panel 8 seat 7.

THE COURT: And you're Kenneth Wytas?

THE JUROR: Correct.

THE COURT: Yes, Mr. Wytas?

THE JUROR: Fran Bloom -- I recently sold

furniture to Tom Jarvis. He is a cop.

THE COURT: Yes.

THE JUROR: With one of the other gentlemen I was on an arson case against our company that they were working on.

THE COURT: What's that name of that company?

THE JUROR: Bear Cycle Sales.

THE COURT: So you --

THE JUROR: (Interposing) Worked with the officers.

THE COURT: Did that experience leave you with any feeling with hearing witnesses from the police department?

THE JUROR: No.

THE COURT: Would you be able to hear the evidence in this case without being influenced by that prior situation?

THE JUROR: Yes.

THE COURT: Will you render a fair and impartial verdict in this case?

THE JUROR: Yes.

THE COURT: I will ask you to remain, sir.

MR. FERRARA: Excuse me. Could you ask this

juror if he would be more influenced to believe the testimony of a police officer.

THE COURT: Okay. Assume -- this is hypothetical, so assume everything is equal. Would you tend to believe a police officer more than or less than you would of any other witness simply because they are a police officer?

THE JUROR: No.

THE COURT: All right. Thank you. This juror will remain.

(Next juror.)

THE COURT: Seven dash two has Springfield police too.

THE CLERK: Juror number 7 dash 2, John Preston, please step forward, sir, right up here.

THE COURT: Mr. Preston, you have indicated you have close relatives who were police officers at some point. There will be police officers testifying in this case so allow me to ask you a hypothetical question.

Assume everything is equal. Would you tend to believe or disbelieve a police witness more than you

would any other witness?

THE JUROR: No. I don't think so.

THE COURT: Will you render a fair and impartial verdict in this case?

THE JUROR: I believe so.

THE COURT: I will ask you that you remain.

(Next juror.)

THE CLERK: There is a traffic policeman; you want to speak to him?

MR. FERRARA: Could we, please, Your Honor?

THE CLERK: Seven dash seven.

Seven dash seven, Francis LaPierre, would you please step forward, sir.

THE COURT: Good morning, Mr. Lapierre.

You indicated you have a cousin who is a Springfield Police Officer; what's his name, by the way?

THE JUROR: David Yelle.

THE COURT: And there will be police officers testifying. I am going to ask you a hypothetical question. Assume everything is equal. Would you tend

to believe a police witness, more or less you would any other witnesses simply because they are police officers.

THE JUROR: No. Definitely not.

THE COURT: All right. I will ask that you remain.

Seven dash eight, please.

(Next juror.)

THE CLERK: Number 7 dash 8, Mr. Termell, please step forward, sir.

THE COURT: Good morning, Mr. Termell. You have -- were an auxiliary police officer for a period of time. There are going to be police officers in this case so allow me to ask you a hypothetical question. Assume everything is equal, would you tend to believe or not believe a police witness more or less than you would any other witness. (Indicating)

THE JUROR: No.

THE COURT: Thank you. This juror will remain.

Yes. I would like you to check, juror number 7 dash 14, Kathleen Martin. Please step forward, ma'am.

(Next juror.)

THE COURT: Good morning, Miss Martin. For the record your husband is a court officer here in Superior Court. In as such he is employed in law enforcement, to the extent that he is an officer, allow me to ask you a hypothetical question. Assume everything is equal. Would you tend to believe a police officer more or less you would any other witnesses?

THE JUROR: No. I don't think so.

THE COURT: Would you render a fair and impartial verdict in this case?

THE JUROR: Yes.

THE COURT: I would like to ask that you remain. Thank you.

I guess 8,3 has some euphemisms about this.

I suppose at this point we should bring in the other jurors.

Would you bring them in?

(The jurors entered at 12:20 p.m.)

THE COURT: Ladies and gentlemen, we are going to bring in the jurors that have already been seated and there are some empty seats and some of you will be called to take those seats and then I will ask you a series of questions.

THE CLERK: Okay, Your Honor.

Juror number 7 dash 2, John Preston, please step forward, take seat number eight.

(Next juror.)

THE CLERK: Juror number 7 dash 4, Naomi McCann, please step forward take seat number nine.

THE CLERK: Defense?

MR. FERRARA: Defense is satisfied.

THE COURT: I just have to ask a few questions.

MR. FERRARA: I'm sorry.

THE COURT: That's all right.

THE COURT: Mr. Preston and Mrs. McCann, I am going to ask you a series of questions. I will pause after each question to see if either of you are effected by either of them unless you have already brought it to our attention simply let us know by raising your

hands and I will inquire at the side of the bench.

Those jurors in the rear are asked to listen to these questions because some of you will be taking the place of jurors in the box and instead of repeating all the questions I will simply ask you if you have heard and understood these questions can see it will be very helpful.

My first question, ladies and gentlemen, is whether either of you or members of your family are related to either the defendant or the alleged victim.

(Pause)

THE COURT: Next, question, have either of you had any business social or any other association, with any party, attorney or alleged victim or witness whose name I read?

(The following discussion
was held at the side bar.)

THE JUROR: I met the defense attorney. You said side bar.

THE COURT: You just have to be a little formal

about it.

Okay. For the record you're juror 7 dash 2, Mr. Preston.

THE JUROR: I think I met you at a party -- I don't know if that makes any bearing on it.

THE COURT: This was a social meeting. Attorneys play an important role.

THE JUROR: I just want to make sure.

THE COURT: It is out in the open.

I understand. What I need to know is, does that experience leave you with some feeling that may influence you as you hear the argument of counsel or the proceedings of the case?

THE JUROR: I don't believe so.

THE COURT: All right. You will render -- will you render a fair and impartial verdict with that contact?

THE JUROR: Okay. (Indicating)

THE COURT: Okay. You may be seated.

(The juror left the side bar.)

THE COURT: I might be repeating this question,

but if I am bear with me.

Either of you have any personal or financial interest in the outcome of this case?

(Pause)

THE COURT: Either you formed or expressed any opinion concerning the guilt or innocence of this defendant?

(Pause)

THE COURT: Are there -- are you aware of or any bias or prejudice you might have or relation in this case or defendant?

(Pause)

THE COURT: Included among the principles of our system of justice are the following: a defendant is presumed innocent until proven guilty beyond a reasonable doubt; the Commonwealth has the burden of proving guilt beyond a reasonable doubt; and a defendant

need not present evidence in his own behalf.

Is there any juror who either does not understand these principles or who will not follow the instructions of this Court in applying these principles to your deliberations and verdict in this case?

(Pause)

THE COURT: And my final question, to you ladies and gentlemen, is whether -- sir or madam, I should say, is whether you know of, specifically, either if you cannot be impartial or indifferent between the parties in hearing the evidence of this case?

(Pause)

THE COURT: I am having no response. I find these two jurors to be indifferent.

THE CLERK: Defense?

MR. FERRARA: Defense is satisfied.

THE CLERK: Commonwealth?

(Pause)

THE CLERK: Will juror number 6 dash 2, Duane Victory, step town from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 7 dash 2, John Preston, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 7 dash 5, Sally Astaldi, please step forward, take seat number one.

(Next juror.)

THE CLERK: Juror number 7 dash 6, Gina Fluharty, please step forward, seat number eight.

THE COURT: Mrs. Astaldi and Fluharty, did each of you hear and understand the questions I said to the other jurors, are either of you affected by either

of those questions?

(Pause)

THE COURT: I find these two jurors indifferent.

THE CLERK: Will juror number 7 dash 5, Sally Astaldi, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 7 dash 6, Gina Fluharty, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 7 dash 7, Francis LaPierre, please step forward take seat number one.

(Next juror.)

THE CLERK: Juror number 7 dash 8, Peter Turmell, please step forward take seat number eight.

THE COURT: Miss LaPierre and Mr. Turmell, did each of you hear and understand the questions I asked the other jurors?

THE JURORS: Yes.

THE COURT: Are either of you affected by any of the questions?

(Pause)

THE COURT: All right. These two jurors are indifferent.

MR. VOTTERO: Commonwealth is satisfied.

THE CLERK: Juror number 7 dash 8, Peter Turmell, please step down from the panel. You have been excused having been challenged.

(The juror steps down.)

THE CLERK: Juror number 7 dash 9, Gerald Crawford, please step forward take seat number eight.

THE COURT: Now, Mr. Crawford, did you hear and

understand the questions I asked the other jurors?

THE JUROR: Yes.

THE COURT: Are you effected by any of these questions?

THE JUROR: No.

THE COURT: I find this juror to be impartial.

MR. FERRARA: Defendant satisfied.

THE COURT: Commonwealth?

MR. VOTTERO: Commonwealth is satisfied.

THE COURT: Very well, the spare jurors are excused.

(The jury pool exited the courtroom.)

THE CLERK: Will juror number 7 dash 9, Gerald Crawford, please stand.

(The juror complies.)

THE CLERK: You have been chosen by the Court as the foreperson of the jury in this trial.

Will everybody else please stand.

(The jurors were sworn.)

THE COURT: Ladies and gentlemen, I ask for your indulgence. In the process of selecting some of you we've had an opportunity to have you go into the jury room and get a little more comfortable. The new jurors, so to speak, haven't had that opportunity. So I ask you to bear with me because we have a fairly brief period of time before we are going to recess for lunch and what I would like to do is take care of some housekeeping matters.

First of all I've told the jurors who were selected earlier some things about maintaining their impartially and they are very important. So if you will bear with me I am going to repeat them now.

We've gone through some efforts to obtain impartial jurors and from this point on it's going to be the jurors' responsibility to maintain this impartiality. It's not always easy to do in a public building in a busy downtown area because you are going to be thrown into perhaps some inadvertent contacts with persons who might have something to do with the case, in the elevators, lunch room, perhaps corridors. So you are

going to have to make an effort to maintain your impartiality. You must make your decision in this case based only on the evidence that you hear here in the courtroom without being influenced by any other information which may or may not be accurate.

So during any recess you should have no contact with anyone having anything to do with the case. Don't discuss this case with anyone, even among yourselves, and don't permit anyone to discuss it with you or in your hearing. If there is any information about the case in the news media put it aside. Pay no attention because you, again, must make your decision without being influenced by that information.

Don't take any private views or conduct any private investigations at any location or any place mentioned in the course of the trial. And make whatever efforts may be necessary to isolate yourself from information about the case.

Now, let me give you a brief thumbnail schedule of what it is you should expect and what your main responsibilities are. First of all when I finish and if there is enough time our clerk, Mr. Martin, is going to read the indictments to you. The indictments were

returned by a Grand Jury. A Grand Jury's function is different than a jury such as you. A Grand Jury accuses. It presents to a defendant, a formal and official complaint. It's the way the criminal process is begun and it culminates in a trial before a jury such as you. It is only a jury such as you that determines guilt or innocence.

So the Grand Jury indictments that will be read to you are accusations. They are not evidence of guilt. They are accusations.

Now, your main function and the function is solely yours, is to decide what, in fact, are or were the relevant times and places. You and you alone will make those decisions. You are going to be judges of the facts. And I want to stress to you that no one is permitted to interfere with that function and I say "no one" I mean not the lawyers, not the judge or anyone else. So you are going to be making those decisions independently, but you are going to be utilizing your common sense and your pool of general life experiences.

Now, the sources from which you are going to be making a decision are the testimony of witnesses, that's

the principle source and the testimony of witnesses comes out by questions put to them by the lawyers. The lawyers put them on the stand and will ask questions and the lawyers will cross-examine them, will ask questions. And your function is to listen, to observe, to make all kinds of judgment that you make by using your common sense and your life's experiences. And you're going to be sizing up the witnesses. You're going to be making some decisions about what to accept, what to reject, what weight you want to place on it and then you're going to be remembering it, what it is the witness said because you're going to keep an open mind until you've heard all of the testimony.

And the fact that someone may testify early in the case or late in the case or in the middle of the case really doesn't matter. So you have got to weigh all of the testimony and keep it in mind so that when you return to the jury room to deliberate you will be in a position to assess the relative testimony and make decisions about it. You have very broad powers. You could believe everything a witness says or nothing about what a witness says or anything in between those two extremes.

So that's your main source of fact finding,

testimony of witnesses. The witnesses will all be sworn, put under oath. They will be brought into this room, one at a time and with perhaps one exception, not be present during the testimony of other witnesses so that when you hear each witness they will be testifying independently of what the witness said as far as this trial is concerned.

Another source of fact finding are exhibits. Exhibits are physical things. I don't know whether there will be any here, but if there are perhaps it will be a document, a photograph, an object. All of those things will go to the jury room with you. There you can study them to whatever extent you wish. And they are another source of evidence in the case.

The law understands that you have powers of reasoning and you can utilize your common sense. So you will be permitted to draw reasonable inferences that logically flow from facts that you find in the course of the trial.

An inference is a lawyer's word for logical deduction. And you will be permitted to be making deductions, inferences from evidence that is before you, which evidence you will be making decisions

about, whether to accept or reject. And I will give you a full instruction about that at the appropriate time, but that's your main source of fact finding in a case. And that's what your function will be, to find the facts.

Just to give you some context of what to expect, because evidence comes in sometimes in segments and it's not clear where they fit in. Counsel are given an opportunity to make opening statements to you and I believe counsel will make an opening statement in this case.

Opening statements are very helpful because they give you an overview of what it is that counsel expects the evidence to be. The important thing for you to remember is that an opening statement is not evidence. It's what the attorney expects the evidence to be. Once you have heard the opening statements, because it's the Commonwealth's burden to prove each of these crimes, each element of each of these crimes beyond a reasonable doubt. It's their burden to go forward and present that evidence to you.

So Mr. Vottero, on behalf of the Commonwealth, after opening statements are made will present his

evidence. Witnesses will be placed on the stand, questions asked, cross-examination by Mr. Ferrara if he chooses, and that will proceed, until questions and answers, until the Commonwealth has presented all the evidence it chooses. At that time the defendant may, under no obligation, may present his evidence in the same format. Witnesses placed on the stand, questions asked, cross-examination by opposing counsel, until you've heard all of the evidence.

The next item will be for each counsel, in turn, to sum up, to highlight to you the portions of the evidence they consider to be most significant. When each counsel have completed that it will be my obligation to instruct you in the law which you must apply to the facts that you, and you alone will find and the case is going to be delivered to you for verdict. You will deliberate and be asked to return a verdict.

So that's what I expect the procedure to be in the course of this trial and I tell you that now so you will be given an understanding and perhaps make your job a little more easy to understand.

Now, I believe it's appropriate at this time to read the indictments.

THE CLERK: On indictment number 85 dash 5415 the jurors of the Commonwealth on their oath present that George D. Perrot, whose other true name, if any, as to the jurors, aforesaid unknown, of 87 Malibu Drive Springfield, in the County of Hampden on or about the 30th day of November, in the year of our Lord one thousand nine hundred and 85, at Springfield, in the County of Hampden, aforesaid did assault one Mary A. Prekop with the intent to rob her and thereby did rob and steal from the person's presence, protection, and possession of said Mary A. Prekop certain property, to wit money, in the amount and the value of less than one hundred dollars of the property of Mary A. Prekop.

On indictment number 85 dash 5416, the jurors of the Commonwealth on their oath present that George D. Perrot whose other true name, if any, to the jurors aforesaid unknown, of 87 Malibu Drive, Springfield, in the County of Hampden, aforesaid on or about the 30th day of November, one thousand nine hundred 85, at Springfield, in the County of Hampden, aforesaid did commit an indecent assault and battery on the person of Mary A. Prekop in violation of Section 138 of Chapter 265 of the Massachusetts General Laws as amended.

On indictment number 85 dash 5418, the jurors of the Commonwealth on their oath present that George D. Perrot whose other or true name, if any, to the jurors, aforesaid unknown, of 85 Malibu Drive, of Springfield, in the County of Hampden, aforesaid on or about the 30th day of January -- November, in the year of our Lord one thousand nine hundred and 85, in Springfield, in the County of Hampden, aforesaid that George D. Perrot did assault Mary A. Prekop with the intent to commit aggravated rape and did commit aggravated rape upon said Mary A. Prekop.

On indictment number 85 dash 5420, the jurors of the Commonwealth on their oath present that George D. Perrot, whose other name or true name, if any, to the jurors, aforesaid unknown, of 87 Malibu Drive, of Springfield, in the County of Hampden, aforesaid, on or about the 30th day of November, in the year of our Lord one thousand nine hundred and 85, at Springfield, in the County of Hampden, aforesaid did break and enter a dwelling, house, to wit, of Mary A. Prekop in the nighttime with the intent to commit a felony and did make an actual assault on a person lawfully there, to wit, Mary A. Prekop in violation of Section 14 of Chapter 266

of the Massachusetts General Laws as amended.

On indictment 95 dash 5425, the jurors of the Commonwealth on their oath present that George D. Perrot, whose other or true name if any, as to the jurors, aforesaid unknown, of 87 Malibu Drive, Springfield, in the County of Hampden, on or before the 30th day of November, in the year of our Lord, one thousand nine hundred and 85, in Springfield, in the County of Hampden, did break and enter a dwelling house, to wit, of Emily Lichwala in the nighttime with the intent to commit a felony.

To these indictments, ladies and gentlemen of the jury, the defendant has pleaded not guilty and for trial thereof puts himself upon his country which country you are.

You are now sworn to try the issues. If he is guilty you will say so. If he is not guilty you will say so and say no more.

Ladies and gentlemen of the jury, harken to the evidence.

THE COURT: Ladies and gentlemen, in view of the fact that we are going to recess in less than 10 minutes it doesn't make sense to ask either of the

lawyers to go forward and fracture their opening. I am going to recess this matter now until two o'clock for lunch.

I know that those of you who had your coats will need to go back to the jury room. Those of you who haven't seen that room you ought to be shown itso you will know where to report when you come back from lunch.

Those of you who are recently seated should note the seat you're in since you will be occupying those same seats throughout the trial. And if you will kindly follow the court officer she will take you to that room.

(The jury exists at 12:47 p.m.)

THE COURT: Anything else we need to do before two?

MR. VOTTERO: Just briefly, one thing occurred to me. I would like the Court to consider on the question of Fran Bloom's testimony.

THE COURT: Question of Fran Bloom's testimony?

MR. VOTTERO: On that particular issue it's going to be difficult to get around the fact that Mr. Bloom believed that Mr. Perrot's case was over forever,

that he had been convicted and the appeal itself was really clearly unforeseeable. They noted the trial judge could not have ruled on inevitable discovery. I am wondering aloud with, to have him testify without having Mr. Perrot's status as being a finished case brought out. I bring that out as another factor for the Court to consider.

THE COURT: Well, there is a whole slew of matters that have to be weighed to that extent. That might be a further matter, as occurred to me already. In any event I will certainly have a ruling for you later on today.

There is nothing else we can resolve at two o'clock?

(The luncheon recess was taken.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 2:08 p.m.)

THE COURT: You may proceed. You ready to

proceed?

MR. VOTTERO: Yes, Your Honor.

* * * * *

OPENING STATEMENT BY MR. VOTTERO

* * * * *

MR. VOTTERO: Mr. Foreman, and members of the jury, as I was introduced to you my name is Brett Vottero. I am an assistant district attorney for the Commonwealth and I work in Hampden County. That is the district attorney's office that I am employed by.

I want to make some opening comments to you and then discuss some of the facts of this case and I want to say at the outset that you need to know that we are grateful that you took the time to serve on a jury and you got the notice in the mail, but nevertheless you are here, you're giving up your time at home with your family to do this. And I may not, in the nature of these proceedings, remind you at the end that the Commonwealth thanks you for your time.

But you do all have a job to determine the truth, to issue a verdict and that word means to speak the truth. In every criminal case whether it's the least significant of charges or very, very serious charges as

you have today you are the body that stands between guilt and innocence. You're the ones who determine whether someone is guilty. And all the work of law enforcement officials, whether they are police officers or prosecutors ultimately results in coming to a jury and presenting the evidence to you and asking you for your consideration.

So I thank you for the time that you'll spend in this case and this will be a difficult case to listen to. It will be difficult, but as I describe the evidence to you I believe you'll see that the evidence in this case will make it a case that is not difficult to judge. It's a case that will have an inescapable conclusion that this man, George Perrot, is guilty of a number of crimes. (Indicating)

Let me describe what they are and where they took place and when. On November 30, of 1985, at about 3:30 in the morning there's a woman at home in a home located at 33 Covel Street in the City of Springfield and she's awakened by some noise and she investigates it. Doesn't quite -- isn't able to determine what it is and goes back to sleep and then hears breaking glass. And this woman is a lady named Emily Lichwala. And what was happening,

what she was hearing was somebody breaking in through a dryer vent in the back of her home and entering in through the basement trying to come up the basement stairs into her kitchen, but found the door barred and the door couldn't be opened.

And this person, George Perrot, went out through the hatchway in the basement and came around and broke in the home through a breezeway. Well, Miss Lichwala is able to escape through her front door and she never sees the person in her home. She never sees. And she returns. And she'll describe the nature and the damage to her home and that her purse was taken.

Well, at about four o'clock there's another home involved and its over here 27 Malibu. This is almost a half a mile away, perhaps a quarter mile just down the street a little to 27 Malibu. (Indicating)

Well, at four o'clock there is a crime that takes place there. Mary Prekop -- Mary Prekop's birthday is tomorrow and she will be 85 tomorrow and when this happened she was 80, 79 years old. You'll hear her testimony. That she lives at 27 Malibu. She's not married, never has been. Has lived at 27 Malibu with her mother and lived alone for quite a long time.

And on November 30, at four o'clock she too hears something that awakens her. And she has a dog. A dog is barking and she gets up and she looks around at her doors and she doesn't see anything and she goes back and she gets a stick and she goes back into her bedroom. And then she hears a scratching sound and what she hears is George Perrot breaking and entering to her home. And she begins to leave her bedroom and gets just as far as the bathroom in the hallway when she is confronted with this individual.

She wont identify George Perrot as the person she confronted. She can tell you it's dark. She will described her vision problems. She is not wearing glasses. She has some cataract history. She remembers the person has black curly hair, no facial hair. He has his hands up like this and she strikes him or tries to with the stick and he takes the stick away from her. And he pushes her in the bedroom on the floor where he begins beating her with his hands. And you'll see the pictures of Mary Prekop as she looked shortly after this attack. And he beat her on her face; he kicked her in her thigh and he raped her. He put something in her vagina. She won't tell you what it was. She doesn't

know, something. (Indicating)

He threw the stick on the bed. He broke a lamp and she will tell you that she closed her eyes. That she pretended to pass out and that she opened them again after he left.

Well, she made a couple of efforts to call the police, was able to dial the phone and the police came. You'll hear that they removed some things from her home because when George Perrot was there, when he left he left something behind. He left some of his hair and left some of his blood. And he left a pair of gloves, mittens that belonged to his sister.

The police arrived and they took the bedsheet that had somewhat appeared to be blood stains on it. They took these gloves that weren't Mary Prekop's and they packaged them up and they sent these things to the FBI who conducted some examinations on them. And you'll hear the FBI testify that the hairs that were found, one hair was found that is consistent with George Perrot's hair and that expert, Mr. Wayne Oakes, will describe how that process takes place.

You'll also hear testimony about what the characteristics are that are in common with George

Perrot's blood and the blood on the bedsheets. You'll know that Mary Prekop could not have been the person who left the blood on the sheet. It was not her blood.

Well, about a week later George Perrot is arrested and that's on December 7. Now, George Perrot cooperates with the police to some extent. He provided them some information and he confesses to them. Now, I don't mean that he confesses fully to all of these crimes because George Perrot is unable to acknowledge what he did to Mary Prekop, but does acknowledge that on November 30, of 1985, he broke into 33 Covel Street and that he broke into 27 Malibu. And he indicates that he had been drinking and having drugs that night. And that he did break into those homes, but insists throughout that he didn't touch anybody.

Opening statements are to give you an idea of what the nature of the evidence is and the nature of -- the evidence in this case is astounding. It's astounding. But when it is over and when each witness has testified and been cross-examined you will be left with one inescapable conclusion. George Perrot broke into 33 Covel Street in the nighttime with the intent to commit a felony. That's a burglary. That he fled from 33 Covel

Street and went to 27 Malibu Street where he broke in, in the nighttime. Somebody is home, with the intent to commit a felony, to rob or to rape, matters not which. And you know, when he was at 27 Malibu he took things with him aside from the dignity from the victim. He found her purse and took a dollar. Committed a robbery in that home and he committed an aggravated rape.

The Judge will tell you at the end of this case exactly what an aggravated rape is. It's one that occurs, in this case during the commission of a felony, committing a burglary on and assault on somebody inside.

The evidence will also suggest to you that when he was done he went home to 87 Malibu down the street. That is where George Perrot was living at the time. So when all of this evidence is in and you're instructed in the law you will be asked to do what juries must do, take the evidence gathered by law enforcement officials and brought to you and presented by prosecutors and evaluate and decide whether or not it is proof beyond a reasonable doubt. And in this case it will be proved beyond any inescapable doubt.

* * * * *

OPENING STATEMENT BY MR. FERRARA

* * * * *

MR. FERRARA: Your Honor, Mr. Foreman, ladies and gentlemen of the jury, I'm going to address what Mr. Vottero said with respect to the evidence in this case in a moment. I also thank you for being witnesses (sic). I know it's a difficulty duty. Sometime you're taken away from your families and your jobs, but it is a duty and one of your duties is to presume George Perrot innocent.

Now, you haven't heard any evidence yet. You heard what Mr. Vottero said. You haven't heard any evidence. You have heard nothing and you heard the Judge say that the defendant is presumed innocent.

Before I begin to tell you what we feel went on in this case I just want to make that very clear to you. What does that mean to presume someone innocent? It means this, it means that if I were to ask you, sir, as Mr. Perrot sits there right now, is he guilty or innocent and if you were to say to me, I haven't heard any evidence so I don't know if he's guilty or innocent that would be an intelligent response and a logical

response, but it fails to comprehend what a presumption of innocence is. Presumption of innocence requires you to say, He is innocent. I haven't heard any evidence. Until the Commonwealth proves this case, I suggest to you he is innocent.

And as I told you, now, I want to tell you something about this case that might cause you to feel the end result isn't quite as inescapable a conclusion as Mr. Vottero tells you. Now, he told you that Emily Lichwala who lived at 33 Covel Street on November 30, 1985, had her home broke into, but she can't tell you who broke into her home. There is no evidence with respect to who broke into her home.

I think a real part of this case is the testimony of Mary Prekop. Okay. This is the woman who I believe was 78 or 79 who lived at 27 Malibu Drive on that same date whose home was broken into. And she was assaulted and that's not an issue. The issue in this case is who did this to these women. Who would do this to this woman? And of course the Commonwealth says it's George Perrot. And in listening to Mr. Vottero's opening he seemed to discount what Mary Prekop can tell you and will tell you about her assailant. He said something about

vision problems that she had.

You're going to see a statement that she gave at eight p.m. the night that this rape occurred and it's going to show you a number of things. It's going to show you a woman with great strength, with great fortitude. A woman who, with great composure during this terrible event had her wits about her, used her head and observed certain things. And she gave a description on November 30, 1985, of her assailant and her description included that the individual was 20 to 30 years old, Caucasian -- white, medium build, black wavy hair, clean shaven.

She further described what he was wearing, I believe she said he was wearing a navy jacket, white sneakers and pants. And she described the pants by saying, "They were not jeans. They're dark, but they're not jeans and they're not corduroys." This was the description that this woman gave on the same date that she had been raped and traumatized. Anyone would acknowledge that having occurred.

And I suggest to you that few people having undergone what she went through would be capable of giving that kind of description, but she wasn't. What's significant is that George Perrot wasn't clean shaven.

May I see those photographs, Mr. Vottero?

These are photographs taken at the police station six days later and these are going to come into evidence. Mr. Perrot wasn't clean shaven. He had a mustache. He had a beard. And you can see it in this photograph. In this photograph and this is a line-up. (Indicating)

You know, Mary Prekop on December 7, was asked to come down to the police station and to view what's called a line-up, a group of people. And in this group of people was Mr. Perrot, here on the right-hand side of this as this faces you. And as she viewed these people, each of these individuals was asked to step forward. And she was viewing them, I believe, through a one-way mirror. He couldn't see her, she could see them. Asked to step forward, to turn to the left, to turn to the right, to step back. (Indicating)

Mr. Perrot was the first person that did this and I believe Mary Prekop is going to tell you that she told the officers who were there, "The man who raped me, man who assaulted me isn't there. He is not in the line-up."

Mary Prekop, later, at another hearing, described this man as having short hair, freshly cut. This woman who supposedly couldn't see, short hair freshly cut and

it's hardly a description of George Perrot.

So how did George Perrot come to be charged with this offense? First of all, he lives on the same street and he was known to the police. And on December 7, yeah December 7, the early morning hours he was arrested.

Now, I'm not going to ask you to like George Perrot. You're not going to like George Perrot. You're going to disdain him, I guess, because of who he is and what he did on December 7. He broke into a couple's home and the man who lived there confronted him and he struck the man and fled and what he did was he fled up the street. He was somewhere on Cooley Street and he snatched a woman's pocketbook and he ran home. And as a result of doing that the police had gotten the call to this first home, the first home he had broken into, the McNabb resident.

The officer who was investigating that saw the woman whose purse was snatched. Her name was Sheileen Sapelli, I believe, and they followed footprints to George's house. So at three o'clock in the morning when they arrive at George's house and George is living with his sister, Nancy Westcott, who you will hear from. And the police banged at the door and Nancy

Westcott, -- her husband let them in first, but Nancy Westcott gets up and the police are there and they are looking for George and they find him. He is in his bedroom.

And when the police come in he was spread up on his bed with the his feet hanging on the end of the bed and his feet on the end of the floor. The appearance of having sat on the bed, passed out. He had his pants on, no shirt and I believe the police and Nancy Westcott tried to wake him. And after some period of time they were able to wake him. They found some drugs in the room. You are going to hear he was under the influence of alcohol and under the influence of drugs that evening. And so the police take him down to the police station.

Now, remember he is not being arrested for what he is on trial. He is not being arrested for having broken into Emily Lichwala's home or having raped Mary Prekop. He is being arrested for having broken into Mr. McNabb's home and having snatched this woman's pocketbook. So they bring them down to the police station and they start questioning him at about five o'clock.

Now, they know he got home at 2:30. They picked him

up at three. He woke up the morning of the sixth. They are questioning him at five a.m. and you're going to hear that he didn't want to answer any questions. He didn't want to answer any questions about the McNabb house break or the purse snatch. He didn't deny it. I think his first statement was, "Yeah, you guys got me for those things. I don't want to talk to you. Leave me alone. I just want to get some sleep," but they wouldn't let him, and not just one officer, multiple officers. I think he must have signed three Miranda warning cards.

And they're questioning him and after a while they bring him down to a cell in the basement of the police station, but he can't get any sleep because there is an officer down there. He will tell you who's harassing him. And I am not asking you for your sympathy for the guy.

Now, he acknowledges he did this breaking and maybe you feel he deserves some harassment, but bear with me. They are keeping him awake by rattling his bars. He is brought up for questioning again and he is questioned. By noontime, by noontime he still hasn't slept. You are going to find out he has been awake for more than 30

hours.

At some point he says, Look, "I will give you a statement. I will sign a statement with respect to the two things that I did, the McNabb house break and the purse snatch." And he does admit to these things, but he is going to tell you they're questioning him about all kinds of things about the Lichwala case. They're questioning him about the Prekop case. They are questioning about house breaks that weren't in the area. They are asking him about people whose homes were broken into and he's very agitated. But eventually they get a statement from him and you'll see it deals with these events that are on trial for November 30, 1985.

Now, I tell you all this because the only real evidence that -- the only, the most probative evidence aspect of this case is his statement. And you have, perhaps, one of the most difficult jobs of a jury in this case and I acknowledge that. And that is having heard this statement you have to draw some conclusions about whether you can really consider it or not. Meaning, was it a statement that was made with a knowing and intelligent waiver of his rights.

Given all of the facts that you hear, and was it a

statement that was given freely, willingly, and voluntarily because that is what the law requires. And if you don't find that then you have to disregard the statement. And you can consider whether this statement is valid when you juxtapose it to the testimony of Mary Prekop.

Now, Mr. Vottero made reference to some, I guess what you term scientific evidence, some hair, some blood. I don't know. I will have an opportunity to cross-examine these experts. I would just ask you to pay attention and consider this testimony of these expert on cross-examination as well as on direct examination. Determine whether this is, how scientific this testimony is.

Is it quantum physics or is it astrology; how subjective are the conclusions that these individuals draw? Are their conclusions dependent upon their judgment? Would all persons necessarily agree with their conclusions? How detailed were their studies? How were their records? I want you to consider all of this. In other words I want you to consider what these individual say in cross-examination as well as what they say under direct.

And I think that what you're going to conclude is that despite Mr. Vottero wishing that this evidence can overcome the testimony of this eyewitness, Mary Prekop, the woman that was there. I think you're go going to conclude that she's credible and that George Perrot is not the man who raped her.

Thank you.

* * * * *

EMILY LICHWALA (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Good afternoon. Please try to keep your voice up and tell the jury your name and the city you live in.

A. Emily Lichwala, Springfield.

Q. Could you spell your last name, ma'am?

A. L-I-C-H-W-A-L-A.

Q. How long have you lived in Springfield?

A. About 26 years now.

Q. And exactly where are you living in Springfield?

A. On Covel Street.

Q. And the number of the home?

A. Thirty-three.

Q. How long ago was that address -- at that particular

address, how long?

A. About 26 years.

Q. Now, did you live there during 1985; were you living there alone?

A. Yes.

Q. And how long had you lived alone?

A. At that time three years.

Q. And if I may ask, how old where you in 1985?

A. Sixty-four.

Q. Now, on November 30, of 1985, were you at your home?

A. Yes.

Q. And what, if anything, do you recall happening early in the morning of November 30, in the night?

A. In the night I'm not a very sound sleeper. I get up frequently, but I really was awakened by jolting of my door that leads to the cellar or basement.

Q. Now, do you have a memory as to roughly what time that was?

A. It was between three and 3:30 a.m.

Q. And could you describe a little bit about your house, what it is, two stories, how you get in, those kinds of things.

A. It's really a one story house, but I have a basement and a rec. room down there too.
Q. Is there an outside entrance to get into your basement?
A. Is there what?
Q. Is there a way to get into your basement from outside of the house?
A. Yes.
Q. A hatchway or a door?
A. Yes. Yes. I have an entrance there.
Q. And is it a regular door?
Is it the kind of hatchway you have to lift up?
A. I don't have a hatchway, but it is a regular door.
Q. All right. Do you know how you left all the doors to your house when you went to bed that night; were they open or closed?
A. My doors are always locked and chained and bolted.
Q. And on November 30, of 1985, when you heard that noise where exactly was it, again, in your house?
A. It was the stairs from the basement to my kitchen.
Q. And would you describe the kind of door you have there from the basement to the kitchen?
A. It is just a regular wooden door.

Q. How is it secured?

A. It has a chain and a bolt.

Q. Now, when you heard this noise what did you do, ma'am?

A. I thought it was my imagination because after the noise it was like a walking down the stairs. It was quite rapid so there was no mistake about that. And then I says, It can't be, but it must be my imagination.

Q. So what did you do?

A. I went back to my bedroom and it was quiet for a little while.

Q. When you say a little while was that a matter of seconds or minutes?

A. It could have been as long as five minutes.

Q. What happened then?

A. I heard a crash, shattering glass, that kind of a noise.

Q. From what part of your home did you hear it from?

A. I heard it from the bedroom.

Q. And can you tell what part of the noise (sic) this home (sic) was coming from?

A. I thought it was the back breezeway door.

Q. What did you do when you heard it?

A. I said, "It's not my imagination. I am sure there is someone there."

Q. And so knowing this what did you do?

A. I wanted to call emergency so I went to the kitchen and I have a wall phone and I was going to call, but then I heard a second crash and that was my second door in the kitchen. It had a glass in the door and it was chained and double locked. I thought if I made the call he would hear me so I decided against the call. When I heard him pushing in and I heard the chain I just went quickly into the bedroom and picked up a few things that I could and I ran out my front door.

Q. At anytime that night did you see anybody in your home?

A. No. Because I didn't wait for him to come through. I knew I was just yards away. I just quickly tried to get out. This is what I wanted to do, just run.

Q. And you were able to get out of the house and over to a neighbor?

A. Through the front door.

Q. Now, what's your best memory as to exactly what time you fled from your home that night?

A. Just maybe little after 3:30. Just a few minutes.

Q. Could you just take a look at this chalk on the chalkboard here and familiarize yourself with it, with this being Forest Hill Road, Covel, Hilltop, Bartels; does that fairly represent the section of Springfield that you live in? (Indicating)

A. Yeah.

Q. And you live at 33 Covel; is that correct?

A. Yes.

Q. Is that on the corner?

A. It's a corner house.

Q. Let me ask you about the doors coming into your home to get -- to go from the outside of the home into your kitchen through the breezeway. How many doors do you have to go through?

A. Please repeat that.

Q. To go from outside of the home all the way into the kitchen through the breezeway, how many doors are there?

A. To get to the kitchen there will be two doors.

Q. To get in the kitchen is one door from the outside end of the breezeway?

A. Yes.

Q. A second door creates a breezeway into a little foyer?

A. Into kitchen.
Q. Right. Directly into the kitchen?
A. Uh-huh.
Q. At some point did you return to your home early that morning?
A. At day break and as soon as my friends was up I wanted to return. I didn't want to bother them because I hadn't slept at all.
Q. Could you describe what, if anything, you observed different about your home from when you had gone to sleep?
A. When I came back?
Q. Yes.
A. Well, -- all the glass shattered in the kitchen and the curtain was down. The wood work was pulled away because the chains were inserted in such a way that it pulled away at all the wood. And I saw the mess, all the shattered glass.
Q. Was there anything from your basement that had been brought upstairs?
A. There was a cue stick from the pool table.
Q. A cue stick. What about the basement of your home; did you take a look down there to see what, if anything, had taken place?
A. When I came home, yes. There was an officer there

that wouldn't let me go somewhere else and he didn't let me touch anything.

Q. All right. Did you discover whether or not anything from your home was missing?

A. Well, when I went to the bedroom my purse was gone.

Q. What sort of things were in your purse and where was it kept in the home?

A. Well, in my purse I had all of my identifications, my credit cards, license, cash, keys, eye glasses, make-up, stuff like that.

MR. VOTTERO: All right. That's all that I have of this witness. Thank you.

MR. FERRARA: I have no questions, Your Honor.

THE COURT: Very well.

MR. VOTTERO: Thank you, very much.

(The witness steps down.)

* * * * *

MARY PREKOP (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Could you tell the members of the jury your name,

please?

A. Mary Prekop.

Q. Could you spell your last name?

A. P-R-E-K-O-P.

Q. And where do you live?

A. 27 Malibu Drive, Springfield.

Q. How long have you lived at that address?

A. Nineteen years.

Q. Have you ever been married, ma'am?

A. What?

Q. Have you ever been married?

A. No.

Q. Have you ever lived there with anybody else?

A. I can't hear you.

Q. Have you ever lived there with anybody else?

A. With my mother.

Q. And how long have you lived by yourself at that address?

A. Ten years. She died 10 years ago.

Q. How old are you today?

A. How old am I today?

Q. Yes.

A. Eighty-four, 85 tomorrow. I mean 84, 85 tomorrow.

Q. Tomorrow is your birthday?

A. Uh-huh.

Q. Now, I wonder if you could tell me, if you could just describe for us first of all the kind of home that you have, whether it has one story or two stories, the number of bedrooms. Tell the jury a little bit about your home.

A. Well, it's a little one story, little ranch house. That's what I call it, with four rooms, two bedrooms, kitchen and living room and bathroom. You don't count that.

Q. In November on the 30th, of 1985, did you have any animals as pets that lived with you?

A. No. Not at that time.

Q. On November 30?

A. In 1985, yes.

Q. And what kind of animal was that?

A. How?

Q. What kind of animal was that?

A. Little cocker spaniel, little black dog.

Q. What was his name?

A. Scuffy, her name.

Q. Her name, I'm sorry.

Do you recall being awaken sometime early in the morning on November 30?

A. That's right.
Q. Do you have a memory as to roughly what time of the morning that was?
A. Well, it had to be between three and four o'clock in the morning.
Q. What was it that woke you?
A. Probably intuition and partly my dog, ran in by the kitchen door and keep barking at the time.
Q. Well, what did you do?
A. Finally, I went to the door. I opened the kitchen door. I was afraid something was behind that door to go to the breezeway, so I didn't open that. I stood there for a few minutes and then I came back and shut the kitchen door.
Q. Now, when you're sleeping in your home do you leave any lights on inside the home?
A. No. The only light I leave on is my bedroom.
Q. But the rest of your home, that you keep dark?
A. That's right.
Q. When you got up, because Scuffy was barking, did you turn on any lights?
A. Well, I turned on the kitchen light so I could get to the back door to open -- well, I haven't -- it hasn't got a lock to it. It has a chain catch to the kitchen door.

Q. Now, at that time, ma'am, do you recall whether or not you had your glasses on?
A. No. When you go like that you don't go to your dresser and look for your glasses. You just go to the door.
Q. You keep your glasses on your dresser in your bedroom?
A. That's right, when I go to bed.
Q. How long have you worn glasses?
A. Say 70 years.
Q. And could you describe what kind of vision you had in November of 1985.
A. Well, the doctors they call it 20/20 vision.
Q. And had you had -- in November of 1985, had you had any kind of medical problems with your eyes?
A. In '81 I had one cataract operation on my right eye.
Q. When you're wearing glasses what is your vision?
A. What's that?
Q. Do you know what your vision is when you're wearing your glasses?
A. I suppose it's going to be same as when they test your eyes and say it's 20/20.
Q. Can you tell us what you are able to see when

you're not wearing any glasses?

A. Today? I mean I can see, but I can't read good.

Q. And in November of 1985 when you weren't wearing your glasses what is it you had difficulty seeing far away or up close?

A. It could be either way.

Q. Now, when you went out to the door could you tell us again which door it was that you opened up?

A. Well, the dog went to the kitchen door. I went to the kitchen door and opened the kitchen door.

Q. This is the door from the kitchen to the breezeway?

A. Well, yes to proper way, but there is like a little platform. To the left of the kitchen door is the door to the breezeway, the door to house proper.

Q. How many, if you're standing outside your home, how many doors do you have to go through to come in the kitchen?

A. Well, it's an aluminum door I open. I guess they call it aluminum. You open it up to get to the breezeway then you just take a couple steps in the breezeway until you're at the door belonging to the house proper. You open -- you unlock and open that, then you go a couple more steps you're in the kitchen door. You open the kitchen door.

Q. It's a total of three doors?

A. Three doors, that's right.

Q. And when you went to bed, ma'am, can you tell me whether any of them were open?

A. Not at that time of year, December. You have all your doors closed.

Q. Do you have a front door as well to your house?

A. A front door?

Q. Yes.

A. Well, everybody has. I have got a front door.

Q. Any other doors in the house?

A. No. That's the only other door.

Q. Now, how long were you in the kitchen then?

A. I don't know why I can't hear you good.

Q. How long did you stay in the kitchen?

A. Oh, I didn't stay long in the kitchen. I just went down to the door. I just walked down to the end of the kitchen and opened the kitchen door then something told me not to open the outside door now, but I call it intuition.

Q. What did you do then?

A. Well, I turned around because I listened for a couple minutes. I didn't hear anything so I just turned around and I come back and shut the kitchen door.

You want me to tell you more?

Q. Well, you then went into the living room?
A. That's right. I sat there for a few minutes. I can't hear anything more so I said to my dog, "I guess we'll go back to bed."
Q. Did you pick up anything with you when you went to the kitchen back to the living room?
A. Yes. I picked up a stick that I had near the kitchen door.
Q. Can you describe the stick for the jury?
A. It's just -- well, let me see, it's just a little plain stick. I tell you where it came from to start with. When people are running for office a lot of times they ask you if they can put a sign up on your lawn or something and they're just -- I can't call it 2X4. I don't know how to express it that way, but a little stick that long and not very wide, like a slab, but a little bit heavier, thicker. (Indicating)
Q. Did you take that with you back in your bedroom?
A. Yes. Something made me take it back in the bedroom.
Q. And when you went into your bedroom did you turn all the lights off in your house that you turned on?
A. I only had one light on in kitchen and I had shut

that off. When I went from the living room I shut that light off and went into the bedroom, but I don't touch the light in bedroom. I leave it on all night.

Q. What kind of light is it?

A. Just a little lamp.

Q. A table lamp?

A. Like a little table lamp.

Q. Did you get back into bed then?

A. I got back into bed, but I didn't get settled.

Q. What happened?

A. I thought I heard glass breaking.

Q. What did you do?

A. Well, I jumped out of the bed and grabbed my stick and I run off in the kitchen. I didn't get very far.

Q. How far did you get?

A. Just the other side of the bathroom near where you put the light on in the kitchen.

Q. If you're standing at the door to your bedroom right now, how far is it to the bathroom?

A. Well, I knew they would be asking me these kinds of questions.

Q. Just something in the courtroom maybe.

A. So I measured it today. It's about eight feet from

the light, the little -- I call hallway or something before you get in the kitchen proper. It's six feet wide.

Q. Okay. It's about eight feet from your bedroom to the light and the kitchen; to the light and kitchen?

A. That's right.

Q. Did you ever get to the light in the kitchen?

A. Yes, because I turned it on.

Q. But when you came back out again after you heard the glass how far did you get?

A. I say that's how far I got. I got just as to put the light on. The party that was coming in was right there and I wont say what I did until you ask me.

Q. What did you see at that point?

A. What did I do at that point?

Q. What did you see?

A. I see a man standing there with his hands over his face.

Q. Can you show how his hands were?

A. Just like this. (Indicating)

Q. What did you do then?

A. Well, got my stick ready to hit him and I was going to hit him on the leg, but my dog was barking and bothering him so much there I didn't went to hurt my dog so I hit him on

the head.

Q. Do you know what part of the head he was hit on?

A. I suppose the top of the head.

Q. And what happened after you hit this person on the head?

A. Well, he took a few more steps and he grabbed me. He pushed me and he pulled me to the bedroom. Knocked me to the floor and before he knocked me to the floor he gave me a black eye.

Q. Now, do you recall him moving his hands away from his face?

A. I wouldn't -- he has to because he grabbed the stick from me. He had to take his hands off. He grabbed the stick.

Q. I understand he had to, but my question is do you have a memory of seeing his hands move away from in front of his face?

A. No.

Q. How long would you say it took him to get you in the bedroom?

A. Probably two, three minutes.

Q. And did you -- were you walking backwards?

A. He was pushing me.

Q. So you remained facing him?
A. I was facing him and he was facing me.
Q. And what happened when he got you to your bedroom, to the entrance of the bedroom?
A. I said he gave me a black eye. Pushed me to the door and he shut the door so the poor dog couldn't get in.
Q. Were you able to hear the dog?
A. The dog was running all over the house barking like mad.
Q. What, if anything, happened to the light in your room?
A. With his right hand he hit my lamp and it broke the bulb and it knocked the lamp to the floor.
Q. When that bulb was broke was there any light left in the room?
A. No. There was no light left in the room because I pulled my shades down at night and it was -- this was between four and five o'clock in the morning. It had to be before four because at four o'clock is when I called the police.
Q. Now, what happened after he had pulled you and you were on the ground?
A. Well, I'm going to say he molested me.
Q. Let me ask you first, what were you wearing; do you

recall?

A. What's that?

Q. What were you wearing?

A. Well, I had my nightgown on. I don't know whether I had my robe on or not.

Q. Do you recall this person saying anything to you?

A. Huh?

Q. Do you recall this person saying anything?

A. No. He didn't say a thing.

Q. When you say he molested you, I know it's difficult, could you describe for the jury exactly what it is he did?

A. Okay. Molested isn't a good enough answer, seeing you want more specific, after he got on top of me and he molested my private part; is that enough?

Q. Let me ask you, you've never been married; is that correct?

A. (Witness indicating.)

Q. How long did this whole attack take; do you have an idea?

A. How long this took?

Q. Probably between say five to 10 minutes at the most.

Q. And did you try to hit him again in your bedroom at all?

A. I didn't get that.

Q. Did you try to hit him again in your bedroom?

A. No. I didn't try to kick him, but --

Q. (Interposing) What exactly did you do in the bedroom after you were pushed on the floor?

A. Well, I say he molested me and he didn't stay too long because the dog was making too much noise and I guess he probably made him nervous. He better get out before something happens, might wake the neighbors.

Q. Were your eyes open or closed during time you were in the bedroom?

A. I think my eyes were closed most of the time too.

Q. Do you have a memory of opening them while you were in the bedroom?

A. After he left I did.

Q. How long after he left did you wait before you opened your eyes?

A. Until I was sure that I had my bearings and I could make it to the telephone.

Q. Now, do you recall anything about this person's hands?

A. No.

Q. Do you recall seeing his hands at all?

A. Just like anybody's hands. I see two hands in front of his face. That's all I remember about his hands.

Q. When you say that he molested your private parts let me just ask you, ma'am, did he put something inside of you?

A. He must have because it made me feel uncomfortable and something was wrong.

Q. You don't know what it was?

A. No.

A. Even if I could see I couldn't see.

Q. There was no light in the room?

A. No. I had my nightgown on.

Q. At what point do you recall closing your eyes?

A. I don't understand.

Oh, after he took the stick away from me he pushed me. I shut my eyes. I didn't want to see it. Just human nature probably for a lot of people not to look over who's attacking you because you don't want to have it on your mind.

Q. So you were still standing in the hallway when you closed your eyes?

A. Sure.

Q. Now, what can you tell us about the person that assaulted you; can you give us some kind of description?

A. Well, --

Q. (Interposing) First of all do you know whether they were white or black?

A. I know he was white. I could tell when he first came in.

Q. Do you recall anything about his hair?

A. His head, yes. Like I say when I said it before he had black hair and it was wavy.

Q. Did you see a mustache or beard?

A. No. His face was clean.

Q. All right. Now, what kind of clothes do you recall seeing?

A. He had a blue jacket and he had white sneakers.

Q. You have any idea what kind of pants he was wearing?

A. No. So many kinds today you don't know what's what's.

Q. Now, after he left your bedroom?

A. Before he left my bedroom, before he left my bedroom he kicked me, well, in the buttocks or the thigh on the left-hand side, same side that he gave me the black eye.

Q. Did he take off your nightgown at all?

A. He didn't take it off he just pushed it up.

Q. Do you know how far up he pushed it?

A. I didn't look. I told you I had my eyes shut all the time. I didn't want to have in my mind any idea of whoever it was that was bothering me.

Q. Do you have a memory as to whether or not he touched you in your breast area at all?

A. Yes. He just touched my right or left nipple, one of them.

Q. With what part of his body, do you recall?

A. What do you mean?

Q. How did he touch you there?

A. Well, with his mouth.

Q. Was this before or after he molested your private parts?

A. This was before. This was the first thing he did.

Q. And he didn't say anything the whole time?

A. He didn't say anything.

Q. Did you say anything that you can recall?

A. I might have screamed, that's about the only thing I said.

Q. And do you have a memory as to how long after he

left how long you waited before you got up?

A. Well two, three minutes and I was sure I could make it.

Q. What did you do at that point?

A. What did I do at that point? I went to the telephone. I called the police.

Q. Were you able to get a hold?

A. What's that?

Q. Were you able to reach the police station?

A. Sure. I called 911, whoever answered, I think it was some woman, she questioned me which police it was I said the Springfield and before long somebody was there.

Q. Now, at some point that morning or that evening after the police came do you remember sitting down and giving a statement to the police?

A. Well, after the police called an ambulance to me. I didn't need an ambulance. I suppose my face looked bad. They called an ambulance and the ambulance took me to the emergency at Wesson Hospital. They checked me down there and then the policewoman came there and she took me to the police station and that's when I give her a thing. It was about -- I think on her paper it says 8:10 I was at the police station, right?

Q. Would that be in the morning you took that police station?

A. Same time in the morning.

Q. Could you just take a look at these two pieces of paper and take a minute to look at them and tell me if you recognize them? (Indicating)

(Pause)

THE WITNESS: Uh-huh.

Q. (By Mr. Vottero) Is that the statement you gave to the police?

A. Yeah, but I didn't give this, any statement about any gloves.

Q. Is this your signature on both pages?

A. They got it here about some gloves. I don't know when they put that in. I didn't see the gloves until two or three hours until after I got home and I went to make up my bed and there was the gloves and the stick was still on the foot of the bed and the gloves too.

Q. These gloves that you saw were they your gloves?

A. No, they weren't mine. That's how I know them. They were blue and purple and pink and all rainbow colors.

MR. VOTTERO: At this time, Your Honor, I would like to offer her statement.

MR. FERRARA: No objection, Your Honor.

THE COURT: Very well. Exhibit 1.

THE CLERK: Exhibit No. 1, Your Honor.

(Commonwealth's Exhibit No. 1 was offered and marked.)

Q. (By Mr. Vottero) Do you have a memory as to whether or not these gloves were the ones that were in your bedroom? (Indicating)

A. They looked just like the ones in the bedroom, all the colors like that on it.

Q. And you don't have a pair of gloves like this?

A. No.

MR. VOTTERO: May these be marked just for identification, Your Honor?

THE COURT: Yes, A for identification.

(Commonwealth's Exhibit Let. A was marked for identification.)

Q. (By Mr. Vottero) Now, how many police officers

would you say you talked to the day after or that day?

A. You mean that same day?

I don't know. Only one came the first time and when they saw my black eye he called, I don't know who he called first. I think another officer came and he called for the ambulance. I don't know he was calling an ambulance. If he told me he was doing it I would have told him I don't need an ambulance.

Q. Did you recognize the person that assaulted you?

A. Did I recognize him?

Q. Was it somebody you ever seen, to your knowledge.

A. If I known something was going to happen I would have had my eyes open good and tried to remember something, but I didn't expect anything so I didn't look him over.

Q. Did you tell the police that you would be unable to identify the person?

MR. FERRARA: Objection, Your Honor.

THE WITNESS: Well, the only thing I know he was young and he had black wavy hair the day he was at my house.

THE COURT: I will let him have it.

THE WITNESS: He was young. He couldn't have been from between 20 and 30 at the most.

Q. (By Mr. Vottero) Did you ever tell him you thought

you would be able to --

A. (Interposing) He had black wavy hair.

Q. Did you ever tell him you thought you would be able to identify the person if you saw him again?

A. If I saw somebody with black wavy hair, just hit me that that's the man, well I would say he looks just like him.

Q. Well, about a week or so after this you were asked to go down to the station to look at a group of men?

A. That's right. Somebody came and picked me up and took me to the station.

Q. Did you see anybody in that group that you recognized?

A. They don't put them in a group one by one. They brought four men. I think nobody had that kind of color hair. Everybody's hair look like they needed a haircut and was hanging down. It's like it never been combed. They looked like some kind of a tramp.

Q. This was one at a time you were seeing them?

A. I think it was four men. It could have been five. I know there was four anyway.

MR. VOTTERO: Thank you. That's all the questions I have.

THE WITNESS: Okay.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Miss Prekop, my name is John Ferrara and I represent George Perrot.

A. Uh-huh.

Q. The man who is on trial here and I don't want to ask you any questions about what the person who broke into your home did to you, but I would like to you ask you a few questions about what you saw.

A. What you mean what I saw?

Q. What you observed about this person, okay?

A. Okay.

Q. First of all I wasn't clear about what you were saying about your glasses. Do you have the same prescription as you had in November of 1985?

A. No, because I've had a cataract operation since and I have had the prescription changed a couple of times.

Q. Okay. I remember you testifying you had a cataract operation in 1981?

A. That's right.

Q. But since 1985 have you had another cataract operation?

A. Yes. On the left eye this September.

Q. Okay. So your prescription now is different than it was in 1985?

A. That's right.

Q. Can you see as well now without your glasses as you could in 1985?

A. Well, I can see much better with the glasses on so I can suppose I can see better with them off. I can really read now, read good.

Q. With your -- now, I'm talking about 1985 with your glasses off, could you see three or four feet away from you?

A. Oh, yes.

Q. Could you see arm length?

A. Oh, yes, more than that.

Q. This night that this man broke into your home certainly you were scared; is that fair to say?

A. That's right. Anybody would be, 85 years old, 79.

Q. Perhaps any age?

A. That's right.

Q. And he broke into your home and I believe your testimony is the first time you heard something you went out into the hallway out of your bedroom and you turned a light on in the kitchen, correct?

A. That's right.
Q. And at that time you didn't see anybody in the kitchen; is that right?
A. Nobody was in the kitchen because the door was locked.
Q. And you went up to the door and you had some sense?
A. Some sense, some feeling that something was wrong there.
Q. And so then you returned to the bedroom?
A. No. I opened the kitchen door. I went to open the breezeway, but I was afraid. So after standing there for a couple minutes I didn't hear a sound. I stepped back into the kitchen and shut the kitchen door and I locked it with a chain instead of a lock. I got a chain on the kitchen door.
Q. And then returned to your bedroom?
A. And I returned to the bedroom.
Q. And it was then you heard another sound; is that correct?
A. I went to the living room first.
Q. Okay.
A. And I sat there for a few minutes and everything sounded quiet so I went in the bedroom, but before I got in the bedroom I heard sounded like glass breaking. I said, "Oh,

geez, there is -- somebody must have been out there and broke the glass on the window on the house proper door."

Q. Ma'am, and at some point you heard another sound; is that right?

A. What do you mean? Yes. Then I heard another sound. I heard no -- that was the same thing, the glass breaking. I thought it was the house proper door, but what I heard wasn't glass breaking it was when the man put his body against my kitchen door -- and today it is still there, his foot print on the wall. He pushed open the kitchen door and what would you call it, the facing or trimming, trim on the kitchen door. He pushed away the door and the chain and made all the noise what I thought was glass breaking; it was that chain.

Q. And when you heard this noise -- you were in the bedroom when you heard that noise?

A. That's right. I jumped out of bed and grabbed my stick.

Q. And when you jumped out of bed and you had your stick you walked about -- I think you testified you measured it, it was about eight feet?

A. About eight feet because I measured it on purpose today.

Q. And you then?

A. I put the light on. I walked as far as the light, but I didn't, probably another step he was already there.

Q. And when you turned this light on this individual was in front of you; is that correct?

A. That wasn't very far because from there to the refrigerator wasn't another eight feet.

Q. Was it about as far as I am from you? (Indicating)

A. Well, no, further.

Q. And at that time he had his hands over his face; is that correct?

A. That's right.

Q. And you struck the man with a stick; is that right?

A. I had the stick in my hands. I said, When I got out of bed I'm going to hit him. I don't know where. I didn't want to hit him on the feet. I rather do that and hurt his feet instead, but my dog was barking all around his feet and I wasn't going to hit my dog.

Q. And after you struck him on the head he took his hands away and he took the stick from you?

A. He grabbed the stick. He grabbed the stick from me and he was pushing me at the same time. In from the bedroom, with his right-hand he knocked the lamp off and with his left

hand he threw the stick on the bed.

Q. You saw him do that?

A. Yes.

Q. And did -- you said the light was on in the kitchen. He pushed you from the kitchen to the bedroom? You saw him push you?

A. That's right.

Q. And did you have an opportunity to see him then?

A. I was shutting my eyes and I was looking too much. I said I don't want to see who it was because I could have bad dreams afterward. I heard of other people having nightmares afterward.

Q. But in the course of this event you were able to see enough to give the police a description of an individual?

A. Only what I saw when he was in the kitchen. He had his hands on his face. He had wavy black hair and he had a blue jacket and white sneakers. That is all I can tell you. I know he was young by his build.

Q. Mr. Vottero showed you this statement that you gave and you read it? (Indicating)

A. Uh-huh.

Q. And that was given later that same day, correct?

A. That's right. After eight o'clock that morning.

I don't know if it says it there at the top.

Q. And can, -- I believe you testified on direct that the man that you saw was clean shaven; is that correct?

A. Uh-huh.

Q. Now, when you say clean shaven --

A. (Interposing) He didn't have no mustache. That is why I thought he had to be a younger fellow to me. I didn't look for a beard, but if he needed a shave it could show up more. He looked clean shaven, no beard.

Q. You're certain of that?

A. Uh-huh.

Q. And no mustache?

A. Nothing on his face.

Q. And you observed this during the time when he was pushing you from the --

A. (Interposing) No. I wasn't trying to see too much on his face. I was too much upset to notice anything.

Q. However, you did give a description of his clothing as well; is that correct, his clothing?

A. Yes. I told you had blue jacket, white sneakers.

Q. And you remember he had a blue jacket and white sneakers?

A. That's right.

Q. And you also said that he was wearing some dark pants, a pair of dark pants?

A. Yes. They weren't jeans and they weren't white.

Q. How do you know they were not jeans, ma'am?

A. Jeans -- I never saw any -- they're all about the same color.

Q. And you indicated -- do you remember the name of the policewoman who took the statement?

A. Do I remember her name?

Q. Yes.

A. Popko.

Q. And it was Marianne Popko?

A. Marianne Popko.

Q. Did you also hurt this individual -- you didn't notice if this individual had any jewelry?

A. No. I didn't see any signs of scars on his face and no jewelry. No other rings or anything.

Q. Would you tell us, please, as best you can, how long was this man's hair?

A. Well, it wasn't too long.

Q. Was it --

A. (Interposing) It looked like somebody went -- he went often, went to a barber shop. It wasn't hanging way down

over his neck.

Q. I was going to ask you if it was about my length, but I am reluctant to.

Was his hair -- was his hair shorter than mine or longer than mine?

A. Well, I wouldn't say for sure. It had to be longer. If you're telling me that some of these people they were showing me at the courthouse (sic) they all had longer hair and pretty stringy and pretty sick looking.

Q. I'm not asking you -- all I'm asking you today --

A. (Interposing) The only time -- what I could see of his hair he had his face covered. You couldn't see too much, but when I hit him on the head I had my hands so close to the stick, hanging onto it I could feel the curly hair and I could see it was black.

Q. Ms. Prekop, do you remember testifying at an earlier hearing about the same thing and describing this man's hair; do you remember that?

A. What I told Miss Popko you have got it right there. (Indicating)

Q. Okay. Do you remember testifying that his hair was short and looked like it had been freshly cut?

A. I couldn't say freshly cut. It was, to me, it

wasn't hanging. I didn't think it was down his neck too far. If it was I didn't look him all over, nobody does when they're being hurt, assaulted.

Q. About a week later do you remember that you were brought to the Springfield Police Department?

A. That's right.

Q. And you have testified that you were shown a group of people; is that correct?

A. That's right.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Ms. Prekop, I want to show you this photograph and ask you -- (Indicating)

A. (Interposing) Why you show me so many? I was only shown four men.

Q. Is that correct?

A. That's right.

Q. When you were shown these men -- do you recognize any of these men as being the men you were being shown that day? (Indicating)

A. I'm not going to say. I'm not sure of which one is which.

Q. Ma'am, I want to show you this man here on the far left. (Indicating)

MR. FERRARA: Your Honor, could I have this marked for identification?

THE COURT: Yes. We will mark that for identification.

(Defendant's Exhibit Let. B was marked for identification.)

THE WITNESS: That man has a mustache.

Q. (By Mr. Ferrara) I'm sorry, Miss Prekop.

A. That's all right.

Q. The man furthest on the left here. (Indicating)

A. You mean the end one?

Q. Yes, ma'am. Does that look like the man who assaulted you on November 30, 1985?

A. How can I say it was when this man has a mustache and a beard? This fellow didn't have any beard. He didn't have any mustache.

Q. Ma'am, with respect to the length of the individual's hair I'm asking you to identify --

A. (Interposing) Yeah. It could be this one, more this length. (Indicating)

Q. It could have been this length? (Indicating)
A. Yeah, but the pictures they showed me had -- nobody had hair on that order. Everybody's hair was hanging down their neck and looked like they needed a hair wash.
Q. Did they show you photographs that day?
A. No. There were four people. I am sure they showed me just four.
Q. Who do you remember was there with you when you looked at these people?
A. Who was there when, where?
Q. At the police station when you looked at these individuals.
A. No. All I know somebody came to the house picked me up.
Q. Were there police officers with you when you viewed these men?
A. Yes. And they told me to sit quietly until they brought the different men out and I was supposed to be behind some kind of screen. I could see them and they couldn't see me and one at a time they brought them out.
Q. Do you remember a man named Francis Bloom?
A. Sure.
Q. Was Mr. Bloom there when you looked at these

individuals?

A. I wont say. I don't remember whether he was there or not.

Q. And did you tell the people who were there that you did not see the man who had assaulted you? (Indicating)

A. Didn't make me think of the man that assaulted me.

Q. I'm sorry, ma'am?

A. None of them made me think of the man who I thought assaulted me.

Q. Ma'am, this gentlemen here, sitting here, is George Perrot, and as you can see today he is clean shaven; does this look like the man who assaulted you?

A. Well, this happened five years ago.

Q. I understand.

A. Different haircut.

Q. The hair looks different?

A. His haircut was different, right. Well, somebody told me he might have been wearing a wig, I don't know, the day he came into my house and it was black hair and wavy.

MR. FERRARA: Could I have this marked for identification, Your Honor?

THE COURT: Is that the second one?

MR. FERRARA: Yes, sir.

THE COURT: C.

THE CLERK: C for ID.

(Defendant's Exhibit Let. C was marked for identification.)

Q. (By Mr. Ferrara) Ms. Prekop, I want to show you this photograph. (Indicating)

A. Well, this is the same one that was with the group, same picture.

Q. Yes, ma'am.

A. Okay.

Q. That was purported to be a picture of George Perrot.

MR. VOTTERO: I object, Your Honor.

THE COURT: Well, are you able to ask the question without that?

Q. (By Mr. Ferrara) First of all, ma'am, the man in that photograph appears to be the man, to you, to be the man who sexually assaulted you on November 30, 1985?

A. The man who assaulted me didn't have a mustache or a beard. He had it on then it had to be false, but he didn't have it. He was clean shaven; the man who came into my house. The coloring of the hair in this picture is a lot like his.

Q. Thank you, ma'am.

Just one, I know this is a difficult question. You testified that this man who assaulted you put his mouth on you?

A. That's right.

Q. And when he put his mouth on you were you able to tell whether or not he had any facial hair?

A. Any what?

Q. Any mustache or beard?

A. How could he have it then when he didn't have it in the kitchen when he came in?

Q. I understand. I am asking, did he feel as though he had a mustache or beard?

A. He didn't stay there a minute. I didn't feel anything like that.

Q. Who cleaned up the mess that was in your house, ma'am?

A. There wasn't any mess, except the broken bulb in the living room and when I came back from the police station my sister and I swept it up and we made up the bed. That's when I found the gloves.

Q. And you and your sister made up the bed?

A. We put clean linen on it. We made the bed on it.

Q. You put the bedspread on it?

A. Yeah. Everything was all made up. That's when I saw the gloves at the foot of the bed. We start making the bed up and I said, "Geez, where did those come from? They aren't mine."

Q. This assault occurred on the floor; is that correct?

A. That's right.

Q. When you made up the bed did you observe any blood on the sheets?

A. If there is any blood on the sheets when we never went on the -- how could his blood be on my sheets?

Q. Ma'am, I'm just asking, to your knowledge, was there any blood on the sheets, if that?

A. Well, there was a blood stain, but that blood stain had been there for 14 or 15 years. Hadn't washed out yet.

You want to ask more questions about how it got there? I'll tell you.

Q. Okay. How did that blood stain get there?

A. Okay. My uncle was living with my mother and I and he had lung trouble and at that time he was coughing, doing a lot of coughing up and the doctor gave, even my doctor, my mother's doctor picked the prescription he was using. Then he

said to him, "If you have one that is not so strong it will help you better in your coughing" and he, on the sheets a lot of times on the pillow case and in his handkerchiefs. I would have to put them in Clorox every time I washed his -- Clorox because they are so stained up. He probably used a box of Kleenex a day spitting up.

Q. But as of November 30, 1985, did you see any blood stains from this man on those sheets?

A. The only blood stain was on that sheet had been washed twenty times, probably more than that because he died in 1982 and he was in the nursing home. I couldn't take care of him and my mother.

Q. Ms. Prekop, do you know a woman named Olivet Edward?

A. Yes. She is a neighbor of mine.

Q. Is she a friend of yours?

A. I thought she was a friend of mine.

Q. Since this incident have you spoken to Olivet Edward; since November of 1985 have you spoken to her?

A. Yes. Oh, yeah, she has been in my house different times.

Q. Have you ever spoke to her about this incident here?

A. We didn't talk about that incident.

The only time we talked about it she came by probably a week or so after he broke in. She came down. But I never brought up the conversation about it. I didn't know she was going to say anything about it. She brought it up a couple times.

MR. FERRARA: I have no further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Just a few more. The relative of yours who had the lung problems, when was the last time he lived in your home?

A. Nineteen eighty. That's when my doctor told me my mother wasn't going to last much longer. I told him I couldn't take care of him and her. So he went to a nursing home in Westfield not far from where a sister of his lived and he died the next year, 1982.

Q. And since the day that he moved out can you give us an idea of how many times you washed that particular bedsheet?

A. I didn't understand you.

Q. The bedsheet that he slept on, how many times have you washed that since he left the home?

A. Okay. From '82 to '85 it got washed a lot of

times.

Q. And did you wash with detergent; did you use soap when you washed?

A. Well, sure I use soap.

Q. Did you use any bleach on that sheet?

A. It was a colored sheet. It was not one plain color. It was a floral sheet as I recall it.

Q. You think you might recognize that sheet again?

A. Sure. I will tell you even now where the blood spots are on the sheets.

Q. This is the sheet. And how many spots of blood did you see on it on November 30, or just before November 30? (Indicating)

A. I was using it on all the time. Only one near the top of the sheet.

MR. VOTTERO: May this be marked, Your Honor, for identification?

THE COURT: D.

THE CLERK: D, Your Honor.

(Commonwealth's Exhibit Let. D was marked for identification.)

Q. (By Mr. Vottero) I understand when it has been wet

and washed a few times you can't identify it.

At any rate you saw only one spot of blood; do you know how big it was?

A. It was big, probably that long, not even that big. (Indicating)

Q. Now, when this person attacked you, where was your purse?

A. My purse was in the other bedroom, on the chair in the other bedroom.

Q. Had anything been taken?

A. Well, when the fellow left he must have gone to the bedroom, he picked up the purse. I know there was only a dollar left in bills because I had been to -- Friday I had been to the grocery store and there was change. The purse was on the kitchen floor.

Q. Is that where you had left it.

A. No. I had left it in the bedroom, but when I went to call the police there was -- my purse was laying on the kitchen floor and I picked it up. I seen my dollar bill was gone and my change purse was gone.

Q. Now, just one last question. You said that when you first saw him in the hallway his hands were up. Show us again where his hands were.

A. Just like that. (Indicating)

Q. And today, ma'am, do you have any memory of seeing those hands away from his face?

A. I wasn't -- this wasn't what you call a movie or something you have to keep your eyes -- supposed to know what your next move is. I just know he took a stick away from me because I hit him on the head. He took it away from me and he pushed me because I was facing him and he pushed me backwards into the bedroom and he threw me to the floor, but before he threw me to the floor he gave me a black eye.

Q. Can you tell us how hard you hit him with that stick?

A. I hit him as hard as I could.

Q. Do you know whether he was hurt at all?

A. I think that's why he gave me a black eye because I hit him first.

MR. VOTTERO: All right. Thank you.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Just a couple more questions, ma'am.

After this incident of November 30, 1985, the next day did you find any blood on the rug where this incident had

occurred?

A. No. I'm pretty sure no bleeding like that, blood falling.

Q. Did you find any blood on your nightgown?

A. No.

Q. Did you find any blood spots anywhere in the house?

A. No.

Q. You saw the stick that was on the bed; is that correct?

A. Yeah.

Q. After the incident?

A. He threw the stick on the bed. Sure the stick was there. I picked up the stick and the gloves so I could make up the bed.

Q. Did you observe any blood on the stick when you picked it up?

A. No.

Q. And when you made up the bed did you see any blood spots on the sheets?

A. The only blood spot was the one that had been there for five, six years.

Q. But did you?

A. And it wasn't fresh blood. Its was brown looking.

It had been why I never used bleach when I washed that sheet because when you put bleach on a color it takes the color out. I wanted it to stay. I used it only on my own bed.

MR. FERRARA: Thank you, ma'am.

MR. VOTTERO: Thank you very much.

(The witness steps down.)

MR. VOTTERO: Your Honor, I ask permission to read Exhibit 1 to the jury at this time.

THE COURT: Yes. I think we should just remind the jury what this is.

MR. VOTTERO: Exhibit 1 is the statement of Mary Prekop.

THE COURT: You heard some testimony from this witness that she gave a statement to the police on the morning thereafter and that's now an exhibit in the case and Mr. Vottero is going to read it to you now.

MR. VOTTERO: "Dated November 30, 1985. My name is Mary A. Prekop. I am 78 years old. I lived alone at 27 Malibu Drive. I have lived there since 1973.

"At about four a.m. this morning I woke up because I thought I heard glass breaking. I went in the kitchen

from where I thought the noise was coming from. I put the light on. I have a dog. The dog went into the kitchen first and I followed her. I opened the kitchen door and found there was nothing there so I sat in the living room for a few minutes and everything was quiet.

"Then I went back in the bedroom and laid down on the bed. The dog laid down next to my bed and all of a sudden she barked and ran off to the kitchen.

"Now, I keep a big stick by my bed and followed her to the kitchen with the -- carrying the stick. The dog started barking. I got as far as the bathroom door. I saw a man standing in the kitchen. I hit him on the head with the stick. He grabbed the stick, pushed me in the bedroom. The dog tried to follow, but the man closed the door. I was still fighting him. He threw me on the floor. He never said anything. I started calling the dog's name, "Scuffy." He hit me on the face a couple of times. I kept screaming after the first time, but after a while I decided I should keep still.

"I kept kicking with my feet and he punched my left eye. He pulled my nightgown and he sucked on my left breast. He did this for a couple of minutes. Then he got on top of me. He pushed my nightgown up and

lifted my leg up. He put something into my vagina, but I'm not sure what it was. He kept his pants on. I never saw his penis. I started moaning. I pretended to pass out. He got up and left the room.

"I waited until everything was quiet. When the dog stopped barking I went into the living room. I saw my pocketbook on the floor. The contents were spilled out. I picked up the change and two envelopes had coupons in them. I put them on the counter. I just had a dollar in my pocketbook. I don't know if he took it or not. I then called the police. I wasn't able to dial at first because I was so nervous. The second time I tried I was able to get through.

"I can describe the man who broke into my home as a white male about 20 to 30 years old. He had dark wavy hair and he was clean shaven. He was average height and weight. He was wearing a blue jacket. It looked like nylon and sneakers which were white. He was wearing a dark color pair of pants that were neither jeans nor corduroy material. I was not wearing glasses. I didn't notice any jewelry, scars.

"The only thing he ever said to me was to keep quite. He said this a few times while he was hitting me.

I forgot to mention when he first came into the bedroom he broke the lamp that was on the dresser. He hit it with his fist and knocked it to the floor. The lamp was on the floor and it went off when he broke it. When the police arrived I noticed a pair of gloves on the bed. They are not mine. I never saw them before."

Thank you, Your Honor.

* * * * *

ROBERT CHEETHAM (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the members of the jury, your name, please?

A. Robert Cheetham.

Q. How are you employed, sir?

A. I am a lieutenant with the Springfield Police Department?

Q. How long have you worked as a police officer?

A. Approximately 12 years.

Q. Were you working in November of 1985?

A. Yes, I was.

Q. Do you recall what your assignment was during that time?

A. I was a patrolman assigned to 12 a.m. to eight a.m., detective bureau.

Q. And did you have in the detective bureau -- your range was the whole city; is that correct?

A. Yes, I was.

Q. Now, on November 30, of 1985, did you have occasion to go to an area in Springfield of Covel Street?

A. Yes, I did.

Q. And could you describe for the members of this jury roughly what time you got there?

A. The time I got there was probably around 4:30 a.m.

Q. And would you describe the building located at 33 Covel Street?

A. It's a single family house.

Q. And when you arrived what was taking place there?

A. I responded there in regard to a past breaking an entering.

Q. Can you just describe for us what's the difference between a police officer at a scene in uniform and a detective, somebody from the detective bureau?

A. Well, somebody from the detective bureau responds to crimes of importance to try to secure any evidence, to call any sort of additional investigative help that might be

required, ask for photographs, and things along those lines.

Q. Now, did you examine the home at 33 Covel Street?

A. Yes, I did.

Q. What observations did you make of the exterior of the home, 33 Covel?

A. In the rear there was a dryer vent that was attached to a cellar window that had been forced inward. It was a broken window at the breezeway and there was a broken Plexiglass to a doorway that let into the kitchen.

Q. I would like to show you two photographs and ask you if you can identify those for the jury. (Indicating)

A. Photograph on the left is the washer and dryer. It's taken from the inside of the house and on top of that is the dryer vent sitting on top of the washer and dryer.

Q. And the second photograph?

A. The second photograph is the cellar window that the dryer vent was attached to. That's taken from the outside of the house.

MR. VOTTERO: May these be marked as exhibits, Your Honor?

MR. FERRARA: No objection.

THE COURT: Two and three.

(Commonwealth's Exhibit Nos.
2-3 were offered and marked.)

Q. (By Mr. Vottero) Now, Exhibit 2 would be the one taken from inside the home and Exhibit 3 would be the one taken from outside of the home.

Could you identify this third photograph that I just handed you? (Indicating)

A. That's a photograph taken from inside the breezeway leading into the kitchen.

Q. And do all of these photographs fairly and accurately depict 33 Covel Street when you arrived on November 30?

A. Yes.

MR. VOTTERO: I would ask this go in as Exhibit 4, Your Honor.

MR. FERRARA: No objection, Your Honor.

THE COURT: Very well, 4.

(Commonwealth's Exhibit No.
4 was offered and marked.)

MR. VOTTERO: With the Court's permission may these be passed to the jury?

THE COURT: Yes.

MR. VOTTERO: For the record that is Exhibits 2, 3, and 4.

THE COURT: Ladies and gentlemen, exhibits will go to the jury room, you can study them for however long you wish. For now I ask you to simply peruse them and pass them along to your neighbor so we may continue on with the examination. The main function, of course, is to listen to the testimony.

Q. (By Mr. Vottero) Was there any other way into -- was there an outside entrance to the basement at 33 Covel?

A. I believe there was a walk out to the basement.

Q. And what condition were you able to find that?

A. It appeared as though it was opened.

Q. Now, did you also have occasion to go to 27 Malibu?

A. Yes, I did.

Q. Can you give us an idea of the distance between 33 Covel and 27 Malibu?

A. My understanding, street miles, it was somewhere in the area of a mile or less as you drove.

Q. Do you know how long it took you to travel the distance?

A. Just a couple of minutes.

Q. Could you take a look at the blackboard there. Is that a fair and accurate depiction of the area of Covel and Malibu?

A. Yes. Appears to be.

Q. And with specific attention to the numbers of 27 Malibu and 33 Covel does those roughly indicate the approximate locations of those addresses?

A. Yes.

Q. Now, when you arrived at 27 Malibu who else was there that you can recall?

A. I was with my partner Eugene Dean, and Officer James Murphy.

Q. And could you describe the exterior of 27 Malibu for the jury, please?

A. 27 Malibu is a single family dwelling with a breezeway attached to the garage.

Q. Now, as you stood looking at the house, the breezeway was to right of the front door?

A. Yes.

Q. I would like to show you this photograph of a home, 27 clearly indicated on the door; is that 27 Malibu? (Indicating)

A. Yes.

Q. Now, holding the photo up so the jury can see, where is the breezeway in relation to that photograph?

A. It would be here. (Indicating)

Q. For the record, you are pointing to the right side of the photograph?

A. To the right.

MR. VOTTERO: I would ask this be marked as Exhibit 5, Your Honor.

(Commonwealth's Exhibit No. 5 was offered and marked.)

Q. (By Mr. Vottero) Now, did you also examine the area of the breezeway itself at 27 Malibu on December 30?

A. Yes.

Q. Could you describe for the jury your memory of what the conditions of the breezeway was?

A. What I can recall of it was the doorway entering the kitchen had been forced open as you look in from the breezeway.

Q. I'd like to show you these two photographs and can you identify what portion of the home and breezeway each of them depict and hold them up so the jury can see as you're describing it. (Indicating)

A. This is the kitchen of the house. This is the doorway entering from the breezeway into the kitchen. And this piece of wood here is some molding around the door. (Indicating)

This is a doorway that enters into like a little -- I would have to say a mud room between the breezeway and this is the same kitchen door that I spoke about earlier. (Indicating)

Q. And then there is a third door from the breezeway too, outside?

A. Yes.

MR. VOTTERO: All right. I would like to offer these also, six and seven in the order described.

MR. FERRARA: No objection, Your Honor.

(Commonwealth's Exhibit Nos. 6-7 were offered and marked.)

MR. VOTTERO: May I pass 5, 6, and 7 to the jury as well?

THE COURT: Yeah.

Q. (By Mr. Vottero) Sir, do you recall whether at 27 Malibu there were any objects on the floor of the kitchen when you were there?

A. I believe there was a purse on the floor.
Q. At 27 Malibu you recall anything else on the floor?
A. No, I don't.
Q. Let me ask you this, do you recall seeing a pool cue at either location?
A. 33 Covel.
Q. And all of the photographs that you examined today do those fairly depict the conditions of each of the homes when you were there on December (sic) 30?
A. November 30. Yes.
MR. VOTTERO: That's all that I have of this witness.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Officer Cheetham, did you inspect the entire premises at 27 Malibu Drive when you arrived there that evening?
A. Did I inspect the entire premises?
Q. Yeah.
A. No. I don't believe I inspected every room.
Q. Did you go in the bedroom?
A. Yes, I did.

Q. Did you make any observations in the bedroom with respect to the carpeting?
A. No.
Q. Did you -- there was some broken glass at 27 Malibu?
A. Broken glass at 27 Malibu? Not that I recall, no.
Q. Was there glass in the breezeway that had been broken?
A. Not that I recall.
Q. You indicated that you found a pool cue?
A. 33 Covel.
Q. 33 Covel. Was that pool cue taken into your possession, into the police's possession?
A. As far as I know it was.
Q. Now, did you find a stick at 27 Malibu?
A. Did I find a stick at 27 Malibu? Yeah. There was a board in the bedroom at 27 Malibu.
Q. Did you see that?
A. Yes.
Q. Did you inspect it?
A. No. No.
Q. Well, in looking at it did you observed any blood stains on the board?

A. No. I didn't inspect the stick or board much.
Q. Okay. Was that taken into evidence?
A. Don't know.
MR. FERRARA: No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Just quickly, who is Thomas Kelly?
A. He's a lieutenant with the Springfield Police Department.
Q. Was he involved at the investigation at 27 Malibu?
A. Yeah, he was.
Q. And in terms, if you will, of supervising officers or the one in charge at the scene of 27 Malibu do you know who that would have been?
A. That would have been Lieutenant Kelly. At that time he was the sergeant. I was the patrolman.
Q. One other question, do you know when these particular photographs were taken?
A. They were taken that morning of November 30.
Q. Do you have an idea as to roughly what time in the morning they were taken or what phase of the investigation?
A. It was in the early morning hours.

Q. Was it still dark out when these photographs were taken?

A. Probably, yes.

Q. And do you ever recall meeting Mary Prekop at 27 Malibu during the time you were there?

A. Yes.

Q. Do you know whether or not she had been taken to the hospital or not at that point?

A. No, I don't.

MR. VOTTERO: Nothing further.

MR. FERRARA: No further questions.

THE COURT: Very well thank you.

(The witness steps down.)

MR. FERRARA: May we approach?

THE COURT: Sure.

(The following discussion was held at the side bar.)

MR. FERRARA: I'm sorry, Your Honor. I had forgotten that when we were in chambers earlier Mr. Vottero had told me he was going to call Sergeant Kelly

for purpose of putting in some photographs or pieces of evidence and he was going to recall him later for other testimony.

MR. VOTTERO: Maybe what we can do is allow me to go with Kelly as far as what I need to for the foundation for the FBI people and break for the day at that point.

THE COURT: Sounds good to me.

MR. FERRARA: Before we do the cross.

(End of the side bar discussion.)

* * * * *

THOMAS KELLY (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name, please and how you're employed.

A. My name is Thomas M. Kelly, K-E-L-L-Y. I am a lieutenant in the Springfield Police Department.

Q. How long have you worked as a police officer?

A. Seventeen and a half years.

Q. And has all that time been with the City of

Springfield?

A. Yes, sir.

Q. To what units have you been assigned from time to time?

A. I began in the uniform division. After four months I was transferred to the crime prevention bureau working in narcotics, organized crime. I then served as a period of time as a liaison to the Superior Court. I then served a year and a half in the homicide unit. I was promoted to lieutenant and I have been in uniform branch for three and a half months.

Q. In 1985 what position did you hold in the Springfield Police Department?

A. I was a sergeant assigned to crime prevention, a head of the morals unit on the four p.m. shift.

Q. What kind of crimes do the morals unit investigate?

A. Vice crimes to a lesser degree, prostitution offenses, street offenses, child abuse, and rapes and sexual assaults.

Q. And as of November 30, of 1985, you have a memory as to roughly how long you had been working in that unit?

A. I had been in the morals squad about 12 years.

Q. Now, on November 30 of 1985, did you have occasion to respond to 27 Malibu Drive in the city?

A. Yes, I did.

Q. Do you recall how that came about?

A. I was notified at home that a sexual assault had taken place on a 79 year old woman.

Q. And how long after being notified did it take you to get to 23 Malibu?

A. Forty-five minutes to an hour.

Q. Did you go to the station first?

A. Went to the station to pick up a cruiser and went to the scene.

Q. When you arrived at 27 Malibu can you describe for us what was going on?

A. There were several uniformed officers. There were plain clothes officers from the detective bureau, a separate bureau from the crime prevention bureau. They were investigating a break in and the sexual assault on an elderly lady.

Q. Did you spend sometime speaking with those officers upon your arrival?

A. I did.

Q. Roughly how much time?

A. I was probably in the house better part of an hour.

Q. And what did you do while you were at 27 Malibu?

A. I examined a bedroom, a rear bedroom door that had been forced. I caused pictures to be taken and I gathered some evidence.

Q. Now, when you arrived there was Mary Prekop still at that home?

A. Yes.

Q. At some point was she taken to a hospital?

A. Yes, she was.

Q. And do you know when that was?

A. Probably 10 minutes after I got there, very early morning hours. I'm not sure the exact time.

Q. When you left, having completed your examination, had she returned yet from the hospital?

A. No. No, sir.

Q. Now, during that 10 minutes that both you and Mary Prekop were there did you have occasion to see her and speak with her?

A. Yes.

Q. Could you describe for the members of the jury her appearance and demeanor?

A. She was upset. She had been struck. I can't tell you exactly where, I don't recall exactly where. It was obvious she had been struck. She was upset, shaken.

Q. I would like you to look at these four photographs and ask you, if you can, if you recognize those? (Indicating)

A. Yes, sir. Those are photographs of the lady I know to be Mary Prekop.

Q. Those fairly and accurately depict the injuries that you saw?

A. Yes, sir.

MR. VOTTERO: May these be marked as exhibits, Your Honor?

THE COURT: Yes.

MR. FERRARA: No objection, Your Honor.

THE COURT: Eight through 11; are there four there?

MR. VOTTERO: Nine, 10, 11, 12.

THE CLERK: Yes, Your Honor. Eight, 9, 10, 11, 12 -- 8, 9, 10, 11.

(Commonwealth's Exhibit Nos. 8-11 were offered and marked.)

Q. (By Mr. Vottero) What's your best memory as to the number of police personnel there at your arrival?

A. I believe it would have been at least one. There was at least one uniformed supervisor, at least two other

uniformed officers, and about two plain clothes. So for a total for about five maybe six or seven tops, officers. There were photographers that were summoned, the district car, the uniform supervisor and the DB personnel.

Q. When you arrived -- when you arrived were you aware of an earlier incident at 33 Covel Street?

A. Not when I first got to Malibu Drive. While I was there I learned of 33 Covel.

Q. Did you ever go to 33 Covel that night?

A. I believe it was later in the day, sir.

Q. And what is your best memory as to the time that you arrived at 27 Malibu and saw Miss Prekop?

A. My normal duty was four p.m. to midnight in November of 1985 and I had gotten off duty, gone home and been asleep several hours so my best estimate of the time is 4:30 and five in the morning and that is just an estimate.

MR. VOTTERO: Your Honor, may the photos eight through 11, the photos of Ms. Prekop be passed to the jury?

THE COURT: Yes. I just want to be sure. Is it 8 to 11 or 8 to 12

MR. VOTTERO: Eight to 11.

Q. (By Mr. Vottero) What role did you play among the

seven or so officers at 27 Malibu?

A. Because of the nature of the assault, it was a sexual assault. It fell under my unit's investigative responsibility. I would have taken control of the scene, gathered evidence and caused things to be done. It was mine.

Q. Now, did you take control of the bedroom scene, for example, at 27 Malibu?

A. Yes, I did.

Q. What's your memory, just tell us what did you observe in the bedroom?

A. A single bed. You walk down the end of a hallway into this rear bedroom. There was a single bed pushed to the left wall as you're looking into the, -- what the bed was against, the wall, there was a single dresser. Very sparsely furnished room. Bed clothes were disheveled. I recovered some items from the bedroom.

Q. Now, before removing any items did you have some photographs taken?

A. Yes.

Q. I would like to show you this photograph first. Can you describe when and where that photograph was taken? (Indicating)

A. It's taken from the doorway looking in, into the

rear bedroom that I just described. It depicts the bed, the frame, a little stand to the side and you can just see a portion of a chair.

Q. Now, I direct your attention to the -- (Indicating)

A. Yes.

Q. Back edge of the bed. Do you see an object depicted on the bed at that location? (Indicating)

A. Yes. It's a little blurred. It is a glove.

Q. Now, was that glove that's depicted in that photograph was it in that location when you first saw it?

A. Yes.

Q. Do you recall seeing a, finding a second glove in that location?

A. The floor.

Q. Where on the floor?

A. At the foot of the bed.

MR. VOTTERO: May this photograph be marked as an exhibit, Your Honor?

MR. FERRARA: May I see it.

(Pause)

MR. FERRARA: No, objection, Your Honor

THE COURT: All right.

THE CLERK: Twelve.

(Commonwealth's Exhibit No. 12 was offered and marked.)

Q. (By Mr. Vottero) And I am going to show you a second photograph and I ask you if that roughly depicts the same area with the glove being held up? (Indicating)

A. You can see the glove slightly up in the right-hand corner. It's a more total view of the bed with the stick laying on top of the bed. It's essentially the same picture.

Q. The glove in that picture is being picked up and being held by somebody?

A. You can see it is being held in the right corner there.

MR. VOTTERO: I would ask that this be marked as an exhibit as well, Your Honor.

THE COURT: Thirteen.

THE CLERK: Yes, Your Honor.

MR. FERRARA: No objection.

(Commonwealth's Exhibit No. 13 was offered and marked.)

Q. (By Mr. Vottero) Now, what items did you remove or recovered from the bedroom, sir?

A. I folded the bedsheet from the corners in and recovered that. I recovered --

Q. (Interposing) Let me just stop you. The bedsheet?

A. -- the bed clothing.

Q. Do you recall anything about it, did you take both sheets or --

A. (Interposing) The bottom.

Q. You recall anything about that particular sheet?

A. It was soiled, appeared to have some fibers on it. It was flowered.

Q. I would like to show you what has been marked Exhibit 2 for identification. Do you recognize this, sir? (Indicating)

A. Yes, sir.

Q. And what is this?

A. That's the bedsheet I recovered from Miss Prekop's bedroom.

Q. And the number of holes and markings -- this sheet, were those holes and marks there when you recovered it?

A. No, sir.

Q. After you recovered the sheet what did you do with it?

A. I placed it into a paper bag, brought it to the police station and placed it into our evidence locker in the crime prevention bureau.

Q. Aside from the sheet what else did you take from the bedroom?

A. A pillow case that was, I believe, plain pink and two ladies mittens, gloves.

Q. I would like to show you this pink pillow case and ask you to identify this as the pillow case that you removed from 28 Malibu? (Indicating)

A. Yes, sir.

Q. And, again, were these markings and holes on it when you found it?

A. No, it wasn't.

Q. And what did you do with this sheet?

A. I brought it to -- I put it in a paper bag, brought it to the crime prevention bureau, placed it in the evidence room, tagged it and put it in the locker.

Q. Were the sheet and the pillow case still together?

A. No, sir.

MR. VOTTERO: May the pillow case be marked as

an exhibit for identification, Your Honor?

MR. FERRARA: No objection, Your Honor, for identification.

THE CLERK: That would be 14, Your Honor.

THE COURT: I believe so.

(Commonwealth's Exhibit Let. E
was marked for identification.)

Q. (By Mr. Vottero) And I'm showing you what has been marked as Exhibit 15 for identification. Do you recognize those items? (Indicating)

A. They are a pair of ladies knit gloves that I recovered from the bedroom of Miss Prekop.

Q. And what did you do with those after you recovered those?

A. I placed them into a bag, tagged them and placed them in the evidence locker following the procedures of the department as for taking evidence.

Q. What observations, if anything did you make of these gloves at the time you recovered them?

A. At the base of a finger I saw what appeared to be a reddish brown stain.

Q. Now, did you see that particular reddish brown

stain on these gloves today?

A. No.

Q. In its place do you see anything?

A. Holes.

Q. Did you put the holes there?

A. No, sir.

Q. All right. Now, could you describe the stick that you discovered in the bedroom or the board?

A. It was a flat piece of multi-layered plywood, maybe a half an inch in thickness, about two and a half, three feet long, at the outside four inches wide.

Q. Did you take that into evidence as well?

Did you take anything else into evidence that you described that you can recall?

A. Not that I recall.

Q. Now, with regards to the rest of the house did you locate another purse anywhere?

A. I don't recall, sir.

Q. All of these items that you had tagged as evidence did you cause any or all of them to be examined for fingerprints?

A. No.

Q. What did you do, sir, with the sheet, the pillow

case, and the gloves?

A. Admitted them all to the Federal Bureau of Investigation in Washington DC for serum, hair and fiber samples.

Q. Do you know, sir, whether or not you also requested at that time an examination for fingerprints?

A. Yes.

Q. And it would be correct to say there were no results in those examinations?

MR. FERRARA: Objection.

THE COURT: What's that, the finger print results?

MR. FERRARA: He is beginning to lead the witness, Your Honor.

THE COURT: In that one area I will permit it.

Q. (By Mr. Vottero) How about the stick, did you recover anything from the stick?

A. I don't recall.

Q. How were these items packaged and delivered to the FBI?

A. The FBI has a set guideline for different types of evidence to be provided, guidelines for packaging and shipping. Those guidelines were followed. The items are

separately wrapped in plain brown paper, then contained within another box sealed. The guidelines are provided by the FBI. There are a whole series of instructions that have to be followed and then shipped in a manner consistent to the FBI's regulations.

Q. Now, were you aware with whether or not any samples of hair or blood from Mary Prekop were taken in the investigation of the November 30, incident?

A. Yes, sir.

Q. And what happened to the samples of Mary Prekop's blood and hair?

A. They were taken at the medical center and they were also shipped to the FBI lab.

MR. VOTTERO: May I just have a moment, Your Honor?

THE COURT: Yes.

(Pause)

Q. (By Mr. Vottero) Now, do you know roughly when all of these materials were sent to the FBI?

A. About the 10th or 11th of December, I believe.

MR. VOTTERO: Your Honor, at this point I would

like to cease questioning for the day and continue tomorrow.

THE COURT: Very well, ladies and gentlemen, it's appropriate to recess this trial until tomorrow morning at 9 o'clock.

Allow me to remind you during this recess you should have no contact with anyone having anything to do with the case. You are not to discuss this case with anyone. Don't take any private views or conduct any investigations and make whatever efforts may be necessary to isolate yourself with information about the case whether it be from media or from any other source.

So I wish you all a pleasant evening.

(The evening recess was held at 4:20 p.m.)

* * * * *

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF HAMPDEN

I, ALICIA CAYODE TORRUELLA, Certified Shorthand Reporter, hereby certify that the foregoing is a true and accurate transcription of my stenographic notes to the best of my knowledge and ability.

ALICIA CAYODE TORRUELLA