**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 17

COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420,25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury on January 7, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231



4/13/93

# I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Commonwealth's Thomas Kelly | | | 212 | 213 |
| | | | 226 | 228 |
| | | | 230 | 236 |
| Thomas Kennedy | 233 | 236 | 238 | |
| Voir Dire of William G. Eubanks | 239 | 253 | 261 | 262 |
| William G. Eubanks | 269 | 302 | 322 | 330 |
| Wayne M. Oakes | 333 | 356 | 382 | 384 |
| Thomas Kelly | | | 388 | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| F for Identification | newspaper article | 209 |
| G for Identification | paper bag | 213 |
| Defendant's 14 | photograph (B for ID) | 222 |
| Commonwealth's 15 | gloves (A for ID) | 288 |
| Commonwealth's 16 | pillow case (E for ID) | 289 |
| Commonwealth's 17 | bedsheet (D for ID) | 290 |
| Commonwealth's 18 | paper bag (G for ID) | 351 |
| Commonwealth's 19 | photograph (C for ID) | 397 |
| Commonwealth's 20 | Miranda card | 399 |
| Commonwealth's 21 | telephone request | 403 |

(The following discussion was held in the Judge's chambers.)

(The Court and counsel were present at 9:13 a.m.)

THE COURT: Good morning, what do you have?

MR. FERRARA: First of all there was a newspaper article last night and there were a number of things about it that disturbed me. I suppose there isn't going to be any newspaper article that wouldn't.

This particular one --

THE COURT: (Interposing) Is that an extra one? Maybe you ought to put it in.

I gave them a strong warning, matter of fact, I warned them a couple of times. Often does the trick.

MR. FERRARA: The gist of the article, Your Honor, is Mr. Perrot is on trial for the second time. Mentions that his life sentence for rape and burglary was overturned by the Supreme Judicial Court in 1990. It mentions that Perrot is now serving a 10 to 12 year sentence for burglary of an elderly couple eight days after the rape. It characterizes that incident as a break similar to the one on trial.

THE COURT: Okay.

MR. FERRARA: And it states that the new trial was ordered because the victim's pocketbook should not have been used as evidence and that's of particular concern.

THE COURT: Okay.

MR. VOTTERO: Are you going to have it marked?

MR. FERRARA: Yes, Your Honor.

THE COURT: Oh, all right. We will mark this as an exhibit for identification. For the record it comes from the Springfield --

MR. FERRARA: (Interposing) Union News.

THE COURT: Of?

MR. FERRARA: January 7th, 1992.

MR. VOTTERO: The other point I need to alert you to is I was advised by Tom Kelly as he was waiting to testify he observed the defendant's mother and sister outside the courtroom and there was another gentleman there that they were talking with. They were sitting on opposite sides of the hallway there and talking and when the jury was excused for the day that gentleman got up and met one of the jurors and they left together. And if it was a relative you have one of the jurors that obviously poses some concern to the Commonwealth.

THE COURT: Do you know who?

MR. VOTTERO: I think I do. I believe it to be juror 4 dash 8, back, right, Donna Carlson. She is the woman who has a son in jail in Connecticut. I asked Tom Kelly to make a note of which seat the juror is in, but he was pointing her out to me as she was leaving and I am very certain that is the juror.

THE COURT: All right.

MR. FERRARA: I'm sorry, Your Honor. With respect to the newspaper article I was going to ask if you would individually question the jurors as to whether they read the article or whether they had exposure to any media with respect to this trial, whether they discussed it with someone and particularly if they discussed -- if the answer is in the affirmative with respect to exposure of some media coverage, whether they discussed it with other jurors.

THE COURT: Well, those are follow-up questions of course.

Look, I suppose I could ask them, as a group, if any juror failed to heed my instructions.

MR. FERRARA: My concern with that question, particularly posed that way is quite honestly is less

likely to elicit a truthful response because it elicits it as a failure to heed your instructions and I think there is -- there might be reluctance on the part of a juror to admit that, but perhaps the more simple question is, Did anyone see any newspaper article or was anyone exposed to the media without making a reference to the instruction, not to do so would be more likely.

You can ask the jurors whether anybody has seen the newspapers and anybody who answers in the affirmative we can bring up to side bar and explore it further.

MR. VOTTERO: That avoids telling them there was something there.

THE COURT: The easiest thing I will just run through each one.

Now, we got that lady. Should we talk to her about this issue?

MR. VOTTERO: Yeah. I'd like her to be questioned as to whether somebody was waiting for her when she got out of court and who it was and did they discuss the case or did her friend discuss with her the people he had met while waiting. I don't know if it is a husband or a son. And again, I am not a hundred percent certain that particular juror is the woman. I could

have Tom Kelly -- I don't know where you're planning to do this. If you're doing it here he could.

THE COURT: Well, I'm going to do it in the courtroom. If I can find there is another empty juror room I will do it in that one right next to the one -- we just don't have the people to move people around.

MR. VOTTERO: Perhaps if you can bring the jury in, give them a few questions, Tom can be in the courtroom and he can tell me at the break which seat.

We also have a voir dire coming up this morning fairly early.

THE COURT: I'm going to bring them all in. That will give him a chance to look at them. I will explain what we are going to do. I really don't know if it's such a good idea to have an individual voir dire until I have some indication that some of them read it in the face of the strongest instructions. I must have said it at least three times yesterday.

Let me talk to this group. We will see what happens.

(The discussion ended.)

(The defendant was present.)

(The Court entered at 9:43 a.m.)

THE COURT: What I propose to do is first of all we ought to mark this. What is that going to be?

THE CLERK: F, I believe. Your Honor, F. for ID.

(Defendant's Exhibit Let. F was marked for identification.)

THE COURT: Okay. I'm going to ask the jurors to come in. I will explain I am going to ask them as a group if they heeded my instructions and then preliminarily point out that I'm not looking for any right answer, so to speak as a truthful answer. It's all important as any question that's appropriate to bring it to our attention. We are not talking about punishment.

I think I can proceed on that level. If there is no need to voir dire, that we can deal with it, the other issue at another recess. We can go right ahead.

You have -- what do you have lined up for the next event?

MR. VOTTERO: I have Tom Kelly. He is still on the stand, a couple more questions for the foundation part of it, if there is any cross, then Tom Kennedy to testify that he saw George Perrot's blood being drawn and took it to Washington and then I have the FBI serologist waiting.

THE COURT: Are we going to voir dire him?

MR. VOTTERO: We'll need to voir dire him. And the hair and fiber expert I anticipate arriving sometime around noon, between noon and one.

THE COURT: All right. Depending on what response I get from the jurors we may have to voir dire them.

Okay. Can you bring them in, please.

(The jurors entered at 9:46 a.m.)

THE COURT: For the record the defendant is present of course and counsel is present.

Good morning, ladies and gentlemen. For the record the jury is present. Counsel and defendant is present.

Ladies and gentlemen, I would like to inquire

of you. Before I do I want to point out something that I think you already know. It's obvious I'm not insulting your intelligence. It is that important that I must stress it. I am going to inquire of you now whether any of you had failed either accidentally or for some other reason to follow the instructions I gave about maintaining your impartiality and we ask this for a lot of reasons. One of which it is not always easy to do, sometimes casually in looking at a newspaper you come across something and sometimes without intending to you overhear something. Any of these matters don't call for any kind of action on my part other than the deep need that we all have to see to it that there's a fair trial.

So I'm appealing for each of you to search your conscience because there is no right answer or wrong answer here. We're simply calling for a truthful answer. So I'm inquiring of you, as a group, whether any of you, for any reason, has been introduced to or somehow exposed to any information about the case from any source, whether it be newspaper, conversation or any other source. If so please raise your hands.

(Pause)

THE COURT: And for the record there is no response from any of the jurors. I think therefore, we are ready to proceed and Lieutenant Kelly was on the stand.

For the record you're the same Thomas Kelly who testified here yesterday?

THE WITNESS: Yes, sir.

* * * * *

THOMAS KELLY (prev. sworn)

REDIRECT EXAMINATION BY MR. VOTTERO (cont'd.)

* * * * *

Q. Sir, what's been marked Exhibit D for identification, this sheet, could you tell me again how you had it packaged before sending it to the FBI?

A. Into a plain brown paper, flat piece of paper that it was folded into and then placed into another box for traveling.

Q. And I'd like you to just to look at this and tell me if either you can recognize it as the same, please, or is it the same kind of sheet that you used?

A. Same kind of sheet.

Q. Thank you. Same kind of sheet.

MR. VOTTERO: Can this be marked, Your Honor, for identification, I believe G.

THE COURT: Yes.

(Commonwealth's Exhibit Let. G
was marked for identification.)

Q. (By Mr. Vottero) Now, at some point, sir, after George Perrot was arrested can you tell me whether or not samples of his hair were obtained and also sent to the FBI?

A. Yes, sir. They were.

MR. VOTTERO: That's all that I have on this matter, Your Honor. I would like to call this witness again at a later time.

THE COURT: All right. You have any questions on these issues?

MR. FERRARA: Yes, Your Honor.

THE COURT: All right.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. I'm sorry, is it Lieutenant Kelly?

A. It is.

Q. Lieutenant, with respect to 27 Malibu Drive were

any fingerprints found at that location to your knowledge?

A. No, sir.

Q. Was evidence of any footprints taken from 27 Malibu Drive?

A. Footprints were recovered, but they were not at 27 Malibu Drive.

Q. Okay. I'm going to ask you to just respond to my question and my question is were any footprints recovered from 27 Malibu Drive?

A. No.

Q. Thank you.

Now, you have testified about sheets and or a sheet and a pillow case being taken from 27 Malibu Drive; is that correct?

A. Yes, sir.

Q. And when that evidence was taken did you, yourself, remove the sheet?

A. Yes.

Q. And when you arrived at the scene. I mean 27 Malibu Drive, the first time Mary Prekop was not there; is that correct?

A. What day are we talking, sir?

Q. November 30, 1985.

A. I spoke with her very briefly at the house and then

she was removed from the house.

Q. And you then left and went to 33 Covel Street; isn't that correct?

A. I didn't say that.

Q. Is that correct?

A. No.

Q. You remained at 27 Malibu Drive?

A. Yes, sir.

Q. When you removed the sheet from the bed was the bed made up?

A. Made up as in ends tucked in and --

Q. (Interposing) Yes. With a sheet on it and a bedspread over it.

A. Yes.

Q. And you testified that you found the gloves on the bed; is that correct?

A. I testified I found one on the bed and one on the floor.

Q. Thank you. You found a glove on the bed that had been made up; is that correct?

A. I don't understand your term "made up." If you mean neatened and a pillow placed in the middle and tucked in and hospital corners, that's not made up.

Q. No, sir. What I mean by "made up" is a sheet on a bed and a bed spread over that sheet, correct?

A. No.

Q. Was the sheet spread over the bed when you removed it?

A. Yes.

Q. And in a manner which would indicate that it had been placed there; is that correct?

When I say placed there, let me be clearer, that it had been placed on the bed to cover the bed.

A. I don't understand that.

Q. Well, was the sheet in a ball or just thrown on the bed?

A. The entire area was in disarray.

Q. When you take a piece of evidence such as the sheet or the pillow case or these gloves is something attached to it to identify the date and place from which it was seized?

A. Property tag.

Q. And if somebody needs to use that property for some purpose, such as inspection of the property or testing of it do they sign some kind of a ledger document to indicate that they've taken custody of that property?

A. Yes, they would.

Q. And what is it that they sign?

A. I'm not sure what process was in place at that time, what procedure was in place. At one point evidence was logged out or in for a case, to be examined, to appear in court. And a separate sheet was kept at the property room. At some point the department changed the property form and officers signed the back of a hard copy. And I'm not sure what was in effect at that time.

Q. Have you had occasion to check the logs or document pertaining to this case before testifying?

A. I've looked in the document.

Q. Have you looked at what you determined were the evidence tags in this case?

A. No.

Q. And you haven't inspected any log book in respect to any particular piece of evidence?

We are talking about specifically the sheet, the pillow case, and the gloves.

A. No, sir.

Q. But you're certain that there was some method in effect to document who would have had access to any one of those three pieces of evidence at any time?

A. That would be standard to maintain the chain of

custody, sir.

Q. And once a piece of evidence is taken into custody it is kept at some location within the police department that is considered secure; is that correct?

A. Yes, sir.

Q. And what location would these pieces of evidence, specifically meaning the bedsheet, the pillow case, and the gloves, what location would they have been kept at in November of '85?

A. In the Crime Prevention Bureau.

Q. Is there a separate property room in the police department?

A. There are several.

Q. And is evidence kept in the property room?

A. Yes.

Q. And evidence for cases which are pending which have yet to come to trial?

A. Yes.

Q. With respect to the bedsheet that you have testified to in this case I believe you testified that when you took that sheet it was soiled and there were a lot of fibers on it; is that correct?

A. There appeared to be. Yes, sir. I don't believe I

used the term "a lot of fibers."

Q. Do you recall saying that there were a lot of fibers?

A. I don't believe I said that.

Q. Was there anyone else present or do you remember who was present when head hair was taken from George Perrot?

A. I wasn't present. I knew who did.

Q. You knew from conversations with individuals?

A. Yes.

Q. When you were at 27 Malibu Drive did you inspect the bedroom from which the sheets were taken?

A. Yes, sir.

Q. Did you notice blood anywhere else in that bedroom?

A. No.

Q. Did you observe a stick to be on the bed at the time that you arrived at that location?

A. Yes.

Q. Did you make observations of that stick?

A. Yes.

Q. Would it be fair to say that you didn't notice any blood on that stick either?

A. I don't recall whether I did or not, sir.

Q. Well, at any time did you observe there to be blood

on that stick, sir?

A. I don't know if I did.

Q. You don't know if you observed stick (sic) on the blood or not?

A. I don't recall.

Q. Well, let me ask you this, had you observed something which you believed to be blood on the stick would you have had that sent to the FBI laboratory for examination?

A. Yes.

Q. Did you do that?

A. No.

Q. You would agree that yesterday you testified when you took that sheet it was soiled, wouldn't you?

A. Yes.

MR. FERRARA: Just one moment, please. Your Honor.

THE COURT: Yes.

(Pause)

Q. (By Mr. Ferrara) Lieutenant, were you present during a line-up, so-called, when Mary Prekop viewed certain individuals with respect to this case?

CITY 002046


A. Yes, sir.

Q. And was Mr. Perrot one of the individuals that she viewed?

A. Yes.

Q. And who else was present when Mary Prekop viewed these individuals?

A. Myself, lieutenant -- then lieutenant now Captain Charles Arpin and Assistant District Attorney Francis Bloom, and Officer John Scanlon.

Q. And when Mary Prekop -- first of all how many individuals do you believe she saw?

A. I know she looked at seven people.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Lieutenant, I want to show you this photograph which has been marked D for identification and I ask you -- first of all do you recognize that? (Indicating)

A. Yes.

Q. And what do you recognize that to be?

A. It's a line-up consisting of seven people and it's the line up that I had several victims view on December 7, 1985.

Q. And does that photograph fairly and accurately depict these individuals as they appeared on that line-up on that day?

A. Yes, sir.

MR. FERRARA: And I would like to offer this into evidence.

MR. VOTTERO: There is no objection.

THE CLERK: Will be number 14, Your Honor.

THE COURT: Okay.

(Defendant's Exhibit B was now offered and marked 14.)

Q. (By Mr. Ferrara) Lieutenant, in Exhibit No. 14 is the individual on the far left George Perrot?

A. Yes, sir.

Q. And is that the way he appeared on December 7th, 1985?

A. Yes, sir.

THE CLERK: It was B for identification, Your Honor.

MR. FERRARA: May I have this published to the jury, Your Honor?

THE COURT: Yes. Ladies and gentlemen, you

should not be taking any notes. I will ask you not to do so.

Q. (By Mr. Ferrara) Now, Lieutenant Kelly, did you have conversation with Mary Prekop while she was viewing these individuals in the line-up?

A. Yes, sir.

Q. And is it true, sir, that at that time she stated that none of the individuals in the line-up were the person who had sexually assaulted her?

A. No.

Q. Did she state to you clearly and unequivocally that all of those people had long scraggly hair and a mustache and beard or excuse me and facial hair and that her assailant did not look like that?

A. No.

Q. Lieutenant, prior to -- you were around that line-up; is that correct?

A. Yes, sir.

Q. And prior to conducting that line-up is it fair to say that you had reviewed the statements taken from Mary Prekop by Marianne Popko?

A. Yes, sir.

Q. And you knew in that statement that Mary Prekop's

assailant was described as clean shaven; is that correct?

A. Yes.

Q. And is it also correct there is not one individual in that line-up who's clean shaven; is that correct?

A. That's correct.

Q. Six individuals in that line-up have a mustache and Mr. Perrot has a mustache and goatee; is that correct?

A. Correct.

Q. Who decided who was going to be in that line-up, sir?

A. I did.

Q. Did you have any discussions with respect to the make up of the line-up with the then Assistant District Attorney Francis Bloom?

MR. VOTTERO: Your Honor, may we approach?

THE COURT: Well, just yes or no.

Q. (By Mr. Ferrara) Yes or no.

A. Yes.

Q. On that date, on December 7, 1985, was Mary Prekop shown a photograph, if any, of other individuals other than George Perrot?

A. Not by me and I don't know if anybody else did.

Q. When this line-up was conducted was Ms. Prekop

behind a one-way mirror or some kind of a glass through which she could see, but the person in the line-up could not see?

A. Yes, sir.

Q. And as the line-up was conducted was it correct that each of the individuals would be asked to step forward; is that correct?

A. Yes, sir.

Q. And then you would be asked to turn to the left and turn to the right?

A. Yes, sir.

Q. And then to backup into the line?

A. Yes, sir.

Q. And did Mr. Perrot do that; did Mr. Perrot do that?

A. Yes, sir.

Q. Were you personally responsible for packaging the sheet and sending it to the FBI lab?

A. No.

Q. Do you know who did that?

A. Yes. Who did that, sir?

A. Sergeant David Louden.

Q. And did Sergeant Louden also package the pillow case and the hair from George Perrot?

A. Yes.

Q. And he packaged all of those items?
A. Yes, sir.
Q. And the gloves as well?
A. Yes, sir.
MR. FERRARA: No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. When you set up a line-up do you generally have one or more suspects in a line-up?
A. Yes, sir.
Q. And how do you go about determining what kinds of other people to put in the line-up with the suspects?
A. The line-up is made up -- when you make up a line-up you look for people who are similar in appearance. If your suspect is a white male with facial hair you attempt to find other white males with facial hair.
Q. And in this line-up most of the other people in this photograph are actually police officers; is that correct?
A. Yes, sir.
Q. Why do you make an effort to put people who look different in there -- I'm sorry, who look the same as the suspect?

A. To be fair to the suspects.

Q. And without getting into the details this was done at 4:30 in the afternoon on December 7?

A. Yes.

Q. And at that point did you have information given to you by George Perrot?

A. Yes.

Q. And you, on the basis of that information you caused this lineup to be assembled?

A. Yes.

Q. What did Mary Prekop say when she viewed the individuals?

A. I asked her to look at all of the individuals and to tell me if she recognized anybody in the group.

At the commission of all seven individuals coming to the window taking the turns as instructed and returning to the line then she told me she was unable to recognize anybody.

Q. Now, from that window how far away is the whole group standing?

A. Probably from here to the prisoner dock.

Q. Now, as each person comes up and you can still see the other six?

A. Yes, sir.

Q. And no doubt -- Mary Prekop no doubt looked at seven people?

A. Yes.

Q. And saw seven individuals come up and turn around?

A. Yes.

Q. Just in terms of the condition of the bed, what's been marked Exhibit 13, is that the way the bed at 27 Malibu Drive looked when you removed the sheet?

A. Yes, sir.

Q. Do you know how the room looked when you left?

A. I believe --

Q. (Interposing) Did you straighten anything up as part of your procedures there?

A. No.

Q. And the only thing you took with you from the room was the bedsheet, a pillow case, the stick, and the gloves?

A. Yes, sir.

MR. VOTTERO: That's all I have.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. So, lieutenant, as I understand it you explained to us that you arranged this line-up with Mr. Perrot and the six

other mustached individuals and no one who was clean shaven because you felt that would be fair to Mr. Perrot?

A. Right.

Q. But you had knowledge of the description of the individual having short dark hair and being clean shaven; is that correct?

A. Yes.

Q. And would it be fair to say within the police department there are individuals of medium build with short dark hair who are clean shaven who you could have placed in the line-up; is that correct?

A. Yes.

Q. And you contemplated who you were going to put up in the line-up and you discussed it with the Assistant District Attorney Francis Bloom; is that correct?

A. Yes.

Q. And did it occur to either of you or did it come up in the course of the conversation because you wanted to be fair to Mr. Perrot that perhaps if you put an individual in the line-up who matched that description Miss Prekop might identify him as most closely resembling her assailant?

MR. VOTTERO: I object, Your Honor.

THE COURT: Do you have that question?

THE WITNESS: I have it.

THE COURT: He might have it.

THE WITNESS: We did not have that conversation as described by you.

Q. (By Mr. Ferrara) Did it occur to you where the victim described her assailant as having short dark hair and being clean shaven that perhaps if you put an individual who matched that description into the line-up given the appearance of Mr. Perrot that she might have identified that individual as most clearly resembling her assailant?

A. No. That never occurred to me.

MR. FERRARA: I have no questions, Your Honor.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Was this line-up just for Mary Prekop?

A. No, sir. Was also for some individuals who had also been victimized on December 7.

Q. And was Mary Prekop asked to look at it because of what George Perrot had told the police earlier on the seventh?

A. Yes.

Q. In fact, hadn't Mary Prekop told you she did not believe she could identify anybody?

A. Yes.

MR. FERRARA: Objection, Your Honor.

THE COURT: Well, he may have it.

Q. (By Mr. Vottero) She told you that?

A. Yes, sir.

Q. And the reason that George Perrot -- the reason that Mary Prekop was asked to look at it was because George Perrot had acknowledged breaking into 27 Malibu Drive on November 30?

MR. FERRARA: Objection, Your Honor. May we approach the bench?

THE COURT: Yes.

(The following discussion
was held at the side bar.)

MR. FERRARA: First of all I think that it's clear that that's probably not the reason. In fact, the evidence is that the line-up probably was arranged prior to the statement having been taken and been contemplated prior to that.

Secondly, it's an issue in this case as to whether that statement was knowingly and willingly given and voluntarily made. And I think that the prejudicial value

of the prejudicial effect of this question is going to outweigh the probative value and I think before the jury hears evidence that they should be instructed with respect to the humane practice ruling in Massachusetts.

THE COURT: Well, that is putting the cart before the horse. I certainly will instruct them on it at an appropriate time. It doesn't make any sense to do it now.

MR. VOTTERO: Your Honor, it's not a case where I need to be concerned about voluntariness. I have the SJC ruling on it. I just believe the door is opened up although I thought he was on here just for chain of custody at this point. I can't let it go without responding to it.

THE COURT: I am going to permit it. I think that is opened up to that extent at least. I like to confine it to the bare minimum, however, if you want to keep some coherence to the issues.

(End of the side bar conference.)

MR. VOTTERO: That's all that I have at this time.

THE COURT: Yes.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Other individuals who viewed Mr. Perrot in the line-up on December 7, included a Mr. McNabb; is that correct?

A. Yes, sir.

Q. And a Shileen Sapelli?

A. Yes, sir.

Q. And they both identified Mr. Perrot as an individual who had committed some acts against them; is that correct?

A. Yes.

(The witness steps down.)

* * * * *

THOMAS KENNEDY (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Thank you, sir. Could you tell the jury your name, please, and how you're employed?

A. My name is Thomas P. Kennedy. I am a sergeant in

the Springfield Police Department.

Q. How long have you worked as a police officer?

A. For about 11 and a half years.

Q. Were you working as a police officer in November of 1985?

A. Yes, I was.

Q. And what were you doing during that time period?

A. At that time I was assigned to the four p.m. to 12 a.m. shift in the detective bureau.

Q. Now, did you have occasion to become involved with the case of George Perrot, just yes or no at this point.

A. Yes.

Q. And I would like to address you to a procedure, a medical procedure that you observed; do you recall that?

A. Yes, I do.

Q. Where did that take place?

A. On the third floor of this building.

Q. And could you tell us roughly when that was?

A. That was on March 31, of 1987.

Q. And can you tell us what you observed?

A. I observed a medical technician withdraw two vials of blood from the arm of George Perrot.

Q. And what was done with those two vials of blood?

A. After the blood was withdrawn in the vials I took custody of the vials. I brought them to the crime prevention bureau, the Springfield Police Department, where I tagged them as evidence.

Q. And at some point in time did you have occasion to take those vials of blood to a different location?

A. Yes, I did.

Q. When and where was that done?

A. On April 1, of 1987, I went to the crime prevention bureau, signed the blood out and then I transported it to the FBI laboratory in Washington DC.

Q. Did you go with anybody when you went to Washington?

A. Yes, I did.

Q. Who was that?

A. Former Assistant District Attorney Francis Bloom.

Q. Did he have any role of possessing that evidence at anytime?

A. No. I was in possession of the evidence.

Q. What did you do with it when you got to Washington?

A. I went to the FBI laboratory where I turned it in as evidence.

Q. Do you know whether you signed anything or whether

Mr. Bloom signed anything in your presence when you arrived there?

A. I don't recall.

Q. Did you take anything else with you other than the blood?

A. Yes.

Q. And what was that?

A. That was hair samples.

Q. Identified as belonging to whom?

A. Mary Prekop.

MR. VOTTERO: Thank you. That's all that I have.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. With respect to these vials of blood, after you took those vials of blood you had taken them to the Springfield Police Department?

A. That's correct.

Q. And where in the Springfield Police Department did you take them?

A. To the crime prevention bureau.

Q. And were they kept there, to your knowledge?

A. Yes, they were.

Q. And did you have to sign some document indicating you were submitting them to someone in the crime prevention bureau?

A. That's correct.

Q. And who was responsible for custody of that particular piece of evidence in the crime prevention bureau?

A. Don't recall who signed it, which officer on that particular date.

Q. You have to sign some document indicating you were submitting it though?

A. Yes. I had to fill out what I called a property tag.

Q. Was there any other log or book which you had to sign?

A. Yes. I believe there was.

Q. So it was both a property tag and another log?

A. The officer that was receiving it would enter it into a log on the date. The next day, the following day, I took the blood to the FBI. I had to sign a log at that time for taking the evidence back out.

Q. And the purpose for doing that to evidence is to record everyone who handled that particular item?

A. Chain of custody, correct.

Q. And when you took this blood to the FBI laboratory in Washington did they have the same requirement that you sign a document to evidence that you were submitting that piece of evidence?

A. I don't recall if I signed a document in Washington or not.

Q. Do you remember who you gave the blood to in Washington?

A. No. I don't recall the name of the technician at the time.

MR. FERRARA: No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. The drawing of the blood and taking it to Washington that all took place over a one to three day period?

A. Yes, it did. The blood was drawn on March 31, 1987, and it was transferred to Washington on April 1, 1987.

MR. VOTTERO: Thank you.

(The witness steps down.)

THE COURT: Ladies and gentlemen, there is going to be a matter that's going to require my attention and that of counsel and will not require yours so I ask for your understanding and I want you to understand that we don't keep jurors waiting unnecessarily. There are matters that do concern the Court that don't concern the jury and we try to schedule that in a way that makes the best use of your time. So we are going to excuse you for what we expect will not be an over long period of time and we ask for your understanding and indulgence.

If you kindly follow the court officer, please.

(The jury exits at 10:26 a.m.)

* * * * *

VOIR DIRE OF

WILLIAM G. EUBANKS (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell Judge Simons your name, please?
A. William G. Eubanks.
Q. And what is your occupation, sir?
A. I'm a supervisory special agent with the Federal

Bureau of Investigation in Dallas, TX.

Q. How long have you been with the FBI?

A. Since August of 1973.

Q. Now, prior to joining the FBI could you give the Judge an idea of your education?

A. Yes. I hold a Bachelor of Science degree in biology from Southern Methodist University in Dallas, Texas, graduating in May of 1973. I also hold a Master of Science in forensic science from George Washington University in Washington, DC, graduating in 1976.

Q. And when you joined the FBI could you tell us how long their training program was for you?

A. Yes. After being assigned to the laboratory division in Washington in August of 1981 at that time I underwent a period of training lasting approximately one year. That training is under the direct supervision for forensic serologists assigned to that unit who have a great deal of experience and who are qualified in the field of forensic serology. In addition, to that one year period of time I also -- you're also required to attend and successfully complete two formal courses at the FBI academy at Quantico, Virginia.

Both courses are accredited courses from the University of Virginia and one deals in basic forensic serology and one

deals with more advance techniques in serology. During the end of that one year of training I underwent several oral examinations as well as oral board and moot courts. And in July of 1982 was qualified to examine and begin testifying in the field of forensic serology.

THE COURT: What year was that, please?

THE WITNESS: July, 1982.

THE COURT: Thank you.

Q. (By Mr. Vottero) And for the record -- could you briefly describe for the record what forensic serology is?

A. It is the examination of body fluid or body fluid stains and the analysis of those stains and body fluid stains on evidence submitted in a case.

Q. During that one year training period could you describe what the nature of the laboratory training was that you did during that year.

A. Well, the laboratory training actually consists of conducting examinations under the direct supervision of qualified examiners in the field of forensic serology, actually examining the evidence, isolating the stains and conducting all of the tests that are routinely conducted on dried stains as well as liquid blood samples.

Q. And who were you ultimately certified by?

A. Ultimately, technically, you're certified by the director of the FBI, but under -- upon the recommendation of people, of course, under him.

Q. And following that certification what were you assigned to do?

A. Beginning in about late July of 1982 I began examining cases submitted from federal, state, and local law enforcement agencies from across the country for the examination and analysis of body fluid stains.

Q. How long did you work in the field of forensic serology actually conducting laboratory examinations?

A. From roughly August 1982 until March 1986.

Q. And during that time period did you teach or attend any additional training courses of any kind?

A. Yeah, a number of several, I should say symposiums and in-services that are given as new technology and new techniques come along primarily at the FBI Academy in forensic science and research center at Quantico, Virginia.

Q. From the time of your certification can you described the various titles and positions you held from then to today?

A. On March of 1986 I was assigned or made the Unit Chief of the Serology Unit at the FBI laboratory and served in

that capacity until roughly November 1988 when I was made the Unit Chief of the DNA Analysis Unit in the FBI laboratory.

Q. And how long did you hold that position in terms of the DNA?

A. From about November of 1988 until mid June of 1989.

Q. And what did you do in June of 1989?

A. At that point I was transferred to the office of inspections in the inspection division and I served in that capacity for approximately one year.

Q. And what are you doing today?

A. I'm assigned to the Dallas field office of the FBI in Dallas, Texas. I am a supervisory special agent. I supervise a squad of roughly 18 agents investigating savings and loan fraud.

Q. Is that recent change one that you desired?

A. Yes, sir.

Q. Now, can you tell me, as Chief of Serology, in the serology unit, how many may people did you supervise?

A. It varied depending on the time during that four year period. I believe we had as many as 14 special agent examiners under my supervision and somewhere from 17 to about 22 or so technicians that I supervised.

Q. Did you then play the roll of trainer for the --

during the one year program?

A. I was ultimately responsible for the training of new examiners and technicians as they came into the unit.

Q. Now, at some point, sir, did you become involved with the Springfield Police Department in an examination of some materials that had been sent to you?

A. Yes.

Q. You recall roughly when that was?

A. That would have been in early 1986.

Q. Now, to jump ahead just a little bit, you conducted an examination on a sheet; is that correct?

A. Yes, sir.

Q. And while -- I realize we are moving quickly, did you isolate some blood group substances on the sheet?

A. Yes, sir.

Q. Now, can you tell us on that particular item what the blood group substances or blood stains were that you identified?

A. May I refer to some notes?

Q. Yes.

A. The sheet that I believe you're talking about was labeled Q3 in our laboratory. That is a number system we give to items in evidence. And the results that I obtained in

examining the blood stains on that sheet and these are what we call genetic marker results. Should I just list them?

Q. If you could, yes.

A. You want me to list them or just tell you or list them.

Q. How many did you find?

A. Identified four different markers on that sheet.

Q. What was the first marker that you identified?

A. An enzyme called PGM and the type was PGM 1+.

Q. Now, just for the record, you had previously ascertained that the stain in question was blood and it was human blood?

A. Yes, sir.

Q. The first marker you instituted is PGM 1+?

A. That's correct.

Q. Can you tell me, sir, based on your experience and training what percentage of the Caucasian population has that particular enzyme?

A. From the population data that's available to us at that time roughly 41 percent of the population would be expected to be PGM 1+.

Q. Did you obtain a second blood group?

A. Yes, sir.

Q. What was that?

A. Another enzyme called EAP and the type was BA.

Q. And again what percentage of the population do you estimate have the enzyme, EAP type BA?

A. Approximately 41 percent.

Q. And, again, is this the Caucasian population, is that you how you expressed it?

A. Yes. The population studies that we're looking at that time and still today are broken down, Caucasian and black.

Q. And for the record are these population studies that you use generally accepted within your scientific community?

A. Yes, sir.

Q. Are you aware of any other population studies that are used by the FBI?

A. At this time this is what we are using. Right now I am not sure what they are using. There are many population studies available.

Q. Did you find a third group, blood group?

A. Yes.

Q. What was that?

A. The serum protein called HP, examined for

haptoglobin. And the type that I identified was a two dash one or two hyphen one.

Q. And what percentage of the population has the haptoglobin two dash one?

A. Approximately 48 percent.

Q. Was a fourth marker found on Exhibit 3, the sheet?

A. Yes.

Q. What was that?

A. Another serum property called transferrin.

Q. What percentage of the population -- was it a particular type of transferrin?

A. Yes. Transferrin TfC was the type I identified.

Q. What percentage of the population has TfC?

A. About 99 percent.

Q. Now, where were all of these particular blood groups located on the questioned item?

A. They were identified on a stain on a sheet. I don't recall exactly where, without looking at the sheet.

Q. Were you able to locate any other stains on the sheet?

A. There was one other stain on the sheet that I located.

Q. And were you able to obtain any blood grouping from

that stain?

A. No, I was not.

Q. Were you able to determine whether or not it was human blood?

A. It was human blood.

Q. Did you also examine a pair of gloves?

A. Yes, sir.

Q. All right. And what were the results of that examination?

A. On one of the gloves which was labeled, again, by us, by the FBI as Q5 I identified human blood on the glove and also identified the enzyme PGM and the type was one plus.

Q. Were you able to obtain any other blood grouping from that blood?

A. No, sir.

Q. What about the second glove?

A. The other glove is Q6. Again, I also identified human blood present on the glove and the enzyme type PGM 1+.

Q. Now, could you tell the Court whether or not you're able to combine these percentages in anyway so you can, for instance, tell us how many people would have all four of these particular blood group substances?

A. Well, based on the frequencies that I mentioned

earlier, from each of the individual enzyme types it's possible to determine or estimate, I should say, a percentage of the population that would be expected to have that particular combination of genetic type or genetic marker types.

Q. And what is the process that you go through to obtain that percentage?

A. It's fairly simple. You simply take the percentages that I mentioned for each of those types and multiply them together and come up with a total percentage.

Q. Point 41 times point 41 times point 48 times point 99?

A. Yes, sir.

Q. And what is the result of that particular process?

A. The result of that is point 08 which is the same as eight percent.

Q. Now, does that process have a term process of multiplying?

A. It's based on the genetic theory; the law of independent events, goes back quite a ways in genetics.

Q. Could you briefly describe what that principle states?

A. Very simply each of these factors are inherited

independent of one another. The fact that you're a PGM say type one plus, and there are actually 10 types within the enzyme, PGM does not necessarily mean that you would be an EAP type BA at which there are about five types. Each of them is independent of the other and there is no connection between any of these.

Q. Is the process also known as the product rule?

A. Yes.

Q. Or the multi-testing system?

A. When you talk about the multi-system you are talking about different systems, what we call electrophoretic system. What we do to identify different types is we are talking about a technique as opposed to a theory.

Q. A multi-testing system is a method you use to extract the blood grouping?

A. Yes. Not extract, but to actually type these enzyme markers.

Q. And the product rule or the law of independent events is what you used to obtain the ultimate percentage of population that would share all of these various blood groups?

A. Yes. It's an approximation.

Q. How many times have you been called to testify in courts of the United States with regards to serology?

A. Probably somewhere in the neighborhood of 100 and 120 times.

Q. Do you have any idea, sir, whether any of those times included the Commonwealth of Massachusetts?

A. Yes, they have.

Q. You have a rough number?

A. Twice I believe.

Q. Can you tell me, sir, how many times you have been called upon to give testimony as to the product rule when you have had a case that involved more than one blood group?

A. I don't recall the number of times, but most times when that is in the results that is an issue in the result or a result. It usually comes up during testimony.

Q. Now, did you conduct an examination of blood identified to you as belonging to George Perrot?

A. Yes, sir.

Q. And what was the result of that examination?

A. The blood sample from George Perrot I examined and obtained five different genetic marker types.

Q. And what were those five genetic marker types?

A. The first type was PGM 1+. The second enzyme type was EAP BA. The third one was HP meaning haptoglobin two hyphen one. The fourth one was another protein or serum

property called Gc type one and the last one was Tf standing for transferrin type C.

Q. Was the blood of George Perrot consistent with the blood that you examined on Q3, the sheet?

A. Yes, sir.

Q. Did you examine blood identified to you as belonging to Mary Prekop?

A. Yes, sir.

Q. And what was the result of that examination?

A. The blood sample reportedly copy being from Mary Prekop I examined and identified her as being type O blood. And the enzyme types were PGM 1+, EAP BA, Hp2, Tf which is transferrin CB, and another factor called the Luis Factor which determines that she was a secretor.

Q. Was George Perrot a secretor by the way?

A. No. He was a non-secretor.

Q. Now, can you tell me, based on your examination of Mary Prekop's blood, whether or not she could have left the blood that you found on Q3, the sheet?

A. The result on the sheet compared to her blood sample are inconsistent and she could not have been the donor of the blood on the sheet.

MR. VOTTERO: Thank you. That's all that I

have for the voir dire at this time.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Mr. Eubanks, when you talk about PGM 1+ you're talking about a factor, a blood factor known as phosphoglucomutase; is that correct?

A. Yes, sir.

Q. When you talk about one plus is that to be distinguished from PGM 1?

A. It is the same as PGM 1 except that PGM 1 refers to a more general typing mechanism that was used or procedure that was used prior to about 1985, early '86. The one plus which is consistent with a one refers to a more advanced technique known as isoelectric focusing which breaks down PGM into 10 types rather than the traditional three.

Q. Would PGM 1 occur less frequently in a given population than PGM 1+?

A. One plus is the most common in the isoelectric focusing type and probably -- I don't know what the percentage for one -- yes, I do.

If I may refer to some notes?

Q. Yeah.

A. For PGM 1 in the Caucasian population, according to the statistics we were using at that time, it would have been roughly 59 percent of the population.

Q. And when you were trying to distinguish between, let's say two factors such as PGM or PGM 1+, is it correct that experts in serology might differ with respect to which of those two factors exist in any given case?

A. Do you mean that they would type one person by type at another way?

Q. That's correct.

A. That's possible. It can occur. It is interpretive results.

Q. In other words there is some subjective determination particularly within typing a particular factor; is that correct?

A. Yes.

Q. So that in this instance when you talk about these percentages they are approximations subjectively arrived at?

A. Yes, sir.

Q. And then when you utilize this product rule that particular percentage is multiplied, really, in number of times; isn't that correct?

A. The percentages for the results that you have for

each frequency would be multiplied several times depending on how many types you have.

Q. So that if there were an error in percentage it might. If that percentage was used under the product rule in this formula it would really become pointed; isn't that correct?

A. That's correct.

Q. So if you took the factor of say PGM 1+ and arrived at a figure of point 41 or 41 percent and you multiplied that out four times, each time you multiplied it that margin of error would be further, it would be multiplied; is that correct?

A. That's correct.

Q. And you are aware of studies which would indicate that, for instance, with PGM 1+ the incident in the Caucasian population is higher than 41 percent, aren't you?

A. There are, I'm sure, instances in which the PGM 1+ have reflected in some population studies as being higher depending on what technique or racial group you're looking at.

Q. Well, within the Caucasian population there are studies that would indicate the incident is perhaps several percentages higher, aren't there?

A. Could be.

Q. And whether you're talking about -- well, would it be fair to say that it would be true for each of the four factors that you described?

A. Yes, sir.

Q. I would say that would be true. There are studies which indicated that their occurrence within the Caucasian population is higher than the figure you have given us?

A. Yes. There are also some that are lower. I might mention, if I may, that the percentages that were used at this time, not in the PGM result, but in the other enzyme or serum protein types are based on averages taken from 65 studies, population studies done on these various markers around 1982 in which we compiled all of those results to come up with averages. And those 65 studies basically were taken from cities and downs across the country.

Q. But you were aware there have been studies done since then, aren't you, sir?

A. Oh, yes.

Q. And you're aware that other forensic laboratories use other figures; is that correct?

A. Yes.

Q. Are you familiar with an individual named Henry Lee?

A. Yes.

Q. And how do you know Mr. Lee?

A. I know Mr. Lee or Dr. Lee who is connected with the Connecticut State Police Crime Laboratory from various meetings and conferences and symposiums in forensic serology I've attended, primarily through that means.

Q. Mr. Eubanks, have you worked any place or worked for any employ other than the Federal Bureau of Investigations?

A. No, I have not.

Q. And when you received your training it's largely been through the Federal Bureau of Investigation?

A. That's correct.

Q. When you're looking at these various factors you have indicated that there were -- that the percentages you used were based on 64, 65 studies; is that correct?

A. Yes, sir.

Q. And are those studies based on geographical area?

A. No. They're actually published studies that may have been for Miami, Florida or Detroit, Michigan or county's from where there's 65 of those various areas of the country. I don't know how many states were included, which were compiled and simulated and grouped, if you will, back in 1982

and were used for the basis of generating our population data that we use.

Q. So they were essentially studies from different geographical areas, correct?

A. Yes, sir.

Q. And based on your knowledge might the different geographical areas have different ethnic makeups?

A. Correct.

Q. And would the percentages even within the Caucasian population vary according to the ethnic makeup of the population?

A. To some extent, yes.

Q. And were there any studies that were from the Massachusetts area that existed at the time you ran these tests on the blood which is the subject of this case?

A. There may have been. I would have to look back at those studies, the 65 studies.

Q. Do you remember if, at the time, you referred to specific studies from this geographical area when you were doing your calculations?

A. No, I did not.

Q. Is that ever done?

A. Generally it's not done and there are special

reasons why that can be done and if you have specific information from a specific area you can use that, but because we examine cases from all over the country and testify all over the country to those results we have compiled results and data from all over the country and the combining of population data from various studies from all over the country, different geographical areas is supported in the literature, that method of combining that information and averaging.

Q. Would you agree though, that scientifically you would be more likely to achieve an accurate result with respect to the occurrence of any one of these blood factors in a population by referring to the studies closest to that population?

A. I would not disagree with that.

Q. And since 1988 are you aware of any studies which would indicate that?

First of all, are you aware of any further studies with respect to the occurrence of these various -- how is it best to describe these, genetic markers?

A. Yes, sir.

Q. The frequency of these various genetic markers within the population nationally?

A. Of any additional studies since 1988? I'm sure

there have been a number of studies.

Q. But you don't know how they would effect percentages that you have testified to?

A. I would expect, and I'm basing this on my opinion, that those percentages would not be that much different than the percentages that we were using at this time, the percentages I have testified to today.

Q. When you say that, not that much difference, do you mean a matter of a few percentage points?

A. Yes.

Q. For any given factor?

A. Probably for any of these factors. You know, I would expect that there are going to be population studies that are going to show numbers higher and numbers lower, upwards of, you know, four or five percentage points. That would not surprise me at all.

Q. Upward of four or five percentage points higher or lower?

A. Yes, sir.

Q. Would you agree that every single one of these factors which you found on that bedsheet are the most common factors -- let me strike that.

Within each of the genetic markers you testified for the

PGM, EAP, haptoglobin, transferrin would you agree that the particular marker found was the most common marker for each of those factors?

A. Yes, I would.

Q. For all four?

A. Yes, sir.

MR. FERRARA: No further questions, Your Honor.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, I take it the best possible population study would be where everyone living in the world was tested?

A. Yes, that would be.

Q. And the FBI, instead, collected 65 different population studies throughout the United States?

A. Yes, sir.

Q. And combined them?

A. That's correct.

Q. Is there any way you can say that the study, if it was done for say Boston in 1980 would have the same results as a study done for Boston in 1990?

A. Not without looking at actual published results for those two studies.

Q. And the actual number of people in Boston and their identities would change in what, some 10 years?

A. That's correct.

Q. Would you, in fact, think that would change the blood results?

A. Yes, it would.

Q. Are you aware of any controlled nationwide scale efforts in the nature of 65 studies that has been generated since the time you have been using these figures?

A. I'm not aware, but it's possible major crime laboratories are using studies of this sort, although they typically -- state crime laboratories I would expect would focus on population studies conducted in their states.

Q. But for the time this 65 study pool is what is used by the FBI to give their estimate of population frequency?

A. That's correct.

MR. FERRARA: A few more questions.

THE COURT: Sure.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. But the percentages of frequency of occurrence of any of these genetic markers in a population might be effected

by the size of the study; is that correct?

A. That's correct.

Q. This particular -- in any particular study, the larger the population you take the greater likelihood you have of accuracy; is that correct?

A. That is correct.

MR. FERRARA: Thank you.

MR. VOTTERO: That's all I have for the voir dire.

THE COURT: All right. We are we going to act now on the issue of qualifying this witness.

Do you want to be heard on that?

MR. FERRARA: No.

MR. VOTTERO: You can do this outside the presence of the jury.

MR. FERRARA: No.

THE COURT: All right. I find this witness to be qualified to testify in the area of forensic serology and specifically those matters covered in the course of the voir dire.

Anything else we need to do out of the presence of the jury?

MR. FERRARA: May we take up the issue whether

he can testify as to the final end result utilizing the product rule.

THE COURT: Is the issue the product rule?

MR. FERRARA: Yes, Your Honor.

THE COURT: Has that been laid to rest in Commonwealth versus Gomes?

MR. FERRARA: I don't believe so, Your Honor.

THE COURT: You want to second guess the Supreme Judicial Court?

MR. FERRARA: I'd like to do it. I understand they only had before them, what they had before them -- the testimony you have before you is different. It's a rule of review that they're not going to --

THE COURT: (Interposing) Well, let's break it down. The method of extracting the markers; is there an issue about that?

MR. FERRARA: No, Your Honor.

THE COURT: All right. The population standard used, is that an issue?

MR. FERRARA: I believe it is.

THE COURT: Okay. You want to go to weight? There is a foundation in fact for the study.

MR. FERRARA: That's correct.

THE COURT: And for the result the foundation of fact is, what was it, 65 I believe it was?

THE WITNESS: Yes, sir.

THE COURT: Sixty-five separate population studies averaged from different parts of the nation.

MR. FERRARA: Yes, sir.

THE COURT: That was as of 1982 and these tests were done in 1985.

MR. FERRARA: Correct.

THE COURT: Or early '86

MR. FERRARA: Within that time range.

THE COURT: Yeah. So I mean whether there were tests available in '88 -- I'm not sure it's really probative, but that I'm not foreclosing you from going in on that. So the population study based on what I've heard I think is sufficient to establish. If you have counter availing evidence I'll hear it.

MR. FERRARA: What I would like to address with respect to the product rule you have.

THE COURT: Now, let's move onto product rule. Okay. The product rule is simple statistical nature that operates on the theory that if there's one marker in the population that has a certain value, but the existence of

more than one marker allows the expert to type it to an even finer percentage the likelihood of a person having more than one marker has diminished. And there were four markers he found, as I understand it. And the product rule is a simple statistical exercise and that's found favor, I believe, in almost all the courts. I think there is an exception Michigan, one of those states. And the Commonwealth has, at least, the Supreme Judicial Court at least as far as I know, the Commonwealth versus Gomes looked with favor upon it. So why should I reinvent the wheel?

MR. FERRARA: Your Honor, what you have before you now is a little bit different case. The Commonwealth versus Gomes, the percentage of population which could have had all of those factors was one point two percent.

THE COURT: Right.

MR. FERRARA: I believe that the scientific community, and if you wish, and that this is established in Commonwealth versus Bozilay (phonetic), a cite which I will give you if you wish, but it is a fairly well known case, states that statistical significance in the scientific community is about 90 percent below nine

percent. There is really not necessarily any acceptance of the statistical significance of any probability. I believe from 90 to 59 percent is characterized as likely, from 95 to 99 percent very likely.

And, of course, in paternity cases evidence of blood factors can be offered, I believe, unless it's at least 90 percent. Here, unlike Gomes where you have a very high likelihood of statistical significance you have a marginal one and it is very important because the Commonwealth's witness, Mr. Eubanks, has testified that there is variance in the percentages of the occurrence of these various genetic markers. Each of these genetic markers are the most common found for these particular blood factors.

When you do the extrapolation that Mr. Eubanks does you come out with a point eight percent, but as he testified, if there is an error in either any one marker that is combined it is extrapolated through the product rule so that while you have, might have eight percent based on that particular study utilized it could just as well come out to 11 or 12 percent which wouldn't be statistically significant.

THE COURT: Five or six percent. This is true.

MR. FERRARA: And, Your Honor, I'm not asking you to keep out all of this evidence. I would not object to his testifying as to the occurrence of these particular percentages and let the jury draw whatever inferences that it wishes to, but I think it is objectionable in this instance and should be kept out to use the product rule.

You have more testimony before you now, I believe, than at least indicated in the case of Gomes with respect to that and it is a much more specific case than Gomes. I think the prejudice in this case does outweigh the probative value of just that final product by the product rule. In other words, I think the product can only be good as its factors are.

We have some problems with the figures, Your Honor. I ask that you rule that he be permitted to testify as to the percentages of given factors, but not to utilize the product rule. And this was, I believe, the ruling of Judge Murphy in the original trial. I recognize Gomes was decided after that.

THE COURT: Well, I will permit the product rule testimony and your rights are saved.

MR. VOTTERO: I do need to have another

blackboard available.

THE COURT: I think we have one.

All right. We will take a recess.

(The Court recessed at 11:26 a.m.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 11:33 a.m.)

* * * * *

WILLIAM C. EUBANKS(sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name please and who's your employer?

A. William G. Eubanks, supervisory special agent, Federal Bureau of Investigation.

Q. How long have you worked for the Federal Bureau of Investigation?

A. Approximately 18 years.

Q. What positions have you held with the FBI?

A. I was initially a laboratory technician in the FBI

laboratory going back to the Fall of 1973 and then was appointed a special agent of the FBI after going through training in March of 1978.

Q. What kind of work did you do at the FBI initially?

A. Initially?

Q. Yeah.

A. As a special agent I was assigned to Kansas City field office for about three and a half years as an investigator investigating federal violations within the jurisdiction of the FBI.

Q. And at that time did you have a change in your duties?

A. Yes, sir.

Q. What did you do?

A. Approximately late August, 1981, I was transferred to the FBI laboratory in Washington DC.

Q. What position did you undertake at that time?

A. At that time I was in training to become an examiner in the field of forensic serology.

Q. What is forensic serology, sir?

A. Serology is the study of body fluids such as blood, semen and other body fluids. Forensic serology is the application of examination techniques for the identification

and analysis of body fluid stains on evidentiary items.

Q. What was your formal education prior to joining the FBI?

A. I graduated with a Bachelor of Science degree of biology of Southern Methodist University of Dallas, Texas. In May 1973 I also held a Master of Science in forensic science degree in George Washington University in Washington DC graduating in 1976.

Q. What is generally covered in the area of forensic science?

A. Forensic science encompasses a broad range of disciplines such as serology, microscopic analysis, firearms and ballistic analysis, mineralogy, document analysis, fingerprints and so forth.

Q. Now, when you were assigned to the serology unit of the FBI did you have to undergo any kind of special training in that area?

A. Yes, sir.

Q. Could you describe that, please?

A. Upon being assigned there in August of 1981 I began a period of training which ran approximately one year and that training consisted of more or less on-the-job training under the direct supervision of experienced and qualified special

agents which were qualified in the field of forensic serology in the FBI laboratory.

Q. Were there any formal courses or classes involved in this one year training program?

A. Yes, sir.

Q. What were those?

A. There were two normal courses. Both courses are graduate level courses with the University of Virginia. The first course dealt primarily with basic forensic serology techniques. The second course, which is more complex, dealt with the more advance techniques developed in the last 15 years or so in forensic serology.

Q. As part of this one year training were you required to pass any kind of examinations?

A. Yes. During those formal courses as well as during the actual training on the job in the laboratory.

Q. Incidentally, what kind of laboratory training was that, how did that work; what did you do in the lab?

A. Well, the laboratory training consisted of a very thorough required review and a lengthy list of reading materials in the literature in the field of forensic serology and related fields such as genetics, such as biochemistry and other fields. It also consisted of the actual examination of

evidentiary items for the identification analysis of body fluid stains of evidentiary items as well as test items that are used in the training and testing of an agent in training in that field.

Q. Did you receive, ultimately, some kind of certification in the field of forensic serology?

A. Yes, sir.

Q. What was that?

A. July of 1982 I was certified by the Director of the FBI as qualified in the field of forensic serology.

Q. And was that certification -- what was your assignment then?

A. At that point I began having assigned to me actual cases submitted from local and state and federal law enforcement agencies across the country and the actual examination and analysis and reporting of results, that of my results in these cases.

Q. And how much of your work during that time was devoted to forensic serology in laboratory examinations?

A. One hundred percent.

Q. During this time how many examinations would you conduct in any given year?

A. Several thousand. I don't know the exact number,

but the average case was anywhere from eight to 12 items of evidence and depending on the number of stains and so forth on any given case that would effect the number of examinations. Individual examinations it would be in the thousands though.

Q. How long did you work in the laboratory as an examiner?

A. Approximately four years.

Q. Did you receive any promotions during this time?

A. Yes.

Q. And what was that?

A. In March, 1986, I was promoted to the Unit Chief or Chief of the Serology Unit in the FBI laboratory.

Q. How did your responsibilities differ as Chief of the Serology Unit?

A. They differed in as much as I have the direct supervision and responsibility for the unit's policies, management of the unit which included at one point about 14 agent examiners and roughly 18 to 22 technicians.

Q. During this time did you then play a role in the training of individuals undergoing that one year certification?

A. Yes. I was ultimately responsible for recommending whether or not a person was qualified or not.

Q. At some point did you leave from the serology unit as chief of that and move onto another area?
A. Yes, sir.
Q. What was that?
A. In 1988, roughly November 1988, I was assigned as the Chief of the DNA Analysis Unit in the FBI laboratory.
Q. Now, as a member of the FBI laboratory were you ever called upon to testify in court about your findings?
A. Yes, sir.
Q. Have you ever been qualified as an expert in the field of forensic serology?
A. Yes, sir.
Q. Could you give us an idea about a number of times?
A. Roughly a number of times, roughly 120 to -- 110 to 120 times.
Q. Courts located where?
A. Throughout the country.
Q. Can you describe for us the process in the FBI for examining items believed to contain body fluid?
A. The process varies depending on what stains you're looking for. For a blood stain the first examination would be simply a visual examination of the piece of evidence. Typically a blood stain will appear as reddish brown or dark

brown dried stain on a piece of clothing.

Once that stain is located visually then a preliminary test, a chemical test is conducted, takes about 15 seconds to do that test. And it's a positive reaction telling that the stain may be blood. The next step could be another chemical test which confirms the presence of blood. And then the later steps would be determining whether or not it was human blood as opposed coming from an animal such as deer or a dog. And then finally, if there is enough stain left after those tests you would attempt to type the stain in various steps such as the ABO blood group. All of us are one of four major blood types which are ABO. Beyond that would be determining of various enzymes and other proteins which are in blood.

Q. Those enzymes or blood groups are -- would it be fair to those, are blood grouping tests?

A. Yes.

Q. Would you describe, roughly, how many different proteins and enzymes you look for when you're examining blood?

A. There's a possibility of attempting about 12 to 13 or 14 in addition to the ABO or including the ABO system, enzymes and proteins.

Q. And are each of those 12 or so identified by the name of the enzyme or protein that you're looking for?

A. Yes, sir.

Q. Can you give us an example of some of the enzymes or proteins you are looking for when you do these tests?

A. Examples would be the enzyme PGM which stands for an enzyme called phosphoglucomutase. By the way, an enzyme is a protein which causes a specific reaction in the body, a chemical reaction.

Another type of enzyme would be EAP which stands for erythrocyte acid phospatase. And, in addition to enzymes there also what we call serum proteins. They are called interserum fraction of the blood such as haptoglobin or Hp as it's abbreviated, transferrin and others.

Q. Now, what is the actual process that you use once you've identified something as human blood.

Could we take first the ABO system? What do you do to the stain to determine whether what its blood group is?

A. You have to remove a portion of the stain and in the ABO system we conduct in the FBI laboratory two tests. Both tests must be conclusive and must confirm each other.

One test tests for the presence of a specific characteristic that is found on the red blood cell. Another one tests for a characteristic found in the serum portion of the blood. If those two tests match then we can conclusively

CITY 002103


say it's type O or type AB.

Q. And without getting into too much detail, additionally, what do you do with the little part of the stain?

A. It's actually cut up into several pieces placed into test tubes and the one test and the other test in the ABO system placed on microscope slides and to the test tubes and the microscope slides are added various chemicals.

Q. Now that you have described the ABO process, if we take, for example, the PGM that you mentioned, that particular enzyme, what process do you use to determine whether PGM is present in the stain?

A. It's a technique known as electropheresis. Electropheresis is a method of separating protein in a gel medium.

Q. Do you have to run a separate test for each of these 12 or so blood group substances?

A. Yes, sir.

Q. You can't take the same piece of clothing and do all the tests on it?

A. Actually, you take four, three of the enzyme tests. One cutting or one portion of the stain is placed in a bluish substance and the blood and body fluid in that stain are

extracted and then you can use that extract on three of the tests. There's another set of three tests in which you can use an additional portion of that extracted blood stain and depending on how much you have you can take it out as far as 12, 13, 14 enzymes, enzymes and proteins.

Q. Do you run different tests on an unknown test based on its size and condition?

A. Yes.

Q. Could you describe how you go through that process of determining which tests you'll run on a particular stain?

A. It all depends on the amount of stain and the concentration of the stain, how dark it is, how readily, how easy it is to remove the stain. If it's on a piece of clothing, for example, you just cut it out. If it's on, say on a hard surface, you would scrape the stain off or perhaps absorb the stain onto a piece of cotton sheeting. It primarily depends on the amount of the stain that's present.

Q. Now, within these proteins and enzymes you indicated there were 12 or 13. How do you identify or how close can you break down these enzymes?

Let's just take PGM. Are there different kinds of PGM or is it whether it's there or not?

A. Well, PGM is there in everybody's body fluid and

blood, but there are different types within the PGM system.

Q. How many types are there within the PGM system?

A. In the system -- there's actually two systems, but in the more discriminatory system known as PGM subtyping there are actually 10 types.

Q. And so the purpose of your exam is to determine which type of PGM subgroup is in the stain?

A. Yes, sir.

Q. Now, what value does that information have to the FBI?

A. The value of the information, not just to FBI, but to anyone who is looking at the results would be to discriminate that stain from one person to another. In other words to compare that particular result with that enzyme result, whether it be ABO or enzyme results with a sample for a known blood sample from some case.

Q. Could you give us an example of what, in the subgroups are what they are called?

A. The PGM subtypes -- there are 10 of them. One plus is one type; another one is one minus; one plus one minus, two minus, a two plus, a two minus two plus, and they have a combination of two one two plus one and three plus and so forth.

Q. Now, is there anyway that the FBI has been able to determine what percentage of the population has a particular kind of subgroup?

A. Yes.

Q. Can you describe that method?

A. They conducted a study back in the early 1980's based on population studies published in the field of serology and in blood banking studies, so forth, in which they took 65 different published studies for these various genetic markers or enzyme types, if you will, and complied those and averaged them, if you will, to come up with percentages of the population that would be expected or estimated to have each of these particular types.

Q. Taking the PGM subgroups, for example, could you give us an idea of how those various subgroups are distributed?

PGM sub one plus, what percentage of the population shares that?

A. According to the American Association of Blood Banks published in 1982 approximately 41 percent in Caucasians and the other remaining subgroups are divided among the other 59 percent.

Q. Now, is that same process and percentages known for

these other 12 and so blood groups?

A. Yes, sir.

Q. And turning to the groupings as a whole, when you go through this process with an unknown stain of finding out if it's blood and if so what its various groups are, when you get results in these different groups can you combine them to determine the percentage of population who have these, all of those groups?

A. Yes, you can.

Q. Can you describe how that is done?

A. Well, as I previously testified to, each particular type within each enzyme has a frequency within the population based on studies that have been conducted. For example, as I said the PGM 1+ type is estimated at around 41 percent of the Caucasian population. If you had say three or four other enzyme types and let's say that their percentages were 50 percent and 30 percent and say 90 percent then you could, through a mathematical calculation, determine the percentage, the percentage of the population who would be expected to have all five of those types simply by multiplying the 41 percent times the 50 percent times the 35 percent times the 90 percent and you would arrive at a percentage of the population to be expected. And you understand, underline expected of that

particular combination of types and genetic markers.

Q. We can go to that a little bit. If we take, for example, four blood groups and all of them are shared by 50 percent of the population would it be simple as saying if you had four, let's say four people, one, two, three, and four, all with these blood group substances. I take it then, of those four people, you're saying, for instance, 50 percent would have PGM 1+. So you would take away two of the four. And ask the next one how many have the next blood group substance, BA for example. And that's the mathematical process?

A. Yes, basically.

Q. Does that have a name, this mathematical process?

A. It's based on the genetic theory of law of independent events.

Q. Is that generally accepted in the scientific community where you work?

A. It dates back to 1865 and the founder of genetics, Mendel.

Q. Now, did you have occasion in this case, in Commonwealth versus George Perrot, to exam any evidence submitted by the Springfield Police Department?

A. Yes, I did.

Q. Can you tell us, roughly, when you received some of the items in that case?

A. I first received items from the Springfield Police Department in January, 1986.

Q. Do you recall what the items were?

A. Yes, I do.

Q. And what were they?

A. A pillow case, a piece of paper, a sheet, another piece of paper and a pair of gloves.

Q. Now, we could begin with what's been marked Exhibit A for identification; do you recognize these objects, sir? (Indicating)

A. Yes, I do.

Q. What are they?

A. It's a pair of gloves.

Q. And how are you able to recognize them?

A. I recognize it from my initial on the item on the evidence tag and other markings on the item which were mine.

Q. Now, what did you do with those gloves.

A. I examined the gloves for the presence of blood.

Q. Could you describe the results of your examination? First you indicated you always begin a visual examination?

A. Yes.

Q. What's the result of your visual examination on these gloves?

A. I found a stain on the gloves, one stain on the, I guess it would be the left glove and another stain on the right glove.

Q. Did you assign these gloves particular numbers?

A. Yes, I did.

Q. What kinds of numbers did you assign these things?

A. Typically when we cut out a stain we will mark it with some indelible ink.

The second stain a Q2B.

Q. And do you use the letter Q in reference to those particular stains?

A. Yes. The system we use to identify and label items is a Q meaning questioned item, question, Q1, Q2 and so forth.

Q. And you also use the letter QX in these examinations at some point?

A. Yes. That stands for a known item such as a known hair or blood sample.

Q. Now, your visual examination of the gloves was that there was a stain on both gloves?

A. Yes, sir.

Q. And what did you do after having observed the stain on the glove?

A. I then conduct what is known as a preliminary chemical test for the presence of blood which was a positive and then removed a portion of the stain of the gloves. Actually these were fairly small stains so I removed almost all of the stain and determined the stain or stains were human blood.

Q. Now, once you determined that they were human blood I take it then you -- the question was whether you could achieve any further testing in the blood grouping systems or the ABO system you testified to.

A. That's correct.

Q. Did you conduct any of those tests?

A. Not in the ABO system.

Q. Now, why not?

A. The material that the blood was on, the amount of stain that was present, in my experience it was unlikely we were going to be able to get the conclusive results in the two prong test that we utilize in the ABO system.

Q. And would that process consume some of the stain?

A. Probably all of the stain.

Q. So what test did you do with what was on the glove?

A. On Q5, which is the left glove, I went directly to -- I bypassed the ABO system. I went directly to two of the genetic markers systems. In the case of Q5, the left glove, I utilized the PGM system and on Q6 the PGM system and another system called haptoglobin.

Q. What were the results of your examination on that glove?

A. On both gloves or one glove?

Q. Take them each separately, if you would.

A. Okay. Actually they are the same, identified human blood on both gloves and I was able to type the human blood. The enzyme type was PGM 1+ on both gloves.

Q. And what is the percentage of the population that would have PGM sub 1+?

A. Approximately 41 percent in the Caucasians.

Q. Now, were you able to obtain any other blood grouping test on the stains from the gloves?

A. No, I was not.

Q. Incidentally what effect does the age of the blood stain and the way it's stored have on your ability to do exams?

A. Generally speaking the older the stain the less likely in obtaining conclusive results in these systems.

Q. Now, these were the gloves that you examined?
A. Yes.
MR. VOTTERO: May these be offered as an exhibit at this time?
MR. FERRARA: No objection, Your Honor.
THE COURT: Fifteen.
THE CLERK: Number 15.

(Commonwealth's Exhibit No. 15 was offered and marked.)

Q. (By Mr. Vottero) Now, I'm going to show you what has been marked Exhibit E for identification.
Could you examine that and tell me if you recognize, identify that? (Indicating)
A. Yes, I do.
Q. And, again, how do you recognize that?
A. From the markings on the item including my initial on the inside.
Q. Now, this pink pillow case which I believe is marked as Exhibit E for identification that's what you received from the Springfield Police Department?
A. Yes, sir.
Q. What examinations did you do of that item?

A. I examined this item for the presence of blood and also the presence of semen.

Q. Were you able to identify either blood or semen on that pillow case?

A. No, I was not.

MR. VOTTERO: May this be entered as an exhibit at this time?

THE COURT: Yes.

MR. FERRARA: No objection, Your Honor.

(Commonwealth's Exhibit No. 16 was offered and marked.)

Q. (By Mr. Vottero) I noticed there is a number of small holes in the pillow case. Did you put those holes there?

A. Yes, sir.

Q. Is that part of your testing procedure?

A. (Witness indicating)

Q. Did you also examine a sheet?

A. Yes, sir.

Q. I would like to hand you Exhibit D for identification, sir, and ask you to take a look at it and see if you can identify this object as well. (Indicating)

A. Yes, I can.
Q. And what is it?
A. It's a bedsheet.
Q. Is this the bedsheet you received from the Springfield Police Department in connection with this case?
A. Yes.
Q. Did you conduct some examination on the bedsheet?
A. Yes, I did.
MR. VOTTERO: May this be marked as an exhibit at this time, Your Honor?
THE COURT: Yes.
MR. FERRARA: No objection.
THE CLERK: Number 17, Your Honor.

(Commonwealth's Exhibit No. 17 was offered and marked.)

Q. (By Mr. Vottero) Now, -- can I have a hand? Now, there's a number of holes in this item as well, sir. How did those holes get on this item? (Indicating)
A. Those were cuts I took from the item.
Q. And let me turn it around, if I can. What are the markings on the hole?
A. The markings, two of them are marked 1B and the

other one is marked 2B and then there are some other holes that are marked 1S, 2S and so forth.

Q. Now, -- thank you very much.

What did you do with the things that you clipped out of this bedsheet?

A. I subjected them to the various analyses, chemical analysis, that I previously testified to for the presence of body fluid stains.

Q. Were you able to detect, first of all, by quick visual examination whether there were any stains on that sheet?

A. Yes, I was.

Q. What was the result of that, how many stains did you recall seeing?

A. There were two stains that were of a brownish color which appeared to be blood. There were some other lighter stains that were either by touch and feel or by sight yellowish or slightly off color stains.

Q. Now, did you examine the stains on this sheet for the presence of semen?

A. Yes, I did.

Q. What was the results of that examination?

A. It was negative. I did not find any semen.

Q. Now, with respect to the two stains -- how had you identified them 1B and two?

A. One B and 2B.

Q. One B and 2B.

Those reddish stains did you test them to determine whether or not they were blood?

A. Yes, I did.

Q. And the result was?

A. I identified both stains as human blood stains.

Q. Now, at that point you then moved onto the grouping test?

A. Yes, sir.

Q. What did you do?

A. As far as 1B goes I tested it for the ABO system first as well as a number of other enzymes and proteins.

Q. What were the results of that exam?

A. On 1B the ABO results was inconclusive. I could not determine the ABO type, but I was able to identify four enzymes, actually two enzymes and two serum protein types.

Q. Let's take the enzymes first from this particular stain. What was the first enzyme that you identified?

A. It was PGM.

Q. And what was its subgrouping?

A. One plus.

Q. Again, what percent of the population has PGM sub 1+?

A. Forty-one percent, approximately.

Q. What was the next enzyme that you obtained?

A. Another enzyme called EAP and the type was BA.

Q. Now, are you able to tell us what percentage of the population has the enzyme EAP BA?

A. Approximately 41 percent.

Q. The third test that you ran found the presence of a protein?

A. That's correct.

Q. What was that?

A. Hp which stands for haptoglobin.

Q. And are you able to tell us what percentage of the population has the protein haptoglobin in their blood?

A. The haptoglobin type that I identified was two one, or two hyphen one and approximately 48 percent are expected to have this type.

Q. Now, what was the fourth protein?

A. The fourth protein or the second protein, fourth marker, if you will, was Tf which stands for transferrin.

Q. And did it have a particular subgroup or type?

A. Yes. The type I identified was C.

Q. And what percentage of the population has transferrin type C?

A. Approximately 99 percent.

Q. Now, if I can go back just a little bit, PGM -- this particular stain had PGM sub 1+, how many other subgroups are there?

A. PGM there are nine others.

Q. EAP -- you indicated this was BA, type BA?

A. Yes.

Q. How many other types of EAP are there?

A. There are four others.

Q. Haptoglobin, this was type two dash one?

A. Yes.

Q. How many other types of haptoglobin are there?

A. Three others.

Q. And with transferrin type C how many other items are there?

A. At least two others.

Q. Were you able to do any additional blood grouping tests on that stain?

A. There was not on that stain. No, that was it.

Q. That was the furthest you were able to go, if you

will?

A. Yes.

Q. What other examinations did you conduct?

A. There was a second stain which I previously testified was labeled 2B and I conducted tests on that stain and identified it as a human blood stain also, but my various tests to determine either an enzyme type or protein type were inconclusive.

Q. Now, you indicated that age would affect your ability to obtain results. Can you give me an idea of what the effect of repeated washing of a sheet would do to your ability to do these grouping tests?

A. My opinion that would be totally impossible to obtain any results on any of those enzymes or proteins.

Q. I would like you to assume that the blood that you found on that sheet was deposited in 1981, 1982 and this sheet was then washed 20 or more times using detergent; would you be able to obtain the results you obtained?

A. No, I would not.

Q. Now, at some point, sir, did you conduct an examination of some known blood samples that were submitted to you?

A. Yes, sir.

Q. And those were known blood samples of whom?

A. One known blood sample was received reportedly coming from George Perrot and another blood sample was received reportedly coming from Mary Prekop.

Q. What did you do with these blood samples?

A. The known liquid blood samples are examined somewhat differently than the dried blood stains. Known blood samples, first step is to separate out what we call the red blood cell fraction from the plasma or serum protein fraction and then we run what we call a forward and reverse grouping. Again, both must confirm each other to determine the ABO type.

Q. And did you do these with these two known blood samples?

A. Yes, I did.

Q. I wonder, sir, with the Court's permission could you diagram on the chalkboard or indicate the results on those two known blood samples in these various group tests.

THE COURT: Yes.

MR. VOTTERO: Thank you.

THE WITNESS: The first known blood sample which I will label K11 and was reportedly taken from George Perrot, I will put his name in the parenthesis. On this particular known blood sample from George Perrot

I did not run the ABO system. Instead I took a portion of the whole blood from the vile of blood and deposited on what we call a piece of cotton sheeting. Allowed it to completely air dry and then used that blood deposited on the cotton sheeting to run the various genetic marker tests which I previously testified to.

I did that and obtained the following results and this is K11 for George Perrot. The results are and I will just put it underneath, PGM 1+, the enzyme EAP BA, the serum protein Hp or haptoglobin, the result is two hyphen one, also another protein called Gc, and the type is one and finally the final protein Tf or transferrin and the type is C.

Q. (By Mr. Vottero) And could you also put the known sample of Mary Prekop up there as well?

A. Prekop was listed as K12 and I will draw a line to separate this. I ran the ABO system on Mary Prekop and she was identified as type O blood PGM 1+, EAP, Hp or haptoglobin type two, and Tf standing for transferrin CB.

Q. Now, if you would, sir, wherever it is convenient on either side of that board could you place the three questioned items that you obtained blood grouping results, the gloves and the sheet and indicate the results you have from

those.

A. You want me to list below?

Q. Whatever is convenient for those.

A. Right. The results for those?

Q. Yes. Indicate what the item was and the blood grouping you obtained.

A. First item was Q3, the sheet. And the results which I've previously testified to were PGM 1+, EAP, BA, Hp 2-1, and Tf, for transferrin, C.

Q. And for the gloves?

A. For the gloves. The gloves were labeled Q5 and Q6. And the only result I got was the PGM enzyme system on both of these was a 1+.

Q. Thank you very much. You can have a seat.

Now, I can ask you a couple of questions about this. This EAP BA is that different than this over here where it says EAP B? Is it the same, however, as what is on the sheet?

A. Yes, it is.

Q. How about the Hp2 that you find on Mary Prekop's; is that different than from the Hp 2-1?

A. Yes, it is.

Q. So it's also different from the one found on the sheet down here? (Indicating)

A. That's correct.

Q. Based on those examinations can you tell me whether or not the blood of Mary Prekop left the stain you identified on Q3, the sheet?

A. No, it did not. The stain, the human blood stain that I typed on the sheet its results are inconsistent with the known blood sample of Prekop.

Q. Because Mary Prekop is an EAP B and Hp2 she didn't leave a stain of EAP BA; is that how it works?

A. That's correct.

Q. Now, I take it because both Mary Prekop and the gloves have PGM 1+ you can't say that that's not her blood?

A. That's correct.

Q. You can't exclude her from leaving the blood on those gloves?

A. That's correct.

Q. Now, could you tell us how Mr. Perrot's known sample compared against the sheet?

A. Well, in the systems that are -- if you compare those systems in which I obtained results on the sheet that is in the PGM system, the EAP system, the Hp and the Tf, transferrin, and compare the sheet results with the known blood sample with Perrot you will see that those results are

the same. That is the PGM 1+, the EAP BA, the Hp 2-1, and the TfC.

Q. Does that mean it's George Perrot's blood on the sheet?

A. No, it does not. It means I cannot eliminate George Perrot as the donor of the blood stain. It's consistent with them. I cannot exclude him from being the depositor of that stain.

Q. Does those blood grouping sets work like fingerprints; can you identify positively a person as leaving blood?

A. No, you cannot.

Q. You can exclude them or include them?

A. That's correct.

Q. Now, in this case on the four blood groupings that you did can we review the percentages?

What is the percentage of the population that would have PGM 1+?

A. Forty-one percent approximately.

Q. EAP BA?

A. Forty-one percent approximately.

Q. Hp 2-1?

A. Forty-eight percent.

Q. TfC?

A. About 99 percent.

Q. You explained earlier the product rule. Did you make an effort in this case to determine what percentage of the population would have all four of those markers in their blood?

A. Yes, I did.

Q. And what percentage is that, sir?

A. Approximately eight percent.

Q. Now, can you tell me, for the record, sir, what was the -- roughly when did you conduct the examination on the sheet and the gloves?

A. That would have been between early January and approximately mid-February 1986.

Q. And when did you receive the sample of George Perrot's blood?

A. That was received on April 1, of April 1987.

Q. Is it a correct statement that the combination that's found on the sheet then of PGM 1+, EAP BA, Hp 2-1 and Gc1, TfC you would expect to find in eight percent of the population?

A. Approiximately.

Q. Is George Perrot included in that percent?

A. Yes.

MR. VOTTERO: That's all I have of this witness.

MR. FERRARA: May I proceed, Your Honor?

THE COURT: Yes.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Mr. Eubanks, I'm not clear on one thing with respect to your duties at the FBI. In August of 1987, were you still running tests yourself or did you have supervisory functions?

A. I had supervisory functions. I was also running tests on those cases I had run previous examinations prior to becoming the Chief of the Serology Unit.

Q. So in this particular case you, yourself, ran these tests?

A. Yes, sir.

Q. And you know that because of your initial on particular items of evidence; is that correct?

A. Yes.

Q. And you did submit a report in August of 1987, to the office of the district attorney; is that correct?

A. If I may refer to some notes?

(Pause)

Q. (By Mr. Ferrara) The report I am referring to is dated August 4, 1987.

A. Yes, that's correct.

Q. And it's in that report that you advised the district attorney's office of the results on the blood that you had and that slide purportedly from both George Perrot and Mary Prekop; is that correct?

A. Yes, sir.

Q. You're signature is on that report, is it, sir?

A. No, sir.

Q. And is there a -- do you have a -- strike that.

Does the FBI have a policy or is there a reason for you not signing the report?

A. That's their policy. I'm not sure why.

Q. In fact, no reports are ever signed; is that correct?

A. That's correct.

Q. And are you, your initials somewhere on that report?

A. Not on the copy that you received. That's actually sent by mail to, in this case, the district attorney's office, but on the yellow copy which goes to the FBI files my initials are on that.

Q. And you have that copy of that?

A. I have a facsimile of it.

Q. And are your initials on there?

A. Yes, sir.

Q. Now, sir, when the FBI receives samples of evidence from the police department you receive them both in person and through the mail?

A. That's correct.

Q. If you receive them through the mail do you require that a cover letter accompany them to identify the sender?

A. Yes. That's highly recommended.

Q. Okay. I don't know if that's -- I understand you're saying it's highly recommended, but my question is that is this, when you receive a piece of evidence through the mail do you require, for purposes of identifying that piece of evidence that the sender accompany a memorandum or letter identifying that sender?

A. That is a general requirement, yes.

Q. And do you usually receive evidence through the

mail?

A. Typically, yes.

Q. But there are some instances where it's hand-delivered; is that correct?

A. Excuse me?

Q. There are instances where it is hand-delivered?

A. Yes.

Q. And when a piece of evidence is hand-delivered do you -- do you require the person who is delivering it to sign a document or a log book or some document to show who it is who submitted it?

A. Yes, I do.

Q. And do you know if that was done in this case?

A. It is the general procedure always to have that done. I don't have any document with me which to show that at this time.

Q. Okay. Would you tell the jury what the reason for that is, if you know?

A. For what?

Q. For the reason for having someone who delivers evidence sign a document to establish who it was that delivered it?

A. That's for chain of custody purposes.

Q. When you say "chain of custody" could you just explain that a little bit further -- by the way what do you mean by "chain of custody"?

A. In any type of evidence you want to establish a chain which those individuals who handle or who let's say submitted, delivered, picked up a piece of evidence at a crime scene you establish what's known as a chain of custody, showing the normal procedure of who handled that evidence.

Q. And is that to show every possible person who might have had access to that evidence?

A. I wouldn't say every possible person, but those that had certainly the primary responsibility for handling or picking up that evidence or submitting the evidence or examining the evidence, yes.

Q. And on this report that you prepared would you look at the first paragraph under which would be on the first page?

A. Okay.

Q. And, sir, who does it indicate delivered that particular specimen to the FBI laboratory?

MR. VOTTERO: I object, Your Honor.

THE WITNESS: Francis --

THE COURT: (Interposing) You want to be heard on this?

MR. VOTTERO: Yeah, please.

(The following discussion was held at the side bar.)

MR. VOTTERO: I've asked him about it, he doesn't know who delivered it. He knows whoever signed for it there and his name appears. What he knows is hearsay.

MR. FERRARA: It may be hearsay, but here is a document that he already stated he prepared. His initial is on it. It indicates who delivered the item. I think I am entitled to have him put who he put in his report.

MR. VOTTERO: He doesn't know he delivered it. You can ask him that if you wish to.

THE COURT: What's the answer going to be?

MR. FERRARA: The answer is going to be personally delivered by Mr. Francis W. Bloom. April 1, 1987, under a letter dated April 1, 1987.

THE COURT: And then where are you going to go from there?

MR. FERRARA: At this junction I am not going to go any further than that.

THE COURT: All right. You can have it.

(End of the side bar discussion.)

Q. (By Mr. Ferrara) Mr. Eubanks, what does your report say to who delivered those blood samples?

A. The report says the blood samples were personally delivered by Mr. Francis Bloom on April 1, 1987.

Q. Generally speaking, if you had a stain, say approximately the size of a half dollar that was relatively a fresh stain would you agree you could run those genetic marker tests for all 13 of the genetic markers that you usually run?

A. Probably so, yes.

Q. But if you don't have a sufficiently large stain or if the stain is too old those are factors that affect how many of the markers you can test for; is that correct?

A. That is correct.

Q. And the age of the stain would be a factor?

A. Yes, sir.

Q. But you can run tests for older stains; is that correct?

When I say "older" I mean stains four, five, 10 years old.

A. It is possible. We would typically attempt. If we had a stain the size, for example, a silver dollar even though perhaps it would be reported to us being four, five years old we would attempt to run the test.

Q. And you have done that and gotten results, correct?

A. In four to five year old stains it's extremely rare to get any results at all. It depends on, of course, on the concentration of the stain, what item it's on, clothing item versus hard surface, the age of the stain, and very important is how the actual item of evidence was stored during that period of time say four, five, years.

Q. My question though, is on a stain four to five years old you have run tests on those types of stains?

A. Yes.

Q. And you have gotten results, haven't you, sir?

A. I have on stains, sir, as identifying stains as blood and as human blood. Perhaps, I don't recall specifically the age, but certainly stains that were about two years old I have obtained a couple of markers, primarily in the serum protein markers.

Q. Now, Mr. Vottero held up this sheet and showed you all the holes in the sheet and you cut those holes out?

A. Yes, sir.

Q. And ran tests on each of those pieces of material that were removed from the holes?

A. That's correct.

Q. And you were able to identify two as human blood; is that correct?

A. Excuse me?

Q. You were able to identify two of the stains as human blood; is that correct?

A. On the sheet?

Q. Yes, sir.

A. Yes.

Q. I'd like to talk to you a little bit.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) About these various genetic markers and help me so that I have, I am phrasing this correctly.

First of all when you talk about PGM, EAP, Hp which is haptoglobin, Tf which is transferrin, you refer to those as blood groups or --

A. (Interposing) Well, you could refer to them as blood, I guess, groups. Really when you refer to blood groups

you are talking about the ABO system. The ABO system is a genetic system in the field of forensic serology. We typically refer to each of these as genetic markers. Technically they are enzymes or proteins which there are various types within each enzyme or protein. And technically it's referred to as a phenotype, the one plus as opposed to one minus.

Q. So to multiply this you would call this a genetic marker and the further refinement a phenotype?

A. Yes.

Q. Can we just refer to that just as a type?

A. Yes.

Q. Would you agree with me, would you agree with me that for PGM 1+ is the most common phenotype found?

A. That's correct.

Q. I believe your testimony it is found in 41 percent of the Caucasian population; EAP BA also is the most common type found; is that correct?

A. That's correct.

Q. Same with the haptoglobin two one?

A. Yes.

Q. Same with transferrin C, they are all the most common type?

A. That is correct.

Q. And when you were testifying about how frequently they occur in the population you indicated each time that you gave a number, approximately; isn't that correct?

And that is because the figures that you have are based on a collection of studies of frequency of occurrence of these blood types that the FBI compiled and then averaged out; is that correct?

A. Yes sir.

Q. And there were how many studies, 65?

A. Yes, 65.

Q. And they were from different associations, American Red Cross or different state laboratories; is that correct?

A. That's is correct.

Q. It came from all different locations of the country?

A. Yes.

Q. And the incident of occurring, having any one of these genetic markers and their subtypes might vary depending on the ethnic makeup of the particular population?

A. That is correct.

Q. When I say that I mean within the Caucasian population, a various of the ethnic makeup, the Caucasian

population?

A. Yes.

Q. So that you would not expect the percentages in say one area of the country, the mid-west to be the same as they would in the northeast; is that correct?

A. I would not expect them to be exactly the same.

Q. Well, understood. In fact, the studies indicated that there was standard various, didn't they?

A. I don't know that I would use the word standard. From the studies I've looked at and, you know, you could go plus or minus four or five percent on any of these.

Q. Plus or minus five percent?

A. Yes.

Q. And of those 65 studies did you have some studies that were from Massachusetts?

A. I don't specifically recall if there were Massachusetts' studies included in this particular compilation of 65. There may have been. I would have to consult some records.

Q. But in this case you didn't do your calculations based on a more localized study of frequency of particular blood types. You used the 1982 study which was an average of the 65 studies?

A. Yes.
Q. When you have a factor such as PGM 1+ you said there were 10 other potential phenotypes?
A. Nine other.
Q. This is the most common?
A. Yes.
Q. When you run this test it's -- this was the test where you extracted the blood from a sample, in this case the sheet, in a test tube; is that correct?
A. Correct.
Q. You add certain ingredients, did you use a electrolysis in this?
A. Yes, I did.
Q. And at some point in this, the extraction it's placed on a gel plate; is that correct?
A. That's correct.
Q. An electrical current is run through?
A. Correct.
Q. And the examiner, the person who is going to make a determination they look at the finished product after this process is completed and they reach a conclusion as to what they have there; is that correct?
A. Yes, based on known controls of known types that

are run on the plates with the questioned items.

Q. And when you looked at this and make this determination was it a color match? You know, was it red or yellow; what was it that indicates to you that you have this particular PGM 1+ as opposed to is there a PGM 1-?

A. Yes, there was.

Q. Okay. As opposed to PGM 1-?

A. It's done -- it actually bands that, separates out the proteins and the 1+ band is located, will migrate or the 1+ protein type, isoenzyme as it's known, will migrate in that gel to a specific point in that gel. And using the technology known as isoelectric focusing and that results -- appears sort of as a band alone, if you will, and that result is compared to a known control or known controls that are run on that plate.

I don't mean known, like for example from Perrot or Prekop, to a plate have been run also. I mean known controls that we designed which are conclusively one plus, one minus with one plus, two plus. So it's a visual comparison.

Q. Is that the same type of test that was run to make a determination, in Mr. Perrot's case, EAP BA, HB 2-1, TfC?

A. Yes. With the exception the other systems are run on conventional electropheresis as opposed to isoelectric

focusing.

Q. And would it be fair to say that making that determination requires some experience and some specialties and training in examining these types of plates?

A. Very definitely.

Q. And to the extent that you're making measurements and visualizing this it's all subjective; is that correct?

A. There's some subjectivity, yes.

Q. When I say that what I mean is if you have a number of experts examining a particular result you know that there can be variance, in the opinion of the experts, as to what they have; isn't that true?

A. There can be some variance, but the results in our laboratory are continually read by an examiner doing the test and also read a second time by another examiner.

Q. And in this case who was the second examiner?

A. I don't have that document in my notes here.

Q. Do you have it in the August 4, 1987, report?

A. No, I don't.

Q. There are various numbers there with initials WK, WM. Would that indicate who the second examiner was in this case?

A. Well, there was another examiner, but he was not

doing any of the serology work. He was doing other forensic examinations. He would not have looked at this.

Q. Okay. I guess my question to you is, was there a second examiner who looked at the blood results?

A. At the time of these tests which were conducted, in the case of the gloves and the sheet which were conducted in 1986, if my memory serves me correct we did not have a second examiner at that time then. The later tests which were run on the, I think, the known blood sample, they're more than likely, I can't say for sure, was a second examiner that looked at those results.

Q. When you say that, in various studies, you might have a range of variance for any one of these particular blood groups of four or five percent you mean that it could be four or five percent higher or four or five percent lower?

A. It could be either way, plus or minus.

Q. So in the case of PGM 1+ this might, in another study be 46 percent occurrence within that population or it may be 36 percent; isn't that correct?

A. That's correct.

Q. I'm no mathematician, but when you enter -- when you use, let's say you had a variance of several percent. You then use it in your calculation. When you reached the end

result was your end result eight percent or something?

And when you use it in that calculation, if there's a discrepancy, if it's not accurate, I understand it's just an approximation, let's say for a given population it was 43 percent instead of 41 percent, that error is magnified by the multiplication, isn't it?

A. To some degree, yes.

Q. And when the multiplication is carried out repeatedly it's further combined, isn't that true?

A. Not exactly. If we were to do the mathematical computation by coming up with some fictitious numbers here it would change, definitely change the end result, but the change -- well, I don't know how, any other way to say it, but other than to demonstrate it or something, it doesn't change the end result. If you up each individual frequency by two or three percent it will up the final frequency, the product of those frequencies by one or two percent or three percent.

Q. Or more?

A. I'm not sure if it would more.

Q. Well, sir, if you have potential variance of five percent and you multiply something by that it could create, say a variance of at least five percent, couldn't it?

A. I think when you multiply those out together the

result is not as significant as you would think.

Q. I'm not sure what I think. My question is you could have a beginning variance of five percent at least -- would you agree with that?

A. Yes.

Q. If you multiply something you have a beginning discrepancy of five percent -- you're starting with five percent?

A. That's correct.

Q. And different police laboratories use different population studies in testing for these genetic markers, don't they, Mr. Eubanks?

A. That's correct.

Q. Massachusetts has a State Police laboratory, don't they?

A. Yes, they do.

Q. And you know from your experience that different police departments, different law enforcement agencies use different private labs; is that correct?

A. Yes.

Q. In Massachusetts?

A. In Massachusetts.

Q. Do they use a private lab?

A. Yes. I don't know.
Q. But you would agree with me that other labs use other populations, excuse me, other studies from more localized populations in making these determinations of the percentage of frequency of occurrence of these particular blood types?
A. I don't have any direct knowledge of that. I would assume that a local laboratory, for example, the state of Texas would more than likely focus in on studies that were conducted on Texas. That would make sense.
Q. So taking your figures, for a moment, the figures that you have, what you're suggesting they mean then is that out of every hundred people nationwide in 1965, excuse me -- well, we don't know the year, but out of every hundred people nationwide you would expect eight of them on an average to exhibit those four blood types that you're talking about.
A. Yes, sir.
Q. About 80 in a thousand?
A. Yes.
Q. And it would vary or it might highly vary; you know it would vary depending on the particular population, particular geographic area?
A. Yes. There would be some variance.

Q. And you do know if that variance would be higher or lower in Massachusetts?

A. No, I don't.

Q. Now, on this case you were able to only test for four genetic markers on that sheet; is that correct?

A. No, that's not correct.

Q. I'm sorry. Five genetic markers.

A. On the sheet there were more genetic markers attempted, but the results were inconclusive. There were four that were conclusive results obtained.

Q. Then the correct statement would be you were able to obtain results for only five genetic markers, correct?

A. On the sheet just four.

Q. Just four?

A. Yeah.

Q. Does the hole in this sheet approximate the size of the stain for 1B? (Indicating)

A. Yes, fairly close.

Q. If I just show this to the jury, so this would be 1B; is that correct?

A. Yes, sir.

Q. And I'm showing you now Exhibit 15. These are the gloves, and there are some holes in the gloves at the base of

the fingers. Do you see that, sir?

A. Yes, sir.

Q. Would those holes approximate the size of the stains that were in those gloves?

A. Approximately.

MR. FERRARA: If I can have just one moment, Your Honor.

THE COURT: Yes.

(Pause)

MR. FERRARA: No further questions, Your Honor.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Why does the same person do the exam in a particular case?

A. That's because it's not advantageous to have two or three different examiners from the serology unit to come and testify in the same case. The examiner who initially did those examinations in the first case will remain as the examiner in that particular discipline, forensic serology, throughout any later submissions.

Q. And can you tell me, a test is inconclusive is that because nothing happens up on your gel, if you will, or because looking at it you can't say, in your opinion, it represents a particular group?

A. It represents -- either there is no activity or in other words I can't see any result or that the result was so weak that I could not make a conclusive call or the result was just absolutely inconclusive.

Q. Now, can you tell me, sir, in the course of working with the FBI do you have occasions to testify on behalf of people who are charged with a crime?

A. Say that again.

Q. Do you ever testify on behalf of the defendant's on the case?

A. Yes, I have.

Q. And you ever undertake any exam where none of your questioned items were consistent with the suspect's and none given to you?

A. Yes.

Q. That's not an uncommon occurrence?

A. No, it is not.

Q. Now, I'm not great at math either so I would like to give you a calculator here and just so you're certain the

CITY 002149


calculator works can you multiply the percentages involved in this case, 41 percent times 41 percent times 48 percent times 99.

MR. FERRARA: I'm going to object, Your Honor.

THE COURT: You want to be heard?

(The following discussion was held at the side bar.)

THE COURT: What's the objection?

MR. FERRARA: I haven't challenged his figure of eight percent. I can't see what the need is for this courtroom demonstration. He said eight percent. I accept it.

MR. VOTTERO: I am going to have him multiplying a set of figures. They're assuming errors given to him and ask him the change.

THE COURT: I'll let him have it.

(End of the side bar discussion.)

Q. (By Mr. Vottero) Have you been able to do that, sir?

A. I will do it now. You are asking me which results,

Q3?

Q. Point 41 percent represents PGM 1+ times point 41 percent representing EAP BA times point 48 percent representing Hp type 2-1 times point 99 percent, the TfC, and rounding off, sir, what is the result?

A. Point 079.

Q. Now, I'd like you to do another multiplication taking an error of say three percent. Could you multiply point 44 percent times point 44 percent times point 51 percent --

THE COURT: (Inteposing) Point what?

MR. VOTTERO: Point 51.

Q. (By Mr. Vottero) Times point 99. We'll leave the last one the same.

Q. What's your result in this case?

A. Point 097.

Q. So it has the three percent change, hasn't been multiplied by itself for a change of percent then?

A. That's correct.

Q. Thank you, sir.

Now, I take it would work the same if you read the other way instead of point 41 percent point 38 percent?

A. Yes.

Q. If there is an error you are not sure of which way the error may be, plus or minus?

A. Yes.

Q. Now, would it be correct, sir, that the ideal population study would be where -- would be one where you studied everybody in the world to determine all their blood types and subtypes?

A. Yes.

Q. Are you familiar, sir, with the argument that you should -- in the area of Springfield, you look for an area close by Springfield or Boston or Hartford?

MR. FERRARA: Objection, Your Honor.

THE COURT: To the phrasing of the question.

MR. VOTTERO: I will rephrase it.

THE COURT: It's to form, I will sustain it otherwise.

Q. (By Mr. Vottero) Would you consider having, using a population study of Hartford as opposed to your study used by the FBI of 65?

A. Yes.

Q. And why would you not do that?

A. Why would I not use a Hartford study as opposed to 65 cities?

Well, the argument for not using that is that you're using a population that represents 65 different studies conducted in various cities and towns across the country conducted independently of each other by 65 different research projects.

Q. A larger population, simply one study?

A. Yes, sir.

Q. Let me ask you, sir, would a population with particular percentages of blood groups in population change in a particular city of say 10 years apart as different people move in and move out?

A. Yes, they would.

Q. Now, you indicated that one crucial factor in your ability to obtain results on an old stain was to how it is stored, how the item is stored; how would that effect your ability? And let's take this sheet as an example.

A. A body fluid stain such as a blood stain from the time the stain is deposited there and it dries up, if that stain were -- or that garment, let's say. The shirt were placed in a bag, sealed and then again it's a dried stain, now sealed and then placed in a deep freeze situation I would be able to probably type some of these markers, even the ABO system a year later or longer.

Q. And what effect would time have on that item and instead of allowing it to dry and washing it with detergent 20 times?

A. Well, in my opinion I wouldn't be able to obtain anything. It would be very questionable if I would be able to identify it as a blood stain.

Q. You indicated on older stains you sometimes had better success with certain proteins as opposed to enzymes?

A. Yes.

Q. Could you provide a little more description about that?

A. Generally, the protein system, such as the Tf and the Hp are more stable. That is you can obtain results in those systems on stains that are older or sometimes weaker than in the enzyme systems.

Q. Now, the enzymes in this case that you found on Q3, the sheet or the PGM enzymes or the AEP enzymes --

A. (Interposing) Yes.

Q. -- what kind of stability do those enzymes have?

A. Well, Hp haptoglobin and Tf are more stable. They are both serum proteins and would be more stable than the PGM system and the last table there would be the EAP system.

Q. Now, can you tell me, sir, you indicated that your

report indicates that Francis Bloom delivered these samples. Do these things come directly from the hand of Francis Bloom to you?

A. No.

Q. How are they delivered to the FBI?

A. The procedure is, in the case of a personal delivery, someone coming to Washington to the FBI laboratory to deliver evidence that he would go down in what is known as the evidence control center and in which they would fill out a form or several forms and sign some forms and the evidence would be received in the evidence control center and then within an hour or two typically it is brought down to a particular forensic unit that would conduct the analysis of that case. If there is more than one unit the one that has the most examinations would typically get the evidence first.

Q. Do you have any knowledge as to whether there was anybody with Mr. Bloom when he turned this evidence into the control center?

A. I vaguely recall Mr. Bloom coming down and I do recall someone else coming with him.

Q. Did you --

A. (Interposing) I don't recall who that was.

MR. VOTTERO: Thank you. Thank you. That is

all that I have.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. I just want to clarify something. When Mr. Vottero asked you why you do these calculations based on the average of those 65 studies you indicated it was advantageous in some way; is that correct?

A. Because of shifts in population and I don't recall specifically what my testimony was there. And the literature supports combining population studies in the matter in which we did. I believe there are some advantages in doing it that way. On the other hand, a specific ethnic group in an isolated area of the country you may also want to look at that group too if you had that availability.

Q. The latter, using a population study from a more specific area would you expect to be more accurate, wouldn't you, sir?

A. There's arguments pro and con. There are at least two studies that I am aware of and probably more in which the studies suggest or the papers suggest the method of combining population frequencies, population frequency data.

Q. Okay. But if you, in any instance have an

individual whose blood you are trying to match from particular evidence, I shouldn't say match, but you want to determine whether there are common markers and you know what area they're from and you know the time frame, wouldn't you agree with me that necessarily it would be more accurate and advantageous to use a localized population study?

A. My opinion -- I'm not sure. I know, -- again, the population shift. It could depend on specific -- let's take for example Eskimos in Alaska. In that particular situation you would want to take a look in population studies and there have been some studies in that particular isolated ethnic group there in a particular state in this country. It's hard to say.

I can only tell you the literature supports the combination of these population studies, at least two studies I'm aware of and I think there are more.

Q. You're ignoring an element that I stated, I believe and that's time.

A. Excuse me?

Q. I believe you're ignoring the element time.

MR. VOTTERO: I object and ask for a question please.

MR. FERRARA: It's coming.

THE COURT: Yes.

Q. (By Mr. Ferrara) That's true only if you're talking about the accuracy of studies over a period of time; is that correct?

A. That would be, yes, if I understand your questioning. Yes.

Q. The reason that would be advantageous and more accurate, generally speaking, because of a shift in population; isn't that correct?

A. That's correct. On the other hand, the combined totals include a large group of people whereas your isolated population typically would be a smaller number. The larger the number the more accurate, overall, the frequency data.

Q. Are you suggesting then that a local lab would, trying to type blood samples with a population study from their geographic area would achieve a more accurate result by using a national study?

A. The literature seems to suggest that.

Q. And that's because of changes in population?

A. And the larger sample too and the cross-section of sampling. It depends on the size of the study that's done.

Q. How many people are studied in one of these samples?

A. Sometimes it's as many as a hundred or perhaps even less, upwards to several thousand or more.

MR. FERRARA: Okay. No further questions, Your Honor.

MR. VOTTERO: Thank you very much.

THE COURT: Very well. We will stand in recess until two o'clock.

(The luncheon recess was held.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 2:09 a.m.)

* * * * *

WAYNE W. OAKES (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name, please and how you're employed?

A. Yes. My name is Wayne W. Oakes. Last name is spelled O-A-K-E-S. And I am a supervisory special agent at

FBI, Federal Bureau of Investigation.

Q. How long have you worked for the FBI?

A. Just about 14 years.

Q. What sort of duties have you performed for the FBI in those 14 years?

A. In the first three years I was assigned to the field of criminal investigators working general criminal matters. About 10 years ago I was assigned to the laboratory at headquarters and from that time on I have been assigned to hairs and fibers unit where I am an examiner in that unit.

I have a Bachelor of Science of biology in Boston College where I was a pre-medical major.

Q. When you were transferred to the laboratory were you required to do any specialized training for that purpose?

A. Yes. Before I was allowed to work cases on my own I was in a one year training period. This consisted of formal training at Quantico, Virginia academy under the supervision of experienced agents. Read the available literature and did numerous practicing examinations, comparison of hairs and identification of hairs. Ultimately I was certified by the director of FBI.

Q. What was your certification?

A. My certificate read forensic microscopics, just a

scientist who uses the microscope to examine evidence. My area of expertise is hairs and textile fibers.

Q. How long have you examined hairs and textile fibers?

A. Ten years.

Q. During that time could you give us a number of examinations you conducted?

A. I think on the average I work anywhere from three to four hundred, possibly five hundred times a year times 10. Somewhere in the vicinity of three thousand to five thousand cases. Most of these cases are either homicide or alleged sexual assaults.

Q. What value is the study of hair and fibers in a criminal investigation?

A. The hairs on our head and or parts of our body are constantly being shed naturally and can be forcibly removed in struggle, can be deposited on another person's body or clothing in a crime scene or in a vehicle or whatnot. By looking at these hairs, these questioned hairs, that might be located in debris, in comparing that with known hair standards from either a victim or -- we can include or exclude individuals that the source of these hairs that might be on another person or at a crime scene.

Q. What is the process you follow when you receive items of evidence for analysis in the hairs and fibers unit of the FBI?

A. Typically of alleged sexual assault or any contact type crimes we will receive the clothing items of both the victim and the suspect and the question will be are there any hairs like the victim on the items from the suspect and vice versa. Or if we have a particular crime scene it might be probative to determine whose hairs are at the crime scene to establish associations or like these items will be clippings and the debris that comes off these items might contain hairs and textile fibers.

The hairs are later picked out of the debris mounted on glass slides. Examined by myself I will determine the race and body area of the hair and whether it is suitable for comparison. If it is a hair for comparison I will mount known hair from a victim and then compare the question hair to the known hair standard.

Q. Now, are there times when you receive evidence to determine whether hairs or fibers that are suitable for analysis are present?

A. Certainly. That is the vast majority of the cases. That shall be the first thing I would do is determine whether

some are hairs, in fact, there and whether they are of value for comparison purposes.

Q. If that step is successful there are times when you later obtain some known samples for comparison?

A. Yes. Certainly.

Q. Now, you indicated that when you received these items they're scraped. Could you describe for us the laboratory process that you follow?

A. Yes. Typically we instruct the field or local police agencies to collect items from the victim and suspect from a crime scene and to package these items separately. Seal these items and package them separately. Once they are received in your unit, the hairs and fibers unit, the items -- let's say from the victim are opened and scraped in one particular room. And in this room we have a table and a rack over the table with clips. The item of clothing, whether it be a sheet or a blouse or bra or whatnot is scraped with a kitchen spatula.

Debris is allowed to fall on a table on which has been placed brown wrapping paper. This debris is then collected in and placed in a pill box which is sealed. The pill box is initialed with my initials WWO, the laboratory number and the Q number which just means questioned item

number that corresponds to the garment or the item that was scraped.

So if we are calling, let's see, a sheet in from the crime scene, Q3, we label the sheet Q3. Scrape the debris off, let it fall onto the paper, collect that into a pill box, put Q3 on the pill box, seal the pill box and then later the hairs are taken out of the pill box and mounted on a glass microscope slide which is permanently sealed and labeled like the pill box has been labeled.

Q. Now, could you describe that step a little more?

Do you take all the hairs out and mount them or do you look through what's in this pill box to select items?

A. Well, it depends on particular items. If it's, let's say a blanket that might have hundreds and hundreds of hairs on it what we would do, we would mount what we call an RS or representative sample of those hairs and we would look at a representative sample of those. If there are little hair fragments or limb hairs or fringe hairs or body hairs in there typically I won't have those mounted on glass microscopes because it's my policy and the general nature of the FBI laboratory.

They're used for comparison purpose. Head hairs and pubic hairs and the reason is one person's head hairs tend

to differ greatly from other person's. Likewise pubic hairs can differ from one person to another. Limb hairs and facial hairs tend not to differ as much from one person to another within a same racial group. So I don't use those for comparison purpose. I will primarily limit myself to relatively full length head hairs and pubic hairs because, as I indicated, those tend to differ the most from one person to another.

Q. Focusing on the examination of hair, now, as opposed to fibers when you're conducting this kind of examination what is it you're looking for in the hair?

A. I'm looking at all of the microscopic characteristics that go to make that hair somewhat unique. It would be just like if you asked me to look at an individual's face. What would I look at? I would look at his eyes, his ears, his nose, the mouth, the hair, the check structure, the bone structure, etc.

There are a number of microscopic characteristics in a person's hairs that I can see under a microscope when I mount the hair in a mounting medium that allows me to look outside. If you look around the courtroom yourself and just look at a person's head hairs you can see tremendous differences on the color, the length and the texture. What I can see, beyond the

obvious, is the internal microscopic characteristics that can vary greatly from one person to another.

Q. With the Court's permission can you diagram what you see under a microscope when you're examining a hair suitable for comparison?

A. Certainly.

THE WITNESS: Your Honor, if I may approach?

THE COURT: Yes.

THE WITNESS: Would it be permissible to use this area of the board, here? (Indicating)

Q. (By Mr. Vottero) Yes, please.

A. We take just an average head hair, not meant to represent anything in this particular case, but just a generic head hair with a bulbous shaped root and long shaft and typical cut tip we will see on a head hair, not a virgin head hair, but one that's been cut.

And we take a portion of the shaft and let's magnify that a couple of hundred times. You begin to see something that has these type of characteristics.

Okay. Now, if you think of this hair as a third dimensional object we are looking inside of this hair shaft now. And think of this as a pencil. Running down the center of the pencil is a core of lead or graphite. Running down the

center of this hair is this core of cells called the medulla and that runs right down the middle of the hair. (Indicating)

The main portion of the pencil, the wooden portion is this area here, the cortex. And then on the outside of the pencil -- think of it like a yellow wooden pencil. You have a layer of paint. We have the cuticle layer that covers the outside of the hair. It's here that we have scales that overlap like shingles on a roof or scales on a fish.

Now, going back to one of these, the three main anatomical groupings, we have the cuticle, the medulla, and the cortex. In this cortex we would typically see, find pigment granules and it's these pigment granules that give hair its color. If you have white hair or gray hair you lack the pigment granules, hence you lack color.

We might also expect to find large dark occlusions called ovoid bodies and sometimes particularly down near the end, root end, down near the end of the root little air filled sacks called cortical fusi. So those are essentially the features and the characteristics I can see under a microscope that you can see.

And it's like -- I like to use the analogy of a person's face. I testified previously when you look at a person's face you look at their eyes, their ears and mouth.

Most people have those characteristics, but when you walk into a room that's crowded you can spot and recognize someone you know even though everyone has two eyes, two ears and a nose and mouth because you know that person. You can detect subtle differences. You can pick out -- oh, yeah, that's that person that I'm pointing out. An experienced hair examiner can pick out subtle differences in these characteristics because these characteristics require --

MR. FERRARA: (Interposing) Your Honor, at this point I'm going to object. I'm going to move to strike the last portion of that answer. I wish to approach the bench and be heard.

(The following discussion was held at the side bar.)

MR. FERRARA: It's quite clear by that analogy that this expert is, in essence, saying that he can identify an individual by hair comparison. The analogy essentially says, his analogy says that he can -- analogy that someone can look at a person and identify them by their features and he is now saying that he can look at a hair and, you know, use those characteristics, make an identification and that's my basis for my motion to

strike.

MR. VOTTERO: Well, this is background information.

He is using an illustration of the process that he uses. I think if he is asked he will acknowledge there are such things and hairs that he can't distinguish.

MR. FERRARA: I understand.

MR. VOTTERO: I think that will become quite clear.

THE COURT: I am going to allow this as background as a way to explain what he does. You can have full opportunity on cross-examination on any of these points.

MR. FERRARA: Thank you, Your Honor.

(End of the side bar discussion.)

Q. (By Mr. Vottero) Sir, you were indicating that an experienced hair examiner would look at each of these various parts of the hair that we might look at various parts of the face. Can I ask you, sir, what is it about the hairs that you pull out from a questioned item that make them suitable for

comparison or not suitable for comparison?

A. As I indicated, my policy, I will only attempt to associate questioned head hairs or question pubic areas with known pubic or head hair samples because those tend to differ the most from one person to another. And I would not attempt, under normal circumstances, to work with a very small fragment like a small head hair fragment because the characteristics that I am talking about can change from the root to the tip. So I want to be conservative. I want to have relatively a full length hair to compare so I can see if there is any change along the shaft of the hair.

Q. Now, you've indicated that this area might represent the middle of the hair. Are there specific things that you're looking for when you are examining the root of the hair or the end of the hair?

A. Sometimes, yeah. Typically I will only look at the roots of the hair to determine how it was removed, whether it was forcibly removed, has tissue adhering to it or perhaps blood or whether it's a bulbous root representing a hair that fell out naturally when it was ready to be sloughed off from the body.

I will look at the tips of the hair, whether they are razor cut or maybe it's a virgin hair or maybe it was split

because it was artificially treated. These characteristics would be found somewhere along the shaft of the hair.

Q. Is this a complete diagram now of the various items that you're looking for when you're making a hair comparison? (Indicating)

A. Essentially, yes.

Q. You could have a seat now then if you would.

What are you able to determine without using a microscope just upon visual examination of the hair?

A. I really don't look at hair without a microscope. I would at least use a very low power stereo microscope to determine, perhaps, the race or the body area or the length to arrive at or determination whether it was suitable for comparison or not.

Q. And other than whether it was head hair or arm hair or fragments are there any other factors about an individual strand of hair that would make it unsuitable for comparison?

A. Essentially the shortness of the hair, if it was a small fragment or whether it was from a body hair like the hand or the arm or the leg, something like that.

Q. Now, turning to each of the individual parts of the hair what kind of differences do you expect to see when you're examining what you described, if you will, the yellow part of

the pencil, the scales on the outside of the hair?

A. As I attempted to indicate, these characteristics are relatively consistent within a person's own hair sample.

In other words, if I were to take 25 hairs from my head I would expect to get a very small range of characteristics within these hairs. These hairs would fall and essentially if I had a lot of scale damage I would expect that to be relatively consistent.

If I had coarse pigmentation I would expect that to be relatively consistent. If I had a thick cuticle that would be a trait that would be significant for associated purposes, but these characteristics can vary greatly from one person to another and that's what allows me to compare question hairs with known hair samples.

Some scales may look as they do in my diagram. Some person's details may be longer or flatter. The cuticle layer, particularly in a person of the Mongoloid and Oriental and American Indian is very thick and well defined. Persons of Negroid race have characteristics of a very thin cuticle. The pigment distribution and size of granules can vary greatly. Some people have no observable ovoid body. Some persons have a lot of ovoid bodies. Sometimes you wont see the medulla at all. It's invisible to the eye under the microscope if of

fragmentary discontinuance, same with the cortical fusi. Some people have a lot, some people don't. So again, these characteristics can vary greatly from one person to another.

Q. How about the characteristics -- let's take, for example, what you described, the ovoid bodies. I understand that some hairs may have a lot, some hairs may have few ovoid bodies themselves. Differs from hair to hair or are they always the same -- that's an ovoid body, and they always look the same?

A. If I was to look at 25 hairs from my head hair -- characteristically my hairs have a lot of ovoid bodies. I would expect to see a lot of ovoids. I could look at 25 hairs from your head and find none for no reason. You just don't look to have a lot of ovoid bodies in your hair sample. They can vary greatly in one person to another.

Q. Is there a specific number of traits that you examine, like a checklist when you look at heads of hair?

A. Not a number per say because the number can vary depending on how you want to count the characteristics. We can talk about the cut, the thickness of it, the clarity of it, whether it's white or clear or cloudy or yellow, whether it had pigment granules in it, how well it's defined. I don't like to use a specific number when I do a comparison, a

question hair versus a known hair sample.

I will compare all of those characteristics side by side using what's called a comparison microscope. And that's nothing more than two microscopes that are pushed together with an optical bridge that allows me to look at the question hair and the known hair side by side. And I compared every single one of those characteristics to the root of the hair to the tip of the hair.

Q. Now, when you're making that comparison of the question hair to a known hair what do you have to see to say they're consistent with each other?

A. Let's take the reverse of that. If I see any differences, in other words, if one hair, the question hair has a thick cuticle, but my known hairs don't have a thick cuticle I will conclude that the question hair did not come from that person represented by the known hair sample.

If the scales are different, if the pigmentation is different, if the absence of cortical fusi or ovoid bodies is different or if the medullation is different I will eliminate that hair as probably having originated from that, the known hair sample.

If the question hair is microscopically indistinguishable, I can't see differences, I will conclude

the question hair is consistent with coming from the individual represented by the known hair sample.

Q. Can you say like in the case of fingerprints, the question hair came from that person?

A. No.

The only instance with which I could say with one hundred percent certainty a question hair, let's say found on this stand, came from my head would be if I pulled that hair and -- pulled it from my head and placed it there. That's the only time I could say that with one hundred percent certainty. However, I will testify if the hair matches, in my opinion, that hair is consistent with coming from me or stated another way it either came from me or another individual of my same race whose hair exhibits all of the same microscopic characteristics or in the same way from the root of the hair and the tips. And it's my experience in 10 years it's extremely rare I will have known hair samples from two different people I can't tell apart.

Q. I take it has happened?

A. It has happened, an extremely rare number of occasions. Generally, I am able to tell a person's hair apart when, in my opinion, which I quote, match a hair or make a hair association although it's not positive like a

fingerprint. It is basis of strong association.

Q. Can you say whether you find a hair consistent with somebody somewhere out there in the world there is somebody with that same -- with a hair that is microscopically the same?

A. You would have to identify that individual and you would have to obtain a known hair sample from him or her. Allow me to compare it with that question hair.

In other words, if I match a hair from here from the stand here, with my known hair standard I can say it's consistent with being my hair. If you're asking me could it match someone else I can't eliminate that possibility. I would have to have that person's hairs and I would have to make a comparison and those person's hairs would also have to match.

Q. In every respect?

A. In every respect.

Q. Now, did you receive some evidence from the Springfield Police Department as concerns the case on trial regarding George Perrot?

A. Yes, I did.

Q. I'd like to show you first what's been marked as Exhibit No. 17 and as well what's been marked as Exhibit G for

identification and ask if you recognize either or both of those objects. (Indicating)

A. Yes. Both of these items have my initials WWO as well as designation Q2 referring to the brown paper and Q3 referring to the sheet. And that just means question item number two and question item number three that I examined.

Q. And are these the items you examined in connection with this case?

A. Yes.

MR. VOTTERO: May formally Exhibit G for identification simply be marked as an exhibit at this time?

MR. FERRARA: No objection, Your Honor.

THE CLERK: Number 18, Your Honor?

THE COURT: Yes.

(Commonwealth's Exhibit No. 18 was offered and marked.)

Q. (By Mr. Vottero) Now, what did you do with this in this case?

A. In this particular case the sheet was examined with using the procedure that I previously testified to. The debris that came off of that sheet, as well as a brown piece

of paper that was received with the sheet was collected with -- placed in a pill box. Hairs were later taken out of the pill box, mounted on a glass microscope slide, and examined by myself.

Q. Did you find any hairs as a result of that procedure that were suitable for comparison?

A. Yes, I did.

Q. How many hairs did you find suitable for comparison?

A. One.

Q. You have any ideas how many you obtained all together?

A. Of the hairs I examined there were several, as I recall, animal hairs. One white hair which was devoid of many characteristics. Perhaps some body hair and one Caucasian head hair that was brown in color. I determined, in my opinion, the only hair that was suitable for significant comparison purposes with known samples or known standards was the one brown head hair.

Q. Now, did you also perceive known samples of the hair of George Perrot and the hair of an individual named Mary Prekop?

A. Yes, I did.

Q. Now, first of all, what did you do with the known sample of George Perrot's hair and the questioned hair?

A. Well, the known hair sample for Mr. Perrot was mounted on a glass microscope slide. At least a number of those hairs were mounted on a microscope slide and a side by side comparison of the known hairs of Mr. Perrot's was examined against the questioned hair removed from the sheet and the brown paper that was accompanying the sheet. And a side by side comparison was conducted, utilizing the comparison microscope which allowed me to look at all those internal characteristics side by side at the same time.

Q. What was the result of your comparison of George Perrot's hair and the hair you found on the sheet?

A. The hair found on the sheet exhibits all the same microscopic hair arranged in the same way as the characteristics present in the known hair from Mr. Perrot. I conclude that question hair was consistent with coming from Mr. Perrot.

Q. Did you also compare the questioned hair with the known hair of Mary Prekop?

A. Yes, I did.

Q. What was the result of that examination?

A. It was dissimilar. And in my opinion it did not

come from Ms. Prekop.

Q. Now, in the course of your work with the FBI can you tell me whether you have been qualified as an expert in this area in courts in this country?

A. Yes, I did have.

Q. Roughly how many times?

A. In excess of 150.

Q. And I may have asked you this before, but again, roughly, how many hair examinations have you done?

A. Literally it would be very hard to figure out. Many examinations I've conducted. I have conducted thousands of examinations in thousands of cases. Many of those cases involved literally hundreds of thousands of hair comparisons or examinations so it would be a very large number. I would not be able to guess what that number would be.

Q. Do you, from time to time, testify on behalf of the defendant as well?

A. Yes, I have, on several occasions.

Q. One last question about the process of taking somebody's hair as that known how was that procedure done?

A. Ideally we like to have what is a representative hair sample. The way I would personally do that is I would take at least five hairs from the side, the back, the top, and

the front. And I would like to have these hairs full length, either plucked or cut as close to the scalp as possible so we can see how the characteristics might range from this root end or the tip of the hair.

The reason I asked for the representative sample because the hairs, let's say on my sideburn area are obviously going to look a little bit different than the hairs on my head. These are starting to gray. They are going to look a little bit different. (Indicating)

Q. If I can take that example right there, if you have hairs to compare from one side of your head and one from the top of your head would those differences, would you be able to say they were consistent with each other?

A. I would have to look with the microscope. I would associate those hairs with the same person.

Q. We can have differences of the hair throughout your head?

A. (Witness indicating.)

MR. VOTTERO: The that's all the questions I have. Thank you, Your Honor.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Mr. Oakes, human hair grows about one half inch a month?

A. That's correct.

Q. Both on the face and on the head?

A. I haven't read any studies about facial hair. The literature suggests head hairs on the average person grows about half an inch a month. I haven't read any such study to make the same statement of facial hair.

Q. You have read studies that indicate there is no difference in growth rate?

A. No. I have no such studies. I can't site one off hand, no.

Q. Have you ever worked for any agency or company other than the Federal Bureau of Investigation doing hair study?

A. No. All of my work with hairs has been with the FBI laboratory.

Q. And all of your involvement with forensic began after you ceased to be a field operative for the FBI; is that correct?

A. I had some forensic experience in training with law enforcement agencies prior to the FBI.

Q. In this particular instance you indicated that one brown Caucasian head hair was found that you associated with the sheet that had been submitted; is that correct?

A. It actually came from the scrapings, what I designated was Q3, which was a sheet and I believe it was Q4 a piece of brown paper.

Q. In other words the one hair that you found was in the brown paper which had contained the sheet?

A. No. I can't make that distinction. It was either on the sheet or on the brown paper sheet in a sealed brown paper bag which were two items together. One was a sheet which I designated was Q3 and one was a piece of brown paper that was like -- the sheet was wrapped in. So because those items were received together, sealed in another container, they were scraped together because I would not be able to testify with one hundred percent certainty whether the head hairs were originally on the sheet or the paper. So they are collected together, scraped together, and the debris is from those two items.

Q. So you can't say that hair was either on that sheet then?

A. It was either on the sheet or the brown piece of paper that was on the sheet.

Q. Do you know who sent you those head hairs, who from the Springfield Police Department sent those hairs to you?

A. No. I don't recall the name. No. It came from the Springfield police and usually it is a transmittal letter that accompanies the evidence. The name escapes me right now. It's been a while.

Q. Can you tell me this, what was the length of the hair that you found on the brown paper?

A. I don't recall.

Q. Do you have any notes with you that would indicate what the length of the hair was that you found in the brown paper?

A. No.

Q. Do you have any recollection of what the length of the hair was in the brown paper?

A. I could only tell you it was a brown Caucasian head hair that was suitable for comparison purposes so therefore, it was not like a quarter of an inch fragment. It was a head hair with natural roots with relatively full length and had a cut tip and it was continuous with the long and known hair sample from Mr. Perrot. I can't tell you whether it was one

half inch, three and a half inches.

Q. You have no recollection of that?

A. No.

Q. What is the width of the slides you use for doing microscopic comparison?

A. If you're attempting to discern the width of the slides --

Q. (Interposing) I am not. What I want you to help me, which I am trying to establish.

A. Sure. Could you repeat the question?

Q. What is the width of the slides?

A. Approximately half an inch.

Q. It is fair to say you would have to cut the hair in any event?

A. No.

Q. Would it be fair to say you have hair greater than one half inch you would have to cut the hair?

A. No.

Q. You mount the hair lengthwise on the slide?

A. In the figure eight and it is possible to mount an 18 inch hair on one slide.

Q. You did testify you microscopically measure hairs, did you, sir?

A. No. I did not testify to that.

Q. Do you recall being asked whether or not you -- strike that.

Can you tell us the length of those, of any of the hairs that you received from the Springfield Police Department that purported to be George Perrot's hair?

A. I have no recollection of exactly how long those hairs were.

Now, if you have the glass microscope slide that contains those hairs I can look at those and see if there is, how many mounted on the slide or whether I can make a visual estimate, but I don't recall now how long they were. Again, I can only tell you that the question hair was consistent in length with the known hairs from Mr. Perrot.

Q. Can you tell us what the diameter the question hair was?

A. No. Other than that it was the same, in consistence with Mr. Perrot's known hair sample.

Q. You can't tell us the diameter of either hair was?

A. It's really irrelevant what the diameter is when you do the side by side comparison. As long as they are the same it doesn't matter whether they are point 0 one millimeters or point one 15 millimeters as long as they are

CITY 002186


the same.

Q. Are you telling us, sir, that if you took the question hair that you found on that paper and you took this one hair that you received, the one hair within the sample of George Perrot's hair that you felt was a match, that if you put those two hairs side by side they'd be identical.

A. I don't think I testified there was one hair. Mr. Perrot's hair, I thought, was a match. That was not my testimony. My testimony was the question hair exhibited the same microscopic hairs as hair present in the known hair standard and was consistent with coming from Mr. Perrot. In answer to your question the diameter or the particulars of the hair, the question hair, was consistent with the diameter, length and particulars in the hairs of the known hair sample.

Q. Tell me something, when you're examining hairs, okay, you have got a number of hairs that were provided that were supposed to be Mr. Perrot's, correct?

A. Correct.

Q. You'd agree with me that hairs from the same individual can look different under a microscope?

A. Hairs from the same person from different areas of the head may have differences.

Q. And when you received George Perrot's hair sample

would you degree that all of the hairs that you received did not look alike?

A. They weren't identical, that's correct. There is a variation amongst a person's hairs.

Q. They weren't identical which they didn't look like microscopically?

A. You're saying two different things. Not identical and look alike are two different things. Identical, that every single pigment granules was in exactly the same place looking alike is different than not being identical.

Q. How many hairs did you receive to be from George Perrot?

A. A significant number of hairs that would constitute, in my opinion, an adequate known hair sample. I can't tell you whether it was 12, 15 or 20 in that point in time. It's been a number of years.

Q. Are you telling me you don't know how many hairs?

A. I can't give you an exact number; that's correct.

Q. And you have a recollection of approximately how many hairs it was?

A. My recollection is there were at least two microscope slides made and again, if you have the microscope and would care to show them to me I can count the hairs, but I

don't recall from a number of years back exactly how many hairs was there at the time. It was my opinion they were there to constitute an adequate known sample to make a valid non-judgment as to whether or not the question hair was consistent with that coming from Mr. Perrot.

Q. Let me ask you, this, when you receive a sample of hair that's supposed to be from an individual can you begin to examine the hair; do you keep records of what you see?

A. At the time that I'm doing my examination I make very brief notes of the general appearance of the hair. In some cases I receive there may be known hair samples from as much as a dozen victims and make very general notes so I don't have to keep putting the known hair sample back on so I have a rough idea of what those hairs look like.

Q. Do you take a measurement of the length of the hair that you receive?

A. If it's an unusual length, if it's an 18 inch head hair so I would note that. Yes. If it's two and a half or three inches I am not going to note that. That's not really significant if the hairs have been two and a half some might be three and a half. It's not a big variation.

Q. You would note if there were significant differences amongst the hairs within the sample, wouldn't you?

A. I might. I might.

Q. And you would make some notes or sometime measure the diameter of the hair to document that they were similar in diameter, wouldn't you, sir?

A. No. No. This is my opinion as to whether or not hairs match.

Q. Can you answer that question yes or no?

A. Restate the question, please.

Q. Would you, in fact, make measurements of the two hairs to document that the diameters of the hairs were similar?

A. No.

Q. When you examine a hair you can tell whether it's animal or human; is that correct?

A. Yes.

Q. You can't determine the sex of the person from the hair; is that fair to say?

A. Not from a microscopic examination. That's not entirely correct. No.

Q. Are you telling us you can determine the sex of the hair from microscopic examination?

A. Under certain circumstances, yes.

Q. What would those circumstances be, yes?

A. If the hair was forcibly removed we can do -- have a root sheath attached to it we can.
Q. Can -- wait. I am going to ask you again.
Can you tell the sex of a person from a hair based on a microscopic examination of the hair?
A. That is what I was attempting to answer.
Q. Complete your answer.
A. Thank you. If you stain the hair, the root sheath tissue and count the X and Y Barr bodies you can determine whether the hair was male or female.
Q. Was that done in this case, sir?
A. It was not able to be done in this case.
Q. Why was it not able to be done?
A. Because the hair was not forcibly removed and didn't have such root sheath tissue attached to it to allow the staining procedure to be effective.
Q. Which hair was not forcibly removed?
A. The question hair on the sheath.
Q. So, in other words, you need some follicular tissue, some tissue from the scalp from the donor to that test?
A. Yes.
Q. So that determination is not actually made from a

part of the hair itself, but rather from some tissue from the scalp?

A. Technically, correct.

Q. Now, I am going to ask you from the hair root, the tip, can you, by microscopic examination make a determination of the sex of the person absent some tissue from the scalp?

A. I can't, no.

Q. Would it be fair to say you can't determine the age of a person from a hair with the exception of infant's hair?

A. Not entirely, no.

Q. Well, when you say "not entirely" are you saying you can determine from the hair a person is perhaps elderly because they are elderly and the absence of pigmentation in the hair?

A. Yes.

Q. You can tell when a hair fell out or was pulled, can't you, sir, generally speaking from examining --

A. (Interposing) Generally speaking, yes.

Q. Hair which has fallen out because of natural causes or disease will have a bulb formation at the end?

A. Typically, yes.

Q. Typically a clean appearing bulb?

A. Yes.

Q. With none of the follicular tissue or scalp tissue we just talked about?

A. (Witness indicating)

Q. And it will have sort of concavity of the root on the bulb end?

A. Concavity? I wouldn't --

Q. (Interposing) An inward indentation on the bulb at the root end?

A. That's not my experience, no.

Q. And would you describe for the jury what a hair that's been pulled out would look like at the root end?

A. It depends on whether the hair was pulled out during it's active growth state or not.

Would you like me to elaborate?

Q. Yes, please.

A. There is three stages of hair growth and they begin, categorically in the telogen stage the hair is ready to be sloughed off naturally and literature suggests about a hundred head hairs a day are shed.

Naturally, if this hair, in this stage, just before it's ready to be shed naturally got pulled it would not give a microscopic appearance that would indicate to me it was forcibly removed because the root would be pulled and no root

sheath tissue attached to it. So in that particular case could have a hair that was forcibly removed, it wouldn't have given microscopic appearance of it.

If you have a hair that is in the anagen stage or active growing stage and you forcibly remove it you would expect to pull some scalp tissue or some tissue with it.

Q. The question here, do you have any notes as to observations you made about the root of that hair?

A. Yes.

Q. But you don't have them with you?

A. I don't have them with -- on me. I have them in my briefcase.

Q. Can you testify, from your recollection, as to what you observed about the root of that hair, the question hair?

A. Yes.

Q. Tell us what you observed.

A. It was a natural root.

Q. Now, you're not telling this jury you can identify someone from a hair, are you, sir?

A. No.

Q. In fact, when you prepared a report in this case -- you recall you prepared a report in this case?

A. Yes, I do.

Q. And your signature --

MR. FERRARA: First of all may I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Mr. Oakes, I want to show you this report. It is dated March 13, 1986. Aside from notations and highlights that I have made, does this appear to be the report that you prepared in this case?

A. It appears to be the copy of the pre-report I prepared.

Q. A copy, yes, sir, and that was on March 13, 1986?

A. Yes.

Q. Your signature does not appear on that report; is that correct?

A. That's correct.

Q. But you know you did, in fact, do the examinations in this instance?

A. Yes.

Q. Are your initials somewhere on that report?

A. My symbols were on the report.

Q. Where would I find those, sir?

A. There is an eight digit laboratory number, the letters S space WKWK are my laboratory symbols.

Q. Do all individuals who prepare reports have some kind of symbol they put on the report to identify they prepared it?

A. All individuals in the FBI, yes.

Q. Would you know what Mr. Eubanks symbols are?

A. Yes.

Q. What are they sir?

A. WM.

Q. And his symbol or initials also appears on this report; is that correct?

A. I don't know that. I would have to look at it again.

Yes. They appear following my symbols.

Q. And you'd agree that well, in fact, in this report that you prepared there is a report sent to the Springfield Police Department; is that correct?

A. Yes.

Q. You state that hair comparisons do not constitute a basis for absolute personal identification?

A. Yes.

Q. And that's what you testified?

A. Yes.

Q. And what you are saying you can't identify somebody

on the basis of hair?

A. You cannot positively identify someone. In other words I can't say with one hundred percent certainty that question hair positively came from Mr. Perrot to the exclusion of any other person in the world possibly exists that someone else may have the same characteristics.

Q. You're not telling this jury that everone's hair is microscopically distinguished, are you?

A. No, I'm not.

Q. You know that's not true?

A. That's right.

Q. What you're saying is that this hair that was your questioned sample was sufficiently similar to one or some of the hairs you received from Mr. Perrot so that you could not excuse Mr. Perrot as having been the source of that hair, correct?

A. That's your characterization of my results, that's not how I state my results.

Q. Is that an accurate statement, though, of the significance of the hair comparison?

A. No.

Q. You're not telling us a hair is not like a fingerprint?

A. No. I've testified that it's not.

Q. What's secondary transfer with respect to hairs?

A. Secondary transfer would be if the defense counsel and myself came into contact with myself and his hairs became deposited on my jacket and I was later to come in contact with the assistant district attorney and your hairs were then to transfer from my jacket to the district attorney. Hairs, in fact, they never had contact with each other, but his hairs ended up on the district attorney's clothes. It's an example of secondary transfer.

Q. With a piece of fabric as large as that sheet isn't it unusual to find just one head hair if someone had, in fact, come in contact with that sheet?

A. No, not in particular.

Q. Would you agree with me that someone -- well, first of all when did you receive that sheet?

A. It was in December of 1985.

Q. And do you have a record of the date?

A. It would be on the laboratory report.

Q. I show you this, sir, would there be something on here that would indicate when you received evidence in that report? (Indicating)

A. The report or the evidence.

Q. I'm sorry. You're right. Is there something on that when you received that evidence?

A. Yes. December 26, 1985.

Q. And you know when you received George Perrot's head hair?

A. I believe I received it sometime after that. I don't recall the exact date. Again, I could give you that information from that laboratory report.

Q. If a number of persons had been in contact with Mr. Perrot on December 7, 1985, at the police station might some of those individual's gotten his hair on their attire, their garments?

A. You're asking me a hypothetical question. I wasn't there on December 7. I have no idea what transpired there.

Q. I know that. But you have already testified that when two people come in contact it's the Locard Principle, isn't it, sir?

A. Yes.

Q. And you already testified that when two people come in contact there might be an exchange of hair, isn't that correct, didn't you just testify to that a short time ago?

A. Yes, in theory. Now, you're asking me a specific date and specific time and asking me if something happened. I

know no personal knowledge if something happened.

Q. I understand that. And that's why I said might. The hair that you found, the question hair didn't bear any indication that it was a hair that had been forcibly pulled; is that correct?

A. In my opinion, no, it did not.

Q. And when you examined it, is it fair to say you saw no indication that it was diseased?

A. I don't recall any indication it was diseased.

Q. Did you see any evidence that it had been damaged in anyway, structure?

A. Not that I recall.

Q. You can't detect that in a hair?

A. In some instances, sure.

Q. Now, when you examine a hair it requires some subjective judgment; isn't that correct?

A. That's correct.

Q. In other words if I had 45 forensic experts or a number of forensic experts, perhaps two, examining a hair there might be disagreement as to whether there's a match between two hairs; isn't that correct?

A. If one had a lesser amount of training it would certainly be a possibility, sure, because it depends on how

much experience you have and someone with less experience or myself might have a different opinion.

Q. So you're familiar with studies where a number of experts have examined large samples of hairs and there is inconsistency with respect to matches of those hairs, aren't you?

A. No. You would have to site the specific study.

Q. Hasn't there been considerable -- strike that.

Are you familiar with the studies of Barnett and Oggle (phonetic) probabilities in human hair comparison, 1982?

A. Yes.

Q. And in response to that study there was another article or response by an individual by Gaudet, correct?

A. Correct.

Q. And there has been a series of disagreements as to the significance that can be placed on particular hair comparison; isn't that true?

A. Yes.

Q. And my question to you was really simple.

Would you agree that even amongst experts who examine hairs there is likely to be some difference of opinion as to whether there is a match between two given hairs?

A. I don't know if I agree with your categorization,

likely to be disagreement. I don't think if you showed that question hair to any qualified experts they would disagree that it matched the hairs of the defendant. That's my honest opinion.

Now, if you take any two experts, you take two attorneys, you take two doctors, you're asking me does the possibiity exist they might have different opinions. Of course, that's what makes the world go round, but if you have qualified experienced competent hair examiners that do this day in and day out and for years on end they are not going to differ, in my opinion, on the conclusion that I reached. I hope that clarifies it.

Q. In other words if we can make analogies it's not a situation where when you say that these hairs were, in your opinion, microscopically so similar Mr. Perrot's couldn't be excluded. It's not a situation where a lay person could simply see these two hairs in comparison on the slide and draw this conclusion?

A. Sir, I have been doing this for 10 years. I have been trained over a year to do this. I have done thousands and thousands of cases. I would not ask someone in the jury or some other lay person that I am skilled and trained with doing. No. I would not expect a lay person to make that

comparison to come up with the conclusion I do. That's my job.

Q. I understand that, sir.

A. It's not something where I could look through the microscope and see these two hairs and say, Geez, these are very similar hairs.

You would have to know what to look for.

Q. I think you agree with me that they looked a lot alike when you would have the experience to determine the significance of that you probably wouldn't. So it requires some training and some subjective judgment on your part?

A. Certainly.

Q. By the way, we made reference to the Locard Principle. The gist of that principle is when two objects come into contact, persons may rub off on each other; isn't that essentially what it is?

A. Essentially, yes.

Q. Generally speaking, when you're doing hair comparisons aren't you looking for more than just one question hair?

A. Not necessarily. I mean sometimes I might receive a ski mask from a bank robbery that the bank robber threw into a dumpster and it may be only one question hair in there. The

fact that there is only one hair in there doesn't mean I can't do a comparison with the known hair sample.

Q. And did you compare hairs from any other source with this unknown hair?

A. Yes.

Q. Were there hairs among the sample that was sent to you from George Perrot which did not match this question hair?

A. When you say "not matched" okay, as I've testified previously on this requires an explanation. The hairs on a person's head can differentiate. I use the example on hair, on my sideburns are going to be different than the hairs on the top of my head.

If the question hair found at a crime scene or another person's clothing comes from the top of my head I would not expect that to match with the sideburn hair that was in my known hair sample, but I would expect it to match those hairs in the sample that were taken from the same general area.

Q. And do you know how these hairs -- you don't know how these hairs were taken from George Perrot?

A. No. I did not take the hairs.

Q. You don't know if they were taken from different parts of his head or one area of his head?

A. No knowledge.

Q. So the question I asked you was, was there dissimilarity with the hairs in that sample different from each other?

A. Generally, the hairs in the known sample matched the question hair. They will have been at least one hair that was microscopically distinguishable. In other words if I find a hair in the known hair sample I compare it, the hair root to tip and I can see no differences I'm not going to go then and compare it with each and every type, beside taking as much as an hour with the 24 other hairs in there. If it's generally like the other hairs, but it's microscopically indistinguishable from one of the first hairs I look at then that is when I am going to stop my comparison.

If you are asking me if it's conceivable that there is a hair in there, given a hair I wouldn't match, sure, probably is. And it would be like the example. If I give a known hair sample from here and you find a question hair on your table from the top of my head would I match them? No. It's a false exclusion. Yes. It would be a false exclusion. The hair really came from me, but I can't match it.

Q. Are you familiar with a study done in 1990 published in the Journal of Forensic Sciences involving scalp hairs taken from 97 Caucaisan individuals, 100 hairs from each

of those individuals.

A. Who was the article by?

Q. I'm not sure, sir. It was in November of 1990.

A. What was the basis of the article? I've read most articles that have been published on hairs. I don't recall, specifically, the substance of that article.

Q. The substance of it was --

MR. VOTTERO: (Interposing) I object, Your Honor.

THE COURT: Sustained.

THE WITNESS: You have the article? I'd be happy to review it.

Q. (By Mr. Ferrara) Did you take photographs of the hairs that you received from a known subject?

A. No.

Q. Do you save the hairs in some way?

A. The hairs are returned to the contributing agency, in this particular case the Springfield Police Department. They are on permanenet glass microscopes and appropriately returned. They are there so anybody who wants to look at them, whether it is the defense expert can conduct the same comparisons that I have conducted.

Q. You are now talking about the two hairs that you

compaired and mounted on a slide?

A. Well, the question hair from the sheet and the 10 or 12 whatever number hairs from Mr. Perrot that are now on glass microscope slides. Those hairs have all been returned to the police department.

Q. When you are writing a lab report that hair comparisons do not constitute basis for absolute personal identification is that something that you include as a matter of policy, when I say "policy," FBI policy?

A. Yes.

Q. Is that something that you're required to put into a report?

A. It is something that I am in total agreement with. That's my personal feeling. I can't discount the possibility that there is someone else in the area that might match Prekop specifically -- Mr. Perrot. So I put that in there.

The person recieving the report in this particular case, the Springfield Police Department, doesn't think it's a one hundred percent absolute identification like a fingerprint because it's not.

MR. FERRARA: Thank you. No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. You don't want to mislead anybody?

A. That's correct.

Q. Now, just a couple of quick questions, sir, why does everything you examine in hairs and fibers come wrapped in a piece of paper?

A. So that the evidence isn't lost. We're talking about trace evidence, hair, fibers, soil and whatnot. Common practice is wrap it up in a clean piece of paper and submit it.

Q. That is how the various agencies that give you things are instructed to do it?

A. As a general rule, yes.

Q. What do you do when, in your examination, when you've discovered a hair, in your opinion, as microscopically indistinguishable, you do anything else?

A. No.

Q. What do you do with the slide?

A. Send it back to the contributor of the evidence.

Q. You don't take any pictures of it.

A. No. No. Not generally.

Q. Is that because you don't make any notes about it was this long and this color? (Indicating)

A. I have general notes as to maybe unusual characteristics. Maybe it has a thick cuticle or prominent ovoid bodies. I don't measure the diameter of the hair. I examine diameter of the known hairs. If they are the same as to color I am looking to include or exclude another particular individual of being the possible distributor of the hair. I might make a general notation of the hair, not always. If it's two and a half, three inches long it is really not a significant factor unless it is so unusual, out of the ordinary.

Q. The point is you either have one that is consistent or not consistent?

A. Right.

Q. And that is your opinion?

A. And if it's microscopically dissimilar I will report the question hair was dissimilar from the known, from the defendant's and did not originate from him, simple as that.

Q. How frequently do you testify in any given week or month?

A. It varies. I usually testify 30 to 40 times a

year.

Q. Do you actually have to get out the slide again and look before you can testify?

A. No.

Q. Why is that?

A. Because I use the same procedure and the same protocol. I have the same criteria each and every time I make a hair match.

MR. VOTTERO: Thank you. That's all that I have.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Do you ever bring your notes with you when you testify?

A. When I think I need to, yes.

Q. But as you sit there now you can't tell us any of the specifics about these two hairs that you compared?

A. Sure. I can tell you a lot about the hairs.

Q. Can't tell us the length, the diameter, and what you can tell us in your subjective opinion what you observed on the microscope, the two hairs was similar?

A. I can tell you the question hair was a brown

Caucasian cut hair with a cut tip and natural root. It had normal pigmentation. It was not medullated. It had a thick cuticle. It had prominent ovoid bodies. The scales were not particularly damaged. They were unremarkable. The diameter, whatever it was, and the length, what it was like, the hairs in the known hair standard from the defendant's there were no significant microscopic differences.

Q. And did you specifically come -- in what town do you reside now?

A. What town do I reside? I reside in Northern Virginia.

Q. Is that near the FBI laboratory?

A. Relatively.

Q. And did you come to Springfield to specifically testify in this case?

A. Yes.

MR. FERRARA: Thank you. No further questions.

THE COURT: Thank you, sir.

We will take our afternoon recess.

(The jury exited the
courtroom at 3:18 p.m.)

MR. VOTTERO: Before you leave we'll need to go

through the questions of the ruling for Francis Bloom.

THE COURT: I can do that right now. I'm going to allow the Commonwealth's motion in limine in relating to the evidence of the so-called quote, false confession.

I am making the following findings: the event involved in the indictment now on trial occurred on or about November the 30th, of 1985. The defendant was arrested approximately December 7, of 1985. And on that day he made the alleged confession or addmissions that admitted the burglary aspect of these cases, but not the rape aspects.

He was convicted of these crimes after trial on December the 7th, 1987. I believe that was the date of the verdict and was after that, I believe, around December the 16, 1987, the event occurred wherein it was a subterfuge effort and a forgery of his name to a confession for use in attempting to obtain addmissions from two other persons, Mr. Timmerman and another gentleman whose name escapes me.

That, of course, was the substantial findings of Judge Moriarty in the motion to dismiss which findings are dated March 19, 1991, filed in these cases and which findings I adopt for purposes of these findings, as well

in all respect so that the events that are the subject of this effort to utilize -- the attempts to utilize an alleged false confession by this defendant occurred two years -- he, in fact, made his own admissions or confessions. They involved an unrelated incident that is the alleged rape involving another victim at another address. They will open up collateral matters that far outweigh any probative value, if any may be in this case. And so for those reasons I am going to allow the Commonwealth's motion.

MR. FERRARA: My objection may be noted.

THE COURT: Your objection noted and your rights are saved.

I don't know if there is anything else you need.

MR. VOTTERO: Not at this point, Your Honor.

(The afternoon recess was held.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 3:24 p.m.)

THE COURT: Mister, you're the same Thomas

Kelly who testified here earlier?

THE WITNESS: Yes, sir.

THE COURT: Very well. No need to go through the oath again.

MR. VOTTERO: Thank you.

* * * * *

THOMAS KELLY (prev. sworn)

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, we've discussed November 30, of 1985. Do you recall where you were early in the morning of December 7, 1985?

A. I was at home.

Q. And what happened early that morning?

A. I received a call at home from the detective bureau asking me to come to the station.

Q. And what information were you given at that point, sir?

A. I was told George Perrot was under arrest, given a brief synopsis of the circumstances and again asked to come to the station.

Q. Did you go to the station?

A. Yes, sir.

Q. Do you have a memory as to what time you arrived?
A. About 4:30.
Q. And your ordinary tour of duty was what?
A. Four to midnight.
Q. Now, without getting into all the details, the matter that George Perrot was under arrest for had nothing to do with the incident of November 30, involving Mary Prekop and Emily Lichwala?
A. That's correct.
Q. Do you know the location, however, of the incident from the December 7, for which he was arrested?
A. Yes, sir. And where was that?
A. It was in the same area.
Q. Are you able to identify with respect to the diagram that's on the board where the incident of December 7, took place?
A. Yes. One of the incidents took place here in what's called Five Town Plaza at the Denny's Restaurant which is almost directly opposite Malibu, between Malibu and Catalina, closer to Malibu. (Indicating)

For reference I put Caldor's here, Parker Street, Forest Hills, this is Cooley. Off the map further down Forest Hills is an area or a street called Ellendale Circle. That is the

home of Mr. McNabb and that is where another incident took place on December 7. (Indicating)

One incident at Five Town Plaza at Denny's Restaurant and another here at Ellendale Circle and another incident took place here at 87 Malibu. (Indicating)

Q. And who lived at 87 Malibu at the time?

A. George Perrot.

Q. Now, do you have a knowledge, sir, as to roughly what time of day it was on December 7, that these various incidents took place?

A. It would have been in the hour to hour and a half prior to my being told.

Q. Sometime in the early morning hours?

A. Two, 2:30, three, four.

Q. You arrived at -- roughly what time did you get to the police station?

A. At about 4:30.

Q. And what did you do upon your arrival at the police station.

A. Spoke with an officer on duty at the time and spoke with an Officer St. Germain and Officer Trites who worked in the Detective Bureau, some uniform officers and Officer Murphy. Familiarized myself with the events of that morning.

Q. Now, these events that took place in this area I wonder if I can ask you a couple more questions about the area. Are you familiar with the area of, this area of Springfield?

A. Yes, sir.

Q. Can you give us an idea of what the distance is, first of all, from 33 Covel Street to 27 Malibu?

A. From the top of that diagram to the bottom is on a straight line is a quarter mile or less.

Q. And have you ever timed how long it takes to either drive or walk that distance?

A. I have driven and walked it.

Q. What are the times roughly?

A. To get from the top to bottom probably takes longer to drive because you have take the turns on, a straight line walk five minutes.

Q. And can you give us an idea of the distance from 27 Malibu to the area on Ellendale where the incident of December 7, took place?

A. These are fairly straight streets when you drive it's going to be a little longer, but from 27 Malibu to the Ellendale Circle street is less than a half a mile on a straight line.

Q. Now, how long would you say it took you to, after getting to the station, familiarize yourself with those events and speak to all the officers?

A. Twenty minutes, 25.

Q. At any point in the early morning of December 7, did you see George Perrot?

A. Yes, sir.

Q. Do you recall where you first saw him?

A. In the interrogation room of the Detective Bureau.

Q. Now, where is the detective bureau in the police department?

A. It's on the second floor rear of the building at the police station, 130 Pearl Street.

Q. Could you describe -- first of all do you have more than one interrogation room?

A. At the time we did not, we do now.

Q. Can you describe what the room was at the time that you used it?

A. It's probably 10 foot by 15 to 18 foot room, block. Has a metal door with a viewing port with a window probably six inches by two foot with wire between the glass. The walls are blocks. The windows have a metal screen over them. It's impossible to see out of. It has several chairs, a

typewriter, desk, pretty stark.

Q. Telephone, anything of that nature?

A. No.

Q. Any kind of refreshments in the room?

A. No.

Q. And I didn't understand. Can you see in or out of the room?

A. You can see in and out by viewing through the port in the door, the porthole in the door, but you can't see out the windows to the outside.

Q. Do you have to do anything to see through the door; is there a window you just walk up and look in?

A. Yeah.

Q. Now, when you first saw them in there do you have a memory as to what time that was?

A. Sometime shortly before five, maybe 10 of.

Q. And did you observe him in the room before going in or did you just go in the room?

A. I looked in first.

Q. Was he with anybody at that point?

A. No.

Q. What, if anything, do you recall him doing as you looked in?

A. Sitting, sitting in a chair.
Q. Awake or asleep at that point?
A. He was awake.
Q. What did you do?
A. I walked into the room, told him who I was, and Mirandized him. I read to him from a card.
Q. How long after you entered the room did you Mirandize him?
A. Within two to three minutes.
Q. Would you describe the process that you followed that evening to Mirandize him?
A. I take the card and I tell him or whoever the person I'm talking to that I Mirandize them. I tell him who I am. I am going to want to talk to them about a certain event and before doing that I'm going to give them what are known as Miranda warnings.
I read the Miranda warnings from the card or paper or however it's printed. The last question I asked is, "Having these rights in mind to you wish to talk to me now?"
Whether they do want to talk to me or not I ask them to sign the card indicating merely that they had the rights and I also paraphrase it with the fact that you sign this as an admission other than you have had your rights read to you.

Q. How long have you been a member of the police department as of November of '85?

A. Tweleve and a half years about.

Q. And how many occasions would you say have been involved in interviewing somebody in that room and reading them their rights?

A. Hundreds.

Q. Now, when you were in the process of reading these rights to Mr. Perrot did you go through them one at a time or did you read the whole thing at once to him?

A. Read verbatim from the card and at the conclusion of each one of the number statements I stop and ask, Do you understand that?

Getting an affirmative response I go to the next one. If I was to get a negative response I would explain it in further detail.

Q. Now, do you recall going through that process with George Perrot?

A. Yes, sir.

Q. And what were his responses at the end of each question in terms of whether or not he had understood that particular question?

A. He answered in the affirmative.

Q. Now, could you tell us something about his appearance and demeanor during that time period you had gone in that room and you began going through these questions with him?

Describe his appearance and demeanor at that time.

A. He had fairly long hair. It was uncombed. He had sneakers on. They were untied. Outer garments -- he wasn't very clean.

Q. I would like to show you what was marked Exhibit C for identification; do you recognize that? (Indicating)

A. Yes, sir.

Q. What's that?

A. That's a picture of George Perrot the day he was arrested.

Q. December 7, of 1985?

A. Yes, sir.

Q. Does that fairly and accurately describe what he looked like that day?

A. With the exception he doesn't have any shoes on, yes.

Q. Do you know when that particular photograph would have been taken?

A. It would have been taken during the booking process

sometime in the morning of the seventh.

MR. VOTTERO: All right. I would ask this be entered as an exhibits.

MR. FERRARA: No objection.

THE COURT: That's 19.

(Commonwealth's Exhibit No.
19 was offered and marked.)

Q. (By Mr. Vottero) What was his attitude toward you as you began giving him his rights?

A. He was complacent, just sitting there. When I would read him one section on occasion he would nod his response. I would ask him to vocalize that and he would say, "Yeah, yes."

Q. Now, I would like to show you this and ask you if you can identify that for us.

A. That's a Miranda warning card used by the Springfield police at the time. It has my signature, Mr. Perrot and Officer Ronald St. Germain as a witness and it's dated 12/7/85 and typed 5:05 a.m.

Q. And did you read him each of the numbers on that?

A. Yes, sir.

Q. And for the record, could you read those numbers?

A. Number one is: "Before we ask you any questions you must understand your rights.

"Number two, you have the right to remain silent.

"Number three, anything you say can be used against you in court.

"Number four, you have the right to talk to a lawyer for advice before we can ask you any questions and to have him with you during questioning.

"Number five is, if you cannot afford a lawyer one will be appointed for you before questioning if you wish.

"Number six is, if you decide to answer questions now without a lawyer present you will still have the right to stop questioning at any time until you talk to a lawyer.

"Number seven is, do you understand what I have read to you?

"Number eight, having these questions right in mind do you wish to talk to me now?"

Q. And that's the card signed by George Perrot in your presence?

A. Yes, sir.

MR. VOTTERO: May they be marked as an exhibit, Your Honor?

MR. FERRARA: No objection, Your Honor.

THE COURT: All right. Twenty.

(Commonwealth's Exhibit No. 20 was offered and marked.)

MR. VOTTERO: May I approach for just a moment, Your Honor.

THE COURT: Sure.

MR. VOTTERO: I just want to bring to the Court's attention there are other exhibit numbers a variety of places. I don't know how you want to handle that.

THE COURT: I would think these are the previous ones 12/9/87, that would be the motion to suppress. It's already been dealt with and number six that must have been during the trial.

MR. VOTTERO: I don't intend to pass it to the jury, but it just may need some time to be sanitized.

THE COURT: Maybe you can put it in this corner here and just leave the rest alone. (Indicating)

THE CLERK: Leave it alone?

THE COURT: Yeah.

(End of the side bar discussion.)

Q. (By Mr. Vottero) When did Officer St. Germain come into the room?

A. I'm sorry, sir.

Q. The officer who witnessed that do you recall when he came in the room?

A. With me. He would have come in with me.

Q. Do you know at that point in time whether or not any other officers had been in there prior to your arrival?

A. No.

Q. Now, after he had completed the signing of this card what was his answer to the last question, number eight, "Having these rights in mind do you wish to talk to me now?"

A. He indicated that he would.

Q. And did you and George Perrot have a discussion at that point?

A. Yes.

Q. What was the topic of that discussion?

A. Initially it was about the pocketbook snatch involving Miss Sapelli and the assault on Mr. McNabb on Ellendale.

Q. Now, how long did you and Mr. Perrot spend discussing those events?

A. Probably 20 minutes.
Q. Did you obtain any written statement during that 20 minutes?
A. No.
Q. Can you describe for us Mr. Perrot's demeanor during that 20 minute conversation?
A. He was calm, kind of resigned to the situation that he was there under arrest. He knew that.
Q. What observations did you make about his sobriety, if any?
A. There was an odor of alcohol on his breath. I thought he was sober.
Q. At anytime did he give you answers to questions that were not responsive?
A. No.
Q. So you do not have any trouble communicating with him?
A. No.
Q. Do you recognize this piece of paper, sir?
A. Yes.
Q. And what's that?
A. That is a form that was in use at the time to indicate a person's right to use the telephone. Every person

brought in under a right has the right to use the telephone within one hour of arrival at the station if he chooses. Signs this form to make him aware of that fact.

Q. And did you know if George Perrot ever signed that?

A. Yes.

Q. Do you know whether or not in your presence he used a telephone?

A. He did not.

Q. Do you recall today what his specific response was to when he wished to use a telephone?

A. I asked if he wanted to use the phone. He didn't want to now, but at some point he would like to talk to a girl.

Q. Did he sign that in your presence?

A. Yes.

Q. The time on this is 5:05, the same time as the card. Were these signed at the same time?

A. Yes.

MR. VOTTERO: May this be marked as an exhibit, Your Honor?

MR. FERRARA: No objection, Your Honor.

THE CLERK: Number 21. Exhibit number 21.

(Commonwealth's Exhibit No. 21 was offered and marked.)

Q. (By Mr. Vottero) After the 20 minutes where you discussed the incident of December 7, when that was at an end did you make an effort to take a written statement at that time?

A. No, sir.

Q. And why was no written statement taken then, do you recall?

A. Based on what he had told me I wanted to begin preparing an affidavit in support of a search warrant for 87 Malibu.

Q. And 87 Malibu is the home of George Perrot?

A. Yes.

Q. So when that 20 minute conversation was over did you leave?

A. Yes.

Q. Prior to leaving did you have any discussion with him whatsoever about the events of November 30, of 1985?

A. Yes.

Q. And could you tell us what that -- when that took place?

A. Told him about my knowledge that he assaulted some elderly ladies in the area, specifically 27 Malibu and 33 Covel and his response, "I don't know anything about any old ladies."

Q. What did you do then, sir?

A. I told him -- I continued the conversation and any point I mentioned the elder ladies his response was, "I don't know anything about any old ladies."

Q. Was this during that 20 minute time period that you already described?

A. Yes.

Q. Was this at the end of it or throughout it?

A. At the end.

Q. At the end. Now, you said you then left to begin working on a search warrant. Where did you go to do that?

A. To the main office of the detective bureau.

Q. And when you left who remained with Mr. Perrot, if anybody?

A. Nobody.

Q. Can you just walk out of the room or is it locked somehow?

A. You can walk out of it if it's unlocked from the outside. If it's locked from the outside you need a key or

someone from the outside to unlock.

Q. Do you know what condition you left the room when you walked out?

A. It was unlocked.

Q. Do you have any idea what was taking place with George Perrot while you were working on the search warrant?

A. No.

Q. How long did you spend working on the warrant?

A. About an hour and a half to prepare the affidavit.

Q. And eventually did you execute a search warrant?

A. Yes.

Q. How long did the whole process take of preparing it, obtaining it and then leaving the station to execute it?

A. Probably two a half hours or more.

Q. You then went to 87 Malibu Drive?

A. Yes.

Q. You have any memories of roughly what time it was you arrived there?

A. It was 8:30, probably a little later.

Q. Now, at that time, sir, while you were in the process of doing that did you take with you to 87 Malibu any of the physical evidence from November 30, of 1985?

A. Yes.

Q. What did you take with you?
A. Pair of knit gloves.
Q. I would like to show you what's marked Exhibit 15? (Indicating)
Are these the glove that you took?
A. Yes.
Q. And when you got to 87 Malibu, sir, just know what did you do with respect to these gloves? (Indicating)
A. I showed them to Miss Westcott who identified herself to me as George Perrot's sister with whom he lived.
Q. And when you showed these to her where were you in the house?
A. Standing outside the door of George Perrot's room.
Q. And did you ask her a question about these?
A. Yes.
Q. And what was the question you asked?
A. I asked her if they were hers.
Q. What was her response?
A. She said she had a pair just like that. I asked her if she could where were they. She indicated she just cleaned out a hallway closet and saw them in there about two weeks ago.
Q. Did you ask her to get the ones that she had?

A. (Witness indicating)

Q. And what did she do?

A. She went to the closet, searched on a shelf and told me they weren't there.

Q. Now, how long did you spend at 87 Malibu between taking the gloves there and executing the search warrant; do you have an idea?

A. Was in the house about an hour.

Q. And when you left the house do you recall where you went?

A. Back to the police station.

Q. And what did you do at the police station?

A. Had further conversation, inventory some evidence, talked with officers, arranged for the booking. I believe the booking had already started with Mr. Perrot and I remember asking that that stand up photo be taken.

Q. Now, sir, at this point when you say "the booking" is it correct he was being booked for the events of December 7, of 1985?

A. Yes, sir.

Q. And could you tell this jury, please, what "booking" is?

A. It's a process where information is taken. Once an

arrest is made a person is brought to the booking area, a desk. There is a sergeant, several uniformed officers that participate in the proceeding. Name, date of birth, social security number, address, occupation, mother's name, father's name, all that personal information is taken. The charges are entered and the arresting officers. And information regarding physical attributes, height, weight, color of your eyes, kind of dress, all that information is noted. Personal property is inventory. They're given the right to use a phone. And some point after that they were present their fingerprints are taken and mug shots were taken.

Q. And where is all this done with respect to the interview rooms in the detective bureau?

A. The interview room is on the second floor. The booking area is on the first floor of the station.

Q. And when you returned from executing the search warrant do you recall seeing George Perrot at that time?

A. He was at the booking.

Q. He was down at the first floor that time when you arrived?

A. Yes, sir.

Q. Now, did you say and or observe the booking procedure or did you go on to do something else?

A. I left the station and attended a religious ceremony for one of my sons.

Q. This was what day of the week?

A. Saturday.

Q. Now, do you have a memory as to what time you would have left the station roughly?

A. About 10:30, 11, I believe.

Q. And other than the 20 minutes or half an hour you spent in the interview room with Mr. Perrot did you spend anymore time with him discussing anything with him before you left to go to the religous meeting?

A. No, sir.

Q. Now, when that service was over did you go home or return to the station?

A. I went back to the station.

Q. Do you have a memory as to roughly what time you went back to that station?

A. Two thirty, three p.m. possibly.

Q. Now, when you got back there what did you do?

A. Made preparations for a line-up.

Q. Is this the line-up you were testifying about previously?

A. Yes.

Q. When you returned from the service did you spend some time, just yes or no, discussing with other officers what had taken place in your absence and at some point you began preparing this line-up?

A. Yes, sir.

Q. How did you go about preparing the line-up?

A. Attempted to find individuals of the same physical build, general characteristics of the suspect, Mr. Perrot, is. I would look at who was on duty at time, both those coming on duty and going off duty who would have had the same general characteristics as Mr. Perrot. I came up with seven individuals, six other individuals besides the suspect fitting that general description.

Q. When you returned and began preparing the line-up do you know where George Perrot was at that time?

A. In a cell block.

Q. Who is Tom Jarvis?

A. He was a detective assigned to the house breaks squad and detective bureau. Is he still with the police force?

A. No, sir. Do you recall seeing him on December 7, of 1985?

A. Yes.

Q. When did you recall first seing him?
A. First seeing him in the morning during preparation of the search warrant.
Q. Did you see him again after you returned from executing the search warrant, do you recall?
A. Yes.
Q. What was he doing when you returned?
A. Interviewing Mr. Perrot.
Q. And?
A. Wait a minute. When I returned from executing the search warrant?
Q. Yes.
A. First of all he was still in the detective bureau.
Q. And Mr. Perrot was being booked at that time?
A. Yes.
Q. Now, when you returned from the religous service you recall seeing Detective Jarvis?
A. Yes.
Q. Where was he?
A. He was interviewing Mr. Perrot.
Q. And where was that taking place?
A. In that interrogation room.
Q. So I take it then you did not see Mr. Perrot being

brought back into that interview?

A. No.

Q. Did you go into that room?

A. No.

Q. Did you have any more contact with George Perrot that afternoon?

A. Yes.

Q. When did that take place?

A. When I conducted the line-up I got him out of his cell. Told him that a line-up is going to occur and I told him generally I was going to have each one come up to the window and making your turns and give him an opportunity to stand somewhere in the line. I let him chose his place in the line-up.

Q. In particular he is the one on the far left; is that the position he chose?

A. Yes, sir.

Q. You say you went down to the lockup. Where is the lockup located?

A. It's in the same booking area. It's a holding area behind the booking desk that contained individual seats.

Q. On the floor?

A. Yes.

Q. Is it just one person to a cell?
A. Yes.
Q. Do you have a memory of having George removed from that cell?
A. Yes.
Q. What was he doing when you went down to remove him; do you recall?
A. It's not exactly a bed. It's a metal shelf that's used for reclining and he was sitting on that.
Q. Was he awake or asleep?
A. Awake.
Q. And where did this line-up take place?
A. The photo ID section which is just off the booking area.
Q. Also on the first floor?
A. Yes.
Q. Now, did you explain what was going on as you walked down that area?
A. I didn't say anything until I got him to the photo area, told him where the line-up was going to occur and about the turns and allowing him to take his position.
Q. Now, at that time during the line-up procedure could you describe for us what George Perrot's demeanor was,

what his attitude was?

A. He was calm. He nodded his acknowledgment of my instructions to them or my information to him. When I said, "You can stand anywhere you want. Move these guys around so you can take your place." he just said, "I'll stand here," and went to the front.

Q. Did you make any observation during this process as to his sobriety?

A. Yes.

Q. And what were those observations?

A. He was steady on his feet, seemed alert to me, understood, went approximately to the place he had chosen and did so on his own power.

Q. Again, did you have any difficulty communicating with him?

A. No.

Q. Did he give you any answers that were not responsive to the conversation?

A. No.

Q. And had you noticed any change whatsoever in Mr. Perrot from when you first saw him at 5:50 in the morning to seeing him during this line-up procedure?

A. No.

Q. Now, do you have a memory as to the time of the line-up procedure?

A. About 4:30.

Q. In fact, there is a clock depicted in Exhibit 14?

A. Yes, sir.

Q. Indicating about 4:32; is that right?

A. Yes, sir.

Q. Now, at that point, sir, can you tell me do you have any knowledge as to the results of the interview of Mr. Perrot by Detective Jarvis?

A. Yes.

Q. And had you see any written documents of any kind?

A. Yes.

Q. How many different written documents had you seen?

A. I believe two.

Q. And had you read those?

A. Yes.

Q. Did you, yourself, ever have any discussion with Mr. Perrot about the contents of either of them during the line-up procedure?

A. No.

Q. And were you present when either of those two statements were taken?

A. No.
Q. Were you present when either of them was signed?
A. No.
Q. At the conclusion of the line-up procedure what did you do?
A. I caused that photo to be taken. Returned Mr. Perrot to his cell. Excused the other individuals. Returned to the DB.
Q. How long did you stay at the police station that afternoon?
A. I left probably 6:30, seven at night.
Q. Did you have anymore contact with George Perrot on that night on December 7?
A. No.
Q. At any time, sir, did you see any of Mr. Perrot's relatives at the police station on December 7?
A. I believe I saw his mother. I know she was with other people, but I don't know who. They were on a bench outside the detective bureau.
Q. On the second floor?
A. Yes.
Q. Do you have any memory as to what point in the day you made those observations?

A. Late in the afternoon.

MR. VOTTERO: Those are all the questions I have at this time.

THE COURT: Can I see counsel?

(The following discussion was held at the side bar.)

THE COURT: Juror number 13 seems to be having a really bad cold and probably a good idea to quit right now.

Do you have any problem bringing him in tommorrow; is that all right.

MR. FERRARA: That's fine.

MR. VOTTERO: Do we want to make any inquiry about the jury?

THE COURT: Is that the one -- it's the one in the far back right, is that juror 13?

THE CLERK: Seven.

THE COURT: Seven is the last one on the right in back near the door.

MR. VOTTERO: That is the one.

MR. FERRARA: Thirteen is the young girl in the front row.

MR. VOTTERO: Perhaps we can break now and do that tomorrow.

THE COURT: Sure.

(End of the side bar discussion.)

THE COURT: Mr. Foreman, ladies and gentlemen, I think this is an appropriate time to recess for the day. You have been at work all day and Lieutenant Kelly you can come back tomorrow for cross-examination.

Allow me to repeat the instructions I have given on several occasions. I am not insulting your intelligence, believe me. It is simply that important so bear with me. During this recess and every other recess you should have no contacts with anyone having anything to do with this case. Don't discuss this case with anyone, even among yourselves. Take particular attention to keeping yourselves apart from information about the case and maybe in the news media because you could be reading the newspaper and yet innocently turn to a part that might have something to do with the case. Be alert to that. Pay attention to it. Put it aside. We can catch up on all of that when all of this case is over, but while the

case is on pay no attention to any such information if it is on the radio or on any other place.

Don't take any private view of any area that's been discussed in the course of the trial and don't conduct any experiments and remain impartial, true to your oath.

Return here tomorrow morning at nine o'clock at which time we will resume the trial. I wish you all a pleasant evening.

(The Court recessed at 4:15 p.m.)

* * * * *

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF HAMPDEN

I, ALICIA CAYODE TORRUELLA, Certified Shorthand Reporter, hereby certify that the foregoing is a true and accurate transcription of my stenographic notes to the best of my knowledge and ability.

ALICIA CAYODE TORRUELLA