**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GEORGE PERROT,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS KELLY, *et al*.<br><br>Defendants. | Case No. 18-cv-10147<br><br>Hon. Page Kelley<br>Magistrate Judge<br><br>**JURY TRIAL DEMANDED** |

# EXHIBIT 18

COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420-25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

TRIAL: HELD IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons, J., and a jury on January 8, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231



1/7/93

# I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Commonwealth | | | | |
| Thomas Kelly | | | | 435 |
| Thomas Jarvis | 465 | 492 | 463<br>518<br>522 | 520 |
| Defense | | | | |
| Nancy Westcott | 535 | 548 | 552 | |
| Charge Conference | 561 | | | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| H for Identification | statement | 475 |
| I for Identification | search warrant waiver | 479 |
| Commonwealth's 22 | Miranda card | 479 |
| Commonwealth's 23 | statement | 489 |
| Defendant's 24 | search warrant waiver (I for ID) | 503 |
| Defendant's 25 | statement (H for ID) | 506 |
| J for Identification D | photo | 550 |

(The following discussion was held in the Judge's chambers.)

(The Court and counsel were present at 9:27 a.m.)

THE COURT: Okay. On the record. Lobby conference at the request of --

MR. VOTTERO: (Interposing) I think --

THE COURT: -- counsel.

MR. VOTTERO: -- both of us.

MR. FERRARA: Your Honor, first of all there was a particular piece of testimony given by Lieutenant Kelly on the sixth that there is some question in my mind as to whether I want to pursue cross-examination of it and for strategic purposes I didn't want to get into the specifics. I want the stenographer to be able to find the question, the response, and she advised me that the tape, that she has it at home. It would take her 20 minutes to get it and I am going to ask you if I can have permission.

I know it would keep the jury waiting to have her go and get it and I would just say there are some other

things that Attorney Vottero and I could do during this period of time and I feel need to be done. In any event, I recognize the delay and inconvenience and I am going to ask you if you permit the stenographer go get that tape.

THE COURT: What is this about? Maybe we can reconstruct.

MR. FERRARA: Well, Your Honor, the problem I have if I discuss it in chambers it might negate any effective use of it in cross-examination.

THE COURT: Do you want to discuss it in camera with me? What's the situation?

MR. FERRARA: If you would like.

THE COURT: Well, I am certainly -- don't insist. I am looking for a way to get around this if there is.

MR. FERRARA: I honestly don't see without having reference to that testimony and it's, I think, a potentially very significant point that I would like to make.

MR. VOTTERO: You know, it just seems to me that the ordinary course here is to rely on counsels' memory and question the witness whether they said the

particular thing during earlier testimony of the case and go back and pull out the earlier testimony in some fashion strikes me as a problem.

The other thing is it was mentioned that we could -- we would have other things that we could do. These are not things that I wish to do and perhaps you need to indicate the other area that you're trying to go through today.

MR. FERRARA: First of all what I am talking about is a potentially prior inconsistent statement and on a point of evidence that is significant. So if you would like to hear me in camera I would be happy to explain.

THE COURT: It's entirely up to you. I am just trying to get my way around this.

MR. FERRARA: What's normally done is -- no, I can't testify as to what he said an earlier time in the same hearing, but I can have the stenographer read it back and that's the way I think it would be properly done and I would chose to proceed.

The other thing that I would like to do and I think would take up 20 minutes is I wanted to have access to know that we have available a Miranda card and one, two,

three, four, five, six and of the original property tags in this case that are in an evidence box and are not readily available and it might cause us a delay during the course of the trial to not have them out and available, more than 20 minutes.

THE COURT: Isn't there a Miranda card in evidence?

MR. FERRARA: Your Honor, there are three or four Miranda cards in this case.

THE COURT: Oh, okay. There's another one you want?

MR. FERRARA: There is one other one I want available. I assume Mr. Vottero may be putting in the other two.

MR. VOTTERO: I hadn't decided whether I put them in. I wanted the one in so the jury can see it is a physical piece of evidence. They may go in, the other two.

MR. FERRARA: I want the Miranda cards available. Also I had subpoenaed through indigent summons a particular property tag which I don't believe Mr. Vottero has here and also an evidence log book from the Springfield Police Department that would show when

particular pieces of evidence was signed in and out. I don't know if that particular keeper of the record is here yet. I believe this will be probably at 9:30.

THE COURT: What do you want these for, cross-examination or you want them for your own case?

MR. FERRARA: I may wish to use them for cross-examination.

THE COURT: Let's see if you can send someone out for them I suppose.

MR. VOTTERO: Well, I've asked the police a few weeks ago to send me the original police folder which is in this case and the others which they were able to locate. After about four or five days they sent that over and then I had them pull out anything, physical evidence they may have had. They put it all together in a box. That arrived Monday and it's been in the safe at the DA's office. I don't know whether these original property tags are there. I haven't seen any original property tags. I don't know where the stuff is. My fear is because of the age of the case it's difficult. He is going to have to locate some of these original things.

MR. FERRARA: Yes. Some of the original property tags that were -- I don't know if they went

into evidence in the first trial. I think they were pended to some of the items.

MR. VOTTERO: There's other stuff in that file from the first trial you could look through.

MR. FERRARA: I think it would take us, realistically, to resolve this, I think it might save time during the trial. It might make a fairer presentation of the case. I am entitled to ask about them.

THE COURT: Well, my inclination is to go forward now and if there is some problem or delay we can figure it out and you will have more than one other opportunity to put it in in some other way, but I think to start to drag the case now we are making some progress even with the voir dire.

MR. FERRARA: I understand. If we, I, can go back to my original point. I still need, I feel, this tape to cross-examine this particular witness effectively by use of a prior inconsistent statement, potentially, I believe, during this trial.

THE COURT: Why don't you -- can't you do it the same way we do it? This is an inconsistent statement he made on the stand in this trial?

MR. FERRARA: Yes.

THE COURT: No problem. The jury heard it. It's just the way you usually do it. You are not talking about a typo, a probable cause hearing six months ago or something like that.

MR. VOTTERO: My handicap is I don't know what it is. So if he has this brief exchange read back by the stenographer I don't have the ability of seeing what was said prior to or after. It stands out with an emphasis different from the jury's collective memory of the testimony.

THE COURT: How can that be?

MR. FERRARA: I'd rather have it done in the usual way. I think it makes more sense.

MR. VOTTERO: I am happy to leave if he wants to put it on the record, Your Honor.

THE COURT: Sure.

THE CLERK: You want your file?

MR. VOTTERO: Nobody is going to touch it.

(Attorney Vottero exits the room.)

MR. FERRARA: Your Honor, there has been some

testimony about a bedsheet and that there were stains found on the bedsheet. There has been testimony that the bedsheet had been washed many times. When Sergeant Kelly originally testified about the bedsheet my notes indicate that he said when he found the bedsheet there were lot of fibers on the bedsheet and that it was soiled.

I think that's significant because there is going to be some focus, some argument about whether or not the blood genetic markers taken from the sheet might have been from a stain left there by the victim's relative. She testified that the victim's relative left a blood stain on the sheet. The condition of the sheet, I believe is a very important issue. Clearly, if the sheet was -- had a lot of fibers and was soiled it may suggest to the jury that the sheet was not washed as frequently as perhaps Miss Prekop stated.

To go a little further, the expert testified that with a blood stain, a fresh blood stain the size of a half dollar that he could extract from that all 13 of the genetic markers that they typically test for in forensic studies of blood. In this case they were only able to identify four genetic markers. I held the sheet up to the jury and the particular hole that was in the

sheet, which the expert testified approximated the size of the stain, was about a half dollar size stain. He testified the only other factors which would -- were the factors which would limit obtaining identification of these markers was age, concentration, -- there were three factors. Two of them were age and concentration.

THE COURT: I think the material that it was deposited on, it might have been.

MR. FERRARA: Yes. Necessarily it has to be a focus of this trial, of the jury's deliberations as to whether or not those might have been markers obtained from the blood stain that the victim testified was on the sheet. There has been no other blood found nowhere else on the premises.

THE COURT: On the glove.

MR. FERRARA: Some found on the glove, nowhere on the night clothes; nowhere on the carpet. When I asked Sergeant Kelly about the condition of this sheet on cross-examination he said, "No, I didn't say the words lot of fibers," and he backed off and basically didn't give a clear indication of what the condition of the sheets was. I think it directly contradicts the statements on direct.

THE COURT: Can I just interrupt. The inconsistency is whether he said "a lot of fibers;" you say and now he denies saying "a lot of fibers"?

MR. FERRARA: And he seemed to be saying that he didn't -- that he might observe some fibers. I think it's significant and I am looking now toward an argument. The reason it is significant, if there are a lot of fibers it would suggest the sheet was on there for perhaps a longer period of time. This woman had a dog named Scuffy, dog hairs, so forth.

So I think it's important. I don't think the 20 minute delay that it would take, given that I do have other things that, I think, in the actual trial of this matter would expedite it.

THE COURT: I am not even sure the delay is justified for this kind of alleged inconsistency period. I mean if it happened during the trial, the court reporter happened to have it handy, it would have been a two minute thing. I am not sure I would exercise my discretion and permit her to go for it. I don't think it's justified.

I think the jury heard it, you can leave it to them. I'm not sure that it's the kind inconsistency that

justifies. That's my judgment and I'll certainly allow you to argue that if you wish. I don't know what else to do. It's really not enough to delay this, I think.

MR. FERRARA: Yes, sir.

THE COURT: Okay.

MR. FERRARA: My objection has been noted for the record?

THE COURT: Yes, of course.

MR. FERRARA: Thank you, Your Honor.

THE COURT: Okay. We will get going.

MR. FERRARA: One other thing that I had forgotten, we should bring Mr. Vottero in. I was simply going to ask you there was another article that contained --

THE COURT: (Interposing) I will ask them again, of course.

(The discussion held in the Judge's chambers was concluded.)

* * * * *

(The defendant was present.)

(The Court and jury were present at 9:52 a.m.)

THE COURT: For the record the defendant is present. The counsel are present. All of the originally impaneled jurors are present.

If you will bear with me, ladies and gentlemen, I have two questions for you. The first is, did any juror fail to adhere to the instructions that I gave you at the recess yesterday?

(Pause)

THE COURT: And does any juror have anything to report to this Court concerning any matter that might have affected your ability to be impartial in hearing the evidence in this case?

(Pause)

THE COURT: There being no response I believe we are ready to proceed.

MR. VOTTERO: I believe I had completed my

direct examination.

THE COURT: Very well. I suppose you're the same Lieutenant Kelly who has testified here yesterday?

THE JUROR: Yes, sir.

MR. FERRARA: Thank you, Your Honor.

* * * * *

THOMAS KELLY (prev. sworn)

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Now, Sergeant Kelly, directing your attention to the morning of December 7, 1985, I believe you testified that you received a telephone call at home; is that correct?

A. Yes, sir.

Q. Was that about 3:30 a.m.?

A. No.

Q. What time was that, sir?

A. It would have been later, sometime past 4:15.

Q. And you then went to the police department; is that correct?

A. Yes.

Q. And you arrived there at approximately 4:30?

A. Approximately, yes.

Q. And when you arrived at the police department you

saw an Officer St. Germain there; is that correct?

A. Yes.

Q. And you went to the Crime Prevention Bureau and you saw George Perrot in the interrogation room; is that correct?

A. No.

Q. Tell me what you did when you arrived at the police department.

A. It would have been the detective bureau, sir.

Q. The detective bureau is distinct from the crime prevention bureau?

A. Yes.

Q. You went to the crime -- detective bureau?

A. Yes.

Q. You saw Mr. Perrot in an interrogation room there; is that correct?

A. Yes, sir.

Q. About what time would that have been, sir?

A. Shortly after arrival, maybe quarter of.

Q. Quarter of five?

A. Yes.

Q. And you were with Officer St. Germain at that time?

A. I don't know if I was with him or by myself. I don't know if he was with me or someone else in the room or in

the building.

Q. When you went into the interrogation room did Officer St. Germain in go in with you?

A. Yes.

Q. And at that time you observed George Perrot there; is that correct?

A. Yes.

Q. And he appeared mussed to you; is that correct?

A. Yes.

Q. And when you say "mussed" would you tell me what you mean?

A. As I said before his hair was unkept. He was dirty. He had his shoes on, but they were untied. That's my description.

Q. I'm sorry?

A. That's my description.

Q. At that time he was wearing pants and a jacket, but no shirt; is that correct?

A. I don't know about no shirt. I'm not sure about that.

Q. You detected an odor of alcohol; is that correct?

A. Yes.

Q. And how close were you to Mr. Perrot?

A. Two feet, two and a half feet.
Q. And there was an a odor of alcohol that you clearly identified as coming from the person of Mr. Perrot; is that correct?
A. I knew it wasn't from me, yes sir.
Q. And you then began to question Mr. Perrot; is that correct?
A. No. I first Mirandized him.
Q. You Mirandized him. You Mirandized him at 5:05 a.m.; is that correct?
A. Yes.
Q. And had you questioned him prior to that?
A. No.
Q. And I want to show you Exhibit No. 20. And this is the Miranda card that you read to him; is that correct?
A. Yes, sir.
Q. And Officer St. Germain's signature is on that card as well?
A. Yes.
Q. So at the time you Mirandized Mr. Perrot Officer St. Germain was there as well?
A. Yes, sir.
Q. And you asked Mr. Perrot some questions with

respect to the December 7, incident; is this correct?

A. Yes.

Q. And so the jury is clear, on December 7, there was an incident of a purse snatch from a woman named Shileen Sapelli, correct?

A. Yes, sir.

Q. And there was also a break into the home of a person named McNabb, correct?

A. Yes.

Q. And it was for those incidents that Mr. Perrot had been arrested?

A. Yes.

Q. And you also testified, I believe, that you asked Mr. Perrot to sign a telephone slip; is that correct?

A. Yes.

Q. And he did that; is that correct?

A. Yes.

Q. And when he signed this telephone slip did he sign this in the correct place?

A. No.

Q. Would you explain to the jury where he signed that?

A. He signed it in the place where I would normally have typed or hand printed his name as the person I was

reading the right to use the phone to. It says person colon, and that's where he signed it.

Q. Thank you.

And at that time you also began to question him about the incidents which are on trial here, meaning the break into the Lichwala residence and the break of Mary Prekop; isn't that correct?

A. Yes.

Q. And at that time he told you, "I don't know anything about those incidents," correct?

A. He used the term, "I don't know anything about any old ladies."

Q. But you understood that to mean what you just asked, "I don't know anything about those incidents," correct?

A. Yes.

Q. Do you recall -- did you actually ask him anything about the McNabb break or was your -- were you asking him only about the Sapelli purse snatching?

A. I asked him about both incidents.

Q. You questioned him for a period of, I believe, twenty minutes you testified to?

A. Yes.

Q. And then you left and asked two officers to prepare

a search warrant affidavit; is that correct?
A. Yes.
Q. And that was sergeant -- excuse me. I don't remember the rank. One of them was an Officer Trites; is that correct?
A. Yes.
Q. And the other officer was whom?
A. St. Germain.
Q. Officer St. Germain.
You then returned to the interrogation room; is that correct?
A. I don't believe I did.
Q. Well, George Perrot remained in the interrogation room from five a.m. to eight a.m.; isn't that correct?
A. Yes.
Q. And during that period from five a.m. to eight a.m. either you or Sergeant Canevari continued to question him; isn't that true?
A. No, sir. I don't believe so.
Q. What do you believe happened from five a.m. through eight a.m., sir?
A. As far as what I did?
Q. As far as when you and or Sergeant Canevari were

questioning him during that period.

A. I can tell you what I did.

Q. I asked you just a moment ago whether, from roughly five to eight a.m. Mr. Perrot was in the interrogation room and either you and Sergeant Canevari were questioning him and your response to that was no?

A. My response to that is I can only tell you what I was doing.

Q. Officer, do you recall -- Lieutenant, did you recall testifying in a related hearing in this case on September 2, 1986?

Do you recall you testified --

A. (Interposing) I testified previously.

Q. It was a motion hearing?

A. Yes.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) And this would have been on September 2, 1986, do you recall this?

A. I'll have to accept that as September 2nd. I don't have it.

Q. Okay. On that date you were asked a question with

respect to George Perrot. "What did you do with him from 5:15 or 5:30 until eight when you went out for 7:30 -- when you went out for a search warrant," and you answered, "He was kept in the interrogation room;" isn't that correct?

A. Yes.

Q. You were then asked -- "Were you talking to him during that period?" "Either myself or Sergeant Canevari was."

A. That's what it says, yes.

Q. Would you agree then that's what occurred between five and eight a.m., sir?

A. As I sit hear today I can't tell you that I or Sergeant Canevari was constantly in touch with Mr. Perrot. It was seven years ago.

Q. I understand that.

Would you agree your memory of this particular event was probably better in September of 1986?

A. Yes.

Q. So having read your testimony on that date would you agree that that is what occurred between five and eight a.m. on December 7, 1985?

A. I will say that it may have occurred.

Q. You have any recollection of anything other than

the interrogation of Mr. Perrot by either Sergeant Canevari and yourself occurring between five and eight a.m. on that day?

A. As to what?

Q. As to what you did, as to what was done with Mr. Perrot while he was in that interrogation room.

Let me simplify it.

As you sit here now, do you recall that during that period of time Mr. Perrot remained in the interrogation room?

A. Yes.

Q. And do you recall at various times you questioned him?

A. Yes.

Q. And you recall at various times Sergeant Canevari questioned him?

A. No.

Q. Okay. Do you remember that at that time Mr. Perrot told you that he didn't want to go down to the holding cell?

A. Yes.

Q. And he gave you a reason for not wanting to go down there, didn't he?

A. That it was cold.

MR. FERRARA: Can I approach the witness again,

Your Honor?

THE COURT: Yes.

Q. (By Mr. Ferrara) Referring to that same hearing on September 2nd, 1986.

A. Yes, sir.

Q. Beginning at page 131, sir, you were asked a question, and during that time period that we're dealing with, 5:15 to seven, 7:30. Was he ever taken down and put in a cell? And to that you answered, "No, sir;" is that correct?

A. That's correct.

Q. And you were asked, "Was there a reason for that?" And your answer was "He was very adamant that he didn't want to be placed in a cell. He said that they were -- based on what he told me I had the feeling that he was very uncomfortable in that closed cell. He would alternate between telling us he didn't want to go to the cell and telling us that he wanted to see his girlfriend." And that's the way you testified on September 2, 1986?

A. Yes.

Q. When you began that answer you said that he was "very adamant that he didn't went to be placed in that cell. He said that they were" and you never completed answering what he said. Do you remember now what he told you?

A. That they were cold. That they were cold.

Q. That "they" the cells were cold?

A. Yes.

Q. And he wanted to call his girlfriend?

A. He wanted to see her.

Q. Sir, isn't what Mr. Perrot told you that they were rattling on his cell bars and banging on the floor outside of his cell?

A. No.

Q. Sergeant, Mr. Perrot indicated to you that he was willing to speak to you regarding the pocketbook snatch that morning; is that correct?

A. Yes.

Q. And did you take a statement from him at that time?

A. No.

Q. And this was at five a.m., correct?

A. Correct.

Q. And did Sergeant Canevari take a statement from him at that time about the pocketbook snatch?

A. No.

Q. What you did was asked Officers Germain and Trites to prepare the search warrant affidavit and then you went and obtained some gloves that are in evidence; isn't that correct?

A. Yes.

Q. And when -- the gloves I am referring to specifically are Exhibit No. 15; is that correct?

A. Yes, sir.

Q. And these gloves were in the property room at the -- were they in the detective bureau or the crime prevention bureau?

A. Crime prevention.

Q. Okay. And you testified earlier those were found at the home of Mary Prekop; is that correct?

A. Yes, sir.

MR. FERRARA: Excuse me, Your Honor.

THE COURT: Yes.

Q. (By Mr. Ferrara) I believe your testimony on direct was that one glove was found on the bed and one glove was found on the floor; is that correct?

A. I believe that's how I found them, yes.

Q. Are you not certain, sir?

Are you not certain as to where you found them?

A. I believe that I found them on the floor and on the foot of the bed.

Q. Is it possible that both gloves were on the floor, sir?

A. It's possible, but I don't think so.

Q. You recall testifying at a hearing on this matter --

MR. FERRARA: May I approach the witness, again?

THE COURT: (Indicating)

Q. (By Mr. Ferrara) You recall testifying in a hearing on this matter on December 19, 1987?

A. Yes.

Q. And you were asked a question?

MR. VOTTERO: Could I have the page, please?

MR. FERRARA: I'm sorry, sir. Page is 197.

Q. (By Mr. Ferrara) You were asked a question at that time with reference to those gloves. "Are those the two gloves that you sent down?" And you answered, "Yes, sir," correct?

A. Yes.

Q. And you were then asked, excuse me. And you were then asked by Assistant District Attorney Bloom, "And those were found where, again, in the bedroom of Mary Prekop?" And you answered, "In the bedroom, on the floor, near the bed." Sir having read that does that refresh your recollection that those gloves were found on the floor?

A. No.
Q. But you would agree that's how you testified on December 9, 1987?
A. Yes.
Q. And your recollection was one was on the bed and one was on the floor or you're uncertain?
A. My memory is one was on the bed and one was on the floor.
Q. In any event, sir, you got these gloves from the crime prevention bureau and they had been tagged into evidence on November 30; is that correct?
A. Yes.
Q. And you testified earlier during this trial that property was identified even by a property tag. Well, it was identified by property tag first of all; is that correct?
A. Right.
Q. And when someone signed out property, sir, they have to sign the property tag to indicate that they had taken it?
A. Yes.
Q. And did you do that on December 7, 1987?
A. I don't know.
Q. You would have signed either the property tag or an

evidence log book; is that correct?

A. Yes, one or the other.

Q. So that when you took those gloves you would -- there would be some signature you had taken those gloves on that day, correct?

A. Yes.

Q. And would it also indicate the time that you took the gloves?

A. No, I don't believe so.

Q. In any event?

A. Well, I'm sorry. Let me back up. Depending on what procedure was in place at that time. I believe the log had a time, but I don't believe there is a time or notation or spot for a time or the tag. So, I can't tell you whether a time was noted.

Q. And you took those gloves -- when you took those gloves were they wrapped at that time or were they simply tagged?

A. Tagged.

Q. And that was -- and at about eight a.m. -- well, let me ask you, at what time did you leave the police department with those gloves?

A. Between eight and 8:30.

Q. And you then went to 87 Malibu Drive; is that correct?

A. Yes.

Q. And you knew that was where George Perrot lived, correct?

A. Yes.

Q. And when you went to 87 Malibu Drive your purposes were twofold; isn't that correct?

Well, let me be more specific. First of all you wanted to conduct a search of the premises pursuant to a search warrant, correct?

A. Yes.

Q. And you also wanted to ask Nancy Westcott, George Perrot's sister about those gloves?

A. Yes.

Q. And when you went there Nancy Westcott's husband answered the door; is that correct?

A. I believe so.

Q. And Nancy Westcott was in the shower, correct -- strike that.

I realize you wouldn't have no way of knowing that she was in the shower.

Nancy Westcott came out of the bathroom and she was

wearing a robe; is that correct?

A. I know that I spoke to her. I don't know what she was wearing.

Q. Do you remember speaking with Mr. Westcott first?

A. Yes.

Q. And do you remember asking Mr. Westcott if you could go down in the basement?

A. I don't recall that.

Q. You recall that the officers wanted to search the basement and they wanted Mr. Westcott to turn the light on in the basement?

A. I don't recall.

Q. And, in any event, you did speak to speak to Nancy Westcott about the gloves, correct?

A. Yes.

Q. And you showed her those gloves; is that correct?

A. Yes.

Q. And I believe you testified yesterday that she said to you, "These are my gloves," and then she looked in the closet for -- strike that.

I believe what you said was, she said, "I have a pair of gloves just like that." And then she looked in the closet for the gloves which she said were just like this; isn't that

correct?

A. I asked her if she recognized those gloves. She said, "I have a pair just like that," and then she told me she had cleaned out a hall closet and when she cleaned out the closet they were in that closet.

Q. Sir, isn't what Nancy Westcott told you that those gloves looked familiar to her?

A. My memory is that she said she had a pair just like that.

Q. You completed the search and brought these gloves back to the police department at 10 a.m.; is that correct?

A. We spent about an hour in the house, yes, sir.

Q. Okay. Would it have been roughly 10 a.m.?

A. Roughly.

Q. And did you then return the gloves to the Crime Prevention Bureau property room?

A. I'm not sure where they were returned.

Q. What do you recall happened with the gloves?

A. I don't know.

Q. Do you recall speaking to an Officer Thomas Jarvis when you returned to the police department?

A. Yes.

Q. That was at approximately 10 a.m.?

A. I don't know if he was there when I got back or if he came in a little later on.

Q. Shortly after you arrived at the police department you spoke to Officer Jarvis; is that correct?

A. At some point, sir.

Q. And you told him that you had questioned George Perrot?

A. Yes.

Q. And you indicated to him that you had searched the premises of 89 Malibu?

A. Yes.

Q. Had you spoken with Thomas Jarvis earlier in the day?

A. Yes.

Q. What time was that, sir?

A. It would have been before I left to execute the search warrant, between 7:30 and 8:30.

Q. When you returned a piece of evidence to the property room do you have to sign a document evidencing you returned it?

A. Depending on -- again, depending on what procedure was in place, either the person turning it in or the person receiving it would have noted its return.

Q. Mr. Kelly, Lieutenant Kelly, didn't Nancy Westcott indicate to you after she had indicated that these gloves looked familiar, that they looked similar to gloves that belonged to George Perrot's girlfriend?

A. I don't recall that.

Q. After you returned to the police station, sir, didn't you ask Officer Jarvis to bring those gloves to Lisa Eldridge's house?

A. I don't recall doing that, sir.

Q. You were the officer in charge of this investigation weren't, you, sir?

I believe your testimony was that this was your case, correct? I think those were your words, correct?

A. I don't believe I said that.

Q. In any event you were directing the investigation of this case; isn't that correct?

A. Yes.

Q. Would it be fair to say that you reviewed every report written about this case?

A. No.

Q. When someone writes a report as they were written in this case and sent to CPB was that something you would read?

A. Yes.

Q. Okay. You are aware, are you not, that after you returned with those gloves to Thomas Jarvis you took those gloves over to Lisa Eldridge's house?

A. I know that he did that.

Q. And that was after you had spoken to him, correct?

A. Yes.

Q. You testified, I believe, that shortly after returning to the police station you went to a religious ceremony for one of your children, sir?

A. Yes, sir.

Q. You then returned to the police station later that afternoon; is that correct?

A. Yes.

Q. Did you see George Perrot at the police station when you returned?

A. Yes.

Q. And, sir, did you testify yesterday that you saw him in booking?

A. In his cell.

Q. I'm sorry. When you returned at 10 a.m. you saw George Perrot at booking; is that correct?

A. He was downstairs, correct.

Q. In the booking area?

A. Yes.

Q. Or in an area where they do booking?

A. Yes.

Q. So we are using terms here -- when we talk about booking we are talking be about photographs, fingerprints, identifying information; is that correct?

A. The cell area, the lower section.

Q. And he was awake at that time, correct?

A. Correct.

Q. He was awake at that time?

A. Yes.

Q. Did you see an Officer Paul Lance (phonetic) there at that time?

A. I don't know. I don't think so.

Q. Do you know Officer Lance (phonetic)? There is an Officer Paul Lance (phonetic), correct?

A. There was.

Q. Later that day you saw Attorney Francis Bloom; is that correct?

A. Yes.

Q. And where in the police department did you see Attorney Francis Bloom?

A. In the DB.

Q. Detective bureau?

A. Detective bureau, yes.

Q. And was he in the interrogation room?

A. No.

Q. Was George Perrot in the interrogation room at that time?

A. I don't believe so. I don't know.

Q. About what time was it that you saw Mr. Bloom?

A. It would have been when I returned to the station, before maybe three or 3:30.

Q. You know that Mr. Bloom -- as a result of being the officer in charge of this investigation you know that Mr. Bloom had been there earlier; isn't that correct?

A. He was there when I got to the station.

Q. So you don't know what went on between -- strike that.

What time did you leave to go to the ceremony for your child?

A. Sometime after 11 to three.

Q. So from 11 to three you don't know what went on with respect to Mr. Perrot; is that correct?

A. Right.

Q. Sergeant Kelly, with respect to the stains on the sheets were there any photographs taken of the stains on the sheets?

A. I don't believe so.

Q. And the stains on the gloves did you photograph those?

A. I don't think so.

Q. Were you present when a head hair was taken from George Perrot?

A. I don't recall being there.

Q. Do you know that they were taken on December 7, 1985?

A. I know they were, yes.

Q. And at that time the bedsheet and the gloves were still in the property room at the Crime Prevention Bureau, isn't that correct?

A. At what time now?

Q. At that time meaning on December 7, 1985.

A. Yes, sir.

Q. They had not been sent to the FBI laboratory yet; is that correct?

A. No.

Q. And do you recall what date those were sent to the

FBI laboratory?

A. I don't have a specific date. I think it was after December 10.

Q. And in addition to hair being taken from Mr. Perrot on December 7, blood was taken from Mr. Perrot on December 8, wasn't it, sir?

MR. VOTTERO: Objection, Your Honor. May we be heard?

(The following discussion was held at the side bar.)

MR. VOTTERO: It was taken on the ninth and the tenth. It is clear in the record. I don't know if he made a mistake.

MR. FERRARA: It was a mistake on my part. I believed it was taken on December 8.

MR. VOTTERO: December 10, in the jail on the motion to suppress. That was the whole --

MR. FERRARA: (Interposing) Let me check. I will correct the date.

(End of the side bar discussion.)

MR. FERRARA: Can I have a moment, Your Honor?

(Pause)

Q. (By Mr. Ferrara) Do you have a memory, sir, of the date the blood was taken?

A. I believe it was December 10th, sir.

Q. Okay. And the sheet and pillow case was sent to the FBI laboratory on December 10; isn't that correct?

A. The 10th or some day after that.

Q. Were there some fingerprints found at 33 Covel Street, sir?

A. I'm not sure.

Q. Do you recall seeing a report from an officer Cheetham who testified earlier made reference to fingerprints being taken?

A. I don't recall seeing that.

MR. FERRARA: May I approach the witness, Your Honor?

MR. VOTTERO: Your Honor, I object. I would like to be heard at side bar.

(The following discussion was held at the side bar.)

MR. VOTTERO: Your Honor, he's approached with a report of Robert Cheetham. He testified he was never asked about fingerprints. This witness says he doesn't know anything about it.

MR. FERRARA: Your Honor this --

MR. VOTTERO: (Interposing) And it's a palm print that's recovered that they're unable to match to anybody.

MR. FERRARA: I don't remember what it was and in looking through my files yesterday evening I find this report from Robert Cheetham that indicates fingerprints taken and I have the report.

MR. VOTTERO: Now, I have to call these people back to say they couldn't do anything with it.

MR. FERRARA: Okay. I will withdraw the question.

THE COURT: All right.

(End of the side bar discussion.)

Q. (By Mr. Ferrara) Did you begin having some discussions, asking some questions of Mr. Perrot at three p.m.

with respect to the Prekop case?

A. Did I?

Q. Yes.

A. No.

MR. FERRARA: No further questions, Your Honor.

MR. VOTTERO: Just a couple.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. 33 Covel Street and 27 Malibu just with respect to those incidents of November 30, not the December 7th, case, were any efforts to obtain usable prints successful?

A. No.

Q. And back in 1985, again, what shift were you working in November?

A. Four p.m. to midnight plain clothes, Crime Prevention Bureau.

Q. What time would you leave the station generally?

A. Quarter of 12.

Q. Quarter of 12 you would go home?

A. Yes, sir.

Q. And that was five days a week or?

A. Four days on two days off was the schedule.

Q. And when you were awakened on November 30, had you worked the previous night?

A. Yes.

Q. And on December 7, the same situation?

A. Yes.

Q. Do you know whether you had to go into work the following day on the seventh?

A. The eighth and the ninth were my days off.

Q. And today in 1992 what is your schedule now?

A. Midnight to eight a.m. uniformed division.

Q. And for the last three or four days have you been working midnight to eight a.m.?

A. Yes.

MR. VOTTERO: That's all I have. Thank you.

MR. FERRARA: No further questions.

THE COURT: Very well. I think this might be an appropriate time to take a morning recess.

Very well, ladies and gentlemen, if you will kindly follow the court.

(Recess was taken at 11:40 a.m.)

* * * * *

(The defendant was present.)

(The Court and jury were present at 11:07 a.m.)

MR. VOTTERO: Thank you, Your Honor.

* * * * *

THOMAS JARVIS (sworn)

DIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Sir, could you tell the jury your name and how you were employed in November of 1985?

A. My name is Thomas Jarvis. I was a Detective at the Springfield Police Department.

Q. And what do you do today?

A. I retired from the Springfield Police Department. I am a student teacher in the Wilbraham school system.

Q. How long were you with the police department all together?

A. Twenty-five years.

Q. During that time what were the various duties you were assigned, bureaus and duties you were assigned to?

A. Detective bureau, approximately 22 years working burglaries, auto theft, major crimes. Prior to that I was a patrolman working the six to two shift, midnight to eight

shift.

Q. In November of '85 do you recall what shift you were assigned and where you were assigned?

A. November of '85 I probably would have been assigned to the burglary squad, detective bureau.

Q. And what hours of duties did you have in November?

A. Eight a.m. to four p.m.

Q. Eight a.m. to four p.m.

You were days and nights in 1985, November?

A. Right.

Q. Now, I would like to direct your attention to December 7, 1985. Was that a normal work day for you?

A. Yes, it was, sir.

Q. And what time did you generally arrive at the police station?

A. Somewhere between 7:30 a.m., quarter to eight a.m.

Q. Now, at some point, sir, on that day did you learn of the arrest of George Perrot?

A. Yes, sir. I did.

Q. Do you recall when you first learned that?

A. When I first came into the detective bureau.

Q. And upon learning that can you just give us an idea of what you did, if anything?

A. I spoke to a few detectives and I went into our interrogation room and I spoke to George Perrot.

Q. Now, do you recall what time it would have been when you first saw Mr. Perrot then?

A. I am going to guess somewhere between 7:30 and quarter to eight, in that area.

Q. Now, you only spent a few minutes before going?

A. Correct.

Q. Was there anybody in the room with Mr. Perrot when you arrived?

A. No, sir.

Q. And could you describe this room?

A. It's a one door with a window and it is approximately 12 foot long by maybe eight foot wide.

Q. And is it a room you use for taking statements from victims and suspects and witnesses?

A. Correct.

Q. Now, what could you -- can you recall today about George Perrot's demeanor, his appearance, when you first went into that room?

Let me ask you a couple of questions before we get to that. I will withdraw the question.

What was the first thing you did when you entered the

room?

A. I told George who I was, Detective Thomas Jarvis. And I Mirandized him and I spoke to him.

Q. Now, how did you give these Miranda rights?

A. Through a card.

Q. Do you recall whether or not you had him sign a card at that particular time?

A. At that particular time I would say he didn't sign a card, no.

Q. Now, when you gave him these rights at that time could you describe the method that you did; did you read them all at once?

A. I go step by step.

Q. And after each of the various questions do you ask him whether he has understood them?

A. Correct.

Q. Now, do you recall his responses then?

A. One response was that they got me for the arrest. He says, There's no sense of you speaking to me. Something to that effect.

Q. Referring to the events of December 7?

A. That's correct, December 7.

Q. Did you take any written statement from him at that

time?

A. No, sir, I didn't.

Q. And how long would you say you spent with George Perrot in that interview room for the first time in the morning?

A. Five to seven minutes, eight minutes.

Q. Were you sitting or standing during this time?

A. I believe I would have been sitting.

Q. How close did you get to George Perrot?

A. George would have been between a table. There would be a table between us.

Q. Can you tell me whether or not you detected the order of alcohol on Mr. Perrot at all?

A. I can't answer that question truthful.

Q. Did he have any difficulty understanding any of the questions that you asked him at that point?

A. No, he didn't.

Q. Were any of his answers unresponsive in any way or inconsistent with the kinds of questions you were asking?

A. No.

Q. Can you, now, with these first few minutes in mind, sir, can you recall anything about his particular appearance or demeanor?

A. I think, if I remember correctly he had a mustache, a beard, he had kind of wild hair like real, real curly hair altogether different than what he is right now. That's about all. He was coherent, talking to me. That's about all I can remember.

Q. Now, what did you do when you left the room?

A. When I left the room I went out and I did about three and a half, four hours of investigation.

Q. Pertaining to what?

A. Particularly a pair of gloves and to be familiar with some cases down at the crime prevention bureau.

Q. Generally to be familiar with George Perrot December 7, and November 30?

A. That's correct.

Q. And you said you spent how long doing that?

A. Roughly for four hours and 20 minutes.

Q. Did you recall whether or not during that time you saw George Perrot again?

A. During that time, no, sir, I didn't.

Q. And when you left the room did you take him anywhere?

A. I believe I brought him down to the booking desk.

Q. Did you stay at the booking desk?

A. No, sir, I didn't.
Q. Now, at that point do you recall whether he had any cuffs on or whether or not?
A. He should have been handcuffed.
Q. Do you have a specific memory today whether he was?
A. No.
Q. But that's your usual procedure?
A. Sometimes it is, sometimes it's not. Depends on the individual.
Q. Now, I wonder if you can recall in your mind going from the second floor interview room in the detective bureau down to the booking area with Mr. Perrot; do you recall that?
A. Yes, I do.
Q. My question, sir, is did you make any observations as to his sobriety during the walk down to the booking area?
A. I don't -- as far as I was concerned he was fine.
Q. Now, when was the next time, sir, that you saw George Perrot?
A. I would say around 12:30 that afternoon.
Q. And where was that?
A. I brought him up from the booking cell up to our detective bureau.
Q. And where did you place him in the detective

bureau?

A. In the interrogation room.

Q. Is this the same room you were in before?

A. That's correct.

Q. Now, you went into the room with him?

A. Yes. I brought him into the room, correct.

Q. And did you stay with him in the room?

A. Yes, I did.

Q. Now, at that time, initially, was there anybody else in the room?

A. No, sir.

Q. What did you do upon bringing him back up to the room?

A. I gave him the Miranda warning. I signed it; we dated it. And we put the time on the card.

Q. Had you noticed any change whatsoever in George's appearance and demeanor when you first seen him in the morning?

A. No, sir.

Q. Now, would you describe the process that you followed when you gave him the Miranda rights the second time?

A. Yes. I read the rights off to him from a card. I dated it I put the time on it and George signed it and I

witnessed it.

Q. Now, I would like to show you what's been marked as Exhibit 20. (Indicating)

My question, sir, is just is this the same kind of card that you used to advise him of his rights? (Indicating)

A. Yes, it is, sir.

Q. And there is eight questions on the card?

A. That's correct.

Q. Did you go through all eight?

A. Yes, sir. I did.

Q. And did you say anything to him after each question?

A. "Do you understand every question I asked you?"

Q. You do that after each question or just at the end?

A. After each question.

Q. What was George Perrot's response in the interview room when you had gone back in?

A. He understood all these questions.

Q. Did he ever indicate to you any difficulty understanding any of these rights that you were advising him of?

A. No, sir.

Q. Did he tell you whether or not he was willing to

talk to you at that point?

A. Yes, he did. He said he'd talked to me.

Q. Now, roughly, what time was this?

A. Well, the Miranda warning was given about 12:40 that afternoon.

Q. And at that point, sir, what was the topic of the conversation between yourself and George Perrot?

A. A crime that was committed the night before.

Q. How long would you say it took you to eventually -- did you take a written statement?

A. Yes, sir. I did.

Q. Okay. My question now is, from the time you began to the time you completed the written statement do you now have an idea how long you spent with George Perrot?

A. I would probably say 45 minutes to an hour for that one statement.

Q. And do you just type as he talks or do you talk it over first? What is the process you follow?

A. I usually take a statement in writing then I reduce it to the typing.

Q. Now, I'd like to show you this and ask if you can identify that. (Indicating)

A. Yes. This is the statement I took from George

Perrot on December 7, 1985, at 12:40 p.m.

Q. And whose signatures appear on this statement?

A. George Perrot and Thomas Jarvis.

Q. When you had completed typing that and incidentally there appears to be two different types of typing, can you explain?

A. I was going from a manual that wasn't working properly to an electric typewriter.

Q. Did you see George Perrot sign that?

A. Yes, I did.

Q. Before you signed it did you read it to him or did he read it in your presence?

A. I would say both that he read it and I double checked to make sure people can read and I read it back to him.

MR. VOTTERO: Now, may this be marked for identification, Your Honor?

THE COURT: Yes.

THE CLERK: It would be H, I believe, Your Honor. H, if I remember the alphabet correctly.

THE COURT: You're right.

(Commonwealth's Exhibit Let. H was marked for identification.)

Q. (By Mr. Vottero) While that's being marked, sir, without getting into the specifics, this was a purse snatch and a break in?

A. That's correct.

Q. Without getting into specifics, there was no sexual assault in those early December incidents; is that right?

A. No, sir. There was.

Q. There was no serious injury of any kind?

A. Well, the gentleman was hit three or four times with a broom handle.

Q. All right. And during this process --

MR. FERRARA: (Interposing) I am going to object and move to strike, Your Honor.

THE COURT: Well, overruled.

Q. (By Mr. Vottero) And it's those events that made up this statement?

A. That's correct.

Q. Now, that statement, sir, concerns what Mr. Perrot had been doing in the evening of December 6, and on into the early morning hours of December 7; is that correct?

A. That's correct.

Q. What information did he give you with respect to

his use of alcohol or drugs on either December 6, or December 7?

A. I would have to refresh my memory with the statement, sir.

Q. Thank you. Could you take a minute then and review that and when you're done just let me know whether or not it refreshes your memory.

A. (Witness complying.) Okay. It refreshes my memory.

Q. What information did he tell you in terms of his consumption of either alcohol or drugs during that time period?

A. Well, it's beers according to the statement, that was purchased; there was some cocaine and marijuana.

Q. Did he indicates whether he was alone or with other people?

A. He indicated he was with a couple of people.

Q. Did you ever, at any time, notice the effects of either alcohol or drugs on George Perrot when you spoke to him in the early afternoon?

A. No, sir, none

Q. After that statement was taken and maybe I need to go back just a little bit. Did you have him sign some

additional papers during this time relating to blood and hair?

A. Yes, sir. I did.

Q. And what were those? What was that paper?

A. He was Mirandized and asked if he would give some blood and hair samples and he was read his rights and a statement and he signed it stating that he would give blood and hair.

Q. Do you recognize that? (Indicating)

A. Yes, I do.

Q. And what is that?

A. This is a search warrant waiver.

Q. Relating to the blood and hair samples?

A. That's correct.

Q. Was it signed in your presence?

A. Yes, it was.

Q. And just for the record, notations at the bottom, were those placed there before or after he signed this?

A. Yeah, this is afterward.

Q. All right. Thank you very much.

MR. VOTTERO: May this be marked for identification, Your Honor?

THE CLERK: I for identification, Your Honor.

(Commonwealth's Exhibit Let. I was marked for identification.)

Q. (By Mr. Vottero) Can you identify this Miranda card, sir? (Indicating)

A. Yes. This is a card that I used to Mirandize him, 12:40 p.m. 12/7/85.

MR. VOTTERO: I would offer this as an exhibit.

MR. FERRARA: No objection, Your Honor.

THE COURT: Twenty-two.

THE CLERK: Yes, Your Honor, number 22.

(Commonwealth's Exhibit No. 22 was offered and marked.)

MR. VOTTERO: I need to be heard at side bar as well.

(The following discussion was held at the side bar.)

MR. VOTTERO: I just want to make clear, for the record, it contains three other exhibit numbers from another hearing and if the defendant doesn't want it sanitized I have no objection, or can, but I want it on

the record.

MR. FERRARA: I would like it sanitized just to reflect the exhibit number as I believe we are doing with the other exhibit.

MR. VOTTERO: We didn't do it with the other exhibit. That is why I would like them both done if the defendant wants it done.

THE COURT: All right. One part of it here is sort of stuck over, I think. I guess we could.

MR. VOTTERO: I am not going to pass it to the jury. So between now and when they go to the jury if the clerk could take an eraser and try to take those off that would be fine.

THE COURT: I can give them an instruction at the time it goes to them, probably better than to try, I am afraid, if you took police labels off. They're glued to it.

MR. FERRARA: I have no strong feeling so I would defer to your judgment.

THE CLERK: Maybe white it in like I did for the other one.

(End of the side bar discussion.)

Q. (By Mr. Vottero) In any event, did you take either the hair or the blood at that point, sir?

A. No, sir. I didn't.

Q. Now, what time would you say you completed the process of the statement relating to the purse snatching and break-in roughly?

A. Twelve forty, 1:40, 1:40 quarter to two, in that area.

Q. And at that, the completion of that could you give us an idea of what Mr. Perrot's demeanor was at that point?

A. I fed him lunch. I let him make six or seven phone calls.

Q. Were these phone calls made in your presence?

A. Yes, sir.

Q. From where?

A. Couple of times I brought him down to the arson squad which is the next division over from the detective bureau squad. He called his girlfriend a couple of times. He called a friend of his a couple of times, excuse me, once if I remember, he called a sister.

Q. And where did you go to get the lunch?

A. Burger King.

Q. Did you go up to the Burger King?
A. No. I sent out for it.
Q. And were you with George Perrot when he had lunch?
A. Yes.
Q. Did you have anything to eat?
A. Yes.
Q. And where did the lunch take place?
A. Probably at my desk which is next to the interrogation room.
Q. Where did these phone calls and lunch, would that have taken place?
Well, is it before, during or after this first statement?
A. I would say after the statement was given.
Q. Did Mr. Perrot use the bathroom at anytime?
A. Yes. I brought him down to the bathroom, the men's room.
Q. Now, did you ever take him back down to the cell on the first floor during this time period?
A. No, sir.
Q. Did he make any request relating to where he should be kept?
A. No, sir.
Q. Now, at some point, sir, did you begin to ask Mr.

Perrot about the incident of November 30, 1985?
A. Yes, sir. I did.
Q. Do you recall when the first time was that you questioned him about that?
A. I would guess at some time around three, 3:10 that afternoon.
Q. And prior to that time have you mentioned it at all during the interview concerning December 7?
A. No, sir.
Q. Now, at that point, sir, when you finished the lunch and the phone calls how did you begin the interview process concerning November 30?
A. I just started speaking to George about certain incidents that happened in that particular area.
Q. And at that time did you go back through the question of his Miranda rights?
A. At that time, no, sir.
Q. Now, can you tell me -- I'm sorry.
MR. VOTTERO: May I have a moment, Your Honor?
THE COURT: Yes.
Q. (By Mr. Vottero) What was his response when you first began questioning him about this incident?
A. I noticed a change in his personality a little bit,

as far as --

Q. (Interposing) Describe it, please.

A. from going from quiet to a little hyper, nervous type of nervousness I would say.

Q. Do you recall what you asked him about initially?

A. What was that, sir?

Q. Do you recall what your first question was concerning the November 30, incident?

A. I believe I was talking to him about some serious burglaries and rapes. Well, when they initially started.

Q. I understand that. And what I am asking you at this point is whether or not you have a memory of the first question you asked him?

A. No. I couldn't remember the first question. No, sir.

Q. As a result of the interview that you went through at this point did you obtain a second written statement?

A. Yes, sir, I did.

Q. Now, would you tell me how long the whole process was from when you began addressing the November 30, incident to when the statement was signed?

A. I am going to guess to 45 minutes to an hour, approximately.

Q. Now, could you discuss the process you went through in taking that written statement?

A. That was written down on a piece of paper and also typed. I believe George spoke to me too a few times while I was typing.

Q. Now, sir, did Mr. Perrot, at anytime, ever admit to you that he had committed some kind of physical assault on one of these ladies?

A. No, sir.

Q. Well, before we get to the actual statement what was the substance of what he was telling you?

A. George told me how he broke into two homes, earlier hours of a particular date.

Q. On November 30, of 1985?

A. That's correct.

Q. Would you look at that please. (Indicating)

A. (Witness complying.)

Q. Do you recognize it?

A. Yes, sir.

Q. What is it?

A. It's a statement given to me by George Perrot on December 7, witnessed by myself. Signed by George Perrot and witnessed by Captain Ernest Stelzer.

Q. Now, I want to ask you some questions about Mr. Perrot's demeanor during this process; did it change from the earlier statement?

A. Yes, it did.

Q. Can you describe any of the changes?

A. George started getting very upset at himself. At one point he asked me if he could take my gun. He wanted to blow his brains out.

Q. Did he use that term?

A. Yes.

Q. How often did he make that request?

A. He just mentioned that once.

Q. What was his demeanor? You said -- was his voice raised?

A. He his voice was raised, getting very nervous kind of upset, hysterical, kind of like he hated himself. That's the --

MR. FERRARA: (Interposing) Objection. Move to strike.

THE COURT: Yes. Sustained.

THE WITNESS: Okay.

Q. (By Mr. Vottero) You can just describe what he was doing.

Let me ask you, sir, at this point, November of 1985, how long had you been a police officer?

A. Back then 20 years, sir.

Q. And is it correct to say that a good portion of your time is spent in interviewing suspects?

A. Yes, it is.

Q. Now, sir, did you ever raise your voice to George Perrot?

A. No, sir.

Q. Did you ever physically threaten him in any way?

A. No, sir.

Q. Physically assault him in anyway?

A. No, sir.

Q. And did you ever do those kinds of things when you were trying to obtain information from a suspect?

A. No, sir.

Q. Why not?

A. Doesn't work. Wont work.

Q. What's the approach you took with George Perrot to confront him with the incident of November 30?

A. The approach I took was a very laid back approach. I am -- which I am a laid back type of person. You don't have to use physical threats or put anybody under stress.

Q. Did you confront him directly with whether or not he had physically touched either of these women in some from?

A. Yes, sir.

Q. Did you ask him that?

A. Yes, I did.

Q. What was his response?

A. He said, "I never touched nobody."

Q. Did you see George Perrot sign this paper?

A. Yes, sir, I did.

Q. And prior to signing it who read it?

A. I read it and I read it to him and I made sure that he read it.

Q. And on the statement there's the initial GP in ink in a number of places. How did those get there?

A. I made mistakes typing. I am not the greatest typer in the world. I made mistakes typing that's why I read it to him. I said, "George, there are some mistakes that were made here. Please initial them just so that you are aware of the mistakes were made."

Q. Did he do that?

A. Yes, sir. He did.

MR. VOTTERO: I would like this offered as an exhibit, Your Honor.

MR. FERRARA: No objection, Your Honor.

THE CLERK: Number 23, Your Honor.

(Commonwealth's Exhibit No. 23 was offered and marked.)

Q. (By Mr. Vottero) Sir, could you read the statement that you took from George Perrot the afternoon of December 7?

A. "My name is George Perrot. I live at 87 Malibu Drive and I am 17 years old. On November 30, 1985, I went to Brattleboro, Vermont, with Mike Edwards, and Bob Timmerman, and Jeff Atkinson. Mike was driving.

"We went to a bar called Flat Street. I started drinking about eight p.m. which is a Friday night. We also drank about a case of Bud. I took a purple mescaline on the way to Vermont. We stayed there until about 2:15 a.m. Michael dropped me -- excuse me. Michael dropped me off about 3:15 a.m. at my house.

"I headed for number 33 Covel Street. The reason I went there I heard it had been broken into before. I had a pair of my sister's gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel Street. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took

it with me. I left through the rear door. I left the pocketbook a few houses down the street.

"I left 33 Covel Street and went to 27 Malibu Drive. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door.

"This occurred about four a.m. on Saturday November 30, 1985. After this I went home. I had been drinking since about seven p.m. that day and had also taken two purple mescaline pills."

Signed George Perrot, December 7, 1985. Witnessed by Thomas Jarvis and Captain Ernest Stelzer.

Q. Now, I have a question, sir. He indicated that he went into 33 Covel through an unlocked rear breezeway door. Did he ever mention anything about a dryer vent to you?

A. No, sir.

Q. And the first statement from that day concerning December 7, do you recall Mr. Perrot giving you a reason why he had broken into the home and stolen the pocketbook?

A. He was looking for money.

Q. Did he tell you why he was looking for money?

A. To buy drugs.

Q. And this statement concerning a purse snatch and

burglary did he say anything in that statement about striking Mr. McNabb?

A. No, sir, he didn't.

Q. The second statement of Mr. Perrot that you just read, when that was completed what did you do?

A. Well, he signed it. I signed it. And I believe he was brought down for a viewing line-up.

Q. Did you have additional dealings with Mr. Perrot during the line-up or after that?

A. Yes, sir. I did.

Q. And did you obtain any other statements from him?

A. No, sir.

MR. VOTTERO: May I have a moment, Your Honor?

THE COURT: Yes.

Q. (By Mr. Vottero) Did you give Mr. Perrot his Miranda rights again following or during the second statement of December 2nd?

A. The second statement? No, sir.

Q. Now, I have one final question. The individual that gave you this statement on December 7, George Perrot, do you see him today?

A. Yes, sir. He is sitting right there. (Indicating)

MR. VOTTERO: May the record reflect the

defendant has been identified, Your Honor?

THE COURT: Yes, it may.

MR. VOTTERO: Thank you.

MR. FERRARA: May I proceed, Your Honor?

THE COURT: Yes.

* * * * *

CROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Officer Jarvis, you arrived at the police station shortly before eight o'clock; is that right?

A. About 7:30, quarter to eight, correct.

Q. And you learned then that George Perrot had been arrested for the December 7, incident; is that correct?

A. That's correct.

Q. You spoke to him briefly; is that correct?

A. That's correct.

Q. And you saw him in the interrogation room in the detective bureau; is that correct?

A. Correct.

Q. When you spoke to him there was no one with you?

A. At that time, no, sir.

Q. Did he indicate to you -- and he indicated to you at that time that, You got me go for these December 7th,

incidents; is that correct?

A. That's correct.

Q. And you didn't take a statement from him at that time?

A. No, sir.

Q. What you did then, you have him brought down to booking, correct?

A. Correct.

Q. And you, yourself, began to familiarize yourself with the incidents of December 7, and November 30, correct?

A. Correct.

Q. And when I say "familiarize yourself" with them you read the statements of Mary Prekop and Emily Lichwala, correct?

A. Yes. Yes.

Q. You read all of the pertinent police reports regarding those incidents?

A. Correct.

Q. You spent about four hours you said doing that?

A. Yes.

Q. But at some point in time, in fact, somewhere around 10 o'clock you had occasion to speak to the then Sergeant Kelly, correct?

A. No.
Q. You did not speak to Sergeant Kelly at around 10 o'clock?
A. I can't answer that truthfully.
Q. Well, do you recall speaking to him at sometime that day?
A. I spoke to him briefly, briefly.
Q. And he told you at that time that he had interrogated or asked some questions of George Perrot, didn't he, sir?
A. No. I can't answer that question, sir.
Q. Okay. Well, he told you that he conducted a search of 87 Malibu Drive, didn't he, sir?
A. I cannot answer that question truthfully, sir. I'm sorry.
Q. Did you become aware, at some point in time, that a search of 87 Malibu Drive had been conducted that morning?
A. I am sure I did at some time.
Q. And at some point in time did you come into possession of these gloves?
A. Yes, sir; we did.
Q. And I'm referring now to Exhibit No. 15.
A. Yes, sir; we did.

Q. I'm sorry?
A. Yes. I believe we came in contact with those gloves, correct.
Q. I'm not clear what you're answering me. I'm asking, did -- at some point in time did you have these gloves?
A. I believe I did. I believe I did, yes.
Q. When you say you believe you did do you recall having those gloves?
A. I recall having those gloves, yes.
Q. And did you go to the evidence locker or the evidence room in the Crime Prevention Bureau to obtain these gloves?
A. I do not know how those gloves -- how I arrived at taking those gloves. I do not remember, but I do remember those gloves.
Q. Okay. Would you agree with me that if you obtained these gloves from the evidence locker, the evidence room in the crime prevention bureau you would have had to sign something to obtain them, correct?
A. That's a good possibility. Yes. It was on a Saturday morning though.
Q. Could you explain that to me; isn't it correct that

every time a piece of evidence is taken from the locker room that you have to sign for it?

A. That's correct.

Q. So when you say it's "a good possibility" what do you mean?

A. Well, it would depend on the crime, sir. There's a lot of different ways of getting evidence. If the evidence was just recovered within a half hour to an hour the evidence is in a patrolman or detective's possession.

Q. Okay.

A. I cannot tell you truthfully how I recovered those gloves. That's it.

Q. Assume for a minute that a piece of evidence had been seized on November 30, 1985, and placed into the evidence locker room. If you wanted access to that piece of evidence you would then have to sign something to obtain it?

If we are talking about week, I'm sorry, a week later or six days later you wanted that piece of evidence you would have to sign something to obtain it, wouldn't you?

A. That's correct.

Q. So would you agree with me that if these gloves had been seized November 30, 1985, and you had them on December 7, 1985, then under your Springfield Police Department evidence

protocol you would have had to have signed something to obtain them?

A. Somebody would have had to sign it; you're correct.

Q. Doesn't ever person who has access to a piece of evidence have to sign a document evidencing that he has that property?

A. Either him or his partner, sir, correct.

Q. Who was your partner on December 7, 1985?

A. I can't tell you.

Q. On December 7th, 1985, you took those gloves to the home of a woman named Lisa Eldridge?

A. That's correct.

Q. And Lisa Eldridge was George Perrot's girlfriend, to your knowledge?

A. That's correct, sir.

Q. And you took those gloves sometime after 10 a.m., correct?

A. I don't know what time it was. It was in the morning.

Q. Well, if you have something to refresh your memory.

A. I have nothing. I don't know if it was nine, 10 o'clock, nine o'clock or 12 o'clock.

Q. Officer, you got these gloves from Tom Kelly,

didn't you, sir?

A. And I told you truthfully I do not know where I received those gloves from, sir.

Q. Did Tom Kelly tell you to bring these gloves over to Lisa Eldridge's house and ask her if they were her gloves?

A. I believe not, no. I believe not.

Q. I believe as part of the investigation you brought those gloves over to Lisa's house.

A. Now, I don't remember anybody telling me what to do.

Q. You don't remember talking to Tom Kelly that morning at all about these gloves?

A. No. Very, very good possibility, but I'm not going to sit here and say yes or no. Sir, I'm sorry.

Q. And you don't remember from where you got the gloves?

A. I remember bringing them up to Lisa's house. I don't remember the time.

Q. Okay. You brought these gloves to Lisa Eldridge's house and you asked her, "Are these your gloves?"

A. That's correct.

Q. And she told you, "No, they're not my gloves," correct?

A. That's correct.
Q. And this is in December, to say it was cold out?
A. Yes, sir.
Q. Did you ask her if she had some gloves?
A. I don't know what the conversation was.
Q. Do you remember asking her if you could see her gloves?
A. I don't remember. I'm sorry.
Q. Do you remember if he she showed you some gloves?
A. There is a good possibility she might have.
Q. Do you remember what they looked like, sir?
A. No, I don't.
Q. Well, do you remember if they were solid color or did it have a pattern?
A. I just said I don't remember what they looked like.
Q. You read the report and you knew that these gloves were found in the home of Mary Prekop on November 30, 1985; is that correct?
A. I'm sure if I read the report, that's correct, sir.
Q. You knew that these gloves had some importance as evidence in that case; is that correct?
A. That's correct.
Q. Did you write a report that day regarding your

conversations with Lisa Eldridge?

A. Repeat that, sir.

Q. Did you write a report that day regarding your conversations with Lisa Eldridge?

A. I would say no. No.

Q. Is that a no?

A. That's a no.

Q. When you sat down across from George Perrot at 7:30 or at that time, early that morning, did you -- was it your testimony that you didn't detect an odor of alcohol about him?

A. No. I said I don't remember that. I don't remember.

Q. Do you remember him having a mussed appearance?

A. Excuse me.

Q. Do you remember him having a mussed appearance, look dirty and scraggly?

A. Well, like I described to the prosecutor he had a rough beard, mustache and hair was real wild.

Q. Was he wearing -- strike that.

And he was wearing sneakers untied, correct?

A. I can't answer that question.

Q. Do you remember whether or not he had a shirt on?

A. I don't remember that either, no.

Q. Sir, would you agree with me that all that day on each occasion that you saw George Perrot he had on a pair of pants and a jacket, but didn't have a shirt on underneath it; do you recall that?

A. I think if you can refresh my memory with a mugshot.

Q. Sir, if I may, -- for the record I'm showing the witness Exhibit No. 19 which has been identified as a photograph of George Perrot.

Does that fairly and accurately depict the way George Perrot appeared on December 7th, 1985?

A. Yes, it does. The jacket I don't remember that well. For some reason I thought he might have had a shirt on.

Q. Okay. Would you agree with that?

A. Yes, sir.

Q. One moment. I will withdraw that.

Now, when you were questioning George Perrot at the beginning, at roughly 12:40 p.m., correct?

A. That's correct.

Q. You weren't the only one questioning him, were you, sir.

A. I was the only one in the room for that particular time and I believe somebody else came in.

Q. Who else came in?

A. I believe Francis Bloom came in for a minute, Francis Bloom.

Q. Into the interrogation room?

A. Yes. I walked out.

Q. And then?

A. There's a good possibility that Lieutenant Arpin came in for a minute.

Q. In fact, it was the arrival of Attorney Bloom that precipitated that questioning at 12:40 p.m.; is that correct?

A. That's correct.

Q. Thereafter, you began questioning Mr. Perrot regarding the incident of December 7, 1985, correct?

A. That's correct.

Q. And you testified that you had him sign a Miranda card at that time; is that correct?

A. That's correct.

Q. You also had him sign a search warrant waiver; is that correct?

A. That's correct.

Q. I'm sorry. Has this --

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yeah.

Q. (By Mr. Ferrara) Officer Jarvis. I want to show you this and I ask you, this is a document marked I for identification; do you recognize this? (Indicating)

A. I did not type it up, but I signed it and George Perrot signed it.

Q. This is your signature here? (Indicating)

A. Yes, it is.

Q. Is this the search warrant waiver you testified Mr. Perrot signed on December 7th, 1985?

A. That's correct.

MR. FERRARA: I would like to offer this into evidence, Your Honor.

MR. VOTTERO: No objection.

THE CLERK: Number 24, Your Honor, Exhibit No. 24.

(Defendant's Exhibit No. 24 was offered and marked.)

Q. (By Mr. Ferrara) And, officer, this search warrant waiver was essentially Mr. Perrot giving consent to the taking of hair and blood samples; isn't that correct?

A. That's correct.

Q. And was that explained to him?
A. Yes, it was.
Q. And who explained that to him?
A. I believe I did. I would have been the officer.
Q. And who prepared this document?
A. I believe between Lieutenant Charles Arpin and Attorney Francis Bloom, sir.
Q. And this particular document is witnessed by Lieutenant Arpin, yourself, and John Scanlon. John Scanlon is another police officer?
A. Yes, he is.
Q. And that was witnessed at 12:40 p.m.?
A. That's correct. That's the time it was put down on that particular statement.
Q. When you put time down on a document that indicates the time that it is executed?
A. That could be the time this particular document was typed up, sir.
Q. Okay. Did Officer Scanlon thereafter participate in the questioning of Mr. Perrot?
A. No, sir, he didn't.
Q. Did he remain in the interrogation room?
A. No, sir, he didn't.

Q. While Mr. Perrot was questioned?
A. No, sir, he didn't.
Q. Thereafter you took a statement from Mr. Perrot with respect to the December 7, incident; is that correct?
A. That's correct.
Q. And at some point in time did you move from the interrogation room to another room to complete the statement?
A. I would have to say no. I would have stayed in that same interrogation room, sir.
Q. Well, I would like to show you this document which is marked H for identification and ask you if you recognize that. (Indicating)
A. Yes, I do.
Q. And that's the statement you took from Mr. Perrot on December 7, with respect to the incident of December 7, correct?
A. That's correct.
Q. And that has your signature on it?
A. That's correct.
Q. And you witnessed Mr. Perrot?
A. That's correct.
MR. FERRARA: I would like to offer this in evidence, Your Honor.

MR. VOTTERO: May we be heard?

THE COURT: Side bar.

(The following discussion was held at the side bar.)

MR. VOTTERO: I mean this is a confession unrelated to the crime. I have no problem with it, but I want the record to be clear it is a deliberate choice of trial strategy.

THE COURT: This is the so called crimes of December 7?

MR. VOTTERO: We have given some of the body but not the specifics.

I am happy to have it go in. We just need to make the record clear.

THE COURT: You want to?

MR. FERRARA: Yes.

THE COURT: All right. This may be 25, I believe.

(End of the side bar discussion.)

(Defendant's Exhibit No. 25 was offered and marked.)

MR. VOTTERO: Commonwealth withdraws the objection.

THE COURT: Very well.

Q. (By Mr. Ferrara) Officer, I would like to show you Exhibit No. 25 and ask you to look at this and does that refresh your recollection that at sometime you changed rooms during the preparation of that document? (Indicating)

A. I would have to say I changed typewriters and by changing the old typewriter, rather I took the old typewriter out of the interrogation room and brought in an electric typewriter.

Q. While you were taking this first statement from Mr. Perrot do you recall him throwing up in the interrogation room, sir?

A. No. He never vomited in the interrogation room, never.

Q. Do you recall a janitor coming in and spreading some type of sand or something on the floor in the interrogation room?

A. Not when I was there, sir, never.

Q. And while you were interrogating Mr. Perrot at four p.m. he began to tell you about what he'd done on December

6th, correct?

A. That's correct.

Q. And he told you he had worked on December 6th, correct?

A. Correct. I believe so.

Q. And that he returned home from work at about five p.m.; isn't that correct?

A. If I could see that, sir. (Indicating)

Q. Would you do this for me, sir; would you read the first paragraph of Exhibit No. 25.

A. "I returned home from work at about five p.m., worked Friday December 6, 1985. I work on construction. I called my girlfriend Lisa Eldridge when I got home from work. I asked her if she was ready to go. I then called Bob Timmerman and asked him to pick me up so we can go out with the girls.

Bob came over at about six p.m. Friday night. We went over to pick up Lisa who lives at 116 Corey Road. From there we went over to East Longmeadow to pick up her friend, Debbie. I'm not sure of her last name. We picked up a case of Bud at the Springfield Package Store at Allen and Cooley. Then we went driving around the city drinking beer and smoking marijuana. We then made two trips up to Dickinson Street

where we bought one half grams of coke on two occasions. Then we went over Bob's house and did a couple of lines of coke. Then we went over to my house and did a couple of lines of coke. Then we went over to the package store and bought another six pack of Bud. It was getting late so we dropped Lisa off at her house and then dropped Debbie off in East Longmeadow."

Q. So you were aware, as you took this statement, that on December 6th, Mr. Perrot had consumed beer, correct?

A. Uh-huh.

Q. Taken cocaine?

A. Correct.

Q. And smoked marijuana?

A. Correct.

Q. And to your knowledge he had not slept since he was arrested at three a.m. that morning until you were questioning him at 12 p.m.?

A. I have no idea whether he slept or not, sir.

Q. Well, didn't Mr. Perrot tell you that he wanted to remain in the detective bureau because they were banging on the bars of the cell downstairs and on the floor?

A. Yes, he did.

Q. And didn't he tell you specifically that it was an

Officer Paul Lance (phonetic) who did that?

A. There was no officer's name he told me, sir.

Q. And didn't he tell you all he wanted to do was go to sleep?

A. No.

Q. No?

THE WITNESS: Excuse me. Can I get some water, Your Honor?

THE COURT: Yes.

THE WITNESS: Thank you. I appreciate it.

Q. (By Mr. Ferrara) Sir, I want to show you Exhibit No. 25 in there when you're making reference to the incident of December 7. Would you read the second paragraph, the rest of that statement?

A. "It was about 12:15 a.m. Saturday morning Bob dropped me off at my house."

You want me to read this out loud, sir?

Q. Yes.

A. "I walked up to Denny's Restaurant at Allen and Cooley Street. I went inside and had a coffee. After finishing my coffee I walked outside and noticed two girls walking from the parking lot toward Denny's. One of the girls had her pocketbook dangling. I ran over and grabbed the

pocketbook and ran across Cooley Street toward my house on Malibu Drive. I went into my house and went to my bedroom. I checked the pocketbook for money and I only saw a little more than a dollar in change. I left the pocketbook in my room. I then left the house and started walking up Malibu. I walked over to Ellendale Street. I walked up to a house. I don't know the number and saw a broken broom handle in the carport. I kicked the front door in and started to walk around what I thought was a dining room. I had the broom handle in front of me so I would bump into anything. I started to hear a lot of voices. I got scared and ran out the front door. The reason I broke into the house was to get money for drugs. I ran back home and the police were there.

Q. Thank you.

Now, when you're questioning Mr. Perrot about these incidents your manner of questioning was to say to him, "And, George, didn't you then do this?" And then he would say yes or no; is that correct?

A. I try to let the defendant tell me in his own words what exactly happened.

Q. And did you write that down as he told you?

A. I try to write it down.

Q. And then you reduce it to a typewritten form?

A. That's correct.

Q. And did you do that in this case?

A. I would have to say I did it, sir.

Q. Okay. And do you have the written statement that you took from George Perrot -- excuse me. Strike that, please.

Do you have your handwritten notes or memorandum about the statements that George Perrot gave you with respect to the incident of December 7?

A. They were destroyed.

Q. Who destroyed them?

A. I destroyed them.

Q. When did you destroy them?

A. When I left the Springfield Police Department last year.

Q. Are these handwritten notes kept in the police file?

A. No, sir.

Q. You began questioning Mr. Perrot at about three p.m. with respect to the incident for which he is on trial here, correct?

A. Correct.

Q. The November 30, 1985, incident?

A. Correct.
Q. And who was present when you questioned Mr. Perrot about those incidents?
A. Just George and myself, sir.
Q. Was there somebody witnessing this questioning?
A. No, sir.
Q. Was someone observing it through a one-way mirror?
A. No, sir. Well, I don't know what was going on in the outside, sir. The door was shut.
Q. You indicated when you're questioning a suspect you don't like to put that individual under stress; is that correct?
A. I try not to, sir.
Q. During the course of questioning of George Perrot when you began questioning him about the rape of Mary Prekop he was yelling, wasn't he?
A. Emotional.
Q. He was emotional? He was crying?
A. I would say he had tears. Yes. He was emotional, upset.
Q. He was swearing for a considerable amount of time?
A. No. I wouldn't say considerable.
Q. Did you observe his face to be red and puffy after

a period of time?

A. I know he was crying. That's all I can tell you.

Q. And you know he was hollering as well?

A. No, sir.

Q. Okay. And at one point you said he asked to take your gun. He wanted to shoot his brains out?

A. Correct.

Q. And did you cease questioning him at that point?

A. I might have gotten him a cup of coffee at that point.

Q. Let me ask you this, at that point had you taken a statement from him, had you gotten this signed written statement about the November 30, 1985 incident?

A. I can't tell you truthfully.

Q. You continued to question him, didn't you, sir?

A. I don't know whether the statement was completed. I don't know whether he was half-way through the statement. I know he became very emotional.

Q. How many times did he tell you that he wanted you to stop, he just wanted to go to sleep?

A. No. No. He never did. He never did, he stayed up with me until seven o'clock that night, sir.

Q. The search warrant waiver, Exhibit No. 24 is marked

four p.m.; is that correct?

A. That's correct, sir.

Q. The statement taken from Mr. Perrot on December 7, 1985, with respect to the December 7, incident, the purse snatching and the McNabb break is also marked 12:40 p.m.; is that correct?

A. That's correct, sir.

Q. And I want to show you Exhibit No. 22 which you testified is the Miranda warning card. That's also marked 12:40 p.m.?

A. That's correct.

Q. And all those documents were signed at the same time?

A. I explained to you about this search warrant. I had nothing to do with the typing of it. When I give him his Miranda warning at 12:40 that was and then it was typewritten after that.

Q. I understands that.

A. Okay.

Q. My question is the --

A. (Interposing) The three of them are 12:40, correct.

Q. My question is all of these documents were signed

at the same time, weren't they?

A. They was signed at 12:40, yes. Yes, sir.

Q. The statement was then started -- okay. This was brought in after it was typewritten 12:40 on it also?

A. Yes, sir.

Q. But the statement also says 12:40?

A. Yes, sir. It does.

Q. All of these document say 12?

A. That's correct.

Q. And all of these documents, to the best of your recollection were signed at the same time, weren't they, sir?

A. I would say the search warrant was not signed at 12:40, sir.

Q. I want to show you this document, Exhibit No. 23 which is George Perrot's statement of the incident for which he is on trial. (Indicating)

A. Yes, sir.

Q. From the rape of Mary Prekop and the break into the Lichwala home. What time is on that statement, sir?

A. There is no time on it, sir.

Q. At what time was that statement taken, if you know?

A. This would have been taken somewhere around three o'clock, quarter to three, sir. There is no time on it.

Q. With respect to the statement of November 30, 1985, prior to your beginning questioning of Mr. Perrot you know that there had been a break at 33 Covel Street on November 30; is that correct?

A. That's correct.

Q. And you knew that a pair of gloves had been recovered there; isn't that correct?

A. Correct.

Q. You knew the method of entry; isn't that correct?

A. Yes, I did.

Q. And the method of entry was through a vent; isn't that correct?

A. Can I look at that, sir?

Q. Yes.

A. I don't know how it was entered. According to this it was entered through a rear unlocked breezeway on 33 Covel Street.

Q. When you read the materials earlier that day, the materials meaning the police report with respect to the break of December 6, do you recall if they said it was an entry through a vent?

A. I don't recall that.

Q. You knew that 27 Malibu drive had been broken into

that evening, correct?

A. That's correct, sir.

Q. And that was the home of Mary Prekop?

A. That's correct.

Q. And you knew from her statement that she had a little black dog named Scuffy, didn't you, sir?

A. I knew she had a dog, sir.

MR. FERRARA: Let me have one moment, Your Honor.

(Pause)

MR. FERRARA: Can I just have one more moment, I am trying to locate a document.

(Pause)

THE WITNESS: Excuse me. Can I have some more water, please?

MR. FERRARA: I have no further questions, Your Honor.

MR. VOTTERO: Just a couple.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. Do you recall what he was hollering when his voice was raised, what it was he was saying?

A. He got very emotional after he talked about the house breaks. I know he got very emotional and like I said at one point he said, "Give me your gun. I want to blow my brains out," something to that effect.

Q. Would you examine that document and see if that refreshes your memory. (Indicating)

Just tell me yes or no whether it refreshes your memory, what it was he was yelling.

A. (Witness complying) Yes, it does refresh my memory.

Q. And what was it that George Perrot was yelling?

A. George Perrot kept on yelling that the drugs made me do it. "The drugs made me do it."

May I continue?

Q. Yeah, please.

A. He also stated that he never touched the woman, he just wanted money.

Q. Thank you.

Now, did he ever say anything to you concerning his use

of Valium on December 7?

A. No.

Q. And you indicated, I believe, on cross that at one point he asked for a cup of coffee?

A. Yes.

Q. And do you recall where you got that?

A. There is a coffee machine right next to my desk.

Q. And the 12:40 time that appears on all those documents, is that the time you began the process or ended the process?

A. This is the time we started the process.

Q. And whether you can recall them today I don't want to ask you that. But what I would like to ask you is that on December 7, when you were with George Perrot were you familiar with all of the facts and events of the crimes committed on November 30?

A. Yes, sir.

MR. VOTTERO: That's all that I have.

* * * * *

RECROSS-EXAMINATION BY MR. FERRARA

* * * * *

Q. Did you keep -- when you took the statement about November 30, now, did you also make handwritten notes about

what he said?

A. Yes, sir.

MR. VOTTERO: Object, Your Honor. Beyond the scope.

THE COURT: He may have it.

THE WITNESS: Repeat that, please.

Q. (By Mr. Ferrara) Well, you just testified that when you were questioning him about the incident of November 30, 1985, when you questioned him did you keep handwritten notes with respect to your questioning of him before you prepared any typewritten document?

A. Yes, sir, there would have been.

Q. Do you have those?

A. No, sir.

Q. What happened to those?

A. Destroyed.

Q. Who destroyed those?

A. I destroyed them. I cleaned my desk out.

Q. How many people have you interrogated during the time that you were a police officer?

MR. VOTTERO: I object Your Honor.

THE COURT: Well, you want to go beyond the scope of redirect of a particular short thing, you want

to get to that you haven't already touched on. Don't abuse it.

MR. FERRARA: Yes.

Q. (By Mr. Vottero) Did you keep all of your handwritten notes of interrogations of defendants in your desk?

A. A lot of them are, yes.

Q. And you destroyed all those when you left?

A. That's right.

MR. FERRARA: No further questions.

* * * * *

REDIRECT EXAMINATION BY MR. VOTTERO

* * * * *

Q. All these notes and things that you take that's what you use to prepare statements and reports?

A. Yes, sir.

MR. VOTTERO: That's all I have.

THE COURT: Very well. Thank you, sir.

(The witness steps down.)

MR. VOTTERO: Commonwealth rests, Your Honor.

THE COURT: Very well. Can I see counsel.

(The following discussion
was held at the side bar.)

THE COURT: Let's just talk a little scheduling. It's now about 12:30. How long do you want to take on motions, for the motion?

MR. FERRARA: I am going to file some motions.

THE COURT: We're not upholding anything, I just want a rough idea.

MR. FERRARA: I am going to be very brief, waive argument, so I don't think it will be very long.

THE COURT: All right. Are you ready to go forward then?

MR. FERRARA: I believe I am. There is a witness that was sequestered. I don't know if she is here or not. If she is here I would be ready to go forward.

THE COURT: What about -- you have a rough idea how long you are going to be?

MR. FERRARA: No, I don't, Your Honor.

I would ask permission -- well, I assuming we are going to take a break, I am going to need a few minutes to talk to Mr. Perrot regarding the issue of whether he

wishes to testify or not and then depending on his answer and whether he chooses to testify I may wish to be heard very briefly in chambers.

THE COURT: Should we recess now for lunch?

MR. VOTTERO: This one witness is ready?

MR. FERRARA: I think it would be a good idea to take a break.

THE COURT: I would like to deal with the motions for sure and then any others. I will give you time to talk to him and anything else you have, witnesses. There are going to be a few minutes, you want them?

MR. FERRARA: No. This witness would take some time.

THE COURT: All right.

(End of the side bar discussion.)

THE COURT: Ladies and gentlemen, it is now 12:30. Commonwealth has rested. There is going to be some matters that are going to require my attention. Rather than keep you waiting over there and maybe picking up five or 10 minutes before we break for lunch I am

going to excuse you now and ask that you return at two so you will have an extended lunch hour while we take care of these other matters. And then we will resume and go forward at two o'clock.

So I wish you all a pleasant lunch.

(The jury exits at 12:29 p.m.)

THE COURT: Why don't we dispose of the motions at this time, if any, and your close of the Commonwealth's case.

MR. FERRARA: Your Honor, I do not have written motions prepared.

THE COURT: All right. You can submit them later.

MR. FERRARA: Okay. Your Honor, at this time I would move for a required finding of not guilty on each of the indictments. That I will waive argument.

THE COURT: All right. For the record the motions are denied as to each of these indictments. Of course these indictments are as you have indicated at the outset.

Let me double check these. 5415 is unarmed

robbery.

MR. VOTTERO: That's correct.

THE COURT: Of course 16 is the same as the original indictment and 5418 is the same as the original indictment and 5420 is without the provision of being armed, again, as is 5425.

MR. VOTTERO: For the record 5425 was changed to reflect simple burglary; 5420 remained burglary and assault on an occupant.

THE COURT: I've got these copies here. It is assault, but without being armed.

MR. VOTTERO: That's correct.

THE COURT: Okay. Very well, then. You will be prepared to go forward then at two o'clock?

MR. FERRARA: Yeah, Your Honor.

(The luncheon recess was taken.)

* * * * *

(The following discussion was held in the Judge's chambers.)

(The Court and counsel were present at 2:05 p.m.)

THE COURT: What have you got?

MR. FERRARA: Your Honor, I just wanted to indicate to the Court, on the record, that I have conferred with the defendant, George Perrot, at length and that his decision at this time is not to take the stand and testify in his trial. Consequently I feel I will be going forward with only one witness and I expect we shall be done rather quickly, perhaps even a little bit before three o'clock even though I don't know the length of Attorney Vottero's cross-examination of this particular witness.

That being the case I have to confess to the Court that I have not yet prepared jury instructions. I thought that I would have this evening to do that. I didn't think today would go as quickly as it did. I would be asking the Court, if it would, in the event we are done that quickly, hold arguments and instructing the jury until tomorrow to give me time to prepare.

THE COURT: I don't have any big problem with doing that except I really think we can have the charge conference. Pretty much everybody has an idea where we are going here. There is nothing that happened here that is so unique, going to take a lot of research. We can at

least touch base on everything. If there is any specific language you can work on that. I would like to utilize the rest of the afternoon and probably would suffice it.

MR. FERRARA: Yes.

THE COURT: Unless I am reading something wrong I don't see any kind of -- any language that falls out of the area of the usual stuff we have.

MR. VOTTERO: The only special instructions that I can think of as it's related to those markings on the Miranda card that are in evidence.

THE COURT: Yeah. I made a notice of that. I have some notes on the bench we can go over.

MR. VOTTERO: The only other questions I of is have, you want to give any instruction about the confessions and the crimes about December 7, and what role and what fashion the jury shall consider those. Those have come in without limitation and I am not asking for such an instruction.

THE COURT: Well, I am willing to give something if the defendant wants it that highlights certain things. Sometimes we make it very clear, but they are making decisions about it. I will be happy to for that area.

MR. VOTTERO: That's one of the matters I felt I needed to give some consideration to. Perhaps the Court will want me to address something. I had proposed the other area was the instructions under the humane practice rule and the Court --

THE COURT: That of course I am required to give and I will.

MR. FERRARA: I don't know if the Court wanted me to go over, would want to consider any specific instructions that I might draft.

THE COURT: I will certainly consider it, but we have some instructions in this area that I can share with you.

THE COURT: Okay.

MR. FERRARA: I would ask that -- I don't know if it is appropriate for me to ask it, if the defendant and counsel with the stenographer can place on the record that the defendant is making that decision not to testify.

THE COURT: You are talking about making a record of it which would be sealed?

I might say that I notice that most counsel are doing that these days to provide for the eventuality that

at some later date they are going to be accused of doing something else.

MR. VOTTERO: He has a history of discharging counsel and making those claims.

MR. FERRARA: If the Court would like me to make a record all I would indicate --

THE COURT: (Interposing) We are talking about a record between you and your client which will then be sealed. The trial Judge doesn't see it; prosecutor doesn't see it. It's there if you need it.

MR. FERRARA: It probably would be a wise thing to do.

Off the record.

(An off the record discussion was held.)

MR. VOTTERO: Only one other issue left that is the woman in the jury on the first day who left with somebody.

THE COURT: What do you want to do with that?

MR. VOTTERO: My preferred course would make her one of the alternates without highlighting the issue or offending her in anyway. It's my preferred

course.

MR. FERRARA: I can understand, but my suggestion would be to handle it, I think, the situation generally would be perhaps to at least voir dire her and to ask her some questions and if the Court feels that there is a problem I will defer to the Court's judgment on that.

THE COURT: I don't have any strong feeling on it.

All right. We will speak to her before the arguments and charge.

All right. So why don't we arrange for your interview now and it wont have to be long.

(Pages 532-534 were sealed
per order of The Court.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 2:27 p.m.)

THE COURT: You may proceed.

MR. FERRARA: Thank you, Your Honor. Your Honor, I would like to call Nancy Westcott.

* * * * *

NANCY WESTCOTT (sworn)

DIRECT EXAMINATION BY MR. FERRARA

* * * * *

Q. Now, would you please state your full name?
A. Nancy Croteau Westcott.
Q. And how old are you, ma'am?
A. Thirty-one.
Q. And what relationship are you to George Perrot?
A. I'm his sister.
Q. What is your marital status, ma'am?
A. I'm married.
Q. Do you have any children?
A. Yes, two.
Q. Two children?
A. Uh-huh.

Q. Directing your attention to December of 1985, was George living with you at that time?

A. Yes, he was.

Q. For how long had he been living with you?

A. I would say probably about five years. Anyway since I had lived at that address.

Q. And where did you reside at that time?

A. 87 Malibu Drive.

Q. And do you still reside there?

A. Yes, I do.

Q. Now, directing your attention specifically to December 7, 1985, at about 3:30 a.m. did something unusual occur at that time?

A. Yes, it did.

Q. Would you tell the jury what occurred at 3:30 a.m. on that day?

A. The police knocked on the door, someone came to the door.

Q. Now, I am going to ask you to keep your voice up a little more.

A. Um, the police came to the door at 3:30. They were looking for George.

Q. And what happened then?

A. My husband got up and answered the door and let the police in. I had gotten up shortly after. They wanted to know if George was at home. I didn't know because I had just gotten up. We went to George's bedroom, his door was locked and I had a key for it. I went to get the key to unlock his door. I opened up his door and I went into his room. He was there.

Q. How many police officers were there that came to your home?

A. I would say anywhere from five to seven. There were quite a few.

Q. Okay. And when you opened the door to George's bedroom did you see him there?

A. Yes, I did.

Q. And would you describe for the jury what his position was in the bedroom at that time?

A. He was laying on the bed and -- actually toward the foot of the bed as if he had sat on the bed and just laid back. And he was sleeping.

Q. And where were his legs and feet in relation to the bed?

A. His feet were on the floor and his legs were partially on the bed and hanging over.

Q. Would you tell the jury how George was attired, how he was dressed at that time?

A. He had on jeans or dungarees. I don't remember if he had on shoes or not. But he had on no shirt.

Q. What happened after the police entered the bedroom?

A. I tried to wake George up and I was having a hard time waking him up. I was shaking him and then a couple of the police were also doing that. And a few minutes later George had woken up. They helped him to get up.

Q. Did he say anything at that time?

A. At that time he wasn't really kind of quite sure what was going on and then when, you know, when he woke up a little bit he thought that I was his girlfriend, Lisa, and he told Lisa to get a hold of his sister which would have been me.

Q. Did you make any observations about his condition at that time?

A. He smelled like he had been drinking. It smelled like he had been drinking. He was kind of out of it.

Q. What did you observe occur then?

A. The police were looking all around his room and they were asking George some questions like where he had been and he really wasn't talking much to them. He wasn't talking

much except, you know, for Lisa to get his sister. There was really not that much conversation in his room.

Q. Did they take George from the house?

A. Yes, they did.

Q. And would you describe how they took him from the house?

A. They escorted him out of the house. I was in the house.

Q. Was he handcuffed at the time?

A. I really can't remember.

Q. About what time was that that they took George out of the house?

A. I would say probably about quarter to four, closer in between quarter to four o'clock.

MR. FERRARA: May I approach the witness, Your Honor?

THE COURT: Yeah.

Q. (By Mr. Ferrara) Mrs. Westcott, I want to show you this picture which for the record it's Exhibit No. 19 and I want to ask you do you recognize who that is? (Indicating)

A. Yes. It's George.

Q. And is that picture fairly accurately depicted how he appeared on December 7, 1985?

A. Yes, it does.

Q. And in that picture you can see that he appears to have a mustache and beard?

A. Uh-huh.

Q. Did he at that time?

A. Yes, he did.

Q. Do you remember for how long he had a mustache and a beard?

A. Quite a while. That's the way he looked.

Q. When you say "quite a while" do you mean week, months?

A. Yes.

Q. Which?

A. It could have been weeks, months. That's the way he looked. He don't just grew one.

Q. When did you next see George after the police took him from the house?

A. Five o'clock that evening.

Q. Where did you see him?

A. At the police station.

Q. Where in the police station did you see him?

A. It was called a viewing room.

Q. Could you describe that for the jury, please?

A. It was like a booth. It wasn't very big. It had a partition in between, another booth on the other side of it. It also wasn't very big.

Q. Was there any kind of barrier between yourself and George when you saw him?

A. Yes.

Q. What kind of barrier was that?

A. It was like a glass wall.

Q. Was anyone with you when you saw George down at the police station?

A. My mother and his girlfriend, Lisa.

Q. And would you describe for the jury what George's appearance was when you saw him at the police station?

A. He looked very fatigued. He was a mess, very upset, tired.

Q. Did you make any observations about his physical person when you saw him there?

A. Yes. He looked like he had been ruffed up. He had some red marks on his face. George had opened his coat and said, "Look what they did to me." He had marks on his chest.

Q. Did he say anything to you about -- did he make any request?

A. Yes. He wanted us to get him an attorney. He said

that.

MR. VOTTERO: I object to his conversation.

THE COURT: Yes, sustained.

Q. (By Mr. Ferrara) Did he indicate to you how he was feeling at that time?

A. Yes, he did.

Q. What did he tell you?

MR. VOTTERO: I object, Your Honor.

THE COURT: You can't repeat what someone else told you. That's hearsay.

MR. FERRARA: May I approach the bench, Your Honor?

THE COURT: Yes.

(The following discussion was held at the side bar.)

MR. FERRARA: I think it's admissible, an exception in this instance because it goes to his state of mind. There have been offered Miranda cards and there has been testimony that he has given these statements freely and voluntarily and in the nature, offer of proof, I think Miss Westcott would say that when she saw him he told her several things. Number

one, that please get me a lawyer. They've got me -- they're asking me questions about things I didn't do and having me sign documents. And I believe he also indicated to her at that time that it was an individual who was named Paul Lance (phonetic) -- strike that, Your Honor. I really don't know if she knows who the individual's name was.

There was an individual who was guarding him banging on the floor, on the bars, and keeping him awake and I think all of that is particularly probative on the state of mind in this instance.

THE COURT: Well, it may be probative to his state of mind. I'm not aware of any exception to the hearsay rule. She can say what she observed. Indeed, she is a fairly close relative, give an opinion of his condition as far as fatigue or coherence or anything of those things. I don't know how you can get in those conversations to the extent that you already have. I don't know you need it anymore. You got it in through one of the policemen, Lance (phonetic) making the noise. So that is about as far you as I think you can go. Pursue the observations.

(<u>End of the side bar discussion.</u>)

Q. (By Mr. Ferrara) Mrs. Westcott, for how long were you with George?

A. At five o'clock.

Q. At the police station at five o'clock?

A. Probably about 15 to twenty minutes.

Q. Without telling us what he said, what, if anything, did you observe about his speech?

A. Very loud, he was kind of hysterical in speaking. He didn't finish all of his sentences. He kind of like directed a lot of sentences all at once. He would start to say something and he would jump to something else. He was upset.

Q. I want to show you -- I want to show you some gloves, which for the record are Exhibit No. 15. (Indicating)

A. Uh-huh.

Q. Later that day on December 7, 1985, did a police officer come to your home?

A. Several.

Q. And when I say "later that day" I mean after they had taken George from the home in the early morning hours; is that correct?

A. Yes.
Q. And about what time was it that these came to your home?
A. It was about nine o'clock in the morning, a.m.
Q. Would you tell the jury what occurred when the police came to your home?
A. There were several police. They were in plain clothes. They had a search warrant. My husband had answered the door. I was -- just shortly gotten out of the shower. I went out into the kitchen to see who was here and what they had wanted. They told me they had a search warrant and they wanted to search, if that would be all right. I said that would be fine. One of the police, I don't recall his name, was asking me questions and asked me if these gloves had looked familiar.
Q. First of all, he had a pair of gloves with him?
A. Yes, he did.
Q. And looking at Exhibit No. 15?
A. Uh-huh.
Q. Did those appear to be the gloves he had with him on that occasion?
A. I would say so. They look like they probably were.
Q. And did you have some conversation with him with

respect to the gloves that he had?

A. Yes.

Q. And what -- would you tell the jury what was said?

A. He asked if the gloves looked familiar. I told him, "Yes." He asked me if I owned a pair, did I own these gloves and I told him no, that they were not mine.

Q. Did you have any further conversation with him about the gloves?

A. About the gloves? I really don't recall. He asked me if they were my gloves and I told him no and I recall we went over that a bunch, if they were familiar or not.

Q. Did you make any mention at that time as to whether or not they might have belonged to someone else?

A. I believe I did, yes.

Q. You said you did tell them the gloves looked familiar to you?

A. Right.

Q. Can you tell us why they looked familiar to you?

A. I thought they were George's girlfriend, Lisa's gloves.

Q. And what is Lisa's full name?

A. Lisa Eldridge.

Q. Did you later learn that the gloves were shown to

you were not her gloves?

MR. VOTTERO: I object to the form of that question.

THE COURT: Sustained.

THE WITNESS: Yes, I did.

Q. (By Mr. Ferrara) At some point in time did you have occasion to -- after this did you have occasion to see Lisa Eldridge?

A. Yes, I did.

Q. And did you, at that time, learn anything with respect to her gloves?

A. Yes. That these were not her's.

MR. VOTTERO: I object to anything beyond yes.

THE COURT: Sustained.

Q. (By Mr. Ferrara) What, if anything, did you later learn with respect to Lisa Eldridge's gloves?

MR. VOTTERO: I object.

THE COURT: I am going to sustain the objection unless she has direct knowledge.

Q. (By Mr. Ferrara) At some later time did you see Lisa Eldridge's gloves?

A. Yes, I did.

Q. And would you tell the jury when it was that you

saw them?
A. We were going to York Street to visit George.
Q. And you say York Street?
A. York Street Jail. It was about a week later or so.
Q. And who went to see George there?
A. My mother, myself and Lisa.
Q. And at that time did you see Lisa with some gloves?
A. Yes, I did.
Q. And were those the gloves that you thought the officer had with him when he came to see her (sic) on December 7?
A. Yes, I did. Yes, they were.
MR. FERRARA: Thank you. No further questions.

* * * * *

CROSS-EXAMINATION BY MR. VOTTERO

* * * * *

Q. When he asked you about the gloves that morning do you recall going and looking in a closet?
A. No, I do not.
Q. The red marks that you saw on George's face you said it looked like he had been abused?
A. Yes.

Q. Do you recall on what part of the face you saw the red marks?

A. His cheeks.

Q. On his cheeks. And is it correct you had some conversation on the phone before going down to the police station?

A. No. It's not correct.

Q. Did somebody in your family have some conversation with him?

A. No, they did not.

Q. Now, is this how he looked when you saw him at five o'clock? (Indicating)

A. Yes.

Q. And where are the red marks on the photograph; can you locate them anywhere?

A. Well, they're on his checks. It's very hard to tell red on a black and white photograph.

Q. Can you look at this photograph? Tell me whether or not on that photograph that I'm showing you now you see any red marks or any marks of any kind? (Indicating)

A. Just his skin.

Q. Okay. Thank you.

A. Your welcome.

MR. VOTTERO: May that be marked for identification, Your Honor?

THE COURT: Yes.

MR. VOTTERO: Is it J?

THE CLERK: J.

(Commonwealth's Exhibit Let. J was marked for identification.)

Q. (By Mr. Vottero) I would also like you to look at Exhibit No. 14, is it correct that you are unable to locate in that photograph any of the marks that you're describing?

A. I can see something on his face whether it is red or not I cannot tell.

Q. And what time is indicated on the clock in the portrait?

A. Four thirty-one.

Q. Now, how long have you known George Perrot?

A. I believe he is 23 years old, 23 years.

Q. And during 1985 when he was living at the home of you and your husband how long had he been living there?

A. Ever since my mother had moved to the house which was, I believe, sometime in 1971, 14, 15 years.

Q. Would it be correct that in November of 1985, you

and your husband had established a curfew, there was a curfew for George when he needed to be in?

A. Yes.

Q. And that was midnight?

A. Twelve o'clock.

Q. Did he ever violate the curfew?

A. Yes, he did.

Q. That was a fairly routine event?

A. Many times.

Q. I would like to show you Exhibit 22. (Indicating) Do you recognize that as your brother's signature, George Perrot?

A. It looks like it. It could be his signature, yes.

Q. You're familiar with his signature?

A. A little bit, yes.

Q. And that's his signature?

A. I would think so.

Q. And I would like to show you Exhibit 23. (Indicating) You recognize that to be his signature on that exhibit as well? (Indicating)

A. Yes. I would say it was.

Q. And for the record, Exhibit 23, is the second

statement of George Perrot.

And this search warrant waiver, Exhibit No. 24, do you recognize that to be your bother's signature as well? (Indicating)

A. Yes, it could be.

Q. And finally, I would like to show you Exhibit 25, a statement concerning the two events of December 7. Do you recognize that as well as being your brother's signature? (Indicating)

A. Yes.

MR. VOTTERO: Thank you. I don't have anything further.

* * * * *

REDIRECT EXAMINATION BY MR. FERRARA

* * * * *

Q. Do you on occasion get correspondence from your brother?

A. Yes, I do.

Q. Would you tell us how he signed his name?

A. He usually signs it G-E-O for George.

Q. Now, I want to show you Exhibit Nos. 22, 24, No. 25, and with specific reference to the letter P in the name Perrot. Is there something distinctive about the way George

makes the letter P?

A. He makes a big P, a big loop.

Q. And I want to show you Exhibit No. -- and is the P similar in all three of the exhibits that I've shown you?

A. It varies a little bit in different ways.

Q. With respect to Exhibit No. 23 would you look at the signature there. Is it fair to say that the letter P there is similar to the other exhibit? (Indicating)

MR. VOTTERO: Your Honor, I object to that and suggest the exhibits speak for themselves.

THE COURT: That question sustained.

MR. FERRARA: Okay.

Q. (By Mr. Ferrara) I would like you to look at Exhibit No. 23. Are the initials GP that appear in four places on this exhibit -- (Indicating)

A. (Interposing) Yes.

Q. Do those appear to be George's handwriting?

A. No.

Q. And what about -- those do not appear to be George's handwriting?

A. George doesn't usually print his G, he writes it in cursive.

Q. And what about the letter P, anything about that?

A. It's the same thing. It's printed. George usually wrote in cursive.

MR. FERRARA: Thank you. That's all I have, Your Honor.

MR. VOTTERO: Nothing further.

THE COURT: You may step down.

(The witness steps down.)

MR. FERRARA: The defense rests, Your Honor.

MR. VOTTERO: May we approach?

THE COURT: Yes.

(The following discussion was held at the side bar.)

MR. VOTTERO: Your Honor, the only rebuttal I expect to have is prior testimony at his first trial where he acknowledges the signature is his. It will take me -- I think I can have it properly typed and labeled for tomorrow.

MR. FERRARA: I don't understand. Who acknowledges what signature is his?

MR. VOTTERO: Mr. Perrot acknowledges the

signature to be his.

MR. FERRARA: There has been -- not been any claim the signature is not his.

THE COURT: Now, can it be said that the signature is not his? I think he pretty well states, sticking to the initials, as I understand it.

MR. FERRARA: It's only the initial that she has testified do not appear to be his; how is this rebuttal?

MR. VOTTERO: It was my impression he was questioning her about the signature on the second confession.

MR. FERRARA: In fact, she said they all look similar and she appears to be his --

MR. VOTTERO: (Interposing) As long as there is no argument tomorrow morning to the jury the signature does not appear to be his.

THE COURT: Okay.

MR. FERRARA: There is no testimony that --

THE COURT: (Interposing) So you are both resting now.

Okay. Let's talk. It is roughly five minutes to three. The most we can do would be arguments and that

would fracture it. I take it you want to do that tomorrow morning?

MR. FERRARA: Please, Your Honor.

THE COURT: We will have a charge conference for the rest of the afternoon.

(End of the side bar discussion.)

THE COURT: Mr. Foreman, ladies and gentlemen, as you have heard, both sides have rested and that means the evidence is completed.

The next event that would take place is that each counsel, in turn, is going to have an opportunity to sum up, to highlight to you those portions of the evidence that they considered to be most significant for their respective positions. And then it will be my obligation to instruct you on the law and then the case is going to be yours for deliberation and verdict.

However, it's now almost three o'clock and it's best that we do those things fresh in the morning. We also have some other matters that are going to occupy counsel and the Court that wont require your attention. So what I propose to do is recess the trial as far as the

jury is concerned until tomorrow morning.

Perhaps it is even more important at this stage of the proceeding that you maintain your impartiality than ever before. So once again I must stress to you that during this recess you should have no contact with anyone that has anything to do with the case, that you do not discuss this case with anyone, even among yourselves, that you not conduct any private views of any location mentioned in the course of the trial, and you don't attempt to perform any experiment and do any kinds of things that would immediately deal with your fact finding functions.

You make whatever efforts may be necessary to maintain your impartiality. Keep yourselves apart from information about the case that might influence, that might be in conversations held without your hearing and if any of this information comes to your attention inadvertently put it aside and pay no attention to it. Maintain your impartiality.

Return here tomorrow morning at nine o'clock at which time we will proceed with arguments and instructions and then the case will be yours.

Stand in recess until tomorrow morning.

(The jury exits at 2:55 p.m.)

THE COURT: All right. So what's happening now?

MR. FERRARA: Your Honor, if I may, at this time I do have some written motions for required findings of not guilty. I would like to renew those motions and I would ask to be heard just very briefly on three of the indictments.

THE COURT: Sure.

MR. FERRARA: Your Honor, with respect to indictment number 85-5416 charging indecent assault and battery on an adult, Mary Prekop; indictment number 85-5418 charging aggravated rape; and indictment number 85-5420 I'm going to ask you to consider dismissing these indictments for the following reason: the victim in this case or the alleged victim in this case -- certainly she is a victim at the hands of someone, has clearly stated that her assailant was not George Perrot.

There has been no identification by anyone of George Perrot as her assailant either for the indecent

assault and battery or for the rape or for the burglary and assault on an occupant.

Now, she was adamant about saying that George Perrot, as he appeared on December 7, of 1985, did not resemble the man that assaulted her in a significant way, specifically the mustache and the beard.

The only evidence that's been admitted to identify Mr. Perrot as the assailant is the blood analysis or testimony by William Eubanks and the hair analysis testimony by Wayne Oakes. And both of those individuals acknowledge that those are not means for identifying an individual. They are means for indicating that an individual may fall into a particular percentage of the population and therefore, cannot be excluded. But I suggest to the Court they are not a means for identifying someone satisfactorily to the law where the victim has said he does not fit the description of the assailant.

You have before you some statements and in none of those statements does George Perrot acknowledge that he committed an indecent assault and battery or rape or assault on the occupant, Mary Prekop. And there is substantial amount of testimony from which the jury might infer that those statements were not given freely,

knowingly, and voluntarily, and I am going to ask you to find that given the state of the evidence that the jury could not, under the law, find that George Perrot was the individual who committed these acts.

MR. VOTTERO: Just briefly, what she's stated repeatedly, she is very concrete in how, the way she states it. How could it be, this man has a beard and a mustache. If she was ever asked she will tell you what she thinks, but clearly that is not an admissible question. The evidence is more than enough to go to the jury on the question of identity.

THE COURT: Okay. On the level of proof required for the stage of the preceding motion for directed verdict I am going to rule there is sufficient evidence so therefore, I am going to deny each of the motions as to each of the indictments.

Okay. Are you ready for the charge conference? We will do that in the lobby.

MR. FERRARA: Sure.

(A recess was taken at 3:02 p.m.)

* * * * *

(The following discussion was held in the Judge's chambers.)

(The Court and counsel
were present at 3:05 p.m.)

THE COURT: Well, let me just run down the list of things that I noted as we were talking about fresh complaint. That's Exhibit 1, I think.

Prior inconsistent statement, now I had jotted down the Rodriguez identification charge, but I don't really think it applies here. That deals with the identification process, line-up, where there is a positive identification made.

MR. VOTTERO: Not at the line-up.

THE COURT: Here there is none.

MR. FERRARA: I have to plead ignorance to that Rodriguez charge.

THE COURT: The Rodriguez charge is the one that's also called the Telfare, T-E-L-F-A-R-E. Rodriguez modified Telfare, I guess. And it talks about line-up identification and one on one and suggestive procedures and it's required to be given before it says identification within or the main issue in the case.

MR. FERRARA: I think what I would like to do is look at that and it may be pertinent in this case.

THE COURT: If you can persuade me it is, I think it is. I will give a standard instruction it is the Commonwealth's burden to prove the identity.

I will tell you exactly what I will give.

Here is the Rodriguez charge.

MR. FERRARA: Thank you, Your Honor.

THE COURT: What I would say is as follows, the burden of proof is on the Commonwealth, extends to every element of the crime or crimes and this includes, specifically, the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime charged. If you are not convinced beyond a reasonable doubt that the defendant was the person that committed a crime then you must find him not guilty.

I think that is appropriate. The further Rodriguez identification I don't think it really talks about identification procedures which resulted in a positive identification.

MR. FERRARA: Yes. I see.

(An off the record discussion was held.)

MR. FERRARA: I agree with you that that charge

it would not be necessary.

THE COURT: Okay. So that comes out.

Okay. Expert testimony, humane practice, I can point out that finding certain markings on exhibits that were placed in preliminary matters that they are not of any consequence. You simply need not concern yourself with those markings.

Now, this is something that you raised a little earlier and I could tell something along these lines, certain crimes took place on December the 7th, of 1985, and some details were admitted for a limited purpose, such as for setting, the context in which this defendant was taken into the custody. They do not represent any evidence that he committed the crimes for which he is now on trial before you. And just leave it at that.

MR. VOTTERO: I expect to make some reference to some of the similarities between the incidents, type of day, the manner of entry, --

THE COURT: (Interposing) Was there any evidence --

MR. VOTTERO: the motive indicated in the statement, if you read the statement in his confession.

THE COURT: Oh, I didn't read that.

MR. VOTTERO: I think it's there. I'm not asking for a specific instruction, but I want to alert you I expect to make some reference to the statement both to show that, to show the motive for these crimes because it illustrated -- a week earlier he acknowledges he is breaking in these homes to get money to get drugs. That is a clear element of the indictment here where I have to show his intent when he breaks in, particularly with the aggravated rape to either commit a burglary in a house. I have all of those burdens and that admission which went in, not by the Commonwealth, but by the defendant and it went in without limitation and so I am going to use it for that reason.

I'm also going to use it because it's my understanding that there is not going to be a frontal assault, if you will, on the voluntariness of that statement which takes place some two and a half hours before the final statement.

MR. FERRARA: I think there is going to be. The voluntariness of all of the statements are to be challenged.

MR. VOTTERO: You do or you don't?

MR. FERRARA: I do. I think that it is going

to be indicated, argued, that none of those were given freely and willingly under the law. It's true that they were admitted without limitation. Their contents are already in front of the jury. I am going to be arguing that they are evidence of his state of mind and well -- I think it would be appropriate to give the instructions the Court has indicated it wishes to give.

THE COURT: I might say this was suggested by the prosecutor.

MR. VOTTERO: What was?

THE COURT: You have successfully argued all sides of this issue.

MR. VOTTERO: I am sitting here, I am taking a back the voluntariness if that one is challenged.

THE COURT: The statutes of humane practice I am not sure you have any choice. That's a crime to which he has pled guilty and it was voluntary. I don't understand.

MR. FERRARA: It's not in evidence.

THE COURT: That's true.

MR. VOTTERO: I think they should be instructed he can't be convicted of these crimes just because they believe he may have committed some earlier crime.

THE COURT: We don't know that he was convicted of these crimes, do we?

MR. FERRARA: No, sir. No. No.

THE COURT: As far as the evidence in this case, I think definitely I am going to give them this instruction. As simple as that.

MR. VOTTERO: Could I hear again the gist of what you will be instructing?

THE COURT: Well, you have heard evidence of certain crimes that took place on December 7, 1985. This defendant is on trial for crimes that occurred on November the 30, of '85. This evidence is admitted for certain limited purposes. And I will avoid commenting on the evidence and what those purposes are.

Now, here's a part that I think is a little difficult. It is not evidence that he committed crimes for which he is now on trial before you. I could see where they could conceivably and I didn't read the statements so I'm not clear on what's in there, if I were to say you are not to convict the defendant on the basis of such evidence of other crimes alone.

MR. VOTTERO: That's fine.

THE COURT: That's sort of unconsciousness of

guilt. The charge that takes some of the sting out of them, I think.

Okay. Now what else have I got here?

There weren't any lesser included?

Okay. You want to charge on the fact he didn't testify?

MR. FERRARA: Yes, please.

THE COURT: Okay.

MR. VOTTERO: While we are on this general failure to testify issue, I take it any instructions for missing witnesses? It has been my habit to make sure on the record there is no argument contemplated on the failure to call witnesses.

MR. FERRARA: I don't think I can make an argument to failure to call witnesses unless for some reason the witness was inaccessible to me and accessible only to you.

MR. VOTTERO: That is exactly how I understand it, but I don't like interrupting a closing. I just want to make sure that is not contemplated in the case.

Now, why didn't you call Chief Stelzer to say he signed?

MR. FERRARA: I was going to ask you that.

THE COURT: Who is the chief these days, Stelzer?

MR. VOTTERO: Then Captain.

THE COURT: I think this is your copy. Here let me give that back to you.

MR. VOTTERO: Oh, yes.

THE COURT: Well, that's all I have.

MR. FERRARA: Any further specific instructions I've requested at this time, but if there are some further instructions I will try out something.

THE COURT: I am just wondering about that indecent A and B; do you went to press that?

MR. VOTTERO: What do you mean?

THE COURT: It's a five year felony. Where is it going to get you? It just deletes everything else.

MR. VOTTERO: Well, --

THE COURT: You are entitled to it if you want it.

MR. VOTTERO: I am going to leave it there.

THE COURT: Okay. I will see you in the morning.

MR. VOTTERO: What time did we say we were starting?

THE COURT: Well, I have been telling the jurors nine o'clock. They never bring them up from the prison until close to 9:30.

(The evening recess was held.)

* * * * *

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF HAMPDEN

I, ALICIA CAYODE TORRUELLA, Certified Shorthand Reporter, hereby certify that the foregoing is a true and accurate transcription of my stenographic notes to the best of my knowledge and ability.

ALICIA CAYODE TORRUELLA