**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 19

GS-P-845



COMMONWEALTH OF MASSACHUSETTS

Hampden, SS.

Superior Court Department
of the Trial Court
Criminal Action No. 85-5415-18
85-5420,25

COMMONWEALTH OF MASSACHUSETTS

vs.

GEORGE PERROT

TRIAL, ARGUMENTS AND CHARGE: IN HAMPDEN COUNTY HALL OF JUSTICE, SUPERIOR COURT, 50 State Street, Springfield, Massachusetts, before Simons., J., and a jury on January 9, 1992.

APPEARANCES:

BRETT VOTTERO, ASSISTANT DISTRICT ATTORNEY, representing the Commonwealth.

JOHN FERRARA, ESQUIRE, representing the Defendant.

Alicia C. Torruella
Certified Shorthand Reporter

PHILBIN & ASSOCIATES
Certified Shorthand Reporters
Certificate of Proficiency
Certificate of Merit

1500 Main Street-Suite 1514
Springfield, MA 01115
Tel (413) 733-4078

P.O. Box 402
Pittsfield, MA 02102
Tel (413) 499-2231



4-13-93

# I N D E X



| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Closings | | | | |
| Mr. Ferrara | 582 | | | |
| Mr. Vottero | 615 | | | |
| Jury Charge | 630 | | | |

(The following discussion was held in the Judge's chambers.)

(The Court and counsel were present at 9:29 a.m.)

THE COURT: Okay. You have anything?

MR. VOTTERO: I think he has a couple of things. I was wondering if I could take a quick read through your humane practice instruction if you have that available.

THE COURT: Evidence has been introduced that the defendant made an admission concerning the crimes charged. You should weigh such evidence with caution and should carefully scrutinize all the circumstances surrounding the alleged admission to determine whether it was made freely and voluntarily and that it was the product of a rational mind.

If you find beyond a reasonable doubt that the alleged admission was made by the defendant freely and voluntarily with understanding of the nature of the alleged admission without fear, threat, coercion or force or either physical or psychological with a mind that was rational.

You may consider that the alleged admissions, together with all the other evidence in determining the guilt or innocence of the defendant. However, if you find upon consideration of all the evidence in the case that the Commonwealth has not satisfied beyond a reasonable doubt that the alleged admission was made freely and voluntarily by the defendant, it was made with a warped mind then you must disregard it entirely.

It is the burden of the Commonwealth to prove the voluntariness of such admissions beyond a reasonable doubt. In considering whether the alleged admission is free and voluntary or not you may consider the conversations, if any, between the police and the defendant. You may consider where the alleged admission was made when, it was made, length of time, if any, the defendant was questioned and the age, disposition, education experience, character and intelligence of the defendant.

MR. FERRARA: Your Honor, are you going to make any explanation of the defendant with respect to I request, as an attorney, that the questioning needs to be discontinued or if he requests the questioning cease, that he -- the police have an obligation then to

discontinue interrogation.

MR. VOTTERO: There is no evidence in the case of that.

THE COURT: Yeah.

MR. FERRARA: It might be inferred by the testimony by Nancy Westcott where she saw him at five p.m. He was very upset and incoherent and appeared to have some red marks and or bruises on his chest and made a request of her to get him a lawyer.

MR. VOTTERO: Subsequent to any admission that was offered.

THE COURT: No. I am not going to get into that.

MR. FERRARA: My objection may be noted?

THE COURT: Yes.

MR. VOTTERO: One question about that instruction, would you, intend to indicate to the jury the basis for the rule is the unreliability of statements which are involuntary.

THE COURT: Frankly, I don't intend to do that. I'm not sure it's wise to do that.

MR. VOTTERO: Okay.

MR. FERRARA: There was some discussion

yesterday, Your Honor, with respect to lesser included offenses and I reviewed the instructions in the first trial last night and I confess to some confusion on one point and that is with respect to the aggravated rape in the first trial. A lesser included instruction was given and it was --

THE COURT: Did he testify?

MR. FERRARA: He did testify in the first trial.

MR. FERRARA: Although in this trial, of course his statement is in, but the discussion with respect to that seems to be that the jury could find if the break was made, the entry was made at a time when he didn't have an intent to commit the rape. In fact, I think the discussion question on it a jury can question on it and the rape then occurred spontaneously, whether or not that would constitute aggravated rape and there was much discussion about general versus specific intent and what the intent was and so forth.

THE COURT: Well, rape and aggravated rape both are general intent crimes. That's not an issue. The thing that raises it to aggravated rape is intent to commit one of the felonies that is delineated in the

statute. Among them are burglary, breaking an entering and robbery. Either one of those would qualify the act as aggravated rape as opposed to one that was not aggravated in subsection B. It may even be more. I am not sure if he fit in any of the others, but I wouldn't be surprised if he did.

MR. VOTTERO: I just checked the burglary, assault on an occupant was one of the delineated crimes.

MR. FERRARA: And it was?

THE COURT: Oh, yeah.

MR. FERRARA: Then I wouldn't be asking for that lesser included.

THE COURT: Even burglary without assault?

MR. VOTTERO: Yeah.

MR. FERRARA: With respect to the robbery charge regarding the alleged victim Emily Lichwala I would ask for a lesser included of larceny on that charge.

MR. VOTTERO: There is no robbery charge of Emily Lichwala.

THE COURT: It's just breaking an entering in the nighttime with intent to commit a felony.

MR. VOTTERO: The jury came back with a larceny

but the Judge dismissed it at sentencing. I don't know why.

MR. FERRARA: Finally I filed a motion requesting a special question.

THE COURT: Yeah?

MR. FERRARA: On the verdict form to the jury. I don't know if the Court has ruled upon that.

THE COURT: Yeah. I've denied that motion. I am going to submit it to them on guilty and not guilty.

MR. FERRARA: My objection be noted.

THE COURT: Yes. His Chapter 266 in that one I think is 15.

MR. VOTTERO: This one is 14, burglary armed on an occupant is 14.

THE COURT: And the unarmed burglary is 15 which is another one of those legislative nightmares. I don't know why they couldn't just point it out.

Okay. Anything else?

MR. FERRARA: No.

THE COURT: Okay. Everybody ready?

THE CLERK: Before everybody leaves I'm a little concerned about these exhibits. Some of them have the markings of the last trial.

THE COURT: Yeah. I am going to give them an instruction about it. I am just going to tell them we decided not to disturb the previous markings. There is a lot of them on there. Some of them are confusing and actually the numbers of the various exhibits have a very important part today in the course of the trial to keep everything straight, but as far as the jury is concerned it doesn't matter. So I am going to tell them that.

MR. VOTTERO: I am not sure we indicated when I introduced Exhibit No. 1, Mary Prekop's statement, it is a sanitized one. I have it sanitized from where it says, "I have a dog since the last attack."

THE COURT: Okay.

(The discussion ended at 9:40 a.m.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 9:47 a.m.)

(The following discussion was held at the side bar.)

MR. VOTTERO: Rather than questioning that juror individually, if you would merely indicate that from time to time people may be waiting for jurors that are done, had contact with people in the halls. If you had anybody in your family that mentioned them talking to a witness could you indicate that.

(End of the side bar discussion.)

THE COURT: Good morning, ladies and gentlemen. Some of what has delayed us is attributable to another matter having nothing to do with the case. There are some scheduling matters I mentioned to you so you will understand that. There are sometimes unavoidable delays. We ask for your understanding.

For the record the defendant, counsel are present, and all of the originally impaneled jurors are present.

Ladies and gentlemen, I have some questions for you dealing with your ability to deliberate as impartial jurors. First of all, did any juror fail to heed my instructions concerning your actions to remain impartial?

(Pause)

THE COURT: Next question. In the course of involved affairs in a public building with public corridors and various persons who may or may have something to do with the case, being thrown into inadvertent contact with others, potentially jurors, that someone is close to, did any juror have any contact direct or indirect with any person either involved in this case or related to someone involved in the case?

(Pause)

THE COURT: And my final question, does any juror have anything to report to this Court concerning your ability to be impartial or any matter that might have occurred and might have affected your ability to be impartial?

(Pause)

THE COURT: There being no response I believe we are ready to proceed.

Ladies and gentlemen, as I indicated to you, the case is now completed as far as evidence is concerned. The next matter is for counsel, each in turn, to sum up their respective positions to you and under our rules Mr. Ferrara is going first.

MR. FERRARA: May I just have one moment?

THE COURT: Yes.

(Pause)

* * * * *

CLOSING ARGUMENT BY MR. FERRARA

* * * * *

MR. FERRARA: Your Honor, Mr. Foreman, ladies and gentlemen of the jury, the government has charged George Perrot with the most serious of crimes. You have heard the evidence about the rape of Mary Prekop, the breaks into the home of Emily Lichwala and Mary Prekop. The government has the burden of overcoming every possible doubt, every logical doubt that you may have. That is their burden. If you retain some doubt as to who committed these acts then you have to resolve that doubt in favor of the defendant. That is our rule of law.

Mary Prekop was raped. The crime was repugnant. I'm sure, as you sat here and listened to her detail what happened you felt emotion; you felt revulsion; you felt anger. You wouldn't be human not to feel that. In fact, I would acknowledge that sitting next to Mr. Perrot that I felt some glares. Glares were felt both as opening arguments were given detailing these crimes and as Mary Prekop testified. I can understand that. But the law is reason unaffected by emotion.

When your considering a matter of this importance you have to be free in your deliberations from anger, pity, or a wish for retribution. You have to use your best reasoning and it's most important in this case because of the difficulty of this case. This is a difficult case.

Contrary to what Mr. Vottero told you the evidence isn't overwhelming. The evidence is, in fact, is extremely contradictory. Now, when I gave you my opening I told you that I believe you'd find that Mary Prekop was a courageous woman as you heard the facts of what occurred on November 30, 1985. And her statement was introduced. And the reason why you know she is a courageous woman is when this man broke into her home on

November 30, 1985, she tells you, I got as far as the bathroom door and I saw a man standing in the kitchen. I hit him on the head with a stick. She wasn't horrified with terror. She takes some action.

This man then grabbed the stick, pushed her into the bedroom. "The dog tried to follow us in, but the man closes the door." She observed that. She understood that. She fought this man. "I was still fighting him. He never said anything. I kept calling the name Scuffy," meaning her dog. "This man hit me on the face a couple of times." Now, we can appreciate the terror of this moment. I suggest to you this woman didn't know if she was going to live or die at that moment.

"I kept kicking with my feet and he punched my left eye. He pulled my nightgown and he sucked on my left breast." She goes into detail of the rape. And here, as this is happening to her she has the wherewithal, the thought to say, "I started moaning. I pretended to pass out. I pretended to pass out. He got up and left the room." That's why I say this is a woman of great strength, presence of mind and certainly her testimony on the stand substantiates that.

This had to be a difficult time for her to get up

there and recount the details of this event, but she didn't make it difficult for us in terms of emotion.

Now, with her presence of mind this woman made observations other than about the actions of the man in keeping the dog out and so forth. She made observations about the individual and I acknowledge she couldn't tell you, give you a precise description of the man, but she certainly made observations about his gross features. She testified to them on the stand and in her statement, this is Exhibit 1, she says, "I can describe the man who broke into my home as a white name, about 20 to 30 years old. He had dark wavy hair and he was clean shaven. He was average height and weight. He was wearing a blue jacket. It looked like nylon and sneakers which were white. He was wearing a dark colored pair of pants. They were neither jeans nor corduroy material. He was not wearing glasses and I didn't notice any jewelry or scars."

Now, Mary Prekop knew the significance of that description when she gave the statement. Nowhere in the statement does it say, I can't identify the man or if I saw the man in a line-up I couldn't identify him and its the Commonwealth, the state, that really seeks to impeach

her credibility on the description of this man. They elicit from her testimony regarding her eyesight, that the man covered his face, that he knocked the light off the bureau, and attempts essentially to discredit, to cause you to believe that she didn't really see these gross features as she describes.

You think that Mary Prekop, after seeing her testify would tell you anything but the absolute truth? You think she didn't see what she said she saw there? I asked her, "How did you know the pants were dark?" She said the pants were dark. I said, "How do you know they're not jeans?" She said, "Jeans are blue." You think she is lying about the pants being dark, but not jeans?

I showed her two pictures. Exhibit No. 14, the line-up. I asked her and I asked her if the man on the left was the man who sexually assaulted her and I showed her a second picture and asked her if this man was the man who sexually assaulted her. She looked at a picture of seven people and then a picture of one person and twice I asked her about George Perrot. What does it say about her mental ability? This 85 year old woman, she looked at me, she said, "They're the same person."

And when I asked her the second time showing her the picture, if this could have been the man that raped her do you remember what her response was? "How can I say this is the man that raped me? This man has a beard and mustache. The man who raped me was clean shaven."

Now, I suggest to you that perhaps Mary Prekop, for all of the reasons, because the man covered his face, because of the trauma, because she didn't want to see the man, couldn't give you a detailed description, but there is no way that that woman is mistaken about the, whether the man was clean shaven or had a beard. In fact, her testimony on the stand, I suggest to you, in virtually every detail you will find that she is consistent with her statement on November 30, 1985. She had the best memory of any witness who testified in this trial.

There's been a lot of evidence in this case and I guess I can simply say your duty is to find the truth, but that's an over simplification. You have to find what's fact, what's not fact. And there has been so much and much of it is contradictory. How can you tell what's that facts and what's not true? Well, facts only fit with facts. And the whole universe one fact will fit with another to put together a puzzle. And all the facts

will fit together. They will all fit together to form a puzzle, to form a picture of a puzzle. But lies will fit only other lies. I don't mean intentional falsehoods. I mean anything that's not true, that's not a fact.

So, now, let's try to put together this puzzle. Start with the chronology November 30, 1985. There are some breaks. There are two breaks into the homes of elderly women who live alone in the Malibu Street area. December 7, 1985, George Perrot is arrested for committing a break in that same area where he lives and a purse snatching. The break, you know, was not into the home of an elderly woman who lived alone. It was a couple named McNabb. And you'll know from his statement he was 17 at the time. If what's contained in here is true, he says he started to hear a lot of voices. "I got scared and ran out the front door."

Now, think about the conduct of this man who broke into Mary Prekop's home. She hit him with a stick. She said, "I might have screamed." The dog is barking and making noise. This man isn't scared. This man beat this woman up, stays there and rapes her. There are some differences in the nature of those two offenses. The one offense, the one type of offense, the ones on November

30, 1985, I suggest to you, the primary purpose, there was for that individual to commit a sexual assault on an elderly woman.

Use your head, read the statements and consider the events. I remember one of the officers, I believe it was Jarvis, stating, "Well, he was shouting," making reference to George Perrot. During the questioning he was shouting, "I did it because of the drugs." Well, I hope you weren't mislead by that. I am sure Mr. Jarvis didn't want to mislead you, but you have to keep in mind George Perrot during this questioning never said he raped anyone. He never said, "I raped a woman." And, you know, if George Perrot said "I did it because of the drugs," and he was referring to these events of November 30, 1985, don't you think Mr. Jarvis would have said, You mean you raped the woman because of the drugs? And his answer would have to have been either yes or no. Look at this statement.

The first statement given on December 7, 1985, has nothing to do with the issues on trial. It has to do with the house break on December 7th, and the purse snatch. And here right on the bottom where he is being questioned about the events of November 30, 1985,

"The reason I broke into the house was to get money for drugs. I ran back home and the police were there." He is saying that at 12:40. According to Jarvis he never even questioned him about these events until three a.m.

So George Perrot is arrested for these crimes of December 7. Excuse speak a moment. He is arrested for the offenses of December 7, and Sergeant Kelly is called at 3:30 in the morning to come to the police station, before four a.m.

Now, he doesn't fit the description given by Mary Prekop. We know that. But he lived on the same street and he has committed a house break and that's the knowledge that they have. That's what you know. That's what they knew. And that's where they are starting from. And Sergeant Kelly gets there at five a.m., excuse me at 4:30, I believe, and starts questioning George.

And George Perrot says, "Yeah, you got me good on those two crimes," meaning the McNabb house break which he is not on trial for and the purse snatching. And Kelly doesn't take a statement from him. He is not questioned. In fact, you know he is not. No statements is taken from him for at least another seven hours and

instead Lieutenant Kelly takes these gloves and goes to speak to Nancy Westcott.

Now, what is the truth about these gloves? I think when I tell you, you need to use your best reasoning. Be a bit of a detective. There's 12 of you. Collectively you heard all of the testimony. There's a massive amount of reasoning power here. I told you facts fit with facts.

Lieutenant Kelly goes to this woman's house and says to her, "Have you ever seen these gloves before?" On direct testimony he says she told me they were her gloves. I believe that was his testimony. I think he said, "She told me they were hers." On cross-examination I said didn't she tell you they looked familiar? Then he's equivocal. Well, she might have.

Okay. What do you know he did with these gloves? He goes back to the station and somehow in some way they get into the hands of Thomas Jarvis. And Thomas Jarvis brings them to Lisa Eldridge's house and asks her if they are her gloves.

Now, when Sergeant Kelly was on the stand I asked him, Sergeant Kelly, or excuse me, Lieutenant Kelly. He was a sergeant at the time. "Lieutenant Kelly, when you

spoke to Nancy Westcott didn't she tell you they looked familiar and that they might belong to George's girlfriend, Lisa Eldridge?" She might have. I'm not sure. My best recollection she said, "They are mine." Then he goes a step further and says she looked for them in a closet.

Then he tells you he went back to the police station. He spoke -- he told you, "I spoke to Thomas Jarvis." Tom says, "Of my questioning of George Perrot I talked to him about the search warrant." Thomas Jarvis gets on the stand. He never talked to Kelly. He didn't talk and doesn't remember talking to him that day and specifically doesn't remember talking to him about the warrant. Doesn't remember talking to him about the gloves. Something is inconsistent here and some questions are there. How does this happen? We know that Kelly has the gloves.

Well, let's find out what happens with these gloves. I start asking him about how he came into possession of these gloves because you heard this is serious evidence, these are in a property room. You are supposed to sign for them.

What did Thomas Jarvis sign? He doesn't remember.

"Well, did you sign the evidence tag?" "I don't know." "You signed the log book?" "I don't know." "Mr. Jarvis, you get these gloves from Lieutenant Kelly who told you to go ask Lisa Eldridge about them?" "I don't know." Well, did you go ask Lisa Eldridge, did you bring the gloves when you spoke to Lisa Eldridge? I asked him, "Did you ask her if these were her gloves?" "Yes, I did." "And she told you no, didn't she?" He said, "Yes. She told me, No." And I asked him, "Did you ask to see her gloves?" "I don't remember." "Sir, didn't she show you a pair of gloves?" "She might have."

Then I ask Mr. Jarvis if he made any report of this conversation with Lisa Eldridge. "No, I didn't." What is Nancy Westcott going to say about these gloves? She says when Thomas Kelly came to see her she told him they looked familiar. She doesn't remember whether she told him she said, I don't remember. She told Sergeant Kelly they might belong to Lisa Eldridge, but she tells you she saw Lisa Eldridge later when they went to visit George and she saw she had her gloves. Okay.

And now you look at all of that and there is only one set of facts that all fit together and make sense. And that's when Tom Kelly went there with these gloves.

He told her, she said to him they looked familiar and probably said to them, they may belong to his girlfriend. Otherwise why would Kelly give these gloves to Jarvis to bring them over to Lisa Eldridge's?

And with respect to Nancy Westcott you heard him testify -- her hearsay they brought her brother out of the house before Sergeant Kelley came back. Now, unless she impressed you as a complete imbecile or a moron you know that when Sergeant Kelly comes back at nine a.m. and was asking her about these gloves that's because it's related to her brother in the case. And what does it say about her credibility? She didn't just say, I never seen any gloves like that. I don't know anything about those gloves. She says, "They look familiar." I'll ask you to remember that when you are assessing Nancy Westcott's credibility. Okay. So this is what happens with the gloves.

Now, back at the police station interrogation of George Perrot has begun with Thomas Jarvis. One of the first things they all do, when I say "they" there are three witnesses to this document. They ask George Perrot to sign a search warrant waiver. Let me read this to you.

"I, George A Perrot, age 17, 87 Malibu Drive, after being advised of my constitutional rights that I do not have to allow a search of my person without a search warrant for hair and blood samples.

After being informed of my absolute right to refuse to consent to a search I do hereby authorize Charles Arpin, Officer John Scanlon, and Tom Jarvis, police officers of the City of Springfield, Massachusetts, conduct a search of my body for hair and blood samples. I understand that the blood sample will be taken by qualified medical personnel. This written permission is given freely and voluntarily by me to the above named officers without any kind of threats or promises or without any offer of regard. "I fully understand any evidence of crime discovering the other may be used against me in a Court of law."

I want to ask you something. Why on December 7, at 12:40 p.m., according to Tom Jarvis, is this the first thing that they do? Use your head. They've got a guy there. Yes, he committed a break in the same neighborhood, in the same area, but he doesn't fit the description of a person who raped Mary Prekop. They haven't brought her down to view him yet in a line-up and

he's already said, I don't know anything about those events. Well, you did hear testimony from Lieutenant Kelly about having to obtain an affidavit -- to obtain an affidavit to bring to Court to go to search 87 Malibu Drive, you just heard the content of that document. Let me suggest this to you. With the facts that I've just given you if they waited to bring Mary Prekop down to identify this man and she didn't. They could never get a warrant to get this hair or blood. Could they on those facts?

MR. VOTTERO: I object Your Honor.

THE COURT: Sustained.

MR. VOTTERO: I asked to be heard at the side bar briefly.

(The following discussion was held at the side bar.)

MR. VOTTERO: I apologize, but the line of argument is improper by motion in limine. I was prevented to put in evidence that George Perrot was a suspect in their earlier rapes. The argument now is how could they pick up George Perrot. I think he has got to stay away from that line of argument.

THE COURT: Yes. I would suggest you do.

(End of the side bar discussion.)

MR. FERRARA: They get his consent. And you know, at about that time there are a number of people participating, if not directly, in witnessing documents in this interrogation of George Perrot.

You know, what does this document, by the way say of George Perrot's state of mind? At 12 o'clock he is freely, willingly and giving, indicating he will give his blood and hair. And from 12:40 until sometime in the afternoon you know that the questioning of George Perrot continues. And I want to get into that in just a minute, but because we come upon some chronology in the issue of blood and hair let me add just blood and hair for a moment.

You have had an FBI expert come in here and testify about blood and I want to suggest to you that this gentlemen is taking a microscopic view of tissue of blood. In other words he is comparing a stain from a sheet trying to find, just to find genetic markers in that stain and then comparing them with a known sample of

George Perrot. Bet we know more about the blood in this case in a broader sense than I ever did.

What do we know about the blood? First of all the only blood stain that the testing was on where that was found in that house other than the stains on the gloves which were never really identified, no testing was done. The only stain found in that house on this bedroom sheet.

Now, the Commonwealth has proceeded in this case as though that stain got on the bedroom sheet somehow by the person who raped Mary Prekop, but there is not any blood on her nightgown and I believe she testified she may have been wearing a rob and there is not any blood on any robe. And the rape didn't occur on the bed and there is not any blood stain on the carpeting and there is not any blood anywhere else throughout the house.

And on cross-examination Mary Prekop says, "Yes, there was a blood stain on the bed and it had been there for a long time and it was there from an uncle who used to cough up blood." But could you get genetic marker results from a blood stain that had been on that sheet for a long time? Well, I asked the expert, "When you're testing for blood on a piece of fabric what are the

limiting factors in terms of obtaining genetic markers?" Do you remember there are 13 genetic markers that they can usually get? Thirteen. And the one that lasts the longest, that one that you can test for the longest period of time, I believe he said and listen, if I state something any one of your memories differs in anyway from what I said please disregard what I say because your collective memory controls. Okay. I don't profess to be able to remember everything better than all of you.

But I believe he said it was the haptoglobin and the Gc. I don't remember what the Gc was. That those lasts on a garment the longest and those are two of the four markers that he finds and I said to him, "Isn't it true that in a stain about the size of a half dollar, a fresh stain you could find all 13 genetic markers?" And he said, "Yes, I'd agree with that." And I said to him, "What are the limiting factors?" He said, "Age, the size of the stain and the concentration of the stain." Those are the three limiting factors.

Well, this is the size of the stain. This is one -- I don't want to bring it out. This is 1B. I asked him, "Does the hole cut in the sheet closely approximate or does it approximate the size of the stain?" He says,

"Yes. That's the size of the stain."

The age of the stain? Well, this sheet went to him, I believe the testimony was somewhere around December 10th. And that is a matter of 10 days after, theoretically, the stain would have been deposited on the sheet. And that they can raise genetic markers five years after there on a sheet. So we know the limiting factors in that. Age, I suggest to you it's not size. Why are they only able to raise four genetic markers? It would have to be concentration, isn't that the only factor remaining? That's if it was a fresh stain.

I'm going to suggest to you the reason that it can only raise four genetic because this was an old stain. You remember Sergeant Kelly said when he removed the sheet, and there was some conflicting testimony about that. There were lot of fibers on it and it was soiled. And look at the sheet. With all due respect to Mary Prekop, we don't know how many sheets she used, if only she had one set of sheets or how many times this had been washed, but given what you know about the absence of blood anywhere else in the house and what that expert told you about being able to test for genetic markers, only being able to raise four genetic markers is

more consistent with a stain having been an old stain.

But having said that and even knowing the rape didn't occur on the bed I would like to talk to you a little bit about his testimony because there is no getting around him saying the four factors he tested for in George's blood match the four factors that were found on that sheet. Well, PGM, EAP, Hp, there is one of these that was raised off the sheet. There are only four factors.

Well, significant it was 41 percent, 41 percent, 45 percent, and 99 percent. Those are the frequencies of those particular blood factors occurring in the white male population, but he testifies about a product rule, a theory where you multiply all three and it leaves you with eight percent of the population that could have all these factors. Eight out of a hundred, 80 out of a thousand and you can go on and on. You know the size of the Springfield area, [illegible]entially a lot of people.

And furthermore with each one of these factors you know there is a margin of error. It could be a few percents higher, could be a few percents lower and there are studies that differ with respect to the percentages.

And you also know that the percentages vary according to his testimony by the ethnicity of the population. And I asked him, wouldn't you be better using a local study versus a national study? What do you know about neighborhoods? Neighborhoods, quite frequently, are made up of somewhat concentrated ethnic groups. You know that. That's your common sense. How does that effect these percentages that he's talking about?

I think, perhaps more importantly, he said, if any one of these factors were off, even though they are the most common factors, if even one of these factors were off it would exclude George Perrot, but in determining these factors it's subjective. You or I couldn't do it, but it's subjective even to an expert. An expert might disagree as to whether you have any one of these factors and after they do the electropheresis they extract the blood using these chemicals and put it into the test tube. And they put it on the gel and run a -- travels a certain distance.

They look. The experts, two experts may not agree that you have PGM 1+ and PGM 1. But this man from the FBI let's credit him with being objective. He is a professional and besides, you know, you got an

independent hair study. We are going tc get into that in a minute, except that the hair study isn't independent. And I will tell you why you know that and that's what's done when the blood expert is up on the stand.

It troubles me this man is saying he is a supervisor yet he, at this time, he is personally running the test. So its logical to ask him, "Why isn't your signature on the report?" "It's a policy. They don't allow that." "Well, why aren't your initials on the report?" Well, we don't do that. And I can speak to you, perhaps you can figure out why. I can't even suggest to you why they don't sign or initial the report, but what he doesn't tell me is that there are some letters on the report that may or may not indicate he is involved on this report and he is off the stand before that's ever learned. "Instead the way you can tell that I did it because, not on your copy, but on the yellow copy I keep I put my initials on it."

Okay. So, the hair expert gets on the stand and, I guess, with not much point at the time. I asked him, "Well, you didn't sign the report," "No. It's FBI. You don't sign, policy, report." "Now, you didn't initial

your report?" No. I put some markings on it. And his were WK. His name is Wayne Oakes. They are not his initials. Well, does Eubanks have a code, what's his? WM, are his Code. On your report? Yes, it is. These aren't two independent examinations.

Mr. Eubanks and Mr. Oakes are jointly participating in at least in this analysis. And the reason that is significant is if you're making a subjective judgment, if you have a close call about whether something is PGM 1+ PGM 1- or Hp2 1 or Hp2 do you think that it would effect your judgment saying, well, those hairs are close?

Let me talk to you about Mr. Oakes for a moment. Now, these gentleman, they are clearly professionals. This fellow testifies 30 to 40 times a year and here is nothing about his manner that suggests anything but that he is a very bright man. Both of these men have had all their training in the FBI and doing police investigations.

Mr. Oakes get on the stand. How can you cross-examine this man? It's difficult. He is a very knowledgeable man. You can cross-examine a knowledgeable guy is it because he's biased? Well, that's your

60

judgment, but I will tell you why you can't cross-examine this guy. Here's a hair expert that gets on the stand that can't tell you anything about the hair he has examined and he doesn't have his notes on the stand to tell you. He's comparing one hair with hairs sent to him that purportedly come from George Perrot. He can't tell you how many hairs came from George Perrot. He admits the hairs on the human head are different. He can't tell you how many hairs might match that one hair that he's found.

He can't tell you the length. You don't have to be a hair expert to figure that out. He can't tell you the length of the hair, the unknown hair. He can't tell you the length of the hair that matches it. Now, isn't that significant where you have testimony with respect to lengths of hair? I think his response is, "Well, they weren't greatly different or I would have said so." "So where are your notes?"

Well, he tells me okay, but he is just comparing his hairs microscopically and he gave you testimony about hair, of scales and of ovoid bodies and medulla and so forth, but he doesn't have the notes and he can't tell you specifically what it is that finally causes him to

conclude.

And that hair is not a means of identifying someone. And he says that right in his report. He admits it. Hair is not a means of identifying someone, but he renders you this opinion that this one hair and at least one hair of the group sent to time by George Perrot they are microscopically so similar that you can't exclude George Perrot as having contributed that hair.

Well, sir, if a lay person had looked through a microscope, just a portion you are talking about, for getting the length or the diameter you couldn't tell us, could we look at it and see those are identical? I mean it would be like looking at fine hairs, and seeing the branches come off in the analysis? "No. I wouldn't ask a lay person to do that. They couldn't do that." You would think they looked pretty similar. You have got to be an expert to make this subjective judgment and furthermore another expert may not agree with him.

How much weight are you going to give that evidence of that one hair that he identified without being able to tell you why specifically it was similar to one that, at least, of the hairs that were sent by George Perrot.

How dissimilar were the other hairs that he got in

the sample? Were there matches in those hairs? The man comes from West Virginia to Springfield to testify. Takes the stand and doesn't have his notes and can't tell you any details about this investigation. Is this a scientist or is this a professional witness?

Let me suggest this to you. He testifies 30 to 40 times a year and in any case, aside from the color of the hair, he could testify just as he did in this case. Well, that's the hair. Well, that's the hair and the glove.

I want to get back to statement that are being taken. Now, there's an issue here whether these statements were voluntary; whether George Perrot freely, knowingly, and willingly waived his right and whether he voluntarily gave these statements. And you heard the testimony of Tom Jarvis who's laid back as he tells us, You don't need to put someone under stress to get them to give a statement. Except that George Perrot has already said as we know, I don't know anything about the November 30, 1985 incident.

And as his questioning somehow continues we had to learn that. Well, yeah, George Perrot was crying at different times and George Perrot was hollering at

different times and I think I asked Sargeant Kelly, well, didn't he say he didn't want to go back down to the lockup because they were rattling on the bars and banging on the floor? He says, no.

Then I ask, if you recall, I brought a document up here and I questioned him about some testimony given back in 1986, less than a year after these incidents. I said to him, Well, you started go give an answer, "You said George Perrot wanted to stay up in the detective bureau. He said they were --" and I asked him well, you never finished the answer. Why did you stop and what was it that he said "they were"? He said, "They were cold. The cells were cold."

Well, maybe that's what George Perrot said, but isn't it curious when Thomas Jarvis takes the stand and I asked him, Well, didn't he tell you he couldn't get any sleep, they are rattling on the bars keeping him awake and banging on the floor? He said, Yes. Do you think he told Thomas Jarvis that and not Sergeant Kelly?

Look at the statement regarding November 30, 1985. This 17 year old boy had worked construction on December 6, gone home. He is drug involved. He is drinking beers; he's doing cocaine, and I believe there indicates

he is smoking marijuana. They arrest him at three or 3:30 just shortly after they know he was out and I acknowledge he was committing criminal offenses, but the point is they know he hasn't had any sleep. He is taken back to the police station. He is kept awake. He is questioned over a long period of time.

Now, I am not going to suggest to you that anyone of you know how someone would feel after drinking large quantities of beer, taking cocaine and smoking marijuana. I trust that none of you do, but, in your personal experience I also trust that some of you may have had a hangover. Some of you may have also gone without sleep for a long time. This is what you have before you. This is the individual that they are questioning. Please take that into consideration when you are considering the voluntariness of these statements.

Finally, at three o'clock, by the way none of these documents are marked. None of the statements are marked with respect to time except the December, the statement in reference to December 6th which is marked 12:40, same time as the search warrant waiver; same time as the Miranda card. So you can learn a lot from the time on these documents.

Finally, a statement is given with respect to the November 30, 1985, incident and George Perrot signs his statement and I believe it was Attorney Vottero that asked Nancy Westcott whether the signature looked like his. And she said "Yes, that signature looks like his." And she thinks, she said, every other signature looked like his, but I asked her if the initials looked like his. She said, "No." Any event the statement is given and then after he gives a statement he's brought down for a line-up.

I will get to the line-up in a moment.

When you are considering the voluntariness of the statement consider what I just told you and what you know about his condition and lack of sleep, what you were able to recall from the testimony of the Commonwealth's witnesses about his conduct during this questioning and please consider this, Nancy Westcott, her mother, and Lisa Eldridge go down to see George Perrot at five p.m. just after he got out of line-up. What does she tell you about George Perrot? He's emotional. His face is red. Appears to have red marks. He's crying. He's incoherent. He is saying things and can't finish sentences. He opens up his jacket and she sees bruises

and marks on him and he asked her to get him a lawyer.

I've talked a little bit about these statements, but if you reach a point, after you hear the Judge's instructions you will conclude that these were not freely, willingly and voluntarily given by George Perrot according to the law. Don't look at them at all. You don't consider these statements.

So, the questioning is done. They got the statements signed. George Perrot is then brought down for a line-up and Mary Prekop tells you this, "None of the guys I saw looked like the guy who raped me." And I don't remember how, but she described them. I thought she said, "They all looked scraggly," but I don't think she remembered. "They looked scraggly." It was something about the hair being too long, too disheveled. They don't look like the guy.

Each one of these individuals is asked to step forward to look, turn to the left, to turn to right, to look back. She gets a good look at him. I don't know if she had her glasses on or not. We can assume she sees them and she said, she told them none of them is the guy. At least that is my recollection of what she said.

This is the same Mary Prekop, by the way, I mean you have people who don't have their -- people who can't remember what they said. Here's an 85 year old woman whose handed this statement that she gave, asked to read it, she read the whole statement. And then, I'm not asking her the questions, Attorney Vottero is. And she's asked is there anything in that -- is everything in that statement correct. She says, "Yes, except for the part about the gloves. I never said that."

Here's an 85 year old woman looking at that statement that she wrote on November 30, 1985. Picking out one thing saying, "I never said that." She remembers what happened, what she said seven years ago. Do you think she remembers?

Well, isn't it just curious that the very last thing in this statement with nothing beneath it is the thing about the gloves that she said she didn't say. What a coincidence that is. That made me think what is the significance of that. Well, is the Commonwealth going to argue to you that that stain got in that sheet off the gloves? The individual was never on the bed, but a glove with blood was alone on the bed and a stain got on the sheet because of the gloves?

I got to go back to the gloves for a minute. I asked Sargeant Kelly who testified, one glove was on the bed, the other was on the floor. In an earlier hearing did you testify they were both on the floor? "Well, I don't think so." So I read it to him. He still wouldn't accept it was the way he testified.

THE COURT: I am going to have to curtail your time.

MR. FERRARA: I will sum up, Your Honor.

You know, this is a difficult case. I can you tell after you heard all of the evidence you will deliberate this case. That you're going to walk out of here confident without any doubt whichever way it is, guilt or innocence, without any doubts, that's on all of the evidence, that made the right call, you have made the right choice. I know it's important to you to make the right decision it would be to make one in your position.

I wish I could tell you you are going to feel that way, but when the testimony of Mary Prekop, versus this other questionable and equivocal evidence I suspect that you wont have that abiding conviction that you know what happened in November 30, 1985. I suspect you can

turn it over in your mind time and time again, weigh the probabilities; if this is correct. What is the probability of this guy's blood and the blood on the sheet if it was fresh blood? Both falling within that eight percent or 10 percent, six percent, whatever percent.

What about Mary Prekop? I mean she is so precise; she is so true; how do you recall it? And I have to tell you, quite frankly, and suggest to you yet respectfully you can't. I would like to tell you that you could walk out of here and beyond any reasonable doubt conclude that George Perrot did not commit these acts. I can tell you that in good faith you have heard this evidence, but I can say to you also you can't walk out of here and conclude in good faith beyond any reasonable doubt that George Perrot committed this rape case despite all of the circumstantial evidence.

If you find the statements are not voluntary, excuse me, if you find the statements are voluntary in different spots where you are reading them I suggest to you, you read the first part of the November 30, 1985, incident as well, and you see that if that suggests anything to you I am going to ask you, based on the

testimony that you heard, after you have deliberated carefully, consider everything that you have heard, and return the only verdict that you can in this case and that's a verdict of not guilty because the Commonwealth has not proven its case beyond a reasonable doubt.

Thank you.

* * * * *

CLOSING ARGUMENT BY MR. VOTTERO

* * * * *

MR. VOTTERO: He stood before you at the beginning of this trial presumed innocent and no evidence had been introduced. He is not innocent anymore. And I suggested to you, in the opening statement, that the proof in this case was not going to be beyond a reasonable doubt. It was going to be inescapeable. There would be no way around it.

Now, the Judge will define for you what reasonable doubt is. It's not proof beyond all doubt. Anything that happens, if you're not there, you can look for, you can seek, you can find a doubt. It is proof beyond a reasonable doubt and there is no reasonable doubt about what took place in this case.

Reason, unaffected by emotion, that's true, but you

will not be unaffected by your emotions. This case will make you emotional. This case made George Perrot emotional as he described what he did. He wanted to take a gun and shoot himself because of what he did. But take the emotion that you have, the power of that emotion and put it into the evidence of this case and that's what you should do with your emotion.

And look at Mary Prekop. Few things have been said to you that the Commonwealth agrees with. But one of them, absolutely, is Mary Prekop is an honest woman. A very honest woman and she testified clearly, "How can I say that it's that man? He has a beard and mustache. The person that did this didn't have a beard and mustache." That is her memory of these events.

Her memory is a man without a beard and mustache, but what was her testimony about the event? She heard the noise. She got a stick, she went back to her bedroom and the only light on at this point is in her bedroom. And she hears a noise that tells her this wasn't her imagination. Somebody is in my house. And what's her state of mind at this point? Can you picture the state of mind of this woman at 80 years old going out with a stick and suddenly being confronted with in the kitchen

with a man doing this. Doing this. (Indicating)

I said to Mary Prekop, "Do you have a memory, Mary, of ever seeing this person's face, hands like this?" What was her answer? "No." No. No, she didn't. And what did she do? She closed her eyes. I mean this is all she could think to do was to close her eyes and be pushed into her bedroom and on the floor and beaten and raped. She knows there is no light on. It was broken. And the question is, could she feel his facial hair on her breast. That's the question. That's the question. No.

Look at the picture of George Perrot and put yourself in an 80 year old woman with vision difficulties with an intruder in her house and he's going like this. You wouldn't see any facial hair on that person. And she is so honest that she will not say anything from this stand this she doesn't remember, that she doesn't recall. And she doesn't recall seeing it. She doesn't recall seeing it. (Indicating)

And she doesn't know how the blood got on that bed. How could it? He was never here in bed. Mary Prekop's statement, "I pretended to pass out." It's pitch black in this room now. The light had been broken. It was the

first thing this person did, that person, the very first thing he did. (Indicating)

Mary Prekop is an honest woman and she can't even tell you exactly what was done to her. Eighty year old woman, unmarried, trying to describe what happened to her. She can tell -- all she can tell you, "Something was put inside my private parts." She didn't see it with her own eyes. If she doesn't recall it she is not going to testify about it. She didn't see the facial hair, but it was there. It was there. We know that in so many different ways and so many different witnesses. That while Mary Prekop couldn't sit here and say, He did that to me. All of the other evidence says that.

Emily Lichwala didn't see anybody, but all of the other evidence tells us that the person that was in her home is George Perrot.

Now, let's just take a brief look at the physical evidence in the case through the testimony of these two men, Wayne Oakes and Bill Eubanks. The blood is consistent with George Perrot. It's among eight percent of the population who would have that particular blood. Is it the blood of Mary Prekop's relative coughing up blood years ago? He was asked, I would like you to

assume that in 1981, some blood was deposited on that sheet and the sheet was washed upwards of 20 times. Would you get results? "No." Uncontradicted. No. He would not get results.

But wait a minute, where did the blood come from? There is blood on the gloves too and the blood on the gloves, while they couldn't type it very far it is the same PGM subtype as the blood on the bed. The gloves weren't hers. They weren't. You know, and I would like you to recall this, this is a very small amount of blood. You probably get more blood cutting yourself shaving. How did George Perrot cut himself? How was he injured? By the stick, by breaking the lamp, don't know, but we know he bled on the gloves, (the gloves are removed and there is blood on the sheet.) Whether it came from him or from the gloves what difference does it making how it got on the sheet. It's there and it's not an uncle who has been dead for sometime.

Now, Wayne Oakes told you he found a single hair suitable for comparison and it was consistent with George Perrot. Not telling you it is George Perrot, he is not trying to pass this off as conclusive. And he told you it was in his experience, over 10 years doing thousands

of these tests, it was very rare, very rare to ever find two hairs from different people that he couldn't tell apart. I don't know what we would all see if we look through a microscope. We don't have the training that he has. "Would an expert disagree?" What was his answer to that? "If somebody had the amount of training and experience not one of them would disagree with my opinion in this case."

That's the affirmative evidence, the gloves, the sheet, the hair. Now what's Tom Kelly's role in the case? I want to suggest one thing to you right now, Tom Kelly and this concerns what they knew or didn't know. On December 7, he is woken up and he comes down. You don't know what Tom Kelly knew or didn't know about George Perrot. It was never asked, What information did you have at that point that made you think George Perrot was involved.

MR. FERRARA: Objection, Your Honor.

MR. VOTTERO: So you don't know and you shouldn't speculate as to what he knows or what he doesn't know.

You know, this case has a confession. Found in -- this confession was voluntary. You don't need

anything else. Do you believe that this is trustworthy? You believe it to the truth and this case is over. (Indicating)

What evidence is there that this statement is voluntary? The evidence that this statement is voluntary is right in the statements themselves because let's think before what I suggested to you that the police extracted this.

Now, let's take Tom Kelly and Tom Jarvis. You know, most of us don't have much experience with police. You have a little insight. These are people on call 24 hours a day. Something happens they come down. They probably had about the same about amount of sleep as George Perrot. That's just the nature of the job. He was doing it as he is testifying.

The statement is voluntary. Are they trustworthy? Were they freely given? That doesn't mean if George Perrot had to do it all over again he would give these statements. It means were they compelled. And Tom Jarvis told you, Look, despite what you may hear or think in the movies it's my experience it doesn't do me much good to yell and scream at somebody and physically threaten them. He has a different approach, an approach

designed to have somebody open up, to be honest with him.

So let's take this series of events from this. Defendant is arrested on December 7, and what's he doing on December 7, when he is arrested? What is he doing on December 7? Stealing somebody's purse down here. Across this street he is breaking into somebody's home up here. One week after this home and this home had been broken into early in the morning. (Indicating)

I would suggest one thing to you about Mr. McNabb's break-in. This is where we start getting into these statements, voluntary or not. Tom Jarvis told you there was nobody sexually assaulted, nobody seriously injured in these events. He told you Mr. McNabb was struck two or three times with a broom handle.

MR. FERRARA: Objection, Your Honor.

MR. VOTTERO: What did George Perrot say in his statement on December 7? This tells you so much about George Perrot and what he's doing on December 7, as he is admitting to this crime and to the crime of November 30.

After he describes taking this purse he says this, "I walked over two streets to Ellendale. I walked up to a house. I don't know the number. I and saw a broken

CITY 001816


broom handle in the carport. I kicked the front door in and started to walk around what I thought was the dining room. I had the broom handle in front of me so I would not bump into anything. Started to hear a lot of voices. I got scared and ran out the front door."

Now, he hit the man first, but he didn't admit that. Why not? Well that's something we're all familiar with. You minimize your culpability. You minimize your sins, you know. I can ask my son, How did that cookie jar get knocked on the floor? It fell. It fell. He minimized it and that's what he is doing in this statement. It shows a thought process consistent with being with voluntary, with being rational.

He's limiting what he is willing to admit to. And it becomes very prominent when they're done with this statement. The one where he says, "You got me for the things last night. You got me for that." He gives that statement. He minimizes his involvement and then they begin to ask him about November 30. "I didn't touch any old ladies." This statement through it, through its contents tells you it's voluntary. You don't need to go to the fact that he is advised of his Miranda rights three or four times, that he signed these waivers

and cards. You don't need to even get into that. That shows he understands what's going on.

This statement, a line tells you that he was rational and voluntary because it wasn't as has been suggested to you, created by the police.

It was hinted during questioning that you told him that the house was broken into and he would say yes. No. No. This is information coming from nowhere except George Perrot. Beginning with what's at the beginning. "On November 30, I went to Brattleboro, Vermont, with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Street. I drinking around eight p.m."

He described what he is drinking, the drug he has taken and who he is with. Did the drugs, repeats that. That is the true George and we will write it down. Noticing George Perrot voluntarily, rationally telling them what's going on on November 30. Then we get to the crimes. How difficult would it be for the police to makeup a statement and have him sign it? I raped this old lady. I went in this way. Have it consistent with all of the known facts that the police have. That's not what this statement admits to. This is what it admits



624

to.

"I headed for number 33 Covel Street. The reason I went there I heard it had been broken into before. I had a pair of my sister's gloves on. They were like wool gloves. I entered a unlocked rear breezeway door at 33 Covel Street." No, he didn't. He kicked in the window, the dryer vent. Why isn't that in the this statement? George Perrot is minimizing what he's doing. That's why it's not there.

If you're a police officer extracting a confession by compulsion you can bet you are going to have the facts of the crime right in the confession. But they don't do that. Tom Jarvis, Tom Kelly, they don't do that. Those are professional men. They advised him of his rights. They hope he's going to open up to them and they write down what he tells them and they don't add to it to make it better. He kicked in the other interior door and "I then entered the house and started looking through the house. I Found a handbag and took it with me."

Now, let's go on to Mary Prekop's. "Went to 27 Malibu Drive. I opened the door of the breezeway," didn't kick the side door in. "I started to go through

the house. A little black dog started barking and I ran out the side door." I didn't touch those women.

This 17 year old boy isn't going to acknowledge that he committed an aggravated rape on an 80 year old woman, but is he emotional? Oh, yes. Oh, yes. So emotional he wants to commit suicide. Why? Why? Because he broke into a home and stole a purse and took a dollar out of it and the police have him, they had him for that for December 7th. Why is he so emotional?

These are voluntary statements and because they are voluntary statements it really doesn't make much difference. There isn't a confession to a rape in there. There's as confession being in the home. There is not more than one person in there on 27 Malibu Drive with Mary Prekop on November 30.

The evidence of his guilt is overwhelming, but take a minute and put yourself in the world of George Perrot's innocence. What kind of world is it where George Perrot is innocent? It's a world where two FBI agents get together and risk their reputations and careers to create evidence to reach conclusions not supported.

MR. FERRARA: Objection, Your Honor.

THE COURT: Hold it.

MR. VOTTERO: It's a kind of world where Tom Kelly and Mr. Jarvis get together to create evidence to pin on this poor man. It's the kind of world where for him to be innocent there has to be such a conspiracy you can't believe. They may have to take the blood and shake it on the -- let's get a little on the gloves. Pull out one of George's hair. Though, it's in the heat of a rape. And the FBI finds that single hair. That's preposterous. Its preposterous.

What is this case all about? It's about a simple truth that a young man with nothing better to do than drink and use some drugs, begins committing these crimes and the motives of these crimes is in there. "I needed money for drugs." And he breaks into 33 Covel Street and he takes a purse, but there's no -- there's no one there and Emily Lichwala has run. So he moves to a different home, 27 Malibu. Familiar, lived there for 10 years. Familiar with this area. Well, he moves to that different home and he breaks into that home and he rapes that woman.

Now, I suggest to you that that is the cause

of his emotion on December 7, when he is confessing. It would be scary, indeed, if he wasn't as he admitted some involvement, some involvement, but not all. And then he goes home, gets into bed just like he did on December 7. And you can read the statement of his activities on December 7.

The world of George Perrot's innocence requires somebody else to be doing these things. Just George is in the neighborhood. He is there at that time everyday, but there has to be somebody else, somebody else with that eight percent. Imagine that eight percent blood, somebody else with hair that matches him. Somebody else in there. The simple truth is this is the man who just isn't somebody you or I wouldn't recognize drinking, using the drugs, going into homes to do these acts and then unwilling to confront himself with what he had done and only being able to admit that he broke in.

Now, his sister testified and the only thing about the gloves and the sister that I ask you to recall and that is that she recognized them. Whether they were hers or not isn't important. The important point is that she recognized the gloves and no one can fault the fact that

no matter how you behave your family will always be your family and will believe you no matter what. That's the way it should be. Reason effected by emotion.

Don't let your emotion about what happened to Mary Prekop influence your verdict. Don't let your emotion about this young man and what he's done affect your ability to judge the evidence fairly He was presumed innocent. He is not any longer.

The word verdict means to speak the truth. And that man on November 30, 1985, committed a burglary at Emily Lichwala's home. He broke and he entered that home and he intended to commit a felony, steal something, to attack someone. And he left there and he went to 27 Malibu Drive. And George Perrot broke into that home in the nighttime with the intent to commit a felony and then he assaulted somebody.

You can look at the pictures of Mary Prekop without appreciating what she is going through as she is being assaulted. No, she doesn't recall whether there was hair on his face in the bedroom. And he committed an indecent assault and battery on her. She testified on that. Then he raped her. It was an aggravated rape. A rape done during the commission of this burglary. And then he

stole from her purse and left.

I ask that you look at this evidence, that you consider what is reasonable doubt and what its not and render the truth so that we may confront George Perrot with what he could not confront himself with, that he is guilty of these crimes.

Thank you.

THE COURT: All right. Ladies and gentlemen, we will take a recess. I caution you that until you have heard my instructions you should not be discussing the case even among yourselves.

(A recess was held at 11:17 a.m.)

* * * * *

(The defendant was present.)

(The Court and the jury were present at 11:40 a.m.)

* * * * *

JURY CHARGE

* * * * *

THE COURT: Good morning, ladies and gentlemen.

The defendant -- for the record the defendant and counsel are present and the originally impaneled jurors are present.

It is now my obligation to instruct you in the law and it is equally your obligation to be guided by the law as I give it to you. That is neither of us has any choice. You must accept the law as I give it to you and apply it to the facts that you alone find. When I tell you that that's not because I'm exercising the authority as a judge. It is really for a much higher reason and it simply is we can't chose to apply it in one case and not another. That's my first instruction, you must accept the law and apply it to the facts that you find.

These instructions -- I am going to discuss with you some general principles that apply to all criminal cases and then I am going to discuss with you the specific principles of law that apply to the facts that involve particular charges, these cases. And you will recall that there are a total of five charges or indictments. There are four that allege Mary Prekop to be the alleged victim and they are a charge of robbery; a charge of indecent assault and battery; a charge of aggravated rape; and a charge of burglary with assault

upon an occupant. And those are the four charges involving Mary Prekop. There is an additional charge of burglary, not with assault upon an occupant, just burglary. And that involves as the alleged victim Emily Lichwala and that is what comprises the five charges for your consideration in this case.

It's going to be helpful to discuss some elementary principles because they are going to illustrate and highlight the legal principles. So allow me to mention to you what the respective roles of the participants in the trial are. Attorneys have a very grave responsibility in the course of a trial. It's their role to present the evidence in the case and it is most helpful to their respective position. It's the duty of counsel to object when there is evidence offered that they believe to be subject to certain rules of evidence and accordingly the only way that it can be appropriately handled is at the side of the bench out of the presence of the jury and decisions made in the case proceeds.

I don't think it is necessary for me to point out that any such activity on the part of either counsel is not to be held against either side in you're consideration of the evidence or in your deliberation

or verdict because if you think that during the course of the trial I made certain rulings suggesting how I felt the case was going in or the issue be resolved then ignore that because it would have been improper for me to do that and I didn't intend to do it. And the decisions that you make on what the facts are is made free from interference from everyone, the lawyers, the judge or anyone else.

My role as a Judge is to see to it that there is an orderly trial, rule on questions of evidence, and to instruct you on the law as I am now doing. Your role is of paramount importance. You and you alone determine what the facts are. In a sense you are judges when you do that just as I am a Judge of the law you are the judges of the facts. No one is permitted to interfere with my role as the Judge of the law. By the same token no one is permitted to interfere with your role in your role as judges of the facts.

In deciding what facts are and the means by which you are going to make those decisions you have certain tools available to you. The main one is your own common sense and your general life experiences. And I stress to you that it's your function alone, no one, not the

judge, the lawyers or anyone else can interfere with it.

If in the course of closing arguments and closing arguments are helpful and legitimate, but in the course of closing arguments counsel gave you an impression how you must find facts or call to your attention a matter of evidence you don't remember collectively then you're free to ignore it because it's your memory of what the testimony in the evidence was that controls. It is for you alone to make these decisions without pressure or interference from anyone.

If, in the course of these instructions that I give you now or during the trial when I ruled on questions of evidence you got the impression that I am suggesting to you how you should make your decisions then ignore that because I didn't intend to and it would have been improper for me to do so. You alone determine the weight and the effect and the value of the evidence and the credibility of the witnesses. Credibility means believability. Once you know those determinations of fact it's your duty to apply it to the law that I am now giving to you.

In determining whether or not this defendant, George Perrot, is guilty or innocent of any or all of the

charges made against him you should, of course, determine without prejudice, without fear or favor and solely from a fair consideration of all of the evidence. Emotion or sympathy for one side or another have no place in your deliberations. And you are not to decide this case on the basis of what you might have learned or heard outside of this courtroom or on the basis of any guesswork or speculation or suspicion or any unanswered questions in your mind.

You may not speculate as to what might or might not have been the facts and you should not be influenced by the lack of popularity of the crimes charged. Rather you should confine your deliberations to the evidence and nothing but the evidence. I'm going to discuss with you now some general principles. Indeed these are monumental principles that apply to all criminal cases. These are the presumption of innocence, the burden of proof, and the element of reasonable doubt.

This is a criminal case and in the beginning of this trial the defendant has the benefit of the presumption of innocence. The law says that a person is presumed to be innocent until he has been proven guilty beyond a reasonable doubt. And that means that no

inference unfavorable to the defendant may be drawn from the fact that he's been indicted.

I'm going to send to the jury room with you and I don't expect you can see it from where you are, but when you do see it in the jury room you will see copies of the indictments are attached to a verdict slip. So you will have a copy of each indictment in this case and when you see it and indeed our clerk read them at the outset of this trial you will see they're formal looking documents that are signed by the Foreman of the Grand Jury and the assistant district attorney. But as I told you at the beginning of the trial that the Grand Jury's function is different than yours. Grand Jury accuses. It commences a process that culminates in a trial before a jury such as you. Only a jury such as you determines guilt or innocence.

The Grand Jury's accusation is a formal way a defendant is advised of the charges against him. So the fact that the defendant has been indicted or was arrested or is here on trial before you none of those things are evidence of his guilt and no inference unfavorable to the defendant may be drawn from the fact that he has been indicted or arrested.

A defendant may be found guilty only on the basis of evidence produced here in court during the trial and no other basis. So an indictment is not any evidence whatsoever of his guilt.

A defendant in a criminal case is not required to produce any evidence of his innocence. The prosecution bears the burden of proving beyond a reasonable doubt every essential element of the crimes charged against the defendant. The defendant has absolutely no burden to introduce any evidence whatsoever. A defendant in a criminal case has an absolute right not to take the stand and testify, an absolute right not to furnish evidence. He has a right to remain silent. That is his constitutional right just as would be yours and mine.

No inference unfavorable to the defendant may be drawn from the fact that he did not testify and, in fact, elected not to take the stand and the fact that he did so is in no way to be regarded by you as involving the question of innocence or guilt. He has a right under our judicial system to say to the Commonwealth, You must prove your case against me beyond a reasonable doubt. I do not have to say a word.

So you will concern yourself solely with the

evidence here. And the evidence, of course, came from the lips of the witnesses and the exhibits in the case. The defendant is entitled to a verdict of not guilty unless the evidence is such to warrant a finding of guilt beyond a reasonable doubt. The burden is on the Commonwealth to prove the defendant guilty beyond a reasonable doubt. That burden never shifts. It stays with the Commonwealth throughout the entire trial.

Now, during your orientation, I believe you would have seen a videotape which mentions, among other things, the burden of proof in civil trials. In civil cases the burden is called a preponderance of the evidence and that really means a tipping of the scales. It means proving something is more likely so than it is not, but this is a criminal case and the burden is much higher. The burden is on the Commonwealth to prove a defendant guilty beyond a reasonable doubt.

The Commonwealth must prove all the essential elements of each of those crimes beyond a reasonable doubt. Now, this doesn't mean that every fact that's been brought out here in the course of the trial must be proved to that standard. It's the essential elements of the crime that must be proved to your satisfaction beyond

a reasonable doubt.

What is proof beyond a reasonable doubt? Well, it's not proof beyond all doubt, nor is it proof beyond a chemical or fanciful doubt, nor proof beyond a possibility of innocence because there is rarely a case so clear that it could be proved beyond a possibility of innocence. A reasonable doubt is not that doubt which may exist in the mind of a man or a woman who is seeking a doubt or an excuse to acquit a defendant. A reasonable doubt means a doubt that remains in the mind of reasonable men and women who are earnestly seeking the truth.

As to the definition of reasonable doubt I am going to refer to the leading decision in this Commonwealth and read to you very briefly from it. What is reasonable doubt? It's a term often used, probably pretty well understood, but not easily defined. It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. It is that state of the case when after the entire comparison, and consideration of all of the evidence leaves the mind of the jurors in that condition that they cannot say they feel an abiding

conviction to a moral certainty of the truth of the charge.

The burden of proof is on the prosecutor. All of -- the presumption of law independent of evidence are in favor of innocence and every person is presumed to be innocent until he is proven guilty. If upon such proof there is reasonable doubt remaining the accused is entitled to the benefit of it by acquittal for it is not sufficient to establish a probability, or a strong one arising from the doctrine of chances that the facts charged is more likely to be true than the contrary. The evidence must establish the truth of the facts to a reasonable and moral certainty. The certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it. This we take to be proof beyond a reasonable doubt because the law, which mostly depends on consideration of a moral nature were to show -- go further than this and require absolute certainty it would exclude certain substantial evidence all together.

Now, I should tell you what is evidence and what is equally important what is not evidence. Opening statements of counsel, closing arguments of counsel,

helpful and legitimate, but they're not evidence. Anything you might have heard about this case outside of court is not evidence. Any question or answer I ordered stricken is not evidence. These instructions that I give you are not evidence.

What is evidence? Evidence is what you have heard from the lips of the witnesses who testified here. They appeared before you under oath in your presence. In your observation they gave answers to questions put to them by the attorneys. You have had an opportunity to listen to what they said, to observe them, and to consider all of the ramifications of what they said and how they said it. That's evidence. What is also evidence are the exhibits in the case and there is a number of exhibits, all of which will go with you to the jury room. You will have an opportunity to review them to whatever extent you feel you wish. They are evidence.

And in connection with the exhibits I should mention to you that each exhibit is given a number, and that's done in order to keep track of them, by each party. I understand that preliminary to this trial, some of those same exhibits have been similarly marked. So you will find that among the exhibits there are some that

may have different exhibit numbers on them and I say to you that the exhibit numbers are of no consequence to you. It doesn't matter if it's Exhibit 2 or 9 or 3. So if you see those numbers on them don't either be confused by them or be concerned about it because they are really of no consequence and I speak now only of the numbers.

So the testimony of the witnesses and the exhibits in the case are evidence and are to be considered. There are two types of evidence from which you may determine facts in this case or in any other case as far as that is concerned. There is direct evidence and circumstantial evidence. Direct evidence is the testimony of the witness who claims to have knowledge of the facts which the witness either saw or heard or somehow sensed. The only question is whether or not you believe the witness.

Circumstantial evidence is the proof of facts where no witness can testify directly to the facts that are stated to be proven. It is therefore, founded on experience and other facts and requires the establishing connection between the known facts and the facts that are sought to be proven. A word that lawyers use for circumstantial evidence is inference and I am going to give you an example in a moment that I believe will make

it very clear to you.

An inference is a permissible deduction and it is permissible to make a deduction only from evidence that is before you which evidence you may accept or reject or give whatever weight you chose. When a material fact is not proven by direct testimony, but is left to be inferred or deducted from other facts indirect evidence then you are at the liberty to use your general knowledge and your common sense and your experience in determining what inferences are reasonably to be drawn from the facts that are in evidence. Such inferences should be considered with all the other evidence in reaching your verdict.

The law makes no distinction between the weight to be given either direct or circumstantial evidence. It does require that you weigh all of the evidence and be convinced of the defendant's guilt beyond a reasonable doubt before he can be convicted.

Now, there are two rules that you must follow with regards to circumstantial evidence. One, you may draw inferences and conclusions only from facts proved to you beyond a reasonable doubt. And two the inferences you draw must be reasonable and based on your common sense

and your life's experiences.

Now, I mentioned an example and I will give you one that judges have used over the years. Assume you have a mailbox near your door and you empty it before you come to court. When you return home at the end of the day you look inside and there is mail in it addressed to you. Now, from those facts you may draw a reasonable inference that the mailman came up and delivered mail into that box sometime during the day. And of course you didn't see him do it because you've been here, in court, all day, but you may, nevertheless, based on your common sense and your life's experiences you may infer, draw a reasonable inference that he did so because of the facts. You know it is your mailbox; you emptied it before you left; you found mail in it addressed to you. That is all I mean by inference.

I would now like to discuss with you intent. Intent is a state of mind. And the intention of a person can't be reviewed by any machine that has yet been invented, but it may be ascertained by a person's actions. Inferences can be drawn from what is evidence or visible. Intent ordinarily can't be proven directly because there is no way of fathoming or reaching into the

human mind in its operations. But you may infer intent from any statements or acts done or omitted to be done and all the other circumstances which indicate state of mind provided that you first find that any or all of such circumstances occurred. You may infer that a person intends the natural and the probable consequences of his own acts.

You should consider all of the circumstances in evidence that you deemed relevant in determining or deciding whether the Commonwealth has proven beyond a reasonable doubt that the defendant acted with a required intent.

Now, there is a general intent required to be proved by the Commonwealth beyond a reasonable doubt as to the charges of rape, aggravated rape and indecent assault and battery. And there is a specific intent that's required to be proved by the Commonwealth with regard to the charges of burglary or breaking an entering in a dwelling and robbery. So allow me to give you an instruction about intent. What we do actuated by an intent is sometimes actuated by a general intent or a reflex action, sometimes a specific intent. There is a difference.

A reflex action is when you do things unconsciously but you intend to do them. You take off your eye glasses pick up a pencil, scratch your head, all the things that we do without giving any serious contemplation or forethought to. Things we do instinctively that is a general intent.

Now, as I indicated to you the indictment charging burglary and robbery require a specific intent and the specific intent requires some deliberation, some forethought, some focusing of the mind, some resolution or purpose to do a certain thing and the contemplated thought must exist before the act is done. So a specific intent is described as being an intent which is definite or explicit. It is intending to do something which has purpose and design. It's the expression of a mental action accompanied by an outward physical act, a desire to do certain things.

Now, as I indicated to you, your function among other things is to decide the credibility of witnesses. In determining the credibility of witnesses and the weight to be given to his or her testimony you should consider the conduct and the demeanor of the witness while testifying; the frankness or lack of frankness

while testifying; the reasonableness or unreasonableness of the testimony; the probability or improbability of the testimony; the opportunity or lack of opportunity of a witness to see or to know the facts concerning what he or she has testified; the accuracy of the witness' recollection and the degree of intelligence shown by the witness. You may also consider a witness' motive to testify and, of course, the interest or lack of interest in the outcome of the case that the witness may have.

You should take into consideration the character and the appearance of the witness at the trial and any bias that he or she has shown in their testimony in determining the credit to be given to their testimony. And as I told you earlier you have very broad powers. You can believe everything a witness says or nothing of what a witness says or anything in between those two extremes.

Now, in the course of this trial you have heard testimony from expert witnesses. Ordinarily witness are not permitted to give opinions. However, where matters are brought out that are beyond the knowledge of an average person the law permits someone who, by training

and education and experience, is qualified in a particular field to give an opinion. That is, for instance, medical doctors in certain kinds of cases. And in this case you heard from a serologist and that is one whose practice is in typing blood and a fiber and hair specialist. There are many other areas where experts testify in the courtroom.

An expert is a witness who is able to assist the jurors in understanding matters beyond the knowledge of the average person. And because the Court qualifies an expert and permits him or her to give an opinion doesn't mean anything other than the fact that the Court rules that he is qualified to give an opinion. In weighing the opinion of an expert you should decide from the experience and background and the history of his work, his learning and education that he gives you, whether his opinion is such that you adopt it as a good opinion, one upon which you would rely and you can disbelieve a witness or you can believe a witness even though he is an expert. He is like every other witness in that sense.

And as I've indicated to you as to any witness you can believe everything he says or nothing of what he says

or anything in between those two extremes. In the course of this trial with regard to some of the witnesses who testified there was some evidence introduced that on an earlier occasion outside of this courtroom that witness or those witnesses made statements which may or may not have been inconsistent with this testimony here in court. That's for you to say.

Whenever there is the introduction of a prior inconsistent statement made on another occasion outside the courtroom that is done for the single purpose only of impeaching the credibility or believability of that witness. If you find it does impeach the credibility of the witness, if it makes that witness less believable to you, that is entirely up to. If you find someone testifying here in court in a substantially different way from something else he or she said or testified to on a prior occasion it is for you to say whether or not that effects the witness' credibility.

The important thing in determining the credibility of a witness when faced with a prior inconsistent statement made outside of the courtroom is whether or not that person's prior statement is, in fact, inconsistent. And, again, that's for you to say. If it is, then does

it deal with something that is of importance, if it is something that minor you may disregard it, if you don't think it affects the credibility of the witness. If you think it is of major concern and the witness' present testimony is a mistake or on attempt to mislead you then you may use it in determining whether to believe that witness or what weight you choose to give to that testimony.

It's important to realize that the substance or the truth of the earlier statement made outside of the courtroom is not evidence in this case. The sole purpose of any testimony of a prior inconsistent statement is for the purpose of impeachment. If you find it does impeach the credibility of a witness you may use it, but it's your determination to make.

Having told you that ordinarily a witness can only testify as to what the witness saw or heard I will point out that you heard some testimony and, in fact, you have an exhibit, I believe it's Exhibit 1 as to what a police officer was told by a Ms. Prekop and that's called a fresh complaint. There is an exhibit in this case that was read to you by the prosecutor and that's a statement taken by a policewoman of what it is that Mary Prekop

told her. This was after the police came to the house and she went to the police station and gave a statement.

Normally a witness can't say what someone else told them, but there are exceptions in sexual assault cases. The statement of fresh complaint by the victim of a sex crime made reasonably promptly, under all of the circumstances, are admissible for limited purpose of corroboration of the victim's testimony. It is not positive evidence or direct proof that the event occurred. It is admitted solely for your consideration for whatever weight you deem it provides on your assessment of the truthfulness of Mary Prekop on the witness stand during this trial and, of course, any detail mentioned in the fresh complaint that was not testified by the witness, Mary Prekop can't be considered as direct evidence.

The burden of proof on the Commonwealth extends to every element of the crime or crimes and this includes, specifically, the burden of proof beyond a reasonable doubt, the identity of the defendant as the perpetrator of the crimes charged. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crimes you must find him not guilty.

You heard some evidence of certain crimes that took place on a December the 7th, 1985. I think they were referred to as a purse snatch and break into the McNabb house. We are concerned with the indictments charging crimes that took place on November the 30, 1985. That is the five indictments before you involving matters that occurred on November the 30, of 1985. And such evidence that you've heard of other crimes were admitted for a limited purpose for providing context in which the defendant was taken and held in custody. So you are not to convict the defendant of these crimes before you on the basis of evidence that he committed other crimes, if he did commit other crimes, on another occasion alone.

Evidence has been introduced that the defendant made certain admissions concerning the crimes charged. Now, let me make a distinction between an admission and a confession. A confession is when someone specifically admits each element of the crime in total. An admission is something other than that. An admission is an acknowledgement not of guilt of the entire crime, but of certain elements or certain facts that would be admissible of guilt. So evidence has been introduced that the defendant made admissions to the police

concerning the crimes charged. And you should weigh such evidence with caution and should carefully scrutinize all the circumstances surrounding the alleged admissions to determine whether they were made freely and voluntarily and that it was the product of a rational mind.

If you find beyond a reasonable doubt that the alleged admissions were made by the defendant freely and voluntarily with understanding of the nature of the alleged admissions, without fear or threat or coercion or force, either physical or psychological and with a mind that was rational you may consider the alleged admissions together with all the other evidence in determining the guilt or innocence of the defendant. However, if you find upon consideration of all of the evidence in the case that the Commonwealth has not satisfied you beyond a reasonable doubt that the alleged admissions were made freely and voluntarily by the defendant and was made with a rational mind then you must disregard them entirely.

It is the burden of the Commonwealth to prove the voluntariness of such admissions beyond a reasonable doubt. In considering whether the alleged admissions

were free and voluntary or not you may consider the conversations, if any, between the police and the defendant. You may consider where the alleged admissions were made and when they were made; the length of time, if any, the defendant was questioned; and the age, disposition, and experience, education, character, and intelligence of the defendant.

I'm about to discuss with you the essential elements of the crimes charged and I am going to take them in no particular order as follows: I am going to first discuss with you the indictment charging unarmed robbery and I will refer to indictment 85 dash 5415 wherein George D. Perrot is charged with on November 30, 1985, at Springfield, did assault Mary A. Prekop with intent to rob her and thereby did rob and steal from the person, presence of, protection, and possession of said Mary A. Prekop certain property to wit money in the amount and value of less than one hundred dollars. The amount of money is not material.

So the defendant in this case, in this indictment is charged with the crime of unarmed robbery, that is a violation of our General Laws Chapter 265, Section 19. And I am going to read to you the relevant portions

of that statute, I refer to subdivision B, "whoever not being armed with a dangerous weapon by force and violence or by assault and putting in fear robs, steals or takes from the person of another or from her immediate control money or other property" and then it goes on to provide some other things.

So in order to find the defendant guilty of this crime the Commonwealth must prove three elements beyond a reasonable doubt. First, that the defendant, George Perrot, with the intent to steal property, either used force or violence on the victim Mary Prekop or assaulted the victim by putting her in fear. Second, that the defendant robbed, stole or took money or other property. And third that the defendant robbed, stole or took this money or other property from the person of the victim or from her possession or control.

To prove the use of force or violence the Commonwealth must prove that the defendant applied some physical force to the body of the victim with the intent to steal property and which, in fact, allowed the defendant to obtain possession of property. The degree of force is immaterial. In the alternative, to prove assault by putting in fear the Commonwealth must prove

that the defendant, by threatening words or gesture put the victim in fear. This must be done with the specific intent to steal property from the person of the victim and, in fact, allow the defendant to obtain possession of the property.

To prove that the defendant robbed, stole or took property the Commonwealth must prove that the defendant, by force or violence, took and carried away property against the victim's will with the intent to deprive her permanently of its possession. The value of the property is immaterial. And the defendant must have acquired dominion and control of the property for some period of time, however brief.

Finally, the property must have been taken from the possession or control of the victim. Property is considered under the control of a person when it is so within her reach, inspection or observation or control that she can readily obtain possession of it if not overcome by violence and fear. The property need not have been owned by the person from whom it is taken. The victim must be aware of the assault which is being committed.

It is not necessary that there be direct evidence

of the defendant's intent and the victim's fear. You may draw reasonable inferences about their mental state from all of the circumstances. There must, of course, be a causal connection between the assault and the acquisition of the property.

I turn now to the indictment charging indecent assault and battery on an adult and that's indictment 85 dash 5416 in which George D. Perrot on November the 30, 1985, at Springfield, did commit an indecent assault and battery on the person of Mary A. Prekop. This alleges a violation of our General Laws Chapter 265, Section 13 which reads as follows: whoever commits an indecent assault and battery on a person who has attained age 14, on an adult, in other words, then it goes on to provide for some other matters.

To prove the defendant guilty of this crime the Commonwealth must prove four things beyond a reasonable doubt. First, that the alleged victim, Mary Prekop, was at least 14 years of age at the time of the alleged offense. Second, that the defendant committed an assault and battery on the alleged victim. Assault and battery is essentially the intentional touching of another person without legal justification or excuse. Third, the

of the defendant's intent and the victim's fear. You may draw reasonable inferences about their mental state from all of the circumstances. There must, of course, be a causal connection between the assault and the acquisition of the property.

I turn now to the indictment charging indecent assault and battery on an adult and that's indictment 85 dash 5416 in which George D. Perrot on November the 30, 1985, at Springfield, did commit an indecent assault and battery on the person of Mary A. Prekop. This alleges a violation of our General Laws Chapter 265, Section 13 which reads as follows: whoever commits an indecent assault and battery on a person who has attained age 14, on an adult, in other words, then it goes on to provide for some other matters.

To prove the defendant guilty of this crime the Commonwealth must prove four things beyond a reasonable doubt. First, that the alleged victim, Mary Prekop, was at least 14 years of age at the time of the alleged offense. Second, that the defendant committed an assault and battery on the alleged victim. Assault and battery is essentially the intentional touching of another person without legal justification or excuse. Third, the

Commonwealth must prove beyond a reasonable doubt that the assault and battery was indecent. As that word is commonly understood measured by common understanding and practices.

An indecent act is one that is fundamentally offensive to conduct, contemporary standards of decency and moral value. It is behavior which the common sense of society would regard as immodest or immoral and improper. An assault and battery is indecent if it involves touching portions of the anatomy commonly thought private, such as a person's genital area or the breast of a female. And fourth, the Commonwealth must prove beyond a reasonable doubt that the alleged victim did not consent.

I turn now to the indictment alleging aggravated rape and that's 85 dash 5418 and that charges George D. Perrot on November the 30, 1985, at Springfield, did assault Mary A. Prekop with intent to commit aggravated rape and did commit aggravated rape upon said Mary Prekop.

This indictment alleges a violation of our General Laws Chapter 265 Section 22 and I am going to read to you the relevant portions of that. "Whoever has sexual

intercourse or unnatural sexual intercourse with a person and compels such person to submit by force and against her will or compels such person to submit by threat of bodily injury" and this is the aggravated aspect of it. "And if either such sexual intercourse or unnatural sexual intercourse results in or is committed during the commission or attempted commission of robbery or burglary, either or both of those" then it goes on to provide some other things.

So, in order to find the defendant guilty of this crime the Commonwealth must prove first and must prove beyond a reasonable doubt first, the act of sexual intercourse which is a penetration, however slight, of the female organ by the defendant's male sexual organ. That's natural intercourse and then there is unnatural intercourse which is the intrusion of any part of the defendant's body into the genital opening of the victim.

So the Commonwealth must prove beyond a reasonable doubt first, an act of sexual intercourse or unnatural sexual intercourse. Second, that the act was against the victim's will, accomplished by force or threat of injury. And third, that the sexual intercourse or unnatural sexual intercourse was committed during the commission of

the crime of either a robbery or burglary or both.

Intercourse does require that there be some penetration of the female sexual organ. The insertion of a penis, no matter how slight into the vagina or the opening of the vagina is sufficient. It does not require there be ejaculation or the completion of the sexual act. And the force necessary is such force as is required to accomplish the penetration.

I turn now to the indictment charging burglary with assault on an occupant. I should tell you that the broad generic term is breaking an entering, one can break and enter into any number of places. If you break and enter into a railroad car, it's not occupied, that's what's called breaking an entering. Or a warehouse that's empty at night that's called breaking an entering. If you break -- but if you break and enter into a dwelling used for habitation and there is someone who lives there or present there, lawfully on the premises, that kind of breaking an entering is called burglary.

The two breaking an entering charges we have in these cases are also called burglary. You will hear those terms used interchangeably in this sense. So the crimes charged are breaking an entering into a

dwelling or burglary.

And I will refer, now, first to indictment number 85 dash 5420. I should point out that the next two indictments, although they charge crimes on different victims are similar, the exception being in that the indictment charging burglary as to Mary Prekop has burglary with assault upon the occupant. The charge involving the alleged victim Emily Lichwala is burglary without there being an assault on an occupant because if you will remember the Commonwealth's theory of the case involving Emily Lichwala is that upon hearing the noises she left the premises so that she was not confronted or assaulted by the intruder. In any event, so that the elements are similar in the sense that they both involve breaking an entering into a dwelling in the nighttime, but one involves an additional element and that's assault upon the occupant.

So I refer now to 85-5420 which alleges that on November the 30, 1985, George D. Perrot did break and enter a dwelling house, to wit, of Mary A. Prekop in the nighttime with intent to commit a felony and did make an actual assault on a person lawfully therein, to wit, Mary A. Prekop.

And that alleges a violation of our General Laws Chapter 266 Section 14 which charges, "Whoever breaks and enters a dwelling house in the nighttime with intent to commit a felony or whoever after having entered with such intent breaks into such dwelling house in the nighttime, any person being lawfully therein, and making an actual assault on a person lawfully therein."

So in order to prove the defendant guilty of this charge the Commonwealth must prove each of these elements beyond a reasonable doubt. First, that the premises were the dwelling house of Mary Prekop. And second, that the dwelling house was broken into by the defendant. Three, the dwelling house was entered by the defendant. Fourth, that the defendant specifically intended at the time of his entry to commit a felony in that dwelling house. And fifth, that all these events took place during the nighttime and sixth that the defendant assaulted Mary Prekop in that dwelling house.

So the first element that the Commonwealth must prove beyond a reasonable doubt is that the premises was the dwelling house of Mary Prekop. To prove this element the Commonwealth must show that the premises were presently a place for the living and habitation of

persons.

The second element which must be proved beyond a reasonable doubt is a breaking. A breaking requires the movement to a material degree of something that bars the way into the entry of the dwelling. Forced opening of a locked door or window, the opening of a closed but unlocked door or window is a breaking.

The third element the Commonwealth must prove beyond a reasonable doubt is an entry. Entry is the unlawful making of ones way into a dwelling. It's sufficient if any part of the defendant's body, hand or foot physically enters the dwelling.

Fourth element the Commonwealth must prove beyond a reasonable doubt is that the defendant specifically intended to commit a felony in the dwelling. In this case the Commonwealth contends that the defendant had a specific intent to steal or rob from the occupant of the building. Robbery or a larceny from a building is a crime that is a felony in this Commonwealth. I instruct you that the defendant must have had the specific intent to commit the felony of either larceny from a building or robbery.

Specific intent is a matter of fact that may or may

not be proven by direct evidence. If not proven by direct evidence the jury may infer a specific intent from a defendant's conduct or on any other evidence or circumstances that you find. So you may consider all of the surrounding facts and circumstances and weigh them in light of your common knowledge and experience in order to determine whether or not to draw the inference that the defendant acted with the required intent.

The next element the Commonwealth must prove beyond a reasonable doubt is that the defendant assaulted the victim in the dwelling. I tell you that assault and battery is the intentional unprivileged and unjustified touching of the body of another. It's the use of force, however slight, upon the person of another.

And the final element the Commonwealth must prove beyond a reasonable doubt is that the breaking an entering took place in the nighttime. And under our law nighttime is the time between one hour after sunset on one day and one hour before sunrise on the next day.

And as I indicated to you the final indictment is similar to, but contains fewer elements than the one I just discussed with you. I refer now to the indictment involving the burglary in the home of Emily Lichwala.

That's L-I-C-H-W-A-L-A. And that indictment number 85 dash 5425 which alleges that on November the 30, 1985, in Springfield, George D. Perrot did break and enter a dwelling house, to wit of Emily Lichwala, in the nighttime with intent to commit a felony.

And this alleges a violation of our General Laws Chapter 266 Section 15. And this is very similar to the previous one. This is unarmed burglary. "Whoever breaks and enters a dwelling house in the nighttime with the intention in the preceding section" and, of course, that's the one that says with intent to commit a felony and I've told you, larceny from a building is a felony; robbery from a person in a building is a felony. "So whoever breaks and enters a dwelling house in the nighttime with the intent to commit a felony" and this is the part that's distinguished from the previous one. "The offender, not being armed nor arming himself in such house with a dangerous weapon nor making an assault upon a person lawfully therein."

So the same element applies, that is the Commonwealth must prove one, that it was a dwelling house of Emily Lichwala. I defined dwelling house for you. Second, that the dwelling house was broken by the

defendant either before or after he entered it. Third, that the dwelling house was entered by the defendant. Fourth, that the defendant specifically intended at the time of his entry to commit a felony in that dwelling house. And fifth, that all these events took place during the nighttime. Each of which must be proved by the Commonwealth to your satisfaction beyond a reasonable doubt.

Now, I am about to submit these cases to you and I am certain I need not remind you that you have a grave responsibility. And I believe you are going to bring to bear all of the wisdom and judgment and conscience that you possess in reaching a verdict. But I do wish you to completely understand that your responsibilities do not extend beyond certain levels. You are not responsible for the conduct of this trial. You are not responsible for anything this defendant did, if he did anything. And you are not responsible for any punishment which might flow if any does. These are simply not your responsibilities and you need not take them on as burdens. And you need not in any way be concerned with any of these matters in your consideration of the evidence and in your deliberations and in your rendition

of a verdict.

Your verdict must be unanimous. That means all 12 of you must agree as to each of these indictments. All that anyone of us can expect from you is that you decide these cases with integrity and with principle. We all expect an impartial verdict without sympathy, without prejudice, not prompted by any facts other than what have been introduced here in court. All we are looking for is a verdict which is dictated by your logic without sympathy for any victim or sympathy for the defendant because emotions have no place in the rendition of a verdict. We are looking for an impartial judgment dictated by your reasoning and in the fullest discharge of your oath as jurors.

Everyone who comes before this Court stands equal before the bar of justice and therefore your judgment must be based on the laws I have given to you and on the evidence and on the facts that you find and nothing else.

Now, Mr. Foreman, I am going to deliver to you, in a moment verdict slips to which, as I've indicated, there is attached a copy of the indictment. And, of course, there are five sets, verdict slips. Of course I can't expect that you can see it from where you are, but when

you get them you will see that in each case they have the caption of the case, Commonwealth of Massachusetts, Hampden -- that's our County. And it has Superior Court Department of the trial court, the number of the indictment. And it says Commonwealth versus George D. Perrot in each case and verdict. And under verdict there is listed a short hand description of what the charge is, robbery unarmed. And then it has a number after it. That's the General Law chapter in each section. And then the other one is indecent assault and battery, parenthesis, on an adult. And then the third one is aggravated rape and the fourth one -- no particular order, fourth one is burglary, assault on an occupant. And then the final one is burglary. Obviously it doesn't say on an occupant.

And in each of these cases there are two choices. It says, "The jury finds the defendant colon, one, not guilty" and there is a place for you to put a check mark there if that is the unanimous verdict of the jury or "two, guilty." One or other. Again all 12 of you must agree and if it were to be guilty put a check mark next to guilty. There is a place to sign as foreman and then the date. Today's date is the 9th of January.

Now, there are 14 of you and I said all 12 of you must agree so obviously we are going to have to reduce your number and our procedures provide for two of your number to be selected from the list and those two will become alternates. They will be asked to remain impartial, not to discuss the case and remain available for any need should there be one.

Before we do that I will see counsel at side bar. If you will bear with me, please.

(The following discussion was held at the side bar.)

THE COURT: Do you have anything to say?

MR. FERRARA: No. I am satisfied with the instructions.

MR. VOTTERO: Your Honor, with respect to the alternate has the Court made any action only moving the juror, particularly --

THE COURT: (Interposing) Now, I don't think I can do it unless everybody agrees on it. If the defendant acquiesces it I wouldn't make any.

MR. FERRARA: Thank you.

THE COURT: She gave no indication when I

raised that issue.

MR. VOTTERO: There were two things I wanted to ask. First of all, I would like you to instruct the jury that rape is a felony. And second of all it is my understanding you instructed them unnatural sexual intercourse is penetration of the female organ by any part of the defendant's body. It's my understanding that also includes penetration by an object not part of the defendant's body put there by the defendant. In light of the testimony of the case I think it is important to be aware of that.

THE COURT: I don't remember any such testimony. The testimony was something put in her private part. She couldn't say what it was.

I don't want them to believe it has to be the defendant's penis or a finger. It could be an object put in there by the defendant.

THE COURT: Yeah. I'm not inclined to do that. If there is some hint of it I think I would.

It is felony, robbery.

MR. VOTTERO: You mentioned robbery and larceny of a building.

THE COURT: That's in the breaking and entering

aspect.

MR. VOTTERO: Uh-huh. Let me just inspect the verdict -- Commonwealth is satisfied with the verdict slips.

THE COURT: Okay. I am going to reduce them and send them out and then you examine, check them and send them in later.

(End of the side bar discussion.)

THE CLERK: Reduce them, Your Honor?

THE COURT: Yeah.

THE CLERK: Will juror number 6 dash 14, Susan Walker, please step down having been chosen as an alternate juror.

(The juror stepped down.)

THE CLERK: Juror number 4 dash 8, Donna Carlson, please step down having been chosen as an alternate juror.

(The juror stepped down.)

THE COURT: Swear the court officers.

THE CLERK: Please raise your right hand.

(The court officers were sworn.)

THE COURT: Very well, ladies and gentlemen, it's going to take a little while to review the exhibits and make certain they are in proper form. Rather than keep you waiting I understand that your lunch has been brought up. If you will kindly follow the court officers and we will bring the exhibits and the verdict slips out to you in short order.

(The jury exits the courtroom.)

THE COURT: Court will stand in recess.

(Pause)

MR. VOTTERO: Commonwealth is satisfied with the verdict slips and the exhibits.

MR. FERRARA: Defense is satisfied with the

verdict slips.

MR. FERRARA: Defendant is satisfied with the exhibits.

(The Court was in recess.)

* * * * *

(The defendant was present.)

(The Court and the jury entered at 3:35 p.m.)

THE CLERK: Mr. Foreman has the jury reached their verdicts?

THE JUROR: Yes, sir.

THE CLERK: Would you please hand that to the court officer.

(Pause)

THE CLERK: Will you please stand, ladies and gentlemen of the jury.

Mr. Perrot, can you please stand.

THE COURT: Very well, will you affirm, please.

THE CLERK: The verdict may be recorded, Your

Honor?

THE COURT: Yes.

Mr. Foreman, harken to the verdict which the Court will record on the following indictments.

On indictment 85 dash 5415 charging the defendant with robbery you say the defendant is guilty?

THE JUROR: Yes, sir.

THE COURT: Do you all say?

THE JURORS: Yes.

THE COURT: On indictment 5416 charging indecent assault and battery do you say the defendant is guilty, Mr. Foreman?

THE JUROR: Yes, sir.

THE COURT: Do you all say, ladies and gentlemen?

THE JURORS: Yes.

THE COURT: On indictment 5418 charging the defendant on aggravated rape do you say the defendant is guilty?

THE JUROR: Yes.

THE COURT: Do you all say so, ladies and gentlemen?

THE JURORS: Yes.

THE COURT: On indictment 5420 charging the defendant with burglary and assault on an adult do you say the defendant is guilty?

THE JURORS: Yes.

THE COURT: Do you all say, ladies and gentlemen?

THE JURORS: Yes.

THE COURT: On indictment 5425 charging the defendant with burglary do you say the defendant is guilty, Mr. Foreman?

THE JUROR: Yes, sir.

THE COURT: Do you all say, ladies and gentlemen of the jury?

THE JURORS: Yes.

THE COURT: Have each of these verdicts been unanimous?

THE JURORS: Yes.

THE COURT: Very well. I am going to order verdicts affirmed and recorded.

Ladies and gentlemen, this, of course, completes your jury service and I want to extend to you the thanks of this Court and to the participants as well.

These are always difficult cases that involve

activities and efforts and you have performed accordingly to the highest standards and performed a valuable service.

And I want to thank you on behalf of your fellow citizens of Hampden County as well as this Court. And if you will bear with me for just a short while.

Kindly follow the court officers. I won't keep you very long.

(The jury exits the courtroom.)

THE COURT: Ready to proceed?

MR. VOTTERO: Yes, Your Honor.

It is argued to the jury that their verdict must be as a result of reason without emotion and I believe that the strength of our system is that the emotion you're unable to use in fact finding we may use in sentencing. And there aren't words to convey the emotions caused by this man's acts. There are not words the victims can use to describe their fear. It will never end. That is clear. And we should look at the defendant when we determine an appropriate sentence -- and I am looking at his life and chronic involvement in juvenile justice

system and the adult system.

In April of 1981, at the age of 13, criminal complaint, subject threatening to do bodily harm to a neighbor, then friend, to have his gang beat him up if the boy don't steal things. Did punch boy in head.

THE COURT: Let me interrupt you. I have a scheduling matter. I am going to hear you fully, of course. I would like to take just a very brief recess. I don't went to keep the jurors too much longer and I will return.

Do you need sometime as far as guidelines?

PROBATION OFFICER: Yes.

THE COURT: Perhaps we could meet in five minutes.

MR. VOTTERO: That will be fine.

(A recess was taken.)

* * * * *

(The defendant was present.)

(The Court entered at 4:16 p.m.)

THE COURT: Very well. We are resuming during

the sentencing procedure and I had interrupted you, Mr. Vottero. If you want to continue now.

MR. VOTTERO: I will, Your Honor. I had just described April of 1981.

October of 1981, breaking an entering, a larceny. Entered an apartment on Allen Street. Threatened the victim and stole a pocketbook with another break. That ended in DYS.

In December of 1981 a CHINS petition for stealing money from his mother and taking cars joy riding.

At the age of 14 in February of 1982, breaking an entering, larceny, breaking into an Allen Street home. Breaking a rear window and stealing a safe.

March of 1982 threatens boy to steal for him or he will have his gang to do him in.

August of 1982 assault on another youngster in the neighborhood with a hoe. Also attacked another youngster who tried to protect the first.

March of 1983, breaking an entering in the daytime three counts, larceny over four counts. The age of 15 in 1983 a stick war in a gang fight with 50 to 60 people. In possession of brass knuckles.

Age 16 breaking an entering in the nighttime two

counts in the area where he lived; assault while armed with intent, larceny of a motor vehicle. At 2:30 in the morning subject came up to victim parked in a car, jumped through the window, punched victim in the mouth. Victim jumped out the of car. George Perrot continued asking for the wallet and continued through the car.

At sentencing we tried to find something in a defendant's background and point to -- all I can find is somebody with no respect for the law and a violent person.

These victims are never going to be safe. I indicated that. And the acts that he committed require a lot of punishment. It's my recommendation, for breaking into that home and for beating that woman, just for that he must be sentenced to life. There was no need for it. You know, even if he is just breaking in to steal the money his decision to beat her is just unbelievable. And the aggravated rape.

I am asking you to impose a concurrent sentence of 40 to 60 years in state prison. The woman was 80. She has never been married and that is what this defendant did to her. Obviously, both of those recommendations take into account the fear Emily Lichwala must live with

having her home broken into and for the acts that he committed there.

I can think of nothing in mitigation other than his age. And at his age that requires a lengthy sentence because there is nothing else to point to.

I am asking you to sentence with emotion. I am asking you to sentence with what the fact finders can't. To look at these acts and to impose a sentence that will make certain that it will be a very long time and it will give the parole board the opportunity to make it never that George Perrot is released.

I believe the sentences are appropriate. I believe the crimes he committed can be no more violent and so I urge you to adopt the Commonwealth's recommendation.

MR. FERRARA: Your Honor, the jury has spoken. I can say nothing which will justify, condone, explain, minimize or mitigate these offenses and I am not going to try to. However, what I would ask the Court to consider is this: George Perrot, at the time these offenses were committed was 17 years old.

They were committed seven years ago. At that time he was living with his sister for a number of years. His mother had been married a number of times and divorced

and I am not blaming his mother. She is in the courtroom. And it is just that George was living in an unstable home. You know that he had become drug involved. You heard testimony that throughout this period of time he was using various substances.

Now, you could sentence with emotion as the prosecutor beseeches you to do and certainly that request is understandable given the offenses. However, Mr. Perrot has been incarcerated for a number of years for the offenses which you heard testimony about that occurred on December 7, 1985.

Taking into consideration the fact of his age, the fact of his drug involvement at the time that these acts occurred and that, in fact, he was under the influence of substances as you have learned from these statements was offered into evidence, statements by Mr. Perrot I'm going to ask you to sentence him to a sentence of 10 to 12 years forthwith on the rape with concurrent sentences on the remaining counts.

THE COURT: I've had the benefit of looking at his record during the recess and I am somewhat persuaded and have to have some consistency, not that I am required to, also can go lower, but I don't think that

is indicated. But I do feel there ought to be some consistency with the previous sentence which I think I've arrived at independently as well.

I am going to impose the same sentence.

All right, Mr. Martin.

THE CLERK: Mr. Perrot, please stand.

(The defendant complied.)

THE CLERK: Harken to the sentence that has been awarded against you on indictment number 85-5418 in consideration of the offense the Court orders the you be punished by confinement in the Massachusetts Correctional Institution for a term of life. Said sentence is to run from and after any other sentence you are now currently serving. The Court also orders the victim witness fee be waived.

On indictment number 85-5420 in consideration of the offense the Court orders that you be punished by confinement in the Massachusetts Correctional Institution Cedar Junction for the term of life. Said sentence is to run concurrent in 85 dash 5418.

On indictment number 85 dash 5415 in consideration

of the offense the Court orders that you be punished by confinement at the Massachusetts Correctional Institution Cedar Junction for not more than twenty years and not less than 15 years. The Court further orders that said sentence is to run concurrent that with that imposed on 85-5418.

On indictment number 85 dash 5425 in consideration of the offense the Court orders that you be punished by confinement in Massachusetts Correctional Institution Cedar Junction for a term of not more than 20 years and not less than 15 years. The Court further orders said sentence is to run concurrent with that sentence imposed on 85-5418.

On indictment number 85-5416 in consideration of the offense the Court orders that you be punished by confinement at the Massachusetts Correctional Institution Cedar Junction of not more than five years and not less than three years. The Court further orders that said sentence is to run concurrent with that sentence imposed on indictment number 85-5418.

Mr. Court Officer, defendant at the bar is in your custody.

(The hearing was concluded.)

* * * * *

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF HAMPDEN

I, ALICIA CAYODE TORRUELLA, Certified Shorthand Reporter, hereby certify that the foregoing is a true and accurate transcription of my stenographic notes to the best of my knowledge and ability.

ALICIA CAYODE TORRUELLA