**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 41

Volume: I
Pages: 1-215
Exhibits: 1-9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 18-CV-10147

\- - - - - - - - - - - - - - - - - - - x

GEORGE PERROT,

Plaintiff,

vs.

CITY OF SPRINGFIELD, et al,

Defendants.

\- - - - - - - - - - - - - - - - - - - x

DEPOSITION OF GEORGE PERROT

Wednesday, July 12, 2023

North Central Correctional Center

500 Colony Road

Gardner, Massachusetts

10:16 a.m. to 3:55 p.m.

Reporter: Karen A. Morgan, CSR/RPR

APPEARANCES:
LOEVY & LOEVY
By Gianna Gizzi, Esquire
and Carla Agbiro, Esquire
311 North Aberdeen Street
Chicago, Illinois 60607
gizzi@loevy.com agbiro@loevy.com
on behalf of the Plaintiff.

CITY OF SPRINGFIELD LAW DEPARTMENT
By Lisa C. deSousa, Esquire
and Tyler J. Kenefick, Esquire
1600 E. Columbus Avenue, 2nd Floor
Springfield, Massachusetts 01103
ldesousa@springfieldcityhall.com
tkenefick@springfieldcityhall.com
on behalf of City of Springfield.

CITY OF SPRINGFIELD LAW DEPARTMENT
By Philip C. Ciccarelli, Esquire
1600 East Columbus Avenue
Springfield, Massachusetts 01103
phil@ciccarelli.law
on behalf of Marianne Popko.



APPEARANCES:
REARDON JOYCE & AKERSON, P.C.
By Austin M. Joyce, Esquire
4 Lancaster Terrace
Worcester, Massachusetts 01609
ajoyce@rja-law.com
on behalf of Charles Arpin.

PRESENT VIA ZOOM:
CITY OF SPRINGFIELD LAW DEPARTMENT
By Robert A. Schmidt, Esquire
1600 East Columbus Avenue
Springfield, Massachusetts 01103
rschmidt@springfieldcityhall.com
on behalf of Thomas Kennedy and Cheryl Clapprood.

KEVIN B. COYLE, ESQUIRE
935 Main Street
Springfield, Massachusetts 01103
attycoyle@aol.com
on behalf of Thomas Jarvis, Andrew Canevari, Paul Glantz and Ronald St. Germaine.



PRESENT VIA ZOOM:
D'AMBROSIO LLP
By Paul M. Tellier, Esquire
185 Devonshire Street, 10th Floor
Boston, Massachusetts 02110
ptellier@dambrosiollp.com
on behalf of City of Springfield.

MORRISON MAHONEY LLP
By Carol Sakowski Lynch, Esquire
Tower Square Building, Suite 2400
1500 Main Street
Springfield, Massachusetts 01115-5387
clynch@morrisonmahoney.com
on behalf of Richard Kane.

MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
By Jared B. Cohen, Esquire
McCormack Building
One Ashburton Place
Boston, Massachusetts 02108
jared.b.cohen@mass.gov
on behalf of Francis Bloom.



I N D E X


| EXAMINATION OF: | PAGE |
|---|---|
| GEORGE PERROT | |
| By Ms. deSousa | 7, 102 |
| By Mr. Ciccarelli | 97 |


E X H I B I T S


| NO. | | PAGE |
|---|---|---|
| Exhibit 1 | Amended Complaint | 7 |
| Exhibit 2 | Hampden County Court Record | 27 |
| Exhibit 3 | Department of Youth Services Parole Division Chronological Vote Record | 30 |
| Exhibit 4 | CORI record | 30 |
| Exhibit 5 | Typed statement | 69 |
| Exhibit 6 | Court docket | 115 |
| Exhibit 7 | Court docket | 116 |
| Exhibit 8 | Court docket | 117 |
| Exhibit 9 | Facebook printout | 191 |


*Electronic exhibits attached to transcript

Page 6

P R O C E E D I N G S

GEORGE PERROT, having been satisfactorily identified by the production of his institutional identification card and duly affirmed that his testimony would be the truth, the whole truth and nothing but the truth, testified as follows in answer to interrogatories by MS. deSOUSA:

MS. deSOUSA: So we'll do the usual stipulations that we've been doing in this case?

MS. GIZZI: Can you repeat them?

MS. deSOUSA: Holding all objections, except as to form, waiving notary, read sign within 30 days and an objection by one side is an objection by all.

MS. AGBIRO: Objections by form but also foundation.

MS. deSOUSA: No. That is not the stipulation.

MS. AGBIRO: We can't stipulate to waiving lack of foundation.

MS. deSOUSA: You're not waiving. We're holding all objections, except as to form, until trial.

MS. GIZZI: That's fine.

Page 7

MS. deSOUSA: So we're ready?

MS. GIZZI: Yes.

Q. Mr. Perrot, my name is Lisa deSousa and I'm an attorney representing the City of Springfield and you understand you're here today under oath to testify in regard to a complaint that you have brought against amongst other entities the City of Springfield, Massachusetts. Do you understand that that's why you're here today?

A. I do.

MS. deSOUSA: And I'm going mark as Exhibit 1 a copy of the amended complaint.

(Exhibit 1 was marked for identification.)

Q. Mr. Perrot, could you look at the document that's been placed in front of you?

(Witness perused document.)

Q. Do you recognize that as a copy of the amended complaint that you filed in this matter?

A. Yes.

Q. Mr. Perrot, you're going to need to try to keep your voice up a little louder than that; okay?

A. Yes, I will.

Q. And, Mr. Perrot, I know that you've

Page 8

testified multiple times in your life but we're just going to quickly review. In order to create an accurate record of what's happening here today you need to have all of your actions -- strike that. All of your answers be verbal. We can't record shakes of the head, gestures, etc. Additionally, it's important that you let me finish my question and I will do my very best to let you finish your answer so only one of us is speaking at once; okay?

A. I will.

Q. If at any time you need to take a break, you can let us know that and we will make every effort to allow you to do that; okay?

A. Yes.

Q. And we would ask that you answer whatever question is in front of you prior to you taking a break; is that understood?

A. Yes.

Q. If you need to consult with your attorneys at any time, you can simply ask to take a break. Do you understand that?

A. I do.

Q. Okay. With those rules going forward we'll proceed. Sir, can you state your full name

Page 9

for the record?

A. George David Perrot.

Q. And have you been known by other names during your life?

A. No.

Q. Have you gone by any aliases?

A. No.

Q. Where do you currently reside?

A. Gardner. At MCI Gardner.

Q. That's where we're conducting this deposition; correct?

A. Yes.

Q. And today, sir, do you have any bank accounts in your name?

A. I don't, no.

Q. Do you have any credit cards in your name?

A. No.

Q. Do you have any money in your account here at this correctional facility?

A. I do.

Q. And what is the source of the funds that are on account in this correctional facility in your name?

MS. AGBIRO: Objection. Form.

Page 10

A. A friend of mine provides me with funds.
Q. What's the name of the friend?
A. Sherrie Frisone.
Q. Can you spell both the first and the last name, please?
A. Sherrie, S-H-E-R-R-I-E. Frisone, F-R-I-S-O-N-E.
Q. Where does Miss Frisone live?
MS. AGBIRO: Objection. Form.
A. Haverhill.
Q. And what is her street address?
A. 1151 Broadway.
Q. Broadway?
A. Yes.
Q. And who does she reside with?
MS. AGBIRO: Objection. Form.
A. She owns the house. She lives by herself.
MS. deSOUSA: So that I can correct it during realtime, can you tell me what the objection to the form is?
MS. AGBIRO: I was unclear whether he was going to actually spell it out. I just need the relevance. The problem is it's too broad.
MS. deSOUSA: Relevancy is not an

Page 11

objection to form. The purpose of putting objections to form on the record is so that in realtime the attorney can correct the issue as to form. Relevancy is left to the time of trial.
MS. AGBIRO: Okay.
MS. deSOUSA: So you have an objection to the form of where she lives or who lives with her?
MS. AGBIRO: There's a lack of foundation but that's fine. Go ahead.
MS. deSOUSA: Again, it's not --
MS. AGBIRO: Go ahead.
Q. Briefly, sir, what's your date of birth?
A. 1/21/68.
MS. deSOUSA: Are you people having trouble hearing the deponent?
Q. You've got to try to project a little bit better, Mr. Perrot.
A. 1/21/68.
(Discussion off the record.)
Q. Where were you born?
A. Springfield, Mass.
Q. Where did you live at the time of your birth?

Page 12

A. Springfield, Mass.
Q. What was the address, sir?
A. At the time of my birth?
Q. Yes.
A. I was a child. I don't know where I lived. I was a child.
Q. What's the first address you remember living at?
A. 87 Malibu Drive.
Q. 87 Malibu Drive in Springfield, Massachusetts?
A. Yes.
Q. And when did you move there?
A. Maybe when I was four.
Q. Who did you live with?
A. My mother, stepfather, my older sisters and my older brother.
Q. So what's your mother's name?
A. Beverly.
Q. Beverly what?
A. Hogan.
Q. Hogan?
A. Yes.
Q. H-O-G-A-N?

Page 13

A. Yes.
Q. Has she been known by other names?
A. Yes. She's been married a couple times.
Q. Can you tell me all of the names that you know that your mother has been known as?
A. Croteau.
Q. C-R-O-T-E-A-U?
A. Yes. Perrot obviously and Garrant, G-A-R-R-A-N-T.
Q. Is your mother still alive, sir?
A. She is.
Q. Where does she currently reside?
A. Chicopee, Mass.
Q. What is her street address?
A. 133 Wilson Avenue.
Q. What is your stepfather's name, sir?
A. Robert.
Q. Robert. What's his last name?
A. Garrant.
Q. G-A-R-R-A-N-T?
A. Yes.
Q. Is he still alive, sir?
A. He is.
Q. Where does he reside?

Page 14

A. 133 Wilson Avenue.
Q. Chicopee, Mass.?
A. Yes.
Q. And you said you lived there with your sisters. What are your sisters' names?
A. Susan.
Q. What's her last name?
A. Croteau.
MS. deSOUSA: Off the record. Off the record at 10:26.
(Brief recess.)
MS. deSOUZA: Back on the record 10:27.
Q. Susan Croteau. Has she been known by any other names?
A. No. Not that I know of, no.
Q. What's her current address?
A. 87 Malibu Drive.
Q. In Springfield?
A. Yes.
Q. That's the address that you grew up in?
A. It is.
Q. Has she lived there continuously since you were a child?

Page 15

A. Yes.
Q. Who else lives at that address?
A. Excuse me. She was married too.
Q. What is her married name?
A. Westcott.
Q. Your sister Susan's last name is Westcott?
A. No. Croteau. Nancy was married.
Q. Was Susan married?
A. She's also married, yes.
Q. Has Susan been known by any name other than Croteau?
A. Yes.
Q. What is it?
A. I believe it's Woods.
Q. Woods. Did she continuously reside at 87 Malibu Drive in Springfield, Mass.?
A. Not since I was a young kid, no.
Q. When did she live there? When did she move there to current?
MS. AGBIRO: Objection. Form.
A. I don't speak with either of my sisters or my brother so I have no idea when they moved or when they lived there. They lived there when I was a kid.

Page 16

Q. Who else lives at 87 Malibu Drive?
A. Currently?
Q. Yes.
A. I have no idea.
Q. And you have a sister Nancy?
A. Yes.
Q. And her last name is also Croteau?
A. It's Westcott now.
Q. It's Westcott now but she was previously known as Nancy Croteau?
A. Yes.
Q. Where does she live?
MS. AGBIRO: Object to form.
MS. deSOUSA: Can you tell me what the objection is?
MS. AGBIRO: Speculative. You didn't establish that he knows that.
MS. deSOUSA: It's not an objection to form.
MS. AGBIRO: Speculation? Yes, it is.
MS. deSOUSA: No, it isn't.
Q. Where does Nancy Westcott currently live?
A. As I told you, ma'am, I don't speak to my brothers or my sisters so I believe she still lives at 87 Malibu Drive.

Page 17

Q. So do you believe that Susan and Nancy both live at 87 Malibu Drive?
A. No. I have no idea where Susan lives.
Q. Did you previously just testify that you believe she lived at 87 Malibu Drive?
A. When I was a kid, yeah, they did.
Q. Who else lives at 87 Malibu Drive?
A. Don't know.
Q. Do you have any other sisters?
A. No.
Q. You have a brother?
A. I have two brothers, yes.
Q. What are their names?
A. David Croteau and Les Croteau.
Q. Les?
A. Yes.
Q. What's Les's full first name?
A. Leslie.
Q. And you don't know where either of them currently reside?
A. I don't, ma'am.
Q. Where is the last place you knew either of

them to reside?
A. My brother David was in the service. After that I have no idea.
Q. How about Leslie?
A. He moved out when I was really young. I have no idea where he lives.
Q. And when is the last time you spoke with Susan?
A. Thirty-five years ago.
Q. How about Nancy?
A. Maybe 2002. 2003 maybe.
Q. Do you still have contact with your mother?
A. I do.
Q. Where did you go to elementary school, sir?
A. Brunton.
Q. In Springfield?
A. Yes.
Q. And what years did you attend Brunton Elementary School in Springfield?
A. I have no idea, ma'am.
Q. Did you attend a middle school or junior high in Springfield?



A. Yes.
Q. What middle school or junior high did you attend?
A. Freedman.
Q. Freedman?
A. Yes.
Q. When did you attend Freedman?
A. I don't know the years, ma'am.
Q. What grades were you in at Freedman?
A. Fifth and sixth.
Q. Did you attend seventh grade?
A. I did.
Q. Where?
A. Kiley Junior High.
Q. Did you finish seventh grade?
A. I didn't, ma'am.
Q. What month did you leave seventh grade?
A. No idea.
Q. Following your leaving Kiley Junior High School sometime in the seventh grade did you go on to any further education?
A. No. I went to DYS.
Q. And when you say you went to DYS, were you committed to the custody of DYS?



A. Yes.
Q. And that was when you were approximately 12?
A. Twelve or 13, yeah.
Q. And where were you held?
A. Westfield Detention.
Q. How long were you at the DYS facility in Westfield?
A. I have no idea, ma'am. Months.
Q. Following your release from the Westfield detention facility did you return to any schooling?
A. No.
Q. Is it fair to say that after you got out of Kiley in the seventh grade, you never had any further formal schooling?
A. Not formal. I went to like a DYS. It was like class, like a trade thing.
Q. Where did you do that?
A. In Springfield.
Q. Where in Springfield?
A. I can't remember the name of the street.
Q. You believe it was run by DYS?
A. Yeah. It was a DYS program, yeah.
Q. How long were you there?



A. On and off for a couple of years.
Q. Do you recall how old you were?
A. Maybe 14, 15.
Q. Where were you living when you attended that facility?
A. Malibu Drive.
Q. And did you obtain your GED at one point?
A. I did, ma'am.
Q. When was that?
A. I believe it was in '84.
Q. Did you take any classes in connection with getting your GED?
A. In DYS, yeah.
Q. At DYS?
A. Yes.
Q. And did you have any education following your obtaining your GED in 1984?
A. No.
Q. Did you have any continuing education or classes while you were incarcerated?
A. No.
Q. Before your arrest in 1987 in connection with the assault of Mary Prekop had you been employed for wages?

Page 22

A. I worked at Bartels Pools.
Q. I believe you said you worked at Bartels Pools?
A. Yes, ma'am.
Q. And where is that, sir?
A. In Springfield.
Q. In Springfield. How long did you work there?
A. Maybe two summers maybe.
Q. For two different summers you worked there?
A. Yes.
Q. And how old were you when you worked there?
A. I believe I was like 15 or 16.
Q. How many hours did you work there?
A. It was usually an eight-hour day.
Q. Full-time?
A. Yeah.
Q. And what did you do?
A. Install pools.
Q. Since that job until 2017 have you held any other jobs for wages outside of a correctional facility?

Page 23

A. Well, I worked part-time for my brother-in-law Mark Westcott.
Q. When was that?
A. I believe it was around -- I was about 17 years old. Just turned 17, 16.
Q. Would that have been in 1987?
A. No. '85.
Q. How long did you work part-time for your brother-in-law Mark Westcott?
A. Maybe a few months before I got arrested.
Q. What did you do for him?
A. It was more like training. He was training me to be a carpenter.
Q. Do you continue to have contact with Mark Westcott?
A. No. He's deceased, ma'am.
Q. I'm sorry?
A. He's deceased.
Q. Are you familiar with someone named Robert Timmerman?
A. I am.
Q. Who is Robert Timmerman?
A. He was a childhood friend.
Q. And when is the last time you spoke with

Page 24

Robert Timmerman?
A. Forty years ago.
Q. Are you familiar with someone named Jeffrey Adkins?
A. I am.
Q. Who is he, sir?
A. Childhood friend.
Q. When is the last time you had contact with him?
A. Same. Probably 40 years ago.
Q. Are you familiar with someone named Lisa Eldridge?
A. I am.
Q. Who is she?
A. She was a childhood girlfriend.
Q. When is the last time you had contact with Lisa Eldridge?
A. Maybe 2005 maybe. I seen her.
Q. In 2005 you believe you saw Lisa Eldridge?
A. Yeah.
Q. What were the circumstances around you seeing Lisa Eldridge in 2005?
A. I happened to run into her.
Q. Where?

Page 25

A. In Springfield.
Q. Where in Springfield did you run into her in 2005?
A. She was working in an establishment I just happened to go in for lunch.
Q. Have you seen her since then?
A. No, ma'am.
Q. Have you had any contact with her?
A. No.
Q. At all. Where were you living when you were arrested on December 7, 1985, sir?
A. Malibu Drive.
Q. Who did you live with there?
A. My sister Nancy and her husband.
Q. Anybody else live there?
A. No.
Q. How long had you lived there?
A. Since I was four maybe.
Q. Your mother did not live there?
A. No, ma'am. She did when I was young.
Q. How old were you when you stopped living with your mother?
A. Maybe 11 maybe.
Q. Who did you live with after you stopped

Page 26

living with your mother when you were 11?
A. My sister Nancy.
Q. Did your sister Nancy have legal custody of you?
A. No.
Q. Why did you stop living with your mother when you were 11 years old?
A. My mother moved out and gave my sister the house.
Q. And gave you to your sister as well?
A. No. She was -- she'd work and be around but she lived with my stepdad.
Q. And you never lived with your mother and your stepfather?
A. Yeah. When I was young.
Q. So your mother and stepfather moved out of the house and left you and the house with your sister Nancy?
A. Yes.
Q. When do you recall first being arrested, sir?
A. When do I recall what?
Q. First being arrested.
MS. AGBIRO: Objection. Form.

Page 27

A. First time I was arrested?
Q. Yes. The first time you were arrested.
A. Maybe 12 years old maybe. Eleven, 12.
Q. Does 1981 sound right?
A. If that's what it says, ma'am.
MS. deSOUSA: This is going to be Exhibit 2 and for the record these are COS RPOD 005864 through 005872.
(Exhibit 2 was marked for identification.)
Q. Can you take a look at the document that I've just handed you, sir?
(Witness perused documents.)
Q. Can you let me know when you've had a chance to look at that?
A. I have, ma'am.
Q. And do you recognize that document as being a copy of your probation records in the Superior Court in Springfield, Massachusetts?
A. I do.
Q. So having looked at this document does it refresh your recollection that you were first arrested in April of 1981 for assault and assault and battery?

Page 28

A. Yes.
Q. And then were you also arrested in November of 1981 for breaking and entering and larceny?
A. That's what it says, ma'am.
Q. And then in February of 1982 were you arrested for breaking and entering and larceny over?
A. That's what it appears to say.
Q. In September of 1982 were you arrested for assault with a deadly weapon?
A. That's what it says, ma'am.
Q. And in March of 1983 were you arrested for receiving stolen property?
A. That's what it says.
Q. In March of 1983 were you also arrested for breaking and entering during the daytime, larceny over, four counts of breaking -- I'm sorry. Strike that. Four counts of larceny over, three counts of breaking and entering in the daytime and one for breaking and entering in the nighttime?
A. That's what it appears to say, ma'am.
Q. November of 1983 were you arrested for disturbing the peace and disorderly person, carrying a deadly weapon?

Page 29

A. That's what it appears to say.
Q. June of 1984 breaking and entering in the nighttime two counts?
A. Again, that's what it appears to say.
Q. May of 1984 assault and battery, assault and battery while armed with intent to rob and larceny of a motor vehicle?
A. That's what it says.
Q. May of 1985 minor in possession of alcohol and illegal sale of alcohol?
A. Yes.
Q. September of 1985 assault and battery with a deadly weapon two counts of that and larceny?
A. That's what it appears to say, ma'am.
Q. In December of 1985 you got arrested for the charges that we're here to talk about today; correct?
A. Correct.
MS. deSOUSA: If this could be Exhibit 3, please. This has a prior exhibit number on it from a previous deposition. If you could just mark over it. So the exhibit that I'm now introducing does not have a Bates number on it but was used at the deposition of Charlie Arpin.

(Exhibit 3 was marked for identification.)
Q. Would you take a minute and look through this document, please, Mr. Perrot?
(Witness perused document.)
Q. Have you had a chance to look through that document, Mr. Perrot?
A. I have, ma'am.
Q. Do you recognize that as a copy of your DYS record?
A. Yes.
Q. Does that correspond with the charges that I just read into the record from your Superior Court probation records?
A. It appears to be.
MS. deSOUSA: If this could be Exhibit 4. This is for you, sir. It's a copy of the CORI.
(Exhibit 4 was marked for identification.)
MS. deSOUSA: We have entered as Exhibit 4 which has City of Springfield request for production Bates number 12348 through 12367.
(Witness perused document.)



Q. Have you had a chance to look through that document, sir?
A. I have, ma'am.
Q. Is that a copy of your criminal record?
A. Appears so.
Q. And would you agree with me, sir, that the first document -- I'm sorry. Strike that. That the offenses that are listed from the most recent to the least, correct, through your adult record?
A. Yes.
Q. Mr. Perrot, you were arrested by the Springfield Police on December 7th of 1985; is that correct?
A. Yes, ma'am.
Q. And in your complaint that you filed in this matter which I showed you a copy of earlier, and you should still have a copy in front of you, you state that on that evening you had broken into a house on Ellendale Street; is that correct?
A. Yes.
Q. And who owned that house?
A. At the time I didn't know.
Q. Do you know now?
A. Yes.



Q. Who owned the house, Mr. Perrot?
A. I can't recall his name.
Q. If I suggested to you the man's name is McNabb, would that refresh your recollection?
A. Yes.
Q. And you also state in your complaint that you also went to a Denny's in Springfield, Massachusetts and stole someone's pocketbook that night; is that correct?
MS. AGBIRO: Objection. Form.
MS. deSOUSA: What's your objection?
MS. AGBIRO: To form.
Q. Did you go to the Denny's in Springfield, Massachusetts and steal someone's pocketbook that night?
A. I did, ma'am.
Q. Do you recall the name of the person that whose pocketbook you stole?
A. I believe it was Sapelli.
MR. JOYCE: Mr. Perrot, I couldn't hear you.
A. Sapelli I believe.
Q. I can't understand what you're saying either, sir.



A. Sapelli. Maybe I'm saying it wrong.
Q. Sapelli? You're saying the person's last name was Sapelli?
A. I believe, ma'am, yes.
Q. Do you think her first name was Sheila?
A. I have no idea.
Q. What you had been doing during the day that you were arrested leading up to you breaking into the McNabb house and stealing the pocketbook from Denny's?
MS. AGBIRO: Objection. Form.
A. I was drinking, using drugs.
Q. You were drinking and doing drugs?
A. I was, ma'am.
Q. And can you take me through your activities on December 6th and December 7th?
MS. AGBIRO: Objection. Form.
A. It was a long time ago, ma'am. I was drinking, using drugs. I mean I don't know what you're looking for.
Q. You are aware, sir, are you not, that you filed a complaint in this matter that makes certain allegations about the events on December 6th and December 7, 1985; correct?

Page 34

A. Can I look at the document, ma'am?
Q. No. I'm asking for your current memory.
A. I don't have a current memory. My lawyers wrote it for me, ma'am.
Q. So you don't have any independent memory of anything that happened to you on December 6th and December 7, 1985 prior to your arrest?
MS. AGBIRO: Objection. Form. Leading. It's your witness.
MS. deSOUSA: I get to lead. You're incorrect but we'll wait for a judge.
MS. AGBIRO: That's fine.
A. Can you rephrase your question, ma'am?
Q. Do you have any memory as you sit here today of any of the events that occurred leading up to your arrest on December 7, 1985?
A. Yes.
Q. From December 6th to December 7, 1985.
A. Yes.
Q. What do you recall, sir?
A. Specifically what are you looking for? I mean you say my memories. As far as my alcohol use, my drug use?
Q. Let's start with who were you with?

Page 35

A. That night I was out with my girlfriend.
Q. Lisa Eldridge?
A. At the time, yes. Bob Timmerman and Jeff.
Q. You're saying Robert Timmerman?
A. And Jeff Adkins, yes.
Q. And Jeff Adkins. And where were the three of you?
A. In Bob's car.
Q. The four of you. In Bob's car?
A. Yes.
Q. And where did you go?
A. Drove around the city drinking, getting high.
Q. What time did you go out to the best of your recollection in the car with those three companions, Lisa, Bob and Jeff?
A. Maybe around seven at night maybe.
Q. And were you all together right up until you broke into the house and stole a pocketbook from Denny's?
MS. AGBIRO: Objection. Form.
A. Pretty much, yeah.
Q. So what time did you break into the house?
A. I don't recall exact time, ma'am.

Page 36

Q. Did you break into the house first or did you steal the pocketbook first?
A. The house was broken into first, ma'am.
Q. And you broke into the house?
A. Yes.
MS. AGBIRO: Objection. Form.
Q. And you also assaulted the homeowner with a baseball bat; isn't that correct? I'm sorry. Strike that. With a broom handle; isn't that correct?
MS. AGBIRO: Objection. Form.
A. No.
Q. Did you plead to that, sir?
A. I pled to the case, yes.
Q. You pled and it included assault and battery with a broom handle; correct?
A. Yes.
Q. So as matter of law you stated that you did do that; correct?
MS. AGBIRO: Objection. Form.
A. For the plea, yes.
Q. So you broke into the house and then you left the house and went to a Denny's?
MS. AGBIRO: Objection. Form.

Page 37

A. Yes.
Q. And how far is it from the house on Ellendale Circle to the Denny's?
A. Maybe a mile.
Q. Were you on foot?
A. Yes.
Q. Where was Jeff at the time?
MS. AGBIRO: Objection. Form.
A. I don't know.
Q. He wasn't with you?
A. No.
Q. And was Bob with you?
A. No.
Q. Was Lisa with you?
A. No.
Q. You were by yourself?
A. Yes.
Q. And where is Ellendale Circle in relation to Malibu Drive?
MS. AGBIRO: Objection. Form.
A. Maybe a half mile.
Q. Had you been in your residence at Malibu Drive immediately prior to breaking into the house at Ellendale Circle?

MS. AGBIRO: Objection. Form.
A. I don't understand the question, ma'am.
Q. When did you stop being with Robert and Jeff and Lisa?
A. I don't recall exact time.
Q. Were you with all three of them and then you were dropped off?
MS. AGBIRO: Objection. Form.
A. Yes.
Q. And all three of them were still in the car, Lisa and Jeff and Bob, when you were dropped off?
A. No.
Q. Who was in the car when you were dropped off?
A. Just me and Bob.
Q. And when did Lisa stop being with you that night?
A. We dropped Lisa off first. She had to be in early so we dropped her off first.
Q. When you say early, what time do you recall dropping her off?
A. Maybe 11:30 maybe.
Q. Where did Lisa live?



A. I believe it was Corey Road.
Q. Corey?
A. Yes.
Q. C-O-R-E-Y?
A. Yes.
Q. And you dropped her off at 11:30?
A. I'd say approximate, ma'am.
Q. When did Jeff leave you?
A. I don't remember an exact time, ma'am. It was forty years ago.
Q. Did she stay in the car until -- did you drop him off immediately after you dropped off Lisa?
A. No. No.
Q. So did the three of you continue to drive around for a while?
A. Yeah.
Q. And do you recall how long approximately?
A. Maybe an hour or two.
Q. And then you dropped Jeff off?
A. Yes.
Q. Where did Jeff live?
A. Malibu Drive.
Q. And when Jeff got dropped off, were you getting dropped off at the same time?



A. Yes.
Q. So did you and Jeff get out of the car at the same time?
A. No.
Q. So he stopped at Jeff's house and then drove to your house on the same street?
A. Yes.
Q. Do you recall what the street address was for Jeff?
A. No.
Q. And were you dropped off immediately afterwards though?
A. Yes.
Q. And did you enter your house when you were dropped off?
A. I don't recall if I did or not, ma'am.
Q. How long of a period of time do you recall going by between you being dropped off and you breaking into the house at Ellendale Circle?
A. I really couldn't tell you.
Q. You don't know if it was immediate or if you did something else for a while?
A. I really don't remember.
Q. Okay. And how long a time between when



you broke into the house at Ellendale Circle and you went to the Denny's and you stole the pocketbook?
MS. AGBIRO: Objection. Form.
A. Maybe a half hour maybe.
Q. And did part of that include the time it took you to walk or run from Ellendale Circle up to Denny's?
A. Yes.
Q. And after you stole the pocketbook at Denny's, what did you do next?
A. Went to my house.
Q. What did you do when you got to your house?
A. Passed out.
Q. And what do you next recall happening, sir?
A. Being woken up by my sister.
Q. And your sister was Nancy?
A. Yes.
Q. And what do you recall about that?
A. She was shaking me and when I got up, there was a bunch of officers in my room.
Q. So you were in your bedroom?
A. Yeah. I thought she was my girlfriend at

Page 42

first when I first woke up. I called her by my girlfriend's name.
Q. Do you have memory of that or is that something that you read over the years?
A. No. I have a memory of that because she said, George, this is your sister. I remember her telling me that and I looked up and there was several officers in my room.
Q. And as you sit here today, do you know the names of the officers that were in your room?
A. No.
Q. Do you recall what they looked like?
A. No, ma'am.
Q. Do you recall if they were men or women?
A. They were all men. I know that.
Q. Do you recall how many officers were in your room?
A. There were several. Maybe six maybe.
Q. So your memory is that six officers were standing in your bedroom?
A. Yeah. I'd say at least six, yeah.
Q. And they were all male?
A. Yes.
Q. And do you recall their race?

Page 43

A. My recollection they were all white I believe.
Q. Your memory is that six white male police officers were in your room?
A. Best I can remember, yeah.
Q. And were they all uniformed?
A. The ones in my room, yeah.
Q. And was Nancy also still in your room?
A. Yes.
Q. What do you next recall?
A. Being brought out to the cruiser.
Q. You were brought out to the cruiser?
A. Yeah.
Q. And when you say brought out, what are you referring to?
A. They put handcuffs on me and walked me out of my house.
Q. Did you get out of your -- strike that. Did you get out of the bed on your own power?
A. No.
Q. So can you describe for me what you recall happening?
A. They picked me up off the bed and put me in handcuffs.

Page 44

Q. Do you recall anything being said to you?
A. No, not at that time, ma'am. No.
Q. Did you understand that they were there because you had just broken into a house and stole a pocketbook?
A. At that time, no.
MS. AGBIRO: Objection. Form.
Q. At that time, no?
A. No.
Q. And then next what do you recall happening?
A. We walked out of my house.
Q. And you were placed into a cruiser?
A. Not immediately, no.
Q. Say again?
A. Not immediately, no.
Q. What do you recall immediately happening?
A. I ran off down the street.
Q. You broke away from them?
A. Yeah.
MS. AGBIRO: Objection. Form.
Q. How far did you run?
A. To the end of the street I got.
Q. Say again?

Page 45

A. I got pretty much to the end of the street.
Q. How far would that be either in feet or yards or how many houses?
A. Maybe 300, 400 yards.
Q. Three or 400 yards?
A. Yeah.
Q. And then what happened?
A. When I ran into the back of the house, there was a fence there and that's where they caught me.
Q. So you ran into someone's back yard?
A. Yes.
Q. What time of day was this, sir?
A. It was early in the morning.
Q. Was it still dark?
A. Yes.
Q. And there was snow on the ground?
MS. AGBIRO: Objection. Form.
A. I don't recall if there was snow or not, ma'am.
Q. Do you recall whether it was cold?
A. It was winter. I know that but I don't have a specific memory if there was snow on the

Page 46

ground.
Q. What did you have on your feet, sir?
A. I believe I had sneakers on.
Q. So did you get up and put your sneakers on before they put the handcuffs on you?
A. No. They were -- I passed out with them on me.
Q. And what do you recall happening next?
A. Getting roughed up by a couple cops.
Q. When you say getting roughed up, can you tell us specifically what you're referring to?
A. They were kicking me. I was on the ground. They were kicking me. I don't know if it was a nightstick or a flashlight. They were hitting me.
Q. And what do you recall happening after that?
A. They picked me up. There was a little fence. They kind of like tossed me over the fence.
Q. When you say there was a little fence, can you describe for us what you're referring to?
A. Like a little like a metal -- like a chain link fence but a short one. Small one.
Q. How tall was this fence?

Page 47

A. Ma'am, I don't know. Maybe three feet, four feet.
Q. So your memory is they picked you up and threw you over a chain link fence?
A. Yes.
Q. Then what happened next?
A. They stuck me back in the cop car.
Q. Say again?
A. They stuck me back in the cop car.
Q. And so after they threw you over the fence, were there police officers on the other side of the fence?
A. Yes.
Q. I see. Did those officers take custody of you?
A. Yes.
Q. And when you say they stuck you in the back of a cop car, do you mean the officers that were on the receiving end on the other side of the fence?
A. Well, they all chased me down the street. I don't know which ones they were, ma'am. There was several of them chasing me.
Q. The police cruiser that you were placed

Page 48

into, was there one or two officers in that?
A. Two officers.
Q. Two officers. And do you recall what those officers looked like?
A. I don't, ma'am.
Q. Did they continue to be white men?
A. Yes.
Q. Were they officers that had previously been in your bedroom?
A. I would assume so, yeah.
Q. I'm not asking you to assume. Did they appear to be the same officers?
A. Then I don't know, ma'am. I don't know.
Q. And then what happened?
A. They brought me to Ellendale Circle.
Q. And what happened at Ellendale Circle?
A. I think they brought Mr. McNabb out to see if he could ID me.
Q. And what do you recall happening then?
A. Driving back to the police station.
Q. What do you recall Mr. McNabb saying?
A. I never even seen him.
Q. So he could see you but you couldn't see him?

Page 49

A. Yeah.
Q. Did you ever find out whether or not he ID'd you that night?
A. No.
Q. In all the time that you've been involved in this case you've never found out whether he ID'd you that night?
A. No.
Q. Okay. So then you went to Pearl Street?
A. Yes.
Q. And we can agree that that's the police headquarters for the Springfield Police Department?
A. Yes.
Q. And did the same officers who drove you to Ellendale Circle did they transport you to Pearl Street?
A. Yes.
Q. And what happened when you got to Pearl Street?
A. They brought me to the desk.
Q. When you say they brought you to the desk, are you referring to the booking area?
A. Yes. I was told to put my hands up on the desk so I could be pat searched.

Page 50

(Reporter clarification.)
A. They told me to put my hands on the desk so they could pat search me and one of the cops gave me a nice little shot to the ribs and I fell down to my knees and, you know, they thought it was funny.
Q. So you were brought into the booking area and they removed your handcuffs there?
A. Yes.
Q. And you were instructed to put your hands on the desk?
A. Yes.
Q. And they pat searched you?
A. They did.
Q. And you say you were struck in the ribs?
A. I was.
Q. And who struck you in the ribs?
A. I don't know the officer's name. One of the cops that were there.
Q. Was it one of the police officers that was originally in your bedroom?
A. I have no recollection which one it was. He was standing behind me.
Q. Did it continue to be all white men around you?

Page 51

A. Yes.
Q. And what happened after that?
A. I believe I was brought to a cell.
Q. And what happened after that?
A. A short time later I was brought up to like an office.
Q. Who brought you up to an office?
A. One of the cops, ma'am.
Q. Is it the same officers that were in your bedroom?
A. I don't recall who brought me up.
Q. Do you recall whether or not it was a white man?
A. It was a white male, yes.
Q. And you were brought into an office?
A. I was.
Q. And what happened when you got to the office?
A. They started asking me questions.
Q. Who is they?
A. The officers that were in the room, ma'am.
Q. So when you got to the office, there were already police officers in the room?
A. Yes.

Page 52

Q. And were they officers that you had seen before that night?
A. No.
Q. How do you know that?
A. They were in plain clothes.
Q. And every officer you had seen up until this point had been in a uniform?
A. That I can remember, yeah.
Q. Okay. And how many officers were in the room?
A. Two.
Q. And the officer that escorted you up was a uniformed officer?
A. I'm not sure. I can't recall.
Q. Did the officer that escorted you up enter the room or did he deliver you to the room and leave?
A. No. He left after.
Q. And the two officers that were in the room can you describe them for us?
A. I can't, ma'am.
Q. Were they both men?
A. Yes.
Q. And were they both white?

Page 53

A. They were.
Q. And tell us what happened when you entered that room.
A. At first they started questioning me about the house break on Ellendale Circle.
Q. You really need to try to keep your voice up a little bit, sir, because even I can't hear you.
A. I said at first they started questioning me about Ellendale, the house break on Ellendale Circle.
Q. And that is the McNabb house that we've been speaking of?
A. Yes.
Q. And did you admit that you had broken into that house?
A. No, I didn't.
Q. You did not?
A. No.
Q. What do you recall telling them?
A. I told them I didn't want to talk to them.
Q. You recall saying I don't want to speak with you?
A. Yes.
Q. Okay. And then what next happened?

Page 54

A. They just kept questioning me.
Q. And for how long?
A. I'd say maybe a half hour. Maybe 20 minutes. I'm not really sure.
Q. And then what happened?
A. They brought me back down to a cell briefly.
Q. Okay. And during that 20 minutes to a half hour the focus of the conversation was on the events of December 7th and specifically around the break-in at Ellendale Circle?
A. At first, yes.
Q. And I'm asking you during that 20 minutes to a half an hour.
A. Yeah. They questioned me about Ellendale Circle. Yeah.
Q. So then you were returned downstairs?
A. Yes.
Q. To the holding area?
A. Yeah. A cell. Yeah.
Q. And you were put back into a cell?
A. Yes.
Q. And how long were you in the cell?
A. I don't know, ma'am. There's not a clock

Page 55

in there. It was pretty brief. Maybe 20 minutes, half hour maybe.
Q. Then what happened?
A. He brought me back upstairs to a different room.
Q. And when you say they, was it the same officer that had escorted you before?
A. I couldn't tell you, ma'am.
Q. Was it the plain clothes officers that you had just been speaking with?
A. No. The guy was in plain clothes but it wasn't the same guy, no.
Q. They escorted you upstairs. It was somebody in plain clothes?
A. Yes.
Q. So somebody in plain clothes that you heretofore had not seen came to your cell and brought you upstairs?
MS. AGBIRO: Objection. Form.
A. Yes, ma'am.
Q. Yes?
A. Yes.
Q. And you went to a different room this time?

Page 56

A. Yes.
Q. And did this new officer, new plain clothes officer enter the room with you?
A. No.
Q. No. He once again delivered you to a room?
A. Yes.
Q. And who was in the room?
A. It was two officers in there, two different officers.
Q. Now two more officers?
A. Yeah.
Q. Okay. And were they also in plain clothes?
A. Yes.
Q. And were they also white men?
A. Yes.
Q. And you don't have any other recollection of their description?
A. It was a long time ago, ma'am.
Q. Is that a no?
A. No.
Q. Okay. And what happened when you entered that room?

Page 57

A. They started questioning me again.
Q. And when you say they started questioning you again, you mean these two new officers. So when you say again, you mean again for you but they hadn't questioned you before; correct?
A. Yes. Yes.
Q. What were they questioning you about?
A. They wanted to know about some house breaks that involved elderly women.
Q. And specifically what do you recall them asking you?
A. If I was the one that broke into the house.
Q. I need you --
A. If I was the one that broke into the house, ma'am.
Q. If you were the one that broke into that house?
A. Yes.
Q. And what house did you understand they were referring to?
A. I believe it was a Malibu Drive and a Covel Street house.
Q. Malibu Drive and what?

A. Covel Street maybe.
Q. Covel?
A. Yes.
Q. C-O-V-E-L-L?
A. If that's the correct spelling, ma'am. I don't know.
Q. And was that near the house that you lived at?
A. Malibu, yeah.
Q. Well, you lived on Malibu. What I'm specifically asking you is whether the intersection that you're referring to of Malibu and Covel was close to there?
A. Covel Street is maybe a mile from.
Q. A mile from where you were living?
A. Yes. Maybe, yeah.
Q. And how did you come to understand that that was the house they were questioning you about?
A. Because that's what they said.
Q. When you say that's what they said, what do you recall them saying?
A. They were asking me if I broke into these two houses and sexually assaulted an elderly woman.
Q. So they were asking you if you broke into



two houses?
A. Yes.
Q. Okay. So when you said Malibu and Covel, are you referring to two separate houses?
A. Well, if one's on Malibu and one's on Covel, yes, ma'am.
Q. So I took you mean a house on the corner of Malibu and Covel. That's why I'm trying to clarify it.
A. No.
Q. Okay. So they were asking you about two separate break-ins, one on Malibu, one on Covel?
A. Yes.
Q. Okay. And the house that they were questioning you about on Malibu, how far was that from your house?
A. Maybe six. Maybe six houses.
Q. Six houses away. Covel Street you're saying is about a mile from where you lived?
A. Yeah.
Q. Okay. And did you know who lived in the house six houses away from you that they were referring to?
MS. AGBIRO: Objection. Form.



A. I didn't know the person there but I seen the person that lived in the house. I didn't know them, no.
Q. They were familiar to you as someone who lived in the same neighborhood as you?
A. I lived on that street since I was like four years old, ma'am. I don't know if they know who I was but I knew the person that lived there. I've seen them out in the yard before.
Q. And as we sit here, sir, who do you know that lives in that house?
A. Well, I know now based on the paperwork Miss Prekop lived there.
Q. Mary Prekop; correct?
A. Yes.
Q. And so I'm just trying to understand what you just told me. So you knew someone to live there and did you generally know that it was a woman, an older woman maybe in her seventies?
MS. AGBIRO: Objection. Form.
A. Either way I didn't know, ma'am, who lived there, how many people lived there.
Q. So you do believe you may have seen her around?



A. I have seen Miss Prekop the yard before, yes.
Q. And what about Covel?
A. Never seen anybody there.
MS. AGBIRO: Objection. Form.
Q. Again?
A. Never seen anybody who lived there.
Q. But were you familiar with the street?
A. My girlfriend lived around the corner, yeah.
Q. And so I'm sorry. I don't recall what street you said Lisa Eldridge lived at.
A. Corey Road.
Q. Corey. So Corey and Covel are close to each other?
A. Right next to each other.
Q. Okay. So that's where you said you don't recall ever seeing anybody at that house?
A. No.
Q. But you were generally familiar with that neighborhood?
A. Yeah.
Q. How long had you been dating Lisa Eldridge in December of 1985?

Page 62

A. A few years maybe. Three years maybe.
Q. And you went to her house during those three years?
A. Numerous occasions, yes.
Q. When you say numerous, was it a weekly event or once every couple months?
A. Pretty much daily, ma'am.
Q. Pretty much daily for three years you had been on Covel Street?
A. I wouldn't say everyday, no, but --
MS. AGBIRO: Objection. Form.
Q. Three or four times a week; would that be a fair estimate?
A. Yes.
Q. Okay. And so what do you recall them asking you about these break-ins at Malibu and Covel?
A. What do I recall them asking me?
Q. Yes.
A. If I broke into the houses and assaulted these women.
Q. And what did you say?
A. No.
Q. And then what happened?

Page 63

A. They just keep questioning me about it.
Q. When you say they kept questioning you about it, what were they saying?
A. They just kept asking me if I was the one that broke into the house.
Q. And how long do you recall them asking you those questions?
A. Maybe a half hour maybe, ma'am.
Q. And then what happened?
A. I was brought back down to a cell again.
Q. All right. And then how long were you in the cell after that?
A. I can't really recall.
Q. Was it an hour? Was it five hours?
A. No. It was maybe half hour, maybe 20 minutes. I can't really -- there's no clock in the cell, ma'am.
Q. And then what happened?
A. They brought me for fingerprints, pictures.
Q. So you were put through the booking process; correct?
A. Yes.
Q. And what happened after that?

Page 64

A. I believe I was brought back to the cell.
Q. And have you seen your booking photos?
A. Yes.
Q. And are any injuries that you allege to have sustained that night visible in those pictures?
A. I couldn't tell you, ma'am.
Q. So you were brought back to the cell. How long were you there?
A. I couldn't really tell you, ma'am.
Q. Was it hours? Was it --
A. No.
Q. -- a day? Was it less than an hour?
A. I'd say less than an hour.
Q. What do you recall happening next?
A. Being brought back upstairs.
Q. And who brought you back upstairs? Now this is your third trip upstairs; correct?
A. Yes.
Q. And who brought you back upstairs?
A. One of the officers, ma'am. I don't know his name. Don't know what he looks like.
Q. Was he uniformed?
A. He might have been.
Q. Do you have any sense of what time of day this is now?

Page 65

A. No.
Q. So do you recall that when you were brought into Pearl Street originally it was still dark out?
A. Yes.
Q. And now maybe three or four hours has gone by?
A. I'd say yes.
Q. So would you agree with me that in all likelihood by now it's light out?
A. It might have been.
Q. So then you were brought back upstairs and do you go back into either of the rooms that you had been in before?
A. Yes.
Q. Which one? The first one or the second one?
A. I don't know exactly which one. They brought me back into an office.
Q. And you know that it was an office you had been in before?
A. Yes.
Q. Who was in the room this time?

Page 66

A. Two officers.
Q. Were they -- strike that. Were they officers that had interrogated you earlier?
A. Yes.
Q. The first time or the second time?
A. I don't really recall, ma'am.
Q. Okay. And what happened then?
A. They started asking me if I would give them blood and hair.
Q. They asked you what?
A. If I would provide blood and hair.
Q. Blood and hair?
A. Yes.
Q. What did you say?
A. I told them I would.
Q. And did you?
A. Not at that particular time, no.
Q. So what happened next?
A. They talked about the procedure and all that.
Q. And then what happened?
A. I believe we started talking about the McNabb house breaking in, if I would give a statement.

Page 67

Q. What did you say?
A. I told them I would give a statement about the house break.
Q. And when did that happen?
A. I don't understand the question, ma'am. When did it happen?
Q. When did you give the statement?
A. Maybe a couple hours, maybe three hours. I don't know. A couple hours after I was there.
Q. So the third time that you were being questioned I believe you just told me they asked you whether or not you would give hair and blood; correct?
A. Yes.
Q. And you agreed that you would?
A. Yes.
Q. And they explained the procedure to you.
A. Yes.
Q. And then they started to question you again about the break-in at the McNabb house on Ellendale Circle; correct?
A. Yes.
Q. And they asked you if you'd give a statement?

Page 68

A. Yes.
Q. And you agreed that you would?
A. I did.
Q. And did you immediately give that statement?
A. Well, he was typing as I was talking.
MS. deSOUSA: Off the record at 11:25.
MS. AGBIRO: Why are we going off the record?
MS. deSOUSA: So I can get my exhibit out.
MS. AGBIRO: We don't have to go off the record for that.
MS. deSOUSA: I'm going off the record. This is my deposition and I'm going off the record at 11:25 so I can get my exhibit.
MS. AGBIRO: Are we talking a break?
MS. deSOUSA: We're taking a break long enough for me to get the exhibit.
MS. AGBIRO: No need to take that tone. We didn't take time off when we got our exhibits.
MS. deSOUSA: Say again?

Page 69

MS. AGBIRO: We didn't take time off when we got our exhibits.
MS. deSOUSA: I had the other exhibits where I knew they were. I'm taking this one slightly out of order and I needed a minute to get it. We're going on the record at 11:26 and this is COS RPOD 004767.
(Exhibit 5 was marked for identification.)
MS. deSOUSA: It's 0004767.
(Witness perused document.)
Q. Is this the statement that you're referring to, sir?
A. No, ma'am.
Q. Do you recognize this statement, sir?
A. I recognize the document, yeah.
Q. We're going to come back to that, sir. Without having the document in front of you can you tell me what you recall saying in the statement that you gave that night relative to the break-in at Ellendale Circle?
A. Can you rephrase that, ma'am? I didn't understand the question.
Q. You said you gave a statement.

Page 70

A. Yes.
Q. And they were typing it while you gave it.
A. Yes.
Q. What did you tell them?
A. I told them that I broke into the house at Ellendale Circle and I took the pocketbook from the girl at Denny's.
Q. You said that you broke into the house at Ellendale Circle?
A. Yes.
Q. And in that same statement you also said that you had gone to Denny's and stole a pocketbook?
A. I did, ma'am.
Q. Had you been questioned up until then about the Denny's incident?
A. Not at all. Not once.
Q. So did you voluntarily tell them about that part of your activities that evening?
A. I told them I'd give them a statement about what I did that night.
Q. And so then you spontaneously included this other crime?
MS. AGBIRO: Objection. Form.
A. No. They went over it with me after the

Page 71

house break and asked me if I stole a pocketbook from Denny's and I said yes.
Q. Okay. And did you sign that statement?
A. Not at that time, no.
Q. When did you sign it?
A. Couple hours later.
Q. Okay. After you gave the statement, what happened next?
A. I believe I was brought back to the cell I believe.
Q. So from the time that you're brought upstairs the third time, you went through would you gave hair and blood and you went through the procedure that that would look like and then you gave a statement and somebody was typing it right then in realtime as you said it?
A. Yes.
Q. How long would you say went by during that time?
A. Maybe -- the time I was in the office? It was a short time because he said he had to change the typewriter or something broke with the typewriter so they brought me back down to the cell.
Q. Then they brought you back up after the

Page 72

typewriter was fixed?
A. I was in the cell for a little while.
Q. Okay. So you had a conversation. You agreed to give a statement and you were brought back down to the cell?
A. Yes.
Q. And your memory is it had something to do with a problem with the typewriter?
A. He said he had to switch the typewriters or something to that effect.
Q. Okay. So then you were in the cell for a little bit?
A. Yes.
Q. Would you say less than a half an hour?
A. No. I was down there for a little bit. I was down there for a little while.
Q. And so when you say a little while, it's more than a half an hour. Was it as long as an hour?
A. Yeah. Maybe. Maybe. I would say, yeah.
Q. And then you're brought back upstairs?
A. Yes.
Q. And who brought you back up? Now this is the fourth time you're being brought back up. Who

Page 73

brought you back up that time?
A. One of the cops, ma'am. I can't recall who it was.
Q. Uniformed?
A. I couldn't tell you.
Q. And you go back upstairs and you give the statement?
A. No.
Q. No. What happened when you went back upstairs?
A. They started asking -- they started talking about the blood and hair again and another guy, I don't know, I thought it was a cop at the time, came in and he was discussing the hair and the blood with me and that I'd be willing to take it and I said, yeah. I'll give you, yeah.
Q. So then this is the second time they discussed the blood and hair with you?
A. Yes, but it was a different guy.
Q. So somebody else came in and you confirmed to them that you were willing to give blood and hair?
A. Yes.
Q. And then after that conversation, did you

Page 74

then give the statement?
A. The statement. He wrote the statement. I didn't see the statement until I signed the blood and hair. I never read it. I just signed it. I signed like three documents.
Q. Okay. So before you said that he typed it as you said it.
A. Yeah. I told him that I broke into the house. It wasn't like -- he was basically telling me, asking me. He asked me if I broke into the house. I said yes. I told him I'd give him a statement about the house and the pocketbook snatch but it wasn't like I would say okay. I went from here. I went up there. He was just typing what he wanted to type and then I left. I never signed anything at that time.
Q. Okay. And I'm sorry. So he types the statement. You don't sign it then and then what happens?
A. I believe he let me make a phone call.
Q. Who did you call?
A. Lisa.
Q. I'm sorry?
A. Lisa Eldridge.

Page 75

Q. You called Lisa Eldridge?
A. I did.
Q. How old was Lisa Eldridge at this point in time?
A. She was also 17.
Q. And what was the purpose in calling Lisa Eldridge?
A. What was the purpose?
Q. Yes.
A. I didn't have a purpose.
Q. Were you looking to get bailed out?
A. I basically called her to tell her I was arrested. I was in jail.
Q. I see. And then what happened?
A. I was left upstairs for a while in one of the offices.
Q. In one of the offices?
A. Yeah. They just left me upstairs.
Q. Was there somebody with you?
A. No.
Q. So you were left alone in a room in the police station?
A. Yes.
Q. For how long?

Page 76

A. I don't really recall how long, ma'am.
Q. Okay. And then what happened?
A. I believe I made another phone call after that.
Q. Who did you call this time?
A. I called Lisa again.
Q. You called Lisa twice?
A. Yes.
Q. And what was the purpose in the second phone call?
A. Just to talk to her, ma'am.
Q. You've got to keep your voice up, Mr. Perrot.
A. Just to talk to her.
Q. Okay. And how long were you on the phone with her?
A. Maybe ten minutes.
Q. And then what happened?
A. They let me stay up in the office.
Q. Did you leave the office to make the phone call?
A. Yes. We went to another room, yeah.
Q. And then they brought you back?
A. Yes.

Page 77

Q. And how did you get their attention that you needed to make that phone call or you wanted to make that phone call?
A. I was in that office when I asked them.
Q. So someone was in the office with you?
A. When I asked to make a phone call, yeah.
Q. Who was in the office with you?
A. One of the cops that was questioning me.
Q. And then after you made that phone call was when you were left alone in the office?
A. Yes. Yes.
Q. How long were you alone in the office?
A. Could have been maybe half an hour, 45 minutes maybe.
Q. And then what happened?
A. I believe one of the officers brought me some food.
Q. And did you eat it?
A. Yeah, I did, ma'am.
Q. Okay. And then what happened?
A. Then we got back into the discussion about the blood and hair and waiver to sign.
Q. So this is the third time that they talked to you about the blood and the hair?

Page 78

A. When they wanted me to sign the paper, yeah.
Q. And so what happened then?
A. I signed a couple documents and that was it.
Q. Okay. And you say that was it. Then what happened?
A. Maybe I was brought back down to the cell. I'm not sure, ma'am.
Q. How long were you in the cell now this time?
A. Ma'am, there's not a clock in the cell, ma'am. I don't know exactly how long I was in there. Could have been 20 minutes.
Q. What's your best memory?
A. Maybe 20 minutes, half hour. Maybe an hour.
Q. Then what happened?
A. I believe they took me out for a lineup or pictures or one of the two.
Q. Okay. When you say pictures, what do you mean?
A. Pictures like.
Q. Your booking photos?

Page 79

A. Yeah.
Q. You testified earlier that that had already happened.
A. They took more. Several pictures, ma'am.
Q. So you had more than one set of booking photos taken that night?
A. Yes. I don't know if they were booking photos but they took pictures of me a couple times.
Q. Was there any difference in the way they approached the second set of photos?
MS. AGBIRO: Objection. Form.
A. I don't understand by like a different approach. I don't know what you mean by that.
Q. Well, you'll agree with me, sir, that when you get booking photos done, you're asked to face the camera and then you turn to one side and then you turn to the other side; correct?
MS. AGBIRO: Objection. Form.
A. I believe so, yeah.
Q. So did they do that twice?
A. No. This was just a picture of me standing up.
Q. Have you ever seen that photo?
A. Yes, I have.

Page 80

Q. Okay. So then at some point you were brought up to a lineup; correct?
A. Yes. At some point, yes.
Q. And can you tell me what you recall about the lineup?
A. What I can recall the lineup? It was me and maybe five, four or five other people.
Q. And were there any similarities that you noticed between what you looked like and what the other people looked like?
MS. AGBIRO: Objection. Form.
A. Yeah.
Q. Can you tell me what the similarities were?
A. Everyone had moustaches or facial hair like I did.
Q. What type of facial hair did you have at the time, sir?
A. I had a moustache and a goatee.
Q. A moustache and a goatee?
A. Yes.
Q. Who did you understand was viewing the lineup?
MS. AGBIRO: Objection. Form.

Page 81

A. Well, at that time Mr. McNabb and the girl that I took her pocketbook.
Q. The woman from Denny's?
A. Yes.
Q. And what were the results of the lineup?
A. At that time I didn't know, ma'am.
Q. Do you know now?
A. Yes.
Q. I'm asking what do you know now?
A. Mr. McNabb and the girl identified me.
Q. So they positively identified you as having broken into the house at Ellendale; correct?
A. Yes.
MS. AGBIRO: Objection. Form.
Q. And stealing the pocketbook at Denny's; correct?
MS. AGBIRO: Objection. Form.
A. Yes.
Q. And do you believe anybody else viewed that lineup?
A. I know now that someone else viewed it.
Q. And who do you believe also else -- sorry. That was terrible. Who else do you believe viewed that lineup that night or morning I guess it was by

Page 82

now.
A. Mrs. Prekop.
Q. And that's Mary Prekop who you previously testified lived on Malibu Drive and was the victim in the assault that you were ultimately convicted of; correct?
A. Yeah.
MS. AGBIRO: Objection. Form.
A. I believe it was her and Mrs. Lichwala. Lichwala I believe her name is.
Q. Lichwala?
A. Lichwala, yeah.
Q. I don't really know how to pronounce it but Emily Lichwala?
A. Yes.
Q. So you believe they both were there?
A. I was told, yes.
Q. And do you believe that Emily Lichwala was the woman who lived at Covel Street that was the second assault you had been questioned about?
MS. AGBIRO: Objection. Form.
A. Yes.
Q. And what were the results of the lineup involving the identifications by Emily Lichwala.

Page 83

Let's start with Emily Lichwala.
A. Neither one identified me.
Q. So your understanding was Emily Lichwala did not identify you as the assailant in her home; correct?
A. Yes.
Q. And Mary Prekop did not identify you as the assailant in her home; correct?
A. Correct.
Q. When did you first become aware of the results of that lineup?
A. I'd say after I received counsel.
Q. When was that in relation to December 7th?
MS. AGBIRO: Objection. Form. You don't have to answer that. If it was told to you by counsel, you don't have to answer that.
MS. deSOUSA: I'm not asking what he was told. I'm asking when he got counsel. That's not privileged.
MS. AGBIRO: Can you repeat the question?
MS. deSOUSA: Go ahead.
(Question was read back by the stenographer.)
MS. AGBIRO: When was that?

Page 84

MS. deSOUSA: When did he receive counsel.
MS. AGBIRO: Okay.
A. I believe at my arraignment I believe.
Q. I'm asking when you received counsel.
A. I received counsel at my arraignment.
Q. When do you believe you were arraigned?
A. I'm not sure if it was the following day or maybe two days. I don't quite remember, ma'am. Might have been two days.
Q. So in relation to that when did you find out that the lineup had included Mary Prekop and Emily Lichwala as victims attempting to identify you?
MS. AGBIRO: Objection. Attorney-client privilege.
MS. deSOUSA: I'm asking when.
MS. AGBIRO: You said in relation to when he got counsel. If counsel told him, that's privileged.
MS. deSOUSA: I'm not asking that. I'm asking when did he become aware.
Q. When did you become aware that Mary Prekop and Emily Lichwala attempted to identify an

Page 85

assailant in the lineup that you were in? When did you become aware of that?
A. I couldn't tell you exactly when, ma'am. It would have been after my arraignment when I spoke to my counsel.
Q. Okay. But it was -- strike that. You were aware of the results of that lineup prior to your first jury trial on the assault; is that fair to say?
MS. AGBIRO: Objection. Form. You can answer.
A. Yes.
Q. In fact, during the trial the fact that neither Emily Lichwala or Mary Prekop had identified you in the lineup was told to the jury; isn't that correct?
A. I can't tell you one way or the other, ma'am. It might have been, yeah.
Q. And during the trial did the issue of whether or not Mary Prekop identified you come up?
A. I believe it did, yes.
Q. Yes, it did?
A. Yes.
Q. And the jury was told that she had not

Page 86

identified you; isn't that correct?
A. I don't specifically have a memory of that, ma'am, but it might be the case, yes.
MS. deSOUSA: We've been going I think for about an hour and a half. They are suggesting that we break for lunch from 12 to one. It's quarter of. I just can keep going until then.
MS. AGBIRO: Until 12, yes.
MS. deSOUSA: So about another 15 minutes and then we'll take about an hour and ten minutes.
Q. So we'll go another 15 minutes, Mr. Perrot. Is that okay with you?
A. Sure.
Q. Okay. I know you've been sitting there quite a while. So when did you get out of jail, out of lockup after the arrest on December 7th?
MS. AGBIRO: Objection. Form.
A. When did I get out of jail?
Q. Out of lockup. Out of Pearl Street.
A. I don't understand the question.
Q. When did you leave Pearl Street following your arrest on December 7th?
A. I believe it would be that Monday. The

Page 87

following Monday I believe.
Q. After you were arraigned?
A. Yes.
Q. Where did you go after the arraignment?
A. York Street County Jail.
Q. York Street County Jail?
A. Yes.
Q. That was on York Street in Springfield at the time; correct?
A. Yes.
Q. And were you denied bail?
MS. AGBIRO: Objection. Form.
A. To tell you the truth I don't even remember, ma'am.
Q. Okay. How long were you at York Street?
A. No. I wasn't denied bail.
Q. How long were you at York Street?
A. Until I was convicted.
Q. So you never posted bail?
A. No. I never posted bail, no.
Q. Just one moment. Do you recall testifying at a motion to suppress prior to the jury trial arising out of your indictment for the assault on Mary Prekop and Emily Lichwala?

Page 88

A. At a suppression hearing?
Q. Yes.
A. Yes.
Q. And you were represented by counsel; correct?
A. I was, yes.
Q. And you were under oath?
A. I was, yes.
Q. And the testimony that you gave was the truth?
A. It was.
Q. And what do you recall testifying to with regard to the statements that you gave about the McNabb and Denny's incidents?
A. Long time ago, ma'am. I'd have to see the document.
Q. You have no present memory of that?
A. No.
Q. Do you have any present memory of any of the testimony that you gave at that time?
A. I remember I told them that the crimes weren't in the right order and I just signed the paper. I didn't really read it.
Q. When you say the crimes weren't in the

Page 89

right order, to what are you referring?
A. It says that the house break -- the pocketbook happened and then the house break. That's not the way it happened, ma'am.
Q. So your memory is that you broke into the house and then you went to Denny's?
A. That's how it happened.
Q. So that's what you testified to at the motion to suppress?
A. Yes. I believe.
Q. What else do you recall testifying to at your motion to suppress relative to that statement?
A. I don't really recall, ma'am.
Q. Do you recall offering any testimony regarding your sobriety?
A. Yes. They did ask me about that, yes.
Q. And what did you say?
A. That I was under the influence. Yes.
Q. Under the influence of what?
A. Alcohol and drugs.
Q. And when you say drugs, sir, what were you referring to?
A. I was drinking alcohol. I did some cocaine. I took some Valiums.

Page 90

Q. So your testimony is that when you were driving around that night, you drank and you took Valium and you took cocaine. Snorting it, injected it? What were you doing?
A. Yes. I snorted it. Yes.
MS. AGBIRO: Objection to form.
Q. You snorted cocaine?
A. Yes.
Q. When was that?
A. The previous night December 6th.
Q. Why don't we focus on you were dropped off on Malibu Drive; okay?
A. Okay.
Q. When in relation to that had you snorted cocaine?
A. I don't know exact time, ma'am. It would have been during the evening. During the evening hours.
Q. Was it before or after Lisa Eldridge was dropped off?
A. It was before.
Q. Did Lisa Eldridge also snort cocaine that night?
MS. AGBIRO: Objection. Form.

Page 91

A. No. She didn't do coke. No.
Q. Say again?
A. She didn't, no.
Q. And you said you also took some Valium?
A. Yes.
Q. When did you take the Valium?
A. Would have been maybe around 11 o'clock.
Q. Lisa Eldridge was still there then?
A. Yes.
Q. And did Lisa Eldridge also take Valium?
MS. AGBIRO: Objection to form.
A. No.
Q. Where did you get the Valium?
A. Stole it from her father.
Q. You stole the Valium from Lisa Eldridge's father?
A. I did.
Q. When had you done that?
A. Couple nights prior.
Q. How many of them had you stolen?
A. Maybe 12. Ten, 12.
Q. Was Lisa Eldridge aware that you had stolen drugs from her father?
A. Not at the time, no.

Page 92

Q. When did she become aware of it?
MS. AGBIRO: Objection to form.
A. When her father asked her about them.
Q. When was that?
A. Maybe a day after they were missing.
Q. The day after you stole them or the day after you got arrested?
A. Maybe the day after I stole them, ma'am.
Q. So by the time you were in the car driving around on December 7th she was aware that you had stolen Valiums from her father?
A. She was aware they were missing. I didn't tell her I took them.
Q. So when did she discover that you took them?
MS. AGBIRO: Objection to form.
A. I don't think she ever did.
Q. And was she aware that you were taking Valium when you were driving around that night?
A. No.
MS. AGBIRO: Objection to form.
Q. Was Jeff aware?
A. No.
Q. Was Robert aware? Bob?

Page 93

MS. AGBIRO: Objection to form.
A. No.
Q. So nobody was aware that you were taking Valium?
A. No.
Q. Were they aware you snorted coke?
A. Yes.
Q. And did Jeff and/or Bob also snort coke with you?
MS. AGBIRO: Objection. Form.
A. Bob did. Jeff didn't.
Q. And you said you were also drinking?
A. Yes.
Q. How much were you drinking?
A. I didn't really keep track, ma'am. Maybe a couple six packs.
Q. And was Bob also drinking?
A. Yes.
Q. Was Jeff also drinking?
A. Yes.
Q. Was Lisa also drinking?
A. Yes.
Q. And when you say that couple six packs, was that all four of you drank a total of a couple

Page 94

six packs or was that your individual consumption?
A. My individual consumption, ma'am.
Q. What type of alcohol were you drinking?
A. Beer.
Q. How long a time were you drinking for? Strike all that. What was the period of time in which you consumed two six packs of beer?
A. Maybe between seven, eight o'clock until maybe, I don't know, just before I got dropped off.
Q. And you don't recall when you got dropped off?
A. I don't recall the exact time. No, ma'am.
Q. But it was after 11:30 because that's when you dropped Lisa Eldridge off; correct?
A. Yes.
Q. And you believe you drove around for an hour, an hour and half after that?
A. I'd say approximately, yeah.
Q. So around 1:00 a.m. do you believe you were dropped off?
A. I don't know the exact time, ma'am.
Q. Understanding that you don't know the exact time do you believe it was after 1:00 a.m.?
A. It might have been.

Page 95

Q. At any rate whenever it was that you got dropped off that's when you stopped drinking?
A. Yes.
MS. AGBIRO: Objection to form.
Q. How much alcohol were the other people consuming that night?
MS. AGBIRO: Objection. Form.
A. I didn't keep track of their alcohol consumption, ma'am.
Q. Do you know how much alcohol you had purchased that night or had available to you that night?
A. We originally bought a case of beer when we first got in the car and I believe we got a couple six packs after that.
Q. So did you consume the -- did you collectively the four of you consume the entire case of beer and then bought more?
MS. AGBIRO: Objection. Form.
A. Yes.
Q. And then did you consume the four of you the additional beer that you had purchased?
A. I don't think the four of us done. It may be me, Bob and Jeff had, yeah.

Page 96

Q. You don't think Lisa Eldridge was involved in the last two six packs?
A. No, I don't.
Q. Did you purchase them after she had left you?
MS. AGBIRO: Objection. Form.
A. No.
Q. Had she just stopped drinking at some point?
A. I really couldn't tell you the answer, ma'am.
Q. I'm trying to understand what you're basing your assumption on that she didn't drink any of the last two six packs. Do you have a memory of that?
A. I don't.
Q. Did you just sense that she wouldn't have drank that much?
A. I just know she didn't drink as much as we did. That's all I know.
MS. deSOUSA: All right. Well, this seems like a good place to take a break. I think we have to notify them that he can go. 11:55 we're off the record.

Page 97

(A break was taken for lunch.)

EXAMINATION BY MR. CICCARELLI
Q. Good afternoon, Mr. Perrot. My name is Attorney Philip Ciccarelli and I am representing Marianne Popko, one of the named defendants in this case. I just want to remind you that you're still under oath and I have a few questions regarding the evening you were arrested; okay?
A. Okay.
Q. Mr. Perrot, you testified earlier today that your sister woke you up on December 6, 1985 I believe and informed you that there were officers at your house; was that your testimony earlier?
A. Well, the officers were already in my room.
Q. Already in your room?
A. Yes.
Q. You testified earlier that the officers, there was about six of them?
A. Yes.
Q. And they were predominantly or all white men?
A. That I can recall, yes.

Q. Was Marianne Popko in your room that evening when you were arrested?
A. I didn't see her, no.
Q. And you testified afterwards that once you were put in handcuffs I believe you made a run for it down the street towards the end of the road; is that accurate?
A. It is.
Q. And when you got to the end of the road, officers stopped you and brought you back over a fence.
A. Well, I ran into a back yard and the fence was there.
Q. And was Officer Marianne Popko part of the group that chased you down and put you back over the fence?
A. I couldn't tell you one way or the other.
Q. Do you remember seeing a female officer that evening when you were arrested?
A. I don't.
Q. You were brought to the police station afterwards and you testified that you were struck in the ribs.
A. I was, yes.



Q. Were you struck in the ribs by a female officer?
A. No, sir.
Q. Do you remember seeing a female officer during the booking procedure?
A. No, sir.
Q. And you testified that after you were booked, you went through about three interviews; is that accurate?
A. Several interviews, yes.
Q. Several interviews. You testified I think earlier about three with two plain shirt detectives?
A. Yes.
MS. GIZZI: Objection. Form.
Q. And were any of those plain clothes officers female?
A. No.
Q. You testified that you were brought up and down the stairs several times between your cell and your interview.
A. Yes.
Q. And you testified that for the most part it was a uniform officer that was bringing you up and down; is that fair to say?



MS. AGBIRO: Objection. Form.
A. That I can recall, yes.
Q. Was that officer ever a female officer?
A. No.
Q. You testified that there was a photo array that you were a part of.
A. I did.
MS. GIZZI: Objection. Form.
Q. And do you ever recall if Officer Popko was involved in the photo lineup?
A. No.
Q. What, if anything, did Officer Popko do in your opinion that violated your constitutional rights?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. I never met Officer Popko so I couldn't tell you.
Q. Do you know if Marianne Popko had anything to do with your case?
MS. AGBIRO: Objection. Form.
A. Just based on the documents that I've written. That I've read pretty much. Excuse me.
Q. Understood. Do you know what position or



rank Marianne Popko had at the time of your arrest?
A. I don't.
Q. Are you aware of any conversations that Officer Popko had with any of the defendants in this case?
A. Am I aware that she?
Q. Yes.
A. I couldn't tell you personally, no.
Q. Do you know what shift Officer Popko worked on the night in question?
MS. AGBIRO: Objection. Form.
A. No.
Q. You answered earlier a question regarding documents that you reviewed.
A. Yes.
Q. That's how you know. What documents did you review?
A. Just the discovery on the case.
Q. Anything in particular?
A. Discovery. That's all I knew it was.
MR. CICCIRELLI: I have no further questions. Thank you.
MS. deSOUSA: Off the record while we switch.

Page 102

(Discussion off the record.)
MS. deSOUSA: Sorry about that. Thank you.

CONTINUED EXAMINATION BY MS. deSOUSA

Q. Mr. Perrot, you're aware that you're still under oath?
A. I do.
Q. So in your complaint you have named in addition to Officer Popko that you just answered some questions for Attorney Ciccarelli about, you've also named Cheryl Clapprood. Do you recall that?
A. Again, my attorneys wrote it.
Q. So you're not aware that you have named Cheryl Clapprood in this complaint?
MS. AGBIRO: Objection. Form.
A. No.
Q. I'm going to ask you to assume that you did name Cheryl Clapprood in this complaint or you can review Exhibit 1 if you want. It should still be in front of you. Do you have that in front of you, sir?
A. I do.
Q. And can you look it over? Actually, you

Page 103

can start just with the caption. Do you see that Cheryl Clapprood is named?
A. I do.
Q. Does that refresh your recollection at all about bringing a claim against a Springfield Police Department employee named Cheryl Clapprood?
A. That's what it says there, ma'am.
Q. Other than looking at this piece of paper on which her name is written, you don't have any specific recollection that you brought a lawsuit against someone named Cheryl Clapprood?
A. Again, ma'am, my attorneys wrote it for me.
Q. I'm just asking you if you yourself know.
A. A specific name, no.
Q. And you just testified in response to a series of questions that were posed to you by Attorney Ciccarelli that during your arrest, your transport and your interrogations that occurred on December 6th and December 7th of 1985 that you didn't see any female officers. You have no recollection of seeing any female officers during that time; is that correct?
A. That's correct, ma'am.

Page 104

Q. And at any time at all in this case have you ever been questioned by a female member of the Springfield Police Department?
MS. AGBIRO: Objection. Form.
A. No.
Q. Have you ever been questioned or interrogated by another person when a female member of the Springfield Police Department was present?
MS. AGBIRO: Objection. Form.
A. No.
Q. As we sit here today, do you know what position Cheryl Clapprood held at the Springfield Police Department in November and December of 1985?
A. No.
Q. Do you know what shift she worked?
A. No.
Q. Do you have any knowledge based on your review of materials in a sense you were convicted of any involvement that Cheryl Clapprood had in your conviction?
A. Other than reading her name, no.
Q. Are you aware, sir, that you have alleged a conspiracy with members of the Springfield Police Department?

Page 105

MS. AGBIRO: Objection. Form.
A. Again, ma'am, my attorneys drafted the complaint for me.
Q. Well, regardless of what the complaint may say do you believe that there was a conspiracy amongst members of the Springfield Police Department that contributed in whole or in part to your conviction for the sexual assault Mary Prekop?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. My personal opinion absolutely.
Q. What do you base that on, sir?
A. The fact that I didn't do the crime.
Q. Other than your statement of your own innocence do you have any evidence or do you know any facts that would support a claim that members of the Springfield Police Department conspired to have you convicted?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. Yes.
Q. What is it?
A. They wrote a false confession against me.
Q. Who do you believe wrote a false

Page 106

confession against you?
A. The Springfield Police Department.
Q. And what false confession are you speaking of?
A. November 30, 1985.
Q. So you're not referring to the confession that Frannie Bloom was involved in?
A. No. I'm referring to the one you put before me, ma'am, as an exhibit.
Q. And so you believe that that was a false confession?
A. I know it was a false confession, yes.
Q. But you signed it?
A. Yes, I did.
Q. And you also had signed Miranda cards that night; correct?
A. Correct.
Q. And this wasn't your first time that you were arrested; correct?
A. It wasn't, ma'am, no.
Q. In fact, the court found, did they not, that you were fully aware of your legal rights due to your prior multiple involvements with the court system; isn't that correct?

Page 107

MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. I can't tell you what the court's conclusion was, ma'am.
Q. Well, you're aware that you challenged that veracity or truthfulness of that statement multiple times over the years; isn't that correct?
A. I have, ma'am, yes.
Q. And no court has ever agreed that that was the product of coercion; correct?
MS. GIZZI: Objection. Form. Lack of foundation. Lack of personal knowledge.
A. In their opinion, yes.
Q. So are you saying that that's a false confession or a fake confession?
A. I don't know the difference.
Q. Are you saying that the allegations in it are false or are you saying that you didn't sign it?
A. I'm saying I signed it unbeknownst to information within it.
Q. And that's because you claim you didn't read it?
A. That's correct, ma'am.
Q. But you had the opportunity to read it?

Page 108

MS. GIZZI: Objection. Form.
A. I could have, yes.
Q. And you didn't.
A. I didn't, no.
Q. Turning back to Cheryl Clapprood in particular, did she have anything to do with that document?
MS. AGBIRO: Objection. Form.
A. Again, ma'am, I never seen or spoke to a female officer.
Q. So is it fair to say she would not have had anything to do with the typing of that document and presentation to you on December 7th?
MS. GIZZI: Objection. Form. Lack of personal knowledge.
A. I couldn't tell you one way or the other.
Q. So you don't have any information that would suggest she had anything else to do with it; is that correct?
MS. GIZZI: Objection. Form.
A. I don't, ma'am, no.
Q. And same with Marianne Popko, right, because there were no women there, no women officers that were there or involved; is that correct?

Page 109

MS. GIZZI: Same objection.
A. That's correct, ma'am.
Q. Okay. And do you know -- do you have any knowledge or facts that Cheryl Clapprood ever conferred with any other member of the Springfield Police Department about your arrest and conviction in 1985 or 1986?
A. Not to my knowledge, ma'am. No.
Q. And same with Marianne Popko. Do you have any information that she ever conferred with any other defendant in this matter about this matter?
A. Other than her name being in the discovery.
Q. What document in particular are you saying you saw Marianne Popko's name in?
A. I can't tell you specifically the document but I've read her name that she was involved questioning Mary Prekop.
Q. I'm sorry. She was involved in what?
A. Questioning Mary Prekop.
Q. Mary Prekop?
A. Yes.
Q. What do you mean by questioning Mary Prekop?

Page 110

A. Well, asking her about the incident, what happened with the case.
Q. And as a result of that questioning, was a statement generated?
MS. AGBIRO: Objection. Form.
A. Not to my knowledge, no.
Q. And up until the date of her death did Mary Prekop ever identify you as her assailant?
MS. GIZZI: Objection. Form.
A. Never.
Q. So Marianne Popko didn't falsify that Mary Prekop identified you; correct?
MS. GIZZI: Objection. Form.
A. Never said she did.
Q. In fact, no member of the Springfield Police Department ever falsified that you were identified by Mary Prekop; isn't that true?
MS. GIZZI: Objection. Form.
A. There was no identification in the case, no.
Q. And in fact, she sat in the courtroom and said she did not identify you; isn't that correct?
MS. GIZZI: Objection. Form.
Q. You heard her say that from the witness

Page 111

stand, didn't you?
A. Several times.
Q. Yes. So a conspiracy -- this conspiracy that you allege doesn't include eliciting false testimony from Mary Prekop because there was none; right?
MS. GIZZI: Objection. Form.
Q. That's what you're saying if she testified truthfully.
MS. GIZZI: Objection.
A. That's not what I'm saying, no.
Q. Are you saying she did not testify truthfully?
A. I'm sure she didn't testify truthfully.
Q. So how would Marianne Popko's questioning of her further a conspiracy to convict you? Can you help me understand what it is you're saying?
A. Ma'am, I was confused. I thought you meant Mary Prekop. I'm sorry. Can you rephrase that question again?
Q. How would Marianne Popko -- the Springfield police officer that you have named in this case is named Marianne Popko and you testified that you feel she's part of a conspiracy because you

Page 112

have seen documents that she questioned Mary Prekop; right?
A. Yes.
Q. Isn't that what you just testified to?
A. Yes.
Q. But that questioning did not result in an identification of you; isn't that correct?
A. Never said it did, ma'am.
Q. So how did Marianne Popko, the Springfield police officer's questioning of Mary Prekop further a conspiracy to wrongfully convict you?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
Q. How is it related?
A. In my opinion? She was involved in the investigation. Simple as that.
Q. So anybody who did anything investigating the case whether it resulted in evidence that was detrimental to you or not is part of a conspiracy. That's the basis of your claim as you sit here today.
MS. GIZZI: Objection. Calls for a legal conclusion. Counsel is testifying. Misstates his testimony.

Page 113

A. Now you're putting words in my mouth.
Q. I don't want to put words in your mouth so why don't you explain it to me. How did Marianne Popko's questioning of Mary Prekop further the conspiracy that you allege in your complaint?
A. I don't know how it furthered it but I'm just -- I allege that she was involved in the investigation.
Q. Okay. Let's move on. I would like to turn to the outcome of the charges that you faced arising out of the events from November and December of 1985; okay? So you were convicted of assault and battery and breaking and entering relative to the Ellendale Circle robbery, attempted robbery on December 6th and 7th; correct?
A. Yes.
Q. And you were also convicted of armed assault in connection with that; is that correct?
A. Yes.
Q. And you were convicted of -- relative to the snatching of the purse you were convicted of -- sorry. They're right here. Unarmed robbery; is that correct?
A. Yes.

Page 114

Q. And assault and battery on a police officer; is that correct?
A. Yes.
Q. And you were sentenced as a result of those; correct?
A. Correct.
Q. And do you remember what your sentences were?
A. I believe it was a ten to 12 with a six to nine concurrent.
Q. So for the burglary does it refresh your recollection that on December 13, 1987 you were sentenced to serve 15 to 20 on and after?
A. No, ma'am. It's not correct.
Q. And on the armed assault in a dwelling you were convicted of -- you were sentenced to ten to 12 years?
A. Yes. That's what I just said.
MS. deSOUSA: I would like to have this marked and for the record it is Bates City of Springfield 005896 through --
MS. GIZZI: Is this a new document?
MS. deSOUSA: 5899. No, no.
MS. GIZZI: I'm sorry. I meant has

Page 115

this not been previously produced?
MS. deSOUSA: No. I like to have it marked now.
(Exhibit 6 was marked for identification.)
Q. Have you had a chance to look at this, Mr. Perrot?
(Witness perused document.)
A. I have, ma'am.
Q. Okay. And is this a copy of your indictment for the breaking and entering at 87 Malibu Drive, the house of Joseph McNabb?
A. No.
Q. I'm sorry. You're 87 Malibu Drive but in the home of Joseph McNabb?
A. Yes.
Q. And the indictment number we can agree is 855414?
A. Correct.
MS. deSOUSA: So we're going to go back to Exhibit 2. Thanks for keeping me on track here, Tyler.
Q. Can you go to Page 155 in their numbering or Bates number 005868. Are you there?

Page 116

A. I am.
Q. Can you go to the last entry on that? Do you see where it says armed assault in a dwelling 855414. That's the indictment for Mr. McNabb's house; right?
A. Correct.
Q. And it was ten to 12 years; correct?
A. As I previously stated, yeah.
MS. deSOUSA: I'd like to have this marked as seven, please. For the record this is Bates number COS our production 006005 and 006004.
(Exhibit 7 was marked for identification.)
Q. Have you had a chance to look through that, sir?
(Witness perused document.)
A. I have, ma'am.
Q. Say again?
A. I have.
Q. Would you agree with me, sir, that this is the indictment for the stealing of the pocketbook from Denny's that we testified to earlier. You testified to earlier.
A. Yes, ma'am.

Page 117

Q. And can you agree with me, sir, that this is indictment 855426?
A. It is.
Q. Can you go back to the Exhibit 2 now, please? And were you convicted, sir, to six to nine years for unarmed robbery as a result of the Denny's assault?
MS. GIZZI: Objection.
Q. I'm sorry. Robbery.
A. I was, ma'am.
Q. And neither of those convictions have ever been overturned; is that correct?
A. None of them were challenged, no.
Q. I'm sorry. I didn't hear you.
A. It was part of a plea agreement, no.
Q. So, no, they've never been disturbed?
A. No.
MS. de SOUSA: I would like to have this marked as Exhibit 8.
(Exhibit 8 was marked for identification.)
MS. deSOUSA: For the record this is Bates 005998 through 006003.
Q. Can you look through this, please?

Page 118

A. That's not the number I got, ma'am.
Q. What number do you have, sir?
A. 855425.
Q. I'm sorry. The Bates numbers is what I was talking about. I apologize.
A. Excuse me?
Q. You're talking about the indictment number and I was putting the Bates numbers on the record.
A. Oh.
MS. GIZZI: It's just to keep the paperwork straight later.
(Witness perused document.)
Q. Have you had a chance to look at that, sir?
A. Yes.
Q. Will you agree with me that this indictment is numbered 855425; correct?
A. Correct.
Q. And this indictment relates to a break-in at -- strike that. At Emily Lichwala's house on November 30th while armed with a pool cue; correct?
A. Yes.
Q. And you were convicted of that; correct?
A. Correct.

Page 119

Q. And if we go back to Exhibit 2 and you look at their page number 157. Are you on that page, sir?
A. I am.
Q. Do you see that you were sentenced on December 14, 1987 to 15 to 20 years as a result of the break-in at Emily Lichwala's house; correct?
A. Concurrent, yes.
Q. Concurrent with?
A. Life sentence.
Q. A life sentence, correct, and this conviction has never been overturned for Emily Lichwala; correct?
A. No.
Q. No, it's not correct or, no, it has never been overturned?
A. No. It's never been turned over.
Q. So you stood convicted and needed to serve a minimum of 15 years for Emily Lichwala and ten for the armed assault at McNabb's house; correct?
MS. GIZZI: Objection. Form.
A. No. That's not the way it happened, ma'am. The 15 to 20 was run with the life sentence not with the ten to 12. I had to serve ten to 12 before I even got to the life sentence.

Page 120

Q. Right. That's on and after. So you would have done ten years on the armed assault and then 15. So regardless of whether you were convicted of rape or not you were going to be in for 25 years; correct?
MS. GIZZI: Objection. Form.
A. Absolutely not, ma'am. You've got your numbers a little mixed up there.
Q. Well, would you like to tell me what you think the numbers say?
A. You've got a sentence running concurrent with one sentence. It goes with that sentence.
Q. So you think because the rape was overturned it undid your sentencing on the Emily Lichwala?
A. Absolutely did.
Q. All right. Thanks. Can you look back at Exhibit 3, please, sir? Four.
A. Which one was that, ma'am?
MS. GIZZI: The CORI.
Q. So, sir, can you look at Page 10 of 19 of your CORI?
A. Okay.

Page 121

Q. So on offense five of 23, do you see that 855414; right?
A. Yes.
Q. And we previously established that that is the McNabb house break; correct?
A. Correct.
Q. And the conviction stands according to your CORI; correct?
A. Yes.
Q. Can you look at the next page, please, sir? I'm sorry. Not the next page. Page 13.
A. Thirteen?
Q. Thirteen of 19, sir. Are you there?
A. I am.
Q. I'm sorry?
A. I am, yes.
Q. Can you look at 855425?
A. Yeah.
Q. And we have previously agreed that that is the Emily Lichwala indictment; correct?
A. Yes.
Q. And do you see that that conviction stands?
MS. GIZZI: Objection. Form.

Page 122

A. That's what it states here, ma'am.
Q. Thank you. Mr. Perrot, can you tell me when you were first -- can you tell me an overview of what DOC facilities you were in during the period of your incarceration?
A. All the facilities I was in?
Q. Yes, please.
A. Walpole.
Q. When were you at Walpole?
A. '87. I transferred to Concord to get my number maybe a couple weeks later and I got transferred back to Walpole. I got transferred here to Gardner in '87. Then I got transferred back to Walpole.
Q. When?
A. '87.
Q. How long were you at Gardner?
A. Only a couple weeks. I got transferred to Norfolk DSU program.
Q. How long were you in Walpole before you went to Norfolk?
A. Maybe three years.
Q. Around 1990 you think you went Norfolk?
A. Yeah.

Page 123

Q. How long were you there?
A. I was there for maybe five months.
Q. Then where did you go?
A. I went back to Walpole.
Q. How long were you at Walpole this time?
A. Couple years maybe.
Q. Then where?
A. Then I went to Old Colony maybe '93. '92, '93 maybe.
Q. How long were you there?
A. I was there maybe four to five months maybe.
Q. Then where?
A. Back to Walpole and I remained at Walpole until they opened up Shirley max and then I got transferred to Shirley max.
Q. When was that?
A. I can't recall. The year they opened it, ma'am.
Q. Approximately is fine.
A. Maybe the late nineties.
Q. How long did you stay there?
A. Until I was released in 2016.
Q. So you stayed at Shirley max for the

Page 124

remainder of your sentence?
A. Yes.
Q. Okay. And can you tell me in general about your disciplinary history while you were at Walpole?
MS. GIZZI: Objection. Form.
A. General like what my disciplinary actions were?
Q. Yes.
A. There was an array of things. Fights, attempted escapes, drugs.
Q. Anything else that you can remember?
A. Several problems with the officers. That's basically what my D boards consisted of.
Q. I'm really having a lot of trouble understanding you, sir.
A. Basically just problems with the cops, drugs and other inmates.
Q. And did you have an enemies list, sir?
A. I'm sure I did, yeah.
Q. Have you ever seen it?
A. I've seen a couple of them, yeah.
Q. How many enemies did you have listed?
A. I didn't have any listed.

Page 125

Q. You didn't have anybody on your enemies list?
A. That's not what I said, ma'am.
Q. How many did you have listed on your enemies list?
A. Several. If you got into a fight with somebody, they go on your enemy list. I personally never put anybody on my enemy list.
Q. How many people to the best of your recollection were on your enemies list?
A. A lot, ma'am.
Q. Was it more than 25?
A. Probably.
Q. More than 30?
A. No. I wouldn't say more than 30. It's probably in the twenties maybe.
Q. Were you associated with a gang when you were in prison?
A. Absolutely not.
Q. You weren't in a white supremacist gang?
A. No.
Q. There was no time where you were --
A. Never, ma'am.
Q. -- facing disciplinary charges for

Page 126

involvement with a white gang?
A. No.
MS. GIZZI: Objection. Form.
Q. In 1995, sir, did you have an incident with -- I'm sorry. Strike that. Did you have a fiancee in or about 1995 while you were incarcerated?
A. I did.
Q. What was her name?
A. Kim Moran.
Q. Kim?
A. Moran.
Q. M-O-R-A-N?
A. Yes.
Q. Where did she live at the time?
A. Malibu Drive.
Q. Malibu Drive in Springfield, Massachusetts?
A. Yes.
Q. So did you grow up on the same street as her?
A. We were neighbors, yes.
Q. She lived there when you lived there?
A. Yes.

Page 127

Q. And when did you begin having a romantic relationship with her?
A. When I was at Norfolk in the phase program.
Q. When was that, sir?
A. I believe '93 maybe. '92, '93.
Q. How did that come to happen? How did you get back in touch with her or she with you?
A. I might have been talking to my sister at the time and --
Q. Which sister?
A. Nancy that lived on Malibu and she came up to see me and --
Q. She being Nancy came up to see you?
A. No. Kim came up to see me.
Q. What did this have to do with you talking to Nancy. You said --
A. She must have been over her house when I called at one point and I talked to her.
Q. Then following that conversation you believe she came to visit you?
A. I know she came to visit me, yeah.
Q. And then you began a romantic relationship?

Page 128

A. Yes.
Q. And when did you become engaged?
A. I don't recall the specific time, ma'am, or day or year. It was after -- it was a while. Maybe a year later.
Q. How long did you continues in a romantic relationship with Miss Moran?
A. Until my case was overturned the first time.
Q. When was that, sir?
A. No. Excuse me. The second time. 2001 maybe.
Q. In 2001?
A. Yes.
Q. And that's when you stopped being romantically involved with Miss Moran?
A. No. It was after I was returned to prison.
Q. In 1995, sir, did you and she get caught attempting to bring heroin into the facility?
A. Yes.
Q. Can you tell me what happened?
A. What happened? I was locked up. We were inside the prison.

Page 129

Q. You were inside a prison?
A. Yes, and go to segregation, ma'am.
Q. How did the scheme come into play, sir?
MS. GIZZI: Objection to form.
A. How did the scheme come into play?
Q. Correct.
A. I don't understand the question.
Q. So how did you and she make a plan to get heroin into the prison?
MS. GIZZI: Objection. Form.
A. I asked her to bring it in.
Q. How did you ask her? What was the form of your communication?
A. I simply asked her.
Q. You wrote her letters, didn't you?
A. Absolutely.
Q. And you gave her detailed instructions in those letters; correct?
A. Probably, yeah.
Q. About where to go to buy the heroin; correct?
MS. GIZZI: Objection. Form.
A. Probably yeah.
Q. And what address to go to?

Page 130

MS. GIZZI: Objection. Form.
A. Probably.
Q. And had you arranged for $400 to be sent to her to purchase the heroin?
A. Probably.
Q. Do you recall that, sir?
A. Yeah. I recall it. I don't recall the exact amount. Ma'am, you're talking about things that happened 30 years ago, 25 years ago. I don't remember exact times, dates and numbers, no.
Q. But you did recall having some amount of money sent to her in order for her to purchase heroin; correct?
A. Yes, I do.
Q. And then you instructed her where to go to buy it; correct?
MS. GIZZI: Objection. Form.
A. As I previously stated, yes.
Q. And then you had her come to the prison with it, correct?
A. Yes.
Q. And then what happened?
A. As I previously stated, we got caught and I was put in segregation.

Page 131

Q. And how did you get caught?
A. I don't know how to answer the question, ma'am. They found the heroin and I got caught with it.
Q. Was it on you or was it on her?
A. It was on the floor.
Q. And she was charged criminally; correct?
A. She was.
MS. GIZZI: Objection. Form.
Q. What was the outcome of those criminal charges?
A. I believe she got a continued without a finding but I'm not sure.
Q. When is the last time you were in touch with Miss Moran?
A. I seen her. When I got out in 2016 when I had visited my sister, I seen her.
Q. So when you got out in 2016, you visited one of your sisters?
A. Yes.
Q. Which sister was that?
A. Nancy.
Q. Is that the last time you saw Nancy?
A. Yeah.

Page 132

Q. And you believe you saw Miss Moran that day?
A. I don't know if it was that day but I was at one point I was visiting my sister, yeah.
Q. Did you visit your sister more than once in 2016?
A. Well, I was there visiting. I stayed a couple days.
Q. At your sister's house?
A. No, not at my sister's house, no. I stayed in Springfield a couple days.
Q. Where were you staying in Springfield?
A. My stepsister's house.
Q. What's your stepsister's name?
A. Thea Glidden.
Q. Say again?
A. Thea Glidden.
Q. T-H-E-A?
A. Yes.
Q. And the last name is?
A. Glidden.
Q. L-I-N?
A. I'm not sure how to spell it, ma'am.
Q. Where does she live?

Page 133

A. She lived in Chicopee at the time.
Q. Where does she live now?
A. No idea.
Q. What's the last address you knew her to be living at?
A. She lived in apartments in Chicopee. That's all I know.
Q. You don't know what street the apartments were on?
A. I don't, ma'am.
Q. Is Lin her birth name or her married name?
A. Her last name?
Q. Her last name.
A. Yeah. It's her birth name.
Q. It's her birth name?
A. Yes.
Q. Was she ever married?
A. Not to my knowledge, no, ma'am.
Q. When is the last time you saw her?
A. 2017 maybe.
Q. 2017. You've had no contact with her since then?
A. No.
Q. So you were staying with her but you think

you saw Miss Moran during that time?
A. I did see her, yes, ma'am. It was the day I visited my sister. I don't know whether it was the first day I was in Springfield or second day. When I visited my sister, I seen Kim Moran.
Q. Did she continue to live on Malibu Drive, Miss Moran?
A. She still lives there to this day, yes.
Q. And how do you know that?
A. Because she hasn't moved.
Q. How do you know that if you don't have any contact with her?
A. Well, okay. I'm assuming she still lives there.
Q. Have you had any contact with her?
A. I just told you, ma'am, not since 2017. That answer is not going to change.
Q. And what were the circumstances around the end of your relationship with Miss Moran?
A. Well, ma'am, I got arrested for smuggling heroin into a prison facility so I think that kind of ended our relationship.
Q. Could you repeat your answer?
A. I was arrested for smuggling heroin into a



correctional facility. That ended our relationship.
Q. Sir, you just testified that -- the smuggling happened in 1995, didn't it?
A. Is that what it says, ma'am?
Q. Mm-mm.
A. Okay. Then it was 1995.
Q. And you just testified that your relationship with her, the engagement to her didn't end until 2001.
A. Rephrase that again, please.
Q. When did your relationship with her end?
A. I don't remember the year.
Q. I can't hear you.
A. I don't remember the year, ma'am.
Q. Do you remember minutes ago testifying that when you were released --
A. Yeah. I was a little confused about what I said because so many things. I mean it happened years ago, ma'am.
Q. So do you believe that you and she stopped having a relationship immediately after she was arrested for heroin --
A. No, it wasn't.
Q. Let me finish my questions and I'll try to



let you finish your answers; okay? I know we've both been at it for a while. Do you believe it was immediately after she was arrested for the heroin?
A. No. No. I believe I continued a relationship with her.
Q. For how long?
A. I can't tell you how long.
Q. Do you recall who ended the relationship? Was it you or she?
A. I'm pretty sure she did.
Q. Do you recall any of the circumstances around that?
A. No, I don't.
Q. In addition to the smuggling of the heroin you and she were involved in a plan to break you out of prison; isn't that correct?
A. Yes.
Q. And you had those plans laid out in the same letters where you told her to go -- where to go to get the heroin; correct?
A. Correct.
Q. And were you charged with that?
A. I was.
Q. What was the outcome of that, sir?



A. I was put in segregation.
Q. How long were you in segregation as a result of that?
A. I don't recall how long, ma'am.
Q. I'm sorry?
A. I don't recall how long I was in there for. I don't.
Q. Were you charged criminally as a result of that?
A. No.
Q. At some point you were charged criminally with an escape attempt; correct?
A. Yes.
Q. That was in 1987?
A. Yes.
Q. Can you tell me what happened then?
A. I tried to escape.
Q. Where were you at that time?
A. Gardner.
Q. Gardner. Here? You were here?
A. Yes.
Q. You were charged criminally with that; correct?
A. I was, yes.

Page 138

Q. And you had two years added to your sentence, didn't you, as a result of that?
A. I believe it was a year.
Q. You think it was a year?
A. Yeah.
Q. And that would have been in addition to the ten to 12 and the 15 to 20 that we've already talked about; correct?
A. No. It ran concurrent.
Q. You believe there was a concurrent sentence?
A. I believe it was.
Q. Okay. That's easily verified. You had another time that you were charged with attempted escape, correct, and you were apprehended in Maine?
A. I left, yeah, to Maine. Yeah.
Q. You were charged with escape; correct?
A. No.
Q. Well, you were apprehended as a fugitive.
A. Okay, but they didn't charge me with escape.
Q. What do you believe you were charged with?
A. You just said I was charged with escape. I wasn't charged with escape.

Page 139

Q. What do you believe you were charged with?
A. I wasn't charged at all.
Q. What happened after they apprehended you?
A. Sent me back to Mass.
Q. Sent you back to prison?
A. Yes.
Q. And that was because your grant of a new trial had been overturned by the Appeals Court; correct?
A. Correct.
Q. And who were you with when you were apprehended?
A. I believe I drove up there with Kim.
Q. With Kim?
A. Yeah.
Q. And that was in 2005?
A. Maybe 2001.
Q. So you were still seeing her then?
MS. AGBIRO: Objection. Form.
A. She's been my childhood friend. We weren't in a relationship.
Q. You weren't in a relationship?
A. No.
Q. Was she charged?

Page 140

A. No.
Q. So when you were released in 2017, sir, where did you first reside?
A. Methuen, Mass.
Q. Methuen?
A. Yes.
Q. M-E-T-H-U-E-N?
A. Yes.
Q. And with whom did you reside?
A. Sherrie Frisone.
Q. Sherrie Frisone?
A. Yes.
Q. And that's F-R-I-S-S-O-N-E?
A. F-R-I-S-O-N-E.
Q. S-O-N-E. And that's the same person that you said continues to deposit money into your account here for you?
A. Yes.
Q. How much does she deposit for you?
A. Canteen money.
Q. I don't know what that means, sir. How much?
A. It varies. She doesn't send me the same amount every time.

Page 141

Q. Approximately how much does she send you?
A. A hundred dollars. $200.
Q. Every month?
A. Yeah.
Q. And how do you know Miss Frisone?
A. I met her at Shirley.
Q. And under what circumstances did you meet her at Shirley?
A. It was on a Cursillo.
Q. I'm having a lot of trouble hearing you.
A. It was on a Cursillo.
Q. I don't know what that means.
A. It was a religious retreat they held at the jail.
Q. It was a religious retreat that they held at Shirley?
A. Yes.
Q. Shirley max?
A. Yes.
Q. And she was a participant in that?
A. Yes.
Q. Did you participate in that as well?
A. Yes.
Q. How long were you involved in that

Page 142

organization?
A. It's like a three-day. It's just a three-day thing. Like people would come in and just tell their stories. There was like no participation on our part. We'd just sit and listen.
Q. Okay. When you say people would come in and tell their stories, what people would come in? Former inmates?
A. No. Just people from the community that had problems in their lives.
Q. And was she one of the speakers?
A. Everybody involved spoke.
Q. So she came in spoke and told her story?
A. Yes.
Q. And then how did you become further acquainted with her?
A. She used to come up to the church on Sundays.
Q. So you went to this event. What is it called again? I'm sorry.
A. A Cursillo.
Q. C-H-R-I-S-E-O?
A. I couldn't tell you the spelling, ma'am. I'm horrible at spelling.

Page 143

Q. And when does this take place, this Cursillo?
A. When does it take place?
Q. Like is it a certain time of year?
A. No. No.
Q. Various times during the year?
A. Yeah.
Q. And do you recall what year it was when you first met Miss Frisone?
A. Maybe 2010. No. Before that. Maybe 2009 or 2010 maybe.
Q. 2009 or '10?
A. Yes.
Q. And then she would come to services at Shirley max?
A. Yes.
Q. And what sort of services? Like mass?
A. Yeah. Catholic mass.
Q. Catholic mass. And you would go to Catholic mass also?
A. Yes.
Q. And you were a regular attendee at Catholic mass while you were at Shirley max?
A. I was, yes.

Page 144

Q. So over time after you saw her for the first time in 2009 or 2010 you became further acquainted with her?
A. Yes.
MS. AGBIRO: Objection. Form.
Q. At some point did you develop a more personal relationship with her?
MS. AGBIRO: Objection. Form.
A. Yes.
Q. And at some point did that relationship become romantic?
A. Yes.
Q. When was that, sir?
A. I don't know the specific date, ma'am. It was later on after maybe a year, maybe two. I don't know.
Q. It was before you were released though?
A. Yes.
Q. And so if you were released in -- was it two or three years before you were released?
A. When you say romantic, like we had a relationship but it wasn't -- you know, there was no like romance involved.
Q. Well, you were incarcerated at the time; correct?

Page 145

A. Yes.
Q. But did you consider her a romantic interest?
A. It was becoming that, yeah.
Q. Did you identify her as your girlfriend?
A. You could say that, yeah.
Q. So when you got out of prison, you started living with her; correct?
A. Yes.
Q. And that was in Methuen, Mass.
A. Yes.
Q. And what was your address in Methuen, Mass.?
A. I don't know. It was an apartment at the time. I can't remember the name of the apartments.
Q. Do you remember the name of the street?
A. I don't, ma'am.
Q. How long did you live in the apartment with Miss Frisone in Methuen, Mass.?
A. Maybe six months. Maybe six months. We didn't live there long.
Q. Did you move out with her?
A. Yes.

Page 146

Q. And where did you next move to?
A. Haverhill.
Q. Haverhill.
A. Yeah.
Q. And what was the address you moved to in Haverhill?
A. I don't know. The name of the street was Groveland. I forget the number.
Q. The name of the street was what?
A. Groveland.
Q. Groveland?
A. Yes.
Q. And that was in Haverhill?
A. Yes.
Q. Was that an apartment or a house?
A. No. It was a house.
Q. Did she own that house?
A. She did, ma'am.
Q. Does she still?
A. She does, yes.
Q. Does she still live there?
A. No.
Q. Who lives there now?
A. She rents it. I don't know.

Page 147

Q. Who did you live with in Methuen besides her?
A. Just me and her.
Q. And who did you live with on Groveland Street besides her?
A. Just me and her.
Q. How long did you live with her there?
A. At Groveland?
Q. Yes.
A. We were there maybe a year.
Q. Then where did you go?
A. Broadway.
Q. Still in Haverhill?
A. Yes.
Q. And what's the number on Broadway?
A. 1151.
Q. And does she continue to live there?
A. She does.
Q. How long did you live there, sir?
A. From the time we moved out of Groveland until I went back to jail.
Q. When you went back to jail March of this year?
A. Yes.

Page 148

Q. You lived other places during that time period too though, didn't you, sir?
A. Temporary, yeah.
Q. What do you mean by temporary?
A. Well, she kicked me out of the house a few times.
Q. Were the police involved?
A. No.
Q. When did she kick you out of the house?
A. Specific dates I have no idea.
Q. When is the last time she kicked you out of her house?
A. Before I was -- just before I was arrested.
Q. Before you were arrested which time, sir?
A. For this case I'm serving time for now.
Q. Lawrence? Were you arrested in Lawrence?
A. Yeah.
Q. Okay. So when you were arrested in Lawrence or when you were violated and are in now as a result of a violation?
A. Ma'am, it's been an ongoing relationship. She's kicked me out several times. Let me put it that way.

Page 149

Q. Okay. So did you live for a period of time in a rooming house?
A. No.
Q. Do you know someone by the name of Alissa Griffin?
A. It's a sober house, ma'am, not a rooming house.
Q. Do you know someone by the name of Alissa Griffin?
A. Yes.
Q. And did you live with her?
A. Yes.
Q. And what was the address?
A. I can't remember. It was a sober house.
Q. What town?
A. Haverhill.
Q. Haverhill.
A. Yeah.
Q. And what street?
A. I can't remember the name of the street.
Q. I'd like you to look at Exhibit 4 which I think is your CORI. Sir, do you see you were arrested on March 8, 2017 for reckless operation of a motor vehicle in Chicopee, Massachusetts?

A. That's on Page 4?
Q. I'm sorry. I didn't hear what you asked me, sir. I'm sorry.
A. That's on Page 4?
Q. I don't know. I actually don't have it in front of me. Let me pull it up. Do you see it on there?
A. No.
Q. Do you recall being arrested in Chicopee, Massachusetts?
A. I do.
Q. And do you recall being arrested in Chicopee, Massachusetts for reckless operation of a motor vehicle?
A. I do, ma'am.
Q. And was that when you were staying with your stepsister?
A. No. I was visiting.
Q. You were visiting your stepsister?
A. Yes.
Q. And the next time that you were arrested do you remember that to be October 10, 2017?
A. If that's what it states, ma'am.
Q. I'm asking you, sir.



A. I was arrested a couple times, ma'am. If that's the date you're referring to, then that's the date.
Q. And you were charged with leaving the scene of a property damage accident and negligent operation; is that correct?
A. That's the same case. Oh, no. That's a different case. Yes.
Q. October of 2017; right?
A. Yes.
Q. How about April 2018, operating after suspension?
MS. GIZZI: Objection. Form. Is there a question?
Q. Do you recall that?
A. I remember being arrested for that crime, yes.
Q. In Haverhill?
A. In Haverhill yes.
Q. And you pled to that; correct?
A. I did, yes.
Q. And then in May of 2018 you were arrested for assault and battery on Alissa Griffin; correct?
A. Yes.



Q. And you pled guilty on May 9, 2018?
A. Say that again.
Q. You pled guilty to those charges?
A. What date was I arrested?
Q. May 7th.
A. Yeah. That's more like it. I pled guilty at my arraignment two days later, yes.
Q. May 9th you pled guilty; correct?
A. Yes.
Q. And you were sentenced to 21 months in the house of correction. Do you recall that?
A. I think it was 60 days, ma'am.
Q. Do you want to look at your CORI?
A. I don't need to look at it, ma'am. It was 60 days.
Q. All right. What were the circumstances around your assaulting Alissa Griffin?
MS. GIZZI: Objection. Form. Misstates the testimony.
A. What were the circumstances? We were drinking and smoking crack cocaine.
Q. Okay.
A. And we got in an argument over my phone. I tried to get my phone from her and we both fell to



the ground. She smacked her head on the ground.
Q. Were there witness statements that contradicted that, sir?
A. Excuse me?
Q. Were there witness statements that contradicted the version that you just gave us?
A. No.
Q. Were you next arrested on January 7, 2019 and you were indicted on May 8, 2019 and charged with rape, resisting arrest, A and B on a police officer, open and gross lewdness?
MS. GIZZI: What page are you referring to in the CORI?
MS. deSOUSA: I'm not.
A. Was I arrested on that date? Yes.
Q. And for those charges that I just read?
A. Yes.
Q. Okay. And what was name of the victim?
A. Lisa. I don't know her last name. Vanderboker or something.
Q. Vanderboker?
A. Vanderboker.
Q. When is the last time you saw Lisa Vanderboker?

Page 154

A. That night.
Q. The night that you were arrested?
A. Yes.
Q. I'm sorry. I meant to ask you. When is the last time you saw Alissa Griffin?
A. I don't even know.
Q. Did you see her after the arrest that we were just speaking of in May of 2018?
A. I've seen her in passing but that's it.
Q. Where were you living? You were living in a sober house in Haverhill with her?
A. No.
MS. AGBIRO: Objection. Form.
Q. Where were you living with her?
A. I wasn't living with her at all.
Q. She's listed as a family member. Is she related to you?
A. No.
Q. You didn't have the same address?
A. No.
Q. Did you identify her as a girlfriend?
A. No.
Q. How did you know her?
A. She lived around the corner from the house

Page 155

I was living in on Groveland Street.
Q. On Groveland Street. And was she a girlfriend?
A. No.
Q. Was that during one of the times that Miss Frisone had kicked you out?
A. Yes.
Q. Had she kicked you out before or after or both?
MS. AGBIRO: Objection. Form.
A. She has kicked me out several times, ma'am.
Q. When you met up with Alissa Griffin, were you living with Miss Frisone at that time?
A. No.
Q. When did you start living with her again after pleading guilty on May 9, 2018?
A. When I got out of jail.
Q. How about the incident in Lawrence with Lisa Vander -- what did you say? Vanderboker?
A. I don't know how to pronounce the name either, ma'am, so.
Q. Do you know how to spell it?
A. Not even close.

Page 156

Q. Okay. When did you last see her? That night?
A. That night. Yes.
Q. Do you have any idea what her address was at the time?
A. She was a street girl, ma'am. I don't know. I don't think she had an address.
Q. You think she was homeless or unhoused?
A. I believe she was living in a shelter, yeah.
Q. You pled as a result of those charges in February of 2020; correct?
A. Not all the charges, no, ma'am.
Q. But as a result of those charges you did enter a guilty plea?
A. Yes.
Q. And you pled to open and gross. I'm sorry. Indecent A and B. Is that what you pled to?
A. Yes.
Q. And what about the resisting arrest?
A. I believe that was part of the plea, yes.
Q. And do you recall, sir, that you had some conditions that you were supposed to adhere to when you entered that plea?

Page 157

A. Yeah. Yeah.
Q. Do you recall that one of them was that you were to not use drugs or alcohol and you were going to be subject to random screens. Do you recall that?
A. I do, yeah.
Q. And did you remain drug or alcohol free?
A. No.
Q. How long did you remain drug or alcohol free?
A. I really couldn't tell you, ma'am.
Q. Was it months?
A. It might have been.
Q. Could it have been more than a month?
A. Could have been.
Q. When did you first have a positive drug screen?
A. Within weeks after I got probation.
Q. So within a couple of weeks you had started using?
A. Yes.
Q. Did you undergo substance abuse and/or alcohol evaluation as a condition of your probation?
A. I spoke with a counselor, yes.

Page 158

Q. Who was that?
A. Her name is -- what was her name? I can't recall her name right now.
Q. How many times did you see her?
A. I spoke with her often. I'm just drawing a blank on her name.
Q. You said I spoke with her. It was during Covid or Covid was just about to start. Were you having virtual visits with her?
A. Yeah. We'd talk on the phone mostly.
Q. Okay. But you don't recall where her office was?
A. She's out of Charlestown, ma'am.
Q. Charleston?
A. Charlestown.
Q. Charlestown?
A. In Boston, yeah.
Q. And do you know what agency she worked for?
A. I don't, ma'am.
Q. Did you have to submit proof of that to your probation officer?
A. She sent monthly reports, yeah.
Q. And have you requested copies of those

Page 159

reports from your probation officer?
A. No, I haven't. Sarah Coughlin. I'm sorry.
Q. Say again?
A. Sarah Coughlin is the name. I'm sorry.
Q. Sarah Kaufmann?
A. Coughlin.
Q. Coughlin. C-O-U-G-H-L-I-N?
A. Ma'am, I'm horrible at spelling so.
Q. Did you ever undergo a trauma evaluation?
A. I believe I did, yes.
Q. And who did that?
A. I think it was someone from the court.
Q. Somebody from the court?
A. Yes.
Q. Do you recall when?
A. I don't, ma'am.
Q. What court?
A. I believe it was Lawrence.
Q. Lawrence District?
A. Superior.
Q. So Essex Superior?
A. Yes.
Q. And have you sought copies of those

Page 160

records?
A. I haven't, ma'am.
Q. And did you have a psychological evaluation and follow any recommendations for treatment?
A. I have, yes.
Q. Who did the psychological evaluation?
A. Dr. Clark.
Q. Dr. Clark?
A. Yes.
Q. Where is he out of or she?
A. BMC in Boston.
Q. BMC meaning?
A. Boston Medical Center.
Q. And when did you have that done?
A. I don't know the exact date or month.
Q. Was it in 2020?
A. It may have been.
Q. Have you gotten copies of those records?
A. I haven't, ma'am.
Q. Okay. And how about have you remained medication compliant?
A. I was, yes.
Q. What medication were you on at the time

Page 161

that you received probation?
A. I believe he started me off with Zoloft or something like that.
Q. When you say he did, who?
A. Dr. Clark, ma'am.
Q. Dr. Clark?
A. Yes.
Q. So you were already seeing Dr. Clark before you entered the plea?
A. I was mandated by probation to see him.
Q. And you think that he put you on Zoloft?
A. I think that's the first thing he tried.
Q. And then what did you go on?
A. I can't remember the next one. I don't remember the name of it.
Q. How long were you on medication prescribed by Dr. Clark?
A. The whole time I was on probation until I was arrested.
Q. Until you got arrested which time?
A. This last time.
Q. And are you currently on any medication, sir?
A. I ain't, ma'am.

Page 162

Q. I'm sorry?
A. No, I'm not.
Q. You're not?
A. No.
Q. You don't have any prescriptions right now for any medication?
A. Just blood pressure.
Q. You got violated on that probation multiple times; is that a fair statement?
A. Yes.
Q. You were violated -- you pled on February 14, 2020; correct?
MS. AGBIRO: Objection. Form.
A. If that's what it says, ma'am.
Q. And then you violated on September 24, 2020; correct?
A. If that's what it states, ma'am.
Q. December 9, 2020; correct?
A. Again, if that's what it states.
Q. March 24, 2021; correct?
A. If that's what it states.
Q. May 17, 2021; correct?
A. If that's what it states in there, ma'am.
Q. July 7, 2021 you had a violation of

Page 163

probation hearing; correct?
A. If that's what the paper says, ma'am.
Q. And you stipulated at that time to violations related to testing positive for alcohol; correct?
MS. GIZZI: Objection. Form. Go ahead.
Q. And you were released in July of 2021 with the stipulation that you were to enter a treatment program; isn't that correct?
A. Yes.
Q. But you did not enter a treatment program.
MS. AGBIRO: Objection. Form.
Q. Correct?
A. I did.
Q. When did you enter a treatment program?
A. I was in Men's Stabilization in Jamaica Plain.
Q. When did you enter there?
A. After that plea, ma'am. Whatever the date was. I don't recall.
Q. If you were there in July of 2021, when did you enter this program?
A. Ma'am, I just stated I don't remember the

Page 164

date I went there.
Q. If you would assume you were there on July 7th, how long -- if you entered the --
A. How long was my stay there? Is that what you're saying?
Q. I'm sorry. No. How long after you were in court did you enter the program? Was it that day? Were you released directly to the program? Was it a week later, a month later?
MS. AGBIRO: Objection. Form.
A. I can't recall how it went to tell you the truth.
Q. How long did you --
A. I believe they -- it was -- I can't remember, ma'am. I really can't.
Q. How long did you undergo treatment at the Men's Stabilization program?
A. How long was I there? A month.
Q. One month?
A. Yeah.
Q. How long were you supposed to be there?
A. A month.
Q. Did they suggest aftercare?
A. No, they didn't.

Page 165

Q. Did you undertake any aftercare?
MS. GIZZI: Objection. Form.
A. I didn't.
Q. Were you violated again on March 9, 2022?
A. Again, ma'am, I don't have a really good memory on dates and times so if that's what it states, yes.
Q. On March 15, 2022 do you recall that you surrendered on a warrant and you were released to enter a sober house, Sober House, Inc., remain drug and alcohol free and report to John Carlson in Lawrence. Do you remember all that?
A. Yes.
Q. Did you enter Sober House, Inc.?
A. I did.
Q. How long were you in Sober House, Inc.?
A. Three, four months maybe.
Q. In August of 2022 you admitted to another violation of probation; correct?
MS. AGBIRO: Objection. Form.
A. If that's what it states, ma'am.
Q. And you admitted to committing the following crimes, A and B, threat to commit a crime, failure to attend the sober house.

Page 166

A. Excuse me?
Q. Do you recall that?
A. No. Can you restate that again?
Q. August 10, 2022 do you recall admitting to your violation of probation?
A. To them? You've got to read the whole thing you read. I admitted to charges of what?
Q. Failure to attend the Sober House, Inc. was part of your violation of probation; correct?
A. It may have been, yeah, but you stated there was a couple crimes involved there?
Q. Those are the crimes you were on probation for. Sorry.
A. Okay.
Q. And then you surrendered on March 8, 2023; correct?
A. Yeah. Yes.
Q. And March 22, 2023 you were sentenced for the violations of probation to one year and one day and that's why you're here today; correct?
A. Correct.
Q. And that relates back to the indecent A and B in Lawrence; correct?
A. Correct.

Page 167

Q. On March 9, 2022 were you arrested for assault and battery on a Joella Mudge?
A. I know I was charged with a threat against her. That was ultimately dismissed, yeah.
Q. It was dismissed due to lack of prosecution; right?
A. Yes.
Q. Because they couldn't find her?
A. No. She was in the courtroom, ma'am.
Q. You believe she was in the courtroom when the charges were dismissed?
A. She was, yes.
Q. When were the charges dismissed?
A. I don't know the date it was but she was in the courtroom. She was part of the hearing.
Q. What was her address at the time?
A. She lived in that sober house that you mentioned before. I don't know.
Q. The same sober house in the assault in 2020?
A. Yes.
Q. So what was your association with the sober house in 2022? Were you living there again?
A. No.

Page 168

Q. Did you tell the police that you had been living there for about a week?
MS. AGBIRO: Objection. Form.
A. At the time of my arrest, I had only been living there about a week.
Q. So you were living there again?
MS. AGBIRO: Objection. Form.
A. No. It's two different sober houses, ma'am. One's in Methuen. One's in Haverhill.
Q. So you were not living in the one from the 2020 --
A. One sober house is in Methuen.
Q. -- with Alissa Griffin?
A. I have never lived with Alissa Griffin, ma'am.
Q. Where were you living then?
MS. AGBIRO: Objection. Form.
A. I don't understand the question.
Q. Where were you living when you were charged with assaulting Alissa Griffin?
A. I was on the street, ma'am. I was living on the street.
Q. You were living on the street?
A. Yeah. I got kicked out, yes, of my house. Yes.

Page 169

Q. Okay. So then do you recall Joella Mudge telling the Haverhill Police that you had stated to her words to the effect of you had raped before and did time for it and you would rape again?
MS. AGBIRO: Objection. Form. Counsel, is the witness testifying or are you testifying?
MS. deSOUSA: Your objection is on the record.
Q. You can answer the question.
A. Can you rephrase that question again? Can you state that question again?
Q. Are you aware that Joella Mudge told the Haverhill Police words to the effect that you had said to her you had raped before and you would do it again. You had raped before. You did time for it and you would do it again. Do you recall her making that accusation against you?
A. I recall hearing that she told the police that, yeah. It was thrown out of court for lack of prosecution.
Q. In February of 2023 were you arrested for negligent operation of a motor vehicle?

Page 170

A. If that's what it states, yes.
Q. Did you plead guilty to that?
A. I believe I did, yes.
Q. And you were sentenced to one year in the house of correction?
A. Yes.
Q. And is this currently what you're in for?
A. It's part of the violation.
Q. And on also March 8, 2023 were you arrested for possession of a stun gun?
A. Yes.
Q. And those charges were dismissed; correct?
A. Yes.
Q. Did you have a stun gun?
A. It wasn't mine, no.
Q. Was it on your person?
A. No.
Q. And since your release from prison, have I reviewed all of the times that you recall being arrested?
A. Can you say that again?
Q. Are there any other times you were arrested other than the times we've just reviewed?
A. Not that know of, ma'am.

Page 171

Q. Sir, did you report -- did you tell anyone that you had attempted to commit suicide in February --
MS. GIZZI: Can we take a break real quick?
MS. deSOUSA: Bob, you need to mute yourself.
MS. GIZZI: Can we take a break real quick then?
MS. deSOUSA: Sure. Going off the record at 3:03.
(A break was taken.)
MS. deSOUSA: So we're going to go back on the record.
Q. Mr. Perrot, you know that you're still under oath; correct?
A. I do.
Q. Mr. Perrot, other than the providers you just testified to me about, Dr. Clark and Miss Coughlin, have you seen any other medical providers since your release from prison?
A. No.
Q. Have you received any other counseling?
A. Other than Sarah Coughlin?

Page 172

Q. Other than Sarah Coughlin.
A. No.
Q. Other than the two facilities that you've identified by name have you received any drug or alcohol treatment?
A. No.
Q. Have you gone to any 12-step programs?
A. When I was in Sober, Inc., that was part of living there. You had to do the 12-step program.
Q. Other than when you were living in a treatment facility have you participated in any 12-step programs?
A. No.
Q. Are you participating in any sobriety or 12-step programs while incarcerated here?
A. No.
Q. Have you had any other treatment at all for medical, physical, psychological, emotional problems other than what we've talked about here today since you were released?
A. No.
Q. Mr. Perrot, I'm sorry. Give me a minute to orient myself. Can you tell us in general when you first became aware of any issues with the hair microscopy science?

Page 173

A. Can you state that again, please?
Q. When did you first become aware that the evidence regarding the hair that was tested which I believe goes by the term hair microscopy; correct?
MS. GIZZI: Objection. Form.
Q. If I say hair microscopy analysis, do you know to what I'm referring?
A. Yes.
Q. When to the best of your recollection did you first become aware that the science underlying hair microscopy analysis was being questioned?
A. I don't know what year it was. I seen something on the TV that that was being challenged and the next day I asked Sherrie to look it up and she got me a pamphlet on it from -- I forget the guy's name.
Q. So you first became aware that the science was being challenged due to a television program that you were watching?
A. Yeah. I seen it on TV. Yeah.
Q. Nobody can hear you.
A. I did. I seen it on TV.
Q. Do you recall what program you were

watching?
A. I don't recall. I think it might have been just on the news in general. It was just like a flash and then they were talking about it. I had Sherrie look it up and she looked it up for me.
Q. And then she contacted someone and got a pamphlet but you don't recall the name associated with that pamphlet?
MS. AGBIRO: Objection. Form.
A. No, I don't.
Q. Without recalling the name of the person was it a scientist?
A. I want to say it was an FBI agent. I believe it was.
Q. Okay. And do you still have that pamphlet?
A. I don't, ma'am, no.
Q. Do you believe that Sherrie might have a copy of that pamphlet?
A. It was several years ago, ma'am. I couldn't tell you.
Q. So you think that you first became aware of the science being questioned around 2016?
A. No. It was way before then.



Q. You just said it was seven years ago so I was just doing the math in my head.
A. Well, I got out in 2016 but I heard about it prior to that.
Q. Approximately how long prior?
A. Maybe it was couple years I believe.
Q. Okay. And then as a result of you becoming aware of the science underlying hair microscopy being called into question, what next steps did you take?
A. I believe Sherrie contacted -- I don't remember his name. It was someone in -- it was in the pamphlet and she went to a convention I believe it was in Florida.
Q. She went to Florida to a convention?
A. Yeah. I believe it was in Florida.
Q. And as a result of that, what happened?
MS. GIZZI: Objection. Form.
A. She started contacting lawyers.
Q. Okay. Did you yourself, not your counsel. I don't want to know anything that your attorneys have told you or that you told your attorneys. Are we clear on that, Mr. Perrot?
A. Yes.



Q. I don't want that and that's not what I'm asking you; all right?
A. Yes.
Q. Have you yourself ever spoken with any scientist associated with the hair microscopy analysis separate from any expert you might have consulted in connection with your attorneys?
A. No.
Q. Okay. So during this period of time where you were on a fact seeking mission about this issue you never talked to any scientists?
A. No.
Q. Okay. Mr. Perrot, have you been diagnosed with any mental health conditions?
A. Yes.
Q. What are they?
A. PTSD.
Q. You've got to keep your voice up, Mr. Perrot.
A. PTSD, attention deficit disorder.
Q. ADHD?
A. Yes.
Q. Anything else?
A. PTSD.



Q. PTSD, ADHD. Anything else?
A. No.
Q. Depression?
A. No. I don't think I've been diagnosed with that, no.
Q. Anxiety disorder?
A. Not that I know of, no.
Q. Oppositional defiant disorder?
A. Not that I know of, no.
Q. Borderline personality disorder?
A. No.
Q. Bipolar?
A. No.
Q. Have you ever had treatment for or been diagnosed with anger control issues?
A. No.
Q. Have you received any counseling or treatment for anger-related issues during any of your periods of incarceration?
A. I took anger management classes.
Q. When was that, sir?
A. It would have been Walpole. I don't know what year.
Q. Can you give me a decade?

A. I'd say the nineties.
Q. Since then have you had any anger control issues? Strike that. Treatment. I apologize.
A. Before I got violated my last time my probation officer asked Sarah Coughlin to start treatment for an anger management program. We really never got into it.
Q. You didn't really get into it?
A. No. We just started talking. Then I got violated so I went to prison.
Q. You really have to try to keep your voice up.
A. I will, ma'am.
Q. It's taking me twice as long to do this because I have to repeat back every one of your answers so please try to keep your voice up. Sir, you alleged in your complaint that between 1984 and 1986 there was a series of assaults on women over 60. What did you base that allegation on?
MS. GIZZI: Objection. Form.
A. Again, ma'am, my lawyers wrote the complaint for me.
Q. You've got to keep your voice up.
A. I said again my lawyers drafted the



complaint for me.
Q. As we sit here today, are you aware of any series of assaults on women over 60 that occurred between 1984 and 1986 in Springfield, Massachusetts?
A. Just based on what I read in reports.
Q. What reports?
A. From the police department.
Q. Who is Mike Dupont?
A. Mike Dupont is a jailhouse lawyer.
Q. What does that mean, a jailhouse lawyer?
A. Someone that's in jail that has more knowledge of the law than the average bear.
Q. Does he have a law degree?
A. He might now. He's on the street. He might now.
Q. During the time you knew him did he have a law degree?
A. No.
Q. Did he assist you while you were incarcerated?
A. He helped me, yes.
Q. In what way did he help you?
A. Showed me how to research cases, look for issues within my transcripts.



Q. Did he write court pleadings for you?
A. He might have, yeah.
Q. Where is he currently residing?
MS. AGBIRO: Objection. Form.
A. No idea, ma'am. I haven't seen Mike Dupont in I don't even know how long.
Q. What was he in prison for?
MS. AGBIRO: Objection. Form.
A. I never asked him, ma'am.
Q. Whether you asked him or not did you know?
A. No.
Q. When was he released?
MS. AGBIRO: Objection. Form.
A. I don't know.
MS. deSOUSA: What form?
MS. AGBIRO: How is he supposed to know that?
MS. deSOUSA: Then he can say I don't know.
MS. AGBIRO: You're asking him to speculate.
Q. When was Mike Dupont released?
A. I don't know, ma'am.
Q. Do you know he was released?



A. Yes.
Q. Were you still incarcerated when he was released?
A. Yes.
Q. But you don't recall what year?
A. No.
Q. Do you remember where he grew up?
A. I didn't have that type of relationship with him, ma'am.
Q. In your complaint you allege that an 80 year old woman was raped and murdered in Springfield by someone after you were convicted. What were you referring to?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. It's a crime that happened in that town, ma'am.
Q. Where?
A. In Springfield.
Q. Where in Springfield?
MS. GIZZI: Objection. Form.
A. I don't know the neighborhood.
Q. When?
MS. GIZZI: Objection, form.

Page 182

A. Ma'am, I don't know the specific date. It was after I was arrested and incarcerated.
Q. How do you recall finding out about it?
MS. GIZZI: Objection. Form.
A. It was on the news I believe.
Q. In your complaint you allege that various defendants that you named in the complaint were familiar with you. How were the Springfield police officers named in the complaint familiar with you?
A. Well, I was arrested several times as a kid, ma'am, so I'm pretty sure they were familiar with me.
Q. So can you look at Exhibit 1, please? Can you tell me by looking at the caption of the case which of the defendants named in your complaint you believe were familiar with you because of your juvenile record?
A. Well, I know Paul Glantz was. I got arrested for assault on him.
Q. When? You got arrested for assaulting Paul Glantz when?
A. Maybe 1983 maybe.
Q. As a juvenile?
A. No. I had just turned 17 but I mean like

Page 183

I stated, ma'am, I was arrested several times as a juvenile so I'm pretty sure they were familiar with me.
Q. I'm asking you specifically with regard to anyone else that you named in this complaint. Do you have any knowledge that they were somehow familiar with you?
A. Not off the top of my head, no.
Q. Okay. You also allege that there were conversations between a Springfield police officer and FBI agents when the hair evidence was delivered to the FBI crime lab in Washington, D.C. Are you generally familiar with those allegations?
MS. GIZZI: Objection. Form.
A. Yes.
Q. And upon what do you base those allegations?
MS. GIZZI: Objection. Form.
A. There was documentation that they spoke with the FBI about it.
Q. What documentation?
A. Through discovery.
Q. Through discovery in this case?
A. Yes. Absolutely.

Page 184

Q. So what specifically are you referring to?
A. I don't know the specific documents, ma'am. It's been a long time since I reviewed this record.
Q. So you've made these allegations about specific conversations taking place in the complaint which is before any discovery was done in this case so to what were you referring?
A. Before discovery was done in the civil case?
Q. In this case.
A. I don't understand the question, ma'am.
Q. You're saying that you got the information through discovery that was done in this case.
A. Criminal case.
Q. That isn't what you said but what discovery in a criminal case are you referring to?
A. November 30, 1985 crimes, Mary Prekop and Emily Lichwala case. You're telling me there's no discovery in the case?
Q. Specifically what documents reflect conversations between Springfield police officers and FBI agents when delivering the hair sample to the FBI office in Washington, D.C.?

Page 185

MS. GIZZI: Objection. Form.
A. Ma'am, I don't know what specific documents but when I went over discovery, there was documentation of the cops and the FBI. I don't know what specific documents they were.
Q. But you believe there was a document that reflects specific conversations?
A. I believe there is, yes.
Q. And you've seen it; is that a yes?
A. I've read documentation that states that the Springfield Police Department coerced with the FBI agents about the hair.
Q. Coerced with them?
A. Excuse me. That was the wrong word. Had conversations about the hair and blood.
Q. You have seen documents that relate to a conversation between Springfield police officers and FBI agents regarding the hair and blood analysis --
A. Again, ma'am, I'm pretty sure. Yes.
Q. Let me finish the question. Regarding the hair and blood samples that were delivered to the FBI laboratory in Washington, D.C.
MS. GIZZI: Objection. Form. Asked and answered.

Page 186

A. Again, I believe so, yes.
Q. But you don't recall what those documents were?
A. I don't recall the specific documents, ma'am.
Q. Okay. Sir, you allege that you gave certain inculpatory evidence to Springfield Police Officer Kane. Do you remember that?
MS. AGBIRO: Objection. Form.
A. Say that again, please.
Q. You turned over information regarding evidence as a result of a conversation that you had with Springfield Police Officer Richard Kane.
MS. GIZZI: Objection.
Q. Do you remember those allegations?
A. I remember allegations but I didn't give Officer Kane any inculpatory information, no.
Q. You didn't give him any information that resulted in the recovery of a pocketbook?
A. No. Me personally, no.
Q. So if there was an appeal filed with the Appeals Court, the SJC in Massachusetts in which it's alleged that you were interrogated and gave evidence to Richard Kane about the whereabouts of a

Page 187

pocketbook, that was not a true allegation in this pleading?
A. Absolutely not.
Q. Okay.
A. As you stated, alleged, ma'am.
Q. Sir, you allege in your complaint that members of the Springfield Police Department in or before 1985 regularly withheld exculpatory or impeachment evidence. Upon what did you base that allegation that there was a regular practice of the Springfield Police Department to do that?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. I'd have to read the complaint again, ma'am. I don't know how I stated it.
Q. Do you have any information about other examples where the Springfield Police Department allegedly withheld exculpatory or impeachment evidence?
A. Well, I've read case law where they have, yes.
Q. What case law?
A. Ma'am, I don't know what the specific names are but I've read case law. Marchand case.

Page 188

Q. Your understanding is the Marchand case is case law?
MS. AGBIRO: Objection. Form.
A. I don't know specific cases off the top of my head, ma'am. I'm not a lawyer.
Q. How about conducted illegal interrogations of juveniles, that it's a regular practice of the Springfield Police Department to conduct illegal interrogations of juveniles?
MS. GIZZI: Objection. Form.
A. Again, I've seen case law on that as well.
Q. Can you point to any specific cases?
A. Not off the top of my head, ma'am. Again, I'm not a lawyer. No.
Q. Specific facts?
A. No.
Q. How about planted physical evidence? Did you have any specific examples in mind of charges that the Springfield Police Department on or before 1985 regularly planted physical evidence?
MS. GIZZI: Same objection.
A. Same answer, ma'am. I've read case law, yeah.
Q. But you can't point to any specific

Page 189

examples?
A. No. I don't have a memory of exact names, no, ma'am.
Q. Same question with regard to fabricating evidence.
MS. GIZZI: Same objection.
A. George Perrot's case.
Q. So you're saying the only example that comes to mind is your own case?
A. That's not what I said, ma'am. You said give me an example; right?
Q. And same question regard to your allegation that suspects were routinely coerced. Upon what did you base that allegations that suspects at the Springfield Police Department on or before 1985 were routinely coerced?
MS. GIZZI: Same objection.
A. Same answer, ma'am. I've read case law, numerous case law. Just because I don't know the names that doesn't mean they don't exist.
Q. How about interrogated under extreme duress or abuse? Any specific examples to support that allegation?
MS. GIZZI: Objection.

Page 190

A. My own case.
Q. On or before your case, sir, were there specific examples?
A. Again, ma'am, I've read case law on all those issues.
Q. Okay. Are you alleging, sir, that you continue to suffer from physical or mental conditions as a result of anything done to you by the Springfield Police Department?
A. Absolutely.
Q. Specifically what?
A. Well, I got PTSD from the time I spent in that prison.
Q. Anything else, sir?
A. I got trust issues. I mean there's numerous issues that --
Q. You have just issues?
A. Trust issues.
Q. Oh, trust. I'm sorry. I didn't hear you. Has anybody diagnosed you with trust issues?
MS. GIZZI: Objection. Form.
A. I don't even know if that's a diagnosis, ma'am.
Q. Has any professional addressed your trust

Page 191

issues with you?
A. No.
MS. deSOUSA: This is going to be the next exhibit.
(Exhibit 9 was marked for identification.)
Q. Do you recognize the documents that I just handed to you, sir?
A. No.
Q. Is this a copy of your Facebook page?
A. I have a Facebook page but I didn't print any of this.
Q. You didn't print it but you wrote it, didn't you?
MS. GIZZI: Objection to form.
A. No, I didn't.
Q. That's your picture, isn't it, Mr. Perrot, on Page 1 of Exhibit 9?
A. It is my picture, ma'am.
Q. And it's your picture again on the last page of this exhibit?
A. It is, ma'am.
Q. And where was that picture taken?
A. I don't recognize where it was. I don't

Page 192

recognize where it was.
Q. On December 8, 2020, sir, did you post I'm free so no female is safe?
A. Absolutely not.
Q. Who is Masunga Edwards?
A. Who?
Q. Who is Masunga Edwards?
A. Your guess is as good as mine.
Q. Do you see him listed as one of your friends?
A. I do, ma'am.
Q. You don't know who that is?
A. I don't.
Q. Do you see, sir, that you posted, ugh, and I love fucking my sister the most. She watched me beat a 17 year old girl senseless and you didn't say a word. I'm so proud of you. Do you see that, sir?
MS. GIZZI: Objection. Form. Testifying.
A. Yeah, I see that.
Q. Who is Thea Glidden?
A. My stepsister.
Q. Did she observe you beat a 17 year girl?
MS. GIZZI: Objection. Lack of

Page 193

foundation. Misstates the testimony.
A. Absolutely not.
Q. Do you see at the bottom of the page, sir, that you stated you're out for blood?
MS. GIZZI: Objection. Lack of foundation. Misstates the testimony.
MS. deSOUSA: There's no testimony.
MS. GIZZI: Yes, you are. This is ridiculous.
Q. Do you see at the bottom of the page, sir, where it says under your name I'm out for blood?
A. I see it, yeah.
Q. What were you referring to?
MS. GIZZI: Objection. Misstates the testimony.
A. I didn't write that, ma'am.
Q. It's your Facebook page, isn't it?
MS. GIZZI: Objection. Form.
A. It is.
Q. Who else had access to it, sir?
A. Alissa Griffin.
Q. Were you living with Alissa Griffin at that time?
A. I never lived with her.

Page 194

Q. How did she have access to your Facebook page, sir?
A. We were getting high together. She knew all my information.
Q. On December 8, 2020 your testimony is that she had access to your Facebook page while you were getting high?
MS. GIZZI: Objection. Form.
A. Prior to that I was getting high with Alissa Griffin and she had access to my information, yes.
Q. How was she accessing your Facebook page, sir?
MS. GIZZI: Objection. Form. Lack of foundation.
A. Ma'am, Alissa Griffin wrote this. She posted these postings.
Q. How do you know that, sir?
A. How do I know that? Because Lisa Kavanaugh spoke with her about it and told her she needs to stop.
Q. Lisa Kavanaugh is?
A. A lawyer with the Innocent Project, yes.
Q. So your testimony is that an attorney

Page 195

contacted Alissa Griffin about this?
A. Yes.
Q. And when did that happen, sir?
A. When my 80 something year old mother called me and asked me if I was on social media.
Q. When did your mother call you, sir?
A. It was around whenever this was posted. I don't know what the date was. She asked me if I was on social media and I said no.
Q. Do you have any documentation of an attorney contacting Alissa Griffin on your behalf on or after December of 2020 telling her to cease and desist posting things in your Facebook page?
A. I don't have documentation but it's real simple for you to ask her.
Q. I'm sorry?
A. I said I don't have documentation but it's real simple for you to ask her.
Q. Where is Lisa Kavanaugh?
MS. GIZZI: Objection. Form.
A. She's a lawyer.
Q. Where?
A. In Boston. She works for the Innocent Project.

Page 196

Q. Did she represent you?
A. She did.
Q. And what was her business address?
A. I couldn't tell you what her business address is.
Q. When is the last time you spoke with Lisa Kavanaugh?
A. After my accident.
Q. After what accident, sir?
A. When I crashed a car in November.
Q. November of 2021?
A. No. November of --
Q. 2022?
A. '22, yes.
Q. And so when you crashed your car in November of 2022, did you tell people that you were attempting to commit suicide?
MS. AGBIRO: Objection. Form.
A. I did, yes.
Q. Who did you tell that to?
A. Lisa, Sherrie.
Q. Did you tell anybody while you were incarcerated?
A. Yes.

Page 197

Q. Who did you tell?
A. A mental health worker.
Q. You were put on a suicide watch as a result of that after you were arrested in November of 2022?
A. No.
Q. Were you put on a suicide watch after being arrested in November of 2022?
A. I just said no, ma'am.
Q. You weren't?
A. No, I wasn't.
Q. Who did you tell that you had attempted to commit suicide?
A. Ma'am, I was in the hospital for two or three weeks after my thing so how could I --
Q. What hospital were you in, sir?
A. In Lahey.
Q. So when I asked you if you had any other medical or mental health treatment, you didn't include a multi-week hospital stay?
A. I thought you meant like mental health.
Q. Physical I said. Medical.
A. My mistake.
Q. So you were in the Lahey Clinic for how

Page 198

long?
A. Maybe two weeks, three weeks.
Q. And that was in November of 2022?
A. Yes.
Q. Have you taken any steps to get copies of those records?
MS. GIZZI: Objection. Form.
A. No need to.
Q. That wasn't the question. Have you taken any steps to get copies of those records?
A. No.
Q. Do you have copies of those records?
A. I don't, no.
Q. You don't know if you do?
A. I said I don't, ma'am.
Q. You don't have copies of those records?
A. No.
Q. You never sought them?
A. No.
Q. Now that you understood that I'm asking you to also disclose medical information, is there any additional medical treatment that you have had that springs to mind now that we have clarified what my question was?

Page 199

A. I had a back operation in 2010.
Q. That was while you were incarcerated?
A. Yes.
Q. My question was specifically since your release.
A. Oh, no.
Q. You're under treatment for high blood pressure?
A. Yes.
Q. Who prescribes your medication?
A. DOC.
Q. Say again?
A. DOC.
Q. The Department of Correction. Before you were incarcerated during the time that you were not incarcerated who was prescribing your medication?
MS. AGBIRO: Objection. Form.
A. I forget his name. My healthcare provider. I can't remember his name.
Q. So you do have a healthcare provider that you've seen since you were released?
A. Yeah.
Q. I've asked you that question now about four times, sir. So who is your healthcare provider

Page 200

that you've seen since your release?
A. I just told you I don't remember his name.
Q. Where is he located?
A. In Groveland, Mass.
Q. Groveland?
A. Yes.
Q. And do you remember the name of the business or clinic?
A. I don't.
Q. Is it a man or a woman?
A. It's a man.
Q. What pharmacy would you get your prescriptions filled at?
A. CVS.
Q. Which CVS, sir?
A. In Haverhill.
Q. Haverhill. What street in Haverhill?
A. I don't remember the name of the street.
Q. Have you sought to get copies of your records from that CVS?
A. No.
Q. Other than Zoloft and your high blood pressure medication have you filled any other prescriptions there since your release?

Page 201

A. Gabapentin.
Q. Gabapen?
A. Gabapentin.
Q. And when you were prescribed that?
A. In 2010 after my back operation.
Q. You had it filled at the CVS in Haverhill?
A. I've been on it since my back operation.
Q. Do you continue to take that medication?
A. No. I'm off it now.
Q. When did you go off of it?
A. Middleton doesn't do it anymore. They don't allow Gabapentin so they took me off it for the two weeks I was there and I haven't been on it since I've been back in DOC.
Q. You filed or had filed on your behalf multiple civil suits during your period of incarceration; is that correct?
A. No. I wouldn't say several.
Q. Did you file a medical malpractice case?
A. Yes.
Q. And it went to trial, correct, in 2015?
A. Yes.
Q. And who were you represented by? Just the name.

Page 202

A. I think his name is James Brunelle.
Q. Brunelle?
A. Brunelle.
Q. B-R-U --
A. I don't know how to spell it, ma'am.
Q. What town does he practice out of?
A. Lowell.
Q. And did he represent you in any other matters other than that medical malpractice case?
A. No.
Q. The jury returned a verdict for the defendant; correct?
A. Correct.
Q. And you filed more than one case against the Department of Correction; correct?
A. Yes.
Q. How many?
A. Maybe one or two. I don't know the number.
Q. What were the allegations that you were making against the Department of Correction?
A. Excessive force.
Q. What were the outcomes of those?
A. I won an excessive force judgment.

Page 203

Q. In what court?
A. It was I want to say Norfolk.
Q. Norfolk Superior?
A. I believe so. I believe it was Norfolk.
Q. When was that, sir?
A. Late eighties, early nineties.
Q. And did you get a monetary judgment?
A. Yeah. A thousand dollars.
Q. One thousand dollars?
A. Yeah. It was actually a settlement.
Q. So you didn't win it. It was a settled matter?
A. Yeah.
Q. So there was no trial?
A. No.
Q. Other than that did you have any other -- any other actions that you filed?
A. I may have but I'm not sure.
Q. Do you recall filing any civil actions in federal court as the result of treatment you allege you received while incarcerated?
A. I may have, yes.
Q. But you don't recall?
A. No.

Page 204

Q. Other than the thousand dollar settlement that you just testified to did any of these civil matters resolve in your favor?
A. No.
Q. And did you file any appeals of discipline that you received during the time of your incarceration?
A. Appeals from disciplinary reports?
Q. Yes.
A. Yes.
Q. How many?
A. I don't know the number, ma'am.
Q. Were any them ever sustained in your favor?
A. DOC is like the federal government. They don't lose. You get denied. You're denied. You never win the case.
Q. Is it fair to make the assumption from that answer that you never won --
A. No.
Q. -- any of those appeals?
A. No.
MS. deSOUSA: Just one minute. We're going to take a three-minute break.

Page 205

MS. GIZZI: Okay. Off the record.
(A break was taken.)
Q. You know you're still under oath, sir?
A. I do.
Q. Sir, have you filed or made any attempt to collect from the state fund under the state statute for persons who allege they have been wrongfully convicted?
A. I believe the Innocent Project has, yes.
Q. I can't hear you.
A. I believe the Innocent Project has, yes.
Q. So you have a claim pending?
A. I don't know if they filed or not. I'm not sure.
Q. Who would have been handling that matter for you?
A. I believe Lisa Kavanaugh.
Q. Lisa Kavanaugh?
A. Yes.
Q. Have you given any testimony in that matter?
A. No.
Q. When do you believe that was filed?
A. I'm not sure if it was filed or not. I'm

not even sure if it was filed.
Q. When is the last time you discussed it with anybody? I don't want to know what they said. I'm asking you when.
A. I don't think I've ever discussed it with them.
Q. Why do you have an impression that they would have filed it for you?
A. I believe, I'm not sure, Mr. Loevy posed the question to me.
Q. I don't want to know what Mr. Loevy said to you.
MS. GIZZI: That's privileged.
Q. Mr. Perrot, have you filed complaints with the Department of Justice against the Lawrence police officers as a result of your arrest in Lawrence?
A. I haven't, no.
Q. Have you filed complaints with anyone as a result -- against the Lawrence Police Department?
A. No.
Q. Have you alleged that the Lawrence Police Department set you up for the rape allegations from Lawrence, Massachusetts?



MS. GIZZI: Objection. Form.
A. Do I believe they set me up?
Q. Have you made that allegation?
A. No.
Q. You've never made that allegation?
A. I've never made a complaint about it, no.
Q. That's not what I'm asking you. Have you made that allegation to anyone?
MS. GIZZI: Objection. Form.
A. Sure.
Q. Who?
MS. GIZZI: Objection. Calls for attorney-client privilege.
MS. deSOUSA: No. Other than lawyers.
Q. My question is always other than lawyers.
A. I've spoken to Sherrie about it.
Q. And what's the nature of your allegations about how you were treated by the Lawrence Police Department?
A. How I was treated? Ma'am, I was found passed out on the sidewalk in broad daylight with a street girl who was urinating on the sidewalk.
Q. Is that it? That's the nature of your



allegation?
A. No, that's not the nature of the allegations but in the police report it states that I called the Hampden County District Attorney's Office to let me know who I had here. All of a sudden I'm charged with rape.
Q. I don't understand what you're saying.
A. In the police officer's report that arrested me he said he called the Hampden County District Attorney's Office to let them know who they had here under arrest.
Q. Other than that do you have any other evidence that --
A. Well, the camera that was 15 feet away from the incident mysteriously wasn't working that day out of every other camera down the whole street of Broadway. It's awful convenient that it wasn't working that day.
Q. Other than that?
A. That's enough for me.
Q. Is there anything else?
A. No, ma'am.
Q. Mr. Perrot, in some of your records you reference that you attempted suicide as a child.



When did you attempt suicide as a child?
A. Maybe when I was 12 I believe.
Q. You have to speak up.
A. Maybe when I was 12 I believe.
Q. When you were 12?
A. Yeah.
Q. And how did you attempt to kill yourself when you were 12?
A. Tried to hang myself.
Q. You tried to hang yourself?
A. Yes.
Q. Where were you?
A. In my house.
Q. At Malibu Drive?
A. Yes.
Q. And who found you?
A. No one found me.
Q. Tell me what happened.
A. Well, I was getting ready to hang myself and I aborted the mission.
Q. Did you receive any treatment as a result of your aborted attempt to kill yourself?
A. No, I didn't.
Q. Did you report it to anyone at the time?

Page 210

A. No.
Q. Were you seeing any therapist at this time?
A. No.
Q. You didn't see any therapist while you were committed to the custody of DYS at the time?
A. Counselors in the DYS.
Q. Did you see them throughout?
A. No.
Q. Or only when you were inpatient. Only when you were in the facility?
A. When you're booked in, they always have a counselor speak with you.
Q. I'm sorry, sir. You've got to try to speak up.
A. In a new commitment when you go in just like a new arrest. You go in. You see mental health. They sit down and they talk to you and ask you a series of questions but as far as seeking counseling and having regular sessions, no.
Q. So, sir, other than the three women that we have talked about here today, Lisa whose last name you can't recall, Alissa Griffin and Mudge. I'm sorry. What was her name? What's the name of

Page 211

the woman in Haverhill, sir?
A. I have no idea who you're talking about.
Q. I think you do.
MS. GIZZI: Objection.
Q. Joella Mudge.
A. Oh, okay.
Q. So Joella Mudge, Lisa Vanderboker and Alissa Griffin, those three women, have you been accused of violently attacking any other women since your release from prison?
MS. GIZZI: Objection. Form.
A. I wasn't charged with violently attacking Jeanette, Joelle. That's number one. I wasn't violently charged with attacking Lisa either.
Q. You don't consider rape violent?
MS. GIZZI: Objection. Form.
A. Was I convicted of rape?
Q. I said accused.
A. Accused. Well, you can accuse anybody of anything.
Q. My question is, sir, other than those three women have you been accused of acts of violence against any other women since you've been released?

Page 212

A. No.
Q. Has Miss Frisone ever called the police as a result of feeling afraid of you?
A. Never.
Q. Have you made any threats against her?
A. Never.
Q. Have you made any threats of harm against anyone else?
MS. GIZZI: Objection. Form.
A. Not that I recall, no.
Q. Do you recall making threats to harm Frannie Bloom?
A. I mean I vented about it.
Q. Do you recall making threats to harm your own attorney Mr. Loevy?
A. Maybe when I was angry. Yeah. I was venting.
Q. Anybody else that you might have threatened harm?
A. Not that I recall, no.
MS. deSOUSA: It's time for us to leave the facility so my suggestion is we should get going tomorrow at nine.
MS. GIZZI: Can we go off the

Page 213

record?
MS. deSOUSA: Yes. Off the record.
(Whereupon, at 3:55 p.m., the deposition was suspended.)

C E R T I F I C A T E

I, GEORGE PERROT, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

Page Line Correction/Reason

_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________

Signed under the pains and penalties of perjury this _____ day of ___________________, 2023.

________________________________
GEORGE PERROT



CERTIFICATE

Commonwealth of Massachusetts
Suffolk ss.

I, Karen A. Morgan, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that GEORGE PERROT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand this 24th day of July, 2023.

Karen A. Morgan

Karen A. Morgan
CSR/RPR

My commission expires:
September 28, 2029

Volume: II

Pages: 216-408

Exhibits: 10-19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 18-CV-10147

\- - - - - - - - - - - - - - - - - - - - x

GEORGE PERROT,

Plaintiff,

vs.

CITY OF SPRINGFIELD, et al,

Defendants.

\- - - - - - - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF GEORGE PERROT

Thursday, July 13, 2023

North Central Correctional Center

500 Colony Road

Gardner, Massachusetts

9:24 a.m. to 3:18 p.m.

Reporter: Karen A. Morgan, CSR/RPR

Page 217

APPEARANCES:
LOEVY & LOEVY
By Gianna Gizzi, Esquire
and Carla Agbiro, Esquire
311 North Aberdeen Street
Chicago, Illinois 60607
gizzi@loevy.com agbiro@loevy.com
on behalf of the Plaintiff.

REARDON JOYCE & AKERSON, P.C.
By Austin M. Joyce, Esquire
4 Lancaster Terrace
Worcester, Massachusetts 01609
ajoyce@rja-law.com
on behalf of Charles Arpin.

KEVIN B. COYLE, ESQUIRE (Morning session)
935 Main Street
Springfield, Massachusetts 01103
attycoyle@aol.com
on behalf of Thomas Jarvis, Andrew Canevari, Paul Glantz and Ronald St. Germain.

Page 218

APPEARANCES:
MORRISON MAHONEY LLP
By Carol Sakowski Lynch, Esquire
Tower Square Building, 1500 Main Street, Suite 2400
Springfield, Massachusetts 01115-5387
clynch@morrisonmahoney.com
on behalf of Richard Kane.

MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
By Jared B. Cohen, Esquire
One Ashburton Place
Boston, Massachusetts 02108
jared.b.cohen@mass.gov
on behalf of Francis Bloom.

PRESENT VIA ZOOM:
CITY OF SPRINGFIELD LAW DEPARTMENT
By Lisa C. deSousa, Esquire
and Tyler J. Kenefick, Esquire
1600 E. Columbus Avenue, 2nd Floor
Springfield, Massachusetts 01103
ldesousa@springfieldcityhall.com
tkenefick@springfieldcityhall.com
on behalf of City of Springfield.

Page 219

PRESENT VIA ZOOM:
CITY OF SPRINGFIELD LAW DEPARTMENT
By Robert A. Schmidt, Esquire
1600 East Columbus Avenue
Springfield, Massachusetts 01103
rschmidt@springfieldcityhall.com
on behalf of Thomas Kennedy and Cheryl Clapprood.

D'AMBROSIO LLP
By Paul M. Tellier, Esquire
185 Devonshire Street, 10th Floor
Boston, Massachusetts 02110
ptellier@dambrosiollp.com
on behalf of City of Springfield.

Page 220

I N D E X


| EXAMINATION OF: | PAGE |
|---|---|
| GEORGE PERROT | |
| By Mr. Joyce | 222 |
| By Mr. Coyle | 285 |
| By Ms. Lynch | 304, 405 |
| By Mr. Cohen | 369 |
| By Ms. deSousa | 401 |


E X H I B I T S


| NO. | | PAGE |
|---|---|---|
| Exhibit 10 | Plaintiff's Answers to Arpin's Interrogatories | 225 |
| Exhibit 11 | Handwritten document 11/24/87 | 235 |
| Exhibit 12 | Google map | 267 |
| Exhibit 13 | Typed letter | 275 |
| Exhibit 14 | Typed letter | 275 |
| Exhibit 15 | Typed letter | 275 |
| Exhibit 16 | Street map | 330 |
| Exhibit 17 | Typed statement | 331 |
| Exhibit 18 | Typed statement | 342 |
| Exhibit 19 | Typed statement | 369 |


*Electronic exhibits attached to transcript

P R O C E E D I N G S

GEORGE PERROT, having been satisfactorily identified by the production of his institutional identification badge and duly affirmed that her testimony would be the truth, the whole truth and nothing but the truth, testified as follows in answer to interrogatories by MR. JOYCE:

MS. GIZZI: Before we start questioning we want make a stipulation on the record hopefully it will be agreed by all the parties that Exhibit 4 I think, the juvenile record, will be under the protective order and that testimony surrounding that exhibit we can go back and let you know what that is specifically.

MS. AGBIRO: It will be marked confidential.

MS. GIZZI: Yes.

MR. JOYCE: We might as well do that now. Four is the CORI?

MS. GIZZI: DYS.

MR. KENEFICK: That was an exhibit in another deposition and there was no protective order on it.

MS. GIZZI: You did ask him.



MS. AGBIRO: We're going to go back. We're going to try to go back.

MS. GIZZI: Tyler, we're going to put it on the record now for this deposition and we can talk later about what that means under the protective order.

MS. deSOUSA: If you want pages of the deposition to be protected, you've got to give us the pages after we get the transcript.

MS. AGBIRO: That's exactly what we're trying to do. So we'll go back and talk about the pages once we get the transcript.

EXAMINATION BY MR. JOYCE

Q. Good morning, Mr. Perrot.
A. Good morning.
Q. My name is Austin Joyce and I represent one of the defendants Charles Arpin. I have a few questions for you. You are the plaintiff in this lawsuit versus Thomas Kelly and other Springfield police officers and the City of Springfield; right?
A. I am.
Q. And am I correct that this lawsuit is important to you?



A. I would say that, yeah.
Q. And this deposition is an opportunity for you to impress us with the value of your case; right?

MS. GIZZI: Objection. Form. Calls for a legal conclusion.

A. I'm not trying to impress anybody.
Q. Okay. Well, did you prepare in any way for you deposition yesterday and today?
A. Not really, no.
Q. Did you read any transcripts?
A. No.
Q. Did you read any police reports?
A. No.
Q. Did you read any prior correspondence or pleadings that you filed?
A. Not yesterday, no.
Q. Well, before yesterday in preparation for yesterday.
A. Yes.
Q. What pleadings or other documents did you review?

MS. GIZZI: Objection to the extent that you're asking about attorney work product.



A. I just read the complaint. Just looked through it.
Q. When did you do that?
A. Maybe four or five days ago.
Q. And after that did you review any documents?
A. No.
Q. Did you talk to anybody in preparation for your deposition today?

MS. GIZZI: Objection. Form. Calls attorney-client privilege.

MR. JOYCE: It does not. I'm not asking for the content.

Q. Did you talk to anybody?
A. Just my girlfriend and told her that I would be getting my deposition over the next couple days.
Q. When did you to talk to her?
A. Yesterday.
Q. How did you talk to her?
A. By telephone.
Q. Did you talk to anybody else to prepare for your deposition?
A. Just briefly I spoke to my lawyers.

Page 225

Q. How many times did you speak to your lawyers?
A. Twice.
Q. And when was that?
A. Yesterday and the day before yesterday.
Q. Were those both in person?
A. Yes.
Q. And did they occur here at Gardner?
A. Yes.
Q. In connection with this lawsuit did you answer some interrogatories that were sent to you from Defendant Arpin?
A. Yes.
MR. JOYCE: Could we have that marked, please, as the next exhibit?
(Exhibit 10 was marked for identification.)
(Witness perused document.)
Q. Mr. Perrot, you have Exhibit 10 there in front of you; right?
A. I do, sir.
Q. And would you look at the last page, please? Is that your signature on the last page?
A. It is.

Page 226

Q. Before you signed those did you read them and review them?
A. I did, yes.
Q. And did you agree with the contents of those answers to interrogatories?
A. Yes.
Q. So I'm going to ask you to turn to interrogatory number three. Would you read that interrogatory to yourself?
MS. GIZZI: The entire thing?
MR. JOYCE: Yes. Just the question.
A. Just the question?
Q. Yes.
A. Okay.
(Witness perused document.)
A. Okay.
Q. And do you see in the response there's an objection that notes partially the first line into the second line that this calls for a narrative better suited for a deposition; right?
A. Yes.
Q. And you will agree we're at your deposition today; right?
A. I do.

Page 227

Q. Can you answer interrogatory number three for me?
MS. GIZZI: Objection.
Q. In your own words.
MS. GIZZI: Objection. Form. Misstates the testimony.
A. Sir, I'm not a lawyer so I was helped to prepare this with my counsel so what it states in it in the interrogatories is my answer.
Q. Do you have any information other than what's on that paper in front of you in the answer to interrogatory number three?
A. Other than the fact that all the police officers involved in my case, no.
Q. I'm sorry. I don't understand that.
A. You asked me how he violated my rights.
Q. Right.
A. Well, all the officers that were involved in the investigation. I don't know what specifically he did. To the best of my recollection I don't know exactly what he did.
Q. Do you know who Charles Arpin is?
A. He's a Springfield police officer. That I know.

Page 228

Q. Do you know who he is? Could you identify him?
A. Sir, this happened 40 years ago. No.
Q. So can you tell us exactly what Charles Arpin did on December 7, 1985 when you were arrested?
MS. GIZZI: Objection. Form.
A. Best of my recollection, no.
Q. Do you have any information about the actions of Charles Arpin other than what's indicated in your answer to interrogatory number three in Exhibit 10?
A. I don't, sir. No.
Q. Down at the bottom of Page 3 it indicates that as part of your answer Defendant Arpin acting in conspiracy with the other individual defendants fabricated evidence. Do you see that?
A. Where are you pointing to?
Q. Bottom of Page 3 the last line.
A. Okay. Yes.
Q. So exactly what evidence did Charles Arpin fabricate?
A. Well, there was a fabricated statement in my case.

Page 229

Q. Which statement?
A. I don't have it before me, sir, so I don't -- I don't know what the exhibit number was. I don't know if Mr. Arpin was in the interrogating room with me or not. I mean I was a young kid. I don't remember exactly who was in the interrogation room.
Q. So you don't have the statement. Can you identify it in some way for us in terms of content, date?
A. No, sir.
Q. And can you describe for us the officers that were in the room when you gave the statement?
A. Again, sir, this happened 40 years ago. No, I can't.
Q. If you turn to the next page, Mr. Perrot, of Exhibit 10. Do you see there your answer talks about including false police reports and witness statements regarding your purported connections to the crimes. Do you see that?
A. Where are you pointing to, sir?
Q. The top line.
(Witness perused document.)
A. Yes.

Page 230

Q. Can you tell me exactly what police reports were false?
A. Well, there was a statement written by the police officers that was used to try to induce two friends of mine about these crimes. The police statement that I reportedly signed about the Prekop and Lichwala case was also fabricated. I signed it unbeknownst to what the statement actually was.
Q. That's a statement that has your signature on it; right?
A. It does, sir.
Q. Okay. And you did sign that?
A. It appears I signed it, yes.
Q. What other reports are false police reports?
A. At this time, sir, my recollection like I said I didn't review the whole file in this case before this deposition so, you know, this happened years ago. I couldn't really point to anything specific right now.
Q. It goes on and talks about false witness statements so can you identify what witness statements you think are false?
A. At this time, sir, no.

Page 231

Q. The next line it goes on to say that Defendant Arpin manufactured false witness testimony as you said to implicate the plaintiff. What false witness testimony was that?
A. At this time, sir, I can't recall the specific what Lieutenant Arpin did.
Q. Did Lieutenant Arpin testify at any of your criminal trials?
A. To the best of my recollection, sir, I can't remember. Like I said, this happened a long time ago. He may have.
Q. You were at each of the criminal trials, weren't you?
A. I was, sir.
Q. You were in attendance and heard all the witnesses testify against you, didn't you?
A. I was, sir.
Q. Did you present witnesses in your defense?
A. No, I didn't, sir.
Q. In either case, either trial?
A. I mean other than -- how do you say it? I don't know the correct word. To refute the blood evidence.
Q. Experts?

Page 232

A. Expert witnesses, yes.
Q. So you presented expert testimony?
A. My lawyer did, yes.
Q. In your defense?
A. Yes.
Q. But no fact witnesses in your defense; is that what you're saying?
MS. GIZZI: Objection. Form.
A. Fact witnesses meaning?
Q. Any witnesses to belie any of the reports or witness statements that the prosecution put in.
MS. GIZZI: Objection. Form.
A. Yes. My sister testified. My mother testified. I don't think my mother testified at the second trial but my sister did, yes. My sister Nancy.
Q. Did you testify in either trial?
A. Yes.
Q. Which one?
A. I believe it was the first trial.
Q. You did not testify in the second trial?
A. No.
Q. So then your answer goes on to say and then suppressed that information during criminal

Page 233

proceedings. What information are you referring to in that answer?
MS. GIZZI: Objection. Form.
A. Again, sir, my lawyers helped me prepare this. I'm not a lawyer so to the best of my recollection I can't remember the specifics of it.
Q. Well, Mr. Perrot, it's your case, isn't it?
A. It is, sir, but, again, sir, I'm not a lawyer so this is all foreign to me.
Q. Sure. I understand but you've lived it for, what, 40 years now almost; right? 1985.
A. You're right, sir. I lived in a maximum security prison defending myself against this case, yeah. I didn't have, you know, time to sit there and read documents and all that because I was being tortured because of this case.
Q. And during that time frame you attended all the trials and heard all the witnesses; right?
A. I did.
Q. And during the preparation for that you reviewed all the police reports, didn't you?
MS. GIZZI: Objection. Form.
A. I tried to, yes.

Page 234

Q. And at some point you were your own attorney. You represented yourself at some part of the case, didn't you?
MS. GIZZI: Objection. Form.
A. I had help from a person in the prison to help me file documents, yeah.
Q. But you filed some documents with Appellate Courts on your own behalf; right?
A. Appellate Courts? No, I don't believe I did, not with the Appellate Court.
Q. And did you file a federal habeas petition by yourself?
A. I didn't, no.
Q. Somebody filed that for you?
A. Mike Dupont helped me file that.
Q. He helped you?
A. Yes.
Q. But it was over your name, wasn't it?
A. Sure was, yes.
Q. And during the criminal process before the trials did you represent yourself for a period of time?
A. I didn't, no.
Q. You did not?

Page 235

A. I never represented myself in court by myself, no.
MR. JOYCE: Mark this as Exhibit 11, please.
(Exhibit 11 was marked for identification.)
Q. Would you take a look at Exhibit No. 11, Mr. Perrot?
(Witness perused document.)
A. I have, yes.
Q. Do you recognize that?
A. I do.
Q. What is it?
A. It's a letter to Bob Timmerman.
Q. Dated November 24, 1987; correct?
A. It is.
Q. And I'm looking at the first line and it says -- well, at the end of the first sentence. And to let you know what kind of questions I'm going to ask you on the stand; right?
A. Yeah.
Q. And why did you tell Mr. Timmerman that?
A. Because I wasn't happy with my counsel and I thought I was foolish enough to represent myself.

Page 236

I was planning on firing my counsel.
Q. So this is preparatory to removing your counsel; is that what you're saying?
MS. GIZZI: Objection. Form.
A. I never actually removed my counsel.
Q. Okay. So you didn't represent yourself at the time of this letter?
A. I wrote the letter if that's what you want to consider representing myself.
Q. Why did you write the letter to Mr. Timmerman?
A. I just told you, sir. I planned on representing myself because I wasn't happy with my counsel.
Q. I understand that but were you trying to prepare Mr. Timmerman for his testimony?
A. I was letting him know that these would be the questions I would ask him on the stand, yeah.
Q. Did Mr. Timmerman testify in your criminal trial?
A. He didn't, sir, no.
Q. Did he testify in either of the criminal trials?
A. He didn't, sir.

Page 237

Q. Why not?
MS. GIZZI: Objection. Calls for attorney-client privilege.
A. My lawyer chose not to call him.
Q. And did you talk to Mr. Timmerman in person?
A. I didn't, sir, no.
Q. So in November 1987 where were you located?
A. Norfolk prison.
Q. And Mr. Timmerman didn't come to visit you, did he?
A. Never, sir, no.
Q. Was this your only communication with Mr. Timmerman about his potential testimony in your case?
A. It is, sir.
Q. I'm sorry?
A. It is, yes.
Q. Can we go back to Exhibit 10, please? Just to reiterate you can't give me anymore information than what's in Exhibit 10 with regard to the information that was suppressed during your criminal proceedings?

Page 238

A. No. You're correct.
Q. Now, it goes on to say they covered up the misconduct and destroyed or suppressed additional evidence that would have exculpated plaintiff including witness statements pointing to other suspects, hiding that information from plaintiff's attorneys and state prosecutors. What exactly are you talking about there, Mr. Perrot?
A. Where are you reading this, sir?
Q. I'm looking at the middle of the paragraph at the top of the page on Page 4. We're still on the same paragraph. We are just continuing on after the semicolon.
(Witness perused document.)
A. Again, sir, my attorneys helped me prepare this so.
Q. So you can't identify for me any specific witness statements that were suppressed; right?
MS. GIZZI: Objection. Form.
A. At this time I can't, sir, no.
Q. Can you identify for me any specific witness statements that were destroyed?
MS. GIZZI: Objection. Form.
A. Well, my counsel requested that --

Page 239

MS. AGBIRO: I'm sorry. Objection. Attorney-client privilege. You can answer to the extent that it does not reveal any information communicated to you by your attorneys. Go ahead.
A. I requested notes from the officers that were destroyed.
Q. Is that the only thing that you can point to right now today?
A. It is, sir, yes.
Q. That was destroyed; right? You don't know of anything else that was destroyed?
A. According to the officers it was destroyed.
Q. Your answer goes on to say that they presented false evidence to state prosecutors and judicial authorities in order to secure and continue charges against the plaintiff. What false evidence did they present?
MS. GIZZI: Objection. Form.
A. Well, they falsely said that I had a pair of my sister's gloves on. My sister testified that never happened so that was false evidence. Mrs. Prekop told them numerous times that I wasn't the person that broke into her house. I guess that's

Page 240

it, sir. My lawyers helped me prepare this. I'm not seasoned counsel.
Q. What gloves are you talking about? Related to which crime?
A. Mary Prekop.
Q. So other than the gloves do you have any other information on false evidence?
A. Mary Prekop's -- the blood stain on Mary Prekop's sheet. She told them it was her uncle's. They testified that it was mine. Hair that they allegedly found in her room. Mrs. Prekop stated that the incident didn't happen in the room on the bed. Said it happened on the floor. I would consider that false evidence, false testimony.
Q. All right. You weren't there when the evidence was found; right?
A. No, sir.
Q. And you take issue with the accuracy of the statement regarding where it was found; is that it?
MS. GIZZI: Objection. Form.
A. Well, they claim it was found on the bed and the victim claims that nobody was on the bed so, yeah. I take -- yes.

Page 241

Q. Let's move on to interrogatory number four, please. Would you read that question to yourself?
(Witness perused document.)
A. Okay.
Q. Do you need a copy of the amended complaint in order to be able to answer so that you know what Paragraph 4 of the complaint says?
A. Yes, please.
Q. Here is Exhibit 1, Mr. Perrot. Feel free to refer to it.
A. Again, sir, what number are we talking about here? As I stated, my lawyers helped me prepare this so I'm not familiar with -- you know, like I stated, I'm a counsel, sir, so.
Q. Interrogatory number four refers to Paragraph 4 of this complaint.
A. Okay.
Q. So feel free to look at that paragraph. Again, in your answer to interrogatory number four you say it's better suited for you to answer at your deposition so my question, sir, is can you answer interrogatory number four for me today?
A. Are you asking me how they tried to

Page 242

convince her?
Q. Let me read the question. Paragraph 4 of your amended complaint alleges the defendants involved in the lineup engaged in pressure tactics towards MP. If these allegations include the actions of Defendant Charles Arpin, please state in complete detail the conduct of Defendant Arpin related to this allegation.
A. Okay.
Q. So are you saying in your complaint or your case that Defendant Arpin engaged in pressure tactics towards Mary Prekop in the lineup?
A. Sure.
Q. And what specifically did Charles Arpin do?
A. Well, if Charles Arpin was at the lineup and was involved in putting the lineup together, they continuously had me walk up and back and forth when none of the other officers that were involved in the lineup had to do that. So they kept -- in my opinion they were trying to make her identify me when she told them several times that she didn't identify me. I'm not the guy that broke into her house.

Page 243

Q. So, Mr. Perrot, as I understand it, and correct me if I'm wrong, during the lineup you and the other people, suspects, people in the lineup were in a room separate from the people that were viewing the lineup; right?
A. Yes.
Q. And you couldn't see who was in the other room viewing the lineup; right?
A. No, I couldn't. No.
Q. And you don't know what order people came in and viewed the lineup, do you?
MS. GIZZI: Objection. Form.
A. No, I don't.
Q. While you were standing there following the instructions during the lineup, you didn't know who was on the other side of the glass, did you?
MS. GIZZI: Objection. Form.
A. Well, the officers told me that the people involved in these cases were here to view me in a lineup.
Q. Well, there was more than Mary Prekop that viewed the lineup, wasn't there?
MS. GIZZI: Objection. Form.
A. Yes.

Page 244

Q. So you don't know if your having to walk back and forth was for somebody other than Mary Prekop, do you?
MS. GIZZI: Objection. Form.
A. Well, being that Miss Sapelli and Mr. McNabb identified me at the scene as the person that broke into the house and stole her purse I would assume that it was someone other than them.
Q. Well, they were also viewing you in the lineup, weren't they?
MS. GIZZI: Objection. Form.
A. I would imagine so, yeah.
Q. And they could have requested that you walk back and forth to get a better look at you, couldn't they?
MS. GIZZI: Objection. Form.
A. Sure, they could. Yeah.
Q. So you don't know what exactly happened when Mary Prekop was standing on the other side of that glass viewing the lineup, do you?
MS. GIZZI: Objection to form.
A. I don't, sir, no.
Q. And in any event she did not identify you at the lineup; right?

Page 245

A. Miss Prekop never identified me, no.
Q. So the lineup was never used against you in the case about the crimes committed against her, was it?
MS. GIZZI: Objection. Form. Calls for a legal conclusion. Lack of foundation.
A. Well, if she couldn't identify me from the lineup, I don't think they would use it, no.
Q. So how were you damaged by the lineup?
MS. GIZZI: Objection to form.
A. How was I damaged?
Q. What was the harm, Mr. Perrot?
A. Well, they were trying to coerce her into picking me as a suspect.
Q. What was the harm to you, Mr. Perrot?
A. I don't know what the specific harm was.
Q. Can you tell me what the harm was to you based on that lineup?
MS. AGBIRO: Objection. Asked and answered.
A. Same thing. Not specifically, no, sir.
Q. Let's look at interrogatory number five and this refers to Paragraph 6 of your amended complaint if you want to look at that. It says that

Page 246

the defendants fabricated or planted evidence to frame you. Again, if you're referring to Defendant Arpin in these allegations in Paragraph 6, can you tell me specifically what Charles Arpin did?
A. Charles Arpin was involved in the investigation; correct?
Q. You have to give me the answers, Mr. Perrot. What did Charles Arpin do?
MS. GIZZI: Objection. Form.
A. Well, I'd say he was involved in planting the gloves. The hair was fabricated. I would say he was involved in the whole investigation. He's just as culpable as the rest of the officers that were there.
Q. How do you know he was involved in planting the gloves?
A. I don't know. I don't know exactly how. How would I know who planted them?
Q. Do you know who planted them?
A. One of the police officers planted them.
Q. Which one?
A. I don't know exactly, sir.
Q. Let's look at interrogatory number six which references Paragraph 26 of the amended

Page 247

complaint if you want to look at that. So today, Mr. Perrot, can you provide me with the specific actions of Charles Arpin related to the allegations in Paragraph 26 of your complaint, your amended complaint?
A. I can't sir, no. I can't describe his specific acts, no.
Q. Moving on to interrogatory number seven. That refers to Paragraphs 41 through 43 of your amended complaint if you want to look at those.
(Witness perused document.)
A. Okay.
Q. All right. First off do those pertain to Defendant Charles Arpin?
A. Sir, it was dark. I couldn't tell you which officers specifically were beating me, no.
Q. So you think that Lieutenant Arpin might have been one of the people that viciously beat you on your way to the police station, threatened to kill you and beat you again upon arriving at the police station?
MS. GIZZI: Objection. Form.
A. He might have been, yes.
Q. Do you know for certain that he was there?

Page 248

MS. GIZZI: Objection. Form.
A. For certain, no, I don't, sir.
Q. So did you file a lawsuit regarding the force that was used against you during your arrest?
A. I didn't, sir.
Q. Let's look at interrogatory number eight which references Paragraph 44 of your amended complaint.
(Witness perused document.)
A. Okay.
Q. So, Mr. Perrot, to date is it your contention that Defendant Arpin was involved in any of these allegations or actions?
MS. GIZZI: Objection. Form.
A. I would have to see the card to see if he was in the room when I was signing them. I don't know specifically, sir.
Q. You don't know if he was there?
A. I don't.
Q. Mr. Perrot, do you remember testifying at a motion to suppress hearing?
A. I do, yes.
Q. And at that hearing did Assistant District Attorney Francis Bloom show you a succession of

Miranda cards signed by you?
A. He did, sir.
Q. At that hearing did you identify your signature on those Miranda cards as being yours?
A. They appeared to be, yes.
Q. So which ones didn't you sign?
MS. GIZZI: Objection. Form. Misstates his testimony.
A. I just stated, sir, they all appeared to be my signature.
Q. Interrogatory number nine, Mr. Perrot. Let's move on to that and that references Paragraphs 46 through 52 of your amended complaint if you want to refer to those.
(Witness perused document.)
A. Okay.
Q. Do you see that?
A. I do.
Q. Now, in connection with the statements that were obtained by the police department did you challenge those on appeal, the voluntariness?
A. My lawyer did, yes.
Q. And what was the result in the Appellate Court?



A. Appellate Court upheld it.
Q. The Appellate Court upheld them as voluntary; right?
A. Yes.
Q. And during any of that process are you able to point to any actions by Defendant Arpin in connection with those statements or interrogation tactics?
A. Again, I wouldn't know whether I could recognize Lieutenant Arpin that day or today so I don't know if he was one of the officers that was keeping me up in the cell.
Q. Let's move on to interrogatory number ten which references Paragraph 53 of your amended complaint.
(Witness perused document.)
A. Okay.
Q. So can you identify for me today exactly which documents Defendant Arpin forged your signature on?
A. Again, sir, someone forged my name on a statement to induce Jeff Adkins. I don't know which officers were involved.
Q. Was it Charles Arpin?



MS. GIZZI: Objection. Form.
A. Could have been, sir.
Q. Do you know whether it was Charles Arpin?
A. Personally I don't know.
Q. And that statement wasn't used in your trial though, was it?
A. It wasn't, sir, no.
Q. Is that the only statement you say that someone forged your signature on?
MS. GIZZI: Objection. Form.
A. That's the only one I claim, sir, yes.
Q. Let's move on to interrogatory number 11, sir, and that references Paragraphs 57 and 58 of your amended complaint and this references back to the lineup; correct?
A. It does, sir.
Q. And we've covered that. What information do you have that anyone coerced or cajoled MP at the lineup?
A. Well, after my trial, Mrs. Prekop contacted my next door neighbor Mrs. Edwards and told her that the police were lying, that that's not the man that broke into my house and they were trying to convince her to say that I was.



Q. So your information comes from Olive Edwards; is that what you're saying?
A. Yes. Mrs. Prekop visited Olive Edwards immediately after my trial and asked her to contact my mother.
Q. And who is Olive Edwards?
A. My next door neighbor at the time.
Q. Where does she live with relation to Mrs. Prekop or where Mrs. Prekop used to live?
MS. AGBIRO: Objection. Form.
A. Mrs. Edwards lived right next to me so maybe five, six houses or seven houses away.
Q. So if I understand your testimony correctly, your information is something that Mrs. Prekop told Mrs. Edwards who told your mother who told you?
A. That's not what I said, sir.
Q. So clarify the chain.
A. What I said is after my trial.
Q. Right.
A. Mrs. Prekop contacted Mrs. Edwards.
Q. Right.
A. And asked her if she can contact my mother because the police were trying to make her say I was

Page 253

the one that broke into her house.
Q. I understand. So Mrs. Prekop gave this information to Mrs. Edwards; right?
A. Yes.
Q. And then Mrs. Edwards gave the information to your mother; right?
A. Yes.
Q. And then you learned of the information from your mother; right?
A. Yes.
Q. Any other information that anyone coerced or cajoled her to identify you at the lineup?
A. Not my specific memory, no, sir.
Q. So let's move on to interrogatory 11 and we're looking at Paragraph 60 to 62 of your amended complaint.
MS. GIZZI: Eleven or 12?
MR. JOYCE: Sorry. Interrogatory 12. Did I misspeak?
Q. Interrogatory 12. Paragraph 60 through 62 of the amended complaint.
A. Okay.
Q. Got it?
A. I do.

Page 254

Q. So today can you tell me what evidence Charles Arpin fabricated?
MS. AGBIRO: Objection. Form. Asked and answered.
A. Again, sir, one of the officers in the case planted the evidence so whether it was Charles Arpin or not I can't specifically state that it was him.
Q. Can you tell me what witness statements Charles Arpin fabricated?
A. Again, sir, I don't know exact. I couldn't describe the officers or know the officers' name that were involved in a false confession or typing up the confession that I signed pertaining to the Mary Prekop case.
Q. Interrogatory number 13 which references Paragraph 94 of your amended complaint.
A. Okay.
Q. That indicates Paragraph 94 of your complaint says the defendants framed you by manufacturing false evidence and withholding exculpatory evidence; right?
A. It does, sir.
Q. Can you tell me today what false evidence

Page 255

was manufactured?
MS. GIZZI: Objection. Form. Asked and answered.
A. The gloves, the hair on Mrs. Prekop's bed. The hair.
Q. Same thing we talked about in answer to an earlier interrogatory? Nothing new?
A. Correct.
Q. And again, do you have any information that Charles Arpin did any of that?
A. I don't, sir.
Q. What exculpatory information or evidence was withheld?
A. Well, if the blood wasn't mine on the sheet, it was obviously somebody else's.
Q. And if I recall correctly, tell me if I'm wrong, didn't some expert testify that the blood could have been yours on the sheet?
MS. GIZZI: Objection. Form.
Q. Based on scientific tests.
A. I don't recall that. At the first trial, yes.
Q. Well, if I understand the process, you were at the trial. The police indicated that they

Page 256

took some evidence from the house which included a sheet?
A. Mm-mm.
Q. And someone at a lab took the sheet and took a sample of the blood stain and tested it; right?
A. Yes.
MS. GIZZI: Objection. Form.
Q. And the results of that test indicated that it could be your blood; right?
A. No. It said I couldn't be excluded.
Q. You couldn't be excluded?
A. Yes.
Q. But you could be included.
A. Could.
Q. All right. What did the police do in connection with that other than have the sheet tested?
A. Well, it ultimately turned out when it was further tested, it wasn't my blood so it was someone else's blood.
Q. So let's move on to interrogatory number 14 which references Paragraph 99 of your amended complaint. Do you see that?

Page 257

A. I do, sir.
Q. Can you tell me today at your deposition what wrongdoing was committed during the investigation by Lieutenant Arpin?
A. I couldn't identify Lieutenant Arpin so I don't know what his exact actions were.
Q. And can you tell me what he did to cover up any wrongdoing as referenced in Paragraph 99?
A. Again, sir, I can't, no.
Q. Moving on to interrogatory 15 which references Paragraph 102.
(Witness perused document.)
A. Okay.
Q. So I'm looking at Paragraph 102 and it references fabricating false statements from you about the location of evidence. Is that a reference to Mary Prekop's purse?
MS. GIZZI: Objection. Form.
A. No.
Q. Is it a reference to Mrs. Lichwala's purse?
A. It is.
Q. All right. And you're saying that you did not tell Richard Kane where the purse was; right?

Page 258

A. I didn't, no.
Q. And what does Charles Arpin have to do with that?
A. Again, sir, I don't know. I can't identify the cops that were with Mr. Kane at the time so I don't know if it was Lieutenant Arpin or it could have been any other cop. I don't know. I specifically don't have a recollection, no.
Q. Well, this conversation with Richard Kane took place when he came to get samples of your blood at York Street Jail; right?
MS. GIZZI: Objection. Form.
A. Yes.
Q. Who else was in the room when he got your blood samples?
A. I believe it was a doctor and another gentleman.
Q. Who was the other gentleman?
A. I don't know who he was, sir.
Q. Was he someone from the jail?
A. Could have been, yeah.
Q. Well, your best memory.
A. I don't know who it was, sir.
Q. Was he a Springfield Police Officer then?

Page 259

MS. GIZZI: Objection. Form. Asked and answered.
A. I'm not sure.
Q. Was he in uniform?
A. No. He was in plain clothes.
Q. And so you don't know who that third gentlemen was; is that what you're saying?
A. I don't, no.
Q. And you don't know if it was Lieutenant Arpin?
A. Again, sir, I just told you I couldn't tell you if it was or wasn't.
Q. Let's move on to interrogatory 16 which is the last interrogatory and that references Paragraph 141 of your amended complaint.
(Witness perused document.)
A. Okay.
Q. So, Mr. Perrot, today can you tell me what conduct by Charles Arpin during the investigation was objectively unreasonable and undertaken intentionally with malice, willfulness, wantonness and reckless indifference to the rights of others. By others I assume that means you.
MS. GIZZI: Objection. Form. Calls

Page 260

for a legal conclusion.
A. Again, sir, I can't identify Lieutenant Arpin so I don't know what his specific acts were.
Q. So is it fair to say that based on going through all those answers to interrogatories that you can't tell me specifically anything that Lieutenant Arpin did during the investigation of the various crimes that you were prosecuted for back in 1985?
MS. GIZZI: Objection. Form. Misstates the testimony.
A. Specifically, no.
Q. Mr. Perrot, when did your mother and father separate?
MS. GIZZI: Objection. Form. Lack foundation.
A. When I was a young kid. I don't know. I might have been three, four. I don't know.
Q. Was it before you remember being at 87 Malibu Drive?
A. Yes.
Q. And where did your father live after he and your mother separated?
A. I was a young kid, sir. I don't know

Page 261

where he lived.
Q. Where is the first place you remember him living?
A. It was an apartment.
Q. Where?
A. Somewhere in Springfield.
Q. Is he still alive?
A. He isn't, no.
Q. When did he die?
A. Maybe 2014, 2015.
Q. When you were growing up at 87 Malibu Drive, did you have grandparents?
A. No.
Q. You said that at some point your mother and stepfather moved to Chicopee; right?
A. Yes.
Q. Why did they move to Chicopee?
MS. GIZZI: Objection. Form.
A. I couldn't tell you, sir. I don't know.
Q. They didn't tell you why?
A. No.
Q. Did they ask you to come with them?
A. I didn't want to go, sir.
Q. Well, that wasn't actually my question.

Page 262

Did they ask you to come with them?
A. I can't recall, no.
Q. But you didn't want to go to Chicopee; right?
A. No.
Q. So you decided to stay with your sister?
A. Correct.
Q. How old was your sister at that time?
A. I'd say she was in her twenties.
Q. Was she married at the time?
A. No.
Q. Why did you want to stay with your sister?
A. It's where I grew up.
Q. 87 Malibu, is that a single-family home?
A. Yes.
Q. Is there one story?
A. Yes.
Q. And where in the building was your room?
A. Where in the building? In the front of the house.
Q. In the front?
A. Yes.
Q. Okay. Was it a furnished basement?
A. No.

Page 263

Q. When you left the house, did you ever climb out of one of the windows?
A. No.
Q. In September of 1985 did you have a driver's license?
A. No.
Q. Did you ever get a driver's license?
A. No. Oh, when I got out of prison, yeah. When I got out of prison in 2016, I got one.
Q. In 2016 is the first time you got a driver's license?
A. Yes.
Q. So in 1985 did you own a car?
A. No.
Q. Did you ever drive a car in 1985?
A. Did I ever drive one?
Q. Yes.
A. Not legally, no.
Q. When you got out of prison in 2016, did you get health insurance?
A. MassHealth, yeah.
Q. As part of MassHealth, did you have to get a primary care physician?
A. Yes.

Page 264

Q. Who is that or who was that in 2016?
A. I can't recall the name, sir.
Q. Did you still have the same primary care physician?
A. No.
Q. When did you stop having a primary care physician?
A. I got a different one maybe in 2021 maybe. I don't know his name either.
Q. So you had a primary care physician from 2016 to 2021, the same one; is that what you're saying?
A. I believe so, yes.
Q. Where was he located?
A. Methuen.
Q. In Methuen. You can't tell me either his first name or his last name?
A. I can't sir, no.
Q. And not where his practice was?
A. No.
Q. Or where his office was located in Methuen?
A. I can't, no.
Q. Did you ever go to his office?

A. I went, yes.
Q. How many times?
A. I don't have a specific number. I didn't go very often.
Q. Why did you have to get a new primary care physician in 2021?
A. Why did I have to?
Q. Well, why did you change primary care physicians in 2021? Let's rephrase it that way.
A. I don't remember why I did, sir.
Q. Where was that primary care physician located?
A. In Groveland, Mass.
Q. Groveland?
A. Yes.
Q. Can you tell me his name?
A. Again, sir, I can't.
Q. First name or last name?
A. I'm bad with names, sir. I'm sorry. I can't provide the name. I don't know his name.
Q. Have you ever been to his office?
A. I have a couple of times, yes.
Q. Where in Groveland is it?
A. On the main street in Groveland. I don't



know the name of it.
Q. How many times have you been to his office?
A. Maybe two or three.
Q. You indicated that at some point you were diagnosed with PTSD; correct?
A. Correct.
Q. What was the trauma with the post trauma?
MS. GIZZI: Objection to form.
A. The post trauma?
Q. Well, post trauma means that you underwent some kind of trauma so what was the trauma that was identified?
A. Well, I spent 30 years in a maximum security prison, sir. Tortured for a rape case I didn't commit.
Q. So there was no other event other than being in prison for all of that length of time?
A. I think 30 years in prison is enough for one event, sir.
Q. What treatment have you gotten for your PTSD?
A. I have counseling with Sarah Coughlin. Prescribed medication.



Q. Was that the Zoloft you were talking about?
A. That was the first one. I don't know the name of the second one.
Q. Any other treatment besides the counseling and the medication?
A. No.
Q. Did you get any treatment for the ADHD?
A. No. I've never been medicated for it, no.
MR. JOYCE: Can we mark that as Exhibit 12, please?
(Exhibit 12 was marked for identification.)
Q. Do you recognize what that is, Mr. Perrot?
A. Appears to be a map of Springfield.
Q. Well, since we're in the 21st century, are you familiar with Google Maps?
A. I'm not, sir, no.
Q. Okay. You never used Google Maps?
A. Never in my life.
Q. Do you recognize the streets depicted on this particular satellite photograph?
A. I can see Malibu Drive, yes.
Q. And there's a red circle dot that's



essentially where 87 Malibu Drive is; correct?
A. Correct.
Q. Okay. Now, as I understand it, and correct me if I'm wrong, you indicated yesterday that Robert Timmerman and Jeff Adkins were childhood friends of yours; right?
A. Correct.
Q. And also Lisa Eldridge was a childhood friend?
A. She was my girlfriend, yes.
Q. Did you meet the three when you attended elementary school?
A. No. They were older than me.
Q. How much older?
A. Maybe four or five years.
Q. So in 1985 you were 17. How old was Robert Timmerman?
A. Early twenties.
Q. And how old was Jeff Adkins?
A. Same. Early twenties.
Q. And how old was Lisa Eldridge?
A. Lisa was my age.
Q. So did you meet her at elementary school?
A. Her I did, yes.

Page 269

Q. You said you went Brunton which is there in the top right corner of the photo?
A. No. I met her actually at junior high.
Q. I'm sorry. Where?
A. I actually met her at Kiley Junior High.
Q. At junior high. Okay. And how did you meet Mr. Timmerman?
A. He lives right up the street from me. He was in the neighborhood.
Q. This is why I did the photograph. I'm going to give you a pen. As best as you can, I would like you to put a mark on Exhibit 12 where as best you can make out Mr. Timmerman's house was and put a T there.
MS. AGBIRO: Counsel, I want to put on the record this is a map of 2023.
MR. JOYCE: 2023. Yesterday. I printed it yesterday.
MS. AGBIRO: Yes. I wanted to make sure since some things change so I wanted to make sure.
MR. JOYCE: Some things have but I don't think the street layout changed but we'll see.
Q. Did you mark where Mr. Timmerman's house

Page 270

was? Approximate location. I don't care if it's exact.
A. I know where he lives, sir.
Q. So you marked a -- what kind of mark did you put?
A. You asked me to put a T; correct?
Q. Yes.
A. Okay. I put a T there.
Q. And could you do the same for Lisa Eldridge's house with an E? Again, if you can see it, she's on Corey Road; right?
A. Yeah. You've only got the beginning.
Q. It's part of it. If it's not, just put it in the margin there and indicate it's further up the street. Just put an approximate location is good.
(Witness did as requested.)
Q. And can you do the same for where Mr. Adkins lived with an A?
(Witness did as requested.)
Q. And now could you put a mark on there where Mrs. Prekop's house was approximate location with a P.
(Witness did as requested.)
Q. And Ellendale Circle is on here. Is

Page 271

Mr. McNabb's house shown on this particular photograph approximate location do you know?
A. I see it right there.
Q. Can you put an M where for his house is?
(Witness did as requested.)
Q. And there's a shopping center here on the left-hand side. Is that where the Denny's was located back in 1985?
A. Yeah.
Q. It's not there now but can you circle the building that was Denny's at the time?
(Witness did as requested.)
Q. Right. And Emily Lichwala lived on Covel Street; right? Can you put an L where that is? I believe you said that Covel was around the corner from Corey where Lisa lived.
(Witness did as requested.)
Q. Okay. Did you do that?
A. I did.
Q. All right. And there was another woman Mrs. Marchand. She lived on Pineview Drive; right?
MS. GIZZI: Objection. Form.
Q. Did Mrs. Marchand live on Pineview Drive?
A. I don't know what street, no.

Page 272

Q. Well, you painted her house at one point, didn't you?
A. I did, yes.
Q. And who did you do that with?
A. Jeff Adkins.
Q. So you and Jeff painted her house and you don't remember what the street was?
A. Sir, this happened 40 something years ago. I don't remember the street, no.
Q. But Pineview is not on this particular map, is it?
A. I don't see it, no.
Q. Do you know where it is?
A. Yeah. I know where it is.
Q. It's off the top of the map, isn't it, in that direction?
MS. GIZZI: Objection. Form.
Q. Of the photograph here.
A. If that's what you're telling me. It's probably five miles from Malibu so.
Q. And based on what you remember about the neighborhood in 1985, can you tell me, understanding that this is a map from yesterday, what changes there might be or what changes are there from the

street layout as it was in back in 1958 to this particular map in 2023?
MS. GIZZI: Objection. Form. He's never seen a 1985 Google Map.
A. I don't know what you mean by layout of the streets, sir. The streets don't change.
Q. Okay. So as far as you know, the streets are in the same place they were back in 1985 as depicted on this map; right?
A. I would assume so, yeah.
Q. The stores in that shopping plaza have changed over the years though. They're not the same ones that were there in 1985, are they?
MS. GIZZI: Objection. Form.
A. I don't know what the stores are there now, sir.
Q. So could you sign and date that at the bottom, please? Today is July 13th.
(Witness did as requested.)
Q. Thank you. Did Robert Timmerman have a job back in 1985?
MS. GIZZI: Objection. Form.
A. He did.
Q. What was his job?



A. He worked at Bartels Pools.
Q. I'm sorry? Try to keep your voice up.
A. He worked at Bartels Pools.
Q. He worked at Bartels Pools and you worked there too, right, at one time?
A. Yes.
Q. Did Mr. Adkins have a job in 1985?
A. I'm not sure.
Q. Did Lisa Eldridge attend school back in 1985?
A. Yes.
Q. What school did she attend?
A. Commerce I believe.
Q. I'm sorry?
A. Commerce.
Q. Again, your voice tends to drop of.
A. Commerce.
Q. Commerce High School?
A. Yes.
Q. On December 7, 1985 you said that the four of you were riding around Springfield. Prior to that you had purchased beer, a case of beer; right?
A. Yes. I believe so, yes.
Q. Who bought the beer?



A. I believe Bob did.
Q. Where did he get it?
A. Springfield Package Store.
Q. Again, you've got to keep your voice up.
A. Springfield Package Store.
Q. Were you with him when he bought it?
A. Yeah. I was in the car, yeah.
Q. And did he have his own car?
A. He did, sir, yeah.
Q. Is that the car you were riding around in?
A. Yes.
Q. Did Jeff Adkins have his own car?
A. No.
Q. So when the four of you went out, did you usually go in Bob's car?
A. We did, sir, yeah.
MR. JOYCE: Can we mark those? There are three different exhibits so the next three exhibits.
(Exhibit 13, Exhibit 14, Exhibit 15 were marked for identification.)
Q. Have you had a chance to review those three exhibits, Mr. Perrot?



A. I looked through them briefly, yeah.
Q. Okay. So these are three letters that you wrote; correct?
A. Correct.
Q. And they're marked, what, 13, 14 and 15; right?
A. Correct.
Q. Can you tell me in which order you wrote them by the exhibit number? Which letter did you write first?
A. I don't know, sir. I really couldn't tell you. There's no dates on them. I wrote them. Simple as that. I wrote them.
Q. I understand that. I know there are no dates. That's why I'm asking which one you wrote first.
A. I don't know, sir. These letters were written several years ago. I don't know. I couldn't tell you.
Q. So when did you write these letters?
A. Early nineties.
Q. Who did you write them to?
A. Kim Moran.
Q. Kim Moran?

Page 277

A. Yes.
Q. And is that how you addressed each letter because it's blacked out or redacted at the top; right?
A. Sir, I couldn't tell you how I addressed them.
Q. Can you tell me what KBG means?
A. Kim belongs to George.
Q. Kim belongs to George. And if you look at what I think is Exhibit 13, down in the it looks like the last full paragraph on the first page it says, picked Sue up, brought her to Rivera. Do you see that?
A. I do.
Q. Is Rivera a code for someplace?
A. It's supposed to say Revere. Just I'm a horrible speller.
Q. Okay. So it's Revere. It's not any kind of code then; right?
A. Correct.
Q. And these relate to the incident you talked about or testified about yesterday concerning the drug smuggling to finance an escape plan; correct?

Page 278

A. Correct, sir.
Q. Now I'm going give you Exhibit No. 9. I'll take those back. We're done with those. Just so we don't have all kinds of papers floating around. All right. I'm going to show you Exhibit No. 9, Mr. Perrot, and I know you answered some questions yesterday but I have a few follow-up. That picture of you, when was that taken?
A. After I was released.
Q. In 2016?
A. Yes.
Q. And so you posed for that picture for someone; right?
A. I did, sir.
Q. Who took the photograph?
A. I believe it was Allie Griffin.
Q. I'm sorry?
A. I believe Allie took it.
Q. Alissa Griffin?
A. Yes.
Q. Where did she take it?
A. I want to say at my stepsister's house but I'm not sure. It looks like my stepsister's apartment.

Page 279

Q. Stepsister?
A. Thea Glidden.
Q. Thea Glidden and where was her apartment at the time?
A. Chicopee.
Q. So Alissa Griffin went to Chicopee with you to your stepsister's apartment; right?
A. She did.
Q. How long -- well, let me back up. What was your relationship with Alissa Griffin?
A. We smoked crack together, sir.
Q. For how long did you do that? Let me rephrase that. I'll withdraw that. How long did you have that relationship with Alissa Griffin?
A. Maybe a few months. Four or five months maybe.
Q. How did the relationship start?
A. She lived around the corner from my house on Groveland Street.
Q. Groveland Street in Haverhill?
A. Yes.
Q. And she lived around the corner at the sober house?
A. No. She lived on Groveland Street around

Page 280

the corner.
Q. Okay. So she had her own apartment?
A. No. She lived with her family in a house.
Q. How did you meet Alissa Griffin?
A. She used to come by my house almost every day. One day she said hello. I started talking to her and that's how I met her.
Q. How did your relationship with Alissa Griffin end?
A. I was charged with domestic on her.
Q. Domestic assault and battery?
A. Correct.
Q. You talked about that yesterday. You had 60 days in the house of correction; right?
A. Yeah. I copped out at my arraignment.
MS. LYNCH: I didn't hear that answer.
A. I said I copped out at my arraignment.
MS. LYNCH: Thank you.
Q. And that was the end of your relationship with Miss Griffin?
A. Yes.
Q. When was that?
A. 2018 maybe.

Page 281

Q. In connection with your answers to questions yesterday you said that Miss Griffin had your access codes for your Facebook; right?
A. She's the one that set it up, yeah.
Q. She set up the account for you?
A. Yes.
Q. When did she do that?
A. I don't know the exact time, sir.
Q. And when she set it up, were you there with her?
A. Yes.
Q. And where did she do it?
A. I believe it was at my sister's apartment.
Q. So when the photograph was taken in Chicopee, that's when she did it?
A. Yeah.
Q. When was that? What year?
A. 2018 I believe.
Q. Did you do anything with the Facebook account?
MS. GIZZI: Objection. Form.
A. I'm not computer savvy, sir, so no.
Q. Well, neither am I. That's why I'm asking questions this way. I'm not on Facebook.

Page 282

A. I've never personally posted anything on Facebook.
Q. Okay. When she set up your Facebook account, did she give you the information?
A. Yes.
Q. So you have the information for the Facebook account?
A. Sir, I couldn't tell you the day after what the information was or today. I'm not real good at remembering stuff like that.
Q. Okay. If we look at the second page there, there are photographs of some people with names. Do you know any of these people?
A. I know two of them.
Q. Which two?
A. Lisa Kavanaugh and Scott Boston.
Q. Which one is Lisa Kavanaugh?
A. One in the middle.
Q. Top right?
A. Yes.
Q. And the other one, please?
A. Scott Boston lower left.
Q. Scott Boston?
A. Yes.

Page 283

Q. How do you know Scott Boston?
A. I met him in the county jail.
Q. And are the nine people whose photographs are here friends of your Facebook? Is that how that works?
A. I don't know any of them so I don't know how they're my friends.
Q. Well, did you do anything to make them your friends on the Facebook account?
A. No.
Q. Did you ever use your Facebook account?
A. Not that I can recall sir, no.
Q. So you said that you learned of this posting that's shown here from your mother; right?
A. Yes.
Q. When was that?
A. I believe it was maybe last year maybe. Yeah. Maybe last year.
Q. 2022 sometime?
A. Yeah.
Q. Can you tell me what month?
A. I couldn't sir, no.
Q. Can you tell me what season? Fall, winter?

Page 284

A. No, I couldn't, sir.
Q. Could you point to a particular holiday that it might have been near?
A. Again, sir, no. I don't know when it was posted.
Q. And I believe yesterday you said that you contacted Lisa Kavanaugh about it; right?
A. I did.
Q. Did you do anything to take down the posts?
A. Lisa Kavanaugh called Facebook and reported it, yeah.
Q. But the post is still there.
A. They don't take it off, sir. That's why it's still there.
Q. Did you go in and change it?
A. I personally didn't, no.
Q. Well, it's your account, isn't it?
A. Sir, like I said, I don't know how to do Facebook stuff and computer stuff. Lisa Kavanaugh spoke to Alissa Griffin about it, told her to stop. Lisa Kavanaugh called Facebook to take the post down. They wouldn't take the post down. That's why it remains there, sir.

Q. Other than talking to Lisa Kavanaugh have you done anything else to remove the Facebook post?
A. Sir, I don't run Facebook. I wouldn't care if it was there or not. I don't go on Facebook and the answer again for the third time is no.
MS. GIZZI: Take a break, five-minute break.
MR. JOYCE: Do you want to take a break?
MS. GIZZI: Yes.
MR. JOYCE: We're going to take a break, people. It's 10:51. Back at 11:00.
(A break was taken.)
MR. JOYCE: Mr. Perrot, I have no other questions for today and I'll turn it over to Kevin.

EXAMINATION BY MR. COYLE

Q. Good morning, Mr. Perrot. I'm Attorney Kevin Coyle and I represent four of the defendants you've named in this matter, Ronald St. Germain, Andrew Canevari, Paul Glantz and Thomas Jarvis. I'd like to ask you directing your attention to the defendant Ronald St. Germain. Do you know mister or



Officer St. Germain?
A. I don't, sir, no.
Q. Would you know him if you saw him?
A. No.
Q. Now, directing your attention to the claims that you've made in your complaint. Can you tell us what role then Officer St. Germain had which you are claiming to violate your rights?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.
A. I can't, sir, other than what's drafted in my complaint.
Q. Did you have any interaction with then Officer St. Germain at any time in connection with these matters which are the subject of your complaint?
A. Again, sir, I couldn't identify Officer St. Germain so I can't answer that.
Q. Is it fair to say that you don't have personal knowledge of anything that Officer St. Germain did that's alleged in the complaint?
A. Other than what's in my complaint, no.
Q. Well, I'm asking if you have personal knowledge of any of the events which took place or



any of the actions that took place by then Officer St. Germain that you are claiming relief from in your complaint?
A. No, sir.
Q. Are you aware of Officer St. Germain fabricating any evidence?
A. Personally, no.
Q. Are you aware of Officer St. Germain destroying or concealing any documents or other relevant evidence to the crimes which you were charged?
A. Other than what was reported that the officers' notes weren't available because they were either lost or destroyed, no.
Q. Do you have any personal knowledge of whether there were any notes created by Officer St. Germain?
A. Personally, no.
Q. Are you aware from your personal knowledge of any actions by Officer St. Germain that would have been participatory in a conspiracy to frame you?
MS. GIZZI: Objection. Form. Calls for a legal conclusion.



A. Specific actions, no.
Q. Let me direct your attention to then Sergeant Andrew Canevari. Do you know Sergeant Canevari?
A. I don't, sir, no.
Q. Would you know him if he walked in the room?
A. No.
Q. Or perhaps more accurately would you have known him if he walked in the room back in 1985?
A. No, sir.
Q. Are you aware of any actions from personal knowledge which then Sergeant Canevari took which you are claiming to support any of the claims for relief that you've made in your complaint?
MS. GIZZI: Objection. Form.
A. No.
Q. Are you aware of any evidence that you claim was fabricated by then Sergeant Canevari?
A. No, sir.
Q. Are you aware of any evidence or probative matters relating to the charges against you back in 1985 and '86 that were destroyed or otherwise withheld from you back at that time?

A. Other than the notes through discovery, no.
Q. What notes are you referring to?
A. The officers' notes. We requested officers' notes that were written during the interrogation and investigation and they claim they didn't have them.
Q. Did then Sergeant Canevari interrogate you?
A. I couldn't answer that, sir.
Q. Do you know if then Sergeant Canevari made any notes of any interaction with you?
A. Personal knowledge, no.
Q. And do you recall any interaction between yourself and then Sergeant Canevari relating to the investigation or the prosecution of the charges against you?
A. I don't know what Officer Canevari looks like so no.
Q. Directing your attention to then Officer Paul Glantz. Do you know Officer Paul Glantz?
A. I do, sir.
Q. And did you know him back in 1985?
A. I did.



Q. And when did you first come to know Officer Glantz?
A. I was arrested by him at a keg party.
Q. Do you recall when that took place?
A. Would have been the summer months of that year.
Q. Of 1985?
A. '84.
Q. '84. Tell us what happened in regard to your interaction with then Officer Glantz at that keg party.
A. My interactions with him other than he arrested me?
Q. Okay. Did you have any conversation with him? Did he say anything to you? Did you say anything to him?
A. No, sir.
Q. So you were arrested at that time?
A. I was.
Q. What was the charge against you?
A. Illegal sale of alcohol. I want to say assault and battery on an officer.
Q. And what was the outcome of those criminal charges?



A. I received ten days in the house of correction.
Q. Was there a guilty verdict entered against you in the Superior Court?
A. I don't believe it went to Superior Court. I believe it was in District Court.
Q. District Court. And what charges were you found guilty of?
A. Assault and battery and illegal sale of alcohol.
Q. Was that after a trial?
A. I believe it was a plea, sir.
Q. What was your next interaction with then Officer Glantz?
A. He was at the police station when I got arrested on November 30th of 1985.
Q. Did you have any interaction with him prior to that keg party in the summer of I think you said 1984?
A. No.
Q. Did you have any interaction with him between the time of that keg party and the time you were arrested in November 1985?
A. No.



Q. Other than those two situations have you ever had any interaction with then Officer Glantz?
A. No.
Q. So tell us -- describe the interaction you had with him in connection with the 1985 matter.
A. He was sitting outside my cell every time they put me in the cell and wouldn't let me go to sleep. Kept rattling my bars with his nightstick.
Q. Did he say anything to you and did you say anything to him?
A. I can't recall at this time, sir.
Q. Did he participate in any interrogation of you?
A. Not that I recall, no.
Q. Did he ever enter the cell that you were in?
A. Other than taking me upstairs, no.
Q. And how many times would you say he I think you used the term rattled the cell?
A. Yeah. He was running his nightstick across the bars.
Q. How many times did that happen?
A. Every time that I returned to the cell they wouldn't let me go to sleep. They made sure I

Page 293

stayed awake.
Q. How long were you in the cell while that was going on?
MS. GIZZI: Objection. Form.
A. I couldn't tell you specifically, sir.
Q. Are you aware of then Officer Glantz fabricating any evidence that was used against you?
A. Not to my personal knowledge, no.
Q. Are you aware of him destroying or concealing any evidence that may have been exculpatory for you in those criminal charges?
A. No.
Q. Do you have any personal knowledge or did you witness any events in which you allege to be part of a conspiracy to wrongfully convict you?
MS. GIZZI: Objection to form.
A. Personal knowledge of him, no.
Q. Directing your attention to Officer Jarvis. Do you know Officer Jarvis?
A. Through the discovery, yes.
Q. Would you recognize him if he was here today?
A. I don't think I could recognize him, no.
Q. Have you ever been in his presence?

Page 294

A. Yes.
Q. When was the first time you were in his presence?
A. Interrogation room.
Q. And when was that?
A. 1985.
Q. And tell us how you first encountered him. Where did you first encounter him and what did he say to you and what did you say to him?
A. I don't know what I specifically said. He introduced himself as a detective when I was brought up to a little office. He wanted to ask me some questions.
Q. And did he ask you questions?
A. He did, sir.
Q. Did you answer the questions?
A. No.
Q. Do you recall if then Officer Jarvis advised you of your rights under the Miranda ruling?
A. He may have.
Q. Do you remember him having you sign a card indicating that you were aware of your Miranda rights?
A. He did have me sign a card, yeah.

Page 295

Q. And so tell us what happened after that in this interview.
A. I told him I didn't want to talk to him.
Q. Was anyone else present during this interview?
A. There was another officer in the room, yes.
Q. And do you know who that officer was?
A. I don't, sir.
Q. How many officers were in the room?
A. Two.
Q. How long were you in the interview room with then Officer Jarvis?
A. Short period of time. When I first went in there, they brought me back downstairs in the cell.
Q. Did you have a second interview with Officer Jarvis?
A. I had several, yeah.
Q. How many interviews did you have with Officer Jarvis that day?
A. Maybe three.
Q. Let's start with the first interview. You indicate that you told him you didn't want to answer

Page 296

his questions. Do I understand that correctly?
A. Correct.
Q. What happened, if anything, as a result of that?
A. They brought me back down to the cell.
Q. And there was a second interview do I understand?
A. There was, yes.
Q. How long was it between the first interview and second interview?
A. I would be guessing if I gave you an estimate of time, sir. I don't know. It wasn't that long. It was a short period of time. Maybe 20 minutes, half hour.
Q. When you went for the second interview, where did that place?
A. In an office as well.
Q. And who was present at the second interview?
A. It was two different officers.
Q. Was Officer Jarvis there?
A. He might have been. I think it was Officer Jarvis but there was another officer there as well.

Page 297

Q. Do you know who the other officer was?
A. I don't, sir.
Q. So tell us what happened at the second interview.
A. They wanted to know about the attacks on the elderly women.
Q. I'm sorry?
A. They wanted to know about the assaults on the elderly women.
Q. What happened? Did you tell them about the assault on the elderly woman?
A. I told them I didn't know anything about it.
Q. So did you willingly answer their questions at that time?
A. Other than I didn't know anything about it, no.
Q. How long did that interview last?
A. I don't know specific time, sir, how long it took. It wasn't that long of a period, maybe 20 minutes maybe. I'm just guessing.
Q. Let me back up to the first interview again. Did you sign a statement at any time during the first interview?

Page 298

A. No.
Q. Did you sign a statement at any time during the second interview?
A. No.
Q. And did any of the people who were interviewing you make any threats to you during that interview?
A. Not that I can recall, sir, no.
Q. How long did the second interview last?
A. Again, sir, I don't have a specific time.
Q. Were you coerced in any way in that second interview to provide information or provide answers?
MS. GIZZI: Objection. Form.
A. Well, they kept telling me they knew that I broke into these houses.
Q. Was that the only thing they did that you felt was coercive?
A. To the best of my memory, yeah.
Q. And do I understand that after that interview you were then brought back to the cell?
A. Yes.
Q. How long were you in that cell before you left again?
A. Again, sir, I didn't have a watch on. I

Page 299

couldn't tell you specific time.
Q. So where did you go for the third interview?
A. Well, they took me to take pictures and fingerprints in-between that time so I went back up to an office.
Q. So the sequence was after the second interview, you had photographs taken. Do I understand that correctly?
A. They took photographs and pictures a couple times.
Q. So the third interview was that in the same location as the first two?
A. It was one of the offices that I was already in, yeah.
Q. Who was present during that interview?
A. Two officers. It was always two officers with me.
Q. Do you know who the officers were in the third interview?
A. No, I don't.
Q. Do you know if one of them was Officer Jarvis?
A. Through discovery I knew one of them was

Page 300

him, yes.
Q. That's the third interview?
A. No. There was another cop there that was asking me about blood and hair.
Q. When you say discovery, do you have a memory of Officer Jarvis being there at the third interview?
A. Specifically, no, sir. I think it was a different officer that was asking me about the blood and hair.
Q. Do you have a specific memory of Officer Jarvis being at the second interview?
A. I believe he was, yes.
Q. Well, I'm asking you if you have an actual memory of that.
A. I don't, sir, no. It happened a long time ago.
Q. Can you tell us what, if any, evidence Officer Jarvis fabricated in relation to the charges against you?
A. He was the officer ultimately typing the statement so I would say the statement he fabricated.
Q. Did you sign that statement?

Page 301

A. Yeah, I did, sir.
Q. Were you given the opportunity to read it?
A. I did.
Q. Are you aware of any other evidence that Officer Jarvis fabricated?
A. Not personally, no.
Q. Are you aware of any evidence, potentially exculpatory evidence that Officer Jarvis either destroyed or concealed?
A. His personal notes of the interview, yeah.
Q. So are you aware of notes that were taken at the interview?
A. Jarvis and Kelly both said they took notes.
Q. Was Kelly present at one of these interviews?
A. Yes.
Q. Which interview was he present at?
A. I don't know, sir. Could have been the second one. I know he was there for the third one talking about the hair and blood that they wanted.
Q. I think you testified yesterday, Mr. Perrot, that the process in these interviews involved them asking you questions and them then

Page 302

typing on their typewriter. Do you recall that?
A. Yes.
Q. Is that how all of these interviews were conducted?
A. No.
Q. Okay. Which interview was not conducted that way?
A. The first interview. I didn't answer any questions. I went back to the cell. The second one they were questioning me about McNabb, Sapelli -- I mean Prekop and Lichwala case. I told them I didn't know anything about it and I told them I would give them a statement about the crimes I broke into I was arrested for that night.
Q. Well, my question was --
MS. LYNCH: Mr. Perrot, could you please keep your voice up? I'm not very far from you and I'm really having trouble hearing you.
A. I will, ma'am.
MS. LYNCH: Thank you.
Q. My question was was the format of the interview where they would ask you questions and then type out something at that time?
A. The guy at the desk was continually typing

Page 303

the whole time I was in there.
Q. Were they reading back lines to you saying is this correct?
A. No.
Q. Was that the document which you ended up signing?
A. I signed three documents that day, sir.
Q. Were those documents all the result of them asking you questions, then typing and then at the end of that asking you to sign the document?
MS. GIZZI: Objection. Form.
A. I never signed it after we discussed it. I signed all the documents at once when they was discussing the blood and hair.
Q. You're saying you didn't sign a statement at the end of each interview?
A. No, I didn't. All the documents I signed were at one time.
Q. Did you have any other interaction with Officer Jarvis other than these interviews that you have just described, I'm sorry, relating to the charges against you back in 1985 that are the subject of the lawsuit. Did you have any other interaction with Officer Jarvis other than the

Page 304

interviews you have just described?
A. Other than he let me make a phone call at lunch, no.
MR. COYLE: That's all I have.

EXAMINATION BY MS. LYNCH

Q. Mr. Perrot, my name is Carol Lynch and I represent Richard Kane with regard to the lawsuit that you filed. Are you on any medication today that would affect your ability to tell the truth?
A. No.
Q. And in 1985 did you have any problems with your vision at all such that you wore glasses or contacts?
A. No.
Q. And have you ever been married?
A. No, ma'am.
Q. Do you have any children?
A. No.
Q. Back in 1985 do you recall what your height was?
A. Same as it is now, ma'am.
Q. What is it now?
A. Maybe five seven.

Page 305

Q. Five seven?
A. Yes.
Q. And do you recall what your weight was in 1985?
A. I don't, ma'am.
Q. What is your weight now?
A. I would say about 200 pounds.
Q. Do you think you weigh more or less than you did then?
A. I don't know, ma'am.
Q. Were you about 17 years old at the time?
A. Yes.
Q. Do you have any estimate as to about how much you weighed then?
A. I don't, ma'am.
Q. Back in 1985 what was your hair color?
A. Brown.
Q. Any particular shade, dark, light?
A. It was light brown, yeah.
Q. And what was your hair style?
A. Back then it was pretty long. Maybe shoulder length.
Q. And did you have straight hair, curly hair, wavy hair?

Page 306

A. It was kind of curly. It was kind of curly, yeah.
Q. Did you wear your hair down or in a ponytail?
A. I just wore it down, ma'am.
Q. Now, as of 1985 had you been diagnosed with any sort of medical conditions at all?
A. Other than PTSD and ADHD, ma'am, no.
Q. That was in 1985?
A. Oh, in 1985 I was never diagnosed with anything.
Q. And why don't I clarify. I'm asking you in 1985, unless I say otherwise, I'm referring to prior to your arrest in December of 1985.
A. Okay.
Q. Okay. So prior to your arrest in 1985 had you ever been diagnosed with any sort of medical condition, disease, anything like that?
A. No.
Q. Had you ever been diagnosed with any sort of mental health condition prior to December of 1985?
A. No.
Q. Again, prior to December of 1985 had you

Page 307

ever been to any sort of mental health provider such as a psychiatrist, a psychologist, a licensed social worker, therapist, counselor?
A. No.
Q. Were you ever diagnosed in any learning disabilities?
A. No.
Q. When you were in school, do you know what an IEP is, an individual education program?
A. Yes.
Q. Did you ever have an IEP when you were in school?
A. No.
Q. So you were never in special education classes?
A. No.
Q. What were your grades in school? What was the last grade you completed?
A. Seventh.
Q. How were your grades in seventh grade?
A. Horrible.
Q. What do you mean by horrible?
A. I never really attended.
Q. So you're saying that your grades were not

Page 308

good because you skipped classes?
A. Skipped class, never finished assignments.
Q. When did you start skipping school?
A. Probably at a young age, ma'am. Elementary school.
Q. Can you give me an approximate grade or year?
A. It was a long time ago, ma'am. I can't, no. Maybe fifth or sixth grade.
Q. That's when you started skipping school?
A. Yeah.
Q. And why did you do that?
A. I just didn't like school.
Q. Were there any sort of truant officers or any school officials that took action to try to get you to go to school?
MS. GIZZI: Objection. Form.
A. Yeah. I believe there was, yeah.
Q. But they weren't successful?
A. Not really, no.
Q. Did either of your parents get involved with trying to get you to go to school?
A. Yes. My mother was always involved, yeah.
Q. Now, when you did apply yourself say

before you started skipping school what kinds of grades did you get?
A. I was never really good at school, ma'am.
Q. So what would you say your average grades were?
A. Probably Cs and Ds.
Q. You were able to read though; correct?
A. Yes.
Q. And you were able to write; correct?
A. Yes.
Q. Did you ever get tutoring or anything like that when you were in school?
A. No.
Q. Now, prior to your arrest again in December of 1985 did you ever work any sort of odd jobs, any jobs besides what you have testified to yesterday?
A. No.
Q. I believe you testified yesterday you worked at a pool company and you started to get into the construction field; is that right?
A. Yes.
Q. And today you testified that you were involved in painting a house?



A. Yes.
Q. Miss Marchand?
A. Yes. That was for the construction worker I was working for, yeah.
Q. So when you painted the house, it was for the construction company?
A. Well, he owned his own business, yes.
Q. So you never like cut lawns or shoveled snow for anyone in the neighborhood?
A. When I was a kid, yeah.
Q. That's what I'm asking you when I said odd jobs.
A. Yeah. Yes.
Q. Did you ever do those jobs for Mary Prekop?
A. No.
Q. Did you ever do those jobs for Emily Lichwala?
A. No.
Q. Do you recall a gas station I think it was a Gulf Station Welker's at the corner of Allen Street and Cooley Street?
A. I do.
Q. Did you ever work there?



A. No.
Q. Did you know anybody that did work there?
A. Yes.
Q. Who did you know?
A. His name was Gary Provencher.
Q. I'm sorry. What was the last name?
A. Gary Provencher.
Q. Provencher.
A. Provencher. I don't know how to spell his name, ma'am.
Q. And what did he do there?
A. I believe he was a manager there.
Q. The manager?
A. I believe so, yeah.
Q. Do you know if he's still alive?
A. He is, yes.
Q. Do you know where he is now?
A. No.
Q. Do you know where he last lived?
A. I never knew where he lived, ma'am.
Q. How did you know him?
A. He was a friend of my sister's.
Q. And what was your father's name?
A. David.



Q. Perrot?
A. Yes.
Q. And what did your father do for work?
A. He was a masonry.
Q. And how far did he go in school?
A. I couldn't tell you, ma'am.
Q. Would you describe the contact that you had with your dad prior to the arrest in December of 1985?
A. I really didn't see my father. We didn't have a good relationship, no.
Q. Just briefly can you tell us why you didn't have a good relationship with him?
A. I just didn't like him.
Q. So how frequently would you see him then?
A. Maybe on holidays.
Q. And did your mom work?
A. She did.
Q. What did your mom do?
A. She was a waitress.
Q. Where was she a waitress?
A. At the Flaming Pit.
Q. Is that in West Springfield?
A. No. It's in Springfield.

Q. Springfield. Is that the last job she held as far as you know?
A. As far as I know, yes.
Q. Do you know how far your mom went in school?
A. I don't, ma'am.
Q. How old is your mom now?
A. I believe she's about to turn 84.
Q. And what's the state of her health as far as you know?
MS. GIZZI: Objection. Form.
A. It's good as far as I know.
Q. And I think you testified yesterday that you have had contact with her?
A. I do.
Q. How often do you have contact with her?
A. Maybe every couple days.
Q. What is the manner of contact meaning phone?
A. Telephone, yes.
Q. Now, I believe you testified yesterday, and I can tell you I had a little trouble hearing some of the questions and some of the answers, so I believe you testified yesterday that you stopped



living with her when you were about 11 years old?
A. I think I was a little older than that. I think maybe 14 or 15.
Q. Okay. And was the reason that you didn't live with her once she moved that you didn't want to move to Chicopee?
A. Yes.
Q. After your mom moved, how often did you have contact with her?
A. Daily.
Q. And what was the manner of contact meaning in person, telephone?
A. In person, yes.
Q. Was that difficult on you not living with your mom?
A. No.
Q. Any particular reason why it wasn't?
A. No.
Q. Now, after your arrest in December 1985, how much contact did you have with your mom?
A. Weekly.
Q. You said after your arrest you had contact with her weekly?
A. Yes.



Q. What was the manner of the contact meaning telephone, in person?
A. She would visit me and I would speak to her on the phone, yes.
Q. And let's talk about the period between the arrest which I believe was on December 7, 1985; is that correct?
A. Correct.
Q. And the first trial was in 1987; correct?
A. Correct.
Q. Where were you residing during that time?
A. Walpole.
Q. You were in that location the entire time?
A. I believe so. I'm not sure but I believe so.
Q. Were you given the option of posting bail during that time?
A. Prior to trial?
Q. Yes.
A. Yes.
Q. Did you try to post bail?
A. I couldn't afford it, no.
Q. Do you remember what the bail was?
A. I remember it was high. I don't remember



the exact number, no.
Q. Any estimate?
A. Maybe 50,000 cash or higher than that.
Q. Did any family member or friend offer to contribute towards the bail?
A. No. I didn't have $50,000. No.
MR. COHEN: Mr. Perrot, I didn't hear that answer.
A. I said I didn't have $50,000 and no one I knew had $50,000, no.
Q. Now, with regard to the first trial did any of your family members attend the trial?
A. Yes.
Q. Who attended?
A. My mother and my sister Nancy.
Q. And how often did they attend?
A. Throughout the trial, ma'am.
Q. So every day?
A. Yes.
Q. Did any of your friends attend the first trial?
A. No, ma'am.
Q. With respect to the second trial did any family members attend?

Page 317

A. My mother and my sister Nancy again. I believe my sister's husband was there as well.
Q. And did any of your friends attend the second trial?
A. No, ma'am.
Q. Your girlfriend, was it Lisa Eldridge is that her name?
A. Yes.
Q. Was she still your girlfriend after you were arrested in December of 1985?
A. No. She moved to Florida with her family.
Q. When did she move?
A. I don't recall exact time, ma'am. It was shortly after I got arrested.
Q. Do you know whether your being arrested had anything to do with her family moving?
A. It didn't, ma'am, no. It was already in the works.
Q. Did she keep in touch with you after she moved?
A. For a short period of time, yeah.
Q. Now, after you were convicted prior to your release from jail which I believe was in 2017, and if you need to break it down to different

Page 318

periods, let me know, but my question for you is did family members visit you at all when you were incarcerated after you were convicted?
A. Yes.
Q. Who visited with you?
A. My mother.
Q. How often did she visit?
A. Maybe once a month maybe.
Q. Any other family members?
A. My sister Nancy visited me a couple of times.
Q. When you say a couple of times, can you be more specific?
A. She didn't visit that often, ma'am. That's as specific as I can be. I maybe seen her half a dozen times.
Q. So after you were convicted, did any of your friends visit with you at all?
A. No.
Q. After you were convicted, did any of your family members have telephone calls with you?
A. Yes.
Q. Who was that and how often?
A. Again, my mother and my sister Nancy once

Page 319

a week maybe.
Q. Any of your friends have telephone calls with you?
A. No.
Q. You said yesterday I believe that you have a brother David. When is the last time you have had contact with your brother David?
A. I seen him when I was released.
Q. From the time of your arrest in December of 1985 until the time of your release did you have any contact with him then?
A. He came up to Walpole one time.
Q. And what does your brother do for work?
A. He was in the service, ma'am.
Q. Which branch?
A. The army.
Q. And in terms of your brother David how old is he now or do you know his date of birth?
A. I don't, ma'am. He's maybe -- he's got to be in his sixties. Maybe 61, 62.
Q. How much older is he than you?
A. I don't know exactly how much older. He's maybe six, seven, eight years older than me, ma'am.
Q. I'm sorry. How old are you, Mr. Perrot?

Page 320

A. 56.
Q. Same question with regard to your sister Nancy. How much older is she than you?
A. She's I believe eight, nine years older than me as well.
Q. And how about your sister Susan? How much older is she than you?
A. She's the second oldest so she's got to be about ten years older than me at least. Maybe 12.
Q. And after you were arrested, did you have any contact with her, Susan?
A. I seen her once at Walpole as well.
Q. No contact with her since?
A. None.
Q. Then you said you had a brother Leslie. How much older is he than you?
A. He's the oldest so he's got to be about 15 years older than me.
Q. What does he do for work?
A. Last I knew he was a car salesman.
Q. Do you know where?
A. I don't, ma'am.
Q. What does Nancy do for work?
A. I believe she works for the post office.

Page 321

Q. How about Susan? What does she do for work?
A. No idea, ma'am.
Q. Is there any particular reason you haven't been closer to Susan?
A. No. No specific reason, no.
Q. Any particular reason you haven't been closer to Leslie?
A. I've never been close to my older brother. I really didn't know him. He moved out of the house when I was young.
MR. JOYCE: Mr. Perrot, you've got to keep your voice up.
A. I said he moved out of my house when I was young so I never really had a relationship with him.
Q. After you were arrested, did any of your family members provide you with financial assistance?
A. Yes.
Q. Who provided you with assistance and how much?
A. My mother and my sister and I couldn't tell you how much, ma'am. It was different. It wasn't always the same.

Page 322

Q. Was there any average amount?
A. No.
Q. When you say sister, was that Nancy?
A. Yes.
Q. Do you remember the most they ever gave you?
A. I don't, ma'am, no.
Q. Now, I believe you testified that you were engaged before; is that correct? You had a fiancee?
A. Yes.
Q. How many times were you engaged?
A. Once, ma'am.
Q. Who were you engaged to?
A. Kim Moran.
Q. Do you remember when that was?
A. It would be in the nineties, ma'am.
Q. When is the last time you had any contact with Kim Moran?
A. I seen her when I was exonerated.
Q. When did you first meet her?
A. I grew up with her. She lived next to me in Malibu since I was a young kid.
Q. And there were a few names you mentioned yesterday that I really was unable to hear much

Page 323

about them so I need to go over a few of those names. I think mentioned a name Pia Linehan; is that correct?
A. No.
Q. Was there any name close to that?
A. Thea Glidden. She's my stepsister.
Q. You mentioned Sherrie Frisone?
A. Yes.
Q. And who is Sherrie Frisone?
A. She's my current girlfriend, ma'am.
Q. When did you first meet Sherrie?
A. 2010.
Q. How often do you see Sherrie?
A. Now?
Q. Yes. You said she's your current girlfriend.
A. Weekly.
Q. And what does Sherrie do for work?
A. She's a realtor.
Q. Do you know where?
A. Haverhill.
Q. You mentioned Melissa Griffin?
A. Yes, I had.
Q. Can you tell us who Melissa Griffin is?

Page 324

A. We used to smoke crack together, ma'am, as I mentioned.
MS. GIZZI: For the record it's Alissa.
MS. LYNCH: Thank you.
Q. And I think you mentioned yesterday someone by the name of Lisa Vanderboker?
A. I didn't mention her, no.
Q. Do you know a Lisa Vanderboker?
A. Yes. She's the girl involved in the case I'm doing time for now, ma'am.
Q. Can you just -- again, I apologize to the extent that I might be going over something you said yesterday but I really couldn't hear at times. Can you just briefly tell us what the charge was against you as to why you're here now in relation to her?
A. Indecent assault and battery, ma'am.
Q. I think the name Jenelle was mentioned yesterday?
A. Yes.
Q. Who is Jenelle?
A. She's a girl that lived in the sober house with me.
Q. What's her last name?

Page 325

A. No idea, ma'am.
Q. And what were the circumstances that led to your living in the sober house?
A. I needed a place to live.
Q. So you voluntarily went there?
A. Yes.
Q. Were you trying to basically stop using drugs?
A. I wouldn't say that, no.
Q. Was it a requirement that you stop using drugs if you were living there?
A. That's part of the requirement, yes.
Q. Were you successful in staying clean when you lived there?
A. No.
Q. Besides the names that we just went over, have you had any other girlfriends since you were arrested?
A. No.
Q. In terms of skills that you possess, Mr. Perrot, that you believe would enable you to hold gainful employment, can you describe those?
MS. GIZZI: Objection. Form.
A. I'm good at carpentry.

Page 326

Q. You're good at carpentry?
A. Yes.
Q. Anything else?
A. No.
Q. Have you ever used a computer?
A. Yes.
Q. Is that while being incarcerated or when you were out?
A. When I was out.
Q. So were you able to operate a computer then at least at that time?
A. Not very well, ma'am, no.
Q. During the time that you have been incarcerated have you received any sort of occupational training at all?
A. No.
Q. Has anyone offered that to you at all? Is that possible?
A. There isn't many opportunities in state prison, ma'am.
Q. Have you been given any opportunity to further your education since you have been incarcerated?
A. Could I have? Yes.

Page 327

Q. Did you?
A. No.
Q. Why not?
A. It seemed kind of pointless when you're doing a life sentence, ma'am.
Q. I believe you testified yesterday that you thought that the first time that you were arrested you were about 11 or 12 years old in approximately 1981. Do you recall that testimony?
A. Yes.
Q. Do you recall what the first arrest was for?
A. Might have been for breaking and entering. I'm not quite sure, ma'am.
Q. Can you tell us what -- strike that. Do you remember approximately how many times you had been arrested prior to December of 1985?
A. Maybe eight or ten.
Q. Can you tell us as many as you can recall what the charges were?
A. It was normally for robbery or getting in fights, assault and battery.
Q. I'm sorry. Robbery, fights and what?
A. Assault and battery charges.

Page 328

Q. Anything else?
A. Larceny.
Q. Now, each of those eight to ten times that you were arrested you were given your Miranda rights, warnings or rights; correct?
MS. GIZZI: Objection. Form.
A. I would assume, yes.
Q. In other words you were read your Miranda rights; correct?
A. Correct, ma'am.
Q. So you knew that you had the right to remain silent; correct?
MS. GIZZI: Objection. Form.
Q. Prior to December 1985.
A. Yes.
Q. And you knew you had the right to have an attorney before you were questioned; correct?
MS. GIZZI: Objection. Form.
A. That's what they say, ma'am.
Q. And you knew you had the right to have an attorney with you when you were questioned; correct?
MS. GIZZI: Objection. Form.
A. That's what they tell you.
Q. And you knew you had the right to stop

Page 329

answering any questions at any time; is that correct?
MS. GIZZI: Objection.
Q. You knew those rights before December 1985?
A. Yes.
MS. LYNCH: By the way, it's 12 o'clock. Are we supposed to stop?
MS. GIZZI: Yes.
(A break was taken for lunch.)
MS. GIZZI: It's 1:28.

CONTINUED EXAMINATION BY MS. LYNCH
Q. You're all set, Mr. Perrot; right?
A. Yes.
Q. Okay. Mr. Perrot, when you would go to visit your girlfriend Lisa Eldridge from your house on Malibu to her house on Corey, which way would you go?
A. Walk up Malibu onto Telbar onto Covel Street and then onto Corey.
MS. LYNCH: Mark this as the next exhibit, please.

Page 330

(Exhibit 16 was marked for identification.)
MS. LYNCH: Exhibit 16 is a copy of the map. It's the city's Bates stamp 012740.
Q. Mr. Perrot, I'm going to give you a yellow highlighter. Could you please mark the path that you would take from your house on Malibu to Corey, the path you just described?
A. This is really not how it goes.
Q. What do you mean?
A. It's not -- the way they have it here isn't the way it looks in the overview of the map that I forget the gentleman's name gave me.
Q. Attorney Joyce.
MS. LYNCH: Well, can we show the witness that map?
A. It's better to draw on a copy of that than this. This is like the streets don't connect.
MS. LYNCH: Is it okay if we use that?
MR. JOYCE: Sure.
MS. LYNCH: The witness is going to mark Exhibit 12 showing his path from Malibu Drive to Corey Road.

Page 331

A. Do you want me to write on this?
Q. Yes, please.
(Witness did as requested.)
Q. Could I see that, please? Thank you. So on Exhibit 12 you did use a yellow highlighter to mark your path that you would walk to go from your house to Lisa Eldridge's house on Corey Road; is that correct?
A. Yes.
Q. Okay. Thank you.
MS. LYNCH: Can we mark this, please, as Exhibit 17?
(Exhibit 17 was marked for identification.)
MS. LYNCH: Exhibit 17 is the statement dated December 7, 2018 which has the city Bates stamp number 004731.
Q. Mr. Perrot, you have in front of you Exhibit 17; correct?
A. I do.
Q. Do you recognize that?
A. Yes.
Q. What is that?
A. It appears to be a statement I gave.

Page 332

Q. That is your signature on the bottom of the page; is that correct?
A. It appears to be, yeah.
Q. Exhibit 17 states that it is a statement taken from George David Perrot, age 17, 87 Malibu Drive, Springfield, has some numbers after it and it says statement taken by Detective Thomas Jarvis on December 7, 1985 at 12:40 p.m. Do you have a present memory of that occurring?
A. The statement being taken at that time?
Q. Yes.
A. I think I provided the information for the statement well before that, ma'am. Maybe the time I signed it.
Q. Okay. I'm just going to read through it. I returned home from work at about five o'clock p.m. Friday, December 6, 1985. Is that an accurate statement?
A. Yeah.
Q. Then it says, I work on construction. Is that an accurate statement?
A. Yes.
Q. And then it says, I called my girlfriend Lisa Eldridge when I got home from work and asked

Page 333

her if she was ready to go out. Is that an accurate statement?
A. Yes.
Q. And then it says, I then called Bob Timmerman and asked him to pick me up so that we could go out with the girls. Is that an accurate statement?
A. Yes.
Q. Then it says, Bob came over at about 6:00 p.m. Friday night. Is that an accurate statement?
A. To the best of my recollection, yeah.
Q. We went over to pick up Lisa who lives at 116 Corey Road. Is that an accurate statement?
A. Yes.
Q. It then says, from there we went over to East Longmeadow to pick up her friend Debbie. I am not sure of her last name. Is that an accurate statement?
A. Yes.
Q. It then says, we picked up a case of Bud at the Springfield Package Store at Allen and Cooley. Is that an accurate statement?
A. Yes.

Page 334

Q. It then says, then we went driving around the city drinking beer and smoking marijuana. Is that an accurate statement?
A. Yes.
Q. It then says, we then made two trips up to Dickinson Street where we bought one half gram of coke on two occasions; is an accurate statement?
A. Yes.
Q. It then says, then we went over to Bob's house and did a couple of lines of coke. Is that an accurate statement?
A. It is, ma'am.
Q. It then says, then we went over to my house and did a couple of lines of coke. Is that an accurate statement?
A. To the best of my recollection it is, ma'am.
Q. It then says, then we went over to the package store and bought another six pack of Bud. Is that an accurate statement?
A. I believe, yes.
Q. It then says, it was getting late so we dropped Lisa off at her house and then dropped Debbie, I can't read what it says after that, in

Page 335

East Longmeadow. Is that an accurate statement?
A. It is, ma'am.
Q. It then says, this was about 12:15 a.m. Saturday morning. Is that an accurate statement?
A. Yes.
Q. It then says, Bob dropped me off at my house. Is that an accurate statement?
A. It is, ma'am.
Q. Then it says, I walked up to Denny's restaurant at Allen and Cooley Street. Is that an accurate statement?
A. No.
Q. What is not accurate about that?
A. I didn't go Denny's at that particular time.
Q. Did you go to Denny's at all that evening?
A. I did.
Q. When did you go to Denny's?
A. After I broke into Mr. McNabb's home.
Q. You went into Denny's after you broke into McNabb's home?
A. Yes, I did.
Q. Okay. The next statement says, I went inside and had a coffee. Is that accurate in terms

Page 336

of when you went to Denny's that you had a coffee?
A. It is.
Q. And it then says, after I finished my coffee, I walked outside and noticed two girls walking from the parking lot towards Denny's. Is that an accurate statement?
A. No.
Q. What is not accurate?
A. The girls were already in the Denny's restaurant.
Q. It then says, one of the girls had her pocketbook dangling. Is that an accurate statement?
A. No. The girl's pocketbook was on the end of the bench at the Denny's restaurant.
Q. So when you stole the pocketbook, did you steal it from inside the restaurant or outside the restaurant?
A. Inside.
Q. So can you describe how you stole the pocket then in Denny's?
A. I walked by the booth, picked it up and ran out the door.
Q. It then says, I ran over and grabbed the pocketbook and ran across Cooley Street toward my

Page 337

house on Malibu Drive. Is that an accurate statement?
A. At that particular time -- from the Denny's are you talking about?
Q. Yes.
A. When I took the pocketbook from Denny's, yes.
Q. It then says, I went into my house and went into my bedroom. Is that an accurate statement?
A. It is.
Q. It then says, I checked the pocketbook for money and only saw a little more than a dollar in change. Is that an accurate statement?
A. To the best of my recollection, ma'am.
Q. Did you say yes?
A. Yes.
Q. It then says, I left the pocketbook in my room. Is that an accurate statement?
A. It is, ma'am.
Q. It then says, I then left the house and started walking up Malibu. I walked over two streets to Ellendale Street. Is that accurate?
A. Again, ma'am, the pocketbook robbery

Page 338

happened after the house break so, no, it's not accurate.
Q. So at what point did you go to Ellendale Street?
A. I went to Ellendale Street first, ma'am.
Q. Where had you been just before you went to Ellendale Street?
A. Out with Bob, my girlfriend, Debbie as the statement states.
Q. So had you been dropped off at your house and then you went immediately to Ellendale Street?
A. Yes, ma'am.
Q. What prompted you to go to that particular street?
A. No idea.
Q. Had you been there before?
A. On the particular street?
Q. Or to that particular house.
A. Not that particular house, no.
Q. Were you familiar with that particular house before you went there that night?
A. No.
Q. The next statement is, I walked up to a house, I don't know the number, and saw a broken

Page 339

broom handle in the carport. Is that an accurate statement when you went there?
A. Yes.
Q. It then says, I kicked the front door in and started to walk armed what I thought was the dining room. Is that an accurate statement?
A. Yes.
Q. I had the broom handle in front of me so I would not bump into anything. Is that an accurate statement?
A. Yes.
Q. It then says, I started to hear a lot of voices. I got scared and ran out the front door. Is that an accurate statement?
A. Yes.
Q. It then says, the reason I broke into the house was to get money for drugs. Is that an accurate statement?
A. It is, ma'am.
Q. What kind of drugs were you looking to buy at that point?
A. No particular drugs I was interested in buying, ma'am. I was a drug addict. I would buy whatever got me -- whatever got me high. There was

Page 340

no particular drug in mind.
Q. Were there drugs that you usually used at that time?
A. I mean I drank. I did coke, took pills.
Q. And then the last line says, I ran back home and the police were there. Is that an accurate statement?
A. Again, ma'am, the house break happened first so, no, it's not really accurate.
Q. So when you ran back home after being at Denny's, when you got there, were the police already there?
A. No.
Q. How long after was it the police were there?
MS. GIZZI: Objection. Form.
A. I have no idea, ma'am. I passed out. I have no idea.
Q. And that was the evening that you had drank a couple of six packs; is that accurate?
A. It is, ma'am.
Q. Do you remember the last time you had a beer that night? What time it was approximately?
A. Probably shortly before Bob dropped me

Page 341

off.
Q. I think I heard you say yesterday that when you were being interviewed by Officer Jarvis that his typewriter malfunctioned at some point?
A. I don't know if it malfunctioned but he said he needed to change typewriters.
Q. Was he using an electric typewriter?
A. I couldn't tell you, ma'am.
Q. The police did show up at your house though that night; correct?
A. They did, ma'am.
Q. What is your understanding as to why they went to your house?
MS. GIZZI: Objection to form.
A. At that particular time when I woke up, I didn't really know what was going on.
Q. Do you have any understanding at this time?
A. Yeah.
Q. Why do you think they --
A. I committed a crime.
Q. But do you have any understanding how they knew you were the one that did it?
MS. GIZZI: Objection. Form.

Page 342

A. No.
MS. LYNCH: Mark this as the next exhibit, please.
(Exhibit 18 was marked for identification.)
MS. LYNCH: The witness has in front of him Exhibit 18 which is the city's Bates stamp 004730.
Q. Mr. Perrot, you have in front of you Exhibit 18; correct?
A. Correct, ma'am.
Q. Can you identify that, please?
A. It's a statement reportedly written by me.
Q. You will notice that the first statement is on Exhibit 18, my name is George Perrot and I live at 87 Malibu Drive and I'm 17 years old. Was that a correct statement as of December 7, 1985?
A. Yeah.
Q. I'm sorry?
A. Yes.
Q. Okay. Then it says, on November 30, 1985 I went to Brattleboro, Vermont with Mike Edwards and Bob Timmerman and Jeff Atkinson. Is that an accurate statement?

Page 343

A. It is.
Q. Then it says, Mike was driving. Is that an accurate statement?
A. It is, ma'am.
Q. It then says, we went to a bar called Flat Street. Is that an accurate statement?
A. It is.
Q. Are those your initials above the letter where it says Flat? It looks like it says F-A-A-T and then it was changed to F-L-A-T. Are those your initials?
A. They might be. It wouldn't appear to be, no.
Q. You don't think those are your initials?
A. No. I don't make my G or my Ps like that.
Q. Who do you think wrote those initials if it wasn't you?
MS. GIZZI: Objection. Form. Calls for speculation.
A. Whoever typed up this statement.
Q. It then says, I started drinking about 8:00 p.m. which is a Friday night. Is that an accurate statement?
A. I would say it is, yeah.

Page 344

Q. It then says, we also drank about a case of Bud. Is that an accurate statement?
A. I would say that, yeah.
Q. It then says, I took a, quote, purple mescaline, end of quote, on the way to Vermont. Is that an accurate statement?
A. It is, ma'am.
Q. It then says, we stayed there until about 2:15 a.m. Is that an accurate statement?
A. It is.
Q. It then says, Michael dropped me off about 3:15 a.m. at my house. Is that an accurate statement?
A. It is, ma'am.
Q. Are those your initials above Michael at the end of the sentence?
A. They don't appear to be, ma'am, no.
Q. It then says, I headed for number 33 Covel Street. Is that an accurate statement?
A. Absolutely not.
Q. It then says, the reason I went there was I heard it had been broken into before. Is that an accurate statement?
A. No.

Page 345

Q. Had you ever heard that it had been broken into?
A. No.
Q. It then said, I had a pair of my sister's gloves on. Is that an accurate statement?
A. It isn't, ma'am.
Q. It then says, they were like wool gloves. Is that an accurate statement?
A. It is not.
Q. It then says, I entered an unlocked rear breezeway door at 33 Covel Street. Is that an accurate statement?
A. It is not, ma'am.
Q. It then says, I kicked the rear inner door in. Is that an accurate statement?
A. It is not, ma'am.
Q. It then says, I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street. Are those accurate statements?
A. No, they're not, ma'am.
Q. Are any of them accurate?
A. No. I never told them I broke into either

Page 346

one of these houses.
Q. So the next paragraph it says, I left 33 Covel Street and went to 27 Malibu Drive. Is that an accurate statement?
A. It isn't, ma'am.
Q. Are any of the statements that follow in that paragraph accurate?
A. They are not, ma'am, no.
MS. LYNCH: I need to go off the record for a second.
(Brief recess.)
MS. LYNCH: Back on the record at 1:53.
Q. I'm sorry, Mr. Perrot. That last statement did you say that was accurate or not?
A. Which one are you referring to, ma'am?
Q. I'm sorry. The last statement.
A. I had been drinking?
Q. Yes.
A. Yeah. That's correct. Yeah.
Q. Okay. And you said that was your signature; correct?
A. It appears to be.
Q. Is that your handwriting December 7, 1985?

Page 347

A. It looks like it, ma'am.
Q. So after you were dropped off if you didn't go to 33 Covel Street, where did you go?
A. To my house.
Q. Did you go anywhere else that night?
A. No.
Q. Mr. Perrot, if you were asked this question before, I apologize. How old were you when you started drinking alcohol?
A. I was really young. Maybe eight or nine.
Q. Eight or nine?
A. Yes.
Q. Where were you getting it at that age?
A. Steal it from our parents.
Q. How old were you when you starting using drugs?
A. Eleven, 12 years old.
Q. What was the first drugs that you used?
A. I started smoking pot.
Q. What did you use after that?
A. I would take pills, cocaine.
Q. Where did you get the money to buy the drugs?
A. Usually I would steal it.

Page 348

Q. Now, with respect to the robbery at the McNabb residence on Ellendale and the purse snatching at Denny's, did you plead guilty to those?
A. I did, ma'am.
Q. What was the sentence that you received for that?
A. I received ten to 12 years with six to nine concurrent, ma'am.
Q. I'm sorry. Ten to 12 years?
A. Ten to 12 years with six to nine concurrent.
Q. Now, after you appealed, you were granted a new trial. Were you released or were you still incarcerated?
A. I was still incarcerated.
Q. Now, do you know who Richard Kane is?
A. Through documents, yes.
Q. Who is Richard Kane to your knowledge?
A. He is one of the police officers that visited me at York Street to take my blood and hair.
Q. Do you remember what he looked like?
A. At this moment, no, ma'am, I don't.
Q. Do you recall if he was wearing a uniform or he was plain clothes?

A. I believe he was in plain clothes.
Q. Did you have conversation with him?
A. Just that he was there to extract my blood.
Q. Can you tell us in as much detail as possible what you remember about your conversations with Richard Kane?
A. I just told you, ma'am. He told me he was there to extract my blood and he extracted my blood.
Q. Well, he's not one that extracted your blood; right?
A. No. He wasn't, no.
Q. Are you saying that's the only conversation you had with him?
A. It's the only conversation I had with him, ma'am. Asked him why he was there and he told me he was there to drain my blood.
Q. You had agreed to have your blood drawn; correct?
A. I did, ma'am, yes.
Q. And that was on December 10, 1985?
A. It was a couple days after I was arrested, yes.
Q. Is that the first time you saw him?



A. To my recollection, yeah.
Q. Where was it in the jail that your blood was extracted?
A. It was like a triage room.
Q. Do you know who the person was that extracted your blood?
A. Not at this time I don't, ma'am, no.
Q. Can you describe them at all?
A. No, I can't, ma'am.
Q. Prior to that date had you been to court yet with regard to the arrest?
MS. GIZZI: Objection to form.
A. Yeah. I believe I went to my arraignment. Yes.
Q. Was your girlfriend Lisa Eldridge in court for the arraignment?
A. I believe she was, ma'am, yes.
Q. Was your girlfriend in the jail on the day that your blood was drawn?
A. Was my girlfriend in the jail?
Q. Right. When your blood was drawn.
A. No, ma'am. They don't allow people in jail in that area, no.
Q. So she wasn't in the room?



MS. AGBIRO: Objection.
A. No, ma'am. She wasn't in the room.
Q. What did your girlfriend look like?
A. She was -- I mean she was a pretty girl. She had brown hair. I mean what else would you like to know, ma'am?
Q. So you considered her to be a pretty girl?
A. Yeah. She was a pretty girl, yeah.
Q. Do you remember speaking to Richard Kane about her?
A. I may have. At some point, yeah, I may have.
Q. What do you remember saying about her?
A. I don't remember the conversation if I had one, ma'am.
Q. Well, do you remember saying to Richard Kane that you had a pretty girlfriend and asking him if he had seen her in court with you earlier?
A. I might have. I might have said that, yeah.
Q. Do you remember at that point Richard Kane advised you that he was there as a supervisor? I'm sorry. Strike that. Do you remember at that point that Richard Kane advised you that he was a police



officer?
A. He told me he was a police officer when he got there.
Q. So you're saying he had already told you he was a police officer?
A. Yeah.
Q. Do you remember him advising you of your Miranda warnings?
A. He never spoke to me about that, no.
Q. You don't remember him pulling out a card and reading the Miranda warnings off the card?
A. I don't have recollection of that, no, ma'am. Could have. Like I said it was 40 years ago. He could have. I don't remember it.
Q. Do you remember saying that you wanted to talk to him?
A. To Mr. Kane?
Q. Yes.
A. Absolutely not, no.
Q. Do you remember him asking you if you understood why the blood samples were taken?
A. Yes. He told me why he was there to take the blood samples, yeah.
Q. And do you remember that he said it was to

Page 353

clear you of the rape?
A. He might have said something to that effect, yes.
Q. Do you remember saying to Richard Kane that you didn't rape any old woman?
A. I might have said that, yeah.
Q. And do you remember saying to Richard Kane, you know how good looking my girlfriend is. Why would I do that?
A. Ma'am, I could have. Like I said, it was 40 years ago.
Q. Do you remember Richard Kane asking you about Covel Street?
A. He didn't ask me about any particular street, no.
Q. Do you remember telling him that you broke into Covel Street?
A. Absolutely not.
Q. Do you remember telling Richard Kane that you knew nothing about a rape at Covel Street?
A. I told him I didn't know nothing about a rape period, nothing about a rape on Covel Street.
Q. Do you remember Richard Kane asking you what you did with the pocketbook?

Page 354

A. No.
Q. He didn't ask you that?
A. Absolutely not.
Q. Do you remember describing for Richard Kane that you ran up Covel Street and telling him that you threw the pocketbook by some bushes by the last house on the street?
A. I don't, ma'am, no.
Q. I'm sorry?
A. I never told him that, no.
Q. Did you tell him that the pocketbook was by the house where the driveway goes up the hill on the right-hand side in the bushes?
A. No, I didn't, ma'am.
Q. Do you know where the pocketbook was actually found, what street it was on?
MS. GIZZI: Objection to form.
A. I remember reading in the police reports, yes.
Q. Do you know which street it was?
A. I believe Hilltop.
Q. Did you tell Richard Kane on this day when your blood was being drawn that you had a small drug problem which was why you broke into homes. It was

Page 355

for coke, cocaine?
A. I don't remember talking to Mr. Kane about any drugs, ma'am, no.
Q. Does that refresh your memory as to anything else that you discussed with Mr. Kane besides what you've already testified to?
A. Does it refresh my memory?
Q. Right.
A. I spoke to him about the blood and I may have had a conversation with him about my girlfriend but that's it.
Q. Now, is that the only time you ever had contact with Richard Kane?
A. Ma'am, I had contact with numerous officers. I was a young kid. I was up all night. I can't recognize who was who. I might have seen him that night. I might not have. I can't say with a clear conscience whether I did or not.
Q. Is the time when your blood was drawn the only time that you specifically remember having contact with Richard Kane?
A. You just asked me that same question, ma'am. Again, I had contact with numerous officers the night I got arrested. I couldn't describe one

Page 356

from the other. I was high on drugs. I didn't sleep probably for two days at the time. I wasn't really focused on what these officers look like and what their names were, ma'am.
Q. I'm just asking you from what you remember.
A. I couldn't tell you, ma'am, no.
Q. Now, is it fair to say that Richard Kane did not testify during your trial? That's correct; right?
MS. GIZZI: Objection. Form.
A. No. That's not true. Well, yeah. He testified at a voir dire hearing I believe. Yeah. He testified I believe.
Q. At an evidentiary hearing?
A. I believe it was a voir dire hearing during trial.
Q. Right. But he never testified at the trial before the jury; is that correct?
A. No. I don't believe he did. No.
Q. That's what I meant.
A. Oh, yeah. Then no.
Q. And Covel Street had to do with -- to the extent Covel Street was one of the charges that you

Page 357

were arrested for that was with regard to Emily Lichwala; correct? She lived on Covel Street.
MS. GIZZI: Objection to form.
A. I got arrested for the McNabb and Sapelli case, ma'am, so no.
Q. You were all also arrested for Emily Lichwala and Mary Prekop as well; correct?
A. I was later charged in conjunction with that case, yes, but I wasn't arrested for that case.
Q. But you were charged?
A. Yes.
Q. Okay. So my question was in terms of the charges that pertain to Covel Street that was with respect to Emily Lichwala; correct?
A. Yes.
Q. Is it fair to say that don't have any information that Richard Kane was involved with regard to the Mary Prekop case?
MS. GIZZI: Objection to form.
A. One way or the other I don't, ma'am.
Q. Now, you were convicted with regard to the Emily Lichwala charges; correct?
A. I was convicted on all charges, ma'am.
Q. And you never appealed with regard to the

Page 358

charges that pertain to Emily Lichwala; is that correct?
A. It was appealed, yes.
Q. It was?
A. The whole case was appealed, ma'am.
Q. It was never overturned; correct?
A. Ma'am, for some reason it was left. It was left -- there was no judgment made on it but it was appealed. The whole case was reversed. Emily Lichwala was part of the case.
Q. When you were let out in 2017, you weren't let out because of anything to do with the charges pertaining to Emily Lichwala, were you?
MS. GIZZI: Objection to form.
A. The cases, it was one case as a whole. I don't understand the question, ma'am.
Q. Okay. Let me try again. Is it your understanding that the reason you were granted the opportunity for a new trial had to do with the hair microscopy evidence?
MS. GIZZI: Objection to form.
A. That and the prosecutor misconduct, the blood evidence. The whole case was challenged, ma'am.

Page 359

Q. The hair evidence that pertained to the Mary Prekop breaking and entry and rape; is that correct?
MS. GIZZI: Objection to form. Lack of foundation.
A. That's where they claim they found my hair, yeah.
Q. Not at Emily Lichwala's house; correct?
A. No.
Q. You deny that you committed the rape of Mary Prekop; correct?
A. I do, yes.
Q. Do you have any idea who actually committed those rapes?
A. I don't, ma'am.
Q. If it wasn't you.
A. No, I don't.
Q. Do you know someone by the name of John Missotti?
A. Do I?
Q. Yes.
A. No.
Q. Do you know someone by the name of John Roy?

Page 360

A. No.
Q. Do you know someone by the name of -- sorry. I don't have the first name. Someone by the name of Jones?
A. I don't, ma'am, no.
Q. Now, after you were released, Mr. Perrot, which I believe was on or around October 18, 2017, can you just give us a summary of what you did and free feel to break it down into time periods, the first year, second year, whatever. If you could just give us a brief summary of what you did.
MS. GIZZI: Objection to form. Vague.
A. I don't even understand what you're looking for, ma'am, so you're going to have to rephrase that question in a different manner.
Q. Okay. I'll be happy to. Essentially I'd like to know how you spent your time since you were released on or about October 18, 2017. So if we could focus on say from the time you were released until the end of 2017, December 31, 2017, do you remember how you spent your time?
A. Mostly with my family.
Q. Which family?

Page 361

A. Sherrie. I visited my mother. I visited my sister.
Q. So did you stay in the Springfield area?
A. No, ma'am. I lived in Haverhill.
Q. Did you work at all during that time?
A. I worked for Mrs. Frisone. I maintenanced her properties.
Q. I'm sorry. I didn't hear what you just said.
A. I worked for Mrs. Frisone. I maintenanced her properties.
Q. Do you remember when you did that, from approximately what date to what date?
A. Pretty much from the time I got out until the time I got arrested, ma'am. That's what I did for work.
Q. I'm sorry. What date did you get arrested?
A. I was arrested a couple times.
Q. What was the first time?
A. Ma'am, I don't know the exact dates.
Q. Just to the best of your memory.
A. I got arrested for driving to endanger. I don't know when the exact date was, the exact month

Page 362

it was.
Q. What was the second one?
A. I believe leaving the scene of an accident.
Q. Any others?
A. I got arrested for a domestic.
Q. When you say domestic, what do you mean?
A. The definition of a domestic is assaulting a household member.
Q. Now, was that a full-time job when you were maintaining -- doing property management?
A. It was, ma'am.
Q. And what were you earning for wages?
A. I didn't get like a normal check. Sherrie just took care of my bills and made sure I had what I needed. They were her properties. She's my girlfriend and that's how I --
Q. How many properties were you managing?
A. At the time she had I believe ten or 11 three deckers, apartment buildings.
Q. Did you live in Haverhill the whole time from 2017 until the time you were reincarcerated?
A. When I first got out, I lived in an apartment in Methuen, Mass. and then a couple months

Page 363

later I moved to Haverhill and I lived there from that time on.
Q. And besides working, is there anything else you can tell us about in terms of how you have spent your time since 2017 until the reincarceration?
A. Well, I really don't know how to answer the question to tell you the truth. How I spent my type. Traveled a little bit. I don't really -- Sherrie used to bring me to the beach, to Laconia. I mean I really don't know how to answer the question, ma'am, how I spent my time. I don't really --
Q. Like what was a typical day for you?
A. Work, come home, eat, hang out with my dog.
Q. When you say you traveled, where would you go?
A. Just she would bring me to different places.
Q. Where is the farthest you went?
A. We never really went far. New Hampshire. Go to Laconia. She's got a place out in Laconia. Go to the beach. She has a beach house in Rockport.

Page 364

Simple stuff like that.
Q. By the way, when you were incarcerated up until 2017, did you have any jobs in the prison?
A. No.
Q. Do you have any jobs here?
A. No.
Q. Is it something that you were able to do if you wanted to or do you have to be asked?
A. There's like jobs in the kitchen that you can get but --
Q. For example there are people out gardening outside. Is that something you could do if you wanted to?
A. No. I don't have enough time to be fortunate enough to have a garden.
Q. No. I'm talking about the garden here.
A. Yeah. You can't. You have to have so much time left in your sentence. There's a wait list.
Q. Now, I noticed, I believe we talked about it a bit yesterday, that you were transferred a number of times within the prison facilities. I think 1993 in particular you were transferred quite a few times. Just briefly what was the reason that

you were getting transferred?
A. Disciplinary actions, ma'am.
Q. Now, you testified yesterday with regard to Exhibit 9.
MS. LYNCH: Which could we show that to the witness that exhibit again, please?
Q. Do you have Exhibit 9 in front of you, Mr. Perrot?
A. I do.
Q. Is there anything on that that you yourself wrote?
A. There isn't, ma'am.
Q. I think you said yesterday that Alissa Griffin you believe that she wrote what's written there.
A. I know for a fact she did.
Q. Why do you believe she would do that?
MS. GIZZI: Objection to form.
A. Why do I believe that?
Q. Yes.
A. She's got a few problems, ma'am.
Q. Can you tell me --
A. She had a few mental problems. She's been in and out of several facilities. She's got some



issues in her life.
Q. Well, did she have any reason to be angry with you?
A. I told you, ma'am, that previously I had a domestic case against her so, yeah. That's a good reason to be angry against me.
Q. In other words did you break up with her and she wanted to continue a relationship, anything like that?
A. We were never in a relationship, ma'am. We got high together.
Q. Are you still in contact with your stepsister Thea Glidden?
A. No.
Q. Why not?
A. No particular reason. I just ain't.
Q. You mentioned I believe yesterday that you had had an excessive force lawsuit against the Department of Corrections. With regard to that case or any other incident where you believe there was excessive force when you were incarcerated, were you ever injured? Physically injured.
A. Yeah.
Q. Can you just describe it briefly?



A. Pretty severely beaten. That's why I filed an excessive force and they left me handcuffed and shackled in a security cell for over 12 hours.
Q. And as a result of any excessive force that you experienced while you were incarcerated, were you ever emotionally injured?
A. Sure.
Q. And can you describe that?
A. I don't know how to describe emotion, ma'am. I mean it's traumatizing.
Q. Did you receive any sort of treatment at all first of all physical for physical injuries inside the prison system?
A. Did I receive treatment?
Q. Yes.
A. There's not much treatment inside a penal institution, ma'am.
Q. Well, did you have any?
A. No.
Q. Did you receive any treatment for mental health injuries, the emotional injuries you said you suffered?
A. No.
Q. Do they let you get treatment outside of



here, any of the facilities?
A. No.
Q. You said yesterday that you tried to commit suicide when you were age 12 or about age 12 but you aborted it. What prompted you to try to do that?
A. Well, ma'am, I was a young kid doing drugs and my life just wasn't going good.
Q. Mr. Perrot, did you ever file tax returns at any time in your life?
A. No, ma'am.
Q. Did you ever keep any sort of -- from the time of your arrest in December 1985 until the current date did you ever keep any sort of a diary or journal, anything like that about any of the events that are the subject of your lawsuit?
A. No.
Q. Or for any of the injuries that you said you have experienced?
A. No.
MS. LYNCH: I think I'm going to defer to Attorney Cohen. Thank you, Mr. Perrot.
MR. COHEN: Would you folks like a short break or should we just keep going?

Page 369

MS. GIZZI: Five minutes. It's 2:25.

(A break was taken.)

(Exhibit 19 was marked for identification.)

MR. COHEN: We'll go back on the record. It's about 2:35.

EXAMINATION BY MR. COHEN

Q. Good afternoon, Mr. Perrot. My name is Jared Cohen. I represent Francis Bloom, one of the defendants in this matter. I'll remind you you're still under oath. Do you understand you're still under oath?

A. I do, sir.

Q. And I'll try to keep my voice up and I'll ask you to do the same. So I'm going to try not to repeat too much of what's already been said but I want to start by asking you some questions about December 7, 1985 when you were arrested. You testified that when you were awakened by your sister on that date, there were six police officers in the room; correct?

A. Well, there were several. I don't know an

Page 370

exact number but there were several officers in the room.

Q. And I believe you testified that all of those individuals in the room were wearing uniforms; correct?

A. It appeared to be, yes.

Q. And I believe you testified that they were all white males?

A. Yes. They were definitely all white, yes.

Q. And I believe you testified you understood they were all Springfield police officers; correct?

A. Yes.

Q. Did you have any reason to believe that any of those men were not police officers?

A. No.

Q. Just moving forward. You testified that shortly afterwards you were roughed up, thrown over a fence and stuck in a cop car; correct?

A. Correct.

Q. And was it police officers in uniforms who did that?

A. Same men that were in my room, yes.

Q. Same men that were in your room?

A. Yes.

Page 371

Q. And I believe you testified you were then placed under arrest and taken to the Springfield Police Station on Pearl Street; correct?

A. No. They brought me to Ellendale Circle first.

Q. But after Ellendale Circle, they brought you to the Springfield Police Station in Pearl Street?

A. Yes.

Q. And was it the same men who were in the room and then who put you in the car and took you there?

A. I realty don't have a recollection exactly who took me there.

Q. Roughly how many people took you to Ellendale Street and then to the police station?

A. There was a cop driving the car and a cop in the back seat with me.

Q. And they were both police officers to the best of your recollection?

A. Yes.

Q. Moving forward. You testified and I'm trying to summarize my recollection of your testimony yesterday and today so if I get any of it

Page 372

wrong, just let me know.

A. I will.

Q. I believe you testified that they brought you to the police station. They brought you to the desk and you were searched when you got there; is that correct?

A. Yes.

Q. I believe you testified that someone gave you a shot to the ribs around that time?

A. Correct.

Q. And I believe you testified that some of the other people around were laughing?

A. Yes.

Q. And I believe you testified that all of those people present were white males?

A. Yes.

Q. And approximately how many were there who were in the vicinity near you at that time when you first got to the police station?

A. Four or five maybe.

Q. And to the best of your knowledge were they all police officers?

A. To the best of my knowledge, yes.

Q. Do you have any reason to believe that any

Page 373

of those men at that time were not police officers?
A. No.
Q. Okay. I believe you testified that they then brought you to a cell and then brought you up to an office room to be questioned by two police officers who you hadn't seen before; is that right?
A. Correct.
Q. And I believe you testified that those two police officers were in plain clothes; is that right?
A. Yes.
Q. And again, you can correct me if mischaracterize but I believe you testified that prior to that all of the police officers that you had encountered had been wearing uniforms?
A. To the best of my recollection.
Q. Okay. So again, you said they first brought you up to an office to be questioned by two plain clothes police officers. Did you have any reason at that time to believe that those two plain clothes individuals were not police officers?
A. No.
Q. Just moving forward. After that you testified, and I'm summarizing now because I don't

Page 374

want to take up too much time going over ground that we've already covered, but you testified that after that you were questioned several more times; correct?
A. Yes.
Q. And you testified that you were taken back and forth between the holding cell and an office room on several occasions; correct?
A. Correct.
Q. And was all of this still taking place inside the police station?
A. Yes.
Q. And that's the Springfield Police Station on Pearl Street?
A. It is.
Q. And I'm not going to go step by step through each of those occasions again but on each of the occasions when you were questioned to the best of your knowledge were they police officers that were questioning you?
A. I had no reason to believe they weren't.
Q. You have no reason to believe that you were being questioned by people who were not police officers?

Page 375

A. Correct.
Q. And it was both. I think you testified that various times it was both officers in uniform and officers in plain clothes; correct?
A. Well, officers in uniform brought me up to the rooms. I believe both times -- three times I was in room they were plain clothes.
Q. So you think once you were inside the room each time the officers questioning you were in plain clothes?
A. Yes.
Q. But again, you have no reason to believe that they were not police officers; correct?
A. Correct.
Q. Now, I just want to ask a few questions about timing. I believe you testified that when you first entered the police station, it was early in the morning but still dark out; is that right?
A. Correct.
Q. By the time the three or four different periods of questioning were over do you have any idea what time it was by that point?
A. I don't, sir, no.
Q. Do you know if it was still dark out at

Page 376

that point or if it was light out?
A. At some point it became light out. Yes.
Q. So at some point you were able to see windows in the building and see that it was light out?
A. Yes.
Q. Just moving back for one moment. You also testified that in-between some of those questionings, I think it was between the third and the fourth time you were questioned, you were also photographed for a second time?
A. Yes.
Q. And that you had previously been booked and photographed when you first arrived?
A. Yes.
Q. Okay. I want to ask you some questions about the lineup that you testified about earlier. Do you have any idea what time of day it was when the lineup began?
A. When it was happening?
Q. Yes.
A. No.
Q. Was it light out?
A. Yes. It was light out.

Page 377

Q. So do you have any approximate estimate how much time had passed from the last interrogation to the lineup?
A. Maybe a couple hours.
Q. A couple hours approximately?
A. Yeah.
Q. So that's from the last interrogation to the lineup. Now, moving backwards, backing up from there, do you have a rough guess about how much time passed from when you first arrived at the police station to the last interrogation?
A. They kept bringing me back and forth, back down to the cell, back up to the room so there was no clocks or anything to look at so I don't know exactly how long it took. Maybe it was hours. Like they just kept doing it. They were bouncing me back and forth.
Q. So you said it was hours?
A. Yeah.
Q. You don't know the exact number of hours?
A. No.
Q. Would it have been at least a couple of hours?
A. At least a couple of hours, yes.

Page 378

Q. So a couple of hours from when you arrived at the police station to when the interrogations were over at least?
A. Oh, to when it was over?
Q. To when the last interrogation was over.
A. Oh, it would have been several hours.
Q. Several hours?
A. Yeah.
Q. And then I believe you just testified a moment ago from that point it was perhaps a couple of hours until the lineup.
A. Yes.
Q. Okay. I think you testified that both Mr. McNabb and a woman from the Denny's viewed the lineup; correct?
A. I was told they were, yeah.
Q. Did you learn -- and did they positively identify you in that lineup?
MS. GIZZI: Objection. Form.
A. They didn't tell me right away, no.
Q. Did you later learn that they had positively identified you in that lineup?
A. Yes.
Q. And did you know at the time whether Mary

Page 379

Prekop and Emily Lichwala were viewing the lineup as well?
A. I was just told other people would be viewing the lineup. They didn't give me any specific names.
Q. Did you later learn that Mary Prekop and Emily Lichwala had viewed that lineup?
A. I did.
Q. And when you later learned that, did you learn whether they positively identified you?
A. They didn't, no.
Q. They did not positively identify you; correct?
A. Correct.
Q. And so they did not positively identify you so no -- let me rephrase that. There was no positive identification of you by them introduced at your trial; correct?
A. No.
Q. Because they didn't positively identify you?
A. Correct.
Q. So that didn't come in against you at your trial?

Page 380

A. No.
Q. So we've just talked about the people who were viewing the lineup. Do you know who conducted, who set up the lineup?
A. No.
Q. You didn't see any police officers or other individuals there setting up a lineup and making sure that things went according to plan?
A. I know police officers were in the lineup.
Q. As individuals to be compared to you?
A. Correct.
Q. But I'm asking about whether you saw anyone at that time who was sort of running the show so to speak, was setting up the lineup and telling people where to go, things of that nature?
A. No.
Q. Do you know who was running that lineup and who prepared the lineup and set it up?
MS. GIZZI: Objection to form. Asked and answered.
A. I later found out when I seen the paperwork in discovery.
Q. What discovery are you referring to specifically?

Page 381

A. Just the discovery in the case. It was a summary, case summary.
Q. When you say in the case, do you mean in the criminal case?
A. Yes.
Q. And when you found that out, who did you find out was running the lineup?
A. I can't recall at this time.
Q. Do you recall whether they were police officers?
A. I would assume they were, yes.
Q. Do you recall whether you found out that anyone other than police officers was running the lineup?
A. I later found out that the district attorney was there.
Q. And who are you referring to when you say you found out that the district attorney was there?
A. The district attorney that prosecuted my case Francis Bloom.
Q. Okay. Let me ask you some questions about that. You mentioned Francis Bloom. Let me ask you some questions. You are aware that Francis Bloom is one of the defendants in the case that you've sued?

Page 382

A. I am, yes.
Q. And who is Francis Bloom to your knowledge?
A. District attorney that prosecuted my case.
Q. When you say your case, you mean the criminal case against you?
A. Yes.
Q. And are you referring to any of the trials in particular or just the case in general?
A. He prosecuted both trails.
Q. So he was the prosecutor in your first trial?
A. Yes.
Q. And you're testifying that he was the prosecutor in your second trial as well?
A. He was, yes.
Q. It wasn't a separate prosecutor who prosecuted your second trial?
A. I don't believe so, no. I believe he prosecuted both cases.
Q. When was the first time that you became aware who Francis Bloom was?
A. When I seen him in the courtroom.
Q. When you seen him in the courtroom and is

Page 383

that at the trial or at an earlier proceeding in court?
A. I believe it was at arraignment I believe.
Q. And I think you already testified to this but approximately when were you arraigned, how long after your arrest?
A. I think two days. Two days maybe. Two or three days.
Q. So that was your arraignment and do you believe that's the first time you became aware of Francis Bloom?
A. No.
Q. I'm sorry. Did you testify that that's when you first became aware of who he was or that's when you first saw him?
A. That's when I first knew who he was.
Q. And is that when you first saw him as well or did you see him at a different time?
A. I seen him at the police station as well.
Q. And can you be more specific where and when you said you saw him at the police station?
A. When they were asking me about the blood and hair.
Q. When they were asking you about the blood

Page 384

and hair?
A. Yes.
Q. Can you be more specific when that was and where that was? We've talked about a lot of different conversations.
A. It was in one of the interrogation rooms when they started discussing about whether I'd be willing to take blood and hair. That's the first time I saw him but I didn't know who he was. I thought he was a cop.
Q. How did you know -- okay. Let me try to ask you to be a little more specific here because we've talked about a number of different interrogations. Which instance of interrogation is this that you're referring to now?
A. It would have been on one of the last interrogations.
Q. Okay. When I asked you a few minutes ago if you had any reason to believe that the people who were asking you questions in those rooms weren't police officers, I think you said no; correct?
A. Correct.
Q. But now you're saying you think that you saw Francis Bloom inside that room?

Page 385

MS. GIZZI: Objection to form.
Misstates the testimony.
A. He came into the room, yes.
Q. Approximately for how long?
A. When they were discussing the waiver to sign blood and hair.
Q. When you were describing the plain clothes individuals who you said were police officers who were questioning you, are you now saying he was one of those individuals or he came in separately?
A. He came in separately.
Q. Okay. I know I just asked you but I just want to be clear. Approximately how long was he inside the room with you for if you can remember?
A. I really don't have a recollection of how long he was in there. I know he was in there when they started discussing the waiver to take blood and hair.
Q. Do you remember seeing him at any other time at the police station that day?
A. Not that I recall, no.
Q. And you testified a moment ago that the arraignment a few days later was the first day you became aware of who he was; correct?

Page 386

A. Yes.
Q. And can you explain that? Did you recognize him at the arraignment?
A. Yes.
Q. And you recognized him from just that one instance that you just testified about?
A. Yeah.
Q. And you don't remember seeing him at the lineup?
A. No. I didn't see him at the lineup.
Q. Give me just one moment. All right. In a moment I'm going to show you Exhibit 1 which is your amended complaint which you have looked at on several occasions. Before I do I just want to clarify. You have not provided responses yet to defendant Francis Bloom's interrogatories in this case; correct?
A. I don't believe I did.
Q. I just want to put that on the record to show I'm referring to the amended complaint and I don't have interrogatory responses to refer to so I'm referring to the amended complaint at Exhibit 1 and I want to ask you about your allegations about planting evidence. In the amended complaint if

Page 387

you'd like to refer in Paragraph 6, 61 to 62, 81 and 92, and I can give those you numbers again if you need them, you allege that defendants planted evidence including blood and hair at the scene of the crime against Mrs. Prekop; is that correct?
A. Yes.
Q. So my question to you is who do you believe planted that evidence? Which defendants?
A. I believe it was the Springfield Police Department.
Q. Okay. And I believe you did testify earlier this morning that one of the police officers planted evidence but you didn't know which one; is that correct?
A. Correct.
Q. Do you have any reason to believe that Francis Bloom planted that evidence?
A. I don't know one way or the other if he did or not.
Q. Okay. So again, my question is do you have any particular reason to believe that he did so and is the answer no?
A. No.
Q. And do you believe that anyone else other

Page 388

than police officers planted evidence against you?
A. I have no knowledge of that, no.
Q. I'm going to ask you. You testified I think not today but yesterday you testified about allegations involving the police and the FBI. Do you remember that and I think you testified that you were generally familiar with allegations that the Springfield Police and the FBI were having conversations about evidence in your case. Does that sound right?
A. From documents that I read, yes.
Q. And if I remember correctly, when we discussed this topic yesterday in the first day of your deposition, you testified that you were aware of those conversations from documents but you couldn't recall specifically which documents?
A. Correct.
Q. Now, that recollection that you stated about Springfield Police having conversations with the FBI, do you have any recollections about Francis Bloom having discussions with the FBI?
A. I know through documentation that he was in contact with the FBI.
Q. Is the basis of your knowledge for that

Page 389

the same as your basis of knowledge that the Springfield Police were speaking with the FBI?
A. Correct.
Q. And that's from documents in the case but you can't specify which ones?
A. The specific document, no.
Q. Okay. I'm going to ask you about your allegations in the complaint about that, again Exhibit 1, and I believe those are contained within Paragraphs 67 through 93 of the complaint. I'll give you a minute to get to that area of the document. In that section of the complaint you alleged that Francis Bloom as well as Springfield police officers conspired with the FBI, with FBI agents, to create false hair or blood evidence; correct?
A. Correct.
Q. And what evidence do you have to support that allegation or belief?
A. What direct evidence do I have?
Q. Yes.
A. Just the fact that he personally drove my hair and blood evidence to Washington, D.C. in his personal car. Seems a little out of context with

Page 390

what the FBI -- you know, how they receive physical evidence.
Q. So you refer to the trip that's alleged in your complaint that Francis Bloom and Springfield Police Officer Tom Kennedy took to Washington, D.C.; correct?
A. I believe it was Kennedy, yes.
Q. How do you know about that trip? I understand that it's alleged in your complaint. I'm curious how you know about that information?
A. I read it in the report somewhere in the file.
Q. And to the best of your memory or understanding, when do you allege that Mr. Bloom and Officer Kennedy went to Washington to speak with FBI agents?
A. I don't know the exact dates, sir.
Q. Well, I don't need exact dates. If you have either rough dates or --
A. It would have been before trial.
Q. Before the first trial?
A. Yes.
Q. And I believe in your complaint in Paragraph 83 you allege that that trip was taken

Page 391

before the FBI performed any analysis on the case; correct?
A. Correct.
Q. Now, to the best of your memory or belief was that before the FBI had conducted any analysis for the Springfield Police Department regarding any other pending rape investigations?
A. I'm not exactly sure, sir.
Q. Is it your belief that Francis Bloom and Officer Kennedy sought out individual FBI agents to speak with?
A. Well, the report states that they went there to question two agents that did analysis on my case so yes.
Q. What report are you referring to?
A. I don't know the exact report. It was in the lab reports.
Q. Is that the same report that you were referring to earlier that's the whole basis for your knowledge about this incident?
A. Correct.
Q. Okay. And is it your memory or understanding from reviewing those documents that the individual FBI agents were already assigned to

Page 392

your case before ADA Bloom and Officer Kennedy went to speak with them?
MS. GIZZI: Objection to form.
A. I don't know if that's true or not one way or the other.
Q. Okay. So based on information you have how do you believe that ADA Bloom and Officer Kennedy identified those FBI agents?
A. How did they identify them?
Q. Yes. How did they know who they were going to D.C. to meet with?
MS. GIZZI: Objection to form.
A. I don't particularly know, sir.
Q. Based on your review of those documents did they go to meet with those FBI agents because the FBI agents were already assigned to perform analysis on this case?
A. I believe they may have been assigned to that case for a prior instance that happened with Miss Prekop.
Q. Okay.
A. Miss Prekop's home was broken into three times, sir.
Q. So it was not only one incident involving

her that the Springfield Police was investigating; correct?

A. Yes.

Q. And it also was not only one incident with her that the Springfield Police was requesting assistance from the FBI about; correct?

A. To my knowledge, yes.

Q. Give me one moment. Just a couple more questions on that. You testified a moment ago that you believed this trip to D.C. happened before the first trial; correct?

A. Yes.

Q. Do you believe that it happened before or after your arraignment on the Prekop charges?

A. I'm pretty sure it was well after.

Q. Just to set our date windows, you were arrested and arraigned on that case in December 1985; correct?

A. Correct.

Q. And the first trial happened in 1987; correct?

A. Correct.

Q. So you think it happened, the trip happened sometime in that period between the end of



1985 and 1987?

A. Yes. I believe so. Yes.

Q. Okay. I'm going to show you another exhibit. This is exhibit, premarked Exhibit 19.

MR. COHEN: This is for folks on Zoom -- well, this copy that I have -- I just realized that the copy that I have is not Bates stamped even though I know this document is but it is the December 16, 1987 statement. Again, I apologize. Somehow the copy that I printed is not Bates stamped even though I know this document is Bates stamped and this is going to be Exhibit 19 which I think is the only exhibit I plan to introduce and show Mr. Perrot.

Q. Before I ask you -- I apologize. Before I ask you about Exhibit 19 that I just showed you I want to ask you a couple of questions first. You allege that Francis Bloom and other defendants fabricated a false confession to the rape of Mary Prekop and forged your signature on it; correct?

A. I never testified that they forged my signature. I said I signed it unbeknownst to reading it.

Q. I believe you testified in Paragraph 96 of



the amended complaint, I can show it to you again if you'd like, that they fabricated a false confession and forged your signature on it.

A. Oh, I thought you were talking about a different statement.

Q. No, no. I was just talking about your allegation about that in the complaint. Would you like to see your amended complaint again?

A. No. I know what you're talking about, yes.

Q. And I'm referring here to the statement, and again, this is in Paragraph 96 and 103 of the amended complaint. I'm now referring to the statement that was discovered after your first conviction was reversed and before your second trial. Do you understand what I'm referring to?

A. Yes.

Q. Okay. So I'd now like you to look at Exhibit 19 which I have just showed you. Do you recognize that document?

A. I do.

Q. And what is it?

A. It's a statement reported to be by myself.

Q. And is this the statement that was the



subject of those allegations I was just asking you about?

A. Yes.

Q. And when was this statement prepared?

MS. GIZZI: Objection to form. Lack of foundation.

Q. Do you know when this statement was prepared?

A. I was told it was prepared after my first trial.

Q. And I'm not going to ask you about every line of the statement but I do want to ask you there's a date on the top the first page. Do you see that date?

A. I do.

Q. What does that say?

A. December 16, 1987.

Q. So that date, correct me if I'm wrong, that date would have been shortly after your first trial; correct?

A. Correct.

Q. And before your second trial; correct?

A. Correct.

Q. Are there any other dates other than in

Page 397

the body of the report? At the top and the bottom of this document are there any other dates listed?
A. Not that I can see, no.
Q. Do you have any reason to believe that this document was created prior to December 16, 1987?
A. To my knowledge, no.
Q. And this document, this statement was never admitted as evidence against you in any trial or court proceeding; correct?
MS. GIZZI: Objection. Form.
A. Correct.
Q. Okay. And just to clarify, when did your second trial take place approximately?
A. '92 I believe.
Q. So it was at least a couple of years after 1987?
A. Correct.
Q. And again, this statement was not introduced at that second trial; correct?
A. It wasn't, no.
Q. And it was not introduced at the first trial either?
A. Correct.

Page 398

Q. In your complaint in Paragraph 97 of the amended complaint you allege that Francis Bloom, quote, despised you and described you as, quote, inherently evil and a sociopath in his own diary and viewed plaintiff, you, Mr. Perrot, as an individual apart from the community of citizens whose rights he was charged with protecting; correct?
A. Correct.
Q. And what is your basis for that belief?
A. I was a 17 year old kid. He was trying to charge me with rape, murder, every other crime that happened in a 25-mile radius of my house.
Q. So what evidence do you have to support the statement that you just made?
A. The fact that I didn't commit a rape to begin with when he had me charged with it.
Q. What's your evidence that Francis Bloom had you charged with it to use your words?
A. Well, he's the district attorney; correct?
Q. Let me rephrase the question. You testified earlier that you were arraigned within a couple of days after your arrest in December 1985; correct?

Page 399

A. Correct.
Q. And was that arraignment where you were officially charged with crimes related to Mary Prekop?
A. I believe it was part of the arraignment, yes.
Q. And what is your basis for stating, as I think you just stated, that Francis Bloom decided to charge you with those crimes?
MS. GIZZI: Objection to form.
A. I mean I really don't know how to answer the question to tell you the truth. I just -- I don't know how to answer the question. The basis. Just the fact the way he went after me. The way he tried to prosecute me for every crime that happened in that neighborhood. I've never broken into a house with anybody home in my life. He's charged me with rape of an elderly woman.
Q. Give me just one moment. I'm almost done.
(Pause)
Q. So I just want to summarize a few things and make sure that it's clarified and I apologize if I repeat anything. I'm almost done here. Prior to your arraignment in December 1985, my understanding

Page 400

from your testimony is that the only time that you recall seeing Francis Bloom at all was toward the end of one of the last interrogations where you stated that you had been questioned by some police officers and you saw him come in toward the end; is that correct?
A. Correct.
Q. And then you never saw him again either that night or at all until your arraignment; correct?
A. Correct.
Q. And the arraignment was when the charges were brought against you.
A. Correct.
Q. And based on your testimony about your review of documents relating to the FBI, you believe that sometime between then and 1987 he traveled to Washington, D.C. to meet with FBI agents.
A. Correct.
Q. Other than those two events that I just described, is there any specific actions that you recall or that you believe Francis Bloom took before your first trial?
A. Not that I recall, sir.

MR. COHEN: I have no further questions at this time.

FURTHER EXAMINATION BY MS. deSOUSA

Q. Mr. Perrot, I have a few more questions for you before we break for today. In response to Attorney Cohen's questions you stated you believe that Tom Kennedy accompanied Mr. Bloom to Washington, D.C. to deliver the hair and blood samples; is that correct?

A. That's what it states in the report, ma'am.

Q. And do you have any -- are you aware that you've named Thomas Kennedy as a defendant in this case?

A. You have to speak up. I can't hear you.

Q. I'm sorry?

A. You've got to speak up. I didn't hear you.

Q. I'll move closer. Is this better?

A. Yes.

Q. Okay. So other than a reference to Thomas Kennedy accompanying Frannie Bloom to Washington, D.C. to deliver the materials to the FBI office, do



you have any other information about anything Thomas Kennedy has to do with claims that you've brought?

A. I don't, ma'am.

Q. Do you know who Thomas Kennedy is?

A. I believe he was a police officer. That's all I know, ma'am.

Q. And would you have recognized him if you saw him?

A. No, I wouldn't, ma'am.

Q. Was he an officer that you believe had interactions with you when you were a juvenile?

A. It's possible, ma'am.

Q. It's possible but you don't have any information supporting that?

A. I don't.

Q. And do you have any information or facts to support any allegation that Thomas Kennedy engaged in a conspiracy with other named defendants or other members of the Springfield Police Department to have you wrongfully convicted for the rape of Mary Prekop?

MS. GIZZI: Objection to form.

A. I don't, ma'am.

Q. Do you have any information that Thomas



Kennedy did anything to result in the alleged wrongful conviction of you for the rape of Mary Prekop?

A. I don't, ma'am.

Q. Since you were convicted in 1986, have you had any interaction with Thomas Kennedy at all?

A. I haven't, ma'am.

Q. Do you believe he testified at your trial?

A. I believe he did.

Q. Your first trial.

A. Yes. I believe he did.

Q. And do you recall as you sit here what the nature of his testimony at the first trial was?

A. Could you say that again, please?

Q. I said as you sit here today, sir, do you have any recollection of what the nature of his testimony at your first trial was?

A. I don't, ma'am.

Q. How about at your second trial? Do you have any recollection that he testified at your second trial?

A. I don't.

Q. Do you have any evidence or facts to support any allegations that he planted evidence



against you?

A. I don't, ma'am.

Q. Do you have any evidence or facts to support your contention that he helped suppress evidence that would be beneficial to you?

A. I don't, ma'am.

Q. Do you have any evidence or facts to support your contention that he offered false testimony?

A. I don't, ma'am.

MS. deSOUSA: I have no further questions at this time but I am going to suspend the deposition because we have not received medical records and other documents the defendants are not in possession of.

MS. GIZZI: We're objecting to that suspension.

MS. deSOUSA: This is my deposition. I get to decide if my deposition is suspended or concluded. I'm going to suspend. You can object. If you want to bring it to the court before we reconvene, you can do that but this deposition is suspended.

MS. GIZZI: I understand that that's

what you're saying. We object based on the court order.

MS. deSOUSA: We're suspending this deposition. Thank you. Does anyone else have any questions?

MS. LYNCH: Very briefly.

FURTHER EXAMINATION BY MS. LYNCH

Q. Mr. Perrot, you stated that Mary Prekop's home had been broken into three times. Do you recall that?

A. I do, ma'am.

Q. Did you know that before you were arrested?

A. I didn't, ma'am.

Q. Okay. Did you know that Emily Lichwala's home had been broken into before you were arrested?

A. I didn't, ma'am.

Q. Since I still have not received your response to my request for production of documents or further answers to interrogatories I just want to ask you at this point other than your involvement with Mr. Kane when your blood was drawn on December 10, 1985, do you have any information to



believe that he violated your rights or was involved in the Mary Prekop investigation?

A. I don't, ma'am.

MS. LYNCH: That's all I have for now but I also join in Lisa deSousa's statement that I think the deposition needs to be suspended because there's still this outstanding discovery.

MS. GIZZI: That's it. We can go off the record now.

(Whereupon, at 3:18 p.m., the deposition was suspended.)



C E R T I F I C A T E

I, GEORGE PERROT, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction/Reason |
|---|---|---|
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |
| _____ | _____ | ____________________ |

Signed under the pains and penalties of perjury this _____ day of ________________, 2023.

________________________________

GEORGE PERROT



CERTIFICATE

Commonwealth of Massachusetts

Suffolk ss.

I, Karen A. Morgan, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that GEORGE PERROT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand this 27th day of July, 2023.

Karen A. Morgan

Karen A. Morgan
CSR/RPR

My commission expires:
September 28, 2029