**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 44

**In the Matter of:**

*George Perrot vs*

*Thomas Kelly, et al.*

---

*Cheryl Clapprood Vol II*

*August 24, 2023*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*

O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------x
GEORGE PERROT,
Plaintiff
Civil Action
v. No. 18-cv-10147

THOMAS KELLY, ET AL.,
Defendants
--------------------------------x

DEPOSITION OF CHERYL CLAPPROOD, a witness called by and on behalf of the Plaintiff, taken pursuant to applicable provisions of the Massachusetts Rules of Civil Procedure, before Nicole E. Lavigne, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Springfield Housing Authority, on Thursday, August 24, 2023, commencing at 10:10 a.m.

VOLUME II



A P P E A R A N C E S

CARLA AGBIRO LINTON, ESQUIRE
GIANNA GIZZI, ESQUIRE
Loevy & Loevy
311 North Aberdeen Street
Chicago, Illinois 60607
agbiro@loevy.com
Counsel for the Plaintiff

LISA deSOUSA, ESQUIRE
TYLER KENEFICK, ESQUIRE
City of Springfield Law Department
1600 East Columbus Avenue
Springfield, Massachusetts 01103
ldesousa@springfieldcityhall.com
Counsel for Defendant City of Springfield
- and -
THOMAS P. CAMPBELL, ESQUIRE
D'Ambrosio LLP
185 Devonshire Street
Boston, Massachusetts 02110
(617) 720-5657
Counsel for Defendant City of Springfield



APPEARANCES CONTINUED:

CAROLE LYNCH, ESQUIRE
Morrison Mahoney
Tower Square
1500 Main Street, Suite 2400
Springfield, Massachusetts 01115
clynch@morrisonmahoney.com
Counsel for Defendant Richard Kane



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| CHERYL CLAPPROOD | |
| (By Ms. Linton) | 5, 235, 237 |
| (By Ms. deSousa) | 223, 237 |


E X H I B I T S


| NO. | | PAGE |
|---|---|---|
| Exhibit 2 | Blue Book | 10 |
| Exhibit 3 | Chain of Custody | 193 |
| Exhibit 4 | Listing of Training | 198 |
| Exhibit 5 | Civil Liability Policy | 211 |


(Exhibits were retained by Attorney Linton.)

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent shall have thirty (30) days in which to read and sign the deposition transcript, after which time it shall be deemed to have been signed, and that the filing and sealing of the deposition transcript are waived.

It is further stipulated and agreed that all objections, except objections as to the form of the question, and all motions to strike shall be reserved until the time of trial.

CHERYL CLAPPROOD, having been satisfactorily identified by the production of her driver's license and duly sworn by the Notary Public, was examined and testified as follows in answer to direct interrogatories:

EXAMINATION BY MS. LINTON:

**Q. Officer Clapprood, I know we're continuing on from a previous deposition, but I just want to go over a couple of the ground rules again just so it's fresh**



**in our mind. So as a reminder, you are under oath, so any answer you give today is under oath and will be treated as such.**

A. Understood.

**Q. There is a court reporter here who's going to be transcribing our conversation, so it's important that we speak slowly. And I will try my best to remember that on my own. And that we let each other finish each other's questions and answers, okay?**

A. Okay.

**Q. And if you don't understand a question, let me know. I'm more than happy to repeat it.**

A. Okay.

**Q. And before you respond to my question, just want to remind you to give a short pause just in case your attorney wants to object.**

A. Thank you.

**Q. And you can ask for a break at any time as long as there's not a question pending.**

A. Thank you.

**Q. Okay. All right. Do you have any questions for me before we begin?**

A. I do not.

**Q. All right. If you have trouble hearing me, just**



**let me know. I'm trying to not yell, also make sure that everyone can hear me.**

**MS. deSOUSA: So I'm pretty sure we put on the record last time, Carla, the areas on the 30(b)(6) notice that she was prepared to testify regarding. We don't need to renew that unless you feel like you want to.**

MS. LINTON: No, I don't think we need to.

MS. deSOUSA: All right.

**Q. (By Ms. Linton) Do you feel -- did you have a chance to review the 30(b)(6) notice again?**

A. I did.

**Q. Okay. Do you need any more time with that or --**

A. No. I'm good. Thank you.

**Q. Okay. Since we spoke about your background last time, I'm just going to jump into the questions about the Springfield Police Department policies, okay?**

A. Okay.

**Q. Now, did the Springfield Police Department have any written policies?**

A. Yes.

**Q. Okay.**



**MS. deSOUSA: So I'm going to -- just for clarification for the deposition transcript, this case, as we all know, arises from, you know, the mid-'80s and so I think it would be helpful if you clarify when you're asking the questions, or if you just want to stipulate in the beginning, that questions like that refer to that time period because, you know, yes, there are written policies now and there were, I guess, written policies then, but it's not going to be helpful when we're trying to use the transcript is my point.**

MS. LINTON: Of course, yes.

So in that -- also, are people on Zoom able to hear me okay?

MS. GIZZI: Yeah, Carla. I can hear you.

MS. LINTON: Okay. Perfect.

MR. CAMPBELL: I can hear you.

MS. LINTON: Perfect.

**Q. (By Ms. Linton) Okay. Now, did the Springfield Police Department have written policies in 1987?**

A. Yes, it did.

**Q. Okay. Now, did you review those written policies to prepare for your deposition today?**
A. I didn't review all of them. I reviewed the rules and regulations, and I reviewed those policies as to maybe pertain to this case or to check to see if -- how we started moving from the rules and regulations book, which was what I had when I graduated from the academy in 1981, to how we started progressing into the general orders and the policies through the '80s into the '90s.
**Q. Okay. Now, let's talk about that a little bit. You said that you had a rule and regulations book when you graduated in the 1980s, correct?**
A. Correct.
**Q. Okay. Where did you review that book to prepare for your deposition today?**
A. I have a copy of that book in my office. I have the 1981 and 1982 or '3 book in the office. It was called the old Blue Book.
**Q. Okay.**
A. And that Blue Book is what I was taught on when I was in the police academy. That's -- when we came on, everyone received a copy of that Blue Book, and in there was the rules and regulations of the Springfield



Police Department for that time.
MS. deSOUSA: Can we go off the record for a second?
MS. LINTON: Yes.
(Discussion off the record.)
MS. deSOUSA: I'm handing the witness Bates stamps -- somehow half of these got turned the wrong way. I apologize. Give me a second -- CoS RPOD 6842 through CoS RPOD 007022.
THE WITNESS: Thank you.
MS. LINTON: And we're going to mark this as Exhibit 2.
(Exhibit 2, Blue Book, marked for identification.)
**Q. (By Ms. Linton) I'll give you a minute to familiarize yourself with this document.**
A. Just flipping some of these the right way.
MS. deSOUSA: Oh, I don't know how I did that.
THE WITNESS: It's probably the way it just came out of the printer.
Okay.
**Q. (By Ms. Linton) All right. Now, does that**



**accurately reflect the substance of the Blue Book that you referred to to prepare for the deposition today?**
A. Yes, it does.
**Q. Now, this Blue Book, it says it was adopted in 1981, correct?**
A. Correct.
**Q. Okay. Does that mean that this -- these were the policies in place in 1981 in the Springfield Police Department at the time?**
A. These were the rules and regulations in place, yes.
**Q. Okay. And how long were this specific set of rules and regulations applicable at the Springfield Police Department for?**
A. The originating date I'm unsure of, whenever the department started. It was known as the Blue Book because of a blue cover. They always had rules and regulations of some standards. And in 1981, as things were outdated and got changed, they revised these rules and regulations to be more applicable to the 1981 police department. It was still contained in a blue, hardcover book. That's why it was known as the Blue Book with your rules and regulations, and it was taught to everyone who was in the Springfield police academy.



It was revised after 1981, maybe 1982 or 1983 and then carried on until, at some point, they started with just maintaining the rules and regulations, and anything thereafter became a general order or a special order. And then those were maintained in the commissioner's office and in the academy.
**Q. Okay. When did they start switching over from updating the rules and regulations to just issuing general orders?**
A. Somewhere along -- it was Chief Fenton, Paul Fenton. So in the mid-1980s, they went to a standardized general order, special order, memorandum to either adopt, change, or to ratify some of these older rules and regulations as things became either outdated or new laws became passed. Some of these old rules and regulations called for things like horses and call boxes and some of the older ways of policing. So as we changed and modernized through that, a lot of the -- instead of constantly changing rules and regulations, they went into a military style of general orders or special orders and memorandums.
**Q. Okay. What is different between a general order and a special order?**
A. The general orders are those that are going to

be more permanent orders that are for the entire department and will likely stand the test of time for a while. They affect everyone from the patrolmen to detectives and they can supersede what's in this book, but it would notify you that this -- the general order supersedes a rule or regulation in the Blue Book.
The special orders are just that, they're more specialized for a temporary order for a specialized group, for specifically the detective bureau or more specialized in effect that it may not be everlasting and can be -- can have a date and time, can take effect on today's date and then only last for six months.
The memorandums are just that, they're memos that would go to the affected person or division to advise you of an upcoming event, of a change in the way we do things for that unit or of a new unit. It's just a memo.
**Q. Why was it necessary for policies to be in writing?**
**MS. deSOUSA: Objection to the form. You can answer.**
THE WITNESS: I would say policies are necessary to be in writing so that people have a way to refer to them. We had



to have a way of holding people accountable. So it was always when you graduated the police academy, you were given whatever we had in writing in regards to rules, regulations, policies, or procedures. Now they're given a disk. It's all digitalized. But to hold people accountable to enforce the rules, regulations, policies, and procedures, they would have to be memorialized in writing.
**Q. (By Ms. Linton) Now, you mentioned that the policies are generally stored in the Blue Book and now they're changed over to a disk. When did the change happen to this point?**
**MS. deSOUSA: Objection. I don't think you're accurately recounting her testimony. She said the rules and regulations were in the Blue Book.**
MS. LINTON: Okay. Let me rephrase.
**Q. (By Ms. Linton) The rules and regulations which are saved in the Blue Book --**
A. Right.
**Q. -- when did they start saving them on a disk?**
A. Sometime in the '90s, mid-'90s. They -- the



Blue Book was no longer handed out to the academy classes. They gave you a disk which contained everything in the rules and regulations.
**Q. Now, when you were in the academy, did you receive particularized training on the policies and regulations that were in the Blue Book?**
A. Yes, we did.
**Q. What did that training look like?**
A. We were --
MS. deSOUSA: So I'm going to just put an objection on the record. You can answer the question --
THE WITNESS: Okay.
MS. deSOUSA: -- but you're asking now for her personal experience as opposed to her testifying as the 30(b)(6) deponent, and you're asking her about her particular academy experience, which is fine. You can do that, but it would not bind the City.
MS. LINTON: Okay.
THE WITNESS: My personalized experience is I remember every day, we would take a section of the rules and regulations, and we could be quizzed on



them or asked about them. We had tests in the academy that would refer back to this Blue Book or these rules and regulations to make sure we understood them.
We had people who would come in, I believe it was Lieutenant, at the time, Whitney who would come in and take a certain section of this Blue Book and make sure that the -- we understood what was being asked of us so that we could be held accountable for it.
**Q. (By Ms. Linton) Now, in 19 -- between 1981 and 1990, did the Springfield Police Department provide formalized -- formal training on the policies and regulations at the academy?**
A. Yes.
MS. deSOUSA: So just so we can be clear, you're using terms that they don't see as synonymous.
THE WITNESS: Yeah.
MS. deSOUSA: So rules and regulation, policies and procedures are not synonymous.
MS. LINTON: Okay.

**Q. (By Ms. Linton) What is the difference between rules and regulations and policies and procedures?**

A. Rules and regulations are the steadfast guidance for being a police officer and how we do things and how the division is run, what they're made of. Policies and procedures come about as things change. As new ideas, new tools of our trade, new ways of doing things, changes in the law come up, you don't want to change your base rules and regulations every time something changes. For example, when Narcan came out, we needed a policy and procedure how to deal with Narcan. When different things came out with HIV and how we were to handle people who may have HIV, we needed a new policy and procedure.

So as things progressed and came about and changes in the law came about, they started to memorialize these changes as policies and procedures, not to be -- not to replace the rules and regulations which stayed the same which dealt with more of how you behave as a police officer, how your hair is to be cut, how your uniform is to be worn. Those things don't change.

Usually, matter of fact of speaking, so those always stayed the same. The detective bureau is still



the detective bureau. The rules and regs will tell you how many officers and what kinds of crimes they deal with, the garage, who's in it, what happens. Those things stayed the same, but the way we did things and the way we responded to things and the way the law changed then became policies and procedures.

**Q. And are the policies and procedures stored separately from the rules and regulations?**

A. Yes, they are.

**Q. Okay. So just for clarification, where are the policies and procedures stored for the Springfield Police Department?**

A. The original policy and procedure would be stored in my office, superintendent's office, or it used to be the chief's office or it would be the commissioner's office. We cut the policies and procedures. We draw them up as orders. We make them an official order. We disseminate it to the whole department.

Now the department has it kept on a power DMS, document management system. Before every bureau or the squad officers would have a big binder, and they would put these policies and procedures in a binder so that the commanding officer could have them; officers who



came in and had a question, you could refer to them. The bureaus had a copy of it. The academy had a copy of it to teach and to instruct the new officers or the -- the officers could get their own copies by coming up to the chief's office.

**Q. Were the policies and procedures given to officers at the academy?**

A. The policies and procedures would be given to you if you were in the academy. If you were already a working officer, they were given to you by way of an order to the commanding officer to be read at roll call. So if a policy or procedure was issued, it would say to the commanding officer: Please read at roll call for the next four consecutive days. So the commander at roll call would say: We have a new policy. We have a new procedure. Read it to them, sign it, and date it that they did do that.

And I think the reason for going four days out was because we were on a four -- most of them are on a four days on, two day off schedule. So hopefully you were getting everybody.

**Q. Okay. Did the Springfield Police Department between 1980 and 1990 provide any particularized training on the policies and procedures at the police**



**academy for new officers?**

A. Yes.

**Q. Okay. What did that training consist of?**

A. The training at the academy level would have been any -- they review all the current policies and procedures and rules and regulations to new recruits. Once a year, they have an inservice week for every member -- every sworn member of the Springfield Police Department is required to go 40 hours of training at the police academy for what they call inservice training, and that was given back in the '80s and is still today.

And when you go to that training, they have an instructor that goes through all the recent policies and procedures that have been updated. So you're getting a year's worth of here's the most recent changes to policies and procedures. They have a class in that. I believe it's a four-hour class and just going over changes and updates to policies and procedures.

**Q. Did you review the policies and procedures that were applicable to the Springfield Police Department between 1980 and 1990 to prepare for this deposition?**

A. No, I did not.

MS. deSOUSA: Off the record for one minute.
(Discussion off the record.)
MS. LINTON: I am pulling the general orders, and it looks like it's the same doc for the rules and regulations. This is what I have for general orders, rules and regulations 1981 to 2023.
MS. deSOUSA: Can you go to the end of it.
MS. LINTON: So these are --
MS. deSOUSA: Yes. So keep going. So you should get to the end of the -- this is what we produced in discovery, right?
MS. LINTON: Yeah.
MS. deSOUSA: Then before the deposition, I segregated out the ones just for this time period and had Natalie send them to you.
MS. LINTON: We have some -- Gianna pulled these for me as well. I want to make sure SP Order 1992, 2007 --
MS. deSOUSA: Do you want me to -- when we take a break, I can go back into my



emails and see what Natalie sent you and reprint those if that's what you want me to do.
MS. LINTON: You know what, Gianna -- I'll ask Gianna.
Gianna?
MS. GIZZI: Yeah.
MS. LINTON: Can you check to see if we got an email from Natalie.
MS. deSOUSA: It might have been from me. I don't know which of us forwarded it, Gianna.
MS. GIZZI: Okay. I was already looking for it and I see it. Do you want me to -- I can forward it to you or do you want me to read off the Bates stamps?
MS. LINTON: Forward them to me so that way it's easier. I can just open my email.
MS. GIZZI: Okay.
Lisa, you're talking about like -- it's like a table, right?
MS. deSOUSA: Gianna, I'm sorry, I would have to get up and look at my own



emails.
MS. GIZZI: No. No. That's okay.
MS. deSOUSA: I don't know exactly what you mean by a table. It should be several different documents that were either GOs or SOs that were issued during the time period in question. Natalie reviewed all of the ones -- we had produced to you all of the ones through whatever date we produced them because they continue to change and supplement them. Natalie went through and segregated the ones for the years that were relevant for this deposition.
MS. LINTON: I just want to make sure that we have them, Gianna, and then --
MS. GIZZI: Yeah. Carla, did you get my email?
MS. LINTON: Yes. Just got it. Oh, okay. I see what you're talking about, the chart.
MS. GIZZI: I'm looking if there was another one too, but I think that's the one you guys are referring to.



MS. LINTON: These are rules and regulations and additional rules and regulations enacted through general or special orders. Okay.
MS. deSOUSA: Is that helpful?
MS. LINTON: Yes.
Are we still on the record?
THE COURT REPORTER: Yes.
**Q. (By Ms. Linton) Okay. Just for clarification, so rules and regulations are separate than the policies and procedures, but the policies and procedures are what you're referring to as general orders?**
A. Correct.
**Q. Okay. So when I use the term "general orders," I'm talking about policies and procedures?**
A. Correct.
**Q. Okay.**
**MS. deSOUSA: Can we go off the record for a minute?**
MS. LINTON: Yes.
(Discussion off the record.)
**Q. (By Ms. Linton) So policies and procedures, we're referring to general orders or special orders, okay, and then -- but the rules and regulations, I'm**

**Q. talking about the rules to the Springfield Police Department?**
A. Sounds correct, yes.
**Q. All right. Now, besides the superintendent's office and in particular, I believe you said supervisors had access to the policies and procedures, correct?**
A. Correct.
**Q. General orders? Okay. Now, were the policies and procedures, general orders, special orders, were they accessible to any member of the police department?**
A. Yes.
**Q. Were they easily accessible to members of the police department?**
A. I suppose a definition of easy would depend. I mean, you'd have to go ask for it. You know, it wasn't necessarily at your fingertips. If you were a squad officer, you would have to come in and ask your commanding officer to see the book. Now, they are even more easily accessible because they are all on computer, and everybody has a computer and they all have email. So now it's just a matter of clicking the button, and all our rules and regs, policies and procedures pop up on the computer.



So now they're very accessible. For what we had back in the '80s, they were about as accessible as they could be.
**Q. Okay. Now, I'm going to ask you questions -- when I ask you questions moving forward, unless I say otherwise, I'm asking for the time period between 1980 and 1990, okay?**
A. Okay.
**Q. Now, within that time period, how were these policies promulgated?**
A. The policies were issued from the chief's office. Again, they were sent out to -- I don't recall when we all got emails available to us. So they might have been delivered -- might have been back when a cadet or an officer would actually take the policy and drop it in your mailbox. They all would get mail, and the new policy would say: This is a new policy or this is a new procedure. Please read it at roll call for the next four days, and then it would be up to the commanding officer to read that new policy and procedure and then to file it in those binders that everyone kept.
So I think the early '80s especially, it was probably done by mail. And then at some point in time



when computers came into play, probably late '80s, '90, maybe even early '90s, so everything was delivered by mail and it was hand-kept and it was in those looseleaf binders. They came from the chief's office. And they were promulgated by the command staff for whatever change was necessary or whatever policy was needed.
**Q. Who wrote those policies? Was it the chief?**
A. The chief would be the final deciding factor. They could have been written or contributed by any member of the command staff or law department.
**Q. And who was the chief in 1987?**
A. I believe it was Chief Paul Fenton.
**Q. And you mentioned earlier that it could be either Chief Paul Fenton or other members of the command staff, correct?**
A. Correct.
**Q. If a policy was added or changed or modified in any way by a member of the command staff, did that have to be approved by Chief Fenton?**
A. Yes.
**Q. Was there a process for that?**
A. I don't think there was a formal process, but it's his name on the bottom of that policy. He's signing the change and he's authorizing it, so it would



be his final decision.
**Q. Okay. Do you know how -- what years Chief Paul Fenton served as chief?**
A. I don't know specifics. He was the chief when I was a cadet in 1979. So he started in the '70s, and he would have gone to the early '90s.
**Q. Was he the chief during the entirety of the George Perrot investigation?**
A. I believe so, yes.
**Q. Now, you've mentioned that it would go from the chief office to the commanding officers?**
A. Yes.
**Q. What do you mean by "commanding officers"?**
A. Every squad, every division bureau in our Springfield Police Department from the time I came on is led by somebody. There is a person of rank that oversees everyone in that division or squad. The highest rank would be your commanding officer. Usually it's a captain. Some smaller divisions had a lieutenant or a sergeant in charge.
**Q. Can you briefly describe the rank system used by the Springfield Police Department.**
A. Sure. In the '80s, the rank system was chief, then deputy chief, then captain, then lieutenant, then

sergeant, then police officer, and then we have cadets.

**Q. So I understand correctly, you said chief, deputy chief, captain, lieutenant, sergeant, police officers, and cadets; is that correct?**

A. Correct.

**Q. Now, you mentioned that the -- I believe this is correct, you mentioned that the higher rank would be supervise -- overseeing those below them? Is what you --**

A. The highest rank in that division or squad would be your commanding officer. So the squads are uniform squads. Springfield Police Department has always had three different squads: Days, evenings, and nights. And then we have a little bit of a break where we have an early roll call for each, but the commanding officer is the same.

They are headed by and always have been, to my knowledge, a captain. A captain is in charge of each three. The detective bureau, the then crime prevention bureau, records, academy are headed by a captain. Some of the smaller divisions, like youth aid, may have had a lieutenant in charge at the time, but the highest ranking is your commanding officer responsible for everybody under him or her.



**Q. And when you say "responsible for," what do you mean?**

A. Their behavior, their work ethic, their attendance, work product, holding them accountable, absenteeism, everything is under that commanding officer.

**Q. Okay. When you say "work product," are you describing work done by those below him like writing reports for example?**

A. Yes.

**Q. Did a commanding officer have to review reports written by a subordinate officer?**

A. Yes.

**Q. Okay. Would a commanding officer review all reports written by a subordinate officer?**

A. Most, if not all, yes.

**Q. And in the cases in which there would be a lieutenant, what would be the lieutenant's responsibilities?**

A. For example, when I was on the CPB on the four to twelve, my lieutenant was William Fitchet, might have been a sergeant in the early '80s. Then he became a lieutenant and he stayed there. Our captain was John Brown, who worked days. So reports would be left for



Captain Brown when he came in on days, but my immediate supervisor was William Fitchet. So work that I did would have to be approved by him first and then left for the captain to review during his day shift.

**Q. Now, were the captains responsible of being aware of what was going on on the day-to-day of cases that were being investigated?**

A. Yes.

**Q. And how would a captain do that?**

A. The captain knew that based on conversations with all the other supervisors. They met -- whenever the captain worked, he was in constant communications with then William Fitchet and Tom Kelly, my supervisors. Also, we did every night what they called a night line. It could also be a daily report line, and we had clipboards of each squads, day shift, night shift.

The CPB did not have a midnight to eight in the morning, only for a little while and that was in the '90s, but each -- if you were teamed up with a partner, whatever you did, whatever case you worked on, whatever important information that you obtained, whatever arrest you made, whatever phone calls you made, communications you made were on the piece of paper



called a night line so that the next shift could see what you did in the previous shift, did you call somebody, did you work on something.

Sometimes if it was pertinent to a criminal case, a copy of that would be placed in the file. Otherwise, it was there, and the captain in the morning would come in and he would also review those night lines.

**Q. Were captains involved significantly -- strike that. Were captains significantly involved in the criminal investigations at times?**

A. No.

**Q. So what was the extent of their involvement with open criminal investigations?**

A. They were aware of open criminal investigations. They would be apprised of what was happening with the investigations, but they act -- took no active part in the investigation.

**Q. How about a lieutenant, would a lieutenant take a more active part in an investigation?**

A. In the '80s, my experience was lieutenants I worked for were also very active in investigating, yes.

**Q. Would a captain -- when you say they were aware and were -- aware what was going on, would they sit in**

Page 33

**an interrogation?**
A. No.
**Q. Would they ever serve as a witness to an interrogation?**
A. I've never seen that, no.
**Q. How would a lieutenant then be involved?**
A. Lieutenant was one of the working crew. The lieutenant often went out with a partner and actively worked on a case or actively, at the time in the 1980s, the crime prevention bureau for example, we also did narcotics. So the lieutenant was actively involved in trying to do undercover buys, assigning people to different areas. The lieutenant would be the one to see that we got the proper search warrants and executed the raid.
The lieutenant would actually go on the raids with us. The lieutenant would actually interview people. He would be a witness to some of those interrogations or interviews. He would actually get involved in pretty much everything that the patrolmen under him did at that time.
**Q. If a lieutenant was working on a case with a subordinate officer, would the lieutenant ultimately be in charge of decisions that were made in regards to a**

Page 34

**case?**
A. Yes.
**Q. Okay. Any decision that would be made regarding how to proceed with a case, would they have to go through a lieutenant first?**
A. Yes.
**Q. So just for clarification, does that mean that lieutenants have to approve a certain decision how to proceed with an investigation for a case?**
A. For the most part, yes. If it was a decision in regards to, for example, an arrest to be made or someone else to be interviewed, we, most times, ran it by our lieutenant. If the lieutenant was off, sometimes that responsibility fell to the senior officer.
**Q. Who would be considered a senior officer? Would that be a sergeant?**
A. The officer with the most time on the job in -- working in the bureau with us. In the '80s in that crime prevention bureau, when I first started, both Tom Kelly and Bill Fitchet were sergeants, and then Bill Fitchet somewhere in the mid-'80s became a lieutenant, but if both were off, then it would be -- we were all considered patrolmen. We like to call ourselves

Page 35

detectives but that's synonymous with patrolmen. We were just plain clothes patrolmen. And whoever had the most time on the job, we would refer -- you know, defer to a decision in regards to the case.
**Q. Now, going back to the policies, after 1990, do you know who was the chief after that?**
A. After somewhere in the '90s there, we had Paula Meara.
**Q. You said Paula Meara, I'm sorry?**
A. Paula, yeah. Paula Meara in the mid-'90s, I believe.
**Q. And when -- was it a she?**
A. She.
**Q. When she became chief, did she approve the new -- any new policies that were enacted?**
A. She did. Policies, and general orders, special orders, personnel orders, memorandums were generated and came out of the chief's office under Paula Meara, yes.
**Q. And when there were the new policies -- if there were new policies issued, how would it get from the chief to the police officers?**
A. Again, the same way. She would issue the new policy, sign it, and then it would go via mail to every

Page 36

commanding officer to the academy and be read at roll call and then put into everybody's binder. And it would -- and at some point right around '95, we had IMS system, which is the new -- which was the computer system. So somewhere right around there, everybody would get email and then they would be stored on their computers.
**Q. Okay. How were policies enforced at the Springfield Police Department?**
A. The policies would have been enforced by the commanding officers or the supervisors that directed the patrolmen to make sure that they were abiding by what the policy said.
**Q. And how was compliance -- was compliance with the policies tracked by the Springfield Police Department?**
A. I don't think the police department had a formal way of tracking compliance with the policies. If the commanding officer thought one of his subordinate officers was outside the policy, a lot of times there was some retraining involved to make sure the policy was understood. If it was in direct disregard to the policy, then it would be an internal investigation unit, and charges might be brought against the

Page 37

employee.
So it was really up to those you worked with, your supervisors to ensure that we were adhering to the policies.
**Q. And was there anyone in charge of making sure that the commanding officers of supervisors were following policies?**
A. The deputies -- the deputy chiefs were assigned -- they were split up, and each of them had different areas to be responsible for. One would be responsible for those three uniform divisions. One would be responsible for the plain clothes or the investigative division. So they were responsible to make sure that the captains under them were enforcing and informing personnel of the policies.
**Q. Did the Springfield Police Department make any effort to audit the effectiveness of the policies?**
A. I don't believe so, no.
**Q. Now, if the policies were amended, did it go through the similar process you described earlier when it is amended by the chief at the time?**
A. Yes.
**Q. And would it be communicated in a similar manner to the rest of the officers?**

Page 38

A. Yes.
**Q. Now, you mentioned earlier that a policy would be amended if there was a change in law, correct?**
A. That would be one reason, yes.
**Q. What would be another reason that a policy would be amended?**
A. A new weapon would come out, and we would have a new policy or a way of dealing with people. A new piece of equipment may come out, something different with the cars maybe, newer models and the way we did things. It could be a case law that came out and changed the way we did things. It could be just common practice: This isn't working. We may have to change the way we're doing things. It could be advice from the law department: This is the way you probably should do this or change that, and then we would adopt a new policy.
**Q. Between 1980 and 1990, did the law department ever make any suggestion regarding amendments to the policies and procedures applicable to the Springfield Police Department?**
A. I'm sure they did. I can't think of a specific time, but we work close with -- we worked closely with the law department. We worked closely with Attorney Ed

Page 39

Pikula and his group of lawyers. So, I mean, we had civil suits where I'm sure the law department said: Here's an issue coming out, and we would take their advice. We worked closely with them, so I'm sure they did.
**Q. And if the law department had a suggestion, would they communicate that to the chief to make an edit?**
A. With the chief and the command staff, yes.
**Q. Who were the members of the command staff?**
A. The command staff consists of the chief, the deputies, and usually the chief's aide, whoever the chief has in the front office assisting him on a day-to-day basis, is usually on the meetings with him in the morning. They have a command staff meeting.
**Q. And you said chief and deputy chief?**
A. The deputy chiefs, yes.
**Q. Who was the deputy chief between 1980 and 1990?**
A. Let's see, the deputies for Paul Fenton were Tom Fitzgerald and Robert Flanagan, and I don't think -- I think Dan Shea had passed before that. Well -- and then Dan Spellacy.
**Q. Dan?**
A. Daniel Spellacy, Robert Flanagan, and Tom

Page 40

Fitzgerald.
**Q. Now, when an amendment was made to a policy, was the previous policy preserved in any way?**
A. Yes. The previous policy was still kept in that binder, and the new policy would say it either supersedes it or it supersedes part of it.
**Q. And those amendments are communicated in the same manner we talked about before?**
A. Correct.
**Q. Now, besides those policies, the general orders and the special orders that we were discussing, and any provision of state law, were there any other written policies that were binding on the Springfield Police Department?**
A. We didn't mention personnel policies.
**Q. Personnel policies?**
A. Yeah. Personnel orders, POs, are dealing with transfers and where someone is assigned.
**Q. And where were those stored?**
A. The same. The same, yeah.
**Q. Okay. And who adopted those policies?**
A. That would be the chief.
**Q. And those were written by the chief as well?**
A. Yes.

Page 41

**Q. Were there any noninternal policies that were binding on the Springfield Police Department, and by "noninternal" I mean any policies that weren't written directly by the Springfield Police Department?**
A. No, no policies other than we were also naturally under Mass General Laws and laws of the Commonwealth, but no policies that I know of, no.
**Q. I'm going to --**
MS. LINTON: Gianna, can you -- oh, it's already there.
MS. GIZZI: Yeah. Do you have a specific page in mind?
MS. LINTON: I just want to make sure that we -- that you have the ones that have the general orders at the bottom.
MS. GIZZI: Yeah. This is --
MS. LINTON: That's it?
MS. GIZZI: Yep.
MS. LINTON: Okay. Perfect. So if you can just scroll to the general orders at the bottom.
MS. GIZZI: Like starting here? This is the index but --
MS. LINTON: Yeah, that's fine.

Page 42

MS. GIZZI: Okay.
**Q. (By Ms. Linton) Superintendent, do you recognize these general orders?**
A. Yes.
**Q. Okay. Now, these general orders were provided by Springfield attorneys I believe in -- on July 26 of this year, and it says that these were the regulations -- the rules and regulations that you may rely on for your testimony today.**
A. Okay.
**Q. Okay. Did you -- do you agree that these are generally the policies and general orders that you reviewed related to the topics that we noticed?**
A. Yes.
**Q. Okay. Now, I'm going to scroll through them.**
MS. LINTON: If you can scroll through them generally.
MS. GIZZI: Yep.
**Q. (By Ms. Linton) Now, is it your understanding that this exhibit includes all of the written policies of the Springfield Police Department on the topics which you have been designated to talk about today?**
**MS. deSOUSA: Okay. So can we go off the record?**

Page 43

MS. LINTON: Sure.
(Discussion off the record.)
**Q. (By Ms. Linton) Now, for clarification, what I'm asking is do you understand that the general orders that we're showing you at the moment, that they include all the general orders, i.e., written policies of the Springfield Police Department within the time period of 1980 and 1990 on the topics on which you have been designated to testify today?**
A. Yes.
MS. deSOUSA: So I'm going to object. Could you just clarify and it also includes other --
MS. LINTON: That was going to be my next question. I just wanted to break it down for the record so that it was clear, 1980 and 1990, those are all -- okay.
MS. deSOUSA: Okay.
**Q. (By Ms. Linton) Now, after that time period, are these also all the general orders from 1990 until the present --**
A. I believe they are, yes.
**Q. -- for the Springfield Police Department?**
A. Yes. Sorry.

Page 44

**Q. Are there any other policies that were applicable or binding to the Springfield Police Department within -- between 1980 and 1990?**
A. Not that I'm aware of, no.
**Q. Okay. Were there any other policies that were applicable or binding to the Springfield Police Department from 1990 to the present?**
A. Not that I'm aware of, no.
**Q. Now, who was the final policymaker for the written policies for the Springfield Police Department?**
A. Who's ever the chief at the time.
MS. deSOUSA: Again, you're talking about then?
MS. LINTON: I'm going to clarify.
MS. deSOUSA: Okay.
**Q. (By Ms. Linton) And between 1980 and 1990, would the chief that would be the final policymakers of the Springfield Police Department be Chief Fenton?**
A. Yes.
**Q. Now, was the policymaking authority ever delegated in any area?**
A. Not that I'm aware of, no.
**Q. So Chief Fenton had complete control over the policies of the Springfield Police Department between**

**1980 and 1990?**
A. He was the final say, yes.
**Q. Okay. And after that time period, it was whoever was chief at the time, correct?**
A. Correct.
**Q. Did that ever change?**
A. Not that I'm aware of, no.
**Q. All right. This --**
**MS. deSOUSA: Can I just clarify for the record that the term "chief" has changed.**
THE WITNESS: Yeah, the title.
MS. LINTON: Okay.
**Q. (By Ms. Linton) How has the term "chief" changed?**
**MS. deSOUSA: I'm sorry.**
THE WITNESS: You sure you want to know this?
**Q. (By Ms. Linton) I need to know. I want to know.**
A. The term "chief" changed to commissioner, and I believe it changed because they took chief -- they took the head of the department out of civil service. Chief is a term used for the head of the department when



you're under civil service. When the City, sometime after Paula Meara, before William Fitchet, decided that they wanted to give the head of the department a contract and not depend on the civil service test, they changed the title from chief to commissioner. So William Fitchet was a commissioner. Paula Meara never was. She was a chief.
And then it went to Commissioner Flynn and then it went back to Commissioner Fitchet. And then when it became me, what they did was I was an acting commissioner because I hadn't -- I hadn't been under contract with the mayor. I was the one appointed to lead the department until he made a decision. So I was acting commissioner. And then he made a contract with me and I became the police commissioner. And then in March of last year -- have I been a superintendent that long -- and then sometime, they wanted to bring back the board of police commissioners to somewhat oversee discipline in the Springfield Police Department, a group of five civilians who were called commissioners. Therefore, they felt I could no longer be called a commissioner. So my title changed to superintendent.
**Q. Understood. So does that mean that you're the first superintendent for the Springfield Police**



**Department?**
A. That's correct.
**Q. Okay. But from chief to commissioner to superintendent, this was all the same job, the same job responsibilities, just different titles?**
A. Correct.
**Q. Now, previously you said you needed to be switched from civil service to contract?**
A. Correct.
**Q. What does that mean, "civil service"?**
A. Springfield Police Department is a civil service department. We are under Mass civil service rules, regulations for our employees. They have to take a test. Civil service certifies that test. When we appoint them, civil service has to agree with the appointment. If we bypass someone, there is an appeal to civil service.
Civil service was a way, I think, a long time ago before us, of keeping politics out of employment. So Massachusetts developed the Civil Service Commission so that there was fairness in hiring. That's why it came about. So we are still under that system where you have to have a certified list to be appointed to the police department. You have to have a certified



list to be promoted in the department, and that went all the way up to chief. You would take a test and you would be appointed.
So they didn't want that system anymore. They wanted a little more freedom to do the national search or to get the best person qualified. So they had to take that position out of civil service, and the mayor now gives you a contract so that he can hire whom he thinks is the best person to run the department without civil service constraints.
**Q. Okay. And just so we're all on the same page, Civil Service is a commission of other people that does this work?**
A. Yes. It's a Civil Service Commission. It operates out of Boston.
**Q. Okay.**
A. And they design the test. They run the tests. They control promotions. They hear appeals. There's board members that hear appeals if you're jumped for promotion. Some departments in Massachusetts are now getting out of the civil service for more freedom to hire who they want and when they want, but Springfield was and still is a civil service department.
**Q. Okay. And Civil Service is just responsible**

**for, like, the personnel aspect of the Springfield**
**Police Department?**
A. Yes.
**Q. Okay. So did the Civil Service issue any**
**policies or regulations that's binding --**
A. No.
**Q. -- on the Springfield Police -- okay.**
**MS. deSOUSA: When we take a break, I can fill in some of this for you because I realize that it's very confusing, but I can explain civil service to you in two minutes.**
MS. LINTON: Let me make sure that I -- the record is clear, I understand so we can continue along.
MS. deSOUSA: Yeah.
**Q. (By Ms. Linton) Now, did the spring -- back to the policies.**
A. Okay.
**Q. Did the Springfield Police Department -- and, again, just for clarification for the record, all the questions I'm asking you now are going to be for the years between 1980 and 1990 unless I say otherwise.**
A. Okay. Understood.



**Q. Did the Springfield Police Department have any policies on report writing?**
A. I don't think we had anything specific to report writing other than the direction of where reports would go. There may have been a policy of how to -- the reports had to be approved by a commanding officer before going to the chief's office, but as far as report writing in itself as to what's to be included in a report or how to generate a report, I don't believe there was a specific policy, no.
**Q. Now, the policy that you're referring to as sort of the trajectory as where a report was supposed to go, where is that policy?**
A. That policy may have been included in other policies about the report can't just simply go to the chief's office without first passing chain of command.
**Q. Okay.**
A. And it's probably in a chain of command policy or something that existed.
**Q. Would that have been a written policy?**
A. I believe it was a written policy.
**Q. Okay. Is it somewhere in this set of policies?**
A. It would have been before these sets of policies.



**Q. It would have been before the 1981 policy?**
A. It would have been somewhere before -- I think before these policies because it was just a separate policy on your commanding officer had to approve reports before it went to the chief's office, but as far as reports to court or to your CO or anything like that, I don't think there's anything written, no.
**Q. Okay. So there was no written policy --**
A. No.
**Q. -- for that?**
**MS. deSOUSA: Can I just -- I'm sorry, can I just see the index for the...**
THE WITNESS: This.
**Q. (By Ms. Linton) Now, was there a written policy for file keeping?**
A. File keeping for?
**Q. As in how are files from the department stored?**
A. Not that I was aware of at that time, no.
**Q. Now, is there a written policy for file sharing as in how a file is shared between either members within the department, members outside the department, or members outside the Springfield Police Department?**
A. I don't think it would have been a written policy, no.



**Q. But was there a policy on that?**
A. There was a way of doing it. I don't think it was a written policy. When we came into, like, the CPB, there was a -- we were taught if you were to remove a file, you signed it out. There was a sheet to sign out the file, where you were going with it, and when it came back. And that was taught to us by our commanding officers that files do not leave the bureau unless you sign them out properly and then you sign them back.
So every time we went to court, if I was to grab the folder, I signed that sheet out saying I was taking it to court, and then I had to bring the file back and then sign it out again.
**Q. Was there a written policy on evidence disclosure, slash, Brady responsibilities?**
A. Can you say that again. Brady?
**Q. Yeah, sure. Brady responsibilities?**
A. I don't think we had heard of Brady during that time period, no.
**Q. How about was there a policy on the disclosure of alternative suspects?**
A. No.
**Q. Was there a policy on prohibiting the**

**fabrication of evidence?**
A. I don't believe there was a specific policy, no.
**Q. Was there an unwritten policy on that?**
A. The fabrication --
**Q. Of evidence.**
A. -- of evidence -- most of what we learned and how we operated in the '80s in that bureau was through the prosecutors we dealt with and the supervisors we dealt with. We work closely with the DA's prosecutors because we were in court almost every day, five days a week. So we became very close to superior court prosecutors.
So a lot of the methodology and everything and as far as evidence and case files and how to conduct these investigations came through our learning from these attorneys day in and day out in court. And as case law came about or things changed, they were usually the ones to notify of us and to help us.
I'm sure there was policies regarding the tagging of evidence and where it went and who had final control and how to -- how we took it out of the office. Again, it was presenting -- at one point in time, we had to present the person in control of the evidence our ID card, and he held onto that until the evidence



came back. But sometimes the evidence did stay with the DA's office in superior court if the trial was ongoing or it finished; the evidence stayed there.
I don't remember a direct policy to address it.
MS. deSOUSA: When you get to a natural breaking point, can we just take a couple minutes. I don't want to interrupt your train of thought, but we've been going about an hour and a half and just --
MS. LINTON: I didn't even know it's been an hour. If you can just bear with me --
MS. deSOUSA: No, of course.
MS. LINTON: -- let me just finish here, and I'll take a quick break, okay. Thank you.
**Q. (By Ms. Linton) Okay. Now, we talk -- you mentioned earlier about the evidence, that there was -- there could have been a policy on how to tag evidence, correct?**
A. Correct.
**Q. Where was that policy?**
A. If it was a policy in regards to tagging evidence, it would be in a GO or an SO in regards to



evidence keeping or storing.
**Q. Are you able to point to where that policy is? You also have a copy there if it's easier.**
A. Yeah.
MS. GIZZI: Carla, this might make sense to take a break for because it's going to take a second to get to what you're talking about.
MS. LINTON: I just have like one more question in this long thing but sure. If it's going to take a while, then we can just take a break.
Let's take a break.
(A brief recess was taken.)
**Q. (By Ms. Linton) So before we took a break -- as a reminder, you're still under oath.**
A. Yes, ma'am.
**Q. Before we took a break, we were talking about policies, correct?**
A. Correct.
**Q. Now, I'm going to put up on the screen -- well, Gianna is going to put on the screen a policy on report writing. Are you able to see that clearly --**
A. Yes.



**Q. -- or do you need it to be bigger?**
A. No. I'm good.
MS. LINTON: It was good before, Gianna. Oh, that works.
THE WITNESS: That works too.
MS. LINTON: Can you make it full screen.
MS. GIZZI: When I did that, it goes out of the zoom.
MS. LINTON: Oh, strange. Last time you had it like -- it was just --
MS. GIZZI: I don't know how to change it so --
MS. LINTON: All right. Are you still able to see it because we're seeing it now.
MS. GIZZI: Is it close enough for you guys?
MS. LINTON: Oh, that's what you mean, out of the zoom, zooming into the document.
MS. GIZZI: Yeah.
**Q. (By Ms. Linton) Is it too small for you now? I think so.**

A. Yeah.

MS. LINTON: All right. Let's go back to the other one.

MR. CAMPBELL: Can you just give us the page number.

MS. GIZZI: 6895.

MS. deSOUSA: 6895, Tom.

**Q. (By Ms. Linton) Have you seen this before?**

A. Yes.

**Q. Okay. What does this policy refer to?**

A. The policy refers to our records division. The records room in the police department, especially during the 1980s, was responsible for categorizing, keeping, filing all generated reports from officers, especially those reports that had to do with arrests or anyone taken into custody, anything that should be to court with an arrest file. The records room at that time maintained these files, and from the records room, they were taken to the appropriate court - juvenile or district or superior.

**Q. Okay. So would that mean that this would be the policy for file keeping as in, like, where the files are going to be stored?**

A. It designated the records division, the records



room as being the primary intake for all these records. There was also supplemental files for each division. The division that created the file also kept a copy of everything. So the CPB in the 1980s had a set of files for everyone that we arrested or dealt with or every case we were investigating.

The records division may have not gotten a copy of the investigation portion of that, but they would have if it pertained to an arrest of an individual or a report that was designated to go to the chief's office.

**Q. Now, is that the only policy that was binding -- and, again, just as reminder, I'm asking questions regarding the 1980 to 1990 time period unless I say otherwise. Is that the only policy pertaining to recordkeeping that was applicable to Springfield Police Department at the time?**

A. To the best of my knowledge for a policy, yes.

**Q. Now, when you say to the best of your knowledge, you're talking to the best of your personal knowledge or are you talking on behalf of the City?**

A. On behalf of the City. There's also a -- you know, for policy, yes. There's also a retaining law. There's a Mass General Law about how long you keep and retain records, but policies, this is the only one I'm



aware of, yes.

**Q. Okay. Now, is there any similar sort of policy regarding file sharing, sharing these documents -- sorry, sharing the file with any entity outside of the Springfield Police Department such as the prosecutor's office?**

A. Not aware of a policy. There was a procedure in place that was known to us. I don't know of a written policy, again, that accompanied that procedure. It was our procedure in the police department, again, to have the sign-out system of any files that were going to the DA's office, but as far as a written policy, I'm not aware of it, no.

**Q. And that procedure wasn't written either?**

A. I don't believe so.

**Q. Now, were there any unwritten policies that were in effect with the Springfield Police Department during this time period?**

A. By "unwritten policies," you mean?

**Q. Policies that were not reduced to writing.**

A. They weren't an official formal policy if it wasn't in writing. There was methodologies and way we did things that were taught to us that may not have been corresponding to a written policy, but when I



first started in the crime prevention bureau, I was taught ways to do things by supervisors and other officers and prosecutors on best practices that may not have followed a written policy.

**Q. Was it the practice of the Springfield Police Department to have supervisors relay that sort of knowledge to subordinate officers?**

A. Yes. And that's the way most of us became investigators that we were. We learned from either senior officers that were in the bureau at the time or the supervisors. There was a lot, and a majority of the time was on-the-job training as to best practices and ways of investigating a case, taking a statement, putting the file together. A lot of that came through, it was a small group of investigators with a small group of supervisors who became very close-knit.

And, again, as I said before, we had court almost every day. So we became close to prosecutors, and we became familiar with judges and procedures done in court and the way things probably should be and should not be. It became more of a -- much more of an on-the-job training process than to refer to written policy.

**Q. Were all police officers or subordinate officers**

**trained the same way?**
A. All police officers, no.
**Q. Okay. What do you mean by that?**
A. Squad officers, people who worked in uniform and did not do investigations, would not have maybe the same knowledge preparing court cases or doing investigations as we may in the CPB. The crime prevention officers may not have had the same closeness to homicide investigations, to the state police lab in collecting evidence as those officers assigned there.
So the general rules and regulations, we were all aware of. The -- our oath of office and the basics and the Mass General Laws and the traffic laws, we were all aware of. But as you became specialized in a different bureau, you may have been more knowledgeable in certain areas.
**Q. Okay. Now, in regards to a certain bureau, how did -- for example, how did the Springfield Police Department ensure that all police officers that were in the crime prevention bureau, for example, were competent in taking witness statements?**
A. I think that was done by simply our commanding officers being aware of our work product, and we would certainly hear from the prosecutors from the DA's



office if our work product was not up to their standards, if we were making a mistake, if there were other ways of doing it that they wanted to know. We became very close with them, and we were also -- through our supervisors, we all received -- there was a law supplement group that put out a monthly newsletter, and if I remember correctly, it was called Edmunds and Heir, Edmunds with a "u" and Heir, I believe, is H-e-i-r. And they were a law service that the crime prevention bureau, we all subscribed to, and it contained -- monthly we would receive it, and it contained case law and Mass law changes, so that we were trying to stay up-to-date with the best practices possible.
So it was through information like that and separate courses that some of us went to and information from the prosecutor's office as to the best practices in regards to an investigation.
**Q. But did the Springfield Police Department have a formal way of ensuring that all of their police officers were -- received the same type of training on how to, for example, investigate a case?**
A. No.
**Q. Did the Springfield Police Department have any**



**way of ensuring that all the detectives in the crime prevention bureau or any bureau were similarly trained on how to put together an investigative file?**
A. That would have been done by, again, our commanding officers. And when you came in brand-new to the CPB, you were with someone who was more experienced and you learned from that person and you would hand in the file to the commanding officer so that, at that point, the commanding officer would say, for example: Cheryl, this does not contain time and date. This does not contain a description. This does not contain and this is how you do it, and then you would learn that way.
And then when we went down to court, the prosecutor would say: This wasn't necessary or this was necessary or you did a good job with the statement. We learned as we went. There was really no formal policy on how to teach.
When you're in the bureau and when we were in the CPB, you're probably talking about 12 officers, maybe 14 officers on that four to midnight shift that I spent most of my time on. So the 14 of us, 8 of us would be working during a night tour. So it's a very close-, tight-knit group that we would all share



information with.
And when we would go down to court, the prosecutor would certainly let us know if something was out of sorts or done incomplete or not to their perfection. So we knew going on, I would say after being in there for a few years, you certainly had your act together as to what was a good case file for whatever it was we were investigating.
**Q. Okay. So to make sure that I understand you correctly, it appears that you would receive, I guess, feedback on whether or not you were properly doing an investigative file and properly doing -- taking a statement from the prosecutor's office, which is outside of Springfield Police Department, correct?**
A. Correct.
**Q. And the supervising officers?**
A. Correct. And sometimes your partner.
**Q. Okay. Now, did all supervising officers do work the same way? Does that question make sense or do you need me to clarify?**
A. Yes. As far as how to go about an investigation, prepare a case, and put together a folder, and what was considered a complete investigation, the two supervisors I had during that

decade, 1980 to 1990, were very similar in their ways of doing that, yes.
**Q. Now, you're speaking from your personal experience?**
A. Yes.
**Q. Okay. Now, on behalf of the City, are you aware of whether or not in general all supervising officers worked in the same way across the divisions?**
**MS. deSOUSA: Objection to the form. You can answer.**
THE WITNESS: I'm not -- I know that there was nothing specific to supervisors in different bureaus. So there was no policy as to the supervisors in a detective bureau as compared to the supervisors in the CPB or the youth aid bureau. We all pretty much had the same job as far as investigations, but people we reported to were different.
So I think most people learned from supervisors and people in their own divisions on what was best to prepare a case for the court.
**Q. (By Ms. Linton) How did the City ensure that**



**these supervisors were competent enough to be able to adequately teach the subordinate officers on how to investigate a case or putting together a case file or taking suspect statements?**
A. The police department learned quickly either from the commanding officers, the other officers in the bureau, or DA Matty Ryan's office, and there were many people that went in and went out quickly for incompetent investigations or their inability to be able to put together a good case.
**Q. Do you know of anyone who left because they were unable to -- they were incompetent to be able to do the investigative work between 1980 and 1990?**
A. I know of transfers. I know of people who came in and didn't last for very long because of their -- either their inability or the subject matter we were investigating was not cut out for them, and they asked out, yes.
**Q. Okay. Who were those people?**
A. The names are unfamiliar now. There was some that came and went like Detective, or Officer John O'Mara wanted to work in this crime prevention bureau and they gave him a chance and he was in there about, I would say, six months to a year and it didn't work. He



was not the right temperament. He didn't have the right patience and so it didn't work. And if it didn't work, the commanding officers went to the captain and said: Not a good fit.
**Q. Okay. Who made the decision whether or not someone made a good -- someone was a good fit?**
A. The commanding -- my supervisor or whoever was their immediate supervisor went to the captain and then the captain would go to the chief and then a transfer would be made.
**Q. Okay. Now, what standard were these officers compared to? How do you -- basically how do you know who was actually doing -- how would they know who's actually doing a good job and who was doing a bad job? What is the standard?**
A. The standard was the best possible case we could prepare to win at court. The standard was officers who came before us in that bureau or your commanding officers who did a good job, who knew what was going to be asked of them when they took the stand, who knew how to prepare a case, who knew how to obtain a conviction.
So my teacher at the time, for example, was Paula Meara, who went on to be chief. She was the one that I learned from how to take statements, and she



told me through her experience of testifying on what defense attorneys and prosecutors were looking for. So that's how many of the women who went into the CPB to do sexual assault cases learned from women who were there before them, and they learned from experience down in court.
**Q. Okay. Was the standard then -- let me just make sure I ask a good question. Would you say, then, that one of the standards of ensuring that a police officer or a detective or any person investigating a case, that the standard of whether or not they are doing a good job investigating a case and completing a file was whether or not that file was able to obtain a conviction?**
**MS. deSOUSA: Objection to the form.**
THE WITNESS: Not just obtain a conviction but meet with the qualification standards of your prosecutor and your supervisor.
**Q. (By Ms. Linton) Was one of the -- were one of the goals of investigating a case obtaining the information needed to obtain a conviction?**
A. Yes. That would certainly be a goal, yes.
**Q. And how was that communicated to investigating**

Page 69

**officers?**
A. I don't think that had to be communicated. I would think that, you know, everybody seemed to be there for the same reason was to, you know, help those who needed help, arrest those who violated the law. And in order to do that, you would have to put a complete case together and give the evidence needed to the prosecutor for the conviction. I would think that would just have been a common goal.
**Q. Was the Springfield Police Department conviction focused?**
A. I don't think the Springfield Police Department was conviction focused as goal orientated to keep a safe community while obtaining convictions, and I would say that convictions weren't our top priority, no.
**Q. I'm sorry, you said convictions weren't your top priority?**
A. Top priority.
**Q. Were, okay.**
A. Yeah.
MS. deSOUSA: You said "weren't," correct?
THE WITNESS: Correct. Wasn't our --
MS. deSOUSA: Were not.

Page 70

THE WITNESS: Were not. Our goal at the police department was our -- the oath of office in keeping people safe and secure and making people feel safe in their communities and arresting people who broke the law. We did our part, and sometimes convictions fall apart for other reasons.
So convictions weren't a top priority, but they were certainly what we strived for.
**Q. (By Ms. Linton) Were the good officers, officers that obtained convictions?**
A. The good off -- all the officers tried to obtain convictions, yes.
**Q. But the officers that were successful, were those officers that generally were able to obtain convictions?**
A. Not --
MS. deSOUSA: Objection to the form.
THE WITNESS: Yeah, not necessarily. I don't think that's the classification of a good officer. There was many good officers who didn't have the opportunity wherever they were assigned to make many

Page 71

arrests. So I don't think the conviction part of it was...
And then a lot of times, we had a lot of work go into an investigation, and for no fault of our own, there was no conviction. May have been for other reasons. So I don't think convictions is the gold standard.
**Q. (By Ms. Linton) Was there a reason why the topics we're discussing about earlier, you know, how to compose a file, how to investigate a case, was there a reason why there was no written policy on that?**
A. Not that I'm aware of. I don't know the reason why. I think a lot of police departments during that time did it that way. It was more of an on-the-job training issue, and as issues became more complex and more of them arose and accreditation and certification came out, then policies were necessary, but back then, it was the way -- it was the way it ran.
**Q. Did the Springfield Police Department have a way of ensuring that all police officers were aware of everything that was needed to do their job?**
**MS. deSOUSA: Objection to the form.**
THE WITNESS: The police department,

Page 72

again, it ran based on those who supervised to make sure that officers had the knowledge and the equipment to do their jobs, and the police department was required to have a -- in the early '80s, it was a three-month academy before you started. It became longer as time went on, and then another 40 hours during the year for you to be in-service to qualify to make sure.
So I would say mostly it was based on the supervisors and the people you worked with as to your ability to do the job.
**Q. (By Ms. Linton) I'm going to segue over a little bit to more specific policies again. Were there any written policies concerning how to handle officer misconduct?**
A. Yes. There was -- there was always a code of conduct. There was always a code of ethics. There was always a conduct of its members for as far as I can remember back in -- to that old Blue Book.
**Q. It was in the Blue Book?**
A. Yes.
**Q. Okay. Are you able to point to where that**

**policy was?**
A. Yeah. The conduct of members is the old Rule 29.
MS. GIZZI: You want me to pull it up?
MS. LINTON: Yes, please.
**Q. (By Ms. Linton) Now, does that -- this is still in Exhibit 2. Do you recognize that Rule 29?**
A. Yes, I do.
**Q. Now, is that the -- is that all the policies within the Springfield Police Department regarding officer misconduct?**
A. That's the major one and then we have, of course, the code of ethics.
**Q. Okay. And where is the code of ethics?**
A. The code of ethics would be on your --
MS. deSOUSA: So do you mean Rule 36, which is the oath of office or -- I'm just trying to help.
THE WITNESS: Oath of office code -- we always have a code of ethics.
MS. deSOUSA: Oh, that's 100.15.
THE WITNESS: Oh, okay.
MS. deSOUSA: That's a GO, I think.



THE WITNESS: GO 100.15, code of ethics.
MS. deSOUSA: And there's also --
MS. LINTON: 100.15, Gianna, are you able to pull it up?
MS. GIZZI: I mean if you give -- yes. It would help if you give me a Bates stamp because they're not in order.
MS. deSOUSA: I don't have that. I just have the index. And then also just before we leave that, there's also Rule 35 that -- relative to IIU. I wasn't quite sure what you were asking about investigation and discipline.
THE WITNESS: How to investigate, yeah.
MS. deSOUSA: I'm trying to point you guys in the right direction here. It's probably -- it was probably in the initial disclosures.
MS. GIZZI: I don't think we have any from the initial disclosures.
MS. deSOUSA: You don't? I think that's when you would have gotten them was



in the initial disclosures. See right there, if you click on that, is it linked? I don't know.
MS. GIZZI: Say that again, Lisa.
MS. deSOUSA: Go back to your table of contents you were just at. Yep. So --
MS. GIZZI: No, it's not linked.
MS. deSOUSA: So can you click on --
THE WITNESS: Code of ethics.
MS. deSOUSA: -- the code of ethics?
MS. GIZZI: Oh, I see. The -- no, you can't unfortunately.
MS. deSOUSA: So then my other suggestion would be to look at the chart that Natalie sent you which gives you the Bates numbers. Maybe that... I don't know how to help with this. Oh, wait, that code of conduct, is it --
MS. LINTON: I saw something on code of -- it should be the one right underneath that. Scroll down.
MS. deSOUSA: Here it is.
MS. LINTON: Is this the code of --
MS. deSOUSA: Yeah. Go back up to A.



MS. LINTON: Okay. So I am seeing that this one says that it's 100.5.
MS. deSOUSA: Right.
**Q. (By Ms. Linton) Is this the code of ethics that was applicable to the department between 1980 and 1990?**
A. It looks like it took a part of it on your second page.
**Q. Now, I'm scrolling, I'm asking because this says that the issue date --**
A. Is '01.
**Q. -- is '01.**
A. Yeah.
**Q. So is it another code of conduct that was applicable?**
A. Yeah. I thought we had a code of conduct in the Blue Book, but it may have been just the oath of office.
**Q. Okay. The oath of office being separate than the blue --**
A. Separate than -- yeah. The oath of office would be your --
MS. deSOUSA: That's Rule 36.
THE WITNESS: -- Rule 36.
**Q. (By Ms. Linton) So right below -- okay. Is**

**that the oath of office?**
A. Yes.
**Q. Okay. And you're saying that the code of conduct would be a part of the oath of office?**
A. Well, I might have thought the oath of office was our code of conduct. Didn't come in until '01. I thought we had a code of conduct before that but maybe not.
MS. deSOUSA: I think I can explain that.
MS. LINTON: Okay. Can you explain it off the record then if you're going to explain to me because --
MS. deSOUSA: Sure.
(Discussion off the record.)
**Q. (By Ms. Linton) Was there a code of ethics applicable to the Springfield Police Department between 1980 and 1990?**
A. I was -- I believe there was, yes.
**Q. Okay. I'm going to move on from this, but I'm going to go back to it after a break so we can have a chance to look for it after. I just want to move things along.**
**Now, besides the code of ethics and besides the**



**code of conduct, was there any other written policies regarding officer misconduct?**
A. For that time period, not that I recall, no.
**Q. Okay.**
**MS. deSOUSA: And you're not asking about investigation, IIU?**
MS. LINTON: I'm not asking about that right now, no.
MS. deSOUSA: Okay.
**Q. (By Ms. Linton) Now, how would claims of misconduct be evaluated?**
A. Claims of misconduct would be evaluated through our internal investigations unit or through the captain of the bureau depending on the severity of the conduct.
**Q. Okay. What do you mean by "depending on the severity of the misconduct"?**
A. If your -- if the severity of the conduct was simply a coming in late or failure to call out sick in a timely manner or something that should be dealt with by the commanding officer, he would do so. If the conduct was a violation of the rule or regulation of the department or something serious, the reports would go to the internal investigation unit.
**Q. Okay. Which reports?**



A. The reports that the commander would write in regards to what the conduct was.
**Q. Okay. So when there was an issue with an officer handling -- a misconduct that is not like coming in late, so something a little bit more serious, I'm assuming, would it be the commanding officer's responsibility to write a report on it?**
A. It would be.
**Q. Is there a policy on how to write that report?**
A. I don't know if there was a policy specifically to how to write the report. It was under the internal investigation unit description where the reports would go to them and then how to investigate the person.
**Q. Okay. Was there a process as to once IIU got the report, and I'm saying "IIU" to talk about the internal investigation unit --**
A. Right.
**Q. -- once IIU got the report, what was the process of an internal investigation?**
A. There was a policy on how the IIU would investigate each report.
MS. LINTON: Gianna, can you bring up the policy on IIU. I believe it's --
MS. deSOUSA: There's actually two,



Rule 32 and Rule 35.
MS. GIZZI: Yeah.
MS. LINTON: Yeah. So can we start with Rule 32.
**Q. (By Ms. Linton) Now, I'm showing -- for the record, I'm showing Rule 32 and the title of this policy is called "Charges and Hearings"; is that correct?**
A. Correct.
**Q. Was this one of the policies discussing how IIU investigated?**
A. Yes.
**Q. Investigated charges of misconduct?**
A. Correct.
**Q. Okay.**
**MS. deSOUSA: Do you want the paper copy?**
THE WITNESS: Thank you. It's not much better. I didn't bring my glasses.
MS. deSOUSA: People in the '80s must have had much better eyesight than they do now.
THE WITNESS: I probably did.
MS. deSOUSA: It's all that screen

time.
MS. GIZZI: Carla, did you ask me to do something?
MS. LINTON: I did not, no.
MS. GIZZI: Okay. Sorry.
MS. LINTON: I'm trying to decipher the handwriting as well.
**Q. (By Ms. Linton) Now, it says here that complaints against police officers, an aggrieved person may request a complaint form. Is that separate than what you're currently mentioning that a commanding officer would be in charge of submitting complaints to the IIU?**
A. Correct. When I said "commanding officers," that would be internal. So if one of the supervisors in the bureau noticed the misconduct, it's an internal complaint. If the public had a complaint against the officer, it would be an external complaint, and this talks about how to get that form, where to file a complaint against an officer.
**Q. Okay. So Rule 32 applies to external complaints?**
**MS. deSOUSA: I'm sorry, I didn't understand what you just said.**



**Q. (By Ms. Linton) I said "Rule 32 applies to external complaints?"**
A. Correct.
**Q. Does it apply only to external complaints?**
A. Yes.
**Q. Okay.**
**MS. deSOUSA: That's a multipage rule.**
THE WITNESS: Yeah.
MS. deSOUSA: I just want to make sure you understood when I handed it to you.
**Q. (By Ms. Linton) So it mentions what needs to be included in a complaint form. Is the complaint form referring to citizen complaint forms?**
A. Correct.
**Q. Okay.**
MS. LINTON: Gianna, you scroll down.
**Q. (By Ms. Linton) And right now we're showing Bates --**
MS. LINTON: Can you scroll down a little bit more so I can see the Bates number.
**Q. (By Ms. Linton) For the record, I'm showing the**



**witness Bates number 6998. Is that an accurate depiction of a complaint form?**
A. For that time period, yes.
**Q. Yeah, for that time period.**
A. Yes, ma'am.
**Q. Okay. Now, were complaint forms if -- once a citizen has completed that complaint form I just showed you, what would happen to that complaint form?**
A. In that time period, they would turn it into the squad commander's office, who's ever the watch commander. I believe back then, they would time and date stamp it and sign the bottom. A copy goes to the aggrieved person or the complaining person, and then the complaint itself went to the chief's office.
The chief's office would be notified of the complaint and then forward it to the IIU.
**Q. Okay. Did the commanding officer review the complaint form before forwarding it?**
A. Not the -- not necessarily the officer's commanding officer, but the person in charge of the watch at the time receiving the complaint. It may be -- for example, it may have been overnight and that officer is gone home. The captain who's sitting there in charge of the station at the time receives the



complaint, and the officer may not have been notified until contacted by the internal investigations unit.
**Q. Okay. And after that, it was given to the chief of police?**
A. Yes.
**Q. And did the chief of police review the citizen complaint form?**
A. Yes. They -- even then, we do now and even then, the chief is aware of any external complaint against an officer.
**Q. Okay. Was the commanding officer able to make the decision as to whether or not to forward a complaint to the chief of police?**
A. No, I don't believe there's any decision-making process. They all went -- they all went regardless of anonymity or drunkenness or -- they all went to be investigated by the IIU.
**Q. Okay. So my next question, so the chief of police, did he have any discretion -- he or she, did they have any discretion on whether or not to forward a citizen complaint to the IIU?**
A. No. It was simply to make he or she aware of it.
MS. LINTON: Gianna, can you show

Rule 35.

MS. GIZZI: Yes.

MS. LINTON: Thank you.

**Q. (By Ms. Linton) Now, Rule 35, for the record, I'm showing the witness Bates stamps 7007. Now, is this an accurate representation of the policies binding the -- referring to the internal investigation unit --**

A. Yes.

**Q. -- within this time period? Okay. And was this the same process for citizen complaints and internal complaints once they reach the IIU?**

A. Yes.

**Q. Now, when the IIU conducted an investigation, was that memorialized in any way?**

A. Yes.

**Q. How was it memorialized?**

A. They had their own system of filing and maintaining all their investigations. The IIU had a -- they had a commander. It was either a -- I believe during this time period, every member of the IIU was a sergeant or above, and they maintain their own files. They would number each complaint and keep it in a file, and then they had so much time to complete an investigation and get back to the then chief of police.



**Q. How much time would they have to complete an investigation?**

A. I believe it's close to the same as it is now, 21 days.

**Q. And what would happen if they did not complete an investigation within 21 days?**

A. There would have to be a reason for why it was not completed because the officers, even back then during the 1980s, in their contract had a time period where charges were to be brought against them. So there was a reg -- it was regulated as to how long you could take to complete an investigation and get it back to the chief of police so that there could be a decision made as to whether or not there was going to be charges or a hearing brought against the officer.

**Q. How would the IIU investigate claims of failure to disclose exculpatory evidence?**

A. The IIU would only get that if there was an internal or external complaint made. So if -- I would say that for that kind of a complaint, it would come from a defense or a prosecutor. On a case saying the officer did not disclose some type of evidence, once the complaint is made, then it goes to the IIU, and the IIU would investigate. If there was any evidence



during that time period during the investigation that didn't get turned over and they can prove that, then charges or a hearing would be held for the officer.

**Q. How would the IIU investigate a claim such as that?**

A. Talk -- just the same way that anybody investigates a case is talk to your complainant, talk to your witnesses, talk to the people involved in the case, what's the evidence that was not turned over, did it, in fact, exist, was it pertinent to the case, did the prosecutor need it, did the defense attorney have standing to say that we needed it and it should have been disclosed, same -- same as any type of investigation the IIU would complete.

**Q. So would it be the same for a claim of fabrication of inculpatory evidence?**

A. Yes.

**Q. And coercive interrogation?**

A. Yes, same.

**Q. Okay. Now, between the time period of 1980 and 1990, are you aware of anyone in the office who was being investigated for failure to disclose exculpatory evidence by the IIU?**

A. I am not aware of anyone, no.



**Q. Okay. Are you talking personal knowledge or on behalf of the City?**

A. Personal knowledge. Both.

MS. deSOUSA: Both.

THE WITNESS: Yeah, both. I'm not aware of it so it would be both.

MS. deSOUSA: This is within your scope?

MS. LINTON: Yes, it's within my scope.

MS. deSOUSA: So she reviewed that, so yeah.

MS. LINTON: I'm specifically using topics, so everything should be, yes.

THE WITNESS: Okay.

**Q. (By Ms. Linton) Now, are you aware of anyone between 1980 and 1990 that was being investigated by IIU regarding fabrication of inculpatory evidence?**

A. No.

**Q. Okay. How about 1985 to 1995?**

A. Not that I'm aware of, no.

**Q. Okay. Are you talking on behalf of the City or personal knowledge?**

A. Both.

**Q. Now, between 1980 and 1990, are you aware of anyone who was being investigated by IIU regarding coercive investigation -- interrogations? I apologize.**
A. Not that I'm aware of, no, but I wouldn't be necessarily, not being ever assigned to the IIU; and if someone was investigated and not sustained and cleared, I'm not sure I would have that knowledge.
**Q. Personal knowledge or on behalf of the City?**
A. Both.
**Q. And is that the same as during the time period between 1985 and 1995?**
A. Yes, it would be.
**Q. And just for clarification, are you saying that you are not aware if there was -- if anyone was being investigated for the topics I just talked about within that time period?**
A. Correct.
**Q. Because you weren't in the IIU?**
A. I wasn't in a position where I would have knowledge of it, and those weren't things that everybody knew about. So if you were charged with fabricating evidence and it went from the commanding officer to the IIU and the IIU investigated it and not sustained it, I think I would have knowledge of



those -- of a sustained, someone being, you know, disciplined for it. I have no knowledge that maybe somebody was charged and cleared.
**Q. I just want to make sure that we're clear. When you're talking about knowledge, are you talking about your personal knowledge?**
A. Both.
**Q. Both?**
A. Both.
**Q. Okay. Now, regarding the topics that we just discussed, are you aware of anyone who had an investigation and the charge was sustained?**
A. For the fabrication or the evidence?
**Q. I'll remind you, it's for failure to disclose exculpatory evidence?**
A. No, I'm not aware of anyone who was sustained.
**Q. And this would include failure to document alternative suspects?**
A. I'm not aware of anyone, no.
**Q. Okay. How about fabrication of inculpatory evidence?**
A. Not that I'm aware of, no.
**Q. How about coercive interrogations?**
A. Not during that time period, no.



**Q. Okay. How about suggestive identification procedures?**
A. Not that I'm aware of, no.
**Q. How about the improper collection of documentation of crime scene evidence?**
A. Not that I'm aware of, no.
**Q. And how about failing to document investigation activities?**
A. No, not that I'm aware of.
**Q. So you're aware of who the defendants are in this case, correct?**
A. I'm aware of one, yes.
**Q. Okay. Are you aware of all defendants in this case?**
A. Probably not.
**Q. Okay. So you don't know who else is included as a defendant in this lawsuit?**
A. Besides Mr. Perrot?
**Q. So just to clarify, I'm talking about the defendants in this civil rights lawsuit, so --**
A. The officers?
**Q. Yes.**
A. Okay.
**Q. So are you aware of who are the officer**



**defendants in the case?**
A. I am, yes.
**Q. Okay. Now, are you aware if any of those officers were ever found by the IIU to have sustained a charge against them for failure to disclose exculpatory evidence?**
A. Not that I'm aware of, no.
**Q. Okay. How about fabrication of inculpatory evidence?**
A. No.
**Q. How about coercive interrogation?**
A. Not that I'm aware of no.
**Q. How about suggestive identification procedures?**
A. No.
**Q. How about the improper collection of evidence?**
A. No.
**Q. And how about the failure to document investigatory activities?**
A. Not that I'm aware of, no.
**Q. Now, were there any written policies concerning the retention of citizen complaints?**
A. No, not that I know of.
**Q. Was there a practice regarding how long a citizen complaint should be retained?**

A. There was, again, the retention law in Massachusetts that I believe IIU followed. What that is for citizens complaints, I don't know. There are now different laws for retaining citizens complaints, but back at that time period, I don't believe there was a specific policy, no.

**Q. And what was the retention law that you're referring to?**

A. There's a general records retention law that the people in the records bureau maintain as far as personnel files, arrest records. They go into incident reports and everything, and most of them are seven years. Some are forever. Any murder evidence and murder retention as far as investigations are forever. And personnel files, some of the material in personnel files we maintain forever.

**Q. How about rape files?**

**MS. deSOUSA: I'm sorry, I didn't understand what you said.**

MS. LINTON: Rape files.

THE WITNESS: Sexual assault files.

MS. deSOUSA: Oh, rape files, okay.

THE WITNESS: Yeah. They were -- the rape kits were new in the '80s, and we were



maintaining them refrigerated forever. Once they were tagged, they were maintained forever. As far as the folders and files go, we just maintain them for the time period that I was there. I don't know if they're under the retention law or not.

**Q. (By Ms. Linton) Was there any policy in place by the Springfield Police Department regarding the retention of sexual assault files?**

A. I don't think there was a specific policy then, no.

**Q. How about a practice or custom?**

A. The practice or custom was to retain them. We had a file that -- where we called open, the files were open or unsolved or active investigations, and then we had to close the file, but we still maintained them whether or not there was a conviction or the victim may have been deceased or passed on or wished not to go forward; we still kept the files.

**Q. Was there a time period as to how long you were supposed to keep the file?**

A. I don't believe there's a specific time period for retention, no.

**Q. What type of reports were written at the**



**Springfield Police Department?**

A. Officers would generate arrest reports, incident reports, open door reports, use of force reports, people that we put -- placed into protective custody. Officers did reports in regards to their vehicles and the status of them, condition of them, lost equipment reports.

We did medical reports as to our own sickness and health. We did prisoner injury reports. We did suicidal reports if someone made a suicidal statement. We did incident reports from the public in regards to crimes that were committed against them, vandalism or any other criminal entity. We did reports if they felt threatened.

We did reports to specific bureaus if we had information on a case that we thought didn't pertain to our bureau but it may have affected the detective bureau, the youth aid bureau, reports were written back and forth.

**Q. What is an open door report?**

A. They were required to write open door reports if, during their shift when walking a beat, they would find a door that was unsecured.

**Q. How were they written, these reports?**



A. During that time period, we had typewriters, and we had what was called "blue sheets," which were the incident reports, because the outside copy was blue. And we had specials, which are a little bit smaller reports that were reports to a specific person or bureau. And then we had the night line reports which were our daily activity reports, and they were all done on typewriter. And most of them were such that you could peel off a copy, and copies went in different directions. It depended on what type of report as to who got what copy.

**Q. Now, was it important for the information in the report to be accurate?**

A. Yes.

**Q. Why?**

A. Well, that's the basis of our well-being and our oath of office and swearing in to be honest and be truthful, and if the report doesn't start out with that, then it's not worth what it's written on.

**Q. Now, were investigating officers, and I'm using the term "investigating officers" to talk about both detectives and police officers since you mentioned they were the same. So were investigating officers aware that a case didn't end with an arrest?**

A. Didn't end with an arrest?
**Q. Yes.**
A. I think officers were aware of the fact that their duties and responsibilities may have ended with the arrest, but nothing ends. I mean, we were -- we could be contacted by the victim again. We could be -- we could deal with the defendant again. We understood that.
**Q. Okay. And did the investigative officers understand that what was written in a report could be used at trial?**
A. Yes.
**Q. Did they understand it can be used during cross-examination?**
A. Yes.
**Q. Did officers understand that that document that -- strike that. Did the officer understand that a report could be used because facts could not be later remembered at trial?**
A. Yes.
**Q. Did they understand that that document could be used to refresh their recollection?**
A. Yes.
**Q. Now, when writing a report, were the reports --**



**did officers ever write drafts of a report before a final report?**
A. Not that I've ever seen and not that I'm aware of, no.
**Q. So did officers generally just write one version of the report?**
A. Usually, yes. And if there was information missing or something needed to be added, they would do what we called a supplemental. So it's another report to go with the original report with other information that was left out or new information that they found out.
**Q. And what if a report needed to be corrected, so what if there needed to be a correction in an initial report, how would that happen?**
A. Well, if it's just a matter of a couple words or something, then we would correct it with -- you could strike out or line out or white out or type over, and you had to initial and your supervisor initialled that there was a change made in the report. If there was something more major, you could void the report and write "void" on it and keep it and then do a -- do another report with what you're changing or you could do a supplemental.



**Q. Okay. If the report was voided, what would happen to the voided report?**
A. The only reports I've seen voided are incident reports, and you'd write "void" across the entire report. It would go to the records room, and I believe that they were destroyed. I don't remember keeping voided reports. You could void an arrest report and, again, you'd write "void" across the entire sheet. It was a booking sheet. So if there was a mistake made on that, and that was saved in the defendant's folder, it would say "void," and then whatever information they had corrected would be on the second sheet.
**Q. Okay. Now, if it was a more minor edit, you said they would strike out?**
A. Yeah.
**Q. What does that mean, "strike out"?**
A. Well, you could draw a line through a sentence that you didn't mean to be there or that was, you know, wrong, and then you could put in the next sentence. And they made -- they used to make us initial it and the supervisor would initial it. You could white it out because we were using typewriters. So we had whiteout. You'd white it out, and you'd put the correct information in.



You could have -- there was a white tape that used to correct what you had typed, and then you could retype over it.
**Q. So let's talk about the white tape. Since I was not around in the '80s, what do you mean by a tape? Is it like something that's -- is it small tape over a word or was it a bigger tape that you can tape --**
A. Small tape.
**Q. Okay.**
A. So there was two ways. They got fancier as the '80s progressed. We came a long way. First we had a little roll of white tape that you would actually press down and roll on the words that you wished to change.
**Q. Okay.**
A. And then you would type over that.
**Q. Okay.**
A. Then they became really sophisticated with the typewriters where the cartridge which the tape typed the letters on the page also had correction tape, and you could hit a button and then retype, and it would white it out for you and then you retype.
**Q. Okay. Now, if you have to strike out or white out something or you use the white tape, did you have to initial?**

A. If it was in a statement from a victim, yes.
**Q. Okay.**
A. If we were -- the procedure was to never give a statement in a case or leave it in a case file if it was just whited out because we assumed, and probably were accurately assuming, people would say: Well, what was that, you know, or did she agree with that or did he agree with that. It wasn't a correct procedure to change a statement without having that person you're taking the statement from initial it, and then the officer would initial it.
**Q. So are you talking about victims or anyone giving a statement?**
A. Any statement that was going into the case file, if there was a change, we would have them -- the person initial it and the officer initial it.
**Q. Initial over the change?**
A. Right next to it.
**Q. Right next to the change?**
A. Yes.
**Q. Okay. And that's, just for clarification, that's both victim and suspect statement or --**
A. Yes.
**Q. -- a defendant's statement? Okay.**



A. Yes, correct.
**Q. Now, was that policy written anywhere?**
A. I don't believe that was written anywhere. That was just a standard operating procedure that was agreed upon down in court and was working well. So that's the way we did it.
**Q. And were all officers within this time period, 1980 to 1990, were all of them aware of that requirement that they have to initial --**
A. Yes.
**Q. -- a statement? Now, once a report is completed, how is it submitted?**
A. So it depends on the type of report. If it's an incident report that we're taking from someone in regards to a crime or a complaint, it's submitted to the records division. If it was a statement or a report in regards to an investigation, it would go in the case file. If it's a report in regards to something else, maybe to the chief's office.
We submit it to the proper direction, and it depended on the type of report we're talking about.
**Q. Now, do these reports have to be approved?**
A. The statements and statements from defendants were usually approved by our commanding officer who was



working at the time. Incident reports did not have to be approved. Specials or reports to the chief had to be approved by your commanding officer.
**Q. Now, if a statement was approved, a statement of a defendant, if it was approved by a commanding officer, how would that -- would that be notated anywhere in the statement?**
A. Not necessarily. We used to include it in our night lines --
**Q. Okay.**
A. -- in our daily reports saying that a statement was taken from so-and-so as the victim, shown to or approved by sergeant. Arrest reports are also approved by commanding officers and that is noted right in the arrest report.
**Q. Okay. Arrest report. And how would it be noted?**
A. It's noted in the narrative of the arrest report. It will say "Captain notified and approved" right in the narrative.
**Q. When were reports required?**
A. Reports were required for all the incidents that we respond to unless -- I mean, when someone gets called to an address, if it's in regards to a criminal



offense or a threat or whatever, then reports are required. Reports are required when you arrest somebody. Reports are required when we use force against anyone. Reports would be required if we placed anyone into protective custody.
Reports are required for any type of formal statement or formal interrogation that we're going to do. Reports are required for injuries we receive while working or -- again, there's different categories like that, open door or damage to your car or accidents that you get into where reports would be required.
**Q. And were all reports, besides the ones we discussed earlier, were all the reports that were made put into the investigative file?**
A. All reports regarding a specific investigation were placed into an investigative file. If the arrest came in and they were not in regards to a specific investigation but an independent arrest, it just went to the records division.
**Q. Now, there was no policy governing note-taking; is that correct?**
A. Notating?
**Q. Note-taking, like --**
A. Note-taking. There was a policy and there was a

rule and regulation about the officers maintaining a notebook, and that came from -- about the officers being assigned to street and walking posts as to anybody they came across or anything they did or any business they checked, they were supposed to keep, according to the rules and regulations, a daily notebook and log about the calls they went on, the people they talked to. That kind of morphed into the daily night lines or the daily lines in investigative bureau. Instead of keeping -- you could keep your own notebook. You could take your own notes, and then most investigators transcribed the notebook into the daily lines or the night lines so that people would see what we dealt with the shift before.

**Q. Now, where is that policy regarding the daily notebook?**

A. That's a rule and regulation from the original Blue Book, I believe, about officers maintaining a notebook.

MS. GIZZI: Carla, do you want it on the screen?

MS. LINTON: Yeah. I think we already have it on the screen, right?

MS. GIZZI: Yeah, I did. I just put



it there but I just want to make sure.

THE WITNESS: There it is. Thank you. Daily diary.

**Q. (By Ms. Linton) Is it --**

**MS. deSOUSA: What rule is it part of?**

MS. LINTON: This is Rule --

MS. GIZZI: -- 15.

MS. deSOUSA: Okay. Right. I got it. Section 21.

**Q. (By Ms. Linton) Now, these daily logs, were they required to be -- were the entries required to be given to a commanding officer?**

A. No.

**Q. Were commanding officers -- did the commanding officers review the daily logs?**

A. If you mean the personal daily diary of a police officer, no, they did not. The commanding officers in these investigative bureaus every day would look at what I'm calling the daily log or the night line. The commanding officers would look at that, but they would not ask individual officers for their notebook or daily diary.

**Q. But they were required to keep that daily diary?**



A. According to the rules and regulations, you're required to keep the daily diary.

**Q. Did the officers receive any training regarding how to keep the daily diary?**

A. Other than what they received in the academy. In the academy when they first went in, that's how we started it, we kept a daily notebook of every day in the academy, and they told us what was to be in it - what we learned, the time of day, what kind -- what was the weather outside, where were we assigned, and they said that this should continue through your police career.

Obviously my locker would be full of notebooks and it became impossible and then computers took over and things happened. And this initially kind of turned into the night lines and the daily lines in the investigators bureaus. The DB did the same as the CPB as the youth aid. Everybody had that, what we call night lines.

**Q. I'm sorry, I had a question and it just skipped my mind. How did the Springfield Police Department ensure compliance with this requirement of keeping a daily diary?**

A. The uniformed captains and the uniformed



sergeants in the early '80s during the roll calls would sometimes ask to see the uniformed officers' daily dairy. Other than that, there was no formal way of making sure, no formal way I remember of them checking to see that every officer had a daily notebook.

The officers in the bureaus, it was easier to see because, again, these night lines or daily lines were posted in the same spot. Every day you came into the office so that you could see what, if any, progress on a case you were working on did the shift before you do. So it was easy for our commanding officers in DB, CPB, or youth aid bureau to see that everybody was keeping up with a daily night line, which when out on the street, you would assume and -- it came from your own notebook on who you were talking to and on what you did. You just transcribed it into the daily lines or the daily night lines.

**Q. Okay. And when you talk about the information that needed -- what information was required to be in the daily logs?**

A. The daily night lines, what they wanted and what was required was what case you worked on, who you talked to, what reports you wrote regarding it, and phone numbers, and if anything needed to be followed up

on the case for the next shift.

**Q. And that was required of all officers to fill that out at the end of their shift?**

A. If you were in the investigative bureaus, yes.

**Q. If you were in investigative bureaus.**

A. Yes.

**Q. So that's both the --**

A. DB, detective bureau; crime prevention bureau; and youth aid bureau.

**Q. Were you required to notate if there were any leads in the night line, any leads in the case?**

A. Yes. Yes.

**Q. How about any potential suspects?**

A. Yes.

**Q. How about any witness interviews?**

A. Yes. You'd put that in there, yes.

**Q. Okay. Now, how did the Springfield Police Department ensure that people were complying with the night lines?**

A. We knew people were complying with the night lines by their commanding officers reviewing the night lines.

**Q. Okay.**

A. And the night lines, you know, it was -- it was



pretty much how the bureau functioned. We had no other way of communicating through shifts other than these night lines. So if somebody was either not doing a night line or leaving information out, it would become quite obvious by the next shift when working on that case.

**Q. Okay. That brings me to my next question. Were supervisors in charge of ensuring that every -- all the relevant information was in the night lines?**

A. Yes. That's one of the things they did, yes.

**Q. Okay. And if there was evidence missing from the night line, did the supervisor let the individual know?**

**MS. deSOUSA: Objection to the form.**

THE WITNESS: As far as I know, they would certainly inquire. There may have been a reason it was left out of a night line. If there was a good reason why the information wasn't there, then if it was explained to the supervisor, you know, it would be acceptable. Other than that, the -- it's your immediate supervisor that's responsible to make sure those night lines have the information needed.



**Q. (By Ms. Linton) What would be a reason as to why information wouldn't be in the night line?**

A. One that I could think of quickly is it involves another officer's family or personal life or a relative; if your investigation led you to a relative of one of the detectives that worked a different shift, you may not want to put that on a night line.

**Q. What does that mean?**

A. So --

**Q. Is it any information regarding police officer families?**

A. No, not necessarily, but if I worked four to midnight and my investigation led me to a friend of one of the detectives that worked days in that same bureau, I may not want to put that on the night line. I may want to just discuss that with the commanding officer and say: I'm dealing with detective so-and-so's ex-wife or best friend. This maybe should be turned over to you, and we would let a supervisor handle the investigation. You may not want to put that on a night line.

**Q. Okay. What if the detective's or police officer's family member was a suspect in an investigation, would that not be put on a night line?**



A. It may not want to put that on a night line yeah.

**Q. So how would that be handled if a police officer's family member is a suspect of a crime or is a witness of a crime, how would that information then be relayed to if it's not on a night line?**

A. That would be relayed directly to a supervisor by a conversation.

**Q. Okay. And if -- would the supervisor notate that anywhere?**

A. The supervisor would probably go to the captain of the bureau to make sure they know, and I'm not sure it would be notated anywhere until that person is talked to or spoken to or the case is resolved.

**Q. Okay. So was that the policy to not write down information if it involved a family member of a police officer?**

A. I don't think it was a policy. It was common sense to not do it.

**Q. Was it a custom?**

A. It was a custom to do those things personally and in-person and talking to your supervisor rather than to write it down, yes.

**Q. Why was that the custom?**

A. Well, it's a sensitive area when you're dealing with people who you're working with, their friends or family, and I'm not sure that it's right to air that out on a report when people start to talk. The police department is no different than a hospital or financial institution or educational institution where rumors and gossip likes to spread and go, and to be talking about somebody's family or to be talking about maybe somebody in their family being a suspect, I'm not sure you want the pressure of that person to interfere before you complete your investigation.

So it would be sensitive information like that that you may not want to share with a whole bureau or a whole department, and you may want to take care of it with your supervisors directly. And that has come up in sexual assaults. It has come up in narcotics investigations. I have arrested officers. We have had our issues within, internally. So there are definitely times where you may not want to put that on a piece of paper that's hanging on a clipboard.

**Q. And did that -- do you recall of a time period where that occurred between 1980 and 1990?**

A. That we didn't put information on --

**Q. Yes. Under those circumstances.**



A. Yes.

**Q. Okay. And did that occur any time between 1980 and 1990 regarding any cases involving sexual assault?**

A. Yes.

**Q. In situations like that like you mentioned, it wouldn't been on the night line but would it be notated anywhere else?**

A. Sorry.

**Q. Would it be notated anywhere else?**

A. It may be. If it is, it's on a report to the captain or to the chief of police to let him know the circumstances. It certainly would not be -- it just would not be on a report with other officers having access to that report.

**Q. So does that mean it wouldn't be included in the file?**

A. It may not be included in the file right away, no.

**Q. Was there ever a situation where note-taking was prohibited?**

A. Not that I'm aware of, no.

**Q. Were investigative officers required to take notes during an interrogation?**

A. Not required.



**Q. Was it the custom for them to take notes during an interrogation?**

A. Usually, yes. Most interrogations, notes were taken, yes.

**Q. What would happen to those notes?**

A. They could be in an officer's personal notes that he or she retained or they could have ended up transcribed to a night line or daily line or they could have been included in the file.

**Q. Okay. So if it's in the personal, is that separate from the daily diary?**

A. If it's the officer's personal notes, yes.

**Q. Okay. Were there any policies regarding notes -- officer personal notes?**

A. Not that I'm aware of, no.

**Q. Now, it states here that daily notes are supposed to be given to the department clerk once an officer was -- were to either retire, resign, or be discharged from the force; is that correct?**

A. That's correct.

**Q. Okay. And was that policy enforced?**

A. Not that I know of.

**Q. So the policy wasn't enforced?**

A. Not that I know of. I don't know who the



department clerk is.

**Q. Okay. Were investigative officers required to hand over their daily diary after they left the Springfield Police Department?**

A. It was -- to my knowledge, it was never enforced.

**Q. So does that mean also that they weren't retained for five years as required by the policy?**

A. Yeah, there'd be no way of knowing that because we never enforced it.

**Q. Okay. Did the department retain any notes from a police officer?**

A. No.

**Q. Was there any situation where notes should not be taken?**

A. Not that I'm aware of, no.

**Q. Were officer notes ever a part of the official file?**

A. Occasionally, yes.

**Q. In what circumstances would the officer notes be part of the investigative file?**

A. There were occasions where notes were taken in a sexual assault case so thoroughly that the investigator made a copy or put them in the case file, but there was

no routine procedure or standard for that.

**Q. Was that limited to sexual assault cases only or just generally speaking?**

A. It's the only ones I know of. I -- it wasn't limited to sexual assault cases and perhaps it would be -- pertain to some narcotics cases investigations and surveillance, but, again, no specific policy.

**Q. Do you know of any notes that were taken during the George Perrot investigation?**

A. I don't, no.

**Q. Was destruction of an officer's personal notes appropriate?**

A. I would say if it's within the five-year time, it's not appropriate, but the knowledge that the department would have that you destroyed them, it's probably impossible. And after five years, I don't think it would be inappropriate.

**Q. So it's expected for officers to retain their notes for five years?**

A. I think it was expected that you would retain your notes for five years, yes, but to the best of my knowledge, departmentwise and my own personal experience, no one ever checked to see.

**Q. How about daily log -- the daily diary, was it**



**appropriate to destroy any entries made into the daily diary?**

A. The daily diary is -- we're using kind of synonymously with the night line or daily log, and those were maintained as far as I know. Where they are now and what happened to them... But as far as I know, we never destroyed or got rid of the daily diary notes.

We're talking so long ago now, I wouldn't know where they ended up, but as far as working there, being part of the office, we never -- we never got rid of those. Your own daily diary or your own notebook, again, we never enforced or asked an officer for it so...

**Q. Okay. So in terms of -- let's switch over to the night line.**

A. Okay.

**Q. Okay. Was it ever appropriate to destroy a night line?**

A. No.

**Q. Okay. And all officers were required to do a night line --**

A. Correct.

**Q. -- at the end of their shift?**

A. Correct. It could be one for your car. If I



worked with another officer, could be one night line because if we did the same thing.

**Q. Okay.**

A. And we would put our names at the bottom of it.

**Q. Okay. Are you aware if all the night lines for George Perrot case were maintained?**

A. As far as I know, everything -- every night line was maintained.

**Q. Was there a particular way that the Springfield Police Department -- that officers in the Springfield Police Department were expected to take notes?**

A. No standard, no.

**Q. Now, if something was written in notes or -- you know, I'm talking daily diary as it's described and explained in this rule, Rule 15, is there a specific requirement as to what gets transferred to the night line?**

A. No, there was no specific requirement.

**Q. Okay. How about to official reports, is there anything -- what would get transferred from these notes to -- what was required to get transferred from these notes to the official report?**

A. There was never anything written as to exactly what goes into either your own daily diary or the night



lines. Through -- it was through working there on a daily basis and looking at other night lines, you knew what was needed. You knew if you needed to follow up on a case. You knew what the information was or who someone talked to or where they're located or how far we got on this case.

It kind of became just a matter of habit rather than anything that was required.

**Q. So was the only way to ensure that relevant and pertinent information to a case be transferred to an official report or night line was whether or not a supervisor noticed that something was missing and everything was transferred over?**

A. Correct, yes. Yeah, you could make that mistake once and leave out somebody's name or number, and then you'd hear about it and now you expect me to contact so-and-so and you left -- you gotta put the number in. You gotta put... So you learn quickly what's required in your night line.

**Q. Okay. Now, I'm assuming that the requirements of what's required in the night lines, were they written anywhere or those were unwritten?**

A. Unwritten.

**Q. Unwritten. Was there any training on report**

**writing?**
A. Other than the academy, no.
**Q. What was taught at the academy regarding report writing?**
A. During that time period, there was, I'm sure, blocks of what is required and how you take an incident report and how you take a statement or how you write a special, what's required of you, how you start a special, how you sign a special. All of our reports end with "Respectfully submitted," and they all start with "Sir" or "Ma'am" at the top with the date. So that would have been in the initial police academy training.
**Q. How about on note-taking, was there any training on that?**
A. Not that I recall, no.
**Q. Now, have you ever heard of any discipline occurring at the Springfield Police Department regarding -- related in any way to report writing?**
A. During that time period?
**Q. Yes, 1980 to 1990.**
A. So during that time period, report writing, some officers received, I think -- you wouldn't call it -- we didn't call it retraining back then. It was



remedial report writing, and that was if they were -- basically it was bad grammar, bad spelling, or bad format, and then we would -- they would have them go to remedial report writing, yes.
**Q. Okay. How about from 1980 to 1995?**
A. I'm sure there was, yes.
**Q. Okay.**
A. Yes.
**Q. Do you recall of any specific instance where an officer received discipline for -- related to bad report writing?**
A. I wouldn't call it discipline --
**Q. Okay.**
A. -- but I would -- I know that there were officers that received remedial training in it. And there's a couple of officers, one was a Hispanic that had -- it was a hard time with the English language, but his reports were -- you couldn't decipher them. So he went several times. Matter of fact, they might have sent him to STCC once for a semester of basic English to help him out with his reports.
There was a couple of cadets that I know -- I can't think of their names -- they -- the spelling was atrocious, so they went to remedial.



**Q. How about any discipline related to any false statements made in a report or a false report?**
A. No, not that I know of.
**Q. Were any of the defendants in this case ever disciplined in any way regarding writing a false report?**
A. Any defendants in this case?
**Q. Yes.**
A. Not that I'm aware of, no.
MS. deSOUSA: So for the record, all of the IIU records for the defendants have been turned over.
MS. LINTON: Let's take a five-minute break.
MS. deSOUSA: Sure.
(A brief recess was taken.)
**Q. (By Ms. Linton) Now, earlier you mentioned -- and, again, I'll remind you, you're under oath.**
A. Yes.
**Q. Earlier you mentioned that there was -- strike that. Was there a policy for the creation and maintenance of an investigatory file or was it just taught through on-the-job training?**
A. I believe it was -- there was no specific



policy. It was just taught as you came on the job. It was more of an on-the-job training.
**Q. And was there any specific policy governing the maintenance of a sexual assault file?**
A. No specific policy that I remember. It was through whatever we learned through the prosecutor's office, the DA's office, and best practices. No specific policy for the retention, no.
**Q. How were sexual assault files stored at the Springfield Police Department between 1987 and 1991?**
A. 1987 and 1991, sexual assault --
**Q. Yes.**
A. -- files were stored in a large Diebold cabinet in the crime prevention bureau office. We had them filed alphabetically in the back Diebold, and I believe it was just under victim's last name.
**Q. Alphabetically you mentioned?**
A. Yes.
**Q. Now, so in the 19 -- in between 1985 -- 1984, 1985, there was a series of sexual assaults happening in Springfield that were being investigated by the Springfield Police Department; is that correct?**
A. Correct.
**Q. And this was a series of sexual assaults that**

**were happening where the victim was an elderly woman; is that right?**
A. That's right.
**Q. Were there separate files for each investigation regarding a claim of sexual assault against an elderly woman?**
A. Yes.
**Q. And were each of these files stored in the same place?**
A. Yes.
**Q. Was there ever an occasion where the Springfield Police Department used one centralized file instead of multiple files?**
A. Not that I'm aware of, no.
**Q. Now, who was responsible for keeping the file?**
A. It was the responsibility of -- could be anybody in -- assigned to the CPB, who's ever working on the cases. It was our responsibility to make sure the files were filed correctly and that everything that needed to be in there, anything pertinent to the case was placed in there. So who's ever investigating the case at the time.
**Q. And for the Perrot investigation, who was that in charge of -- who was --**



A. There was many of us involved in the Perrot investigation that I remember, and every one of us involved would have been responsible for whatever victim you were working with at the time. Before a defendant was realized, it was just filed under the victim's names; and if you had any investigative purpose with each victim, then you worked on that file and it was your responsibility.
**Q. Okay. And once a defendant was realized, what happened with the files?**
A. If a defendant was realized, then they could have been combined, not the files but grouped together with an elastic band. We would group them together to prepare for court.
**Q. So at that point, did it become a centralized file?**
A. It does. They maintain their independence. In other words, we didn't take everything from one of the victim's file and combine it. We simply grouped all the files in their own separate folders together.
**Q. Do you know at what point the files related to the Perrot investigation were joined together?**
A. I do not know at what point that Mr. Perrot was connected with one or more of the victims to go to



court, but when he was, it would have been grouped together for whatever case we thought he was responsible for.
**Q. Okay, but you're not aware as to when that happened?**
A. I do not.
**Q. And when you're saying "unaware," you're talking about personal knowledge or on behalf of the City?**
A. Both.
**Q. Now, in regards to a file, what must be put in a file?**
A. In the case file, everything pertinent to the case should be in there. So the night lines that are connected with it should be in there. The incident report itself should be in there. Any statements, any arrays that are used should be in there or descriptions of what was done as far as lookouts or suspects should be in there. Any interrogative statements should be in there, anything that the investigator deems pertinent to the case.
**Q. How about evidence receipts?**
A. Yeah, evidence tags, yes. The tag -- the evidentiary tags used during that time period were multiple copies of different colors, and the white



copy, which was the outer copy, went with the evidence itself, and I believe it was the pink copy of that tag that went into the case folder or file.
**Q. Okay.**
MS. LINTON: Gianna, can you bring up an evidence tag for me.
MS. GIZZI: Yeah. Just give me one second. Does it matter which one?
MS. LINTON: No.
**Q. (By Ms. Linton) The pink tag went into the evidence folder you said?**
A. Yes.
**Q. And how about the different colors, what's the other colors? Was there a white tag?**
A. Yeah. The white one stayed with the evidence. I don't know where -- there was a hard copy, a back to it, I'm not sure where that -- I don't recall where that went.
**Q. What color was the hard copy?**
A. It was also a white. It was a...
**Q. Is this the evidence tag you were referring to?**
A. Yes.
**Q. Now, segueing into evidence tags for a minute, was there -- were investigative officers trained on how**

**to fill out an evidence tag?**
A. Yes.
**Q. Okay. And when did they receive that training?**
A. They received that training whenever they were assigned to the particular bureau they were in.
**Q. Did different bureaus have different trainings regarding evidence tags?**
A. No. We were pretty standard as far as evidence itself.
**Q. Okay. And this says "Records Copy" at the bottom.**
A. Right.
**Q. What does that mean?**
A. That one of them went to records room.
**Q. So was this separate -- was this separate than the tag that was tagged to evidence?**
A. This is one of the copies of the tag itself.
MR. CAMPBELL: Carla, can you just read into the record the Bates number.
MS. LINTON: Sure. Bates number is 004743.
MR. CAMPBELL: Thank you.
MS. deSOUSA: And, again, that's CoS RPOD.



MS. LINTON: I just realized there's two different things.
**Q. (By Ms. Linton) So the records copy goes to the records department?**
A. Yes.
**Q. And this is the copy that is also tagged along with the evidence?**
A. No. There's --
**Q. There's a separate copy?**
A. Yeah, separate. There's three or four. I can't remember now if there's three or four on each evidence tag, and you peel it off. And like I said, the original top went with the evidence itself, one went to records, and there was a pink-colored copy in this tag and that went into the folder.
**Q. Okay. Now, how were officers trained to fill out this form, fill out the property receipt?**
A. Well, it was pretty self-explanatory. They knew that the right is for the lab or the officer receiving the property. So we -- none of us ever touched the right section of that block where it says "Destroyed" or "Final Disposition." That was for the prosecuting office. And "Persons Arrested," and the "Date of Birth," the "Item," and "Make and Model" and "Serial



Number" are pretty self-explanatory.
The important ones to us were, you know, what is it you're tagging, and if there's a victim or owner, then it should be there, and who was the officer submitting it.
**Q. Okay. Now, this tag doesn't have anything under "Officer receiving property"; is that right?**
A. "Officer receiving property" --
**Q. Where it says "For property division use," that --**
A. Correct.
**Q. Yeah. So that -- it's blank. Does this mean that this wasn't given to the records, I guess, division?**
A. Yeah, no. It would simply mean that we -- we're not looking at the copy where it went to the lab or wherever the evidence was shipped off to. It means you're not looking at the copy that received that plastic bag.
**Q. Okay. So even though this says "Records Copy," the records copy would be the one that would be sent over, right?**
A. No. The records copy went to the records room or the records division, and it would go into his



arrest folder.
**Q. Okay.**
A. But the -- so the pink copy would also not be filled out on that block because that copy, as soon as I filled out or whoever fills out the evidence form, that goes right into the file.
**Q. Right.**
A. So I'm thinking it's the hard copy, the base copy, or the white copy, with it that's going to have that block filled out by the lab or by the person receiving it or by the DA who is making the decision to destroy.
**Q. Okay. The serial number on the top, is that sequential?**
A. Yes.
**Q. Okay. So would the serial number at the top of a property receipt, would it be around the same set of numbers around a given time period?**
A. Should be, yes.
**Q. So let's say that on December 8, 1985, the serial number was 51465, does that mean that within that time period, December 8, December 9, it should be around the 514-somethings?**
A. It might be unless, and the only reason why that

Page 133

could be a whole different set of numbers is where the officer got the property tag to tag the evidence. If the officer is tagging evidence in a bureau, in this case in the DB, and he or she is getting the evidence tags from the DB, they're going to be somewhat similar, comes from the same group of evidence tags.
**Q. Right.**
A. You could have an officer who goes down to the book to talk to somebody else and say: Give me an evidence tag, and they hand him or her an evidence tag from that group, you're going to get a totally different sequential number.
**Q. Okay. And -- but if this is property collected at the same time --**
A. Right.
**Q. -- they should be --**
A. If Sergeant Canevari tagged that and grabbed the next one from the same location, the numbers are going to be sequential or somewhat similar or close.
**Q. Somewhat similar, okay.**
A. Yes.
**Q. So can you -- can one assume that if there is evidence tagged with similar numbers regarding evidence that was pulled -- evidence that was taken for a**

Page 134

**specific case and the serial numbers are similar, can you assume that it was done around the same time?**
A. Yes.
MS. deSOUSA: Objection to the form.
**Q. (By Ms. Linton) Does a file -- does an investigatory file have an index as to what's in the file?**
A. No.
**Q. Did each bureau have its own evidence tag book?**
A. Yes.
**Q. But they're also similar in sequence as well?**
A. Correct.
**Q. Would there be a reason to re-inventory a piece of evidence?**
**MS. deSOUSA: Objection to the form.**
THE WITNESS: Re-inventory as to?
**Q. (By Ms. Linton) Let me rephrase. Would there be a reason to create a new property tag for a piece of evidence?**
A. Not that I'm aware of, no. No.
**Q. If there was no index in the investigatory file, how would an investigative officer or a supervisor know what's supposed to be in the file?**
**MS. deSOUSA: Objection.**

Page 135

THE WITNESS: The supervisor would know just through experience of a complete case. The investigators know through experience on what's looked for within the file. I mean, it would be -- it's not -- it was not unusual for a prosecutor who's prosecuting the case to look at the file to ask for something else or just say: Did you do this, and usually the answer is: We didn't do it.
Can you do it, and we would do it, like obtain another statement or look for something else.
**Q. (By Ms. Linton) When you say earlier that an investigator would know what we look for in the file, are you referring to a prosecutor, what a prosecutor would look for in a file?**
A. Prosecutor or the investigator. I mean, after you do so many of these, you know what should be in there, what should be included.
**Q. When would a prosecutor normally be involved in a case -- sorry, strike that. When would a prosecutor first get involved in a case?**
**MS. deSOUSA: Objection.**

Page 136

THE WITNESS: The prosecutor would first get involved in the case when we have a suspect and he's been arraigned and a prosecutor has been assigned the case from the district attorney. We -- we're pretty standard of having pretrial conferences with the officers involved, and we'd bring the case file.
**Q. (By Ms. Linton) Where would these pretrial conferences take place?**
A. They would take place in 50 State Street, either the District Attorney's Office downstairs or superior court upstairs.
**Q. And during those meetings with the prosecutors, would you bring over an investigative file?**
A. Yes.
**Q. And this would be before the investigation was complete?**
A. Could be. There could be some outstanding things yet to be done to show them our status, yes.
**Q. And what would be the prosecutor's role in this -- during these meetings?**
A. The prosecutor is looking for what he or she believes she needs to prove the case. So if there's --

a prosecutor reads through everything and feels that a statement from someone else should be taken or something else should be done, then that's the time to do it and let us know at the pretrial.
**Q. So are these meetings considered pretrial meetings?**
A. Sometimes they would just have conferences. It depends on the case, but a lot of the sexual assault cases, those prosecutors were -- they were very good. They were well-prepared, and they would meet with us a few times before the case was scheduled for trial.
**Q. And when you say "very good," what do you mean?**
A. I mean they were very thorough and let you know exactly what it was they were looking for. As time goes on and the court gets busier, though, some of those things have lapsed, you know, where they don't have time to -- we didn't know exactly what was going to be asked of us, what was exactly going to be expected, but back then in the '80s, we knew for sure what was going to be asked of us and expected.
**Q. Are you aware of -- you're aware that ADA -- I don't know if it's DA Bloom was the prosecutor in the first trial for George Perrot; is that correct?**
A. I am, yes.



**Q. Okay. Do you know if they had pretrial meetings with Bloom?**
A. I don't know and I was never involved in a pretrial conference with ADA Bloom.
**Q. Was it standard for sexual assault cases to meet with the ADA before -- during the investigatory process?**
A. With the prosecutors, I had, yes. ADA Bloom, prior to this, I had never had a sexual assault case with him. I had done narcotics cases with him, but the three or four prosecutors I had usually for sexual assault cases had the pretrial. And I did not -- I don't think I had any cases prior with ADA Bloom.
**Q. Prior to this case, you didn't have any?**
A. Correct.
**Q. And these files you mentioned, the investigative files before -- while it was still at the Springfield Police Department, they were stored in the records division?**
A. No. The investigative files were in the bureau of the investigation. So the sexual assault files were stored in the crime prevention bureau.
**Q. Okay. Who had access to these files?**
A. Anyone who worked in the crime prevention



bureau.
**Q. Was it just limited to anyone who worked at the crime prevention bureau or did everyone who worked in the Springfield Police Department?**
A. Yeah, it was limited to officers who were assigned to the crime prevention bureau.
**Q. Now, generally were defense attorneys allowed to review the file?**
A. They could review the file on a request and with the permission of the prosecutor.
**Q. So a criminal defense attorney couldn't go to the police station and ask for the file?**
A. No.
**Q. After the investigation is complete, how is a file maintained?**
A. It stayed in those Diebolds with a disposition on it, and then when the Diebolds were full and we couldn't get anything else in there, many of the cases with a disposition were packed up and they were moved to a room that was referred to as "dead records."
**Q. And was that also what happened after a conviction was obtain -- maintained?**
A. Yes.
**Q. When did the Springfield Police Department first



issue policy regarding an officer's Brady obligation?**
A. That was just very recently.
**Q. How recently?**
A. How recently is very recently, within the last year.
**Q. So by "year," between 2022, 2023?**
A. Between '21 and '23.
**Q. '21 and '23?**
A. Yeah.
**Q. When were officers first made aware of the Brady obligation?**
A. Probably about the same time.
**Q. Okay. So prior than, let's say, at the earliest, 2021, were officers aware of their obligation under Brady?**
A. Officers, no.
**Q. Were investigative officers aware of their Brady obligations?**
A. No.
**Q. Were any commanding officers aware of their Brady obligations?**
A. Incoming officers?
**Q. Commanding officers.**
A. Oh, commanding officers, no, I don't believe so

before that time. No.
**Q. Were officers aware of their obligation to disclose exculpatory evidence?**
A. Yes.
**Q. When did they become aware of that obligation?**
A. Officers are trained to disclose exculpatory evidence, and I would say the prosecutors would remind us before each case to make sure that everything that should be in there is in there in a case file or being presented to court.
**Q. Were officers aware of this obligation between 1980 and 1990?**
A. Yes.
**Q. Was there an official policy regarding the need to --**
A. No.
**Q. -- disclose exculpatory evidence?**
A. No, I don't believe there's an official policy. No.
**Q. Was there an unofficial policy?**
A. I would say it was known to the investigators. It was standard procedure for investigators to make sure that everything was complete and turned over to the prosecutor or to their commanding officer. It was



our practice, I would say.
**Q. Was there any training on it, in exculpatory evidence?**
A. Not specific, no.
**Q. How were officers made aware, then, of what -- what was considered to be exculpatory evidence?**
A. It would just be through their experience as they kept presenting cases to court and who they were working with and how to prepare a case through their commanding officer.
**Q. Was there any policy concerning impeachment evidence?**
A. No.
**Q. Was it important for SPD officers to make reports or memorialize all of the investigative leads that they learned during an investigation?**
A. Yes.
**Q. Why?**
A. Well, it certainly would be important to the prosecutors to know about any leads they had, and I'm sure that everybody else working on the case, it would be important for them to know so that we're all on the same page working towards the same goal in the investigation.



**Q. Was it important for SPD officers to turn over all police reports and notes in an investigation to a criminal defendant?**
**MS. deSOUSA: Did you say to a criminal defendant?**
MS. LINTON: Yes.
MS. deSOUSA: Okay. I just want to make sure I understood what you were saying.
THE WITNESS: We did -- sorry. We did not directly turn anything in the files to the criminal defendant. It would be who was ever handling the case, the prosecutor through the criminal defendant's attorney where some evidence was -- would be turned over or would be shown. That was -- it was not a police officer's role.
**Q. (By Ms. Linton) But it was important for SPD officers to turn over all exculpatory evidence that they knew of during an investigation, correct?**
A. Turn over to?
**Q. Prosecutor.**
A. Prosecutor, yes.
**Q. Now, within the period of -- the time period of**



**1980 and 1990, was the identification by a witness considered to be Brady evidence -- sorry, not Brady evidence, exculpatory evidence?**
A. The identification?
**Q. By a witness --**
A. By a witness --
**Q. -- of a suspect.**
A. -- yes.
MS. deSOUSA: Objection. I'm not understanding your question. Maybe it's me. I might be -- I might be old, but did you just say a witness identifying a suspect is exculpatory?
MS. LINTON: Exculpatory evidence.
MS. deSOUSA: A witness identifying a defendant is exculpatory?
MS. LINTON: A suspect. So it could be not a defendant, like someone else --
MS. deSOUSA: Okay.
MS. LINTON: Understand what I'm saying?
MS. deSOUSA: Now I understand what you're saying. I'm sorry, I did not understand what you were saying.

**Q. (By Ms. Linton) So do you understand what I'm saying?**
A. Yes.
**Q. If a witness identified somebody --**
A. If somebody identifies someone in our crime or in our investigation, yes, it would be.
**Q. If that person is not the defendant?**
A. Yes.
MS. deSOUSA: Sorry. Just had a --
MS. LINTON: It's okay.
MS. deSOUSA: -- little senior moment, I guess.
**Q. (By Ms. Linton) Now, the manner in which an identification procedure is done, is that evidence that would be given to a prosecutor?**
A. Yes.
**Q. How about witness statements, all witness statements, is that evidence that would be given to a prosecutor?**
A. Yes.
**Q. How about alternative suspects, is that evidence that would be given to a prosecutor?**
A. You mean if we developed a lead and a suspect turned out not to be?



**Q. Yes.**
A. Yes. We would let the prosecutor know, yes.
**Q. How about if you were investigating someone and it was unsure as to whether or not that person did it or not, so not someone that was excluded?**
A. I would say it depends and I would say because if we think through follow-up investigation, we rule that person out, I'm not sure how much information we would turn over to the prosecutor on that if it didn't go too far. If it went a little bit further in the investigation and we thought maybe we had a real viable suspect and we put more work into it, I would say yes, we would tell. But if it's a -- if it's a ruled out right away, like there's no way this person is a suspect, the person says he was in a different location and can prove it, I'm not sure that all that information would go to the prosecutor.
**Q. Okay. Would that be considered exculpatory evidence?**
A. I -- we develop a lot of suspects in cases, in, like, sexual assault cases, and if the suspect is a suspect because of circumstantial evidence and ruled out right away, I'm not sure other than it may be in a night line or the daily log that this person was



checked and... But if you're talking about somebody that we have probable cause or we put some work into, yes, it's exculpatory evidence. Yes.
**Q. If you didn't put work into it, then it's not exculpatory evidence?**
A. If it's ruled out right away, no.
**Q. And just for clarification, was there a written policy on obligation to disclose exculpatory evidence?**
A. No.
**Q. No. And how about impeachment, impeachment evidence?**
A. No.
**Q. Who made the decision not to have a policy on this subject?**
**MS. deSOUSA: I'm having a little trouble hearing the end of your sentences, Carla.**
**Q. (By Ms. Linton) Who made the decision not to have a policy on a subject?**
**MS. deSOUSA: On a subject, okay.**
THE WITNESS: A policy on a subject?
**Q. (By Ms. Linton) Yes. On any subject.**
A. You mean like you investigate a suspect?
**Q. So in terms of the policies of the Springfield**



**Police Department, who made a decision not to have a policy on something?**
**MS. deSOUSA: On "something" are you saying now?**
MS. LINTON: On the subject.
THE WITNESS: On the subject.
**Q. (By Ms. Linton) Yes. Who would make a decision on -- who would make a decision to not have a policy on a subject, and by "subject" I just mean a topic, like --**
**MS. deSOUSA: Oh, subject matter. Subject matter, I got you.**
THE WITNESS: On a subject matter?
**Q. (By Ms. Linton) On subject matter, yes.**
A. I don't necessarily think there was decisions not to. I don't think the decision ever came up. In other words, I don't -- a lot of police work back then in the '80s and '90s was done as we learned it or as procedure or on-the-job training, and I don't think the subject ever came up where somebody sat in a room and said: You know, this is the way we store files. I think we need a policy. I don't think it was a -- necessarily a decision. I don't think people realized the changing and the way that the, you know, policing

Page 149

was going to come down the pike. I don't think it was a -- I don't think there was a decision to be made. I think it's just the way things were done.

**Q. Okay. At any point between 1980 to 1995, did the department ever learn of any problems with evidence disclosure?**

A. With evidence disclosure to the prosecutor?

**Q. In general.**

A. In general, evidence disclosure, not that I'm aware of, no.

**Q. Were any efforts made to learn of any such problems?**

A. Not that I'm aware of, no.

**Q. How would the department learn of any problems with --**

A. I would say we would have a complaint from a defense attorney or a prosecutor.

**Q. Now, prior to 1987, were there any trainings conducted on exculpatory evidence?**

A. Not that I'm aware of, no.

**Q. Any training regarding the disclosure of impeachment evidence?**

A. No.

**Q. How about between the time period of 1980 to**

Page 150

**1995, was there any training done on the disclosure of exculpatory evidence?**

A. No.

**Q. How about on the disclosure of impeachment evidence?**

A. No.

**Q. Throughout the period of 1980 to 1995, did you -- did the Springfield Police Department ever become aware -- sorry, strike that. Between the period of 1980 to 1995, did the Springfield Police Department ever discipline an officer or a member of the department for failure to turn over exculpatory evidence?**

A. Not that I'm aware of, no.

**Q. Now, was there ever a written policy between -- strike that. Between 1980 and 1995, was there ever a policy requiring the disclosure of alternative suspects?**

A. Requiring?

**Q. Disclosure of alternative suspects.**

A. A policy, no.

**Q. How about an unwritten policy?**

A. Well, it was certainly our procedure to -- if we had a suspect that turned out to no longer have any

Page 151

value in the case, we could rule them out. We investigated sexual assaults and other crimes to prove guilt or innocence. So if we could prove innocence and rule you out, we certainly did rule you out. So we'd be going another direction, and, again, that may have been noted in a night line; or if there was a lot of work put into it or we were going certainly in one direction, it was also noted to the prosecutor, but as for a policy, no.

**Q. How about was there ever a written policy requiring the exclusion of alternative suspects?**

A. No, no written policy.

**Q. How about unwritten policy?**

A. As part of the -- as part of the normal procedure of investigation, yes.

**Q. How about reporting on an alternative suspect, was there an unwritten policy?**

A. It was probably procedure for us to -- so that the next investigator the next shift or the next person working on the case would not -- you know, you don't have to go through it if you've already checked someone out and it's not that person, and yes, you'd want to let the other investigators know. And on cases like rape investigations, sexual assault, many investigators

Page 152

are involved in it.

**Q. Was there any concern in the department that the lack of having a formal policy on the disclosure of alternative suspects would create problems with evidence disclosure?**

A. No.

**Q. Did the department -- between this time period, did the department ever become aware of any problems regarding the disclosure of alternative suspects?**

A. No.

**Q. Did they make any efforts regarding learning if there were -- any problems existed --**

A. No.

**Q. -- regarding the disclosure of alternative suspects?**

A. No, they did not.

**Q. Was there ever a written policy prohibiting the use of unreliable evidence?**

A. A policy, no.

**Q. How about an unwritten policy?**

A. It would be -- it would be poor investigative work to depend on unreliable evidence.

**Q. And how would the department ensure that its investigative officers was not relying on unreliable**

Page 153

**evidence?**
**MS. deSOUSA: Objection.**
THE WITNESS: I guess through the commanding officers, through the night lines, through the work they're doing, and through your prosecutors, you would certainly know if you've got a problem with somebody relying on unreliable evidence.
**Q. (By Ms. Linton) Who were -- strike that. How did the Springfield Police Department ensure that the commanding officers were also not relying on unreliable evidence?**
**MS. deSOUSA: Objection.**
THE WITNESS: I guess the only reason they would know if the commanding officers are relying on unreliable evidence is through what they hear from court through the prosecutors or through the defense attorneys.
**Q. (By Ms. Linton) And if the prosecutor doesn't raise the issue, is there any way that the Springfield Police Department would be aware of commanding officers and subordinate officers relying on unreliable evidence?**

Page 154

**MS. deSOUSA: Objection.**
THE WITNESS: Only if the defense attorney raised the issue also or the defendant.
**Q. (By Ms. Linton) If the defendant raised an issue regarding defendants or the -- anyone actually, if anyone were to raise an issue regarding the use of unreliable evidence in a case, would the Springfield Police Department open an investigation on that?**
A. Yes.
**Q. Would it be automatic?**
A. Yes.
**Q. And who would conduct that investigation?**
A. Internal investigation unit.
**Q. And would that investigation be memorialized somewhere?**
A. Yes.
**Q. Now, was there a policy regarding the use of fabricated evidence?**
A. No policy, no.
**Q. Was there an unwritten policy?**
A. I would say yes.
**Q. Okay.**
**MS. deSOUSA: So for the record, other than what she's already testified to regarding their code of ethics and oath and all of that, that's what you're asking her now, a separate one?**

Page 155

MS. LINTON: Yeah. I'm asking her right now if there was any policy prohibiting use of fabricated evidence.
THE WITNESS: No other than code of ethics. Sorry.
**Q. (By Ms. Linton) Now, we still haven't gotten the code of ethics, right.**
A. Did we ever get the code of ethics? Is that under conduct?
MS. deSOUSA: Might be under conduct. I don't -- I would look first at Rule 29.
MS. LINTON: Gianna, can you bring up Rule 29.
MS. deSOUSA: We lost Gianna?
MS. LINTON: We might have.
(Discussion off the record.)
**Q. (By Ms. Linton) Did you have a chance to review it?**
A. Yeah.
**Q. Now, where in Rule 29 are you referring to regarding the prohibited use of fabricated evidence?**

Page 156

A. So I think that would be covered --
MS. deSOUSA: Here's the last page. Sorry. This is the very last page.
I did get the code of ethics, but it is from the 2000s.
MS. LINTON: From the 2000s?
MS. deSOUSA: '01, I think.
MS. LINTON: So we don't have code of ethics --
THE WITNESS: We don't have a code of ethics until the 2001? I find that hard to believe but...
MS. deSOUSA: This is the one we've been looking for, and it is --
MS. LINTON: Yep. Yep.
MS. deSOUSA: -- after.
MS. LINTON: Okay.
MS. deSOUSA: Sorry for the interruption.
MS. LINTON: Are we on the record?
MS. deSOUSA: Yep.
**Q. (By Ms. Linton) Do you see where in the code of conduct you're referring to regarding the policy**

**regarding the prohibited use of fabricated evidence?**

A. Not specifically other than the report's truthfulness, "... necessary reports on time in accordance with established department procedure. Reports submitted by employees shall be truthful and complete. No employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information."

**Q. But that's referring to reports, not evidence?**

A. Report and evidence, yeah. I would think that that would go for -- you know, this other one where it says "Any action to discredit the department." So withholding evidence I'm sure would discredit the --

**Q. But you would agree that there's nothing specific there that --**

A. There's nothing specific, correct. Yeah.

**Q. Want to make sure -- I have to ask a question again just to finish it and then you can give your answer. You would agree that there's nothing specific in the policies regarding the prohibited use of fabricated evidence; is that correct?**

A. Correct.

**Q. And this is a policy applicable between 1980 and 1990; is that right?**



A. Right.

**Q. Now, earlier we were discussing the code of ethics; is that correct?**

A. Correct.

**Q. And earlier we were referring to what we believed to be Order Number 100.15 regarding the code of ethics; is that correct?**

A. Correct.

**Q. I'm going to --**

MS. LINTON: For the people on Zoom, it's SPD 0353.

MS. deSOUSA: This would have been from the initial disclosures.

MS. LINTON: Yeah, this would have been from the initial disclosures.

MR. CAMPBELL: So did you say five minutes, Carla?

MS. LINTON: I said 100.15, SPD 0353. I wasn't calling for a break. I was giving you the Bates numbers.

MR. CAMPBELL: Okay, all right. Thank you.

MS. deSOUSA: And that's from the initial disclosures, Tom, not from the



large one from the response to requests for production.

MR. CAMPBELL: Okay, thank you.

**Q. (By Ms. Linton) Now, this code of ethics, is this the code of ethics -- does it say the effective date is 2001?**

A. Yes.

**Q. Okay. So does that mean that this is not the code of ethics that was applicable at the time -- during 1980 to 1990?**

A. Correct.

**Q. Okay. Was there a code of ethics?**

A. No. There was apparently no code of ethics. Just an oath of office.

**Q. Now, was there any concern -- did the Springfield -- strike that. Did the Springfield Police Department have any concern that a lack of a policy regarding the prohibited use of fabricated evidence could potentially create problems with evidence disclosure?**

A. No, not that I'm aware of.

**Q. Did the Springfield Police Department ever become aware of any problems regarding evidence disclosure?**



A. During that time period, no, not that I'm aware of.

**Q. From 1980 to 1990, did the --**

A. No.

**Q. Okay. How about from 1990 to 1995, did the Springfield Police Department become aware of any problems related to evidence disclosure?**

A. No.

**Q. Were there any efforts made by the Springfield Police Department to make such -- to learn of such problems?**

A. No.

**Q. And how would the Springfield Police Department learn of any prohibited use of fabricated evidence?**

A. By a complaint - defendant, defendant's counsel, or prosecution, or another investigator, or supervisor.

**Q. Was there any policy in place for obtaining the criminal history of suspects?**

A. Can you say that one more --

**Q. Sure. Was there any policy in place between 1980 and 1990 concerning obtaining criminal history of suspects?**

A. No policy, no.

**Q. Was there any unwritten policy?**

A. It would be good practice to check a background of a suspect for the investigator, and we -- personal knowledge, we did it several times.

**Q. In what instances would you have done it?**

A. If we were -- well, if we're -- we have a suspect, we want to know -- I mean, it would be only good police work to know what kind of a person you're looking for, what criminal history they have, what other charges they have on their record, what are the convictions they have, do they have a license to carry firearms, those such things.

**Q. And how would they -- how would one check the criminal history of a suspect?**

A. In that time frame, you'd go on CJIS, and you can run the name for a board of prisons -- I believe BOP was still -- it was still then. And they're going to give you any prior convictions. CJIS would also have the capability of giving you LT -- license to carry information.

**Q. Okay. And if a suspect's criminal history was run, was that memorialized anywhere?**

A. It would be memorialized in CJIS files, yes.

**Q. Would that be included in the file?**

A. Not necessarily, no.



**Q. Were any investigative officers trained on how to take notes during a suspect interrogation?**

A. Some could have been, yes.

**Q. Okay. What type of training were given to officers regarding note-taking during a suspect interrogation?**

A. There was some schools some of the officers did attend, and I did attend crime scene search, crime scene investigation and interrogation. In those classes, which were held at Framingham, they were weeklong classes, some of it did involve a little bit of note-taking, yes. So the officers that attended those schools would have received that.

**Q. Was that training provided by the Springfield Police Department?**

A. It was offered by the Springfield Police Department, and the training were MPTC instructors, Municipal Police Training Council instructors, and it was held at Framingham state police barracks.

**Q. And was that training provided between 1980 and 1990?**

A. Yes.

**Q. And was the training optional?**

A. Yes.



**Q. Were officers required to do that training?**

A. No.

**Q. What officers were -- what officers did do the training?**

A. Those who volunteered for it, those who were asked if you wanted to go and if it was something you were interested in. The only mandatory training was the -- if you're investigating sexual assaults, there was a mandatory sexual assault school that we all attended. It was offered through Municipal Police Training Council. It was one week, and I believe it was held in Agawam.

**Q. Now, were officers required to maintain any notes taken during the suspect interrogation?**

A. They were not required, no.

**Q. Okay. Was there a policy regarding the administration of Miranda warnings during the suspect interrogation?**

A. I don't believe there was a specific policy, no.

**Q. Was there a training on providing suspects with the Miranda warning during interrogation?**

A. Not specific that I recall, no.

**Q. Was there any sort of practice regarding that?**

A. Yes.



**Q. What was the practice?**

A. We knew it was the law. We were given Miranda cards. We were -- I believe the cards came out every time we had in-service training also. Every time an officer went to the 40-hour in-service, some cards were provided, not only the Miranda cards but cards where people in custody would make phone calls. We had special cards for that. They would go over the Miranda case. They would go over the need to issue and when to issue Miranda. It was instructed to us as part of the law.

**Q. Was there any custom that was sort of like a procedure on how a suspect was supposed to be given the Miranda warnings in interrogation?**

A. It was understood and taught and handed down, and we learned quickly to any type of interaction with a suspect regards to the crime that he committed, Miranda should be given, time and date, and then it was practiced to staple that Miranda card to the inside of the folder.

**Q. Okay. When would the Miranda be given?**

A. As soon as we engage with a suspect.

**Q. And if the suspect was interviewed or interrogated by different individuals, when would**

**the -- would they be Mirandized again?**
A. Yes.
**Q. Was there any policy in place regarding the documentation of the suspect's statement --**
A. No.
**Q. -- besides what we talked about already?**
A. Yeah, no specific policy, no.
**Q. Was there any policy in place regarding how to conduct the suspect interrogation?**
A. No.
**Q. Were there any policies in place regarding the number of officers that were required to be present during a suspect interrogation?**
A. No.
**Q. Were officers able or allowed to interrogate a suspect by themselves?**
A. In certain instances, yes.
**Q. Under what instances?**
A. If we felt comfortable with one person in the interrogation room, if the suspect wanted just one officer, there were times when one officer would conduct that investigation, yes.
**Q. Were any -- were there any instances that would require more than one officer to conduct an**



**interrogation?**
A. There were times when more than one officer, yes.
**Q. What times were more than one officer required for an investigation?**
A. I don't think there was a special policy or requirement. It was based on our experience and our training to know that maybe this person was not going to cause any difficulties or disturbances while giving the statement, that one person had all the knowledge that one person needed to interview and/or interrogate in a manner that would be beneficial for the prosecution, or did a couple officers have different information where you would want them both in there.
It depends. It was different than the '80s to be present. Now it's naturally all videotape, so it's a different situation, but back then it was in a room that was connected to the bureau right within the division that the person was in.
**Q. Okay. Did anyone make a decision as to whether or not -- strike that. Was anyone in charge of making the decision as to whether or not more than one person was needed in the interrogation room?**
A. I think the decision was based on the



interrogator, on the officers themselves.
**Q. Now, was there any special policies or customs regarding the interrogation of a suspect that could be responsible for a sexual assault?**
A. No special policies and, to my knowledge, nothing different than any other criminal investigation.
**Q. Between 1980 and 1990, did the Springfield Police Department ever investigate a high -- any high-stake crimes?**
**MS. deSOUSA: Objection.**
THE WITNESS: Any?
**Q. (By Ms. Linton) High-stake crimes?**
A. High-stake crimes?
**Q. Yes.**
A. Meaning?
**Q. Crimes that were very important for --**
**MS. deSOUSA: Objection.**
THE WITNESS: Very important crimes, yes.
**Q. (By Ms. Linton) Yes?**
A. Yes.
**Q. How about crimes that were -- how do I phrase this -- did the -- were there any crimes that required**



**more resources from the Springfield Police Department to solve compared to other crimes?**
**MS. deSOUSA: I'm going to object both to the form of the question, and this goes beyond the scope of anything that was identified in your 30(b)(6) notice.**
MS. LINTON: I'm trying to -- I am trying to -- I'm asking this question to tie it back, but I'm just trying to be on the same page in talking about this question.
MS. deSOUSA: Well, can you point me to what area you're -- that you noticed for preparation because --
MS. LINTON: Yes.
MS. deSOUSA: -- there was nothing about resources or...
MS. LINTON: You know what, I'm going to -- I'm going to ask that question in a different way.
**Q. (By Ms. Linton) Let me ask you this: Did the Springfield Police Department have any policies regarding the use of audio or video recording during the suspect investigation -- during a suspect**

**interrogation?**
A. Not then, no.
**Q. Okay. Did the Springfield Police Department ever use any audio or video recordings during a suspect interrogation?**
**MS. deSOUSA: At any time?**
**Q. (By Ms. Linton) During 1980 to 1995?**
A. Not that I'm aware of, no. We didn't have the capability during that time. We had no recording equipment in any interrogation room.
**Q. So was the only record of an investigation -- I'm sorry. Was the only record of interrogation the -- a witness -- a suspect statement?**
**MS. deSOUSA: Objection.**
THE WITNESS: Yes. And then -- and the officer's notes or that daily log or night line, who we talked to and when.
**Q. (By Ms. Linton) Were there any investigations where a -- were there any investigations where a suspect was interrogated in a manner different than how you just testified to?**
**MS. deSOUSA: Objection.**
THE WITNESS: Other than in our room in the office with an officer asking



questions of the suspect?
**Q. (By Ms. Linton) Yes.**
A. There may have been suspects or people interrogated or questioned down at court. Other than that, not that I know of, no.
**Q. Would there be any reason to deviate from the standard of allowing an interrogator to decide how to conduct a suspect interrogation on his own?**
**MS. deSOUSA: Objection.**
THE WITNESS: Not that I'm aware of, no.
**Q. (By Ms. Linton) Now, was there any training regarding obtaining suspect statements?**
A. Nothing formal from the police department after your academy training or if you went to one of those schools I mentioned, no.
**Q. Now, besides what we talked about earlier -- I'm going to switch over to retention. Besides what we talked about earlier regarding certain files that were kept forever, like the homicide files, was there any -- and also the daily logs that was a policy that we discussed earlier, was there any other policy regarding retention and destruction of documents at the Springfield Police Department?**



**MS. deSOUSA: Again, state law which she also mentioned.**
MS. LINTON: Besides --
THE WITNESS: Yeah, besides the state retention law, no policy that I'm aware of, no.
**Q. (By Ms. Linton) And how about the retention and destruction of evidence?**
A. Not the decision of the Springfield Police Department.
**Q. Can you explain what you mean.**
A. In other words, we needed -- it was the decision of the DA's office for destruction of evidence.
**Q. Was the DA's office the only entity responsible to decide as to whether or not to destroy evidence?**
A. Yes.
**Q. Was there a custom in place that wasn't a policy regarding the retention of documents?**
**MS. deSOUSA: Other than what she's already testified to?**
**Q. (By Ms. Linton) Other than what you already testified to?**
A. Yeah, no, just -- that's all I know of.
**Q. Okay. Did the Springfield Police Department**



**provide any training on the retention of -- retention or destruction of documents?**
A. No.
**Q. Now, in regards to the policies we were discussing, were there any different policies and procedures that were applicable to the different departments?**
A. The departments within the station?
**Q. Yes.**
A. There may have -- there may have certainly been policies pertaining to the detective bureaus with some of the crimes that they handled, but nothing in regards to statements or interrogations.
**Q. Okay. Were there any difference in policy regarding the documentation of information learned during a rape investigation?**
A. No.
**Q. Was there any difference in policy regarding the training given to these investigative officers regarding the use of police reports?**
A. Well, the --
MS. deSOUSA: I'm sorry, so are you couching this as for investigations into sexual crimes? Is that what you said?

MS. LINTON: I'm talking about -- no. I'm talking about the different divisions.

**Q. (By Ms. Linton) So I want to know if there was any difference in policy regarding the training given to these officers on how to use a police report or how to write a police report?**

A. No.

**Q. Were officers in these different departments, the crime prevention bureau, the detective bureau, were they -- did they have -- were they subject to different policies regarding note-taking, witness statements, or writing any other type of reports, supplemental report, lineup reports?**

A. No.

**Q. Did the crime prevention bureau, the detective bureau have any policies regarding the recording of any information during -- the audio or media recording of any information? So that would include photographs of any information or evidence during an investigation.**

A. No.

**Q. Were there any unofficial policies that were different between these two departments?**

A. As far as photographs or evidence?

**Q. Yes.**



A. No. Not that I'm aware of, no.

**Q. How about any of the other things I mentioned like writing reports or taking statements?**

A. No.

**Q. Does the Springfield Police Department have any specific policy regarding the documentations of photographs that might have been shown to a witness?**

A. Policy, no. We --

**Q. Was there a custom?**

A. Yes.

**Q. What was the custom?**

A. The custom was what the prosecution -- prosecutors wanted us to do down in superior court. Their preferences during a photographic array somewhere around '85 changed. So somewhere around 1985, 1986, or before, we would show stacks of mug shots based on age, race, height, weight. We could separate the stacks, and we would show you hundreds of photos and ask you if you recognized a person that did this to you or is there someone similar so we could get an idea.

And then right around '85, '86, it changed to if you have a suspect in mind, a name of a suspect, they would go in a six-person array that the folders had the blocks cut out of and six very similar-looking



individuals in that array with instructions: If you see the suspect that did this to you, can you point him out. And it switched right around the mid-'80s from the whole stack of photos to if we had a suspect or a name, showing the six. And we also, during some occasions, would use a lineup.

**Q. Okay. In the instance of -- during the Perrot investigation, which form was used? Did you use the stack or did you use the six-person lineup?**

A. I don't recall.

MS. deSOUSA: So, and, again, I'm going to go back to the 30(b)(6) notice which wasn't specific to Perrot.

MS. LINTON: It is. It says "... answers include, but not limited to, document any photographs used during the investigation of the MP rape investigation, including the use of photographs and a photo array."

MS. deSOUSA: She's testified to the policy but --

MS. LINTON: That's what I'm asking.

MS. deSOUSA: Okay. So you're asking whether that policy was followed during --



MS. LINTON: Yeah, which policy. I was asking --

MS. deSOUSA: Oh, which policy, I get it.

MS. LINTON: Yeah.

**Q. (By Ms. Linton) What was the method used during that time period?**

A. Yeah, that case was right when we changed. So without a name, if we didn't have George Perrot's name, we were looking to see if any of these women recognized, it would be the look through all the mug shots.

**Q. So would it be the stacks or would it be the six?**

A. It would be the stacks.

**Q. It would be the stacks during the Perrot investigation?**

A. Yes.

**Q. And in what instance would a lineup be used?**

A. If we had the suspect at the station and we were going to show somebody a lineup because of the clothes or the demeanor, it was very recent, we still back then would use the two-way mirror downstairs and conduct a lineup.

Page 177

**Q. Were there any written policies concerning whether files had to be produced to prosecutors?**
A. I don't believe there was a written policy, no.
**Q. And was there an informal policy we discussed earlier?**
A. Yes, informal.
**Q. Were there any policies regarding what materials needed to be included and produced to the prosecutors or the criminal defense attorneys?**
A. No written policies, no.
**Q. And I know we touched upon it earlier but just to make sure we clarify, were there -- was there an unwritten policy as to what needed to be produced to prosecutors or criminal defense attorneys?**
A. Yes.
**Q. Okay. Now, I just want to make sure that we're concise. So what exactly was customary for Springfield Police Department to hand over to the prosecutors besides what you already testified before?**
A. Just what I said before, that we would go down and -- pretrial and show the prosecutor the folder, and he or she would be satisfied with what was in there, or if they needed more. And the prosecutor was the one to make the decision on what was going to be shown or what

Page 178

we were going to talk to about with the defense attorneys. We never made that decision.
**Q. How about the production of police files?**
A. The production of them?
**Q. Police files, so giving police files specific to prosecutors or criminal defense attorneys?**
A. We would always bring down the original file, and it would be up to them to ask for copies or...
**Q. Were officers provided any training on that subject, on what to give over to the prosecutors or the criminal defense attorneys?**
A. No specific training, no.
**Q. Is there ever an occasion where officers needed to choose what needed to be given over to the prosecutor?**
A. Not that I recall, no. I mean, officers would always -- it was pretty common practice to bring down everything and be told they didn't need it rather than not have it. So we would usually bring down everything.
**Q. Is there any situation when you wouldn't bring down everything to a prosecutor?**
A. No.
**Q. Were all handwritten notes given to the**

Page 179

**prosecutor?**
A. If they were included in the case file, yes.
**Q. Were commanding officers responsible for reviewing all reports?**
A. Yes.
**Q. Were reports ever rejected?**
A. I'm sorry, say it again.
**Q. Were reports ever rejected by a commanding officer?**
A. Yes.
**Q. In what instance would a report be rejected?**
A. Information they felt was missing, the setup of the report itself, grammar. We had a lieutenant who was a master's in English. He had a red pen. So you'd get that back a lot.
**Q. What would happen if a report was missing?**
A. Missing?
**Q. Sorry. I apologize. What would happen if a report was rejected?**
A. They needed to be fixed. So you'd go back. If it was a small thing, you could fix it. If it was information, you did a supplemental, and you corrected what was asked of you.
**Q. Was the original report kept in that instance?**

Page 180

A. Not if the whole report was rejected.
**Q. But if it was just part of the report, would that be kept anywhere?**
A. Yes.
**Q. Where would it be kept?**
A. It would be kept in the case file with the correction.
**Q. Would there be any record made of a report being rejected?**
A. Not necessarily, no.
**Q. What is the effect of a supervisor signing a report?**
A. It means he approves of what's in the report. He accepts it for fact, and he approves of it. It can either go in a case file or go up to the next level.
**Q. What does it mean if a report is not signed by a supervisor?**
A. It can mean a couple things, either the supervisor didn't approve it or the supervisor didn't see it.
**Q. How many IIU investigations resulted in discipline that you're aware of at the Springfield Police Department before 1985?**
A. I would have no way of knowing that.

**Q. In your personal capacity or on behalf of the City?**
A. Either.
**Q. How about in general, are you aware of any investigations resulting in discipline at the Springfield Police Department?**
**MS. deSOUSA: Ever?**
THE WITNESS: Ever? You got jumped on.
**Q. (By Ms. Linton) 1980 to 1995?**
A. 1980 to 1995?
**Q. Yes.**
A. How many investigations resulted in discipline?
**Q. Yes.**
A. I wouldn't know.
MS. deSOUSA: I think her last question, perhaps I'm wrong, was: Were there any?
THE WITNESS: I'm sure there were. Oh, there were discipline. We hand out discipline all the time for -- not just reports though. I mean, I couldn't --
**Q. (By Ms. Linton) Any of the investigations, I want to know any investigations made by the IIU, how**



**many of them resulted in discipline between that time period 1980 to 1995?**
**MS. deSOUSA: I just want to make sure we're all asking the same question. You're saying any investigation done by the IIU, not just related to reports?**
MS. LINTON: No. Any.
MS. deSOUSA: Okay.
THE WITNESS: I wouldn't know.
**Q. (By Ms. Linton) Personal knowledge or on behalf of the City?**
A. Both. Either one, I wouldn't know.
MS. LINTON: I'm just going to check real quick if Gianna is back.
Gianna, are you back? No, okay. Just wanted to make sure I didn't miss anything.
**Q. (By Ms. Linton) Who was in charge of the police academy in 1985?**
A. I'm not certain. It would have been a captain. I thought -- it might be Captain Billy Cochran, but it would have been -- no. That's too long ago for Captain Cochran.
MS. deSOUSA: He'd only been a cop



for...
THE WITNESS: Yeah. Captain Parylak -- it would have been a captain.
**Q. (By Ms. Linton) A captain?**
A. Yes.
**Q. Okay, but you're not aware who was the captain -- do you know who was a captain in 1980, 1990, between that time period?**
A. In the academy.
**Q. That was in charge of the academy, yes.**
A. Yeah, I'm not certain, no. It was always a captain in that position, but I'm not sure.
**Q. Was it -- and you're saying you're not sure personal knowledge or on behalf of the City?**
A. Both.
**Q. How were police officers evaluated?**
A. During the first year of a police officer being hired, he or she is evaluated quarterly by their commanding officers and the supervisors that supervise them on their shift.
**Q. Okay. And how was the evaluation process done in 1985?**
A. That --
**Q. Sorry, strike that. How was the evaluation**



**process like between 1980 and 1990?**
A. That was the same. It was a standardized evaluation form done by who you worked for, and it was your first year on the job, which is considered a probationary year. And that's the only time that the police officers are evaluated.
**Q. So after the year, are police officers evaluated at all?**
A. No.
**Q. And is that evaluation documented, the first one?**
A. Yes.
**Q. And only one?**
A. Yes.
**Q. What would happen if a police officer received a negative evaluation?**
A. You can do a couple things. There can be an extension of the probation to address the areas that he or she did bad with the evaluation. You can -- you can send back to the academy for a period of weeks if it's something like report writing or something to that effect, or they can be terminated without any other cause. You can just terminate on probation.
**Q. To your knowledge, was anyone ever terminated**

**between 1980 and 1995 for failing to pass the evaluation?**
A. I'm sure officers were terminated during that time on probation. It wasn't uncommon to not be successful during your first year. I can't come up with a name for you. I wasn't directly involved but...
**Q. Do you know how many officers during that time period were terminated?**
A. From 1980 to 1985 --
**Q. 1995.**
A. 1995. 1980 -- so the 15-year period, we may be talking about five or six officers.
**Q. Five or six officers?**
A. Yeah.
**Q. Where were the files related to the Mary Prekop, Emily Lichwala, and Mae Marchand investigations kept?**
A. In the crime prevention bureau.
**Q. Now, did the detective bureau also work on these cases?**
A. Not with the sexual assault victims.
**Q. Okay. So not with these sexual assault victims?**
A. Correct.
**Q. So the only bureau that was investigating the Mary Prekop, Emily Lichwala, and Mae Marchand assault**



**investigation, that was only done by the crime prevention bureau?**
A. Correct.
**Q. Now, related to this 1985 investigation of George Perrot, were all files related to any investigation while he was considered a suspect, where were those files kept?**
A. In the crime prevention bureau.
**Q. Were there any files in any other bureau where George Perrot was a suspect during the 1980-1995 period?**
A. There may have been files in the detective bureau if he was suspected of anything else outside of a sexual assault.
**Q. Were there any files in the detective bureau?**
A. I believe there was, yes.
**Q. What files were those?**
A. There may have been files in the DB in regards to -- I believe it was a pocketbook snatch or breaking and entering. He may have some files in the detective bureau with that.
**Q. If -- let me just ask it directly. Emily Lichwala was, in one occasion, raped and another occasion was not. Did she have two different files**



**with two different bureaus or were those files put together?**
A. It would have been both in the CPB. It was an attempted assault on Emily also.
**Q. Yes. Unsuccessful?**
A. So it was investigated by CPB.
**Q. Are you familiar with the Denny's incident?**
**MS. deSOUSA: Say again.**
**Q. (By Ms. Linton) With the Denny's incident with --**
**MS. deSOUSA: Oh, Denny's incident. I thought you were talking about a case.**
THE WITNESS: Slightly.
**Q. (By Ms. Linton) Okay. Would that file be located in a place other than the crime prevention bureau?**
A. That file may have been in the DB.
**Q. Were the files that were kept in the crime prevention bureau ever joined with the file in the detective bureau once they were identified to have a similar suspect?**
A. When they -- when they went -- brought down to the prosecutor's office, they may have been joined, yes.



**Q. At the prosecutor's office?**
A. Yes.
**Q. But before the prosecutor's office, would they have been joined?**
A. No.
**Q. And when they were joined, where were all the files in-house?**
A. I believe the -- they would have been back to the CPB. It was more of a CPB investigation than a DB investigation. More of us were involved.
**Q. And in this case, would those files be put together in a rubber band like you described earlier?**
A. Yes.
**Q. And once the files were joined, where was the evidence stored?**
A. The evidence would have remained stored wherever it was sent to. Some of it remained in the DA's office, third floor of the prosecutor's office. Some may have remained with the state police in the lab if anything was sent there.
**Q. What evidence was stored at the DA's office?**
A. Whatever physical evidence we had would have went down to the DA's office and is either there or -- no. It probably would have stayed there. There's no

place for it back at the police station.
**Q. When was the evidence taken to the prosecutor's office?**
A. At any pretrial meeting that the prosecutor would have called. I wasn't involved in it. So if it was ADA Bloom, whenever he wanted to meet with the officers and bring down the evidence and the case file, that's when it would have went down.
**Q. Okay. So that's your personal knowledge, correct? That's your personal knowledge?**
A. Personal knowledge, yeah.
**Q. On behalf of the City, do you know --**
A. Or my lack of personal knowledge.
**Q. On behalf of the City, do you know when that evidence was moved from the Springfield Police Department to the DA's office?**
A. Not specifically, no.
**Q. Once the files were joined by the prosecutor -- were joined after the prosecutor meeting, at that time was evidence also transferred over to the prosecutor's office?**
A. It should have been, yes.
**Q. What evidence was at the state police lab?**
A. I don't know. I don't know what was sent to the



state police or what was sent -- I have no personal knowledge of what was sent out.
**Q. And on behalf of the City, do you --**
A. City, I wouldn't know.
MS. deSOUSA: So wait, I don't believe we were asked this on behalf of the City.
MS. LINTON: So I'm -- it says here "The creation, modification, retention, location, and movement and/or production of any investigative file, document, or materials, including report, physical evidence, notes, and photographs."
MS. deSOUSA: So we turn the evidence over to the prosecutor. So that's what she's saying. She's further saying she doesn't know what went to the state police. That's --
MS. LINTON: But she should know what went from the Springfield Police Department --
MS. deSOUSA: To the prosecutor.
**Q. (By Ms. Linton) But so do you guys not give anything to the state police lab?**



A. We could have. I did not on the two cases I worked on. If someone else worked on a case with the same suspect and evidence went to the state police, I'm not sure.
**Q. Okay, but that would be -- how would evidence get to the state police lab?**
A. The evidence gets to the state police lab by the person assigned to the evidence in the crime prevention bureau. There was an officer assigned, and that's what he did every morning. If there was evidence to be analyzed by the state police lab, whether it's drugs or clothing or the rape kit, would go -- sometimes he would go to the state police lab. Sometimes he would go to UMass Amherst.
**Q. Okay, but Springfield Police Department would send it to the state police?**
A. Yes.
MS. deSOUSA: So we would rely on the file that's already been turned over to you relative to where the evidence went.
MS. LINTON: Yeah, but I wanted to -- that's one of the topics I wanted to discuss, but it's fine.
**Q. (By Ms. Linton) Okay. While the evidence was**



**still at the Springfield Police Department at the crime prevention bureau or the detective bureau, because I believe there was --**
A. Dual.
**Q. -- yeah, two different locations, where was the evidence stored?**
A. Depending on the type of evidence, again, if it needed refrigeration, there was a refrigerator in both the crime prevention bureau and the detective bureau. So if it did not, there was an evidence locker and secured area in the crime prevention bureau, and we have an evidence room located in the police department at 130 Pearl Street.
**Q. Okay. Did evidence need to be checked out if it was going to be taken out by anyone --**
A. Yes.
**Q. -- at the Springfield -- okay. And was that process documented anywhere?**
A. Yes.
**Q. Where was that documented?**
A. It would be documented on the property tag, and it would be documented on a log that the CPB had and the detective bureau had as far as files and any evidence removed.

MS. LINTON: I'm going to show you what I'm going to mark as Exhibit Number 3.
(Exhibit 3, Chain of Custody Form, marked for identification.)
**Q. (By Ms. Linton) Exhibit 3, Bates numbers CoS RPOD 12401.**
**MS. deSOUSA: Can I just see the document?**
MS. LINTON: Yeah, sure. I'm sorry.
MS. deSOUSA: Okay. Yep.
**Q. (By Ms. Linton) Are you able to see my screen?**
A. Yes.
**Q. Okay. Is this a chain of custody form?**
A. Yes.
**Q. Is this the log that you're referring to --**
A. Yes.
**Q. -- regarding to whether -- okay. Now, in regards to the Perrot case, was evidence taken in and out of the evidence locker, was that notated --**
A. Yes.
**Q. -- at -- with a chain of custody form?**
A. Yes.
**Q. Okay. And did officers use a chain of custody form when they were taking evidence out of the locker**



**for -- during the George Perrot investigation?**
A. Yes.
**Q. And any of the related sexual assaults?**
A. Yes.
**Q. Okay. So does that mean that there should be a filled-out version of chain of custody form for the evidence?**
A. Yes.
**Q. Okay. Do you have a personal recollection of seeing --**
A. I don't remember personally, no.
**Q. Okay.**
A. I don't think I had that much evidence myself with the case but...
**Q. Okay. You don't have a personal recollection of seeing one?**
A. I don't.
**Q. And if there was a chain of custody form that was filled out -- you mentioned that there was a chain of custody form, would that be in the file?**
A. Should be, yes.
MS. LINTON: Okay. I have a few more questions. I'm just going to take a quick break to review my notes to make sure I



didn't miss anything.
MS. deSOUSA: Okay. So you're going to take a break now or before --
MS. LINTON: I'm going to ask a few more questions, and then I'll be --
MS. deSOUSA: Okay.
MS. LINTON: I just want to go to review my notes.
**Q. (By Ms. Linton) All right.**
**MS. deSOUSA: And I'm just going to have a couple cleanup, so just so you know.**
MS. LINTON: Okay.
**Q. (By Ms. Linton) Were there any incidents between 1980 and 1987 where any officers were found to have failed to comply with Brady obligations, and by "Brady obligations," I mean failed to comply with their duty to disclose or pass over exculpatory or impeachment evidence?**
A. No.
**Q. How about any incidents between 1980 and the present?**
A. No.
MS. deSOUSA: Yeah, I don't think we agreed to prepare her on that.



MS. LINTON: You did. It's right here.
MS. deSOUSA: No. In fact, we specifically objected to this. We had a long conversation about this.
MS. LINTON: Right. And we amended it and that's why this was amended. I specifically --
MS. deSOUSA: Yeah. We never agreed to this because I tried to explain this to you, any time there's a motion to suppress, there's -- these issues are raised and there's -- we don't track that. That would have to come through the DA's office.
So the City --
MS. LINTON: Right.
MS. deSOUSA: -- has not agreed to be bound from 1980 to 2023 for any time somebody has questioned our identification procedures. That's just not reasonable.
MS. LINTON: But we agreed -- I agreed with you with the court, because it said here "any courts," so when I amended it, I limited it to just within the

Springfield Police Department because we talked about like -- you were like any single time this file and the police -- and in court, that would raise this issue. So I specifically limited it to just within the Springfield Police Department.
MS. deSOUSA: "... or any court." Read your amended one.
MS. LINTON: Well, it was supposed to be edited for that.
MS. deSOUSA: Well, it wasn't and I didn't prepare her on this --
MS. LINTON: That's fine.
MS. deSOUSA: -- for that reason.
MS. LINTON: Okay. Can we go off the record for a second.
MS. deSOUSA: Of course.
(Discussion off the record.)
MS. LINTON: All right. Let's actually take a five-minute break so I can review my notes.
MS. deSOUSA: Sure, of course.
(A brief recess was taken.)
MS. LINTON: I am going to have to



use my computer, so I'm going to let you know, Tom, the Bates number of what I'm referring to.
MR. CAMPBELL: Thanks.
**Q. (By Ms. Linton) Okay. So I just have a couple questions on training.**
A. Training?
**Q. Yes. Did you review any training materials to prepare for the deposition?**
A. Yes.
MS. deSOUSA: Yes. And we produced these to you.
**Q. (By Ms. Linton) Right.**
A. Yes, we did. Training.
MS. LINTON: So this is going to be Exhibit 4, and it's a lot of them. This is the Bates stamp CoS 11776 to 12347, which I believe are these.
(Exhibit 4, Listing of Training, marked for identification.)
**Q. (By Ms. Linton) Would it be -- this is a list of the subjects that were covered in the training manual?**
A. The academy?



**Q. Yes, because I'm not connected to the internet right now, so I can only have this list and I can click one by one?**
A. Okay.
**Q. But does this seem similar -- familiar to what you reviewed in preparation for this deposition?**
A. Yes.
**Q. Okay. So I'm seeing like nine-ish parts with a couple subparts; is that correct?**
A. Correct.
MS. deSOUSA: Well, I don't know that -- I'm going to object.
MS. LINTON: Okay. What are you objecting to exactly?
MS. deSOUSA: I don't understand what you're referring to. I mean, we've produced to you hundreds of pages that have hundreds of topics. So, for example, I'm just picking one at random, courtroom preparation and presentation, and then that is further divided to responding to a court summons or subpoena, the complaint, preparation for testimony.
So is that on this list?



MS. LINTON: I believe so.
MS. deSOUSA: Where?
MS. LINTON: Give me one of them.
MS. deSOUSA: Courtroom preparation and presentation, which is part of the course that was titled "A Court Preparation, Arresting, Case Processing." That was a three-hour course.
MS. LINTON: Because I believe I saw that in here.
MS. deSOUSA: Yeah, but you're saying that there was only 11 topics. That's why --
MS. LINTON: No.
MS. deSOUSA: Okay.
MS. LINTON: So it's the way that it's saved in this folder --
MS. deSOUSA: But we didn't produce it as that. We produced all of the documents as one.
MS. LINTON: Hold on one second. So this is what was produced, all right. So this was what was produced. It says "SPD Training Materials, Exhibit 20," and I'm

not sure why but there's always a PDF with all of the exhibits in one before they're split up. And I said "nine" because it seems to be --

MS. deSOUSA: Right but that's just the way that they went out. So, like, for example, let me show you this one. You asked her a bunch of questions about how they were trained in records, and here's documents and recording, which is part of a course that was called "Written Communication" that was 14 hours of total instructional time.

MS. LINTON: Yes, but my question right now is whether -- if these are the documents that she reviewed. That's my question.

MS. deSOUSA: But you're not showing her documents.

MS. LINTON: Well, I'm about to. That's why I started with, like, the organization. I told her I can go one by one so I can show her exactly what I'm talking about.



MS. deSOUSA: I mean, okay.

MS. LINTON: I was trying to save us some time of going one by one to see if it was every single page was the one, but if it's easier --

MS. deSOUSA: I mean, I'm willing to stipulate for the record that the documents that we produced to you in advance of this deposition are those documents.

MS. LINTON: Okay, yes. Just so that we don't have to --

MS. deSOUSA: And I just -- but further, that we produced them to you as illustrative; that this is one year's worth of materials. It's not every year. It's not -- it was just an illustrative example that was either from 1981 or 1982, I think we decided on.

MS. LINTON: Okay.

MS. deSOUSA: So --

THE WITNESS: My academy, '81.

MS. deSOUSA: I think it was your academy, yes. So with that caveat, then I'm certainly willing to stipulate for the



record that those exhibits are the ones that she reviewed in anticipation of this testimony today.

MS. LINTON: Perfect. Okay. Perfect.

**Q. (By Ms. Linton) Now, were these the policies in effect -- for the record, were these the policies in effect during the George Perrot -- sorry, strike that. Strike that. I'm getting confused.**

**What years was this training material for?**

A. This seems to be the training manual from 1981, my academy. So this is what we are taught in my academy, not necessarily policy.

**Q. Yes, okay.**

**MS. deSOUSA: And that's why it was illustrative because all the different named defendants went to academies different years.**

THE WITNESS: Different times.

MS. LINTON: That's exactly what my next question is. So I'm trying to orient myself.

MS. deSOUSA: Okay.

**Q. (By Ms. Linton) Now, are you aware of any**



**changes that were made to this training material after 1981 during the 1981 and 1990 period?**

A. I would imagine there were some changes, yes.

**Q. Now, are there any additional training materials that you're aware of that exist after this '81, '82 period?**

A. Not that I'm aware of, no.

MS. deSOUSA: But for the record, yes, there are additional training materials that exist somewhere in the world from before 1981 and right up until 2023 --

MS. LINTON: Yes.

MS. deSOUSA: -- because we offer academies multiple times each year.

MS. LINTON: Yes.

**Q. (By Ms. Linton) The reason why I'm asking is because it was mentioned that it was difficult to locate any other records. So I'm just confirming if any other records have been located since I received that information?**

A. I have not, no.

**Q. Now, is this the world of documents that you reviewed to prepare for your deposition testimony today regarding training?**

A. Yes.
**Q. All right. I'm going to bring your attention to Bates number 11774, CoS RPOD 11774. I have it on my screen as well. Do you recognize this document?**
A. Yes.
**Q. All right.**
A. 1977.
**Q. Okay. What is the name of -- who is Deputy Chief Daniel Shea?**
A. Dan Shea was a deputy's chief in the department during that time period.
**Q. Okay. And it says "Overview of Criminal Investigations."**
A. Okay.
**Q. Was this document part of some type of training on criminal investigations?**
**MS. deSOUSA: Are you asking her whether it was in 1981?**
MS. LINTON: No. 1977. I want to know if this was a --
THE WITNESS: In '77, Chief Dan Shea taught a portion of the police academy in investigations because part of his responsibilities was in DB.



**Q. (By Ms. Linton) Okay. So this was part of the police academy training?**
A. It was either part of the police academy training or it was part of the training that he offered for those officers assigned to the detective bureau.
**Q. Okay. So did every officer go -- are you aware if every officer went through this training?**
A. No.
**Q. Now, I'm going to scroll down. How were these trainings normally conducted?**
A. If this was a part of the police academy training, then it was during the three months that a new recruit received before they became a police officer. Dan Shea, if I remember correctly, taught at a local college too and was known as a good instructor and offered classes to those detectives who were going to go into or be assigned to the detective bureau. He may have done that on his own.
**Q. Okay. And it says here that there were three basic tools of investigating. Do you see that?**
A. Yes.
**Q. And it says "Information, interrogation, and instrumentation"; is that correct?**
A. Yes, that's correct.



**Q. And were officers taught those basic tools of being an investigator?**
A. In the academy and then later on, yes.
**Q. Okay. Now, it says here that inculpatory statements are admission of guilt; is that correct?**
A. Yes.
**Q. And then exculpatory statements are evidence of innocence, I'm assuming?**
A. That's what it says.
**Q. Okay. Were officers taught the difference between inculpatory and exculpatory statements?**
A. Not that I'm aware of, no.
**Q. Now, it says "NCIC and LEAPS." What is NCIC and LEAPS?**
A. NCIC and LEAPS were the two -- like the Criminal Justice Information System is now. It was the national criminal justice's law enforcement something. They were local statewide networks, if you will, to get onto to get people's information, to get license information, to get warrant information. That National Crime Information Center was for the country, and LEAPS was more localized.
**Q. Okay. Now, it says here that for -- there were three Is that you should focus on, again, the three Is**



**in the beginning, the basic tools, one of them being information. It says "You need information to conduct good information." I believe that says "sources, witnesses, company records, information, etc. The experienced informant will get his info from bartenders, hookers, and street persons."**
**Is that how they were -- police officers were trained to get information?**
A. No.
**Q. No?**
A. This is looking more like his syllabus for college.
**Q. Okay.**
A. You know, he taught a college course in -- he perhaps used it for officers that were going to be assigned to the DB, but it looks more like a syllabus that he prepared for his college course.
**Q. Would that be included -- would his college information be saved with the SPD training information?**
A. It may have been if he used it to teach detectives going into the DB. It may have been saved.
**Q. So if he used this for detectives, then it would have been saved?**
A. Yes. If he used it to be an informational

course to those that went in the DB, it may have been saved with our material, yes.
**Q. Okay. So it would have been saved if it was used for training?**
A. Yes.
**Q. Now, it says here "Interrogation or questioning" -- "Interrogation or questioning suspects," and I'm reading verbatim, so excuse me, "and witnesses: You must be able to sell yourself to the person under interrogation. This will enable you to gain much information. A good investigator will be able to get info. You have to find a person's weak spot and work on it, and soon he will crack or he doesn't, then he/she is telling the truth."**
**I am sorry. I am just trying my best --**
A. That's okay.
**Q. -- to read this information. Okay. Is that the training that was given to the Springfield Police Department regarding interrogation?**
A. No.
**Q. Okay.**
A. That's more like Dan Shea's opinion.
**Q. Okay.**
A. So it's more -- it does seem like a college



syllabus or college course prep, and they used it for maybe people just going into the DB for the first time.
**Q. So are you saying that it was used for training if it was --**
A. It may have been.
**Q. Okay.**
A. I have no knowledge of that.
**Q. All right. Now, it says here that "A good investigator will get people to talk. Most people who talk will go to jail, and if they didn't talk, then they would still be on the streets. It is very important to comply with Miranda when conducting interrogation."**
**Is that something that you remember being trained on when you were going through the academy?**
A. Yes. I remember the importance of Miranda.
**Q. Okay. And how about the previous part?**
A. I don't remember anybody instructing us in that, that most people who talk will go to jail.
**Q. Okay. It's written really strange on this document.**
A. Yeah, it is.
**Q. Okay. So was this part of the Springfield Police Department --**



A. Not officially part of any training that I'm aware of, no.
**Q. Not officially, okay. Yeah, I'm not going to try to decipher what it says. I'm going to show you -- I only have two more exhibits, and then we should be finishing up here.**
(Exhibit 5, Civil Liability Policy, marked for identification.)
**Q. (By Ms. Linton) I'm going to show you Exhibit Number 5. The numbers are 11637 to 11643.**
**MS. deSOUSA: What is this under?**
MS. LINTON: Civil liability.
MS. deSOUSA: 11637 -- I don't seem to have that part of it.
Do you have it, Cheryl.
THE WITNESS: No.
MS. LINTON: Gianna, are you back?
MS. GIZZI: Yep. Do you want me to pull something up?
MS. LINTON: Yes. Can you pull up civil liability. It should be in the folder but the Bates is 11637.
MS. GIZZI: Yep.
MS. LINTON: Thank you.



**Q. (By Ms. Linton) Okay. Now, do you recognize this document?**
A. No.
**Q. No. Does this appear to be the training provided to officers for civil liability?**
MS. LINTON: You can scroll down Gianna, too, if you can.
MS. GIZZI: Yes.
THE WITNESS: It appears to be, yes.
**Q. (By Ms. Linton) Okay. Did you have a chance to review this document? If so, I'll give you a chance to look at it.**
A. Yeah, I don't remember reviewing this one.
**Q. Okay.**
MS. GIZZI: Carla, do you want her to look at a specific section?
MS. LINTON: I kind of just want a quick overview of all of it because I have a general question to ask about it. So if you can just scroll down.
**Q. (By Ms. Linton) Are you aware as to -- is this the same time period of the 1981, 1982 period for training --**
A. It appears --

Page 213

**Q. -- material?**
A. It appears to be, yes.
**Q. Okay. So if -- is this -- does this encompass all of the training that was given regarding civil liability to officers at the police academy?**
**MS. deSOUSA: Objection. We have given you one year's worth of materials. So they were given for illustrative purposes and are not meant to be conclusive of all training given on any subject matter. It was just for illustrative purposes.**
MS. LINTON: So just for clarification, are you saying that even though we're talking about 1981 and 1982, there might be more documents within that time frame that are not in here?
MS. deSOUSA: So are you asking her just for that academy year?
MS. LINTON: Yes, that academy year, the police academy year of 1981, 1982. That's why I asked the year in the beginning.
MS. deSOUSA: Okay. So these are the

Page 214

topic outlines that they were given. So --
THE WITNESS: Yes, it would be all we received in civil liability, yes.
MS. LINTON: Okay. If you scroll down, Gianna, to page number 19.
**Q. (By Ms. Linton) And it says "Civils Rights Violation." Do you see that?**
A. Yeah.
**Q. And it consists of one paragraph. It says "Most civil rights violations are the result of an officer committing an intentional tort as outlined above."**
**Would it be useful for you to see those intentional torts or did you review them?**
A. Yeah, I think I got them.
**Q. Okay. "Other civil rights actions are brought as a result of violations of the U.S. and State Constitution and more specifically of the amendments to the U.S. Constitution. Seldom do negligent acts or omissions rise to the level of being civil rights violations at this time."**
**Is that how you remember the training being in 1981 to 1982?**
A. Yes.
**Q. Okay. And at the time, what were you taught**

Page 215

**that negligent acts or omissions meant?**
A. Specifically I can't tell you what the instructor would have said, but I think it was commonly known that omissions would mean leaving out anything that would affect the case one way or the other.
**Q. Okay.**
**MS. deSOUSA: Can I ask that I see the next part of this?**
MS. LINTON: The next part of the civil rights violation?
MS. deSOUSA: Yeah.
MS. LINTON: That's it.
Oh, go down. There's a statute.
MS. deSOUSA: That's the Massachusetts civil rights statute.
THE WITNESS: Yeah.
MS. deSOUSA: Can you keep going for a minute. Okay. So --
MS. LINTON: Do you want to go off the record or --
MS. deSOUSA: No. I just want to note for the record that the successive sections -- you said that was all that was related to civil rights violations, but the

Page 216

successive sections also talk about civil rights violations, including the part on excessive force.
So I just wanted to correct that for the record.
MS. GIZZI: Lisa, this is Gianna. That's not a proper objection so --
MS. deSOUSA: Well, I'm just correcting it for the record because the whole exhibit wasn't in front of us, which is why I asked to see the whole exhibit.
MS. GIZZI: That's fine, but I did show you the whole exhibit before she asked the questions. So just objection to form, right. That's the stipulation.
MS. deSOUSA: Well, this is a 30(b)(6), Gianna, but thanks for your input.
**Q. (By Ms. Linton) Okay. I just want to also make clear the civil rights violation section talks about state and federal; is that correct?**
A. Correct.
**Q. That section? Okay. And I'll let you review it again more if you want to, but besides that, were any**

**discussions about omissions made further down into civil rights liability when you were talking about -- when you were receiving training on that topic, besides that section, did you -- were you trained on any other instances or omissions --**
A. No.
**Q. -- concerning civil rights?**
A. No. Just that.
**Q. And does any of the discussions about omissions -- is any other discussion about omissions made in the rest of this document?**
A. No.
MS. deSOUSA: And that was Exhibit 5?
MS. LINTON: Yes, this was Exhibit 5. Thanks, Gianna. You can remove the exhibit now.
MS. GIZZI: Okay.
**Q. (By Ms. Linton) I just have a few more questions. Earlier you mentioned that the -- earlier you test -- strike that. Earlier you testified that there was no official policy -- no written policy, excuse me, regarding the interrogation of a suspect; is that correct?**
A. Correct.



**Q. All right, but was there any policy at all?**
A. No policy, no.
**Q. Was there any sort of policy written or unwritten regarding documenting or memorializing interrogations of suspects?**
A. No formal policy. The only informal policy we had was practice.
**Q. Just want to make sure I don't go over anything that was already done. Was there a procedure on documenting or memorializing interrogation of suspects?**
A. We -- there was, and they had a procedure as far as the Miranda rights, the phone call, if there was going to be a statement taken, and making sure that the -- it was noted, and that night line, that daily line so the next shift would understand what happened and who we interrogated, and then the supervisor reading the statement taken. Other than that, nothing formal in a policy written, no.
**Q. You mentioned the supervisor reviewing the statement taken?**
A. Yes.
**Q. How would that work?**
A. We always -- after the statement was taken, if the supervisor was working, they would show the



supervisor the statement. If he wanted anything else or you wanted to inquire of something else with the suspect, you could. If he -- if he said you were all set, then that ended the interrogation.
**Q. Okay. And if the supervisor reviewed the statement and approved it, would that be notated anywhere in the statement?**
A. No.
**Q. No. Would a supervisor need to sign a statement for any reason?**
A. No.
**Q. You mentioned a phone call. What do you mean by "phone call"?**
A. A lot of times, depending upon the condition, the age of the suspect before interrogation, we would allow them to make a phone call if they wanted to.
**Q. What was the age needed -- what age would a suspect have to be that you would give them a phone call?**
A. If it was -- obviously if it was 16 or below, they needed -- they couldn't do the statement. They needed a parent or an interested adult. But if it was close, if you were 17 to 20, a lot of times we told you to call somebody and asked you to get some consultation



before talking with us.
**Q. Is there any situation where you wouldn't tell someone within that age group to make a phone call?**
A. Not that I recall, no.
**Q. And in 1985, what -- was minors considered 16 and below?**
A. I believe so in '85, yes.
**Q. And in between 1985 and 1987, and you might have mentioned this before, but was there a policy on disclosing exculpatory evidence or suspects to the prosecutor? And I'm talking about a policy.**
A. No.
**Q. There was no policy?**
A. No.
**Q. Now, between 1985 and 1987, was there a policy on disclosing exculpatory evidence to suspects?**
A. No policy, no.
**Q. Between 1985 and 1987, was there a policy on disclosing -- you know what, I already asked that question. Between 1985 and 1987, were there any general or special orders issued by the Springfield Police Department concerning exculpatory evidence, interrogation of minors, or conducting lineups of suspects?**

A. Not that I'm aware of, no.
**Q. And in 1985, was there any procedure, any procedure, written or unwritten, on documenting or memorializing in-person lineups?**
A. We did. It was -- it was nothing -- it wasn't a formal policy, but photos were taken of the lineups used and preserved with the case file. We may have had the names of everybody in the lineup too, but most of the time they came from the shelter.
**Q. Wait, what do you mean "they came from the shelter"?**
A. To participate in our lineup, sometimes we didn't have officers with changes of clothes or people that could fill in. The Worthington Street shelter is right next door to the police department and usually provided several people of the same age, build, nationality, or color that we were looking for for our lineup. We would ask if we could get volunteers.
**Q. Okay. And was that the common practice to ask the --**
A. The whole lineup --
**Q. -- shelter?**
A. The whole lineup procedure was not used very often. So when it was, the couple times I was involved



in it, that's where a couple of the volunteers came from.
**Q. Was it common for police officers to be standing in for -- in the lineup?**
A. If we could find one that fit the look-alike so that it made the lineup nonsuggestive, yes. Not in uniform of course but...
**Q. Was it common for the lineup to be conducted with solely police officers?**
A. No. I've never seen it solely police officers, no.
**Q. I have one more question. After an arrest was made for a specific crime, did the Springfield Police Department have any policy or practice of continuing to investigate any other suspect?**
A. It wouldn't be unusual for more information to come in and for us to continue investigating, yes.
**Q. So was a file ever considered closed?**
A. No.
**Q. Was there any specific practice or policy regarding maintaining an investigation file when a criminal defendant appeals his conviction?**
A. No, no written policy.
**Q. Now, did the Springfield Police Department ever**



**investigate on its own when a criminal defendant claimed a coerced or false confession?**
A. Did we do our own investigation?
**Q. Yes.**
A. I don't remember it happening. I don't remember the accusation, but I can't see us doing the investigation, no.
**Q. You say "no," okay.**
MS. LINTON: All right. That is all that I have.
MS. deSOUSA: Okay. I have a couple.
MS. LINTON: Yeah, we're good. That's all I have.
MS. deSOUSA: So I can go?
MS. LINTON: Yes.
MS. deSOUSA: All right. I promise I will be brief.
THE WITNESS: You better.

EXAMINATION BY MS. deSOUSA:
**Q. Thank you, Superintendent.**
**MS. deSOUSA: And you're hanging in, right?**
THE COURT REPORTER: Yes.



MS. deSOUSA: Okay. All right.
**Q. (By Ms. deSousa) So you have been asked a number of questions about training over the years at the department, and at one point in your answer, you mentioned MPTC.**
A. Yes.
**Q. And for the record, can you just explain what MPTC is and what is its role in screening Springfield police officers.**
A. Sure. MPTC is the Municipal Police Training Council and it's for the state of Massachusetts and that's who sets all the standards in regards to training for police recruits, for continual training with police officers, for training in special categories. They have their own instructors, and they set the syllabus for the in-service training each year. It may change.
They're the ones that set the requirements, and they're the ones who say who can have an academy. They certify an academy. There's a MPTC academy, and then I believe there's only two or three other towns or cities that are allowed to have their own police academy, and Springfield is one of them.
**Q. And do they review your academy curriculum on a**

Page 225

regular basis?
A. Yes. They usually set most of it, and they certainly do review it, yes.
Q. And do the academy instructors get their materials directly from MPTC?
A. Yes. And instructors have to be MPTC certified.
Q. You were also asked a number of questions, Superintendent, about what's been referred to as Brady.
A. Yes.
Q. And you testified that there was no formal Brady policy until a couple of years ago. Do you recall that?
A. Yes.
Q. And that coincided with the Department of Justice coming in and also, at the same time, the Hampden County District Attorney's Office creating and disseminating what is referred to in shorthand as a Brady list, correct?
A. Correct.
Q. And in that context, the Brady information is specifically addressed to IIU or other impeachment-type evidence that might relate to police officers, correct?
A. Correct.
Q. And that's specifically what you were referring

Page 226

to, is it not?
A. That is.
Q. But you also testified, did you not, that from the time -- from 1980 through the present but certainly since 1980 forward, that it was the practice at the Springfield Police Department to turn over all evidence to the District Attorney's Office, including any exculpatory evidence; isn't that true?
A. That's correct.
Q. And during your trainings at the police academy, during the relevant years, it's true, is it not, that you were trained that it was an obligation of the state, of the Commonwealth in a criminal case to turn over all exculpatory evidence to criminal defendants, were you not?
MS. LINTON: Objection; form.
THE WITNESS: Correct.
Q. (By Ms. deSousa) So whether that was referred to as "Brady information" or not, you understood that anything that might show someone's innocence, the Constitution of the United States required it to be turned over, correct?
A. Correct.
MS. LINTON: Objection; form.

Page 227

Q. (By Ms. deSousa) You also testified regarding --
MS. LINTON: I'm sorry, don't mean to interrupt. Can you please give me a pause before you answer.
THE WITNESS: Oh, sure. Sorry.
MS. LINTON: Sorry. Go ahead.
Q. (By Ms. deSousa) You also testified regarding the codification or a written statement at the Springfield Police Department that would speak to police officers' obligations with regard to turning over evidence or falsifying evidence.
Do you remember those series of questions?
A. Yes.
Q. And at one point, you said: I would assume it was in the code of ethics. We looked at the code of ethics and at least the written copy that we have wasn't even in effect during the relevant years, correct?
MS. LINTON: Objection; form.
THE WITNESS: Correct.
Q. (By Ms. deSousa) But you also testified, did you not, to Rule 29 --
A. Yes.

Page 228

Q. -- of the rules and regulations, correct?
A. Correct.
Q. And that was in effect during those relevant years, correct?
A. Correct.
Q. And having had an opportunity to review it, can you speak to what Section 1 of Rule 29 says.
A. Yes. "All members of the department shall obey the rules and regulations as set forth herein: The ordinance of the City of Springfield, the laws of the Commonwealth of Massachusetts, and the United States of America and shall perform their duties with silent courage, discretion, placing safety and welfare of the City of Springfield and its citizens first at all times."
Q. So Section 1 would also prohibit officers from falsifying evidence for example?
MS. LINTON: Objection; form.
THE WITNESS: Correct. It would be a violation of the law.
Q. (By Ms. deSousa) And tampering with evidence in any way, in fact, would be covered by that Section 1, correct?
MS. LINTON: Objection; form.

THE WITNESS: Correct.
**Q. (By Ms. deSousa) Falsifying reports?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) Offering false testimony at a trial?**
A. Correct.
MS. LINTON: Objection; form. I'm sorry, I said it in my head, not out loud.
THE WITNESS: Correct.
**Q. (By Ms. deSousa ) You've also -- and I just want to try to try to straighten this out. So you've also testified regarding file retention. And in a case that's gone -- that goes to trial, the file is turned over to the District Attorney's Office, correct?**
A. Correct.
**Q. And in some cases, there might be parts of it they say: Oh, we don't need this part, I guess; is that true?**
MS. LINTON: Objection; form.
THE WITNESS: True.
**Q. (By Ms. deSousa) And then -- but other than that, the entire file is turned over to the District Attorney's Office, correct?**



MS. LINTON: Objection; form. Go ahead.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) And it's not the police officers who are deciding what's exculpatory or even important; is that true?**
MS. LINTON: Objection; form.
THE WITNESS: True. The prosecutor makes those decisions or the DA himself, yes.
**Q. (By Ms. deSousa) You at one point were shown a blank chain of custody form. Do you recall that?**
A. Yes.
**Q. And does that form, when it's filled out, does that go with the file to the District Attorney's Office?**
A. Yes.
**Q. And specifically in the cases involving George Perrot, did much of that file stay at the District Attorney's Office?**
MS. LINTON: Objection; form.
THE WITNESS: To the best of my knowledge, yes, most of that's there.
**Q. (By Ms. deSousa) And you're aware that there**



**was two full trials in the George Perrot matter, correct?**
A. Correct.
**Q. And a number of evidentiary hearings, correct?**
A. Correct.
**Q. And a number of appeals, correct?**
A. Correct.
**Q. And all of those are handled by the District Attorney's Office, not the Springfield Police Department; is that correct?**
A. That's correct.
**Q. Superintendent, you were also shown in this last set of exhibits an outline of some training that was given in -- I guess in or around 1981, 1982 relative to civil liability. Do you remember that --**
A. Yes.
**Q. -- document that you were shown?**
A. Yes.
**Q. And there --**
**MS. deSOUSA: Is there a way that we could get that put back up, Carla?**
MS. LINTON: Sure.
If you want it up on the big screen, Gianna, are you able to pull up the --



MS. GIZZI: Yes. What -- yes, I can pull it up, but I'm sorry, Lisa, I missed what -- you want the civil liability one?
MS. deSOUSA: Yes. I think Carla put it in separately as Exhibit 5.
MS. LINTON: Yeah.
MS. GIZZI: Yes.
MS. LINTON: It should be 7a in the folder.
MS. GIZZI: Is this the right document?
MS. deSOUSA: It is the right document. Could you scroll down, please.
MS. GIZZI: Mm-hmm.
MS. deSOUSA: I'm sorry, you went further than I needed you to. Just at the bottom of that -- the page before this -- no. Right there.
**Q. (By Ms. deSousa) So you were asked some questions about "Seldom do negligent acts or omissions rise to the level of being civil rights violations at this time."**
**Did I read that sentence correctly?**
A. You did.

**Q. And you understand that sentence talks about negligent acts, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) Or negligent omissions, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) As opposed to intentional omissions or acts, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) And you would understand from that that if you intentionally omitted something that harmed someone's constitutional right to, for example, a fair trial, that you could be liable for civil rights violations under those instances, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) And it's making a distinction between acts that are done with intent and acts that were done negligently, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.



**Q. (By Ms. deSousa) And police officers are aware of that distinction for any number of reasons, are they not?**
MS. LINTON: Objection; form.
THE WITNESS: Absolutely.
**Q. (By Ms. deSousa) Specifically every officer is aware that there's a difference between a negligent motor vehicle violation and an intentional one, correct?**
MS. LINTON: Objection; form.
THE WITNESS: Correct.
**Q. (By Ms. deSousa) So finally, and this is actually my final question, you were asked at the very beginning of this morning, that seems a long time ago now --**
A. It was.
**Q. -- whether conviction was the goal -- was a goal of criminal investigations.**
A. Yes.
**Q. Do you recall being asked that?**
A. I do.
**Q. And during the relevant time period, actually right up through today, Springfield police officers are not rated or ranked based on their conviction rate, are they?**



A. No. There's no -- there's no evaluations as far as conviction rates, no.
**Q. It isn't even tracked, is it?**
A. It's not.
MS. deSOUSA: That's all I have.
MS. LINTON: Does Tom or anybody else have any questions?
MR. CAMPBELL: Not I.
MS. LINTON: I just have one follow-up question.

EXAMINATION BY MS. LINTON:
**Q. You testified earlier that Section 1 of Rule 29 had prohibited the fabrication of evidence or the reliance of unauthorized use of fabrication of evidence within that section; is that correct?**
A. That's correct.
**Q. And you mentioned that it was because it was a violation of law, correct?**
A. Correct.
**Q. What law are you referring to?**
A. Evidentiary law. I would say that it must be against the law to fabricate and to lie and to create evidence to prove somebody's guilt.



**Q. What law specifically are you referring to?**
A. I wouldn't know the specific law, but I am pretty sure that it's covered not to be able to fabricate evidence or to be able to falsely convict someone.
**Q. Were you taught about a specific law during -- at any point during your training at the Springfield Police Department?**
A. During the training, I had all my Mass laws pretty well down, yes. They go over Mass laws and they go over traffic laws.
**Q. By "Mass law," are you talking about Massachusetts law?**
A. Yes.
**Q. And you're talking about traffic law?**
A. Both.
**Q. Both, okay. Were you trained on any type of federal law?**
A. No.
**Q. And do you recall of any Mass law that specifically stated that fabrication of evidence or unauthorized use of unreliable evidence was against the law?**

A. No, I can't specifically state. I'm just pretty sure I wouldn't do it.

MS. deSOUSA: Okay. So now I am going to ask one more question.

EXAMINATION BY MS. deSOUSA:

**Q. You are aware that it's a violation in Massachusetts to file a false police report, correct?**

A. Yes, I am.

MS. LINTON: Okay. Now I have a follow-up question.

EXAMINATION BY MS. LINTON:

**Q. Are you aware --**

A. You guys are killing me.

**Q. Were you aware between 1980 and 1995 of a Massachusetts law that made it illegal to falsify evidence or fabricate evidence, any evidence, not just police reports?**

A. Nothing specific, no.

MS. LINTON: Okay. No further questions.

MS. deSOUSA: I think we're all set.

MS. LINTON: Thank you so much for



sitting through this.

THE WITNESS: Thank you.

THE COURT REPORTER: I just have to put on the record, Carla, are you ordering the original transcript regular delivery, eight to ten business days?

MS. LINTON: Yes, that's fine.

THE COURT REPORTER: Lisa, do you need a copy of the transcript?

MS. deSOUSA: Oh, yes, I do. Electronic is fine.

(The witness was excused.)

(The deposition concluded at 4:25 p.m.)



COMMONWEALTH OF MASSACHUSETTS HAMPSHIRE, SS.

I, NICOLE E. LAVIGNE, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 24th day of August, 2023, at 10:10 a.m., the person hereinbefore named, CHERYL CLAPPROOD, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of her knowledge concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

My Commission Expires: April 19, 2024

Nicole E. Lavigne

Nicole E. Lavigne, RPR
Notary Public



ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Lisa deSousa, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Carla Agbiro Linton, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

PLEASE ATTACH TO THE DEPOSITION OF CHERYL CLAPPROOD
CASE: 18-cv-10147
DATE TAKEN: AUGUST 24, 2023

ERRATA SHEET

Please refer to Page 240 for Errata Sheet instructions and distribution instructions.

PAGE LINE CHANGE REASON

_____________________________________________________
_____________________________________________________
_____________________________________________________
_____________________________________________________
_____________________________________________________
_____________________________________________________
________________________________________

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of ____________, 2023.

______________________

**(**

**(30)**
5:4

**0**

**004743**
129:21
**007022**
10:10
**01**
76:10,11 77:6 156:8
**0353**
158:11,18

**1**

**1**
228:7,16,22 235:14
**100.15**
73:22 74:1,4 158:6, 18
**100.5**
76:2
**11**
200:12
**11637**
211:10,13,22
**11643**
211:10
**11774**
205:3
**11776**
198:17
**12**
63:20
**12347**
198:17
**12401**
193:6
**130**
192:13
**14**
63:21,22 201:12
**15**
106:8 119:15
**15-year**
185:11
**16**
219:20 220:5
**17**
219:23
**19**
16:12 124:19 214:5
**1977**
205:7,19
**1979**
28:5
**1980**
19:23 20:23 26:6 38:18 39:18 43:8,17 44:3,16 45:1 49:23 58:13 65:1 66:13 76:5 77:18 87:20 88:17 89:1 102:8 113:22 114:2 121:21 122:5 141:12 144:1 149:4,24 150:7,10, 16 157:23 159:10 160:3,21 162:20 167:8 169:7 181:10, 11 182:2 183:7 184:1 185:1,9,11 195:14,20 196:18 226:4,5 237:16
**1980-1995**
186:10
**1980s**
9:13 33:9 57:13 58:4 86:9
**1981**
9:8,18 11:5,8,18,20 12:1 16:12 21:8 51:1 202:17 203:11 204:2,11 205:18 212:22 213:15,21 214:22 231:14
**1982**
9:18 12:1 202:17 212:22 213:15,21 214:22 231:14
**1983**
12:1
**1984**
124:19
**1985**
88:20 89:11 124:19, 20 132:20 174:15 180:23 182:19 183:22 185:9 186:4 220:5,8,15,18,20 221:2
**1986**
174:15
**1987**
8:23 27:11 124:10, 11 149:18 195:14 220:8,15,18,20
**1990**
16:13 19:23 20:23 26:7 35:5 38:18 39:18 43:8,17,20 44:3,7,16 45:1 49:23 58:13 65:1 66:13 76:5 77:18 87:21 88:17 89:1 102:8 113:22 114:3 121:21 141:12 144:1 157:24 159:10 160:3,5,21 162:21 167:8 183:7 184:1 204:2
**1991**
124:10,11
**1992**
21:22
**1995**
88:20 89:11 122:5 149:4 150:1,7,10,16 160:5 169:7 181:10, 11 182:2 185:1,10, 11 237:16

**2**

**2**
10:13,14 73:8
**20**
200:24 219:23
**2000s**
156:6,7
**2001**
156:12 159:6
**2007**
21:22
**2021**
140:14
**2022**
140:6
**2023**
21:8 140:6 196:18 204:11
**21**
86:4,6 106:10 140:7, 8
**23**
140:7,8
**26**
42:6
**29**
73:3,8 155:15,17,24 227:23 228:7 235:14

**3**

**3**
9:18 193:2,3,5
**30(b)(6)**
7:5,13 15:16 168:6 175:12 216:17
**32**
80:1,4,6 81:21 82:1
**35**
74:11 80:1 85:1,4
**36**
73:17 76:22,23

**4**

**4**
198:16,19
**40**
20:9 72:8
**40-hour**
164:5
**4:25**
238:14

**5**

**5**
211:7,10 217:13,14 232:5
**50**
136:11
**514-somethings**
132:23
**51465**
132:21

**6**

**6842**
10:9
**6895**
57:6,7
**6998**
83:1

**7**

**7007**
85:5
**70s**
28:5
**77**
205:21
**7a**
232:8

**8**

**8**
63:22 132:20,22
**80s**
9:9 20:11 26:2,23 27:1 28:23 30:22 32:21 34:19 53:7 72:5 80:20 93:24 100:5,11 108:1 137:19 148:18 166:15
**81**
202:21 204:5
**82**
204:5
**85**
174:15,21 220:7
**86**
174:21

**9**

**9**
132:22
**90**
27:1
**90s**
9:10 14:24 27:2 28:6 31:20 35:7 148:18
**95**
36:3

**A**

**abiding**
36:12
**ability**
72:13
**absenteeism**
30:5
**Absolutely**
234:5
**academies**
203:17 204:14
**academy**
9:8,22 11:24 12:6 14:3 15:1,4,18 16:2,15 19:2,7,9 20:1,4,10 29:20 36:1 72:6 107:5,6,8 121:2,3,12 170:15 182:19 183:9,10 184:20 198:24 202:21,23 203:12,13 205:22 206:2,3,11 207:3 210:15 213:5,19,20,21 224:19,20,22,24 225:4 226:10
**acceptable**
110:21
**accepts**
180:14
**access**
25:6 114:14 138:23
**accessible**
25:11,13,20 26:1,2
**accidents**
104:10
**accompanied**
59:9
**accordance**
157:4
**accountable**
14:2,8 16:11 30:4
**accreditation**
71:17
**accurate**
83:1 85:6 96:13
**accurately**
11:1 14:16 101:6
**accusation**
223:6
**act**
32:17 64:7
**acting**
46:10,14
**action**
157:12
**actions**
214:15
**active**
32:17,20,22 94:15
**actively**
33:8,9,11
**activities**
91:8 92:18
**activity**
96:7
**acts**
214:18 215:1 232:20 233:2,10,21
**ADA**
137:21 138:4,6,8,13 189:6
**added**
27:17 98:8
**additional**
24:2 204:4,9
**address**
54:4 103:24 184:18
**addressed**
225:21
**adequately**
66:2
**adhering**
37:3
**administration**
163:17
**admission**
207:5
**adopt**
12:13 38:16
**adopted**
11:4 40:21
**adult**
219:22
**advance**
202:8
**advice**
38:14 39:4
**advise**
13:15
**affect**
13:3 215:5
**affected**
13:14 95:17
**Agawam**
163:12
**age**
174:16 219:15,17 220:3 221:16
**aggrieved**
81:9 83:13
**agree**
42:11 47:15 101:7,8 157:14,19
**agreed**
5:2,9 102:4 195:24 196:9,17,21,22
**ahead**
227:7 230:2
**aid**
29:21 65:16 95:18 107:18 108:12 109:9
**aide**
39:12
**air**
113:3
**allowed**
139:7 165:15 224:22
**allowing**
170:7
**alphabetically**
124:15,17
**alternative**
52:22 90:18 145:21 150:17,20 151:11,16 152:4,9,14
**amended**
37:19,21 38:3,6 196:6,7,23 197:8
**amendment**
40:2
**amendments**
38:19 40:7 214:17
**America**
228:12
**Amherst**
191:14
**analyzed**
191:11
**and/or**
166:11 190:10
**anonymity**
84:16
**answers**
6:9 175:15
**anticipation**
203:2
**anymore**
48:4
**apologize**
10:8 89:3 179:18
**apparently**
159:13

**appeal** 47:16
**appeals** 48:18,19 222:22 231:6
**appears** 64:10 212:9,24 213:2
**applicable** 11:13,20 20:22 38:20 44:2,6 58:15 76:5,14 77:17 157:23 159:9 172:6
**applies** 81:21 82:1
**apply** 82:4
**appoint** 47:15
**appointed** 46:12 47:23 48:3
**appointment** 47:16
**apprised** 32:16
**approve** 34:8 35:14 51:4 180:19
**approved** 27:19 31:3 50:6 102:22,24 103:2,3,4,5,13,19 219:6
**approves** 180:13,14
**area** 44:21 113:1 168:13 192:11
**areas** 7:5 33:13 37:10 61:16 184:18
**arises** 8:4
**arose** 71:17
**arraigned** 136:3
**array** 174:14,23 175:1,19
**arrays** 127:16
**arrest** 31:23 34:11 57:17 58:9 69:5 93:11 95:2 96:24 97:1,5 99:7 103:13,15,16,18 104:2,16,18 132:1 222:12
**arrested** 58:5 113:17 130:23
**arresting** 70:5 200:7
**arrests** 57:15 71:1
**aspect** 49:1
**assault** 68:4 93:21 94:9 114:3 116:23 117:2,5 124:4,9,11 125:5 137:8 138:5,9,12,21 146:21 151:24 163:9 167:4 185:20,21,24 186:14 187:4
**assaults** 113:16 124:20,24 151:2 163:8 194:3
**assigned** 37:9 40:18 61:10 70:24 89:5 105:3 107:10 125:17 129:5 136:4 139:6 191:8,9 206:5,17 208:16
**assigning** 33:12
**assisting** 39:13
**assume** 108:14 133:22 134:2 227:15
**assumed** 101:5
**assuming** 79:6 101:6 120:20 207:8
**atrocious** 122:24
**attempted** 187:4
**attend** 162:8
**attendance** 30:4
**attended** 162:12 163:10
**attention** 205:2
**attorney** 6:16 38:24 87:11 136:5 139:11 143:14 149:17 154:3
**Attorney's** 136:12 225:16 226:7 229:15,24 230:15,20 231:9
**attorneys** 42:6 53:16 68:2 139:7 153:19 177:9,14 178:2,6,11
**audio** 168:23 169:4 173:17
**audit** 37:17
**authority** 44:20
**authorizing** 27:24
**automatic** 154:11
**aware** 31:6 32:15,23,24 44:4,8,22 45:7 51:18 59:1,7,13 61:12,14,23 65:6 71:13,21 84:9,22 87:21,24 88:6,16,21 89:1,4,14 90:11,16,19,22 91:3,6,9,10,12,13,24 92:3,7,12,19 96:23 97:3 98:3 102:8 114:21 115:15 116:16 119:5 123:9 125:14 127:4 134:20 137:21 140:10,14,17,20 141:2,5,11 142:5 149:10,13,20 150:9,14 152:8 153:22 159:21,23 160:1,6 169:8 170:10 171:5 174:1 180:22 181:4 183:6 203:24 204:5,7 206:6 207:12 211:2 212:21 221:1 230:24 234:1,7 237:7,14,16

**B**

**back** 16:2 20:11 21:24 26:2,14 35:5 46:9,17 49:17 52:7,10,13 54:1 57:3 71:18 72:21 75:5,24 77:21 83:11 85:24 86:8,12 93:5 95:18 121:24 124:15 128:16 137:19 148:17 166:17 168:9 175:12 176:22 179:15,20 182:14,15 184:20 188:8 189:1 211:17 231:21
**background** 7:17 161:1
**bad** 67:14 122:2,10 184:19
**bag** 131:19
**band** 126:13 188:12
**barracks** 162:19
**bartenders** 208:6
**base** 17:9 132:8
**based** 31:10 72:1,11 166:7,24 174:16 234:24
**basic** 122:20 206:20 207:1 208:1
**basically** 67:12 122:2
**basics** 61:12
**basis** 39:14 96:16 120:2 225:1
**Bates** 10:7 22:16 74:7 75:16 82:20,22 83:1 85:5 129:19,20 158:20 193:5 198:2,17 205:3 211:22

**bear**
54:11
**beat**
95:22
**begin**
6:22
**beginning**
8:7 208:1 213:23 234:14
**behalf**
58:20,21 65:6 88:2, 22 89:8 127:8 181:1 182:10 183:14 189:12,14 190:3,6
**behave**
17:20
**behavior**
30:3
**believed**
158:6
**believes**
136:24
**beneficial**
166:12
**big**
18:22 231:23
**bigger**
56:1 100:7
**Bill**
34:21
**Billy**
182:21
**bind**
15:19
**binder**
18:22,23 36:2 40:5
**binders**
26:21 27:4
**binding**
40:13 41:2 44:2,6 49:5 58:11 85:6
**Birth**
130:24
**bit**
9:11 29:14 72:15 79:5 82:22 96:4 146:10 162:11
**blank**
131:12 230:12
**block**
130:21 132:4,10
**blocks**
121:6 174:24
**Bloom**
137:22 138:2,4,8,13 189:6
**blue**
9:19,21,23 10:14 11:1,4,16,17,21,22 13:6 14:12,18,21 15:1,6 16:3,8 72:21, 22 76:16,19 96:2,3 105:18
**board**
46:18 48:19 161:15
**book**
9:7,12,15,17,18,19, 21,23 10:14 11:1,4, 16,22,23 13:4,6 14:12,18,21 15:1,6 16:3,8 25:19 72:21, 22 76:16 105:18 133:9 134:9
**booking**
99:9
**BOP**
161:16
**Boston**
48:15
**bottom**
27:23 41:15,21 83:12 119:4 129:11 232:17
**bound**
196:18
**boxes**
12:17
**Brady**
52:16,17,18,19 140:1,10,15,17,21 144:2 195:15,16 225:8,10,18,20 226:19
**brand-new**
63:5
**break**
6:18 21:24 29:14 43:15 49:8 54:15 55:6,12,13,15,18 77:21 123:14 158:19 194:24 195:3 197:20
**breaking**
54:6 186:19
**briefly**
28:21
**bring**
46:17 52:13 79:22 80:19 128:5 136:7, 15 155:16 178:7,17, 19,21 189:7 205:2
**brings**
110:7
**broke**
70:5
**brought**
36:24 86:10,15 187:22 214:15
**Brown**
30:24 31:1
**build**
221:16
**bunch**
201:8
**bureau**
13:9 17:24 18:1,21 28:14 29:19,20 33:10 34:19,20 52:8 53:7 60:1,10 61:15, 17,20 62:10 63:2,19 65:15,16 66:7,22 67:18 78:14 81:16 93:10 95:17,18 96:6 105:10 108:12 109:8,9 110:1 111:14 112:12 113:13 124:14 129:5 133:3 134:9 138:20, 22 139:1,3,6 166:18 173:9,15,16 185:17, 18,23 186:2,8,9,13, 15,21 187:16,19,20 191:9 192:2,9,11,23 206:5,17
**bureaus**
19:2 65:13 95:15 106:19 107:17 108:6 109:4,5 129:6 172:11 187:1
**busier**
137:15
**business**
105:5 238:6
**button**
25:23 100:20
**buys**
33:12
**bypass**
47:16

C

**cabinet**
124:13
**cadet**
26:15 28:5
**cadets**
29:1,4 122:22
**call**
12:17 19:12,14,15 20:10 26:18 29:15 32:2 34:24 36:2 78:18 107:18 121:23,24 122:12 218:12 219:12,13, 16,19,24 220:3
**called**
9:19 12:16 31:14 32:1 46:20,21 62:7 80:7 94:14 96:2 98:9 103:24 189:5 201:11
**calling**
106:20 158:19
**calls**
31:23 105:7 108:1 164:7
**CAMPBELL**
8:20 57:4 129:18,22 158:16,21 159:3 198:4 235:9
**Canevari**
133:17
**capability**
161:18 169:9
**capacity**
181:1
**captain**
28:19,24 29:3,18,20 30:23 31:1,4,9,10,12 32:6,23 67:3,8,9 78:13 83:23 103:19 112:11 114:11 182:20,21,22 183:2, 3,4,7,12
**captains**
31:5 32:9,10 37:14 107:24
**car**
104:10 118:24

**card**
53:24 164:19
**cards**
164:3,5,6,8
**care**
113:14
**career**
107:12
**Carla**
7:4 8:17 23:17 55:5 81:2 105:20 129:18 147:17 158:17 212:15 231:21 232:4 238:4
**carried**
12:2
**carry**
161:10,19
**cars**
38:10
**cartridge**
100:18
**case**
6:15 8:3 9:5 31:21 32:5 33:9,22 34:1,4, 9 35:4 38:11 53:14, 17 58:6 60:13 62:12, 22 64:7,22 65:23 66:3,10 67:16,21 68:10,12,21 69:7 71:11 86:21 87:7,9, 10 91:11,14 92:1 95:16 96:24 101:4, 14 102:18 108:10,22 109:1,11 110:6 112:14 116:23,24 119:6 120:4,6,10 123:4,7 125:20,22 127:2,12,13,20 128:3 133:4 134:1 135:3,7,22,23 136:2, 4,8,24 137:8,11 138:9,14 141:8,9 142:9,21 143:13 151:1,20 154:8 164:9 176:8 179:2 180:6,15 187:12 188:11 189:7 191:2 193:18 194:14 200:7 215:5 221:7 226:13 229:13
**cases**
30:17 31:6 61:6 68:4 114:3 117:2,5,6 125:18 137:9 138:5, 10,12,13 139:18 142:8 146:20,21 151:23 185:19 191:1 229:17 230:18
**categories**
104:9 224:15
**categorizing**
57:13
**caveat**
202:23
**Center**
207:21
**centralized**
125:12 126:15
**certification**
71:17
**certified**
47:23,24 225:6
**certifies**
47:14
**certify**
224:20
**chain**
50:16,18 193:3,13, 21,23 194:6,18,19 230:12
**chance**
7:13 66:23 77:22 155:21 212:10,11
**change**
12:13 13:15 14:13 17:6,9,22 23:11 27:6,24 38:3,13,16 45:6 56:13 98:20 100:13 101:9,15,17, 19 224:17
**changed**
11:19 12:18 14:13 18:6 27:17 38:12 45:11,15,21,22 46:5, 22 53:17 174:15,21 176:8
**changing**
12:19 98:23 148:24
**charge**
28:20 29:18,22 33:24 37:5 81:12 83:20,24 90:12 92:5 110:8 125:24 166:21 182:18 183:10
**charged**
89:21 90:3
**charges**
36:24 80:7,13 86:10, 15 87:3 161:9
**chart**
23:21 75:14
**check**
9:5 22:8 161:1,12 182:13
**checked**
105:5 117:23 147:1 151:21 192:14
**checking**
108:4
**Cheryl**
5:14 63:10 211:15
**chief**
12:10 27:7,8,11,12, 14,19 28:2,3,4,7,11, 23,24 29:2,3 35:6, 14,22 37:21 39:7,9, 11,13,16,18 40:22, 23 44:11,17,18,23 45:4,10,14,21,22,23 46:5,7 47:3 48:2 67:9,23 84:3,6,9,13, 18 85:24 86:13 103:2 114:11 205:9, 10,21
**chief's**
18:15 19:5 26:11 27:4 35:18 39:12 50:7,16 51:5 58:10 83:14,15 102:19
**chiefs**
37:8 39:17
**choose**
178:14
**circumstances**
113:24 114:12 116:20
**circumstantial**
146:22
**cities**
224:21
**citizen**
82:15 83:7 84:6,21 85:10 92:21,24
**citizens**
93:3,4 228:14
**City**
15:19 46:1 58:20,21 65:6,24 88:2,22 89:8 127:8 181:2 182:11 183:14 189:12,14 190:3,4,7 196:15 228:10,14
**civil**
39:2 45:23 46:1,4 47:8,10,11,12,14,15, 17,18,20 48:7,10,12, 14,21,23,24 49:4,11 91:20 211:7,12,21 212:5 213:4 214:3, 10,15,19 215:10,15, 24 216:1,20 217:2,7 231:15 232:3,21 233:16
**civilians**
46:20
**Civils**
214:6
**CJIS**
161:14,17,22
**claim**
87:4,15 125:5
**claimed**
223:2
**claims**
78:10,12 86:16
**Clapprood**
5:14,22
**clarification**
8:2 18:10 24:9 34:7 43:3 49:21 89:13 101:21 147:7 213:14
**clarify**
8:5 43:12 44:14 45:9 64:20 91:19 177:12
**class**
20:17,18
**classes**
15:2 162:10,11 206:16
**classification**
70:21
**cleanup**
195:11
**clear**
16:18 43:16 49:14 90:4 216:20
**cleared**
89:6 90:3

**clerk**
115:17 116:1
**click**
75:2,8 199:2
**clicking**
25:22
**clipboard**
113:20
**clipboards**
31:16
**close**
38:23 53:11 56:17 60:18 62:4 86:3 94:16 133:19 219:23
**close-**
63:24
**close-knit**
60:16
**closed**
222:18
**closely**
38:23,24 39:4 53:9
**closeness**
61:8
**clothes**
35:2 37:12 176:21 221:13
**clothing**
191:12
**Cochran**
182:21,23
**code**
72:18,19 73:14,15, 16,20,21 74:1 75:9, 10,17,19,23 76:4,13, 15 77:3,6,7,16,24 78:1 155:2,8,11,12 156:5,9,11,23 158:2, 6 159:4,5,9,12,13 227:16
**codification**
227:9
**coerced**
223:2
**coercive**
87:18 89:3 90:23 92:11
**coincided**
225:14
**collected**
133:13
**collecting**
61:10
**collection**
91:4 92:15
**college**
206:15 208:12,14, 17,18 209:24 210:1
**color**
128:19 221:17
**colors**
127:24 128:13,14
**combine**
126:19
**combined**
126:12
**comfortable**
165:19
**command**
27:5,10,15,18 39:9, 10,11,15 50:16,18
**commander**
19:15 79:1 83:11 85:19
**commander's**
83:10
**commanding**
18:24 19:11,13 25:19 26:20 28:11, 13,18 29:11,15,23 30:5,11,14 36:1,11, 19 37:6 50:6 51:4 52:8 61:22 63:5,8,9 66:6 67:3,7,18 78:20 79:6 81:11,14 83:17, 20 84:11 89:22 102:24 103:3,5,14 106:13,15,18,21 108:11 109:21 111:16 140:20,23,24 141:24 142:10 153:4,11,15,22 179:3,8 183:19
**commission**
47:20 48:12,14
**commissioner**
45:21 46:5,6,8,9,11, 14,15,22 47:3
**commissioner's**
12:6 18:16
**commissioners**
46:18,20
**committed**
95:12 164:17
**committing**
214:11
**common**
38:12 69:9 112:18 178:17 221:19 222:3,8
**commonly**
215:3
**Commonwealth**
41:7 226:13 228:11
**communicate**
39:7
**communicated**
37:23 40:7 68:24 69:2
**communicating**
110:2
**Communication**
201:12
**communications**
31:12,24
**communities**
70:5
**community**
69:14
**company**
208:4
**compared**
65:15 67:12 168:2
**competent**
61:21 66:1
**complainant**
87:7
**complaining**
83:13
**complaint**
81:10,17,18,20 82:14,15 83:2,6,7,8, 14,16,18,21 84:1,7, 9,13,21 85:22 86:19, 20,23 92:24 102:15 149:16 160:15 199:22
**complaints**
81:9,12,22 82:2,4 85:10,11 92:21 93:3, 4
**complete**
44:23 64:23 69:7 85:23 86:1,5,12 87:14 113:11 135:2 136:18 139:14 141:23 157:6
**completed**
83:7 86:8 102:12
**completing**
68:12
**complex**
71:16
**compliance**
36:14,18 107:22
**comply**
195:15,16 210:12
**complying**
109:18,20
**compose**
71:11
**computer**
25:21,24 36:4 198:1
**computers**
27:1 36:7 107:14
**concern**
152:2 159:15,17
**concise**
177:17
**concluded**
238:13
**conclusive**
213:9
**condition**
95:6 219:14
**conduct**
53:14 72:19,20 73:2 75:18 76:13,15 77:4, 6,7 78:1,14,17,21 79:2 154:13 155:13, 14 156:24 165:9,22, 24 170:8 176:23 208:2
**conducted**
85:13 149:19 206:10 222:8
**conducting**
210:12 220:23
**conference**
138:4
**conferences**
136:6,10 137:7
**confession**
223:2
**confirming**
204:18

**confused** 203:9
**confusing** 49:10
**connected** 126:24 127:14 166:18 199:1
**consecutive** 19:14
**considered** 34:16,24 64:23 137:5 142:6 144:2 146:18 184:4 186:6 220:5 222:18
**consist** 20:3
**consists** 39:11 214:9
**constant** 31:12
**constantly** 12:19
**Constitution** 214:17,18 226:21
**constitutional** 233:15
**constraints** 48:10
**consultation** 219:24
**contact** 120:16
**contacted** 84:2 97:6
**contained** 11:21 15:2 62:11,12
**contents** 75:6
**context** 225:20
**continual** 224:13
**continue** 23:10 49:15 107:11 222:17
**continuing** 5:22 222:14
**contract** 46:4,12,14 47:8 48:8 86:9
**contributed** 27:9
**control** 44:23 48:18 53:21, 23
**conversation** 6:6 112:8 196:5
**conversations** 31:10
**convict** 236:5
**conviction** 67:21 68:14,17,22 69:8,10,13 71:1,6 94:17 139:22 222:22 234:17,24 235:3
**convictions** 69:14,15,16 70:7,8, 12,14,17 71:7 161:10,17
**cop** 182:24
**copies** 19:4 96:9 127:24 129:17 178:8
**copy** 9:17,23 19:2 32:5 55:3 58:3,7 80:17 83:12 96:3,9,11 116:24 128:1,2,16, 19 129:10 130:3,6,9, 14 131:16,18,20,21, 23 132:3,4,8,9 227:17 238:9
**correct** 9:13,14 11:5,6 24:13,16 25:3,7,8 27:15,16 29:4,5,7 38:3 40:9 45:4,5 47:2,6,9 54:20,21 55:19,20 64:14,15, 17 69:22,23 80:8,9, 14 81:14 82:3,16 89:17 91:11 98:17 99:24 100:2 101:8 102:1 104:21 115:19,20 118:22,24 120:14 124:22,23 131:11 134:12 137:23 138:15 143:20 157:16,21,22 158:3,4,7,8 159:11 185:22 186:3 189:10 199:9,10 206:23,24 207:5 216:4,21,22 217:23,24 225:18, 19,22,23 226:9,17, 22,23 227:19,21 228:1,2,4,5,19,23 229:1,4,7,10,15,16, 24 230:3 231:2,3,4, 5,6,7,10,11 233:2,4, 6,8,10,12,17,19,22, 24 234:9,11 235:17, 18,20,21 237:8
**corrected** 98:13 99:12 179:22
**correcting** 216:9
**correction** 98:14 100:19 180:7
**correctly** 29:2 62:7 64:10 125:19 206:14 232:23
**Cos** 10:9 129:23 193:5 198:17 205:3
**couching** 172:23
**Council** 162:18 163:11 224:11
**counsel** 5:3 160:15
**country** 207:21
**County** 225:16
**couple** 5:24 54:7 98:16 122:16,22 166:13 180:18 184:17 195:11 198:5 199:9 221:24 222:1 223:11 225:11
**courage** 228:13
**courses** 62:16
**court** 6:5 24:8 51:6 52:11, 13 53:10,11,16 54:2 57:17,19 60:17,20 61:6 63:14 64:2 65:23 67:17 68:6 102:5 126:14 127:1 136:13 137:15 141:10 142:8 153:17 170:4 174:13 196:22 197:4,7 199:21 200:6 223:24 238:3, 8
**courtroom** 199:19 200:4
**courts** 196:23
**cover** 11:17
**covered** 156:2 198:22 228:22 236:4
**CPB** 30:20 31:18 52:4 58:4 61:7 63:6,20 65:16 68:3 107:17 108:12 125:17 187:3,6 188:9 192:22
**crack** 209:13
**create** 134:18 152:4 159:19 235:24
**created** 58:3
**creating** 225:16
**creation** 123:21 190:9
**crew** 33:7
**crime** 29:19 33:10 34:20 60:1 61:7,20 62:9 63:1 66:22 91:5 102:15 109:8 112:4, 5 124:14 138:22,24 139:3,6 145:5 162:8 164:17 173:9,15 185:17 186:1,8 187:15,18 191:8 192:1,9,11 207:21 222:13
**crimes** 18:2 95:12 151:2 167:10,13,14,17,19, 23,24 168:2 172:12, 24
**criminal** 32:4,11,14,15 95:13

103:24 139:11 143:3,5,12,14 160:18,21 161:8,13, 20 167:6 177:9,14 178:6,11 205:12,16 207:15,17 222:22 223:1 226:13,14 234:18

**cross-examination**
97:14

**current**
20:5

**curriculum**
224:24

**custody**
57:16 95:4 104:5 164:7 193:3,13,21, 23 194:6,18,20 230:12

**custom**
94:12,13 112:20,21, 24 115:1 164:12 171:17 174:9,11,12

**customary**
177:17

**customs**
167:2

**cut**
17:20 18:16 66:17 174:24

**D**

**DA**
66:7 132:11 137:22 230:9

**DA's**
53:9 54:2 59:12 61:24 124:7 171:13, 14 188:17,21,23 189:16 196:14

**daily**
31:15 96:7 103:11 105:6,9,12,15 106:3, 11,16,17,20,22,24 107:2,4,7,16,23 108:2,5,7,13,16,17, 20,21 115:8,11,16 116:3 117:24 118:1, 3,4,7,11 119:14,24 120:2 146:24 169:16 170:21 218:14

**dairy**
108:3

**damage**
104:10

**Dan**
39:21,22,23 205:10, 21 206:14 209:22

**Daniel**
39:24 205:9

**date**
11:15 13:11,12 19:17 23:10 63:10 76:9 83:12 121:11 130:23 159:6 164:18

**day**
15:22 19:20 31:4,16 53:10,16 60:18 106:19 107:7,9 108:8

**day-to-day**
31:6 39:14

**days**
5:4 19:14,18,20 26:19 29:13 30:24 31:1 53:10 86:4,6 111:14 238:6

**DB**
107:17 108:11 109:8 133:4,5 186:18 187:17 188:9 205:24 208:16,21 209:1 210:2

**dead**
139:20

**deal**
17:11 18:2 97:7

**dealing**
38:8 40:17 111:17 113:1

**dealt**
17:19 53:8,9 58:5 78:19 105:14

**decade**
65:1

**deceased**
94:18

**December**
132:20,22

**decide**
170:7 171:15

**decided**
46:2 202:18

**deciding**
27:8 230:5

**decipher**
81:6 122:18 211:4

**decision**
28:1 34:3,8,10 35:4 46:13 67:5 84:12 86:14 132:11 147:13,18 148:1,7,8, 16,23 149:2 166:20, 22,24 171:9,12 177:24 178:2

**decision-making**
84:14

**decisions**
33:24 148:15 230:9

**deemed**
5:6

**deems**
127:19

**defendant**
91:17 97:7 103:5 126:5,9,11 143:3,5, 12 144:16,18 145:7 154:4,5 160:15 222:22 223:1

**defendant's**
99:10 101:24 143:14 160:15

**defendants**
91:10,13,20 92:1 102:23 123:4,7,11 154:6 203:17 226:14

**defense**
68:2 86:21 87:11 139:7,11 149:17 153:18 154:2 177:9, 14 178:1,6,11

**defer**
35:3

**definition**
25:15

**delegated**
44:21

**delivered**
26:14 27:2

**delivery**
238:5

**demeanor**
176:22

**Denny's**
187:7,9,11

**department**
7:19,21 8:23 10:1 11:9,14,16,21 13:2 16:13 18:12,19,20 19:22 20:9,22 25:2, 11,14 27:10 28:15, 22 29:12 36:9,16,17 37:16 38:15,18,21, 24 39:2,6 40:14 41:2,4 42:21 43:7,23 44:3,7,10,18,24 45:23,24 46:3,13,19 47:1,11,12,24 48:1, 9,23 49:2,20 50:1 51:17,21,22 57:12 58:16 59:5,10,17 60:6 61:19 62:19,24 64:14 66:5 69:10,12 70:2 71:20,24 72:4 73:11 76:5 77:17 78:22 94:8 95:1 107:21 109:18 113:5,14 115:17 116:1,4,11 117:15 119:10,11 121:18 124:10,22 125:12 130:4 138:18 139:4, 24 148:1 149:5,14 150:8,10,12 152:2,7, 8,23 153:10,22 154:9 157:4,12 159:17,22 160:6,10, 13 162:15,17 167:9 168:1,22 169:3 170:14,24 171:10,24 174:5 177:18 180:23 181:6 189:16 190:21 191:15 192:1,12 197:1,6 205:10 209:19 210:24 220:22 221:15 222:14,24 224:4 225:14 226:6 227:10 228:8 231:10 236:9

**departments**
48:20 71:14 172:7,8 173:8,22

**departmentwise**
117:22

**depend**
25:15 46:4 152:22

**depended**
96:10 102:21

**depending**
78:14,15 192:7 219:14
**depends**
102:13 137:8 146:6 166:15
**depiction**
83:2
**deponent**
5:4 15:16
**deposition**
5:5,7,23 8:2 9:2,16 11:2 20:23 21:17 23:14 198:9 199:6 202:9 204:23 238:13
**deputies**
37:8 39:12,19
**deputy**
28:24 29:3 37:8 39:16,17,18 205:8
**deputy's**
205:10
**describe**
28:21
**describing**
30:8
**description**
63:11 79:12
**descriptions**
127:16
**design**
48:17
**designated**
42:22 43:9 57:24 58:10
**desousa**
7:3,11 8:1 10:2,6,19 13:20 14:15 15:10, 14 16:17,21 21:1,9, 12,16,23 22:10,23 23:3 24:5,18 42:23 43:11,18 44:12,15 45:9,16 49:8,16 51:11 54:5,13 57:7 65:9 68:15 69:21,24 70:19 71:23 73:17, 22,24 74:3,9,17,23 75:5,8,10,13,22,24 76:3,22 77:9,14 78:5,9 79:24 80:16, 20,24 81:23 82:7,10 88:4,7,11 93:18,22 106:5,9 110:14 123:10,15 129:23 134:4,15,24 135:24 143:4,7 144:9,15,19, 22 145:9,11 147:15, 20 148:3,11 153:2, 13 154:1,24 155:14, 18 156:3,8,14,17,19, 22 158:12,23 167:11,18 168:3,12, 16 169:6,14,22 170:9 171:1,19 172:22 175:11,20,23 176:3 181:7,16 182:3,8,24 187:8,11 190:5,14,22 191:18 193:7,10 195:2,6,10, 23 196:3,9,17 197:7, 11,14,17,22 198:11 199:11,15 200:2,4, 11,15,18 201:5,18 202:1,6,12,20,22 203:15,23 204:8,13 205:17 211:11,13 213:6,18,24 215:7, 11,14,17,21 216:8, 16 217:13 223:11, 14,16,20,22 224:1,2 226:18 227:1,8,22 228:21 229:2,5,11, 22 230:4,11,24 231:20 232:4,12,15, 19 233:5,9,13,20 234:1,6,12 235:6 237:3,6,23 238:10
**destroy**
118:1,17 132:12 171:15
**destroyed**
99:6 117:15 118:7 130:21
**destruction**
117:11 170:23 171:8,13 172:2
**detective**
13:9 17:24 18:1 29:19 65:14 66:21 68:10 95:17 109:8 111:17 172:11 173:9,15 185:18 186:12,15,20 187:20 192:2,9,23 206:5,17
**detective's**
111:22
**detectives**
13:4 35:1 63:1 96:22 111:6,14 206:16 208:21,22
**develop**
146:20
**developed**
47:20 145:23
**deviate**
170:6
**diary**
106:3,17,23,24 107:2,4,23 115:11 116:3 117:24 118:2, 3,7,11 119:14,24
**Diebold**
124:13,15
**Diebolds**
139:16,17
**difference**
17:1 172:14,18 173:4 207:10 234:7
**difficult**
204:17
**difficulties**
166:9
**digitalized**
14:7
**direct**
5:18 36:22 54:4
**directed**
36:11
**direction**
50:4 74:18 102:20 151:5,8
**directions**
96:10
**directly**
41:4 112:7 113:15 143:11 185:6 186:22 225:5
**discharged**
115:19
**discipline**
46:19 74:14 121:17 122:10,12 123:1 150:11 180:22 181:5,13,20,21 182:1
**disciplined**
90:2 123:5
**disclose**
86:17,22 87:22 90:14 92:5 141:3,6, 17 147:8 195:17
**disclosed**
87:13
**disclosing**
220:10,16,19
**disclosure**
52:16,21 149:6,7,9, 21 150:1,4,17,20 152:3,5,9,14 159:20, 24 160:7
**disclosures**
74:20,22 75:1 158:13,15,24
**discovery**
21:14
**discredit**
157:12,13
**discretion**
84:19,20 228:13
**discuss**
111:16 191:23
**discussed**
90:11 104:13 170:22 177:4
**discussing**
40:11 71:10 80:10 158:2 172:5
**discussion**
10:5 21:3 24:21 43:2 77:15 155:20 197:18 217:10
**discussions**
217:1,9
**disk**
14:6,13,23 15:2
**disposition**
130:22 139:16,19
**disregard**
36:22
**disseminate**
18:18
**disseminating**
225:17
**distinction**
233:20 234:2
**district**
57:20 136:5,12 225:16 226:7 229:15,23 230:15,19

231:8
**disturbances**
166:9
**divided**
199:21
**division**
13:14 17:5 28:14,17 29:10 37:13 57:11, 24 58:2,3,7 102:16 104:19 131:9,14,24 138:19 166:19
**divisions**
28:19 29:21 37:11 65:8,22 173:2
**DMS**
18:20
**doc**
21:5
**document**
10:17 18:21 56:21 90:17 91:7 92:17 97:16,21 175:16 190:11 193:8 205:4, 15 210:21 212:2,11 217:11 231:17 232:11,13
**documentation**
91:5 165:4 172:15
**documentations**
174:6
**documented**
184:10 192:18,20, 21,22
**documenting**
218:4,10 221:3
**documents**
23:5 59:3 170:23 171:18 172:2 200:20 201:10,16,19 202:7, 9 204:22 213:16
**door**
95:3,20,21,23 104:10 221:15
**downstairs**
136:12 176:23
**drafts**
98:1
**draw**
18:17 99:17
**driver's**
5:16
**drop**
26:16
**drugs**
191:11
**drunkenness**
84:16
**Dual**
192:4
**duly**
5:16
**duties**
97:4 228:12
**duty**
195:17

**E**

**earlier**
27:13 37:20 38:2 54:18 71:10 104:13 123:17,20 135:14 158:2,5 170:17,19, 22 177:5,11 188:12 217:19,20 235:14
**earliest**
140:14
**early**
26:23 27:2 28:6 29:15 30:22 72:5 108:1
**easier**
22:18 55:3 108:6 202:5
**easily**
25:13,20
**easy**
25:15 108:11
**Ed**
38:24
**edit**
39:8 99:13
**edited**
197:10
**Edmunds**
62:7,8
**educational**
113:6
**effect**
13:10,11 59:17 180:11 184:22 203:7,8 227:18 228:3
**effective**
159:5
**effectiveness**
37:17
**effort**
37:17
**efforts**
149:11 152:11 160:9
**elastic**
126:13
**elderly**
125:1,5
**Electronic**
238:11
**email**
22:9,19 23:18 25:22 36:6
**emails**
22:1 23:1 26:13
**Emily**
185:16,24 186:22 187:4
**employee**
37:1 157:6
**employees**
47:13 157:5
**employment**
47:19
**enable**
209:10
**enacted**
24:3 35:15
**encompass**
213:3
**end**
21:9,13 96:24 97:1 109:3 118:23 121:10 147:16
**ended**
97:4 115:7 118:9 219:4
**ends**
97:5
**enforce**
14:8
**enforced**
36:8,10 115:21,23 116:6,10 118:12
**enforcement**
207:17
**enforcing**
37:14
**engage**
164:22
**English**
122:17,20 179:14
**ensure**
37:3 61:19 65:24 107:22 109:18 120:9 152:23 153:10
**ensuring**
62:20 63:1 68:9 71:21 110:8
**enter**
157:6
**entered**
157:7
**entering**
186:20
**entire**
13:1 99:4,8 229:23
**entirety**
28:7
**entity**
59:4 95:13 171:14
**entries**
106:12 118:1
**equipment**
38:9 72:3 95:6 169:10
**established**
157:4
**ethic**
30:3
**ethics**
72:19 73:14,15,16, 21 74:2 75:9,10 76:4 77:16,24 155:2,9,11, 12 156:5,10,12 158:3,7 159:4,5,9, 12,13 227:16,17
**evaluated**
78:11,12 183:16,18 184:6,7
**evaluation**
183:21,24 184:3,10, 16,19 185:2
**evaluations**
235:2
**evenings**
29:13
**event**
13:15
**everlasting**
13:10

**everybody's**
36:2
**evidence**
52:15 53:1,5,6,14, 20,23,24 54:1,3,18, 19,24 55:1 61:10 69:7 86:17,22,24 87:9,16,23 88:18 89:22 90:13,15,21 91:5 92:6,9,15 93:13 110:11 127:21,22 128:1,6,11,15,21,23 129:1,7,8,16 130:7, 11,13 131:17 132:5 133:2,3,4,6,10,23,24 134:9,14,19 141:3,7, 17 142:3,6,12 143:15,19 144:2,3, 14 145:14,18,21 146:19,22 147:3,5,8, 11 149:5,7,9,19,22 150:2,5,13 152:5,18, 22 153:1,8,12,16,24 154:8,19 155:7 156:1 157:1,9,10,13, 21 159:18,19,23 160:7,14 171:8,13, 15 173:19,23 188:15,16,21,22 189:2,7,15,20,23 190:13,14 191:3,5,7, 8,10,20,24 192:6,7, 10,12,14,24 193:18, 19,24 194:7,13 195:18 207:7 220:10,16,22 225:22 226:6,8,14 227:12 228:17,21 235:15,16 236:1,5,22,23 237:18
**evidentiary**
127:23 231:4 235:23
**ex-wife**
111:18
**EXAMINATION**
5:21 223:20 235:13 237:6,13
**examined**
5:17
**excessive**
216:3
**excluded**
146:5
**exclusion**
151:11
**exculpatory**
86:17 87:22 90:15 92:5 141:3,6,17 142:2,6 143:19 144:3,13,14,16 146:18 147:3,5,8 149:19 150:2,12 195:17 207:7,11 220:10,16,22 226:8, 14 230:5
**excuse**
209:8 217:22
**excused**
238:12
**executed**
33:14
**exhibit**
10:13,14 42:20 73:8 193:2,3,5 198:16,19 200:24 211:7,9 216:10,11,13 217:13,14,16 232:5
**exhibits**
201:2 203:1 211:5 231:13
**exist**
87:10 204:5,10
**existed**
50:19 152:12
**expect**
120:16
**expected**
117:18,20 119:11 137:19,20
**experience**
15:15,18,22 32:21 65:4 68:1,5 117:23 135:2,4 142:7 166:7
**experienced**
63:6 208:5
**explain**
49:11 77:9,11,13 171:11 196:10 224:7
**explained**
110:20 119:15
**extension**
184:18
**extent**
32:13
**external**
81:18,21 82:2,4 84:9 86:19
**eyesight**
80:21

**F**

**fabricate**
235:24 236:5 237:18
**fabricated**
154:19 155:7 156:1 157:1,21 159:18 160:14
**fabricating**
89:22
**fabrication**
53:1,4 87:16 88:18 90:13,20 92:8 235:15,16 236:22
**fact**
17:23 87:10 97:3 122:19 180:14 196:3 228:22
**factor**
27:8
**facts**
97:18
**failed**
195:15,16
**failing**
91:7 185:1
**failure**
78:18 86:16 87:22 90:14,17 92:5,17 150:12
**fair**
233:16
**fairness**
47:21
**fall**
70:7
**false**
123:1,2,5 157:7 223:2 229:5 237:8
**falsely**
236:5
**falsify**
237:17
**falsifying**
227:12 228:17 229:2
**familiar**
60:19 187:7 199:5
**familiarize**
10:17
**families**
111:11
**family**
111:4,23 112:4,16 113:3,8,9
**fancier**
100:10
**fault**
71:5
**federal**
216:21 236:19
**feedback**
64:11
**feel**
7:7,12 70:4
**feels**
137:1
**fell**
34:14
**felt**
46:21 95:13 165:19 179:12
**Fenton**
12:10,11 27:12,14, 19 28:3 39:19 44:18, 23
**file**
26:21 32:5 51:15,16, 19,20 52:5,6,13 57:17,22 58:3 59:3,4 60:14 63:3,8 64:7,12 66:3 68:12,13 71:11 81:19 85:22 94:14, 16,21 101:4,14 102:18 104:14,16 114:16,17 115:9 116:18,21,24 123:22 124:4 125:12,15 126:7,16,19 127:10, 11,12 128:3 132:6 134:5,6,7,21,23 135:5,7,15,17 136:8, 15 139:8,9,12,15 141:9 161:23 178:7 179:2 180:6,15 187:14,17,19 189:7 190:11 191:19 194:20 197:3 221:7 222:18,21 229:13, 14,23 230:15,19 237:8

**filed**
124:15 125:19 126:5
**files**
51:17 52:8 53:14 57:18,22 58:2,4 59:11 85:21 93:11, 15,16,17,20,21,22 94:3,9,14,19 124:9, 13 125:4,8,13,19 126:10,12,20,21 138:16,17,20,21,23 143:11 148:21 161:22 170:19,20 177:2 178:3,5 185:15 186:5,7,9,12, 15,17,18,20,24 187:1,18 188:7,11, 14 189:18 192:23
**filing**
5:7 57:14 85:17
**fill**
49:9 109:2 129:1 130:16,17 221:14
**filled**
132:4,5,10 194:19 230:14
**filled-out**
194:6
**fills**
132:5
**final**
27:8 28:1 44:9,17 45:2 53:20 98:2 130:22 234:13
**finally**
234:12
**financial**
113:5
**find**
95:23 156:12 209:12 222:5
**fine**
15:18 41:24 191:23 197:13 216:12 238:7,11
**fingertips**
25:17
**finish**
6:8 54:14 157:18
**finished**
54:3
**finishing**
211:6
**firearms**
161:11
**fit**
67:4,6 222:5
**Fitchet**
30:21 31:2,13 34:21, 22 46:2,6,9
**Fitzgerald**
39:20 40:1
**five-minute**
123:13 197:20
**five-year**
117:13
**fix**
179:21
**fixed**
179:20
**Flanagan**
39:20,24
**flipping**
10:18
**floor**
188:18
**Flynn**
46:8
**focus**
207:24
**focused**
69:11,13
**folder**
52:12 64:23 99:10 128:3,11 130:15 132:1 164:20 177:21 200:17 211:22 232:9
**folders**
94:3 126:20 174:23
**follow**
120:3
**follow-up**
146:7 235:11 237:11
**force**
95:3 104:3 115:19 216:3
**forever**
93:13,14,16 94:1,3 170:20
**form**
5:10 13:20 65:9 68:15 70:19 71:23 81:10,19 82:14 83:2, 7,8,18 84:7 110:14 130:17 132:5 134:4, 15 168:4 175:8 184:3 193:3,13,21, 24 194:6,18,20 216:14 226:16,24 227:20 228:18,24 229:3,8,20 230:1,7, 12,14,21 233:3,7,11, 18,23 234:4,10
**formal**
16:14 27:22 36:17 59:21 62:20 63:17 104:6,7 108:3,4 152:3 170:14 218:6, 18 221:6 225:10
**formalized**
16:14
**format**
122:3
**forms**
82:15 83:6
**forward**
22:15,17 26:5 83:16 84:12,20 94:19 226:5
**forwarded**
22:11
**forwarding**
83:18
**found**
92:4 98:11 195:14
**four-hour**
20:18
**frame**
161:14 213:17
**Framingham**
162:10,19
**freedom**
48:5,21
**fresh**
5:24
**friend**
111:13,18
**friends**
113:2
**front**
39:13 216:10
**full**
56:6 107:13 139:17 231:1
**functioned**
110:1

**G**

**gain**
209:11
**garage**
18:3
**gave**
15:2 66:23
**general**
9:9 12:4,9,12,20,22, 24 13:5 21:4,7 24:3, 12,14,23 25:9,10 35:16 40:10 41:6,15, 20 42:3,5,12 43:4,6, 20 58:23 61:11,13 65:7 93:9 149:8,9 181:4 212:19 220:21
**generally**
14:12 42:12,17 70:16 98:5 117:3 139:7
**generate**
50:9 95:2
**generated**
35:17 57:14
**George**
28:8 117:9 119:6 137:23 176:9 186:5, 10 194:1 203:8 230:18 231:1
**Gianna**
21:20 22:4,5,6,12,23 23:16 41:9 55:22 56:4 74:4 79:22 82:18 84:24 128:5 155:16,18 182:14,15 211:17 212:7 214:5 216:6,17 217:15 231:24
**give**
6:2,15 10:8,16 46:3 57:4 69:7 74:6,7 101:3 128:7 133:9 157:18 161:17 178:10 190:23 200:3 212:11 219:18 227:4
**giving**
101:13 158:19 161:18 166:9 178:5
**GIZZI**
8:17 22:7,13,20 23:2,17,22 41:11,16,

18,22 42:1,18 55:5 56:8,12,17,22 57:6 73:4 74:6,21 75:4,7, 11 80:2 81:2,5 85:2 105:20,24 106:8 128:7 211:18,23 212:8,15 216:6,12 217:17 232:1,7,10, 14

**glasses**
80:19

**goal**
68:23 69:9,13 70:1 142:23 234:17

**goals**
68:21

**gold**
71:8

**good**
7:16 56:2,3 63:16 64:7 66:10 67:4,6, 14,19 68:8,11 70:11, 13,22 110:18 137:9, 12 161:1,7 206:15 208:3 209:11 210:8 223:12

**GOS**
23:6

**gossip**
113:7

**gotta**
120:17,18

**governing**
104:20 124:3

**grab**
52:11

**grabbed**
133:17

**graduated**
9:7,13 14:3

**grammar**
122:2 179:13

**ground**
5:24

**group**
13:9 39:1 46:20 60:15,16 62:6 63:24 126:13 133:6,11 220:3

**grouped**
126:12,19 127:1

**guess**
8:11 64:10 131:13 145:12 153:3,14 229:18 231:14

**guidance**
17:3

**guilt**
151:3 207:5 236:1

**guys**
23:24 56:18 74:18 190:23 237:15

**H**

**H-E-I-R**
62:9

**habit**
120:7

**hair**
17:20

**half**
10:7 54:9

**Hampden**
225:16

**hand**
63:7 116:3 133:10 177:18 181:20

**hand-kept**
27:3

**handed**
15:1 82:11 164:15

**handing**
10:6

**handle**
17:13 72:16 111:19

**handled**
112:3 172:12 231:8

**handling**
79:4 143:13

**handwriting**
81:7

**handwritten**
178:24

**hanging**
113:20 223:22

**happen**
14:14 83:8 86:5 98:15 99:2 115:5 179:16,18 184:15

**happened**
107:15 118:6 126:10 127:5 139:21 218:15

**happening**
32:16 124:20 125:1 223:5

**happy**
6:12

**hard**
122:17 128:16,19 132:8 156:12

**hardcover**
11:22

**harmed**
233:15

**he/she**
209:14

**head**
45:23,24 46:3 229:9

**headed**
29:17,20

**health**
95:9

**hear**
7:2 8:16,17,20 48:18,19 61:24 120:16 153:17

**heard**
52:19 121:17

**hearing**
6:24 86:15 87:3 147:16

**hearings**
80:7 231:4

**height**
174:17

**Heir**
62:8

**held**
16:10 53:24 87:3 162:10,19 163:12

**helpful**
8:5,12 24:5

**high**
167:9

**high-stake**
167:10,13,14

**higher**
29:7

**highest**
28:18 29:10,22

**hire**
48:8,22

**hired**
183:18

**hiring**
47:21

**Hispanic**
122:16

**history**
160:18,21 161:8,13, 20

**hit**
100:20

**HIV**
17:12,13

**hold**
14:7 200:21

**holding**
14:1 30:4

**home**
83:23

**homicide**
61:9 170:20

**honest**
96:17

**hookers**
208:6

**horses**
12:16

**hospital**
113:5

**hour**
54:9,11

**hours**
20:9 72:8 201:12

**hundreds**
174:18 199:17,18

**I**

**i.e.**
43:6

**ID**
53:24

**idea**
174:20

**ideas**
17:7

**identification**
10:15 91:1 92:13 144:1,4 145:14 193:4 196:19 198:20 211:8

**identified**
5:15 145:4 168:6 187:20

**identifies**
145:5

**identifying**
144:12,15
**IIU**
74:12 78:6 79:14,15, 18,20,23 80:10 81:13 83:16 84:17, 21 85:11,13,18,20 86:16,18,23,24 87:4, 14,23 88:18 89:2,5, 18,23 92:4 93:2 123:11 180:21 181:24 182:6 225:21
**illegal**
237:17
**illustrative**
202:14,16 203:16 213:8,11
**imagine**
204:3
**impeachment**
142:11 147:10 149:22 150:4 195:18
**impeachment-type**
225:21
**importance**
210:16
**important**
6:6 31:22 96:12 131:2 142:14,19,22 143:1,18 167:17,19 210:12 230:6
**impossible**
107:14 117:16
**improper**
91:4 92:15 157:7
**IMS**
36:3
**in-house**
188:7
**in-person**
112:22 221:4
**in-service**
72:9 164:4,5 224:16
**inability**
66:9,16
**inaccurate**
157:7
**inappropriate**
117:17
**incident**
93:11 95:2,11 96:3 99:3 102:14 103:1 121:6 127:14 187:7, 9,11
**incidents**
103:22 195:13,20
**include**
43:5 90:17 103:8 173:18 175:15
**included**
50:8,14 82:14 91:16 114:15,17 115:9 135:20 161:23 177:8 179:2 208:18
**includes**
42:20 43:12
**including**
175:18 190:12 216:2 226:7
**Incoming**
140:22
**incompetent**
66:9,12
**incomplete**
64:4
**inculpatory**
87:16 88:18 90:20 92:8 207:4,11
**independence**
126:17
**independent**
104:18
**index**
41:23 51:12 74:10 134:6,21
**individual**
58:9 106:22 110:12
**individuals**
164:24 175:1
**info**
208:5 209:12
**informal**
177:4,6 218:6
**informant**
208:5
**information**
31:22 62:15,17 64:1 68:22 95:16 96:12 98:7,10,11 99:11,24 108:18,19 110:4,9, 19,24 111:2,10 112:5,16 113:12,23 120:4,10 146:8,17 157:8 161:19 166:14 172:15 173:17,18,19 179:12,22 204:20 206:22 207:16,19, 20,21 208:2,3,4,8,19 209:11,17 222:16 225:20 226:19
**informational**
208:24
**informing**
37:15
**initial**
74:19,22 75:1 98:14, 19 99:20,21 100:24 101:10,11,16,17 102:9 121:12 158:13,15,24
**initialled**
98:19
**initially**
107:15
**injuries**
104:8
**injury**
95:9
**innocence**
151:3 207:8 226:20
**input**
216:18
**inquire**
110:16 219:2
**inservice**
20:7,10
**inside**
164:19
**instance**
122:9 175:7 176:19 179:11,24
**instances**
161:4 165:17,18,23 217:5 233:17
**institution**
113:6
**instruct**
19:3
**instructed**
164:10
**instructing**
210:18
**instructional**
201:13
**instructions**
175:1
**instructor**
20:14 206:15 215:3
**instructors**
162:17,18 224:15 225:4,6
**instrumentation**
206:23
**intake**
58:1
**intent**
233:21
**intentional**
214:11,13 233:9 234:8
**intentionally**
233:14
**interaction**
164:16
**interested**
163:7 219:22
**interfere**
113:10
**internal**
36:23 78:13,23 79:11,16,19 81:15, 16 84:2 85:7,10 86:19 154:14
**internally**
113:18
**internet**
199:1
**interrogate**
165:15 166:11
**interrogated**
164:24 169:20 170:4 218:16
**interrogation**
33:1,4 87:18 92:11 104:7 114:23 115:2 162:2,6,9 163:14,18, 21 164:14 165:9,13, 20 166:1,23 167:3 169:1,5,10,12 170:8 206:22 209:6,7,10, 19 210:13 217:22 218:10 219:4,15 220:23
**interrogations**
33:19 89:3 90:23 115:3 172:13 218:5
**interrogative**
127:18

**interrogator**
167:1 170:7
**interrogatories**
5:19
**interrupt**
54:7 227:4
**interruption**
156:20
**interview**
33:17 166:11
**interviewed**
34:12 164:23
**interviews**
33:19 109:15
**investigate**
62:22 66:3 71:11 74:15 79:13,21 86:16,24 87:4 147:23 167:9 222:15 223:1
**investigated**
31:7 80:11,13 84:17 87:22 88:17 89:2,6, 15,23 124:21 151:2 187:6
**investigates**
87:7
**investigating**
32:22 58:6 60:13 64:8 66:17 68:10,12, 21,24 96:20,21,23 125:21 146:3 163:8 185:23 206:20 222:17
**investigation**
28:8 32:18,20 34:9 36:23 58:8 62:18 64:22,24 71:4 74:14 78:6,23 79:12,16,19 85:7,13,24 86:2,6,12 87:1,14 89:3 90:12 91:7 102:17 104:15, 18 111:5,13,20,24 113:11 117:9 125:4, 23 126:2,22 136:17 138:21 139:14 142:16,24 143:2,20 145:6 146:7,11 151:15 154:9,13,14, 15 162:9 165:22 166:5 167:7 168:24 169:11 172:16 173:19 175:8,17 176:17 182:5 186:1, 4,6 188:9,10 194:1 222:21 223:3,7
**investigations**
32:11,14,15,17 53:15 61:5,7,9 65:18 66:9 78:13 84:2 85:18 93:14 94:15 113:17 117:6 151:24 169:18,19 172:23 180:21 181:5,13,23, 24 185:16 205:13, 16,23 234:18
**investigative**
37:13 63:3 64:12 66:13 97:9 104:14, 16 105:9 106:19 109:4,5 114:22 116:2,21 126:6 128:24 134:22 136:15 138:16,20 140:17 142:15 152:21,24 162:1 172:19 190:11
**investigator**
116:23 127:19 135:15,18 151:19 160:16 161:2 207:2 209:11 210:9
**investigators**
60:9,15 105:12 107:17 135:3 141:21,22 151:23,24
**investigatory**
92:18 123:22 134:6, 21 138:6
**involve**
162:11
**involved**
32:9,10 33:6,11,20 36:21 87:8 112:16 126:1,3 135:21,23 136:2,7 138:3 152:1 185:6 188:10 189:5 221:24
**involvement**
32:13
**involves**
111:3
**involving**
114:3 230:18
**issue**
35:23 39:3 49:4 71:16 76:9 79:3 140:1 153:21 154:3, 6,7 164:9,10 197:4
**issued**
19:12 23:6 26:11 35:21 220:21
**issues**
71:16 113:18 196:12
**issuing**
12:8
**Item**
130:24

**J**

**jail**
210:10,19
**job**
34:18 35:3 47:4 63:16 65:17 67:14, 19 68:12 71:22 72:13 124:1 184:4
**jobs**
72:4
**John**
30:23 66:21
**joined**
126:22 187:19,23 188:4,6,14 189:18, 19
**judges**
60:19
**July**
42:6
**jump**
7:18
**jumped**
48:19 181:8
**Justice**
207:16 225:15
**justice's**
207:17
**juvenile**
57:19

**K**

**keeping**
47:19 51:15,16 55:1 57:14,22 70:3 99:6 105:10 107:22 108:13 125:15
**Kelly**
31:13 34:21
**killing**
237:15
**kind**
86:20 105:8 107:9, 15 118:3 120:7 161:7 212:17
**kinds**
18:2
**kit**
191:12
**kits**
93:24
**knew**
31:10 64:5 67:19,20, 21 89:21 109:20 120:2,3,4 130:18 137:19 143:20 164:2
**knowing**
116:9 180:24
**knowingly**
157:6
**knowledge**
29:18 58:17,18,19 60:7 61:6 72:3 88:1, 3,23 89:7,8,20,24 90:2,5,6 116:5 117:14,22 127:8 161:3 166:10 167:5 182:10 183:14 184:24 189:9,10,11, 13 190:2 210:7 230:23
**knowledgeable**
61:15

**L**

**lab**
61:9 130:19 131:16 132:10 188:19 189:23 190:24 191:6,7,11,13
**lack**
152:3 159:17 189:13
**language**
122:17
**lapsed**
137:16
**large**
124:13 159:1

**late**
27:1 78:18 79:5
**law**
17:8,16 18:5 27:10 38:3,11,15,18,24 39:2,6 40:12 53:17 58:22,23 62:6,9,12 69:5 70:6 93:1,7,9 94:6 164:2,11 171:1,5 207:17 228:20 235:20,22,23,24 236:2,3,7,13,14,16,19,21,24 237:17
**laws**
12:15 41:6 61:13 93:4 228:10 236:10,11,12
**lawsuit**
91:17,20
**lawyers**
39:1
**lead**
46:13 145:23
**leads**
109:11 142:15,20
**LEAPS**
207:13,14,15,21
**learn**
63:12 120:18 149:5,11,14 160:10,14
**learned**
53:6 60:9 63:7,17 65:20 66:5 67:24 68:4,5 107:9 124:6 142:16 148:18 164:16 172:15
**learning**
53:15 152:11
**leave**
52:8 74:11 101:4 120:15
**leaving**
110:4 215:4
**led**
28:16 111:5,13
**left**
30:24 31:3 66:11 98:11 110:17 116:3 120:17
**letters**
100:19
**level**
20:4 180:15 214:19 232:21
**liability**
211:7,12,21 212:5 213:5 214:3 217:2 231:15 232:3
**liable**
233:16
**license**
5:16 161:10,18 207:19
**Lichwala**
185:16,24 186:23
**lie**
235:24
**lieutenant**
16:6 28:20,24 29:3,22 30:18,21,23 32:19 33:6,7,8,11,13,16,17,22,23 34:5,13,22 179:13
**lieutenant's**
30:18
**lieutenants**
32:21 34:8
**life**
111:4
**likes**
113:7
**limited**
117:2,5 139:2,5 175:15 196:24 197:5
**lines**
32:8 103:9 105:9,13 107:16,19 108:7,16,17,21 109:19,21,22,24 110:3,9,24 119:5 120:1,2,21 127:13 153:5
**lineup**
173:13 175:6,9 176:19,21,24 221:8,12,18,21,23 222:4,6,8
**lineups**
220:23 221:4,6
**linked**
75:2,7
**Linton**
5:21 7:9,12 8:14,19,21,22 10:4,12,16,24 14:11,19,20 15:20 16:12,24 17:1 21:4,11,15,20 22:4,8,17 23:15,19 24:1,6,9,20,22 41:9,13,17,19,24 42:2,16,19 43:1,3,14,19 44:14,16 45:13,14,19 49:13,17 51:14 54:10,14,17 55:9,15 56:3,6,10,14,19,23 57:2,8 65:24 68:20 70:11 71:9 72:14 73:6,7 74:4 75:19,23 76:1,4,24 77:11,16 78:7,10 79:22 80:3,5 81:4,6,8 82:1,13,18,19,21,24 84:24 85:3,4 88:9,13,16 93:20 94:7 105:22 106:4,7,11 111:1 123:13,17 128:5,9,10 129:20 130:1,3 134:5,17 135:14 136:9 143:6,18 144:14,17,20 145:1,10,13 147:18,22 148:5,7,14 153:9,20 154:5 155:5,10,16,19,21 156:7,9,16,18,21,23 158:10,14,18 159:4 167:13,21 168:7,15,18,21 169:7,18 170:2,12 171:3,7,21 173:1,3 175:14,22 176:1,5,6 181:10,23 182:7,10,13,18 183:4 187:9,14 190:8,19,23 191:21,24 193:1,5,9,11 194:22 195:4,7,9,12,13 196:1,6,16,21 197:9,13,15,19,24 198:5,13,15,21 199:13 200:1,3,9,14,16,21 201:14,20 202:2,10,19 203:4,6,20,24 204:12,15,16 205:19 206:1 211:9,12,17,20,24 212:1,6,10,17,21 213:13,20 214:4,6 215:9,12,19 216:19 217:14,18 223:9,12,15 226:16,24 227:3,7,20 228:18,24 229:3,8,20 230:1,7,21 231:22 232:6,8 233:3,7,11,18,23 234:4,10 235:7,10,13 237:10,13,21,24 238:7
**Lisa**
22:21 75:4 216:6 232:2 238:8
**list**
47:23 48:1 198:21 199:2,24 225:18
**Listing**
198:19
**local**
206:15 207:18
**localized**
207:22
**locate**
204:18
**located**
120:5 187:15 192:12 204:19
**location**
133:18 146:15 190:10
**locations**
192:5
**locker**
107:13 192:10 193:19,24
**log**
105:7 106:20 117:24 118:4 146:24 169:16 192:22 193:15
**logs**
106:11,16 108:20 170:21
**long**
6:18 11:12 46:17 47:18 55:10 58:23 66:15 86:11 92:23 94:20 100:11 118:8 182:22 196:5 234:14
**longer**
15:1 46:21 72:7 150:24
**look-alike**
222:5
**looked**
135:4 227:16

**lookouts**
127:17
**looseleaf**
27:3
**lost**
95:6 155:18
**lot**
12:18 36:20 53:13 60:11,14 71:3,14 137:8 146:20 148:17 151:6 179:15 198:16 219:14,23
**loud**
229:9
**LT**
161:18

**M**

**made**
17:5 31:23,24 33:24 34:3,11 40:2 46:13, 14 67:5,6,10 86:14, 19,23 95:10 98:20 99:9,20 104:13 116:24 118:1 123:2 140:10 142:5 147:13,18 148:1 149:2,11 160:9 178:2 180:8 181:24 204:1 217:1,11 222:6,13 237:17
**Mae**
185:16,24
**mail**
26:16,24 27:3 35:24
**mailbox**
26:16
**maintain**
85:21 93:10,16 94:4 126:17 163:13
**maintained**
12:5 57:18 94:2,16 118:5 119:6,8 139:15,22
**maintaining**
12:3 85:18 94:1 105:1,18 222:21
**maintenance**
123:22 124:4
**major**
73:13 98:21
**majority**
60:11
**make**
7:1 16:4,8 18:17 21:22 23:15 36:12, 21 37:14,16 38:19 39:7 41:13 49:13 55:5 56:6 64:9,19 68:7 70:24 72:2,9 82:10 84:11,22 90:4 99:20 106:1 110:23 112:12 120:14 125:18 130:24 141:8,22 142:14 143:8 148:7,8 152:11 157:17 160:10 164:7 166:20 177:12,16,24 182:3, 16 194:24 216:19 218:8 219:16 220:3
**makes**
230:9
**making**
37:5 62:2 70:4 108:4 132:11 166:21 218:13 233:20
**management**
18:21
**mandatory**
163:7,9
**manner**
37:23 40:8 78:19 145:13 166:12 169:20
**manual**
198:23 203:11
**March**
46:16
**Marchand**
185:16,24
**mark**
10:12 193:2
**marked**
10:14 193:4 198:20 211:8
**Mary**
185:15,24
**Mass**
41:6 47:12 58:23 61:13 62:12 236:10, 11,13,21
**Massachusetts**
47:20 48:20 93:2
215:15 224:11 228:11 236:14 237:8,17
**master's**
179:14
**material**
93:15 203:10 204:1 209:2 213:1
**materials**
177:7 190:12 198:8 200:24 202:15 204:4,10 213:7 225:5
**matter**
17:23 25:22 66:16 98:16 120:7 122:19 128:8 148:11,12,13, 14 213:11 231:1
**Matty**
66:7
**mayor**
46:12 48:7
**Meaning**
167:16
**means**
131:17 180:13
**meant**
213:9 215:1
**Meara**
35:8,9,10,18 46:2,6 67:23
**media**
173:17
**medical**
95:8
**meet**
68:17 137:10 138:5 189:6
**meeting**
39:15 189:4,19
**meetings**
39:14 136:14,22 137:5,6 138:1
**member**
20:8 25:11 27:10,18 85:20 111:23 112:4, 16 150:11
**members**
25:13 27:14 39:10 48:19 51:20,21,22 72:20 73:2 228:8
**memo**
13:17
**memorandum**
12:12
**memorandums**
12:21 13:13 35:17
**memorialize**
17:17 142:15
**memorialized**
14:10 85:14,16 154:15 161:21,22
**memorializing**
218:4,10 221:4
**memos**
13:13
**mention**
40:15
**mentioned**
14:11 27:13 28:10 29:6,7 38:2 54:18 96:22 114:5 123:17, 20 124:17 138:16 170:16 171:2 174:2 194:19 204:17 217:19 218:19 219:12 220:9 224:5 235:19
**mentioning**
81:11
**mentions**
82:13
**met**
31:11
**method**
176:6
**methodologies**
59:22
**methodology**
53:13
**mid-'80s**
8:4 34:22 175:3
**mid-'90s**
14:24 35:10
**mid-1980s**
12:11
**midnight**
31:18 63:21 111:13
**military**
12:20
**mind**
6:1 41:12 107:21 174:22

**minor**
99:13
**minors**
220:5,23
**minute**
10:16 21:2 24:19 128:23 215:18
**minutes**
49:12 54:7 158:17
**Miranda**
163:17,21 164:2,6,8, 10,14,18,19,21 210:12,16 218:12
**Mirandized**
165:1
**mirror**
176:23
**misconduct**
72:17 73:12 78:2,11, 12,16 79:4 80:13 81:16
**missed**
232:2
**missing**
98:8 110:11 120:12 179:12,16,17
**mistake**
62:2 99:9 120:14
**Mm-hmm**
232:14
**Model**
130:24
**models**
38:10
**modernized**
12:18
**modification**
190:9
**modified**
27:17
**moment**
43:5 145:12
**monthly**
62:6,11
**months**
13:12 66:24 206:12
**morning**
31:19 32:6 39:15 191:10 234:14
**morphed**
105:8
**motion**
196:11
**motions**
5:11
**motor**
234:8
**move**
77:20,22
**moved**
139:19 189:15
**movement**
190:10
**moving**
9:6 26:5
**MP**
175:17
**MPTC**
162:17 224:5,8,10, 20 225:5,6
**mug**
174:16 176:11
**multipage**
82:7
**multiple**
125:13 127:24 204:14
**Municipal**
162:18 163:10 224:10
**murder**
93:13,14

**N**

**named**
203:17
**names**
66:20 119:4 122:23 126:6 221:8
**Narcan**
17:10,12
**narcotics**
33:11 113:16 117:6 138:10
**narrative**
103:18,20
**Natalie**
21:18 22:1,9 23:7,11 75:15
**national**
48:5 207:16,20
**nationality**
221:17
**natural**
54:6
**naturally**
41:6 166:16
**NCIC**
207:13,15
**necessarily**
25:17 70:20 83:19 89:5 103:8 111:12 148:15,23 161:24 180:10 203:13
**needed**
17:11,14 27:6 47:7 68:22 69:5,7 71:22 87:12 98:8,13,14 108:19,24 110:24 120:3 125:20 166:11,23 171:12 177:8,13,23 178:13, 14 179:20 192:8 219:17,21,22 232:16
**negative**
184:16
**negligent**
214:18 215:1 232:20 233:2,5 234:7
**negligently**
233:22
**networks**
207:18
**newer**
38:10
**newsletter**
62:6
**night**
31:14,15,16 32:1,7 63:23 96:6 103:9 105:9,13 106:20 107:16,19 108:7,13, 17,21 109:11,19,20, 21,24 110:3,4,9,12, 17,23 111:2,7,15,20, 24 112:1,6 114:6 115:8 118:4,15,18, 21 119:1,5,7,16,24 120:2,11,19,21 127:13 146:24 151:6 153:4 169:17 218:14
**nights**
29:13
**nine-ish**
199:8
**noninternal**
41:1,3
**nonsuggestive**
222:6
**normal**
151:14
**Notary**
5:17
**notate**
109:10 112:9
**notated**
103:6 112:13 114:6, 9 193:19 219:6
**Notating**
104:22
**note**
215:22
**note-taking**
104:20,23,24 114:19 121:14 162:5,12 173:11
**notebook**
105:2,7,11,12,16,19 106:22 107:7 108:5, 15 118:11
**notebooks**
107:13
**noted**
103:14,17,18 151:6, 8 218:14
**notes**
105:11 114:23 115:1,3,5,6,12,13, 14,16 116:11,14,17, 20,22 117:8,11,19, 21 118:7 119:11,13, 20,22 143:2 162:2 163:14 169:16 178:24 190:13 194:24 195:8 197:21
**notice**
7:5,13 168:6 175:12
**noticed**
42:13 81:16 120:12 168:13
**notified**
83:15 84:1 103:19
**notify**
13:5 53:18
**number**
57:5 82:23 83:1 85:22 120:15,17

129:19,20 131:1 132:13,16,21 133:12 158:6 165:12 193:2 198:2 205:3 211:10 214:5 224:3 225:7 231:4,6 234:2
**numbers**
75:16 108:24 132:18 133:1,18,23 134:1 158:20 193:5 211:10

**O**

**O'MARA**
66:22
**oath**
6:1,2 55:16 61:12 70:2 73:18,20 76:16, 18,20 77:1,4,5 96:17 123:18 155:2 159:14
**obey**
228:8
**object**
6:16 43:11 168:3 199:12
**objected**
196:4
**objecting**
199:14
**objection**
13:20 14:15 15:11 65:9 68:15 70:19 71:23 110:14 134:4, 15,24 135:24 144:9 153:2,13 154:1 167:11,18 169:14,22 170:9 213:6 216:7, 14 226:16,24 227:20 228:18,24 229:3,8, 20 230:1,7,21 233:3, 7,11,18,23 234:4,10
**objections**
5:10
**obligation**
140:1,11,14 141:2,5, 11 147:8 226:12
**obligations**
140:18,21 195:15,16 227:11
**obtain**
67:21 68:13,16,22 70:13,16 135:12 139:22
**obtained**
31:22 70:12
**obtaining**
68:21 69:14 160:17, 21 170:13
**obvious**
110:5
**occasion**
125:11 178:13 186:23,24
**Occasionally**
116:19
**occasions**
116:22 175:6
**occur**
114:2
**occurred**
113:22
**occurring**
121:18
**offense**
104:1
**offer**
204:13
**offered**
162:16 163:10 206:4,16
**Offering**
229:5
**office**
9:17,18 12:6 18:14, 15,16 19:5 25:5 26:12 27:4 28:11 35:18 39:13 50:7,16 51:5 53:21 54:2 58:10 59:6,12 61:12 62:1,17 64:13 66:7 70:3 73:18,20 76:17, 18,20 77:1,4,5 83:10,14,15 87:21 96:17 102:19 108:9 118:10 124:7,14 130:23 136:12 159:14 169:24 171:13,14 187:23 188:1,3,18,21,23 189:3,16,21 196:14 225:16 226:7 229:15,24 230:16,20 231:9
**officer**
5:22 17:4,20 18:24 19:10,11,13 25:18, 19 26:15,20 28:18 29:1,11,15,23 30:6, 11,12,14,15 33:23 34:15,16,18 36:1,19 50:6 51:4 63:8,9 66:21 68:9 70:22 72:16 73:12 78:2,20 79:4 81:12,18,20 83:17,20,23 84:1,10, 11 86:15,22 87:3 89:23 91:24 97:17 101:11,16 102:24 103:3,6 106:13,18 108:5 111:10,16 112:17 115:14,18 116:12,17,20 118:12 119:1 122:10 130:19 131:4,7,8 133:2,3,8 134:22 141:24 142:10 150:11 164:5 165:21,24 166:2,4 169:24 179:9 183:17 184:15 191:9 206:6, 7,14 214:10 234:6
**officer's**
79:6 83:19 111:4,23 112:4 115:6,12 117:11 140:1 143:17 169:16
**officers**
18:2,22,24 19:3,4,7 20:1 28:11,13 29:4 35:22 36:11,20 37:6, 24 52:8 57:14 60:3, 7,10,24 61:2,4,8,10, 19,23 62:21 63:5,20, 21 64:16,18 65:7 66:2,6 67:3,11,17,19 69:1 70:11,12,13,15, 16,23 71:21 72:2 81:9,14 86:8 91:21 92:4 95:2,5 96:20, 21,22,23 97:3,9,16 98:1,5 102:7 103:14 105:1,2,18 106:15, 16,18,21,22 107:3 108:6,11 109:2,21 113:17 114:13,22 116:2 117:18 118:20 119:10 121:23 122:15,16 128:24 130:16 136:7 139:5 140:10,14,16,17,20, 22,23,24 141:2,6,11 142:5,14 143:1,19 152:24 153:4,11,15, 22,23 162:1,5,7,12 163:1,3,13 165:12, 15 166:13 167:1 172:19 173:5,8 178:9,13,16 179:3 183:16,19 184:6,7 185:3,7,12,13 189:7 193:23 195:14 206:5 207:1,10 208:7,15 212:5 213:5 221:13 222:3,9,10 224:9,14 225:22 228:16 230:5 234:1,23
**officers'**
108:2 227:11
**official**
18:18 59:21 116:17 119:19,22 120:11 141:14,18 217:21
**officially**
211:1,3
**older**
12:14,17
**omissions**
214:19 215:1,4 217:1,5,10 232:20 233:5,10
**omitted**
233:14
**on-the-job**
60:12,22 71:15 123:23 124:2 148:19
**ongoing**
54:3
**open**
22:18 32:14,15 94:14,15 95:3,20,21 104:10 154:9
**operated**
53:7
**operates**
48:15
**operating**
102:4
**opinion**
209:22
**opportunity**
70:23 228:6
**opposed**

15:15 233:9
**optional**
162:23
**order**
12:4,5,12,22,23 13:5,8 18:18 19:11 21:22 69:6 74:8 158:6
**ordering**
238:4
**orders**
9:9 12:9,21,24 13:1, 7 18:17 21:5,7 24:4, 12,14,23 25:9,10 35:16,17 40:10,11, 17 41:15,20 42:3,5, 12 43:4,6,20 220:21
**ordinance**
228:10
**organization**
201:22
**orient**
203:21
**orientated**
69:13
**original**
18:13 98:10 105:17 130:13 178:7 179:24 238:5
**originating**
11:15
**other's**
6:9
**outdated**
11:19 12:15
**outer**
128:1
**outline**
231:13
**outlined**
214:11
**outlines**
214:1
**outstanding**
136:19
**overnight**
83:22
**oversee**
46:18
**overseeing**
29:8
**oversees**
28:17
**overview**
205:12 212:18
**owner**
131:3

**P**

**p.m.**
238:14
**packed**
139:19
**pages**
199:17
**paper**
31:24 80:16 113:20
**paragraph**
214:9
**parent**
219:22
**part**
32:17,20 34:10 40:6 70:6 71:2 76:6 77:4 106:5 116:17,21 118:10 151:14 164:10 180:2 200:5 201:10 205:15,23 206:1,3,4,11 210:17, 23 211:1,14 215:8,9 216:2 229:18
**participate**
221:12
**particularized**
15:5 19:23
**parties**
5:3
**partner**
31:20 33:8 64:17
**parts**
199:8 229:17
**Parylak**
183:3
**pass**
185:1 195:17
**passed**
12:15 39:21 94:18
**passing**
50:16
**patience**
67:2
**patrolmen**
13:3 33:20 34:24 35:1,2 36:12
**Paul**
12:10 27:12,14 28:2 39:19
**Paula**
35:7,9,10,18 46:2,6 67:23
**pause**
6:15 227:4
**PDF**
201:1
**Pearl**
192:13
**peel**
96:9 130:12
**pen**
179:14
**pending**
6:19
**people**
8:15 13:24 14:1,7 16:5 17:13 33:12,18 38:8 48:12 61:4 65:18,20,21 66:8,14, 19 70:3,4,5 72:12 80:20 87:8 93:10 95:4 101:6 105:8,13 109:18,20 113:2,4 148:23 158:10 164:7 170:3 210:2,9,19 221:13,16
**people's**
207:19
**Perfect**
8:19,21 41:19 203:4, 5
**perfection**
64:5
**perform**
228:12
**period**
8:9 21:18 23:7 26:6, 9 43:7,19 45:3 52:20 58:13 59:18 78:3 83:3,4,9 85:9,20 86:9 87:1,20 89:10, 16 90:24 93:5 94:5, 20,22 96:1 102:7 113:21 121:5,20,22 127:23 132:18,22 143:24 149:24 150:7,9 152:7 160:1 176:7 182:2 183:8 184:20 185:8,11 186:11 204:2,6 205:11 212:22 234:22
**permanent**
13:1
**permission**
139:10
**Perrot**
28:8 91:18 117:9 119:6 125:23 126:1, 22,23 137:23 175:7, 13 176:16 186:5,10 193:18 194:1 203:8 230:19 231:1
**Perrot's**
176:9
**person**
13:14 28:16 48:6,9 53:23 63:7 68:10 79:13 81:9 83:13,20 96:5 101:9,15 112:13 113:10 132:10 145:7 146:4, 8,14,15,24 151:19, 22 161:7 165:19 166:8,10,11,19,22 174:19 191:8 209:10
**person's**
209:12
**personal**
15:15 58:19 65:3 88:1,3,23 89:8 90:6 106:17 111:4 115:6, 10,12,14 117:11,22 127:8 161:2 181:1 182:10 183:14 189:9,10,11,13 190:1 194:9,15
**personalized**
15:21
**personally**
112:21 194:11
**personnel**
35:17 37:15 40:15, 16,17 49:1 93:11,15
**persons**
130:23 208:6
**pertain**
9:5 95:16 117:6
**pertained**
58:9

**pertaining**
58:14 172:11
**pertinent**
32:4 87:10 120:10 125:20 127:12,19
**phone**
31:23 108:24 164:7 218:12 219:12,13, 16,18 220:3
**photo**
175:19
**photographic**
174:14
**photographs**
173:18,23 174:7 175:16,18 190:13
**photos**
174:18 175:4 221:6
**phrase**
167:23
**physical**
188:22 190:12
**picking**
199:19
**piece**
31:24 38:9 113:19 134:13,18
**pike**
149:1
**Pikula**
39:1
**pink**
128:2,10 132:3
**pink-colored**
130:14
**place**
11:8,10 59:8 94:7 125:9 136:10,11 160:17,20 165:3,8, 11 171:17 187:15 189:1
**placing**
228:13
**plain**
35:2 37:12
**plastic**
131:19
**play**
27:1
**pocketbook**
186:19
**point**
8:13 12:2 14:14 26:24 36:3 53:22 54:6 55:2 63:9 72:24 74:17 126:15,21,23 149:4 168:12 175:2 224:4 227:15 230:11 236:8
**police**
7:19,21 8:23 9:22 10:1 11:8,14,21,24 14:3 16:13 17:4,20 18:12 19:22,24 20:8, 10,22 25:1,11,14 28:15,22 29:1,3,12 35:22 36:9,15,17 37:16 38:21 40:13 41:2,4 42:21 43:7,23 44:2,6,10,18,24 46:15,18,19,24 47:11,24 49:2,7,20 50:1 51:22 57:12 58:15 59:5,10,17 60:5,24 61:2,9,18,19 62:19,20,24 64:14 66:5 68:9 69:10,12 70:2 71:14,20,21,24 72:4 73:11 77:17 81:9 84:4,6,13,19 85:24 86:13 94:8 95:1 96:22 106:17 107:11,21 109:17 111:10,22 112:3,16 113:4 114:11 116:4, 12 119:10,11 121:12,18 124:10,22 125:12 138:18 139:4,12,24 143:2, 17 148:1,17 150:8, 10 153:10,22 154:9 159:16,22 160:6,10, 13 161:7 162:15,16, 18,19 163:10 167:9 168:1,22 169:3 170:14,24 171:9,24 172:20 173:5,6 174:5 177:18 178:3, 5 180:23 181:6 182:18 183:16,17 184:6,7,15 188:19 189:1,15,23 190:1, 17,20,24 191:3,6,7, 11,13,15,16 192:1, 12 197:1,3,6 205:22 206:2,3,11,13 208:7 209:18 210:24 213:5,21 220:22 221:15 222:3,9,10, 13,24 224:9,10,13, 14,22 225:22 226:6, 10 227:10,11 230:4 231:9 234:1,23 236:9 237:8,19
**policies**
7:19,22 8:10,11,23 9:2,4,9 11:8 13:18, 22 14:5,9,12 15:5 16:14,22 17:2,5,17 18:6,7,11,16,23 19:6,8,24 20:5,14, 17,19,21 24:10,11, 15,22 25:6,9,23 26:10,11 27:7 35:5, 15,16,20,21 36:8,10, 15,18 37:4,7,15,17, 19 38:20 40:10,13, 15,16,21 41:1,3,5,7 42:12,20 43:6 44:1, 5,10,24 49:5,18 50:2,15,22,24 51:3 53:19 55:19 58:24 59:16,19,20 71:18 72:15,16 73:10 78:1 80:10 85:6 92:20 115:13 147:24 157:20 165:11 167:2,5 168:22 172:4,5,11 173:11, 16,21 177:1,7,10 203:6,7
**policing**
12:17 148:24
**policy**
17:11,14 18:13 19:12,16 26:15,17, 20 27:6,17,23 35:24 36:13,20,21,23 38:2, 5,8,17 40:2,3,4,5 50:5,10,11,13,14,18, 20,21 51:1,4,8,14, 19,24 52:1,3,15,21, 24 53:2,3 54:4,19, 22,23 55:2,22 57:10, 11,22 58:11,14,17, 22 59:2,7,9,12,21,24 60:4,23 63:18 65:14 71:12 73:1 79:9,10, 20,23 80:7 93:6 94:7,10 102:2 104:20,24 105:15 112:15,18 115:21,23 116:8 117:7 123:21 124:1,3,5,8 140:1 141:14,18,20 142:11 147:8,13,19,21 148:2,8,22 150:15, 17,21,22 151:9,10, 12,13,17 152:3,17, 19,20 154:18,20,21 155:6 156:24 157:23 159:17 160:17,20, 23,24 163:16,19 165:3,7,8 166:6 170:21,22 171:5,17 172:14,18 173:4 174:6,8 175:21,24 176:1,3 177:3,4,13 203:13 211:7 217:21 218:1,2,3,6,18 220:9,11,13,15,17, 18 221:6 222:14,20, 23 225:11
**policymaker**
44:9
**policymakers**
44:17
**policymaking**
44:20
**politics**
47:19
**poor**
152:21
**pop**
25:24
**portion**
58:8 205:22
**POS**
40:17
**position**
48:7 89:19 183:12
**posted**
108:8
**posts**
105:3
**potential**
109:13
**potentially**
159:19

**power**
18:20
**practice**
38:13 60:5 92:23 94:12,13 142:1 161:1 163:23 164:1 178:17 218:7 221:19 222:14,20 226:5
**practiced**
164:19
**practices**
60:3,12 62:13,18 124:7
**preferences**
174:14
**Prekop**
185:15,24
**prep**
210:1
**preparation**
168:14 199:6,20,23 200:4,7
**prepare**
9:2,15 11:2 20:23 64:22 65:22 67:17, 21 126:14 142:9 195:24 197:12 198:9 204:23
**prepared**
7:6 208:17
**preparing**
61:6
**present**
43:21 44:7 53:23 165:12 166:16 195:21 226:4
**presentation**
199:20 200:5
**presented**
141:10
**presenting**
53:22 142:8
**preserved**
40:3 221:7
**press**
100:12
**pressure**
113:10
**pretrial**
136:6,9 137:4,5 138:1,4,12 177:21 189:4
**pretty**
7:3 33:20 65:17 110:1 129:8 130:18 131:1 136:5 178:17 236:4,11 237:1
**prevention**
29:19 33:10 34:20 60:1 61:8,20 62:10 63:2 66:22 109:8 124:14 138:22,24 139:3,6 173:9,15 185:17 186:2,8 187:15,19 191:8 192:2,9,11
**previous**
5:23 32:2 40:3,4 210:17
**previously**
47:7
**primary**
58:1
**printer**
10:22
**prior**
138:9,13,14 140:13 149:18 161:17
**priority**
69:15,17,18 70:9
**prisoner**
95:9
**prisons**
161:15
**probable**
147:2
**probation**
184:18,23 185:4
**probationary**
184:5
**problem**
153:7
**problems**
149:5,12,14 152:4,8, 12 159:19,23 160:7, 11
**procedure**
17:11,14 18:13 19:12,16 26:18,21 59:7,9,10,14 101:3,8 102:4 117:1 141:22 145:14 148:19 150:23 151:15,18 157:4 164:13 218:9, 11 221:2,3,23
**procedures**
14:6,9 16:22 17:2,6, 17 18:6,7,11,17,23 19:6,8,24 20:6,15, 17,20,21 24:11,15, 22 25:6,10,24 38:20 60:19 91:2 92:13 172:6 196:20
**proceed**
34:4,9
**process**
27:21,22 37:20 60:22 79:14,18 84:15 85:10 138:7 183:21 184:1 192:18
**Processing**
200:7
**produce**
200:18
**produced**
21:14 23:8,10 177:2, 8,13 198:11 199:17 200:19,22,23 202:8, 13
**product**
30:4,7 61:23 62:1
**production**
5:15 159:2 178:3,4 190:10
**progress**
108:9
**progressed**
17:15 100:11
**progressing**
9:8
**prohibit**
228:16
**prohibited**
114:20 156:1 157:1, 20 159:18 160:14 235:15
**prohibiting**
52:24 152:17 155:7
**promise**
223:16
**promoted**
48:1
**promotion**
48:20
**promotions**
48:18
**promulgated**
26:10 27:5
**proper**
33:14 102:20 216:7
**properly**
52:9 64:11,12
**property**
130:17,20 131:7,8,9 132:17 133:2,13 134:18 192:21
**prosecuting**
130:22 135:7
**prosecution**
160:16 166:13 174:12
**prosecutor**
63:15 64:3 68:18 69:8 86:21 87:11 135:6,16,18,21,22 136:1,4,23 137:1,22 139:10 141:24 143:13,22,23 145:15,19,22 146:2, 9,17 149:7,17 151:8 153:20 177:21,23 178:15,22 179:1 189:4,18,19 190:15, 22 220:11 230:8
**prosecutor's**
59:5 62:17 64:13 124:6 136:21 187:23 188:1,3,18 189:2,20
**prosecutors**
53:8,9,12 60:3,18 61:24 68:2 136:14 137:9 138:8,11 141:7 142:20 153:6, 18 174:13 177:2,8, 14,18 178:6,10
**protective**
95:4 104:5
**prove**
87:2 136:24 146:16 151:2,3 236:1
**provide**
16:13 19:23 172:1
**provided**
42:5 162:14,20 164:6 178:9 212:5 221:16
**providing**
163:20

**provision**
40:12
**public**
5:17 81:17 95:11
**pull**
73:4 74:5 211:19,20 231:24 232:2
**pulled**
21:21 133:24
**pulling**
21:4
**purpose**
126:7
**purposes**
213:9,12
**put**
7:4 15:11 18:23 36:2 55:21,22 62:6 63:3 64:22 66:10 69:6 95:4 99:19,23 104:14 105:24 109:16 111:7,15,20, 24 112:1 113:19,23 116:24 119:4 120:17,18 127:10 146:12 147:2,4 151:7 187:1 188:11 231:21 232:4 238:4
**putting**
60:14 66:3

**Q**

**qualification**
68:17
**qualified**
48:6
**qualify**
72:9
**quarterly**
183:18
**question**
5:11 6:11,14,19 15:12 19:1 23:7 43:15 55:10 64:19 68:8 84:18 107:20 110:7 144:10 157:17 168:4,8,11,19 181:17 182:4 201:14,17 203:21 212:19 220:20 222:12 234:13 235:11 237:4,11
**questioned**
170:4 196:19
**questioning**
209:7
**questions**
6:9,21 7:18 8:6,8 26:4,5 49:22 58:12 170:1 194:23 195:5 198:6 201:8 216:14 217:19 224:3 225:7 227:13 232:20 235:8 237:22
**quick**
54:15 182:14 194:23 212:18
**quickly**
66:5,8 111:3 120:18 164:16
**quizzed**
15:24

**R**

**race**
174:17
**raid**
33:15
**raids**
33:16
**raise**
153:21 154:7 197:4
**raised**
154:3,5 196:12
**ran**
34:12 71:19 72:1
**random**
199:19
**rank**
28:16,18,21,23 29:7, 10
**ranked**
234:24
**ranking**
29:23
**rape**
93:17,20,22,24 151:24 172:16 175:17 191:12
**raped**
186:23
**rate**
234:24
**rated**
234:24
**rates**
235:3
**ratify**
12:13
**re-inventory**
134:13,16
**reach**
85:11
**read**
5:4 19:11,13,16 22:16 26:18,20 36:1 129:19 197:8 209:17 232:23
**reading**
209:8 218:17
**reads**
137:1
**real**
146:11 182:14
**realize**
49:10
**realized**
126:5,9,11 130:1 148:23
**reason**
19:18 38:4,5 69:4 71:9,12,13 86:7 110:17,18 111:1 132:24 134:13,18 153:14 170:6 197:14 204:16 219:10
**reasonable**
196:20
**reasons**
70:7 71:7 234:2
**recall**
26:12 78:3 113:21 121:16 122:9 128:17 163:22 175:10 178:16 220:4 225:11 230:12 234:20 236:21
**receipt**
130:17 132:17
**receipts**
127:21
**receive**
15:5 62:11 64:10 104:8 107:3 129:3
**received**
9:23 62:5,21 107:5 121:23 122:10,15 129:4 131:18 162:13 184:15 204:19 206:13 214:3
**receives**
83:24
**receiving**
83:21 130:19 131:7, 8 132:11 217:3
**recent**
20:14,16 176:22
**recently**
140:2,3,4
**recess**
55:14 123:16 197:23
**recognize**
42:3 73:8 205:4 212:1
**recognized**
174:19 176:11
**recollection**
97:22 194:9,15
**record**
7:4 10:3,5 15:11 21:1,3 24:7,19,21 42:24 43:2,16 45:10 49:14,21 77:12,15 80:6 82:24 85:4 123:10 129:19 154:24 155:20 156:21 161:9 169:11,12 180:8 197:16,18 202:7 203:1,7 204:8 215:20,22 216:5,9 224:7 238:4
**recording**
168:23 169:9 173:16,17 201:10
**recordings**
169:4
**recordkeeping**
58:15
**records**
29:20 57:11,12,17, 18,24 58:1,7,24 93:9,10,11 99:5 102:16 104:19 123:11 129:10,14 130:3,4,14 131:13, 20,21,23,24 138:18 139:20 201:9

204:18,19 208:4
**recounting**
14:16
**recruit**
206:13
**recruits**
20:6 224:13
**red**
179:14
**reduced**
59:20
**refer**
8:8 13:24 16:2 19:1 35:3 57:10 60:22
**referred**
11:2 139:20 225:8, 17 226:18
**referring**
23:24 24:12,23 50:11 82:15 85:7 93:8 128:21 135:16 155:24 156:24 157:9 158:5 193:15 198:3 199:16 225:24 235:22 236:2
**refers**
57:11
**reflect**
11:1
**refresh**
97:22
**refrigerated**
94:1
**refrigeration**
192:8
**refrigerator**
192:8
**reg**
86:11
**regard**
227:11
**regs**
18:1 25:23
**regular**
225:1 238:5
**regulated**
86:11
**regulation**
13:6 16:22 78:21 105:1,17
**regulations**
9:4,6,12,24 11:10, 13,18,20,23 12:3,8, 14,16,20 14:5,9,18, 20 15:3,6,24 16:3,15 17:2,3,9,18 18:8 20:6 21:6,8 24:2,3, 10,24 42:8 47:13 49:5 61:11 105:6 107:1 228:1,9
**rejected**
179:6,8,11,19 180:1, 9
**relate**
225:22
**related**
42:13 121:19 122:10 123:1 126:21 160:7 182:6 185:15 186:4, 5 194:3 215:24
**relative**
74:12 111:5 191:20 231:14
**relay**
60:6
**relayed**
112:6,7
**relevant**
23:13 110:9 120:9 226:11 227:18 228:3 234:22
**reliance**
235:16
**rely**
42:9 191:18
**relying**
152:24 153:8,11,16, 23
**remained**
188:16,17,19
**remedial**
122:1,4,15,24
**remember**
6:7 15:22 54:4 62:7 72:21 99:6 108:4 124:5 126:2 130:11 194:11 206:14 210:14,16,18 212:13 214:21 223:5 227:13 231:15
**remembered**
97:19
**remind**
6:15 90:14 123:18 141:7
**reminder**
6:1 55:16 58:12
**remove**
52:5 217:15
**removed**
192:24
**renew**
7:7
**repeat**
6:12
**rephrase**
14:19 134:17
**replace**
17:18
**report**
31:15 50:2,3,8,9,12, 15 55:22 58:10 79:7, 9,11,15,18,21 95:20 96:10,13,18 97:10, 18,24 98:1,2,6,9,10, 13,15,20,21,23 99:1, 2,5,7 102:11,13,14, 17,18,21 103:15,16, 19 113:4 114:10,13, 14 119:22 120:11,24 121:3,7,19,22 122:1, 4,11 123:2,6 127:15 157:10 173:5,6,12 179:11,13,16,19,24 180:1,2,8,12,13,16 184:21 190:12 237:8
**report's**
157:2
**reported**
65:18
**reporter**
6:5 24:8 223:24 238:3,8
**reporting**
151:16
**reports**
30:9,11,15,24 50:4,6 51:5,6 57:14,15 78:22,24 79:1,12 93:12 94:24 95:2,3, 5,7,8,9,10,11,13,15, 18,21,24 96:3,5,6,7 97:24 99:3,4,7 102:22 103:1,2,11, 13,21,22 104:1,2,3, 4,6,8,11,12,13,15 108:23 119:19 121:9 122:18,21 142:15 143:2 157:3,5,9 172:20 173:12,13 174:3 179:4,6,8 181:22 182:6 229:2 237:19
**representation**
85:6
**reprint**
22:2
**request**
81:10 139:9
**requests**
159:1
**require**
165:24
**required**
20:9 72:5 95:21 103:21,22 104:2,3,4, 6,8,11 106:12,24 107:2 108:19,22 109:2,10 114:22,24 116:2,8 118:20 119:21 120:8,18,21 121:6,8 163:1,13,15 165:12 166:4 167:24 226:21
**requirement**
102:9 107:22 119:16,18 166:7
**requirements**
120:20 224:18
**requiring**
150:17,19 151:11
**reserved**
5:11
**resign**
115:18
**resolved**
112:14
**resources**
168:1,17
**Respectfully**
121:10
**respective**
5:3
**respond**
6:14 103:23
**responded**
18:5
**responding**
199:21

**response**
159:1
**responsibilities**
30:19 47:5 52:16,18 97:4 205:24
**responsibility**
34:14 79:7 125:16, 18 126:8
**responsible**
29:23 30:1 31:5 37:10,11,12,13 48:24 57:13 110:23 125:15 126:3 127:3 167:4 171:14 179:3
**rest**
37:24 217:11
**result**
214:10,16
**resulted**
180:21 181:13 182:1
**resulting**
181:5
**retain**
58:24 94:13 116:11 117:18,20
**retained**
92:24 115:7 116:8
**retaining**
58:22 93:4
**retention**
92:21 93:1,7,9,14 94:6,9,23 124:8 170:18,23 171:5,7, 18 172:1 190:9 229:13
**retire**
115:18
**retraining**
36:21 121:24
**retype**
100:3,20,21
**review**
7:13 9:1,3,15 20:5, 21 30:11,14 31:4 32:7 83:17 84:6 106:16 139:8,9 155:21 194:24 195:8 197:21 198:8 212:11 214:13 216:23 224:24 225:3 228:6
**reviewed**
9:3,4 23:8 42:13 88:11 199:6 201:16 203:2 204:23 219:5
**reviewing**
109:21 179:4 212:13 218:19
**revised**
11:19 12:1
**rid**
118:7,10
**rights**
91:20 214:6,10,15, 19 215:10,15,24 216:2,20 217:2,7 218:12 232:21 233:16
**rise**
214:19 232:21
**Robert**
39:20,24
**role**
136:21 143:17 224:8
**roll**
19:11,13,15 26:18 29:15 36:1 100:12, 13 108:1
**room**
57:12,17,18 58:1 99:5 129:14 131:23 139:20 148:20 165:20 166:17,23 169:10,23 192:12
**routine**
117:1
**RPOD**
10:9,10 129:24 193:6 205:3
**rubber**
188:12
**rule**
9:12 13:6 73:2,8,17 74:11 76:22,23 78:21 80:1,4,6 81:21 82:1,8 85:1,4 105:1, 17 106:5,7 119:15 146:7 151:1,4 155:15,17,24 227:23 228:7 235:14
**ruled**
146:13,22 147:6
**rules**
5:24 9:4,6,24 11:10, 13,17,19,23 12:3,8, 14,16,19 14:5,8,17, 20 15:3,23 16:3,21 17:2,3,9,18 18:1,8 20:6 21:6,7 24:1,2, 10,24 25:1,23 42:8 47:12 61:11 105:6 107:1 228:1,9
**rumors**
113:6
**run**
17:5 48:9,17 161:15, 21
**Ryan's**
66:7

**S**

**safe**
69:14 70:3,4
**safety**
228:13
**sat**
148:20
**satisfactorily**
5:15
**satisfied**
177:22
**save**
202:2
**saved**
14:21 99:10 200:17 208:19,21,23 209:2, 3
**saving**
14:23
**scene**
91:5 162:8,9
**schedule**
19:20
**scheduled**
137:11
**school**
163:9
**schools**
162:7,13 170:16
**scope**
88:8,10 168:5
**screen**
55:21,22 56:7 80:24 105:21,23 193:11 205:4 231:23
**screening**
224:8
**scroll**
41:20 42:15,16 75:21 82:18,21 206:9 212:6,20 214:4 232:13
**scrolling**
76:8
**sealing**
5:7
**search**
33:14 48:5 162:8
**section**
15:23 16:8 106:10 130:21 212:16 216:20,23 217:4 228:7,16,22 235:14, 17
**sections**
215:23 216:1
**secure**
70:3
**secured**
192:11
**segregated**
21:17 23:12
**segue**
72:14
**segueing**
128:23
**Seldom**
214:18 232:20
**self-explanatory**
130:18 131:1
**sell**
209:9
**semester**
122:20
**send**
21:18 184:20 191:16
**senior**
34:14,16 60:10 145:11
**sense**
55:6 64:19 112:19
**sensitive**
113:1,12
**sentence**
99:17,19 232:23 233:1
**sentences**
147:16

**separate**
24:10 51:3 62:16 76:18,20 81:10 115:11 125:4 126:20 129:15 130:9,10 155:4 174:17
**separately**
18:8 232:5
**sequence**
134:11
**sequential**
132:14 133:12,19
**sergeant**
28:20 29:1,3 30:22 34:17 85:21 103:13 133:17
**sergeants**
34:21 108:1
**serial**
130:24 132:13,16,21 134:1
**series**
124:20,24 227:13
**serve**
33:3
**served**
28:3
**service**
45:23 46:1,4 47:8, 10,11,12,14,15,17, 18,20 48:7,10,12,14, 21,23,24 49:4,11 62:9
**set**
11:12 50:22 58:4 132:17 133:1 219:4 224:16,18 225:2 228:9 231:13 237:23
**sets**
50:23 224:12
**setup**
179:12
**severity**
78:14,16,17
**sexual**
68:4 93:21 94:9 113:16 114:3 116:23 117:2,5 124:4,9,11, 20,24 125:5 137:8 138:5,9,11,21 146:21 151:2,24 163:8,9 167:4 172:24 185:20,21 186:14 194:3
**share**
63:24 113:13
**shared**
51:20
**sharing**
51:19 59:3,4
**Shea**
39:21 205:9,10,21 206:14
**Shea's**
209:22
**sheet**
52:5,12 99:8,9,12
**sheets**
96:2
**shelter**
221:9,11,14,22
**shift**
31:4,16,17 32:1,2 63:21 95:22 105:14 108:10 109:1,3 110:5 111:6 118:23 151:19 183:20 218:15
**shifts**
110:2
**shipped**
131:17
**short**
6:15
**shorthand**
225:17
**shots**
174:16 176:12
**show**
84:24 136:20 174:16,18 176:21 177:21 193:1 201:7, 23 211:4,9 216:13 218:24 226:20
**showed**
83:7
**showing**
43:5 80:5,6 82:19,24 85:5 175:5 201:18
**shown**
103:12 143:16 174:7 177:24 230:11 231:12,17
**sick**
78:18
**sickness**
95:8
**sign**
5:5 19:17 35:24 52:6,9,14 83:12 121:9 219:9
**sign-out**
59:11
**signed**
5:6 52:5,12 180:16
**significantly**
32:9,10
**signing**
27:24 180:11
**silent**
228:12
**similar**
37:20,23 59:2 65:1 133:5,19,20,23 134:1,11 174:20 187:21 199:5
**similar-looking**
174:24
**similarly**
63:2
**simply**
50:15 61:22 78:18 84:22 126:19 131:15
**single**
197:3 202:4
**Sir**
121:11
**sit**
32:24
**sitting**
83:23 238:1
**situation**
114:19 116:14 166:17 178:21 220:2
**situations**
114:5
**six-person**
174:23 175:9
**skipped**
107:20
**slash**
52:16
**Slightly**
187:13
**slowly**
6:7
**small**
56:23 60:15 100:6,8 179:21
**smaller**
28:19 29:21 96:4
**snatch**
186:19
**so-and-so**
103:12 120:17
**so-and-so's**
111:17
**solely**
222:9,10
**solve**
168:2
**somebody's**
113:8 120:15 236:1
**someone's**
226:20 233:15
**sophisticated**
100:17
**sort**
50:11 59:2 60:6 163:23 164:12 218:3
**sorts**
64:4
**SOS**
23:6
**Sounds**
25:3
**sources**
208:3
**SP**
21:22
**SPD**
142:14 143:1,18 158:11,18 200:23 208:19
**speak**
6:7 227:10 228:7
**speaking**
17:23 65:3 117:3
**special**
12:4,12,21,23 13:7 24:4,23 25:10 35:16 40:11 121:8,9 164:8 166:6 167:2,5 220:21 224:14
**specialized**
13:8,10 61:14

**specials**
96:4 103:2
**specific**
11:12 38:22 41:12 50:3,10 53:2 65:12 72:15 93:6 94:10,22 95:15 96:5 104:15, 17 117:7 119:15,18 122:9 123:24 124:3, 5,8 134:1 142:4 157:15,16,19 163:19,22 165:7 174:6 175:13 178:5, 12 212:16 222:13,20 236:3,7 237:20
**specifically**
13:9 79:10 88:13 157:2 189:17 196:4, 8 197:5 214:17 215:2 225:21,24 230:18 234:6 236:2, 22 237:1
**specifics**
28:4
**Spellacy**
39:22,24
**spelling**
122:2,23
**spent**
63:22
**split**
37:9 201:3
**spoke**
7:17
**spoken**
112:14
**spot**
108:8 209:13
**spread**
113:7
**spring**
49:17
**Springfield**
7:19,21 8:22 9:24 11:8,13,24 16:13 18:11 19:22 20:8,22 25:1 28:15,22 29:12 36:9,15 37:16 38:20 40:13 41:2,4 42:6,21 43:7,23 44:2,6,10, 18,24 46:19,24 47:11 48:22 49:1,7, 20 50:1 51:22 58:15 59:5,17 60:5 61:18 62:19,24 64:14 69:10,12 71:20 73:11 77:17 94:8 95:1 107:21 109:17 116:4 119:9,10 121:18 124:10,21,22 125:11 138:17 139:4,24 147:24 150:8,10 153:10,21 154:8 159:16,22 160:6,9,13 162:14, 16 167:8 168:1,22 169:3 170:24 171:9, 24 174:5 177:17 180:22 181:6 189:15 190:20 191:15 192:1,17 197:1,6 209:18 210:23 220:21 222:13,24 224:8,23 226:6 227:10 228:10,14 231:9 234:23 236:8
**squad**
18:22 25:17 28:14, 17 29:10 61:4 83:10
**squads**
29:11,12,13 31:16
**stack**
175:4,9
**stacks**
174:16,17 176:13, 15,16
**staff**
27:5,10,15,18 39:9, 10,11,15
**stamp**
74:8 83:12 198:17
**stamps**
10:7 22:16 85:5
**stand**
13:2 67:20
**standard**
67:11,15,16,17 68:7, 11 71:8 102:4 117:1 119:12 129:8 136:6 138:5 141:22 170:7
**standardized**
12:12 184:2
**standards**
11:18 62:2 68:9,18 224:12
**standing**
87:12 222:3
**staple**
164:19
**start**
12:7 14:23 80:3 96:18 113:4 121:8, 10
**started**
9:6,8 11:16 12:2 17:16 28:5 34:20 60:1 72:7 107:7 201:21
**starting**
41:22
**state**
40:12 61:9 136:11 162:19 171:1,4 188:19 189:23 190:1,17,24 191:3,6, 7,11,13,16 214:16 216:21 224:11 226:13 237:1
**stated**
236:22
**statement**
60:13 63:16 64:13 95:10 101:1,4,9,10, 13,14,22,24 102:11, 16 103:4,7,11 104:7 121:7 135:12 137:2 165:4 166:10 169:13 218:13,17,20,23 219:1,6,7,9,21 227:9
**statements**
61:21 66:4 67:24 102:23 123:2 127:15,18 145:17,18 170:13 172:13 173:11 174:3 207:5, 7,11
**states**
115:16 226:21 228:11
**statewide**
207:18
**station**
83:24 139:12 172:8 176:20 189:1
**status**
95:6 136:20
**statute**
215:13,15
**stay**
54:1 62:13 230:19
**stayed**
17:19,24 18:4 30:23 54:3 128:15 139:16 188:24
**STCC**
122:20
**steadfast**
17:3
**stipulate**
8:7 202:7,24
**stipulated**
5:2,9
**stipulation**
216:15
**store**
148:21
**stored**
14:12 18:7,11,14 36:6 40:19 51:17 57:23 124:9,13 125:8 138:18,22 188:15,16,21 192:6
**storing**
55:1
**straighten**
229:12
**strange**
56:10 210:20
**street**
105:3 108:14 136:11 192:13 208:6 221:14
**streets**
210:11
**strike**
5:11 32:9 97:17 98:18 99:14,16 100:22 123:20 135:22 150:9,16 153:9 159:16 166:21 183:24 203:8,9 217:20
**strived**
70:10
**style**
12:20
**subject**
66:16 147:14,19,20, 21,22 148:5,6,9,11, 12,13,14,20 173:10 178:10 213:10

**subjects**
198:22
**submit**
102:20
**submitted**
102:12,15 121:10 157:5
**submitting**
81:12 131:5
**subordinate**
30:12,15 33:23 36:19 60:7,24 66:2 153:23
**subparts**
199:9
**subpoena**
199:22
**subscribed**
62:10
**substance**
11:1
**successful**
70:15 185:5
**successive**
215:22 216:1
**suggestion**
38:19 39:6 75:14
**suggestive**
91:1 92:13
**suicidal**
95:10
**suits**
39:2
**summons**
199:22
**superintendent**
42:2 46:16,22,24 47:4 223:21 225:8 231:12
**superintendent's**
18:14 25:4
**superior**
53:11 54:2 57:20 136:12 174:13
**supersede**
13:4
**supersedes**
13:6 40:6
**supervise**
29:8 183:19
**supervised**
72:1
**supervising**
64:16,18 65:7
**supervisor**
31:2 67:7,8 68:19 98:19 99:21 110:12, 20,22 111:19 112:7, 9,11,22 120:12 134:22 135:1 160:16 180:11,17,19 218:16,19,24 219:1, 5,9
**supervisors**
25:6 31:11,14 36:11 37:3,6 53:8 60:2,6, 11,16 62:5 64:24 65:12,14,15,21 66:1 72:12 81:15 110:8 113:15 183:19
**supplement**
23:11 62:6
**supplemental**
58:2 98:9,24 173:12 179:22
**suppose**
25:15
**supposed**
50:12 94:21 105:5 115:17 134:23 164:13 197:9
**suppress**
196:11
**surveillance**
117:7
**suspect**
66:4 101:22 111:23 112:4 113:9 136:3 144:7,13,17 145:23 146:12,15,21,22 147:23 150:24 151:16 161:2,6,13 162:2,5 163:14,17 164:13,17,22,23 165:9,13,16,20 167:3 168:24 169:4, 13,20 170:1,8,13 174:22 175:2,4 176:20 186:6,10 187:21 191:3 217:22 219:3,15,18 222:15
**suspect's**
161:20 165:4
**suspected**
186:13
**suspects**
52:22 90:18 109:13 127:17 145:21 146:20 150:18,20 151:11 152:4,9,15 160:18,22 163:20 170:3 209:8 218:5, 10 220:10,16,24
**sustained**
89:6,24 90:1,12,16 92:4
**swearing**
96:17
**switch**
118:14 170:18
**switched**
47:8 175:3
**switching**
12:7
**sworn**
5:16 20:8
**syllabus**
208:11,16 210:1 224:16
**synonymous**
16:19,23 35:1
**synonymously**
118:4
**system**
18:21 28:21,23 36:4, 5 47:22 48:4 59:11 85:17 207:16

**T**

**table**
22:22 23:4 75:5
**tag**
54:19 127:22 128:2, 6,10,14,21 129:1,16, 17 130:12,14 131:6 133:2,10 134:9,18 192:21
**tagged**
94:2 129:16 130:6 133:17,23
**tagging**
53:20 54:23 131:3 133:3
**tags**
127:22,23 128:23 129:7 133:5,6
**taking**
52:12 60:13 61:21 64:12 66:4 101:10 102:14 174:3 193:24
**talk**
9:11 42:22 54:17 79:15 87:6,7,8 96:21 100:4 108:18 113:4 133:9 178:1 210:9, 10,19 216:1
**talked**
40:8 89:15 105:8 108:23 112:14 120:5 165:6 169:17 170:17,19 197:2
**talking**
22:21 23:20 24:15 25:1 44:12 55:8,18 58:19,20 63:20 88:1, 22 90:5 91:19 101:12 102:21 108:15 112:22 113:7,8 118:8 119:14 127:7 147:1 168:10 173:1,2 185:12 187:12 201:24 213:15 217:2 220:1,11 236:13,16
**talks**
81:19 216:20 233:1
**tampering**
228:21
**tape**
100:1,4,5,6,7,8,12, 18,19,23
**taught**
9:21 11:23 52:4,7 59:23 60:2 121:3 123:23 124:1 164:15 203:12 205:22 206:14 207:1,10 208:14 214:24 236:7
**teach**
19:3 63:18 66:2 208:20
**teacher**
67:22
**teamed**
31:20
**telling**
209:14
**temperament**
67:1

**temporary**
13:8
**ten**
238:6
**term**
24:14 45:10,14,21, 24 96:21
**terminate**
184:23
**terminated**
184:22,24 185:3,8
**terms**
16:18 118:14 147:24
**test**
13:2 46:4 47:14 48:2,17 217:20
**testified**
5:18 155:1 169:21 171:20,22 175:20 177:19 217:20 225:10 226:3 227:1, 8,22 229:13 235:14
**testify**
7:6 43:9
**testifying**
15:16 68:1
**testimony**
14:17 42:9 199:23 203:3 204:23 229:5
**tests**
16:1 48:17
**there'd**
116:9
**thing**
55:10 119:2 179:21
**things**
11:18 12:14,16 13:16 17:4,6,8,12, 15,21 18:4,5 38:11, 12,14 53:17 59:23 60:2,20 77:23 89:20 107:15 110:10 112:21 130:2 136:20 137:16 149:3 161:11 174:2 180:18 184:17
**thinking**
132:8
**thinks**
48:9
**thirty**
5:4
**thought**
36:19 54:8 76:15 77:5,7 95:16 127:2 146:11 182:21 187:12
**threat**
104:1
**threatened**
95:14
**three-hour**
200:8
**three-month**
72:6
**tie**
168:9
**tight-knit**
63:24
**time**
5:5,12 6:18 7:4,15, 18 8:8 10:1 11:9 13:2,11 16:6 17:9 21:18 23:7 26:6,9,24 28:15 29:22 33:9,21 34:18 35:3 37:21 38:23 43:7,19 44:11 45:3,4 47:18 51:18 52:11,20 53:22 56:10 57:18 58:13, 16 59:18 60:10,12 63:10,22 67:22 71:15 72:7 78:3 81:1 83:3,4,9,11,21,24 85:9,20,23 86:1,9 87:1,20 89:10,16 90:24 93:5 94:4,20, 22 96:1 102:7 103:1 107:9 113:21 114:2 117:13 121:5,20,22 122:17 125:22 126:4 127:23 132:18,22 133:14 134:2 137:3, 14,17 140:12 141:1 143:24 149:24 152:7 157:3 159:9 160:1 161:14 164:4,18 169:6,9 176:7 181:21 182:1 183:8 184:5 185:4,7 189:19 196:11,18 197:3 201:13 202:3 205:11 210:2 212:22 213:17 214:20,24 221:9 225:15 226:4 232:22 234:14,22
**timely**
78:19
**times**
32:11 34:12 36:20 71:3 113:19 122:19 137:11 161:3 165:21 166:2,4 203:19 204:14 219:14,23 221:24 228:15
**title**
45:12 46:5,22 80:6
**titled**
200:6
**titles**
47:5
**today**
6:2 9:2,16 11:2 20:12 42:9,22 43:9 203:3 204:23 234:23
**today's**
13:12
**told**
68:1 107:8 178:18 201:22 219:23
**Tom**
31:13 34:20 39:19, 24 57:7 158:24 198:2 235:7
**tools**
17:7 206:20 207:1 208:1
**top**
69:15,16,18 70:8 121:11 130:13 132:13,16
**topic**
148:9 214:1 217:3
**topics**
42:13,21 43:8 71:10 88:14 89:15 90:10 191:22 199:18 200:12
**tort**
214:11
**torts**
214:13
**total**
201:12
**totally**
133:11
**touched**
130:20 177:11
**tour**
63:23
**towns**
224:21
**track**
196:13
**tracked**
36:15 235:4
**tracking**
36:18
**trade**
17:7
**traffic**
61:13 236:12,16
**train**
54:8
**trained**
61:1 63:2 128:24 130:16 141:6 162:1 201:9 208:8 210:15 217:4 226:12 236:18
**training**
15:5,8 16:14 19:24 20:3,4,9,11,13 60:12,22 62:21 71:16 107:3 120:24 121:13,14 122:15 123:23 124:2 129:3, 4 142:2 148:19 149:21 150:1 162:4, 14,17,18,20,23 163:1,4,7,11,20 164:4 166:8 170:12, 15 172:1,19 173:4 178:9,12 198:6,7,8, 14,19,22 200:24 203:10,11 204:1,4,9, 24 205:15 206:2,4,7, 12 208:19 209:4,18 210:3 211:1 212:4, 23 213:4,10 214:21 217:3 224:3,10,13, 14,16 231:13 236:8, 10
**trainings**
129:6 149:18 206:10 226:10
**trajectory**
50:12
**transcribed**
105:12 108:16 115:8
**transcribing**
6:6

**transcript**
5:5,7 8:3,13 238:5,9
**transfer**
67:9
**transferred**
119:16,20,21 120:10,13 189:20
**transfers**
40:18 66:14
**treated**
6:3
**trial**
5:12 54:2 97:11,19 137:11,23 229:6,14 233:16
**trials**
231:1
**trouble**
6:24 147:16
**true**
226:8,11 229:19,21 230:6,8
**truth**
209:14
**truthful**
96:18 157:5
**truthfulness**
157:3
**turn**
83:9 143:1,11,19,21 146:9 150:12 190:14 226:6,13
**turned**
10:8 87:2,9 107:15 111:18 123:12 141:23 143:15 145:24 150:24 191:19 226:22 229:14,23
**turning**
227:11
**twelve**
30:21
**two-way**
176:23
**type**
62:21 86:22 87:13 94:24 96:10 98:18 100:15 102:13,21 104:6 162:4 164:16 173:12 192:7 205:15 236:18
**typed**
100:2,18
**typewriter**
96:8
**typewriters**
96:1 99:22 100:18

**U**

**U.S.**
214:16,18
**ultimately**
33:23
**UMASS**
191:14
**unable**
66:12
**unauthorized**
235:16 236:23
**unaware**
127:7
**uncommon**
185:4
**undercover**
33:12
**underneath**
75:20
**understand**
6:11 29:2 43:4 49:14 64:9 81:24 93:19 97:10,13,16,17,21 144:20,22,24 145:1 199:15 218:15 233:1,13
**understanding**
42:19 144:10
**understood**
6:4 16:4,9 36:22 46:23 49:24 82:11 97:7 143:8 164:15 226:19
**unfamiliar**
66:20
**uniform**
17:21 29:11 37:11 61:4 222:7
**uniformed**
107:24 108:2
**unit**
13:16 36:24 78:13,23 79:12,16 84:2 85:7 154:14
**United**
226:21 228:11
**unofficial**
141:20 173:21
**unreliable**
152:18,22,24 153:8,11,16,23 154:8 236:23
**unsecured**
95:23
**unsolved**
94:15
**Unsuccessful**
187:5
**unsure**
11:15 146:4
**unusual**
135:6 222:16
**unwritten**
53:3 59:16,19 120:22,23,24 150:22 151:13,17 152:20 154:21 160:24 177:13 218:4 221:3
**up-to-date**
62:13
**upcoming**
13:15
**updated**
20:15
**updates**
20:19
**updating**
12:8
**upstairs**
136:13

**V**

**vandalism**
95:12
**vehicle**
234:8
**vehicles**
95:5
**verbatim**
209:8
**version**
98:5 194:6
**viable**
146:11
**victim**
94:17 97:6 101:1,22 103:12 125:1 126:4,7 131:3
**victim's**
124:16 126:6,19
**victims**
101:12 126:24 185:20,21
**video**
168:23 169:4
**videotape**
166:16
**violated**
69:5
**violation**
78:21 214:7 215:10 216:20 228:20 234:8 235:20 237:7
**violations**
214:10,16,20 215:24 216:2 232:21 233:17
**void**
98:21,22 99:4,7,8,11
**voided**
99:1,2,3,7
**volunteered**
163:5
**volunteers**
221:18 222:1

**W**

**wait**
75:17 190:5 221:10
**waived**
5:8
**walking**
95:22 105:3
**wanted**
43:15 46:3,17 48:5 62:3 66:22 108:21 163:6 165:20 174:13 182:16 189:6 191:21,22 216:4 219:1,2,16
**warning**
163:21
**warnings**
163:17 164:14
**warrant**
207:20
**warrants**
33:14

**watch**
83:10,21
**ways**
12:17 17:7 60:2,13 62:3 65:1 100:10
**weak**
209:12
**weapon**
38:7
**weather**
107:10
**week**
20:7 53:11 163:11
**weeklong**
162:11
**weeks**
184:20
**weight**
174:17
**welfare**
228:13
**well-being**
96:16
**well-prepared**
137:10
**white**
98:18 99:21,23 100:1,4,12,21,22,23 127:24 128:14,15,20 132:9
**whited**
101:5
**whiteout**
99:23
**Whitney**
16:7
**William**
30:21 31:2,13 46:2,6
**win**
67:17
**wished**
94:18 100:13
**withholding**
157:13
**witnesses**
87:8 208:4 209:9
**woman**
125:1,6
**women**
68:3,4 176:10
**word**
100:7
**words**
98:16 100:13 126:18 148:17 171:12
**work**
30:3,4,7,8 31:2 32:3 38:23 48:13 53:9 61:23 62:1 64:18 66:13,22,24 67:2,3 71:4 146:12 147:2,4 148:17 151:7 152:22 153:5 161:7 185:18 209:13 218:22
**worked**
30:24 31:12,21 32:22 33:9 37:2 38:23,24 39:4 61:4 65:8 72:12 108:22 111:6,12,14 119:1 126:7 138:24 139:2, 3 184:3 191:2
**working**
19:10 33:7,22 34:19 38:13 63:23 102:5 103:1 104:9 108:10 110:5 113:2 118:9 120:1 125:17 126:4 142:9,21,23 151:20 218:24
**works**
56:4,5
**world**
204:10,22
**worn**
17:21
**worth**
20:16 96:19 202:14 213:7
**Worthington**
221:14
**write**
79:1,7,9,11 95:21 98:1,5,22 99:4,8 112:15,23 121:7 173:6
**writing**
13:19,23 14:4,10 30:8 50:2,4,8 55:23 59:20,22 97:24 121:1,4,19,22 122:1, 4,11 123:5 173:12 174:3 184:21
**written**
7:22 8:10,11,23 9:1 27:9 30:12,15 40:12, 23 41:3 42:20 43:6 44:10 50:20,21 51:7, 8,14,19,23 52:3,15 59:8,12,14,24 60:4, 22 71:12 72:16 78:1 92:20 94:24 95:18, 24 96:19 97:10 102:2,3 119:13,23 120:22 147:7 150:15 151:10,12 152:17 177:1,3,10 201:11 210:20 217:21 218:3,18 221:3 222:23 227:9,17
**wrong**
10:8 99:19 181:17
**wrote**
27:7 108:23

**Y**

**year**
20:7 42:7 46:16 66:24 72:8 140:5,6 183:17 184:4,5,7 185:5 202:15 204:14 213:19,20,21,22 224:16
**year's**
20:16 202:14 213:7
**years**
23:13 28:2 49:23 64:6 93:13 116:8 117:16,19,21 203:10,18 224:3 225:11 226:11 227:18 228:4
**yell**
7:1
**youth**
29:21 65:16 95:18 107:18 108:12 109:9

**Z**

**zoom**
8:16 56:9,20 158:10
**zooming**
56:20