**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 47

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*

O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CASE NO: 18-cv-10147

GEORGE PERROT,
Plaintiff,
-vs-
THOMAS KELLY, THOMAS JARVIS, RICHARD KANE, CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN, THOMAS KENNEDY, CHIEF ERNEST STELZER, MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAN,
Defendants.

DEPOSITION
OF
THOMAS JARVIS

Pretrial deposition taken before Jolene Isdale, Licensed Shorthand Reporter, No. 497, and Notary Public pursuant to the Massachusetts Rules of Civil Procedure. Mr. Thomas Jarvis provided his testimony from his home residence in Massachusetts on July 25, 2023, commencing at 1:00 p.m.

Magna Legal Services
866-624-6221
www.MagnaLS.com



A P P E A R A N C E S

REPRESENTING THE PLAINTIFF, GEORGE PERROT:
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, Illinois 60607
BY: GIANNA GIZZI, ESQ.
Gizzi@loevy.com

REPRESENTING THE WITNESS DEFENDANT, THOMAS JARVIS:
LAW OFFICE OF KEVIN COYLE
1299 Page Boulevard
Springfield, Massachusetts 01104
BY: KEVIN COYLE, ESQ.
Attycoyle@aol.com

REPRESENTING THE CITY OF SPRINGFIELD:
D'AMBROSIO, LLP
185 Devonshire Street
10th Floor
Boston, Massachusetts 02110
BY: THOMAS CAMPBELL, ESQ.
Tcampbell@dambrosiollp.com
(Appearances continued on page 3)



REPRESENTING THE CITY OF SPRINGFIELD:

CITY OF SPRINGFIELD LAW DEPARTMENT
1600 East Columbus Avenue
2nd Floor
Springfield, Massachusetts 01103
BY: LISA DeSOUSA, ESQ.
Ldesousa@springfieldcityhall.com

REPRESENTING FRANCIS BLOOM:
OFFICE OF MASSACHUSETTS ATTORNEY GENERAL
1 Ashburton Place
Boston, Massachusetts 02108
BY: JARED B. COHEN, ESQ.
Jared.b.cohen@mass.gov

REPRESENTING THE DEFENDANT, CHARLES ARPIN:
REARDON, JOYCE & AKERSON, P.C.
4 Lancaster Terrace
Worcester, Massachusetts 01609
BY: AUSTIN JOYCE, ESQ.
Ajoyce@rja-law.com

(Appearances continued on page 4)



REPRESENTING THE DEFENDANT, RICHARD KANE:

MORRISON MAHONEY, LLC
1500 Main Street
Suite 2400
Springfield, Massachusetts 01115-0001
BY: CAROLE SAKOWSKI LYNCH, ESQ.
Clynch@morrisonmahoney.com

ALSO APPEARING:
Mary Vo, Magna Legal Services
Massachusetts, Notary

STIPULATIONS AS TO TAKING OF DEPOSITION

IT IS HEREBY STIPULATED AND AGREED by and between counsel representing the respective parties that each party reserves the right to make specific objections at the trial to each and every question asked and of the answers given thereto by the deponent, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the respective parties that proof of the official authority of the Notary Public before whom this deposition is taken is waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the respective parties that the reading and signing of the deposition by the deponent is reserved.

IT IS FURTHER STIPULATED AND AGREED by and between counsel representing the respective parties that all defects, if any, as to the notice of the taking of the deposition are waived.

Filing of the Notice of Deposition with the original transcript is waived.



THE COURT REPORTER: Attorneys, please let me know your transcript orders, if you have one.
MR. COYLE: Kevin Coyle, I represent Thomas Jarvis, the witness. I will not be ordering a transcript today.
MS. GIZZI: Sure. We'll just do the electronic mini.
THE COURT REPORTER: And original hard copy?
MS. GIZZI: Sure.
THE COURT REPORTER: Attorney Campbell, could you please let me know who you represent and what your firm is? I don't have your contact information.
MR. CAMPBELL: The firm is D'Ambrosio, LLP, that's D-A-m-b-r-o-s-i-o, and my email address is tcampbell@dambrosioLLP.com.
THE COURT REPORTER: Thank you. And could you please tell me your street address?
MR. CAMPBELL: 185 Devonshire



Street, 10th floor, Boston 02110.
THE COURT REPORTER: Attorney Campbell, who are you representing in this deposition?
MR. CAMPBELL: I represent the City.
THE COURT REPORTER: Do you need to order a transcript?
MR. CAMPBELL: No, thank you.
THE COURT REPORTER: Okay.
MR. CAMPBELL: Actually, on second thought, could you put me down for a transcript, please?
THE COURT REPORTER: Thank you. Attorney Lynch, you're from Morrison and Mahoney, right?
MS. LYNCH: Yes, and I represent Richard Kane.
THE COURT REPORTER: Do you need to order a transcript, Attorney Lynch?
MS. LYNCH: No.
THE COURT REPORTER: Okay. Attorney DeSousa, can you please tell me who you represent in this deposition?



MS. DeSOUSA: The City of Springfield.
THE COURT REPORTER: Okay. Are you with Attorney Campbell?
MS. DeSOUSA: We both represent the City.
THE COURT REPORTER: Can I get your address and email?
MS. DeSOUSA: Yes. (Contact information taken off the record.) Work for the City of Springfield.
THE COURT REPORTER: Thank you.
MS. DeSOUSA: You're welcome.
THE COURT REPORTER: Attorney Coyle, could I ask you to please vouch for the identity of your client, Thomas Jarvis, that he is who he claims to be before we give the oath?
MR. COYLE: He is indeed, Thomas Jarvis.
MS. VO: I'm going to swear in Thomas Jarvis. Would everyone like me to check his ID?
THE WITNESS: Sure. (Displays driver's license.)

MS. VO: Perfect. Can you move your hand up?
THE WITNESS: (Indicating). I don't know.
MR. COYLE: A little bit higher, Tom.
MS. VO: Just wait right there. Okay. I see your last name. Perfect. Thank you so much.
THE WITNESS: You're welcome.
MS. VO: Before we start, I just need to swear in the witness. Would you like me to do that now before we put it on the record?
MR. COYLE: We're going to put this on the record. We're going to agree to the usual stipulations. And an agreement -- an objection by one is an objection by all.
MS. GIZZI: Yes.
MR. COYLE: Okay.
MS. VO: Okay. I'll go and swear in Thomas. So Thomas, could you raise your right hand. Do you solemnly swear that you will tell the



truth, the whole truth and nothing but the truth, so help you, God?
THE WITNESS: I do.
MS. VO: Thank you.
THE WITNESS: Okay. You're welcome.
MS. GIZZI: For the record, this is the deposition of Thomas Jarvis in the case of George Perrot versus Kelly, et al. The case number is 18-CV-10147. It's being taken on July 25, 2023 at 1:00 p.m. Eastern time pursuant to notice. This deposition is being taken in accordance with the Federal Rules of Civil Procedure and the local rules for the United States District Court of Massachusetts.
DIRECT EXAMINATION
BY MS. GIZZI:
**Q. Good afternoon, Officer. My name is Giana and I'm one of the attorneys for the Plaintiff, George Perrot in this litigation. Could we start with you stating and spelling your full name for the record?**
A. Thomas, J-a-r-v-i-s.



**Q. Thank you. And Mr. Jarvis, have you ever been deposed before?**
A. Never.
**Q. So I'm going to go over some ground rules so that we're on the same page throughout the deposition. First, when you answer a question in a deposition, you'll need to have a verbal response. So no nodding or head shaking because that is really difficult for the court reporter to take down, okay?**
A. Yes.
**Q. Okay. If, at any point, I'm being unclear or my questions don't make sense, just let me know and I can clarify or rephrase it, okay?**
A. Okay.
**Q. I also just ask that you wait until I finish asking a question before you begin answering and I will also do my best not to cut off your answers. And that's for two reasons primarily: because you might deprive your attorney of an objection, and also because the court reporter cannot transcribe two people talking about at the same time; is that fair?**
A. That's fair.



**Q. Lastly, if you need a break, just ask. The only caveat is that if I've asked a question, you do have to answer it before we take a break, okay?**
A. Okay.
**Q. So these first few questions I'm going to ask, I ask universally. So please don't take offense. Have you consumed any alcohol in the past 24 hours?**
A. No.
**Q. Great. In the past 24 hours, have you taken any medication that would inhibit your ability to testify truthfully?**
A. I'm on medications.
**Q. Okay. And that's totally fine, but do you know if any of those medications would inhibit your ability to testify truthfully?**
A. No, they wouldn't.
**Q. Okay. Is there any other reason you can think of that you wouldn't be able to testify truthfully in this deposition?**
A. No other reason.
**Q. Okay. Great. Did you review any documents in preparation for today's deposition?**
A. Yes, I did.

**Q. Okay. And do you remember what those documents were?**
A. Everything pertaining to the case.
**Q. Okay. So does that include court transcripts?**
A. No.
**Q. Okay. Would that include police reports?**
A. Yes.
**Q. Okay. What about witness statements?**
A. No.
**Q. What about victim statements?**
A. Yes.
**Q. What else do you remember reviewing in preparation for today's deposition?**
A. So I had trial -- trial depositions, I believe.
**Q. Like trial testimony?**
A. Trial testimony.
**Q. Okay.**
A. And my statements.
**Q. Okay. Did you review any audio or video recordings to prepare?**
A. No.



**Q. Okay. And other than your attorneys, did you talk to anyone about your deposition?**
A. No.
**Q. Officer, how old are you today?**
A. I'm 81.
**Q. Okay. Did you ever serve in the military?**
A. No.
**Q. These first few questions are just background, so bear with me. Where did you attend high school?**
A. Commerce High School, Springfield, Massachusetts.
**Q. And what year did you graduate from high school?**
A. 1960.
**Q. Did you attend any other educational institution after high school?**
A. Two years of college, yes.
**Q. Okay. And what college was that?**
A. STCC College, Springfield.
**Q. Okay. Did you obtain an associate's degree from there?**
A. Yes, I did.



**Q. And what was your associate's degree in?**
A. Police Science.
**Q. Okay. So would that have been about 1962 you would have obtained that degree?**
A. While I was working full time, I was also going to college.
**Q. Okay. So do you remember what year you finished with that degree?**
A. About 1972.
**Q. 1972. Okay. I gotcha. And what year did you start at the Springfield Police Department?**
A. I believe November of '66.
**Q. And do you remember what year you left the Springfield Police Department?**
A. 1991. 1991.
**Q. Okay. And was that because you retired?**
A. I retired.
**Q. Okay. Before we move on to specifics, I just want to make sure is there anyone else in the room with you during your deposition right now?**
A. No.



**Q. Okay. So first, going to your career at the Springfield Police Department, what was the first position you remember having when you were brought on?**
A. Patrolman.
**Q. Okay. Do you remember about how many years you were a patrolman?**
A. About four. Three to four.
**Q. Okay. After you were a patrolman, what was the next position you had?**
A. Detective Bureau.
**Q. What was your job title when you first started at the Detective Bureau?**
A. Just a detective.
**Q. Okay. And do you remember what shift you started out there as?**
A. 6 at night, 2 in the morning. 4 in the afternoon to midnight.
**Q. Okay. How many years were you a detective in the Detective Bureau?**
A. I think 15, 16.
**Q. Did you have another position -- did you have a position after you were a detective in the Detective Bureau?**
A. I went on days --

**Q. Okay.**
A. -- at the Detective Bureau.
**Q. And what were the hours when you were on days? What was that shift?**
A. 7:45 to 4 -- excuse me, 7:45 a.m. to a quarter to 4 p.m.
**Q. Okay. And how long were you working days in the Detective Bureau at that time?**
A. About 15 years.
**Q. Was that the position you were in when you retired from the Springfield Police Department?**
A. Yes.
**Q. Other than Springfield, have you ever worked for another law enforcement agency?**
A. The Town of West Hartford, Connecticut for a short period of time.
**Q. Do you remember what year that approximately was?**
A. That was in '62, I believe.
**Q. And why did you end up leaving that police department?**
A. I had a lot -- I had many offers. Springfield was the closest. So I took Springfield PD.



**Q. Okay. Understood. So going back to your early days of your career, you said you started at the Springfield Police Department about 1960?**
A. '66.
**Q. '66. I'm sorry, 1966. Is that also then when you started at the academy?**
A. Correct.
**Q. Okay. And when you attended in 1966, how long was the academy?**
A. It was about a month.
**Q. Okay. Do you remember generally what kind of training you received at the academy?**
A. Basic shooting, how you treated people, just common sense, write a report, how to operate a car.
**Q. Okay. So would you say that a lot of the training at the academy was to prepare you for being a patrolman?**
A. To be a police officer, correct.
**Q. Okay. Did you receive any training on how to conduct sexual assault investigations while you were at the academy?**
A. No, I did not.



**Q. I think you mentioned this, but did you say you were taught how to write reports at the academy?**
A. Correct.
**Q. What about conducting interrogations? Is that something you were taught?**
A. No. You know what? I cannot answer that question truthfully. So...
**Q. Okay. Is that because you don't remember?**
A. Don't remember.
**Q. Okay. Do you remember if you had any training on handling evidence?**
A. Yes.
**Q. And then what about taking suspect statements, is that something you were trained on while you were at the academy?**
A. I don't remember.
**Q. Okay. And now moving on to, you know, after you were done with the academy, did you receive any training during your time as a detective or a patrolman at the Springfield Police Department about sexual assault investigations?**



A. No.
**Q. What about interrogations?**
A. No. Sexual assault was later on.
**Q. Okay. What do you mean by later on?**
A. During my time in the Police Department, I learned how to handle evidence.
**Q. Okay. And how throughout your time in the Police Department did you learn? Like was there, you know, did you learn from other officers? Was --**
A. Other officers.
**Q. -- there seminars?**
A. Other officers.
**Q. Okay. Would this be like your superior officers?**
A. Correct.
**Q. Okay. So for things like handling evidence and how to conduct certain investigations, this was on-the-job training, would you characterize it?**
A. Absolutely.
**Q. Okay. Would you also say that you were trained on taking suspect statements like through being on the job?**
A. Correct.

**Q. Okay. Did you ever get any other training, formal or informal, on taking suspect statements throughout your career at Springfield?**
A. Common sense and working with the older detectives.
**Q. Okay. So your learned from working with more experienced detectives --**
A. Yes.
**Q. -- on how to take suspect statements?**
A. Correct.
**Q. What would that consist of, if you remember, you just sitting in on a suspect interview or something different?**
A. Yes, I would be sitting in with other detectives or it's common sense.
**Q. Okay. In 1985, what was your role in the Springfield Police Department?**
A. I was working house breaks.
**Q. Okay. Was that a specific unit in the Detective Bureau?**
A. That's correct.
**Q. Do you remember what your tour or your shift was in 1985?**
A. 7:45 a.m. to 3:45 p.m.



**Q. Okay. Going back to how you learned to take suspect statements, what were you taught specifically about how to take a suspect statement?**
A. First of all, it was just common sense; but second of all, when you work with a detective that has 10 or 15 more years than I did, I followed his directions.
**Q. Okay. And when you say it's common sense, you're going to have to break it down for me as someone who's never been in law enforcement. What do you mean by that?**
A. You give the gentleman the Miranda decision -- excuse me, your Miranda warning and you start speaking to him, okay?
**Q. Okay. And did you develop your own personal practice of like --**
A. Yes. Yes, I did.
**Q. Okay. Could you describe what was your personal practice in taking suspect statements?**
A. My personal practice was always give the gentleman or the woman her Miranda or his Miranda warnings, okay? And just start asking him questions or asking her questions pertaining



to what was going on and what was she being arrested for.
**Q. And would you usually be taking notes like real time or did you record statements like with an audio device?**
A. A lot of the times, I was writing.
**Q. Okay.**
A. A lot of the times, it was just listening.
**Q. Okay. Was that something that you learned from, you know, the superior officers or detectives? Is that what they did and that's why you did that?**
A. Yes. That's part of it, yes.
**Q. Okay. During your time as a detective in the Springfield Police Department, about approximately how many rape investigations were you involved in in any capacity?**
A. I would say I never was involved in rape. I know the common -- I was never involved in a rape investigation.
**Q. And when you say you weren't involved, what is your understanding of being involved in the investigation?**
A. We have our own bureau that does



rapes. So I do house breaks. They do rapes. We have different squads.
**Q. What if a case involved a house break and a rape? Would you have to work together?**
A. That's correct.
**Q. Okay. How many from your time in the mid '80s, how many officers were on the house break squad?**
A. Let's see, I believe seven.
**Q. Okay. And how many of those officers were working at a given time?**
A. Sometimes five. Sometimes seven. Depends on -- depends on days off.
**Q. Okay. Was it ever less than three from your memory?**
A. On a weekend, there's a possibility. It could have been three.
**Q. Okay. And do you know how many officers worked in the squad that handled rapes?**
A. No idea, ma'am.
**Q. Okay. So today, Officer Jarvis, do you know you're here to testify about the investigation into George Perrot for the 1985 sexual assault and break-ins that --**

MR. COYLE: Objection.
ATTORNEY: Objection.
THE COURT REPORTER: I didn't catch who made the second objection after Mr. Coyle. Can you tell me who objected, please?
MS. DeSOUSA: Yes, I also did.
A. (No response).
BY MS. GIZZI:
**Q. You can answer.**
A. Are we all set?
**Q. Yes.**
A. You asked me a question.
**Q. Yes, are you aware of that?**
A. Repeat the question because you were interrupted.
MS. GIZZI: Court Reporter, can you read back the question?
(The reporter read back the last question.)
THE COURT REPORTER: Sorry, but I had difficulty hearing the question at the end because of the overlap of multiple objections.
MS. GIZZI: Let's just get this



on the record then. I thought we made a stipulation an objection for one defendant is for all. So Lisa, there's no way to object.
MS. LYNCH: There's no way for me to know if someone else is going to making an objection at the same time, but Giana, thanks for the practice tip.
MS. GIZZI: There was --
MR. COYLE: I did not object because I heard Lisa objecting. I'm relying on hers.
MS. GIZZI: Regardless, please wait until I finish the question to object.
**Q. Okay. I'll just repeat it.**
**So do you know you're here to testify about the 1985 investigation into George Perrot regarding sexual assaults, a series of sexual assaults that occurred in Springfield?**
MS. DeSOUSA: Objection.
A. Yes, I do.
BY MS. GIZZI:
**Q. Okay. Do you understand that the**



**investigation into George Perrot led to the wrongful conviction?**
MR. COYLE: Objection.
MS. DeSOUSA: Objection.
MR. COYLE: You can answer.
A. I do not know that.
BY MS. GIZZI:
**Q. Okay. Well, let's start with you telling me everything that you recall about the investigation in 1985 into George Perrot.**
A. Well, from what I remember, 1985, I responded to a house break and it was -- it was early in the morning. And there was a woman who was an 80-year-old victim. I thought it was just a house break, but it turned out to be a rape and a house break.
So I called our Crime Prevention Bureau all handles all rapes in the city. I looked for finger prints and with the FBI. I spent three days with the FBI with fingerprints. And I found out that George Perrot and his friends had done some work around that particular woman's property.
**Q. Okay. I'll stop you right there. Thank you. That's helpful.**



**Do you remember how you learned that George Perrot and a friend of his had done work on this woman's property?**
A. She told me.
**Q. She told you?**
A. The owner of the property.
**Q. Do you remember the name of the victim that you responded to the call of?**
A. I believe it was Marchand, M-a-r-c-h-a-n-d, I believe.
**Q. Okay. Do you remember if this was the first of this type of crime that you had investigated at least that year that was a rape and a house break?**
A. Yes. For me, that was the first time.
**Q. Okay. When you responded to that call for the house break, were you with another officer or did you go by yourself?**
A. I was with another officer.
**Q. And do you remember the name of the officer?**
A. I do not.
**Q. Okay. And did you take the victim's statement when you responded to the scene?**

Page 29

A. I spoke to the victim. The statement was taken, I believe, by the rape squad.
**Q. Okay. So going back a little, you mentioned that you called the Crime Prevention Bureau because this was the type of crime that they handled, right?**
A. That's correct.
**Q. Okay. Do you remember who ended up responding from the Crime Prevention Bureau that night?**
A. That morning, I do not.
**Q. Okay. Do you have any memory if it was Sergeant Thomas Kelly?**
A. I do not --
**Q. Okay.**
A. -- remember.
**Q. Okay. Moving on, did you ever work with Officer Thomas Kelly while you were at the Springfield Police Department?**
A. No.
**Q. Did your paths ever cross professionally in your capacity as a police officer?**
A. Yes.

Page 30

**Q. How so?**
A. Him walking by me. Me walking by him. Hello.
**Q. Was the Detective Bureau and the Crime Prevention Bureau, were they in the same like physical space in the police department?**
A. Yes, you would walk down the hall.
**Q. And so could you see the Crime Prevention Bureau --**
A. No.
**Q. -- officers?**
A. No. Excuse me, no.
**Q. Did you know Officer Kelly in a personal capacity?**
A. No.
**Q. So you never hung out with him or socialized outside?**
A. No.
**Q. Soy how would you describe your relationship with Officer Kelly when you were employed at the Springfield Police Department?**
A. I did not have a relationship with him. There was "Hello, how are you?"
**Q. Okay. So you never worked a case with him?**

Page 31

A. No.
**Q. Okay. What about Officer -- or excuse me, Captain Ernest Stelzer? What was your relationship with Captain Stelzer?**
A. He was my Captain in the Detective Bureau.
**Q. Okay. What years was he your Captain in the Detective Bureau?**
A. I couldn't tell you that. There was always a turnover. Always a different Captain.
**Q. Do you remember if he was the Captain in 1985?**
A. Yes, he was.
**Q. Okay. Do you know an individual or did you know an individual by the name of Francis Bloom?**
A. Yes.
**Q. Could you describe what your relationship was with Francis Bloom while you were employed at the Springfield Police Department?**
A. He prosecuted cases for me from the DA's Office.
**Q. Would it be fair to say that you had worked on more than one case that he had ended up**

Page 32

**prosecuting while you were a detective?**
A. Yes.
**Q. Okay. Can you approximate how many?**
A. I couldn't tell you that.
**Q. Would you say it's less than five?**
A. I don't remember.
**Q. Okay.**
A. 40, 35 years ago, I don't remember.
**Q. I understand. Did Attorney Bloom ever do any legal work for you separate and apart from the prosecuting, you know --**
A. No.
**Q. -- cases?**
A. No.
**Q. Did you ever socialize with Attorney Bloom outside of your work?**
A. No.
**Q. Were you familiar with or did you know George Perrot before December of 1985?**
A. No.
**Q. So you never had any interactions with George prior to December 7, 1985?**
A. No.
**Q. Okay. Taking you back to the 1985, '85 period and we already touched on this a**

**little, but were you aware of the sexual assaults that happened in Springfield on elderly women?**
MS. DeSOUSA: Objection.
A. No.
BY MS. GIZZI:
**Q. You never became aware of a series of sexual assaults?**
MS. DeSOUSA: Objection.
A. No, I never remembered.
BY MS. GIZZI:
**Q. Okay. So when you went and responded to the victim, Ms. Marchand's home, just to make sure I'm understanding, you weren't aware of other sexual assaults that had happened on elderly women in Springfield?**
MS. DeSOUSA: Objection.
A. No.
BY MS. GIZZI:
**Q. Okay. Even after December 7, 1985, did you become aware of sexual assaults that were being -- that George Perrot was being investigated for?**
A. I do not remember.
**Q. Okay. Could you explain a little bit what the responsibility of the Detective**



**Bureau was from your experience?**
A. Repeat.
**Q. What were the responsibility of the Detective Bureau when you were a detective there? Like what type of crimes were they responsible for investigating?**
A. We had homicides. We had auto theft. We had burglaries. We had arson investigators. We had bomb investigators.
**Q. Okay. And if you know, how did that differ from the Crime Prevention Bureau's role?**
A. Crime prevention does rapes and narcotics, assaults on women, children.
**Q. And whenever there was overlap between -- within an investigation with the Detective Bureau and the Crime Prevention Bureau, was that something that happened often at the Springfield Police Department?**
MR. JOYCE: Objection.
A. I couldn't tell you.
BY MS. GIZZI:
**Q. Can you think of anytime it happened while you were a detective there?**
A. You know, I don't remember. It's a long time.



**Q. I understand. It's okay.**
**You mentioned earlier that in preparation for your deposition, you might have looked at some testimony from a trial. Did I remember that correctly?**
A. That's correct.
**Q. Okay. Did you have any independent recollection of your testimony for the cases that involved George Perrot?**
MR. COYLE: Objection. You can answer.
A. Would you repeat that question one more time, please.
BY MS. GIZZI:
**Q. Sure. Do you have any independent recollection of your testimony involving the cases against George Perrot?**
A. No.
**Q. Okay. Did reviewing the trial testimony documents refresh your memory about that at all?**
A. Yes.
**Q. Okay. I'm going to share my screen now and show you one of those documents.**
MR. COYLE: Let me just, if I



could, Tom, do you need a short break? Would that be helpful to you?
THE WITNESS: Yes, it would.
MS. GIZZI: That's fine.
MR. COYLE: Let's take five minutes.
MS. GIZZI: Let's come back at 12:50. I'm sorry, that's my time. Let's come back at 1:50.
THE WITNESS: That's good. Thanks.
MS. GIZZI: Off the record.
(Off the record at 1:44 p.m.)
(Whereupon, Plaintiff's Exhibit 1, Commonwealth of Massachusetts vs. George D. Perrot, Transcript of Hearing held before Hampden County Grand Jury on December 13, 1985, was marked for identification.)
(On the record at 1:51 p.m.)
BY MS. GIZZI:
**Q. Officer Jarvis, are you ready?**
A. (Inaudible).
MR. COYLE: Can you hear us, Tom?

THE WITNESS: (Inaudible).
MR. COYLE: Are you there, Tom? Can you hear me, Tom?
THE WITNESS: (Inaudible).
MR. COYLE: If you can hear me, wave your hand at the camera.
THE WITNESS: (No response).
MR. COYLE: I'm not sure what the problem is. Tom, if you can hear me, wave your hand at the camera.
THE WITNESS: No response.
MR. COYLE: Tom, it doesn't seem like you can hear us. We have to work out our technical issues.
(Off the record at 1:54 p.m. for Attorney Coyle to contact Mr. Jarvis.)
(On the record at 1:54 p.m.)
BY MS. GIZZI:
**Q. So back on the record and I'm showing you on your screen, Officer Jarvis, a document. Are you able to see that?**
A. I was wondering what that was.
**Q. Let me know if you want me to Zoom in.**
A. Yeah, please.



**Q. Okay. Can you read that now?**
A. I'm trying get the whole thing. Can you scroll up for me?
**Q. Yes. That was the main text.**
A. Go ahead.
**Q. I was going to ask you, did you testify in the Grand Jury hearing for George Perrot's case on December 13, 1985?**
A. I testified in two cases. So I don't know. That could have been -- let's see, 1985, that could have been the first case I testified.
**Q. Do you have any independent recollection of testifying at the Grand Jury hearing on December 13, 1985?**
A. I had one testimony for Perrot in front of the Grand Jury and then I had one trial for Perrot. And then after I retired, I had a second trial for George Perrot.
**Q. Okay. So you testified on three separate occasions in cases that --**
A. No, no. Two trials, one Grand Jury, correct.
**Q. Okay. So I'm showing you this document. This is the first page of the**



**transcript for the Grand Jury hearing testimony. And I'm going to scroll to another page that I'm going to ask you about in a second.**
MS. GIZZI: Which for counsel, it's COSPROD004195, that's the Bates stamp.
BY MS. GIZZI:
**Q. So first, directing your attention to page 31 on this transcript. Do you see your name --**
A. Yes.
**Q. -- at the top of that document?**
A. Yes, I do.
**Q. Okay. Would you take a minute or however long you need to review this part of the transcript and let me know when you're done? And I'll scroll down.**
A. Keep scrolling.
**Q. (Scrolling.)**
A. Scroll.
**Q. (Scrolling.)**
A. Scroll.
**Q. Before going on to next page, I just wanted to ask you, did you see that you testified that you became involved in this investigation**



**regarding George Perrot on December 7th around 12:40 p.m.?**
A. Correct.
**Q. Do you have any reason to dispute this was your sworn testimony?**
A. Scroll up a little bit, please.
**Q. (Scrolling.)**
A. Up.
**Q. (Scrolling.) That's the next page and back to the first.**
A. Go back to the first page and scroll.
MR. COYLE: I think you mean down, Tom.
THE WITNESS: What's that, Kevin?
MR. COYLE: You want her to scroll down, is that what you want?
A. Scroll down, I'm sorry. Scroll down.
BY MS. GIZZI:
**Q. (Scrolling.)**
A. Okay. Scroll down.
**Q. (Scrolling.)**
A. Okay.

**Q. After you review that, do you have any reason to dispute that was your testimony during the Grand Jury hearing?**
A. That's correct.
**Q. So my question is do you have a reason to dispute this was your testimony?**
A. I will not dispute that's my testimony.
**Q. Okay. Thank you.**
**So now I'm going to scroll to the next page which is 32 on this transcript. And also please take a moment to read through this and let me know and I'll scroll down.**
A. (Reviews exhibit.) Okay. Scroll down.
**Q. (Scrolling.)**
A. Okay. Scroll down.
**Q. (Scrolling.)**
A. Keep scrolling.
**Q. (Scrolling.)**
A. Hold it. (Reviews documentation.) Scroll down, please.
**Q. (Scrolling.)**
A. Scroll.
**Q. (Scrolling.)**



A. Scroll.
**Q. (Scrolling.)**
A. Scroll.
**Q. Let me know are you done with this page.**
A. Correct.
**Q. Okay. So in those -- in that testimony that you testified that you explained to Mr. Perrot his constitutional rights and then you took his statement, correct?**
A. Correct.
**Q. And that statement was involving a break-in from the night prior; is that correct?**
A. That's correct.
**Q. And do you have any reason to dispute that's your testimony?**
A. That's my testimony.
**Q. Okay.**
A. That's it.
**Q. The next thing you testified to was that you had done in relation to this case was take another statement by Mr. Perrot approximately two hours after the first statement. And I'll -- hold on. Let me get to that page. I'll give you a chance to review this half of this page and let me know when you're done.**



A. (Reviews exhibit.) Scroll down, please.
**Q. You don't have to read the whole statement. I want to ask you about whether this refreshes your recollection about the timeline of the statements that you took of George Perrot on December 7, 1985?**
A. I would like you to scroll all the way down, please.
**Q. (Scrolling.)**
A. Keep going.
**Q. (Scrolling.)**
A. Keep going.
**Q. (Scrolling.)**
A. Keep going.
**Q. (Scrolling.)**
A. Stop. (Reviews exhibit.) Keep going.
**Q. (Scrolling.) This is the last page of your testimony.**
A. Correct.
**Q. So after you reviewed your Grand Jury testimony, as you sit here today, is there anything that you dispute as being truthful?**



A. No.
**Q. Okay. I'm going to stop sharing my screen now so you don't have to look at that.**
**Officer Jarvis, do you have an independent recollection of testifying at George Perrot's first trial in December 1987?**
A. I remember, yes.
**Q. Okay. And I lied that I said I was going to stop sharing my screen because I'm going to continue to do so.**
MS. GIZZI: And this one we'll mark as Exhibit 2. For counsel City 003021 it starts with.
(Whereupon, Plaintiff's Exhibit 2, Transcript of Trial held in Hampden County Superior Court before Judge Murphy and a jury continuing on December 9, 1987, was marked for identification.)
**Q. Officer Jarvis, can you see the document on your screen?**
A. Not that well. Enlarge it, please.
**Q. (Sharing exhibit.)**
A. Can you enlarge it a little bit

Page 45

more?
**Q. Yes. Give me a second.**
A. Okay. I can see it.
**Q. Okay. So this is marked as Exhibit 2. And have you reviewed this first page?**
A. Mm-hmm.
**Q. Is that a yes?**
A. Yes.
**Q. Okay. Let me direct your attention to page 130 of the transcript. Do you see your name on line 16?**
A. Yes.
**Q. And then under that, it says, "Direct examination by Mr. Bloom," correct?**
A. Correct.
**Q. And would that be a reference to Attorney Francis Bloom?**
A. That's correct.
**Q. Okay. So this first page, you see you introduce yourself to the jury?**
A. Yes.
**Q. Do you see that?**
A. Correct.
**Q. Okay. And as you testified earlier,**

Page 46

**but to confirm, your tour of duty as of December 7, 1985 was about 7:30 a.m. to 3:45 p.m.?**
A. We're usually in there from 7:45 to 3:45.
**Q. Okay.**
A. Roll call.
**Q. Gotcha. So roll call was before your shift started?**
A. Roll call is 7:45.
**Q. Okay.**
A. a.m.
**Q. Gotcha. And when you were working that shift in December 1985, were you working four days a week or how many days a week?**
A. We had five and two. Excuse me, four and two.
**Q. Four and two. Okay. And did you have in December of 1985, did you have regular days you were off or did it change?**
A. Let's see, we had Monday off one week. Tuesday, Wednesday, Thursday, and then we would have one weekend. No, we worked Monday through Friday and then we worked -- I don't remember.

Page 47

**Q. Okay. That's okay.**
A. I can't be -- I don't remember.
**Q. Okay. That's okay. Would you just continue reading this testimony? And I can scroll back up if you want to start at the top of the page, just let me know.**
A. (Reviews exhibit.) I can see about the 7:30. You can scroll.
**Q. Okay. (Scrolling.)**
A. You can scroll.
**Q. Before moving on, I'm going to ask you, did you testify in this trial that the first encounter with George on December 7, 1985 was around 7:30 -- somewhere between 7:30 and 8:00 a.m.?**
A. Correct.
**Q. Okay. Does that still sound accurate to you?**
A. Yes.
**Q. Okay. I'm going to continue. You can read the second half of this now.**
A. (Reviews exhibit.) Scroll.
**Q. (Scrolling.)**
A. (Reviews exhibit.) Scroll.
**Q. (Scrolling.)**

Page 48

A. (Reviews exhibit.) Scroll.
**Q. Before moving to the next page, do you have any reason to dispute this testimony?**
A. (No response.)
**Q. Sorry, Officer Jarvis, can you hear me?**
A. I can hear you now.
**Q. And I'll share my screen again. Do you have any reason to dispute the testimony that you read on this page?**
A. No.
**Q. And let me know when you are through line 12 because then it's just a sidebar.**
A. (Reviews exhibit.) That's correct.
**Q. Okay. And so then from here, I'll skip half of this. This is a sidebar after the trial.**
A. Mm-hmm.
**Q. Going to page 139 of this transcript. And let me see if I have it. Would you read the highlighted portion just to yourself and let me know when you're done?**
A. You got smaller on me.
**Q. Sorry. You're right. I did.**
(Adjusts screen size.)

A. (Reviews exhibit.) Are you going to let me?

**Q. I was going to ask you, are you done with that part?**

A. Can you scroll down?

**Q. Let me know when you're done reading the highlighted part.**

A. (Reviews exhibit.)

**Q. Are you done with that?**

A. Yes, I am.

**Q. So you testified during the trial that after you dropped Mr. Perrot at the booking desk that day, you went to familiarize yourself with the November 30, 1985 cases; is that accurate?**

MS. DeSOUSA: Objection.

A. No. I can't remember.

BY MS. GIZZI:

**Q. Okay. Well, I'm just asking if you testified to that. Do you have a reason to dispute the testimony?**

A. I will not dispute Grand Jury testimony.

**Q. Understood. Actually, Officer Jarvis, this is the trial, the first trial. So**



**it's in 1987.**

A. Mm-hmm.

**Q. So do you have a reason to dispute your trial testimony?**

A. No, none whatsoever.

**Q. Okay. So it's accurate then that after you introduced yourself to Mr. Perrot in the morning of December 7, 1985, you went to familiarize yourself with the other involved cases?**

MS. DeSOUSA: Objection. Attorney Gizzi, are you referring to what's highlighted here?

MS. GIZZI: We can go off the record if there's confusion.

MS. LYNCH: Let's go off the record.

(Off the record at 2:15 p.m.)

(On the record at 2:16 p.m.)

BY MS. GIZZI:

**Q. Okay. For clarity of the record, Officer Jarvis, you testified that you went to familiarize yourself with a couple of cases; is that correct?**

A. That's correct.



**Q. Okay. And when the cases you're referring to were in Rock Ridge or in relation to George Perrot, right?**

A. Perrot (pronouncing), correct.

**Q. Okay. I'm going to give you an opportunity to keep reading the rest of this page and let me know when you're done and I'll keep scrolling.**

A. Enlarge, please.

**Q. (Adjusts screen font size.)**

(Scrolling.)

A. Thank you. Scroll.

**Q. (Scrolling.)**

A. Scroll.

**Q. (Scrolling.)**

A. Scroll.

**Q. (Scrolling.)**

A. Scroll.

**Q. I'm going to ask you a couple of questions first. One of the things that you testified doing was reading the police files to familiarize yourself with the cases; is that correct?**

A. That's correct.

**Q. Okay. What all does a sexual**



**assault case file contain?**

ATTORNEY: Objection.

THE COURT REPORTER: Who objected? Would you mind stating your name when you object because I can't see all of the boxes on the Zoom screen.

MS. DeSOUSA: Lisa DeSousa. Objection.

A. I went back up to the Detective Bureau to find out what had happened that night before. Are you on?

BY MS. GIZZI:

**Q. Yes, I can hear you. I'm sorry, I just didn't want to --**

A. At 7:30 a.m. at the Detective Bureau, I was told they had George Perrot in custody. I said, "Regarding what?"

They said he was "breaking into I believe two houses, a pocketbook was stolen and a woman was assaulted."

And I said to the other detective, "I was looking at him for rape. That he broke into her house."

I went down to the booking desk. I

brought George Perrot upstairs. I asked him about my breaking and entering. And he said he had "nothing to do with it". So I brought him downstairs.

**Q. Officer Jarvis, who -- going back to when they told you they had George Perrot in custody, do you remember what officers?**

A. There was numerous detectives.

**Q. Okay.**

A. In that day.

**Q. Do you remember if they were in the Detective Bureau or the Crime Prevention Bureau?**

A. Detective Bureau. We might have had a couple of members of the Crime Prevention Bureau there also. I don't remember that.

**Q. Okay. And you just testified that you were leaving or you were talking to Mr. Perrot about your break-in?**

A. Yes.

**Q. What did you mean by that?**

A. Well, he had worked at Marchand's house.

**Q. Okay.**

A. And his name came up at the house break.



**Q. Okay. So is that what you were referring to --**

A. Yes.

**Q. -- the Marchand --**

A. That's correct.

**Q. Okay.**

A. Yes.

**Q. Okay. Did you end up actually asking him questions about Mae Marchand?**

A. At some point in time, I did.

**Q. Okay. But before you actually asked Mr. Perrot questions about those break-ins, did you leave him with the booking officers?**

A. He was booked. He was already locked up from the prior night. He was under arrest.

**Q. Correct.**

A. Okay? Correct.

**Q. Yes.**

A. He was charged. He was in this jail cell.

**Q. Okay. And just referring back to your -- referring back to the testimony that you gave during the trial about familiarizing yourself with these cases, what did you do**



**specifically to familiarize yourself with these other cases?**

A. I spoke to the arresting officers.

**Q. And the arresting officers for which incidents?**

A. For the night before the incident. He has passed away.

**Q. Right. Understood.**

**Did you do anything in terms of investigation or to familiarize yourself with the incidents that occurred on November 30, 1985?**

A. I just told you. I -- I was -- are we talking about Mae Marchand's incident or are we talking about the incident when he was arrested?

**Q. I'm asking now about the November 30th which was a week prior to his arrest?**

A. Was that the break-in and entering that I had to go to?

**Q. No. That was --**

A. I'm confused --

**Q. -- the November --**

A. I'm confused here now, okay? This is 35 years ago.



**Q. I understand. I understand.**

A. Let's go in order if we can do it. You're going from here to here to here.

**Q. So I can represent to you that the Mae Marchand, that was in October -- excuse me, September of 1985. That break-in. So now we're talking about December 1985. So when Mr. Perrot was arrested and you ended up speaking with him on the 7th, right?**

A. If he was arrested, that was the night I spoke to him, that morning.

**Q. Correct.**

A. And that was the last time I've ever spoken to him.

**Q. Right. Okay. Did you have any involvement in investigating a rape of Mary Prekop or Emily Lichwala?**

A. No.

**Q. Did you have any involvement in investigating a break-in of Emily Lichwala in November of 1985?**

A. No.

**Q. Just switching gears to more general aspects of your job. While you were a detective in the Detective Bureau of the Springfield Police**

**Department, what types of different reports did you have to author like throughout an investigation?**

A. I had -- well, I was in the auto theft for ten years. I was in the house break squad for five years. Now repeat that question again, please.

**Q. Sure. What kind of different types of reports did you have to draft during an investigation? Any kind of investigation.**

A. Well, if I made an arrest, I had to make a report on the arrest. If I -- if I received a complaint that the house was broken into, I had to make -- finish a report on the house break and what was done. Anything related to police work, whether it was house break, auto theft, I had to do it.

**Q. Okay. Did you ever have to author something called a special report?**

A. A special report? Write special? I've heard of write a special, if you wanted a day off, you'd write a special.

**Q. Okay.**

A. If you wanted sick leave, we wrote a special.



**Q. Okay. That's I think is what I'm referring to. So thank you for letting me know about that.**

**So was something called a special that you would write to your superior --**

A. Yes.

**Q. -- officer?**

A. Correct.

**Q. And you just named a few examples, but what were other purposes of writing a special?**

A. If you want to be transferred, you wrote a special. If you worked overtime, you wrote a special. Like I said, sick leave, a day off. That's examples.

**Q. What about in regards to an investigation or like an ongoing case? Would you ever write a special to your superior officer in that situation?**

A. No.

**Q. Okay.**

A. No.

**Q. Did you ever use specials to, you know, update officers on different shifts?**

A. We would wait until the officers



came in if we had something to tell them.

**Q. Okay.**

A. Face-to-face.

**Q. Okay. Was there a policy or procedure that instructed officers on how to write a special or what circumstances they should be written?**

MS. DeSOUSA: Objection.

A. Not to my knowledge.

BY MS. GIZZI:

**Q. And were specials something that could be addressed to anyone in the police department?**

MS. DeSOUSA: De-Sousa, objection.

A. Usually if you wrote a special, that was to a commander, from a sergeant to the Chief.

BY MS. GIZZI:

**Q. Okay. If you were writing a special to your superior officer, generally, at what point during your shift would you write that?**

A. Either morning or afternoon.

**Q. So if you were working the day shift like you mentioned earlier, 7:30 to 3:45, is that something you would do at the beginning and the**



**end of your shift?**

A. No. I don't understand what you're getting at.

**Q. I'm just trying to understand if that was a practice that you had if you would generally write them at the end of the shift, or in the middle, or in the beginning?**

A. It depends on what you were looking for, what you were doing.

**Q. Okay. Okay. I'm going to share my screen again. Hold on. It's giving me -- do you want to take a break real quick --**

A. No.

**Q. -- or do you want to keep going?**

A. I'm all set.

**Q. Okay. I'm just making sure since it's going to take a second to pull this up.**

MS. GIZZI: And we will mark this exhibit as 3, please.

(Whereupon, Plaintiff's Exhibit 3, Springfield Police Department, Special to Captain Stelzer from Thomas Jarvis, dated December 7, 1985, was marked for identification.)

A. Special to Captain. Okay.

Page 61

**Q. And I can zoom in once more here.**
A. Yeah.
MS. GIZZI: And for the attorneys, this is CITY 004732.
MR. COYLE: Is this Exhibit 3?
BY MS. GIZZI:
**Q. Officer Jarvis, have you ever seen this document before?**
A. Yes.
**Q. And just directing your attention to the top left corner --**
A. Yeah.
**Q. -- can you --**
A. I see it.
**Q. Can you read out loud what that date is?**
A. December 7, 1985.
**Q. Okay.**
A. Special report to Captain Stelzer.
**Q. Does that date indicate the day the special was written on?**
A. It should be.
**Q. And you mentioned this already, but who is this special address to?**
A. My Captain.

Page 62

**Q. And would that be Captain Ernest Stelzer?**
A. That's correct.
**Q. Okay.**
A. (Reading softly.) That's correct.
**Q. Okay. Officer Jarvis, is that your signature on the bottom under "Respectfully"?**
A. Yes.
**Q. And is all the handwriting contained in this --**
A. That's correct.
**Q. -- it's yours?**
A. Correct.
**Q. Okay. And do you have any basis to think that what is contained in this special was inaccurate in any way?**
A. No, that's correct.
**Q. Okay. So do you know why you wrote the special to Captain Stelzer?**
A. I believe he was working that day.
**Q. Why do you believe that?**
A. Because he signed. He signed one of the statements that was given by George.
**Q. Okay. So do you know if you wrote the special before or after that?**

Page 63

A. I couldn't tell you. I could not tell you.
**Q. And when you say you can't tell us, is that because you don't remember?**
A. I don't remember.
**Q. Okay. Just clarifying.**
A. Thank you.
**Q. Is there any other reason that you think Captain Stelzer was there working that day besides the signature on that statement?**
A. I think things occurred on a Saturday. I'm not too sure. For some reason, I have Saturday on my brain that they arrested George Perrot. And he does not work Saturdays, so I could be wrong on that also.
**Q. No, that's okay. I'm just trying to understand why it's written. So even assuming Captain Stelzer was there, why did you write this special to him?**
A. Well, to me, I wanted to let the Captain know that as far as he was concerned -- as far as I was concerned, he was not telling the truth to me.
**Q. And by --**
A. That's the...

Page 64

**Q. I'm sorry. I didn't mean to cut you off. Go ahead.**
A. To me, I didn't believe Mr. Perrot saying the drugs made him do it.
**Q. Okay. So you wrote this special to inform --**
A. The Captain.
**Q. -- Captain Stelzer about that conversation with George?**
A. That's correct.
**Q. Okay.**
A. Yes.
**Q. Was it a standard practice to send a special if both yourself and the Captain were working that day?**
A. Yes. This way, it's written and if he needed it like you have it. It's incidents like this.
**Q. What do you mean incidents like this?**
A. I did not believe he was telling the truth. So I threw a special to Captain Stelzer.
**Q. Did you directly hand this special to Captain Stelzer?**
A. Wait a minute here. This is -- this

is approved by the Lieutenant. This is approved. That was approved by Lieutenant Arpin. Too many years have gone by. I'm sorry.

**Q. What does it signify to you that it was approved by Lieutenant Arpin?**

A. To me, it means Lieutenant Arpin was working that day and the Captain was working that day. So you have to go -- you have to go in sequence, okay? When you're -- it's like the military. You have to go in sequence. Lieutenant, Captain, Deputy Chief, Chief.

**Q. Okay. So for a special that's addressed to Captain, it has to go through a Lieutenant first?**

A. He has to read it, okay it, and then put it -- if the Captain was there, give it to the Captain. If the Captain wasn't there, put it in the Captain's box or office.

**Q. Okay. Understood. So you wouldn't have directly handed it to Captain Stelzer regardless if he was there or not because it needed approval by a lieutenant; is that fair?**

A. That's how we usually run things, correct.

**Q. Okay. About how long would that**



**practice take from you writing the special to it getting approved by the Lieutenant?**

A. I couldn't tell you.

**Q. Less than five minutes? More than five minutes?**

A. A few minutes.

**Q. Okay. So not a very lengthy process?**

A. No.

**Q. So going back to your career as a detective at Springfield, could you estimate how many interrogations you were involved in throughout your career?**

A. I can't give you an answer.

**Q. I'll help you out. More than 50 or less than 50?**

A. More than 50.

**Q. Okay. More than 100?**

A. Around -- around 100.

**Q. Okay. Okay. That's okay. I'm not holding you to an exact. I just wanted to get an idea.**

**So generally, when you were conducting interrogations, were you doing that on your own or were you doing that with another partner or**



**officer?**

A. Sometimes -- I lost you.

**Q. I'm sorry?**

A. Okay.

**Q. Do you need the question read back?**

A. I lost you. Would you repeat?

**Q. Oh, yes. Can you hear me now?**

A. Now, I can.

**Q. Okay. So generally speaking when you conducted interrogations, were you conducting those on your own or with another officer?**

A. You can do it by yourself or you can do it with your partner. It doesn't matter.

**Q. Okay. What was your preference or practice personally?**

A. It really didn't matter. It really didn't matter. A lot of times, I did it by myself. A lot of times, I had my partner or somebody else with me.

**Q. So you didn't have a preference one way or another?**

A. No.

**Q. Okay. What about taking notes. Did you generally take notes during interrogations?**

A. Yes.



**Q. And would that be just hand writing your own notes?**

A. Yes.

**Q. Okay. Was there a practice or policy within the department regarding taking notes during interrogations?**

A. No.

**Q. So it wasn't required to do, right?**

A. Correct.

**Q. And going back, I missed asking you about this, was there any type of expectation when you did take notes about putting those in the case file?**

A. I never put mine in the police file. No, I should -- there was -- sometimes we did and sometimes we didn't.

**Q. Do you remember why --**

A. We weren't forced to do it. If we took notes, it would be scribble and you take a statement, scribble enough, you know, you got it on paper. You got it on the notes.

**Q. Okay. Do you remember any instances where you did include your handwritten notes in a police file?**

A. I couldn't tell you.

**Q. Okay. Do you remember if there was a policy or I'm sorry, if there was a practice in the department about putting handwritten notes in police files?**
A. There was never an order.
**Q. Okay.**
A. A police order.
**Q. Were there any department guidelines or requirements on how to memorialize a suspect's confession?**
A. No.
**Q. So you could just put anything you wanted in there?**
A. No.
**Q. Okay. So what --**
A. You couldn't put anything you wanted in there.
**Q. Okay. So explain to me what was the expectation about how to memorialize a suspect's confession?**
A. You would Miranda -- you would give him his Miranda rights. You would speak to him. If he wanted to speak to you, he would speak to you. If he didn't want to speak to you, you returned him to his cell.



Now if he wanted to speak to you, you would give him his Miranda warning on a piece of paper, on a card, put his name. He would -- he would sign his name after he'd been Mirandized. He would sign his name, the date, the time. And he was Mirandized. And that was it. You start speaking to him.
**Q. And did you ever ask a suspect to hand write his own confession or statement if he said he was willing to do so?**
A. Oh, absolutely.
**Q. Okay. Would you still then type up that statement or would you just let it be handwritten as long as it was legible?**
A. I would type it up, but my typing is horrible. I would type it up.
**Q. And was that a practice that you personally adopted of typing up a confession of a suspect or was that something expected?**
A. I don't know what other detectives did.
**Q. But for you, it was -- you can say it was a practice that you had?**
A. Correct.
**Q. Okay. Back in 1985, were there typewriters in the interrogation rooms at the Springfield Police Department?**



A. Usually there was one.
**Q. In the actual interrogation room?**
A. Yes.
**Q. In suspect interrogations or interviews, did you in your career ever use an audio recording device to record a statement?**
A. Never.
**Q. Do you know if any of the detectives ever did while you were at the Springfield Police Department?**
A. No.
**Q. You don't know one way or the other, is that what you're saying?**
A. I don't think we had them.
**Q. Okay. That was going to be my next question. Do you know if there was a department policy on maintaining handwritten notes after a suspect was charged?**
A. No, there was no policy.
**Q. So you could throw them out later in theory?**
A. Would you repeat that again, please?
**Q. So in theory, you could throw out a suspect's notes after an interview?**



A. Yes.
**Q. When a suspect informed you that he wanted to confess or would talk about a given incident, was generally more than one officer in the room to witness a suspect's confession?**
A. It's up to the individual police officer. If I was taking a statement, I would do it by myself or I would have my partner in there with me, or if he didn't want to get involved, it's many things.
**Q. Was there ever a --**
A. There was --
**Q. -- I'm sorry, go ahead.**
A. No. No.
**Q. Okay. Was there certain situations or certain types of suspects that you would have wanted to have a partner or another officer in the room while they were giving their confession?**
A. Violent. If you know they're going to be violent.
**Q. Any other situations that you can think of?**
A. No, not really.
**Q. Okay. So was there a department**

**policy or expectation regarding officers witnessing a suspect's confession?**
A. No.
**Q. Would an officer --**
A. No.
**Q. I'm sorry, go ahead.**
A. I'm sorry. Repeat. Repeat that, please.
**Q. My last question was was there a department policy or expectation of an officer witnessing a suspect's confession?**
A. There's times that supervisors came in and looked at the confession, a captain, a lieutenant, a sergeant. I've had times like that, yes.
**Q. In what situations would a captain or a lieutenant --**
A. Different situations.
**Q. Could you give me an example?**
A. Well, the Perrot case.
**Q. And what about the Perrot case required, or not required, or resulted in a supervisor signing the confession?**
A. He signed the confession. He was an onlooker, so he signed it.



**Q. What do --**
A. Yeah.
**Q. What do you mean by onlooker?**
A. It is -- the captain is in charge. I'm writing a confession. I'm taking a confession. He comes in, sees how things are going. And then after my name is signed, he comes in. He looks it all over. And it's not necessary. He's -- he may -- he may sign the confession also as a witness.
**Q. Okay. I'm --**
A. But it's not mandatory that you have to have a witness in there.
**Q. Okay. So if it's not mandatory, why would you do it?**
A. He's in charge.
**Q. Well, would he have asked you?**
A. He's in charge.
**Q. What does that mean, he's in charge?**
A. He's number one. He's your boss.
**Q. So if he asked you to sign a statement --**
A. No. No, we're getting confused here. If I took a confession, I would sign my name as a police officer, okay? In one



particular instance there, Captain Stelzer signed as a witness which is very rare.
**Q. Okay. I follow you. What I'm trying to understand is why in that situation would the Captain sign as a witness to the statement if it wasn't mandatory?**
A. I believe because of the crimes that were committed that night before.
**Q. Okay. So because you think the serious nature of the crimes --**
A. Mm-hmm.
**Q. -- that Mr. Perrot was accused of.**
A. Mm-hmm.
**Q. Is that a "yes"?**
A. Yes.
**Q. And to make sure I'm clear, what does it mean when a Captain signs as a witness to a confession?**
A. He signs. He looks at the statement. He talks to the suspect. If everything is okay, he signs it.
**Q. Okay. Does it include that the Captain is witnessing the suspect signing the statement?**
A. Yes. I opened up a can of worms



with this. Usually one subject, one police officer takes a statement. You do not need two police officers sitting there. You can use one. You can use two, okay? That particular day, he came in and he witnessed it. Very rare.
**Q. Okay. Did Captain Stelzer from your experience ever sit in on the actual interrogation of a suspect?**
A. I couldn't tell you that.
**Q. Is that because you don't remember an instance in which --**
A. I'm out in the street. He's inside.
**Q. When you were a detective and you were conducting interrogations, do you remember if Captain Stelzer ever sat in on an interrogation?**
A. To my knowledge, no.
**Q. Okay. So you mentioned earlier typewriting statements. So what was your practice if a typewritten statement had typos and needed to be edited?**
A. We had the suspect initial it where there was problems.
**Q. Was that a department practice or policy?**

A. No, that was just common sense.
**Q. Was common sense a part of the department practice or policy?**
A. No, that was a detective doing it. You saw that -- you see when you're questioned when you're on the stand.
**Q. Were there any department guidelines or requirements about how to correct a typewritten confession?**
A. No.
**Q. Did you as the interrogating officer have to sign off or notate that on a typewritten document that had been corrected?**
A. No.
MS. GIZZI: Okay. Let's take a ten-minute break.
THE WITNESS: Okay.
MR. COYLE: The time would be back, what? 3:05?
MS. GIZZI: Yes.
MR. COYLE: Okay.
MS. GIZZI: Thanks.
(Off the record at 2:55 p.m.)
(On the record at 3:08 p.m.)
(Whereupon, Plaintiff's Exhibit 4,



Statement taken from George David Perrot; Statement taken by Detective Thomas Jarvis on December 7, 1985 at 12:40 p.m., was marked for identification.)
BY MS. GIZZI:
**Q. Officer Jarvis, I'm sharing my screen with you again with what has been marked as Exhibit 4 which is Bates stamped CITY 004730. I will zoom in. Let me know if that's enough though.**
A. A little more, please.
**Q. I'm sorry?**
A. Zoom a little more please.
**Q. Okay. And I just want you to look at the document generally and then I'll ask you specifics, but -- here, I'll just show you the whole thing. Oh, excuse me, this is 4731.**
**Officer Jarvis, have you ever seen this document before?**
A. Mm-hmm.
**Q. Can you hear me?**
A. I hear you. I'm reading it.
**Q. Okay. Do you want to read the whole thing before I ask you questions about it?**



A. Yes, please.
**Q. Okay. Let me know when you want me to scroll down.**
A. (Reviews exhibit.) Okay. Scroll.
**Q. (Scrolling.)**
A. (Reviews exhibit.) Scroll.
**Q. (Scrolling.) And that's it end of the document.**
A. (Reviews exhibit.)
**Q. Okay. Have you ever seen this document before?**
A. That's my writing and that's his writing.
**Q. But have you ever seen this document --**
A. Yes.
**Q. -- before?**
A. Yes.
**Q. Okay. So on the screen now is two signatures. The first or the one directing your attention to the statement taken by Detective Thomas Jarvis, December 7, 1985. Do you see your signature under that text?**
A. I see it, yes.
**Q. Is that, in fact, your signature?**



A. Yes.
**Q. Okay. Do you have an independent recollection of typing up the statement?**
A. Yes.
**Q. And what is that recollection that you have about typing up the statement?**
A. I used two typewriters. And I'm looking for his initials. Could you show me from the beginning again, please?
**Q. Yes, this is the top.**
A. Could you show me the whole?
**Q. (Scrolling.)**
A. (Reviews exhibit.)
**Q. Let's start with what you just testified to. You used two typewriters.**
A. Yes.
**Q. Why did you use two typewriters?**
A. The first one was a real old one. So I had to go an electrical one that I found.
**Q. Okay. And is that why the two paragraphs are in different type face because they're different typewriters?**
A. Correct.
**Q. Okay. So starting back at the top, this first paragraph where it says, "Statement**

**taken from George David Perrot, age 17, 87 Malibu Drive, Springfield." And there's -- it looks like a series of numbers. "Statement taken by Detective Thomas Jarvis on December 7, 1985 at 12:40 p.m." Do you see that text?**

A. Yes.

**Q. Okay. Was this part of your personal practice to include this like introductory paragraph in the beginning of the statement?**

A. Yes.

**Q. Was this something that was a department policy?**

A. No.

**Q. Is this something that you learned through your on-the-job training with those other officers?**

A. Yes.

**Q. Would you say that was your standard practice in --**

A. Yes.

**Q. -- typing up statements?**

A. Yes.

**Q. Okay. And as you can see, the end of this statement, it says it was taken at 12:40**



**p.m.**

A. Yes.

**Q. Does that mean that's when you started typing it up, or finished or something else?**

A. I started at 12:40 p.m.

**Q. Okay. Do you remember what time you finished typing up the statement?**

A. No.

**Q. Okay. So you mentioned you had to switch typewriters. When you switched typewriters, did you go to a different interrogation room?**

A. No, we have typewriters -- other typewriters in the Detective Bureau, three or four of them.

**Q. And so was that something you brought into the interrogation room that George was already in at that time?**

A. Correct.

**Q. And so does that mean you typed up the statement in the presence of George?**

A. Yes.

**Q. And then going back towards the bottom where it says, "Statement given by George**



**David Perrot," and then his signature. Did you witness George sign the statement?**

A. Yes.

**Q. And was there anybody else there present when he did that?**

A. No.

**Q. Okay. I'm going to move on. I'm going to keep sharing by screen, but I'm going to move on to another statement and I will zoom in, as well. I'll let you read through this before asking you questions and let me know when you're done.**

A. My allergies are killing me.

THE COURT REPORTER: Is this document going to be marked as Exhibit 5, Attorney Gizzi?

MS. GIZZI: Yes. Thank you.

(Whereupon, Plaintiff's Exhibit 5, Statement from George Perrot, starting with "My name is George Perrot and I live at 87 Malibu Drive", was marked for identification.)

A. Zoom in for me, please.

**Q. Okay.**

A. Thank you. Okay.



**Q. And would you like me to scroll?**

A. Scroll, please.

**Q. (Scrolling.)**

A. Okay. That's George. Okay.

**Q. Have you ever seen this statement before?**

A. Yes.

**Q. In what capacity did you see this statement before today?**

A. With my attorney.

**Q. Okay. Before that, had you seen this statement before?**

A. No.

**Q. Okay. So directing your attention to the bottom of the page where it says "witnessed," that first line, is that your signature.**

A. Correct.

**Q. Okay. And whose signature is below yours?**

A. Captain Ernie Stelzer.

**Q. Okay. And we touched upon this a little bit earlier, but was Captain Stelzer ever in the interrogation room when George gave you any of the information contained in the**

**statement?**
A. He would pop in occasionally.
**Q. And about how many times do you think he popped in?**
A. I couldn't tell you.
**Q. Was it more than one?**
A. I could not tell you.
**Q. Because you don't remember?**
A. I don't remember.
**Q. Okay. When Captain Stelzer popped into the interrogation room, did he ever engage in any questioning of George?**
MR. COYLE: Objection. You can answer, if you can.
A. I don't remember.
BY MS. GIZZI:
**Q. Do you remember why Captain Stelzer popped into the interrogation room?**
A. I don't remember.
**Q. Was it common for Captain Stelzer or a Captain to pop into an interrogation room of a suspect while the interrogation was going on?**
A. Sometimes.
**Q. Was it common in that it happened more than 50 percent of the time?**



A. I can't be truthful.
**Q. Let me clarify that. Is it because you don't remember?**
A. I don't remember.
**Q. And did you ever leave the interrogation room when George was in there on December 7, 1985? I'm sorry, during the questioning?**
A. One of the police officers, one of the detectives was going out for lunch and he wanted to talk to me outside the room. So he picked up lunch for George, myself and himself. That's the only time I left.
**Q. Who was that detective?**
A. John Scanlon.
**Q. Was that before or after this statement that is currently on your screen was drafted?**
A. I don't remember that.
**Q. Was it before or after the statement that we previously talked about that I'm now putting on your screen again was drafted?**
A. I don't remember.
Q. Okay. Give me just a second. (Brief pause.) Just generally, if there were two police officers in a questioning of a suspect in the room, would both police officers sign off on that confession of a suspect?



A. Yes.
**Q. Okay. I'm going to now direct your attention to another document which -- let me know if you can see this.**
A. It's small.
MS. GIZZI: Let's go off the record for a minute. Let me get the right document up. I'll be back in less than a minute. Sorry.
(Off the record at 3:23 p.m.)
(On the record at 3:24 p.m.)
BY MS. GIZZI:
**Q. Before moving on, Officer Jarvis, to another document, you mentioned that Captain Stelzer popped into the interrogation room. Did any other officer while you were questioning George stop in, stop in, pop in --**
A. No.
**Q. -- anything like that?**
A. No.
**Q. No?**
A. No.



**Q. So Lieutenant Arpin didn't stop in at any point?**
A. No.
**Q. Did you ever leave the questioning of George Perrot when he was being asked about 33 Covel Street?**
A. Repeat that, please.
**Q. Do you remember any questions that either yourself or another officer asked of George Perrot regarding a 33 Covel Street?**
A. No.
**Q. C-o-v-e-l.**
A. No.
**Q. Okay. What about questions about Emily Lichwala?**
A. No.
MS. GIZZI: And that's L-i-c-h-w-a-l-a, for the record.
**Q. Okay. So now I'm going to move on a to that other document that I mentioned.**
THE COURT REPORTER: Attorney Gizzi, will you be marking this as the next exhibit?
MS. GIZZI: Yes, I am marking it as Exhibit 6. It is Bates stamped,

starting as Bates stamped CITY 001880
and it's a trial transcript from
January 8, 1992.
(Whereupon, Plaintiff's Exhibit 6,
Trial Transcript of George Perrot,
dated January 8, 1991, CITY 001880, was
marked for identification.)
BY MS. GIZZI:
**Q. So earlier, Officer Jarvis, you testified you had testified in the second trial of George Perrot. Do you remember testifying to that audio?**
A. Partially, yes.
**Q. Okay. So that's this document in front of you. Just take a moment to look at it. This is the first page of the transcript and I just want --**
A. Can I get --
**Q. -- yes, I can give it to you for context.**
A. (Reviews documentation.) Okay.
**Q. I'll scroll down so you can see the whole thing.**
A. Okay. Got it.
**Q. Now directing your attention to page**



**465 of the transcript which is CITY 001924. Officer, Mr. Jarvis, does this appear to be the start of your testimony in the second trial of George Perrot?**
A. Correct. Do you want to scroll?
**Q. Yes. (Scrolling.)**
A. Okay.
**Q. (Scrolling.)**
A. Okay.
**Q. (Scrolling.)**
A. All right.
**Q. And once you get to the highlighted portio, would you just read that out loud for the record?**
A. (Reading softly.) And on the day you recall (Inaudible words) (Soft voice) when you first learned that? When I first came into the Detective Bureau. Upon learning, that can you give you us an idea of what you did, if anything. Okay.
MS. GIZZI: Court reporter, did you get that?
THE COURT REPORTER: Partial. He was reading softly.
A. Would you like me to read it again?



**Q. Just the highlighted portion.**
A. (Reading aloud.) Now at some point on that day, did you learn of the arrest of George Perrot?
Yes, sir, I did.
Do you recall when you first learned that?
When I first came into the Detective Bureau.
And upon learning that, can you just give us an idea of what you did, if anything? Was there anybody in the room with Mr. Perrot? (End of reading.)
**Q. Sorry, this first line here.**
A. (Reading aloud.) I spoke to a few detectives. I went into our interrogation room and I spoke to George Perrot. (End of reading.)
**Q. Okay. I'll stop you there. Thank you. What detectives did you speak with when you got to the Detective Bureau on December 7, 1985?**
A. I can't remember all of everybody. It was quite a few.
**Q. Can you name any of them?**
A. John Scanlon, Captain Stelzer, whoever was working on the midnight to eight



shift. No, I can't remember.
**Q. Did you speak with Thomas Kelly?**
A. No, I don't believe so.
**Q. What about Ronald St. Germain?**
A. No, I believe they're with the Crime Prevention Bureau.
**Q. Andrew Canevari?**
A. No.
**Q. Thomas Kennedy?**
A. I don't remember.
**Q. Scrolling down to the middle of this page where it's starting on line nine, you were asked, "Was there anything in the room with Mr. Perrot when you arrived?"**
**And you testified, "No, sir."**
**Do you see that?**
A. Mm-hmm.
**Q. Is that a "yes"?**
A. That's "No, sir." Correct. There was nobody in the room.
**Q. I'm just asking because for the court reporter, I know sometimes it's easy to get into the habit of saying "mm-hmm". I'm not trying to be, rude but just trying to get it clear.**

A. Excuse me.
**Q. Did anybody ever later when you were in the room with George ever come in to the interrogation room? This is right when you got there that morning.**
A. Captain Stelzer popped in. That was it. It was basically George and I.
**Q. And maybe my question wasn't clear. So this would have been the time that you first went in to the interrogation room to see George before you took any statements. Did anybody else come in the room at that point?**
A. No.
**Q. And do you still think Captain Stelzer popped in then or do you think so it was later?**
A. I think it was later.
**Q. Okay. Moving on to page 470 of the transcript. Would you just start with line one. You can read it to yourself and then I'll ask you some questions.**
A. (Reviews exhibit.)
**Q. Did you finish reading through line eleven?**
A. I finished reading line eleven, but



I did not have George in the room at the time.
**Q. What do you mean you did not have George in the room at the time?**
A. George was not in the room at the time.
**Q. When you left to conduct this investigation, you mean?**
A. I don't remember.
**Q. Okay.**
A. I'm having a hard time remembering this.
**Q. Do you have --**
A. I don't recall.
**Q. I'm sorry, go ahead.**
A. No, go ahead.
**Q. Did you, in fact, conduct some investigation on December 7, 1985 after you first interacted with George?**
A. Yes, I did.
**Q. And as you testified in this transcript that we're looking at now, was part of that investigation related to a pair of gloves?**
A. Yes, it was.
**Q. And what exactly did you do in relation to a pair of gloves with this**



**investigation?**
A. I was told by the other detectives that he was wearing a pair of gloves.
**Q. What detectives told you that?**
A. The twelve to eight shift men.
**Q. From the Crime Prevention Bureau or the Detective Bureau?**
A. The Detective Bureau. So I believe I went to his girlfriend's house to look for his gloves, the gloves he was wearing. He was put back in a cell. He was put back in a cell.
**Q. Understood. Were these gloves that had been collected and were in evidence?**
A. No. The detectives told me that he was wearing a pair of gloves the night of the break-ins and rape and he couldn't find them. So I went up to his girlfriend's house.
**Q. The detectives told you they couldn't find the gloves?**
A. I believe.
**Q. What else did the detectives tell you in relation to these gloves?**
A. I believe they were furry or they were -- that's all. That's all I can remember.
**Q. Was it your understanding based on**



**your conversation with those detectives that this was potentially a piece of evidence for these crimes?**
A. Correct.
**Q. So when you went to George's girlfriend's house, what did you --**
A. I honored -- I can't remember. I cannot remember.
**Q. Do you remember going to her house though?**
A. His mother's or her house, I'm -- I cannot remember.
**Q. And when you say his mother's, are you referring to George's mom?**
A. Pardon me?
**Q. When you say his mother, are you referring to George's mother?**
A. Correct.
**Q. Did you go with anybody, whether it was George's house or George's girlfriend's house, did you go with any other officer?**
A. John Scanlon.
**Q. And regardless of which house you ended up going to, what did you learn from this investigative errand?**

Page 97

A. 35 years ago, I can't -- I don't know. I don't remember that.
**Q. Do you remember if you found a pair of gloves?**
A. No.
**Q. No, you don't remember?**
A. I don't remember.
**Q. Okay. Other than going to a house, either George's mother's or his girlfriend's regarding this pair of gloves, what else did you do during this investigation in the morning of December 7, 1985?**
A. I don't remember.
**Q. Did you review police reports from these crimes?**
A. I don't remember. I really don't.
**Q. Do you think that's something you would have done if they were available to you?**
A. Yes.
**Q. Okay. Directing your attention to page 474 of this transcript. I'll let you read the whole page and then let me know when you get through line 11.**
A. Scroll. Scroll, please.
**Q. (Scrolling.)**

Page 98

A. (Reviews exhibit.) Scroll.
**Q. Scrolling.**
A. (Reviews exhibit.) Okay.
**Q. And will you just read the highlighted portion out loud for the record?**
A. (Reading aloud.) My question now is from the trial you began to the time you completed the written statement, do you now have an idea of how long you spent with George Perrot?
Probably 45 minutes to an hour for that one statement.
And do you just type as you talk? Did you talk? And first, what is the process you follow?
I usually take a statement in writing and then reduce it to typing. (End of reading aloud.)
**Q. Thank you. Do you have any reason to dispute this was your testimony?**
A. That was my testimony.
**Q. And when you do that, you usually take a statement in writing and then reduce it to typing. Were you -- did you mean by that handwriting?**
A. Yes.

Page 99

**Q. And did you do that usually in a, notebook, or a note pad, or did you have any type of --**
A. We had --
**Q. -- a report?**
A. We had yellow pads from the Detective Bureau.
**Q. Okay. I'll move further down. This page 42 of the transcript which starts at the last line. Can you see that first, Officer Jarvis, the highlighted portion?**
A. Yes.
**Q. Okay. Now it says, "Now, at some point, sir, did you begin to ask Mr. Perrot about the incident of November 3, 1985?"**
**You testified, "Yes, sir, I did."**
**And then the attorney asked, "Do you recall the first time was that you questioned him about that?"**
**You answered, "I would guess at sometime around 3 -- 3:10 that afternoon."**
**Did I read that correctly?**
A. That's correct.
**Q. And do you have any reason to dispute that you testified as such?**

Page 100

A. No.
**Q. Okay. So around 3 p.m. according to your testimony, you took a second statement from George after questioning him about November 30, 1985; is that correct?**
A. Mm-hmm.
**Q. Is that a "yes"?**
A. Yes.
**Q. Okay. Do you have an independent recollection of --**
A. No --
**Q. -- taking that --**
A. I don't. I'm having a hard time remembering these.
**Q. Okay.**
A. You know, it's 35 years.
**Q. In the course of taking discussing these events with George and drafting this second statement, were any other officers present in that process?**
A. I couldn't -- no.
**Q. Okay. I'm going to move on to 485. Do you see that highlighted portion, sir?**
A. (Reading softly.) Yes.
**Q. And is this the process that you had**

**when taking a suspect's statement back in 1985?**
A. It depends. It depends. Sometimes, I write things down. Sometimes, I take it from the subject's mouth -- suspect's.
**Q. Do you mean that you would sometimes type write it while they were telling in real time what happened?**
A. Yeah, and then I would stop them.
**Q. Did you have a preferred practice for yourself in taking a suspect's statement, whether that was handwriting first or type writing?**
A. It depends on the situation.
**Q. What does it depend on?**
A. Homicide, stolen car, a drug arrest I made. It depends on the situation.
**Q. So for a homicide, what was your standard practice, for example?**
A. I don't remember.
**Q. But you do remember that your practice differed depending on the type of crime that was involved?**
A. Correct.
**Q. Okay.**
THE WITNESS: Excuse me, my



allergies are killing me. I apologize.
MS. GIZZI: You're fine. Do you want to take a break?
THE WITNESS: No, I'm all set.
MS. GIZZI: Okay.
**Q. . I'm going to go to the next page. And now we were on page 491 of the trial testimony. Officer Jarvis, would you read this? I mean you can read it to yourself.**
A. (Reading aloud.) Do you have additional dealings with Mr. Perrot during the lineup or after that?
Yes, sir, I did. (End of reading aloud.)
**Q. What other additional dealings did you have with George after the second statement?**
A. I don't remember. I do not remember.
**Q. Were you involved with the lineup that George Perrot participated in on December 7, 1985?**
A. I remember a little bit of a lineup or -- I cannot remember. I don't remember.
**Q. Okay. And the last piece of**



**testimony that I'm going to ask you about, I believe which is page 499 of the transcript. Just take your time to read this and let me know when you're done.**
A. (Reviews exhibit.) Yeah. Do you want me to read that out loud?
**Q. No, I was just asking you to read that to yourself. Are you done reading that to yourself though?**
A. Yes.
**Q. And then I'm going to keep scrolling. This is the second half of that. So just read that, too.**
A. (Reviews exhibit.) Mm-hmm. Yes.
**Q. Here's the next part of that. Do you want me to go back?**
A. Please, go back.
**Q. Sorry. (Scrolling.)**
A. All right. (Reviews exhibit.) Do you want to scroll?
**Q. Okay. (Scrolling.)**
A. Okay.
**Q. Okay. Do you have any reason to dispute that this is your testimony and that it's accurate?**



A. It's mine.
**Q. Okay. Why didn't you write a report on your interaction with George's girlfriend, Lisa Eldridge, in the morning of December 7th, 1985?**
A. No need for it.
**Q. And what do you mean there was no need for it?**
A. There was no need for it.
**Q. Why was there not a need for it?**
A. We didn't find nothing. It's a -- no. No.
**Q. And did you --**
A. There was no need for a report. There was no need for it.
**Q. I'm just trying to clarify because earlier you testified that you didn't remember the interaction --**
A. Well --
**Q. -- I'm sorry?**
A. (No response.)
**Q. I'm sorry, were you going to say something, Officer?**
A. No, I'm just looking at the statement.

**Q. Okay. So you don't remember what the interaction, if any, was with George's girlfriend that you had on December 7, 1985; is that fair to say?**
A. No. No.
**Q. No, it's not fair?**
A. I -- I don't know what kind of -- I have no idea what interaction I had with that girl.
**Q. Okay. So how do you know there was no need for a report if you don't remember what the interaction was?**
A. There was no need. There was no need for it.
**Q. And how do you know that?**
A. I've been on -- I've been around the block for 25 years. There was no need for it. If I found them, it would have been great.
**Q. Okay. If you found some potential relevant evidence regarding -- in that interaction with George's girlfriend, would you have written a report?**
A. It would have been brought in and used as evidence.
**Q. And if George's girlfriend had given**



**you some new piece of information, would you have written a report in that scenario?**
A. Yes, I would have.
**Q. And what kind of report would that have been?**
A. I have no idea.
**Q. Well, it wouldn't have been an arrest report, right?**
A. That's for sure.
**Q. Is there like a general report form that you used?**
A. No, we use -- we use copies. Just three copies on a loose law report.
THE COURT REPORTER: I'm sorry, did you say "loose law report"?
THE WITNESS: It's a small report.
A. We would have a small report that you would write a special on.
**Q. Okay. So this is the last page I want to ask you about in your trial testimony. So --**
MR. COYLE: What page is this?
MS. GIZZI: Sorry. Page 512 of the transcript, but Bates stamped



1971.
A. (Reading aloud softly.) "Do you have your handwritten notes and memorandum in the police department." "And destroying your --" (Continued reading that is too soft spoken/inaudible). Springfield Police Department, last year, that's the truth.
**Q. Okay. And you have --**
A. (Reading aloud softly.)
**Q. Did you have an independent recollection of destroying your handwritten notes from your interrogations with George Perrot?**
A. I always destroy my notes. Once the statement is written, the notes are destroyed.
**Q. And at what point would you destroy your handwritten notes in the course of an investigation or prosecution?**
A. When the statement is taken from the defendant, I would destroy my notes.
**Q. And was that a protocol to destroy the --**
A. That was the police officer's -- every police officer and individual, he tells different things. He does different things.
**Q. Did you know of other detectives in**



**the Detective Bureau of the Springfield Police Department if that was something that they also did?**
A. A lot of them did it, yes.
**Q. And you see in this statement -- or I'm sorry, this testimony where you were asked "When did you destroy them?"**
**"When I left the Springfield Police Department last year."**
**So are you now saying that that is not the case? You didn't destroy them when you left the Springfield Police Department?**
A. They were destroyed. I -- I destroy my notes. I cleaned the desk out and I left my job. So whatever was in there or -- well, that was it.
**Q. To be clear, did you destroy your handwritten notes --**
A. I don't --
**Q. -- periodically?**
A. I don't remember regarding George. 30 plus years ago, I don't remember.
**Q. But you don't dispute that you testified to this, that you destroyed your notes when you left the Police Department in '91,**

**right?**
A. I cleaned my whole desk out, destroyed everything and left.
**Q. Okay. And did you know that this case was being retried when you left the Springfield Police Department in 1991?**
A. No.
**Q. Okay. I'm going to stop sharing my screen.**
**Okay. Officer Jarvis, moving on from this case specifically, were you ever disciplined in your role as a law enforcement officer at Springfield Police Department?**
A. No.
**Q. And have you, other than this case, ever been sued in your capacity as a police officer?**
A. No.
**Q. Could you explain how it worked if you worked overtime when you were a detective in the Detective Bureau?**
A. I would write a special.
**Q. Did you have to get preapproved to work overtime?**
A. No.



**Q. So it was something that you notified the Captain of in a special after you had already incurred the overtime?**
A. We would not get paid. We would just get hours.
**Q. Okay. What does that mean?**
A. We did not get paid for overtime. We just got hours off.
**Q. Okay. So overtime would translate into like paid time off?**
A. Yes.
**Q. Okay. And that was the case in 1985, as well?**
A. Yes.
**Q. In the course of your career in the Detective Bureau, did you ever have to fill out property receipts for evidence?**
A. Yes.
**Q. Was this a standard part of your job as a detective?**
A. Yes.
**Q. Could you explain how property receipts were supposed to be filled out?**
A. Depends on what it was for.
**Q. Okay. I'll pull up one as**



**reference. That will be easier.**
MS. GIZZI: I'm not sure what Exhibit number we're on.
THE COURT REPORTER: This will be 7 if you're going to mark it.
MS. GIZZI: 7. Yes, we'll mark it.
(Whereupon, Plaintiff's Exhibit 7, Springfield Police Department property receipt for one pair of gloves, was marked for identification.)
A. Sergeant Kelly.
**Q. Yeah, let me know when you're done and we can go from there.**
A. Okay. I never saw that.
**Q. Okay. And do you recognize this to be s Springfield Police Department property receipt?**
A. That's it.
**Q. Okay.**
A. Yes.
**Q. Were these like carbon copies?**
A. Yes.
**Q. Okay. And when you had to fill one out, did you have to give someone else the other**



**copy of it?**
A. Yes.
**Q. Okay. And who would that be?**
A. The man in charge of the evidence room.
**Q. Okay. So what happened to the other copy, the one that wasn't given to the person in charge of the evidence room?**
A. We -- we just received a receipt. That was the receipt we received. The evidence, he would keep the front. He would keep the front paper. I believe the last paper, the last piece, we would just receive that right there.
**Q. Okay. From your experience, were property receipts, the copy that didn't go to the evidence room manager, were those kept in the case file?**
A. Yes.
**Q. Okay.**
A. It should have been.
**Q. Okay. Directing your attention to the number in the top-right corner; do you see that?**
A. 49536?
**Q. Yes. Do you know what this number**

**represents --**
A. No.
**Q. -- or signifies?**
A. No.
**Q. Do you know if every property receipt had a number like this in the corner?**
A. I believe so.
**Q. And when the officer as shown below, for the officer submitting property, Sergeant Kelly, would that be in your understanding the individual collecting the evidence?**
A. That's correct.
**Q. Okay.**
A. Yes.
**Q. Okay. All right. I'm going to stop sharing my screen then.**
MS. GIZZI: I believe I'm almost done, but I just need a few minutes to look over my notes, Officer Jarvis. So can we take one last break and reconvene at 4:15?
THE WITNESS: Sounds good.
MS. GIZZI: Okay. Thank you. We'll go off the record.
(Off the record at 4:04 p.m.)



(On the record at 4:15 p.m.)
BY MS. GIZZI:
**Q. Okay. Just a couple follow-ups and then I'll be done and get you out of here. So going book to your testimony in the second trial, I'm going to show you a page, again, which is page 514 of your testimony on January 8, 1992. I believe we previously marked this as Exhibit 6.**
A. Widen it, please.
**Q. I'm sorry?**
A. Widen it, please.
**Q. Yes. So I just wanted to ask you about these parts right here that are highlighted where you were asked, "How many times did he tell you that he wanted you to stop? That he wanted to go to sleep?"**
**And you answered, "No. No. He never did. He never did. He stayed up with me until 7:00 that night."**
**Do you see that?**
A. That's correct.
**Q. Okay. Did you work overtime until 7:00 on December 7, 1985?**
A. Yes, I did.
**Q. And you spent some of that time with**



**George?**
A. John Scanlon.
**Q. I'm sorry?**
A. Go ahead.
**Q. You spent some of that time from that afternoon, late afternoon around 4:00 p.m. to 7:00 with George Perrot?**
A. George used the phone four to six times after 4:00. Before 4:00, yes.
**Q. Okay. And I'm asking you if -- I'm going to stop sharing. You were working overtime since your shift would have ended at 3:45, right?**
A. Correct.
**Q. Okay. So you worked approximately three hours of overtime on December 7, 1985?**
A. Correct.
**Q. Okay.**
MS. GIZZI: Thank you so much. I don't have any further questions for you, Officer. And I can't speak for the other attorneys, but I appreciate it.
THE WITNESS: Thank you.
MR. COYLE: I have nothing.
THE WITNESS: Thank you.



MR. JOYCE: I don't have any questions.
MS. LYNCH: I have no questions.
MS. DeSOUSA: No questions. Thank you, Officer Jarvis.
MR. COHEN: I do have a few very quick questions if you can all bear with me for a moment.
THE WITNESS: Who are you? Who am I speaking to?
MR. COHEN: Yes, absolutely, Officer Jarvis, My name is Jared Cohen. I represent Francis Bloom, one of the defendants in this matter.
THE WITNESS: Okay. Francis.
MR. COHEN: And I just have a couple of questions for you.
CROSS-EXAMINATION
BY MR. COHEN:
**Q. First, in your experience as an officer, when you were investigating a crime before an individual was charged, would you be working with the prosecutor who was going to handle the criminal case?**
A. I worked -- I've worked with Franny

on a big auto theft case --
**Q. Okay.**
A. -- prior --
**Q. And I apologize. I didn't mean to interrupt. My question is more in your typical experience when you were investigating a case before the defendant was charged, would you be working with the prosecutor in investigating the case before the defendant was charged?**
A. Yes.
**Q. In what way or in what capacity?**
A. That particular -- you represent Franny Bloom?
**Q. I am, but I'm not asking you about a particular case right now. I was just asking you about your general experience.**
A. I think in 25 years, I can remember two times that I worked with investigators before we made the arrest.
**Q. And you worked for prosecutors before making an arrest?**
A. Excuse me. Excuse me. One time. One time, I believe. I worked -- I worked with -- I worked with Mr. Bloom.
**Q. Okay. Just so I'm clear, was your**



**response that you remembered one time when you ever worked with a prosecutor before an arrest in this case is that's what you were -- is that what response was?**
A. (No response.)
**Q. I just want to make sure I understood your response properly.**
A. Yeah, I can't be sure. I can't be sure. You know, 35 years, 34 years is a long time.
**Q. Okay. Let me just ask you a couple of specific questions about this case and I'll be done shortly.**
**On the night of Mr. Perrot's arrest that you were testifying about before earlier; do you remember that?**
A. Yeah.
**Q. And you were talking about the interrogation of Mr. Perrot on the night of his arrest; do you remember that?**
A. I was not there on the night of his arrest.
**Q. Well --**
A. The next day, I was -- I came to work.



**Q. Pardon me. Pardon me. The morning after his arrest. That's what I was referring to.**
A. Correct.
**Q. At that time, do you remember seeing Francis Bloom at the police station at that time?**
A. Yes.
**Q. And what specifically do you remember, what do you remember about seeing him that day?**
A. Did I lose you, Mr. Cohen?
**Q. I believe so. I'm here. Can you hear me?**
A. Okay. Your screen went off. You went off screen. I -- he was -- he was -- he was there -- he was there to assist, I believe.
**Q. To assist with what?**
A. I believe there was blood and hair taken, okay? I believe there was blood and hair taken from Mr. Perrot.
**Q. You're referring to the morning after Mr. Perrot's arrest?**
A. That afternoon, that morning or afternoon, whatever it was.
**Q. And at that time, were you aware**



**that Mr. Bloom would be the prosecutor on Mr. Perrot's case?**
A. No. No.
**Q. When did you become aware that Mr. Bloom would be the prosecutor in Mr. Perrot's case?**
A. Not until I got into court.
**Q. And in your experience before you got into court when you were investigating a case, did you ever know who the prosecutor was going to on that case?**
A. Never. No.
MR. COHEN: Okay. That's all I have. Thank you very much, Officer Jarvis.
THE WITNESS: Okay. All set?
MR. COYLE: All done. Thank you.
MS. GIZZI: Thank you very much, Officer Jarvis.
THE WITNESS: You're welcome.
THE COURT REPORTER: Attorney Cohen, I didn't have your contact information on the paperwork received at the beginning.

MR. COHEN: Sure.
THE COURT REPORTER: Can you please tell me your firm's name and address?
MR. COHEN: I'm with the Attorney General's Office in Boston. I can give you the full address, if you want it?
THE COURT REPORTER: Please.
MR. COHEN: It's 1 Ashburton Place in Boston, Mass 02108.
THE COURT REPORTER: And your email?
MR. COHEN: Jared.b.cohen@mass.gov.
THE COURT REPORTER: Thank you, and do you need a transcript?
MR. COHEN: I will almost certainly be ordering a transcript. I need to get -- I will probably reach out to confirm the cost and then I will order as soon as I get approval from my office to do so.
THE COURT REPORTER: Okay.
MR. COHEN: Thank you.



MR. JOYCE: Jolene, I will order. I'll take a copy, a PDF and the txt or whatever it's called.
THE COURT REPORTER: Attorney Austin Joyce, let me just confirm. You're from Reardon?
MR. JOYCE: Yes.
THE COURT REPORTER: Thank you.
(Whereupon, the deposition was concluded at 4:26 p.m.)



STATE OF CONNECTICUT:
: ss:
COUNTY OF FAIRFIELD :

I, Jolene F. Isdale, Certified Shorthand Reporter do hereby certify that Thomas Jarvis was by first duly sworn by Mary Vo, Massachusetts Notary, to testify to the truth, the whole truth, and nothing but the truth, and that the above deposition was recorded stenographically pursuant to Notice by me and reduced to typewriting by me.

I FURTHER CERTIFY taken that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place specified hereinbefore.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office at Newtown, Connecticut, this 25th day of July, 2023.

______________________________________

Jolene Isdale, Certified Shorthand Reporter

My Notary Commission Expires:
April 30, 2024



I N D E X


WITNESS: THOMAS JARVIS

| EXAMINATIONS | PAGE |
|---|---|
| DIRECT EXAMINATION BY MS. GIZZI | 10 |
| CROSS-EXAMINATION BY MR. COHEN | 116 |

LIST OF EXHIBITS

| No. | (Marked for Identification) | PAGE |
|---|---|---|
| 1 | Commonwealth of Massachusetts vs. George D. Perrot, Transcript of Hearing held before Hampden County Grand Jury on December 13, 1985, | 36 |
| 2 | Transcript of Trial held in Hampden County Superior Court before Judge Murphy and a jury continuing on December 9, 1987 | 44 |
| 3 | Springfield Police Department, Special to Captain Stelzer from Thomas Jarvis, dated December 7, 1985 | 60 |
| 4 | Statement taken from George David Perrot; Statement taken by Detective Thomas Jarvis on December 7, 1985 at 12:40 p.m., | 78 |
| 5 | Statement from George Perrot, starting with "My name is George Perrot and I live at 87 Malibu Drive", | 83 |
| 6 | Trial Transcript of George Perrot, dated January 8, 1991, CITY 001880 | 89 |
| 7 | Springfield Police Department property receipt for one pair of gloves | 111 |


**REPORTER'S NOTE: All marked exhibits retained by Attorney Gizzi.

C E R T I F I C A T E O F D E P O N E N T

I, ________________________, having read the foregoing transcript consisting of my testimony given at the aforementioned time and place, do hereby attest to the correctness and truthfulness of the transcript to the best of my knowledge as originally transcribed and/or with the changes as noted on the attached Errata Sheet.

__________________________
(Signature of Deponent)

Subscribed and sworn to before me
__________________
This _________ day of _______________________,
2023.

_________________________
Notary Public



ERRATA SHEET

Please note any corrections on this sheet.
Do not mark up the transcript.

The ORIGINAL JURAT and ERRATA SHEETS must be NOTARIZED if there are any noted changes and returned within 30 days of receipt to the attorney who took the DIRECT EXAMINATION. All other counsel of record must be sent a copy, along with a copy to our office for our records.

Page Line From To

_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

Date Thomas Jarvis

Sworn to before me this ______day _______________
2023.