**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 48

**In the Matter of:**

*George Perrot vs*

*Thomas Kelly, et al.*

---

*Charles Arpin*

*June 09, 2023*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*

O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO: 18-CV-10147

*********************************** *
GEORGE PERROT, Plaintiff, *
vs.
THOMAS KELLY, THOMAS JARVIS, *
RICHARD KANE, CHARLES APRIN, JOHN
SCANLON, DAVID LOUDEN, THOMAS *
KENNEDY, CHIEF ERNEST STELZAR,
MARIANNE POPKO, PAUL GLANTZ, RONALD *
ST. GERMAIN, ANDREW CANEVARI,
CHERYL CLAPROOD, CAPTAIN JOHN *
BROWN, UNKNOWN OFFICERS OF THE
SPRINGFIELD POLICE DEPARTMENT, THE *
CITY OF SPRINGFIELD, MASSACHUSETTS,
FRANCIS BLOOM, WILLIAM EUBANKS, &
WAYNE OAKES, and UNKNOWN AGENTS OF
THE FEDERAL BUREAU OF *
INVESTIGATION,
Defendants *
*********************************** *

DEPOSITION OF: CHARLES ARPIN
TAKEN AT: LAW OFFICE OF TYLER INGRAHAM
100 Main Street, Third Floor
Northampton, Massachusetts
June 9, 2023 10:07 A.M.

Sharon Waskiewicz
Court Reporter



APPEARANCES:

Representing the Plaintiff:
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
BY: GIANNA GIZZI, ESQ.
CARLA AGBIRO, ESQ.
312-243-5900
gizzi@loevy.com
agbiro@loevy.com

Representing the Defendant, Charles Arpin:
REARDON, JOYCE & AKERSON, P.C.
4 Lancaster Terrace
Worcester, MA 01609
BY: AUSTIN M. JOYCE, ESQ.
508-754-7285 Fax: 508-753-7220
ajoyce@rja-law.com

(Appearances continued on Page 3)



APPEARANCES: (Continued from Page 2)

Representing the Defendant, City of Springfield:
CITY OF SPRINGFIELD LAW DEPARTMENT:
1600 E. Columbus Avenue, 2nd Floor
Springfield, MA 01103
BY: TYLER KENEFICK, ESQ.
413-426-4215
tkenefick@springfieldcityhall.com

Representing the Defendant, Richard Kane:
MORRISON MAHONEY, LLC
1500 Main Street, Suite 2400
Springfield, MA 01115-0001
BY: CAROLE SAKOWSKI LYNCH, ESQ.
413-737-4373 FAX: 413-739-3125
clynch@morrissonmahoney.com

APPEARING VIA ZOOM:

Lisa Desousa, Esq., ldesousa@springfieldcityhall.com
Phillip Ciccarelli, Esq.
Robert Schmidt, Esq.



I N D E X

WITNESS: CHARLES ARPIN

| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Agbiro | 5 |
| Mr. Cohen | 214 |

| EXHIBITS: | PAGE: |
|---|---|
| Exhibit CA-1, Answers to Plaintiff's Interrogatories | 81 |
| Exhibit CA-2, details of report | 100 |
| Exhibit CA-3, transcript, Pages 43-48 | 146 |
| Exhibit CA-4, summary | 152 |
| Exhibit CA-5, history, DYS history | 165 |
| Exhibit CA-6, reports | 187 |

(Exhibits scanned to document)

MR. JOYCE: Same stipulations as yesterday. Read and sign. Waive the notary, 30 days.
MR. KENEFICK: Objection for one is an objection for all.
MR. JOYCE: Okay. Read and sign.

CHARLES ARPIN, Deponent, having first been satisfactorily identified and duly sworn, deposes and states as follows:

EXAMINATION BY MS. AGBIRO:
**Q. Good morning, Mr. Arpin.**
A. Good morning.
**Q. My name is Carla Agbiro. Mr. Arpin, have you ever been deposed before?**
A. Once.
**Q. Once. When were you perviously deposed?**
A. What was that?
**Q. When were you previously deposed?**
A. A long time ago.
**Q. A long time ago?**
A. A long time ago.
**Q. A couple years ago?**



A. More like 15, 20.
**Q. Fifteen, twenty.**
A. Yeah.
**Q. Okay. And was it in a similar setting; in person?**
A. Yes.
**Q. Okay. All right. I'm going to go over the ground rules again, for the deposition, just because it's been a long time and it is always good to do a refresher. Okay?**
A. Go ahead.
**Q. Okay. As you know, a deposition is -- I'm going to be asking you some questions and there is going to be court reporter right there who is going to be transcribing our conversation today. It's going to be under oath so it's important that you give truthful answers.**
**In order for the court reporter to be able to transcribe our conversation today it is important that we give verbal answers. So instead of a head nod or um-hmm or uh-huh, you have to give a verbal answer. And if, for some reason, you didn't, I'll just give you a gentle reminder, okay?**
A. Okay.



**Q. Also, if you don't understand a question that I pose, I'm more than happy to clarify. Just let me know and I'll rephrase the question for you.**
A. Okay.
**Q. And the same thing goes if you didn't hear my question as well, okay?**
A. Okay.
**Q. Now, when I do make a question, you do want to give a break before you respond because your attorney, or anybody else, may want to raise an objection and we want to give some time for that.**
A. Okay.
**Q. Lastly, if you need a break, feel free to let me know. I'm more than happy to take a break. I do ask that if there is any question pending, that you answer the question first before you take a break.**
A. Okay.
**Q. And one more thing as well, if I ask you a question, and you answer it, I'm going to assume that you understood the question that I posed. If I ask you a question you are required to answer unless your attorney instructs you otherwise.**
A. Okay.



**Q. So even if someone raises an objection, you are still going to answer unless your attorney instructs you not to answer.**
A. Okay.
**Q. Now, do you understand that you're oath today?**
A. Yes.
**Q. Is there any reason that you're aware of that you are not going to be able to give a full and accurate testimony today?**
A. I don't know of anything, at this point, no.
**Q. Are you currently taking any sort of medication that might inhibit your ability to provide full and complete testimony?**
A. No.
**Q. Okay. Do you have any medical conditions that might prevent you from being able to give full and accurate testimony today?**
A. No.
**Q. How did you first learn about this litigation?**
A. How do I feel about it?
**Q. How did you first learn about it? We'll**

**get there.**
A. I got a notice from my attorney.
**Q. Okay. And when did you get that notice?**
A. A few weeks ago.
**Q. A few weeks ago.**
**And that was the first time you learned about this case?**
A. Yes.
**Q. You said "a few weeks ago". Do you remember the timeframe, like month?**
A. No. Just a few weeks ago.
**Q. Just a few weeks ago.**
**And you don't have any recollection of hearing about the case but for a few weeks ago?**
A. No.
**Q. How did you prepare for this deposition today?**
A. I made an appointment with my attorney to discuss the matters.
**Q. Now, without revealing the substance of your communications, because that's privileged, when did you make an appointment with your attorney?**
A. I made it -- I'm not sure what day -- but the appointment was on June 2nd of this year.



**Q. The appointment was on June 2nd, so about a week ago?**
A. I think exactly a week ago.
**Q. Okay. And that was the day that you made the appointment, or that was the day you met with your attorney?**
A. That's the date I met with my attorney.
**Q. Okay. For around how long did you meet with your attorney?**
A. A couple of our hours, at best.
**Q. A couple of hours?**
A. Yes.
**Q. Did you meet with your attorney after June 2nd?**
A. Yes.
**Q. When was the second meeting?**
A. The following Monday.
**Q. The following Monday.**
**So does June 5th sound familiar?**
A. Yes.
**Q. How long did that meeting last with your attorney?**
A. About an hour.
**Q. About an hour.**



**Did you meet with your attorney again after June 5th?**
A. I'm sorry?
**Q. Did you meet with your attorney again after June 5th?**
A. No. Not until this morning.
**Q. Not until this morning.**
**Was anyone else present, at any of these meetings, either the June 2nd meeting or the June 5th meeting?**
A. No.
**Q. Just you and your attorney?**
A. Yes.
**Q. Did you review any documents to prepare for the meeting?**
A. I looked over the notice and some of the documents that I'd had from a while back. No. I correct on that, because I didn't have it.
I believe I received some from my attorney, but I'm not sure. I can't say positively that I did.
**Q. You can't say positively that you did what, that you received what documents from your attorney?**



A. About the case.
**Q. About the case?**
A. Yes.
**Q. Okay.**
A. The fact that it was coming up and had to do with all of the materials about the upcoming case.
**Q. What aren't you necessarily sure about?**
A. Right now I'm not necessarily sure about anything on that. I've given it to you as best I can as of this time.
**Q. Okay. I want to make sure I understand. Are you not sure that you received documents from your attorney regarding this case? Is that what you're not sure about?**
A. I'm not sure when I got them, and that's about it.
**Q. Okay. So you're not sure when you got them?**
A. Right.
**Q. You're not sure if you got them more than a couple of weeks ago; is that what you're saying?**
A. No.
**Q. No. Do you remember what documents you reviewed with your attorney?**

Page 13

A. Grand jury minutes of a trial. And there was another group of papers, and I don't recall what they were about. They were about the case but, what it was actually about, I don't remember.
**Q. Did any of those documents refresh your recollection?**
A. Not really.
**Q. No? Did you review any photos, or any other type of media, to prepare for this deposition?**
A. No.
**Q. Now, besides talking to your attorney, did you talk to anyone else to prepare for this deposition?**
A. No.
**Q. No?**
**Did you talk to anyone at the Springfield Police Department?**
A. No.
**Q. Did you speak with any former members or employees of the Springfield Police Department?**
A. No.
**Q. Have you spoken with any of the other defendants or their representatives?**
A. No.

Page 14

**Q. Have you spoken to anyone else at all about this case?**
A. No.
**Q. Do you, personally, know Mr. George Perrot?**
A. No.
**Q. Do you know -- or do any of these names sound familiar? Do you know a Mr. James Jones?**
A. No.
**Q. John Mezzetti?**
A. No.
**Q. Jeffrey Atkins?**
A. No.
**Q. Robert Timmerman?**
A. No.
**Q. William Gidgeon?**
A. No.
**Q. Todd Swinger?**
A. No.
**Q. Andrew Sotiroeous?**
A. No.
**Q. Mr. Arpin, I'm going to ask you a couple of background questions to kind of get to know you a little better.**

Page 15

**What neighborhood did you grow up in?**
A. Initially Indian Orchard. It's a part of Springfield.
**Q. A part of Springfield?**
A. Yes.
**Q. Have you lived in Springfield your entire life?**
A. No.
**Q. Where have you lived besides Springfield?**
A. Ludlow, Massachusetts.
**Q. And when did you move there?**
A. Early '70s.
**Q. And when did you return to Springfield?**
A. I haven't returned to Springfield.
**Q. Oh, sorry. So you still live there?**
A. Yes.
**Q. Okay. Do you currently live with anyone?**
A. No.
**Q. You live by yourself?**
A. Yes.
**Q. Were you born in Springfield?**
A. No.
**Q. Where were you born?**
A. Ludlow.

Page 16

**Q. Ludlow. Okay. When did you originally move to Springfield?**
A. Mid 1950s.
**Q. And who did you live with at the time?**
A. My mother and two brothers.
**Q. Did you attend school in Springfield?**
A. Yes.
**Q. What school did you attend?**
A. Holy Family Elementary School.
**Q. And where did you go after that?**
A. After that?
**Q. Yes.**
A. Technical High School.
**Q. And what year did you graduate Technical High School?**
A. I didn't.
**Q. You didn't?**
A. No.
**Q. When did you stop attending Technical High School?**
A. Mid '60S is the best I can come up with.
**Q. Do you recall what grade you stopped?**
A. I left in my junior year.
**Q. Your junior year. Okay. And what did**

Page 17

**you do after that?**
A. I worked.
**Q. Where did you work?**
A. I worked for a man doing reconditioned homes on properties and things like that.
**Q. And what did you do for him?**
A. Odds and ends. Painting, decorating, a little carpentry. Nothing specific.
**Q. And how long did you do that for?**
A. A few years.
**Q. A few years. Do you have an estimate of how long?**
A. Three or four years.
**Q. Three or four years.**
**And what did you do after you finished working for the man that you did?**
A. I went back to high school.
**Q. You went back to high school?**
A. Yeah.
**Q. Did you go to a specific school?**
A. I did.
**Q. What school did you go to?**
A. Springfield Trade High School.
**Q. And how long were you there?**

Page 18

A. Three years. No. I think it was two years.
**Q. Two years?**
A. Yes.
**Q. Did you graduate?**
A. Yes.
**Q. After you graduated from Springfield Trade High school, what did you do?**
A. I continued working.
**Q. Where did you work?**
A. For the same man I had been working for before I went back to school.
**Q. And how long did you work for him at that time?**
A. A few years.
**Q. A few years?**
A. Yes.
**Q. Around the same time as before or longer?**
A. No, it wasn't longer.
**Q. Was it shorter?**
A. I don't remember.
**Q. And what did you do after you worked for him at that time?**
A. I worked for Sears and Roebuck for a

Page 19

while.
**Q. And how long did you do that?**
A. A few years. I can't give you any more than that.
**Q. And what did you do after working at Sears?**
A. At some point I went to work for the police department.
**Q. Did you go straight to work for the police department or did you have to receive any type of training before going to the police department?**
MR. JOYCE: Objection. Go ahead.
THE WITNESS: I received training when I began the first day.
**Q. Do you remember what year you started working for the police department?**
A. I think it was 1969.
**Q. 1969.**
**Did you have to attend the police academy at all?**
A. We had four weeks of in-house training.
**Q. And what did that training consist of?**
A. Most of the four weeks had to do with studying law, First Aid, some firearms training, but

Page 20

mostly about the laws that were most important to law enforcement at that time.
**Q. Do you remember learning about any policies and procedures specific to the Springfield Police Department?**
A. Yes. There was a manual.
**Q. There was a manual.**
A. Yes.
**Q. Did they go over that manual with you?**
A. Yes.
**Q. Earlier you mentioned that you were studying laws specific to the police; is that right?**
A. Yes.
**Q. I want to make sure. I don't want to ever say something that you didn't say, so you have to just let me know.**
**Do you remember what type of crimes they were?**
A. Crimes against a property, crimes against a person.
**Q. Okay. Do you remember learning about any laws specific to your responsibility as a police officer?**
A. No.

**Q. Do you remember learning about any responsibilities you had, any legal responsibilities that you had as a police officer?**
A. I don't recall.
**Q. Do you remember learning about how to handle evidence?**
A. Not in -- I don't recall that in that training there.
**Q. Okay. Do you remember learning about how to handle evidence in a subsequent training?**
A. Yes. But I can't tell you when.
**Q. Do you remember learning about how to preserve evidence?**
A. Yes.
**Q. Were you trained on how to document your work?**
A. No.
**Q. Were you told that you were required to memorialize the events that you partook in during the day?**
A. Yes.
**Q. Do you remember what the requirements were in terms of documentation?**
MR. KENEFICK: Objection.



THE WITNESS: No.
**Q. (By Ms. Agbiro) What was your first position when you for the started with the police department?**
A. Uniformed division, the midnight shift.
**Q. And how long did you do that?**
A. About a year.
**Q. So around 1969 to 1970?**
A. Yes.
**Q. What were your responsibilities in the uniformed division, the midnight shift?**
A. Patrolling your district, respond to calls.
**Q. Anything else?**
A. Take some decisive action depending upon the situation.
**Q. What do you mean by "decisive action"?**
A. Call for an ambulance; send somebody to the hospital; make an arrest; make a report.
**Q. You'd said, "make a report". Would you make a report every night or only when something decisive happened?**
MR. JOYCE: Objection.
THE WITNESS: The best I can recall,



only if something happened.
**Q. (By Ms. Agbiro) Did you have any other responsibilities besides patrolling the district, responding to calls, and taking decisive action?**
A. It was a long time ago. What I've given you is all I recall.
**Q. What did you do after the uniformed division?**
A. I transferred to the detective bureau on the midnight shift.
**Q. And what was your position there?**
A. I was a patrolman. That's what you called it. There was no official detective designation. So I was a police officer working in the detective bureau.
**Q. Is it my understanding that you didn't have a detective role but, as a patrolman, were you operating as a detective?**
A. Yes.
**Q. So would you consider yourself to be a detective during that time?**
A. Yes.
**Q. How long were you there, in the detective bureau, as a detective?**



A. About seven years, six or seven years.
**Q. Around 1976?**
A. About that.
**Q. And what were your responsibilities as a detective, in the detective bureau, midnight shift?**
A. We would assist the patrol division with incidents that required further follow up. We also would patrol the city in various neighborhoods.
**Q. And when you mentioned that you would assist, what incidents would you follow up, what would that look like?**
A. A serious assault. Generally where there was a crime, a more serious crime.
**Q. And how would you follow up?**
A. Interview witnesses and speak to the victim, gather evidence.
**Q. Did you receive any sort of training when you moved from the uniformed division to the detective bureau?**
A. No.
**Q. No? Would you say that the detective -- when you were in the detective bureau, did you have different responsibilities than you had in the uniformed division?**

MR. JOYCE: Objection.
THE WITNESS: Yes. I had different responsibilities.
**Q. (By Ms. Agbiro) How did you learn how to execute your responsibilities in the detective bureau?**
A. Other detectives who had been there before me and the supervisor, the sergeant in charge.
**Q. Was there some sort of mentorship program?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) No? Did other detectives just teach you, voluntarily, how to become a detective?**
A. I would work with various different ones.
**Q. Okay. Who was your supervisor when you were in the detective bureau, or on the midnight shift, between 1970 and 1976; do you remember?**
A. George Collins.
**Q. George Collins.**
A. You know, I'd have to backtrack. It was the supervisor sergeant on a day watch. At some point I was on a day watch much later on. But back



then, the best I recall, my training came from fellow officers in there. And the sergeant, and I just don't remember offhand who it is now.
**Q. Okay. Were you aware if the police department had any formal training for detectives?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of any.
**Q. (By Ms. Agbiro) What did you do, after you were a patrolman, when you left the midnight shift?**
A. I didn't get the last part.
**Q. When did you do after you left the midnight shift?**
A. I went to the afternoon shift, four to twelve midnight.
**Q. Okay. The detective bureau?**
A. Yes.
**Q. Was it still the same division?**
A. What's that?
**Q. Was it still the same position as a patrolman, a detective?**
A. Yes.
**Q. How long did you do that?**
A. A few years.



**Q. What did you do after being on the midnight shift -- I mean the midday shift?**
A. I went to the day shift.
**Q. The day shift. Do you remember what year you went and started doing day shift work?**
A. To long ago.
**Q. Do you remember approximately how long you did the day shift?**
A. A few years.
**Q. What happened -- what did you do after the day shift?**
A. At some point I was promoted to sergeant.
**Q. Do you remember when?**
A. No. A few years after.
**Q. What was your responsibilities as sergeant?**
A. I went back to the uniformed division and it was supervision, mostly street supervision, and also the booking desk.
**Q. I have, you went back to the uniform division as supervision?**
A. As a sergeant.
**Q. As a sergeant. And you mentioned you supervised the booking desk; is that what you said?**



A. Sometimes.
**Q. What else did you do?**
A. I was a supervisor, a street supervisor --
**Q. A street supervisor?**
A. -- in the patrol division.
**Q. And what were your responsibilities, as a supervisor, for the uniform division?**
A. Basically the same as I had when I was in the midnight division as a sergeant. Or was I -- I say that but I've lost track.
**Q. You told me that you were in the midnight and shift and then the midday shift and then, after the day shift, you were promoted to sergeant; does that seem accurate?**
A. No. Not accurate. I've got to back up.
**Q. Okay.**
A. I was never a sergeant in the detective bureau, midnights or otherwise.
**Q. Okay.**
A. I had gone to the 4 o'clock detective bureau and then I had gone to days for a while. Then I was promoted to sergeant some time when I was on days in the detective bureau.

**Q. Okay. And then you testified that you went back to the uniformed division when you were promoted to sergeant; is that accurate?**
A. That's accurate.
**Q. And you supervised the officers in the uniform division; is that correct?**
A. Yes.
**Q. And when you say supervised, what do you mean, what were your responsibilities as a supervisor?**
A. To assist them if they needed assistance.
**Q. And how would you assist them? Can you give me an example?**
A. I would discuss with them what's going on and maybe what the next course of action would be. Or, if they'd already made an arrest, I would say bring them in to book them and arrest them, things along those lines.
**Q. The individuals that you supervised, did they have to get your approval for anything?**
A. Not generally, no.
**Q. Were they required to keep you appraised of what was going on?**
A. No.



**Q. Did you talk to officers in the uniform division at any time besides when they came to you for help?**
A. Yeah.
**Q. Okay. Would those conversations be on a professional matter or just personal?**
MR. JOYCE: Objection.
THE WITNESS: Mostly professional, about the job.
**Q. (By Ms. Agbiro) If they were not asking you for help, what were you talking to them about?**
A. Some matter of common interest. I don't recall what. But it would have been something maybe previous on their tour of duty. But I can't recall much.
**Q. Did you help the officers in the uniform division investigate cases?**
MR. JOYCE: Objection.
THE WITNESS: In what capacity?
MS. AGBIRO: You tell me. In any capacity.
MR. JOYCE: Objection.
THE WITNESS: Could you repeat the question, please?



MS. AGBIRO: Sure.
**Q. (By Ms. Agbiro) Did you help the officers in the uniform division investigate cases in any capacity?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: I don't recall.
**Q. (By Ms. Agbiro) Did you review any work product created by officers in the uniform division?**
MR. JOYCE: Objection.
THE WITNESS: Sometimes.
**Q. (By Ms. Agbiro) Sometimes.**
**In what occasions would you feel the need to review a work product from an officer?**
MR. JOYCE: Objection.
THE WITNESS: If they wanted some clarification or I wanted to impart something or learn more about it from them.
**Q. (By Ms. Agbiro) But they weren't required to show you any documents?**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) I'm sorry. Any work product?**
MR. JOYCE: Objection.



THE WITNESS: Not in the position that I was in, no.
**Q. (By Ms. Agbiro) Did you have any responsibilities, as sergeant, besides assisting individuals in the uniform division?**
A. Like I say, I worked at the booking desk on occasion.
**Q. Okay. And what would you do at the booking desk?**
A. Maintain the prisoners, book prisoners, sometimes we had oversight for the jail, a lock up facility.
**Q. And you were over supervising the booking desk, and you'd said that you maintain the prisoners, what does that mean?**
A. Well, we had to do checks on 'em periodically and make sure they had their phone calls. We book them. We photograph them, fingerprint them. That was not my responsibility but we oversaw all of what went on there.
**Q. Okay. And when you say "we," was it you and another sergeant or was it you and other individuals?**
A. No. There was other police officers also

Page 33

assigned to the booking desk.
**Q. And were you assigned to supervise those other police officers?**
A. Yes.
**Q. After you were sergeant in the uniform division, what did you do after that?**
A. I was promoted to lieutenant.
**Q. When were you promoted to lieutenant? Do you remember what year?**
A. No.
**Q. Do you remember how long it took for you to be promoted from sergeant to lieutenant?**
A. I don't know.
**Q. Do you know if it took five years?**
A. I don't know.
**Q. Do you think it took ten years?**
A. I don't think it was ten years.
**Q. Do you think between five and ten or do you think between one and five?**
A. I'm not sure.
**Q. You're not sure.**
**And when you were promoted to lieutenant, what division were you in or put in?**
A. It was general detective bureau. We

Page 34

handled crimes against the property, crimes against the person.
**Q. And when you mentioned crimes against a person, what types of crimes would that be?**
A. Assault. Robberies.
**Q. Did you also handle sexual assaults?**
A. No.
**Q. And how long were you in the general detective division or bureau?**
A. I really don't know. I don't remember.
**Q. And what were your responsibilities as lieutenant?**
A. Supervised the detectives assigned to the detective bureau, that shift, and to work along with them.
**Q. Were your responsibilities as a lieutenant different than that of a sergeant?**
A. A little more comprehensive but basically the same.
**Q. Explain to me what you mean by a little more?**
A. Now I supervise the sergeants that were in the division and not just police officers assigned there. And I was responsible for vacations and, you

Page 35

know, getting them done, those kinds of things.
**Q. So you were responsible for both the uniform officers and the sergeants?**
A. Yes.
**Q. And what did it look like, you supervising the uniformed officers, what did those duties entail?**
MR. JOYCE: Objection.
THE WITNESS: I wasn't supervising the -- would you repeat the question, please?
MS. AGBIRO: Sure. Let me rephrase.
**Q. (By Ms. Agbiro) Of the individuals that you mentioned, that you supervised as a lieutenant, how did you supervise them; what were the duties that you had?**
A. Well, to make sure that they came to work. Assist them if they had any questions out in the field and in charge of some of the paperwork, the vacations, the sick days and things like that. Those are partly administrative but mostly involved with crimes and patrol and things along those lines.
**Q. You also mentioned that you also work alongside individuals in the detective bureau?**

Page 36

A. Sometimes. Or sometimes I'd work alone.
**Q. In what instances would you work alone?**
A. If there wasn't an extra detective, going out on patrol, by himself, I would go out with him.
**Q. And those occasions you worked by yourself?**
A. Yes.
**Q. And what were your responsibilities on those cases? Like what were you required to do?**
MR. JOYCE: Objection.
THE WITNESS: Could you repeat?
MS. AGBIRO: Sure.
**Q. (By Ms. Agbiro) When you had a case, what were your responsibilities for the case?**
A. I would get an available detective or two and consult with them and have them take over the case. Or, if it was serious enough, I would assist them.
**Q. If it were serious. And what type of case would be serious?**
A. A serious assault, breaking and entering or maybe a victim. I mean, if somebody inside was assaulted. That -- it's an escalation of many crimes and they become serious, more serious.

**Q. Were you responsible for assigning cases to the detective?**
A. No.
**Q. Were you responsible for assigning cases to the sergeants or anyone?**
A. No. Generally mostly of the cases were picked up from what was going on out in the field. Then, if the patrol officers felt they needed assistance, they'd call for it. And, yes, maybe I would assign which ones go there, but sometimes, if I'm on the street, they would take the call. It wasn't my sole responsibility. It was oversight I guess.
**Q. So let me make sure I understand. If the officers that were on the field, if they were able to resolve the case on their own, then it wouldn't be brought to the detective; is that correct?**
MR. JOYCE: Objection.
THE WITNESS: That would depend upon the severity, the magnitude of the case.
**Q. (By Ms. Agbiro) And in the instances in which the patrol officers need to hand the case over to a detective, what would that process look like?**



MR. JOYCE: Objection.
THE WITNESS: They would probably work together for a while longer, not necessarily hand it over. If it required immediate attention, they would continue the investigation they would with the assistance of the detective. Otherwise it would be forwarded to the detective bureau day watch and they would have total responsibility for all the case -- oversight of all the cases that came through the detective bureau.
**Q. (By Ms. Agbiro) If a patrol officer needed help from a detective, would they go straight to the detective himself, or would they have to ask somebody else?**
MR. JOYCE: Objection.
THE WITNESS: They could request help over the radio.
**Q. (By Ms. Agbiro) They could request help over the radio?**
A. They didn't have to. They could.
**Q. They could.**
A. Otherwise the detective may not know if they've something going on. That's the best that I can recall.



**Q. Okay. Do you remember if anyone was in charge of patrolling -- strike that.**
**Do you remember if anyone was in charge of pairing a patrol officer with a detective if they needed extra help?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of it.
**Q. (By Ms. Agbiro) You mentioned earlier that the patrol officers could radio for a detective.**
**Who were they radioing to?**
A. The dispatcher.
**Q. And would the dispatcher call the detective?**
A. Yes.
**Q. And if a detective in your unit was called by a patrol officer to assist with the case, would you find out about it?**
A. Yes.
**Q. How would you find out about it?**
A. Probably hear it over the radio or have a conversation with the detective at some point.
**Q. Were you generally aware of all of the cases that your detectives had?**



A. No. I don't exactly know what you mean by "generally".
**Q. Okay. I can rephrase if it's easier.**
A. Yes.
**Q. Were you aware of all the cases that your detectives were assigned to?**
A. No.
**Q. Were you only aware of some of the cases that the detectives were assigned to?**
A. When I was on the afternoon shift, right. I wasn't aware of all the cases.
**Q. After you were in the general detective bureau, where did you work after that?**
A. I think I was promoted to captain at some point.
**Q. Do you remember when you were promoted to captain?**
A. No, I don't.
**Q. And where did you work when you were captain?**
A. I went to the uniformed division of the night shift.
**Q. And how long were you there for?**
A. I don't remember.

**Q. Did you go anywhere after that?**
A. Several year later I was -- I'm confused right now. At some point I was promoted or transferred to the detective bureau. I don't recall how that worked out whether they happened simultaneously or one after the other.
I was a captain in the uniform division and, at some point, I was transferred to the detective bureau, you know, on days, overseeing the whole detective bureau.
**Q. Did you go anywhere else after being in the detective bureau?**
A. I was an acting deputy chief for a little while.
**Q. Were you promoted from captain to acting deputy chief?**
A. Yes.
**Q. How long did you do that?**
A. I don't know. This is so far back, I'm having difficulty trying to, you know.
**Q. I understand. I understand. What were you responsibilities as captain?**
MR. JOYCE: Objection.
THE WITNESS: I had oversight at the detective bureau.



**Q. (By Ms. Agbiro) And by oversight what were you required to do?**
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: Keep track of the officers that were sched -- made sure they came to work and who was at work. That part I'd have to know. In certain cases they were given to certain units in there. There were several, crimes against a property, crimes against a person. And I would make sure they were given to the right units for investigation.
**Q. (By Ms. Agbiro) How did you get cases?**
A. I don't recall how, but they got on my desk at some point.
**Q. Was there any type of process to make sure that you were given cases?**
MR. JOYCE: Objection.
THE WITNESS: I'm sure there was, but I don't know what it was. I just know I had the cases.
**Q. (By Ms. Agbiro) How were your responsibilities from captain different than lieutenant?**



MR. KENEFICK: Objection.
THE WITNESS: I had more responsibility. It was the number of personnel that I was responsible for. It was greater. And it wasn't just the day watch, it was the afternoon watch and the midnight watch.
**Q. (By Ms. Agbiro) Who was your boss when you were captain?**
A. The deputy chief.
**Q. And do you remember who the acting deputy chief was when you were captain?**
A. No.
**Q. Did you have to meet with your deputy chief while you were captain?**
MR. JOYCE: Objection.
THE WITNESS: Occasionally.
**Q. (By Ms. Agbiro) And what occasion would you have to meet with your deputy chief?**
A. Just generally how things were going in the detective bureau. If there was a particular case he might be interested in, or if I thought one should be brought to their attention, I would do that.



**Q. Did you have to give the deputy chief any type of reports?**
A. No.
**Q. Did you have to keep him appraised of your day-to-day of what was going on?**
A. No.
**Q. Were you required at all to write a daily report about what was happening in the division?**
MR. KENEFICK: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) When you were captain, did you meet with your lieutenants?**
A. Would you please repeat that?
**Q. Sure. Strike that.**
**When you were captain, did you have meetings with your lieutenants?**
A. Yes.
**Q. How many times did you meet with them?**
A. Maybe at least once a day to, you know, to know -- just to overall find out how their cases were going.
**Q. Would it be like a standing meeting every day?**

Page 45

MR. KENEFICK: Objection.
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Would you meet with every single lieutenant or some lieutenant? Would it be a group meeting? Can you describe these meetings a little bit more for me?**
MR. JOYCE: Objection.
THE WITNESS: All of them.
**Q. (By Ms. Agbiro) At the same time?**
A. No. No.
**Q. Were they required to met with you every day?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Were they required to give you any type of written report as to what was going on --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- with what was going on with their responsibilities?**
MR. JOYCE: Objection.
THE WITNESS: If I requested it, yeah.

Page 46

**Q. (By Ms. Agbiro) If you requested it?**
A. It wasn't daily reporting to me, not in an official capacity. While my contact with them would be just so I could understand where their case was and how it was progressing.
**Q. Did you have a general understanding as to what cases they were working on?**
A. Yes.
**Q. Were you required to receive updates as to what was going on with the cases --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- that they were working on?**
MR. JOYCE: Sorry. Objection.
THE WITNESS: Would you repeat that again?
**Q. (By Ms. Agbiro) Were you required to receive updates --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- about the cases that the lieutenants were working on?**
THE WITNESS: I'm having trouble with the "required". Could you repeat that again, please?

Page 47

**Q. (By Ms. Agbiro) Sure. Were the lieutenants required to give you updates about the cases they were working on?**
MR. JOYCE: Objection.
THE WITNESS: I never -- you know, I always had them, so I don't know whether it was required or not. I know that I checked with them periodically on the cases. And I don't know if it was a standing thing or, you know, a paper order or not. I don't know.
**Q. (By Ms. Agbiro) When you were promoted to lieutenant, did the captain, at that time, did the captain inform you of your responsibilities?**
A. I think so, yeah.
**Q. Did you receive any type of training?**
A. Not at that time, no.
**Q. Did you have a clear understanding of what your responsibilities were?**
A. Yes.
**Q. When you were lieutenant, did you meet with your sergeants frequently?**
A. I met with them. I don't remember whether it was frequently or not.

Page 48

**Q. But did you meet with them?**
A. Yes.
**Q. Were the sergeants required to give you any written reports?**
MR. JOYCE: Objection.
THE WITNESS: Only if I needed that or the department needed it.
**Q. (By Ms. Agbiro) Were you generally aware, as a lieutenant, of the cases that your sergeants were working on?**
A. Generally, yes.
**Q. Of all the cases that they were working on?**
A. Probably not.
**Q. If you weren't aware of their cases, how could you supervise them?**
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: I spoke with them on a daily basis and they would keep me apprised of anything of note, anything serious.
**Q. (By Ms. Agbiro) But if they didn't -- when they spoke to you, did they speak to you about other cases?**

Page 49

A. No. Of course not.
**Q. And if they didn't speak to you about the cases, then how would you supervise them --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- on those cases that you didn't know about?**
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: At some point I would review those cases.
**Q. (By Ms. Agbiro) At what point, after the case was completed?**
A. If it was a case of a particular note. The caseloads were horrendous and many of those crimes are easily handled by the detectives themselves. I get final reports, mostly informal, in how they handled them and I was satisfied at that time.
In a more serious case, it required more serious involvement, more report writing, more consultation.
**Q. If the case wasn't serious, and you didn't get a formal report, what would an informal report look like?**

Page 50

MR. JOYCE: Objection.
THE WITNESS: Just a few notes on the case, the complaint form itself. They would note on there what they had done.
Many times it was so minor that sometimes advising the reporting party was sufficient.
**Q. (By Ms. Agbiro) Did you inform -- was there any type of policy that required that a sergeant come to you with a specific type of case?**
MR. JOYCE: Objection.
THE WITNESS: Not that I'm aware of.
**Q. (By Ms. Agbiro) How did a sergeant know if a case was serious enough to come to you?**
MR. JOYCE: Objection.
THE WITNESS: I think through their professional training, and regular training, they would know what they had to push up. Somebody had to explain to them, along the way, I'm sure. And whenever there was something of sufficient note, I was notified of it. And if I became aware of any particular case that I thought could be significant, then I would ask and we would

Page 51

have a meeting over it.
**Q. (By Ms. Agbiro) You mentioned training. Who would offer these trainings? And correct me if I'm wrong, you testified earlier that you were trained by others?**
MR. JOYCE: Objection.
THE WITNESS: It was an informal training. In other words, there was no policy, at that time, that I was aware of. So it was like on-the-job training. We're talking a lot of years back.
**Q. (By Ms. Agbiro) So there was no policy at the time. Correct me if I'm wrong, are you saying that was no policy, there was no official policy, at the time, that would inform a sergeant as to what cases they were required to bring to a lieutenant; is that what you're saying?**
MR. JOYCE: Objection.
THE WITNESS: I don't know if there was one or not.
**Q. (By Ms. Agbiro) Are you saying that you don't know or you saying that you can't say one way or the other if there was a policy?**
MR. JOYCE: Objection.

Page 52

THE WITNESS: I don't know whether there was one or not.
**Q. (By Ms. Agbiro) When you were promoted to lieutenant, were you aware of any policy then?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) When you were promoted to captain, were you aware of any such policy then?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) When you were promoted to acting deputy chief, were you aware of any such policy then?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
MR. JOYCE: Is this a good time for a bathroom break?
MS. AGBIRO: Give me one more question and then we can break.
MR. JOYCE: Sure. That's why I'm asking.
**Q. (By Ms. Agbiro) Did you have any positions after acting deputy chief?**
A. Can you repeat that, please?

**Q. Sure. Did you have any position after you were promoted to acting deputy chief?**
A. So when the slot was filled on a permanent basis, I went back to the detective bureau.
**Q. As captain?**
A. Yes.
MS. AGBIRO: Okay. Let's take a break.
(Recess taken)
**Q. (By Ms. Agbiro) Earlier, before break, you were talking about when you returned to the captain position after you were acting deputy chief.**
**Do you remember that?**
A. Yeah. I remember when I went back, yes.
**Q. What bureau did you return to? Did you go back to the detective bureau or the --**
A. The detective bureau.
**Q. The detective bureau.**
**Did you go anywhere after that?**
A. Out the door.
**Q. And what year did you retire?**
A. 2010.
**Q. 2010? And do you remember how long you were back at the detective bureau?**
A. I don't.



**Q. You don't remember how long?**
A. I do not.
**Q. Do you remember if it was five years before you retired?**
A. I can't help you on that one. It's too far back.
**Q. Does 20 years sound too crazy?**
A. It was probably a couple. I can't guess at it but it wasn't 20 years. The best I can do for you is it was a few years.
**Q. And what does a few years mean to you?**
A. A few years.
**Q. I'm sorry. I do want to get some sort of understanding on a time frame here on these positions.**
**Do you remember, when you were first promoted to sergeant, after you were in the detective bureau in the midnight shift. So I have that you started in 1976 and then you went to the 4 o'clock shift and then you went to the day shift.**
A. Yes.
**Q. Do you remember if you were a sergeant in the '80s?**
A. I don't remember.



**Q. Do you remember if it were a lieutenant in the'80s?**
A. (Witness nodding head)
**Q. Do you remember what your role was in the '80s?**
A. I don't.
**Q. Do you remember what your role was around the '90s?**
A. Not at this point I don't.
**Q. How were you selected for the job of acting deputy chief?**
MR. JOYCE: Objection.
THE WITNESS: I think I was the senior ranking captain. I had more time on the job than anyone else.
This was not a civil service promotion. It was just an in-house one that civil service allows when there's no -- there's no list out there, a civil service list. So there was nothing. The department generally follows the seniority rule and I was the senior captain at that time.
**Q. (By Ms. Agbiro) And who approached you to be the acting deputy chief?**



MR. JOYCE: Objection.
THE WITNESS: It was the Chief of Police.
**Q. (By Ms. Agbiro) The Chief of Police?**
A. Yes.
**Q. Do you know what happened to the previous deputy chief?**
A. I think he retired.
**Q. Do you know who the Chief of Police was at that time?**
A. No.
**Q. Do you know how long he served in that position until they found a replacement.**
A. Yes. At some point there was a list, a civil service list, and a deputy chief was selected.
**Q. How long did it take to select a new deputy chief?**
A. I don't know. I don't remember.
**Q. Do you remember what your position was in December of 1985?**
A. No.
**Q. You don't remember?**
A. No, I do not.
**Q. Is there anything I can show you to**

**refresh your recollection?**
A. What's that?
**Q. Is there anything I can show you to refresh your recollection?**
A. I don't remember. I don't think that there is anything you can show me.
**Q. Do you have any independent recollection at all about -- any role you played in the George Perrot investigation?**
A. Not at this point in time.
**Q. Do you have any independent recollection at all as to any --**
MS. DESOUSA: Counsel, I'm sorry. I can't hear any of the end of your questions at all.
MS. AGBIRO: I'll try to speak louder.
**Q. (By Ms. Agbiro) Do you have any independent recollection at all as to any role you played, or may have played, in the current prosecution of George Perrot?**
A. I do not.
**Q. I'm going to go ahead and show you the interrogatories you filled out for the case.**



A. Okay.
MS. DESOUSA: Counsel, again, I'm sorry. I'm not hearing your questions.
MS. AGBIRO: My apologies. I just passed Mr. Arpin his interrogatories for the case.
MR. JOYCE: If you want to go off the record for a second.
(Off-record discussion)
MS. AGBIRO: Back on the record.
Can you hear me better now?
MS. DESOUSA: Yes.
**Q. (By Ms. Agbiro) Mr. Arpin, have you seen this document before?**
A. Yes.
**Q. You have seen this document.**
**When was the last time you saw this document? And, Mr. Arpin, I'd like to give you a minute to review the document.**
A. Do you want me to read through this whole thing?
**Q. Until you're comfortable, until you feel you're familiar with the document.**
A. Well, I'm not going to be familiar with



it unless I read it.
**Q. Do you remember reading this document before?**
A. Yes.
**Q. Was it recently?**
A. Yes.
**Q. I'm going to direct you to Interrogatory No. 5.**
**Do you see it?**
A. Yes.
**Q. Your answer to -- Interrogatory No. 5, as you can see, generally asked about whether or not you believe Mr. Perrot committed the rape of M.P. or any other illegal acts.**
**Do you see that?**
A. I see that.
**Q. Okay. And your answer to the interrogatory was specifically that based upon certain statements and physical evidence -- you're more than free to read it -- It says specifically that "I believe that George Perrot committed the nighttime burglary of McNabb and subsequent armed and assault and battery of Joseph McNabb and unarmed robbery of Sheileen Sapelli".**



**Do you see that?**
A. I do see that.
**Q. Does that refresh your recollection as to the George Perrot case?**
A. I still don't have independent knowledge, but that is apparently my grand jury testimony.
**Q. Okay. That was your grand jury testimony on the Perrot case; is that what you said?**
A. Yeah. I mean, it purports to be, yeah. I assume it's accurate. So I'm not going to -- but I don't remember the incident, is what I'm telling you. So much time has gone by it's hard for me to actually visualize or have that thing, that incident clear in my head.
I know I said that and that's all I can tell you right now. I said that at that time.
**Q. Okay. When you were answering these Plaintiff's interrogatories, did you refer to any documents before answering them?**
A. I don't recall.
**Q. Do you remember filling these out?**
A. Do I remember what?
**Q. Filling out the interrogatories, answering these interrogatories?**

A. I'm going to tell you no, I don't. I know I did, because I signed them and what have you. But I don't have any independent knowledge on my own. It has been a long, long time.

**Q. Now, I can represent to you that these interrogatories were filled out in 2018. That was around three years ago, right?**

MR. JOYCE: Five. The math is five.

MS. AGBIRO: It was around five years ago.

THE WITNESS: That's long for me.

**Q. (By Ms. Agbiro) Okay. That's long time for you?**

A. Yes.

**Q. Five years?**

A. Yes.

**Q. I'm going to go ahead and refer you to Page 8. Let's start on Page 8.**

A. Yep. I'm there.

**Q. So Interrogatory No. 12 specifically asks your -- "...each activity, action, or investigative tasks that you participated in during the MP rape investigation."**

**Do you see that?**



A. I do see that.

**Q. Do you recall anything about the M.P. rape investigation?**

A. I maybe did then but I don't know now.

**Q. I'm going to refer you to your answer on Page 9?**

A. Yes. I'm on nine.

**Q. If you can go ahead and read your answer.**

A. Which one?

**Q. To No. 12. Yes. If you can read it out load?**

A. Answer. You want this out loud?

**Q. Yes.**

A. "At the time of the Plaintiff's arrest, in December 1985, I was a lieutenant assigned to the Detective Bureau's Housebreak Squad. Captain Ernest Stelzer was the Commanding Officer. The officers assigned to the squad were responsible for investigating burglaries, breaking and enterings and property crimes."

"At the time there had been several nighttime burglaries in a particular area of the city, some of which included the assault and battery of the occupants. About 10 P.M. on December 6, 1985,



another nighttime burglary occurred at the home of Joseph McNabb and his wife at 6 Allendale Street."

"During the burglary Mr. McNabb was struck three times with a broom handle by a man. A few hours later, about 2:30 A.M., on December 7, 1985, Sheileen Sapelli had her pocketbook snatched by a white male later identified as George Perrot."

"She later identified Mr. Perrot as the perpetrator and officers recovered her pocketbook at Mr. Perrot's residence, where he was arrested.

"As indicated in an earlier answer, I assisted Assistant District Attorney Bloom, and Sergeant Thomas Kelly in coordinating a lineup on December 7, 1985, and I testified in Grand Jury proceedings. I do not recall any other participation in the M.P. rape investigation"

**Q. Do you remember being a lieutenant in 1985?**

A. Date-wise, no, if you're talking independently. This here says it must be so, but I can't tell you, from my memory, much about all of this. It's just a fog for me. I'm having trouble with that.

**Q. Okay. Are there any cases, in your**



**memory right now, that stand out to you from your career at the Springfield Police Department?**

A. No.

**Q. You don't member any case?**

A. Not that stand out, no. I don't remember any particular case. It's been a long time. And I'm getting old.

**Q. Do you remember if there was a series of break-ins while you were at the -- when you lieutenant at the police department?**

A. There's always been break-ins, and serious ones. I can't recall any particular one.

**Q. There wasn't a time, in your memory, of a certain string of sexual assaults in Springfield?**

A. I don't remember them on my own. I just can't. My memory just isn't showing it for me.

**Q. Do you remember if you ever supervised Sergeant Thomas Kelly when you were a lieutenant?**

A. No.

**Q. Do you know who Sergeant Thomas Kelly is?**

A. Yes.

**Q. Who is he?**

A. He's deceased now. But he was a lieutenant and, at some point, he was assigned to, I

think, the crime prevention bureau. That's about all I can tell you about it right now.
**Q. You were working with Thomas Kelly?**
A. No. We're separate units, separate bureaus. He worked under the crime prevention bureau; I worked under the detective bureau. We both reported to separate captains, different captains.
**Q. So you have no independent recollection at all of working with Thomas Kelly?**
A. No.
**Q. Do you have any independent recollection at all of supervising Thomas Kelly?**
A. No.
**Q. Can you describe the housebreak squad?**
A. It was a unit of detectives that were assigned the responsibility of investigating burglaries, breaking and enterings and mostly that.
**Q. Was there -- like was it always the housebreak squad or was it something that was created?**
MR. KENEFICK: Objection.
MR. JOYCE: Objection. You might want to retry that one.
MS. AGBIRO: Strike that.



**Q. (By Ms. Agbiro) Do you remember --**
A. I don't recall it being formulated or anything, so my answer is: I don't know how that came about, that unit. But it was attached to the detective bureau.
**Q. Do you remember if you had just came onto the unit?**
A. Yes.
**Q. Were you assigned to the unit?**
A. Yes.
**Q. Who assigned you to the unit?**
A. I suppose it would have been the captain.
**Q. Okay. Were there any other units within the detective bureaus?**
MR. JOYCE: Objection.
THE WITNESS: There were.
**Q. (By Ms. Agbiro) What other units were there?**
A. There are units that investigated robberies and murders, along that line. Armed robberies, larcenies. Not larcenies. Larcenies from a person.
**Q. Were you ever assigned to any type of squad when you were at the detective bureau?**



A. No.
**Q. As a lieutenant, at the detective bureau, were you only responsible for supervising detectives or sergeants that were in the detective bureau?**
MR. JOYCE: Objection.
THE WITNESS: No. Just in the housebreak squad.
**Q. (By Ms. Agbiro) Just in the housebreak squad.**
A. Right.
**Q. How many officers were assigned to the squad?**
MR. JOYCE: Objection.
THE WITNESS: Perhaps six.
**Q. (By Ms. Agbiro) Six?**
A. I'm not sure.
**Q. Was it just police officers or were there sergeants? What -- who -- what were the roles of the individuals assigned to the housebreak squad?**
MR. JOYCE: Objection.
THE WITNESS: The best I can recall is they were police officers.
**Q. (By Ms. Agbiro) Did the housebreak squad have any sergeants?**



A. Not that I recall.
**Q. Did the housebreak squad have any detectives?**
A. This were all detectives.
**Q. They were all detectives?**
A. Yes.
**Q. But they weren't uniformed?**
A. No.
**Q. So all the six officers were detectives?**
A. Yes.
**Q. Do you remember any of the detectives that you worked with on the housebreak squad?**
A. Not now.
**Q. How many detectives -- sorry. How many lieutenants were assigned to the detective bureau, do you know?**
MR. JOYCE: Objection.
THE WITNESS: It varied from time to time, so I can't tell you how many. There may have been one at any given time, a couple. Sometimes the sergeants would use -- would replace a lieutenant for whatever reason. It's just not clear cut.
**Q. (By Ms. Agbiro) When you say it wasn't**

**clear cut, was there a certain policy as to how the work was distributed or assigned?**
MR. KENEFICK: Objection.
MR. JOYCE: Objection.
THE WITNESS: Well, the supervisor of each squad would get the reports, the crime reports. And then they would then review them and assign them to the various detectives for further investigation.
**Q. (By Ms. Agbiro) Would they give the reports of -- when you say "reports," what do you mean?**
A. A report of the crime. Somebody broke into this home at such and such a time and stole some items, and there is an official police report specifically made by uniformed officers and then it is forwarded to the detective bureau. And then it's disseminated by virtue of the squads that are in there, the different units.
**Q. And who was in charge of disseminating the police report to the squads?**
MR. JOYCE: Objection.
THE WITNESS: Well, it would ultimately be the captain. His



responsibility unless he had a subordinate, a lieutenant do it. But it came from a ranking officer.
**Q. (By Ms. Agbiro) A lieutenant such as yourself?**
A. What's that?
**Q. A lieutenant such as yourself?**
A. Could I have been? Yes, I could have been. Sure.
**Q. To your knowledge did the different squads communicate with one another?**
A. What's that?
**Q. Did the different squads, in the detective bureau, did they communicate with one another about their cases?**
MR. JOYCE: Objection.
THE WITNESS: I don't know if they communicated with each other but I don't know what they would be communicating over. It's possible.
**Q. (By Ms. Agbiro) Do you know if there was, for example, a case that could fall in the purview of two different squads, would the two different squads talk about the case together?**



MR. JOYCE: Objection.
THE WITNESS: It's possible. I don't recall any particular ones, but it's possible.
**Q. (By Ms. Agbiro) Was there any sort of policy, that you know of, that required the lieutenants of different squads to discuss a case with another squad if they found that they had relevant information?**
MR. JOYCE: Objection.
THE WITNESS: Is there a policy?
MS. AGBIRO: Yes.
THE WITNESS: I don't know if there was a policy.
**Q. (By Ms. Agbiro) We talked a little bit about training earlier.**
**Was the only training that you received occur when you first arrived at the police department --**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) -- any official training?**
A. No. There was --
MS. GIZZI: Lisa, you have to



identify yourself when you make an objection because the court reporter doesn't know who it is.
MS. DESOUSA: Okay. Thanks.
THE WITNESS: Could you repeat that please?
**Q. (By Ms. Agbiro) Did you -- was the only training, was the only official training you received was when you first started the police academy?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection by Lisa Desousa.
THE WITNESS: All set to go?
MR. JOYCE: Yes. Go ahead and answer.
THE WITNESS: Was there any other training?
MS. AGBIRO: Official training.
THE WITNESS: Yeah. We had inservice training once a year.
**Q. (By Ms. Agbiro) What do you mean by inservice training?**
A. Where you'd be taken out of your actual training, groups of officers from various different

parts, so they had a forum for the training. You know, you had to train them, you know, with the changes in the laws. First day, firearms. Anything that is a skill for a police officer to know.

**Q. Who were required to attend those trainings?**

**A.**

MR. KENEFICK: Objection.

MS. DESOUSA: Objection. Lisa Desousa, objection.

THE WITNESS: As far as, you know, is there a policy? I don't make the policy. I don't know. I just know that the department did it. They did training.

**Q. (By Ms. Agbiro) I'm sorry. I don't think you understood my question. I'd said, who is required to attend these trainings?**

A. Who's required?

**Q. Yes.**

MS. DESOUSA: Objection. Lisa Desousa.

THE WITNESS: The police officer -- the sworn personnel in the department, and even the civilians had a separate one. But



the sworn personnel were required to go in to inservice training once a year.

**Q. (By Ms. Agbiro) And was it the same training every year for everyone in the department?**

MR. JOYCE: Objection.

THE WITNESS: It would have been for all of the police officers. And then because supervisors had some different responsibilities, both would share certain things. But then they'd break apart depending on supervisors.

**Q. (By Ms. Agbiro) Who was -- who was in charge of the trainings?**

MR. JOYCE: Objection.

THE WITNESS: I don't remember. That person was, you know, appointed by the chief.

**Q. (By Ms. Agbiro) It was a person appointed by the chief?**

A. Yeah. I don't know who that would have been at that time or any particular time.

**Q. Do you know, was the deputy chief in charge of running these trainings?**

MR. JOYCE: Objection.



THE WITNESS: I don't know.

**Q. (By Ms. Agbiro) What entity, within the police department, was in charge of running these trainings?**

MR. JOYCE: Objection.

THE WITNESS: Well, I suppose it starts with the Chief of Police and down to a deputy chief. But I don't know what they did actually.

**Q. (By Ms. Agbiro) Do you know who created the trainings?**

MR. JOYCE: Objection.

THE WITNESS: No.

**Q. (By Ms. Agbiro) When you were serving as acting deputy chief, do you remember being involved with any of the trainings provided to the other police officers or any officers?**

MR. JOYCE: Objection.

THE WITNESS: I don't recall.

**Q. (By Ms. Agbiro) Do you remember learning or discussing the training program at all with the Chief of Police?**

MR. JOYCE: Objection.

THE WITNESS: I don't recall.



**Q. (By Ms. Agbiro) Do you remember being involved, and when you were the acting deputy chief, with trainings at all?**

MR. JOYCE: Objection.

THE WITNESS: I don't remember.

**Q. (By Ms. Agbiro) Did you have to attend those trainings?**

A. Yes.

**Q. Did you have to attend those trainings when you were a sergeant?**

A. Yes.

**Q. Did you have to attend those trainings when you were a lieutenant?**

A. Yes.

**Q. Did you have to attend those trainings when you were a captain?**

A. Yes.

**Q. Did you have to attend those trainings when you acting as deputy chief?**

A. No.

**Q. Does anybody above deputy chief have to attend those trainings?**

MR. KENEFICK: Objection.

THE WITNESS: I don't know.

**Q. (By Ms. Agbiro) The person above deputy chief would be the Chief of Police, correct?**
A. Yes.
**Q. Did the Chief of Police have to attend the trainings?**
MR. KENEFICK: Objection.
MS. DESOUSA: Objection. Lisa Desousa.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Were you acting as deputy chief for a long time?**
A. Not very long.
**Q. When you were appointed by the Chief of Police, to be the acting deputy chief, were you informed of your responsibilities?**
A. No. Just taking it over for the deputy chief.
**Q. Who told you what to do?**
A. I wasn't told what to do. I was told that I had the assignment, and I knew enough about it. If I had any questions, I would check with the other deputy chief and he would assist me.
**Q. (By Ms. Agbiro) Did the other deputy chief provide you with any formal training?**
MR. JOYCE: Objection.



THE WITNESS: No.
**Q. (By Ms. Agbiro) Were there any manuals provided to the Deputy Chief that outlined your responsibilities?**
MR. JOYCE: Objection.
THE WITNESS: No. That I know of.
**Q. (By Ms. Agbiro) Then how did you know what you were supposed to do?**
A. You learn it coming up through the ranks, and dealing with the deputy chief and the supervisor. And then I, of course, consulted with the senior deputy chief, and he helped me immensely.
**Q. Did you know all the responsibilities of the deputy chief?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) You were never the Chief of Police, correct?**
A. Sorry?
**Q. You were never the Chief of Police, correct?**
A. That's correct.
**Q. Was the only way for you to know all of the responsibilities of the Chief of Police, in your opinion, would you say that the only way you could know what the Chief of Police was supposed to do was to serve as Chief of Police?**



MR. JOYCE: Objection.
THE WITNESS: Would you please repeat the question?
MS. AGBIRO: I'll rephrase.
**Q. (By Ms. Agbiro) In your opinion, is the only way that you would know all the responsibilities as Chief of Police is if you held that role?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) Did you know all of the responsibilities that was required of the Acting Deputy Chief?**
MR. KENEFICK: Objection.
THE WITNESS: I know some of the important ones and, again, that was from working with the Deputy Chief from time to time. I had a working understanding.
**Q. (By Ms. Agbiro) Were there any specialized trainings for captains?**
MR. JOYCE: Objection.
THE WITNESS: No. Not that I know of.



**Q. (By Ms. Agbiro) As a captain you weren't required to attend any specialized training that was specific to your responsibilities?**
MR. JOYCE: Objection.
THE WITNESS: Yes. That's correct.
**Q. (By Ms. Agbiro) As a lieutenant were there any specific trainings, you were required to attend, specific to your responsibilities?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) As a sergeant were you required to attend any specific trainings specific to your responsibilities?**
MR. JOYCE: Objection.
THE WITNESS: I missed the beginning of your question.
MS. AGBIRO: As a sergeant.
THE WITNESS: As a sergeant?
MR. JOYCE: Object.
THE WITNESS: No.
MS. AGBIRO: I think this is a good time for our lunch.
MR. JOYCE: Just before -- housekeeping, I was to marking this as

Exhibit 1.
MS. AGBIRO: Sure. Exhibit 1.
MR. JOYCE: You didn't mark it, but you referred to it.
MS. AGBIRO: Yes. Can we mark this as Exhibit 1.
(Exhibit CA-1, Answer to Plaintiff's Interrogatories, marked)
(Recess taken)
MS. AGBIRO: Back on the record.
**Q. (By Ms. Agbiro) I'm going to refer you back to Exhibit 1, Page 9.**
A. Page 9.
**Q. Mr. Arpin, I am referring you back to your answer to Interrogatory No. 12. And it says there that, you know, in December of 1985, you were a lieutenant assigned to the detective bureau's housebreak squad; is that correct?**
A. Yes.
**Q. Do you have any reason to dispute that that was the case?**
A. No.
**Q. And then afterwards it says that Captain Ernest Stelzar was the commanding officer; is that**



**correct?**
A. Yes.
**Q. Do you have any reason to dispute that that was indeed the case?**
A. Please, can you repeat that?
**Q. Sure. Do you have any reason to dispute that that indeed was the case?**
A. No.
**Q. Okay. Now, it says, if you look to -- I'm going to skip one sentence and go over to the sentence that starts with "at the time." The sentence reads, "At the time there have been several nighttime burglaries, in a particular area of the city, some of which included assault and battery of the occupants?"**
**Is that correct?**
A. That's what it says, yes.
**Q. Do you have any reason to dispute that that was indeed what was happening at that time?**
A. No.
**Q. Earlier you testified that you were a supervisor at this time?**
A. Yes.
**Q. And as a supervisor your job is to**



**supervise individuals below you, correct?**
A. Part of it.
**Q. And you testified earlier that, as a lieutenant, you were responsible for supervising sergeants.**
**Am I right?**
A. Yes. Under my direction.
**Q. Under your direction; is that right?**
A. Yeah.
**Q. Now, you also testified earlier that depending on the complexity of the case you would also assist the detectives and the sergeants.**
**Is that right?**
A. Please repeat that again, please.
**Q. Yes. So you also previously testified that, depending on the complexity of the case, you would also assist the individuals who you were supervising; is that correct?**
A. Yes.
**Q. In your experience, with your 40 years in this department, was a series of nighttime burglaries -- that was happening in one area of the city -- over a short span of time, be considered a complex case?**
MR. JOYCE: Objection.



THE WITNESS: I don't know if complex is right, but it's a case and it's an important one.
**Q. (By Ms. Agbiro) It's an important one. Is that a case that you, as a lieutenant, would have to be involved in?**
A. I don't know if I have to be, but I was.
**Q. You were involved with it?**
A. Yes.
**Q. Are you saying that you remember being involved with the case, or are you saying that you would generally be involved in a case like this?**
MR. JOYCE: Objection. You can go ahead and answer it.
THE WITNESS: I'm going on -- this is one of the situations that became very important because of the magnitude of the crimes. So who would that be something I'd be involved in, yes. If I was there, and I was.
**Q. (By Ms. Agbiro) As a lieutenant who would be involved in the case, would your primary duties be supervising the individuals who were actively investigating the case, or would you be**

**playing a more active role in the investigation?**
MR. JOYCE: Objection.
THE WITNESS: I would not be supervising them at that stage. They're pretty autonomous when they're working like that in conjunction with each other. I was there, hopefully, to gather some understanding of what this was all about.
**Q. (By Ms. Agbiro) So who would be supervising this whole incident?**
MR. JOYCE: Objection.
THE WITNESS: There was nobody standing there saying do this, do that. They were self-actuated and they working with each other. And that's how that investigation went down.
There was nobody directing them. They were all seasoned-detectives and operating on their training and their experience.
**Q. (By Ms. Agbiro) Okay. You were in the department for 40 years, correct?**
A. Forty-one.
**Q. (By Ms. Agbiro) Forty-one years.**



**And you do understand that police department have a hierarchy, correct?**
MR. JOYCE: Objection.
THE WITNESS: I know about police departments.
**Q. (By Ms. Agbiro) And my question was: Do you understand there is a hierarchy?**
MR. JOYCE: Objection.
THE WITNESS: Yes.
**Q. (By Ms. Agbiro) In the hierarchy, that you described earlier, where you, personally, were promoted from the uniformed division all the way to the detective division. It is evident that detectives aren't at the top of the hierarchy, correct?**
MR. KENEFICK: Objection.
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: No.
**Q. (By Ms. Agbiro) And, in fact, detectives are supposed to be supervised by sergeants; is that correct?**
MR. JOYCE: Objection.
MS. AGBIRO: Go ahead.



THE WITNESS: I think you're taking there is nobody standing there supervising each of them. You have a supervisor who is trying to get a handle on everything that's going on. His job is to gather information and formulate it.
These detectives are self-actuated. They've got crimes and they're following -- I would have been interfering with them while they're conducting that active investigation. I got that information later on, all of it.
I was not there dictating what's to be done. I was there to supervise and give guidance, if requested. They were all well-trained detectives. They were doing a good job and I was there because I wanted to have first-hand view of what was going on. That's basically it.
But not dictating or directing or anything like that. I gain a lot of information from the reports and discussing with them after that scene has been closed down for the time being.



**Q. (By Ms. Agbiro) What is your definition of "supervise"?**
A. Supervise means an awful lot. It's overseeing; it's guidance. It's assisting and providing information. It's a wide-based thing, supervision. It's just wide-based.
**Q. Under a hierarchy, wouldn't the person supervising those underneath them be responsible for them?**
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: I don't know if I'm responsible for them. Probably. But I'm there, not to direct them, mostly to oversee it so I can have an understanding of what went down.
They're going to make reports and I'm going to review those reports. It's just impossible to be there -- and I know -- I think what you're trying to say is: Well, Joe, you go do this. I can't do that. No supervisor can. You have to let the investigators go.
You can discuss with them, if there

Page 89

is a problem, you can assist -em. But you're not directing them. They were pretty much operating on their own through years of experience.
**Q. (By Ms. Agbiro) How many years do you have to have in the police department before you become a detective?**
MR. JOYCE: Objection.
THE WITNESS: There is no policy or rule on that.
**Q. (By Ms. Agbiro) There is no policy, as a lieutenant, regarding how many years a person has to work in the police department before they're promoted to a detective?**
MR. JOYCE: Objection.
THE WITNESS: Detective are at the discretion of the Chief of Police.
**Q. (By Ms. Agbiro) Does the Chief of Police make every single promotion in the city -- every single promotion decision at the police department?**
MS. DESOUSA: Objection.
THE WITNESS: Of course not. The chief will assign people as needed. But there were things done with assignments that

Page 90

have nothing to do with the chief. I don't know what else to tell you.
**Q. (By Ms. Agbiro) Can you become detective if you have been a uniformed officer for one year?**
MR. JOYCE: Objection.
THE WITNESS: Well, I don't know about the current policy.
**Q. (By Ms. Agbiro) At the time in 19 --**
A. At that time --
MR. JOYCE: Objection.
THE WITNESS: -- as I understood it, it was at the discretion of the Chief of Police. And I don't think there's any time constraints on it, you know, that you have to do so much. I'm not aware of that.
**Q. (By Ms. Agbiro) As a lieutenant, was it -- as a lieutenant, you were -- if you were responsible for supervising a sergeant under you, or a detective under you, were you responsible for making sure that they knew how to do their jobs?**
MR. JOYCE: Objection.
THE WITNESS: I don't think so. I think they're well-trained and they know how to do their job. In my interactions with

Page 91

them, that's how I saw it.
**Q. (By Ms. Agbiro) Was it your responsibility to make sure that they were well-trained and knew how to do their jobs?**
MR. JOYCE: Objection.
THE WITNESS: As a supervisor, at my level, no.
**Q. (By Ms. Agbiro) Who's responsibility was it to make sure that the sergeants were well-trained to do their jobs?**
MS. DESOUSA: Objection. This is Lisa Desousa.
THE WITNESS: I don't know. Someone above them, I guess.
**Q. (By Ms. Agbiro) As a captain is it your job to make sure that those under you were well-trained to do their jobs?**
MS. DESOUSA: Objection. Lisa Desousa.
THE WITNESS: It all comes from the chief's office, all the training they get and when it is being conducted. At least back then. I don't know about today.
**Q. (By Ms. Agbiro) As a lieutenant you**

Page 92

**wouldn't let someone handle an investigation on their own unless you thought that they were trained, to your satisfaction, that they could handle the case?**
A. All the detectives, that ever were in the detective bureau, had a lot of training. I didn't have to train them. I would give them assignments, when it was necessary, but most of the time they're immediate supervisors would make sure that they're well -- that they have all the information that they need.
**Q. Going back to this case, when you were working alongside the other detectives and sergeants that were working on the housebreak squad, you mentioned earlier that you were supervising them, correct? Is that what you mentioned?**
**I just want to make sure that I understand that.**
A. I was a -- as best as I can recall, I was a lieutenant in the house-break squat at that time.
**Q. (By Ms. Agbiro) And what would be your responsibilities the if you were working on that type of case?**
MR. JOYCE: Objection.
THE WITNESS: It would be to

determine what was happening, and the events in their working together. I'm trying to gather information while I'm there and get answers. Somebody does it and that's the supervisor.

**Q. (By Ms. Agbiro) So that would mean that you would be responsibile for making sure they were doing their job well?**

MS. DESOUSA: Objection.

THE WITNESS: It's just making sure they were doing their job.

**Q. (By Ms. Agbiro) What would not doing their job look like?**

MR. JOYCE: Objection.

THE WITNESS: I don't know. In that case they were all doing their job. Because they were active and they weren't sitting around and drinking their coffee. It was observation and a little bit of discussion.

I knew they were doing their job. I got that feedback from them just by being there observing them and, on occasion, speaking with them.

**Q. (By Ms. Agbiro) What would they tell you**



**that would assure you that they were doing their jobs?**

MR. JOYCE: Objection.

THE WITNESS: I can't go there. I don't know what that -- I don't remember. I never had any criteria with what they had to tell me.

**Q. (By Ms. Agbiro) But you remember that you conversations with them regarding the case?**

A. I'm sure I've had conversations. I'm sure did. I don't remember what I said. It's 40 years ago.

**Q. But you do remember that you did have conversations with them about this case?**

A. Yes.

**Q. So you do remember this case?**

A. I just don't know the intricacies of it anymore. I know the case and what it involved and from my grand jury testimony. I don't have independent -- if I didn't have that, I wouldn't remember any of this.

**Q. Do you remember, or do you see anywhere within this interrogatory, any discussions or conversations that you had with the sergeants or**



**detectives in this case?**

A. No. No. There is nothing in there that I'm aware of.

**Q. Now, the next sentence in your response to Interrogatory No. 12 says: About 10 p.m., on December 6th, 1985, another nighttime burglary occurred at the home of Joseph McNabb and his wife on 6 Allendale Street.**

**Do you see that?**

A. Yes.

**Q. Do you have any reason to dispute that that is correct?**

A. No.

**Q. And after it says: A few hours later, about 2:30 on December 7, 1985, Sheileen Sapelli had her pocketbook snatched by a white male, later identified as George Perrot.**

**Do you have any reason to dispute that that is correct?**

A. No.

**Q. As a lieutenant would you provide any guidance -- strike that.**

**As a lieutenant was it your responsibility to make sure that sergeants or**



**detectives abided by all -- strike that.**

**Afterward it says: Later she identified Mr. Perrot as the perpetrator and Officer -- she later identified Mr. Perrot as the perpetrator and officers recovered her pocketbook at Mr. Perrot's residence where he was arrested.**

**Do you see that?**

A. I see that, yes.

**Q. Do you have any reason to dispute that this is correct?**

A. No. I have no reason.

**Q. Generally speaking who would be responsible for making an arrest on the case?**

MR. KENEFICK: Objection.

THE WITNESS: All police officers are authorized to make an arrest.

**Q. (By Ms. Agbiro) And if you're working on a case with a sergeant or a detective, is it customary for anyone to make an arrest in that case or is it one specific person that is supposed to make the arrest?**

MR. JOYCE: Objection.

THE WITNESS: It varies from case to case. I can't give you an answer on any

particular one because it varies.
**Q. (By Ms. Agbiro) Okay. Is it customary for a lieutenant to make an arrest?**
MR. KENEFICK: Objection.
THE WITNESS: It's not usually the lieutenant's job to make the arrest.
He would be involved in discussions or what have you. An arrest is based on getting enough probable cause to make that arrest.
I don't have any first-hand recollection about that. I really don't.
But I look at this and, if I look at this, and what it says there, there was enough probable cause to make an arrest and further the investigation.
**Q. (By Ms. Agbiro) I was going to ask you about that. As a lieutenant is it your responsibility to make sure they have enough probable cause to make an arrest, right?**
MS. DESOUSA: I'm sorry, Counsel. I didn't hear most of that question.
**Q. (By Ms. Agbiro) I'd said: As a lieutenant it is your responsibility to make sure**



**that those underneath you have enough probable cause to make an arrest; is that correct?**
MR. JOYCE: Objection.
THE WITNESS: If you're talking generally, I'D say the answer is no.
**Q. (By Ms. Agbiro) How about in a case like this?**
MR. JOYCE: Objection.
THE WITNESS: In this case here a decision was made to make the arrest.
**Q. (By Ms. Agbiro) There was a discussion because you wanted to make sure you did it right, right?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection. Lisa Desousa.
THE WITNESS: I wanted to make sure there was probable cause.
**Q. (By Ms. Agbiro) You wanted to make sure that there was Probable cause?**
A. Probable cause to make the arrest.
**Q. And wasn't it one of your responsibilities to make sure you were arresting the right guy?**
MS. JOYCE: Objection.



THE WITNESS: If there is enough evidence, an arrest is made.
**Q. (By Ms. Agbiro) As a lieutenant, in those discussions you had with the officers and the detectives that were working on this case, you had to review evidence to make sure that they had enough probable cause, right?**
MR. JOYCE: Objection.
THE WITNESS: There was enough -- there was probable cause.
**Q. (By Ms. Agbiro) Yes. But you had to review evidence to determine that there was enough probable cause?**
A. Well, I was present when all that was going on. So through discussions with the officers I was satisfied that there was probable cause and they made the arrest. We made the arrest, or whatever the case may be.
**Q. So after you had decided that there was probable, cause, what is normally the next step in the investigation?**
MR. JOYCE: Objection.
THE WITNESS: Well, if you have got the suspect there, he would be placed under



arrest.
**Q. (By Ms. Agbiro) And what would happen after the arrest?**
A. After the arrest he would be taken to the police station and be booked and charged accordingly.
**Q. And after a person is booked and charged, what happens after that?**
MR. JOYCE: Objection.
THE WITNESS: Any number of things could happen. But after he's arrested, charged and arrested, he goes to the booking desk and he's arrested, fingerprints and things like that, and he's placed in a cell.
**Q. (By Ms. Agbiro) I want to show you Exhibit 2.**
MS. AGBIRO: I'm marking this as Exhibit 2.
(Exhibit CA-2, details of report, marked)
**Q. (By Ms. Agbiro) Mr. Arpin, do you recognize this document?**
A. I do.
**Q. You do. Do you recognize this specific document or the police report in general?**
A. Well, I recognize it because it is

authored or at least signed by me.
**Q. Now, earlier you mentioned that you were there, correct?**
A. What did I say?
**Q. Earlier, when I was asking you about the investigation, you'd said you were there. I just want to clarify what you mean by "there"?**
A. I don't recall whether I said that or not in that particular frame.
**Q. So let me ask it this way, how did you know there was probable cause for an arrest?**
A. Because the investigating officers had enough information, as a group, there was enough probable cause. That's how I know. They made that information known through reports, through verbal conversations, through gathering of evidence. Just good police work.
**Q. And as a lieutenant would you be responsible to review those reports as evidence?**
MR. JOYCE: Objection.
THE WITNESS: A supervising officer would check with his CO, find out how the report would be done, who should do it, explain everything to the CO.



I don't have any independent knowledge going back to that. But I know that this report states that Captain Stelzar was fully aware of all of this and agreed also that there was enough probable cause for the arrest and the charges.
**Q. (By Ms. Agbiro) Let's go back. On top of the report, do see the date?**
**What's the date on the top?**
A. 12/7/85.
**Q. And can you go ahead and read the report?**
MR. JOYCE: Out loud or to himself?
MS. AGBIRO: Out loud.
THE WITNESS: "About 5:40 p.m. Captain E. Stelzar, et al arrested, at 130 Pearl Street, George D. Perrot, 17, of 87 Malibu Drive on the following charges: Armed burglary, two counts; armed assault in a dwelling, assault and robbery, armed assault and robbery with a pool cue; stolen pocketbook, $50 cash; credit cards; possession of various instruments.
These charges stem from the home invasion of Emily Lichwala, age 64, of 33



Covel Street on 11/30/85 at 5 - 3 -" -- it looks like 3:25 a.m.
"As a result of another home invasion of Mary A, ^ check exhibit age 78, of 27 Malibu Drive, on 11/30/85, at 4 a.m." -- in parentheses -- "35 minutes after the previous incident, he was additionally charged with armed burglary with a weapon, a stick, an assault on the occupant."
"Aggravated rape, assault and battery, armed with a stick. Stolen was a $1 bill. Also charged with indecent assault and battery, assault and battery."
And then, in parentheses, it says, "see summary, statements, and officers' reports."
**Q. (By Ms. Agbiro) And that's your signature on the bottom?**
A. Yes.
**Q. What does it mean to be the reporting officer?**
MR. JOYCE: Objection.
THE WITNESS: Where in this --
MS. AGBIRO: Underneath the



signature.
THE WITNESS: Underneath the signature. That's whoever signed the report. That's what that means.
**Q. (By Ms. Agbiro) And what does it mean to sign the report?**
A. Lieutenant Charles Arpin.
**Q. What does it mean when you signed the report? When you signed the report, are you attesting to the validity of the document, that you wrote the document?**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) Why would an officer sign the report?**
MR. JOYCE: Objection.
THE WITNESS: So there would be ownership. So they would know who actually authored the report.
**Q. (By Ms. Agbiro) So would that mean you authored the report?**
A. Yes. I authored this report.
**Q. And in order for you to get information from this report, Captain Stelzar had to tell you this information in the report.**

MS. DESOUSA: I'm sorry, again. I could not hear the end of your question.
**Q. (By Ms. Agbiro) In order to you to know the information to write in the report, Lieutenant Stelzar had to tell you that information; is that correct?**
A. No. I knew the information, and I discussed it with the captain and he'd said I should write the report. I briefed him of all of this, in our discussion, and then I submitted a report.
**Q. You told Captain Stelzar the information?**
A. I discussed it with him.
**Q. And where did you get your information from?**
A. All of the officers involved in the investigation. Through verbal communication and written communication.
**Q. Did you discuss it with the other officers as a way to know what was going on in the case?**
A. I don't recall who -- or if I reviewed or spoke with all the officers. I don't have that independent knowledge, right? It's been too long. I'm going by what I see in this report, and I'm



trying to answer your question as best I can.
**Q. You would agree that by talking to the officers, to get the information for the report, and you confirm with Captain Stelzar, that would be you supervising them; is that right?**
MR. JOYCE: Objection.
THE WITNESS: Part of my job -- I don't know what you'd call it. All I know is I had those discussions with them. And we continued to have those at the police station, and I informed the captain and, as a result, I wrote this report. I can't tell you anything else.
**Q. (By Ms. Agbiro) That was as a supervisor you wrote that, right?**
MR. JOYCE: Objection.
THE WITNESS: I'm just going to say, I wrote that report. I'm a supervisor and I wrote a report.
**Q. (By Ms. Agbiro) But are you saying that you weren't supervising them?**
MS. DESOUSA: Objection. Lisa Desousa.
THE WITNESS: At the time, no. I



was helping to conduct the investigation. I don't know if speaking and trying to get gather information is supervising. Perhaps that's your definition. For me that was police work and trying to get to the bottom of things.
And I was getting to the bottom of things with patrolmen, supervisors, whoever was there at the scene. That's how it's done. But I was not there saying you give this report and do that. That's all done later on at the station before this was made.
A lot of thought and gathering went into -- and, again, I don't have first-hand information, my own. But I look at this and that was a good police report and provided all the available information to show that there was probable cause for an arrest.
I don't know what else you want from me.
**Q. (By Ms. Agbiro) Normally a lieutenant would have first-hand information about cases, right?**
MR. JOYCE: Objection.



THE WITNESS: You're saying normally a lieutenant wouldn't have that?
MS. AGBIRO: Yes.
THE WITNESS: Well, I disagree with you on that.
**Q. (By Ms. Agbiro) Are lieutenants actively responding to calls for help?**
A. They can sometimes. And this was a follow-up to multiple calls. It was an unusual circumstance. And back then, I was also a street supervisor at that time as a lieutenant so that was part of my responsibility to be up there.
**Q. Supervising the officers on the scene?**
MR. JOYCE: Objection.
THE WITNESS: Doing my job which involved supervision, getting evidence, all of that. All of that. I'm a supervisor. I suppose what I'm doing is I'm supervising.
**Q. (By Ms. Agbiro) You're supervising the officers that are on the scene?**
A. I'm conducting supervision in the whole scene I'm looking at. I know what you're trying to do but I can't give you the answer you want. That is just the way I remember, just like I said.

**Q. Did you have to report back to your supervisor?**
A. I don't know if I -- you say "had to". Of course I had to. But I don't know if I had to or not. It was a very serious set of crimes. At the time, I don't believe the captain was there. That was later on in the morning time, when he came in, as best as I can recall.
**Q. And you'd said, of course you had to. Why did you have to?**
A. Because that's my job as a supervisor, to go out there and see what's going and gather the facts, all of that. Supervising doesn't just mean dictating. It means over-viewing the whole scene and getting an understanding that I can give to my commanding officer which I did with this report.
**Q. After someone is arrested, would you make sure that the person gets back to the station?**
(Background noise heard)
A. The noise kind of drowned you out.
**Q. After a person is arrested, as a lieutenant at the scene, you'd make sure that the person got back to the station, right?**
MR. JOYCE: Objection.



**Q. (By Ms. Agbiro) That the person that you arrested got back to the station?**
MR. JOYCE: Objection.
THE WITNESS: He was going back to the station. It didn't a command from me. He was going back to the station.
**Q. (By Ms. Agbiro) And then, after the person is booked and has fingerprints and put in the cell, what are the next steps in the investigation?**
MR. JOYCE: Objection.
THE WITNESS: He's in the cell and he's going to be taken to court. But, in a heavy investigation like this, he was brought up to the detective bureau and he was questioned.
**Q. (By Ms. Agbiro) He was questioned?**
A. Yes.
**Q. And who would question him? What type of officer would question him?**
MR. JOYCE: Objection.
THE WITNESS: Any detective, supervisor or otherwise.
**Q. (By Ms. Agbiro) And if the case was as important as this, how many officers would question?**



MR. KENEFICK: Objection.
MR. JOYCE: Objection.
THE WITNESS: Well, there were several. Because this was investigated by two different bureaus in the police department. You had detectives from the detective bureau and you had detectives from the crime prevention bureau because they handled sex crimes.
The detective bureau handles crime against property. There were both of those crimes in that area so both of those bureaus had a stake in that and some officers were involved in interrogation, as far as I can recall.
**Q. (By Ms. Agbiro) As a lieutenant in a case like this, where you have two different bureaus, what would be your responsibilities --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- when it came to interrogation? You can answer.**
THE WITNESS: Responsibility to see what was going on and what was happening and for them to inform me of the information



that they had gathered and what happened.
So my responsibility was to gather information, which I did. And I put it together and made a report. The officers, they know how to conduct investigations and so they do it. And the outcome of that was this report.
**Q. (By Ms. Agbiro) Would you sit in the room when they were questioning the suspect?**
A. I would not interfere unless it was an important matter that couldn't wait.
**Q. What do you mean by an important matter that couldn't wait?**
A. Just what I said. Something important enough in the line of police work, whether it was that case or another, but something more to get or I need a little information myself to continue on with the summary so I could make the arrest report.
**Q. So a case like this case?**
A. What's that?
**Q. So a case like this case, you would sit in?**
MR. JOYCE: Objection.
THE WITNESS: Not necessarily, other

than to just ask a question. I didn't participate in any of the interrogations and I wasn't there to witness them.

If I went in there, it was because I needed some additional information, information that I was gathering for the report and for my supervisors.

**Q. (By Ms. Agbiro) Did you ever participate in an interrogation where you were a supervisor?**

A. As a sergeant I did, a few times, because I was a working supervisor. I was in the detective bureau, the afternoon shift, and I had a partner that wasn't a supervisor so we worked together as police officers.

**Q. And how about as a lieutenant, did you --**

A. Yes.

**Q. -- participate in any interrogations?**

A. Interrogations? I can't recall any whatsoever. I perhaps did but I can't remember any.

**Q. How about as a captain?**

A. As a captain?

**Q. Yes.**

A. I don't recall ever taking part in an interrogation as a captain.



**Q. And let me go back. When you say you don't recall participating in interrogations as a lieutenant, are you saying you have no memory of it, or you can't say one way or another that you participated in interrogations?**

MR. JOYCE: Objection.

THE WITNESS: I have no memory of it.

**Q. (By Ms. Agbiro) Was it possible that you didn't participate in interrogations as a lieutenant?**

A. I don't know.

**Q. Is it a possibility?**

A. Anything is possible.

**Q. As a lieutenant it would be your responsibility to make sure that the officers working had all the information they need to be able to execute their job responsibilities, right?**

MR. JOYCE: Objection.

THE WITNESS: I can't answer that question. They were self-sufficient and what have you.

Try to clarify what you're asking me, please.

**Q. (By Ms. Agbiro) I want to know if it**



**would be, as a lieutenant supervising -- generally it's a hierarchy where there are people above, other people to make sure that the people below them are doing their job correct.**

**You'd agree with that, right?**

A. Yeah. It makes sense.

**Q. That's how that would work. And the way you insure that people were doing their job correctly is making sure that they have all the information and knowledge they need to be able to do that job.**

**You can agree with that, right?**

MR. JOYCE: Objection.

THE WITNESS: That's one of my responsibilities as a supervisor. I don't know. I can't be in there one on one, and I don't have any recollection of doing any of those things.

Please rephrase it again, because I'm getting confused. I'm sorry.

**Q. (By Ms. Agbiro) As a lieutenant it was one of your responsibilities to make sure that the officers underneath you had all of the knowledge that they needed to be able to properly execute their job; is that right?**



MR. JOYCE: Objection.

THE WITNESS: That's not my responsibility. Most of that stuff comes from training, that's outside of my scope, from the academy and specialized training schools. They have schools that train for all types of crimes, sex crimes, all of those things.

I, as a supervisor, am not responsible that they have that. That comes from a higher command from the chief's office.

**Q. (By Ms. Agbiro) Okay. Let me ask you this. When you were a sergeant, or a detective, did you receive training on how to interrogate juveniles?**

MR. JOYCE: Objection.

THE WITNESS: I never had any training on how to interrogate juveniles.

You said juveniles, did you not?

MS. AGBIRO: Yes.

THE WITNESS: Yeah. No. I never had any specialized training on that.

**Q. (By Ms. Agbiro) Did you interrogate juveniles in the same way that you interrogated**

**anybody else?**
MR. JOYCE: Objection.
THE WITNESS: I never interrogated juveniles. There is a juvenile bureau that handles that.
**Q. (By Ms. Agbiro) What would be the definition of a juvenile?**
A. I don't know about today --
(Multiple speakers)
A. -- but it was under --
**Q. Sorry.**
A. I'm sorry. Go ahead.
**Q. Did you know the definition of a juvenile when you were at the police department in 1985?**
MR. JOYCE: Objection.
THE WITNESS: Yes.
**Q. (By Ms. Agbiro) What would be a juvenile?**
A. Under the age of 17.
**Q. Under the age of 17.**
A. Yes.
**Q. So 17 was the cutoff point.**
A. You were an adult, yeah, at 17. You were an adult and would be prosecuted as an adult.



**Q. Did the definition of juvenile ever change throughout your career with the police department?**
MR. JOYCE: Objection.
THE WITNESS: During my career?
MS. AGBIRO: Yes.
THE WITNESS: No.
**Q. (By Ms. Agbiro) No?**
A. No.
**Q. Now, it says here that --**
**Do you remember that George Perrot was arrested because of the burglaries that happened on December 6th or the break ins that happened on December 6th?**
A. I have no first hand. I'd have to look at the reports. I don't remember.
**Q. You don't have any reason to dispute that that actually is a fact, correct?**
A. What's that?
**Q. You don't have any reason to dispute that this is actually a fact?**
A. What is actually a fact?
**Q. That he was arrested as a result of the break ins that happened on December 6th?**



MS. DESOUSA: Objection. Lisa Desousa.
(Multiple speakers)
MS. DESOUSA: I can't hear any of the discussion that's going on.
MS. AGBIRO: I am going to repeat the question.
**Q. (By Ms. Agbiro) Do you have any reason to dispute that George Perrot was arrested as a result of the burglaries that happened on December 6th?**
MS. DESOUSA: Objection. Lisa Desousa.
THE WITNESS: What's in that report is the only recollection that I have now. So he was arrested, on that date, for those crimes.
**Q. (By Ms. Agbiro) As a lieutenant, working on this case, would you be responsible for notifying the other division that worked on sex crimes if you had information for them?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: It would be anybody's,



as a supervisor, responsibility. And sometimes you don't even need a supervisor. If another detective bureau is investigating crime on the street, and they need assistance for any various reasons, they can call the radio and ask for it.
It doesn't have to be a supervisor initially and they don't get questioned on it. They were requesting assistance and it would be provided out there.
**Q. (By Ms. Agbiro) Did the bureau that handled sex crimes get involved with this arrest at the police station?**
MR. KENEFICK: Objection.
MS. DESOUSA: I didn't hear what you'd just said.
**Q. (By Ms. Agbiro) I'd said: Did the bureau that handles sex crimes get involved with this arrest at the police station?**
MR. JOYCE: Objection.
THE WITNESS: I don't recall. I know they became involved at some point but I don't know exactly where. I have no first-hand knowledge of that. But I know

Page 121

they were involved by virtue of the crime.
**Q. (By Ms. Agbiro) In the second sentence, after your answer to Interrogatory No. 2, it says: As indicated in an earlier answer, I assisted Assistant District Attorney Bloom and Sergeant Thomas Kelly in coordinating, on December 7th, 1985 and testified in grand jury proceedings.**
**Do you see that?**
A. Yes.
**Q. Do you have any reason to dispute that that indeed did happen?**
A. No.
**Q. As a lieutenant, coordinating a line up, would you be in charge as to who is selected for a line up?**
MR. JOYCE: Objection.
THE WITNESS: Who is -- I wasn't involved in that, so I don't know how they were selected. But I wasn't involved. There was Attorney Bloom and Sergeant Kelly. And I may have made arrangements for securing a room in which to do that.
But I didn't participate in the line up, per se, and I don't think I was there

Page 122

when the idea was made. I was somewhere else in the building doing something, following up on the information.
**Q. (By Ms. Agbiro) Do you remember that you weren't there in the building, in the room?**
A. In that room, I wasn't involved in the line up, no. I was coordinating and making sure rooms were available. And arrangements were made to get personnel for the line up.
**Q. I want to direct you to Exhibit A of your interrogatories. This is the last two pages of Exhibit A -- Exhibit 1.**
A. This is the page here?
MR. JOYCE: That's it there.
THE WITNESS: This is the page here? No. It's in black. I'll find it. The last page you'd said?
MS. AGBIRO: The last three pages at the bottom.
THE WITNESS: All right.
**Q. (By Ms. Agbiro) Does this document look familiar to you?**
A. Well, I know what it purports to be. It looks like a document for the line up and who

Page 123

participated in it. But I wasn't active in doing that. I was doing something, I'm sure, but I wasn't involved it that. That was being done by other officers.
**Q. It was being done by Assistant District Attorney Bloom?**
A. Yeah, he was there.
**Q. Was it being done by Sergeant Thomas Kelly, both of them; who was doing the line up?**
MR. JOYCE: Both sides.
THE WITNESS: Both sides on this one?
MR. JOYCE: Yes.
THE WITNESS: Okay.
(Witness reviewing document)
What's your question?
**Q. (By Ms. Agbiro) My question was: Who was involved in the line ups, if it wasn't you, on the list of names that are on this document?**
A. Well, there is a list of names there and the report is authored by Detective John Scanlon. So he must have been instrumental in that. I'm almost fairly certain I wasn't there when that was being done.

Page 124

**Q. Let me direct you to the top part of the document. It says there: In 1984 an ongoing investigation by the detective bureau and the crime prevention bureau had been conducted in regards to several breaking and enterings, armed assault on the occupants and sexual assault; is that correct?**
A. Yes.
**Q. Do you have any reason to dispute that that is true?**
A. No.
**Q. And earlier you'd said the crime prevention bureau would be the bureau in charge of sexual --**
A. Sex crimes.
**Q. Sex crimes?**
A. Yes.
**Q. So it appears that the detective bureau and crime prevention bureau have been working together since 1984; is that right?**
MR. JOYCE: Objection.
THE WITNESS: They were working together because of a joint crime. So whenever the date of this is, they were working together, yes.

**Q. (By Ms. Agbiro) Okay. And it wasn't a joint crime; it was crimes that were happening, a series of crimes, right?**
A. There was a series of crimes that fell under the detective bureau and crime prevention bureau.
**Q. A series of --**
A. Crimes.
**Q. The break ins and the assaults?**
A. And the assaults and the rape.
**Q. And this category of cases, that started in the middle of 1984; is that right?**
A. Yes. In this case, yeah. In '84, yeah.
**Q. Now, with your experience in the police department, would you agree that a series of cases that requires two different bureaus to work on together would be a big case?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: It is not my decision to make.
**Q. (By Ms. Agbiro) Personally, for you, would it be considered a big case?**
A. It could be depending on the magnitude of



it, how many victims, how serious were the crimes.
**Q. How often do the two bureaus work together to solve a series of cases for I believe six months?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) In your experience in the police department, being a supervisor, do you recall any instances where two bureaus would work together, over an extensive period of time, to solve a series of cases?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of any.
**Q. (By Ms. Agbiro) You weren't aware.**
**So this is the only one that you're aware of?**
A. Yes.
**Q. So this makes it a big deal?**
MR. KENEFICK: Objection.
MS. DESOUSA: Objection.
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: It's important.



**Q. (By Ms. Agbiro) It's an important case, right?**
A. It an important case.
**Q. And, as a lieutenant, you would be responsible to make sure everyone that does their job correctly; is that not right, if it is an important case?**
MS. DESOUSA: Objection.
MR. JOYCE: Objection.
THE WITNESS: It is my job to supervise and make sure the job gets done properly.
**Q. (By Ms. Agbiro) And, in order for you to make sure the job gets done properly, you are going to make sure that the officers, that you were supervising, are doing everything the way they are supposed to; is that right?**
MR. JOYCE: Objection.
THE WITNESS: I can't guarantee that. They're in different places. I'm in touch with them and I gather the information and ask them if they need assistance or anything. And that's all I can do.
And I was satisfied, at that time,



that they were all right. They were on track. They seemed to be following the department policy on some very serious crimes that happened in the community.
**Q. (By Ms. Agbiro) What was the department policy when it came to investigating these crime?**
MR. JOYCE: Objection.
THE WITNESS: Again, you're getting beyond me. I don't know what the policy is other than the different trainings that we had and seminars and things that are coming down from the chief's office from time to time.
Police officers are pretty much self actuated. They are trained investigators. And I could trust that they were doing their job effectively. Beyond that, I mean, I can't answer it.
**Q. (By Ms. Agbiro) Is it your testimony that you didn't know the policy that you were holding your officers to, that you just said that you were sure that they were following?**
MR. KENEFICK: Objection.
THE WITNESS: What is this policy

again? Please repeat it.

**Q. (By Ms. Agbiro) You mentioned a policy earlier, when I asked you the question. You'd said that you were sure that the officers that you were supervising were following the department policies. I'm asking you what those department policies were, and your answer was --**

MR. JOYCE: Objection.

**Q. (By Ms. Agbiro) -- no. Am I wrong?**

A. What are the policies? I can't dictate them to you. I just can't. But there are policies that guide the officers and supervisors on how to conduct an investigation. And, if there is a supervisor on scene, he will act in a supervisory manner. If one is needed one will be called.

And supervising involved a whole lot of things, as I've said earlier.

**Q. What was the policy on selecting individuals for a line up?**

MR. JOYCE: Objection.

THE WITNESS: I don't recall what it was. There is a general knowledge. I can't people specifically for this incident here, but you try to get as many people who



resemble the target of your investigation.

So that was addressed by Detective John Scanlon.

**Q. (By Ms. Agbiro) And Detective John Scanlon was a person who was under you; is that right?**

A. I'm not sure. He, at times, did. And, at other times -- it depends -- I think he was part of the unit that I was in, so I would have been his supervisor.

**Q. So you would not have been working with him if you were not his supervisor, right?**

A. I had overall responsibility for the lineup. I had given it to the officers. I don't really recall but I know -- I don't think I was there, present, when they did the ID's.

I would like to say I was, but I don't have that recollection. At least in the aftermath of the report I was satisfied that it was done properly.

**Q. If you weren't there, when a lineup happened, how were you satisfied it was done properly?**

MR. JOYCE: Objection.

MR. KENEFICK: Objection.



THE WITNESS: Because I had discussions with the officers who were involved. Perhaps -- I don't recall this -- but probably Attorney Boom and especially John Scanlon's report pretty much determines how they picked, who they took for the lineup, where they got them from.

I don't remember that. I don't think I was there.

**Q. (By Ms. Agbiro) Was the only way that you confirmed that the lineup was done correctly was by officer reports? Did you look at anything else to confirm that it was done correctly?**

A. No. Just discussion with the officers and the report. I relied pretty heavily on that.

**Q. (By Ms. Agbiro) Now, you agree that the line up is a visual thing; is that correct?**

MR. JOYCE: Objection.

THE WITNESS: Well, that's part of it, yes.

**Q. (By Ms. Agbiro) And you testified that -- and you select people who look similar to the suspect; is that right?**

MR. JOYCE: Objection.



THE WITNESS: As best we can.

**Q. (By Ms. Agbiro) How could you be sure the person that you are supervising selected people that looked similar to the suspect if you're not there?**

A. Well, I saw the picture aftermath and they looked to be fair. You have to deal with what you have there. I don't think anybody would look exactly like Perrot but, again, I don't have any recollection.

But I can feel satisfied that John Scanlon and the other officers and the attorney did their best to make this a fair and impartial lineup. And, when I looked at the photos afterwards, it appeared fair to me.

**Q. As a supervisor can you adequately supervise someone after the job was done?**

MR. JOYCE: Objection.

THE WITNESS: I certainly can't supervise them for a past event, no.

**Q. (By Ms. Agbiro) So you would have to be there to be able to supervise someone appropriately?**

MR. JOYCE: Objection.

THE WITNESS: You don't have to be

holding his hand to be there. You can supervise by being satisfied that there are a group of people conducting that, and you have faith in them, and then you look afterwards at the photo.
So I was supervising but perhaps not right there at that moment.
**Q. (By Ms. Agbiro) How did you know that you weren't there? How do you know that you weren't there?**
A. I don't at this stage. I really don't.
**Q. So is there a chance that you were there?**
A. No. I'm not saying there was a chance. I'm just saying I don't recall being there.
**Q. You don't recall being there but is there a chance that you could be there.**
**Are you certain that you weren't there?**
A. I'm not certain of anything right now. I just don't think I was there. I have no recollection of being there when that set was finally set up.
If I was there, I still have no recollection at this point.
**Q. So there is a chance that you were there?**
A. I'm not saying there's chance. I'm just



saying I wasn't there -- I don't recall being there.
**Q. Are you saying that you don't know one way or the other that you weren't there?**
MR. JOYCE: He's saying he doesn't recall. You know, enough.
THE WITNESS: I just don't recall.
MS. GIZZI: That's not an answer though.
MR. JOYCE: She's badgering. He's answering it. He says he doesn't recall.
THE WITNESS: I don't recall.
MS. AGBIRO: I'm trying to understand if you have a good understanding and what you mean by that. That's all. And that's why I'm clarifying.
THE WITNESS: You are a little bit too soft.
MS. AGBIRO: I'm saying, I'm making sure that I understand what you mean by you don't recall.
THE WITNESS: It means that I don't recall. I don't remember first hand whether I was or wasn't there. I don't recall.
**Q. (By Ms. Agbiro) Did the department**



**policy regarding lineups require a minimal amount of people to be in the room?**
A. I don't know.
**Q. You don't know?**
A. I don't know.
**Q. As a lieutenant you do understand that lineups are extremely important for a case, right?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: Ask the question again.
MS. AGBIRO: You know what, I'll strike that and I'll just ask the question another way.
**Q. (By Ms. Agbiro) As a lieutenant you understand the importance of a lineup, right?**
MR. JOYCE: Objection.
THE WITNESS: As a police officer, I knew, never mind a lieutenant. As a police officer, right up to the time I retired, I knew the importance of a line up.
**Q. (By Ms. Agbiro) What was the importance of a lineup?**



A. You have to be as fair as possible.
**Q. And, as a supervisor, wouldn't you want to be there to make sure that it was as fair as possible?**
MR. JOYCE: Objection.
THE WITNESS: There's a lot of things that I was doing. I was pretty busy. I was probably wasn't there because I was involved with something else.
**Q. (By Ms. Agbiro) Do you remember what you were involved with?**
A. I do not.
**Q. But you remember you were involved with something else?**
A. I did not say that. I'd said I probably was involved in something else. Because I don't recall having been there when the ID was made, I don't recall.
**Q. And if you were working on this lineup with Sergeant Kelly, does that mean you were also supervising him, correct?**
MR. JOYCE: Objection.
THE WITNESS: I wasn't supervising he. He is a supervisor and he has his own

supervisors.
**Q. (By Ms. Agbiro) And, again, with the hierarchy, lieutenants are above sergeants, right?**
MR. JOYCE: Objection.
THE WITNESS: They are. But he's from another bureau. I'm not his direct supervisor.
**Q. (By Ms. Agbiro) As a lieutenant you would know what requirement are needed to make sure a lineup to be proper; is that right?**
MR. JOYCE: Objection.
THE WITNESS: Could you ask that again, please? Sorry. I couldn't hear you.
**Q. (By Ms. Agbiro) Yes. As a lieutenant you would know what requirements needed to be done in order to make sure that a lineup is done proper; is that right?**
MR. JOYCE: Objection.
THE WITNESS: Maybe not. It's hard to say. But I do know, I never participated in one before. I don't recall being active at the time.
But I do know that lineups are very important and they have to be done fairly.



And there's enough officers in there, and sometimes a supervisor, and we had an ADA.
So I was satisfied that that was a good lineup, after the fact, unfortunately.
**Q. (By Ms. Agbiro) Do you remember who was in the lineup, who was there?**
A. No. No. There is a list of names there but I have no idea who was there. Well, I might because some might be police officers.
(Witness reviewing document)
They were all -- it looks like -- police officers.
**Q. (By Ms. Agbiro) Was it customary for a police officer, who is investigating the crime, to be also a part of the lineup?**
MR. JOYCE: Objection.
THE WITNESS: The criteria is to get somebody who closely resembles them. Sometimes you just can't get exact.
So these people must have -- again, I cannot recall. I don't recall being there, so I can't attest to that. But I know, in past ones, when they had to use police officers, because they had no choice,



they've done their best to get somebody who is similar stature, similar race. It's just a known -- it's known by most detectives what it takes.
And if one or two detectives don't know, there are others that do know. It's a very important part of an identification possess.
**Q. (By Ms. Agbiro) Is it customary to select someone that the victim has probably seen before in the role of an officer?**
MR. JOYCE: Objection.
THE WITNESS: I don't know why they made the selection. I don't know that.
**Q. (By Ms. Agbiro) I'm asking is it customary?**
MR. JOYCE: Objection.
THE WITNESS: Well, it shouldn't be.
**Q. (By Ms. Agbiro) It shouldn't be because the person had seen that person and it is noted that that person could not be a suspect; is that right?**
MR. JOYCE: Objection.
THE WITNESS: All I can tell you is that they do their best and it is a known



thing to make sure you get people for the line up as closely as possible that resemble the person or the subject of the line up.
I just can't give you anymore. It's just not there.
**Q. (By Ms. Agbiro) Is the victim's description of the suspect considered when choosing individuals for a lineup?**
MR. JOYCE: Objection.
THE WITNESS: Please repeat that again for me, please.
**Q. (By Ms. Agbiro) Is a victim's description of the suspect considered in deciding which individuals to select for a lineup?**
THE WITNESS: From what I know about lineups, it's somebody who looks similar.
**Q. (By Ms. Agbiro) Similar to the guy you caught or similar to what the victim told you?**
A. No. It would be the person who was arrested. The topic. It would have been as close to what he looks like.
**Q. The person arrested?**
A. Yes.
**Q. As a supervisor, is this case, you would**

**also look at evidence that was given to you by the individuals that you supervise; is that right?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: I would look at any and all evidence that came my way.
**Q. (By Ms. Agbiro) In a case like this, would it be your practice to present evidence that you felt was necessary to make your case?**
MR. JOYCE: Objection.
THE WITNESS: I don't recall.
**Q. (By Ms. Agbiro) I'm asking you, for you, during your experience as a supervisor, would you ask for evidence if you felt it was necessary?**
MR. JOYCE: Objection.
THE WITNESS: I would want to make sure that all evidence involved in the case is gathered and brought to the station and tagged and documented. All evidence of a crime.
**Q. (By Ms. Agbiro) Would you ask the officers that you supervised to bring the evidence to you or tag it?**
A. Oh, no. I wouldn't take it. It's an



important chain of custody. So individual officers would tag the evidence.
**Q. What happened after the individual officer tagged it?**
A. Well, it wouldn't come to my office. It would wind up in the property room where it is kept. And is available for all investing officers to look at.
**Q. And, as a lieutenant, would you go to the property room to be able to look at the evidence that was collected?**
MR. JOYCE: Objection.
THE WITNESS: No. I probably wouldn't. I would have one of the -- one of the investigators would have done it perhaps on their own.
**Q. (By Ms. Agbiro) So how do you become aware that evidence has been selected in the case?**
A. A lot of that is common knowledge. You know, somebody's going to turn in that evidence and we're going to know that there may be others there.
The officers' reports, they're all instructed, if you're going to turn evidence in, you have to do a proper tag and make it in your report.



So that's the way I understand it to be done?
**Q. (By Ms. Agbiro) How do you become aware of the evidence that's been tagged?**
A. Because it shows up in the reports the officers make.
**Q. And you never go and look at the evidence yourself?**
A. I could. I don't know whether I did or did not here, but I have many times and I could have.
**Q. Let me ask you this, as a lieutenant, it's partly your responsibilities to make sure the officers that you supervise do their best to solve the crime; is that right?**
MR. JOYCE: Objection.
THE WITNESS: Could you repeat?
**Q. (By Ms. Agbiro) I'd said: In your role as a lieutenant, a part or your responsibilities is to make sure the officers do their best to solve a crime; is that right?**
MR. JOYCE: Objection.
THE WITNESS: I can't stand over 'em. I have to trust them to do their job. I know that by observing them, reading their



reports, and conversations with 'em. So I'm not out there making sure or whatnot.
I am making sure by just being a supervisor and interacting with them. That's how I always felt. And that is how I gained enough information to help me.
**Q. (By Ms. Agbiro) You would agree that the point of the police department is to solve crimes, right?**
MR. KENEFICK: Objection.
MR. JOYCE: Objection.
MS. DESOUSA: Objection. This is Lisa Desousa.
THE WITNESS: That is just one of the responsibilities.
**Q. (By Ms. Agbiro) And the other responsibility would be to protect society, right, or protect the community?**
A. That's part of it. There's a lot of others. That's not their sole responsibility.
**Q. What other responsibilities the?**
MR. JOYCE: Objection.
THE WITNESS: Oh, I can't begin to list them. I really can't. But they're

numerous. Accident investigation, tending
to people who've been injured out there,
just to name a few.
**Q. (By Ms. Agbiro) Do you agree that one of those responsibilities is to solve a crime? Would it not then follow, that as a people supervising individuals out there solving a crime, that is your job to make sure they're doing it well?**
MR. JOYCE: Objection.
THE WITNESS: I know that from their reports and conversations I have. That's how I do that.
**Q. (By Ms. Agbiro) that wasn't my question. My question was: Is it part of your responsibilities, as a supervisor, to make sure that they were doing their job well?**
MR. JOYCE: Objection.
THE WITNESS: It's their responsibility if they are doing their job correctly. And, as supervisor, to insure that that is being done. That is part of police work and supervision. But they don't have, like I'd said, they don't have a unit that goes around and checks everything they



do.
**Q. (By Ms. Agbiro) Do you remember testifying in the grand jury in this case?**
A. I remember testifying, yes.
**Q. You remember testifying.**
**Do you remember going to the court to testify?**
A. If I testified, yeah. I was at the court, sure.
**Q. I'm going to show you an exhibit.**
**Ms. AGBIRO: I'll mark it as Exhibit No. 3.**
MR. JOYCE: And while she does that, can we take a break?
MS. AGBIRO: Sure.
(Exhibit CA-3, transcript, pages 43-48, marked)
(Recess taken)
MS. AGBIRO: Back on the record.
**Q. (By Ms. Agbiro) Mr. Arpin, I believe I asked you before the break if you remember testifying in court.**
A. Yes. I remember I testified, yes.
**Q. I'm going to show you Exhibit 3.**



A. Did you say what you were going to ask about? Do you want me to review the whole thing?
**Q. No. I want you to take the time.**
**Do you recognize this document?**
A. Yes.
**Q. Do you recognize it as your grand jury testimony?**
A. Yes.
**Q. Do you remember what you testified to when you went to the grand jury?**
A. I have no recollection.
**Q. You have no recollection.**
**I'm going to ask you to go ahead and review your testimony from the grand jury.**
(Witness reviewing document)
A. If you would refer to a certain line, point to a certain line, if you are going to ask a question about a particular matter, that would be most helpful to me.
**Q. I want to give you the time because you don't remember the testimony.**
A. I don't. But if you zoom in on something, I will try and look at it and give you an answer.



**Q. Okay. Well, the first thing I'm going to ask you is if you have any reason to believe the testimony is not accurate.**
**Are you able to answer the question?**
A. Do I think it's accurate?
**Q. Yes.**
A. That's a copy of the testimony that I gave, or that's what I gave, yeah.
**Q. Do you have any reason to dispute that you testified in front of the grand jury?**
A. No. No reason to.
**Q. Do you remember working with an officer named "Murphy".**
A. No. But he's mentioned in here.
**Q. You don't remember supervising Officer Murphy?**
A. No.
**Q. And in order for you to be working with Officer Murphy, you would have to be supervising him, correct?**
A. Again?
**Q. If you were working with Officer Murphy, you'd have to be supervising him; is that right?**
A. No. Not necessarily.

**Q. In this instance Officer Murphy reported to you about his findings when he responded to the incident on 6 Allendale Circle.**
A. On Allendale, Circle, yes.
**Q. Would he be informing you of his findings if you weren't his supervisor?**
A. Of course he would. He would be notifying any officer that was there in conjunction with that. So not only would he consult with me, he'd consult with other officers that he's working with.
**Q. Would he consult with you if he was under you?**
A. Of course he would. Police officers are police officers. Especially at the scenes of crimes, the rank structure pretty much isn't the driving force. It's trying to get information about the crime that's done and who may have committed it.
If a supervisory command has to be made, there are supervisors there and they can make it. Many times, just with a discussion, a plan is agreed to by everyone and it's followed.
Your idea of supervision isn't the way it works in the police department. There's a lot of



working together to cross rank. That's the way it is. And there is a lot of respect for those supervisors -- those officers who are supervisors.
But we -- not me, I haven't been there in a long time -- but they speak with each other and they respect each other and they pass information on. And they asked questions if, in fact, they need assistance. That is how an investigation is done.
**Q. I don't mean to cut you off but my question was: If everything in this testimony is correct and Officer Murphy responded to a break in at 6 Allendale Circle -- is that right?**
A. If it says it here, it must be.
**Q. Right. And you were responsible for the break in division -- I'm sorry. Is it specifically referred to as the housebreak squad?**
A. The housebreak squad. It's a unit inside the detective bureau.
**Q. Yes. And you were the lieutenant for the housebreak squad, right?**
A. That's correct.
**Q. And if Officer Murphy was responding to a housebreak, that means that Officer Murphy was one of your officers; is that right?**



MR. JOYCE: Objection.
THE WITNESS: No. He worked for the uniformed division. I worked for the detective bureau.
**Q. (By Ms. Agbiro) So you wouldn't be supervising the officers, just the detectives?**
A. In an investigation, it's not so much about supervision unless a command decision has to be made. It is a passing make sure everybody understands what's going on and talk together what course of action to be taken. The supervisor would lead that.
**Q. The supervisor would make the decisions that needed to be made in the case?**
A. I don't know if you made a decision right then and there. If one had to be made, he would make it and be satisfied all were in agreement because it was a serious matter. So just for the sake of being a supervisor commands aren't given.
They're experienced cops and they investigated a crime and information was taken from that. And, based on that information, I testified before the grand jury.
**Q. Do you recall when you learned about**



**officer Murphy's findings? Do you remember?**
A. No.
MS. AGBIRO: I need to take a break to get something off the printer.
(Recess taken)
MS. AGBIRO: Back on the record. I'm going to mark this as Exhibit 4.
(Exhibit CA-4, summary, marked)
**Q. (By Ms. Agbiro) Mr. Arpin, do you recognize this document?**
A. This document?
**Q. Yes.**
A. Yes.
**Q. What is this document?**
A. A summary report regarding that incident that we were speaking about here.
**Q. Who would be in charge of writing a summary report?**
A. Who would be in charge of what?
**Q. Writing the summary report.**
A. I don't know who's responsibility it was but I think I wrote the -- the supervisor would write the report. And I believe I did write the summary report.

**Q. A supervisor is normally responsible for writing the summary report?**
MR. JOYCE: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: Not necessarily.
**Q. (By Ms. Agbiro) Can a uniformed police officer write a summary report?**
MR. KENEFICK: Objection.
THE WITNESS: Under certain circumstances, yes. And so could plain clothes officers.
**Q. (By Ms. Agbiro) When you were a police officer, did you ever write a summary report?**
A. On occasion I think.
**Q. And as a detective, did you write a summary report as well?**
A. I can't recall any, but I'm sure I did.
**Q. Have you previously read this document?**
MS. DESOUSA: I didn't hear you.
**Q. (By Ms. Agbiro) Have you previously read the document?**
A. I've read a lot. I'm pretty sure I read this one. But, if you give me a couple of minutes, I'll read this one.



**Q. Sure.**
A. (Witness reviewing document)
Okay.
**Q. (By Ms. Agbiro) Do you have any reason to dispute the accuracy of this summary?**
A. No.
**Q. Do you remember what division Andrew Caneberry worked for?**
A. He worked for the detective bureau.
**Q. So he is one of your detective persons?**
MR. JOYCE: Objection.
THE WITNESS: I don't recall at this time because he was and he wasn't at different times. So, on this particular one, he could have been on the afternoon shift. I wouldn't have been his direct supervisor.
**Q. (By Ms. Agbiro) As a lieutenant, you only supervise sergeants on certain shifts?**
A. In a detective bureau, yes. I mean, you oversee. When an incident goes down, the ranking officer assumes control. And that must have been what happened that night because I assumed control.
But I can't recall now. I think he was



working the four to twelve shift. That's the best answer that I can give.
**Q. Do you remember what bureau Thomas (inaudible) worked for?**
A. No.
**Q. Do you remember what bureau Patrick Cavanaugh worked for?**
A. No.
**Q. How about Ronald St. Germaine?**
A. I think that might have been the crime prevention bureau.
**Q. Do you recall working with any of these officers?**
A. Not working with them, no. I mean, based on here, I don't recall whether I was out there in the field or not. But I do know I wrote this report.
**Q. Do you remember reviewing any of their work regarding this case?**
A. Well, I would have reviewed any reports that they made.
**Q. You would have reviewed any report, you say?**
A. I would have reviewed any reports that were made by those officers regarding this incident.



**Q. Even if you weren't the supervisor?**
A. I was not their supervisor. And it they were on different shift, the dog watch guys -- depending on -- if I was -- I don't recall what shift I was on back then, but I wrote this report based upon information I gained from those officers.
**Q. Did you work with James Grimaldi?**
A. Who?
**Q. I'd said James Grimaldi. I'm not sure if I'm pronouncing it correctly.**
A. James -- I don't recognize that last name.
**Q. How about --**
A. Oh. Gromily.
**Q. Gromily?**
A. I think Gormily -- I don't know.
**Q. How about John Mortel?**
A. I don't know what shift he was on.
**Q. Do you remember working with any of the officers on this summary?**
A. I don't recall working with them.
**Q. Do you recall working with a Gerald Foley?**
A. No. But I must have had a conversation

Page 157

with him, but I don't recall in particular.
**Q. How did you know of any of the officers that were on it?**
A. I think multiple reports, reports that were submitted.
**Q. Did you just review the reports and you didn't write the summary?**
A. It would be fair to say that, yes. And, if I had any questions, I would have asked them.
**Q. Earlier you testified that you worked with them on this case.**
A. Which ones? Because some of the names here, it looks like I'm just seeing them.
**Q. Earlier, I believe it is in your interrogatory, that you worked alongside the officers in this case. And we were discussing about lieutenants and how if it was important case, such as this one, and you testified that you would work alongside the officers in the case?**
A. I don't recall which ones they were because we didn't mention any of these names earlier. I'm not saying I didn't discuss this with them; I'm saying I don't recall.
**Q. I'm saying this summary -- what you'd**

Page 158

**said, you helped and were involved in, in addition to other aspects of the case?**
A. That's my answer.
**Q. So it's not true that you just read summaries and just read police reports and wrote the summaries, right?**
A. There is several locations, several shifts that this took place over. I may have, at a certain time, like midnights or maybe the next morning. It's too far back for me to define specifically. I recognize those names and if, in fact they're mentioned here, and what they did, I either had access to the reports and/or spoke with them. But I can't tell you for sure. I don't recall. It's been a long time.
**Q. What was the purpose of the summary?**
MR. JOYCE: Objection.
THE WITNESS: To document the incident and to make sure the upper echelon, the chief and deputies are aware of what has happened and also to prepare for court, for eventually a court o case.
That's the opinion of all that.
**Q. (By Ms. Agbiro) Did the chief ask for a**

Page 159

**summary of this case?**
A. No. But the chief gets sent information summaries and what have you on serious cases. I don't know. It's not standard operating, but it does happen. And I believe some of the summaries may have gone to the chief, but I don't recall. Certainly the deputies.
**Q. Did the deputies ask for a summary?**
A. I have no recollection.
**Q. Did the deputies ask for an update on the case?**
A. Generally it doesn't have to because the reports come automatically. It's a given. So, most of the time, anything serious goes to the chief and deputy chiefs. So he would have had access to that shortly thereafter.
**Q. Do you have any conversation with the deputy chief regarding this case?**
A. I don't recall.
**Q. As a lieutenant you would have a conversation with the deputy chief about important cases, right?**
MR. JOYCE: Objection.
THE WITNESS: Not unless the captain

Page 160

wasn't there. So I didn't have that kind of access to the deputy chief. If it was a serious matter, if my captain wasn't there, yes, I could speak to a deputy chief. I don't know if I missed on, whether that happened.
**Q. (By Ms. Agbiro) And would this summary be a part of the police file of the investigation?**
A. It should be.
**Q. I just have one more question, on Exhibit 1, before we move on.**
**Now, on an important case, as a lieutenant, I believe you testified you would have conversations with people you supervised regarding the case, so that you could get a better understanding.**
**Is that how your job responsibilities would work?**
A. Yes. That is how my responsibilities would be, yes.
**Q. And you also would be aware of any suspects that would be present in a case, right?**
A. If that information was relayed to me, yes, I would be.

**Q. As a lieutenant, being present in these meetings, would you make sure to ask that information so you knew what the status of the case is?**
MR. JOYCE: Objection. What point of this investigation are you taking your questions from? Because I don't understand what part of the investigation, down the road, that night, the next day? Could you define that for me.
**Q. As a lieutenant, supervising the people beneath you investigating the case, you wouldn't know if they had a suspect for a crime, right?**
MR. JOYCE: Objection.
THE WITNESS: That's a very general question you're asking.
MS. AGBIRO: You can answer it, if you understand the question.
THE WITNESS: I don't understand it.
MS. AGBIRO: Let me rephrase.
**Q. (By Ms. Agbiro) As a lieutenant, supervising detectives, you would want to know if the detectives had a suspect for one of their cases, right?**
MR. JOYCE: Objection.



THE WITNESS: I'd want to know if anybody had a suspect whether it be a detective under my command or elsewhere or other police officers. Important information, I would want information on as soon as possible. And probably through some of the officers that worked under my command at any given time.
**Q. (By Ms. Agbiro) And if you were in a meeting with one of your subordinates in a case, and know of a suspect, that is information that you would want to know, right?**
MR. JOYCE: Objection.
THE WITNESS: It is important information and, yes, I would have known about it.
**Q. (By Ms. Agbiro) And would you allow your subordinate to leave that meeting without giving you that information?**
A. That's never happened in my 41 years with the police department that anybody left without giving me information, at least as far as I know.
**Q. When is the first time you learned of the name George Perrot; do you remember?**



A. Before this incident that I don't recall.
**Q. Do you remember when?**
A. No. But it was prior to this incident. He was a suspect of breaking and enterings in the neighborhood and what have you. Not too much more than that. But I had heard his name prior to these incidents.
**Q. I apologize if you answered this, but did you hear his name frequently?**
A. I don't recall.
**Q. Did you know who George Perrot was before this incident?**
A. Before this incident? I might have, but I'm not sure.
**Q. Do you remember personally interacting with Mr. Perrot?**
A. I don't recall any interaction with Mr. Perrot.
**Q. Do you remember working on any cases, prior cases --**
A. I don't remember.
**Q. -- involving Mr. Perrot?**
A. I could have. I could have. It could have come across my desk but I don't recall.



**Q. (By Ms. Agbiro) But you do remember he was a suspect in the prior cases before this case?**
A. I don't know. I don't recall.
**Q. You're saying that you don't remember? I'm just clarifying because earlier you said he was a suspect of prior break ins.**
A. Well, right now my answer is still that, because I'm confused on this and I'm going to tell you, I can't answer that question correctly, because I don't know what the correct answer is now.
**Q. Do you think there is anything that would be able to refresh your recollection as to whether or not you had heard the name George Perrot?**
MR. JOYCE: I'm sorry. There -- in the middle there, I lost the word. Do you think what?
**Q. (By Ms. Agbiro) Do you think there is anything that would be able to refresh your recollection as to whether or not you had previously heard of Mr. Perrot?**
A. I don't know. If you've got something there, show me and helpfully it'll ...
**Q. (By Ms. Agbiro) As a lieutenant you would be aware of the frequent flyers, I guess,**

**people who repeat and they do the same crime?**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) Is that right?**
A. Could you give me that question again?
**Q. If there's someone who continues to be a suspect in the cases you supervise --**
A. Yes.
**Q. -- you would know that as a lieutenant?**
MR. JOYCE: Objection.
THE WITNESS: I'm still having troubled understanding your question.
**Q. (By Ms. Agbiro) As a supervisor you would be aware if your officers are dealing with the same person again and again as a suspect in a crime?**
MR. JOYCE: Objection.
THE WITNESS: I may or I may not. I may or may not.
MS. AGBIRO: I'm going to mark this as Exhibit 5.
(Exhibit CA-5, DYS history, marked)
MS. AGBIRO: Back on the record.
**Q. (By Ms. Agbiro) Earlier you testified that the age to be a juvenile, at the police department was 17, correct? Under 17?**



A. Under 17. That's throughout the state of Massachusetts.
**Q. Would you have a juvenile record after you turned 17. Would --**
A. I don't know.
MS. DESOUSA: I didn't hear that question at all.
MS. AGBIRO: I asked would someone have a juvenile record after they turned 17.
MS. DESOUSA: Objection.
THE WITNESS: Would they have -- somebody -- I need some clarification. Are you talking about somebody who is already a juvenile, has a record, and then turns 17?
MS. AGBIRO: Yes.
THE WITNESS: Would he still have a record?
**Q. (By Ms. Agbiro) Basically, when a juvenile is in the division, would they continue to interact with the individual after they turned 17?**
MS. DESOUSA: Objection.
THE WITNESS: The police department may have some interaction. But any report of arrest or victim of a crime, or anything



like that, those reports would remain in the system. But no longer is the police department responsible. They become an adult at 17 and they are charged as an adult.
**Q. (By Ms. Agbiro) And would you be aware of -- if something happens, like a breaking and entering --**
A. Yes.
**Q. -- do your officers respond to the scene, or detectives respond to the scene, whether they are a juvenile or not?**
MR. JOYCE: Objection.
MS. AGBIRO: Go ahead.
THE WITNESS: Any officer could respond to a scene with a crime in progress.
**Q. (By Ms. Agbiro) Would your officer be in charge of that until they found out who did it?**
A. Whoever responded would make the report and that report would be forwarded to the appropriate bureau for follow up. They would follow up any leads that they had during the course of their shift.
But they would make a record, submit it, and that would become available to the other bureaus.



**Q. I'm going to refer you to Page 6.**
MR. JOYCE: On Exhibit 5?
MS. AGBIRO: On Exhibit 5.
**Q. (By Ms. Agbiro) Okay. Do you see that it says there that Mr. Perrot was charged with breaking and entering?**
A. Yes.
**Q. And do you see that it was January 25th?**
A. Yes.
**Q. I will represent to you that --**
A. No. Wait a second. This says "court". I don't know which date refers to the incident, or is there one here?
**Q. I'm talking the date right there in the first column.**
A. All right. That's a date of the arrest or the incident or whatever?
**Q. Yes. At what point was Mr. Perrot over the age of 17?**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) Would you have known about it as a lieutenant?**
A. What's your question again?
**Q. As a lieutenant would you have known --**

MS. DESOUSA: I can't hear you.
MS. AGBIRO: Scratch that.
**Q. (By Ms. Agbiro) Let me ask you this: As a lieutenant, investigating this case, would have known about that prior charge of Mr. Perrot?**
A. We're assuming he's an adult. He was 17 or older for this arrest.
**Q. Yes. And he is charged with something your department covers.**
MS. DESOUSA: I'm sorry, Counsel. I couldn't hear any of the words that you just said.
MS. AGBIRO: And he was charged with a violation that your department covers or handles.
**Q. (By Ms. Agbiro) Would you have known about it?**
A. I wouldn't have in the detective bureau.
**Q. You wouldn't have known about that?**
A. I wouldn't have known about it. Is he -- Well, I would if he's an adult.
**Q. He is, according to your testimony.**
A. I may or may not know if he was arrested. I did not see every arrest that was made. This is



the first time I can recall ever seeing this document and, you know, what it relates to.
**Q. Was it your practice to look up the arrest history of a suspect of a case that you're supervising?**
A. No. That wouldn't have been a responsibility of mine. That information could come to me through another officer whether it was in the detective bureau, the uniformed division or whatever, but I have never seen this document and it is news to me.
**Q. Okay.**
MR. JOYCE: Just for clarification, because I don't understand. The date on the document, 1/5/85, is that the date of the incident or the date the court case was filed?
MS. AGBIRO: The date it was charged. That's my understanding, the date he was charged.
MR. JOYCE: So the court case was filed 1/25/85 with the juvenile court?
MS. AGBIRO: Yes. That's my understanding.



**Q. (By Ms. Agbiro) Moving to Exhibit 5. I have a couple more questions, and we're nearing the end here. I have a couple more questions regarding the policies that you were aware of.**
**When you were -- at any point during your time at the police department, was there ever an instance where you would use a Photo Ray instead of a lineup?**
A. There is more Photo Rays that are used than lineups, tremendously. And it's a normal practice with every police department.
**Q. There are more Photo Rays then lineups; is that what you say?**
A. Yeah. Lineups are a rare thing compared to Photo Rays.
**Q. Why?**
A. I don't know. I don't make that policy.
**Q. And would it be customary to do -- is there any -- strike that.**
**Is there any occasion where you would do a Photo Ray and a lineup for one case?**
MR. KENEFICK: Objection.
THE WITNESS: I don't know. I never was involved in one.



**Q. (By Ms. Agbiro) Did you ever supervise a case where they did a Photo Ray and a lineup?**
A. I don't recall any.
**Q. Are you aware of any instance where an individual or victim would be shown photos of a potential suspect before a lineup?**
A. That's possible, sure.
**Q. In what instances would it be possible?**
A. What's that?
**Q. In what instances would it be possible?**
A. I don't know. Serious crime and that's the only ID they have. And the investigating officers, whether it was detectives or crime prevention bureau, they may want to go to lineup and maybe they're not satisfied that the ID is 100 percent. I don't know.
**Q. Even in an important case like this case?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) If there was a Photo Ray done, is that something that would be documented?**
A. Yes.
**Q. And it would be put in the file?**
A. Yes. The investigatory file.

**Q. How long -- who would be responsible for making sure everything gets put in the investigatory file?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) Who puts things in the investigatory file?**
MR. JOYCE: Objection.
THE WITNESS: The investigating officers in the detective bureau would do a summary on all the facts in it and have it looked at by their supervisor. And from there we go to the records division, is the best I understand.
**Q. (By Ms. Agbiro) So the records division would be responsible for keeping the investigatory file?**
MR. JOYCE: Objection.
THE WITNESS: I may have to back up on that one. I think the bureaus keep them, or at lest they did back then. I'm pretty sure of that.
Some files go to records but the investigatory files, I think they stay in



individual bureaus.
**Q. (By Ms. Agbiro) And who is supervising the investigatory files?**
MR. JOYCE: Objection.
THE WITNESS: What?
**Q. (By Ms. Agbiro) Who is supervising the investigatory files?**
MR. JOYCE: Objection.
THE WITNESS: The captain has all the responsibility for everything. I'm sure he must assign somebody.
I don't recall back then. Somehow that folder made its way into a file cabinet. But I don't recall any of that.
**Q. (By Ms. Agbiro) As a lieutenant you would review the investigatory files to make sure that --**
MR. JOYCE: Objection.
THE WITNESS: If it was under my thing. I think the crime prevention bureau took over responsibility for the investigation. It was a joint one. I think that's what happened. I'm not positive.
But because of the sexual crime,



instead of having two different bureaus handling the same incident anymore, as in the beginning when the case was really hot, I think they took final custody.
**Q. (By Ms. Agbiro) Do you know when they took final custody?**
A. No.
**Q. Who would be in charge to turn over the investigatory file once it was turned over to the crime prevention bureau?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
Probably one of the investigating officers.
**Q. (By Ms. Agbiro) How would they know they had turned the file over?**
MR. JOYCE: Objection.
THE WITNESS: Probably discussed it with a supervisor and with the captain. I don't recall ever having a discussion like that about any file.
**Q. (By Ms. Agbiro) What would be customary, in a situation like that, for them to get the information from you?**
MR. JOYCE: Objection.



**Q. (By Ms. Agbiro) I'm not asking about this specific case, I'm asking customary.**
A. Not necessarily. Because it would be -- the investigators have a file; the case is going nowhere or it's concluded, and it's given over to the records clerk -- who was a secretary in the detective bureau back then -- and she would have just filed it alphabetically into a file cabinet because there was nothing more to do on the case.
**Q. Is anyone responsible for reviewing the file to make sure that it is complete?**
MR. JOYCE: Objection.
THE WITNESS: Not that I'm aware of.
**Q. (By Ms. Agbiro) Are you trained to know what a complete file is?**
MR. JOYCE: Objection.
THE WITNESS: To me a file, an aski file may not be complete. It may be they can go no further. It is still going to be filed away as being active.
**Q. (By Ms. Agbiro) Do you know what type of reports, documentation, memorandums, communications, do you know what type of documents are supposed to be in an investigatory file?**

MR. JOYCE: Objection.
THE WITNESS: All documents that pertain to an individual crime.
**Q. (By Ms. Agbiro) Are there any exceptions?**
MR. JOYCE: Objection.
THE WITNESS: Not that I'm aware of.
**Q. (By Ms. Agbiro) Who makes sure that all those documents are in the file?**
MR. JOYCE: Objection.
THE WITNESS: That would the supervisor or the investigating officer. Probably the investigating officer.
**Q. (By Ms. Agbiro) The investigating officer doesn't have anyone supervising to make sure he was putting everything in the file?**
MR. JOYCE: Objection.
THE WITNESS: I don't know. I never had that kind of a situation happen.
**Q. (By Ms. Agbiro) You never had a situation where --**
A. That I can recall, it came through to me before it got put in the cabinet.
**Q. What was that?**
A. I'm not aware of all the cases that have



been filed, for whatever reasons.
**Q. That's fine. My question is: As a supervisor are you insuring that your officers are putting everything they need to put in, in an investigative file?**
MR. JOYCE: Objection.
THE WITNESS: As best I can. And if they tell me they are putting it away or I ask them, they put it away. But some get by me. I don't know what they're doing today, but there was no real protocol for doing that.
The thing was, when the case was complete, or at a dead end, it went into that file cabinet.
Now, you can chisel down as far as you want and I can't tell you anything more than that. That's basically what I can recall from back 35 years ago.
**Q. (By Ms. Agbiro) So is it your testimony today that the officers that were -- the investigating officers did not have anyone supervising an investigatory file?**
MR. JOYCE: Objection.



MS. DESOUSA: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) What do you mean that you don't know?**
A. I don't know.
**Q. You don't know if there was anyone supervising the investigatory file?**
MR. JOYCE: Objection.
THE WITNESS: I don't know. I can't answer your question because I don't know.
**Q. (By Ms. Agbiro) Do you remember ever checking the investigatory file, any investigatory file for completeness?**
MR. JOYCE: Objection.
THE WITNESS: I've looked at files. I don't recall what for. I could have. I could very well have, but I don't have recollection of that.
**Q. (By Ms. Agbiro) Was it the policy of the Springfield Police Department to not look at files?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: I can't answer that question. I don't know.



**Q. (By Ms. Agbiro) Was it the practice at the Springfield Police Department to not look at investigatory files as a supervisor?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: I can't answer that question. I don't know how to. I don't know.
**Q. (By Ms. Agbiro) I'm going to ask the question a little different.**
**Was it the practice of the Springfield Police Department for supervisors not to review an investigatory file for completeness?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: Not that I can think of.
**Q. (By Ms. Agbiro) Who was responsible for giving investigatory files to -- handing it over to the prosecution?**
MR. JOYCE: Objection.
MS. DESOUSA: I'm sorry. I didn't hear the end of the question.
**Q. (By Ms. Agbiro) Who was responsible for making sure that the investigatory file was given to**

**the prosecution?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: It could have been anybody. It could have been the detective on the case, his supervisor. There was no policy that I'm aware of. But it would have been somebody that was either aware of or involved in that particular investigation.
**Q. (By Ms. Agbiro) So you cannot tell me or point to any policy whatsoever that would tell you who was responsible for handing over the investigatory file to the prosecution?**
MR. JOYCE: Objection.
THE WITNESS: I can't point to anybody who was responsible because I don't know.
**Q. (By Ms. Agbiro) Are you aware of any policies or procedures in place at the Springfield Police Department to make sure exculpatory evidence was given to the prosecution?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of any policy. But that was a given, exculpatory



evidence would be turned over to the prosecution. But I'm not aware of a policy for that, at least back then. At least back then.
**Q. (By Ms. Agbiro) Who taught you that?**
MR. JOYCE: Objection.
THE WITNESS: Who what?
**Q. (By Ms. Agbiro) Who taught you that exculpatory evidence was supposed to be turned over to the prosecution?**
A. I don't know if anybody taught me that. But it was a known thing in police work. Sometimes you run across exculpatory evidence and it should be turned over to, I would imagine, to the district attorney's office and they would take it from there.
**Q. Did you remember receiving training on exculpatory responsibilities with regards to exculpatory evidence?**
A. No.
**Q. You don't remember receiving any training at all?**
A. No.
**Q. You don't remember reading any policies regarding exculpatory evidence?**



A. No. Only what I saw on the news.
**Q. You'd said only what you saw on the news?**
A. In the news you would see that, but I was not aware of any policy. But it was a given. I'm assuming it was done, but I can't speak for anybody else.
**Q. You assume it was done, but was there any procedures in place to make sure that it got done?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of any procedures that addressed exculpatory information. I'm not aware of them.
**Q. (By Ms. Agbiro) Were you aware of any procedures when you were captain?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Were you aware of any procedures after you were deputy chief?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) At any point in your career, at the Springfield Police Department, did you have the responsibility to insure that exculpatory evidence was given to the prosecution?**



MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) At any point in your career, did you become aware of anyone who was responsible for insuring that exculpatory evidence went to the prosecution?**
MR. JOYCE: Objection.
THE WITNESS: Please ask that again.
MS. AGBIRO: Sure.
**Q. (By Ms. Agbiro) At any point in your career did you ever become aware of the person responsible for insuring that exculpatory evidence went to the prosecution?**
THE WITNESS: No.
**Q. (By Ms. Agbiro) Even during your time as acting deputy chief, you did not know if there was any procedure in place or to insure that exculpatory evidence went to the prosecution?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) You would agree that that's that a very important part of a police investigation, right?**
MS. DESOUSA: Objection.

**Q. (By Ms. Agbiro) You would agree that handing over exculpatory evidence to the prosecution is an important part of police duties?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
MS. AGBIRO: You can answer.
THE WITNESS: I don't know. I always thought it was important, but I don't -- I never had occasion to run across it, exculpatory evidence.
**Q. (By Ms. Agbiro) How to handle exculpatory evidence would be something that the acting deputy chief would be aware of, right?**
MS. DESOUSA: I'm sorry. I cannot hear you.
**Q. (By Ms. Agbiro) How to handle exculpatory evidence would be something that the acting deputy chief would be aware of, right?**
MR. JOYCE: Objection.
THE WITNESS: I never was aware of any, so I'm assuming, no, I don't.
**Q. (By Ms. Agbiro) Now, were you ever taught what exculpatory evidence was or is?**
A. I didn't have to be taught. I know what



it is.
**Q. How did you know what it was?**
A. Television, news, all of that.
**Q. Did you ever receive any guidance from higher ups at the Springfield Police Department?**
MS. DESOUSA: Objection.
THE WITNESS: I don't recall.
**Q. (By Ms. Agbiro) Did you ever receive any training as to what exculpatory evidence was?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) When you were learning on the -- when you were learning from other supervisors, how to do your job, did you ever discuss exculpatory evidence?**
A. I don't recall.
**Q. When you were a sergeant, did you learn from a senior sergeant what exculpatory evidence is?**
A. No. It never came up.
**Q. How about when you were a lieutenant?**
A. (Witness shaking head)
**Q. How about when you were a detective?**
A. I never had any contact with exculpatory knowledge or exculpatory evidence. I know what it



is; and I know what should be done with it, but I never ran the process.
MS. AGBIRO: Can you mark this one.
(Exhibit CA-6, reports, marked)
**Q. (By Ms. Agbiro) Have you seen this document before?**
A. No.
**Q. No. I'll give you a second to read through.**
A. Okay.
(Witness reviewing document)
Okay.
**Q. As a supervisor in this case you would read everything that's in the file, correct?**
MR. KENEFICK: Objection.
THE WITNESS: In this particular case, yes. But not all cases.
**Q. Okay. But in this case, though, you would read everything that was in the file?**
A. In this case, sure.
**Q. And if this was in the file, you would have read it then, correct?**
A. This would not have been in the file.
**Q. It would not have been in the file in**



**this case?**
A. Captain Brown, crime prevention bureau. This is a report of detectives in his bureau who submit what they're called "a lifeline". It's a summary of something that they did on their shift. I never saw that.
**Q. But you guys were working together on the case, right?**
A. Not day in and day out. Once the crime prevention bureau became involved in this, they pretty much assumed most of the investigation as I understand it. We weren't having meetings or anything like that. As far as I recall, they investigated it and I wouldn't see this because it's a note from their captain.
**Q. Did the crime prevention bureau have a file on this and then did you have a file on it?**
MR. JOYCE: Objection.
THE WITNESS: That I didn't know.
**Q. (By Ms. Agbiro) If you did, would that information be shared between the bureaus?**
A. There was some sharing, but I wasn't part of the thing. I didn't know if it was. My understanding, at this time, was the case was

referred to the crime prevention bureau for further investigation.

**Q. And why were you involved in the arrest that happened after this?**

A. I was what?

**Q. Involved in the arrest that happened after this?**

A. Maybe they needed help. I don't know. It's a case I was familiar with. I don't know. But once this went to the crime prevention bureau, it became their responsibility to further the investigation. Most of this stuff you're talking about earlier is prior to that. This is follow up after the investigation.

**Q. Are you talking about George Perrot's arrest?**

A. Well, I'm talking about this involvement with the officers. These are detectives assigned to the crime prevention bureau and I cannot account for it.

**Q. As a supervisor, and given your experience at the police -- actually let me refer you to a section in this letter.**

**Do you see where it says: We were**



**finally able to obtain the name of the subject?**

A. What is that again?

**Q. It says here, in the paragraph, it says: We were finally able to obtain the name of the suspect, which you had a discussion with in the spring, and felt his and the rapist's voices were similar?**

**Do you see that?**

A. I see that, yeah.

**Q. And you see it says that he is age 17.**

**Do you see that?**

A. I see that.

**Q. As a supervisor in the case, in this investigation before the arrest, would you consider that to be exculpatory evidence?**

MR. JOYCE: Objection.

MS. DESOUSA: Objection.

THE WITNESS: I'm not going to, you know, pass judgment on this when I'm not familiar with it and I'm not responsible with it. I don't have enough information and, I can tell you this, I don't know.

**Q. (By Ms. Agbiro) You don't know this exculpatory information?**



MR. JOYCE: Objection.

THE WITNESS: I'm not going to make that judgment on just two sentences here. And it was not my responsibility to make it back then. And I'm not going to second guess that.

**Q. (By Ms. Agbiro) I can represent to you that this was one of the break ins that George Perrot was a suspect in.**

A. Okay.

**Q. That would be an alternative suspect, right?**

MR. JOYCE: Objection.

THE WITNESS: It would be what?

**Q. (By Ms. Agbiro) An alternative suspect then, right?**

MS. DESOUSA: I'm sorry. I didn't get --

MR. JOYCE: Alternative suspect.

THE WITNESS: I couldn't get that word.

Alternative? I'm not going to pass judgment because I'm not an expert. This is another officer's report to his captain.



Somebody else maybe should make that. I'm not the one to make that.

**Q. (By Ms. Agbiro) I'm asking generally then. Would you consider the identification of an alternative suspect to be exculpatory evidence?**

MS. DESOUSA: Objection.

MR. JOYCE: Objection.

THE WITNESS: It could be. I can't tell you.

**Q. (By Ms. Agbiro) Is there any situation where it wouldn't be?**

MS. DESOUSA: Objection.

MR. JOYCE: Objection.

THE WITNESS: I can't answer that.

**Q. (By Ms. Agbiro) You can't answer that with your forty years of experience with the police department?**

MS. DESOUSA: Objection.

MR. JOYCE: Objection.

THE WITNESS: It doesn't matter. I can't answer it. I'm not qualified to answer it and I don't feel comfortable answering it. It's not within my domain. It's something that happened 35 years ago.

I can't answer it.
**Q. (By Ms. Agbiro) But do you feel as though you had a good understanding of what exculpatory evidence was when you were with the police department?**
MR. JOYCE: Objection.
THE WITNESS: I had an understanding.
**Q. (By Ms. Agbiro) But not a good enough understanding to know if that was exculpatory evidence, right?**
MR. JOYCE: Objection. Argumentative.
THE WITNESS: I think it's out of my purview. I don't think I'm qualified to make that decision or make that answer. I just can't do it.
**Q. (By Ms. Agbiro) Who would be qualified to make that decision?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: Some high ranking official, an attorney. Perhaps an attorney, a district attorney. Somebody can make that but I am not qualified. I don't have enough information and it's within my purview and



never was.
**Q. (By Ms. Agbiro) It never was in your purview?**
MS. DESOUSA: Objection.
THE WITNESS: About the evidence. About that being exculpatory. This is coming up after the fact.
**Q. (By Ms. Agbiro) After what fact?**
A. The actual crimes that were committed.
**Q. This report was authored on October 29th. Are you saying this was authored after this report?**
A. I'm mistaken on that. I would say this. If I had been aware of that report back then, I would have gone in to my commanding officer and brought it to his attention and asked for advice. But I never saw this. And I don't feel qualified that I can make that answer now.
There is somebody else who can because I don't remember everything that happened. Yeah, you've got this down here, but there is something else that happened there that I feel it is insufficient evidence to make any kind of qualified answer on that. Sorry.
**Q. (By Ms. Agbiro) Were you aware of who**



**was responsible for drafting or updating SPD policies?**
MS. DESOUSA: Objection.
THE WITNESS: You say SPD?
MS. AGBIRO: Springfield Police Department.
THE WITNESS: I don't know who was responsible. I really don't.
**Q. (By Ms. Agbiro) One more thing. Were you ever responsible for reviewing and updating any Springfield Police Department policies?**
MR. JOYCE: Objection.
THE WITNESS: I think I did for a while.
**Q. (By Ms. Agbiro) In what role?**
A. I don't know. It didn't last long. It was to review them and make recommendations to the chief's office on it.
**Q. Would it be when you were acting deputy chief?**
MR. JOYCE: Objection.
THE WITNESS: No. It was a lesser rank.
**Q. (By Ms. Agbiro) Did you ever have to**



**draft and policies?**
A. Not that I can recall.
**Q. Did you ever question any policies be updated?**
MR. JOYCE: Objection.
THE WITNESS: I don't remember. That was a long time ago.
MS. AGBIRO: Okay. I'm going to take five minutes to review.
(Recess taken)
MS. AGBIRO: Back on the record.
**Q. (By Ms. Agbiro) Mr. Arpin, as a supervisor were you ever aware of any misconduct by officers at any point?**
MS. DESOUSA: I didn't hear the end of your sentence.
MS. AGBIRO: You want me to say the end of the sentence or the whole thing?
MS. DESOUSA: You might as well just say the whole thing.
**Q. (By Ms. Agbiro) Mr. Arpin, while were supervisor, were you ever made aware of any misconduct by any of your subordinates?**
A. I'm sure I have.

**Q. And what would be the process as a lieutenant, for you, if you were made aware of any misconduct by your police officers?**
MR. JOYCE: Objection.
THE WITNESS: I would have to get somebody involved from internal affairs. Well, if it was just misconduct, I would look into it myself and afterwards just refer it up the chain if it were serious enough.
If it was misconduct of a minor type, I wouldn't do anything other than just, you know, perhaps admonish, you know, tell the officer not to do that. And we're talking about minor things. Something serious I would have to make a report and forward it up the chain to my commanding officer.
**Q. (By Ms. Agbiro) Is there a policy in place that used to tell you what is minor and what is considered important enough to take it up the chain?**
MR. JOYCE: Objection.
THE WITNESS: I don't know if there is.



**Q. (By Ms. Agbiro) You don't know if there is?**
THE WITNESS: Right. I don't know if there is. I am sure there is but I have no knowledge of what that is or whatever.
**Q. (By Ms. Agbiro) Were you aware if such a policy existed when you were lieutenant?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: I'm not aware of the policy, no.
**Q. (By Ms. Agbiro) Would you have been aware, as lieutenant, in 1985, of any policy regarding how to handle misconduct by a police officer?**
MS. DESOUSA: Objection.
MR. JOYCE: Objection.
THE WITNESS: I don't recall. All I could tell you is what I would do. I don't recall if there was anything there or if I was aware of it. But if I -- with years of experience, and somebody came to me with a complaint, I would take the appropriate action.



But I didn't have a manual to go by, or a book or anything, and I'm not aware of it.
**Q. (By Ms. Agbiro) No one gave you a manual on how to handle misconduct of a police officer?**
MR. JOYCE: Objection.
THE WITNESS: Not that I can recall.
**Q. (By Ms. Agbiro) But it was a responsibility of a supervisor to handle misconduct of officers?**
MS. DESOUSA: Objection.
THE WITNESS: I don't know that it was a responsibility other than forwarding it up. I knew that whether it was a policy or not.
**Q. (By Ms. Agbiro) But you can't point to any policies requiring you to push certain things up?**
MR. JOYCE: Objection.
THE WITNESS: I can't, no.
**Q. (By Ms. Agbiro) Were there any disciplinary policies, you were made aware of, when you were a supervisor?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.



**Q. (By Ms. Agbiro) If a police officer -- if there was a complaint against a police officer, is there a process as to how that complaint would be handled?**
MR. JOYCE: Objection.
THE WITNESS: There is a process.
**Q. (By Ms. Agbiro) If there was a complaint put against one of the police officers, that you, supervised, was there a policy in place on how you were supposed to handle it?**
MR. JOYCE: Objection.
THE WITNESS: I'm not aware of that. There was a civilian policy. I don't know about the officers.
**Q. (By Ms. Agbiro) If there was such policy, would you have been aware of that policy when you were a supervisor?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: I don't know. I might have.
**Q. (By Ms. Agbiro) Do you have any reason to believe you wouldn't have been aware of that policy, if it existed, when you were a supervisor?**

MS. DESOUSA: Objection.
THE WITNESS: I don't know. I just don't know.
**Q. (By Ms. Agbiro) You don't know if you'd be aware of the policy?**
MS. DESOUSA: Objection.
THE WITNESS: Yeah. I don't know. I don't know if I would be aware or not. Just because it exists doesn't mean I'm aware of it.
**Q. (By Ms. Agbiro) Wasn't it your responsibility to handle the complaints that were given to you by the police officers?**
MS. DESOUSA: Objection.
THE WITNESS: You're giving me insufficient information for me to give you an answer.
MS. AGBIRO: This is a reminder to let me finish the question first for the court reporter.
**Q. (By Ms. Agbiro) If there was a complaint put against one the police officers you were supervising, was it your responsibility to handle that complaint?**



MS. DESOUSA: Objection.
THE WITNESS: I'd have to take some action.
**Q. (By Ms. Agbiro) Was it your responsibility to take that action?**
MR. JOYCE: Objection.
THE WITNESS: When you say "responsibility," it has a lot of meanings. It could be written responsibility. Kind of narrow your question down for me, please.
MS. AGBIRO: Sure.
**Q. (By Ms. Agbiro) Did you have any written responsibilities to handle complaints regarding officers that you supervised?**
MR. JOYCE: Objection.
THE WITNESS: I did not.
**Q. (By Ms. Agbiro) Did you have any unofficial responsibilities to handle complaints of officers that you supervised?**
MR. KENEFICK: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) How were you aware of that responsibility?**
A. I was aware of the fact that there was a



complaint made and I would send it up. I wasn't aware of a policy that laid out how I would handle it. If I had a complaint, and it was serious enough to push it up, I would do that.
I would write the report, take that down and I would forward it to the chief's office and most likely to my commanding officer first.
**Q. (By Ms. Agbiro) And what would happen to the complaint after it was given to the commanding officer?**
MR. JOYCE: Objection.
THE WITNESS: Depending upon the severity of it, it could be forwarded to the internal affairs division, or it could be sent back to the commanding officer to handle it, meaning a lesser severity.
**Q. (By Ms. Agbiro) And if it was brought back to the commanding officer, what would happen?**
MR. JOYCE: Objection.
THE WITNESS: I don't know what the commanding officer would do. I would follow the instructions that were given to me, if it was mine, and there would be instructions from the chief's office or deputy chief.



**Q. (By Ms. Agbiro) Did you handle any complaints when you were acting deputy chief?**
A. Not that I can recall.
**Q. Did you handle any complaints when you were captain?**
A. I did have some that were forwarded my way through the deputy chief, from the chief's office.
**Q. And what -- how would you -- what were your responsibilities on how to respond?**
MR. JOYCE: Objection.
THE WITNESS: To investigate it.
**Q. (By Ms. Agbiro) To investigate it?**
A. (Witness nodding head)
**Q. (By Ms. Agbiro) And if the claim was substantiated, what would happen then?**
MR. JOYCE: Objection.
THE WITNESS: Regardless of how the investigation turned out, I would forward a report to the chief's office.
**Q. (By Ms. Agbiro) Who was in charge of deciding discipline of police officers?**
A. Discipline, I believe, comes from the chief's office.

**Q. And is the chief's office the only entity that is able to discipline an officer?**
MR. JOYCE: Objection.
THE WITNESS: He wouldn't actually. He would assign it to somebody. If it's serious enough, he would assign it to internal affairs.
And, if it was of a minor status, he would send it with a memo to the commanding officer effected in the complaint.
**Q. (By Ms. Agbiro) During your time at the police department, were you ever aware of any misconduct allegations made into any of the defendants in this case, officer defendants in this case?**
MR. JOYCE: Objection.
MS. DESOUSA: I didn't hear that.
**Q. (By Ms. Agbiro) I'd said: During your time at the police department, were you ever aware of any misconduct allegations against any of the police defendants in this case?**
A. Not that I'm aware of.
**Q. Did you ever receive any training on interrogations while you were at the police**



**department?**
A. Never.
**Q. Never?**
**Do you what was the policy of the department if you had to -- any specific -- do you know -- strike that.**
**Do you know if the department had any procedures in place for interrogation?**
MR. JOYCE: Objection.
THE WITNESS: I don't know.
**Q. (By Ms. Agbiro) Were you ever aware of any procedures, interrogation procedures at the Springfield Police Department?**
MR. JOYCE: Objection.
MS. DESOUSA: Objection.
THE WITNESS: I'm not aware of it.
**Q. (By Ms. Agbiro) But you did do interrogations while you were at the police department, correct?**
A. What kind of interrogations?
**Q. Suspect interrogations?**
A. Yes. I was involved in interrogations, sure.
**Q. And at some point, that was one of your**



**responsibilities to do suspect interrogations?**
A. An interrogation is determined by the investigating officers, if they're investigating a complaint or a crime.
I don't understand what you are asking. Did I do interrogations? Yes, I did do interrogations for crimes and part of my work as an investigator I did that.
**Q. As part of your work as an investigator --**
A. Yes.
**Q. -- you were tasked --**
A. Not as a supervisor but as an investigator.
**Q. I'm not asking that. I'm asking when you were an investigator, one of your job responsibilities would have been to do interrogations of a suspect?**
A. If it was required or if it was necessary. Not all investigations involved interrogations.
**Q. Do you have any reason to believe that if a policy, regarding interrogations, were to exist, that you would not have been aware of that policy --**
(Multiple objections)



**Q. (By Ms. Agbiro) -- while you were doing interrogations?**
(Multiple objections)
THE WITNESS: I don't know that I would be aware of it or not. All I know is that I wasn't aware of it. I don't know whether one existed or not.
**Q. (By Ms. Agbiro) How many interrogations did you do --**
A. I don't know.
**Q. -- when you were with the department?**
A. I don't know.
**Q. Was it 20?**
A. Like I'd said, I don't know.
**Q. One hundred?**
A. I don't.
**Q. Can you provide a ballpark estimate?**
A. I can't.
**Q. Would you describe it as you'd done a lot of investigations?**
MR. JOYCE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Did you take more than one invest -- interrogation?**

Page 209

A. Yes.
MS SAKOWSKI: Before you asked him investigation, now you're asking interrogation?
MS. AGBIRO: No.
**Q. (By Ms. Abrigo) Did you take more than ten interrogations?**
A. I don't know.
**Q. Was conducting an interrogation a frequent part of your job responsibilities --**
MR. JOYCE: Objection.
**Q. (By Ms. Agbiro) -- when you were an investigator?**
MR. JOYCE: Objection.
THE WITNESS: When I was an investigator, interrogations weren't that frequent. I can't tell you how many there were, not for me anyway.
**Q. (By Ms. Agbiro) If you had a question, as to any sort of process, any aspect of the interrogation process, is there any policy you would be able to point to, to provide any guidance?**
MR. JOYCE: Objection.
THE WITNESS: No.

Page 210

**Q. (By Ms. Agbiro) Any policy that you would be able refer to for any guidance?**
MR. JOYCE: Objection.
THE WITNESS: Could you repeat that one, please?
**Q. (By Ms. Agbiro) I'd said: Would there be any policy that you can refer to for any guidance on interrogation?**
MR. JOYCE: Objection.
THE WITNESS: I wasn't aware. I don't know if they had one or not. I wasn't aware.
**Q. (By Ms. Agbiro) Was it your practice to write down any notes that -- to write down notes while you wee doing an interrogation?**
A. I don't know what the practice, the common practice would be. But sometimes you would and sometimes you wouldn't. Sometimes the interrogation would go by a question and give a statement or something. This is variables. I can't give you a definite one.
**Q. I'm asking specifically for your practice. Would it be your practice to take notes while doing an interrogation?**

Page 211

A. I don't think so.
**Q. So you wouldn't take notes during an interrogation?**
A. I say, I don't think I did. Because I always had an interrogation and I was with somebody so they would take -- if there were notes to be taken, they would. I wouldn't take them. I didn't take the notes.
**Q. And how many people, when you were doing an interrogation, was there ever a situation -- strike that.**
**How many people would normally take an interrogation; how many officers?**
MR. JOYCE: Objection.
THE WITNESS: Well, normally it's a broad term. A lesser investigation, one or two officers, I suppose if it was a much larger investigation, it would involve multiple officers.
I've never participated in one of those big ones.
**Q. (By Ms. Agbiro) But there has been times in which there would be more multiple -- more than two officers in the room interrogating a witness at**

Page 212

**the same time?**
A. It could happen, yeah.
**Q. Would be there be any occasions where there was just one officer the room interrogating a suspect?**
A. I don't know. I always had somebody when I did it, but there's no rule on it. And I can't answer for whatever's going on in the department.
**Q. Was there a practice, commonly, where people do it in pairs at least?**
MR. JOYCE: Objection.
THE WITNESS: A lot of times it's a minimum of, you know, a couple of officers will conduct it. But I suppose there's been investigations with more. I can't say there weren't any. There's probably -- No. I don't think there's any rule on how to conduct one. I think the investigating officers have to determine that.
**Q. (By Ms. Agbiro) Now, when you were a supervisor and you were talking to the police officers, whom you were supervising, about interrogation, would your review be limited to just a discussion, or would you ask or request notes from**

**the interrogation?**
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: I would -- they would author a report afterwards and they would make that copy available to me so I could review it.
**Q. (By Ms. Agbiro) So officers were required to write a report after any interrogation?**
MR. JOYCE: Objection.
THE WITNESS: I don't know that they're required. All I know is what I did and I would ask for a report.
**Q. (By Ms. Agbiro) You would ask your subordinates to write a report of the interrogation?**
A. I'd want to see the statement, yes. If they got a statement, yeah. And, as a supervisor, I would want to see the report when they're through.
**Q. (By Ms. Agbiro) And if they didn't have a statement?**
A. I would try to find out why. Maybe there is a good reason.
**Q. Would you want to make sure -- strike that.**



MS. AGBIRO: Okay. I have no further questions for you.
MR. JOYCE: Anybody on the line have anything?
(Some remote attorneys respond in the negative)
MR. COHEN: I have a couple of very quick ones. This is Jared Cohen, just a couple quick questions for the witness.

EXAMINATION BY MR. COHEN:
**Q. Can you hear me all right?**
A. Yes.
**Q. You mentioned earlier that you thought Assistant attorney -- sorry -- Assistant District Attorney Francis Bloom was involved in helping to set up a lineup after George Perrot was arrested; is that right?**
A. Yes.
**Q. Do you remember seeing Francis Bloom at the police station on that day?**
A. I can't say yes or no. I don't know.
**Q. To the best of your knowledge, do you know whether he was, in fact, there?**



A. I can't say.
**Q. And, to the best of your knowledge, do you know whether Francis Bloom participated in George Perrot's interrogation after his arrest?**
A. I'm not sure. I am not sure. He could have, but I'm not sure.
**Q. To the best of your knowledge, do you know whether Francis Bloom participated in George Perrot's arrest itself?**
A. I don't believe so. I don't think so.
**Q. And, to the best of your knowledge, do you know if Francis Bloom participated in any investigation of George Perrot prior to his invest -- prior to his arrest? Pardon me.**
A. I'm not aware of that.
MR. COHEN: Okay. That's all I have.
COURT REPORTER: Do you need a copy of the transcript, Attorney Cohen?
MR. COHEN: I will almost certainly need a copy. I do need to -- just because of the way my office's procedure works, I need to get a pre-budget approval. I will need an estimate of the cost when you know.



jared.b.cohen@mass.gov.
MS. DESOUSA: So the city definitely wants one for both today and yesterday. Send invoices before July 1st. Electronic copy is fine.
ldesousa@springfieldcityhall.com

(Deposition concluded at 4:46 p.m.)

I, SHARON WASKIEWICZ, Notary Public, do hereby certify that CHARLES ARPIN appeared before me and satisfactorily identified himself on the 8th day of June, 2023, at the LAW OFFICE OF TYLER INGRAHAM, 100 Main Street, Third Floor, Northampton, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this case; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND this 27th day of June, 2023.

Sharon Waskiewicz

------------------------

Sharon Waskiewicz My Commission expires:
Notary Public July 26, 2024



Today's date: June 19, 2023
To: Austin Joyce, Esq.
Copied to: Carla Agbiro, Esq.
Lisa Desousa, Esq.
Tyler Kenefick, Esq.
From: Sharon Waskiewicz
Deposition of: Charles Arpin
Taken: June 9, 2023
Action: George Perrot vs Thomas Kelly, Thomas Jarvis, Richard Kane, et al

Enclosed is a copy of the deposition of CHARLES ARPIN. Pursuant to the Rules of Civil Procedure, Mr. Arpin has thirty days to sign the deposition from today's date.

Please have Mr. Arpin sign the enclosed signature page. If there are any errors, please have him mark the page, line, and error on the enclosed correction sheet. He should not mark the transcript itself. This addendum should be forwarded to all interested parties.

Thank you for your cooperation in this matter.



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO: 18-CV-10147

*********************************** *
GEORGE PERROT, *
Plaintiff, *
vs.
THOMAS KELLY, THOMAS JARVIS, RICHARD KANE, CHARLES APRIN, JOHN SCANLON, DAVID LOUDEN, THOMAS KENNEDY, CHIEF ERNEST STELZAR, MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAIN, ANDREW CANEVARI, CHERYL CLAPROOD, CAPTAIN JOHN BROWN, UNKNOWN OFFICERS OF THE SPRINGFIELD POLICE DEPARTMENT, THE CITY OF SPRINGFIELD, MASSACHUSETTS, FRANCIS BLOOM, WILLIAM EUBANKS, WAYNE OAKES, and UNKNOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION, *
Defendants *
*********************************** *

I, CHARLES ARPIN, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief.

WITNESS MY HAND, this day of , 2023.

________________________
Charles Arpin

sw



CORRECTION SHEET

DEPONENT: Charles Arpin
CASE: George Perrot vs Thomas Kelly, Thomas Jarvis, Richard Kane, et al
DATE TAKEN: June 9, 2023

***********************************************
PAGE / LINE / CHANGE OR CORRECTION AND REASON
***********************************************
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------
-----/------/-----------------------------------

**Exhibits**

**Exhibit CA-1**
4:11 81:7
**Exhibit CA-2**
4:13 100:18
**Exhibit CA-3**
4:14 146:16
**Exhibit CA-4**
4:15 152:8
**Exhibit CA-5**
4:16 165:20
**Exhibit CA-6**
4:17 187:4

**$**

**$1**
103:12
**$50**
102:21

**-**

**-em**
89:1

**1**

**1**
81:1,2,6,12 122:12 160:11
**1/25/85**
170:22
**1/5/85**
170:15
**10**
62:24 95:5
**100**
172:16
**11/30/85**
103:1,5
**12**
61:20 62:10 81:15 95:5
**12/7/85**
102:10
**130**
102:15
**15**
6:1
**17**
102:16 117:19,20, 22,23 165:24 166:1, 4,9,14,20 167:4 168:19 169:7 190:10
**19**
90:8
**1950s**
16:3
**1969**
19:17,18 22:8
**1970**
22:8 25:19
**1976**
24:2 25:19 54:19
**1984**
124:2,19 125:12
**1985**
56:20 62:15,24 63:6, 14,18 81:16 95:6,15 117:14 121:6 198:13
**1st**
216:4

**2**

**2**
100:15,17 121:3
**20**
6:1 54:7,9 208:13
**2010**
53:21,22
**2018**
61:6
**25th**
168:8
**27**
103:5
**29th**
194:10
**2:30**
63:5 95:15
**2nd**
9:24 10:1,14 11:9

**3**

**3**
103:1 146:12,24
**30**
5:3
**33**
102:24
**35**
103:6 178:19 192:24
**3:25**
103:2

**4**

**4**
28:21 54:19 103:5 152:7
**40**
83:20 85:22 94:12
**41**
162:20
**43-48**
146:16
**4:46**
216:8

**5**

**5**
59:8,11 103:1 165:19 168:2,3 171:1
**5:40**
102:14
**5th**
10:19 11:2,5,9

**6**

**6**
62:24 63:2 95:8 149:3 150:12 168:1
**60S**
16:21
**64**
102:24
**6th**
95:6 118:13,14,24 119:11

**7**

**7**
63:5,14 95:15
**70s**
15:12
**78**
103:4
**7th**
121:6

**8**

**8**
61:18
**80s**
54:23 55:5
**84**
125:13
**87**
102:16

**9**

**9**
62:6 81:12,13
**90s**
55:8

**A**

**a.m.**
63:5 103:2,5
**abided**
96:1
**ability**
8:14
**Abrigo**
209:6
**academy**
19:19 72:9 116:5
**access**
158:13 159:15 160:2
**Accident**
145:1
**account**
189:19
**accuracy**
154:5
**accurate**
8:10,19 28:15,16 29:3,4 60:10 148:3,5
**act**
129:14
**acting**
41:13,15 43:13 52:12,23 53:2,11 55:11,24 75:15 76:2, 19 77:9,13 79:14 184:16 185:13,18 195:19 204:2
**action**
22:15,17 23:4 29:15

61:21 151:11 198:24 202:3,5
**active**
85:1 87:10 93:17 123:1 137:21 176:20
**actively**
84:24 108:6
**activity**
61:21
**acts**
59:14
**actual**
72:23 194:9
**actuated**
128:15
**ADA**
138:2
**addition**
158:1
**additional**
113:5
**additionally**
103:7
**addressed**
130:2 183:11
**adequately**
132:16
**administrative**
35:21
**admonish**
197:13
**adult**
117:23,24 167:4,5 169:6,21
**advice**
194:15
**advising**
50:6
**affairs**
197:6 203:14 205:7
**aftermath**
130:18 132:6
**afternoon**
26:14 40:10 43:8 113:12 154:15
**Afterward**
96:2
**Agbiro**
5:12,15 22:2 23:2 25:4,13 26:8 30:10, 20 31:1,2,8,12,19,22 32:3 35:12,13 36:12, 13 37:22 38:12,19 39:9 42:2,5,15,24 43:10,20 44:12 45:4, 10,16,20 46:1,12,17, 20 47:1,12 48:8,18, 22 49:5,8,11 50:8,13 51:2,12,21 52:3,7, 11,18,22 53:7,9 55:23 56:4 57:16,18 58:4,10,13 61:9,12 65:24 66:1,17 67:8, 15,23 68:24 69:10 70:4,21 71:5,12,15, 21 72:7,18,21 73:15 74:3,12,18 75:2,10, 14,20 76:1,6 77:1,9, 22 78:2,7,17 79:7,8, 13,21 80:1,6,11,17, 21 81:2,5,10,11 84:4,21 85:9,21,24 86:6,10,18,20,24 88:1,11 89:5,11,18 90:3,8,16 91:2,8,15, 24 92:20 93:6,12,24 94:8 96:17 97:2,17, 23 98:6,11,18 99:3, 11 100:2,14,16,19 102:7,13 103:17,24 104:5,13,19 105:3 106:14,20 107:22 108:3,6,19 110:1,7, 16,23 111:16,20 112:8 113:8 114:9, 24 115:20 116:13, 20,23 117:6,17 118:6,8 119:6,8,18 120:11,17 121:2 122:4,18,21 123:17 125:1,22 126:8,15, 23 127:1,13 128:5, 19 129:2,9 130:4 131:10,16,21 132:2, 21 133:8 134:12,18, 24 135:10,13,16,23 136:10 137:2,8,14 138:5,13 139:9,15, 19 140:6,12,17 141:7,12,21 142:17 143:3,17 144:7,16 145:4,13 146:2,11, 15,19,20 151:5 152:3,6,9 153:4,6, 12,20 154:4,18 158:24 160:7 161:16,19,20 162:9, 17 164:1,17,23 165:3,12,18,21,22 166:8,15,18 167:6, 14,17 168:3,4,21 169:2,3,13,16 170:18,23 171:1 172:1,20 173:6,15 174:2,6,15 175:5,14, 21 176:1,14,21 177:4,7,13,19 178:20 179:3,11,19 180:1,9,17,23 181:10,18 182:5,8 183:13,17,21 184:3, 9,10,15,21 185:1,6, 11,16,22 186:8,12 187:3,5 188:20 190:23 191:7,15 192:3,10,15 193:2,8, 16 194:2,8,24 195:5, 9,15,24 196:8,11,12, 17,21 197:19 198:1, 6,12 199:4,8,16,20 200:1,7,15,22 201:4, 11,18,21 202:4,11, 12,17,22 203:8,17 204:1,13,15,21 205:11,18 206:11,17 208:1,8,23 209:5,12, 19 210:1,6,13 211:22 212:20 213:8,14,19 214:1
**age**
102:24 103:4 117:19,20 165:23 168:19 190:10
**Aggravated**
103:10
**agree**
106:2 115:5,11 125:15 131:16 144:7 145:4 184:21 185:1
**agreed**
102:4 149:21
**agreement**
151:17
**ahead**
6:11 19:12 57:23 61:17 62:8 72:14 84:14 86:24 102:11 117:12 147:13 167:14
**Aid**
19:24
**allegations**
205:13,20
**Allendale**
63:2 95:8 149:3,4 150:12
**alongside**
35:24 92:12 157:15, 19
**alphabetically**
176:8
**alternative**
191:11,15,19,22 192:5
**ambulance**
22:18
**amount**
135:1
**and/or**
158:13
**Andrew**
14:20 154:7
**answering**
60:17,19,24 134:10 192:23
**answers**
6:17,20 93:4
**anybody's**
119:24
**anymore**
94:18 140:4 175:2
**apologies**
58:4
**apologize**
163:8
**apparently**
60:6
**appeared**
132:15
**appears**
124:17
**appointed**
74:16,19 77:12
**appointment**
9:18,22,24 10:1,5
**appraised**
29:22 44:5
**apprised**
48:20

**approached**
55:23
**appropriately**
132:22
**approval**
29:20 215:23
**approximately**
27:7
**area**
62:22 82:13 83:22 111:12
**Argumentative**
193:11
**armed**
59:22 66:20 102:18, 19 103:8,11 124:5
**Arpin**
5:8,13,15 14:22 58:5,13,18 81:14 100:19 104:7 146:20 152:9 196:12,21
**arrangements**
121:21 122:8
**arrest**
22:19 29:16,17 62:14 96:13,16,19, 21 97:3,6,8,10,15,20 98:2,10,20 99:2,17 100:1,3,4 101:11 102:6 107:19 112:18 120:12,19 166:24 168:16 169:7,24 170:4 189:3,6,16 190:14 215:4,9,14
**arrested**
63:10 96:6 100:10, 11,12 102:15 109:17,21 110:2 118:12,23 119:9,16 140:20,22 169:23 214:17
**arresting**
98:22
**arrived**
71:18
**aski**
176:17
**asks**
61:20
**aspect**
209:20
**aspects**
158:2
**assault**
24:12 34:5 36:21 59:23 62:23 82:14 102:18,19,20 103:9, 10,12,13 124:5,6
**assaulted**
36:23
**assaults**
34:6 64:14 125:9,10
**assign**
37:10 69:8 89:23 174:11 205:5,6
**assigned**
33:1,2 34:13,23 40:6,9 62:15,18 64:24 65:16 66:9,11, 23 67:11,19 68:15 69:2 81:17 189:18
**assigning**
37:1,4
**assignment**
77:19
**assignments**
89:24 92:6
**assist**
24:6,10 29:11,12 35:18 36:17 39:17 77:21 83:12,17 89:1
**assistance**
29:11 37:9 38:6 120:5,9 127:22 150:8
**Assistant**
63:12 121:5 123:5 214:15
**assisted**
63:12 121:4
**assisting**
32:4 88:4
**assume**
7:20 60:10 183:7
**assumed**
154:23 188:11
**assumes**
154:22
**assuming**
169:6 183:5 185:21
**assure**
94:1
**Atkins**
14:12
**attached**
66:4
**attend**
16:6,8 19:19 73:5,17 76:6,9,12,15,18,22 77:4 80:2,8,12
**attending**
16:19
**attention**
38:5 44:1 194:15
**attest**
138:22
**attesting**
104:10
**attorney**
7:10,23 8:2 9:2,18, 22 10:6,7,9,13,22 11:1,4,12,20,24 12:13,24 13:11 63:12 121:5,20 123:6 131:4 132:12 193:21,22 214:15,16 215:19
**attorney's**
182:15
**attorneys**
214:5
**author**
213:5
**authored**
101:1 104:18,20,21 123:21 194:10,11
**authorized**
96:16
**automatically**
159:13
**autonomous**
85:5
**aware**
8:8 26:4,7 39:8,23 40:5,8,11 48:9,15 50:12,22 51:9 52:4, 8,12 90:15 95:3 102:4 126:14,15,16 142:18 143:3 158:20 160:21 164:24 165:13 167:6 171:4 172:4 176:13 177:6, 24 181:7,8,18,23 182:2 183:4,10,12, 13,17 184:4,11 185:13,18,20 194:13,24 196:13,22 197:2 198:6,10,13, 21 199:2,21 200:12, 16,23 201:5,8,10 202:22,24 203:2 205:12,19,22 206:11,16 207:23 208:5,6 210:10,12 215:15
**awful**
88:3

**B**

**back**
11:17 17:17,18 18:12 25:24 27:17, 20 28:16 29:2 41:19 51:11 53:4,13,15,23 54:6 58:10 81:10,12, 14 91:23 92:11 102:2,7 108:10 109:1,18,23 110:2,4, 6 114:1 146:19 152:6 156:5 158:10 165:21 173:19,21 174:12 176:7 178:19 182:3 191:5 194:13 196:11 203:15,18
**background**
14:23 109:19
**backtrack**
25:22
**badgering**
134:9
**ballpark**
208:17
**based**
59:18 97:8 151:22 155:14 156:5
**basically**
28:9 34:18 87:19 166:18 178:18
**basis**
48:20 53:4
**bathroom**
52:17
**battery**
59:23 62:23 82:14 103:11,13
**began**
19:14
**begin**
144:23

**beginning**
80:15 175:3
**beneath**
161:11
**big**
125:17,23 126:19 211:21
**bill**
103:12
**bit**
45:7 71:15 93:19 134:16
**black**
122:16
**Bloom**
63:12 121:5,20 123:6 214:16,20 215:3,8,12
**book**
29:17 32:10,18 199:2
**booked**
100:5,6 110:8
**booking**
27:19,24 32:6,9,13 33:1 100:11
**Boom**
131:4
**born**
15:21,23
**boss**
43:10
**bottom**
103:18 107:5,7 122:19
**break**
7:9,13,14,17 52:17, 19 53:7,9 74:10 118:13,24 125:9 146:14,21 150:11,15 152:3 164:6 191:8
**break-ins**
64:9,11
**breaking**
36:21 62:19 65:17 124:5 163:4 167:7 168:6
**briefed**
105:9
**bring**
29:17 51:16 141:22
**broad**
211:16
**broke**
69:13
**broom**
63:4
**brothers**
16:5
**brought**
37:17 44:1 110:14 141:18 194:14 203:17
**Brown**
188:2
**building**
122:2,5
**bureau**
23:9,15,24 24:5,19, 22 25:6,18 26:16 28:19,22,24 33:24 34:9,14 35:24 38:8, 11 40:13 41:4,9,10, 12 42:1 43:23 53:4, 14,15,16,17,23 54:18 65:1,6 66:5,24 67:2,4 68:15 69:17 70:14 92:5 110:14 111:7,8,10 113:12 117:4 120:3,11,18 124:3,4,12,17,18 125:5,6 137:6 150:18 151:4 154:9, 20 155:3,6,11 167:21 169:18 170:9 172:14 173:10 174:20 175:10 176:7 188:2,3,10,16 189:1, 10,19
**bureau's**
62:16 81:17
**bureaus**
65:5 66:14 111:5,12, 17 125:16 126:2,10 167:24 173:20 174:1 175:1 188:21
**burglaries**
62:19,22 65:17 82:13 83:21 118:12 119:10
**burglary**
59:22 63:1,3 95:6 102:18 103:8
**busy**
136:7

**C**

**CA-1**
81:7
**CA-2**
100:18
**CA-3**
146:16
**CA-4**
152:8
**CA-5**
165:20
**CA-6**
187:4
**cabinet**
174:14 176:8 177:22 178:15
**call**
22:18 37:9,11 39:13 106:8 120:6
**called**
23:13 39:17 129:15 188:4
**calls**
22:13 23:4 32:18 108:7,9
**Caneberry**
154:8
**capacity**
30:19,21 31:4 46:3
**captain**
40:14,17,20 41:7,15, 22 43:1,11,14,17 44:12,16 47:13,14 52:8 53:5,11 55:14, 22 62:16 66:12 69:24 76:16 80:1 81:23 91:15 102:3, 15 104:23 105:8,11 106:4,11 109:6 113:20,21,24 159:24 160:3 174:9 175:18 183:14 188:2,15 191:24 204:5
**captains**
65:7 79:22
**cards**
102:21
**career**
64:2 118:2,5 183:22
184:4,11
**Carla**
5:15
**carpentry**
17:8
**case**
9:7,14 12:1,2,6,13 13:3 14:2 36:13,14, 17,20 37:16,21,23 38:10 39:17 43:23 46:4 49:12,13,19,22 50:3,10,14,23 57:24 58:6 60:4,8 64:4,6 70:22,24 71:7 81:21 82:4,7 83:11,16,23 84:2,5,11,12,22,24 92:3,11,22 93:16 94:9,14,16,18 95:1 96:13,18,19,23,24 98:6,9 99:5,18 105:20 110:23 111:17 112:16,19,21 119:19 125:13,17,23 127:1,3,7 135:7 140:24 141:7,9,17 142:18 146:3 151:14 155:18 157:11,16, 17,19 158:2,22 159:1,11,18 160:12, 15,22 161:3,11 162:10 164:2 169:4 170:4,16,21 171:21 172:2,17 175:3 176:2,4,9 178:13 181:6 187:13,17,18, 20 188:1,8,24 189:9 190:13 205:14,15,21
**caseloads**
49:14
**cases**
30:17 31:3 36:9 37:1,4,6 38:10 39:24 40:5,8,11 42:9,15, 19,23 44:21 46:7,10, 20 47:3,8 48:9,12, 15,24 49:3,5,10 51:16 63:24 70:15 107:23 125:11,15 126:3,12 159:3,22 161:22 163:19,20 164:2 165:6 177:24 187:17

**cash**
102:21
**category**
125:11
**caught**
140:18
**Cavanaugh**
155:7
**cell**
100:13 110:9,11
**chain**
142:1 197:9,17,21
**chance**
133:12,13,16,23,24
**change**
118:2
**charge**
25:8 35:19 39:3,4 69:20 74:13,23 75:3 121:14 124:12 152:17,19 167:18 169:5 175:8 204:21
**charged**
100:5,6,11 103:8,12 167:4 168:5 169:8, 13 170:19,20
**charges**
102:6,17,23
**Charles**
5:8 104:7
**check**
77:20 101:22 103:4
**checked**
47:7
**checking**
179:12
**checks**
32:16 145:24
**chief**
41:13,16 43:12,14, 17,21 44:2 52:12,23 53:2,11 55:11,24 56:2,4,7,9,15,17 74:17,19,22 75:7,8, 15,22 76:2,19,21 77:2,4,10,12,13,16, 21,23 78:3,10,12,14, 17,20,24 79:2,3,10, 15,19 89:17,18,23 90:1,12 158:20,24 159:2,6,14,18,21 160:2,4 183:18 184:16 185:13,18 195:20 203:24 204:2,7
**chief's**
91:21 116:11 128:12 195:18 203:6,24 204:7,20,24 205:1
**chiefs**
159:15
**chisel**
178:16
**choice**
138:24
**choosing**
140:7
**Circle**
149:3,4 150:12
**circumstance**
108:10
**circumstances**
153:10
**city**
24:8 62:22 82:14 83:22 89:19 216:2
**civil**
55:16,18,19 56:15
**civilian**
200:13
**civilians**
73:24
**claim**
204:15
**clarification**
31:17 166:12 170:13
**clarify**
7:2 101:7 114:22
**clarifying**
134:15 164:5
**clear**
47:18 60:13 68:23 69:1
**clerk**
176:6
**close**
140:20
**closed**
87:23
**closely**
138:18 140:2
**clothes**
153:11
**coffee**
93:18
**Cohen**
214:7,8,11 215:16, 19,20
**collected**
142:11
**Collins**
25:20,21
**column**
168:15
**comfortable**
58:22 192:22
**command**
110:5 116:11 149:19 151:8 162:3,7
**commanding**
62:17 81:24 109:16 194:14 197:17 203:7,9,15,18,21 205:9
**commands**
151:19
**committed**
59:13,21 149:18 194:9
**common**
30:12 142:19 210:17
**commonly**
212:9
**communicate**
70:11,14
**communicated**
70:18
**communicating**
70:19
**communication**
105:16,17
**communications**
9:21 176:22
**community**
128:4 144:18
**compared**
171:14
**complaint**
50:3 198:23 200:2,3, 7 201:21,24 203:1,3, 9 205:10 207:4
**complaints**
201:12 202:13,18 204:2,4
**complete**
8:15 176:11,15,18 178:14
**completed**
49:12
**completeness**
179:13 180:13
**complex**
83:23 84:2
**complexity**
83:11,16
**comprehensive**
34:18
**concluded**
176:5 216:8
**conditions**
8:17
**conduct**
107:1 112:5 129:13 212:14,18
**conducted**
91:22 124:4
**conducting**
87:10 108:21 133:3 209:9
**confirm**
106:4 131:13
**confirmed**
131:11
**confused**
41:2 115:19 164:8
**conjunction**
85:6 149:8
**considered**
83:23 125:23 140:7, 13 197:21
**consist**
19:22
**constraints**
90:14
**consult**
36:16 149:9,10,12
**consultation**
49:21
**consulted**
78:11
**contact**
46:3 186:23
**continue**
38:5 112:17 166:19
**continued**
18:9 106:10

**continues**
165:5
**control**
154:22,23
**conversation**
6:15,19 39:22
156:24 159:17,21
**conversations**
30:5 94:9,10,14,24
101:16 144:1 145:11
160:14
**coordinating**
63:13 121:6,13
122:7
**cops**
151:20
**copy**
148:7 213:6 215:18,
21 216:5
**correct**
11:18 29:6 37:18
51:3,13 77:2 78:18,
21,22 80:5 81:18
82:1,16 83:1,18
85:22 86:2,15,22
92:15 95:12,19
96:10 98:2 101:3
105:6 115:4 118:18
124:6 131:17 136:21
148:20 150:11,21
164:10 165:24
187:14,22 206:19
**correctly**
115:8 127:6 131:11,
13 145:20 156:10
164:9
**cost**
215:24
**Counsel**
57:13 58:2 97:21
169:10
**counts**
102:18
**couple**
5:24 10:10,11 12:21
14:22 54:8 68:21
153:23 171:2,3
212:13 214:7,9
**court**
6:14,18 72:2 110:12
146:6,9,22 158:21,
22 168:11 170:16,
21,22 201:20 215:18

**Covel**
103:1
**covers**
169:9,14
**crazy**
54:7
**created**
31:9 65:20 75:10
**credit**
102:21
**crime**
24:13 65:1,5 69:7,13
111:8,10 120:4
121:1 124:3,11,18,
22 125:2,5 128:6
138:14 141:20
143:14,20 145:5,7
149:18 151:21
155:10 161:12
165:1,14 166:24
167:16 172:11,13
174:20,24 175:10
177:3 188:2,9,16
189:1,10,19 207:4
**crimes**
20:17,19 34:1,3,4
35:22 36:23 42:11,
12 49:15 62:20
84:18 87:8 109:5
111:9,12 116:7
119:17,20 120:12,18
124:14,15 125:2,3,4,
8 126:1 128:4 144:8
149:15 194:9 207:7
**criteria**
94:6 138:17
**cross**
150:1
**cue**
102:20
**current**
57:20 90:7
**custody**
142:1 175:4,6
**customary**
96:19 97:2 138:13
139:9,16 171:18
175:21 176:2
**cut**
68:23 69:1 150:9
**cutoff**
117:22

**D**

**daily**
44:8 46:2 48:20
**date**
10:7 102:8,9 119:16
124:23 168:12,14,16
170:14,15,16,18,19
**Date-wise**
63:19
**day**
9:23 10:4,5 19:14
21:20 25:23,24 27:3,
4,5,8,11 28:14 38:8
43:7 44:20,24 45:13
54:20 73:3 161:8
188:9 214:21
**day-to-day**
44:6
**days**
5:3 28:22,24 35:20
41:9
**dead**
178:14
**deal**
126:19 132:7
**dealing**
78:10 165:13
**deceased**
64:23
**December**
56:20 62:15,24 63:5,
14 81:16 95:6,15
118:13,14,24 119:11
121:6
**decided**
99:19
**deciding**
140:13 204:22
**decision**
89:20 98:10 125:20
151:8,15 193:14,17
**decisions**
151:13
**decisive**
22:15,17,22 23:4
**decorating**
17:7
**defendants**
13:23 205:14,21
**define**
158:10 161:9

**definite**
210:21
**definition**
88:1 107:4 117:7,13
118:1
**department**
13:17,20 19:8,10,11,
16 20:5 22:4 26:5
48:7 55:20 64:2,10
71:19 73:14,23 74:4
75:3 83:21 85:22
86:2 89:6,13,20
111:6 117:14 118:3
125:15 126:9 128:3,
5 129:5,6 134:24
144:8 149:24 162:21
165:24 166:22 167:3
169:9,14 171:6,11
179:20 180:2,12
181:20 183:22 186:5
192:17 193:5 195:6,
11 205:12,19 206:1,
5,7,13,19 208:11
212:8
**departments**
86:5
**depend**
37:20
**depending**
22:15 74:11 83:11,
16 125:24 156:4
203:12
**depends**
130:8
**Deponent**
5:8
**deposed**
5:16,18,20
**deposes**
5:9
**deposition**
6:8,12 9:16 13:9,13
216:8
**deputies**
158:20 159:7,8,10
**deputy**
41:13,16 43:12,13,
16,21 44:2 52:12,23
53:2,11 55:11,24
56:7,15,17 74:22
75:8,15 76:2,19,21
77:1,10,13,15,21,22
78:3,10,12,14 79:15,

19 159:15,18,21 160:2,4 183:18 184:16 185:13,18 195:19 203:24 204:2,7

**describe**
45:6 65:14 208:19

**description**
140:7,13

**designation**
23:14

**desk**
27:19,24 32:6,9,14 33:1 42:17 100:12 163:24

**Desousa**
57:13 58:2,12 71:20 72:4,11,12 73:9,10, 20,21 77:7 89:21 91:11,12,18,19 93:9 97:21 98:15 105:1 106:22,23 119:1,2,4, 12,13 120:15 125:19 126:21 127:8 144:12,13 153:19 166:6,10,21 169:1, 10 179:1,22 180:5, 15,21 181:3 184:24 185:5,14 186:6 190:17 191:17 192:6,12,18 193:19 194:4 195:3 196:15, 19 198:9,16 199:11 200:19 201:1,6,14 202:1 205:17 206:15 216:2

**details**
100:18

**detective**
23:9,13,15,17,18,21, 23,24 24:5,19,21,22 25:5,15,18 26:16,21 28:18,21,24 33:24 34:9,14 35:24 36:3, 15 37:2,17,24 38:7, 8,11,13,14,23 39:5, 10,14,16,22 40:12 41:4,9,10,12 42:1 43:23 53:4,15,16,17, 23 54:17 62:16 65:6 66:5,14,24 67:2,4 68:15 69:17 70:14 81:17 86:13 89:7,14, 16 90:3,19 92:5 96:18 110:14,21 111:7,10 113:11 116:14 120:3 123:21 124:3,17 125:5 130:2,4 150:18 151:4 153:15 154:9, 10,20 162:3 169:18 170:9 173:10 176:6 181:5 186:22

**detectives**
25:7,14 26:5 34:13 39:24 40:6,9 49:15 65:15 67:3 68:3,4,5, 9,11,14 69:9 83:12 86:14,20 87:7,16 92:4,12 95:1 96:1 99:5 111:6,7 139:3,5 151:6 161:21,22 167:11 172:13 188:3 189:18

**determine**
93:1 99:12 212:19

**determined**
207:2

**determines**
131:5

**dictate**
129:10

**dictating**
87:13,20 109:14

**difficulty**
41:20

**direct**
59:7 88:14 122:10 124:1 137:6 154:16

**directing**
85:17 87:20 89:2

**direction**
83:7,8

**disagree**
108:4

**disciplinary**
199:21

**discipline**
204:22,23 205:2

**discretion**
89:17 90:12

**discuss**
9:19 29:14 71:7 88:24 105:18 157:22 186:14

**discussed**
105:8,12 175:17

**discussing**
75:21 87:22 157:16

**discussion**
58:9 93:19 98:11 105:10 119:5 131:14 149:21 175:19 190:5 212:24

**discussions**
94:23 97:7 99:4,15 106:9 131:2

**dispatcher**
39:12,13

**dispute**
81:20 82:3,6,18 95:11,18 96:9 118:17,20 119:9 121:10 124:8 148:9 154:5

**disseminated**
69:18

**disseminating**
69:20

**distributed**
69:2

**district**
22:12 23:3 63:12 121:5 123:5 182:14 193:22 214:15

**division**
22:5,11 23:8 24:6, 18,24 26:18 27:17, 21 28:6,8,10 29:2,6 30:2,17 31:3,9 32:5 33:6,23 34:9,23 40:21 41:7 44:9 86:12,13 119:20 150:15 151:3 154:7 166:19 170:9 173:13,15 203:14

**document**
21:15 58:14,16,18, 19,23 59:2 100:20, 23 104:10,11 122:21,24 123:15,19 124:2 138:10 147:4, 15 152:10,11,14 153:18,21 154:2 158:18 170:1,10,15 187:6,11

**documentation**
21:23 176:22

**documented**
141:19 172:21

**documents**
11:14,17,23 12:12, 23 13:5 31:20 60:19 176:23 177:2,8

**dog**
156:3

**domain**
192:23

**door**
53:19

**draft**
196:1

**drafting**
195:1

**drinking**
93:18

**Drive**
102:17 103:5

**driving**
149:16

**drowned**
109:20

**duly**
5:9

**duties**
35:7,15 84:23 185:3

**duty**
30:14

**dwelling**
102:19

**DYS**
165:20

**E**

**earlier**
20:11 39:9 51:4 53:9 63:11 71:16 82:21 83:3,10 86:11 92:14 101:2,5 121:4 124:11 129:3,17 157:10,14,21 164:5 165:22 189:13 214:14

**Early**
15:12

**easier**
40:3

**easily**
49:15

**echelon**
158:19
**effected**
205:10
**effectively**
128:17
**Electronic**
216:4
**Elementary**
16:9
**em**
32:16 143:23 144:1
**Emily**
102:24
**employees**
13:20
**end**
57:14 105:2 171:3 178:14 180:22 196:15,18
**ends**
17:7
**enforcement**
20:2
**entail**
35:7
**entering**
36:21 167:8 168:6
**enterings**
62:19 65:17 124:5 163:4
**entire**
15:6
**entity**
75:2 205:1
**Ernest**
62:16 81:24
**escalation**
36:23
**estimate**
17:11 208:17 215:24
**et al**
102:15
**event**
132:20
**events**
21:19 93:1
**eventually**
158:22
**evidence**
21:6,10,13 24:16 59:19 99:2,6,12 101:16,19 108:16 141:1,6,8,14,17,19, 22 142:2,10,18,20, 23 143:4,7 181:20 182:1,9,13,18,24 183:24 184:5,12,18 185:2,10,12,17,23 186:9,15,18,24 190:15 192:5 193:4, 10 194:5,22
**evident**
86:13
**exact**
138:19
**EXAMINATION**
5:12 214:11
**exceptions**
177:4
**exculpatory**
181:20,24 182:9,13, 17,18,24 183:11,23 184:5,12,17 185:2, 10,12,17,23 186:9, 15,18,23,24 190:15, 24 192:5 193:4,9 194:6
**execute**
25:5 114:17 115:23
**exhibit**
81:1,2,6,7,12 100:15,17,18 103:4 122:10,12 146:10, 12,16,24 152:7,8 160:10 165:19,20 168:2,3 171:1 187:4
**exist**
207:22
**existed**
198:7 200:24 208:7
**exists**
201:9
**experience**
83:20 85:20 89:4 125:14 126:8 141:13 189:22 192:16 198:22
**experienced**
151:20
**expert**
191:23
**explain**
34:20 50:19 101:24
**extensive**
126:11
**extra**
36:3 39:6
**extremely**
135:7

**F**

**facility**
32:12
**fact**
12:5 86:20 118:18, 21,22 138:4 150:7 158:12 194:7,8 202:24 214:24
**facts**
109:13 173:11
**fair**
132:7,13,15 136:1,3 157:8
**fairly**
123:23 137:24
**faith**
133:4
**fall**
70:22
**familiar**
10:19 14:8 58:23,24 122:22 189:9 190:20
**Family**
16:9
**feedback**
93:21
**feel**
7:13 8:23 31:13 58:22 132:11 192:22 193:2 194:16,21
**fell**
125:4
**fellow**
26:1
**felt**
37:8 141:9,14 144:5 190:6
**field**
35:19 37:7,15 155:16
**Fifteen**
6:2
**file**
160:8 172:23,24 173:3,7,17 174:13 175:9,15,20 176:4,8, 11,15,17,18,24 177:8,15 178:5,15, 23 179:7,12,13 180:13,24 181:13 187:14,19,21,23,24 188:17
**filed**
170:17,22 176:7,20 178:1
**files**
173:23,24 174:3,7, 16 179:15,20 180:3, 18
**filled**
53:3 57:24 61:6
**filling**
60:21,23
**final**
49:16 175:4,6
**finally**
133:20 190:1,4
**find**
39:18,20 44:21 101:22 122:16 213:21
**findings**
149:2,5 152:1
**fine**
178:2 216:5
**fingerprint**
32:19
**fingerprints**
100:12 110:8
**finish**
201:19
**finished**
17:15
**firearms**
19:24 73:3
**first-hand**
87:18 97:11 107:15, 23 120:24
**flyers**
164:24
**fog**
63:22
**folder**
174:13
**Foley**
156:23

**follow**
24:7,10,14 145:6 167:21 189:13 203:21
**follow-up**
108:9
**force**
149:17
**form**
50:3
**formal**
26:5 49:23 77:23
**formulate**
87:6
**formulated**
66:2
**forty**
192:16
**Forty-one**
85:23,24
**forum**
73:1
**forward**
197:17 203:6 204:19
**forwarded**
38:8 69:17 167:20 203:13 204:6
**forwarding**
199:13
**found**
56:13 71:8 167:18
**frame**
54:14 101:9
**Francis**
214:16,20 215:3,8, 12
**free**
7:13 59:20
**frequent**
164:24 209:10,17
**frequently**
47:22,24 163:9
**front**
148:10
**full**
8:9,15,18
**fully**
102:4

**G**

**gain**
87:21
**gained**
144:6 156:6
**gather**
24:16 85:7 87:5 93:3 107:3 109:12 112:2 127:21
**gathered**
112:1 141:18
**gathering**
101:16 107:14 113:6
**gave**
148:8 199:4
**general**
33:24 34:8 40:12 46:6 100:23 129:22 161:14
**generally**
24:12 29:21 37:6 39:23 40:2 43:22 48:8,11 55:21 59:12 84:12 96:12 98:5 115:1 159:12 192:3
**gentle**
6:23
**George**
14:4 25:20,21 57:8, 21 59:21 60:4 63:7 95:17 102:16 118:11 119:9 162:24 163:11 164:13 189:15 191:8 214:17 215:3,8,13
**Gerald**
156:22
**Germaine**
155:9
**Gidgeon**
14:16
**give**
6:17,20,21,23 7:9,11 8:9,18 19:3 29:13 44:2 45:17 47:2 48:3 52:18 58:18 69:10 87:14 92:6 96:24 107:10 108:23 109:15 140:4 147:20,23 153:23 155:2 165:4 187:8 201:16 210:19,21
**giving**
162:18,22 180:18 201:15
**GIZZI**
71:24 134:7
**good**
5:13,14 6:9 52:16 80:21 87:17 101:17 107:17 134:13 138:3 193:3,8 213:22
**Gormily**
156:16
**grade**
16:22
**graduate**
16:14 18:5
**graduated**
18:7
**grand**
13:1 60:6,7 63:14 94:19 121:7 146:3 147:6,10,14 148:10 151:23
**greater**
43:7
**Grimaldi**
156:7,9
**Gromily**
156:14,15
**ground**
6:8
**group**
13:2 45:6 101:13 133:3
**groups**
72:24
**grow**
15:1
**guarantee**
127:19
**guess**
37:13 54:8 91:14 164:24 191:6
**guidance**
87:15 88:4 95:22 186:4 209:22 210:2, 7
**guide**
129:12
**guy**
98:23 140:17
**guys**
156:3 188:7

**H**

**hand**
37:23 38:4 118:15 133:1 134:22
**handing**
180:18 181:12 185:2
**handle**
21:6,10 34:6 63:4 87:4 92:1,3 185:11, 16 198:14 199:5,9 200:10 201:12,23 202:13,18 203:3,16 204:1,4
**handled**
34:1 49:15,17 111:9 120:12 200:4
**handles**
111:10 117:5 120:18 169:15
**handling**
175:2
**happen**
100:2,10 121:11 159:5 177:18 203:8, 18 204:16 212:2
**happened**
22:22 23:1 27:10 41:5 56:6 112:1 118:12,13,24 119:10 128:4 130:21 142:3 154:23 158:21 160:6 162:20 174:23 189:4,6 192:24 194:19,21
**happening**
44:9 82:19 83:22 93:1 111:23 125:2
**happy**
7:2,14
**hard**
60:12 137:19
**head**
6:21 55:3 60:14 186:21 204:14
**hear**
7:6 39:21 57:14 58:11 97:22 105:2 119:4 120:15 137:13 153:19 163:9 166:6 169:1,11 180:22 185:15 196:15

205:17 214:12
**heard**
109:19 163:6 164:13,20
**hearing**
9:14 58:3
**heavily**
131:15
**heavy**
110:13
**held**
79:10
**helped**
78:12 158:1
**helpful**
147:19
**helpfully**
164:22
**helping**
107:1 214:16
**hierarchy**
86:2,7,10,14 88:7 115:2 137:3
**high**
16:13,15,20 17:17, 18,23 18:8 193:20
**higher**
116:11 186:5
**history**
165:20 170:4
**holding**
128:20 133:1
**Holy**
16:9
**home**
63:1 69:14 95:7 102:23 103:3
**homes**
17:5
**horrendous**
49:14
**hospital**
22:19
**hot**
175:3
**hour**
10:23,24
**hours**
10:10,11 63:5 95:14
**house-break**
92:19
**housebreak**
62:16 65:14,19 67:7, 8,19,23 68:2,12 81:18 92:13 150:16, 17,20,23
**housekeeping**
80:24
**hundred**
208:15

**I**

**ID**
136:17 172:12,15
**ID's**
130:16
**idea**
122:1 138:8 149:23
**identification**
139:7 192:4
**identified**
5:9 63:7,8 95:17 96:2,4
**identify**
72:1
**illegal**
59:14
**imagine**
182:14
**immensely**
78:12
**impart**
31:17
**impartial**
132:13
**importance**
135:17,22,23
**important**
6:16,20 20:1 79:18 84:3,4,17 110:24 112:11,12,14 126:24 127:1,3,6 135:7 137:24 139:7 142:1 157:17 159:21 160:12 162:4,14 172:17 184:22 185:3,8 197:21
**impossible**
88:19
**in-house**
19:21 55:17
**inaudible**
155:4
**incident**
60:11,13 85:10 103:7 129:23 149:3 152:15 154:21 155:24 158:19 163:1,3,12,13 168:12,17 170:16 175:2
**incidents**
24:7,10 163:7
**included**
62:23 82:14
**indecent**
103:12
**independent**
57:7,11,19 60:5 61:3 65:8,11 94:20 102:1 105:23
**independently**
63:20
**Indian**
15:2
**individual**
142:1,3 166:20 172:5 174:1 177:3
**individuals**
29:19 32:5,23 35:13, 24 67:19 83:1,17 84:23 129:19 140:8, 14 141:2 145:7
**inform**
47:14 50:8 51:15 111:24
**informal**
49:16,23 51:7
**information**
71:9 87:5,11,22 88:5 92:9 93:3 101:13,15 104:22,24 105:4,5,7, 11,13 106:3 107:3, 16,18,23 111:24 112:3,17 113:5,6 114:16 115:9 119:21 122:3 127:21 144:6 149:17 150:6 151:21,22 156:6 159:2 160:23 161:2 162:5,11,15,19,22 170:7 175:23 183:12 188:21 190:21,24 193:24 201:16
**informed**
77:14 106:11
**informing**
149:5
**inhibit**
8:14
**initially**
15:2 120:8
**injured**
145:2
**ins**
118:13,24 125:9 164:6 191:8
**inservice**
72:20,22 74:2
**inside**
36:22 150:17
**instance**
149:1 171:7 172:4
**instances**
36:2 37:22 126:10 172:8,10
**instructed**
142:23
**instructions**
203:22,23
**instructs**
7:23 8:3
**instrumental**
123:22
**instruments**
102:22
**insufficient**
194:22 201:16
**insure**
115:8 145:20 183:23 184:17
**insuring**
178:3 184:5,12
**interact**
166:20
**interacting**
144:4 163:15
**interaction**
163:17 166:23
**interactions**
90:24
**interest**
30:12
**interested**
43:24
**interfere**
112:10

**interfering**
87:9
**internal**
197:6 203:14 205:7
**interrogate**
116:15,18,23
**interrogated**
116:24 117:3
**interrogating**
211:24 212:4
**interrogation**
111:14,21 113:9,24 206:8,12 207:2 208:24 209:4,9,21 210:8,15,19,24 211:3,5,10,13 212:23 213:1,9,15 215:4
**interrogations**
113:2,17,18 114:2,5, 10 205:24 206:18, 20,21,22 207:1,6,7, 16,20,22 208:2,8 209:7,16
**interrogatories**
57:24 58:5 60:18,23, 24 61:6 81:8 122:11
**interrogatory**
59:7,11,18 61:20 81:15 94:23 95:5 121:3 157:15
**Interview**
24:15
**intricacies**
94:17
**invasion**
102:24 103:4
**invest**
208:24 215:13
**investigate**
30:17 31:3 204:12, 13
**investigated**
66:19 111:4 151:21 188:14
**investigating**
62:19 65:16 84:24 101:12 120:3 128:6 138:14 161:11 169:4 172:12 173:9 175:13 177:11,12,13 178:22 207:3 212:18
**investigation**
38:6 42:14 57:9 61:23 62:3 63:16 69:9 85:1,16 87:11 92:1 97:16 99:21 101:6 105:16 107:1 110:9,13 124:3 129:13 130:1 145:1 150:8 151:7 160:8 161:5,7 174:22 181:9 184:23 188:11 189:2,12,14 190:14 204:19 209:3 211:16,18 215:13
**investigations**
112:5 207:19 208:20 212:15
**investigative**
61:21 178:5
**investigator**
207:8,9,13,15 209:13,16
**investigators**
88:23 128:15 142:15 176:4
**investigatory**
172:24 173:2,7,16, 24 174:3,7,16 175:9 176:24 178:23 179:7,12 180:3,13, 18,24 181:13
**investing**
142:7
**invoices**
216:4
**involve**
211:18
**involved**
35:21 75:15 76:2 84:6,8,11,12,19,22 94:18 97:7 105:15 108:16 111:14 120:12,18,22 121:1, 18,19 122:6 123:3, 18 129:16 131:3 136:9,11,13,16 141:17 158:1 171:24 181:9 188:10 189:3, 6 197:6 206:22 207:19 214:16
**involvement**
49:20 189:17
**involving**
163:22
**items**
69:15

**J**

**jail**
32:11
**James**
14:8 156:7,9,11
**January**
168:8
**Jared**
214:8
**jared.b.cohen@ mass.gov.**
216:1
**Jeffrey**
14:12
**job**
30:9 55:10,15 82:24 87:5,17 90:24 91:16 93:8,11,13,16,20 97:6 106:7 108:15 109:11 114:17 115:4,8,10,23 127:5, 10,11,14 128:17 132:17 143:23 145:8,16,19 160:17 186:14 207:15 209:10
**jobs**
90:20 91:4,10,17 94:2
**Joe**
88:21
**John**
14:10 123:21 130:3, 4 131:5 132:11 156:17
**joint**
124:22 125:2 174:22
**Jones**
14:8
**Joseph**
59:23 63:2 95:7
**JOYCE**
5:1,6 19:12 22:23 25:1,11 26:6 30:7, 18,22 31:5,10,15,21, 24 35:8 36:10 37:19 38:1,16 39:7 41:23 42:4,20 43:18 45:2, 8,14,19,22 46:11,14, 19 47:4 48:5,17 49:4,7 50:1,11,15 51:6,18,24 52:5,9, 14,16,20 55:12 56:1 58:7 61:8 65:22 66:15 67:5,13,20 68:17 69:4,22 70:16 71:1,10 72:10,14 74:5,14,24 75:5,12, 18,23 76:4 77:24 78:5,15 79:4,11,23 80:4,9,14,19,23 81:3 83:24 84:13 85:2,11 86:3,8,17,23 88:10 89:8,15 90:5,10,21 91:5 92:23 93:14 94:3 96:22 98:3,8, 14,24 99:8,22 100:8 101:20 102:12 103:22 104:12,15 106:6,16 107:24 108:14 109:24 110:3,10,20 111:2, 19 112:23 114:6,18 115:12 116:1,16 117:2,15 118:4 119:22 120:20 121:16 122:14 123:10,13 124:20 125:18 126:5,13,22 127:9,18 128:7 129:8,20 130:23 131:18,24 132:18,23 134:4,9 135:8,18 136:5,22 137:4,11, 18 138:16 139:12, 17,22 140:9 141:3, 10,15 142:12 143:15,21 144:11,22 145:9,17 146:13 151:1 153:3 154:11 158:17 159:23 161:4,13,24 162:13 164:14 165:2,9,15 167:13 168:2,20 170:13,21 172:18 173:4,8,18 174:4,8, 18 175:11,16,24 176:12,16 177:1,5,9, 16 178:6,24 179:8, 14,21 180:4,14,20

181:2,14,22 182:6 183:9,15,19 184:1,7, 19 185:4,19 186:10 188:18 190:16 191:1,13,19 192:7, 13,19 193:6,11,18 195:12,21 196:5 197:4,22 198:8,17 199:6,18,23 200:5, 11,18 202:6,15 203:11,19 204:11,17 205:3,16 206:9,14 208:21 209:11,14,23 210:3,9 211:14 212:11 213:2,10 214:3

**judgment**
190:19 191:3,23

**July**
216:4

**June**
9:24 10:1,14,19 11:2,5,9

**junior**
16:23,24

**jury**
13:1 60:6,7 63:14 94:19 121:7 146:3 147:6,10,14 148:10 151:23

**juvenile**
117:4,7,13,18 118:1 165:23 166:3,9,14, 19 167:12 170:22

**juveniles**
116:15,18,19,24 117:4

**K**

**keeping**
173:16

**Kelly**
63:13 64:18,20 65:3, 9,12 121:6,20 123:9 136:20

**KENEFICK**
5:4 21:24 31:6 43:3 44:10 45:1 65:21 69:3 73:8 76:23 77:6 79:16 86:16 96:14 97:4 111:1 119:23 120:14 126:6,20 128:23 130:24 135:9 141:4 144:10 153:8 171:22 187:15 202:20 213:3

**kind**
14:23 109:20 160:1 177:18 194:22 202:9 206:20

**kinds**
35:1

**knew**
77:19 90:20 91:4 93:20 105:7 135:20, 22 161:3 199:14

**knowledge**
60:5 61:3 70:10 102:2 105:23 115:10,22 120:24 129:22 142:19 186:24 198:5 214:23 215:2,7,11

**L**

**laid**
203:2

**larcenies**
66:21

**larger**
211:18

**Lastly**
7:13

**law**
19:24 20:1

**laws**
20:1,12,22 73:3

**ldesousa@ springfieldcityhall. com**
216:6

**lead**
151:12

**leads**
167:21

**learn**
8:21,24 25:4 31:18 78:9 186:17

**learned**
9:6 151:24 162:23

**learning**
20:3,21 21:1,5,9,12 75:20 186:12,13

**leave**
162:18

**left**
16:23 26:9,12 162:21

**legal**
21:2

**lesser**
195:22 203:16 211:16

**letter**
189:23

**level**
91:7

**Lichwala**
102:24

**lieutenant**
33:7,8,12,22 34:12, 17 35:14 43:2 45:5 47:13,21 48:9 51:16 52:4 55:1 62:15 63:17 64:10,18,24 67:2 68:22 70:2,4,7 76:13 80:6 81:17 83:4 84:5,21 89:12 90:16,17 91:24 92:19 95:21,23 97:3, 18,24 99:3 101:18 104:7 105:4 107:22 108:2,11 109:22 111:16 113:15 114:3,10,14 115:1, 20 119:18 121:13 127:4 135:6,16,20 137:8,14 142:9 143:11,18 150:19 154:18 159:20 160:13 161:1,10,20 164:23 165:8 168:22,24 169:4 174:15 186:20 197:2 198:7,13

**lieutenant's**
97:6

**lieutenants**
44:13,17 46:21 47:2 68:15 71:7 108:6 137:3 157:17

**life**
15:7

**lifeline**
188:4

**limited**
212:23

**lines**
29:18 35:22

**lineup**
63:13 130:14,20 131:7,11 132:13 135:17,24 136:19 137:10,16 138:4,6, 15 140:8,14 171:8, 21 172:2,6,14 214:17

**lineups**
135:1,7 137:23 140:16 171:10,12,14

**Lisa**
71:24 72:11 73:9,20 77:7 91:12,18 98:15 106:22 119:1,12 144:13

**list**
55:19,20 56:14,15 123:19,20 138:7 144:24

**litigation**
8:22

**live**
15:15,17,19 16:4

**lived**
15:6,9

**load**
62:11

**locations**
158:7

**lock**
32:11

**long**
5:21,22,23 6:9 10:8, 21 17:9,12,24 18:13 19:2 22:6 23:5,23 26:23 27:6,7 33:11 34:8 40:23 41:18 53:22 54:1 56:12,16 61:4,11,12 64:6 77:10,11 105:23 150:5 158:15 173:1 195:16 196:7

**longer**
18:18,19 38:3 167:2

**looked**
11:16 132:4,7,14 173:12 179:15

**lost**
28:11 164:15
**lot**
51:11 87:21 88:3 92:5 107:14 129:16 136:6 142:19 144:19 149:24 150:2 153:22 202:8 208:19 212:12
**loud**
62:12 102:12,13
**louder**
57:17
**Ludlow**
15:10,24 16:1
**lunch**
80:22

**M**

**M.P.**
59:13 62:2 63:16
**made**
9:18,23 10:4 29:16 42:7 69:16 98:10 99:2,17 101:14 107:13 112:4 121:21 122:1,8 136:17 139:14 149:19 151:9,14,15,16 155:20,24 169:24 174:13 196:22 197:2 199:21 203:1 205:13
**magnitude**
37:21 84:17 125:24
**maintain**
32:10,14
**make**
7:8 9:22 12:11 20:14 22:19,20,21 32:17 35:17 37:14 42:12, 18 72:1 73:12 88:17 89:19 91:3,9,16 92:8,16 95:24 96:16, 19,20 97:3,6,9,15, 19,20,24 98:2,10,12, 16,18,20,22 99:6 109:17,22 112:18 114:15 115:3,21 125:21 127:5,11,14, 15 132:13 136:3 137:9,16 140:1 141:9,16 142:24 143:6,12,19 145:8, 15 149:20 151:9,13, 16 158:19 161:2 167:19,23 171:17 174:16 176:11 177:14 181:20 183:8 191:2,4 192:1,2 193:14,17,22 194:16,22 195:17 197:16 213:6,23
**makes**
115:6 126:19 177:7
**making**
90:20 93:7,10 96:13 115:9 122:7 134:18 144:2,3 173:2 180:24
**male**
63:7 95:16
**Malibu**
102:17 103:5
**man**
17:4,16 18:11 63:4
**manner**
129:15
**manual**
20:6,7,9 199:1,4
**manuals**
78:2
**mark**
81:3,5 146:11 152:7 165:18 187:3
**marked**
81:8 100:18 146:17 152:8 165:20 187:4
**marking**
80:24 100:16
**Mary**
103:4
**Massachusetts**
15:10 166:2
**materials**
12:6
**math**
61:8
**matter**
30:6,12 112:11,12 147:18 151:18 160:3 192:20
**matters**
9:19
**Mcnabb**
59:22,23 63:2,3 95:7
**meaning**
203:16
**meanings**
202:8
**means**
88:3 104:4 109:14 134:21 150:23
**media**
13:9
**medical**
8:17
**medication**
8:14
**meet**
10:8,13 11:1,4 43:16,21 44:13,19 45:4 47:21 48:1
**meeting**
10:16,21 11:9,10,15 44:23 45:6 51:1 162:10,18
**meetings**
11:9 44:17 45:6 161:2 188:12
**member**
64:4
**members**
13:19
**memo**
205:9
**memorandums**
176:22
**memorialize**
21:19
**memory**
63:21 64:1,13,16 114:3,7
**mention**
157:21
**mentioned**
20:11 24:9 27:23 34:3 35:14,23 39:9 51:2 92:14,15 101:2 129:2 148:14 158:12 214:14
**mentorship**
25:9
**met**
10:5,7 45:12 47:23
**Mezzetti**
14:10
**Mid**
16:3,21
**midday**
27:2 28:13
**middle**
125:12 164:15
**midnight**
22:5,11 23:10 24:5 25:18 26:9,13,15 27:2 28:10,12 43:9 54:18
**midnights**
28:19 158:9
**mind**
135:20
**mine**
170:7 203:23
**minimal**
135:1
**minimum**
212:13
**minor**
50:5 197:11,15,20 205:8
**minute**
58:19
**minutes**
13:1 103:6 153:23 196:9
**misconduct**
196:13,23 197:3,7, 11 198:14 199:5,9 205:13,20
**missed**
80:15 160:5
**mistaken**
194:12
**moment**
133:7
**Monday**
10:17,18
**month**
9:10
**months**
126:4
**morning**
5:13,14 11:6,7 109:7 158:10
**Mortel**
156:17
**mother**
16:5

**move**
15:11 16:2 160:11
**moved**
24:18
**Moving**
171:1
**MP**
61:22
**multiple**
108:9 117:9 119:3 157:4 207:24 208:3 211:19,23
**murders**
66:20
**Murphy**
148:13,16,19,22 149:1 150:11,22,23
**Murphy's**
152:1

**N**

**named**
148:13
**names**
14:7 123:19,20 138:7 157:12,21 158:11
**narrow**
202:10
**nearing**
171:2
**necessarily**
12:7,8 38:4 112:24 148:24 153:5 176:3
**needed**
29:11 37:8 38:13 39:6 48:6,7 89:23 113:5 115:23 129:15 137:9,15 151:14 189:8
**negative**
214:6
**neighborhood**
15:1 163:5
**neighborhoods**
24:8
**news**
170:10 183:1,2,3 186:3
**night**
22:21 40:22 154:23 161:8
**nighttime**
59:22 62:21 63:1 82:13 83:21 95:6
**nod**
6:21
**nodding**
55:3 204:14
**noise**
109:19,20
**normal**
171:10
**notary**
5:3
**note**
48:21 49:13 50:4,21 188:15
**noted**
139:20
**notes**
50:2 210:14,23 211:2,6,8 212:24
**notice**
9:2,3 11:16
**notified**
50:21
**notifying**
119:19 149:8
**number**
43:5 100:9
**numerous**
145:1

**O**

**oath**
6:16 8:5
**Object**
80:19
**objection**
5:4,5 7:11 8:1 19:12 21:24 22:23 25:1,11 26:6 30:7,18,22 31:5,6,10,15,21,24 35:8 36:10 37:19 38:1,16 39:7 41:23 42:4,20 43:3,18 44:10 45:1,2,8,14, 19,22 46:11,14,19 47:4 48:5,17 49:4,7 50:1,11,15 51:6,18, 24 52:5,9,14 55:12 56:1 65:21,22 66:15 67:5,13,20 68:17 69:3,4,22 70:16 71:1,10,20 72:1,10, 11 73:8,9,10,20 74:5,14,24 75:5,12, 18,23 76:4,23 77:6, 7,24 78:5,15 79:4, 11,16,23 80:4,9,14 83:24 84:13 85:2,11 86:3,8,16,17,23 88:10 89:8,15,21 90:5,10,21 91:5,11, 18 92:23 93:9,14 94:3 96:14,22 97:4 98:3,8,14,15,24 99:8,22 100:8 101:20 103:22 104:12,15 106:6,16, 22 107:24 108:14 109:24 110:3,10,20 111:1,2,19 112:23 114:6,18 115:12 116:1,16 117:2,15 118:4 119:1,12,22, 23 120:14,20 121:16 124:20 125:18,19 126:5,6,13,20,21,22 127:8,9,18 128:7,23 129:8,20 130:23,24 131:18,24 132:18,23 135:8,9,18 136:5,22 137:4,11,18 138:16 139:12,17,22 140:9 141:3,4,10,15 142:12 143:15,21 144:10,11,12,22 145:9,17 151:1 153:3,8 154:11 158:17 159:23 161:4,13,24 162:13 165:2,9,15 166:10, 21 167:13 168:20 171:22 172:18 173:4,8,18 174:4,8, 18 175:11,16,24 176:12,16 177:1,5,9, 16 178:6,24 179:1,8, 14,21,22 180:4,5,14, 15,20 181:2,3,14,22 182:6 183:9,15,19 184:1,7,19,24 185:4, 5,19 186:6,10 187:15 188:18 190:16,17 191:1,13 192:6,7,12,13,18,19 193:6,11,18,19 194:4 195:3,12,21 196:5 197:4,22 198:8,9,16,17 199:6, 11,18,23 200:5,11, 18,19 201:1,6,14 202:1,6,15,20 203:11,19 204:11,17 205:3,16 206:9,14, 15 208:21 209:11, 14,23 210:3,9 211:14 212:11 213:2,3,10
**objections**
207:24 208:3
**observation**
93:19
**observing**
93:22 143:24
**obtain**
190:1,4
**occasion**
32:7 43:20 93:22 153:14 171:20 185:9
**Occasionally**
43:19
**occasions**
31:13 36:5 212:3
**occupant**
103:9
**occupants**
62:24 82:15 124:6
**occur**
71:18
**occurred**
63:1 95:7
**October**
194:10
**Odds**
17:7
**off-record**
58:9
**offer**
51:3
**offhand**
26:3
**office**
91:21 116:12 128:12 142:5 182:15 195:18 203:6,24 204:8,20, 24 205:1

**office's**
215:22
**officer**
20:23 21:3 23:14 31:14 38:12 39:5,17 62:17 70:3 73:4,22 81:24 90:4 96:3 101:21 103:21 104:13 109:16 110:19 131:12 135:19,21 138:14 139:11 142:4 148:12,15,19,22 149:1,8 150:11,22, 23 152:1 153:7,13 154:22 167:15,17 170:8 177:11,12,14 194:14 197:14,18 198:15 199:5 200:1, 2 203:7,10,15,18,21 205:2,10,14 212:4
**officer's**
191:24
**officers**
26:2 29:5 30:1,16 31:3,9 32:24 33:3 34:23 35:3,6 37:8, 15,23 39:10 42:7 62:17 63:9 67:11,17, 22 68:9 69:16 72:24 74:7 75:17 96:5,15 99:4,15 101:12 105:15,19,22 106:3 108:13,20 110:24 111:13 112:4 113:14 114:15 115:22 123:4 127:15 128:14,21 129:4,12 130:14 131:2,14 132:12 138:1,9,12,24 141:22 142:1,7 143:6,13,19 149:10, 14,15 150:3,24 151:6 153:11 155:13,24 156:6,20 157:2,15,19 162:4,7 165:13 167:10 172:13 173:10 175:13 178:3,21,22 189:18 196:14 197:3 199:10 200:8,14 201:13,22 202:14,19 204:22 207:3 211:13,17,19,24 212:13,19,22 213:8
**officers'**
103:15 142:22
**official**
23:13 46:3 51:14 69:15 71:21 72:8,18 193:21
**older**
169:7
**on-the-job**
51:10
**ongoing**
124:2
**operating**
23:18 85:19 89:3 159:4
**opinion**
79:1,8 158:23
**Orchard**
15:2
**order**
6:18 47:10 104:22 105:3 127:13 137:16 148:18
**originally**
16:1
**outcome**
112:6
**outlined**
78:3
**over-viewing**
109:14
**oversaw**
32:20
**oversee**
88:14 154:21
**overseeing**
41:9 88:4
**oversight**
32:11 37:12 38:10 41:24 42:2
**ownership**
104:17

**P**

**p.m.**
62:24 95:5 102:14 216:8
**pages**
122:11,18 146:16
**Painting**
17:7
**pairing**
39:5
**pairs**
212:10
**paper**
47:10
**papers**
13:2
**paperwork**
35:19
**paragraph**
190:3
**Pardon**
215:14
**parentheses**
103:6,14
**part**
15:2,4 26:11 42:8 83:2 106:7 108:12 113:23 124:1 130:8 131:19 138:15 139:7 143:18 144:19 145:14,21 160:8 161:7 184:22 185:3 188:22 207:7,9 209:10
**participate**
113:2,8,17 114:10 121:23
**participated**
61:22 114:5 123:1 137:20 211:20 215:3,8,12
**participating**
114:2
**participation**
63:15
**partly**
35:21 143:12
**partner**
113:12
**partook**
21:19
**parts**
73:1
**party**
50:6
**pass**
150:6 190:19 191:22
**passed**
58:5
**passing**
151:9
**past**
132:20 138:23
**Patrick**
155:6
**patrol**
24:6,8 28:6 35:22 36:4 37:8,23 38:12 39:5,10,17
**patrolling**
22:12 23:3 39:3
**patrolman**
23:12,17 26:9,21
**patrolmen**
107:8
**Pearl**
102:16
**pending**
7:15
**people**
89:23 115:2,3,8 129:23,24 131:22 132:3 133:3 135:2 138:20 140:1 145:2, 6 160:14 161:10 165:1 211:9,12 212:10
**percent**
172:16
**period**
126:11
**periodically**
32:17 47:8
**permanent**
53:4
**perpetrator**
63:9 96:3,4
**Perrot**
14:5 57:9,21 59:13, 21 60:4,8 63:7,8 95:17 96:3,4 102:16 118:11 119:9 132:9 162:24 163:11,16, 18,22 164:13,20 168:5,18 169:5 191:8 214:17 215:13
**Perrot's**
63:10 96:5 189:15 215:4,9

**person**
6:5 20:20 34:2,4 42:12 66:22 74:16, 18 77:1 88:7 89:12 96:20 100:6 109:18, 21,23 110:1,8 130:5 132:3 139:20,21 140:3,19,22 165:14 184:11
**personal**
30:6
**personally**
14:4 86:11 125:22 163:15
**personnel**
43:6 73:23 74:1 122:9
**persons**
154:10
**pertain**
177:3
**perviously**
5:18
**phone**
32:17
**photo**
133:5 171:7,9,12,15, 21 172:2,20
**photograph**
32:18
**photos**
13:8 132:14 172:5
**physical**
59:19
**picked**
37:7 131:6
**picture**
132:6
**place**
158:8 181:19 183:8 184:17 197:20 200:9 206:8
**places**
127:20
**plain**
153:10
**Plaintiff's**
60:18 62:14 81:7
**plan**
149:21
**played**
57:8,20
**playing**
85:1
**pocketbook**
63:6,9 95:16 96:5 102:21
**point**
8:11 19:7 25:24 27:12 39:22 40:15 41:3,8 42:17 49:9,11 55:9 56:14 57:10 64:24 117:22 120:22 133:22 144:8 147:17 161:4 168:18 171:5 181:11,15 183:21 184:3,10 196:14 199:16 206:24 209:22
**police**
13:17,20 19:8,10,11, 16,19 20:5,12,22 21:3 22:3 23:14 26:4 32:24 33:3 34:23 56:3,4,9 64:2,10 67:17,22 69:15,21 71:18 72:9 73:4,22 74:7 75:3,7,17,22 77:2,4,13 78:18,20, 24 79:2,3,10 86:1,4 89:6,13,17,18,20 90:13 96:15 100:5, 23 101:17 106:10 107:5,17 111:5 112:15 113:13 117:14 118:2 120:13,19 125:14 126:9 128:14 135:19,20 138:9,12, 14,24 144:8 145:22 149:14,15,24 153:6, 12 158:5 160:8 162:4,21 165:23 166:22 167:2 171:6, 11 179:20 180:2,12 181:20 182:12 183:22 184:22 185:3 186:5 189:22 192:16 193:5 195:5,11 197:3 198:14 199:5 200:1,2,8 201:13,22 204:22 205:12,19, 20,24 206:13,18 212:21 214:21
**policies**
20:4 129:5,6,10,11 171:4 181:19 182:23 195:2,11 196:1,3 199:17,21
**policy**
50:9 51:9,12,14,23 52:4,8,13 69:1 71:6, 11,14 73:12 89:9,11 90:7 128:3,6,9,20,24 129:2,18 135:1 171:17 179:19 181:7,11,24 182:2 183:4 197:19 198:7, 11,13 199:14 200:9, 13,16,24 201:5 203:2 206:4 207:22, 23 209:21 210:1,7
**pool**
102:20
**pose**
7:2
**posed**
7:21
**position**
22:3 23:11 26:20 32:1 53:1,11 56:13, 19
**positions**
52:23 54:15
**positive**
174:23
**positively**
11:20,22
**possess**
139:8
**possession**
102:22
**possibility**
114:12
**potential**
172:6
**practice**
141:8 170:3 171:11 180:1,11 210:13,16, 17,23 212:9
**pre-budget**
215:23
**prepare**
9:16 11:14 13:9,12 158:21
**present**
11:8 99:14 130:16 141:8 160:22 161:1
**preserve**
21:13
**pretty**
85:5 89:2 128:14 131:5,15 136:7 149:16 153:22 173:21 188:11
**prevent**
8:18
**prevention**
65:1,5 111:8 124:4, 12,18 125:5 155:11 172:14 174:20 175:10 188:2,10,16 189:1,10,19
**previous**
30:14 56:6 103:7
**previously**
5:20 83:15 153:18, 20 164:19
**primary**
84:22
**printer**
152:4
**prior**
163:3,6,20 164:2,6 169:5 189:13 215:13,14
**prisoners**
32:10,14
**privileged**
9:21
**probable**
97:9,15,19 98:1,17, 19,20 99:7,10,13,16, 20 101:11,14 102:5 107:19
**problem**
89:1
**procedure**
184:17 215:22
**procedures**
20:4 181:19 183:8, 11,14,18 206:8,12
**proceedings**
63:15 121:7
**process**
37:24 42:18 187:2 197:1 200:3,6 209:20,21

**product**
31:9,14,23
**professional**
30:6,8 50:17
**program**
25:10 75:21
**progress**
167:16
**progressing**
46:5
**promoted**
27:12 28:14,23 29:3 33:7,8,12,22 40:14, 16 41:3,15 47:12 52:3,7,11 53:2 54:17 86:12 89:13
**promotion**
55:17 89:19,20
**pronouncing**
156:10
**proper**
137:10,16 142:24
**properly**
115:23 127:12,14 130:19,22
**properties**
17:5
**property**
20:19 34:1 42:11 62:20 111:11 142:6, 10
**prosecuted**
117:24
**prosecution**
57:21 180:19 181:1, 13,21 182:2,10 183:24 184:6,13,18 185:2
**protect**
144:17,18
**protocol**
178:11
**provide**
8:14 77:23 95:21 208:17 209:22
**provided**
75:16 78:3 107:17 120:10
**providing**
88:5
**purports**
60:9 122:23
**purpose**
158:16
**purview**
70:23 193:13,24 194:3
**push**
50:18 199:17 203:4
**put**
33:23 110:8 112:3 172:23 173:2 177:22 178:4,9 200:8 201:22
**puts**
173:6
**putting**
177:15 178:4,8

**Q**

**qualified**
192:21 193:13,16,23 194:16,22
**question**
7:1,3,6,8,15,16,20, 21,22 30:24 35:10 52:19 73:16 79:6 80:16 86:6 97:22 105:2 106:1 110:18, 19,24 113:1 114:20 119:7 123:16,17 129:3 135:11,14 145:13,14 147:18 148:4 150:10 160:10 161:15,17 164:9 165:4,11 166:7 168:23 178:2 179:10,24 180:7,10, 22 196:3 201:19 202:10 209:19 210:19
**questioned**
110:15,16 120:8
**questioning**
112:9
**questions**
6:13 14:23 35:18 57:14 58:3 77:20 150:7 157:9 161:6 171:2,3 214:2,9
**quick**
214:8,9

**R**

**race**
139:2
**radio**
38:18,20 39:10,21 120:6
**radioing**
39:11
**raise**
7:10
**raises**
8:1
**ran**
187:2
**rank**
149:16 150:1 195:23
**ranking**
55:14 70:3 154:21 193:20
**ranks**
78:9
**rape**
59:13 61:22 62:3 63:16 103:10 125:10
**rapist's**
190:6
**rare**
171:14
**Ray**
171:7,21 172:2,20
**Rays**
171:9,12,15
**read**
5:2,6 58:20 59:1,20 62:8,10 102:11 153:18,20,22,24 158:4,5 187:8,14,19, 22
**reading**
59:2 143:24 182:23
**reads**
82:12
**real**
178:11
**reason**
6:22 8:8 68:23 81:20 82:3,6,18 95:11,18 96:9,11 118:17,20 119:8 121:10 124:8 148:2,9,11 154:4 200:22 207:21
213:22
**reasons**
120:5 178:1
**recall**
13:2 16:22 21:4,7 22:24 23:6 26:1 30:13,14 31:7 39:1 41:4 42:16 60:20 62:2 63:15 64:12 66:2 67:21 68:1 71:3 75:19,24 92:18 101:8 105:21 109:8 111:15 113:18,23 114:2 120:21 126:10 129:21 130:15 131:3 133:14,15 134:1,5,6, 10,11,20,22,23 136:17,18 137:21 138:21 141:11 151:24 153:17 154:12,24 155:12,15 156:4,21,22 157:1, 20,23 158:15 159:6, 19 163:1,10,17,24 164:3 170:1 172:3 174:12,14 175:19 177:21 178:19 179:16 186:7,16 188:13 196:2 198:18,20 199:7 204:3
**receive**
19:10 24:17 46:9,18 47:16 116:15 186:4, 8 205:23
**received**
11:19,23 12:12 19:13 71:17 72:8
**receiving**
182:16,20
**recently**
59:5
**recess**
53:8 81:9 146:18 152:5 196:10
**recognize**
100:20,22,24 147:4, 6 152:10 156:11 158:11
**recollection**
9:13 13:6 57:1,4,7, 11,19 60:3 65:8,11 97:12 115:16 119:15

130:18 132:10 133:19,22 147:11,12 159:9 164:12,19 179:18
**recommendations** 195:17
**reconditioned** 17:4
**record** 58:7,10 81:10 146:19 152:6 165:21 166:3,9,14,17 167:23 196:11
**records** 173:13,15,23 176:6
**recovered** 63:9 96:5
**refer** 60:18 61:17 62:5 81:11 147:16 168:1 189:22 197:9 210:2, 7
**referred** 81:4 150:16 189:1
**referring** 81:14
**refers** 168:12
**refresh** 13:5 57:1,4 60:3 164:12,18
**refresher** 6:10
**regular** 50:17
**relates** 170:2
**relayed** 160:23
**relevant** 71:9
**relied** 131:15
**remain** 167:1
**remember** 9:10 12:23 13:4 18:21 19:15 20:3,17, 21 21:1,5,9,12,22 25:19 26:3 27:4,7,13 33:9,11 34:10 39:2,4 40:16,24 43:13 47:23 53:12,13,22 54:1,3,16,22,24 55:1,4,7 56:18,19,22 57:5 59:2 60:11,21, 22 63:17 64:5,8,15, 17 66:1,6 68:11 74:15 75:15,20 76:1, 5 84:10 94:5,8,11, 13,16,21,22 108:24 113:19 118:11,16 122:4 131:8 134:22 136:10,13 138:5 146:2,4,5,6,21,23 147:9,21 148:12,15 152:1 154:7 155:3,6, 17 156:19 162:24 163:2,15,19,21 164:1,4 179:11 182:16,20,23 194:19 196:6 214:20
**reminder** 6:23 201:18
**remote** 214:5
**repeat** 30:23 35:10 36:11 44:14 46:15,23 52:24 72:5 79:6 82:5 83:14 119:6 129:1 140:10 143:16 165:1 210:4
**rephrase** 7:3 35:12 40:3 79:7 115:18 161:19
**replace** 68:22
**replacement** 56:13
**report** 22:19,20,21 44:9 45:17 49:20,23,24 69:13,15,21 100:18, 23 101:23 102:3,8, 11 104:4,6,9,14,18, 20,21,23,24 105:4,9, 10,24 106:3,12,18, 19 107:11,17 109:1, 16 112:4,7,18 113:7 119:14 123:21 130:19 131:5,15 142:24 152:15,18, 20,23,24 153:2,7,13, 16 155:16,21 156:5 166:23 167:19,20 188:3 191:24 194:10,11,13 197:16 203:5 204:20 213:5, 9,13,15,18
**reported** 65:7 149:1
**reporter** 6:14,18 72:2 201:20 215:18
**reporting** 46:2 50:6 103:20
**reports** 44:3 48:4 49:16 69:6,7,11 87:22 88:17,18 101:15,19 103:16 118:16 131:12 142:22 143:5 144:1 145:11 155:19,23 157:4,6 158:5,13 159:13 167:1 176:22 187:4
**represent** 61:5 168:10 191:7
**representatives** 13:23
**request** 38:17,19 212:24
**requested** 45:23 46:1 87:15
**requesting** 120:9
**require** 135:1
**required** 7:22 21:18 24:7 29:22 31:20 36:9 38:4 42:3 44:8 45:12,16 46:9,17,23 47:2,7 48:3 49:19 50:9 51:16 71:6 73:5,17,18 74:1 79:14 80:2,7,12 207:18 213:8,12
**requirement** 137:9
**requirements** 21:22 137:15
**requires** 125:16
**requiring** 199:17
**resemble** 130:1 140:2
**resembles** 138:18
**residence** 63:10 96:6
**resolve** 37:16
**respect** 150:2,6
**respond** 7:9 22:12 167:10,11, 16 204:10 214:5
**responded** 149:2 150:11 167:19
**responding** 23:4 108:7 150:22
**response** 95:4
**responsibile** 93:7
**responsibilities** 21:2 22:10 23:3 24:4,23 25:3,5 27:15 28:7 29:9 32:4 34:11,16 36:8,14 41:22 43:1 45:21 47:14,19 74:9 77:14 78:4,13,24 79:9,14 80:3,8,13 92:21 98:22 111:18 114:17 115:14,21 143:12,18 144:15,21 145:5,15 160:17,19 182:17 202:13,18 204:10 207:1,16 209:10
**responsibility** 20:22 32:19 37:12 38:9 43:5 65:16 70:1 91:3,8 95:24 97:19, 24 108:12 111:22 112:2 114:15 116:3 120:1 130:13 144:17,20 145:19 152:21 170:7 174:10,21 183:23 189:11 191:4 199:9, 13 201:12,23 202:5, 8,9,23
**responsible** 34:24 35:2 37:1,4 43:6 62:18 67:3 83:4 88:8,13 90:18,19

96:13 101:19 116:10 119:19 127:5 150:14 153:1 167:3 173:1, 16 176:10 180:17,23 181:12,16 184:5,12 190:20 195:1,8,10
**result**
103:3 106:12 118:23 119:10
**retire**
53:20
**retired**
54:4 56:8 135:21
**retry**
65:23
**return**
15:13 53:14
**returned**
15:14 53:10
**revealing**
9:20
**review**
11:14 13:8 31:8,14 49:10 58:19 69:8 88:18 99:6,12 101:19 147:2,14 157:6 174:16 180:12 195:17 196:9 212:23 213:7
**reviewed**
12:24 105:21 155:19,21,23
**reviewing**
123:15 138:10 147:15 154:2 155:17 176:10 187:11 195:10
**road**
161:8
**robberies**
34:5 66:20,21
**robbery**
59:24 102:19,20
**Robert**
14:14
**Roebuck**
18:24
**role**
23:17 55:4,7 57:8,19 79:10 85:1 139:11 143:17 195:15
**roles**
67:18
**Ronald**
155:9
**room**
112:9 121:22 122:5, 6 135:2 142:6,10 211:24 212:4
**rooms**
122:8
**rule**
55:21 89:10 212:7, 17
**rules**
6:8
**run**
182:13 185:9
**running**
74:23 75:3

**S**

**sake**
151:18
**SAKOWSKI**
209:2
**Sapelli**
59:24 63:6 95:15
**satisfaction**
92:3
**satisfactorily**
5:9
**satisfied**
49:17 99:16 127:24 130:19,21 132:11 133:2 138:3 151:17 172:15
**Scanlon**
123:21 130:3,5 132:12
**Scanlon's**
131:5
**scene**
87:23 107:9 108:13, 20,22 109:14,22 129:14 167:10,11,16
**scenes**
149:15
**sched**
42:7
**school**
16:6,8,9,13,15,20 17:17,18,20,22,23 18:8,12
**schools**
116:6
**scope**
116:4
**Scratch**
169:2
**Sears**
18:24 19:6
**seasoned-detectives**
85:18
**secretary**
176:6
**section**
189:23
**securing**
121:22
**select**
56:16 131:22 139:10 140:14
**selected**
55:10 56:15 121:14, 19 132:3 142:18
**selecting**
129:18
**selection**
139:14
**self-actuated**
85:14 87:7
**self-sufficient**
114:20
**seminars**
128:11
**send**
22:18 203:1 205:9 216:4
**senior**
55:14,22 78:11 186:18
**seniority**
55:21
**sense**
115:6
**sentence**
82:10,11,12 95:4 121:2 196:16,18
**sentences**
191:3
**separate**
65:4,7 73:24
**sergeant**
25:8,23 26:2 27:12, 16,22,23 28:10,14, 18,23 29:3 32:4,22 33:5,12 34:17 50:10, 13 51:15 54:17,22 63:13 64:18,20 76:10 80:11,17,18 90:18 96:18 113:10 116:14 121:5,20 123:8 136:20 186:17,18
**sergeants**
34:22 35:3 37:5 47:22 48:3,10 67:4, 18,24 68:21 83:5,12 86:21 91:9 92:12 94:24 95:24 137:3 154:19
**series**
64:8 83:21 125:3,4, 7,15 126:3,12
**serve**
79:3
**served**
56:12
**service**
55:16,18,19 56:15
**serving**
75:14
**set**
72:13 109:5 133:20 214:16
**setting**
6:4
**severity**
37:21 203:13,16
**sex**
111:9 116:7 119:20 120:12,18 124:14,15
**sexual**
34:6 64:14 124:6,13 174:24
**shaking**
186:21
**share**
74:9
**shared**
188:21
**sharing**
188:22
**Sheileen**
59:24 63:6 95:15
**shift**
22:5,11 23:10 24:5

25:19 26:10,13,14 27:2,3,4,5,8,11 28:13,14 34:14 40:10,22 54:18,20 113:12 154:16 155:1 156:3,4,18 167:22 188:5
**shifts** 154:19 158:8
**short** 83:23
**shorter** 18:20
**shortly** 159:16
**show** 31:20 56:24 57:3,6, 23 100:14 107:18 146:10,24 164:22
**showing** 64:16
**shown** 172:5
**shows** 143:5
**sick** 35:20
**sides** 123:10,11
**sign** 5:2,6 104:6,14
**signature** 103:18 104:1,3
**signed** 61:2 101:1 104:3,8,9
**significant** 50:24
**similar** 6:4 131:22 132:4 139:2 140:16,17,18 190:7
**simultaneously** 41:6
**single** 45:5 89:19,20
**sit** 112:8,21
**sitting** 93:17
**situation** 22:16 175:22 177:18,19 192:10 211:10
**situations** 84:16
**skill** 73:4
**skip** 82:10
**slot** 53:3
**snatched** 63:6 95:16
**society** 144:17
**soft** 134:17
**sole** 37:12 144:20
**solve** 126:3,11 143:13,19 144:8 145:5
**solving** 145:7
**somebody's** 142:20
**sort** 8:13 24:17 25:9 54:13 71:5 209:20
**Sotiroeous** 14:20
**sound** 10:19 14:8 54:7
**span** 83:23
**SPD** 195:1,4
**speak** 13:19 24:15 48:23 49:2 57:16 150:5 160:4 183:5
**speakers** 117:9 119:3
**speaking** 93:23 96:12 107:2 152:16
**specialized** 79:22 80:2 116:5,22
**specific** 17:8,20 20:4,12,22 50:10 80:3,7,8,12 96:20 100:22 176:2 206:5
**specifically** 59:18,20 61:20 69:16 129:23 150:15 158:11 210:22
**spoke** 48:19,23 105:22 158:13
**spoken** 13:22 14:1
**spring** 190:6
**Springfield** 13:16,20 15:3,4,6,9, 13,14,21 16:2,6 17:23 18:7 20:4 64:2,14 179:20 180:2,11 181:19 183:22 186:5 195:5, 11 206:13
**squad** 62:16,18 65:14,19 66:24 67:7,9,12,19, 23 68:2,12 69:6 71:8 81:18 92:13 150:16, 17,20
**squads** 69:18,21 70:11,13, 23,24 71:7
**squat** 92:19
**St** 155:9
**stage** 85:4 133:11
**stake** 111:13
**stand** 64:1,5 143:22
**standard** 159:4
**standing** 44:23 47:9 85:13 87:2
**start** 61:18
**started** 19:15 22:3 27:5 54:19 72:9 125:11
**starts** 75:7 82:11
**state** 166:1
**statement** 210:20 213:16,17,20
**statements** 59:19 103:15
**states** 5:10 102:3
**station** 100:5 106:11 107:12 109:18,23 110:2,5,6 120:13,19 141:18 214:21
**stature** 139:2
**status** 161:3 205:8
**stay** 173:24
**Stelzar** 81:24 102:3,15 104:23 105:5,11 106:4
**Stelzer** 62:17
**stem** 102:23
**step** 99:20
**steps** 110:9
**stick** 103:9,11
**stipulations** 5:1
**stole** 69:14
**stolen** 102:20 103:11
**stop** 16:19
**stopped** 16:22
**straight** 19:9 38:13
**street** 27:18 28:3,5 37:11 63:2 95:8 102:16 103:1 108:10 120:4
**strike** 39:3 44:15 65:24 95:22 96:1 135:14 171:19 206:6 211:11 213:23

**string**
64:14
**struck**
63:4
**structure**
149:16
**studying**
19:24 20:12
**stuff**
116:3 189:12
**subject**
140:3 190:1
**submit**
167:23 188:4
**submitted**
105:10 157:5
**subordinate**
70:1 162:18
**subordinates**
162:10 196:23 213:15
**subsequent**
21:10 59:22
**substance**
9:20
**substantiated**
204:16
**sufficient**
50:7,21
**summaries**
158:5,6 159:3,5
**summary**
103:15 112:18 152:8,15,18,20,23 153:2,7,13,16 154:5 156:20 157:7,24 158:16 159:1,8 160:7 173:11 188:5
**supervise**
33:2 34:22 35:15 48:16 49:3 83:1 87:14 88:2,3 127:11 132:17,20,22 133:2 141:2 143:13 154:19 165:6 172:1
**supervised**
27:24 29:5,8,19 34:13 35:14 64:17 86:21 141:22 160:14 200:9 202:14,19
**supervising**
32:13 35:6,9 65:12 67:3 83:4,18 84:23 85:4,10 87:2 88:8 90:18 92:14 101:21 106:5,21 107:3 108:13,18,19 109:13 115:1 127:16 129:5, 16 132:3 133:6 136:21,23 145:6 148:15,19,23 151:6 161:10,21 170:5 174:2,6 177:14 178:23 179:7 201:23 212:22
**supervision**
27:18,21 88:6 108:16,21 145:22 149:23 151:8
**supervisor**
25:8,17,23 28:3,4,5, 8 29:10 69:5 78:10 82:22,24 87:3 88:22 91:6 93:5 106:14,18 108:11,17 109:2,11 110:22 113:9,11,13 115:14 116:9 120:1, 2,7 126:9 129:14 130:10,12 132:16 136:2,24 137:7 138:2 140:24 141:13 144:4 145:15,20 149:6 151:11,13,19 152:22 153:1 154:17 156:1,2 165:12 173:12 175:18 177:11 178:3 180:3 181:6 187:13 189:21 190:13 196:13,22 199:9,22 200:17,24 207:12 212:21 213:17
**supervisors**
74:8,11 92:8 107:8 113:7 129:12 137:1 149:20 150:3 180:12 186:14
**supervisory**
129:14 149:19
**suppose**
66:12 75:6 108:18 211:17 212:14
**supposed**
78:8 79:2 86:21 96:20 127:17 176:23 182:9 200:10
**suspect**
99:24 112:9 131:23 132:4 139:21 140:7, 13 161:12,22 162:2, 11 163:4 164:2,6 165:6,14 170:4 172:6 190:5 191:9, 11,15,19 192:5 206:21 207:1,17 212:5
**suspects**
160:22
**Swinger**
14:18
**sworn**
5:9 73:23 74:1
**system**
167:2

**T**

**tag**
141:23 142:2,24
**tagged**
141:19 142:4 143:4
**takes**
139:4
**taking**
8:13 23:4 77:15 87:1 113:23 161:5
**talk**
13:12,16 30:1 70:24 151:10
**talked**
71:15
**talking**
13:11 30:11 51:11 53:10 63:19 98:4 106:2 166:13 168:14 189:12,15,17 197:15 212:21
**target**
130:1
**tasked**
207:11
**tasks**
61:22
**taught**
182:5,8,11 185:23, 24
**teach**
25:14
**Technical**
16:13,14,19
**Television**
186:3
**telling**
60:11
**ten**
33:16,17,18 209:7
**tending**
145:1
**term**
211:16
**terms**
21:23
**testified**
29:1 51:4 63:14 82:21 83:3,10,15 121:7 131:21 146:8, 23 147:9 148:10 151:22 157:10,18 160:13 165:22
**testify**
146:7
**testifying**
146:3,4,5,21
**testimony**
8:10,15,19 60:6,7 94:19 128:19 147:7, 14,21 148:3,7 150:10 169:22 178:20
**the'80s**
55:2
**thing**
7:5,19 47:9 58:21 60:13 88:5 131:17 140:1 147:2 148:1 171:14 174:20 178:13 182:12 188:23 195:9 196:18,20
**things**
17:5 29:17 35:1,20, 22 43:22 74:10 89:24 100:9,13 107:6,8 115:17 116:8 128:11 129:17 136:7 173:6 197:15 199:17
**Thomas**
63:13 64:18,20 65:3, 9,12 121:5 123:8 155:3

**thought**
43:24 50:23 92:2 107:14 185:8 214:14
**time**
5:21,22,23 6:9 7:11 9:6 12:10 16:4 18:14,18,23 20:2 23:5,21 28:23 30:2 45:10 47:13,17 49:18 51:9,13,15 52:16 54:14 55:14, 22 56:10 57:10 58:17 60:12,16 61:4, 12 62:14,21 64:6,13 68:18,19,20 69:14 74:21 77:10 79:19, 20 80:22 82:11,12, 19,22 83:23 87:24 90:8,9,13 92:7,19 106:24 108:11 109:6,7 126:11 127:24 128:12,13 135:21 137:22 147:3,20 150:5 154:13 158:9,15 159:14 162:8,23 170:1 171:6 184:15 188:24 196:7 205:11,19 212:1
**timeframe**
9:10
**times**
44:19 50:5 63:4 113:10 130:7,8 143:10 149:21 154:14 211:22 212:12
**Timmerman**
14:14
**today**
6:15,19 8:6,10,19 9:17 91:23 117:8 178:10,21 216:3
**Todd**
14:18
**told**
21:18 28:12 77:17, 18 105:11 140:18
**top**
86:14 102:7,9 124:1
**topic**
140:20
**total**
38:9
**touch**
127:21
**tour**
30:14
**track**
28:11 42:6 128:2
**Trade**
17:23 18:8
**train**
73:2 92:6 116:6
**trained**
21:15 51:5 92:2 128:15 176:14
**training**
19:11,13,21,22,24 21:8,10 24:17 26:1,5 47:16 50:17 51:2,8, 10 71:16,17,22 72:8, 17,18,20,22,24 73:1, 14 74:2,4 75:21 77:23 80:2 85:19 91:21 92:5 116:4,5, 15,18,22 182:16,20 186:9 205:23
**trainings**
51:3 73:6,17 74:13, 23 75:4,11,16 76:3, 7,9,12,15,18,22 77:5 79:22 80:7,12 128:10
**transcribe**
6:19
**transcribing**
6:15
**transcript**
146:16 215:19
**transferred**
23:9 41:4,8
**tremendously**
171:10
**trial**
13:1
**trouble**
46:22 63:22
**troubled**
165:11
**true**
124:9 158:4
**trust**
128:16 143:23
**truthful**
6:17
**turn**
142:20,23 175:8
**turned**
166:4,9,20 175:9,15 182:1,9,14 204:19
**turns**
166:14
**twelve**
26:15 155:1
**twenty**
6:2
**type**
13:9 19:10 20:17 36:19 42:18 44:3 45:17 47:16 50:9,10 66:23 92:21 110:18 176:21,23 197:12
**types**
34:4 116:7

**U**

**uh-huh**
6:21
**ultimately**
69:24
**um-hmm**
6:21
**unarmed**
59:23
**underneath**
88:8 98:1 103:24 104:2 115:22
**understand**
7:1 8:5 12:11 37:14 41:21 46:4 86:1,7 92:17 134:13,19 135:6,17 143:1 161:6,17,18 170:14 173:14 188:12 207:5
**understanding**
23:16 46:6 47:18 54:14 79:20 85:8 88:15 109:15 134:13 160:16 165:11 170:19,24 188:24 193:3,7,9
**understands**
151:10
**understood**
7:21 73:16 90:11
**uniform**
27:20 28:8 29:6 30:1,17 31:3,9 32:5 33:5 35:3 41:7
**uniformed**
22:5,11 23:7 24:18, 24 27:17 29:2 35:6 40:21 68:7 69:16 86:12 90:4 151:3 153:6 170:9
**unit**
39:16 65:15 66:4,7, 9,11 130:9 145:23 150:17
**units**
42:10,13 65:4 66:13, 17,19 69:19
**unofficial**
202:18
**unusual**
108:9
**upcoming**
12:6
**update**
159:10
**updated**
196:4
**updates**
46:9,18 47:2
**updating**
195:1,10
**upper**
158:19
**ups**
123:18 186:5

**V**

**vacations**
34:24 35:20
**validity**
104:10
**variables**
210:20
**varied**
68:18
**varies**
96:23 97:1
**verbal**
6:20,22 101:15 105:16
**victim**
24:16 36:22 139:10

140:18 166:24 172:5
**victim's**
140:6,12
**victims**
126:1
**view**
87:18
**violation**
169:14
**virtue**
69:18 121:1
**visual**
131:17
**visualize**
60:13
**voices**
190:6
**voluntarily**
25:14

**W**

**wait**
112:11,13 168:11
**Waive**
5:2
**wanted**
31:16,17 87:17
98:12,16,18
**watch**
25:23,24 38:8 43:8,9
156:3
**weapon**
103:8
**wee**
210:15
**week**
10:2,3
**weeks**
9:4,5,9,11,12,14
12:21 19:21,23
**well-trained**
87:16 90:23 91:4,9,
17
**whatever's**
212:8
**whatnot**
144:2
**whatsoever**
113:19 181:11
**white**
63:7 95:16
**who've**
145:2
**wide-based**
88:5,6
**wife**
63:2 95:7
**William**
14:16
**wind**
142:6
**witnesses**
24:15
**word**
164:15 191:21
**words**
51:8 169:11
**work**
17:3 18:10,13 19:7,9
21:16 25:16 27:5
31:8,14,22 34:14
35:18,23 36:1,2 38:3
40:13,19 42:8 69:2
89:13 101:17 107:5
112:15 115:7 125:16
126:2,10 145:22
155:18 156:7 157:18
160:18 182:12
207:7,9
**worked**
17:2,4 18:22,24 32:6
36:5 41:5 65:5,6
68:12 113:13 119:20
151:2,3 154:8,9
155:4,7 157:10,15
162:7
**working**
17:16 18:9,11 19:5,
16 23:14 46:7,12,21
47:3 48:10,12 65:3,9
79:19,20 85:5,14
92:12,13,21 93:2
96:17 99:5 113:11
114:15 119:18
124:18,21,24 130:11
136:19 148:12,18,22
149:10 150:1 155:1,
12,14 156:19,21,22
163:19 188:7
**works**
149:24 215:22
**write**
44:8 105:4,9 152:22,
23 153:7,13,15
157:7 203:5 210:14
213:9,15
**writing**
49:20 152:17,20
153:2
**written**
45:17 48:4 105:17
202:9,12
**wrong**
51:4,13 129:9
**wrote**
104:11 106:12,15,
18,19 152:22 155:16
156:5 158:5

**Y**

**year**
9:24 16:14,23,24
19:15 22:7 27:4 33:9
41:2 53:20 72:20
74:2,4 90:4
**years**
5:24 17:10,11,13,14
18:1,2,3,15,16 19:3
24:1 26:24 27:9,14
33:14,16,17 51:11
54:3,7,9,10,11,12
61:7,10,15 83:20
85:22,24 89:3,5,12
94:12 162:20 178:19
192:16,24 198:21
**yesterday**
5:2 216:3

**Z**

**zoom**
147:22