**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 49

# In the Matter of:

*George Perrot vs*

*Thomas Kelly, et al.*

---

*Andrew Canevari*

*July 21, 2023*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*

O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO. 18-cv-10147
*************************************************
GEORGE PERROT, *
Plaintiff *
v. *
THOMAS KELLY, THOMAS JARVIS RICHARD KANE, *
CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN, *
THOMAS KENNEDY, CHIEF ERNEST STELZER, *
MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAIN,*
ANDREW CANEVARI, CHERYL CLAPPROOD, CAPTAIN *
JOHN BROWN, UNKNOWN OFFICERS OF THE SPRINGFIELD *
POLICE DEPARTMENT, the CITY OF SPRINGFIELD, *
MASSACHUSETTS, and FRANCIS BLOOM, *
Defendants *
*************************************************

DEPOSITION OF: ANDREW CANEVARI
APPEARING REMOTELY FROM:
BRADENTON, FLORIDA
July 21, 2023 10:06 a.m.
Brenda M. Ginisi
Court Reporter



REMOTE APPEARANCES:
Representing the Plaintiff:
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
BY: CARLA AGBIRO, Esq., pro hac vice
and GIANNA GIZZI, ESQ.
(312) 243-5900
E-mail: agbiro@loevy.com
ggizzi@loevy.com
Representing Thomas Kelly and Marianne Popko:
PHILIP C. CICCARELLI, ATTORNEY AT LAW
55 N. Pleasant Street
Amherst, Massachusetts 01002
BY: PHILIP C. CICCARELLI, ESQ.
(413) 230-3255
E-mail: philip@ciccarelli.law
Representing Thomas Kelly and Cheryl Clapprood:
LAW OFFICE OF ROBERT A. SCHMIDT
One Monarch Place, Suite 370
Springfield, Massachusetts 01144
BY: ROBERT A. SCHMIDT, ESQ.
(413) 732-0347
E-mail: attyschmidt@gmail.com



REMOTE APPEARANCES CONT'D:
Representing Andrew Canevari; Thomas Jarvis;
Paul Glantz; Ronald St. Germain:
KEVIN COYLE, ESQ.
C/O NAGE
1299 Page Boulevard
Springfield, Massachusetts 01104
KEVIN B. COYLE, ESQ.
(413) 787-1524
Representing Charles Arpin:
REARDON, JOYCE & AKERSON, PC
4 Lancaster Terrace
Worcester, Massachusetts 01609
BY: AUSTIN M. JOYCE, ESQ.
(508) 754-7285
E-mail: ajoyce@rja-law.com



REMOTE APPEARANCES CONT'D:
Representing the City of Springfield:
CITY OF SPRINGFIELD
Springfield City Law Department
36 Court Street, #210
Springfield, Massachusetts 01103
BY: LISA DESOUSA, ESQ.
and TYLER J. KENEFICK, ESQ.
(413) 787-6085
E-mail: ldesousa@springfieldcityhall.com
tkenefick@springfieldcityhall.com
Representing the City of Springfield:
D'AMBROSIO LLP
185 Devonshire Street, 10th Floor
Boston, Massachusetts 02110
BY: PAUL M. TELLIER, ESQ.
(617) 720-5657
E-mail: ptellier@dambrosiollp.com

APPEARANCES CONT'D:
Representing Francis Bloom:
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place, 19th Floor
Boston, Massachusetts 02108
BY: JARED B. COHEN, ESQ.
(617) 963-2833
E-mail: jared.b.cohen@mass.gov
Representing Richard Kane:
MORRISON MAHONEY LLP
Tower Square
1500 Main Street, Suite 2400
Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQ.
(413) 737-4373
E-mail: clynch@morrisonmahoney.com



I N D E X

WITNESS: ANDREW CANEVARI

EXAMINATION BY: PAGE:
Ms. Agbiro 7

EXHIBITS: PAGE:
Exhibit 1, Property Receipt No. 51465..........74
Exhibit 2, Property Receipt No. 50320..........90
Exhibit 3, Property Receipt No. 50323..........96
Exhibit 4, Property Receipt No. 50321..........98
Exhibit 5, Property Receipt No. 50322.........100
Exhibit 6, Property Receipt No. 50324.........101
Exhibit 7, Report, September 22, 1985.........103



ANDREW CANEVARI, having first been identified by the production of his driver's license, duly sworn pursuant to Executive Order 144, testified as follows:

EXAMINATION BY MS. AGBIRO:

**Q. Good morning. How are you?**
A. Good morning, Miss. I'm fine. Thank you.
**Q. Can you please state and spell your name for the record.**
MR. COYLE: Before we start with questions, could we just agree that we're going to use the usual stipulations; an objection by one is an objection by all?
MS. AGBIRO: Yes.
MR. COYLE: Okay. Just have that on the record.
**Q. (By Ms. Agbiro) Mr. Canevari, can you please state and spell your name for the record.**
A. First name Andrew, A-N-D-R-E-W.



Last name Canevari, C-A-N-E-V-A-R-I.
**Q. (By Ms. Agbiro) Okay. Thank you. Have you given a deposition before?**
A. I did one probably 25, 30 years ago, maybe.
**Q. Okay. And what case was that for?**
A. That was a case -- an out-of-state case where a gentleman was arrested for murder in Vermont and he led investigates to believe that a vehicle and the murder weapon had been left in Springfield in a parking lot on Boston Road. And I was dispatched up there to look at the vehicle.
**Q. Okay. You said, that was 20, 30 years ago?**
A. It was a long time ago. And I don't remember the defendant's case. The defendant's name who was on the case.
**Q. Okay. And was that the only time you were deposed?**
A. The only time I can recall yes, ma'am.
**Q. Okay. And I'm assuming that wasn't during Zoom, correct?**
A. That is correct. That was in

Page 9

person, yes.
**Q. Have you testified in court before?**
A. Oh, yeah. Hundreds of times, yes.
**Q. Hundreds of times. Okay. And this was all -- and how many times did you testify in court throughout your career at the Springfield Police Department?**
A. How many times?
**Q. Yeah.**
A. All I can say is hundreds. Perhaps, in the thousands. I don't know. Just -- I mean it's just what I do. I testified a lot. I had a lot of cases.
**Q. Okay. All right. So I know that you've been sworn to give testimony a number of times, and I know that you've been deposed a couple of times -- I mean, at least once. I'm sure you're familiar with the procedure here. But I still want to go over everything, especially, because we're doing this over Zoom. All right?**
**So first things first, the answers that you give today in this deposition are going to be under oath, as you would in a courtroom with a judge and a jury.**

Page 10

**Now, we do have a court reporter here to transcribe the deposition today, because of that we ask that you please give verbal answers so that way the court reporter's able to take down everything that you say and that I say.**
**Also, I also want to remind everyone to speak slowly because if we speak too fast, then, the court reporter won't be able to take everything down. And we also need to be mindful of allowing each other to finish our sentences before we jump in. Okay?**
**Okay. And it's also good if you can give a slight pause before you answer, just in case any attorney wants to make an objection.**
A. I understand.
**Q. Now, if your attorney -- your attorney will, likely, object periodically. However, unless your attorney instructs you not to answer, you have to answer the question.**
A. Okay. I understand.
THE COURT REPORTER: Can I just interrupt and just say, Mr. Canevari, can you move a little closer to your computer just because you're a little muffly. And

Page 11

if we get going I don't want to interrupt everybody.
THE WITNESS: Okay.
THE COURT REPORTER: Okay. Go right ahead.
**Q. (By Ms. Agbiro) And if you need a break, you can ask for a break at anytime. However, I do ask that, if you ask for a break, you answer any question that I have pending before we go for a break. Okay?**
A. (nonverbal response)
**Q. All right. Do you understand these rules?**
A. Yes.
**Q. Do you have any questions?**
A. No, ma'am.
**Q. All right. Now, this deposition's being conducted over Zoom, so obviously we have some type of issues with technology. If, by chance, you do not hear what I ask or you do not understand me, or the audio drops out, please let me know. I'm more than happy to reask the question. Okay?**
A. (nonverbal response)

Page 12

**Q. All right. Now, is there any reason why you're aware -- is there any reason that you're aware that might prevent you from giving honest and accurate testimony today?**
A. No.
**Q. Do you have any medical conditions that might interfere with your ability to provide your full and complete testimony today?**
A. No.
**Q. Do you have any medical conditions that are related to your ability to testify?**
A. My ability to testify, was that your question?
**Q. Yes.**
A. No, I do not.
**Q. And are there any other medical conditions that might impact your memory?**
A. Old age. Is that a medical condition?
**Q. I don't think so. Okay. Now, where are you currently located? I know that you stated earlier that you're in Florida. But where, exactly, are you located right now?**
A. I'm in my home in Florida. I gave

Page 13

the address.
**Q. Now, is there anyone else in the room with you right now?**
A. No. Not in this room, no.
**Q. Okay. Now, I do ask if someone were to come into the room that you let me know.**
A. Okay. If anybody does come in it'll be a five-year-old grandson. So you'll have to forgive us if he does charge in here. But I'll get him out as soon as possible.
**Q. That's completely fine. Thank you for the heads-up. Are you looking at anything on your computer screen right now other than the Zoom screen?**
A. No.
**Q. Are there any documents right now currently displaying on your screen?**
A. No.
**Q. Are you looking at any documents right now that are printed out in front of you?**
A. I have some documents here, yes. But I'm not looking at them at the moment.
**Q. Are those documents related to this case?**

Page 14

A. Yes.
**Q. What documents are in front of you right now?**
A. They're documents that I authored some years ago. They would be a report, short report, to Captain Stelzer, and another report to Captain Stelzer. These were authored on 9/22/85 and 9/23/85. Also, a copy of property slip No. 50322, No. 50321, No. 50323, No. 50324, No. 51458, and No. 51465.
**Q. Okay. Where these documents given to you by your attorney?**
A. Yes. They were sent to me by my attorney, yes.
**Q. Okay. Do you have anything else in front of you?**
A. No.
**Q. Okay.**
A. I'm at my desk so there's stuff here, but not pertaining to this case.
**Q. Okay. Are there any messaging or e-mail service right now open on your computer?**
A. In the background in the screen there's something by that has to do with my

Page 15

log-on. I might have done it incorrectly and left that up there. But other than that, no nothing.
**Q. Okay. All right. That's fine. Mr. Canevari, do you understand that you're here today to testify about the investigation that led to the conviction of George Perrot in 1985?**
A. Yes.
**Q. Now, you have been served with a complaint in this case, correct?**
A. I have been served with a complaint, is that your question?
**Q. Yes. In this case, correct?**
A. Are you talking about something I got in 2018?
**Q. Yes. Most likely.**
A. Yes. I have that in a file, yes. I was served.
**Q. Okay. And did you get a chance to review that complaint?**
A. Not recently. But I recall getting it.
**Q. * Okay. And do you understand that the investigation led by the Springfield Police Department contributed to the wrongful conviction**

Page 16

**of George Perrot?**
MR. COYLE: Objection as to form.
MS. DESOUSA: Objection. I'm objecting and I asked you to clarify the question. I thought I misheard it, but I guess I didn't.
MR. COYLE: Objection.
MS. AGBIRO: Are you objection -- joining, Kevin, or are you raising a different question?
MS. DESOUSA: I'm raising an objection to an opinion question of an expert witness. But you can go ahead.
MS. AGBIRO: Okay.
**Q. (By Ms. Agbiro) All right, Mr. Canevari. I apologize. You can answer the question.**
THE WITNESS: Would you repeat the question, please.
MS. AGBIRO: Court reporter, you can read the question.

* (Question read, page 15)

THE WITNESS: I don't know if I understand that. I understand that he was convicted. He was sent to jail. And that he was recently been -- his conviction has been overturned. So I do understand that.

**Q. (By Ms. Agbiro) Okay. And you understand that you've been named as a defendant, not as a witness, in this case, correct?**

A. I do, yes.

**Q. All right. Do you know an individual -- did you ever work with a detective named Jarvis?**

A. Worked with? Side by side on a case? I don't believe I did. I don't think we ever worked in the same cruiser on the same investigation.

However, Tom Jarvis was on the job before I went on the job by, at least, a few years. He always preceded me on shifts. In other words, when I was on the dog watch he was on four to 12. And when I went on four to 12 he was probably on days.

So I understand he was a detective in the house-break squad on days in the detective



bureau at the same time that I was a detective sergeant and shift supervisor on the second shift, four to 12 or six it two, in the same bureau. So that I would work in conjunction with each other but not directly with each other, so that's fair to say.

**Q. So just to make sure I understand you clearly, you're testifying that Jarvis -- you guys worked in the same bureau. However, Jarvis worked a different shift?**

A. Yes.

**Q. Okay. And at the time that you're stating right now, you were a sergeant?**

A. Yes.

**Q. And Jarvis was a detective?**

A. Yes.

**Q. Okay. Were sergeants responsible for supervising detectives?**

A. Yes.

**Q. Did you ever supervise Jarvis?**

A. I can't recall ever directly supervising him.

**Q. Did you ever work on the same cases at Jarvis, even if it wasn't at the same time.**



A. Well, it's possible. A lot of -- my involvement in a case would, most likely, be if I picked up on the case shortly after it occurred -- let's assume that Tommy Jarvis, Thomas Jarvis, was a detective investigating house breaks and he worked on days, if a house break occurred on my shift and I went and investigated that night, I would write a report not to Thomas Jarvis. I would write to Captain Stelzer or whoever was in charge of the detective bureau.

And he might, in fact, take that report and give it to Thomas Jarvis, because Thomas would eventually be assigned that case. To handle that case and see through to whatever natural conclusion it could, whether a conviction or not being able to solve.

So that's kind of the way it happened. If I had something that I picked up on at night, I would turn any evidential -- I would return them to Captain Stelzer, unless I was able to make an arrest. And if I did that, I would create a folder, request a complaint, and then it would go through its normal course.

**Q. Okay. When you say "normal course,"**



**what do you mean?**

A. Well, I mean, that it would be brought to the court in the morning, whichever court was going to handle it. And they would issue a complaint or not. So that's kind of what's -- the job I did.

**Q. Okay. And in the scenario that you posed where you would make an arrest and -- I apologize. Strike that.**

**In the scenario that you posed, where you would respond to a break-in during your shift and then give that information to the captain, and that captain gives information to an individual, let's say Jarvis, in that circumstance, would you need to communicate with Jarvis at all regarding what you responded to and what you learned?**

A. Whatever I had, I would put on paper. I thought my reports were very thorough. If anybody had any questions, I'm sure they might come to me individually, or the captain might himself. But I don't recall any such communication in this particular instance.

**Q. Was it your normal course of**

**practice to write everything down on paper?**
A. If I thought that it was important enough or that it -- or it needed more investigation I would send -- I would forward it to the captain so that he can decide how it should be handled from there. So that's -- that was normal for me.
**Q. Okay. And when you say that you put things down on paper, are you referring to a police report or something else?**
A. Well, most of my -- if my report resulted in an arrest, I would make an official police report, an arrest report. If it did not, if it was an investigation, I would generally type it out on the sheet of paper to Captain Stelzer and I would tell him what we did -- or what I did or what officers under my command did. I would send it along so it could be further investigated, or sometimes the captain would kick it back to me, say, "I want you to work on this."
**Q. Okay. Now, when you say you type it up on a piece of paper, at the time, was it a computer or -- in 1985, when you typed things on a piece of paper, would it be a computer or a**



**typewriter?**
A. I can't remember whether it was a computer or typewriter. I don't know whether we started using computers back then, by then. I think we might. Certainly, they were a lot easier to type on to back up on a mistake than a typewriter.
I would suggest -- I would suggest that these reports that I had, the two I referred to, the reports of 9/23/85 and 9/22/85 were probably done on the computer. At least one of them. A full page.
**Q. Did you have experience using a typewriter?**
A. Yes.
**Q. When you were -- okay. And earlier you mentioned that they -- that computers were easier because you can go back. What did you mean?**
A. Well, I mean, if I made a mistake, if I misspelled a word or left off a comma, or made a mistake like that, I could read it over and go back and make changes a lot easier with a computer than I could with a typewriter.



**Q. Forgive me, I was born in the 90s so I don't understand how a typewriter necessarily worked. If there was a mistake in a typewriter, how would you fix it?**
A. Back in the day, there was a thing called White Out. And it was white -- it was actually a white slip of paper you'd slip behind the typewriter, the ribbon as it came up, and you'd type over a misspelled word, and it would white out, like, say, a K, where you want to put something else, and then you can type over that. I mean, it was always a mess, but it was the best we had.
**Q. Okay. So it was like a white piece of paper you put behind --**
A. There was an all-white piece of paper that you put behind on the pad so that when you struck it next you would actually type -- retype the same letter. Let's say there was an improper K, you retype the same K and it would white over the top of the one you originally struck.
**Q. Okay. And was that how -- if -- strike that. If you did make a mistake while**



**writing something on the typewriter, was that how you guys were taught how to fix something, if you needed to make a mistake, or was there any other way to rectify a mistake that's written on the typewriter?**
MR. JOYCE: Objection.
THE WITNESS: There was only one of two ways. Rip up the original and start over. There was another way and this was with an eraser. You use a special eraser that would erase ink. And that was a real mess, that's why we tried to stay away from it.
**Q. (By Ms. Agbiro) Okay. And during your time at the Springfield Police Department, did you ever use a type -- did you ever -- strike that. During your time at the Springfield Police Department, did you ever interrogate a witness?**
A. A witness, yes.
**Q. And did you ever take a witness's statement?**
A. Yes.
**Q. How about a suspect statement?**
A. Yes.

**Q. Okay. And did you ever take a suspect's statement with a typewriter?**
A. Yes.
**Q. Okay.**
A. I'm sure I did, yes.
**Q. Okay. And what would be the process of taking a suspect statement with the typewriter?**
A. I would sit down in front of a typewriter and the suspect or the witness would sit facing me. And this is, generally, after we had some conversation so I can get a sense of where the statement is going. And then, I would start typing the statement. And every time I would type some of it, I would make sure that we agreed on what I was typing.
**Q. Okay. And what happened once the statement would be done?**
A. Once the statement is done, I would -- if there was not another officer with me I would call in an officer witness so that we keep it -- he or she could watch while the suspect or the witness read the statement so that we could go both sign off as witnesses. We tried to have two witness on every statement without -- without



exception.
**Q. Okay. You would try to have two witnesses on every statement without exception?**
A. Yes. That would have been my protocol, yes.
**Q. That was going to be my next question. Was there a protocol for that?**
A. A written protocol? I don't know that.
**Q. That's fine, if there wasn't a written protocol. How about an unwritten protocol?**
A. That was my protocol. I mean, that -- I mean, it doesn't take long if -- if you have a court case that doesn't -- it's got holes in it. I mean, you find out early in your career that these are the things that the Court expects, that defense attorneys expect, and the DAs expect.
If you have a statement, that it should be witnessed by an officer who's actually in the room and saw the statement being read and signed by the victim or by the witness, or the defendant.
**Q. Okay. And is that a protocol you**



**came up with by yourself, or did someone teach that to you?**
A. I don't know.
MS. AGBIRO: I'm sorry. My dog. He's very sensitive.
**Q. (By Ms. Agbiro) To the best of your recollection, would there be an occasion as to why a witness would need to initial a statement or certain parts of a statement?**
A. Yes.
**Q. Okay. What would be the occasion?**
A. If there was an error, a typewritten error by the officer. Back in the day, before we had computers, we would ask the defendant to initial the fact that that was an error. I would usually make a notation of that at the bottom somewhere.
**Q. There would be a notation at the bottom somewhere, that there was an error?**
A. That was what I recall doing. That if we asked the defendant or a witness to do that, that we would make a line at the bottom. Say I've noticed inconsistencies or corrections on this statement that the officers asked me to initial.



And I initialed them in the place --
**Q. Okay. So it would have, like, an explanation at the bottom?**
A. That was what I had done on occasion. I recall that, yes.
**Q. Did other officers do that too, that you know of?**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) I didn't get a verbal answer and I'm just going to remind you the court reporter needs to take it down. So my question was, do you know of any other officers like -- strike that. Let me reask the question.**
**Do you know if any other officers also wrote down the explanation at the bottom of the statement, if it needed to be initialed?**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) You can answer.**
A. I can't believe that it didn't happen with other officers. But I can't make any specific recollections regarding the particular officer, no.
**Q. Okay. Now, going back to Jarvis,**

**besides in the work setting, did you know Jarvis personally, Detective Jarvis?**
A. No. Not outside the work setting, no.
**Q. And have you -- when's the last time you spoke with Detective Jarvis?**
A. I've been off the job since 1999. I believe it would have been sometime before that. Certainly, not since then.
**Q. You haven't talked to him since this lawsuit has been filed?**
A. That's correct.
**Q. One more thing. Going back to the statements, conversation I was talking about earlier, is there a reason why you would ask a suspect to initial a statement, instead of going back and just correcting the statement as you described earlier with, like, the White Out process?**
MR. COYLE: Objection.
**Q. (By Ms. Agbiro) You can answer.**
A. The only reason I could think of is because the error was of such magnitude. Like, maybe, a whole word or something like that. You



know, you would have to retype the whole statement to get it to look decent. So that's the only reason I could think of.
**Q. Okay. So if the air was of a big magnitude, then, you would have to rewrite the whole statement. But if it's a small one -- go ahead -- I'm sorry. I just want to make sure I understand. If it's a small one, that's when you just initial?**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) Go ahead. You can answer.**
A. Well, I didn't have a cutoff point where I -- I don't ever recall myself having to rewrite the whole statement.
**Q. Okay.**
A. I mean, sometimes you'd start taking a statement from a person and be half way through it and they say - especially the defendant - and say, you know, that's a lie. Is everybody still there?
MR. COYLE: Can you hear us?
THE WITNESS: Yeah, I lost something.



MR. COYLE: Can you hear me, Andy?
THE WITNESS: I can hear you. Yes, sir.
MR. COYLE: Can you hear Attorney Agbiro?
**Q. (By Ms. Agbiro) Can you hear me?**
A. Yes, ma'am. I can.
**Q. But you can't -- can you see us?**
A. No, I cannot. You know what happened, my mouse was under a sheet of paper. Inadvertently, I put my hand down on it and lost something. Let me --
MS. AGBIRO: Okay. Let's go off the record.

(A recess was taken)

**Q. (By Ms. Agbiro) Now, I believe you were explaining to me before we broke off there, the -- you said -- I believe the last thing you said was you don't remember making a mistake requiring you to write the whole statement?**
A. Yeah. It seems to me like there might have been one or two occasions where I got



partially through a defendant's statement and he said, you know what, I lied. You know, I actually did it or this -- none of that ever happened. That might have happened in my career. I have a 30-year career. And most of it was in the detective bureau so, I mean, those types of things have happened.
**Q. Okay. And if you find out midway through that -- in those situations, when midway the through the suspect says okay, never mind, I lied, what happens in that situation?**
A. Well, it depends on whether or not he wants to tell me the truth. I mean, if he says I lied and now I don't want to say anymore, I would keep the lie. I would probably keep the lie and testify that this is what he told me up to that point. And then he said, you know what, I lied.
So I would make a record of that. I can't believe I wouldn't. I think that that's what I would have done. But that's what I would have...
**Q. Okay. And if he does tell you the truth, what happens then?**

A. Well, I don't know. What's the truth? I mean, I can only tell what he's telling I can only write down what he's telling me. Whether it's the truth or not I don't know. Sometimes it's borne out by evidence and sometimes it isn't, so I don't know if it's the truth.
**Q. Okay.**
A. If he wants to change his statement, I'll change it. But I would probably keep the original, the one he started with. That's probably what I would do because that would be evidentiary as well.

(Feedback)

MS. AGBIRO: Okay. I'm sorry. I don't know where that feedback came from.
**Q. (By Ms. Agbiro) Now, how about ADA -- sorry. How about District Attorney Bloom, do you recall ever working with District Attorney Bloom?**
A. Yes.
**Q. Okay. What do you recall about working with district Attorney Bloom?**



A. What do I recall. He was a competent, professional prosecutor.
**Q. Do you remember working on any cases with him?**
A. None that I can recall specifically. But I recall working on cases that he prosecuted, yes.
**Q. And when you would work with Bloom, what would that look like?**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) You can answer.**
A. What would it look like? Usually, I would not meet with him until the case was actually set for trial. I would be called as a witness. And normally, in most cases, he would want to know some specifics about my testimony. And then, I would testify and he would question.
**Q. Okay. You said, usually, you wouldn't meet with him when the cases were set for trial. Would you ever meet with him while you were investigating a case?**
A. Possibly. But I don't recall.
**Q. When you normally met with him, would it be at the police department or somewhere**



**else?**
A. No. It would be at the courthouse on the day of. Usually, on the day of trial or the day of grand jury.
**Q. Okay. So would that be your first interaction with him, usually, at the day at the grand jury?**
A. Generally, yes.
**Q. Okay. Do you remember when you first started to interact with Bloom while you were at the Springfield Police Department?**
A. No.
**Q. Do you know how long -- strike that. How long did you know Bloom, in 1985?**
A. I don't know. I mean, this is too far back for me to -- too far back for me to try and pick a date how long I've known about the --
**Q. That's fine. Do you think it would be more than 10 years?**
A. I went on the job in 1970, so by 1985 I was a sergeant in the detective bureau on the four to 12 or six to two shift. I had some fairly high-profile cases, I'm sure. He was an ADA in the district attorney's office. I'm sure



that we crossed paths on a number of occasions. But I can't say, for sure, when, exactly, he started.
**Q. Okay. Did you ever have occasion to meet with him at the police department?**
A. I don't recall that, no.
**Q. You don't recall meeting with him at the police department, or you don't recall either way?**
A. I don't recall either way. I don't recall that specifically. Don't forget, I was on the evening shift for most of my career. And he was a -- you know, he was a daytime prosecutor. So I mean, it would have to be extraordinary, in my opinion, for him to come to the police department in the evening. But I don't recall that ever happening.
**Q. And when you did have cases that were prosecuted by Bloom, did Bloom ever -- in your cases, did Bloom ever collect evidence for you?**
A. Collect evidence for me?
**Q. Yes.**
A. No.

Page 37

**Q. Or collect evidence in any of the cases that you worked on?**
A. I mean, this question is --
**Q. I know.**
A. I'm sorry. But no, why would he? He's he doesn't function as an evidence collector. I'm the evidence collector. A police officer as a witness. But, certainly, not a ADA, a district attorney. I don't understand why they would do that.
**Q. Yeah. Would it be normal for a -- strike that. In your experience, would -- did you ever have an occasion for Bloom to have to transfer evidence from one location to another?**
A. No. I can't recall that.
**Q. During your time at the Springfield Police Department, did you ever have to -- did you ever submit evidence to the FBI for testing?**
A. Me, personally, no. Not that I recall.
**Q. Did you ever work on cases where evidence was submitted to the FBI for testing?**
A. I can't recall, specifically. But I would be surprised if that weren't the case. Like

Page 38

I said, some of our cases were high profile. They didn't handle all evidence at that time. He would only handle certain -- especially, if it wasn't tested. He wanted to know it wasn't tested by a local police department, a local jurisdiction first, because they wouldn't retest it after a negative test by another police department. We call that -- they want to get submitted to them or not submitted.
**Q. Okay. So for high-profile cases that evidence was submitted to the FBI?**
A. I can't say that in all high-profile cases or in any high-profile cases. All I recall is, that, at some point, some evidence was submitted to the FBI.
**Q. Okay. And do you know who would be in charge of taking the evidence to the FBI?**
A. Ultimately, everything came out of the captain's office and the detective bureau. He would determine whether or not, I would think, that evidence should or should not be submitted to the FBI.
**Q. Okay.**
A. I might request it. But I don't

Page 39

know I don't know if I could certainly convince the captain that they should be submitted.
**Q. Okay. But to your knowledge, is that something a prosecutor would do?**
A. Certainly, the prosecutor might have some say in it. Certainly, the district attorney could say this should be submitted to the FBI, yes.
**Q. And let me make sure we understand my question. Would the prosecutor personally take evidence to the FBI?**
A. The prosecutor himself? The DA?
**Q. Yes. Yes.**
A. Not in my experience, no.
**Q. And besides working with Bloom in the work setting, did you know ADA Bloom personally?**
A. Well, at some point after -- yes, I did.
**Q. Okay. How so?**
A. Actually, Bloom was my attorney in my divorce case.
**Q. Okay. Bloom was your -- and when did that happen?**

Page 40

A. I would say, 1995, perhaps. Something like that. But I may be wrong by many years. I'm thinking it was about that time.
**Q. Okay. Were you still working at the Springfield Police Department during that time?**
A. Yes.
**Q. And ADA Bloom, was he still at the district attorney's office during that time?**
A. I can't believe he was. But I mean, I can't believe I would have asked him if he was still the DA. I think he was in private practice. You know, I can't recall that.
**Q. But you asked him to be your divorce attorney?**
A. I asked him if he was interested in handling the case for me, yes, because I knew him.
**Q. Did you know him in his capacity outside of being a district attorney?**
A. Not really. I mean, we had no reason to be in any capacity but professional. We never hung out. We never had a drink together. We never went to dinner or anything like that.
**Q. Okay. When's the last time you spoke with Bloom?**

A. Well, I'm saying I left the police department in 1999. I can't believe I spoke to him after that anytime.
**Q. Anytime from 1999?**
A. Since after 1999, I can't believe that I spoke to him. I cannot recall speaking to him after I left the police department. However, I still had many cases hanging. It's possible that I get called in to testify in cases after I left the police department and he was the ADA in the case, but I don't recall.
**Q. Okay. It's possible that after you left in '99, that Bloom was the ADA in a case that you had before you left?**
A. Well, I know that I had some cases that I had to go back and testify on, even after I left the police department. And it's conceivable that he could have been the ADA in those cases. However, I have no independent recollection.
**Q. Okay. Now, I'm going to ask you some questions regarding your independent memory of the case -- of the circumstances surrounding the complaint filed in this case. Now, if I ask you if you have an independent memory of**



**something, do you understand what I mean?**
A. Yes, ma'am.
**Q. Now, I know that you have documents that are in front of you that were sent to you by your attorney.**
A. Yes.
**Q. But without thinking about those documents, what is your independent memory of your involvement in the investigation of the Emily Lichwala and Mary Prekop break-ins in 1985?**
A. I had no involvement in those investigations, in those particular victims.
**Q. So you have no involvement, at all, with the Emily Lichwala investigation?**
A. That's correct.
**Q. Okay. You didn't have any involvement on the Mary Prekop investigation?**
A. That is correct.
**Q. Did you have any involvement in the Mae Marchand investigation?**
A. Yes.
**Q. What was your involvement in the Mae Marchand investigation?**
A. I was two-fold, actually. As I



wrote in this report, I'd have to refer to it. My independent recollection is minimal, at best. In fact, the only recollection I have I could say say satisfactorily, is my rereading these reports I wrote, and the evidence slips I had, because I remember going out there.
I remember going out there. I remember going out there with John Regnier, Detective John Regnier. And when we went out we observed the scene, the broken window, the fact that officers had been there before. There was some fingerprint powder.
And beyond that, I recall that we found a second window that -- that an attempt would be made to enter. And we made some observations there. Took some fingerprints, took some photographs. And I recall, we also collected some evidence, I thought, from a bed. I remember collecting bed sheets and turning those in for evidence, possibly.
**Q. Okay. Do you remember the first window that you saw that was broken?**
A. Yeah, that was -- that was -- you know, that was a mess. That was completely broken



in, yes.
**Q. Okay. And where was that window located?**
A. My recollection, it was in the kitchen. That's what the report said. But I have no independent recollection.
**Q. Okay. Now, just in terms of your independent recollection, do you remember where the second window was?**
A. It wasn't that far. It was around the right side of the house from the original location. It wasn't that far away. Maybe, less than halfway around the house. That's my recollection. But it may be faulty. This is a long time ago.
**Q. Okay. That's fair. Now, you mentioned you collected certain evidence at the Mae Marchand's house; is that right?**
A. Yes.
**Q. Okay. What did you do with that evidence?**
A. Well, we put a property tag on it. Generally, that evidence is left in an evidence room. We have an overnight evidence room. So the

property officers, in the morning, they pick it up and log it wherever they need to so they can -- they can find it when they need to.

And then, a lot of times the investigating officer, if there is one, will ask that that office be submitted to the state police lab or somewhere else so they can be, you know, further examined.

**Q. So you put a property tag on it and then you -- I want to make sure I understand. You take it to the police station?**

A. Yes.

**Q. And is there a specific department you give it to in the police station?**

A. Well, like I said, I'm on the night shift. The department that handles it is the evidence room, the evidence division. And they only work during the day.

So they would -- we would lock it in an evidence room overnight, and then the evidence room would be opened in the morning by the property officers. And they would take charge of any evidence that's in there and bring it down to the property room and store it.



**Q. Okay. Is the evidence room that is accessible during the night shift, where is that located?**

A. In the detective bureau.

**Q. In the detective bureau. Okay. And who has access to the evidence room?**

A. The officers who work in the detective bureau. Mainly, the shift supervisor. That would be me. And any officers that brought in evidence during the course of a shift. They have to have access to it so they can store the items.

**Q. In 1985, was there any sort of record that was kept of individuals who's access to the evidence room?**

A. Individuals with access to the evidence room?

**Q. Yeah.**

A. I don't recall. I don't know.

**Q. Did officers have to sign out a key to access -- strike that. Was the evidence room locked?**

A. Yes.

**Q. Okay. And was it locked with a key?**



A. Yes.

**Q. Okay. Did officers, or detectives, supervisors that worked the night shift, did they have to sign out a key to access the evidence room?**

A. No.

**Q. No? Where was the key stored?**

A. I can't recall.

**Q. Do you remember how many keys there were for the evidence room?**

A. No.

**Q. Do you know there are multiple keys for the evidence room?**

A. I don't even -- I don't even remember that. I'm thinking that there was, probably, something on some humongous piece of wood or something very heavy so that nobody could stick in their pocket and bring it home. I may be wrong about that.

**Q. Okay.**

A. The evidence key that was kept on the overnight, if you needed to log evidence into the evidence room, we would have access to the evidence room. That's the only way to get in



there, was with a key.

**Q. Okay. Was there anyone responsible for that key?**

A. I would expect that the shift supervisor would accept responsibility when he or she came on duty.

**Q. So besides collecting the evidence from the Mae Marchand home, do you recall any other involvement in the Mae Marchand investigation?**

A. No. Nothing beside what I put on paper. I'm sure you have the documents that I have.

**Q. I hope so. Now, prior to the 1985 break-ins of Emily Lichwala and Mary Prekop, do you remember -- do you have any dependent recollection of any interactions you had -- sorry. Strike that.**

**Prior to the 1985 break-ins of Emily Lichwala and Mary Prekop, did you have any interactions with George Perrot?**

A. Not that I recall, no.

**Q. So just to confirm, the Emily Lichwala and Mary Prekop break-ins and**

**assault, that happened in November 30th --**
A. I don't know.
**Q. -- 1985? So prior to November 30, 1985, do you remember interacting with George Perrot?**
A. Well, he was -- my report, if you read it, indicates that I had some interaction with him, when he voluntarily came to the police station.
**Q. Okay. And do you have any independent recollection about that interaction?**
A. No. Don't know.
**Q. Okay. How about before that, did you ever interact with George Perrot?**
A. I can't ever recall meeting him before that, no.
**Q. Okay. Mr. Canevari, can I -- I'm going to ask you a couple questions about your preparation for this deposition. Did you do anything to prepare for this deposition today?**
A. I read over the reports that I authored. Other than that, that's that.
**Q. Okay. Did you meet with your attorneys?**



A. Mr. Coyle and I have spoken on the phone on several occasions.
**Q. Okay. When were those occasions? And let me preface, when I ask you these questions, I do not want you to reveal, at all, any substance of the conversations you had with your attorney? Okay? Okay.**
A. When were they?
**Q. Yes.**
A. Over the last few weeks we talked once or twice. He was telling me that I would have to --
**Q. No.**
A. -- originally -- okay. Let me just briefly, some conversation about --
MR. COYLE: Excuse me. I'm going to instruct you not to discuss or reveal any of the substance of our conversations. She's only asking you about dates right now.
THE WITNESS: No. I don't recall the dates.
**Q. (By Ms. Agbiro) Okay. That's fine. Now, did you speak with them over the phone?**



A. Yes.
**Q. Okay. How long were those conversations?**
A. Not more than five or 10 minutes on an occasion.
**Q. Was there any other person on the phone call, besides your attorney?**
A. No.
**Q. Okay. Now, you mentioned that you reviewed some reports. Did any of them refresh your recollection?**
A. Yes. Yeah, a little bit. Yeah.
**Q. Is there anything inaccurate about any of the reports that you reviewed?**
A. I don't believe so.
**Q. Okay.**
A. Why would I put down anything inaccurate on my report? All my reports were truthful and honest, and the best I could make. So that's -- those were good reports.
**Q. Okay. Now, did you review any photos or videos to prepare for this deposition?**
A. No.
**Q. Now, other than your attorney, did**



**you speak with anyone else to prepare for this deposition?**
A. No.
**Q. Did you speak with anyone else at the Springfield Police Department?**
A. No.
**Q. How about any of the other defendants or their representatives?**
A. No.
**Q. All right. Did you speak --**
A. I don't even think I know who the other defendants are. Other than Tommy Jarvis and Francis Bloom, I don't know who they are.
**Q. Okay.**
A. I've heard all the names mentioned by the attorneys here today. But those are all news to me.
**Q. Okay. Has any other attorneys, beside your attorney, reached out to you?**
A. No.
**Q. Do you did you ever work with an individual named Thomas Kelly?**
A. Yes.
**Q. Okay.**

A. Yes.
**Q. In what capacity did you work with Detective Kelly?**
A. For a time I was -- I was assigned to the same bureau as he was. And he was on that shift when I was on that shift.
**Q. And which bureau was that?**
A. Crime prevention bureau.
**Q. Do you remember that year that was? What years? Time frame?**
A. No. It's a matter of record, though.
**Q. Okay. And in what capacity did you work with him?**
A. We were on the same shift. We were doing, basically, doing the same job.
**Q. What was your impression of Detective Kelly?**
MR. COYLE: Objection. You may answer.
THE WITNESS: I thought he was a fine officer.
**Q. (By Ms. Agbiro) Okay. Did you ever work with Detective Kelly after you guys were**



**together at the crime prevention bureau?**
A. On occasion, after I left the crime prevention bureau, and I was shift supervisor on the four to 12 detective bureau, if they had a drug raid and they -- they were a little short on officers and they felt they could safely do the drug raid, they would ask for my help. On occasion, that one or two occasions over years we participated in a drug raid with the crime prevention bureau.
**Q. Okay. How about Thomas Kennedy, did you ever work with Thomas Kennedy?**
A. Yes.
**Q. Okay. What capacity did you work with Thomas Kennedy?**
A. I'd say, he worked for me in the Florida detective bureau years for some years. I shouldn't say years, because I can't recall. But he, you know, worked in the detective bureau under my supervision. He was a detective on the four to 12, slash, six to two shift. And he advanced -- he made sergeant and advanced through the ranks.
**Q. How about Marianne Popko, did you ever work with Marianne Popko?**



A. No.
**Q. Did you ever work with Cheryl Clapprood?**
A. No.
**Q. How about Ronald St. Germain?**
A. I would have to say, no.
**Q. Okay.**
A. I know who Ronnie was, of course. But I never directly with him, that I can recall.
**Q. How did you know -- in what capacity did you know Ronald St. Germain?**
A. You know, at some point in my career I knew everybody on the Springfield Police Department by name and by face. I mean, it's just -- it's a relatively small department. When I went on the job my badge number was 288. And over the course of a couple years I got to know, literally, everybody on the department. They knew me, for the most part and I knew them. But these were just casual business acquaintances. We never worked -- in most cases, I never worked directly with 90 percent of the officers on the department.
**Q. Okay. Did you ever work with Paul Glantz?**



A. No.
**Q. Do you, personally, know George Perrot?**
A. No. I only met him -- my recollection is I only met him that one night that he came to the police department. I was a shift supervisor on the four to 12. And I might have asked him some questions, and I might have witnessed the statement he gave. But beyond that, my recollection's I never met him before that or after that.
**Q. Okay. Do you know an individual named Jeff Adkins?**
A. I'd have to refer to my notes. But I think Jeff Adkins was one of the people who came in that night and gave us a statement.
**Q. Okay. Is that your only recollection of any interaction with an individual named Jeff Adkins?**
A. Yes.
**Q. Okay. How been about an individual named Robert Timmerman.**
A. I'd have to refer to my notes again. But I also believe Robert Timmerman came in that

Page 57

night and gave us a statement.
**Q. And is that your only recollection of an individual named Robert Timmerman?**
A. Yes.
**Q. Now, did you personally know Mae Marchand?**
A. No, I did not. Never met her, actually. When we went that night she was not there.
**Q. Did you personally know an individual Emily Lichwala?**
A. No.
**Q. Did you personally know Mary Prekop?**
A. I did not.
**Q. Okay. All right. I'm going to ask you a couple questions, just to get to know you a little bit better in terms of your background.**
**When did you start working for the Springfield Police Department?**
A. I think I went on the job in 1970.
**Q. And what was the first job you had at the Springfield Police Department?**
A. The first job I had was the first job everybody has. That's on the guard watch

Page 58

uniform squad. That's the midnight to 8:00 a.m. shift.
**Q. Anted how long did you do that -- how long did you do that for?**
A. I did that for, I think, about two years.
**Q. And what position did you hold after that?**
A. I was transferred to the midnight -- the same shift midnight to eight detective bureau.
**Q. Okay. And how long did you do that?**
A. I think, about two years. But this is all a matter of record. But I think, maybe, two years. Something like that.
**Q. Okay. And when you were -- a detective at that point --**
A. Yes.
**Q. -- were you the detective? Okay, okay. And then, after you were at the detective bureau, what did you do after that?**
A. After that I made sergeant.
**Q. Okay. Do you remember what year that was?**
A. I think it was 1976, fall, winter.

Page 59

It's a matter of record.
**Q. Okay. And when you made sergeant, where were you assigned?**
A. I was assigned to the midnight to 8:00 a.m. uniform squad.
**Q. And how long were you there for?**
A. One year.
**Q. One year. And where'd you go after that?**
A. I went back to the detective bureau on the four to 12 shift.
**Q. And how long were you there for?**
A. Forever. I think, probably, about close to 20 years. But like I said, this was a matter of record.
**Q. Were you in that position, in 1985?**
A. Yes.
**Q. What were your responsibilities as a sergeant in the detective bureau in that time frame?**
A. To make out the roster, to supervise the detectives who work there. There was, probably, I would say, a total of, maybe, 12 of us. And on any given night there was probably

Page 60

seven, eight, or nine, something like that, working. We'd make up the roster, supervise any investigations we had, make sure the paperwork that they turned in was in order and correct. And, basically, that was it.
Whatever came up -- I knew, certainly, if it was serious we went out. Sometimes people we would come in. We'd always have a man at the offices. We would always have one man at the desk so if anybody came in to the detective bureau at night we'd have somebody. There's always one person working inside.
**Q. Okay. Now, when you say if you were supervised, the detectives, what would that look like?**
MR. JOYCE: Objection.
THE WITNESS: I'm sorry, I didn't hear that.
MR. COYLE: You can answer. There was an objection.
THE WITNESS: Okay. No. I went to work every night. I sent guys out as they were assigned. And if anything came up they had a question on they would ask me,

or if I went to a scene where they were at and I had something to interject, I would interject. I mean, I had oversight over all detective cases that happened on the four to 12. And if I felt there was something beyond my capacity or if there was a very serious case, a homicide, I would notify the captain. And, generally, he would call in the homicide squad to investigate.

**Q. (By Ms. Agbiro) Now, you mentioned that you would make sure that their reports were in order. Were you responsible for reviewing the reports that they wrote?**

A. Yes.

**Q. And what would you review them for?**

A. First of all, completion. That they had the right information in there. In other words, if they had made an arrest report, I'd want to know all the information that was required should be in there. And that it was correctly done and, you know, there was really no bad errors in it. Certainly, I'd want to see that because I was putting my approval on it so I would want to



make sure it was correct.

Beyond that, if they requested a complaint, a lot of times we -- complaints we'd write a report to the captain requesting a complaint on -- let's say, a house break-in occurred, if they had some information on and they would make an ID on they'd request a complaint. I'd do all those approvals and I'd make sure everything was in order before they submit it.

**Q. Okay. Were detectives required to get your approval before they engaged in that type of conduct about complaints?**

MS. DESOUSA: Objection.

**Q. (By Ms. Agbiro) You can answer. I'm sorry.**

A. Were they required to get my approval? Well, I wouldn't submit it without an approval. They wouldn't submit it without my approval. So yeah, I would say, they're required.

**Q. Okay. Can you describe a little bit what type of action required your approval?**

MS. DESOUSA: Objection.

**Q. (By Ms. Agbiro) You can answer.**

A. What type of action required my



approval.

**Q. Yeah.**

A. I mean, in general, these guys went out, they were their own bosses. They made decisions. I mean, police officers need to make decisions based on what they see right in front of them and what they know the law to be.

So if they made an arrest, I wasn't going to unarrest somebody. You know what I mean? If they went out and made an arrest on the case and brought that person in and booked them for whatever, I certainly wouldn't second guess them on it. But I would want to see the report and want to discuss with them the facts of the case to make sure that there was -- it was a good case.

These were a lot of good men that worked for me at the time. It was -- they did a wonderful job. I had great people.

**Q. Okay. But what about longer-term investigations, how would how were you involved in long-term investigations as a supervisor?**

MR. JOYCE: Objection.

**Q. (By Ms. Agbiro) You can answer.**

A. To put it very succinctly, we



weren't involved in long-term investigations. No on that shift. Everybody on days, the dayshift, all specialized in something. Either a larceny squad, a house-break squad, or a homicide-robbery squad. So if a case came down, they would own it.

And if I started a case and couldn't clear it, in other words, I could not make an arrest, I would write a report to the captain with all the evidence and what I have done as far as investigative work, or what our team have done, and I would submit it to the captain.

And, generally, that's where it died, from my perspective. I wouldn't pick it up the next day, unless the captain gave it back to me and said, I want you to work on this. But that was fairly rare.

**Q. (By Ms. Agbiro) Okay. Now, the captain, at that time, was he considered a supervisor as well?**

MS. DESOUSA: Objection.

THE WITNESS: Yep.

**Q. (By Ms. Agbiro) Okay. How was he considered a supervisor?**

MS. DESOUSA: Objection.

THE WITNESS: Well, it's a quasi-military operation. I mean, it has a rank system starting with a patrolman and going up to the chief of police. And everybody in line is superior or not superior to the person below them. So it's pretty obvious that, if a person is one rank higher than you, then, you answer to him or her, and you're expected to do what they told you. So it's fairly obvious. Like I said, it's a quasi-military operation.

**Q. (By Ms. Agbiro) So that would mean that your captain at the time supervised you?**

A. Yes.

**Q. And who was your captain at the time?**

A. Ernest Stelzer.

**Q. Okay. Now, during this time period, in 1985, can you clarify a little bit more about that quasi-military operation that you just described; what did that look like?**

A. You'd need for more specific than that. I'm not sure I understand the question. I



thought I explained it the best I could.

**Q. Sure. Let me ask it this way, in 1985, do you know what were the captain's responsibilities at the time?**

A. Captain of detectives?

**Q. Yes. Your captain. So Captain Stelzer, what were his responsibilities?**

A. His responsibilities, in my opinion, just my observation, was supervise any investigation that came to the deputy.

**Q. Would that include both day and night shift?**

A. Yes.

**Q. And as sergeant for the night shift, did you keep Captain Stelzer appraised of all the investigations that were occurring in your unit at the time?**

A. Yes. If we didn't clear it with an arrest or with a request for a complaint, then, I would write a report or ensure that I officer investigating the case would report to the captain informing him of what was done -- what was done up to that point. They could continue it on days, if they needed to.



**Q. Okay. Was there ever a circumstance, that you remember, where an investigation was continued during the night?**

A. You mean, something started on days and they gave it to us for the night?

**Q. Yes, sir.**

A. I don't remember specifically. But I can't believe that that didn't occur. I'm sure it did.

**Q. Okay. And in 1985, what was the rank above captain?**

A. Deputy chief.

**Q. And what was your understanding of a deputy chief's role?**

A. Well, my recollection was there were two deputy chiefs at the time. One was -- generally had oversight over the uniform squads. One, generally, had oversight of the plain clothes squad.

**Q. And by "oversight," what do you mean?**

A. It means, just what any organization does, when they give somebody responsibility over a unit of people, and, generally, to make sure



they do their job and -- I don't know. Do your job. Oversight is oversight.

**Q. Okay. Now, in 1985, do you remember when the deputy sheriffs were?**

A. Deputy chiefs.

**Q. Deputy chiefs. I apologize.**

A. I do not, no.

**Q. And what was the rank above deputy chief?**

A. Chief of police.

**Q. Chief of police? And do you remember who that was in 1985?**

A. No, I do not. I would have to speculate. I can't be sure.

**Q. Okay. Now, just to clarify, earlier you mentioned that you were in this position for -- I believe you said 20 years; is that correct?**

A. You're talking about a shift supervisor on the four to 12 detective bureau?

**Q. Yes.**

A. Yeah, that's -- that's probably close, yes.

**Q. Okay. Did you have any position**

Page 69

**after that?**
A. Yes. I was transferred to days.
**Q. Okay. And how long were you the supervisor on the dayshift?**
A. I was a supervisor of the homicide robbery squad on days. Probably, I don't know, maybe, five years prior to my -- you'd have to clarify the dates. I can't recall that.
**Q. That's fine. Was that the last position you had --**
A. Yes, ma'am.
**Q. -- prior to retirement?**
A. Yes, ma'am.
**Q. Now, did you receive any training when you started at the Springfield Police Department?**
A. Yes.
**Q. Okay. What training did you receive when you first started at the police department?**
A. The standard police academy courses that -- that program was probably, maybe, six weeks. Something like that. All kinds of police work, investigation, firearms, arrest techniques. Stuff you might imagine. Laws, criminal laws,

Page 70

cases. There was a lot to it.
**Q. Okay. Were you trained on interrogations?**
A. I can't recall specifically getting training.
**Q. Okay. Were you trained on how to write a police report?**
A. I think so, yeah.
**Q. Okay. Were you trained on -- strike that. Did you receive any additional training, once you were promoted to sergeant?**
A. Well, throughout my career, we would get training based on -- sometimes on court decisions. We got some training on the breathalyzer, because I was a breathalyzer operator when I was a sergeant on the guard watch. I got fingerprint collection evidence from an FBI agent. Hazardous driving, high speed driving training at Westover Air Force. I mean, there was a lot of things over the course of my career.
**Q. Did you remember receiving training on how to handle exculpatory evidence?**
A. Not specifically. I don't recall getting training.

Page 71

**Q. Okay. Were you ever trained on your duty to turn over all evidence to criminal defendants?**
A. I was aware that evidence -- it might be exculpatory. Could be requested by the defense attorney. And that, generally, I never turned it over. I turned it over to the district attorney. And he would turn it over to the defense attorney. Yes, I was aware that exculpatory evidence is --
**Q. Okay. Were you aware of that in 1985?**
A. I'm sure, yes.
**Q. And do you know how you were made a aware of that?**
A. I studied a lot individually before I became sergeant and after, so it -- I was aware of --
**Q. Okay. You studied on your own, not --**
A. Yes.
**Q. Okay. Not related to your -- not related to any training provided by the Springfield Police Department?**

Page 72

A. I studied a lot on my own, yes.
**Q. Now, when you were trained by the Springfield Police Department, who provided those trainings?**
A. I can't recall. I mean, sometimes the officers who are running the academy would have a specialized class, because a new case would come up or a Court decision. Something that dramatically affected the way we do our job. And sometimes it would be a specialized.
Like I said, I think the state police ran a breathalyzer class for us. And I think, I recall an FBI agent doing a fingerprint collection class for us. Those are two I remember specifically.
MS. AGBIRO: All right. Now I'm -- let's take a five-minute break. We've been going for, like an hour-and-a-half.

(A recess was taken)

**Q. (By Ms. Agbiro) Sergeant Canevari, I have a couple questions about the question about the Emily Lichwala investigation.**

Page 73

A. The what investigation?
**Q. Emily Lichwala investigation.**
A. Okay.
**Q. Now, earlier you mentioned that you weren't involved in this investigation, correct?**
A. Not that I recall, no.
**Q. Do you recall collecting any evidence in that case?**
A. Well, I collected evidence. I collected evidence throughout my career. You're talking about something that happened in what year?
**Q. We're talking about November 30, 1985.**
A. I don't recall specifically collecting any evidence, no.
**Q. How about on December 1985. Do you recall collecting any evidence in the Lichwala case?**
A. Can I refer to my property slips?
**Q. Actually, let me do one better. I'm going to show it on the screen so that we all have access to what we're looking for -- looking at. Are you able to see my screen?**

Page 74

A. I see that, yes.
**Q. Do you see a document?**
A. Yes.
**Q. Okay. Does this document look familiar to you?**
A. Yes.
MS. AGBIRO: Okay. I'm going to introduce this as exhibit. I'm going to mark this as Exhibit 1. The Bates stamps being CITY004723.

(Exhibit 1, Property Receipt No. 51465, marked)

**Q. (By Ms. Agbiro) Now, is this one of the property receipts you referred to?**
A. Yes.
**Q. Okay. Now, this is property receipt 51465; is that right?**
A. That part of the screen is blocked out for me, Miss. I can refer to my own notes on that, if that's okay with you.
**Q. Yes. If you have a copy of 51465, that's what I'm looking at. I don't know why it's blocked out from your screen.**

Page 75

A. Well, because all the photographs are stacked up on that side. 51465, yes.
**Q. Do you also see property receipt 51458?**
A. Yes.
**Q. Now, is that your name at the bottom of 51465?**
A. Yes.
**Q. And is the date for this property receipt December 8, 1985?**
A. Yes.
**Q. Okay. Now, what is this property receipt referring to?**
A. It's referring to -- referring to property receipt 51465. It's a plastic bag containing head and hair samples of George Perrot.
**Q. Okay. Now, was the hair samples collected in reference to this property receipt -- what case was that collected for?**
A. I don't know.
**Q. Do you have any recollection of this property receipt?**
A. Well, I can tell you that's my

Page 76

handwriting. And I have no recollection. I can't recall taking this sample.
**Q. Okay. Would you have written this property receipt, if you hadn't taken the sample?**
A. No.
**Q. Do you have any reason to dispute that you took the sample?**
MR. COYLE: Objection.
THE WITNESS: No.
**Q. (By Ms. Agbiro) Okay. Was this the standard property receipt that was used in 1985?**
A. Yes.
**Q. Okay. Now, during your usual course of practice, what evidence would you -- what information would you fill out on this property receipt?**
A. Whatever I knew. Whatever was relevant I would fill out.
**Q. I'm sorry. Was that, whatever you?**
A. Whatever was relevant.
**Q. Okay.**
A. In other words, if I knew it was evidence, or I knew it was stolen, or I knew it was pawned, I would circle whatever I felt was

appropriate based on the information I had at the time.
**Q. Okay. Would you fill out the owner victim section?**
A. If I knew the owner victim.
**Q. All right. Would you fill out the address and telephone section?**
A. Of the owner?
**Q. Yes.**
A. I might not fill out the address and the telephone number, if it was a case that was under active investigation. A lot of times, if I knew the owner victim, I would put the owner victim's name down, and then I would include the complaint number or the report number on the original -- in the original complaint by the victim.
**Q. Okay.**
A. But I didn't do this in this case.
**Q. And just so we're on the same page, on December 8, 1985, you were working the night shift, correct?**
A. Yes, ma'am.
**Q. Okay. So you would have tooken this**



**hair sample that night?**
A. Yes.
**Q. Now, the "yes" next to "arrest made" is circled, correct?**
A. That is correct.
**Q. All right. And if I recall earlier, you testified that you wouldn't work on a case that -- you would work on cases that happened during the nighttime, during your shift?**
A. Yes.
**Q. Okay. So if George Perrot was arrested at this point, does that mean that your shift arrested George?**
A. Not necessarily.
**Q. Okay. Can you explain that to me a little bit, because, my understanding was that you would work on cases that came in at night, so how would it not --**
A. Well --
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) Go ahead. You can answer.**
A. There might be a case where the shift that I was relieving, in other words, the



day shift, asked me to do something at night. That was not uncommon. Or maybe I was ordered to do something by the captain. In other words, if I came to work at four o'clock and the captain was there and said I want you to do this, then, I went and did it. That was a normal procedure. And the expectation that I would go do it, if the captain told me to do it.
**Q. Okay. So on those circumstances, you would continue something that happened during the day?**
A. Whatever I was told to do, I would do it, yeah.
**Q. Okay. Now, I'm going to go down to -- I'm going to go down to 12/8/85. Do you see that?**
A. Are you talking about 51458?
**Q. Yes. Sorry. Yes. 51458?**
A. Yes, ma'am.
**Q. Now, this is a separate property receipt, correct?**
A. That's a separate property tag and a separate evidence bag yes, sir.
**Q. And that's your signature at the**



**bottom, correct?**
A. Yes, it is.
**Q. And the date for this one is also 12/8/85, correct?**
A. That is correct.
**Q. Okay. Now, this property receipt, it states that it's for hair samples; is that right?**
A. Yes.
**Q. Pubic hair samples?**
A. That is correct.
**Q. Now, here it says that -- it says, "arrest made" and it says, "no"; do you see that?**
A. I can only -- I can only assume -- I don't know why those two are different. That's the first I've noticed it. I don't know why they're different. I can only assume that I made a mistake on either the first sheet or the second one.
**Q. Okay.**
A. But today, I have no knowledge whether George Perrot was in custody or he came in and gave these voluntarily. I'm assuming, he was in custody.

**Q. Now, do you know if these samples were collected at the same time?**

A. If the samples were collected at the time that I turned in these property slips?

**Q. No. Yeah, at the same time. so were the hair samples from the pubic hair that relates to property receipt 51458, were they collected at the same time that the hair samples were collected from his head in relation to 51465?**

A. I have no independent recollection of that, but I can't believe they weren't. Assuming they were.

**Q. Okay. Okay. Now, do you recall if these samples were taken in relation to the Emily Lichwala break-ins?**

A. I do not recall why they were taken, or why I took them, or who told me to take them. Anything like that. I'm sorry. I wish I had a recollection.

**Q. Now, I can represent to you that these were, in fact, samples that were taken for the Emily Lichwala investigation.**

A. Okay.

**Q. Does that refresh your memory, at**



**all, regarding your involvement with the Emily Lichwala investigation?**

A. No.

MS. DESOUSA: Objection.

**Q. (By Ms. Agbiro) Now, normally, if an investigation had carried over from the daytime, who'll instruct you to do something in that investigation?**

MS. DESOUSA: Objection.

**Q. (By Ms. Agbiro) You can answer.**

A. Normally, would be the captain asking to do something at night.

**Q. Okay.**

A. But I can't say that was the case here.

**Q. Do you recall ever being asked by anybody else, besides the captain, to do something at night that happened -- that was continuance from the day?**

A. Yeah. Sometimes something that would be going on on days. It would be something that -- like, perhaps, a witness to interrogate or to get a statement from a witness, an evidentiary statement, or to pick up some evidence, or go over



-- that was not uncommon. I mean, it didn't happen all that often. But it wasn't uncommon to do that for a day officer to ask us to assist them on a case.

**Q. With the officer?**

A. Officer would, yeah. But as far as instruction, that would come from the captain.

**Q. Okay. Do you recall what happened? Like, what you did with these property receipts after you drafted them?**

A. Same thing. I would have locked them in the evidence room for the evidence crew to pick up in the morning.

**Q. And after you locked them in the evidence room, would you have any further involvement with that evidence?**

A. No.

**Q. Okay. Would you track the evidence to see what happened, where it ended up?**

A. No. It's not my case, per se, so I wouldn't -- I wouldn't need to track it. It wouldn't be in any folder -- any complaint folder that I was attached to.

**Q. Okay. Now, let's take another step**



**back in 1985. When you were a sergeant at the detective bureau, do you recall an investigation into a series of rapes that were happening against -- rapes and break-ins that were happening against older women?**

A. I was aware of that.

**Q. Okay. What did you know about that?**

A. I knew that there was a series of rapes against elderly women, break-ins and rapes, perhaps, two or three. They were in the Indian Orchard Section, I believe, or the 16 Acres section. I can't remember which. And they were, kind of, confined to that area.

**Q. Okay.**

A. And my understanding was that -- I should say, I can't recall because I don't know. I don't want to be broad. So I don't recall enough to be able to say with definitively what I recall.

**Q. Okay. But I don't want you to assume or speculate. But I do want to know what you do recall from that situation.**

A. My recollection is that there was a series of rapes, more than one or two, involving

elderly women in their bed. The house was broken into in the middle of the night, generally, and that the description of the assailant or assailants was generally consistent with one another. In other words, it could have been the same suspect.

**Q. Do you remember what that description was?**

A. No.

**Q. Okay. Did you know if the department had an idea of who could fit that description?**

MS. DESOUSA: Objection.

MR. COYLE: Objection.

**Q. (By Ms. Agbiro) Go ahead.**

A. No. I wasn't involved in the investigation, per se. I mean, these were crime prevention bureau cases, for the most part. They did have a house break part to them. But, in general, a serious crime was the forceable rape. And the crime prevention bureau took over those investigations, as I recall.

**Q. Now, earlier you mentioned that, you know, there were some cases that you considered to**



**be high-profile cases.**

MS. DESOUSA: Objection.

MS. AGBIRO: What's the basis of your objection, Lisa?

MS. DESOUSA: That isn't his testimony.

MS. AGBIRO: He just agreed that it was.

MS. DESOUSA: My objection's on the record.

**Q. (By Ms. Agbiro) So when you were discussing high profile cases that went to the -- where evidence went to the FBI, for example, were the series of rapes that were occurring in 1985, were those considered to be high-profile cases?**

MS. DESOUSA: Objection.

THE WITNESS: High profile is a moniker that I used.

**Q. (By Ms. Agbiro) Right.**

A. Homicide, the rape of an elderly women in her bed in the middle of the night, I would say that's a high-profile case.

**Q. Now, besides sending evidence to the FBI, what -- in your opinion, how were**



**high-profile cases treated differently at the Springfield Police Department and other cases?**

MS. DESOUSA: Objection.

THE WITNESS: All cases that were crimes we were aware of, on the separate shifts. We were all aware of crimes that were committed, in general. In general, we were all aware of crimes that were committed anywhere in the city.

And, certainly, a case like this, with an elderly woman was raped in her bed in the middle of the night at her house, is something that we're all very attentive to, I would say, that's fair to say.

But I mean, in the course of an evening we could have 10 other cases that we had to prioritize because they were there, they were immediate. If something occurred, a robbery occurred or something like that, or a homicide or serious assault, that's where went. That's what we investigated.

**Q. (By Ms. Agbiro) Okay. When you say that you were all-attentive to those -- you know,**



**to something like the 1985 cases, what do you mean exactly?**

A. I mean, that we're all aware that. They were occurring.

**Q. Okay. In this circumstance, would it be common to exchange information across bureaus relevant to those high-profile crimes?**

MS. DESOUSA: Objection.

THE WITNESS: I think that whatever information I might have obtained came from Captain Stelzer or somebody on the day shift. I didn't cross information with somebody like Tom Kelly in the bureau or anything like that, that I can ever recall, on this case or these cases.

**Q. (By Ms. Agbiro) Okay. Do you recall having discussions with Captain Stelzer about any of the rapes that occurred in 1985? So I'm referring to Mae Marchand, Emily Lichwala, or Mary Prekop.**

A. Not specifically.

**Q. Now, in regards to the break-ins or assaults that were occurring in 1985, were you aware if there were any suspects that the police**

**department were investigating?**
MS. DESOUSA: Are you asking for all break-ins and assaults in 1985?
MS. AGBIRO: I'm asking for the specific -- how about this, let me rephrase the question. I'll withdraw the question.
**Q. (By Ms. Agbiro) In regards to the break-ins and assaults that occurred in 1985 relating to Mae Marchand, Emily Lichwala, and Mary Prekop, are you aware of any suspects that the Springfield Police Department was investigating at the time?**
A. No.
**Q. Do you know if there are any leads in regards to any suspects in those cases?**
A. I don't know.
**Q. Now, in regards to the Mae Marchand crime specifically, do you know if there were any suspects in that investigation?**
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) You can answer.**
A. Who would have considered somebody a suspect? I mean, from the police department? Did the police department have suspects? I don't



know.
**Q. Okay. But earlier you testified that the description of the assailant -- of the crimes against these women were similar; is that right?**
MS. DESOUSA: Objection.
THE WITNESS: (Witness nodding)
**Q. (By Ms. Agbiro) You can't nod your head. The court reporter needs to...**
A. Yep. That's my understanding. That's my recollection, that the suspect in these cases, the description was similar.
**Q. Okay. I'm going to share my screen with you quickly. Hold on. Show you what I'm going to mark as Exhibit 2. This is Bates stamp COSRPOD012402.**

(Exhibit 2, Property Receipt No. 50320, marked)

**Q. (By Ms. Agbiro) Now, earlier you testified that you collected evidence at Mae Marchand's house; is that correct?**
A. Yes.



**Q. Now, was this a property receipt reflecting the evidence that you collected?**
A. This is the first time I've seen this. I don't have this with me or paperwork. I didn't know my name was on it. But I believe that this might have been submitted by Richie Fleury, who was with me that night, at my direction. But as far as -- I mean, I'm surmising that based on what I see here.
MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) Let's go over it. So this -- where it says "officer submitting property," does it say Jarvis?**
A. Yes.
**Q. And Canevari, right?**
A. I think that's my name, yes.
**Q. Okay. Fleury underneath it?**
A. Yes.
**Q. Okay. If Jarvis's name is on this report, does that mean he was there?**
MR. JOYCE: Objection.
THE WITNESS: I can't say.
**Q. (By Ms. Agbiro) Okay.**
A. I don't recall Tommy Jarvis being



there. This was late at night.
**Q. Okay. But you were there?**
A. Yes.
**Q. And Fleury was there?**
A. I believe he was, yes.
**Q. Okay. And if Jarvis was there, would that mean that Jarvis was there during the night shift?**
A. No. I don't believe -- I was there that might, and Thomas Jarvis was not there when I was there. When I collected that evidence, I'll say Jarvis was not there, no.
Perhaps, Officer Fleury included him because there was some conversation with Tom Jarvis at the change of shifts. I don't know. I don't know.
**Q. Do you remember the conversation that was had at change of shift?**
A. I'm not saying there was one. I might have come in at six o'clock that night. We have two shifts. We had officers -- they have officers come in at four, and we had officers come in and six. So I might not have seen Tom Jarvis my shift that night. Would be a matter of record

somewhere.
**Q. Do you recognize that handwriting?**
A. I do not. I believe it might be Richard Fleury's. But I'm not positive. He's passed away.
**Q. Now, do you recall collecting two pillows and a bed sheet at Mae Marchand's house?**
A. I recall a bed sheet. I can't recall pillows. I would have to refer to my report to the captain to verify that.
**Q. Now, do you recognize the signature underneath where it says "officer receiving property," do you recognize that signature?**
A. Are you talking about the right side of this property slip?
**Q. Yes.**
A. I can't see it because there's this line of photographs here. You have to move it to the left side of screen to try and see it.
**Q. Let's see if I can figure out a way to -- can you see it like this?**
A. No. I don't recognize that officer's signature.
**Q. Now, do you see a date that says,**



**"September 25th?**
A. Twenty-third, I think, in the upper left?
**Q. No. On the right side next to that signature?**
A. Yes. Looks like 25, yes.
**Q. Okay. Now, as you just stated, the property receipt is dated for the 23rd; is that right?**
A. Yes.
**Q. If you collected evidence during your night shift, you mentioned that they will go in an evidence locker, correct?**
A. Yes.
**Q. How long would the evidence stay in that evidence locker?**
A. Well, generally, overnight unless it was a weekend.
**Q. Okay.**
A. If it was a weekend, then, the officer collecting the evidence in this case, it looks like a crime prevention bureau officer came down and picked it up.
On this case, and in all cases



concerning evidence, whether it was detective bureau or crime prevention, the officer assigned to the evidence bureaus on days works on shifts -- works on the day shift. So he wouldn't -- and Monday through Friday so he wouldn't collect it until Monday morning. So if it was on the weekend, it could have been a two-day lapse there before it was actually picked up.
**Q. Now, just so I can understand. The officers assigned to evidence bureau, are those officers that are from, like, the crime prevention bureau and the detective bureau?**
A. Well, depending on where the case -- where the case will ultimately be investigated, if it was a detective bureau case, the evidence room, in the main evidence room is the detective bureau the department evidence room.
In the case of the crime prevention bureau, they have their own evidence locker with drugs, things like that because they also handled drugs, and rape kits on stuff like that, that they handled separately from the detective bureau. And that's, obviously, where this ended up.
**Q. Okay. So that evidence was separate**



**than -- that evidence was stored separately than where the detective bureau evidence was stored?**
A. Looks like it to me. It was stored in the crime prevention evidence log.
**Q. Okay. Now, is any person from the from these entities, is any person able to be assigned to the evidence bureau?**
MS. DESOUSA: Objection.
THE WITNESS: Yes. There are officers that are assigned there full time.
**Q. (By Ms. Agbiro) Okay. Officers were assigned to the detective evidence bureau full time?**
A. Yes.
**Q. So would there be officers assigned to the evidence bureau that are also assigned to investigating cases out on the field?**
A. No.
**Q. Now, I'm going to show you Exhibit 3. Are you able to see my screen?**
A. Yes.
MS. AGBIRO: All right. I'm going to mark this as Exhibit 3, COSRPOD12403.

(Exhibit 3, Property Receipt
No. 50323, marked)

**Q. (By Ms. Agbiro) Now, do you recall seeing this property -- recall -- sorry. Do you have any independent recollection about this property receipt?**

A. No.

**Q. Okay. Now, is that your name next to the line that says "officer submitting property"?**

A. Yes.

**Q. And is that your handwriting?**

A. Yes.

**Q. Oak. Now, does -- is the receipt dated September 23, 1985?**

A. 9/23/85, yes.

**Q. Now, this one states that it's hair samples for Robert Timmerman; is that correct?**

A. That is correct.

**Q. Do you recall collecting hair samples from Robert Timmerman?**

A. I do not.



**Q. Did you know Robert Timmerman was a submitted suspect for the Mae Marchand crime?**

A. I would think he was a suspect, yes. That's why I submitted the sample.

**Q. I'm going to show you Exhibit 4. (By Ms. Agbiro) Are you able to see Exhibit 4; it's property receipt 50321. Are you able to see it?**

A. Yes.

MS. AGBIRO: Okay. I'm going to mark this as Exhibit 4. COSRPOD12404.

(Exhibit 4, Property Receipt
No. 50321.

Q. (By Ms. Agbiro) Now, is that your name on the bottom of the property receipt?

A. Yes, ma'am.

**Q. Is that your handwriting?**

A. Yes, it is.

**Q. This one's also dated for September 23, 1985; is that correct?**

A. Yes.

**Q. An this is hair sample for**



**Richard C. Croughwell; is that correct?**

A. Yes.

**Q. Do you have any independent recollection of Richard Croughwell?**

A. I do not.

**Q. Do you remember getting -- obtaining his hair samples?**

A. I do not.

**Q. Was Richard Croughwell a suspect in the Mae Marchand --**

A. I would have to refer to my report to Captain Stelzer after that, to determine whether or not he was one of the group that came in to talk to us that night, or whether he was related to the victim and might have been in that same house, and we needed to submit that hair sample to eliminate him as -- you know, that hair sample. Those are the only two reasons. Either he was a suspect or he lived -- he had access to that house.

**Q. Okay. Understood. And just to confirm, does the C-O-M-P next to Mae Marchand's name, does that refer to the complaint?**

A. That would be -- the report number,



155O12. It was originally taken by the person who went out and put the report about the break-in in.

**Q. Okay.**

MS. AGBIRO: Exhibit 5.

(Exhibit 5, Property Receipt,
No. 50322, marked)

**Q. (By Ms. Agbiro) Do you see it's 5-0-3-2-2?**

A. Yes.

**Q. Okay. It's COSRPOD12405. Is that your handwriting?**

A. Yes.

**Q. And your name at the bottom of the property receipt?**

A. Yes, it is.

**Q. And the date is also September 23, 1985, correct?**

A. (nonverbal response)

**Q. Just a reminder, you got to do answers?**

A. I said, yes.

Page 101

(Exhibit 6, Property Receipt
No.50324, marked)

**Q. (By Ms. Agbiro) And then, lastly, Exhibit 6, is that your handwriting?**
A. Yes.
**Q. Okay. And your name at the bottom of the receipt?**
A. Yes, it is.
**Q. And this is for a fingernail, correct?**
A. That's correct.
**Q. And also the date is September 23, 1985?**
A. Yes.
**Q. Okay. Do you remember if, besides you and Officer Fleury, do you know if any other officers wrote a property -- submitted a property receipt in connection with the Mae Marchand investigation?**
MR. COYLE: Objection. You can answer.
**Q. (By Ms. Agbiro) Did you answer?**
A. I didn't answer, no. I have no

Page 102

recollection of anybody else submitting a property slip at that time.
**Q. Now, I'm going to show you, I think, Exhibit 7 at this point.**
MS. DESOUSA: Tyler, you're not on mute.
**Q. (By Ms. Agbiro) Okay. Can you see my screen?**
A. Yes.
**Q. Okay. Now, is this the September 22, 1985, report to Captain Stelzer you were referring to earlier?**
A. Yes.
**Q. Now, have you had a chance to review this report?**
A. I've looked it over, yes.
**Q. Do you need another minute with it before I start asking questions?**
A. Is it okay if I have my own copy right in front of me?
**Q. Sure.**
MS. AGBIRO: I'm going to just mark this as Exhibit 7. Bates number COSRPOD12412.

Page 103

(Exhibit 7, Report,
September 22, 1985, marked)

**Q. (By Ms. Agbiro) Okay. Did you get a chance to review the copy you have?**
A. Yes, ma'am.
**Q. Okay. Now, is that your name at the bottom of this report?**
A. Yes, it is.
**Q. Does that mean that you drafted this report?**
A. Yes, I did.
**Q. Okay. And now, it says here that the initial investigation was conducted by Jarvis and Mulvagh, I guess. What was that? I couldn't hear you.**
A. Brian Mulvagh, is the officer's name.
**Q. Now, it states here that one of the officers identified by George Perrot as being one of the white male youth that were hired to paint around Mae Marchand's house?**
A. Yes. That's what I wrote down.
**Q. Okay. Now, it says that Perrot has**

Page 104

**an extensive file with the department. What did you mean by that?**
A. That means that he has an extensive arrest record.
**Q. Okay. And how did you become aware of that arrest record?**
A. I have no independent recollection. Whether I went and looked him up in records or -- that's what I assume I would have done. I wouldn't have said it unless I knew it.
**Q. All right. And then it says here that -- that "Perrot called DB at about 7:00 p.m. on September 21st"; do you see that?**
A. Yes.
**Q. Does "DB" stand for detective bureau?**
A. Yes, it does.
**Q. And it says, that, "Perrot agreed to come in and talk to us"; is that right?**
A. Yes.
**Q. Okay. Who did Perrot talk to, when he came in on September 21st?**
A. I don't have his statement so I don't know who actually took it. I'm assuming,

Officer Detective McFarley and Detective Kennedy took his statement.

**Q. And were those two officers, officers that you supervised?**

A. Yes.

**Q. And then it says that "Perrot mentioned that had he was with Jeff Adkins and Robert Timmerman at the time"; is that right?**

A. Yes.

**Q. Now, it states here that Adkin also talked to the detective bureau.**

A. Yes.

**Q. Okay. Do you know when he talked to the detective bureau?**

A. That same night.

**Q. That same night?**

A. Yes.

**Q. And it says that Timmerman was also contacted and taken to the detective bureau; is that right?**

A. Yes.

**Q. Okay. And was that -- that also happened the same night?**

A. Yes.



**Q. Okay. Now, do you know who spoke with Adkins?**

A. I have no independent recollection of that. I'm sorry. I would have a statement here to verify either way.

**Q. Okay. And do you know who spoke to Timmerman?**

A. I do not.

**Q. Okay. So it says here that "Timmerman was near panicked on interview. He lost his color, was visibly shaken and couldn't speak. In addition, many of the details he provided to us during the previous night were inconsistent with the statements of Adkins and Perrot"; is that correct?**

A. If I wrote it, it's correct, yes.

**Q. Okay. Now, was that written from your personal knowledge?**

A. It appears as though it was.

**Q. Okay. So you were in the room with Timmerman while he was getting questioned?**

MR. COYLE: Objection.

THE WITNESS: At some point, I made those observations myself. It,



certainly -- it appears that that's what I meant when I wrote that report.

**Q. (By Ms. Agbiro) And it says here, that Nancy and Mark Wescott were contacted and informed you guys that Perrot came home around 12:30 on September 21st; is that correct?**

MS. DESOUSA: Objection.

THE WITNESS: That's what it says on this report, yes.

**Q. (By Ms. Agbiro) Okay. Who reached out to Nancy and Mark Wescott?**

A. I don't know. I have no independent recollection of whether or not they came in or I dispatched detective to their house to verify the story while he was still giving a statement. That would have been something I would try to do, if possible. But I can't recall independently.

**Q. Okay. Now, it says here that around 10:00 p.m. on September 21st, officers Fleury and Regnier; is that correct?**

A. Regnier, yes.

**Q. Regnier and yourself went to the victim's home at 26 Pine View Drive?**

A. Yes.



**Q. Okay. That victim being Mae Marchand, correct?**

A. That's correct.

**Q. Now, earlier you testified that when you went to Mae Marchand's home other police officers had previously already gone to that house; is that right?**

A. That is correct.

MR. JOYCE: Objection.

**Q. (By Ms. Agbiro) Do you know who those other police officers were?**

A. No.

**Q. Okay. Do you know if they -- when they went to the home?**

A. No.

**Q. And was this the first time that you went to Mae Marchand's home in relation to this specific break-in?**

A. Yes.

**Q. Okay. And it says here, as you discussed earlier, "the broken glass fell from the window in the breezeway." And you described that there were also a screen that was cut in another kitchen window on the northwest corner of the**

**house; is that right?**
A. Yes.
**Q. Okay. And they're also prints on the window --**
A. Correct.
**Q. -- that Regnier dusted, photographs, and lifted the prints; is that correct?**
A. That is correct.
**Q. Okay. And it says here that you were let in by Richard Croughwell; is that right?**
A. Yes.
**Q. This is the victim's grandson?**
A. Yes.
**Q. All right. And you learned that Mae Marchand hadn't stayed at that house for about a month; is that right?**
A. Croughwell had not stayed in the house for about a month.
**Q. Oh, I apologize. Croughwell had not stayed in the house for about a month; is that right?**
A. Yes.
**Q. Okay. Now, here it says that you observed blood stains, hair samples, dirt, and**



**debris on the pillows and sheets, and secured them for evidence; is that correct?**
A. Yes.
**Q. And pending the injury with the victim?**
A. Yes.
**Q. Okay. Now, were these the the blood stains, hair samples, that were -- the pillows and sheets that were reflected on the property receipts that we reviewed earlier?**
MS. DESOUSA: Objection.
THE WITNESS: Yes, there was a property sheet turned in by Officer Fleury.
**Q. (By Ms. Agbiro) Okay. So this was the evidence that was turned in by Officer Fleury?**
A. Yes.
**Q. Okay. All right. And then, after that it says that "All the officers who interviewed Timmerman, Adkins, and Perrot, thought that they were involved with the rape?**
A. Yes.
**Q. So does that mean they were considered to be suspects of the Marchand rape?**
A. I considered them to be suspects.



And all the officers, who were there that not, who worked with me, considered them suspects. Yes. I would say, that's fair to say.
**Q. Okay. And it says that "Timmerman seems to the most culpable. He fits the description given by the victim"; is that right?**
A. Yes.
**Q. All right. I'm going to stop sharing now. Actually, I do have one more question. I'm going to show you Exhibit 2 again.**
**What was the practice -- when were property receipts normally drafted?**
A. They're normally drafted when you have the evidence back at the police station. In other words, you bring the evidence in, bring it into the detective bureau, get a property slip and them write it out. That's how I did it, and that's how she did it.
**Q. Is it the same day the evidence is collected?**
A. Yes.
**Q. I'm going to show you Exhibit 2 again. This is the property receipt of the evidence collected when you entered -- when you**



**went to the home with Fleury on September 21st, correct?**
A. May I refer to my notes here?
**Q. Sure.**
A. Because what happened here, I believe, is I came to work on the 22nd and then work into the 23rd.
**Q. Okay. Now, if I refer you back to Exhibit 7 --**
A. Yep.
**Q. It says that you collected the evidence on September 21st at 10:00 p.m. However, the property receipt is dated for September 23rd. Is there a reason why the property receipt will be dated for two days after the evidence was collected?**
A. I have no idea why the date of the 23rd is on there. I have no idea. In fact, my property slips are dated the same day, the 23rd.
**Q. That is correct.**
A. I don't know why. My recollection is, that this was on one shift. If I collected the property on the 23rd or 22nd, I would have wrote down that date. If this was in error, then,

it was my error.
**Q. Okay. If the property on this receipt that's written, that we've already established wasn't your handwriting, that would be an error?**
A. Well, if it wasn't on the 23rd, if I didn't collect the property on the 23rd and then I wrote the 23rd, I can only assume it was because I made an error. But, I mean, that's not like me.
I don't know what day of the week these were, which might be important. If it was a weekend and they collected the evidence on the 25th, after I submitted it on the 23rd, we could probably -- I don't even know what date this alleged -- this rape and the house break was reported on. So I have none of that information in front of me.
All I can say is, if I wrote the 23rd or the 21st and something doesn't correlate, it was because I made an error. It's not because I'm trying to change the narrative here.
**Q. Okay. Did you ever testify at George Perrot's trial?**
A. No. Not that I can recall.



**Q. Okay.**
A. That's something I would remember. No.
**Q. Okay. But you did collect evidence that was used against him in the Emily Lichwala case, right?**
A. I don't know. I don't know what evidence was used in any case.
**Q. Do you remember speaking with Detective Bloom at all regarding --**
A. Detective who?
**Q. Sorry. District Attorney Bloom.**
A. Regarding this case?
**Q. Regarding the hair and -- the hair samples you collected from George.**
A. I do not.
**Q. Were you ever contacted by Detective Bloom regarding the hair sample you collected in this case?**
A. I can't recall that, no.
**Q. I have one more question about Detective Bloom.**
A. DA Bloom, you mean? DA Bloom?
**Q. I'm sorry, the Ds. I have one**



**question on DA Bloom. Besides your divorce proceeding, did he ever represent you in any other legal capacity, in any other matter?**
A. No, ma'am. He did a lousy job on my divorce too. Go ahead. It's not a laughing matter.
**Q. Sorry. It's a sensitive subject. Okay. I am -- I just need two minutes to just review my notes to make sure I'm not missing anything and then we'll be back. Okay? Let's just take a short two-minute break.**

(A recess was taken)

**Q. (By Ms. Agbiro) I only have a few more questions and then I am done. I appreciate you hanging out for the entire time.**
**My one question is, Timmerman wasn't arrested for the Mae Marchand rapes, right?**
A. I didn't arrest anybody.
**Q. Did Timmerman -- to your knowledge, did Timmerman remain a suspect for the Mae Marchand crime?**
A. I don't know.



MS. DESOUSA: Objection.
**Q. (By Ms. Agbiro) What was that? I'm sorry, I didn't hear you.**
A. I don't know.
**Q. Okay. Do you know why he was ruled out as a suspect?**
MS. DESOUSA: Objection.
MR. COYLE: Objection.
THE WITNESS: I don't know if he was ruled out. Like I said, it wasn't my case to investigate.
**Q. (By Ms. Agbiro) Did you have -- did you ever do any interrogations with Kelly?**
A. I don't think so.
**Q. Okay. Did you do any interrogations with Jarvis?**
A. No.
MS. AGBIRO: Okay. I have no further questions.
MR. COYLE: I have nothing.
MS. DESOUSA: No questions.
MR. JOYCE: no questions.
MS. LYNCH: No questions.
MR. TELLIER: No questions.

MR. SCHMIDT: No questions.
THE COURT REPORTER: May I just ask Ms. Agbiro, Mr. Coyle, do you need copies of the transcript?
MR. COYLE: No.
MS. AGBIRO: I'll take a copy.
MS. DESOUSA: I need a copy. And one for Attorney Schmidt, and one for Attorney Ciccarelli, please.
THE COURT REPORTER: Everybody else all set? Perfect. Thank you.

(Deposition concluded at 1:00 p.m.)



C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

I, BRENDA M. GINISI, a court reporter and Notary Public, do hereby certify:

ANDREW CANEVARI, the witness whose testimony is hereinbefore set forth, was duly sworn by me, pursuant to Mass. R. Civ. P. 27, 29, 30, 30A and 31, and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of August, 2023.

Brenda Ginisi

Brenda M. Ginisi My Commission expires:
Notary Public June 2, 2028



Date: August 15, 2023
To: Carla Agbiro, Esq.
Copied to: Lisa DeSousa, Esq.;
Philip C. Ciccarelli, Esq; Robert A. Schmidt, Esq.
From: Brenda M. Ginisi
Deposition of: Andrew Canevari
Taken: July 21, 2023
Action: George Perrot v. Thomas Kelly, et al
==================================================

Enclosed is a copy of the deposition of Andrew Canevari. Pursuant to the Rules of Civil Procedure, Mr. Canevari has thirty days to sign the deposition from today's date.

Please have Mr. Canevari sign the enclosed signature page. If there are any errors, please have him mark the page, line and error on the enclosed correction sheet. He should not mark the transcript itself. This addendum should be forwarded to all interested parties.

Thank you for your cooperation in this matter.



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO. 18-cv-10147
*************************************************
GEORGE PERROT, *
Plaintiff *
v. *
THOMAS KELLY, THOMAS JARVIS RICHARD KANE, *
CHARLES ARPIN, JOHN SCANLON, DAVID LOUDEN, *
THOMAS KENNEDY, CHIEF ERNEST STELZER, *
MARIANNE POPKO, PAUL GLANTZ, RONALD ST. GERMAIN,*
ANDREW CANEVARI, CHERYL CLAPPROOD, CAPTAIN JOHN
* BROWN, UNKNOWN OFFICERS OF THE SPRINGFIELD
*
POLICE DEPARTMENT, the CITY OF SPRINGFIELD, *
MASSACHUSETTS, and FRANCIS BLOOM, *
Defendants *
*************************************************

I, Andrew Canevari, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief.

WITNESS MY HAND, this day of , 2023.

________________________
ANDREW CANEVARI
bmg

CORRECTION SHEET

DEPONENT: Andrew Canevari

CASE: George Perrot vs. Thomas Kelly, et al

DATE TAKEN: July 21, 2023

**************************************************

PAGE / LINE / CHANGE OR CORRECTION AND REASON

**************************************************

______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________
______/______/____________________________________

**Exhibits**

**CanevariEx. 1**
6:10 74:9,12
**CanevariEx. 2**
6:11 90:15,18 111:10,22
**CanevariEx. 3**
6:12 96:20,23 97:2
**CanevariEx. 4**
6:13 98:5,6,11,13
**CanevariEx. 5**
6:14 100:4,6
**CanevariEx. 6**
6:15 101:1,5
**CanevariEx. 7**
6:16 102:4,23 103:1 112:9

**1**

**1**
74:9,12
**10**
35:19 51:4 87:16
**10:00**
107:19 112:12
**12**
17:21 18:3 35:22 54:4,21 56:7 59:11, 23 61:5 68:20
**12/8/85**
79:15 80:4
**12:30**
107:6
**144**
7:4
**15**
16:23
**155O12**
100:1
**16**
84:11
**1970**
35:20 57:20
**1976**
58:24
**1985**
15:6 21:23 35:14,21 42:10 46:13 48:14, 19 49:3,4 59:16 65:20 66:3 67:10 68:3,12 71:12 73:14, 17 75:11 76:11 77:21 84:1 86:14 88:1,18,23 89:3,8 97:17 98:22 100:19 101:14 102:11 103:2
**1995**
40:1
**1999**
29:7 41:2,4,5
**1:00**
117:13

**2**

**2**
90:15,18 111:10,22
**20**
8:13 59:14 68:17
**2018**
15:14
**21st**
104:13,22 107:6,19 112:1,12 113:19
**22**
102:11 103:2
**22nd**
112:6,23
**23**
97:17 98:22 100:19 101:14
**23rd**
94:8 112:7,13,18,19, 23 113:6,7,8,13,19
**25**
8:4 94:6
**25th**
94:1 113:13
**26**
107:23
**288**
55:16

**3**

**3**
96:20,23 97:2
**30**
8:4,13 49:4 73:14
**30-year**
32:5
**30th**
49:1

**4**

**4**
98:5,6,11,13

**5**

**5**
100:4,6
**5-0-3-2-2**
100:10
**50320**
90:19
**50321**
14:9 98:7,14
**50322**
14:9 100:7
**50323**
14:9 97:3
**50324**
14:9
**51458**
14:10 75:5 79:17,18 81:7
**51465**
14:10 74:13,19,23 75:3,8,16 81:9

**6**

**6**
101:1,5

**7**

**7**
102:4,23 103:1 112:9
**7:00**
104:12

**8**

**8**
75:11 77:21
**8:00**
58:1 59:5

**9**

**9/22/85**
14:7 22:10
**9/23/85**
14:8 22:10 97:18
**90**
55:22
**90s**
23:1
**99**
41:13

**A**

**A-N-D-R-E-W**
7:24
**a.m.**
58:1 59:5
**ability**
12:7,11,12
**academy**
69:20 72:6
**accept**
48:5
**access**
46:6,11,14,16,21 47:4,23 73:23 99:19
**accessible**
46:2
**accurate**
12:4
**acquaintances**
55:20
**Acres**
84:11
**action**
62:21,24
**active**
77:12
**ADA**
33:19 35:24 37:8 39:16 40:7 41:10,13, 18
**addition**
106:12
**additional**
70:10
**address**
13:1 77:7,10
**Adkin**
105:10
**Adkins**
56:13,15,19 105:7 106:2,14 110:19
**advanced**
54:21,22
**affected**

72:9
**Agbiro**
7:7,18,21 8:2 11:6 16:8,14,15,20 17:6 24:14 27:4,6 28:9,19 29:21 30:11 31:5,6, 13,18 33:16,18 34:11 50:23 53:23 61:11 62:14,23 63:23 64:17,22 65:13 72:16,22 74:7, 15 76:10 78:21 82:5, 10 85:15 86:3,7,11, 19 87:23 88:16 89:4, 7,21 90:8,21 91:11, 23 96:11,22 97:5 98:6,10,16 100:4,9 101:4,23 102:7,22 103:4 107:3,10 108:10 110:14 115:15 116:2,12,18 117:3,6
**age**
12:18
**agent**
70:18 72:13
**agree**
7:15
**agreed**
25:15 86:7 104:18
**ahead**
11:5 16:13 30:7,11 78:21 85:15 115:5
**air**
30:4 70:19
**all-attentive**
87:24
**all-white**
23:16
**alleged**
113:15
**allowing**
10:10
**Andrew**
7:1,24
**Andy**
31:1
**answers**
9:21 10:3 100:22
**Anted**
58:3
**anymore**
32:14
**anytime**
11:7 41:3,4
**apologize**
16:16 20:9 68:6 109:19
**appears**
106:19 107:1
**appraised**
66:15
**approval**
61:24 62:11,17,18, 19,21 63:1
**approvals**
62:8
**area**
84:13
**arrest**
19:21 20:8 21:12,13 61:19 63:8,10 64:8 66:19 69:23 78:3 80:13 104:4,6 115:20
**arrested**
8:8 78:12,13 115:19
**assailant**
85:3 90:3
**assailants**
85:4
**assault**
49:1 87:21
**assaults**
88:23 89:3,8
**assigned**
19:13 53:4 59:3,4 60:23 95:2,10 96:7, 10,12,15,16
**assist**
83:3
**assume**
19:4 80:14,17 84:21 104:9 113:8
**assuming**
8:22 80:23 81:12 104:24
**attached**
83:23
**attempt**
43:14
**attentive**
87:13
**attorney**
10:14,16,17,18 14:12,14 31:5 33:19, 20,24 37:9 39:6,21 40:14,18 42:5 50:7 51:7,24 52:19 71:6, 8,9 114:12 117:8,9
**attorney's**
35:24 40:8
**attorneys**
26:18 49:24 52:16, 18
**audio**
11:21
**authored**
14:4,7 49:22
**aware**
12:2,3 71:4,9,11,15, 17 84:6 87:5,6,8 88:3,24 89:10 104:5

**B**

**back**
21:19 22:4,6,18,23 23:5 27:13 28:24 29:13,17 35:16 41:16 59:10 64:14 84:1 111:14 112:8 115:10
**background**
14:23 57:17
**bad**
61:22
**badge**
55:16
**bag**
75:16 79:23
**based**
63:6 70:13 77:1 91:8
**basically**
53:16 60:5
**basis**
86:3
**Bates**
74:9 90:15 102:23
**bed**
43:18,19 85:1 86:21 87:11 93:7,8
**big**
30:4
**bit**
51:12 57:17 62:20 65:20 78:16
**blocked**
74:20 75:1
**blood**
109:24 110:7
**Bloom**
33:19,21,24 34:8 35:10,14 36:19,20 37:13 39:15,16,21, 23 40:7,24 41:13 52:13 114:10,12,18, 22,23 115:1
**booked**
63:11
**born**
23:1
**borne**
33:5
**bosses**
63:4
**Boston**
8:11
**bottom**
27:16,19,22 28:3,16 75:7 80:1 98:17 100:15 101:7 103:8
**break**
11:7,8,10 19:6 72:17 85:19 113:15 115:11
**break-in**
20:11 62:5 100:2 108:18
**break-ins**
42:10 48:15,19,24 81:15 84:4,9 88:22 89:3,8
**breaks**
19:5
**breathalyzer**
70:15 72:12
**breezeway**
108:22
**Brian**
103:17
**briefly**
50:15
**bring**
45:23 47:18 111:15
**broad**
84:17
**broke**
31:19

**broken**
43:10,22,24 85:1 108:21
**brought**
20:3 46:9 63:11
**bureau**
18:1,3,9 19:10 32:6 35:21 38:19 46:4,5,8 53:5,7,8 54:1,3,4,10, 17,19 58:10,20 59:10,19 60:11 68:20 84:2 85:18,21 88:13 94:22 95:2,10, 12,15,16,19,22 96:2, 7,12,16 104:16 105:11,14,19 111:16
**bureaus**
88:7 95:3
**business**
55:20

**C**

**C-A-N-E-V-A-R-I**
8:1
**C-O-M-P**
99:22
**call**
25:20 38:8 51:7 61:9
**called**
23:6 34:14 41:9 104:12
**Canevari**
7:1,21 8:1 10:22 15:4 16:16 49:17 72:22 91:15
**capacity**
40:17,20 53:2,13 54:14 55:10 61:6 115:3
**captain**
14:6,7 19:9,20 20:13,21 21:5,15,19 39:2 61:8 62:4 64:8, 11,14,18 65:14,16 66:5,6,7,15,21 67:11 79:3,4,7 82:11,17 83:7 88:11,17 93:10 99:12 102:11
**captain's**
38:19 66:3
**career**
9:6 26:16 32:4,5
36:12 55:12 70:12, 20 73:10
**carried**
82:6
**case**
8:6,7,8,16,17 10:14 13:24 14:20 15:9,12 17:8,14 19:2,3,13,14 26:15 34:13,21 37:24 39:22 40:16 41:11,13,22,23 61:7 63:10,14,15 64:5,6 66:21 72:7 73:8,19 75:20 77:11,19 78:7, 23 82:14 83:4,20 86:22 87:10 88:15 94:21,24 95:13,14, 15,18 114:6,8,13,19 116:10
**cases**
9:13 18:23 34:3,6, 15,19 35:23 36:18, 20 37:2,21 38:1,10, 13 41:8,9,15,18 55:21 61:4 70:1 78:8,17 85:18,24 86:1,12,15 87:1,2,4, 16 88:1,15 89:15 90:12 94:24 96:17
**casual**
55:20
**chance**
11:20 15:18 102:14 103:5
**change**
33:8,9 92:15,18 113:21
**charge**
13:9 19:10 38:17 45:22
**Cheryl**
55:3
**chief**
65:4 67:12 68:9,10, 11
**chief's**
67:14
**chiefs**
67:16 68:5,6
**Ciccarelli**
117:9
**circle**
76:24
**circled**
78:4
**circumstance**
20:15 67:2 88:5
**circumstances**
41:22 79:9
**city**
87:9
**CITY004723**
74:10
**Clapprood**
55:3
**clarify**
16:4 65:20 68:15 69:8
**class**
72:7,12,14
**clear**
64:7 66:18
**close**
59:14 68:23
**closer**
10:23
**clothes**
67:18
**collect**
36:20,22 37:1 95:5 113:7 114:4
**collected**
43:17 44:17 73:9,10 75:19,20 81:2,3,7,8 90:22 91:2 92:11 94:11 111:20,24 112:11,16,22 113:12 114:15,19
**collecting**
43:19 48:7 73:7,16, 18 93:6 94:21 97:22
**collection**
70:17 72:14
**collector**
37:6,7
**color**
106:11
**comma**
22:21
**command**
21:17
**committed**
87:7,9
**common**
88:6
**communicate**
20:15
**communication**
20:23
**competent**
34:2
**complaint**
15:9,10,19 19:22 20:5 41:23 62:3,5,7 66:19 77:15,16 83:22 99:23
**complaints**
62:3,12
**complete**
12:8
**completely**
13:11 43:24
**completion**
61:17
**computer**
10:23 13:13 14:22 21:23,24 22:3,11,24
**computers**
22:4,17 27:14
**conceivable**
41:17
**concluded**
117:13
**conclusion**
19:15
**condition**
12:19
**conditions**
12:6,10,17
**conduct**
62:12
**conducted**
11:18 103:14
**confined**
84:13
**confirm**
48:23 99:22
**conjunction**
18:4
**connection**
101:19
**considered**
64:18,23 85:24 86:15 89:22 110:23, 24 111:2
**consistent**
85:4

**contacted**
105:19 107:4 114:17
**continuance**
82:18
**continue**
66:23 79:10
**continued**
67:3
**contributed**
15:24
**conversation**
25:11 29:14 50:15 92:14,17
**conversations**
50:6,18 51:3
**convicted**
17:3
**conviction**
15:6,24 17:4 19:15
**convince**
39:1
**copies**
117:3
**copy**
14:8 74:23 102:19 103:5 117:6,7
**corner**
108:24
**correct**
8:23,24 15:9,12 17:8 29:12 42:15,18 60:4 62:1 68:18 73:5 77:22 78:4,5 79:21 80:1,4,5,11 90:23 94:13 97:20,21 98:22 99:1 100:19 101:11,12 106:15,16 107:6,20 108:2,3,8 109:5,7,8 110:2 112:2,20
**correcting**
29:17
**corrections**
27:23
**correctly**
61:21
**correlate**
113:19
**COSRPOD012402**
90:16
**COSRPOD12403**
96:23
**COSRPOD12404**
98:11
**COSRPOD12405**
100:12
**COSRPOD12412**
102:24
**couple**
9:17 49:18 55:17 57:16 72:23
**courses**
69:20
**court**
9:2,6 10:1,4,8,21 11:4 16:20 20:3,4 26:15,17 28:11 70:13 72:8 90:9 117:2,10
**courthouse**
35:2
**courtroom**
9:23
**Coyle**
7:14,19 16:2,7 29:20 30:22 31:1,4 50:1,16 53:19 60:19 76:8 85:14 101:21 106:22 116:8,20 117:3,5
**create**
19:22
**crew**
83:12
**crime**
53:8 54:1,2,9 85:17, 20,21 89:18 94:22 95:2,11,18 96:4 98:2 115:23
**crimes**
87:5,6,8 88:7 90:4
**criminal**
69:24 71:2
**cross**
88:12
**crossed**
36:1
**Croughwell**
99:1,4,9 109:10,17, 19
**cruiser**
17:15
**culpable**
111:5
**custody**
80:22,24
**cut**
108:23
**cutoff**
30:13

**D**

**DA**
39:12 40:11 114:23 115:1
**DAS**
26:18
**date**
35:17 75:10 80:3 93:24 100:18 101:13 112:17,24 113:14
**dated**
94:8 97:17 98:21 112:13,15,19
**dates**
50:19,22 69:8
**day**
23:5 27:13 35:3,4,6 45:18 64:14 66:11 79:1,11 82:19 83:3 88:11 95:4 111:19 112:19 113:10
**days**
17:22,24 19:6 64:2 66:23 67:4 69:2,6 82:21 95:3 112:15
**dayshift**
64:2 69:4
**daytime**
36:13 82:7
**DB**
104:12,15
**debris**
110:1
**December**
73:17 75:11 77:21
**decent**
30:2
**decide**
21:5
**decision**
72:8
**decisions**
63:5,6 70:14
**defendant**
17:7 26:23 27:14,21 30:19
**defendant's**
8:16 32:1
**defendants**
52:8,12 71:3
**defense**
26:18 71:6,9
**definitively**
84:18
**department**
9:7 15:24 24:15,18 34:24 35:11 36:5,8, 16 37:17 38:5,7 40:5 41:2,7,10,17 45:13, 16 52:5 55:14,15,18, 22 56:6 57:19,22 69:16,19 71:24 72:3 85:11 87:2 89:1,11, 23,24 95:17 104:1
**dependent**
48:16
**depending**
95:13
**depends**
32:12
**deposed**
8:19 9:16
**deposition**
8:3 9:22 10:2 49:19, 20 51:22 52:2 117:13
**deposition's**
11:17
**deputy**
66:10 67:12,14,16 68:4,5,6,8
**describe**
62:20
**description**
85:3,8,12 90:3,12 111:6
**desk**
14:19 60:10
**DESOUSA**
16:3,11 28:8,18 30:10 34:10 62:13, 22 64:20,24 78:20 82:4,9 85:13 86:2,5, 9,16 87:3 88:8 89:2, 20 90:6 91:10 96:8 102:5 107:7 110:11 116:1,7,21 117:7

**details**
106:12
**detective**
17:11,23,24 18:1,15 19:5,10 29:2,6 32:6 35:21 38:19 43:9 46:4,5,8 53:3,18,24 54:4,17,19,20 58:10, 16,18,19 59:10,19 60:11 61:4 68:20 84:2 95:1,12,15,16, 22 96:2,12 104:15 105:1,11,14,19 107:14 111:16 114:10,11,18,22
**detectives**
18:18 47:2 59:22 60:14 62:10 66:5
**determine**
38:20 99:12
**died**
64:13
**differently**
87:1
**dinner**
40:22
**direction**
91:7
**directly**
18:5,21 55:9,21
**dirt**
109:24
**discuss**
50:17 63:14
**discussed**
108:21
**discussing**
86:12
**discussions**
88:17
**dispatched**
8:12 107:14
**displaying**
13:17
**dispute**
76:6
**district**
33:19,20,24 35:24 37:8 39:6 40:8,18 71:7 114:12
**division**
45:17
**divorce**
39:22 40:13 115:1,5
**document**
74:2,4
**documents**
13:16,19,21,23 14:2, 4,11 42:3,8 48:12
**dog**
17:20 27:4
**drafted**
83:10 103:10 111:12,13
**dramatically**
72:9
**drink**
40:21
**Drive**
107:23
**driver's**
7:2
**driving**
70:18
**drops**
11:21
**drug**
54:5,7,9
**drugs**
95:20,21
**Ds**
114:24
**duly**
7:3
**dusted**
109:6
**duty**
48:6 71:2

**E**

**e-mail**
14:22
**earlier**
12:22 22:16 29:15, 18 68:15 73:4 78:6 85:23 90:2,21 102:12 108:4,21 110:10
**early**
26:16
**easier**
22:5,18,23
**elderly**
84:9 85:1 86:20 87:11
**eliminate**
99:17
**Emily**
42:10,14 48:15,20, 24 57:11 72:24 73:2 81:15,22 82:2 88:19 89:9 114:5
**ended**
83:19 95:23
**engaged**
62:11
**ensure**
66:20
**enter**
43:15
**entered**
111:24
**entire**
115:17
**entities**
96:6
**erase**
24:11
**eraser**
24:10
**Ernest**
65:18
**error**
27:12,13,15,19 29:23 112:24 113:1, 5,9,20
**errors**
61:22
**established**
113:4
**evening**
36:12,16 87:16
**eventually**
19:13
**evidence**
33:5 36:20,22 37:1, 6,7,14,18,22 38:2, 11,14,17,21 39:11 43:5,18,20 44:17,21, 23,24 45:17,20,23 46:1,6,10,15,17,21 47:4,10,13,21,22,23, 24 48:7 64:9 70:17, 22 71:2,4,10 73:8,9, 10,16,18 76:14,23 79:23 82:24 83:12, 15,16,18 86:13,23 90:22 91:2 92:11 94:11,13,15,16,21 95:1,3,10,15,16,17, 19,24 96:1,2,4,7,12, 16 110:2,15 111:14, 15,19,24 112:12,15 113:12 114:4,8
**evidential**
19:19
**evidentiary**
33:12 82:23
**EXAMINATION**
7:7
**examined**
45:8
**exception**
26:1,3
**exchange**
88:6
**exculpatory**
70:22 71:5,10
**Excuse**
50:16
**Executive**
7:3
**exhibit**
74:8,9,12 90:15,18 96:20,23 97:2 98:5, 6,11,13 100:4,6 101:1,5 102:4,23 103:1 111:10,22 112:9
**expect**
26:18 48:4
**expectation**
79:7
**expected**
65:9
**expects**
26:17
**experience**
22:13 37:12 39:14
**expert**
16:13
**explain**
78:15
**explained**
66:1
**explaining**
31:19

**explanation**
28:3,16
**extensive**
104:1,3
**extraordinary**
36:14

**F**

**face**
55:14
**facing**
25:10
**fact**
19:11 27:15 43:3,10 81:21 112:18
**facts**
63:14
**fair**
18:5 44:16 87:14 111:3
**fairly**
35:23 64:16 65:10
**fall**
58:24
**familiar**
9:18 74:5
**fast**
10:7
**faulty**
44:14
**FBI**
37:18,22 38:11,15, 17,22 39:7,11 70:17 72:13 86:13,24
**feedback**
33:14,17
**fell**
108:21
**felt**
54:6 61:5 76:24
**field**
96:17
**figure**
93:20
**file**
15:16 104:1
**filed**
29:11 41:23
**fill**
76:15,18 77:3,6,10
**find**
26:16 32:8 45:3
**fine**
7:10 13:11 15:3 26:10 35:18 50:23 53:22 69:9
**fingernail**
101:10
**fingerprint**
43:12 70:17 72:13
**fingerprints**
43:16
**finish**
10:10
**firearms**
69:23
**fit**
85:11
**fits**
111:5
**five-minute**
72:17
**five-year-old**
13:8
**fix**
23:4 24:2
**Fleury**
91:6,17 92:4,13 101:17 107:19 110:13,15 112:1
**Fleury's**
93:4
**Florida**
12:22,24 54:17
**folder**
19:22 83:22
**Force**
70:19
**forceable**
85:20
**Forever**
59:13
**forget**
36:11
**forgive**
13:9 23:1
**form**
16:2
**forward**
21:4
**found**
43:14
**frame**
53:10 59:20
**Francis**
52:13
**Friday**
95:5
**front**
13:20 14:2,16 25:8 42:4 63:6 102:20 113:17
**full**
12:8 22:12 96:10,13
**function**
37:6

**G**

**gave**
12:24 56:9,16 57:1 64:14 67:5 80:23
**general**
63:3 85:20 87:7
**generally**
21:14 25:10 35:8 44:23 61:8 64:12 67:17,18,24 71:6 85:2,4 94:17
**gentleman**
8:8
**George**
15:6 16:1 48:21 49:5,14 56:3 75:17 78:11,13 80:22 103:20 113:23 114:15
**Germain**
55:5,11
**give**
9:15,22 10:3,13 19:12 20:12 45:14 67:23
**giving**
12:3 107:15
**Glantz**
55:24
**glass**
108:21
**good**
7:9,10 10:12 51:20 63:15,16
**grand**
35:4,7
**grandson**
13:8 109:12
**great**
63:18
**group**
99:13
**guard**
57:24 70:16
**guess**
16:6 63:12 103:15
**guys**
18:9 24:2 53:24 60:22 63:3 107:5

**H**

**hair**
75:17,18 78:1 80:7, 10 81:6,8 97:19,22 98:24 99:7,16,17 109:24 110:8 114:14,18
**half**
30:18
**halfway**
44:13
**hand**
31:11
**handle**
19:14 20:4 38:2,3 70:22
**handled**
21:6 95:20,22
**handles**
45:16
**handling**
40:16
**handwriting**
76:1 93:2 97:14 98:19 100:13 101:5 113:4
**hanging**
41:8 115:17
**happen**
28:21 39:24 83:2
**happened**
19:18 25:16 31:10 32:3,4,7 49:1 61:4 73:11 78:8 79:10 82:18 83:8,19 105:23 112:5
**happening**
36:17 84:3,4

**happy**
11:22
**Hazardous**
70:18
**head**
75:17 81:9 90:9
**heads-up**
13:12
**hear**
11:20 30:22 31:1,2,4,6 60:18 103:16 116:3
**heard**
52:15
**heavy**
47:17
**high**
38:1 70:18 86:12,17
**high-profile**
35:23 38:10,12,13 86:1,15,22 87:1 88:7
**higher**
65:8
**hired**
103:21
**hold**
58:7 90:14
**holes**
26:15
**home**
12:24 47:18 48:8 107:5,23 108:5,14,17 112:1
**homicide**
61:7,9 69:5 86:20 87:20
**homicide-robbery**
64:4
**honest**
12:4 51:19
**hope**
48:14
**hour-and-a-half**
72:18
**house**
19:5,6 44:11,13,18 62:5 85:1,19 87:12 90:23 93:7 99:16,20 103:22 107:14 108:7 109:1,15,18,20 113:15
**house-break**
17:24 64:4
**humongous**
47:16
**hundreds**
9:3,4,10
**hung**
40:21

**I**

**ID**
62:7
**idea**
85:11 112:17,18
**identified**
7:2 103:20
**imagine**
69:24
**impact**
12:17
**important**
21:2 113:11
**impression**
53:17
**improper**
23:20
**inaccurate**
51:13,18
**Inadvertently**
31:11
**include**
66:11 77:14
**included**
92:13
**inconsistencies**
27:23
**inconsistent**
106:14
**incorrectly**
15:1
**independent**
41:19,21,24 42:8 43:2 44:6,8 49:11 81:10 97:7 99:3 104:7 106:3 107:12
**independently**
107:17
**Indian**
84:10
**individual**
17:11 20:14 52:22 56:12,18,21 57:3,11
**individually**
20:21 71:16
**individuals**
46:14,16
**information**
20:12,13 61:18,20 62:6 76:15 77:1 88:6,10,12 113:16
**informed**
107:5
**informing**
66:22
**initial**
27:8,15,24 29:16 30:9 103:14
**initialed**
28:1,17
**injury**
110:4
**ink**
24:11
**inside**
60:12
**instance**
20:23
**instruct**
50:17 82:7
**instruction**
83:7
**instructs**
10:18
**interact**
35:10 49:14
**interacting**
49:4
**interaction**
35:6 49:7,11 56:18
**interactions**
48:17,21
**interested**
40:15
**interfere**
12:7
**interject**
61:2,3
**interrogate**
24:18 82:22
**interrogations**
70:3 116:13,15
**interrupt**
10:22 11:1
**interview**
106:10
**interviewed**
110:19
**introduce**
74:8
**investigate**
61:10 116:11
**investigated**
19:7 21:18 87:22 95:14
**investigates**
8:9
**investigating**
19:5 34:21 45:5 66:21 89:1,12 96:17
**investigation**
15:5,23 17:16 21:4,14 42:9,14,17,20,23 48:10 66:10 67:3 69:23 72:24 73:1,2,5 77:12 81:22 82:2,6,8 84:2 85:17 89:19 101:20 103:14
**investigations**
42:12 60:3 63:20,21 64:1 66:16 85:22
**investigative**
64:10
**involved**
63:20 64:1 73:5 85:16 110:20
**involvement**
19:2 42:9,11,13,17,19,22 48:9 82:1 83:16
**involving**
84:24
**issue**
20:5
**issues**
11:19
**items**
46:12

**J**

**jail**
17:3
**Jarvis**
17:12,17 18:8,9,15,20,24 19:4,8,12 20:14,16 28:24 29:1,

2,6 52:12 91:13,24 92:6,7,10,12,15,23 103:14 116:16
**Jarvis's** 91:19
**Jeff** 56:13,15,19 105:7
**job** 17:17,18 20:6 29:7 35:20 53:16 55:16 57:20,21,23,24 63:18 68:1,2 72:9 115:4
**John** 43:8,9
**joining** 16:9
**JOYCE** 24:6 60:16 63:22 91:21 108:9 116:22
**judge** 9:24
**jump** 10:11
**jurisdiction** 38:5
**jury** 9:24 35:4,7

**K**

**Kelly** 52:22 53:3,18,24 88:13 116:13
**Kennedy** 54:11,12,15 105:1
**Kevin** 16:9
**key** 46:20,24 47:4,7,21 48:1,3
**keys** 47:9,12
**kick** 21:19
**kind** 19:17 20:5 84:13
**kinds** 69:22
**kitchen** 44:5 108:24
**kits** 95:21
**knew** 40:16 55:13,18,19 60:6 76:17,22,23 77:5,13 84:8 104:10
**knowledge** 39:3 80:21 106:18 115:21

**L**

**lab** 45:7
**lapse** 95:7
**larceny** 64:3
**lastly** 101:4
**late** 92:1
**laughing** 115:5
**law** 63:7
**laws** 69:24
**lawsuit** 29:11
**leads** 89:14
**learned** 20:17 109:14
**led** 8:9 15:5,23
**left** 8:10 15:1 22:21 41:1,7,10,13,14,17 44:23 54:2 93:19 94:3
**legal** 115:3
**letter** 23:19
**license** 7:3
**Lichwala** 42:10,14 48:15,20, 24 57:11 72:24 73:2, 18 81:15,22 82:2 88:19 89:9 114:5
**lie** 30:20 32:15
**lied** 32:2,11,14,18
**lifted** 109:7
**Lisa** 86:4
**literally** 55:18
**lived** 99:19
**local** 38:5
**located** 12:21,23 44:3 46:3
**location** 37:14 44:12
**lock** 45:19
**locked** 46:22,24 83:11,14
**locker** 94:13,16 95:19
**log** 45:2 47:22 96:4
**log-on** 15:1
**long** 8:15 26:14 35:13,14, 17 44:15 51:2 58:3, 4,11 59:6,12 69:3 94:15
**long-term** 63:21 64:1
**longer-term** 63:19
**looked** 102:16 104:8
**lost** 30:23 31:11 106:11
**lot** 8:11 9:12,13 19:1 22:5,23 45:4 62:3 63:16 70:1,20 71:16 72:1 77:12
**lousy** 115:4
**LYNCH** 116:23

**M**

**made** 22:20,22 43:15 54:22 58:21 59:2 61:19 63:4,8,10 71:14 78:3 80:13,17 106:23 113:9,20
**Mae** 42:20,23 44:18 48:8, 9 57:6 88:19 89:9,17 90:23 93:7 98:2 99:10,22 101:19 103:22 108:2,5,17 109:15 115:19,23
**magnitude** 29:23 30:5
**main** 95:16
**make** 10:14 18:7 19:21 20:8 21:12 22:23 23:24 24:3 25:14 27:16,22 28:21 30:7 32:19 39:9 45:10 51:19 59:21 60:2,3 61:12 62:1,7,8 63:5, 15 64:7 67:24 115:9
**making** 31:21
**male** 103:21
**man** 60:9,10
**Marchand** 42:20,23 48:8,9 57:6 88:19 89:9,17 98:2 99:10 101:19 108:2 109:15 110:23 115:19,23
**Marchand's** 44:18 90:23 93:7 99:22 103:22 108:5, 17
**Marianne** 54:23,24
**mark** 74:9 90:15 96:23 98:11 102:22 107:4, 11
**marked** 74:13 90:19 97:3 100:7 101:2 103:2
**Mary** 42:10,17 48:15,20, 24 57:13 88:20 89:10

**matter**
53:11 58:13 59:1,15 92:24 115:3,6
**Mcfarley**
105:1
**means**
67:22 104:3
**meant**
107:2
**medical**
12:6,10,16,18
**meet**
34:13,19,20 36:5 49:23
**meeting**
36:7 49:15
**memory**
12:17 41:21,24 42:8 81:24
**men**
63:16
**mentioned**
22:17 44:17 51:9 52:15 61:11 68:16 73:4 85:23 94:12 105:7
**mess**
23:12 24:12 43:24
**messaging**
14:21
**met**
34:23 56:4,5,10 57:7
**middle**
85:2 86:21 87:12
**midnight**
58:1,9,10 59:4
**midway**
32:8,9
**mind**
32:10
**mindful**
10:9
**minimal**
43:2
**minute**
102:17
**minutes**
51:4 115:8
**misheard**
16:5
**missing**
115:9
**misspelled**
22:21 23:9
**mistake**
22:6,20,22 23:3,24 24:3,4 31:21 80:18
**moment**
13:22
**Monday**
95:5,6
**moniker**
86:18
**month**
109:16,18,20
**morning**
7:9,10 20:3 45:1,21 83:13 95:6
**mouse**
31:10
**move**
10:23 93:18
**muffly**
10:24
**multiple**
47:12
**Mulvagh**
103:15,17
**murder**
8:8,10
**mute**
102:6

**N**

**named**
17:7,12 52:22 56:13, 19,22 57:3
**names**
52:15
**Nancy**
107:4,11
**narrative**
113:21
**natural**
19:15
**necessarily**
23:2 78:14
**needed**
21:3 24:3 28:17 47:22 66:24 99:16
**negative**
38:7
**news**
52:17
**night**
19:7,19 45:15 46:2 47:3 56:5,16 57:1,8 59:24 60:11,22 66:12,14 67:3,5 77:21 78:1,17 79:1 82:12,18 85:2 86:21 87:12 91:7 92:1,8, 20,24 94:12 99:14 105:15,16,23 106:13
**nighttime**
78:9
**No.50324**
101:2
**nod**
90:8
**nodding**
90:7
**nonverbal**
11:11,24 100:20
**normal**
19:23,24 20:24 21:7 37:11 79:6
**northwest**
108:24
**notation**
27:16,18
**notes**
56:14,23 74:21 112:3 115:9
**noticed**
27:23 80:16
**notify**
61:8
**November**
49:1,4 73:14
**number**
9:15 36:1 55:16 77:11,15 99:24 102:23

**O**

**Oak**
97:16
**oath**
9:23
**object**
10:17
**objecting**
16:4
**objection**
7:17 10:14 16:2,3,7, 8,12 24:6 28:8,18 29:20 30:10 34:10 53:19 60:16,20 62:13,22 63:22 64:20,24 76:8 78:20 82:4,9 85:13,14 86:2,4,16 87:3 88:8 89:20 90:6 91:10,21 96:8 101:21 106:22 107:7 108:9 110:11 116:1,7,8
**objection's**
86:9
**observation**
66:9
**observations**
43:16 106:24
**observed**
43:10 109:24
**obtained**
88:10
**obtaining**
99:6
**obvious**
65:7,10
**occasion**
27:7,11 28:5 36:4 37:13 51:5 54:2,8
**occasions**
31:24 36:1 50:2,3 54:8
**occur**
67:8
**occurred**
19:3,6 62:6 87:19 88:18 89:8
**occurring**
66:16 86:14 88:4,23
**office**
35:24 38:19 40:8 45:6
**officer**
25:19,20 26:20 27:13 28:23 37:7 45:5 53:22 66:20 83:3,5,6 91:12 92:13 93:12 94:21,22 95:2 97:11 101:17 105:1 110:13,15
**officer's**

93:23 103:17
**officers**
21:17 27:24 28:6,13, 15,21 43:11 45:1,22 46:7,9,20 47:2 54:6 55:22 63:5 72:6 92:21,22 95:10,11 96:10,11,15 101:18 103:20 105:3,4 107:19 108:6,11 110:18 111:1
**offices**
60:9
**official**
21:12
**older**
84:5
**one's**
98:21
**open**
14:22
**opened**
45:21
**operation**
65:2,12,21
**operator**
70:16
**opinion**
16:12 36:15 66:8 86:24
**Orchard**
84:11
**order**
7:3 60:4 61:13 62:9
**ordered**
79:2
**organization**
67:22
**original**
24:8 33:10 44:11 77:16
**originally**
23:21 50:14 100:1
**out-of-state**
8:7
**overnight**
44:24 45:20 47:22 94:17
**oversight**
61:3 67:17,18,20 68:2
**overturned**
17:5
**owner**
77:3,5,8,13

**P**

**p.m.**
104:12 107:19 112:12 117:13
**pad**
23:17
**paint**
103:21
**panicked**
106:10
**paper**
20:19 21:1,9,15,22, 24 23:7,15,17 31:10 48:12
**paperwork**
60:3 91:4
**parking**
8:11
**part**
55:19 74:20 85:18, 19
**partially**
32:1
**participated**
54:9
**parts**
27:9
**passed**
93:5
**paths**
36:1
**patrolman**
65:3
**Paul**
55:24
**pause**
10:13
**pawned**
76:24
**pending**
11:9 110:4
**people**
56:15 60:8 63:18 67:24
**percent**
55:22
**Perfect**
117:11
**period**
65:19
**periodically**
10:17
**Perrot**
15:6 16:1 48:21 49:5,14 56:3 75:17 78:11 80:22 103:20, 24 104:12,18,21 105:6 106:15 107:5 110:19
**Perrot's**
113:23
**person**
9:1 30:18 51:6 60:12 63:11 65:6,7 96:5,6 100:1
**personal**
106:18
**personally**
29:2 37:19 39:10,17 56:2 57:5,10,13
**perspective**
64:13
**pertaining**
14:20
**phone**
50:2,24 51:7
**photographs**
43:17 75:2 93:18 109:6
**photos**
51:22
**pick**
35:17 45:1 64:13 82:24 83:13
**picked**
19:3,18 94:23 95:8
**piece**
21:22,24 23:14,16 47:16
**pillows**
93:7,9 110:1,8
**Pine**
107:23
**place**
28:1
**plain**
67:18
**plastic**
75:16
**pocket**
47:18
**point**
30:13 32:17 38:14 39:18 55:12 58:16 66:23 78:12 102:4 106:23
**police**
9:7 15:23 21:10,13 24:15,17 34:24 35:11 36:5,8,15 37:7,17 38:5,7 40:5 41:1,7,10,17 45:6, 11,14 49:8 52:5 55:13 56:6 57:19,22 63:5 65:4 68:10,11 69:15,19,20,22 70:7 71:24 72:3,12 87:2 88:24 89:11,23,24 108:5,11 111:14
**Popko**
54:23,24
**posed**
20:8,10
**position**
58:7 59:16 68:16,24 69:10
**positive**
93:4
**possibly**
34:22 43:20
**powder**
43:12
**practice**
21:1 40:11 76:14 111:11
**preceded**
17:19
**preface**
50:4
**Prekop**
42:10,17 48:15,20, 24 57:13 88:20 89:10
**preparation**
49:19
**prepare**
49:20 51:22 52:1
**pretty**
65:7

**prevent**
12:3
**prevention**
53:8 54:1,3,10 85:18,21 94:22 95:2, 11,18 96:4
**previous**
106:13
**previously**
108:6
**printed**
13:20
**prints**
109:3,7
**prior**
48:14,19 49:3 69:7, 12
**prioritize**
87:17
**private**
40:11
**procedure**
9:18 79:6
**proceeding**
115:2
**process**
25:6 29:19
**production**
7:2
**professional**
34:2 40:20
**profile**
38:1 86:12,17
**program**
69:21
**promoted**
70:11
**property**
14:8 44:22 45:1,9, 22,24 73:20 74:12, 16,18 75:4,10,13,16, 19,23 76:4,11,15 79:20,22 80:6 81:4,7 83:9 90:18 91:1,13 93:13,15 94:8 97:2, 6,8,12 98:7,13,17 100:6,16 101:1,18 102:1 110:9,13 111:12,16,23 112:13,14,19,23 113:2,7
**prosecuted**
34:6 36:19
**prosecutor**
34:2 36:13 39:4,5, 10,12
**protocol**
26:5,7,8,11,12,13,24
**provide**
12:7
**provided**
71:23 72:3 106:13
**pubic**
80:10 81:6
**pursuant**
7:3
**put**
20:18 21:8 23:10,15, 17 31:11 44:22 45:9 48:11 51:17 63:24 77:13 100:2
**putting**
61:24

**Q**

**quasi-military**
65:2,11,21
**question**
10:19 11:9,23 12:13 15:11 16:5,10,12,17, 19,21,23 26:7 28:12, 14 34:17 37:3 39:10 60:24 65:24 72:23 89:6 111:10 114:21 115:1,18
**questioned**
106:21
**questions**
7:15 11:15 20:20 41:21 49:18 50:5 56:8 57:16 72:23 102:18 115:16 116:19,21,22,23,24 117:1
**quickly**
90:14

**R**

**raid**
54:5,7,9
**raising**
16:9,11
**ran**
72:12
**rank**
65:3,8 67:11 68:8
**ranks**
54:22
**rape**
85:20 86:20 95:21 110:20,23 113:15
**raped**
87:11
**rapes**
84:3,4,9,24 86:14 88:18 115:19
**rare**
64:16
**reached**
52:19 107:10
**read**
16:21,23 22:22 25:22 26:21 49:7,21
**real**
24:11
**reask**
11:22 28:13
**reason**
12:1,2 29:15,22 30:3 40:20 76:6 112:14
**reasons**
99:18
**recall**
8:20 15:20 18:21 20:22 27:20 28:5 30:14 33:20,23 34:1, 5,6,22 36:6,7,8,10, 11,16 37:15,20,23 38:13 40:12 41:6,11 43:13,17 46:19 47:8 48:8,22 49:15 50:21 54:18 55:9 69:8 70:4,23 72:5,13 73:6,7,15,18 76:2 78:6 81:13,16 82:16 83:8 84:2,16,17,19, 22 85:22 88:14,17 91:24 93:6,8,9 97:5, 6,22 107:17 113:24 114:20
**receipt**
74:12,18 75:4,11,14, 16,19,23 76:4,11,16 79:21 80:6 81:7 90:18 91:1 94:8 97:2,8,16 98:7,13,17 100:6,16 101:1,8,19 111:23 112:13,14 113:3
**receipts**
74:16 83:9 110:10 111:12
**receive**
69:14,18 70:10
**receiving**
70:21 93:12
**recently**
15:20 17:4
**recess**
31:16 72:20 115:13
**recognize**
93:2,11,13,22
**recollection**
27:7 41:19 43:2,3 44:4,6,8,14 48:17 49:11 51:11 56:5,18 57:2 67:15 75:22 76:1 81:10,19 84:23 90:11 97:7 99:4 102:1 104:7 106:3 107:13 112:21
**recollection's**
56:10
**recollections**
28:22
**record**
7:13,20,23 31:14 32:19 46:14 53:11 58:13 59:1,15 86:10 92:24 104:4,6
**records**
104:8
**rectify**
24:4
**refer**
43:1 56:14,23 73:20 74:21 93:9 99:11,23 112:3,8
**reference**
75:19
**referred**
22:9 74:16
**referring**
21:9 75:14,15 88:19 102:12
**reflected**
110:9

**reflecting**
91:2
**refresh**
51:10 81:24
**Regnier**
43:8,9 107:20,21,22 109:6
**related**
12:11 13:23 71:22, 23 99:15
**relates**
81:6
**relating**
89:9
**relation**
81:9,14 108:17
**relevant**
76:18,20 88:7
**relieving**
78:24
**remain**
115:22
**remember**
8:16 22:2 31:21 34:3 35:9 43:6,7,8,18,21 44:8 47:9,15 48:16 49:4 53:9 58:22 67:2,7 68:3,12 70:21 72:14 84:12 85:7 92:17 99:6 101:16 114:2,9
**remind**
10:6 28:10
**reminder**
100:21
**repeat**
16:18
**rephrase**
89:5
**report**
14:5,6 19:8,12 21:10,11,13 43:1 44:5 49:6 51:18 61:19 62:4 63:13 64:8 66:20,21 70:7 77:15 91:20 93:10 99:11,24 100:2 102:11,15 103:1,8, 11 107:2,9
**reported**
113:16
**reporter**
10:1,8,21 11:4 16:20 28:11 90:9 117:2,10
**reporter's**
10:4
**reports**
20:19 22:9,10 43:4 49:21 51:10,14,18, 20 61:12,14
**represent**
81:20 115:2
**representatives**
52:8
**request**
19:22 38:24 62:7 66:19
**requested**
62:2 71:5
**requesting**
62:4
**required**
61:20 62:10,16,19, 21,24
**requiring**
31:22
**rereading**
43:4
**respond**
20:11
**responded**
20:16
**response**
11:11,24 100:20
**responsibilities**
59:18 66:4,7,8
**responsibility**
48:5 67:23
**responsible**
18:17 48:2 61:13
**resulted**
21:12
**retest**
38:6
**retirement**
69:12
**return**
19:20
**retype**
23:19,20 30:1
**reveal**
50:5,17
**review**
15:19 51:21 61:16 102:14 103:5 115:9
**reviewed**
51:10,14 110:10
**reviewing**
61:13
**rewrite**
30:5,15
**ribbon**
23:8
**Richard**
93:4 99:1,4,9 109:10
**Richie**
91:6
**Rip**
24:8
**Road**
8:11
**robbery**
69:6 87:19
**Robert**
56:22,24 57:3 97:20, 23 98:1 105:8
**role**
67:14
**Ronald**
55:5,11
**Ronnie**
55:8
**room**
13:3,4,6 26:21 44:24 45:17,20,21,24 46:1, 6,15,17,21 47:5,10, 13,23,24 83:12,15 95:15,16,17 106:20
**roster**
59:21 60:2
**ruled**
116:5,10
**rules**
11:13
**running**
72:6

**S**

**safely**
54:6
**sample**
76:2,4,7 78:1 98:4, 24 99:17,18 114:18
**samples**
75:17,18 80:7,10 81:1,3,6,8,14,21 97:20,23 99:7 109:24 110:8 114:15
**satisfactorily**
43:4
**scenario**
20:7,10
**scene**
43:10 61:1
**Schmidt**
117:1,8
**screen**
13:13,14,17 14:23 73:22,24 74:20 75:1 90:13 93:19 96:20 102:8 108:23
**section**
77:4,7 84:11,12
**secured**
110:1
**send**
21:4,18
**sending**
86:23
**sense**
25:11
**sensitive**
27:5 115:7
**sentences**
10:10
**separate**
79:20,22,23 87:5 95:24
**separately**
95:22 96:1
**September**
94:1 97:17 98:22 100:19 101:14 102:11 103:2 104:13,22 107:6,19 112:1,12,13
**sergeant**
18:2,13 35:21 54:22 58:21 59:2,19 66:14 70:11,16 71:17 72:22 84:1
**sergeants**
18:17
**series**
84:3,8,24 86:14
**served**
15:8,10,17

**service**
14:22
**set**
34:14,19 117:11
**setting**
29:1,3 39:16
**shaken**
106:11
**share**
90:13
**sharing**
111:9
**sheet**
21:15 31:10 80:18 93:7,8 110:13
**sheets**
43:19 110:1,9
**sheriffs**
68:4
**shift**
18:2,10 19:7 20:12 35:22 36:12 45:16 46:2,8,10 47:3 48:4 53:6,15 54:3,21 56:6 58:2,10 59:11 64:2 66:12,14 68:19 77:22 78:9,13,24 79:1 88:12 92:8,18, 24 94:12 95:4 112:22
**shifts**
17:19 87:6 92:15,21 95:3
**short**
14:5 54:5 115:11
**shortly**
19:3
**show**
73:22 90:14 96:19 98:5 102:3 111:10, 22
**side**
17:13 44:11 75:3 93:14,19 94:4
**sign**
25:23 46:20 47:4
**signature**
79:24 93:11,13,23 94:5
**signed**
26:22
**similar**
90:4,12
**sir**
31:3 67:6 79:23
**sit**
25:8,10
**situation**
32:11 84:22
**situations**
32:9
**slash**
54:21
**slight**
10:13
**slip**
14:8 23:7 93:15 102:2 111:16
**slips**
43:5 73:20 81:4 112:19
**slowly**
10:7
**small**
30:6,8 55:15
**solve**
19:16
**sort**
46:13
**speak**
10:7 50:24 52:1,4,10 106:12
**speaking**
41:6 114:9
**special**
24:10
**specialized**
64:3 72:7,10
**specific**
28:22 45:13 65:23 89:5 108:18
**specifically**
34:5 36:11 37:23 67:7 70:4,23 72:15 73:15 88:21 89:18
**specifics**
34:16
**speculate**
68:14 84:21
**speed**
70:18
**spell**
7:12,22
**spoke**
29:6 40:24 41:2,6 106:1,6
**spoken**
50:1
**Springfield**
8:11 9:6 15:23 24:15,17 35:11 37:16 40:5 52:5 55:13 57:19,22 69:15 71:24 72:3 87:2 89:11
**squad**
17:24 58:1 59:5 61:9 64:4,5 67:19 69:6
**squads**
67:17
**St**
55:5,11
**stacked**
75:3
**stains**
109:24 110:8
**stamp**
90:15
**stamps**
74:9
**stand**
104:15
**standard**
69:20 76:11
**start**
7:14 24:8 25:13 30:17 57:18 102:18
**started**
22:4 33:10 35:10 36:3 64:6 67:4 69:15,19
**starting**
65:3
**state**
7:12,22 45:6 72:11
**stated**
12:21 94:7
**statement**
24:21,23 25:2,7,12, 13,17,18,22,24 26:3, 19,21 27:8,9,24 28:17 29:16,17 30:1, 6,15,18 31:22 32:1 33:8 56:9,16 57:1 82:23,24 104:23 105:2 106:4 107:15
**statements**
29:14 106:14
**states**
80:7 97:19 103:19 105:10
**stating**
18:13
**station**
45:11,14 49:9 111:14
**stay**
24:12 94:15
**stayed**
109:15,17,20
**Stelzer**
14:6,7 19:9,20 21:15 65:18 66:7,15 88:11, 17 99:12 102:11
**step**
83:24
**stick**
47:18
**stipulations**
7:16
**stolen**
76:23
**stop**
111:8
**store**
45:24 46:11
**stored**
47:7 96:1,2,3
**story**
107:15
**strike**
20:9 23:24 24:16 28:13 35:13 37:12 46:21 48:18 70:9
**struck**
23:18,22
**studied**
71:16,19 72:1
**stuff**
14:19 69:24 95:21
**subject**
115:7
**submit**
37:18 62:9,17,18 64:11 99:16
**submitted**
37:22 38:8,9,11,15,

21 39:2,7 45:6 91:6 98:2,4 101:18 113:13
**submitting** 91:12 97:11 102:1
**substance** 50:6,18
**succinctly** 63:24
**suggest** 22:8
**superior** 65:5,6
**supervise** 18:20 59:21 60:2 66:9
**supervised** 60:14 65:14 105:4
**supervising** 18:18,22
**supervision** 54:20
**supervisor** 18:2 46:8 48:5 54:3 56:7 63:21 64:19,23 68:20 69:4,5
**supervisors** 47:3
**surmising** 91:8
**surprised** 37:24
**surrounding** 41:22
**suspect** 24:23 25:7,9,21 29:16 32:10 85:6 89:23 90:11 98:2,3 99:9,19 115:22 116:6
**suspect's** 25:2
**suspects** 88:24 89:10,15,19, 24 110:23,24 111:2
**sworn** 7:3 9:15
**system** 65:3

**T**

**tag** 44:22 45:9 79:22
**taking** 25:7 30:17 38:17 76:2
**talk** 99:14 104:19,21
**talked** 29:10 50:10 105:11, 13
**talking** 15:13 29:14 68:19 73:11,13 79:17 93:14
**taught** 24:2
**teach** 27:1
**team** 64:10
**techniques** 69:23
**technology** 11:19
**telephone** 77:7,11
**TELLIER** 116:24
**telling** 33:2,3 50:11
**terms** 44:7 57:17
**test** 38:7
**tested** 38:4
**testified** 7:4 9:2,12 78:7 90:2, 22 108:4
**testify** 9:5 12:11,12 15:5 32:16 34:17 41:9,16 113:22
**testifying** 18:8
**testimony** 9:15 12:4,8 34:16 86:6
**testing** 37:18,22
**thing** 23:5 29:13 31:20 83:11
**things** 9:21 21:9,23 26:17 32:6 70:20 95:20
**thinking** 40:3 42:7 47:15
**Thomas** 19:4,8,12,13 52:22 54:11,12,15 92:10
**thought** 16:5 20:19 21:2 43:18 53:21 66:1 110:19
**thousands** 9:11
**time** 8:15,18,20 18:1,12, 24 21:22 24:15,17 25:13 29:5 37:16 38:2 40:3,5,8,23 44:15 53:4,10 59:19 63:17 64:18 65:14, 17,19 66:4,17 67:16 77:2 81:2,4,5,8 89:12 91:3 96:10,13 102:2 105:8 108:16 115:17
**times** 9:3,4,5,8,16,17 45:4 62:3 77:12
**Timmerman** 56:22,24 57:3 97:20, 23 98:1 105:8,18 106:7,10,21 110:19 111:4 115:18,21,22
**today** 9:22 10:2 12:4,8 15:5 49:20 52:16 80:21
**told** 32:16 65:10 79:8,12 81:17
**Tom** 17:17 88:13 92:15, 23
**Tommy** 19:4 52:12 91:24
**tooken** 77:24
**top** 23:21
**total** 59:23
**track** 83:18,21
**trained** 70:2,6,9 71:1 72:2
**training** 69:14,18 70:5,10,13, 14,19,21,24 71:23
**trainings** 72:4
**transcribe** 10:2
**transcript** 117:4
**transfer** 37:14
**transferred** 58:9 69:2
**treated** 87:1
**trial** 34:14,20 35:3 113:23
**truth** 32:13,24 33:2,4,6
**truthful** 51:19
**turn** 19:19 71:2,8
**turned** 60:4 71:7 81:4 110:13,15
**turning** 43:19
**Twenty-third** 94:2
**two-day** 95:7
**two-fold** 42:24
**two-minute** 115:11
**Tyler** 102:5
**type** 11:19 21:14,21 22:6 23:9,11,18 24:16 25:14 62:11,21,24
**typed** 21:23

**types**
32:6
**typewriter**
22:1,3,7,14,24 23:2, 3,8 24:1,5 25:2,7,9
**typewritten**
27:12
**typing**
25:13,15

**U**

**ultimately**
38:18 95:14
**unarrest**
63:9
**uncommon**
79:2 83:1,2
**underneath**
91:17 93:12
**understand**
10:15,20 11:12,21 15:4,22 17:2,5,7,23 18:7 23:2 30:8 37:9 39:9 42:1 45:10 65:24 95:9
**understanding**
67:13 78:16 84:15 90:10
**Understood**
99:21
**uniform**
58:1 59:5 67:17
**unit**
66:16 67:24
**unwritten**
26:11
**upper**
94:2
**usual**
7:16 76:13

**V**

**vehicle**
8:10,12
**verbal**
10:3 28:10
**verify**
93:10 106:5 107:14
**Vermont**
8:9
**victim**
26:22 77:4,5,13,17 99:15 108:1 110:5 111:6
**victim's**
77:14 107:23 109:12
**victims**
42:12
**videos**
51:22
**View**
107:23
**visibly**
106:11
**voluntarily**
49:8 80:23

**W**

**wanted**
38:4
**watch**
17:20 25:21 57:24 70:16
**ways**
24:8
**weapon**
8:10
**week**
113:10
**weekend**
94:18,20 95:7 113:12
**weeks**
50:10 69:22
**Wescott**
107:4,11
**Westover**
70:19
**when's**
29:5 40:23
**where'd**
59:8
**whichever**
20:3
**white**
23:6,7,10,14,21 29:18 103:21
**who'll**
82:7
**window**
43:10,14,22 44:2,9 108:22,24 109:4
**winter**
58:24
**withdraw**
89:6
**witness's**
24:20
**witnessed**
26:20 56:9
**witnesses**
25:23 26:3
**woman**
87:11
**women**
84:5,9 85:1 86:21 90:4
**wonderful**
63:18
**wood**
47:17
**word**
22:21 23:9 29:24
**words**
17:20 61:19 64:7 76:22 78:24 79:3 85:5 111:15
**work**
17:11 18:4,23 21:20 29:1,3 34:8 37:21 39:16 45:18 46:7 52:21 53:2,14,24 54:12,14,24 55:2,23 59:22 60:22 64:10, 15 69:23 78:7,8,17 79:4 112:6,7
**worked**
17:13,15 18:9,10 19:6 23:3 37:2 47:3 54:16,19 55:21 63:17 111:2
**working**
33:20,24 34:3,6 39:15 40:4 57:18 60:2,12 77:21
**works**
95:3,4
**write**
19:8,9 21:1 31:22 33:3 62:4 64:8 66:20 70:7 111:17
**writing**
24:1
**written**
24:4 26:8,11 76:3 106:17 113:3
**wrong**
40:2 47:19
**wrongful**
15:24
**wrote**
28:16 43:1,5 61:14 101:18 103:23 106:16 107:2 112:24 113:8,18

**Y**

**year**
53:9 58:22 59:7,8 73:12
**years**
8:4,14 14:5 17:19 35:19 40:3 53:10 54:8,17,18 55:17 58:6,12,14 59:14 68:17 69:7
**youth**
103:21

**Z**

**Zoom**
8:23 9:20 11:18 13:13