**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 50

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss. SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

COMMONWEALTH

v.

GEORGE PERROT

Docket Nos. 85-5415, 16, 18, 20, and 25

## DEFENDANT'S PROPOSED FINDINGS OF FACT

### Introduction[1]

1. Hair microscopy is an obsolete forensic technique first developed in the 1860s for comparing macroscopic and microscopic class characteristics of hairs. Ex. 25 at 3 (2009 Oien Article); Ex. 31 at 160-61 (2009 NAS Report).

> *Explanation: FBI Agent Oien's 2009 article notes that the first reported use of forensic human hair comparison was by Rudolf Virchow in 1861. Ex. 25 at 3 (2009 Oien Article). As explained in detail below, the 2009 NAS Report found serious methodological, statistical, and testimonial problems in the field of hair microscopy. Ex. 31 at 160-61 (2009 NAS Report).*

2. For decades, the Federal Bureau of Investigation ("FBI") used hair microscopy in an attempt to associate an unknown hair (from a crime scene or a suspect's home, for example) with a known person (typically a suspect or a victim). Ex. 27 at 1-2 (4/20/2015 Press Release); MFNT Tr. II, 158:24-159:5 (LeBeau); Kafadar Aff. ¶ 10.

> *Explanation: The FBI has performed hair microscopy since at least the 1970s through 2000. MFNT Tr. II, 158:24-159:5 (LeBeau) (testifying that the FBI has identified*

[1] Citations to the September 11, 2015 hearing transcript are notated as "MFNT Tr. I"; Citations to the September 25, 2015 hearing transcript are notated as "MFNT Tr. II"; Citations to Mr. Perrot's 1992 trial transcripts are notated as "Trial Tr. I-IV"; Citations to Mr. Perrot's 1987 trial transcripts are notated as "First Trial Tr. I-VI"; Citations to Mr. Perrot's Motion to Suppress hearing transcript are notated as "MTS Tr."; Exhibits cited herein refer to exhibits introduced during the September 11, 2015 and September 25, 2015 hearings; Documents marked for identification during the September 11, 2015 and September 25, 2015 hearings are notated as "Ex. __ for ID."

*cases dated as far back as 1970s); Ex. 27 at 1-2 (4/20/2015 Press Release) (noting that in 2000, it became the standard practice at the FBI use mitochondrial DNA testing for hair). As Dr. Kafadar explains in her affidavit, the "objective of hair microscopy is generally to establish the likelihood that a particular person (typically a suspect or victim in a crime) is the source of a particular hair (typically one found at [a] crime scene or other location relevant to a crime)." Kafadar Aff. ¶ 10.*

3. In 2000, hair microscopy became largely obsolete when the FBI lab began to routinely perform mitochondrial DNA testing on hair. Ex. 27 at 1-2 (4/20/2015 Press Release).

*Explanation: The April 20, 2015 FBI press release notes that in 2000 it became the standard practice at the FBI to confirm hair microscopy results using mitochondrial DNA. Id.*

4. While hair microscopy was still in use in forensic laboratories, FBI hair examiners regularly submitted reports and testified in criminal trials concerning purported associations based on microscopic hair comparisons. *Id.* at 2.

*Explanation: The April 20, 2015 FBI press release notes that the FBI examiners "submitted reports or testified in trials using microscopic hair analysis." Id.*

5. Although the FBI has for many years understood that hairs do not provide the basis for unique identification, the FBI nevertheless continued to claim, even as late as 2009, that hair comparison could "provide a strong basis for an association," and examiners would regularly testify in court to the association's putative probative value. Ex. 25 at 1, 18 (2009 Oien Article); Ex. 30 at 3-10 (FBI Guidance Document); Ex. 31 at 160 (2009 NAS Report).

*Explanation: In a 2009 article, FBI Agent Oien wrote that, although hair comparison is not capable of determining that "a hair came from one individual to the exclusion of all others," it can nevertheless "provide a strong basis for an association," and it is the responsibility of the FBI examiner to "clearly state . . . the significance or weight of an association." Ex. 25 at 1, 18 (2009 Oien Article). The FBI has provided numerous examples of instances where FBI agents provided such testimony. Ex. 30 at 3-10 (FBI Guidance Document); see also Ex. 31 at 160 (2009 NAS Report) (reporting that "several members of the committee have experienced courtroom cases in which, despite the lack of a statistical foundation, microscopic hair examiners have made probabilistic claims based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial.").*

6. Starting in 2012, the FBI initiated a review of thousands of hair microscopy cases to determine whether the FBI's lab reports and examiner testimony met generally accepted scientific standards (the "hair microscopy audit"). Ex. 27 at 1 (4/20/2015 Press Release); Ex. 29 at 1 (Audit Agreement); Ex. 30 (FBI Guidance Document); Ex. 37 (Confidentiality Agreement).

> *Explanation: The FBI explained that it is conducting an audit "to address errors made in statements by FBI examiners regarding microscopic hair analysis in the context of testimony and laboratory reports." Ex. 27 at 1 (4/20/2015 Press Release). Exhibit 29 is an agreement between the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers ("NACDL") concerning "what the science of microscopic hair examinations supports." Ex. 29 at 1 (Audit Agreement). Exhibit 30 is a guidance document that was created and used by FBI reviewers conducting the audit and provides instruction on how to code particular scientific errors. Ex. 30 (FBI Guidance Document). And Exhibit 37 is a confidentiality agreement between the FBI, the Innocence Project, and NACDL. Ex. 37 (Confidentiality Agreement).*

7. The hair microscopy audit was initiated in response to two events: (1) the seminal 2009 report by the National Academy of Sciences entitled *Strengthening Forensic Science in the United States: A Path Forward*, which determined that hair microscopy was highly unreliable ("the NAS Report"); and (2) the exonerations of three individuals in the Washington D.C. region—Donald Gates, Santae Tribble, and Kirk Odom—all of whom were convicted using scientifically flawed hair microscopy testimony by three different FBI hair examiners. MFNT Tr. II, 16:24-17:7 (Koropp), 149:4-10 (Oien); Ex. 27 at 1-2 (4/20/2015 Press Release); Ex. 31 at 155-161 (NAS Report).

> *Explanation: Koropp explained in his testimony that the review came about as the result of "an NAS report . . . that called into question hair microscopy and some of the statements that FBI analysts were making about their findings" and "three pretty prominent exonerations in Washington DC that came in quick succession, all of which involved discredited hair microscopy analysis." MFNT Tr. II, 16:24-17:7 (Koropp); see also Ex. 31 at 155-161 (NAS Report) (finding statistical, methodological, and testimonial problems in hair microscopy). These three cases are Donald Gates, Kirk Odom, and Santae Tribble. MFNT Tr. II, 149:4-10 (Oien). The FBI press release confirms that the FBI agreed to conduct the review following the exoneration of these three individuals and cites the NAS Report for the proposition that linking criminal defendants to crimes using hair is "highly unreliable." Ex. 27 at 1-2 (4/20/2015 Press Release).*

8. In the Odom, Gates, and Tribble exonerations, DNA testing conclusively demonstrated that these individuals were innocent, and in one instance demonstrated that a hair the FBI identified as human in origin was, in fact, a dog hair. MFNT Tr. II, 17:7-11 (Koropp).

> *Explanation: Koropp explained that the Odom, Gates, and Tribble cases "resulted in exonerations," because DNA testing showed "conclusively that these people were innocent." Id. at 17:7-9. Koropp further explained that in one case "one of the hairs that was said to be human by the FBI actually turned out to be a dog hair." Id. at 17:9-11.*

9. As a result of the NAS Report and the FBI hair microscopy audit, it is now understood by the scientific community that the FBI had no basis for assigning a probative value to hair association. Ex. 31 at 160 (2009 NAS Report); Ex. 29 at 1 (Audit Agreement).

> *Explanation: The NAS concluded that assigning probative value to hair associations is erroneous, because "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population." Ex. 31 at 160 (2009 NAS Report). Similarly, the FBI has declared that assigning a statistical weight, probability, likelihood, or rareness to a positive association "exceeds the limits of the science." Ex. 29 at 1 (Audit Agreement).*

10. The FBI has re-reviewed the testimony in this case and concluded that there were eight scientific errors in FBI Agent Wayne Oakes's testimony in George Perrot's 1992 trial; these errors improperly suggested that Mr. Perrot was the unique source of the crime scene hair, improperly assigned a weight or statistical value to the purported association between Mr. Perrot and the crime scene hair, and improperly used the examiner's purported experience as a basis to suggest a probative value of the hair association. *See* Ex. 32 at 3, 8 (10/7/2014 DOJ Letter); Ex. 33 (10/16/2014 DOJ Letter).

> *Explanation: Exhibits 32 and 33 are letters sent by the Department of Justice ("DOJ") to Mr. Perrot's counsel on October 7 and 16, 2014, explaining that a joint DOJ and FBI review determined that FBI Oakes's testimony in Mr. Perrot's 1992 trial contained statements that exceeded the limits of science and were, therefore, invalid. Ex. 32 at 3, 8 (10/7/2014 DOJ Letter); Ex. 33 (10/16/2014 DOJ Letter).*

11. In addition to the errors recognized in the FBI review, the FBI did not have a valid statistical foundation to even declare an association between Mr. Perrot and the crime scene hair in the first instance. Ex. 31 at 161 (2009 NAS Report); Kafadar Aff. ¶¶ 19-20.

> _Explanation_: *The NAS Report found that the morphological characteristics in hair are insufficient to allow for statistical analysis, because (1) the reliability of the characteristics varies by case; (2) there is a lack of agreement on the number of criteria necessary to declare a "match"; and (3) there is a lack of a clear definition of what constitutes a "match." Ex. 31 at 161 (2009 NAS Report). Dr. Kafadar likewise concluded that there is no scientific basis for an examiner to make a hair association. Kafadar Aff. ¶¶ 19-20.*

## Procedure for Performing Microscopic Analysis of Hair

12. In conducting microscopic hair analysis, an FBI examiner would typically begin by gathering any hairs present on crime scene evidence. Ex. 25 at 7-8 (2009 Oien Article); MFNT Tr. I, 135:22-25 (Oien).

> _Explanation_: *In his 2009 article, Oien explains that the first step in the process is collecting and preserving hairs and debris on the evidentiary item using techniques such as taping, scraping, picking, and vacuuming. Ex. 25 at 7-8; see also MFNT Tr. I, 135:22-25 (Oien) (confirming this process).*

13. Any hairs recovered by the FBI are typically given a preliminary macro- and microscopic examination, categorized as either "Caucasian," "Negroid," or "Mongoloid,"[2] and categorized based on region of the body from which the hair came. Ex. 31 at 156 (2009 NAS Report); Ex. 25 at 7-8 (2009 Oien Article); MFNT Tr. I, 20:5-6 (Ziolkowski).

> _Explanation_: *The NAS Report explains that hairs are first examined macroscopically for visible features such as color, shaft form, length, and overall shaft thickness. Ex. 31 at 156 (2009 NAS Report); see also MFNT Tr. I, 20:5-6 (Ziolkowski) (testifying that microscopic hair comparison "entail[s] looking at the hairs first macroscopically" to determine whether the hair is human, what part of the body it came from, and whether it is suitable for comparison purposes).*
>
> *As Oien's 2009 article explains, hairs are then mounted on slides and, based on a preliminary microscopic analysis, are categorized by racial group and by region of the body from which the hair originated. Ex. 25 at 7-8 (2009 Oien Article). The possible*

[2] Mr. Perrot is not suggesting that the examiner is capable of actually making a determination of the racial background of the source of the hair. Instead, Mr. Perrot is only relating the FBI's own description of their process for performing a hair examination.

*racial groups are Caucasian, which "typically means of European decent," Negroid, which "typically means of Sub-Saharan African descent," and Mongoloid, which "typically means of Asian or Native American descent." Id. at 8.*

14. Hairs from the head or pubic regions are considered by the FBI to be susceptible to microscopic hair comparison; any such hairs found on the evidentiary item are mounted on slides and compared to hair samples from known sources in a side-by-side analysis. Ex. 25 at 8 (2009 Oien Article); MFNT Tr. I, 136:6-11 (Oien), 34:21-35:1 (Ziolkowski).

*Explanation: Oien's 2009 article explains that only head and pubic hairs are considered suitable for comparison, because hairs from other body areas "do not contain sufficient variation in their microscopic characteristics to reliably distinguish between hairs from different individuals." Ex. 25 at 8 (2009 Oien Article); see also MFNT Tr. I, 136:6-11 (Oien) ("[T]he only hairs that we can consider to be suitable to be compared to a known sample would be head hairs and pubic hairs."). Elizabeth Ziolkowski confirmed this approach during her testimony. MFNT Tr. I, 34:21-35:1 (Ziolkowski) ("You would have to know at least what somatic regions, was it a head or pubic hair because we didn't compare any other kind of hairs.").*

15. In comparing the questioned hair to the known hair, the hair analyst could examine a number of different microscopic characteristics, including color; treatment; pigment aggregation; shaft form; pigment distribution; medulla appearance; hair diameter; medullary index; presence or absence of cortical fusi; cuticular margin; tip shape; and shaft diameter. Ex. 31 at 157 (2009 NAS Report).

*Explanation: The NAS Report identifies these microscopic characteristics, which may be—but are not required to be—considered by analysts during hair comparison. Id.*

16. When examining particular features, the hair examiner did not actually measure the characteristics using objective or quantitative criteria, but rather made a subjective determination about the characteristics. MFNT Tr. I, 178:7-179:5 (Oien). For example, when observing shaft "thickness," the examiner did not use any objective measurement, such as micrometers, to determine the circumference of the shaft, nor was there any uniform definition of what constitutes a "thick" or "thin" shaft; instead, the characterization of shaft thickness was left entirely to the subjective judgment of the individual examiner. *Id.* at 177:7-178:10. Likewise, there was no objective or

quantitative measurement for declaring hair color, characterizing ovoid bodies, assessing pigment density, or characterizing any other hair features. *Id.*

> *Explanation: Oien conceded that hair examiners do not take objective measurements when examining different variables such as shaft thickness, ovoid bodies, pigment density, and color. Id. at 177:7-178:10. Instead, Oien conceded that these determinations were left to the subjective judgment of the hair examiner. Id. at 178:15-21. As a result, different examiners' interpretation of a specific characteristic could be different. Id. at 178:7-179:5.*

17. Hair examiners exercised subjective judgment in selecting which hairs and how many hairs to mount and examine, as well as in selecting which fields of view to employ for their examination, choices that could affect the information available to the examiner. *Id. at* 171:9-11, 175:9-23, 177:1-3 (Oien), 22:9-20 (Ziolkowski); Ex. 25 at 12 (2009 Oien Article).

> *Explanation: Oien testified that examiners exercise discretion on how many hairs to examine. MFNT Tr. I, 171:9-11 (Oien); see also id. at 22:9-20 (Ziolkowski) (testifying that the number of hairs "would vary quite a bit from examiner to examiner and from what the examiner is seeing as he or she is doing the comparisons"). Oien also acknowledged that characteristics change based on field of view. Id. at 175:9-23 (Oien); see also Ex. 25 at 12 (2009 Oien Article) ("That characteristic may change slightly at a different focal plane even at the exact same location and may change dramatically at a different location in the hair. In a single hair, there are hundreds or even thousands of possible different fields of view"). And Oien acknowledged that the way a hair is mounted could result in missing information. MFNT Tr. I, 177:1-3 (Oien).*

18. In theory, in order for the hair analyst to conclude there is an association between the questioned and known hairs, he or she must determine that the characteristics exhibited by the questioned samples are represented in the known sample. Ex. 25 at 11 (2009 Oien Article); Ex. 31 at 156 (2009 NAS Report). Notably, the comparison that is made between a questioned sample and known exemplars is not a "one to one" comparison; rather, the analyst compares the characteristics that she or he observes to be present in the questioned sample to the *range* of characteristics that she or he observes to be present in the numerous hairs that make up the known exemplar. MFNT Tr. I, 173:3-9 (Oien).

*Explanation: Oien's 2009 article notes that an association is declared when "the questioned hair exhibits the same microscopic characteristics as the hairs in the known hair sample." Ex. 25 at 11 (2009 Oien Article). Similarly, the NAS Report notes that a determination of a "match" between questioned and known hairs "means only that the hair could have come from any person whose hair exhibited—within some levels of measurement uncertainties—the same microscopic characteristics." Ex. 31 at 156 (2009 NAS Report). Oien also testified that hair comparison requires the examiner to develop a profile of characteristics of a known source based on the totality of the hair samples provided, and he acknowledged that there is almost never a one-to-one correlation between a particular known hair and the questioned hair. MFNT Tr. I, 173:3-9 (Oien).*

19. Like the assessment of individual characteristics, the ultimate determination that there is an association or exclusion is a subjective, not an objective, inquiry. *Id.* at 178:22-179:5; Ex. 25 at 12 (2009 Oien Article). As a result, there is neither a uniform set of characteristics that hair analysts must examine nor agreement on the significance of various characteristics; instead, assessments vary by case and by examiner, each of whom may use idiosyncratic criteria. Ex. 25 at 10, 18 (2009 Oien Article); MFNT Tr. I, 32:9-10 (Ziolkowski), 15c8:7-12, 160:23-161:1, 173:3-9, 174:24-175:3 (Oien).

*Explanation: As Oien acknowledged, the assessment of whether there is a hair association as a whole is based on a subjective weighing of characteristics. MFNT Tr. I, 178:22-179:5 (Oien); see also Ex. 25 at 12 (2009 Oien Article) (this process is one of "pattern-recognition" rather than a "'checklist' or 'archetype' approach.").*

*As Oien's 2009 article notes, "there is no accepted number of characteristics that must be similar between the two known samples." Ex. 25 at 18 (2009 Oien Article); see also MFNT Tr. I, 160:23-161:1 (Oien) ("The number can vary depending on how finite you want to get with your descriptions of certain things. I've seen checklists from various sources, some that contain 16 up to 25 or so.").*

*Instead, "[t]he assessment of what is or is not a meaningful or significant difference lies at the core of the training and experience of the forensic hair examiner." Ex. 25 at 10 (2009 Oien Article); see also MFNT Tr. I, 158:7-12 (Oien) (testifying that hair microscopy depends largely on examiner experience); see also MFNT I, 32:9-10 (Ziolkowski) (acknowledging that different hair examiners "may have keyed in on different [characteristics] more heavily than others.").*

*Subjective assessment is necessary because there is variation among hairs taken from a particular individual, and even within a single hair. MFNT Tr. I, 174:24-175:3 (Oien). As a result, the examiner must develop a profile of characteristics of a known source based on the totality of the hair samples provided, and there is almost never a one-to-one correlation between a particular known hair and the questioned hair. Id. at 173:3-9.*

20. A hair examiner cannot articulate the basis for a hair association beyond generalities such as the assertion that the characteristics in the questioned hair looked the same as those in the known hair. *Id.* at 162:9-15, 163:18-164:3, 166:12-19.

> <u>Explanation</u>: *Oien testified that the basis for a hair association cannot be articulated. Id. at 162:9-15. Oien further explained that, in his opinion, it is hard to document all of the observable characteristics in hair. Id. at 163:23-25. Accordingly, no document exists that sets out a standardized number of observable characteristics and sets forth what they looked like in the question hair and the known hair. Id. at 166:12-19. Oien explains that he "would articulate an association" as occurring when "all the characteristics in the questioned hair [are] represented in the known hair sample." Id. at 163:18-164:3.*

**<u>The 2009 NAS Report:</u>**
***<u>Strengthening Forensic Science in the United States: A Path Forward</u>***

21. In 2009, the NAS published a report entitled *Strengthening Forensic Science in the United States: A Path Forward*, which found serious methodological, statistical, and testimonial problems in the field of hair microscopy. Ex. 31 at 160-61 (2009 NAS Report).

> <u>Explanation</u>: *The NAS Report cites a lack of scientifically accepted statistics about the frequency of hair characteristics, a lack of uniform standards for declaring an association, the imprecision of the technique, and the imprecision of language in reporting microscopic hair results, and concludes that morphological associations must be confirmed using mitochondrial DNA testing. Id.*

22. In particular, the NAS Report found three distinct statistical limitations with respect to hair microscopy. First, there is a lack of statistical information about the frequencies of hair characteristics in the population. *Id*. at 160. Second, there is a lack of objective, consistent morphological characteristics in human hair that would allow for statistical analysis of hair. *Id*. And third, there is a lack of agreement on the number of criteria necessary to declare a "match" or a clear definition of what constitutes a "match." *Id*.

> <u>Explanation</u>: *The NAS Report indicates that "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population." Id. The NAS further explains that, while features of human hair can be divided broadly into "major" and "secondary" characteristics, "the 'best' or most reliable characteristics will vary by case." Id. And finally, the NAS concludes*

*that there are "no uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match'" and that the "categorization of hair features depends heavily on examiner proficiency and practical experience." Id.*

23. As a result of these limitations, the authors of the NAS Report concluded that not only can hair microscopy not be used to uniquely identify an individual as the source of a hair—a fact that had long been recognized—but that there were no scientifically acceptable data which would permit probabilistic statements regarding the likelihood that an evidentiary hair came from a particular source. *Id*. at 160-61; *see also* Kafadar Aff. ¶ 9(a), (c).

*Explanation: The NAS, like other authorities, concluded that there is "no scientific support for the use of hair comparisons for individualization." Ex. 31 at 161 (2009 NAS Report). But the NAS went further, making clear that even probabilistic estimates are impermissible, because there is no consensus "on the number of features on which hairs must agree before an examiner may declare a 'match'" and "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population." Id. at 160.*

*As Dr. Kafadar further explained in her affidavit, there is no population data on the frequency of morphological hair characteristics or size of the relevant population. Kafadar Aff. ¶ 9(a). "In the absence of such data it is not possible to calculate the statistical significance of any positive association between the known hair sample and the unidentified hair sample. . . . Hence, no conclusions about the positive value of hair microscopy evidence can be reliably made." Id. ¶ 9(c).*

24. Despite these limitations, the NAS Report called attention to the fact that its committee members had observed microscopic hair examiners making probabilistic statements during trials based on the examiners' anecdotal or individual experiences. Ex. 31 at 160 (2009 NAS Report). The NAS Report also observed problems with imprecise terminology in describing hair microscopy results, and noted that this imprecise testimony may be understood by a jury to suggest individualization. *Id*. at 161.

*Explanation: The NAS explains that "several members of the committee have experienced courtroom cases in which, despite the lack of a statistical foundation, microscopic hair examiners have made probabilistic claims based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial." Id. at 160. The NAS further found that terms such as "associated with," although commonly used by examiners, are "not*

> *clearly defined and . . . can be misunderstood to imply individualization." Id. at 160-61.*

25. The NAS Report concluded that hair microscopy is useful only to the extent that it can sort hairs for mitochondrial DNA testing, and that microscopic hair analysis alone is of limited probative value. *Id*.

> *<u>Explanation</u>: As the NAS explains, "[i]n cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value." Id. at 161. But the NAS further cautioned that there have been no studies to "quantify the reliability of [the] joint use" of mtDNA and hair microscopy, and therefore it has not been validated whether these techniques can be used in tandem. Id. The NAS concluded that the only use for hair microscopy is in "determining which hairs are sufficiently similar to merit comparisons with DNA analysis and for excluding suspects and assisting in criminal investigations." Id. at 160.*

26. The deficiencies identified in the NAS Report affect two aspects of hair microscopy: (1) the ability to make an association between a known sample and an unknown hair, and (2) the ability to determine the statistical significance of the association. Kafadar Aff. ¶ 14; MFNT Tr. II, 78:20-79:3 (Kafadar).

> *<u>Explanation</u>: Dr. Kafadar explains: "Hair analysis . . . necessarily involves statistics and probabilities in two major assumptions on which it rests. First, hair analysis assumes, at a minimum, that a trained examiner can make an association between a known sample hair and another unidentified hair sample relevant to the crime. Second, hair analysis assumes that an examiner can then state the statistical significance of that association. Each assumption is based on probabilistic and statistical concepts." Kafadar Aff. ¶ 14; see also MFNT Tr. II, 78:20-79:3 (Kafadar) (testifying that statistics and probabilities are relevant (1) to making an association—because "you have to identify what features are useful for making the identification," and (2) to commenting on its significance—because you need to know "how frequent those features might be").*

27. As Dr. Kafadar testified, without valid statistics, there is no scientific basis for an examiner to make a hair association. Kafadar Aff. ¶¶ 15-18; MFNT Tr. II, 80:18-81:5, 82:2-21, 83:9-10, 83:25-84:14, 85:3-25 (Kafadar).

> *<u>Explanation:</u> In order to declare a hair association, there are three statistical requirements: validity, consistency, and well-characterized error probabilities. Kafadar Aff. ¶ 15.*

*Validity is concerned with whether a measurement is accurate; that is, if a hair is 150 μ in diameter, will it measure at 150 μ.*[3] *Id. ¶ 16. Accuracy can be affected by instruments, environmental conditions, and factors concerning examiners. MFNT Tr. II, 82:2-21 (Kafadar). Consistency is concerned with how variable the results are. Kafadar Aff. ¶ 17. In other words, if you do the exact same measurement, do you get the same result? MFNT Tr. II, 83:9-10 (Kafadar). Factors associated with consistency are changes between measurements, issues with instruments, and variables concerning examiners. Id. at 83:25-84:14.*

*Error probabilities are the odds that the measurement will return the correct answer. Kafadar Aff. ¶ 18. Error probabilities can be further broken into sensitivity and specificity. Sensitivity is the probability the analysis will determine that two hairs are from the same source or share the same characteristics, when in fact they do come from the same source or share the same characteristics. Id. ¶ 18(a), (c); MFNT Tr. II 85:3-25 (Kafadar). Specificity is the probability the analysis will identify that two hairs are from different sources or have different characteristics, when in fact they do not come from the same source or have different characteristics. Kafadar Aff. ¶ 18(b), (c); MFNT Tr. II, 85:3-25 (Kafadar).*

28. In the case of hair microscopy, no such statistics exist, and therefore FBI examiners have no basis to declare an association between an evidentiary hair and known samples. Kafadar Aff. ¶ 19; MFNT Tr. II, 82:22-83:4, 87:24-88:2, 87:19-21 (Kafadar); Ex. 31 at 160 (2009 NAS Report).

*Explanation: As Dr. Kafadar concludes, there is no scientific basis for making a hair association, because there is no information demonstrating that hair microscopy is valid, consistent, and has well-determined error probabilities. Kafadar Aff. ¶ 20; MFNT Tr. II, 87:24-88:2 (Kafadar) (testifying that there have not been valid studies along these lines, although there were some "limited" statistical studies). As the NAS found, there are "no uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match.'" Ex. 31 at 160 (2009 NAS Report); see also MFNT Tr. II, 87:19-21 (Kafadar). Without a uniform standard, "the scientific basis for an 'association' is not clear." Kafadar Aff. ¶ 20. The fact that hair microscopy is a subjective analysis is a major source of variability in results. MFNT Tr. II, 82:22-83:4 (Kafadar). As a result of these factors, there is currently no statistical basis for an examiner to declare an association based on microscopic examination.*

29. As Dr. Kafadar further testified, without valid statistics on the frequency of characteristics in the relevant population, there is no basis for an examiner to assign a probative value

[3] Validity has two sub-components: "accuracy," meaning that the measurement produces the right result, and "precision," meaning the measurement produces the right result every time. MFNT Tr. II, 80:18-81:5 (Kafadar).

or statistical weight to the hair association. Kafadar Aff. ¶¶ 10, 22-24; MFNT Tr. II, 88:12-19, 88:23-89:7, 89:14-90:4, 90:11-91:23, 93:13-17, 111:2-4 (Kafadar); Ex. 35 at 117 (Kafadar Article) .

> *Explanation:* *In order to make a statement establishing that a particular person is the source of a particular hair, an understanding of statistics and probabilities is necessary "to form a valid conclusion regarding the likelihood that a particular person is the source of a hair." Kafadar Aff. ¶ 10.*
>
> *In particular, you need to know the "frequency with which the characteristics on which the association was based appear in the relevant population." Id. ¶ 22; see also MFNT Tr. II, 88:12-19 (Kafadar) (testifying that you need to know how "rare" the features are). This requires knowing the size and characteristics of the reference pool or having a model of the size and reference pool. Kafadar Aff. ¶ 23; see also MFNT Tr. II, 88:23-89:7 (Kafadar) (testifying that you need to understand the frequency of features in different ethnic and racial populations). You also need to know the frequency of characteristics in the reference pool. Kafadar Aff. ¶ 24.*
>
> *It is impossible to derive the likelihood that a hair came from a particular person without first having a set number of characteristics that are examined. MFNT Tr. II, 89:14-90:4 (Kafadar) (agreeing with the Court's suggestions that "you have to have an understanding of the number of characteristics" and "[y]ou have to know, in a sense, theoretically, how many characteristics there could be in this particular population pool as to hair"); see also Ex. 35 at 117 (Kafadar Article) (chart indicating the number of features necessary at different levels of sensitivity and specificity to reach a given positive predictive value; the number of features needed to assure confidence can "easily become very large").*
>
> *These characteristics need to be well defined. See MFNT Tr. II, 111:2-4 (Kafadar) (stating it is "very difficult to try to assign . . . any kind of statistical equal weight for any kind of association if it's just subjective"); id. at 93:13-17 (Kafadar: "It would be real helpful if you had a range of what you mean by 'thick.'" Court: "You mean definition?" Kafadar: "Yes, that's correct. Because you also want the next examiner to be using that same definition.").*
>
> *Finally, it is necessary to understand whether the characteristics are independent or dependent variables, requiring empirical studies and statistical analyses. Kafadar Aff. ¶ 24; MFNT Tr. II, 90:11-91:23 (Kafadar).*

30. In the case of hair microscopy, no such statistics or probabilities exist. As a result, even if there were a basis to declare an association—which, as Dr. Kafadar's testimony and the NAS Report make clear, there is not—there is still no basis to assign a probative value or statistical weight to the hair association. *See* Ex. 31 at 160 (2009 NAS Report); Ex. 29 at 1 (Audit Agreement).

*<u>Explanation</u>: As the NAS concluded, "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population." Ex. 31 at 160 (2009 NAS Report). Likewise, the FBI has conceded that "[m]icroscopic hair analysis is limited . . . in that the size of the pool of people who could be included as a possible source of a specific hair is unknown. An examiner report or testimony that applies probabilities to a particular inclusion of someone as a source of a hair of unknown origin cannot be supported." Ex. 29 at 1 (Audit Agreement).*

31. Absent this statistical basis, any hair association is nothing more than a "guess," and the most one could conclude using hair microscopy is that the hairs "kind of look the same." MFNT Tr. II, 91:24-92:8, 92:9-12, 94:24-95:3 (Kafadar); Kafadar Aff. ¶ 25.

*<u>Explanation</u>: Dr. Kafadar explained that without a reference pool, frequency data, or information on independence, you are not justified in giving probabilities about the value of a piece of evidence. MFNT Tr. II, 91:24-92:8; Kafadar Aff. ¶ 25. Instead, the value of the evidence would be a "guess." MFNT Tr. II, 92:9-12 (Kafadar). In the absence of these data, the most one could say is that the hairs "kind of look the same" but one must also acknowledge that it is unknown "how many other hairs, or pieces of evidence in the universe also could look the same." Id. at 94:24-95:3.*

**<u>Background of the FBI Hair Microscopy Audit</u>**

32. Starting in 2012, the FBI began its audit of hair microscopy cases, which encompasses nearly 3,000 federal and state criminal cases where an FBI examiner submitted reports or testified at trials using microscopic hair analysis; the review focuses on cases prior to 2000, when it became the standard practice at the FBI to use mitochondrial DNA testing in hair cases. Ex. 27 at 1-2 (4/20/2015 Press Release); MFNT Tr. II, 28:5-29:11 (Koropp).

*<u>Explanation</u>: In a press release issued this year, the FBI explains that it identified for review nearly 3,000 cases where FBI examiners may have submitted reports or testified in trials using microscopic hair analysis to inculpate a defendant. Ex. 27 at 1-2 (4/20/2015 Press Release). The press release notes that the review focuses on cases prior to 2000, when mitochondrial DNA testing on hair became routine at the FBI. Id. Koropp confirmed in his testimony that the audit concerns cases where there was a hair association that was used in a trial or plea that occurred prior to the introduction of routine mitochondrial DNA testing in 1999. MFNT Tr. II, 28:5-29:11 (Koropp).*

33. The FBI hair microscopy audit is being performed by FBI crime lab in collaboration with the Innocence Project and NACDL. *Id. at* 14:24-15:2 (Koropp), 124:3-6 (LeBeau); Ex. 29 at 1 (Audit Agreement); Ex. 37 (Confidentiality Agreement).

> <u>Explanation</u>: *Koropp testified that the "project is a collaboration between the FBI crime lab and the Innocence Project and the National Association of Criminal Defense Lawyers." MFNT Tr. II, 14:24-15:2 (Koropp). Likewise, LeBeau explained that the "participants that the FBI partnered with were the Innocence Project and the National Association of Criminal Defense Attorneys." Id. at 124:3-6 (LeBeau). Exhibit 29 is an agreement between the FBI, the Innocence Project, and NACDL concerning "what the science of microscopic hair examinations supports." Ex. 29 at 1 (Audit Agreement). Exhibit 37 is a confidentiality agreement between the FBI, the Innocence Project, and NACDL. Ex. 37 (Confidentiality Agreement).*

34. The scope of the review is limited to FBI testimony and FBI lab reports and does not encompass review of bench notes; the Innocence Project and NACDL sought to review the bench notes but were denied access by the FBI. MFNT Tr. II, 33:15-25 (Koropp), 171:18-172:2 (LeBeau).

> <u>Explanation</u>: *Koropp testified that "we have never been allowed access to the bench notes. And I don't have any reason to believe that other people were allowed as well." Id. at 33:15-25 (Koropp). LeBeau likewise confirmed that the review did not include bench notes, because it was "focused on the communication of the result, how was the contributor notified of the findings of our exam and then how was the court notified as to those findings and their meaning." Id. at 171:18-172:2 (LeBeau).*

35. The hair microscopy audit reviews transcripts on a line-by-line or sentence-by-sentence basis and evaluates whether individual sentences or passages were scientifically supported. The review does not consider the effect of limiting language, disclaimers, or accurate testimony elsewhere in the transcript in determining whether there was an error; therefore, if there was proper testimony and improper testimony, then the improper testimony was flagged as an error. *Id.* at 152:5-9 (LeBeau); 46:17-47:1, 49:16-50:11 (Koropp).

> <u>Explanation</u>: *LeBeau explained that the FBI reviewed the transcripts on a "line by line" or "sentence by sentence" basis and did "not consider the context in which statements were made." Id. at 152:5-9 (LeBeau). Likewise, Koropp testified that the review was not made on a cumulative basis of proceeding questions and answers; instead the review was looking for specific scientific errors in the testimony. Id. at 46:17-47:1 (Koropp); see also id. at 49:16-23 (did not look at the entire testimony in determining whether there was an error). Koropp further explained that the reviewer*

*might look at a series of several questions and answers to find an error, but would still find an error even if there was a clarification about the error 20 pages later. Id. at 49:24-50:11.*

**Agreement between the FBI, the Innocence Project, and NACDL Concerning the Science of Hair Microscopy**

36. The document entitled *Microscopic Hair Comparison Analysis* (Ex. 29) (the "Audit Agreement") sets forth the agreement between the FBI, Innocence Project, and NACDL on the state of the science of hair microscopy and explains what kinds of testimony are scientifically valid and what kinds of testimony are not scientifically valid. Ex. 29 at 1 (Audit Agreement); MFNT Tr. II, 18:7-12 (Koropp); *see also id.* at 125:4-6 (LeBeau).

*Explanation: The Audit Agreement is "an agreement between the FBI and the Innocence Project and the National Association of Criminal Defense Lawyers of what the science of microscopic hair examinations supports." Ex. 29 at 1 (Audit Agreement). Koropp confirmed that this document is "one of the key documents in the audit where the FBI, the Innocence Project and NACDL came to an agreement about what could be said with regard to hair microscopy analysis that was scientifically valid; and equally important, what could not be said and what was agreed upon to be scientifically invalid." MFNT Tr. II, 18:7-12 (Koropp). LeBeau likewise testified that the document reflected "the agreed upon error types that we used as a foundation for our review." Id. at 125:4-6 (LeBeau).*

37. The Audit Agreement is an FBI-authored document that was created with input from the Innocence Project, NACDL, and Winston & Strawn. Ex. 29 at 1 (Audit Agreement); MFNT Tr. II, 19:10-18 (Koropp), 125:7-10 (LeBeau).

*Explanation: The Audit Agreement is printed on FBI letterhead. Ex. 29 at 1 (Audit Agreement). Koropp further explained that the Audit Agreement is "a FBI document but there was inputted [sic] at various meetings and drafts exchanged with the Innocence Project and NACDL and also with me as well where we tried to clarify language with them and make sure that they covered everything that needed to be covered." MFNT Tr. II, 19:10-18 (Koropp); see also id. at 125:7-10 (LeBeau) (agreeing that the error types were developed after discussion among the participants).*

38. The Audit Agreement explains that, because "[m]icroscopic hair analysis is limited . . . in that the size of the pool of people who could be included as a possible source of a specific hair is unknown," any "examiner report or testimony that applies probabilities to a particular inclusion of

someone as a source of a hair of unknown origin cannot be scientifically supported." Ex. 29 at 1 (Audit Agreement).

> *Explanation: The quoted language comes directly from the Audit Agreement, which reflects an agreement between the FBI, NACDL, and the Innocence Project on the science of hair microscopy for purposes of the review. Id.*

39. The Audit Agreement identifies three particular error types made by FBI examiners that exceeded the limits of science. *Id.*

> *Explanation: The Audit Agreement, which reflects an agreement between the FBI, NACDL, and Innocence Project on the science of hair microscopy for purposes of the review, sets forth three particular error types. Id.*

40. Type I errors are instances where the examiner "stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others." *Id*.

> *Explanation: The quoted language comes directly from the Audit Agreement, which reflects an agreement between the FBI, NACDL, and the Innocence Project on the science of hair microscopy for purposes of the review. Id.*

41. Type II errors are instances where the examiner "assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association." *Id*.

> *Explanation: The quoted language comes directly from the Audit Agreement, which reflects an agreement between the FBI, NACDL, and the Innocence Project on the science of hair microscopy for purposes of the review. Id.*

42. Type III errors are instances where the examiner "cite[d] the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual." *Id.*

<u>Explanation</u>: *The quoted language comes directly from the Audit Agreement, which reflects an agreement between the FBI, NACDL, and the Innocence Project on the science of hair microscopy for purposes of the review. Id.*

43. The Audit Agreement provides that an examiner's testimony is appropriate only if it "reflected the fact that hair comparison could not be used to make a positive identification, but that it could indicate, at the broad class level, that a contributor of a known sample could be included in a pool of people of unknown size, as a possible source of the hair evidence (without in any way giving probabilities, an opinion as to the likelihood or rareness of the positive association, or the size of the class) or that the contributor of a known sample could be excluded as a possible source of the hair evidence based on the known sample provided." *Id*. at 1-2.

<u>Explanation</u>: *The quoted language comes directly from the Audit Agreement, which reflects an agreement between the FBI, NACDL, and the Innocence Project on the science of hair microscopy for purposes of the review. Id.*

44. The central concern uniting the errors targeted by the hair microscopy audit is that no reliable statistics exist establishing the frequency with which a particular hair characteristic is distributed in the population. MFNT Tr. II, 18:17-21 (Koropp), 159:15-20 (LeBeau).

<u>Explanation</u>: *Koropp testified that the central problem underpinning the agreement was that "there was no scientific statistics with regard to the frequency with which a particular hair characteristic is distributed in the population." Id. at 18:17-21 (Koropp); see also id. at 159:15-20 (LeBeau) (agreeing that the three error types are problems that suggest that there is a statistical weight behind the conclusions offered in court, and testifying that the errors have a statistical basis).*

45. Given the state of the science, a hair examiner cannot provide statistics concerning the likelihood of an association, state or imply that it is rare or infrequent to have a hair association, or rely on his or her anecdotal experience to create an impression of a probative value of the association. *Id.* at 18:23-19:3 (Koropp); MFNT Tr. I, 187:12-20 (Oien); MFNT Tr. II, 99:16-25, 117:20-118:17 (Kafadar), 172:9-18 (LeBeau). It is, therefore, an error either to use word "rare" or to use equivalent language suggesting rareness of an association. MFNT Tr. II, 22:14-25 (Koropp).

*Explanation: As Koropp explained, given the lack of statistics, you "couldn't say that one hair definitely came from a particular person but you also couldn't suggest that it might be rare that that didn't happen or you couldn't use your own ad hoc experience: I have done this 10,000 times and there's never been a time when I couldn't distinguish two hairs." Id. at 18:23-19:3.*

*In response to the Court's question whether Type II errors would include "use of the term 'rare' or . . . some other equivalent language that would suggest 'rare,'" Koropp testified that this error type "would absolutely be rareness and language that would suggest rareness." Id. at 22:14-25.*

*Similarly, Kafadar, LeBeau, and Oien all agreed that statistical concepts can be expressed or suggested qualitatively rather than quantitatively. MFNT Tr. I, 187:12-20 (Oien) (agreeing that "probabilities can be expressed in words and in numbers"); MFNT Tr. II, 99:16-25 (Kafadar) (agreeing that it is "possible to suggest a statistical weight for [sic] likelihood using words rather than numbers"); id. at 117:20-118:17 (testifying that it is improper to give a number or "to imply a number."); id. at 172:9-18 (LeBeau) (testifying that it is improper not only to state but also to "suggest the hair came from a single individual to the exclusion of all others").*

46. In 2014, Dr. Kafadar was asked to opine on the terms of the FBI review as reflected in the Audit Agreement as well as the testimony in particular cases under review. *See* Ex. 34 (2014 Kafadar Letter); MFNT Tr. II, 106:9-21 (Kafadar).

*Explanation: The letter explains that Dr. Kafadar was asked by Peter Neufeld of the Innocence Project to provide an opinion about the Audit Agreement (Ex. 29) and the testimony and findings in two particular cases. See Ex. 34 (2014 Kafadar Letter). Dr. Kafadar's 2014 Letter was shared with NACDL and the FBI. Id. Dr. Kafadar explained the background of the letter: "I view my role as an educational one and they were asking me if these are, you know, statistically if these are the kinds of statements that were being made. Are they statistically valid?" MFNT Tr. II, 106:9-14 (Kafadar). In providing her opinion, she reviewed the three error types. Id. at 106:15-21.*

47. Dr. Kafadar concluded that the three error types appropriately reflected the limits of science. Ex. 34 at 2 (2014 Kafadar Letter); MFNT Tr. II, 106:7-21 (Kafadar).

*Explanation: Dr. Kafadar explained in the letter that "[i]n the absence of any data on the frequency of those class characteristics, nor on the size of the reference population, one can calculate neither the sensitivity nor specificity of these characteristics, nor the prior odds, and hence cannot calculate the statistical significance of any positive association." Ex. 34 at 2 (2014 Kafadar Letter). At the hearing, Dr. Kafadar affirmed in her 2014 Letter to the FBI that the three error types would not be statistically valid statements. MFNT Tr. II, 106:7-21 (Kafadar) ("And so, when I wrote the letter I said I would agree that these would not be statistically valid statements to make.").*

48. Dr. Kafadar also affirmed at the hearing that the hair microscopy review appropriately considered both numerical and non-numerical statements suggesting a probative value to be unjustified in the absence of statistical data. Such statements could include words such as "rare" or phrases such as "associated with." *Id.* at 99:1-25, 100:4-5, 111:18-19, 118:4-17; Ex. 31 at 160-61 (2009 NAS Report). .

> *Explanation: Dr. Kafadar testified that it is possible to express statistical weight using words and not numbers. Id. at 99:16-25 (Kafadar); see also id. at 118:13-17 (Kafadar) (testifying that it is improper to either provide a number or imply a number).*
>
> *Dr. Kafadar explained that even the phrase "associated with" could be understood to suggest a statistical basis (as the NAS recognized). MFNT Tr. II, at 99:21-25 (Kafadar); Ex. 31 at 160-61 (2009 NAS Report). Dr. Kafadar testified that it would be also inappropriate to say that it is "more likely than not" or "very likely" that a hair came from a particular individual. MFNT Tr. II, at 118:4-12 (Kafadar).*
>
> *Finally, Dr. Kafadar explained that the word "rare" is improper because it implies a small probability. Id. at 100:4-5; id. at 111:18-19 (testifying that rare "[c]ould be interpreted as a small probability"); id. at 99:1-15(testifying that you could not testify that a match was "very rare" without knowing the features used to make the assessment, the sensitivity or specificity of those features, and whether those features were independent).*

**FBI Guidance on Particular Errors**

49. In order to provide guidance to FBI reviewers, the FBI Office of General Counsel and the FBI Laboratory Division created a document "to ensure consistency in the application of the scientific standards agreed upon by the FBI, the Innocence Project, and the National Association of Criminal Defense Attorneys" in the Audit Agreement (the "FBI Guidance Document"). Ex. 30 at 1 (FBI Guidance Document); MFNT Tr. II, 24:1-3, 51:3-12 (Koropp), 125:15-126:6 (LeBeau).

> *Explanation: The FBI Guidance Document (Ex. 30) was created by the FBI to provide guidance to its reviewers in reviewing transcripts for the hair microscopy audit. See MFNT Tr. II, 24:1-3 (Koropp) ("This is the document that was used by the FBI during the audit as a basis to provide guidance for people in the FBI who were reviewing the transcripts for errors."); id. at 125:15-126:6 (LeBeau) (agreeing that the document was developed "to assist those who would be conducting the review in this case"). NACDL and Winston & Strawn did not use this document in reviewing*

*transcripts. Id. at 51:3-12 (Koropp) (testifying that NACDL and Winston & Strawn used only the Audit Agreement's definition of the three error types).*

50. The FBI Guidance Document provides that "[a]ny conflict between the [FBI Guidance Document (Ex. 30) and the Audit Agreement (Ex. 29)] must be resolved in favor of the [Audit Agreement]." Ex. 30 at 1 (FBI Guidance Document).

*Explanation: The quoted language comes directly from the FBI Guidance Document, which the FBI developed to provide guidance to its reviewers. Id.*

51. With respect to the phrase "consistent with," the FBI Guidance Document provides that "[i]t is not appropriate to use the term 'consistent with' in a manner that suggests a probability or likelihood that a hair came from a specific individual without noting that it could be consistent with numerous other hairs. The phrase 'consistent with' is generally not the problem; it is what comes before or after it." Ex. 30 at 3 (FBI Guidance Document); *see also* MFNT Tr. II, 47:12-48:18 (Koropp).

*Explanation: The quoted language comes directly from the FBI Guidance Document, which the FBI developed to provide guidance to its reviewers. Ex. 30 at 3 (FBI Guidance Document). Similarly, Koropp explained that the phrase "consistent with" was not an error per se, but could be in certain contexts. MFNT Tr. II, 47:12-48:18 (Koropp).*

52. The FBI Guidance Document provides several examples that demonstrate it is a Type II error to testify that an evidentiary hair is consistent with coming from a particular individual. *See* Ex. 30 at 3 (FBI Guidance Document).

*Explanation: The FBI provides the following as examples of Type II errors: "I concluded it was consistent with having originated from him"; "I concluded that those—the single Negroid pubic hair from the socks was consistent with coming from [redacted defendant name]"; "this hair is consistent with coming from that person"; "those items exhibited the same microscopic characteristics as the known head hairs from [redacted defendant name] and, therefore, are consistent with originating from her." Id.*

53. Although LeBeau testified that the crime lab had some difficulty in implementing the guidance for the phrase "consistent with," LeBeau did not identify any problems with the error

conclusions in the Perrot case, and he clarified that his testimony was not intended to suggest that there was any problem with the conclusions reached regarding the errors present in this case. MFNT Tr. II, 145:14-147:6, 160:18-24, 186:25-187:3 (LeBeau).

> *Explanation: LeBeau testified that the FBI lab had some difficulty in reviewing "consistent with" testimony. Id. at 145:14-147:6. Nevertheless, LeBeau did not testify that there were problems with the "consistent with" errors found in the Perrot case. Moreover, LeBeau explicitly conceded that the purpose of his testimony was "not to withdraw the errors that have been conceded in this particular case." Id. at 186:25-187:3; see also id. at 160:18-24 (conceding that he is not testifying to "withdraw," "walk back," or "undermine" the concessions in this case).*

54. The FBI Guidance Document provides that use of the term "rare" is inappropriate if it is used to describe the likelihood of a hair coming from a particular individual. Ex. 30 at 7 (FBI Guidance Document).

> *Explanation: The FBI Guidance Document explains that "[u]se of the term 'rare' or 'remote' to describe the likelihood of a hair coming from a specific individual is inappropriate." Id. Moreover, the FBI Guidance Document notes that the following testimony is a Type II error: "[B]ased on my experience it's rare that we cannot distinguish between microscopic characteristics of hair from two different individuals by side by side comparison"; "[I]n my experience, I have found only very rarely that two different individuals share exactly the same fifteen points of comparison." Id.*

55. The FBI Guidance Document provides that use of the word "strong" to suggest probability or likelihood of a hair originating from a particular individual is a Type II error. *Id*. at 8.

> *Explanation: The FBI Guidance Document explains that "use of the term 'strong' to suggest any type of probability or likelihood that hair originated from a specific individual is inappropriate." Id. The FBI Guidance Document finds the following phrases to be a Type II error: "strong association" and "a very strong basis for an association." Id.*

56. The FBI Guidance Document notes that testimony comparing hair microscopy analysis to recognizing a familiar face in a crowded room is a Type I error because it suggests individualization. *Id*. at 8-9.

> *Explanation: The FBI Guidance Document explicitly finds that a face analogy similar to the one used by Oakes in the Perrot case, is a Type I error, because it suggests that hair is "unique to an individual in the same manner a unique combination of features on a face allows you to identify one person." Id. at 9. In particular, the FBI Guidance*

> *Document cites the following testimony as error: "We use the very same principle of yourself when you walk into a very crowded room. How do you recognize your spouse or your best friend in a crowded room? We all have an identifying number of features to our face. We have two eyes, nose, mouth, ears. Same with hairs. The fact that a person has those is not unique to that person but how they're distinctly arranged on that person allows you to pick your spouse out or your friend." Id. at 8-9.*

57. The FBI Guidance document provides numerous examples of Type III errors, where "[t]he examiner cites the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual." *Id.* at 14.

> *Explanation: The FBI Guidance Document lists the following as examples: "However, in my experience, in looking at hundreds and hundreds of hair samples, it's very rare for me to find two known head hair or public hair samples that I can't distinguish microscopically." Id. "So it's very rare—to answer your question it's very rare to see two individual [sic] who head hairs or pubic hairs exhibit all the same microscopic characteristics." Id. "And twice during my period as an examiner I found individuals that I could not distinguish microscopically, their hair sample." Id.*

**Review Procedure**

58. In conducting the review, the FBI would first determine whether an analyst had made an association between a known hair and a question hair. MFNT Tr. II, 27:5-8 (Koropp), 131:22-25 (LeBeau).

> *Explanation: Koropp testified that, first, "[t]he FBI would look at its internal records and try to make a determination of whether an analyst had done some type of hair microscopy and found a match." Id. at 27:5-8. LeBeau testified that "essentially, [the FBI] had to initially go through lab case files and try to figure out whether or not hair—microscopic hair comparisons were actually done on a given case." Id. at 131:22-132:1 (LeBeau).*

59. If the analyst found an association, then the FBI would contact the prosecutor determine whether the association was used in connection with a trial or plea and whether DNA analysis was done to confirm the association. *Id.* at 27:8-13 (Koropp), 132:1-6 (LeBeau).

> *Explanation: Koropp testified that, "If [an association had been found] then they would then contact, send a letter out to a prosecutor to find out, did you use that hair microscopy analysis at a trial or in a plea? Did the person get convicted? Was there any DNA analysis done to confirm the hair microscopy?" Id. at 27:8-13 (Koropp).*

*LeBeau indicated that, if hair comparison had been done in a given case, the FBI "would move to a request to the contributing agency, usually the police agency who submitted the case, to figure out whether or not the case had actually gone forward, charges had been filed and whether or not an individual had actually gone to court." Id. at 132:1-6 (LeBeau).*

60. If a person was convicted (by trial or guilty plea) and there was no DNA confirmation, then the FBI would get a copy of the transcript. *Id.* at 27:14-21 (Koropp), 132:12-15 (LeBeau).

*Explanation: Koropp indicated that "If it turned out that the hair microscopy analysis was used, if it turned out the person was convicted and there had been no DNA confirmation, they would then ask the prosecutor for a copy of the transcript of the agent's testimony so that it could be reviewed by the FBI internally among their lab people and their attorneys to determine whether the testimony was appropriate or whether it was one of these three error types." Id. at 27:14-21 (Koropp). LeBeau testified that once it was determined that an analyst had testified, "a request [would be made] for actual transcripts of testimony by our examiners in the hair discipline so that we could conduct our review internally." Id. at 132:12-15 (LeBeau).*

61. Alternatively, if the FBI was able to obtain the transcript before making contact with the prosecutor, then the FBI could move ahead to the review stage without contacting the prosecutor. *Id.* at 132:19-22.

*Explanation: LeBeau testified that the procedure "allows us to, if you will, skip ahead in the work flow if we were able to get the transcript before we made any contact with anyone." Id.*

62. This procedure was necessary because the FBI did not keep detailed records about whether a particular analyst testified in a particular case, nor did the FBI maintain transcripts of their testimony. *Id.* at 27:23-28:19 (Koropp).

*Explanation: Koropp testified that the procedure outlined in the review protocol was necessary because "[the FBI] didn't keep detailed records of a particular analyst going to testify in a particular case." Id. at 27:23- 28:9. He also stated that the FBI did not "keep copies of the testimony that their agents had provided in cases in a database of that." Id. at 28:10-19.*

63. If transcripts were not available, the FBI would review proxies for transcripts such as closing arguments or sometimes appellate briefs. *Id.* at 127:25-128:11 (LeBeau); Ex. 30 at 1 (FBI Guidance Document).

*<u>Explanation</u>: LeBeau testified that if transcripts were unavailable, "in lieu of testimony transcripts, if there were what we called proxies, maybe closing arguments or such, that would be our only option to review, we would sometimes review those as well. . . . In general, just closing arguments or sometimes appellate briefs, things of that nature." MFNT Tr. II, 127:25-128:11 (LeBeau). The FBI Guidance Document also indicates that, "[i]n the event the FBI is not provided a transcript, the FBI will review transcript substitutes or proxies, when available. Transcript substitutes or proxies will include briefs or other court filings that appear to reflect portions of FBI testimony presented in a relevant proceeding." Ex. 30 at 1 (FBI Guidance Document).*

64. After obtaining the transcripts, the FBI would review the testimony using the Audit Agreement and the FBI Guidance Document and fill out a report indicating whether the testimony was appropriate or contained errors. MFNT Tr. II, 29:17-22 (Koropp), 134:1-16 (LeBeau); Ex. 29 at 1-2 (Audit Agreement); Ex. 30 at 3-18 (FBI Guidance Document).

*<u>Explanation</u>: Koropp testified that the FBI had a "group of people . . . who would review the testimony and fill out a sheet that said, we found error 1, error 2, error 3, or we found the testimony was appropriate. They would also identify where in the transcript they believed those errors were." MFNT Tr. II, 29:17-22 (Koropp). LeBeau indicated that, when conducting their review, FBI reviewers "had that guidance document as well as the three error types and another document related to the process itself." Id. at 134:1-5 (LeBeau). He agreed that "after [the review] was conducted [he was] provided documentation as a result of that review." Id. at 134:6-8. The Audit Agreement defines the three error types used in the review and "appropriate" statements. Ex. 29 at 1-2 (Audit Agreement). The guidance document provides examples of these error types. Ex. 30 at 3-18 (FBI Guidance Document).*

65. The results of the FBI's review were sent to Winston & Strawn and NACDL, which would also review the transcripts to identify any additional errors. MFNT Tr. II, 29:21-30:2 (Koropp), 134: 9-22 (LeBeau).

*<u>Explanation</u>: Koropp testified that the FBI "would send [the results of their review] to me, I would distribute them to attorneys at [Winston & Strawn] as well as to the NACDL representatives. We basically served as a backstop, we do the same review." Id. at 29:21-30:2 (Koropp). LeBeau testified that the FBI "passed [their] review results to the Innocence Project and National Association of Criminal Defense Lawyers, they did their review and then submitted it back to [the FBI]." Id. at 134:9-22 (LeBeau).*

66. NACDL and Winston & Strawn used the Audit Agreement (Ex. 29) to identify errors in transcripts, and also reached a common understanding of what the FBI considered to be errors through their discussions with FBI. *Id.* at 51:13-17 (Koropp).

> *Explanation: Koropp testified that, in addition to the language defining error in the Audit Agreement, Winston & Strawn "would look at the first 10 or 20 transcripts, whatever it was, we would have discussions with the FBI, we would get a better and clearer idea of what the FBI considered to be error and what it considered not to be error." Id.*

67. NACDL and Winston & Strawn would notify the FBI of any additional errors they had identified. *Id.* at 136:3-17 (LeBeau).

> *Explanation: LeBeau testified that, if NACDL and Winston & Strawn reviewers "uncovered other phrases, other parts of testimony or laboratory reports that they felt also fit within a category, we would consider that and bring it back to our team to review and then make a decision and notify them of that decision." Id.*

68. If there were disagreements between the FBI and NACDL or Winston & Strawn as to what constituted an error, the parties would have a teleconference with FBI Agent Marc LeBeau to discuss the disagreement. *Id.* at 30:2-8 (Koropp), 134:13-22 (LeBeau).

> *Explanation: Koropp testified that "if there were times where there were disagreements we would then have phone calls, it would be me, a representative of the NACDL, and a fellow from the FBI named Marc LeBeau . . . we would go over those disagreements to try to make sure the FBI had been comprehensive in finding all the errors." Id. at 30:2-8 (Koropp). LeBeau testified that "[w]e had the opportunity to discuss [the results]." Id. at 134:13-22 (LeBeau).*

69. The FBI ultimately made the decision whether testimony was erroneous and the DOJ would send a final notice letter to the prosecutors and the defendant. *Id.* at 30:12-22 (Koropp), 137:3-5, 138:4-7 (LeBeau).

> *Explanation: Koropp testified that "at the end of the day it was the FBI's decision, and there were times when they changed their minds based on what we said and there were times when we agreed to disagree. And those disagreements are noted in notice letters when they occur." Id. at 30:12-22 (Koropp). LeBeau indicated that "the DOJ sent a letter of notification to prosecutors and to the defendant in relation to the specific cases . . . which they reviewed" and that "the final notice included any additional statements that we agreed should be on that form." Id. at 138:4-7; 137:3-5 (LeBeau).*

70. Any errors identified by NACDL or Winston & Strawn with which the FBI did not agree were noted in the final notice letter to the defendant. *Id.* at 30:9-16 (Koropp).

> *<u>Explanation</u>: Koropp testified that any disagreements remaining after a discussion with the FBI "[were] noted in notice letters when they occur[ed]." Id.*

71. Over 95% of the time, NACDL and Winston & Strawn agreed with FBI on the errors. *Id.* at 48:13-18.

> *<u>Explanation</u>: Koropp testified that "well over 95 percent of the time we agreed with the FBI, there was very little disagreement, that was just around the edges of certain transcripts." Id.*

72. The errors noted in the review document are actual scientific errors. *Id.* at 52:4-7, 52:12-14 (Koropp), 160:8-14, 187:23-188:4, 189:24-190:6 (LeBeau); Ex. 32 (10/7/2014 DOJ Letter).

> *<u>Explanation</u>: When asked if he was "aware that the FBI believed that they were identifying potential errors," Koropp testified that he was "not aware of the FBI knowing one thing or another." MFNT Tr. II, 52:4-15 (Koropp). He indicated, instead, that these "were errors that the FBI had determined were scientifically invalid statements that should never have been made in a court of law." Id. at 52:12-14.*
>
> *LeBeau admitted that the Audit Agreement "reflects an agreement between the FBI and the Innocence Project and the National Association of Criminal Defense Lawyers of what the science of hair microscopic examinations supports." Id. at 189:24-190:6 (LeBeau); Ex. 29 (Audit Agreement). He also conceded that the Audit Agreement "says nothing about 'potential errors.'" MFNT Tr. II, 187:23-188:4 (LeBeau). With respect to the document sent to Mr. Perrot, LeBeau conceded that it "doesn't say it was a 'potential error.'" Id. at 188:23-189-23. He admitted that this document had his signature on it. Id. at 190:11-1; see also Ex. 32 (10/7/2014 DOJ Letter) (containing LeBeau's signature).*

## <u>Findings and Notification of Error in Perrot's Case</u>

73. In Mr. Perrot's case, the FBI received the transcript from the DOJ, rather than the prosecutor, because Mr. Perrot's defense counsel first brought the case to the attention of the DOJ. MFNT Tr. II, 132:23-133:5 (LeBeau).

> *<u>Explanation</u>: LeBeau testified that "[his] notes indicated that [the transcript] came from a defense attorney that was representing Mr. Perrot." Id.*

74. While three laboratory scientists from the FBI typically reviewed a case as a part of the audit, the FBI reviewed Mr. Perrot's case during a "surge" period, where the FBI made the decision to review cases with a team comprised of two attorneys and a scientist. *Id.* at 130:3-17. As the Commonwealth's witness conceded, the FBI's decision to use this protocol did not mean that there was anything wrong with the review of Mr. Perrot's case. *Id.* at 187:4-7.

> *Explanation: LeBeau testified that Mr. Perrot's case was reviewed during a "surge where we had a large number of transcripts in-house that we wanted to push through the review." Id. at 130:3-17. During that time, each review team "consisted of a single attorney, a single scientist, and an attorney from our office to general counsel; but that was the agreed upon deviation, if you will, from the process." Id. at 13:8-11. LeBeau clarified that he did not mean to indicate that there was anything wrong with the review of Mr. Perrot's case because his case was reviewed during the surge period. Id. at 187:4-7.*

75. LeBeau was involved with administratively reviewing the results of the review of Mr. Perrot's case but did not perform the initial review of the laboratory reports and transcripts in Mr. Perrot's case. *Id.* at 135:18-136:2; 153:23-154:1.

> *Explanation: LeBeau testified that he was "only involved in the review of the administrative portion of [Mr. Perrot's case]." Id. at 135:24-136:2. LeBeau explained that his "role was simply to review the paperwork, the final typed-up paperwork to assure that what was handwritten matched what was typed." Id. at 135:11-13.*

76. Although he did not take part in the initial document review in Mr. Perrot's case, LeBeau e-mailed and had a follow-up conversation with NACDL about the results of the review. *Id.* at 153:13-22.

> *Explanation: LeBeau testified that he was involved in the "review of the transcripts of this case before the defense team received this letter." Id.*

77. NACDL and/or the Innocence Project identified additional sections of the transcript testimony that they deemed to be errors in Mr. Perrot's case. *Id.* at 136:18-24.

> *Explanation: LeBeau explained that NACDL and/or the Innocence Project had identified additional sections of the transcript testimony in Mr. Perrot's case that they wished to have deemed as error types. Id. The additional sections identified by*

*NACDL and/or the Innocence Project were included in the final notice sent to Mr. Perrot by the DOJ. Id.*

78. LeBeau reviewed portions of Oakes's testimony in Mr. Perrot's case and personally approved the designation of a Type II error. Ex. 32 at 10 (10/7/2014 DOJ Letter).

*Explanation: An email from LeBeau attached to the letter sent to Mr. Perrot on October 7, 2014, notes that LeBeau "met with [the FBI] Review Team and discussed the additional items you reference for the George Perrot case . . . We agree that [Trial Tr. Vol. II, 371:12-21] should be an additional Error 2 and will add it to the FBI's Review Evaluation Form on this case." LeBeau and the FBI Review Team agreed that the following testimony constituted a Type II error:*

> *Q: What you're saying is that this hair that was your questioned sample was sufficiently similar to one or some of the hairs you received from Mr. Perrot so that you could not excuse Mr. Perrot as having been the source of that hair, correct?*
>
> *A: That's your characterization of my results, that's not how I state my results.*
>
> *Q: Is that an accurate statement, though, of the significance of the hair comparison?*
>
> *A: No.*

*Trial Tr. II, 371:12-21.*

79. LeBeau ultimately signed off on and approved all of the findings of error in Mr. Perrot's case. Ex. 32 at 8 (10/7/2014 DOJ Letter); MFNT Tr. II, 190:11-14 (LeBeau).

*Explanation: Page 2 of the FBI Microscopic Comparison Analysis Review Evaluation Form, which reports the errors found in Mr. Perrot's case, has LeBeau's signature next to printed text that says "Approved by" and bears the date 9/5/2014. Ex. 32 at 8 (10/7/2014 DOJ Letter); see also MFNT Tr. II, 190:11-14 (LeBeau) (confirming this is his signature).*

80. On October 7 and 16, 2014, the DOJ informed Mr. Perrot that the microscopic hair comparison testimony of Oakes at Mr. Perrot's 1992 trial exceeded the limits of science. *See* Ex. 32 (10/7/2014 DOJ Letter); Ex. 33 (10/16/2014 DOJ Letter).

*Explanation: Exhibits 32 and 33 are letters sent by the DOJ to Mr. Perrot's counsel on October 7 and 16, 2014, explaining that a joint DOJ and FBI review of laboratory reports and testimony by FBI Laboratory examiners had determined that "microscopic*

*hair comparison analysis containing erroneous statements was used" in his case. Ex. 32 at 2 (10/7/2014 DOJ Letter). The October 7, 2014 letter noted that the microscopic hair comparison testimony presented in his case "included statements that exceeded the limits of science and were, therefore, invalid." Id. at 3.*

81. The Hampden County District Attorney's Office was also informed of these errors. Ex. 32 at 2 (10/7/2014 DOJ Letter); Ex. 33 at 1 (10/16/2014 DOJ Letter).

*Explanation: Letters sent to Mr. Perrot on October 7, 2014 and October 16, 2014 attach cover letters indicating that the Hampden County District Attorney's Office was sent the same information that was sent to Mr. Perrot. Ex. 32 at 2 (10/7/2014 DOJ Letter); Ex. 33 at 1 (10/16/2014 DOJ Letter).*

82. The letter first sent to Mr. Perrot on October 7, 2014, mistakenly attached the review results for a different defendant, necessitating a second letter. MFNT Tr. II, 33:9-12, 34:13-24 (Koropp); Ex. 32 (10/7/2014 DOJ Letter); Ex. 33 (10/16/2014 DOJ Letter).

*Explanation: Koropp testified, upon examining the October 7, 2014 letter, that "[w]hat you can see here is the FBI or Department of Justice probably made a mistake and attached the wrong form." MFNT Tr. II, 33:9-12 (Koropp); Ex. 32 (10/7/2014 DOJ Letter). He also noted that the second letter to Mr. Perrot, dated October 16, 2014, attached "the actual FBI review form that pertained to Mr. Perrot's case, and as you can see it's on U.S. Department of Justice and FBI letterhead, and this is what the FBI filled out." MFNT Tr. II, 34:13-24 (Koropp); Ex. 33 (10/16/2014 DOJ Letter).*

83. The October 7, 2014 letter indicated that the FBI had reviewed four laboratory reports and the testimony of Oakes from Mr. Perrot's January 7, 1992, trial in evaluating his case for potential hair microscopy errors. Ex. 32 at 7-8 (10/7/2014 DOJ Letter).

*Explanation: The evaluation form attached to the letter sent to Mr. Perrot by the FBI on October 7, 2014, indicates that the FBI's review included laboratory reports dated 11/29/1985, 3/13/1986, 4/2/1986, and 8/4/1987 and Oakes's trial testimony. Id.*

84. The FBI concluded that Oakes's testimony in Mr. Perrot's case contained all three error types. Ex. 32 at 8 (10/7/2014 DOJ Letter); Ex. 33 at 2 (10/16/2014 DOJ Letter); MFNT Tr. II, 35:19-20 (Koropp).

*Explanation: The October 7, 2014 letter sent by the FBI attached a review sheet that identified page and line numbers for instances in which Oakes's testimony exceeded the limits of science; the FBI found errors of Type I, II, and III in Oakes's testimony.*

> *Ex. 32 at 8 (10/7/2014 DOJ Letter). The October 16, 2014 letter also included review results noting that all three types of testimonial errors were made in Mr. Perrot's case. Ex. 33 at 2 (10/16/2014 DOJ Letter). Koropp likewise explained in his testimony that all three error types were found in Oakes's testimony. MFNT Tr. II, 35:19-20 (Koropp).*

85. The FBI determined that Oakes committed a Type I error by "stat[ing] or imply[ing] that the evidentiary hair could be associated with a specific individual to the exclusion of all others." Ex. 32 at 3, 8 (10/7/2014 DOJ Letter); Ex. 33 at 2 (10/16/2014 DOJ Letter); *see also* MFNT Tr. I, 27:19-29:13 (Ziolkowski); MFNT Tr. II, 172: 9-18 (LeBeau).

> *Explanation: The FBI review identified a Type I individualization error in Oakes's testimony where Oakes said:*
>
> > *And it's like—I like to use the analogy of a person's face. I testified previously when you look at a person's face you look at their eyes, their ears and mouth. Most people have those characteristics, but when you walk into a room that's crowded you can spot and recognize someone you know even though everyone has two eyes, two ears and a nose and mouth because you know that person. You can detect subtle differences. You can pick out—oh, yeah, that's that person that I'm pointing out. An experienced hair examiner can pick out subtle differences in these characteristics because these characteristics require . . . .*
> >
> > *Trial Tr. II, 341:21-342:8 (Oakes).*
>
> *Ex. 32 at 8 (10/7/2014 DOJ Letter). The FBI deemed this analogy a Type I error. Id.; Ex. 33 at 2 (10/16/2014 DOJ Letter).*
>
> *This testimony is improper because hair comparison is class-based evidence and cannot form the basis for positive identification. See MFNT Tr. I, 27:19-29:13 (Ziolkowski) (explaining that hair comparison cannot form the basis for positive identification); MFNT Tr. II, 172:9-18 (LeBeau) (conceding that it is improper to say or suggest that individualization is possible).*

86. The FBI also determined that Oakes committed five Type II errors by "assign[ing] to the positive association a statistical weight or probability or provid[ing] a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that the valid statistical weight can be

assigned to a microscopic hair association." Ex. 32 at 3, 8 (10/7/2014 DOJ Letter); *see also* MFNT Tr. II, 98:13-25 (Kafadar); MFNT Tr. I, 187:12-20 (Oien).

> *<u>Explanation</u>: Reviewers identified five instances of Type II errors in Oakes's testimony:*
>
> 1) *If the question hair is microscopically indistinguishable, I can't see differences, I will conclude the question hair is consistent with coming from the individual represented by the known hair sample. Trial Tr. II, 348:23-349:2 (Oakes).*
>
> 2) *It has happened, an extremely rare number of occasions. Generally, I am able to tell a person's hair apart when, in my opinion, which I quote, match a hair or make a hair association although it's not positive like a fingerprint. It is basis of strong association. Id. at 349:20-350:1.*
>
> 3) *I conclude that question hair was consistent with coming from Mr. Perrot. Id. at 353:16-18.*
>
> 4) *My testimony was the question hair exhibited the same microscopic hairs as hair present in the known hair standard and was consistent with coming from Mr. Perrot. Id. at 361:9-11.*
>
> 5) *Q: What you're saying is that this hair that was your questioned sample was sufficiently similar to one or some of the hairs you received from Mr. Perrot so that you could not excuse Mr. Perrot as having been the source of that hair, correct?*
>
> *A: That's your characterization of my results, that's not how I state my results.*
>
> *Q: Is that an accurate statement, though, of the significance of the hair comparison?*
>
> *A: No. Id. at 371:12-21.*
>
> *Ex. 32 at 8 (10/7/2014 DOJ Letter). The FBI deemed these statements to exceed the limits of science. Id.*
>
> *Testimony suggesting that a "match" is "the basis of strong association" is improper because no statistical analysis of hair or hair comparison has been conducted to validate any sort of probabilistic testimony. MFNT Tr. II, 98:13-25 (Kafadar) (testifying that, because there is no population database or reference pool documenting hair characteristic frequency, probabilistic testimony like that offered at Mr. Perrot's trial by Oakes is not justified); MFNT Tr. I, 187:12-20 (Oien) (testifying that you "can never give statistics" and agreeing that "probabilities can be expressed in words and numbers").*

87. Finally, the FBI determined that Oakes committed two Type III errors by "cit[ing] the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual." Ex. 32 at 3, 8 (10/7/2014 DOJ Letter); *see also* MFNT Tr. II, 100:6-101:22 (Kafadar).

*Explanation: The FBI, in its letters, identified two instances of Type III errors:*

> *1) And it's my experience in 10 years it's extremely rare I will have known hair samples from two different people I can't tell apart. Trial Tr. II, 349:16-18 (Oakes).*
>
> *2) It has happened, an extremely rare number of occasions. Generally, I am able to tell a person's hair apart when, in my opinion, which I quote, match a hair or make a hair association although it's not positive like a fingerprint. It is basis of strong association. Id. at 349:20-350:1.*

*Ex. 32 at 8 (10/16/2014 DOJ Letter). The FBI deemed these quantifications of Oakes's experience as exceeding the limits of science. Id.*

*Testimony that suggests an analyst's experience has some connection or correlation to the accuracy of his or her conclusions is improper because no studies have been conducted to establish any connection between an analyst's experience and his or her accuracy. MFNT Tr. II, 100:6-101:22 (Kafadar) (testifying that quantification of an analyst's experience is impossible; no studies have been conducted that could reliably represent a hair examiner's accuracy).*

88. The results embodied in the letters sent to Mr. Perrot represent the official results of the FBI review. Ex. 32 at 2, n.1 (10/7/2014 DOJ Letter).

*Explanation: A footnote in the letter sent to Mr. Perrot on October 7, 2014, indicates that "the results embodied in the attached report represent the official results of the FBI's review of the case." Id.*

89. The DOJ noted in the letter that it took "no position regarding the materiality of the error in this case." *Id.* at 3.

*Explanation: The quoted language comes directly from the letter sent to Mr. Perrot on October 7, 2014. Id.*

90. The DOJ did, however, indicate that, in federal cases, it planned to, "in the interest of justice . . . waiv[e] reliance on the statute of limitations . . . and *any procedural-default defense in order to permit the resolution of legal claims* arising from the erroneous presentation of microscopic hair examination laboratory reports or testimony." *Id.* at 2-3 (emphasis added).

> *Explanation: The quoted language comes directly from the letter sent to Mr. Perrot on October 7, 2014. Id.*

91. Although the FBI conducted an additional review of Mr. Perrot's case, that additional review was rejected by the DOJ, *see* MFNT Tr. II, 144:1-10 (LeBeau), Ex. 32 at 2 n.1 (10/7/2014 DOJ Letter), and thus the re-review is "not part of the record," as the Commonwealth concedes. MFNT Tr. II, 143:8-10 (side bar conference).

> *Explanation: A footnote in the letter sent to Mr. Perrot on October 7, 2014, indicates that "the FBI conducted additional review of this case. However, certain aspects of the approach of the additional review were rejected by the DOJ." Ex. 32 at 2, n.1 (10/7/2014 DOJ Letter); see also MFNT Tr. II, 144:1-10 (LeBeau) (noting that the DOJ rejected aspects of the additional review). Attorney Farris admitted at side bar that this additional review was "not part of the record." MFNT Tr. II, 143:8-10 (side bar conference).*

**Errors in the Commonwealth's Opening and Closing Statements**

92. The FBI did not review the Commonwealth's opening and closing statements for Type I, II, or III errors as part of the FBI hair microscopy audit. Ex. 32 at 1 (10/7/2014 DOJ Letter).

> *Explanation: The letter sent to Mr. Perrot on October 7, 2014 states that the FBI and DOJ reviewed "laboratory reports and testimony by FBI Laboratory examiners in cases involving microscopic hair comparison analysis." Id. The letter does not state anywhere that the FBI and DOJ reviewed any other materials related to Mr. Perrot's case. See id.*

93. The Commonwealth's opening statement at Mr. Perrot's trial contained a Type I error by stating or implying that a question hair found at the M.P. crime scene was Mr. Perrot's hair to the exclusion of all others. Trial Tr. I, 107:8-10 (Commonwealth opening statement); *Ex. 29 at 1 (Audit Agreement defining Type I errors)*.

> *Explanation: During its opening statement, the Commonwealth asserted that "You'll hear that . . . when George Perrot was [at the M.P. crime scene], when he left he left something behind. He left some of his hair." Trial Tr. I, 107:8-10 (Commonwealth opening statement). This is a Type I error. Ex. 29 at 1 (Audit Agreement defining Type I errors).*

94. The Commonwealth's opening statement at Mr. Perrot's trial contained a Type II error by assigning to the positive association a statistical weight or probability or providing a likelihood that the question hair originated from Mr. Perrot. Trial Tr. I, 107:17-19 (Commonwealth opening statement); *Ex. 29 at 1 (Audit Agreement defining Type II errors)*.

> *Explanation: During its opening statement, the Commonwealth asserted that "And you'll hear the FBI testify that the hairs were found, one hair was found that is consistent with George Perrot's hair." Trial Tr. I, 107:17-19 (Commonwealth opening statement). This is a Type II error. Ex. 29 at 1 (Audit Agreement defining Type II errors).*

95. The Commonwealth's closing statement at Mr. Perrot's trial contained a Type I error by stating or implying that a question hair found at the M.P. crime scene was Mr. Perrot's hair to the exclusion of all others. Trial Tr. IV, 627:3-11 (Commonwealth closing statement); *Ex. 29 at 1 (Audit Agreement defining Type I errors)*.

> *Explanation: During its closing statement, the Commonwealth asserted that in order for Mr. Perrot to be innocent, there would have to be a "conspiracy you can't believe" where the police "Pull out one of George's hair . . . [a]nd the FBI finds that single hair. That's preposterous. Its [sic] preposterous." Trial Tr. IV, 627:3-11 (Commonwealth closing statement). This is a Type I error. Ex. 29 at 1 (Audit Agreement defining Type I errors).*

96. During its closing statement, the Commonwealth asserted that Mr. Perrot "before you at the beginning of this trial [was] presumed innocent and no evidence had been introduced. He is not innocent anymore." Trial Tr. IV, 615:10-16 (Commonwealth closing statement). The Commonwealth also asserted during its closing statement that "He was presumed innocent. He is not any longer." *Id.* at 629:7-8.

> *Explanation: At the outset of its closing statement, the Commonwealth asserted that Mr. Perrot "before you at the beginning of this trial [was] presumed innocent and no evidence had been introduced. He is not innocent anymore." Id. at 615:10-16.*

*Toward the end of its closing statement, the Commonwealth also asserted that "He was presumed innocent. He is not any longer." Id. at 629:7-8.*

97. During its closing statement, the Commonwealth stated "What kind of world is it where George Perrot is innocent? It's a world where two FBI agents get together and risk their reputations and careers to create evidence to reach conclusions not supported . . . . It's a kind of world where Tom Kelly and Mr. Jarvis get together to create evidence to pin on this poor man. It's the kind of world where for him to be innocent there has to be such a conspiracy you can't believe . . . . That's preposterous. Its [sic] preposterous." *Id.* at 626:19-627:11.

*Explanation: During its closing statement, the Commonwealth asserted "What kind of world is it where George Perrot is innocent? It's a world where two FBI agents get together and risk their reputations and careers to create evidence to reach conclusions not supported . . . . It's a kind of world where Tom Kelly and Mr. Jarvis get together to create evidence to pin on this poor man. It's the kind of world where for him to be innocent there has to be such a conspiracy you can't believe . . . . That's preposterous. Its [sic] preposterous." Id.*

## Limiting Language

98. Potential limiting language was not within the official scope of the review and was not evaluated by the Innocence Project or NACDL; the note regarding "potential limiting language" on the FBI's page of findings in Mr. Perrot's letter thus does not reflect an official finding of the review. MFNT Tr. II, 38:14-22 (Koropp); Ex. 29 (Audit Agreement).

*Explanation: The Audit Agreement does not contain any language regarding procedure for evaluating "potential limiting language." Ex. 29 (Audit Agreement). Koropp testified regarding potential limiting language that "[t]here was something that was not part of the audit, the FBI at some point during the audit as the errors began to cascade in, started basically making a materiality determination that we didn't think was part of the audit, so we would not review this, this would be language that someone at the FBI thought was relevant to whether the statements by the examiner were material and because it really wasn't any part of the scientific review we didn't review it or offer any comment on it." MFNT Tr. II, 38:14-22 (Koropp).*

99. FBI reports and live testimony sometimes included limiting language explaining that a hair was not the basis for a unique identification. MFNT Tr. I, 137:24-138:6; 144:3-12, 146:3-6 (Oien); MFNT Tr. II, 55: 17-22 (Koropp), 158: 17-159:14 (LeBeau).

*Explanation: As Oien testified: "I have seen evidence that we have employed a limiting language statement on any positive hair report going back to the mid-seventies, and that the actual words and the phrase have changed slightly, but the basic premises remain the same, and after we have a positive association statement in a report, it's followed by something to the effect that hairs are not a means of identification." MFNT Tr. I, 137:24-138:6 (Oien); see also id. at 144:3-12 (testifying that he would "expect" and "hope" that the language used in testimony would not be different than in the report, and that the a subcommittee report instructs that "what's in the report is what should be testified to"); id. at 146:3-6 (agreeing that it is "incumbent upon a hair examiner to testify about the qualifying language that appears on the report"); MFNT Tr. II, at 55:17-22 (Koropp) (testifying that lab reports with limiting language "always [had] the same sentence"); id. at 158:17-159:14 (LeBeau) (testifying that "you cannot say that a hair came from a specific individual to the exclusion of all others, that's why that disclaimer language has been in reports since as far back as we have reviewed, which was in the '70s.").*

100. As the Commonwealth's expert conceded, however, this limiting language only concerns Type I errors, and does not address the issue of whether probabilities or probative values may be assigned to a hair association. MFNT Tr. I, 187:6-9 (Oien); MFNT Tr. II, 176:15-23 (LeBeau); Ex. 34 at 2 (2014 Kafadar Letter).

*Explanation: During Oien's cross-examination, he agreed that "the disclaimer only went to individualization. It didn't talk about probabilistic testimony." MFNT Tr. I, 187:6-9 (Oien). During his testimony, LeBeau conceded that an examiner could not use a disclaimer and then proceed to give misleading or scientifically invalid testimony. MFNT Tr. II, 176:15-23 (LeBeau).*

*As Dr. Kafadar explains in her 2014 letter to the FBI, "In my view, it is certainly* ***necessary*** *for an examiner to admit that a 'hair match' is not like a 'fingerprint match' and that it cannot be used to exclude every person on the planet. But it is not* ***sufficient*** *without substantial data confirming the frequency of the characteristics on which the association was based and the size of the reference population (or 'pool') to whom the analysis would refer. Without this information, the single statement could be misinterpreted to imply greater confidence in the rarity of the positive association than we may—or may not—find to be true otherwise." Ex. 34 at 2 (2014 Kafadar Letter) (emphasis in original).*

**The FBI Audit Results and NAS Report Are Newly Discovered Evidence**

101. Prior to the issuance of the NAS Report, hair microscopy literature failed to address the need for population frequency data and relevant reference pools in hair microscopy to support conclusions about probative value. Kafadar Aff. ¶ 9(d).

*Explanation: Dr. Kafadar explained that in her role in preparing the NAS report, "[n]one of the literature that I saw before 2009 suggested the importance of population frequency data and relevant reference pools for hair microscopy to provide reliable conclusions for purposes of probative value. These requirements appear to have been unrecognized by the hair microscopy community until the 2009 NAS Report and the FBI's recent acknowledgement of errors in prior testimony." Id.*

102. Prior to and at the time of the trial, scientific studies by B.D. Gaudette attempted to develop a statistical foundation for hair microscopy associations. Gaudette largely did so by attempting to quantify the likelihood that one hair found to be indistinguishable from another came from the same source. *See id.* ¶ 31; Ex. 31 at 158 nn.73 & 77 (2009 NAS Report). These studies include:

a. B.D. Gaudette and E.S. Keeping. *An Attempt at Determining Probabilities in Human Scalp Hair Comparison.* Journal of Forensic Sciences 19(3):599-606 (1974) (accepted for publication in 1973);

b. B.D. Gaudette. *Probabilities and Human Pubic Hair Comparisons.* Journal of Forensic Sciences 21(3):514-517 (1976) (accepted for publication in 1975);

c. B.D. Gaudette. *Some Further Thoughts on Probabilities and Human Hair Comparisons.* Journal of Forensic Sciences 23(4):758-763 (1978);

d. B.D. Gaudette. *A Supplementary Discussion of Probabilities and Human Hair Comparisons*. Journal of Forensic Sciences. 27(2):279-289 (1981).

Gaudette's work did not attempt to collect data on the frequency of hair characteristics within a population. Kafadar Aff. ¶ 25.

*Explanation: Dr. Kafadar explained: "While the lack of quantifiable, statistical foundations in hair microscopy was largely unrecognized in the hair microscopy community, some early authors attempted to bring a statistical foundation to hair microscopy. For example, an article by B.D. Gaudette (1974), which the NAS Committee reviewed, attempted to quantify the likelihood that questioned hairs found to be indistinguishable from those from a suspect would have in actuality come from a source other than a suspect." Id. ¶ 31. Later studies by Gaudette attempted to refine this number or study methodology. See Ex. 31 at 158 nn. 73 & 77 (2009 NAS Report). Gaudette's work did not acknowledge the necessity of a population database for the frequency of characteristics. Kafadar Aff. ¶ 25.*

103. The Gaudette studies were subsequently criticized by Barnette and Ogle as having serious methodological problems, including potential examiner bias resulting from the fact that all the

hairs in the studies came from different sources. *See* P.D. Barnett and R.R. Ogle. *Probabilities and human hair comparison. Journal of Forensic Sciences* 27(2):272-278 (1982) (accepted for publication in 1981); *see also* Kafadar Aff. ¶¶ 25, 32.

> *Explanation: Gaudette's work was subject to some criticism, "most significantly in an article by P.D. Barnett and R.R. Ogle." but this article was primarily a methodological critique and "it did not suggest that population frequency databases and references pools were necessary for conclusions from hair analyses." Kafadar Aff. ¶ 32.*

104. Subsequently, R.A. Wickenheiser and D.G. Hepworth attempted to address the bias critiques of Gaudette's work by introducing several same-sourced hairs into the analysis. This study suffered from its own methodological problems, however, as it (1) involved only two examiners, which eliminates a significant source of variability, and (2) failed to acknowledge the need for a population database. R.A. Wickenheiser and D.G. Hepworth. *Further evaluation of probabilities in human hair comparisons*. Journal of Forensic Sciences 35(6):1323-1329 (1990); *see also* Kafadar Aff. ¶¶ 34, 35; Ex. 31 at 158 (2009 NAS Report).

> *Explanation: As Dr. Kafadar explained, Weickenheiser and Hepworth study was "limited by the fact that it involved only two examiners." Kafadar Aff. ¶ 34; see also Ex. 31 at 158 (2009 NAS Report) ("[A] study with only two examiners cannot offer accurate and precise estimates of bias in the population of examiners."). Weickenheiser and Hepworth's study also "failed to acknowledge the necessity of a population database for data on the frequency of characteristics. Without such a population database (as well as the objective measurement process described above), this study could not provide a basis for a statistically valid statement regarding hair microscopy evidence." Kafadar Aff. ¶ 35.*

105. Because these articles did not acknowledge the need for (nor sought to provide) data on the frequency of characteristics within a relevant population, they could not and did not provide a scientific basis for testimony about the probative value of hair microscopy. MFNT Tr. II 96:13-18 (Kafadar); Ex. 31 at 160 (2009 NAS Report).

> *Explanation: Dr. Kafadar testified that statistical studies on hair microscopy "were kind of missing the concept of representativeness, so it wasn't from the population." MFNT Tr. II, 96:13-18 (Kafadar). "No scientifically accepted statistics*

*exist about the frequency with which particular characteristics of hair are distributed in the population." Ex. 31 at 160 (2009 NAS Report).*

106. Although the statistical concepts underlying the NAS Report and Dr. Kafadar's critique of hair microscopy have existed for decades, they were not fully appreciated in the context of hair microscopy until 2009, with the publication of the NAS Report. Kafadar Aff. ¶¶ 9(d), 29, 38; MFNT Tr. II, 95:8-14 (Kafadar).

*Explanation: Concepts of "population database and a reference pool were well known in the broader scientific community for decades, [but] hair examiners prior to the 2009 NAS report did not appear to recognize the need for this information for making valid statements about the probative value of an association in hair microscopy." Kafadar Aff. ¶ 29; see also MFNT Tr. II, 95:8-14 (Kafadar) (testifying that these concepts "have been known in the scientific community [for a] long time . . . and are not new concepts"); Kafadar Aff. ¶ 9(d) ("None of the literature that [Dr. Kafadar] saw before 2009 suggested the importance of population frequency data and relevant reference pools for hair microscopy to provide reliable conclusions for purposes of probative value. These requirements appear to have been unrecognized by the hair microscopy community until the 2009 NAS Report and the FBI's recent acknowledgement of errors in prior testimony."). Dr. Kafadar thus concluded that "the critical literature and evidence reviewed by the NAS reflects that the need for a population frequency database and a reference pool to make statements regarding the probative value of hair evidence was not understood at that point, much less accepted within the hair microscopy community until the FBI's recent concessions." Id. ¶ 38.*

107. At the time of Mr. Perrot's trial, the scientific community did not have any mandated standards for hair microscopy testimony. MFNT Tr. I, 142:1-8 (Oien).

*Explanation: Oien testified that, although there were sources the FBI looked to for "approved language," "established, mandated standard[s] . . . [were] not something that we have, or had at that time in forensic science." Id.*

108. Reports and testimony at the time of Mr. Perrot's trial routinely used terms such as "consistent with," "matched," "rare," or "very rare." *Id.* at 27:4-28:7, 53:14-18; 54:1-8 (Ziolkowski). These phrases are now widely understood to be inappropriate and statistically unsupported. Ex. 30 at 3-4, 7-8 (FBI Guidance Document); MFNT Tr. I, 137:9-18 (Oien).

*Explanation: Ziolkowski noted in her testimony that hair analysts used terms like "consistent with" and "matched" in reports. MFNT Tr. I, 27:04-28:07 (Ziolkowski); cf. Ex. 30 at 3-4 (FBI Guidance Document) (finding error to state that a hair is "consistent with" coming from an individual). She also remembered that analysts*

*would testify that it was "rare" or "very rare" to find a match and be wrong. MFNT Tr. I, 53:14-18; 54:1-8 (Ziolkowski); cf. Ex. 30 at 3-4 (FBI Guidance Document) (finding error to state that an association is "rare"). Additionally, Oien testified that the term "matched" was used at the time of Mr. Perrot's trial, but that after his trial "it was identified that the term may have been misleading or confusing to people so we tried not to use that term any more." MFNT Tr. I, 137:9-18 (Oien).*

109. At the time of Mr. Perrot's 1992 trial, the only guidelines or parameters in existence for testimony by a hair analyst were contained within the 1985 FBI report entitled *Committee on Forensic Hair Comparison—Subcommittee 4—Report Writing, Conclusions and Court Testimony*, which was the result of an FBI symposium (the "1985 Symposium"). *See* Ex. 26 (1985 Symposium); MFNT Tr. I, 143:3-9 (Oien).

*<u>Explanation</u>: When asked if there were guidelines or policies that provided parameters for hair analysts' testimony, Oien responded that "[t]he one that I'm aware of was the result of a symposium that was held in 1985 at the FBI academy on forensic hair comparisons." MFNT Tr. I, 143:3-9 (Oien). The 1985 Symposium, the document to which he referred, was entered as Exhibit 26.*

110. The 1985 Symposium, while recognizing that hair is not the basis for a unique identification, approved several types of testimony that are now identified as errors, including testimony assigning statistical and probabilistic values to comparison findings. *See* Ex. 26 at 108-112 (1985 Symposium); Ex. 30 at 12-14 (FBI Guidance Document); MFNT Tr. I, 144:17-145:12, 185:12-20 (Oien); MFNT Tr. II, 98:18-25 (Kafadar); Ex. 29 at 1 (Audit Agreement).

*<u>Explanation</u>: The 1985 Symposium provides that the strongest conclusion a hair examiner could reach would be that the questioned hair is "consistent with having come from John Doe," which is based on "a strong association between the questioned hair and the known sample." See Ex. 26 at 108 (1985 Symposium); see also MFNT Tr. I, 144:17-24 (Oien) (discussing the 1985 Symposium). This testimony would now be considered a Type II error. Ex. 30 at 12-14 (describing Type II errors as instances in which an analyst provided "an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association" and providing examples of this error type that include testimony that a questioned hair was "consistent with" coming from a suspect). There are separate categories for instances when the hair "could have come from John Doe" or "John Doe qualifies as being the donor of the questioned hair." Ex. 26 at 108-9 (1985 Symposium); see also MFNT Tr. I, 144:24-145:12 (Oien). These may also qualify as Type II errors. The document further provides that although hair "unlike fingerprints, did not permit a positive*

*identification to be made, except in a few rare instances" a hair examination revealing "similarity of structure, color, pigmentation and other characteristics can be [of] strong probative value in the majority of cases when considered along with other evidence." Ex. 26 at 110 (1985 Symposium).*

*The 1985 Symposium goes on to explain that "the probability data from the published research of Gaudette, coauthored by a statistician and verified by other statisticians, has shown when a positive hair comparison has been made by a qualified hair examiner, the chances of coincidental matches are relatively rare. The hair could match that of another individual, but it is much more likely to have originated from the same source to which it was compared. Gaudette's probability data on positive hair comparisons on Caucasian scalp hairs can be stated in several ways. . . . It will be left to laboratory policy or the individual examiner whether he can personally substantiate and defend in court the findings from these studies." Id.; see also MFNT Tr. I, 185:12-20 (Oien) (reading portions of this passage). In addition, the document goes on to discuss the "uniqueness" of Negroid, Mongoloid, and Caucasian hairs. Ex. 26 at 112 (1985 Symposium). As Dr. Kafadar and the FBI review make clear, probabilistic statements or statements of probative value are impermissible. MFNT Tr. II, 98:18-25 (Kafadar) (testifying that, because there is no population database or reference pool about hair characteristic frequency, probabilistic testimony like that offered at Mr. Perrot's trial by Oakes is not justified); Ex. 29 at 1 (Audit Agreement) (defining Type II errors as instances in which "[t]he examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hare originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association").*

111. Even as late as 2009, FBI analyst Oien published a scientific review of literature entitled *Forensic Hair Comparison: Background Information for Interpretation*, publication number 09-03 of the Laboratory Division of the FBI. Ex. 25 (2009 Oien Article). Although it was issued only a few months before the NAS Report, Oien's article came to virtually the opposite conclusions of the NAS Report. Specifically, Oien concluded that (1) hair microscopy "can provide a strong basis for an association," (2) the lack of statistics does not render an association invalid, and (3) probative value not only may—but must—be communicated qualitatively or semiqualitatively in testimony, despite the lack of statistical foundation. *Id.* at 1, 18.

*<u>Explanation</u>: In April 2009—just a few months prior to the August 2009 publication of the NAS Report—FBI Agent Oien published an article insisting that hair microscopy "can provide a strong basis for an association." Id. at 1. Oien acknowledged that frequency data does not exist for microscopic hair characteristics; therefore "the significance of their occurrence within a single sample cannot be expressed and*

*compared numerically," and instead "must be done qualitatively or semiqualitatively." Id. at 18. Oien argued that "[s]imply because the statistical probability of hair evidence cannot be calculated does not make the comparison unreliable." Id. Oien concluded that it is the examiner's obligation not only to testify to "the limitations of the science" but also to testify to "the significance or weight of an association or exclusion." Id.*

112. The initiation of the 2012 hair microscopy audit constitutes the first public acknowledgment by the FBI that the reliability of hair microscopy analysis is limited in that the size of the pool of people who could be included as a possible source of a specific hair is unknown. It also constitutes the first public acknowledgment by the FBI of the three error types that have since been found to be present in Mr. Perrot's case. MFNT Tr. II, 20:15-22:8 (Koropp); c*ompare* Ex. 29 (Audit Agreement) *with* Ex. 25 at 1, 18 (2009 Oien Article); *see also* MFNT Tr. II, 169:4-18 (LeBeau).

*<u>Explanation</u>: Koropp testified, based on his review of relevant literature and publicly available documents, that these three error types had never been articulated and the FBI had never acknowledged these kinds of errors before the audit. MFNT Tr. II, 20:15-22:8 (Koropp). The Audit Agreement notes that "[m]icroscopic hair analysis is limited, however, in that the size of the pool of people who could be included as a possible source of a specific hair is unknown. An examiner report or testimony that applies probabilities to a particular inclusion of someone as a source of a hair of unknown origin cannot be scientifically supported." Ex. 29 at 1 (Audit Agreement). The Audit Agreement defines three types of errors related to this concession. Id. Oien's 2009 article, by contrast, contains no indication of these limitations, and offers conclusions that would be seen as error under the review protocol. Ex. 25 at 1, 18 (2009 Oien Article).*

*To the extent that the DOJ criminal task force examined hair microscopy testimony, this information was not made public, as discussed below, and moreover, as LeBeau conceded, the FBI did not look to problems in the Hair and Fiber Unit besides the problems associated with Michael Malone. MFNT Tr. II, 169:4-18 (LeBeau).*

113. Prior to the inception of the hair microscopy audit, notice letters such as the one issued to Mr. Perrot had never gone out to criminal defendants in hair microscopy cases. *Id.* at 41:2-17 (Koropp).

*<u>Explanation</u>: Koropp testified that, in his experience, "prior to the inception of the audit . . . notice letters like this had not gone out in cases involving hair microscopy." Id.*

114. Prior to the issuance of the letters to Mr. Perrot on October 7 and 16, 2014, the FBI had never acknowledged that the FBI examiner, Supervisory Special Agent Wayne M. Oakes, made any errors during his testimony at Mr. Perrot's 1992 trial. *Id.*

> *Explanation: After reviewing the letters sent to Mr. Perrot by the FBI acknowledging errors in Oakes's testimony in his case, Koropp testified that "[b]ased on [his] experience, prior to the inception of the audit, no, notice letters like this had not gone out in cases involving hair microscopy." Id.*

115. While the FBI hair audit is still ongoing as of April 2015, the FBI has reported that FBI examiner testimony in 96% of analyzed trial transcripts contained erroneous statements, *demonstrating that the erroneous testimony in Mr. Perrot's case was common at the time of his trial* in 1992. Ex. 27 at 2 (4/20/2015 Press Release); MFNT Tr. II, 161:15-162:1 (LeBeau).

> *Explanation: The FBI press release explains that, as of the date of its release, the FBI had reviewed 268 cases wherein FBI examiners provided testimony used to inculpate a defendant at trial, and concluded that FBI examiners made erroneous statements in 257 (or 96%) of those cases. Ex. 27 at 2 (4/20/2015 Press Release). Similarly, during the hearing, LeBeau confirmed that "it's not the norm" not to find errors in the transcripts. MFNT Tr. II, 161:15-162:1 (LeBeau).*

**The 1997 OIG Report and 1996-2004 DOJ Task Force**[4]

116. In 1997, the Office of Inspector General ("OIG") issued a publicly available report investigating 28 lab examiners at the FBI Lab, mostly in the Explosives, Chemistry-Toxicology, and Materials Analysis Units. *See* Ex. 39 at 3 (2014 OIG Report).

> *Explanation: The 2014 OIG report explains that the 1997 OIG investigation and report focused on allegations by a whistleblower named Fred Whitehurst, which primarily concerned "the Explosives Unit, the Chemistry-Toxicology Unit, and the Materials Analysis Unit." Id.*

[4] At the September 25, 2015 hearing, the Court requested that the Commonwealth provide a redacted version of this report. MFNT Tr. II, 171:13-14. The Commonwealth has failed to produce a redacted version of the report by the time of filing. Mr. Perrot is proffering this document for the sole purpose of responding to the Commonwealth's argument that the 1996-2004 DOJ Task Force and the 1997 OIG Report put Mr. Perrot on notice of any potential problems with Oakes's testimony. *See* Commonwealth Opp. to Def's Mot. for New Trial at 66-70.

117. Although the 1997 OIG Report did address the testimony of Michael Malone, an examiner in the Hair and Fiber Unit, it did not address his work on hair microscopy, but instead concerned his work on a tensile testing of a purse strap. *Id.* at 3 & n.5, 4 n.8 (2014 OIG Report).

> *Explanation: The 2014 OIG report makes clear that although the 1997 OIG Report examined the work of Michael Malone—an FBI analyst whose work involved hair microscopy—the 1997 OIG Report only addressed Malone's work in other disciplines and did not involve any assessment of Malone's work on microscopic hair analysis. Id. at 3 & n.5 (2014 OIG Report) (explaining that the OIG's investigation "did not include an examination of all examiners or the operations of the Hairs and Fibers Unit of the Lab" although it did investigate the work of Michael Malone concerning "a tensile test on a leather strap"); id. at 4, n.8 (1997 OIG Report "did not criticize Malone for his work in the field of hair and fiber analysis.").*

118. Alongside the OIG investigation, there was a 1996-2004 DOJ Criminal Division Task Force that investigated 13 FBI examiners, including Michael Malone. Ex. 39 at 4-5 (2014 OIG Report).

> *Explanation: The 2014 OIG Report described the work of the DOJ Task Force. Id. This work included identifying cases involving 13 lab examiners whose work had been criticized by the OIG, notifying prosecutors involved with these cases, submitting lab reports and other materials in these cases for independent review, and transmitting the independent reviewers' conclusions to prosecutors. Id. Michael Malone was among the 13 FBI examiners whose testimony was reviewed by the Task Force. Id.*

119. Although the Task Force did review Malone's work in the Hair and Fiber Unit, the details of this review were not made public, and results were provided only to prosecutors; notably, it has since been found that in almost all instances, prosecutors ***failed*** to make appropriate or timely disclosures to the defendants whose cases had been reviewed and were found to have issues. *Id.* at iii. Consequently, several individuals were ***executed or died without learning of the review*** or the results in their cases. *Id.* at ii; *see also id.* at 70.

> *Explanation: The 2014 OIG Report noted that it was left to the discretion of prosecutors whether to disclose the results of the review to criminal defendants. Id. at iii. The DOJ had documentation indicating that prosecutors disclosed the reports to the criminal defendants in only 13 of 402 case files reviewed. Id. As a result, "some defendants learned very late—or perhaps never—that their convictions may have been tainted." Id. The OIG suggests that Benjamin H. Boyle, Michael Lockhart, Gerald E. Stano, and Joseph Young either were executed or died of natural causes without*

*learning of the review or the DOJ's findings. Id. at ii. The OIG criticized the task force for not "describ[ing] to the public, in more detail, the case review it was undertaking" which would have "allowed defendants, defense organizations, and others to be notified of the potential effect on capital convictions." Id. at 70.*

120. Oakes was not one of the FBI agents examined by the DOJ Task Force, and consequently, Mr. Perrot's case was not reviewed until the 2012 hair microscopy audit, the results of which were disclosed in October, 2014. *Id.* at 87.

*Explanation: The 2014 OIG Report lists the agents who were reviewed by the DOJ Task Force, and Oakes is not included in the list. Id.*

**Other Problems with Oakes's Hair Analysis**

121. Since the time of Mr. Perrot's trial, the term "match" or "matched" has been identified as misleading or confusing, and is no longer used by hair examiners when explaining hair microscopy results to a jury. MFNT Tr. I, 137:9-18 (Oien), 46:9-12 (Ziolkowski).

*Explanation: Oien testified that the term "matched" was used prior to 1992, but that after the time of trial in Perrot's case, the term was no longer used because "it was identified that the term may have been misleading or confusing to people so we tried not to use that term any more." Id. at 137:9-18 (Oien). Likewise, Ziolkowski testified that "match" is now viewed as a problem, although she believed that it was used at the time. Id. at 46:9-12 (Ziolkowski).*

122. Oakes used the terms "match," or derivatives of this word such as "matches" or "matched," at least 15 times in his testimony during Mr. Perrot's second trial. Trial Tr. II, 349:11-16, 349:21-350:1, 350:9-11, 350:9-12, 350:12-14, 361:8, 364:5-6, 376:1-3, 376:13-17, 379:4-5, 379:14-16, 379:16-18, 379:19-20, 381:14-16, 384:7-8 (Oakes).

*Explanation: Oakes used the term "match" or its derivatives in the following parts of his testimony:*

> *"However, I will testify if the hair matches, in my opinion, that hair is consistent with coming from me or stated another way it either came from me or another individual of my same race whose hair exhibits all of the same microscopic characteristics or in the same way from the root of the hair and the tips." Id. at 349:11-16.*

*"Generally, I am able to tell a person's hair apart when, in my opinion, which I quote, match a hair or make a hair association although it's not positive like a fingerprint." Id. at 349:21-350:1.*

*"In other words, if I match a hair from here from the stand here, with my known hair standard I can say it's consistent with being my hair." Id. at 350:9-11.*

*"If you're asking me could it match someone else I can't eliminate that possibility." Id. at 350:9-12.*

*"I would have to have that person's hairs and I would have to make a comparison and those person's hairs would also have to match." Id. at 350:12-14.*

*"Mr. Perrot's hair, I thought, was a match." Id. at 361:8.*

*"This is my opinion as to whether or not hairs match." Id. at 364:5-6.*

*"I don't think if you showed that question hair to any qualified experts they would disagree that it matched the hairs of the defendant." Id. at 376:1-3.*

*"If the question hair found at a crime scene or another person's clothing comes from the top of my head I would not expect that to match with the sideburn hair that was in my known hair sample, but I would expect it to match those hairs in the sample that were taken from the same general area." Id. at 376:13-17.*

*"Generally, the hairs in the known sample matched the question hair." Id. at 379:4-5.*

*"If you are asking me if it's conceivable that there is a hair in there, given a hair I wouldn't match, sure, probably is." Id. at 379:14-16.*

*"If I give a known hair sample from here and you find a question hair on your table from the top of my head would I match them?" Id. at 379:16-18.*

*"The hair really came from me, but I can't match it." Id. at 379:19-20.*

*"I can't discount the possibility that there is someone else in the area that might match Prekop specifically—Mr. Perrot." Id. at 381:14-16.*

*"I have the same criteria each and every time I make a hair match." Id. at 384:7-8.*

123. It is best practices to record observations in bench notes. MFNT Tr. I, 159:24-160:4 (Oien), 35:16-36:24 (Ziolkowski).

> *<u>Explanation</u>: Oien agreed that he would record his "observations in bench notes about the different types of characteristics [he] was observing," and that it was "best practices to do that." Id. at 159:24-160:4 (Oien). Likewise, Ziokowski testified that, "[w]hen doing an examination, documentation of some kind is made so that you can go back and refer to it. The amount of documentation has evolved through the years." Id. at 35:16-19 (Ziolkowski). In 1991, Ziokowski would have "put down a few characteristics when I was doing the comparison to trigger my memory about what I was seeing that was similar." Id. at 36:21-24.*

124. Oakes's bench notes do not reveal the analysis conducted by Oakes in reaching the conclusion that there was a hair association between Mr. Perrot's samples and the question hair. The bench notes do not contain a characteristic-by-characteristic comparison between the known and unknown samples. Ex. 12 at 2 (Bench notes).

> *<u>Explanation</u>: In the bench notes, the question hair is described as: "One brn. cohh—natural root, tip broken (shredded [sic]) Like k6 hh's." Id. K6 is the known samples from Mr. Perrot. Thus, the entirety of the description of the unknown hair is that it is a brown Caucasian head hair with a natural root and broken tip that looked like Mr. Perrot's hair.*
>
> *Mr. Perrot's samples are characterized as: "Straight med brn cohh's cut.[/] Color consist—med abs, cut. thick, good defin., [/] Prom obs [/] Scales well defined, pigm [illegible] sct. conc → cut" Id.*

125. Oakes could not testify to basic details about unknown hair such as length or diameter, despite the fact that the length of the attacker's hair was a key issue in the case. Trial Tr. II, 384:14-385-7 (Oakes). Moreover, Oakes's testimony on the unknown hair appears to reflect that Oakes was in fact reading the characterization of the known samples from Mr. Perrot, as he incorrectly stated that the tip of the unknown hair was cut when in fact it was broken according to his bench notes. *Id.*; Ex. 12 at 2 (Bench notes).

> *<u>Explanation</u>: The extent of Oakes's characterization of the question hair was: "I can tell you the question hair was a brown Caucasian cut hair with a cut tip and natural root. It had normal pigmentation. It was not medullated. It had a thick cuticle. It had prominent ovoid bodies. The scales were not particularly damaged. They were unremarkable. The diameter, whatever it was, and the length, what it was like, the*

*hairs in the known hair standard from the defendant's there were no significant microscopic differences." Trial Tr. II, 384:14-385:7 (Oakes). Oakes appears to have been reading the description of Mr. Perrot's hair, as the question hair had a broken tip, not a cut tip, according to Oakes's bench notes. Ex. 12 at 2 (Bench notes) (describing the question hair as having "natural root, tip broken (shredded [sic])").*

126. The standard preferred practice in hair microscopy is to collect a representative selection of 25 to 50 hairs from the contributor of the known samples. MFNT Tr. I, 20:23-22:4, 30:5-21 (Ziolkowski), 169:2-18 (Oien).

*Explanation: As Ziolkowski explained, the typical range would be 25-50 head hairs. Id. at 20:23-22:4 (Ziolkowski) ("25 to 50 would be a nice range, and from the five different areas of the head."); id. at 30:5-21 (agreeing that you would ideally "collect 25 to 50 hairs from five different parts of the head" but that it "was done differently from case to case. It might be 25 to 50. It might be less. It might be from all five parts of the head, it might be from fewer"). Similarly, Oien testified that it is ideal to collect 25 to 50 or more hairs from different regions of the head for an examination. Id. at 169:2-18 (Oien).*

127. In Mr. Perrot's case, Oakes could not say how many hairs were collected, but suggested that it could be as few as 12. Trial Tr. II, 362:11-363:5 (Oakes).

*Explanation: Oakes testified that he cannot give "an exact number" and that he could not tell "whether it was 12, 15, or 20 in that point in time." Id.*

128. In 1991 and 1992, it was not common practice to perform blind administration of hair microscopy to reduce or eliminate cognitive bias, although it has become common practice. MFNT Tr. I, 45:10-16 (Ziolkowski).

*Explanation: Ziolkowski agreed that "[t]oday in some forensic sciences, we're dealing with blind administration to even deduce or eliminate cognitive bias" but that she was not aware of this being practiced prior to 1991. Id.*

129. The bench notes show that Oakes did not perform a blind administration when examining the hairs in Mr. Perrot's case because only one set of known hairs—Mr. Perrot's—was tested and because the bench notes mention Mr. Perrot by name. Ex. 12 at 2 (Bench notes).

*Explanation: The bench notes reflect that that hair samples from only one source—Mr. Perrot—were tested, and that Oakes understood Mr. Perrot was the source of the hair samples, as the bench notes indicate, "K6-hh George Perrot." Id.*

130. It is now understood that it is critical to shield forensic examiners from potentially biasing information. Ex. 28 at 600, 612 (Why Experts Make Errors); MFNT Tr. II, 182:18-183:8 (LeBeau); MFNT Tr. I, 43:24-44:6 (Ziolkowski).

> *Explanation: In a 2006 article, Itiel Dror and David Charlton reported the results of a study that found that biasing information influenced the determinations of fingerprint examiners. Ex. 28 at 600 (Why Experts Make Errors). The study concluded that "fingerprint experts were vulnerable to biasing information when they were presented within relatively routine day-to-day contexts, such as corroborative (or conflicting) evidence of confession to a crime. Thus contextual information does not need to be extreme and unique to influence experts in their fingerprint examination and judgment." Id. at 612.*
>
> *LeBeau acknowledges it is important to shield hair analysts from biasing information because hair microscopy relies on observations rather than measurements. MFNT Tr. II, 182:18-183:8 (LeBeau). Likewise, Ziolkowski testified that "if you said 'oh, just compare these two.' You're already biased to think there may be a match or there may not be a match, depending on the circumstances presented to you. Another way would be if someone senior to you tells you that there's something that's true, could that color your perception before you start looking at the evidence." MFNT Tr. I, 43:24-44:6 (Ziolkowski).*

131. ADA Bloom took the highly unusual step of personally delivering samples of Mr. Perrot's hair to Agents Oakes in Washington, D.C. in April, 1987. Ex. 11 (FBI lab report).

> *Explanation: FBI laboratory reports reflect that ADA Bloom personally delivered samples of Mr. Perrot's hair to the FBI laboratory in April 1987. Id.*

132. During this visit, Bloom likely conveyed his strong conviction of Mr. Perrot's guilt, biasing Oakes's analysis of Mr. Perrot's hair. MFNT Tr. II, 182:16-183:10 (LeBeau); Ex. 16 (George Perrot statement dated 12/7/85); Murrie Aff. at 14.

> *At the time he delivered the samples, Mr. Perrot had already been aggressively interrogated and made a partial admission and was the prime suspect in the M.P. rape. Ex. 16 (George Perrot statement dated 12/7/85). Because ADA Bloom was aware of this admission and was actively prosecuting Mr. Perrot for the M.P. rape, he likely conveyed his conviction of Mr. Perrot's guilt to Oakes. As Daniel Murrie indicated in his affidavit, "Given this strong potential for confessions and other sources of information to bias the forensic science procedures that should independently corroborate (or refute) them, authorities 'recommend, as much as possible, that forensic examiners be isolated from undue influences such as direct contact with the investigating officer . . . and other irrelevant information—such as whether the suspect had confessed.'" Murrie Aff. at 14. LeBeau also conceded that,*

> *unlike chemistry, which is "a very objective analysis" that "relies on measurements" and is therefore not impacted by "biasing information," "hair microscopy relies on observations." MFNT Tr. II, 182:16-183:10 (LeBeau). As such, it can be influenced by biasing information like that conveyed by ADA Bloom when he personally delivered samples of Mr. Perrot's hair to the FBI laboratory. Murrie Aff. at 14.*

133. Oien's 2009 article recommends "verification or confirmation" by "a second qualified examiner [who] conduct[s] an independent microscopic comparison of the hair that has been associated. The second examiner must conduct a thorough, complete analysis and must be free to reach his or her own conclusion on each hair. Only upon the second examiner's reaching agreement should a microscopic hair association be reported. In accordance with FBI Laboratory standard operating procedures, when this conclusion is reached, these hairs are submitted for mtDNA testing." Ex. 25 at 11 (2009 Oien Article).

> *<u>Explanation</u>: The quoted language comes directly from Oien's 2009 article on Hair Microscopy. Id.*

134. Oakes's bench notes bear no indication that any confirmatory testing took place in Mr. Perrot's case. *See* Ex. 12 at 2 (Bench notes); Trial Tr. II 333:16-385:18 (Oakes).

> *<u>Explanation</u>: The bench notes that were produced reflect only a single instance of testing by Oakes, and do not reflect any confirmatory testing. See Ex. 12 at 2 (Bench notes). Likewise, Oakes did not testify that confirmatory testing took place. Trial Tr. II, 333:16-385:18 (Oakes).*

**<u>Mr. Perrot's Counsel Failed to Challenge Oakes's Hair Microscopy</u>**

135. John Ferrara served as counsel for Mr. Perrot from 1991 to 1993, and represented Mr. Perrot during his trial on January 6 to 9, 1992. Ex. 6 (Docket); MFNT Tr. I, 57:10-58:1 (Ferrara).

> *<u>Explanation:</u> The docket indicates Judge Ferrara entered an appearance for Mr. Perrot on September 18, 1991 and that a Notice of Appointment of Counsel ("NAC") was filed on September 19, 1991. Ex. 6 (Docket). Judge Ferrara testified that he was counsel to Mr. Perrot until appellate counsel was appointed "sometime in 1993." MFNT Tr. I, 57:10-58:1 (Ferrara).*

136. Judge Ferrara filed a motion for an amount not to exceed $800 in funds to retain an expert witness related to hair analysis on October 29, 1991. Ex. 21 (Motion); MFNT Tr. I, 77:3-9 (Ferrara).

> *<u>Explanation:</u> On October 29, 1991, Judge Ferrara filed a motion entitled "Ex Parte Motion for Allowance of Costs and Expenses: Hair Analysis Expert" seeking an amount not to exceed $800 in funds for a hair microscopy expert. Ex. 21 (Motion); MFNT Tr. I, 77:3-9 (Ferrara).*

137. Judge Ferrara retained Elizabeth Ziolkowski in connection with Mr. Perrot's case in the fall of 1991. MFNT Tr. I, 11:20-12:10 (Ziolkowski), 77:14-18 (Ferrara).

> *<u>Explanation:</u> Judge Ferrara did not specifically recall when he engaged Ziolkowski, but he testified that he seems to have engaged Ziolkowski as a consulting expert at some time after October 29, 1991, when he requested funds for an expert. Id. at 77:14-18 (Ferrara). Ziolkowski also testified that she was hired to assist Judge Ferrara in the fall of 1991. Id. at 11:20-12:10 (Ziolkowski).*

138. Ziolkowski worked for K-Chem Laboratories in the fall of 1991 through the beginning of 1992. Ex. 1 (Ziolkowski CV); Ex. 3 (Ziolkowski 1991 CV); MFNT Tr. I, 11:6-9, 15:22-24 (Ziolkowski).

> *<u>Explanation:</u> Ziolkowski's CV from 1991 states that she was employed at K-Chem Laboratories at that time. Ex. 3 (Ziolkowski 1991 CV). Ziolkowski's current CV states that she was employed at K-Chem Laboratories from 1987-1993. Ex. 1 (Ziolkowski CV). Ziolkowski testified that she worked at K Chem Laboratories at that time. MFNT Tr. I, 11:6-9, 15:22-24 (Ziolkowski).*

139. Ziolkowski's work at K-Chem Laboratories included forensic analysis of hairs and fibers. Ex. 3 (Ziolkowski 1991 CV): MFNT Tr. I, 11:10-16 (Ziolkowski).

> *<u>Explanation:</u> Ziolkowski's 1991 CV indicates that she conducted "forensic analysis of fire debris, blood, hair and fibers, gunshot residue and documents." Ex. 3 (Ziolkowski 1991 CV). Ziolkowski testified that at K-Chem Laboratories she "did trace evidence including fire debris, some serology and occasionally, very occasionally we would go to crime scenes," and that hair microscopy "was part of the trace evidence that we did." MFNT Tr. I, 11:10-16 (Ziolkowski).*

140. On January 3, 1992, Judge Ferrara filed a motion for an order to deliver the hair found at the M.P. crime scene and Mr. Perrot's sample hairs so that they could be inspected by Ziolkowski. Ex. 2 (Motion); MFNT Tr. I, 78:9-79:12 (Ferrara).

> *<u>Explanation:</u> On January 3, 1992, Judge Ferrara filed a motion entitled "Defendant's Motion for Order to Deliver Evidence for Expert Inspection." The motion requested that "a slide containing a hair taken from [Mr. Perrot], and a hair allegedly found on a sheet taken from the home of the victim" and "representative hairs taken from George Perrot" be delivered to K-Chem Laboratories for Ziolkowski's inspection. Ex. 2 (Motion); MFNT Tr. I, 78:9-79:12 (Ferrara).*

141. At the time that Judge Ferrara filed his Friday, January 3, 1992 motion regarding the hair found at the M.P. crime scene and Mr. Perrot's sample hairs, Mr. Perrot's trial was scheduled to begin on Monday, January 6, 1992. Ex. 6 (Docket); MFNT Tr. I, 78:20-79:01 (Ferrara).

> *<u>Explanation:</u> The docket indicates that Mr. Perrot's trial was scheduled to begin on January 6, 1991. Ex. 6 (Docket); see also MFNT Tr. I, 78:20-79:1 (Ferrara).*

142. Mr. Perrot's trial began on January 6, 1992. Ex. 6 (Docket); MFNT Tr. I, 78:20-79:1 (Ferrara).

> *<u>Explanation:</u> The docket indicates that Mr. Perrot's trial began on January 6, 1992. Ex. 6 (Docket); see also MFNT Tr. I, 78:20-79:1 (Ferrara).*

143. Judge Ferrara did not file any motion to inspect the hair found at the M.P. crime scene or Mr. Perrot's sample hairs prior to the motion he filed on January 3, 1992. Ex. 6 (Docket); MFNT Tr. I, 80:9-12 (Ferrara).

> *<u>Explanation:</u> The docket does not show that any motions seeking inspection of the hairs at issue in Mr. Perrot's case were filed prior to January 3, 1992. Ex. 6 (Docket). Judge Ferrara testified that he did not recall whether or not he considered filing a motion to get access to this evidence prior to January 3, 1992. MFNT Tr. I, 80:09-12 (Ferrara).*

144. The court allowed the January 3, 1992 motion, but only "to extent inspection be made at police station or courthouse on 1-6-92." Ex. 2 (Motion); MFNT Tr. I, 78: 9-79:14 (Ferrara).

> *<u>Explanation</u>: After reviewing his papers and the docket, Judge Ferrara testified that he filed a motion to inspect evidence on January 3, 1992, which was allowed in part by the court. Ex. 2 (Motion); MFNT Tr. I, 78: 9-79:14 (Ferrara).*

145. Ziolkowski could not have inspected the hair found at the M.P. crime scene or Mr. Perrot's sample hairs in compliance with the Court's order, because the high-powered, closely-calibrated microscopes necessary to perform hair comparison analysis are not portable and could not have been moved to the police station or courthouse to examine the hairs. MFNT Tr. I, 13:12-15:8 (Ziolkowski).

> *Explanation: Ziolkowski testified that the microscope she would have used in 1991 to conduct a hair comparison analysis would not have been portable and that, as a result, she would not have conducted a hair analysis at the police station or courthouse. Id.*

146. Ziolkowski has never examined a hair at a police station or courthouse, and therefore did not examine the hair found at the M.P. crime scene or samples from Mr. Perrot. *Id.* at 15:1-15:8.

> *Explanation: Ziolkowski testified that she has no memory of ever examining a hair at a police station or courthouse. Id.*

147. The rate that K-Chem Laboratories billed for Ziolkowski's work in 1991 and 1992 was $125 per hour. MFNT Tr. II, 13:16-20 (Higgins).

> *Explanation: Michael Higgins, the owner of K-Chem Laboratories, testified that, in 1991, K-Chem Laboratories charged $125 per hour for work performed on behalf of a defendant represented by the Committee for Public Counsel Services. Id.*

148. Records from K-Chem Laboratories indicate that K-Chem Laboratories billed Judge Ferrara's law firm $625 on January 23, 1992 for work related to Mr. Perrot's case. Ex. 4 (K-Chem case list); Ex. 5 (K-Chem invoice/ledger).

> *Explanation: Annotations from the K-Chem Laboratories case list show Judge Ferrara's firm as the submitting agency for work associated with "George Perrot." Ex. 4 (K-Chem case list). The K-Chem Laboratories billing ledger has an entry on January 23, 1992, for $625 for Judge Ferrara's law firm. Ex. 5 (K-Chem invoice/ledger).*

149. K-Chem Laboratories billed Judge Ferrara for five hours of Ziolkowski's time on Mr. Perrot's case. MFNT Tr. II, 13:21-23 (Higgins); MFNT Tr. I, 47:24-49:18 (Ziolkowski); Ex. 5 (K-Chem invoice/ledger).

*<u>Explanation:</u> Higgins testified that Ziolkowski's billing rate was $125 per hour. MFNT Tr. II, 13:21-23 (Higgins). Judge Ferrara was billed $625 by K-Chem for the Perrot case. Ex. 5 (K-Chem Laboratories invoice/ledger). Ziolkowski testified, based on her review of K-Chem Laboratories invoices and her knowledge of her billing rate at that time, that she worked less than six hours on Mr. Perrot's case. MFNT Tr. I, 47:24-49:18 (Ziolkowski).*

150. Ziolkowski did not testify at Mr. Perrot's 1992 trial. Trial Tr. I, 2; Trial Tr. II, 203; Trial Tr. III, 422; Trial Tr. IV, 572.

*<u>Explanation</u>: Ziolkowski never testified during the course of Mr. Perrot's January 1992 trial, as demonstrated by the list of witnesses at the front of each trial transcript volume. Trial Tr. I, 2; Trial Tr. II, 203; Trial Tr. III, 422; Trial Tr. IV, 572.*

151. The only work that Ziolkowski performed on Mr. Perrot's case was to consult with Judge Ferrara and discuss strategies for how he might cross-examine the Commonwealth's hair analyst. MFNT Tr. I, 25:13-26:10 (Ziolkowski), 113:3-114:16 (Ferrara).

*<u>Explanation</u>: Ziolkowski testified that she was frequently hired to consult on cases in which she did not examine evidence; as a consultant on those cases, she explained the process of examining hairs to attorney with whom she was consulting. Id. at 25:13-26:10 (Ziolkowski). Judge Ferrara testified that he would have used the services of a consulting expert to gather information to assist him in cross examining the Commonwealth's expert. Id. at 113:3-114:16 (Ferrara).*

152. Judge Ferrara filed only two discovery motions seeking forensic evidence during the course of his representation of Mr. Perrot. Ex. 6 (Docket); MFNT Tr. I, 65:19-72:2 (Ferrara).

*<u>Explanation</u>: Judge Ferrara testified that he filed only two discovery motions seeking forensic evidence throughout the course of his representation of Mr. Perrot. Ex. 6 (Docket); MFNT Tr. I, 65:19-72:2 (Ferrara).*

153. Judge Ferrara never received and did not review Oakes's handwritten bench notes created during the course of his microscopic hair analysis. MFNT Tr. I, 83:8-85:17 (Ferrara).

*<u>Explanation</u>: Judge Ferrara testified that he did not request or review the hair comparison analyst's handwritten notes. Id.*

154. If Judge Ferrara had requested and been able to review Oakes's bench notes, he could have used those bench notes to cross examine Oakes. *Id.* at 113:3-114:17.

*<u>Explanation</u>: Judge Ferrara testified that, with respect to the cross-examination of Oakes, he would have sent all available expert reports and documentation to an expert*

*for consultation in order to prepare for the cross-examination. Id. Judge Ferrara familiarized himself with the field of hair microscopy, and would have gathered all available information and incorporated it into his cross-examination of Oakes. Id.*

**<u>M.P. Stated that Mr. Perrot Was Not the Assailant</u>**

155. For over six years, from the date of her assault through Mr. Perrot's 1992 trial, M.P. consistently stated that Mr. Perrot was not the man who assaulted her on November 30, 1985. Ex. 18 at 2 (Police lineup summary); Trial Tr. I, 158:17-19 (M.P.).

*<u>Explanation</u>: At the December 7, 1985 police lineup, M.P. did not identify Mr. Perrot as the man who attacked her. Ex. 18 at 2 (Police lineup summary) (M.P. "unable to identify anyone"). In addition, during Mr. Perrot's January 1992 trial, M.P. testified that Mr. Perrot was not her attacker because Mr. Perrot did not fit her description of the assailant. Trial Tr. I, 158:17-19 (M.P.) (M.P. stating "How can I say [Mr. Perrot was the attacker] when [Mr. Perrot] has a mustache and a beard [on December 7, 1985]? [The attacker] didn't have any beard. [The attacker] didn't have any mustache.").*

156. Just hours after her assault, M.P. gave a statement to police officers in which she described the man who attacked her as having dark, wavy hair and as being clean shaven. Ex. 15 (M.P. statement to police); Trial Tr. I, 172:14-20 (M.P. statement read into evidence).

*<u>Explanation</u>: In M.P.'s statement to the police, she described the assailant as "a white male about 20-30 years old. He had dark, wavy hair, and he was clean shaven. He was average height and weight. He was wearing a blue jacket, it looked like nylon and sneakers, which were white. He was wearing a dark color pair of pants that were neither jeans nor corduroy material." Ex. 15 (M.P. statement to police); see also Trial Tr. I, 172:14-20 (M.P.) (Commonwealth reading into evidence M.P.'s statement).*

157. Mr. Perrot had ***long*** hair, a ***mustache***, and a ***full goatee*** at the time he was arrested on December 7, 1987. Ex. 19 (Police lineup photo); Ex. 20 (Perrot booking photos); Trial Tr. III, 500:17-18 (Jarvis).

*<u>Explanation</u>: The photos of Mr. Perrot from December 7, 1985 show that he had long hair, a mustache, and a full goatee. Ex. 19 (Police lineup photo); Ex. 20 (Perrot booking photos). In addition, Detective Jarvis testified at trial that on December 7, 1985 Mr. Perrot had "a rough beard, mustache and hair was real wild." Trial Tr. III, 500:17-18 (Jarvis).*

158. At the December 7, 1985 police lineup, M.P. did not identify Mr. Perrot as the man who attacked her on November 30, 1985. Ex. 18 at 2 (Police lineup summary).

> <u>Explanation</u>: *At the police lineup, M.P. did not identify Mr. Perrot as the man who attacked her. Id. (M.P. "unable to identify anyone").*

159. At the December 7, 1985 police lineup, two other victims of past break-ins and sexual assaults, M.M. and E.L., also did not identify Mr. Perrot as the attacker. *Id.*

> <u>Explanation</u>: *At the police lineup, neither M.M. nor E.L. identified Mr. Perrot as the man who attacked them. Id. (M.M. "unable to identify anyone" and E.L. "unable to identify anyone").*

160. At the December 7, 1985 police lineup, Mr. Perrot was the only teenager and was the only individual in the lineup who appeared disheveled. *Id.* at 1 (Police lineup summary); Ex. 19 (Police lineup photo).

> <u>Explanation</u>: *Out of the six individuals in the police lineup other than Mr. Perrot, five were police officers and one other was a prisoner. Ex. 18 at 1 (Police lineup summary). All six individuals in the lineup other than Mr. Perrot were older than teenagers, and all of them were well-groomed in their appearance in comparison to Mr. Perrot. Ex. 19 (Police lineup photo).*

161. The seven individuals in the December 7, 1985 police lineup were Mr. Perrot, one other prisoner, and five police officers who are clearly identifiable by their clean haircuts, well-groomed mustaches, and physiques. Ex. 18 at 1 (Police lineup summary); Ex. 19 (Police lineup photo).

> <u>Explanation</u>: *The seven individuals in the lineup were documented in the police lineup summary. Ex. 18 at 1 (Police lineup summary). The individuals' appearances are documented in the lineup photograph. Ex. 19 (Police lineup photo).*

162. At Mr. Perrot's 1992 trial, M.P. described the man who attacked her as having ***short***, ***dark***, ***wavy hair***, and as being ***clean shaven***. Trial Tr. I, 141:9-10, 154:2-13, 155:18-156:1 (M.P.).

> <u>Explanation</u>: *At trial, M.P. described the perpetrator as having short, dark, wavy hair, and as being clean shaven. Id. at 141:9-10 (perpetrator "had black hair and it was wavy"); 154:2-13 (perpetrator was "clean shaven," "nothing on his face"); 155:18-156:1 (perpetrator had hair that "wasn't hanging way down over his neck," and he "looked like somebody went – he went often, went to a barber shop").*

163. As M.P. recognized during her trial testimony, her description of the assailant was inconsistent with Mr. Perrot, who at the time of his arrest had ***long hair***, a ***mustache***, and a ***full goatee***. *Id.* at 147:15-17, 158:17-19, 160:4-17.

> *Explanation: Repeatedly during her trial testimony, M.P. stated that Mr. Perrot did not fit the description of her attacker because her attacker had short hair and was clean shaven whereas Mr. Perrot had long hair, a mustache, and full goatee. Id. at 147:15-17 (Mr. Perrot did not look like the attacker because he did not have "that kind of color hair," "looked like [he] needed a hair cut," and "looked like some kind of tramp"); id. at 158:17-19 (M.P. stating "How can I say [Mr. Perrot was the attacker] when [Mr. Perrot] has a mustache and a beard [on December 7, 1985]? [The attacker] didn't have any beard. [The attacker] didn't have any mustache."); id. at 160:4-17 (M.P. indicating that Mr. Perrot, who was clean shaven at the time of trial, did not resemble her attacker).*

164. M.P. also testified that her November 30, 1985 statement to the police had been altered after she last saw it, to incorrectly assert that it was while the police were first in her bedroom that she noticed a pair of gloves. Ex. 15 at 2 (M.P. statement to police); Trial Tr. I, 144:11-20 (M.P.).

> *Explanation: The last paragraph of M.P.'s November 30, 1985 statement to police states, "When the police arrived I noticed a pair of gloves on the foot of the bed. They are not mine. I never saw them before." Ex. 15 at 2 (M.P. statement to police). At trial, however, M.P. specifically and emphatically explained that she had never provided this information and that her statement had been altered to include this information. In particular, M.P. testified that "I didn't give this, any statement about any gloves" and that "They got it here about some gloves. I don't know when they put that in. I didn't see the gloves until two or three hours until after I got home and I went to make up my bed and there was the gloves." Trial Tr. I, 144:11-20 (M.P.).*

**The False Admission of Presence in M.P.'s Home**

165. Mr. Perrot was arrested on December 7, 1985 in connection with a robbery that had taken place on the night of December 6, 1985. Ex. 18 (Police Lineup Summary).

> *Explanation: Mr. Perrot was arrested at approximately 2:50 a.m. for an incident involving a pocketbook snatch in a Denny's parking lot that occurred earlier that night. Id.*

166. Police officers at the Springfield Police Department were familiar with Mr. Perrot prior to arresting him on December 7, 1985. *Id.* at 1; MTS Tr., 42:5-6 (Westcott).

> *Explanation: Mr. Perrot had been arrested on prior occasions and had spent time in juvenile custody. Ex. 18 at 1 (Police Lineup Summary) ("George David Perrot has*

*been a suspect in these investigations for quite some time.”). In addition, during the Motion to Suppress hearing, Mr. Perrot’s sister Nancy Westcott testified that Mr. Perrot and certain police officers had a history of prior incidents. MTS Tr., 42:5-6 (Westcott).*

167. Mr. Perrot was interrogated on-and-off for over twelve hours by the Springfield Police Department on December 7, 1985. Trial Tr. III, 484:16-485:23 (Westcott), 538:21-539:14 (Jarvis); Ex. 16 (George Perrot Statement dated 12/7/85).

*Explanation: Mr. Perrot was escorted out of his home by several police officers around 4:00 a.m. on December 7, 1985, and brought to the police station. Trial Tr. III, 538:21-539:14 (Jarvis). At approximately 4:30 p.m., Perrot signed a partial admission stating that he was responsible for the E.L. and M.P. break-ins. Id. at 484:16-485:23 (Westcott); Ex. 16 (George Perrot Statement dated 12/7/85).*

168. The police officers who interrogated Mr. Perrot on December 7, 1985 were also involved in the investigation of the M.P. November 30, 1985 sexual assault. Trial Tr. I, 187:3-17 (Kelly); Trial Tr. II, 403:4-404:13 (Kelly); Trial Tr. III, 482:23-484:23 (Jarvis).

*Explanation: Officers Thomas Kelly and Thomas Jarvis investigated the M.P. November 30, 1985 sexual assault, and interrogated Mr. Perrot about the assault on December 7, 1985. Trial Tr. I, 187:3-17 (Kelly); Trial Tr. II, 403:4-404:13 (Kelly); Trial Tr. III, 482:23-484:23 (Jarvis).*

169. While being interrogated on December 7, 1985, Mr. Perrot was questioned about the M.P. November 30, 1985 sexual assault even though he had been arrested for an unrelated crime. Trial Tr. II, 403:19-404:13, 410:17-411:22 (Kelly); Trial Tr. III, 481:5-484:23 (Jarvis).

*Explanation: Officers Kelly and Jarvis both testified that they questioned Mr. Perrot about the M.P. November 30, 1985 sexual assault late in the afternoon of December 7, 1985, after Mr. Perrot signed the statement related to the purse snatching. Trial Tr. II, 403:19-404:13, 410:17-411:22 (Kelly); Trial Tr. III, 481:5-484:23 (Jarvis).*

170. While interrogating Mr. Perrot on December 7, 1985, the Springfield Police Department used a tactic known as a “false evidence ploy.” Ofshe Aff. at 19; MTS Tr., 169:21-170:18 (Jarvis).

*Explanation: During the course of interrogating Mr. Perrot, police officers “confronted” Mr. Perrot with a pair of gloves that they falsely claimed incriminated Mr. Perrot in the M.P. November 30, 1985 assault. In fact, while the police made numerous attempts throughout the morning of Mr. Perrot’s interrogation to link the*

*gloves to his sister or girlfriend, their actions and the subsequent trial testimony of these two females strong support the idea that neither one of them claimed ownership of the gloves. Ofshe Aff. at 19; MTS Tr., 169:21-170:18 (Jarvis). Also during the course of interrogating Mr. Perrot, police officers used a pair of sneakers that they claimed incriminated Mr. Perrot in the M.P. November 30, 1985 assault, even though the officers had no evidence that those sneakers had anything to do with any of the assaults for which he was being investigated. Ofshe Aff. at 19; MTS Tr., 169:21-170:18 (Jarvis).*

171. Mr. Perrot was seventeen years old at the time he was arrested and interrogated on December 7, 1985. Ex. 18 (Police Lineup Summary).

*Explanation: Mr. Perrot was born on January 21, 1968, which made him seventeen years old on December 7, 1985. Id.*

172. While being interrogated on December 7, 1985, Mr. Perrot was suffering the after-effects of heavy drug and alcohol use the prior night. Trial Tr. III 508:11-509:14 (Jarvis); MTS Tr., 53:16-56:16 (Perrot); Murrie Aff. at 10-12.

*Explanation: The night of December 6, 1985, Mr. Perrot consumed beer, took cocaine, and smoked marijuana. Trial Tr. III 508:11-509:14 (Jarvis); MTS Tr., 53:16–56:16 (Perrot); Murrie Aff. at 10-12.*

173. Mr. Perrot was highly emotional while being interrogated on December 7, 1985. Trial Tr. III, 513:18-514:7 (Jarvis).

*Explanation: During the interrogation, Mr. Perrot was crying and asked Detective Jarvis for his gun so that he could shoot himself. Id.*

174. Police officers rattled their batons on Mr. Perrot's holding cell on December 7, 1985. MTS Tr., 61:16-62:7 (Perrot).

*Explanation: Despite his exhaustion, Mr. Perrot was not able to sleep at the police station because the police officers rattled the bars of his cell at the police station to keep him awake. Id.*

175. Police officers kicked Mr. Perrot, hit him with sticks or flashlights, and threw him over a small fence when they arrested him and brought him to the police car. *Id.* at 57:23-58:20.

*Explanation: Mr. Perrot testified that "[s]everal officers started kicking me, hitting me with sticks. Stick or flashlights, and two officers threw me over a little fence." Id. at 58:1-3.*

176. When Mr. Perrot was placed in the back seat of the police cruiser, a police officer threatened to kill Mr. Perrot. *Id.* at 59:12-15.

> *Explanation: Mr. Perrot testified that an officer threatened to kill him when he was in the back seat of the police car. Id.*

177. Then-Assistant District Attorney Francis Bloom was present when Mr. Perrot was being interrogated on December 7, 1985. Trial Tr. III, 457:19-458:3, 502:1-504 (Jarvis).

> *Explanation: ADA Bloom's arrival in the interrogation room precipitated questioning that began at 12:40 p.m. on December 7, 1985. Id. at 457:19-458:3, 502:1-504.*

178. Following Mr. Perrot's first trial, ADA Bloom used a fabricated and forged purported confession from Mr. Perrot in an unsuccessful effort to obtain confessions from Mr. Perrot's friends. Ex. D for ID (Forged statement).

> *Explanation: Exhibit D for ID is a copy of the document that ADA Bloom forged, purporting to be a confession from Mr. Perrot admitting to certain sexual assaults. Id. This document is a complete fabrication, and Mr. Perrot's friends did not confess to any crimes as a result of ADA Bloom's use of this document.*

179. Mr. Perrot did not have counsel or any parent or guardian present when he was being interrogated. MTS Tr., 62:23-63:1, 65:18-66:2, 67:1-8 (Perrot).

> *Explanation: During the Motion to Suppress hearing, Mr. Perrot testified that police officers, but no other individuals, were present in the room when he was being interrogated. Id. at 62:23-63:1, 65:18-66:2, 67:1-8.*

180. There is no video or audio recording of the interrogation. Trial Tr. III, 485:1-5 (Jarvis); MTS, 62:21-22 (Perrot).

> *Explanation: Detective Jarvis testified at trial that the "process" of taking Mr. Perrot's statement was it "was written down on a piece of paper and also typed. I believe George spoke to me too a few times while I was typing." Trial Tr. III, 465:1-5 (Jarvis). Detective Jarvis did not mention the interrogation being recorded by video or audio. In addition, during the Motion to Suppress hearing Mr. Perrot testified that the interrogation room was "just a little room with a desk and a typewriter in it" and did not mention any equipment to record the interview with video or audio. MTS Tr., 62:21-22 (Perrot).*

181. Mr. Perrot has no recollection of signing the December 7, 1985 statement to the police about the incidents at 33 Covel Street and 27 Malibu Drive involving E.L. and M.P. *Id. at* 66:11-23, 67:21-23, 96:10-16, 96:23-97:8, 102:4-13, 103:5-7.

> *Explanation: During the Motion to Suppress hearing, Mr. Perrot testified that on December 7, 1985 he signed a statement with respect to the McNabb break-in and the pocketbook snatch, but that is the only statement that he remembered signing during the interrogation that day. Id. at 66:11-23, 67:21-23, 96:10-16, 96:23-97:8, 102:4-13, 103:5-7.*

182. Mr. Perrot's December 7, 1985 statement is written in a manner that is plainly more consistent with a police officer's speech patterns rather than those of an exhausted seventeen-year-old. For example, the document states that Mr. Perrot "entered an unlocked rear breezeway door" and "kicked the rear inner door in" at 33 Covel Street, and that he "opened the door to the breezeway and kicked the side door in" at 27 Malibu Drive. Ex. 16 (George Perrot statement dated 12/7/85); *see also* MTS Tr., 100:6-9 (Perrot).

> *Explanation: Mr. Perrot's statement reads, in part, "I entered an unlocked rear breezeway door at 33 Covel St. I kicked the rear inner door in. . . . I left 33 Covel St. and went to 27 Malibu Dr. I opened the door to the breezeway and kicked the side door in." Ex. 16 (George Perrot statement dated 12/7/85); see also MTS Tr., 100:6-9 (Perrot) ("Q: Did [the police officers] tell you that you had unlocked a breezeway door and kicked the rear inner door in? A: That's how they said I entered the house. Yes, they did.").*

183. When arguing to the jury that Mr. Perrot's December 7, 1985 statement to the police was not voluntary, Judge Ferrara did not discuss the fact that the police had used a false evidence ploy during Mr. Perrot's interrogation. Trial Tr. IV, 582:12-615:6 (Ferrara closing argument).

> *Explanation: Nowhere in Judge Ferrara's closing argument did he mention that police officers used a pair of gloves and a pair of sneakers that they claimed incriminated Mr. Perrot in the M.P. November 30, 1985 assault even though the officers did not have definitive evidence that those gloves or sneakers in fact incriminated Mr. Perrot. Id.*

184. When arguing to the jury that Mr. Perrot's December 7, 1985 statement to the police was not voluntary, Judge Ferrara did not discuss the fact that Springfield police officers were familiar with Mr. Perrot prior to arresting him on December 6, 1985. *Id.*

> _Explanation_: *Nowhere in Judge Ferrara's closing argument did he mention that police officers were familiar with Mr. Perrot prior to his December 7, 1985 arrest and thus targeted him for questioning about crimes other than those for which he had been arrested that night. Id.*

185. When arguing to the jury that Mr. Perrot's December 7, 1985 statement to the police was not voluntary, Judge Ferrara did not discuss the fact that then-ADA Francis Bloom had been present during Mr. Perrot's interrogation. *Id.*

> _Explanation_: *Nowhere in Judge Ferrara's closing argument did he mention that then-ADA Bloom, who was the lead prosecutor for the M.P. November 30, 1985 assault, participated in the interrogation even though Mr. Perrot was arrested for a different crime on December 7, 1985. Id.*

186. Judge Ferrara failed to argue effectively the voluntariness of Mr. Perrot's December 7, 1985 statement to the police. *Id.*

> _Explanation_: *Judge Ferrara was deficient in his closing argument regarding the voluntariness of Mr. Perrot's statement to police by not discussing the fact that the police had used a false evidence ploy during Mr. Perrot's interrogation, the fact that police were familiar with Mr. Perrot prior to his December 7, 1985 arrest, or the fact that then-ADA Bloom was present during Mr. Perrot's interrogation. Id.*

## **Other Physical Evidence**

187. The November 30, 1985 M.P. assault occurred on the bedroom floor in M.P.'s house. Trial Tr. I, 163-65 (M.P.).

> _Explanation_: *M.P. testified that the assault occurred on the bedroom floor of her home. Id.*

188. The police officers investigating the November 30, 1985 M.P. crime scene did not find any blood on the bedroom floor. *Id.* at 182-83, 194 (Cheetam).

> _Explanation_: *The police officers who investigated the crime scene did not report finding any blood on the bedroom floor. Id.*

189. When police officers initially collected M.P.'s bed sheet from the crime scene, they did not note the presence of any blood stains on the bed sheet. *Id*. at 194:11-13 (Kelly).

> *<u>Explanation</u>: At Mr. Perrot's trial, Officer Kelly testified that when he collected the bed sheet from M.P.'s bedroom he recalled that "It was soiled, appeared to have some fibers on it. It was flowered." Id. He did not mention any blood stains on the sheet.*

190. Blood stains were found on M.P.'s bed sheet only after the bed sheet was collected and brought into evidence following the November 30, 1985 M.P. assault. Trial Tr. II, at 290:17-292:9 (Eubanks).

> *<u>Explanation</u>: FBI Agent William Eubanks testified that he found human blood stains on the bed sheet that was delivered to him in connection with the M.P. November 30, 1985 assault. Id.*

191. At trial, M.P. testified that the blood on her bed sheet belonged to her uncle, who had previously lived with her and had a respiratory disease that made him cough up blood. Trial Tr. I, 163:13-164:12 (M.P.).

> *<u>Explanation</u>: M.P. testified that the only blood stain on her bed sheet "had been there for 14 or 15 years. Hadn't washed out yet." She elaborated that her "uncle was living with my mother and I and he had lung trouble and at that time he was coughing, doing a lot of coughing up and the doctor gave, even my doctor, my mother's doctor picked the prescription he was using. Then he said to him, 'If you have one that is not so strong it will help you better in your coughing' and he, on the sheets a lot of times on the pillow case and in his handkerchiefs. I would have to put them in Clorox every time I washed his – Clorox because they are so stained up. He probably used a box of Kleenex a day spitting up. . . . The only blood stain on that sheet had been washed twenty times, probably more than that . . . ." Id.*

192. M.P. testified that any blood found on the bed sheet could not have been the result of the November 30, 1985 assault because the assault occurred on the floor. *Id.* at 163:9-12.

> *<u>Explanation</u>: M.P. testified that "If there is any blood on the sheets when we never went on the [bed] – how could his blood be on my sheets?" Id.*

193. FBI Agent William Eubanks performed serological testing in connection with the investigation of the November 30, 1985 M.P. assault. Trial Tr. II, at 269-333 (Eubanks).

> *<u>Explanation</u>: Eubanks testified about the serological testing that he performed in connection with this case. Id.*

194. Eubanks performed serological testing on the blood stains found on M.P.'s bed sheet. *Id.* at 290:17-295:19.

*Explanation: Eubanks described the serological tests that he conducted on the blood stains found on the M.P. bed sheet, as well as the results of his tests. Id.*

195. Eubanks's serological tests on M.P.'s bed sheet identified two blood stains. One stain could not be categorized beyond being human blood. *Id*. at 292:9, 295:3-8. The other stain contained subgroups PGM 1 sub+, EAP BA, Hp 2-1, Tf C. Ex. 10 (FBI lab report); Trial Tr. II, 292:10-295:2 (Eubanks).

*Explanation: Eubanks's March 1986 report from the FBI contains the results of serological testing performed on the bed sheet recovered from the M.P. crime scene, with results from one stain being PGM 1 sub+, EAP BA, Hp 2-1, Tf C. Ex. 10 (FBI lab report); Trial Tr. II, 292:10-295:2 (Eubanks) (explaining results of his grouping tests). Eubanks testified that the other stain on the bed sheet could not be categorized beyond being human blood. Id. at 292:9, 295:3-8.*

196. Eubanks testified that the combination of four markers found in the stain from which he could obtain markers would be present in approximately eight percent of the population. *Id*. at 301:3-22.

*Explanation: Eubanks agreed that it is "a correct statement that the combination that's found on the sheet then of PGM 1+, EAP BA, Hp 2-1 and Gc1, TfC you would expect to find in [approximately] eight percent of the population." Id.*

197. Eubanks conducted serological tests on blood samples collected from M.P., and these tests revealed that M.P. was grouped as blood Type O, PGM sub 1+, EAP B, Hp 2, Tf CB, Le (a-b+), secretor. Ex. 11 (FBI lab report).

*Explanation: An August 1987 report from the FBI contains the results of serological testing performed on M.P.'s blood samples and shows that M.P. was grouped as blood Type O, PGM sub 1+, EAP B, Hp 2, Tf CB, Le (a-b+), secretor. Id.*

198. Eubanks conducted serological tests on blood samples collected from Mr. Perrot, and these tests revealed that Mr. Perrot was grouped as blood Type O, PGM sub 1+, EAP BA, Hp 2-1, Gc 1, Tf C, ESD 1, PEP A 1, G6PD A, Le (a+b-), non-secretor. Ex. 11 (FBI lab report); Ex. I for ID, at DA Discovery 245.

*Explanation: A January 1986 report from the FBI contains the results of serological testing performed on Mr. Perrot's blood samples and shows that Mr. Perrot was grouped as blood Type O, PGM sub 1+, ESD 1, PEP A 1, G6PD A, Le(a+b-), non-*

*secretor. Ex. I for ID, at DA Discovery 245. In addition, an August 1987 report from the FBI contains the results of further serological testing performed on Mr. Perrot's blood samples and shows that Mr. Perrot was grouped as PGM sub 1+, EAP B, Hp 2-1, Gc 1, Tf C. Ex. 11 (FBI lab report).*

199. Eubanks testified that M.P. could be excluded as the source of blood on her bed sheet, but that Mr. Perrot could not be excluded as the source of blood on M.P.'s bed sheet. Trial Tr. II, 299:2-7, 299:17-300:8 (Eubanks).

*Explanation: Eubanks testified that M.P.'s serological results excluded her as the source of blood on her bed sheet, but that Mr. Perrot's serological results did not exclude him as the source of blood on M.P.'s bed sheet. Id. at 299:2-7 (M.P. blood inconsistent with blood stain on bed sheet), 299:17-300:8 (Perrot blood consistent with blood stain on bed sheet).*

200. The FBI did not conduct serological tests on the blood stains found on the bed sheet recovered from the November 30, 1985 M.P. crime scene for markers PEP A, G6PD, or Le, even though the results of prior serological testing on Mr. Perrot's blood samples contained the results of his sub-groupings for those markers. Ex. 10 (FBI lab report); Ex. I for ID, at DA Discovery 245.

*Explanation: A January 1986 report from the FBI contains results of serological testing performed on Mr. Perrot's blood samples including PEP A 1, G6PD A, and Le(a+b-). Ex. I for ID, at DA Discovery 245. The March 1986 report from the FBI with results of serological testing on the bed sheet recovered from the M.P. crime scene, however, does not contain any results of sub-groupings for those markers. Ex. 10 (FBI lab report).*

201. FBI laboratory bench notes underlying the serological testing of evidence related to the November 30, 1985 M.P. assault include the annotation "(A)" in the column designated for ABO test results. Ex. N for ID, at DA Discovery 699.

*Explanation: The FBI Laboratory bench notes for the bed sheet suggest that ABO blood testing was attempted on the bed sheet and include the annotation "(A)", indicating a weak positive for A antigens. Id.*

202. During Mr. Perrot's second trial, Eubanks testified that he tested the M.P. bed sheet blood stains for ABO type but that his test results were inconclusive. Trial Tr. II, 292:1-295:8 (Eubanks).

*Explanation: Although his bench notes for the bed sheet contain an "(A)" annotation in the column designated for ABO test results, during Eubanks's testimony at Mr. Perrot's trial he made no mention of this information and testified that he tested the bed sheet blood stains for ABO type but that his test results were inconclusive. Id.*

203. Then-ADA Bloom personally drove blood samples taken from Mr. Perrot from Springfield, MA to the FBI laboratory in the Washington, DC area and delivered them for Eubanks to conduct serological testing. Ex. 11 (FBI lab report); Trial Tr. II, 308:5-8 (Eubanks).

*Explanation: Eubanks testified that his report of the results of his analysis on the blood samples from Mr. Perrot, Ex. 11 (FBI lab report), notes that "the blood samples were personally delivered by Mr. Francis Bloom on April 1, 1987." Trial Tr. II, 308:5-8 (Eubanks).*

204. Judge Ferrara did not mention during closing argument that then-ADA Bloom personally drove Mr. Perrot's blood samples from Springfield, MA to the Washington, DC area. Trial Tr. IV, 582:14-615:6 (Ferrara closing argument).

*Explanation: Nowhere in Judge Ferrara's closing argument did he mention that then-ADA Bloom, who was the lead prosecutor for the M.P. November 30, 1985 assault, personally drove Mr. Perrot's blood samples to the FBI laboratory and delivered them for Eubanks to conduct serological testing. Id.*

205. M.P. testified that she found the gloves on the floor when she returned from the hospital. Trial Tr. I, 144:17-20 (M.P.).

*Explanation: M.P. testified that she "didn't see the gloves until two or three hours until after I got home and I went to make up my bed and there was the gloves and the stick was still on the foot of the bed and the gloves too." Id.*

206. At Mr. Perrot's first trial, Kelly testified that he found both gloves on the floor. 1987 Trial Tr. III, 195:19-196:2, 197:14-17 (Kelly).

*Explanation: Kelly testified at Mr. Perrot's first trial that the gloves "were in the bedroom – in the same bedroom on the floor" and that he found these gloves "In the bedroom on the floor near the bed." Id.*

207. At Mr. Perrot's second trial, however, Kelly testified that he found one glove on the floor and the second glove on M.P.'s bed. Trial Tr. II, 215:17-18 (Kelly).

*Explanation: Kelly testified at Mr. Perrot's second trial that he "found one [glove] on the bed and one [glove] on the floor." Id.*

208. Kelly claimed that he thereafter brought the pair of gloves to Mr. Perrot's sister, Nancy Westcott, and determined that they were her gloves. *Id.* at 406:3-407:4.

> *Explanation: Kelly testified at Mr. Perrot's second trial that he brought the gloves to Nancy Westcott's house, who "said she had a pair just like that" but when she looked for the gloves in her closet she could not find them in her closet. Id.*

209. Mr. Perrot's sister, Nancy Westcott, however, testified that she told Kelly the gloves looked like a pair that belonged to Mr. Perrot's girlfriend, but she thereafter learned that the gloves actually did not belong to Mr. Perrot's girlfriend because Mr. Perrot's girlfriend still had her own pair. Trial Tr. III, 546:12-548:12 (Westcott).

> *Explanation: Westcott testified at Mr. Perrot's second trial that she told Kelly that the gloves looked like a pair of gloves that belonged to Mr. Perrot's girlfriend, but that she later saw Mr. Perrot's girlfriend wearing her own gloves, so those that Kelly showed her could not have belonged to Mr. Perrot's girlfriend. Id.*

210. Jarvis's testimony about the gloves corroborated the testimony of Mr. Perrot's sister: Jarvis testified that after Kelly spoke to Mr. Perrot's sister, Jarvis took the pair of gloves to Mr. Perrot's girlfriend, who denied they were hers and produced a similar pair of gloves. *Id.* at 498:17-499:10 (Jarvis).

> *Explanation: Jarvis testified at Mr. Perrot's second trial that he brought the gloves to Mr. Perrot's girlfriend's house, that she told him that they were not her gloves, and that "There is a good possibility" she showed him another pair of gloves so that she could demonstrate the gloves in question did not belong to her. Id.*

211. Springfield Police Department Property Receipt numbers 49449 and 49492 are both property receipts for the same pair of gloves found at the November 30, 1985 M.P. crime scene. Ex. 17 (Property receipts); Ex. G for ID, at DA Discovery 134.

> *Explanation: Springfield Police Department Property Receipt number 49492 is a receipt for "1 PR Knit Gloves" taken from "27 Malibu Dr.," which is the location of the November 30, 1985 M.P. crime scene. Ex. 17 (Property receipts). Springfield Police Department Property Receipt number 49449 is a receipt for "1 Pair Gloves Red Stains" taken from "Bedroom" at "27 Malibu Dr.," which is the location of the November 30, 1985 M.P. crime scene. Ex. G for ID, at DA Discovery 134.*

212. Springfield Police Department Property Receipt numbers 49452 and 49492 are next to each other despite being forty numbers apart. Ex. 17 (Property receipts).

*Explanation: Springfield Police Department Property Receipt numbers 49452 and 49492 were produced on the same page even though there are forty other property receipts between these two. Id.*

213. Springfield Police Department Property Receipt number 49492 is backdated. *Id.*

*Explanation: Springfield Police Department Property Receipt number 49492 is dated November 30, 1985, but the date is inserted to the right of a crossed out "12," indicating that the writer initially wrote "12" for December and then backdated the tag. Id.*

214. Springfield Police Department Property Receipt number 49536 is a third property receipt for the same pair of gloves found at the November 30, 1985 M.P. crime scene. Ex. E for ID, at DA Discovery 419-20.

*Explanation: Springfield Police Department Property Receipt number 49536 is a receipt for "1 Pair Gloves Red Stains" taken from "Bedroom" at "27 Malibu Dr.," which is the location of the November 30, 1985 M.P. crime scene. Id.*

215. Eubanks performed serological testing on the blood stains found on the gloves recovered from the M.P. crime scene. Ex. 10 (FBI lab report); *see also* Trial Tr. II, 284:10-288:7 (Eubanks).

*Explanation: Eubanks's March 1986 report contains the results of serological analyses on the gloves recovered from the M.P. crime scene. Ex. 10 (FBI lab report); see also Trial Tr. II, 284:10-288:7 (Eubanks) (explaining his serological testing of the gloves).*

216. Eubanks's serological tests on the gloves from the M.P. crime scene showed that the marker PGMsub 1+ was present on both gloves. Ex. 10 (FBI lab report); Trial Tr. II, 287:10-12 (Eubanks).

*Explanation: Eubanks's March 1986 report contains the results of serological testing performed on the gloves recovered from the M.P. crime scene, showing that blood on both gloves contained the marker PGMsub 1+. Ex. 10 (FBI lab report). Eubanks testified consistent with this report. Trial Tr. II, 287:10-12 (Eubanks).*

217. Eubanks testified the PGMsub 1+ marker on the gloves would be present in approximately forty-one percent of the Caucasian population. *Id.* at 287:13-15.

> *<u>Explanation</u>: During his testimony, Eubanks explained that "Approximately 41 percent" of the Caucasian population has the marker PGMsub 1+. Id.*

218. Eubanks testified that neither M.P. nor Mr. Perrot could be excluded as the source of blood on the gloves recovered from the M.P. crime scene. *Id.* at 299:11-16, 299:17-300:2.

> *<u>Explanation</u>: Eubanks testified that M.P.'s and Mr. Perrot's serological results did not exclude either of them as the source of blood on the gloves recovered from the M.P. crime scene. Id. at 299:11-16 (explaining that M.P. cannot be excluded as the source of blood on the gloves), 299:17-300:2 (explaining that serological results show that Mr. Perrot's blood samples include PGMsub 1+, and thus Mr. Perrot cannot be excluded as the source of blood on the gloves).*

219. The serological testing results from the M.P., M.M., and E.L. assaults in 1984 and 1985 were consistent with one single perpetrator (who was not Mr. Perrot) depositing the serological evidence at all crime scenes. Harper Aff. ¶¶ 11, 14, 16, 19.

> *<u>Explanation</u>: The serological testing results performed on evidence collected from the M.P., M.M., and E.L. assaults in 1984 and 1985 showed that all serological evidence could have come from an individual (who was not Mr. Perrot) with Type A blood who was a secretor and had PGM sub 1+. Id. ¶¶ 11, 14, 16, 19.*

220. The Type A, secretor with PGM sub 1+ who contributed the semen at the M.M. assault could have contributed the semen and blood at the E.L. and M.P. assaults. *Id.* ¶¶ 11, 14, 16, 19.

> *<u>Explanation</u>: The serological testing results for evidence collected from the M.P., M.M., and E.L. assaults in 1984 and 1985 were all consistent with an individual with Type A blood who was a secretor and had PGM sub 1+. Id. ¶¶ 11, 14, 16, 19.*

221. Mr. Perrot could not have been the source of the semen found at the M.M. crime scene. *Id.* ¶¶ 10, 12.

> *<u>Explanation</u>: The semen found at the M.M. crime scene tested for A and H antigens. A antigens are not found in individuals with Type O blood, like Mr. Perrot. In addition, because the semen found at the M.M. crime scene tested for A and H antigens, the contributor of the semen had to have been a secretor, as non-secretors do not secrete blood type antigens into bodily fluids. Mr. Perrot is a non-secretor. For these reasons, Mr. Perrot could not have been the source of the semen found at the M.M. crime scene. Id. ¶¶ 10, 12.*

222. Judge Ferrara did not pursue comprehensive confirmatory testing of serological results. MFNT Tr. I, 65:19-72:2 (Ferrara).

> *Explanation: Judge Ferrara testified that he likely had test results and lab reports from the investigation of related rapes in his possession while representing Mr. Perrot. Id. Although these results reveal clear discrepancies, Judge Ferrara failed to request any confirmatory testing to verify the Commonwealth's results. Id.*

223. Judge Ferrara did not call any expert witness to rebut Eubanks's trial testimony about his serological analysis. Trial Tr. I, 2; Trial Tr. II, 203; Trial Tr. III, 422; Trial Tr. IV, 572.

> *Explanation: The list of witnesses at the front of each trial transcript volume demonstrate that Judge Ferrara never called a defense witness to serve as an expert in rebuttal to Eubanks's testimony about his serological analysis. Trial Tr. I, 2; Trial Tr. II, 203; Trial Tr. III, 422; Trial Tr. IV, 572.*

**Interactions Between the Commonwealth and the FBI**

224. The Commonwealth worked closely with the FBI throughout the investigation and prosecution of Mr. Perrot. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (bench notes from FBI agents); Ex. 13 (ADA Bloom notes); Ex. 14 (ADA Farris notes); Ex. U for ID at DA Discovery 631 (12/20/1987 letter from ADA Bloom to Eubanks); Trial Tr. II, 239-333 (Eubanks), 333-385 (Oakes).

> *Explanation: Agents from the FBI conducted forensic testing on certain evidence from the M.P. November 30, 1985 crime scene, including Agent William Eubanks who conducted serological testing and Agent Wayne Oakes who conducted microscopic hair analysis. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (Bench notes); Trial Tr. II, 239-333 (Eubanks testimony about his serological analysis); Trial Tr. II, 333-385 (Oakes) (testifying about microscopic hair analysis). The original trial prosecutor, then-ADA Francis Bloom, personally interacted with the FBI, including Eubanks and Oakes, including personally hand-delivering evidence to them and discussing their results and trial strategy with them. Ex. 13 at 12-13, 23-29 (ADA Bloom notes) (referencing interactions with Eubanks and Oakes and the numerous pieces of evidence sent from the Springfield Police Department to the FBI for forensic testing); Ex. 11 (FBI lab report) (noting that "Specimens personally delivered by Mr. Francis W. Bloom on April 1, 1987"); Ex. U for ID at DA Discovery 631 (12/20/1987 letter from ADA Bloom to Eubanks regarding serological testing of certain evidence and referencing their other interactions); Trial Tr. II, 308:5-8 (Eubanks) (testifying that one of his reports notes that "the blood samples were personally delivered by Mr. Francis Bloom on April 1, 1987"). ADA Farris's handwritten notes also include references to Eubanks and Oakes. Ex. 14 (ADA Farris notes).*

225. The Commonwealth sent evidence related to the November 30, 1985 M.P. assault to the FBI for forensic testing. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (Bench notes); Ex. 13 at 12-13, 23-29 (ADA Bloom notes); Trial Tr. II, 239-333 (Eubanks), 333-85 (Oakes).

> Explanation: *The Commonwealth sent various pieces of evidence to the FBI for forensic testing, including serological analysis and microscopic hair analysis. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (Bench notes); Trial Tr. II, 239-333 (Eubanks) (testifying about his serological analysis); id at 333-85 (Oakes) (testifying about microscopic hair analysis). ADA Bloom's notes specifically document the various pieces of evidence that were sent to the FBI for testing. Ex. 13 at 12-13, 23-29 (ADA Bloom notes) (referencing interactions with Eubanks and Oakes and the numerous pieces of evidence sent from the Springfield Police Department to the FBI for forensic testing); see also Ex. 11 (FBI lab report) (noting, "Specimens personally delivered by Mr. Francis W. Bloom on April 1, 1987"); Trial Tr. II, 308:5-8 (Eubanks) (testifying that one of his reports notes that "the blood samples were personally delivered by Mr. Francis Bloom on April 1, 1987").*

226. FBI Agent Wayne Oakes conducted the microscopic hair analysis of evidence submitted in connection with the November 30, 1985 M.P. assault. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (Bench notes); Trial Tr. II, 333-85 (Oakes).

> *Explanation: A March 1986 FBI report contains part of the results from Oakes's microscopic hair analysis—specifically, results from Oakes comparing Mr. Perrot's hair sample to the hair found at the crime scene. Ex. 10 (FBI lab report). An August 1987 FBI report contains further results from Oakes's microscopic hair analysis—specifically, results from Oakes comparing M.P.'s hair sample to the hair found at crime scene. Ex. 11 (FBI lab report). Oakes generated bench notes during the course of his microscopic hair analysis. Ex. 12 (Bench notes). At Mr. Perrot's trial, Oakes testified about his microscopic hair analysis and his results. Trial Tr. II, 333-85 (Oakes).*

227. FBI Agent William Eubanks conducted the serological testing of evidence submitted in connection with the November 30, 1985 M.P. assault. Ex. 10 (FBI lab report); Ex. 11 (FBI lab report); Ex. 12 (bench notes from FBI agents); Trial Tr. II, 239-333 (Eubanks).

> *Explanation: A March 1986 FBI report contains part of the results from Eubanks's serological testing—specifically, blood testing results from the bed sheet and gloves collected from the M.P. crime scene. Ex. 10 (FBI lab report). An August 1987 FBI report contains further results from Eubanks's serological analysis—specifically, results from Eubanks's analysis of Mr. Perrot's blood samples. Ex. 11 (FBI lab report). Eubanks generated bench notes during the course of his serological testing.*

*Ex. 12 (Bench notes). At Mr. Perrot's trial, Eubanks testified about his serological analysis and his results. Trial Tr. II, 239-333 (Eubanks).*

228. Then-ADA Francis Bloom personally interacted with Oakes and Eubanks to discuss their forensic analysis of evidence related to the November 30, 1985 M.P. assault. Ex. 11 (FBI lab report); Ex. 13 at 12-13, 23-29 (ADA Bloom notes); Ex. U for ID at DA Discovery 631 (12/20/1987 letter from ADA Bloom to Eubanks); Trial Tr. II, 308:5-8 (Eubanks).

*Explanation: ADA Bloom's notes specifically document the interactions he had with the FBI, including Eubanks and Oakes, including personally hand-delivering evidence to them and discussing their results and trial strategy with them. Ex. 13 at 12-13, 23-29 (ADA Bloom notes); see also Ex. U for ID at DA Discovery 631 (12/20/1987 letter from ADA Bloom to Agent Eubanks regarding serological testing of certain evidence and referencing their other interactions). An August 1987 FBI report confirms that ADA Bloom personally hand-delivered blood samples to the FBI lab for testing to be conducted. Ex. 11 (FBI report noting that "Specimens personally delivered by Mr. Francis W. Bloom on April 1, 1987"). On the witness stand, Eubanks confirmed that "the blood samples were personally delivered by Mr. Francis Bloom on April 1, 1987." Trial Tr. II, 308:5-8 (Eubanks).*

229. The Commonwealth called FBI Agent Wayne Oakes and FBI Agent William Eubanks as witnesses at Mr. Perrot's trial. Trial Tr. II, 239-41 (Eubanks), 333-35 (Oakes).

*Explanation: Oakes and Eubanks—the two forensic experts proffered by the Commonwealth at Mr. Perrot's trial—are both FBI analysts, trained in FBI protocol and procedure. Id. at 239-41 (Eubanks), 333-35 (Oakes).*

**The Commonwealth Did Not Turn Over Exculpatory Materials to Mr. Perrot's Trial Counsel**

230. Judge Ferrara never had access to the bench notes or working papers that Eubanks drafted while conducting serological testing of materials connected to Mr. Perrot's case. MFNT Tr. I, 83:16-84:8 (Ferrara).

*Explanation: At the evidentiary hearing, Judge Ferrara testified that the Commonwealth did not disclose Eubanks's bench notes at the time of the trial because disclosing such notes was not standard practice at the time. Id. ("I likely didn't have these because even if I moved for these, it's likely the request would have been denied. Typically we were not provided with experts' handwritten notes.").*

231. On December 4, 1991, Judge Ferrara filed "Defendant's Motion to Inspect Evidence," which was allowed on December 13, 1991. Ex. 6 (docket); Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara).

> *Explanation: Judge Ferrara filed docket #67, titled "Defendant's Motion to Inspect Evidence," on December 4, 1991. Ex. 6 (docket); Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara). That Motion contains a notation from the Court, dated December 13, 1991, allowing the Motion. Ex. 7 (pleading #67).*

232. The Motion to Inspect Evidence sought "documents of any nature" related to any bed sheet recovered from the M.P. November 30, 1985 crime scene. Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara).

> *Explanation: Defendant's Motion to Inspect Evidence sought "documents of any nature" regarding "Physical evidence taken from the home of the alleged victim, [M.P.], on 11/30/85 and thereafter; a.) bedsheet(s)." Ex. 7 (pleading #67); MFNT Tr. I, 72:05-73:13 (Ferrara) (Judge Ferrara testimony explaining the types of documents that he sought under this Motion to Inspect Evidence).*

233. The Motion to Inspect Evidence also sought "documents of any nature" related to any gloves recovered from the M.P. November 30, 1985 crime scene. Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara).

> *Explanation: Defendant's Motion to Inspect Evidence sought "documents of any nature" regarding "Physical evidence taken from the home of the alleged victim, [M.P.], on 11/30/85 and thereafter . . . c.) gloves." Ex. 7 (pleading #67); MFNT Tr. I, 72:05-73:13 (Ferrara) (Judge Ferrara testimony explaining the types of documents that he sought under this Motion to Inspect Evidence).*

234. The Motion to Inspect Evidence sought "documents of any nature" related to blood and hair samples taken from Mr. Perrot. Ex. 7 (pleading #67); MFNT Tr. I, 72:05-73:13 (Ferrara).

> *Explanation: Defendant's Motion to Inspect Evidence sought "documents of any nature" regarding "Blood and hair samples taken from the defendant, George Perrot." Ex. 7 (pleading #67); MFNT Tr. I, 72:05-73:13 (Ferrara) (Judge Ferrara testimony explaining the types of documents that he sought under this Motion to Inspect Evidence).*

235. The Motion to Inspect Evidence sought "documents of any nature" related to blood samples taken from M.P. Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara).

*<u>Explanation</u>: Defendant's Motion to Inspect Evidence sought "documents of any nature" regarding "Blood samples taken from the alleged victim, [M.P.]." Ex. 7 (pleading #67); MFNT Tr. I, 72:5-73:13 (Ferrara) (Judge Ferrara testimony explaining the types of documents that he sought under this Motion to Inspect Evidence).*

236. Judge Ferrara did not receive the FBI's bench notes or work papers regarding serological testing results on the bed sheet, Mr. Perrot's blood samples, and M.P.'s blood samples, even though his Motion to Inspect Evidence specifically sought "documents of any nature" related to these items. Ex. 7 (pleading #67); MFNT Tr. I, 83:16-84:8 (Ferrara).

*<u>Explanation</u>: At the evidentiary hearing, Judge Ferrara testified that the Commonwealth did not disclose Eubanks's bench notes at the time of the trial because disclosing such notes was not standard practice at the time. MFNT Tr. I 83:16-84:8 (Ferrara) ("I likely didn't have these because even if I moved for these, it's likely the request would have been denied. Typically we were not provided with experts' handwritten notes."). However, Judge Ferrara had filed Defendant's Motion to Inspect Evidence, which was allowed and which sought "documents of any nature" regarding "Physical evidence taken from the home of the alleged victim, [M.P.], on 11/30/85 and thereafter; a.) bedsheet(s); . . . Blood and hair samples taken from the defendant, George Perrot, and; Blood samples taken from the alleged victim, [M.P.]." Ex. 7 (pleading #67).*

237. Then-ADA Francis Bloom generated handwritten notes at the time he was prosecuting Mr. Perrot. Ex. 13 (ADA Bloom notes).

*<u>Explanation</u>: ADA Bloom's handwritten notes were produced as part of the Commonwealth's August 3, 2015 production in this case and were admitted at the evidentiary hearing as Ex. 13 (ADA Bloom notes).*

238. Bloom's handwritten notes contain information that tends to exculpate Mr. Perrot. Ex. 13 (ADA Bloom notes); MFNT Tr. I, 89:16-90:03 (Ferrara).

*<u>Explanation</u>: ADA Bloom's handwritten notes state "One of the blood stains (The blood found on the sheet in her bedroom) is not consistent with Perrot's sub-grouping!!" Ex. 13 at DA Discovery 376 (ADA Bloom notes). As Judge Ferrara explained during the evidentiary hearing when reviewing Bloom's handwritten notes, serological evidence indicating that Mr. Perrot's blood was not consistent with the blood on the bed sheet taken from M.P.'s house would tend to be exculpatory evidence for Mr. Perrot. MFNT Tr. I, 89:16-90:03 (Ferrara).*

239. Bloom's handwritten notes state, "One of the blood stains (The blood found on the sheet in her bedroom) is not consistent with Perrot's sub-grouping!!" Ex. 13 at DA Discovery 376 (ADA Bloom notes); MFNT Tr. I, 89:16-90:3 (Ferrara).

> *<u>Explanation</u>: The handwritten notes of Bloom state "One of the blood stains (The blood found on the sheet in her bedroom) is not consistent with Perrot's sub-grouping!!" Ex. 13 at DA Discovery 376 (ADA Bloom notes). At the evidentiary hearing, Judge Ferrara read this line from Bloom's handwritten notes. MFNT Tr. I, 89:16-90:3 (Ferrara).*

240. Bloom's handwritten notes and the exculpatory information therein were not disclosed to Mr. Perrot or his trial counsel before Mr. Perrot's trial. MFNT Tr. I, 87:10-24 (Ferrara).

> *<u>Explanation</u>: During his evidentiary hearing testimony, Judge Ferrara stated that he would not have had access to the handwritten notes of Bloom at the time of trial because they would have been protected attorney work-product. Id.*

241. The Commonwealth preliminarily concluded that Mr. Perrot was not a serological match based on early testing of the evidence. Ex. 13 at DA Discovery 376 (ADA Bloom notes).

> *<u>Explanation</u>: The handwritten notes of Bloom state "One of the blood stains (The blood found on the sheet in her bedroom) is not consistent with Perrot's sub-grouping!!" Id.*

242. ADA Farris generated handwritten notes at the time she was working on Mr. Perrot's case prior to his January 1992 trial. Ex. 14 (ADA Farris notes).

> *<u>Explanation</u>: Farris's handwritten notes were produced as part of the Commonwealth's August 3, 2015 production in this case and were admitted at the evidentiary hearing as Ex. 14 (ADA Farris notes).*

243. Farris's handwritten notes contain information that would have allowed defense counsel to impeach the credibility of government witnesses more effectively. *Id.*; MFNT Tr. I, 91:1-23 (Ferrara).

> *<u>Explanation</u>: Farris's handwritten notes state "Routine – head hair don't maintain" and state "FBI DNA." Ex. 14 at DA Discovery 386 (ADA Farris notes). As Judge Ferrara explained during the evidentiary hearing when reviewing Farris's handwritten notes, he would have had no way of knowing what those notes meant without having had the chance to review them. MFNT Tr. I, 91:1-23 (Ferrara). Such notes would have allowed Judge Ferrara to cross examine Oakes about his "routine"*

*of not maintaining hairs he examined, and about the possibility of DNA testing that was never performed in this case, thereby impeaching Oakes's credibility.*

244. Farris's handwritten notes state "Routine – head hair don't maintain." Ex. 14 at DA Discovery 386 (ADA Farris notes).

*Explanation: The handwritten notes of Farris state "Routine – head hair don't maintain." Id.*

245. Farris's handwritten notes state "FBI DNA." *Id.*

*Explanation: The handwritten notes of Farris state "FBI DNA." Id.*

246. Neither Farris's handwritten notes nor the exculpatory information contained therein were disclosed to Mr. Perrot or his trial counsel before Mr. Perrot's trial. MFNT Tr. I, 90:16-25 (Ferrara).

*Explanation: During his evidentiary hearing testimony, Judge Ferrara stated that he would not have had access to the handwritten notes of Farris at the time of trial because they would have been protected attorney work-product. Id.*

**Karen Kafadar**

247. Dr. Karen Kafadar is a qualified expert in the field of statistics and the application of statistics as applied to forensic sciences. Kafadar Aff. ¶¶ 1-3, 6; MFNT Tr. II, 70:14-17, 70:20-22, 70:25-71:2, 72:24-73:8, 73:3-5, 73:11-17, 73:23-74:2, 74:12-75:12, 75:19-20 (Kafadar); Ex. 35 (Kafadar Article).

*Explanation: Dr. Kafadar is Commonwealth Professor and Chair of the Statistics Department at the University Virginia. MFNT Tr. II, 70:14-17 (Kafadar); Kafadar Aff. ¶ 1. She has a Ph.D. in Statistics from Princeton, an M.S. in Statistics from Stanford, and a B.S. in Mathematics from Stanford. MFNT Tr. II, 70:20-22 (Kafadar); Kafadar Aff. ¶ 1. Her focus is on robust statistical methods and applications in the physical, medical, biological, and chemical engineering sciences. MFNT Tr. II, 70:25-71:2 (Kafadar); Kafadar Aff. ¶ 2.*

*Dr. Kafadar has "extensive experience in the application of statistics to forensic sciences." Kafadar Aff. ¶ 3. This year, she published an article, Statistical Issues in Assessing Forensic Evidence, in the peer-reviewed journal, International Statistical Review. See Ex. 35 (Kafadar Article).*

> *Dr. Kafadar has served on three National Academy of Sciences committees: a 2003-2004 NAS committee addressing composite bullet lead analysis, MFNT Tr. II, 72:24-73:2 (Kafadar); a 2009 NAS committee that prepared the report, Strengthening Forensic Science in the United States: A Path Forward, for which she heard testimony and reviewed literature on hair microscopy, id. at 73:2-8, 75:19-20; and 2014 NAS Committee that reported on eyewitness identification, id. at 73:3-5 .*
>
> *In addition, Dr. Kafadar is a member of the Forensic Science Standard Board, an organization which oversees the Organization of Scientific Area Committees, a joint initiative between National Institute of Standards and Technology, and the United States Department of Justice aimed at improving forensic sciences and ensuring that there are scientific bases for methods used in forensic science, including hair microscopy. Id. at 73:23-74:2, 74:12-75:12; Kafadar Aff. ¶ 6. Dr. Kafadar is the chair of the American Statistical Association Committee on Statistics and Forensic Science. MFNT Tr. II, 73:11-13 (Kafadar). She is the co-principal investigator in the Center of Excellence in Forensic Science, which was created at the direction of the National Institute of Science and Technology. Id. at 73:11-17.*

248. Dr. Kafadar was not paid for her time in testifying in *Commonwealth v. Perrot*. *Id.* at 71:5-6; Kafadar Aff. ¶ 5.

> *Explanation: Dr. Kafadar explains: "I view my testimony in this case (and in the one other case in New York City in which I have testified) as a public service; to that end, I have not received any compensation for my testimony." Kafadar Aff. ¶ 5; see also MFNT Tr. II, 71:5-6 (Kafadar) (testifying that she is not being paid for her time in the case).*

249. Dr. Kafadar went on a "fact finding mission" to the FBI Laboratory in Quantico, Virginia, observing their hair microscopy processes and lecturing on statistics at the invitation of FBI agent LeBeau. MFNT Tr. II, 77:6-9 (Kafadar); Kafadar Aff. ¶ 8.

> *Explanation: Dr. Kafadar notes that "At the invitation of Mr. Marc LeBeau, I and three colleagues visited the FBI Laboratory in Quantico, Virginia, to better understand some of their forensic processes and to provide laboratory scientists information on the value of statistical methods in forensic science." Kafadar Aff. ¶ 8; see also MFNT Tr. II, 77:6-9 (Kafadar) (referring to her visit as a "fact finding mission").*

250. Dr. Kafadar had direct involvement in preparing the 2009 NAS report, *Strengthening Forensic Science in the United States: A Path Forward*; in doing so, Dr. Kafadar assessed the state of the science of hair microscopy, reviewed scientific literature on hair microscopy, heard testimony

from hair microscopy experts, and analyzed statistical issues underpinning hair microscopy. MFNT Tr. II, 75:16-20 (Kafadar); Kafadar Aff. ¶ 4.

*<u>Explanation</u>: Dr. Kafadar "served on the National Academy of Sciences ("NAS") Committee on Identifying Needs of Forensic Science Community, National Research Council, which culminated in the 2009 report, Strengthening Forensic Science in the United States: A Path Forward. The work of the Committee included a comprehensive review of the state of the science of hair microscopy, as well as a thorough review and analysis of scientific literature concerning hair microscopy." Kafadar Aff. ¶ 4 (citations omitted). She further elaborated that in this process she heard testimony from hair examiner Max Houck. MFNT Tr. II, 75:16-20 (Kafadar)*

251. Dr. Kafadar also played a direct role in the FBI Hair Microscopy Audit, writing a letter in 2014 to the FBI that explained fundamental principles of statistics and probabilities related to hair microscopy and assessed whether the Audit Agreement (Ex. 29) appropriately reflected the statistical limitations on what a hair microscopy examiner may assert in court or in reports. MFNT Tr. II, 75:25-76:13 (Kafadar); Kafadar Aff. ¶ 7.

*<u>Explanation</u>: Dr. Kafadar explains that, in 2014, she was "asked by Peter Neufeld to submit a letter to the FBI, the Innocence Project, and the National Association of Criminal Defense [Lawyers] explaining some fundamental principles of statistics and probabilities as they relate to hair microscopy generally, and, in particular, as they related to certain testimony given by FBI hair analysts from the 1970s through the late 1990s in criminal trials." Kafadar Aff. ¶ 7. As part of this process she "was asked to read . . . two-page document from the FBI about the different types of errors and to assess whether in my statistical judgment those did in fact reflect inappropriate uses of terminology." MFNT Tr. II, 75:6-10 (Kafadar).*

**<u>David Koropp</u>**

252. At the time of the hearing, David Koropp was a partner in the Chicago office of Winston & Strawn. MFNT Tr. II, 14:13-14 (Koropp).

*<u>Explanation</u>: Koropp testified at the hearing that he was "an attorney at Winston and Strawn . . . based in Chicago." Id.*

253. Koropp served as counsel to the Innocence Project and NACDL in conjunction with their participation in the review. *Id.* at 15:1-2.

*<u>Explanation</u>: When asked about his involvement with the FBI audit of hair comparison evidence, Koropp testified that he "served as counsel to the Innocence Project, and to*

*some extent to the NACDL" in their collaboration with the FBI crime lab on the audit. Id.*

254. In this capacity, Koropp drafted protocol documents for the audit, provided legal analysis and factual research, participated in meetings between the FBI, the DOJ, the Innocence Project and NACDL, reviewed transcripts for findings of error, and supervised and assisted dozens of attorneys who were involved in reviewing transcripts. *Id.* at 15:2-15.

*Explanation: Koropp testified that, as counsel to the Innocence Project and NACDL, he "assisted with the drafting of protocol documents that would govern the audit itself," "provided legal analysis or factual research," and "participated directly in meetings with the FBI and DOJ personnel along with the Innocence Project representatives and those of the NACDL where we worked out the protocol that would be used for the audit." Id. at 15:2-9. After the audit began, he "then participated personally and directly in reviewing transcripts and FBI findings about errors and also supervised dozens of attorneys at Winston and Strawn in doing that work, also assisted the NACDL, who had their own representatives also doing that work." Id. at 15:10-15.*

255. Koropp became involved in the hair microscopy audit because of his past involvement in another FBI audit of a "similarly discredited forensics tool," composite bullet lead analysis. *Id.* at 16:3-17.

*Explanation: When asked how he became involved with the hair comparison audit, Koropp testified that "[t]he FBI had conducted a similar audit a couple of years ago with regard to what was called composite bullet lead analysis. That was a similarly discredited forensics tool that the FBI was using, and [it was] the same sort of process" as that undertaken in the hair comparison audit. Id. at 16:3-13. The composite bullet lead analysis audit "involved dozens and dozens of attorneys at [Koropp's] office and similar work with the FBI in developing protocols and actually having a review process." Id. at 16:14-17.*

256. In the course of the hair audit, Koropp performed a comprehensive review of relevant literature and publicly available FBI documents regarding hair comparison analysis. *Id.* at 20:15-19, 21:2-6.

*Explanation: Koropp agreed that during the course of the hair comparison audit he "review[ed] relevant literature and other publically available documents . . . published by the FBI regarding hair comparison analysis." Id. at 20:15-19 (Koropp). He "attempt[ed] to be comprehensive" in this review of materials, and he "used every computer research facility available to [him] and to numerous associates at [Winston & Strawn]." Id. at 21:2-6.*

**Cary Oien**

257. Oien was trained by the same hair experts that were the subject of the audit. MFNT Tr. I, 153:1-6 (Oien).

*Explanation: Oien agreed that he was "trained by hair experts who were already testifying in court" and that "these same experts . . . were also subject to the audit." Id.*

258. Oien was never trained in statistics. *Id.* at 154:23-155:5.

*Explanation: When asked "[w]hat, if any, training . . . [he] received on statistics and probabilities as it relates to assigning a probability of a random match in hair comparison evidence," Oien responded that he had not received any such training "because there's no basis to assign a probability." Id.*

259. From 2011-2015, Oien was chief of the division of the FBI crime lab that handles hair microscopy. *Id.* at 147:17-148:1; Ex. 24 (Oien CV).

*Explanation: Oien testified (and his CV reflects) that he was named Chief of the Scientific Analysis Section of the FBI crime lab in 2011. MFNT Tr. II, 147:17-148:1 (Oien); Ex. 24 (Oien CV). He testified that the Scientific Analysis Section includes the Trace Evidence Unit, which includes hair microscopy. MFNT Tr. I, 147:17-148:1.*

Dated: December 4, 2015

Respectfully submitted,

By: /s/ Kirsten V. Mayer
Kirsten V. Mayer
BBO #641567
Christopher J. Walsh
BBO #685252
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
kirsten.mayer@ropesgray.com
christopher.walsh@ropesgray.com

Nicholas C. Perros
(Admitted pro hac vice)
ROPES & GRAY LLP
2099 Pennsylvania Ave
Washington, DC 20006
(202) 508-4663
nicholas.perros@ropesgray.com

Also of counsel and on briefing:

Lisa M. Kavanaugh, Director
BBO #647261
CPCS Innocence Program
21 McGrath Highway
Somerville, MA 02143
(617) 607-5762
lkavanaugh@publiccounsel.net

M. Chris Fabricant
(Motion for admission pro hac vice pending)
Dana M. Delger
(Motion for admission pro hac vice pending)
Innocence Project, Inc.
40 Worth Street, Suite 701
New York, NY 10013
(212) 364-5997
cfabricant@innocenceproject.org
ddelger@innocenceproject.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing document was served on the Office of the District Attorney, Hall of Justice, 50 State Street, Springfield, MA 01103 on this 4th day of December, 2015.

/s/ Christopher J. Walsh
Christopher J. Walsh (BBO #685252)