**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 53

# In the Matter of:

*George Perrot vs*

*Thomas Kelly, et al.*

*Richard Kane*

*June 08, 2023*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO: 18-CV-10147

************************************* *
GEORGE PERROT,
Plaintiff, *
vs.
THOMAS KELLY, THOMAS JARVIS, *
RICHARD KANE, CHARLES APRIN, JOHN
SCANLON, DAVID LOUDEN, THOMAS *
KENNEDY, CHIEF ERNEST STELZAR,
MARIANNE POPKO, PAUL GLANTZ, RONALD *
ST. GERMAIN, ANDREW CANEVARI,
CHERYL CLAPROOD, CAPTAIN JOHN *
BROWN, UNKNOWN OFFICERS OF THE
SPRINGFIELD POLICE DEPARTMENT, THE *
CITY OF SPRINGFIELD, MASSACHUSETTS,
FRANCIS BLOOM, WILLIAM EUBANKS, *
WAYNE OAKES, and UNKNOWN AGENTS OF
THE FEDERAL BUREAU OF *
INVESTIGATION,
Defendants *
************************************* *

DEPOSITION OF: RICHARD KANE
TAKEN AT: LAW OFFICE OF TYLER INGRAHAM
100 Main Street, Third Floor
Northampton, Massachusetts
June 8, 2023 1:20 P.M.

Sharon Waskiewicz
Court Reporter



APPEARANCES:

Representing the Plaintiff:
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
BY: GIANNA GIZZI, ESQ.
CARLA AGBIRO, ESQ.
312-243-5900
gizzi@loevy.com
agbiro@loevy.com

Representing the Defendant, Charles Arpin:
REARDON, JOYCE & AKERSON, P.C.
4 Lancaster Terrace
Worcester, MA 01609
BY: AUSTIN M. JOYCE, ESQ.
508-754-7285 Fax: 508-753-7220
ajoyce@rja-law.com

(Appearances continued on Page 3)



APPEARANCES: (Continued from Page 2)

Representing the Defendant, City of Springfield:
CITY OF SPRINGFIELD LAW DEPARTMENT:
1600 E. Columbus Avenue, 2nd Floor
Springfield, MA 01103
BY: TYLER KENEFICK, ESQ.
413-426-4215
tkenefick@springfieldcityhall.com

Representing the Defendant, Richard Kane:
MORRISON MAHONEY, LLC
1500 Main Street, Suite 2400
Springfield, MA 01115-0001
BY: CAROLE SAKOWSKI LYNCH, ESQ.
413-737-4373 FAX: 413-739-3125
clynch@morrissonmahoney.com

APPEARING VIA ZOOM:

Jared Cohen, Esq. jared.b.cohen@mass.gov
Phillip Ciccarelli, Esq.
Robert Schmidt, Esq.



I N D E X

WITNESS: RICHARD KANE


| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Gizzi | 5 |

| EXHIBITS: | PAGE: |
|---|---|
| Exhibit RK-1, letter | 67 |
| Exhibit RK-2, Springfield Police Department property receipt | 78 |
| Exhibit RK-3, Springfield Police Department property receipt | 79 |
| Exhibit RK-4, general report form | 90 |
| Exhibit RK-5, transcript | 103 |
| Exhibit RK-6, Answers to Plaintiff's Interrogatories | 118 |
| Exhibit RK-7, General Report Form | 138 |


(Exhibits 1-4 and 6-7 scanned to document)

Page 5

MS. GIZZI: For the record this is the deposition of Richard Kane in the case of George Perrot, et al. The case number, 18-CV-10147, being taken on June 8th, 2023, at 1:20 p.m.
Pursuant to notice this deposition is being taken in accordance with the Rules of Civil Procedure and the local rules for the United States District Court of Massachusetts.

RICHARD KANE, Deponent, having first been satisfactorily identified and duly sworn, deposes and states as follows:

EXAMINATION BY MS. GIZZI:
Q. Good afternoon, Officer. My name is Gianna, as I mentioned earlier. I'm the attorney for the Plaintiff, George Perrot, in this litigation.
Can we start by you spelling your full name?
A. Richard, R-I-C-H-A-R-D, Kane, K-A-N-E.
MS. SAKOWSKI: Okay. And before we move on, we need to tap out stipulations.

Page 6

So the usual stipulations around here are all objections, except as to form, are reserved until the time of trial and motions to strike are reserved until the time of trial.
Is that acceptable with everyone?
MR. KENEFICK: An objection for one is an objection for all?
MS. SAKOWSKI: Yes.
MS. GIZZI: That's fine.
(By Ms. Gizzi) Officer, have you ever been deposed before?
A. Yes.
Q. I'm just going to go over a couple of rules for the deposition, so that we are on the same page, as reminders. And you might already know some of these or your attorney may have gone over them.
First, whenever I ask you a question, try to give a verbal response instead of like shaking your head or um-hmm, uh-uh. That makes it hard for the reporter to transcribe.
If at any point I'm being unclear, or my question doesn't make sense, just ask me to clarify and I will do so. But, if you do answer a question,

Page 7

I'll assume that you understood it.
Is that fair?
A. Yes.
Q. Also, importantly for the court reporter, I will try to let you finish your answers before I ask my next question. I also would ask that you wait until my question is done before you begin answering. And that is important for a few reasons, mostly because the court reporter can't transcribe, you know, what's being said when two people are talking. But you also might deprive your attorney of an objection.
And while sometimes you might anticipate where I am going with a question, it might actually be going in a different direction and then it makes for a confusing transcript.
Does that all make sense?
A. Yes.
Q. And we can take a break, at any point, we can take one. But the only caveat to that is if there is a question is pending. I just ask that you answer the question and then we can take a break, okay?
A. Yes.

Page 8

Q. And the first two questions I ask universally, so please don't take offense.
Have you consumed any alcohol in the past 24 hours?
A. No.
Q. In the past 24 hours have you taken any medication that would inhibit your ability to testify truthfully?
A. No.
Q. And is there any other reason you might not be able to testify truthfully today?
A. No.
Q. Did you review any documents in preparation for this deposition?
A. Yes.
Q. Okay. And do you remember what those documents are?
A. The arrest report. I'm sorry. Strike that not an arrest report. A report I wrote after leaving the jail in Springfield.
Q. Would that have been a report that you wrote in December of 1985?
A. No.
Q. Okay. When would you have -- or when did

Page 9

you write that report, if you remember?
A. It was October of '85.
Q. Did you review any other police reports that you didn't author but another officer authored?
A. Yes.
Q. Okay. And who authored those other reports that you reviewed?
A. I don't remember their names. They were detective bureau officers.
Q. Okay. What about other documents, did you review any other documents in preparation for this deposition?
A. What kind of documents?
Q. Any transcripts or letters or anything on paper basically?
A. No letters. A transcript of a hearing.
Q. Was it a transcript of testimony that you gave?
A. Yes.
Q. All right. If at any point you remember something -- I know this happened a long time ago -- so if at any point you remember something that you didn't testify to earlier, you can just let me know. That's totally fine. You can be like, oh, I remember

Page 10

I actually read this. Because we'll go over some documents so you'll have and can see them. So I just wanted to get a since beforehand.
Other than your attorneys, did you talk to anyone about this deposition?
A. No.
Q. Okay. Let's go into some of your background.
What is your current age?
A. Seventy-two.
Q. Did you ever serve in the military?
A. Yes.
Q. When did you serve in the military?
A. I served six years. I don't remember the dates. I want to say 1971 to '77 maybe. I'm not sure.
Q. Do you remember if it was before your time at the Springfield Police Department?
A. Both before and during.
Q. Okay. What branch of the military?
A. Army.
Q. Now, I'm going to ask about your education.
Where did you attend high school?

Page 11

A. Commerce High School.
Q. Is that around this area?
A. Springfield.
Q. What year did you graduate high school?
A. 1969.
Q. Did you attend any other educational institution after high school?
A. Yes. Holyoke Community College and Springfield Technical Community College.
Q. Did you obtain a degree from either of those?
A. No.
Q. When did you start at the Springfield Police Department, what year?
A. August of 1974.
Q. And when did you leave the Springfield Police Department?
A. September 14th, 1991.
Q. So between those dates, could you just walk me through, starting in the beginning, what your role was within the department when you first signed on, or what your assignment was?
A. I first went through the police academy. Then I was assigned, as a new police officer, to the

Page 12

4 to 12 shift in uniform and then, after several weeks, I was assigned to the midnight to eight shift in uniform.
Q. What does that mean for someone, that has not been in the law enforcement field, that you were assigned in uniform?
A. I was a street cop, just a cop.
Q. I've got you. So you were patrolling?
A. Yes.
Q. So how long were you in the uniformed division?
A. Through my whole career?
Q. Yes.
A. I was on the dog watch for probably three, four, five months. I'm not 100 percent sure. And I was then transferred to plain clothes in the crime prevention bureau.
Q. Do you remember what year you were transferred to the crime prevention bureau?
A. I don't know. It was right after graduation after serving on the midnight to eight shift for three or four months.
Q. So this would still be the mid '70s though, the mid to late '70s?

Page 13

A. Yes.
Q. Okay. And as -- was that something you had to apply for, for the transfer?
A. No.
Q. What were your responsibilities as a officer in the uniform division?
A. Mostly I was a cop in a cruiser assigned to a district. In fact, I was a floating officer, being new on the job, and I floated through several districts every night, maybe with a different partner. It was part of training.
Q. Okay. So would that include responding to calls that came in during that shift?
A. Oh, sure. Yes.
Q. Would that also include any like investigation or follow-up investigation?
A. I mean, no. Not really, no.
Q. Okay. And when you were transferred to the crime prevention bureau, how did your responsibilities change, if at all?
A. Well, there was several divisions in the crime prevention bureau. I was first assigned to the 5 to 1 shift in the narcotics unit.
Q. And about how long were you in the narcotics division?

Page 14

A. I would say, and I'm guessing, a couple of years.
Q. After your assignment in the narcotics division, where did you go from there?
A. I was transferred to days in the crime prevention bureau.
Q. Maybe I misunderstood. I thought the narcotics division was part of the crime prevention.
A. It is.
Q. So when you were done in the narcotics division, you were transferred where?
A. To days in the crime prevention bureau.
Q. And there wasn't a specific division that you were in at that point?
A. There was. And I believe -- because I'm not 100 percent sure because I was there a long time -- but it might have been in the organized crime division.
Q. Going back to your time in the academy, what kind of training, generally, did you receive during the academy?
A. We received training in the traffic division, patrol division, the law, court testimony, how to write reports, how to -- general investigation procedures.

Page 15

Q. For a second I want to go back to your various positions and roles. Could you remind me, I apologize if you've already said this, you were in the uniformed division when you first started in 1974, you'd said, after the academy?
A. Right.
Q. And you were there for a few months you'd said?
A. Yes. Between the four o'clock shift and the midnight shift it was probably more like four or five months, yeah. I'm guessing. It's an approximate time.
Q. So that takes you to about the summer of 1975, about, and your next role was what?
A. I was transferred to the crime prevention bureau for the 5 p.m. to 1 a.m. shift.
Q. And that what was when you were working in the narcotics division?
A. Yes.
Q. And about how long were you working in the narcotics division?
A. Yes. Was that what --

Page 16

Q. No. I'd said about how long?
A. About two years. You know, that's approximate.
Q. That's okay. I understand. I'm not holding you to specifics. So if that takes you to about 1977, then you mentioned you want to the organized crime division, you think?
A. Yes. On the day shift in the crime prevention group.
Q. I've got you. And about how long were you assigned to the organized crime division day shift?
A. I'm not sure.
Q. Do you remember if it was longer than you were in the narcotics or shorter?
A. I don't remember.
Q. Do you remember what the next assignment you had after that was?
A. I believe I was transferred to the four to midnight shift in uniform. Again, I'm not quite sure of the time frame.
Q. That means that you were back in patrolling?
A. Yes.

Page 17

Q. And was that something that you had to volunteer for?
A. No.
Q. You just got the assignment?
A. Yes.
Q. Who, in the department, made those calls, those assignments at that time?
A. Someone higher than me. I'm assuming the chief.
Q. Okay.
A. Or the captain of the squad.
Q. Do you remember was it -- who the chief was in the mid, late '70's?
A. Yes. Chief Paul Fenton, F-E-N-T-O-N.
Q. Okay. So going back to the training in the academy, did you receive any training on specifically sexual assault investigations?
A. I'm sure there was a seminar during that eight or 12-month period that we were in the academy. I don't even remember how long that was but, yeah. There was a seminar in that police academy.
Q. Was that seminar by a fellow officer or somebody from outside the department, do you know?
A. Both, I believe. Outside and someone

Page 18

came in.
Q. Was there anything -- do you remember if there was any information shared about how to conduct sexual assault investigations in that seminar?
A. Well, I do remember a woman from the YWCA coming in to talk about battered women and things like that.
Q. But nothing specific about the investigation aspects of?
A. Oh, I'm sure there was.
Q. You don't have an independent recollection now?
A. No.
Q. Okay. After the academy did you receive any training or education on sexual assault investigations?
A. Yes. Of course it was on-the-job training working in the sexual assault unit. And there were seminars that I attended with the FBI, and several of them with the FBI.
Q. Do you remember about how many, throughout your career as a police officer, in Springfield, about how many seminars you attended with the FBI?

Page 19

A. No, I don't remember how many.
Q. Besides the FBI seminars, and on-the-job training, do you remember any training specifically, internally in the department, about how to go about rape investigations?
A. There was training every year. Everybody was assigned to a one-week training where they -- you went in and you spent the whole week on various issues. That was through my whole 17 years, that one-week inservice training.
Q. Okay. That makes sense.
Was the inservice training a different topic every year?
A. Many topics, not just one topic. They were eight hours a day, Monday through Friday, and it was every year.
Q. Not a specific year, but do you remember learning about anything with sexual assault investigations in any of those inservice trainings?
A. I really can't answer. I'm not sure. There was a lot of on-the-job training.
Q. Okay. As far as interrogations, did you receive any training in the academy for how to conduct an interrogation?

Page 20

A. I'm sure I did, yes. But it probably was in the academy, right in the beginning of my career.
Q. And what about other forms of training for interrogations? Like you mentioned the FBI seminars. Was that anything that you did for that topic?
A. Those FBI trainings were both basically about rape investigations and evidence collection.
Q. Okay. So how, as an officer coming out of the academy, did you learn how to do an interrogation then?
A. Somewhat. I mean, I hadn't gotten real practice. But, yes, they taught us how to do that.
Q. In the academy years?
A. In the academy, yeah.
Q. Got you. But, other than that, there wasn't any specific training, that you can remember, as far as interrogations in the department?
A. For?
Q. For interrogations.
A. A lot of them again were part of working, working with experienced officers for many years, and the various things we investigated, so on-the-job training.

Page 21

Q. That makes sense. Do you remember any officers who mentored you or taught you, or that you had shadowed basically, in the sexual assault investigation early on?
A. The sexual assault investigation, yeah. Paula Meara was her name. She became the commissioner. I worked with her. In the morals unit, under her. Not under her. I was senior to her, but she hadn't been trained.
I worked a little bit with Cheryl Claprood, not much, but a little bit on the afternoon shift. And I also worked with Marianne Popko. But, again, she was younger than me. But they had been sent to many academies and because we depended on the female officers to talk with the victims if possible.
Q. That was going to be my next question. You read my mind.
Was it pretty common for female officers to take the lead -- or maybe not the lead -- but to do a lot of the sexual assault investigation work?
A. A lot of the statements.
Q. Okay. So did you have any training in the academy about dealing with juvenile suspects?
A. I knew what a juvenile was but I'm sure,

Page 22

in the academy, they talked about a person under the age of 17. But no special training. I didn't work in the bureau.
Q. Do you remember, during your career, if there was a policy or any type of proceeder of dealing with juvenile suspects?
A. Yes. There was a policy that if you had a juvenile suspect, under arrest, the parents were to be notified.
Q. Do you remember if that was like a written policy?
A. I'm sure it was a police, a Springfield Police Department policy to have the parents present.
Q. Okay. And I think I just jumped around. But after the -- so going back to your various roles, as an officer in the police department, you mentioned that you were in the organized organize crime division and then you went back to the uniformed division.
A. Correct.
Q. Do you remember approximately what years you were there?
A. I don't. It was probably about a year and a half though.

Page 23

Q. Okay. And would that have been like the same type of responsibilities that you had when you were there in that uniformed division previously?
A. Yeah. Similarly I was in uniform. I was in a cruise and I also had a walking post.
Q. And what shift were you during that one?
A. That was four to midnight.
Q. Did you have a partner most shifts, or were you working by yourself?
A. When I worked in the north end of Springfield, the District 1A, I had a partner, yes.
Q. Do you remember about how many officers would be patrolling, on a given shift, for the uniformed division back then?
A. No. Because it varied because of sickness and things, yeah.
Q. If everyone showed up for a shift, though, do you remember?
A. Luckily, if everybody showed up, I got to do my walking post.
Q. Okay. And what did the walking post include?
A. Well, I worked in an area in Springfield, Forest Park, the X. You know, towards the end of the

Page 24

night, I shook a bunch of doors, made sure they were locked. And, earlier in the shift I was at an elderly project and I made sure elderly people get across the street to the drug store.
Q. And was that a responsibility you had alone, during your shift, or did you have someone with you?
A. On the walking post I was alone.
Q. Did you ever have any cases or investigations where you worked with Sergeant Thomas Kelly?
A. Did I actually work with Tom Kelly? I worked the same shift with him in the crime prevention bureau, that five to one shift.
Q. But do you have any specific recollection of working alongside him on a given call or investigation?
A. No. No. He wasn't a sergeant then. He was -- we had been in the same academy. He was the same rank as me. I believe he got a promotion.
Q. Okay. And maybe you can shed some light on this. The crime prevention bureau and the detective bureau, how were they -- how do they work together, or how do they work separately?

MR. KENEFICK: Objection.
THE WITNESS: They were separate. They were two separate offices, separated by the Youth Aid bureau. So at one end of the building you had a detective bureau and in the middle you had the Youth Aid bureau and then the rear staircase, leading up to the second floor, you had the crime prevention bureau.
Q. (By Ms. Gizzi) Okay. What was your understanding of what the detective bureau was responsible or tasked with?
A. Murders. You know, housebreaks.
Q. Okay.
A. Assaults.
Q. Was there overlap, you think, between the types of crime that the crime prevention bureau investigated versus the detective bureau?
MR. KENEFICK: Objection.
THE WITNESS: An overlap? No. But the crime prevention bureau normally would end their night at one a.m., that five to one shift, and the detective bureau had a midnight to eight shift. They would take



over any calls for crime prevention that they had to respond to.
Q. (By Ms. Gizzi) Specifically in 1984, 1985, what division were you working in?
A. The crime prevention bureau.
Q. Okay. Did you like all the moving around.
A. Yeah. It was a nice change of scenery.
Q. And when you were at the crime prevention bureau, in '84, '85, were you in a specific division like you were previously?
A. Yes. I was in the morals unit.
Q. And what was the morals unit responsible for?
A. Well, rape, prostitution, things that had nothing to do with morals. So we handled liquor licenses, late closings of bars, sexual assaults and things like that. A good part of it was prostitution. There was a heavy amount of prostitution in Springfield.
Q. So in your role on the morals unit, what would you do on an average shift; were you mostly in the station or were you out responding to calls?
A. A little bit of both. When we arrived at



the police station, we'd follow up on the day shift. And we also did restraining orders back then. I think that was right then they were issued. So there was always a stack of restraining orders that had to be served.
And in our bureau, the two bureaus, they tried to serve the restraining orders. And, if they didn't get them done on days, they passed them on down to us or we would go back the next day and try again.
Q. I've got you. Okay.
And how long or what year were you at the morals unit until?
A. Until I retired in 1991.
Q. And during your time working in the morals unit, did you have a specific like tour that you were definitely assigned to?
A. It was in the day shift most of it.
Q. And what would the hours be hours on the day shift?
A. That was 8:00 to 4:30, I think, 4:00 or 4:30.
Q. And I know I'm asking you to think back a lot but, in December of 1985, were you working the



day shift?
A. What month?
Q. December.
A. December, yes.
Q. And what would an average week look like, were you working several days a week or less?
A. In the division we worked four days on and two days off.
Q. Okay. Do you remember -- if you had worked Sundays, like were you working Sundays, Mondays or did you have specific days of the week?
A. The weekends we alternated, so at least everyone did at least one weekend.
Q. But it wasn't like one person's responsibility for the weekends?
A. No. It was alternated weekends.
Q. And during your time at the Springfield Police Department, generally, how many sexual assault investigations do you think you were a part of?
A. I can't give you an exact number. A lot, though.
Q. Okay. I completely understand that you were probably not keeping track of that, but any ballpark would be helpful. Like over 100, less than

100?
A. It could be less than 100 but I'm not sure.
Q. Did you ever, throughout those investigations, did you see a lot of instances where victims were repeatedly targeted?
A. Did I?
Q. Yeah.
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: Can you repeat that again?
MS. GIZZI: Sure.
Q. (By Ms. Gizzi) Did you ever see repeat victims in sexual assault in --
A. Just in sexual assault?
Q. Yes.
A. I don't know. I can't answer that question. I'm sorry.
Q. Okay. Is it that you just don't remember?
A. I don't remember. I know I've been to things where they were a second time, but the second time might not have been a sexual assault.



Q. But a first time?
A. It was a sexual assault.
Q. Okay. What about how many interrogations you were involved in throughout your time at the department?
MS. SAKOWSKI: About anything or ....
MS. GIZZI: Um-hmm.
THE WITNESS: I don't know. It was a lot because I was in the drug unit. There were a lot of drug arrests. Of course, there was a lot of prostitution and a lot of rape, gaming arrests, to name but a few. There was a lot. I couldn't give you a specific number but I obviously stayed there from the time I got put back on the crime prevention bureau, until I retired, because I was doing the job.
Q. (By Ms. Gizzi) Right. Right. So more than ten interrogations?
A. Oh, yeah. There were more than ten in narcotics alone.
Q. What about in just the morals unit, do you have a sense of how many you were involved in?



A. No.
Q. Were you ever in an interrogation with Officer Kelly, Thomas Kelly?
A. I'm not sure. Tom Kelly I and shared the same desk but we rarely, if ever, worked together. We were doing different things. And then he made sergeant and he was doing different -- so I don't think I was actually with almost that much.
Q. You don't have any memories specifically of being in an interrogation room with Officer Kelly?
A. No.
Q. And during your, you know, tenure at the morals unit doing interrogations, generally what was your role or what was your responsibilities in that setting?
A. It varied depending on what we were doing. If you were talking about interrogating a female, I was just there and I didn't do much. And, if you were interrogating a male, I asked a lot of questions.
Q. Were you ever in a room, in an interrogation room with a suspect by yourself? Like was it common or did it happen where there was just one officer?



MR. JOYCE: Objection.
THE WITNESS: No. Usually there would be two, at least, the two working together.
Q. (By Ms. Gizzi) So the best that you can remember, you remember having to conduct an interrogation by yourself?
A. Not an interrogation, no.
Q. And is there something that you would conduct by yourself that's as opposed to an investigation?
A. There were things that I was given assignments to do, by the captain, by myself.
Q. Right. Right. And what were those assignments that you're thinking of?
A. Well, I transported a lot of evidence to the lab we had at the time, in Burlington, Mass, for examination, and I'd go by myself. And I'd check it out at the police station and check it in with the lab technician.
I was sent on various things. I know I've gone to an elementary school a couple of times where there was a problem with a parent and the child and the teacher. And it really didn't involve the

Page 33

crime prevention bureau but I went because they sent me. And then, other things that Captain Brown, at the time, asked me to do.
Q. Was Captain Brown your direct supervisor while you were at the crime prevention bureau?
A. When I was in the crime prevention bureau, there were three different, at least three different captains in charge.
Q. And was Captain Brown one of them?
A. At the end he was.
Q. And who were the other ones, those other two?
A. I had a Captain Tom Fitzgerald, Captain Omer McMann, Captain Brook.
Q. Okay. And which --
A. Captain Maffen.
Q. Do you know how to spell that?
A. M-A-F-F-E-N.
Q. Do you remember what years they were -- each captain was your supervisor for?
A. No. Well, Captain Maffen was the first one when I first was assigned to the crime prevention bureau out of uniform. Captain Brown was the last one I served under until I retired. And in between

Page 34

that there was Captain Fitzgerald, who was promoted. Captain McMann.
Q. Okay.
A. I think Captain McMann was actually after Captain Brown. I might not be right. Captain Brown was there when I left in '91.
Q. Okay. Was Captain Brown also your supervisor in 1985, or was that someone else?
A. I would say he definitely was.
Q. And going back to the interrogations, when you conducted them, personally, was it your practice to take notes?
A. It depends. I had a notepad if I needed it. It depends on what I was doing. I mean, I didn't always -- it depends on what my intentions were, how I was going to question somebody. If it was going to be lengthy, I would take notes. If it was just something simple, I wouldn't.
Q. And what would you consider a lengthy interrogation?
A. For me at this age today or back then?
Q. Back then.
A. Back then, a lengthy investigation would probably be an hour.

Page 35

Q. That's fair. I'm not looking for it by the minute, by any means.
Is it safe to say it would have been your practice to take notes during an interrogation that would have lasted at least an hour?
A. Yes. Depending on where I was taking the interrogation. A lot of the interrogations were taken at the police station, in my office, in an interrogation room. If I needed it, I would excuse myself for a minute and I would make notes and then go back into the interrogation room. But I didn't always sit there writing notes.
Q. I've got you. Okay.
What about -- I'm not sure what the department had back then -- but was there ever a time that you had your interrogations recorded with any type of audio recording device?
A. I never had. I know that came in but I don't know when they were recording.
Q. Was that something that you know other officers to have done?
MR. JOYCE: Objection.
MR. KENEFICK: Objection.
THE WITNESS: (Witness shaking head)

Page 36

Q. (By Ms. Gizzi) Okay. Was there a practice, as far as you know, in the Springfield Police Department, of taking notes during interrogations? Was that something that was encouraged or not?
MR. KENEFICK: Objection.
THE WITNESS: I think I've answered that. I am sure some officers did. I told you how I did it. If it was going to be something quick, I didn't. But if it was going to last, you know, a couple of minutes, then I could put it in the night report. Because I was right in the station, I would go to my desk and put the note on my desk, write it out there, and keep it until the end of the shift.
Q. (By Ms. Gizzi) Okay. And just to be clear, and I don't mean to be redundant, but how -- what I'm asking is specifically how you learned that practice, how you developed it.
A. Well, during the police academy, when we were being training, uniformed police officers carried notebooks with them. And the superior officers checking them --

Page 37

Q. I'm sorry. Can we hold on a second? The Zoom is gone. Can we take a break? I apologize.
(Off the record)
MS. GIZZI: Back on the record.
Q. (By Ms. Gizzi) Do you remember, you were saying, in the uniform division that you were carrying a notebook around. I was asking about documentation.
A. Yes. That was taught in the academy. We had a notebook with the daily things we did on our shift.
Q. Was this something that each officer was responsible for, like each officer had their own notebook?
MR. KENEFICK: Objection.
THE WITNESS: Yeah.
Q. (By Ms. Gizzi) Was that something that you did all throughout your career, at the Springfield Police Department, was keep a notebook?
A. No. When I went into to plain clothes, I didn't keep a notebook. We had reports we wrote to the commander.
Q. So the type of documenting your day, or the events of your shift, was different when you were

Page 38

in the uniformed division versus in the plain clothes?
A. The way they did it, yes, it was different.
Q. And how did you learn about the way you did it in the crime prevention bureau?
A. At the end of the night you type out what you did.
Q. Okay. Was there a name for that, what the reports were called?
A. Reports. Daily reports.
Q. And did you give them to somebody? Were they addressed to somebody?
A. They were addressed to the captain, yes.
Q. Just so I am clear, at the end of every shift, were you writing the report, or were you writing it as things happened throughout the shift?
A. It depends if I was in doing something in the station like an interrogation. I would leave that and put some notes on my desk and then put it into my thing. But I didn't type a report every night and the person I worked with did it.
Q. And besides those daily reports, during your time at the crime prevention bureau, was there

Page 39

any other type of reports or documentation that you were responsible for?
A. Well, we would write arrest reports.
Q. Arrest reports?
A. Um-hmm.
Q. Okay. And was that something that you were specifically also responsible for, or were there other officers doing that?
A. I would say the officer that made the arrest had to write a report. And, if there were two of them working together, one of them wrote the report.
Q. And what other reports besides arrest reports and those daily reports?
A. Well, requesting vacation time reports.
Q. Okay. Like administrative things.
A. Yes.
Q. And what about reports or documentation for evidence?
A. Well, we tag evidence, yes.
Q. And who was responsible for tagging the evidence?
A. The officer that had the evidence would put it in an envelope, put a tag on it, and turn it

Page 40

over to the evidence officer.
Q. And the evidence officer was different than the officer who was tagging it usually?
A. If they were in the same office. If they were sitting where we're sitting, then the officer who had the evidence had it out and marked it and clipped it to the envelope and turned it over. The only other person who had access to that evidence room was the evidence officer.
Q. Okay. That was what I was going to ask.
Were the evidence officers -- were they a separate division than the crime prevention bureau?
MR. KENEFICK: Objection.
THE WITNESS: The crime prevention bureau had its own evidence officer. And the detective bureau and uniformed division used the same -- it was a much bigger evidence room.
Q. (By Ms. Gizzi) I want to go back to something you'd said earlier about your responsibilities as a -- in the morals unit. So this would have been the mid '80s, I believe, in the crime prevention bureau.
Can you give like an example of types of

things you would do on your shift during your time in the morals unit?
A. In the mid '80s unit you're talking about?
Q. Um-hmm.
A. Whatever was leftover from the night before. If there were things that needed to be served on people, we would go and try to serve them. I think we would normally try to read the reports, from the night before, left by the captain.
And we had our own things that were turned in by the uniform squad for investigation, and by the detective bureau and the crime prevention bureau. And the supervisor would dish them out and we would go out and try to finish the paperwork up.
Q. Okay. Would that involve -- so I guess what I'm trying to get clarity on is: Was there a role, within the Springfield Police Department, of a detective, or like was anybody in that role?
A. Like as a detective?
Q. Yes. Is there a difference between a detective and a police officer in the department?
MR. KENEFICK: Objection.
THE WITNESS: Only in the rank. I



mean, the regular police officer would have a uniform; somebody in the detective bureau or crime prevention bureau were in plain clothes. That was the only difference basically. I mean, they were assigned to districts and we basically had the city to cover.
Q. (By Ms. Gizzi) So when you were in plain clothes, as an officer in the plain clothes crime prevention bureau, would you have considered yourself a detective?
A. Probably only on payday. I never considered -- they called them detectives but they were police officers. I am no better than anybody else because I wore plain clothes. I didn't need to be called a detective, if that's what you're asking me.
Q. Okay. So it wasn't like a formal position, in the department, as far as you understood it?
MR. KENEFICK: Objection.
THE WITNESS: Was it formal? I guess. I don't know. Formal, explain "formal".



See how I'm dressed? That is how I went to work. And they went into work in a blue uniform, sometimes a tie in the winter. No tie in the summer.
Did they come into the prevention bureau and say, you're Detective Kane? No. They came in said: You're Richard Kane? Yeah.
But, yeah, the detective bureau is considered detectives, the crime prevention bureau is considered detectives. Nobody, that I know of, really cared one way or another.
Q. (By Ms. Gizzi) Okay. That makes sense.
Also, going back to the uniformed division versus in plain clothes, could you elaborate on what the difference in responsibilities were between the two divisions?
MR. JOYCE: Objection.
THE WITNESS: In the uniformed division we were assigned to districts, and that was their responsibility. In the detective bureau or crime prevention, where you had the whole city, that was their



responsibility. You followed up on the uniformed police officers' reports and things that happened.
Q. (By Ms. Gizzi) Okay. Were there ever instances where uniformed police officers, from your experience, were following up on an investigation?
A. I can tell you that sometimes when there was a crime committed and, for instance, a plate number was given out, they would roam their district, or even a little bit outside their district, they would roam around and try to locate that plate or a description of the person that matched what they put out on the air.
So they did some investigative work, yes, if that's what you're saying. In plain clothes they wanted to catch the guy if they could.
Q. Right. Okay. So would that mean those officers were responding to 911 calls, that came in during that shift, or was that everyone's responsibility?
MR. KENEFICK: Objection.
MS. SAKOWSKI: I'm sorry. I'm not sure I followed your question.
Who were you talking about, the

uniformed?
MS. GIZZI: The uniformed.
MS. SAKOWSKI: Okay.
Q. (By Ms. Gizzi) Who was responsible, in the department, for responding to 911 emergency calls?
MR. KENEFICK: Objection.
THE WITNESS: Whoever the radio operator gave the call to. If it was District 1, a 911 call came in, they would turn it over to the District 1 car.
Q. (By Ms. Gizzi) And this is my own naivete of how police departments work.
Q. Would you ever have 911 calls be directed to the crime prevention bureau?
A. Yeah. It could happen. They could call right up. They had a radio in our office. They would say we got this call online from so and so and someone should pick it up and talk to them.
Is that what you're saying?
Q. Yes, that's my question.
Do you remember in what instances a 911 call would be directed to the crime prevention bureau?



MS. SAKOWSKI: Objection.
THE WITNESS: Well, the uniformed car could call in and say there was somebody in the crime prevention bureau investigating an assault that took place behind Holy Name Church in Springfield, Forest Park, and a person matching that description was seen. And we try to locate him and we would try to help.
Q. (By Ms. Gizzi) So there was a lot of -- I shouldn't say a lot. But wouldn't it be fair to say you worked with the uniformed division and then the crime prevention bureau?
A. That is he way it is -- it supposed to work that way, yeah.
Q. And did it actually work that way?
A. Sure.
Q. Moving on a little bit to, as you might know, the Plaintiff, George Perrot for this case, did you know George Perrot, before December of 1985, did you know who he was?
A. No.
Q. So then I guess that answers my next question. You didn't have any interactions with him



prior to December 1985?
A. Yeah. The beginning of December of 1985 was the first time I spoke with Mr. Perrot or he spoke with me.
Q. Do yu remember if you ever had any interactions with family members of George Perrot?
A. No, I never did.
Q. Did you know who George's father was at the time?
A. No.
Q. So talking about this time period of 1984 1985, were you aware, at that time, there was a series of sexual assaults in Springfield of elderly women?
A. Of just elderly women?
Q. Yes.
A. I wasn't totally aware, no.
Q. Would that have fallen within the purview of the crime prevention bureau?
A. Sure. Between the two day and night shifts, sure.
Q. If that was something that the crime prevention bureau was investigating, would you have known about it even if it wasn't during your shift?



MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: Not necessarily, no.
Q. (By Ms. Gizzi) I think you talked about this earlier. How did the day shift communicate with the night shift?
A. They made reports. And I'll be honest with you, sometimes, if it was a slow day, they didn't always make out a report. A lot of them would stay in the office.
Q. Okay. Was that something that happened frequently?
MR. KENEFICK: Objection.
MR. JOYCE: What happened frequently?
Q. (By Ms. Gizzi) That there was like slow days that there was no reports when you got in, from your shift, on like the night shift?
A. A lot of times, like on a Sunday or something, it might be slow.
Q. Even in the academy, when you started in the police department were you told or taught to always write a report on the shift even it was slow?
MR. KENEFICK: Objection.
THE WITNESS: No. Not to my

recollection, no.
Sometimes, in the cruiser, on the midnight to eight shift, they had us count broken windows at the schools. We had to write a report on how many broken windows were in each school in your district so they could determine how many windows had to be replaced, so you wrote a report.
Q. (By Ms. Gizzi) Okay. I believe you'd said like that would be in a cruiser so would that be a police officer in the uniformed division?
A. Yes.
Q. How about in the crime prevention bureau, were you always expected to write a report for every shift?
MR. KENEFICK: Objection.
THE WITNESS: I don't think anybody ever questioned it if we didn't have a report because we didn't write a report, if that is what you're asking.
Q. (By Ms. Gizzi) Yes. So it wasn't like the next day the captain was going to come yell at you if you didn't have a report from a slow shift?
MR. KENEFICK: Objection.



THE WITNESS: No.
Q. (By Ms. Gizzi) So you'd said you were not aware of the series of sexual assaults in Springfield of the elderly women, at the time, or you don't remember if you were aware?
A. Well, the word elderly is what's throwing me off. I was aware of sexual assaults, and many of them, in that time frame that you're talking about, but they weren't all elderly women. And they were all in the 16 Acres section of Springfield but, no, they weren't all elderly women. There were young kids.
Q. Do you know how big the 16 Acres section was?
A. Sixteen acres.
Q. That would probably make sense.
A. Kind of.
Q. Do you know if those sexual assaults, that you are referring to that are not just of older women, were you aware of those at the time?
A. I was involved with all of 'em on the day shift. And they involved younger school-aged kids. No elderly women. Middle-aged women, and there was a ton of them.



Q. And this is just to make sure I'm clear. This was -- you're talking about in 1985?
A. In the '80s area is what I thought you were talking about.
Q. Yeah. In the mid '80s though.
A. There was a rash of rape cases and sexual assault, assault and battery on these victims. And it went on quite a while until we made an arrest finally.
Q. And what year did the arrest you're referencing, what year was that?
A. I can't tell you the year. You gave me the '80s and that was going on around then.
Q. Do you remember when that rash of sexual assaults ended, about?
A. Well, I can tell you it ended when he went to jail. The date, I don't know.
Q. And who was the suspect?
A. It turned out he was guilty. He was a hockey player for the Springfield Pics. And he lived in the neighborhood and he wore a hockey mask over his face, you know the hockey stockings that they wear with the eyes cut out.
Q. Do you remember the name?



A. I don't.
Q. Do you remember how many assaults that you were investigating or that were eventually -- that he was charged with?
A. Who was?
Q. I'm sorry. This hockey player?
A. I don't remember how many there was. There was a lot of them.
Q. Would you say more than five?
A. Oh, yeah.
Q. So you weren't separately aware of sexual assaults specifically on elderly women but you were investigating these sexual assaults in the mid '80s; is that right?
A. Yeah. And I also investigated two younger boys in the '80s, the late '80s that were sexually assaulted in a park in Springfield while they were fishing on spring vacation.
Q. Was there a specific type of report that you used for investigating sexual assaults?
A. That I would use?
Q. Yeah.
A. Well, there's the nightly reports that I told you about. And if I made an arrest, I would

have to make out an arrest report and I would go into much more detail.

Q. So was the crime prevention bureau investigating, if you know, investigating all of the sexual assaults that were occurring in the mid '80s?

A. I think the best way to answer that for you would be that the detective bureau got involved too because they was some after midnight, or after one in the morning, and they would respond. So it wasn't just the crime prevention bureau. And it was mostly the house break unit of the detective bureau.

Because these elderly people are normally home in the wee hours of the morning. And usually a uniformed car would be dispatched by 911 and then they call the detective bureau because there was no one in the crime division.

Q. Okay. That makes sense. So they got involved in the investigations if they were so late at night that the crime prevention bureau -- no one was there?

A. Right.

Q. Okay. And would -- in that situation would they hand it off, would the detective bureau hand off the investigation to the crime prevention



bureau?

A. If there was a sexual assault, they would write a report, yes.

Q. I guess what I mean by "hand off," would you then, as a crime prevention bureau officer, take over the investigation for the rest of it?

A. Only if the captain assigned it. It depends who he assigned it to. Detective Greer would send a report over, the captain would assign 'em out, if there was an assault, a sexual assault on a person.

Q. And do you know if the department, or the crime prevention bureau, specifically was investigating the series of sexual assaults, that you were a part of, as being committed by one person?

MR. KENEFICK: Objection.

MS. SAKOWSKI: I'm sorry. Did you say one person?

MS. GIZZI: Yes.

THE WITNESS: Could you say that question again, please.

MS. GIZZI: Sure.

Q. (By Ms. Gizzi) Do you know if in that time, in the mid '80s, those sexual assaults that you



were involved in, were you or the department investigating them as though they were committed by one person or the same person?

MS. SAKOWSKI: Objection.

MR. KENEFICK: Objection.

THE WITNESS: Can I answer that?

MS. GIZZI: Um-hmm.

THE WITNESS: I didn't know about all of them, no.

Q. (By Ms. Gizzi) Well, any of them. Were you investigating any of them potentially?

A. Yes. I was investigating one in particular.

Q. Do you remember who the victim was in that one?

A. Yeah. She lived at Covel Street.

Q. Do you remember her name?

A. Emily -- it's a funny last name.

Q. Lichwala?

A. Lacagla? Lichalla. Lichalla.

Q. I was also not going to be able to pronounce it, so I appreciate you taking a stab at it.

So you were involved in investigating her



sexual assault?

A. In the very beginning, yes.

Q. How did you come to be involved in that?

A. That morning, apparently the detective bureau or uniformed officers transported her to the hospital. And I was sent to the City of Chicopee to pick up a person that the police had on a warrant there. And then, after dropping that person off at the police station, I was sent to the hospital to pick up Emily Lichwala to have the police and Linda Derosier take a statement from her.

Q. So you went to pick up Emily from the hospital to bring her to the police station?

A. Yeah. So they could get a statement. So Linda Desrosier, the female officer at work that day, could take her statement of exactly what happened.

Q. Do you know why Officer Desrosier did not go to the hospital to take the statement?

A. Who, Linda Desrosier?

Q. Yes.

A. While she didn't take it at the hospital? Well, they were releasing her, the victim. And, before bringing her home -- because we still had to go to the house and see what we could find out. We

Page 57

needed a statement from her because we really didn't know what happened.
Q. And when you went to pick up Ms. Lichwala, from the hospital, did she tell you anything about her assault at that time?
A. I don't really remember driving her from the hospital, Springfield Hospital, back to the police station -- which was probably an eight-minute drive -- having a conversation with her. The police woman -- because of the type of crime it was -- it was I didn't want to make her feel uncomfortable talking to me. And that's kind of the way we always handled these things.
That's why we had Linda Derosier and Marianne Popko and several others. And Marianne -- or Linda, rather, took her in into a private area where she could take a report away from everybody.
Q. And that actually brings up another question.
Was it standard practice for the female officers to always take the sexual assault victim's statements?
MR. KENEFICK: Objection.
THE WITNESS: It wasn't in writing

Page 58

but it was out of politeness. I mean, it's embarrassing what happens to these women. And for them having to talk to me, after having a situation like that happened at whatever time in the morning it was; I don't think you would appreciate it.
Q. (By Ms. Gizzi) Right. Right. So not a written policy but something you guys did as a courtesy or respect?
A. Out of respect.
MR. KENEFICK: Objection.
Q. (By Ms. Gizzi) Was there ever a time you had to take a sexual assault victim's statement?
A. I have, yes.
Q. Do you remember about how many times that happened?
A. Not many, but a few. There were no policewomen there.
Q. Okay. So when Officer Desrosier took Ms. Lichwala's statement, after that sexual assault, were you present at all in the room?
A. No. It was a private room.
Q. And after she took her statement, did you talk to Officer Desrosier about what Emily --

Page 59

A. I don't remember if I exactly talked to her right then. I know we took her home, because it had been a long night for her and it was getting late. We wanted to get to the house to see exactly what went on and how he got in.
Q. And so did you, in fact, end up going to Ms. Lichwala's house?
A. Yes.
Q. And that was during that same shift?
A. Yes.
Q. And what did you end up doing when you got to her house that day?
A. We collected some evidence from the clothing she had on, the sheets on the bed, the pillowcases on the bed. And I went in the basement to see where the break was. And it was a small window and I think it was a drier vent was sticking in. You know how cellar windows are. It wasn't very big, but that was pushed out.
And it appeared he gained access that way, which said he was a very small person. We'd thought that how do you fit in there. I replaced the window back in and the vent back in.
Q. So the window wasn't -- there wasn't

Page 60

anything broken, like you were able to just put it back together, if you remember?
A. I think I did what we call a "police lock". I secured it for now until somebody more talented than me could permanently fix it.
Q. Okay. I've got you.
Was there anything else you remember -- besides the items that you mentioned collecting, like the bedsheets and --
A. I think some of her clothing that we collected. The bedsheets and I think the blanket and bedspread and pillowcases, I'm pretty sure is everything we collected.
Q. Okay. And was it just you and Officer Desrosier there collecting evidence?
A. Yeah, I believe so. I'm not 100 percent sure. Yeah, but I believe so.
Q. Do you remember about how long you were at Ms. Lichwala's house that day?
A. No, I don't. It was -- for her, I thought it was a very long day. So we were there at the police station for a good part of the day. She was very upset. And we were trying to calm her down and trying to get her some help.

Q. And were there any like other evidence technicians who came to the scene to take photos of the pieces of evidence that you ended up collecting?
A. I don't remember that time, but I'm sure we notified the photo lab. But I don't remember them coming out. And the fingerprint, they're on the same division the photo and fingerprint lab, yeah. I don't remember.
Q. And do you remember when this assault happened, a month and year?
A. Yeah. October 24, 1985.
Q. And you mentioned that you weren't sure if someone came and took photos of the evidence. Was that something --
A. Normally we would call. But that was usually a two-man thing. And they'd have to fingerprint and photograph every prisoner coming in to the police station. And they sometimes can't just get out there. So I don't remember if they came while I was there. I don't believe they did, but I'm not sure.
Q. Would it ever have been your practice to take photos yourself?
A. No.



Q. So that means that the vent being pushed in wasn't photographed if there was nobody there other than you?
A. The glass wasn't broken. The frame, if I remember correctly, was what I put back in. And the hose somebody -- you know how a plastic cutter can cut a hole and put a drier vent through it, those were just pushed out. And, like I'd said, I tried to just secure the window, as best I could, until somebody could fix it or photograph it or whatever. But I didn't feel we, at that point, should be leaving her window open.
Q. Okay. And just generally zooming out to your career in the crime prevention bureau, how often were you collecting evidence at a crime scene?
A. What kind of scene?
Q. At a crime scene, yes.
A. Well, sometimes, in the crime prevention bureau, there were a shortage of people. I went on drug raids to assist because they didn't have enough help, and I would collect narcotics and paraphernalia and things like that. I would tag them.
Then in some of those drug raids there was substantial money. We would count it out at the



police station, tag it, put it in evidence with the evidence officer.
Q. So to get a specific like frequency, was that something that was happening once a week, once a month, on average?
MR. KENEFICK: Objection.
THE WITNESS: It happened a lot. I'm not saying sexual assaults only but there were raids on, believe it or not, gaming raids and evidence was collected and, you know, tagged and put in the property room.
Q. (By Ms. Gizzi) So let me ask it a different way.
Out of all the times that you were going, physically, to a crime scene what percentage of the time were you collecting evidence, would you think?
A. Me, personally?
Q. Um-hmm.
A. I don't know. I can't answer that question.
Q. Okay. Fair.
So going back to the sexual assaults in the mid '80s that you were investigating --



A. Which ones?
Q. The ones that you mentioned that you were more a part of, the ones of the middle-aged women, right, you mentioned.
A. And younger women?
Q. Yes. What was your role in those investigations?
A. I was spending eight-hours a day hiding out sometimes in the woods trying to collect evidence. And that's where we collected all those hockey stockings with the holes cut out. We had a bag full. And we were trying to hide to see if somebody would come walking, because we knew exactly where they were coming through. And that went on for weeks.
Q. Okay. Do you remember if you had a partner or partners?
A. I had partners, yes. In those cases it wasn't a policewoman. I think it was a fellow whose name is David White, for a while. I believe David McGibbon was the sergeant, investigation on days, and a fellow by the name of LeClaire, Donald LeClaire. And we alternated days out, on the day shift, in the woods hiding out.

Page 65

Q. Like a stake out situation?
A. And we also put a woman out in the area where one of the rapes took place, out in the open, and hid at the bottom of the ravine around the time the last attack took place over there. So we spent quite a bit of time. But that all tied into the hockey player.
Q. Do you remember were you involved in apprehending the hockey placer?
A. No. Actually it was done on the night shift.
Q. Do you remember what year, approximately, that he was apprehended?
A. No. But I know that it was either Sergeant or Lieutenant Fitchet that made the arrest.
(Court reporter asks witness to repeat)
THE WITNESS: I believe it was a sergeant. William Fitchet, F-I-T-C-H-E-T.
Q. (By Ms. Gizzi) I thought you'd said sergeant or lieutenant?
A. Yeah. He could have been a lieutenant because he also became a captain and a commissioner. But back then he was a sergeant, a lieutenant. I know he wasn't a captain because he would have been

Page 66

out there.
Q. (By Ms. Gizzi) Do you remember if that was before or after the Emily Lichwala assault in October?
A. I would say before.
Q. And he was apprehended?
A. Yes.
Q. And I think I know the answer to this. Were you involved in any post arrest investigation or interrogation of the hockey player?
A. No. I actually had nothing else to do with it after that. I did go to the trial and I can tell you he took a plea under the -- I can't remember what it was. But he doesn't remember doing it. The Alford plea, A-L-F-O-R-D.
Q. Do you remember who was the officer who interrogated the hockey player?
A. It was at night. I don't know.
Q. Would that have been something the detective bureau would have been involved in?
A. Well, it involved rapes, and I don't think they were involved at all. It involved women being raped. I think it took the whole day and night of the crime prevention bureau.

Page 67

Q. When you have spent time with Emily Lichwala, in October of 1985, after she was sexually assaulted, did you learn any information about a potential suspect?
A. I don't even know if I had any kind of a conversation with her. It was pretty much done by Linda Desrosier.
Q. Do you remember, even if you learned from another officer, do you remember a suspect's name coming up at all?
A. I never heard of any suspect in the case.
Q. Okay. I'm going to show you an exhibit. It will just take a second.
MS. GIZZI: Can you mark this please.
(Exhibit RK-1, letter, marked)
Q. (By Ms. Gizzi) Officer Kane, do you recognize this document that I just handed you?
A. Um-hmm.
Q. Is that a yes?
A. Yes. I'm sorry.
Q. That's okay.
And what do you recognize the document to be?

Page 68

A. Obviously Linda Derosier went, because she was having a very hard time. And it was near -- it was coming to the date that her husband had passed away. And that's when Arthur Cicerchia, who was the fingerprint and photograph, went out and took pictures.
Q. So just to take a step back. First, would this be the type of report that you would write at the end of a shift?
A. Yes.
Q. Do you know if you typed it up?
A. Well, the dead give away that I didn't type it up is: Attempted to pick up hookers at Frank B. Murray Street. No one would go for the virally handsome R. Kane this P.M. So I did not type this.
Q. I understand. So you believe that officer Derosier typed it up?
A. No. I'm 125 percent sure it wasn't me.
Q. Okay. You never know. You could talk in the third person.
A. I don't deny that I am that, but I didn't type that.
Q. Fair. Fair.
Do you remember working this shift, on

October 29th, 1985, after reviewing that document? And take your time if you want.
A. Are you saying the 29th?
Q. Yes.
A. You know, I don't remember a lot of it. But I would have been involved. My name's on there. But I don't know any of these -- this John Mezzetti from Helberg Road. I don't know that person. And anything else on here, we were checking around the Par Willow area. And I don't even remember that, to be honest with you.
I do know that there was a rape there and we must have drove over there after. I think the gist of this was how upset Ms. Lichwala was. And she really needed to get some help. And the policewoman was the right person to try to hook her up with rape counselors, and she refused.
And the scary part about the whole thing was it was coming up to three years since her husband passed away and she was deathly afraid to live there. And if I remember, she had no other family in the area.
Q. Okay. And she lived alone?
A. I'm 99 and a half percent sure she was



all by herself.
Q. And this report, then, would have been typed up on the day of October 29th, 1985?
A. Unless she wasn't looking at the calender right, that would be the date we put.
Q. And if you need to take another moment or so to look at it, is there anything in that report that you dispute or you think that she inaccurately typed up?
A. (Witness reviewing document)
No. I know that she typed that. And I have a really good memory of going to -- that street is right around the corner.
Q. What street are you referring to?
A. Helberg Street. And I think that was Ms. Lichwala's thoughts because she had seen him in the neighborhood. But I'm not sure. You're talking a long time ago. And if it says we went to the house and spoke with his sister, I'm sure we did.
Q. You just don't have an independent recollection of that?
A. Maybe on my day off. I don't know. We could probably string the pictures together, if he had ever been arrested. I don't know. I am not



sure.
Can I ask you a favor? Can I take a break?
Q. Sure.
(Recess taken)
MS. GIZZI: Back on the record.
Q. (By Ms. Gizzi) So I wanted to ask another question about Exhibit 1 in front of you. Generally speaking, would you have read the typed out report that Officer Derosier did before it was submitted?
A. No. Not necessarily.
Q. Would it be something that you were -- were you present while she typed it up, do you remember?
A. No. I'm sure I didn't leave. We always left at the same time. She might have just attached it to the captain's reports.
Q. And directing your attention to about half way down the first paragraph. The sentence: The print on the drier vent was hers. The vent was returned to her and put in place by Officer Cicerchia.
Do you remember Officer Cicerchia being



there?
A. Yeah. Cicerchia.
Q. Do you have -- does this refresh your recollection about you putting in the vent versus him?
A. Well, I know I put the window back in. I thought the vent was just hanging there. But he might have come after. I don't remember him being there. And he ran it for fingerprints.
Q. And earlier you mentioned collecting some evidence at the scene for Emily Lichwala at her house.
Was this something that you did with gloves on or no?
A. I don't believe I even touched it. I believe Linda Derosier did it.
Q. Would it have been your practice to do it with gloves?
MR. KENEFICK: Objection.
MS. SAKOWSKI: Objection.
THE WITNESS: I don't remember.
Q. (By Ms. Gizzi) Do you remember if she had gloves on when she collected evidence on this day?

Page 73

A. I don't know.
Q. Was it a practice in the crime prevention bureau to have gloves on when you went to a crime scene?
MR. KENEFICK: Objection.
THE WITNESS: I think every cruiser had gloves in the trunk. But I'm not 100 percent sure and I'm not sure about that day. I don't remember.
Q. (By Ms. Gizzi) Do you remember being any instruction or training in the academy or subsequently in the department about evidence collection?
A. I know we probably had a class, but I don't remember what was said there, if anything. It was a long time ago.
Q. Was it a typical part of your job, in the morals unit of the crime prevention bureau, to collect evidence yourself?
MR. KENEFICK: Objection.
THE WITNESS: Myself? No. It could have been anybody but, in this case, I assume it would have been a policewoman.
Q. (By Ms. Gizzi) And I know that you

Page 74

mentioned earlier that you didn't remember the name John Mezzetti coming up?
A. Yeah. It rings no bell at all.
Q. Do you have any independent recollection of going to speak with Mr. Mezzetti's sister on that day?
A. I really don't even remember that. But it was right around the corner so I'm sure we must have.
Q. And do you have any recollection of follow-up investigation that you were involve in regarding this sexual assault of Emily Lichwala?
A. Follow up in which way?
Q. Whether it was trying to contact Mr. Mezzetti.
A. I know that I didn't try to contact him. I don't even know if they had a way to contact him. I thought you'd said he lived in Worcester or something.
Q. Would it have been typical for you to try to contact him, you, yourself, or somebody else in the bureau?
MR. KENEFICK: Objection.
THE WITNESS: Yes. It could have

Page 75

been anybody in the bureau. Even somebody on nights might have picked up on it and tried. Obviously we didn't have the phone number. We didn't have anything. It would have been in the report. Worcester is a big place. It's kind of hard.
Q. (By Ms. Gizzi) Okay. So did you have any other involvement in investigating this sexual assault incident of Emily Lichwala?
A. On this day?
Q. After. I'm sorry. After this day.
A. Yes, I did.
Q. What was that?
A. It was in the beginning of December, around the 10th of 12th, I went to York Street Jail, under the order of Caption John Brown, to collect some blood samples. He gave two -- two or three blood vials. I can't remember exactly. And I was to meet a Terry Aberdale, who was the -- I assume -- the pharmacist or the nurse there, to watch blood being drawn from Mr. Perrot.
Q. So did Captain Brown instruct you to go watch what that blood being collected from Mr. Perrot in relation to the October sexual assault on Emily?

Page 76

A. He never said. He didn't speak to this or anything else. He'd said: You are to go and watch Mr. Aberdale take blood right out of his arm and then you are to return it to the station.
Q. Okay. Did Captain Brown give you any other context when he instructed you to go to the York Street Jail for that purpose?
A. I don't know what you mean by "context".
Q. That's fair.
I mean, did he give you any background information about why you were going to get blood?
A. No. I'll be honest, the way this happened on that particular day was, it was late in the afternoon and everybody goes home at 4 o'clock. And I guess he looked at me said take these vials and go to the jail and meet Mr. Aberdale and watch the blood being drawn.
Q. Was that something that you had done before that date of watching someone's blood get drawn?
A. Years before that, when I was in uniform it happened, yes.
Q. And was it when you are talking about the years before that you were instructed to do that, was

that something similar where you were just there to watch the blood be drawn?
A. It was on an arrest. I was in uniform and it was nothing I remember similar to this. It was for something else.
Q. And, when you went to -- so on that date, December 10th, 1985, to the York Street Jail to collect that blood, did you have anything with you?
A. A couple of vials. There might have been three, but at least two or three vials of the blood to give to Mr. Aberdale.
Q. Okay. What about like did you carry a notepad or a notebook with you?
A. I didn't.
Q. And, at that time, before you went to the York Street Jail, had you met or seen George Perrot before then?
A. Never.
Q. And had you ever seen or -- excuse me. Have you ever heard anybody in the police department talk about George Perrot?
A. Not that I can remember, no.
Q. I'm going to show you another report. This will be Exhibit 2. I'll mark it this time.



(Exhibit RK-2, Springfield Police Department property receipt, marked)
Q. (By Ms. Gizzi) So Officer Kane, have you ever seen this document before?
A. Well, I made it out.
Q. Okay. And could you describe what it is?
A. This one says: One tube of blood taken at York Street Jail, by T. Aberdale, from George Perrot. Charges: Aggravated rape, burglary. One tube.
Q. Did you write this? The handwriting on here, does it belong to you?
A. I wrote this, yes.
Q. All the handwriting on --
A. Except for the property division.
Q. So is the type of property receipt that you would fill out for a piece of evidence?
A. I see that I wrote one tube of blood, but at the bottom I wrote blood samples for John Colcatic [phonetic]. He was the lab.
Q. Yes. And I'm not trying to trick you so I'll give you the other property receipt. I was just trying to be simplistic about it. But there is another one that says to you.



A. Yeah. Okay.
Q. So you weren't losing your mind. Don't worry.
MS. GIZZI: So this will be Exhibit 3.
(Exhibit RK-3, Springfield Police Department, property receipt, marked)
Q. (By Ms. Gizzi) So okay, now that you have both of them in front of you, just for context, and are those property receipts that you would have filled out for evidence in this case?
A. Um-hmm.
Q. Is that a yes?
A. Um-hmm. I'm sorry. I'm still looking at it.
Q. Just let me know when you're done reviewing that.
A. I'm done, yes.
Q. So just a couple of general questions. The number at the top right, either of them, 494097? What does that refer to?
A. The number that was on the pad that I wrote on.
Q. So I guess was it kind of like a checkbook and there was a number for each -- on each



property receipt?
A. Yeah. It looks like these are the back of it.
Q. Do you remember was it on carbon paper?
A. It could be. I really don't remember.
Q. So the Exhibit 3, that I just handed to you, which is the one that says three tubes of blood.
A. Yes, I see it.
Q. On this one, is this also your handwriting all on this side, all on the left side of the exhibit?
A. That, the three is not my handwriting.
Q. Okay. Is any of it your handwriting?
A. Yes. The name George, aggravated rape, robbery, taken at York Street Jail. T. Aberdale.
Q. Did you write the --
A. This phone number, I didn't write that, no.
Q. And do you recognize the handwriting as someone else's?
A. No.
Q. And then, on the other side, under for property division use, that's not your handwriting, correct?

A. No. That would be the officer receiving the property.
Q. Okay. So I know we jumped around. So when, after or during collecting the blood was these property receipts written filled out?
A. By me on 12/10.
Q. So was it after you got back to the station?
A. Yes.
Q. And were they actually physically put on an envelope or on a piece of evidence that has the blood on them?
A. The vials of blood?
Q. Um-hmm.
A. They were put in an envelope and sealed.
Q. With the property receipts?
A. Because this was attached to it.
Q. Okay. I understand.
And so who did you give the evidence to, if you remember, once you got back from York Street Jail?
A. I don't -- let me look at the right for property divisions. I have no clue. I don't remember.



Q. So if this three is not your handwriting?
A. The three only, yeah.
Q. Do you have any idea who's handwriting it is?
A. No.
Q. Did you write just the tubes of blood, or was there a number under the number?
A. No. I would have to assume I wrote three tubes of blood. Because that's what I remember bringing back, two to three tubes.
Q. Okay. You are just saying that you don't recognize the three to be your handwriting?
A. Well, look under the three. It looks like somebody tried to alter.
Q. Okay. And I think you mentioned below, under the remarks section on that same exhibit, is that your handwriting, the blood samples for FBI?
A. No. And I can hardly read it.
Q. I know it's light.
A. Everything I did, to the best of my recollection, there was a fellow by the name of John Colcatic, out of Northern Massachusetts. He was a lab technician that the city had contracted with.
Q. So going back to that other Exhibit No.



2, under the remarks section where it says: Blood samples for John Colcatic. That is your handwriting?
A. Yes.
Q. Did anybody accompany you, any other officer go with you to the York Street Jail to -- let me step back.
So specifically, in regards to that visit to the York Street Jail, could you walk me through, once you got there, what's the first thing you did?
A. I checked it in. They took me to a room. And I sat there for a few minutes until Mr. Aberdale came. And we talked for a while and he'd said that he had to go and get George Perrot and he'd be right back.
Q. And how long were you in the room by yourself before he brought back George Perrot?
A. Not very long, but I can't say.
Q. A couple of minutes, you think?
A. Yeah. It could have been five minutes. It wasn't long. I'm assuming he went to the jail block where he was. I don't know where he was.
Q. Right. Right.
A. I know he came back with George Perrot.
Q. Do you remember -- so this was a Tuesday,



December 10th, 1985.
Do you remember if you had worked the day before, on Monday?
A. I don't.
Q. Do you remember if that was part of your usual tour at that time?
A. If it was part of my usual tour, I would have made something. But I don't remember if I worked or not.
Q. Even more specifically, do you remember if you were working Mondays in December of 1985?
A. I worked many Mondays. I mean, we were on a four and two and, when your weekend showed up, you got two days off if you worked the weekend. I can't tell you.
Q. So you're in the examination room and Terry Aberdale brings George Perrot in, correct?
A. Yes.
Q. What was the first interaction that you had with Mr. Perrot?
A. The first was when I identified myself.
Q. And what did you say?
A. I told him I was a police officer for the City of Springfield. I gave him my name and told him

Page 85

I was a police officer for the City of Springfield.
Q. So were you in plain clothes that day?
A. Yes.
Q. And did Mr. Perrot respond or say anything to that?
A. I don't really remember if he said anything at that point. At that point, if I remember correctly, blood was being drawn from his arm.
Q. Okay. Were you ever, throughout that interaction, were you ever along in the room with George?
A. No.
Q. So when you were in there, George was in there and Mr. Aberdale was in there too?
A. Yes.
Q. What happened after he started taking his blood?
A. Mr. Perrot started talking freely about his girlfriend and how pretty she was. And I think it was shortly after that -- he also said how pretty she was and something to the effect of that he would never rape an old lady. And if you just saw my girlfriend, you would know that. And that's when I Miranda-ized him so he would know who I was.

Page 86

Q. And when you Miranda-ized him, did you have him sign anything like a right's waiver again?
A. I always carried a Miranda card in my wallet all throughout my career. I don't recall if I had him sign it. I know I read it to him so he would get it word for word, to make sure he totally understood his rights, and he'd said he definitely understood his rights.
Q. And about how long were you in the examination room with George before he started talking about his girlfriend.
A. I know he had a little conversation with Terry Aberdale, Mr. Aberdale. I know that Mr. Aberdale told him what he was going to do and who he was going to do it for. And then he started it, so for maybe three or four minutes.
Q. And after he was Miranda-ized, did you ask him any questions?
A. Well, he kept talking about Covel Street. And I did ask him. He'd said, I broke into Covel Street, but I didn't rape any old lady. And so I asked him if he knew where the pocketbook was.
Q. So he's talking about -- just so I understand -- he is talking about his girlfriend and

Page 87

how pretty she is. You Miranda-ize him and then he volunteers information that he broke into Covel Street?
A. Yes. Because he'd said, I'm not a rapist. I have a drug problem. And it was cocaine, he told me.
Q. And was this unprompted by you?
A. Um-hmm.
MS. SAKOWSKI: That's a yes?
THE WITNESS: Yes.
Q. (By Ms. Gizzi) Was it your practice within, you know, your time at the crime prevention bureau, to Miranda-ize somebody when they were, you know, having blood taken for a specific crime?
MR. KENEFICK: Objection.
THE WITNESS: You know, it didn't happen very often. If I thought they needed to know their Miranda warnings, before they said something that could come up and hurt them, I would give them Miranda warnings every time.
Q. (By Ms. Gizzi) And every time you gave them their Miranda warnings, do you generally have them sign a waiver or does it depend on the

Page 88

situation?
MR. KENEFICK: Objection.
THE WITNESS: It depended on the situation. He was so sure he understood he'd said that I definitely understand. I want to talk. And, you know, I think it had more to do with the blood being drawn out of his arm and wanting to just talk while he's ...
Q. (By Ms. Gizzi) And what was the sense -- I guess could you elaborate on that, what do you mean by it had more to do with the blood being taken out of his arm?
A. I can't really. But I was watching the blood coming out of his arm and I'm sure he was uncomfortable. I think he just wanted to just start talking to forget about the blood coming out of his arm.
It was kind of strange, and I was shocked, because I didn't go there to speak with him.
Q. And that was going to be another question that I'd ask.
Did Captain Brown instruct you to ask him about anything during that time?

A. I don't remember. But I would have to think, because the only reason I knew about a missing pocketbook was somebody telling me. And I don't remember. I don't know.
Q. Did you know what Mr. Perrot was accused of when you were going into York Street Jail?
A. Of everything he was accused of?
Q. Yes.
A. To tell you the truth, I didn't even think it. I just went and did what I was told to do and watched the blood for the chain of custody. Where the problem started was when he started taking to me and I felt he needed to know his Miranda warnings.
Q. Just to make sure I understand, were you aware that Mr. Perrot was interrogated a couple of days prior to the blood being drawn?
A. No, I wasn't.
Q. Do you remember talking to any officers in the Springfield Police Department, about George, before he went to York Street Jail?
A. No, I don't.
Q. So I'm going to show you another exhibit. You don't need that any more.



MS. GIZZI: This is Exhibit 4.
(Exhibit RK-4, general report form, marked)
Q. (By Ms. Gizzi) Have you ever seen this before, this document?
A. Yes.
Q. And what is this document?
A. This is a special I wrote to Captain Brown after leaving the York Street Jail.
Q. What does that mean, "a special," in this context?
A. A general report form advising him of what he sent me there to do.
Q. I guess what I want to know is, where does the name "special" come from, that you guys don't call it a general report.
A. A special to Captain John Brown.
Q. Right. But where does that come from?
A. A special report to Captain John Brown. I always --
Q. I've seen it multiple times. That's why I'm asking.
A. It's a special report. It's an arrest report.



Q. It's not just like an ordinary report you wrote after a shift?
A. No. A daily report. I'm sure this went to the chief's office.
Q. I understand.
And just directing your attention to where it says: Reporting officer.
Above that, is that your signature?
A. On the first page?
Q. Yeah. Any of them.
A. Yeah.
Q. Are these like half sheets that you --
A. Yeah. This would be the ...
Q. Right. Okay.
MS. SAKOWSKI: And the witness just folded the paper over in half.
MS. GIZZI: Thank you.
THE WITNESS: In fact, you see it says "chief's copy".
MS. GIZZI: Yes, it does.
Q. (By Ms. Gizzi) So when did you write this report during your shift?
A. Immediately after leaving York Street Jail I went back to the police station. I remember



that it was getting late. And I had a conversation with Tom Kelly and I wrote the report.
Q. Do you remember if you wrote the report before you talked to Tom Kelly or after?
A. I think during. He was going to go out and look and see if he could locate the pocketbook.
Q. Okay. So I want to go through, specifically, the lines just to make sure I understand everything.
The first line, the first half of this page starts with: About 3 p.m. today I went to the York Street Jail with a search warrant waiver signed by George Perrot.
Did I read that correctly?
A. Yes.
Q. I don't know what that word says. "Giving"?
A. Giving me permission.
Q. Giving me permission to have blood samples drawn. Then "I" something.
A. Met.
Q. I met with Terry Aberdale, of the jail medical staff. Perrot was brought up to the examining room at the jail and Abergale took samples

Page 93

of his blood.
Did I read that correctly?
A. Yes.
Q. While this was going on Perrot started talking freely about his girlfriend. And you testified to that previously, correct?
A. Yeah.
Q. How pretty she was and asked me if I had seen him in court with her earlier.
Did you respond when he asked you that?
A. No, I didn't.
Q. Were you at the court hearing that day?
A. No, I wasn't.
Q. At that point I told Perrot who I was. I advised him -- going to the next half of this page -- Miranda warnings. He told me he definitely understood his rights and wanted to talk with me.
I asked him if he understood why the blood samples were being taken, he said to clear him of rape.
Did I read that correctly?
A. Yes.
Q. Did he say anything else of why his blood was being taken?

Page 94

A. Other than to clear him of the rape charge, not at that point.
Q. Did he say anything about clearing him of the rape of who, like about who the victims were?
A. No.
Q. He again stated that he didn't rape any old woman.
Had he said that prior? Had he said that more than once?
A. No. I think, when I told you that, I wrote it in.
Q. I'm just wondering because you wrote: He again stated.
So I was just wondering if he said that multiple times, from your memory?
A. From my memory, no.
Q. And he said: Do you know how good looking my girlfriend is? Why would I do that?
I asked him about Covel Street.
How did you ask him about Covel Street, I guess, what was the question you asked him?
A. Do you know something about Covel Street.
Q. And he'd said?
A. He'd said he broke in. He knew nothing

Page 95

about a rape. I asked him what he did with the pocketbook. He described how he ran up Covel Street. He stated that he threw the pocketbook into some bushes by the last house on the street.
Q. So just to stop right there, were you the one that brought up the pocketbook first, or did he mention that?
A. No. I brought it up.
Q. Okay. And you believe, even though you don't remember, that you must have talked to someone in order to get that information about the pocketbook.
A. Yeah. I don't know where that came from, but somebody had to say something to me that she was missing a pocketbook or something.
Q. Okay. Did you know the woman, who was talking about Covel Street during this interaction, that it was Emily Lichwala from a previous?
A. I don't think Emily's name was ever mentioned to him. Just Covel Street.
Q. Okay. But it wasn't in your knowledge, at the time, that Emily Lichwala was the one whose house was broken into?
A. And raped. Yes, I knew that.

Page 96

Q. Well, again, I'm sorry. To be clear, that her house was broken into on November 30th, 1985?
MS. SAKOWSKI: I'm sorry. Can you repeat that question?
Q. (By Ms. Gizzi) Are you aware that Emily Lichwala's house was broken into on November 30th, 1985?
A. A second time?
Q. Yes.
A. This time I was not, no.
Q. And going back to the document, he'd said the house with the driveway goes up the hill on the right, on the right-hand side in the bush.
He gave you all that detail?
A. Yes.
Q. And how did he describe that he disposed of the pocketbook?
A. I don't remember, but I assume he had thrown it in the bushes when he was running.
Q. Okay. And then it states: When I got back to the PD office, I relayed this information to Sergeant Kelly.
Do you remember how you relayed it to

him; was this in person?
A. Yes.
Q. So he was at the station?
A. Yes.
Q. And did Sergeant Kelly say anything in response?
A. I heard him say that he was going to go look. And I believe he went with Cheryl Claprood, but I'm not 100 percent certain.
Q. Going down to the next line, Perrot seemed to have a very soft spoken voice, just like the victim on Covel Street described in her statement.
Do you know what you're referencing here?
A. I think, in Ms. Lichwala's statement, she stated he had a -- if you went back, I could show you -- a calm voice while all this was going on.
Q. And when you wrote this, though, you didn't know that he was referring to Ms. Lichwala?
A. No. Somewhere I had heard that this was said and I listened to his voice.
Q. Is it possible that Sergeant Kelly told you this information while you were writing it?
MR. KENEFICK: Objection.



MS. SAKOWSKI: Objection.
Q. (By Ms. Gizzi) It's not possible?
A. (Witness shaking head)
Q. (By Ms. Gizzi) Is that a no?
A. Yeah. No. It's a no, yeah.
Q. I just want to make sure.
And this at all your handwriting on the back side of the report?
A. Yes. It's hard to believe, yes.
Q. I'm just trying to understand where you got this information, if you weren't aware of this November 30th break in.
So is it possible that you got it from Sergeant Claprood?
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: I don't believe so, no. Somewhere I knew they were going to be going out there and I thought I was told they were going to try and look for the pocketbook. That's the only reason I can think. I don't think Claprood was a sergeant, at the time, but I'm not sure.
Q. (By Ms. Gizzi) Just to make sure that



I'm understanding, are you saying that it's not possible for Sergeant Kelly to have provided you with that information, that we just discussed, or are you saying that you just don't know one way or the other?
A. No. He told me that it wouldn't be in this the report. I would never accept that somebody else told me, after I left the jail and went to the police station to make out a report, that would be filing a false report. And he did not say that to me.
Q. So going into the York Street Jail, you did not know that Emily Lichwala was a victim of a second break in on November 30th but, when you're writing your report, you do know that.
So how did you get that information?
MS. SAKOWSKI: Objection. You can answer, if you can.
THE WITNESS: I don't know. I think, in the initial investigation of Ms. Lachwala's rape, with Derosier, somehow the type of voice that this man had -- and, if you go back in the reports, I think you will see, he was very -- I don't know if it was soft or nice talking but, in other



words, he was not rough talking or -- voice-wise.
Q. (By Ms. Gizzi) So you're basing that off of what was, you know, you learned through that -- from that first assault of Emily?
A. Yes. Exactly.
Q. Okay. Understood.
And just for completeness, this last sentence, I believe, says: Perrot also stated he has a --
A. Coke problem. Coke.
Q. What does that word say? A small drug problem. I think it must say a small drug problem.
A. Yeah. He breaks into homes. And the drug, I asked him, was coke.
Q. Okay. Was this also -- did he also offer that information unprompted or did you have to ask him?
A. I had to ask him.
About the coke.
Q. Yes.
A. I knew he had a drug problem, yeah.
Q. Well, did he volunteer that he had a drug problem?

Page 101

A. Oh, yeah.
Q. And you didn't ask him why he was breaking into homes?
A. No. If he did, I'd have said it in there. He'd stated that he had a small drug problem and that's why he breaks into homes. And he mentioned cocaine and I just put it in parentheses, coke.
Q. Okay. At this point was his blood still being drawn in that exam room when he was talking about the drug problem?
A. This whole time, after all the blood was drawn, he took him right back to his cellblock. So, that would have been when his blood was being drawn. And I left.
Q. And after you left the York Street Jail, do you remember approximately what time you got back to the station?
A. No. I just know the nightshift was on so that would have been five to one in the morning.
Q. So it was after your shift had ended technically?
A. (Witness nodding head)
Q. Is that a yes?

Page 102

A. Yes.
Q. I understand? It's easy to do.
So is there anything, after reading through that, that you remember differently now or that you would add from that interaction with George?
A. No. That's it.
Q. And it's addressed to Captain Brown, right?
A. (Witness nodding head)
Q. Is that a yes?
A. Yes.
Q. And did you, personally, hand it to him, or does it go in a mailbox?
A. If I remember correctly, he had a slot in his door. And his office was right in the crime prevention bureau for him to read in the morning.
Q. And did Sergeant Kelly tell you anything else about what he was going to do as far as going to look for this pocketbook?
A. I know he was going to go look for the pocketbook but that's all he said. I am pretty sure he went with Cheryl Claprood. I'm just telling you what I am trying to remember. It was a long time ago. I'm pretty sure she was involved with him

Page 103

searching.
Q. Do you remember if, back in October, when you had gone to Emily Lachwala's house after that initial break in and rape, do you remember if you noted any property of hers missing or stolen?
A. Not that I can remember.
Q. So nothing --
A. Her pocketbook maybe. I don't remember.
Q. Okay. That is fair.
I'm going to show you another document.
MS. GIZZI: Can we go off the record?
(Off record)
MS. GIZZI: Back on the record.
(Exhibit RK-5, transcript, marked)
Q. (By Ms. Gizzi) I just handed Counsel, and the witness, Exhibit 5. We'll go through it specifically. But was this one of the documents that you reviewed, just looking at it briefly, before your deposition? I know it's not the whole thing.
A. Yeah. Briefly, yeah.
Q. Do you remember testifying at a court hearing in December of 1987?
A. It wasn't a trial. It was a hearing, yes.

Page 104

Q. Right. Correct. But you do have a memory of that?
A. I was at the courthouse on something else, yes.
Q. So directing your attention to Page 65 on the top where it's Bates stamped City 003626.
So what I want to ask you about starts on Line 10.
The attorney asks you: Did you have instructions to be present when the blood was drawn? You answered, yes, sir. Captain Brown told me to take this search warrant waiver, signed by Mr. Perrot, to the jail, meet Mr. Aberdale, and pick up blood samples that Mr. Aberdale would draw from Mr. Perrot in my presence.
A. Right.
Q. And do you remember testifying to that effect?
A. Yes.
Q. I know we talked about this little bit earlier, but did you have anything else besides the search warrant waiver with you and the vials, that you remember?
A. Here?

Q. I'm sorry. When you went to the York Street Jail.
A. Yeah. I had a waiver, that I called a search warrant waiver, but it was a waiver that gave us the right to speak with him. And I had three vials, I believe, two to three vials, but I believe it was three.
Q. And were you instructed by Captain Brown to have all three of those vials filled with blood?
A. You know what, he told me to give the vials to Mr. Aberdale, so that's what I did.
Q. And the waiver that Mr. Perrot signed, was it was already signed by Mr. Perrot, or were you getting it signed there?
A. No. It was already signed.
Q. Okay. Moving on to Page 67, City 003628. About the middle of the page down the attorney asked you: Did you notify Mr. Perrot's attorney that you intended to go to York Street with that consent form to have his blood taken? You answered: No, sir. I was told that his attorney agreed and that's why the consent form was drawn up. I didn't notify his attorney, no, not myself.
Do you remember testifying to that



effect?
A. Yep.
Q. Who informed you that his attorney agreed?
A. I don't remember. I would have to say Captain Brown, but I don't really remember.
Q. I know that you said it wasn't all that uncommon for you to go watch a suspect have blood drawn. But, in other instances where you did, was there an attorney present?
A. In other instances?
Q. Yes. Other than this with George Perrot.
A. Yeah. I don't think, but I don't remember.
Q. Do you know if it was department policy to make sure the attorney agreed or was notified if their client's blood was being drawn?
MR. KENEFICK: Objection.
THE WITNESS: Yeah. That's above my -- I don't know.
Q. (By Ms. Gizzi) Is it that you do not remember or you just don't know if that was a practice?
MR. KENEFICK: Objection.



THE WITNESS: I don't know.
Q. (By Ms. Gizzi) Okay. Next page, 68, you said earlier that -- I'm sorry. Halfway down Line 8, 9, yourself and Mr. Aberdale were present in the room; is that correct?
A. Yes.
Q. And were you ever alone in the room with Mr. Aberdale?
A. Are you asking me that now?
Q. Yes. I'm sorry.
A. I think in the very beginning, and then he went to get Mr. Perrot.
Q. Did you have any conversations with Mr. Aberdale about the process of blood being drawn or George or anything?
A. No.
Q. Had you known Mr. Aberdale before that interaction?
A. I knew him, yes.
Q. And in what capacity did you know him?
A. When I was in high school, he was a pharmacist at a drug store that I worked for part time after school.
Q. So would you say that was in a



professional capacity that you knew him?
A. Well, I made sodas at a soda fountain and ice cream sundaes. If you want to call that professional, yes.
Q. Yes. I would say that's professional for high school.
So Page 70 now, you testified, starting at the top, Mr. Perrot started talking freely. And earlier we talked about that he started talking about his girlfriend; is that correct?
A. Yes.
Q. Did he mention who his girlfriend was, like by name?
A. No.
Q. Was he talking about his girlfriend -- when he was talking about his girlfriend, were you responding?
A. I don't think so. He was asking me if I had seen his girlfriend, if that's what you're asking, and I had not see his girlfriend.
Q. And you responded and said no then, when he asked you that?
A. I don't think I even answered. I wasn't sure what he was talking about where I would see his

Page 109

girlfriend. I thought, to be honest, when you read this, I thought he meant in the jail waiting to visit him or something, that I'd passed this pretty girl. But he meant something different.
Q. Were you confused about what he was talking about when you were sitting there?
A. Yeah.
Q. And, at that point, you had already identified yourself as a police officer, correct?
A. That's when I started giving him his Miranda warnings because I know he didn't know who I was.
Q. Right. Okay. Now, directing your attention to Page 73, Line 5 going over -- in response to the attorney asking: And you gave him his Miranda rights, correct?
Yes, sir. When he was speaking freely, I figured I'd better let him know who I am at that point. So I stopped him, told him who I was, took the card out of my pocket and read him his Miranda warnings. I just wanted him to be sure he knew who I was.
A. Right.
Q. Do you remember at what point you had

Page 110

stopped him, informed him, and read him his Miranda rights?
A. No. I think it was right after the girlfriend. I don't remember exactly. But I knew, when he was blabbing away, that he should know who I was.
Q. And he didn't say anything at that point about Covel Street and any break-ins, though? Before you stopped him, I mean.
A. No, he didn't.
Q. And then on the same page, further down, starting on Line 18, the attorney asked him: After you gave him his Miranda rights you asked him some questions, correct? And you stated: I believe I did, yes.
At what point were you going to ask him questions? Like if that wasn't your purpose going there, why did you decide to?
A. Well, because I had Miranda-ized him, and he was talking freely, and he was admitting to the break-in on Covel Street, so I asked him about the pocketbook.
Q. So before you asked him any questions, he admitted to this break-in on Covel Street?

Page 111

A. Yeah. That he didn't rape any old woman and he talked about his girlfriend, yeah.
Q. And in that same part of the conversation he'd volunteered that he had broken into Covel Street?
A. Yeah.
Q. Was that something that Captain Brown, or another officer, suggested that you do, ask him about Covel Street or get information from him?
A. That I don't remember clearly. I mean, I knew about Covel Street.
Q. Right. And when you say you knew about Covel Street, obviously you were part of the investigation based on that report from October of Emily?
A. Yes.
Q. Was that what you were asking about, that incident, if you know?
A. That's all I was talking about, at that point, was Covel Street.
Q. At Covel Street in October?
A. In October.
Q. Okay. And the next page, Page 74, the attorney asks: What was his response? And you

Page 112

testified: He told me a location on Covel Street, of a house at the end of the street, where the driveway goes up a hill, by Hilltop Street, where he placed the woman from Covel Street pocketbook in the bushes. And I believe it was on the right-hand side of the house.
Do you remember testifying to that?
A. Yes.
Q. Did he say this almost verbatim, like did he say this the way that you're testifying to it?
A. Well, I didn't have my notes with me. Again, I was at court for something else. And I'd been brought into this and that's the way I remembered, yes.
Q. Did he say anything else about this pocketbook in that conversation at the jail?
A. Other than what I've already told you about the coke problem --
Q. Right. Other than that.
A. -- and that he doesn't rape victims. He doesn't rape women. He has this beautiful girlfriend and he doesn't have to rape women.
He had a coke problem. That's why he broke into homes.

Page 113

Q. Did he say that he took anything from the pocketbook, or did you ask?
A. I don't think I really even asked.
Q. I don't understand why wouldn't you ask if he took something out of the pocketbook?
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: I didn't ask it. I don't know why I didn't. If I could remember 30 something years ago, I could probably give you an answer.
But I have no clue why I didn't ask him. Again, I was there to get blood.
Q. (By Ms. Gizzi) Okay. So you weren't approaching it in the same way you would approach it in an interrogation?
A. I wasn't trying to interrogate him at all.
Q. And I think I know the answer to this but, to be clear, you didn't take any notes, when you were at the York Street Jail, in this conversation with George?
A. No, I didn't. You mean written notes?
Q. Yes.

Page 114

A. No.
Q. It was only when you got back to the station, right?
A. Yes. Eight to ten minutes, probably, back to the station.
Q. Okay. You can put this aside with that one.
After you told Sergeant Kelly about the location of the pocketbook, did you ever follow up with him about what he found, if anything?
A. I think the next day, when he came in and I was leaving, he told me he had found the pocketbook. I'm not exactly sure that's how it happened. He did tell me, at some point. I believe it was at the change of shifts. Because after I wrote that report I went home.
Q. Right. Because you already had overtime by that point?
A. Yeah. Overtime of nothing.
Q. Fair. Technically, overtime then?
A. Technically. Nothing in the pocket, though.
Q. Did you ever learn of the outcome of what George's invest -- the investigation into the Emily

Page 115

Lachwala sexual assault?
A. I'm sorry. Can you repeat that?
Q. Did you ever learn the outcome of the investigation into Emily Lachwala's -- the sexual assault in October and the break in from November?
A. Yeah. I know he had gone to jail.
Q. And by "he," you mean George Perrot?
A. Yes.
Q. Did you ever testify, besides in this motion hearing, in regards to the George Perrot cases?
A. No.
Q. So you never testified at trials?
A. No.
Q. Did you ever -- were you ever involved in investigating alternate suspects into the sexual assault of Emily Lichwala?
A. Not that I can remember. I know we had -- as I 'd stated earlier, and they are in the reports, their names -- but I don't even remember going to that house, but I must have.
Q. Beyond what's in that report, that Officer Derosier typed up from that October date, would there be a paper trail, or any type of other

Page 116

report, if other steps were taken to investigate John Roseti?
MR. KENEFICK: Objection.
THE WITNESS: I have no clue.
Q. (By Ms. Gizzi) And I think I can ask that a better way.
If anything had been done to further investigate the suspect of the October sexual assault of Emily Lichwala, would that have been documented?
MR. KENEFICK: Objection.
THE WITNESS: All I can say is I don't know. But I'm sure, if there were something, it would have been documented, but I don't know.
Q. (By Ms. Gizzi) I'm asking, I guess, would you have documented it if you were the officer?
A. Oh, sure. Yes.
And you testified earlier that you left the Springfield Police Department in 1991, correct?
A. Yes.
Q. And what were the circumstances that you left the Springfield Police Department?
A. I was offered a position, in a business that I had wanted to get involved with, by my

brother. And I had done it for a few months before leaving and thought that this is what I wanted to do for the rest of my career. I resigned. I tried to get a leave of absence to try this out for a month, and I was denied, so I resigned.
Q. Did you ever work at any other law enforcement agency besides Springfield?
A. No. Not at all.
Q. And when you left in -- excuse me -- before you left 1991, were you aware of George Perrot's original conviction being overturned?
A. I had heard somewhere that it was overturned and he had a second trial.
Q. Yes. Do you remember who you heard that for?
A. No.
Q. Do you remember learning the outcome of his first trial?
A. I kind of do, but I wasn't there.
Q. Okay. That was going to be my next question.
Did you ever attend, even though you didn't testify, ever attend any of his trials?
A. No.



Q. After the December 10th York Street Jail interaction, did you ever see George Perrot again, if you remember?
A. No. There was an evidentiary hearing. I might have seen him there.
Q. Okay. Fair. Yes.
Besides those two, he would have been in court than as well. Okay. Good point.
A. Yes.
Q. But besides those two, you don't ever remember seeing him, right?
A. No. Not that I remember.
Q. I'm going to hand you one last document.
(Exhibit RK-6, Answers to Plaintiff's Interrogatories, marked)
Q. (By Ms. Gizzi) So I'll go over a few specifically but first, just looking at it, have you ever seen this document before?
A. Yes.
Q. And what do you recognize it to be?
A. My answers.
Q. So it says: Plaintiff's interrogatories; is that fair?
A. Right.



Q. Flipping to Page 10, the second to the last page.
A. Page what, ten?
Q. Yes. Is that your signature on that page, the top of the page?
A. That is, yes.
Q. Did you review this document before signing it? And you can take your time.
A. I reviewed it, but is it the same?
Q. You can check. I'm not trying to trick you?
A. (Witness reviewing document)
Q. Have you read it? Have you looked at that?
A. Yes.
Q. Have you seen this document before?
A. Yes.
Q. And you saw the main part of the text before you signed it on the last page?
A. Yes, I did.
Q. So directing your attention to Page 4, I'm going to ask you something specific about your answer.
So the bolded text, it looks like your



answer. And directing your attention to probably the 4th paragraph. It starts with: Most likely I spoke to Officer Marianne Popko, regarding the break-in at Emily Lachwala's home, as she worked in the same division as I did.
Do you see that?
A. Um-hmm.
Q. Do you remember if you spoke with Officer Popko about the break-in that you and Officer Derosier were investigating in October?
A. I really don't, but she worked in the same squad. You know, I knew the two of them were talking. They handled the rape cases so I may have said something to her, but I don't remember.
Q. I think that answers my next question, which is: Do you remember what you spoke with Officer Popko about, about this break-in?
A. Not really, no.
Q. Do you remember if she was at the station when you returned on December 10th, after returning from York Street Jail?
A. Who.
Q. Officer Popko. I'm sorry.
A. No. If she was working that day, she

Page 121

would have gone home.
Q. And then the next day paragraph states: I spoke to Emily Lachwala about the fact that her home had been broken into and the fact that she had been raped:
Which brings me to my question: Did you speak to Emily Lichwala after September 10th, 1985?
A. I never spoke with her after December 10th, no.
Q. Okay. So you weren't involved in like returning her pocketbook or anything to her?
A. No.
Q. So when you spoke to Emily, about the fact you know her home had been broken into, this was all prior to December 10th, 1985?
A. Yes.
Q. And then the next to the last line is: I spoke to ADA Francis Bloom during the court hearing on December 7th, 1987.
Do you remember what that conversation with ADA Bloom was?
A. No.
Q. Was it about -- well, do you remember if it was about the break-in of Emily Lichwala?

Page 122

A. I assumed it was but ...
Q. Were you ever involved in invest -- or were you involved in investigating other sexual assaults that were occurring in 1985 on elderly women?
A. I don't know. If you gave me names, I could tell you.
Q. Okay. That works. Like Mary Greka?
A. No.
Q. Do you know who, from your division was, from the crime prevention bureau, who was responsible or involved in investigating her rapes?
A. I'm not 100 percent sure. But if I was a guessing person, the detective bureau and probably Cheryl Claprood. And maybe Marianne Popko. I can't be sure of that.
Q. Okay. Is there a reason that you know that the detective bureau would have been involved in Mary Popko's investigation as opposed to Emily Lachwala's?
A. Well, I think at the time they probably responded. And, in the other incidents where I was involved, she had been taken to the hospital and we took over when we got in at 8 o'clock in the morning.

Page 123

Q. Okay. And directing your attention to the next page, which is Page 5 and also Question 5, is it your position that George Perrot committed the rape of MG, which is Mary Greka. I know you'd said you didn't have involvement in that --
MR. KENEFICK: Objection.
Q. (By Ms. Gizzi) -- in your interrogatory.
Did you have a position on whether Mr. Perrot was involved in Emily Lachwala's actual rape?
MR. KENEFICK: Objection.
THE WITNESS: Just on the rape, is that what you're saying?
MS. GIZZI: Yes. The one that you were involved in.
THE WITNESS: I didn't form an opinion on the rape, no.
Q. (By Ms. Gizzi) So you didn't have a position or an opinion on who was the assailant of Emily Lichwala at all?
A. In the housebreak I had formed an opinion because he told me.
Q. Right. Fair. But of the previous break-in and rape of Emily Lichwala.

Page 124

A. That's the one that I'm talking about, the one where she was raped.
Q. Okay. So this is, I think, where the confusion is. I'll just represent to you, and Counsel can correct me if I misrepresent something. But Emily Lichwala was assaulted. Her house was broken into in October of 1985 and that was when she was sexually assaulted. Then her house was broken into again in November of 1985 but she was not sexually assaulted at that time?
A. Correct.
Q. So you're involvement was with that October one, right?
A. The earlier one, correct.
Q. So when you were talking to George, you were asking him about that October one?
A. Yeah. I really didn't know there was a second break-in at that house. If that is what you're asking, I had no clue.
Q. So then that would mean that you never talked to Ms. Lichwala about that second break-in?
A. No.
Q. And do you remember if you talked to anybody in the police department about that second

break-in?
A. I know didn't I didn't talk to anybody. I had no idea there was a second break-in.
Q. Okay. You can put that one aside. I have a couple of more questions for you.
So I know you were obviously working on the 10th, based on the documents of December 10th, 1985, when you went to York Street Jail?
A. Correct.
Q. Do you remember if you were working December 7th, the day George Perrot was brought in and arrested?
A. I have no idea. I know I didn't arrest him, if that's what you are asking.
Q. No. No. I understood that.
But did you have any memory of seeing him, in passing, at the station?
A. No, I didn't. Do you know what time he was arrested?
Q. Yes. Early morning.
A. No. I never saw him. That was probably before I even came to work.
Q. Right. And he was at the station for several hours during the day on the 7th, so that's



why I was asking, as well, about if you had seen him in passing around the station.
A. I wouldn't have known him even if I saw him.
Q. Right. That's fair. But when you saw him on the 10th, you didn't have any recollection of seeing him a few days earlier?
A. Never.
Q. Okay. And we talked a little bit about Sergeant Kelly. You'd said you had graduated the academy with him, correct?
A. Yes.
Q. How would you describe your relationship during the period that you were an officer at the Springfield Police Department; were you colleagues; did you ever socialize?
A. I didn't socialize with him, no.
Q. What was your opinion of Sergeant Kelly as a police officer?
A. I never formed an opinion. I would assume he was fairly smart. He was promoted to sergeant and then to lieutenant. We shared a desk and he was always polite to me. He had a good sense of humor. When I left my lunch overnight, I opened



the drawer the next day and it stunk. So that was the kind of relationship that I had with him.
Q. So just a professional relationship?
A. Yes.
Q. At any point did Sergeant Kelly become your supervisor?
A. No.
Q. And I think earlier you mentioned that he didn't -- that you didn't work directly alongside him on any cases; is that correct?
A. Not that I can remember. No, I never worked with him.
Q. Did you ever hear about other officers who worked with him, like did he have a reputation in the police department?
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: I guess we all have reputations, of some sort, in the police department. I don't know anything different that I can say to you. I don't.
Q. (By Ms. Gizzi) And that's fair, and I understand it might be just through the grapevine. But did he have -- like were you ever aware of a



reputation of Sergeant Kelly and what was it?
MR. KENEFICK: Objection.
MS. SAKOWSKI: Objection.
THE WITNESS: I wasn't -- I was very friendly with him, as far as sitting at the same desk, sharing a desk. But I never worked with him or never was involved with any interrogations with him. We always seemed to have different assignments.
Q. (By Ms. Gizzi) When you entered, you know, the police academy back in '74, what was your goal as a police officer? Did you have goals? Did you want to become a sergeant or anything like that?
A. No. My goal was I wanted to be a uniformed police officer.
Q. Okay. Nothing beyond that?
A. Nope. I was single and I just wanted to see if I could do some good.
Q. In the Springfield Police Department, in the time that you were an officer there, do you know what the process was for becoming a sergeant?
A. Yeah. There were a set of books that you'd have to read. I don't know how many. I'd have to guess. And I started going to Springfield

Page 129

Technical Community College for police courses but I never finished and I went on my way in '91?
Q. When did you start the courses at Springfield Technical?
A. I don't know. It was off and on. I was in the crime prevention bureau and it was hard in the beginning because of court time and not being able to make these courses. So I stopped for a while and then I went back. And I was only a couple of courses away and I decided I wasn't going to be bothered with reading the books and studying.
Q. Did you have to do those, or do you know if you -- if an officer had to go through those course in order to get a higher rank?
MR. KENEFICK: Objection.
THE WITNESS: No. You would take a written test, which I did take once, without reading any books and going to school. And, you know, I read the books and I was enjoying what I was doing.
Q. (By Ms. Gizzi) Okay. And do you remember what year Sergeant Kelly became sergeant?
A. I don't.
Q. Do you remember if it was before George

Page 130

Perrot's case came to you?
A. He must have been a sergeant because I think, in the report, I addressed him as Sergeant Kelly.
Q. Okay. Do you know when Sergeant Kelly -- I'm sorry. You said that earlier, because you were in the academy together.
A. There you go.
Q. And you'd said that because you were in the academy. You both started in the police department in 1974, right?
A. The same class, yes, 50 people.
Q. Did you know everyone in your class?
A. (Witness nodding head)
Q. Was there any other officers, that you worked with in the morals unit, that graduated the academy with you?
A. No.
MS. GIZZI: I think that's all the questions I have. But first I want to take a break to go over my notes and we may be done. So five minutes.
(Recess taken)
MS. GIZZI: Back on the record.

Page 131

Q. (By Ms. Gizzi) Officer Kane, I just have a couple more follow-up questions for you. And I put those documents, Exhibit 1 -- and I don't remember what this one was.
A. Four.
Q. Four. Thank you. Okay. First let's start with this chronological. Going back to that October 1985 report by Officer Derosier.
Would you say that your memory of the events in 1985 was better than your memory now, today, about those events?
A. Yeah. Better today you mean?
Q. No. Was it better in 1985?
A. I remember this pretty but I'm sure I can't remember everything. But yeah, I remember it pretty well because the condition of the victim, yes.
Q. So particularly with Emily Lichwala, in October of 1985, you feel like you have a strong memory of that incident because of her condition?
A. This, in particular, I kind of remember. But I don't have the same memory of this.
MS. SAKOWSKI: And the witness is referring to Exhibit 1.
MS. GIZZI: Thank you.

Page 132

Q. (By Ms. Gizzi) And you mentioned earlier that you did not have any recollection of the witness talking about a potential suspect, John Mezzetti?
A. Yeah.
Q. And just to make sure I am correct, in looking at this first paragraph and, you know, if you need to relook at it, but there is nothing in here about the suspect's voice other than the statement about John Mezzetti, correct?
A. (Witness reviewing document)
Yep. Correct.
Q. Do you have any independent memory of Ms. Lichwala describing the assailant's voice?
A. I had picked up from somewhere that he was soft spoken, but I'm not sure from who.
Q. And I'm assuming then, you don't remember when you learned this information about the offender being soft spoken?
A. No. I'm not sure when.
Q. Okay. You were not in the room for part of the conversation where Emily Lichwala was giving a statement to Officer Derosier, right?
A. Right. They would have had a private room at the crime prevention unit.

Q. And did Officer Derosier debrief you after her conversation with Emily Lichwala?
A. She could have. I mean, we had to drive her to her home. Yeah. I mean, she probably did have a conversation with me. I don't remember.
Q. So you don't remember -- I guess I want to make sure.
You don't remember having a conversation or you do not remember the contents of the conversation?
A. No, I don't remember the contents.
Q. So going back to Exhibit 4, which was your handwritten special to Captain Brown after your York Street visit with George Perrot.
When you wrote this statement, in 1985, was your memory better as to the events of your interaction with George than it is today?
A. Better than?
Q. Yes.
A. Well, I probably wrote this ten minutes after leaving the jail.
Q. I know it's a silly question, but I just wanted to make sure your memory was better than when you wrote it?



A. Oh, absolutely.
Q. That would make sense unless you had some super power that I didn't know existed.
Specifically in the second part of that document, Page 2 of 3, you mentioned that you -- about middle way through the statement that starts with: I asked him about Covel Street.
A. Okay.
Q. How did you know to ask him about Covel Street?
A. The only reason I knew was that was the only thing I was really involved with in regards to George Perrot. Any of the other assaults and rapes and break-ins, this was the one. So I assume I was sent there by Captain Brown regarding Covel Street.
Q. Okay. So is it possible that any of your supervisors told you to ask him about that?
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: Told them about?
MS. GIZZI: Covel Street.
THE WITNESS: I really don't remember if anybody told me.
Q. (By Ms. Gizzi) And I'm just asking if it



is possible that any of your superiors told you that?
MS. SAKOWSKI: Objection. You can answer.
THE WITNESS: I don't know. But I can tell you I'm the only one -- this is the only one I was really involved with, and I heard it somewhere.
Q. (By Ms. Gizzi) And do you remember, you know, you wrote that you asked him about Covel Street. Did you provide him any more information about what you were asking about Covel Street?
MS. SAKOWSKI: I'm sorry. Can you repeat that question?
Q. (By Ms. Gizzi) When you asked him about Covel Street, did you provide him with any more context on what you were asking him about?
A. Well, no. Because he had already told me. I believe that is what you are asking me, if he had broke into Covel Street, but he didn't rape any old lady.
Q. Okay. So that's where I'm confused. It says, a couple of lines up, right, it says --
A. Where?
Q. I'm sorry. Right above, "I asked him".



So like three lines up it starts with the sentence: He again stated that he didn't rape any old woman. He'd said about how good looking my girlfriend is.
Is you can point it out to me, that would be great, in the statement, but it doesn't say anything about he broke into a house on Covel Street until you asked him I guess.
A. Well, that could be true, until I asked him he might not have said it, but I'm not sure. Somewhere he told me he broke into Covel Street and he didn't rape any old lady and he had a coke habit.
Q. Did he say what house on Covel Street that he allegedly broke into?
A. I don't remember if he gave me the house number.
Q. And what about the date, did you provide him a date of -- or did did he provide a date of when he allegedly broke into Covel Street?
A. I asked him to provide a date, I believe.
Q. Because at this point you didn't know that there was two separate instances?
A. There was a second incident; is that what you're saying?
Q. Right.

Page 137

A. I didn't know anything about the second one.
Q. Right. So, in your mind, you were asking him about October?
A. Yes.
Q. I understand. And do you remember if he provided other information about his alleged break-in of Covel Street, like if he knew who lived there?
A. No.
Q. Okay. And you also mentioned, I think I asked you this earlier, but I want to confirm, that you didn't ask him what he did with the pocketbook, he just volunteered that information?
A. I think I asked him what he did with the pocketbook.
Q. Oh, I see. I apologize. But you didn't ask him if he took anything from the pocketbook?
A. I don't believe I asked him if he took anything. And I really didn't know if anything was taken. I didn't ask him.
Q. Right. So did you ever like see, whether it was in evidence, or at the scene in October, Emily Lichwala's Pocketbook.

Page 138

A. I never saw her pocketbook.
Q. Okay. One more exhibit, I promise. This is will be Exhibit No. 7.
(Exhibit RK-7, general report form, marked)
Q. (By Ms. Gizzi) Okay. So have you seen this document before?
A. Yes.
Q. Is this a document that you authored?
A. That I wrote?
Q. Yes.
A. Yes.
Q. Is that your signature below the reporting officer?
A. Yes.
Q. And it looks like the date was September 6th, 1991. Is that what your memory is of writing this report?
A. Yeah, it must be.
Q. So would you just take a moment and read the text of this starting with "this is to inform"? Out loud.
A. This is to inform you that I will be resigning my position from the police department

Page 139

effective on 9/14/91. I regret to do this at this time in my career but due to my circumstances and the strict adherence of the police commissioner to the rules and regulations regarding my requested leave of absence, I'm left with no other alternative.
At a time when police officers are leaving the job at an alarming rate, and crime is on the increase and there is a shortage of funds to hire new officers you would think the civilian commissioners, that determine our fate, take a look at this policy that they have adopted.
Q. Okay. So what is the policy that you were referring to, in this statement, about?
A. Leave of absence.
Q. And was that what you were describing earlier about when you requested to leave to pursue this business?
A. I originally requested time off and, in my mind I wanted, like if I did get a month, to make a decision. Because I know they have done it for other officers in the police department. Several. More than a couple. Several.
Q. Do you know what other officers that were extended this leave of absence that you with want?

Page 140

A. Yeah. Retired Police Chief Tom Fitzgerald. And I can tell you he took a temporary position as a federal -- in the federal -- some kind of federal probation department. Federal probation. An officer who ended up being commissioner, Paula Meara, took a leave of absence to join the FBI and flunked out of the academy and they took her back under the fact that she'd asked for leave.
There are more but I can't really tell you. But I know they were doing it and I figured that I would try to do this instead of leave and just walk away.
Q. At the time, you know, when you made this decision to resign, did you feel like the policy was, you know, being unfairly applied to you versus other officers?
MR. KENEFICK: Objection.
THE WITNESS: Obviously.
Q. (By Ms. Gizzi) Okay. That's fair. Would you say that looking back at that time in 1991, you know, the circumstances in which you left the department you were, you know, not happy with the department and the reasons that you had to leave?
A. No. And I have to be very honest with

you. I had the best job in the Springfield Police Department. I had lots of time off. I love my job. But I also loved another job and it became part of, should I stay or should I leave? I just decided to leave.
Q. So if they would have extended you the leave of absence, for a month, would you have not resigned?
A. Not at that at this time. I would have used that month to try out what over people had a chance to try and make a more informed decision.
Q. Understood. And did that -- the business opportunity, that you described earlier, did you end up doing that, you know, post your Springfield law enforcement career?
A. Do you mean, are you asking am I still doing that job?
Q. Well just, I guess, did you end up actually pursing that after you left the department?
A. Yes. In fact, I'm still doing it.
Q. What type of business is that?
A. It is a small real estate appraisal company.
Q. Since leaving the Springfield Police



Department, have you done any type of private investigative work or security work or anything?
A. (Witness shaking head)
Q. No? And wrapping up here, I know you said you shared a desk with Sergeant Kelly while you were in the Springfield Police Department?
A. Yeah. In the crime prevention bureau, yeah.
Q. Did you ever discuss your cases with him or vice versa?
A. No. I think I've already said this, but we were kind of assigned to different things. We never worked together. We never did the same things together. I might have been working one night because they were short in the organized crime, or the drug unit, and he might have been working. You know what I mean? But we actually never rode together on a shift.
Q. Right. Right. But were there instances where you were both at your desk in the station?
A. Yeah, I'm sure. Especially at the beginning of the shifts.
Q. And that's, I guess, it's in that context that I'm asking. Even though you didn't work direct



with him, if you guys ever talked about your cases individually, or his cases, or what you were working on?
A. No. I don't remember. It seemed like we always had something to do. We never discussed what we were doing. It just seemed like we were in the bureau in different directions.
Q. No problem. Did you ever have a conversation with Thomas Kelly about George Perrot?
A. To the best of my knowledge, no.
Q. Did you keep in contact with Tom Kelly after you left the department?
A. No. I went to his funeral, but he didn't answer.
Q. That was going to be next question, if you had went to the funeral.
Well, did you keep in contact, after you left the department, with any of the police officers that you worked with?
A. When you say "contact," did I talk or go out and have drinks with?
Q. Yes. Call, check in, or stop by?
A. I know I had a couple of conversations with William Fitchet just about different things.



Not police work. No, not really.
I worked a lot with a fellow named Donald Greer on the drug unit on nights in the crime prevention bureau. And, when he retired, because he got sick, I've never seen him again and that's probably more than 38 years.
Q. Okay. I think that's all the questions I have, but I can't speak for the other attorneys.
MS. SAKOWSKI: Nothing.
MR. KENEFICK: Nothing for me.
MR. JOYCE: I don't have anything.
(Directed to the parties on Zoom)
Do you guys have anything?
MS. GIZZI: They left.

(Deposition concluded at 5:33 p.m.)

Page 145

I, SHARON WASKIEWICZ, Notary Public, do hereby certify that RICHARD KANE appeared before me and satisfactorily identified himself on the 8th day of June, 2023, at the LAW OFFICE OF TYLER INGRAHAM, 100 Main Street, Third Floor, Northampton, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this case; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND this 19th day of June, 2023.

------------------------

Sharon Waskiewicz My Commission expires:
Notary Public July 26, 2024

Page 146

Today's date: June 19, 2023
To: Carole Sakowski Lynch Esq.
Copied to: Gianna Gizzi, Esq.
Austin Joyce, Esq.
Tyler Kenefick, Esq.
From: Sharon Waskiewicz
Deposition of: Richard Kane
Taken: June 8, 2023
Action: George Perrot vs Thomas Kelly, Thomas Jarvis, Richard Kane, et al

Enclosed is a copy of the deposition of RICHARD KANE. Pursuant to the Rules of Civil Procedure, Mr. Kane has thirty days to sign the deposition from today's date.

Please have Mr. Kane sign the enclosed signature page. If there are any errors, please have him mark the page, line, and error on the enclosed correction sheet. He should not mark the transcript itself. This addendum should be forwarded to all interested parties.

Thank you for your cooperation in this matter.

Page 147

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
CASE NO: 18-CV-10147

*********************************** *
GEORGE PERROT, *
Plaintiff, *
vs.
THOMAS KELLY, THOMAS JARVIS, *
RICHARD KANE, CHARLES APRIN, JOHN
SCANLON, DAVID LOUDEN, THOMAS *
KENNEDY, CHIEF ERNEST STELZAR,
MARIANNE POPKO, PAUL GLANTZ, RONALD *
ST. GERMAIN, ANDREW CANEVARI,
CHERYL CLAPROOD, CAPTAIN JOHN *
BROWN, UNKNOWN OFFICERS OF THE
SPRINGFIELD POLICE DEPARTMENT, THE *
CITY OF SPRINGFIELD, MASSACHUSETTS,
FRANCIS BLOOM, WILLIAM EUBANKS, *
WAYNE OAKES, and UNKNOWN AGENTS OF
THE FEDERAL BUREAU OF *
INVESTIGATION,
Defendants *
*********************************** *

I, RICHARD KANE, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief.

WITNESS MY HAND, this day of , 2023.

______________________________
Richard Kane

sw

Page 148

CORRECTION SHEET

DEPONENT: Richard Kane
CASE: George Perrot vs Thomas Kelly, Thomas Jarvis, Richard Kane, et al
DATE TAKEN: June 8, 2023

************************************************

PAGE / LINE / CHANGE OR CORRECTION AND REASON

************************************************

-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------
-----/------/---------------------------------

**0**

**003626**
104:6
**003628**
105:16

**1**

**1**
13:23 15:18 45:10, 11 71:8 131:3,23
**10**
104:8 119:1
**100**
12:15 14:17 28:24 29:1,2 60:16 73:7 97:9 122:13
**10th**
75:15 77:7 84:1 118:1 120:20 121:7, 9,15 125:7 126:6
**12**
12:1
**12-month**
17:19
**12/10**
81:6
**125**
68:18
**12th**
75:15
**14th**
11:18
**16**
50:10,13
**17**
19:9 22:2
**18**
110:12
**18-CV-10147**
5:4
**1969**
11:5
**1971**
10:15
**1974**
11:15 15:7 130:11
**1975**
15:16
**1977**
16:6
**1984**
26:3 47:11
**1985**
8:22 26:4 27:24 34:8 46:20 47:1,2,12 51:2 61:11 67:2 69:1 70:3 77:7 84:1,11 96:3,8 121:7,15 122:4 124:7,9 125:8 131:8, 10,13,18 133:15
**1987**
103:22 121:19
**1991**
11:18 27:14 116:19 117:10 138:17 140:20
**1:20**
5:5
**1A**
23:11

**2**

**2**
77:24 83:1 134:5
**2023**
5:4
**24**
8:4,6 61:11
**29th**
69:1,3 70:3

**3**

**3**
79:4 80:6 92:11 134:5
**30**
113:10
**30th**
96:2,7 98:12 99:13
**38**
144:6

**4**

**4**
12:1 76:14 90:1 119:21 133:12
**494097**
79:19
**4:00**
27:21
**4:30**
27:21,22
**4th**
120:2

**5**

**5**
13:23 15:18 103:16 109:14 123:2
**50**
130:12
**5:33**
144:16

**6**

**65**
104:5
**67**
105:16
**68**
107:2
**6th**
138:17

**7**

**7**
138:3
**70**
108:7
**70's**
17:13
**70s**
12:23,24
**73**
109:14
**74**
111:23 128:11
**77**
10:15
**7th**
121:19 125:11,24

**8**

**8**
107:3 122:24
**80s**
40:22 41:3 51:3,5,13 52:13,16 53:5 54:24 63:24
**84**
26:10
**85**
9:2 26:10
**8:00**
27:21
**8th**
5:4

**9**

**9**
107:4
**9/14/91**
139:1
**91**
34:6 129:2
**911**
44:18 45:5,10,14,22 53:14
**99**
69:24

**A**

**A-L-F-O-R-D**
66:15
**a.m.**
15:18 25:22
**Aberdale**
75:19 76:3,16 77:11 78:8 80:15 83:11 84:17 85:14 86:13, 14 92:22 104:13,14 105:11 107:4,8,14, 17
**Abergale**
92:24
**ability**
8:7
**absence**
117:4 139:5,14,24 140:6 141:7
**absolutely**
134:1
**academies**
21:14
**academy**
11:23 14:20,22 15:7 17:16,19,21 18:14 19:23 20:2,10,14,15 21:23 22:1 24:19 36:21 37:9 48:20

73:11 126:11 128:11 130:7,10,17 140:7
**accept** 99:6
**acceptable** 6:6
**access** 40:8 59:20
**accompany** 83:4
**accordance** 5:7
**accused** 89:5,7
**acres** 50:10,13,15
**actual** 123:9
**ADA** 121:18,21
**add** 102:5
**addressed** 38:13,14 102:7 130:3
**adherence** 139:3
**administrative** 39:16
**admitted** 110:24
**admitting** 110:20
**adopted** 139:11
**advised** 93:15
**advising** 90:12
**afraid** 69:20
**afternoon** 5:17 21:11 76:14
**age** 10:9 22:2 34:21
**agency** 117:7
**aggravated** 78:9 80:14
**agreed** 105:21 106:4,16
**Aid** 25:4,6
**air** 44:13
**alarming** 139:7
**alcohol** 8:3
**Alford** 66:15
**alleged** 137:7
**allegedly** 136:13,18
**alongside** 24:16 127:9
**alter** 82:14
**alternate** 115:16
**alternated** 28:12,16 64:23
**alternative** 139:5
**amount** 26:19
**answering** 7:7
**answers** 7:5 46:23 118:14,21 120:15
**anticipate** 7:13
**apologize** 15:5 37:2 137:16
**apparently** 56:4
**appeared** 59:20
**applied** 140:15
**apply** 13:3
**appraisal** 141:22
**apprehended** 65:13 66:6
**apprehending** 65:9
**approach** 113:15
**approaching** 113:15
**approximate** 15:14 16:3
**approximately** 22:21 65:12 101:17
**area** 11:2 23:23 51:3 57:16 65:2 69:10,22
**arm** 76:3 85:8 88:8,13, 15,18
**Army** 10:21
**arrest** 8:18,19 22:8 39:3,4, 10,13 51:8,10 52:24 53:1 65:15 66:9 77:3 90:23 125:13
**arrested** 70:24 125:12,19
**arrests** 30:11,13
**arrived** 26:24
**Arthur** 68:4
**asks** 65:16 104:9 111:24
**aspects** 18:9
**assailant** 123:19
**assailant's** 132:13
**assault** 17:17 18:4,15,18 19:18 21:3,5,20 28:18 29:15,16,24 30:2 46:5 51:7 54:2, 10 56:1 57:5,21 58:13,20 61:9 66:3 74:12 75:9,24 100:5 115:1,5,17 116:8
**assaulted** 52:17 67:3 124:6,8, 10
**assaults** 25:15 26:17 47:13 50:3,7,18 51:15 52:2,12,13,20 53:5 54:14,24 63:8,23
122:4 134:13
**assign** 54:9
**assigned** 11:24 12:2,6 13:7,22 16:11 19:7 27:17 33:22 42:5 43:21 54:7,8 142:12
**assignment** 11:22 14:4 16:17 17:4
**assignments** 17:7 32:13,15 128:9
**assist** 62:20
**assume** 7:1 73:23 75:19 82:8 96:19 126:21 134:14
**assumed** 122:1
**assuming** 17:8 83:20 132:16
**attached** 71:17 81:17
**attack** 65:5
**Attempted** 68:13
**attend** 10:24 11:6 117:22, 23
**attended** 18:19,23
**attention** 71:19 91:6 104:5 109:14 119:21 120:1 123:1
**attorney** 5:18 6:17 7:11 104:9 105:17,18,21,23 106:3,10,16 109:15 110:12 111:24
**attorneys** 10:4 144:8
**audio** 35:17
**August** 11:15
**author** 9:4
**authored** 9:4,6 138:9

**average**
26:22 28:5 63:5
**aware**
47:12,17 50:3,5,7,20 52:11 89:16 96:6 98:11 117:10 127:24

**B**

**back**
14:20 15:3 16:22 17:15 22:15,18 23:14 27:2,9,23 30:16 34:10,21,22, 23 35:11,15 37:4 40:19 43:15 57:7 59:23 60:2 62:5 63:23 65:23 68:7 71:6 72:6 80:2 81:7, 20 82:10,24 83:6,14, 16,23 91:24 96:12, 22 97:16 98:8 99:22 101:13,17 103:2,13 114:2,5 128:11 129:9 130:24 131:7 133:12 140:7,20
**background**
10:8 76:10
**bag**
64:12
**ballpark**
28:24
**bars**
26:17
**based**
111:14 125:7
**basement**
59:15
**basically**
9:15 20:7 21:3 42:5, 6
**basing**
100:3
**Bates**
104:6
**battered**
18:6
**battery**
51:7
**beautiful**
112:21
**bed**
59:14,15
**bedsheets**
60:9,11
**bedspread**
60:12
**begin**
7:7
**beginning**
11:20 20:2 47:2 56:2 75:14 107:11 129:7 142:22
**bell**
74:3
**belong**
78:12
**big**
50:13 59:19 75:5
**bigger**
40:17
**bit**
21:10,11 26:24 44:10 46:18 65:6 104:20 126:9
**blabbing**
110:5
**blanket**
60:11
**block**
83:21
**blood**
75:17,18,20,23 76:3, 11,17,19 77:2,8,10 78:7,18,19 80:7 81:4,12,13 82:6,9,17 83:1 85:8,17 87:14 88:7,12,15,17 89:11, 17 92:19 93:1,19,23 101:9,12,14 104:10, 14 105:9,20 106:8, 17 107:14 113:13
**Bloom**
121:18,21
**blue**
43:3
**bolded**
119:24
**books**
128:22 129:11,18,19
**bothered**
129:10
**bottom**
65:4 78:19
**boys**
52:16
**branch**
10:20
**break**
7:19,22 37:2 53:11 59:16 71:3 98:12 99:13 103:4 115:5 130:21
**break-in**
110:21,24 120:3,9, 17 121:24 123:24 124:18,21 125:1,3 137:7
**break-ins**
110:8 134:14
**breaking**
101:3
**breaks**
100:14 101:6
**briefly**
103:18,20
**bring**
56:13
**bringing**
56:23 82:10
**brings**
57:18 84:17 121:6
**broke**
86:20 87:2 94:24 112:24 135:19 136:6,10,13,18
**broken**
49:4,5 60:1 62:4 95:23 96:2,7 111:4 121:4,14 124:7,8
**Brook**
33:14
**brother**
117:1
**brought**
83:16 92:23 95:6,8 112:13 125:11
**Brown**
33:2,4,9,23 34:5,7 75:16,22 76:5 88:23 90:9,17,19 102:7 104:11 105:8 106:6 111:7 133:13 134:15
**building**
25:5
**bunch**
24:1
**bureau**
9:9 12:17,19 13:19, 22 14:7,13 15:18 22:3 24:14,22,23 25:4,5,6,9,11,17,18, 21,23 26:5,10 27:6 30:17 33:1,5,7,23 38:6,24 40:12,15,16, 23 41:13,14 42:2,3, 10 43:6,9,11,23 45:15,24 46:4,13 47:19,23 49:13 53:3, 7,10,11,15,19,23 54:1,5,13 56:5 62:14,19 66:20,24 73:3,18 74:22 75:1 87:13 102:16 122:11,14,18 129:6 142:7 143:7 144:4
**bureaus**
27:6
**burglary**
78:9
**Burlington**
32:17
**bush**
96:14
**bushes**
95:4 96:20 112:4
**business**
116:23 139:17 141:12,21

**C**

**calender**
70:4
**call**
24:16 45:9,10,16,18, 23 46:3 53:15 60:3 61:15 90:16 108:3 143:22
**called**
38:10 42:13,16 105:3
**calls**
13:13 17:6 26:1,23 44:18 45:6,14
**calm**
60:23 97:17
**capacity**
107:20 108:1

**captain**
17:11 32:13 33:2,4, 9,13,14,16,20,21,23 34:1,2,4,5,7 38:14 41:10 49:22 54:7,9 65:22,24 75:22 76:5 88:23 90:8,17,19 102:7 104:11 105:8 106:6 111:7 133:13 134:15
**captain's**
71:18
**captains**
33:8
**Caption**
75:16
**car**
45:11 46:3 53:14
**carbon**
80:4
**card**
86:3 109:20
**cared**
43:12
**career**
12:12 18:22 20:2 22:4 37:18 62:14 86:4 117:3 139:2 141:15
**carried**
36:23 86:3
**carry**
77:12
**carrying**
37:7
**case**
5:2,3 46:19 67:11 73:22 79:10 130:1
**cases**
24:9 51:6 64:18 115:11 120:13 127:10 142:9 143:1, 2
**catch**
44:16
**caveat**
7:20
**cellar**
59:18
**cellblock**
101:13
**chain**
89:11
**chance**
141:11
**change**
13:20 26:8 114:15
**charge**
33:8 94:2
**charged**
52:4
**Charges**
78:9
**check**
32:18,19 119:10 143:22
**checkbook**
79:24
**checked**
83:10
**checking**
36:24 69:9
**Cheryl**
21:10 97:8 102:22 122:15
**Chicopee**
56:6
**chief**
17:9,12,14 140:1
**chief's**
91:4,19
**child**
32:23
**chronological**
131:7
**Church**
46:6
**Cicerchia**
68:4 71:23,24 72:2
**circumstances**
116:21 139:2 140:21
**city**
42:6 43:24 56:6 82:23 84:24 85:1 104:6 105:16
**Civil**
5:8
**civilian**
139:9
**Claprood**
21:11 97:8 98:14,22 102:22 122:15
**clarify**
6:23
**clarity**
41:17
**class**
73:14 130:12,13
**clear**
36:18 38:15 51:1 93:19 94:1 96:1 113:20
**clearing**
94:3
**client's**
106:17
**clipped**
40:7
**closings**
26:17
**clothes**
12:16 37:20 38:2 42:4,9,15 43:16 44:15 85:2
**clothing**
59:14 60:10
**clue**
81:23 113:12 116:4 124:19
**cocaine**
87:5 101:7
**coke**
100:11,15,20 101:8 112:18,23 136:11
**Colcatic**
78:19 82:22 83:2
**colleagues**
126:15
**collect**
62:21 64:9 73:19 75:16 77:8
**collected**
59:13 60:11,13 63:10 64:10 72:23 75:23
**collecting**
60:8,15 61:3 62:15 63:17 72:10 81:4
**collection**
20:8 73:13
**College**
11:8,9 129:1
**commander**
37:22
**Commerce**
11:1
**commissioner**
21:7 65:22 139:3 140:5
**commissioners**
139:10
**committed**
44:8 54:15 55:2 123:3
**common**
21:18 31:23
**communicate**
48:5
**Community**
11:8,9 129:1
**company**
141:23
**completely**
28:22
**completeness**
100:8
**concluded**
144:16
**condition**
131:16,19
**conduct**
18:3 19:24 32:6,10
**conducted**
34:11
**confirm**
137:11
**confused**
109:5 135:21
**confusing**
7:16
**confusion**
124:4
**consent**
105:19,22
**considered**
42:10,13 43:10,11
**consumed**
8:3
**contact**
74:14,16,17,21 143:11,17,20
**contents**
133:9,11
**context**
76:6,8 79:8 90:11 135:16 142:23
**contracted**
82:23

**conversation**
57:9 67:6 86:12 92:1 111:3 112:16 113:21 121:20 132:21 133:2,5,8,10 143:9
**conversations**
107:13 143:23
**conviction**
117:11
**cop**
12:7 13:7
**copy**
91:19
**corner**
70:13 74:8
**correct**
22:20 80:24 84:17 93:6 104:1 107:5 108:10 109:9,16 110:14 116:19 124:5,11,14 125:9 126:11 127:10 132:5,9,11
**correctly**
62:5 85:8 92:14 93:2,21 102:14
**Counsel**
103:15 124:5
**counselors**
69:17
**count**
49:3 62:24
**couple**
6:14 14:2 32:22 36:11 77:9 79:18 83:18 89:16 125:5 129:9 131:2 135:22 139:22 143:23
**courses**
129:1,3,8,9
**court**
5:9 7:4,9 14:24 65:16 93:9,12 103:21 112:12 118:8 121:18 129:7
**courtesy**
58:9
**courthouse**
104:3
**Covel**
55:16 86:19,20 87:2 94:19,20,22 95:2,17, 20 97:12 110:8,21, 24 111:4,9,11,13,20, 21 112:1,4 134:7,9, 15,21 135:9,11,15, 19 136:6,10,12,18 137:8
**cover**
42:7
**cream**
108:3
**crime**
12:17,19 13:19,22 14:6,9,13,18 15:17 16:7,8,11 22:17 24:13,22 25:8,17,21 26:1,5,9 30:16 33:1, 5,6,22 38:6,24 40:12,14,22 41:13 42:3,9 43:10,23 44:8 45:15,23 46:4,13 47:19,22 49:13 53:3, 10,16,19,24 54:5,13 57:10 62:14,15,17, 18 63:16 66:24 73:2, 3,18 87:12,14 102:15 122:11 129:6 132:24 139:7 142:7, 15 144:3
**cruise**
23:5
**cruiser**
13:7 49:2,10 73:6
**current**
10:9
**custody**
89:11
**cut**
51:23 62:7 64:11
**cutter**
62:6

**D**

**daily**
37:10 38:11,23 39:14 91:3
**date**
51:17 68:3 70:5 76:19 77:6 115:23 136:16,17,19 138:16
**dates**
10:15 11:19
**David**
64:20
**day**
16:8,11 19:15 27:1, 9,18,20 28:1 37:23 47:20 48:5,8 49:22 50:21 56:15 59:12 60:19,21,22 64:8,23 66:23 70:3,22 72:24 73:9 74:6 75:10,11 76:13 84:2 85:2 93:12 114:11 120:24 121:2 125:11,24 127:1
**days**
14:6,13 27:8 28:6,7, 8,11 48:16 64:21,23 84:14 89:17 126:7
**dead**
68:12
**dealing**
21:23 22:6
**deathly**
69:20
**debrief**
133:1
**December**
8:22 27:24 28:3,4 46:20 47:1,2 75:14 77:7 84:1,11 103:22 118:1 120:20 121:8, 15,19 125:7,11
**decide**
110:18
**decided**
129:10 141:4
**decision**
139:20 140:14 141:11
**degree**
11:10
**denied**
117:5
**deny**
68:21
**department**
10:18 11:14,17,21 17:6,23 19:4 20:18 22:13,16 28:18 30:5 35:15 36:3 37:19 41:18,22 42:19 45:5 48:21 54:12 55:1 73:12 77:20 78:2 79:6 89:20 106:15 116:19,22 124:24 126:15 127:15,20 128:19 130:11 138:24 139:21 140:4,22,23 141:2, 19 142:1,6 143:12, 18
**departments**
45:13
**depend**
87:24
**depended**
21:14 88:3
**depending**
31:16 35:6
**depends**
34:13,14,15 38:18 54:8
**Deponent**
5:12
**deposed**
6:12
**deposes**
5:13
**deposition**
5:2,6 6:15 8:14 9:12 10:5 103:19 144:16
**deprive**
7:11
**Derosier**
56:11 57:14 68:1,17 71:10 72:16 99:20 115:23 120:10 131:8 132:22 133:1
**describe**
78:6 96:17 126:13
**describing**
132:13 139:15
**description**
44:12 46:7
**desk**
31:5 36:14,15 38:20 126:22 128:6 142:5, 20
**Desrosier**
56:15,17,19 58:19, 24 60:15 67:7
**detail**
53:2 96:15
**detective**
9:9 24:23 25:5,11,

18,23 40:16 41:13, 19,20,22 42:2,11,16 43:6,9,23 53:7,11, 15,23 54:8 56:4 66:20 122:14,18

**detectives**
42:13 43:10,11

**determine**
49:7 139:10

**developed**
36:20

**device**
35:17

**difference**
41:21 42:4 43:17

**differently**
102:4

**direct**
33:4 142:24

**directed**
45:14,23 144:12

**directing**
71:19 91:6 104:5 109:13 119:21 120:1 123:1

**direction**
7:15

**directions**
143:7

**directly**
127:9

**discuss**
142:9

**discussed**
99:3 143:5

**dish**
41:14

**dispatched**
53:14

**disposed**
96:17

**dispute**
70:8

**district**
5:9 13:8 23:11 44:9, 10 45:10,11 49:6

**districts**
13:10 42:6 43:21

**division**
12:11 13:6 14:1,5,9, 12,14,19,24 15:6,20, 23 16:7,11 22:18,19 23:3,14 26:4,10 28:7 37:6 38:1 40:12,16 43:16,21 46:12 49:11 53:16 61:7 78:15 80:23 120:5 122:10

**divisions**
13:21 43:18 81:23

**document**
67:18,23 69:1 70:10 78:4 90:5,7 96:12 103:10 118:13,18 119:7,12,16 132:10 134:5 138:7,9

**documentation**
37:8 39:1,18

**documented**
116:9,13,16

**documenting**
37:23

**documents**
8:13,17 9:10,11,13 10:2 103:17 125:7 131:3

**dog**
12:14

**Donald**
64:22 144:2

**door**
102:15

**doors**
24:1

**draw**
104:14

**drawer**
127:1

**drawn**
75:21 76:17,20 77:2 85:8 88:7 89:17 92:20 101:10,13,14 104:10 105:22 106:9,17 107:14

**dressed**
43:1

**drier**
59:17 62:7 71:21

**drinks**
143:21

**drive**
57:9 133:3

**driveway**
96:13 112:2

**driving**
57:6

**dropping**
56:8

**drove**
69:13

**drug**
24:4 30:10,11 62:20, 23 87:5 100:12,13, 15,22,23 101:5,11 107:22 142:16 144:3

**due**
139:2

**duly**
5:13

**E**

**earlier**
5:18 9:23 24:2 40:20 48:5 72:10 74:1 93:9 104:21 107:3 108:9 115:19 116:18 124:14 126:7 127:8 130:6 132:1 137:11 139:16 141:13

**early**
21:4 125:20

**easy**
102:2

**education**
10:23 18:15

**educational**
11:6

**effect**
85:21 104:18 106:1

**effective**
139:1

**eight-hours**
64:8

**eight-minute**
57:8

**elaborate**
43:16 88:11

**elderly**
24:3 47:13,15 50:4, 6,9,11,23 52:12 53:12 122:4

**elementary**
32:22

**else's**
80:20

**em**
50:21 54:9

**embarrassing**
58:2

**emergency**
45:5

**Emily**
55:18 56:10,12 58:24 66:3 67:1 72:11 74:12 75:9,24 95:18,22 96:6 99:12 100:5 103:3 111:15 114:24 115:4,17 116:9 120:4 121:3,7, 13,24 122:19 123:9, 20,24 124:6 131:17 132:21 133:2 137:24

**Emily's**
95:19

**encouraged**
36:5

**end**
23:10,24 25:4,22 33:10 36:16 38:7,15 59:6,11 68:9 112:2 141:13,18

**ended**
51:15,16 61:3 101:21 140:5

**enforcement**
12:5 117:7 141:15

**enjoying**
129:20

**entered**
128:10

**envelope**
39:24 40:7 81:11,15

**estate**
141:22

**et al**
5:3

**events**
37:24 131:10,11 133:16

**eventually**
52:3

**everyone's**
44:19

**evidence**
20:8 32:16 39:19,20, 22,23 40:1,2,6,8,9, 11,15,18 59:13

60:15 61:1,3,13 62:15 63:1,2,10,17 64:10 72:11,23 73:12,19 78:17 79:10 81:11,19 137:23
**evidentiary** 118:4
**exact** 28:20
**exam** 101:10
**examination** 5:16 32:18 84:16 86:10
**examining** 92:24
**excuse** 35:9 77:19 117:9
**exhibit** 67:12,16 71:8 77:24 78:1 79:4,5 80:6,11 82:16,24 89:23 90:1, 2 103:14,16 118:14 131:3,23 133:12 138:2,3,4
**existed** 134:3
**expected** 49:14
**experience** 44:6
**experienced** 20:22
**explain** 42:23
**extended** 139:24 141:6
**eyes** 51:23

**F**

**F-E-N-T-O-N** 17:14
**F-I-T-C-H-E-T** 65:18
**face** 51:22
**fact** 13:8 59:6 91:18 121:3,4,14 140:8 141:20
**fair** 7:2 35:1 46:11 63:22 68:23 76:9 103:9 114:20 118:6,23 123:23 126:5 127:22 140:19
**fairly** 126:21
**fallen** 47:18
**false** 99:9
**family** 47:6 69:21
**fate** 139:10
**father** 47:8
**favor** 71:2
**FBI** 18:19,20,24 19:2 20:4,7 82:17 140:6
**federal** 140:3,4
**feel** 57:11 62:11 131:18 140:14
**fellow** 17:22 64:19,22 82:21 144:2
**felt** 89:13
**female** 21:15,18 31:18 56:15 57:20
**Fenton** 17:14
**field** 12:5
**figured** 109:18 140:10
**filing** 99:9
**fill** 78:17
**filled** 79:10 81:5 105:9
**finally** 51:9
**find** 56:24
**fine** 6:10 9:24
**fingerprint** 61:6,7,17 68:5
**fingerprints** 72:9
**finish** 7:5 41:15
**finished** 129:2
**fishing** 52:18
**fit** 59:22
**Fitchet** 65:15,18 143:24
**Fitzgerald** 33:13 34:1 140:2
**fix** 60:5 62:10
**Flipping** 119:1
**floated** 13:9
**floating** 13:8
**floor** 25:8
**flunked** 140:7
**folded** 91:16
**follow** 27:1 74:13 114:9
**follow-up** 13:16 74:11 131:2
**Forest** 23:24 46:6
**forget** 88:17
**form** 6:2 90:2,12 105:19, 22 123:16 138:4
**formal** 42:18,22,23,24
**formed** 123:21 126:20
**forms** 20:3
**found** 114:10,12
**fountain** 108:2
**frame** 16:21 50:8 62:4
**Francis** 121:18
**Frank** 68:13
**freely** 85:18 93:5 108:8 109:17 110:20
**frequency** 63:3
**frequently** 48:12,14
**Friday** 19:15
**friendly** 128:5
**front** 71:8 79:8
**full** 5:20 64:12
**funds** 139:8
**funeral** 143:13,16
**funny** 55:18

**G**

**gained** 59:20
**gaming** 30:13 63:10
**gave** 9:18 45:9 51:12 75:17 84:24 87:22 96:15 105:4 109:15 110:13 122:6 136:14
**general** 15:1 79:18 90:2,12, 16 138:4
**generally** 14:21 28:18 31:13 62:13 71:9 87:23
**George** 5:3,19 46:19,20 47:6 77:16,21 78:8 80:14 83:13,16,23 84:17 85:11,13 86:10 89:20 92:13 102:5

106:12 107:15 113:22 115:7,10 117:10 118:2 123:3 124:15 125:11 129:24 133:14,17 134:13 143:9
**George's** 47:8 114:24
**Gianna** 5:18
**girl** 109:3
**girlfriend** 85:19,23 86:11,24 93:5 94:18 108:10, 12,15,16,19,20 109:1 110:4 111:2 112:21 136:3
**gist** 69:14
**give** 6:19 28:20 30:14 38:12 40:24 68:12 76:5,10 77:11 78:22 81:19 87:20 105:10 113:11
**giving** 92:17,18,19 109:10 132:21
**Gizzi** 5:1,16 6:10,11 25:10 26:3 29:13,14 30:8, 19 32:5 36:1,17 37:4,5,17 40:19 42:8 43:14 44:4 45:2,4,12 46:10 48:4,15 49:9, 21 50:2 54:19,22,23 55:7,10 58:7,12 63:13 65:19 66:2 67:14,17 71:6,7 72:22 73:10,24 75:7 78:3 79:4,7 87:11,22 88:10 90:1,4 91:17, 20,21 96:6 98:2,4,24 100:3 103:11,13,15 106:21 107:2 113:14 116:5,15 118:16 123:7,14,18 127:22 128:10 129:21 130:19,24 131:1,24 132:1 134:21,24 135:8,14 138:6 140:19 144:14
**glass** 62:4
**gloves** 72:14,18,23 73:3,7
**goal** 128:12,14
**goals** 128:12
**good** 5:17 26:18 60:22 70:12 94:17 118:8 126:23 128:18 136:3
**graduate** 11:4
**graduated** 126:10 130:16
**graduation** 12:21
**grapevine** 127:23
**great** 136:5
**Greer** 54:8 144:3
**Greka** 122:8 123:4
**group** 16:9
**guess** 41:16 42:23 46:23 54:4 76:15 79:23 88:11 90:14 94:21 116:15 127:18 128:24 133:6 136:7 141:18 142:23
**guessing** 14:2 15:13 122:14
**guilty** 51:19
**guy** 44:16
**guys** 58:8 90:15 143:1 144:13

**H**

**habit** 136:11
**half** 22:24 69:24 71:20 91:12,16 92:10 93:15
**Halfway** 107:3
**hand** 53:23,24 54:4 102:12 118:13
**handed** 67:18 80:6 103:15
**handled** 26:16 57:13 120:13
**handsome** 68:15
**handwriting** 78:11,14 80:10,12, 13,19,23 82:1,3,12, 17 83:2 98:7
**handwritten** 133:13
**hanging** 72:7
**happen** 31:23 45:16 87:17
**happened** 9:21 38:17 44:3 48:11,14 56:16 57:2 58:4,16 61:10 63:7 76:13,22 85:16 114:14
**happening** 63:4
**happy** 140:22
**hard** 6:20 68:2 75:6 98:9 129:6
**head** 6:20 35:24 98:3 101:23 102:9 130:14 142:3
**hear** 127:13
**heard** 67:11 77:20 97:7,20 117:12,14 135:7
**hearing** 9:16 93:12 103:22, 23 115:10 118:4 121:18
**heavy** 26:19
**Helberg** 69:8 70:15
**helpful** 28:24
**hid** 65:4
**hide** 64:12
**hiding** 64:8,24
**high** 10:24 11:1,4,7 107:21 108:6
**higher** 17:8 129:14
**hill** 96:13 112:3
**Hilltop** 112:3
**hire** 139:8
**hockey** 51:20,21,22 52:6 64:11 65:7,9 66:10, 17
**hold** 37:1
**holding** 16:5
**hole** 62:7
**holes** 64:11
**Holy** 46:5
**Holyoke** 11:8
**home** 53:13 56:23 59:2 76:14 114:16 120:4 121:1,4,14 133:4
**homes** 100:14 101:3,6 112:24
**honest** 48:7 69:11 76:12 109:1 140:24
**hook** 69:16
**hookers** 68:13
**hose** 62:6

**hospital**
56:6,9,13,18,21 57:4,7 122:23
**hour**
34:24 35:5
**hours**
8:4,6 19:15 27:19 53:13 125:24
**house**
53:11 56:24 59:4,7, 12 60:19 70:18 72:12 95:4,23 96:2, 7,13 103:3 112:2,6 115:21 124:6,8,18 136:6,12,14
**housebreak**
123:21
**housebreaks**
25:13
**humor**
126:24
**hurt**
87:19
**husband**
68:3 69:19

**I**

**ice**
108:3
**idea**
82:3 125:3,13
**identified**
5:13 84:21 109:9
**Immediately**
91:23
**important**
7:8
**importantly**
7:4
**inaccurately**
70:8
**incident**
75:9 111:18 131:19 136:22
**incidents**
122:22
**include**
13:12,15 23:22
**increase**
139:8
**independent**
18:11 70:20 74:4 132:12
**individually**
143:2
**inform**
138:21,23
**information**
18:3 67:3 76:11 87:2 95:11 96:22 97:23 98:11 99:3,15 100:17 111:9 132:17 135:10 137:7,13
**informed**
106:3 110:1 141:11
**inhibit**
8:7
**initial**
99:19 103:4
**inservice**
19:10,12,19
**instance**
44:8
**instances**
29:5 44:5 45:22 106:9,11 136:21 142:19
**institution**
11:7
**instruct**
75:22 88:23
**instructed**
76:6,24 105:8
**instruction**
73:11
**instructions**
104:10
**intended**
105:19
**intentions**
34:15
**interaction**
84:19 85:10 95:17 102:5 107:18 118:2 133:17
**interactions**
46:24 47:6
**internally**
19:4
**interrogate**
113:17
**interrogated**
66:17 89:16
**interrogating**
31:17,19
**interrogation**
19:24 20:11 31:2,10, 22 32:7,8 34:20 35:4,7,9,11 38:19 66:10 113:16
**interrogations**
19:22 20:4,18,20 30:3,20 31:13 34:10 35:7,16 36:4 128:8
**interrogatories**
118:15,22
**interrogatory**
123:7
**invest**
114:24 122:2
**investigate**
116:1,8
**investigated**
20:23 25:18 52:15
**investigating**
46:4 47:23 52:3,13, 20 53:4 54:14 55:2, 11,12,24 63:24 75:8 115:16 120:10 122:3,12
**investigation**
13:16 15:1 18:9 21:4,5,20 24:17 32:11 34:23 41:12 44:6 53:24 54:6 64:21 66:9 74:11 99:19 111:14 114:24 115:4 122:19
**investigations**
17:17 18:4,16 19:5, 19 20:8 24:10 28:19 29:5 53:18 64:7
**investigative**
44:14 142:2
**involve**
32:24 41:16 74:11
**involved**
30:4,24 50:21,22 53:7,18 55:1,24 56:3 65:8 66:9,20,21,22 69:6 102:24 115:15 116:24 121:10 122:2,3,12,18,23 123:9,15 128:7 134:12 135:6
**involvement**
75:8 123:5 124:12
**issued**
27:3
**issues**
19:9
**items**
60:8

**J**

**jail**
8:20 51:17 75:15 76:7,16 77:7,16 78:8 80:15 81:21 83:5,8, 20 89:6,21 90:9 91:24 92:12,22,24 99:7,11 101:16 104:13 105:2 109:2 112:16 113:21 115:6 118:1 120:21 125:8 133:21
**job**
13:9 30:18 73:17 139:7 141:1,2,3,17
**John**
69:7 74:2 75:16 78:19 82:21 83:2 90:17,19 116:1 132:3,9
**join**
140:6
**JOYCE**
32:1 35:22 43:19 48:14 144:11
**jumped**
22:14 81:3
**June**
5:4
**juvenile**
21:23,24 22:6,8

**K**

**K-A-N-E**
5:22
**Kane**
5:2,12,22 43:6,7 67:17 68:15 78:3 131:1
**keeping**
28:23

**Kelly**
24:11,12 31:3,4,10 92:2,4 96:23 97:5,22 99:2 102:17 114:8 126:10,18 127:5 128:1 129:22 130:4, 5 142:5 143:9,11
**KENEFICK**
6:7 25:1,19 35:23 36:6 37:15 40:13 41:23 42:21 44:21 45:7 48:13,23 49:16, 24 54:16 55:5 57:23 58:11 63:6 72:19 73:5,20 74:23 87:15 88:2 97:24 106:18, 24 116:3,10 123:6, 11 128:2 129:15 140:17 144:10
**kids**
50:12,22
**kind**
9:13 14:21 50:17 57:12 62:16 67:5 75:6 79:23 88:19 117:19 127:2 131:20 140:3 142:12
**knew**
21:24 64:13 86:22 89:2 94:24 95:24 98:18 100:22 107:19 108:1 109:21 110:4 111:11,12 120:12 134:11 137:8
**knowledge**
95:21 143:10

**L**

**lab**
32:17,20 61:5,7 78:20 82:23
**Lacagla**
55:20
**Lachwala**
115:1 121:3
**Lachwala's**
99:20 103:3 115:4 120:4 122:20 123:9
**lady**
85:22 86:21 135:20 136:11
**lasted**
35:5
**late**
12:24 17:13 26:17 52:16 53:18 59:4 76:13 92:1
**law**
12:5 14:24 117:6 141:14
**lead**
21:19
**leading**
25:7
**learn**
20:10 38:5 67:3 114:23 115:3
**learned**
36:19 67:8 100:4 132:17
**learning**
19:18 117:17
**leave**
11:16 38:19 71:16 117:4 139:4,14,16, 24 140:6,8,11,23 141:4,5,7
**leaving**
8:20 62:12 90:9 91:23 114:12 117:2 133:21 139:7 141:24
**Leclaire**
64:22
**left**
34:6 41:10 71:17 80:10 99:7 101:15, 16 116:18,22 117:9, 10 126:24 139:5 140:21 141:19 143:12,18 144:14
**leftover**
41:6
**lengthy**
34:17,19,23
**letter**
67:16
**letters**
9:14,16
**licenses**
26:17
**Lichalla**
55:20
**Lichwala**
55:19 56:10 57:4 66:3 67:2 69:14 72:11 74:12 75:9 95:18,22 97:19 99:12 115:17 116:9 121:7,24 123:20,24 124:6,21 131:17 132:13,21 133:2
**Lichwala's**
58:20 59:7 60:19 70:16 96:7 97:15 137:24
**lieutenant**
65:15,20,21,23 126:22
**light**
24:21 82:19
**Linda**
56:10,15,19 57:14, 16 67:7 68:1 72:16
**lines**
92:8 135:22 136:1
**liquor**
26:16
**listened**
97:21
**litigation**
5:19
**live**
69:20
**lived**
51:20 55:16 69:23 74:18 137:8
**local**
5:8
**locate**
44:11 46:8 92:6
**location**
112:1 114:9
**lock**
60:4
**locked**
24:2
**long**
9:21 12:10 13:24 14:17 15:22 16:1,10 17:20 27:12 59:3 60:18,21 70:18 73:16 83:15,17,20 86:9 102:23
**longer**
16:14
**looked**
76:15 119:13
**losing**
79:2
**lot**
19:21 20:21 21:20, 21 27:24 28:20 29:5 30:10,11,12,14 31:19 32:16 35:7 46:10,11 48:9,18 52:8 63:7 69:5 144:2
**lots**
141:2
**loud**
138:22
**love**
141:2
**loved**
141:3
**Luckily**
23:19
**lunch**
126:24

**M**

**M-A-F-F-E-N**
33:18
**made**
17:6 24:1,3 31:6 39:9 48:7 51:8 52:24 65:15 78:5 84:8 108:2 140:13
**Maffen**
33:16,21
**mailbox**
102:13
**main**
119:18
**make**
6:23 7:17 35:10 48:9 50:16 51:1 53:1 57:11 86:6 89:15 92:8 98:6,24 99:8 106:16 129:8 132:5 133:7,23 134:2 139:19 141:11
**makes**
6:20 7:15 19:11 21:1 43:14 53:17
**male**
31:19

**man**
99:21
**Marianne**
21:12 57:15 120:3 122:15
**mark**
67:14 77:24
**marked**
40:6 67:16 78:2 79:6 90:3 103:14 118:15 138:5
**Mary**
122:8,19 123:4
**mask**
51:21
**Mass**
32:17
**Massachusetts**
5:10 82:22
**matched**
44:12
**matching**
46:7
**Mcgibbon**
64:21
**Mcmann**
33:14 34:2,4
**means**
16:22 35:2 62:1
**meant**
109:2,4
**Meara**
21:6 140:6
**medical**
92:23
**medication**
8:7
**meet**
75:19 76:16 104:13
**members**
47:6
**memories**
31:9
**memory**
70:12 94:15,16 104:2 125:16 131:9, 10,19,21 132:12 133:16,23 138:17
**mention**
95:7 108:12
**mentioned**
5:18 16:6 20:4 22:16 60:8 61:12 64:2,4 72:10 74:1 82:15 95:20 101:7 127:8 132:1 134:5 137:10
**mentored**
21:2
**met**
77:16 92:21,22
**Mezzetti**
69:7 74:2,15 132:3,9
**Mezzetti's**
74:5
**MG**
123:4
**mid**
12:23,24 17:13 40:22 41:3 51:5 52:13 53:5 54:24 63:24
**middle**
25:6 105:17 134:6
**middle-aged**
50:23 64:3
**midnight**
12:2,21 15:12 16:20 23:7 25:24 49:3 53:8
**military**
10:11,13,20
**mind**
21:17 79:2 137:3 139:19
**minute**
35:2,10
**minutes**
36:12 83:11,18,19 86:16 114:4 130:22 133:20
**Miranda**
86:3 87:18,20,23 89:13 93:16 109:11, 16,20 110:1,13
**Miranda-ize**
87:1,13
**Miranda-ized**
85:24 86:1,17 110:19
**misrepresent**
124:5
**missing**
89:2 95:15 103:5
**misunderstood**
14:8
**moment**
70:6 138:20
**Monday**
19:15 84:3
**Mondays**
28:11 84:11,12
**money**
62:24
**month**
28:2 61:10 63:5 117:4 139:19 141:7, 10
**months**
12:15,22 15:9,13 117:1
**morals**
21:7 26:12,13,16,21 27:13,16 30:23 31:13 40:21 41:2 73:18 130:16
**morning**
53:9,13 56:4 58:5 101:20 102:16 122:24 125:20
**motion**
115:10
**motions**
6:4
**move**
5:24
**moving**
26:6 46:18 105:16
**multiple**
90:21 94:15
**Murders**
25:13
**Murray**
68:14

**N**

**naivete**
45:13
**name's**
69:6
**named**
144:2
**names**
9:8 115:20 122:6
**narcotics**
13:23 14:1,4,9,11 15:20,23 16:15 30:22 62:21
**necessarily**
48:3 71:12
**needed**
34:13 35:9 41:7 57:1 69:15 87:17 89:13
**neighborhood**
51:21 70:17
**nice**
26:8 99:24
**night**
13:10 24:1 25:22 36:12 38:7,22 41:6, 10 47:20 48:6,17 53:19 59:3 65:10 66:18,23 142:14
**nightly**
52:23
**nights**
75:2 144:3
**nightshift**
101:19
**nodding**
101:23 102:9 130:14
**north**
23:10
**Northern**
82:22
**note**
36:14
**notebook**
37:7,10,14,19,21 77:13
**notebooks**
36:23
**noted**
103:5
**notepad**
34:13 77:13
**notes**
34:12,17 35:4,10,12 36:3 38:20 112:11 113:20,23 130:21
**notice**
5:6
**notified**
22:9 61:5 106:16
**notify**
105:18,22
**November**
96:2,7 98:12 99:13 115:5 124:9

**number**
5:3 28:20 30:15 44:9 75:4 79:19,21,24 80:17 82:7 136:15
**nurse**
75:20

**O**

**objection**
6:7,8 7:12 25:1,19 29:9 32:1 35:22,23 36:6 37:15 40:13 41:23 42:21 43:19 44:21 45:7 46:1 48:1,13,23 49:16,24 54:16 55:4,5 57:23 58:11 63:6 72:19,20 73:5,20 74:23 87:15 88:2 97:24 98:1,15 99:16 106:18,24 113:6 116:3,10 123:6,11 127:16 128:2,3 129:15 134:18 135:2 140:17
**objections**
6:2
**obtain**
11:10
**occurring**
53:5 122:4
**October**
9:2 61:11 66:4 67:2 69:1 70:3 75:24 103:2 111:14,21,22 115:5,23 116:8 120:10 124:7,13,16 131:8,18 137:4,24
**offender**
132:17
**offense**
8:2
**offer**
100:16
**offered**
116:23
**office**
35:8 40:4 45:17 48:10 91:4 96:22 102:15
**officer**
5:17 6:11 9:4 11:24 13:6,8 17:22 18:22 20:9 22:16 31:3,10, 24 37:12,13 39:9,23 40:1,2,3,5,9,15 41:22 42:1,9 49:11 54:5 56:15,17 58:19, 24 60:14 63:2 66:16 67:9,17 68:17 71:10, 22,24 78:3 81:1 83:5 84:23 85:1 91:7 109:9 111:8 115:23 116:16 120:3,8,9,17, 23 126:14,19 128:12,15,20 129:13 131:1,8 132:22 133:1 138:14 140:5
**officers**
9:9 20:22 21:2,15,18 23:12 35:21 36:8,22, 24 39:8 40:11 42:14 44:5,18 56:5 57:21 89:19 127:13 130:15 139:6,9,21,23 140:16 143:18
**officers'**
44:2
**offices**
25:3
**older**
50:19
**Omer**
33:14
**on-the-job**
18:17 19:2,21 20:23
**one-week**
19:7,10
**online**
45:18
**open**
62:12 65:3
**opened**
126:24
**operator**
45:9
**opinion**
123:16,19,21 126:18,20
**opportunity**
141:13
**opposed**
32:10 122:19
**order**
75:16 95:11 129:14
**orders**
27:2,4,7
**ordinary**
91:1
**organize**
22:17
**organized**
14:18 16:7,11 22:17 142:15
**original**
117:11
**originally**
139:18
**outcome**
114:23 115:3 117:17
**overlap**
25:16,20
**overnight**
126:24
**overtime**
114:17,19,20
**overturned**
117:11,13

**P**

**p.m.**
5:5 15:18 68:15 92:11 144:16
**pad**
79:21
**paper**
9:15 80:4 91:16 115:24
**paperwork**
41:15
**Par**
69:10
**paragraph**
71:20 120:2 121:2 132:6
**paraphernalia**
62:21
**parent**
32:23
**parentheses**
101:7
**parents**
22:8,13
**park**
23:24 46:6 52:17
**part**
13:11 14:9 20:21 26:18 28:19 54:15 60:22 64:3 69:18 73:17 84:5,7 107:22 111:3,13 119:18 132:20 134:4 141:3
**parties**
144:12
**partner**
13:11 23:8,11 64:17
**partners**
64:17,18
**passed**
27:8 68:3 69:20 109:3
**passing**
125:17 126:2
**past**
8:3,6
**patrol**
14:24
**patrolling**
12:8 16:23 23:13
**Paul**
17:14
**Paula**
21:6 140:5
**payday**
42:12
**PD**
96:22
**pending**
7:21
**people**
7:10 24:3 41:8 53:12 62:19 130:12 141:10
**percent**
12:15 14:17 60:16 68:18 69:24 73:8 97:9 122:13
**percentage**
63:16
**period**
17:19 47:11 126:14
**permanently**
60:5
**permission**
92:18,19
**Perrot**
5:3,19 46:19,20 47:3,6 75:21,23 77:16,21 78:9 83:13,

16,23 84:17,20 85:4, 18 89:5,16 92:13,23 93:4,14 97:10 100:9 104:13,15 105:12,13 106:12 107:12 108:8 115:7,10 118:2 123:3,9 125:11 133:14 134:13 143:9

**Perrot's**
105:18 117:11 130:1

**person**
22:1 38:22 40:8 44:12 46:7 54:11,15, 18 55:3 56:7,8 59:21 68:20 69:8,16 97:1 122:14

**person's**
28:14

**personally**
34:11 63:18 102:12

**pharmacist**
75:20 107:22

**phone**
75:3 80:17

**phonetic**
78:20

**photo**
61:5,7

**photograph**
61:17 62:10 68:5

**photographed**
62:2

**photos**
61:2,13,23

**physically**
63:16 81:10

**pick**
45:19 56:7,10,12 57:3 68:13 104:13

**picked**
75:2 132:14

**Pics**
51:20

**pictures**
68:6 70:23

**piece**
78:17 81:11

**pieces**
61:3

**pillowcases**
59:15 60:12

**place**
46:5 65:3,5 71:22 75:6

**placer**
65:9

**plain**
12:16 37:20 38:1 42:3,8,9,15 43:16 44:15 85:2

**Plaintiff**
5:19 46:19

**Plaintiff's**
118:14,22

**plastic**
62:6

**plate**
44:8,11

**player**
51:20 52:6 65:7 66:10,17

**plea**
66:13,15

**pocket**
109:20 114:21

**pocketbook**
86:22 89:3 92:6 95:2,3,6,12,15 96:18 98:21 102:19,21 103:8 110:22 112:4, 16 113:2,5 114:9,13 121:11 137:12,15, 18,24 138:1

**point**
6:22 7:19 9:20,22 14:15 62:11 85:7 93:14 94:2 101:9 109:8,19,24 110:7, 16 111:20 114:14,18 118:8 127:5 136:4, 20

**police**
9:3 10:18 11:14,17, 23,24 17:21 18:22 22:12,13,16 27:1 28:18 32:19 35:8 36:3,21,22 37:19 41:18,22 42:1,14 44:2,5 45:13 48:21 49:11 56:7,9,10,13 57:8,9 60:3,22 61:18 63:1 77:20 78:1 79:5 84:23 85:1 89:20 91:24 99:8 109:9 116:19,22 124:24 126:15,19 127:15,19 128:11,12,15,19 129:1 130:10 138:24 139:3,6,21 140:1 141:1,24 142:6 143:18 144:1

**policewoman**
64:19 69:15 73:23

**policewomen**
58:18

**policy**
22:5,7,11,13 58:8 106:15 139:11,12 140:14

**polite**
126:23

**politeness**
58:1

**Popko**
21:12 57:15 120:3,9, 17,23 122:15

**Popko's**
122:19

**position**
42:19 116:23 123:3, 8,19 138:24 140:3

**positions**
15:4

**post**
23:5,20,21 24:8 66:9 141:14

**potential**
67:4 132:3

**potentially**
55:11

**power**
134:3

**practice**
20:13 34:12 35:4 36:2,20 57:20 61:22 72:17 73:2 87:11 106:23

**preparation**
8:14 9:11

**presence**
104:15

**present**
22:13 58:21 71:14 104:10 106:10 107:4

**pretty**
21:18 60:12 67:6 85:19,20 87:1 93:8 102:21,24 109:3 131:14,16

**prevention**
12:17,19 13:19,22 14:7,9,13 15:17 16:9 24:14,22 25:8,17,21 26:1,5,9 30:17 33:1, 5,6,22 38:6,24 40:12,14,23 41:13 42:3,10 43:5,10,23 45:15,23 46:4,13 47:19,23 49:13 53:3, 10,19,24 54:5,13 62:14,18 66:24 73:2, 18 87:12 102:16 122:11 129:6 132:24 142:7 144:4

**previous**
95:18 123:23

**previously**
23:3 26:11 93:6

**print**
71:21

**prior**
47:1 89:17 94:8 121:15

**prisoner**
61:17

**private**
57:16 58:22 132:23 142:1

**probation**
140:4

**problem**
32:23 87:5 89:12 100:11,13,22,24 101:5,11 112:18,23 143:8

**Procedure**
5:8

**procedures**
15:2

**proceeder**
22:5

**process**
107:14 128:21

**professional**
108:1,4,5 127:3

**project**
24:3

**promise**

138:2
**promoted**
34:1 126:21
**promotion**
24:20
**pronounce**
55:22
**property**
63:11 78:2,15,16,22 79:6,9 80:1,23 81:2, 5,16,23 103:5
**prostitution**
26:15,19,20 30:12
**provide**
135:10,15 136:16, 17,19
**provided**
99:2 137:7
**purpose**
76:7 110:17
**pursing**
141:19
**Pursuant**
5:6
**pursue**
139:16
**purview**
47:18
**pushed**
59:19 62:1,8
**put**
30:16 36:12,14 38:20 39:24 44:12 60:1 62:5,7 63:1,11 65:2 70:5 71:22 72:6 81:10,15 101:7 114:6 125:4 131:2
**putting**
72:4

**Q**

**question**
6:18,23,24 7:6,7,14, 21,22 21:16 29:19 34:16 44:23 45:21 46:24 54:21 57:19 63:21 71:8 88:21 94:21 96:5 117:21 120:15 121:6 123:2 133:22 135:13 143:15
**questioned**
49:18
**questions**
8:1 31:20 79:18 86:18 110:14,17,23 125:5 130:20 131:2 144:7
**quick**
36:10

**R**

**R-I-C-H-A-R-D**
5:22
**radio**
45:8,17
**raids**
62:20,23 63:9,10
**ran**
72:9 95:2
**rank**
24:20 41:24 129:14
**rape**
19:5 20:8 26:15 30:13 51:6 69:12,16 78:9 80:14 85:22 86:21 93:20 94:1,4,6 95:1 99:20 103:4 111:1 112:20,21,22 120:13 123:4,10,12, 17,24 135:19 136:2, 11
**raped**
66:23 95:24 121:5 124:2
**rapes**
65:3 66:21 122:12 134:13
**rapist**
87:5
**rarely**
31:5
**rash**
51:6,14
**rate**
139:7
**ravine**
65:4
**read**
10:1 21:17 41:9 71:9 82:18 86:5 92:14 93:2,21 102:16 109:1,20 110:1 119:13 128:23 129:19 138:20
**reading**
102:3 129:11,18
**real**
20:12 141:22
**rear**
25:7
**reason**
8:10 89:2 98:21 122:17 134:11
**reasons**
7:8 140:23
**recall**
86:4
**receipt**
78:2,16,22 79:6 80:1
**receipts**
79:9 81:5,16
**receive**
14:21 17:16 18:14 19:23
**received**
14:23
**receiving**
81:1
**recess**
71:5 130:23
**recognize**
67:18,23 80:19 82:12 118:20
**recollection**
18:12 24:15 49:1 70:21 72:4 74:4,10 82:21 126:6 132:2
**record**
5:1 37:3,4 71:6 103:11,12,13 130:24
**recorded**
35:16
**recording**
35:17,19
**redundant**
36:18
**refer**
79:20
**referencing**
51:11 97:14
**referring**
50:19 70:14 97:19 131:23 139:13
**refresh**
72:3
**refused**
69:17
**regret**
139:1
**regular**
42:1
**regulations**
139:4
**relation**
75:24
**relationship**
126:13 127:2,3
**relayed**
96:22,24
**releasing**
56:22
**relook**
132:7
**remarks**
82:16 83:1
**remember**
8:16 9:1,8,20,22,24 10:14,17 12:18 16:14,16,17 17:12, 20 18:2,5,21 19:1,3, 17 20:17 21:1 22:4, 10,21 23:12,18 28:9 29:21,22 32:6 33:19 37:5 45:22 47:5 50:5 51:14,24 52:2,7 55:14,17 57:6 58:15 59:1 60:2,7,18 61:4, 5,8,9,19 62:5 64:16 65:8,12 66:2,13,14, 16 67:8,9 68:24 69:5,10,21 71:15,24 72:8,21,22 73:9,10, 15 74:1,7 75:18 77:4,22 80:4,5 81:20,24 82:9 83:24 84:2,5,8,10 85:6,7 89:1,4,19 91:24 92:3 95:10 96:19,24 101:17 102:4,14,23 103:2,4,6,8,21 104:17,23 105:24 106:5,6,14,22 109:24 110:4 111:10 112:7 113:10 115:18,20 117:14,17 118:3,11,12 120:8,

14,16,19 121:20,23 124:23 125:10 127:11 129:22,24 131:3,14,15,20 132:16 133:5,6,8,9, 11 134:23 135:8 136:14 137:6 143:4
**remembered** 112:14
**remind** 15:4
**reminders** 6:16
**repeat** 29:11,14 65:16 96:5 115:2 135:13
**repeatedly** 29:6
**replaced** 49:8 59:22
**report** 8:18,19,21 9:1 36:13 38:16,21 39:10,12 48:9,22 49:5,8,14, 19,23 52:19 53:1 54:3,9 57:17 68:8 70:2,7 71:10 75:5 77:23 90:2,12,16,19, 23,24 91:1,3,22 92:2,3 98:8 99:6,8,9, 14 111:14 114:16 115:22 116:1 130:3 131:8 138:4,18
**reporter** 6:21 7:4,9 65:16
**reporting** 91:7 138:14
**reports** 9:3,7 15:1 37:21 38:10,11,23 39:1,3, 4,13,14,15,18 41:9 44:2 48:7,16 52:23 71:18 99:22 115:20
**represent** 124:4
**reputation** 127:14 128:1
**reputations** 127:19
**requested** 139:4,16,18
**requesting** 39:15
**reserved** 6:3,4
**resign** 140:14
**resigned** 117:3,5 141:8
**resigning** 138:24
**respect** 58:9,10
**respond** 26:2 53:9 85:4 93:10
**responded** 108:21 122:22
**responding** 13:12 26:23 44:18 45:5 108:17
**response** 6:19 97:6 109:15 111:24
**responsibilities** 13:5,20 23:2 31:14 40:21 43:17
**responsibility** 24:5 28:15 43:22 44:1,20
**responsible** 25:12 26:13 37:13 39:2,7,21 45:4 122:11
**rest** 54:6 117:3
**restraining** 27:2,4,7
**retired** 27:14 30:17 33:24 140:1 144:4
**return** 76:4
**returned** 71:22 120:20
**returning** 120:20 121:11
**review** 8:13 9:3,11 119:7
**reviewed** 9:7 103:18 119:9
**reviewing** 69:1 70:10 79:16 119:12 132:10
**Richard** 5:2,12,22 43:7
**right's** 86:2
**right-hand** 96:14 112:5
**rights** 86:7,8 93:17 109:16 110:2,13
**rings** 74:3
**RK-1** 67:16
**RK-2** 78:1
**RK-3** 79:5
**RK-4** 90:2
**RK-5** 103:14
**RK-6** 118:14
**RK-7** 138:4
**Road** 69:8
**roam** 44:9,11
**robbery** 80:15
**rode** 142:17
**role** 11:21 15:16 26:21 31:14 41:18,19 64:6
**roles** 15:4 22:15
**room** 31:10,21,22 35:9,11 40:9,18 58:21,22 63:12 83:10,15 84:16 85:10 86:10 92:24 101:10 107:5, 7 132:20,24
**Roseti** 116:2
**rough** 100:1
**rules** 5:7,8 6:15 139:4
**running** 96:20

**S**

**safe** 35:3
**SAKOWSKI** 5:23 6:9 29:9 30:6 44:22 45:3 46:1 48:1 54:17 55:4 72:20 87:9 91:15 96:4 98:1,15 99:16 113:6 127:16 128:3 131:22 134:18 135:2,12 144:9
**samples** 75:17 78:19 82:17 83:2 92:20,24 93:19 104:14
**sat** 83:11
**satisfactorily** 5:13
**scary** 69:18
**scene** 61:2 62:15,16,17 63:16 72:11 73:4 137:23
**scenery** 26:8
**school** 10:24 11:1,4,7 32:22 49:6 107:21,23 108:6 129:18
**school-aged** 50:22
**schools** 49:4
**sealed** 81:15
**search** 92:12 104:12,22 105:4
**searching** 103:1
**section** 50:10,13 82:16 83:1
**secure** 62:9
**secured** 60:4

**security**
142:2
**seminar**
17:18,21,22 18:4
**seminars**
18:19,23 19:2 20:5
**send**
54:9
**senior**
21:8
**sense**
6:23 7:17 19:11 21:1 30:24 43:14 50:16 53:17 88:10 126:23 134:2
**sentence**
71:20 100:9 136:1
**separate**
25:2,3 40:12 136:21
**separated**
25:3
**separately**
24:24 52:11
**September**
11:18 121:7 138:17
**sergeant**
24:10,18 31:7 64:21 65:15,18,20,23 96:23 97:5,22 98:14, 23 99:2 102:17 114:8 126:10,18,22 127:5 128:1,13,21 129:22 130:2,3,5 142:5
**series**
47:13 50:3 54:14
**serve**
10:11,13 27:7 41:8
**served**
10:14 27:5 33:24 41:8
**serving**
12:21
**set**
128:22
**setting**
31:15
**Seventy-two**
10:10
**sexual**
17:17 18:4,15,18 19:18 21:3,5,20 26:17 28:18 29:15, 16,24 30:2 47:13 50:3,7,18 51:6,14 52:11,13,20 53:5 54:2,10,14,24 56:1 57:21 58:13,20 63:8, 23 74:12 75:8,24 115:1,4,16 116:8 122:3
**sexually**
52:17 67:2 124:8,10
**shadowed**
21:3
**shaking**
6:19 35:24 98:3 142:3
**shared**
18:3 31:4 126:22 142:5
**sharing**
128:6
**she'd**
140:8
**shed**
24:21
**sheets**
59:14 91:12
**shift**
12:1,2,22 13:13,23 15:11,12,18 16:8,12, 20 21:12 23:6,13,17 24:2,6,13,14 25:23, 24 26:22 27:1,18,20 28:1 36:16 37:11,24 38:16,17 41:1 44:19 47:24 48:5,6,17,22 49:3,15,23 50:22 59:9 64:23 65:11 68:9,24 91:2,22 101:21 142:18
**shifts**
23:8 47:21 114:15 142:22
**shocked**
88:20
**shook**
24:1
**short**
142:15
**shortage**
62:19 139:8
**shorter**
16:15
**shortly**
85:20
**show**
67:12 77:23 89:23 97:16 103:10
**showed**
23:17,19 84:13
**sick**
144:5
**sickness**
23:16
**side**
80:10,22 96:14 98:8 112:5
**sign**
86:2,5 87:24
**signature**
91:8 119:4 138:13
**signed**
11:21 92:12 104:12 105:12,13,14,15 119:19
**signing**
119:8
**silly**
133:22
**similar**
77:1,4
**Similarly**
23:4
**simple**
34:18
**simplistic**
78:23
**single**
128:17
**sir**
104:11 105:20 109:17
**sister**
70:19 74:5
**sit**
35:12
**sitting**
40:5 109:6 128:5
**situation**
53:22 58:4 65:1 88:1,4
**Sixteen**
50:15
**slot**
102:14
**slow**
48:8,15,19,22 49:23
**small**
59:16,21 100:12,13 101:5 141:22
**smart**
126:21
**socialize**
126:16,17
**soda**
108:2
**sodas**
108:2
**soft**
97:11 99:24 132:15, 18
**someone's**
76:19
**sort**
127:19
**speak**
74:5 76:1 88:20 105:5 121:7 144:8
**speaking**
71:9 109:17
**special**
22:2 90:8,10,15,17, 19,23 133:13
**specific**
14:14 18:8 19:17 20:17 24:15 26:10 27:16 28:11 30:15 52:19 63:3 87:14 119:22
**specifically**
17:17 19:3 26:3 31:9 36:19 39:7 52:12 54:13 83:7 84:10 92:8 103:17 118:17 134:4
**specifics**
16:5
**spell**
33:17
**spelling**
5:20
**spending**
64:8
**spent**
19:8 65:5 67:1

**spoke**
47:3,4 70:19 120:2, 8,16 121:3,8,13,18
**spoken**
97:11 132:15,18
**spring**
52:18
**Springfield**
8:20 10:18 11:3,9, 13,16 18:23 22:12 23:11,23 26:20 28:17 36:2 37:19 41:18 46:6 47:13 50:4,10 51:20 52:17 57:7 78:1 79:5 84:24 85:1 89:20 116:19, 22 117:7 126:15 128:19,24 129:4 141:1,14,24 142:6
**squad**
17:11 41:12 120:12
**stab**
55:22
**stack**
27:4
**staff**
92:23
**staircase**
25:7
**stake**
65:1
**stamped**
104:6
**standard**
57:20
**start**
5:20 11:13 88:16 129:3 131:7
**started**
15:6 48:20 85:16,18 86:10,15 89:12 93:4 108:8,9 109:10 128:24 130:10
**starting**
11:20 108:7 110:12 138:21
**starts**
92:11 104:7 120:2 134:6 136:1
**stated**
94:6,13 95:3 97:16 100:9 101:5 110:14 115:19 136:2
**statement**
56:11,14,16,18 57:1 58:13,20,23 97:13, 15 132:8,22 133:15 134:6 136:5 139:13
**statements**
21:21 57:22
**states**
5:9,14 96:21 121:2
**station**
26:23 27:1 32:19 35:8 36:13 38:19 56:9,13 57:8 60:22 61:18 63:1 76:4 81:8 91:24 97:3 99:8 101:18 114:3,5 120:19 125:17,23 126:2 142:20
**stay**
48:10 141:4
**stayed**
30:15
**step**
68:7 83:6
**steps**
116:1
**sticking**
59:17
**stipulations**
5:24 6:1
**stockings**
51:22 64:11
**stolen**
103:5
**stop**
95:5 143:22
**stopped**
109:19 110:1,9 129:8
**store**
24:4 107:22
**strange**
88:19
**street**
12:7 24:4 55:16 68:14 70:12,14,15 75:15 76:7 77:7,16 78:8 80:15 81:20 83:5,8 86:19,21 87:3 89:6,21 90:9 91:23 92:12 94:19,20,22 95:2,4,17,20 97:12 99:11 101:16 105:2, 19 110:8,21,24 111:5,9,11,13,20,21 112:1,2,3,4 113:21 118:1 120:21 125:8 133:14 134:7,10,15, 21 135:10,11,15,19 136:6,10,12,18 137:8
**strict**
139:3
**strike**
6:4 8:18
**string**
70:23
**strong**
131:18
**studying**
129:11
**stunk**
127:1
**submitted**
71:11
**subsequently**
73:12
**substantial**
62:24
**suggested**
111:8
**summer**
15:15 43:4
**sundaes**
108:3
**Sunday**
48:18
**Sundays**
28:10
**super**
134:3
**superior**
36:23
**superiors**
135:1
**supervisor**
33:4,20 34:8 41:14 127:6
**supervisors**
134:17
**supposed**
46:14
**suspect**
22:8 31:22 51:18 67:4,11 106:8 116:8 132:3
**suspect's**
67:9 132:8
**suspects**
21:23 22:6 115:16
**sworn**
5:13

**T**

**tag**
39:20,24 62:22 63:1
**tagged**
63:11
**tagging**
39:21 40:3
**takes**
15:15 16:5
**taking**
35:6 36:3 55:22 85:16 89:12
**talented**
60:5
**talk**
10:4 18:6 21:15 45:19 58:3,24 68:19 77:21 88:6,8 93:17 125:2 143:20
**talked**
22:1 48:4 59:1 83:12 92:4 95:10 104:20 108:9 111:2 124:21, 23 126:9 143:1
**talking**
7:10 31:17 41:3 44:24 47:11 50:8 51:2,4 57:12 70:17 76:23 85:18 86:11, 19,23,24 88:17 89:19 93:5 95:17 99:24 100:1 101:10 108:8,9,15,16,24 109:6 110:20 111:19 120:13 124:1,15 132:3
**tap**
5:24
**targeted**
29:6

**tasked**
25:12
**taught**
20:13 21:2 37:9 48:21
**teacher**
32:24
**Technical**
11:9 129:1,4
**technically**
101:22 114:20,21
**technician**
32:20 82:23
**technicians**
61:2
**telling**
89:3 102:22
**temporary**
140:2
**ten**
30:20,21 114:4 119:3 133:20
**tenure**
31:12
**Terry**
75:19 84:17 86:13 92:22
**test**
129:17
**testified**
93:6 108:7 112:1 115:13 116:18
**testify**
8:7,11 9:23 115:9 117:23
**testifying**
103:21 104:17 105:24 112:7,10
**testimony**
9:17 14:24
**text**
119:18,24 138:21
**thing**
38:21 61:16 69:18 83:9 103:19 134:12
**things**
18:6 20:23 23:16 26:15,18 29:23 31:6 32:12,21 33:2 37:10 38:17 39:16 41:1,7, 11 44:3 57:13 62:22 142:12,13 143:24
**thinking**
32:15
**Thomas**
24:10 31:3 143:9
**thought**
14:8 51:3 59:22 60:21 65:19 72:7 74:18 87:17 98:19 109:1,2 117:2
**thoughts**
70:16
**threw**
95:3
**throwing**
50:6
**thrown**
96:20
**tie**
43:3,4
**tied**
65:6
**time**
6:3,5 9:21 10:18 14:17,20 15:14 16:21 17:7 27:15 28:17 29:23,24 30:1, 4,16 32:17 33:3 35:15 38:24 39:15 41:1 47:3,9,11,12 50:4,8,20 54:24 57:5 58:5,12 61:4 63:17 65:4,6 67:1 68:2 69:2 70:18 71:17 73:16 77:15,24 84:6 87:12,21,22 88:24 95:22 96:9,11 98:23 101:12,17 102:23 107:23 119:8 122:21 124:10 125:18 128:20 129:7 139:2, 6,18 140:13,20 141:2,9
**times**
32:22 48:18 58:15 63:15 90:21 94:15
**today**
8:11 34:21 92:11 131:11,12 133:17
**told**
36:8 48:21 52:24 84:23,24 86:14 87:6 89:10 93:14,16 94:10 97:22 98:19 99:5,7 104:11 105:10,21 109:19 112:1,17 114:8,12 123:22 134:17,20,23 135:1,17 136:10
**Tom**
24:12 31:4 33:13 92:2,4 140:1 143:11
**ton**
50:24
**top**
79:19 104:6 108:8 119:5
**topic**
19:13,14 20:6
**topics**
19:14
**totally**
9:24 47:17 86:6
**touched**
72:15
**tour**
27:16 84:6,7
**track**
28:23
**traffic**
14:23
**trail**
115:24
**trained**
21:9
**training**
13:11 14:21,23 17:15,16 18:15,18 19:3,6,7,10,12,21,23 20:3,17,24 21:22 22:2 36:22 73:11
**trainings**
19:19 20:7
**transcribe**
6:21 7:9
**transcript**
7:16 9:16,17 103:14
**transcripts**
9:14
**transfer**
13:3
**transferred**
12:16,19 13:18 14:6, 12 15:17 16:19
**transported**
32:16 56:5
**trial**
6:3,5 66:12 103:23 117:13,18
**trials**
115:13 117:23
**trick**
78:21 119:10
**true**
136:8
**trunk**
73:7
**truth**
89:9
**truthfully**
8:8,11
**tube**
78:7,10,18
**tubes**
80:7 82:6,9,10
**Tuesday**
83:24
**turn**
39:24 45:11
**turned**
40:7 41:12 51:19
**two-man**
61:16
**type**
22:5 23:2 35:17 37:23 38:7,21 39:1 52:19 57:10 68:8,13, 15,22 78:16 99:21 115:24 141:21 142:1
**typed**
68:11,17 70:3,9,11 71:9,14 115:23
**types**
25:17 40:24
**typical**
73:17 74:20

**U**

**uh-uh**
6:20
**um-hmm**
6:20 30:8 39:5 41:5 55:7 63:19 67:19 79:11,13 81:14 87:8 120:7
**unclear**
6:22

**uncomfortable**
57:11 88:16
**uncommon**
106:8
**understand**
16:4 28:22 68:16 81:18 86:24 88:5 89:15 91:5 92:9 98:10 102:2 113:4 127:23 137:6
**understanding**
25:11 99:1
**understood**
7:1 42:19 86:7,8 88:4 93:17,18 100:7 125:15 141:12
**unfairly**
140:15
**uniform**
12:1,3,6 13:6 16:20 23:4 33:23 37:6 41:12 42:2 43:3 76:21 77:3
**uniformed**
12:10 15:6 22:18 23:3,14 36:22 38:1 40:16 43:15,20 44:2, 5 45:1,2 46:2,12 49:11 53:14 56:5 128:15
**unit**
13:23 18:18 21:8 26:12,13,21 27:13, 16 30:10,23 31:13 40:21 41:2,3 53:11 73:18 130:16 132:24 142:16 144:3
**United**
5:9
**universally**
8:2
**unprompted**
87:7 100:17
**upset**
60:23 69:14
**usual**
6:1 84:6,7

**V**

**vacation**
39:15 52:18
**varied**
23:15 31:16
**vent**
59:17,23 62:1,7 71:21 72:4,7
**verbal**
6:19
**verbatim**
112:9
**versa**
142:10
**versus**
25:18 38:1 43:16 72:4 140:15
**vials**
75:18 76:15 77:9,10 81:13 104:22 105:6, 9,11
**vice**
142:10
**victim**
55:14 56:22 97:12 99:12 131:16
**victim's**
57:21 58:13
**victims**
21:15 29:6,15 51:7 94:4 112:20
**virally**
68:14
**visit**
83:7 109:2 133:14
**voice**
97:11,17,21 99:21 132:8,13
**voice-wise**
100:2
**volunteer**
17:2 100:23
**volunteered**
111:4 137:13
**volunteers**
87:2

**W**

**wait**
7:6
**waiting**
109:2
**waiver**
86:2 87:24 92:12 104:12,22 105:3,4, 12
**walk**
11:20 83:8 140:12
**walking**
23:5,20,21 24:8 64:13
**wallet all**
86:4
**wanted**
10:3 44:16 59:4 71:7 88:16 93:17 109:21 116:24 117:2 128:14,17 133:23 139:19
**wanting**
88:8
**warnings**
87:18,20,23 89:14 93:16 109:11,21
**warrant**
56:7 92:12 104:12, 22 105:4
**watch**
12:14 75:20,23 76:3, 16 77:2 106:8
**watched**
89:11
**watching**
76:19 88:14
**wear**
51:23
**wee**
53:13
**week**
19:8 28:5,6,11 63:4
**weekend**
28:13 84:13,14
**weekends**
28:12,15,16
**weeks**
12:2 64:15
**White**
64:20
**William**
65:18 143:24
**Willow**
69:10
**window**
59:17,23,24 62:9,12 72:6
**windows**
49:4,5,7 59:18
**winter**
43:3
**woman**
18:5 57:10 65:2 94:7 95:16 111:1 112:4 136:2
**women**
18:6 47:14,15 50:4, 9,11,20,23 52:12 58:2 64:3,5 66:22 112:21,22 122:5
**wondering**
94:12,14
**woods**
64:9,24
**Worcester**
74:18 75:5
**word**
50:6 86:6 92:16 100:12
**words**
100:1
**wore**
42:15 51:21
**work**
21:20 22:2 24:12,23, 24 43:2 44:14 45:13 46:15,16 56:15 117:6 125:22 127:9 142:2,24 144:1
**worked**
21:7,10,12 23:10,23 24:10,13 28:7,10 31:5 38:22 46:12 84:2,9,12,14 107:22 120:4,11 127:12,14 128:7 130:16 142:13 143:19 144:2
**working**
15:19,22 18:18 20:21,22 23:9 24:16 26:4 27:15,24 28:6, 10 32:3 39:11 68:24 84:11 120:24 125:6, 10 142:14,16 143:2
**works**
122:8
**worry**
79:3
**wrapping**
142:4
**write**

9:1 15:1 36:15 39:3, 10 48:22 49:5,14,19 54:3 68:8 78:11 80:16,17 82:6 91:21

**writing**
35:12 38:16,17 57:24 97:23 99:14 138:18

**written**
22:11 58:8 81:5 113:23 129:17

**wrote**
8:19,22 37:21 39:11 49:8 78:13,18,19 79:22 82:8 90:8 91:2 92:2,3 94:11,12 97:18 114:16 133:15,20,24 135:9 138:10

**Y**

**year**
11:4,14 12:18 19:6, 13,16,17 22:23 27:12 51:10,11,12 61:10 65:12 129:22

**years**
10:14 14:3 16:2 19:9 20:14,22 22:21 33:19 69:19 76:21, 24 113:10 144:6

**yell**
49:22

**York**
75:15 76:7 77:7,16 78:8 80:15 81:20 83:5,8 89:6,21 90:9 91:23 92:12 99:11 101:16 105:1,19 113:21 118:1 120:21 125:8 133:14

**young**
50:11

**younger**
21:13 50:22 52:16 64:5

**Youth**
25:4,6

**yu**
47:5

**YWCA**
18:5

**Z**

**Zoom**
37:2 144:12

**zooming**
62:13