**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities ........ iii

Standard of Review ........ 1

I. Issue Preclusion Does Not Bar Plaintiff from Challenging the December 7, 1985 Confession Statement ........ 9

A. Perrot was Denied a "Full and Fair Opportunity to Litigate" the Voluntariness of the Statement his Criminal Proceedings as a Result of Defendants' Misconduct. ........ 10

B. Even if Perrot Had a "Full and Fair Opportunity to Litigate" the Issue, Preclusion Would Still Not Apply Because the SJC Decision is Not a Final and Valid Judgment ........ 13

1. The SJC Decision is not a final and valid judgment on the Prekop Crimes because that conviction was vacated ........ 13

2. The SJC's 1990 decision is not a final and valid judgment because Perrot had no ability to appeal it ........ 17

C. Even if This Court Considers the Vacated Conviction to be Extant, Issue Preclusion Still Does Not Apply. ........ 18

1. The SJC Only Analyzed the Voluntariness of the False Confession Statement ........ 18

2. The Statement's voluntariness was not essential to the SJC's judgment. ........ 20

II. Plaintiff's Claims In This Case Are Not *Heck*-Barred. ........ 21

III. A Reasonable Jury Could Find That the Individual Defendants Withheld Exculpatory Evidence ........ 28

A. Original Statement from Decembre 7, 1985 ........ 31

B. Jarvis's Handwritten Interrogation Notes ........ 33

C. Kelly's Interviews of Adkins and Timmerman ........ 34

D. Suspect's Shoeprint at Prekop's Residence ........ 35

E. Other Suppressed Evidence ........ 36

IV. The Record Demonstrates That Individual Defendants

Falsified Or Destroyed Evidence. .......... 38

V. Kelly and Jarvis's False Testimony Led to Perrot's Wrongful Convictions. .......... 43

VI. Qualified Immunity .......... 45

VII. Probable Cause .......... 48

VIII. Conspiracy .......... 49

IX. Monell .......... 52

A. The City of Springfield's Lacked Adequate Policies Despite the Obvious Need to Implement Them. .......... 53

B. The City of Springfield failed to properly train and supervise its employees .......... 56

X. A Jury Must Decide All Plaintiff's State Law Claims. .......... 60

A. Malicious Prosecution .......... 60

B. Civil Conspiracy .......... 62

C. Intentional Infliction of Emotional Distress .......... 63

D. Massachusetts Civil Rights Act .......... 64

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546 (1st Cir. 1994) ....................62

*Alcorta v. Texas*, 355 U.S. 28 (1957) ....................43

*Allen v. McCurry*, 449 U.S. 9 (1980) ....................13

*Almeida v. Rose*, 55 F.Supp.3d 200 (D. Mass. 2014) ....................48

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ....................9

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ....................29

*Armstrong v. Squadritto*, 152 F.3d 564 (7th Cir. 1998) ....................54, 55

*Avery v. Burke Cnty.,* 660 F.2d 111 (4th Cir. 1981) ....................54, 55

*Avery v. Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ....................39

*Bailey v. Andrews*, 811 F.2d 366 (7th Cir.1987) ....................19

*Baker v. Dist. of Columbia*, 326 F.3d 1302 (D.C.Cir.2003) ....................55

*Bally v. Northeastern Univ*., 403 Mass. 713 N.E.2d 49 (1989) ....................64, 64

*Bazinet v. Thorpe*, 190 F. Supp. 3d 229 (D. Mass. 2016) ....................63, 64

*Beck v. Ohio*, 379 U.S. 89 (1964) ....................49

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014) ....................36

*Bobby v. Bies*, 556 U.S. 825 (2009) ....................21

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................28,

*Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008) ....................38, 48

*Bryant v. Thomas*, 725 F. App'x 72 (2d Cir. 2018) ....................37

*California v. Trombetta*, 467 U.S. 479 (1984) ....................29

*Campbell v. Casey*, 166 F.Supp.3d 144 (D Mass. 2016) ....................61

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................22, 27

*Chestnut Hill Dev. Corp. v. Otis Elevator Co*., 739 F. Supp. 692 (D. Mass. 1990) ....................10

*City of Canton v. Harris*, 489 U.S. 378 (1989) ....................53, 54, 55, 57

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ....................52

*Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) ....................43

*Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC*,
994 F.3d 77 (1st Cir. 2021) ....................13
*Commonwealth v. Graves*, 112 Mass. 282 (1873) ....................18
*Connick v. Thompson*, 563 U.S. 51 (2011) ....................54, 55, 57
*Crane v. Kentucky*, 476 U.S. 683 (1986) ....................20
*Doby v. South Carolina Dep't of Corrections*, 741 F.2d 76 (4th Cir. 1984)....................19
*Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013) ....................46, 58
*Dukes v. City of Albany*, 289 F. Supp. 3d 387 (N.D.N.Y. 2018) ....................15, 25
*Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988)....................50
*Echavarria v. Roach*, 565 F. Supp. 3d 51 (D. Mass. 2021) ....................39, 63
*Elkins v. Summit Cnty., Ohio*, 615 F.3d 671 (6th Cir. 2010) ....................30
*Estate of Bennett v. Wainwright*, 548 F.3d 155 (1st Cir. 2008) ....................50
*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006)....................15
*Fountain v. City of Methuen,* 630 F. Supp. 3d 298 (D. Mass. 2022) ....................62
*Fox v. Hayes*, 600 F. 3d 819 (7th Cir. 2010) ....................48, 64
*Franklin Sav. Ass'n v. Off. of Thrift Supervision*, 35 F.3d 1466 (10th Cir. 1994)....................14
*Franks v. Delaware*, 438 U.S. 154 (1978) ....................49
*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) ....................38
*Giglio v. United States*, 405 U.S. 150 (1972).................... 28, 29, 44
*Giragosian v. Ryan*, 547 F.3d 59 (1st Cir. 2008)....................10
*Goddard v. Kelley*, 629 F.Supp.2d 115 (D.Mass.2009)....................64
*Gual Morales*, 579 F.2d 677 (1st Cir. 1978) ....................50
*Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26 (1st Cir. 1995) ....................44
*Haley v. City of Boston*, 2013 WL 4936840 (D. Mass. Sept. 12, 2013) ....................55
*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)....................28, 46, 47
*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979) ....................50
*Heck v. Humphrey*, 512 U.S. 477 (1994) .................... *passim*
*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013) ....................48, 49

*Hilchey v. Haverhill*, 537 F.Supp.2d 255 (D. Mass. 2008) ....................48

*Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018) ....................57

*In re Ranbaxy Generic Drug Application Antitrust Litig.*, 573 F. Supp. 3d 459 (D. Mass. 2021) ....................20

*Jackson v. Coalter*, 337 F.3d 74 (1st Cir. 2003) ....................13, 14

*Jarosz v. Palmer*, 436 Mass. 526 (Mass. 2002) ....................20

*Jarosz v. Palmer*, 49 Mass. App. Ct. 834 (Mass. 2000) ....................18

*Johnson v. Mahoney* 424 F.3d 83 (1st Cir. 2005) ....................11, 12

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ....................54, 55

*Kobatake v. E.I. DuPont De Nemours & Co.,* 162 F.3d 619 (11th Cir. 1998) ....................14

*Kurker v. Hill*, 44 Mass. App. Ct. 184, 689 N.E.2d 833 (1998) ....................62

*Kyles v. Whitley*, 514 U.S. 419 (1995). ....................36

*Langely v. Prince*, 926 F.3d 145 (5th Cir. 2019) ....................14

*Lego v. Twomey*, 404 U.S. 477 (1972) ....................19

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ....................28, 29, 46

*Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007) ....................43, 64

*Limone v. United States*, 579 F.3d 79 (1st Cir.2009) ....................61

*Lopez v. Massachusetts*, 349 F. Supp. 2d 109 (D. Mass. 2004) ....................36, 37

*Lundborg v. Phoenix*, 91 F.3d 265 (1st Cir. 1996) ....................9

*Magraw v. Roden,* 743 F.3d 1 (1st Cir. 2014) ....................29

*Manganella v. Evanston Ins. Co*., 700 F.3d 585 (1st Cir. 2012) ....................10

*Maxwell v. Indianapolis*, 998 F.2d 431 (7th Cir. 1993) ....................49

*McCambridge v. Hall*, 303 F.3d 24 (1st Cir. 2002) ....................29

*McDonough v. Smith*, 588 U.S. 109 (2019) ....................23

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir.1996) ....................58

*Migra v. Warren City School District*, 465 U.S. 75 (1984) ....................13

*Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017) ....................44

*Mitchell v. City of Bos.,* 130 F. Supp. 2d 201 (D. Mass. 2001) ....................44

*Mlodzinski v. Lewis*, 648 F.3d 24 (1st Cir. 2011) ....................46

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir.2009) ....................58

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)....................52

*Montana v. U.S.*, 440 U.S. 147 (1979) ....................11

*Mooney v. Holohan*, 294 U.S. 103 (1935) ....................39, 47

*Mullins v. Corcoran*, 488 Mass. 275 (Mass. 2021)....................20

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................39

*No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21 (1st Cir. 1985) ....................13

*Noonan v. Wonderland Greyhound Park Realty LLC*,
723 F. Supp. 2d 298, 349 (D. Mass. 2010) ....................22, 46, 60, 61

*O'Connell v. Alejo*, 2020 WL 1244852, (D. Colo. Mar. 16, 2020) ....................15

*Oahn Nguyen Chung v. StudentCity.com, Inc.,* 854 F.3d 97 (1st Cir. 2017) ....................9

*O'Connell v. Fed. Ins. Co*., 484 F. Supp. 2d 223 (D. Mass. 2007)....................9

*O'Leary v. Liberty Mut. Ins. Co*., 923 F.2d 1062 (3d Cir. 1991) ....................21

*Olszewski v. Spencer*, 466 F.3d 47 (1st Cir. 2006)....................30

*Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ....................55

*Pearson v. Callahan*, 555 U.S. 223 (2009)....................45

*Pellegrini v. Ne. Univ*., 323 F. Supp. 3d 182 (D. Mass. 2018) ....................17

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986)....................52, 54

*Penate v. Kaczmarek* No. CV 3:17-30119-KAR,
2018 WL 4654708, (D. Mass. Sept. 27, 2018) ....................17

*Perea v. Ed. Cultural, Inc*., 13 F.4th 43 (1st Cir. 2021) ....................9

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019)....................14

*Peterson v. U.S. Bank Nat. Ass'n*, 918 F. Supp. 2d 89 (D. Mass. 2013) ....................9

*Planned Parenthood League of Massachusetts, Inc. v. Blake*,
417 Mass. 467 N.E.2d 985 (1994)....................64

*Polay v. McMahon*, 10 N.E.3d 1122 (Mass. 2014)....................63

*Pyle v. Kansas*, 317 U.S. 213 (1942) ....................43

*Ramallo Bros. Printing v. El Dia, Inc*., 490 F.3d 86 (1st Cir. 2007) ....................9, 10, 19

*Roman v. Trs. of Tufts Coll.,* 964 N.E.2d 331, 341 (Mass. 2012) ....................63

*Rumsfeld v. Freedom NY*, 329 F.3d 1320 (Fed. Cir. 2003)....................14

*Salton v. Philips Domestic Appliances*, 391 F.3d 871 (7th Cir. 2004)....................14

*Sampson v. United States*, 832 F.3d 37 (1st Cir. 2016). ....................21

*Sanchez v. Foley*, 972 F.3d 1 (1st Cir. 2020)....................50

*Santiago v. Fenton*, 891 F.2d 373 (1st Cir. 1989) ....................50, 60, 61

*Santiago v. Keyes*, 890 F. Supp. 2d 149 (D. Mass. 2012) ....................64

*Schand v. City of Springfield*, 380 F. Supp. 3d 106 (D. Mass. 2019)....................52, 59, 61

*Schand v. McMahon* 487 F. Supp. 3d 71 (D. Mass. 2020)....................13, 15

*Tausevich v. Bd. of Appeals of Stoughton*, 402 Mass. 146 (1988) ....................18

*Tavakoli v. Los Angeles*, 2019 WL 1297950 (C.D. Cal. Mar. 18, 2019)....................10

*Tolan v. Cotton*, 572 U.S. 650 (2014) ....................9

*Trammell v. McKune*, 485 F.3d 546 (10th Cir. 2007)....................37

*Tsao v. Desert Palace, Inc.,* 698 F.3d 1128 (9th Cir. 2012) ....................54, 55

*U.S. v. Lawson*, 736 F.2d 835 (2d. Cir. 1984) ....................14

*United Brotherhood v. Operative Plasterers*, 721 F.3d 678 (D.C. Cir. 2013)....................14

*United States v. Agurs*, 427 U.S. 97 (1976) ....................29

*United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019) ....................44

*United States v. Bagley,* 473 U.S. 667 (1985)....................29

*United States v. Butler*, 955 F.3d 1052 (D.C. Cir. 2020)....................44

*United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) ....................30

*United States v. Deaner*, 1 F.3d 192 (3d Cir.1993)....................34

*United States v. Dollard*, 780 F.2d 1118 (4th Cir. 1985) ....................19

*United States v. Figueroa-Quinones*, 21 F. Supp. 3d 138 (D.P.R. 2014)....................34

*United States v. González–González*, 258 F.3d 16 (1st Cir. 2001) ....................29

*United States v. Hufstetler*, 782 F.3d 19 (1st Cir. 2015) ....................19

*United States v. Inman*, 352 F.2d 954 (4th Cir. 1965)....................19

*United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990)....................19

*United States v. McKithen*, 10 F. App'x 217 (4th Cir. 2001) ....................19

*United States v. Reyes-Romero*, 959 F.3d 80 (3d Cir. 2020) ....................21

*United States v. Tosi*, 897 F.3d 12 (1st Cir. 2018) ....................22

*United States v. Ward*, 182 F. App'x 779 (10th Cir. 2006) ....................33

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ....................22

*United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) ....................30

*White v. Massachusetts*, 382 F. Supp. 2d 248 (D. Mass. 2005) ....................26

*Williams v. Chicago*, 733 F.3d 749 (7th Cir. 2013) ....................49

*Williams v. City of Boston*, 771 F. Supp. 2d 190 (D. Mass. 2011) ....................47

*Wolfson v. Brammer,* 616 F.3d 1045 (9th Cir. 2010) ....................13

*Wynne v. Rosen*, 464 N.E.2d 1348 (1984) ....................61

**Statutes**

42 U.S.C. 1983 .................... *passim*

Full Faith and Credit Act, 28 U.S.C. §1738 ....................13

Mass. G.L. c. 12, § 11H ....................64

Mass. G.L. c. 12, § 11J ....................64

RESTATEMENT (2D) JUDGMENTS §27(5)(c) ....................11

**Additional Cites**

ANSI/ASB Standard 035, Standard for the Examination of Documents for Alterations, 2020, 1st Ed., https://www.nist.gov/organization-scientific-area-committees-forensic-science/forensic-document-examination-subcommittee ....................32

**Introduction**

In 1984 and 1985, Springfield Police Department ("SPD") was investigating a series of home invasions and sexual assaults targeting elderly women, including, Mary Prekop, Emily Lichwala, and Mae Marchand. (Pl.'s SOAF ¶1; Defs.' SOMF ¶1, ¶¶45-46, ¶¶62-66). Specifically, on November 30, 1985, an unknown male broke into Prekop's home at 27 Malibu Drive and sexually assaulted her ("Prekop Crimes"). (Defs.' SOMF ¶¶62-66). According to the SPD, that same suspect broke into Lichwala's residence earlier in the night and stole her pocketbook ("Lichwala Crimes").[1] (Defs.' SOMF ¶¶56-61). When Lichwala heard the intruder breaking into her home, she ran to her neighbor's house to call the police; never seeing or encountering the intruder. (Defs.' SOMF ¶¶56-61).

George Perrot did not commit these crimes. Whoever committed these crimes, they had absolutely nothing to do with the Plaintiff, George Perrot, who was only 17 years old at the time. Perrot is completely innocent.

About a week after the crimes described above, on December 6, 1985, a Friday, Perrot worked a full day at his construction job and returned home about 5 pm. (Pl.'s SOAF ¶2). That night, Perrot, his girlfriend, Lisa Eldridge, one of her friends, and Bob Timmerman were planning to go out. (Pl.'s SOAF ¶3). Timmerman picked up Perrot around 6 pm, and they drove to pick up Eldridge and her friend. (Pl.'s SOAF ¶4). From there, the four friends went to a local convenience store and purchased a case of beer. (Pl.'s SOAF ¶5). They drove around town drinking beer, smoking marijuana, and hanging out. (Pl.'s SOAF ¶5). At one point, the four friends went to Timmerman's house to partake in some cocaine. (Pl.'s SOAF ¶5). In all, Perrot

[1]Plaintiff recognizes that *Heck* bars him from bringing suit or recovering damages against anyone for actions related to Lichwala's November 30th break-in because that conviction still stands. However, Plaintiff is maintaining his innocence for the Lichwala crimes for the purposes of this brief.

took several valiums, drank about 12 beers, and consumed about a gram of cocaine, resulting in severe intoxication. (Pl.'s SOAF ¶6).

After cruising around for a couple hours, Timmerman and Perrot dropped Eldridge and her friend off at their homes. (Pl.'s SOAF ¶7). And at about 12:15 am, Timmerman dropped Perrot off at his house. (Pl.'s SOAF ¶7). From there, Perrot walked to Ellendale Street and entered a house he thought was unoccupied in search of money. (Pl.'s SOAF ¶8). A few minutes later, Perrot started hearing voices and upon realizing the residents were home, he ran out the front door. (Pl.'s SOAF ¶9). After fleeing the house, Perrot walked to the neighborhood Denny's restaurant to buy a coffee. (Pl.'s SOAF ¶10). As he was leaving, Perrot, desperate for money, grabbed a pocketbook from another patron and ran home, where he passed out on his bed at about 2:30 am. (Pl.'s SOAF ¶10).

At 2:45 am, SPD uniformed officers arrived at Perrot's home, where Mark Westcott, Perrot's brother-in-law, let them in and showed them to Perrot's bedroom. (Pl.'s SOAF ¶11). Nancy Westcott, Perrot's older sister, opened the door to Perrot's bedroom for the officers and found Perrot passed out. (Pl.'s SOAF ¶12). Perrot was so deeply asleep that it took several minutes for Ms. Westcott to wake her brother from unconsciousness. (Pl.'s SOAF ¶12). And when she finally did, the officers yanked Perrot out of bed, arresting and handcuffing him based on their suspicion he was the culprit for the Denny's theft. (Pl.'s SOAF ¶13). As the officers escorted him out of the house, Perrot, disoriented and afraid, bolted and ran through several backyards before the police caught up to him. (Pl.'s SOAF ¶¶13-14). When they did, the officers repeatedly kicked and hit Perrot as he was on the ground, handcuffed. (Pl.'s SOAF ¶14).

At about 4:00 am, the officers transported Perrot to the police station, where he was taken to the booking desk and searched. (Pl.'s SOAF ¶16). As the officers patted Perrot down, one of

them punched him in the rib cage, triggering laughter from nearby officers. (Pl.'s SOAF ¶17). The officers placed Perrot in a holding cell where Officer Paul Glantz continuously rattled his baton against the cell's bars to prevent Perrot from being able to fall asleep. (Pl.'s SOAF ¶20).

After the officers took Perrot away, his sister called their mother, Beverly Daly, and told her that Perrot had been arrested. (Pl.'s SOAF ¶15). At approximately 4:45 am, Ms. Daly called the police station and asked if her son was there, and the officers told her that he was not. (Pl.'s SOAF ¶18). About an hour later, an officer brought Perrot to an interrogation room, with a desk and a typewriter, where two detectives waited, one of whom was Thomas Kelly. (Pl.'s SOAF ¶21). Kelly started questioning Perrot about the break-in on Ellendale Street and the Denny's incident. (Pl.'s SOAF ¶22). In response, Perrot told them that he did not want to talk to them, and that he just wanted to go to sleep. (Pl.'s SOAF ¶22). But the detectives persisted until Perrot relented and started answering their questions. (Pl.'s SOAF ¶22).

After about 20 minutes, the detectives brought Perrot back to the booking desk, where he was fingerprinted, photographed, and processed. (Pl.'s SOAF ¶23). Perrot returned to the holding cell for approximately a half hour before officers brought him back to the interrogation room. (Pl.'s SOAF ¶23).

During the second interrogation session, Kelly and another detective questioned Perrot about the two break-ins and the rape described above that occurred on November 30, 1985. (Pl.'s SOAF ¶24). Kelly screamed at Perrot, repeatedly telling him that he was the assailant. (Pl.'s SOAF ¶25). They fed Perrot details of the crimes, recounting to him how, at 4:00 am on November 30, 1985, "he" broke into a house on 27 Malibu and the owner's little black dog barked at "him." (Pl.'s SOAF ¶25). But because he was not involved in those crimes, Perrot did not provide the detectives with any information about those incidents. (Pl.'s SOAF ¶26).

The officers then escorted Perrot back down to the cell where he remained for a period of time. (Pl.'s SOAF ¶27). Afterward, officers brought him to a different interrogation room where two new detectives waited. (Pl.'s SOAF ¶28). During this interview, the detectives asked Perrot about a pharmacist's murder that he knew nothing about. (Pl.'s SOAF ¶28). Perrot became progressively more sleep deprived throughout these interrogations, and at one point, vomited during the questioning. (Pl.'s SOAF ¶43).

Meanwhile, Officers Ronald St. Germain and Thomas Trites prepared an affidavit for a search warrant for Perrot's residence, 87 Malibu Drive. (Pl.'s SOAF ¶29). At about 9:00 am, Kelly and Sgt. Andrew Canevari went to 87 Malibu to conduct the search. (Pl.'s SOAF ¶30). Kelly brought a pair of gloves with him that were allegedly recovered from Prekop's residence on November 30, 1985. (Pl.'s SOAF ¶30). While executing the search warrant, Kelly showed Ms. Westcott the gloves and asked her if she had seen them before. (Pl.'s SOAF ¶31). Ms. Westcott told Kelly that she thought they looked like gloves that Lisa Eldridge had worn. (Pl.'s SOAF ¶31). Despite this, Kelly invented a false story that Ms. Westcott told him that the gloves were hers and she had recently lost or misplaced them. (Pl.'s SOAF ¶32). Notably, the officers' search yielded nothing that linked Perrot to the Prekop Crimes. (Pl.'s SOAF ¶33).

Upon concluding the search, Kelly returned to the police station and spoke with Jarvis, filling him in on the investigation. (Pl.'s SOAF ¶34). Subsequent to this conversation, Jarvis took the gloves to Ms. Eldridge's residence and asked her if the gloves belonged to her; Ms. Eldridge told Jarvis that they were not hers. (Pl.'s SOAF ¶35).

Back at the station, around 12:40 pm, Officers Thomas Jarvis and John Scanlon explained to Perrot that they wanted to collect hair and blood samples from him to compare to evidence recovered from a couple of recent rapes. (Pl.'s SOAF ¶36). Knowing he was not involved in

these assaults, Perrot agreed to provide the samples, and signed a waiver to that effect. (Pl.'s SOAF ¶37). During this interrogation session, officers also presented Perrot with the typewritten statement about the Denny's theft and Ellendale break-in, which he signed. (Pl.'s SOAF ¶38).

From about 3:00 to 4:30 pm, Jarvis continued interrogating Perrot about the Prekop and Lichwala Crimes. And Perrot repeatedly denied his involvement. (Pl.'s SOAF ¶39). Unwilling to accept Perrot's denial, Jarvis fabricated a second typewritten confession, purportedly by Perrot, about the Prekop and Lichwala Crimes. Since first being confronted with this false confession, Perrot has consistently denied providing Jarvis, or any other SPD officer, information about the Prekop Crimes. (Pl.'s SOAF ¶41).

To make the statement appear legitimate, Jarvis elicited sufficient facts from Perrot about his whereabouts prior to the attack on Prekop, and then had Perrot sign the statement with only the information he provided in the first paragraph. (Pl.'s SOAF ¶43). The version signed by Perrot did not contain any confessions. Subsequently, Jarvis inserted the purported confession to the Prekop Crimes into the original document, photocopied it, and then provided the copy of the fabricated Statement (hereinafter "Fabricated Statement" or "Statement") to the prosecutor. (Pl.'s SOAF ¶44). By photocopying the Fabricated Statement, all defects, alterations, indentations, corrections, or page substitutions from the original document are lost. To this day, Perrot nor his attorneys have seen the original copy of the Statement. (Pl.'s SOAF ¶¶68-70). Only the photocopied version was introduced at trial. (Pl.'s SOAF ¶56). Jarvis intentionally suppressed the original Fabricated Statement to conceal his misconduct. He also destroyed all his notes taken during Perrot's interrogation. (Pl.'s SOAF ¶42).

At 4:30 pm, Kelly coordinated a lineup involving Perrot. (Pl.'s SOAF ¶47). The three sexual assault victims, Prekop, Marchand, and Lichwala, all came to the station to view this line

up.[2] (Pl.'s SOAF ¶47). None of the women identified Perrot as their assailant. (Defs.' SOMF ¶136). And none of the women asked to hear the line up participants speak, even though the officers informed the women that they could do so. (Pl.'s SOAF ¶48).

Later that night, Perrot was finally allowed to visit with his mother, sister, and girlfriend at the police station. (Pl.'s SOAF ¶49). During their visit, Perrot cried and explained how the police officers "roughed him up." (Pl.'s SOAF ¶49). Perrot was hysterical, begging his mother and sister to get him a lawyer because the police were trying to frame him for crimes he did not commit. (Pl.'s SOAF ¶49).

That was exactly what happened. Despite no legitimate evidence tying Perrot to the Prekop Crimes, SPD officers sought charges against Perrot for the sexual assault and burglary of Mary Prekop. Later in December 1985, a grand jury indicted Perrot on the Denny's theft and the Ellendale break-in, as well as on charges relating to the Prekop Crimes and Lichwala Crimes. (Defs.' SOMF ¶151). In April 1986, Bloom brought more charges against Perrot relating to another sexual assault, involving Mae Marchand, that occurred on September 21, 1985. (Pl.'s SOAF ¶69).

In February 1987, Perrot pled guilty to the Denny's theft and Ellendale break-in. (Defs.' SOMF ¶153). From 1985 through 1987, Francis Bloom, then Assistant District Attorney, prosecuted Perrot for a variety of charges stemming from the Prekop and Lichwala Crimes. (Pl.'s SOAF ¶50). On April 1, 1987, Bloom and Officer Thomas Kennedy personally delivered forensic evidence, including Perrot's blood, two rape kits, and Prekop's blood and hair, to the FBI for further analysis. (Defs.' SOMF ¶¶221-23, ¶¶239-241).

[2] An unknown male assailant sexually assaulted Emily Lichwala on October 24, 1985. Although SPD suspected Perrot, he was never charged with crimes relating to that incident.

After two years of continuances, Perrot's jury trial began on December 8, 1987, lasting for five days. On the first day of trial, Prekop and Lichwala testified, and neither one identified Perrot as their assailant. And Prekop did not testify about the recovered gloves. The next day, Officers Robert Cheetham, Marianne Popko, Kennedy, Jarvis, and Kelly took the stand. During her examination, Popko read Prekop's statement to the jury, including the false fact: "When the police arrived, I noticed a pair of gloves on the foot of the bed. They are not mine. I never saw them before." (Pl.'s Ex. 16, Trial 2 Trans., 1/6/92, p. 144) (Pl.'s Ex. 4, Prekop Statement, 11/30/85). This laid the necessary foundation for Bloom to introduce the gloves as evidence. Kennedy, Jarvis, and Kelly testified. Jarvis testified on direct examination about the Statement concerning the Prekop Crimes, and the court admitted the Statement into evidence. (Pl.'s SOAF ¶58). Without an identification from the victims or conclusive forensic evidence, the case against Perrot largely hinged on this Statement. During his closing, Bloom argues that the jury does not have to look at any other evidence beyond the Statement. (Pl.'s SOAF ¶59). Bloom even argues that the Statement is the "most important piece of evidence in this case." (Pl.'s SOAF ¶59).

A jury found Perrot guilty on all counts. (Defs.' SOMF ¶202). Two days later, Perrot appealed. (Defs.' SOMF ¶203). On that same day, and despite the recent conviction, Bloom and Kelly conspired to manufacture a false confession by Perrot about the Prekop, Lichwala, and Marchand sexual assaults. (Pl.'s SOAF ¶69). Bloom claimed they did so to induce Jeffrey Adkins and Bob Timmerman into implicating themselves, as well as Perrot for the crimes he was not yet convicted of. (Pl.'s SOAF ¶69).

On July 5, 1990, the Supreme Judicial Court ("SJC") vacated Perrot's convictions and remanded the case for a new trial. (Defs.' SOMF ¶203). On January 6, 1992, the second jury trial began and concluded just three days later, and it largely mirrored Perrot's first trial. (Defs.'

SOMF ¶205). The jury again found Perrot guilty on all counts, including aggravated rape, unarmed robbery, indecent assault and battery, burglary, and burglary with assault. (Defs.' SOMF ¶236). Among other shorter concurrent terms, the court sentenced Perrot to two life sentences.

Determined to clear his name, Perrot appealed his 1992 convictions a few days after the jury's verdict. On May 3, 1995, the appellate court affirmed his convictions. (Defs.' SOMF ¶301). The following week, Perrot filed an application for further appellate review by the SJC, which the SJC denied. (Defs.' SOMF ¶301).

For the majority of the 1990s and 2000s, Perrot was incarcerated. From 2000 to 2014, Perrot pursued every legal avenue he could to prove he was innocent of the Prekop and Lichwala Crimes. (Defs.' SOMF ¶¶301-315). In 2012, Perrot finally got his break—the FBI began auditing cases they were involved in that relied on hair microscopy, and Perrot's case was one of them. (Defs.' SOMF ¶316). Through this audit, the FBI determined that Agent Oakes, the "hair analysis expert" in both of Perrot's trials, made erroneous statements and exaggerated the forensic conclusions. (Pl.'s SOAF ¶79).

In July 2014, Perrot filed his fourth motion for a new trial. (Defs.' SOMF ¶317). The court granted his motion as to the Prekop crimes, vacating the related convictions. (Defs.' SOMF ¶318). Finally, in October 2017, the Hampden District Attorney's office filed a *nolle prosequi* for all charges relating to Prekop. (Defs.' SOMF ¶321). After more than 30 years of wrongful conviction cause by Defendants' collective misconduct, Perrot was finally free, after which he brought this lawsuit seeking redress.

## STANDARD OF REVIEW

A court may grant summary judgment only if the record, construed in the light most amiable to the nonmovant, presents no genuine issue as to any material fact and reflects the

movant's entitlement to judgment as a matter of law. *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021). In conducting this appraisal, courts must take "all the facts in the light most flattering to the nonmoving party, resolving any evidentiary conflicts in that party's favor." *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). An issue is "genuine" if a reasonable factfinder could resolve it in favor of either party, and an issue is "material" if it holds the potential to change the outcome of the suit. *Id.*

This Court assesses the record evidence in the light most favorable to Perrot and draws reasonable inferences in his favor. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Perrot's claims and that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I. ISSUE PRECLUSION DOES NOT BAR PLAINTIFF FROM CHALLENGING THE DECEMBER 7, 1985 CONFESSION STATEMENT.

A party seeking to invoke the doctrine of collateral estoppel must establish that (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment. *Ramallo Bros. Printing v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007).

Defendants bear the burden to prove that issue preclusion applies in this case. *See Peterson v. U.S. Bank Nat. Ass'n*, 918 F. Supp. 2d 89, 100 (D. Mass. 2013); *O'Connell v. Fed. Ins. Co.*, 484 F. Supp. 2d 223, 226 (D. Mass. 2007); *see also*, *Lundborg v. Phoenix*, 91 F.3d 265, 271–72 (1st Cir. 1996). Defendants have failed to meet this burden.

In this case, Defendants did not, and cannot, establish that each of these elements exist, as explained in detail below.

**A. Perrot was Denied a "Full and Fair Opportunity to Litigate" the Voluntariness of the Statement his Criminal Proceedings as a Result of Defendants' Misconduct.**

Preclusion is an equitable doctrine. *See Chestnut Hill Dev. Corp. v. Otis Elevator Co.*, 739 F. Supp. 692, 696 (D. Mass. 1990); *Giragosian v. Ryan*, 547 F.3d 59, 64 (1st Cir. 2008) ("[R]es judicata should be addressed from the perspective of fairness and efficient judicial administration since the doctrine of claim preclusion is not applied rigidly where such interests would not be served."). As an equitable doctrine, issue preclusion can be defeated when there has been a material change in circumstances. *Ramallo Bros. Printing*, 490 F.3d at 90. Withholding exculpatory evidence is just the sort of wrongdoing that destroys a previous proceeding's preclusive effect. *E.g.*, *Tavakoli v. Los Angeles*, 2019 WL 1297950, at *6 (C.D. Cal. Mar. 18, 2019) ("[I]ssue preclusion does not apply where . . . the arresting officers lied, fabricated evidence, or intentionally concealed exculpatory evidence").

The heart of Perrot's federal constitutional claim is that he was wrongly convicted, in part, based on the Statement, and that the Defendants suppressed evidence of their misconduct–evidence that would have allowed Perrot to demonstrate that this statement was fabricated and that he was innocent. Perrot's state criminal proceedings were systematically corrupted by the Defendants' misconduct. As such, it would be plainly unjust to rule that the Defendants do not need to litigate claims in this civil rights suit because their own misdeeds infected the state-court proceedings, resulting in the denial of Perrot's motion to suppress.

For prior proceedings to have preclusive effect, a party must have had a "full and fair opportunity to litigate the issue in the previous action." *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012); *Allen*, 449 U.S. at 95 (Supreme Court has repeatedly recognized

"that the concept of collateral estoppel cannot apply when the party . . . did not have a 'full and fair opportunity' to litigate that issue in the earlier case."). "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. U.S.*, 440 U.S. 147, 164 (1979); RESTATEMENT (2D) JUDGMENTS §27(5)(c) (no preclusion where "the party sought to be precluded, as a result of the conduct of his adversary . . . , did not have an adequate opportunity . . . to obtain a full and fair adjudication in the initial action").

Even more, the Court already addressed collateral estopped in its decision denying Defendants' motions to dismiss, reasoning:

> When the trial court found that plaintiff's confession following his initial interrogation was voluntary, *Perrot I*, 554 N.E.2d at 1208, that court did not have information concerning the extent of defendants' bad acts. Altogether, plaintiff alleges that defendants framed him to solve a high-profile string of rapes and assaults and vindicate their personal animosity toward him, which clearly bears on the integrity of their initial interrogation. Most of this was not known at the time of the initial motion to suppress or subsequent appeal. *E.g.*, *Perrot II*, 648 N.E.2d at 1316 (noting that ADA Bloom's "overzealous and seriously misguided scheme" to forge Mr. Perrot's "name to a bogus postconviction confession" was not "known at the time the defendant's appeal was heard in the [SJC]"); *Perrot IV*, 2016 WL 380123, at *32 (finding that ADA Bloom's feelings towards Mr. Perrot "enable a person possessing public authority to shed restraints and scruples that limit the exercise of power," and that these "feelings that filled [ADA] Bloom's mind, coupled with his trip to Washington, D.C., produce a reasonable foundation for the inference that Bloom voiced his views about Perrot to Oakes" before Agent Oakes' testimony at Mr. Perrot's second trial). Denied the full context of defendants' scheme, Mr. Perrot "lacked a full and fair opportunity to litigate the issue in the first action." *Johnson*, 424 F.3d at 83 (internal quotation marks and citations omitted).

(Dkt. 187, Report & Recommendations on Defs.' Mots. Dismiss, pp 27-28, n. 15).

This Court's rationale applies equally to Defendants' issue preclusion arguments at summary judgment. The Court correctly rejected Defendants' position that collateral estoppel bars Perrot's claims, including challenging the Statement's voluntariness. And since the motion to dismiss ruling, Perrot has further developed the record to show that Defendants' misconduct

prevented him from being able to fully litigate these issues. The developed record exposed the broad scope of Defendants' malfeasance, which includes—Jarvis's destruction of his interrogation notes from December 7, 1985, SPD's suppression of the existence of multiple alternative suspects, SPD's suppression of the original Statement, Kelly's fabricated account of the recovery of the gloves, as well as several other examples that will be discussed in the following sections.

Moreover, Defendants rely on *Johnson v. Mahoney* to contend that Perrot is precluded from challenging the Statement. 424 F.3d 83 (1st Cir. 2005). Their reliance is misplaced. The court in *Johnson* did not even grapple with the line of cases that discuss how issue preclusion operates when a conviction has been vacated, and thus, *Johnson* does not merit sincere consideration. Additionally, *Johnson* does not control here because the circumstances surrounding the vacating of Perrot's convictions were legally and factually distinct from Mr. Johnson's. In *Johnson*, Donnell Johnson, 16 years old at the time, was charged and convicted of first-degree murder. *Id.* at 85. Following his conviction, Mr. Johnson appealed to the SJC and the SJC affirmed the holding. *Id.* After serving five years of his sentence, new evidence was discovered that exonerated Mr. Johnson, and as a result, the prosecutor's office nolle prossed the charges. *Id.*

Unlike Mr. Johnson, Perrot filed a motion for a new trial for the convictions at issue and the court granted it for all but one. Whereas in *Johnson*, a court never vacated the conviction at issue, so the SJC's decision was still extant. Here, by granting Perrot's motion for a new trial in 2016, the 1990 SJC decision was effectively nullified.

Because Defendants' misconduct denied Perrot the opportunity to fully litigate the relevant issues, the SJC's 1990 decision does not bar Perrot from challenging the Statement in this civil action.

### B. Even if Perrot Had a "Full and Fair Opportunity to Litigate" the Issue, Preclusion Would Still Not Apply Because the SJC Decision is Not a Final and Valid Judgment.

1. The SJC Decision is not a final and valid judgment on the Prekop Crimes because that conviction was vacated.

When a conviction is vacated, there is no final determination of the facts so it cannot be given "preclusive force either as a matter of collateral estoppel or as a matter of the law of the case." *Jackson v. Coalter*, 337 F.3d 74, 85 (1st Cir. 2003); *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985); *see also Schand v. McMahon*, 487 F. Supp. 3d 71, 77 (D. Mass. 2020). Preclusion applies only when "issues were conclusively determined in a prior action," which among other things requires that a prior judgment *exist* and be "final on the merits." *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010); *see also* Restatement (Second) of Judgments §27 (1983) (preclusion requires a "valid and final judgment" on an "issue of fact or law actually litigated"). The Supreme Court held that §1983 did not alter these common-law rules of preclusion. *Allen v. McCurry*, 449 U.S. 90, 96-98 (1980) (noting also that the Full Faith and Credit Act, 28 U.S.C. §1738 requires "federal courts to give preclusive effect to state-court *judgments*") (emphasis added); *accord Migra v. Warren City School District*, 465 U.S. 75, 80-81 (1984). Thus, vacated state-court judgments cannot preclude subsequent federal §1983 actions.

It is important to note that once a court enters final judgment, antecedent interlocutory orders typically merge into the judgment and become subject to appellate review. *See Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC*, 994 F.3d 77, 82 (1st Cir.

2021); *see also Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019). In these cases, when a conviction is vacated, so too are the interlocutory rulings that preceded the conviction. *See Peterson*, 931 F.3d at 554-55.

Federal courts across the country agree that it is black-letter, "hornbook law" that a vacated judgment has no preclusive force. *Jackson*, 337 F.3d at 85; *see also Langely v. Prince*, 926 F.3d 145, 164 (5th Cir. 2019) (stating that once a judgement "is reversed on appeal, it's obviously no longer 'valid' and retains *zero* preclusive effect"); *United Brotherhood v. Operative Plasterers*, 721 F.3d 678, 691 (D.C. Cir. 2013) ("A judgment vacated either by the trial court or on appeal has no estoppel effect in a subsequent proceeding"); *Salton v. Philips Domestic Appliances*, 391 F.3d 871, 881 (7th Cir. 2004) ("[O]nce a judgment is reversed it ceases to have collateral estoppel effect."); *Rumsfeld v. Freedom NY*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) ("[A] vacated judgment 'has no preclusive force either as a matter of collateral or direct estoppel.'"); *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 624 (11th Cir. 1998) ("A judgment that has been vacated . . . is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel."); *Franklin Sav. Ass'n v. Off. of Thrift Supervision*, 35 F.3d 1466, 1469 (10th Cir. 1994) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel."); *U.S. v. Lawson*, 736 F.2d 835, 837 (2d. Cir. 1984) ("It has long been established . . . that when a judgment has been reversed . . . the effect is to nullify the judgment entirely and place the parties in the position of no trial having taken place.").

Federal courts have rejected precisely the argument that Defendants advanced here—that a denied motion to suppress in a criminal proceeding that led to a wrongful conviction has preclusive effect in subsequent § 1983 litigation even after the conviction has been set

aside—calling it "an absurd argument." *Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006); *O'Connell v. Alejo*, 2020 WL 1244852, at *4 (D. Colo. Mar. 16, 2020) ("[A] vacated judgment, even if not vacated as a result of evidence exonerating the defendant, should not be given preclusive effect."); *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 393 (N.D.N.Y. 2018) ("Defendants' interpretation of collateral estoppel seems plainly wrong—a vacated criminal conviction cannot have preclusive effect" in §1983 case alleging a coerced confession).

In 1990, the Massachusetts Supreme Judicial Court ("SJC") vacated Perrot's 1987 convictions but affirmed the trial court's ruling as to the voluntariness of his December 7, 1985 Statement. But once the trial court vacated Perrot's conviction for the Prekop Crimes in 2016, the SJC's decision—including its affirmation of the denial of motion to suppress—became a nonextant judgment. Thus, the trial court's decision to deny Perrot's motion to suppress cannot whole-sale preclude challenging the Statement's voluntariness in this litigation.

The procedural background in *Schand v. McMahon* closely mirrors that in this case. 487 F. Supp. 3d 71, 75-76 (D. Mass. 2020). In *Schand*, the plaintiff was wrongfully convicted of murder in 1987. *Id.* at 75. Following his conviction, the plaintiff sought review on multiple occasions based, in part, on police misconduct, such as doctored police reports and coerced witness statements. *Id.* Eventually, the plaintiff appealed the superior court's denial of his motion for a new trial to the SJC, which affirmed the lower court's decision. *Id.* In 2013, a superior court granted the plaintiff's motion for a new trial based on new evidence. *Id.* In §1983 litigation that followed these events, the defendants argued that the plaintiff was barred from contending that a police report was evidence of fabrication based on a prior SJC judgment. *Id.* at 77-78. The court rejected these arguments, reasoning that when a "conviction is vacated there is no final determination of the facts so it cannot be given preclusive force." *Id*. at 77. The *Schand* Court

expressly declined to follow *Johnson* because the court in *Johnson* indicated that the conviction at issue was merely nolle prossed and did not analyze whether the plaintiff's conviction was vacated. *Id.* at 77-78.

However, further complicating the analysis is the fact that the Statement includes claims about the Lichwala Crimes, for which Perrot has not been exonerated:

> My name is George Perrot and I live at 87 Malibu Dr. and I am 17 years old. On Nov. 30, 1985, I went to Brattleboro, Vermont with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Strret. I started drinking about 8:00 P.M. which was a Friday night. We also drank about a case of Bud. I took a "Purple Mescaline" on the way to Vermont. We stayed there until about 2:15 A.M. Michael dropped me off about 3:15 at my house.
>
> **I headed for number 33 Covel St. The reason I went there was I heard it had been broken into before**. I had a pair of my sisters gloves on. They were like wool gloves. **I entered an unlocked rear breezeway door at 33 Covel St. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street.** I left 33 Covel St. and went to 27 Malibu Dr. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door. This occurred about 4:00 A.M. on Saturday Nov. 30, 1985. After this I went home.
>
> I had been drinking since about 7:00 P.M. that day and had also taken two purple mescaline pills.[3]

In the above quoted language from the Statement, the bolded text represents assertions about the Lichwala Crimes. As shown above, only about one-third of the Statement refers to the Lichwala Crimes. The rest of the Statement is either fabricated, such as the third paragraph, or truthful, such as the first paragraph. Because the conviction for the Lichwala Crimes stands, preclusion may apply to these specific sentences that refer to the Lichwala break-in. However, Perrot should not be barred from challenging the Statement's voluntariness as a whole because the Lichwala statements provide crucial context for the remainder of the Statement.

---

[3] This Statement does not reflect the handwritten notations or markings that the typewritten statement, attached as Plaintiff's Exhibit 6, contains.

If Defendants had drafted two separate confession documents, one about the Lichwala Crimes and one about the Prekop Crimes, then this analysis would be straightforward. In that case, when the court granted Perrot's motion for a new trial in 2016, that would undoubtedly vacate all the prior rulings, including the SJC determination about the motion to suppress. The only reason this analysis is more complicated is because Defendants claimed that Perrot confessed to two separate crimes in the same document, one of which he has not been able to overturn his conviction for. It cannot be that the happenstance of how Defendants decided to manufacture Perrot's "confession"—one versus two documents—dictates whether he can proceed to vindicate his constitutional rights.

Therefore, the doctrine of issue preclusion cannot bar Perrot from challenging at least part of the Statement.

2. The SJC's 1990 decision is not a final and valid judgment because Perrot had no ability to appeal it.

When assessing whether a judgment was final for purposes of issue preclusion, courts should consider whether "the parties were fully heard, the judge's decision [was] supported by a reasoned opinion, and the earlier opinion was subject to review." *Pellegrini v. Ne. Univ.*, 323 F. Supp. 3d 182, 186-87 (D. Mass. 2018).

In *Penate v. Kaczmarek*, the plaintiff sued several governmental actors under §1983 following a court's granting of his motion for new trial on drug-related criminal convictions. No. CV 3:17-30119-KAR, 2018 WL 4654708, at *10 (D. Mass. Sept. 27, 2018). In the civil litigation, the defendants claimed that issue preclusion barred the plaintiff from asserting that a defendant police officer's misconduct was material under *Brady* because a court had already decided that issue to the contrary. *Id.* at *9. However, the district court rejected the defendants' argument, explaining that the earlier decision was not final on the point for which the defendants

relied on it. *Id.* at *10. Specifically, the court reasoned that the criminal court granted the plaintiff's motion for a new trial based on other government misconduct. *Id.* Therefore, barring an appeal from the Commonwealth, the plaintiff could not appeal the favorable outcome on the basis of a disagreement with a particular finding. *Id.* (citing *Commonwealth v. Graves*, 112 Mass. 282, 283 (1873) ("The defendant is not legally aggrieved by his discharge from custody, and therefore cannot appeal from the order of discharge.")).

Issue preclusion may not be invoked unless there was an available avenue for review of the prior ruling on the issue. *Jarosz v. Palmer*, 49 Mass. App. Ct. 834, 837 (Mass. 2000); *see also*, *Tausevich v. Bd. of Appeals of Stoughton*, 402 Mass. 146, 150 (1988) (declining to apply issue preclusion where there was no appealable judgment or order).

Here, Perrot had no such avenue to challenge the SJC's 1990 decision. Like the posture in *Penate*, the SJC granted Perrot's request for a new trial but disagreed that the trial court erred in denying his motion to suppress the Statement. Thus, Perrot could not appeal the SJC's favorable outcome—reversing the convictions and remanding the case for a new trial—simply because he disagreed with a specific finding.

Therefore, the SJC's decision is no longer a final and valid judgment on the merits that can now trigger issue preclusion.

**C. Even if This Court Considers the Vacated Conviction to be Extant, Issue Preclusion Still Does Not Apply.**

Even assuming the applicable law affords a partially vacated judgment some preclusive force, Perrot's state-court proceedings still would not preclude his challenge to the Statement, for two additional reasons.

1. <u>The SJC Only Analyzed the Voluntariness of the False Confession Statement.</u>

First, preclusion requires that "the issue sought to be relitigated must be identical to the issue decided in the earlier action." *Ramallo Bros. Printing,* 490 F.3d at 90; *see also*, *Bailey v. Andrews,* 811 F.2d 366, 370 (7th Cir.1987) (collateral estoppel inapplicable where issues litigated at prior suppression hearing were not the same as those sought to be litigated in subsequent civil rights claim).

Here, Defendants contend that that the SJC's 1990 decision bars Perrot from challenging the Statement, specifically whether Perrot voluntarily gave the police the information contained within it.

Assessing a confession's voluntariness is distinct from assessing its reliability or authenticity as admissible evidence. To make a voluntariness determination, courts engage in a "totality of the circumstances" inquiry, which requires a balancing of the officers' tactics with the unique background of the individual suspect. *United States v. Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015). The lynchpin of the court's analysis is whether the government's conduct overtook the will of the defendant. *See United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990).

A defendant challenging the voluntariness of his confession may be questioned only concerning the nature of his confession and not about his guilt or innocence. *United States v. McKithen*, 10 F. App'x 217, 218 (4th Cir. 2001); *United States v. Dollard,* 780 F.2d 1118, 1122 (4th Cir. 1985); *United States v. Inman,* 352 F.2d 954, 956 (4th Cir. 1965). In making a voluntariness determination, "the trial judge is 'duty-bound to ignore implications of reliability ... and to shut from his mind any internal evidence of authenticity that a confession itself might bear.'" *Doby v. South Carolina Dep't of Corrections,* 741 F.2d 76, 78 (4th Cir. 1984) (quoting *Lego v. Twomey,* 404 U.S. 477, 484 n. 12 (1972)). The sole issue in such a hearing is whether a confession was coerced. *Lego*, 404 U.S. at 485.

Moreover, a defendant's case may stand or fall on their ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility and this is "entirely independent of any question of voluntariness." *Crane v. Kentucky*, 476 U.S. 683, 687 (1986). As the Supreme Court observed, this simple insight is reflected in the Federal Rules of Evidence and "statutory and decisional law of virtually every State in the Nation." *Id.*

Here, Perrot did not dispute whether the Statement was fabricated during the motion to suppress hearing, in part because that was not the purpose of that hearing. And thus, no court has addressed or ruled on this issue. Because Defendants suppressed and withheld the original version, and Perrot only possessed a copy of the Statement, any falsification of the Statement was not even on the trial court's radar.

Accordingly, Perrot can contest the Statement on the grounds that it was manufactured or forged because these issues are independent from the voluntariness analysis.

2. <u>The Statement's voluntariness was not essential to the SJC's judgment.</u>

Because the SJC reversed and remanded Perrot's 1987 convictions despite affirming the trial court's finding that Mr. Perrot's statement was voluntary, it was not essential to the SJC's decision.

To be "essential to the prior judgment," the issue must be essential to the merits of the underlying case. *Jarosz v. Palmer*, 436 Mass. 526, 529 (Mass. 2002). In other words, the issue must have had a "bearing on the outcome of the case," and not "merely [have been] essential to a determination of the narrow issue before the court at that time. *Mullins v. Corcoran*, 488 Mass. 275, 282 (Mass. 2021) (quoting *Jarosz*, 436 Mass. at 529).

Issue preclusion does not preclude litigants from relitigating an issue if it came under consideration only collaterally or incidentally. *In re Ranbaxy Generic Drug Application Antitrust*

*Litig.*, 573 F. Supp. 3d 459, 475 (D. Mass. 2021). In defining whether an issue was essential, courts ask whether it "was critical to the judgment or merely dicta." *United States v. Reyes-Romero*, 959 F.3d 80, 94 (3d Cir. 2020); (quoting *O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1067 (3d Cir. 1991)).

If a judgment does not depend on a given determination, re-litigation of that determination is not precluded. *Bobby v. Bies*, 556 U.S. 825, 834 (2009) "A determination ranks as necessary or essential only when the final outcome hinges on it." *Id.* at 835; *Sampson v. United States*, 832 F.3d 37, 46 (1st Cir. 2016).

In the present case, the outcome from SJC's 1990 decision did not hinge on its findings that Perrot's Statements were voluntary. Based on grounds unrelated to the Statement, the SJC ultimately reversed all of Perrot's convictions and remanded the case for a new trial.

Additionally, in its opinion, the SJC simply recited the factual findings of the trial court and did not engage in any additional analysis or examination of the law concerning the Statement. The SJC spent a majority of the opinion discussing the primary legal issue on review—the inevitable discovery rule. Viewing the SJC's ruling as a whole, the SJC's treatment of the trial court's denial of Perrot's motion to suppress was an incidental finding. Therefore, issue preclusion also fails for that reason.

For the foregoing reasons, this Court should conclude that Perrot is not precluded from challenging the Statement.

## II. PLAINTIFF'S CLAIMS IN THIS CASE ARE NOT *HECK*-BARRED.

The City Defendants make a perfunctory argument that Plaintiff cannot challenge anything about the December 7, 1985 written "confession" which, among other things, contains several inculpatory statements attributed to Plaintiff implicating him in the Prekop crimes. *See* Ex. 6. The entire extent of their legal argument consists of a two-sentence conclusory description

of the holding in *Heck v. Humphrey*, 512 U.S. 477 (1994). Dkt. 340 at 27.[4] Defendant Arpin makes a similarly threadbare argument which, though titled as "*Heck v. Humphrey* Bar," is, in substance, primarily an argument about statute of limitations. Dkt. 333 at 6-7. Arpin's brief makes three non-controversial points: (1) any claims that were never *Heck*-barred by any of Plaintiff's convictions are untimely; (2) claims that would necessarily imply the invalidity of Plaintiff's extant convictions[5] remain *Heck*-barred; and thus (3) the only claims "remain[ing] to the Plaintiff are those claims concerning the [Prekop] convictions that were previously barred by *Heck v. Humphrey*, but then accrued upon the removal of that bar," *i.e.,* when the Prekop conviction was vacated. Dkt. 333 at 7. But that's where Arpin's analysis ends—save for identifying, as an example, one of Plaintiff's claims which he agrees *would* be valid, Arpin offers no analysis or argument for why any of Plaintiff's claims in this lawsuit are *not* valid (*i.e.,* that would fall into category 1 or 2, rather than 3). *Id.*

Both of these arguments are woefully underdeveloped and undersupported, logically and legally, and are therefore forfeited.[6] *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of

[4] Their description is wrong. City Defendants describe *Heck* as a bar to suit "where [plaintiff's] claims would implicate the validity of a" an extent criminal conviction. Dkt. 340 at 27 the language used by *Heck* is that the bar applies only to claims where "a *judgment* in favor of the plaintiff would *necessarily imply the invalidity*" of the extant conviction, *see Heck*, 512 U.S. at 487 (emphasis added).

[5] Arpin's description is also wrong. He asserts that *Heck* bars any of Plaintiff's claims "that would tend to invalidate" any extant conviction, Dkt. 333 at 7, but like the City Defendants, this is an inaccurate paraphrase that elides the narrow rigidity of the actual rule ("*necessarily* imply the invalidity") set forth by the Supreme Court in *Heck*, 512 U.S. at 487.

[6] Neither Kane nor Bloom raises any argument under *Heck* at all, so their forfeiture of the issue is even more straightforward. *See United States v. Tosi*, 897 F.3d 12, 15 (1st Cir. 2018) ("[A]rguments available at the outset but raised for the first time in a reply brief need not be considered."); *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) (finding that "argument is waived as a means to support the pending motion" when raised for the first time in reply, since plaintiff was deprived of the opportunity to address them).

course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]").

There are myriad reasons, factual and legal, why these Defendants are plainly wrong that *Heck* entitles them to summary judgment on any of Plaintiffs claims. While Plaintiff is loathe to spend valuable pages of briefing shadowboxing arguments which these Defendants have utterly failed to make, he lays out some of these reasons below.

First, the types of situations which the *Heck* rule was designed to avoid bear no resemblance to Plaintiff's claims here. The holding in *Heck* was animated by the "principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments," and imported the doctrinal concept of favorable termination from the tort of malicious prosecution to effectuate the "strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck*, 512 U.S. at 484-485; *see also McDonough v. Smith*, 588 U.S. 109, 110 (2019) (noting *Heck*'s concern with the prospect of "collateral attacks on criminal judgments through civil litigation," and emphasis on avoiding "parallel litigation and conflicting judgments").

Here, there is no 'collateral attack' or prospect of 'conflicting resolutions arising out of the same or identical transaction'. Plaintiff was convicted of two separate sets of crimes involving two separate victims at two distinct locations. The state elected to try Plaintiff for these distinct crimes in one consolidated trial, though it could just as easily have tried him twice separately for them. Though the state was initially entirely successful in securing convictions, at the end of Plaintiff's long road of criminal proceedings, there is a split decision. Plaintiff's convictions for the Prekop crimes have been vacated, but the Lichwala conviction remains intact. In this lawsuit, Plaintiff advances claims solely in connection with his assertions that his

constitutional rights were violated by state actors in obtaining his convictions for the Prekop crimes. Though there are some areas of factual overlap, the claims have nothing to do with the Lichwala conviction, and there is certainly no collateral attack—indeed, the contours of the claims Plaintiff asserts here would look the same whether the Lichwala conviction remained, was vacated, or had never been entered in the first place. *Heck* is concerned with "conflicting resolutions arising out of the same or identical transaction." *Heck*, 512 U.S. at 484. *Heck* simply has nothing to say when there are parallel but distinct underlying events, one leading to an extant conviction, and the other to a vacated conviction from which the claims arise.

Second, and turning from animating principles to the plain language of the holding, *Heck*'s poses no bar to disparate civil and criminal judgments covering different aspects of overlapping (though not coterminous) sets of facts. The *Heck* bar is narrow. It requires only that a plaintiff seeking "damages for allegedly unconstitutional conviction . . . "must prove that the conviction . . . has been reversed" or otherwise "declared invalid." In seeking damages for Defendants' constitutional violations leading to the Prekop convictions, *Heck* requires only that Plaintiff proves that those convictions have been vacated, which is not disputed. Phrased slightly differently, *Heck* requires only that "the district court must consider whether a *judgment* in favor of the plaintiff would *necessarily imply the invalidity of his conviction*," and if so, the claim may proceed only if the conviction has been vacated. *Id.* at 487 (emphasis added). Put simply, in the event Plaintiff's claims here proceed to trial, would an observer looking at a resulting judgment in Plaintiff's favor on each of those claims—boiled down to their constituent elements—*necessarily* conclude as a result that Plaintiff's Lichwala conviction must be invalid? If the answer is no, the claims are not *Heck*-barred. And here, the answer is plainly no. A judgment that one or more of the Defendants fabricated or suppressed evidence which deprived Plaintiff of a

fair trial on the Prekop crimes or coerced him to make involuntary inculpatory statements related to the Prekop crimes, would not, on its face, *necessarily* impugn the validity of the Lichwala conviction. In this regard, Defendants' inaccurate paraphrasing gives the game away, for they know that they cannot meet the standard *Heck* actually sets. So instead, they argue that such a scenario would "implicate the validity" of the Lichwala conviction, Dkt. 340 at 27, or "tend to invalidate" that conviction, Dkt. 333 at 7. But the test is not whether there might be some tension between the judgments, or whether one might legitimately have questions about the Lichwala conviction as a result—the test is, would the judgments be facially irreconcilable, and here the answer is no.

*Dukes v. City of Albany* is persuasive precedent which provides a closely analogous illustration of this principle. 289 F. Supp. 3d 387 (N.D.N.Y. 2018). In *Dukes*, the plaintiff brought §1983 claims alleging that, through a combination of coercion and trickery, during several sequential episodes of interrogation over the course of a single day, the defendants had coerced and fabricated a false confession for the murder of Erik Mitchell; the defendants had also obtained statements implicating plaintiff in an earlier robbery of Mitchell's apartment. 289 F. Supp. 3d at 390-91. The plaintiff had been tried and convicted of both the robbery and the murder in a single trial, but successfully overturned his conviction for the murder charge when the real killer came forward and confessed. *Id.* at 391-92. However, at the time he brought the civil claims, the plaintiff had an extant conviction for the Mitchell robbery. *Id.* at 392.

The defendants in *Dukes* argued the plaintiff's claims were *Heck*-barred "because any challenge to the fairness of his murder trial would implicate the validity of the robbery conviction as well," and asserted that "a challenge to the interrogation that resulted in Dukes' murder confession 'would necessarily cast doubt on the validity of the robbery confession,' since

officers elicited both confessions during the same day-long interrogation." *Id.* at 397. The court rejected this argument, finding that, although the charges were initially prosecuted at the same trial, "the murder and robbery charges Dukes faced are so distinct that are effectively two separate prosecutions," and since the charges "were based on two distinct events" with "distinct elements and potential sentences," *Heck* stood as no obstacle to the plaintiff's civil claims. *Id.*

Third, even if Defendants' *Heck* argument were not precluded by the straightforward legal principles articulated above, it would run into a morass of complex factual questions with which they have *entirely* failed to grapple, demonstrating that at a minimum the Court cannot resolve any potential *Heck* issues at summary judgment. For starters, although the City Defendants describe the issue as involving a single "statement" involving both the Prekop and Lichwala crimes, Dkt. 340 at 26-27, this is a gross oversimplification and elides a deep well of complex and hotly-disputed facts. This purported "statement" is a single *document* which contains an array of *statements* attributed to Plaintiff—some of which he does not dispute, some of which he contends represent false statements Defendants coerced him into adopting during the course of the interrogation, and some of which are words he never said at all and were fabricated out of whole cloth by Defendants. *See generally* PSOF ¶¶40-44. While these various statements eventually ended up in a single document, they arise from various interactions with Plaintiff involving different sub-sets of officers over different phases of an interrogation that lasted 12 hours. *Id.* Adding further to this factual complexity, "[i]n order to determine whether a suspect voluntarily and knowingly waived his Fifth Amendment right, the Supreme Court has routinely applied a 'totality of circumstances' test, *White v. Massachusetts*, 382 F. Supp. 2d 248, 253 (D. Mass. 2005), and a jury in this case might reasonably find that this 'totality of circumstances' calculus stacked up differently at different points in the interrogation process, depending on the

point in time (perhaps facing a tension between an increasingly coercive state of sleep deprivation and a decreasingly coercive level of intoxication), proximity to episodes of physical violence, the number of officers present in the room, and the particular array of coercive tactics and misconduct present at any particular phase of the interrogation.

The fact-bound nature of the analysis was recognized by the Court in rejecting this same *Heck* argument at the motion to dismiss stage. Dkt. 187 at 14. The Court recognized that there might be some specific factual pieces, in terms of allegations casting doubt on those aspects of Plaintiff's "statement concerning the burglary of Ms. Lichwala's residence," which might be precluded by *Heck*, while other aspects of the case were focused on "investigation of the assault on M.P.," and the circumstances in which, "in the course of questioning, [Plaintiff] made statements . . . that were related to the rape of M.P.," which would not be *Heck*-barred. *Id.*

In light of all of this factual and legal complexity, Defendants' perfunctory hand-wave towards the *Heck* issue falls far short of their burden of "informing the district court of the basis for its motion, and identifying those portions of [the factual record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Finally, even if all of the above were not correct, at most the *Heck* issue would implicate Plaintiff's Fifth Amendment coercive interrogation claims, which *to some degree* overlap factually (though certainly not in a necessarily irreconcilable way, as discussed above) with the circumstances from which the inculpatory Lichwala statements arose. There is no question, however, that Plaintiff has triable Fourteenth Amendment fabrication of evidence claims focused narrowly on the specific statements within the written "confession" relating to Prekop. Plaintiff is the master of his own claims and is entitled to present a case at trial that focuses on proving that those specific statements were fabricated by Defendants (*i.e.*, that Plaintiff never said those

words, or if he did, that they were a false narrative knowingly concocted by Defendants which Plaintiff simply regurgitated). There is no plausible basis to argue that fabrication claims focused only on those aspects of the written "confession" relating to Prekop, and eschewing any claim arising from the aspects of the written "confession" relating to Lichwala, would *necessarily* imply the invalidity of the Lichwala conviction.[7]

For any or all of the reasons above, Defendants' *Heck* arguments should be rejected, and do not warrant granting summary judgment on Plaintiff's claims.

## III. A REASONABLE JURY COULD FIND THAT THE INDIVIDUAL DEFENDANTS WITHHELD EXCULPATORY EVIDENCE.

Summary judgment is inappropriate because the record reveals that the Individual Defendants withheld exculpatory evidence from Perrot and his defense attorneys.

As is well-known, prosecutors must turn over material exculpatory evidence to the defense. *See, e.g., Brady v. Maryland,* 373 U.S. 83, 87 (1963). The duty to disclose covers impeachment evidence too, even if the evidence is not inherently exculpatory. *See, e.g., Giglio v. United States,* 405 U.S. 150, 154–55 (1972). That is what the Fifth and Fourteenth Amendments' Due Process Clauses require. *See, e.g., Haley v. City of Boston,* 657 F.3d 39, 47 (1st Cir. 2011). The duty that these cases established has always applied equally to prosecutors and law enforcement officers. *See id.* at 50; *Limone v. Condon,* 372 F.3d 39, 47 (1st Cir. 2004).

---

[7] There is an array of potential trial issues which may need to be resolved through motions *in limine* or other opportunities for legal and factual argument prior to or during trial, which would dictate exactly how the trial on Plaintiff's claims would work in practice. There may be pre-trial boundaries set on the testimony of certain witnesses or the argument of counsel, or perhaps limiting instructions to the jury, to ensure the issues at trial are focused on Plaintiff's constitutional claims arising from the Prekop convictions, and not peripheral but adjacent factual issues which may bleed over into Plaintiff's extant convictions. Evidence can be admissible for one purpose even if not others, so evidence of the coercive circumstances of the interrogation may be admissible to prove fabrication of the Prekop statements even in the event that Plaintiff has no stand-alone coercive interrogation claim. These are all trial management issues, however, and not issues that bear on whether Plaintiff has developed sufficient facts to warrant a trial on his claims. Whatever challenges the Court may anticipate in trial management given the complexities of this case, those need not be resolved at this stage and do not provide any basis for summary judgment.

There are two types of *Brady* violations. *See, e.g., United States v. González–González,* 258 F.3d 16, 21–22 (1st Cir. 2001). The first occurs when the undisclosed evidence shows that prosecutors knowingly used perjured testimony or allowed false testimony to go uncorrected. *See, e.g., United States v. Agurs,* 427 U.S. 97, 103–04 (1976); *Giglio,* 405 U.S. at 153; *see also González–González,* 258 F.3d at 21. For this violation, undisclosed evidence is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103. The second type of *Brady* violation occurs when prosecutors suppress evidence favorable to the defense, even if the evidence does not involve false testimony. *Id.* at 104; *González–González,* 258 F.3d at 22. For this violation, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also*, *McCambridge v. Hall*, 303 F.3d 24, 37 (1st Cir. 2002) (a "reasonable probability" is a probability sufficient to undermine confidence in the outcome). As the Supreme Court observed in *Agurs,* "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113.

The *Brady* rule would be empty if the government could circumvent it by simply destroying evidence that was harmful to its theory of the case. *Magraw v. Roden*, 743 F.3d 1, 7–8 (1st Cir. 2014). For that reason, the Supreme Court formulated two tests to address such circumstances. *See Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988); *California v. Trombetta,* 467 U.S. 479, 486 (1984). Under the first test, the government violates a defendant's due process rights when it disposes of or loses evidence that had *apparent* exculpatory value. *Trombetta,* 467 U.S. at 485-87 (emphasis added). Under the second test, when the evidence at issue is not

apparently exculpatory, but just potentially useful to the defense, the government only violates due process if it destroys the evidence in bad faith. *See Youngblood*, 488 U.S. at 57–58.

In either analysis, the destroyed evidence must also be irreplaceable. *Olszewski v. Spencer,* 466 F.3d 47, 58 (1st Cir. 2006). But general testimony about the possible nature of the destroyed evidence is an inadequate substitute for testimony informed by its actual examination. *United States v. Cooper*, 983 F.2d 928, 932 (9th Cir. 1993) (holding that destroyed lab equipment had apparent exculpatory value for defense against conspiracy to manufacture methamphetamine).

Whenever potentially exculpatory evidence is permanently destroyed or lost by the government, "courts face the treacherous task of divining the import of materials whose contents are unknown, and very often, disputed." *Trombetta,* 467 U.S. at 486. While there is no universal litmus test for what qualifies as "apparent," courts generally assess the value of the destroyed evidence in light of various circumstances. *See, e.g., Elkins v. Summit Cnty., Ohio*, 615 F.3d 671 (6th Cir. 2010) (finding that an officer's memo about an alternative suspect's statements concerning rape and murder had apparent exculpatory value).

In evaluating whether the exculpatory value of the evidence was apparent, courts often consider whether the government was on notice of its significance, based on statements made by the defendant or requests to preserve. *See, e.g.*, *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015); *Cooper,* 983 F.2d at 932.

Here, viewing the record in the light most favorable to Perrot, Defendants withheld multiple pieces of exculpatory evidence that they were required to turn over, primarily: (a) original version of the Statement; (b) Jarvis's handwritten notes from his interrogation of Perrot; (c) Kelly's notes or reports from interviewing Adkins and Timmerman; and (d) the suspect's

shoeprint on Prekop's door. Each of these evidentiary items meet the threshold under *Youngblood* or *Trombetta.*

**a. Original Statement from December 7, 1985**

First, Jarvis never disclosed the original version of the December 7, 1985 Statement that was falsified as demonstrated during Perrot's first trial. During the trial, James Hammerschmith, Perrot's criminal defense attorney, objected to a copy of the Statement being admitted into evidence, and a subsequent sidebar ensued. (Pl.'s SOAF ¶¶71-73).

(The following conference was held at side bar)

MR. HAMMERSCHMITH: This is a copy.

MR. BLOOM: I think that is the original. It may or may not be, I may have put holes in it.

THE COURT: What's that?

MR. HAMMERSCHMITH: It looks like a copy to me.

THE COURT: I don't know, it may be. It looks like it came out of your file.

MR. BLOOM: I think I put it in my folder.

THE COURT: Is the original with the motion to suppress.

MR. BLOOM: I put the original in with the motion to suppress. Then Terry O'Brien gave it to me in the Clerk's office and I think I had cause to have the two holes put in it to put in a folder, but the original was put in on the motion to suppress and marked, and then I got it back before trial, I signed out for it. I do believe that is the original.

MR. HAMMERSCHMITH: It looks very clearly to me to be a Xerox. The paper even has the shadows on it from the Xerox.

THE COURT: Are you objecting.

MR. HAMMERSCHMITH: Yes.

THE COURT: On the basis that it is --

MR. HAMMERSCHMITH: That it is a copy, yes.

THE COURT: Okay, where do you think it is.

MR. BLOOM: I will have them look for it and see if they have it.

THE COURT: We can recess early for lunch.

MR. BLOOM: I can finish up with him in five minutes.

THE CLERK: This has to be the original, because if this were a copy, it wouldn't be on there.

THE COURT: It may be they introduced a copy at the motion to suppress.

MR. HAMMERSCHMITH: I didn't care about copies at that point.

THE COURT: There is one I think attached to my findings as to what it was, one way or the other.

MR. HAMMERSCHMITH: The reason -- I'm not trying to make things difficult, but I think when we were talking about things like that, I think it is important to see the original.

THE COURT: Well, are you contesting the fact that it's not an exact copy?

MR. HAMMERSCHMITH: I don't know whether it is an exact copy or not, that's my problem.

Based on the collective evidence in the record, the original version of the Statement was exculpatory because it would have demonstrated that the officers assembled it—e.g., Jarvis added information in after Perrot signed it, Jarvis pieced together parts of Perrot's statement with fabricated parts, etc. Not only was the original Statement exculpatory, but its exculpatory value

was also apparent because Mr. Hammerschmith put Defendants on notice in 1987 about the importance of the original Statement as the transcript of the sidebar reflects.

Furthermore, the Statement's original version was irreplaceable because it is the only form of the Statement that would expose Defendants' manual manipulation. The prosecution's case revolved around this Statement, arguing that it proved Perrot was in Prekop's residence at the time of the sexual assault. Taking that at face value, the jury easily disregarded Perrot's own self-serving testimony.

Without the original, retaining a forensic document expert to analyze the Statement would have been futile.[8] Although Perrot testified that he did not recall signing the Statement and denied providing information about the Prekop Crimes to police, this testimony was not a comparable substitution for the original Statement, and neither was a copy of the Statement. By photocopying the Statement, all defects, alterations, indentations, corrections, or page substitutions from the original document are lost.

Even if the Court does not consider the original Statement to be patently exculpatory, the original is, at minimum, potentially exculpatory for the reasons described above. Moreover, the record illustrates that Defendants discarded the original in bad faith.

In assessing whether the government acted in bad faith, courts consider whether: (1) the government was on notice that the defendant believed the evidence to be potentially exculpatory; (2) the defendant's assertion to the government that the evidence possesses potential exculpatory value was merely conclusory or supported by objective, independent evidence, (3) the government still had possession of or the ability to control the disposition of the evidence at the

[8] ANSI/ASB Standard 035, *Standard for the Examination of Documents for Alterations,* 2020, 1st Ed., https://www.nist.gov/organization-scientific-area-committees-forensic-science/forensic-document-examination-subcommittee

time it received notice from the defendant of the evidence's potential exculpatory value, (4) the destroyed evidence was central to the government's case, (5) the government offers an innocent explanation for its failure to preserve the evidence, and (6) the destruction of the evidence was in accordance with standard procedure and the evidence was adequately documented prior to its destruction*. See, e.g., United States v. Ward*, 182 F. App'x 779, 785 (10th Cir. 2006).

Here, four of these six factors weigh in favor of finding that Defendants acted in bad faith. As explained above, Mr. Hammerschmith's request for the original Statement alerted Bloom, and thereby the police, of the value and necessity of receiving the original for Perrot's defense. The Statement was vital to the prosecution's case against Perrot, as it was the only direct evidence that tied him to the Prekop break-in and assault.

Despite this, neither Jarvis, Bloom, or any other Defendant offered no explanation, much less an innocent one, about the original's whereabouts or for its failure to preserve it. Instead, Bloom insisted to the criminal court and Mr. Hammerschmith that the Statement's copy was the original, despite clear markings that it was Xeroxed. As is often the case when law enforcement destroy evidence per a policy or regulation, Jarvis did not keep a record of the original Statement's existence or disposition. Nor did Jarvis refer to a procedure that mandates their routine disposal of such evidence.

Therefore, one can easily infer that the destruction of the original Statement was in bad faith.

**b. Jarvis's Handwritten Interrogation Notes**

Second, Jarvis withheld his handwritten notes from his interrogation of Perrot. At the second trial, Jarvis testified that when he took statements from suspects, he normally handwrote the statement and then typed it up afterwards. (Pl.'s SOAF ¶60). And Jarvis explained that was

the process he followed in taking Perrot's statements on December 7, 1985. (Pl.'s SOAF ¶60). When asked whether he had those handwritten notes, Jarvis testified that he destroyed the notes in 1991 when he retired from the Springfield Police Department. (Pl.'s SOAF ¶42). Based on the absence of these notes in the record, including the prosecution's file, Jarvis never turned these notes over to the prosecutors.

Under *Youngblood*, Jarvis's interrogation notes were at least potentially exculpatory for Perrot's defense because they would have omitted any mention of Perrot's alleged confession to the Prekop Crimes, which would constitute both exculpatory and impeaching evidence. The record clearly shows that since 1986, Perrot denied giving Jarvis any information about his involvement in the Prekop Crimes. As such, the Statement was central to the prosecution's case against Perrot and its substance was fiercely contested. Although Jarvis maintained his interrogation notes throughout Perrot's prosecution, conviction, and appeals, he never disclosed them to prosecution. Unlike in cases where the courts find no bad faith,[9] Jarvis's destruction was not routine or to comply with a department-mandated policy.

Lastly, Jarvis's notes were unique evidence that Perrot could not reconstruct. These notes were the only contemporaneous documentation of Perrot's interrogation. The officers did not record, via cassette or otherwise, Perrot's interrogation. Thus, there was no other available evidence that Perrot could have relied on to corroborate his denial of the Statement's confession of the Prekop Crimes.

**c. Kelly's Interviews of Adkins and Timmerman**

[9] Courts "have previously held that destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence." *United States v. Figueroa-Quinones*, 21 F. Supp. 3d 138, 142 (D.P.R. 2014) (quoting *United States v. Deaner,* 1 F.3d 192, 200 (3d Cir.1993)).

Third, Kelly suppressed notes or documentation of their multiple interviews of Mr. Adkins and Mr. Timmerman. (Pl.'s SOAF ¶67). Kelly interviewed Mr. Adkins and Mr. Timmerman during the course of his investigation into the series of sexual assaults in Springfield in the mid-eighties. But there are no reports, notes, memos, or the like that memorialized these interviews.

Without these documents in the record, or even references to them during the state court proceedings, the Court should infer that Defendants (a) failed to disclose and (b) destroyed them. Undoubtedly, any documentation of Adkins' or Timmerman's accounts of November 30, 1985 had exculpatory value for Perrot's defense. As he testified during his first trial, Perrot was hanging out with Adkins and Timmerman the night prior and into the early morning of November 30, 1985. Therefore, any statements that Adkins and Timmerman gave to the police about their activities that night would corroborate Perrot's timeline, potentially even providing an alibi.

Even if Kelly only wrote a memo that he spoke with Adkins and Timmerman about the night in question, without providing any substance about the interviews, Perrot was still entitled to that information because without it, he could not intelligibly assess whether to call the two friends as witnesses.

**d. Suspect's Shoeprint at Prekop's Residence**

During one of the interrogation sessions, an officer showed Perrot his shoe and claimed it matched a shoeprint on Prekop's door. (Pl.'s SOAF ¶45). At the first trial, Prekop testified that the assailant had kicked in her breezeway door. (Pl.'s Ex. 10, 12/9/87, pp. 235-36) (attempting to describe a shoeprint left on or around the door). Later, Prekop explained that the intruder left a footprint on her wall, which remained there up through the second trial. (Pl.'s SOAF ¶61).

However, there is no documentation that officers photographed or otherwise preserved that shoeprint for examination or comparison. Yet, Jarvis testified that they confronted Perrot with a pair of sneakers and gloves during his interrogation. (Defs.' Ex. EE, 9/2/86, p. 169). And according to Bloom's notes, Officer Trites took Perrot's sneaker and made a comparison to a shoeprint. (Pl.'s SOAF ¶109).

Defendants should have disclosed the shoeprint's existence to Perrot and his attorney because they would have investigated the source of that shoeprint and could have easily made a comparison to Perrot's own shoes.

**e. Other Suppressed Evidence**

Not only did Defendants suppress the evidence described above, but they also withheld the existence of alternative suspects, Perrot's first blood analysis results, and Prekop's medical records from the sexual assault examination.

Under the reasonable probability standard for determining whether suppressed *Brady* evidence would have produced a different verdict, courts must analyze the cumulative effect of undisclosed evidence in determining whether a reasonable probability exists that the nondisclosure would have produced a different verdict, rather than evaluating each piece of evidence individually for materiality. *Lopez v. Massachusetts*, 349 F. Supp. 2d 109, 120 (D. Mass. 2004).

Evidence of the existence of alternative suspects for crimes that another person was later convicted of is material under *Brady*. *See e.g., Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490, 446 (1995) (evidence of alternative suspects allows the defense to attack "the reliability of the investigation" if it shows that investigators were less than energetic in exploring other potential suspects); *Bies v. Sheldon*, 775 F.3d 386, 400 (6th Cir. 2014) (holding that on its

face, the nondisclosure of the identities of the other suspects was an egregious breach of the State's *Brady* obligations); *Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (suppressing evidence of alternative suspects "could also have been used to cast doubt on police officers' decision to focus their attention ... on [the defendant] rather than" the other suspects); *Lopez*, 349 F. Supp. 2d at 119-20 (finding that suppressed police reports and notes of an alternative suspect justified an evidentiary hearing).

Throughout SPD's investigation in 1984-1985, SPD considered seven other individuals as suspects for one or more of the sexual assaults and home invasions on elderly women. (Pl.'s SOAF ¶74).

- Todd Swenor, Jeffrey Adkins, Andy Sotiropoulous, and Robert Timmerman were suspects in the Marchand assault.
- William Geagan was a suspect for the Prekop Crimes.
- John Mezzetti Jr. and John P. Roy were suspects in Emily Lichwala's assault that occurred on October 24, 1985.

None of this information was turned over to Perrot or his attorneys. Moreover, there is no record that any of these individuals were cleared of suspicion that would justify nondisclosure.

Second, Defendants collected blood samples from Perrot on at least two occasions—the first was on December 10, 1985, and the second was on March 31, 1987. (Pl.'s SOAF ¶¶90, 94). After the first collection, Kane sent one blood vial to SERI and the other two vials to the FBI. (Pl.'s SOAF ¶¶91-92). According to the records, SERI analyzed Perrot's blood and issued an invoice for this testing to SPD on December 31, 1985. (Pl.'s SOAF ¶89). However, the record is devoid of the SERI's analysis results. Over the course of two criminal trials, several appeals and post-conviction motions, and civil discovery, there is no innocent reason for the failure to disclose these results. If Perrot's blood type did not match the physical evidence at the crime scene, it would have "undermine[d] ... the entire prosecution case as to all charges." *See Bryant*

*v. Thomas*, 725 F. App'x 72, 75 (2d Cir. 2018) (citing *Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005)).

The Supreme Court held in *Brady* that a prosecutor's failure to disclose exculpatory evidence to a criminal defendant violates a defendant's right to a fair trial. *Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008). And a police officer's deliberate concealment of exculpatory evidence violates this same right and can give rise to liability under §1983. *Id.* Thus, the law was sufficiently clear in 1984 that a state actor would have known that suppression of exculpatory blood test results would violate a defendant's rights. *Id.*

Lastly, sometime prior to November 27, 1987, Perrot's attorney requested Prekop's November 30, 1985 medical records from Bloom. (Pl.'s SOAF ¶51). Bloom responded that he would check with the police about the existence of any such records. Then, on December 1, 1987, Bloom received the relevant medical records. However, Bloom never produced the records to Perrot or his attorney. (Pl.'s SOAF ¶53). Importantly, these records revealed when Prekop arrived at the hospital on the morning following her sexual assault, which directly contradict Kelly's timeline of his investigation on November 30, 1985. Kelly testified that he spoke with Prekop when he arrived at her residence early in the morning of November 30, 1985, and then she was transported to the hospital.

Therefore, this evidence was material because Perrot and his attorney could have utilized these records to impeach Kelly's testimony.

## IV. **<u>THE RECORD DEMONSTRATES THAT INDIVIDUAL DEFENDANTS FALSIFIED OR DESTROYED EVIDENCE.</u>**

Contrary to Defendants' claims, the record is littered with examples of how the Individual Defendants falsified evidence against Mr. Perrot in his criminal proceedings. And while

Defendants may dispute these examples, the Court must view the record in the light most favorable to Mr. Perrot.

A reasonable jury could conclude that Defendants fabricated evidence used to prosecute and convict Perrot. The Supreme Court and First Circuit have held unequivocally that police officers violate due process when they fabricate evidence for use against a criminal defendant. *Mooney, v. Holohan*, 294 U.S. 103, 112-113 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Echavarria v. Roach*, 565 F. Supp. 3d 51, 81 (D. Mass. 2021) (quoting *Limone*, 372 F.3d 39 at 44-45). This due process theory is entirely independent of the suppression theory discussed above. *Avery v. Milwaukee*, 847 F.3d 433, 438-443 (7th Cir. 2017).

Construed in the light most favorable to Perrot, the record contains ample evidence that Defendants fabricated, or participated in the fabrication of, evidence that was used to frame Perrot for the Prekop Crimes.

Most notably, Defendants fabricated a substantial part of the Statement, as set out below by the highlighted text.

My name is George Perrot and I live at 87 Malibu Dr. and I am 17 years old.

On Nov.30 1985 I went to Brattleboro Vermon with Mike Edwards and Bob Timmerman and Jeff Atkison.Mike was driving.We went to a bar called Fast Strret.I started drinking about 8:00P.M.which was a Friday night.We also drank about a case of Bud.I took a "Purple Mescaline" on the way to Vermont.We stayed there until about 2:15A.M. Mychael dropped me off about3:15 at my house.about I headed for number 33 Covel St.The reason I went there was I heard it had been broken into before.I had a pair of my sisters gloves on.They were like wool gloves.I entered an unlocked rear breezeway door at 33 Covel St.I kicked the rear inner door in.I entered the house and started looking through the house.I found a handbag and took it with me.I left through the rear door.I left the pocketbook a few houses down the street.

I left 33 Covel St.and went to 27 Malibu Dr.I opened the door to the breezeway and kicked the side door in.I started to go through the house and a little black dog started barking and I ran out the side door.This occured about 4:00A.M. on Saturday Nov.30,1985.After this I went home.

I had been drinking since about 7:00P.M. that day and had also taken two purple mescaline pills.

Signed ______ Dec 7, 1985

Witnessed ______

For almost 40 years now, Perrot has consistently denied providing Jarvis, or any other Defendant, with information, inculpatory or otherwise, about the Prekop Crimes. In the 1986 motion to suppress hearing, Perrot testified that he did not sign this Statement, nor did he provide information about the Prekop and Lichwala Crimes to the police. (Pl.'s SOAF ¶26). At his first trial in 1987, Perrot confirmed that he did not break into Prekop's residence on November 30, 1985, nor did he assault Prekop. Perrot again testified that he never told the police any information contained in the Statement about the Lichwala and Prekop Crimes. (Pl.'s SOAF ¶56). During his deposition in the present case, Perrot affirmed his prior testimony on these matters. (Pl.'s SOAF ¶57).

Second, the Defendants conspired with one another to fabricate several evidentiary items related to a pair of gloves purportedly recovered from Prekop's residence. Because Perrot adamantly denied making statements about gloves to Jarvis, Defendants needed to fortify their case by inventing a connection between Perrot and the gloves.

In an attempt to link these gloves to Perrot, Kelly falsely reported the conversation he had with Nancy Westcott on December 7, 1985. Kelly drafted a report claiming that Ms. Westcott relayed to him that the gloves looked just like a pair she had but "could not find" after searching her closet. (Pl.'s SOAF ¶¶31-32). At both trials, Kelly testified to this fictitious exchange he claimed he had with Ms. Westcott, tainting the jury with this fabrication. Contrary to Kelly's account, Ms. Westcott testified she did not tell Kelly that she had gloves that looked like the ones he showed her, nor did she search for them in her closet. (Pl.'s SOAF ¶¶31-32). Westcott unequivocally stated that she did not own a pair of gloves that looked like the ones that Kelly showed her. (Pl.'s SOAF ¶¶31-32). In fact, Ms. Westcott told Kelly that the gloves looked similar to ones that Lisa Eldridge had. (Pl.'s SOAF ¶¶31-32).

Defendants try to minimize Kelly's fabrication by arguing that whether Ms. Wescott or Ms. Eldridge owned these gloves, Perrot had access to them. However, Defendants ignore the fact that later in the morning of December 7th, Ms. Eldridge told Jarvis that the gloves he showed her were not hers. Faced with that reality, Kelly and Jarvis concocted a story that tied Perrot to the gloves found at Prekop's residence.

In their brief, Defendants claimed there is no evidence in any of the transcripts that anyone testified that Perrot had on his sister's gloves during the November 30, 1985 crimes. (Dkt. 340, p. 30). Defendants are patently wrong. Jarvis testified to that effect when he read the Statement into the record at both trials.

Additionally, Popko fabricated part of Mary Prekop's statement about her November 30, 1985 rape. Specifically, Defendants falsely attributed the last paragraph on the written statement to Mary Prekop: "When the police arrived I noticed a pair of gloves on the foot of the bed. They are not mine. I never saw them before." (Pl.'s SOAF ¶88). During the second trial, Prekop

expressly testified that she never told the police that she found gloves in her bedroom after the November 30, 1985 sexual assault. (Pl.'s Ex. 16 Trial 2 Test., 1/6/92, p. 144). In fact, Prekop testified that she did not even see the gloves until she returned home from the hospital and police station, after she gave her statement.

Further casting doubt on the gloves' origin, Kelly used three different evidence tags for purportedly the same pair of gloves. On November 30, 1985, Detectives Kelly and Louden inventoried a pair of gloves from Prekop's residence, which they tagged with the evidence receipt No. 49492. But then Kelly inventoried two more pairs of gloves allegedly from Prekop's residence on the same date, which he tagged with evidence receipt Nos. 49449 and 49536. Yet, the prosecution only introduced one pair of gloves at trial.

When Mr. Hammerschmith brings up his concern about the foundation for introducing the gloves at trial, Bloom offers only a partial explanation. (Ex. 76, 12.9.87, p. 189) (reading from left to right):

THE COURT: His sister's gloves.

MR. BLOOM: Yes, and if it becomes an issue, the sister identified the gloves later in the day for Kelly, so I don't intend to put it all in if it's not necessary, but I think there certainly is a foundation for offering them.

MR. HAMMERSCHMITH: My understanding is there were two pairs of gloves taken.

MR. BLOOM: No, there was one pair of gloves taken, it was re-marked with a second property slip and it was sent to the F.B.I., but only one pair of gloves taken to the Prekop home, my understanding is.

MR. HAMMERSCHMITH: I was misinformed, then.

THE COURT: Okay.

(End of side bar conference)

Bloom did not explain why there were three distinct evidentiary tags for the same pair of gloves, and the record does not provide any such explanation elsewhere.

Not only did Defendants fabricate material evidence that was introduced at trial, but they also fabricated peripheral evidence to eliminate doubt and solidify their case against Perrot, such as: (a) Statements that Officer Kane claimed Perrot made to him on December 10, 1985 about breaking in to 33 Covel Street, and (b) Marchand's supplementary statement to Jarvis that she thought her assailant's voice sounded like Perrot's.[10]

When examining the record in the light most favorable to Perrot, and drawing reasonable inferences, Defendants fabricated part of Perrot's Statement and multiple evidentiary details surrounding the gloves.

## V. KELLY AND JARVIS'S FALSE TESTIMONY LED TO PERROT'S WRONGFUL CONVICTIONS.

Defendants accurately recite the law concerning Defendants' immunity for their in-court testimony. However, Defendants are not shielded by absolute immunity for their pretrial and out-of-court conduct that they then testify about in court.

The government violates a criminal defendant's right to due process of law when it allows false evidence to go uncorrected when it is introduced. *See Alcorta v. Texas,* 355 U.S. 28, 31 (1957); *Pyle v. Kansas,* 317 U.S. 213, 215-16 (1942). The constitutional duty to intervene to correct false testimony by a government witness is not limited to the prosecutor. *Limone v. United States*, 497 F. Supp. 2d 143, 218 (D. Mass. 2007), *aff'd on other grounds,* 579 F.3d 79 (1st Cir. 2009).

Absolute immunity does not protect officers from liability for falsifying police reports, making false statements to the prosecutor, and otherwise fabricating evidence, even when police also testify about these matters in court. *See Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015);

[10] Perrot was excluded as being the assailant of Marchand by forensic evidence. (Pl.'s SOAF ¶80). Moreover, Marchand viewed the lineup with Perrot in it on December 7, 1985, but she did not request to hear any of the individuals in the lineup speak, despite officers offering that option.

*see also*, *Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017) (holding that officer was not entitled to absolute immunity for the false statements he made in his warrant affidavit).

As several courts, including the First Circuit, have noted, a police defendant cannot use *Briscoe*'s rule of absolute immunity as a shield to protect an entire course of conduct merely because, at some point, the defendant provided testimony in a judicial proceeding. *Mitchell v. City of Bos.*, 130 F. Supp. 2d 201, 212 (D. Mass. 2001); *Guzman–Rivera v. Rivera–Cruz,* 55 F.3d 26, 29 (1st Cir. 1995) (stating the immunized nature of an act "does not spread backwards like an inkblot, immunizing everything it touches.").

The government's introduction of false testimony is material if the evidence 'could in any reasonable likelihood have affected the judgment of the jury.' " *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (per curiam) (quoting *Giglio*, 405 U.S. at 154). That "'reasonable likelihood' standard does not require the defendant to show 'that he more likely than not would have been acquitted' absent the false statements. *United States v. Butler*, 955 F.3d 1052, 1058 (D.C. Cir. 2020). Rather, the defendant need show only that the false testimony 'undermines confidence' in the verdict. Thus, even if the false testimony '*may* not have affected the jury's verdict,' it is material if the evidence reasonably *could* have affected the verdict."

When viewing the record in the light most favorable to Perrot, the record reveals the following notable examples of how Defendants falsely testified during both trials:

- Kelly's testimony concerning the circumstances surrounding the recovered gloves;
- Kelly's testimony about his conversation with Nancy Westcott on December 7, 1985;
- Jarvis's and Kelly's testimony about how they treated Perrot during the interrogations; and,
- Kelly's testimony as to Perrot's willingness to answer questions;
- Jarvis's testimony about Perrot's inculpatory statements to him during the interrogation.

Defendants argue that there is no evidence from which a jury could conclude that Kelly lied about his conversation with Ms. Westcott. In support of this position, Defendants presume that the juries in Perrot's criminal trials discredited Ms. Westcott's testimony on this topic. But by that same logic, if a civil jury believed Ms. Westcott's account of her conversation with Kelly, then a reasonable jury could determine that Kelly lied about the exchange. Moreover, Officer Popko read into the record Prekop's statement, including the fabricated part about finding the gloves in her house. This false testimony also contributed to Perrot's first conviction because it was the only evidentiary foundation offered for the admission of the gloves.

Based on the record and all favorable inferences, Defendants Kelly, Jarvis, and Popko provided false testimony during one or both of Perrot's trials, which led to his wrongful convictions.

## VI. <u>QUALIFIED IMMUNITY</u>

A court analyzing qualified immunity at summary judgment asks (1) whether a reasonable jury could conclude that the facts "make out a violation of a constitutional right" and (2) "whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As discussed in further detail in *infra* X, genuine disputes preclude summary judgment on the first inquiry. There is sufficient evidence in the record that would allow a jury to conclude that Defendants suppressed and fabricated evidence and that they conspired to frame Perrot for the crimes against M.P., all in violation of his right to due process. Any disputes of the underlying facts supporting Perrot's suppression and fabrication claims must be resolved by a jury.

As to the second inquiry, the court considers (1) "whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he

was doing violated the right," and (2) "whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32–33 (1st Cir. 2011). There is no question that the right not to be framed by law enforcement was firmly established in 1987 and 1991. *See Limone v. Condon*, 372 F.3d 39, 45 (2004) ("...those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit"); *see also Drumgold v. Callahan*, 707 F.3d 28, 43 (1st Cir. 2013) ("There can be no doubt that, under the line of cases running from *Mooney* and *Pyle* to *Brady,* the law was firmly settled at the time of Drumgold's criminal trial that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant"); *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011) ("[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights").

Perrot raises two distinct due process violation theories. Perrot first argues that various Police Officer Defendants fabricated evidence, including Perrot's alleged confession and the statement from Nancy Wescott, to frame him for the crimes against M.P. Perrot also argues that the Police Officer Defendants suppressed various forms of favorable evidence, including the original version of Perrot's November 30, 1985 statement and the original blood analysis conducted by the SERI lab in December 1985 in furtherance of this scheme. The Defendants do not offer any arguments that they are entitled to qualified immunity from either of these theories. Thus any argument that qualified immunity should apply here is waived. *See Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) ("[t]he

purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum").

Any argument that Police Officer Defendants are entitled to qualified immunity here also fails on the merits. *Limone* makes clear that police officers cannot fabricate confessions to secure a conviction against a defendant. No officer could reasonably believe that fabricating a confession to a crime does not fall within the purview of *Limone*. In fact, knowledge of *Limone* is not even necessary here. Any officer worth his salt would know that he could not manufacture a confession to pin a crime on a suspect without violating every principle within our criminal justice system. This is also the case with fabricating witness statements. See *Williams v. City of Boston*, 771 F. Supp. 2d 190, 206 (D. Mass. 2011) (police officers are not entitled to qualified immunity where the plaintiff alleges a due process violation based on the fabrication of evidence).

The Police Officer Defendants are also not entitled to qualified immunity for suppressing favorable evidence from Perrot and his attorneys. *See Haley v. City of Boston*, 657 F.3d 39, 50 (1st Cir. 2011) (qualified immunity not available where police officers deliberately suppressed key witnesses' statements). Perrot's blood was sent to a SERI lab for testing, but the results of that test were never given to Perrot or his defense attorneys. As discussed *supra X*, it is likely that the SERI lab results contained favorable evidence for Perrot. The police also failed to provide any information about the stick that was collected at M.P.'s home, which allegedly contained DNA evidence of the perpetrator. There is no doubt that in 1985, the law was clearly established that police officers were prohibited from suppressing favorable evidence. As the First Circuit stated in *Haley*, this right not be framed by police through the deliberate concealment of evidence can be traced to 1935 when the Supreme Court decided *Mooney v. Holohan*, 294 U.S.

103 (1935). Courts have found that this right extends to suppression of exculpatory lab evidence. *See Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008) ("Therefore, the law was sufficiently clear in 1984 that a state crime lab technician would have known that suppression of exculpatory blood test results would violate a defendant's rights"). Thus, summary judgment as to these claims should be denied.

Defendants' argument that Judge Lindsay's dismissal of Perrot's federal habeas corpus petition warrants summary judgment in their favor is unpersuasive. The petition did not consider the issues that are currently present before this Court. The Police Officers are not entitled to summary judgment on the question of qualified immunity.

## VII. <u>PROBABLE CAUSE</u>

Defendants argue that Plaintiff's malicious prosecution argument fails because there was probable cause to charge Plaintiff with the crimes against M.P. Not only does this argument lack merit but it also completely disregards the ample evidence of fabrication and misconduct in the record.

First, at this juncture, Plaintiff is required to show a genuine dispute the defendant caused a seizure of the plaintiff pursuant to legal process, unsupported by probable cause, and those criminal proceedings terminated in plaintiff's favor. *Almeida v. Rose*, 55 F.Supp.3d 200, 204 (D. Mass. 2014) (quoting *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99- 101 (1st Cir. 2013)). Defendants contest just one of these elements, arguing that they are entitled to summary judgment because probable cause existed to prosecute Perrot as a matter of law.

Whether probable cause exists is a quintessential question for the jury. *Hilchey v. Haverhill*, 537 F.Supp.2d 255, 260 (D. Mass. 2008). The probable cause standard is objective and based on the facts known to the officers. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010).

Officers have probable cause when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). When the facts underlying probable cause are disputed, a jury must decide. *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *Williams v. Chicago*, 733 F.3d 749, 757 (7th Cir. 2013).

Here, the record properly construed in Perrot's favor, a reasonable jury could easily conclude that there was no probable cause to charge Mr. Perrot for the crimes against M.P. At the time of Plaintiff's arrest for the December 7th Crimes, not a single shred of evidence tied Plaintiff to the crime. Defendant Jarvis admits that during his initial questioning of the M.P. crimes to Plaintiff, Plaintiff only stated that "he knew nothing of old ladies" during his initial interrogation of Perrot. Perrot never provided Jarvis with any information about the crimes against M.P. because he was innocent of those crimes. The only evidence linking Plaintiff to the M.P. crimes was evidence that was made up by defendants: the fabricated "confession" and the planted glove evidence. Defendants used this fabricated evidence to establish probable cause to charge Mr. Perrot with the M.P. crimes. It is well-settled that Defendants cannot rely on fabricated evidence and false statements to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Hernandez-Cuevas*, 723 F.3d at 103-05. Defendants' motion must be denied.

## VIII. <u>CONSPIRACY</u>

In order to build a case against Perrot, Defendants worked in concert to legitimize the fabricated statement and to ensure that the gloves found at the scene would be tied to Perrot.

A civil rights conspiracy is "a combination of two or more persons acting in

concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" *Sanchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) (citing *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008)).

"[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988). The First Circuit has decided that a jury should decide conspiracy claims where circumstantial evidence as limited as conversations between defendant police officers during an investigation permits the inference that the defendants agreed to violate a plaintiff's constitutional rights, *Santiago*, 891 F.2d at 389; *see also Hampton*, 600 F.2d at 621 ("The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives."); *Gual Morales*, 579 F.2d 677, 680-81 (1st Cir. 1978) (noting that summary judgment should be granted with "great circumspection" where a conspiracy claim turns on a defendant's state of mind).

The facts viewed in Perrot's favor show that the Defendants worked in concert to ensure Plaintiff's conviction for the crimes against M.P. Each one of the remaining Defendants participated in the plot to frame Perrot. Despite testifying to the contrary, it is clear the Defendant Jarvis spoke with Defendant Kelly when he returned to the station with the gloves after speaking with Nancy Wescott. (Pl.'s SOAF ¶¶31-32, 34-35). Since Nancy Wescott told him that they looked like it belonged to Lisa Eldrige, Jarvis asked Kelly to take the gloves to Lisa

Eldrige to confirm. To this day, Defendant Kelly has been unable to explain why he took the gloves to Lisa Eldrige's home or how he got in possession of the gloves. (Pl.'s SOAF ¶58).

Further, Defendant Popko fabricated a portion of M.P.'s November 30, 1984 statement where she states that she found a pair of gloves in her bedroom after the attack, which M.P. disputed at trial. (Pl.'s SOAF ¶80). A jury could also reasonably conclude that either Popko or Kelley suppressed M.P.'s statement that the blood found on the sheet belonged to her deceased uncle.

Defendant Kennedy, who was in charge of the investigation of another sexual assault of another elderly woman (a crime which Defendants also attempted to pin on Perrot), knew of George and his crew for months prior to the December 7th arrest, and was complicit in securing a conviction against Perrot. So much so that he personally took the blood and hair evidence to the FBI office in D.C. with Defendant Bloom. Defendant Kennedy was an active part of the investigation team of the 1985 crimes against elderly women and he joined in the conspiracy to tunnel focus on Perrot as the person responsible for these crimes.

Defendant Canevari is in a similar boat. Canevari was also heavily involved in the investigations of the 1985 crimes. However, as a supervisor of the Detective Bureau at the SPD, his involvement goes even deeper because he was in charge of reviewing the reports and statement of his subordinate officers, including Defendant Jarvis. This would make him responsible for reviewing the statement Perrot allegedly gave Jarvis where he "confessed" to the crimes against M.P. Canevari also participated in the interrogation of Perrot after his arrest.

Given these facts, a jury could reasonably find that these Defendants agreed to pursue a case against George for the crimes against M.P. [do you want to add that Defendants are missing the point in their arguments, we aren't alleging any of the those things are constitutional

violation]. To the extent Defendants assert in cursory fashion that Perrot lacks evidence that they entered an agreement to violate his rights, they again fail to construe the facts in Perrot's favor and their argument "ignores the reasonable inferences that might be drawn by a jury regarding coordination among Defendants to obtain [Perrots]'s conviction through [violations of due process]." *Schand v. Springfield*, 380 F.Supp.3d 106, 136 (D. Mass. 2019).

## IX. <u>MONELL</u>

At the heart of this case is the City of Springfield's actions, or better, *inactions*, which led to Perrot's wrongful incarceration. Perrot was wrongfully convicted because the Police Officer Detectives were more concerned with closing the case over seeking the truth, and the City lacked policies, adequate training, and supervision to prevent such misconduct. This absence of accountability gave the Police Officer Detectives the freedom not to document or preserve their investigatory activities, interviews, and interrogations, which in turn enabled them to fabricate and suppress evidence without leaving any trace of wrongdoing. The City also failed to provide adequate training on a police officer's *Brady* obligation to turn over all favorable evidence to the accused. In short, the City's deficient policies and oversight led the Police Officer Defendants to believe that they could act with impunity, giving them free-range to implicate Perrot for a crime he did not commit.

A municipality can be directly liable under § 1983 for constitutional violations caused by (1) enforcement of a municipal policy, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); (2) a widespread, though unwritten, custom or practice, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); or (3) action of a municipal final policymaker, *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986). Municipalities can also be liable for failure to train, where the need for more or

better training is sufficiently obvious, and where the lack of training causes injury. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

As discussed above, the underlying constitutional violations are clear: George's due process rights fortified by the Fifth and Fourteenth Amendment were violated when (1) Detective Jarvis' failed to deliver Perrot's original statement to the prosecution as required under *Brady*; (2) Detective Jarvis and Kelly failed to preserve their notes of Perrot's interrogations; (3) Detective Jarvis and Kelly failed to preserve their notes of their interviews with Bob Timmerman and Jeff Adkins; and (4) the Detectives' decision to link the gloves found in M.P. residence to Perrot.

A jury could reasonably find that the City's failure to adopt adequate policies to prevent this misconduct and its failure to ensure the adequate training of its police officers showed a deliberate indifference to Perrot's constitutional rights. The jury could find, for example, that the City's failure to promulgate uniform policies on what was required to be put in an investigatory case file was the reason Detective Jarvis felt empowered to destroy his notes. (Pl.'s SOAF ¶42). Or maybe a jury could find that the City's failure to adequately supervise its employees allowed the Police Officer Defendants to fabricate evidence against Perrot. Nevertheless, the fact that these factual questions remain inherently precludes the possibility of summary judgment on the *Monell* claims.

### A. The City of Springfield's Lacked Adequate Policies Despite the Obvious Need to Implement Them.

In 1985, the City had no *Brady* policies (Pl.'s SOAF ¶101), no policies on adequate note-taking during interrogations (Pl.'s SOAF ¶97), and no policies on how any notes officers did take should be preserved (Pl.'s SOAF ¶103).

It is undisputed that a City can be held liable for any constitutional violation that resulted

as a result of the enforcement of its policies. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury"). The failure to adopt a policy where a need for one is evident is also viewed as an official policy. *See Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("[i]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable"); *see also Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) ("Official policy may be established by the omissions of supervisory officials as well as from their affirmative acts"); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) ("A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations"). When alleging a policy of inaction, a municipality may be held liable under Section 1983 for its failure to implement a policy in "a situation that demands a policy" and that the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Squadritto*, 152 F.3d 564, 577-78 (7th Cir. 1998).

In *Canton*, the Supreme Court considered whether a municipality could be liable under a failure-to-train *Monell* theory. There, the Supreme Court "distinguished between a city's deliberate or conscious choice not to have a policy, which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." *Armstrong*, 152 F.3d at 578 (internal citations and quotation marks omitted). "[M]unicipal liability under Section 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *Canton*, 489 U.S. at 388-89, quoting *Pembaur*, 475 U.S. 469, 483-484 (1986). Several courts have expanded this beyond the failure-to-train context to include situations where a municipality fails to adopt a policy where the violation of a constitutional right was foreseeable. See

*Armstrong v. Squadritto*, 152 F.3d 564, 577-78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986); *Avery v. Burke Cnty*., 660 F.2d 111, 114 (4th Cir. 1981); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143–44 (9th Cir. 2012). The City's " 'policy of inaction' " in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). This Court previously recognized a policy of inaction claim in *Haley v. City of Boston*, 2013 WL 4936840 (D. Mass. Sept. 12, 2013). *See Haley*, 2013 WL 4936840, at *5 (A municipality may set a "policy" bringing it within the scope of section 1983 liability if it "fail[s] ... to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations) (citing *Baker v. Dist. of Columbia,* 326 F.3d 1302, 1306 (D.C.Cir.2003)).

To prevail on a policy of inaction claim, Plaintiff must show that the city failed to establish a "policy in a situation that demands such a policy." *Armstrong*, 152 F.3d at 577-78. Here, the ramifications of failing to adequately adopt policies that ensure the proper preservation of police memorandum are obvious. *See Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992) (deliberate indifference "occurs when the need for more or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need.") (citing *Canton*, 489 U.S. at 390). The City's own witness testified as to the importance of memorization and documentation of investigative leads. *See* Pl's Ex. 44, 142:14-142:24.

It would be nearly impossible to ensure that a criminal defendant's rights to due process are adequately protected without properly preserving all documentation memorializing all

aspects of a criminal investigation. For example, Detective Kelly spoke to two witnesses, Jeff Adkins and Bob Timmerman, who could corroborate Perrot's whereabouts on November 30, 1985. Yet, Detective Jarvis failed to either memorialize his conversations with these witnesses or failed to preserve these notes. Any potentially exculpatory information in these notes was lost, due to the lack of policy surrounding adequate documentation and preservation.

Equally important is the need to adopt adequate *Brady* policies. If notes of these interactions actually existed, then they were required to be turned over under *Brady*. When asked whether in 1985 Springfield had any policies on an officer's *Brady* responsibilities, the City's witness stated that she did not believe that they had heard about *Brady* during that time period. *See* Pl's Ex. 44, 52:15-20. This is particularly concerning, given that by this point *Brady v. Maryland* was decided over 20 years prior. The lack of any *Brady* policies left Springfield Police Officers with no choice but to figure out the parameters of exculpatory evidence on their own. *See* Pl's Ex. 49, 71:1-72:1.

According to now Superintendent Clapprood, Springfield did eventually adopt Brady policies – at some point between 2021 and 2023. Unfortunately, this change came too late for Perrot who spent a decade wrongfully incarcerated for the crimes against M.P. in the interim.

**B. <u>The City of Springfield failed to properly train and supervise its employees</u>**

The City had a subpar training program which failed to properly prepare police officers on how to conduct a proper investigation that adequately adhered to their constitutional *Brady* obligations.

Similar to the policy of inaction claim, a City is liable for its failure to adequately train its officers if the need to adopt better policies to prevent a violation of constitutional rights were "so obvious" that it can be reasonably said that the City was "deliberately indifferent" to the rights of

the individuals who came in contact with the SPD. *Canton*, 489 U.S. at 390. A municipality can be found to be deliberate indifferent if the "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program *Connick v. Thompson*, 563 U.S. 51, 61 (2011). When the need for more or different training is "so obvious" and "inadequate" that it is likely to result in a constitutional violation, this constructive notice can be satisfied by a single incident. *Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018). The City had a responsibility to ensure that SPD officers were adequately trained to protect the due process rights of individuals such as Perrot, who were accused of committing a crime within its jurisdiction.

Here, the record is deprived of any meaningful training policies aimed at ensuring that police officers were properly trained officers in *Brady* disclosure obligations. In fact, Defendants testified that the SPD not only failed to provide them with any training on their *Brady* obligations, but failed to teach them what exculpatory evidence even is. *See generally* (Pl.'s SOAF ¶¶109-110)

The only reference to exculpatory evidence in the training manual provided by the City is the following:

> Purpose and Goals of the Investigator
> To Identify the Guilty Party
> To locate the Guilty party
> Establish that persons guilt or innocents.
>
> Inculpatory Statements - Admissions of guilt
> Exculpatory Statements Evidence of innocents
>
> Must consider both when conducting an investigation

This is a far cry from what the law actually is: "law enforcement officers have a

correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013) (citing *Moldowan v. City of Warren,* 578 F.3d 351, 381 (6th Cir.2009); *McMillian v. Johnson,* 88 F.3d 1554, 1567 (11th Cir.1996)). This cursory explanation of evidence fails to provide any insight as to what evidence is considered "favorable," the distinction between exculpatory and impeachment evidence, or, most importantly, **the requirement to turn over all such evidence to the prosecution.** For SPD's *Brady* training to be considered adequate, a police officer would have to derive a competent understanding of all of these facets of their disclosure obligations from "Exculpatory Statements…Evidence of innocents…Must consider both when conducting an investigation." A reasonable jury could agree with Perrot that this cursory explanation is inadequate.

According to the City, the SPD officers were aware of their obligations to turn over all exculpatory evidence to defendants. However, the City fails to cite to any direct evidence to support this contention. The evidence in the record also disputes this. First, it is clear that the City provided no guidance as to what exculpatory evidence was. Second, despite the City's contention to the contrary, officers did not hand over all evidence in the case to the prosecutor. *See* Pl's Ex. 44, 146:3-17 (Q: How about if you were investigating someone and it was unsure as to whether or not that person did it or not, so not someone that was excluded? A: I would say it depends and I would say because if we think through follow-up investigation, we rule that person out, I'm not sure how much information we would turn over to the prosecutor on that if it didn't go too far. If it went a little bit further in the investigation and we thought maybe we had a real viable suspect and we put more work into it, I would say yes, we would tell. But if it's a – if it's ruled out right away, like there's no way this person is a suspect, the person says he was in a different location and can prove it, I'm to sure that all that information would go to the

prosecutor"); *see also* 229:11-230:3. Evidently, the police officers did make preliminary decisions as to what evidence was turned over to the prosecution.

The City's reliance on *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 132 (D. Mass. 2019) is misplaced. First, the bulk of the discussion surrounding the claim revolved around the failure to train officers on how to conduct proper identification procedures, not their *Brady* violations. *See Schand*, 380 F. Supp. 3d at 131-134. Second, the Defendants in *Schnad* testified that they received training above the minimal requirements. This is not the case here, where the Defendants received no training on their *Brady* obligations.

Finally, the misconduct alleged in this case differs from the misconduct alleged in *Schand*. In *Schand*, the Court held that the allegations that the police officers deliberately conducted an improperly suggestive photo array to obtain Plaintiff's conviction undercut the argument that the misconduct was a result of improper training. Here, Perrot does not allege that all of the evidence suppressed was done in bad faith. For example, Perrot does not understand why the Police Officer Defendants failed to turn over any notes of their conversations with Jeff Adkins and Bob Timmerman. *Schand* is not dispositive as to those claims.

However, Perrot does allege that Police Officer Defendants acted in bad faith in suppressing certain evidence, such as the original version of Perrot's statement, from Perrot during his criminal trial. However, unlike *Schnad*, it is immaterial if Defendants acted in bad faith with withholding the original version of the statement. Even if there was no bad-faith involved, it is still very likely that the original version of Perrot's statement would have been withheld because the City provided no guidance on what constituted favorable evidence. Even the best Detectives arguably could have been led to believe that a photocopy was sufficient to meet their *Brady* obligations. Thus, even if a jury were to conclude that the Defendants did not

deliberately intend to withhold the original version of Perrot's statement, it could conclude that the conduct was a result of the City's failure to properly train its officers on what evidence needed to be turned over to the prosecution.

Lastly, any argument that need to properly train SPD officers on their *Brady* obligations was not "obvious" is waived and merit. *See Noonan*, 723 F. Supp. 2d at 349. By the time Perrot was investigated for the M.P. crimes in 1985, *Brady* was a well-known constitutional doctrine. The principles underlying *Brady* and its progeny is the idea that a criminal trial would not be fair if a criminal defendant was deprived of access to evidence that could exculpate him or is in any other way favorable to his defense. There would be no value in *Brady* if law enforcement, the individuals in charge of gathering the evidence for the prosecution, were not aware of their duties to disclose such evidence. Indeed, by Defendants own account, even the media was discussing the importance of exculpatory evidence. See Pl's Ex. 48, 186:2-3 (Q: How did you know what [exculpatory evidence] was? A: Television, news, all of that). If the media found exculpatory evidence important enough to cover during that time period, how could the SPD not find it important enough to teach? Not ensuring that police officers understood what evidence needed to be turned over to the prosecution created a risk that certain evidence would be withheld, such as was the case here with Perrot's original statement.

## X. <u>A JURY MUST DECIDE ALL PLAINTIFF'S STATE LAW CLAIMS.</u>

### A. Malicious Prosecution

To establish a viable malicious prosecution claim, Perrot must show that: (1) Defendants instituted his criminal case, (2) it ended in his favor, (3) there was no probable cause, and (4) Defendants acted maliciously. *Santiago v. Fenton*, 891 F.2d 373, 378-88 (1st Cir. 1989). Defendants make no arguments as to the first inquiry and have waived any arguments to the

contrary *See Noonan*, 723 F. Supp. 2d at 349. With regards to the third inquiry, as discussed *supra*, there was no probable cause to arrest Perrot for the Prekop Crimes. Thus, the only remaining issues in dispute are (1) whether the proceedings for the Prekop Crimes terminated in Perrot's favor and (2) whether Police Officer Defendants acted with malice.

As a preliminary matter, whether a party acted with malice is a question of fact reserved for a jury. *Santiago*, 891 F.2d at 388. Malice can be inferred from a lack of probable cause and "is defined as 'any wrong or unjustifiable motive.'" *Campbell v. Casey*, 166 F.Supp.3d 144, 153 (D Mass. 2016) (citing *Limone v. United States*, 579 F.3d 79, 109 (1st Cir.2009)). Here, since there was a lack of probable cause, a jury could infer that the Police Officer Defendants acted with malice. Moreover, the record reflects that Defendant Jarvis and Kelly deliberately suppressed exculpatory evidence, which is sufficient to survive summary judgment on this issue.

Lastly, despite Defendants' contention to the contrary, Perrot's criminal case for the Prekop Crimes terminated in his favor and is supported by the *nolle prosequi*. *Schand*, 380 F. Supp. 3d at 137 (citing *Wynne v. Rosen*, 464 N.E.2d 1348, 1351 (1984)). Defendants misstate the standard for which a *nolle prosequi* cannot be considered as evidence that a proceedings ended in Perrot's favor. A nolle prosequi is not viewed as favorable termination only where it was entered on the basis of a procedural or technical defect. *Id*. ("[t]he *Wynne* standard has been satisfied in this case, because the District Attorney's *nolle prosequi* was not issued merely "on the basis of a procedural or technical defect"). In *Schand*, the Court proceeded to state that even though "[i]t is true that the District Attorney's statement accompanying the *nolle prosequi* understandably disclaimed any suggestion that it constituted an opinion that Schand was innocent or that prosecutorial misconduct occurred" it "cannot be said that the dismissal of the charges against Schand was 'inconsistent with innocence." *Id*.

Here, the Commonwealth entered a nolle prosequi because the Superior Court found that the expert testimony concerning hair microscopy was unreliable and required a new trial. In the *nolle prosequi*, the prosecution states that given the passage of time, there was insufficient admissible evidence available to prosecute Perrot again on the crimes against Prekop. Similar to *Schand*, Defendants' argument that the *nolle prosequi* was not entered because of a finding of a Perrot's innocence does not negate that the fact that the reasons as to why the *nolle prosequi* was entered are not inconsistent with Perrot's innocence. Summary judgment must be denied.

**B. Civil Conspiracy**

Defendants are also not entitled to summary judgment on the state-law conspiracy claims for the same reason it should be denied for federal conspiracy claims discussed above. Perrot brings a state-law conspiracy claim under a vicarious liability theory. "For this type of civil conspiracy to apply, there must be "(1) a 'common design or agreement, though not necessarily express, between two or more persons to do a wrongful act' and (2) proof of 'some tortious act in furtherance of the agreement.'" *Fountain v. City of Methuen*, 630 F. Supp. 3d 298, 316 (D. Mass. 2022) (citing *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994) (overruled on other grounds)). "Under this approach, a defendant must provide 'substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan.'" *Id*. (citing *Kurker v. Hill*, 44 Mass. App. Ct. 184, 689 N.E.2d 833, 836 (1998)).

There is sufficient evidence in the record that would allow a reasonable jury to find that the Defendants acted in concert to frame Perrot for the crimes against M.P. and that, at a minimum, Defendants Jarvis and Kelly, made "tortious act" in furtherance of this plot. *See Hill*, 44 689 N.E.2d at 837 (a vicarious liability conspiracy theory can be pursued with evidence that a defendant provided substantial assistance "with the knowledge that such assistance is

contributing to a common tortious plan"). As such, summary judgment should be denied as to Perrot's state-law conspiracy claim.

**C. Intentional Infliction of Emotional Distress**

Under Massachusetts law, "[t]o make out a claim of intentional infliction of emotional distress, the [plaintiff must] show (1) that [the defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014). Conduct qualifies as extreme and outrageous only if it goes beyond all possible bounds of decency, and is regarded as atrocious, and "utterly intolerable in a civilized community.'" *Id.* (quoting *Roman v. Trs. of Tufts Coll.*, 964 N.E.2d 331, 341 (Mass. 2012)).

Defendants wish for this Court to view the record in their favor. Based on Defendants' version of the facts, which Perrot vehemently disputes, Defendants assert that they are entitled to summary judgment on the IIED claim. However, a reasonable jury could find that engaging in conduct that violated Perrot's right to a fair trial, including fabricating and suppressing evidence, that then led to his imprisonment for decades is outrageous and extreme conduct. *See Echavarria v. Roach*, 565 F. Supp. 3d 51, 94-95 (D. Mass. 2021); *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 240 (D. Mass. 2016) ("[P]olice officers fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown—would be sufficient to meet the high standard for a claim of IIED."). Arguably, framing a 17-year-old for such serious crimes is the definition of "extreme and outrageous."

Accordingly, a trial on that claim is necessary against each of the Defendants. As detailed, they participated directly, supervised, and conspired to manufacture evidence, including

false statements, to prosecute and convict Perrot of rape and break-in that he did not commit, and they withheld other evidence that would have allowed Perrot to fully defend himself against the false charges. As a result, Perrot spent decades in prison as a convicted sex offender. If the jury accepts these facts, they easily meet the "high standard" for an IIED claim. *Limone*, 497 F. Supp. 2d at 227; *Bazinet*, 190 F. Supp. 3d at 240; *Fox v. Hayes*, 600 F. 3d 819, 842 (7th Cir. 2010). Summary judgment should be denied.

**D. Massachusetts Civil Rights Act**

Because Defendants' argument for summary judgment rests solely on disputed, material facts, Perrot's Massachusetts Civil Rights Act ("MCRA") claim cannot be disposed of as a matter of law.

To establish an MCRA claim, Perrot must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion. *See* Mass. G.L. c. 12, §§ 11H &11J.

Although the MCRA is the state "counterpart" to §1983, there are some important differences. *Santiago v. Keyes*, 890 F. Supp. 2d 149, 153–54 (D. Mass. 2012). For example, to succeed on an MCRA claim, a plaintiff must show that the derogation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49, 52 (1989).

"A 'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'" *Goddard v. Kelley,* 629 F.Supp.2d 115, 128 (D.Mass.2009) (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 631 N.E.2d 985 (1994)). "Intimidation" means putting a person in fear for the purpose of compelling

or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.* Accordingly, liability may be found where (1) a defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do. *Id.* at 128.

Defendants utilized all three—threats, intimidation, and coercion— to frame Perrot for a sexual assault and break-in that he did not commit. In the 1986 motion to suppress hearing, Perrot testified that that the officers who interrogated him verbally abused him, threatened him, and screamed at him during questioning. (Pl.'s SOAF, ¶19). Perrot also testified that he repeatedly told the officers he did not want to speak with them, but they continued interrogating him. (Pl.'s SOAF, ¶54).

Throughout the day, the officers did not allow Perrot to sleep, despite his worsening emotional state and sleep deprivation. (Pl.'s SOAF, ¶20). For example, one officer, Paul Glantz, continuously rattled his baton on the cell bars that Perrot was held in to prevent him from being able to fall asleep. (Pl.'s SOAF, ¶20).

Considering Perrot's own testimony about the officers' misconduct during the interrogations, no version of the record supports Defendants' position on this claim.

Therefore, viewing the record in a light most favorable to Perrot, Defendants are not entitled to judgment as a matter of law on his MCRA claim.

**CONCLUSION**

Dated: May 17, 2024

Respectfully Submitted,

*/s/ Gianna Gizzi*

*One of the Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Mark Loevy-Reyes, BBO No. 707974
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
Ph: (312) 243-5900
Fax: (312) 243-5902

Debra Loevy, BBO No. 569212
Jon Loevy*
Steven Art*
Gayle Horn*
Gianna Gizzi*
Carla Agbiro*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
gizzi@loevy.com
*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I, Gianna Gizzi, an attorney, hereby certify that on May 17, 2024, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Gianna Gizzi

*One of Plaintiff's Attorneys*