**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GEORGE PERROT<br>Plaintiff,<br><br>v.<br><br>THE CITY OF SPRINGFIELD, et. al.,<br>Defendants | CIVIL ACTION NO: 18-CV-10147<br><br><br><br>PLAINTIFF'S STATEMENT OF<br>ADDITIONAL MATERIAL FACTS |

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. In 1984 and 1985, Springfield Police Department ("SPD") was investigating a series of home invasions and sexual assaults targeting elderly women. (Pl.'s Ex. 26, Lineup Summary, 12/7/85) (Pl.'s Ex. 15, Mot. Dismiss Hr'g, 2/25/91, 29:22-30:8).

2. On Friday, December 6, 1985, 17-year-old George Perrot worked a full day at his construction job and returned home about 5 pm. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

3. Perrot called his girlfriend, Lisa Eldridge, and asked her if she was ready to go out. Then Perrot called his friend, Bob Timmerman, and asked him to come pick him up. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

4. At approximately 6 pm, Timmerman picked up Perrot, and the two drove to pick up Eldridge and her friend. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

5. From there, the four friends went to a local convenience store and purchased a case of beer. They drove around town drinking beer and smoking marijuana. At one point, the four friends went to Timmerman's house to do lines of cocaine. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

6. Throughout the night, Perrot took several valiums, drank about 12 beers, and consumed about a gram of cocaine. (Pl.'s Ex. 38, Perrot Statement, 12/7/85) (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 53-56).

7. After cruising around for a couple hours, Timmerman and Perrot dropped Eldridge and her friend off at their homes. And at about 12:15 am, Timmerman dropped Perrot off at his house. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

8. From there, Perrot walked to Ellendale Street and entered a house he thought was unoccupied in search of money. (Pl.'s Ex. 38, Perrot Statement, 12/7/85) (Pl.'s Ex. 41, Perrot Dep., 7/12/23, 36:22-37:6, 40:14-41:11).

9. A few minutes later, Perrot started hearing voices and upon realizing the residents were home, he ran out the front door. (Pl.'s Ex. 38, Perrot Statement, 12/7/85).

10. After fleeing the house, Perrot walked to the neighborhood Denny's restaurant to buy a coffee. As he was leaving, Perrot grabbed a pocketbook from another patron and ran home, where he passed out on his bed at about 2:30 am. (Pl.'s Ex. 38, Perrot Statement, 12/7/85) (Pl.'s Ex. 41, Perrot Dep., 7/12/23, 32:13-19, 36:22-37:6) (Defs.' SOMF ¶83).

11. At 2:45 am, SPD officers arrived at Perrot's home, where Mark Westcott, Perrot's brother-in-law, let them in and showed them to Perrot's bedroom. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 6-7).

12. Nancy Westcott, Perrot's older sister, opened the door to Perrot's bedroom for the officers and found Perrot passed out. It took several minutes for Ms. Westcott to be able to wake her brother from unconsciousness. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 6-8).

13. The officers pulled Perrot out of bed, arrested and handcuffed him. Then the officers escorted him out of the house. (Defs.' SOMF ¶99) (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 10-11).

14. Disoriented and afraid, Perrot bolted and ran through several backyards before the police caught up to him. When the officers caught Perrot, they repeatedly kicked and hit him as he was on the ground, handcuffed. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 56-58, 78-81).

15. Following the officers' departure, Ms. Westcott called her mother, Beverly Daly, and told her that Perrot had been arrested. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 10-11).

16. At about 4:00 am, the officers transported Perrot to the police station, where he was taken to the booking desk and searched. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 59-60, 123-24).

17. As one of the officers patted Perrot down, the officer punched him in the rib cage, triggering laughter from nearby officers. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 59-60) (Pl.'s Ex. 41, Perrot Dep., 50:2-18).

18. At approximately 4:45 am, Ms. Daly called the police station and asked if her son was there and the officers told her that he was not. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 46-47).

19. Throughout the day, SPD officers, including Thomas Kelly, Thomas Jarvis, and Andrew Canevari, interrogated Perrot on and off for several hours, during which time the officers did not allow Perrot to fall asleep. The officers also threatened, verbally abused, and

screamed at Perrot. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 62-64, 121-122, 131) (Pl.'s Ex. 46, Jarvis's Answers to Interrogs., p. 3, ¶6).

20. One of the Defendant Officers, Paul Glantz, continuously rattled his baton on the cell bars that Perrot was intermittently held in. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 60-65, 67).

21. An officer brought Perrot to an interrogation room, with a desk and a typewriter, where two detectives waited, one of whom was Kelly. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 123-25).

22. Kelly started questioning Perrot about the break-in on Ellendale Street and the Denny's incident. In response, George told them that he did not want to talk to them, and that he just wanted to go to sleep. But the detectives persisted until George relented and started answering their questions. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 62-64, 129-30).

23. After about 20 minutes, Kelly brought Perrot back to the booking desk, where he was fingerprinted, photographed, and processed. Then officers returned Perrot to the holding cell for approximately a half hour before bringing him back to the interrogation room. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 64-65) (Pl.'s Ex. 41, Perrot Dep., 54:1-55:5).

24. During the second interrogation session, the detectives, one of which was Kelly, questioned Perrot about two break-ins and a rape that occurred on November 30, 1985. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, 65:18-66:23, 134:5-137:6, 139:12-142:23).

25. During this interrogation, Kelly and the other detective screamed at Perrot, repeatedly telling him that he was the assailant. They fed Perrot details of the crimes. For example, Kelly told Perrot how, at 4:00 am on November 30, 1985, "he" broke into a house on

27 Malibu and the owner's little black dog barked at "him." (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, 70:9-19, 99:14-101:2, 134:5-137:6, 139:12-142:23).

26. Perrot did not provide the detectives with any information about those incidents. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, p. 97).

27. Then, officers escorted Perrot back down to the cell where he remained for a period of time. (Pl.'s Ex. 41, Perrot Dep., 63:1-64:18).

28. Afterward, officers brought Perrot to a different interrogation room where two new detectives waited. During this interview, the detectives asked Perrot about a pharmacist's murder that he knew nothing about. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 67-68).

29. Meanwhile, Officers Ronald St. Germain and Thomas Trites prepared an affidavit for a search warrant for Perrot's residence, 87 Malibu Drive. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, p. 130) (Pl.'s Ex. 42, Search Warrant & Affidavit, 12/7/85).

30. At about 9:00 am, Kelly and Canevari went to 87 Malibu to conduct the search. Kelly brought a pair of gloves with him that were allegedly recovered from Prekop's residence on November 30, 1985. (Pl.'s Ex. 42, Search Warrant & Affidavit, 12/7/85) (Pl.'s Ex. 12, Trial 1 Test., 12/11/87, pp. 135-38).

31. While executing the search warrant, Kelly showed Ms. Westcott the gloves and asked her if she had seen them before. She told Kelly that she thought they looked like gloves that Lisa Eldridge had worn. (Pl.'s Ex. 12, Trial 1 Test., 12/11/87, pp. 61-63, 71-72).

32. Despite this, Kelly invented a false story that Ms. Westcott told him that the gloves were hers and she had recently lost or misplaced them. (Pl.'s Ex. 5, Kelly Memo, 12/7/85) (Pl.'s Ex. 12, Trial 1 Test., 12/11/87, pp. 61-63, 71-72).

33. The officers found nothing that linked Perrot to the Prekop Crimes from the search of his residence. (Defs.' Ex. YY, Grand Jury Test., 12/13/85, p. 41).

34. Upon concluding the search, Kelly returned to the police station and spoke with Jarvis, filling Jarvis in on the investigation thus far. (Pl.'s Ex. 10, Trial 1 Trans., 12/9/87, p. 224) (Pl.'s Ex. 18, Trial 2 Trans., 1/8/92, p. 453).

35. Subsequent to this conversation, Jarvis took the gloves to Eldridge's residence and asked her if the gloves belonged to her. Eldridge told Jarvis that the gloves did not belong to her. (Pl.'s Ex. 18, Trial 2 Trans., 1/8/92, pp. 495-99).

36. Back at the station, around 12:40 pm, Officers Jarvis and John Scanlon explained to Perrot they wanted to collect hair and blood samples from him to compare to evidence recovered from a couple of recent rapes. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 72-74, 93-94).

37. Knowing he was not involved in these assaults, Perrot agreed to provide the samples and signed a waiver to that effect. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 72-74, 93-94).

38. During this interrogation session, officers, including Jarvis, also presented Perrot with the typewritten statement about the Denny's theft and Ellendale break-in, which he eventually signed. (Pl.'s Ex. 38, Perrot Statement, 12/7/85) (Pl.'s Ex. 41, Perrot Dep., 64:14-78:5, 88:19-23).

39. From about 3:00 to 4:30 pm, Jarvis continued interrogating Perrot about the Prekop and Lichwala Crimes, to which Perrot repeatedly denied his involvement. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104, 166-71) (Pl.'s Ex. 13, Trial 1 Test. 12/11/87, pp. 107-118).

40. As of his interrogation of Perrot, Jarvis was aware of what Prekop and Lichwala had reported about their respective November 30, 1985 break ins and assault. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 170-71).

41. Jarvis fabricated the Statement that he claimed Perrot provided on December 7, 1985. (Pl.'s Ex. 6, False Confession Statement, 12/7/85) (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104) (Pl.'s Ex. 13, Trial 1 Test. 12/11/87, pp. 107-118).

42. Since first being confronted with the Statement, Perrot has consistently denied providing Jarvis, or any other SPD officer, information about the Prekop Crimes. Although Jarvis took notes during his interrogation of Perrot, he never turned them over to prosecution and destroyed them. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104) (Pl.'s Ex. 13, Trial 1 Test. 12/11/87, pp. 107-118) (Pl.'s Ex. 18, Trial 2 Trans. 1/8/92, pp. 511-513).

43. To make the statement appear legitimate, Jarvis elicited facts from Perrot about his whereabouts prior to the attack on Prekop, and then had Perrot sign the statement with only the information he provided in the first paragraph. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104) (Pl.'s Ex. 6, False Confession Statement, 12/7/85).

44. Subsequently, Jarvis inserted the confession to the Prekop Crimes into the original document, photocopied it, and then provided the copy of the Statement to the prosecutor. (Pl.'s Ex. 6, False Confession Statement, 12/7/85). (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104) (Pl.'s Ex. 6, False Confession Statement, 12/7/85).

45. Jarvis confronted Perrot with a pair of sneakers during one of the interrogation sessions. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 169-70) (Pl.'s Ex. 1, Declaration of George Perrot, 5/9/24, ¶4).

46. Perrot became progressively more sleep deprived throughout these interrogations, and at one point, vomited during the questioning. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 67-68).

47. On December 7, 1985, at about 4:30 pm, Kelly and Lieutenant Charles Arpin arranged a lineup for Mae Marchand, Emily Lichwala, and Mary Prekop. Francis Bloom, then an assistant district attorney, assisted in coordinating the lineup and was present at the police station when it was conducted. (Defs.' SOMF ¶133, ¶136) (Pl.'s Ex. 26, Summary of Lineup, 12/7/85).

48. During this lineup, SPD officers instructed the three women that they could request the lineup participants to speak, but none chose to do so. (Pl.'s Ex. 26, Summary of Lineup, 12/7/85).

49. After the lineup, Perrot was allowed to visit with his mother, sister, and girlfriend at the police station. During their visit, Perrot cried and confided to them how the police officers "roughed him up." Perrot begged his mother and sister to get him a lawyer because the police were trying to frame him for crimes he did not do. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 34, 48-50).

50. From 1985 through 1987, Francis Bloom prosecuted Perrot for a variety of charges stemming from the Prekop and Lichwala Crimes. (Pl.'s Ex. 15, Mot. Dismiss Hr'g Test. 2/25/91, 46:3-11).

51. Sometime prior to November 27, 1987, Attorney James Hammerschmith requested Mary Prekop's November 30, 1985 medical records from Bloom . (Pl.'s Ex. 8, Correspondence between Hammerschmith & Bloom, 11/27/87).

52. Bloom received Prekop's medical records on December 1, 1987 from Baystate Medical Center. Among other information, these medical records notated the time Prekop arrived at the hospital and the time she was discharged. (Pl.'s Ex. 3, M.P.'s Medical Records, 11/30/85).

53. Perrot or his counsel never received Prekop's medical records from November 30, 1985. (Pl.'s Ex. 1, Declaration of George Perrot, 5/9/24, ¶14).

54. In the motion to suppress hearing, Perrot testified that he told the police officers he did not want to speak with them during the initial interrogation session. Despite this, the officers kept questioning Perrot. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 63-64).

55. In the motion to suppress hearing, Perrot testified that he did not sign this Statement. (Defs.' Ex. EE, Mot. Suppress Hr'g, 9/2/86, pp. 66-67, 96-104).

56. At his first trial in 1987, Perrot confirmed that he did not break into Prekop's residence on November 30, 1985 nor did he assault Prekop. Perrot again testified that he never told the police any information contained in the Statement about the Prekop Crimes. (Pl.'s Ex. 13, Trial 1 Test. 12/11/87, pp. 107-118).

57. During his deposition in the present case, Perrot affirmed his prior testimony on these matters. (Pl.'s Ex. 41, Perrot Dep., p. 105).

58. During Perrot's first trial, Jarvis testified on direct examination about the Statement concerning the Lichwala and Prekop Crimes, and the court admitted the Statement into evidence. Only the photocopied version was introduced at trial. (Pl.'s Ex. 10, Trial 1 Test. 12/9/87, pp. 149-151, 160-62).

59. During his closing, Bloom argues that the jury does not have to look at any other evidence beyond the Statement. Bloom even argues that the Statement is the "most important piece of evidence in this case." (Pl.'s Ex. 13, Trial 1 Trans. 12/14/85, pp. 53-54).

60. During the second trial, Jarvis read the Statement concerning the Lichwala and Prekop Crimes into the record. He also testified that he normally took handwritten notes during interrogations. (Pl.'s Ex. 18, Trial 2 Test. 1/8/92, pp. 488-490, 511-520).

61. During the second trial, Prekop testified that the intruder left a footprint on her kitchen wall, which remained on her wall until the time of her trial testimony. (Pl.'s Ex. 18, Trial 2 Test. 1/6/92, p. 151).

62. Among other items, Kelly collected the stick from Prekop's bedroom on November 30, 1985. (Pl.'s Ex. 17, Trial 2 Test. 1/7/92, p. 228).

63. Following her October 24, 1985 sexual assault, Emily Lichwala told SPD Officer DeRosier that she thought her assailant sounded like a neighborhood boy who lived on Forest Hills Road. (Pl.'s Ex. 24, Lichwala Statement, 10/24/85).

64. Officer Richard Kane, along with DeRosier, determined the individual that Lichwala described was John Mezzetti Jr. (Pl.'s Ex. 25, DeRosier & Kane Memo to Capt. Brown, 10/29/85).

65. SPD was able to recover a partial print off a jewelry box in Lichwala's residence following her assault on October 24, 1985. (Pl.'s Ex. 22, SPD Letter to FBI, 11/8/85).

66. On October 28, 1985, SPD Officer Curtis McKenzu drafted a memo about a suspicious male in the area of Lichwala's residence. (Pl.'s Ex. 21, McKenzu Report, 10/28/85).

67. Detective Kelly interviewed Perrot's friends, Jeff Adkins and Bob Timmerman, during the course of his investigation into the series of sexual assaults in Springfield. These interviews occurred before Perrot's arrest. (Pl.'s Ex. 15, Mot. Dismiss Hr'g Test. 2/25/91, pp. 29-31) (Pl.'s Ex. 43, Declaration of Jeffrey Adkins, 5/16/24, ¶7).

68. On October 7, 1985, Jarvis drafted a statement on behalf of Mae Marchand alleging that Marchand reported to him that the voice of her assailant from September sounded like Perrot's voice. (Defs.' Ex. J, 10/7/85).

69. On December 16, 1987, Bloom and Kelly manufactured a false confession statement, forging Perrot's signature. (Pl.'s Ex. 14, Forged Confession, 12/16/87) (Pl.'s Ex. 15, Mot. Dismiss Hr'g, 2/25/91, p. 48:7-52:23) (Def. Bloom's SOMF ¶19).

70. Bloom claimed they did so to induce Jeffrey Adkins and Bob Timmerman into implicating themselves for the Marchand assault, as well as Perrot, for the crimes he was not yet convicted of. (Pl.'s Ex. 15, Mot. Dismiss Hr'g, 2/25/91, 65:22-67:23).

71. Bloom and SPD never disclosed to Perrot the original version of his December 7, 1985 Statement about the Prekop and Lichwala Crimes. (Pl.'s Ex. 10, Trial Test. 12/9/87, pp. 151-55) (Pl.'s Ex. 6, Statement, 12/7/85).

72. Hammerschmith raised the issue of the Statement being a copy at trial during Jarvis's direct examination. (Pl.'s Ex. 10, Trial Test. 12/9/87, pp. 151-55).

73. Bloom represented to Hammerschmith and the court that the version being introduced was the "original." (Pl.'s Ex. 10, Trial Test. 12/9/87, pp. 158-59).

74. Throughout SPD's investigation in 1984-1985, SPD considered seven other individuals as suspects for one or more of the sexual assaults and home invasions of elderly women. (Pl.'s Ex. 21, McKenzu Report, 10/28/85) (Pl.'s Ex. 24, Lichwala Statement, 10/24/85) (Pl.'s Ex. 25, DeRosier & Kane Memo, 10/29/85) (Pl.'s Ex. 29, Canevari Report, 9/22/85) (Pl.'s Ex. 30, Report & Notes on Alternative Suspects) (Pl.'s Ex. 15, Mot. Dismiss Hr'g, 2/25/91, p. 47:49-22).

75. In April 1986, Bloom brought more charges against Perrot relating to another woman's sexual assault, Mae Marchand, that occurred on September 21, 1985. (Pl.'s Ex. 39, Marchand Indictments, 4/7/86).

76. During his closing argument, Bloom contends that the jury does not have to look at any other evidence beyond the Statement, if they take it on its face. (Pl.'s Ex. 14, Trial 1 Test., 12/14/87, p. 53).

77. Bloom argued that the Statement is "the most important piece of evidence in this case" because everything else is just "icing on the cake." (Pl.'s Ex. 14, Trial 1 Test., 12/14/87, p. 54).

78. William G. Eubanks testified that the blood found on Prekop's sheets was consistent with Perrot's blood. (Pl.'s Ex. 17, Trial 2 Trans., 1/7/92, 299:17-300:).

79. Through this audit, the FBI determined that Agent Oakes, the "hair analysis expert" in both of George's trials, made erroneous statements and exaggerated the forensic conclusions. (Defs.' Ex. TT, Court's Findings of Fact, Rulings of Law, & Order, 1/26/16 pp. 42-43).

80. Serological testing results excluded Perrot as the source of semen from Marchand's assault and Lichwala's October 1985 assault. (Pl.'s Ex. 15, Mot. Dismiss Hr'g, 2/25/91, 65:22-67:23) (Pl.'s Ex. 50, Perrot's Proposed Findings of Fact, 12/4/15, ¶¶218-221).

**The Gloves**

81. On November 30, 1985, Detectives Kelly and Louden inventoried a pair of gloves from Prekop's residence, which they tagged with the evidence receipt No. 49492. (Pl.'s Ex. 2, Evidence Receipt, 11/30/85, p. 1).

82. Detective Kelly inventoried two other pairs of gloves from Prekop's residence on November 30, 1985, which he tagged with evidence receipt Nos. 49449 and 49536. (Pl.'s Ex. 2, Evidence Receipt, 11/30/85, pp. 2-3).

83. One glove was recovered from the floor and the other glove was found on the bed. (Pl.'s Ex. 16, Trial 2 Test. 1/6/92, pp. 190-92).

84. SPD sent the gloves, tagged No. 49492, to the FBI on December 10, 1985. (Pl.'s Ex. 7, SPD Letter to FBI, 12/10/85).

85. Every piece of evidence that SPD collected was inventoried and assigned a number on a property tag. That number follows that evidentiary item wherever it goes. (Pl.'s Ex. 10, Trial 1 Test. 12/9/87, p. 190).

86. Evidence tags from the same location should have sequential or similar numbers, indicating they were tagged around the same time. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 128:23-134:3)

87. Pursuant to the City's Rule 30(b)(6) representative, there is, and was, no reason to create a new property tag for a piece of evidence that has already been inventoried and tagged. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 134:15-134:20).

88. During the second trial, Prekop testified that she never told the police that she found gloves in her bedroom after the November 30, 1985 sexual assault. And that someone other than her added this sentence in, "When the police arrived I noticed a pair of gloves on the foot of the bed. They are not mine. I never saw them before." (Pl.'s Ex. 16, Trial 2 Trans., 1/6/92, p. 144) (Pl.'s Ex. 4, Prekop Statement, 11/30/85).

**Blood Analysis**

89. SPD sent a blood sample from Perrot to the Serological Research Institute ("SERI") prior to sending his blood to the FBI. SERI conducted an analysis of Perrot's blood sample. The results were never disclosed. (Pl.'s Ex. 27, SERI Invoice, 12/31/85).

90. On December 10, 1985, Officer Kane went to York Street Jail to observe blood being drawn from Perrot and collected three vials of blood from him. (Defs.' Ex. CC, Kane Special, 12/10/85).

91. On December 11, 1985, Kane sent one of the three vials of Perrot's blood to John Abbott of SERI. (Pl.'s Ex. 32, SERI Evidence Receipt, 12/11/85).

92. On January 2, 1986, SPD mailed the other two vials of Perrot's blood to the FBI. (Pl.'s Ex. 33, SPD Letter to FBI, 1/2/86).

93. On January 23, 1986, FBI informed SPD that Perrot's blood grouping was "PGM 1+, ESD 1, PEP A1, G6PD A, Le (a+b-) (non secretor)." (Pl.'s Ex. 34, FBI Letter to SPD, 1/23/86).

94. On March 31, 1987, Officer Thomas Kennedy observed a second blood draw from Perrot and, as a result, collected two vials of his blood. (Pl.'s Ex. 35, Evidence Receipt, 3/31/87).

95. On April 1, 1987, Kennedy and Bloom personally delivered Perrot's second blood sample to the FBI. (Pl.'s Ex. 36, Bloom Letter to FBI, 4/1/87).

96. On August 4, 1987, FBI reported to SPD that Perrot's blood grouping was "PGM 1+ EAP BA Hp 2-1 Gc 1, Tf C." (Pl.'s Ex. 37, FBI Letter to SPD, 8/4/87).

**Monell**

97. In 1985, SPD had no policy requiring police officers to take notes during interrogations. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 114:22-114:24) (Pl. Ex. 47, Jarvis Dep., 7/25/23, 68:4-68:9).

98. In 1985, SPD did not have a written policy or procedure for documenting or memorializing the interrogations of suspects. (Pl.'s Ex. 45, Def. City's Resp. to Pl.'s RTA, 7/21/23, ¶5, ¶7).

99. In 1985, SPD did not have a written policy or procedure for interrogating suspects. (Pl.'s Ex. 45, City's Responses to Pl.'s RTA, 7/21/23, ¶4, ¶6).

100. Between 1985 and 1987, SPD did not have a written policy or procedure concerning disclosing exculpatory evidence. (Pl.'s Ex. 45, City's Responses to Pl.'s RTA, 7/21/23, ¶¶17-18).

101. In 1985, the SPD did not have a written policy or procedure concerning a police officer's *Brady* obligations. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 139:24-140:16).

102. Prior to 2021, the SPD officers were not aware of their *Brady* obligations. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 140:10-141:1).

103. In 1985, the SPD did not have written policy or procedure on preserving officer's personal notes. (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 115:13-115:15).

104. In 1985, the SPD police officers would notate witness interviews in their daily notes or "night lines." (Pl.'s Ex. 44, Clapprood Dep. 8/24/23, 109:10-109:16).

105. In 1985, the SPD did not have a policy or procedure on preserving any notes taken during an interrogation. (Pl.'s Ex. 47, Jarvis Dep., 7/25/23, 68:11-68:16).

106. In 1985, the SPD did not have a policy or procedure on preserving a police officer's handwritten notes. (Pl.'s Ex. 47, Jarvis Dep., 7/25/23, 69:1-69:5, 71:17-72:2).

107. In 1985, the SPD did not have a policy or procedure on memorializing a suspect's confession. (Pl.'s Ex. 47, Jarvis Dep., 7/25/23, 69:8-69:11).

108. According to Bloom's notes, Officer Trites took Perrot's sneaker and made a comparison to a shoeprint. (Pl.'s Ex. 51, p. 23).

109. Between 1980-1995, the SPD did not provide any training on the disclosure of exculpatory evidence. (Pl's Ex. 44, Clapprood Deposition 149:24-150:3)

110. The police officers and detectives in this case did not receive any training on the disclosure of exculpatory evidence. (Pl's Ex.48, Charles Arpin Deposition, 182:16-19) (Pl's Ex. 49, Andrew Canevari Deposition, 70:21-24)

**<u>Bloom</u>**

111. Bloom got to know Springfield police officers on a personal level and became friends with them through the course of his work as a prosecutor. (Pl.'s Ex. 51, Bloom Dep., 1/23/19, 20:11-18).

112. At the time of Bloom's initial involvement in Perrot's criminal case, Bloom and Kelly were friends; in 1991, Bloom testified that he and Kelly had been friends for years. (Pl.'s Ex. 51, Bloom Dep., 1/23/19, 52:4-13, 77:10-78:17) (Pl.'s Ex. 15, 1727:10-22).

113. Bloom was even more friendly with other Springfield police officers, including Kennedy, with whom he would socialize and spend time at his home. (Pl.'s Ex. 51, Bloom Dep., 1/23/19, 78:18-79:8, 81:12-24). Bloom was also friendly with Jarvis. (*Id.* at 121:19-21).

114. It was a "common practice" for Bloom, as a prosecutor, to go to the police station at the request of Springfield police to aid in their investigations. P's Ex. 15 (Bloom 1991 Testimony) at 58:22-59:13 (Bloom describing going to the police station at the request Springfield police as "a common practice," and answering affirmatively that this was in

connection with a police investigation). That common practice included interviewing suspects. *Id.* at 59:17-60:4.

115. Bloom's memory of the Perrot case is extremely limited. After he left the DA's office, he made a conscious decision to "cut it off from [his] perspective," "like a bad limb," and "tried to have nothing to do with [the case] any longer." Ex. 52 (Bloom Dep.) at 44:1-7. Reviewing documents about the case and even his own prior testimony has not served to refresh his recollection about the events that took place. *Id.* at 8:4-14; *see also id.* at 88:4-14 (Bloom has no independent memory of his actions in connection with the initial criminal investigation into Perrot on December 7, 1985).

116. Bloom first became involved in the investigation of Perrot for the Prekop sexual assault on December 7, 1985. Ex. 15 (Bloom 1991 Testimony) at Perrot 1720:21-1721:16 (came to the police station in the morning after Perrot's arrest related to the unrelated break-in and purse-snatching); Ex. 52 (Bloom Dep.) at 85:1-21. At this time, Perrot had not been arrested on the Prekop sexual assault; Bloom had conversations with one or more Defendant Officers about Perrot's status as a suspect who was being investigated by police in connection with that crime. Ex. 15 (Bloom 1991 Testimony) at Perrot 1721:10-22;

117. Bloom was involved in the investigation of Perrot for the Prekop sexual assault, alongside at least eight or nine Springfield police officers, including Kelly, Stelzer, Arpin, Kennedy, McFarlin, and Jarvis. Ex. 15 (Bloom 1991 Testimony) at Perrot 1730:13-21 (Bloom testifies he was involved in the investigation alongside these other officers).

118. Bloom was personally present in the room, along with the Defendant Officers, during portions of Perrot's interrogation. Ex. 52 (Perrot Dep.) at 383:9-384:10. Perrot's first

recollection of seeing Bloom was during a portion of the interrogation when they were discussing taking samples of Perrot's blood and hair. *Id.*

119. Based on Bloom's conduct during the interrogation, Perrot initially believed that Bloom was a police officer, not a prosecutor, and only specifically recognized who Bloom was when Perrot saw him several days later at his arraignment. *Id.* at 384:8-10 ("That's the first time I saw him but I didn't know who he was. I thought he was a cop."), 385:22-386:4 (Perrot recognized Bloom at the arraignment as having been present during the interrogation). Perrot does not recall exactly how long Bloom was inside the interrogation room or exactly when he arrived, but he was already in the room at the time Defendants began discussing blood and hair samples. *Id.* at 385:12:18.

120. Perrot does not recall seeing Bloom on multiple separate occasions during the course of the interrogation but does not rule out the possibility. Id. at 385:19-21 (does not recall seeing Bloom on other occasions), 386:5-7 (only recognized him from the one occasion). Bloom testified falsely at his deposition when he stated unequivocally that he was "absolutely not" in the room for "any of the interrogation of Mr. Perrot." Ex. 52 (Bloom Dep.) at 130:24-131:2.

121. Bloom was present at the police station during the physical line-ups that Perrot participated in, Ex. 52 (Bloom Dep.) at 88:21-92:8 (Bloom describing his role as being sent to supervise and observe the lineup, and to "make sure that it looks fair on its face"), although Perrot does not recall seeing Bloom at that time. Ex. 41 (Perrot Dep.) at 386:8-10.

122. At the time of his involvement in investigating and ultimately prosecuting Perrot, Bloom harbored extreme animosity towards Perrot: Bloom held the opinion that Perrot "is absolutely devoid of all factor we normally associate with human beings," and believed Perrot to

be "inherently evil." Ex. 51 (Bloom Handwritten Notes) at CITY 006231; Ex. 52 (Bloom Dep.) at 147:3-148:14.

123. Bloom admits that he met with Kelly, Canevari, and a number of other Springfield Police officers, to discuss with them a plan to fabricate a false confession to the Marchand sexual assault and attribute that false confession to Perrot. Ex. 52 (Bloom Dep.) at 45:23-47:1; 53:23-54:14. Bloom admits that he worked with these officers to try to make this fabricated statement "look more authentic." *Id.* at 47:2-10. Bloom admits that this fabricated statement was a "subterfuge," the purpose of which was to try to trick people into confessing to the Marchand sexual assault by making them believe they were already implicated in the crime by this fabricated statement. *Id.* at 46:4-47:1. Bloom may have been present while Kelly and others were typing up the fabricated Marchand confession. *Id.* at 58:10-13. The fabricated confession is dated December 16, 1987 and contains purported admissions to sexual assaulting three women (Prekop, Lichwala and Marchand) on four separate occasions. Ex. 14 (copy of the fabricated confession).

124. Regarding the fabricated Marchand confession, Bloom admits that "the entire document is fraudulent," Ex. 52 (Bloom Dep.) at 61:3-7, and that this fraudulent document was "authorized by" him. Ex. 15 (Bloom 1991 Testimony) at Perrot 1723:9-12; *see also id.* at 16-17 ("Ultimately before anything was done with it I had seen it and approved it."). Bloom admits that he could have forged Perrot's signature on the document. *Id.* at Perrot 1724:15-23 ("Could have been" Bloom who signed Perrot's name.).

125. Bloom believes to this day that it was entirely appropriate to withhold from Perrot the evidence that Bloom had fabricated a false confession attributed to Perrot, and he thinks that

evidence of this fabricated statement should not have ever been turned over to Perrot's attorneys. Ex. 52 (Bloom Dep.) at 45:4-19, 62:20-24.

126. Bloom believes that it was a reasonable approach to law enforcement work to be involved in "approving misstatements of facts and untruths constantly," and that in fabricating a false confession and attributing it to Perrot, he "did what law enforcement officers do all the time." Ex. 52 (Bloom Dep.) at 60:1-4; 69:19-13.

127. Bloom was personally present for and participated in the interrogation of Adkins and Timmerman in connection with the Marchand assault, alongside four or five police officers, and may have been present when the fabricated confession falsely attributed to Perrot was shown to those individuals as part of the subterfuge to try to secure their confessions for the Marchand assault. Ex. 15 (Bloom 1991 Testimony) at Perrot 1733:11-1736:7; 1743:20-1744:5 ("four or five police officers" were interrogating Adkins and Timmerman alongside Bloom).

128. Bloom admits that, if Adkins or Timmerman had confessed involvement in the Marchand assault, one potential avenue would have been to use that as leverage to convince them to testify against Perrot and implicate him in the Marchand assault. Ex. 52 (Bloom Dep.) at 105:16-22.

129. The Board of Bar Overseers found that it was inappropriate for Bloom to have signed the fabricated Marchand confession, and that in doing so he had made a material misstatement of fact in violation of his obligations as an attorney. Ex. 52 (Bloom Dep.) at 60:5-11.

130. After Kelly and Bloom created the fabricated Marchand confession, Kelly and Bloom talked about the document on several occasions, including in 1991 after Perrot's

convictions were first vacated and in advance of Bloom's testimony in a motion hearing in advance of Perrot's criminal retrial. Ex. 15 (Bloom 1991 Testimony) at Perrot 1726:18-1727:19.

131. Kelly is lying when he claims he had nothing to do with fabricated Marchand confession signed by Bloom and falsely attributed to Perrot. Ex. 52 (Bloom Dep.) at 45:3-47:10 (describing in detail Kelly's involvement in designing and creating the fabricated Marchand confession); *id.* at 47:13-16 ("[T]he idea that Tom Kelly's name was used without his permission or somebody else signed his name is ludicrous."); *id.* at 49:3-8 (Bloom disputes Kelly's claim not to know how Kelly's signature got on the fabricated Marchand confession, saying "I know it's untrue"); *id.* at 51:12-23 (Kelly is the one who "hatched the whole 'idea'" of the fabricated confession); *id.* at 62:8-15 (Bloom "knew" that Kelly "was not telling [him] the truth.").

132. Kelly was a corrupt police officer with a reputation and history of violating the constitutional rights of citizens. Ex. 52 (Bloom Dep.) at 49:21-22 ("Tommy Kelly had more brutality charges than I change my underwear."); *id.* at 80:15-24 ("[I]t was well known in my circles what [Kelly's] record was for alleged abuses."); *id.* at 49:13-16, 50:18-51:6 (Kelly was "very close" with DA Ryan, who "took good care of Tom Kelly over the years"; DA Ryan and Kelly had a "political patronage" relationship, and Ryan would pull strings to insulate Kelly from accountability for his misconduct; DA Ryan "bailed Tommy Kelly out more than once"); *id.* at 49:3-12 (Kelly was able to get away with lying about the fabricated Marchand confession due to his close relationship with DA Ryan); *id.* at 62:17-18 ("Ryan and Kelly were tied at the hip. . . . Ryan had bailed Kelly out a number of times."); *id.* at 32:17-34:10, 35:12-36:8 (describing in detail DA Ryan's "inappropriate relation with the Genovese crime family" and his corrupt and vindictive practices); *see also generally id.* at 49:9-51:11.

Dated: May 17, 2024

Respectfully Submitted,
*/s/ Gianna Gizzi*
*One of the Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Mark Loevy-Reyes, BBO No. 707974
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
Ph: (312) 243-5900
Fax: (312) 243-5902

Debra Loevy, BBO No. 569212
Jon Loevy*
Steven Art*
Gayle Horn*
Gianna Gizzi*
Carla Agbiro*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
gizzi@loevy.com
*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I, Gianna Gizzi, an attorney, hereby certify that on May 17, 2024, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Gianna Gizzi
*One of Plaintiff's Attorneys*