**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GEORGE PERROT<br>Perrot,<br><br>v.<br><br>THE CITY OF SPRINGFIELD, et. al.,<br>Defendants | CIVIL ACTION NO: 18-CV-10147 |

**PLAINTIFF'S *CORRECTED* MEMORANDUM IN OPPOSITION TO DEFENDANT BLOOM'S MOTION FOR SUMMARY JUDGMENT[1]**

## INTRODUCTION

Defendant Bloom admits that, in a scheme described as "egregious" by the Massachusetts appellate court, he authorized and then helped to craft a fabricated confession falsely attributed to Perrot which purports to document a non-existent series of statements in which Perrot supposedly admitted to four sexual assaults, including two sexual assaults on Mary Prekop, and implicated two other men alongside himself. Pl.'s SOAF ¶¶69-70; Bloom's SOMF ¶19; *see Com. v. Perrot*, 38 Mass. App. Ct. 478, 482 (1995). Bloom also admits that he then was present for interrogations where he, alongside four or five police officers, tried to use this fabricated confession to trick those men into confessing to the fraudulent account of the assaults described therein. Pl.'s SOAF ¶¶123-24, 127. The men did not confess, but had they done so, Bloom acknowledges that one potential avenue would have been to try to leverage those confessions to flip those men to then testify against Perrot. Pl.'s SOAF ¶128.

[1] On today's date, Bloom's counsel alerted Plaintiff's counsel that the record citations in this document did not match the numbered paragraphs in his Statement of Additional Facts. (Dkt. 363). Thus, Plaintiff corrected the record citations and is re-filing this memorandum with only those revisions.

Bloom acknowledges that "the entire documents is fraudulent," yet maintains that this document should never have been disclosed to Perrot's defense team. Pl.'s SOAF ¶¶124-25. In Bloom's opinion, this type of "egregious" scheme was a reasonable approach to law enforcement work, which involves "approving misstatements of facts and untruths constantly;" Bloom thinks he did nothing more than "what law enforcement officers do all the time." P.'s SOAF ¶126.

Taking the above facts alone—which are not just viewed in the light most favorable to Perrot, but admitted by Bloom—a reasonable jury could infer that Bloom was involved in a similar scheme a couple of years earlier, on December 7, 1985, in which false statements confessing to involvement in assaulting Ms. Prekop were fabricated by law enforcement and falsely attributed to Perrot, causing his wrongful conviction for the Prekop assault. It was "common practice" for Bloom to go to the police station and aid police in their investigations, including interviewing suspects. Pl.'s SOAF ¶114. Despite that common practice, and despite Bloom's supposed complete lack of memory about the events of December 7, 1985, Bloom vociferously denies that he ever even set foot in the interrogation room when Perrot was being questioned at the police station—a denial contradicted by Perrot's testimony that Bloom was in the interrogation room at a critical juncture in the events that day. Pl.'s SOAF ¶¶114-116, 118.

Coupled with these unapologetic admissions of a practice of egregious misconduct, and strong consciousness of guilt evidence in the form of Bloom's false denials to minimize his role, there is also strong, disturbing motive evidence that Bloom wanted to harm Perrot: Bloom viewed Perrot as less than human and believed him to be "inherently evil." Pl.'s SOAF ¶122.

Viewed all together, there is an abundance of compelling evidence, both direct and circumstantial, the Bloom was personally involved in the misconduct surrounding Perrot's interrogation, which ultimately resulted in the fabrication of false inculpatory statements and the

use of those statements at trial to convict Perrot for the Prekop crimes which he had nothing to do with. Moreover, there is no plausible argument that Bloom's role in these matters was not investigatory. For these reasons, as described further below, Perrot is entitled to a jury trial on his claims against Bloom, and Bloom's motion for summary judgment must be denied.

**FACTUAL SUMMARY**

In 1985, Defendant Bloom worked as a prosecutor in the Hampden County District Attorney's Office. Bloom SOF ¶1. He had close personal and professional relationships with police officers in the Springfield police department, including a number of the Defendant Officers. Personally, he became friends with several of them through the course of his work, including some officers with whom he would socialize and visit their homes. Pl.'s SOAF ¶111-13. Professionally, Bloom worked closely with the Springfield police, and it was common practice for him to go to the police station at their request to aid in their investigations, including helping them interview suspects. Pl.'s SOAF ¶113-14.

Bloom first began playing a role in the police investigation into the Prekop assault mere hours after Perrot's arrest in the morning of December 7, 1985. Pl.'s SOAF ¶116. Perrot had been arrested on other crimes, and Bloom had conversations with a number of Defendant Officers about their investigation into the Prekop assault and Perrot's status as a suspect. *Id.* Bloom was personally present in the interrogation room during portions of Perrot's interrogation, and Perrot initially believed he was one of the police officers. Pl.'s SOAF ¶118-19. Bloom lied at his deposition when he denied ever being in the interrogation room, *id.*, demonstrating that he believes he has something to hide. For good reason—the Defendants who participated in Perrot's interrogation, including Bloom, conspired together to frame Perrot for the Prekop assault, including fabricating false inculpatory statements and attributing them to Perrot.

December 7, 1985 was not the last time Bloom engaged in egregious misconduct that involved fabricating false statements attributed to Perrot framing him for the Prekop assaults. Almost exactly two years later, Bloom, Kelly, Canevari, and a number of other officers conspired together—in a scheme that Bloom authorized—to fabricate just such another false statement. Pl.'s SOAF ¶¶69-70. Bloom, along with a number of police officers, used that fabricated statement to interrogate two of Perrot's friends to try to trick them into confessing to another assault. Pl.'s SOAF ¶127. Those men did not confess, but if they had, Bloom may have used their confessions as leverage to try to flip them to testify against Perrot. Pl.'s SOAF ¶128. This is all consistent with Bloom's deep-seated hatred of Perrot, who he views as "inherently evil" and less than human. Pl.'s SOAF ¶122.

## LEGAL STANDARD

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Credibility determinations are for the jury, and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

### I. Bloom is not entitled to summary judgment.

Bloom's summary judgment motion advances only two arguments.[2] First, Bloom contends he is entitled to absolute prosecutorial immunity. Dkt. 331 at 7-14. Second, Bloom

[2] Any other arguments which Bloom could have raised, but failed to do so, are now forfeited for purposes of summary judgment. *See United States v. Tosi*, 897 F.3d 12, 15 (1st Cir. 2018) ("[A]rguments available at the outset but raised for the first time in a reply brief need not be considered."); *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) (finding that "argument is waived as a means to support the pending motion" when raised for the first time in reply, since Perrot was deprived of the opportunity to address them). In any event, to the extent that Bloom could have but failed to raise arguments similar to the arguments raised by his co-Defendants, even if those arguments were not forfeited they would fail for the same reasons discussed by Perrot in his response to those arguments.

argues that Perrot lacks evidence to implicate Bloom in any constitutional violation (which Bloom argues first through the qualified immunity framework, *id.* at 14-18, and then as a substantively identical stand-alone argument, *id.* at 18-19). These arguments fail. Bloom's absolute argument fails because he misconstrues the conduct for which Perrot seeks to hold him liable. Perrot's claims against Bloom arise from Bloom's role in fabricating evidence against Perrot form the outset of the Prekop investigation, in conspiracy with the Defendant Officers, during a phase in the case when Perrot had yet to be charged with the Prekop assault and during which time Bloom's role was undisputably investigatory. And Bloom's argument that Perrot lacks evidence to implicate him in any constitutional violations suffers the fatal flaw that it fails to construe the record in Perrot's favor. Construed favorably to Perrot, Bloom conspired with Defendant Officers to frame Perrot by fabricating his false confession for the Prekop assault. Bloom's subsequent conduct in fabricating a *second* false confession attributed to Perrot for a separate assault—a fraud which Bloom admits to authorizing, in conjunction with Kelly and other Defendant Officers—may not serve as the basis for an additional legal claim, but provides powerful evidence of Bloom's conspiracy with Defendant Officers and his intent to railroad Perrot that underscores the evidentiary support for Perrot's underlying claims.

Because Bloom's misconduct is not immunized, and because a jury must resolve factual disputes regarding Bloom's role in fabricating Perrot's confession for the Prekop assault, Bloom's summary judgment motion must be denied.

### A. Bloom is not entitled to absolute immunity for his role fabricating evidence against Perrot during the Prekop investigation.

While Bloom devotes nearly a full page of briefing recounting the policy justifications for absolute prosecutorial immunity, ultimately he concedes, as he must, that he is not entitled to absolute immunity for his conduct in an investigatory capacity. Dkt. 331 at 7-8. In arguing that

he is entitled to absolute immunity for his misconduct in this case, Bloom bears the burden of overcoming the presumption that he is entitled only to qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). "That burden is a heavy one." *Penate v. Kaczmarek*, 928 F.3d 128, 135 (1st Cir. 2019); *see also Burns v. Reed*, 500 U.S. 478, 487 (1991) (courts must act sparingly in accepting assertions of absolute immunity, and must not extend such immunity "further than its justification would warrant").

Bloom's burden here is heavier still, since he already advanced this same argument at the motion to dismiss stage and lost.[3] *See* Dkt. 187 at 9-10, adopted by Dkt. 202. As this Court previously held, "[a] prosecutor's absolute immunity is narrowly circumscribed, encompassing only those actions which can be characterized as 'quasi-judicial.'" Dkt. 187 at 9 (quoting *Siano* v. *Justices of Massachusetts*, 698 F.2d 52, 58 (1st Cir. 1983)). This immunity does not extend to "fabricating evidence long before a grand jury has made an indictment." *Id.* (citing *Buckley*, 509 U.S. at 275-76). Applying this standard, the Court correctly found that "[t]o the extent Perrot's claims concern ADA Bloom's actions during the investigatory phase of the case, . . . Bloom is entitled only to qualified immunity," and that Perrot's complaint properly alleged that "all of ADA Bloom's acts took place outside the judicial process while law enforcement officers and ADA Bloom were still investigating the attack on [Prekop]."

---

[3] The Court's prior decision at the motion to dismiss stage is law of the case. Provided that the favorably-construed evidence in the summary judgment record supports the allegations advanced in Perrot's complaint, there is no basis to reach a different result in the issues covered in the Court's lengthy, detailed, and well-reasoned motion to dismiss ruling—particularly where Bloom has offered no argument that the Court got it wrong the first time around. *See, e.g., Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (While "[a] court has the power to revisit prior decisions of its own, . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . .").

Attempting to evade the straightforward application of the Court's prior ruling, Bloom argues that his presence at the police station, following Perrot's arrest for the McNabb break-in and Denny's purse-snatching, was not investigatory in nature, and thus his conduct there should still be shielded by absolute immunity. Dkt. 331 at 9-11. The problem with Bloom's argument is that it fails to construe the factual record in the light most favorable to Perrot. Properly construed, it is evident that Bloom's conduct at the police station were investigatory in nature and therefore Bloom is not entitled to absolute immunity.

It was a "common practice" for Bloom, as a prosecutor, to go the police station to at the request of Springfield police officers to aid in their criminal investigations. Pl.'s SOAF ¶114. As part of this practice, Bloom would be called upon to participate in interviews or interrogations of suspects. *Id.* And that's exactly what happened in connection with the Prekop investigation: Bloom came down to the station to participate in the investigation of that case, had conversations with one or more of the Defendant Officers about Perrot's status as a suspect, and ultimately participated in Perrot's interrogation and in subsequent line-up identification procedures. Pl.'s SOAF ¶¶116-18, 121.

Bloom's recitation of the facts seeks to minimize his role in Perrot's interrogation, but that is not the only version of events that a jury could believe. While Perrot could only recall one specific period of time where he definitively saw Bloom in the interrogation room, a jury could conclude Bloom's role was more extensive. Perrot initially believed that Bloom—who he would only later identify after he saw Bloom again at his arraignment—was a police officer, and so a jury could readily conclude that his recollection of different phases of the interrogation as involving police officers also included Bloom. Pl.'s SOAF ¶119. Moreover, Bloom's unequivocal and vociferous denial that he was ever in the interrogation room, Pl.'s SOAF ¶120,

contrasted with his claimed lack of any independent recollection of his actions in connection with the investigation, Pl.'s SOAF ¶115, and with Perrot's clear memory of Bloom's presence, Pl.'s SOAF ¶118, permits an inference that Bloom is lying in an attempt to conceal the extent of his involvement in the interrogation—because a true account of that involvement would expose Bloom to liability. *United States v. Littlefield*, 840 F.2d 143, 148, n.4 (1st Cir. 1988) (explaining logical basis for axiomatic rule that when a defendant "makes some statement tending to show his innocence, and this explanation or statement is later shown to be false, the jury may consider whether this circumstantial evidence points to a consciousness of guilt," since "it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence") (quoting 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 15.12, at 466-67 (3d ed. 1977)). Regardless, since the test for absolute immunity relates to Bloom's function, and not the extent or duration of his role, on this issue most of Bloom's (incorrect) factual assertions are simply irrelevant.

Lastly, Bloom argues that, since Perrot had already been arrested and there was probable cause to support that arrest, Bloom is entitled to absolute immunity for his conduct at the police station. Dkt. 331at 10. This argument is flawed for both legal and factual reasons. Legally, Bloom is wrong that absolute immunity attaches simply because conduct occurs after police have probable cause. "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5; *Filler v. Kellett*, 859 F.3d 148, 153(1st Cir. 2017) ("Importantly, absolute immunity does not necessarily apply to all actions that a prosecutor may take once the 'judicial phase' begins."); *id*. at 154 ("[T]he fact that a prosecutor engaged in certain activities after a prosecution had already commenced is not necessarily dispositive of the question whether absolute immunity attaches.").

Factually, Perrot had been arrested for two completely unrelated crimes, Pl.'s SOAF ¶116, and so his arrest for those crimes, even if supported by probable cause, does nothing to diminish the inescapable conclusion that the *Prekop* case was squarely in an investigatory phase. Indeed, prior to Perrot's (fabricated) confession for that crime, far from probable cause, there was literally zero evidence supporting Perrot's involvement in that crime.

Bloom also argues that he is entitled to absolute immunity for his undisputed fabrication of a fraudulent confession attributed to Perrot and confessing to involvement in the Marchand assault.[4] Dkt. 313 at 12-14. Again, his argument relies on misconstruing the relevant facts. First, under Bloom's own account of the purpose of the fabricated Marchand confession, it had nothing to do with his prosecutorial function of preparing a case for trial. Instead, as Bloom himself tells it, the point of creating the fabricated Marchand confession was to use it during interrogations of Adkins and Timmerman—who were apparently suspects in but had not been charged with the Marchand assault—as part of subterfuge to convince the men that they had already been implicated and that they should therefore confess. Pl.'s SOAF ¶¶69-70, 127. This preparatory step for an interrogation of uncharged suspect's is quintessentially investigatory. Moreover, even in relation to Perrot, the fabricated Marchand confession clearly fell during an investigatory phase—the bogus statement is dated December 16, 1987, Pl.'s SOAF ¶69, the same day that the charges against Perrot in connection with the Marchand case were *nolle prosequied*. Thus, at the time the statement was created, Perrot was not charged with any crime related to the Marchand crime—there was simply no extant case or charge in which Bloom could possibly have been

[4] Bloom also argues that he is entitled to absolute immunity for his conduct in traveling to Washington D.C. with Kennedy and the forensic evidence. Dkt. 331 at 11-12. This argument is irrelevant, since none of Perrot's claims arise directly from Bloom's conduct during this visit.

engaging in any conduct considered prosecutorial. Bloom is not entitled to absolute immunity for his role in created the fabricated Marchand confession.[5]

**B. Bloom is not entitled to qualified immunity, and there is sufficient evidence supporting his involvement in constitutional violations.**

Bloom also argues, in two separate sections of his brief, that Perrot lacks sufficient evidence that Bloom's conduct violated any of Perrot's constitutional rights—first, arguing that this entitles him to qualified immunity under the first step of that two-step analysis,[6] Dkt. 331 at 14-18, and second, advancing the same as a stand-alone argument that there is insufficient evidence of Bloom's misconduct to sustain any constitutional claims, *id.* at 18-19. Since the arguments are substantively identical, Perrot addresses them together.

Bloom's argument is unavailing because again he fails to properly construe the summary judgment record in Perrot's favor, and particularly as to the significant circumstantial evidence supporting Bloom's central and substantial involvement in a conspiracy with the Defendant Officers to violate Perrot's constitutional rights. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, (2003) ("The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n. 17 (1957)).

Bloom characterizes the summary judgment record as establishing nothing more than his mere presence in the interrogation room during one particular phase of the interrogation, but that

[5] Moreover, even if Bloom were entitled to absolute immunity from liability for creating the fabricated statement, that misconduct could still be used as relevant evidence, *e.g.* of Bloom's state of mind, intent, and *modus operandi*, to support Perrot's claims arising from other, clearly investigatory phases of the case.

[6] Bloom offers no argument that he is entitled to qualified immunity because the relevant constitutional principles were not clearly established at the time of the Prekop investigation, and any such argument is now forfeited. *See Tosi*, 897 F.3d at 15; *Noonan*, 723 F. Supp. 2d at 349.

Perrot has adduced no evidence that Bloom did or said anything to violate Perrot's rights. Dkt. 331 at 15-16. Of course, it is far from surprising that Perrot's account of his interrogation lacks a clear blow-by-blow account of exactly who said and did what, and when—at the time of the interrogation, Perrot was a scared 17-year-old, under the influence of drugs and alcohol, who was snatched from his home in the middle of the night by police and subjected to a 12-hour interrogation conducted by an array of unfamiliar individuals. But, properly construed, the record reveals ample evidence from which a jury could find Bloom liable for his role in Perrot's unconstitutional interrogation and the fabricated Prekop confession.

First, there is substantial evidence that, regardless of the extent of Bloom's involvement, Perrot was subjected to an abusive and manipulative interrogation which culminated in the fabrication of a false confession for the Prekop assault—attributing to Perrot words he never said confessing to a crime he did not commit.

Second, as discussed above, there are not two competing accounts between Bloom and Perrot about what happened in the interrogation room. Instead, there is Perrot's clear though admittedly imprecise account of Bloom's presence, and Bloom's surprisingly vociferous denial (given his claimed complete lack of memory) that he was ever in the interrogation room at all. This false denial is compelling 'consciousness of guilt' evidence which would permit a jury to infer that Bloom was motivated to hide the nature and extent of his role in the interrogation. *Littlefield*, 840 F.2d at 148, n.4.

Third, the timing of Bloom's involvement is powerful evidence that he was no mere observer and played a personal role in the fabrication of Perrot's false confession. Perrot's first recollection of Bloom's presence during the interrogation is that he was there around the time there a discussion of obtaining a waiver to test Perrot's blood and hair. Pl.'s SOAF ¶118. And, as

Bloom concedes in his motion, "immediately follow[ing] the discussion of hair and blood evidence," Defendants first extracted inculpatory statements from Perrot. Dkt. 331 at 9. While Bloom construes the record as showing he left the interrogation room before the statements were taken, Dkt. 331 at 9 ("Perrot did not place ADA Bloom in the interrogation room while he provided his statement"), the deposition testimony he cites to support this contains no discussion of who was in the room at all—it was simply Perrot's narrative description of his interactions with one individual who was primarily involved in the taking the statements, *See* Ex. 52 at 73:9-74:5. One inference from the evidence may be that Bloom left, but it is certainly a reasonable inference—given Perrot's testimony that he cannot recall exactly how long Bloom was in the interrogation room for—that Bloom was present for the interactions "immediately following" the blood and hair discussion where Perrot unambiguously puts Bloom in the room.

Fourth, there is ample circumstantial evidence that, regardless of exactly what he said or did in the room, Bloom played an active and willing role in planning and executing the coercive interrogation and fabrication of the false Prekop confession. After arriving at the station to assist in the Prekop investigation, Bloom had conversations with one or more Defendant Officers about Perrot's status as a suspect, Pl.'s SOAF ¶116, and Bloom's behavior and demeanor in the interrogation room led Perrot to believe that Bloom was among the group of police officers who were subjecting him to the ordeal of a prolonged interrogation, Pl.'s SOAF ¶119. Viewed in its entirety and construed in Perrot's favor, the interrogation of Perrot and the statements police ultimately obtained from were plainly and obviously improper, inappropriate, and unconstitutional. Bloom's presence for at least part of this plainly improper interrogation strongly, and his failure to do anything (either at the time, or at any time thereafter leading up to Perrot's first criminal trial) to speak out about or reveal this inappropriate conduct strongly

supports the inference that Bloom was an active and willing participant, and not an innocent bystander, in these constitutional violations.

Fifth, there is strong evidence that Bloom had a motive to frame Perrot. At the time of his involvement in the Prekop case, Bloom harbored extreme animosity towards Perrot, holding the opinion that Perrot "is absolutely devoid of all factor[s] we normally associate with human beings," and he believed Perrot to be "inherently evil." Pl.'s SOAF ¶122. Certainly, a jury could believe that someone who viewed Perrot in such an extreme and dehumanizing way would be willing to ignore the boundaries of the constitution in an effort to implicate Perrot in a crime.

Sixth, the improper interrogation and evidence fabrication for which Perrot seeks to hold Bloom liable during the Prekop investigation fits within a pattern of using fabricated evidence and "subterfuge" to trick suspects into confessing, including in a shocking subsequent incident which Bloom admits he (alongside Kelly, Canevari, and other Defendant Officers) took part in. Pl.'s SOAF ¶¶69-70, ¶¶123-127. In an incident closely mirroring the fabricated Prekop statement which gives rise to Perrot's claims here, Bloom admits that he authorized and worked to create *another* fabricated statement attributed to Perrot and implicating him in a crime he did not commit, including potentially forging Perrot's signature on the document. Pl.'s SOAF ¶¶69-70. Adding to the probative value of this admitted fabricated Marchand confession in supporting Bloom's disputed role in creating the disputed fabricated Prekop confession, Bloom contends to this day that there was nothing wrong with what he did. Pl.'s SOAF ¶¶125-126. Bloom believes that it was appropriate to withhold evidence of this fabricated confession from Perrot, and that it should never have been turned over to Perrot's criminal defense team after it was discovered in the prosecution file. Pl.'s SOAF ¶125. Furthermore, Bloom believes that, in fabricating a false confession and attributing it to Perrot, he "did what law enforcement officers do all the time,"

and that it was a reasonable approach to law enforcement work to be "constantly" involved in "approving misstatements of facts and untruths." Pl.'s SOAF ¶126. Indeed, Bloom admits that he was present for and participated in the interrogation of Adkins and Timmerman, alongside four or five police officers, including potentially when those individuals were confronted with the fabricated Marchand confession as part of the subterfuge to try to secure their confessions. Pl.'s SOAF ¶127. Adkins and Timmerman did not succumb to the subterfuge, but if they had, Bloom admits that one potential avenue would have been to use their confessions as leverage to convince them to testify against Perrot and implicate him in the Marchand assault. Pl.'s SOAF ¶128. These admissions are stark evidence of Bloom's attitude and approach to investigative work which are strong circumstantial evidence that he took a similar role and approach in fabricating the Prekop confession.[7]

Seventh, in addition to the evidence of Bloom contemporaneous conspiracy with other Defendant Officers discussed above, there is after-the-fact evidence of an ongoing conspiracy between Bloom and Kelly. After the fabricated Marchand confession was discovered, and in advance of Bloom's testimony in a motion hearing in Perrot's criminal proceedings, Kelly and Bloom had several private conversations together where they discussed the fabricated confession. Pl.'s SOAF ¶130. A jury could infer that these conversations were for the purpose of

[7] Bloom argues that Perrot cannot make out an independent constitutional claim arising directly from the admittedly fabricated Marchand confession, because it was not used introduced into evidence against him at any criminal trial. Dkt. 331 at 17-18. However, the Court already found, in its ruling on the motions to dismiss, that Perrot "has stated a claim for relief against ADA Bloom with regard to the forged confession," since "[i]t played some role prior to the second trial in the prosecutor's preparation and evaluation of the strength of the case." Dkt. 189 at 11, n.13. Bloom offers nothing new to argue against this conclusion, and so the Court should not revisit this determination. *Christianson*, 486 U.S. at 817. Regardless, even if the fabricated Marchand confession were not an independent substantive basis for Bloom's liability, as the Court found, "[b]ecause the confession was fabricated to coerce friends of [Perrot's] into admitting to committing an additional burglary with him, it also vividly demonstrates the lengths to which ADA Bloom was willing to go to implicate [Perrot] in the rape of M.P., including fabricating evidence." Dkt. 187 at 11, n.13.

Kelly and Bloom getting their stories straight about their misconduct in advance of Bloom's testimony and to prevent further revelations that might both reveal their misconduct and undermine the strength of their bogus case against Perrot in advance of his criminal re-trial.

* * *

The above evidence, construed favorably for Perrot, would readily support a jury's conclusion that Bloom personally participated, alongside Defendant Officers, in an unconstitutional interrogation and in the fabrication of false evidence against Perrot. At a minimum, it plainly supports that Bloom conspired with those officers to engage in misconduct, which would be a sufficient basis on which to hold him accountable for the constitutional violations at issue, even if there were not such extensive circumstantial evidence of his direct personal involvement. *See Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (explaining that conspiracy can be proven through circumstantial evidence). Perrot is entitled to try his claims against Bloom to a jury, and so Bloom's motion must be denied.

## CONCLUSION

Defendant Bloom's investigatory role defeats his claim of absolute immunity. Furthermore, the disputed facts regarding Bloom's role in fabricating false evidence used to convict Perrot of the Prekop crimes defeats both his assertion of qualified immunity and his claimed entitlement to summary judgment on the underlying substance of Perrot's constitutional claims. For these reasons, discussed in detail above, Bloom's motion should be denied.

Respectfully Submitted,

*/s/ Jon Loevy*
*One of the Plaintiff's Attorneys*

*Attorneys for Plaintiff*

Mark Loevy-Reyes, BBO No. 707974
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
Ph: (312) 243-5900
Fax: (312) 243-5902

Debra Loevy, BBO No. 569212
Jon Loevy*
Steven Art*
Gayle Horn*
Gianna Gizzi*
Carla Agbiro*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
jon@loevy.com
*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I, Gianna Gizzi, an attorney, hereby certify that on May 21, 2024, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

*/s/ Gianna Gizzi*
*One of Plaintiff's Attorneys*