# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GEORGE PERROT, | ) | |
| | ) | Case No. 18-cv-10147 |
| Plaintiff, | ) | |
| | ) | Hon. Page Kelley |
| v. | ) | Magistrate Judge |
| | ) | |
| THOMAS KELLY, *et al.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

---

# EXHIBIT 10

reduction to writing, ability to read the statement and sign the statement, within an hour, an hour and a half time period?

A. Yes, sir.

Q. And just for the record, sir, can you tell us, is this the statement that was reduced to writing that details what Mr. Perrot told you on December 7th of 1985 concerning the incident with Mrs. Prekop and Mrs. Lichwala on 11/30/85?

(Witness reads statement)

A. That is the statement, sir.

Q. And the GP's, that's what you are referring to, if there was a spelling error or something, the initialing by the defendant?

A. He would initial it George Perrot, GP, correct.

MR. BLOOM: I offer this document, Your Honor

(Shown to Mr. Hammerschmith)

MR. HAMMERSCHMITH: May council approach, Your Honor.

(The following conference was held at side bar)

MR. HAMMERSCHMITH: This is a copy.

MR. BLOOM: I think that is the original. It may or may not be, I may have put holes in it.

THE COURT: What's that?

MR. HAMMERSCHMITH: It looks like a copy to me.

THE COURT: I don't know, it may be. It looks like it came out of your file.

MR. BLOOM: I think I put it in my folder.

THE COURT: Is the original with the motion to suppress.

MR. BLOOM: I put the original in with the motion to suppress. Then Terry O'Brien gave it to me in the Clerk's office and I think I had cause to have

the two holes put in it to put in a folder, but the original was put in on the motion to suppress and marked, and then I got it back before trial, I signed out for it. I do believe that is the original.

MR. HAMMERSCHMITH: It looks very clearly to me to be a Xerox. The paper even has the shadows on it from the Xerox.

THE COURT: Are you objecting.

MR. HAMMERSCHMITH: Yes.

THE COURT: On the basis that it is --

MR. HAMMERSCHMITH: That it is a copy, yes.

THE COURT: Okay, where do you think it is.

MR. BLOOM: I will have them look for it and see if they have it.

THE COURT: We can recess early for lunch.

MR. BLOOM: I can finish up with

him in five minutes.

THE CLERK: This has to be the original, because if this were a copy, it wouldn't be on there.

THE COURT: It may be they introduced a copy at the motion to suppress.

MR. HAMMERSCHMITH: I didn't care about copies at that point.

THE COURT: There is one I think attached to my findings as to what it was, one way or the other.

MR. HAMMERSCHMITH: The reason -- I'm not trying to make things difficult, but I think when we were talking about things like that, I think it is important to see the original.

THE COURT: Well, are you contesting the fact that it's not an exact copy?

MR. HAMMERSCHMITH: I don't know whether it is an exact copy or not, that's my problem.

Case 1:18-cv-10147-MPK Document 361-10 Filed 05/17/24 Page 153 of 276



MR. BLOOM: He knows it is an exact copy, but he wants to --

THE COURT: We went through that last week.

MR. BLOOM: I have a few more questions, it will be quarter of one, I will recall him at two.

THE COURT: Okay.

(End of side bar conference)

Q. (By Mr. Bloom) Detective Jarvis, as you were concluding the procedure with Mr. Perrot, did you have occasion just prior to his signing of the document to give his Miranda warnings to him again the third time?

A. Yes, sir.

Q. Is the card that I have just handed you a card that represents the Miranda warnings that you gave to him near the conclusion of this process that started about 3:00?

A. Yes, sir.

Q. Is that also signed by George Perrot?

A. Yes, sir, it is.

Q. Can you tell us, Detective Jarvis, does it indicate the time that he signed that card?

A. Excuse me for a second.

Q. Is there a time on that card?

A. It's 4:20 A.M.

Q. So that's not the card that you gave him, correct?

A. No, sir.

Q. All right. Now, when you were talking to Mr. Perrot, can you tell us, the Court and jury, can you describe for the Court and jury what his emotional state was, as you remember it?

A. Mr. Perrot was very highly emotional, at sometimes crying, and at one point asked me, he said I'd like to have your gun so I could blow my brains out.

Q. And this crying existed how many times during the hour, hour and a half period?

A. Quite a few times.

Q. How many times did he make a statement like that to you about killing himself?

A. He only made that statement once to me.

Q. Total time period you were with him was basically how long, from 3:00?

A. An hour and fifteen minutes to an hour and a half.

MR. BLOOM: That's all I have on this, Judge. I'd like to have the right to recall Detective Jarvis.

THE COURT: Mr. Foreman, ladies and gentlemen, we are going to recess a few minutes early for lunch. It is quarter of one now, we will reconvene at quarter of two.

(Luncheon recess taken at 12:45 P.M.)

(Hearing reconvened at 2:05 P.M. The defendant and jury were present)

Q. (By Mr. Bloom) During the time period you were with him, specifically from 3:00 to 4:15 or 4:30, whatever the exact time period was, did you have any problems with him during that time?

A. No, sir, we got along very well together.

Q. After you were done taking the statement at 4:20 or 4:30 or thereabouts, that was pretty much the end of your involvement with him for that day, correct?

A. Yes, sir.

MR. BLOOM: If I could just have a moment, Judge, I'd like to offer this document.

MR. HAMMERSCHMITH: May we be heard?

(The following conference was held at side bar)

MR. HAMMERSCHMITH: This is the

original, Your Honor. The only thing --

THE COURT: For the record, this is the statement that was discussed at side bar prior to the noon lunch break.

MR. HAMMERSCHMITH: The only thing I wanted to make clear for the record is that the defendant is reserving his right to challenge the voluntariness of the statement under Tavares, and I'd like to make that clear.

THE COURT: It is a question for the jury.

MR. BLOOM: You have to instruct on every case.

THE COURT: Don't you feel the issue of the Miranda warnings, too? Or are you talking just about the voluntariness of the statement?

MR. HAMMERSCHMITH: Tavares and Williams both.

THE COURT: I would intend to put both those issues to the jury.

MR. HAMMERSCHMITH: Okay.

THE COURT: Sure.

(End of side bar conference)

THE COURT: That will be Exhibit 5.

(Exhibit No. 5, statement, marked into evidence)

Q. (By Mr. Bloom) Detective Jarvis, I wonder if you'd be kind enough to read Exhibit 5 to the jury, which you previously identified as I believe what was reduced to writing during that hour to hour and half time period concerning the incidents of November 30, 1985, at 27 Malibu and 33 Covel?

A. "My name is George Perrot, and I live at 87 Malibu Drive, and I am 17 years old. On November 30, 1985, I went to Brattelboro, Vermont, with Mike Edwards and Bob Timmerman and Jeff Atkinson. Mike was driving. We went to a bar called Flat Street. I started drinking about 8:00 P.M., which was a Friday night. We also drank about a case of Bud. I took a purple mescaline on the way to Vermont. We stayed

there until about 2:15 A.M. Michael dropped me off about 3:15 A.M. at my house.

"I headed for number 33 Covel Street. The reason I went there was I heard it had been broken into before. I had a pair of my sister's gloves on. They were like wool gloves. I entered an unlocked rear breezeway door at 33 Covel Street. I kicked the rear inner door in. I entered the house and started looking through the house. I found a handbag and took it with me. I left through the rear door. I left the pocketbook a few houses down the street.

"I left 33 Covel Street and went to 27 Malibu Drive. I opened the door to the breezeway and kicked the side door in. I started to go through the house and a little black dog started barking and I ran out the side door. This occurred about 4:00 A.M. on Saturday, November 30, 1985.

"After this, I went home. I had been drinking since about 7:00 P.M. that day and had also taken two purple mescaline pills.

"Signed George Perrot, December 7, 1985, witnessed by Thomas Jarvis and Captain Ernest

Stelzer."

Q. Just finally, correct me if I'm wrong, there are four indications of the initials GP on that statement, is that correct?

A. That's correct, sir.

Q. Could you just tell us again for the jury what that signifies in reference to Exhibit No. 5?

A. Those are the mistakes I made typing, George Perrot initialed them to show the mistakes were made.

MR. BLOOM: That's all I have of this witness, Your Honor.

CROSS EXAMINATION BY MR. HAMMERSCHMITH:

Q. Is it fair to say that you asked Mr. Perrot to initial those?

A. Yes, sir, I did.

Q. Now, on this day, December 7, 1985, you first arrived at the Detective Bureau about 7:30 or

7:35 in the morning?

A. Yes, sir, I did.

Q. And shortly thereafter, you spoke with Mr. Perrot for the first time?

A. Yes, sir, I did.

Q. And that would have been around 7:45 or 7:50 in the morning?

A. Yes, sir.

Q. And before doing so, you spoke, did you, with Sergeant Kelly?

A. I can't be sure of that.

Q. You may have spoken with Sergeant Kelly?

A. I might have, I may not have. I can't be sure of that.

Q. Who is Sergeant Kelly?

A. He is the sergeant of the Crime Prevention Bureau.

Q. What was his position at the time there?

A. He was, I believe, one of the head investigators for rapes.

Q. Would he have been the head investigator for this particular case, Miss Prekop's incidents?

A. Yes, sir, I believe so.

Q. You think you may have spoken with him, but you are not sure?
A. I'm not too sure, sir.
Q. When you saw Mr. Perrot for the first time that morning, it was in an interrogation room, wasn't it?
A. Yes, sir, it was.
Q. When you saw him that day, you had a chance to look at how he appeared that morning?
A. Yes, sir, I did.
Q. And would it be fair to say that his hair did not appear to have been freshly cut?
A. I can't answer that question, sir.
Q. Do you recall whether or not he had any facial hairs, a beard or a moustache?
A. He had a beard and a moustache, I believe, yes, sir.
Q. And you don't remember what his hair looked like?
A. No, sir, I don't.
Q. I believe you said you took him down to the booking room?
A. Booking area, yes, sir.

Q. And that would have been shortly after you first saw him that morning?
A. Yes, sir.
Q. And at some point after that, he would have had his picture taken, is that right?
A. If it was done, it would have been taken within an hour or so, half hour, forty minutes.
Q. I'm going to show you a photograph and ask you to take a look at it, and can you tell us what that picture is?
A. That is George Perrot with a beard, a moustache and curly hair.
Q. And can you tell us when that picture was taken?
A. 1985.
Q. And the date?
A. December 7, 1985.
Q. Would it be fair to say you recognize that to be a booking photograph such as is taken at the Springfield Police Department?
A. That should be a booking photograph.

(Photograph shown to Mr. Bloom)