UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEORGE PERROT,

Plaintiff,

v. CIVIL ACTION NO. 18-10147-MPK[1]

THOMAS KELLY, et al.,

Defendants.

**MEMORANDUM AND ORDER ON DEFENDANT FRANCIS BLOOM'S MOTION FOR SUMMARY JUDGMENT (#330); DEFENDANT CHARLES ARPIN'S MOTION FOR SUMMARY JUDGMENT (#332); DEFENDANT RICHARD KANE'S MOTION FOR SUMMARY JUDGMENT (#334); AND THE MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#336)**

KELLEY, U.S.M.J.

I. Introduction

In 1984 and 1985, the Springfield Police Department was investigating a series of home invasions and sexual assaults against elderly women. Following a jury trial in December 1987, Plaintiff George Perrot was convicted of crimes related to one of those home invasions: the unarmed robbery, indecent assault and battery, burglary and assault in a dwelling, and aggravated rape of 78-year-old Mary Prekop on November 30, 1985. In the same trial, Perrot was also convicted of burglary of the home of Emily Lichwala, a crime which took place on the same date as the Prekop burglary and rape.

Perrot was sentenced to life in prison on the Prekop convictions and 15-20 years on the

[1] With the parties' consent, this case was assigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (##266, 267.)

Lichwala conviction, to be served consecutively to the life sentence for the aggravated rape of Prekop.[2] In January 2016, Perrot's fourth motion for a new trial filed in the Massachusetts Superior Court, Hampden County, was granted with respect to the Prekop convictions on the ground that trial testimony by an Federal Bureau of Investigation ("FBI") agent regarding the forensic analysis of hair recovered at the scene of the crime lacked proper scientific foundation.[3] The Hampden County District Attorney's Office ("D.A.'s Office") declined to retry Perrot for the Prekop convictions.

In this case, Perrot asserts that he was wrongfully convicted of the Prekop crimes as the result of police and prosecutorial misconduct. Specifically, he alleges that Thomas Kelly ("Sgt. Kelly"),[4] Thomas Jarvis ("Det. Jarvis"), Richard Kane ("Officer Kane"), Charles Arpin ("Lt. Arpin"), Thomas Kennedy ("Sgt. Kennedy"), Marianne Popko ("Officer Popko"), Paul Glantz ("Officer Glantz"), Ronald St. Germain ("Officer St. Germain"),[5] Andrew Canevari ("Sgt. Canevari"), Cheryl Clapprood ("Officer Clapprood"), the City of Springfield, Massachusetts (the

---

[2] Contemporaneously, Perrot was charged with assault and a purse-snatching at a local restaurant and the break-in and assault of a homeowner, incidents which occurred in the early morning hours of December 7, 1985. He pled guilty to those crimes and was sentenced to 10-12 years for the break-in and assault of the homeowner, and a concurrent sentence of 6-9 years for the purse-snatching.

[3] Perrot's motion for a new trial on the Lichwala conviction was denied.

[4] Sgt. Kelly is deceased, and the named party is Judith Kelly, as administrator of his estate. In this Order, the court refers to Sgt. Kelly as the party.

[5] On May 2, 2023, counsel for Officer St. Germain filed a suggestion of death notifying the court that St. Germain had died on January 16, 2023. (#235.) At the motion hearing held on August 27, 2024, with the consent of all parties, Officer St. Germain was dismissed from the case. (#388.) Defendants William Eubanks, Wayne Oakes, and the United States of America were previously dismissed from this case on September 4, 2019, along with "all [] unnamed parties" to the action, *see* #186; #170 at 4, and an individual defendant whom Perrot had mistakenly identified as "Paul Lance." (#202 at 5); *see Perrot v. Kelly,* Civil Action No. 18-10147-DPW, 2023 WL 2939277, at *2 n.4 (D. Mass. Feb. 15, 2023), *report and recommendation adopted,* 2023 WL 2607763 (D. Mass. Mar. 23, 2023).

"City"), and Assistant District Attorney Francis Bloom ("ADA Bloom") violated his rights by coercing him into falsely incriminating himself, fabricating evidence, destroying evidence, conspiring to frame him, failing to intervene, and maliciously prosecuting him. In his Amended Complaint (#126), Perrot asserts claims against the defendants under 42 U.S.C. § 1983 for violations of his Fifth and Fourteenth Amendment rights under the United States Constitution, and under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, for violations of his concomitant state rights. (#126 ¶ 137.) He also asserts state law claims for malicious prosecution, civil conspiracy, and negligent and intentional infliction of emotional distress.[6] *See id.* Finally, Perrot sues the City for the actions of its instrumentality, the Springfield Police Department ("SPD"), under *Monell v. Dep't of Soc. Services of the City of New York*, 436 U.S. 658 (1978), alleging that the department failed to train and supervise its officers or institute policies designed to ensure that officers complied with their obligations under the United States Constitution.[7] *Id.* ¶¶ 139-40.

This Memorandum and Order addresses ADA Bloom's Motion for Summary Judgment (#330); Lt. Arpin's Motion for Summary Judgment (#332); Officer Kane's Motion for Summary Judgment (#334); and the Municipal Defendants' Motion for Summary Judgment.[8] (#336.) For the reasons set out below, the motions for summary judgment of ADA Bloom, Lt. Arpin, and

---

[6] Perrot previously asserted a claim for "spoliation of evidence[,]" but as this court observed in its February 15, 2023 Report and Recommendation, "Massachusetts does not recognize a cause of action for spoliation" and such a claim "may not be prosecuted." *Perrot,* 2023 WL 2939277, at *8 n.11 (citing *Fletcher v. Dorchester Mut. Ins. Co.*, 773 N.E.2d 420, 424 (Mass. 2002)).

[7] This court has informed the parties that the trial in this case will be bifurcated, and that Perrot's *Monell* claim against the City of Springfield will be tried separately, if necessary. *See* #397.

[8] Sgt. Kelly, Det. Jarvis, Sgt. Kennedy, Officer Popko, Officer Glantz, Officer St. Germain, Sgt. Canevari, Officer Clapprood, and the City are, collectively, the "Municipal Defendants."

Officer Kane are allowed. The Municipal Defendants' motion for summary judgment is allowed in part and denied in part.

## II. The Facts

Based on a review of the properly-cited evidence in the summary judgment record, the court finds that the following facts are undisputed.[9]

### A. ADA Bloom's Involvement in the Perrot Investigation and Prosecution[10]

ADA Bloom worked as a prosecutor in the D.A.'s Office beginning sometime between 1975 and 1977, until around January of 1990. (#331-1 at 11, 15.) During his time with the Office, it was a "common practice" for him to go to SPD headquarters at the request of the SPD in order to help in their investigations. (#361-15 at 59-60.) ADA Bloom had been directed by the Hampden County District Attorney to attend identification line-ups to ensure that they were fair to the suspect and not unduly suggestive. (#331-1 at 90-93.)

---

[9] In their respective statements of fact, the parties cite to record evidence which does not support their assertions. Specifically, the defendants often omit a record cite (in which case, the court did not adopt the asserted fact) or cite to an incorrect page or line. Perrot, in addition to citing incorrect page numbers, often cites to multiple pages of the record, most of which are not relevant to the asserted fact, forcing the court to parse through the record to determine whether the asserted fact was in fact supported. Where the court was readily able to determine the correct citation, it included the asserted facts; otherwise, it did not. In addition, some of Perrot's objections to defendants' asserted facts are based on semantics, an erroneous interpretation of the asserted facts, or speculation. Perrot cites to evidence which he claims contradicts asserted facts but does not. In such instances, the court has accepted the asserted facts as undisputed. Finally, the court notes that Perrot filed an unopposed Motion to Strike certain facts on hearsay grounds (#355), which this court allowed at the hearing on these motions. *See* #388. Stricken facts are mentioned in this Order only to provide necessary context.

[10] The Municipal Defendants filed a consolidated joint statement of material facts. (#337.) Officer Kane and Lt. Arpin incorporated the facts in the consolidated joint statement in their motions for summary judgment. (##332, 334.) ADA Bloom's Motion for Summary Judgment (#330) includes a statement of material facts distinct from that of the Municipal Defendants. For this reason, the court lists facts regarding ADA Bloom separately but, where appropriate, includes facts with respect to him in the global factual findings which follow.

As discussed in more detail *infra,* in December 1987 Perrot was convicted of aggravated rape, burglary and assault in a dwelling, unarmed robbery, indecent assault and battery, and burglary and sentenced to life in prison. *See Commonwealth v. Perrot*, Nos. 85-5415, 5416, 5418, 5420, 5425, 2016 WL 380123, at *10 (Mass. Super. Ct. Jan. 26, 2016) ("*Perrot IV*"). As noted above, the victims in that case were two elderly women, Mary Prekop and Emily Lichwala. ADA Bloom was the trial prosecutor. *See id.*, at *9-10. Shortly after Perrot's convictions, on December 16, 1987, ADA Bloom fabricated a confession by Perrot in which Perrot admitted to, among other things, raping Prekop, Lichwala, and another woman. (#331-5.) That fabricated confession also implicated Perrot's friends Robert Timmerman and Jeffrey Adkins. *Id.* ADA Bloom created the confession in order to induce Adkins and Timmerman into implicating themselves and Perrot in the rape of the third woman, Mae Marchand, who was another victim in the series of sexual assaults on elderly women that the SPD was investigating. (#361-15 at 66-68.)

ADA Bloom testified at his 2019 deposition that he met with Sgt. Kelly (and maybe Sgt. Canevari), along with officers of the SPD, to discuss with them the plan to fabricate a confession to the Marchand sexual assault and attribute that confession to Perrot; however, it was not their intent to use the statement against Perrot. (#361-52 at 13-16.) ADA Bloom acknowledged that this confession was a "subterfuge," the purpose of which was to prompt Adkins and Timmerman to confess to the Marchand sexual assault by making them believe they were already implicated in the crime. *Id.* at 14. Bloom admitted that he approved the use of the confession. *Id.* The fabricated confession was not shown to Perrot or his counsel.

On June 4, 1990, the Massachusetts Supreme Judicial Court ("SJC") reversed Perrot's

convictions after finding that evidence prejudicial to Perrot should not have been admitted at trial. *See Commonwealth v. Perrot*, 554 N.E.2d 1205, 1212-15 (Mass. 1990) ("*Perrot I*"). The Commonwealth retried Perrot in January 1992, this time with a different prosecutor. *See Perrot IV*, 2016 WL 380123, at *11. Before Perrot's retrial, by which time ADA Bloom no longer worked at the D.A.'s Office, prosecutors learned of the fabricated confession and gave it to Perrot's counsel, who filed a motion to dismiss the charges against Perrot based on prosecutorial misconduct. *See Commonwealth v. Perrot*, 648 N.E.2d 1315, 1316 (Mass. App. Ct. 1995) ("*Perrot II*"). The motion was denied. The confession was not introduced at the retrial and Perrot was again convicted. On appeal, the Massachusetts Appeals Court ("MAC") affirmed the conviction, holding that the confession caused no harm in his retrial. *Id.* at 1317.

ADA Bloom became friends with some Springfield police officers through his work as a prosecutor. (#361-52 at 7.) At the time he first became involved in Perrot's case, ADA Bloom had had a friendly relationship with Sgt. Kelly for years, although he did not socialize with Sgt. Kelly outside of work. *Id.* at 15, 21-22. He was friends with other SPD officers, including Sgt. Kennedy, with whom he did socialize outside of work. *Id.* at 22. ADA Bloom was also friendly with Det. Jarvis. *Id.* at 32.

At the time he was involved in preparing the case against Perrot and prosecuting him, ADA Bloom referred to Perrot as "absolutely devoid of all factor[*sic*] we normally associate with human beings" and "inherently evil." (#361-52 at 39.)

B. The SPD's Investigation into the Crimes Against Elderly Women

1. The September 21, 1985 Incident at 26 Pineview Drive

In the early morning of Saturday, September 21, 1985, Springfield Police Officer Linda DeRosier of the Crime Prevention Bureau interviewed Marchand at the Wesson hospital in Springfield, Massachusetts. (#338-2.) Marchand, who was 82 years old, told Officer DeRosier that three teenage boys had broken a breezeway window to get into her house. *Id.*; *see* #338-3. She reported that one of the boys had raped her and that the boys had taken money from her wallet as they left. *Id.* She provided a description of the rapist but was unable to describe the other two boys. *Id.*

2. The October 24, 1985 Incident at 33 Covel Street

On October 29, 1985, Officer Kane was sent to a Springfield hospital to pick up Lichwala, who had been sexually assaulted in her home on October 24, 1985, and was being released following treatment. Officer Kane drove her to SPD headquarters so that she could provide a statement to a female officer, Officer Desrosiers. (#338-13 at 5-6.) After Lichwala gave a statement to Officer Desrosiers, both Kane and Desrosiers drove her to her home, where they collected evidence. *Id.* at 7-8. Officer Kane had no further involvement in the Lichwala matter, or in any matter involving Perrot, until he was later sent to witness Perrot's blood draw on December 10, 1985, as discussed below. *Id.* at 10.

3. The November 30, 1985 Incident at 33 Covel Street

At about 3:25 a.m. on Saturday, November 30, 1985, Lichwala awoke in her home at 33 Covel Street to the sound of loud bangs and glass breaking. She ran out her front door and to her neighbor's house and called the police. (#338-14 at 1.) Officers arrived at her house

approximately twenty minutes later. *Id*. The intruder, whom Lichwala had not seen, had taken a beige handbag which contained cash and credit cards. *Id.* at 3.

4. The November 30, 1985 Incident at 27 Malibu Drive

That same morning, before 4:00 a.m., Prekop, who was then 78 years old, woke up in her home at 27 Malibu Drive because her dog was barking. She got up to investigate but found nothing and returned to bed. *Id.*; #338-15 at 9. When she then heard what sounded like the two doors leading in from her breezeway being kicked in, Prekop went to the kitchen, where she was met by a white male in his early twenties who had dark wavy hair and wore a black jacket and sneakers. (#338-14 at 4; #338-15 at 11.) The intruder pushed her back into the bedroom and closed the door behind him, leaving the dog outside. (#338-15 at 9.) He threw Prekop to the floor, beat her, and raped her. *Id.* at 10.

Officers responded to Prekop's house at around 4:00 a.m. Ten minutes later, SPD detectives arrived at her house from the Lichwala residence. (#338-14 at 3.) Officers observed that Prekop's purse had been ransacked, but Prekop was unsure if anything was missing. *Id.* at 4; #338-15 at 14. In the bedroom, police discovered a pair of white gloves. One glove was on the floor, while the other was on the bed. One of them had blood on it. Sgt. Kelly tagged them as evidence (#338-14 at 4-5.) Officer Popko took Prekop's statement that morning. (#338-15 at 8.) In her statement, Prekop did not identify Perrot as her assailant, nor did her description of the assailant match Perrot's. *Id.* at 8-11.

5. The December 7, 1985 Incident at 6 Ellendale Circle

On Friday, December 6, 1985, Perrot worked a full day at his construction job before he returned to his home at 87 Malibu Drive at around 5:00 p.m. (#361-38 at 2.) At about 6:00 p.m.,

Perrot, his girlfriend Lisa Eldridge, and his two friends Timmerman and Adkins purchased a case of beer and drove around Springfield, drinking and smoking marijuana. *Id.*; #361-41 at 11. At some point, the group went to Timmerman's house where they did lines of cocaine. (#361-38 at 2.) Over the course of the night, Perrot took "some" valiums, drank about twelve beers, and consumed about a gram of cocaine. (#338-31 at 53-56.) Timmerman dropped Perrot back at his house at about 12:15 a.m. the next morning, December 7, 1985. (#361-38 at 2.) Perrot then walked to Ellendale Circle and broke into a house he thought was unoccupied in order to get money for drugs. *Id.*; #361-41 at 11-12. At approximately 2:15 a.m., Springfield Police Officer James Murphy responded to a call regarding a break-in at 6 Ellendale Circle. He spoke to the homeowners, Joseph and Helen McNabb. (#338-17 at 1.)

According to Perrot, after leaving the house on Ellendale Circle, he walked to the neighborhood Denny's restaurant to buy a coffee. As he was leaving, he grabbed a pocketbook from another patron—Sheileen Sapelli—and ran home, where he later passed out on his bed at around 2:30 a.m. (#361-38; #361-41 at 10-12.)

### C. <u>The Arrest of Perrot, the Gathering of Evidence, and the Indictments</u>

In the early morning hours of December 7, 1985, Springfield police officers went to Perrot's home at 87 Malibu Drive. After they were allowed into the home, Perrot's sister, Nancy Westcott, led them to Perrot's bedroom where Perrot was sleeping. On the floor, near where Perrot's feet hung off the bed, was Sapelli's pocketbook. (#338-17 at 4.) It took several minutes for Westcott to wake Perrot, who appeared "kind of out of it" when he first woke up. (#338-31 at 8.) Perrot was arrested, escorted out of the house by Officer Murphy, and taken to SPD headquarters. *Id.* at 10-11; #338-17 at 4. During the course of his arrest, Perrot broke away from

officers and ran down the street before they later caught up to him and repeatedly kicked and hit him as they handcuffed him. (#331-2 at 46.) At some point, an officer took Perrot's sneaker and made a comparison to a shoeprint impression left behind on Prekop's kitchen wall. (#361-51 at 23; #361-1 at 1.)

1. The December 7, 1985 Events at SPD Headquarters

At around 4:00 a.m., Perrot was taken to the booking desk at SPD headquarters and searched. (#338-31 at 59.) As Perrot was patted down, several officers standing nearby laughed, and one officer punched him in the side. *Id.* at 60; #361-41 at 15. As the day progressed, various SPD officers, including Sgt. Kelly and Det. Jarvis, interrogated Perrot on and off for several hours. (#361-46 at 3-4.) According to Perrot, these officers threatened and verbally abused him, screamed at him, and did not allow him to sleep even though he told them he was tired. (#338-31 at 62-65, 121-22.) Perrot initially told officers that he did not want to talk to them and instead wanted to sleep, and it was only after they persisted in interrogating him did Perrot begin answering their questions. *Id.* at 63-64.

Officer Glantz, whom Perrot knew from a previous arrest for the illegal sale of alcohol and assault and battery on a police officer, was on duty that day. (#338-23 at 24.) Officer Glantz banged on the bars of Perrot's cell with his baton and prevented Perrot from sleeping in the time between his arrest and his transfer to an interview room about an hour later. *Id.* at 26-27; #338-31 at 60-62. Officer Glantz had no further interactions with Perrot or involvement with his case. (#338-23 at 27.)

When Perrot was brought to the interview room at 5:05 a.m., Sgt. Kelly and Officer St. Germain, both of the SPD Crime Prevention Bureau, questioned him. Before asking any

questions, Sgt. Kelly read Perrot his Miranda rights from a card, asked Perrot if he understood those rights, and after Perrot responded affirmatively, he signed the Miranda card. (#338-31 at 124-27.) Sgt. Kelly also informed Perrot that he had the right to use the telephone. Perrot declined but said that he wanted to call his girlfriend later. Perrot signed another card acknowledging his right to make a phone call. *Id.* at 127-28. Officers then returned Perrot to his holding cell where he remained for approximately thirty minutes before he was brought back into the interrogation room. *Id.* at 64-65; #361-41 at 16.

During the second interrogation session, SPD detectives, one of whom was Sgt. Kelly**,** questioned Perrot about the two break-ins and the attacks on elderly women. (#338-31 at 66, 139-42.) Sgt. Kelly also asked Perrot about some items still missing from the purse-snatch at Denny's. Perrot told him that they were probably still in his room at 87 Malibu Drive. When Sgt. Kelly asked Perrot about the recent attacks on elderly women, Perrot said he did not know anything about them. (#338-20 at 16; #338-21 at 2.) The interview lasted approximately thirty minutes and was the only interview of Perrot conducted by Sgt. Kelly. (#338-20 at 16, 20; #338-31 at 133-35.) At its conclusion, officers escorted Perrot back down to his cell where he remained for a period of time. (#361-41 at 18.) Later in the day, when officers had finished questioning him for a period, Perrot asked to remain in the interrogation room rather than returning downstairs to his cell which he described as cold and uncomfortable. Perrot was allowed to stay. (#338-21 at 3-4.)

That same morning, Sgt. Kelly obtained a search warrant for Perrot's residence and took the gloves he had found in Prekop's bedroom with him when he went to execute it. (#338-20 at 17-18; #338-21 at 8-9.) Officers found nothing at Perrot's home that linked him to the crimes

against Prekop. (#338-51 at 41.) After the search, Sgt. Kelly returned to SPD headquarters, spoke with Det. Jarvis about the status of the investigation, and inventoried two other pairs of gloves that had been found at the home. (#361-2; #361-10 at 222; #361-18 at 34.)

Around 7:30 that morning, Det. Jarvis spoke to Perrot. (#361-18 at 48.) He read Perrot his rights at approximately 7:45 a.m. (#338-15 at 23.) When he asked Perrot if he understood those rights, Perrot remarked that they "got [him] good for the two incidents that happened last night." *Id.* at 24. After this exchange, Perrot was fingerprinted, photographed, and booked. *Id.* at 25; #338-31 at 146.

Det. Jarvis next saw Perrot at approximately 12:45 p.m., in the detective bureau investigation room at SPD headquarters, where he read Perrot his Miranda warnings a second time. (#338-15 at 26-27.) Officer St. Germain was with Det. Jarvis when Perrot signed the Miranda card, and he signed as a witness. (#338-31 at 127.) Perrot said that he was willing to talk to Jarvis. (#338-15 at 28-29; #338-21 at 14-15.) Det. Jarvis spoke with Perrot for approximately forty-five minutes and reduced Perrot's answers to a written statement about his activities on December 6-7, 1985. Both Perrot and Jarvis signed this statement. (#338-21 at 15-16; *see* #361-38 at 2.) Det. Jarvis also asked Perrot's permission to take hair and blood samples from him to compare with evidence that had been recovered from recent rapes. Perrot stated that he knew nothing about the crimes but signed a search warrant waiver agreeing to provide the samples. (#338-21 at 17-18; #338-31 at 72-74, 93-94.)

Sometime after Perrot gave his first statement, he made phone calls to his girlfriend, his mother, and his sister before he and Det. Jarvis ate lunch together. Det. Jarvis, who was familiar with the details of the two incidents involving Prekop and Lichwala, sat down with Perrot again

at 3:00 p.m. to discuss them. (#338-15 at 31; #338-31 at 170-71.) Perrot admitted to breaking into both of their homes but denied assaulting either woman. (#338-48; #338-21 at 21; #361-6.) According to Perrot, he had not touched them and had wanted only money. After admitting to these break-ins, Perrot became upset and asked for Det. Jarvis's gun so that he could "blow his brains out[,]" at the same time claiming that "the drugs made me do it." (#338-21 at 21-23, 27; #338-48; #361-6.)

Following their conversation, Jarvis prepared a typewritten statement of what Perrot had told him.[11] He then showed Perrot what he had written, and Perrot appeared to read it over before signing it. (#338-15 at 32.) The document was time-stamped, and Perrot initialed any mistakes that Det. Jarvis had made in typing it. *Id.*; #361-6. Perrot admits that the signature on this statement is his. (#338-22 at 10; *see* #338-23 at 17.) Before Perrot signed this statement, Det. Jarvis gave Perrot his Miranda warnings for a third time. (#338-15 at 34-35.)

Later that afternoon, Sgt. Kelly, Lt. Arpin, and others assembled a line-up which included Perrot and six other individuals who generally resembled him. (#361-17 at 209-11.) ADA Bloom was directed to go to SPD headquarters to approve it. (#338-24 at 2-3.) When the line-up concluded later that same day at approximately 5:00 p.m., ADA Bloom left SPD headquarters. (#331-1 at 89, 133-34.)[12] While he was there, ADA Bloom did not speak to anyone regarding

---

[11] Det. Jarvis also took handwritten notes during his interrogation of Perrot, but he later destroyed them when he left the SPD in 1991. (#361-18 at 93.)

[12] Perrot states that ADA Bloom falsely testified at his 2019 deposition that he was not in the room for any of Perrot's interrogations, *see* #361-52 at 35, and suggests that, for this reason, one can infer Bloom's "consciousness of guilt" and draw the conclusion that he played a much greater role than he admits in "orchestrating" the coercion and fabrication of Perrot's inculpatory statements. This argument is unconvincing. Not only has ADA Bloom accepted as undisputed Perrot's version of the facts—i.e., that he was present during the part of the interrogation when officers asked Perrot to sign a waiver to provide samples—but Perrot's own material facts assert that at his 2019 deposition, ADA Bloom had only a

Perrot's questioning, *id.* at 131-32, but, according to Perrot, he did enter Perrot's interrogation room as officers were discussing whether Perrot would sign the waiver to give samples of his hair and blood. (#331-2 at 383-84.)[13] After the line-up, Perrot visited with his girlfriend, his mother, and his sister at SPD headquarters. Perrot cried, told them that officers had "roughed him up[,]" and asked his mother to get him a lawyer because they were accusing him of "things" he had not done. (#338-31 at 34, 48-49.)

2. <u>The Events at the York Street Jail</u>

At Perrot's arraignment on December 9, 1985, the court appointed counsel to represent him. Officer Kane went to the York Street Jail, where Perrot was detained, on December 10, 1985, to witness and document blood being drawn from Perrot.[14] (#338-13 at 10-11.) Until this point, Kane had not seen Perrot. *Id.* at 12.

When Officer Kane, who was accompanied by a member of the jail medical staff, arrived and met with Perrot, Perrot began to speak about his girlfriend. Officer Kane stopped Perrot, identified himself, and advised Perrot of his Miranda rights. *Id.* at 13. After this exchange, Perrot continued to speak with him, and admitted to breaking into Lichwala's home but denied raping her. *Id.* at 14. Officer Kane asked Perrot about the beige handbag that was still missing, and Perrot stated that he had tossed the bag into some bushes near Lichwala's house. *Id.* at 18. After

---

limited memory of Perrot's 1985 criminal cases. *Id.* at 4. The court has not considered this "consciousness of guilt" argument, or any other unsupported arguments and conclusions in Perrot's responses. The court also rejects Perrot's assertions that individual defendants falsified evidence simply because their testimony, or other statements they offered, differed from Perrot's version.

[13] Perrot does not recall when ADA Bloom entered the room or how long he was there. At the time, Perrot did not know who Bloom was and thought he might be a police officer. *Id.* at 384.

[14] Kane took with him the search warrant waiver Perrot had signed on December 7, 1985, in which Perrot consented to the blood draw. (#338-13 at 21-22; #338-29; #338-28.)

the blood draw, Kane returned to SPD headquarters and wrote a report about his conversation with Perrot. *Id.* at 15-17; #338-29. He submitted the report to his commanding officer and told Sgt. Kelly what he had learned. Sgt. Kelly went with Officer Clapprood to Covel Street to look for the handbag. (#338-13 at 19-20.) The pair later located the bag in the area where Perrot had said he had disposed of it. (#338-15 at 4.)

3. <u>Perrot Is Indicted</u>

On December 16, 1985, a Hampden County grand jury returned eighteen indictments against Perrot. The indictments included charges relating to the Prekop rape and burglary, the Lichwala burglary, the McNabb burglary, and the purse-snatching at Denny's. (#361-39).[15]

D. <u>Perrot's Motions to Suppress, His Trials, and the Post-Conviction Proceedings</u>

1. <u>The Motions to Suppress</u>

a. <u>*The First Motion to Suppress*</u>

On September 2, 1986, the trial court held an evidentiary hearing on Perrot's motion to suppress statements he had made after his arrest on December 7, 1985, relating to the Prekop and Lichwala break-ins. *See generally* #338-31. Sgt. Kelly, Det. Jarvis, and Officer James Murphy were witnesses for the Commonwealth, while Perrot testified and called his sister, Westcott, and his mother, Beverly Daly, as witnesses. Perrot testified that he did not sign any statements directly because of the physical abuse he had suffered at the time of his arrest, but said that at the time he signed them police were screaming at him and threatening him. *Id.* at 120-22. Perrot's motion to suppress these statements was denied.

[15] During its investigation, the SPD had considered several other men as suspects for one or more of these incidents. (#361-21; #361-24; #361-25; #361-29; #361-30; #361-15 at 48.)

In a written decision, the trial court found that Perrot "had been through the procedure of arrest, booking, Miranda warning and police interrogation on at least 10 previous occasions[,]" had exaggerated his consumption of alcohol and drugs, and further found that photographs that had been taken of him while he was in custody revealed "no indication of bruises or beating." (#338-32 at 6.) Specifically, the court's order stated:

> The defendant, although only 17 years old, had been exposed to the arrest procedure many times and was fully aware of his rights, made knowing and intelligent waivers, and voluntary statements admitting some crimes and denying others. He was not under the influence of drugs or alcohol when questioned. The police did not beat or coerce him into those statements. He was kept in the detective bureau at his own request rather than be returned to his cell and had several periods to himself during the day when he was seen to be dozing. He was fed by Jarvis and allowed to use the phone on several occasions. The defendant never refused to answer questions nor did he ask that questioning cease or that he be provided with a lawyer.

*Id.* at 7.

b. *The Second Motion to Suppress*

Perrot filed a second motion to suppress in which he moved to suppress statements he had made to Officer Kane on December 10, 1985, while his blood was being drawn, and also moved to suppress Lichwala's handbag. *See generally* #338-27. A hearing was held on the motion on December 7, 1987. Perrot argued, based on then-recent United States Supreme Court precedent,[16] that even though Kane had advised him of his Miranda rights, Kane's actions in subjecting him to post-arraignment questioning after he had been appointed an attorney violated his Sixth Amendment right to counsel. (#338-27 at 100-03.) The trial court suppressed Perrot's statements to Kane but denied the motion to suppress the handbag.

[16] *Michigan v. Jackson*, 475 U.S. 625 (1986).

2. April 1987: Hair and Blood Samples Are Submitted to the FBI Crime Lab

On April 1, 1987, ADA Bloom accompanied Sgt. Kennedy, who was transporting physical evidence connected to Perrot's prosecution, to Washington, D.C. (#331-1 at 112, 124; #331-3 at 102-03; #331-4.) ADA Bloom intended to speak with FBI Special Agents William Eubanks and Wayne Oakes about the scientific testing of hair and blood evidence because the agents were expected to provide expert testimony at Perrot's trial, and Bloom wanted to interview them before they did so. (#331-1 at 111-13.) ADA Bloom and Sgt. Kennedy, however, did not speak to the agents about Perrot's prosecution and ended up dropping the evidence off at the FBI's Crime Lab and departing after five to ten minutes. (#331-3 at 106-07.)

3. December 1987: the First Trial on the Prekop and Lichwala Charges

Sometime before November 27, 1987, Perrot's attorney requested Prekop's medical records from ADA Bloom. (#361-8.) ADA Bloom had received Prekop's records from December 1, 1987, which included timestamps of her arrival at, and discharge from, the hospital. (#361-3.) ADA Bloom never provided these records to Perrot's counsel before the first trial. (#361-1 at 4.)

At Perrot's first trial in December of 1987, Prekop testified that she had not identified Perrot as the person who had raped her. (#338-49 at 3.) Sgt. Kelly testified that he was present when Prekop viewed the line-up containing Perrot on December 7, 1985, and that Prekop had not identified Perrot as her attacker. (#338-15 at 46.) He also testified about the pair of white gloves he had found in Prekop's bedroom on November 30, 1985, and which he had later brought to Perrot's house on December 7, 1985 to show to Westcott. (#338-33 at 20-21.) Sgt. Kelly testified that Westcott had told him that she had a pair just like them, but that they were missing. *Id.* at 22.

Westcott testified about being asked about the gloves by a police officer and said that she had told the officer the gloves looked familiar but thought they might belong to Perrot's girlfriend, Eldridge. (#361-12 at 72-73.) Sgt. Kelly also testified about Lichwala's handbag that had been discovered in the bushes. (#361-10 at 211-13.)[17]

Special Agent Eubanks, Chief of the FBI Serology Unit in Washington, D.C., testified about the forensic testing performed on a bloodstain found on a sheet in Prekop's bedroom, and about the forensic analysis performed on bloodstains located on the gloves found in Prekop's bedroom. (#338-34 at 3-6.) Eubanks testified that the blood found on the sheet was inconsistent with Prekop's blood and consistent with Perrot's, but that the blood found on the gloves was consistent with both Perrot and Prekop's blood. (#361-11 at 33-36.) Special Agent Oakes testified that he had examined the sheet, removed hairs from it, and had later compared them to hair known to belong to Perrot. (#338-34 at 7-9.) He testified that a hair he examined from the sheet "exhibited all of the same microscopic characteristics arranged in the same way as the known hair standards from Mr. Perrot" and that there were no "variations" between the two hairs. *Id*. at 8-9. When he compared the hair from the sheet with a sample of Prekop's hair, "[t]he questioned hair did not originate from Ms. Prekop." *Id*. at 9.

Lichwala testified about the burglary of her home and the theft of her handbag. (#338-49 at 4-25.) Officer Popko testified regarding the statement she took from Prekop on November 30, 1985, and she identified four photographs of Prekop taken on that date which documented injuries Prekop had sustained in the attack. (#361-10 at 89-95.) Sgt. Kennedy testified about observing a second blood draw from Perrot on March 31, 1987, and about taking Perrot's blood

[17] The handbag was entered into evidence at trial. (#361-10 at 213.)

and hair samples to the FBI Crime Lab on April 1, 1987. *Id.* at 116-19. Det. Jarvis testified about his interactions with Perrot on December 7, 1985, including giving Perrot his Miranda warnings and obtaining the signed statement from Perrot concerning the Lichwala and Prekop break-ins. *Id.* at 130-60.

Perrot testified and told the jury he did not remember being given his Miranda warnings nor did he recall signing a Miranda card. (#361-12 at 87-88.) He did, however, review the Miranda card and acknowledge that the signature appeared to be his. *Id.* Perrot further testified that he thought he was advised of his right to use the phone and had signed a piece of paper to that effect but was nevertheless unsure. *Id.* He admitted that the signature on the form concerning his right to use the phone appeared to be his. *Id.* at 89. Perrot then reviewed the statement in which he admitted to both the Lichwala and Prekop break-ins. Although he admitted that the signature on the statement appeared to be his, *id.* at 92-93, he denied telling police that he broke into either home. *Id.* at 115-18.

On December 14, 1987, a jury convicted Perrot on all counts. On appeal, the SJC found that the statements Perrot had made to Officer Kane had been properly suppressed. *See Perrot I,* 554 N.E.2d at 1208. The SJC also affirmed the trial judge's denial of Perrot's motion to suppress the statements he made after his arrest admitting to the Lichwala and Prekop burglaries, finding that the trial judge had properly found that Perrot's statements on December 7, 1985 had been voluntarily made after a knowing and intelligent waiver of his constitutional rights. *Id*. However, the SJC reversed the judgment of the trial court and ordered a new trial, finding that the handbag discovered as a result of Perrot's statements to Kane should not have been admitted into evidence at trial. *Id.* at 1212.

4. January 1992: the Second Trial on the Prekop and Lichwala Charges

Perrot was tried a second time in January of 1992. Lichwala's handbag was not admitted into evidence, and Perrot did not testify.[18] *See Commonwealth v. Perrot*, 787 N.E.2d 1154 (Mass. App. Ct. 2003) ("*Perrot III*") (unpublished disposition). Special Agent Eubanks again testified about analysis of the bloodstains found on the gloves he had received from the SPD, and he also testified that blood found on Prekop's sheet was consistent with Perrot's blood. (#361-17 at 99-100; #338-20 at 8-9.) Special Agent Oakes again testified about the analysis of hair samples he had received from the SPD. (#338-20 at 12-15.)

Prekop again testified that Perrot did not resemble the person who had raped her. (#338-26 at 7-8.) She also testified that the bloodstains found on her sheet were old bloodstains and were not from her assailant. *Id.* at 9-10. The written statement which Officer Popko had prepared following her interview of Prekop contained Prekop's statement that when the police had arrived at her home, Prekop had noticed a pair of gloves on the foot of the bed that were not hers and which she had never seen before. Prekop had signed this statement on November 30, 1985. At the second trial, however, Prekop testified that she was not sure when the information about the gloves had been added to her statement because she had not noticed the gloves until she returned from the hospital, which occurred after she had spoken with Officer Popko. (#361-16 at 144-46.) Prekop further testified that the intruder had left a shoeprint on her kitchen wall which was still there at the time of her trial testimony. *Id.* at 152.

Sgt. Kelly also testified at the second trial. He identified the gloves, sheet, and pillowcase

---

[18] Officer Popko did not testify either. (#338-26 at 2.)

he had taken from Prekop's house on November 30, 1985, and he again testified that Prekop did not identify Perrot in the line-up held on December 7, 1985. (#338-20 at 2; #361-16 at 191-99.) Sgt. Kelly also testified that he had shown the gloves found at Prekop's house to Westcott, who had remarked that she had a similar pair but could not locate them. (#338-20 at 18-19.) Westcott once more testified that SPD officers had shown her a pair of gloves which she said looked familiar and which she believed may have belonged to Eldridge. (#361-18 at 123-26.) Westcott further testified, however, that she later learned that the gloves were not Eldridge's. *Id.*

Sgt. Kennedy testified at the second trial that he had observed Perrot's second blood draw on March 31, 1987, and that he and ADA Bloom had brought the blood, along with Perrot's hair samples, to the FBI Crime Lab in Washington, D.C. Det. Jarvis testified that Perrot never admitted to assaulting Prekop or Lichwala, and he read Perrot's statement concerning the incidents into the record. (#361-18 at 70-71, 92; #338-21 at 23.) Detective Jarvis further testified that on December 7, 1985, he took the gloves that had been recovered from Prekop's house to Eldridge's house. (#361-18 at 78.)

Perrot was again found guilty on all charges. (#338-37 at 2-3.) For the Prekop charges, Perrot received a sentence of life imprisonment on the charge of aggravated rape and a sentence of life imprisonment on the charge of burglary and assault. For the Lichwala burglary, the court imposed a sentence of 15-20 years, to be served following the sentence for the Prekop aggravated rape conviction.

On direct appeal, the MAC affirmed Perrot's conviction, *see Perrot II,* 648 N.E.2d at 1315-17,[19] and the SJC denied further appellate review. *See Commonwealth v. Perrot*, 651

[19] On direct appeal, the principal issue raised by Perrot was that the trial court erred in denying his

N.E.2d 409 (Mass. 1995). In April of 2000, Perrot filed a motion for a new trial based, inter alia, on allegations that the prosecutor's closing argument at the second trial was improper and prejudicial. A judge of the Superior Court agreed and allowed the motion. The MAC, however, reversed the Superior Court's decision, finding that errors in the prosecutor's closing argument did not create a substantial risk of a miscarriage of justice, *see Perrot III*, 787 N.E.2d at 1154, and the SJC denied further appellate review. *See Commonwealth v. Perrot*, 805 N.E.2d 44 (Mass. 2004).

5. <u>The Remaining Charges Against Perrot</u>

Perrot pled guilty to the charge of armed assault in a dwelling against McNabb at Ellendale Circle and the unarmed robbery at Denny's. He received a sentence of 10-12 years for the McNabb assault and a concurrent sentence of 6-9 years for the Denny's robbery. Neither conviction has been overturned.

E. <u>Perrot's Convictions for the Rape and Burglary of Prekop Are Vacated</u>

In 2012, the FBI questioned the science underlying the testimony of its hair microscopy examiners and audited its prior microscopy cases, including Perrot's. *See Perrot IV*, 2016 WL 380123, at *33. The FBI determined that Special Agent Oakes had made erroneous statements and had exaggerated his forensic conclusions with respect to hair analysis at Perrot's trial. *Id.,* at

---

pretrial motion for dismissal of the indictments due to prosecutorial misconduct, i.e., ADA Bloom's fabrication of Perrot's confession in order to coerce Perrot's friends to confess to the Marchand attack. The MAC concluded that ADA Bloom's conduct was egregious, but because the confession was never admitted against Perrot at trial and did not result in uncovering any evidence that could be used against him at trial, he was not prejudiced as a result of Bloom's misguided scheme and, therefore, the trial court did not err in denying his motion to dismiss the indictments for prosecutorial misconduct. The MAC further held that the trial court did not err by refusing to admit evidence of the scheme in the second trial, as such evidence "did not have even tangential relevance to the evidence on which the Commonwealth was to rely; it suggested no shortcoming in the police investigation of [Perrot's] case." *Perrot II*, 648 N.E.2d at 1317.

*34-35. On July 8, 2014, Perrot filed his fourth motion for a new trial, arguing that the Commonwealth had presented false and misleading testimony regarding the hair evidence, and that counsel at his second trial had provided ineffective assistance by failing to investigate this evidence. *Id.*, at *1, 24.

On January 26, 2016, the Superior Court allowed Perrot's motion, in part, and granted him a new trial on the Prekop charges based on the demonstrated scientific unreliability of the FBI's hair microscopy. *Id.*, at *45. The court denied the motion for a new trial as to the Lichwala charges. *Id.* The Commonwealth appealed the order for a new trial, while Perrot appealed the motion's denial with respect to the Lichwala charges. In October 2017, Perrot and the Commonwealth agreed to dismiss their cross-appeals with prejudice. (#337 at 60, ¶¶ 320-21.) On October 18, 2017, as part of the agreement with Perrot, the Commonwealth filed a *nolle prosequi* with respect to the Prekop charges in the Superior Court. (#338-47 at 1.)

III. <u>Standard of Review</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "A 'genuine issue' is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)) (additional citations and quotations omitted).

When considering a motion for summary judgment, the court construes the record in the

light most favorable to the nonmoving party and resolves all reasonable inferences in that party's favor. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.* at 152. "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial." *Id.* (additional citation omitted). "[T]he 'nonmoving party may not rest upon mere allegations or denials of [the movant's] pleading but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial.'" *Id.* (additional citations and quotations omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences[.]" *Id.* (additional citations and quotations omitted). "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 152-53 (additional citations and quotations omitted).

## IV. Discussion

### A. ADA Bloom's Motion for Summary Judgment

Perrot brings a claim against ADA Bloom under § 1983 for violating his Fifth and Fourteenth Amendment rights by fabricating evidence used against him and coercing him into falsely confessing.[20] ADA Bloom moves for summary judgment on these claims on the grounds that he is entitled to absolute immunity or qualified immunity or, in the alternative, that his

[20] Perrot's failure to intervene claim against ADA Bloom was previously dismissed on qualified immunity grounds. *See Perrot,* 2023 WL 2939277, at *12.

actions did not deprive Perrot of any constitutional rights.[21]

"Section 1983 'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.'" *Mercurio v. Town of Sherborn*, 287 F. Supp. 3d 109, 118–19 (D. Mass. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)). In order to prevail under § 1983, a plaintiff must show that the defendants (1) acted under color of state law, and (2) deprived the plaintiff of a right secured by the Constitution or the laws of the United States. *Id*. (citation omitted). "[I]t is well-settled that only those who participated in conduct that deprived plaintiffs of their constitutional rights can be held liable" under § 1983. *Slavas v. Town of Monroe*, Civil Action No. 16-30034-KAR, 2017 WL 959575, at *12 (D. Mass. Mar. 10, 2017) (citing *Velez-Rivera v. Agosto-Alicea*, 437 F.3d 145, 156 (1st Cir. 2006)).

Even if a plaintiff can establish that his constitutional rights were violated, summary judgment in favor of the defendant may still be warranted on immunity grounds. *Segrain v. Duffy*, No. 23-1854, __ F.4th __, 2024 WL 4263271, at *6 (1st Cir. Sept. 23, 2024) (even if plaintiff produces sufficient evidence from which a reasonable jury could find a constitutional violation, defendant official may still be entitled to summary judgment based on qualified immunity). "[P]rosecutors are absolutely immune in exercising the core prosecutorial functions of 'initiating a prosecution and ... presenting the State's case.'" *Penate v. Kaczmarek,* 928 F.3d 128, 135 (1st Cir. 2019) (alteration in original) (additional citation omitted). In determining whether a prosecutor's actions are properly characterized as prosecutorial in nature and therefore

---

[21] Perrot concedes that he does not have a claim against ADA Bloom for the fabricated confession concerning the Marchand rape. *See Warnick v. Cooley*, 895 F.3d 746, 753 (9th Cir. 2018) (defendant's due process rights are not violated where fabricated evidence is not actually used against him) (and cases cited). He asserts, however, that ADA Bloom's fabrication of the confession "provides powerful evidence of Bloom's conspiracy with Defendant Officers and his intent to railroad Perrot." (#356 at 5.)

subject to absolute immunity, the court applies a "functional approach" which "looks to 'the nature of the function performed, not the identity of the actor who performed it,' nor to the 'particular act' in isolation." *Id.* (additional citation omitted). "Applying this approach, the Supreme Court has recognized that ... 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.'" *Id.* at 136 (additional citations omitted).

On the flip side, absolute prosecutorial immunity is not available "where the prosecutor's conduct lacked a 'functional tie to [a] judicial process' initiated by the prosecutor." *Id.* (additional citation omitted) (alteration in original). "So, absolute immunity does not protect prosecutors when they give advice to police during a criminal investigation [or] fabricate evidence long before a grand jury has made an indictment." *Id.* (additional citations omitted). "These functions have been deemed 'administrative' or 'investigative,' and, in exercising them, 'a prosecutor is in no different position than other executive officials,' such as police, and 'qualified immunity is the norm for them.'" *Id.* (additional citation omitted).

Thus, if Perrot's constitutional claims arise from ADA Bloom's actions in an administrative or investigative capacity, ADA Bloom is entitled only to the defense of qualified immunity. *See Filler v. Kellett*, 859 F.3d 148, 155 (1st Cir. 2017). He is shielded by qualified immunity unless Perrot can establish that (i) ADA Bloom violated a constitutional right, and (ii) that constitutional right was "clearly established" at the time of the violation. *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013). "This second part ... has two aspects," namely, "the clarity of the law at the time of the violation," and "whether a reasonable defendant would have

understood that his conduct violated plaintiff's constitutional rights" under the particular facts of the case. *Id.* (additional citation omitted). Unlike absolute immunity, the "scope or extent of [qualified] immunity" does not depend "on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated." *Anderson v. Creighton*, 483 U.S. 635, 643 (1987). Instead, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (additional citations and quotations omitted).

This court previously found that if the factual record were to support Perrot's allegations that during the investigatory phase of the case, ADA Bloom falsified evidence that was used against him or coerced him into confessing, or conspired with others to do so, he would not be entitled to qualified immunity. That is because the alleged conduct—fabricating evidence and coercing a confession—violated constitutional rights that were clearly established at the time of the alleged wrongdoing in this case. *See Perrot,* 2023 WL 2939277, at *11-12. As explained below, however, the court finds that ADA Bloom is entitled to qualified immunity because Perrot has not offered sufficient evidence for summary judgment purposes that ADA Bloom violated any constitutional right.

Perrot asserts that ADA Bloom fabricated evidence against him and conspired with others to do so. It is undisputed that on December 7, 1985, ADA Bloom went to SPD headquarters after Perrot's arrest, conferred with SPD officers about Perrot's status as a suspect, and participated in the identification line-up containing Perrot later that day. With respect to ADA Bloom's role in any interviews or interrogations, Perrot acknowledges that the undisputed evidence places ADA

Bloom in the interrogation room only once, for a brief time, during the course of his questioning, and he offers no evidence that ADA Bloom himself ever questioned him. Still, Perrot speculates that there is evidence in the summary judgment record from which a jury could conclude that ADA Bloom's role was more extensive. He argues that because he believed ADA Bloom was a police officer when he first saw him, a jury could infer that his later recollections of police officers during different phases of the interrogation could include ADA Bloom. In addition, he speculates that because ADA Bloom testified in 2019 that he was never in the interrogation room, it is reasonable to infer that he has been untruthful about the extent of his involvement.

There is simply not enough evidence in the summary judgment record to allow the claims against ADA Bloom to go forward. Other than the fabricated confession with respect to the Marchand rape—which was not introduced at either of Perrot's trials—there is no record evidence that ADA Bloom interrogated him or had any role in fabricating evidence offered at trial. The inferences Perrot asks the court to make simply do not "flow rationally from the underlying facts[.]" *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 137-38 (1st Cir. 2013) (additional citation and quotations omitted). There is also no evidence to support Perrot's allegations that ADA Bloom spoke with officers at any time about inducing or coercing him to confess to any crimes. The same holds true for Perrot's claim that ADA Bloom attempted to frame him by misleading Agent Eubanks regarding the blood evidence, because the facts at summary judgment are that ADA Bloom never spoke with Eubanks.

In sum, despite Perrot's claim that there are genuine issues of material fact in the summary judgment record pertaining to ADA Bloom, the evidence he cites in his favor impermissibly relies "'on improbable inferences, conclusory allegations, or rank speculation.'"

*Snell v. Neville,* 998 F.3d 474, 486 (1st Cir. 2021) (quoting *Enica v. Principi*, 544 F.3d 328, 336 (1st Cir. 2008)); *see Morales v. Ramirez,* 906 F.2d 784, 789 n.6 (1st Cir. 1990) ("'It is a settled principle of Rule 56 jurisprudence that, where a nonmovant bears the burden of proof, [he] can defeat summary judgment only if [he] can 'reliably demonstrate that specific facts sufficient to create an authentic dispute exist.'") (additional citation omitted). ADA Bloom is entitled to summary judgment on Perrot's § 1983 claim against him.[22]

B. Lt. Arpin's Motion for Summary Judgment

Perrot's claims against Lt. Arpin echo those he makes against all of the individual defendants in boilerplate style—that is, that Arpin violated Perrot's constitutional rights by coercing him into falsely incriminating himself, withholding evidence from the prosecution, fabricating evidence, destroying evidence, failing to intervene, and maliciously prosecuting him. Perrot claims that because Lt. Arpin helped supervise the SPD's investigation of the series of assaults in Springfield from 1984 to 1985, he was therefore responsible for overseeing the conduct of the other defendant officers throughout that investigation. He claims that Lt. Arpin was present at SPD headquarters when Perrot was interrogated in December 1985, that he interviewed witnesses (other than Perrot), wrote and reviewed police reports, took McNabb's statement, approved Perrot's arrest and the charges against him, coordinated the identification

[22] Any § 1983 conspiracy or malicious prosecution claim against ADA Bloom also fails. To the extent these claims are based on Bloom's role in Perrot's prosecution, ADA Bloom is entitled to absolute immunity under the principles articulated above. *See Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 151 (1st Cir. 2015) (where ADA's involvement "was limited to his actions as a prosecutor in connection with preparing the Commonwealth's evidence at trial[,]" absolute immunity shielded him from malicious prosecution and conspiracy claims under § 1983). To the extent these claims are based on actions he took in an administrative or investigative capacity, they are discussed *infra*, along with Perrot's state law claims against him.

line-up, participated in obtaining Perrot's signature on the search warrant waiver for his blood draw, and testified at the grand jury hearings against Perrot on December 13, 1985, and April 10, 1986.

Lt. Arpin asserts that because the Lichwala conviction was never vacated, any claims relating to it are barred by *Heck v. Humphrey,* 512 U.S. 477 (1994). The court agrees and therefore confines its discussion to the claims against Lt. Arpin that relate to the Prekop convictions.

In order to sustain any § 1983 claim against Lt. Arpin, Perrot must first establish that Arpin, while acting in his capacity as a police officer for the City, deprived him of a federal constitutional right through actions taken either individually or in a supervisory capacity. Regarding claims against Lt. Arpin in his supervisory capacity, Arpin cannot be held liable under a theory of respondeat superior—he is liable only for his own acts or omissions. *See Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021). "To connect the liability dots successfully between supervisor and subordinate in this context, a plaintiff must show 'that one of the supervisor's subordinates abridged the plaintiff's constitutional rights' <u>and</u> that the supervisor's (in)action 'was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as ... gross negligence amounting to deliberate indifference.'" *Id.* (quoting *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 514-15 (1st Cir. 2016)) (alterations and emphasis in original).

"Deliberate indifference requires a plaintiff to demonstrate or allege '(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk.' Indeed, '[m]ere negligence will not suffice: the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of

others.'" *Id.* (alternation in original) (additional citations omitted). In addition, "deliberate indifference alone does not equate with supervisory liability," but rather '[c]ausation [is also] an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid[.]' ... [t]he causation requirement 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Id.* (all but first and last alteration in original) (additional citations omitted).

The parties agree that Lt. Arpin was present at SPD headquarters when Perrot was interrogated by other officers, that he helped assemble the line-up at which Prekop did not identify Perrot as her assailant, and that he took McNabb's statement regarding the assault at Ellendale Circle to which Perrot pled guilty. Perrot has not introduced any evidence that Lt. Arpin communicated with the officers who interrogated him or that he otherwise had any role in obtaining Perrot's confessions. Perrot has failed to establish for summary judgment purposes that Arpin was aware of Sgt. Kelly's or Det. Jarvis's alleged attempts to coerce Perrot into confessing, or that he encouraged or failed to stop his subordinates from doing so. Moreover, Perrot has not established that the line-up he participated in was unduly suggestive or otherwise violated due process, and in any event, Prekop failed to identify him.

Perrot makes no meaningful argument as to how Lt. Arpin violated his constitutional rights by overseeing Perrot's signing a waiver allowing samples of his blood and hair to be taken,[23] or by testifying at the grand jury.[24] *See Johnson v. City of Worcester*, Civil Action No.

[23] Perrot has not presented any evidence that Lt. Arpin coerced him into signing this waiver.

[24] Lt. Arpin is entitled to absolute immunity for his testimony before the grand jury. *See Rehrberg v. Paulk*, 566 U.S. 356, 367 (2012) (grand jury witnesses, including law enforcement officers, absolutely immune from § 1983 claims based upon grand jury testimony).

17-40103-TSH, 2020 WL 1140077, at *7 (D. Mass. Mar. 9, 2020) (summary judgment for police lieutenant defendant on § 1983 claim where plaintiff failed to set forth "*any* facts which would support a finding that [defendant] was involved in the decision to arrest him either directly or in his supervisory capacity.") (emphasis in original).

For these reasons, Lt. Arpin is entitled to summary judgment on the § 1983 claim asserted against him.[25]

C. Officer Kane's Motion for Summary Judgment

Officer Kane's involvement in Perrot's investigation and prosecution was minimal; his role related primarily to investigating the crimes committed against Lichwala. Officer Kane interviewed Lichwala after the October 1985 break-in of her home and, based on that interview, believed that Lichwala had described a suspect different from Perrot. As set out above, Kane went to the York Street Jail to document Perrot's blood draw and, while there, Perrot told him that he had broken into a home on Covel Street but had not raped the woman inside. He also told Officer Kane that he had thrown that woman's (Lichwala's) handbag in the bushes. Officer Kane then wrote a report about Perrot's statements.

Before Perrot's first trial, Perrot's statements were suppressed because Officer Kane's questioning Perrot after an attorney had been appointed for him violated Perrot's Sixth Amendment right. These statements were not introduced at trial, and Officer Kane did not testify at either of Perrot's trials. The handbag was not introduced at the second trial. As mentioned above, Perrot is barred under *Heck* from attacking the Lichwala conviction. There is no evidence

[25] As discussed *infra*, Lt. Arpin is entitled to qualified immunity with respect to Perrot's § 1983 malicious prosecution claim. Perrot's § 1983 conspiracy claim and his state law claims against Lt. Arpin are also discussed *infra*.

in the summary judgment record that Kane fabricated the statements Perrot made about the Lichwala case during the blood draw, and regardless, those statements did not concern the Prekop charges. *See Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 594-95 (1st Cir. 2011) (§ 1983 claim dismissed where there was nothing in the complaint "beyond raw speculation" to suggest that defendants participated, in any form, in the misconduct plaintiff alleged).

For these reasons, summary judgment will enter for Officer Kane on Perrot's § 1983 claim against him.[26]

D. <u>The Municipal Defendants' Motion for Summary Judgment</u>

The remaining individual defendants, Officer Clapprood, Sgt. Kennedy, Officer Popko, Sgt. Kelly, Sgt. Canevari, Officer Glantz, and Det. Jarvis, together move for summary judgment on Perrot's claims that they violated his constitutional rights and conspired with each other to do so. Perrot's allegations against them include arresting him for sexually assaulting Prekop without sufficient probable cause; fabricating, falsifying, and/or coercing Perrot's confession to one or more crimes for which he was convicted; conducting an improper identification line-up; and planting, destroying, and/or withholding evidence. Officers Clapprood, Popko, and Glantz, and Sgts. Kennedy and Canevari assert that given their tangential involvement in the Perrot investigation and his arrest and prosecution, no reasonable jury could find that they violated Perrot's constitutional rights. They also assert that any claim by Perrot based on the alleged invalidity of his December 7, 1985 confession is barred by the doctrine of issue preclusion and *Heck*. Finally, they argue that if this court finds that Perrot has established that there are disputed

[26] As discussed *infra*, Officer Kane is entitled to qualified immunity with respect to Perrot's § 1983 malicious prosecution claim. Perrot's § 1983 conspiracy claim, along with his state law claims against Officer Kane, are also discussed *infra*.

material facts in the record from which a reasonable jury could find that any of these defendants violated his constitutional rights, they are entitled to absolute or qualified immunity.

1. Perrot's § 1983 Claim Against Clapprood, Canevari, Glantz, Popko, and Kennedy

Perrot's claims against Officer Clapprood and Sgt. Canevari deserve little discussion. Clapprood found Lichwala's handbag after Officer Kane learned from Perrot where he had disposed of it. She did not testify at either of Perrot's trials.

Perrot's case against Sgt. Canevari is equally thin. Canevari's role in the SPD investigation was limited to gathering evidence related to the Marchand assault. His only connection to Perrot was that he was present at SPD headquarters when Perrot, long before he was arrested, voluntarily gave a statement denying his involvement in the Marchand incident, and he prepared a draft report stating that Perrot, and others, denied any participation in the crimes against Marchand. Sgt. Canevari was not involved in the investigation or the prosecution of the Prekop or Lichwala charges.

Officer Glanz was present when Perrot was booked and placed into a holding cell on December 7, 1985, and Glantz rattled the bars of his cell with his baton to prevent him from sleeping in the brief period between his arrest and his interrogation. There is no evidence that Glantz destroyed, concealed, or fabricated any evidence, or engaged in any conspiracy to wrongfully convict Perrot. (#338-23 at 27.) Officer Glantz did not violate Perrot's constitutional rights by briefly disrupting Perrot's sleep as the police waited to question him. *See Tesch v. County of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (concluding that, though certain impositions "may rise to the level of a constitutional violation" if prolonged, "it is not unreasonable for a pretrial detainee to expect to experience a short-term imposition on a basic

human necessity.")

Officer Popko took Prekop's statement on November 30, 1985. In that statement, Officer Popko noted that Prekop did not identify Perrot as her assailant, and Officer Popko testified to that at Perrot's first trial. At the first trial, Officer Popko also read to the jury the portion of Prekop's statement in which Prekop said she saw gloves in her bedroom and they did not belong to her. At the second trial, Prekop testified that she had not said this, because she did not see the gloves until after Popko had taken her statement.

Perrot's contention that Officer Popko violated his constitutional rights by fabricating part of Prekop's statement concerning the gloves fails. Officer Popko did not testify at Perrot's second trial, and Prekop contradicted the statement in her testimony. There is no evidence that Popko intentionally misstated the facts in her report. *See Boulais v. Town of Rehoboth*, Civil Action No. 00-12086-GAO, 2002 WL 1760874, at *2 (D. Mass. July 31, 2002) (summary judgment to defendant officer on § 1983 claim where plaintiff failed to introduce evidence that statement in officer's report "was *intentionally* false, as opposed to accidentally or negligently mistaken.") (emphasis in original). And even if one assumes that Popko intentionally inserted a false statement about the gloves into her police report, that statement caused Perrot no harm, as Prekop testified that the statement was wrong. *See Correia v. Town of Framingham*, 969 F. Supp. 2d 89, 98 (D. Mass. 2013) ("[T]he filing of a false police report does not, by itself and without further consequences to the plaintiff, violate § 1983.") (additional citation omitted). Perrot has not identified any other evidence which he claims Officer Popko falsified, fabricated, or unlawfully suppressed, nor has he identified any exculpatory evidence withheld by her.

Sgt. Kennedy's involvement in the Perrot arrest and prosecution, although minimal in

relation to that of Sgt. Kelly and Det. Jarvis, was more substantial than that of Clapprood, Canevari, Glantz, or Popko. Sgt. Kennedy was present when blood was drawn from Perrot on March 31, 1987, in connection with the Prekop charges, and he signed out Perrot's blood and hair samples from an SPD evidence locker before he and ADA Bloom brought them to Washington, D.C the next day, on April 1, 1987.

Though the pair delivered these samples to the FBI and returned to Springfield without speaking to anyone at the FBI Crime Lab other than the person who accepted the evidence, Perrot claims that it can be inferred that Sgt. Kennedy, along with ADA Bloom and Det. Jarvis, manipulated this evidence in order to secure his conviction. There is simply insufficient evidence in the summary judgment record, however, to support this inference.

For these reasons, Clapprood, Canevari, Glantz, Popko, and Kennedy are entitled to summary judgment on Perrot's § 1983 claims against them.

2. Perrot's Claims Against Sgt. Kelly and Det. Jarvis

Perrot asserts that on December 7, 1985, he was coerced into making statements that implicated him in the Prekop and Lichwala break-ins. As set out above, shortly after his arrest that day, Perrot confessed to Sgt. Kelly that he had stolen Sapelli's purse at Denny's and had broken into the McNabb home on Ellendale Circle. He denied any involvement with the crimes against elderly women that the SPD was investigating. Perrot asserts that later that day, however, he was coerced into making statements to Det. Jarvis in which he admitted breaking into the homes of Lichwala and Prekop but denied having sexually assaulted either woman. Det. Jarvis prepared two written statements, one concerning the break-in at the McNabb's home and the purse-snatch at Denny's, and one about the Prekop and Lichwala break-ins, which Perrot signed.

Both statements were witnessed by Det. Jarvis. Although Perrot admits that the signatures on both statements are his, he claims that he did not read the latter statement before signing it. Kelly and Jarvis contend that they gave Perrot multiple Miranda warnings before he made these statements or signed the waivers.

As set out above, before his first trial, Perrot moved to suppress the oral and written statements he had made regarding the Prekop and Lichwala break-ins on the grounds that, at the time of his interrogation, he was sleep deprived and still under the influence of drugs and alcohol. He claimed he did not remember being given Miranda warnings, signing the Miranda card, making any oral or written admissions, or signing the statements. He also claimed to have been beaten and threatened by police. Following an evidentiary hearing, the trial judge denied the motion, finding that Perrot's oral and written statements had been made knowingly, intelligently, and voluntarily.

Sgt. Kelly and Det. Jarvis contend that the doctrine of issue preclusion bars Perrot from relitigating the voluntariness of his statements regarding the Prekop and Lichwala break-ins and that such statements cannot form the basis of any claims against them.[27] Perrot argues that the doctrine is inapplicable.

"It is well-established that the doctrine of collateral estoppel applies in civil rights actions brought pursuant to 42 U.S.C. § 1983." *Johnson v. Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005)

---

[27] Kelly and Jarvis argue that because *Heck* prevents Perrot from challenging any statements that relate to the Lichwala conviction, and because Perrot's statements about the Lichwala break-in are in the same document as the statements about the Prekop break-in, *Heck* bars Perrot from challenging the voluntariness of his statements about the Prekop charges as well. The court agrees that Perrot cannot challenge the Lichwala statements at trial but finds that he still may challenge the Prekop statements, even though statements relating to both convictions are in the same document.

(citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980)). "'[A] party to a civil action against a former criminal defendant may invoke the [doctrine] to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution.'" *Id.* (quoting *Aetna Cas. & Sur. Co. v. Niziolek*, 481 N.E.2d 1356, 1360 (Mass. 1985)). "Federal courts must give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgment emerged." *Id*. (citing *Kremer v. Chem. Constr. Corp*., 456 U.S. 461, 466 (1982)). As applied by Massachusetts courts, when an issue of fact or law has been "actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or different claim." *Jarosz v. Palmer*, 766 N.E.2d 482, 487-88 (Mass. 2002) (additional citations omitted); *see Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012).

"The burden of demonstrating that an issue is precluded 'is always on the person raising the bar.'" *Mullins v. Corcoran*, 172 N.E.3d 759, 767 (Mass. 2021) (quoting *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 479 N.E.2d 1386, 1390 (Mass. 1985)). The party facing preclusion, however, "bears the burden of proof on the question of fairness." *Bellermann v. Fitchburg Gas & Elec. Light Co.*, 18 N.E.3d 1050, 1066-67 (Mass. 2014) (citation omitted). "A judge has wide discretion in deciding whether the doctrine should apply in a particular case." *Id*. at 1065 (citing *Matter of Brauer*, 890 N.E.2d 847, 857 (Mass. 2008)).

Defendants argue that Perrot is collaterally estopped from relitigating the voluntariness of his statements made on December 7, 1985, in which he confessed to breaking into Prekop's home, because the SJC decision affirming the trial judge's denial of the motion to suppress is "a valid and final judgment." (#340 at 26.)

Perrot claims that he did not have a "full and fair opportunity to litigate" the issue of the voluntariness of his confession, which the *Johnson* court held is a requirement for the doctrine to apply, *see* 424 F.3d at 93, because the motion judge did not know the extent of the wrongful conduct by the officers who took the statement. This evidence "would have allowed Perrot to demonstrate that this statement was fabricated and that he was innocent." (#362 at 19.) "As such, it would be plainly unjust to rule that the Defendants do not need to litigate claims in this civil rights suit because their own misdeeds infected the state-court proceedings, resulting in the denial of Perrot's motion to suppress." *Id*.

In his supplemental brief, Perrot lists the specific evidence that was not presented or was not available to the trial judge at the time the motion was litigated, including, among other things: the original version of Perrot's statement regarding the Prekop crimes (which has never been recovered), the fact that Jarvis destroyed his handwritten notes of the interrogation, evidence with respect to the gloves found at Prekop's home that Perrot asserts demonstrates that the police fabricated evidence against him, exculpatory blood analysis results suppressed by the police, the existence of alternate suspects in the SPD investigation of the series of assaults, and the fabricated confession that ADA Bloom created concerning the Marchand rape. (#393 at 2-3.)

The trial judge's findings on the motion to suppress reveal that Perrot attempted to undermine the credibility of the police witnesses on such points as the timing of certain events, the length of time of the questioning, and what information was exchanged by police officers. (#338-32 at 7.) The judge, without much discussion, rejected these arguments as "without merit." *Id*. This court finds that the motion judge might well have been swayed by the evidence that Perrot proffers now on the issue of the credibility of the police and finds that the issue of the

voluntariness of his statements was not "fully and fairly litigated." *See Day v. Kerkorian*, 814 N.E.2d 745, 750 (Mass. App. Ct. 2004) ("Issue preclusion is not available where there is 'ambiguity concerning the issues, the basis of decision, and what was deliberately left open by the judge.'") (additional citation omitted). The court exercises its discretion to find that the defendants have not met their burden to demonstrate that the issue of the voluntariness of Perrot's confession should not be relitigated, and that Perrot has met his burden on the question of fairness.[28]

[28] Perrot makes other arguments in support of his contention that he should be allowed to relitigate the voluntariness of his confession. He argues that the SJC's decision is not a valid and final judgment because he "had no ability to appeal it." (#362 at 26.) This is plainly wrong: he did appeal it, to the SJC.

Second, Perrot argues that because his conviction for the Prekop crimes was vacated, there is no final judgment. (#362 at 19-20.) He quotes *Jackson v. Coalter*, 337 F.3d 74, 85 (1st Cir. 2003) for the proposition that when a conviction is vacated, "there is no final determination of the facts so it cannot be given 'preclusive force either as a matter of collateral estoppel or as a matter of the law of the case.'" (#362 at 22, quoting *Jackson*, 337 F.3d at 74.) Two years after *Jackson*, the First Circuit in *Johnson* found that issue preclusion applied where two municipal defendants sought to preclude the plaintiff from relitigating an issue decided in the earlier criminal proceedings in his subsequent § 1983 claim. *See Johnson*, 424 F.3d at 94. The court found that "issues decided in criminal prosecutions may preclude their later litigation in a civil action" and concluded that relitigating whether there was prejudice to plaintiff as a result of government's discovery error—"the significant issue" in his establishment of a constitutional violation—was precluded where that issue had already been "adjudicated and decided adversely to [him] by the SJC[.]" *Id*. As in this case, in *Johnson* the plaintiff's convictions were vacated and charges were nolle prossed by the Commonwealth; the First Circuit, however, did not discuss the effect of the vacation of Johnson's conviction or mention *Jackson*.

The First Circuit has not revisited this issue and courts in this district have grappled with how to reconcile *Johnson* with *Jackson* when applying issue preclusion in cases involving a vacated conviction. In *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 141 (D. Mass. 2019), for example, in ruling on summary judgment motions, District Court Judge Ponsor found that where plaintiff's conviction had been vacated and the Commonwealth had nolle prossed the charges, certain claims in his § 1983 action that were addressed by the trial judge, by the SJC, and then in a habeas petition, were barred by collateral estoppel under *Johnson*, which he found to be "precisely on point." *Id*. at 141. After Judge Ponsor's ruling, the case was transferred to District Court Judge Young, who ruled post-trial that since plaintiff's conviction had been vacated, *Jackson* dictated that collateral estoppel would not apply. *Schand v. McMahon*, 487 F. Supp. 3d 71, 78 (D. Mass. Sept. 16, 2020). He distinguished *Johnson* "because the court in *Johnson* indicated that the conviction was merely nolle prossed, and did not analyze whether he was granted a new trial that vacated the conviction." *Id*. This court finds that even though *Johnson* permits issue preclusion

The voluntariness of Perrot's statements is related to another claim Perrot has made, one that was never previously litigated: that the police fabricated the statement concerning the Prekop break-in. Perrot posits that Detective Jarvis added the confession to the Prekop break-in to the statement that Perrot made, and then covered up the alteration by photocopying the statement. *See* #363 at ¶¶ 41-44. Defendants argue that this theory "has been manufactured" late in the litigation "*with absolutely no proof or evidence at all*." (#375 at 3-5.) (emphasis in original). At the motion to suppress hearing and at his first trial, Perrot steadfastly insisted that he never told the police anything about the Prekop break-in, *see, e.g*., #338-31 at 67, 96-97 (transcript of motion to suppress), *Perrot I*, 554 N.E.2d at 1211 ("[b]oth the fact, and the validity, of his statements to the police were strenuously denied by the defendant in his testimony at the trial"), and one obvious inference to be drawn from his testimony is that the part of his confession concerning the Prekop break-in was fabricated by the police. As far as the court can tell from examining the voluminous record, however, it does appear that the first time Perrot makes the detailed allegations concerning Jarvis's photocopying the statement is in connection with summary judgment. As defendants argue, this may well violate the law in the First Circuit that prohibits a party from "manufactur[ing] an issue of fact" on the eve of summary judgment. *See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.,* 447 F.3d 105, 110 (1st Cir. 2006).

The court will not preclude Perrot from claiming at trial that the police fabricated the statement. The court has insufficient information at this time to decide whether he waited too long to make the photocopying allegations against Jarvis. The court will not, for purposes of

---

to apply in cases where convictions have been vacated, it does not dictate that result in all cases.

summary judgment, consider Perrot's proffered facts concerning Jarvis's photocopying the statement.

There are genuine issues of material fact with respect to Perrot's claims against Sgt. Kelly and Det. Jarvis concerning their role in coercing him over the course of multiple interrogations into falsely incriminating himself and their role in fabricating the statement concerning the Prekop break-in. There are also genuine issues of material fact with regard to the gloves found at Prekop's. Perrot contends that the gloves were planted by Sgt. Kelly, and that Kelly later falsely testified that Westcott told him she had a pair like the ones he showed her but could not locate them. As discussed above, Westcott claimed that she told Sgt. Kelly that she did not own a pair of gloves like the ones Kelly showed her, but that she thought she had seen Eldridge wearing a similar pair. After speaking with Westcott, Sgt. Kelly returned the gloves to SPD headquarters and spoke briefly with Det. Jarvis. At the second trial, Det. Jarvis testified that sometime in the morning on December 7, 1985, he brought the gloves to Eldridge's house. To the extent that Perrot is asserting that Sgt. Kelly and Det. Jarvis gave false testimony regarding the gloves, they are entitled to absolute immunity. To the extent that Perrot claims they planted these gloves in Prekop's bedroom or fabricated this evidence in order to implicate Perrot, this claim avoids, "albeit just barely, the 'swing of the summary judgment scythe.'" *Lopera v. Compass Grp. USA, Inc.*, 578 F. Supp. 3d 130, 138 (D. Mass. 2021) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

For the reasons stated in the court's February 15, 2023 Report and Recommendation denying defendants' motion to dismiss,[29] the court finds that Kelly and Jarvis are not entitled to

[29] *See Perrot*, 2023 WL 2939277, at *13 n.14.

qualified immunity with respect to these claims.

3. Perrot's § 1983 Malicious Prosecution Claim

Any § 1983 Fourth Amendment malicious prosecution claim against the individual defendants fails. They are entitled to qualified immunity because, at the time of the events in question, there was no clearly established constitutional counterpart to the state law claim. As the court in *Schand v. City of Springfield* observed:

> The First Circuit has noted that, at least prior to 1994, the law was not clearly established that a claim based upon malicious prosecution … could be asserted via § 1983. In that year, in *Albright v. Oliver*, 510 U.S. 266, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), the Court, in dicta, suggested that the Fourth Amendment might permit assertion of such a claim. As late as 2003, the First Circuit observed that it was 'an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation.'

380 F. Supp. 3d at 135 (additional citations omitted); *see also Britton v. Maloney*, 196 F.3d 24, 28 (1st Cir. 1999) (finding there could be no Fourth Amendment-based § 1983 malicious prosecution claim unless plaintiff had been arrested, detained, and restricted in travel before charges were brought). Perrot was arrested in 1985; his first trial ended in 1987, and his second ended in 1990. Therefore, at all relevant times, the law was not clearly established that malicious prosecution could form the basis of any § 1983 claim.

For these reasons, each of the individual defendants are entitled to summary judgment on Perrot's § 1983 claim for malicious prosecution.

4. Perrot's § 1983 Conspiracy Claim

Perrot makes sweeping allegations that all of the individual defendants conspired together to create false hair and blood evidence, coerce him into falsely incriminating himself, withhold evidence from the prosecution, fabricate and destroy evidence, frame him, and fail to intervene

and maliciously prosecute him. The individual defendants argue that they are entitled to summary judgment in the absence of any actual evidence of an agreement.

"To prevail on a claim of conspiracy, plaintiff need not prove an express agreement, but merely that there is sufficient circumstantial evidence of an agreement to conspire." *Wickers v. Gouin*, Civil Action No. 07-12235-MBB, 2011 WL 832500, at *8 (D. Mass. Mar. 3, 2011) (citing *Earle v. Benoit*, 850 F.2d 836, 845 (1st Cir. 1988)). Nevertheless, "although conspiracy claims often rest on inferences, 'summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations' to support his theory." *Spencer v. City of Boston,* Civil Action No. 13-11528-MBB, 2015 WL 6870044, at *10 (D. Mass. Nov. 6, 2015) (quoting *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 1988)). Where, as here, "[t]he crux of the plaintiff's conspiracy claim, in essence, is that all of the individual defendants must have participated 'in concert' because they were all around [during the investigation and prosecution of the case,]" "such a conclusory assertion is," without more, insufficient "to maintain a viable conspiracy claim beyond summary judgment." *Mercurio*, 287 F. Supp. 3d at 122. "'[I]t is not enough ... that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism ... [r]ather the plaintiff bears the burden of showing that the alleged conspirators reached an understanding or had a meeting of the minds to violate his rights.'" *Id.* (quoting *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 547 (D.N.J. 2013) (alterations in original).

Perrot does not point to any specific facts that establish the existence of an agreement between the defendants necessary to form a conspiracy. Instead, he relies on unsubstantiated

inferences, speculation, and conjecture to support his contention that he was wrongfully convicted of the Prekop charges and that all of the individual defendants who participated in the investigation and prosecution of the case must have conspired together to ensure his conviction. He asks the court to make unwarranted inferences which he contends could support a finding that the defendants agreed to conspire against him, even going so far as to suggest that a defendant's mere presence in the building when Perrot was being questioned, or a defendant's review of reports, is sufficient to establish participation in a conspiracy.

Perrot's conclusory assertions that all of the individual defendants worked together to frame him, simply because they were involved in some capacity in the investigation that led to his conviction, is insufficient to establish for summary judgment purposes the agreement and concerted action necessary to form a conspiracy. *See Turkowitz v. Town of Provincetown*, 914 F. Supp. 2d 62, 74 (D. Mass. 2012) ("While a conspiracy may be established by implication through circumstantial evidence, summary judgment is warranted where the non-moving party relies solely on conclusory allegations and presents 'no evidence, either direct or circumstantial of an agreement among defendants from which a reasonable jury could [infer the existence of] a conspiracy among them.'") (additional citation omitted) (alteration in original).

For these reasons, each of the individual defendants are entitled to summary judgment on Perrot's § 1983 conspiracy claim.[30]

[30] The common law civil conspiracy claim Perrot brings against each of the individual defendants is similarly deficient. As with his § 1983 conspiracy claim, Perrot has failed to point to evidence demonstrating the existence of any agreement, concerted action, or "common design" between two or more of the individual defendants. *See Maroney v. Fiorentini*, 673 F. Supp. 3d 30, 61 (D. Mass. 2023), *appeal docketed*, No. 24-1508 (1st Cir. May 16, 2024) (Massachusetts' civil conspiracy theories require evidence of either actions taken "in concert with or pursuant to a common design" ("concerted action" conspiracy), or evidence of some "common design or an agreement." ("common design" theory))

5. Perrot's Remaining Due Process Claims

Finally, to the extent Perrot claims that any of the individual defendants violated his due process rights by destroying, or by failing to disclose, certain evidence relating to Det. Jarvis's handwritten notes, missing interview reports, the shoeprint found in Prekop's home, the results of further blood analysis, Prekop's medical records, or evidence relating to the existence of alternate suspects, such claims fail. With respect to Jarvis's notes, Perrot appears to recognize the frailty of this argument, claiming that, under *Arizona v. Youngblood*, 488 U.S. 51 (1988), these notes "were at least potentially exculpatory … because they would have omitted any mention of Perrot's alleged confession to the Prekop Crimes[.]" (#362 at 33.) Beyond his failure to offer any evidence of their actual content aside from speculation, Perrot has presented no evidence that Jarvis acted in bad faith when he discarded these notes—which were never stored as part of the department's case file, *see* #361-18 at 93—at the time he retired from the SPD in 1991. *See Magraw v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014) (defendant cannot prevail on due process claim under *Youngblood,* where the theory is that the evidence's "exculpatory value was not apparent before its destruction … unless he establishes that the state acted in bad faith.") Perrot next claims that because "there are no reports, notes, memos, or the like that memorialized" Kelly's interview of Adkins and Timmerman, "the Court should infer that Defendants (a) failed to disclose and (b) destroyed" this particular evidence. (#362 at 35.) But the court will not make that inference in the absence of any actual evidence that these reports ever even existed. Perrot also argues that officers failed to "photograph[] or otherwise preserve[] t[he] shoeprint" found at

(additional citations and quotations omitted). Because Perrot offers no evidence to support either theory, summary judgment shall enter for the defendants on this claim as well.

Prekop's home "for examination or comparison." *Id.* at 36. Though Perrot does not specify whether he frames this claim under *Youngblood* or *California v. Trombetta*, 467 U.S. 479 (1984), a case which contemplates a due process claim where the state "fails to preserve irreplaceable evidence possessing exculpatory value that is apparent before its destruction," *see Magraw*, 743 F.3d at 7-8, he nonetheless claims that officers "should have disclosed the shoeprint's existence" so that he and his counsel could have "made a comparison." (#362 at 36.) Perrot's speculation as to the evidentiary weight of the shoeprint is insufficient. *See Magraw*, 743 F.3d at 8-9 ("It will often be the case that evidence no longer available might have been inculpatory, exculpatory, or simply inconclusive. If the state's failure to preserve such evidence could give rise to an inference that the evidence was exculpatory, there would be little need for the *Trombetta-Youngblood* dichotomy.")

The court also rejects Perrot's arguments based on *Brady v. Maryland*, 373 U.S. 83 (1963) with respect to the existence of alternate suspects, the results of further blood analysis, and Prekop's medical records. "To make an effective *Brady* claim, '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Maldonado-Pena*, 4 F.4th 1, 25 (1st Cir. 2021) (additional citations omitted) (alterations and emphasis in original). Perrot surmises that one individual was an alternate suspect for the Prekop crimes, but the only evidence he offers—an SPD report of a man acting suspiciously at a grocery store (*see* #361-28)—bears no obvious relation to the Prekop investigation. Similarly, though Perrot acknowledges that the record is "devoid" of the results of any such testing, he appears to infer that any results which were

received from the testing of one particular blood vial sent to the FBI's Serological Research Institute would have been exculpatory to him. "Mere conjecture that certain [information] 'might contain exculpatory evidence' without 'any supporting evidence or arguments to indicate this was, in fact, the case,' is inadequate to ground a claimed *Brady* violation." *United States v. Simon*, 12 F.4th 1, 52 n.13 (1st Cir. 2021) (collecting cases) (additional citations omitted). Finally, though Perrot claims that he could have used Prekop's medical records "to impeach Kelly's testimony" and "directly contradict [the] timeline of [Kelly's] investigation on November 30, 1985[,]" *see* #362 at 38, the First Circuit has recognized that where supposed suppressed impeachment evidence "is cumulative or impeaches on a collateral issue[,]" as it does here, such evidence "is immaterial under *Brady*." *Maldonado-Pena*, 4 F.4th at 26 (additional citation and quotations omitted).

6. Perrot's State Law Claims Against the Individual Defendants

Perrot has asserted state law claims against the individual defendants for violation of the MCRA, malicious prosecution, and negligent and intentional infliction of emotional distress.

a. *MCRA Claims*

The allegations which support Perrot's claims against the individual defendants under Chapter 12, Section 11I of the MCRA, § 1983's state analog, are identical to those that support his § 1983 claim. To prevail on the MCRA claim, Perrot "'must prove that (1) [his] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) [has] been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion.'" *Jakuttis v. Town of Dracut*, 95 F.4th 22, 34 (1st Cir. 2024) (quoting *Buster v. George W. Moore, Inc.*, 783

N.E.2d 399, 408 (Mass. 2003)) (alterations in original).

For the same reasons that Perrot has failed to establish any claim against ADA Bloom, Lt. Arpin, or Officers Kane, Clapprood, Canevari, Glantz, Popko, and Kennedy under § 1983, they are entitled to summary judgment with respect to Perrot's analogous MCRA claims. *See Delaney v. Town of Abington*, 211 F. Supp. 3d 397, 408 (D. Mass. 2016) ("Given the court's determination that defendants are entitled to summary judgment on the federal § 1983 … claims, it follows that there is no violation of state or federal law on which to ground an MCRA claim.").[31] However, given Perrot's surviving § 1983 claim against Sgt. Kelly and Det. Jarvis, there are genuine issues as to whether his attendant rights under the MCRA were interfered with by means of threats, intimidation and coercion and, therefore, Perrot's MCRA claim against them survives. *See McGrath v. Town of Sandwich*, 169 F. Supp. 3d 251, 259 (D. Mass. 2015) (where police defendant was not entitled to summary judgment on due process claim brought under § 1983, he was, "for the same reasons," not entitled to summary judgment on corresponding due process claim brought under the MCRA).

b. *Malicious Prosecution*

To recover for malicious prosecution under Massachusetts law, Perrot must establish four elements: 1) that the defendant initiated a criminal action against him; 2) that the criminal prosecution ended in his favor; 3) that there was no probable cause to initiate the criminal charge; and 4) that the defendant acted maliciously. *See Foley v. Polaroid Corp.*, 508 N.E.2d 72,

[31] To the extent this court has determined that any individual defendant is entitled to qualified immunity as to Perrot's § 1983 claim, that defendant is entitled to qualified immunity with respect to Perrot's corresponding MCRA claim against them. *See Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) ("[T]he [SJC] has held that MCRA claims are subject to the same standard of immunity for police officers that is used for claims asserted under § 1983.") (additional citation omitted).

82-83 (Mass. 1987); *see also Sullivan v. Choquette,* 420 F.2d 674, 676 (1st Cir. 1969). Where the Commonwealth declines to pursue a criminal action against a defendant by a *nolle prosequi*, the case is deemed terminated in the defendant's favor only if the stated reasons are consistent with the innocence of the accused. *Wynne v. Rosen,* 464 N.E.2d 1348, 1350-51 (Mass. 1984) (citing Restatement (Second) of Torts §§ 659-60 (1977) and concluding that a malicious prosecution claim is viable only if the conclusion of the criminal case is consistent with actual innocence). Moreover, "'[t]he want of probable cause is a vital and indispensable element in the plaintiff's case' ... and 'must be affirmatively proved ... not ... inferred from the existence of malice ... or ... the fact of acquittal.' This element is to be judged on the honest and reasonable belief of the party at the time he instituted the criminal complaint.'" *Id.* at 1352 (additional citations and quotations omitted).

Perrot's convictions for the Prekop charges were vacated because expert testimony concerning hair evidence admitted at his trial was determined years later to be unreliable. Specifically, the court determined that the admission of such evidence was not harmless error, and, therefore, the convictions could not stand. However, this hair evidence was not the only evidence against Perrot at his trial, and, for this reason, the decision to vacate his conviction does not equate to his exoneration. The Commonwealth's stated reasons for filing a *nolle prosequi* with respect to the Prekop charges included: (1) Perrot's agreement to dismiss his appeal relating to the Lichwala break-in; (2) the FBI's decision to disavow the sworn testimony of its special agents concerning hair microscopy; (3) the fact that Perrot would need to be retried thirty years after the commission of the underlying offenses; (4) the fact that both Prekop and the lead investigator were dead, and several civilian and law enforcement witnesses were retired or

otherwise not available to testify; (5) the likelihood that any further forensic testing would be unavailable due to deterioration; (6) changes in the law which would not likely subject Perrot to any additional sentence beyond the years he had already served; and, (7) the fact that Perrot had been compliant with the conditions of his release pending disposition of the appeals. *See generally* #338-47.

Because none of these stated reasons are "consistent with the innocence" of Perrot, the case against him for the Prekop charges cannot be said to have been terminated in his favor. *See Miller v. Home Depot USA, Inc.*, 949 N.E.2d 948 (Mass. App. Ct. 2011) (where Commonwealth had entered a *nolle prosequi* following the reversal of plaintiff's conviction based on the unavailability of witnesses and based on failure of the trial judge in the criminal case to conduct an evidentiary hearing into the voluntariness of plaintiff's confession, circumstances of the *nolle prosequi* did not compel an inference that there existed a lack of reasonable grounds to pursue the prosecution) (unpublished disposition); *but see Britton v. Maloney*, 196 F.3d 24, 31 (1st Cir. 1999) (circumstances surrounding *nolle prosequi* suggest that charges were retaliatory and prosecution declined to pursue charges because they were baseless).

Perhaps more importantly, the *nolle prosequi* in Perrot's case was entered pursuant to an agreement between Perrot and the Commonwealth. *See Wynne v. Rosen,* 464 N.E.2d at 1351 (recognizing that "where a *nolle prosequi* is entered by the procurement of the party prosecuted, or by his consent, or by way of compromise, such party cannot have an action for malicious prosecution" because, "[i]n these instances … the action of the accused is inconsistent with innocence.") (additional citations and quotations omitted); *see also Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 104 (D. Mass. 2003) (malicious prosecution claim failed where the dismissal

of some charges against a defendant "based on his plea to related charges, d[id] not evidence [his] innocence" but instead "constitute[d] a compromise" which reflected actions "inconsistent with innocence.") (additional citations and quotations omitted).

c. _Negligent and Intentional Infliction of Emotional Distress_

Perrot also brings a claim against the individual defendants for negligent and intentional infliction of emotional distress. Citing the relevant statute of limitations, the defendants assert that any such claim is barred because it accrued when Perrot became aware of the underlying facts, an occurrence which they claim was almost thirty years ago.

Massachusetts law provides for a three-year statute of limitations for filing negligence-based tort claims, *see* Mass. Gen. Laws ch. 260, § 2, which begins to run when "a plaintiff 'knows, or reasonably should have known' of an injury caused by defendant's conduct.'" *Schand*, 380 F. Supp. 3d at 138 (quoting *Doe v. Harbor Schs., Inc.*, 843 N.E.2d 1058, 1061 (Mass. 2006)); *see* Mass. Gen. Laws ch. 260, § 2. There is little case law on the issue of when such a claim arising out of an alleged wrongful conviction accrues, but one session of this court concluded that such a claim accrues when the plaintiff first knew of the alleged wrongdoing, regardless of whether he was still incarcerated. *See Schand*, 380 F. Supp. 3d at 138-40 (that statute of limitations would accrue prior to conviction being overturned is a recognition of the burden placed on defendants due to the passage of time and the issue of lost documents, faded memories, and unavailable witnesses); *see also Echavarria v. Roach,* 565 F. Supp. 3d 51, 96 (D. Mass. 2021) (record demonstrates that over two years before his presentment, plaintiff was aware that he had been harmed by defendants' failure to disclose exculpatory evidence). Like the plaintiff in *Schand*, Perrot first raised the issues underlying any negligence claim in numerous

post-conviction proceedings that took place long before three years before the start of this suit. For this reason alone, the individual defendants are entitled to summary judgment on Perrot's claim of negligent infliction of emotional distress.[32]

Perrot's allegations with respect to his claim of intentional infliction of emotional distress relate only to his interrogation and, therefore, are limited to Sgt. Kelly, Officer Kane, and Det. Jarvis. As to Kane, Perrot presents no evidence that Kane's questioning, which occurred after he read Perrot his Miranda rights and after Perrot initiated the conversation, amounted to anything other than routine police questioning. *See Barbosa v. Conlon*, 962 F. Supp. 2d 316, 334 (D. Mass. 2013) ("[T]o the extent that police are merely carrying out their obligations as law enforcement officers, their conduct as a matter of law is not deemed extreme and outrageous."). There are, however, genuine issues of material fact with respect to Perrot's claims against Sgt. Kelly and Det. Jarvis and their interrogation of him on December 7, 1985, and, therefore, summary judgment on Perrot's intentional infliction of emotional distress claim is denied as to these two defendants. *See McGrath v. Town of Sandwich*, 169 F. Supp. 3d 251, 259 (D. Mass. 2015) (declining to allow summary judgment where genuine issues remained with respect to intentional infliction of emotional distress claim premised on same allegations that comprised surviving § 1983 claim).

7. Perrot's Claims Against the City

As the City argues, and this court recognizes, any negligent infliction of emotional distress claim cannot go forward because Perrot failed to adequately plead it in his Amended

[32] Furthermore, any negligence claim Perrot asserts against the individual defendants is barred by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258. *See Schand*, 380 F. Supp. 3d at 140 (MTCA bars negligence actions against public employees).

Complaint and in addition, he failed to properly present it to the City under the relevant statute. "Under Massachusetts law, one who wishes to assert a negligence claim against a municipality must 'present[] his claim in writing to the [defendant] within two years after the date upon which the cause of action arose.'" *Haley v. City of Boston*, 657 F.3d 39, 53-54 (1st Cir. 2011) (quoting Mass. Gen. Laws ch. 258, § 4, and dismissing negligence claim where plaintiff failed to comply with the statute) (alterations in original). There is no evidence that Perrot ever did this, and therefore any claim against the City is waived. To the extent Perrot intended to bring an intentional infliction of emotional distress claim against the City, or any other intentional tort, the City cannot be sued for the intentional torts of its employees. *See Mercurio*, 287 F. Supp. 3d at 125 (citing *Canales v. Gatzunis,* 979 F. Supp. 2d 164, 175 (D. Mass. 2013)).

## V. Conclusion

For the reasons stated above, ADA Bloom's Motion for Summary Judgment (#330) is allowed; Lt. Arpin's Motion for Summary Judgment (#332) is allowed; Officer Kane's Motion for Summary Judgment (#334) is allowed; and the Municipal Defendants' Motion for Summary Judgment (#336) is allowed in part and denied in part.

October 11, 2024

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge