```
              UNITED STATES DISTRICT
               COURT DISTRICT OF
                 MASSACHUSETTS

                      CIVIL ACTION NO: 18-CV-10147




GEORGE PERROT
      PLAINTIFF

v.

THE CITY OF SPRINGFIELD, et. al.
      DEFENDANTS




-----------------------------------------------------
        DEPOSITION OF:  HAYLEY CLEARY, MPP, PhD
-----------------------------------------------------




            Taken before Nicole A. Stewart, Court
Reporter, Notary Public, pursuant to Rule 30 of the
Federal Rules of Civil Procedure, VIA ZOOM PLATFORM,
on February 5, 2024.




                  Nicole A. Stewart
                   Court Reporter
```

```
 1   APPEARANCES:


 2

     FOR THE PLAINTIFF:
 3
     LOEVY & LOEVY
 4   311 North Aberdeen Street
     Chicago, IL 60607
 5   312-243-5900
          BY:   CARLA AGBIRO, ESQ.
 6             Agbiro@loevy.com


 7             MARK LOEVY-REYES, ESQ.
               Mark@loevy.com

 8

 9   FOR THE DEFENDANT:

10   CITY OF SPRINGFIELD LAW DEPARTMENT
     1600 East Columbus Avenue
11   Springfield, MA 01103
     413-886-5205
12        BY:   LISA C. DESOUSA, ESQ.
               Ldesousa@springfieldcityhall.com

13

14   FOR THE DEFENDANT:

15   REARDON JOYCE & AKERSON, P.C.
     4 Lancaster Terrace
16   Worcester, MA 01609
     508-754-7285
17        BY:   AUSTIN M. JOYCE, ESQ.
               Ajoyce@rja-law.com

18

19   FOR THE DEFENDANT:

20   MORRISON MAHONEY LLP
     1500 Main Street, Suite 2400
21   Springfield, MA 01115
     413-737-4373
22        BY:   CAROLE S. LYNCH, ESQ.
               Clynch@morrisonmahoney.com

23


24
```

```
 1   FOR THE DEFENDANT:

 2   CITY OF SPRINGFIELD LAW DEPARTMENT
     1600 East Columbus Avenue
 3   Springfield, Massachusetts 01103
     413-886-5205
 4        BY:   ROBERT A. SCHMIDT, ESQ.
                Rschmidt@springfieldcityhall.com
 5

 6   FOR THE DEFENDANT:

 7   MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
     1 Ashburton Place, 19th Floor
 8   Boston, MA 02108
     617-727-2200
 9        BY:   ANDRE A. JANISZEWSKI, ESQ.
                Andre.a.janiszewski@mass.gov
10

11   FOR THE DEFENDANT:

12   D'AMBROSIO LLP
     185 Devonshire Street, 10th Floor
13   Boston, MA 02110
     617-720-5657
14        BY:   THOMAS P. CAMPBELL, ESQ.
                Tcampbell@dambrosiollp.com
15

16   FOR THE DEFENDANT:

17   CICCARELLI LAW
     55 North Pleasant Street
18   Amherst, MA 01002
     413-230-3255
19        BY:   PHILIP C. CICCARELLI, ESQ.
                Phil@ciccarelli.law
20

21

22

23

24
```

```
 1                      I N D E X

 2

 3   Appearances.................................... 2-3

 4

 5   HAYLEY CLEARY, MPP, PhD

 6        Examination by Attorney deSousa.............. 5

 7        Examination by Attorney Lynch.............. 107

 8        Examination by Attorney Joyce.............. 125

 9

10                       EXHIBITS

11   No.  Description                          Page

12   1    Nolle Prosequi.............................. 41

13   2    Findings and Rulings on Defendant's Motion To

14        Suppress Statement......................... 41

15   3    Hayley Cleary, MPP, PhD Report.............. 41

16   4    Cleary's CV................................ 41

17

18

19

20

21

22

23

24
```

```
 1                    S T I P U L A T I O N S

 2

 3          It is agreed by and between the parties

 4   that all objections, except objections as to the form

 5   of the question, and all motions to strike

 6   unresponsive answers are reserved to be raised at the

 7   time of trial for the first time.

 8          It is further agreed that the deponent

 9   will read and sign the deposition, notary waived, and

10   that the sealing of said deposition will be waived.

11

12          HAYLEY CLEARY, MPP, PhD, the Deponent,

13   having been first duly sworn and identified by

14   production of her driver's license, deposes and says

15   as follows:

16

17   EXAMINATION BY ATTORNEY DESOUSA:

18      Q.    Dr. Cleary, my name is Lisa deSousa, and

19   I'm an attorney in Massachusetts and I represent the

20   City of Springfield in the matter of George Perrot

21   versus the City of Springfield and a number of named

22   individuals.  And you have provided a report

23   containing opinions on various matters involved in

24   that case, is that correct?
```

```
 1        A.     Yes.

 2        Q.     And I want to begin by, have you been

 3   deposed before?

 4        A.     Yes.

 5        Q.     And have you been deposed in your

 6   capacity as an expert witness before?

 7        A.     Yes.

 8        Q.     I'm going to go over briefly then just

 9   some rules of the road to get through the deposition

10   as painlessly as we can.  And I would ask us to pay

11   special attention to the fact that we are doing this

12   by Zoom which sort of adds to some of the challenges

13   of doing these types of things.  Okay?

14        A.     Okay.

15        Q.     So, first and most importantly, all of

16   your answers have to be verbal.  They can't be by

17   gesture, nod, et cetera.  All right?

18        A.     Yes.

19        Q.     Secondly and most difficult, which

20   usually presents the most difficulty is that I have to

21   let you finish your answer and you need to let me

22   finish my question so that we have a clear record and

23   so you absolutely know what I'm asking before you

24   begin the answer.  Okay?
```

1          A.      Okay.

2          Q.      Frequently, during these depositions, one

3   or both of us will forget that rule and we need to

4   gently remind ourselves to let the other person

5   finish.  Okay?

6          A.      I understand.

7          Q.      All right.  There is no judge here today,

8   although your testimony is under oath, and you may

9   during the course of this deposition hear various

10  other attorneys making objections.  Those objections

11  are to save the matter for the court to rule on later

12  and do not prevent you from answering the question

13  that's been asked.  Do you understand that?

14         A.      Yes.

15         Q.      If at any time at all you require a break

16  for any reason, please let us know and we will attempt

17  to accommodate that.  All right?

18         A.      Thank you.

19         Q.      And if you don't understand my question,

20  I can tell you right now it will be me, not you, and

21  if you let me know that, I'll try to reword it in a

22  way that's more understandable.  Okay?

23         A.      Thank you.

24         Q.      If in answering my question you feel you

1   cannot give an answer without referring to documents

2   that you have reviewed in this matter, please let me

3   know that and we will attempt to accommodate that so

4   that you can have whatever materials you need in front

5   of you to fully, completely, and truthfully answer my

6   question.   Okay?

7        A.      Okay.

8        Q.      And do you have available to you today

9   the documents that you reviewed in forming your

10  opinion?

11       A.      I have them electronically.

12       Q.      Okay.  And similarly, do you have a copy

13  of your report available?

14       A.      I have a hard copy of my report here.

15       Q.      Okay.  And other than your report, do you

16  have any other hard documents sitting in front of you

17  right now?

18       A.      No.

19       Q.      Unless I refer you to a document or you

20  let me know that you would want to refer to a

21  document, I would ask you that not refer to documents

22  and instead you try to answer from your present memory

23  and once we exhaust your present memory, if you need

24  to refer to documents, we will make every effort to

1   accommodate that.  All right?

2       A.      Sure.

3       Q.      Is there anything that would prevent you

4   from being able to testify today fully, completely,

5   and truthfully?

6       A.      No.

7       Q.      Are you on any drugs or under the effects

8   of any intoxicating alcohol or drugs that would

9   prevent your ability to testify today?

10      A.      No.

11      Q.      Do you suffer from any medical conditions

12  or memory issues that would prevent you from being

13  able to testify today?

14      A.      No.

15      Q.      All right.  So, do you have any questions

16  for me before we begin?

17      A.      I don't.  Thank you.

18      Q.      So, I would like you to briefly beginning

19  with college and for the record review your education,

20  please.

21      A.      Sure.  I received undergraduate degrees

22  in Psychology and Russian Studies from the University

23  of Virginia.  I earned a Master's degree in Public

24  Policy from Georgetown University and I earned a PhD

1   in Developmental Psychology from Georgetown

2   University.

3        Q.     And can you give me years of graduation

4   from those three programs?

5        A.     Yes.  Undergraduate was 2004, Master's

6   degree, 2007, and Doctoral degree, 2010.

7        Q.     And what year were you born, ma'am?

8        A.     1981.

9        Q.     And since your receipt of your PhD, where

10  have you been employed, ma'am?

11       A.     Briefly -- let's see, since the PhD,

12  briefly with a non-profit called Voices for Virginia's

13  Children and then shortly thereafter, Virginia

14  Commonwealth University where I have been employed

15  ever since.

16       Q.     And you have done scholarly work

17  continuously since you began your PhD program, is that

18  a fair statement?

19       A.     Other than a brief reprieve from

20  academia, yes.

21       Q.     And is there a particular area that your

22  scholarly work concentrates in?

23       A.     Yes.  Generally the application of

24  adolescent development to legal context and more

1  specifically police interviewing and interrogation of

2  young people.

3       Q.     And when you use the term young people,

4  what do you have in mind when you use that term?

5       A.     As a developmental psychologist, I define

6  adolescents as the period between puberty and complete

7  brain maturation.  Generally speaking, that's between

8  the ages of about ten to twenty-five.

9       Q.     So, you don't generally concentrate on

10 children younger than ten?

11      A.     In my experience, children younger than

12 ten are frequently not interrogated by police.

13      Q.     And generally, you don't concentrate on

14 persons over older than twenty-five?

15      A.     Not as much as adolescents.

16      Q.     Okay.  And during your professional

17 career, you have spent some time acting as an expert

18 witness as you are in this case, is that true?

19      A.     Yes.

20      Q.     And focussing on the last, let's say

21 since 2020, what percentage of your time would you say

22 you devote to offering your services as an expert

23 witness?

24      A.     How do you -- I'm not sure how to define

1    what percent of my time.  Could you help me understand

2    that?

3         Q.    Sure.  Would you say that if you work

4    fifty hours a week, in general, ten hours of that is

5    spent on this pursuit?  If it's easier for you to

6    think of it by month or week, whatever way makes the

7    most sense to you.

8         A.    Thank you.  I see.  I would say over the

9    course of a year, maybe five to ten percent of my work

10   hours.

11        Q.    Okay.  And you charge for those services,

12   correct?

13        A.    For my time, yes.

14        Q.    And what is your hourly rate?

15        A.    It's typically 300 per hour.

16        Q.    And focusing on the period of 2020

17   through the end of 2023, how much money have you made

18   during that time providing expert witness services?

19        A.    I don't know.

20        Q.    Do you have an estimate?

21        A.    I could attempt to generate one.  I keep

22   records but I haven't reviewed them specifically.

23   Since 2020, I would say maybe $15,000.

24        Q.    A year?

```
 1        A.      No.  Total.  That's --

 2        Q.      Okay.

 3        A.      That's a very rough estimate.

 4        Q.      Okay.  And how much have you made in this

 5   matter to date?

 6        A.      I would have to review my invoice to

 7   answer that correctly.

 8        Q.      How many hours did you spend reviewing

 9   the documents that were provided to you in preparing

10   the report that we have received in this matter?

11        A.      I would also have to review my invoice to

12   answer that specifically.

13                THE COURT REPORTER:  Hold on one

14        second.  I apologize for interrupting.  I have

15        Robert Schmidt in my waiting room.  Let me just

16        admit him.

17                ATTORNEY DESOUSA:  Sure.  That's

18        fine.  I apologize for doing this but it has

19        just occurred to me that I haven't approved any

20        of my staff's time, so they won't get paid

21        unless I take a very brief break, so I

22        apologize.

23                ATTORNEY AGBIRO:  No worries, Lisa.

24        How much time do you need?
```

```
 1              ATTORNEY DESOUSA:  To approve time?

 2              ATTORNEY AGBIRO:  Yeah.

 3              ATTORNEY DESOUSA:  I'm not even

 4    leaving this desk.  It will take me like five

 5    minutes at the most.

 6              ATTORNEY AGBIRO:  Okay.

 7              ATTORNEY DESOUSA:  I just forgot it

 8    was Monday which tells you something I guess

 9    about where my head is.

10              ATTORNEY AGBIRO:  It's early Monday

11    morning.

12              ATTORNEY DESOUSA:  Just give me one

13    minute here.

14              ATTORNEY AGBIRO:  No problem.

15              ATTORNEY LYNCH:  You know, Lisa,

16    while you're taking this, does it make sense to

17    -- can anyone hear me?

18              ATTORNEY DESOUSA:  Yes, Carole, I

19    can.

20              ATTORNEY LYNCH:  I was just

21    wondering, while you're doing that, would it

22    make sense for Ms. Cleary to double-check her

23    invoice or whatever she has now?

24              ATTORNEY DESOUSA:  Sure.  That would
```

```
 1        be great.
 2                      (A recess was taken)
 3                      ATTORNEY DESOUSA:   Back on the
 4         record.
 5        Q.      (By Attorney deSousa)  So, Dr. Cleary,
 6   did you have an opportunity to review your invoice?
 7        A.      I did.
 8        Q.      Okay.  And how much have you been paid in
 9   this matter?
10        A.      I billed sixteen hours for $4,800.
11        Q.      And have you had prior occasions to work
12   with the Loevy firm?
13        A.      Have I?  I don't think so.
14        Q.      Okay.  How many cases have you worked on
15   over the course of your career would you estimate
16   where you offered expert testimony?
17        A.      In cases I have offered testimony, maybe
18   about twenty.  I have consulted on more than that.
19        Q.      Okay.  And of those twenty cases, have
20   they all been -- well, tell me what type of cases
21   those were.
22        A.      So, criminal trials, some post-conviction
23   hearings, some innocence claims or innocence
24   proceedings, and a few civil cases.
```

1        Q.       And focussing just on the civil cases,

2    was it your understanding that they were civil rights

3    claims?

4        A.       I don't know.

5        Q.       And focussing solely on the civil -- I'm

6    sorry.  Strike that.

7                 Focussing solely on the civil cases, were

8    you ever retained or consulted by defendants?

9        A.       No.

10       Q.       Now, when you were retained in this

11   matter, what did you understand the scope of the

12   request for your services to be?

13       A.       I understood the scope to be review

14   materials that were germane to the case and offer an

15   opinion about the degree to which the social science

16   can speak to false or unreliable confessions.

17       Q.       And when you say the social science, can

18   you tell me what you mean by that?

19       A.       Sure.  I'm trained as a psychologist and

20   the vast majority of research on coerced confessions

21   and false confessions occurs under the discipline of

22   psychology conducted by psychologists.

23       Q.       And were you -- were there specific

24   questions that you were to answer?

1      A.      Not that I recall.

2      Q.      And can you tell me just in general,

3    we'll certainly talk about more of the specifics as

4    this deposition goes on, but in general, what was your

5    understanding of the nature of the claims being

6    pursued by Mr. Perrot?

7      A.      Do you mean what was my understanding

8    prior to my review of the materials?

9      Q.      Prior or during.

10     A.      Okay.

11              ATTORNEY AGBIRO:  Objection to the

12        extent that it calls for any attorney work

13        product.  So, as long as it doesn't refer to

14        any conversations.

15              THE WITNESS:  I see.  My

16        understanding was that Mr. Perrot -- am I

17        pronouncing that correctly?

18     Q.      (By Attorney deSousa)  Yes.

19     A.      Okay.  My understanding was that Mr.

20    Perrot was claiming that the confessions that he

21    offered to -- or the confessions that for which he was

22    convicted of sexual assault were untrue.

23     Q.      And in being retained in this case, were

24    you anticipated to bring any expertise regarding

1    policing practices in the course of your opinion?

2        A.    It depends on how you define policing

3    practices.

4        Q.    Okay.  So, you understand that the

5    interrogations in question were done in 1985, correct?

6        A.    Yes.

7        Q.    And it would be true, wouldn't you agree,

8    that there are standards within the policing world

9    that govern police behavior?

10       A.    Yes.

11       Q.    Correct?  And do you have any expertise

12   in what policing practices were relative to

13   interrogation in general?

14       A.    I have a strong degree of familiarity

15   about policing practices because it is relevant to my

16   work.  I do not have specific training or credentials

17   in police practices.

18       Q.    And focusing on 1985, do you have a

19   strong knowledge of or familiarity with policing

20   practices as they existed in 1985?

21       A.    Policing practices then and now differ

22   widely all across the country.

23       Q.    So, I'm -- but what I'm specifically

24   asking you is whether you yourself had a knowledge of

1   policing practices in 1985 and if you feel that you

2   had knowledge of policing practice in 1985 in one area

3   of the country or in one particular size of police

4   department?  That's what I'm interested in hearing

5   about.

6         A.      I understand.  Thank you.  I do not have

7   specific knowledge of Springfield Police Department's

8   practices in 1985.

9         Q.      Do you have specific knowledge of any

10  police department's practices in 1985?

11        A.      I would have to review some of the cases

12  that I have worked prior that did involve review of

13  training manuals, I can think of a few, although the

14  locations are escaping me to be honest.  So, I have

15  encountered specific police training via their records

16  or their departmental documentation in a few specific

17  areas as part of my casework.

18        Q.      And as you sit here today, you think you

19  may have had some cases that were concerned with

20  interrogation practices in police departments in 1985?

21        A.      It's possible.  I would have to look at

22  all of my records.

23        Q.      When you were reviewing the matters in

24  this case, did you draw upon any particular knowledge

```
 1   of policing practice in 1985 in arriving at any of
 2   your opinions?
 3        A.     No.
 4        Q.     So, I would like to focus on the -- so
 5   much of your report, and it's on Page 2 if it's
 6   helpful to you to refer to it, that recounts the
 7   documents that you reviewed in preparation for this
 8   deposition.
 9        A.     Yes.
10        Q.     And is that a complete --
11                   ATTORNEY DESOUSA:  I'm sorry, Carla.
12         Did you say something?
13                   ATTORNEY AGBIRO:  No.
14                   ATTORNEY DESOUSA:  I'm hearing --
15                   ATTORNEY AGBIRO:  I heard that too.
16         I'm going to mute my mic but it wasn't on my
17         end.
18                   ATTORNEY DESOUSA:  Yeah.  It might
19         be hard for you to mute because you're going to
20         be the one that wants to object but if other
21         people aren't muted --
22                   ATTORNEY AGBIRO:  Yes.
23                   ATTORNEY DESOUSA:  -- if they could
24         mute, that might help.  Thanks.
```

```
 1        Q.     (By Attorney deSousa)  Okay.  So,
 2   beginning on Page 2, you -- is this a complete list of
 3   the documents that you reviewed?  You listed twenty
 4   separate documents?
 5        A.     Twenty-one.  There's one on the next
 6   page.
 7        Q.     I don't have that.  Oh, I'm sorry.
 8        A.     The top of the next page.
 9        Q.     Yes.  No.  You're right.  I skipped a
10   page over.
11        A.     I missed it as well.  This is the
12   complete list of documents that I reviewed prior to
13   drafting the report.  Since then, it came to my
14   attention that there were additional depositions and I
15   briefly reviewed them prior to today.
16        Q.     And what are those depositions?
17        A.     They were the depositions of Mr. Bloom
18   and -- I'm sorry.  I'm not going to remember their
19   names.  There was the District Attorney and a few of
20   the officers.
21        Q.     And were those provided to you by counsel
22   for the plaintiff?
23        A.     Yes.
24                    ATTORNEY DESOUSA:  Carla, I'm going
```

1        to ask if at our first break you could provide

2        us with any additional documents that have been

3        sent to her in anticipation of this deposition

4        so that we have that available for the

5        deposition this morning.

6                     ATTORNEY AGBIRO:  Sure.  You want

7        the deposition transcripts?

8                     ATTORNEY DESOUSA:  No.  No.  No.

9        No.  No.  I just want the -- I have those.  I

10       just want the names.

11                    ATTORNEY AGBIRO:  Yeah.

12                    ATTORNEY DESOUSA:  I just want the

13       names.

14                    ATTORNEY AGBIRO:  Oh, the names of

15       the deps that were sent to her.  Sure.  I was

16       about to say, do you want the transcript or

17       just the names.  Got it.

18                    ATTORNEY DESOUSA:  No.  No.  I just

19       want the names of anything that has been sent

20       to her since the report was generated.

21                    ATTORNEY AGBIRO:  All right.  Got

22       it.

23       Q.    (By Attorney deSousa)  And you reviewed

24   all of the documents listed on here as well as these

1    three or four additional deposition transcripts?

2         A.     Yes.

3         Q.     And did any of documents that you

4    reviewed after the production of your report change

5    any of the opinions that you put in this report?

6         A.     No.

7         Q.     Did they add to it at all?

8         A.     No.

9         Q.     So, under number 1, you have listed, List

10   of defendants.  Can you tell me, what was that?  What

11   list of defendants did you review?

12        A.     There was a document -- I don't remember

13   the specifics but it was a table and in fact, now that

14   I'm reflecting upon it, defendants might be the wrong

15   word.  It was a list of participants in the situation,

16   so officers, the names of victims and complainants,

17   and then a rough approximation of when things

18   occurred.

19        Q.     And, so, was the list of defendants also

20   the case timeline that you refer to in that number 1?

21        A.     Yes.  It's a single document.

22        Q.     And is it a one-page document or a

23   multi-page document?

24        A.     I don't remember.  I would have to look

1  at it.

2      Q.      And where you recounted the timeline

3  within this report, did you rely upon that in full or

4  in part in determining that timeline?

5      A.      Actually very little because I

6  constructed my own timeline in the process of

7  reviewing the documents.  That's my usual approach.

8  And then just by virtue of the order in which I

9  reviewed the documents, I believe I encountered that

10 case timeline close to the end after I had done my own

11 review.

12     Q.      Okay.  So, is there a particular reason

13 why you listed it first if you reviewed it last?

14     A.      No.  These are not listed in the order in

15 which I reviewed them.  They're probably listed in the

16 order they appear in my computer.

17     Q.      Okay.  And the next category is, Mass.

18 DYS, Department of Youth Services, placement history.

19 What do you recall about that document or those

20 documents?

21     A.      If memory serves, it was a listing of the

22 dates in which Mr. Perrot resided in state facilities,

23 so the date of admission and the date of discharge and

24 the name of the facility.

```
 1        Q.      And was there anything else included in
 2   those records?
 3        A.      Possibly.  That's what I remember.
 4        Q.      Do you remember when you reviewed any
 5   medical evaluations of him from DYS?
 6        A.      I can't remember if those -- if there
 7   were different types of documents in the same file.  I
 8   would have to look at it again.
 9        Q.      And well, regardless of whether it came
10   from DYS or not, do you recall reviewing medical
11   records of Mr. Perrot from the time leading up to
12   1985?
13        A.      There was a report from a psychiatrist in
14   a facility.  I'm not sure if you would consider that
15   medical records but I recall that one.
16        Q.      And is that the report you refer to from
17   January of 1986?
18        A.      Yes.
19        Q.      So, that was before his arrest in this
20   case, correct?  I mean -- sorry.  Strike that.
21               That was after his arrest in this case,
22   correct?
23        A.      Correct.
24        Q.      And, so, but my question is, did you see
```

1   any psychiatric evaluations of him or medical

2   evaluations of him from before his arrest?

3         A.      I don't recall.

4         Q.      Okay.  And George Perrot's juvenile court

5   records, you reviewed?  That's number 3 on --

6         A.      Yes.

7         Q.      -- your list?

8         A.      That's correct.

9         Q.      And what did those records consist of?

10        A.      I don't remember the content or the

11   specific format.

12        Q.      Did it include the dates of his arrest?

13        A.      Quite possibly.  I don't remember

14   specifically.

15        Q.      Did it list the various things he has

16   been arrested for?

17        A.      I could tell you if I looked at them.

18   It's been since the last fall when I reviewed the

19   materials and submitted the report.

20        Q.      But at least as you sit here today,

21   nothing of import springs to mind about those records?

22        A.      I mean, they're relevant to his youth

23   history and his arrest history.

24        Q.      Okay.  And you reviewed his mugshot and

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                    **27**

1    his line-up photos.  When you say that, do you mean

2    the mugshot from his 1985 arrest or were there -- did

3    you see his previous mugshots?

4         A.     I don't recall specifically.

5         Q.     Okay.  And similarly, his arrest record,

6    when you said you reviewed his arrest record, was that

7    up to his arrest in 1985?

8         A.     I don't recall.

9         Q.     Do you recall seeing any of his arrest

10   records since his release?

11        A.     I don't recall.

12        Q.     And then you reviewed his statement that

13   George Perrot gave on September 21st, 1985 regarding a

14   response to a phone call from someone whose name is

15   Mae Marchand.  Do you recall that statement?

16        A.     I do.

17        Q.     Did you review any of the other

18   statements that were taken from people relative to the

19   Mae Marchand incident in September, in or about

20   September of 1985?

21        A.     Are you asking me if I remember reviewing

22   them?

23        Q.     Yes.

24        A.     I remember reviewing them, yes.  I do not

```
 1   recall every detail of the content of the discovery.
 2        Q.    Okay.  So, this says you reviewed a
 3   statement from George Perrot?
 4        A.    Yes.
 5        Q.    In September of 1985, and what I'm
 6   specifically asking you is whether you also reviewed
 7   statements from anybody else relative to that
 8   incident?  And I'm not -- this isn't -- I'm not trying
 9   to trick you.
10        A.    Sure.
11        Q.    Did you review a statement from his
12   girlfriend at the time named Lisa Eldridge relative to
13   the Mae Marchand issue?  Did you --
14        A.    I don't -- I don't recall.
15        Q.    Did you review a statement from someone
16   named Timmerman, the same -- that also in September of
17   1985?
18        A.    I'm sorry.  Did you ask did I review a
19   statement by Timmerman or to Timmerman?
20        Q.    Yes.  By.
21        A.    By Timmerman?  I do not -- I don't
22   recall, no, a statement from that person.
23        Q.    If you had reviewed statements from other
24   people other than George Perrot, would you have listed
```

 1    those separately?

 2         A.    Yes.  I believe so, yes.

 3         Q.    And you can agree with me that they're

 4    not listed on here, correct?

 5         A.    Correct.

 6         Q.    All right.  And then you reviewed a

 7    statement from Joseph McNabb dated 12/7/1985, correct?

 8         A.    Yes.

 9         Q.    And who did you understand Joseph McNabb

10    to be?

11         A.    He was an individual whose house was

12    broken into.

13         Q.    And you reviewed the statement from

14    George Perrot relative to both the break-in at

15    McNabb's house and a purse-snatching that occurred

16    that same day, is that correct?

17         A.    Yes.

18         Q.    And you reviewed a statement from George

19    Perrot dated 12/7/85 regarding what's referenced on

20    here as the 11/30/85 break-ins.  Do you recall

21    reviewing that statement?

22         A.    I do.

23         Q.    And what do you recall the underlying

24    accusations were for the 11/30/85 break-ins?

1        A.      Those were the allegations regarding

2    sexual assault on elderly women.

3        Q.      Not Mae Marchand though, correct?

4        A.      You will have to forgive me because there

5    were multiple related crimes in a similar timeframe

6    and I cannot keep straight the different women's

7    names.

8        Q.      Okay.  If I suggested to you that the

9    November 30th, 1985 break-ins related to a woman named

10   Emily Lichwala and Mary Prekop, would that refresh

11   your recollection?

12       A.      Yes.  Thank you.

13       Q.      And then this report of Dr. Harry

14   Michelson, we spoke about that briefly, correct?

15       A.      Yes.

16       Q.      And that was from January 15th, 1986?

17       A.      Yes.

18       Q.      And do you recall in what records you

19   found Dr. Michelson's report?

20       A.      I believe it was packaged with other

21   records from the correctional facility or a detention

22   facility if memory serves.

23       Q.      Okay.  And did you review other documents

24   from that detention facility or just his report?

Hayley Cleary, MPP, PhD
February 05, 2024                                                          31

```
 1        A.      In the file, if I'm remembering
 2   correctly, there were assorted one-page supplemental
 3   documents, for example, the -- a page where an officer
 4   documented suicidal ideation for example.  Sometimes,
 5   the files come to me as a single PDF and I'm not sure
 6   if they originated from different sources.
 7        Q.      Okay.  And you list that you reviewed the
 8   suppression hearing transcript from September 2nd,
 9   1986?
10        A.      Yes.
11        Q.      And did you review that in total?
12        A.      Yes.
13        Q.      And the first trial transcript, did you
14   review that in total?
15        A.      I believe so.
16        Q.      And the second trial transcript, did you
17   review that in total?
18        A.      I believe so.
19        Q.      And the intake from North Central CI, how
20   many pages was that?
21        A.      I have no idea.
22        Q.      Do you recall anything specifically about
23   that document?
24        A.      I believe it included an intake history
```

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                    **32**

```
 1   where an intake officer would review the person's
 2   medical, social, family history.  I believe that
 3   information was included.
 4        Q.    Okay.  And you reviewed a letter to Bob
 5   Timmerman dated 11/24/1987, do you recall that
 6   document?
 7        A.    Yes.
 8        Q.    And what was that document?
 9        A.    I believe that document was a handwritten
10   letter from Mr. Perrot essentially proclaiming his
11   innocence of the sexual assaults.
12        Q.    And George Perrot's pro se affidavit
13   dated October 7th, 1985, did you review that?
14        A.    Yes.
15        Q.    And what do you recall that document
16   containing?
17        A.    I believe it was a statement similarly
18   arguing that he did not commit the sexual assaults.
19        Q.    And completion certificates and letters
20   of support for Mr. Perrot's parole application, do you
21   recall specifically what those documents were?
22        A.    There were a few certificates for
23   programs that he completed while incarcerated.  I
24   don't recall the nature of the programs.  And then
```

1    there was a supplemental letter from -- I don't know

2    the nature of the person's profession but, you know,

3    supporting his application for parole.

4            Q.      Do you recall who that person was?

5            A.      I don't off the top of my head.  I would

6    have to look at the document again.

7            Q.      Does the name Sherrie Frisone refresh

8    your recollection?

9            A.      I would have to look at the document.

10           Q.      Okay.  And then you reviewed both days of

11   Mr. Perrot's deposition, correct?

12           A.      Yes.

13           Q.      And Officer Jarvis's deposition?

14           A.      Yes.

15           Q.      And at least until the supplemental

16   documents that were sent to you after you produced

17   your report, that's the total of the documents you

18   reviewed in preparing the report?

19           A.      Yes.

20           Q.      Did you have access to any of his

21   disciplinary records during the period of his

22   incarceration?

23           A.      If they were included in the -- I don't

24   know how to say -- the materials from the correctional

1  facility, in that combined PDF, then I would have had

2  access to them.

3       Q.     So, you believe that in addition to the

4  documents that are listed here, you may have had

5  documents from after his conviction, his

6  post-conviction incarceration records?

7       A.     Oh, post-conviction incarcerations, I

8  don't think so.  I would have to look at my folder of

9  materials again.

10      Q.     Okay.  And how about any medical records

11 or psychological records, counselling records from

12 2017, since his release from incarceration?

13      A.     Those are less relevant to my analysis.

14      Q.     Did you review them?

15      A.     I don't think so.

16      Q.     Okay.  And did you have an opportunity to

17 review the decision rendered by the court after the

18 suppression hearing?

19      A.     Do you mean in transcript form?

20      Q.     No.  The written opinion that the judge

21 issued at the conclusion of the suppression hearing.

22      A.     Unless I made a mistake, everything that

23 I reviewed is listed on Page 2 of the report.

24      Q.     Okay.  And similarly, you didn't review

1   any of the Appellate Court decisions that reviewed

2   various matters including the voluntariness of his

3   confession, you didn't review any of the Appellate

4   Court decisions on those issues?

5        A.      Unless I made an error of omission,

6   everything that I reviewed is listed on Page 2 and 3

7   of the report.

8        Q.      Okay.  And can we agree that if you do

9   discover that you made an error of omission that you

10  will inform plaintiff's counsel and they will in turn

11  inform us?

12       A.      Absolutely.

13       Q.      And we will at this point go forward

14  assuming that you have accurately told us what you

15  have reviewed.  Okay?

16       A.      Yes.

17       Q.      Okay.  Great.  So, a little while ago,

18  you indicated that your understanding of your

19  retention was that you would review the confessions

20  that Mr. Perrot gave in 1985, is that correct?

21       A.      And the surrounding materials regarding

22  the case.

23       Q.      And when you refer to confessions, what

24  confessions in particular are you -- were you asked to

1   review?

2       A.      I was provided with written statements,

3   one pertaining to the purse-snatching and the break-in

4   and the second pertaining to the sexual assaults.

5       Q.      And as you sit here today, what is your

6   understanding of what crimes Mr. Perrot was convicted

7   of in 1987?

8       A.      I believe he was convicted of sexual

9   assaults on Ms. Lichwala and Prekop.

10      Q.      So, when you were reviewing these

11  documents, it was your understanding that he had been

12  found guilty of the rape of both women?

13      A.      It's possible.  I don't recall the

14  specific details.

15      Q.      Okay.  And you also understand that he

16  was granted a second trial in the 90s?

17      A.      Yes.

18      Q.      And you reviewed those transcripts,

19  didn't you?

20      A.      I did.

21      Q.      And what is your understanding of what

22  crimes Mr. Perrot was convicted of in 1992?

23      A.      I believe it was the same crimes.

24      Q.      And do you have an understanding of what

1    led to Mr. Perrot being granted a new trial in 2017?

2         A.     This is plumbing the depths of my memory

3    but I recall that there -- if this is the case and I'm

4    not confusing it with another -- that there was

5    concern around crime analysts, perhaps a particular

6    crime analyst from the FBI whose cases were called

7    into question, something having to do with improper

8    DNA analysis and there was DNA collected from Mr.

9    Perrot in this case.

10        Q.     And, so, you believe that the DNA

11   analysis led to his release in 2017 in some way?

12        A.     I don't know what led to his release.

13        Q.     Okay.  And do you believe that the

14   confessions that you reviewed and offered opinions on

15   had anything to do with the grant of the new trial in

16   2017?

17        A.     I have no idea why he was granted a new

18   trial.

19        Q.     And do you know what crimes he was

20   granted a new trial on in 2017?

21        A.     I'm not familiar with the particulars of

22   the court proceeding.  My role was to focus on the

23   events leading up to the confession interrogation.

24        Q.     Okay.  Are you familiar with the term

1   nolle prosequi?

2         A.      Yes.

3         Q.      We sometimes also refer to it as a nol

4   pros --

5         A.      Yes.

6         Q.      -- because it's easier for us all to say

7   that I guess.

8         A.      Right.

9         Q.      And what do you understand that to mean?

10        A.      My understanding is that that occurs when

11  the prosecutor decides to not move forward with a case

12  because they feel that there's not enough evidence to

13  convict.

14        Q.      And do you believe a nol pros was entered

15  in this case?

16        A.      I don't recall.  I don't know.

17        Q.      So, would it also be fair to say that you

18  -- if a nol pros did issue in this case, you don't

19  have any understanding of what the basis of a decision

20  not to re-prosecute is, correct?

21        A.      That's up to the attorneys.

22        Q.      Do you believe that Mr. Perrot was

23  exonerated of something in 2017?

24        A.      No.

1       Q.      I would like to switch focus to 1985.  Do

2    you know what the age in Massachusetts to be

3    prosecuted as an adult was in 1985?

4       A.      No.

5       Q.      Do you know who determines what age

6    someone is going to be prosecuted as an adult?

7       A.      It's usually the legislature and the

8    state code.

9       Q.      Okay.  Would it have been important to

10   you in determining the appropriateness of an

11   interrogation to understand the legal standard at the

12   time the interrogation was being done?

13      A.      Can you repeat that, please?

14      Q.      In offering your opinion on the

15   appropriateness of an interrogation, is it important

16   to you to understand what the legal standard is that

17   the interrogators, in this case the Springfield Police

18   Department, was operating under?

19      A.      Not specifically because the process of

20   interrogation and the people involved are what I am

21   reviewing and applying the social science to.  So,

22   it's not my job to determine that police officers

23   broke the law or did not break the law.

24      Q.      So, in your analysis of that, I guess

1   what I think I'm hearing you say, is that it's not

2   relevant to your analysis whether the interrogation

3   was lawful or not?

4         A.      It's not my job to determine what is

5   lawful.

6         Q.      Okay.  Fair enough.  So, I would like to

7   now switch to the risk factors that you listed on Page

8   5 of your report.  If it's helpful to you to review

9   that, I'm happy to have you have that front of you.

10        A.      Thank you.

11               ATTORNEY DESOUSA:  To the other

12         attorneys that are here, we -- I assume you

13         have now all received from Megan Landry the

14         documents that we're now in the process of

15         referring to.  Carla specifically, did you get

16         them?

17               ATTORNEY AGBIRO:  Yes, I did.

18               ATTORNEY DESOUSA:  So, I think it

19         would be helpful just going forward, so we

20         don't have to keep sort of clumsily doing this,

21         if we agree to put them in?  Okay?

22               ATTORNEY AGBIRO:  That's fine.

23               ATTORNEY DESOUSA:  All right.  So,

24         Nicole, I don't know what order they got to you

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                  **41**

```
1   in.  So, maybe if could tell me that, we could
2   go from there.
3                 THE COURT REPORTER:  I have the nol
4   pros as the first one.
5                 ATTORNEY DESOUSA:  So, why don't we
6   list that as Exhibit 1?
7                 THE COURT REPORTER:  Okay.  And then
8   I have the PDF labelled as 1986 Findings and
9   Rulings on Defendant's Motion To Suppress as
10  the second one.
11                ATTORNEY DESOUSA:  Yeah.
12                THE COURT REPORTER:  And then the
13  third one is Cleary Expert Report.
14                ATTORNEY DESOUSA:  Yeah.
15                THE COURT REPORTER:  And then the
16  last one is actually labelled Exhibit 3 but it
17  was the fourth one to me and that's Cleary's
18  CV.
19                ATTORNEY DESOUSA:  Okay.  That's
20  great.  So, we can all agree that those are
21  going to go in as 1, 2, 3, 4?
22                ATTORNEY AGBIRO:  Yeah.
23                   (Exhibits 1 through 4, marked)
24  Q.    (By Attorney deSousa)  So, turning to
```

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                              **42**

1    Page 5 of your report, you list various risk factors,

2    is that true?

3         A.      Yes.

4         Q.      One of the factors that you list is

5    cognitive impairments, correct?

6         A.      Correct.

7         Q.      And can you tell me what you mean by

8    cognitive impairments?

9         A.      Cognitive impairments can include low IQ

10   or intellectual disability, what we formerly would

11   call mental retardation but that term isn't used

12   anymore, lower levels cognitive functioning that can

13   impair everyday life.

14        Q.      And did you -- are you aware of whether

15   Mr. Perrot suffered from any cognitive impairment in

16   1985?

17        A.      Mr. Perrot -- may I review -- may I refer

18   to my report?

19        Q.      Sure.

20        A.      There's a specific section that I wanted

21   to re-review.  Okay.  Thank you.  So, I did not

22   receive any academic records or psychometric testing,

23   I don't know that any was available, I asked but the

24   only information I have about his functioning is his

1   grade records.  So, to more specifically answer your

2   question, no, I don't have specific documentation of

3   cognitive impairments.

4        Q.     And you also list -- so, you are not

5   aware of what Mr. Perrot's IQ is today?

6        A.     No.

7        Q.     And you're not aware of what his IQ was

8   in 1985?

9        A.     His IQ wasn't available in any of the

10  documentation that I reviewed.

11       Q.     And what about mental illness?  Are you

12  aware of any mental illness from which Mr. Perrot

13  suffered in 1985?

14       A.     So, he was diagnosed somewhere around

15  that time with antisocial personality disorder and

16  drug and alcohol abuse.  I don't know if it was

17  specifically categorized as substance abuse disorder

18  but in the category of psychopathology.

19       Q.     And I'm sorry.  I skipped the first one

20  and I apologize.  So, you have stated the first risk

21  factor is adolescence and developmental immaturity.

22  And you have already told us what adolescence means to

23  you.  I believe you said age ten through twenty-five?

24       A.     Generally speaking, yes.

1      Q.     And what do you mean by the term

2   developmental immaturity?

3      A.     Developmental immaturity refers to a

4   range of cognitive and psychosocial abilities that are

5   continuing to develop and refine during the

6   adolescence period.  So, for example, the ability to

7   control one's impulses, the ability to plan ahead, the

8   ability to self regulate our emotions, the ability to

9   maintain cognitive control during periods of emotional

10  arousal, those are relative to adults, less well

11  developed capacities in adolescents.

12     Q.     So, I'm just trying to understand it in

13  context.  So, when you use the term developmental

14  immaturity, are you saying -- let's just take an

15  average fifteen-year-old, are you saying developmental

16  immaturity would be a risk factor if they're less

17  mature than your average fifteen-year-old or if

18  they're less mature than an adult?

19     A.     I'm saying developmental immaturity is a

20  feature of adolescence, what we call normative

21  adolescence so young people with no specific

22  impairments or no pathologies, it's a feature of this

23  life stage.

24     Q.     And is it true that while you can speak

1   broadly about developmental characteristics for that

2   pretty broad age group, ten to twenty-five, there's

3   differentiations in that from individual to

4   individual, correct?

5        A.     Correct.

6        Q.     So, you might have a very mature

7   twelve-year-old or a very immature

8   twenty-four-year-old, is that fair?

9        A.     With a caveat.  So, there are different

10  types of maturity, right?  There's emotional maturity,

11  there's social maturity, there's physical maturity.

12  So, absolutely individuals can mature in different

13  domains along different timetables.

14              THE COURT REPORTER:  Hold on one

15         second.  Mark Loevy-Reyes for the plaintiff

16         just entered my waiting room.  Let me just

17         admit him.

18              ATTORNEY DESOUSA:  Sure.  You can

19         let him in.

20        Q.     (By Attorney deSousa)  And do you have

21  any specific information as it would relate to George

22  Perrot's level of developmental maturity or immaturity

23  in 1985?

24        A.     So, we knew his chronological age.  We

1   knew that he had a history of family instability and

2   negative life events or what we would call trauma or

3   life adversity.  We knew he had, from the evidence I

4   reviewed, a pretty extensive relationship with drugs

5   and alcohol which can be very neurotoxic to an

6   adolescent brain.

7        Q.     Did you have any other information about

8   his particular levels of developmental maturity?

9        A.     Let's see, there was his academic record.

10  So, he dropped out of school -- according to Mr.

11  Perrot, he reported dropping out of school in the

12  seventh grade, so that's information about his

13  interaction with formal schooling.  That's all that

14  comes to mind at the moment.

15       Q.     Okay.  And are you aware of any police

16  department in the United States that requires officers

17  to determine IQ of someone prior to interrogating

18  them?

19       A.     I don't.

20       Q.     And how about for mental illness, are you

21  aware of any police department in the United States

22  that requires police officers to determine whether

23  someone suffers from an underlying mental illness

24  before interrogating them?

```
 1          A.      I'm not.
 2          Q.      How about other cognitive impairments,
 3   are you aware of any police department in the United
 4   States that requires consideration of that prior to
 5   interrogating someone?
 6          A.      I'm not.
 7          Q.      And you're not -- today, is it also true
 8   that you're not aware of any police department that
 9   would have required that in 1985?
10          A.      That's correct.
11          Q.      Are you aware of any court decisions,
12   laws, or regulatory guidelines in 1985 that required
13   police officers to determine IQ before interrogating a
14   suspect?
15          A.      No.
16          Q.      Are you aware of any court decision,
17   laws, or regulatory guidelines that required police
18   officers to determine whether a suspect suffered from
19   cognitive impairments prior to interrogating a
20   suspect?
21          A.      No.
22          Q.      How about mental impairments?  Are you
23   aware of any court decision, laws, or regulatory
24   guidelines in 1985 that required police officers to
```

1    determine any mental impairments prior to

2    interrogating a suspect?

3         A.    No.

4         Q.    Are you aware of any method in 1985 that

5    would have allowed a police officer to determine a

6    suspect's IQ prior to interrogating them?

7         A.    No.

8         Q.    How about cognitive impairment?  Are you

9    aware of any method that was available to police

10   officers in 1985 to determine whether or not a suspect

11   suffered from any cognitive impairment?

12        A.    No.

13        Q.    And mental illness, are you aware of any

14   method in 1985 that would have allowed a police

15   officer to determine whether a suspect suffered from

16   any mental illness or impairment prior to

17   interrogating them?

18        A.    No.

19        Q.    I would now like to switch gears to

20   reviewing the timeline from December 7th, 1985.  And I

21   would say that this is going to be a fairly

22   substantial chunk of questioning and we can take a

23   break now or we can take a break during it, whichever

24   you would prefer.

1          A.        Thank you for asking.  I'm fine.

2          Q.        Okay.  Good.  So, in arriving at the

3    opinions that are included in your report, how did you

4    determine the salient facts that occurred on December

5    7th, 1985?

6          A.        I'm afraid I don't understand that

7    question.

8          Q.        So, you recounted within your report

9    various events that you detail as having happened on

10   December 7th, 1985.  And what I'm asking you is, what

11   did you use to determine that?

12         A.        I see.  Thank you.  I used the

13   information in the suppression hearing transcript from

14   the participants who testified there and occasionally

15   information from later depositions.

16         Q.        Okay.  So, what time do you believe that

17   Mr. Perrot was arrested?

18         A.        If memory serves, the police apprehended

19   him in his home around 3:30 in the morning.  I don't

20   know if that equated to arrest.  He may have been

21   formally arrested later on but that's the time when he

22   was at his home and police came to retrieve him.

23         Q.        Okay.  And what were you able to

24   determine regarding his sobriety at the time that the

1    police came to his home at 3:30?

2          A.      So, he had provided extensive information

3    about the drugs and alcohol that he had consumed

4    beginning around seven or eight o'clock the night

5    prior up until about 2:30 in the morning is when he

6    returned home and, so, that was information relevant

7    to his sobriety.  I believe that one of the officers

8    also testified that he smelled of alcohol when he

9    arrived at the police station.

10         Q.      Was he able to walk when he was roused

11   from his bed at 3:30 in the morning?

12         A.      Yes.

13         Q.      Was he able to run?

14         A.      Yes.

15         Q.      And he testified at the motion to

16   suppress that he had drank two six packs of beer.  Do

17   you recall that?

18         A.      Yes.

19         Q.      And from about seven o'clock or eight

20   o'clock at night because it varies but let's go with

21   seven until one o'clock in the morning, correct?

22         A.      That sounds correct to me, yes.

23         Q.      And that he had also snorted a gram of

24   cocaine, correct?

1        A.      Yes.

2        Q.      And he testified at the motion to

3    suppress that he had taken eight Valium, do you recall

4    that?

5        A.      I do.

6        Q.      And do you have any sense of the level of

7    impairment that someone of his age and size would have

8    been displaying if they had consumed twelve beers, a

9    gram of cocaine, and had taken eight Valium?

10       A.      Can you repeat the first part of that

11   question, please?

12       Q.      Do you have an opinion or an

13   understanding of the level of sobriety that someone

14   would be displaying if they had drank twelve beers,

15   snorted a gram of cocaine, and taken eight Valium?

16       A.      So, I am not a medical doctor but that

17   sounds like an extensive amount of substances in a

18   person's system to me.

19       Q.      Would it be consistent with somebody who

20   was able to walk?

21       A.      I can't answer that.

22       Q.      Would it be consistent with somebody who

23   was able to run?

24       A.      I don't know.

1        Q.      At the motion to suppress hearing, George

2   Perrot testified under oath that he remembered being

3   awoken by police.  Do you recall that testimony?

4        A.      I do.

5        Q.      And he remembers running away from the

6   police?

7        A.      Yes.

8        Q.      Correct?  And he remembers being driven

9   in the cruiser and he describes where the officers

10  were and what they did during that drive, do you

11  recall that testimony?

12       A.      I do.

13       Q.      And he remembers being brought to the

14  booking desk and he recalls officers laughing at him

15  and one hitting him in the ribcage causing him to fall

16  down.  Do you recall that testimony?

17       A.      I do.

18       Q.      And it was detailed, would you agree?

19       A.      Yes.

20       Q.      And there was a lot of description in

21  that, is that correct?

22       A.      That's fair, yes.

23       Q.      And is that in your opinion consistent

24  with somebody who had had -- who was his age and his

1  size and had drank twelve beers, snorted a gram of

2  cocaine, and had eight Valiums?

3          A.      In my opinion, that assessment would

4  require a medical doctor's input.

5          Q.      And then Mr. Perrot testified that he

6  remembered being brought to a cell after going through

7  booking and staying there for forty-five minutes to an

8  hour, do you recall that?

9          A.      I do.

10         Q.      And then he remembers being taken

11 upstairs to an office and he described that office,

12 isn't that correct?

13         A.      Yes.

14         Q.      And he was questioned then for fifteen

15 minutes to half an hour about the break-in at the

16 McNabb's and the purse-snatching from the Denny's

17 restaurant, correct?

18         A.      Yes.

19         Q.      And then he was returned to his cell --

20 I'm sorry.  Strike that.

21                 Then he was brought downstairs for

22 fingerprinting and mugshots, correct?

23         A.      I believe so, yes.

24         Q.      And then after that, he was returned to

1    his cell, correct?

2         A.    Correct.

3         Q.    And he was in -- back in his cell,

4    according to his recollection, for twenty minutes to a

5    half an hour, do you recall all that?

6         A.    Yes.

7         Q.    And, again, his testimony under oath in

8    1986 about those events was pretty detailed, correct?

9         A.    Sure.

10        Q.    It was logical, it was coherent, and it

11   followed a timeline, correct?

12        A.    His testimony, yes, on the stand.

13        Q.    And, again, would that level of recall be

14   consistent with someone who had -- who was his age and

15   his size who had consumed twelve beers, snorted a gram

16   of cocaine, and taken eight Valiums?

17        A.    That would require a medical

18   professional's input.

19        Q.    So, then after about twenty minutes to a

20   half hour in the cell, he was brought back to the

21   statement room.  Do you recall that?

22        A.    Yes.

23        Q.    And now he was being asked about what is

24   often referred to in the testimony as the Covel Street

1   and the Malibu Drive incidents but what that really is

2   is shorthand for break-ins and violent sexual assaults

3   of two women, correct, Emily Lichwala and Mary Prekop?

4        A.      Correct.

5        Q.      Okay.  And he was questioned about those,

6   according to his testimony, for about a half an hour,

7   is that correct?

8        A.      That sounds right to me.

9        Q.      And during that time, he remembers being

10  presented with and signing the statement about the

11  McNabb break-in and the pocketbook theft, correct?

12       A.      Yes.

13       Q.      At Denny's?  The pocketbook theft at

14  Denny's?

15       A.      Yes.

16       Q.      And he reviewed those statements during

17  the motion -- that statement during the motion to

18  suppress and he agreed with everything that was in

19  that statement, correct?

20       A.      Yes.  He -- yes.

21       Q.      And you have read his deposition

22  testimony as well?

23       A.      I have.

24       Q.      And in 2023, he still is stating that he

1    did those crimes, correct?

2         A.     Yes.

3         Q.     And then he says he was brought into

4    another room and then he was questioned about two

5    unsolved murders.  Do you remember that testimony?

6         A.     I don't remember that testimony.

7         Q.     You don't remember that he recounts being

8    questioned about two unsolved murders that have

9    nothing to do with Emily Lichwala or Mary Prekop or

10   the McNabbs or the Denny's incident?

11        A.     There was a lot of discovery in this case

12   and I don't remember all of the details.

13        Q.     Okay.  And then he testified that he

14   vomited, do you remember that?

15        A.     I do remember that.

16        Q.     And they took about a twenty-minute break

17   to clean up the floor, correct?

18        A.     I don't recall.

19        Q.     All right.  And then he states that he

20   remembers very well being questioned about the rapes.

21   Do you remember him using that phrase during the

22   motion to suppress?

23        A.     I do not remember that level of detail

24   from the suppression hearing transcript.

1      Q.      Okay.  But he does not recall signing the

2   statements about the rape, the violent attack and rape

3   of Emily Lichwala and the violent attack and rape of

4   Mary Prekop, is that correct?

5      A.      What I recall about that statement was

6   that he testified that he never read the statements

7   that he signed.

8      Q.      And then he says he was in the cell for

9   about two to three hours until 12:30 or one in the

10  afternoon.  So, he was brought in, he was questioned

11  for a few hours, and then he had a two to three hour

12  break where he was back in his cell, do you recall

13  that?

14     A.      Not specifically.

15     Q.      Okay.  And then he recalls being asked

16  about giving hair and blood samples and that it was

17  related to the investigation of the rapes and that he

18  agreed to that willing.  Do you recall that testimony?

19     A.      I do, yes.

20     Q.      And he also tells that during that

21  afternoon, a couple of other things happened.  He

22  recalls being brought food and he ate the food and

23  there were two other -- there were two officers in the

24  room with his while he ate his food.  Do you recall

1  that testimony?

2       A.     Not specifically.

3       Q.     And he was allowed access to a phone and

4  he chose to call his girlfriend, do you remember that?

5       A.     I do.

6       Q.     And in fact, he says he was left alone in

7  a room with access to the phone and he may have called

8  his girlfriend more than once.  Do you recall that?

9       A.     No.

10      Q.     And then he requested not to be brought

11  back down to the cell.  Do you remember that part of

12  the motion to suppress?

13      A.     I don't.

14      Q.     So, you don't recall that he said he was

15  cold and he didn't want to go back down there so they

16  let him stay in the interrogation room?

17      A.     I don't specifically recall every detail

18  from the suppression transcript.

19      Q.     So, when he first got to the station, he

20  was given Miranda warnings and he was also -- and he

21  signed a Miranda card, do you recall that?

22      A.     Yes.

23      Q.     And do you recall that he also was told

24  he could use a phone at that time and he signed a card

1  acknowledging that he was told he could make a phone

2  call but that he was choosing not to, do you recall

3  that?

4         A.      Vaguely.

5         Q.      And he signed three Miranda cards.  He

6  didn't deny that he was given his Miranda rights at

7  least the first time.  He says they are his signature

8  but he doesn't recall signing them.  Do you remember

9  that testimony?

10        A.      Not specifically.

11        Q.      So, the statement about the break-ins at

12 Emily Lichwala's house and Mary Prokop's house, he

13 does not say he raped either of those women, isn't

14 that correct?

15        A.      Are you asking me about the content of

16 the statement?

17        Q.      Yes.

18        A.      Are you asking me if I remember from

19 memory?

20        Q.      I'm asking you if you recall that the

21 statement that you reviewed did not include an

22 admission to the rapes?

23        A.      I reviewed this four months ago and I

24 don't remember the specific words.

1        Q.      What do you believe that the confession

2   that you have called into question was a confession

3   to?

4        A.      Sexual assault.

5        Q.      You believe he confessed to a sexual

6   assault?

7        A.      I think we could resolve this very

8   quickly if I just reviewed the statement and refreshed

9   my memory.

10       Q.      Yes.  I think that would be a good idea.

11               ATTORNEY DESOUSA:  And I think

12       probably, Carla --

13               ATTORNEY AGBIRO:  Yes.

14               ATTORNEY DESOUSA:  -- maybe a couple

15       minute break so Dr. Cleary could review the two

16       confessions that are from December 7th, 1985, I

17       think that would be helpful.

18               ATTORNEY AGBIRO:  I agree.

19               ATTORNEY DESOUSA:  All right.  So,

20       we're going to take -- it's 10:18 and we're

21       going to come back at 10:25.  Okay?

22               ATTORNEY AGBIRO:  Sounds good.

23               (A recess was taken)

24               ATTORNEY DESOUSA:  Back on the

```
 1           record.
 2           Q.      (By Attorney deSousa)   Okay.  So, you
 3    have had an opportunity to review the statements, yes?
 4           A.      Yes.
 5           Q.      And did he confess to the rapes?
 6           A.      No.
 7           Q.      Now, when you reviewed the statement at
 8    the motion to suppress, he stated that on the evening
 9    of November 30th, he did go to Brattleboro as it says
10    in that statement, correct?
11           A.      I don't recall specifically what he said
12    at his suppression hearing.
13           Q.      Do you recall that he said that he was
14    with Timmerman and Atkins that night?
15           A.      Are you asking me what he stated at the
16    suppression hearing?
17           Q.      Yes.
18           A.      I don't recall specifically what he
19    stated at the suppression hearing.
20           Q.      Do you remember at the suppression
21    hearing that he had taken two hits of the purple
22    Mescaline on November 30th?
23           A.      I don't specifically remember what he
24    said at the suppression hearing.
```

1       Q.      Do you recall that he denied remembering

2    that he had told the two officers that he had broken

3    into Emily's house and Mary's house?

4       A.      I don't remember the specifics of the

5    suppression hearing.

6       Q.      Do you recall that he acknowledged under

7    oath that it was his signature on that statement?

8       A.      Yes.

9       Q.      And that he remembered that he testified

10   that he did recall telling them about the McNabb

11   break-in and the stealing the purse from Denny's, do

12   you remember that?

13      A.      Yes.

14      Q.      So, I'm going to switch gears and talk

15   about some of the factors that you base your opinion

16   on, and I'm going to be starting on Page 8 of your

17   report and specifically the section marked Adolescence

18   and developmental immaturity and which continues to

19   Page 10 of your report.

20      A.      Okay.

21      Q.      Do you see the part that I'm referring

22   to?

23      A.      I do.  Thank you.

24      Q.      Okay.  At the beginning of this section,

1    you state, Scholars and courts have both recognized.

2    Do you see that statement?

3          A.      I do.

4          Q.      The scholar that you're referencing is

5    yourself, correct?  Footnote 22 is your own

6    scholarly --

7          A.      So, the article -- my article that I

8    cited, in that article I describe how many different

9    scholars and different courts have recognized the

10   relevance of adolescent development to interrogation.

11         Q.      Okay.  And what courts?

12         A.      The Supreme Court.

13         Q.      And do you recall what cases you're

14   citing?

15         A.      So, I would have been referring to

16   Miller, J.D.B, Roper v. Simmons, those Supreme Court

17   cases all referenced developmental science.

18         Q.      And what dates were those cases decided?

19         A.      In the 20 -- 2000s.

20         Q.      In the early 2000s?

21         A.      Yes.  Mid to late 2000s.

22         Q.      So, when you said mid to late 2000s, you

23   mean aughts, right, mid to --

24         A.      Aughts, yes.  Thank you.

1        Q.      Okay.  Because we're not to the mid 2000s

2    yet?

3        A.      We're not, yes.

4        Q.      What was the status of scholarly research

5    into adolescent development at the interface with

6    interrogations in 1985?

7        A.      In 1985, there was not very much research

8    specifically applying adolescent development to the

9    legal context, although there was a very robust

10   developmental science at that time.

11       Q.      What do you mean by a robust

12   developmental science?

13       A.      I mean a strong understanding about how

14   adolescents think and behave in general.

15       Q.      But it had not apparently been applied in

16   a legal context, is that the distinction you're

17   making?

18       A.      I'm making the distinction that at that

19   -- by that year had not been well studied in

20   specifically an interrogation context.

21       Q.      Okay.  So, there was an area of research

22   for adolescent development but there hadn't been the

23   level of inquiry specifically focussing on adolescent

24   development and the impact on criminal interrogation,

1    is that what you're saying?

2          A.      Mostly.  And if I may clarify.  There was

3    also a literature emerging at that time about

4    adolescent development as it relates to legal

5    decision-making in general with regard to, say,

6    competency hearings or understanding of the legal

7    process.  Later, that literature began to refine and

8    focus even more specifically on police interrogation.

9          Q.      But that was not the case in 1985?

10         A.      Essentially no.

11         Q.      Do you know what the legal standard for

12   interrogation of adolescents in Massachusetts in 1985

13   was?

14         A.      What do you mean by the legal standard?

15         Q.      The legal standard for interrogating

16   adolescents.  What was the legal standard in

17   Massachusetts in 1985 for police officers to

18   interrogate adolescents?

19         A.      I don't understand what you mean by the

20   legal standard.

21         Q.      Do you know whether a seventeen-year-old

22   under Massachusetts law in 1985 was required to have a

23   parent or friendly adult with them?

24         A.      I don't believe that was the case.

1       Q.      And was there any other particular

2    guidance in Massachusetts through statutory case law

3    or regulatory agency that governed police officers if

4    they were interrogating a seventeen-year-old in 1985

5    in Massachusetts?

6       A.      I don't know.

7       Q.      So, I would like you to take a moment and

8    look through the citations that are included from Page

9    8 to Page 10 up to the Miranda comprehension section

10   and tell me whether any of the citations that you're

11   relying upon predate 1985.

12      A.      They don't.  I rely on the most

13   contemporary comprehensive research that's available.

14      Q.      So, now we're going to go through the

15   next section which starts on Page 10 and runs to Page

16   11 and is concerned with youth Miranda -- youth

17   Miranda rights comprehension and waiver.  Have you

18   drawn your attention to that section?

19      A.      Yes.  Thank you.

20      Q.      So, for the purposes of this section, are

21   you using the same definition of youth that is -- that

22   you testified to earlier, so age ten to twenty-five?

23      A.      Yes.

24      Q.      And we can agree that within that, you

1  know, a ten-year-old's comprehension of various

2  matters is probably more nuanced than a -- I mean less

3  nuanced than a twenty-year-old's, is that fair to say?

4       A.     Yes.

5       Q.     And within age groups, you would expect

6  to see differences, correct?

7       A.     Differences in what?

8       Q.     So, one seventeen-year-old might have a

9  different level of comprehension of Miranda rights or

10 the effect of a waiver than another

11 seventeen-year-old?  It's not a straight line, is that

12 fair?

13      A.     I see.  Yes, there are individual

14 differences and also patterns across the lifespan.

15      Q.     And would life experiences also influence

16 an adolescent's ability to comprehend their Miranda

17 rights and the effect of a waiver?

18      A.     Not necessarily.

19      Q.     Would prior interaction with the criminal

20 justice system, for example being arrested,

21 interrogated, and having their rights read before,

22 would that in your opinion influence the -- would it

23 be more probable than not that that would influence

24 your understanding of your Miranda rights and the

1    effect of a waiver?

2         A.    Not necessarily.

3         Q.    How about -- strike that.

4               Are you aware that George Perrot

5    testified at his suppression hearing that he was well

6    aware of what his Miranda rights were?

7         A.    I don't recall the specifics of the

8    suppression hearing.

9         Q.    Whether you recall it or not, if George

10   Perrot testified under oath that he -- on December

11   7th, 1985 that he was well aware of what his Miranda

12   rights were, would that influence your opinion about

13   his comprehension of his Miranda rights?

14        A.    That would require me making a

15   reliability assessment that I wouldn't be comfortable

16   making.

17        Q.    Why would you not be comfortable making

18   that assessment?

19        A.    Because people are not necessarily good

20   self reporters of their own abilities and states.

21        Q.    So, I think I already asked you this, but

22   you did not review the decision of Judge Murphy on

23   that issue after the suppression hearing, is that

24   correct?

Hayley Cleary, MPP, PhD
February 05, 2024                                                        69

1        A.      I don't believe so.

2        Q.      Okay.  And in this section, you also

3   speak to IQ as impacting comprehension, correct?

4        A.      Yes.  Research demonstrates the

5   relationship between IQ and Miranda comprehension.

6        Q.      And we don't know -- you don't know what

7   his IQ was at that time, correct?

8        A.      I don't believe so.

9        Q.      So, I'm going to be asking you this

10  repeatedly.  So, the research that you have cited

11  relative to this section, does any of that predate

12  1985?

13       A.      None of the particular citations that I

14  included predate 1985.

15       Q.      Do you have any citations to any cases

16  where courts have held police departments to a

17  standard that you're enunciating when providing

18  seventeen-year-olds with their Miranda rights?

19       A.      I'm sorry.  I don't understand the

20  question.

21       Q.      So, in this section, you are stating, are

22  you not, that it is a factor that should be considered

23  when Mirandizing somebody is that you should be making

24  a determination about their ability to comprehend

1   based both on their age and their IQ, correct?

2       A.    No, that's not what I'm asserting.

3       Q.    Okay.  What are you --

4       A.    That research demonstrates that

5   individuals with lower IQ struggle to understand their

6   Miranda warnings and to apply the information in

7   Miranda to their own legal situation.  That is

8   different from -- nowhere in my report am I asserting

9   that it is -- that the law requires police officers to

10  do this.  I'm simply conveying what research shows

11  about what impairs Miranda comprehension.

12      Q.    So, are you not aware that this report is

13  being used to bring a claim that the officers involved

14  in the interrogation of George Perrot violated his

15  civil rights?

16      A.    I am aware.

17      Q.    And does your report speak to that issue?

18      A.    That's not for me to decide.  My report

19  speaks to the science around why some people admit to

20  crimes that they didn't actually commit.

21      Q.    So, is it your opinion that the police

22  officers in interrogating George Perrot that night

23  violated his civil rights?

24      A.    That's not for me to decide.

```
 1        Q.     And, so, is it fair to say that is not
 2   your opinion?
 3        A.     I don't have an opinion on police
 4   officers' violations of his civil rights either way.
 5        Q.     And is that because you don't have an
 6   understanding of what the legal standards are that
 7   they're operating under?
 8        A.     No.  It's because I'm not a judge.
 9        Q.     Okay.  Let's move onto the next section
10   on Psychopathology which starts on Page 11 and
11   concludes on Page 12.
12        A.     Yes.
13        Q.     In that section, you reference, we talked
14   about this a little earlier, a report in which George
15   Perrot was diagnosed in January of 1986 with
16   antisocial personality disorder?
17        A.     Correct.
18        Q.     And substance abuse issues, correct?
19        A.     Yes.
20        Q.     And can you explain what antisocial
21   personality disorder is?
22        A.     Generally speaking, it's a pattern of
23   consistent disregard for authority and rule violating
24   behavior.
```

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                    **72**

1        Q.       Is it the same as psychopathology?

2        A.       It's a type of psychopathology.

3        Q.       And is it marked by a lack of empathy?

4        A.       It can be.

5        Q.       Is that a diagnostic criteria for

6     antisocial personality disorder?

7        A.       I'm not comfortable speaking directly to

8     the diagnostic criteria because I'm not a clinician.

9        Q.       Is it the same as -- does somebody who

10    suffers from antisocial personality disorder, would

11    they also be described as being a sociopath?

12       A.       I'm not able to answer that as a

13    non-clinician.

14       Q.       You do have a PhD in psychology, correct?

15       A.       In developmental psychology.

16       Q.       And does someone who has antisocial

17    personality disorder, are they -- is it marked by a

18    lack of veracity in recounting of events?

19       A.       I don't feel comfortable answering

20    questions about diagnostic criteria.

21       Q.       Well, based on what you have reviewed,

22    what characteristics of George Perrot that you have

23    been able to discern from your review of the records

24    are consistent with that diagnosis?