1        A.       So, the diagnosis was provided by a

2   psychiatrist, a medical doctor.  That's where I

3   gleaned information.  And my role is to explain if or

4   how psychopathologies like antisocial personality

5   disorder have been empirically related to propensity

6   for false confession and they have.

7        Q.       In 1985, would the police officers who

8   were interrogating Mr. Perrot had to have reason to

9   know that he might be suffering from antisocial, I

10  guess is suffering from the right -- it might be -- he

11  might have antisocial personality disorder, is there a

12  way that the police officers would have been expected

13  to know that?

14       A.       I don't know.

15       Q.       Are you -- is it your opinion that if

16  they did know that he had antisocial personality

17  disorder that he should have been treated differently

18  during the course of the interrogation?

19       A.       I believe that -- let me think about that

20  for a moment.  I don't really know much about how he

21  was treated because there is no electronic recording

22  of the interrogation, so all I have to go on is the

23  officers' account of the interrogation and the

24  suspect's account of the interrogation.

1        Q.      Okay.  So, forget the word differently.

2    Is there a specific criteria that you feel police

3    officers in 1985 should have applied to their

4    interrogation approach if they had known that Mr.

5    Perrot suffered from antisocial personality disorder?

6        A.      I mean, I believe that police officers in

7    1985 and now should question suspects in a

8    non-accusatorial approach that utilizes investigative

9    interviewing techniques.  That's our understanding of

10   interrogation best practices.

11       Q.      And you believe that was the standard in

12   1985?

13       A.      I don't know what you mean by the

14   standard and I don't know specifically how -- what

15   techniques officers used to question him because

16   there's no recording.

17       Q.      Okay.  So, does any of the research that

18   you cited in this section, does it predate 1985?

19       A.      None of the specific citations I used as

20   examples predate 1985, no.

21       Q.      And do you have any citation in any

22   cases, statutes, or regulatory guidance that requires

23   police officers to take into account a diagnosis of

24   antisocial personality disorder when interrogating

1    someone?

2         A.     No.

3         Q.     Let's move to Trauma and life adversity

4    which starts on Page 12 and continues to Page 13.  Do

5    you have that in front of you?

6         A.     I do.

7         Q.     And does any of that research predate

8    1985?

9         A.     None of the citations that I included

10   predate 1985.

11        Q.     And do you have any citations to any

12   cases where courts have held that police departments

13   should consider trauma and life adversity when

14   interrogating suspects?

15        A.     No.

16        Q.     How would police officers have access to

17   information that would determine whether someone's

18   life events or past trauma was negatively impacting

19   their ability to be interrogated?

20        A.     I don't know what information police

21   officers had in this case or routinely access.

22   Sometimes, that information is available, for example,

23   in the materials that I reviewed but I don't know the

24   degree to which police seek information about suspects

```
 1   as part of their investigative process.
 2        Q.     Are you stating that that is a standard
 3   that they should be held to?
 4        A.     That's not for me to decide.
 5        Q.     Okay.  Let's look at 14 to 16 which deals
 6   with intoxication and sleep deprivation.
 7                    ATTORNEY DESOUSA:  And at this
 8          point, Nicole, it would be helpful if you could
 9           share Exhibit 2.
10        Q.     (By Attorney deSousa)  Dr. Cleary, you
11   have not previously had an opportunity to review this,
12   is that correct?
13        A.     I don't believe so.
14        Q.     Okay.  So, it's not a short document.
15   So, would you like to take a short break so that you
16   can review it?
17        A.     If you would like me to, I would be happy
18   to.
19        Q.     Yeah.  I think that would be helpful.
20                    ATTORNEY DESOUSA:  Carla?
21                    ATTORNEY AGBIRO:  Yes.
22                    ATTORNEY DESOUSA:  I think it would
23          probably be easier if you could just e-mail the
24           doctor with the document rather than having to
```

1       keep -- stay on Zoom and read it this way.

2                   ATTORNEY AGBIRO:  Okay.  That's

3       fine.  Dr. Cleary, would that be easier for

4       you?

5                   THE WITNESS:  Yes, I think so.  Then

6       I can scroll myself.

7                   ATTORNEY AGBIRO:  Okay.  One second.

8                   ATTORNEY DESOUSA:  So, we'll go off

9       the record for let's say ten minutes.  And it's

10      about -- we'll come back around -- well, why

11      don't we take a fifteen-minute break?  And then

12      we'll try to go until 12:30 after that.  All

13      right?  So, how about if we all come back at

14      five after eleven?  Is that okay?

15                  ATTORNEY AGBIRO:  That's fine.

16                  (A recess was taken)

17                  ATTORNEY DESOUSA:  Back on the

18      record.

19      Q.     (By Attorney deSousa)  So, doctor, I

20  assume that you have had an opportunity to review that

21  decision?

22      A.     Yes.

23      Q.     And, again, this is the first time you

24  have had an opportunity to review that decision?

```
 1          A.      Yes.

 2          Q.      And what did Judge Murphy decide relative

 3   to the effect of the purported intoxication on Mr.

 4   Perrot's waiver?

 5          A.      The judge ruled the waiver knowing,

 6   intelligent, and voluntary and found "that the

 7   defendant has exaggerated the quantity of beer and

 8   drugs he had consumed."

 9          Q.      And I believe your testimony is that it's

10   -- that it's in fact the judge's determination that

11   should control when deciding these issues, correct?

12          A.      A judge rules on confession voluntariness

13   and waiver validity.

14          Q.      And that's what happened here, correct?

15          A.      Yes.

16          Q.      And on your citations on Pages 14 to 16,

17   does any of that research relative to intoxication and

18   sleep deprivation, did any of that research predate

19   1985?

20          A.      No.

21          Q.      And do you have any citation to any cases

22   where courts have held police departments to

23   particular standards relative to intoxication and/or

24   sleep deprivation?
```

```
 1        A.     No.

 2        Q.     Whether you're aware of any court

 3   decisions or not, it's true, is it not, that Judge

 4   Murphy had an evidentiary hearing on those very issues

 5   amongst others, correct?

 6        A.     Yes.

 7        Q.     And he was present when the witnesses

 8   testified?

 9        A.     The judge?

10        Q.     Yes.

11        A.     I assume so.

12        Q.     And he had an opportunity to evaluate the

13   creditability of the witnesses, correct?

14        A.     I assume so.

15        Q.     And George Perrot himself took the stand

16   at that time, isn't that also correct?

17        A.     Yes.

18        Q.     And he was aware -- and I'm sorry.

19   Strike that.

20               And in 1986, people's memories of the

21   events from 1985 would presumably be fresher than they

22   would be in the 2017 to 2024 years, is that correct?

23        A.     I think so, yes.

24        Q.     And you read the motion to suppress
```

1    transcripts, correct?

2         A.    Yes.

3         Q.    And you saw that counsel for Mr. Perrot

4    argued that the confessions should have been stricken

5    in part because of sleep deprivation, correct?

6         A.    I believe so.

7         Q.    And in part because of intoxication,

8    correct?

9         A.    Yes.

10        Q.    And the judge who was charged with the

11   responsibility of knowing and applying the law didn't

12   find that to be true, correct?

13        A.    Correct.

14        Q.    So, now I would like to go to the next

15   section of your report which starts on Page 16 and it

16   runs 16 to 18 on Police presumptions of guilt and

17   investigator bias.  And my first question is that the

18   citations that you make in that section, does any of

19   that predate 1985?

20        A.    No.

21        Q.    And are you aware of any cases where

22   courts have held -- that have held that police

23   departments need to consider issues of police

24   presumptions of guilt and/or investigatory bias during

1   interrogations of suspects?

2       A.      No.

3       Q.      Is it your opinion that the Springfield

4   Police Department's questioning of George Perrot on

5   December 7th, 1985 was influenced by their presumption

6   of his guilt and/or investigatory basis?

7       A.      Yes.

8       Q.      And what facts in the records do you base

9   that opinion upon?

10      A.      The facts of the record that I base that

11  opinion upon were that they were -- the officers were

12  looking at Mr. Perrot for these crimes even though he

13  denied that he was involved in the sexual assaults

14  while readily admitting guilt for others.  In fact, it

15  was Detective -- excuse me.  I forget his rank.

16  Officer Jarvis testified that he told another

17  detective, I was looking at him for the rape.  And,

18  so, in my opinion, they entered the interrogation

19  looking to elicit a confession for rape from Mr.

20  Perrot.

21      Q.      And you have reviewed, have you not, the

22  statement that George Perrot gave relative to the Mae

23  Marchand rape and break-in, the first one where he

24  described being at the Big E and he came in because

1   the grandson said -- the grandson believed that he and

2   his friends were the ones who had broken in and

3   assaulted his mom -- his grandma?

4        A.     I recall the specific content.  I don't

5   remember which statement it was included in.

6        Q.     So, I think if you look at your

7   statements from the statement from September of

8   1985 --

9        A.     So, there's the statement from Perrot to

10  Thomas Jarvis on December --

11       Q.     Go ahead.

12       A.     December 7th, 1985 at 12:40.

13       Q.     Yes.

14       A.     Then there's a second statement, same

15  date, no time that I believe was prepared by Detective

16  Jarvis and signed by Mr. Perrot.  Is that what you

17  mean by the first and second statements?

18       Q.     No.  I mean the statement -- if you go

19  back to your list, it's Number 6.

20       A.     Would you like me to pull --

21       Q.     No.  No.  I just want to make sure we're

22  both talking about the same thing.

23       A.     Okay.  Okay.

24       Q.     So, do you see on your list --

1          A.      Yes.

2          Q.      -- it's number 6, Statement from George

3   Perrot regarding call from MM, which is Mae Marchand's

4   grandson, and it's dated September 21st, 1985?

5          A.      Yes.

6          Q.      And do you recall that statement?

7          A.      Vaguely, yes.

8          Q.      Okay.  And, so, the night of that

9   statement, George Perrot voluntarily went to the

10  Springfield Police Department, correct?

11         A.      I believe so, yes.

12         Q.      And he said in essence, I was contacted

13  by this woman's grandson and he is saying that he

14  thinks I raped, broke in and raped his grandmother,

15  correct?

16         A.      Yes.

17         Q.      And I didn't and I'm going to tell you

18  all the things I did that night that were not breaking

19  in and raping his grandmother, correct?

20         A.      I believe so, yes.

21         Q.      And he gives a pretty detailed statement

22  about I went out with my friends, we drank, we did

23  drugs, we climbed over fences to go in and out of a

24  local fair.  My girlfriend was also with me but I did

1   all these other things but I didn't break in and rape

2   this old lady, correct?

3       A.      Right.

4       Q.      Does that refresh your recollection?

5       A.      Yes.

6       Q.      But he tells the police that he and his

7   friends did know this woman because they had been

8   painting her garage, do you remember that?

9       A.      Yes.

10      Q.      Okay.  And is it likely that police

11  officers getting this information might discern that

12  perhaps this was the perpetrator of the break-in and

13  rape of Mae Marchand?

14      A.      It is likely that that contributed to

15  their initial identification of Mr. Perrot.  The

16  problem with that --

17      Q.      And then -- go ahead.  I'm sorry.  I

18  didn't mean to cut you off.

19      A.      The problem occurs when investigators

20  adhere to that assumption of guilt and even

21  double-down on it even in the face of information that

22  would suggest otherwise, like a denial for example.

23      Q.      So, are you saying the standard is that

24  if a suspect denies the crime, the interrogation

Hayley Cleary, MPP, PhD
**February 05, 2024**                                              85

1   should stop?

2        A.      No.

3        Q.      Are you saying that a suspect denying a

4   crime should be conclusively presumed to be true?

5        A.      No.

6        Q.      And the statement at issue doesn't

7   include an admission of the rapes, isn't that true?

8        A.      Yes.

9        Q.      So, to the extent that Officer Jarvis

10  went in with an investigatory basis that Mr. Perrot

11  raped both of those women, that didn't result in a

12  false confession of those rapes, did it?

13       A.      I'm not making determinations about

14  whether confessions are false or true.  I am sharing

15  the science about factors that predict likelihood of

16  false confessions.

17       Q.      He didn't confess to the rapes at all, so

18  whether it was false or true, whatever bias Jarvis had

19  or didn't have, it didn't result in a confession at

20  all, isn't that true?

21       A.      He signed a statement admitting to

22  entering the houses where women reported being

23  sexually assaulted and he was convicted of sexual

24  assault.

Hayley Cleary, MPP, PhD
February 05, 2024                                                           86

1        Q.      But he specifically denied the sexual

2   assaults?

3        A.      Yes.

4        Q.      So, the bias didn't result in a

5   confession to the events that he was ultimately

6   convicted of, being the sexual assault of Mary Prekop,

7   correct?

8        A.      Mr. Perrot did not confess to the sexual

9   assaults.

10       Q.      And he was never convicted of sexually

11  assaulting Emily Lichwala, was he?

12       A.      I get the two cases, multiple cases

13  confused, so I can't answer that specifically.

14       Q.      How many women do you believe in 1987

15  that Mr. Perrot was convicted of raping?

16       A.      There was involved in this voluminous

17  record Mary Prekop, Emily Lichwala, and Mae Marchand.

18  These were women who reported sexual assaults around

19  that time and police suspected Mr. Perrot of those at

20  various points in time.

21       Q.      How many was he convicted of?

22       A.      I don't recall the specific trial

23  determinations.

24       Q.      Which of the investigators on December

1  7th, 1985 in your opinion were influenced by a

2  presumption of George Perrot's guilt and/or

3  investigatory bias?

4          A.     The people who questioned him were --

5  make sure I get their names correct -- Sergeant Kelly

6  and Detective Jarvis questioned him repeatedly about

7  sexual assaults.

8          Q.     So, when you say repeatedly, how many

9  times do you believe he was questioned about those?

10         A.     Multiple times in and out of periods of

11 isolation.

12         Q.     By isolation, you mean he was either in

13 his cell or in an office with nobody asking him

14 questions, is that what you mean?

15         A.     Yes.

16         Q.     He wasn't put into an isolation unit?

17         A.     I mean, he was in state custody in a room

18 by himself.

19         Q.     And you'll agree with me, will you not,

20 that he testified that the first of the three times he

21 was questioned, it was not about Emily Lichwala or

22 Mary Prekop's assaults, correct?

23         A.     I believe that's correct.  I forget the

24 specific order of questioning.  There were multiple

1   bouts.

2        Q.     And at least one point, he was questioned

3   about two unsolved murders, correct?

4        A.     I don't recall that specifically.

5        Q.     Okay.  So, I think you have already

6   testified to this but going back to the September

7   1985, Mae Marchand, lady they painted her house -- her

8   garage, you didn't read any of the other statements

9   that were taken at that time from other witnesses, his

10  girlfriend, Bob Timmerman, I can't remember Atkins'

11  first name right now?  You didn't read any of those

12  statements?

13       A.     I don't believe so.  I would have to look

14  at my folder again.

15       Q.     And are you aware based on the records

16  that you have reviewed that at least one of the

17  investigators from the September 1985 night felt that

18  Templeman or Timmerman was more likely to be the

19  perpetrator than George Perrot?

20       A.     I was not aware.

21       Q.     And do you know whether either of those

22  officers were involved in the December 1985

23  interrogation of Mr. Perrot?

24       A.     I don't know.

1        Q.      Do you know whether Mr. Perrot was

2    questioned about whether or not Mr. Timmerman was the

3    perpetrator of the assaults?

4        A.      I don't recall.

5        Q.      In your opinion, do investigators have a

6    duty to recuse themselves from an investigator once

7    they make a determination in their own mind of who the

8    lead suspect is?

9        A.      No.

10       Q.      What do you -- what is your opinion on

11   the standard that officers should be following if they

12   make a determination in their own mind of who the lead

13   suspect is?

14       A.      My opinion is that investigators are

15   obligated to seek corroboration of information that

16   they obtain from suspects.

17       Q.      And in this case, do you feel that there

18   was not any corroboration?

19       A.      There was DNA evidence that was obtained

20   from the scene.  There were gloves that were in

21   question that one of the defendants disagreed with

22   police about the source of the gloves.

23       Q.      Do you know whether or not that evidence

24   was presented to a jury?

1    A.      I don't recall specifically.

2    Q.      If there is a piece of evidence and one

3  person says that the evidence was this and another

4  person says that's not what the evidence shows, should

5  police be stopped from presenting that evidence to a

6  jury?

7    A.      It's not my decision what information

8  gets presented to a jury.

9    Q.      Okay.  You have read the trial

10  transcripts, correct?

11    A.      I read them back in October of last year.

12    Q.      I know that and, you know, for whatever

13  reason, there was no preparation for today's

14  deposition, but in the trial transcript, you read the

15  testimony of the officers who responded on November

16  30th, 1985 to Mary Prekop's house after she had been

17  violently sexually assaulted, correct?

18    A.      I read the trial transcript in

19  preparation for my report.

20    Q.      And those officers testified that one of

21  the pieces of evidence that they took from the scene

22  was ladies' gloves, correct?

23    A.      I believe so.  Again, there is a large

24  volume of discovery that I did not re-review in

1   totality in preparation for a deposition about my

2   report.

3        Q.     And the officer -- one of the officers

4   that responded to the scene testified that George

5   Perrot's sister, Nancy Westcott, said, I have a pair

6   of gloves that look like what you're describing.  And

7   he said, Can you go get them?  And she said, Oh, I

8   went to get them where I knew they were and they're

9   not there anymore.  Does that refresh your

10  recollection about the testimony that the officer

11  offered about the gloves?

12       A.     I don't recall specifically what the

13  officer testified about gloves.

14       Q.     Do you recall that Nancy Westcott

15  testified that she did not say that, that she did not

16  own a pair of gloves like that and she never told the

17  officer that and that she might have said, I think

18  George's girlfriend might have had a pair of gloves

19  like that?  Does that refresh your recollection about

20  Nancy Westcott's testimony?

21       A.     That sounds vaguely familiar but I don't

22  recall specific details of every person who testified

23  in multiple trials.

24       Q.     And if that testimony was given in front

1  of a jury and the jury said, I don't believe Nancy

2  Westcott, I believe the police officer and I therefore

3  believe that those gloves were Nancy Westcott's that

4  were found in the home of Mary Prekop after she had

5  been violently raped, that was their job, right, to

6  make determinations of fact within the confines of a

7  jury, correct?

8       A.     Yes.

9       Q.     So, in what way did the Springfield

10 Police Department misuse in your opinion the evidence

11 about let's say the gloves?

12      A.     I believe that my report is being

13 misconstrued.  My role is to share with the court the

14 science about what we have learned about the

15 investigative process and how errors in the

16 investigative process can capitalize on psychological

17 biases and result in particular outcomes.  There is

18 extensive research on confirmation bias or what we

19 call investigator bias in an investigative context

20 around tunnel vision and how it colors legal actor's

21 decision-making, not just police but also prosecutors

22 down the road.  So, my report shares that science

23 along with science about other risk factors that are

24 related to false and unreliable confession statements.

1       Q.      You understand your opinion is being

2   offered in a case where none of those things are at

3   issue, correct?  This case is about George Perrot

4   saying that the actions of the Springfield Police

5   Department violated his civil rights.  That's what

6   this case is about, doctor.  I don't know what you

7   thought the case was about but that's what this case

8   is about.  So, I'm trying to put into context the

9   usefulness of research that postdates these events by

10  several decades to the case that we're currently

11  involved with.

12      A.      That I believe I can answer for you.

13  Just because the research postdates the events doesn't

14  mean that those events weren't a function of what we

15  now know.  I mean, take a medical analogy for example.

16  We now know how blood moves from the -- through the

17  brain using functional magnetic resonance imaging.  We

18  didn't have fMRI 100 years ago but that doesn't mean

19  the blood flow doesn't work through the brain in the

20  same way.  The research is recent but explicates the

21  psychological components of the process, of coercion,

22  of Miranda rights comprehension or non-comprehension,

23  whatever the relevant factor is.  My job is to

24  summarize and share the research and apply it to the

1   case facts that are available to me.

2        Q.    I understand that, doctor, but your

3   analogy doesn't answer my question.  If we were to

4   take modern medical science and apply it to a doctor

5   in the 1920s who was treating people without

6   antibiotics and we would now say, of course they

7   should have been given antibiotics with that level of

8   an infection, we can't use that research now to go

9   back and say the doctor in the 1920s was guilty of

10  malpractice, can we?

11       A.    I'm not making determinations about the

12  officers.  I'm sharing the science and the -- Mr.

13  Perrot's legal claims are what they are.  I'm not a

14  civil attorney.

15       Q.    Okay.  Let's go to the next section which

16  is Confession contamination and scripting.  You

17  reference in the beginning of that section, which it

18  starts on Page 18 to 19, a technique called the Reid

19  Technique.  What is that?

20       A.    The Reid Technique is a method of

21  criminal investigation developed, proposed, and

22  copyrighted by a company called Reid and Associates.

23       Q.    When?

24       A.    The Reid Technique originally has been

 1   around for maybe fifty something years, the 19 --

 2        Q.     It wasn't involved in 1985?

 3        A.     The Reid Technique has been around since

 4   before 1985, much before.

 5        Q.     What is it?

 6        A.     It is a nine-step process for

 7   interrogating suspects of a crime.

 8        Q.     And when was it developed?

 9        A.     In the 60s maybe.

10        Q.     And are you aware as you sit here today

11   of any caselaw that requires the Reid Technique be

12   followed in interrogation of suspects at any time?

13        A.     No.  It's an interrogation training

14   approach, one of many.

15        Q.     It's not the only way to interrogate

16   suspects then?

17        A.     No.

18        Q.     And it's not required by any caselaw?

19        A.     No.

20        Q.     And it's not required by any regulatory

21   body of police officers that you're aware of?

22        A.     No.

23        Q.     And it's not -- and you know that it was

24   or was not followed in the George Perrot case?

```
 1        A.     I can't speak to that specifically.

 2        Q.     Okay.  What is confession scripting?

 3        A.     Confession scripting is when officers

 4   intentionally or unintentionally lead suspects through

 5   a recounting of events through a series of leading

 6   and/or closed-ended questions that elicit a specific

 7   narrative that occurred.  Scripting can be sort of

 8   general or gentle if you will or in the case where a

 9   confession statement is literally created and written

10   by an investigator, it can be literally scripted.

11        Q.     What is confession contamination?

12        A.     Contamination is when details about the

13   crime that are in theory known only to the true

14   perpetrator and police become communicated to suspects

15   through the process of questioning most often,

16   although it can come from other sources like

17   neighborhood gossip or news, et cetera.

18        Q.     And the scholarly research that you have

19   cited on Pages 18 to 19, does any of that predate

20   1985?

21        A.     No.

22        Q.     You describe the confession as having a

23   relative lack of details?

24        A.     Yes.
```

1      Q.      And by the confession, I'm assuming that

2   we're talking only about the confession relative to

3   the break-ins at Emily Lichwala and Mary Prekop's

4   homes?

5      A.      I'm talking about the written -- the two

6   written or typed, excuse me, typed statements.

7      Q.      Both statements about the McNabb and the

8   Denny's?  There's two statements, right?  One has to

9   do with the events of December 7th and one has to do

10  with November 30th but doesn't include the rapes, it

11  just has the break-ins, correct?

12     A.      Yes.

13     Q.      And, so, are you saying both of those

14  statements suffered from a relative lack of detail?

15     A.      Can you -- if would like me to elaborate

16  on --

17     Q.      Sure.  I'll find it.

18     A.      Thank you.  Direct me to the location.

19     Q.      It starts on the bottom of 18 and

20  continues onto 19, In the present case.

21     A.      Yes.  Thank you.  Can you repeat your

22  question, please?

23     Q.      Are you saying -- so, first of all, can

24  we agree that you're referring here to the statements

1   relative to the November 30th, 1985 events, not the

2   December 7th events, correct?

3        A.     Yes.

4        Q.     And you're saying it's remarkably sparse?

5        A.     Yes.

6        Q.     Okay.  And what -- upon what did you base

7   that?

8        A.     My experience reviewing very many

9   interrogations and confessions.

10       Q.     I'm sorry.  That was a really badly

11  worded question.  What I meant was, specifically in

12  what ways did it seem sparse to you?

13       A.     So, there was not any detail about the --

14  excuse me.  There was not very much detail about the

15  events leading up to the crime, not a lot of detail

16  about the motive for the crime, the events that

17  occurred after the crime.  Each of those things were

18  mentioned in a sentence or two but in totality, the

19  statement is, you know, about a double-space typed

20  page which in my opinion is relatively sparse.

21       Q.     Okay.  So, you state, It contains the

22  crime locations, correct?

23       A.     Yes.

24       Q.     The method of entry?

```
 1          A.      Yes.

 2          Q.      And some additional details and you use

 3   as examples the wool gloves and a barking dog?

 4          A.      Yes.

 5          Q.      Correct?

 6          A.      Yes.

 7          Q.      Then before the crime, he described

 8   travelling to Vermont, drinking, taking drugs,

 9   correct?

10          A.      Yes.

11          Q.      And that seems not detailed to you?

12          A.      I have reviewed confession statements

13   that are pages and pages long.

14          Q.      And have you reviewed some that have been

15   less long than that?

16          A.      Yes.

17          Q.      So, this isn't just, I did it, correct?

18   There's more details than that, isn't there?

19          A.      There is more details than, I did it,

20   yes.

21          Q.      And, well, at least about the use of

22   drugs and where he had been and all of that, that

23   seemed pretty detailed, correct?

24          A.      I mean, I stand by my statement in the
```

1   report that to me, this written confession is sparse

2   in my assessment of sparse.

3        Q.     When you compare the statement that

4   George Perrot gave in September of 1985, which he

5   voluntarily showed up and gave, correct?

6        A.     Yes.

7        Q.     And the statement he gave about the

8   events of December 7th, 1985 and the statement that he

9   gave about the events on November 30th, 1985, did you

10  see any consistencies between those statements?

11       A.     I would have to look at them side by side

12  again.

13       Q.     Well, do you recall a lot of detail from

14  Mr. Perrot about the drugs he took?

15       A.     I would have to look at them side by side

16  again.

17       Q.     Do you recall any detail about his

18  recreational activities in the evenings in question

19  leading up to the break-ins?

20       A.     I would have to re-review the statements

21  side by side.

22       Q.     Okay.  And isn't there an argument to be

23  made that the relative lack of details in the

24  confessions suggest that it was not scripted by the

1  police but rather was what the perpetrator gave?

2       A.      Not necessarily.

3       Q.      How about the fact that he doesn't state

4  -- doesn't admit to the sexual assaults?  Doesn't that

5  support a conclusion that the confessions were not

6  scripted?

7       A.      Not necessarily.

8       Q.      So, wouldn't a police officer be more

9  interested in scripting a confession that confessed to

10 the crimes they were investigating?

11      A.      You're asking me to speak to the police

12 officers' motives if I'm understanding you correctly

13 and I don't think I can answer that.

14      Q.      So, don't you think by suggesting that

15 the confession was a product of contamination and/or

16 scripting that you are speaking to the police

17 officers' motives?

18      A.      I am providing context based on the

19 research on contamination, confession contamination

20 and scripting that -- that could have occurred in this

21 case.

22      Q.      And you state that more probably than not

23 it did occur in this case?

24      A.      Can you repeat that, please?

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                         **102**

1     Q.     Can you state that it's your opinion that

2   it more probably than not did occur in this case?

3     A.     Do you mean that officers scripted the

4   confession statement?

5     Q.     Yes.

6     A.     So, I reviewed the confession statement,

7   which is typed here, and I stated in my report if this

8   is accurate.

9     Q.     If what is accurate?

10     A.     If -- so, Mr. Perrot alleged that police

11   generated the details about the home break-ins in

12   Covel Street and Malibu.

13     Q.     That's not what I'm asking you though.  I

14   mean, obviously if you accept his versions of events,

15   then -- I'm asking you whether reviewing the document

16   and the information in front of you, you can state

17   that it's your opinion that it is more probable than

18   not that it was as a result of confession

19   contamination and/or scripting?  Leaving aside

20   credibility, determinations about what George Perrot

21   says or what the police say, based on the document

22   that you're reviewing, can you state that?

23     A.     Can I?  No.

24     Q.     You also state that one of the problems

1    with confessions that are as a result of contamination

2    and/or scripting is that ordinarily, the police stop

3    investigating crimes once they get a confession, am I

4    accurately recounting what you stated?

5          A.      Often times.

6          Q.      Did that happen here?

7          A.      I would have to re-review the police

8    materials to specifically answer which investigative

9    actions occurred before the interrogation and which

10   occurred after.

11         Q.      Well, are you aware that after Mr.

12   Perrot's conviction, they were actively pursuing other

13   suspects that may have had a role in these break-ins

14   and assaults?

15         A.      I'm not familiar with that detail.

16         Q.      Okay.  So, if that's true, would that

17   undermine determination that this was a scripted

18   confession?

19         A.      I'm not making a determination that this

20   is a scripted confession.

21         Q.      Would it weigh against it having been a

22   scripted confession?

23         A.      I think information about when and how

24   the police conduct investigations to elicit

1  information that either confirms a confession

2  statement or discounts it is relevant and important.

3      Q.    I don't understand your answer.  I don't

4  understand how that answered my question.  Could you

5  repeat it?  Maybe I missed something.

6      A.    Well -- and perhaps I misunderstood your

7  question.  If so, I apologize.  So, you're asking me

8  is it -- I think you were asking me, would it be

9  important to know if the police continued their

10  investigation after the conviction and I would say

11  yes, that's good information to know.

12      Q.    Okay.  Now I'm going to switch gears to

13  after George Perrot's release in 2017.  And I'm going

14  to ask that you review, because I believe you stated

15  you had not yet been able to, the nol pros that was

16  issued.

17              ATTORNEY DESOUSA:  And that's

18          Exhibit 1, Nicole, if you could share that.

19          This is a four-page document.  Dr. Cleary,

20          would you like us to go off record for maybe

21          five minutes so you can read it without us all

22          watching you read it?

23              THE WITNESS:  Sure.  Thank you.

24              ATTORNEY DESOUSA:  Sure.  So, we'll

```
 1          go off record for five minutes.
 2                        (A recess was taken)
 3                        ATTORNEY DESOUSA:  Back on the
 4           record.
 5          Q.     (By Attorney deSousa)  So, Dr. Cleary,
 6     you have had a chance to review this document?
 7          A.     Yes.
 8          Q.     And, so, you understand that in this
 9     document, the District Attorney's office explained its
10     reasoning for not retrying Mr. Perrot?
11          A.     Yes.
12          Q.     And they reference the forensic testing
13     that has now been deemed unreliable, correct?
14          A.     Yes.
15          Q.     They reference the fact that he had
16     already at that point in time served longer than he
17     would have under our current sentencing guidelines --
18          A.     Yes.
19          Q.     -- were he convicted today and that he
20     had not violated the conditions of his parole,
21     correct?
22          A.     Yes.
23          Q.     It had nothing to do with any confession,
24     issues on confession, correct?
```

1              ATTORNEY AGBIRO:  Objection.

2        Objection to hearsay.  Everything on here is

3        hearsay.

4              ATTORNEY DESOUSA:  I'm asking her

5        what she reviewed but your objection is on the

6        record.

7        Q.    (By Attorney deSousa)  Dr. Cleary, did

8   you understand my question?

9        A.    I believe so.  The document does not

10   reference a confession.

11       Q.    Are you aware of George Perrot's

12   activities since 2017?

13       A.    Not particularly other than the

14   activities in prison for which he earned a

15   certificate.  That was part of the materials I

16   reviewed.

17       Q.    I'm sorry.  I meant to say since 2017.

18       A.    I'm sorry.  No, I'm not familiar.

19       Q.    And, so, I take it you're not aware that

20   he has been arrested multiple times?

21       A.    No.

22       Q.    And you're not aware that he has on three

23   separate occasions been accused of violent attacks on

24   women?

```
 1        A.      No.
 2        Q.      If he has had repeated accusations and
 3   confessions to attacks on women, would that influence
 4   your opinions in this case in any way?
 5        A.      Not necessarily.
 6                    ATTORNEY DESOUSA:  That's all that I
 7           have.  I'm sure maybe some of the other defense
 8           attorneys might want to or maybe not.  Carole,
 9           are you talking?  Because you're on mute.
10                    ATTORNEY LYNCH:  I have a few
11           questions unless somebody else wants to go
12           first.
13                    ATTORNEY AUSTIN:  Go ahead, Carole.
14                    ATTORNEY LYNCH:  Okay.
15
16   EXAMINATION BY ATTORNEY LYNCH:
17        Q.      Dr. Cleary, I represent Richard Kane who
18   is named as a defendant in this case.  Did you review
19   any documents in preparation for your deposition
20   today?
21        A.      I reviewed my report in detail.
22        Q.      Okay.  Now, do you know Craig Miller?
23        A.      No.
24        Q.      So, you have never met him or spoken to
```

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                                                     **108**

1   him or communicated with him in any way?

2        A.     I don't believe I know anyone by that

3   name.

4        Q.     Okay.  Do you know anything about his

5   reputation at all?

6        A.     No.

7        Q.     Okay.  So, is it fair to say that you are

8   not aware that he has given an opinion in this case?

9        A.     No.  I don't know him.

10       Q.     Okay.  So, you have not read his report?

11       A.     No.  No.

12       Q.     Now, in the list of appearances that we

13  were given by Mr. Perrot's counsel, we were provided

14  with a list that states your appearances as an expert

15  witness at trial or deposition.  Is that something

16  that you prepared?  It has ten cases.

17       A.     I'm sorry.  Are you asking about a

18  document that lists my testimony at trial?

19       Q.     Yes.

20       A.     Yes.  The record of times that I have

21  appeared in court, that's correct, I have prepared

22  that.

23       Q.     Okay.  And actually it looks like it was

24  last updated on November 1, 2023.  Is that accurate?

```
 1         A.      Let's see, are you asking me if I have

 2  testified since then?

 3         Q.      No.  I'm talking about the list itself.

 4         A.      Yes, it was accurate at the time of the

 5  -- it was dated at the top.

 6         Q.      Okay.  One of the cases that you listed

 7  is Simmers versus King County.  Do you recall that

 8  case?

 9         A.      Yes.

10         Q.      Okay.  Who were you hired by on that

11  case?

12         A.      Mr. Simmers' attorney.

13         Q.      Okay.  And who was that?

14         A.      His name is David Owens.

15         Q.      It wasn't Loevy and Loevy?

16         A.      Mr. Owens contacted me.  I'm actually

17  unsure of his affiliation.  I think has multiple, for

18  example, like a law school at the University of

19  Washington.  I'm not certain who he is affiliated

20  with.

21         Q.      Okay.  Because I believe your testimony

22  earlier was that you did not think you had worked with

23  Loevy and Loevy before?

24         A.      Actually, now that you say that, thank
```

```
1    you for reminding me, there was a case that I provided

2    consultation on, not the Simmers case but an

3    additional case that was included -- decided before I

4    provided a report.  That was from Loevy and Loevy.

5         Q.    And what was the name of that case?

6         A.    The individuals' names, there were two

7    individuals, their names were Cory Batchelor and Kevin

8    Bailey I believe.  I communicated with their

9    attorneys.  I reviewed the case and materials and

10   consulted with counsel but did not --

11                   ATTORNEY AGBIRO:  Objection.

12          Objection to any answer that is going to

13          infringe on any work product privilege.

14          Consultation would include that.

15                   THE WITNESS:  I did not provide a

16          report in that case.

17        Q.    (By Attorney Lynch)  That case is not

18   listed on this document.  You said it was called Cory

19   Batchelor and Kevin Bailey were the plaintiffs?

20        A.    Yes.  And if you're referring to the

21   document of mine that I think you're referring to,

22   that is a list of cases in which I have actually

23   testified.

24        Q.    Okay.  Just briefly, with regard to this
```

```
 1   Cory Batchelor and Kevin Bailey case, what were they

 2   accused of?

 3       A.    It was a disputed confession case.

 4               ATTORNEY AGBIRO:  Objection.  I'm

 5           going to object again because if there was no

 6           type of report done, then this is all work

 7           product.  It's not discoverable.

 8               ATTORNEY LYNCH:  How is it not

 9           discoverable?

10               ATTORNEY AGBIRO:  Because there was

11           no report done.  If an attorney reached out to

12           her to ask if she's going to be able to work on

13           the case but didn't actually retain her, that's

14           work product.  That's under Rule 26.  That's

15           not discoverable.  So, no, I'm going to direct

16           her not to answer.

17       Q.    (By Attorney Lynch)  Did that case have

18   to do with someone that you would say was a juvenile

19   or a youth?

20               ATTORNEY AGBIRO:  I'm going to

21           object again.  Any answer that requires you to

22           call on any knowledge, call from any type of

23           attorney consultation is not discoverable.

24           It's covered by attorney client, attorney work
```

```
 1          product privilege.
 2          Q.      (By Attorney Lynch)  Do you have any
 3   information about that case other than what you
 4   received from Loevy and Loevy?
 5          A.      I'm not sure what you mean by
 6   information.  I'm not sure how to answer that.
 7          Q.      Well, do you know anything about that
 8   case other than what you received from Loevy and
 9   Loevy?
10          A.      I reviewed case materials but I did not
11   issue a report.
12          Q.      In terms of the case materials that you
13   reviewed, do you remember if it had to do with a youth
14   or, you know, someone you considered to be juvenile?
15                     ATTORNEY AGBIRO:  And I'm going to
16        object to the extent that that case material
17        was given to you by an attorney, that's work
18        product.
19          Q.      (By Attorney Lynch)  So, the question is,
20   did you review any materials that were given to you
21   other than from the attorney?
22          A.      No.
23          Q.      Now, with respect to this Simmers versus
24   King County case, do you remember what that case is
```

1    about?

2         A.      It was a disputed confession case.

3         Q.      And what were you asked to do in that

4    case?

5         A.      I was asked to review materials and draft

6    a report explaining the social science related to the

7    factors that I identified and apply them to the case.

8         Q.      Do you remember what the -- that was a

9    civil case, correct?

10        A.      Yes.

11        Q.      What do you recall about the plaintiff in

12   that case?

13        A.      I recall he was a young man, maybe

14   fifteen or sixteen years old at the time of the crime.

15   There was a murder, a stabbing of an individual on a

16   trail in the State of Wisconsin and Mr. Simmers was

17   interrogated by police about the -- that stabbing

18   attack and in an exaggerated fashion, he confessed to

19   stabbing an individual who was hiking on the trail.

20        Q.      I'm sorry.  Did you say exaggerated

21   fashion?

22        A.      Yeah.  So, in one case -- so, for

23   example, in the course of this interrogation, this

24   young person purported to be like a gang banger and

1    confessed -- said that he had killed something like

2    thirteen other individuals and he provided a lot of

3    details about how, you know, these -- stabbing

4    occurred.  There was a lot of braggadocio in his

5    communication with investigators if I recall

6    correctly.

7         Q.     Okay.  And what opinion did you -- what

8    opinion or opinions did you provide in that case?

9         A.     My opinion was, you know, here are the

10   risk factors for false confessions that are

11   empirically demonstrated that I see as present in this

12   case.  I don't remember which specific factors were

13   relevant to that particular case but it would be in my

14   report.

15        Q.     Well, do you remember if you found that

16   the same risk factors were present in the Simmers case

17   as you're saying were present in the Perrot case?

18        A.     Several of them would have been the same

19   because Mr. Simmers was I believe fifteen or sixteen

20   but there were also different risk factors involved in

21   that case.

22        Q.     Do you recall which ones you thought were

23   the same?

24        A.     I would have to look at the report side

```
 1    by side.

 2         Q.     Do you remember which ones you thought

 3    were different?

 4         A.     I would have to look at the report side

 5    by side again.  I'm sorry.

 6         Q.     And there is a date provided there on

 7    your list that says 1/18/23.  Is that the date of your

 8    deposition?

 9         A.     Yes.

10         Q.     Do you remember who the attorney or

11    attorneys were that were representing Mr. Simmers in

12    that case at the time of your deposition?

13         A.     David Owens.

14         Q.     No one from Loevy and Loevy?

15         A.     He was the only attorney present that I

16    recall on behalf of Mr. Simmons, Simmers.

17         Q.     And are you saying that Attorney Owens is

18    not a member of the law firm Loevy and Loevy?

19         A.     Maybe he is.  I don't -- I don't know who

20    he works for.  I don't specifically recall.  Maybe --

21         Q.     Do you -- I'm sorry.

22         A.     I mean, I don't -- I don't know who he

23    works for.  Maybe it's Loevy and Loevy.  I don't

24    really understand the scope of their organization I
```

1    guess.

2         Q.    Okay.  Well, for purposes of

3    clarification, with regard to the Simmers case, do you

4    recall Loevy and Loevy being involved in any way in

5    terms of providing you with information, paying your

6    bills, you know, anything like that?

7         A.    So, I mean, the information that I

8    received came from Mr. Owens.  It's possible that -- I

9    mean, I'm gathering that Mr. Owens is an attorney

10   associated with Loevy and Loevy.  If that's true, then

11   maybe I just misunderstood at the time.  It's possible

12   that they paid the invoice.  I just don't specifically

13   recall.  I just remember working with Mr. Owens.

14        Q.    But at this point, do you remember

15   receiving any e-mails that came from the firm Loevy

16   and Loevy or receiving any correspondence with their

17   letterhead on it?

18        A.    Maybe.  I just don't -- I just remember

19   Mr. Owens.

20        Q.    Do you recall if you used the same

21   research for your opinions in the Perrot case that you

22   used in the Simmers case?

23        A.    So, the science is the science and for,

24   you know, relevant risk factors such as adolescence

1    and developmental immaturity for example, the

2    scientific basis for the relevance of adolescent

3    development in that case is the same scientific basis

4    as the relevance for adolescent development in this

5    case.  So, in that sense, yes, some of the science is

6    the same but most likely, there were different

7    additional risk factors that were present in one case

8    and not the other in which case the empirical basis

9    for that would be different as well.

10        Q.      And do you know what the outcome is or

11   was of that case?

12        A.      I haven't heard anything since the

13   deposition.

14        Q.      So, you don't know if it's still ongoing

15   or it has been resolved somehow?

16        A.      I don't know.

17        Q.      Do you remember any details about the

18   police interrogation that occurred of Mr. Simmers?

19        A.      I remember that only the final confession

20   statement was electronically recorded and not the

21   interrogation that preceded it.

22        Q.      Do you recall any details as to how he

23   was interrogated that led you to believe that he made

24   a false confession?

```
 1        A.      Well, I definitely didn't opine that he
 2    made a false confession and --
 3        Q.      I'm sorry.  I didn't hear what you just
 4    said.
 5        A.      I said, I did not opine that he -- that
 6    Mr. Simmers made a false confession because I never
 7    speak to a confession as being true or false.  As for
 8    the interrogation techniques that were used, I
 9    honestly don't remember the specifics.  I have
10    reviewed a lot of cases but I would have summarized
11    them in my report.
12        Q.      Do you know when Mr. Perrot stated for
13    the first time that he did not confess to the break-in
14    at Emily Lichwala's house and Mary Prekop's house?
15        A.      I don't remember the specific timeline of
16    the recantations.
17        Q.      By the way, did you ever have any contact
18    yourself with Mr. Perrot whether in person, via
19    e-mail, by phone, anything like that?
20        A.      No.
21        Q.      If you can just bear with me for a
22    second, I'm just looking at something in your report.
23    You stated on Page 9 in your report that, Youth are
24    also socialized to comply with authority figures,
```

1   especially legal authority figures.  Do you recall --

2        A.     Yes.

3        Q.     -- that statement?

4        A.     Yes.

5        Q.     Okay.  Did you think that based on the

6   information that you reviewed that Mr. Perrot always

7   complied with authority figures prior to his arrest in

8   1985?

9        A.     So, the evidence that was -- the case

10  material that was available to me suggested sometimes

11  yes and sometimes no.

12       Q.     And what things did he not comply with?

13       A.     Well, he had an arrest record, which is

14  an indication of law violation, and he ran -- he

15  testified, as did police, that he ran from police when

16  they came to his house to arrest him early that

17  morning.

18       Q.     And did that information affect your

19  opinions at all in this case?

20       A.     I mean, I considered it like I consider

21  all the information that's available to me.  He also

22  exhibited significant -- excuse me.  He also exhibited

23  compliance with authority figures.  After he got to

24  the interrogation at the police station, he willingly

1   as far as I can tell answered the police's questions

2   and willingly confessed to the purse-snatching and the

3   break-in but not to the sexual assaults.

4       Q.     And then on Page 11 of your report -- and

5   I apologize if you have already answered this.  I must

6   have missed it if you did.  On Page 11, you made

7   mention of a pre-trial summary document.  Can you tell

8   me what that is?

9       A.     Can you direct me to --

10      Q.     Yeah.  It's on Page 11, the first full

11  paragraph before the Section C, Psychopathology

12  section, about a third of the way down.

13      A.     Oh, yes.  Thank you.  I think that was

14  the intake.  I would have to look at the actual

15  documents again and, again, there were many.  But in

16  the intake document at I guess the correctional

17  facility maybe, he provided background information

18  about his academic history and family history, so it

19  could have been that.

20      Q.     And you think it's a document that he

21  prepared himself?

22      A.     Let's see.  I don't recall specifically.

23  I'm sorry.

24      Q.     And starting on Page 11, you made

1  reference to Mr. Perrot's apparent alcohol and drug

2  abuse when he was a youth.  Do you recall that?

3       A.    Yes.

4       Q.    And it's fair to say that alcohol and

5  drug abuse could cause a youth or anyone else to do

6  things that they wouldn't ordinarily do, would you

7  agree with that?

8       A.    Yes.

9       Q.    So, someone who, if they were completely

10 sober, may not rape someone but someone who is under

11 the influence of alcohol or drugs may rape someone,

12 would you agree with that statement?

13      A.    That would be an oversimplification that

14 I don't think my expertise can speak to in

15 developmental psychology.

16      Q.    Do you feel that you have the

17 qualifications to state whether someone under the

18 influence of alcohol and/or drugs would be susceptible

19 to making a false confession?

20      A.    So, my expertise in police interrogations

21 and false confessions includes understanding the

22 literature that demonstrates that intoxication has

23 been empirically related to constructs that contribute

24 to false confessions like suggestibility, like Miranda

1  comprehension problems.  So, my expertise is in the

2  literature.

3      Q.    Have you seen any literature that

4  discusses the propensity of someone whether they're a

5  youth or even an adult to commit crimes because

6  they're under the influence of alcohol or drugs?

7      A.    I mean, there's certainly a literature

8  on, yes, on the relation between substance use and

9  delinquency or criminal activity.

10     Q.    So, you have reviewed that type of

11 research?

12     A.    I mean, in general, yes, that literature

13 exists whether it's, you know, documentation of

14 someone's intoxication at the time of arrest or

15 whether it's research methods using self report,

16 asking people if they were using drugs or alcohol and

17 committed a crime.  It's a very large literature.

18     Q.    Do you have expertise in that area?

19     A.    Only to the extent that delinquency and

20 criminal activity relates to police interrogations

21 which is my primary of expertise.

22     Q.    Now, with respect to Mr. Perrot's

23 childhood, his residential history, on Page 13, you

24 noted that he had a tremendous degree of residential

1  instability and family stress.  What were you

2  referring to there?

3       A.     So, based on the DYS records I reviewed,

4  he had multiple placements in foster care.  He had

5  periods of incarceration and was in and out of the

6  custody of his mother during his childhood and

7  adolescence.

8       Q.     Okay.  And were you including the fact

9  that apparently his mother moved to a different

10  residence and he stayed with his sister?

11      A.     I was aware of that, yes.

12      Q.     Okay.  And were you aware that it was

13  actually Mr. Perrot's choice to stay with his sister

14  and not move with his mother?

15      A.     Yes.

16      Q.     In other words, his mother didn't abandon

17  him, she would have taken him if he wanted to go?

18      A.     That sounds familiar, yes.

19      Q.     And just going back just briefly, with

20  regard to the research that you're aware of that

21  discusses how someone may be impaired while under the

22  influence of alcohol and drugs, from what you're aware

23  of, does the research demonstrate that someone so

24  impaired would risk not comprehending that what they

1    were doing is wrong?

2         A.    That is a different subspecialty of

3    psychology that is not my area of expertise.

4         Q.    And on Page 20 of your report in the

5    second full paragraph, you stated, There is some

6    evidence to suggest that police ignored physical

7    evidence that was inconsistent with their narrative

8    that Mr. Perrot committed the crimes.  Can you tell me

9    what the some evidence is that you were referring to?

10        A.    I believe that was in reference to the

11   issue around the location of the gloves and the owner

12   of the gloves that were referenced in the second

13   confession statement.

14                    ATTORNEY LYNCH:  Okay.  That's all I

15        have.  Thank you, Dr. Cleary.

16                    THE WITNESS:  Thank you.

17                    ATTORNEY DESOUSA:  Anyone else?

18                    ATTORNEY JOYCE:  Yeah.  I have a few

19        if I may.

20                    THE WITNESS:  May I ask -- I don't

21        mean to interrupt -- if I can get a snack?

22                    ATTORNEY DESOUSA:  Of course.  So,

23        do you want like twenty minutes?  Austin, how

24        long do you have do you think?

```
 1                         ATTORNEY JOYCE:  I'm going to guess
 2           maybe twenty minutes, half hour.  I don't
 3           anticipate long, no.
 4                         ATTORNEY DESOUSA:  So, is just a
 5           snack enough, doctor, or do you want to get
 6           something more substantial?  We don't want
 7           to --
 8                         THE WITNESS:  I can eat in ten,
 9           fifteen minutes if that's okay.
10                         ATTORNEY DESOUSA:  That's perfect.
11           Thank you.
12                         (A recess was taken)
13                         ATTORNEY JOYCE:  Back on the record.
14
15    EXAMINATION BY ATTORNEY JOYCE:
16        Q.     Good afternoon, Dr. Cleary.  I'm Austin
17    Joyce representing one of the defendants here.  I'm
18    looking at your resum   and I wanted to ask you a few
19    questions about some of your education.  I gather that
20    in 2004 that BA was your undergrad degree at UVA?
21        A.     Yes.
22        Q.     I'm sorry?
23        A.     Yes.  That's correct.  Excuse me.
24        Q.     Sorry.  Maybe I got to turn my volume up.
```

1    Okay.  All right.  And then from there, did you go

2    directly to Georgetown?

3         A.     I worked for one year before going to

4    graduate school.

5         Q.     And what was that employment?

6         A.     I worked as a lab manager for a faculty

7    member running her research lab.

8         Q.     Faculty of which school?

9         A.     Georgetown University.

10        Q.     Okay.  And, so, you started your --

11   that's Master's in Public Administration, Public

12   Policy?  I'm sorry.

13        A.     Yes.  It was actually a dual degree

14   program.  So, students pursue the Master of Public

15   Policy and the PhD in Developmental Psychology

16   simultaneously.

17        Q.     And how are those two disciplines

18   related?

19        A.     That's a great question.

20        Q.     I thought so.

21        A.     I apologize.  That was reflexive.  So,

22   all of the work that I do as a developmental

23   psychologist and the work of the people in my program

24   who pursue different avenues of developmental

1  psychology all have policy implications.  So, the idea

2  is to translate developmental science to policy-making

3  to help policy-makers make more empirically informed

4  decisions.

5        Q.      Okay.  I think I understand that.  All

6  right.  And it was the same program but you got the

7  two degrees out of the same program, is that correct?

8        A.      Well, not exactly.  They are two distinct

9  programs and you pursue them simultaneously through a

10 special admissions process.

11       Q.      Okay.  So, while you were pursuing your

12 MPP, you were also pursuing your PhD?

13       A.      Exactly.

14       Q.      But how do the programs overlap or how

15 did they back then?

16       A.      Sure.  So, some of the coursework that I

17 took in the policy school counted toward coursework

18 requirements in the school of psychology.  That was

19 part of the purpose of the dual degree program.

20       Q.      Okay.  And were there other course

21 requirements for the developmental psychology program

22 that you took after you got your MPP?

23       A.      So, all of the coursework occurred within

24 the first two years but I took courses housed in and

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                128

1    designed by the policy school at the same time I took

2    courses housed in and designed by the psychology

3    department.

4         Q.     Okay.  So, your courses in public policy

5    were before you got your degree but not afterwards, is

6    that right?

7         A.     Correct.

8         Q.     And from 2007 to 2010, you were working

9    on the PhD part of the program, correct?

10        A.     Exactly.  That's correct.

11        Q.     And then after there, you were it says

12   assistant professor of psychology teaching.  Why that

13   distinction when you first went to Virginia

14   Commonwealth?

15        A.     Because in institutions of higher

16   education, particularly research intensive ones like

17   VCU, faculty can have different specializations.  So,

18   teaching faculty primarily have teaching

19   responsibilities and little or no research

20   responsibilities and they are typically not tenure

21   track positions.  They're contract positions.  Whereas

22   tenure track positions are research focussed and

23   progress along a timeline toward tenure and promotion.

24        Q.     All right.  So, it says 2011 to 2012.  Is

1   that just the first year you were at Virginia

2   Commonwealth?

3       A.      That's correct.

4       Q.      And what courses did you teach then?

5       A.      I taught a lot of Statistics.  I taught

6   Developmental Psychology.  I taught a course in

7   Community Based Service Learning.  What else did I

8   teach?  It was a long time ago.

9       Q.      All right.  And when you -- I gather in

10  2012, you became a tenure track?

11      A.      That's correct.

12      Q.      And do you still teach?

13      A.      Yes.

14      Q.      And what courses do you teach?

15      A.      I teach our Masters Capstone course in

16  Criminal Justice Policy Analysis.  I regularly teach

17  our undergraduate Capstone course in Criminal Justice.

18  For a long time, I taught the doctoral course in

19  Research Design.  I'm not teaching that currently.

20  Those are my -- the ones in my regular rotation.

21      Q.      And how often do you teach class at the

22  school?

23      A.      Typically, I'm on a two two load which

24  means two courses in the fall and two courses in the

1    spring.

2          Q.      And how do you spend the rest of your

3    time?

4          A.      Conducting research and engaging in

5    service activities.

6          Q.      What does your research consist of?

7          A.      Studies that help us better understand

8    the nature of police interviewing and interrogation,

9    particularly of young people.

10         Q.      And how do you go about conducting those

11   studies?

12         A.      Well, it depends on the nature of the

13   research question.  I have done work with people who

14   are detained in jail facilities asking them about

15   their interrogation experiences.  I have conducted

16   studies with police investigators.  I have conducted

17   studies with parents of adolescents having to do with

18   their knowledge and experience with juvenile

19   interrogations.  I have done experimental work.  I

20   have done theoretical work.

21         Q.      Do those studies involve your

22   interviewing people?

23         A.      No.  Not usually, no.

24         Q.      So, I -- how did you conduct the study

1    then if you don't interview these various people?

2         A.      Well, we have a lot of research methods

3    available to us as social scientists and I have used a

4    lot of them.  So, for example, one of my early

5    studies, systematically examining video recorded

6    interrogations of youth, I have conducted self report

7    studies, like surveys, where people report on their

8    experiences and I have done that with both suspects

9    and investigators.  Sometimes we use a vignette design

10   meaning we give case material or a hypothetical

11   situation to respondents and systemically vary the

12   type of information they receive and see if it affects

13   their perceptions or attitudes.  Those are just some

14   of the research methods that social scientists use.

15        Q.      Okay.  Now, I see that in 2009, you

16   became an associate professor.  Is that because you

17   achieved tenure and it's a promotion of sorts?

18        A.      In 2019, yes.

19        Q.      2019.  I'm sorry.  I forget the 1.  2019?

20        A.      That's correct.

21        Q.      Okay.  And how did -- did your job at

22   Virginia Commonwealth University change at all when

23   that happened?

24        A.      I think technically slightly.  The

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                            **132**

```
1    allocation of my time to research, teaching, and

2    service, those percentages changed ever so slightly

3    but the bulk of my activities still fall in those same

4    three categories as any faculty member.

5         Q.    Okay.  And your resum  also indicates at

6    the same time, you became part of the affiliate

7    faculty at a center associated with Virginia

8    Commonwealth, right?

9         A.    Correct.

10        Q.    And what is that center?

11        A.    The Center for Cultural Experiences in

12   Prevention is basically just a group of faculty with a

13   shared interest and an expertise in promoting the

14   wellbeing of typically disadvantaged or

15   underrepresented groups.  So, it's a cadre of

16   psychologists and I'm one of -- maybe a social work

17   professor.  I'm one of the few outside the psychology

18   department.  We mentor students together.  We share

19   resources.  We share technical expertise to support

20   one another in our work.

21        Q.    And how many are on the faculty at the

22   center?

23        A.    Maybe about twelve to fifteen folks.

24        Q.    All right.  They are all associated with
```

1    Virginia Commonwealth University?

2         A.    Yes.

3         Q.    Now, you indicate that you're under

4    contract for this book, Interviewing youth, a working

5    title.  Have you finished it?

6         A.    No.

7         Q.    Do you know when you might?

8         A.    Well, it's due to the publisher in

9    November, so I certainly hope before then.

10        Q.    Okay.  So, it's still a work in progress

11   then?

12        A.    Correct.  Yes.

13        Q.    And the publisher is Oxford University

14   Press?

15        A.    Yes.

16        Q.    You indicated in your report that you

17   have done lectures with -- I'm looking at Page 2 of

18   your report -- where you have given lectures to police

19   departments and attorney organizations at local,

20   state, and federal levels.  Which police departments

21   have you lectured for?

22        A.    Richmond Police Department, my local PD.

23   That's the -- I think that's the only local level

24   organization.

1        Q.      Okay.  How about at the state level?

2        A.      So, this state level, sure, refers to

3    attorney organizations.  So, I have spoken at like

4    public defender conferences in Mississippi and Ohio

5    maybe.  I can't remember all off the top of my head.

6    Some have been in person, some virtual.  I think maybe

7    four different -- Virginia's defense organization, I

8    spoke at their statewide conference one year.

9        Q.      And how about federal level lectures, how

10   many of those have you done?

11       A.      Sure.  A few talks at the FBI, at the

12   national academy, the training academy, for police

13   officials.

14       Q.      And when was that?

15       A.      Pardon?

16       Q.      When were those?

17       A.      I don't have my CV in front of me.  I

18   believe they're listed on my CV if you have that.

19   Probably about ten years ago maybe.

20       Q.      So, would those have been just after you

21   started at Virginia Commonwealth as a tenure track?

22       A.      Around that same time.  The individual --

23   the chief criminologist that I worked with there I had

24   been working with since graduate school, so I might

1    have even guest lectured before VCU.

2         Q.    Now, I want to ask you some questions

3    about Page 5 of your report.

4         A.    Sure.

5         Q.    And the risk factors that you enumerate

6    here.  In terms of evaluating these risk factors, do

7    you look at whether they're present or the degree to

8    which they're present?

9         A.    Both.

10        Q.    Both?  Okay.  So, is there some sort of

11   rating scale for each risk factor that you employ?

12        A.    No.  No such rating scale exists.

13        Q.    Okay.  So, it's more than just

14   determining that these risk factors are present when

15   you try to evaluate them, right?

16        A.    Yes.

17        Q.    And how do you go about evaluating each

18   risk factor?

19        A.    I'm sorry.  Could you repeat that?

20        Q.    Sure.  How do you go about evaluating

21   each risk factor?

22        A.    Oh, I see.  Well, I evaluate the

23   discovery that's provided to me.  If there's an

24   electronic recording, I begin there.  And if there's

1   an associated transcript, I begin there.  If not, I

2   review and reconstruct all of the accounts of the

3   interrogation as documented in the case record, like

4   suppression hearing transcript or if it's discussed at

5   trial.  In terms -- and that's to get the best

6   understanding I can of how the interrogation was

7   conducted, its length, its location, the techniques

8   that officers used, however much information is

9   available about that.  In terms of dispositional risk

10  factors, I will usually ask for additional

11  documentation that may speak to those dispositional

12  risk factors, like school or academic records, like

13  forensic or other psychological evaluations,

14  information that is available and documented that

15  would attest to the potential presence of one of these

16  risk factors.

17          Q.     So, in this particular case -- or well,

18  let me ask this generally I guess.  In terms of

19  looking at what you have listed for personal and

20  dispositional risk factors, cognitive impairments, so

21  I'm trying to understand how you determine the

22  severity of that risk from case to case and compare

23  them?

24          A.     Sure.  Using cognitive impairments as an

1   example, there might be information available in a

2   person's academic record in which they were given an

3   IQ test by, say, a school psychologist and so that

4   information would enable me to understand if they had

5   a psychiatric or an intellectual disability diagnosis

6   or not.  If they did, what was the diagnosis, you

7   know.  An IQ of 95 is different from an IQ of 75 even

8   in terms of the degree of impairment that may be

9   relevant to interrogation.

10       Q.     All right.  So, if I understand you then,

11  in terms of the risk regarding cognitive impairments,

12  the more normal the educational level, the less the

13  risk, is that what you're saying?

14       A.     Not specifically.  So, let's take

15  intellectual disability as a specific example or IQ,

16  right?  IQ has been demonstrated to relate to Miranda

17  comprehension to kind of subsequent issues related to

18  the interrogation.  And, so, if there is indication --

19  if there's information about the person's low IQ, then

20  that is relevant for I think the court to understand

21  the science around how IQ relates to Miranda

22  comprehension or the ability to withstand

23  interrogative pressures and that's the science that I

24  share in my reports.

1        Q.     All right.  If I understand you, you're

2   saying that the lower the IQ, the higher the risk

3   factor is or the greater the risk factor?

4        A.     I don't quantify them in that relative

5   sense.  I provide the information to judges or juries

6   to make that determination themselves because I'm not

7   opining directly about a confession's true or false

8   nature.

9        Q.     Right.  But if I understand you, you're

10  opining as to the likelihood based on these risks that

11  the confession was false, right?

12       A.     I'm saying that there's information from

13  social science research about, for example, the

14  relation between IQ and intellectual disability and

15  Miranda comprehension just as one example that the

16  courts in my view should consider when they are making

17  reliability determinations.

18       Q.     Now, you talked about transient risk

19  factors and you look at -- you have specified acute

20  intoxication.  And what do you consider acute

21  intoxication?

22       A.     Intoxication at the time of the

23  interrogation as opposed to a more, a broader

24  substance abuse disorder.

**Hayley Cleary, MPP, PhD**
**February 05, 2024**                                                                    **139**

1        Q.       All right.  But you use acute

2    intoxication, so --

3        A.       Right.

4        Q.       -- what does that mean?

5        A.       Intoxication at the time of the

6    interrogation.

7        Q.       Okay.  So, is there a sliding scale with

8    regard to that, somebody more drunk than some other

9    person or just the fact that they're intoxicated?

10       A.       Sure.  The research that's available has

11   compared intoxication to -- intoxicated individuals to

12   sober individuals on a number of outcome measures.

13   I'm not aware off the top of my head of specific

14   information looking at degrees of intoxication or how

15   that would be quantified.

16       Q.       All right.  So, if I understand you,

17   you're saying the blood alcohol level, if we're

18   talking about alcohol, doesn't matter, just the fact

19   that there is alcohol present, that's a risk factor?

20       A.       I understand your question.  I'm saying

21   we don't know if it matters.

22       Q.       Okay.  How about drug intoxication as

23   opposed to alcohol intoxication, does the presence of

24   some drug in the system affect your assessment in the

1   same way that alcohol does?

2          A.       In theory, yes.  Depending on the types

3   of drugs, of course there are many, but to the extent

4   to which drug intoxication affects memory, information

5   processing, information recall, the, you know, ability

6   to weigh the past versus the present versus the future

7   outcome of events, drug intoxication can impair those

8   abilities, those cognitive and socio-emotional

9   abilities, and that's relevant to interrogation

10  decision-making.

11         Q.       Does the experience that the suspect or

12  person being questioned have with the law enforcement

13  process enter into your evaluation of any risk

14  factors?

15         A.       Potentially.  So, if I can direct you to

16  page -- give me just one moment, please.  Okay.  So, I

17  provide an example on Page 10 in the Miranda section.

18  And this is a distinction that I'm often asked about

19  and it's important to understand the distinction

20  between research that exists on system experience as

21  it relates to Miranda comprehension and research on

22  system experience as it relates to coercion.  I do not

23  know of any research speaking to the latter but to the

24  former, and this is captured in like the last complete

1   sentence on Page 10, some studies that have asked

2   folks whether they have previous history with police

3   are actually less capable in terms of language

4   processing and information, have lower literacy levels

5   for example, than young people who have had no prior

6   contact with the legal system.  So, it's relevant in

7   some sense but maybe not others.

8           Q.      Okay.  And in what sense would it be

9   relevant?

10          A.      Miranda comprehension is one example.

11          Q.      But in what way?  What way is it relevant

12  to understanding Miranda?

13          A.      So, I'll -- I mean, just so I don't

14  misspeak, I'll quote my own report directly.

15  Legal-system involved youth have shown deficits in

16  language processing and comprehension, reading levels,

17  vocabulary and grammar, and listening comprehension

18  abilities compared to non-offending youth.

19          Q.      Okay.  So, I'm having trouble

20  understanding how that presents a problem to

21  understand the Miranda warnings.  You have the right

22  to remain silent, what about that is confusing?

23          A.      So, there are specific clinical tests

24  that have been designed to test, to empirically assess

1   knowing this intelligentness, forgive my butchering of

2   the language, but the degree to which individuals

3   understand the words and vocabulary used in common

4   Miranda warnings and the degree to which individuals

5   can apply that knowledge if they have it to their own

6   legal circumstances.  And research shows that

7   system-involved young people at least actually perform

8   poorer on those measures compared to normative youth

9   or what we call community sample, kids in general who

10  don't necessarily have prior legal experience.

11       Q.     Does your assessment of any of the -- or

12  the presence of any of these risk factors involve

13  credibility determinations by you?

14       A.     No.

15                  ATTORNEY JOYCE:  Thank you, doctor.

16       That's all I have.

17                  THE WITNESS:  Thank you.

18                  ATTORNEY DESOUSA:  Anybody else?

19                  ATTORNEY JOYCE:  I guess not, Lisa.

20                  ATTORNEY DESOUSA:  Okay.  Thank you,

21       doctor.  Thank you, Carla.  We will see you all

22       tomorrow.

23                  (Witness excused)

24

```
 1                    UNITED STATES DISTRICT
                       COURT DISTRICT OF
 2                        MASSACHUSETTS


 3


 4         I, NICOLE A. STEWART, a Notary Public in and
      for the Commonwealth of Massachusetts, do certify
 5    that pursuant to notice, there came before me on
      February 5, 2024, VIA ZOOM PLATFORM, the following
 6    named person, to wit:  HAYLEY CLEARY, MPP, PhD, who
      was by me duly sworn to testify to the truth and
 7    nothing but the truth as to her knowledge touching
      and concerning the matters in controversy in this
 8    cause; that she was thereupon examined upon her oath
      and said examination reduced to writing by me; and
 9    that the deposition is a true record of the testimony
      given by the witness, to the best of my knowledge and
10    ability.

11         I further certify that I am not a relative or
      employee of counsel or attorney for any of the
12    parties, or a relative or employee of such parties,
      nor am I financially interested in the outcome of the
13    action.

14         WITNESS MY HAND, this 21st day of February,
      2024.
15

16                    _____

17                         Nicole A. Stewart

18

19    My Commission expires:  May 12, 2028

20

21

22

23

24
```

```
1                     SIGNATURE/ERRATA SHEET

2        I have read the foregoing, and it is a true

3     transcript of the testimony given by me at the taking

4     of the subject deposition with the following

5     corrections/changes, if any:

6

7     _____          _____

8        Date                        HAYLEY CLEARY, MPP, PhD

9

10    PAGE    LINE   CHANGE                           REASON

11    ------------------------------------------------------

12    ------------------------------------------------------

13    ------------------------------------------------------

14    ------------------------------------------------------

15    ------------------------------------------------------

16    ------------------------------------------------------

17    ------------------------------------------------------

18    ------------------------------------------------------

19    ------------------------------------------------------

20    ------------------------------------------------------

21    ------------------------------------------------------

22    Case Name: PERROT V. THE CITY OF SPRINGFIELD, et. al.

23    Date Taken:  February 5, 2024

24    nas
```